7/17/97
4:00

Michael Chertoff (MC 6790)
Geoffrey S. Berman (GB 1851)
LATHAM & WATKINS
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
(201) 639-1234
Attorneys for Plaintiff
Walsh Securities Inc.




UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES INC.,<br><br>Plaintiff,<br><br>v.<br><br>CRISTO PROPERTY MANAGEMENT, LTD., A/K/A G.J.L. LIMITED, NATIONAL HOME FUNDING, INC., CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC., CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C., WILLIAM J. KANE, GARY GRIESER, ROBERT SKOWRENSKI, II, RICHARD CALANNI, RICHARD DIBENEDETTO, JAMES R. BROWN, STANLEY YACKER, ESQ., MICHAEL ALFIERI, ESQ., RICHARD PEPSNY, ESQ., ANTHONY M. CICALESE, ESQ., LAWRENCE M. CUZZI, BRIAN G. REILLY, ANTHONY D'APOLITO, and DAP CONSULTING, INC.,<br><br>Defendants. | Civil Action No. 97-3496<br><br>Hon. (WGB)<br><br>**<u>COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

1. Plaintiff brings this action for violations of the Racketeer Influenced and Corrupt Organizations Act and common-law fraud.

## PARTIES

2. Plaintiff Walsh Securities Inc. ("Walsh Securities") is, and was at all relevant times, a Delaware corporation with its principal place of business located in Parsippany-Troy Hills, New Jersey. Walsh Securities is a wholesale mortgage banker in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions. Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage market known as the "subprime" market. "Subprime" mortgages are made to borrowers who, because of past financial dealings or because of their credit history, are unable to obtain mortgage loans from "prime" mortgage lenders at prime lending rates. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans.

3. Defendant Cristo Property Management, Ltd. a/k/a G.J.L. Limited ("Cristo Property"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Union County, New Jersey. Cristo Property is, and was at all relevant times, owned and controlled by defendant Kane.

4. Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

5. Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey. Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

6. Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Kane is the President and Director of Cristo

Property. In addition, Kane is, and was at all relevant times, a licensed mortgage solicitor for, and an employee of, NHF.

7. Defendant Gary Grieser ("Grieser"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Grieser is the owner of Capital Assets.

8. Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Skowrenski is the owner of NHF.

9. Defendant Richard Calanni ("Calanni"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Calanni is, and was at all relevant times, associated with TF Certified Real Estate Appraisals.

10. Defendant Richard DiBenedetto ("DiBenedetto"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. DiBenedetto is, and was at all relevant times, associated with Eastern States Appraisal Services.

11. Defendant James R. Brown ("Brown"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Brown is, and was at all relevant times, associated with Professional Evaluators of Union.

12. Defendants Calanni, DiBenedetto and Brown (collectively, "the Appraisers"), are, and were at all relevant times, real property appraisers hired by NHF and Cristo Property.

13. Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

14. Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

15. Defendant Richard Pepsny, Esq., ("Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

16. Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

17. Defendants Yacker and Cicalese (jointly, "the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction, and they, together with defendants Alfieri and Pepsny, were selected by NHF and/or Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

18. Defendant Lawrence M. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

19. Defendant Brian G. Reilly, ("Reilly"), upon information and belief, is, and was at all relevant times, a New Jersey resident.

20. Defendant Anthony D'Apolito ("D'Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident. D'Apolito was at all relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF.

21. Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey. DAP Consulting is owned and controlled by defendant D'Apolito.

**JURISDICTION**

22. Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

**VENUE**

23. Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

## INTRODUCTION

24. Since early June 1996, defendants Cristo Property, NHF, Capital Assets, Kane, Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Yacker, Alfieri, Pepsny, Cicalese, Cuzzi, Reilly, D'Apolito and DAP Consulting (collectively, "the defendants") have been engaged in a pattern of racketeering activity which has resulted in over two hundred mortgage loans being purchased by Walsh Securities from NHF for amounts ranging up to eight times the real value of the properties at issue. Walsh Securities was induced to purchase these mortgage loans from NHF based on fraudulent misrepresentations contained in the mortgage loan applications, including appraisals of the properties at issue. The proceeds from Walsh Securities' mortgage loans would, among other things, be distributed among the defendants as their illicit profits.

25. The defendants engaged in a pattern of racketeering throughout the State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson Counties, where certain of the properties are located, and in Morris County, where Walsh Securities is located.

26. Walsh Securities remains liable for a substantial portion of the value of these mortgage loans fraudulently obtained by defendants. Walsh Securities will not be able to recover the full amounts that have been lent through foreclosures on the properties because, due to the fraudulently inflated appraisals of the real properties that secure the mortgage loans, many of the properties are not of value equal to or greater than the amount of the mortgage loans.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

27. A mortgage loan is a loan in which real property is used as collateral for the loan. The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

28. Mortgage bankers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

29. Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers which provides the funds for the borrower at the time of closing. In these instances, Mortgage Bankers are paid fees, generally by the borrower, for originating the mortgage loans so that they can then be sold to other investors. Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. 17:11B-1, *et seq*.

30. Potential mortgage loan borrowers who, because of, for example, their credit histories, can not obtain traditional financing from "prime" Mortgage Bankers, seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the higher risk of such mortgage loans.

31. After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

32. The Mortgage Bankers who deal directly with the borrower are said to "originate" the mortgage loan. The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded. Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, references, appraisals of the underlying properties, and other documents.

33. Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. 45:14F-1, *et seq*. The appraisers are typically paid by the borrowers of the mortgage loans.

34. The appraisal of the real property that is to be mortgaged is one of the most important steps in the mortgage loan process. The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower. In addition, since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults

on the mortgage loans. In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

35. Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to the closing of the properties and the mortgage loans.

36. Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents. Correspondents often sell their mortgage loans to lenders known are as wholesalers.

37. Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying loans. The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions. The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

38. Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually on the day of the closings. The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

## The New Jersey Mortgage Loan Frauds

39. Instead of the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent. The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and deceiving Walsh Securities into financing the loans based on these inflated values. The values

were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the resales even took place the same day as the first purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. The mortgage loan proceeds provided by Walsh Securities were then distributed among the defendants.

**"The NHF/Cristo Property" Enterprise**

40. Defendants carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the NHF/Cristo Property Enterprise" or "the Enterprise").

41. Defendants formed the NHF/Cristo Property Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. Each defendant personally played a role in the management and the operation of the enterprise.

42. The NHF/Cristo Property Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities with the understanding by members of the NHF/Cristo Property Enterprise that Walsh Securities would rely on the applications in deciding whether to accept the mortgage loans originated by the NHF/Cristo Property Enterprise. Apart from other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

43. Immediately after closing on the resale of the real properties, the borrowers would secretly and fraudulently convey a majority percentage of the ownership of each real property to a member of the NHF/Cristo Property Enterprise. This secret and fraudulent conveyance constituted an act of default under each mortgage loan.

**The Pattern**

44. The NHF/Cristo Property Enterprise carried out numerous fraudulent transactions through a pattern of frauds, as follows:

a) Kane, acting through Cristo Property, purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties.

b) Kane, Grieser, Cuzzi and/or Reilly identified, through personal contacts, advertisements, and other means, individuals who were willing to buy these properties from Cristo Property and sign the mortgage loans. Typically, these properties were purchased as purported investment vehicles to be used as rental properties. Many of the properties, however, were abandoned and could not be rented.

c) Kane, acting through Cristo Property, had the properties appraised by licensed appraisors. In the majority of the instances, either Calanni, DiBenedetto or Brown appraised the property.

d) Such appraisals were in all instances for amounts falsely inflated well above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

e) Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted to Walsh Securities. These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties. Such false information included:

1) The applications included appraisals of the properties which were fraudulently inflated.

2) The applications included the sales prices of the properties which reflected the fraudulent appraised values as opposed to the true values of the properties.

3) The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

4) The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5) The applications indicated that the seller, Cristo Property, had provided the buyers second mortgage loans in the properties, when, in fact, no second mortgage loan payments were ever made or intended to be made.

6) The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a 60% interest in the properties to Capital Assets under secret Joint Venture Agreements.

7) The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property. In fact, the buyers bought the properties without paying any monies to the seller, Cristo Property.

8) The applications typically contained other false information, such as the ages of the borrowers and other credit-related information concerning the borrowers.

f) D'Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans. In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF. The payments were designed to, and did, corrupt D'Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his obligations to Walsh Securities. The payments from NHF and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D'Apolito was acting as a faithful employee.

g) The Closing Attorneys were paid by Cristo Property. On the days of the closings, the Closing Attorneys would transmit to Cristo Property the proceeds of the mortgage loans fraudulently obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though the requirements and pre-conditions to the mortgage loans

were not met. Cristo Property would then distribute certain of those proceeds to various members of the NHF/Cristo Property Enterprise, including Pepsny and Alfieri who helped facilitate certain of the transactions, for the purpose of illicitly enriching those members.

h) Around the date designated to close each of these 200-plus properties, the purchasers signed Powers of Attorney and secret Joint Venture Agreements with Capital Assets which conveyed 60 percent of the ownership in the properties to Capital Assets. A true and correct copy of a sample Joint Venture Agreement is attached as Exhibit A. These documents and conveyances were never disclosed to Walsh Securities and violated the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not have financed the mortgage loans had it been aware of the plan to reconvey the properties.

i) Capital Assets then collected the rents, if any, from the rental of these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the mortgage loan payments when due and to pay all other expenses of the properties. In addition, on information and belief, as in a classic pyramid fraud, funds from new mortgage loans were secretly used to make interest payments on older loans. In this way, the NHF/Cristo Property Enterprise misled Walsh Securities into believing that none of the loans originated by the NHF/Cristo Property Enterprise were delinquent.

j) There were several variations on the scam:

1) Some borrowers/buyers were induced to invest $1,000.00 in a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00. Cuzzi had these purchasers execute secret Joint Venture Agreements and Powers of Attorney and provide their names and social security numbers. Upon information and belief, Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

2) Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. Upon

information and belief, Reilly traveled to New York to deliver closing papers which were signed by the purchasers and notarized by Reilly and then returned by Reilly to Capital Assets, and Cuzzi and/or Grieser without the purchasers attending any closings.

3) Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to Capital Assets and to Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed papers which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

k) In sum, upon information and belief, like traditional pyramid schemes, money obtained by the NHF/Cristo Property Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the NHF/Cristo Property Enterprise.

l) Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

45. The operations of the NHF/Cristo Property Enterprise are illustrated in the following examples of specific properties "flipped" by the NHF/Cristo Property Enterprise:

a) 600 5th Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2) On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property for $182,500.00 to an individual borrower/buyer with the initials K.P.

3) A mortgage loan on the property, in K.P.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4) A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property. In fact, no down payment was ever made.

5) A second mortgage for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P. In fact, Cristo Property never intended to receive payment from K.P. for that second mortgage.

6) In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the NHF/Cristo Property Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

7) Yacker acted as the closing attorney on this mortgage loan, and transmitted the loan proceeds to Cristo Property despite the fact that pre-conditions to the closing where not met.

8) After the closing, Yacker filed a deed transferring sixty percent of the property to Capital Assets.

b) 1017-1019 Bangs Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which property was fraudulently appraised by Brown for $200,000.00.

2) On that same day, July 25, 1996, Cristo Property sold 1017-1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M.

3) A mortgage loan on the property, in J.M.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00.

4) A down payment in the amount of $20,000.00 was purportedly provided by J.M. to Cristo Property. In fact, no down payment was ever made.

5) A second mortgage for $30,000 at a 6% interest rate was purportedly given by Cristo Property to J.M. In fact, Cristo Property never intended to receive payment from J.M. for that second mortgage.

6) Yacker acted as the closing attorney on this mortgage loan, and transmitted the loan proceeds to Cristo Property despite the fact that pre-conditions to the closing where not met.

7) After the closing, Yacker filed a deed transferring sixty percent of the property to Capital Assets.

8) J.M.'s mortgage loan application contains a "gift letter" from defendant Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made.

46. There are over two hundred instances of transactions similar to the two outlined above.

**COUNT I.**

**VIOLATION OF 18 U.S.C. § 1962(c) (RICO)**

47. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 46 as if fully set forth herein.

48. 18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

49. All defendant are persons within the meaning of 18 U.S.C. § 1961(3).

50. In violation of the above-mentioned statute, the defendants associated with the NHF/Cristo Property Enterprise, which was an association in fact consisting of the defendants together and with other persons not known to plaintiff.

51. The NHF/Cristo Property Enterprise engaged in, and conducted activities which affected, interstate commerce.

52. Each defendant conducted and participated in the conduct of the affairs of the NHF/Cristo Property Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

53. This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

a) Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan originated by the NHF/Cristo Property Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut. In turn, that lender wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

b) Commercial bribery, as described in N.J.S.A. § 2C:21-10, in that D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF) and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to transfer the loans originated by the NHF/Cristo Property Enterprise and financed by Walsh Securities.

54. The above-mentioned predicate acts of racketeering activity conducted by defendants through the NHF/Cristo Property Enterprise caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts by defendants. The members of the NHF/Cristo Property Enterprise were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh Securities. Many of these mortgage loans are delinquent and/or in default. Based on the falsely inflated appraisals for the real properties and other fraudulent acts by the defendants, Walsh Securities will be unable to recoup the full amounts of many of the outstanding mortgage loans.

55. By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has suffered the following foreseeable losses and damages:

a) the losses of monies loaned based on the falsely appraised real properties and other fraudulent representations. Many of the properties are worth less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

b) other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(c), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT II.

## VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

56. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 55 as if fully set forth herein.

57. 18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection . . .(c) of this section."

58. Through a series of activities outlined above in Count I, defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above in paragraphs 48 through 54.

59. Each of the defendants willfully and knowingly agreed and conspired with other defendants to commit the above referenced predicate acts of wire fraud and commercial bribery.

60. By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has suffered the following foreseeable losses and damages:

a) the losses of monies loaned based on the falsely appraised real properties and other fraudulent acts of defendants. Many of the properties are worth less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover anywhere close to the full amounts loaned;

b) other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(d), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT III.

## COMMON-LAW FRAUD

61. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 60 as if fully set forth herein.

62. By the illegal and fraudulent acts and schemes described above, defendants willfully and intentionally defrauded Walsh Securities and made or caused to be made false, fraudulent and material misrepresentations and omissions to plaintiff concerning mortgage loans bought by Walsh Securities from NHF. Each of these mortgage loans originated by the NHF/Cristo Property Enterprise were fraudulently obtained in that they were based on falsely inflated appraisals. In addition, these mortgage loans also were made based on other information falsely provided to Walsh Securities including incorrect credit histories and or statements of net worth, among other things.

63. In making and carrying out these material misrepresentations, defendants, and each of them, intended to and did deceive plaintiff.

64. Plaintiff believed and relied upon these material misrepresentations and omissions.

65. As a result of defendants' material misrepresentations and omissions plaintiff suffered damages substantially in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that defendants are liable to it, jointly and severally, for common-law fraud and award damages, punitive damages and other such relief as may be appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment against all defendants jointly and severally awarding plaintiff the following relief:

1. Compensatory and consequential damages in an amount as yet undetermined, trebled pursuant to 18 U.S.C. § 1964(c); and

2. Costs of this action, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

3. An award of punitive damages as a result of defendants' fraud; and

4. Other such relief as is just and equitable.

**DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a jury for all issues for which it has a right to a trial by jury.

Dated: July 17, 1997

LATHAM & WATKINS
Michael Chertoff (MC 6790)
Geoffrey S. Berman (GB 1851)
One Newark Center
Newark, NJ 07101-3174
Telephone (201) 639-1234
Telecopy (201) 639-7298
ATTORNEYS FOR PLAINTIFF WALSH SECURITIES INC.

By: ______________________
Michael Chertoff



NY_DOCS\121900.1

# THIS JOINT VENTURE AGREEMENT

made this April 1, 1997

BETWEEN:

AND: CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., LLC (Hereinafter "Capital Assets") 10 WEST BERGEN PLACE, SUITE 201 RED BANK, NEW JERSEY 07701

WITNESSETH THAT the parties wish to enter into a form of Joint venture to be known as, and CAPITAL ASSETS, a Joint Venture, (also designated herein as the "Business"), and to be located at:

10 WEST BERGEN PLACE, SUITE 201
RED BANK, NEW JERSEY 07701

NOW THEREFORE, IT IS AGREED AS FOLLOWS:

1. The function of Capital Assets and its contribution to the Joint Venture is to manage, improve, maintain and rent real property in the State of New Jersey as per this agreement. The function and contribution of is to contribute his good name and credit to the Joint Venture.

2. The parties recognize that all data of the business and any other information are the property of the partnership and may be confidential in nature. This information will not be disclosed to the public indiscriminately.

3. The parties shall divide the profits (or losses) of the business in the following proportion or ratio:

[illegible] discriminate on the basis of this information, nor on whether you choose to furnish it. However, we are encouraged to do so. The law provides that a Lender may [illegible] on the basis of visual observation [illegible]. However, if you choose not to furnish it, under Federal regulations this Lender is [illegible]

Capital Assets 60%

40%

The same ratio shall specifically be reflected in all deeds and other evidence of title; i.e., Capital Assets as to a 60% interest and as to a 40% interest, pursuant to agreement dated April 1, 1997 and designated as and CAPITAL ASSETS, a Joint Venture



4. In the event that either party wishes to buy out the interest of the other party on any particular property, the same 60-40 ratio shall be used to determine the value. However, Capital Assets shall have the sole right to retain a licensed appraiser for the purpose of setting the value

5. The parties understand that Capital Assets shall have total control of all properties, including the absolute right to obtain financing, and to determine what properties are bought and sold, for what price, and under what terms and conditions. They shall cooperate with each other in order to further the purposes of the Joint Venture.

6. shall have the right to attend all closings where property is being purchased and receive a minimum of $1,000.00 per transaction from Capital Assets for a minimum of four (4) closings.



7. None of the parties hereto shall sell, convey, pledge, encumber or assign their interest in the Joint Venture to any other person or entity

8. By separate instrument of even date herewith, shall execute a durable POWER OF ATTORNEY to Capital Assets giving the latter full authority to sell any property and to sign any deeds or other papers consistent with the terms of the within agreement

...against discrimination on the basis of this information, nor on whether you choose to furnish it. However, if you choose not to furnish it, under Federal regulations the lender is...

9. The parties acknowledge that represents the business entity known as Capital Assets and The said specifically has been informed of his right to retain separate counsel of his own choosing and at his own expense.

10. This agreement shall take effect on the date first above written.

IN WITNESS WHEREOF the parties have signed this agreement on the indicated date.

CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO., LLC.

By

[illegible] discriminate on the basis of this information, or on whether you choose to furnish it. However, if you choose not to furnish it [illegible]. The law provides that a Lender may [illegible]