

Michael Chertoff (MC 6790)
Geoffrey S. Berman (GB 0851)
Robert A. Magnanini (RM 7356)
LATHAM & WATKINS
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
(201) 639-1234
Attorneys for Plaintiff
Walsh Securities, Inc.

**FILED**

NOV 7 1997

AT 8:30 _____
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WALSH SECURITIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> CRISTO PROPERTY MANAGEMENT, LTD., A/K/A G.J.L. LIMITED, DEK HOMES OF NEW JERSEY, INC., OAKWOOD PROPERTIES INC., NATIONAL HOME FUNDING, INC., CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC., CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C., WILLIAM J. KANE, GARY GRIESER, ROBERT SKOWRENSKI, II, RICHARD CALANNI, RICHARD DIBENEDETTO, JAMES R. BROWN  THOMAS BRODO, RONALD J. PIERSON, STANLEY YACKER, ESQ., MICHAEL ALFIERI, ESQ., RICHARD PEPSNY, ESQ., ANTHONY M. CICALESE, ESQ., LAWRENCE M. CUZZI, ANTHONY D'APOLITO, DAP CONSULTING, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, NATIONS TITLE INSURANCE OF NEW YORK INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, and COASTAL TITLE AGENCY, <br><br> Defendants. | Civil Action No. CV  97-3496 (WGB) <br><br> Hon. William G. Bassler <br><br><br> **AMENDED COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

1.      Plaintiff brings this action for violations of the Racketeer Influenced and Corrupt Organizations Act, common-law fraud and breaches of contract.

## PARTIES

2.      Plaintiff Walsh Securities, Inc. ("Walsh Securities") is, and was at all relevant times, a Delaware corporation with its principal place of business located in Parsippany-Troy Hills, New Jersey.  In April 1996, Walsh Securities became a successor in interest to GF Mortgage Corp.  Walsh Securities is a wholesale mortgage banker in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions. Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage market known as the "subprime" market.  "Subprime" mortgage loans are made to borrowers who, because of past financial dealings or because of their credit history, are unable to obtain mortgage loans from "prime" mortgage lenders at prime lending rates.  "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans.

3.      Defendant Cristo Property Management, Ltd., a/k/a G.J.L. Limited, upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Union County, New Jersey.  Cristo Property is, and was at all relevant times, owned and controlled by defendant Kane.

4.      Defendant DEK Homes of New Jersey, Inc. ("DEK Homes") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its

principal place of business in New Jersey. Upon information and belief, DEK Homes is, and was at all relevant times, owned and controlled by defendant Kane.

5.     Defendant Oakwood Properties, Inc. ("Oakwood Properties") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, Oakwood Properties is, and was at all relevant times, owned and controlled by defendant Kane.

6.     Defendants Cristo Property Management, Ltd. (a/k/a G.J.L. Limited), DEK Homes, and Oakwood Properties are all owned and controlled by defendant Kane and referred to herein collectively as "Cristo Property".

7.     Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

8.     Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey. Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

9.     Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Kane owns and controls Cristo Property, DEK

3

Homes and Oakwood Properties.  In addition, Kane is, and was at all relevant times, a licensed

mortgage solicitor for, and an employee of, NHF.

        10.     Defendant Gary Grieser ("Grieser"), upon information and belief, is, and

was at all relevant times, a New Jersey resident.  Grieser is the owner of Capital Assets.

        11.     Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and

belief, is, and was at all relevant times, a New Jersey resident.  Skowrenski is the owner of NHF.

        12.     Defendant Richard Calanni ("Calanni"), upon information and belief, is,

and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New

Jersey.  Calanni is, and was at all relevant times, associated with TF Certified Real Estate

Appraisals.

        13.     Defendant Richard DiBenedetto ("DiBenedetto"), upon information and

belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser

in New Jersey.  DiBenedetto is, and was at all relevant times, associated with Eastern States

Appraisal Services.

        14.     Defendant James R. Brown ("Brown"), upon information and belief, is,

and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New

Jersey.  Brown is, and was at all relevant times, associated with Professional Evaluators of

Union.

        15.     Defendant Thomas Brodo ("Brodo"), upon information and belief, is, and

was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New

Jersey.

16.     Defendant Ronald J. Pierson ("Pierson"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

17.     Defendants Calanni, DiBenedetto, Brown, Brodo and Pierson (collectively, "the Appraisers"), are, and were at all relevant times, real property appraisers hired by NHF and Cristo Property.

18.     Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

19.     Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

20.     Defendant Richard Pepsny, Esq., ("Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

21.     Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

22.     Defendants Yacker and Cicalese (jointly, "the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction. The Closing Attorneys, together with defendants Alfieri and Pepsny, were selected

by NHF, Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

23.     Defendant Lawrence M. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

24.     Defendant Anthony D'Apolito ("D'Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident.  D'Apolito was at all relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF.

25.     Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey.  DAP Consulting is owned and controlled by defendant D'Apolito.

26.     Defendant Commonwealth Land Title Insurance Company, Inc. ("Commonwealth Title"), upon information and belief, is, and was at all relevant times, a Pennsylvania corporation with its principal place of business in Pennsylvania.

27.     Defendant Nations Title Insurance of New York Inc. ("Nations Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

28.     Defendant Fidelity National Title Insurance Company of New York, Inc. ("Fidelity Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

29.     Defendant Coastal Title Agency, Inc. ("Coastal Agency"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its

6

principal place of business in New Jersey. Coastal Agency is, and was at all relevant times, a title insurance broker that was selected by NHF, Capital Assets, Cristo, and/or the Closing Attorneys to broker title insurance for the real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

    30.  Defendants Commonwealth Title, Nations Title and Fidelity Title (collectively, "the Title Insurance Defendants") are, and were at all relevant times, title insurance companies that issued closing settlement letters to Walsh Securities, as the mortgage lender, which letters, among other things, indemnified Walsh Securities against fraud by the Closing Attorneys.

## JURISDICTION

    31.  Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

## VENUE

    32.  Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

## INTRODUCTION

33.    Since early 1996, defendants Cristo Property, NHF, Capital Assets, Kane, Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri, Pepsny, Cicalese, Cuzzi, D'Apolito, DAP Consulting and Coastal Agency (collectively, "the RICO defendants") have been engaged in a pattern of racketeering activity which has resulted in approximately two hundred twenty mortgage loans being purchased by Walsh Securities from NHF for amounts ranging up to eight times the preceding sales prices of the properties at issue. Walsh Securities was induced to purchase these mortgage loans from NHF based on fraudulent misrepresentations contained in the mortgage loan applications, including appraisals of the properties at issue.  The proceeds from Walsh Securities' mortgage loans would, among other things, be distributed among the RICO defendants as their illicit profits.

34.    The RICO defendants engaged in a pattern of racketeering throughout the State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson Counties, where certain of the properties are located, and in Morris County, where Walsh Securities is located.

35.    Walsh Securities remains liable for a substantial portion of the value of these mortgage loans fraudulently obtained by the RICO defendants.  Walsh Securities will not be able to recover the full amounts that have been lent through foreclosures on the properties because, due to the fraudulently inflated appraisals of the real properties that secure the mortgage loans, many of the properties are not of value equal to or greater than the amount of the mortgage loans and the fraudulent sales contracts.  In addition, this fraud perpetrated against Walsh

8

Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits.

36.     With respect to these fraudulently obtained mortgage loans, the Title Insurance Defendants issued to Walsh Securities, as the mortgage lender, closing service letters which require the Title Insurance Defendants to reimburse Walsh Securities for losses arising out of the fraudulent actions of the Closing Attorneys. Both of the Closing Attorneys, Yacker and Cicalese, were specifically approved to handle closings by the Title Insurance Defendants.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

37.     A mortgage loan is a loan in which real property is used as collateral for the loan. The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

38.     Mortgage bankers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

39.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers which provide the funds for the borrowers at the time of closings. In these instances, Mortgage Bankers are paid fees, generally by the borrowers, for originating the mortgage loans so that they can then be sold to other investors. Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. 17:11B-5, et seq.

9

40.     Potential mortgage loan borrowers who, because of, for example, their credit histories, can not obtain traditional financing from "prime" Mortgage Bankers, seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the increased delinquency risk of such mortgage loans.

41.     After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

42.     The Mortgage Bankers who deal directly with the borrowers are said to "originate" the mortgage loans.  The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded. Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, references, appraisals of the underlying properties, and other documents.

43.     Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. 45:14F-1, et seq.  The appraisers are typically paid by the borrowers of the mortgage loans.

44.     The appraisal of the real property that is to be mortgaged is one of the most important steps in the mortgage loan process.  The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower.  In addition,

since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults on the mortgage loans. In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

45.     Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to the closing of the properties and the mortgage loans.

46.     Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents. Correspondents often sell their mortgage loans to lenders who are known as wholesalers. Correspondents, in their contracts for sales of mortgage loans with wholesale Mortgage Bankers, typically promise that they will stand by the genuineness of the loan applications and other necessary paperwork.

47.     Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying mortgage loans. The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions. The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

48.     Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually on the day of the closings.  The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

## Title Insurance And Its Role In Real Estate Transactions

49.     Title insurance is insurance that provides for coverage, in return for premiums, for insuring, guaranteeing or indemnifying owners of real property or lenders of mortgage loans on real property against certain losses or damages as a result of defects in the titles or encumbrances on the titles of the real properties.  Title insurance is usually purchased every time real property is purchased or refinanced.  In most instances, mortgage lenders require that owners who will be borrowing money to finance their purchases of real property acquire title insurance coverage that also protects the mortgage loan lenders who will be lending money for the financing of the properties.

50.     In almost all instances, owners or borrowers who seek to purchase title insurance do not deal directly with the companies that provide title insurance, but rather, contact title agents who act as the brokers or middlemen between the title insurance companies and the owners or borrowers.  These title agents collect premiums, issue title insurance policies on behalf of the title insurance companies, and may perform other tasks relating to the transfers of interest in the properties, including filing deeds.  Title agents may be, and often are, affiliated with more

12

than one title insurance company. Title insurance companies have relationships with multiple title agencies.

51.    As part of the title insurance policies issued to owners who are borrowing money to finance their purchases of real property, title insurance companies typically issue closing service letters for the benefit of the mortgage loan lenders. In these closing service letters, the title insurance companies agree to indemnify the mortgage loan lenders against loss in connection with, among other things, fraud or misapplication by the closing attorneys. Usually, these closing service letters are required by mortgage loan lenders as pre-conditions to providing the mortgage loans. The title insurance companies will usually only issue such closing service letters, and provide indemnification against fraud, where the closings are handled by one of the companies' approved attorneys. True and correct copies of sample closing service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

## The New Jersey Mortgage Loan Frauds

52.    Instead of the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent. The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and by deceiving Walsh Securities into financing the mortgage loans based on these inflated values. The values were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the resales even took place the same day as the first purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. On the days of the closings, the

13

Closing Attorneys would fraudulently transfer the mortgage loan proceeds provided by Walsh Securities to themselves and certain of the other RICO defendants, even though the pre-conditions imposed by Walsh Securities for the transfer of such proceeds had not been met.

### "The NHF/Cristo Property" Enterprise

53.     The RICO defendants carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the NHF/Cristo Property Enterprise" or "the Enterprise").

54.     The RICO defendants formed the NHF/Cristo Property Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. Each RICO defendant personally played a role in the management and the operation of the Enterprise.

55.     The NHF/Cristo Property Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and NHF, with the understanding by members of the NHF/Cristo Property Enterprise that Walsh Securities would rely on the fraudulent applications in deciding whether to accept the mortgage loans originated by the NHF/Cristo Property Enterprise. A true and correct copy of the Program Participant Loan Purchase And Sale Agreement between NHF and Walsh Securities, through its predecessor in interest, is attached as Exhibit D. Apart from

14

other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

56.     Unknown to Walsh Securities, the buyer/borrowers had secretly and fraudulently agreed to convey, after the closing on the resale of the real properties, a majority percentage of the ownership of each real property to a member of the NHF/Cristo Property Enterprise. These secret and fraudulent conveyances constituted an act of default under the mortgage loans.

### The Pattern

57.     The NHF/Cristo Property Enterprise carried out numerous fraudulent transactions through a pattern of frauds, as follows:

(a)     Kane, acting through Cristo Property, purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties.

(b)     Kane, Grieser, and/or Cuzzi identified, through personal contacts, advertisements, and other means, individuals who were willing to buy these properties from Cristo Property and sign the mortgage loans. Typically, these properties were purchased as purported investment vehicles to be used as rental properties. Many of the properties, however, were abandoned and could not be rented.

(c)     Kane, acting through Cristo Property and/or NHF, had the properties appraised by licensed appraisers. In almost all instances, the property was appraised by Calanni, DiBenedetto, Brown, Brodo or Pierson.

15

(d)     Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

(e)     Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted, through D'Apolito, to Walsh Securities. These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties. Such false information included the following:

1)  The applications included appraisals of the properties which were fraudulently inflated.

2)  The applications included purported sales prices of the properties which reflected the fraudulent appraised values as opposed to the true values or sales prices of the properties.

3)  The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

4)  The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5)  The applications typically indicated that the seller, Cristo Property, had provided the buyers second mortgage loans in the properties, when, in fact, no bona fide second mortgages were provided and no second mortgage loan payments were ever

made or intended to be made.   These purported second mortgage loans were often never recorded by the Closing Attorneys, further evidencing that they were not bona fide second mortgages.

   6)  The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a sixty percent interest in the properties to Capital Assets under secret Joint Venture Agreements.

   7)  The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property.   In fact, the buyers bought the properties without paying any moneys to the seller, Cristo Property.

   8)  The applications typically contained other false information about the real estate transactions designed to present them as better credit risks.

   (f) D'Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans.  In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF.  The payments were designed to, and did, corrupt D'Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his obligations to Walsh Securities.  The payments from NHF

and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D'Apolito was acting as a faithful employee.

(g)     On the days of the closings, the Closing Attorneys would fraudulently transmit to themselves and certain other RICO defendants, including Cristo Property, the proceeds of the mortgage loans illicitly obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though they were aware that one or all of the following requirements and pre-conditions to the mortgage loans, among others, were not met: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. In addition, the Closing Attorneys, in furtherance of the fraud, falsely certified at the time of the closings that the above mentioned pre-conditions to closing, imposed by Walsh Securities, had been met. These false certifications were made on HUD-1 settlement statements, forms required by the United States Department of Housing and Urban Development.

(h)     The Closing Attorneys, along with Pepsny and Alfieri, also furthered the fraud by preparing and recording or causing to be recorded various deeds involved in these transactions. These deeds included the deeds covering the sales to Cristo Property, the deeds from Cristo Property to the borrowers, and the deeds conveying an interest in sixty percent of the properties from the borrowers to Capital Assets.

18

(i)    Typically, around the date designated to close these properties, the purchasers signed Powers of Attorney, secret Joint Venture Agreements with Capital Assets and deeds which conveyed sixty percent of the ownership in the properties to Capital Assets. A true and correct copy of a sample Joint Venture Agreement is attached as Exhibit E. A true and correct copy of a sample deed conveying sixty percent of the ownership in the properties to Capital Assets is attached as Exhibit F. (In Exhibit F Capital Assets is misspelled "Capital Assests.") These deeds conveying a sixty percent ownership interest were then filed or caused to be filed by either the Closing Attorneys or Coastal Agency. The Joint Venture Agreements and deeds were never disclosed to Walsh Securities. Such conveyances constituted a default under the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not have financed the mortgage loans had it been aware of the plans to reconvey interest in the properties.

(j)    Capital Assets then collected the rents, if any, from the rental of these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the mortgage loan payments when due and to pay other expenses of the properties. In addition, on information and belief, as in a classic pyramid fraud, funds from new mortgage loans were secretly used to make interest and principle payments on older loans. In this way, the NHF/Cristo Property Enterprise misled Walsh Securities into believing that none of the loans originated by the NHF/Cristo Property Enterprise were delinquent. In fact, as further evidence of a classic pyramid fraud relying on new transactions to continue to fund the older transactions, most of the properties that were claimed to be renovated were never renovated and thus could not be rented. Additionally, at other properties which contained individuals who could have been

renters, no attempts were made to collect rent from those individuals who were living in the properties.

        (k)     There were several variations on the scam:

1) Some borrowers/buyers were induced to invest $1,000.00 in a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00. Cuzzi had these purchasers execute secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney and provide their names and social security numbers. Upon information and belief, Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

2) Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. Upon information and belief, an individual named Brian Reilly on at least one occasion on behalf of the NHF/Cristo Property Enterprise traveled to New York to deliver closing papers which were signed by the purchasers, notarized by Reilly, and then returned to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings.

3) Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to

Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

(l)      In sum, upon information and belief, like traditional pyramid schemes, money obtained by the NHF/Cristo Property Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the NHF/Cristo Property Enterprise.

(m)      Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

58.      The operations of the NHF/Cristo Property Enterprise are illustrated in the following examples of specific properties "flipped" by the NHF/Cristo Property Enterprise:

(a)      600 5th Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2) On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property to an

individual borrower/buyer with the initials K.P. for the purported amount of $182,500.00. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared and signed by Pepsny and filed by Coastal Agency.

3) A mortgage loan on the property, in K.P.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4) A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property. In fact, no down payment was ever made.

5) A second mortgage loan for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P. In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from K.P. for that loan and K.P. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

6) In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the NHF/Cristo Property Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-

22

conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) K.P. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; and (4) K.P. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Fidelity Title issued a closing statement letter to Walsh Securities, which requires Fidelity Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Fidelity Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

(b)     1017-1019 Bangs Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which property was fraudulently appraised by Brown for $200,000.00.

2) On that same day, July 25, 1996, Cristo Property sold 1017-1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared by Pepsny and filed by Coastal Agency.

23

3) A mortgage loan on the property, in J.M.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00.

4) A down payment in the amount of $20,000.00 was purportedly provided by J.M. to Cristo Property. In fact, no down payment was ever made.

5) J.M.'s mortgage loan application contains a "gift letter" from defendant Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made, nor was the gift that was to be part of the down payment ever given to the seller.

6) A second mortgage loan for $30,000 at a 6% interest rate was purportedly given by Cristo Property to J.M. In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from J.M. for that loan and J.M. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) J.M. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; and (4) J.M. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States

Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Commonwealth Title issued a closing statement letter to Walsh Securities, which requires Commonwealth Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Commonwealth Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

59.  There are over two hundred and twenty instances of transactions similar to the two outlined above.


## COUNT I.

## VIOLATION OF 18 U.S.C. § 1962(c) (RICO)

60.  Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 59 as if fully set forth herein.

61.  18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

62.  All the RICO defendant are persons within the meaning of 18 U.S.C. § 1961(3).

63.    In violation of the above-mentioned statute, the RICO defendants associated with the NHF/Cristo Property Enterprise, which was an association in fact consisting of the RICO defendants together and with other persons not known to plaintiff.

64.    The NHF/Cristo Property Enterprise engaged in, and conducted activities which affected, interstate commerce.

65.    Each RICO defendant conducted and participated in the conduct of the affairs of the NHF/Cristo Property Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

66.    This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

(a)    Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the RICO defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan originated by the NHF/Cristo Property Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut. Walsh Securities then sent by facsimile the necessary closing service documents to a bank in Texas that acted as the custodian for the lender in Connecticut. Once satisfied that the necessary documentation was present, that bank in Texas then sent by facsimile its authorization to the Lender in Connecticut, who, in turn, then wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

(b)    Commercial bribery, as described in N.J.S.A. § 2C:21-10, in that

D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF)

and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to

transfer the loans originated by the NHF/Cristo Property Enterprise and financed by Walsh

Securities.

67.    The above-mentioned predicate acts of racketeering activity conducted by

the RICO defendants through the NHF/Cristo Property Enterprise caused Walsh Securities to

finance mortgage loans based on falsely inflated appraisals for real properties and other

fraudulent acts by the RICO defendants.  The members of the NHF/Cristo Property Enterprise

were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh

Securities.  Many of these mortgage loans are delinquent and/or in default.  Based on the falsely

inflated appraisals for the real properties and other fraudulent acts by the RICO defendants,

Walsh Securities will be unable to recoup the full amounts of many of the outstanding mortgage

loans.

68.    By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has

suffered the following foreseeable losses and damages:

(a)    the losses of moneys loaned based on the falsely appraised real

properties and other fraudulent representations.  Many of the properties are worth far less than

the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh

Securities will not be able to recover the full amounts loaned;

(b)     the fraud perpetrated against Walsh Securities has injured the

business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount

of business and profits;

(c)     other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine

that the RICO defendants are liable to it, jointly and severally, for violations of 18 U.S.C. §

1962(c), and award treble damages, attorneys fees and costs, and other such relief as may be

appropriate.

## COUNT II.

## VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

69.     Plaintiff repeats and realleges each and every allegation of paragraphs 1

through 68 as if fully set forth herein.

70.     18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire

to violate any provisions of subsection . . .(c) of this section."

71.     Through a series of activities outlined above in Count I, the RICO

defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above in paragraphs 61 through

67.

72.     Each of the RICO defendants willfully and knowingly agreed and

conspired with other RICO defendants to commit the above referenced predicate acts of wire

fraud and commercial bribery.

73.     By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has

suffered the following foreseeable losses and damages:

28

(a)     the losses of moneys loaned based on the falsely appraised real

properties and other fraudulent acts of the RICO defendants.  Many of the properties are worth

far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore,

Walsh Securities will not be able to recover the full amounts loaned;

(b)     the fraud perpetrated against Walsh Securities has injured the

business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount

of business and profits;

(c)     other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine

that the RICO defendants are liable to it, jointly and severally, for violations of 18 U.S.C. §

1962(d), and award treble damages, attorneys fees and costs, and other such relief as may be

appropriate.

## COUNT III.

## COMMON-LAW FRAUD

74.     Plaintiff repeats and realleges each and every allegation of paragraphs 1

through 73 as if fully set forth herein.

75.     By the illegal and fraudulent acts and schemes described above, the RICO

defendants willfully and intentionally defrauded Walsh Securities and made or caused to be

made false, fraudulent and material misrepresentations and omissions to plaintiff concerning

mortgage loans bought by Walsh Securities from NHF.  Each of these mortgage loans originated

by the NHF/Cristo Property Enterprise were fraudulently obtained in that they were based on

falsely inflated appraisals.  In addition, these mortgage loans also were made based on other