UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
------------------------------------x

WALSH SECURITIES, INC.,

                          Plaintiff,

      -against-

CRISTO PROPERTY MANAGEMENT, LTD.,
a/k/a    G.J.L. LIMITED, DEK HOMES OF
NEW JERSEY, INC., OAKWOOD PROPERTIES
INC.,     NATIONAL HOME FUNDING, INC.,
CAPITAL ASSETS PROPERTY MANAGEMENT &
INVESTMENT CO., INC., CAPITAL ASSETS
PROPERTY MANAGEMENT, L.L.C., WILLIAM
J. KANE,     GARY GRIESER,    ROBERT
SKOWRENSKI, II,     RICHARD CALANNI,
RICHARD DIBENEDETTO,    JAMES R. BROWN,
THOMAS BRODO,     DONALD J. PIERSON,
STANLEY YACKER, ESQ., MICHAEL ALFIERI,
ESQ., RICHARD PEPSNY, ESQ., ANTHONY M.
CICALESE, ESQ.,     LAWRENCE M. CUZZI,
ANTHONY D'APOLITO,    DAP CONSULTING,
INC.,     COMMONWEALTH   LAND    TITLE
INSURANCE COMPANY,    NATIONS TITLE
INSURANCE OF NEW YORK INC., FIDELITY
NATIONAL TITLE    INSURANCE COMPANY OF
NEW YORK, and    COASTAL TITLE AGENCY,

                          Defendants.
------------------------------------x

FILED

JAN 1 6 1998

AT 8:30 ................M
WILLIAM T. WALSH
CLERK

Civ.Action No. 97-3496(WGB)

Hon. WILLIAM G. BASSLER

-      -      -

NOTICE OF MOTION
TO STAY ALL PROCEEDINGS
BY ENLARGING TIME TO ANSWER
AND BY STAYING DISCOVERY

F.R.Civ.P. 6(b), 26(c)


      PLEASE TAKE NOTICE that upon the annexed affidavit of

Richard A. Finkel, Esq., dated January 13, 1998, the accompanying

Memorandum of Law, and upon all the prior pleadings and proceedings

had herein, the undersigned will move this Honorable Court before

the Honorable William G. Bassler, United States District Judge for

the District of New Jersey, on the 23rd day of February, 1998 at

10:00 a.m., or as soon thereafter as counsel may be heard, for an

1

Order immediately staying all proceedings in the instant matter by granting an enlargement of the time to answer or otherwise move (F.R.Civ.P. 6[b]) and by granting a stay of all discovery (F.R.Civ.P. 26[c]), pending completion of Grand Jury proceedings and any proceedings that may arise from indictments that may be filed as a result of said Grand Jury proceedings, or until the further order of this Honorable Court.

In accord with Rule 7.1(d)(1) of the Local Rules of this Honorable Court, annexed hereto as Exhibit A is a Proposed Order.

Dated:     New York, New York
           January 13, 1998

                              JOSEPH V. SORRENTINO, Esq.
                              70 Hudson Street, Penthouse Suite
                              Hoboken, New Jersey 07030
                              201-656-6525
                                             and
                              MEISSNER, KLEINBERG & FINKEL, LLP
                              275 Madison Avenue, Suite 1000
                              New York, New York 10016
                              212-689-8600

                              *Attorneys for Defendants*
                              CRISTO PROPERTY MANAGEMENT, LTD.,
                              DEK HOMES OF NEW JERSEY, INC.,
                              OAKWOOD PROPERTIES INC., and
                              WILLIAM J. KANE

                              By:  _Joseph V. Sorrentino_
                                   Joseph V. Sorrentino (JVS 7324)

2

*To:*
Clerk, United States District Court
for the District of New Jersey
Martin Luther King Federal Building
50 Walnut Street
Newark, New Jersey 07102


*Copy:*

The United States Attorney
District of New Jersey
970 Broad Street
Newark, New Jersey 07102

Michael Chertoff, Esq.
LATHAM & WATKINS
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174

DRAZIN & WARSHAW, P.C.
Attorneys for Defendants Capital Assets
Property Management & Investment Co., Inc.
Capital Assets Property Management
& Investment Co., L.L.C. and Gary Grieser
25 Reckless Place
P.O. Box 8909
Red Bank, New Jersey 07701-8909

RICHARD L. FRIEDMAN, ESQ.
GIORDANO, HALLERAN & CIESLA
Attorneys for Michael Alfieri, Esq.
P.O. BOX 190
125 Half Mile Road
Middletown, New Jersey 07748

MARK W. CATANZARO, ESQ.
Attorney for Richard Pepsny
513 South Lenola Road
Moorestown, New Jersey 08057

FOX, ROTHSCHILD, O'BRIEN, & FRANKEL, LLP
Attorneys for Nations Title & Fidelity National Title
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648-2311

AUGUST W. FISCHER, ESQ.
Attorney for Richard Calanni
53 Pequot Road
Ringwood, New Jersey 07456

CRUMMY, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE
Attorneys for Stanley Yacker, Esq.
One Riverfront Plaza
Newark, New Jersey 07102-5497

DAVID KOTT, ESQ.
MCCARTER & ENGLISH
Attorneys for Commonwealth Land Title Insurance co.
Gateway Four
Newark, New Jersey 07102

CHARLES J. ULIANO, ESQ.
CHAMLIN, ROSEN & ULIANO
Attorneys for Anthony D'Apolito
and Dap Consulting
268 Norwood Avenue
West Long Branch, New Jersey 07764

MICHAEL D. SCHOTTLAND, ESQ.
Attorney for National Home Funding, Inc.
And Robert Skowrenski, II
36 West Main Street
Freehold, New Jersey 07728

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
------------------------------------X
WALSH SECURITIES, INC.,

                    Plaintiff,

     -against-

CRISTO PROPERTY    MANAGEMENT, LTD.,
a/k/a   G.J.L. LIMITED, DEK HOMES OF
NEW JERSEY, INC.,  OAKWOOD PROPERTIES          Civ.Action No. 97-3496(WGB)
INC.,     NATIONAL HOME FUNDING, INC.,
CAPITAL ASSETS PROPERTY  MANAGEMENT &          Hon. WILLIAM G. BASSLER
INVESTMENT CO., INC.,  CAPITAL ASSETS
PROPERTY MANAGEMENT, L.L.C.,   WILLIAM
J. KANE,      GARY  GRIESER,    ROBERT              -      -      -
SKOWRENSKI,  II,     RICHARD  CALANNI,
RICHARD DIBENEDETTO,   JAMES R. BROWN,         AFFIDAVIT  IN  SUPPORT OF
THOMAS   BRODO,     DONALD  J. PIERSON,        MOTION TO STAY PROCEEDINGS
STANLEY YACKER, ESQ., MICHAEL ALFIERI,         BY ENLARGING TIME TO ANSWER
ESQ., RICHARD PEPSNY, ESQ., ANTHONY M.         AND BY  STAYING DISCOVERY
CICALESE, ESQ.,     LAWRENCE M. CUZZI,
ANTHONY D'APOLITO,    DAP CONSULTING,           F.R.Civ.P. 6(b), 26©
INC.,     COMMONWEALTH   LAND    TITLE
INSURANCE  COMPANY,     NATIONS  TITLE
INSURANCE OF NEW YORK INC.,  FIDELITY
NATIONAL  TITLE  INSURANCE COMPANY OF
NEW YORK,  and   COASTAL TITLE AGENCY,

                    Defendants.
------------------------------------X


STATE  OF NEW YORK }
COUNTY OF NEW YORK } S.S:


          RICHARD A. FINKEL, having been duly sworn, deposes and

states under oath as follows:

          1.   I am an attorney-at-law, admitted to the Bar of the

United  States  District  Courts  for  the  Southern,  Eastern  and

Northern Districts of New York, and a partner in the law firm of

                              1

Meissner, Kleinberg & Finkel, LLP, of counsel to Joseph Sorrentino, Esq., a member of the Bar of this Honorable Court,[1] and I respectfully submit this affidavit in support of the motion of Defendants CRISTO PROPERTY MANAGEMENT, LTD., DEK HOMES OF NEW JERSEY, INC., OAKWOOD PROPERTIES INC., and WILLIAM J. KANE, to stay the instant civil proceedings by enlarging time to answer and by staying discovery pursuant to Rules 6(b) and 26© of the Federal Rules of Civil Procedure.

2.   This application to stay the instant civil proceeding is respectfully submitted to this Honorable Court in order to, (a) ensure that defendants Cristo, DEK, Oakwood, and Kane will have a fair opportunity to defend against the allegations of the instant civil complaint, unaffected by the pendency of a criminal investigation and without forcing Mr. Kane to waive his Fifth amendment privilege in order to defend the civil action; (b) permit the investigations conducted by federal and state government agencies to proceed unimpeded by the pendency of parallel civil proceedings involving the same parties and based upon the same facts; © to maximize judicial economy by allowing the various government investigations to proceed to completion and thereby rendering moot some or all of the issues of the instant civil

---

[1]Respectfully submitted herewith are applications of Joseph Sorrentino, Esq., respectfully requesting the *pro hac vice* admission of your affiant, Richard A. Finkel, Esq., and of Ronald M. Kleinberg, Esq., partners in the law firm of Meissner, Kleinberg & Finkel, LLP.

proceeding; (d) foreclosing any attempt by any target of the criminal investigation to thwart or interfere with the criminal investigation, or from gaining any unfair advantage during the pendency of the investigations conducted by the Government.

## FACTS

3.    On or about November 13, 1997, plaintiff caused the Summons and Amended Complaint in the instant action to be accepted by counsel for defendants Cristo Property Management, Ltd., DEK Homes of New Jersey, Inc., and Oakwood Properties Inc., and William J. Kane (hereinafter: "the moving parties"), as service upon said defendants.[2]

4.    The allegations of the Amended Complaint concern numerous real estate transactions, wherein it is alleged that the defendants, including William Kane, and Cristo Property Management, participated "in a pattern of racketeering activity" which resulted in mortgage loans being purchased by plaintiff based upon allegedly "fraudulent misrepresentations contained in the mortgage loan applications."    Amended Complaint ¶33.    The mortgage loans concerned the purchase of property allegedly located in Monmouth, Essex, Union, Hudson and Morris Counties in New Jersey.    Amended Complaint ¶34.

---

[2]The date for the filing of motions and/or an answer to the Amended Complaint was extended by a So Ordered Stipulation, dated December 2, 1997.

3

For the Court's convenience, a copy of the Amended Complaint is attached as Exhibit B.

5.     It has become a matter of public knowledge that the United States Attorney for the District of New Jersey is conducting a federal Grand Jury investigation into the real estate transactions involving plaintiff and the defendants in this action. Moreover, the same transactions that are the gravamen of the instant R.I.C.O. action are the subject of the United States Attorney's Grand Jury investigation.

6.     According to numerous press reports, the United States Attorney, as well as several New Jersey state prosecutors and State agencies, are conducting investigations into the real estate transactions that involve plaintiff, Mr. Kane and the other defendants named in the instant complaint. *See, e.g.,* The Sunday Star Ledger, July 13, 1997,[3] p.1, p.8.; The Asbury Park Sunday

---

[3]The report of The Sunday Star Ledger, July 13, 1997, p.1, at p.8, included the following:
      The U.S. Attorney's Office in Newark is investigating whether federal crimes have occurred, including mail fraud and bank fraud. Prosecutors in at least two counties are also investigating, and the state Attorney General's Office is considering looking into the deals.
      Two state regulatory agencies, the Department of Banking and Insurance and the Real Estate Appraiser Board, are also investigating.

On the same day, July 13, 1997, the report in the Asbury Park Press included a confirmation of the investigation by the U.S. Attorney:
      Meanwhile, federal probes and others continue.
      "It's still in the early stages, and it's too early for

4

Press, July 13, 1997, p.A1,A8.

7.    As part of the Grand Jury investigation, the United States Attorney has applied for, obtained and executed search warrants and has caused subpoenas to be issued, seeking documents in the possession of various of the defendants in the instant civil matter.

8.    The issuance of federal search warrants establishes that the United States Attorney has presented evidence sufficient to satisfy a Federal Judge that it has sustained its prerequisite burden of probable cause.

9.    Press reports of on or about July 30, 1997, revealed that federal search warrants were executed at the premises of several of the defendants named herein, involving numerous real estate transactions "with one element in common:  Walsh securities, Inc."  Asbury Park Press, July 30, 1997, p. A1.  And, according to other reports, the records of plaintiff were subpoenaed by state prosecutors and investigators.  The Asbury Park Press, July 8, 1997;  The Star Ledger, July 30, 1997.

10.   Press reports establish that records and other materials were seized from plaintiff Walsh Securities and defendants Cristo Property Management, National Home Funding, Capital Assets Property Management & Investment, Capital Assets

---

me to comment," said Michael Guadagno, who heads the fraud unit at the U.S. Attorney's office in Newark. "But we're making progress."
P. A1, A10.

5

Property Management, Gary Grieser, Robert Skowrenski, and Stanley Yacker, Esq., by government investigators pursuant to search warrants or subpoenas. The Star Ledger, July 30, 1997, p.1.,col.1; Asbury Park Press, July 8, 1997.

11. Your affiant is informed by co-counsel Joseph V. Sorrentino, Esq., and by Michael S. Washor, Esq., that they serve as legal counsel to Mr. Kane concerning the criminal investigation, and that Mr. Kane has been served with a federal grand jury subpoena duces tecum. Your affiant is further informed by Messrs. Sorrentino and Washor that, following Mr. Kane's receipt of the subpoena, they met with an Assistant United States Attorney for the District of New Jersey, who informed them that Mr. Kane and the entities with which he was affiliated are among the targets of the federal investigation.

### CONSIDERATIONS IN SUPPORT OF THE EXERCISE OF DISCRETION AND ISSUANCE OF A STAY.

12. As established above, in the present situation, the instant civil case and the pending federal and state investigations concern the *identical* subject matter and the same parties.

13. A stay of the present proceedings will therefore ensure the integrity of the grand jury proceedings, and will permit

6

the various government agencies to continue their respective investigations unimpeded by the pendency of the instant matter.

14.   A stay will also recognize the importance of Mr. Kane's Fifth amendment rights and will guarantee his fair day in court to defend against the allegations raised by the civil complaint.

15.   Because of the identity of the subject matter of the Government's investigation and of the present civil matter, the resolution of the criminal proceedings may moot and resolve the instant civil proceeding, or may simplify the issues or otherwise reduce the scope of discovery in the civil case.

16.   Moreover, here, where the allegations and theory of the complaint appear *identical* to the focus of the federal grand jury investigation, and where the civil action has not been commenced by a government agency seeking to protect the general public, it is submitted that the balance of the equities swings strongly in favor of the issuance of a stay.

17.   Additionally, the continued active pendency of the instant civil matter places defendant Kane in untenable position of having to choose between waiving his Fifth Amendment rights in order to vigorously defend the civil case, or invoking the Fifth Amendment and thereby risking a virtual surrender of a defense in the instant case.   Either choice effectively allows plaintiff to exploit the present circumstances by achieving advantages

7

concerning the government's investigation or otherwise obstructing or interfering with the government's investigation by obtaining statements or documents from the moving parties, or by forcing the moving parties into a virtual surrender of their rights in the civil litigation.

18.   However, a stay of this civil proceeding will not adversely affect any public interest, will allow the criminal proceeding to develop further and thereby may resolve, simplify or moot some or all of the issues of the instant civil matter.

19.   It is therefore respectfully submitted that there is no substantial reason not to issue the requested stay.   Moreover, the stay will properly and appropriately protect more important consideration of Mr. Kane's constitutional rights under the Fifth Amendment, will allow Mr. Kane and the other defendants to defend both actions to the fullest, and will maximize judicial economy.

20.   On behalf of Mr. Kane, we therefore respectfully request that this Honorable Court issue an order staying all proceedings in the instant matter, including the necessity to answer, until the later of the following two dates: (A) the date that the statute of limitations has run on every federal or state crime for which Mr. Kane or Cristo could be indicted based upon the alleged illegal conduct giving rise to the instant action, or (B) the date of completion of all proceedings that arise from the government's investigations, including any indictments against Mr.

8

Kane and the other moving parties, that may have already been filed or may be filed subsequent to the date of the order of this Court order, based upon the alleged illegal conduct that is the gravamen of the instant matter.

Respectfully submitted,

Richard A. Finkel  (RAF 0851)

Sworn to before me this
13th day of January, 1998

Notary Public

PHILIP MEISSNER
Notary Public, State of New York
No. 4833020
Qualified in Nassau County
Commission Expires

9

UNITED STATES DISTRICT COURT
DISTRICT  OF  NEW  JERSEY
------------------------------------X
WALSH SECURITIES, INC.,

                    Plaintiff,

      -against-

CRISTO  PROPERTY    MANAGEMENT,  LTD.,
a/k/a    G.J.L. LIMITED, DEK HOMES OF
NEW JERSEY, INC.,  OAKWOOD PROPERTIES          Civ.Action No.  97-3496(WGB)
INC.,    NATIONAL  HOME FUNDING, INC.,
CAPITAL ASSETS PROPERTY  MANAGEMENT &          Hon. WILLIAM G. BASSLER
INVESTMENT CO., INC.,  CAPITAL ASSETS
PROPERTY MANAGEMENT, L.L.C.,    WILLIAM            -      -      -
J. KANE,      GARY   GRIESER,    ROBERT
SKOWRENSKI,  II,      RICHARD  CALANNI,
RICHARD DIBENEDETTO,    JAMES R. BROWN,
THOMAS  BRODO,     DONALD  J.  PIERSON,              ORDER
STANLEY YACKER, ESQ., MICHAEL ALFIERI,
ESQ., RICHARD PEPSNY, ESQ., ANTHONY M.
CICALESE, ESQ.,    LAWRENCE M. CUZZI,
ANTHONY D'APOLITO,    DAP  CONSULTING,
INC.,    COMMONWEALTH    LAND    TITLE
INSURANCE  COMPANY,    NATIONS   TITLE
INSURANCE OF NEW YORK INC., FIDELITY
NATIONAL  TITLE  INSURANCE COMPANY OF
NEW YORK,  and   COASTAL TITLE AGENCY,

                    Defendants.
------------------------------------X


         A motion having been made before this Court on February 23,

1998, by counsel for plaintiffs CRISTO PROPERTY MANAGEMENT, Ltd., DEK

HOMES OF NEW JERSEY, Inc., OAKWOOD PROPERTIES Inc., and WILLIAM J.

KANE, for an Order staying all proceedings in the instant matter by

granting an enlargement of the time to answer or otherwise move

(F.R.Civ.P. 6[b]) and by granting a stay of all discovery (F.R.Civ.P.

26[c]), pending  completion  of  Grand  Jury  proceedings  and  any



proceedings that may arise from indictments that may be filed as a result of said Grand Jury proceedings, or until the further order of this Honorable Court.

Now, on motion of JOSEPH V. SORRENTINO, Esq., and MEISSNER, KLEINBERG & FINKEL, LLP, attorneys for plaintiffs CRISTO PROPERTY MANAGEMENT, LTD., DEK HOMES OF NEW JERSEY, INC., OAKWOOD PROPERTIES INC., and WILLIAM J. KANE,

IT IS ORDERED, ADJUDGED, AND DECREED that:

1.    The motion for an enlargement of the time to answer or otherwise move (F.R.Civ.P. 6[b]) is Granted;

2.    The motion for a stay of all discovery (F.R.Civ.P. 26[c]) is Granted; and

3.    All proceedings in the instant matter are hereby stayed; pending completion of Grand Jury proceedings and any proceedings that may arise from indictments that may be filed as a result of said Grand Jury proceedings, or until the further order of this Court.

Dated:      Newark,   New Jersey
            _____, 1998

                              IT IS SO ORDERED:


                              _____
                              **Hon.   WILLIAM G. BASSLER**
                              United States District Judge
                              District of New Jersey

Michael Chertoff (MC 6790)
Geoffrey S. Berman (GB 0851)
Robert A. Magnanini (RM 7356)
LATHAM & WATKINS
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
(201) 639-1234
Attorneys for Plaintiff
Walsh Securities, Inc.

ORIGINAL FILED
NOV 07 1997
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CRISTO PROPERTY MANAGEMENT, LTD., A/K/A G.J.L. LIMITED, DEK HOMES OF NEW JERSEY, INC., OAKWOOD PROPERTIES INC., NATIONAL HOME FUNDING, INC., CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC., CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C., WILLIAM J. KANE, GARY GRIESER, ROBERT SKOWRENSKI, II, RICHARD CALANNI, RICHARD DIBENEDETTO, JAMES R. BROWN, THOMAS BRODO, RONALD J. PIERSON, STANLEY YACKER, ESQ., MICHAEL ALFIERI, ESQ., RICHARD PEPSNY, ESQ., ANTHONY M. CICALESE, ESQ., LAWRENCE M. CUZZI, ANTHONY D'APOLITO, DAP CONSULTING, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, NATIONS TITLE INSURANCE OF NEW YORK INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, and COASTAL TITLE AGENCY,<br><br>Defendants. | Civil Action No. CV 97-3496 (WGB)<br><br>Hon. William G. Bassler<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.    Plaintiff brings this action for violations of the Racketeer Influenced and Corrupt Organizations Act, common-law fraud and breaches of contract.

## PARTIES

2.    Plaintiff Walsh Securities, Inc. ("Walsh Securities") is, and was at all relevant times, a Delaware corporation with its principal place of business located in Parsippany-Troy Hills, New Jersey. In April 1996, Walsh Securities became a successor in interest to GF Mortgage Corp. Walsh Securities is a wholesale mortgage banker in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions. Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage market known as the "subprime" market. "Subprime" mortgage loans are made to borrowers who, because of past financial dealings or because of their credit history, are unable to obtain mortgage loans from "prime" mortgage lenders at prime lending rates. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans.

3.    Defendant Cristo Property Management, Ltd., a/k/a G.J.L. Limited, upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Union County, New Jersey. Cristo Property is, and was at all relevant times, owned and controlled by defendant Kane.

4.    Defendant DEK Homes of New Jersey, Inc. ("DEK Homes") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its

2

principal place of business in New Jersey. Upon information and belief, DEK Homes is, and was at all relevant times, owned and controlled by defendant Kane.

      5.    Defendant Oakwood Properties, Inc. ("Oakwood Properties") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, Oakwood Properties is, and was at all relevant times, owned and controlled by defendant Kane.

      6.    Defendants Cristo Property Management, Ltd. (a/k/a G.J.L. Limited), DEK Homes, and Oakwood Properties are all owned and controlled by defendant Kane and referred to herein collectively as "Cristo Property".

      7.    Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

      8.    Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey. Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

      9.    Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Kane owns and controls Cristo Property, DEK

3

Homes and Oakwood Properties.  In addition, Kane is, and was at all relevant times, a licensed

mortgage solicitor for, and an employee of, NHF.

10.     Defendant Gary Grieser ("Grieser"), upon information and belief, is, and

was at all relevant times, a New Jersey resident.  Grieser is the owner of Capital Assets.

11.     Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and

belief, is, and was at all relevant times, a New Jersey resident.  Skowrenski is the owner of NHF.

12.     Defendant Richard Calanni ("Calanni"), upon information and belief, is,

and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New

Jersey.  Calanni is, and was at all relevant times, associated with TF Certified Real Estate

Appraisals.

13.     Defendant Richard DiBenedetto ("DiBenedetto"), upon information and

belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser

in New Jersey.  DiBenedetto is, and was at all relevant times, associated with Eastern States

Appraisal Services.

14.     Defendant James R. Brown ("Brown"), upon information and belief, is,

and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New

Jersey.  Brown is, and was at all relevant times, associated with Professional Evaluators of

Union.

15.     Defendant Thomas Brodo ("Brodo"), upon information and belief, is, and

was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New

Jersey.

16.     Defendant Ronald J. Pierson ("Pierson"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

17.     Defendants Calanni, DiBenedetto, Brown, Brodo and Pierson (collectively, "the Appraisers"), are, and were at all relevant times, real property appraisers hired by NHF and Cristo Property.

18.     Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

19.     Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

20.     Defendant Richard Pepsny, Esq., ("Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

21.     Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

22.     Defendants Yacker and Cicalese (jointly, "the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction. The Closing Attorneys, together with defendants Alfieri and Pepsny, were selected

by NHF, Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

23.     Defendant Lawrence M. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

24.     Defendant Anthony D'Apolito ("D'Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident.  D'Apolito was at all relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF.

25.     Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey.  DAP Consulting is owned and controlled by defendant D'Apolito.

26.     Defendant Commonwealth Land Title Insurance Company, Inc. ("Commonwealth Title"), upon information and belief, is, and was at all relevant times, a Pennsylvania corporation with its principal place of business in Pennsylvania.

27.     Defendant Nations Title Insurance of New York Inc. ("Nations Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

28.     Defendant Fidelity National Title Insurance Company of New York, Inc. ("Fidelity Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

29.     Defendant Coastal Title Agency, Inc. ("Coastal Agency"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its

principal place of business in New Jersey. Coastal Agency is, and was at all relevant times, a title insurance broker that was selected by NHF, Capital Assets, Cristo, and/or the Closing Attorneys to broker title insurance for the real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

      30.    Defendants Commonwealth Title, Nations Title and Fidelity Title (collectively, "the Title Insurance Defendants") are, and were at all relevant times, title insurance companies that issued closing settlement letters to Walsh Securities, as the mortgage lender, which letters, among other things, indemnified Walsh Securities against fraud by the Closing Attorneys.

<center>**JURISDICTION**</center>

      31.    Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

<center>**VENUE**</center>

      32.    Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

<center>7</center>

## INTRODUCTION

33.     Since early 1996, defendants Cristo Property, NHF, Capital Assets, Kane,

Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri, Pepsny,

Cicalese, Cuzzi, D'Apolito, DAP Consulting and Coastal Agency (collectively, "the RICO

defendants") have been engaged in a pattern of racketeering activity which has resulted in

approximately two hundred twenty mortgage loans being purchased by Walsh Securities from

NHF for amounts ranging up to eight times the preceding sales prices of the properties at issue.

Walsh Securities was induced to purchase these mortgage loans from NHF based on fraudulent

misrepresentations contained in the mortgage loan applications, including appraisals of the

properties at issue.  The proceeds from Walsh Securities' mortgage loans would, among other

things, be distributed among the RICO defendants as their illicit profits.

34.     The RICO defendants engaged in a pattern of racketeering throughout the

State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson Counties,

where certain of the properties are located, and in Morris County, where Walsh Securities is

located.

35.     Walsh Securities remains liable for a substantial portion of the value of

these mortgage loans fraudulently obtained by the RICO defendants.  Walsh Securities will not

be able to recover the full amounts that have been lent through foreclosures on the properties

because, due to the fraudulently inflated appraisals of the real properties that secure the mortgage

loans, many of the properties are not of value equal to or greater than the amount of the mortgage

loans and the fraudulent sales contracts.  In addition, this fraud perpetrated against Walsh

8

Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits.

36.     With respect to these fraudulently obtained mortgage loans, the Title Insurance Defendants issued to Walsh Securities, as the mortgage lender, closing service letters which require the Title Insurance Defendants to reimburse Walsh Securities for losses arising out of the fraudulent actions of the Closing Attorneys. Both of the Closing Attorneys, Yacker and Cicalese, were specifically approved to handle closings by the Title Insurance Defendants.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

37.     A mortgage loan is a loan in which real property is used as collateral for the loan. The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

38.     Mortgage bankers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

39.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers which provide the funds for the borrowers at the time of closings. In these instances, Mortgage Bankers are paid fees, generally by the borrowers, for originating the mortgage loans so that they can then be sold to other investors. Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. 17:11B-5, et seq.

40.     Potential mortgage loan borrowers who, because of, for example, their credit histories, can not obtain traditional financing from "prime" Mortgage Bankers, seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the increased delinquency risk of such mortgage loans.

41.     After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

42.     The Mortgage Bankers who deal directly with the borrowers are said to "originate" the mortgage loans.  The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded. Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, references, appraisals of the underlying properties, and other documents.

43.     Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. 45:14F-1, et seq.  The appraisers are typically paid by the borrowers of the mortgage loans.

44.     The appraisal of the real property that is to be mortgaged is one of the most important steps in the mortgage loan process.  The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower.  In addition,

10

since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults on the mortgage loans. In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

45.     Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to the closing of the properties and the mortgage loans.

46.     Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents. Correspondents often sell their mortgage loans to lenders who are known as wholesalers. Correspondents, in their contracts for sales of mortgage loans with wholesale Mortgage Bankers, typically promise that they will stand by the genuineness of the loan applications and other necessary paperwork.

47.     Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying mortgage loans. The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions. The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

48.     Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually on the day of the closings.  The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

## Title Insurance And Its Role In Real Estate Transactions

49.     Title insurance is insurance that provides for coverage, in return for premiums, for insuring, guaranteeing or indemnifying owners of real property or lenders of mortgage loans on real property against certain losses or damages as a result of defects in the titles or encumbrances on the titles of the real properties.  Title insurance is usually purchased every time real property is purchased or refinanced.   In most instances, mortgage lenders require that owners who will be borrowing money to finance their purchases of real property acquire title insurance coverage that also protects the mortgage loan lenders who will be lending money for the financing of the properties.

50.     In almost all instances, owners or borrowers who seek to purchase title insurance do not deal directly with the companies that provide title insurance, but rather, contact title agents who act as the brokers or middlemen between the title insurance companies and the owners or borrowers.  These title agents collect premiums, issue title insurance policies on behalf of the title insurance companies, and may perform other tasks relating to the transfers of interest in the properties, including filing deeds.  Title agents may be, and often are, affiliated with more

12

than one title insurance company. Title insurance companies have relationships with multiple title agencies.

51.    As part of the title insurance policies issued to owners who are borrowing money to finance their purchases of real property, title insurance companies typically issue closing service letters for the benefit of the mortgage loan lenders. In these closing service letters, the title insurance companies agree to indemnify the mortgage loan lenders against loss in connection with, among other things, fraud or misapplication by the closing attorneys. Usually, these closing service letters are required by mortgage loan lenders as pre-conditions to providing the mortgage loans. The title insurance companies will usually only issue such closing service letters, and provide indemnification against fraud, where the closings are handled by one of the companies' approved attorneys. True and correct copies of sample closing service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

## The New Jersey Mortgage Loan Frauds

52.    Instead of the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent. The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and by deceiving Walsh Securities into financing the mortgage loans based on these inflated values. The values were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the resales even took place the same day as the first purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. On the days of the closings, the

13

Closing Attorneys would fraudulently transfer the mortgage loan proceeds provided by Walsh Securities to themselves and certain of the other RICO defendants, even though the pre-conditions imposed by Walsh Securities for the transfer of such proceeds had not been met.

## "The NHF/Cristo Property" Enterprise

53.    The RICO defendants carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the NHF/Cristo Property Enterprise" or "the Enterprise").

54.    The RICO defendants formed the NHF/Cristo Property Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. Each RICO defendant personally played a role in the management and the operation of the Enterprise.

55.    The NHF/Cristo Property Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and NHF, with the understanding by members of the NHF/Cristo Property Enterprise that Walsh Securities would rely on the fraudulent applications in deciding whether to accept the mortgage loans originated by the NHF/Cristo Property Enterprise. A true and correct copy of the Program Participant Loan Purchase And Sale Agreement between NHF and Walsh Securities, through its predecessor in interest, is attached as Exhibit D. Apart from

other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

56.     Unknown to Walsh Securities, the buyer/borrowers had secretly and fraudulently agreed to convey, after the closing on the resale of the real properties, a majority percentage of the ownership of each real property to a member of the NHF/Cristo Property Enterprise.  These secret and fraudulent conveyances constituted an act of default under the mortgage loans.

### The Pattern

57.     The NHF/Cristo Property Enterprise carried out numerous fraudulent transactions through a pattern of frauds, as follows:

(a)     Kane, acting through Cristo Property, purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties.

(b)     Kane, Grieser, and/or Cuzzi identified, through personal contacts, advertisements, and other means, individuals who were willing to buy these properties from Cristo Property and sign the mortgage loans. Typically, these properties were purchased as purported investment vehicles to be used as rental properties.  Many of the properties, however, were abandoned and could not be rented.

(c)     Kane, acting through Cristo Property and/or NHF, had the properties appraised by licensed appraisers.  In almost all instances, the property was appraised by Calanni, DiBenedetto, Brown, Brodo or Pierson.

15

(d)      Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth.  These appraisals were for amounts up to eight times the actual value of the properties.

(e)      Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted, through D'Apolito, to Walsh Securities.  These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties.  Such false information included the following:

1)  The applications included appraisals of the properties which were fraudulently inflated.

2)  The applications included purported sales prices of the properties which reflected the fraudulent appraised values as opposed to the true values or sales prices of the properties.

3)  The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

4)  The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5)  The applications typically indicated that the seller, Cristo Property, had provided the buyers second mortgage loans in the properties, when, in fact, no bona fide second mortgages were provided and no second mortgage loan payments were ever

made or intended to be made.  These purported second mortgage loans were often never recorded by the Closing Attorneys, further evidencing that they were not bona fide second mortgages.

6)  The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a sixty percent interest in the properties to Capital Assets under secret Joint Venture Agreements.

7)  The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property.  In fact, the buyers bought the properties without paying any moneys to the seller, Cristo Property.

8)  The applications typically contained other false information about the real estate transactions designed to present them as better credit risks.

(f)      D'Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans.  In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF.  The payments were designed to, and did, corrupt D'Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his obligations to Walsh Securities.  The payments from NHF

and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D'Apolito was acting as a faithful employee.

(g)     On the days of the closings, the Closing Attorneys would fraudulently transmit to themselves and certain other RICO defendants, including Cristo Property, the proceeds of the mortgage loans illicitly obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though they were aware that one or all of the following requirements and pre-conditions to the mortgage loans, among others, were not met: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. In addition, the Closing Attorneys, in furtherance of the fraud, falsely certified at the time of the closings that the above mentioned pre-conditions to closing, imposed by Walsh Securities, had been met. These false certifications were made on HUD-1 settlement statements, forms required by the United States Department of Housing and Urban Development.

(h)     The Closing Attorneys, along with Pepsny and Alfieri, also furthered the fraud by preparing and recording or causing to be recorded various deeds involved in these transactions. These deeds included the deeds covering the sales to Cristo Property, the deeds from Cristo Property to the borrowers, and the deeds conveying an interest in sixty percent of the properties from the borrowers to Capital Assets.

(i)     Typically, around the date designated to close these properties, the purchasers signed Powers of Attorney, secret Joint Venture Agreements with Capital Assets and deeds which conveyed sixty percent of the ownership in the properties to Capital Assets. A true and correct copy of a sample Joint Venture Agreement is attached as Exhibit E. A true and correct copy of a sample deed conveying sixty percent of the ownership in the properties to Capital Assets is attached as Exhibit F. (In Exhibit F Capital Assets is misspelled "Capital Assests.") These deeds conveying a sixty percent ownership interest were then filed or caused to be filed by either the Closing Attorneys or Coastal Agency. The Joint Venture Agreements and deeds were never disclosed to Walsh Securities. Such conveyances constituted a default under the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not have financed the mortgage loans had it been aware of the plans to reconvey interest in the properties.

(j)     Capital Assets then collected the rents, if any, from the rental of these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the mortgage loan payments when due and to pay other expenses of the properties. In addition, on information and belief, as in a classic pyramid fraud, funds from new mortgage loans were secretly used to make interest and principle payments on older loans. In this way, the NHF/Cristo Property Enterprise misled Walsh Securities into believing that none of the loans originated by the NHF/Cristo Property Enterprise were delinquent. In fact, as further evidence of a classic pyramid fraud relying on new transactions to continue to fund the older transactions, most of the properties that were claimed to be renovated were never renovated and thus could not be rented. Additionally, at other properties which contained individuals who could have been

19

renters, no attempts were made to collect rent from those individuals who were living in the properties.

        (k)     There were several variations on the scam:

        1) Some borrowers/buyers were induced to invest $1,000.00 in a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00. Cuzzi had these purchasers execute secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney and provide their names and social security numbers. Upon information and belief, Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

        2) Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. Upon information and belief, an individual named Brian Reilly on at least one occasion on behalf of the NHF/Cristo Property Enterprise traveled to New York to deliver closing papers which were signed by the purchasers, notarized by Reilly, and then returned to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings.

        3) Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to

Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

(l)     In sum, upon information and belief, like traditional pyramid schemes, money obtained by the NHF/Cristo Property Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the NHF/Cristo Property Enterprise.

(m)     Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

58.     The operations of the NHF/Cristo Property Enterprise are illustrated in the following examples of specific properties "flipped" by the NHF/Cristo Property Enterprise:

(a)     600 5th Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2) On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property to an

individual borrower/buyer with the initials K.P. for the purported amount of $182,500.00. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared and signed by Pepsny and filed by Coastal Agency.

3) A mortgage loan on the property, in K.P.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4) A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property. In fact, no down payment was ever made.

5) A second mortgage loan for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P. In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from K.P. for that loan and K.P. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

6) In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the NHF/Cristo Property Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-

conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) K.P. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; and (4) K.P. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Fidelity Title issued a closing statement letter to Walsh Securities, which requires Fidelity Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Fidelity Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

(b)    1017-1019 Bangs Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which property was fraudulently appraised by Brown for $200,000.00.

2) On that same day, July 25, 1996, Cristo Property sold 1017-1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared by Pepsny and filed by Coastal Agency.

3) A mortgage loan on the property, in J.M.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00.

4) A down payment in the amount of $20,000.00 was purportedly provided by J.M. to Cristo Property. In fact, no down payment was ever made.

5) J.M.'s mortgage loan application contains a "gift letter" from defendant Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made, nor was the gift that was to be part of the down payment ever given to the seller.

6) A second mortgage loan for $30,000 at a 6% interest rate was purportedly given by Cristo Property to J.M. In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from J.M. for that loan and J.M. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) J.M. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; and (4) J.M. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States

Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

           8) Prior to the closing, Commonwealth Title issued a closing statement letter to Walsh Securities, which requires Commonwealth Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Commonwealth Title to perform closings.

           9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

      59.    There are over two hundred and twenty instances of transactions similar to the two outlined above.

## COUNT I.

## VIOLATION OF 18 U.S.C. § 1962(c) (RICO)

      60.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 59 as if fully set forth herein.

      61.    18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

      62.    All the RICO defendant are persons within the meaning of 18 U.S.C. § 1961(3).

63.     In violation of the above-mentioned statute, the RICO defendants associated with the NHF/Cristo Property Enterprise, which was an association in fact consisting of the RICO defendants together and with other persons not known to plaintiff.

64.     The NHF/Cristo Property Enterprise engaged in, and conducted activities which affected, interstate commerce.

·65.     Each RICO defendant conducted and participated in the conduct of the affairs of the NHF/Cristo Property Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

66.     This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

(a)     Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the RICO defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan originated by the NHF/Cristo Property Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut. Walsh Securities then sent by facsimile the necessary closing service documents to a bank in Texas that acted as the custodian for the lender in Connecticut. Once satisfied that the necessary documentation was present, that bank in Texas then sent by facsimile its authorization to the Lender in Connecticut, who, in turn, then wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

(b)     Commercial bribery, as described in N.J.S.A. § 2C:21-10, in that D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF) and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to transfer the loans originated by the NHF/Cristo Property Enterprise and financed by Walsh Securities.

67.     The above-mentioned predicate acts of racketeering activity conducted by the RICO defendants through the NHF/Cristo Property Enterprise caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts by the RICO defendants.  The members of the NHF/Cristo Property Enterprise were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh Securities.  Many of these mortgage loans are delinquent and/or in default.  Based on the falsely inflated appraisals for the real properties and other fraudulent acts by the RICO defendants, Walsh Securities will be unable to recoup the full amounts of many of the outstanding mortgage loans.

68.     By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has suffered the following foreseeable losses and damages:

(a)     the losses of moneys loaned based on the falsely appraised real properties and other fraudulent representations.  Many of the properties are worth far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

(b)    the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

(c)    other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(c), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT II.

### VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

69.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 68 as if fully set forth herein.

70.    18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection . . .(c) of this section."

71.    Through a series of activities outlined above in Count I, the RICO defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above in paragraphs 61 through 67.

72.    Each of the RICO defendants willfully and knowingly agreed and conspired with other RICO defendants to commit the above referenced predicate acts of wire fraud and commercial bribery.

73.    By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has suffered the following foreseeable losses and damages:

(a)       the losses of moneys loaned based on the falsely appraised real properties and other fraudulent acts of the RICO defendants.  Many of the properties are worth far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

(b)       the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

(c)       other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(d), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT III.

## COMMON-LAW FRAUD

74.       Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 73 as if fully set forth herein.

75.       By the illegal and fraudulent acts and schemes described above, the RICO defendants willfully and intentionally defrauded Walsh Securities and made or caused to be made false, fraudulent and material misrepresentations and omissions to plaintiff concerning mortgage loans bought by Walsh Securities from NHF.  Each of these mortgage loans originated by the NHF/Cristo Property Enterprise were fraudulently obtained in that they were based on falsely inflated appraisals.  In addition, these mortgage loans also were made based on other

29

information falsely provided to Walsh Securities including incorrect credit histories and or statements of net worth, among other things.

76.    In making and carrying out these material misrepresentations, the RICO defendants, and each of them, intended to and did deceive plaintiff.

77.    Plaintiff believed and relied upon these material misrepresentations and omissions.

78.    As a result of the RICO defendants' material misrepresentations and omissions plaintiff suffered damages substantially in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants are liable to it, jointly and severally, for common-law fraud and award damages, punitive damages and other such relief as may be appropriate.

## COUNT IV.

## BREACH OF CONTRACT BY NHF

79.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 78 as if fully set forth herein.

80.    On April 24, 1995, NHF and Walsh Securities, (through its predecessor in interest GF Mortgage Corp.) entered into a Program Participant Loan Purchase And Sale Agreement (the "Agreement"). A true and correct copy of the Agreement is attached as Exhibit D. The Agreement between NHF and plaintiff was entered into in exchange for consideration and contained mutual covenants. The Agreement covered the sale of mortgage loans from NHF to Walsh Securities involved in the NHF/Cristo Property Enterprise.

81.    Plaintiff has duly performed all the conditions of the Agreement.

30

82.     NHF, as the seller of mortgage loans, agreed to certain "Representations, Warranties and Covenants of Seller" in Article 6 of the Agreement, including the representation that all information in the loan applications prepared by NHF was true and correct. NHF has breached its representations because the loan applications contained falsely inflated appraisals and other false information.

83.     Plaintiff has notified NHF of its breach of the Agreement and its obligation to repurchase said mortgage loans. NHF has refused to repurchase said mortgage loans, in violation of Article 6 of the Agreement.

84.     By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the NHF is liable to it for breach of contract and award damages, attorneys fees and other such relief as may be appropriate.

## COUNT V.

## BREACH OF CONTRACT BY THE TITLE INSURANCE DEFENDANTS

85.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 84 as if fully set forth herein.

86.     In conjunction with real property transactions involving the NHF/Cristo Property Enterprise, borrowers of mortgage loans from plaintiff obtained title insurance from the Title Insurance Defendants. The Title Insurance Defendants, in exchange for valuable consideration, provided Walsh Securities with closing service letters covering the conduct of the Closing Attorneys, who were specifically approved by the Title Insurance Defendants. Walsh

31

Securities, required such closing service letters as a pre-condition to its agreeing to provide the mortgage loans.

87.     Pursuant to these closing service letters, the Title Insurance Defendants are required to reimburse plaintiff for losses arising out of, among other things, fraud or misapplication by the Closing Attorneys. True and correct copies of sample closing service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

88.     The Closing Attorneys engaged in fraud and misapplication in connection with the NHF/Cristo Property Enterprise. Among other things, the Closing Attorneys fraudulently transferred mortgage loan proceeds knowing that the following pre-conditions to closings imposed by Walsh Securities, among others, had not been satisfied: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. Walsh Securities has incurred substantial loss as a result of the fraud and/or misapplication by the Closing Attorneys.

89.     Plaintiff has duly performed all of its obligations under the closing service letters of the Title Insurance Defendants and has notified the Title Insurance Defendants of its losses as a result of the fraud and/or misapplication by the Closing Attorneys.

90.     The Title Insurance Defendants have failed to reimburse plaintiff for the losses it has incurred based on the fraud and/or misapplication of the approved attorneys as covered by the closing service letters.

91.    By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the Title Insurance Defendants are liable to it for breach of contract and award damages, attorneys fees and other such relief as may be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against:

1.    All RICO defendants jointly and severally awarding plaintiff the following relief:

    (a)    Compensatory and consequential damages in an amount as yet undetermined, trebled pursuant to 18 U.S.C. § 1964(c); and

    (b)    Costs of this action, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

    (c)    An award of punitive damages as a result of defendants' fraud; and

    (d)    Other such relief as is just and equitable;

2.    NHF awarding plaintiff the following relief:

    (e)    Compensatory and consequential damages in an amount as yet undetermined, and

    (f)    Costs of this action, including reasonable attorneys' fees, and

    (g)    Other such relief as is just and equitable.

3.    All the Title Insurance Defendants awarding plaintiff the following relief:

(h)     Compensatory and consequential damages in an amount as yet

undetermined, and

(i)     Costs of this action, including reasonable attorneys' fees, and

(j)     Other such relief as is just and equitable.

34

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff hereby demands a jury for all issues for which it has a right to a trial by jury.

Dated: November 7, 1997

> LATHAM & WATKINS
> Michael Chertoff (MC 6790)
> Geoffrey S. Berman (GB 0851)
> Robert A. Magnanini (RM 7356)
> One Newark Center
> Newark, NJ 07101-3174
> Telephone (201) 639-1234
> Telecopy (201) 639-7298
> ATTORNEYS FOR PLAINTIFF WALSH
> SECURITIES INC.

By:_____
> Michael Chertoff