McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Defendant/Third-Party
  Plaintiff Commonwealth Land Title Insurance Company
DK-4593 (David R. Kott, Esq.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------------------x

WALSH SECURITIES, INC.,                                    :

v.                          Plaintiff,                     :          Civil Action No. 97-3496
                                                                      Honorable William G. Bassler

CRISTO PROPERTY MANAGEMENT, LTD.,                          :
a/k/a G.J.L. LIMITED, DEK HOMES OF
NEW JERSEY, INC., OAKWOOD                                  :
PROPERTIES INC., NATIONAL HOME
FUNDING, INC., CAPITAL ASSETS                              :
PROPERTY MANAGEMENT & INVESTMENT
CO., INC., CAPITAL ASSETS                                  :
PROPERTY MANAGEMENT, L.L.C.,
WILLIAM J. KANE, GARY GRIESER,                             :
ROBERT SKOWRENSKI, II, RICHARD
CALANNI, RICHARD DIBENEDETTO, JAMES                        :          **THIRD-PARTY COMPLAINT**
R. BROWN, THOMAS BRODO, RONALD J.
PIERSON, STANLEY YACKER, ESQ.,                             :
 MICHAEL ALFIERI, ESQ., RICHARD
PEPSNY, ESQ., ANTHONY M. CICALESE,                         :
ESQ., LAWRENCE M. CUZZI, ANTHONY
D'APOLITO, DAP CONSULTING, INC.,                           :
COMMONWEALTH LAND TITLE INSURANCE
COMPANY, NATIONS TITLE INSURANCE                           :
OF NEW YORK INC., FIDELITY NATIONAL
TITLE INSURANCE COMPANY OF NEW                             :
YORK, COASTAL TITLE AGENCY, and
STEWART TITLE GUARANTY COMPANY,                            :
IRENE DiFEO, DONNA PEPSNY,
WEICHERT REALTORS, AND VECCHIO                             :
REALTY, INC. D/B/A MURPHY REALTY
BETTER HOMES and GARDENS,                                  :

                            Defendants.                    :
and
                                                           :

COMMONWEALTH LAND TITLE INSURANCE
COMPANY,                                                   :

                  Defendant/Third Party Plaintiff,         :
v.
                                                           :

ROBERT WALSH and ELIZABETH ANN DeMOLA,
                                                           :

                  Third Party Defendants.
                                                           :

------------------------------------------------------------------x

Defendant/third-party plaintiff Commonwealth Land Title Insurance Company ("Commonwealth"), by way of Third-Party Complaint against third-party defendants Robert Walsh and Elizabeth Ann DeMola, says:

1.      Plaintiff has commenced an action against defendant/third-party plaintiff Commonwealth Land Title Insurance Company for the causes set forth in the Third Amended Complaint, a copy of which is attached hereto as Exhibit A.

2.      At all material times herein, third-party defendant, Robert Walsh, was the President of Walsh Securities, Inc. and third-party defendant, Elizabeth Ann DeMola, was a Senior Mortgage Underwriting Officer.

3.      The third-party defendants were knowing and active participants in seeking to obtain high risk mortgagors for purposes of profiting by securitization and sale of Walsh Securities, Inc. assets.

4.      The third-party defendants failed to follow the procedures for due diligence which were established and in place at Walsh Securities, Inc. They had a duty of good faith and fair dealing.

5.      As a direct result of such breach, while defendant/third-party plaintiff Commonwealth Land Title Insurance Company denies any liability to plaintiff or to any other defendant, if defendant/third-party plaintiff Commonwealth Land Title Insurance Company is found liable, it is entitled to contribution from third-party defendants Robert Walsh and Elizabeth Ann DeMola pursuant to the New Jersey Tortfeasors Contribution Act.

WHEREFORE, defendant/third-party plaintiff Commonwealth Land Title Insurance

Company demands judgment against third-party defendants Robert Walsh and Elizabeth Ann

DeMola, jointly and severally.

> McCARTER & ENGLISH, LLP
> Attorneys for Defendant/Third-Party
>  Plaintiff Commonwealth Land Title
>  Insurance Company

By:

> David R. Kott
> A Member of the Firm

Dated:  4/5/05

## AFFIDAVIT OF SERVICE

STATE OF NEW JERSEY  )
                     )ss.:
COUNTY OF ESSEX      )

NANETTE R. McCALL, of full age, being duly sworn according to law, upon her oath

deposes and says:

1.     I am employed by the firm of McCarter & English, LLP, attorneys for defendant

Commonwealth Land Title Insurance Company in the within matter.

2.     On April 5, 2005, I caused to be delivered by mail the Third-Party Complaint

upon the persons named in the attached Service List.

*Nanette R. M^c Call*
NANETTE R. McCALL

Sworn and subscribed to
before me this 5th day
of April     , 2005.

*Diana L. Christmas*
**DIANA L. CHRISTMAS**
A Notary Public Of New Jersey
My Commission Expires Jan. 16, 2007

NWK: 1303215.01

Revised 4/02/05

## SERVICE LIST

## WALSH SECURITIES, INC. V. CRISTO PROPERTY MANAGEMENT, ET AL CIVIL ACTION NO. 97-3496(WGB)

Robert A. Magnanini, Esq.
Boies, Schiller & Flexner LLP
150 John F. Kennedy
Short Hills, NJ 07078
**Attorney for plaintiff Walsh Securities, Inc. and for third-party defendant Robert Walsh**

Ronald M. Kleinberg, Esq.
Richard A. Finkel, Esq.
Meissner, Kleinberg & Finkel, LLP
275 Madison Ave., Suite 1000
New York, New York 10016
**Attorney for defendants Cristo Property Management, LTD, DEK Homes of NJ, Inc.,
Oakwood Properties, Inc., and William J. Kane**

Joseph Sorrentino, Esq.
404 Manor Road
Staten Island, New York 10314
**Attorney for defendants Cristo Property Management, LTD, DEK Homes of NJ, Inc.,
Oakwood Properties, Inc., and William J. Kane**

Michael Schottland, Esq.
Schottland, Manning, Rosen, Callendo & Munson, PA
36 W. Main Street
Freehold, NJ 07728
**Attorney for Defendants National Home Funding, Inc. and Robert Skowrenski, II**

Martin R. McGowan, Jr., Esq.
Methfessel & Werbel
3 Ethel Road
Suite 300
Edison, New Jersey 08818
**Attorneys for Defendant Coastal Title Agency**

Edward C. Bertucio, Jr., Esq.
Hobbie, Corrigan, Bertucio & Tashjy, P.C.
125 Wyckoff Road
Eatontown, NJ 07724
**Attorney for Defendant Michael Alfieri, Esq.**

Robert J. Reilly, III, Esq.
Reilly, Supple & Wischusen, LLC
571 Central Avenue
New Providence, NJ  07974
**Attorney for defendant Michael Alfieri, Esq. on the Sixth Count**

Theodore W. Daunno, Esq.
1033 Clifton Avenue
Clifton, New Jersey  07013
**Attorney for Defendant Lawrence M. Cuzzi**

Mark W. Catanzaro, Esq.
Blason IV
Suite 208
513 Lenola Road
Moorestown, New Jersey  08057
**Attorney for defendants Richard Pepsny and Donna Pepsny**

Thomas D. Flinn, Esq.
Garrity, Graham, Favette & Flinn
1 Lackawanna Plaza, Box 4205
Montclair, NJ 07042
**Attorney for Defendant Anthony M. Ciccalese**

Anthony Argiropoulous, Esq.
Fox, Rothschild, O'Brien & Frankel
997 Lenox Drive, Bldg. 3
Lawrenceville, New Jersey  08648
**Attorney for Defendants Fidelity National Title Insurance and Nations Title Insurance**

Edward J. Hayes, Jr., Esq.
Fox, Rothschild, O'Brien & Frankel
2000 Market Street
10th Floor
Philadelphia, Pennsylvania  19103-3291
**Attorney for Defendants Fidelity National Title Insurance and Nations Title Insurance**

Pasquale Menna, Esq.
Kauff and Menna
170 Broad Street
P.O. 762
Red Bank, New Jersey  07701
**Attorneys for defendant Roland J. Pierson**

Frederick Alworth, Esq.
Gibbons Del Deo Dolan Griffinger & Vecchione, PC
1 Riverfront Plaza
Newark, NJ  07102
**Attorney for defendant Stewart Title Guaranty Company**

John B. McCusker, Esq.
McCusker Anselmi Rosen Carvelli & Walsh, PC
127 Main Street
Chatham, NJ  07928
**Attorney for defendant Weichert Realtors**

Thomas Brodo, Pro Se
139B Fort Lee Road
Teaneck, New Jersey 07666

James R. Brown, Pro Se
1089 Cedar Avenue
Union, New Jersey 07083

Richard Calanni, Pro Se
One Old Farm Road
Tinton Falls, New Jersey 07724

Anthony D'Apolito, Pro Se
909 Woodland
Wall Township, NJ 07719

Richard DiBenedetto, Pro Se
153 Stephens Lane
Mahwah, New Jersey 07430

Irene DiFeo, Pro Se
5 Leann Court
Old Bridge, NJ 08857

Stanley Yacker, Esq., Pro Se
33 Broadway, #1
Ocean Grove, NJ 07756-1397

Capital Assets Property Management, LLC
10 West Bergen Place
Red Bank, NJ 07701

Andrew I. Indeck, Esq.
Scarinci & Hollenbeck, LLC
1100 Valleybrook Avenue
P.O. Box 790
Lyndhurst, NJ 07071
**Attorney for Garden State Indemnity Co. (Legal Malpractice carrier
for defendant Michael Alfieri)**

NWK2: 1304466.01

# *EXHIBIT A*

Robert A. Magnanini, Esq. (RM 7356)
BOIES, SCHILLER & FLEXNER LLP
150 JOHN F. KENNEDY PARKWAY
SHORT HILLS, NEW JERSEY 07078
973-218-1111
Attorneys for Plaintiff Walsh Securities, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,

        Plaintiff,

vs.

Action No. CV 97-3496 (WGB)

Hon. William G. Bassler

**THIRD AMENDED COMPLAINT**

CRISTO ROPERTY MANAGEMENT, LTD.,
a/k/a G.J.L. LIMITED, DEK HOMES OF NEW
JERSEY, INC., OAKWOOD PROPERTIES, INC.,
NATIONAL HOME FUNDING, INC., CAPITAL
ASSETS PROPERTY MANAGEMENT &
INVESTMENT CO., INC., CAPITAL ASSSETS
PROPERTY MANAGEMENT, L.L.C., WILLIAM
KANE, GARY GRIESER, ROBERT SKOWRENSKI, II,
RICHARD CALANNI, RICHARD DiBENEDETTO,
JAMES R. BROWN, THOMAS BRODO, ROLAND
PIERSON, STANLEY YACKER, ESQ., MICHAEL
ALFIERI, ESQ., RICHARD PEPSNY, ESQ.,
ANTHONY M. CICALESE, ESQ., LAWRENCE
CUZZI, ANTHONY D'APOLITO, DAP CONSULTING,
INC., COMMONWEALTH LAND TITLE INSURANCE
CO., NATIONS TITLE INSURANCE OF NEW YORK,
INC., FIDELITY NATIONAL TITLE INSURANCE CO.
OF NEW YORK, COASTAL TITLE AGENCY,
STEWART TITLE GUARANTY COMPANY,
IRENE DIFEO, DONNA PEPSNY, WEICHERT
REALTORS, AND VECCHIO REALTY, INC. D/B/A
MURPHY REALTY BETTER HOMES and GARDENS

        Defendants.

1.    Plaintiff brings this action for violations of the Racketeer Influenced and

Corrupt Organizations Act, common-law fraud, negligence and breaches of contract.

## PARTIES

2.      Plaintiff Walsh Securities, Inc. ("Walsh Securities") is, and was at all relevant times, a Delaware corporation with its principal place of business located in Parsippany-Troy Hills, New Jersey. In April 1996, Walsh Securities became a successor in interest to GF Mortgage Corp. Walsh Securities is a wholesale mortgage banker in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions.  Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage market known as the "subprime" market. "Subprime" mortgage loans are made to borrowers who, because of past financial dealings or because of their credit history, are unable to obtain mortgage loans from "prime" mortgage lenders at prime lending rates. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans.

3.      Defendant Cristo Property Management, Ltd., a/k/a G.J.L. Limited, upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Union County, New Jersey. Cristo Property is, and was at all relevant times, owned and controlled by defendant Kane.

4.      Defendant DEK Homes of New Jersey, Inc. ("DEK Homes") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, DEK Homes is, and was at all relevant times, owned and controlled by defendant Kane.

2

5.    Defendant Oakwood Properties, Inc. ("Oakwood Properties") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, Oakwood Properties is, and was at all relevant times, owned and controlled by defendant Kane.

6.    Defendants Cristo Property Management, Ltd. (a/k/a G.J.L. Limited), DEK Homes, and Oakwood Properties are all owned and controlled by defendant Kane and referred to herein collectively as "Cristo Property".

7.    Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

8.    Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey. Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

9.    Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Kane owns and controls Cristo Property, DEK Homes and Oakwood Properties. In addition, Kane is, and was at all relevant times, a licensed mortgage solicitor for, and an employee of, NHF.

10.    Defendant Gary Grieser ("Grieser"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Grieser is the owner of Capital Assets.

3

11.     Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Skowrenski is the owner of NHF.

12.     Defendant Richard Calanni ("Calanni"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Calanni is, and was at all relevant times, associated with TF Certified Real Estate Appraisals.

13.     Defendant Richard DiBenedetto ("DiBenedetto"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. DiBenedetto is, and was at all relevant times, associated with Eastern States Appraisal Services.

14.     Defendant James R. Brown ("Brown"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Brown is, and was at all relevant times, associated with Professional Evaluators of Union.

15.     Defendant Thomas Brodo ("Brodo"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

16.     Defendant Roland J. Pierson ("Pierson"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

17.     Defendants Calanni, DiBenedetto, Brown, Brodo and Pierson (collectively, "the Appraisers"), are, and were at all relevant times, real property

4

appraisers hired by NHF and Cristo Property.

18.     Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

19.     Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

20.     Defendant Richard Pepsny, Esq., ("Richard Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

21.     Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

22.     Defendants Yacker and Cicalese jointly, ("the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction. The Closing Attorneys, together with defendants Alfieri and Richard Pepsny, were selected by NHF, Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

23.     Defendant Lawrence J. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

24.     Defendant Anthony D'Apolito ("D'Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident. D'Apolito was at all

5

relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF.

25.    Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey. DAP Consulting is owned and controlled by defendant D' Apolito.

26.    Defendant Irene DiFeo ("DiFeo"), upon information and belief, is, and was at all relevant times, a resident of New Jersey and a licensed real estate broker in New Jersey in an employment or agency relationship with Vecchio Realty, Inc. d/b/a Murphy Realty Better Homes and Gardens.

27.    Defendant Donna Pepsny ("Donna Pepsny"), upon information and belief, is, and was at all relevant times, a resident of New Jersey and a licensed real estate broker in New Jersey in an employment or agency relationship with Weichert Realtors.

28.    Defendant Weichert Realtors ("Weichert"), upon information and belief, is, and was at all relevant times, a New Jersey real estate services firm with its principal place of business in New Jersey in an employment or agency relationship with Donna Pepsny.

29.    Defendant Vecchio Realty, Inc. d/b/a Murphy Realty Better Homes and Gardens ("Murphy Realty"), upon information and belief, is, and was at all relevant times, a New Jersey real estate services firm with its principal place of business in New Jersey in an employment or agency relationship with DiFeo.

30.    Defendant Commonwealth Land Title Insurance Company, Inc. ("Commonwealth Title"), upon information and belief, is, and was at all relevant times, a

6

Pennsylvania corporation with its principal place of business in Pennsylvania.

31.     Defendant Nations Title Insurance of New York Inc. ("Nations Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

32.     Defendant Fidelity National Title Insurance Company of New York, Inc. ("Fidelity Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

33.     Defendant Coastal Title Agency, Inc. ("Coastal Agency"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Coastal Agency is, and was at all relevant times, a title insurance broker that was selected by NHF, Capital Assets, Cristo, and/or the Closing Attorneys to broker title insurance for the real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

34.     Defendant Stewart Title Guaranty Company ("Stewart"), upon information and belief, is, and was at all relevant times, a Deleware corporation with its principal place of business in Texas and, upon information and belief, is licensed to do business in the State of New Jersey.

35.     Defendants Commonwealth Title, Nations Title, Fidelity Title and Stewart (collectively, "the Title Insurance Defendants") are, and were at all relevant times, title insurance companies that issued closing settlement letters to Walsh Securities, as the mortgage lender, which letters, among other things, indemnified Walsh Securities against fraud by the Closing Attorneys.

7

## JURISDICTION

36.     Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. §
1964(c).

## VENUE

37.     Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. §
1965(a).

## INTRODUCTION

38.     Since early 1996, defendants Cristo Property, NHF, Capital Assets, Kane,
Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri,
Richard Pepsny, Cicalese, Cuzzi, D'Apolito, DAP Consulting, DiFeo, Donna Pepsny and
Coastal Agency (collectively, "the RICO defendants") have been engaged in a pattern of
racketeering activity which has resulted in approximately two hundred twenty mortgage
loans being purchased by Walsh Securities from NHF for amounts ranging up to eight
times the preceding sales prices of the properties at issue. Walsh Securities was induced
to purchase these mortgage loans from NHF based on fraudulent misrepresentations
contained in the mortgage loan applications, including appraisals of the properties at
issue. The proceeds from Walsh Securities' mortgage loans would, among other things,
be distributed among the RICO defendants as their illicit profits.

39.     The RICO defendants engaged in a pattern of racketeering throughout the
State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson
Counties, where certain of the properties are located, and in Morris County, where Walsh
Securities is located.

40.     Walsh Securities remains liable for a substantial portion of the value of

8

these mortgage loans fraudulently obtained by the RICO defendants. Walsh Securities will not be able to recover the full amounts that have been lent through foreclosures on the properties because, due to the fraudulently inflated appraisals of the real properties that secure the mortgage loans, many of the properties are not of value equal to or greater than the amount of the mortgage loans and the fraudulent sales contracts. In addition, this fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits.

41.     With respect to these fraudulently obtained mortgage loans, the Title Insurance Defendants issued to Walsh Securities, as the mortgage lender, closing service letters which require the Title Insurance Defendants to reimburse Walsh Securities for losses arising out of the fraudulent actions of the Closing Attorneys. Both of the Closing Attorneys, Yacker and Cicalese, were specifically approved to handle closings by the Title Insurance Defendants.

42.     Defendant DiFeo was an agent of Murphy Realty and the acts alleged to be committed by DiFeo in this Complaint were committed in the scope of her employment or agency relationship with Murphy Realty and were of a kind for which DiFeo was engaged to perform by Murphy Realty.

43.     Defendant Donna Pepsny was an agent of Weichert and the acts alleged to be committed by Donna Pepsny in this Complaint were committed in the scope of her employment or agency relationship with Weichert and were of a kind for which Donna Pepsny was engaged to perform by Weichert.

9

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

44.     A mortgage loan is a loan in which real property is used as collateral for the loan. The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

45.     Mortgage bankers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

46.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers which provide the funds for the borrowers at the time of closings. In these instances, Mortgage Bankers are paid fees, generally by the borrowers, for originating the mortgage loans so that they can then be sold to other investors. Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. 17: 11B-5, et seq.

47.     Potential mortgage loan borrowers who, because of, for example, their credit histories, can not obtain traditional financing from "prime" Mortgage Bankers, seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the increased delinquency risk of such mortgage loans.

48.     After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

10

49.     The Mortgage Bankers who deal directly with the borrowers are said to "originate" the mortgage loans. The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded.  Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, references, appraisals of the underlying properties, and other documents.

50.     Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. 45: 14F-1, et seq. The appraisers are typically paid by the borrowers of the mortgage loans.

51.     The appraisal of the real property that is to be mortgaged is one of the most important steps in the mortgage loan process. The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower. In addition, since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults on the mortgage loans. In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

52.     Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to the closing of the properties and the mortgage loans.

53.     Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents. Correspondents

11

often sell their mortgage loans to lenders who are known as wholesalers. Correspondents, in their contracts for sales of mortgage loans with wholesale Mortgage Bankers, typically promise that they will stand by the genuineness of the loan applications and other necessary paperwork.

54.     Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying mortgage loans. The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions. The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

55.     Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually on the day of the closings. The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

### Title Insurance And Its Role In Real Estate Transactions

56.     Title insurance is insurance that provides for coverage, in return for premiums, for insuring, guaranteeing or indemnifying owners of real property or lenders of mortgage loans on real property against certain losses or damages as a result of defects

in the titles or encumbrances on the titles of the real properties. Title insurance is usually purchased every time real property is purchased or refinanced. In most instances, mortgage lenders require that owners who will be borrowing money to finance their purchases of real property acquire title insurance coverage that also protects the mortgage loan lenders who will be lending money for the financing of the properties.

57.     In almost all instances, owners or borrowers who seek to purchase title insurance do not deal directly with the companies that provide title insurance, but rather, contact title agents who act as the brokers or middlemen between the title insurance companies and the owners or borrowers. These title agents collect premiums, issue title insurance policies on behalf of the title insurance companies, and may perform other tasks relating to the transfers of interest in the properties, including filing deeds. Title agents may be, and often are, affiliated with more than one title insurance company. Title insurance companies have relationships with multiple title agencies.

58.     As part of the title insurance policies issued to owners who are borrowing money to finance their purchases of real property, title insurance companies typically issue closing service letters for the benefit of the mortgage loan lenders. In these closing service letters, the title insurance companies agree to indemnify the mortgage loan lenders against loss in connection with, among other things, fraud or misapplication by the closing attorneys. Usually, these closing service letters are required by mortgage loan lenders as pre-conditions to providing the mortgage loans. The title insurance companies will usually only issue such closing service letters, and provide indemnification against fraud, where the closings are handled by one of the companies' approved attorneys. True and correct copies of sample closing service letters from each Title Insurance Defendant

13

are attached as Exhibits A, B and C.

### The New Jersey Mortgage Loan Frauds

59.     Instead of the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent. The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and by deceiving Walsh Securities into financing the mortgage loans based on these inflated values. The values were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the re-sales even took place the same day as the first purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. On the days of the closings, the Closing Attorneys would fraudulently transfer the mortgage loan proceeds provided by Walsh Securities to themselves and certain of the other RICO defendants, even though the preconditions imposed by Walsh Securities for the transfer of such proceeds had not been met.

### "The NHF/Cristo Property" Enterprise

60.     The RICO defendants carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the NHF/Cristo Property Enterprise" or "the Enterprise").

61.     The RICO defendants formed the NHF/Cristo Property Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds

14

financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. Each RICO defendant personally played a role in the management and the operation of the Enterprise.

62.     The NHF/Cristo Property Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and NHF, with the understanding by members of the NHF/Cristo Property Enterprise that Walsh Securities would rely on the fraudulent applications in deciding whether to accept the mortgage loans originated by the NHF/ Cristo Property Enterprise. A true and correct copy of the Program Participant Loan Purchase And Sale Agreement between NHF and Walsh Securities, through its predecessor in interest, is attached as Exhibit D. Apart from other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

63.     Unknown to Walsh Securities, the buyer/borrowers had secretly and fraudulently agreed to convey, after the closing on the resale of the real properties, a majority percentage of the ownership of each real property to a member of the NHF/Cristo Property Enterprise. These secret and fraudulent conveyances constituted an act of default under the mortgage loans.

**The Pattern**

64.     The NHF/Cristo Property Enterprise carried out numerous fraudulent transactions through a pattern of frauds, as follows:

15

(a)     Kane, acting through Cristo Property, purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties.

(b)     Kane, Grieser, DiFeo, Donna Pepsny and/or Cuzzi identified, through personal contacts, advertisements, and other means, individuals who were willing to buy these properties from Cristo Property and sign the mortgage loans. Typically, these properties were purchased as purported investment vehicles to be used as rental properties. Many of the properties, however, were abandoned and could not be rented.

(c)     Kane, acting through Cristo Property and/or NHF, had the properties appraised by licensed appraisers. In almost all instances, the property was appraised by Calanni, DiBenedetto, Brown, Brodo or Pierson.

(d)     Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

(e)     Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted, through D' Apolito, to Walsh Securities. These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties. Such false information included the following:

1) The applications included appraisals of the properties which were fraudulently inflated.

2) The applications included purported sales prices of the

16

properties which reflected the fraudulent appraised values as opposed to the true values or sales prices of the properties.

3) The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

4) The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5) The applications typically indicated that the seller, Cristo Property, had provided the buyers second mortgage loans in the properties, when, in fact, no bona fide second mortgages were provided and no second mortgage loan payments were ever made or intended to be made. These purported second mortgage loans were often never recorded by the Closing Attorneys, further evidencing that they were not bona fide second mortgages.

6) The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a sixty percent interest in the properties to Capital Assets under secret Joint Venture Agreements.

7) The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property. In fact, the buyers bought the properties without paying any moneys to the seller, Cristo Property.

8) The applications typically contained other false information

17

about the real estate transactions designed to present them as better credit risks.

(f)    D' Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans. In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF. The payments were designed to, and did, corrupt D' Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his obligations to Walsh Securities. The payments from NHF and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D' Apolito was acting as a faithful employee.

(g)    On the days of the closings, the Closing Attorneys would fraudulently transmit to themselves and certain other RICO defendants, including Cristo Property, the proceeds of the mortgage loans illicitly obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though they were aware that one or all of the following requirements and pre-conditions to the mortgage loans, among others, were not met: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the down payment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. In addition, the Closing Attorneys, in furtherance of the fraud, falsely certified at the time of the

closings that the above mentioned pre-conditions to closing, imposed by Walsh Securities, had been met. These false certifications were made on HUD-1 settlement statements, forms required by the United States Department of Housing and Urban Development.

(h)     The Closing Attorneys, along with Richard Pepsny and Alfieri, also furthered the fraud by preparing and recording or causing to be recorded various deeds involved in these transactions. These deeds included the deeds covering the sales to Cristo Property, the deeds from Cristo Property to the borrowers, and the deeds conveying an interest in sixty percent of the properties from the borrowers to Capital Assets.

(i)     Typically, around the date designated to close these properties, the purchasers signed Powers of Attorney, secret Joint Venture Agreements with Capital Assets and deeds which conveyed sixty percent of the ownership in the properties to Capital Assets. A true and correct copy of a sample Joint Venture Agreement is attached as Exhibit E. A true and correct copy of a sample deed conveying sixty percent of the ownership in the properties to Capital Assets is attached as Exhibit F. (In Exhibit F Capital Assets is misspelled "Capital Assests. ") These deeds conveying a sixty percent ownership interest were then filed or caused to be filed by either the Closing Attorneys or Coastal Agency. The Joint Venture Agreements and deeds were never disclosed to Walsh Securities. Such conveyances constituted a default under the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not have financed the mortgage loans had it been aware of the plans to reconvey interest in the properties.

(j)     Capital Assets then collected the rents, if any, from the rental of

19

these properties and pooled them, using funds from the pooled rents to pay Walsh
Securities the mortgage loan payments when due and to pay other expenses of the
properties. In addition, on information and belief, as in a classic pyramid fraud, funds
from new mortgage loans were secretly used to make interest and principle payments on
older loans. In this way, the NHF/Cristo Property Enterprise misled Walsh Securities into
believing that none of the loans originated by the NHF /Cristo Property Enterprise were
delinquent. In fact, as further evidence of a classic pyramid fraud relying on new
transactions to continue to fund the older transactions, most of the properties that were
claimed to be renovated were never renovated and thus could not be rented. Additionally,
at other properties which contained individuals who could have been renters, no attempts
were made to collect rent from those individuals who were living in the properties.

     (k)    There were several variations on the scam:

    1) Some borrowers/buyers were induced to invest $1,000.00 in
a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return
of $6,000.00.  Cuzzi had these purchasers execute secret Joint Venture Agreements,
deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney
and provide their names and social security numbers. Upon information and belief, Cuzzi
was an employee of Capital Assets and was paid a fee for each mortgage loan.

    2) Another variation included simply obtaining the purchasers'
names and social security numbers. Instead of attending closings, the purchasers signed
papers which were then returned to the Closing Attorneys. The purchasers also executed
the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to
Capital Assets and Powers of Attorney in exchange for payments of $1,000.00 to

20

$3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. Upon information and belief, an individual named Brian Reilly on at least one occasion on behalf of the NHF /Cristo Property Enterprise traveled to New York to deliver closing papers which were signed by the purchasers, notarized by Reilly, and then returned to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings.

3) Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

(l)      In sum, upon information and belief, like traditional pyramid schemes, money obtained by the NHF/Cristo Property Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the NHF/Cristo Property Enterprise.

(m)      Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

21

65.     The operations of the NHF/Cristo Property Enterprise are illustrated in the following examples of specific properties "flipped" by the NHF/Cristo Property Enterprise:

(a)     600 5th Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2) On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property to an individual borrower/buyer with the initials K.P. for the purported amount of $182,500.00. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared and signed by Richard Pepsny and filed by Coastal Agency.

3) A mortgage loan on the property, in K.P.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4) A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property. In fact, no down payment was ever made.

5) A second mortgage loan for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P. In fact, the second mortgage was not a bona

22

file second mortgage loan because Cristo Property never intended to receive payment from K.P. for that loan and K.P. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

       6) In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the NHF/Cristo Property Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

       7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) KP. had not paid a down payment or deposit; (3) there was no bona fide second mortgage; and (4) KP. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

       8) Prior to the closing, Fidelity Title issued a closing statement letter to Walsh Securities, which requires Fidelity Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Fidelity Title to perform closings.

       9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

       (b)     1017-1019 Bangs Avenue, Asbury Park, New Jersey.

23

1) Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which Property was fraudulently appraised by Brown for $200,000.00.

2) On that same day, July 25, 1996, Cristo Property sold 1017 1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M. In fact, the sales contract was not a bona fide contract because J.M. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared by Richard Pepsny and filed by Coastal Agency.

3) A mortgage loan on the property, in J.M.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00.

4) A down payment in the amount of $20,000.00 was purportedly provided by J.M. to Cristo Property. In fact, no down payment was ever made.

5) J.M.'s mortgage loan application contains a "gift letter" from defendant Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made, nor was the gift that was to be part of the down payment ever given to the seller.

6) A second mortgage loan for $30,000 at a 6% interest rate was purportedly given by Cristo Property to J.M. In fact, the second mortgage was not a bona

24

fide second mortgage loan because Cristo Property never intended to receive payment

from J.M. for that loan and J.M. never intended to make payment for that loan. Moreover,

the second mortgage loan was never recorded.

7) Yacker was the closing attorney on this mortgage loan, and

transmitted the loan proceeds to himself and to other members of the Enterprise,

including Cristo Property. Yacker transmitted such funds even though he knew that the

following pre-conditions, among others, to the closing imposed by Walsh Securities were

not met: (1) there was no bona fide sales contract or bona fide sales price; (2) J.M. had

not paid a down payment or deposit; (3) there was no bona fide second mortgage; and (4)

J.M. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement

required by the United States Department of Housing and Urban Development that all

closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Commonwealth Title issued a closing

statement letter to Walsh Securities, which requires Commonwealth Title to reimburse

Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney

approved by Commonwealth Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a

deed transferring a sixty percent interest in the property to Capital Assets.

66.    There are over two hundred and twenty instances of transactions similar to

the two outlined above.

## COUNT I

## VIOLATION OF 18 U.S.C. & 1962(c) (RICO)

67.    Plaintiff repeats and realleges each and every allegation of paragraphs

1 through 66 as if fully set forth herein.

68.     18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

69.     All the RICO defendant are persons within the meaning of 18 U.S.C. § 1961(3).

70.     In violation of the above-mentioned statute, the RICO defendants associated with the NHF/Cristo Property Enterprise, which was an association in fact consisting of the RICO defendants together and with other persons not known to plaintiff.

71.     The NHF/Cristo Property Enterprise engaged in, and conducted activities which affected, interstate commerce.

72.     Each RICO defendant conducted and participated in the conduct of the affairs of the NHF/Cristo Property Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

73.     This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

        (a)     Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the RICO defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan

originated by the NHF/Cristo Property Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut. Walsh Securities then sent by facsimile the necessary closing service documents to a bank in Texas that acted as the custodian for the lender in Connecticut. Once satisfied that the necessary documentation was present, that bank in Texas then sent by facsimile its authorization to the Lender in Connecticut, who, in turn, then wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

(b) Commercial bribery, as described in N.J.SA § 2C:21-10, in that D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF) and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to transfer the loans originated by the NHF/Cristo Property Enterprise and financed by Walsh Securities.

74.     The above-mentioned predicate acts of racketeering activity conducted by the RICO defendants through the NHF/Cristo Property Enterprise caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts by the RICO defendants. The members of the NHF/Cristo Property Enterprise were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh Securities. Many of these mortgage loans are delinquent and/or in default. Based on the falsely inflated appraisals for the real properties and other fraudulent acts by the RICO defendants, Walsh Securities will be unable to recoup the full amounts of many of the outstanding mortgage loans.

75.     By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has

27

suffered the following foreseeable losses and damages:

   (a)  the losses of moneys loaned based on the falsely appraised real properties and other fraudulent representations. Many of the properties are worth far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

   (b)  the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

   (c)  other consequential, incidental and special damages.

  WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants and defendants Weichert and Murphy Realty are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(c), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

**COUNT II**

**VIOLATION OF 18 U.S.C. & 1962(d) (RICO)**

  76.  Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 75 as if fully set forth herein.

  77.  18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection. . . (c) of this section."

  78.  Through a series of activities outlined above in Count I, the RICO defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above.

  79.  Each of the RICO defendants willfully and knowingly agreed and conspired with other RICO defendants to commit the above referenced predicate acts of

28

wire fraud and commercial bribery.

80.    By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has suffered the following foreseeable losses and damages:

(a)    the losses of moneys loaned based on the falsely appraised real properties and other fraudulent acts of the RICO defendants. Many of the properties are worth far less than the mortgage loans originated by the NHF /Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

(b)    the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

(c)    other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determinet hat the RICO defendants and defendants Weichert and Murphy Realty are liable to it, jointly and severally, for violations of 18 U.S.C. §1962(d), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT III

## COMMON-LAW FRAUD

81.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 80 as if fully set forth herein.

82.    By the illegal and fraudulent acts and schemes described above, the RICO defendants willfully and intentionally defrauded Walsh Securities and made or caused to be made false, fraudulent and material misrepresentations and omissions to plaintiff concerning mortgage loans bought by Walsh Securities from NHF. Each of these

29

mortgage loans originated by the NHF/Cristo Property Enterprise were fraudulently obtained in that they were based on falsely inflated appraisals. In addition, these mortgage loans also were made based on other information falsely provided to Walsh Securities including incorrect credit histories and or statements of net worth, among other things.

83.     In making and carrying out these material misrepresentations, the RICO defendants, and each of them, intended to and did deceive plaintiff.

84.     Plaintiff believed and relied upon these material misrepresentations and omissions.

85.     As a result of the RICO defendants' material misrepresentations and omissions plaintiff suffered damages substantially in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants and defendants Weichert and Murphy Realty are liable to it, jointly and severally, for common-law fraud and award damages, punitive damages and other such relief as may be appropriate.

## COUNT IV

## BREACH OF CONTRACT BY NHF

86.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 85 as if fully set forth herein.

87.     On April 24, 1995, NHF and Walsh Securities (through its predecessor in interest GF Mortgage Corp.), entered into a Program Participant Loan Purchase And Sale Agreement (the "Agreement"). A true and correct copy of the Agreement is attached as Exhibit D. The Agreement between NHF and plaintiff was entered into in exchange for

30

consideration and contained mutual covenants. The Agreement covered the sale of mortgage loans from NHF to Walsh Securities involved in the NHF/Cristo Property Enterprise.

88.    Plaintiff has duly performed all the conditions of the Agreement.

89.    NHF, as the seller of mortgage loans, agreed to certain "Representations, Warranties and Covenants of Seller" in Article 6 of the Agreement, including the representation that all information in the loan applications prepared by NHF was true and correct. NHF has breached its representations because the loan applications contained falsely inflated appraisals and other false information.

90.    Plaintiff has notified NHF of its breach of the Agreement and its obligation to repurchase said mortgage loans. NHF has refused to repurchase said mortgage loans, in violation of Article 6 of the Agreement.

91.    By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the NHF is liable to it for breach of contract and award damages, attorneys fees and o other such relief as may be appropriate.

## COUNT V

## BREACH OF CONTRACT BY THE TITLE INSURANCE DEFENDANTS

92.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 91 as if fully set forth herein.

93.    In conjunction with real property transactions involving the NHF /Cristo Property Enterprise, borrowers of mortgage loans from plaintiff obtained title insurance

31

from the Title Insurance Defendants. The Title Insurance Defendants, in exchange for valuable consideration, provided Walsh Securities with closing service letters covering the conduct of the Closing Attorneys, who were specifically approved by the Title Insurance Defendants. Walsh Securities, required such closing service letters as a pre-condition to its agreeing to provide the mortgage loans.

94.    Pursuant to these closing service letters, the Title Insurance Defendants are required to reimburse plaintiff for losses arising out of, among other things, fraud or misapplication by the Closing Attorneys. True and correct copies of sample closing service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

95.    The Closing Attorneys engaged in fraud and misapplication in connection with the NHF /Cristo Property Enterprise. Among other things, the Closing Attorneys fraudulently transferred mortgage loan proceeds knowing that the following pre-conditions to closings imposed by Walsh Securities, among others, had not been satisfied: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the down payment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. Walsh Securities has incurred substantial loss as a result of the fraud and/or misapplication by the Closing Attorneys.

96.    Plaintiff has duly performed all of its obligations under the closing service letters of the Title Insurance Defendants and has notified the Title Insurance Defendants of its losses as a result of the fraud and/or misapplication by the Closing Attorneys.

97.    The Title Insurance Defendants have failed to reimburse plaintiff for the

32

losses it has incurred based on the fraud and/or misapplication of the approved attorneys as covered by the closing service letters.

98.     By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the Title Insurance Defendants are liable to it for breach of contract and award damages, attorneys fees and other such relief as may be appropriate.

**COUNT VI**

**NEGLIGENCE BY ALFIERI, CICALESE AND RICHARD PEPSNY**

99.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 98 as if fully set forth herein.

100.     Defendants Alfieri, Cicalese and Richard Pepsny were at all relevant times attorneys licensed by the New Jersey Supreme Court and engaged in the practice of law, including participation in what is generally known as real estate closings and title work.

101.     Defendant Alfieri was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser, subsequent purchaser, mortgagee and to act in a professional capacity to assist in preparing documents, completing required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

102.     Defendant Cicalese was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser,

33

subsequent purchaser, mortgagee and to act in a professional capacity to assist in preparing documents, completing required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

103.    Defendant Richard Pepsny was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser, subsequent purchaser, mortgagee and to act in a professional capacity to assist in preparing documents, completing required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

104.    Defendants Alfieri, Cicalese and Richard Pepsny were selected by NHF, Capital Assets and/or Cristo Property to facilitate the real property closing involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

105.    By virtue of the status of defendants Alfieri, Cicalese and Richard Pepsny, and by virtue of the licenses granted to them by the New Jersey Supreme Court to practice law, and based upon the ordinary practices and procedures established for the practice of law, Alfieri, Cicalese and Richard Pepsny had certain duties and obligations to carry out their closing requirements in the ordinary course in each transaction at issues in this Complaint.

106.    Plaintiff Walsh Securities was within the class of persons relying upon the expertise of defendants Alfieri, Cicalese and Richard Pepsny in each transaction at issue in this Complaint.

34

107.   Notwithstanding their duties, in each transaction at issue in this Complaint, defendants Alfieri, Cicalese and Richard Pepsny negligently failed to adhere to such standards and by virtue of such negligence, and as a direct result thereby, Walsh Securities suffered substantial damages. Defendants Alfieri, Cicalese and Richard Pepsny breached their respective duties of ordinary care owed to Walsh Securities by, *inter alia*, failing to exercise that degree of ordinary care necessary to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities. In particular, defendants Alfieri, Cicalese and Richard Pepsny failed to meet or otherwise enforce the following mortgage loan requirements and preconditions: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing.

108.   In addition, defendants Alfieri, Cicalese and Richard Pepsny (1) negligently failed to alert Walsh Securities that deposit monies called for in various transactions were not actually provided by the purchasers; (2) negligently prepared documents which by their very nature were inconsistent with the terms of the mortgage issued in favor of Walsh Securities; (3) negligently failed to record certain documents which were part of the transaction; and (4) negligently failed to follow the procedures which in the ordinary closing, fee and mortgagee, should have been followed.

WHEREFORE, on this COUNT, plaintiff Walsh Securities prays that the Court find and determine that defendants Alfieri, Cicalese and Richard Pepsny are liable to it,

jointly and severally, for negligence and award damages, punitive damages and other such relief as may be appropriate.

## COUNT VII

## RESPONDEAT SUPERIOR – WEICHERT AND MURPHY REALTY

109.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 108 as if fully set forth herein.

110.    Defendant Weichert is, and, was at all relevant times, in an employment or agency relationship with Donna Pepsny who was a licensed real estate broker for Weichert.

111.    Defendant Murphy Realty is, and, was at all relevant times, in an employment or agency relationship with DiFeo who was a licensed real estate broker for Murphy Realty.

112.    The illegal and fraudulent acts and schemes committed by Donna Pepsny and described above were committed in the scope of her employment or agency relationship with Weichert and were of a kind for which Donna Pepsny was engaged to perform by Weichert.

113.    Weichert was reckless and/or failed to exercise reasonable care in supervising the actions of Donna Pepsny taken in the illegal and fraudulent acts and schemes described above.

114.    Weichert is vicariously liable for the damages and losses sustained by plaintiff as a result of the actions of Donna Pepsny.

115.    The illegal and fraudulent acts and schemes committed by DiFeo and described above were committed in the scope of her employment or agency relationship

36

with Murphy Realty and were of a kind for which DiFeo was engaged to perform by Murphy Realty.

116.    Murphy Realty was reckless and/or failed to exercise reasonable care in supervising the actions of DiFeo taken in the illegal and fraudulent acts and schemes described above.

114.    Murphy Realty is vicariously liable for the damages and losses sustained by plaintiff as a result of the actions of DiFeo.

115.    WHEREFORE, on this COUNT, plaintiff Walsh Securities prays that the Court find and determine that defendants Weichert and Murphy Realty are vicariously liable to it for the illegal and fraudulent acts and schemes committed by DiFeo and Donna Pepsny and award damages, punitive damages and other such relief as may be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against:

1.    All RICO defendants and Weichert jointly and severally awarding plaintiff the following relief:

(a)    Compensatory and consequential damages in an amount as yet undetermined, trebled pursuant to 18 U.S.C. § 1964(c); and

(b)    Costs of this action, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1 964(c); and

(c)    An award of punitive damages as a result of defendants' fraud; and

(d)    Other such relief as is just and equitable;

2.    NHF awarding plaintiff the following relief:

(e)    Compensatory and consequential damages in an amount as yet
undetermined, and

(f)    Costs of this action, including reasonable attorneys' fees, and

(g)    Other such relief as is just and equitable.

3.    All the Title Insurance Defendants awarding plaintiff the following relief:

(h)    Compensatory and consequential damages in an amount as yet
undetermined,

(i)    Costs of this action, including reasonable attorneys' fees, and

(j)    Other such relief as is just and equitable.

4.    Weichert awarding plaintiff the following relief:

(k)    Compensatory and consequential damages in an amount as yet
undetermined,

(l)    Costs of this action, including reasonable attorneys' fees, and

(m)    Other such relief as is just and equitable.

5.    Murphy Realty awarding plaintiff the following relief:

(n)    Compensatory and consequential damages in an amount as yet
undetermined,

(o)    Costs of this action, including reasonable attorneys' fees, and

(p)    Other such relief as is just and equitable.

38

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury for all issues for which it has a right to a trial by jury.

BOIES, SCHILLER & FLEXNER LLP
ATTORNEYS FOR PLAINTIFF WALSH
SECURITIES INC.

BY_____
Robert A. Magnanini

Dated: January 31, 2005

39