# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY NEWARK VICINAGE

| | |
|---|---|
| WALSH SECURITIES, INC.,<br><br>              Plaintiff,<br><br>v.<br><br>CRISTO PROPERTY MANAGEMENT, LTD., a/k/a G.J.L. LIMITED, DEK HOMES OF NEW JERSEY, INC., OAKWOOD PROPERTIES INC., NATIONAL HOME FUNDING, INC., CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC., CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C., WILLIAM J. KANE, GARY GRIESER, ROBERT SKOWRENSKI, II, RICHARD CALANNI, RICHARD DIBENEDETTO, JAMES R. BROWN, THOMAS BRODO, RONALD J. PIERSON, STANLEY YACKER, ESQ., MICHAEL ALFIERI, ESQ., RICHARD PEPSNY, ESQ., ANTHONY M. CICALESE, ESQ., LAWRENCE M. CUZZI, ANTHONY D'APOLITO, DAY CONSULTING, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, NATIONS TITLE INSURANCE OF NEW YORK INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, COASTAL TITLE AGENCY, and STEWART TITLE GUARANTY COMPANY, IRENE DiFEO, DONNA PEPSNY, WEICHERT, REALTORS, AND VECCHIO REALTY, INC. D/B/A MURPHY REALTY BETTER HOMES and GARDENS,<br><br>              Defendants. | CIVIL ACTION NO. 97-3496 (WGB)<br><br>CERTIFICATION OF JOHN B. MCCUSKER<br><br>IN SUPPORT OF WEICHERT, REALTORS' MOTION TO DISMISS |

I, John B. McCusker, Esq. of full age, upon my oath certify and state:

1.     I am an attorney licensed to practice law in New Jersey and am a Director of the law firm of McCusker, Anselmi, Rosen, Carvelli and Walsh, P.A., counsel for the Defendant Weichert, Realtors ("Weichert"). I make this Certification pursuant to Rule 12(b) in support of Weichert's Motion to Dismiss Plaintiff's Third Amended Complaint as to Weichert because Plaintiff's claims are time-barred.

2.     A true and accurate copy of a sample of the Asbury Park Press series, "House of Cards" is attached hereto as Exhibit A.

3.     A true and accurate copy of Plaintiff's Complaint is attached hereto as Exhibit B.

4.     A true and accurate copy of Plaintiff's Amended Complaint is attached hereto as Exhibit C.

5.     A true and accurate copy of Plaintiff's Second Amended Complaint is attached hereto as Exhibit D.

6.     A true and accurate copy of the April 28, 1998 Order, staying discovery is attached hereto as Exhibit E.

7.     A true and accurate copy of the May 30, 2000 Order, administratively dismissing the within matter is attached hereto as Exhibit F.

8.  A true and accurate copy of Donna Pepsny's Indictment is attached hereto as Exhibit G.

9.  A true and accurate copy of Elizabeth Ann Demola's Indictment is attached hereto as Exhibit H.

10.  A true and accurate copy of Plaintiff's Third Amended Complaint is attached hereto as Exhibit I.

11.  A true and accurate copy of Irene DiFeo's Answer to Plaintiff's Third Amended Complaint is attached hereto as Exhibit J.


/s John B. McCusker
John B. McCusker, Esq. (JBM 1482)
McCusker, Anselmi, Rosen,
Carvelli & Walsh, P.A.
127 Main Street
Chatham, New Jersey
(973) 635-6300
Attorneys for Defendant
Weichert, Realtors


Dated: May 10, 2005

# EXHIBIT A

☒ (advertisement)



## HOUSE OF CARDS



**WHAT AILS ASBURY?**
A CITY SEARCHES FOR SOLUTIONS

■

MESSAGE BOARD

■

SEND e-mail

■

ASBURY PARK PRESS

# Would you pay $200,000 for this house?

Published in the Asbury Park Press 6/29/97

**Address:**
506 Asbury Ave., Asbury Park

**Purchase price:**
$23,500

**Sale price:**
$200,000

**Elapsed time:**
15 days

**Assessed value:**
$31,100

**Mortgage:**
$146,250



One of the dozens of Asbury Park rental properties bought and then sold by Cristo Property Management in the past year. This building sold for more than eight times what Cristo paid for it.

PETER ACKERMAN photo

# Sales of the century

By WILLIAM CONROY
and NANCY SHIELDS
STAFF WRITERS

ASBURY PARK -- During the past 12 months, one company has been quietly buying dozens of residential properties in this blighted city and reselling them within days -- in some cases, the same day -- for two to eight times the original sale price.

After years of tumbling property values and urban decay, a spike in the city's real estate market might be seen as a promising sign that Asbury Park is finally coming back.

Case 2:97-cv-03496-DRD-JAD   Document 160-2   Filed 06/17/05   Page 6 of 118 PageID: 1341

But something about these deals doesn't add up.

A 10-week investigation by the Asbury Park Press has detailed a series of extraordinary real estate transactions -- centered in Asbury Park, but also involving properties in Long Branch and at least two other Monmouth County municipalities -- in which property prices have been sharply inflated and millions of dollars in mortgage loans obtained on the inflated values.



Cristo Property Management bought this Munroe Avenue house, which has an assessed value of $52,100, for $13,500. Nine days later, it was sold for $108,000. It has a mortgage of $81,000.

The Monmouth County prosecutor's office is investigating "the possibility of criminal activity involved in these transactions," Second Assistant Prosecutor Robert A. Honecker Jr. said Friday. The investigation began in May after the prosecutor's office received an inquiry from the Press, Honecker said. He declined to discuss the investigation further.

In a typical case, a two-family house at 509 Ridge Ave. in Asbury Park was bought by the company, Cristo Property Management Ltd. of Union Beach, for $40,000 and sold the very same day to an out-of-town investor for $138,000. That's a 245 percent profit in less than 24 hours.

For tax purposes, the assessed value of the property at 509 Ridge Ave. is $37,700. Nonetheless, when the property was sold to the out-of-town investor, a mortgage was obtained for $103,500 -- roughly 2 1/2 times the assessed value.

But the transaction didn't end there. In a final step, the investor conveyed 60 percent of the title to a second company, Red Bank-based Capital Assets Property Management & Investment Co. Inc., for "the sum of under one hundred dollars," according to the deed.

At least 60 residential property sales in Asbury Park and 13 in Long Branch have followed a similar pattern. Without making any significant improvements, Cristo sold the properties -- many of which were dilapidated and had been vacant for years -- for an average of three times what it paid for them just days or weeks before.

The properties -- mostly two- to four-family houses -- have been purchased from Cristo by 30 individual investors, many from northern New Jersey and some from New York. Each investor bought from one to nine properties. In every case, the investors have conveyed 60 percent of their properties to Capital Assets for less than $100.

From June 1996 through February, Cristo paid $3.7 million to buy the 73 properties in Asbury Park and Long Branch and sold them for $11.2 million -- a gross profit of $7.5 million.

"This is definitely strange," said Mary Lou Hartman, Asbury Park's tax assessor, who is keeping a separate file on the Cristo sales. She has notified the N.J. Division of Taxation that she will not use the sales as a measure of assessed value for tax purposes.



Asbury Park tax assessor Mary Lou Hartman called the transactions "strange."

"These are ridiculous prices," Hartman said, "not the normal market here, not overnight."

"My question is: 'What has changed in this area to make this property, in two weeks, suddenly worth $100,000 more?' " said James G. Aaron, the Long Branch city attorney. He was referring to a property at 93 N. Broadway that Cristo bought for $100,000 and sold 15 days later for $200,000.

"Does it raise suspicion?" Aaron said. "Yes, it raises suspicion."

Hartman said the inflated prices create a distorted

picture of the city's worth. If the sales were counted for tax purposes, Hartman said, they could unfairly increase assessed values and tax bills for other properties. The inflated sale prices ultimately could trigger a cutback in state aid to city schools, she said.

"When you set up a tax base for people, you use comparable sales for properties," Aaron said. "And with these dramatic increases, we want to make sure we don't harm other residents."

Assessed property values in Asbury Park are estimated to be 105 percent of true market value. In other words, market values are, on average, slightly lower than assessed values. In Long Branch, assessed value is estimated to be 96 percent of true market value.



Long Branch city attorney James G. Aaron said Cristo's dealings raise suspicion.

A review by the Press of deeds, mortgages and other records, combined with interviews of dozens of government officials, real estate experts and business analysts, has uncovered a number of unusual aspects of the transactions. Among the findings are these:

- Cristo, which also operates under the name G.J.L. Limited, sold 16 of the 73 properties on the same day it bought them. The average price the company received on these same-day sales was 3.2 times what it paid.
- Three of the individual investors, who among them are listed as the buyers of 10 properties, said they have not put up any money, either in down payments or mortgage loan payments. Two of those individuals said they gave power of attorney to Capital Assets and were unaware of key details of the sales and mortgages.
- One of the three individuals said Capital Assets paid him so the company could list his name as the buyer of four properties.
- According to the dates on the deeds, Cristo sold 12 of the 73 properties before it owned them.

- In all 73 of the transactions in Asbury Park and Long Branch, Cristo sold the property to an individual linked with Capital Assets.
- Cristo and Capital Assets were created within a week of each other last June, according to corporate records on file with the N.J. Department of State. A spokesman for Capital Assets said there is no connection between the two companies.
- Visits to the 73 properties in May and June revealed that, months after the last of them were bought, at least half remained vacant. Many of the vacant properties need substantial repairs.
- The Long Branch transactions are under investigation by the city, according to the city attorney.
- Walsh Securities of Parsippany-Troy Hills Township, which holds all the mortgages on the properties, said it has launched an "in-depth internal investigation of the loans" in response to an inquiry from the Press.

In a letter to the Press, Robert C. Walsh, the company's president, said the mortgages were issued based on "normal verification procedures," including credit checks and property appraisals by "state licensed appraisers." He also said that to his knowledge, payments on the mortgages are current.

## It doesn't quite add up

What's behind the deals? The heads of Cristo and Capital Assets won't talk to the Press. And no one else is certain.

According to Steven Todd, director of education for the Center for Real Estate Studies in Rolling Hills, Calif., the systematic inflation of property values often is associated with schemes to obtain large sums of mortgage money.

A typical scheme, Todd said, works like this: One entity buys property and ostensibly sells it to another entity at an inflated price. But the buyer puts up no money. A mortgage is then obtained for 70 percent to 80 percent of the inflated value.

"The buyer walks away from the property," Todd said. The lender then forecloses "and the seller and the buyer

split the difference" between the original price paid for the property and the amount of the mortgage, Todd said.

"There could be . . . winking and nodding going on at any point in the chain," said Keith Gumbinger, vice president of HSH Associates, a mortgage research company in Butler. Gumbinger said he, too, has seen examples of such schemes.

As long as the parties to the scheme can keep getting more mortgage loans using "straw buyers," they can use the proceeds to make the payments on earlier loans, Todd said. "It's like a Ponzi scheme," he said, referring to a type of fraudulent investment scheme.

Todd and Gumbinger were careful to say they were describing how such schemes have worked in the past. They said they were not implying that Cristo and Capital Assets are doing the same thing.

But not one of dozens of real estate professionals and lawyers the Press interviewed could explain the inflated sale prices. They simply do not make sense from an investor's point of view, experts said.

"It just is amazing," said John J. Williams, a Wall Township real estate agent who is familiar with Asbury Park properties. "The marketplace does go up and down, but it doesn't go up and down 100 percent in a day."

"I am drawing a blank," said Richard M. Slotkin, a lawyer in Roseland, who will teach a course on real estate law at Rutgers University Law School, Newark, in the fall. "I cannot come up with a rational reason why anyone would do this," he said, referring to buyers paying such high prices for the properties.

The investors' eagerness to pay top dollar is especially surprising given the current state of the rental market in Monmouth and Ocean counties, said Todd of the Center for Real Estate Studies.

The supply of apartments in Monmouth and Ocean counties exceeds the demand by 7,000 units, according to the center, a nonprofit group that studies real estate markets around the country. The center does an annual estimate of regional supply and demand for apartments, based on building permits issued, tenant turnover rates

and other data, he said.

"A property doesn't go from $50,000 to $150,000 just on its sheer good looks, unless there is some kind of independent event," said Arthur M. Greenbaum, a Woodbridge Township lawyer who specializes in real estate.

For example, rezoning in a particular area could boost property values by making them potentially more lucrative, said Greenbaum, who has represented the New Jersey Association of Realtors, among other clients, for 35 years. Such rezoning has not happened where Cristo has bought and sold its properties.

The properties Cristo bought and sold in Asbury Park are scattered throughout the city, with the exception of the northwest section, the one remaining area of predominantly single- family homes. Thus, the deals do not appear to be speculative buys made in anticipation of an event or project that would increase value in one part of town.

The Long Branch properties Cristo bought are clustered, mostly in North Long Branch, but that may be because there is a higher concentration of inexpensive rental properties there, said Aaron, the Long Branch attorney.

The many questions surrounding the transactions have led real estate experts inside and outside Asbury Park and Long Branch to wonder how viable the investments are in the long term. Hartman, the Asbury tax assessor, worries what it will mean to the city if the properties do not draw enough tenants and the mortgage payments go unpaid.

## The key players

The Press tried repeatedly, and unsuccessfully, to interview the presidents of Cristo and Capital Assets.

William J. Kane, president of Cristo, referred questions to his lawyer, Joseph V. Sorrentino, who has an office in Staten Island. Sorrentino said it was inappropriate for Kane to comment, because of an investigation, though the lawyer declined to specify who is investigating or what is being investigated.

In records on file with the Department of State, Kane is

listed as a director and president of Cristo, though that does not necessarily mean he is an owner.



Capital Assets president Gary Grieser.

Gary Grieser, president of Capital Assets, also has declined comment, despite repeated requests by telephone and letter, and office visits by reporters. Grieser has a colorful past in Long Branch, where as the owner of a juice bar that featured nude entertainment, he clashed with city officials.

In 1990, the Long Branch City Council found Grieser in violation of liquor laws and suspended his license for Murphy's Law, a Chelsea Avenue bar. Grieser then opened Strutters, which featured nude dancers but served no alcohol.

Strutters closed in February 1992 after a bankruptcy judge signed an order liquidating the business, finding that it was hopelessly mired in debt.

Two representatives of Capital Assets -- John Conneely, the rental sales manager, and Rayfield James, who handles public relations -- did agree to an interview, though they declined to answer most questions about the company's operations.

James said there is no connection between Capital Assets and Cristo. He would not say who owns Capital Assets.

James is a key figure in Asbury Park politics. In the past two years, he has led a successful effort by Asbury United, a political group, to gain control of both the city school board and city council. James is chairman of the group but has not run for office in the city.

Capital Assets referred reporters to James after his group's successful May 13 citywide council elections. James said the company had "briefly engaged" him as its spokesman.

James was barred last year from the over-the-counter securities industry and fined $20,000 by the National Association of Securities Dealers. The association fined him for repeatedly failing to respond to NASD inquiries into his financial dealings with a particular customer

when James was employed at a Philadelphia brokerage.
The nature of the inquiry was not disclosed.

James has a simple answer for those who are skeptical
about the real estate transactions. "Maybe the investors
think the future of Asbury Park looks bright," he said.

Conneely suggested that location may have something
to do with it. "There's not many pieces of Asbury Park
that are very far from the ocean," he said.

"Property is worth what people pay for it," James
added.

The company holding the mortgages on the Cristo
sales, Walsh Securities, is what is known in the industry
as a subprime lender. It's an area of the mortgage
business that has grown rapidly in the 1990s. Walsh
specializes in purchasing loans from mortgage brokers
for borrowers who would not meet the more stringent
credit standards used by banks for top-rated loans.

"Walsh is a specialty mortgage finance company
engaged primarily in the business of purchasing non-
conforming mortgages nationwide," the firm's
president, Robert Walsh, wrote in response to a written
inquiry from the Press. Walsh added that his company
is "presently purchasing in excess of $100 million"
worth of mortgages per month.

In April, Resource Bancshares Mortgage Group Inc., of
Columbia, S.C., announced an agreement to merge with
Walsh and a separate company, Resource Bancshares
Corp. The merger is subject to shareholder and
regulatory approvals.

Walsh had revenue of $36 million and net income of
$18.4 million for the first quarter of this year. Walsh
gets funding for many of its loans by selling mortgage-
backed securities to investors.

In his letter to the Press, Walsh said: "Although the 73
loans (for the Asbury Park and Long Branch properties)
constitute a small part of our total business, they are
important to us. Your questions have evoked a review
and investigation of these loans."

## Tracking the transactions

The Press began its investigation in April after copies

of deeds recording Cristo's purchases and sales of
dozens of properties in the city arrived in the Asbury
Park tax assessor's office. Reporters reviewed deeds
and mortgages in the Monmouth County clerk's office
in Freehold, along with records filed in Asbury Park
and in Long Branch. The search uncovered 60
properties in Asbury Park and 13 properties in Long
Branch that Cristo has bought and sold since June 1996.

Cristo also has bought and sold at least a few properties
in other Monmouth County towns, including Neptune
and Red Bank. The transactions appear to follow the
same pattern of purchase and quick sale at a much
higher price. For example, Cristo bought a property at
126 Leighton Ave. in Red Bank for $40,000 in May
1996 and sold it a month later for $120,000.

But the bulk of the company's Monmouth County
activity apparently has been in Asbury Park and Long
Branch.

Capital Assets representatives said the company also
manages properties elsewhere in New Jersey, including
Plainfield, Paterson and Newark.

The Press was able to locate seven of the 30 investors --
some acting as individuals, some as couples -- who
bought properties from Cristo at inflated prices then
conveyed 60 percent of the value to Capital Assets. Of
those seven, three declined to comment.

Two investors who agreed to be interviewed said they
talked to representatives of Capital Assets who asked
them to sign over power of attorney for the purpose of
purchasing properties, fixing them up and renting them
out or selling them. The investors, Mario Cuzzi Jr., of
West Babylon, N.Y., and Alphonse Salvatoriello,
Cranford Township, would not name the Capital Assets
representatives.

None of the investors interviewed said they knew
exactly how or why their names were being used.

Cuzzi, 35, whose name is on three deeds and mortgages
in Asbury Park and one in Long Branch, said
representatives of Capital Assets told him they needed
his "credit" to buy properties because their lender
would not lend the company any more money. In
exchange, Cuzzi said he was paid a fee for the use of
his name on deeds and mortgages, though he wouldn't

say how much.

"They paid me right away, as soon as the properties
went through, when they got the money from the bank,"
he said.

Pamela Ricigliano, 25, of Edison Township, is listed as
the buyer of four properties in Asbury Park that Cristo
sold for a total of $603,500. "It was through a friend I
did it," Ricigliano said. "I didn't want to do it."

Asked why she invested in Asbury Park, Ricigliano
said: "Honestly, I have no idea."

She declined to comment further during a telephone
interview. Later, reporters visited Ricigliano at her
parents' Edison home, where she lives. During a brief
interview, Ricigliano said, "I didn't pay any money" for
the properties listed in her name.

She declined to comment on other details of the
transactions. She interrupted the interview to telephone
her brother, who she said is lawyer. After speaking with
him, she said she would answer no more questions.

Salvatoriello, 69, said he signed over power of attorney
to Capital Assets. When first asked how much money
he and his wife, Elaine, put down on two properties in
Asbury Park, Salvatoriello said: "Not that much money.
I'll have to check on it."

Later in the same conversation he said, "I haven't paid a
penny."

If Ricigliano and the others made no down payment on
the properties, it may be because Cristo lent them the
down payment by issuing second mortgages on the
properties, said Robert Skowrenski II, president of
National Home Funding Inc., Freehold Township,
which brokered all the mortgages for the Cristo sales.
Skowrenski said records in his files show second
mortgage notes issued by the seller, which is Cristo, to
individual buyers.

"To me, that answers that question for people not to
have to come out-of-pocket with cash," Skowrenski
said.

One other investor reached by telephone, Ralph
Juergensen, of Edison, was listed as the buyer of two

properties. His wife, Alicia, was listed as purchasing four.

"It's just an investment," Juergensen said before cutting off the interview and referring questions to his lawyer, whose name he would not give. "Capital Assets is managing my properties for us."

## What is it really worth?

Even if Cristo didn't receive a penny in down payments from the individuals who purchased the properties, it still took in far more in mortgage money than it originally paid for the properties. The company paid $3.7 million for the 73 properties. It received $8.2 million in mortgage money. Even without a single dollar paid directly by any of the buyers, Cristo more than doubled its money.

The Press has been unable to learn who performed the property appraisals that were required to obtain the mortgages. According to Skowrenski, National Home Funding chose the appraisers from a list approved by Walsh Securities, the firm that actually holds the mortgages. Skowrenski said he considered the names of the appraisers private financial information and would not divulge them.

The mortgages for most of the properties are 15-year balloons. The monthly payments are as low as if the borrower had 30 years to pay off the debt, with a large payment due at the end of the 15-year term. That arrangement is typical in the industry for investment property buyers, he said.

Because loans on investment properties are considered to be higher-risk than, say, a loan on an owner-occupied house, the annual interest rate is higher than for a typical home loan, Skowrenski said.

Real estate professionals have difficulty understanding how an appraiser could decide that these properties justify the mortgages issued on them.

"I'd like to see the appraisals," said Hartman, the Asbury Park tax assessor.

Appraisers must do a thorough review of the history of the property and what it has sold for, and what similar properties have sold for in the area, said Donald

Case 2:97-cv-03496-DRD-JAD   Document 160-2   Filed 06/17/05   Page 17 of 118 PageID: 1352

Moliver, director of the Real Estate Institute at
Monmouth University, West Long Branch.

Moliver, who is an appraiser himself, said the sales
prices Cristo is receiving for the multifamily houses in
Asbury Park seem far above the market value of such
properties.

The average price Cristo received for the 60 houses it
sold in Asbury Park was $154,320, according to the
deeds. The average price Cristo paid for these
properties was $50,619.

"That flies right in the face of the experience most
people have had in the marketplace," Moliver said.

The final step in all of the property sales -- when the
individual buyer conveys 60 percent of the property's
value to Capital Assets -- is no less puzzling to real
estate professionals than the appraisals and mortgages.

"Who is the real owner? What is the true
consideration?" asked Aaron, the Long Branch city
attorney, using a legal term for what is exchanged by
the parties in a contract.

It is important to note that an individual remains liable
for paying the entire mortgage debt, regardless of what
shares of the property he or she conveys to other
parties, said Slotkin, the Roseland lawyer. Unless
Capital Assets specifically signed some kind of
assumption-of-debt agreement, the individual remains
responsible for paying off the mortgage, Slotkin said.

Capital Assets spokesman James declined to discuss the
specific financial arrangements between Capital Assets
and the individuals. Regarding the 60-40 split, James
said: "It's not an unusual arrangement. The property
manager is going to do a much better job" if the
company owns a share of the property.

Published in the Asbury Park Press

Copyright ©1997-1999 IN Jersey.
Use of this site signifies your agreement to the Terms of Service (updated
2/25/98).
Site design by IN Jersey.

**Asbury Park Press**



**HOUSE
OF CARDS**

■

**WHAT AILS
ASBURY?**
A CITY SEARCHES
FOR SOLUTIONS

■

MESSAGE BOARD

■

SEND e-mail

■

ASBURY PARK PRESS

# A guide to understanding the real estate game

By LAURENCE ARNOLD
and JOHN T. WARD
STAFF WRITERS

Consider the typical home sale.

After enduring back-and-forth price negotiations, painstaking verification of their personal finances and a stressful closing process, millions of buyers each year white-knuckle their way to the American Dream. In the end, a house changes hands, usually at a price approximating that of similar houses nearby.

But that's not how things went in dozens of deals in several New Jersey communities last year.

Run-down, sometimes vacant houses in depressed neighborhoods changed hands twice in the space of weeks, sometimes within hours. The prices in the second sales bore no resemblance to either prevailing market conditions or the preceding sale. Finally, buyers obtained mortgages on the inflated prices.

The deals, first detailed two weeks ago by the Asbury Park Press, have been described by Monmouth County Prosecutor John Kaye as "probably fraudulent." His office is probing at least 80 home sales in Monmouth County, as are the U.S. Justice Department and at least two state agencies.

If the deals themselves were far from typical, so has been the fallout from them.

Some of the major players have started pointing fingers at each other in an effort to be seen as victims rather than perpetrators.

But information uncovered last week suggests that some of the parties involved have previous ties, including employees who seemed at times to have their feet in different camps.

And pictures began to emerge of some compelling personalities behind the land deals:

The 29-year-old businessman who lives with his parents, and who brought together millions of dollars in deals.

The mortgage banker who once drove a hot dog truck, worked his way to the presidency of a savings and loan, and is on the verge of making hundreds of millions in stock -- unless the sale of his company is torpedoed by this investigation.

The entrepreneur who once ran a Long Branch club featuring totally nude dancers -- unlike those at typical go-go bars in New Jersey, where pasties are the norm -- because the establishment served only juice and soda and not alcohol.

## The pattern and major players

Cristo Property Management Ltd. of Union Beach was the buyer, and later the seller, in the original 73 transactions detailed by the Press.

Cristo's buyers were investors who, in some cases, never made a down payment or subsequent mortgage payment. Hence the belief by some real estate experts that they were "straw" buyers fronting for unknown others.

In every case, the buyers obtained mortgages through National Home Funding Inc. of Freehold Township, which functioned as an intermediary that linked borrowers with a lender. In every instance, that lender was Walsh Securities Inc. of Parsippany-Troy Hills Township, a fast-growing player in what's known as the "sub-prime" mortgage market. That's where people with no credit or impaired credit go for home loans, and get charged interest rates several points higher than their more creditworthy neighbors.

In all 73 deals, a real estate appraiser provided a report that supported the Walsh loan.

In every instance, those new homeowners quickly sold, for $100 or less, a 60 percent interest in the property to a firm created within a week of Cristo's incorporation in June 1996, Capital Assets Property Management & Investment Inc., Red Bank. And one lawyer handled that aspect of the deal each time.

Walsh Securities, which hired former U.S. Attorney Michael Chertoff to lead an internal investigation, says there are 202 properties with loans of nearly $22 million in which all four of the above-named companies had a role.

## The blame game

Major players in the deals began blaming each other last week.

Robert C. Walsh, the chairman, chief executive, president and major shareholder of the private company that he founded, Walsh Securities Inc., said in an interview that all clues point to the mortgage firm that brought him the deals: National Home Funding.

"We believe it's isolated to this one situation, this one correspondent," Walsh said, referring to National Home Funding.

Moreover, Walsh officials contend, Walsh Securities is the one firm that can't dodge financial responsibility if the mortgage holders default.

"If a fraud was perpetrated, we own the risk," Walsh lawyer John Oberdorf said last week.

Nevertheless, Walsh Saturday said he intends to hold National Home Funding responsible for all mortgages found to be fraudulent.

But Robert Skowrenski II, the owner of National Home

Funding, said his firm is blameless and that the heads of at least two of the other companies -- Walsh Securities and Cristo -- are now conspiring to make him the "fall guy."

"A lot of people made money, and it wasn't me," he said in an interview.

### Divided loyalties?

At least two players may have had simultaneous ties to more than one company involved in the deals.

William J. Kane, president of Cristo, is licensed by the New Jersey Department of Banking and Insurance as a mortgage solicitor with National Home Funding -- the firm whose access to Walsh's loans helped Cristo make $7.5 million in profit on the flipping -- or quick reselling -- of the 73 Asbury park and Long Branch properties.

In other words, he was a property seller who was in a position to initiate loans for his buyers to enable him to pocket big profits -- and that's just what he did, according to Skowrenski.

"The loan officer in this whole situation was Billy Kane," Skowrenski said. "There was not anyone else in my office who wrote any of these loans."

Kane has consistently declined comment on the deals.

Anthony D'Apolito, of Tinton Falls, is an account representative at Walsh Securities who drives a Mercedes leased by Capital Assets. Its plate reads "DAP INC."

Skowrenski said D'Apolito introduced him in February 1996 to Kane and to Gary Grieser, now president of Capital Assets. Three months later, Cristo and Capital Assets were incorporated and the flipping pattern began.

D'Apolito's lawyer, Charles J. Uliano, said last week that his client "did not break any laws or do anything wrong." Saturday, Walsh disclosed that he has suspended D'Apolito from his job.

While it remains unclear if D'Apolito had any connection with the questionable deals, what is clear is that the transactions brought together a cast of players with colorful backgrounds.

A who's who:

### The flipper

William J. Kane, in addition to serving as president of Cristo, has a background as a builder. As president of a company called Slope/Greenwood Realty, Kane earned some publicity in 1990 by building a project in a rundown section of Brooklyn.

But in 1995, Kane and his wife, Yvonne, filed for bankruptcy protection, claiming debts of $364,819. His sole source of income that year, he said in court papers, was his job as an estimator for D & Sons Construction

Corp. of Staten Island, where he earned $41,175.

D & Sons is a company that itself has bought some Shore properties and quickly sold them at dramatically higher prices.

The Kanes have lived in their home on Oakwood Drive in the Parlin section of Sayreville for 12 years.

Last month, Kane referred questions to his lawyer, Joseph V. Sorrentino, who said Kane cannot comment.

## The middle man

His attorney refers to him as "the kid." But Robert Skowrenski II, a 29-year-old who lives with his parents in Ocean Township, fears another label: "fall guy."

In an interview last week, he said the leaders of the three other companies in the transactions -- Walsh Securities, Cristo and Capital Assets -- have met privately since the investigation began.

"And nobody ever called me," he said.

Skowrenski said Kane was in charge of the paperwork -- the mortgage applications, financial statements of borrowers and appraisals -- done for each sale.

But one of Walsh's lawyers, John Oberdorf, pointed out that the paperwork itself lists Skowrenski as the mortgage broker.

"He is the mortgage banker in this connection," Oberdorf said. "He's the one preparing the files."

On Wednesday, Skowrenski said: "I have 18 to 20 registered solicitors who depend on me, and I feel like a complete fool right now."

## The money man

Robert C. Walsh's first business venture was hardly extraordinary. He drove a hot dog truck. But since then, Walsh has crafted a long and storied career in the lending industry. Walsh said that people who know him know he is not a party to fraud. Still, there is discomfort.

"The embarrassing part," he said, "is having your mom call you up and say, 'Hey, you OK?' " In 1984, Walsh created Carteret Mortgage Co., the mortgage banking arm of Carteret Savings Bank, briefly the state's largest savings and loan. At the age of 38, in 1989, he became president and chief operating officer of the bank.

In a story on Walsh's promotion, Crain's New York Business called Carteret's mortgage operation "the house that Walsh built."

Walsh told the newspaper that his lack of a college degree had not hurt him one bit.

"If anything, I think my background has helped me. This is a gut business, a common sense business, and that's what my career has been about," he said then.

Case 2:97-cv-03496-DRD-JAD   Document 160-2   Filed 06/17/05   Page 22 of 118 PageID: 1357

Walsh continued his rise at the bank by adding the title of chief executive officer in 1990. But a year later he left for new challenges.

He said at the time that he wanted to work as an investment banker and trader specializing in mortgage securities, as well as to spend more time with his two daughters, then 5 and 2.

Eighteen months after Walsh departed, Carteret was taken over by federal regulators as a failed savings and loan. Regulators cited financial losses from poorly underwritten loans on commercial real estate and residential development.

At the New York investment house of Gruntal & Co. in 1991, Walsh launched a unit specializing in sub-prime mortgages. And in April 1996, he led a buyout in which Walsh Securities was created as an independent firm.

The outcome of the present investigation into land flips might have special significance to Walsh.

Walsh Securities is in a proposed merger agreement to be voted on by shareholders of a South Carolina mortgage bank, Resource Bancshares Mortgage Group Inc. Using the value of Resource Bancshares stock at Friday's closing, Walsh would get approximately $191 million worth of stock if the deal goes through.

Officials at Resource Bancshares continue to report that the deal remains on the table, but that they are awaiting the results of Walsh's internal probe.

## The appraisers

One key step in the transactions involved obtaining official appraisals that seemed to defy prevailing opinion about the value of properties in urban neighborhoods. How could a state-licensed appraiser play a role in land deal in which a home bought for $75,000 was sold the same day for $204,000?

At least three appraisers are known to have handled valuation work on the 73 properties.

One appraiser has said he was duped. Richard Calanni of Tinton Falls said he based his appraisals on "comparable" sales that, unbeknownst to him at the time, were in fact other sales orchestrated by the same group of companies.

"I'm saddened by this," said Calanni, a member of the Tinton Falls Planning Board, whose company is TF Certified Real Estate Appraisals.

He said he thought the escalating prices meant investors were intent on revitalizing Asbury Park.

"I wanted to be part of something great," he said.

A second appraiser, Richard DiBenedetto, is already the subject of a professional practices complaint that alleges he arrived at an inflated value for a Neptune house sold in March 1996. DiBenedetto, whose business is Eastern

States Appraisal Services, claims he did few, if any, appraisals on the disputed transactions.

A third appraiser is a convicted felon, now on parole. James R. Brown of Union Township was stripped of his mortgage brokering license after his 1990 conviction, but now he has a real estate appraisal license.

Brown spent two years in jail on a 10-year sentence after admitting he defrauded 16 clients out of $100,000 through his Elizabeth real estate and insurance brokerage. His current company is Professional Evaluators of Union. Brown's lawyer, Thaki Ismael, declined comment.

James Hsu, executive director of the Real Estate Appraiser Board, said the board is investigating the role of the appraisers in the real estate transactions that are under review.

He declined comment on how Brown obtained an appraiser's license while a license issued by a separate board, the Real Estate Commission, was revoked because of the 1990 criminal conviction.

## The lawyers

In the voluminous paperwork produced by the various land transactions, the names of two lawyers repeatedly appear.

One is Stanley Yacker of Matawan. In the 73 original land flips investigated by the Press, he was involved each time in the final step of the process -- when the second buyers conveyed 60 percent ownership of their new possession to Capital Assets.

That final piece of the transaction has proved thorny.

A state tax official said Thursday that each transfer of 60 percent ownership to Capital Assets seems to have violated a state law. In each case, the second buyer should have paid a real estate transfer fee based on the value of the outstanding mortgage.

Also, Walsh Securities Saturday declared that because it was not notified of the 60 percent conveyance, every mortgage it issued for those houses is in default.

Yacker has said that his role in the transactions was limited to preparing the new deeds. He said he did not function as a lawyer for Capital Assets.

The other lawyer involved in each case is Richard J. Pepsny of Matawan. He represented Cristo when that company bought properties, and when it resold the properties for radically higher prices.

Pepsny, too, described his role as narrow. He said that as far as he knew, the difference in prices may have been caused by renovation to the homes.

"There were no red flags when I saw the bigger resale price," he said.

Case 2:97-cv-03496-DRD-JAD   Document 160-2   Filed 06/17/05   Page 24 of 118   PageID: 1359

## The final piece

At least until now, Gary Grieser's best-publicized investment was probably his ownership of a nude bar that the city of Long Branch battled to close.

According to court papers filed by his wife in a divorce action, he also has worked for a real estate agent, managed projects for a construction company, bought commercial real estate and invested in a fitness club and tanning salon.

Grieser is president of Capital Assets Property Management and Investment Co. in Red Bank. In the dozens of land deals under investigation, Grieser's company ends up with 60 percent ownership of properties after they have been bought, then sold at a much higher price.

The cost to Capital Assets for the 60 percent ownership: less than $100 in each case.

Grieser has declined to answer any questions about his role in the transactions.

By contrast, he was an oft-quoted and colorful figure in Long Branch politics in the early 1990s.

"He could sell sand to the Arabs," said one Long Branch official in 1991, as the city sought to shut down Grieser's nude bar, Strutters.

By selling only soda and juice at the establishment, Grieser sidestepped state regulations that prohibited fully nude dancers where alcohol is sold.

He opened Strutters after the city yanked the liquor license of the club's prior operation, a bar called Murphy's Law, for selling alcohol to minors.

Grieser showed during that dispute that he would not be pushed around. He called city officials "sleazebags" and "worms" and vowed just before opening Strutters: "I'm going to trash this town."

He tried a different approach in 1990, running as a protest candidate in the race for City Council. He got six votes.

In 1989, he pleaded guilty to illegal possession of a handgun. He was placed on probation for a year and fined $2,530.

As for his divorce, he and his wife entered mediation that resulted in a 1996 agreement that dissolved their 3 1/2-year marriage. His ex-wife declined to discuss Grieser last week, saying only that "he's a very nice man."

In her complaint for divorce, Suzanne Grieser wrote that in 1991, Grieser gave her a 3-karat engagement ring appraised at $28,000.

"Sometime thereafter," she wrote, he replaced it with a cubic zirconia ring valued at $300.

Case 2:97-cv-03496-DRD-JAD   Document 160-2   Filed 06/17/05   Page 25 of 118 PageID: 1360

"I do not know where the diamond has gone," she wrote,
"but I suspect the defendant pawned (it) and used the
monies obtained to pay for one of his investment(s)."

Published in the Asbury Park Press 7/13/97

Posted: 07/23/97 04:01:09 PM.

© 1997, *Asbury Park Press*

# EXHIBIT B

Michael Chertoff (MC 6790)
Geoffrey S. Berman (GB 1851)
LATHAM & WATKINS
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
(201) 639-1234
Attorneys for Plaintiff
Walsh Securities Inc.

*ORIGINAL FILED*

*JUL 1 7 1997*

*WILLIAM T. WALSH, CLERK*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES INC., <br><br> Plaintiff, <br><br> v. <br><br> CRISTO PROPERTY MANAGEMENT, LTD., A/K/A G.J.L. LIMITED, NATIONAL HOME FUNDING, INC., CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC., CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C., WILLIAM J. KANE, GARY GRIESER, ROBERT SKOWRENSKI, II, RICHARD CALANNI, RICHARD DIBENEDETTO, JAMES R. BROWN, STANLEY YACKER, ESQ., MICHAEL ALFIERI, ESQ., RICHARD PEPSNY, ESQ., ANTHONY M. CICALESE, ESQ., LAWRENCE M. CUZZI, BRIAN G. REILLY, ANTHONY D'APOLITO, and DAP CONSULTING, INC., <br><br> Defendants. | Civil Action No. 97-3496 (WGB) <br><br> Hon. <br><br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

1.    Plaintiff brings this action for violations of the Racketeer Influenced and Corrupt Organizations Act and common-law fraud.

## PARTIES

2.     Plaintiff Walsh Securities Inc. ("Walsh Securities") is, and was at all relevant times, a Delaware corporation with its principal place of business located in Parsippany-Troy Hills, New Jersey. Walsh Securities is a wholesale mortgage banker in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions. Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage market known as the "subprime" market. "Subprime" mortgages are made to borrowers who, because of past financial dealings or because of their credit history, are unable to obtain mortgage loans from "prime" mortgage lenders at prime lending rates. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans.

3.     Defendant Cristo Property Management, Ltd. a/k/a G.J.L. Limited ("Cristo Property"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Union County, New Jersey. Cristo Property is, and was at all relevant times, owned and controlled by defendant Kane.

4.     Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

5.     Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey. Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

6.     Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Kane is the President and Director of Cristo

2

Property. In addition, Kane is, and was at all relevant times, a licensed mortgage solicitor for, and an employee of, NHF.

7.    Defendant Gary Grieser ("Grieser"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Grieser is the owner of Capital Assets.

8.    Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Skowrenski is the owner of NHF.

9.    Defendant Richard Calanni ("Calanni"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Calanni is, and was at all relevant times, associated with TF Certified Real Estate Appraisals.

10.    Defendant Richard DiBenedetto ("DiBenedetto"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. DiBenedetto is, and was at all relevant times, associated with Eastern States Appraisal Services.

11.    Defendant James R. Brown ("Brown"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Brown is, and was at all relevant times, associated with Professional Evaluators of Union.

12.    Defendants Calanni, DiBenedetto and Brown (collectively, "the Appraisers"), are, and were at all relevant times, real property appraisers hired by NHF and Cristo Property.

13.    Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

14.    Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

3

15.     Defendant Richard Pepsny, Esq., ("Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

16.     Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

17.     Defendants Yacker and Cicalese (jointly, "the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction, and they, together with defendants Alfieri and Pepsny, were selected by NHF and/or Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

18.     Defendant Lawrence M. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

19.     Defendant Brian G. Reilly, ("Reilly"), upon information and belief, is, and was at all relevant times, a New Jersey resident.

20.     Defendant Anthony D'Apolito ("D'Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident.  D'Apolito was at all relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF.

21.     Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey.  DAP Consulting is owned and controlled by defendant D'Apolito.

## JURISDICTION

22.     Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

## VENUE

23.     Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

4

## INTRODUCTION

24.     Since early June 1996, defendants Cristo Property, NHF, Capital Assets, Kane, Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Yacker, Alfieri, Pepsny, Cicalese, Cuzzi, Reilly, D'Apolito and DAP Consulting (collectively, "the defendants") have been engaged in a pattern of racketeering activity which has resulted in over two hundred mortgage loans being purchased by Walsh Securities from NHF for amounts ranging up to eight times the real value of the properties at issue.  Walsh Securities was induced to purchase these mortgage loans from NHF based on fraudulent misrepresentations contained in the mortgage loan applications, including appraisals of the properties at issue.  The proceeds from Walsh Securities' mortgage loans would, among other things, be distributed among the defendants as their illicit profits.

25.     The defendants engaged in a pattern of racketeering throughout the State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson Counties, where certain of the properties are located, and in Morris County, where Walsh Securities is located.

26.     Walsh Securities remains liable for a substantial portion of the value of these mortgage loans fraudulently obtained by defendants.  Walsh Securities will not be able to recover the full amounts that have been lent through foreclosures on the properties because, due to the fraudulently inflated appraisals of the real properties that secure the mortgage loans, many of the properties are not of value equal to or greater than the amount of the mortgage loans.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

27.     A mortgage loan is a loan in which real property is used as collateral for the loan.  The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

28.     Mortgage bankers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

5

29.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers which provides the funds for the borrower at the time of closing. In these instances, Mortgage Bankers are paid fees, generally by the borrower, for originating the mortgage loans so that they can then be sold to other investors. Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. 17:11B-1, *et seq.*

30.     Potential mortgage loan borrowers who, because of, for example, their credit histories, can not obtain traditional financing from "prime" Mortgage Bankers, seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the higher risk of such mortgage loans.

31.     After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

32.     The Mortgage Bankers who deal directly with the borrower are said to "originate" the mortgage loan.   The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded. Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, references, appraisals of the underlying properties, and other documents.

33.     Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. 45:14F-1, *et seq.*  The appraisers are typically paid by the borrowers of the mortgage loans.

34.     The appraisal of the real property that is to be mortgaged is one of the most important steps in the mortgage loan process. The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower.   In addition, since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults

6

on the mortgage loans.  In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

35.   Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to the closing of the properties and the mortgage loans.

36.   Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents.  Correspondents often sell their mortgage loans to lenders known are as wholesalers.

37.   Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying loans.  The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions.  The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by issuing bonds.  This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

38.   Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually on the day of the closings.  The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

## The New Jersey Mortgage Loan Frauds

39.   Instead of the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent.  The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and deceiving Walsh Securities into financing the loans based on these inflated values.  The values

were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the resales even took place the same day as the first purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. The mortgage loan proceeds provided by Walsh Securities were then distributed among the defendants.

### "The NHF/Cristo Property" Enterprise

40.    Defendants carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the NHF/Cristo Property Enterprise" or "the Enterprise").

41.    Defendants formed the NHF/Cristo Property Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. Each defendant personally played a role in the management and the operation of the enterprise.

42.    The NHF/Cristo Property Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities with the understanding by members of the NHF/Cristo Property Enterprise that Walsh Securities would rely on the applications in deciding whether to accept the mortgage loans originated by the NHF/Cristo Property Enterprise. Apart from other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

43.    Immediately after closing on the resale of the real properties, the borrowers would secretly and fraudulently convey a majority percentage of the ownership of each real property to a member of the NHF/Cristo Property Enterprise. This secret and fraudulent conveyance constituted an act of default under each mortgage loan.

8

## The Pattern

44.    The NHF/Cristo Property Enterprise carried out numerous fraudulent transactions through a pattern of frauds, as follows:

a) Kane, acting through Cristo Property, purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties.

b) Kane, Grieser, Cuzzi and/or Reilly identified, through personal contacts, advertisements, and other means, individuals who were willing to buy these properties from Cristo Property and sign the mortgage loans. Typically, these properties were purchased as purported investment vehicles to be used as rental properties.  Many of the properties, however, were abandoned and could not be rented.

c) Kane, acting through Cristo Property, had the properties appraised by licensed appraisers.  In the majority of the instances, either Calanni, DiBenedetto or Brown appraised the property.

d) Such appraisals were in all instances for amounts falsely inflated well above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

e) Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted to Walsh Securities.  These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties.   Such false information included:

1)    The applications included appraisals of the properties which were fraudulently inflated.

2)    The applications included the sales prices of the properties which reflected the fraudulent appraised values as opposed to the true values of the properties.

3)    The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

9

4)     The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5)     The applications indicated that the seller, Cristo Property, had provided the buyers second mortgage loans in the properties, when, in fact, no second mortgage loan payments were ever made or intended to be made.

6)     The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a 60% interest in the properties to Capital Assets under secret Joint Venture Agreements.

7)     The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property.  In fact, the buyers bought the properties without paying any monies to the seller, Cristo Property.

8)     The applications typically contained other false information, such as the ages of the borrowers and other credit-related information concerning the borrowers.

f)  D'Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans.   In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF.  The payments were designed to, and did, corrupt D'Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his obligations to Walsh Securities.  The payments from NHF and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D'Apolito was acting as a faithful employee.

g)  The Closing Attorneys were paid by Cristo Property.  On the days of the closings, the Closing Attorneys would transmit to Cristo Property the proceeds of the mortgage loans fraudulently obtained from Walsh Securities.  The Closing Attorneys transmitted those funds even though the requirements and pre-conditions to the mortgage loans

were not met.   Cristo Property would then distribute certain of those proceeds to various members of the NHF/Cristo Property Enterprise, including Pepsny and Alfieri who helped facilitate certain of the transactions, for the purpose of illicitly enriching those members.

h) Around the date designated to close each of these 200-plus properties, the purchasers signed Powers of Attorney and secret Joint Venture Agreements with Capital Assets which conveyed 60 percent of the ownership in the properties to Capital Assets. A true and correct copy of a sample Joint Venture Agreement is attached as Exhibit A.   These documents and conveyances were never disclosed to Walsh Securities and violated the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not have financed the mortgage loans had it been aware of the plan to reconvey the properties.

i) Capital Assets then collected the rents, if any, from the rental of these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the mortgage loan payments when due and to pay all other expenses of the properties. In addition, on information and belief, as in a classic pyramid fraud, funds from new mortgage loans were secretly used to make interest payments on older loans. In this way, the NHF/Cristo Property Enterprise misled Walsh Securities into believing that none of the loans originated by the NHF/Cristo Property Enterprise were delinquent.

j) There were several variations on the scam:

1) Some borrowers/buyers were induced to invest $1,000.00 in a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00. Cuzzi had these purchasers execute secret Joint Venture Agreements and Powers of Attorney and provide their names and social security numbers. Upon information and belief, Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

2) Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.   Upon

11

information and belief, Reilly traveled to New York to deliver closing papers which were signed by the purchasers and notarized by Reilly and then returned by Reilly to Capital Assets, and Cuzzi and/or Grieser without the purchasers attending any closings.

3)    Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to Capital Assets and to Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed papers which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

k) In sum, upon information and belief, like traditional pyramid schemes, money obtained by the NHF/Cristo Property Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the NHF/Cristo Property Enterprise.

l) Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans.   Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

45.    The operations of the NHF/Cristo Property Enterprise are illustrated in the following examples of specific properties "flipped" by the NHF/Cristo Property Enterprise:

a) 600 5th Avenue, Asbury Park, New Jersey.

1)    Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2)    On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property for $182,500.00 to an individual borrower/buyer with the initials K.P.

12

3)    A mortgage loan on the property, in K.P.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4)    A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property. In fact, no down payment was ever made.

5)    A second mortgage for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P. In fact, Cristo Property never intended to receive payment from K.P. for that second mortgage.

6)    In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the NHF/Cristo Property Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

7)    Yacker acted as the closing attorney on this mortgage loan, and transmitted the loan proceeds to Cristo Property despite the fact that pre-conditions to the closing where not met.

8)    After the closing, Yacker filed a deed transferring sixty percent of the property to Capital Assets.

b) 1017-1019 Bangs Avenue, Asbury Park, New Jersey.

1)    Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which property was fraudulently appraised by Brown for $200,000.00.

2)    On that same day, July 25, 1996, Cristo Property sold 1017-1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M.

3)    A mortgage loan on the property, in J.M.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00.

4)    A down payment in the amount of $20,000.00 was purportedly provided by J.M. to Cristo Property. In fact, no down payment was ever made.

13

5)      A second mortgage for $30,000 at a 6% interest rate was purportedly given by Cristo Property to J.M. In fact, Cristo Property never intended to receive payment from J.M. for that second mortgage.

6)      Yacker acted as the closing attorney on this mortgage loan, and transmitted the loan proceeds to Cristo Property despite the fact that pre-conditions to the closing where not met.

7)      After the closing, Yacker filed a deed transferring sixty percent of the property to Capital Assets.

8)      J.M.'s mortgage loan application contains a "gift letter" from defendant Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made.

46.     There are over two hundred instances of transactions similar to the two outlined above.

**COUNT I.**

**VIOLATION OF 18 U.S.C. § 1962(c) (RICO)**

47.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 46 as if fully set forth herein.

48.     18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

49.     All defendant are persons within the meaning of 18 U.S.C. § 1961(3).

50.     In violation of the above-mentioned statute, the defendants associated with the NHF/Cristo Property Enterprise, which was an association in fact consisting of the defendants together and with other persons not known to plaintiff.

51.     The NHF/Cristo Property Enterprise engaged in, and conducted activities which affected, interstate commerce.

52.     Each defendant conducted and participated in the conduct of the affairs of the NHF/Cristo Property Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

53.     This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

a)     Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan originated by the NHF/Cristo Property Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut. In turn, that lender wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

b)     Commercial bribery, as described in N.J.S.A. § 2C:21-10, in that D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF) and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to transfer the loans originated by the NHF/Cristo Property Enterprise and financed by Walsh Securities.

54.     The above-mentioned predicate acts of racketeering activity conducted by defendants through the NHF/Cristo Property Enterprise caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts by defendants. The members of the NHF/Cristo Property Enterprise were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh Securities. Many of these mortgage loans are delinquent and/or in default. Based on the falsely inflated appraisals for the real properties and other fraudulent acts by the defendants, Walsh Securities will be unable to recoup the full amounts of many of the outstanding mortgage loans.

55.     By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has suffered the following foreseeable losses and damages:

15

a) the losses of monies loaned based on the falsely appraised real properties and other fraudulent representations.  Many of the properties are worth less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

b) other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(c), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT II.

### VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

56.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 55 as if fully set forth herein.

57.     18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection . . .(c) of this section."

58.     Through a series of activities outlined above in Count I, defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above in paragraphs 48 through 54.

59.     Each of the defendants willfully and knowingly agreed and conspired with other defendants to commit the above referenced predicate acts of wire fraud and commercial bribery.

60.     By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has suffered the following foreseeable losses and damages:

a) the losses of monies loaned based on the falsely appraised real properties and other fraudulent acts of defendants.  Many of the properties are worth less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover anywhere close to the full amounts loaned;

b) other consequential, incidental and special damages.

16

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(d), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT III.

## COMMON-LAW FRAUD

61.   Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 60 as if fully set forth herein.

62.   By the illegal and fraudulent acts and schemes described above, defendants willfully and intentionally defrauded Walsh Securities and made or caused to be made false, fraudulent and material misrepresentations and omissions to plaintiff concerning mortgage loans bought by Walsh Securities from NHF.  Each of these mortgage loans originated by the NHF/Cristo Property Enterprise were fraudulently obtained in that they were based on falsely inflated appraisals.  In addition, these mortgage loans also were made based on other information falsely provided to Walsh Securities including incorrect credit histories and or statements of net worth, among other things.

63.   In making and carrying out these material misrepresentations, defendants, and each of them, intended to and did deceive plaintiff.

64.   Plaintiff believed and relied upon these material misrepresentations and omissions.

65.   As a result of defendants' material misrepresentations and omissions plaintiff suffered damages substantially in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that defendants are liable to it, jointly and severally, for common-law fraud and award damages, punitive damages and other such relief as may be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against all defendants jointly and severally awarding plaintiff the following relief:

1.     Compensatory and consequential damages in an amount as yet undetermined, trebled pursuant to 18 U.S.C. § 1964(c); and

2.     Costs of this action, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

3.     An award of punitive damages as a result of defendants' fraud; and

4.     Other such relief as is just and equitable.


## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury for all issues for which it has a right to a trial by jury.

Dated: July 17, 1997

LATHAM & WATKINS
Michael Chertoff (MC 6790)
Geoffrey S. Berman (GB 1851)
One Newark Center
Newark, NJ 07101-3174
Telephone (201) 639-1234
Telecopy (201) 639-7298
ATTORNEYS FOR PLAINTIFF WALSH
    SECURITIES INC.

By: _____

Michael Chertoff

18

NY_DOCS\121900.1

# EXHIBIT C

Michael Chertoff (MC 6790)
Geoffrey S. Berman (GB 0851)
Robert A. Magnanini (RM 7356)
LATHAM & WATKINS
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
(201) 639-1234
Attorneys for Plaintiff
Walsh Securities, Inc.



UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CRISTO PROPERTY MANAGEMENT, LTD., A/K/A G.J.L. LIMITED, DEK HOMES OF NEW JERSEY, INC., OAKWOOD PROPERTIES INC., NATIONAL HOME FUNDING, INC., CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC., CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C., WILLIAM J. KANE, GARY GRIESER, ROBERT SKOWRENSKI, II, RICHARD CALANNI, RICHARD DIBENEDETTO, JAMES R. BROWN, THOMAS BRODO, RONALD J. PIERSON, STANLEY YACKER, ESQ., MICHAEL ALFIERI, ESQ., RICHARD PEPSNY, ESQ., ANTHONY M. CICALESE, ESQ., LAWRENCE M. CUZZI, ANTHONY D'APOLITO, DAP CONSULTING, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, NATIONS TITLE INSURANCE OF NEW YORK INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, and COASTAL TITLE AGENCY,<br><br>Defendants. | Civil Action No. CV 97-3496 (WGB)<br><br>Hon. William G. Bassler<br><br><br>**AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiff brings this action for violations of the Racketeer Influenced and

Corrupt Organizations Act, common-law fraud and breaches of contract.

### PARTIES

2.      Plaintiff Walsh Securities, Inc. ("Walsh Securities") is, and was at all

relevant times, a Delaware corporation with its principal place of business located in Parsippany-

Troy Hills, New Jersey.  In April 1996, Walsh Securities became a successor in interest to GF

Mortgage Corp.  Walsh Securities is a wholesale mortgage banker in the business of, among

other things, purchasing retail mortgage loans from other mortgage bankers, known as

correspondents, and packaging those mortgage loans for use as securities in secured transactions.

Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage

market known as the "subprime" market.  "Subprime" mortgage loans are made to borrowers

who, because of past financial dealings or because of their credit history, are unable to obtain

mortgage loans from "prime" mortgage lenders at prime lending rates.  "Subprime" mortgage

loans generally provide for interest rates several percentage points higher than "prime" mortgage

loans.

3.      Defendant Cristo Property Management, Ltd., a/k/a G.J.L. Limited, upon

information and belief, is, and was at all relevant times, a New Jersey corporation with its

principal place of business in Union County, New Jersey.  Cristo Property is, and was at all

relevant times, owned and controlled by defendant Kane.

4.      Defendant DEK Homes of New Jersey, Inc. ("DEK Homes") upon

information and belief, is, and was at all relevant times, a New Jersey corporation with its

2

principal place of business in New Jersey.  Upon information and belief, DEK Homes is, and was at all relevant times, owned and controlled by defendant Kane.

      5.     Defendant Oakwood Properties, Inc. ("Oakwood Properties") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey.  Upon information and belief, Oakwood Properties is, and was at all relevant times, owned and controlled by defendant Kane.

      6.     Defendants Cristo Property Management, Ltd. (a/k/a G.J.L. Limited), DEK Homes, and Oakwood Properties are all owned and controlled by defendant Kane and referred to herein collectively as "Cristo Property".

      7.     Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey.  NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

      8.     Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey.  Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

      9.     Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident.  Kane owns and controls Cristo Property, DEK

3

Homes and Oakwood Properties. In addition, Kane is, and was at all relevant times, a licensed mortgage solicitor for, and an employee of, NHF.

    10.    Defendant Gary Grieser ("Grieser"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Grieser is the owner of Capital Assets.

    11.    Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Skowrenski is the owner of NHF.

    12.    Defendant Richard Calanni ("Calanni"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Calanni is, and was at all relevant times, associated with TF Certified Real Estate Appraisals.

    13.    Defendant Richard DiBenedetto ("DiBenedetto"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. DiBenedetto is, and was at all relevant times, associated with Eastern States Appraisal Services.

    14.    Defendant James R. Brown ("Brown"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Brown is, and was at all relevant times, associated with Professional Evaluators of Union.

    15.    Defendant Thomas Brodo ("Brodo"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

4

16.     Defendant Ronald J. Pierson ("Pierson"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

17.     Defendants Calanni, DiBenedetto, Brown, Brodo and Pierson (collectively, "the Appraisers"), are, and were at all relevant times, real property appraisers hired by NHF and Cristo Property.

18.     Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

19.     Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

20.     Defendant Richard Pepsny, Esq., ("Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

21.     Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

22.     Defendants Yacker and Cicalese (jointly, "the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction. The Closing Attorneys, together with defendants Alfieri and Pepsny, were selected

5

by NHF, Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

23.     Defendant Lawrence M. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

24.     Defendant Anthony D'Apolito ("D'Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident. D'Apolito was at all relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF.

25.     Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey. DAP Consulting is owned and controlled by defendant D'Apolito.

26.     Defendant Commonwealth Land Title Insurance Company, Inc. ("Commonwealth Title"), upon information and belief, is, and was at all relevant times, a Pennsylvania corporation with its principal place of business in Pennsylvania.

27.     Defendant Nations Title Insurance of New York Inc. ("Nations Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

28.     Defendant Fidelity National Title Insurance Company of New York, Inc. ("Fidelity Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

29.     Defendant Coastal Title Agency, Inc. ("Coastal Agency"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its

6

principal place of business in New Jersey. Coastal Agency is, and was at all relevant times, a

title insurance broker that was selected by NHF, Capital Assets, Cristo, and/or the Closing

Attorneys to broker title insurance for the real property closings involving mortgage loans

originated by NHF and subsequently sold to Walsh Securities.

      30.    Defendants Commonwealth Title, Nations Title and Fidelity Title

(collectively, "the Title Insurance Defendants") are, and were at all relevant times, title insurance

companies that issued closing settlement letters to Walsh Securities, as the mortgage lender,

which letters, among other things, indemnified Walsh Securities against fraud by the Closing

Attorneys.

## JURISDICTION

      31.    Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. §

1964(c).

## VENUE

      32.    Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. §

1965(a).

7

## INTRODUCTION

33.     Since early 1996, defendants Cristo Property, NHF, Capital Assets, Kane, Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri, Pepsny, Cicalese, Cuzzi, D'Apolito, DAP Consulting and Coastal Agency (collectively, "the RICO defendants") have been engaged in a pattern of racketeering activity which has resulted in approximately two hundred twenty mortgage loans being purchased by Walsh Securities from NHF for amounts ranging up to eight times the preceding sales prices of the properties at issue. Walsh Securities was induced to purchase these mortgage loans from NHF based on fraudulent misrepresentations contained in the mortgage loan applications, including appraisals of the properties at issue.  The proceeds from Walsh Securities' mortgage loans would, among other things, be distributed among the RICO defendants as their illicit profits.

34.     The RICO defendants engaged in a pattern of racketeering throughout the State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson Counties, where certain of the properties are located, and in Morris County, where Walsh Securities is located.

35.     Walsh Securities remains liable for a substantial portion of the value of these mortgage loans fraudulently obtained by the RICO defendants.  Walsh Securities will not be able to recover the full amounts that have been lent through foreclosures on the properties because, due to the fraudulently inflated appraisals of the real properties that secure the mortgage loans, many of the properties are not of value equal to or greater than the amount of the mortgage loans and the fraudulent sales contracts.  In addition, this fraud perpetrated against Walsh

8

Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits.

36.     With respect to these fraudulently obtained mortgage loans, the Title Insurance Defendants issued to Walsh Securities, as the mortgage lender, closing service letters which require the Title Insurance Defendants to reimburse Walsh Securities for losses arising out of the fraudulent actions of the Closing Attorneys. Both of the Closing Attorneys, Yacker and Cicalese, were specifically approved to handle closings by the Title Insurance Defendants.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

37.     A mortgage loan is a loan in which real property is used as collateral for the loan. The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

38.     Mortgage bankers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

39.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers which provide the funds for the borrowers at the time of closings. In these instances, Mortgage Bankers are paid fees, generally by the borrowers, for originating the mortgage loans so that they can then be sold to other investors. Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. 17:11B-5, et seq.

9

40.     Potential mortgage loan borrowers who, because of, for example, their credit histories, can not obtain traditional financing from "prime" Mortgage Bankers, seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the increased delinquency risk of such mortgage loans.

41.     After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

42.     The Mortgage Bankers who deal directly with the borrowers are said to "originate" the mortgage loans. The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded. Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, references, appraisals of the underlying properties, and other documents.

43.     Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. 45:14F-1, et seq. The appraisers are typically paid by the borrowers of the mortgage loans.

44.     The appraisal of the real property that is to be mortgaged is one of the most important steps in the mortgage loan process. The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower. In addition,

10

since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults on the mortgage loans. In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

45. Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to the closing of the properties and the mortgage loans.

46. Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents. Correspondents often sell their mortgage loans to lenders who are known as wholesalers. Correspondents, in their contracts for sales of mortgage loans with wholesale Mortgage Bankers, typically promise that they will stand by the genuineness of the loan applications and other necessary paperwork.

47. Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying mortgage loans. The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions. The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

11

48.     Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually on the day of the closings. The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

### Title Insurance And Its Role In Real Estate Transactions

49.     Title insurance is insurance that provides for coverage, in return for premiums, for insuring, guaranteeing or indemnifying owners of real property or lenders of mortgage loans on real property against certain losses or damages as a result of defects in the titles or encumbrances on the titles of the real properties. Title insurance is usually purchased every time real property is purchased or refinanced. In most instances, mortgage lenders require that owners who will be borrowing money to finance their purchases of real property acquire title insurance coverage that also protects the mortgage loan lenders who will be lending money for the financing of the properties.

50.     In almost all instances, owners or borrowers who seek to purchase title insurance do not deal directly with the companies that provide title insurance, but rather, contact title agents who act as the brokers or middlemen between the title insurance companies and the owners or borrowers. These title agents collect premiums, issue title insurance policies on behalf of the title insurance companies, and may perform other tasks relating to the transfers of interest in the properties, including filing deeds. Title agents may be, and often are, affiliated with more

12

than one title insurance company.  Title insurance companies have relationships with multiple
title agencies.

       51.    As part of the title insurance policies issued to owners who are borrowing
money to finance their purchases of real property, title insurance companies typically issue
closing service letters for the benefit of the mortgage loan lenders.  In these closing service
letters, the title insurance companies agree to indemnify the mortgage loan lenders against loss in
connection with, among other things, fraud or misapplication by the closing attorneys.  Usually,
these closing service letters are required by mortgage loan lenders as pre-conditions to providing
the mortgage loans.  The title insurance companies will usually only issue such closing service
letters, and provide indemnification against fraud, where the closings are handled by one of the
companies' approved attorneys.  True and correct copies of sample closing service letters from
each Title Insurance Defendant are attached as Exhibits A, B and C.

## The New Jersey Mortgage Loan Frauds

      52.    Instead of the typical real estate transactions described above, the
transactions involved in this lawsuit were fraudulent.  The participants in the frauds arranged to
obtain mortgage loans by artificially inflating the apparent values of the underlying properties,
and by deceiving Walsh Securities into financing the mortgage loans based on these inflated
values.  The values were inflated through the participants' practice of purchasing the properties,
and then quickly reselling or "flipping" the properties.  These subsequent resales took place
immediately or very soon after the first purchases.  In some instances, the resales even took place
the same day as the first purchases.  In all these "flips," the real properties at issue were resold
for up to eight times the immediately preceding sales prices.  On the days of the closings, the

13

Closing Attorneys would fraudulently transfer the mortgage loan proceeds provided by Walsh Securities to themselves and certain of the other RICO defendants, even though the pre-conditions imposed by Walsh Securities for the transfer of such proceeds had not been met.

### "The NHF/Cristo Property" Enterprise

53.     The RICO defendants carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the NHF/Cristo Property Enterprise" or "the Enterprise").

54.     The RICO defendants formed the NHF/Cristo Property Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. Each RICO defendant personally played a role in the management and the operation of the Enterprise.

55.     The NHF/Cristo Property Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and NHF, with the understanding by members of the NHF/Cristo Property Enterprise that Walsh Securities would rely on the fraudulent applications in deciding whether to accept the mortgage loans originated by the NHF/Cristo Property Enterprise. A true and correct copy of the Program Participant Loan Purchase And Sale Agreement between NHF and Walsh Securities, through its predecessor in interest, is attached as Exhibit D. Apart from

14

other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

56.     Unknown to Walsh Securities, the buyer/borrowers had secretly and fraudulently agreed to convey, after the closing on the resale of the real properties, a majority percentage of the ownership of each real property to a member of the NHF/Cristo Property Enterprise. These secret and fraudulent conveyances constituted an act of default under the mortgage loans.

## The Pattern

57.     The NHF/Cristo Property Enterprise carried out numerous fraudulent transactions through a pattern of frauds, as follows:

(a)     Kane, acting through Cristo Property, purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties.

(b)     Kane, Grieser, and/or Cuzzi identified, through personal contacts, advertisements, and other means, individuals who were willing to buy these properties from Cristo Property and sign the mortgage loans. Typically, these properties were purchased as purported investment vehicles to be used as rental properties. Many of the properties, however, were abandoned and could not be rented.

(c)     Kane, acting through Cristo Property and/or NHF, had the properties appraised by licensed appraisers. In almost all instances, the property was appraised by Calanni, DiBenedetto, Brown, Brodo or Pierson.

15

(d)     Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

(e)     Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted, through D'Apolito, to Walsh Securities. These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties. Such false information included the following:

1) The applications included appraisals of the properties which were fraudulently inflated.

2) The applications included purported sales prices of the properties which reflected the fraudulent appraised values as opposed to the true values or sales prices of the properties.

3) The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

4) The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5) The applications typically indicated that the seller, Cristo Property, had provided the buyers second mortgage loans in the properties, when, in fact, no bona fide second mortgages were provided and no second mortgage loan payments were ever

16

made or intended to be made. These purported second mortgage loans were often never recorded by the Closing Attorneys, further evidencing that they were not bona fide second mortgages.

6) The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a sixty percent interest in the properties to Capital Assets under secret Joint Venture Agreements.

7) The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property. In fact, the buyers bought the properties without paying any moneys to the seller, Cristo Property.

8) The applications typically contained other false information about the real estate transactions designed to present them as better credit risks.

(f)     D'Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans. In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF. The payments were designed to, and did, corrupt D'Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his obligations to Walsh Securities. The payments from NHF

17

and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D'Apolito was acting as a faithful employee.

        (g)     On the days of the closings, the Closing Attorneys would fraudulently transmit to themselves and certain other RICO defendants, including Cristo Property, the proceeds of the mortgage loans illicitly obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though they were aware that one or all of the following requirements and pre-conditions to the mortgage loans, among others, were not met: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. In addition, the Closing Attorneys, in furtherance of the fraud, falsely certified at the time of the closings that the above mentioned pre-conditions to closing, imposed by Walsh Securities, had been met. These false certifications were made on HUD-1 settlement statements, forms required by the United States Department of Housing and Urban Development.

        (h)     The Closing Attorneys, along with Pepsny and Alfieri, also furthered the fraud by preparing and recording or causing to be recorded various deeds involved in these transactions. These deeds included the deeds covering the sales to Cristo Property, the deeds from Cristo Property to the borrowers, and the deeds conveying an interest in sixty percent of the properties from the borrowers to Capital Assets.

18

(i)     Typically, around the date designated to close these properties, the

purchasers signed Powers of Attorney, secret Joint Venture Agreements with Capital Assets and

deeds which conveyed sixty percent of the ownership in the properties to Capital Assets. A true

and correct copy of a sample Joint Venture Agreement is attached as Exhibit E. A true and

correct copy of a sample deed conveying sixty percent of the ownership in the properties to

Capital Assets is attached as Exhibit F. (In Exhibit F Capital Assets is misspelled "Capital

Assests.") These deeds conveying a sixty percent ownership interest were then filed or caused to

be filed by either the Closing Attorneys or Coastal Agency. The Joint Venture Agreements and

deeds were never disclosed to Walsh Securities. Such conveyances constituted a default under

the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would

not have financed the mortgage loans had it been aware of the plans to reconvey interest in the

properties.

(j)     Capital Assets then collected the rents, if any, from the rental of

these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the

mortgage loan payments when due and to pay other expenses of the properties. In addition, on

information and belief, as in a classic pyramid fraud, funds from new mortgage loans were

secretly used to make interest and principle payments on older loans. In this way, the

NHF/Cristo Property Enterprise misled Walsh Securities into believing that none of the loans

originated by the NHF/Cristo Property Enterprise were delinquent. In fact, as further evidence of

a classic pyramid fraud relying on new transactions to continue to fund the older transactions,

most of the properties that were claimed to be renovated were never renovated and thus could not

be rented. Additionally, at other properties which contained individuals who could have been

19

renters, no attempts were made to collect rent from those individuals who were living in the properties.

        (k)     There were several variations on the scam:

        1) Some borrowers/buyers were induced to invest $1,000.00 in a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00. Cuzzi had these purchasers execute secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney and provide their names and social security numbers. Upon information and belief, Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

        2) Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. Upon information and belief, an individual named Brian Reilly on at least one occasion on behalf of the NHF/Cristo Property Enterprise traveled to New York to deliver closing papers which were signed by the purchasers, notarized by Reilly, and then returned to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings.

        3) Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to

20

Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

(l)     In sum, upon information and belief, like traditional pyramid schemes, money obtained by the NHF/Cristo Property Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the NHF/Cristo Property Enterprise.

(m)     Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

58.     The operations of the NHF/Cristo Property Enterprise are illustrated in the following examples of specific properties "flipped" by the NHF/Cristo Property Enterprise:

(a)     600 5th Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2) On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property to an

individual borrower/buyer with the initials K.P. for the purported amount of $182,500.00. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property. and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared and signed by Pepsny and filed by Coastal Agency.

3) A mortgage loan on the property, in K.P.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4) A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property. In fact, no down payment was ever made.

5) A second mortgage loan for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P. In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from K.P. for that loan and K.P. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

6) In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the NHF/Cristo Property Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-

22

conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) K.P. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; and (4) K.P. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Fidelity Title issued a closing statement letter to Walsh Securities, which requires Fidelity Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Fidelity Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

(b)     1017-1019 Bangs Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which property was fraudulently appraised by Brown for $200,000.00.

2) On that same day, July 25, 1996, Cristo Property sold 1017-1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared by Pepsny and filed by Coastal Agency.

23

3) A mortgage loan on the property, in J.M.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00.

4) A down payment in the amount of $20,000.00 was purportedly provided by J.M. to Cristo Property. In fact, no down payment was ever made.

5) J.M.'s mortgage loan application contains a "gift letter" from defendant Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made, nor was the gift that was to be part of the down payment ever given to the seller.

6) A second mortgage loan for $30,000 at a 6% interest rate was purportedly given by Cristo Property to J.M. In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from J.M. for that loan and J.M. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) J.M. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; and (4) J.M. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States

24

Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

        8) Prior to the closing, Commonwealth Title issued a closing statement letter to Walsh Securities, which requires Commonwealth Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Commonwealth Title to perform closings.

        9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

    59.    There are over two hundred and twenty instances of transactions similar to the two outlined above.

## COUNT I.

## VIOLATION OF 18 U.S.C. § 1962(c) (RICO)

    60.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 59 as if fully set forth herein.

    61.    18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

    62.    All the RICO defendant are persons within the meaning of 18 U.S.C. § 1961(3).

25

63.     In violation of the above-mentioned statute, the RICO defendants associated with the NHF/Cristo Property Enterprise, which was an association in fact consisting of the RICO defendants together and with other persons not known to plaintiff.

64.     The NHF/Cristo Property Enterprise engaged in, and conducted activities which affected, interstate commerce.

65.     Each RICO defendant conducted and participated in the conduct of the affairs of the NHF/Cristo Property Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

66.     This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

(a)     Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the RICO defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan originated by the NHF/Cristo Property Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut. Walsh Securities then sent by facsimile the necessary closing service documents to a bank in Texas that acted as the custodian for the lender in Connecticut. Once satisfied that the necessary documentation was present, that bank in Texas then sent by facsimile its authorization to the Lender in Connecticut, who, in turn, then wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

26

        (b)     Commercial bribery, as described in N.J.S.A. § 2C:21-10, in that D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF) and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to transfer the loans originated by the NHF/Cristo Property Enterprise and financed by Walsh Securities.

        67.     The above-mentioned predicate acts of racketeering activity conducted by the RICO defendants through the NHF/Cristo Property Enterprise caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts by the RICO defendants. The members of the NHF/Cristo Property Enterprise were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh Securities. Many of these mortgage loans are delinquent and/or in default. Based on the falsely inflated appraisals for the real properties and other fraudulent acts by the RICO defendants, Walsh Securities will be unable to recoup the full amounts of many of the outstanding mortgage loans.

        68.     By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has suffered the following foreseeable losses and damages:

        (a)     the losses of moneys loaned based on the falsely appraised real properties and other fraudulent representations. Many of the properties are worth far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

27

(b)     the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

(c)     other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(c), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT II.

### VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

69.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 68 as if fully set forth herein.

70.     18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection . . .(c) of this section."

71.     Through a series of activities outlined above in Count I, the RICO defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above in paragraphs 61 through 67.

72.     Each of the RICO defendants willfully and knowingly agreed and conspired with other RICO defendants to commit the above referenced predicate acts of wire fraud and commercial bribery.

73.     By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has suffered the following foreseeable losses and damages:

28

(a)    the losses of moneys loaned based on the falsely appraised real

properties and other fraudulent acts of the RICO defendants.  Many of the properties are worth

far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore,

Walsh Securities will not be able to recover the full amounts loaned;

(b)    the fraud perpetrated against Walsh Securities has injured the

business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount

of business and profits;

(c)    other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine

that the RICO defendants are liable to it, jointly and severally, for violations of 18 U.S.C. §

1962(d), and award treble damages, attorneys fees and costs, and other such relief as may be

appropriate.

### COUNT III.

### COMMON-LAW FRAUD

74.    Plaintiff repeats and realleges each and every allegation of paragraphs 1

through 73 as if fully set forth herein.

75.    By the illegal and fraudulent acts and schemes described above, the RICO

defendants willfully and intentionally defrauded Walsh Securities and made or caused to be

made false, fraudulent and material misrepresentations and omissions to plaintiff concerning

mortgage loans bought by Walsh Securities from NHF.  Each of these mortgage loans originated

by the NHF/Cristo Property Enterprise were fraudulently obtained in that they were based on

falsely inflated appraisals.  In addition, these mortgage loans also were made based on other

29

information falsely provided to Walsh Securities including incorrect credit histories and or statements of net worth, among other things.

76.     In making and carrying out these material misrepresentations, the RICO defendants, and each of them, intended to and did deceive plaintiff.

77.     Plaintiff believed and relied upon these material misrepresentations and omissions.

78.     As a result of the RICO defendants' material misrepresentations and omissions plaintiff suffered damages substantially in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants are liable to it, jointly and severally, for common-law fraud and award damages, punitive damages and other such relief as may be appropriate.

## COUNT IV.

## BREACH OF CONTRACT BY NHF

79.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 78 as if fully set forth herein.

80.     On April 24, 1995, NHF and Walsh Securities, (through its predecessor in interest GF Mortgage Corp.) entered into a Program Participant Loan Purchase And Sale Agreement (the "Agreement"). A true and correct copy of the Agreement is attached as Exhibit D. The Agreement between NHF and plaintiff was entered into in exchange for consideration and contained mutual covenants. The Agreement covered the sale of mortgage loans from NHF to Walsh Securities involved in the NHF/Cristo Property Enterprise.

81.     Plaintiff has duly performed all the conditions of the Agreement.

30

82. NHF, as the seller of mortgage loans, agreed to certain "Representations, Warranties and Covenants of Seller" in Article 6 of the Agreement, including the representation that all information in the loan applications prepared by NHF was true and correct. NHF has breached its representations because the loan applications contained falsely inflated appraisals and other false information.

83. Plaintiff has notified NHF of its breach of the Agreement and its obligation to repurchase said mortgage loans. NHF has refused to repurchase said mortgage loans, in violation of Article 6 of the Agreement.

84. By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the NHF is liable to it for breach of contract and award damages, attorneys fees and other such relief as may be appropriate.

## COUNT V.

## BREACH OF CONTRACT BY THE TITLE INSURANCE DEFENDANTS

85. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 84 as if fully set forth herein.

86. In conjunction with real property transactions involving the NHF/Cristo Property Enterprise, borrowers of mortgage loans from plaintiff obtained title insurance from the Title Insurance Defendants. The Title Insurance Defendants, in exchange for valuable consideration, provided Walsh Securities with closing service letters covering the conduct of the Closing Attorneys, who were specifically approved by the Title Insurance Defendants. Walsh

31

Securities, required such closing service letters as a pre-condition to its agreeing to provide the mortgage loans.

87. Pursuant to these closing service letters, the Title Insurance Defendants are required to reimburse plaintiff for losses arising out of, among other things, fraud or misapplication by the Closing Attorneys. True and correct copies of sample closing service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

88. The Closing Attorneys engaged in fraud and misapplication in connection with the NHF/Cristo Property Enterprise. Among other things, the Closing Attorneys fraudulently transferred mortgage loan proceeds knowing that the following pre-conditions to closings imposed by Walsh Securities, among others, had not been satisfied: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. Walsh Securities has incurred substantial loss as a result of the fraud and/or misapplication by the Closing Attorneys.

89. Plaintiff has duly performed all of its obligations under the closing service letters of the Title Insurance Defendants and has notified the Title Insurance Defendants of its losses as a result of the fraud and/or misapplication by the Closing Attorneys.

90. The Title Insurance Defendants have failed to reimburse plaintiff for the losses it has incurred based on the fraud and/or misapplication of the approved attorneys as covered by the closing service letters.

32

91.     By reason of the foregoing facts, plaintiff has been damaged in excess of

$1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine

that the Title Insurance Defendants are liable to it for breach of contract and award damages,

attorneys fees and other such relief as may be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against:

1.      All RICO defendants jointly and severally awarding plaintiff the following

relief:

(a)     Compensatory and consequential damages in an amount as yet

undetermined, trebled pursuant to 18 U.S.C. § 1964(c); and

(b)     Costs of this action, including reasonable attorneys' fees, pursuant

to 18 U.S.C. § 1964(c); and

(c)     An award of punitive damages as a result of defendants' fraud; and

(d)     Other such relief as is just and equitable;

2.      NHF awarding plaintiff the following relief:

(e)     Compensatory and consequential damages in an amount as yet

undetermined, and

(f)     Costs of this action, including reasonable attorneys' fees, and

(g)     Other such relief as is just and equitable.

3.      All the Title Insurance Defendants awarding plaintiff the following relief:

33

(h)     Compensatory and consequential damages in an amount as yet

undetermined, and

(i)     Costs of this action, including reasonable attorneys' fees, and

(j)     Other such relief as is just and equitable.

34

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury for all issues for which it has a right to a trial by jury.

Dated: November 7, 1997

                    LATHAM & WATKINS
                    Michael Chertoff (MC 6790)
                    Geoffrey S. Berman (GB 0851)
                    Robert A. Magnanini (RM 7356)
                    One Newark Center
                    Newark, NJ 07101-3174
                    Telephone (201) 639-1234
                    Telecopy (201) 639-7298
                    ATTORNEYS FOR PLAINTIFF WALSH
                    SECURITIES INC.

          By:_____
                    Michael Chertoff

# EXHIBIT D

Michael Chertoff (MC 6790)
Geoffrey S. Berman (GB 0851)
Robert A. Magnanini (RM 7356)
LATHAM & WATKINS
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
(201) 639-1234
Attorneys for Plaintiff
Walsh Securities, Inc.

RECEIVED

FEB 11 1998

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,

　　　　　Plaintiff,

v.

CRISTO PROPERTY MANAGEMENT,
LTD., A/K/A G.J.L. LIMITED, DEK
HOMES OF NEW JERSEY, INC.,
OAKWOOD PROPERTIES INC.,
NATIONAL HOME FUNDING, INC.,
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC., CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C., WILLIAM J.
KANE, GARY GRIESER, ROBERT
SKOWRENSKI, II, RICHARD CALANNI,
RICHARD DIBENEDETTO, JAMES R.
BROWN, THOMAS BRODO, RONALD J.
PIERSON, STANLEY YACKER, ESQ.,
MICHAEL ALFIERI, ESQ., RICHARD
PEPSNY, ESQ., ANTHONY M. CICALESE,
ESQ., LAWRENCE J. CUZZI, ANTHONY
D'APOLITO, DAP CONSULTING, INC.,
COMMONWEALTH LAND TITLE
INSURANCE COMPANY, NATIONS TITLE
INSURANCE OF NEW YORK INC.,
FIDELITY NATIONAL TITLE INSURANCE
COMPANY OF NEW YORK, and COASTAL
TITLE AGENCY,

　　　　　Defendants.

Civil Action No. CV 97-3496 (WGB)

Hon. William G. Bassler

SECOND AMENDED COMPLAINT

JURY TRIAL DEMANDED

1.      Plaintiff brings this action for violations of the Racketeer Influenced and Corrupt Organizations Act, common-law fraud and breaches of contract.

## PARTIES

2.      Plaintiff Walsh Securities, Inc. ("Walsh Securities") is, and was at all relevant times, a Delaware corporation with its principal place of business located in Parsippany-Troy Hills, New Jersey.  In April 1996, Walsh Securities became a successor in interest to GF Mortgage Corp.  Walsh Securities is a wholesale mortgage banker in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions. Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage market known as the "subprime" market.  "Subprime" mortgage loans are made to borrowers who, because of past financial dealings or because of their credit history, are unable to obtain mortgage loans from "prime" mortgage lenders at prime lending rates.  "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans.

3.      Defendant Cristo Property Management, Ltd., a/k/a G.J.L. Limited, upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Union County, New Jersey.  Cristo Property is, and was at all relevant times, owned and controlled by defendant Kane.

4.      Defendant DEK Homes of New Jersey, Inc. ("DEK Homes") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its

2

principal place of business in New Jersey. Upon information and belief, DEK Homes is, and was at all relevant times, owned and controlled by defendant Kane.

      5.     Defendant Oakwood Properties, Inc. ("Oakwood Properties") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, Oakwood Properties is, and was at all relevant times, owned and controlled by defendant Kane.

      6.     Defendants Cristo Property Management, Ltd. (a/k/a G.J.L. Limited), DEK Homes, and Oakwood Properties are all owned and controlled by defendant Kane and referred to herein collectively as "Cristo Property".

      7.     Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

      8.     Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey. Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

      9.     Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Kane owns and controls Cristo Property, DEK

3

Homes and Oakwood Properties. In addition, Kane is, and was at all relevant times, a licensed mortgage solicitor for, and an employee of, NHF.

10.     Defendant Gary Grieser ("Grieser"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Grieser is the owner of Capital Assets.

11.     Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Skowrenski is the owner of NHF.

12.     Defendant Richard Calanni ("Calanni"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Calanni is, and was at all relevant times, associated with TF Certified Real Estate Appraisals.

13.     Defendant Richard DiBenedetto ("DiBenedetto"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. DiBenedetto is, and was at all relevant times, associated with Eastern States Appraisal Services.

14.     Defendant James R. Brown ("Brown"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Brown is, and was at all relevant times, associated with Professional Evaluators of Union.

15.     Defendant Thomas Brodo ("Brodo"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

4

16.     Defendant Ronald J. Pierson ("Pierson"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

17.     Defendants Calanni, DiBenedetto, Brown, Brodo and Pierson (collectively, "the Appraisers"), are, and were at all relevant times, real property appraisers hired by NHF and Cristo Property.

18.     Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

19.     Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

20.     Defendant Richard Pepsny, Esq., ("Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

21.     Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

22.     Defendants Yacker and Cicalese (jointly, "the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction. The Closing Attorneys, together with defendants Alfieri and Pepsny, were selected

5

by NHF, Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

23.     Defendant Lawrence J. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

24.     Defendant Anthony D'Apolito ("D'Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident. D'Apolito was at all relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF.

25.     Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey. DAP Consulting is owned and controlled by defendant D'Apolito.

26.     Defendant Commonwealth Land Title Insurance Company, Inc. ("Commonwealth Title"), upon information and belief, is, and was at all relevant times, a Pennsylvania corporation with its principal place of business in Pennsylvania.

27.     Defendant Nations Title Insurance of New York Inc. ("Nations Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

28.     Defendant Fidelity National Title Insurance Company of New York, Inc. ("Fidelity Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

29.     Defendant Coastal Title Agency, Inc. ("Coastal Agency"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its

6

principal place of business in New Jersey. Coastal Agency is, and was at all relevant times, a title insurance broker that was selected by NHF, Capital Assets, Cristo, and/or the Closing Attorneys to broker title insurance for the real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

      30.    Defendants Commonwealth Title, Nations Title and Fidelity Title (collectively, "the Title Insurance Defendants") are, and were at all relevant times, title insurance companies that issued closing settlement letters to Walsh Securities, as the mortgage lender, which letters, among other things, indemnified Walsh Securities against fraud by the Closing Attorneys.

**JURISDICTION**

      31.    Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

**VENUE**

      32.    Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

7

## INTRODUCTION

33.     Since early 1996, defendants Cristo Property, NHF, Capital Assets, Kane, Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri, Pepsny, Cicalese, Cuzzi, D'Apolito, DAP Consulting and Coastal Agency (collectively, "the RICO defendants") have been engaged in a pattern of racketeering activity which has resulted in approximately two hundred twenty mortgage loans being purchased by Walsh Securities from NHF for amounts ranging up to eight times the preceding sales prices of the properties at issue. Walsh Securities was induced to purchase these mortgage loans from NHF based on fraudulent misrepresentations contained in the mortgage loan applications, including appraisals of the properties at issue. The proceeds from Walsh Securities' mortgage loans would, among other things, be distributed among the RICO defendants as their illicit profits.

34.     The RICO defendants engaged in a pattern of racketeering throughout the State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson Counties, where certain of the properties are located, and in Morris County, where Walsh Securities is located.

35.     Walsh Securities remains liable for a substantial portion of the value of these mortgage loans fraudulently obtained by the RICO defendants. Walsh Securities will not be able to recover the full amounts that have been lent through foreclosures on the properties because, due to the fraudulently inflated appraisals of the real properties that secure the mortgage loans, many of the properties are not of value equal to or greater than the amount of the mortgage loans and the fraudulent sales contracts. In addition, this fraud perpetrated against Walsh

8

Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits.

36.     With respect to these fraudulently obtained mortgage loans, the Title Insurance Defendants issued to Walsh Securities, as the mortgage lender, closing service letters which require the Title Insurance Defendants to reimburse Walsh Securities for losses arising out of the fraudulent actions of the Closing Attorneys. Both of the Closing Attorneys, Yacker and Cicalese, were specifically approved to handle closings by the Title Insurance Defendants.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

37.     A mortgage loan is a loan in which real property is used as collateral for the loan. The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

38.     Mortgage bankers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

39.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers which provide the funds for the borrowers at the time of closings. In these instances, Mortgage Bankers are paid fees, generally by the borrowers, for originating the mortgage loans so that they can then be sold to other investors. Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. 17:11B-5, et seq.

9

40.     Potential mortgage loan borrowers who, because of, for example, their credit histories, can not obtain traditional financing from "prime" Mortgage Bankers, seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the increased delinquency risk of such mortgage loans.

41.     After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

42.     The Mortgage Bankers who deal directly with the borrowers are said to "originate" the mortgage loans. The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded. Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, references, appraisals of the underlying properties, and other documents.

43.     Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. 45:14F-1, et seq. The appraisers are typically paid by the borrowers of the mortgage loans.

44.     The appraisal of the real property that is to be mortgaged is one of the most important steps in the mortgage loan process. The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower. In addition,

10

since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults on the mortgage loans. In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

45.     Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to the closing of the properties and the mortgage loans.

46.     Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents.  Correspondents often sell their mortgage loans to lenders who are known as wholesalers.  Correspondents, in their contracts for sales of mortgage loans with wholesale Mortgage Bankers, typically promise that they will stand by the genuineness of the loan applications and other necessary paperwork.

47.     Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying mortgage loans. The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions. The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

11

48.    Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually on the day of the closings.  The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

## Title Insurance And Its Role In Real Estate Transactions

49.    Title insurance is insurance that provides for coverage, in return for premiums, for insuring, guaranteeing or indemnifying owners of real property or lenders of mortgage loans on real property against certain losses or damages as a result of defects in the titles or encumbrances on the titles of the real properties.  Title insurance is usually purchased every time real property is purchased or refinanced.  In most instances, mortgage lenders require that owners who will be borrowing money to finance their purchases of real property acquire title insurance coverage that also protects the mortgage loan lenders who will be lending money for the financing of the properties.

50.    In almost all instances, owners or borrowers who seek to purchase title insurance do not deal directly with the companies that provide title insurance, but rather, contact title agents who act as the brokers or middlemen between the title insurance companies and the owners or borrowers.  These title agents collect premiums, issue title insurance policies on behalf of the title insurance companies, and may perform other tasks relating to the transfers of interest in the properties, including filing deeds.  Title agents may be, and often are, affiliated with more

12

than one title insurance company. Title insurance companies have relationships with multiple title agencies.

51.    As part of the title insurance policies issued to owners who are borrowing money to finance their purchases of real property, title insurance companies typically issue closing service letters for the benefit of the mortgage loan lenders. In these closing service letters, the title insurance companies agree to indemnify the mortgage loan lenders against loss in connection with, among other things, fraud or misapplication by the closing attorneys. Usually, these closing service letters are required by mortgage loan lenders as pre-conditions to providing the mortgage loans. The title insurance companies will usually only issue such closing service letters, and provide indemnification against fraud, where the closings are handled by one of the companies' approved attorneys. True and correct copies of sample closing service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

## The New Jersey Mortgage Loan Frauds

52.    Instead of the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent. The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and by deceiving Walsh Securities into financing the mortgage loans based on these inflated values. The values were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the resales even took place the same day as the first purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. On the days of the closings, the

13

Closing Attorneys would fraudulently transfer the mortgage loan proceeds provided by Walsh Securities to themselves and certain of the other RICO defendants, even though the pre-conditions imposed by Walsh Securities for the transfer of such proceeds had not been met.

"The NHF/Cristo Property" Enterprise

53.     The RICO defendants carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the NHF/Cristo Property Enterprise" or "the Enterprise").

54.     The RICO defendants formed the NHF/Cristo Property Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. Each RICO defendant personally played a role in the management and the operation of the Enterprise.

55.     The NHF/Cristo Property Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and NHF, with the understanding by members of the NHF/Cristo Property Enterprise that Walsh Securities would rely on the fraudulent applications in deciding whether to accept the mortgage loans originated by the NHF/Cristo Property Enterprise. A true and correct copy of the Program Participant Loan Purchase And Sale Agreement between NHF and Walsh Securities, through its predecessor in interest, is attached as Exhibit D. Apart from

14

other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

56.     Unknown to Walsh Securities, the buyer/borrowers had secretly and fraudulently agreed to convey, after the closing on the resale of the real properties, a majority percentage of the ownership of each real property to a member of the NHF/Cristo Property Enterprise. These secret and fraudulent conveyances constituted an act of default under the mortgage loans.

<u>The Pattern</u>

57.     The NHF/Cristo Property Enterprise carried out numerous fraudulent transactions through a pattern of frauds, as follows:

(a)     Kane, acting through Cristo Property, purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties.

(b)     Kane, Grieser, and/or Cuzzi identified, through personal contacts, advertisements, and other means, individuals who were willing to buy these properties from Cristo Property and sign the mortgage loans. Typically, these properties were purchased as purported investment vehicles to be used as rental properties. Many of the properties, however, were abandoned and could not be rented.

(c)     Kane, acting through Cristo Property and/or NHF, had the properties appraised by licensed appraisers. In almost all instances, the property was appraised by Calanni, DiBenedetto, Brown, Brodo or Pierson.

15

(d)     Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

(e)     Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted, through D'Apolito, to Walsh Securities. These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties. Such false information included the following:

1) The applications included appraisals of the properties which were fraudulently inflated.

2) The applications included purported sales prices of the properties which reflected the fraudulent appraised values as opposed to the true values or sales prices of the properties.

3) The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

4) The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5) The applications typically indicated that the seller, Cristo Property, had provided the buyers second mortgage loans in the properties, when, in fact, no bona fide second mortgages were provided and no second mortgage loan payments were ever

16

made or intended to be made. These purported second mortgage loans were often never recorded by the Closing Attorneys, further evidencing that they were not bona fide second mortgages.

6) The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a sixty percent interest in the properties to Capital Assets under secret Joint Venture Agreements.

7) The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property. In fact, the buyers bought the properties without paying any moneys to the seller, Cristo Property.

8) The applications typically contained other false information about the real estate transactions designed to present them as better credit risks.

(f)     D'Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans. In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF. The payments were designed to, and did, corrupt D'Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his obligations to Walsh Securities. The payments from NHF

17

and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D'Apolito was acting as a faithful employee.

(g)     On the days of the closings, the Closing Attorneys would fraudulently transmit to themselves and certain other RICO defendants, including Cristo Property, the proceeds of the mortgage loans illicitly obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though they were aware that one or all of the following requirements and pre-conditions to the mortgage loans, among others, were not met: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. In addition, the Closing Attorneys, in furtherance of the fraud, falsely certified at the time of the closings that the above mentioned pre-conditions to closing, imposed by Walsh Securities, had been met. These false certifications were made on HUD-1 settlement statements, forms required by the United States Department of Housing and Urban Development.

(h)     The Closing Attorneys, along with Pepsny and Alfieri, also furthered the fraud by preparing and recording or causing to be recorded various deeds involved in these transactions. These deeds included the deeds covering the sales to Cristo Property, the deeds from Cristo Property to the borrowers, and the deeds conveying an interest in sixty percent of the properties from the borrowers to Capital Assets.

18

(i)     Typically, around the date designated to close these properties, the purchasers signed Powers of Attorney, secret Joint Venture Agreements with Capital Assets and deeds which conveyed sixty percent of the ownership in the properties to Capital Assets. A true and correct copy of a sample Joint Venture Agreement is attached as Exhibit E. A true and correct copy of a sample deed conveying sixty percent of the ownership in the properties to Capital Assets is attached as Exhibit F. (In Exhibit F Capital Assets is misspelled "Capital Assests.") These deeds conveying a sixty percent ownership interest were then filed or caused to be filed by either the Closing Attorneys or Coastal Agency. The Joint Venture Agreements and deeds were never disclosed to Walsh Securities. Such conveyances constituted a default under the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not have financed the mortgage loans had it been aware of the plans to reconvey interest in the properties.

(j)     Capital Assets then collected the rents, if any, from the rental of these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the mortgage loan payments when due and to pay other expenses of the properties. In addition, on information and belief, as in a classic pyramid fraud, funds from new mortgage loans were secretly used to make interest and principle payments on older loans. In this way, the NHF/Cristo Property Enterprise misled Walsh Securities into believing that none of the loans originated by the NHF/Cristo Property Enterprise were delinquent. In fact, as further evidence of a classic pyramid fraud relying on new transactions to continue to fund the older transactions, most of the properties that were claimed to be renovated were never renovated and thus could not be rented. Additionally, at other properties which contained individuals who could have been

19

renters, no attempts were made to collect rent from those individuals who were living in the properties.

        (k)     There were several variations on the scam:

        1) Some borrowers/buyers were induced to invest $1,000.00 in a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00. Cuzzi had these purchasers execute secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney and provide their names and social security numbers. Upon information and belief, Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

        2) Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. Upon information and belief, an individual named Brian Reilly on at least one occasion on behalf of the NHF/Cristo Property Enterprise traveled to New York to deliver closing papers which were signed by the purchasers, notarized by Reilly, and then returned to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings.

        3) Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to

20

Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

(l)     In sum, upon information and belief, like traditional pyramid schemes, money obtained by the NHF/Cristo Property Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the NHF/Cristo Property Enterprise.

(m)     Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

58.     The operations of the NHF/Cristo Property Enterprise are illustrated in the following examples of specific properties "flipped" by the NHF/Cristo Property Enterprise:

(a)     600 5th Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2) On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property to an

21

individual borrower/buyer with the initials K.P. for the purported amount of $182,500.00.  In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property.  The deed for that fraudulent transaction was prepared and signed by Pepsny and filed by Coastal Agency.

3) A mortgage loan on the property, in K.P.'s name, was originated by NHF.  Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4) A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property.  In fact, no down payment was ever made.

5) A second mortgage loan for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P.  In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from K.P. for that loan and K.P. never intended to make payment for that loan.  Moreover, the second mortgage loan was never recorded.

6) In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the NHF/Cristo Property Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property.  Yacker transmitted such funds even though he knew that the following pre-

22

conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) K.P. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; and (4) K.P. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Fidelity Title issued a closing statement letter to Walsh Securities, which requires Fidelity Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Fidelity Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

(b)      1017-1019 Bangs Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which property was fraudulently appraised by Brown for $200,000.00.

2) On that same day, July 25, 1996, Cristo Property sold 1017-1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared by Pepsny and filed by Coastal Agency.

23

3) A mortgage loan on the property, in J.M.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00.

4) A down payment in the amount of $20,000.00 was purportedly provided by J.M. to Cristo Property. In fact, no down payment was ever made.

5) J.M.'s mortgage loan application contains a "gift letter" from defendant Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made, nor was the gift that was to be part of the down payment ever given to the seller.

6) A second mortgage loan for $30,000 at a 6% interest rate was purportedly given by Cristo Property to J.M. In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from J.M. for that loan and J.M. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following preconditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) J.M. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; and (4) J.M. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States

24

Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Commonwealth Title issued a closing statement letter to Walsh Securities, which requires Commonwealth Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Commonwealth Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

59.    There are over two hundred and twenty instances of transactions similar to the two outlined above.

## COUNT I.

## VIOLATION OF 18 U.S.C. § 1962(c) (RICO)

60.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 59 as if fully set forth herein.

61.    18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

62.    All the RICO defendant are persons within the meaning of 18 U.S.C. § 1961(3).

25

63.    In violation of the above-mentioned statute, the RICO defendants associated with the NHF/Cristo Property Enterprise, which was an association in fact consisting of the RICO defendants together and with other persons not known to plaintiff.

64.    The NHF/Cristo Property Enterprise engaged in, and conducted activities which affected, interstate commerce.

65.    Each RICO defendant conducted and participated in the conduct of the affairs of the NHF/Cristo Property Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

66.    This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

(a)    Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the RICO defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan originated by the NHF/Cristo Property Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut.  Walsh Securities then sent by facsimile the necessary closing service documents to a bank in Texas that acted as the custodian for the lender in Connecticut.  Once satisfied that the necessary documentation was present, that bank in Texas then sent by facsimile its authorization to the Lender in Connecticut, who, in turn, then wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

26

(b)     Commercial bribery, as described in N.J.S.A. § 2C:21-10, in that D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF) and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to transfer the loans originated by the NHF/Cristo Property Enterprise and financed by Walsh Securities.

67.     The above-mentioned predicate acts of racketeering activity conducted by the RICO defendants through the NHF/Cristo Property Enterprise caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts by the RICO defendants. The members of the NHF/Cristo Property Enterprise were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh Securities. Many of these mortgage loans are delinquent and/or in default. Based on the falsely inflated appraisals for the real properties and other fraudulent acts by the RICO defendants, Walsh Securities will be unable to recoup the full amounts of many of the outstanding mortgage loans.

68.     By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has suffered the following foreseeable losses and damages:

(a)     the losses of moneys loaned based on the falsely appraised real properties and other fraudulent representations. Many of the properties are worth far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

27

(b)      the fraud perpetrated against Walsh Securities has injured the

business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount

of business and profits;

(c)      other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine

that the RICO defendants are liable to it, jointly and severally, for violations of 18 U.S.C. §

1962(c), and award treble damages, attorneys fees and costs, and other such relief as may be

appropriate.

## COUNT II.

## VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

69.      Plaintiff repeats and realleges each and every allegation of paragraphs 1

through 68 as if fully set forth herein.

70.      18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire

to violate any provisions of subsection . . .(c) of this section."

71.      Through a series of activities outlined above in Count I, the RICO

defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above in paragraphs 61 through

67.

72.      Each of the RICO defendants willfully and knowingly agreed and

conspired with other RICO defendants to commit the above referenced predicate acts of wire

fraud and commercial bribery.

73.      By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has

suffered the following foreseeable losses and damages:

28

(a)     the losses of moneys loaned based on the falsely appraised real properties and other fraudulent acts of the RICO defendants. Many of the properties are worth far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

(b)     the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

(c)     other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(d), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT III.

## COMMON-LAW FRAUD

74.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 73 as if fully set forth herein.

75.    By the illegal and fraudulent acts and schemes described above, the RICO defendants willfully and intentionally defrauded Walsh Securities and made or caused to be made false, fraudulent and material misrepresentations and omissions to plaintiff concerning mortgage loans bought by Walsh Securities from NHF. Each of these mortgage loans originated by the NHF/Cristo Property Enterprise were fraudulently obtained in that they were based on falsely inflated appraisals. In addition, these mortgage loans also were made based on other

29

information falsely provided to Walsh Securities including incorrect credit histories and or statements of net worth, among other things.

76. In making and carrying out these material misrepresentations, the RICO defendants, and each of them, intended to and did deceive plaintiff.

77. Plaintiff believed and relied upon these material misrepresentations and omissions.

78. As a result of the RICO defendants' material misrepresentations and omissions plaintiff suffered damages substantially in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants are liable to it, jointly and severally, for common-law fraud and award damages, punitive damages and other such relief as may be appropriate.

## COUNT IV.

## BREACH OF CONTRACT BY NHF

79. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 78 as if fully set forth herein.

80. On April 24, 1995, NHF and Walsh Securities, (through its predecessor in interest GF Mortgage Corp.) entered into a Program Participant Loan Purchase And Sale Agreement (the "Agreement"). A true and correct copy of the Agreement is attached as Exhibit D. The Agreement between NHF and plaintiff was entered into in exchange for consideration and contained mutual covenants. The Agreement covered the sale of mortgage loans from NHF to Walsh Securities involved in the NHF/Cristo Property Enterprise.

81. Plaintiff has duly performed all the conditions of the Agreement.

30

82.    NHF, as the seller of mortgage loans, agreed to certain "Representations, Warranties and Covenants of Seller" in Article 6 of the Agreement, including the representation that all information in the loan applications prepared by NHF was true and correct. NHF has breached its representations because the loan applications contained falsely inflated appraisals and other false information.

83.    Plaintiff has notified NHF of its breach of the Agreement and its obligation to repurchase said mortgage loans. NHF has refused to repurchase said mortgage loans, in violation of Article 6 of the Agreement.

84.    By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the NHF is liable to it for breach of contract and award damages, attorneys fees and other such relief as may be appropriate.

## COUNT V.

## BREACH OF CONTRACT BY THE TITLE INSURANCE DEFENDANTS

85.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 84 as if fully set forth herein.

86.    In conjunction with real property transactions involving the NHF/Cristo Property Enterprise, borrowers of mortgage loans from plaintiff obtained title insurance from the Title Insurance Defendants. The Title Insurance Defendants, in exchange for valuable consideration, provided Walsh Securities with closing service letters covering the conduct of the Closing Attorneys, who were specifically approved by the Title Insurance Defendants. Walsh

31

Securities, required such closing service letters as a pre-condition to its agreeing to provide the mortgage loans.

87.     Pursuant to these closing service letters, the Title Insurance Defendants are required to reimburse plaintiff for losses arising out of, among other things, fraud or misapplication by the Closing Attorneys.  True and correct copies of sample closing service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

88.     The Closing Attorneys engaged in fraud and misapplication in connection with the NHF/Cristo Property Enterprise.  Among other things, the Closing Attorneys fraudulently transferred mortgage loan proceeds knowing that the following pre-conditions to closings imposed by Walsh Securities, among others, had not been satisfied: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing.  Walsh Securities has incurred substantial loss as a result of the fraud and/or misapplication by the Closing Attorneys.

89.     Plaintiff has duly performed all of its obligations under the closing service letters of the Title Insurance Defendants and has notified the Title Insurance Defendants of its losses as a result of the fraud and/or misapplication by the Closing Attorneys.

90.     The Title Insurance Defendants have failed to reimburse plaintiff for the losses it has incurred based on the fraud and/or misapplication of the approved attorneys as covered by the closing service letters.

91.    By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the Title Insurance Defendants are liable to it for breach of contract and award damages, attorneys fees and other such relief as may be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against:

1.    All RICO defendants jointly and severally awarding plaintiff the following relief:

(a)    Compensatory and consequential damages in an amount as yet undetermined, trebled pursuant to 18 U.S.C. § 1964(c); and

(b)    Costs of this action, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

(c)    An award of punitive damages as a result of defendants' fraud; and

(d)    Other such relief as is just and equitable;

2.    NHF awarding plaintiff the following relief:

(e)    Compensatory and consequential damages in an amount as yet undetermined, and

(f)    Costs of this action, including reasonable attorneys' fees, and

(g)    Other such relief as is just and equitable.

3.    All the Title Insurance Defendants awarding plaintiff the following relief:

33

(h)     Compensatory and consequential damages in an amount as yet

undetermined, and

(i)     Costs of this action, including reasonable attorneys' fees, and

(j)     Other such relief as is just and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury for all issues for which it has a right to a trial by jury.

Dated: February 11, 1998

> LATHAM & WATKINS
> Michael Chertoff (MC 6790)
> Geoffrey S. Berman (GB 0851)
> Robert A. Magnanini (RM 7356)
> One Newark Center
> Newark, NJ 07101-3174
> Telephone (201) 639-1234
> Telecopy (201) 639-7298
> ATTORNEYS FOR PLAINTIFF WALSH
> SECURITIES INC.

By: _____
        Michael Chertoff

34

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

FILED

APR 2 8 1998

AT 8:30 . . . . . . . . . . . . . M
WILLIAM T. WALSH
CLERK

WALSH SECURITIES, INC.,

             Plaintiff,

v.

CRISTO PROPERTY MANAGEMENT,
LTD., et als.,

             Defendants.

Civ. No. 97-3496(WGB)

O R D E R



This matter having come before the Court upon the motion of Defendants Stanley Yacker, Cristo Property Management, DEK Homes, Oakwood Properties, and William Kane for a stay during the pendency of criminal investigations and proceedings being conducted by the United States Attorney's Office;

Defendants Capital Assets, Gary Grieser, Richard Calanni, Roland Pierson, Richard Pepsny, Anthony D'Apolitto, DAP Consulting, and Anthony Cicalese having joined in the motion to stay;

The Court having considered the submissions of the parties and the argument of counsel, and the sealed, in camera affidavit of the Government summarizing the criminal investigation;

For the reasons set forth in the Court's opinion filed this day; and

For good cause shown;

It is this __26th__ day of __April__, 1998, hereby ORDERED that all interrogatory and deposition discovery in this action is **stayed until November 1, 1998.**

It is further ORDERED that document discovery in this action ordered by United States Magistrate Judge Dennis M. Cavanaugh **shall continue as ordered;**

It is further ORDERED that any parties who have been served and who have not yet filed answers in this action shall do so or shall otherwise move within **thirty (30) days** of the date of this order.

WILLIAM G. BASSLER, U.S.D.J.

2