# EXHIBIT F

MAY 3 0 2000

AT 8.30 ............. A1
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,          :

      Plaintiff,          :     Civ. No. 97-3496

v.          :     ORDER          ENTERED
                                     ON
CRISTO PROPERTY MANAGEMENT,          :           THE DOCKET
LTD. et als.
                                 MAY 3 0 2000

      Defendants.          :           WILLIAM T. WALSH, CLERK
                                 By
                                   (Deputy Clerk)

    This matter having come before the Court upon the motion of
the Court for a status conference; and

    The Court having considered the submissions of the parties
in response to the Deputy Clerk's letter of May 1, 2000; and,

    The Court having considered in camera, the sealed
declaration of Assistant U.S. Attorney, Alan Liebman, in support
of continued stay, summarizing the status of the criminal
investigation; and,

    The Court having conducted a conference on the record on May
26, 2000, in the presence of counsel representing the plaintiff
and defendants; and,

    In light of the pending criminal investigation, all of the
parties, except National Home Funding and Robert Skowrenski II,
are of the opinion that discovery should not proceed; and,

    For the reasons set forth in the Court's opinion filed on
April 28, 1998 and for good cause shown;

IT IS on this 26th day of May, 2000, hereby ORDERED that all

discovery in this action is stayed pending further order of the

Court;

   IT IS FURTHER ORDERED that this case be administratively

dismissed until further order of the Court.

WILLIAM G. BASSLER, U.S.D.J.

# EXHIBIT G

AL:2000R00335

ORIGINAL FILED

JAN 26 2001

WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA          :     Hon.

v.                                :     Criminal No. 01-47 (AmW)

STANLEY YACKER,                   :
IRENE DIFEO, and
DONNA PEPSNY                      :     Title 18, United States Code,
                                  :     Sections 371, 1343 and 2

## I N D I C T M E N T

The United States Grand Jury in and for the District of
New Jersey, sitting in Newark, charges as follows:

### COUNT 1
(Conspiracy to commit wire fraud)

### Real estate brokers and salespersons

1.  At all times relevant to this Indictment:

a.  Brokers and salespersons performed a critical
role in many residential real estate transactions.  Sellers of
real estate engaged brokers and salespersons to find purchasers
for a given property.  Purchasers of real estate relied upon
brokers and salespersons to locate a suitable home for them to
acquire.  Brokers and salespersons, after procuring a purchaser
for the property, often prepared the contract of sale using
standard, pre-printed forms.

b.  Real estate brokers and salespersons were
licensed by the State of New Jersey and subject to its laws, as
well as industry codes of ethics and standards of practice which
they voluntarily agreed to observe.  Among other requirements,

New Jersey law provided that licensed brokers and salespersons owed a fiduciary duty to their clients, such as purchasers, and were required to deal fairly with all parties and to disclose any material information as to the physical condition of a property.

### Attorneys

2.   At all times relevant to this Indictment:

a.   The roles performed by attorneys for the seller and purchaser also were critical components of residential real estate transactions, including the process by which title to property was conveyed from seller to purchaser, called the closing; the proper receipt and disbursement of funds at closing; and the proper documentation of the transaction.

b.   Among other responsibilities, the attorney for the purchaser would typically:

(i)   review the real estate contract of sale on the purchaser's behalf with a view toward protecting the purchaser's interests;

(ii)   receive the mortgage loan proceeds from the mortgage lender shortly before the closing;

(iii)   conduct the closing, including dis-bursing funds to the seller and others, preparing a settlement statement called a "HUD-1" or "RESPA" (named after the federal Real Estate Settlement Procedures Act) to accurately and completely de-

-2-

tail receipts and disbursements involved in the
transaction, preparing and reviewing other closing
documents, and complying with the lender's closing
instructions; and

(iv)  cause closing documents such as the
deed and mortgage to be recorded.

c.    Attorneys practicing law in New Jersey were
subject to ethics rules adopted by the New Jersey Supreme Court.
Among other things, those ethics rules required lawyers to
represent clients with reasonable diligence, to sufficiently
explain a matter to permit the client to make informed decisions,
to consult with their client concerning the means of achieving
the objective of the representation, to disclose in writing the
basis or rate of their legal fees within a reasonable time after
commencing the representation, and to avoid conflicts between the
interests of one client and the interests of another client, a
third person, or their own interests.  In addition, attorneys
were prohibited from knowingly making a false statement of
material fact or law to a third person and from engaging in
conduct involving dishonesty, fraud, deceit, or misrepresenta-
tion.

-3-

<u>Mortgage loans</u>

3.  At all times relevant to this Indictment:

a.  A mortgage loan was a loan in which real
property was used as collateral.  Generally, the amount of the
loan was limited to a percentage of the lower of the appraised
market value of the property or its sales price.  The relation-
ship of the mortgage loan amount to the lower of market value or
sales price was known as the loan to value ratio.

b.  It was unusual for a lender to legitimately
provide a mortgage loan to cover 100% of the purchase price of a
home, that is, not to require any down payment from the pur-
chaser.  Even then, generally only those purchasers with strong
credit histories could qualify for a no-down payment loan, and
then only with the payment of substantial fees to the lender --
called points because they were calculated based on a percentage
of the loan amount -- and with a higher interest rate on the
loan.

c.  Among the factors considered by lenders in
deciding whether and on what terms to make a mortgage loan were
the following:

(i) the income and assets of the purchaser-
borrower, and the nature and extent of the docu-
mentation required by the lender to verify the
borrower's income and assets;

-4-

(ii) the purchaser-borrower's liabilities and credit history;

(iii) the market value or sales price of the property, and resulting loan to value ratio;

(iv) whether the purchaser-borrower would contribute his or her own funds as a down payment toward the purchase;

(v) whether the seller would provide financing by loaning to the purchaser-borrower a portion of the purchase price and taking a second mortgage on the property to secure that interest; and

(vi) for multi-family residential properties, the existing leases and the expected rental income from the property.

d. Funds for the actual loan were often transferred by wire to the escrow or trust account of an attorney participating in the closing, usually the purchaser's attorney, to be disbursed by that attorney at closing.

e. Following the closing on a property, the lender would often sell that mortgage loan, individually or in groups of loans, to another entity. The entity which purchased such a loan relied on the accuracy and genuineness of the documents related to the loan, including any contract of sale and HUD-1/RESPA settlement statement.

-5-

Effect of sales prices on property
. value assessments and municipal finances

4.   At all times relevant to this Indictment:

a.   Under New Jersey law, municipalities were
generally required to assess residential real estate at fair
market value.

b.   Municipalities, county governments, and the
State of New Jersey maintained records of the assessed values of
properties within the municipalities and the ratio of the sale
prices of real property in relation to the assessed values of the
real property.

c.   The State's Department of Education determined
the amount of school aid to municipalities based on a formula
which included the equalized property valuation for that munici-
pality.  For a given municipality, that valuation was calculated
based on an average over a period of time of the ·sales prices
reported within the municipality.  If the reported sales prices
exceeded the properties' assessed value, then the resulting
valuation upward could, through the application of the school aid
formula, cause a reduction in the amount of state aid to that
municipality.

d.   Also, if high reported sales prices required
the municipality to adjust its property values upwards, then
property taxes could increase for the owners of properties in the
affected areas of that municipality.

-6-

<u>The defendants</u>

5.   At all times relevant to this Indictment defendant **STANLEY YACKER** was an attorney at law in New Jersey.  He maintained offices in Matawan, New Jersey.

6.   At all times relevant to this Indictment defendant **IRENE DIFEO** was a licensed real estate broker in New Jersey.  She maintained an office in Hazlet, New Jersey.

7.   At all times relevant to this Indictment defendant **DONNA PEPSNY** was a licensed real estate salesperson in New Jersey.  She maintained an office in Rumson, New Jersey.

#### THE CONSPIRACY

8.   Between as early as in or around mid-1995 and as late as in or around mid-1997, in the District of New Jersey and elsewhere, defendants

> **STANLEY YACKER,**
> **IRENE DIFEO,** and
> **DONNA PEPSNY**

did knowingly and wilfully combine, conspire, confederate, and agree with each other and with others to commit an offense against the United States, that is, to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and to do so by means of wire communications, contrary to 18 U.S.C. § 1343.

-7-

## OBJECT OF THE CONSPIRACY

9. It was a principal object of the conspiracy that defendants **STANLEY YACKER, IRENE DIFEO**, and **DONNA PEPSNY**, acting for their own financial gain, sought to take advantage of purchasers seeking to acquire affordable homes for themselves and their families, often under necessity; misrepresented to those purchasers the terms of the transactions; and falsified documents relating to the closings on those homes and relating to the mortgage loans obtained by the purchasers.

## MEANS AND METHODS OF THE CONSPIRACY

10. Beginning as early as in or around 1995, defendants **IRENE DIFEO** and **DONNA PEPSNY** sought, in consideration for commission payments to them, to locate purchasers for properties being sold in various locations in New Jersey. These properties in most cases had only recently been acquired by the selling entity and, in many instances, were in disrepair and had undergone cosmetic or incomplete repairs to make them appear inhabitable.

11. In order to attract purchasers, signs were often placed on the properties and advertisements were placed in newspapers claiming that the properties could be acquired for little or no down payment or closing costs. This representation was designed to, and did, appeal to purchasers whose financial circumstances left them without sufficient funds for a meaningful

-8-

down payment or for closing costs.

12.  Prospective purchasers who called the telephone numbers reflected on the signs and in the advertisements were put in contact with either defendant **IRENE DIFEO** or defendant **DONNA PEPSNY**, who then sought to induce the purchasers to enter into contracts of sale, which were prepared by **DIFEO** or **PEPSNY** respectively.

13.  In order to cause purchasers to enter into contracts of sale for, and subsequently acquire title to, these properties, defendants **IRENE DIFEO** and **DONNA PEPSNY** engaged in misrepresentations and fraudulent conduct, including the following:

a.  failing to disclose the true purchase price of the home, instead marketing the home on the basis of the monthly mortgage payment which would be required of the purchaser;

b.  misrepresenting the nature and interest rate of the mortgage loan for which the purchaser would qualify, and the amount of the resulting monthly payment;

c.  failing to disclose material information about the poor and cosmetically-concealed state of the home;

d.  failing to disclose prior problems and unperformed repairs involving the same seller;

-9-

e. misrepresenting that no down payment or closing costs would be required in transactions where purchasers were in fact required to provide a down payment and to pay closing costs;

f. creating or causing the creation of documents called gift letters, to establish the false appearance that a relative or friend of the purchaser was contributing funds toward the purchase of the home;

g. participating in the falsification of loan applications on behalf of purchasers;

h. using funds of the seller to obtain money orders to establish the false appearance that the purchaser had contributed those monies as a down payment toward the purchase of the home;

i. falsely increasing the purchase price of a home after a contract of sale had been fully executed in order to inflate the amount of the mortgage loan -- based on a percentage of that sales price -- available for the transaction;

j. failing to disclose to purchasers that as a result of their minimal down payment and the fraudulent increase in the purchase price, the seller would require the purchaser to execute at closing and become responsible for an additional, second mortgage loan, thereby increasing the purchaser's monthly mortgage obligations;

-10-

k. causing the falsification of numerous documents related to the transaction;

l. misleading those purchasers who wished to borrow funds to complete repairs or renovations of the home as to the amount of funds which they could obtain for that purpose; and

m. fraudulently altering or causing to be altered contracts of sale, and either forging the signatures of purchasers to contracts of sale or fraudulently using true signatures taken from an earlier, fully-executed, lower-priced contract of sale.

14. Defendants **IRENE DIFEO** and **DONNA PEPSNY** sought to steer prospective purchasers to a particular mortgage company for a mortgage loan, often collecting wage and tax documents from the purchasers themselves and participating in the preparation of loan applications and related documents. Co-conspirator loan officers of that mortgage company would falsify documents in support of a loan application for the purchaser.

15. Defendants **IRENE DIFEO** and **DONNA PEPSNY** also sought to steer purchasers to use defendant **STANLEY YACKER** as their closing attorney.

16. In the course of representing purchasers who agreed to retain him as their attorney, but in fact to further his own interests and those of the seller and co-conspirators **IRENE DIFEO** and **DONNA PEPSNY**, defendant **STANLEY YACKER** engaged in

-11-

misrepresentations and fraudulent conduct, including the follow-
ing:

        a. causing purchasers to sign critical closing
documents in blank;

        b. misrepresenting the nature and interest rate
of the mortgage loan for which the purchaser had qualified, and
the amount of the resulting monthly payment;

        c. failing to disclose prior problems and
unperformed repairs involving the same seller;

        d. failing to disclose to purchasers that, as a
result of the purchaser's minimal down payment and the fraudulent
increase of the purchase price, the seller would require the
purchaser to execute at closing and become responsible for an
additional, second mortgage loan, thereby increasing the pur-
chaser's monthly mortgage obligations;

        e. concealing the fact that some purchasers
received funds out of closing to make repairs on their ill-
repaired homes, by issuing checks to the purchasers in the names
of other persons or entities;

        f. causing the falsification of numerous
documents related to the transaction, including HUD-1/RESPA
settlement statements which disguised the true nature and details
of the transaction;

-12-

g.   failing to advise his purchaser-clients to abandon the closing when it was in their best interest to do so, and in fact encouraging or pressuring them to complete the closing under those circumstances, even after he acknowledged that contracts of sale had been fraudulently altered and the signatures forged or fraudulently taken from an earlier, fully-executed, lower-priced contract of sale;

h.   creating a fictitious sale of a property to a purchaser's relative who would then convey the property to the actual purchaser, in order to justify a false increase in the final purchase price of the home and to inflate the amount of the mortgage loan available for the transaction;

i.   creating the false appearance in the mortgage loan file that debts of the purchasers were paid off as part of the closing, as required by a lender, by photocopying checks written by the purchasers which he then returned to them;

j.   failing to provide purchasers with copies of documents related to their closings; and

k.   failing to record deeds to establish and protect the purchasers' interests in their properties.

17.   Defendant **STANLEY YACKER** earned substantial legal fees and defendants **IRENE DIFEO** and **DONNA PEPSNY** earned substantial commissions for their participation in the scheme.

- 13 -

18. Consequently, numerous purchasers were saddled with multiple mortgage payments at interest rates, in amounts, and on terms which they could not sustain; properties in disrepair which had been purchased at high prices well in excess of their true market values; and unsettled states of title to their homes. As a result of the actions of defendants **STANLEY YACKER, IRENE DIFEO,** and **DONNA PEPSNY,** numerous purchasers with limited funds or weak credit histories who had been induced to purchase these homes on the representation of no down payments and no closing costs eventually lost their homes due to foreclosure and were compelled in some instances to file for bankruptcy.

# EXHIBIT H

AL:2002R00141

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA         :      Hon.

              v.                 :      Criminal No. 02-508 (KSH)

ELIZABETH A. DEMOLA              :      Title 18, United States Code,
a/k/a "Betty Ann" Demola                Sections 371, 1343, and 2

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey,

sitting at Newark, charges as follows:

### COUNT 1
### (Conspiracy to commit wire fraud)

#### Background

1.  At all times relevant to this Indictment:

a.  Defendant **ELIZABETH A. DEMOLA**, also known as

"Betty Ann" Demola, was the National Sales Manager of Walsh

Securities, Inc. ("Walsh Securities"), a company whose other

principals were her brothers.  Walsh Securities was engaged

primarily in the business of funding residential mortgage loans,

with its main office in Parsippany, New Jersey and with numerous

branch offices throughout the United States.  **DEMOLA** was also a

shareholder in Walsh Securities.

b.  Walsh Securities was a wholesale mortgage

lender, whose loan programs were made known to companies which

functioned as mortgage originators.  Those loan programs featured

various interest rates and other terms on which Walsh Securities was prepared to provide financing for borrowers. Mortgage originators would generally complete a loan application and take other information from a prospective borrower, among other steps, and then forward the loan application and other information about the borrower and property purchase to Walsh Securities. Mortgage originators were paid fees for bringing a loan to Walsh Securities, in addition to any fees paid by the borrower directly to the mortgage originator.

2. At all times relevant to this Indictment, Walsh Securities would then, in a process known as underwriting, review materials concerning a mortgage loan, which included an appraisal of the value of the property and credit and income information as to the borrower, in deciding whether or not to make the loan.

3. At all times relevant to this Indictment, Greenwich Capital Markets, Inc., of Greenwich, Connecticut ("Greenwich Capital"), which is not named here as a co-conspirator, was a source of funds for most mortgage loans made by Walsh Securities in New Jersey. Walsh Securities would fund those mortgage loans by drawing down on a credit facility, called a "warehouse" credit line, with Greenwich Capital. The funds of Greenwich Capital were often transferred by wire from a bank account outside New Jersey directly to the escrow or trust account of a New Jersey attorney participating in the closing of

-2-

title on the property, to be disbursed according to instructions provided to the attorney by Walsh Securities.

4. At all times relevant to this Indictment, Walsh Securities pursued one or both of the following courses of action with regard to mortgage loans acquired from mortgage originators: (a) Walsh Securities resold individual loans or groups of loans to other entities in transactions known as "whole loan sales," and (b) Walsh Securities, beginning in or around September 1996, pooled together large numbers of loans and sold interests in the pools to investors in a process called "securitization."

### Fraudulent real estate practices

5. At all times relevant to this Indictment:

a. A "land flip" was a transaction in which real property was purchased or was under contract to be purchased at a relatively low price and was to be resold shortly thereafter to another at a significantly higher price. In a fraudulent land flip: (i) the higher price on resale did not fairly represent the market value of the property in an arms-length transaction, but was an artificially high price, generally supported by an inflated and false appraisal; and (ii) the higher, fraudulent resale price was used to generate a mortgage loan, the proceeds of which were disbursed for purposes including completion of the initial purchase of the property and distribution to the participants in the scheme.

-3-

b. Generally, fraudulent land flips involved two categories of buyer-borrowers. One category consisted of persons who had a genuine interest in owning and holding title to a particular property. Another category concerned persons who were identified as the buyer-borrower on the resale of the property but who had no genuine interest in owning, occupying, or holding title to the particular property and were often unaware that a property was being purchased, and a mortgage loan obtained, in their name.

## THE CONSPIRACY

6. From in or around 1996 to at least as late as in or around August 1997, in the District of New Jersey and elsewhere, defendant

### ELIZABETH A. DEMOLA

knowingly and wilfully combined, conspired, confederated, and agreed with others to commit an offense against the United States, that is, to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and to do so by means of interstate wire communications, contrary to 18 U.S.C. § 1343.

-4-

## OBJECTS OF THE CONSPIRACY

7. The objects of the conspiracy included: (a)
allowing various co-conspirators to benefit from fraudulently
participating in sales of properties utilizing falsified
transaction documents; and (b) allowing Walsh Securities to
fraudulently increase its inventory of mortgage loans, to the
anticipated benefit of defendant **ELIZABETH A. DEMOLA** and other
co-conspirators.

## MEANS AND METHODS OF THE CONSPIRACY

8. In furtherance of the conspiracy, defendant
**ELIZABETH A. DEMOLA** and her co-conspirators sought to cause Walsh
Securities to fund an increasing number of mortgage loans
initiated by various mortgage originators and others, including
persons participating in fraudulent land flips. Their purpose in
doing so was to enlarge Walsh Securities' inventory of mortgage
loans to permit Walsh Securities to profitably securitize its
loan pools. **DEMOLA** and her co-conspirators planned thereby to
make Walsh Securities appear financially more successful and
attractive, in order to benefit themselves by facilitating either
an initial public offering of the company's stock or an
acquisition by, or merger with, another mortgage company.

9. In order to facilitate fraudulent land flipping
activity and to generate the resulting mortgage loans for Walsh
Securities, defendant **ELIZABETH A. DEMOLA** and her co-

-5-

conspirators took the following actions, among others:

a. accepting kickbacks from land flippers in connection with the processing of fraudulent mortgage applications and related documents on properties sold by such persons;

b. preparing fictitious leases designed to show that multi-family properties which were the subject of loan applications were occupied by rent-paying tenants and therefore would appear to generate rental income sufficient to support a mortgage loan;

c. agreeing to have the fraudulent land flipping seller and others create second mortgage documents in order to conceal the absence of actual down payments by buyers;

d. approving and funding loans knowing that buyers had not made the down payments reflected in the loan documents;

e. preparing fictitious attorney escrow letters showing non-existent down payments by buyers;

f. pressuring appraisers to inflate their valuations of properties to justify higher mortgage loans;.

g. pressuring and demanding that loan originators and others submit their loan applications and related documents to Walsh Securities, particularly towards the end of each month;

-6-

h. improperly eliminating underwriting conditions which were not met;

i. directing loan underwriters and others to overlook suspicious loan applications and supporting documentation;

j. approving and funding loans without first having obtained an accurate, written appraisal;

k. approving, funding, reselling and securitizing loans supported by appraisals they knew contained inflated market values and other false information;

l. approving, funding, reselling and securitizing loans supported by escrow letters and second mortgages which were not genuine;

m. approving, funding, reselling and securitizing loans knowing that mortgage payments would be made not by the buyer-borrower but by co-conspirators; and

n. directing and participating in the purging of documents from loan files and the alteration of documents in loan files.

10. When Greenwich Capital sought to have its representatives inspect various properties which stood as the collateral for Walsh Securities' mortgage loans, defendant **ELIZABETH A. DEMOLA** and her co-conspirators took steps to forestall those inspections and to conceal problems with the

-7-

properties by, among other things, causing persons to temporarily and cosmetically cover up defects in the properties and physically delaying inspections by a Greenwich Capital representative in order to allow that concealment activity to be completed.

11. As a result of the increased loan volume generated through the fraudulent land flipping activity, in or around early 1997, the principals of Walsh Securities were able to induce Resource Bancshares Mortgage Group, Inc. ("RBMG"), a large South Carolina mortgage company, to enter into an agreement to merge with Walsh Securities. Under the terms of the proposed merger, shareholders of Walsh Securities, including defendant **ELIZABETH A. DEMOLA**, were to receive substantial and valuable shareholdings in RBMG when the merger was concluded. In addition, **DEMOLA** was to become an Executive Vice-President of the merged entity, with a substantial salary, as well as bonuses, commissions, and benefits.

12. Beginning in or around late June 1997 the fraudulent land flipping activity and the corresponding number of mortgage loans funded by Walsh Securities began to decline, as the result of a law enforcement investigation into the fraudulent activity and a series of newspaper articles concerning the allegations.

13. Defendant **ELIZABETH A. DEMOLA** and her co-conspirators sought for their benefit to preserve the proposed merger with RBMG and the warehouse credit line with Greenwich Capital -- both of which were threatened by the law enforcement investigation and the press disclosures of the allegations of fraud -- by causing Walsh Securities to issue false, lulling communications to outside parties concerning the nature and scope of the fraud and the purported lack of involvement of management personnel at Walsh Securities. In those communications and by other means, Walsh Securities falsely ascribed sole blame for the fraud to persons outside the company and to lower-level employees of the company.

14. For a period of time defendant **ELIZABETH A. DEMOLA** and her co-conspirators were able through these communications and other means to successfully delay action by RBMG and Greenwich Capital which would have threatened the financial windfall anticipated by **DEMOLA** and her co-conspirators. Ultimately, however, and despite those efforts, RBMG terminated the proposed merger and Greenwich Capital terminated its warehouse line of credit.

-9-

## OVERT ACTS

15. In furtherance of the conspiracy and in order to effect the objects thereof, defendant **ELIZABETH A. DEMOLA** and her co-conspirators caused the following overt acts to be committed in the District of New Jersey and elsewhere:

a. In 1996 and 1997 **DEMOLA** instructed lower-level employees at Walsh Securities to approve and fund mortgage loans without written appraisals.

b. In 1996 and 1997 **DEMOLA** caused Greenwich Capital Markets on various occasions to wire transfer, through various bank accounts outside New Jersey into attorneys' bank accounts in New Jersey, monies to fund mortgage loans being approved and funded on the basis of falsified documents.

c. In January 1997 **DEMOLA** participated in meetings at Walsh Securities with co-conspirators to discuss fraudulent loan activity.

d. In June 1997 **DEMOLA** participated in meetings at Walsh Securities with co-conspirators to discuss fraudulent loan activity.

e. On or about July 3, 1997 **DEMOLA** caused a letter, sent from Walsh Securities to Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

- 10 -

f.   On or about July 10, 1997 **DEMOLA** caused a
letter, sent from Walsh Securities to parties including Greenwich
Capital Markets, to falsely describe the fraudulent loan
activity.

g.   On or about July 24, 1997 **DEMOLA** caused a
letter, sent from Walsh Securities to parties including Greenwich
Capital Markets, to falsely describe the fraudulent loan
activity.

h.   On or about August 27, 1997 **DEMOLA** caused a
letter, sent from Walsh Securities to parties including RBMG and
Greenwich Capital Markets, to falsely describe the fraudulent
loan activity.

All in violation of Title 18, United States Code,
Section 371.

## COUNTS 2-4
### (Wire fraud)

1. The allegations contained in paragraphs 1 through 5 and 8 through 14 of Count 1 of this Indictment are reiterated as if set forth at length.

2. From in or around 1996 to at least as late as in or around August 1997, in the District of New Jersey and elsewhere, defendant

### ELIZABETH A. DEMOLA,

having knowingly and wilfully devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, as set forth in Count 1 of this Indictment, did, on or about the dates set forth below, for the purpose of executing the scheme and artifice and attempting to do so, cause to be transmitted by means of wire in interstate commerce writings, signs, signals, and sounds, that is, **DEMOLA** caused materially false statements and half-truths, and the concealment of material information, to be made in lulling letters and communications sent by Walsh Securities to various parties concerning the nature and scope of the fraud and the purported lack of involvement of management personnel at

Walsh Securities, as set forth below:

| Count | Approx. Date | Nature of wire transmission |
|-------|--------------|------------------------------|
| 2 | July 3, 1997 | Facsimile transmittal of letter from Walsh Securities in New Jersey to Greenwich Capital Markets in Connecticut |
| 3 | July 10, 1997 | Facsimile transmittal of letter from Walsh Securities in New Jersey to Greenwich Capital Markets in Connecticut |
| 4 | August 27, 1997 | Facsimile transmittal of letter from Walsh Securities in New Jersey to RBMG in South Carolina |

In violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL

_Anne M Butler_

FOREPERSON

_Christopher J. Christie_
CHRISTOPHER J. CHRISTIE
United States Attorney

# EXHIBIT I

Robert A. Magnanini, Esq. (RM 7356)
BOIES, SCHILLER & FLEXNER LLP
150 JOHN F. KENNEDY PARKWAY
SHORT HILLS, NEW JERSEY 07078
973-218-1111
Attorneys for Plaintiff Walsh Securities, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,

　　　　　Plaintiff,

vs.

Action No. CV 97-3496 (WGB)

Hon. William G. Bassler

**THIRD AMENDED COMPLAINT**

CRISTO ROPERTY MANAGEMENT, LTD.,
a/k/a G.J.L. LIMITED, DEK HOMES OF NEW
JERSEY, INC., OAKWOOD PROPERTIES, INC.,
NATIONAL HOME FUNDING, INC., CAPITAL
ASSETS PROPERTY MANAGEMENT &
INVESTMENT CO., INC., CAPITAL ASSSETS
PROPERTY MANAGEMENT, L.L.C., WILLIAM
KANE, GARY GRIESER, ROBERT SKOWRENSKI, II,
RICHARD CALANNI, RICHARD DiBENEDETTO,
JAMES R. BROWN, THOMAS BRODO, ROLAND
PIERSON, STANLEY YACKER, ESQ., MICHAEL
ALFIERI, ESQ., RICHARD PEPSNY, ESQ.,
ANTHONY M. CICALESE, ESQ., LAWRENCE
CUZZI, ANTHONY D'APOLITO, DAP CONSULTING,
INC., COMMONWEALTH LAND TITLE INSURANCE
CO., NATIONS TITLE INSURANCE OF NEW YORK,
INC., FIDELITY NATIONAL TITLE INSURANCE CO.
OF NEW YORK, COASTAL TITLE AGENCY,
STEWART TITLE GUARANTY COMPANY,
IRENE DIFEO, DONNA PEPSNY and WEICHERT
REALTORS

　　　　　Defendants.

1.　　Plaintiff brings this action for violations of the Racketeer Influenced and

Corrupt Organizations Act, common-law fraud, negligence and breaches of contract.

### PARTIES

2.      Plaintiff Walsh Securities, Inc. ("Walsh Securities") is, and was at all relevant times, a Delaware corporation with its principal place of business located in Parsippany-Troy Hills, New Jersey. In April 1996, Walsh Securities became a successor in interest to GF Mortgage Corp. Walsh Securities is a wholesale mortgage banker in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions.  Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage market known as the "subprime" market. "Subprime" mortgage loans are made to borrowers who, because of past financial dealings or because of their credit history, are unable to obtain mortgage loans from "prime" mortgage lenders at prime lending rates. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans.

3.      Defendant Cristo Property Management, Ltd., a/k/a G.J.L. Limited, upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Union County, New Jersey. Cristo Property is, and was at all relevant times, owned and controlled by defendant Kane.

4.      Defendant DEK Homes of New Jersey, Inc. ("DEK Homes") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, DEK Homes is, and was at all relevant times, owned and controlled by defendant Kane.

2

5.      Defendant Oakwood Properties, Inc. ("Oakwood Properties") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, Oakwood Properties is, and was at all relevant times, owned and controlled by defendant Kane.

6.      Defendants Cristo Property Management, Ltd. (a/k/a G.J.L. Limited), DEK Homes, and Oakwood Properties are all owned and controlled by defendant Kane and referred to herein collectively as "Cristo Property".

7.      Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

8.      Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey. Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

9.      Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Kane owns and controls Cristo Property, DEK Homes and Oakwood Properties. In addition, Kane is, and was at all relevant times, a licensed mortgage solicitor for, and an employee of, NHF.

10.     Defendant Gary Grieser ("Grieser"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Grieser is the owner of Capital Assets.

3

11.     Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Skowrenski is the owner of NHF.

12.     Defendant Richard Calanni ("Calanni"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Calanni is, and was at all relevant times, associated with TF Certified Real Estate Appraisals.

13.     Defendant Richard DiBenedetto ("DiBenedetto"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. DiBenedetto is, and was at all relevant times, associated with Eastern States Appraisal Services.

14.     Defendant James R. Brown ("Brown"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Brown is, and was at all relevant times, associated with Professional Evaluators of Union.

15.     Defendant Thomas Brodo ("Brodo"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

16.     Defendant Roland J. Pierson ("Pierson"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

17.     Defendants Calanni, DiBenedetto, Brown, Brodo and Pierson (collectively, "the Appraisers"), are, and were at all relevant times, real property

4

appraisers hired by NHF and Cristo Property.

18.     Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

19.     Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

20.     Defendant Richard Pepsny, Esq., ("Richard Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

21.     Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

22.     Defendants Yacker and Cicalese jointly, ("the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction. The Closing Attorneys, together with defendants Alfieri and Richard Pepsny, were selected by NHF, Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

23.     Defendant Lawrence J. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

24.     Defendant Anthony D'Apolito ("D' Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident. D' Apolito was at all

5

relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF.

25. Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey. DAP Consulting is owned and controlled by defendant D' Apolito.

26. Defendant Irene DiFeo ("DiFeo"), upon information and belief, is, and was at all relevant times, a resident of New Jersey and a licensed real estate broker in New Jersey in an employment or agency relationship with Weichert Realtors.

27. Defendant Donna Pepsny ("Donna Pepsny"), upon information and belief, is, and was at all relevant times, a resident of New Jersey and a licensed real estate broker in New Jersey in an employment or agency relationship with Weichert Realtors.

28. Defendant Weichert Realtors ("Weichert"), upon information and belief, is, and was at all relevant times a New Jersey real estate services firm with its principal place of business in New Jersey in an employment or agency relationship with DiFeo and Donna Pepsny.

29. Defendant Commonwealth Land Title Insurance Company, Inc. ("Commonwealth Title"), upon information and belief, is, and was at all relevant times, a Pennsylvania corporation with its principal place of business in Pennsylvania.

30. Defendant Nations Title Insurance of New York Inc. ("Nations Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

31. Defendant Fidelity National Title Insurance Company of New York, Inc.

6

("Fidelity Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

32.   Defendant Coastal Title Agency, Inc. ("Coastal Agency"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Coastal Agency is, and was at all relevant times, a title insurance broker that was selected by NHF, Capital Assets, Cristo, and/or the Closing Attorneys to broker title insurance for the real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

33.   Defendant Stewart Title Guaranty Company ("Stewart"), upon information and belief, is, and was at all relevant times, a Deleware corporation with its principal place of business in Texas and, upon information and belief, is licensed to do business in the State of New Jersey.

34.   Defendants Commonwealth Title, Nations Title, Fidelity Title and Stewart (collectively, "the Title Insurance Defendants") are, and were at all relevant times, title insurance companies that issued closing settlement letters to Walsh Securities, as the mortgage lender, which letters, among other things, indemnified Walsh Securities against fraud by the Closing Attorneys.

## JURISDICTION

35.   Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

## VENUE

36.   Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

7

## INTRODUCTION

37.     Since early 1996, defendants Cristo Property, NHF, Capital Assets, Kane,
Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri,
Richard Pepsny, Cicalese, Cuzzi, D'Apolito, DAP Consulting, DiFeo, Donna Pepsny and
Coastal Agency (collectively, "the RICO defendants") have been engaged in a pattern of
racketeering activity which has resulted in approximately two hundred twenty mortgage
loans being purchased by Walsh Securities from NHF for amounts ranging up to eight
times the preceding sales prices of the properties at issue. Walsh Securities was induced
to purchase these mortgage loans from NHF based on fraudulent misrepresentations
contained in the mortgage loan applications, including appraisals of the properties at
issue. The proceeds from Walsh Securities' mortgage loans would, among other things,
be distributed among the RICO defendants as their illicit profits.

38.     The RICO defendants engaged in a pattern of racketeering throughout the
State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson
Counties, where certain of the properties are located, and in Morris County, where Walsh
Securities is located.

39.     Walsh Securities remains liable for a substantial portion of the value of
these mortgage loans fraudulently obtained by the RICO defendants. Walsh Securities
will not be able to recover the full amounts that have been lent through foreclosures on
the properties because, due to the fraudulently inflated appraisals of the real properties
that secure the mortgage loans, many of the properties are not of value equal to or greater
than the amount of the mortgage loans and the fraudulent sales contracts. In addition, this
fraud perpetrated against Walsh Securities has injured the business reputation of Walsh

8

Securities and caused Walsh Securities to lose a substantial amount of business and profits.

40.     With respect to these fraudulently obtained mortgage loans, the Title Insurance Defendants issued to Walsh Securities, as the mortgage lender, closing service letters which require the Title Insurance Defendants to reimburse Walsh Securities for losses arising out of the fraudulent actions of the Closing Attorneys. Both of the Closing Attorneys, Yacker and Cicalese, were specifically approved to handle closings by the Title Insurance Defendants.

41.     Defendants DiFeo and Donna Pepsny were agents of Weichert and the acts alleged to be committed by DiFeo and Donna Pepsny in this Complaint were committed in the scope of their employment or agency relationship with Weichert and were of a kind for which DiFeo and Donna Pepsny were engaged to perform by Weichert.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

42.     A mortgage loan is a loan in which real property is used as collateral for the loan. The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

43.     Mortgage bankers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

44.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers which

9

provide the funds for the borrowers at the time of closings. In these instances, Mortgage
Bankers are paid fees, generally by the borrowers, for originating the mortgage loans so
that they can then be sold to other investors. Mortgage Bankers are licensed by the State
of New Jersey under N.J.S.A. 17: 11B-5, et seq.

45.    Potential mortgage loan borrowers who, because of, for example, their
credit histories, can not obtain traditional financing from "prime" Mortgage Bankers,
seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage
market. "Subprime" mortgage loans generally provide for interest rates several
percentage points higher than "prime" mortgage loans, to take account of the increased
delinquency risk of such mortgage loans.

46.    After potential mortgage loan borrowers have found Mortgage Bankers
from whom they will seek to obtain mortgage loans, the mortgage loan application
process begins.

47.    The Mortgage Bankers who deal directly with the borrowers are said to
"originate" the mortgage loans. The originating Mortgage Bankers are responsible for
ensuring that all necessary paperwork is obtained from prospective borrowers and
properly recorded. Included in this necessary paperwork are the mortgage loan
applications, contracts of sale for the underlying properties, credit histories, statements of
net worth, references, appraisals of the underlying properties, and other documents.

48.    Originating Mortgage Bankers usually select the appraisers who are also
licensed by the State of New Jersey under N.J.S.A. 45: 14F-1, et seq. The appraisers are
typically paid by the borrowers of the mortgage loans.

49.    The appraisal of the real property that is to be mortgaged is one of the

10

most important steps in the mortgage loan process. The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower. In addition, since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults on the mortgage loans. In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

50.    Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to the closing of the properties and the mortgage loans.

51.    Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents. Correspondents often sell their mortgage loans to lenders who are known as wholesalers. Correspondents, in their contracts for sales of mortgage loans with wholesale Mortgage Bankers, typically promise that they will stand by the genuineness of the loan applications and other necessary paperwork.

52.    Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying mortgage loans. The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions. The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by

11

issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

53.     Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually on the day of the closings. The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

## Title Insurance And Its Role In Real Estate Transactions

54.     Title insurance is insurance that provides for coverage, in return for premiums, for insuring, guaranteeing or indemnifying owners of real property or lenders of mortgage loans on real property against certain losses or damages as a result of defects in the titles or encumbrances on the titles of the real properties. Title insurance is usually purchased every time real property is purchased or refinanced. In most instances, mortgage lenders require that owners who will be borrowing money to finance their purchases of real property acquire title insurance coverage that also protects the mortgage loan lenders who will be lending money for the financing of the properties.

55.     In almost all instances, owners or borrowers who seek to purchase title insurance do not deal directly with the companies that provide title insurance, but rather, contact title agents who act as the brokers or middlemen between the title insurance companies and the owners or borrowers. These title agents collect premiums, issue title insurance policies on behalf of the title insurance companies, and may perform other

12

tasks relating to the transfers of interest in the properties, including filing deeds. Title agents may be, and often are, affiliated with more than one title insurance company. Title insurance companies have relationships with multiple title agencies.

56.     As part of the title insurance policies issued to owners who are borrowing money to finance their purchases of real property, title insurance companies typically issue closing service letters for the benefit of the mortgage loan lenders. In these closing service letters, the title insurance companies agree to indemnify the mortgage loan lenders against loss in connection with, among other things, fraud or misapplication by the closing attorneys. Usually, these closing service letters are required by mortgage loan lenders as pre-conditions to providing the mortgage loans. The title insurance companies will usually only issue such closing service letters, and provide indemnification against fraud, where the closings are handled by one of the companies' approved attorneys. True and correct copies of sample closing service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

<strong>The New Jersey Mortgage Loan Frauds</strong>

57.     Instead of the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent. The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and by deceiving Walsh Securities into financing the mortgage loans based on these inflated values. The values were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the re-sales even took place the same day as the first

13

purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. On the days of the closings, the Closing Attorneys would fraudulently transfer the mortgage loan proceeds provided by Walsh Securities to themselves and certain of the other RICO defendants, even though the preconditions imposed by Walsh Securities for the transfer of such proceeds had not been met.

### "The NHF/Cristo Property" Enterprise

58.    The RICO defendants carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the NHF/Cristo Property Enterprise" or "the Enterprise").

59.    The RICO defendants formed the NHF/Cristo Property Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. Each RICO defendant personally played a role in the management and the operation of the Enterprise.

60.    The NHF/Cristo Property Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and NHF, with the understanding by members of the NHF/Cristo Property Enterprise that Walsh Securities would rely on the fraudulent applications in deciding whether to accept the mortgage loans originated by the NHF/

14

Cristo Property Enterprise. A true and correct copy of the Program Participant Loan

Purchase And Sale Agreement between NHF and Walsh Securities, through its

predecessor in interest, is attached as Exhibit D. Apart from other illicit profits received,

Skowrenski, through NHF, received fees from these transactions in excess of one million

dollars.

61.     Unknown to Walsh Securities, the buyer/borrowers had secretly and

fraudulently agreed to convey, after the closing on the resale of the real properties, a

majority percentage of the ownership of each real property to a member of the

NHF/Cristo Property Enterprise. These secret and fraudulent conveyances constituted an

act of default under the mortgage loans.

### The Pattern

62.     The NHF/Cristo Property Enterprise carried out numerous fraudulent

transactions through a pattern of frauds, as follows:

(a)     Kane, acting through Cristo Property, purchased real property

located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson

Counties.

(b)     Kane, Grieser, DiFeo, Donna Pepsny and/or Cuzzi identified,

through personal contacts, advertisements, and other means, individuals who were

willing to buy these properties from Cristo Property and sign the mortgage loans.

Typically, these properties were purchased as purported investment vehicles to be used as

rental properties. Many of the properties, however, were abandoned and could not be

rented.

(c)     Kane, acting through Cristo Property and/or NHF, had the

15

properties appraised by licensed appraisers. In almost all instances, the property was appraised by Calanni, DiBenedetto, Brown, Brodo or Pierson.

(d)     Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

(e)     Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted, through D' Apolito, to Walsh Securities. These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties. Such false information included the following:

1) The applications included appraisals of the properties which were fraudulently inflated.

2) The applications included purported sales prices of the properties which reflected the fraudulent appraised values as opposed to the true values or sales prices of the properties.

3) The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

4) The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5) The applications typically indicated that the seller, Cristo

16

Property, had provided the buyers second mortgage loans in the properties, when, in fact, no bona fide second mortgages were provided and no second mortgage loan payments were ever made or intended to be made. These purported second mortgage loans were often never recorded by the Closing Attorneys, further evidencing that they were not bona fide second mortgages.

6) The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a sixty percent interest in the properties to Capital Assets under secret Joint Venture Agreements.

7) The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property. In fact, the buyers bought the properties without paying any moneys to the seller, Cristo Property.

8) The applications typically contained other false information about the real estate transactions designed to present them as better credit risks.

(f)    D' Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans. In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF. The payments were designed to, and did, corrupt D' Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his

17

obligations to Walsh Securities. The payments from NHF and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D' Apolito was acting as a faithful employee.

(g)     On the days of the closings, the Closing Attorneys would fraudulently transmit to themselves and certain other RICO defendants, including Cristo Property, the proceeds of the mortgage loans illicitly obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though they were aware that one or all of the following requirements and pre-conditions to the mortgage loans, among others, were not met: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the down payment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. In addition, the Closing Attorneys, in furtherance of the fraud, falsely certified at the time of the closings that the above mentioned pre-conditions to closing, imposed by Walsh Securities, had been met. These false certifications were made on HUD-1 settlement statements, forms required by the United States Department of Housing and Urban Development.

(h)     The Closing Attorneys, along with Richard Pepsny and Alfieri, also furthered the fraud by preparing and recording or causing to be recorded various deeds involved in these transactions. These deeds included the deeds covering the sales to Cristo Property, the deeds from Cristo Property to the borrowers, and the deeds conveying an interest in sixty percent of the properties from the borrowers to Capital

Assets.

(i)     Typically, around the date designated to close these properties, the purchasers signed Powers of Attorney, secret Joint Venture Agreements with Capital Assets and deeds which conveyed sixty percent of the ownership in the properties to Capital Assets. A true and correct copy of a sample Joint Venture Agreement is attached as Exhibit E. A true and correct copy of a sample deed conveying sixty percent of the ownership in the properties to Capital Assets is attached as Exhibit F. (In Exhibit F Capital Assets is misspelled "Capital Assests. ") These deeds conveying a sixty percent ownership interest were then filed or caused to be filed by either the Closing Attorneys or Coastal Agency. The Joint Venture Agreements and deeds were never disclosed to Walsh Securities. Such conveyances constituted a default under the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not have financed the mortgage loans had it been aware of the plans to reconvey interest in the properties.

(j)     Capital Assets then collected the rents, if any, from the rental of these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the mortgage loan payments when due and to pay other expenses of the properties. In addition, on information and belief, as in a classic pyramid fraud, funds from new mortgage loans were secretly used to make interest and principle payments on older loans. In this way, the NHF/Cristo Property Enterprise misled Walsh Securities into believing that none of the loans originated by the NHF /Cristo Property Enterprise were delinquent. In fact, as further evidence of a classic pyramid fraud relying on new transactions to continue to fund the older transactions, most of the properties that were claimed to be renovated were never renovated and thus could not be rented. Additionally,

19

at other properties which contained individuals who could have been renters, no attempts were made to collect rent from those individuals who were living in the properties.

        (k)     There were several variations on the scam:

        1) Some borrowers/buyers were induced to invest $1,000.00 in a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00. Cuzzi had these purchasers execute secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney and provide their names and social security numbers. Upon information and belief, Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

        2) Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. Upon information and belief, an individual named Brian Reilly on at least one occasion on behalf of the NHF /Cristo Property Enterprise traveled to New York to deliver closing papers which were signed by the purchasers, notarized by Reilly, and then returned to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings.

        3) Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any

20

closings. Instead of attending closings, the purchasers simply signed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

(l)　In sum, upon information and belief, like traditional pyramid schemes, money obtained by the NHF/Cristo Property Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the NHF/Cristo Property Enterprise.

(m)　Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

63.　The operations of the NHF/Cristo Property Enterprise are illustrated in the following examples of specific properties "flipped" by the NHF/Cristo Property Enterprise:

(a)　600 5th Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2) On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property

21

to an individual borrower/buyer with the initials K.P. for the purported amount of $182,500.00. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared and signed by Richard Pepsny and filed by Coastal Agency.

3) A mortgage loan on the property, in K.P.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4) A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property. In fact, no down payment was ever made.

5) A second mortgage loan for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P. In fact, the second mortgage was not a bona file second mortgage loan because Cristo Property never intended to receive payment from K.P. for that loan and K.P. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

6) In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the NHF/Cristo Property Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise,

22

including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) KP. had not paid a down payment or deposit; (3) there was no bona fide second mortgage; and (4) KP. had not paid certain closing costs. Yacker certified on a HUD-I settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Fidelity Title issued a closing statement letter to Walsh Securities, which requires Fidelity Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Fidelity Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

(b)     1017-1019 Bangs Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which Property was fraudulently appraised by Brown for $200,000.00.

2) On that same day, July 25, 1996, Cristo Property sold 1017 1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M. In fact, the sales contract was not a bona fide contract because J.M. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared by Richard Pepsny and filed by Coastal Agency.

23

3) A mortgage loan on the property, in J.M.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00.

4) A down payment in the amount of $20,000.00 was purportedly provided by J.M. to Cristo Property. In fact, no down payment was ever made.

5) J.M.'s mortgage loan application contains a "gift letter" from defendant Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made, nor was the gift that was to be part of the down payment ever given to the seller.

6) A second mortgage loan for $30,000 at a 6% interest rate was purportedly given by Cristo Property to J.M. In fact, the second mortgage was not a bona fide second mortgage loan because Cristo Property never intended to receive payment from J.M. for that loan and J.M. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) J.M. had not paid a down payment or deposit; (3) there was no bona fide second mortgage; and (4)

24

J.M. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Commonwealth Title issued a closing statement letter to Walsh Securities, which requires Commonwealth Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Commonwealth Title to perform closings.

9) After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets.

64.    There are over two hundred and twenty instances of transactions similar to the two outlined above.

## COUNT I

## VIOLATION OF 18 U.S.C. & 1962(c) (RICO)

65.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 64 as if fully set forth herein.

66.    18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

67.    All the RICO defendant are persons within the meaning of 18 U.S.C. § 1961(3).

68.    In violation of the above-mentioned statute, the RICO defendants associated with the NHF/Cristo Property Enterprise, which was an association in fact

25

consisting of the RICO defendants together and with other persons not known to plaintiff.

69.     The NHF/Cristo Property Enterprise engaged in, and conducted activities which affected, interstate commerce.

70.     Each RICO defendant conducted and participated in the conduct of the affairs of the NHF/Cristo Property Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

71.     This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

(a)     Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the RICO defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan originated by the NHF/Cristo Property Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut. Walsh Securities then sent by facsimile the necessary closing service documents to a bank in Texas that acted as the custodian for the lender in Connecticut. Once satisfied that the necessary documentation was present, that bank in Texas then sent by facsimile its authorization to the Lender in Connecticut, who, in turn, then wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

(b) Commercial bribery, as described in N.J.SA § 2C:21-10, in that

26

D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF) and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to transfer the loans originated by the NHF/Cristo Property Enterprise and financed by Walsh Securities.

72.     The above-mentioned predicate acts of racketeering activity conducted by the RICO defendants through the NHF/Cristo Property Enterprise caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts by the RICO defendants. The members of the NHF/Cristo Property Enterprise were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh Securities. Many of these mortgage loans are delinquent and/or in default. Based on the falsely inflated appraisals for the real properties and other fraudulent acts by the RICO defendants,  Walsh Securities will be unable to recoup the full amounts of many of the outstanding mortgage loans.

73.     By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has suffered the following foreseeable losses and damages:

(a)     the losses of moneys loaned based on the falsely appraised real properties and other fraudulent representations. Many of the properties are worth far less than the mortgage loans originated by the NHF/Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

(b)     the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

(c)     other consequential, incidental and special damages.

27

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO defendants and defendant Weichert are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(c), and award treble damages, attorneys fees and costs, and other such relief as may be appropriate.

## COUNT II

### VIOLATION OF 18 U.S.C. & 1962(d) (RICO)

74.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 73 as if fully set forth herein.

75.    18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection. . . (c) of this section."

76.    Through a series of activities outlined above in Count I, the RICO defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above in paragraphs 61 through 67.

77.    Each of the RICO defendants willfully and knowingly agreed and conspired with other RICO defendants to commit the above referenced predicate acts of wire fraud and commercial bribery.

78.    By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has suffered the following foreseeable losses and damages:

(a)    the losses of moneys loaned based on the falsely appraised real properties and other fraudulent acts of the RICO defendants. Many of the properties are worth far less than the mortgage loans originated by the NHF /Cristo Property Enterprise, and, therefore, Walsh Securities will not be able to recover the full amounts loaned;

(b)    the fraud perpetrated against Walsh Securities has injured the

28

business reputation of Walsh Securities and caused Walsh Securities to lose a substantial
amount of business and profits;

(c)     other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determinet
hat the RICO defendants and defendant Weichert are liable to it, jointly and severally, for
violations of 18 U.S.C. §1962(d), and award treble damages, attorneys fees and costs, and
other such relief as may be appropriate.

## COUNT III

## COMMON-LAW FRAUD

79.     Plaintiff repeats and realleges each and every allegation of paragraphs 1
through 78 as if fully set forth herein.

80.     By the illegal and fraudulent acts and schemes described above, the RICO
defendants willfully and intentionally defrauded Walsh Securities and made or caused to
be made false, fraudulent and material misrepresentations and omissions to plaintiff
concerning mortgage loans bought by Walsh Securities from NHF. Each of these
mortgage loans originated by the NHF/Cristo Property Enterprise were fraudulently
obtained in that they were based on falsely inflated appraisals. In addition, these
mortgage loans also were made based on other information falsely provided to Walsh
Securities including incorrect credit histories and or statements of net worth, among other
things.

81.     In making and carrying out these material misrepresentations, the RICO
defendants, and each of them, intended to and did deceive plaintiff.

82.     Plaintiff believed and relied upon these material misrepresentations and

omissions.

83.     As a result of the RICO defendants' material misrepresentations and

omissions plaintiff suffered damages substantially in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine

that the RICO defendants and defendant Weichert are liable to it, jointly and severally,

for common-law fraud and award damages, punitive damages and other such relief as

may be appropriate.

## COUNT IV

## BREACH OF CONTRACT BY NHF

84.     Plaintiff repeats and realleges each and every allegation of paragraphs 1

through 83 as if fully set forth herein.

85.     On April 24, 1995, NHF and Walsh Securities (through its predecessor in

interest GF Mortgage Corp.), entered into a Program Participant Loan Purchase And Sale

Agreement (the "Agreement"). A true and correct copy of the Agreement is attached as

Exhibit D. The Agreement between NHF and plaintiff was entered into in exchange for

consideration and contained mutual covenants. The Agreement covered the sale of

mortgage loans from NHF to Walsh Securities involved in the NHF/Cristo Property

Enterprise.

86.     Plaintiff has duly performed all the conditions of the Agreement.

87.     NHF, as the seller of mortgage loans, agreed to certain "Representations,

Warranties and Covenants of Seller" in Article 6 of the Agreement, including the

representation that all information in the loan applications prepared by NHF was true

and correct. NHF has breached its representations because the loan applications contained

30

falsely inflated appraisals and other false information.

88.     Plaintiff has notified NHF of its breach of the Agreement and its obligation to repurchase said mortgage loans. NHF has refused to repurchase said mortgage loans, in violation of Article 6 of the Agreement.

89.     By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the NHF is liable to it for breach of contract and award damages, attorneys fees and o other such relief as may be appropriate.

## COUNT V

## BREACH OF CONTRACT BY THE TITLE INSURANCE DEFENDANTS

90.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 89 as if fully set forth herein.

91.     In conjunction with real property transactions involving the NHF /Cristo Property Enterprise, borrowers of mortgage loans from plaintiff obtained title insurance from the Title Insurance Defendants. The Title Insurance Defendants, in exchange for valuable consideration, provided Walsh Securities with closing service letters covering the conduct of the Closing Attorneys, who were specifically approved by the Title Insurance Defendants. Walsh Securities, required such closing service letters as a pre-condition to its agreeing to provide the mortgage loans.

92.     Pursuant to these closing service letters, the Title Insurance Defendants are required to reimburse plaintiff for losses arising out of, among other things, fraud or misapplication by the Closing Attorneys. True and correct copies of sample closing

31

service letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

93. The Closing Attorneys engaged in fraud and misapplication in connection with the NHF /Cristo Property Enterprise. Among other things, the Closing Attorneys fraudulently transferred mortgage loan proceeds knowing that the following pre-·conditions to closings imposed by Walsh Securities, among others, had not been satisfied: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the down payment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. Walsh Securities has incurred substantial loss as a result of the fraud and/or misapplication by the Closing Attorneys.

94. Plaintiff has duly performed all of its obligations under the closing service letters of the Title Insurance Defendants and has notified the Title Insurance Defendants of its losses as a result of the fraud and/or misapplication by the Closing Attorneys.

95. . The Title Insurance Defendants have failed to reimburse plaintiff for the losses it has incurred based on the fraud and/or misapplication of the approved attorneys as covered by the closing service letters.

96. By reason of the foregoing facts, plaintiff has been damaged in excess of $1,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the Title Insurance Defendants are liable to it for breach of contract and award damages, attorneys fees and other such relief as may be appropriate.

32

## COUNT VI

## NEGLIGENCE BY ALFIERI, CICALESE AND RICHARD PEPSNY

97.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 96 as if fully set forth herein.

98.     Defendants Alfieri, Cicalese and Richard Pepsny were at all relevant times attorneys licensed by the New Jersey Supreme Court and engaged in the practice of law, including participation in what is generally known as real estate closings and title work.

99.     Defendant Alfieri was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser, subsequent purchaser, mortgagee and to act in a professional capacity to assist in preparing documents, completing required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

100.    Defendant Cicalese was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser, subsequent purchaser, mortgagee and to act in a professional capacity to assist in preparing documents, completing required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

101.    Defendant Richard Pepsny was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser, subsequent purchaser, mortgagee and to act in a professional capacity to assist

33

in preparing documents, completing required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

102.    Defendants Alfieri, Cicalese and Richard Pepsny were selected by NHF, Capital Assets and/or Cristo Property to facilitate the real property closing involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

103.    By virtue of the status of defendants Alfieri, Cicalese and Richard Pepsny, and by virtue of the licenses granted to them by the New Jersey Supreme Court to practice law, and based upon the ordinary practices and procedures established for the practice of law, Alfieri, Cicalese and Richard Pepsny had certain duties and obligations to carry out their closing requirements in the ordinary course in each transaction at issues in this Complaint.

104.    Plaintiff Walsh Securities was within the class of persons relying upon the expertise of defendants Alfieri, Cicalese and Richard Pepsny in each transaction at issue in this Complaint.

105.    Notwithstanding their duties, in each transaction at issue in this Complaint, defendants Alfieri, Cicalese and Richard Pepsny negligently failed to adhere to such standards and by virtue of such negligence, and as a direct result thereby, Walsh Securities suffered substantial damages. Defendants Alfieri, Cicalese and Richard Pepsny breached their respective duties of ordinary care owed to Walsh Securities by, *inter alia*, failing to exercise that degree of ordinary care necessary to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities. In particular, defendants Alfieri, Cicalese and Richard Pepsny failed to

34

meet or otherwise enforce the following mortgage loan requirements and preconditions: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing.

106.    In addition, defendants Alfieri, Cicalese and Richard Pepsny (1) negligently failed to alert Walsh Securities that deposit monies called for in various transactions were not actually provided by the purchasers; (2) negligently prepared documents which by their very nature were inconsistent with the terms of the mortgage issued in favor of Walsh Securities; (3) negligently failed to record certain documents which were part of the transaction; and (4) negligently failed to follow the procedures which in the ordinary closing, fee and mortgagee, should have been followed.

WHEREFORE, on this COUNT, plaintiff Walsh Securities prays that the Court find and determine that defendants Alfieri, Cicalese and Richard Pepsny are liable to it, jointly and severally, for negligence and award damages, punitive damages and other such relief as may be appropriate.

### COUNT VII

### RESPONDEAT SUPERIOR - WEICHERT

107.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 106 as if fully set forth herein.

35

108.    Defendant Weichert is, and, was at all relevant times, in an employment or
agency relationship with DiFeo and Donna Pepsny who were licensed real estate brokers
for Weichert.

109.    The illegal and fraudulent acts and schemes committed by DiFeo and
Donna Pepsny described above were committed in the scope of their employment or
agency relationship with Weichert and were of a kind for which DiFeo and Donna
Pepsny were engaged to perform by Weichert.

110.    Weichert was reckless and/or failed to exercise reasonable care in
supervising the actions of DiFeo and Donna Pepsny taken in the illegal and fraudulent
acts and schemes described above.

111.    Weichert is vicariously liable for the damages and losses sustained by
plaintiff as a result of the actions of DiFeo and Donna Pepsny.

112.    WHEREFORE, on this COUNT, plaintiff Walsh Securities prays that the
Court find and determine that defendant Weichert is liable to it for the illegal and
fraudulent acts and schemes committed by DiFeo and Donna Pepsny and award damages,
punitive damages and other such relief as may be appropriate.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against:

1.    All RICO defendants and Weichert jointly and severally awarding plaintiff
the following relief:

(a)    Compensatory and consequential damages in an amount as yet
undetermined, trebled pursuant to 18 U.S.C. § 1964(c); and

(b)    Costs of this action, including reasonable attorneys' fees, pursuant

36

to 18 U.S.C. § 1 964(c); and

  (c) An award of punitive damages as a result of defendants' fraud; and

  (d) Other such relief as is just and equitable;

 2. NHF awarding plaintiff the following relief:

  (e) Compensatory and consequential damages in an amount as yet undetermined, and

  (f) Costs of this action, including reasonable attorneys' fees, and

  (g) Other such relief as is just and equitable.

 3. All the Title Insurance Defendants awarding plaintiff the following relief:

  (h) Compensatory and consequential damages in an amount as yet undetermined,

  (i) Costs of this action, including reasonable attorneys' fees, and

  (j) Other such relief as is just and equitable.

 4. Weichert awarding plaintiff the following relief:

  (k) Compensatory and consequential damages in an amount as yet undetermined,

  (l) Costs of this action, including reasonable attorneys' fees, and

  (m) Other such relief as is just and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury for all issues for which it has a right to a trial by jury.

BOIES, SCHILLER & FLEXNER LLP
ATTORNEYS FOR PLAINTIFF WALSH
SECURITIES INC.

BY _____
Robert A. Magnanini

Dated: January 28, 2005

38



Irene Difeo, attorney pro se
5 Leann Court
Old Bridge, NJ 08857
(732) 679-0354
ID 7757

RECEIVED
U.S. DISTRICT COURT

7005 MAR 11  P 2: 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,                                    x

                        Plaintiff,

v.                                                          Civil Action No. 97-3496
                                                            Hon. William G. Bassler

CRISTO PROPERTY MANAGEMENT, LTD.,
a/k/a G.J.L. LIMITED, DEK HOMES OF
NEW JERSEY, INC., OAKWOOD
PROPERTIES INC., NATIONAL HOME
FUNDING, INC., CAPITAL ASSETS
PROPERTY MANAGEMENT & INVESTMENT
CO., INC., CAPITAL ASSETS
PROPERTY MANAGEMENT, L.L.C.,
WILLIAM J. KANE, GARY GRIESER,
ROBERT SKOWRENSKI, II, RICHARD
CALANNI, RICHARD DIBENEDETTO, JAMES
R. BROWN, THOMAS BRODO, RONALD J.
PIERSON, STANLEY YACKER, ESQ.,
MICHAEL ALFIERI, ESQ., RICHARD
PEPSNY, ESQ., ANTHONY M. CICALESE,
ESQ., LAWRENCE M. CUZZI, ANTHONY
D'APOLITO, DAP CONSULTING, INC.,
COMMONWEALTH LAND TITLE INSURANCE
COMPANY, NATIONS TITLE INSURANCE
OF NEW YORK INC., FIDELITY NATIONAL
TITLE INSURANCE COMPANY OF NEW
YORK, COASTAL TITLE AGENCY, and
STEWART TITLE GUARANTY COMPANY,
IRENE DiFEO, DONNA PEPSNY,
WEICHERT REALTORS, AND VECCHIO
REALTY, INC. D/B/A MURPHY REALTY
BETTER HOMES and GARDENS,

                        Defendants.
                                                            x

ANSWER TO THIRD AMENDED
COMPLAINT, ANSWER TO CROSS-
CLAIM FOR CONTRIBUTION,
SEPARATE DEFENSES, CROSS-
CLAIM FOR CONTRIBUTION AND
CROSS-CLAIM FOR
INDEMNIFICATION ,
ANSWER TO CROSSCLAIM FOR
INDEMNIFICATION, AND JURY DEMAND

Defendant Irene DiFeo, by way of Answer to the Third Amended Complaint, says:

1.   The first paragraph of the third amended complaint characterizes the matter, and, accordingly, defendant DiFeo incorporates by reference her responses to the allegations that follow.

### PARTIES

2. through 17. inclusive.   Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

18., 19., 20.   Defendant DiFeo admits the allegations of these paragraphs.

21. through 25. Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of this paragraph.

26.   Defendant DiFeo denies any relationship with Weichert after 1990 and admits the remainder of the allegation.

27.   Defendant DiFeo denies that defendant Papsny was licensed as a broker and admits the remainder of the allegation.

28.   Defendant DiFeo denies the relationship alleged with Weichert and admits the remainder of the allegation.

29. through 34. inclusive.   Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

1

## JURISDICTION

35.   Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of this paragraph.

## VENUE

36.   Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of this paragraph.

## INTRODUCTION

37. through 41. inclusive.   Defendant DiFeo denies any involvement in a RICO scheme and that she was an agent of Weichert and does not have sufficient knowledge or information to allow her to admit or deny the remainder of the allegations of these paragraphs.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

42.   Defendant DiFeo denies the allegations of the second sentence and admits the allegations of the first sentence of the paragraph.

43.   Defendant DiFeo admits the allegations of this paragraph.

44.   through 53.   Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

2

## Title Insurance and its Role in Real Esate Transactions

54. Defendant DiFeo admits the allegations of this paragraph.

55. and 56. Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

## The New Jersey Mortgage Loan Frauds

57. Defendant DiFeo denies the allegations of this paragraph as to her transactions insofar as they apply to plaintiff, and as to the remainder of the allegations of this paragraph, Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of the paragraph.

## "The NHF/Cristo Property" Enterprise"

58. to 61. inclusive. Defendant DiFeo denies the allegations of these paragraphs as to her transactions insofar as they apply to plaintiff, and as to the remainder of the allegations of this paragraph, Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

## The Pattern

62. to 64. inclusive. Defendant DiFeo denies the allegations of these paragraphs as to her transactions insofar as they apply to plaintiff, and as to the remainder of the

3

allegations of this paragraph, Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

## COUNT I

### Violation of 18 U.S.C. section 1962(c) (RICO)

65.  Defendant DiFeo incorporates by reference her responses to paragraphs 1. to 64.

66. Defendant DiFeo admits the allegation of paragraph 66.

67.  to 73.  Defendant DiFeo denies the allegations of these paragraphs as to her transactions insofar as they apply to plaintiff, and as to the remainder of the allegations of this paragraph, Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

Wherefore, defendant DiFeo demands judgment against the plaintiff dismissing the third amended complaint with prejudice, for reasonable attorneys' fees, for costs of suit and for such other relief as the Court deems appropriate.

## COUNT II

### Violation of 18 U.S.C. section 1962(d) (RICO)

74.  Defendant DiFeo incorporates by reference her responses to paragraphs 1. to 73.

75. Defendant DiFeo admits the allegation of paragraph 75.

76. to 78.  Defendant DiFeo denies the allegations of these

4

paragraphs as to her transactions insofar as they apply to plaintiff, and as to the remainder of the allegations of this paragraph, Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

Wherefore, defendant DiFeo demands judgment against the plaintiff dismissing the third amended complaint with prejudice, for reasonable attorneys' fees, for costs of suit and for such other relief as the Court deems appropriate.

### COUNT III

### Common Law Fraud

79.   Defendant DiFeo incorporates by reference her responses to paragraphs 1 to 78.

79 through 83. Defendant DiFeo denies the allegations of these paragraphs as to her transactions insofar as they apply to plaintiff, and as to the remainder of the allegations of this paragraph, Defendant DiFeo does not have sufficient knowledge or information to allow her to admit or deny the allegations of these paragraphs.

Wherefore, defendant DiFeo demands judgment against the plaintiff dismissing the third amended complaint with prejudice, for reasonable attorneys' fees, for costs of suit and for such other relief as the Court deems appropriate.

### COUNTS IV, V, VI, VII, VIII

84. to 112.   The allegation of these counts and paragraphs make no claim against defendant DiFeo, and accordingly, she makes no response.

### FIRST SEPARATE DEFENSE

1.   The third amended complaint fails to state a claim on which relief can be granted.

### SECOND SEPARATE DEFENSE

1.   The four year statute of limitations applicable to RICO actions ran prior to institution of this action as did the six year statute of limitations on common law fraud contained in <u>N.J. Stat. Ann.</u> Section 2A:14-1.

2.   No tolling period is applicable to this action because Betty Anne DeMola, believed to be an officer of plaintiff, was involved in the factual complex pleaded by plaintiff.

3.   Additionally, on information and belief, Robert Walsh and James Walsh, principals of plaintiff were involved in the factual complex pleaded by plaintiff.

### THIRD SEPARATE DEFENSE

1.   The conduct of plaintiff's agents, as set forth the second separate defense constitutes inequitable conduct and bars plaintiff from relief under the related doctrines of unclean hands, estoppel and laches.

### ANSWER TO CROSS-CLAIM FOR CONTRIBUTION

Defendant DiFeo denies liability on any cross-claim for

6

contribution.

## ANSWER TO CROSS-CLAIM FOR INDEMNIFICATION

Defendant DiFeo denies liability on any cross-claim for indemnification.

## CROSS-CLAIM FOR CONTRIBUTION

Defendant diFeo denies liability to any party to this matter, but if she is found liable to any party, demands contribution from each and every other party.

## CROSS-CLAIM FOR INDEMNIFICATION

Defendant diFeo denies liability to any party to this matter, but if she is found liable to any party, demands indemnification from each and every other party.

## JURY DEMAND

Defendant demands trial by jury.

Dated: March 11, 2005

_Irene DiFeo_
Irene DiFeo
Attorney Pro Se

## CERTIFICATION OF NO LITIGATION L. CIV.R 11.2

I hereby certify that, based upon information provided to me, this controversy is not the subject of any action pending in any court or of a pending arbitration or pending administrative proceeding, except many of the defendants, including me have been

7

subject to criminal proceedings in this Court, and I am going to

be re-sentenced; also, Elizabeth DeMola has been indicted.

Dated: March 11, 2005

Irene DiFeo
Attorney Pro SE

8