## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,

        Plaintiff,

v.

CRISTO PROPERTY MANAGEMENT, LTD., a/k/a
G.J.L. LIMITED, DEK HOMES OF NEW JERSEY,
INC., OAKWOOD PROPERTIES INC., NATIONAL
HOME FUNDING, INC., CAPITAL ASSETS
PROPERTY MANAGEMENT & INVESTMENT
CO., INC., CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C., WILLIAM I. KANE,
GARY GRIESER, ROBERT SKOWRENSKI, II,
RICHARD CALANNI, RICHARD DIBENEDETTO,
JAMES R. BROWN, THOMAS BRODO, RONALD J.
PIERSON, STANLEY YACKER, ESQ., MICHAEL
ALFIERI, ESQ., RICHARD PEPSNY, ESQ.,
ANTHONY M. CICALESE, ESQ., LAWRENCE M.
CUZZI, ANTHONY D'APOLITO, DAY
CONSULTING, INC., COMMONWEALTH LAND
TITLE INSURANCE COMPANY, NATIONS TITLE
INSURANCE OF NEW YORK INC., FIDELITY
NATIONAL TITLE INSURANCE COMPANY OF
NEW YORK, COASTAL TITLE AGENCY, and
STEWART TITLE GUARANTY COMPANY, IRENE
DiFEO, DONNA PEPSNY, WEICHERT,
REALTORS, AND VECCHIO REALTY, INC. D/B/A
MURPHY REALTY BETTER HOMES and
GARDENS,

        Defendants.

Civil Action No. 97-3496
Honorable William G. Bassler

---

## BRIEF IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT
## TO FEDERAL RULE OF CIVIL PROCEDURE 12

**McCusker, Anselmi, Rosen,**
**Carvelli & Walsh, P.C.**
127 Main Street
Chatham, New Jersey 07928
(973)635-6300
Attorneys for Defendant
Weichert, Realtors

On the Brief:
John B. McCusker (JBM 1482)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ...................................................................... 1

LEGAL ARGUMENT ..................................................................................... 1

A.   PLAINTIFF HAS NOT COMPLIED WITH THE APPLICABLE
     TWO YEAR STATUTE OF LIMITATION WITH RESPECT TO
     ITS CLAIMS OF RESPONDEAT SUPERIOR LIABILITY
     AGAINST WEICHERT ............................................................... 1

B.   PLAINTIFF FAILED TO EXERCISE VIABLE ALTERNATIVES
     TO PRESERVE ITS CLAIMS ..................................................... 2

     1.   PLAINTIFF FAILED TO TIMELY MOVE TO AMEND
          THE COMPLAINT ............................................................ 2

     2.   PLAINTIFF WAS NOT PRECLUDED FROM
          COMMENCING A NEW ACTION AGAINST
          WEICHERT ....................................................................... 6

C.   PLAINTIFF'S CLAIMS DO NOT RELATE BACK TO THE
     FILING OF THE COMPLAINT ................................................... 7

     1.   PLAINTIFF WAS NOT MISTAKEN AS THE
          INDENTITY OF WEICHERT ........................................... 8

     2.   WEICHERT DID NOT HAVE NOTICE THAT
          PLAINTIFF INTENDED TO COMMENCE AN ACTION
          AGAINST IT ..................................................................... 10

          a.   PLAINTIFF CANNOT DISPENSE WITH THE
               NOTICE REQUIREMENT ..................................... 11

          b.   PLAINTIFF CANNOT MEET ITS BURDEN OF
               PROOF THAT WEICHERT HAD NOTICE OF ITS
               CLAIMS ................................................................. 12

D.   PLAINTIFF IS NOT ENTITLED TO UPRECEDENTED
     BLANKET PUBLIC POLICY PROTECTIONS ........................ 13


CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Courtney v. La Salle University*, 124 F.3d 499 (3d Cir. 1997)....................... 5

*Cureton v. National Collegiate Athletic Assoc.*, 252 F.3d 267 (3d Cir. 2001) ........................................................................................................ 3

*Dandrea v. Malsbury Manufacturing Co.*, 839 F.2d 163 (3d Cir. 1986) ........................................................................................................ 8

*Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.,* 87 F. Supp.2d 394 (D.N.J. 2000) ........................................................................ 4

*Frankel v. Moody*, 393 F.2d 279 (3d Cir. 1968) ............................................. 1

*Garvin v. City of Philadelphia*, 354 F.3d 215 (3d Cir. 2003).................. 8, 10

*Hauptman v. Wilentz*, 570 F. Supp. 351 (D.N.J. 1983) ................................ 14

*Kocian v. Getty Refining & Marketing Co.*, 707 F.2d 748 (3d Cir. 1983) ...................................................................................................... 14

*Kinnally v. Bell of Pennsylvania,* 784 F. Supp. 1139 (E.D.Pa. 1990).......... 11

*Lundy v. Adamar of New Jersey, Inc.*, 34 F.3d 1173 (3d Cir. 1994).........9-12

*Pittson Co. v. Sedgwick James of New York*, 971 F. Supp. 915 (D.N.J. 1997) ........................................................................................................ 7

*Rycolene Products, Inc., v. C&W Unlimited*, 109 F.3d 883 (3d Cir. 1997) ........................................................................................................ 7

*Schiavone v. Fortune*, 477 U.S. 21 (1986) ..................................................... 8

*Walsh Securities, Inc., v. Cristo Property Management, Inc.*, 7 F. Supp.2d 523 (D.N.J. 1998) ................................................................. 3, 14

*Williams v. Rene*, 72 F.3d 1096 (3d Cir. 1995) ........................................... 12

## STATE CASES

*Carter v. Reynolds*, 175 N.J. 402 (2003) .......................................................... 1

*Di Cosala v. Kay*, 91 N.J. 159 (1982).............................................................. 1

## UNPUBLSHED CASES

*Jones v. Servellon*, Civ. A. No. 94-1038-LFO, 1996 WL 554513
(D.D.C. Sept. 18, 1996) ........................................................................... 2

*Kemp Industrial Inc., v. Safety Light Corp.*, Civ. A. No. 92-95, 1994
WL 532130 (D.N.J. Jan. 25, 1994)...................................................... 8, 11

*Shirsat v. Mutual Pham. Co., Inc.,* No. Civ. A. 93-3202, 1996 WL
273674, * 3-4 (E.D.Pa. May 15, 1996) ............................................... 9, 10

## Preliminary Statement

The underlying facts of the within matter detailed in Weichert, Realtors ("Weichert") Memorandum of Law ("Memorandum of Law") demonstrate unequivocally that Plaintiff, Walsh Securities ("Plaintiff"), has failed to comply with the applicable statute of limitations.   Weichert submits that Plaintiff's conclusory assertions of equity and public policy protections set forth in its consolidated opposition brief ("Plaintiff's Opposition") are inapposite such that Plaintiff's claims must be summarily dismissed as to Weichert, despite Plaintiff's thinly-veiled attempts to muddy the waters.

## Legal Argument

**A.    Plaintiff Has Not Complied With the Applicable Two Year Statute of Limitations With Respect to Its Claims of Respondeat Superior Liability Against Weichert.**

Plaintiff alleges that, unlike the more than two dozen RICO defendants in this matter, Weichert is liable under the theory of respondeat superior for the acts of its former independent contractor, Donna Pepsny ("Pepsny").   Respondeat superior liability exists where an employee's negligent acts caused injury to a third party and "at the time of the occurrence, the employee was acting within the scope of his or her employment." *Carter v. Reynolds*, 175 N.J. 402, 408 (2003); *see also*, *Di Cosala v. Kay*, 91 N.J. 159 (1982). It is primarily applied in cases of negligent conduct rather than in cases involving intentional acts. *Frankel v. Moody*, 393 F.2d 279, 280 (3d Cir. 1968).   As Plaintiff correctly points out, but incorrectly

applies, the statute of limitations for respondeat superior liability is the same as the applicable limitations period for the employee's underlying acts. *Jones v. Servellon*, Civ. A. No. 94-1038-LFO, 1996 WL 554513, at *3 (D.D.C. Sept. 18, 1996). The statute of limitations for negligent acts is two years. Accordingly, the statute of limitations for respondeat superior liability arising out of those acts is also two years. Despite this two-year period, Plaintiff failed to commence its action against Weichert until 2005, nearly six (6) years subsequent to the expiration of the limitations period. As set forth in Weichert's Motion Papers, however, even if Plaintiff attempts to shop for statutes of limitations and employ the four-year RICO statute of limitations, its claims are still time barred.

Notwithstanding its idle behavior, and in a vain attempt to protect its claims from the applicable limitations period, Plaintiff states that its claims against Weichert are protected by the Relation Back Doctrine, the Entire Controversy Doctrine and public policy considerations. These allegations, however, cannot breathe life back into Plaintiff's stale claims.

**B.   Plaintiff Failed to Exercise Viable Alternatives to Preserve Its Claims.**

   **1.   Plaintiff Failed to Timely Move to Amend the Complaint.**

Plaintiff boldly asserts, but offers no support for, the proposition that the Stay of Discovery and/or the Administrative Dismissal tolled the statute of limitations. As set forth in Weichert's Motion Papers, however, neither of these

administrative tools, whether by their terms, or by interpretation of case law and/or statutory law, precluded Plaintiff from amending the Complaint to name Weichert as a party.

In issuing its opinion regarding the Stay of Discovery, the Court specifically addressed the fact that the Stay of Discovery was not indefinite and it invited "the parties [to] petition the Court to lift or modify the stay if there is a change of circumstances warranting it." *Walsh Securities, Inc., v. Cristo Property Management, Inc.*, 7 F. Supp.2d 523, 529 (D.N.J. 1998).

Plaintiff contends that it repeatedly requested that this Court lift the Stay of Discovery and/or the Administrative Dismissal so it could pursue its claims. *See e.g.*, Plaintiff's Opposition at pp. 6, 9 and 25. Plaintiff, however, fails to set forth when it made such repeated requests, in what form the repeated requests were made, to whom the repeated requests were made, and on what grounds, if any, the repeated requests were denied.[1]

Moreover, Plaintiff's assertions are disingenuous at best because a cursory review of the docket reflects that, notwithstanding the Stay of Discovery and

---

[1] Instead Plaintiff repeatedly invites Weichert to engage in a factual dispute by repeatedly asserting that Weichert is not prejudiced by Plaintiff's lack of timely prosecution. *See e.g.*, Plaintiff's Opposition at 16. Without engaging in a factual spat, it is well settled law that a long delay in commencing an action against a previously unnamed party will "at some point ...become undue placing an unwarranted burden on the court or will become prejudicial placing an unfair burden on the opposing party." *Cureton v. National Collegiate Athletic Assoc.*, 252 F.3d 267, 273 (3d Cir. 2001). Additionally, in repeatedly asserting that Weichert has not been prejudiced by Plaintiff' lack of timeliness in commencing its action against Weichert, Plaintiff fails to take into account the fact that Weichert does not bear the burden of proving prejudice with respect to any of its procedural defenses. Moreover, Plaintiff fails to take into consideration that despite its claims that Weichert is not prejudiced by being named eight years into an action, and that Plaintiff has not been able to take discovery in this case, at least 250,000 documents have been produced to date by the original parties to this matter. Weichert did not learn of the existence of these papers until June 2005, nearly eight (8) full years after the Complaint was filed.

subsequent Administrative Dismissal, the court entertained various motions and court conferences in 1998, 1999 and 2000. *See* Supplemental Certification of John B. McCusker ("Supplemental McCusker Certification") at Exhibit A.    For example, on July 6, 1998, Defendant Anthony Cicalese moved the court for leave to answer cross claims.    The court granted his motion. *Id.* On January 7, 1999 a non-party, Garden State Indemnity, moved to intervene in the action. The motion was denied on February 7, 1999. *Id.* Beginning in the spring of 2000 and extending into 2001, several defendants sought court intervention regarding the change and/or substitution of counsel and assistance with managing the document repository. *Id.* Plaintiff did not employ any of these opportunities to assert that it intended to add any new defendants and/or causes of action.    Moreover, Plaintiff's claims that it repeatedly tried to vacate the Administrative Dismissal are further weakened by the fact that in 2004 Defendant Michael Alfieri, not Plaintiff, moved to lift the Administrative Dismissal, or in the alternative, dismiss the case. The Court granted Defendant Alfieri's motion.    Supplemental McCusker Certification at Exhibit B.  Again, noticeably absent from the record to date is any attempt by Plaintiff to timely prosecute its case against Weichert.

In an effort to justify its inaction, Plaintiff states that 1) there are no case law holdings that prelude an administrative dismissal from operating to toll the statute of limitations; and 2) the *Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.*, case, 87 F. Supp.2d 394 (D.N.J. 2000), cited by Weichert, in which this court held

that an administrative dismissal issued during or toward the end of discovery did not operate to toll the statute of limitations, is inapposite.   *See* Plaintiff's Opposition at p. 14.   Again, Plaintiff's argument is procedurally and factually flawed.   Procedurally, Plaintiff attempts to deflect the burden of proof in this matter.   It is Plaintiff's burden to demonstrate that the Stay of Discovery and/or Administrative Dismissal operated to toll the statute of limitations; it is not incumbent on Weichert to prove that the Stay of Discovery and/or Administrative Dismissal did not toll the statute of limitations.   *See Courtney v. La Salle Univ.*, 124 F.3d 499, 505 (3d Cir. 1997).   Plaintiff has not and cannot meet its burden.

Factually, Plaintiff's argument fails for two reasons. Plaintiff states that it, Plaintiff "has not had the benefit of any discovery and has been prevented from taking discovery" such that the statute of limitations should be equitably tolled. Plaintiff's Opposition at p. 14.   Plaintiff's ability to take discovery in this matter is wholly irrelevant, and had no bearing on Plaintiff's strategic decision to not name Weichert as a party to this matter. The *Electric Mobility* Court did not draw any distinction in issuing the administrative dismissal according to the phase of discovery. Plaintiff, therefore, cannot take it upon itself to do so.   Plaintiff knew or should have known of Weichert in 1997 at the time it filed its Complaint. Again Plaintiff chose not to name it as a party to the action until 2005.

5

Moreover, if Plaintiff did not need the benefit of discovery in 2005 to name Weichert as a party, it cannot argue that a failure to conduct discovery in 1997 precluded it from naming Weichert as a party in any of the first three Complaints.

Plaintiff's argument also fails factually because as set forth in footnote 1, and as discussed at the June 4, 2005 Status Conference before the Honorable Madeline Cox Arleo, at least 250,000 pages of discoverable information have been produced to date.  Plaintiff's statement that it has not taken discovery in this case is simply not supported by reality.  Plaintiff cannot meaningfully distinguish the within Administrative Dismissal from administrative dismissals previously issued by this Court, such that it can demonstrate that the Administrative Dismissal tolled the statute of limitations.

**2.    Plaintiff Was Not Precluded from Commencing a New Action Against Weichert.**

In the unlikely event this Court determines that the Administrative Dismissal precluded Plaintiff from moving the Court for leave to amend its Complaint, Weichert asks the Court to dismiss Plaintiff's claims as untimely because Plaintiff was always free to commence a separate action against Weichert.

In explaining its failure to pursue this option, Plaintiff inappropriately seeks shelter in the Entire Controversy Doctrine stating that a new action "would be contrary to the well-stated purposes of the [Entire Controversy Doctrine.]"  While Weichert does not dispute the general purpose behind the Entire Controversy

6

Doctrine, Plaintiff's reliance on it is entirely misplaced because the Entire
Controversy Doctrine simply does not apply to the facts of this case.

The Entire Controversy Doctrine precludes a plaintiff from commencing
*successive* lawsuits involving related claims. *Rycolene Prods., Inc., v. C&W
Unlimited*, 109 F.3d 883, 887 (3d Cir. 1997) (emphasis added). Contrary to
Plaintiff's beliefs and conclusory statements regarding its application, it does not
preclude a Plaintiff from commencing a timely action while an action on related
claims against separate parties is pending. *Id.* (the Entire Controversy Doctrine
"does not require dismissal when multiple actions involving the same or related
claims are pending simultaneously."); *see also*, *Pittson Co. v. Sedgwick James of
New York*, 971 F. Supp. 915, 917 (D.N.J. 1997) ("the Entire Controversy Doctrine
does not preclude the initiation of a second action before the first action has been
concluded").

Application of the Entire Controversy Doctrine is wholly inappropriate in
this case because Plaintiff is engaged in the prejudgment phase of litigation and
had the opportunity to timely commence a simultaneous separate action, against
Weichert. *See id.* Despite Plaintiff's best efforts to convince the Court that it is
the victim in this case, Plaintiff was not precluded by the Entire Controversy
Doctrine, nor by any other legal precedent, from commencing a separate action
against Weichert.

**C.     Plaintiff's Claims Do Not Relate Back to the Filing of the Complaint.**

Rule 15(c)(3) of the Federal Rules of Civil Procedure sets forth very limited circumstances pursuant to which an amended pleading seeking to add a new party relates back to the filing of the original complaint for purposes of the statute of limitations. *Garvin v. City of Philadelphia*, 354 F.3d 215 (3d Cir. 2003).  Under Rule 15(c)(3) an amended complaint naming a new party relates back to the original complaint where (1) the claim asserted arose out of the same conduct, transaction or occurrence set forth in the original pleading; (2) the party named in the new complaint had notice of the institution of the action within 120 days of the filing of the original complaint; and (3) the newly named party knew or should have known that, but for a mistake concerning its identity, the action would have been brought against it. *Id.* at 221; *Kemp Indus. Inc., v. Safety Light Corp.*, Civ. A. No. 92-95, 1994 WL 532130, at *10 (D.N.J. Jan. 25, 1994).  Plaintiff, not the newly named party, bears the burden of proving all three prongs of Rule 15(c)(3). In determining whether a plaintiff has met its burden, a reviewing court is bound to recognize and accept the plain language of Rule 15 criteria. *Dandrea v. Malsbury Mfg. Co.*, 839 F.2d 163, 166 (3d Cir. 1986) (*citing, Schiavone v. Fortune*, 477 U.S. 21, 30, (1986) (interpreting an earlier, similar version of Rule 15, finding no relation back and holding "we accept the Rule as meaning what it says")); *see also, Kemp Indus. Inc.*, 1994 WL 531130, at *11.  Try as it may, Plaintiff cannot meet its burden.

### 1. Plaintiff Was Not Mistaken as the Identity of Weichert.

The plain meaning of the "mistake condition" of Rule 15(c)(3) demands that a plaintiff demonstrate that it was mistaken as to the new defendant's identity and that it intended to sue that party at the time it filed the initial complaint. *Id.* at *12. It will not be met where plaintiff declined to assert liability against the newly named defendant at the time the initial complaint was filed and "there is no reason for [that] party to believe that the plaintiff did anything other than make a deliberate choice between potential defendants." *Lundy v. Adamar of New Jersey, Inc.*, 34 F.3d 1173, 1174 (3d Cir. 1994); *see also, Shirsat v. Mutual Pharm. Co., Inc.,* No. Civ. A. 93-3202, 1996 WL 273674, *3-4 (E.D.Pa. May 15, 1996) ("in light of plaintiff's knowledge of pertinent events and potential individual defendants within the statute of limitations period and plaintiff's delay in filing [its] motion [to amend], plaintiff's failure to sue any individual defendants can reasonably be viewed as deliberate legal strategy, not merely error").

Consistent with Plaintiff's misinterpretation of the procedural posture of this case to date, Plaintiff has misinterpreted the mistake condition of Rule 15(c)(3). Rather than demonstrate how and/or why Plaintiff was mistaken as to Weichert's identity, Plaintiff disingenuously attempts to shift the burden of proof to Weichert, stating (without explaining why Weichert was not named as a party in the first three Complaints) that Weichert "should have known that when [Plaintiff] was

9

permitted to do so, it would name [Weichert] in this action." Plaintiff's Opposition at p. 17. This conjecture, and attempt at shifting the burden of proof, does not demonstrate that Plaintiff was mistaken as to Weichert's identity. Plaintiff most likely relies on it, however, because it cannot in good faith aver that it was mistaken as to Weichert's identity at the time if filed any of its complaints.

As set forth in its Memorandum of Law, Weichert's limited nexus to this matter is through Pepsny. Pepsny's involvement as an independent real estate broker in the Plaintiff's land flipping scheme was well known. Details of her dealings were literally published in the newspaper and fully examined in the course of a criminal jury trial. Nonetheless, Plaintiff chose to wait eight (8) years after the Asbury Park Press uncovered Plaintiff's land flipping scheme, and more than four (4) months after the Administrative Dismissal was lifted, to assert liability against Weichert for its short lived independent contract relationship with Pepsny. Clearly, Plaintiff did not delay because it was mistaken as to Weichert's identity; rather, several years after the fact, it seeks to alter its litigation tactics. *Garvin*, 354 F.2d at 221; *Shirsat*, 1996 WL 273674, at *3. Plaintiff cannot, however, plead mistake in an attempt to escape the consequences of poor legal strategy. *Lundy*, 34 F.3d at 1173. Plaintiff cannot meet the mistake condition of Rule 15(c)(3) with respect to Weichert; therefore, its claims do not relate back eight (8) years to the time the initial Complaint was filed.

**2.    Weichert Did Not Have Notice That Plaintiff Intended to Commence an Action Against It.**

Even if this court were to find that Plaintiff was mistaken as to the identity of Weichert, Plaintiff's averment of mistake alone is not sufficient to permit relation back. *Lundy*, 34 F.3d at 1183. Plaintiff bears the burden of proving that the party it seeks to add by amendment knew within 120 days of the filing of the original complaint that Plaintiff *intended* to name it in the original complaint but omitted it by mistake.    *Kemp*, 1994 WL 532130, at *11 (citations omitted) (emphasis in original).

**a.    Plaintiff Cannot Dispense with the Notice Requirement.**

Rather than meeting its burden of proof in demonstrating that Weichert possessed the requisite notice of Plaintiff's claims, Plaintiff obviates the notice requirement and argues that "because of a lack of prejudice to [Weichert] the notice requirement is less important."  Plaintiff's Opposition at p. 16.   While Plaintiff offers no support for this outlandish proposition, it refers to cases from Pennsylvania, as well as the Fourth, Sixth and Ninth Circuits, that recognize that a new party may receive notice of an action through informal means.  *Id.* (*citing*, *Kinnally v. Bell of Pennsylvania*, 784 F. Supp. 1136 (E.D.Pa. 1990)).  Plaintiff's reliance on *Kinnally* is inappropriate with respect to Weichert.    *Kinnally* recognized informal notice under Rule 15(c)(3) because the newly named parties

were individual defendants preparing individual defenses in parallel administrative matters. That is simply not the case with respect to Weichert.

Despite Plaintiff's contentions that the procedural posture of this case renders the Rule 15(c)(3) notice requirement "less important," in this action than in other relation back cases, the Third Circuit has repeatedly held that Plaintiff cannot dispense with this factor when meeting the rigorous Rule 15(c)(3) criteria. *See e.g., Lundy*, 34 F.3d at 1183.

### b. Plaintiff Cannot Meet Its Burden of Proof That Weichert Had Notice of Its Claims.

Not only has Plaintiff attempted to delete the notice requirement from Rule 15(c)(3), Plaintiff has also failed to set forth even a scintilla of evidence demonstrating that Weichert received even informal notice of the action. Plaintiff alleges that 1) Weichert is responsible, under the theory of respondeat superior, for Pepsny's actions; 2) because of Weichert's independent contractor's involvement in the parallel criminal proceedings Weichert had notice of the within matter in November 1997 (within 120 days of the filing of the Complaint); and 3) Weichert knew in November 1997 that Plaintiff intended to name it as a party to the within matter. There is not an ounce of proof for these conclusory statements.

In assessing these allegations, it bears repeating that an employer's respondeat superior liability is "secondary to that of the employee which is primary." *Williams v. Rene*, 72 F.3d 1096, 1199 (3d Cir. 1995). An employer will

be vicariously liable only if the employee is liable for negligent conduct and such negligent conduct occurred within the scope of the employee's employment. *Id.* Thus absent employee liability, secondary liability cannot be imputed to the employer.

Incredibly, while Plaintiff argues that Weichert, as a non-party, was aware in November 1997 that Plaintiff commenced the within lawsuit and was also aware that Plaintiff intended to assert claims of secondary liability against Weichert for Pepsny's, its former independent contractor, acts, Plaintiff fails to explain that Pepsny was not named as a defendant until January 2005. It is absurd to state that 1) Weichert knew of commencement of the within matter; and 2) Weichert knew that Plaintiff intended to assert claims of secondary liability against it when Plaintiff had not even named Pepsny in the Complaint. *See id.*

Given this fact, Plaintiff cannot meet its burden of proving that Weichert knew or had reason to know that Plaintiff intended to assert secondary respondeat superior liability against it arising out of Pepsny's actions. *See id.*

As demonstrated above and contrary to Plaintiff's generalizations, Plaintiff's claims against Weichert do not relate back to the filing of the initial Complaint because Plaintiff cannot meet the Third Circuit's criteria of Relation Back. Its claims, therefore, are wholly time barred.

**D.   Plaintiff is Not Entitled to Unprecedented Blanket Public Policy Protections.**

Despite Plaintiff's attempts to disavow the statute of limitations applicable in this matter and replace it with the doctrine of equitable tolling, "the important public policy reasons behind the statutes of limitations are not best served if the statute is tolled indefinitely, while evidence stales, memories fade and courts and adversaries wait, until the Plaintiff at his leisure alleges actual discovery, despite the avalanche of evidence that would put all but the most indiligent Plaintiffs on notice of a cause of action." *Hauptman v. Wilentz*, 570 F. Supp. 351 (D.N.J. 1983).   Moreover, the Third Circuit demands that a party seeking the benefit of equitable tolling prove that it was misled by the party asserting the statute of limitations or that it was in some extraordinary way prevented from asserting its rights; or that it timely asserted its rights in the wrong forum. *See Kocian v. Getty Refining & Marketing Co.*, 707 F.2d 748, 753 (3d Cir. 1983).

Plaintiff's eleventh hour argument simply fails.   Plaintiff has not demonstrated (or even stated) that Weichert actively misled and/or precluded it from filing its claims.  Nor has it demonstrated that the Court's administrative tools precluded it in any way, extraordinary or otherwise, from commencing an action against Weichert.   Rather, quite the opposite, this Court expressly held that Plaintiff could move to lift the Stay of Discovery if it experienced a change in circumstances. *Walsh Securities, Inc.,* 7 F. Supp.2d at 529.

Moreover, its self-serving conclusions that public policy considerations entitle it to bypass the statute of limitations are flatly contravened by the New Jersey judiciary. Plaintiff, at its leisure, chose to commence an action against Weichert some eight (8) years after an avalanche of information was identified in the press, and through multiple government and private party investigations. Its reliance on public policy for protections in a case concerning a fraudulent scheme it architected are at a minimum insulting the integrity of this Court. Plaintiff's untimely claims must be summarily dismissed.

### Conclusion

Plaintiff has failed to comply with the applicable statute of limitations. Moreover, its claims do not fall within the purview of any legally recognized tolling provision. Its claims against Weichert must be summarily dismissed.

> **McCusker, Anselmi, Rosen,**
> **Carvelli & Walsh, P.C.**
> 127 Main Street
> Chatham, New Jersey 07928
> (973)635-6300
> Attorneys for Defendant
> Weichert, Realtors


> By: /s/John B. McCusker
> John B. McCusker (JBM 1482)

**Dated**: June 17, 2005



Not Reported in F.Supp.                                                                          Page 1

Not Reported in F.Supp., 1996 WL 554513
**(Cite as: Not Reported in F.Supp.)**

**C**

Not Reported in F.Supp., 1996 WL 554513
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
William Anthony JONES, Plaintiff,
v.
Dr. Cesar SERVELLON and Gallaudet University,
Defendants.
**Civ. A. No. 94-1038-LFO.**

Sept. 18, 1996.

*MEMORANDUM*

OBERDORFER, District Judge:
This Motion to Dismiss or, in the Alternative, for
Summary Judgment arises out of a lawsuit brought
by plaintiff William Anthony Jones against
defendants Dr. Cesar Servellon and Gallaudet
University. Jones alleges in his complaint that
Servellon sexually molested him during a medical
examination. Servellon previously filed a motion
to dismiss, which was granted on the ground that
Servellon was a federal employee at the time of the
incident and therefore subject to suit only under the
terms of the Federal Tort Claims Act. Gallaudet
University now files a separate motion to dismiss,
contending that it may not be held vicariously liable
for the actions of Servellon because Servellon was
not employed by Gallaudet University at the time of
the incident. Gallaudet University also contends
that, insofar as the complaint alleges a sexual
battery, the cause of action is barred by the statute
of limitations.

For the reasons stated below, the Motion to Dismiss
or, in the Alternative, for Summary Judgment is
granted in part and denied in part.

I.

At the time of the alleged incident in 1991,
Servellon was a physician and psychiatrist
employed by the National Health Services Corps of
the United States Public Health Service. He was
assigned to provide medical services to students at
Gallaudet University in Washington, D.C., a
specialized school for the deaf. Jones was a
student at Gallaudet University. On March 5,
1991, Jones went to see Servellon to be fitted with a
new hearing aid. While he was being treated for
excess earwax, Jones claims that Servellon
negligently applied a caustic chemical to his ears,
rendering him unconscious. Allegedly, as Jones
faded in and out of consciousness, Servellon
sexually molested him.

On March 4, 1994, approximately three years later,
Jones filed suit against Servellon and Gallaudet
University. Thereafter, the United States moved to
substitute itself for Servellon as a defendant under
the Federal Tort Claims Act. An Order dated May
5, 1995 granted the motion to substitute. The
United States then filed a motion to dismiss, which
was granted on the ground that Jones failed to file
an administrative grievance with the Department of
Health and Human Services within two years as
required by the FTCA. *See* 28 U.S.C. §
2679(d)(5)(A) (1988).

Gallaudet University now moves to dismiss the
complaint on two grounds: (1) that it may not be
held vicariously liable for the actions of Servellon,
and (2) that Jones failed to file his lawsuit within
the one-year statute of limitations provided for
battery claims.

II.

A.

In his complaint, Jones alleges that Gallaudet
University should be held liable for the actions of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1996 WL 554513
**(Cite as: Not Reported in F.Supp.)**

Servellon under the theories of negligent hiring, negligent supervision, and/or *respondeat superior.*
In order to prevail under either of these three theories, however, Jones must first be able to present evidence tending to show that Gallaudet University and Servellon maintained a master-servant relationship. *See Murphy v. Army Distaff Foundation, Inc.,* 458 A.2d 61, 62-63 (D.C.1983). Gallaudet University argues that, since it is undisputed Servellon was an employee of the Federal Government at the time of the incident, he cannot also be considered an employee of the University.

The common law, however, unlike the New Testament, does not prohibit a man from serving two masters at the same time. It is well-established that an individual may be employed simultaneously by two different employers. *See* Restatement (Second) of Agency §§ 226 , 227 (1958); *see also Dellums v. Powell,* 566 F.2d 216, 220-22 (D.C.Cir.1978) ; *Safeway Stores, Inc. v. Kelly,* 448 A.2d 856, 860-61 (D.C.1982). As expressed in the Restatement, "A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others." Restatement (Second) of Agency § 227. In determining whether a secondary master-servant relationship has been formed, the crucial factor is right of control. *See id.* § 220(2); *Safeway Stores,* 448 A.2d at 860 & n. 10 . FN1

> FN1. Other relevant factors that go towards defining the master-servant relationship are (1) whether the employer supplies the instrumentalities, tools, and place of work; (2) the length of employment-Servellon was appointed to serve for three years, *see* Pl.'s Ex. 6; (3) and whether the work is part of the regular business of the employer-Gallaudet University, as one of its functions, maintained a fully staffed Student Health Service, *see* Pl.'s Ex. 4.

In this case, although it is undisputed that Servellon

was a "general servant" of the Federal Government, there is also evidence to support a finding that he was a "special servant" of Gallaudet University. The record contains deposition testimony by the Deputy Director of the National Health Services Corps explaining that members of the Corps are under the "joint responsibility" of the organization where they are placed and the Federal Government. Pl.'s Ex. 2 at 8. The Deputy Director also stated, " [T]he organization where the person is assigned is the sort of first line supervisor and first line kind of evaluator." *Id.* at 11. Elsewhere in the record are statements made by Gallaudet University acknowledging supervisory responsibility for Servellon. The minutes of a meeting conducted on June 18, 1990 noted that "Dr. Hinds [the Medical Director of Gallaudet University] would supervise Dr. Servellon on medical practice and procedure...." Pl.'s Ex. 8 at 1. Those same minutes also stipulated that "while seeing students on-campus Dr. Servellon is an agent of Gallaudet and will be covered as such (re: insurance) and liable as such.... " *Id.* at 2.

In practice, it was Gallaudet University that conducted Servellon's annual performance appraisal, using a form provided by the Federal Government. The appraisal was completed and signed by Dr. Ilnez Hinds, the Medical Director of Gallaudet University. Dr. Hinds also exercised disciplinary authority over Servellon. At one point, Dr. Hinds suspended Servellon pending the outcome of a University investigation based on the same allegations at issue here. *See* Pl.'s Ex. 13.
Since there is ample evidence in the record to support a finding that Gallaudet University was a " special employer" of Servellon, the University may be held liable for Servellon's tortious conduct.

### B.

Both parties agree that, under the three-year statute of limitations for negligence and other causes of action, the complaint would be deemed to have been timely filed. FN2 *See* D.C.Code Ann. § 12-301(8) (1994). Gallaudet University, however, contends that this cause of action should be characterized as a battery, thus triggering the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3

Not Reported in F.Supp., 1996 WL 554513
**(Cite as: Not Reported in F.Supp.)**

one-year statute of limitations. *See id.* § 12-301(4) (1994). Such an argument is unpersuasive on two bases. First, insofar as Jones alleges negligent hiring and negligent supervision on the part of Gallaudet University, those torts are independent of Servellon's intentional conduct. The D.C. Circuit has stated that a cause of action for negligent supervision or negligent training has a three-year limitations period, even if the negligent conduct of the employer results in an intentional tort by the employee. *See Hunter v. District of Columbia,* 943 F.2d 69, 72-73 (D.C.Cir.1991).

> FN2. The alleged incident occurred on March 5, 1991, and Jones filed his complaint on March 4, 1994.

Second, regarding the cause of action under *respondeat superior,* although the legal analysis is slightly more complicated, the result is substantially the same. Unlike a claim for negligent hiring or negligent supervision, a claim under *respondeat superior* does not allege a separate and distinct tort by the employer, but rather holds the employer vicariously liable for torts of the employee. Thus, the applicable statute of limitations for *respondeat superior* depends upon the nature of the torts alleged to have been committed by the servant. In his complaint, Jones alleges four causes of action against Servellon. Count I alleges medical malpractice based on the negligent application of a caustic chemical used to clean Jones's ears. That same count, however, also alleges sexual battery. To the extent that Jones seeks to have Gallaudet University held accountable for battery under *respondeat superior,* the cause of action is time-barred. Jones may not avoid the statute of limitations by cloaking his battery claim in the language of negligence or medical malpractice. *See Maddox v. Bano,* 422 A.2d 763, 764-65 (D.C.1980) (citing *Morfessis v. Baum,* 281 F.2d 938 (D.C.Cir.1960)). Of course, with regard to any negligence on the part of Servellon leading up to the sexual contact, Jones may proceed against Gallaudet University.

Count II alleges a negligent failure to provide informed consent regarding the nature of the

ear-cleaning procedure and use of the caustic chemical. Although the tort of failure to provide informed consent is one flip-side to the tort of battery, the D.C. Circuit has held that the two causes of action are analytically different and are subject to different statutes of limitations. *See Canterbury v. Spence,* 464 F.2d 772, 793 (D.C.Cir.1972). The Court in *Canterbury* specifically held that a claim for failure to provide informed consent is governed by the three-year provision. *Id.* Again, however, Count II also includes allegations relating to the sexual battery, and to the extent that Jones seeks to hold Gallaudet University liable for Servellon's failure to provide informed consent to such a battery, the claim is time-barred.

Count III alleges intentional infliction of emotional distress, which Jones concedes is time-barred.

Count IV alleges, as an alternative and inconsistent cause of action, that Jones may have consented to the sexual contact, but even so, Servellon was negligent in his actions because he should have known that he would cause emotional distress. Although it is not clear that a complaint alleging consensual sexual relations, even in a doctor-patient relationship, states a cause of action for negligent infliction of emotional distress, *see Simmons v. United States,* 805 F.2d 1363, 1366 (9th Cir.1986) ( "[C]ourts do not routinely impose liability upon physicians in general for sexual contact with patients."), in any event, Gallaudet University does not raise that issue here. What is clear is that negligent infliction of emotional distress arising from consensual sexual relations, if it is a tort, is one distinct from battery. Therefore, the three-year statute of limitations applies.

### III.

Gallaudet University's Motion to Dismiss or, in the Alternative, for Summary Judgment is granted in part insofar as Gallaudet University seeks to avoid liability under *respondeat superior* for Servellon's alleged sexual battery and intentional infliction of emotional distress. In all other respects, the motion is denied.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1996 WL 554513
**(Cite as: Not Reported in F.Supp.)**


                    *ORDER*

It is this 11th day of September 1996 hereby

ORDERED: that defendant Gallaudet University's
Motion to Dismiss or, in the Alternative, for
Summary Judgment is GRANTED IN PART
insofar as Gallaudet University seeks to avoid
liability under *respondeat superior* for Servellon's
alleged sexual battery and intentional infliction of
emotional distress, and is DENIED IN PART with
respect to all other claims; and it is further

ORDERED: that a status conference to discuss
further administration of this case is scheduled for
*October 24, 1996 at 10:00 a.m. in Courtroom 3.*

D.D.C.,1996.
Jones v. Servellon
Not Reported in F.Supp., 1996 WL 554513

Briefs and Other Related Documents (Back to top)

• 1:94CV01038 (Docket) (May. 11, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                          Page 1

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

**H**
Not Reported in F.Supp., 1994 WL 532130
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
KEMP INDUSTRIES, INC. and Apollo Associates,
Ltd. Plaintiffs,
v.
SAFETY LIGHT CORP., USR Industries, Inc.,
USR Chemicals, Inc., USR Lighting, Inc., USR
Metals, Inc. U.S. Natural Resources, Inc., the
Prudential Insurance Company of America and John
Does I-X, Defendant.
**Civ. A. No. 92-95 (AJL).**

Jan. 25, 1994.

Bruce D. Nimensky , Berger & Bornstein, P.A.,
Morristown, NJ, for plaintiffs.
Samuel P Moulthrop , Laura M. Massaia , Riker,
Danzig, Scherer, Hyland & Perretti, Morristown,
NJ, for defendant The Prudential Ins. Co. of
America.

OPINION

LECHNER, District Judge.
This is an action by Kemp Industries ("Kemp") and
Apollo Associates, Ltd. ("Apollo") (collectively the
"Plaintiffs") against Safety Light Corporation ("
Safety Light"), USR Industries, Inc. ("USR
Industries"), USR Chemicals, Inc. ("USR Chemicals
"), USR Lighting, Inc. ("USR Lighting"), USR
Metals, Inc., ("USR Metals"), U.S. Natural
Resources, Inc. ("USNR") and The Prudential
Insurance Company of America ("Prudential")
(collectively the "Defendants") for declaratory,
injunctive and monetary relief under the
Comprehensive Environmental Response,
Compensation and Liability Act ("CERCLA"), 42
U.S.C. §§ 9601 *et seq.,* the New Jersey Spill
Compensation and Control Act (the "Spill Act"),
N.J.S.A. §§ 58:10-23.11 *et seq.,* Federal common

law and New Jersey common law.

Currently before the court is Prudential's motion for
summary judgment on the Plaintiffs' New Jersey
statutory cause of action and all but one of the
Plaintiffs' common law causes of action. FN1 For
the reasons set forth below, Prudential's motion for
summary judgment is granted as to the common law
counts, and granted in part as to New Jersey
statutory count.

*Facts*

Kemp is a corporation organized and existing under
the laws of the state of Delaware and has a place of
business in West Milford, New Jersey. *See*
Complaint, filed 1 June 1993 ("Second
Amended Complaint"), ¶ 4. FN2 Kemp is
currently owner of the land and premises designated
as lots 12 ("Lot 12") and 13 ("Lot 13") in Block
3901 on the tax map of the Township of Hanover,
Morris County, New Jersey (collectively, the "
Hanover Site"). *Id.; see* Opp.Brief at 1-2. Until at
least February 1987, Kemp was known as Van Dyk
Research Corporation ("Van Dyk"). *See* Second
Amended Complaint, ¶ 5; Plaintiffs' O'Mara Dep.
at 87-90.

Apollo is a limited partnership organized and
existing under the laws of New Jersey and has a
place of business in Morristown, New Jersey. *See*
Second Amended Complaint, ¶ 6. Apollo is the
owner of lands adjacent to the Hanover Site (the "
Adjacent Lands"). *Id.,* ¶ 8. Apollo is also
prospective purchaser of the Hanover Site. *Id.,* ¶
6; Opp.Brief at 3 & n. 8.

United States Radium ("USR") was a corporation
existing under the laws of Delaware, engaged in,
among other things, the production of phosphors.
*See* Moving Brief at 4. In or about 1980, USR
underwent corporate restructuring. As a result of
the reorganization, USR formed Safety Light, USR

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Industries, USR Chemicals, USR Lighting, USR Metals and USNR (collectively, the "USR Companies"). Second Amended Complaint, ¶ 8A; Moving Brief at 4 n. 3. Before 1950, USR owned the Lot 13. Opp.Brief at 1.

In the late 1940s, USR decided to construct a facility on Lot 13 to accommodate anticipated expansion of its phosphor production operations. Moving Brief at 4; Davenport Dep. at 8. USR required financing for the project, and approached Prudential FN3 to secure such financing.

On 10 July 1950, USR and Prudential entered into an agreement whereby Prudential would acquire title to Lot 13 from USR and pay for the cost of a building to be erected thereon according to USR's specifications (the "1950 Sale Contract"). Moulthrop Cert., Ex. B. Title to Lot 13 was conveyed to Prudential on 21 December 1950. *See id.,* Ex. C.

Also pursuant to the 1950 Sale Contract, Prudential and USR agreed to enter into a lease agreement whereby Prudential would lease Lot 13 to USR for a term of 25 years (the "Lease Agreement"). *See* Moving Brief at 5; Opp.Brief at 1; Moulthrop Cert., Ex. D. Under the Lease Agreement, USR was obligated to pay property taxes on, purchase insurance for, and bear the risk of loss from damage to Lot 13. Moulthrop Cert., Ex. D.

USR occupied Lot 13 as tenant of Prudential for approximately fourteen years. During this time, USR operated a phosphor production facility on Lot 13. Opp.Brief at 1. Prudential states, and Plaintiffs do not dispute, that Prudential "neither conducted any activity on Lot 13 nor participated in any manner in the operation or management of [Lot 13]" during the time it held title to the lot. Moving Brief at 5.

On or about 24 July 1964, Prudential reconveyed title to Lot 13 to USR (the "1964 Sale"). *See* Moulthrop Cert., Ex.E. The leasehold created by the Lease Agreement was merged into the 1964 Sale. *Id.* USR thereafter continued to operate its phosphor production facility located on Lot 13. Opp.Brief at 2.

In or about May 1956, USR acquired title to Lot 12. Moulthrop Cert., Ex.F. By agreement, dated 17 November 1969, USR sold the Hanover Site, consisting of Lot 12 and Lot 13, to Van Dyke (the "1969 Sale Contract"). FN4 *See* Nimensky Cert., Ex. B. By agreement, dated 8 December 1969, USR agreed to make certain improvements to the Hanover Site, including, *inter alia,* the drainage of "the race pond located upon the lands (the "Race Pond")...." *Id.,* Ex. C (the "1969 Improvements Contract").

As a condition precedent to approval of Van Dyk's use of the Hanover Site, the Township of Hanover required the Race Pond to be drained, filled in and levelled by October 1970. Pollack Aff., ¶ 6. In the spring of 1970, when Van Dyk determined that USR was not going to fulfill its obligation under the 1969 Improvements Contract to drain the Race Pond before the township's October 1970 deadline, Van Dyk began drainage of the pond. *See id.,* ¶¶ 5-7.

Upon draining the Race Pond, Van Dyk discovered "a yellowish sludge ... in the pond bed." *Id.,* ¶ 7. At Van Dyk's direction, the sludge was subjected to chemical analysis. The analysis revealed "that the sludge had a high content of cadmium sulfide and zinc sulfide." *Id.,* ¶ 8. Kemp has conceded that as of 1970, Max Pollack ("Pollack"), then president of Van Dyk, was "aware that the [Race Pond] contained cadmium." Moulthrop Cert., Ex. I (Kemp's response to Prudential's Second Set of Interrogatories) at 6. Later in 1970, Van Dyk "had the sludge removed from the [Race Pond], thus creating [a] waste pile [ (the "Waste Pile") ]." *Id.* at 19.

In early 1970, Van Dyk began to manufacture copying machines at the Hanover Site. Opp.Brief at 2. Van Dyk ceased to use the Hanover Site for any purpose by 1984, and at that time entered into negotiations with Apollo for the sale of the Hanover Site. Plaintiffs' O'Mara Dep. at 40. On 17 August 1984 Van Dyk entered into a contract to sell the Hanover Site to Apollo (the "1984 Sale Contract"). FN5 Moulthrop Cert., Ex. G.

Earlier, in February 1984, Van Dyk submitted to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 3

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Township of Hanover a completed Hazardous
Substances Questionnaire (the "February 1984
Questionnaire"). FN6 *See id.,* Ex. J. The February
1984 Questionnaire requested that Van Dyk list "all
hazardous substances at [the Hanover Site], with
maximum quantity of each [that] would be present
at any one given time during the year." *Id.* at 1.
Van Dyk responded, *inter alia:*

> We also have on the property (sketch attached)
> about 400,000 lbs of a mixture of Cadmium
> Sulfide and Zinc Sulfide. It is about 25%
> moisture. We estimate 60,000 lbs of cadmium
> Sulfide and 240,000 lbs. of Zinc Sulfide. This
> material was on the property when Van Dyk
> purchased it in 1969. It was then in an acidic
> slurry which we dried out.

*Id.* at 2 (Addendum # 1). A hand-sketched map is
attached to the February 1984 Questionnaire,
showing the size and placement of the hazardous
waste deposit mentioned by Van Dyk. According
to the map, which contains a scale, a "pile of
Cadmium Sulfide & Zinc Sulfide, estimate: 60,000
lbs. CdS, 240,000 lbs ZnS," is located
approximately one hundred yards from a building
labeled "Bldg H." *Id.* at 6.

Thomas O'Mara ("O'Mara"), president of Van Dyk
in 1984, testified that the Waste Pile was "
approximately 12, 15 feet high, approximately 15 to
20 feet wide [and] approximately 30 feet long."
O'Mara Dep. at 28. O'Mara confirmed that prior to
August of 1984, he was "aware ... that [the Waste
Pile] had cadmium compounds in it," *id.* at 47, and "
that the [W]aste [P]ile was something to be
concerned about." *Id.* at 62.

It appears Apollo was first alerted to the presence of
hazardous substances on the Adjacent Lands by a
report from TRC Environmental Consultants, Inc. ("
TRC"), FN7 dated 20 June 1984 (the "20 June
1984 TRC Report"). *See* Moulthrop Cert., Ex. L at
19 (Apollo's response to Prudential's Second Set of
Interrogatories; Responding to interrogatory 32,
which asks when Apollo "became aware of the
presence of hazardous substances or wastes on the
Adjacent Lands," Apollo stated: "See TRC report
of June 20, 1984."); *id.,* Ex. M (20 June 1984 TRC
Report). The 20 June 1984 TRC Report stated:

> A waste pile alleged to contain heavy metals is

still present on the [Hanover Site]. Apollo had
conducted analyses of soils on [the Adjacent
Lands] where runoff was evident from the
[W]aste [P]ile[ ]. These analyses ... show
elevated levels of cadmium, lead and zinc. TRC
understands that Apollo had been involved in an
effort to have the present owner, Van Dyk,
remove or control the [W]aste [P]ile. The
[W]aste [P]ile [is] also [a] potential source [ ] of
heavy metal contamination to ground water
flowing under the Apollo property.

*Id.* The 20 June 1984 TRC Report was forwarded
to Apollo on 26 July 1984. *See* Moulthrop Cert.,
Ex. N.

On 8 January 1985, Van Dyk filed with the New
Jersey Department of Environmental Protection ("
DEP") FN8 an "Initial Notice" of the proposed sale
of the Hanover Site. *Id.,* Ex. O at 1. On 15
January 1985, Radiation Safety Associates ("RSA")
performed and reported on a radiological evaluation
of the Hanover Site at the request of TRC (the "
RSA Report"). *See* Moulthrop Cert., Ex. Q. The
RSA Report identified a radioactive "hot spot" on
the "extreme eastern end of the property." *Id.* The
RSA Report stated that "as it exists, ... it is [RSA's]
opinion that [the hot spot] does not constitute an
immediate public health hazard from a radiological
standpoint." *Id.* RSA recommended, however, "
that this spot be excavated with a health physicist
present, and the source of this radiation be
identified and disposed of in an appropriate manner.
" *Id.* The RSA Report also reported background
radiation at two to five times the level which could
normally be expected. FN9 *Id.*

On 18 January 1985, DEP received from Van Dyk a
"Site Sampling Plan" for the Hanover Site (the "
Sampling Plan"), prepared by TRC. *See*
Moulthrop Cert., Ex. O at 4, Ex. P. Under the
heading "Areas of Environmental Concern," the
Sampling Plan listed the Waste Pile, as well as "
possible radiological contamination throughout the
[Hanover] [S]ite." Moulthrop Cert, Ex. P at 2.

The Sampling Plan also described the danger of
exposure from the Waste Pile:

> The most probable route of exposure from these
> sources would be the ground water.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                         Page 4

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Radiological contamination has been detected in the ground water at the adjacent downgradient site. Surface water runoff from the [W]aste [P]ile flows to the north corner of the property in a low swampy area.... Present information for the area indicates that the ground water flow is in a southerly direction towards the Whippany River. *Id.* The Sampling Plan also stated: "The [W]aste [P]ile is a result of the excavation of an effluent disposal lagoon used by U.S. Radium during [its] manufacturing operations." *Id.*

The Sampling Plan further indicated that " [p]revious investigations at the [Adjacent Lands] ha[ve] indicated elevated levels of radiation and phenols in the ground water." *Id.* at 12. The Sampling Plan indicated that the Waste Pile was the likely source of such contamination:

Since the contaminated water was from an upgradient well, the likely source is the Van Dyk property [, the Hanover Site].... Also, since there was a cadmium sulfate pile on the site, the eight EP toxic metals will be analyzed in both soil and ground water.

*Id.*

On 4 February 1985, DEP received from Van Dyk a revision to the Sampling Plan, dated 30 January 1985 (the "Revised Sampling Plan"), also prepared by TRC. *See* Moulthrop Cert., Ex. T. The Revised Sampling Plan reiterated the "Areas of Environmental Concern" and information regarding the contamination of the Adjacent Lands contained in the Sampling Plan. *Id.* at 2, 12. A second revision to the Sampling Plan, dated 25 April 1985 (the "Second Revised Sampling Plan"), also prepared by TRC, was received by DEP on 7 June 1985. *See* Moulthrop Cert., Ex. U. The Second Revised Sampling Plan again listed the Waste Pile and "a small area of elevated radiological levels on the [Hanover] [S]ite" as being "areas of environmental concern." *Id.* at 2.

A third revision to the Sampling Plan, dated 27 August 1985 (the "Third Revised Sampling Plan") was received by DEP on 20 September 1985. *See* Moulthrop Cert., Ex. V. Among its listing of "areas of environmental concern," the Third Revised Sampling Plan included the Waste Pile, "three

settling lagoons operated by [USR] that have since been backfilled (possible source of radiation)" and an "above ground tank farm operated by [USR] and later decommissioned by Van Dyk." *Id.* at 2. The Third Revised Sampling Plan also listed "ground water quality in general" as being among areas of concern on the Hanover Site. *Id.*

At some point during 1985, Van Dyk commenced removal of the Waste Pile as the "first step to comply with ECRA." O'Mara Cont.Dep. at 120. The removal of the Waste Pile eventually resulted in an expenditure of approximately $68,000 on the part of Van Dyk. *See* Moulthrop Cert., Ex. W at 14. The record indicates that the removal of the Waste Pile was completed by, at latest, 30 January 1985. *See* Moulthrop Cert., Ex. T at 4 (figure to Revised Sampling Plan, indicating position of " former cadmium sulfate waste pile"); *id.*, Ex. S at 2 (DEP Site Evaluation Submission, dated 25 January 1985, indicating "Cadmium Sulfate Waste Pile" was "removed").

Also as part of the ECRA compliance process, TRC conducted soil analysis at the Hanover Site in September 1985 (the "September 1985 Soil Analysis "). *See* Moulthrop Cert., Ex. W, Table 1. Plaintiffs state the results of the September 1985 Soil Analysis were available in February 1986. Tr. at 6-7. The September 1985 Soil Analysis showed surface cadmium levels of up to 7,700 ppm, and cadmium levels well in excess of 1,000 ppm at depths up to six feet. Moulthrop Cert., Ex. W, Table 1. One soil sample revealed a cadmium concentration of 28,000 ppm at a depth of two to four feet. *Id.*

On 13 February 1986, Lawrence Berger ("Berger"), an officer of Apollo, FN10 met with officials of the DEP at the DEP's offices (the "DEP Meeting"). Berger Cert., ¶ 9. During the DEP Meeting, a DEP official, upon reviewing test data concerning the Hanover Site, told Berger that the data indicated cadmium levels "greatly in excess of those permissible under DEP's standards." FN11 *Id.*, ¶ 15; *see* Berger Dep. at 52-53. The DEP official also informed Berger that such levels of cadmium " might constitute a health hazard." FN12 Berger Cert., ¶ 16.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 5

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Berger states that the moment of the DEP official's statements during the DEP Meeting on 13 February 1986 "was the first time that anyone had informed [him] of the presence of cadmium on the [Hanover Site] in excess of what might be considered acceptable levels." *Id.,* ¶ 17; *see* Berger Dep. at 52-53. Berger states he had discussions with TRC on areas of environmental concern prior to the DEP Meeting, but was unaware of the extent of the cadmium problem before the DEP Meeting:

At no time during these discussions [ (between TRC and Berger) ] did we discuss cadmium as a potential environmental problem. In fact, prior to [the DEP Meeting] I was unaware of the existence of cadmium on the [Hanover Site] at levels that would pose a health concern.

At the time of the [DEP Meeting], it was my understanding that the levels of radiation that had been identified did not constitute a public health concern. I had been so advised by the environmental consultants. FN13

Berger Cert., ¶ 11-12. Burger has further testified: "It would seem to me that TRC should have known that [cadmium contamination] was the problem and we should have dealt with it long before what I found to be a fairly embarrassing meeting." Berger Dep. at 52.

By letter, dated 27 May 1986, TRC gave Berger "a brief overview of the problems found" on the Hanover Site (the "27 May 1986 TRC Letter"). *See* Moulthrop Cert., Ex. X. The 27 May 1986 TRC Letter stated: "Much of the surface and subsurface soils in the northern 1/3 of the property are contaminated with either cadmium, barium, and/or zinc. *Id.* The 27 May 1986 TRC Letter further notified Berger of "one very localized area (approximately one foot by one foot) of high radioactivity." *Id.* TRC explained: "The metal contamination is probably the result of improper wastes generated by U.S. Radium, the former property owner. Likewise, the localized area of high radioactivity is probably from U.S. Radium activities." *Id.*

In spite of its findings of contamination and radioactivity, TRC concluded that the "health risk potential" from these environmental conditions was "minimal." *Id.* However, TRC advised Berger that "[d]uring remediation the health risk potential will need to be redefine[d]." *Id.*

On 15 January 1992, Plaintiffs filed a seven-count complaint (the "Complaint") against Safety Light as successor to USR, demanding that Safety Light be compelled to "commence removal and remedial action" with respect to environmental hazards on the Hanover Site, as well as other declaratory and monetary relief. The Complaint alleged that USR " utilized unsafe and improper methods to dispose of large quantities of liquid and solid waste," including, *inter alia:*

(a) the indiscriminate burying of radio active wastes;

(b) the stock piling upon the [Hanover Site] of a cadmium sulfate waste pile;

(c) the discharging of liquid hazardous waste onto the subject premises and into affluent lagoons and other detention and catch basins.

Complaint, ¶ 10.

Count one of the Complaint ("Count I") alleged that these illegal acts entitled Plaintiffs to declaratory, injunctive and monetary relief under CERCLA. *Id,* ¶¶ 16-27. Count two of the Complaint ("Count II ") sought relief under the Spill Act. *Id.,* ¶¶ 28-36. Count three ("Count III") sought recovery under Federal common law. *Id.,* ¶¶ 37-42. Count four ("Count IV") sought to hold Safety Light strictly liable for the damages and cleanup costs and responsibilities associated with the Hanover Site. *Id.,* ¶ ¶ 43-50. Count five (" Count V") sought recovery on the theory of negligence. *Id.,* ¶¶ 51-54. Count six ("Count VI ") sought recovery on the theory of nuisance. *Id.,* ¶ ¶ 55-65. Finally, count seven ("Count VII") sought recovery on the basis of alleged fraud and deceit on the part of Safety Light. *Id.,* ¶¶ 67-70.

On 26 August 1992, Plaintiffs amended the Complaint to include Prudential as a defendant (the "Amended Complaint"). The Amended Complaint is in all other respects substantially identical to the Complaint.

Plaintiffs argue that they first learned in May of 1992 that Prudential held title to part of the Hanover Site from December 1950 through July

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 6

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

1964. *See* Opp.Brief at 7-8. Plaintiffs point to
Safety Light's response to Plaintiffs' interrogatories,
dated 1 May 1992 (the "May 1992 Safety Light
Response"), where Safety Light disclosed this
information. FN14 *See* Nimensky Cert., Ex. A at 2.
Plaintiffs further state that it was from the May
1992 Safety Light Response that they first learned
that USR's use of cadmium "might perhaps have
dated back to Prudential's period of ownership."
FN15 Opp.Brief at 8 (citing Nimensky Cert., Ex. A
at 6, where Safety Light responds that cadmium was
used at the Hanover Site "at least" during 1966-67).

Prudential has certified, by its Associate Regional
Counsel, Richard E. Pigott ("Pigott"), that "
Prudential had no notice, formal or informal," of the
instant action until receipt of the Amended
Complaint in September 1992. Pigott Cert., ¶¶
4-5. Prudential states that upon receipt of the
Amended Complaint, it began a search of internal
files for documents referring to the instant litigation,
and found nothing other than a file relating to
Prudential's former ownership of Lot 13. *Id.,* ¶¶
5-6.

Plaintiffs assert, however, that Prudential obtained
informal notice of the suit on or about 8 May 1992.
To this end, Plaintiffs point to the oral and written
testimony of Irving D. Cohen ("Cohen"), president
of Enviro-Sciences, Inc. ("ESI"). FN16 *See* 23
December Letter-Brief. At his 21 December 1993
deposition, Cohen testified Prudential is a client of
ESI. Cohen Dep. at 9. Cohen testified that on 6
May 1992, he received a letter from Plaintiffs'
counsel enclosing the May 1992 Safety Light
Response. *Id.* at 7. Cohen stated that in reviewing
the May 1992 Safety Light Response on or about 8
May 1992, he noticed that Prudential was in the
chain of title to Lot 13. *Id.* at 8-9. Cohen testified
that he recognized a potential conflict of interest
between his representation of Prudential and of
Plaintiffs. *Id.*

Cohen stated that he immediately telephoned Harris
Sanders, Prudential's director of environmental
affairs ("Sanders"), to inform him of the potential
conflict (the "8 May Phone Conversation"). *Id.*
Cohen indicated that during the 8 May Phone
Conversation, he told Sanders that there was a "

potential for a lawsuit." *Id.* at 9. Cohen testified:
> Since the information was provided to us, to us as
> a part of a lawsuit against Safety Light, which
> was [USR], I would have indicated to Harris that
> we're working a site with Kemp and Apollo and ...
>  Berger and it came to my attention that through
> this information that ... there is a court case and I
> found a potential for conflict through lawsuit if
> they were brought into the picture *and at that
> point in time that it hadn't been decided yet.*
*Id.* at 9-10. Cohen also answered affirmatively
when asked whether he informed Sanders that
Plaintiffs "were considering whether or not to bring
Prudential into the case." FN17 *Id.* at 10.

In October 1992, ESI conducted soil sampling at
the Hanover Site (the "October 1992 Soil Analysis"
). *See* Nimensky Cert., Ex. L. During the October
1992 Soil Analysis, "ESI discovered a plastic bag
of material (a yellow/green fluorescent-like powder .
..) at a depth of approximately 48 below grade.
This on-site location is known as the former
[c]admium [s]ulfide/[z]inc [s]ulfide Waste Pile
[a]rea. The material was analyzed and found to
contain cadmium at a concentration of 176,000 ppm.
" FN18 *Id.* at 4.

As stated, the Second Amended Complaint was
filed 1 June 1993. The Second Amended
Complaint added the remaining USR Companies as
defendants; in all other respects, the Second
Amended Complaint is substantially identical to the
Complaint and the Amended Complaint.

Prudential now moves for summary judgment on
Counts II through VI of the Second Amended
Complaint on the ground that these counts are
time-barred as to Prudential. Prudential also
moves for summary judgment on Counts III, V and
VI on the ground that these counts are substantively
deficient, as a matter of law.

*Discussion*

A. *Summary Judgment Standard of Review*

To prevail on a motion for summary judgment, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 7

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) . The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986); *see also Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("The threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " (citations omitted); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) ("[S]ummary judgment is inappropriate when a conflict on a material fact is present in the record."); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ; *Williams v. New Castle County,* 970 F.2d 1260, 1264 (3d Cir.1992) ; *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 75 (3d Cir.1991) ; *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990) ; *Todaro v. Bowman,* 872 F.2d 43, 46 (3dCir.1989). " 'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll-Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine

issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with ' specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586-87 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 251-52), *cert. denied,* --- U.S. ----, 111 S.Ct. 2827 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* " If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323-24 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *see* Fed.R.Civ.P. 56(e); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Carlson v. Arnot-Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) ( "nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Page 8

*Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

### B. *Counts III, V and VI*

Count III of the Second Amended Complaint seeks relief under Federal common law. Prudential seeks summary judgment on Count III, arguing that, with respect to Plaintiffs' instant claims, there exists no Federal common law under which Plaintiffs can recover. *See* Moving Brief at 30 (citing *City of Milwaukee v. Illinois and Michigan,* 451 U.S. 304 (1981)). Plaintiffs submitted no response to Prudential's argument in this regard, and indicated at oral argument that they agreed to dismissal of Count III as to Prudential. Tr. at 5. Accordingly, Prudential is granted summary judgment on Count III.

Count V of the Second Amended Complaint alleges negligence on the part of the Defendants under the common law of New Jersey. Prudential seeks summary judgment on Count V on the ground that Prudential had no legal duty upon which a claim of negligence could be founded. *See* Moving Brief at 31. Plaintiffs submitted no response to Prudential's argument with respect to Count V, and indicated during oral argument that they agreed to dismissal of this count as against Prudential. Tr. at 5. Accordingly, Prudential is granted summary judgment on Count V.

Count VI of the Second Amended Complaint seeks recovery on the common law theory of nuisance. Prudential seeks summary judgment on Count VI on the ground that Prudential engaged in no conduct which could give rise to a nuisance action. *See*

Moving Brief at 32. Plaintiffs submitted no response to Prudential's argument on Count VI, and indicated during oral argument that they agreed to dismissal of this count as to Prudential. Tr. at 5. Accordingly, Prudential is granted summary judgment on Count VI.

### C. *Counts II and IV*

The only counts addressed in Prudential's motion which remain to be considered are Counts II and IV. As stated, Count II seeks recovery under the Spill Act. Count IV seeks recovery under the theory of strict liability. Prudential seeks summary judgment on Counts II and IV on the ground that Plaintiffs' assertion of these counts against Prudential is barred by the applicable limitations period.

#### 1. *Relation Back of the Amended Complaint*

As stated, the Complaint, filed 15 January 1992, named only Safety Light as a defendant. It was by the Amended Complaint, filed 26 August 1992, that Prudential was brought into the action. Plaintiffs seek to have the Amended Complaint relate back to the date of the filing of the Complaint, so that for limitations purposes, their action against Prudential would be deemed to have been filed 15 January 1992.

Rule 15(c) of the Federal Rules of Civil Procedure provides, in relevant part:

(c) Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) FN19 is satisfied and, within the period provided by Rule 4(j) FN20 for service of the summons and the complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 9

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

and (B) *knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.*

Fed.R.Civ.P. 15(c)(3) (emphasis added).

The language of Rule 15(c)(3), and particularly of subpart (B) thereof, indicates that the rule allows for relation back only where the plaintiff was mistaken as to the identity of the proper party in filing the original complaint, and had actually intended to sue the party to be added by amendment. The rule also requires that the defendant to be added knew or should have known there was such a mistake within 120 days of filing of the original complaint. The rule does not appear, on its face, to provide for relation back where the initial party sued was intended to be sued, and the omission of the second defendant was, or reasonably appeared to be, a strategic decision and not a mistake concerning the identity of the proposed defendant.

This interpretation of the language of Rule 15(c)(3) is supported by the purpose behind the rule. The Advisory Committee Note on the 1966 amendment to Rule 15(c), which added subsection (3), states:

Rule 15(c) is amplified to state more clearly when an amendment of a pleading changing the party against whom a claim is asserted (*including an amendment to correct a misnomer or misdescription of a defendant* ) shall "relate back" to the date of the original pleading.

The problem has arisen most acutely in certain actions by private parties against officers or agencies of the United States. Thus an individual denied social security benefits by the Secretary of Health, Education and Welfare may secure review of that decision by bringing a civil action against that officer within sixty days. In several recent cases the claimants instituted timely action *but mistakenly named as defendant the United States, the Department of HEW, the " Federal Security Administration" (a nonexistent agency), and a Secretary who had retired from office nineteen days before.* Discovering their mistakes, the claimants moved to amend their complaints to name the proper defendant; by this time the statutory sixty-day period had expired.

The motions were denied on the ground that the amendment "would amount to the commencement of a new proceeding and would not relate back so as to avoid the [statute of limitations]."

Fed.R.Civ.P. 15(c), Advisory Committee Notes, 1966 Amendment (emphasis added). The rule, therefore, was intended to allow for correction of mistakes in pleading, not for an escape from the consequences of poor legal strategy.

"The 'mistake condition' ... is not limited to cases of misnamed or misdescribed parties, rather the [r]ule is widely understood to allow the addition of new parties that were never named or described." *Heinly v. Queen,* 146 F.R.D. 102, 107 (E.D.Pa.1993); *see Advanced Power Systems v. Hi-Tech Systems,* 801 F.Supp. 1450, 1457 (E.D.Pa.1992) ("In view of the history of the application of Rule 15(c), the phrase 'a mistake concerning a proper party' should clearly not be read to limit its usefulness to cases of misnomer." (citing 3 Moore's Federal Practice ¶ 15.15[4.-2] at 15-167 n. 15 (1988)); *Hicks v. Resolution Trust Corp.,* 738 F.Supp. 279, 287 (N.D.Ill.1990) (same).

In accordance with the language and purpose of Rule 15(c)(3) , however, courts have repeatedly held that in order for an amendment adding a defendant to relate back under Rule 15(c)(3), "a plaintiff may not merely have failed to sue the proposed party; rather, the plaintiff must have initially [intended to sue the proposed party,] sued the wrong party and [be] attempting to correct the mistake." *Jordan v. Tapper,* 143 F.R.D. 567, 574 (D.N.J.1992); *see Kilkenny v. Arco Marine, Inc.,* 800 F.2d 853, 857 (9th Cir.) ("Rule 15(c) was intended to protect a plaintiff who mistakenly names a party and then discovers, after the relevant statute of limitations has run, the identity of the proper party. Rule 15(c) was never intended to ... permit a plaintiff to engage in piecemeal litigation." ), *cert. denied sub nom Kilkenny v. Atlantic Richfield Co.,* 480 U.S. 934 (1986); *Richardson v. John F. Kennedy Memorial Hospital,* --- F.Supp. ----, No. 92-2899, 1993 WL 492383 at * 4 (E.D.Pa. 26 Oct.1993) ("To satisfy the [mistake condition], plaintiff, at the time he filed his complaint, must have committed some sort of mistake concerning

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 10

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

the identity of the proper defendant."); *Kress v. Hall-Houston Oil Co.,* --- F.Supp. ----, No. 92-543, 1993 WL 166274 at * 4 (D.N.J. 12 May 1993) ( Rule 15(c)(3) is "[d]esigned to protect a plaintiff who mistakenly names a party...."); *Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metropolitan Bottling Co., Inc.,* 785 F.Supp. 514, 516 (E.D.Pa.1992) ("[A]n amendment should relate back only where there has been an error made concerning the identity of the proper party."); *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1142 (E.D.Pa.1990) (relation back permitted where "the wrong party is blamed while the real culprit remains unknown," or where a plaintiff "lists the technically incorrect party in her complaint"); *Gabriel v. Kent General Hospital, Inc.,* 95 F.R.D. 391, 395 (D.Del.1982) (relation back allowed where plaintiff "made a mistake in selecting the original defendants").

"Lack of knowledge of the proper party does not permit an amendment to relate back under the mistake prong of Rule 15(c)." *Campbell v. Ward,* 792 F.Supp. 1150, 1153 (E.D.Mo.1992); *see Simmons v. South Central Skyworkers, Inc.,* 936 F.2d 268, 269-70 (6th Cir.1991) (in products liability action, where plaintiff's discovery revealed none of named defendants had manufactured product, and plaintiff subsequently filed amended complaint, mistake prong not satisfied and amended complaint did not relate back); *Rylewicz v. Beaton Services, Ltd.,* 888 F.2d 1175, 1181 (7th Cir.1989) ( "[L]ack of knowledge of proper party ... does not permit an amendment to relate back under Rule 15(c) [ (3) ]...."); *Norton v. International Harvester Co.,* 627 F.2d 18, 22-23 (7th Cir.1980) (same); *Wood v. Worachek,* 618 F.2d 1225, 1230 (7th Cir.1980) (same).

As indicated by the language of Rule 15(c)(3), the plaintiff's mistake is not itself sufficient to permit relation back. The defendant added by amendment must, within 120 days of the filing of the original complaint, have known, or have reasonably been able to know, that it was *intended* to be sued in the original complaint and was omitted by mistake. *See Kilkenny,* 800 F.2d at 857 (Plaintiff "may have been mistaken as to the identity of the proper defendants at the time she filed the original

complaint, but that is not the critical inquiry under [R]ule 15(c). We are concerned with what [defendants] knew or should have known during the limitations period."); *Kemper v. URECO,* --- F.Supp. ----, No. 88-9618, 1991 WL 125178 at * 1 (E.D.Pa.1991) ("In contexts other than misnomer, courts should use something akin to a reasonableness test to determine whether the party should have known he was the one intended to be sued.' " (quoting 6A C. Wright & A. Miller, Federal Practice and Procedure § 1498 at 139 (1990) ); *Ratcliffe v. Insurance Company of North America,* 482 F.Supp. 759, 763-64 (E.D.Pa.1980) (same).

Courts have stressed that it is crucial to fulfillment of the mistake condition that the proposed defendant did not have reason to believe that its omission from the initial complaint was a deliberate strategy, rather than an error in pleading. *See Kilkenny,* 800 F.2d at 857 (fact which may cause " the unnamed party to conclude that it was not named because of a strategic reason rather than as a result of the plaintiff's mistake" renders relation-back inappropriate under Rule 15(c) ); *Heinly,* 146 F.R.D. at 107 ("reasonable belief that the failure to join a new defendant was a deliberate strategy" would prevent amendment from relating back); *Advanced Power Systems,* 801 F.Supp. at 1457 ("The 'mistake' condition does not isolate a specific type or form of error in identifying parties, but rather is concerned fundamentally with the new party's awareness that failure to join it was error rather than deliberate strategy."); *Great Northeastern Lumber,* 785 F.Supp. at 516 (relation back not permitted where added defendant "may have believed plaintiff made a deliberate choice rather than a 'mistake' in deciding not to join it").

If the party originally named in the complaint was not mistakenly named, and was in fact a proper party, the unnamed defendant will have reason to believe it was not omitted by mistake, but by strategy. *See Kress,* 1993 WL 166274 at * 4 (where securities fraud plaintiffs named investment house, but omitted source of investment house's misleading information, omission was "seemingly a strategic decision" and not a mistake); *Rhyder v. Santos,* --- F.Supp. ----, No. 91-2920, 1992 WL

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

25863 at *2 (E.D.Pa. 5 Feb. 1992) ("[I]t cannot be said that plaintiff had made a 'mistake' in naming the original defendant [in the complaint under 42 U.S.C. § 1983] since plaintiff continues to allege that [the original] defendant used excessive force against him."); *Kinnally,* 748 F.Supp. at 1142 (mistake is either technical error in pleading or " instances in which the wrong party is blamed while the real culprit remains unknown").

Similarly, if the omitted defendant would be liable to the plaintiff under a different theory than is alleged against the named plaintiff, the unnamed defendant may be led to conclude that it was intentionally omitted from the action. *See Rhyder,* 1992 WL 25863 at *2 (plaintiff could not establish defendant's knowledge of mistake where "[t]he claim for relief against the [original defendant] is separate and distinct from what would be alleged against the [proposed defendant]"); *see also Potts v. Allis-Chalmers Corp.,* 118 F.R.D. 597, 609 (N.D.Ind.1987) ("lack of identity" between unnamed defendant and named defendant militated against finding of mistake); *compare Potts,* 118 F.R.D. at 609, *with Advanced Power Systems,* 801 F.Supp. at 1457 (where unnamed defendant closely related to named defendant, unnamed defendant should have known it would have been named but for mistake); *Kinnally,* 748 F.Supp. at 1136 (same).

Also, if the unnamed defendant's potential liability is so apparent that the plaintiff, with the exercise of reasonable diligence, should know of such potential liability, the plaintiff's failure to name the defendant may well appear as a deliberate strategy rather than a mistake. *See Engel v. Minissale,* --- F.Supp. ----, No. 90-4400, 1993 WL 21232 at *3 (E.D.Pa. 21 Jan. 1993) (no relation back where plaintiffs were not diligent in their efforts to ascertain the identity of the proper defendant); *Kemper,* 1991 WL 125178 at *2 ("[I]f plaintiff's own inexcusable neglect was responsible for the failure to name the correct party, an amendment substituting the proper party will not be allowed, notwithstanding adequate notice to the new party."); *Potts,* 118 F.R.D. at 609 (Plaintiff "was or should have been fully aware that [new defendant] was a proper party to this litigation long before the statute of limitations ran.... This lack of justification for delay ... reasonably could

make [plaintiff's] initial decision not to name the [new defendant] as a defendant appear to be a strategy decision."); *Mathews v. KFC National Management Co.,* No. 86-1181 slip op. at 3 (E.D.Pa. 20 Nov. 1986) (no relation back where the identity of new defendants "could have been discovered through discovery and a trademark search"); *see also Kilkenny,* 800 F.2d at 857 ("A plaintiff's failure to amend its complaint to add a defendant after being notified of a mistake concerning the identity of a proper party therefore may cause the unnamed party to conclude that it was not named because of a strategic decision rather than as a result of the plaintiff's mistake."); *Campbell,* 792 F.Supp. at 1153 ("Plaintiff's inaction could have been viewed as an intentional decision not to sue and belies his contention that [defendant] should have known that the failure to include it in the original complaint was a mere mistake.").

When opposing a motion for summary judgment based on a statute of limitations defense, the " [p]laintiff bears the burden of establishing a record and a factual basis for [its] assertion that a mistake was made concerning the identity of the party he seeks to add as a defendant." *Richardson,* 1993 WL 492383 at *5 (granting summary judgment on statute of limitations grounds where plaintiff did not carry burden); *see Campbell,* 792 F.Supp. at 1152-53 (granting summary judgment on limitations bar because "plaintiff has offered no proof that its failure to name [new defendant] in the original complaint resulted from a mistake within the meaning of Rule 15(c)"); *In re School Asbestos Litigation,* 768 F.Supp. 146, 151 (E.D.Pa.1991) (same). FN21

Plaintiffs have not submitted anything to suggest their failure to name Prudential in the Complaint was due to a "mistake" within the meaning of Rule 15(c)(3). They did not improperly name Safety Light when they had intended to name Prudential. *See Jordan,* 143 F.R.D. at 574. It appears instead that they properly named Safety Light in the Complaint, and later sought to add Prudential, not to correct a prior mistake, but as a separate act of trial strategy. Indeed, the fact that Plaintiffs continued, and still continue, to assert their claims against Safety Light after Prudential had been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 12

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

named undercuts any contention that Safety Light was mistakenly named in the Complaint, and that Prudential was intended to be named in the Complaint. *See Rhyder,* 1992 WL 25863 at *2.

Plaintiffs contend they did not know of Prudential's potential role in this action until after the filing of the Complaint. *See* Opp.Brief at 30. However, Plaintiffs' "[l]ack of knowledge of the proper party" is irrelevant to the relation back inquiry. *Rylewicz,* 888 F.2d at 1181. Rather, it is Prudential's understanding of its status that is central to this analysis. *See Kilkenny,* 800 F.2d at 857.

The facts at bar indicate Prudential had good reason to understand that its omission from the Complaint was not the result of mistake, but of deliberate strategy on the part of Plaintiffs. The fact that Safety Light was a proper defendant in this action, and was not mistakenly named, gave Prudential reason to believe Plaintiffs had deliberately decided to pursue USR and its successors rather than Prudential. *See Kress,* 1993 WL 166274 at *4.

Further support for such an understanding is provided by the fact that Prudential could be liable to Plaintiffs, if at all, under a different theory than that asserted against Safety Light. Safety Light would be liable, if at all, as successor to USR, which is alleged to have discharged waste at the Hanover Site. *See* Complaint, ¶ 8B. Prudential, on the other hand, could be liable only as the owner of a part of the Hanover Site. FN22 The difference in theories of recovery reasonably indicates that Plaintiffs had intended to pursue only the successor liability theory, and had intentionally omitted Prudential because it would be liable under a different theory. *See Rhyder,* 1992 WL 25863 at *2
.

In addition, Plaintiffs failed to sue Prudential in the Complaint notwithstanding Prudential's ownership of the Hanover Site, which was public knowledge. Plaintiffs concede Prudential appeared in the chain of title to Lot 13, Tr. at 8, and do not dispute that Prudential appeared on the deed transferring Lot 13 to Van Dyk in 1969. Tr. at 4; Massaia Cert., Ex. C. Plaintiffs' failure to name Prudential in spite of the ease of discovering Prudential's potential

liability reasonably indicates Prudential was intentionally omitted from the Complaint. *See Potts,* 118 F.R.D. at 609.

After reviewing Prudential's role at the Hanover Site, as described in the May 1992 Safety Light Response, Plaintiffs waited more than three months before naming Prudential as a Defendant. This delay further indicates Prudential was not mistakenly omitted from the Complaint. *See Campbell,* 792 F.Supp. at 1153 ("Plaintiff admits that he did not learn of the possible role of [the new defendant] until almost a year after the suit was filed and the statute of limitations had run.... Even after plaintiff learned that [the new defendant] had a possible role in the suit, he waited several months before filing an amended complaint. Plaintiff's inaction could have been viewed as an intentional decision not to sue and belies his contention that [the new defendant] should have known that the failure to include it in the original complaint was a mere mistake."); *Keller v. United States,* 667 F.Supp. 1351, 1357-58 (S.D.Cal.1987) (holding same), *aff'd without op.,* 930 F.2d 920 (9th Cir.1991).

Finally, Cohen's 8 May Phone Conversation with Sanders gave Prudential perhaps its most compelling indication that its omission from the Complaint was a strategic decision and not a mistake. According to evidence submitted by Plaintiffs, Cohen stated to Sanders that there was a potential for conflict "*if*" Prudential "were brought into the picture *and at that point in time that it hadn't been decided yet.*" *Id.* at 10. It also appears Cohen informed Sanders that Plaintiffs "were considering whether or not to bring Prudential into the case." *Id.*

These statements plainly indicate that Plaintiffs were 'deciding' and 'considering' whether to bring Prudential into the case. They indicate that Plaintiffs' decision concerning the naming of Prudential was the result of deliberation, not of mistake. If Plaintiffs had truly omitted Prudential by mistake, they would have named Prudential immediately, not after deliberation.

The 8 May Phone Conversation provided Prudential

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 13

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

with its only information concerning the instant suit prior to the running of the 120 day period under Rule 15(c)(3). *See* Pigott Cert., ¶¶ 4-5; Cohen Dep. at 8-10. This information did not indicate the omission of Prudential as a mistake, as required by Rule 15(c)(3). Rather, it indicated quite the opposite, that Prudential was deliberately omitted from the Complaint, and could be named depending on the outcome of Plaintiffs' strategic deliberations.

Under these circumstances, the Amended Complaint cannot relate back to the date of the filing of the Complaint. Plaintiffs did not make a mistake in pleading within the meaning of Rule 15(c)(3). Moreover, Prudential did not, within 120 days of the filing of the Complaint, know or have reason to know that, but for Plaintiff's mistake, it would have been named in the Complaint. Fed.R.Civ.P. 15(c)(3). Accordingly, for the purposes of this analysis, the date of the filing of this action against Prudential is 26 August 1992.

This application of Rule 15(c)(3) appears to be the soundest way to reconcile the rule with the policy of repose behind New Jersey's statutes of limitations. As the Second Circuit has noted:

> [T]he relation back rule "is intimately connected with the policy of the statute of limitations." It is designed to operate equably with that statute, to accommodate the statute of limitations policies that prevent stale claims from being litigated, and permit their repose. *Clearly the relation back rule was not designed to provide a means to either circumvent or expand the limitations period.*

*In re Allbrand Appliance & Television Co., Inc.,* 875 F.2d 1021, 1025 (2d Cir.1989) (emphasis added) (quoting Fed.R.Civ.P. 15(c), Advisory Committee Notes, 1966 Amendment).

New Jersey has addressed the limitations problem caused by unknown or unknowable defendants by way of the fictitious party, or 'John Doe,' practice. New Jersey's fictitious party practice permits a plaintiff who does not know the identity of the defendant to file an action against a fictitious name and later amend the complaint to state the defendant's true name. *See* N.J.Ct.R. 4:26-4. Under this practice, an amendment substituting a

known defendant for an unknown 'John Doe' defendant will relate back to the original complaint, even where the amendment is made after the running of the statute of limitations. *See id.; Viviano v. CBS, Inc.,* 101 N.J. 538, 547 (1986) (Fictitious party practice "suspends the statute [of limitations] when the plaintiff is unaware of the true identity of the defendant.").

There is, therefore, no reason to permit the Amended Complaint to relate back simply because Plaintiffs assert they did not know of Prudential's identity until after the statute of limitations had run. The device chosen by the New Jersey legislature to address such a situation is fictitious party practice under N.J.Ct.R. 4:26-4. Fictitious party practice was available to Plaintiffs; they could have used it to address the problem of the unknown defendant. *See Bryan v. Associated Container Transportation,* ---F.Supp. ----, No. 92-2933, 1993 WL 485813 at *9 (permitting New Jersey's fictitious party practice in Federal court). Plaintiffs chose not to; they cannot now correct this strategy and circumvent the limitations period through Rule 15(c)(3). *See In re Allbrand Appliance & Television Co., Inc.,* 875 F.2d at 1025. FN23

### 2. *Statute of Limitations for an Environmental Strict Liability Claim*

As stated, Count IV of the Second Amended Complaint seeks recovery on the theory of strict liability. Prudential seeks summary judgment on this count on the ground that it is time barred.

Pursuant to N.J.S.A. 2A:14-1, actions at common law for "trespass to real property, for any tortious injury to real or personal property ... [or] for any tortious injury to the rights of another [other than personal injury, libel or slander], ... shall be commenced within six years next after the cause of any such action shall have accrued." N.J.S.A. 2A:14-1. This six-year statute of limitations is applicable to environmental tort actions at common law, and more specifically to environmental actions based on strict liability. *See Amland Properties v. Aluminum Co. of America,* 808 F.Supp. 1187, 1190 (D.N.J.1992) ; *Hatco Corp. v. W.R. Grace &*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 14

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

*Co.-Conn.,* 801 F.Supp. 1309, 1323 (D.N.J.1992) ;
*Allied Corp. v. Frola,* 730 F.Supp. 626, 631
(D.N.J.1990).

"Ordinarily, the statute of limitations for an action
begins to run when all the elements of the cause of
action are present, or, more plainly, 'from the
moment of the wrong.' " *Amland Properties,* 808
F.Supp. at 1190 (quoting *Lopez v. Swyer,* 62 N.J.
267, 274 (1973)). In some situations, however, the
law of New Jersey recognizes the 'discovery rule,'
an equitable principle whose purpose is "to avoid
harsh results that otherwise would flow from
mechanical application of a statute of limitations."
*Vispisiano v. Ashland Chemical Co.,* 107 N.J. 416,
426 (1987).

Under the discovery rule, a cause of action does not
"accrue," for the purpose of the statute of
limitations "until the plaintiff 'learns, or reasonably
should learn, the existence of that *state of facts*
which may equate in law with a cause of action.' "
*Id.* (quoting *Burd v. New Jersey Telephone Co.,* 76
N.J. 284, 291 (1978) (emphasis in original)); *see
Apgar v. Lederle Laboratories,* 123 N.J. 450, 455
(1991) (same). As the Supreme Court of New
Jersey has explained, the discovery rule places "
emphasis upon the *factual* nature of an injured
party's knowledge of a basis for a cause of action....
[A] plaintiff must have an awareness of 'material
facts' relating to the existence and origin of his
injury rather than comprehension of the legal
significance of such facts." *Lynch v. Rubacky,* 85
N.J. 65, 73 (1981) (emphasis in original) (citing
*Burd,* 76 N.J. at 291-93); *see Hatco Corp.,* 801
F.Supp. at 1323. Moreover, "the statute is
triggered by a plaintiff's knowledge of 'material
facts,' not by conclusive proof of every relevant
fact." *Hatco Corp.,* 801 F.Supp. at 1324.

"[I]t is the province of the court to take into account
and balance all the equities of each case for the
purposes of determining whether the party invoking
the rule is equitably entitled to its benefit." *Amland
Properties,* 808 F.Supp. at 1191; *see Lopez,* 62
N.J. at 275. "Courts have recognized that the size
and complexity of environmental cases ... may
present difficulties with regard to statutes of
limitations." *Amland Properties,* 808 F.Supp. at

1191. In light of the difficulty of ascertaining the
existence of and responsibility for environmental
injuries, courts have commonly applied the
discovery rule in environmental tort cases. *See id.;
Hatco Corp.,* 801 F.Supp. at 1323; *Frola,* 730
F.Supp. at 632; *Vispisiano,* 107 N.J at 434. For
these reasons, the discovery rule will be applied to
the instant case.

Plaintiffs argue that, under New Jersey law, a cause
of action does not accrue until the plaintiff is or
should be aware of the existence of an injury *and*
that such injury is the fault of an identifiable
defendant. Opp.Brief at 31. Plaintiffs cite *Frola,*
730 F.Supp. at 631, for this proposition.

Plaintiffs correctly point out that in *Frola,* it was
held that a cause of action in an environmental tort
case "accrues in New Jersey when a plaintiff knows
or reasonably should know of his or her cause of
action and of the identity of a party or parties who
may be responsible for the injury, in this case the
dumping of hazardous substances on land." 730
F.Supp. at 632. The court in *Frola* based its
conclusion on the holding of the New Jersey
Supreme Court in *Abboud v. Viscomi,* 111 N.J. 56
(1988). *See* 730 F.Supp. at 631-32. There, it was
held that a person is not "aware of that state of facts
which may equate in law with a cause of action"
unless and until that person is aware that his or her "
injury is due to the fault or neglect of an identifiable
individual or entity." *Abboud,* 111 N.J. at 62-63.

Since the decisions in *Abboud* and *Frola,* the New
Jersey Supreme Court has revisited and abrogated
the rule pronounced by those cases. In the 1991
decision in *Apgar,* 123 N.J. 450, the New Jersey
Supreme Court addressed a products liability action
against a drug manufacturer. In response to a
statute of limitations defense, the plaintiff asserted
that "the statute of limitations did not begin to run
on her claim until she learned the identities of the
manufacturers of the drugs she had taken." 123
N.J. at 456. The New Jersey Supreme Court
rejected this argument, and held that the plaintiff's
cause of action accrued when she knew her injury
was the fault of a third party, irrespective of her
knowledge of the identity of that party. *Id.* The
court explained:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

That the specific identity of a potential defendant is not a requirement for commencing an action is now beyond argument. In *Viviano* ..., we made it clear that a plaintiff can file a complaint naming " John Doe" defendants if the actual identity of the wrongdoer is unknown. FN24

*Id.*

The principle of *Apgar* is equally applicable to actions grounded in environmental tort. *See Amland Properties,* 808 F.Supp. at 1192 (applying rule of *Apgar* to New Jersey common law environmental tort action; declining to follow *Frola* and *Abboud* ). In accordance with this principle, " the discovery rule does not toll the statute of limitations until the precise parties responsible for the injury are known, but only until it is or should be apparent that *some* other party is at fault. *Id.* (emphasis in original); *see Vispisiano,* 107 N.J. at 434 (accrual of action occurs when it is evident that the cause of the injury is "(a) the fault of (b) a third party.").

Because the Amended Complaint does not relate back to the 15 January 1992 filing of the Complaint, in order for Plaintiffs' claims against Prudential to survive the statute of limitations, Plaintiffs' cause of action against Prudential must not have accrued prior to 26 August 1986, six years before the date upon which Plaintiffs filed the Amended Complaint naming Prudential as a defendant. In other words, Plaintiffs must not, before 26 August 1986, have known, or have reasonably been able to know, the existence of a state of facts giving rise to an action, and that such facts were the fault of another party. *See Vispisiano,* 107 N.J. at 426; *Amland Properties,* 808 F.Supp. at 1192.

Plaintiffs contend that the Third Circuit's holding in *Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3d Cir.1976), *cert. denied,* 429 U.S. 1038 (1977), renders the above inquiry an impossibly exacting one to resolve on summary judgment. Opp.Brief at 20, 39. In *Goodman,* it was held that where there existed disputed issues of fact as to the time of discovery of a cause of action, summary judgment on a statute of limitations defense cannot be sustained. 534 F.2d at 573-75. However, as observed by the court in *Amland Properties,* the

Circuit's decision in *Goodman* does little to alter the analysis under Rule 56:

The Third Circuit's holding in *Goodman* does not preclude this court's consideration of the factual issues surrounding [the plaintiff's] causes of action, but, rather informs and sets the parameters for that consideration. Moreover, even where the discovery rule is applicable, a jury's involvement is not invariably required; indeed, the Third Circuit recognized after *Goodman* that the presumption favoring jury determinations of factual issues surrounding the discovery rule was not an absolute. *See Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 498 (3d Cir.1985) ("Since the applicability of the statute of limitations usually involves questions of fact for the jury, *defendants bear a heavy burden* in seeking to establish as a matter of law that the challenged claims are barred.")

808 F.Supp. at 1192 (granting summary judgment on statute of limitations defense based on finding as to date of discovery of action); *see Hatco Corp.,* 801 F.Supp. at 1323-24 (same).

It therefore remains within the province of this court, even in light of *Goodman,* to grant judgment as a matter of law on an issue involving the discovery rule where there exists no genuine issue of material fact as to when an action was, or reasonably should have been, discovered. *See Amland Properties,* 808 F.Supp. at 1193 ("As in other contexts, this court must defer to the fact finding function of a jury unless it can be demonstrated that there is no genuine issue of material fact as to when [plaintiff's] cause of action against [the moving party] accrued.").

Prudential may be granted summary judgment if it establishes beyond a genuine issue of material fact that Plaintiffs' cause of action accrued before 26 August 1986. *See id.; Matsushita,* 475 U.S. at 586-87. It has been held that an environmental strict liability claim accrues when the plaintiff " knew [or should have known] of its injury and that the injury was the fault of another." *Amland Properties,* 808 F.Supp. at 1187 (applying accrual standard to all common law environmental tort claims); *see Hatco Corp.,* 801 F.Supp. at 1323 (applying standard to environmental strict liability

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 16

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

claim).

Prudential has carried its burden for summary judgment. The undisputed facts in the record indicate Plaintiffs' cause of action accrued at latest by February 1986, if not earlier. By that time, Plaintiffs knew of the existence of high levels of cadmium and cadmium compounds throughout the Hanover Site, that the cadmium deposits constituted a health hazard and required removal and that a third party was responsible for the presence of the cadmium deposits.

As early as 1970, Van Dyk was "aware that the [Race Pond] contained cadmium." Moulthrop Cert., Ex. I (Kemp's response to Prudential's Second Set of Interrogatories). Also during that year, chemical analysis of the sludge removed from the Race Pond revealed not only that the sludge contained cadmium, but that it contained "a high content of cadmium sulfide...." Pollack Aff., ¶ 8.

At least as of February 1984, Van Dyk knew the Waste Pile created by dredging the Race Pond contained an estimated 60,000 pounds of cadmium sulfide. Moulthrop Cert., Ex. J at 2 (February 1984 Questionnaire). Van Dyk knew or should have known at that time that this significant quantity of cadmium compound constituted a health hazard. As indicated by Van Dyk in the February 1984 Questionnaire, the Waste Pile was located approximately one hundred yards from a building. FN25 *Id.* at 6. The Waste Pile was also listed under the heading "hazardous substances" in the February 1984 Questionnaire. *Id.* at 2. Indeed, O'Mara, then president of Van Dyk, confirmed that prior to August 1984, he was "aware that [the Waste Pile] had cadmium compounds in it," and " that the [W]aste [P]ile was something to be concerned about." O'Mara Dep. at 47, 62.

Apollo also became aware of the presence and significance of the Waste Pile in 1984. The 20 June 1984 TRC Report revealed to Apollo that "a waste pile alleged to contain heavy metals is still present on the [Hanover Site]." Moulthrop Cert., Ex. M. Apollo was further informed that soil analyses conducted where runoff from the Waste Pile was evident revealed "elevated levels of cadmium, lead and zinc." *Id.* The 20 June 1984 TRC Report also informed Apollo that the Waste Pile was a "potential source of heavy metal contamination to ground water...." *Id.*

In January 1985, a "hot spot" was detected at the Hanover Site and brought to Van Dyk's attention. Moulthrop Cert., Ex. Q (RSA Report). While the hot spot was deemed not to constitute an "*immediate* public health hazard," Plaintiffs were informed that the spot should "be excavated with a health physicist present, and the source of this radiation [should] be identified and disposed of in an appropriate manner." *Id.* (emphasis added). Also during that month, background radiation at the Hanover Site was found to be two to five times the level which could normally be expected. *Id.*

Also in January 1985, in a submission to the DEP, Van Dyk listed among "[a]reas of [e]nvironmental [c]oncern" at the Hanover Site the Waste Pile and " possible radiological contamination *throughout* the [Hanover] [S]ite." Moulthrop Cert., Ex. P. (Sampling Plan) (emphasis added). The Sampling Plan also recognized health hazards from the Waste Pile could result from seepage into the ground water, noting that "[r]adiological contamination has been detected in the ground water at the adjacent gradient site." *Id.* Moreover, the Sampling Plan noted that such ground water contamination could spread to the Whippany River. *Id.*

Finally and significantly, the Sampling Plan stated that the Waste Pile was "a result of the excavation of an effluent disposal lagoon used by [USR] during [its] manufacturing operations." *Id.* Accordingly, by January 1985 at the latest, Plaintiffs knew that a third party was responsible for the existence of hazardous substances at the Hanover Site.

The Third Sampling Plan, submitted by Van Dyk to DEP on 20 September 1985, made further reference to USR's role in causing the hazardous conditions at the Hanover Site. From the Third Sampling Plan, it is evident that in September 1985, Van Dyk knew USR operated an "above ground tank farm" and three settling lagoons which were a "possible source of radiation." FN26 Moulthrop Cert., Ex. V. The Third Sampling Plan also expressed concern over "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 17

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

ground water quality in general." *Id.* at 2.

Any doubts, reasonable or otherwise, Plaintiffs may have had as to the significance of the cadmium deposits at the Hanover Site were resolved during February 1986. During that month, upon receipt of the September 1985 Soil Analysis, Plaintiffs learned the Hanover Site had surface cadmium levels of up to 7,700 ppm, and cadmium levels well above 1,000 ppm at depths up to six feet. Moulthrop Cert., Ex. W, Table 1.

Plaintiffs point to the difficulty of ascertaining the amount of environmental harm caused by the increased levels of cadmium at the Hanover Site, and the difficulty of ascertaining whether these levels exceeded DEP standards. Opp.Brief at 7 n. 11, 20 n. 13. It is absurd to suggest, as Plaintiffs do, that they could not reasonably have known the level of environmental and health risk caused by the cadmium concentrations at the Hanover Site. For example, Plaintiffs put forth that proposed DEP cleanup standards for cadmium are 1.0 ppm for residential sites, and 100 ppm for non-residential sites. Opp.Brief at 7 n. 11. Plaintiffs therefore assert it was impossible to know whether the DEP would have required cleanup of the cadmium at the Hanover Site, and whether the presence of the groundwater constituted "contamination," until the DEP Meeting. *Id.; see id.* at 22-23.

As indicated, the September 1985 Soil Analysis revealed levels of cadmium several hundred times higher than the range referred to by Plaintiffs. *See* Moulthrop Cert., Ex. W., Table 1. Plaintiffs should have known that such levels would constitute an environmental hazard under any standard. Moreover, as early as 1984, Plaintiffs had estimated the amount of cadmium compound in the Waste Pile at 60,000 pounds. Moulthrop Cert., Ex. J at 2. As cadmium and cadmium compounds were classified as a "hazardous substance" by the DEP in 1984, *see* N.J.A.C. 7:1E, Appendix A, R.1980, d. 185 (effective 28 April 1980), Plaintiffs knew or should have known at that time that such a large amount of cadmium would require removal. Indeed, any contention by Plaintiffs to the contrary was undercut by their own actions when, in 1985, they commenced removal of the Waste Pile.

O'Mara Cont.Dep. at 120.

To the extent that awareness of "contamination, i.e. that cadmium was present in levels that would be a health concern," Opp.Brief at 22, was required for the Plaintiffs' cause of action to accrue, FN27 this requirement was also satisfied before the DEP Meeting. In internal documents and DEP submissions in 1984 and 1985, Plaintiffs themselves documented the risk of cadmium seepage into ground water and thereby into local rivers. Moulthrop Cert., Ex. P at 2; *id.,* Ex. M. The Plaintiffs in fact noted "elevated levels of radiation and phenols in the ground water" at the Adjacent Lands in early 1985, and further noted that the Waste Pile was the likely source of the ground water contamination. *Id.,* Ex. P at 12.

Plaintiffs at the very least should have known that the introduction of such large quantities of this hazardous substance into ground water and rivers would constitute a health hazard. On at least two occasions before the DEP Meeting, Plaintiffs in fact referred to conditions at the Hanover Site as constituting "contamination." *See* Moulthrop Cert., Ex. M (20 June 1984 TRC Report); *id.,* Ex. P at 2 (Sampling Plan); *see also* Moulthrop Cert., Ex. X (27 May 1986 Letter, informing Plaintiffs that "[m]uch of the surface and subsurface soils in the northern 1/3 of the property are contaminated with ... cadmium....").

Any difficulties Plaintiffs may have encountered in ascertaining the significance of the cadmium problem at the Hanover Site were certainly resolved at the DEP Meeting on 13 February 1986. At that time, Plaintiffs were informed by the DEP that the levels of cadmium at the Hanover Site were "greatly in excess of those permissible under DEP's standards." Berger Cert., ¶ 15. Plaintiffs concede they "learned of the existence of possible contamination in the [DEP Meeting] on February 13, 1986." Opp.Brief at 28; *see id.* at 33 (" Plaintiffs knew of the existence of contamination at the Hanover Site ... on February 13, 1986.").

Under the undisputed facts at bar, Plaintiffs' cause of action in strict liability against Prudential accrued, at the latest, on 13 February 1986. At that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 18

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

time, they knew or should have known of the existence of contamination at the Hanover Site and that the contamination constituted a health risk and required removal. Moreover, by that date, they knew or should have known that such contamination was the fault of another. FN28 Plaintiffs were therefore aware, or should have been aware, by 13 February 1986 of the state of facts which might give rise to their strict liability claim. *See Vispisiano,* 107 N.J. at 426; *Amland Properties,* 808 F.Supp. at 1192. Because the Amended Complaint, naming Prudential as a defendant, was filed more than six years after this date, Plaintiffs' strict liability claim is time-barred as to Prudential. N.J.S.A. 2A:14-1. FN29

Plaintiffs argue that even though they knew of the existence of some contamination in February 1986, they did not know of other discharges of cadmium by USR, which are also the subject of the Complaint, until 1992. Plaintiffs point specifically to the plastic bags of buried cadmium uncovered in 1992 by ESI, and USR's channelling of cadmium waste from a settling pond into a local brook, revealed in the 4 December 1992 Supplemental Response. *See* Opp.Brief at 29; Nimensky Cert., Ex. K at 7; *id.,* Ex. L. Plaintiffs contend that each of these discharges gave rise to causes of action separate from that based on the Waste Pile, and that the statute of limitations on these causes of action did not begin to run until the discovery of these discharges in 1992. Opp.Brief at 29-30.

Plaintiffs appear to ignore that under the discovery rule, the statute of limitations begins to run when the plaintiff knew *or reasonably should have known* of the facts which would support the cause of action. *See Apgar,* 123 N.J at 455; *Vispisiano,* 107 N.J. at 426. The discovery rule, therefore, " requires diligence and reasonable investigative efforts on the part of the plaintiff" to determine the existence of injury. *Hatco Corp.,* 801 F.Supp. at 1324; *see Vispisiano,* 107 N.J at 416. Moreover, " the statute is triggered by a plaintiff's knowledge of ' material facts,' not by conclusive proof of every relevant fact." *Hatco Corp.,* 801 F.Supp. at 1324.

By February 1986, Plaintiffs had been notified by the DEP that the cadmium levels at the Hanover

Site greatly exceeded DEP standards. *See* Berger Dep. at 52-53. Plaintiffs concede that "the data that the [DEP] highlighted during the [DEP Meeting] indicated that cadmium was present in elevated levels not only in the [Race Pond] area, but also in *other locations throughout the Hanover Site.* " Opp.Brief at 5 (emphasis in original). Plaintiffs further state that this information "indicated [USR's] use of the [Race Pond] was not the only source of cadmium on the Hanover Site:"

> The [DEP Meeting] first revealed to Plaintiffs not only that cadmium in elevated levels was present in locations throughout the Hanover Site, but also that the presence of such far-reaching contamination was caused by another abnormally dangerous activity-one that was entirely distinct from that which caused the presence of cadmium in the lagoon area.

*Id.* at 5-6.

Indeed, Plaintiffs knew before the DEP Meeting that the Waste Pile was not an isolated incidence of contamination at the Hanover Site. In January 1985, the RSA Report identified the radioactive " hot spot" on the eastern end of the Hanover Site. Moulthrop Cert., Ex. Q. The RSA Report also reported background radiation levels two to five times normal. *Id.* The Sampling Plan, submitted by Van Dyk to DEP in January 1985, indicated Van Dyk's knowledge of "possible radiological contamination *throughout the [Hanover] [S]ite.*" *Id.,* Ex. P at 2 (emphasis added). The Third Revised Sampling Plan, submitted by Van Dyk to DEP in September 1985, indicated that three settling lagoons and an above ground tank, all used by USR, were areas of environmental concern to Van Dyk. *See* Moulthrop Cert., Ex. V at 2. The " ground water quality in general" at the Hanover Site was also an environmental concern to Van Dyk as of the date of the Third Revised Sampling Plan. *Id.*

Plaintiffs therefore knew by February 1986, at the latest, that cadmium-related and other contamination existed throughout the Hanover Site and not just near the Waste Pile. Plaintiffs also knew by February 1986 that the presence of cadmium contamination throughout the Hanover Site was the result of activity distinct from that which caused the Waste Pile. *See* Opp.Brief at 5-6.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 19

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Under these facts, Plaintiffs knew of the "material facts" required for their cause of action by, at the latest, February 1986; it was not necessary that they had conclusive proof of every fact. *See Hatco Corp.,* 801 F.Supp. at 1324. Moreover, by February 1986, Plaintiffs were on inquiry notice such that they, at the very least, should have discovered the other sources of contamination shortly thereafter. FN30 *See id.* at 1324. Accordingly, that part of Plaintiffs' claim which is based on these other discharges also accrued in February 1986, and was time-barred by August 1992 when the Amended Complaint was filed naming Prudential. N.J.S.A. 2A:14-1.

An argument similar to Plaintiffs' was addressed by the court in *Hatco Corp.,* 801 F.Supp. 1309. There, it was held that a DEP notice put the plaintiff "on notice of facts sufficient to trigger the running of the statute of limitations as to the [environmental] problems directly addressed [in the DEP notice]." *Id.* at 1324. The court noted, however, that other problems had been discovered at the site, which the DEP's notice did not address. The court stated: "To the extent that the [DEP's notice] did not address specifically every problem that has since been discovered at the site, it nonetheless triggered a duty on [plaintiff's] part to ' exercise reasonable diligence and intelligence' to investigate and discover those problems." *Id.* (quoting *Vispisiano,* 107 N.J. at 416).

The court then pointed out that when the plaintiff received the DEP's notice, "it was not as if it had for the first time been made aware that substantial polluting activities had occurred on the site." *Id.* Noting that all that is required for the accrual of a cause of action is the plaintiff's knowledge of " material facts" behind the cause of action, the court stated:

[A]s to the problems not specifically addressed in the [DEP's Notice], the Court finds that the [DEP] put [plaintiff] on inquiry notice such that [plaintiff] "should have" discovered their existence shortly thereafter, through the exercise of "reasonable diligence and intelligence." The court finds that such diligence would have revealed facts sufficient to equate [plaintiff's] strict liability claim more than six years before

[it] filed this action....
*Id.* (quoting *Vispisiano,* 107 N.J. at 419).

The reasoning of *Hatco Corp.* is directly apposite to the instant facts. Whether Plaintiffs knew of every discharge for which Defendants could be liable before August 1986, they knew in February 1986 of the 'material facts' necessary for their cause of action to accrue. *See* 801 F.Supp. at 1324. Moreover, these facts put the Plaintiffs on inquiry notice such that, through the exercise of reasonable diligence, they could and should have quickly discovered the extent of the environmental damage to the Hanover Site. *Id.* Plaintiffs' cause of action in strict liability therefore accrued, in its entirety, in February 1986, and was time-barred when the Amended Complaint was filed. FN31 N.J.S.A. 2A:14-1.

Plaintiffs also argue that they did not know until 1992, after the filing of the Complaint, of Prudential's potential liability in this matter. As stated, however, knowledge of the responsible party's identity is not necessary for the accrual of a cause of action; it is only necessary that "it is or should be apparent that *some* other party is at fault." *Amland Properties,* 808 F.Supp. at 1192; *see Apgar,* 123 N.J. at 456. Moreover, even if knowledge of Prudential's identity were necessary to the accrual of Plaintiffs' cause of action, Plaintiffs are chargeable with such knowledge. As stated, Prudential's ownership of Lot 13 was public record, and was in fact reflected on the deed transferring the property to Van Dyk in 1969. Tr. at 4, 7; Massaia Cert., Ex. C. Plaintiffs therefore should have known of Prudential's potential responsibility for the contamination on the Hanover Site when it learned of such contamination in February 1986.

Plaintiffs argue that "even if the Court were to hold that Plaintiffs should have known that Prudential had owned [Lot 13], mere knowledge of Prudential's ownership would have been insufficient to give Kemp and Apollo a cause of action.... A cause of action for environmental contamination requires a showing not only of ownership, but of ownership *at the time of discharge.*" Opp.Brief at 36 (emphasis in original) (citing *State v. Ventron Corp.,* 94 N.J. 473 (1983)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 20

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

The validity *vel non* of Plaintiffs' characterization of
the law in this regard is irrelevant to the instant
analysis. It was not necessary to the accrual of the
cause of action under the statute of limitations that
Plaintiffs knew of Prudential's specific acts with
respect to the discharge. As noted, the statute of
limitations is triggered by Plaintiffs' "knowledge of '
material facts,' not by conclusive proof of every
relevant fact." *Hatco Corp.,* 801 F.Supp. at 1324.
Plaintiffs knew in February of 1986 of the
contamination at the Hanover Site, and knew or
should have known by that time of Prudential's
ownership of Lot 13. FN32 At this time, Plaintiffs
knew, or should have known, of the "material facts"
necessary to support a cause of action against
Prudential, and that cause of action had therefore
accrued. *Id.* Under Plaintiff's interpretation of the
discovery rule, a cause of action would not be '
discovered,' and the statute of limitations would not
be triggered, until the jury makes findings of fact.

Plaintiffs further argue that equitable considerations
should preclude the barring of their strict liability
claim on statute of limitations grounds. "[I]t would
be derelict for the Court to apply strictly and
uncritically a statutory period of limitations without
considering conscientiously the circumstances of
the individual case and assessing the Legislature's
objective in prescribing the time limitation as
related to a particular claim." *Kaczmarek v. New
Jersey Turnpike Authority,* 77 N.J. 329, 338 (1978).
However, statutes of limitations "serve[ ]
important policies which may not lightly be
disregarded." *Id.* As the New Jersey Supreme
Court has stated:

A statute of limitations has two purposes. The
first is to stimulate litigants to pursue a right of
action within a reasonable time so that the
opposing party may have a fair opportunity to
defend, thus preventing the litigation of stale
claims. The second function of to "penalize
dilatoriness and serve as a measure of repose."

*Ochs v. Federal Insurance Co.,* 90 N.J. 108, 112
(1982) (citing *Kaczmarek,* 77 N.J. at 337; *Farrell
v. Votator Division of Chemetron Corp.,* 62 N.J.
111 (1975)).

Such policies of repose and fairness are particularly
compelling where, as here, a defendant last held

title to the subject property nearly than thirty years
ago. Prudential certifies that it now has few, if any,
documents which may be related to the instant
litigation. Pigott Cert., ¶ 6. Moreover, the
Plaintiffs knew of the presence of the cadmium at
the Hanover Site, and of Prudential's ownership
over Lot 13, over twenty years ago. In light of
Plaintiff's dilatoriness, and Prudential's strong
interest in repose from concern about a twenty-year
old problem, the application of the statute of
limitations in this case does not "unnecessarily
sacrifice individual justice...." *Zaccardi v. Becker,*
88 N.J. 245, 259 (1982). Accordingly, the equities
of this case argue in favor of barring Plaintiffs' strict
liability claims on statute of limitations grounds.

Prudential has established, beyond a genuine issue
of material fact, that Plaintiffs' cause of action
against them in strict liability accrued more than six
years prior to the filing of the Amended Complaint.
Count IV of the Amended Complaint was therefore
time-barred as to Prudential. Accordingly,
Prudential is granted summary judgment on Count
IV of the Second Amended Complaint.

### 3. *Statute of Limitations Under the Spill Act*

As stated, Count II seeks contribution under the
Spill Act. Prudential's argument for summary
judgment on this count is also based on statute of
limitations grounds. The Spill Act was enacted in
1976 "to control the transfer and storage of
hazardous substances and to provide liability for
damage sustained within [New Jersey] as a result of
any discharge of said substances, by requiring the
prompt containment and removal of such pollution...
." N.J.S.A. 58:10-23.11a.

Pursuant to section 23.11f of the Spill Act:
Whenever any hazardous substance is discharged,
the department may, in its discretion, act to clean
up and remove or arrange for the cleanup and
removal of such discharge or may direct the
discharger to clean up and remove, or arrange for
the cleanup and removal of, such discharge.
N.J.S.A. 58:10-23.11f(a)(1).

The Spill Act imposes strict liability for pollution

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 21

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

cleanup and removal costs, "no matter by whom incurred," upon "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance." FN33 N.J.S.A. 58:10-23.11g(c)(1). Such persons are liable " jointly and severally." *Id.* Under the Spill Act, " [s]uch person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the [DEP] or a local unit pursuant to ... [section] 23.11f." *Id.*

Prior to 1992, the Spill Act did not provide for a private right of action for recovery of cleanup costs and other damages due to the discharge of hazardous substances. *See Bowen Engineering,* 799 F.Supp. at 478; *Jersey City Redevelopment Auth. v. PPG Industries,* 655 F.Supp. 1257, 1263 (D.N.J.1987).

Effective 10 January 1992, section 23.11f was amended to include a private right of contribution among joint tortfeasors. *See* N.J.Pub.L. 373 ; *Bowen Engineering,* 799 F.Supp. at 478. The amendment provides, in relevant part:

Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of [N.J.S.A. 58:10-23.11g(c) ].... In the resolving of contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate.

N.J.S.A. 58:10-23.11f(a)(2). It is under this provision that Count II seeks recovery.

The Spill Act does not contain a statute of limitations for private contribution actions brought under section 23.11f(a)(2). "Therefore, the limitations period applicable to this action must be selected from among those statutes of limitation

available for actions seeking comparable relief at common law." *Skadegaard v. Farrell,* 578 F.Supp. 1209, 1214 (D.N.J.1984); *see Montells v. Haynes,* 133 N.J. 282, 292 (1993) (New Jersey Law Against Discrimination ("NJLAD"), which does not specify limitations period, is governed by New Jersey's two-year residual statute of limitations for common law personal injury actions); *see also White v. Johnson & Johnson Products, Inc.,* 712 F.Supp. 33, 37 (D.N.J.1989) ("The NJLAD does not specify a statute of limitations, so the Court must select from among the general statutes of limitations enacted in New Jersey.").

The New Jersey Supreme Court has not yet ruled on the limitations period applicable to contribution actions under the Spill Act. "In the absence of an authoritative pronouncement from the state's highest court, the task of a [F]ederal court is to predict how that court would rule." *Blum v. Witco Chemical Corp.,* 829 F.2d 367, 376 (3d Cir.1987); *see Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981).

Pursuant to N.J.S.A. 2A:14-1, actions at common law for "trespass to real property, for any tortious injury to real or personal property ... [or] for any tortious injury to the rights of another [other than personal injury, libel or slander], ... shall be commenced within six years next after the cause of any such action shall have accrued." N.J.S.A. 2A:14-1. This six-year statute of limitations is applicable to environmental tort actions at common law. *See Amland Properties,* 808 F.Supp. at 1190; *Hatco Corp.,* 801 F.Supp. at 1323; *Frola,* 730 F.Supp. at 631. Such environmental actions are the common law actions most analogous to a private action for contribution under the Spill Act. Accordingly, it appears that New Jersey's six-year limitations period for property damage actions, N.J.S.A. 2A:14-1, would be applicable to private actions under the Spill Act. FN34

Plaintiffs argue that this six-year period began running on 10 January 1992, the date upon which the contribution provision was added to the Spill Act. *See* Opp.Brief at 12. For this proposition, Plaintiffs rely primarily on the decision in *T & E Industries v. Safety Light Corp.,* 680 F.Supp. 696

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 22

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

(D.N.J.1988).

In *T & E Industries,* the court addressed a statute of
limitations defense to an action under CERCLA to
recover the costs of hazardous waste removal, 42
U.S.C. § 9607. As the court there pointed out,
prior to the enactment of the Superfund
Amendments and Reauthorization Act of 1986 ("
SARA"), 42 U.S.C. § 9613(h) , a cost recovery
action under 42 U.S.C. § 9607 existed without a
statute of limitations. *See* 680 F.Supp. at 704; *see
also* 42 U.S.C. § 9607 (West 1983). SARA, upon
its enactment, imposed a limitations period on
CERCLA cost recovery actions, requiring that such
actions be commenced "within three years after
completion of the removal action." 42 U.S.C. §
9613(g)(2). The defendant sought to use the
SARA limitations period to bar the plaintiff's
CERCLA claim, which had existed prior to SARA's
enactment. 680 F.Supp. at 704; *see also United
States v. Kramer,* 757 F.Supp. 397, 437
(D.N.J.1991) (applying rationale of *T & E
Industries* to SARA statute of limitations defense to
CERCLA cost recovery action).

The court rejected the limitations argument, stating:
   Where, as here, a statute creates a period of
   limitations where none had previously existed,
   the period will begin to run with respect to
   preexisting claims on the effective date of the
   statute.
*Id.* In arriving at this conclusion, the court relied
principally on the Supreme Court's decision in *Sohn
v. Waterson,* 84 U.S. 599 (1873). 680 F.Supp. at
704.

In *Sohn,* the Supreme Court held that the retroactive
application of a statute of limitations to an existing
cause of action could be unconstitutional:
   A statute of limitations may undoubtedly have
   effect upon actions which have already accrued as
   well as upon actions which will accrue after its
   passage. Whether it does so or not will depend
   upon the language of the act, and the apparent
   intent of the legislature to be gathered therefrom.
   When a statute declares generally that no action ..
   . of a certain class shall be brought, except within
   a certain limited time after it shall have accrued,
   the language of the statute would make it apply to

past actions as well as to those arising in the
future. But if an action accrued more than the
limited time before the statute was passed a literal
interpretation of the statue would have the effect
of absolutely barring such action at once. It will
be presumed that such was not the intent of the
legislature. Such an intent would be
unconstitutional. To avoid such a result, and to
give the statute [of limitations] a construction that
will enable it to stand, courts have given it a
prospective operation.
*Id.* at 599. The court therefore concluded that a
new statute of limitations should begin to run on
existing claims at the time of the limitations statute's
enactment. *Id.* at 600.

It is recognized that "[t]he century-old *Sohn* rule
still enjoys great viability." *Reuther v. Trustees of
the Trucking Employees of Passaic and Bergen
County Welfare Fund,* 575 F.2d 1074, 1078 n. 4 (3d
Cir.1978). However, the rule of *Sohn* is inapposite
to the instant facts. In *Sohn* and in *T & E
Industries,* the defendants sought to use a
newly-enacted statute of limitations to bar a cause
of action which pre-dated the statute of limitations,
and which had theretofore not been subject to a
limitations period. *See Sohn,* 84 U.S. at 597; *T &
E Industries,* 680 F.Supp. at 704-705. In such a
situation, it would be unfair to allow the new statute
of limitations to destroy claims that had existed
prior to its enactment.

Where, as in the case of a CERCLA cost recovery
action, Congress has allowed a cause of action to
exist without a limitations period, potential
plaintiffs, in reliance on that fact, may have elected
to postpone the bringing of an action. It would be
unjust to allow a new statute of limitations to cut off
such actions without allowing the plaintiff
reasonable time to bring the pre-existing suit. *See
Block v. North Dakota,* 461 U.S. 273, 286 n. 23
(1983) ( "The Constitution ... requires that statutes
of limitations must allow a reasonable time after
they take effect for the commencement of suits upon
*existing causes of action.*"); *Texaco, Inc. v. Short,*
454 U.S. 516, 527 n. 21 (1982) ("A statute [of
limitations] could not bar the existing rights of
claimants without affording this opportunity; if it
should attempt to do so, it would not be a statute of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 23

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

limitations, but an unlawful attempt to extinguish rights arbitrarily." (citation omitted)).

Courts applying the *Sohn* rule have repeatedly indicated that it is tailored specifically to avoid the unfairness of extinguishing existing causes of action with a newly-enacted statute of limitations, and should be confined to such situations. *See Block,* 461 U.S. at 286 n. 23 (Where a newly-created limitations period allowed 12 years for suit against officers of United States, "*if* an 'officer's suit' was available prior to [the date of enactment of the limitations period] and *if* the laches or limitations period for such a suit was longer than 12 years ... [the new statute of limitations] arguably was unconstitutional to the extent it extinguished claims that could have been brought at the time of its passage." (emphasis in original)); *Texaco, Inc.,* 454 U.S. at 527 n. 21 (1982) ("A statute [of limitations] could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily." (citation omitted)); *United States v. Morena,* 245 U.S. 392, 397 (1918) (*Sohn* rule applies to "a limitation of time ... upon the assertion of a right theretofore having no limitation upon its assertion...."); *United States v. Lindsay,* 202 F.2d 239, 240 (1st Cir.1953) ("The *Sohn* rule " was openly resorted to only for the purpose of preventing the statutes [of limitations] from cutting off existing rights."), *aff'd,* 346 U.S. 568 (1954) ; *Superior Engraving Co. v. National Labor Relations Board,* 183 F.2d 783, 789 (7th Cir.1950) (The *Sohn* rule provides "that where a statute creates a period of limitations where none had previously existed, the period will begin to run with respect to preexisting claims, on the effective date of the statute."), *cert. denied,* 340 U.S. 930 (1951) ; *Scardina v. Wood,* 649 F.Supp. 793, 796 (N.D.Ohio 1986) ("[T]o the extent a legislative act amends a statute of limitations so as to bar accrued causes of action which were not barred by the previous statute, it is unconstitutional." (citing *Sohn,* 84 U.S. at 599)).

The situation is entirely different where, as here, the defendant seeks to bar a newly-created cause of action based on a pre-existing statute of limitations.

In such a case, the plaintiff could not have relied on a legislative pronouncement that the cause of action was not subject to a limitations period. Indeed, where an applicable statute of limitations precedes the enactment of a cause of action, it would appear that, absent an expression of legislative intent to the contrary, the new cause of action should be subject to the limitations period to the same extent as any other cause of action. In other words, the new cause of action should be barred to the extent it accrued further in the past than the limitations period allows.

As stated, a private cause of action for contribution under the Spill Act did not exist prior to the enactment of section 23.11f(a)(2). *See Bowen Engineering,* 799 F.Supp. at 478. Section 23.11f(a)(2) is not, therefore, a statute which bars an existing cause of action, such as are affected by the rule of *Sohn. See Block,* 461 U.S. at 286 n. 23. Requiring that Plaintiffs' cause of action have accrued no more than six years before the filing of the Amended Complaint would not "extinguish" a preexisting claim under the Spill Act, and therefore does not invoke the protections of the *Sohn* rule. *Id.*

The ramifications of Plaintiffs' position need only be considered in order to conclude that the *Sohn* rule cannot apply here. Plaintiffs could have incurred cleanup and removal costs resulting from the discharge of hazardous waste, as are now recoverable under the Spill Act, one hundred years ago. Plaintiffs could have been fully aware of the relevant discharges and the responsible parties at that time. Under Plaintiffs' application of the *Sohn* rule, once the Spill Act's contribution provision had been enacted, they could have then brought suit against those responsible parties, without regard to how long before the enactment they knew of the facts behind the discharge. Indeed, under Plaintiffs' position, any costs for removal of hazardous waste, no matter when incurred, would now be recoverable under the Spill Act. The spate of Spill Act contribution suits which would follow from such an interpretation cannot, absent a legislative expression to the contrary, be presumed to have been within the intention of the New Jersey legislature in enacting section 23.11f(a)(2).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 24

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Because the *Sohn* rule does not apply to the instant circumstances, the date upon which Plaintiffs' Spill Act claim accrued was, for limitations purposes, the date upon which Plaintiffs learned, or reasonably should have learned, "the existence of that *state of facts* which may equate in law with a cause of action'" for contribution under the Spill Act. *Vispisiano,* 107 N.J. at 426. FN35

Section 23.11f(a)(2) sets forth the requirements of a cause of action for contribution:

"Whenever one or more dischargers or persons cleans up and removes a discharge of hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance.... In any action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of ... [N.J.S.A] 58:10-23.11g."

N.J.S.A. 58:10-23.11f(a)(2). Section 23.11g(c), in turn, provides:

Any person who has *discharged* a *hazardous substance,* or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, *for all cleanup and removal costs* no matter by whom incurred.

N.J.S.A. 58:10-23.11g(c)(1).

Under the Spill Act, the term "discharge" is defined as

any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of [New Jersey], or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State.

N.J.S.A. 58:10-23.11b(h).

"Hazardous substances" under the Spill Act are those substances defined as such by the DEP under their statutory authority to do so. N.J.S.A. 58:10-23.11b(k). Such substances "shall include the list of hazardous substances adopted by the

[F]ederal Environmental Protection Agency." *Id.* As stated, cadmium and cadmium compounds were listed as hazardous substances under the Spill Act as early as 1980. *See* N.J.A.C. 7:1E, Appendix A, R.1980, d. 185.

Accordingly, Plaintiffs' cause of action accrued when they became aware, or should have become aware, that (1) a discharge of cadmium had occurred, (2) for which a third party may be responsible, and (3) they engaged in cleanup of this discharge. *See* N.J.S.A. 58:10-23.11f(a)(2) ; *Vispisiano,* 107 N.J. at 426. As stated, Plaintiffs' knowledge of the identity of the responsible third party was not necessary for the cause of action to accrue. *See Amland Properties,* 808 F.Supp. at 1192.

The undisputed facts at bar indicate that, with respect to Plaintiffs' removal of the Waste Pile, Plaintiffs' cause of action for contribution accrued, at the latest, in February 1986. It is undisputed that Plaintiffs knew, by February 1986, of the presence of cadmium at the Hanover Site, a "hazardous substance" within the meaning of the Spill Act. *See supra* at 53-59; N.J.A.C. 7:1E, Appendix A, R.1980, d. 185. It is also undisputed that, by that time, Plaintiffs knew or should have known that a third party had "discharged" the cadmium onto the property, within the meaning of the Spill Act. *See supra* at 53-59. Finally, the record indicates that Plaintiffs had completed removal of the Waste Pile by January 1985. Moulthrop Cert., Ex. S at 2; *id.,* Ex. T at 4. Plaintiff's Spill Act claim for contribution to removal of the Waste Pile, therefore, accrued no later than February 1986. Because that claim accrued more than six years prior to the filing of the Amended Complaint, it is time-barred as to Prudential.

Plaintiffs assert that they could not have 'discovered' a cause of action under section 23.11f(a)(2) until the date of enactment of that provision, 10 January 1992, because the cause of action did not exist prior to that date. Opp.Brief at 15. Plaintiffs argue that until that date, the facts of which they were aware could not "equate in law with a cause of action." *Id.*

Plaintiffs' assertion in this regard is irrelevant. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 25

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

New Jersey legislature enacted the Spill Act's contribution provision without a statute of limitations, and therefore subject to New Jersey's existing residual statutes of limitations. In this enactment was the implicit recognition that hazardous substance removals which had taken place further in the past than the applicable limitations period allowed would not be subject to the contribution provision. To hold otherwise would be to allow any removal, whenever effected, to now be actionable under the Spill Act; such an approach cannot be read into the intent of the legislature absent some affirmative indication to the contrary. FN36

Accordingly, if Plaintiffs' cause of action under the Spill Act accrued prior to 10 January 1986, it would not be actionable under the Spill Act's contribution provision. FN37 Because Plaintiffs' Spill Act claim against Prudential accrued, at the latest, in February 1986, it was actionable only if brought within six years thereafter. Because it was not brought within that time, it is time-barred.

Plaintiffs further argue that the barring of their Spill Act claim on statute of limitations grounds is rendered inappropriate by equitable considerations. It is recognized that the Spill Act is grounded in important policies of allocation of blame and responsibility for environmental cleanup costs. *See* N.J.S.A. 58:10-23.11a (Spill Act statement of purpose). However, as stated, important considerations of repose and fairness also underlie the statute of limitations. *See Ochs,* 90 N.J. at 112. As stated, these policies are particularly compelling in the instant circumstances, and do not unnecessarily sacrifice the right of Plaintiffs to their day in court. *See supra* at 69. Accordingly, equitable considerations do not preclude application of the statute of limitations to bar Plaintiffs' Spill Act claim.

Prudential has established, beyond a genuine issue of material fact, that Plaintiffs' Spill Act claim for contribution with respect to removal of the Waste Pile accrued more than six year prior to the filing of the Amended Complaint; that claim is therefore time barred as to Prudential. Accordingly, Prudential is granted summary judgment on Count

II to the extent that count seeks contribution for costs incurred in removing the Waste Pile.

Summary judgment cannot be granted, however, on that part of Count II which seeks contribution for cleanup costs not related to the Waste Pile. As stated, section 23.11f(a)(2) provides that a contribution plaintiff can recover "whenever [he] cleans up and removes a discharge of a hazardous substance...." N.J.S.A. 58:10-23.11f(a)(2). Similarly, under section 23.11g(c), defendants under section 23.11f(a)(2) are liable only "for all cleanup and removal costs." N.J.S.A. 58:10-23.11g(c). Therefore, a cause of action under section 23.11f(a)(2) can accrue only when a plaintiff has engaged in cleanup and removal of a discharge of a hazardous substance. *See Hatco Corp. v. W.R. Grace & Co.-Conn.,* 836 F.Supp. 1049, 1093 (D.N.J.1993) ( "To qualify as a contribution plaintiff [under the Spill Act], [plaintiff] must demonstrate that it has cleaned up and removed a discharge of a hazardous substance." ); *Bowen Engineering,* 799 F.Supp. at 480 (Spill Act contribution claim premature where DEP had not yet commenced removal of hazardous substance and fixed liability on plaintiff; granting summary judgment to defendant on Spill Act claim); *see also Buonviaggio,* 122 N.J. at 16-17 (cause of action for claim against Spill Fund under section 23.11g(b) does not accrue until plaintiff is assured by DEP that it would be directed to incur cleanup costs and damages were "fixed" on plaintiff); *cf. McPherson v. Cleveland Punch & Shear Co.,* 816 F.2d 249, 250 (6th Cir.1987) ("[A] cause of action for contribution does not accrue until the joint tortfeasor has paid more than his proportionate share of liability." (citation omitted)); *United New York Sandy Hook Pilots Assoc. v. Rodermond Industries, Inc.,* 394 F.2d 65, 75 (3d Cir.1968) (For the purposes of N.J.S.A 2A:14-1, "a claim for indemnity does not accrue until the indemnitee's liability is fixed by a judgment against *or payment by* the indemnitee." (emphasis added)).

Though the facts in the record establish the date of the removal of the Waste Pile, they do not even address when the other removals, if any, which are the subject of Count II took place. As to such other removals, Prudential has not established beyond a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 26

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

genuine issue of material fact that Plaintiffs' Spill Act contribution claim is time-barred. Accordingly, summary judgment cannot be granted on Count II to the extent that count seeks contribution for cleanup costs not incurred in removing the Waste Pile.

### Conclusion

For the reasons stated, Prudential's motion for summary judgment is granted as to Counts III, IV, V and VI of the Second Amended Complaint. Summary judgment is granted to Prudential on Count II to the extent that count seeks contribution for Plaintiffs' removal of the Waste Pile; summary judgment on Count II is denied to the extent that count seeks contribution for other removal costs incurred by Plaintiffs.

> FN1. In support of its motion for summary judgment, Prudential has submitted: Defendant The Prudential Insurance Company of America's Brief in Support of its Motion for Summary Judgment (the "Moving Brief"), including Statement Pursuant to Local Rule 12G (the "Prudential 12G"); Defendant The Prudential Insurance Company of America's Reply Brief in Support of its Motion for Summary Judgment (the " Reply Brief"); Certification of Richard E. Pigott (the "Pigott Cert."); Certification of Samuel P. Moulthrop (the "Moulthrop Cert."), including as Exhibit A, transcript of deposition of John Davenport (the " Davenport Dep."), and as Exhibit K, transcript of deposition of Thomas O'Mara (the "O'Mara Dep."); Certification of Laura M. Massaia (the "Massaia Cert."), including as Exhibit B, transcript of continued deposition of Thomas O'Mara (the "O'Mara Cont.Dep.").
>
> In opposition to Prudential's motion for summary judgment, Plaintiffs have submitted: Plaintiff's Brief in Opposition to Defendant the Prudential Insurance Company of America's Motion for

Summary Judgment (the "Opp. Brief"), including Statement Pursuant to Local Rule 12G (the "Plaintiffs' 12G"); Certification of Bruce D. Nimensky (the " Nimensky Cert."), including as Exhibit D, affidavit of Maxwell Pollack (the "Pollack Aff."), as Exhibit E, transcript of deposition of Maxwell Pollack (the " Pollack Dep."), as Exhibit F, transcript of deposition of Thomas O'Mara (the " Plaintiffs' O'Mara Dep."), as Exhibit G, Certification of Lawrence S. Berger (the " Berger Cert."), as Exhibit H, transcript of deposition of Lawrence S. Berger (the " Berger Dep."), as Exhibit I, Certification of K. Paul Steinmeyer (the "Steinmeyer Cert."), and as Exhibit M, transcript of deposition of John W. Wilson (the " Wilson Dep.").

On 27 December 1993, Plaintiffs submitted a letter-brief, dated 23 December 1993, supplementing their Opposition Brief (the "23 December Letter-Brief"). By Order, dated 13 October 1993, it was directed that opposition briefs be served by 3 November 1993; no provision for supplemental opposition or sur-reply briefs was made. Moreover, pursuant to Rule 12N and Appendix N of the General Rules for the District of New Jersey, all motion papers were to be submitted no later than sixteen business days prior to the motion's return date. In this case, the return date was 10 January 1993, and the deadline for submissions on the motion was 15 December 1993. The 23 December Letter-Brief was therefore submitted in an untimely and inappropriate manner. However, in light of Plaintiffs' representation that they came upon the information contained in the 23 December Letter-Brief only after the submissions on this motion were made, the 23 December Letter-Brief will be considered. Attached to the 23 December Letter-Brief were the Certification of Irving D. Cohen (the " Cohen Cert.") and the transcript of the 21 December 1993 deposition of Irving D.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 27

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Cohen (the "Cohen Dep."). These will also be considered in conjunction with the instant motion.
Oral argument on this motion was heard on 10 January 1993. References to the transcript of the oral argument will be as: " Tr. at ----."

FN2. The Second Amended Complaint is the pleading upon which Plaintiffs rely as of the writing of this opinion. Prior pleadings and the nature of the amendments thereto are discussed *infra* at 17-21.

FN3. Prudential is a corporation organized and existing under the laws of New Jersey and has its principal place of business in New Jersey.

FN4. Prudential appeared as a prior owner of Lot 13 on the deed that transferred the Hanover Site from USR to Van Dyk. Massaia Cert., Ex. C. Prudential's dates of ownership were also reflected. *Id.*

FN5. It does not appear that, as of the time this action was instituted, Kemp had actually transferred the Hanover Site to Apollo. *See* Second Amended Complaint, ¶ 4 (Kemp is owner of Hanover Site).
The 1984 Sale Contract was amended on 7 January 1985 and 4 February 1987. *See* Moulthrop Cert., Ex. H; Plaintiffs' O'Mara Dep. at 87-90. Neither of the amendments appear to bear on the instant inquiry.

FN6. The parties have not indicated the reason Van Dyk was required to submit the February 1984 Questionnaire.

FN7. The signing of the 1984 Sale Contract triggered a review pursuant to the New Jersey Environmental Cleanup Responsibility Act ("ECRA"), N.J.S.A. 13:1K-6 *et seq.*, as a precondition to the transfer of the Hanover Site. *See* N.J.S.A 7:26B-1.6(a)(1); Plaintiffs' O'Mara Dep.

at 46. Van Dyk hired TRC for the purpose of ensuring compliance with environmental laws and regulations before transferring the Hanover Site to Apollo. *See* Berger Cert., ¶ 4. As the prospective purchaser of the Hanover Site, Apollo also had an interest in the Hanover Site's environmental compliance, and had developed an expertise in environmental compliance matters. In September 1984, Van Dyk authorized Apollo to act as its agent with regard to environmental issues which might arise in connection with ECRA compliance. *Id.,* ¶ 5. As Van Dyk's Agent, Apollo was aware of TRC's work for Van Dyk. *Id.,* ¶ 6.

FN8. The title of the DEP has since been changed to the Department of Environmental Protection and Energy. For the purposes of this opinion, the entity will be referred to as "DEP."

FN9. The RSA Report contains a scaled map of the Hanover Site which places the Waste Pile less than sixty feet from a metal storage building, and less than two hundred feet from a building containing a machine shop, storage facility and lab. *See* Moulthrop Cert., Ex. Q.

FN10. Berger is president of United States Realty Resources, which is the general partner of United States Land Resources. United States Land Resources is a general partner of Apollo. Berger Cert., ¶ 1.

FN11. In a letter to Berger, dated 23 June 1986 (the "DEP Letter"), the DEP summarized the results of the DEP meeting: During a meeting at the Bureau's offices on February 13, 1986, the Bureau indicated its comments on the "draft" analytical data submitted in January 1986. The data indicated unacceptable elevated levels of petroleum hydrocarbons, metals and the base neutrals in the soils on-site. In addition, elevated levels of gross beta and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 28

Not Reported in F.Supp., 1994 WL 532130
(Cite as: Not Reported in F.Supp.)

gross alpha have been noted due to the radiological "hot spot."
Nimensky Cert., Ex. J.

FN12. Plaintiffs concede that "the data that the [DEP] highlighted during the [DEP Meeting] indicated that cadmium was present in elevated levels not only in the lagoon area, but also in *other locations throughout the Hanover Site.*" Opp.Brief at 5 (emphasis in original). Plaintiffs therefore concede they received indication during the DEP Meeting that the elevated level of cadmium at the Hanover Site was caused by an "abnormally dangerous activity that was entirely distinct from" the Waste Pile. *Id.* at 6.

FN13. By way of affidavit, Berger has also stated: "It is my understanding that before February 13, 1986, Van Dyk was similarly unaware of the existence of cadmium and radiological substances on the subject property at levels that would pose a health concern." Berger Cert., ¶ 13.
Rule 27A of the General Rules for the District of New Jersey provides: " Affidavits shall be restricted to statements of fact within the personal knowledge of the affiant." The "state of mind" of Van Dyk with respect to cadmium contamination at the Hanover Site cannot be within the personal knowledge of Berger, who is at most an officer of Apollo. Accordingly, Berger's assertion as to Van Dyk's state of mind will be disregarded.

FN14. Prudential's ownership of Lot 13 was reflected on the deed transferring ownership of the Hanover Site to Van Dyk.
   Tr. at 4; Massaia Cert., Ex. C. Moreover, Plaintiffs concede that the chain of title for the Hanover Site is a matter of public record. Tr. at 8.

FN15. In its supplemental responses to Plaintiffs' interrogatories, dated 4

December 1992 (the "December 1992 Supplemental Response"), Safety Light confirmed that cadmium was used at the Hanover Site from 1956 to 1967. *See* Nimensky Cert., Ex. K at 4.
It was also disclosed in the 4 December 1992 Safety Light Response that, as early as 1950, USR channelled effluent waste from a settling pond into a local brook. *Id.* at 7. In October 1993, it was confirmed that waste containing cadmium was channelled from a settling pond to the Whippany River from 1950 to approximately 1955. *See* Wilson Dep. at 20-21.

FN16. ESI replaced TRC as Plaintiffs' environmental consultant in 1988. *See* Moulthrop Cert., Ex. W. at 1.

FN17. Later during his deposition, Cohen stated that when he indicated what he "would" have told Harris, he intended to indicate what he had actually told Harris. Cohen Dep. at 24.

FN18. In January 1993, ESI returned to the Hanover Site to investigate the extent of burial of materials near the former location of the Waste Pile (the "January 1993 Soil Analysis"). Two excavations were made in the immediate vicinity of the excavation made during the October 1992 Soil Analysis. Both these excavations uncovered cadmium compounds at depths of approximately three feet, buried both in plastic bags and without containers. *See* Nimensky Cert., Ex. L at 4-5; Opp.Brief at 9 n. 12.

FN19. Rule 15(c)(2) allows a pleading to relate back to the original pleading when " the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." Fed.R.Civ.P. 15(c)(2)
.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 29

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

FN20. Rule 4(j) provides that service of a summons and complaint upon a defendant must be made within 120 days after filing of the complaint. Fed.R.Civ.P. 4(j).

FN21. A line of cases in the Northern District of Illinois has held the mistake requirement of Rule 15(c)(3) to be a prudential limitation, rather than an absolute condition to relation back. This line of cases appears to have began with *Hampton v. Hanrahan,* 522 F.Supp. 140 (N.D.Ill.1981), where it was held:
If the notice requirements [of Rule 15(c) ] are properly met, there is no unfair prejudice to the proposed defendant, and the delay in joinder is not due to inexcusable neglect by the plaintiffs, it should make no difference whether the amendment to be related back corrects a mistake of fact or law.
*Id.* at 145; *see Hensley v. Soo-Line Railroad Co.,* 777 F.Supp. 1421, 1424 (N.D.Ill.1991) (Where mistake prong not satisfied, "relation back is still possible if the added party had notice"); *Hicks v. Resolution Trust Corp.,* 738 F.Supp. 279, 287 (N.D.Ill.1990) (citing *Hampton,* 522 F.Supp. at 145).
This reading of Rule 15(c)(3), however, appears to contravene the plain language of the rule. The requirements of Rule 15(c)(3) are listed in the conjunctive; none of the requirements, the mistake condition included, are listed as 'considerations' or ' factors.' *See* Fed.R.Civ.P. 15(c)(3). Moreover, the Supreme Court, in describing the requirements of Rule 15(c)(3), has prefaced them by stating: " Relation back is dependent upon four factors, *all of which must be satisfied.*" *Schiavone v. Fortune,* 477 U.S. 21, 29 (1986) (emphasis added).
In light of the plain language of Rule 15(c)(3) and the Supreme Court's interpretation of the rule, the decisions in *Hampton* and its progeny will not be followed. Rather, consistent with the

holdings of other courts, satisfaction of the mistake requirement will be treated as an absolute condition for relation back, and failure to satisfy this requirement will itself be sufficient to bar relation back under Rule 15(c)(3). *See, e.g, Richardson,* 1993 WL 492383 at *5 (E.D.Pa.) (acknowledging that all other requirements under Rule 15(c)(3) had been satisfied but refusing to allow relation back for failure to satisfy mistake condition); *Jordan,* 143 F.R.D. at 573-74 (D.N.J.) (failure to satisfy mistake requirement alone barred relation back under Rule 15(c)(3) ; *Campbell,* 792 F.Supp. at 1152-53 (E.D.Mo.) (acknowledging that notice requirement had been fulfilled but refusing to allow relation back solely on ground of failure to fulfill mistake requirement); *Great Northeastern,* 785 F.Supp. at 516 (E.D.Pa.) (refusing to allow relation back solely on ground of failure to satisfy mistake requirement); *In re Asbestos School Litigation,* 768 F.Supp. at 146 (E.D.Pa.) (same).

FN22. Plaintiffs do not dispute that Prudential did not conduct operations at the Hanover Site during its ownership of Lot 13, but instead, for the entire period of its ownership, leased the property to USR. Opp.Brief at 1.

FN23. Federal Rule of Civil Procedure 15(c)(1) allows state relation back law to govern a state claim in Federal court if state law "affords a more forgiving principle of relation back than the one provided by [Rule 15(c) ]." Fed.R.Civ.P. 15(c), Advisory Committee Notes, 1991 Amendment; *see Bryan,* 1993 WL 485813 at *9 (quoting *id.*). Under Fed.R.Civ.P. 15(c)(1), "if New Jersey law would permit [relation back], the [F]ederal Rules permit the amendment [to relate back]." *Bryan,* 1993 WL 485813 at *8; *see In re Sharps Run Associates, L.P.,* 157 B.R. 766, 799-800 (D.N.J.1993) (applying New Jersey relation back rule pursuant to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 30

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Fed.R.Civ.P. 15(c)(1) ); *Wilson v. City of Atlantic City,* 142 F.R.D. 603, 605-06 (D.N.J.1992) (same).

New Jersey's relation back law does not, in this case, provide a more forgiving outcome to Plaintiffs. Substantially mirroring Rule 15(c)(3), New Jersey's relation back rule requires, *inter alia,* that the defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him." N.J.Ct.R. 4:9-3. As stated, Plaintiffs have not established that the failure to name Prudential in the Complaint was due to a ' mistake' for relation back purposes.

Moreover, N.J.Ct.R. 4:9-3 requires that the notice and mistake requirements be fulfilled not within 120 days after filing of the original complaint, as provided in Rule 15(c)(3), but "within the period provided by law for commencing the action...." N.J.Ct.R. 4:9-3. In other words, unlike the Federal rule, New Jersey's relation back rule does not expand the limitations period 120 days for filing of the amendment; notice of the amendment must be given within the applicable limitations period. *Id.* In the instant case, it is undisputed that Prudential did not receive notice, formal or informal, of the instant action until at least 8 May 1992. *See* Pigott Cert., ¶¶ 4-5; Cohen Dep. at 8-10. As discussed *infra* at 53-59, this date was at least three months after the statute of limitations had run as to Plaintiffs' state law claims. Accordingly, the Amended Complaint cannot relate back to the date of the filing of the Complaint under Rule 15(c)(1) and N.J.Ct.R. 4:9-3.

FN24. The court in *Apgar* apparently relied on the availability of N.J.Ct.R. 4:26-4, which permits a plaintiff who does not know the identity of the defendant to file an action naming a fictitious defendant and later amend the complaint to name the actual defendant. *See* N.J.Ct.R. 4:26-4. In *Viviano,* the New Jersey Supreme Court

stated that the filing of a fictitious-party complaint "suspends the statute [of limitations] when the plaintiff is unaware of the true identity of the defendant." 101 N.J. at 547. In other words, the amended complaint would relate back to the 'John Doe' complaint. *See id.* In light of the availability of fictitious party practice, the court in *Apgar* concluded that it would not be unduly harsh to commence the statute of limitations when the identity of the defendant is not known. *See* 123 N.J. at 456.

In the past, the Third Circuit has suggested that New Jersey's fictitious-party practice may not be available to toll a statute of limitations in Federal court. *See Juzwin v. Asbestos Corp., Ltd.,* 900 F.2d 686, 690 (3d Cir.) (stating in *dicta* that "the New Jersey fictitious defendant rule is not available to a plaintiff in [F]ederal court since it is a procedural device, not a rule of substantive law"), *cert. denied,* 498 U.S. 896 (1990) ; *Talbert v. Kelly,* 799 F.2d 62, 66 n. 1 (3d Cir.1986) (John Doe practice will not toll statute of limitations in Federal court even where state law allows such tolling.); *Britt v. Arvanitis,* 590 F.2d 57, 62 (3d Cir.1978) (same).

These decisions might have cast some doubt on the applicability of the rule of *Apgar* in Federal court.

These decisions appear, however, to have been superseded by the 1991 Amendments to Rule 15(c). Effective 1 December 1991, Rule 15(c) was amended to permit relation back of an amended complaint " when relation back is permitted by the law that provides the statute of limitations applicable to the action." Fed.R.Civ.P. 15(c)(1). The Advisory Committee Notes on the 1991 amendment to Rule 15(c) state that Rule 15(c)(1) "is intended to make it clear that the rule does not apply to preclude any relation back that may be permitted under the applicable limitations law. Generally, the applicable limitations law will be state law." Fed.R.Civ.P. 15, Advisory Committee Notes, 1991

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 31

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

Amendment, paragraph (c)(1).
The Advisory Committee Notes further state: "Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim." *Id.* It appears, therefore, that notwithstanding the Third Circuit's past suggestions to the contrary, New Jersey's fictitious-party practice would be available to toll the statute of limitations in Federal court. *See Bryan,* 1993 WL 485813 at *9 (permitting fictitious party practice in Federal court); *Wilson,* 142 F.R.D. at 606 & n. 1 (refusing to dismiss amended 'John Doe' complaint on statute of limitations grounds because New Jersey's fictitious-party practice tolled statute of limitations; distinguishing *Britt,* 590 F.2d 57, on basis of 1991 amendments to Fed.R.Civ.P. 15(c) ). Accordingly, the rationale of *Apgar,* refusing to toll the limitations period until the identity of the defendant is known, is applicable in Federal court. *See Amland Properties,* 808 F.Supp. at 1192 (applying rule of *Apgar* in Federal court).

FN25. The RSA Report, issued to Van Dyk on 15 January 1985, indicated in a scaled map that the Waste Pile was less than sixty feet from a metal storage building, and less than two hundred feet from a building containing a machine shop, storage facility and lab. *See* Moulthrop Cert., Ex. Q.

FN26. The 27 May 1986 TRC Letter also informed Plaintiffs that "[t]he metal contamination [at the Hanover Site] is probably the result of improper waste generated by [USR], the former property owner. Likewise, the localized area of high radioactivity is probably from [USR] activities." Moulthrop Cert., Ex. X.

FN27. The Plaintiffs have not cited any authority for the proposition that accrual of a cause of action in environmental tort

requires knowledge of "contamination," as they define that term.

FN28. Plaintiffs have conceded: " Plaintiffs knew prior to August 26, 1986 that the contamination was 'the fault of another.' Once they learned of the contamination [at the DEP Meeting], Plaintiffs suspected that the former operator of the facility on the Hanover Site was responsible." Opp.Brief at 33.

FN29. Similar results were reached on similar facts by the courts in *Amland Properties,* 808 F.Supp. 1187, and *Hatco Corp.,* 801 F.Supp. at 1309. In *Amland Properties,* the court granted the defendant summary judgment on the plaintiff's common law environmental tort claims on the ground that they were time-barred under N.J.S.A. 2A:14-1. In defining the date of accrual of the cause of action, the court noted that the plaintiff knew of the existence of "significant concentrations" of hazardous substances on the property, that the problem "was serious" and that "it was not the responsible party" more than six years before the filing of the complaint. 808 F.Supp at 1193-94. The court held that the facts of which the plaintiffs were aware constituted "a state of facts which may give rise to a cause of action" in environmental tort. *Id.* at 1194.
In *Hatco Corp.,* the court granted the defendant summary judgment pursuant to the statute of limitations on an environmental strict liability claim. There, the court stated that the cause of action accrued when the plaintiff received notice from the DEP that "extensive groundwater contamination" and "high concentrations" of hazardous chemicals existed on their site. 801 F.Supp. at 1323. Though the plaintiff claimed that it did not know of the extensive nature of the environmental problems until it conducted further studies, the court concluded that the DEP's information put plaintiffs "on notice

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 32

Not Reported in F.Supp., 1994 WL 532130
(Cite as: Not Reported in F.Supp.)

of facts sufficient to trigger the running of the statute of limitations...." *Id.*

Plaintiffs attempt to rely on *Bowen Engineering*, 799 F.Supp. 467, where the court rejected the defendant's contention that the plaintiff's environmental tort claims were time-barred. There, however, the court relied heavily on the fact that " [e]arly test results were inconclusive at best, with no indication that the site was contaminated." *Id.* at 481. In contrast, tests results on the Hanover Site, available to Plaintiffs in February 1986, indicated conclusively the presence of greatly elevated levels of a hazardous substance. *See* Moulthrop Cert., Ex. W, Table 1 (September 1985 Soil Analysis). That the Hanover Site was contaminated and contained health risks was confirmed to Plaintiffs by the DEP no later than 13 February 1986. *See* Berger Cert., ¶ 15.

The holding in *Bowen Engineering* is inapposite to the instant facts. Rather, the instant facts are more akin to those presented in *Amland Properties* and *Hatco Corp.*

FN30. The ease with which Plaintiffs could have discovered the buried plastic bags of cadmium in 1986 is revealed by the ease with which they discovered the bags in 1992. The bags were discovered at a depth of only four feet, and within the immediate vicinity of the area where the Waste Pile had been located. Nimensky Cert., Ex. L at 4.

FN31. To conclude otherwise would allow plaintiffs to litigate their claim in piecemeal fashion, contrary to the policy of repose behind the statute of limitations.

For example, a party who had purchased a building could discover, shortly after the purchase, that a part of the building was infested with termites. At that point, he could elect not to sue the seller, and allow the statute of limitations to expire. Years later, after the statute of limitations had expired, the buyer could discover termites

in other areas of the building.

Under Plaintiffs' approach, the buyer could, upon discovering other infestation, sue the seller, notwithstanding that the seller gained repose from the buyer's failure to sue on the initial discovery of infestation. Such an approach strans logic and the policy behind the limitations period. The sounder conclusion is that the initial discovery of infestation put the buyer on inquiry notice such that he should have discovered other existing infestations, and provided him with the material facts sufficient for his claim to accrue. The cause of action accrued, in its entirety, at the initial discovery of termite infestation.

Similarly, in the instant case, Plaintiffs' entire cause of action accrued when it was informed at the DEP Meeting of the extensive cadmium contamination problems at the Hanover Site.

FN32. Plaintiffs also should have known by February 1986 that discharges could have taken place during Prudential's ownership. Prudential owned Lot 13 for more than thirteen years. *See* Plaintiffs' 12G Statement, ¶ 1. In light of the extent of USR's discharges, Plaintiffs should have anticipated that discharges may have taken place during Prudential's ownership.

FN33. "Hazardous substances" for the purposes of the Spill Act are those substances listed on the "environmental hazardous substance list" adopted by the Department pursuant to N.J.S.A. 34:5A-4(a), and those which are otherwise "defined as such by the [DEP], after public hearing...." N.J.S.A. 58:10-23.11b. Cadmium and cadmium compounds have been listed as hazardous substances by the DEP at least since 1980. *See* N.J.A.C. 7:1E, Appendix A, R.1980, d. 185 (effective 28 April 1980); 12 N.J.R. 68(a), 314(a).

FN34. The parties are in agreement that the six-year limitations period should

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 33

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

apply to Count II. *See* Moving Brief at 29; Opp.Brief at 15.

FN35. The parties have not cited, and there does not appear to be, a published decision of a New Jersey state or Federal court interpreting when a cause of action for contribution under section 23.11f(a)(2) "accrues" for the purposes of the limitations period. However, cases involving contribution claims against the New Jersey Spill Compensation Fund (the " Spill Fund") under the Spill Act, N.J.S.A. 58:10-23.11g(a), are instructive on the issue.

Under section 23.11g(a), the Spill Fund is strictly liable for cleanup and removal costs resulting from discharges of hazardous wastes "no matter by whom sustained." The Spill Act provides for recovery of such costs by the Spill Fund against responsible parties "without regard to fault." *See* N.J.S.A. 58:10-23.11g(b), (c).

Pursuant to section 23.11k: "Claims [against the Spill Fund] shall be filed ... not later than one year after discovery of damage." N.J.S.A. 58:10-23.11k. Cases interpreting the 'accrual' of an action against the Spill Fund for limitations purposes have applied New Jersey's common law 'discovery rule' to the inquiry. One court stated: "We think it fair to infer that the Legislature contemplated that 'discovery rule' principles would be applicable in determining 'the date of discovery of the damage [for the purposes of section 23.11k]." *Enertron Industries, Inc. v. Mack,* 242 N.J.Super. 83, 90 (App.Div.1990); *see Buonviaggio v. Hillsborough Township Committee,* 122 N.J. 5, 7 (1991) (quoting *Enertron Industries,* 242 N.J.Super. at 90, with approval).

Applying the discovery rule to actions against the Spill Fund, the court in *Enertron Industries* stated that the cause of action accrued on "the date [plaintiffs] action accrued on "the date [plaintiffs]

learned or should have learned 'of that *state of facts* which might equate in law with a cause of action." 242 N.J.Super. at 91 (quoting *Burd,* 76 N.J. at 291 (emphasis in original)). Reasoning that the Spill Fund was liable under section 23.11g(a) for "costs and damages arising from a 'discharge' of 'hazardous substances,' " the court concluded that a cause of action against the Spill Fund accrued for limitations purposes when the plaintiffs knew or should have known "that a 'discharge' of 'hazardous substances' [as those terms are defined by the Spill Act] had occurred." *Id.* The New Jersey Supreme Court later refined the rule of *Enertron Industries* by holding that a claim against the Spill Fund does not accrue until the plaintiff incurs, or is directed by the DEP to incur, cleanup costs. *See Buonviaggio,* 122 N.J. at 16-17 (section 23.11k's statute of limitations does not begin to run until plaintiff is assured by DEP that it would be directed to incur cleanup costs and damages were fixed); *see also In re NL Industries, Inc.,* 240 N.J.Super. 162, 170 (App.Div.1990) (same).

FN36. The Senate Environmental Quality Committee Statement to section 23.11(f)(a)(2) states, in relevant part: " [W]ording changes intend to clarify that the committee substitute applies to any cleanup or removal, *irrespective of the date of discharge.*" N.J.S.A. 58:10-23.11f, Senate Environmental Quality Committee Statement, Senate No. 2657 and Assembly No. 3659, L.1991, c. 372 (emphasis added). This statement does not imply that the legislature intended all *removals,* whenever effected, to be actionable under section 23.11f(a)(2). It merely states that removals which are effected to remedy *discharges* which occurred at any time in the past are actionable under the section.

In the instant case, the removal itself occurred prior to the date permitted by the limitations period. It is on this ground

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 34

Not Reported in F.Supp., 1994 WL 532130
**(Cite as: Not Reported in F.Supp.)**

> that Plaintiffs' Spill Act claim is
> time-barred. Nothing in the legislative
> history of section 23.11(f)(a)(2) militates
> against this conclusion.
>
> FN37. This is not to suggest that the
> Spill Act's contribution provision does not
> apply retroactively to removals which took
> place before its effective date. *See Bowen
> Engineering,* 799 F.Supp. at 480 (holding
> that Spill Act contribution provision
> applies retroactively). Rather, the rule
> adopted herein only limits the retroactive
> application of section 23.11f(a)(2) to the
> extent required by the six-year statute of
> limitations applicable to such actions.

D.N.J. 1994
Kemp Industries, Inc. v. Safety Light Corp.
Not Reported in F.Supp., 1994 WL 532130

Briefs and Other Related Documents (Back to top)

• 2:92CV00095 (Docket) (Jan. 15, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                          Page 1

Not Reported in F.Supp., 1996 WL 273674
**(Cite as: Not Reported in F.Supp.)**

**H**
Not Reported in F.Supp., 1996 WL 273674
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
    United States District Court, E.D. Pennsylvania.
                    Nagesh SHIRSAT
                            v.
    MUTUAL PHARMACEUTICAL CO., INC.
                **No. CIV. A. 93-3202.**

                    May 15, 1996.

            MEMORANDUM AND ORDER

HUTTON, Judge.
Presently before the Court are plaintiff's motion for
leave to file an amended complaint and defendant's
opposition.

                *I. BACKGROUND*

This civil action involves plaintiff's allegations that
he was wrongfully discharged from his employment
with Mutual Pharmaceutical Co., Inc. ("Mutual") on
April 30, 1992. Plaintiff commenced this action on
June 15, 1993, naming only Mutual as a defendant.
In his complaint, plaintiff alleges that Mutual
terminated his employment in retaliation for his
complaints and stated intention to report to the
authorities certain of Mutual's alleged practices in
violation of the Federal Food, Drug, and Cosmetic
Act and the rules and regulations of the Federal
Food and Drug Administration.

After plaintiff filed this case, attorneys for the
government filed a motion to stay plaintiff's civil
action pending the government's ongoing criminal
investigation of Mutual. Plaintiff did not oppose
the stay, and, accordingly, this Court issued a stay
in January of 1994.

As a result of the government's criminal

investigation, Mutual pleaded guilty to a seven
count indictment and entered into a non-appealable
plea agreement in which Mutual agreed to pay a
fine of $3.25 million. In addition to the
government's indictment against Mutual, the
government also indicted four employees of Mutual
and proceeded to trial against them.

Following the conclusion of the employees' criminal
trial, this Court lifted the stay in this case in May of
1995. In July of 1995, plaintiff retained new
counsel. Subsequently, in October of 1995, the
parties entered into an agreement staying the action
once again until January 15, 1996.

Plaintiff now moves to amend his complaint to add
Richard Roberts ("Roberts"), the president of
Mutual, as a defendant, to add three new counts
against Mutual and Roberts, and to "flesh out" his
previous factual allegations. The three new counts
involve claims for intentional infliction of
emotional distress, interference with "financially
beneficial employment relations," and interference
with prospective contractual relations.

                *II. DISCUSSION*

        A. *Amendment of Pleadings in General*

Rule 15(a) of the Federal Rules of Civil Procedure
provides that, when a responsive pleading has
already been served, "a party may amend the party's
pleading only by leave of court or by written
consent of the adverse party; and leave shall be
freely   given   when   justice   so   requires."
Fed.R.Civ.P.  15(a).  Such  leave  is  within  the
discretion of the court. *Zenith Radio Corp. v.
Hazeltine Research, Inc.,* 401 U.S. 321, 330 (1971)
; *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d
Cir.1993).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1996 WL 273674
**(Cite as: Not Reported in F.Supp.)**

### B. *Addition of Roberts*

When an amendment seeks to change or add a party, and the amendment is sought outside of the statute of limitations period (as in this case), Rule 15(c)(3) provides that the amendment relates back to the date of the original pleading when: (1) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; (2) the party to be brought in by the amendment has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits; (3) the party to be brought in knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party; and (4) the second and third requirements are satisfied within the period provided by Federal Rule of Civil Procedure 4(m).

This Court concludes that the third requirement has not been met in this case. In *Advanced Power Systems v. Hi-Tech Systems,* 801 F.Supp. 1450 (E.D.Pa.1992), the court explained that "[t]he ' mistake' condition does not isolate a specific type or form of error in identifying parties, but rather is concerned fundamentally with the new party's awareness that failure to join it was error rather than a deliberate strategy." *Id.* at 1457. In determining whether a party considered its omission from a law suit an error or a deliberate legal strategy, courts may consider the close identity of interest between an omitted party and a named party, *Advanced Power Systems,* 801 F.Supp. at 1457, and the plaintiff's awareness of the omitted party as a potential defendant. *See Kilkenny v. Atlantic Richfield Co.,* 800 F.2d 853, 857 (9th Cir.1986) (no relation back where plaintiff, inter alia, failed to amend her complaint after being informed of potential defendants), *cert. denied,* 480 U.S. 934 (1987) ; *Potts v. Allis-Chalmers Corp.,* 118 F.R.D. 597 (N.D.Ind.1987) (where plaintiff should have been aware of proper defendant at the outset, delay in amending complaint could be viewed by defendant as strategy, rather than mistake); *Curry v. Johns-Manville Corp.,* 93 F.R.D. 623 (E.D.Pa.1982) (no relation back where third-party

defendants were impleaded five months before plaintiffs moved to add them as direct defendants, because defendants could have interpreted plaintiffs' decision as strategy not error). As the Ninth Circuit has explained, Rule 15(c)(3) "was never intended to assist a plaintiff who ignores or fails to respond in a reasonable fashion to notice of a potential party, nor was it intended to permit a plaintiff to engage in piecemeal litigation." *Kilkenny,* 800 F.2d at 857-58.

In this case, it was reasonable for Roberts to view his omission as a deliberate legal strategy by plaintiff, not merely an error. Plaintiff's asserted reason for adding Roberts at this time is that testimony elicited during the criminal trial of Mutual's employees revealed facts establishing Roberts' liability for plaintiff's wrongful termination. Specifically, plaintiff allegedly learned that Roberts instructed the director of human resources to offer plaintiff the opportunity to resign, in lieu of termination, if plaintiff agreed not to report Mutual's violations to the appropriate authorities.

The Court finds this reason unconvincing. Obviously, the plaintiff was aware of the offer to resign at the time he was terminated. Indeed, plaintiff states that he "refused to resign under these conditions and was therefore terminated." (Pl.'s Mem. at 11). In addition, at the time of termination, several employees of Mutual were present, including the director of human resources, a private investigator, and at least one management personnel. (Pl.'s Ex. B at 2908). At no time before the present motion was filed, however, did plaintiff attempt to sue any of Mutual's employees individually. Plaintiff did not include in his suit the director of human resources, who allegedly communicated the offer of resignation to him. In addition, despite the obvious involvement of management in plaintiff's termination, plaintiff did not attempt to sue any of Mutual's managers individually before the present motion was filed. Nor did plaintiff include a "John Doe" defendant at any time. Thus, notwithstanding plaintiff's knowledge of potential individual defendants to this action, plaintiff never attempted to sue, or gave any indication that he would sue, such individuals.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3

Not Reported in F.Supp., 1996 WL 273674
**(Cite as: Not Reported in F.Supp.)**

Moreover, despite the fact that plaintiff learned of Roberts' involvement in March of 1995, FN1 that the stay in this case was lifted in May of 1995, and that the parties did not agree to a further stay until October of 1995, plaintiff did not file this motion to amend until a month after the second stay ended. Such a delay provides further indication that plaintiff now seeks to change a legal strategy, rather than correct an error. FN2

> FN1. Plaintiff allegedly learned of Roberts' involvement through the trial testimony of Michael Smith, Mutual's director of human resources. A portion of the transcript of Mr. Smith's testimony is attached as plaintiff's exhibit B and dated March 21, 1995.

> FN2. Although plaintiff hired new counsel in July of 1995, and counsel understandably needed time to familiarize themselves with the case, the Court once again notes that the events surrounding plaintiff's termination, except for Roberts' alleged complicity, were clearly established from the beginning. Therefore, if there had been an error in not suing individual employees or managers of Mutual, one would believe that such an error would have been easily spotted early on in counsel's review of the case.

Finally, the Court notes that plaintiff's position before this time is well summarized in his testimony given at the criminal trial of Mutual's employees:
  Q. Okay. Now, you would agree that the management of Mutual is who you're claiming violated your rights; is that correct?
  A. The company on whole as such violated my rights.
(Def.'s Ex. B at 131).

It is clear that, in light of plaintiff's knowledge of pertinent events and potential individual defendants within the statute of limitations period and plaintiff's delay in filing this motion, plaintiff's failure to sue any individual defendants can reasonably be viewed as deliberate legal strategy, not merely error.

Therefore, the Court will not allow the addition of Roberts as a defendant.

### C. *Addition of New Claims*

When a new claim is sought to be added, denial of leave may be based upon, among other grounds, the futility of amendment. *Lorenz,* 1 F.3d at 1413 (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Futility of amendment has generally been construed as meaning that a court should refuse to allow an amendment that would not survive a motion to dismiss. *Williams v. Bensalem Racing Assoc., Inc.,* Civ. A. No. 94-5777, 1995 WL 395951, at *2 (E.D.Pa. June 29, 1995); *see Massarsky v. General Motors Corp.,* 706 F.2d 111, 125 (3d Cir.), *cert. denied,* 464 U.S. 937 (1983).

As always, when considering a motion to dismiss for failure to state a cause of action under Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court shall take all allegations contained in the complaint as true and construe them in the light most favorable to the plaintiff. *H.J. Inc. v. Northwest Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989) ; *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990). The complaint shall only be dismissed if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Northwest Bell,* 492 U.S. at 249-50 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) ).

In addition, when considering a motion to dismiss for insufficient specificity under Rule 8(a) of the Federal Rules of Civil Procedure, the Supreme Court has held that a complaint must provide the defendants with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). The Third Circuit has interpreted the fair notice requirement to mean that the "crucial questions are whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer. " *Frazier v. Southeastern Penn. Transp. Auth.,* 785 F.2d 65, 68 (3d Cir.1986). Generally, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4

Not Reported in F.Supp., 1996 WL 273674
**(Cite as: Not Reported in F.Supp.)**

court explained that a complaint is sufficiently specific when it sets forth the conduct complained of, the time, the place, and those responsible. *See id.* at 67-68.

### 1. *Count Two: Intentional Infliction of Emotional Distress*

In count two, plaintiff alleges intentional infliction of emotion distress by Mutual. Mutual argues that plaintiff's intentional infliction of emotional distress claim should be dismissed because the Pennsylvania Worker's Compensation Act ("PWCA") provides the exclusive remedy for plaintiff's employment-related claim.

In most cases, the PWCA is the exclusive remedy of an employee for an injury arising in the course of employment. *Price v. Philadelphia Elec. Co.,* 790 F.Supp. 97, 99 (E.D.Pa.-1992). An exception exists, however, for injuries caused to an employee by the intentional conduct of a fellow employee who was motivated by personal animosity towards the other. *Id.* For example, the PWCA does not bar intentional infliction of emotional distress claims for sexual or racial harassment by a fellow employee. *Id.* at 100.

In this case, the plaintiff has not alleged any conduct by an employee of Mutual that was motivated by personal animosity towards the plaintiff. Although plaintiff alleges that the acts of Mutual's employees were willful and malicious, (Am.Compl.¶ 28), it is clear from the complaint that this animosity is related to business considerations, rather than to any personal characteristics of plaintiff (as, for example, sexual or racial harassment would be). *See Whitney v. Xerox Corp.,* C.A. No. 94-CV-3852, 1994 WL 412429, *6 (E.D.Pa. Aug. 2, 1994) (emotional distress caused as a result of campaign by plaintiff's supervisors to force him out after plaintiff reported the unlawful activities of some fellow employees and thereby embarrassed his supervisors was due to "business related animosity" and barred by the PWCA); *Tiscornia v. Sysco Corp.,* Civ. A. No. 95-3178, 1995 WL 574334, *4 (E.D.Pa. Sept. 26, 1995) (injuries caused to plaintiff as a result of

blowing the whistle on his supervisor's wrongdoing were motivated by "business related animosity" and barred by PWCA).

Even if the claim were not barred, however, the facts alleged do not support a claim of intentional infliction of emotional distress. A viable claim of intentional infliction of emotional distress must allege conduct that is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988) (quoting *Buczek v. First Nat'l Bank of Mifflintown,* 531 A.2d 1122, 1125 (Pa.Super.1987)).

The Third Circuit in *Cox* noted that:

At the outset, it must be recognized that it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress. In the context of a dismissal, it has been noted that "while loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event" and cannot provide the basis for recovery for intentional infliction of emotional distress. Moreover, courts applying Pennsylvania law have failed to find conduct outrageous where an employer deceived an employee into foregoing other employment, or even where the employer engaged in a premeditated plan to force an employee to resign by making employment conditions more difficult.

*Cox,* 861 F.2d at 395 (citations omitted).

In *Cox,* the Third Circuit found that where an employer fired an employee on the first day back to work, knowing that the employee had undergone triple bypass surgery, knowing that the employee's physical and emotional recuperation were not complete, knowing that by firing the employee "it was endangering his chances of collecting medical and disability benefits," and knowing that by firing the employee "it was depriving him of a valuable therapeutic tool and jeopardizing his chances to obtain alternate employment," the dismissal of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 5

Not Reported in F.Supp., 1996 WL 273674
**(Cite as: Not Reported in F.Supp.)**

employee, while performed with "an improper
motive and notwithstanding the potential effects on
[the employee]," did not rise to the level of
outrageousness which is required under
Pennsylvania law. *Id.* at 395-96.

In this case, plaintiff has merely alleged that his
improper termination was the sole cause of his
emotional suffering. Plaintiff alleges no
circumstances surrounding his termination that
would rise to the level of outrageousness as
explained in *Cox.* Accordingly, plaintiff has failed
to state a cause of action for intentional infliction of
emotional distress, and this amendment would be
futile.

### 2. *Count Three: Interference with Employment Relations*

In count three, plaintiff claims Roberts interfered
with plaintiff's "financially beneficial employment
relations" with Mutual. Even assuming such a
cause of action exists, since the Court has not
granted leave to add Roberts as a defendant, this
count cannot stand.

### 3. *Count Four: Interference with Prospective Contractual Relations*

In count four, plaintiff alleges that Roberts and
Mutual interfered with prospective contractual
relationships between plaintiff and other
pharmaceutical companies. Mutual argues that
plaintiff has failed to allege with adequate
specificity such prospective contractual
relationships.

In *Advanced Power Systems v. Hi-Tech Systems,*
801 F.Supp. 1450 (E.D.Pa.1992), the court
explained that:
[E]ven at the pleading stage, a plaintiff may not
rest a claim for tortious interference with
prospective contractual relations on a mere hope
that additional contracts ... would have been
forthcoming but for defendant's interference.
The complaint must allege facts that, if true,
would give rise to a reasonable probability that

particular anticipated contracts would have been
entered into.
*Id.* at 1459.

In his complaint, the plaintiff merely alleges that "
Plaintiff's difficulty in obtaining work in the
pharmaceutical industry is directly attributable to
the circumstances underlying this matter,"
(Am.Compl.¶ 44), and "Defendant Mutual and
Defendant Roberts have intentionally interfered
with prospective contractual relationships between
Plaintiff and other pharmaceutical companies with
an intent to harm the Plaintiff by preventing any
such relationships from accruing." (Am.Compl.¶
45).

These allegations are inadequately specific to
support a claim for interference with prospective
contractual relations. Plaintiff does not specify any
particular relation that was allegedly interfered
with, what conduct by Mutual and Roberts
amounted to interference, or facts that would give
rise to a reasonable probability that, but for the
interference, the particular anticipated contracts
would have been entered into. Thus, the Court will
not allow this amendment as well.

### D. *"Fleshing Out" of Previous Factual Allegations*

Plaintiff claims that, in addition to seeking leave to
add a defendant and new counts, he is "using this
opportunity to provide more specificity to Plaintiff's
factual allegations. Defendant should not be heard
to challenge Plaintiff's Motion to File an Amended
Complaint on this basis insofar as the Amended
Complaint simply 'fleshes out' the details of
Plaintiff's original pleading." (Pl.'s Mem. at 12-13
n. 5). Mutual has not challenged these
amendments.

### III. *CONCLUSION*

For the foregoing reasons, plaintiff's motion is
granted in part and denied in part. An appropriate
Order follows.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6

Not Reported in F.Supp., 1996 WL 273674
**(Cite as: Not Reported in F.Supp.)**


### *ORDER*

AND NOW, this 13th day of May, 1996, upon
consideration of Plaintiff's Motion for Leave to File
an    Amended    Complaint,    IT    IS    HEREBY
ORDERED that Plaintiff's Motion is GRANTED in
part and DENIED in part.

E.D.Pa.,1996.
Shirsat v. Mutual Pharmaceutical Co., Inc.
Not Reported in F.Supp., 1996 WL 273674

Briefs and Other Related Documents (Back to top)

• 2:93CV03202 (Docket) (Jun. 15, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.