1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
2

3     WALSH SECURITIES, INC.,        :  Case No. 2:97-cv-3496-DRD-MAS
                                      :
4            Plaintiff,              :
                                      :
5        vs.                         :
                                      :  Newark, New Jersey
6     CRISTO PROPERTY MANAGEMENT,     :  Friday, September 19, 2008
      et al.,                         :  2:53 p.m.
7                                     :
             Defendants.       :
8     ─────────────────────

9                    TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE MICHAEL A. SHIPP
10                  UNITED STATES MAGISTRATE JUDGE

11    APPEARANCES:

12    For the Plaintiff:          Boies, Schiller & Flexner, LLP
                                   By:  ROBERT A. MAGNANINI, ESQUIRE
13                                 150 JFK Parkway, 4th Floor
                                   Short Hills, NJ  07078
14                                 (973) 218-1111

15
      For Defendant Commonwealth
16    Land Title Insurance Co.:   McCarter & English, LLP
                                   By:  DAVID R. KOTT, ESQUIRE
17                                 Four Gateway Center
                                   100 Mulberry Street
18                                 P.O. Box 652
                                   Newark, NJ  07101-0652
19                                 (973) 622-4444

20

21    Transcription Company:      KLJ Transcription Service
                                   246 Wilson Street
22                                 Saddle Brook, NJ  07663
                                   (201)703-1670 - Fax (201)703-5623
23

24    Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
25

1    APPEARANCES (Cont.):

2    For Defendants
     Fidelity National Title Ins.
3    And Nations Title Ins.:        Fox Rothschild, LLP
                                     By:  EDWARD J. HAYES, ESQ.
4                                    2000 Market Street, Tenth Floor
                                     Philadelphia, PA  19103-3291
5                                    (215) 299-2092

6    For Defendant Coastal
     Title Agency:                   Methfessel & Werbel, PC
7                                     By:  MARTIN R. McGOWAN, JR., ESQ.
                                      3 Ethel Road, Suite 300
8                                     Edison, NJ 08818
                                      (732) 248-4200

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3     MOTION FOR LEAVE TO FILE 4TH AMENDED COMPLAINT          PAGE

4     Argument by Mr. Magnanini . . . . . . . . . . . . . . . . 5

5     Argument by Mr. Kott  . . . . . . . . . . . . . . . . 13

6     Argument by Mr. Hayes . . . . . . . . . . . . . . . . 17

7     Argument by Mr. McGowan . . . . . . . . . . . . . . . 22

8     Argument by Mr. Magnanini . . . . . . . . . . . . . . 24

9     Argument by Mr. Kott  . . . . . . . . . . . . . . . . 28

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                                    4

1              (Hearing commenced at 2:53 p.m.)

2         THE COURT:  Okay.  Good afternoon.  We are on the

3    record in the matter of Walsh Securities versus Cristo

4    Properties, Docket Number 97-3496.

5         May I have appearances of counsel, please?

6         MR. MAGNANINI:  Yes, Your Honor.  Robert Magnanini

7    from Boies, Schiller and Flexner, for the plaintiff Walsh

8    Securities, Inc.

9         THE COURT:  Good afternoon.

10        MR. KOTT:  Hi, Judge.  Nice to see you again.  David

11   Kott, K-O-T-T, McCarter and English, LLP, for the defendant

12   Commonwealth Land Title Insurance Company.

13        THE COURT:  Okay.

14        MR. HAYES:  Good afternoon, Judge.  Edward Hayes, Fox

15   Rothschild, for Fidelity National Title and Nations Title.

16        THE COURT:  Good afternoon.

17        MR. McGOWAN:  Good afternoon, Your Honor.  Martin

18   McGowan from Methfessel and Werbel on behalf of Coastal Title

19   Agency.

20        THE COURT:  Good afternoon, counsel.

21        We are here today -- and let me just say this right

22   from the start.  There are a lot of smaller issues that are at

23   issue here.  I've read the papers and I'm really most concerned

24   about this whole relation back issue, so I don't want to

25   belabor a whole lot of additional oral argument, when that's

1   really my prime concern here.  I think the papers are clear on

2   any and all other issues, but the issue that I have the most

3   concern about and I'd like for you to kind of focus in on is

4   really this whole relation back issue.

5          On June 27th, plaintiff filed a motion for leave to

6   file a fourth amended complaint.  The motion has been

7   vigorously opposed.  The Court is interested in oral argument

8   this afternoon and counsel should largely concentrate the

9   arguments on that issue.

10         Let me first hear from plaintiff's counsel and then

11  I'll hear from defense.

12         MR. MAGNANINI:  Yes, Your Honor.  Thank you.

13         Your Honor, may it please the Court, I'll focus in on

14  your area of concern, which is what we thought you'd be

15  interested in.

16         As you know, this case is a 1997 case, it was

17  originally filed back in July.  It was active until April of

18  1998, so we had six months of activity, during which time the

19  plaintiffs had amended the complaint once and we added the

20  title companies after having made claims, the claims hadn't

21  been paid, so they were added to the case.

22         The case was then stayed between 1998 and 2004, when

23  Judge Bassler -- and despite a lot of efforts on our part to

24  get the government to make a decision on what they were doing

25  with the case, they wouldn't do that, and it actually took an

1   appearance in court that they had actually told me that morning

2   they wouldn't be agreeing to a lifting of the stay, but Judge

3   Bassler convinced them otherwise.

4           So, we got the case going again in 2004.  We made the

5   -- we put in an amendment in January of 2005, which brought in

6   additional parties, did not include any new claims against any

7   of the current defendants.  After about a year of motion

8   practice, that was resolved.

9           The case was stayed again for mediation, which took

10  about 19 months, and then Your Honor has activated it again

11  back in January of 2008.

12          So, pursuant to the case management order, as you

13  noted, we had filed this amendment adding six new counts

14  against the four remaining defendants, the three title

15  companies and their agent Coastal Title Agency.  As Your Honor

16  saw in our papers, our basis for the amendment was a Rule

17  15(a), which says that leave shall be freely granted when

18  justice so requires.

19          And I could discuss the arguments about delay, if Your

20  Honor would like, but focusing on the relation back we looked

21  at Rule 15(c)(2), which states that claims asserted in an

22  amended pleading will relate back to the original date of

23  filing if the new allegations arise out of the same conduct

24  transaction or occurrence as alleged in the original pleadings.

25  The Supreme Court, I think, boiled it down well in the Mayle

1   <u>versus Felix</u> case, where they're looking at it, is it a common

2   core of operative facts.

3          And so, what we went back and did was we looked at the

4   complaint that we had and we looked at additional information

5   that had come out during the depositions which we got to take

6   during the mediation.  The stay on discovery was lifted by

7   Magistrate Arleo and we were allowed to take nine depositions

8   of the perpetrators of the racketeering scheme.  And during

9   that time, we got information from Mr. Kane and Mr. Grieser,

10  the two guys at the heart of the scheme, about different

11  things, and so some of that is the information we added into

12  the complaint.

13         And what we also did was we clarified our legal

14  theories.  What we've tried to do, basically, Your Honor, is

15  take this racketeering scheme with 28 defendants and narrow

16  down what's left, which are basically contract and we believe

17  fraud claims and either -- and negligence claims against

18  Coastal Title Agency and its principals, Commonwealth, Nations

19  and Fidelity Title Insurance Companies.  And it's all of the

20  new facts or new legal theories all relate to this common core

21  of operative facts, which is the racketeering scheme that

22  defrauded Walsh Securities out of $25 million dollars.

23         And as part of -- as a necessary part of the

24  racketeering scheme, in order for Walsh to wire money to any

25  closing lawyer or anywhere, it needed two things:  initial --

1    well, besides the buyer and all that -- it needed a title

2    insurance policy or a binder to be issued, and it needed a

3    closing service protection letter, which was also issued by the

4    title companies through Coastal.  And what those things

5    provided the mortgage bank with was assurances that, if it

6    wired the money, that its closing instructions would be filed.

7    It was actually going to get a purchaser who was able -- a bona

8    fide purchaser, if you will, who can make payments and that its

9    position, its mortgage would be recorded properly.

10          And, in fact, what we've alleged, both in our prior

11   complaints and with these amendments, is that didn't occur,

12   that Walsh's closing instructions weren't followed, that the

13   documents, the mortgages and notes were not recorded properly.

14   As a matter of fact, in going through some of the documents

15   we've come upon, we've got Cristo Properties, which bought the

16   property for, say $10,000, from an estate and then sold it to

17   one of the straw buyers.  We actually have the sale from Cristo

18   to the straw buyer, which is financed by Walsh, being recorded

19   first before Cristo was actually bought the property from the

20   buyer.

21          So, these were actions and events that the Coastal

22   Title participated in.  Actually, on April 8th of 1997, they

23   must have had a wheelbarrow full of closing documents they took

24   down and filed.  And, again, Coastal is the agent of the title

25   companies; because, without the closing service protection

1    letters, without the binders, Walsh was never going to wire

2    money to close these loans.

3            And, so, what we viewed this as, Your Honor, was that

4    the original pleading involves an agreement between the

5    parties.  When we're saying agreement or a contract between

6    Walsh and the title companies or an agreement between Walsh and

7    Coastal.  And the claims arising out of, quote, the entry into

8    that agreement or revolving around the consummation of that

9    agreement would be considered to have arisen from the same

10   conduct under Rule 15(c).  And that case is the Lind versus

11   Vanguard Offset Printers, 857 F.Supp. 1060.

12           And Commonwealth actually, in their papers on page 20,

13   admits that the transaction at issue, as they state, is the

14   consummation of this agreement between Commonwealth to provide

15   title insurance and Walsh Securities to loan money.  Now,

16   Commonwealth -- the premiums to the title companies were paid

17   by the buyers, but as we've discovered that was actually paid

18   by money that Walsh Securities had wired.  But, again, without

19   the issuance of the policy or the binder and the closing

20   service protection letter, there never would have been a

21   closing and a wiring of the money from Walsh Securities.

22           So, all of the facts that we've alleged in our amended

23   complaint and these legal theories relate back to that -- this

24   RICO scheme or fraud in which a property was acquired, was

25   inflated by the appraisers, was sold to a straw buyer and the

1   closing agents, the lawyers actually sent in a letter saying

2   we've got 25 percent of the money in escrow or there was a

3   second mortgage and, then, based on those criteria, Walsh

4   issued a mortgage.  And, again, without the title insurance

5   policy or binder or the closing service protection letter,

6   Walsh would have never issued the money.  So, all of the facts

7   that we've included in the complaint and the new legal theories

8   are all tied to that same issue.

9        We haven't gone back and said, you know, in 1995 a

10  vehicle owned by the title companies was driving down the road

11  and ran over Mr. Walsh, and we've added that in.  If you go

12  through the amended complaint, all of our additions relate to

13  the scheme to acquire properties, have them inflated in value

14  and sell them off to Walsh Securities.  And a necessary part of

15  that was the provision of title insurance and the closing

16  service protection letters.

17       As you see, some of our other claims relate to events

18  that happened subsequently to us originally naming the title

19  companies, and those events were:  Walsh had put the title

20  companies on notice that it had been defrauded and it had

21  insufficient capital to foreclose on, also an inability to

22  foreclose on because of the way the documents were recorded,

23  and the title companies had failed to cover Walsh for its

24  losses.

25       So, the legal theories we've asked for in addition

1   have be -- have been to ask that the Court declare that the

2   title insurance companies should provide coverage on these

3   policies.  Again, the policies, all that information, all those

4   -- all the facts of those claims relate back to the original

5   amendment in 1998 and have been in the case the entire time.

6          One of the things -- one of the cases the defendants

7   pointed out was the Unicure case, which actually says that the

8   focus isn't really on a connection between the claims that are

9   required, but a connection between the facts forming the basis

10  of those claims.  And, again, all the facts we've added have

11  been things that have come out of either documents or these

12  depositions from the mediation and that's what we've put in the

13  fourth amended complaint.

14         And, then, all of the legal theories that we've added

15  are, again, either based on facts that were in the amended

16  complaint or on these new facts.  And if you go back to the

17  Blatt versus Merrill Lynch case in the District of New Jersey,

18  916 F.Supp. 1343, it says the assertion of new legal theories

19  based on facts previously alleged or reasonably inferred from

20  facts previously alleged is permissible.

21         And I think the touchstone for this relation back is

22  whether there's any prejudice to the defendants, whether the

23  case has proceeded along, they've taken discovery, they've put

24  in expert testimony and things like that and now they're -- now

25  the playing field has shifted on them.  In this case, because

Magnanini - Argument                                    12

1   of these delays in what we've had, both sides have put out

2   document requests, we've put documents into a central

3   repository, but we haven't taken any depositions for use in

4   this case.  So, there hasn't been any discovery that's occurred

5   that the -- or anything that's happened that the defendants

6   could point to that somehow they've been prejudiced by the

7   relation back.

8        And then, if you go through -- excuse me.  I guess I

9   don't need to go into -- Fidelity had also raised a futility

10  defenses.

11       THE COURT:  No, you --

12       MR. MAGNANINI:  But you don't need that.  But I've --

13  we've looked at all the cases, Your Honor, and as I said, I

14  think this case is much more akin to the <u>Kovats versus Rutgers</u>

15  case, which is an old D.N.J. case from '86.  But in that case,

16  the plaintiffs were allowed to amend four years after the case

17  had been filed and after an administrative termination similar

18  to Walsh Securities.  And the judge held that:

19       "Since the issues raised by the amendments have been

20    the subject of ongoing discovery" -- and these issues will

21    be the subject of discovery when it -- when we get it going

22    again -- "I fail to see how either party will be prejudiced

23    by these amendments.  Any alleged delay, absent a showing

24    of bad faith, does not warrant denial of leave to amend."

25       And that was Judge Debevoise.

1          So, all of -- I guess, in a nutshell, all of the facts

2     that we've added came from when we finally got to depose a

3     couple of people intimately involved with the RICO scheme; and,

4     then, all of the legal theories are based on those facts or the

5     facts that were already in here.  And so, therefore, we believe

6     this clearly relates back.  As I said, we haven't tried to

7     expand the scope of this, it's -- everything is tied to money

8     was paid for premiums, policies, binders, closing service

9     protection letters were issued and they haven't been paid on it

10    and that's where we are.

11          THE COURT:  Okay.  Thank you, Mr. Magnanini.

12          Mr. Kott?

13          MR. KOTT:  Yeah, thank you, Judge.

14          The federal rule, the terms of the federal rule don't

15    help us much on this analysis, because we need to look at some

16    of the case law to find the interpretation of the federal rule.

17    And in particular, Judge Greenaway's decision in the <u>Farrell</u>

18    case, he refers to type and time, and we look at time and type

19    to determine whether something like this amendment would relate

20    back.

21          And let me address first time.  The claims in the

22    original complaint against the title companies dealt with what

23    the title companies did after the loss occurred; that is, after

24    the loss occurred and a claim was presented, did the title

25    companies honor the claim.  The proposed amendment by the

1   plaintiff, the proposed fourth amendment -- amended complaint,

2   the time frame addressed is before the policies were ever

3   issued, before the loss was ever issued.  Because in the

4   proposed fourth amended complaint, what the plaintiff is

5   alleging is facts relating to the conduct of the title

6   companies that would have occurred well in advance of what --

7   when the loss occurred.

8          Turning to Greenaway's second aspect, type -- and I'm

9   going to use words active and passive.  I'm not using them in

10  the states -- you know, in the technical terms.  But in the

11  original complaint or in the second and third, what is alleged

12  against us, the title companies, is essentially kind of what I

13  would call a passive kind of conduct; you didn't honor a claim

14  that you should have honored.  In the proposed fourth amended

15  complaint, it is much more active kind of conduct; meaning, you

16  were an active tortfeasor here, you were engaged in the

17  conduct, you were part of the fraud.

18         So, when we look at time and type, to put the meat on

19  the Federal Rule of Civil Procedure 15, we find -- accepting

20  Judge Greenaway's analysis, which is a, I think, a fairly well-

21  established analysis -- that, in fact, this does not relate

22  back.

23         Plaintiffs say, Mr. Magnanini just said, well, you

24  know, we had sued all these other parties and alleged all these

25  bad things against these other parties and, therefore, you, the

1   title companies, it ought to relate back.  Except for we have

2   Unicure and we have some other decisions, cited more in

3   Fidelity's brief than in mine, that says we don't get relation

4   back, because you said in your original complaint Bill was a

5   wrongdoer and now you want to amend to add David as a

6   wrongdoer.  We don't do that.  The relation back, the fact that

7   there is allegations against some other party does not relate

8   back when you try to take those allegations and now move them

9   to the other party.

10          I'm nearing the end.  I want to answer any questions,

11  but I just want to make two points.

12          I think when you look at the relation back

13  jurisprudence, what you're really looking at, one of the things

14  was were these defendants aware from reading the complaint,

15  could they have been aware that, really, the complaint was

16  talking about them.  And when you look at the third amended

17  complaint, which was the last one that was filed, there is no

18  way, because of time and type, the title insurance defendants

19  could have known, oh, when he was doing these other

20  allegations, this complex fraudulence scheme, that he was

21  saying that we were the participants in that scheme.

22          And, finally, there was some discussion of prejudice

23  just now by Mr. Magnanini.  I believe and I believe with a fair

24  amount of confidence, that on the relation back prejudice is

25  not a factor.  That may be a factor on whether we're -- whether

1   the plaintiff is granted leave to amend the complaint when you

2   look at the case law, but I don't believe that prejudice is a

3   factor on relation back.  Because after all, Judge, relation

4   back, what we're really talking about is the statute of

5   limitations.

6          And let me give you an easy example.  Two-year statute

7   of limitations for personal injury.  Plaintiff's in an

8   automobile accident, he sues two years and two months later and

9   there's no prejudice.  Well, the fact that there's no prejudice

10  by the late lawsuit is not a defense, because it's a statute of

11  limitations.  On statute of limitations, we don't look at

12  prejudice, we look at whether or not the statute was met or not

13  met.

14         So, I think, for these reasons on this record, there

15  ought not to be relation back.

16         And let me just add one thing on prejudice, if the

17  Court thinks I am wrong on my analysis.  I don't think it is

18  correct for Mr. Magnanini to say, in these circumstances, an

19  11-year-old lawsuit, we have to show prejudice, because how do

20  we, after 11 years -- as I stand here today, I can't tell you

21  what witnesses are gone, I can't tell you what documents are

22  gone, what recollection is faded, and all the other indicia of

23  prejudice that might be shown.  I might be able to do that in

24  nine months, if you allow the amendment; but, in nine months,

25  if I come back and say I'm prejudiced, you might not allow me

1    to do it.

2           I would submit, an 11-year-old lawsuit -- and if you

3    take all the stays out, the stays are almost six years -- so,

4    we have a five-year lawsuit that was amended three times, the

5    most recent amendment is in 2005, that the burden ought not to

6    be on the defendants to show prejudice, the burden ought to be

7    on the plaintiff to show the absence of prejudice to the

8    defendants; meaning, all the witnesses are available, they all

9    have recollection, the documents are all there and the other

10   indicia.

11          If the Court has any questions, I --

12          THE COURT:  Thank you, Mr. Kott.

13          And Mr. Hayes, it is, correct?

14          MR. HAYES:  Yes, that's correct, Your Honor.  Good

15   afternoon.

16          THE COURT:  And I'm sure we're not going to be

17   redundant of the issues already raised by Mr. Kott, correct?

18          MR. HAYES:  Not at all, Judge.

19          THE COURT:  Thank you.

20          MR. HAYES:  And, in fact, I have a complete different

21   issue to deal with, --

22          THE COURT:  That's right.

23          MR. HAYES:  -- because one of the sought amendments --

24          THE COURT:  Fidelity.

25          MR. HAYES:  -- against only Fidelity --

1          THE COURT:  Okay.

2          MR. HAYES:  -- is this memo that was issued in August

3    of 1997, after the <u>Asbury Park Press</u> had broke the story about

4    the fraud and the artificially-inflated values and the problems

5    in this particular transaction.  And as Your Honor has seen,

6    while Mr. Magnanini didn't attach it, we attached to our

7    response the memo in question, as well as, we think more

8    importantly, the response to that memo nine days later from

9    Walsh saying that we believe your memo is inappropriate and

10   improper and we will bring claims against you as a result of

11   it, in August of 1997.

12         Now, the issue, as David mentioned, is clearly a

13   statute of limitations issue.  If Your Honor were to entertain

14   a tortious interference claim, which is what they seek to amend

15   with respect to Fidelity only, there's a six-year statute.  The

16   memo was issue in 1997.  They have no argument that they were

17   unaware of its existence until recently.  They have no argument

18   that it was merely discovered or recently discovered as part of

19   this discovery in the mediation.  They wrote in response to it

20   nine days after the memo was issued.

21         It is a question of whether Your Honor will allow

22   relation back to, in essence, destroy our statute of

23   limitations defense, which creates a futility situation for

24   purpose of amendment.  And I would argue to you, Judge, that on

25   that claim they cannot in good conscience make an argument that

1   it relates back to the facts that were a part of the underlying

2   case.   The case, as originally filed and as amended, was that

3   the, quote/unquote, RICO defendant engaged in a mass fraud by

4   which Walsh lost millions and millions of dollars, all of which

5   occurred prior to the Asbury Park breaking the story.

6           As to Mr. Kott's client and my client, we were not

7   alleged to be a participant in the fraud in any aspect

8   whatsoever.   The claim of the multi-count complaint against Mr.

9   Kott's client and mine was simple:  you issued a closing

10  protection letter to us, the closing protection letter were --

11  they were issued at each closing and they constituted a

12  contract between your company and Walsh to protect against the

13  fraud that we've complained of in this case.   Not you're a

14  participant, but you had a contractual obligation under the

15  closing protection letter to protect us against the fraud.

16          Now, interestingly, although we hear all these

17  arguments about the title policies, the companies also issued

18  title policies at each of those closings.   Those title policies

19  were not the subject of the first complaint and the second

20  complaint and the third complaint or the fourth complaint, the

21  complaint was limited to Mr. Kott's client and my client didn't

22  do what they were contractually obligated to do under the

23  closing protection letters.

24          Now, we look at this new claim.   This new claim says,

25  after you didn't do what you should have done under the closing

1    protection letters, you got angry with the fact that we brought

2    a claim and you issued a memo to your agents after the fraud

3    was complete, after we had submitted claims to you saying that,

4    before any subsequent policies are issued in which Walsh is a

5    lender, approval from Fidelity must be obtained, and that that

6    somehow tortiously interfered with Walsh's business.

7            Well, Judge, there's no clearer example in my mind of

8    that being a separate unrelated set of circumstances.  To use

9    Mr. Kott's phrases of time, you know, it was not at the same

10   time, it did not involve the same transaction, it did not

11   involve the same facts, it was a completely unrelated claim

12   that's now being raised 11 years after it happened when the

13   client, Walsh, knew about it, threatened to bring the claim in

14   the August 21, 1997 memo, and now decides to bring it for the

15   first time in 2008.  Judge, I -- to me, there can be no

16   relation back on that claim.

17           With respect to the relation back, I think Mr. Kott

18   hit all of the points I wanted.  I agree with him, prejudice is

19   not an issue.  Your Honor has to make two decisions here.

20   First, do I permit an amendment, in general.  And Your Honor

21   can look at prejudice on that end of it, but in dealing with

22   our futility argument, which is primarily one of the statute of

23   limitations.  Mr. Magnanini only gets it around if he can get

24   where the relation back doctrine applied.  And prejudice is not

25   in any of the cases that I saw with relation back, and we have

1    cited a few cases in our brief in the latter portion that talk

2    exactly as Mr. Kott said, you don't get the protection by

3    claiming we said someone else did something wrong.  When you

4    had the opportunity in your initial filing, when you had the

5    opportunity in all of your amendments to say that we did

6    something wrong, but didn't do it, you don't get the protection

7    of relation back.

8           The only other thing I would mention, Judge, that the

9    inference that is trying to be created here is that something

10   happened in these depositions during the mediation that caused

11   Walsh to recognize that it had this claim against us.  With all

12   due respect, Judge, those depositions were taken for a specific

13   purpose and that was to provide us with an opportunity to

14   determine if there was evidence that the principals of Walsh

15   participated in the fraud.  That was the purpose for those

16   depositions.  They were not open-end depositions, the stay was

17   lifted for a very limited purpose.  And to argue that something

18   was discovered in those depositions is just disingenuous,

19   nothing was discovered at all.

20          Every single fact that's in the current proposed

21   amended complaint was in Walsh's possession when they filed the

22   first complaint, when they filed the second complaint, when

23   they filed the third complaint and when they filed the fourth

24   complaint.  And as I said in my submission, Judge, there has to

25   come a time when a defendant can feel comfortable that, while

1   claims may have existed, that they can no longer be brought.

2   That's the whole purpose of the statute of limitations.  I

3   would suggest to you that, after 11 years, I think my client

4   had the right to assume it would not be sued for a memo that

5   was issued in August of 1997 and it would not be alleged as an

6   active participant in a fraud, when it was never alleged to

7   have been one before.

8          So, as far as we're concerned, Judge, there can be no

9   relation back here, both amendments against my client would be

10  barred by the statute and, therefore, would be barred by the

11  statute and we would respectfully request that Your Honor not

12  permit the amendment.  Thank you, sir.

13         THE COURT:  Thank you.

14         Mr. McGowan?

15         MR. McGOWAN:  Thank you, Your Honor.

16         One of the benefits of going last, Your Honor, is a

17  lot of it's already been said.

18         THE COURT:  Yeah.  One second, let me just make sure

19  my notes are clear here.

20                    (Extended pause)

21         THE COURT:  Okay, Mr. McGowan, please proceed.

22         MR. McGOWAN:  Thank you, Your Honor.

23         THE COURT:  Thank you.

24         MR. McGOWAN:  I think Mr. Kott put his finger on it

25  early on in his presentation when he said the relation back

1   doctrine, what we're really talking about is a statute of

2   limitations.  For ten years, my client has been identified as a

3   RICO defendant.  In other words, for ten years, my client has

4   fallen on the intentional side of things, as opposed to the

5   negligent side of things.

6          And the intentional side of things and the negligent

7   side of things, it seems to me, are the grand dichotomy of

8   American jurisprudence.  It was alleged for ten years, through

9   four versions of this complaint, that I was in cahoots with the

10  appraisers, that I was in cahoots with the phony buyers, that I

11  was in cahoots with the crooked attorneys, that I was in

12  cahoots with Mr. Kane and his business organization.  It is no

13  longer going to be alleged that.  So, for ten years, this case

14  has been defended by my -- not only by myself, but by my

15  client's personal counsel, pursuant to a reservation of rights

16  agreement, on that basis.

17         I take it from Your Honor's interest in hearing from

18  us regarding the statute of limitations slash relation back

19  issue, that Your Honor is interested in the fact that these

20  claims aren't just restating or parsing or more particularizing

21  claims that have already been in this case, these are new

22  claims.  And if Your Honor wasn't thinking they were new

23  claims, then this statute of limitations issue, the relation

24  back issue would be of less interest to you, I think.

25         It is now no longer going to be alleged that I was in

1   cahoots with anyone, it is now going to be alleged that I was

2   independently negligent.  Well, we've had various explanations

3   here for the existence of statutes of limitations.  One of them

4   is to curtail litigation.  It is not in the public policy of

5   this state, in the federal court or the state court or any

6   other place, to foster litigation after a certain period of

7   time, that's why statutes of limitations exist.

8           In this case, you know, whether you use a two-year

9   statute, a six-year statute, a seven, eight, nine, you can use

10  any statute that you could divine, it is ten years since the

11  original filing, it is more than that since the actions that

12  are alleged to have harmed the plaintiff have taken place, and

13  there have been four complaints, none of which have alleged

14  negligence as to my client.  The statute has run.  This is a

15  new claim, it's an entirely different defense, it's an entirely

16  -- it has entirely different remedies, it has entirely

17  different ramifications, it's a new ball game and it's a ball

18  game that I would suggest has been barred by the statute of

19  limitations for any number of years.

20          That's what I have to say, Judge.

21          THE COURT:  Okay.  Thank you.

22          Mr. Magnanini?

23          MR. MAGNANINI:  Yes, Your Honor.  Let me see if I can

24  put this together quick for you.

25          THE COURT:  I'm interested in hearing what you have to

1   say about prejudice and --

2            MR. MAGNANINI:  Roger that, Your Honor.

3            Actually -- and that's what -- I knew I wasn't

4   completely off the mark, but if you -- and we've actually cited

5   the case -- I'm not going to read them all to you -- but on

6   page 9 of our reply brief there it says -- if you go back to

7   Evans Products versus West American Insurance Company, the

8   Third Circuit says the primary policy underlying the Rule 15(c)

9   in a relation back is avoiding prejudice to defendant and it

10  says:

11           "To avoid prejudice to defendant, it's necessary,

12       quote, 'that the defendant be able to anticipate claims

13       that might follow from the facts alleged by the plaintiff,'

14       close quote" -- that's, sorry, out of a Ninth Circuit case,

15       and then -- "notice to the defendant of the facts that

16       caused the injury alleged in the amended pleading is,

17       therefore, paramount.  When such notice has been provided,

18       an amendment should be permitted, quote, 'to facilitate the

19       fair trial of the existing issues between plaintiff and

20       defendants.'"

21           And then, if you go back to a Third Circuit case we

22  cited from 2004, Bensel versus Allied Pilots Association, the

23  court said that, if defendants had fair notice of the general

24  fact situation of which -- upon which the amending party

25  proceeds then relation back is proper.  So, prejudice is a

1    touchstone.

2            And one of the other points I would just like to clear

3    up, Your Honor, is the six causes of action that we're

4    alleging, we've alleged common law fraud against Coastal Title

5    and that's primarily coming out of -- just so you think I'm not

6    disingenuous -- from a deposition of Mr. Kane who, for the

7    first time during the mediation we got to depose him.  Since,

8    of course, he was an adversary, he went to -- pled guilty, went

9    to jail.  And he testified that he was actually at a meeting

10   with his lawyer with Mr. Pepsny and Mr. McGowan's principal,

11   Robert Agel, in which Mr. Agel told him, quote, how to do

12   things right to keep these deals going.

13           So, our focus on adding common law -- now, Mr. McGowan

14   will disagree with my I guess how I phrase that -- but our

15   common law fraud claims stem from that.  The common law fraud

16   claims against Commonwealth, Fidelity and Nations are vicarious

17   liability claims, because of the acts of their agent.  We

18   haven't thrown them into these RICO claims or anything else,

19   nor, as Mr. McGowan suggested, have we divorced him completely

20   from any intentional wrongdoing.

21           They were on notice of intentional wrongdoing and, as

22   a matter of fact, their defense throughout this has been we

23   didn't do it, we didn't participate, we didn't do anything

24   wrong.  But, again, going through documents that we've got,

25   they weren't filing things properly.  So, if they weren't doing

1   this intentionally, they sure weren't doing it properly and

2   that's why we had the negligence claims in there.

3          And, then, the other claims we have against the title

4   companies -- wrongful delay, and denial of insurance claims,

5   and coverage and a declaration asking for coverage so we can

6   get paid -- all, again, relate back to these initial claims

7   that we've had.  And, then -- I think that Mr. Kott's point.

8          Mr. Hayes had a separate point, Your Honor, on the

9   August 1997.  And, again, that -- what he -- what he'd like to

10  do is really have you parse and draw a line between the cause

11  and the effect.  That he's quoted a couple of cases which

12  really aren't on point, in which the memo or the documents were

13  miscited or that sort of thing.  What we've alleged in the

14  complaint was, after this fraud and directly as a result of

15  this fraud, Mr. Hayes's client I think will admit they issued

16  this memo saying, we will not issue policies to any loan

17  underwritten by Walsh Securities unless we've had time to

18  review it and issue a written approval.

19         And what we've alleged, that in a fluid, quick

20  mortgage situation where you go to several bankers with one

21  loan shopping for the best rate for the lowest points for the

22  client and the most money for the broker, any broker that had

23  to submit it to Walsh Securities get underwriting approval so

24  they know Walsh would underwrite the loan, then turn around and

25  send that packet to Fidelity to have them review the

1   underwriting and then issue a written decision before they knew

2   that Fidelity would issue title insurance or a closing service

3   protection letter in order for Walsh, the mortgage bank, to

4   wire money.  That just wasn't going to happen.

5         So, again, what we're alleging is that, as a result of

6   this fraud, Fidelity did what it did, it issued this memo and

7   then -- and as a result of that -- now, it's not specifically

8   worded in the memo -- but asa a result of the memo, people

9   steered business away from Walsh Securities.  And, again, the

10  effect of all of these facts that we've alleged in all of these

11  claims is all the same things.  Business was steered way from

12  Walsh, Walsh couldn't get funding, the deal to sell Walsh

13  Securities collapsed and Walsh's word is now, because of all

14  these events, it's not worth anything other than this lawsuit.

15        And that's where -- how we see all these things

16  related to the same set of underlying facts and circumstances

17  and, so, I think that, in a nutshell, Your Honor, hits the

18  major points you've heard.

19        MR. KOTT:  Judge, I --

20        THE COURT:  Yes.

21        MR. KOTT:  -- don't normally ask, but may I have 30

22  seconds just on one narrow thing?

23        THE COURT:  Sure, wrap it up, please.

24        MR. KOTT:  I just want to address, because Mr.

25  Magnanini addressed Evans Products, a Third Circuit case on the

1    issue of prejudice.

2            THE COURT:  One second.  Okay, go ahead.

3            MR. KOTT:  And I had used earlier the word notice.  If

4    something relates back, it relates back in part because the

5    defendant, from reading the original complaint, was on notice

6    that there were claims being asserted against him for that.

7    And, in that situation, there is no prejudice and that's really

8    what Evans Products is saying.  Evans Products -- when we --

9    when Evans Products uses the word prejudice, they are not using

10   it or the court is not using it in the way that it is being

11   used on -- should plaintiff be granted leave to amend; meaning,

12   did the defendant lose evidence and things like that.

13           If the Court finds that there's -- this is proper

14   relation back, you rule in favor of the plaintiff, then what

15   Evans Products says is, there's no prejudice to these

16   defendants, because they could have, from reading the original

17   complaint and the facts pled, known that the reference was to

18   them under time and type.  It is a different use of the word

19   prejudice.  On the other hand, if the Court does not find that

20   it meets the criteria for relation back, the Farrell case,

21   Judge Greenaway, then you don't get to the prejudice type of

22   question the way you do on leave to appeal; meaning, was

23   evidence lost and things of those -- that -- I'm sorry, leave

24   to amend.  Then you don't get to that issue.

25           And so, really, what I'm saying is, when you read

1   <u>Evans Products</u> and <u>Evans Products</u> talks about prejudice, all

2   <u>Evans Products</u> is saying is, if it relates back, there is

3   conclusive no prejudice to the defendant, because the defendant

4   would have known from the original complaint that there were

5   claims asserted against it.

6           THE COURT:  Okay.  Thank you.  Okay, counsel.  I thank

7   you very much for your oral arguments, it's been helpful.  The

8   Court right now is planning on issuing a written opinion on

9   this within the next week or so, so this matter should be

10  resolved in short order.  Okay?  Thank you very much.

11          MR. MAGNANINI:  Thank you, Judge.

12          MR. KOTT:  Thank you, Your Honor.

13          THE CLERK:  All rise.

14              (Hearing adjourned at 3:32 p.m.)

15              C E R T I F I C A T I O N

16      I, TERRY L. DeMARCO, court-approved transcriber,

17  certify that the foregoing is a correct transcript from the

18  electronic sound recording of the proceedings in the above-

19  entitled matter.

20

21

22  ___12/08/08_____          *S / Terry L. DeMarco*_____
            Date                    Terry L. DeMarco, AD/T 566
23                                  KLJ Transcription Service

24

25