EXHIBIT  A

Robert A. Magnanini, Esq.
STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, Fourth Floor
Short Hills, New Jersey 07078
973-218-1111
Attorneys for Walsh Securities, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WALSH SECURITIES, INC., | : | Civil Action No. 97-cv-3496 (DRD)(MAS) |
| | : | |
| Plaintiff, | : | Hon. Dickinson R. Debevoise |
| | : | |
| vs. | : | |
| | : | |
| CRISTO PROPERTY MANAGEMENT, | : | |
| LTD., a/k/a G.J.L. LIMITED; DEK HOMES | : | |
| OF NEW JERSEY, INC.; OAKWOOD | : | |
| PROPERTIES, INC.; NATIONAL HOME | : | |
| FUNDING, INC.; CAPITAL ASSETS | : | |
| PROPERTY MANAGEMENT & | : | |
| INVESTMENT CO., INC.; CAPITAL | : | |
| ASSETS PROPERTY MANAGEMENT, | : | |
| L.L.C.; WILLIAM KANE; GARY GRIESER; | : | |
| ROBERT SKOWRENSKI, II; RICHARD | : | |
| CALANNI; RICHARD DiBENEDETTO; | : | |
| JAMES R. BROWN; THOMAS BRODO; | : | **FOURTH AMENDED COMPLAINT** |
| ROLAND PIERSON; STANLEY YACKER, | : | |
| ESQ.; MICHAEL ALFIERI, ESQ.; RICHARD | : | |
| PEPSNY, ESQ.; ANTHONY M. CICALESE, | : | |
| ESQ.; LAWRENCE CUZZI; ANTHONY | : | |
| D'APOLITO; DAP CONSULTING, | : | |
| INC.; COMMONWEALTH LAND TITLE | : | |
| INSURANCE CO.; NATIONS TITLE | : | |
| INSURANCE OF NEW YORK, INC.; | : | |
| FIDELITY NATIONAL TITLE INSURANCE | : | |
| CO. OF NEW YORK; COASTAL TITLE | : | |
| AGENCY; DONNA PEPSNY; WEICHERT | : | |
| REALTORS; and VECCHIO REALTY, INC. | : | |
| D/B/A MURPHY REALTY BETTER HOMES | : | |
| and GARDENS, | : | |
| | : | |
| Defendants. | : | |

1.      Plaintiff brings this action for violations of the Racketeer Influenced and Corrupt Organizations Act, common-law fraud, negligence and breaches of contract.

## PARTIES

2.      Plaintiff Walsh Securities, Inc. ("Walsh Securities") is, and was at all relevant times, a Delaware corporation and wholly-owned subsidiary of Walsh Holding Company, Inc., with its principal place of business located in Parsippany-Troy Hills, New Jersey. In April 1996, Walsh Securities became a successor in interest to GF Mortgage Corp. Walsh Securities is a wholesale mortgage banker in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers or mortgage brokers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions. Walsh Securities focuses primarily on buying mortgage loans from the segment of the mortgage market known as the "subprime" market. "Subprime" mortgage loans are made to borrowers who, because of past financial dealings or because of their credit history, are unable to obtain mortgage loans from "prime" mortgage lenders at prime lending rates. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans.

3.      Defendant Cristo Property Management, Ltd., a/k/a G.J.L. Limited, upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Union County, New Jersey. Cristo Property is, and was at all relevant times, owned and controlled by defendant William J. Kane.

4.      Defendant DEK Homes of New Jersey, Inc. ("DEK Homes") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, DEK Homes is, and was at all relevant times, owned and controlled by defendant Kane.

1

5.      Defendant Oakwood Properties, Inc. ("Oakwood Properties") upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, Oakwood Properties is, and was at all relevant times, owned and controlled by defendant Kane.

6.      Defendants Cristo Property Management, Ltd. (a/k/a G.J.L. Limited), DEK Homes, and Oakwood Properties are all owned and controlled by defendant Kane and referred to herein collectively as "Cristo Property".

7.      Defendant National Home Funding, Inc. ("NHF"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. NHF is, and was at all relevant times, owned and controlled by defendant Skowrenski.

8.      Defendant Capital Assets Property Management & Investment Co., Inc. and defendant Capital Assets Property Management, L.L.C. (jointly, "Capital Assets"), upon information and belief, are, and were at all relevant times, New Jersey corporations with their principal places of business in New Jersey. Both Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. are, and were at all relevant times, owned and controlled by defendant Grieser.

9.      Defendant William J. Kane ("Kane"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Kane owns and controls Cristo Property, DEK Homes and Oakwood Properties. In addition, Kane is, and was at all relevant times, a licensed mortgage solicitor for NHF.

10.     Defendant Gary Grieser ("Grieser"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Grieser is the owner of Capital Assets.

11.     Defendant Robert Skowrenski, II, ("Skowrenski"), upon information and belief, is, and was at all relevant times, a New Jersey resident. Skowrenski is the owner of NHF.

12.     Defendant Richard Calanni ("Calanni"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Calanni is, and was at all relevant times, associated with TF Certified Real Estate Appraisals.

13.     Defendant Richard DiBenedetto ("DiBenedetto"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. DiBenedetto is, and was at all relevant times, associated with Eastern States Appraisal Services.

14.     Defendant James R. Brown ("Brown"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey. Brown is, and was at all relevant times, associated with Professional Evaluators of Union.

15.     Defendant Thomas Brodo ("Brodo"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

16.     Defendant Roland J. Pierson ("Pierson"), upon information and belief, is, and was at all relevant times, a New Jersey resident and a licensed real estate appraiser in New Jersey.

17.     Defendants Calanni, DiBenedetto, Brown, Brodo and Pierson (collectively, "the Appraisers"), are, and were at all relevant times, real property appraisers hired by NHF and Cristo Property.

18.     Defendant Stanley Yacker, Esq., ("Yacker"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

3

19.     Defendant Michael Alfieri, Esq., ("Alfieri"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

20.     Defendant Richard Pepsny, Esq., ("Richard Pepsny"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

21.     Defendant Anthony M. Cicalese, Esq., ("Cicalese"), upon information and belief, is, and was at all relevant times, a New Jersey resident and an attorney admitted to practice in New Jersey.

22.     Defendants Yacker and Cicalese jointly, ("the Closing Attorneys") were at all relevant times, approved attorneys by the title insurance companies involved in each transaction. The Closing Attorneys, together with defendants Alfieri and Richard Pepsny, were selected by Capital Assets and/or Cristo Property to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

23.     Defendant Lawrence J. Cuzzi, ("Cuzzi"), upon information and belief, is, and was at all relevant times, a New York resident.

24.     Defendant Anthony D'Apolito ("D' Apolito"), upon information and belief, is, and was at all relevant times, a New Jersey resident. D' Apolito was at all relevant times an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at NHF and other correspondents.

25.     Defendant DAP Consulting, Inc. ("DAP Consulting"), upon information and belief, is, and was at all relevant times, a New Jersey corporation located in Monmouth County, New Jersey. DAP Consulting is owned and controlled by defendant D' Apolito.

4

26.    Defendant Commonwealth Land Title Insurance Company, Inc. ("Commonwealth Title"), upon information and belief, is, and was at all relevant times, a Pennsylvania corporation with its principal place of business in Pennsylvania.

27.    Defendant Nations Title Insurance of New York Inc. ("Nations Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

28.    Defendant Fidelity National Title Insurance Company of New York, Inc. ("Fidelity Title"), upon information and belief, is, and was at all relevant times, a New York corporation with its principal place of business in New York.

29.    Defendant Coastal Title Agency, Inc. ("Coastal Title"), upon information and belief, is, and was at all relevant times, a New Jersey corporation with its principal place of business in New Jersey. Coastal Title is, and was at all relevant times, a title insurance broker that was selected by Capital Assets, Cristo, and/or the Closing Attorneys to broker title insurance for the real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

30.    Defendants Commonwealth Title, Nations Title, and Fidelity Title (collectively, "the Title Insurance Defendants") are, and were at all relevant times, title insurance companies that issued closing service protection letters and title insurance policies to Walsh Securities, as the mortgage lender, which title policies and letters, among other things, indemnified Walsh Securities against fraud by the Closing Attorneys and other Defendants.

31.    Defendant Donna Pepsny ("Donna Pepsny"), upon information and belief, is, and was at all relevant times, a resident of New Jersey and a licensed real estate broker in New Jersey in an employment or agency relationship with Weichert Realtors.

32.     Defendant Weichert Realtors ("Weichert"), upon information and belief, is, and was at all relevant times, a New Jersey real estate services firm with its principal place of business in New Jersey in an employment or agency relationship with Donna Pepsny.

33.     Defendant Vecchio Realty, Inc. d/b/a Murphy Realty Better Homes and Gardens ("Murphy Realty"), upon information and belief, was at all relevant times, a New Jersey real estate services firm with its principal place of business in New Jersey.

## JURISDICTION

34.     Jurisdiction is proper according to 28 U.S.C. § 1331 and 18 U.S.C. §1964(c).

## VENUE

35.     Venue is proper according to 28 U.S.C. § 1391(b) and 18 U.S.C. §1965(a).

## INTRODUCTION

36.     Since early 1996, defendants Cristo Property, Capital Assets, NHF, Kane,Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri, Richard Pepsny, Cicalese, Cuzzi, D'Apolito, DAP Consulting,  and Coastal Title (collectively, "the RICO Defendants") have been engaged in a pattern of racketeering activity which has resulted in approximately two hundred twenty mortgage loans being purchased by Walsh Securities from NHF for amounts ranging up to eight times the preceding sales prices of the properties at issue. Walsh Securities was induced to purchase these mortgage loans from NHF based on fraudulent misrepresentations contained in the mortgage loan applications, including appraisals of the properties at issue. The proceeds from Walsh Securities' mortgage loans would, among other things, be distributed among the RICO Defendants as their illicit profits.

37.     The RICO Defendants engaged in a pattern of racketeering throughout the State of New Jersey and elsewhere, including in Monmouth, Essex, Union and Hudson Counties,

6

where certain of the properties are located, and in Morris County, where Walsh Securities is located.

38.     Walsh Securities remains liable for a substantial portion of the value of these mortgage loans fraudulently obtained by the RICO Defendants. Walsh Securities will not be able to recover the full amounts that have been lent through foreclosures on the properties because, due to the fraudulently inflated appraisals of the real properties that secure the mortgage loans, many of the properties are not of value equal to or greater than the amount of the mortgage loans and the fraudulent sales contracts. In addition, this fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits, including the sale of the company for more than $400 million.

39.     With respect to these fraudulently obtained mortgage loans, the Title Insurance Defendants issued to Walsh Securities, as the mortgage lender, title insurance policies and closing service protection letters which required the Title Insurance Defendants to reimburse Walsh Securities for losses arising out of the fraudulent actions of the Closing Attorneys. Both of the Closing Attorneys, Yacker and Cicalese, were specifically approved to handle closings by the Title Insurance Defendants.

## FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

40.     A mortgage loan is a loan in which real property is used as collateral for the loan. The amount of a mortgage loan is a percentage, usually 70 to 75 percent, of the actual value of the property.

7

41.     Mortgage bankers and brokers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

42.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers or bankers which provide the funds for the borrowers at the time of closings. In these instances, Mortgage Bankers are paid fees, generally by the borrowers, for originating the mortgage loans so that they can then be sold to other investors. Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. § 17:11B-5, *et seq.*

43.     Potential mortgage loan borrowers who cannot obtain traditional financing from "prime" Mortgage Bankers (for example, due to poor credit histories), seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market. "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the increased delinquency risk of such mortgage loans.

44.     After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

45.     The Mortgage Bankers who deal directly with the borrowers are said to "originate" the mortgage loans. The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded. Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, references, appraisals of the underlying properties, and other documents.

46.     Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. § 45:14F-1, *et seq*. The appraisers are typically paid by the borrowers of the mortgage loans.

47.     The appraisal of the real property that is to be mortgaged is one of the most important steps in the mortgage loan process. The appraisal, which is supposed to reflect the true market value of the property, is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower. In addition, since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults on the mortgage loans. In the event of a default on the mortgage loan, such as where the borrower does not make payments under the mortgage loan, the lender can foreclose on the property, sell it, and recover the value of the mortgage loan.

48.     Originating Mortgage Bankers either keep the mortgage loans or sell the mortgage loans to other entities, typically prior to or just after the closing of the properties and the mortgage loans.

49.     Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents. Correspondents often sell their mortgage loans to lenders who are known as wholesalers. Correspondents, in their contracts for sales of mortgage loans with wholesale Mortgage Bankers, typically promise that they will stand by the genuineness of the loan applications and other necessary paperwork.

50.     Mortgage Banker wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying mortgage loans. The wholesalers usually fund the mortgage loans with short term lines of credit

9

that they have previously established with large lending institutions. The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them by issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

51.     Wholesalers who fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually prior to or on the day of the closings. The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are compiled with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

### Title Insurance And Its Role In Real Estate Transactions

52.     Title insurance is insurance that provides for coverage, in return for premiums, for insuring, guaranteeing or indemnifying owners of real property or lenders of mortgage loans on real property against certain losses or damages as a result of defects in the titles or encumbrances on the titles of the real properties. Title insurance is usually purchased every time real property is purchased or refinanced. In most instances, mortgage lenders require that owners who will be borrowing money to finance their purchases of real property acquire title insurance coverage that also protects the mortgage loan lenders who will be lending money for the financing of the properties.

53.     In almost all instances, owners or borrowers who seek to purchase title insurance do not deal directly with the companies that provide title insurance, but rather, contact title agents who act as the brokers or middlemen between the title insurance companies and the

owners or borrowers. These title agents collect premiums, issue title insurance policies on behalf of the title insurance companies, and may perform other tasks relating to the transfers of interest in the properties, including filing deeds. Title agents may be, and often are, affiliated with more than one title insurance company. Title insurance companies have relationships with multiple title agencies.

54.    Here, the Title Insurance Defendants entered into agency agreements with Coastal Title as a title agent, under which Coastal Title was granted certain rights to conduct business on behalf of the Title Insurance Defendants. Pursuant to these agency agreements, the Title Insurance Defendants delegated certain responsibilities, which Coastal Title undertook to perform on behalf of and for the benefit of the Title Insurance Defendants. The responsibilities delegated to and undertaken by Coastal Title included the origination of applications for title insurance, the preparation of abstracts, the examination of titles to real estate, the preparation and issuance of commitments, binders, and reports of title, the issuance of policies of title insurance, the issuance of closing service protection letters, and the recording of all necessary papers.

55.    As part of the title insurance policies issued to owners who are borrowing money to finance their purchases of real property, title insurance companies typically issue title policies and closing service protection letters for the benefit of the mortgage loan lenders. In these closing service protection letters, the title insurance companies agree to indemnify the mortgage loan lenders against loss in connection with, among other things, fraud or misapplication by the closing attorneys. Usually, these closing service protection letters are required by mortgage loan lenders as pre-conditions to providing the mortgage loans. The title insurance companies will usually only issue such closing service protection letters, and provide indemnification against fraud, where the closings are handled by one of the companies' approved attorneys. True and

correct copies of sample closing service protection letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

### The New Jersey Mortgage Loan Frauds

56.    In contrast to the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent. The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and by deceiving Walsh Securities into financing the mortgage loans based on these inflated values. The values were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the re-sales even took place the same day as the first purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. On the days of the closings, the Closing Attorneys would fraudulently transfer the mortgage loan proceeds provided by Walsh Securities to themselves and certain of the other RICO Defendants, even though the preconditions imposed by Walsh Securities for the transfer of such proceeds had not been met.

### "The Cristo/Capital Assets" Enterprise

57.    The RICO Defendants carried out these frauds through an unlawful enterprise, an association in fact of individuals and entities, including attorneys and appraisers (the enterprise is hereafter referred to as "the Cristo/Capital Assets Enterprise" or "the Enterprise").

58.    The RICO Defendants formed the Cristo/Capital Assets Enterprise, among other things, to turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated

appraisals. Each RICO Defendant personally played a role in the management and the operation of the Enterprise.

59.     The Cristo/Capital Assets Enterprise relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by William Kane and his companies using NHF, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and NHF, with the understanding by members of the Cristo/Capital Assets Enterprise that Walsh Securities would rely on the fraudulent applications in deciding whether to accept the mortgage loans originated by the Cristo/Capital Assets Enterprise. A true and correct copy of the Program Participant Loan Purchase And Sale Agreement between NHF and Walsh Securities, through its predecessor in interest, is attached as Exhibit D. Apart from other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

60.     Unknown to Walsh Securities, the buyer/borrowers had secretly and fraudulently agreed to convey, after the closing on the resale of the real properties, a majority percentage of the ownership of each real property to a member of the Cristo/Capital Assets Enterprise. These secret and fraudulent conveyances constituted an act of default under the mortgage loans.

### The Pattern

61.     The Cristo/Capital Assets Enterprise carried out numerous fraudulent transactions through a pattern of frauds, as follows:

        (a)     Kane, acting through Cristo Property and other entities, purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties.

13

(b)     Kane, Grieser, Donna Pepsny and/or Cuzzi identified, through personal
contacts, advertisements, and other means, individuals who were willing to buy these properties
from Cristo Property and sign the mortgage loans. Typically, these properties were purchased as
purported investment vehicles to be used as rental properties. Many of the properties, however,
were abandoned and could not be rented.

(c)     Kane, acting through Cristo Property and/or NHF or other entities, had the
properties appraised by licensed appraisers. In almost all instances, the property was appraised
by Calanni, DiBenedetto, Brown, Brodo or Pierson.

(d)     Such appraisals were in all instances for amounts falsely inflated above
what the properties were actually worth. These appraisals were for amounts up to eight times the
actual value of the properties.

(e)     Mortgage loan applications for the borrowers/buyers of the properties
were then compiled by the Cristo/Capital Assets Enterprise and submitted, through D'Apolito, to
Walsh Securities. These applications were falsified in several material respects in order to induce
Walsh Securities to finance mortgage loans well in excess of the true values of the properties.

Such false information included the following:

1) The applications included appraisals of the properties which were
fraudulently inflated.

2) The applications included purported sales prices of the properties which
reflected the fraudulent appraised values as opposed to the true values or sales prices of the
properties.

3) The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

4) The applications indicated that the buyers had provided the seller, Cristo Property, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.

5) The applications typically indicated that the seller, Cristo Property or other entities, had provided the buyers second mortgage loans in the properties, when, in fact, no bona fide second mortgages were provided and no second mortgage loan payments were ever made or intended to be made. These purported second mortgage loans were often never recorded by the Closing Attorneys or Coastal Title, further evidencing that they were not bona fide second mortgages.

6) The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a sixty percent interest in the properties to Capital Assets under secret Joint Venture Agreements.

7) The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, Cristo Property. In fact, the buyers bought the properties without paying any moneys to the seller, Cristo Property.

8) The applications typically contained other false information about the real estate transactions designed to present them as better credit risks.

(f)     D'Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh

15

Securities to finance the mortgage loans. In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF. The payments were designed to, and did, corrupt D'Apolito, place him in a conflict of interest, cause his loyalties to be divided, and cause him to breach his obligations to Walsh Securities. The payments from NHF and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D'Apolito was acting as a faithful employee.

        (g)      On the days of the closings, the Closing Attorneys would fraudulently transmit to themselves and certain other RICO Defendants, including Cristo Property and Capital Assets, the proceeds of the mortgage loans illicitly obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though they were aware that one or all of the following requirements and pre-conditions to the mortgage loans, among others, were not met: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the down payment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. In addition, the Closing Attorneys, in furtherance of the fraud, falsely certified at the time of the closings that the above mentioned pre-conditions to closing, imposed by Walsh Securities, had been met. These false certifications were made on HUD-1 settlement statements, forms required by the United States Department of Housing and Urban Development.

(h)    The Closing Attorneys, along with Richard Pepsny and Alfieri, also furthered the fraud by preparing and recording or causing to be recorded various deeds involved in these transactions. These deeds included the deeds covering the sales to Cristo Property, the deeds from Cristo Property to the borrowers, and the deeds conveying an interest in sixty percent of the properties from the borrowers to Capital Assets.

(i)    Typically, around the date designated to close these properties, the purchasers signed Powers of Attorney, secret Joint Venture Agreements with Capital Assets and deeds which conveyed sixty percent of the ownership in the properties to Capital Assets. A true and correct copy of a sample Joint Venture Agreement is attached as Exhibit E. A true and correct copy of a sample deed conveying sixty percent of the ownership in the properties to Capital Assets is attached as Exhibit F. (In Exhibit F Capital Assets is misspelled "Capital Assests.") These deeds conveying a sixty percent ownership interest were then filed or caused to be filed by either the Closing Attorneys or Coastal Title. The Joint Venture Agreements and deeds were never disclosed to Walsh Securities. Such conveyances constituted an immediate default under the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not have financed the mortgage loans had it been aware of the plans to reconvey interest in the properties.

(j)    Capital Assets then collected the rents, if any, from the rental of these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the mortgage loan payments when due and to pay other expenses of the properties. In addition, on information and belief, as in a classic pyramid fraud, funds from new mortgage loans were secretly used to make interest and principle payments on older loans. In this way, the Cristo/Capital Assets Enterprise misled Walsh Securities into believing that none of the loans

17

originated by the Cristo/Capital Assets Enterprise were delinquent. In fact, as further evidence of a classic pyramid fraud relying on new transactions to continue to fund the older transactions, most of the properties that were claimed to be renovated were never renovated and thus could not be rented. Additionally, at other properties which contained individuals who could have been renters, no attempts were made to collect rent from those individuals who were living in the properties.

      (k)    There were several variations on the scam:

      1) Some borrowers/buyers were induced to invest $1,000.00 in a corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00. Cuzzi had these purchasers execute secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney and provide their names and social security numbers. Upon information and belief, Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

      2) Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. Upon information and belief, an individual named Brian Reilly on at least one occasion on behalf of the Cristo/Capital Assets Enterprise traveled to New York to deliver closing papers which were signed by the purchasers, notarized by Reilly, and

then returned to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings.

3) Upon information and belief, Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney which were then returned to the Closing Attorneys. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments.

(l)     In sum, upon information and belief, like traditional pyramid schemes, money obtained by the Cristo/Capital Assets Enterprise through the fraudulently obtained mortgage proceeds from Walsh Securities was used to pay future investors, purchasers, and/or existing mortgage loans, as well as to provide illicit profits for the members of the Cristo/Capital Assets Enterprise.

(m)     Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities was unable to recoup the full amounts of the outstanding mortgage loans even if it foreclosed on the properties.

62.     The operations of the Cristo/Capital Assets Enterprise are illustrated in the following examples of specific properties "flipped" by the Cristo/Capital Assets Enterprise:

(a)     600 5th Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 600 5th Avenue, Asbury Park, New Jersey on December 10, 1996 for $90,000.00, which property was fraudulently appraised by Calanni for $182,500.00.

2) On December 27, 1996, 17 days after it was purchased by Cristo Property, 600 5th Avenue, Asbury Park, New Jersey was sold by Cristo Property to an individual borrower/buyer with the initials K.P. for the purported amount of $182,500.00. In fact, the sales contract was not a bona fide contract because K.P. never intended to pay that amount for the property and Cristo Property never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared and signed by Richard Pepsny and filed by Coastal Title.

3) A mortgage loan on the property, in K.P.'s name, was originated by NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $127,750.00.

4) A down payment in the amount of $18,250.00 was purportedly provided by K.P. to Cristo Property. In fact, no down payment was ever made.

5) A second mortgage loan for $36,500 at a 6% interest rate was purportedly given by Cristo Property to K.P. In fact, the second mortgage was not a bona file second mortgage loan because Cristo Property never intended to receive payment from K.P. for that loan and K.P. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.

6) In order to fraudulently represent that the property would be used as a rental property to produce income for mortgage payments, the Cristo/Capital Assets Enterprise generated false rental agreements which were attached to K.P.'s mortgage loan application.

7) Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the Enterprise, including Cristo Property and Capital Assets. Yacker transmitted such funds even though he knew that the following pre-conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) K.P. had not paid a down payment or deposit; (3) there was no bona fide second mortgage; and (4) K.P. had not paid certain closing costs. Yacker certified on a HUD-l settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

8) Prior to the closing, Fidelity Title issued a title insurance policy and a closing service protection letter to Walsh Securities, which requires Fidelity Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Coastal Title and/or Yacker, an attorney approved by Fidelity Title to perform closings, to comply with Walsh Securities' written closing instructions, or fraud of or misapplication by Coastal Title and/or Yacker in handling Walsh Securities' funds.

9) After the closing, Yacker caused Coastal Title to file a deed transferring a sixty percent interest in the property to Capital Assets.

(b)     1017-1019 Bangs Avenue, Asbury Park, New Jersey.

1) Kane, acting through Cristo Property, purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, which Property was fraudulently appraised by Brown for $200,000.00.

2) On that same day, July 25, 1996, Cristo Property sold 1017- 1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with

21

the initials J.M. In fact, the sales contract was not a bona fide contract because J.M. never

intended to pay that amount for the property and Cristo Property never intended to receive that

amount for the property. The deed for that fraudulent transaction was prepared by Richard

Pepsny and filed by Coastal Title.

3) A mortgage loan on the property, in J.M.'s name, was originated by

NHF. Walsh Securities, based on the fraudulent misrepresentations contained in the loan

application, financed the mortgage loan in the amount of $150,000.00.

4) A down payment in the amount of $20,000.00 was purportedly

provided by J.M. to Cristo Property. In fact, no down payment was ever made.

5) J.M.'s mortgage loan application contains a "gift letter" from defendant

Cuzzi which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a

gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said

gift was never made, nor was the gift that was to be part of the down payment ever given to the

seller.

6) A second mortgage loan for $30,000 at a 6% interest rate was

purportedly given by Cristo Property to J.M. In fact, the second mortgage was not a bona fide

second mortgage loan because Cristo Property never intended to receive payment from J.M. for

that loan and J.M. never intended to make payment for that loan. Moreover, the second mortgage

loan was never recorded.

7) Yacker was the closing attorney on this mortgage loan, and transmitted

the loan proceeds to himself and to other members of the Enterprise, including Cristo Property

and Capital Assets. Yacker transmitted such funds even though he knew that the following pre-

conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there

was no bona fide sales contract or bona fide sales price; (2) J.M. had not paid a down payment or deposit; (3) there was no bona fide second mortgage; and (4) J.M. had not paid certain closing costs. Yacker certified on a HUD-1 settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met.

    8) Prior to the closing, Commonwealth Title issued a title insurance policy and closing service protection letter to Walsh Securities, which requires Commonwealth Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Coastal Title and/or Yacker, an attorney approved by Commonwealth Title to perform closings, to comply with Walsh Securities' written closing instructions, or fraud of or misapplication by Coastal Title and/or Yacker in handling Walsh Securities' funds.

    9) After the closing, Yacker caused Coastal Title to file a deed transferring a sixty percent interest in the property to Capital Assets.

  63.  There are over two hundred and twenty instances of fraudulent transactions similar to the two outlined above.

### Consequences Visited Upon Walsh Securities

  64.  Following proper and timely demands by Walsh Securities that their losses be covered under the closing service protection letters and/or the title insurance policies, the Title Insurance Defendants failed to process and pay the covered claims.  To date, the Title Insurance Defendants have refused to process and pay these claims.

  65.  Additionally, as a result of the aforementioned acts, Walsh Securities experienced the diminution and/or complete loss of its value as a going concern, which exceeded $450 million.

## COUNT I

## VIOLATION OF 18 U.S.C. § 1962(c) (RICO)

66.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 65 as if fully set forth herein.

67.     18 U.S.C. Section 1962(c) makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

68.     All the RICO Defendants are persons within the meaning of 18 U.S.C. § 1961(3).

69.     In violation of the above-mentioned statute, the RICO Defendants associated with the Cristo/Capital Assets Enterprise, which was an association in fact consisting of the RICO Defendants together and with other persons not known to Plaintiff.

70.     The Cristo/Capital Assets Enterprise engaged in, and conducted activities which affected, interstate commerce.

71.     Each RICO Defendant conducted and participated in the conduct of the affairs of the Cristo/Capital Assets Enterprise and played a role in the management and operation of the enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud and commercial bribery.

72.     This pattern of racketeering included the following illegal acts defined as predicate acts of RICO liability under 18 U.S.C. § 1961, including, but not limited to the following:

        (a)     Wire fraud, as described in 18 U.S.C. § 1343, in that for the purposes of executing the RICO Defendants' scheme and artifice to defraud, and to obtain money and

property by means of false and fraudulent pretenses, representations, and promises, in each instance where Walsh Securities agreed to finance a mortgage loan originated by the Cristo/Capital Assets Enterprise, Walsh Securities wired its authorization to release funds in its line of credit to a lender in Connecticut. Walsh Securities then sent by facsimile the necessary closing service documents to a bank in Texas that acted as the custodian for the lender in Connecticut. Once satisfied that the necessary documentation was present, that bank in Texas then sent by facsimile its authorization to the Lender in Connecticut, who, in turn, then wired a bank in New York which bank then wired funds to the escrow accounts of the Closing Attorneys in New Jersey.

(b) Commercial bribery, as described in N.J.SA § 2C:21-10, in that D'Apolito, through DAP Consulting, received over $10,000.00 from Skowrenski (through NHF) and at least $90,000.00 from Kane (through Cristo Property) for transferring or causing to transfer the loans originated by the Cristo/Capital Assets Enterprise and financed by Walsh Securities.

73. The above-mentioned predicate acts of racketeering activity conducted by the RICO Defendants through the Cristo/Capital Assets Enterprise caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts by the RICO Defendants. The members of the Cristo/Capital Assets Enterprise were illicitly enriched through the receipt of the mortgage loan proceeds financed by Walsh Securities. Many of these mortgage loans became delinquent and/or defaulted. Based on the falsely inflated appraisals for the real properties and other fraudulent acts by the RICO Defendants, Walsh Securities has been unable to recoup the full amounts of many of the outstanding mortgage loans.

74. By reason of the aforesaid violations of 18 U.S.C. § 1962(c) plaintiff has suffered the following foreseeable losses and damages:

(a) the losses of moneys loaned based on the falsely appraised real properties and other fraudulent representations. Many of the properties are worth far less than the mortgage loans originated by the Cristo/Capital Assets Enterprise, and, therefore, Walsh Securities has not been able to recover the full amounts loaned;

(b) the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

(c) other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO Defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(c), and award treble damages, attorneys' fees and costs, and other such relief as may be appropriate.

## COUNT II

## VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

75. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 74 as if fully set forth herein.

76. 18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection. . . (c) of this section."

77. Through a series of activities outlined above in Count I, the RICO Defendants conspired to violate 18 U.S.C. § 1962(d) as set forth above.

78. Each of the RICO Defendants willfully and knowingly agreed and conspired with other RICO Defendants to commit the above referenced predicate acts of wire fraud and commercial bribery.

79. By reason of the aforesaid violations of 18 U.S.C. § 1962(d) plaintiff has suffered the following foreseeable losses and damages:

(a) the losses of moneys loaned based on the falsely appraised real properties and other fraudulent acts of the RICO Defendants. Many of the properties are worth far less than the mortgage loans originated by the Cristo/Capital Assets Enterprise, and, therefore, Walsh Securities has not been able to recover the full amounts loaned;

(b) the fraud perpetrated against Walsh Securities has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits;

(c) other consequential, incidental and special damages.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO Defendants are liable to it, jointly and severally, for violations of 18 U.S.C. § 1962(d), and award treble damages, attorneys' fees and costs, and other such relief as may be appropriate.

## COUNT III

## COMMON-LAW FRAUD

80. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 79 as if fully set forth herein.

81. By the illegal and fraudulent acts and schemes described above, the RICO Defendants willfully and intentionally defrauded Walsh Securities and made or caused to be made false, fraudulent and material misrepresentations and omissions to plaintiff concerning

27

mortgage loans bought by Walsh Securities from NHF. Each of these mortgage loans originated by the Cristo/Capital Assets Enterprise were fraudulently obtained in that they were based on falsely inflated appraisals. In addition, these mortgage loans also were made based on other information falsely provided to Walsh Securities including incorrect credit histories and or statements of net worth, among other things.

82.    Coastal Title issued, on behalf of the Title Insurance Defendants, closing service protection letters and title insurance commitments with the intent and purpose that Walsh Securities would rely on the same.  In doing so, Coastal Title failed to disclose that the loan transactions at issue were fraudulent and that the closing documents were not timely and properly recorded.

83.    In making and carrying out these material misrepresentations, the RICO Defendants, and each of them, intended to and did deceive Plaintiff.

84.    Plaintiff believed and relied upon these material misrepresentations and omissions.

85.    As a direct and proximate result of the RICO Defendants' material misrepresentations and omissions plaintiff suffered damages substantially in excess of $400,000,000.00.

WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the RICO Defendants are liable to it, jointly and severally, for common-law fraud and award damages, punitive damages and other such relief as may be appropriate.

## COUNT IV

## BREACH OF CONTRACT BY NHF

86.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through

85 as if fully set forth herein.

87.     On April 24, 1995, NHF and Walsh Securities (through its predecessor in interest GF Mortgage Corp.), entered into a Program Participant Loan Purchase And Sale Agreement (the "Agreement"). A true and correct copy of the Agreement is attached as Exhibit D. The Agreement between NHF and plaintiff was entered into in exchange for consideration and contained mutual covenants. The Agreement covered the sale of mortgage loans from NHF to Walsh Securities involved in the Cristo/Capital Assets Enterprise.

88.     Plaintiff has duly performed all the conditions of the Agreement.

89.     NHF, as the seller of mortgage loans, agreed to certain "Representations, Warranties and Covenants of Seller" in Article 6 of the Agreement, including the representation that all information in the loan applications prepared by NHF was true and correct. NHF has breached its representations because the loan applications contained falsely inflated appraisals and other false information.

90.     Plaintiff has notified NHF of its breach of the Agreement and its obligation to repurchase said mortgage loans. NHF has refused to repurchase said mortgage loans, in violation of Article 6 of the Agreement.

91.     By reason of the foregoing facts, plaintiff has been damaged in excess of $400,000,000.00. WHEREFORE, on this COUNT, plaintiff prays that the Court find and determine that the NHF is liable to it for breach of contract and award damages, attorneys fees and other such relief as may be appropriate.

## COUNT V

## BREACH OF CONTRACT BY THE TITLE INSURANCE DEFENDANTS

92.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through

91 as if fully set forth herein.

93.     In conjunction with real property transactions involving the Cristo/Capital Assets Enterprise, borrowers of mortgage loans from plaintiff obtained title insurance from the Title Insurance Defendants. The Title Insurance Defendants, in exchange for valuable consideration, provided Walsh Securities with title insurance policies and closing service protection letters covering the conduct of the Closing Attorneys, who were specifically approved by the Title Insurance Defendants. Walsh Securities required such title insurance policies and closing service protection letters as a pre-condition to its agreeing to provide the mortgage loans.

94.     Pursuant to these title insurance policies and closing service protection letters, the Title Insurance Defendants were and are required to reimburse plaintiff for losses arising out of, among other things, "[f]ailure of the Issuing Agent or Attorney to comply with [Walsh Securities'] written closing instructions," or fraud of or misapplication by the Issuing Agents or Closing Attorneys in handling Walsh Securities' funds. True and correct copies of sample closing service protection letters from each Title Insurance Defendant are attached as Exhibits A, B and C.

95.     Coastal Title and/or the Closing Attorneys failed to comply with Walsh Securities' closing instructions and/or engaged in fraud and misapplication in connection with the Cristo/Capital Assets Enterprise. Among other things, the Closing Attorneys fraudulently transferred mortgage loan proceeds knowing that the following pre-conditions to closings imposed by Walsh Securities, among others, had not been satisfied: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the down payment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required

for closing; (4) the borrowers had not paid certain closing expenses required for closing; and (5) the Closing Attorneys fraudulently transmitted by facsimile to Walsh Securities falsified HUD-1 Closing Statements that concealed the fact that closing funds were repeatedly being disbursed to certain RICO Defendants, in part for the seller (Cristo) to purchase the property several days after closing on the sale of the property. Walsh Securities has incurred substantial loss as a result of the fraud and/or misapplication by the Closing Attorneys.

96.     Plaintiff has duly performed all of its obligations under the closing service protection letters and title insurance policies of the Title Insurance Defendants and has notified the Title Insurance Defendants of its losses as a result of, among other things, the RICO scheme alleged herein, and Coastal Title's and/or the Closing Attorneys' noncompliance with Walsh Securities' closing instructions and their fraud and/or misapplication of Walsh Securities' funds.

97.     The Title Insurance Defendants have failed to reimburse plaintiff for the losses, which are covered under the closing service protection letters and/or the title insurance policies.

98.     The law imposes on every contract a duty of good faith and fair dealing.  In the context of an insured's claim for coverage under a contract of insurance, the insurer's duty of good faith includes a duty to process and pay covered claims in a reasonable time, or to conduct a meaningful and timely investigation to determine whether a reasonable basis for denial exists.

99.     The Title Insurance Defendants breached their respective duties of good faith and fair dealing by failing to process and pay covered claims in a reasonable time.  In connection therewith, the Title Insurance Defendants knew or recklessly disregarded the fact that they lacked a reasonable basis for denying the claims.  This is evidenced, in part, by the Title Insurance Defendants' reckless indifference to facts or proofs submitted by Walsh Securities and

by the Title Insurance Defendants' premature terminations of their investigation upon the filing of this action against them seeking coverage.

100.    As a natural and probable consequence of the aforesaid breach of contract and covenant of good faith and fair dealing, Walsh Securities has been substantially damaged, including consequential damages encompassing the diminution and/or complete loss of its value as a going concern, which exceeded $450 million.

WHEREFORE, on this COUNT, plaintiff Walsh Securities prays that the Court find and determine that the closing service protection letters and/or the title insurance policies provide coverage to Walsh Securities for losses suffered in connection with the loan transactions at issue, and that the Title Insurance Defendants breached their contract and the duty of good faith and fair dealing under the closing service protection letters and/or title insurance policies and are liable for all of the natural and probable consequences of such a breach of contract, including consequential damages, attorneys' fees, and other such relief as may be appropriate.

## COUNT VI

## NEGLIGENCE BY ALFIERI, CICALESE AND RICHARD PEPSNY

101.    Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 100 as if fully set forth herein.

102.    Defendants Alfieri, Cicalese and Richard Pepsny were at all relevant times attorneys licensed by the New Jersey Supreme Court and engaged in the practice of law, including participation in what is generally known as real estate closings and title work.

103.    Defendant Alfieri was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser, subsequent purchaser, mortgagee and to act in a professional capacity to assist in preparing documents, completing

required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

104.    Defendant Cicalese was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser, subsequent purchaser, mortgagee and to act in a professional capacity to assist in preparing documents, completing required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

105.    Defendant Richard Pepsny was called upon to prepare the necessary closing documents and represent various interests including the interests of seller, purchaser, subsequent purchaser, mortgagee and to act in a professional capacity to assist in preparing documents, completing required forms, reviewing title reports, and in closing various transactions of conveyance and mortgage between many of the parties described above.

106.    Defendants Alfieri, Cicalese and Richard Pepsny were selected by NHF, Capital Assets and/or Cristo Property to facilitate the real property closing involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

107.    By virtue of the status of defendants Alfieri, Cicalese and Richard Pepsny, and by virtue of the licenses granted to them by the New Jersey Supreme Court to practice law, and based upon the ordinary practices and procedures established for the practice of law, Alfieri, Cicalese and Richard Pepsny had certain duties and obligations to carry out their closing requirements in the ordinary course in each transaction at issues in this Complaint.

108.    Plaintiff Walsh Securities was within the class of persons relying upon the expertise of defendants Alfieri, Cicalese and Richard Pepsny in each transaction at issue in this Complaint.

109.    Notwithstanding their duties, in each transaction at issue in this Complaint, defendants Alfieri, Cicalese and Richard Pepsny negligently failed to adhere to such standards and by virtue of such negligence, and as a direct result thereby, Walsh Securities suffered substantial damages. Defendants Alfieri, Cicalese and Richard Pepsny breached their respective duties of ordinary care owed to Walsh Securities by, *inter alia*, failing to exercise that degree of ordinary care necessary to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities. In particular, defendants Alfieri, Cicalese and Richard Pepsny failed to meet or otherwise enforce the following mortgage loan requirements and preconditions: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the down payment or deposit required for closing; (3) Cristo Properties and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing.

110.    In addition, defendants Alfieri, Cicalese and Richard Pepsny (1) negligently failed to alert Walsh Securities that deposit monies called for in various transactions were not actually provided by the purchasers; (2) negligently prepared documents which by their very nature were inconsistent with the terms of the mortgage issued in favor of Walsh Securities; (3) negligently failed to record certain documents which were part of the transaction; and (4) negligently failed to follow the procedures which in the ordinary closing, fee and mortgagee, should have been followed.

WHEREFORE, on this COUNT, plaintiff Walsh Securities prays that the Court find and determine that defendants Alfieri, Cicalese and Richard Pepsny are liable to it, jointly and

34

severally, for negligence and award damages, punitive damages and other such relief as may be appropriate.

## COUNT VII

### WRONGFUL DELAY AND/OR DENIAL OF INSURANCE CLAIM
### BY TITLE INSURANCE DEFENDANTS

111. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 110 as if fully set forth herein.

112. The Title Insurance Defendants' failure to process and pay covered claims in a reasonable time was done intentionally without debatable reason and/or in reckless disregard of the fact that they had no valid reason for doing so.

113. As a natural and probable consequence of the aforementioned conduct, Walsh Securities has been substantially damaged, including consequential damages encompassing the diminution and/or complete loss of its going-concern value.

WHEREFORE, on this COUNT, plaintiff Walsh Securities prays that the Court find and determine that the Title Insurance Defendants are liable to it for wrongful delay and/or denial of the insurance claims, and award damages, including consequential damages, attorneys' fees, and such other relief as may be appropriate.

## COUNT VIII

### DECLARATION OF COVERAGE
### AGAINST THE TITLE INSURANCE DEFENDANTS

114. Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 113 as if fully set forth herein.

115.   The Title Insurance Defendants failed to reimburse Walsh Securities for the aforesaid losses, which Walsh Securities asserts are covered under the closing service protection letters and/or the loan policies.

116.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Walsh Securities seeks a declaration of the rights, duties, and obligations of the parties with respect to the title insurance policies and closing service protection letters and that the issuance of a declaratory judgment will terminate some or all of the existing controversy between the parties.

WHEREFORE, on this COUNT, plaintiff Walsh Securities prays that the Court declare and adjudge that the closing service letters and/or the loan policies provide coverage to Walsh Securities for losses suffered in connection with the loan transactions at issue.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against:

1.   All RICO Defendants jointly and severally awarding plaintiff the following relief:

(a)   Compensatory and consequential damages in an amount as yet undetermined, trebled pursuant to 18 U.S.C. § 1964(c); and

(b)   Costs of this action, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1 964(c); and

(c)   An award of punitive damages as a result of defendants' fraud; and

(d)   Other such relief as is just and equitable;

2.   NHF awarding plaintiff the following relief:

(a)   Compensatory and consequential damages in an amount as yet undetermined, and

(b)   Costs of this action, including reasonable attorneys' fees, and

36

       (c)     Other such relief as is just and equitable.

3.     All the Title Insurance Defendants awarding plaintiff the following relief:

       (a)     Compensatory and consequential damages in an amount as yet

undetermined,

       (b)     Costs of this action, including reasonable attorneys' fees, and

       (c)     Other such relief as is just and equitable.

## **DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a jury for all issues for which it has a right to a trial by jury.

                  Respectfully submitted,

                     /s/
                  Robert A. Magnanini
                  **STONE & MAGNANINI LLP**
                  150 John F. Kennedy Parkway, 4th floor
                  Short Hills, New Jersey 07078
                  (973) 218-1111
                  Counsel for Plaintiff Walsh Securities, Inc.

Dated: July 10, 2009

EXHIBIT  B

**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Defendant/Third-Party Plaintiff,
Commonwealth Land Title Insurance Company

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WALSH SECURITIES, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>CRISTO PROPERTY MANAGEMENT, LTD., a/k/a<br>G.J.L. LIMITED, DEK HOMES OF NEW JERSEY,<br>INC., OAKWOOD PROPERTIES INC.,<br>NATIONAL HOME FUNDING, INC., CAPITAL<br>ASSETS PROPERTY MANAGEMENT &<br>INVESTMENT CO., INC., CAPITAL ASSETS<br>PROPERTY MANAGEMENT, L.L.C., WILLIAM J.<br>KANE, GARY GRIESER, ROBERT<br>SKOWRENSKI, II, RICHARD CALANNI,<br>RICHARD DIBENEDETTO, JAMES R. BROWN,<br>THOMAS BRODO, RONALD J. PIERSON,<br>STANLEY YACKER, ESQ., MICHAEL ALFIERI,<br>ESQ., RICHARD PEPSNY, ESQ., ANTHONY M.<br>CICALESE, ESQ., LAWRENCE M. CUZZI,<br>ANTHONY D'APOLITO, DAP CONSULTING,<br>INC., COMMONWEALTH LAND TITLE<br>INSURANCE COMPANY, NATIONS TITLE<br>INSURANCE OF NEW YORK INC., FIDELITY<br>NATIONAL TITLE INSURANCE COMPANY OF<br>NEW YORK, COASTAL TITLE AGENCY,<br>DONNA PEPSNY, WEICHERT REALTORS, and<br>VECCHIO REALTY, INC. D/B/A MURPHY<br>REALTY BETTER HOMES and GARDENS,<br><br>                    Defendants.<br>and<br><br>COMMONWEALTH LAND TITLE INSURANCE<br>COMPANY<br><br>          Defendant/Third-Party Plaintiff,<br>v.<br><br>ROBERT WALSH, JAMES WALSH and<br>ELIZABETH ANN DeMOLA,<br><br>          Third-Party Defendants. | Civil Action No. 97-cv-3496 (DRD) (MAS)<br>Honorable Dickinson R. Debevoise<br><br><br><br>**ANSWER TO FOURTH AMENDED<br>COMPLAINT, SEPARATE DEFENSES,<br>ANSWER TO CROSS-CLAIMS, CROSS-<br>CLAIM FOR CONTRIBUTION, CROSS-<br>CLAIM FOR INDEMNIFICATION AND<br>THIRD-PARTY COMPLAINT AGAINST<br>ROBERT WALSH, JAMES WALSH AND<br>ELIZABETH ANN DeMOLA** |

MEI 8783046v.1

Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Company (hereinafter "Commonwealth"), a corporation of the Commonwealth of Pennsylvania, having its principal place of business in the Commonwealth of Virginia, by way of Answer to the Fourth Amended Complaint, says:

1.     Answering the allegations of paragraph 1, insofar as they are directed at this defendant, they are denied.  This defendant is without sufficient knowledge of information to admit or deny the remaining allegations of paragraph 1.

## AS TO PARTIES

2.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 2.

3.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 3.

4.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 4.

5.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 5.

6.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 6.

7.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 7.

8.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 8.

9.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 9.

-2-

10.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 10.

11.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 11.

12.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 12.

13.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 13.

14.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 14.

15.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 15.

16.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 16.

17.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 17.

18.     Answering the allegations of paragraph 18, this defendant admits that to its knowledge defendant Stanley Yacker, Esq. was an attorney admitted to practice in New Jersey. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 18.

19.     Answering the allegations of paragraph 19, this defendant admits that to its knowledge defendant Michael Alfieri, Esq. was an attorney admitted to practice in New Jersey.

This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 19.

20. Answering the allegations of paragraph 20, this defendant admits that to its knowledge defendant Richard Pepsny, Esq. was an attorney admitted to practice in New Jersey. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 20.

21. Answering the allegations of paragraph 21, this defendant admits that to its knowledge defendant Anthony M. Cicalese, Esq. was an attorney admitted to practice in New Jersey. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 21.

22. Answering the allegations of paragraph 22, this defendant admits that on certain transactions closing service letters were issued on behalf of defendant Yacker and defendant Cicalese. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 22.

23. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 23.

24. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 24.

25. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 25.

26. Answering the allegations of paragraph 26, this defendant admits that at the time of the transactions referred to in the Fourth Amended Complaint it was a corporation of the Commonwealth of Pennsylvania with its principal place of business in the Commonwealth of

-4-

Pennsylvania. This defendant states that at the current time it is a corporation of the Commonwealth of Pennsylvania with its principal place of business in the Commonwealth of Virginia. The remaining allegations of paragraph 26 are denied.

27. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 27.

28. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 28.

29. Answering the allegations of paragraph 29, this defendant admits that defendant Coastal Title Agency, Inc. engages in business in New Jersey and is and was licensed as a title insurance agent by the State of New Jersey. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 29.

30. Answering the allegations of paragraph 30, this defendant admits that it is a title insurer and admits that defendant Coastal Title Agency, Inc. issued certain Closing Service Letters. With respect to the terms of the Closing Service Letters, they speak for themselves. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 30.

31. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 31.

32. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 32.

33. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 33.

-5-

## AS TO JURISDICTION

34.    This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 34.

## AS TO VENUE

35.    This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 35.

## AS TO INTRODUCTION

36.    This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 36.

37.    This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 37.

38.    This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 38.

39.    Answering the allegations of paragraph 39, this defendant admits that defendant Coastal Title Agency, Inc. issued certain Closing Service Letters.  Insofar as the remaining allegations of paragraph 39 are directed at this defendant, they are denied.  This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 39.

## AS TO FACTUAL ALLEGATIONS

### The Mortgage Banking Industry

40.    Answering the allegations of paragraph 40, this defendant admits that a loan can be made in which real property is used as collateral for the loan.  The remaining allegations of paragraph 40 are denied.

41.    The allegations of paragraph 41 are admitted.

-6-

ME1 8783046v.1

42.     Answering the allegations of paragraph 42, this defendant admits that certain mortgage bankers do not utilize their own funds in making mortgage loans, and that certain mortgage bankers sell mortgage loans to other parties which provide the funds for the borrowers at the time of closings.  This defendant further admits that in certain transactions mortgage bankers are paid fees by borrowers for originating mortgage loans.  This defendant further admits that mortgage bankers can be licensed by the State of New Jersey.  The remaining allegations of paragraph 42 are denied.

43.     Answering the allegations of paragraph 43, this defendant admits that there are certain borrowers who cannot obtain traditional financing because of an increased delinquency risk and who accordingly pay a higher than market interest rate.  The remaining allegations of paragraph 43 are denied.

44.     Answering the allegations of paragraph 44, this defendant admits that mortgage loan applications are taken for mortgage loans.  The remaining allegations of paragraph 44 are denied.

45.     Answering the allegations of paragraph 45, this defendant admits that there are certain mortgage bankers who deal directly with borrowers and who take certain paperwork from prospective borrowers, including mortgage loan applications and other documents.  The remaining allegations of paragraph 45 are denied.

46.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 46.

47.     Answering the allegations of paragraph 47, this defendant admits that with respect to certain mortgage loans appraisals of the property securing the loan are done.  This defendant

-7-

also admits that on certain mortgage loans appraisals are relied upon by certain lenders. The remaining allegations of paragraph 47 are denied.

48. The allegations of paragraph 48 are denied.

49. Answering the allegations of paragraph 49, this defendant admits that there are persons known as "Correspondents" who sell mortgage loans to lenders. The remaining allegations of paragraph 49 are denied.

50. Answering the allegations of paragraph 50, this defendant admits that certain entities buy mortgage loans from correspondents and those entities fund the mortgage loans in a variety of ways, and from time to time those entities retain the mortgage loans or resell them. The remaining allegations of paragraph 50 are denied.

51. Answering the allegations of paragraph 51, this defendant admits that certain entities who fund mortgage loans originated by correspondents provide certain instructions to closing attorneys. The remaining allegations of paragraph 51 are denied.

## AS TO TITLE INSURANCE AND ITS ROLE IN REAL ESTATE TRANSACTIONS

52. Answering the allegations of paragraph 52, this defendant admits that title insurance is insurance that provides for specified coverage in return for premiums. This defendant further admits that title insurance is from time to time purchased when real property is purchased or refinanced, and that certain mortgage lenders require that owners who borrow money to finance purchases of real property acquire title insurance coverage. The remaining allegations of paragraph 52 are denied.

53. Answering the allegations of paragraph 53, this defendant admits that from time to time owners or borrowers who seek to purchase title insurance do not deal directly with the title insurer in connection with purchase of the insurance. This defendant also admits that from time to time title agents perform certain specified tasks with respect to the purchase of title

-8-

insurance. This defendant also admits that from time to time certain agents may be affiliated with more than one title insurance company. This defendant also admits that from time to time certain title insurance companies may have relationships with more than one title agency. The remaining allegations of paragraph 53 are denied.

54. Answering the allegations of paragraph 54, insofar as they are directed at this defendant, they are denied. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 54.

55. Answering the allegations of paragraph 55, this defendant admits that certain title insurers and/or their agents on certain occasions issue Closing Service Letters. With respect to the terms of the Closing Service Letters, they speak for themselves. This defendant admits that Exhibit A attached to the Complaint is a Closing Service Letter issued by co-defendant Coastal Title Agency, Inc. The remaining allegations of paragraph 55 are denied.

## AS TO THE NEW JERSEY MORTGAGE LOAN FRAUDS

56. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 56.

## AS TO "THE CRISTO/CAPITAL ASSETS" ENTERPRISE

57. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 57.

58. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 58.

59. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 59.

60. This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 60.

## AS TO THE PATTERN

61.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 61.

62.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 62.

63.     Answering the allegations of paragraph 63, insofar as they are directed at this defendant, they are denied.  This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 63.

## AS TO CONSEQUENCES VISITED UPON WALSH SECURITIES

64.     Answering the allegations of paragraph 64, this defendant admits that it has not made any payments to plaintiff.  The remaining allegations of paragraph 64 are denied.

65.     The allegations of paragraph 65 are denied.

## AS TO COUNT I

## VIOLATION OF 18 U.S.C. § 1962(c) RICO

Count I of the Fourth Amended Complaint seeks no judgment against this defendant and accordingly no answer is required of this defendant.

## AS TO COUNT II

## VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

Count II of the Fourth Amended Complaint seeks no judgment against this defendant and accordingly no answer is required of this defendant.

## AS TO COUNT III

## COMMON-LAW FRAUD

Count III of the Fourth Amended Complaint seeks no judgment against this defendant and accordingly no answer is required of this defendant.

MEI 8783046v.1

## AS TO COUNT IV

## BREACH OF CONTRACT BY NHF

Count IV of the Fourth Amended Complaint seeks no judgment against this defendant and accordingly no answer is required of this defendant.

## AS TO COUNT V

## BREACH OF CONTRACT BY THE TITLE INSURANCE DEFENDANTS

92.     The answers to repeated allegations are repeated as though set forth herein.

93.     Answering the allegations of paragraph 93, this defendant admits that certain borrowers obtained title insurance issued by this defendant and that this defendant on certain loans provided plaintiff with Closing Service Letters.  The remaining allegations of paragraph 93 are denied.

94.     Answering the allegations of paragraph 94, the terms and conditions of the Closing Service Letters speak for themselves.  This defendant admits that the Closing Service Letter attached as Exhibit A to the Fourth Amended Complaint is a Closing Service Letter issued by co-defendant Coastal Title Agency, Inc.  The remaining allegations of paragraph 94 are denied.

95.     This defendant is without sufficient knowledge or information to admit or deny the allegations of paragraph 95.

96.     This defendant admits that plaintiff has notified this defendant that plaintiff has allegedly sustained losses on certain loans.  The remaining allegations of paragraph 96 are denied.

97.     Answering the allegations of paragraph 97, this defendant admits that it has not made any payments to plaintiff.  The remaining allegations of paragraph 97 are denied.

98.     The allegations of paragraph 98 are denied.

-11-

MEI 8783046v.1

99.     Answering the allegations of paragraph 99, insofar as they are directed at this defendant, they are denied.  This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 99.

100.    Answering the allegations of paragraph 100, insofar as they are directed at this defendant, they are denied.  This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 100.

## AS TO COUNT VI

### NEGLIGENCE BY ALFIERI, CICALESE AND RICHARD PEPSNY

Count VI of the Fourth Amended Complaint seeks no judgment against this defendant and accordingly no answer is required of this defendant.

## AS TO COUNT VII

### WRONGFUL DELAY AND/OR DENIAL OF INSURANCE CLAIM BY TITLE INSURANCE DEFENDANTS

111.    The answers to repeated allegations are repeated as though set forth herein.

112.    Answering the allegations of paragraph 112, insofar as they are directed at this defendant, they are denied.  This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 112.

113.    Answering the allegations of paragraph 113, insofar as they are directed at this defendant, they are denied.  This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 113.

## AS TO COUNT VIII

### DECLARATION OF COVERAGE AGAINST THE TITLE INSURANCE DEFENDANTS

114.    The answers to repeated allegations are repeated as though set forth herein.

ME1 8783046v.1

115. Answering the allegations of paragraph 115, insofar as they are directed at this defendant, they are denied. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 115.

116. Answering the allegations of paragraph 116, insofar as they are directed at this defendant, they are denied. This defendant is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 116.

## FIRST SEPARATE DEFENSE

The Fourth Amended Complaint fails to state claim upon which relief can be granted as to this defendant.

## SECOND SEPARATE DEFENSE

Plaintiff's Fourth Amended Complaint against this defendant is barred by its own negligent conduct and the conduct of its agents, employees and officers.

## THIRD SEPARATE DEFENSE

Plaintiff's Fourth Amended Complaint against this defendant is barred by the acts of its agents, employees and officers which constitute laches.

## FOURTH SEPARATE DEFENSE

Plaintiff's Fourth Amended Complaint against this defendant is barred by the facts of its agents, employees and officers which constitute estoppel.

## FIFTH SEPARATE DEFENSE

Plaintiff's Fourth Amended Complaint against this defendant is barred by the acts of its agents, employees and officers which constitute waiver.

## SIXTH SEPARATE DEFENSE

Plaintiff Walsh Securities, Inc., as assignee of any Closing Service Letters, would have no higher rights under those letters than the assignor of the letters.

-13-

MEI 8783046v.1

## ANSWER TO CROSS-CLAIMS

This defendant denies any cross-claims made against it including but not limited to any cross-claims for contribution and/or cross-claims for indemnity.

## CROSS-CLAIM FOR CONTRIBUTION

Defendant, Commonwealth Land Title Insurance Company, denies any liability to plaintiff or to any other defendant, but if Commonwealth Land Title Insurance Company is found liable, it demands contribution from Cristo Property Management, Ltd., a/k/a G.J.L. Limited, Dek Homes of New Jersey, Inc., Oakwood Properties, Inc., National Home Funding, Inc., Capital Assets Property Management & Investment Co., Inc., Capital Assets Property Management, L.L.C., William Kane, Gary Grieser, Robert Skowrenski, II, Richard Calanni, Richard DiBenedetto, James R. Brown, Thomas Brodo, Ronald Pierson, Stanley Yacker, Esq., Michael Alfieri, Esq., Richard Pepsny, Esq., Anthony M. Cicalese, Esq., Lawrence Cuzzi, Anthony D'Apolito, DAP Consulting, Inc., Nations Title Insurance of New York, Inc., Fidelity National Title Insurance Company of New York, Coastal Title Agency, Donna Pepsny, Weichert Realtors, and Vecchio Realty, Inc. d/b/a Murphy Realty Better Homes and Gardens pursuant to the New Jersey Tortfeasors Contribution Act.

## CROSS-CLAIM FOR INDEMNIFICATION

While denying any liability to the plaintiff or to any other defendant whatsoever, defendant Commonwealth Land Title Insurance Company nevertheless asserts that any losses sustained by plaintiff or by any other defendant were the proximate result of the actions of defendants Stanley Yacker, Esq., Michael Alfieri, Esq., Richard Pepsny, Esq., Anthony M. Cicalese, and Coastal Title Agency, which actions were primary and active, and if defendant Commonwealth Land Title Insurance Company is found liable to plaintiff with respect to such damages, such liability results solely from secondary, imputed, vicarious or passive negligence

-14-

MEI 8783046v.1

and defendants Stanley Yacker, Esq., Michael Alfieri, Esq., Richard Pepsny, Esq., Anthony M. Cicalese, and Coastal Title Agency are liable to defendant Commonwealth Land Title Insurance Company by way of indemnification for any and all sums which defendant Commonwealth Land Title Insurance Company may be required to pay in this action.

### THIRD-PARTY COMPLAINT

Defendant/third-party plaintiff Commonwealth Land Title Insurance Company ("Commonwealth"), by way of Third Party Complaint against third-party defendants Robert Walsh, James Walsh and Elizabeth Ann DeMola says:

1.    Plaintiff has commenced an action against defendant/third-party plaintiff Commonwealth for the causes set forth in the Fourth Amended Complaint, a copy of which is attached hereto as Exhibit A.

2.    At all material times herein, third-party defendants, Robert Walsh, James Walsh and Elizabeth Ann DeMola were officers, directors and/or employees of Walsh Securities, Inc.

3.    The third-party defendants were negligent, or engaged in fraud, or breached their legal and/or fiduciary duties, or otherwise were engaged in wrongdoing or fault, which caused or contributed to the losses claimed by plaintiff in this case.

4.    As a direct result of the negligence or fraud or breach of their legal and/or fiduciary duties or the wrongdoing or the fault of third-party defendants, while defendant/third-party plaintiff Commonwealth denies any liability to plaintiff or to any other defendant, if defendant/third-party plaintiff Commonwealth is found liable, it is entitled to contribution from third-party defendants Robert Walsh, James Walsh and/or Elizabeth Ann DeMola pursuant to the New Jersey Tortfeasors Contribution Act.

-15-

WHEREFORE, defendant/third-party plaintiff Commonwealth demands judgment against third-party defendants Robert Walsh, James Walsh and Elizabeth Ann DeMola, jointly and severally.

McCARTER & ENGLISH, LLP
Attorneys for Defendant/Third-Party
  Plaintiff Commonwealth Land Title
Insurance Company

By:

David R. Kott
A Member of the Firm

Dated: 7|23|09

-16-

## AFFIDAVIT OF SERVICE

STATE OF NEW JERSEY  )
                            )ss.:
COUNTY OF ESSEX  )

        NANETTE R. McCALL, of full age, being duly sworn according to law, upon her oath deposes and says:

        1.      I am employed by the firm of McCarter & English, LLP, attorneys for Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Company in the within matter.

        2.      On July 23, 2009, I caused to be delivered by electronic filing, regular mail and/or certified mail Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Company's Answer to Fourth Amended Complaint, Separate Defenses, Answer to Cross-Claims, Cross-Claim for Contribution, Cross-Claim for Indemnification and Third-Party Complaint Against Robert Walsh, James Walsh and Elizabeth Ann DeMola upon the persons named in the attached Service List.

                                        *Nanette R. McCall*
                                        NANETTE R. McCALL

Sworn and subscribed to
before me this 23 day
of July, 2009.

*Debra Anne Kaufman*

**DEBRA ANNE KAUFMAN**
**A Notary Public of New Jersey**
**My Commission Expires 12/1/2010**

ME1 8783046v.1