**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Defendant/Third Party Plaintiff
    Commonwealth Land Title Insurance Company

|  |  |
|---|---|
| WALSH SECURITIES, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>CRISTO PROPERTY MANAGEMENT, LTD., A/K/A G.J.L. Limited, ET AL.,<br><br>        Defendants. | UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF NEW JERSEY<br><br>Civil Action No. 97-cv-3496 (DRD)(MAS)<br><br>Hon. Dickinson R. Debevoise, U.S.S.D.J.<br>Hon. Michael A. Shipp, U.S.M.J.<br><br>**CERTIFICATION OF GARY R. TULP IN SUPPORT OF DEFENDANT COMMONWEALTH LAND TITLE INSURANCE COMPANY'S LETTER BRIEF SEEKING PERMISSION TO INQUIRE INTO THE TERMS OF THE SETTLEMENT AGREEMENTS AMONG PLAINTIFF AND CO-DEFENDANTS** |

**GARY R. TULP**, hereby certifies as follows:

1.     I am an attorney at law of the State of New Jersey and am associated with the firm of McCarter & English, LLP, attorneys for Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Company ("Commonwealth") in this case. I make this Certification in support of Commonwealth's application for permission to inquire into the terms of the settlement agreements entered into between plaintiff and co-defendants Messrs. Skowrenski and Alfieri. I am fully familiar with the facts and information set forth herein.

2.      Attached hereto as Exhibit A is a true and accurate copy of pertinent portions of the transcript of the Deposition of Robert C. Walsh, dated April 9, 2010.

3.      Attached hereto as Exhibit B is a true and accurate copy of pertinent portions of the transcript of the Deposition of Robert Walter Skowrenski, II, dated May 25, 2010.

4.      Attached hereto as Exhibit C is a true and accurate copy of pertinent portions of the transcript of the Deposition of Michael Alfieri, dated June 2, 2010.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

GARY R. TULP

Dated:  August 16, 2010

2

# **EXHIBIT A**

ME1 10392990v.1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2            CIVIL NO. 97-3496 (DRD)

 3     ---------------------------

       WALSH SECURITIES,           :
 4     INC.,                       :
                                   :
 5            Plaintiff,           :
                                   :
 6            v.                   :
                                   :
 7     CRISTO PROPERTY             :
       MANAGEMENT,LTD., a/k/a      :
 8     G.J.L. LIMITED; DEK         :
       HOMES OF NEW JERSEY,        :
 9     INC.; OAKWOOD               :
       PROPERTIES, INC.;           :
10     NATIONAL HOME FUNDING,      :
       INC.; CAPITAL ASSETS        :
11     PROPERTY MANAGEMENT &       :
       INVESTMENT CO., INC.;       :
12     CAPITAL ASSETS              :
       PROPERTY MANAGEMENT,        :
13     L.L.C.; WILLIAM KANE;       :
       GARY GRIESER; ROBERT        :
14     SKOWRENSKI, II;             :
       RICHARD CALANNI;            :
15     RICHARD DI BENEDETTO;       :
       JAMES R. BROWN; THOMAS      :
16     BRODO; ROLAND PIERSON;      :
       STANLEY YACKER, ESQ.;       :
17     MICHAEL ALFIERI, ESQ.;      :
       RICHARD PEPSNY, ESQ.;       :
18     ANTHONY M. CICALESE,        :
       ESQ.; LAWRENCE CUZZI;       :
19     ANTHONY D'APOLITO; DAP      :
       CONSULTING, INC.;           :
20     COMMONWEALTH LAND           :
       TITLE INSURANCE CO.;        :
21     NATIONS TITLE               :
       INSURANCE OF NEW YORK,      :
22     INC.;                       :
                                   :
23                                 :
                                   :
24                                 :
                                   :
25                                 :
                                   :
```

COPY

DEPOSITION UPON
ORAL EXAMINATION
OF
ROBERT C. WALSH



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

```
 1                              :
     FIDELITY NATIONAL           :
 2   TITLE INSURANCE CO. OF      :
     NEW JERSEY; COASTAL         :
 3   TITLE AGENCY; DONNA         :
     PEPSNY; WEICHERT            :
 4   REALTORS and VECCHIO        :
     REALTY, INC. D/b/a          :
 5   MURPHY REALTY BETTER        :
     HOMES AND GARDENS,          :
 6                               :
         Defendants.             :
 7   ------------------------
 8
 9
10
11        T R A N S C R I P T of the stenographic
12   notes of HOWARD A. RAPPAPORT, a Notary Public and
13   Certified Shorthand Reporter of the State of
14   New Jersey, Certificate No. XI00416, taken at the
15   offices of MC CARTER & ENGLISH, LLP, Four Gateway
16   Center, Newark, New Jersey, on Friday,
17   April 9, 2010, commencing at 9:35 a.m.
18
19
20
21
22
23
24
25
```

```
 1
 2                  I N D E X
 3
     WITNESS                       PAGE
 4
 5   ROBERT C. WALSH
 6   Direct examination by Mr. Kott        6
     Cross-Examination by Mr. Hayes      172
 7
 8   EXHIBITS    DESCRIPTION        FOR IDENT.
 9   Robert    Notice to take oral        5
     Walsh-1     deposition of plaintiff
10              Walsh Securities
     Robert    Fourth amended complaint   5
11   Walsh-2
     Robert    Letter dated April 3,      5
12   Walsh-3     1998 from Walsh
               Securities to William T.
13             Lutz
     Robert    Letter dated July 3, 1997  107
14   Walsh-4
     Robert    Letter dated July 30,      108
15   Walsh-5     1996
     Robert    Agreement of settlement    110
16   Walsh-6
17
18
19
20
21
22
23
24
25
```

```
 1   A P P E A R A N C E S:
 2   STONE & MAGNANINI
     150 John F. Kennedy Parkway
 3   Short Hills, New Jersey 07078
     BY:  ROBERT A. MAGNANINI, ESQ.,
 4      AMY WALKER WAGNER, ESQ.,
     for the Plaintiff
 5
     MC CARTER & ENGLISH, LLP
 6   Four Gateway Center
     100 Mulberry Street
 7   Newark, New Jersey 07102-0652
     BY:  DAVID R. KOTT, ESQ.,
 8   for Defendant/Third-Party Plaintiff Commonwealth Land
     Title Insurance Company
 9
     FOX, ROTHSCHILD, O'BRIEN & FRANKEL
10   997 Lenox Drive
     Lawrenceville, New Jersey 08648
11   BY:  EDWARD J. HAYES, ESQ.,
     for Defendants Nations Title Insurance and
12   Fidelity National Title Insurance
13   METHFESSEL & WERBEL
     3 Ethel Road
14   Suite 300
     Edison, New Jersey 08818
15   BY:  MARTIN R. MC GOWAN, ESQ.,
     for Coastal Title Agency
16
17
18
19
20
21
22
23
24
25
```

```
 1        (Exhibits marked for identification
 2   Robert Walsh-1, Notice to take oral deposition of
 3   plaintiff Walsh Securities; Robert Walsh-2, Fourth
 4   amended complaint; Robert Walsh-3, Letter dated
 5   April 3, 1998 from Walsh Securities to William T.
 6   Lutz.)
 7        MR. KOTT:  Before we swear the witness,
 8   I had marked for identification exhibit Robert
 9   Walsh-1, which is a notice to take oral deposition of
10   plaintiff Walsh Securities, Inc. which I served on
11   Mr. Magnanini.
12        Robert Walsh-2 is the fourth amended
13   complaint that is filed as document 302, filed with
14   the clerk electronically on 07/10/2009.  Attached to
15   it is document number 302-2, electronically filed the
16   same day, which are the exhibits.
17        Exhibit Robert Walsh-3 is an April 3,
18   1998 letter and its enclosures written by Fred H.
19   Schlesinger, vice president and general counsel of
20   Walsh Securities, Inc., to William T. Lutz, Esquire,
21   Sedwick Law Firm, apparently making a claim under a
22   mortgage bankers bond.
23        MR. MAGNANINI:  Do you have copies of
24   those?  I didn't bring any.
25        MR. KOTT:  Yes.
```



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

106

1      Now, it was our assumption -- that's why
2  I said it was assumed -- that a good chance that
3  would be a fraudulent loan.
4      It didn't mean that we lost a lot of
5  money on those particular loans.  It just meant those
6  were loans that we had to deal with and we had to
7  work those loans out.
8      Q      That one and a half percent, we are
9  dealing with about 220 loans in this case?
10     A      Yes.
11     Q      The one and a half percent, how many
12 loans does that represent company-wide?
13     A      Probably about the same.
14     Q      Now the arithmetic is not adding up.  I
15 asked you non NHF loans.
16     A      That was about one and a half, two
17 percent of our total loans that were closed.
18     It's coming out, equating to about the
19 same number, but not anything to do with that number.
20 It is a coincidence.
21     Q      Let me try it this way.
22     You received non-fraud -- I'm sorry,
23 withdrawn.
24     You received fraud loans from people
25 other than NHF, is that true?

107

1      A      That's correct.
2      Q      And about one and a half percent of your
3  portfolio were fraud loans received from people other
4  than NHF, is that true?
5      A      Presumed fraud loans.  I can't sit here
6  today and tell you that.
7      I'm saying that the one and a half
8  percent, Mr. Kott, were loans that didn't make their
9  first payment.
10     Q      You received approximately one and a
11 half percent loans other than from NHF in which the
12 loan -- in which there was not a payment on the first
13 payment, correct?
14     A      That is correct.
15     Q      That was presumed to be a fraud, is that
16 correct?
17     A      That's correct.
18     MR. MAGNANINI:  David, when you get to a
19 break?
20     MR. KOTT:  Let's break.
21     (Recess at 11:50 a.m.)
22     (Deposition resumes at 12:05 p.m.)
23     MR. KOTT:  Will you mark this?
24     (Exhibits marked for identification
25 Robert Walsh-4, Letter dated July 3, 1997;

108

1  Robert Walsh-5, Letter dated July 30, 1996.)
2      MR. KOTT:  Okay, we are at 12:10, we
3  will go back on.
4  BY MR. KOTT:
5      Q      Let me follow up with one or two
6  questions.
7      About the failure to make the first
8  payment, which is a strong suspicion of a fraud that
9  we talked about, do you remember that?
10     A      Yes, I do.
11     Q      About when did that first begin to
12 happen at Walsh?
13     A      It was standard in the industry.  It
14 wasn't unique to Walsh.
15     Q      Okay.
16     A      Almost all the players had it.
17     Q      Was it a greater percentage of loans in
18 the New Jersey market than in your other market?
19     A      Probably a little bit more in Michigan.
20     Q      I marked earlier exhibit Robert Walsh-2,
21 which is the fourth amended complaint.
22     I assume that is something that you
23 reviewed in preparation for your deposition?
24     A      It was.
25     Q      Is there any thing stated in the fourth

109

1  amended complaint that is untrue?
2      A      Not that I recall.
3      Q      In the fourth amended complaint there
4  are certain allegations against Robert Skowrenski and
5  his company, National Home Funding, which we have
6  been calling NHF.  What was his involvement in these
7  frauds?
8      A      We know that NHF's paper came in.  We
9  know that Mr. Kane brought in that particular paper.
10     That is the extent -- I read obviously
11 the depositions of people that pointed a finger to
12 Mr. Skowrenski.
13     Walsh Securities' firsthand knowledge of
14 what Mr. Skowrenski knew or didn't know, I don't have
15 any information.
16     Q      Your company sued Mr. Skowrenski,
17 correct?
18     A      That's correct.
19     Q      Your company settled with him?
20     A      Yes.
21     Q      What was the terms of the settlement?
22     MR. MAGNANINI:  I guess you got the
23 settlement.  Was that confidential?  I thought it
24 was.
25     MR. HAYES:  I don't really care what you



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

110

1  called it. I can't imagine that you could consider
2  it confidential in this litigation.
3        MR. KOTT: Oh good, a fight is breaking
4  out.
5        I'm going to mark a document produced by
6  Mr. Hayes, but actually it is a document 359
7  electronically filed on 10-26-09. It is entitled,
8  "Agreement of settlement release between W/WFI
9  interest and S/NFH interest, and we'll mark that as
10  exhibit Robert Walsh-6, Mr. Rappaport.
11        (Exhibit marked for identification
12  Robert Walsh-6, Agreement of settlement.)
13      Q    Call your attention, Mr. Walsh, to page
14  four of the document, Robert Walsh-6. I would ask
15  you, is that your signature on the bottom left-hand
16  corner?
17        (Exhibit handed to the witness.)
18      A    Yes.
19        MR. MAGNANINI: David, Amy is right.
20        MR. KOTT: Amy is always right.
21        MR. MAGNANINI: That's why I'm listening
22  to her.
23        Judge Shipp said this was sealed. They
24  took it off the public record.
25        Remember he had to refile?

111

1        MR. KOTT: Okay.
2        MR. MAGNANINI: Off the record for a
3  second, Howard.
4        (Record read.)
5      Q    Tell me what facts, if any, Walsh
6  Securities has with respect to Mr. Skowrenski's
7  involvement in the fraud?
8      A    The company does not have any direct
9  facts about Mr. Skowrenski. We read certain things
10  in the deposition. We know that National Home
11  Funding was sending in loans. The paper of National
12  Home Funding was sending in loans, and we know that
13  Mr. Kane was delivering loans.
14      Q    Was delivering the loans from NHF?
15      A    Correct, or they were going through
16  Mr. D'Apolito.
17      Q    Well, in the fourth amended complaint
18  there is some fairly specific allegations against
19  Mr. Skowrenski, is that true?
20      A    That is correct.
21      Q    And those allegations essentially allege
22  that he was an integral part of these mortgage
23  frauds, is that correct?
24      A    That's correct.
25      Q    And you have no reason to believe that

112

1  what is stated in the fourth amended complaint is
2  untrue, is that correct?
3      A    That's correct.
4      Q    Earlier we talked about the lulling
5  letters. Let me show you exhibit Robert Walsh-4.
6        Is that one of the lulling letters?
7        (Exhibit handed to the witness.)
8        (Pause.)
9      A    It is.
10      Q    And on page -- the third page there is a
11  signature. Is that your signature?
12      A    It is.
13      Q    You in fact signed this letter, is that
14  correct?
15      A    That is correct.
16      Q    And this letter was addressed to
17  Greenwich Capital Markets?
18      A    That's correct.
19      Q    They were people from whom you were
20  borrowing money?
21      A    That is correct.
22      Q    If Greenwich Capital Markets cut you
23  off, meaning they would stop lending you money, you
24  would have trouble remaining in business, is that
25  true?

113

1      A    They did cut us off.
2      Q    Did that cause significant business
3  problems for you?
4      A    It did.
5      Q    Ultimately to your going out of
6  business?
7      A    No.
8        MR. MAGNANINI: Objection to form.
9      A    It didn't help the situation, but they
10  cut us off just about the time of this letter, a
11  little prior.
12      Q    In any event, at the time this letter
13  was written, your company very much wanted Greenwich
14  Capital Markets to continue to loan money to your
15  company?
16      A    That is correct.
17      Q    So you could use that money to loan to
18  borrowers, correct?
19      A    Finance the loans that we were
20  acquiring, correct.
21      Q    Okay.
22        Did you have an understanding of why in
23  the Bette Ann DeMola's prosecution the federal
24  government considered this letter to be improper?
25      A    I don't.

29 (Pages 110 to 113)

**Rizman**
**Rappaport**
**Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# **EXHIBIT B**

MEI 10392990v.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 97-3407 (DRD)

WALSH SECURITIES, INC.,            :
                                   :
                  Plaintiff,       :    DEPOSITION UPON
                                   :    ORAL EXAMINATION
       v.                          :         OF
                                   :    ROBERT WALTER
CRISTO PROPERTY MANAGEMENT,        :    ~SKOWRENSKI~, II
LTD., et al.,                      :
                                   :
                  Defendants.      :
- - - - - - - - - - - - - - - - - -

T R A N S C R I P T   of the

stenographic notes of STANLEY B. RIZMAN, a Notary

Public and Certified Shorthand Reporter of the State

of New Jersey, Certificate No. XI00304, taken at the

offices of Manning, Caliendo & Thomson, PA, 36 West

Main Street, Freehold, New Jersey, on Tuesday, May

25, 2010, commencing at 10:12 a.m.



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Appearances:

STONE & MAGNANINI, LLP
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
BY: ROBERT A. MAGNANINI, ESQ. and
    AMY WALKER WAGNER, ESQ.
For the Plaintiff.

MC CARTER & ENGLISH, LLP,
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056
BY: DAVID R. KOTT, ESQ.,
For Commonwealth Land Title Insurance Company

FOX ROTHSCHILD, LLP
997 Lenox Drive
Lawrenceville, New Jersey 08648
BY: EDWARD J. HAYES, ESQ.
For Nations Title Insurance and
    Fidelity National Title Insurance

METHFESSEL & WERBEL, PC
3 Ethel Road
Suite 100
Edison, New Jersey 08818
BY: MARTIN R. MC GOWAN, ESQ.
For Coastal Title Agency

MANNING, CALIENDO & THOMSON, PA
36 West Main Street
Freehold, New Jersey 07728
BY: VINCENT P. MANNING, ESQ.
For the Witness

RICHARD CALANNI,
Pro se.

---

**INDEX**

WITNESS                                    PAGE

ROBERT W. SKOWRENSKI, II

    Direct examination by Mr. Kott        5, 202
    Direct examination by Mr. Calanni     98
    Direct examination by Mr. Hayes       99, 227
    Direct examination by Mr. McGowan     170
    Direct examination by Ms. Wagner      173, 230

EXHIBITS    DESCRIPTION                    IDENT.

Skowrenski-1  Sunday Star-Ledger article    9
              3-13-97
Skowrenski1-2 Fourth Amended Complaint      13
              filed 7-10-09

Skowrenski-3  1996 Income Tax return for    33
              National Home Funding, Inc.
Skowrenski-4  Document entitled Program,    115
              "Participant Loan Purchase and
              Sale."
Skowrenski-5  Document entitled "First      181
              Mortgage Fee Sheet."

Skowrenski-6  Document entitled "Request    182
              for Title to be Ordered."
Skowrenski-7  Allonge                       184

Skowrenski-8  Document entitled Assignment  184
              of Security Interest

---

ROBERT WALTER SKOWRENSKI, II,
residing at 15 Mallard Lane, Ocean, New
Jersey, being first duly sworn, testifies as
follows:

DIRECT EXAMINATION

BY MR. KOTT:

Q    Mr. Skowrenski, do you have a business
address?

A    Yes. 3301B Route 66 Neptune, New
Jersey. 07753.

Q    What is the name of that business?

A    America's First Funding Group.

Q    And what is the nature of that
business?

A    Mortgage broker.

Q    Are you an owner in that company?

A    Yes.

Q    Is that a corporation or a Subchapter
S?

A    Presently -- it was a C Corp. and it
has been transferred to an S Corp.

Q    Are you the only shareholder of that?

A    Correct.

Q    When was this founded?

A    August of '99.

---

Q    Mr. Skowrenski, my name is David Kott,
K-o-t-t. I'm a lawyer and I represent the defendant
Commonwealth Land Title Insurance Company in this
lawsuit.

        You're giving a deposition today.
About how many depositions have you given?

A    I don't recall.

Q    Can you estimate for me?

A    A couple.

Q    Let me give you some ground rules for
the deposition. If you are asked a question and you
do not understand it, will you tell us?

A    Yes.

Q    If you answer a question, we will
assume you understood it. That is okay with you?

A    Okay.

Q    If you're interrupted or cut off in the
middle of one of your answers, will you tell us that
you've been interrupted?

A    Yes.

Q    So if you answer a question, we'll
assume your answers are full, fair and complete
answers to the question.

        That is okay with you?

A    Yes.



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

26

1  weren't a target?
2      A    No. I received a thank-you letter from
3  the U.S. Attorneys at some point.
4      Q    Where are the letters?
5      A    With the rest of the documents when I
6  thought this case was over. Destroyed.
7      Q    What do you mean by that? What do you
8  mean by that?
9      A    That the case was over or that this
10  issue was over? What do I mean by that?
11      Q    What do you mean by "destroying
12  documents"?
13      A    I mean that when the FBI returned every
14  document to me, I no longer required them. So they
15  were shredded.
16      Q    Why were they shredded?
17      A    Because they were no longer required.
18      Q    Hadn't this Walsh lawsuit been filed at
19  that point?
20      A    I don't believe so.
21      Q    When did the FBI return the documents
22  to you, approximately?
23      A    When?
24      Q    Yes.
25      A    Years ago.

27

1      Q    Can you be any more specific than that?
2      A    Three to five years ago. Four to five
3  years ago.
4          I mean, they've returned stuff a lot
5  longer as well. The last documents they
6  specifically returned to me with copies of files.
7      Q    When you said you threw documents
8  away -- let's go a little slower. At some point the
9  FBI seized a number of documents, correct?
10      A    Correct.
11      Q    At some point were those documents
12  returned to you or your lawyer?
13      A    Yes.
14      Q    About when were they returned?
15      A    Again, three to five years ago.
16      Q    What did you do with those documents
17  when you got them back?
18      A    I shredded them after they were -- I
19  think they were shredded after the last case you and
20  I were involved with.
21      Q    The case where you sued Coastal and
22  Commonwealth?
23      A    I believe so.
24      Q    Who made the decision to shred them?
25      A    Well, it was told to me --

28

1          MR. MANNING: Don't testify to any
2  conversations you may have had with anyone who was
3  an attorney representing you.
4      Q    My question was: Who made the decision
5  to shred them? That is, did you make that decision
6  or did somebody else?
7      A    No. I did.
8      Q    Did you shred all of the documents that
9  were returned to you --
10      A    Yes.
11      Q    -- by the FBI?
12      A    Yes.
13      Q    I'm not going to mark it. I can if
14  counsel wants me to.
15          Let me show you a letter dated November
16  4th from Alain, A-l-a-i-n, Liebman, L-i-e-b-m-a-n,
17  Assistant United States Attorney, to Mr. Schottland,
18  where he purports to return certain documents. Does
19  that refresh your recollection or help -- or help
20  you remember when the FBI returned the documents to
21  you?
22      A    The date of that letter?
23          MR. MAGNANINI: The date of the letter.
24          MR. CALANNI: November 4th.
25      Q    Hang out for a second.

29

1          MR. KOTT: I'm handing to Mr. Magnanini
2  the November 4, 2002 letter from Federal Prosecutor
3  Liebman to Mr. Schottland.
4          (Pause.)
5      Q    Do you currently have any National Home
6  Funding documents?
7      A    No.
8      Q    Are you aware of any National Home
9  Funding documents or copies of any National Home
10  Funding documents are?
11      A    No.
12      Q    At some point did you reach an
13  agreement with the plaintiff that the plaintiffs --
14  I'm sorry. Singular.
15          At some point did you reach an
16  agreement with the plaintiff in this case that the
17  plaintiff would drop the lawsuit against you?
18      A    Yes.
19      Q    When was that agreement reached?
20      A    I don't know the exact date. I'd have
21  to look at the document.
22      Q    What document are you referring to?
23      A    A Settlement Agreement.
24      Q    When was the last time you looked at
25  that document?

8 (Pages 26 to 29)



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

30

1    A    Months ago.
2    Q    Do you still have that document?
3    A    I don't.  I have a copy of it now.
4    Q    Where did you get the copy of it?
5    A    From Vince.
6    Q    Mr. Manning?
7    A    Yes.
8    Q    Were you involved, yourself, in the
9    negotiations of that agreement?
10    A    No.
11    Q    Were you present when any of those
12    negotiations occurred?
13    A    No.
14    Q    What did you agree to do as part of
15    that agreement?
16    A    I'm under the impression --.
17         MR. MANNING:  Have you had a ruling yet
18    from Magistrate Judge Shipp on the availability of
19    that document?
20         MR. KOTT:  No, we've not.
21         MR. MAGNANINI:  No.  It is still under
22    seal.
23         MR. MANNING:  I don't think you should
24    go on with that if what he agreed to do was reduced
25    to that document and the document is not available.

31

1         MR. KOTT:  Yes.  I would think there
2    are two separate questions.  At least, it would be
3    my position that there would be two separate issues.
4         Number one, the ability of us to see
5    the document and a separate issue whether I can
6    question the witness on what the settlement was.
7         So if it is your position that I can't
8    question him on what the settlement was rather than
9    what does the document say?
10         That is your position?
11         MR. MANNING:  I think it is.
12         MR. KOTT:  Why don't I pose the
13    questions and you can instruct him not to answer?
14    There won't be many.
15    Q    Can you tell me what the agreement was
16    you reached with the plaintiffs in connection with
17    the plaintiff agreeing to dismiss the case --
18         MR. MANNING:  I am going to instruct --
19    Q    -- dismiss the case against you?
20         MR. MANNING:  I instruct you not
21    answer, Mr. Skowrenski, until the issues relating to
22    that document have been resolved.
23    Q    Can you tell me whether you agreed to
24    give testimony or not give any testimony in this
25    case concerning the case as part of that agreement?

32

1         MR. MANNING:  I give you the same
2    instruction.
3         MR. KOTT:  I have some other questions
4    along that line, but I don't want to burden the
5    record with that.  I think we know where we are on
6    that.
7    Q    Mr. Skowrenski --
8         MR. KOTT:  Can you mark this as the
9    next exhibit?
10         (Exhibit Skowrenski-3, 1996 Income Tax
11    return for National Home Funding, Inc., marked for
12    identification.)
13    Q    I've marked as Skowrenski-3 a U.S.
14    Income Tax Return for an S Corporation for 1996 for
15    National Home Funding, Inc., and ask you, Mr.
16    Skowrenski, if you can identify that document for
17    us?
18    A    You want me to read what it says?
19    Q    No.  Can you tell us what the document
20    is?
21    A    National Home Funding income tax return
22    for 1996.  Like federal income tax return.
23    Q    On the first page, near the bottom
24    where it says "Please sign here," there is a
25    signature.  Whose signature is that?

33

1    A    It says "Robert Fine."
2    Q    Was that the person who prepared it for
3    you.  Do you know?
4    A    I have no idea.
5    Q    I call your attention to --
6         MR. MAGNANINI:  David, do you have a
7    copy of that?
8         MR. KOTT:  No.  Do you want to see it?
9         MR. HAYES:  Which year?
10         MR. KOTT:  '96.
11         (Document handed to Mr. Magnanini.)
12         (Pause.)
13    Q    Mr. Skowrenski, when your accountants
14    would prepare the returns for National Home Funding,
15    would you sign them?
16    A    I believe so.
17    Q    With respect to Statement 1, page 1 of
18    Statement 1.  See, it lists some columns, the first
19    of which is "Amortization" and it is"$1,190."
20    A    Yes.
21    Q    The next one is "Commissions,
22    $915,083."
23         Do you see that?
24    A    Yes.
25    Q    What is that for, those commissions?

9 (Pages 30 to 33)



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

90

1    Q    How about with an agent named Irene
2  DiFeo?
3    A    No.
4    Q    Were you aware that Mrs. Pepsny and Ms.
5  DiFeo were prosecuted by the Federal Prosecutor and
6  went to trial?
7    A    Am I aware today?  Yes.
8    Q    How did you become aware of that?
9    A    Newspaper.
10   Q    Did you give any information to any law
11 enforcement people with respect to either Ms. Pepsny
12 or Ms. DiFeo?
13   A    No.  I couldn't have because I didn't
14 know them.
15       MR. KOTT:  Can we go off the record?
16       (Discussion off the record.)
17       MR. KOTT:  Let's go back on the record.
18 BY MR. KOTT:
19   Q    With respect to -- I'm addressing this
20 to counsel and not to you.  You just --
21   A    Shut up?
22       MR. KOTT:  I won't use the word shut
23 up.
24       MR. HAYES:  Unless you wish to object.
25       MR. KOTT:  With respect to the

91

1  settlement, I interpreted what Judge Shipp said in
2  our phone conference, which was not on the record,
3  but I interpreted what he said was we could not use
4  the written Settlement Agreement but that we could
5  inquire as to what the terms of the settlement was.
6  Either you have a different recollection as to
7  that --
8        MR. MANNING:  I don't have a
9  recollection of that, in that way.  That could be a
10 failure of my recollection.
11       MS. WAGNER:  My understanding, in
12 accordance with whenever the Order gets entered,
13 within a certain number of days to provide you with
14 a redacted copy of the Settlement Agreement and
15 provide the Court with an unredacted copy.
16       MR. HAYES:  I agree.  That is clearly
17 what he said.
18       We also raised a separate issue of the
19 scope of the inquiry could be made of witnesses
20 separate and apart from the document.
21       My recollection -- it was in response
22 to some of the statements I made -- was that the
23 judge said that he was of the opinion that the
24 substance of the settlement could be inquired about
25 without the document, itself.  The document was not

92

1  necessary, regardless of the scope of the
2  redactions, and he would decide if an issue arose
3  whether they were overbroad or not; that he was
4  going to permit witnesses to be questioned about the
5  negotiations and the terms of the settlement.
6        Again, unfortunately, with there being
7  no transcript, it is all of your recollection.
8        That is my recollection of where he
9  ended up on the issue.
10       MS. WAGNER:  I don't recall him making
11 a specific ruling on it.  I don't know, unless he
12 was actually looking at it, whether he could rule on
13 whether or not there was a confidential provision in
14 there that was precluding testimony about
15 negotiations or the content of the Settlement
16 Agreement.
17       MR. KOTT:  This is my issue, if I can
18 use the word "issue."  I'm going to assume there is
19 a confidentiality provision because you represented
20 that to the Court.
21       My issue is I don't think that means
22 under the Federal Rules of Civil Procedure I can't
23 ask this witness about it.  That is, I don't think
24 because two parties to a lawsuit, between and among
25 themselves, decide something is confidential means

93

1  that it is not discoverable under the Federal Rules
2  of Civil Procedure or it is covered by any
3  privilege.  That is my issue.
4        Just like if Mr. McGowan and I were to
5  reach some agreement that something would be
6  confidential, I don't think, therefore, my Rule
7  30(b)(6) or his Rule 30(b)(6) could say:  No, I have
8  an agreement; it's going to be confidential.
9        That is what I'm struggling with.
10       MS. WAGNER:  I think we disagree about
11 that.  Isn't that something that would have to be
12 raised with the Court?
13       MR. KOTT:  What would be the legal
14 basis?
15       MS. WAGNER:  Courts routinely favor
16 settlement.  They encourage parties to enter into
17 settlements.
18       Unless it is a document that is
19 actually filed and approved by the Court, it is
20 generally deemed to be confidential or courts have
21 upheld the confidentiality of settlement agreements.
22       MR. KOTT:  Third parties to --
23 outsiders to the litigation.  Not to parties to the
24 litigation.  But -- is the instruction -- addressed
25 to you -- instruction not to answer continue in the

24 (Pages 90 to 93)



Rizman
Rappaport
Dillon&Rose,LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

94

1 light of the way I've parsed this out?  That is, the
2 difference between what was agreed to and what the
3 Settlement Agreement states?
4         MR. MANNING:  Yes.  Because I would
5 rather have the witness answers these questions or
6 not after a ruling by Judge Shipp due to terms that
7 I'm aware of in that Settlement Agreement that I
8 think require a ruling by Judge Shipp.
9         MR. HAYES:  Is the concern there could
10 be financial ramifications to your client?
11        MR. MANNING:  I don't think I can
12 answer that without the Settlement Agreement being
13 something that we can talk about.
14        MR. KOTT:  Meaning that alone would be
15 confidential.
16        MR. MANNING:  Yes.
17 BY MR. KOTT:
18    Q     Let me try another question to you, Mr.
19 Skowrenski.
20        So far as you know, is any settlement
21 you reached with the plaintiff a secret between you
22 and Walsh Securities?
23    A     I don't have an opinion on that.
24    Q     I'm asking so far as you know.
25        MR. MANNING:  I have to object.  The

95

1 witness' understanding of the ramifications or
2 the --
3         MR. KOTT:  He could have signed it.
4         MR. MANNING:  Correct.
5         The Confidentiality Agreement goes to
6 really legal issues that I don't think he's
7 competent to answer.
8         Is he aware he entered into a
9 settlement?
10        Yes.
11        Is he aware that the Fourth amended
12 Complaint was dismissed?
13        Yes.
14        MR. KOTT:  My next and probably my last
15 question on this is:  Is it his understanding that
16 the settlement he reached with the plaintiff is
17 confidential between him and the plaintiff and
18 cannot be disclosed to third parties?
19        MR. MANNING:  Well, whether he believes
20 that or not, his personal opinion doesn't affect
21 whether it is or not.
22        MR. KOTT:  He's the party to the
23 Settlement Agreement.
24        MR. MANNING:  Right.
25        MR. KOTT:  If he doesn't --

96

1         MR. MANNING:  He may need legal advice.
2         MR. KOTT:  If he does believe that, he
3 can tell me that.
4         MR. MANNING:  Okay.
5 BY MR. KOTT:
6    Q     Sir, my question is this:
7         Mr. Skowrenski, so far as you know, is
8 the settlement that you have reached with the
9 plaintiff, which led to the dismissal of the
10 Complaint against you by the plaintiff,
11 confidential?
12    A     I would need a legal opinion on that.
13        MR. KOTT:  Could we break for lunch?
14        MR. MANNING:  Certainly.
15        (Luncheon recess.)
16
17
18
19
20
21
22
23
24
25

97

1         A F T E R N O O N   S E S S I O N
2
3 R O B E R T  W.  S K O W R E N S K I, resumed
4 DIRECT EXAMINATION
5 BY MR. CALANNI:
6    Q     I thought of questions that Mr. Kott
7 had asked and it is in line.  But the one question I
8 do want to ask you is you did mention several times
9 in your deposition that you introduced me to Bill
10 Kane because you were giving me work.  You were
11 hoping to give me more work in my profession and we
12 did work prior, National Home Funding, and basically
13 it was a favor.  Is that true?
14    A     Yes.
15    Q     Okay.  At any point in your mind did
16 you think that you were hooking me up with Bill Kane
17 because the three of us were conspiring to defraud
18 Walsh Securities?
19    A     Absolutely not.
20        MR. CALANNI:  That's all I need to ask.
21        Thank you, Robert.
22        Everyone else, have a good day.
23        MR. MANNING:  Thank you, Mr. Calanni.
24        (Mr. Calanni leaves the room.)
25        MR. KOTT:  I yield to Mr. Hayes.

25 (Pages 94 to 97)



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

210

1    A    No.
2    Q    Did Mr. D'Apolito tell you whether
3 Elizabeth DiMola was involved in setting up the
4 meeting?
5    A    I'm not sure. I don't recall.
6    Q    In the Fourth Amended Complaint there
7 is an allegation on pages 15 and 16 that reads as
8 follows: Quote: D'Apolito received these mortgage
9 loan applications from NHF and transmitted or caused
10 them to be transmitted to his employer, Walsh
11 Securities, to induce Walsh Securities to finance
12 the mortgage loans. In exchange for transmitting or
13 causing to transmit the applications to Walsh
14 Securities, D'Apolito, through DAP Consulting,
15 received cash payments totaling at least $90,000
16 from Kane, through Cristo Property, and received
17 cash payments in excess of $10,000 from Skowrenski
18 through NHF. These payments were designed to and
19 did corrupt D'Apolito, place him in a conflict of
20 interest, cause his loyalties to be divided, and
21 cause him to breach his obligations to Walsh
22 Securities. The payments from NHF and Cristo
23 Property to D'Apolito were unknown by, and not
24 disclosed to, Walsh Securities, which was misled
25 into believing that D'Apolito was acting as a

211

1 faithful employee."
2         That paragraph, I will tell you, was in *
3 the original Complaint and in the First, Second and
4 Third Amended Complaints as well in this case. Does
5 that sound familiar to you when you had read one of
6 the earlier Complaints?
7    A    Yes.
8    Q    My first question to you is: Do you
9 know why Walsh made the decision to dismiss you from
10 this lawsuit?
11        MR. MANNING: I object -- wait a
12 minute. Does he know why Walsh --
13        MR. KOTT: Yes.
14        MR. MANNING: Withdraw my objection.
15    A    I believe because of our settlement.
16    Q    Walsh had made some very serious
17 allegations against you, is that correct?
18    A    I definitely agree.
19    Q    You have not given a deposition in this
20 case, is that correct? This is your first
21 deposition in this case?
22    A    Yes.
23    Q    You told us earlier you never have
24 spoken with Walsh Securities lawyers or given a
25 statement with respect to whether or not you were

212

1 involved in these frauds, right?
2    A    Correct.
3    Q    So Walsh for some period of time
4 believed you were involved in the fraud and so
5 stated in the pleadings that they filed, correct?
6    A    Okay. Yes.
7    Q    At some point Walsh agreed to settle
8 the case and dismiss the Complaint against you, is
9 that correct?
10    A    Correct.
11    Q    Do you know why it was that Walsh
12 agreed to settle the case and dismiss the Complaint
13 against you?
14    A    I can just speculate that --
15        MR. MANNING: Don't speculate.
16    A    No. I don't know.
17    Q    So far as you know, they filed these
18 Complaints, alleged very serious allegations against
19 you and then, without ever hearing your side of the
20 story, on their own they decided to dismiss this
21 case; is that what you're saying to me?
22    A    Yes.
23    Q    What did your dad do?
24    A    My dad? He was a Wall Streeter.
25    Q    What do you mean by that?

213

1    A    He worked for a Wall Street firm.
2    Q    What did he do for the firm? Meaning
3 did he sweep the --
4    A    No. He traded -- he was, I believe,
5 like head of -- he traded their equities in and out
6 of the market.
7    Q    Which firm was he with?
8    A    He retired from Commerce Bank.
9    Q    When you got into the mortgage
10 business, did you discuss your business with him as
11 a father and son would do?
12    A    Yes.
13    Q    Was he one of your advisors?
14 Informally, I'm talking about.
15    A    Very informally.
16    Q    Was he a very sophisticated person so
17 far as business was concerned?
18    A    I wouldn't say that. No.
19    Q    He's a trader for European Bank and
20 you're saying he's not very sophisticated?
21    A    I'm saying he doesn't have a college
22 degree.
23    Q    I didn't ask you that. You could be
24 sophisticated without a college degree, correct?
25    A    I would call him sophisticated in the

54 (Pages 210 to 213)



**Rizman**
**Rappaport**
**Dillon & Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

230

1  A    I might have.
2  Q    Do you know when he would have worn the
3  wire?
4  A    No.
5  Q    Would it have been before the frauds
6  became public?
7  A    I have no idea.
8  Q    Was there an occasion in which National
9  Home Funding sued Commonwealth Title and Coastal?
10  A    Yes.
11  Q    Why did National Home Funding sue them?
12  A    You'd have to let me read the
13  Complaint.  I couldn't add upon it right now.
14  Q    Do you have any idea why today?
15  A    Yeah.  Something to do with the
16  recording of the policies and the transactions of
17  the deed, I believe, and the fact that there should
18  have been red flags and notifications to NHF as the
19  lender for that minute.  I think it had something to
20  do with a violation of their responsibility to NHF.
21  Q    Did you enter into a settlement with
22  them?
23  A    Yes.
24  Q    What was the terms of that settlement?
25  A    I believe monetary.

231

1  Q    Do you remember how much?
2  A    I think Commonwealth was approximately
3  50,000 and I think Coastal was approximately
4  275,000.
5  Q    Do you recall why you settled as
6  opposed to going to trial?
7  A    I believe there was a mediation
8  process.
9  Q    It settled during the course of
10  mediation?
11  A    I think it settled after that.  The
12  mediator comes in, talks to both sides.  He actually
13  put a value on it.  What he thought or something
14  like that.
15  Q    Do you recall if Commonwealth or
16  Coastal admitted to any wrongdoing?
17  A    I don't believe so.  I don't recall
18  specifically the agreement.
19  MS. WAGNER:  No further questions.
20  MR. KOTT:  No questions.
21  DIRECT EXAMINATION (Continuing)
22  BY MR. HAYES:
23  Q    Mr. Skowrenski, the assignment that you
24  have in front of you was notarized by Ms. DeMola?
25  A    Yes.

232

1  Q    Do you recall when you got the mass
2  group of assignments to execute from Mr. Schottland
3  who notarized those?  Would Ms. DiNonno still have
4  been in your employ at that time?
5  A    I think it was someone in this office.
6  Q    Someone had made an allegation after
7  Mr. DiNonno had his issues and was no longer a
8  quote, unquote, partner of yours in the mortgage
9  business that his money remained in the business and
10  that his sister-in-law remained in your employ
11  because she was his eyes.  Have you ever heard that
12  allegation before, that he required you to keep her
13  on because his money was still there?
14  A    No.
15  MR. HAYES:  Okay.  That's it.
16  Thank you, sir.  Appreciate your time.
17  MR. KOTT:  Off the record.
18  (Discussion off the record.)
19  MR. KOTT:  On the record.
20  Counsel have agreed that I will be the
21  custodian of the original exhibits from today but I
22  will send copies to Mr. Manning, Ms. Wagner, Mr.
23  Hayes and Mr. McGowan.
24  The second thing.  We've had a
25  discussion off the record and Mr. Hayes and I have

233

1  told counsel, both Mr. Manning and Ms. Walker, that
2  we have no further questions for this witness today
3  but we're not concluding the deposition; that
4  subject to the rules of the Court concerning whether
5  or not issues concerning the settlement between Mr.
6  Skowrenski and National Home Funding and Walsh
7  Securities are discoverable.  Meaning if the court
8  says we can inquire into that, we will be coming
9  back a second time to inquire into that.
10  (Deposition concluded at 4:32 p.m.)
11  (Exhibits retained by Mr. Kott.)
          - - -

59 (Pages 230 to 233)

**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# **EXHIBIT C**

ME1 10392990v.1

MICHAEL ALFIERI

Page 1

```
 1                   UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
 2                   Civil Action No.
                     97-cv-3496 (DRD) (MAS)
 3
       WALSH SECURITIES, INC.,    :
 4                                :
                  Plaintiff,      :
 5                                :
           vs.                    :   DEPOSITION OF:
 6                                :   MICHAEL ALFIERI
       CRISTO PROPERTY MANAGEMENT,
 7     LTD., a/k/a G.J.L. LIMITED;
       OAKWOOD PROPERTIES, INC.;
 8     NATIONAL HOME FUNDING, INC.;
       CAPITAL ASSETS PROPERTY
 9     MANAGEMENT & INVESTMENT CO.,
       INC.; CAPITAL ASSETS PROPERTY
10     MANAGEMENT, L.L.C.; WILLIAM
       KANE; GARY GRIESER; ROBERT
11     SKOWRENSKI, II; RICHARD CALANNI;
       RICHARD DiBENEDETTO; JAMES R.
12     BROWN; THOMAS BRODO; ROLAND
       PIERSON; STANLEY YACKER, ESQ.;
13     MICHAEL ALFIERI, ESQ.; RICHARD
       PEPSNY, ESQ.; ANTHONY M.
14     CICALESE, ESQ.; LAWRENCE CUZZI;
       ANTHONY D'APOLITO; DAP CONSULTING,
15     INC.; COMMONWEALTH LAND TITLE
       INSURANCE CO.; NATIONS TITLE
16     INSURANCE OF NEW YORK, INC.;
       FIDELITY NATIONAL TITLE
17     INSURANCE CO. OF NEW YORK;
       COASTAL TITLE AGENCY; DONNA
18     PEPSNY; WEICHERT REALTORS; and
       VECCHIO REALTY, INC., D/B/A
19     MURPHY REALTY BETTER HOMES
       And GARDENS                :
20                                :
                  Defendants.     :
21     - - - - - - - - - - - - -
22
23
24
25
```

MICHAEL ALFIERI

Page 2

1       TRANSCRIPT of the stenographic notes of
2   the proceedings in the above-entitled matter, as
3   taken by and before JANET BAILYN, a Certified
4   Shorthand Reporter and Notary Public of the State of
5   New Jersey, held at the office of STONE & MAGNANINI,
6   150 John F. Kennedy Parkway, Short Hills, New Jersey,
7   on June 2, 2010, commencing at 10:11 in the forenoon.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2               INDEX
3   WITNESS       DIRECT CROSS REDIRECT RECROSS
4   MICHAEL ALFIERI
    BY MR. JASO      5
    BY MR. KOTT        86
5
6
7           E X H I B I T S
8   NUMBER        DESCRIPTION        PAGE
9   Alfieri-1    Notice of Deposition       10
    Alfieri-2    New Vision Title Agency Website   59
10  Alfieri-3    Group of Documents      63
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1 A P P E A R A N C E S :
2
3      STONE & MAGNANINI, LLP
       BY: ERIC H. JASO, ESQ.
4         JEFFREY A. SHOOMAN, ESQ.
          AMY WALKER WAGNER, ESQ.
5      150 John F. Kennedy Parkway
       Short Hills, New Jersey 07078
6      Attorneys for Plaintiff
7      McCARTER & ENGLISH, LLP
       BY: DAVID R. KOTT, ESQ.
8      Four Gateway Center
       100 Mulberry Street
9      Newark, New Jersey 07102-4056
       Attorneys for Defendant
10     Commonwealth Land Title Insurance Co.
11     HOBBIE, CORRIGAN, BERTUCIO
       & TASHJY,
12     P.C. BY: EDWARD BERTUCIO, ESQ.
       125 Wyckoff Road
13     Eatontown, New Jersey 07724
       Attorneys for Michael Alfieri
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1 M I C H A E L   A L F I E R I, residing at 431
2 Princeton Avenue, Brick, New Jersey, having been duly
3 sworn by the Notary, testified as follows:
4 DIRECT EXAMINATION BY MR. JASO:
5         MR. KOTT:  I spoke with Martin McGowan
6   yesterday of the Methfessel law firm who represents
7   Coastal, and he told me he was not coming this
8   morning.  I also received an e-mail from Edward Hayes
9   of the Fox Rothschild law firm, the attorney for two
10  of the title insurance companies, and he told me he
11  was not coming.  As to whether they want copies of
12  the transcripts, I don't know that.  I'll leave that
13  to the court reporter to check with their offices.
14  My guess is they do but they didn't tell me that.
15      Q.   Mr. Alfieri, my name is Eric Jaso,
16  J-a-s-o.  I'm counsel to Stone & Magnanini.  We
17  represent Walsh Securities in this matter.  With me
18  is Amy Wagner and Jeff Shooman.  And for the record
19  your attorney is here, Mr. Bertucio.
20      MR. BERTUCIO:  Bertucio.
21      Q.   Have you ever been deposed before, sir?
22      A.   Yes.
23      Q.   How many times?
24      A.   Two or three.
25      Q.   In a civil case like this?

2 (Pages 2 - 5)

MICHAEL ALFIERI

Page 10

1 this lawsuit. Is that correct?
2    A.    Yes.
3    Q.    And what was the resolution of that?
4    A.    We were dismissed -- we are trying to
5 get dismissed from the case, but there is no final
6 resolution yet.
7    Q.    Was there not a settlement between Walsh
8 and you?
9    A.    There was a settlement between Walsh and
10 us, correct, my firm, yes.
11        MR. JASO: Let me just mark for the
12 record as Alfieri Exhibit One a Notice of Deposition.
13        (Alfieri-1, Notice of Deposition, is
14 received and marked for identification.)
15    Q.    Do you recognize that document?
16    A.    I do.
17    Q.    And that's the document pursuant to
18 which you are testifying here today?
19    A.    Yes.
20    Q.    I realize that the document does not
21 have a request attached to it, but did you bring any
22 documents with you here today?
23    A.    I brought my attorney's letter saying
24 that the deposition is today.
25    Q.    But nothing to produce to the plaintiff

Page 11

1 today?
2    A.    No.
3    Q.    Now, did you meet with counsel to
4 prepare for this deposition?
5    A.    We spoke briefly on my way up.
6    Q.    On the telephone?
7    A.    Yes.
8    Q.    Did you review any documents besides the
9 letter you referenced in preparation for today's
10 deposition?
11    A.    No, sir.
12    Q.    Did you have any conversations with
13 anyone besides your attorney about this deposition?
14    A.    No.
15    Q.    And how long did you speak to your
16 attorney today on the telephone?
17    A.    Four minutes.
18    Q.    He's going to charge you for 15. Very
19 good. Let's go back to your educational background.
20 Starting with college. Could you tell me where you
21 went to college and when you graduated?
22    A.    Seton Hall undergraduate. I took
23 courses at Kean College at the time because I was
24 working full time and I went to Touro Law School in
25 New York and I graduated in '89.

Page 12

1    Q.    And did you take the bar shortly after
2 that?
3    A.    I did.
4    Q.    Here in New Jersey?
5    A.    And Pennsylvania.
6    Q.    And are you still a member of both bars?
7    A.    Yes.
8    Q.    Ever have any problems with the bar,
9 licensing, anything like that, lapses?
10    A.    No.
11    Q.    So you graduated law school in '89.
12 What did you -- did you have any employment before
13 law school? Did you have a job between college and
14 law school, anything like that?
15    A.    I always worked full time even when I
16 was in law school.
17    Q.    What did you do?
18    A.    I worked at a supermarket.
19    Q.    Here in New Jersey?
20    A.    Yes.
21    Q.    Are you from New Jersey originally?
22    A.    Yes.
23    Q.    What part?
24    A.    Central.
25    Q.    So after graduating law school and

Page 13

1 passing the bar -- let me ask you this: Did you have
2 any legal jobs during law school?
3    A.    No.
4    Q.    After you passed the bar or even before
5 you passed the bar, what job did you have?
6    A.    I worked full time at a supermarket and
7 paid my way through law school, and I was married at
8 the time as well so I supported my family.
9    Q.    Still married?
10    A.    I am.
11    Q.    Children?
12    A.    Yes.
13    Q.    How many?
14    A.    Three.
15    Q.    Grown up now?
16    A.    Yes.
17    Q.    What was your first job after passing
18 the bar, not the supermarket but as you began your
19 legal career?
20    A.    I started as a lawyer with my brother
21 Sal Alfieri, worked with him for six months and then
22 opened my own firm.
23    Q.    And did Sal -- may I call him Sal? Did
24 Sal have his own law firm. Is that how that worked?
25    A.    He did.

4 (Pages 10 - 13)

MICHAEL ALFIERI

Page 118

1 over this case. Okay? All over this case meaning
2 what?
3    Q.    That's what they pay me for.
4    A.    I just don't want to mischaracterize.
5 Did he represent him in buy and sells? Yes.
6    Q.    And he represented Mr. Kane and his
7 companies in connection with borrowings?
8    A.    Which is not uncommon.
9    Q.    His wife was a realtor on some of the
10 transactions that Mr. Kane was involved in. Is that
11 correct?
12    A.    I believe so but that's -- again, I
13 don't know for sure. You would have to ask Rick and
14 Donna that question.
15    Q.    But you believe that to be the case.
16 Right?
17    A.    I believe that to be the case, but I am
18 not positive on which transactions she was involved
19 in.
20    Q.    He was affiliated in the practice of law
21 with you. Correct?
22    A.    Yes.
23    Q.    And you owned an interest in Selective.
24 Correct?
25    A.    Yes.

Page 119

1    Q.    And Selective loaned money to Mr. Kane.
2 Correct?
3    A.    Again, I don't remember that
4 transaction.
5    Q.    But based on the documents?
6    A.    It looks like there was a mortgage, yes.
7    Q.    Did you know -- a woman's name here, she
8 was legal secretary or a paralegal to Stanley Yacker,
9 her name was Lorraine King?
10    A.    I don't recall her.
11    Q.    Do you know Stanley Yacker?
12    A.    I -- he was in Matawan so I knew he was
13 a local attorney.
14    Q.    Had you done other transactions where he
15 was on the other side?
16    A.    I think I was involved with one or two
17 transactions with him but very limited.
18    Q.    What is Mr. Pepsny doing now?
19    A.    Practicing law.
20    Q.    Mostly residential?
21    A.    Based on my most recent conversation
22 with him he's doing residential real estate. He's
23 doing some bankruptcy work, he has -- he's running a
24 firm on his own.
25    Q.    Was he still working with you when his

Page 120

1 wife was convicted in the first trial?
2    A.    No, he was gone by that time.
3    Q.    Did you -- withdrawn. You were named as
4 a defendant by Walsh Securities in the original
5 complaint and a number of other complaints. Correct?
6    A.    The original complaint and I think the
7 amended complaint.
8    Q.    At some point did Walsh Securities
9 dismiss its complaint against you?
10    A.    It did.
11    Q.    Was that part of a settlement you
12 reached with Walsh Securities?
13    A.    And my E&O insurance.
14    Q.    And by E&O insurance you're referring to
15 your legal malpractice carrier?
16    A.    Correct.
17    Q.    Was there any more to your settlement
18 with Walsh other than you paid them money and they
19 gave you a release, any other agreements as part of
20 the settlement?
21         MR. BERTUCIO: Let me just intervene
22 here. There was a confidentiality agreement, so I
23 don't know where you stand with regard to him
24 answering these questions now. I don't have an
25 objection to Mr. Alfieri answering the question at

Page 121

1 all because I don't think it impacts anything.
2         MR. JASO: Well, obviously we would want
3 to enforce the confidentiality agreement vis-a-vis
4 that settlement agreement. I think I understand what
5 you're getting at, whether there was some other
6 things being agreed to besides just a fee settlement.
7 Can we have a minute to consult with Mr. Magnanini if
8 he is available?
9         MR. KOTT: Of course.
10        (A recess takes place.)
11        (The pending question is read by the
12 court reporter.)
13        MR. JASO: I will object to that
14 question as to form. I will say that there is, as
15 counsel indicated, a confidentiality agreement that
16 Walsh Securities considers enforceable and --
17 however, I will state our view that this particular
18 question since it's asking in my view what is not in
19 the agreement would not violate -- the answer to that
20 question is not going to violate the confidentiality
21 agreement as we view it, but that any further
22 questions with regard to the substance of what is in
23 the agreement may violate the confidentiality
24 agreement. So with that, that's what I have to say
25 about that.

31 (Pages 118 - 121)

MICHAEL ALFIERI

Page 122

1       MR. BERTUCIO: My position is there's a
2   confidentiality agreement so I'm going to instruct
3   the client to abide by that.  I have a slightly
4   different view as to one aspect of the agreement and
5   whether that aspect is truly confidential or not that
6   Magnanini & Stone have, but for purposes of this
7   deposition just to keep it simple I'm going to
8   instruct him not to answer any questions,
9   Mr. Alfieri, involving the actual terms of the
10  agreement or the particulars of the settlement.
11      If you want to ask him questions, the
12  answers to which I anticipate are going to say,
13  that's not in the agreement, that obviously is not
14  confidential I submit.  I would want to know what
15  counsel's position would be as to that so that we're
16  at least in agreement as to that before he answers
17  the question.  It is Mr. Alfieri's intention to abide
18  by the confidentiality agreement.
19      MR. KOTT: I am not following whatever
20  it is -- you're instructing him not to answer the
21  pending question?
22      MR. BERTUCIO: No.  The pending
23  question, you can ask that, but going forward I am
24  going to anticipate you asking other questions.
25      MR. JASO: I agree with your

Page 123

1   characterization.
2       MR. BERTUCIO: We will go question by
3   question, Michael, so delay a moment before you
4   answer.
5       A.   Okay.  What was the question?
6       Q.   Are there any other terms other than the
7   payment of the money?
8       A.   Yes.
9       Q.   What are the other terms?
10      MR. BERTUCIO: Object to that on
11  confidentiality and instruct him not to answer.
12      Q.   Can you tell me how much was paid by you
13  or on your behalf as part of the settlement with
14  Walsh?
15      MR. BERTUCIO: Object to the question.
16  Same reason, confidentiality.
17      Q.   Can you tell me whether as part of the
18  settlement you gave either a recorded or written
19  some other type of statement to Walsh or its
20  attorneys?
21      A.   Not that I recall.
22      Q.   Can you tell me whether as part of the
23  settlement you agreed to give any particular type of
24  testimony?
25      A.   No.

Page 124

1       Q.   Can you tell me whether as part of the
2   settlement you agreed to cooperate with Walsh
3   directly or indirectly in any way, shape or form?
4       A.   No.
5       MR. JASO: Can I just interject.
6   Obviously the question has been answered, but since
7   the preface of your question is:  Can you tell me,
8   the answer no, I'm not sure --
9       MR. KOTT: Fair enough.
10      MR. JASO: Maybe you want to reask it.
11      Q.   As part of the settlement did you agree
12  directly or indirectly to give any testimony or to
13  cooperate with Walsh in any way?
14      A.   I haven't read the agreement in a long
15  time but not to my recollection.
16      Q.   Who are the signatories to the
17  agreement?  And what I'm asking:  Is Robert Walsh
18  personally a signatory?
19      A.   I don't remember.  I think it was our
20  attorney but I'm not sure.
21      Q.   Did you receive a release, that is, a
22  written release as part of the settlement?
23      A.   I don't recall.
24      Q.   If you had received a written release
25  would your attorney have a copy as well as you?

Page 125

1       A.   Yes.
2       MR. BERTUCIO: Just for purposes of the
3   record, if you make a request of that from either me
4   or Mr. Magnanini, that might be part of the
5   confidentiality also.
6       MR. KOTT: I understand that.
7       Q.   Was Mr. Pepsny a part of your settlement
8   agreement with the plaintiff, meaning whatever -- was
9   he a party to that agreement?
10      A.   The agreement was with our E&O carrier
11  who I understand represented more than just myself
12  and Rick, and I think it was more of a global
13  agreement.
14      Q.   So whatever agreement you reached with
15  the plaintiff, that also went to the benefit of Mr.
16  Pepsny.  Is that true?
17      MR. JASO: Object to form.
18      A.   That's my understanding.
19      Q.   Were you personally involved in
20  negotiating the settlement?
21      A.   I spoke to my attorney about it.
22      Q.   Putting that aside.  I wasn't asking
23  that.  Were you in the room when any of the terms
24  were being negotiated?
25      A.   No.

32 (Pages 122 - 125)

MICHAEL ALFIERI

Page 126

1    Q.   Do you know why Walsh entered into the
2  settlement with you?
3        MR. BERTUCIO:  I'm going to object on
4  that one.  I'll object on that one on
5  confidentiality.  Also attorney/client privilege too.
6  The only way he would know anything is talking to me.
7    Q.   Let me rephrase the question.  Putting
8  aside your conversations with your lawyer, which I am
9  not asking about, do you know why Walsh entered into
10  the settlement agreement with you?
11    A.   I would like to think because they
12  realized they have no claim against me.
13    Q.   And what's your basis for that?  Putting
14  aside what you talked with your attorney about.
15  Where do you get that from?  If you get it from your
16  attorney don't tell me.
17    A.   Because I didn't do anything wrong,
18  improper.
19    Q.   Well, at any point before today have you
20  given a statement to Walsh's attorneys?
21    A.   Specifically to them?  Specifically to
22  them?  Is that what your question is?
23    Q.   Specifically or generally to them.
24    A.   There were pleadings along the way
25  that --

Page 127

1    Q.   Well, at one point Walsh filed some
2  pleadings that accused you of some very serious
3  conduct.  Correct?
4    A.   Yes.
5    Q.   Do you know what it was that made Walsh
6  change its mind that you were not guilty of very
7  serious conduct?
8    A.   I don't know what documents they looked
9  at, but the original complaint was amended where we
10  weren't closing attorneys, so even way early on in
11  the case they realized that my involvement was not as
12  they initially pled it.
13    Q.   Right.  But at the time you were
14  dismissed from the case the state of the pleadings at
15  that time was you were a RICO defendant.  Correct?
16    A.   There was a RICO case.
17    Q.   So my question is:  Do you know what it
18  was that Walsh learned that made it conclude that you
19  were not a proper RICO defendant?
20        MR. JASO:  Object to form.
21    A.   You would have to ask Walsh.
22    Q.   Coming back to what I was asking before,
23  you did not give them any information before you
24  reached that settlement on whether or not you were a
25  proper RICO defendant.  Is that true?

Page 128

1        MR. JASO:  Objection to form.  You can
2  answer.
3    A.   I am sure there were arguments made by
4  my attorney that were compelling.
5    Q.   How do you know that?
6    A.   Because they're good attorneys.
7    Q.   I would stipulate they're good
8  attorneys.  But how do you know that they made
9  arguments?
10    A.   You're asking me -- I wasn't involved in
11  the conversation.  You're asking me generally why did
12  they let me out?  I am telling you why I think they
13  let me out.
14    Q.   Why did you agree to confidentiality in
15  the settlement?
16    A.   On advice of counsel.
17        MR. BERTUCIO:  Objection to that.
18    Q.   I don't have any further questions.
19        MR. JASO:  Let me just take a moment,
20  please.  I have nothing further.  Thank you for your
21  time.
22        MR. KOTT:  On the record.  Plaintiff's
23  counsel will be the custodian of the original
24  deposition exhibits and as we have done throughout,
25  he will supply copies to the witness's counsel, to

Page 129

1  Mr. McGowan, to me and to Mr. Hayes.
2        MR. JASO:  That's correct.
3        MR. BERTUCIO:  I don't feel the need to
4  take possession of any copies of documents or any
5  documents.
6        (The deposition is concluded at 1:20
7  p.m.)
8
9    _____
10        MICHAEL ALFIERI
11  Subscribed and sworn to before me
12  this _____ day of _____, 2010.
13
14    _____
15        Notary Public
16
17
18
19
20
21
22
23
24
25

33 (Pages 126 - 129)