# STONE MAGNANINI LLP

COMPLEX COMMERCIAL LITIGATION

**NEW JERSEY OFFICES**   150 JFK Parkway, Short Hills, NJ 07078   P 973.218.1111   F 973.218.1106

August 16, 2010

**VIA CM/ECF AND U.S. MAIL**

Honorable Michael A. Shipp
United States Magistrate Judge
M.L. King, Jr. Federal Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

Re:   Walsh Securities, Inc. v. Cristo Property Management, Ltd., et al.
      Civil Action No.: 97-3496 (DRD/MAS)

Dear Judge Shipp:

This firm represents Plaintiff Walsh Securities, Inc. ("Walsh Securities") in the above-referenced matter. Pursuant to paragraph 4 of this Court's scheduling order dated July 22, 2010, Walsh Securities hereby submits this informal letter brief (pursuant to a discussion with Your Honor's Law Clerk) regarding the return of witness statements that are protected work product and that the Title Company Defendants ("Defendants") have unjustifiably refused to return or destroy.

## I.   BACKGROUND

By way of brief factual background regarding this dispute, Latham & Watkins LLP was originally engaged to conduct an internal investigation on behalf of Walsh Securities into a fraudulent mortgage Ponzi scheme that caused Walsh Securities to sustain millions of dollars in losses, and which directly led to the filing of the Complaint in this matter and subsequent litigation. As part of that internal investigation, the firm conducted several interviews with employees who were either knowingly involved in this scheme or who worked at Walsh Securities during the relevant time period. As part of these interviews, the attorneys performing the interview, which in many cases was the undersigned, summarized their notes of the witness statements into the interview memos that are at issue in this letter brief. The interviews partially formed the basis of an opinion letter (as well as the underlying Complaint) from Michael Chertoff of Latham & Watkins (Ex. A) which stated, in part, that "approximately 220 loans (representing approximately $24 million) were fraudulently obtained from Walsh Securities pursuant to an elaborate pyramid scheme which required the concerted action of several individuals and entities." This scheme as outlined in Mr. Chertoff's opinion letter involved fraudulent appraisals that overinflated the value of the properties, loan applications that indicated

borrowers had provided down payments when none were provided and the closing attorneys created fraudulent escrow letters concealing this fact, the creation of phony second mortgages when there was really no bona fide second mortgage, and a secret conveyance at closing of a sixty percent interest in the property from the straw buyers (with the assistance of the closing attorneys) to a separate entity involved in the fraud, all to the detriment of Walsh Securities.

At the request of these Defendants, the parties were ordered to participate in a mediation before Judge Boyle, which lasted nearly two years but did not result in a settlement. During the mediation, Defendants asked for the production of the Latham & Watkins interview memoranda because Defendants claimed they could not settle the matter because no discovery had occurred. Defendants then requested copies of the interview memos for use during the mediation so that they were "fully informed" in their efforts to attempt to resolve the case. Although we did not believe we were legally obligated to turn over the memos, we told Defendants we would provide them with redacted copies of the interview memos for the sole purpose of facilitating settlement during the mediation under Fed. R. Evid. 408. (Ex. B)

After mediation failed, the undersigned wrote Defendants' counsel on January 9, 2008 (Ex. C) requesting return or destruction of the memos in accordance with Fed. R. Civ. P. 26(b)(5), which instructs that once a party has made a claim of privilege, *inter alia*, the party must "promptly return, sequester, or destroy the specified information any copies it has; [and] *must not use or disclose the information until the claim is resolved . . .*" (emphasis added). In blatant violation of the Rule, counsel for Commonwealth responded that he did not destroy, return, or even sequester the memos as contemplated by the Rule. (Ex. D) Indeed, we have reason to believe that Defendants' counsel has utilized these memos in depositions thus far, once again, plainly violating the Rule's dictates that once a claim of privilege has been made, the party "*must not use*" the materials.

The memos are clearly protected under the work product doctrine as they were written in anticipation of litigation, in preparation for trial, and Defendants have neither demonstrated substantial need for the materials, nor that they cannot obtain the substantial equivalent information through other means without undue hardship. For the reasons set forth more fully below, Defendants should be ordered to return or destroy the documents, and more importantly, be barred from utilizing these documents going forward in this litigation.

**II.     THE INTERVIEW NOTES ARE PROTECTED WORK PRODUCT**

"A party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . ." Fed. R. Civ. P. 26(b)(3)(A). The exception to this rule is when a party shows both (1) substantial need for the materials; and (2) cannot obtain the substantial equivalent of the materials through other means, without undue hardship. Fed. R. Civ. P. 26(b)(2)(A)(ii).

There was *actual litigation pending* when most of these interviews were conducted. Litigation commenced on July 17, 1997, and many of the interviews were conducted before that date and through August of 1997, prior to the filing of the Amended Complaint. Importantly, out

Honorable Michael A. Shipp
August 16, 2010
Page 3 of 5

of twenty-four (24) interview memos, seventeen (17) of them are marked "DRAFT." Thus, the interview memos were both conducted in anticipation of litigation *and* trial, and are thus plainly covered by the Rule.

Indeed, it is beyond cavil that the memos here are protected work product. As the Third Circuit has explicitly held, discovery of an attorneys' interview notes will be discoverable only in "rare situation[s]." *In re Grand Jury Investigation*, 599 F.2d 1224, 1231 (3d Cir. 1979). There, the court dealt with attorneys' interview notes and held that there are a few special considerations that courts need to deal with, and be particularly mindful of, when considering protection of interview notes under the work product doctrine. Indeed, these considerations all counsel strongly in favor of non-disclosure: (1) the notes may reveal the attorney's thought processes; (2) the reliability of the notes for accuracy is a function of many factors, such as the contemporaneous nature of the note taking and editorial discretion of the attorney; (3) discovery of the notes could turn the attorney into a witness; and (4) the information in the notes is of little utility, particularly when the adversaries can interview those witnesses themselves. *Id.* at 1231. Relying on *Hickman v. Taylor*, 329 U.S. 495 (1947), the Supreme Court's seminal work product case, the court thus found that the documents would be discoverable only in a "rare situation." *Id.* Thus, under governing precedent in this circuit, the interview memos at issue are both (1) clearly protected by the work product doctrine; and (2) only discoverable upon a very specialized, particularized showing by the party seeking the documents.

In this District, there is a dearth of caselaw as to the discoverability of witness interview notes by attorneys, most likely because the Third Circuit put the issue to rest over 30 years ago. However, the issue has cropped up in other courts, most notably the Southern District of New York, and courts there have almost uniformly held that witness interview notes are to be jealously guarded by the privilege. *See, e.g., SEC v. Strauss*, No. 09 Civ. 4150, 2009 U.S. Dist. LEXIS 101227, at *12 (S.D.N.Y. Oct. 28, 2009) ("[t]o the extent the interview notes and memoranda were prepared by counsel, they easily fit within the protection of the work-product doctrine"); *SEC v. Stanard*, 06 Civ. 7736 (GEL), 2007 U.S. Dist. LEXIS 46432, at *4 (S.D.N.Y. June 26, 2007) (notes of interviews "conducted in order to determine whether to initiate litigation" protected as work product); *SEC v. Cavanagh*, 98 Civ. 1818 (DLC), 1998 U.S. Dist. LEXIS 3713, at *5 (S.D.N.Y. Mar. 23, 1998) ("[t]he notes at issue in this case are classic work-product . . .").

Other circuit courts are in accord with the Third Circuit's teaching in *In re Grand Jury Investigation*. *See, e.g., McKenzie v. McCormick*, 27 F.3d 1415, 1420 (9th Cir. 1994) (Kozinski, J.), *cert. denied*, 513 U.S. 1118 (1995). The Seventh Circuit recently held, in a like instance, that a law firm's notes made in anticipation of litigation are clearly protected work product. *Sandra T.E. v. S. Berwyn Sch. Dist.*, 600 F.3d 612 (7th Cir. 2009). The court there began by noting the two purposes underlying the work product doctrine: to protect against revealing an attorney's mental impressions, and, as pertinent here, to "limit the circumstances in which attorneys may piggyback on the fact-finding investigation of their more diligent counterparts." *Id.* at 622 (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)).

In *Sandra T.E.*, a school district hired a law firm to conduct an investigation related to a teacher at the school who sexually abused children. The district court held that the investigatory notes were not work product because the law firm was hired as an investigator, not an attorney. But the Seventh Circuit reversed and wholly rejected this approach. "Work-product protection applies to attorney-led investigations when the documents at issue 'can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Id.* at 622 (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996)).

In short, the interview memos constitute core work product. Latham & Watkins and the undersigned functioned as Walsh Securities' attorney for the dual functions of investigation and bringing suit. Interview memos of interested parties for the purpose of anticipating litigation, and preparation for trial, fall squarely within the contours of the privilege.

### III.  DEFENDANTS HAVE NOT MET THEIR HIGH BURDEN TO OVERCOME THE PRIVILEGE

We briefly address the argument that Defendants' purported need and inability to obtain the equivalent information should give way to the privilege. This argument should be rejected out of hand. Defendants both (1) lack substantial need for the documents; and (2) could have and should have obtained the equivalent information without any undue hardship.

Defendants' burden is high; it will only be met "in rare situations, such as those involving witness unavailability." *EEOC v. Int'l Profit Assocs.*, 206 F.R.D. 215 (N.D. Ill. 2002) (quoting *Trustmark Ins. Co. v. General & Cologne Life Re of America*, No. 00 C 1926, 2000 U.S. Dist. LEXIS 18917 (N.D. Ill. Dec. 19, 2000). Indeed, the Supreme Court in *Upjohn Co v. U.S.*, 449 U.S. 393, 401-02 (1981), held that a "far stronger showing of necessity and unavailability by other means" is required when dealing with interview memos authored by attorneys. Because we are dealing with core work product here, Defendants must establish a "highly persuasive showing of need." *Crosby v. City of N.Y.*, No. 09 Civ. 9693 (SAS), 2010 U.S. Dist. LEXIS 63424, at *33 (S.D.N.Y. June 22, 2010).

There is absolutely no reason why Defendants cannot interview these witnesses on their own, and there is no reason why Defendants did not attempt to interview these witnesses earlier in this litigation. There has been no showing or offering of witness unavailability. Defendants lack need, let alone substantial need; they are seeking to piggyback off of the efforts of Plaintiff's counsel and their failure to perform any investigation into this matter. *Sandra T.E.*, 600 F.3d at 622. Assuming, *arguendo,* that there is a showing of need, there has not been – nor can there logically be – any showing that Defendants cannot obtain the substantial equivalent because the witnesses have always been available to Defendants in the very same way that the witnesses were available to Plaintiff's counsel. *Cf. Brombard v. Montana*, No. CV-05-32-BLG-RF-CSO, 2007 U.S. Dist. LEXIS 67810 (D. Mont. Sept. 13, 2007) ("even if [the party] did have a substantial need for this information, he has been able to obtain the substantial equivalent of the materials by other means"). The witnesses, including those that are now former employees, are not under Plaintiff's control. Defendants can obtain *the equivalent* of the contents of the memos by interviewing them or deposing them.

Honorable Michael A. Shipp
August 16, 2010
Page 5 of 5

    Defendants have been on notice for years about the existence and content of the notes at issue. Indeed, the fact that Defendants have had the notes since 2007 counsels now strongly in favor of return or destruction and a ruling that they cannot be used in this litigation. Defendants could have (and indeed may have) interviewed witnesses in the notes to corroborate or otherwise challenge their statements for years now. Defendants have at their disposal the opportunity to call these witnesses for depositions, which they have not. The interview memos are quite simply the property of Walsh Securities' counsel, are in many cases drafts, and are protected work product that were turned over to Defendants for the *sole* purpose of facilitating settlement under Fed. R. Evid. 408, and should have been returned or destroyed at the request of counsel upon the failure of the mediation.

## IV.   CONCLUSION

    The witness interview memos were prepared by counsel, including the undersigned, in anticipation of litigation and preparation for trial. They are core work product entitled to the fullest protection under the law. For the foregoing reasons, Defendants should return or destroy the documents at issue, and be precluded from utilizing them, at all, in this litigation.

    We thank the Court for its continued and kind attention to this matter.

Respectfully submitted,

/s/ Robert A. Magnanini

cc: All counsel of record (via CM/ECF)
    Richard Calanni (via regular mail)
    Richard DiBenedetto (via regular mail)

# EXHIBIT A

CHICAGO OFFICE
SEARS TOWER, SUITE 5800
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 876-7700
FAX (312) 993-9767

HONG KONG OFFICE
23RD FLOOR
STANDARD CHARTERED BANK BUILDING
4 DES VOEUX ROAD CENTRAL, HONG KONG
TELEPHONE + 852-2905-6400
FAX + 852-2905-6940

LONDON OFFICE
ONE ANGEL COURT
LONDON EC2R 7HJ ENGLAND
TELEPHONE + 44-171-374 4444
FAX + 44-171-374 4460

LOS ANGELES OFFICE
633 WEST FIFTH STREET, SUITE 4000
LOS ANGELES, CALIFORNIA 90071-2007
TELEPHONE (213) 485-1234
FAX (213) 891-8763

MOSCOW OFFICE
ITSA GASHEKA, 7, DUCAT II, SUITE 900
MOSCOW, RUSSIA 125047
TELEPHONE + 7-095 785-1234
FAX + 7-095 785-1235

NEW YORK OFFICE
885 THIRD AVENUE, SUITE 1000
NEW YORK, NEW YORK 10022-4802
TELEPHONE (212) 906-1200
FAX (212) 751-4864

# LATHAM & WATKINS
ATTORNEYS AT LAW
ONE NEWARK CENTER
NEWARK, NEW JERSEY 07101-3174
TELEPHONE (973) 639-1234
FAX (973) 639-7298

PAUL R. WATKINS (1899 - 1973)
DANA LATHAM (1898 - 1974)

September 30, 1997

ORANGE COUNTY OFFICE
650 TOWN CENTER DRIVE, SUITE 2000
COSTA MESA, CALIFORNIA 92626-1925
TELEPHONE (714) 540-1235
FAX (714) 755-8290

SAN DIEGO OFFICE
701 "B" STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8197
TELEPHONE (619) 236-1234
FAX (619) 696-7419

SAN FRANCISCO OFFICE
505 MONTGOMERY STREET, SUITE 1900
SAN FRANCISCO, CALIFORNIA 94111-2562
TELEPHONE (415) 391-0600
FAX (415) 395-8095

SILICON VALLEY OFFICE
75 WILLOW ROAD
MENLO PARK, CALIFORNIA 94025-3656
TELEPHONE (415) 328-4600
FAX (415) 463-2600

TOKYO OFFICE
INFINI AKASAKA, MINATO-KU
TOKYO 107, JAPAN
TELEPHONE +813-3423-3970
FAX +813-3423-3971

WASHINGTON, D.C. OFFICE
1001 PENNSYLVANIA AVE., N.W., SUITE 1300
WASHINGTON, D.C. 20004-2505
TELEPHONE (202) 637-2200
FAX (202) 637-2201

FILE NO. 025776-0000

Walsh Securities Inc.
4 Campus Drive
Parsippany, NJ 07054

Re:   Loans Originating from National Home Funding, Inc. and
      Loans on Properties Located in Providence, Rhode Island

Ladies and Gentlemen:

Over the past several weeks, we have investigated, with the assistance of Deloitte & Touche LLP, two general categories of mortgage loans financed by Walsh Securities Inc. ("Walsh Securities"): (i) loans that were originated by National Home Funding, Inc. ("National Home Funding") between February, 1996 and June, 1997 (the "National Home Funding Loans"), and (ii) loans on properties located in Providence, Rhode Island between June, 1996 and May, 1997 (the "Providence Loans"). You have asked us to summarize for you our preliminary findings with respect to these two categories of loans, and we do so herein. As we complete our internal review of these loans, we will supplement our findings as appropriate.

## I. The National Home Funding Loans

Walsh Securities financed a total of 388 loans originated by National Home Funding between April, 1995 and June, 1997. We have examined loan files for 342 of these loans and have reached preliminary findings with respect to them, as set forth below.[1]

---

[1] We are in the process of reviewing the remaining National Home Funding loan files (with the exception of four files that Walsh Securities, as of this date, has been unable to obtain).

LATHAM & WATKINS

Walsh Securities Inc.
September 30, 1997
Page 2

Of the 342 National Home Funding loans we have examined (which total approximately $37 million), our preliminary determination is that (i) approximately 220 loans (representing approximately $24 million) were fraudulently obtained from Walsh Securities pursuant to an elaborate pyramid scheme which required the concerted action of several individuals and entities (the "Pyramid Scheme Loans"); (ii) approximately 100 loans (representing approximately $11 million) involved no apparent fraud; and (iii) approximately 20 loans (representing approximately $2.5 million) were based on inflated appraisals for the apparent purpose of allowing the borrowers to receive one hundred percent financing for the properties.

The object of the Pyramid Scheme was to obtain mortgage loans from Walsh Securities based on fraudulently inflated appraisals, appraisals that were in some cases up to several times the actual value of the homes. In addition to the fraudulent appraisals, those involved in this Pyramid Scheme would submit to Walsh Securities other false information. For example, the loan applications would (i) indicate that the borrowers had provided a down payment for the properties when, in fact, none was provided; (ii) indicate that the seller had taken back a second mortgage when, in fact, there was no bona fide second mortgage; and (iii) often contain false information about the real estate transactions designed to present them as better credit risks.

Central to this Pyramid Scheme was the secret conveyance, often through a filed deed, of a sixty percent interest in the property from the borrowers to one of the key entities in the fraud, which entity was responsible for (i) collecting and "pooling" the rents, if any, from the properties and (ii) making mortgage loan payments on behalf of the borrowers. Proceeds from the new loans fraudulently obtained from Walsh Securities in this scheme would be used to enrich the participants in the fraud[2] and to make principal and interest payments on prior loans fraudulently obtained from Walsh Securities. As in a classic pyramid or Ponzi scheme, new loans were needed to keep the prior loans current.

Most of the Pyramid Scheme Loans have been delinquent since June, 1997, when Walsh Securities discontinued funding new loans originated by National Home Funding. It is our preliminary estimate that the losses on these mortgages will be significant. On average, the actual value of these properties is far less than the amount of the mortgage. Many of these properties are uninhabited and some properties cannot be inhabited without substantial improvements. We estimate that, on average, the loss on these mortgages may be greater than one-half of the mortgage amount.

Separate and apart from the Pyramid Scheme Loans discussed above are approximately 20 National Home Funding Loans that are based on inflated appraisals. It appears

---

[2] Our investigation to date has not developed evidence indicating that any senior management official at Walsh Securities was a participant in the Pyramid Scheme.

LATHAM & WATKINS

Walsh Securities Inc.
September 30, 1997
Page 3

that the appraisals were inflated so that the borrowers could obtain approximately one hundred percent financing for the property. A percentage of the mortgage proceeds may also have been distributed to enrich the sellers and their representatives. However, unlike the Pyramid Scheme Loans which, by their nature, inevitably lead to a substantial loss to Walsh Securities, it is unclear what loss, if any, will result from these approximately 20 loans, for which the appraisal was inflated to obtain approximately one hundred percent financing. As long as the borrowers continue to make payments on these mortgages, there is no loss to the mortgage holder. Moreover, unlike the Pyramid Scheme Loans, there is no indication that the income from these properties is being "pooled" or that the borrowers have transferred an interest in the property to another entity. Thus, unlike the Pyramid Scheme Loans, these loans can be self-sustaining and capable of performance. Moreover, even if these loans were to become delinquent, the loss would be far less than in the Pyramid Scheme Loans because the appraisals are less exaggerated.

While our analysis is very preliminary with respect to these approximately 20 loans, the loans do appear to share certain characteristics with approximately 95 of the loans we examined in Providence, Rhode Island, which we discuss below.

## II. The Providence Loans

We have examined 170 loan files on properties located in Providence, Rhode Island (approximately totaling $12 million). Our preliminary determination is (i) none of the loans involve any form of the Pyramid Scheme discussed above; (ii) approximately 95 loans were based on inflated appraisals apparently designed to achieve approximately one hundred percent financing for the properties (representing approximately $7 million); and (iii) approximately 75 loans involved no apparent fraud (representing approximately $5 million).

With respect to the approximately 95 loans involving inflated appraisals, it is unclear whether any significant loss will result to Walsh Securities. The properties, on inspection, appear to be well maintained. Those that are not owner-occupied are generally rented. There also does not appear to be dissatisfaction among either the tenants or the borrowers to whom we spoke. The mortgage payments for these properties are not being "pooled" and there have been no secret transfers of interest in the properties of which we are aware. Thus, these loans can be self-sustaining. Significantly, the delinquency rate for these properties does not appear to be materially different from the delinquency rate for the other Providence Loans which do not involve apparent fraud. Were these properties to be foreclosed as a result of non-performance, the actual value of the properties, in general, may be approximately seventy-five to eighty percent of the loan amount.[3]

---

[3] The approximate twenty to twenty-five percent differential appears to reflect the financing of the transaction costs of the sale and profit to the seller.

LATHAM & WATKINS

Walsh Securities Inc.
September 30, 1997
Page 4

      We understand that Walsh Securities does not require additional investigation into the remainder of its loan portfolio. We further understand that Walsh Securities has adopted internal procedures to help curtail fraud against the company and has currently suspended funding for any property with a recent sale transaction until additional underwriting policies and procedures can be implemented. We are prepared to provide additional assistance to Walsh Securities, as appropriate.

Very truly yours,

Michael Chertoff
of LATHAM & WATKINS

# EXHIBIT B

# BOIES, SCHILLER & FLEXNER LLP

150 JOHN F. KENNEDY PARKWAY • 4TH FLOOR • SHORT HILLS, NJ 07078 • PH. 973.218.1111 • FAX 973.218.1106

December 5, 2007

**VIA FEDERAL EXPRESS**

David R. Kott, Esq.
McCarter & English
Four Gateway Center
Newark, NJ 07101

      Re:    Walsh Securities, Inc. v. Cristo Property Management, Ltd., et al.
               Civil Action No.: 97-3496 (DRD/MS)

Dear David:

    I write in response to your letter of November 19, 2007 and will disregard both the tone of the letter and the asperstions against my character or conduct. I understand that you are frustrated with this litigation, but surely not as frustrated as Walsh Securities, Inc. ("WSI"). The suggestion for this mediation was initially made by the Defendants to Judge Arleo. After WSI had agreed to that procedure, Judge Bassler, as you may recall, asked at a motion hearing why this matter had not been settled with the title companies. You responded that you believed the title companies had defenses against WSI because it may have been a participant in the fraud and, therefore, the title companies may not have to pay. Judge Bassler responded that he did not believe that he would find any case law to that effect, and you candidly agreed that you had not. Judge Bassler replied that he thought not, and told us he was planning to order the parties to attend an all-day settlement conference with clients. You responded that Judge Arleo had already addressed the issue and had scheduled a mediation with Judge Boyle. Since that time, the mediation has focused on discussions with other parties and extended discovery at the request of the Defendants.

    To date, despite numerous sessions, WSI has never received one single counter-offer to any of its demands. You had suggested that settlement would be possible if we provided additional information, some which you likely may not obtain in the course of litigation. In order to attempt to satisfy you and your client, I spent several months discussing and trying to obtain the documents related to the *Cityscape v. WSI* litigation from WSI's prior counsel. After several months of pulling teeth, I did obtain two disorganized boxes of documents. We then organized the documents, reviewed them for privilege and forwarded the vast majority of documents to you. In my cover letter to you, I candidly told you about the difficulty in obtaining the documents and Seiden Wayne's difficulty in actually locating documents in their files, because the file had been closed seven years ago, and the firm had transformed several times. I also offered to host a



BOIES, SCHILLER & FLEXNER LLP

David R. Kott, Esq.
December 5, 2007
Page 2 of 2

conference call with David Phillips from Seiden Wayne, WSI's prior counsel, so that he could explain exactly what they had done and what they had found. You did not take me up on the offer for a conference call, and instead wrote the letter. You also had asked to see the interview memos from Latham & Watkins initial investigation. To that end, I have reviewed all the files that we received from Latham & Watkins, and are providing copies of all of the interview memos related to Latham & Watkins' initial investigation of the Asbury Park fraud scheme. As you can see, these interview notes are redacted to the least extent practicable. I have also enclosed a copy of the September 30, 1997 letter from Latham & Watkins to WSI.

I have telephoned both Latham & Watkins and Seiden Wayne, and again asked them to review their electronic and hard copy files to determine if they have any other documents which you requested. I will be out of the country until Wednesday, December 12, 2007, and upon my return will again follow up with them.

As you may see, I too am frustrated with the process, especially after a year and a half where I have not received a counter-offer to any of WSI's demands, nor have I received any discovery from Commonwealth besides the most minimal files containing copies of the title insurance policies. Despite my skepticism that WSI will receive a realistic, or any, counter-offer during the next mediation session, we are providing copies of the redacted interview memos in BSF's files and the September 30, 1997 letter. We will also send copies of some of the documents from the *Cityscape* litigation which we received from Seiden Wayne in a final attempt to resolve this matter in the mediation. I would be happy to discuss this matter further with you on or after Wednesday, December 12, 2007.

Very truly yours,

Robert A. Magnanini

RAM/aa
Enclosures
cc:    Honorable John M. Boyle
        Edward J. Hayes, Esq.
        Martin McGowan, Esq.

# EXHIBIT C

# BOIES, SCHILLER & FLEXNER LLP

150 JOHN F. KENNEDY PARKWAY • 4TH FLOOR • SHORT HILLS, NJ 07078 • PH. 973.218.1111 • FAX 973.218.1106

January 9, 2008

<u>**VIA FACSIMILE AND E-MAIL**</u>

David R. Kott, Esq.
McCarter & English
Four Gateway Center
Newark, NJ 07101

Edward J. Hayes, Esq.
Fox Rothchild
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291

Martin McGowan, Esq.
Methfessel & Werbel
3 Ethel Road, Suite 300
Edison, NJ 08818

Re: Walsh Securities, Inc. v. Cristo Property Management, Ltd., et al.
Civil Action No.: 97-3496 (DRD/MS)

Gentlemen:

In an effort to mediate this matter, I previously provided you with copies of interview memos that I would not have ordinarily turned over in the regular course of litigation. Since our efforts at mediation have failed I am requesting the return or destruction of all copies of the interview memos. Please provide me with a certification indicating the manner in which you are returning or destroying the memos.

Thank you for your courtesies in handling this promptly. Please feel free to contact me or Amy Wagner with any questions.

Very truly yours,

Robert A. Magnanini

RAM/aa

NEW YORK    WASHINGTON DC    FLORIDA    CALIFORNIA    NEW HAMPSHIRE    NEW JERSEY
www.bsfllp.com

# EXHIBIT D

JAN. 15. 2008 10:26AM     (973) 624 7070                           NC. 3745    P. 2

FAX



McCARTER
ENGLISH
ATTORNEYS AT LAW

January 15, 2008

**BY FAX AND REGULAR MAIL**

Robert A. Magnanini, Esq.
Boies, Schiller & Flexner LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078

Re:  <u>Walsh Securities, Inc. v. Cristo Property Management, et al.</u>
     Civil Action No. CV 97-3496 (WGB)

David R. Kott
Partner
T. 973.622.4444
F. 973.624.7070
dkott@mccarter.com

Dear Mr. Magnanini:

Thank you very much for your January 9, 2008 letter with respect to interview memos. I have not yet destroyed them. It is our view that the interview memos are discoverable. I think that probably the easiest way to deal with this issue is to discuss the issue when we appear before Judge Shipp for a status conference (whenever that is scheduled) and ask Judge Shipp how he wants to deal with it -- whether he wants formal motions, briefs, etc.

Very truly yours,

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
T. 973.622.4444
F. 973.624.7070
www.mccarter.com

David R. Kott

DRK:lfj

cc:  Edward J. Hayes, Jr., Esq. (by fax and regular mail)
     Martin R. McGowan, Jr., Esq. (by fax and regular mail)

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

ME1 7054868v.1

JAN. 15. 2008 10:26AM    (973) 624 7070                              NO. 3745   P. 1

# FACSIMILE TRANSMISSION



| SEND FAX TO: | COMPANY: | FAX NO: | PHONE NO: |
|---|---|---|---|
| Robert A. Magnanini, Esq. | Boies, Schiller & Flexner LLP | 973.218.1106 | 973.218.1111 |
| Martin R. McGowan, Jr., Esq | Methfessel & Werbel | 732.248.4437 | 732.650.6506 |
| Edward J. Hayes, Jr., Esq. | Fox, Rothschild, O'Brien & Frankel | 215.299.2150 | 215.299.2092 |

| FROM: | EMAIL: | FAX NO: | PHONE NO: |
|---|---|---|---|
| David R. Kott/00488 | dkott@mccarter.com | 973.624.7070 | 973.622.4444 |

**January 15, 2008**

Total number of pages including cover: 2                    Client/Matter: 21795/00012

Call, If Problems:

Comments: <u>Walsh Securities v. Cristo Property Management, et al.</u>

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
T. 973.622.4444
F. 973.624.7070
www.mccarter.com

THE INFORMATION CONTAINED IN THE FACSIMILE MESSAGE IS ATTORNEYS' PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE PERSON OR ENTITY NAMED ABOVE. IF YOU ARE NOT THE INTENDED RECIPIENT (OR SOMEONE RESPONSIBLE TO DELIVER TO THE INTENDED RECIPIENT), PLEASE BE AWARE THAT ANY DISSEMINATION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY AT 973.622.4444 AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U. S. POSTAL SERVICE. THANK YOU.

ME1 7055112v.11