# RICHARD CALANNI, PRO SE

1 Old Farm Road
Freehold NJ 07728
Phone (732) 389-8735
Fax (732) 389-2853

September 10, 2010

Honorable Michael A. Shipp
United States Magistrate Judge
United States District Court
District Of New Jersey

Re: WALSH SECURITIES, INC.,

Action No. CV 97-3496 (WGB)

Dear Judge Shipp,

I myself Richard Calanni, pro-se submits a response to Document 421 filed by Stone & Magnanini LLP representing the plaintiff Walsh Securities.

**The plaintiff claims**, I didn't seek permission. I did and was signed by judge Shipp

Not until today after speaking with an intern in Judge Shipps chambers, Carmen in Judge Debevoise's chambers and Norma in the clerks office did I understand what **moving papers were.** Sorry to make so many phone calls but I'm Trying to do this right.

**The plaintiff states** in their **opening paragraph** that I was granted leave to file dismissal on or before August 11, 2010. When I received the Signed order granting me permission from the Honorable Judge Michael Shipp, U.S.M.J, **I called the clerks office** asking what do I do next. **I specifically asked what are moving papers.** (I had no clue what that term means.) **The clerk told me it was the letter I sent in, already filed with Judge Shipp. That all are uploaded into a system, filed and all Judges see it who are involved in this case.** I was told I now wait for a response from any opposing attorney and then answer that on or before Sept. 11. It was not explained to me that moving papers meant I should now file with Judge Debevoise. If I was made aware that is what it meant, I would have hand delivered it. Even that would have been impossible. I received it on Aug. 11, 2010. I am submitting the Post Marked envelope. I only started to understand this when reading the Document 421 I am answering today, that was faxed over to me on Sept. 2 by the plaintiff and Judge Shipps chambers. So please forgive me your honor. I'm sure the people at the clerks office didn't intentionally mislead me. It was

just a matter of words that we as people are accustomed of using at our jobs that send a different message to the receiver not accustom to hearing said in a certain way. Please take into consideration. However, going forward the plaintiff states that dismissal should not be issued until all depositions are done. So should I have filed in August the same reason for opposition would exist from the plaintiff.

**The plaintiffs counter statement** of material facts. The plaintiff relying on a plea deal of one property located in 26 Avenue of Two Rivers, Rumson NJ, made with a federal prosecutor in a federal case, undermines legal proceedings of testimony of depositions and discovery in this case.

I have explained myself and testified during my deposition of being dictated by my attorney in the federal criminal end of this case. **My attorney told me "I was pleading guilty to someone else's truth".** Those were his words to me. That in federal criminal law no intent was necessary, but my presence among these people were under federal law is automatic guilt. My attorney gave me another plea to read prior me signing the one I signed. That plea I read my actions were without intent. We were sitting in a court room when I read it. He took it from me and left. The next thing I know I'm signing something totally different in the FBI office in Shrewsbury NJ. I told him this isn't the same one he gave me to read. I thought he handed me something else by mistake. But the moment I said that, US Asst.Atorney Liebman slapped punched the desk, shocking me. My attorney told Liebman he wanted to speak to me alone. Liebman left the room with another FBI agent leaving me and my attorney alone. I didn't know what was going on. I was stunned. My attorney told me if I don't sign this one, I will go to jail and I better convince the judge I believe what I am signing at sentencing time. He said if I don't, convince the judge and I get the judge angry will go to jail. I told my attorney what kind of law is that, and if I sign this plea and the plaintiff, who I believe is the real master mind of this, sue's me down the line what happens then?. He said it will never go that far. That this case is so complicated that they will settle out of court, and that he can make this go away for me like it never happened. I said to him, "if this winds up in court down the line I will expose you and I will repeat all you told me". He said "sign it, it will never get there and that's the law". SO here we are today.

**The plaintiff claims** I didn't submit As far as documents. How do I submit documents of truth. It's the burden of the plaintiff to submit evidence to . And all the evidence of deposition resulting in discovery has proven just has I said above.

**If the plaintiff** believes a plea deal is all that is needed to undermine the discovery of their own case, a plea of guilty from Betty Ann Dimola, executive of Walsh Securities and sister of the plaintiff, represented by the plaintiff at her deposition should end this case for all.

**The plaintiff submit's a memorandum from Laurie King** information sent to me by Laurie King and according to the plaintiff is produced by William Kane. That is just what

I have said along, Laurie King and William Kane, and others deceived me by sending me false information of sales that may have taken place or may not have taken place. Theses sent to me by Laurie King were to have the support of an attorney, (a officer of the court). He turned out to be Stanley Yacker who is another crook and served prison time pertaining to this case. He was part of the conspiracy connected to Laurie King. All along sending false information to me. **What the plaintiff submits is documented proof I was being lied to.** Part of the conspiracy was against me to. I was a target for them. My biggest crime was trust. I still don't know if the info is true or not.

**NOT TRUE: The plaintiff submits** that I described my self as a **spoke on the wheel.** It **was Judge Wolin words who described me as a spoke on a wheel** that spun out of control and he did not know what to do with me. The asst. US Attorny Liebman said to Judge Wolin, That he was not even sure if I knew all the players and he doesn't know what to do with me either. This is at my sentencing and no one know what to do with me including my attorney, who just sat there with his head down. I kept turning looking at him waiting for him to step in and help. At this point when a Judge and the Prsecutor don't know what to do, would you not think my attorney would say something ( even grunt ). I was alone through this whole thing and lied to. I had no representation when I thought I did.

**The plaintiff submits** Judge Wolins comments of which he says " you weren't making the big money" The fact is I was making no money but my appraisal fee. A conspiracy Rico Act 18 U.S.C consist of 2 or more people to **actually plan a plot to defraud someone or an entity for a monetary gain.** I planned with no one to gain anything as all witness testified under oath during depositions in this case..

All witness brought forth proves under discovery that I had no intended connection to the plaintiffs case 97-3496. It only proves that my plea submitted by the plaintiff was a plea under derress, fair and the unknown.

**The plaintiff submit's a memorandum dated December 13, 1996, of Closing Information from an Attorney of Law** which is considered an acceptable source of information. and Laurie King labeled William Kane as the "RING LEADER". But the plaintiff has chosen once again to just submit what they would like to benefit them and not the **WHOLE TRUTH.** They submit to your honor that the RING LEADER, Mr. William Kane, Mr. Stanley Yacker, **Attorney of Law**,(that's a joke) and Laurie King (who I was told is Stanley Yacker's secretary at the time) are the ones leaving a paper trail of deceit. A paper trail to lie, and fool me.
That's what that document is submitted by the plaintiff. **And I thank the Plaintiff for** finding that memorandum/document and submitting it. **Proof that I had to be lied to,** and deceived by fraudulent paper work that caused the inflation of my appraisals. And a scheme that was already in progress before I was assigned any work from National Home Funding, Robert Skowrenski, who was my client and approved the information I was supplied

**But the plaintiff did not submit to your honor** Williams Kanes testimony under oath where he admits I had nothing to do with a conspiracy, testified under oath and crossed then re-crossed by me that I never conspired to defraud Walsh Securities.

Depositions / discovery has brought out a kick backs scheme, (incentive) and 60% partnering ventures that were all hidden from me. That in its self will inflate the value of appraisals, **Not my hand.**

**William Kanes** "THE RING LEADERS" deposition I was able to afford at that time, and buy. Now I have no credit and work is I'm living one trip at a time as a limousine owner operator driver.

I can't afford to buy
**Laurie Kings** depisition

**Kelly O'neals** deposition processor for Walsh Securities Who admits taking parts of file about and throwing them away in the presence of Betty Ann DiMola,

**Betty Ann Dimola**, Pleaded guilty, Executive of Walsh Securities, sister of Robert and James Walsh, who the plaintiff attorney representing even though she pleaded guilty. (how bazzar, fair and truthful is that. If the plaintiff really wants to find out the truth. they represent someone who pleads guilty? but then try to use my plea as gosple.?)

**Robert Skowrenski'** National Home Funding deposition

**But I bought William Kanes** "THE RING LEADERS" deposition

The following memorandum submitted by the plaintiff to indicate a connection to these criminals is only proof of what I have been saying all these 14 years. That they were deceiving me with fraudulent documents such as these. Especially from law offices — and I certify that this statement is true by my own hand writing and not type

Richard Calanni

Sept 10, 2010

# STANLEY YACKER
ATTORNEY AT LAW
330 HIGHWAY 34, SUITE 3
P.O. BOX 991
MATAWAN, NEW JERSEY 07747

TELEPHONE (908) 566-9300
FAX (908) 290-2477

PLEASE REPLY TO:
MATAWAN OFFICE

CRANBURY - MONROE AREA OFFICE
RABINOWITZ, OKAMATA, WEINER & YACKER
552 Applegarth Road
Cranbury, New Jersey 08512
Phone (609) 655-1242 - FAX (609) 655-2511

# MEMORANDUM

TO:  Bill Kane (Alice)   335-1456
     Richard Pepsny      566-3506
     Larry Cuzzi         747-8780
     John Conneely
     Ed Rice             988-0224
     Rich Calanni        542-8558

FROM: Lory King

DATE: December 13, 1996

RE: Closed Properties - Week Ending 12/13/96

*****************************************************************

Get Ready, Christmas is coming.

The following is a list of properties that have closed through my office within the past week. Of course, if anyone has any questions, please call me.

## PROPERTIES CLOSED ON 12/11/96

48 SOUTH 5TH AVENUE, LONG BRANCH
DONALD DEVINCENZO    PP $130,000    MTG. $97,500

## PROPERTIES CLOSED ON 12/12/96

209 SECOND AVENUE, ASBURY PARK
JOSEPH L. AMADOR    PP $180,000*   MTG. $135,000*

*Indicates a change between original loan application amount and actual figure at time of closing.

WK019610

```
 1                UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEW JERSEY
 3
 4
   WALSH SECURITIES, INC.,
 5                                    Action No. CV 97-3496 (WGB)
 6              Plaintiff,            Hon. William G. Bassler
 7   vs.
 8
   CRISTO PROPERTY MANAGEMENT, LTD.,
 9   a/k/a G.J.L. LIMITED, DEK HOMES OF
   NEW JERSEY, INC., OAKWOOD PROPERTIES,
10   INC., NATIONAL HOME FUNDING, INC., CAPITAL
   ASSETS PROPERTY MANAGEMENT &
11   INVESTMENT Co., Inc., CAPITAL ASSETS
   PROPERTY MANAGEMENT, L.L.C., WILLIAM
12   KANE, GARY GRIESER, ROBERT SKOWRENSKI, III,
   RICHARD CALANNI, RICHARD DiBENEDETTO,
13   JAMES R. BROWN, THOMAS BRODO, ROLAND
   PIERSON, STANLEY YACKER, ESQ., MICHAEL
14   ALFIERI, ESQ., RICHARD PEPSNY, ESQ.,
   ANTHONY M. CICALESE, ESQ., LAWRENCE
15   CUZZI, ANTHONY D'APOLITO, DAP CONSULTING,
   INC., COMMONWEALTH LAND AND TITLE INSURANCE
16   CO., NATIONS TITLE INSURANCE OF NEW YORK,
   INC., FIDELITY NATIONAL INSURANCE CO.
17   OF NEW YORK, COASTAL TITLE AGENCY,
   STEWART TITLE GUARANTY COMPANY,
18   IRENE DIFEO, DONNA PEPSNY, WEICHERT
   REALTORS, AND VECCHIO REALTY, INC. D/B/A
19   MURPHY REALTY BETTER HOMES and GARDENS.
20              Defendants.
21   _____/ Volume II, Pages 132-258
22
     DEPOSITION OF:     WILLIAM KANE.
23
     DATE/TIME:         May 4, 2007; 9:30 a.m.
24
     PLACE:             Kanabay Court Reporters
25                      Feather Sound Square, Suite 19
                        Clearwater, Florida
```

Page 133

```
 1  REPORTED BY:    Robert William Wagner
                    Notary Public,
 2                  State of Florida at large.
 3  APPEARANCES:
 4  MR. ROBERT A. MAGNANINI, Esquire
    Appearing via video conference
 5  Boies, Schiller & Flexner, L.L.P.
    150 John F. Kennedy Parkway
 6  Short Hills, New Jersey 07078
    Attorney for Plaintiff Walsh Securities, Inc.
 7
    MR. DAVID KOTT, Esquire
 8  Appearing via teleconference
    McCarter & English, L.L.P.
 9  Four Gateway Center
    100 Mulberry Street
10  Newark, New Jersey 07102
    Counsel for Commonwealth Land and Title
11
    MR. MARTIN R. McGOWAN, JR., Esquire
12  Appearing via teleconference
    Methfessel & Werbel
13  3 Ethel Road, Suite 300
    Edison, New Jersey 08818
14  Attorney for Coastal Title
15  MS. MUKTI PATEL, Esquire
    Appearing via teleconference
16  Fox Rothschild, L.L.P.
    Princeton Pike Corporate Center
17  997 Lenox Drive, Building 3
    Princeton, New Jersey 08648
18  Attorney for Nations Title and Fidelity National
19  MR. RICHARD CALANNI, Pro Se
    Appearing via teleconference.
20
21
22
23
24          KANABAY COURT REPORTERS
    TAMPA AIRPORT MARRIOTT HOTEL (813) 224-9500
25     ST. PETERSBURG – CLEARWATER (727) 821-3320
```

Page 134

```
 1               INDEX
 2  WILLIAM KANE                    135   1
    DIRECT      By Mr. Kott         135   4
 3  DIRECT      By Mr. Calanni      142   7
    DIRECT      By Ms. Patel        153  17
 4  DIRECT      By Mr. McGowan      158  21
    REDIRECT    By Mr. Kott         163  24
 5  DIRECT      By Mr. Magnanini    167  18
    REDIRECT    By Mr. Kott         245  10
 6  REDIRECT    By Mr. Calanni      254   8
    FURTHER REDIRECT  By Mr. Kott   255   6
 7  Errata sheet                    256   1
    Reporter's Certificates         257   1
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Kanabay Cou

BY MR. CALANNITO DEPONENT KANE

1  So I think the next lawyer who is going to
2  question you is Mr. Calanni, who is a defendant in
3  the case and was an appraiser; and he is what we
4  call pro se, which means he does not have a lawyer.
5  THE DEPONENT: Okay.
6  (Discussion off the record.)
7  DIRECT EXAMINATION
8  BY MR. CALANNI:
9  Q. Bill, did notice he called me an attorney when he
10 first introduced me to you?
11 A. Yes, sir.
12 Q. I moved up from an appraiser to an attorney.
13 Bill, you and I have gone through hell is the
14 least to say here. I'm not an attorney. There's no trick
15 questions here. There's no follow-ups. It's just me and
16 you. And you and I worked together in a certain routine
17 along with Robert; and with us, there's one -- there's two
18 answers; one is either the truth or one is a lie. And what
19 I read in the paper was at the time you were sentenced, you
20 did say, "Your Honor, I want to make things right." And
21 this is your opportunity with me.
22 First of all, there were things that I was told
23 you said during the investigation with the FBI that I didn't
24 believe and I wouldn't believe. And I waited this long to
25 get an opportunity to talk to you and ask you questions.

Kanabay Cou

1  And so far what I've seen is exactly what I've been
2  expecting and in the answers from you, at least 95 percent
3  from what I can tell, have been truthful.
4  And one thing you did say was when Mr. Kott asked
5  you, "Did you ever pay any appraisers $1,500," I've been
6  bombarded with that question because I was told from
7  deposition that Anthony D'Apolito has said you paid me
8  $1,500 an appraisal cash.
9  Did that ever happen, Bill?
10 A. No.
11 Q. Did you and I ever sit down to conspire against
12 anyone?
13 A. No.

BY MR. CALANNI / TO DEPONENT KANE

Page 146

11    Q. Did I ever know of any straw buyers?
12    A. I don't believe so.
13    Q. Did I know that there were strawberry -- straw
14 buyers involved, let's say?
15    A. No.
16    Q. Did I know Gary Grieser at the time I did the
17 appraisal on Avenue of Two Rivers in Rumson (phonetic)?
18    A. I would have no reason to know what -- I don't
19 believe so. I don't --
20    Q. You introduced me to Gary a long time after that
21 in your office?
22    A. It's possible.
23    Q. Did I know of the 60 percent of ownership --
24    A. I got it.
25    Q. -- that was going on?

Kanabay Cou

Page 147

1    A. I don't believe so.

Page 149

1  Go ahead.
2  A. But if Cristo owned it, it would have to match the
3  title report. So...
4  Q. It would have to match the title report, so it
5  would have to stay on?
6  A. Yes.
7  Q. Is it possible that it wasn't reported yet?
8  A. Sure.
9  Q. Were any of my appraisals ever redone?
10  A. By you?
11  Q. No, redone by some other appraiser. Was any of my
12  appraisals ever taken apart and redone?
13  A. It's possible. I have no recollection of any
14  specific appraisals.
15  Q. Do you recall my appraisals in your office on your
16  desk —
17  A. Yes.
18  Q. — being separated and being redone by James
19  Brown?
20  A. It's possible. Not in my office. They would have
21  went to James Brown directly, but that is possible.
22  Q. They would have gone to James Brown directly?
23  A. I mean, we wouldn't do it in the office, no.
24  Q. Did you ever inform me that my appraisals were
25  being used for second mortgages?

Page 150

1  A. No.
2  Q. There were ten appraisals that disappeared — and
3  you and I had this conversation — that was going down to
4  Resources and they were kicked back for whatever reason.
5  And I never had the opportunity to review them. Do you
6  recall those ten appraisals?
7  A. No. Kicked back by Resource? Resource had
8  nothing to do with — it would have been Greenwich.
9  Q. It would have been Greenwich? Did I never know
10  that my appraisals were going to Greenwich?
11  A. I have no idea. It was Walsh Securities, yes. I
12  doubt you would have known Greenwich.
13  Q. You doubt I would have known Greenwich. Did I
14  always bring my appraisals up to you in Cristo Management?
15  A. Yes, yes.
16  Q. Were any of my — were any appraisals of mine that
17  I've done, were the properties of those appraisals closed
18  prior to the appraisals coming up to your office?
19  A. It's possible.
20  Q. Are you aware that Robert Skowrenski and I had a
21  conversation pertaining to the missing appraisals that I'm
22  speaking about, the ten missing appraisals?
23  A. No.
24  Q. It was also said during the federal investigation
25  by the county prosecutor's office to me that furniture was

Page 151

1  being moved from house to house in order to fool residency.
2  Do you know of that?
3  A. No. The houses were what they were. We never
4  moved anything around.
5  Q. Kellie is a processor?
6  A. She was, yes.
7  Q. Kellie was a processor?
8  A. Yes.
9  Q. Veronica, does that name mean anything to you?
10  A. Yes.
11  Q. There was Veronica?
12  A. Yes.
13  Q. When my appraisals were sent up to Walsh
14  Securities, whose responsibility is it to review?
15  Veronica's and Kellie's or Kellie's and not Veronica's?
16  A. Well, it was Kellie; and then when it went to
17  underwriting — again, to the best of my recollection, it
18  went to underwriting. And then underwriting would pull
19  x-amount of — quality control would pull x-amount of deals.
20  And that was a gentleman they had brought in. Again, his
21  name I don't remember, but Veronica worked for him. So
22  either he would review it or Veronica would review it.
23       In the beginning before Veronica was there or the
24  QC, it was up to Paul DelRusso.
25  Q. Did I ever work to your knowledge with Brodo?

Page 152

1  A. Not at all.
2  Q. Richard DiBenedetto?
3  A. No.
4  Q. James Brown?
5  A. Not to my knowledge.
6  Q. And you and I never sat down and had a
7  conversation, a pow-wow if you would say, to conspire and
8  have a conspiracy to develop any kind of a scam to defraud
9  anyone; is that true?
10  A. I don't remember any sit-down or pow-wows or
11  anything like that, no.
12  Q. Okay. Going back to the final inspections, did
13  you ever order a final inspection for me?
14  A. Actually anything is possible. I don't recall
15  any. It could have been done. Again, if I'm not mistaken,
16  any final inspections would have been done with D & S or
17  DEK. But Cristo I don't think ever did any final
18  inspections.

*BY MR CALANNI
TO
DEPONENT KANE*

6 (Pages 149 to 152)

BY MR. CALANNI / TO DEPONENT KANE

Page 153

```
 2      Q. And all my appraisals that I did that went up to
 3   Walsh Securities, National Home Funding was my client?
 4      A. That is correct.
 5      Q. It was also said that you paid me — let me take
 6   that back.
 7          The question was why did you pay me, and the
 8   reason I gave was because I had no distinguish between you
 9   as a loan officer and Robert Skowrenski working together.
10          There was no under-the-table payment of any kind
11   other than my appraisal fee; is that correct?
12      A. That is correct.
13          MR. CALANNI: Okay. Bill, that's all I have to
14   ask you.
15          THE DEPONENT: Okay. Thank you.
16          (Discussion off the record.)
```

*BY MR. CALANN/TO DEPONENT KANE*

Page 254

1  question
2  BY MR. KOTT:
3  Q. And would Ms. Demola have known about the 60/40
4  arrangement?
5  A. No.
6  MR. KOTT: Thank you. I do not actually have
7  any further questions.
8         REDIRECT EXAMINATION
9  BY MR. CALANNI:
10 Q. Just a couple, Bill. I'm the only appraiser that
11 shows up for the depositions or court, whatever. And it
12 seems to me when a question's asked about appraisers, it's
13 always appraisers like Rich Calanni. So I need to clear up
14 something here.
15 (Court reporter asks for the microphone to be moved.)
16 BY MR. CALANNI:
17 Q. Did you get what I said?
18 A. Yes, we got that so far.
19 Q. Did you ever call me to ask me to come up with a
20 price on an appraisal?
21 A. Not to my recollection, no.
22    MR. CALANNI: All right, Bill.
23    THE DEPONENT: Okay.
24    MR. CALANNI: Yes, there are others, but I
25 think Mr. Kott covered it and...

Kanabay Cou

Your Honor, by Proof of submitted discovery, of testimony from witness's and or defendants and the memorandum to blind me from the scheme, it is clear, that I have no guilt in this matter. It has taken 14years for me to finally question these individuals. The so called Ring Leader William Kane, who obviously was, who admits to his guilt, time and time again testifies I was not part of it.

It is very true that these things have caused hardship. A terrible thing. But I am one of them. I am tied and weary. My wife suffers. My income is moment to moment. Other people who have benefited are still. This case currently charging up has now caused my wife illness to worsen and now she's loosing her hair. It is 2am Sept 10, 2010 and I'm still answering this response. I have a 4am job to do, the only one of the day and no sleep. There's no more I can give to clear my name. All that has been said is all that can be said. Illness and poverty is all that my wife and I have now. I cant even pay our health insurance this month or meet my budget at all.

Please, I ask you to strongly consider and read the facts. Regardless of how experts can twist and bend the the truth in this case, I still have faith in our system and I truly believe in the bench. Till this day, no one testified I was part of this crime and no one ever will. Please free me from this nightmare.

Sincerely

*[signature]*

Richard Calanni

Sept 10, 2010