# STONE ⬛ MAGNANINI
LLP

COMPLEX COMMERCIAL LITIGATION

NEW JERSEY OFFICES    150 JFK Parkway, Short Hills, NJ 07078    P 973.218.1111    F 973.218.1106

October 5, 2011

**VIA CM/ECF and FEDERAL EXPRESS**

Honorable Michael A. Shipp, U.S.M.J.
United States District Court for the District of New Jersey
Martin Luther King, Jr. Federal Building
50 Walnut Street
Newark, New Jersey 07101

    Re:   *Walsh Securities, Inc. v. Cristo Property Management, LTD, et al.*
           Civil Action No. 97-3496 (DRD/MAS)

Dear Judge Shipp:

    This firm represents Plaintiff Walsh Securities Inc. ("Plaintiff" or "WSI") in the above-referenced action. This letter addresses the discovery disputes that arose during the depositions of the Title Insurance Defendants' Rule 30(b)(6) witness, Donna Sullivan. Ms. Sullivan was the corporate designee for Commonwealth, Nations and Fidelity. The issues were brought to the Court's on September 27, 2011 by way of a teleconference during the Nations deposition.

    The primary issue is whether the Title Insurance Defendants must disclose business related information that is relevant to Plaintiff's claims; namely, the amount that Defendants set as their reserve for Plaintiff's claims for title insurance as that information relates to WSI's bad faith claim and how the Title Insurance Defendants reviewed, investigated, and analyzed those claims. In addition, after contacting the Court regarding this dispute, the Title Insurance Defendants broadened their objections and precluded questioning about (a) which employees were involved in setting reserves, and (b) what numerical authority those individuals had for setting reserves.

    Plaintiff is not seeking attorney-client communications or work product; in fact, Plaintiff is not seeking the discovery of documents or communications of any kind, which is key to the Court's analysis. Quite simply, WSI only seeks the underlying fact of the amount that the Title Insurance Defendants set as their reserves in this case. However, if the Court concludes that Plaintiff is not entitled to that information, then in the alternative, WSI should be allowed to question the Rule 30(b)(6) witness about who set the reserves and the limits of their authority. All of these questions go directly to whether the Title Insurance Defendants followed their own protocol under their claims manual and their regular business practice when evaluating WSI's claims.

Hon. Michael A. Shipp
October 5, 2011
Page 2 of 12

     For these reasons, and those set forth below, the Court should order that this information is discoverable in the context of a deposition, and is not subject to the claims of privilege asserted by the Title Insurance Defendants.

### I.    BACKGROUND

     The issue first arose during the Rule 30(b)(6) deposition of Ms. Sullivan in her capacity as the corporate designee for Commonwealth. The following colloquy occurred between counsel for the plaintiff and Commonwealth:

> Q.   . . . On page 23879 underneath "Reserving Practices. Claims officers must establish a reserve for each claim, which represents a realistic estimate of the anticipated net loss to the insurer based upon the facts then known."
>
> Do you know if a claim reserve was made on the Walsh Securities properties?
>
> A.   I know there is a claims reserve.
>
> Q.   What is it?
>
> MR. KOTT: Hold on. Excuse me. Was the question how much?
>
> MR. MEE: Yes.
>
> MR. KOTT: I'm inclined to instruct the witness not to answer but maybe you can tell me why I'm wrong on that.
>
> MR. MEE: I think you're wrong because it's not privileged. Whether Commonwealth decided to establish a reserve probably occurred prior to your being hired as counsel. This is --
>
> MR. KOTT: Not correct.
>
> MR. MEE: Even if it -- even if you were hired as counsel at that time, I would imagine that it's a normal business practice and procedure. How would that be privileged?
>
> MR. KOTT: Well, just like reporting to me is a normal business, asking me questions is a normal business --
>
> MR. MEE: I'm asking for the amount, not whether or not you had discussions with her about how much the amount should be.

* * *

> MR. KOTT: Mr. Mee, I have instructed the witness not to answer so you can proceed to your next question.
>
> MR. MEE: Actually I would like to know your basis for instructing her not to answer.
>
> MR. KOTT: The basis is privilege, work product privilege of the party and of the attorney.
>
> MR. MEE: It's an underlying fact.
>
> * * *
>
> MR. KOTT: Also could not lead to discoverable evidence. That's an objection, that's not the grounds for instructing her, but that's part of the objection, but it deals with how the client evaluates the case for settlement and I don't think you're entitled to that.
>
> MR. MEE: I think that it actually deals with how the client handled this claim by Walsh Securities. It's an underlying fact in this case. Whether or not she had communicated with you about – or whether or not Commonwealth had communicated with you about how much the amount should be, that's not what I'm asking. I'm asking for a fact of whether or not there is a reserve and the fact of what that amount is . . .

(Ex. A, Relevant Portions of the Commonwealth Dep. Tr. at 226:16-229:11).

The same issue arose during the Rule 30(b)(6) depositions for Nations Title Insurance and Fidelity National Title Insurance. When counsel for Walsh Securities began questioning Ms. Sullivan about Nations' loss reserves, the following dispute ensued after which counsel contacted the Court:

> Q. Was there a corporate policy to set a reserve on claims?
>
> A. I don't have any regulations. I mean I don't have anything that was instructive to the claims people at that time.
>
> Q. Was there a reserve set by Nations on this claim?
>
> A. I don't recall if there was -- I think at some point there were some reserves on files.

Hon. Michael A. Shipp
October 5, 2011
Page 4 of 12

> Q. Presently you know --
>
> A. I don't know if it was set by Nations. I don't know at what point it was set.
>
> &ast; &ast; &ast;
>
> Q. Okay. Was it customary for the company to set up reserves on claims?
>
> A. Yeah, I would say that you would usually set a reserve. Obviously you set an expense reserve based on anticipated cost and loss on anticipated -- you know, or what you thought could be the exposure, you know, there's kind of an art, you know.
>
> Q. What about major claims? Are reserves set on all major claims?
>
> A. I mean, if you think there's going to be no loss you probably have zero loss reserve. If you're going to have if you're in litigation, you're necessarily going to have an expense reserve.
>
> Q: Is there a loss reserve for this case?
>
> A: Yes.
>
> Q: What is the amount?
>
> MR. HAYES: Object. And instruct you not to answer. Work product. You're not entitled to it.
>
> MR. MEE: . . . I am asking for the fact of the amount of the reserve. I'm not asking for any communications that you and your client may have had as dealing with how to calculate that amount.

(Ex. B, Relevant Portions of the Nations Dep. Tr. at 104:15-107:14).

And finally, on the last day of Ms. Sullivan's testimony, counsel again questioned Ms. Sullivan about Fidelity's loss reserves, and Fidelity's counsel again objected. This time, however, the Title Insurance Defendants inappropriately broadened their objection to cover information concerning the employees' authority to set the reserve:

> Q. At any point in time did Fidelity set a reserve on Walsh's claims?

A.    I believe reserves were set at one time, yes.

\*    \*    \*

Q.    Who at the company is part of the decision-making process for setting a reserve?

A.    Well, usually the claims administrator.

Q.    Which is who in this case?

A.    Today it's Vincent Sharkey.

Q.    And –

A.    I'm sorry. It would be the claims administrator and usually the claims administrator only has a certain amount of authority, so if it's above that you would usually have to do that in consultation with somebody higher up.

Q.    And who would that be higher up?

A.    In this case I think Vince would have to get approval from probably -- well, I mean if it's within his authority he can do it himself obviously. If it was higher up he would probably go next to David Eizenman.

Q.    Do you know whether or not this was within Mr. Sharkey's approval range or did he have to go to Eizenman?

A.    I don't think that Vincent set the present reserves but –

MR. HAYES: I don't want you to discuss the amount of his authority.

THE WITNESS: Okay.

A.    But --

MR. MEE: First of all, that is an improper direction to the client. I am not asking her for the amount. I had not even actually planned on asking that question but it's a great question. Maybe I should. Anyway, but it's an improper objection. The fact of whether or not Mr. Sharkey has a certain range of authority is a mere fact. There's nothing at all privileged about that number.

MR. HAYES: Mr. Mee, if you're not entitled to know the amount, and we believe that the Court will ultimately rule in this case, you're not going to get it in the back door by asking whether or not the amount that was set in this case was outside of Mr. Sharkey's authority. So I made a perfectly legitimate statement to my client not to mistakenly blurt out the amount of Mr. Sharkey's authority because it ties into what we said yesterday. If ultimately Judge Shipp rules you're entitled to it, you're entitled to it, but you're not going to get it indirectly today.

MR. MEE: It's absolutely incorrect, I think you know that as well as Mr. Kott and I think that it's not a back door way of getting the answer. Whether or not it may indicate what the range of that ultimate reserve is, that's reading tea leaves but the fact of whether or not someone has authority to set a specific number is quite different than the number that it was set at.

\* \* \*

MR. KOTT: Since Mr. Mee dragged me into this fight, I agree with Mr. Hayes. I didn't want my silence to be construed as agreeing with Mr. Mee.

\* \* \*

Q. Would an attorney have been involved in setting the reserve or just the decision by -- or is it just the decision by the claims administrator?

MR. HAYES: Object to the form in that it implies the claims administrator is not an attorney.

A. The claims administrators are attorneys.

Q. I guess the question is: Would outside counsel have been involved in setting the reserve or is that decision made inhouse?

MR. KOTT: I object based on attorney/client privilege.

MR. HAYES: Same objection. Don't answer the question.

MR. MEE: Wait. You're instructing -- why don't we -- I don't know, maybe the question is unclear.

MR. HAYES: You're asking whether or not an outside attorney was involved in the reserve decision. You're not entitled to know that information because that's a privileged communication between the client and the attorney, the outside attorney. You now know that it was set internally by claims administrators who were attorneys. You're not entitled to know that the outside attorney participated in that process.

MS. WAGNER: One of the things that Judge Shipp specifically asked us to let him know, and maybe you're going to file a motion to seal and submit something under seal to him about this --

MR. KOTT: I had not thought about that. That may be a good idea.

MS. WAGNER: Whether or not an attorney set the reserve or whether it was a corporate official. So we're trying to tease out exactly who was involved.

MR. HAYES: You already know that an attorney was involved in setting the reserve. Corporate official in the case law means a corporate official who is not an attorney. The reserves in this case were set by attorneys and that's what this witness has just testified to. Whether or not outside counsel was also involved in the setting of the reserve we don't think has anything to do with the issue.

MS. WAGNER: So it's an attorney admitted in New Jersey that set these reserves?

MR. HAYES: I don't know where they're admitted but they're attorneys.

MS. WAGNER: Acting in the scope of their job as an attorney? Were they inhouse counsel?

MR. HAYES: They're attorneys who are administering claims for the company, not as outside counsel, as employees of the company.

MR. MEE: I think she asked whether or not they're inhouse counsel. Whether or not they are -- if they provide a role within the company as counsel to the company or whether or not their role is specifically in adjusting claims.

> MR. HAYES: I think they do both. They provide advice and counsel to the company in the way in which they administer the claims.
>
> Q. Getting back to the questioning. Apart from being a claims adjuster what other roles did Mr. Bottalico provide? What other roles did he play within the company?
>
> A. Well, I think that was his primary role to review and investigate claims, to make a decision whether to settle them, pay them.
>
> Q. Was he within the office of general counsel within the company?
>
> A. He's with -- he was within the claims department.
>
> Q. Is that separate than general counsel's department?
>
> A. The claims center manager reports to general counsel, but I don't know if it's considered part of that department.

(Ex. C, Relevant Portions of the Fidelity Dep. Tr. at 46:14-57:3).

It is clear from the discussions above, the Title Insurance Defendants improperly precluded testimony concerning factual matters that are at issue in this case.

## II. ARGUMENT

### THE FACT OF THE TITLE INSURANCE DEFENDANTS' LOSS RESERVES ARE UNDERLYING FACTS IN THIS CASE THAT ARE NOT PROTECTED BY ANY PRIVILEGE

#### A. *The Work Product Doctrine Does Not Attach to Testimony Concerning the Numerical Amount that the Title Insurance Defendants Set as their Reserve.*

Contrary to their assertions, the work product privilege does not attach to *testimony* concerning facts about the Defendants' loss reserves. Importantly, Plaintiff did not request the production of any documents or any attorneys' written work product. Instead, during the Rule 30(b)(6) depositions Plaintiff simply asked questions about underlying facts in the litigation that could not possibly convey any mental impressions, opinions, advice, or strategies.

The doctrine plainly does *not* apply to testimony. "[I]t is black-letter law that, even when applicable, the work-product doctrine protects only documents and not underlying facts and, therefore, may not be used as a shield in response to questions posed during a deposition." *LaBrecque v. Sch. Admin. Dist. No. 57*, 463 F. Supp. 2d. 88, 96 (D. Me. 2006); *see, e.g.*, *Westinghouse Elec. Corp. v. Republic of Phil.*, 951 F.2d 1414 (3d Cir. N.J. 1991) ("the attorney-client privilege promotes the attorney-client relationship, and, indirectly, the functioning of our legal system, by protecting the confidentiality of communications between clients and their attorneys. In contrast, the work-product doctrine promotes the adversary system directly by protecting the *confidentiality of papers* prepared by or on behalf of attorneys in anticipation of litigation." (emphasis added)). Plaintiff's counsel only requested testimony about the amount of Defendants' reserve, not for documents or communications that might pertain to that amount. By its very plain terms, the doctrine only applies to *written* work product. "It must be remembered that, at least as codified in the [Federal Rules], the work product doctrine *applies only to tangible things – not testimony*." *SR Int'l Bus Ins. Co. v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291, 2002 U.S. Dist. LEXIS 10919, at *19 (S.D.N.Y. June 19, 2002) (emphasis added). "[T]he work-product doctrine protects only documents and not the underlying facts and, therefore, may not be used as a shield in response to questions posed during a deposition." *LaBrecque*, 463 F. Supp. 2d at 96. By its very nature, the doctrine is cabined to "documents and tangible things." *See* Fed. R. Civ. P. 26(b)(3)(A).

Moreover, as the U.S. Supreme Court has held, "the deposition-discovery rules are to be accorded a broad and liberal treatment," and "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Additionally, the burden establishing the existence of the work product privilege falls on the party asserting it. *Westwood Products, Inc. v. Great American E&S Ins., Co.*, No. 10-3605, 2011 U.S. Dist. LEXIS 84171, at *34 (D.N.J. Aug. 1, 2011) ("the party asserting work product protection bears the burden to show the doctrine applies") (quoting *Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306 (D.N.J. 2008)).

Accordingly, Rule 26 and the caselaw are both clear that the work product doctrine only applies to documents and tangible things. It cannot be used as a shield to prevent a witness from answering questions – questions that do not, by their very terms, seek communications or even descriptions of documents or tangible things – during a deposition. The objections based on privilege should be overruled.

### B. *The Underlying Facts of the Amount Set by the Title Defendants Are Not Protected by the Work Product Doctrine.*

The record is clear here: Plaintiff inquired as to the amount of loss reserves set by the Title Insurance Defendants. Plaintiff did not – and does not – seek documents or tangible things reflecting an attorneys' thoughts, conclusions, or other mental impressions. Plaintiff merely seeks disclosure of underlying facts in this litigation. The doctrine still does not shield factual information from disclosure even if those facts *might* reveal an attorney's thought process through deductive reasoning.

Hon. Michael A. Shipp
October 5, 2011
Page 10 of 12

Then-Magistrate Judge Salas was eminently clear about this in *Ford Motor Co v. Edgewood Properties*, 257 F.R.D. 418, 422 (D.N.J. 2009) ("[u]nderlying facts are not protected by the work product doctrine"). In *Ford*, a party invoking the work product doctrine made an argument that because an attorney helped prepare an third-party witness affidavit, the affidavit thus contained the attorney's mental impressions because he made certain "strategic decisions and 'cherry-picked' certain areas in which the affiant would testify . . ." *Id.* The court flatly rejected this argument and ordered disclosure of the affidavit: "the affidavit is purely factual in nature, and accepting [the cherry-picking] argument would subvert the underlying purpose of the attorney work product doctrine." *Id.* The *Ford* court's holding is simple: even *if* an attorney adds to the total mix of information that yields a bottom line figure such as the calculation of a loss reserve, even *when* an attorney adds their conclusions to a discussion that produces an underlying fact, even *where* an attorney contributes to a bottom-line business decision that generates a business judgment – that calculation, that fact, and that judgment are all not protected by the work product doctrine. This Court is in accord. *Kane v. Mfrs. Life Ins. Co.*, No. 08-4581, 2010 U.S. Dist. LEXIS 52525, at *26-27 (D.N.J. May 26, 2010) (Shipp, J.) (citing *Ford* approvingly).

      **C.**      ***Communications Concerning the Underlying Facts of the this Case Are Not Protected by the Attorney-Client Privilege.***

The Title Insurance Defendants are not protected from disclosing a numerical amount simply because that amount was communicated to counsel because the attorney-client privilege only protects disclosure of communications, not underlying facts communicated to an attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981). This was concisely stated by the U.S. Supreme Court in *Upjohn*:

> The protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Upjohn Co. v. United States*, 449 U.S. 383, 395-396 (1981) (quoting *Philadelphia v. Westinghouse Electric Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962) (emphasis in original). Communications that relate simply to business matters do not fall within the protection. "The activity must be 'peculiarly within the province of an attorney at law.'" *Metalsalts Corp. v. Weiss*, 76 N.J. Super. 291, 298 (Ch. Div. 1962) (citing 58 Am. Jur., Witnesses, § 480, p. 268). "The attorney-client privilege does not protect nonlegal communications based on business advice given by a lawyer. Where a lawyer mixes legal and business advice the communication is not privileged unless 'the communication is designed to meet problems which can fairly be characterized as predominantly legal.'" *Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 204 (E.D.N.Y. 1988) (citing cases and quoting 2 J. Weinstein & M. Berger, Weinstein's Evidence, para. 503(a)(1)(01) at 503-22).

Here, without question, the fact of the amount of the Title Defendants' reserve is a matter of business judgment. As Ms. Sullivan testified, the decision to set a reserve was based on the corporate claims manual or by company practice; that it was customary for each company to set claims reserves; and that the decision to set reserves and the amount was made by someone who was not within the general counsel's department. As the court is amply aware, "[i]t is not the decision itself that is privileged but the confidential communications to and from the attorney and client that resulted in that decision." *Cuno*, 121 F.R.D. at 204. There is, in fact, no colorable argument that the information sought by Plaintiff is even a *communication* concerning legal advice. Rather, it is simply a numerical amount. Therefore, Defendants cannot possibly demonstrate, as they must, that "the communication in question was made for the express purpose of securing legal not business advice." *SEPTA v. CaremarkPCS Health, L.P.*, 254 F.R.D. 253, 259 (E.D. Pa. 2008).

\* \* \*

Defendants may attempt to obfuscate this entire issue by claiming that the loss reserves are irrelevant and therefore not discoverable. Indeed, the question of the relevance of loss reserves in a litigation has divided courts.[1] But this thread of caselaw is of no moment, for the Federal Rules and the caselaw are both abundantly clear that relevance objections are completely inappropriate in depositions. *See* Fed. R. Civ. P. 30(c)(2); *Webster v. City of Bixby*, 2011 U.S. Dist. LEXIS 99505 (N.D. Okla. Sept. 2, 2011) ("[A] relevance objection is not a proper ground on which to instruct a witness not to answer or to terminate a deposition") (quoting *Edwards v. Ctr. Moriches Union Free Sch. Dist.*, No. 05-CV-2735, 2009 U.S. Dist. LEXIS 17763, at \*9-10 n. 5 (E.D.N.Y. Mar. 9, 2009)). To the extent Defendants argue relevance, their attempts should be rejected.

### III. CONCLUSION

Defendants seek to shield underlying facts in this litigation that are not protected by the work product doctrine or the attorney-client privilege. The information was sought in three

---

[1] *Compare Mirarchi v. Seneca Specialty Insurance Company*, No. 10-3617, 2011 U.S. Dist. LEXIS 80871, at \*6 (E.D. Pa. July 22, 2011) ("courts usually hold that that it is irrelevant and therefore not discoverable") *with North River Ins. Co. v. Greater N.Y. Mut. Ins. Co.*, 872 F. Supp. 1411, 1412 (E.D. Pa. 1995) (the amount set aside for reserves "is certainly germane to any analysis [defendant] made of the claim's value, and of whether defendant acted in bad faith in processing the claim"); *General Elec. Capital Corp. v. DIRECTV, Inc.*, 184 F.R.D. 32 (D. Conn. 1998) (finding as relevant information on loss reserves that "did 'entail an evaluation . . . based upon a thorough factual . . . consideration'") In other words, courts are generally more inclined to find the information discoverable when there is a bad faith claim at issue. In this litigation, plaintiff has specifically pleaded bad faith in Count V in its Fourth Amended Complaint. *See* Dkt. 302 ¶¶ 98-100.

Hon. Michael A. Shipp
October 5, 2011
Page 12 of 12

depositions and could easily have been provided with the uttering of but a number.[2] No communications, written work product, or other tangible things have been sought. Accordingly, we respectfully ask that this Court overrule all of the objections proffered on the record as to loss reserves and allow Plaintiff to continue the deposition of the Title Insurance Defendants' Rule 30(b)(6) witness in order to obtain this information.

Respectfully submitted,

Robert A. Magnanini

---

[2] As mentioned in the foregoing, the question that spawned this round of briefing involved the amount of reserves set aside for Plaintiff's insurance claims. Counsel later then inappropriately broadened the objection to cover other facts that are also clearly not covered by the doctrine, such as whether it was within a certain employee's authority (with respect to the amount) to set a loss reserve for Plaintiff's claims.