# EXHIBIT C

Donna Sullivan

Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
 2              Civil Action No.
                97-cv-3496 (DRD) (MAS)
 3
     WALSH SECURITIES, INC.,      :
 4                                :
               Plaintiff,         :
 5                                :
         vs.                      :    DEPOSITION OF:
 6                                :    DONNA SULLIVAN
     CRISTO PROPERTY MANAGEMENT,
 7   LTD., a/k/a G.J.L. LIMITED;
     OAKWOOD PROPERTIES, INC.;
 8   NATIONAL HOME FUNDING, INC.;
     CAPITAL ASSETS PROPERTY
 9   MANAGEMENT & INVESTMENT CO.,
     INC.; CAPITAL ASSETS PROPERTY
10   MANAGEMENT, L.L.C.; WILLIAM
     KANE; GARY GRIESER; ROBERT
11   SKOWRENSKI, II; RICHARD CALANNI;
     RICHARD DiBENEDETTO; JAMES R.
12   BROWN; THOMAS BRODO; ROLAND
     PIERSON; STANLEY YACKER, ESQ.;
13   MICHAEL ALFIERI, ESQ.; RICHARD
     PEPSNY, ESQ.; ANTHONY M.
14   CICALESE, ESQ.; LAWRENCE CUZZI;
     ANTHONY D'APOLITO; DAP
15   CONSULTING INC.; COMMONWEALTH
     LAND TITLE INSURANCE CO.;
16   NATIONS TITLE INSURANCE OF
     NEW YORK, INC.; FIDELITY
17   NATIONAL TITLE INSURANCE CO.
     OF NEW YORK, INC.; COASTAL
18   TITLE AGENCY; DONNA PEPSNY;
     WEICHERT REALTORS; and VECCHIO
19   REALTY, INC., d/b/a MURPHY
     REALTY BETTER HOMES AND
20   GARDENS                     :
               Defendants.       :
21                               :
        - - - - - - - - - - - -
22
23
24
25
```

Donna Sullivan

Page 2

1     TRANSCRIPT of the stenographic notes of
2   the proceedings in the above-entitled matter, as
3   taken by and before JANET BAILYN, a Certified
4   Shorthand Reporter and Notary Public of the State of
5   New Jersey, held at the office of STONE & MAGNANINI,
6   150 John F. Kennedy Parkway, Short Hills, New Jersey,
7   on September 28, 2011, commencing at 9:30 in the
8   forenoon.

Donna Sullivan

Page 46

1    A.    I think there may be something about
2    keeping them advised as to the investigation.
3    Q.    Such as what?
4    A.    If you get a claim in, for instance, you
5    have a certain amount of time that they suggest you
6    acknowledge the claim and if you -- I think there may
7    be -- different states have regulations on keeping
8    the insured current, so it may vary depending on the
9    state you're in.
10   Q.    Outside --
11   A.    I don't know if there are specific
12   timelines that are set by the claims department for
13   doing that.
14   Q.    At any point in time did Fidelity set a
15   reserve on Walsh's claims?
16   A.    I believe reserves were set at one time,
17   yes.
18   Q.    When were those reserves set?
19   A.    I don't recall what year they were set.
20   Q.    Were there multiple reserves?
21   A.    At one time I believe there were
22   multiple reserves, but I believe they have been --
23   the files have been consolidated to one main file.
24   Q.    When there were multiple reserves how
25   many reserves were there?

1      A.    I'm -- it's a guess.  I am not supposed
2  to guess.
3      Q.    Well, more than one obviously?
4      A.    Not for each individual transaction.  I
5  don't think it would have been more than eight files
6  that were originally set up for groups of underlying
7  files.
8      Q.    So potentially eight separate reserves?
9      A.    It may have been.
10     Q.    What was the purpose of setting the
11 reserve?
12     A.    I don't know the purpose of it.
13     Q.    Is it -- I mean, is it corporate policy?
14 Is it something they do -- that the company does for
15 every claim that comes in?
16     A.    Well, you would make I guess a risk
17 assessment and might reserve for that, or you might
18 reserve because you have mediation coming forward and
19 you want to reserve the amount that you think you
20 might be willing to offer at that mediation.  I think
21 it's varied from company to company and over time,
22 the rules on that.
23     Q.    Is there a distinction between major
24 claims and minor claims as to whether or not to set a
25 reserve?

Donna Sullivan

Page 48

```
 1      A.    No.
 2      Q.    So there are reserves set for minor
 3   claims as well?
 4      A.    Sure.
 5      Q.    Who at the company is part of the
 6   decision-making process for setting a reserve?
 7      A.    Well, usually the claims administrator.
 8      Q.    Which is who in this case?
 9      A.    Today it's Vincent Sharkey.
10      Q.    And --
11      A.    I'm sorry.  It would be the claims
12   administrator and usually the claims administrator
13   only has a certain amount of authority, so if it's
14   above that you would usually have to do that in
15   consultation with somebody higher up.
16      Q.    And who would that be higher up?
17      A.    In this case I think Vince would have to
18   get approval from probably -- well, I mean if it's
19   within his authority he can do it himself obviously.
20   If it was higher up he would probably go next to
21   David Eizenman.
22      Q.    Do you know whether or not this was
23   within Mr. Sharkey's approval range or did he have to
24   go to Eizenman?
25      A.    I don't think that Vincent set the
```

Donna Sullivan

Page 49

1  present reserves but --
2           MR. HAYES:  I don't want you to discuss
3  the amount of his authority.
4           THE WITNESS:  Okay.
5      A.    But --
6           MR. MEE:  First of all, that is an
7  improper direction to the client.  I am not asking
8  her for the amount.  I had not even actually planned
9  on asking that question but it's a great question.
10 Maybe I should.  Anyway, but it's an improper
11 objection.  The fact of whether or not Mr. Sharkey
12 has a certain range of authority is a mere fact.
13 There's nothing at all privileged about that number.
14          MR. HAYES:  Mr. Mee, if you're not
15 entitled to know the amount, and we believe that the
16 Court will ultimately rule in this case, you're not
17 going to get it in the back door by asking whether or
18 not the amount that was set in this case was outside
19 of Mr. Sharkey's authority.  So I made a perfectly
20 legitimate statement to my client not to mistakenly
21 blurt out the amount of Mr. Sharkey's authority
22 because it ties into what we said yesterday.  If
23 ultimately Judge Shipp rules you're entitled to it,
24 you're entitled to it, but you're not going to get it
25 indirectly today.

Donna Sullivan

Page 50

1         MR. MEE:  It's absolutely incorrect, I
2   think you know that as well as Mr. Kott and I think
3   that it's not a back door way of getting the answer.
4   Whether or not it may indicate what the range of that
5   ultimate reserve is, that's reading tea leaves but
6   the fact of whether or not someone has authority to
7   set a specific number is quite different than the
8   number that it was set at.  So --
9         MR. HAYES:  For the third time today we
10  will agree to disagree, but the same instruction has
11  been given to the client.
12        MR. KOTT:  Since Mr. Mee dragged me into
13  this fight, I agree with Mr. Hayes.  I didn't want my
14  silence to be construed as agreeing with Mr. Mee.
15        MR. MEE:  I assumed that you didn't.
16     Q.     Do you know who set the reserve for
17  Walsh's claims?
18     A.     I don't recall.
19     Q.     Prior to Mr. Sharkey who held his
20  position?
21     A.     As claims administrator, Ken Aran,
22  A-r-a-n.
23     Q.     And do you know whether or not Mr. Aran
24  set the reserve at issue in this case?
25     A.     I don't believe so.

Donna Sullivan

Page 51

1   Q.   Who was Mr. Aran's superior?
2   A.   Of course that was a different time and
3   a different structure in the company at that point.
4   Eizenman wasn't an employee. So I would think that
5   Ken reported to Gary Urquhart.
6   Q.   Do you know if he set the reserve in
7   this case?
8   A.   Ken?
9   Q.   Either Mr. Aran or Mr. Urquhart.
10  A.   I believe it was set before their time.
11  Q.   Prior to Mr. Urquhart who held that
12  position?
13  A.   Well, it's not holding the same position
14  exactly, but the claims administrator was Arnold
15  Bottalico.
16  Q.   Do you know whether Mr. Bottalico set
17  the claims reserve?
18  A.   He may have.
19  Q.   Has the claims --
20  A.   I'm not sure of the exact year but it
21  might have been during his...
22  Q.   What year would that have been?
23  A.   That Arnold handled the claim?
24  Q.   No, that Mr. Bottalico was there.
25  A.   Well, I believe Ken took over the file

Donna Sullivan

Page 52

1  in 2005.  I know he started with the company in 2005
2  and I think he took over the claim maybe in December
3  of '05, so assuming it was before that point.
4       Q.    And who was Mr. Bottalico's superior?
5       A.    I believe the claims center manager,
6  Debra Smith, and --
7       Q.    Do you know whether or not she set the
8  reserve in this case?
9       A.    I think the claims administrator would
10 have done it.  Whether he would have gotten authority
11 from her I don't know.
12      Q.    Do you know whether or not the claims
13 reserve has ever changed throughout this litigation?
14      A.    Yes.
15      Q.    Do you know whether or not it's
16 increased or decreased?
17      A.    Yes.
18      Q.    Has it increased?
19      A.    No.
20      Q.    Has it decreased?
21      A.    Yes.
22      Q.    Aside from the -- Mr. Bottalico, Mr.
23 Sharkey's position, I know they've changed so I can't
24 reference their title, but claims administrator, I
25 think you said, who else -- aside from counsel, who

Donna Sullivan

Page 53

1   else would have been involved in that -- in the
2   decision to set the reserve?
3       A.    You know what, I guess I'm going to have
4   to change because I threw Debra Smith's name in there
5   and she was a claims center manager but only from
6   2002 going forward, so it could have been reserved
7   even prior to her being the claims center manager.
8   And prior to her I think Gary Urquhart was the claims
9   center manager for two years.  It could have been
10  done during his time frame.  Before that I'm not sure
11  if it was Al Yorio or if there was somebody else in
12  between.  But I think it probably would have been
13  done at that level of authority.  I don't think it
14  would have gone higher than that at that point.
15      Q.    If the reserve changed over a period of
16  time would that have dictated whether or not the case
17  was handled by the major claims division?
18      A.    No.  Are you saying -- is that a
19  hypothetical?
20      Q.    No.  My question is:  If, let's say, the
21  reserve is set below a certain amount, does that
22  dictate whether or not it's handled by major claims?
23      A.    No.  Once it's in major claims I
24  think -- usually it will stay there.  I don't know if
25  there's any set policy but...

Donna Sullivan

Page 54

1    Q.    Would an attorney have been involved in
2  setting the reserve or just the decision by -- or is
3  it just the decision by the claims administrator?
4         MR. HAYES:  Object to the form in that
5  it implies the claims administrator is not an
6  attorney.
7    A.    The claims administrators are attorneys.
8    Q.    I guess the question is:  Would outside
9  counsel have been involved in setting the reserve or
10 is that decision made inhouse?
11        MR. KOTT:  I object based on
12 attorney/client privilege.
13        MR. HAYES:  Same objection.  Don't
14 answer the question.
15        MR. MEE:  Wait.  You're instructing --
16 why don't we -- I don't know, maybe the question is
17 unclear.
18        MR. HAYES:  You're asking whether or not
19 an outside attorney was involved in the reserve
20 decision.  You're not entitled to know that
21 information because that's a privileged communication
22 between the client and the attorney, the outside
23 attorney.  You now know that it was set internally by
24 claims administrators who were attorneys.  You're not
25 entitled to know that the outside attorney

Donna Sullivan

Page 55

1  participated in that process.
2              MS. WAGNER: One of the things that
3  Judge Shipp specifically asked us to let him know,
4  and maybe you're going to file a motion to seal and
5  submit something under seal to him about this --
6              MR. KOTT: I had not thought about that.
7  That may be a good idea.
8              MS. WAGNER: Whether or not an attorney
9  set the reserve or whether it was a corporate
10  official. So we're trying to tease out exactly who
11  was involved.
12              MR. HAYES: You already know that an
13  attorney was involved in setting the reserve.
14  Corporate official in the case law means a corporate
15  official who is not an attorney. The reserves in
16  this case were set by attorneys and that's what this
17  witness has just testified to. Whether or not
18  outside counsel was also involved in the setting of
19  the reserve we don't think has anything to do with
20  the issue.
21              MS. WAGNER: So it's an attorney
22  admitted in New Jersey that set these reserves?
23              MR. HAYES: I don't know where they're
24  admitted but they're attorneys.
25              MS. WAGNER: Acting in the scope of

Donna Sullivan

Page 56

1   their job as an attorney?  Were they inhouse counsel?
2             MR. HAYES:  They're attorneys who are
3   administering claims for the company, not as outside
4   counsel, as employees of the company.
5             MR. MEE:  I think she asked whether or
6   not they're inhouse counsel.  Whether or not they
7   are -- if they provide a role within the company as
8   counsel to the company or whether or not their role
9   is specifically in adjusting claims.
10            MR. HAYES:  I think they do both.  They
11  provide advice and counsel to the company in the way
12  in which they administer the claims.
13       Q.   Getting back to the questioning.  Apart
14  from being a claims adjuster what other roles did Mr.
15  Bottalico provide?  What other roles did he play
16  within the company?
17       A.   Well, I think that was his primary role
18  to review and investigate claims, to make a decision
19  whether to settle them, pay them.
20       Q.   Was he within the office of general
21  counsel within the company?
22       A.   He's with -- he was within the claims
23  department.
24       Q.   Is that separate than general counsel's
25  department?

Donna Sullivan

Page 57

1    A.    The claims center manager reports to
2  general counsel, but I don't know if it's considered
3  part of that department.
4    Q.    Who else do they report to, the claims
5  center manager?
6    A.    She reported -- at least during my
7  tenure here she's reported directly to the general
8  counsel for the title group.
9    Q.    Do you know whether or not the company
10 was following its normal course of business in
11 determining whether or not to set a reserve or --
12 when it set the reserve?
13   A.    Yeah, I guess you can characterize that
14 they were analyzing the claim, and I assume for
15 whatever reason they believed that that would be a
16 reserve that should be set for that file. I don't
17 know the actual basis, but we shouldn't be setting
18 reserves randomly so it should have been his
19 assessment.
20         (Fidelity-10, Form 10-K, is received and
21 marked for identification.)
22   Q.    I'm handing you what's marked as
23 Fidelity-10. It is the form 10-K annual report to
24 the U.S. Securities and Exchange Commission for the
25 fiscal year ending December 31, 2010. Is it the