# EXHIBIT D

10-K 1 fnf12311010k.htm FORM 10-K

---

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (No Fee Required)**
For the Fiscal Year Ended December 31, 2010

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (No Fee Required)**

Commission File No. 1-32630

EXHIBIT
Fidelity-10
9/28/11

# Fidelity National Financial, Inc.
*(Exact name of registrant as specified in its charter)*

| Delaware | 16-1725106 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| 601 Riverside Avenue<br>Jacksonville, Florida 32204 | (904) 854-8100 |
| *(Address of principal executive offices, including zip code)* | *(Registrant's telephone number, including area code)* |

Securities registered pursuant to Section 12(b) of the Act:

| <u>Title of Each Class</u> | <u>Name of Each Exchange on Which Registered</u> |
|---|---|
| Common Stock, $0.0001 par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K, or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated ☑    Accelerated ☐    Non-accelerated filer ☐    Smaller reporting company ☐

    filer ☑        filer ☐      (Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

The aggregate market value of the shares of the common stock held by non-affiliates of the registrant as of June 30, 2010 was $2,814,002,098, based on the closing price of $12.99 as reported by the New York Stock Exchange.

As of January 31, 2011, there were 223,725,673 shares of Common Stock outstanding.

The information in Part III hereof is incorporated herein by reference to the registrant's Proxy Statement on Schedule 14A for the fiscal year ended December 31, 2010, to be filed within 120 days after the close of the fiscal year that is the subject of this Report.


FIDELITY NATIONAL FINANCIAL, INC.
FORM 10-K
TABLE OF CONTENTS

| | | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 18 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 18 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19 |
| Item 6. | Selected Financial Data | 21 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 7A. | Quantitative and Qualitative Disclosure About Market Risk | 45 |
| Item 8. | Financial Statements and Supplementary Data | 47 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 86 |
| Item 9A. | Controls and Procedures | 86 |
| Item 9B. | Other Information | 86 |
| **PART III** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 86 |
| Item 11. | Executive Compensation | 86 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 86 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 86 |
| Item 14. | Principal Accounting Fees and Services | 86 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 86 |

i

Table of Contents

## PART I

### Item 1. *Business*

We are a holding company that through our subsidiaries provides title insurance, mortgage services, specialty insurance and information services. We are the nation's largest title insurance company through our title insurance underwriters — Fidelity National Title, Chicago Title, Commonwealth Land Title, and Alamo Title — which collectively issued more title insurance policies in 2010 than any other title company in the United States. We also provide flood insurance, personal lines insurance, and home warranty insurance through our specialty insurance subsidiaries. We own a minority interest in Ceridian Corporation ("Ceridian"), a leading provider of global human resources, payroll, benefits and payment solutions. We also own a minority interest in Remy International, Inc. ("Remy"), a leading global vehicular parts designer, manufacturer, remanufacturer, marketer and distributor of aftermarket and original equipment electrical components for automobiles, light trucks, heavy-duty trucks and other vehicles.

During 2010, we completed a project to reduce the number of our title insurance underwriters in order to eliminate certain legal, operating and oversight costs associated with operating multiple separate and independent underwriters. Our remaining four principal title insurance underwriters are Fidelity National Title, Chicago Title, Commonwealth Land Title, and Alamo Title. Security Union Title and Ticor Title were merged into Chicago Title. Lawyers Title was merged into Fidelity National Title.

We currently have three reporting segments as follows:

- *Fidelity National Title Group.* This segment consists of the operations of our title insurance underwriters and related businesses. This segment provides core title insurance and escrow and other title-related services including collection and trust activities, trustee's sales guarantees, recordings and reconveyances.

- *Specialty Insurance.* This segment consists of certain subsidiaries that issue flood, home warranty, homeowners', automobile and other personal lines insurance policies.

- *Corporate and Other.* This segment consists of the operations of the parent holding company, certain other unallocated corporate overhead expenses, other smaller operations, and our share in the operations of certain investments in minority-owned affiliates, including Ceridian and Remy.

### *Competitive Strengths*

We believe that our competitive strengths include the following:

*Leading title insurance company.* We are the largest title insurance company in the United States and a leading provider of title insurance and escrow and other title-related services for real estate transactions. Through the third quarter of 2010, our insurance companies had a 37.2% share of the U.S. title insurance market, according to the American Land Title Association ("ALTA").

*Established relationships with our customers.* We have strong relationships with the customers who use our title services. Our distribution network, which includes over 1,350 direct residential title offices and approximately 5,500 agents, is among the largest in the United States. We also benefit from strong brand recognition in our multiple title brands that allows us to access a broader client base than if we operated under a single consolidated brand and provides our customers with a choice among brands.

*Strong value proposition for our customers.* We provide our customers with title insurance and escrow and other title-related services that support their ability to effectively close real estate transactions. We help make the real estate closing more efficient for our customers by offering a single point of access to a broad platform of title-related products and resources necessary to close real estate transactions.

*Proven management team.* The managers of our operating businesses have successfully built our title business over an extended period of time, resulting in our business attaining the size, scope and presence in the industry that it has today. Our managers have demonstrated their leadership ability during numerous acquisitions through which we have grown and throughout a number of business cycles and significant periods of industry change.

*Competitive cost structure.* We have been able to maintain competitive operating margins in part by monitoring our businesses in a disciplined manner through continual evaluation and management of our cost structure. When compared to our industry competitors, we also believe that our structure has fewer layers of management which allows us to operate with lower overhead costs.

*Commercial title insurance.* While residential title insurance comprises the majority of our business, we believe that we are the largest provider of commercial real estate title insurance in the United States. Our network of agents, attorneys, underwriters

1

Table of Contents

*Reserve for Claim Losses.* Title companies issue two types of policies, owner's and lender's policies, since both the new owner and the lender in real estate transactions want to know that their interest in the property is insured against certain title defects outlined in the policy. An owner's policy insures the buyer against such defects for as long as he or she owns the property (as well as against warranty claims arising out of the sale of the property by such owner). A lender's policy insures the priority of the lender's security interest over the claims that other parties may have in the property. The maximum amount of liability under a title insurance policy is generally the face amount of the policy plus the cost of defending the insured's title against an adverse claim; however, from time to time, we do incur losses in excess of policy limits. While most non-title forms of insurance, including property and casualty, provide for the assumption of risk of loss arising out of unforeseen future events, title insurance serves to protect the policyholder from risk of loss from events that predate the issuance of the policy.

Unlike many other forms of insurance, title insurance requires only a one-time premium for continuous coverage until another policy is warranted due to changes in property circumstances arising from refinance, resale, additional liens, or other events. Unless we issue the subsequent policy, we receive no notice that our exposure under our policy has ended and, as a result, we are unable to track the actual terminations of our exposures.

Our reserve for claim losses includes reserves for known claims ("PLR") as well as for losses that have been incurred but not yet reported to us ("IBNR"), net of recoupments. We reserve for each known claim based on our review of the estimated amount of the claim and the costs required to settle the claim. Reserves for IBNR claims are estimates that are established at the time the premium revenue is recognized and are based upon historical experience and other factors, including industry trends, claim loss history, legal environment, geographic considerations, and the types of policies written. We also reserve for losses arising from escrow, closing and disbursement functions due to fraud or operational error.

The table below summarizes our reserves for known claims and incurred but not reported claims related to title insurance.

|  | As of December 31, 2010 | % | As of December 31, 2009 | % |
|---|---|---|---|---|
|  | (In millions) | | | |
| PLR | $ 344.8 | 15.6% | $ 358.5 | 14.4% |
| IBNR | 1,866.1 | 84.4 | 2,130.3 | 85.6 |
| Total Reserve | $ 2,210.9 | 100.0% | $ 2,488.8 | 100.0% |

Although most claims against title insurance policies are reported relatively soon after the policy has been issued, claims may be reported many years later. Historically, approximately 60% of claims are paid within 5 years of the policy being written. By their nature, claims are often complex, vary greatly in dollar amounts and are affected by economic and market conditions, as well as the legal environment existing at the time of settlement of the claims. Estimating future title loss payments is difficult because of the complex nature of title claims, the long periods of time over which claims are paid, significantly varying dollar amounts of individual claims and other factors.

Our process for recording our reserves for claim losses begins with analysis of our loss provision rate. We forecast ultimate losses for each policy year based upon examination of historical policy year loss emergence (development) and adjustment of the emergence patterns to reflect policy year differences in the effects of various influences on the timing, frequency and severity of claims. We also use a technique that relies on historical loss emergence and on a premium-based exposure measurement. The latter technique is particularly applicable to the most recent policy years, which have few reported claims relative to an expected ultimate claim volume. After considering historical claim losses, reporting patterns and current market information, and analyzing quantitative and qualitative data provided by our legal, claims and underwriting departments, we determine a loss provision rate, which is recorded as a percentage of current premiums. This loss provision rate is set to provide for losses on current year policies, but due to development of prior years and our long claim duration, it periodically includes minor amounts of estimated adverse or positive development on prior years' policies. Any significant adjustments made to the loss reserves relating to the comparison to our actuarial analysis are made in addition to this loss provision rate. We have been recording our periodic loss provision rate at 6.8%, 7.3% and 8.5% of title premiums in 2010, 2009 and 2008, respectively, with 6.0%, 7.3% and 8.5% relating to the respective year. In 2010, adverse development of $30.4 million or 0.8% of 2010 premiums was accounted for in the loss provision rate. At each quarter end, our recorded reserve for claim losses is initially the result of taking the prior recorded reserve for claim losses, adding the current provision to that balance and subtracting actual paid claims from that balance, resulting in an amount that management then compares to the range of reasonable estimates provided by the actuarial calculation. This process resulted in us recording additional adjustments to our stated loss provision in 2009 and 2008,

as noted below.

Due to the uncertainty inherent in the process and to the judgment used by both management and our actuary, our ultimate liability may be greater or less than our carried reserves. If the recorded amount is within the actuarial range but not at the central

28