# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES, INC., <br>     Plaintiff, <br><br> v. <br><br> CRISTO PROPERTY MANAGEMENT, LTD.; G.J.L. LIMITED; DEK HOMES OF NEW JERSEY, INC.; OAKWOOD PROPERTIES, INC.; NATIONAL HOME FUNDING, INC.; CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC.; CAPITAL ASSETS PROPERTY MANAGEMENT, LLC; WILLIAM KANE; GARY GRIESER; ROBERT SKOWRENSKI, II; RICHARD CALANNI; RICHARD DiBENEDETTO; JAMES R. BROWN; THOMAS BRODO; ROLAND PIERSON; STANLEY YACKER, ESQ.; MICHAEL ALFIERI, ESQ.; RICHARD PEPSNY, ESQ.; ANTHONY M. CICALESE, ESQ.; LAWRENCE CUZZI; ANTHONY D'APOLITO; DAP CONSULTING, INC.; COMMONWEALTH LAND TITLE INSURANCE CO.; NATIONS TITLE INSURANCE OF NEW YORK, INC.; FIDELITY NATIONAL TITLE INSURANCE CO. OF NEW YORK; COASTAL TITLE AGENCY; STEWART TITLE GUARANTY COMPANY; IRENE DiFEO; DONNA PEPSNY; WEICHERT REALTORS; and VECCHIO REALTY, INC., d/b/a MURPHY REALTY BETTER HOMES AND GARDENS, <br>     Defendants. | Judge Dickinson R. Debevoise <br> Magistrate Judge Michael A. Shipp <br><br> Civ. A. No. 97-3496 (DRD)(MAS) |

## BRIEF OF NATIONS TITLE INSURANCE OF NEW YORK, INC. AND FIDELITY NATIONAL TITLE INSURANCE CO. OF NEW YORK IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Edward J. Hayes, Esquire<br>
David H. Colvin, Esquire<br>
Fox Rothschild LLP<br>
2000 Market Street, Twentieth Floor<br>
Philadelphia, PA 19103<br>
(215) 299-2092<br>
(215) 299-2150 (facsimile)

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | FACTUAL BACKGROUND | 1 |
| | The title claims | 2 |
| | General Background | 4 |
| | The assignments of loans originated by NHF | 4 |
| III. | ISSUE | 7 |
| IV. | LEGAL ARGUMENT | 7 |
| | A. The Summary Judgment Standard | 7 |
| | B. Summary judgment must be entered in favor of Fidelity on any title insurance policy claims resulting from unrecorded assignments since Walsh never provided those assignments to the closing attorney or to the title agent for recording. | 8 |
| V. | CONCLUSION | 12 |

# TABLE OF AUTHORITIES

Page(s)

**CASES**

American Savings and Loan v. Lawyers Title Ins. Co.,
 793 F.2d 780 (6th Cir. 1986) .................................................................................9

Anderson v. Liberty Lobby Inc.,
 477 U.S. 242 (1986) ................................................................................................7

Celotex Corp. v. Catrett,
 477 U.S. 317 (1986) ................................................................................................7

Feldman v. Urban Commercial, Inc.,
 87 N.J.Super. 391, 209 A.2d 640 (App.Div. 1965) ...........................................9, 11

First American Title Insurance Company v. Kessler,
 452 So.2d 35 (D.C. Fla. 1985) ................................................................................9

Kaucher v. County of Bucks,
 455 F.3d 418 (3rd Cir. 2006) ...................................................................................7

Keown v. West Jersey Title and Guaranty Company,
 161 N.J.Super. 19, 390 A.2d 715 (App.Div. 1978) ................................................9

Lujan v. National Wildlife Fed'n,
 497 U.S. 871 (1990) ................................................................................................7

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 475 U.S. 574 (1986) ................................................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ......................................................................................................7

Defendants, Fidelity National Title Insurance Co. of New York and Nations Title Insurance of New York, Inc. (collectively, "Fidelity"), by and through their undersigned counsel, Fox Rothschild LLP, respectfully submit this brief in support of their motion for partial summary judgment on certain of the claims asserted by plaintiff, Walsh Securities, Inc. ("Walsh"). For the reasons that follow, the Court should grant Fidelity's motion.

### I.   INTRODUCTION

This Court is extremely familiar with the facts of this case based on its long history before the Court. While Fidelity believes it has no liability on any of the claims asserted by Walsh, Fidelity understands that the standard applicable to a motion for summary judgment would preclude a finding for Fidelity at this stage of the litigation as to several of the claims asserted by Walsh. However, this motion is directed to certain title claims asserted by Walsh in the litigation because, based on the admitted facts and the applicable law, Fidelity is entitled to judgment on those claims at this time. In particular, Fidelity is entitled to summary judgment with respect to those title claims pursued by Walsh relating to losses alleged to have occurred as a result of the lack of recording of assignments in favor of Walsh.

### II.   FACTUAL BACKGROUND

This case involves approximately 220 loans which were made to various third parties between April of 1996 and June 5, 1997. In all of the complaints that it has filed in these proceedings, Walsh alleges that it was the victim of a fraudulent scheme perpetrated by a vast number of individuals, mortgage companies, real estate appraisers and attorneys to induce it to

1

fund the mortgage loans at artificially inflated prices.[1] All of the loans in this case were originated by Defendant National Home Funding ("NHF") and were funded by Walsh.

Walsh has set forth a variety of claims against the other defendants, ranging from negligence to fraud to RICO violations. All of the claims against those parties have either been dismissed, settled, defaulted or stayed by bankruptcy, leaving only the claims against the title insurance underwriters remaining in the litigation. It is important to note that in <u>every</u> complaint filed to date, Fidelity was never alleged to be a participant in the scheme, directly or indirectly. Instead, the sole claim asserted by Walsh, prior to the Fourth Amended Complaint, was limited to a breach of contract claim in which Walsh alleged that Fidelity, as well as defendant Commonwealth Land Title Insurance Company ("Commonwealth"), breached the terms of certain closing service letters that were allegedly issued in connection with the fraudulent transactions. In the Fourth Amended Complaint, Walsh was given leave to assert for the first time title claims against Fidelity, despite the fact that those claims had not been raised in the more than a decade that had passed since the subject transactions.

### The title claims

After being permitted to assert title claims in its Fourth Amended Complaint, Walsh initially resisted identifying the properties on which it was making claims and identifying the nature of those claims. Finally, after being directed by Magistrate Shipp to do so, Walsh submitted documents setting forth the nature of its title claims. ***See exhibit "A" to Certification of Edward J. Hayes ("Hayes certification").*** In those documents, Walsh identified a series of 39 properties on which it was making a title claim.

---

[1] Interestingly, two of Walsh's own employees, Anthony D'Apolito and Kellie O'Neill, were indicted and pled guilty to direct involvement in the fraud. Another employee, Elizabeth Demola, the national sales manager of Walsh, was also indicted and pled guilty to charges relating to certain "lulling" letters issued after the discovery of the fraud.

2

As can be seen from the claims submitted by Walsh, as to certain of its claims, it contends that it sustained losses as the assignee of National Home Funding as a result of its rights being extinguished by third party foreclosure tax sales of the subject properties. The basis for Walsh's claim under the title policies is that assignments of the mortgages to Walsh were not recorded in the public records and that, as a result, Walsh did not receive notice of those foreclosures, thereby precluding it from taking action to protect its interest in the properties.

Upon receipt of those claims, Fidelity conducted title searches on the various properties to determine the validity of the claims being presented by Walsh. Of those properties, it was discovered that as to 29 of the properties, assignments to Walsh were not of record at the time of the tax foreclosure sales. A summary of the information disclosed by the title searches on those 29 properties is reflected in the chart attached as exhibit "B" to the Hayes certification.[2] However, the fact that assignments were not of record on the 29 properties does not result in Walsh having a title claim under the policies due to the fact that Walsh never delivered the assignments to the title agency or closing attorney for recording, but instead sent the assignment directly to NHF and, upon return, then sent the assignments to the secondary market purchaser of the loan for recording. Any harm suffered from a lack of recording is directly attributable to Walsh's conduct and, as such, no claim can be pursued against Fidelity. In order to understand whether the claims made by Walsh are recoverable under the title policies, it is important to understand how Walsh processed loans and the reasons the assignments to Walsh were not of record.

---

[2] Due to the sheer size of the title search results, Fidelity has not included them in the Hayes certification, however, the title searches have been supplied to all counsel. To the extent the Court wishes those title searches to be made a part of the record, Fidelity is willing to do so.

## General Background

A loan transaction with Walsh would start with the taking of a loan application by a participant/mortgage broker. *Walsh deposition, p. 325.*[3] The participant would gather all of the documentation necessary for the underwriting of the loan. *Walsh deposition, p. 326-527.* The participant would also order an appraisal of the subject property. *Walsh deposition, p. 325-326.* Once the loan package was completed, it would be forwarded to Walsh for underwriting. *Walsh deposition, p. 327.*

If Walsh was satisfied with the package, it would issue a commitment for the loan to the participant. *Walsh deposition, p. 328.* Walsh would then prepare the loan documents. *Walsh deposition, p. 329.* At this point, the closing department at Walsh would get involved in the transaction. *Walsh deposition, p. 331.* The closing department would issue closing instructions and would arrange for the transfer of funds to the closing attorney. *Walsh deposition, p. 331.*

Interestingly, Walsh required that all of the loans which are the subject of this litigation be closed in the name of NHF despite the fact it was funding the loans at settlement. *Walsh deposition, p. 382.* It also required that the title insurance policies be issued initially in the name of NHF. *Walsh deposition, p. 382.* It was confirmed at the deposition of Robert C. Walsh, the president of Walsh, that the company decided to structure the mortgage loan transactions in this manner in an effort to limit its liability for possible wrongdoing by NHF. *Walsh deposition, p. 668.*

## The assignments of loans originated by NHF

Since Walsh's title claims involve the failure to record assignments to Walsh, it is important to understand the procedures established by Walsh with respect to assignments. At his

---

[3] A copy of relevant portions of the transcript of the deposition of Robert C. Walsh is attached as Exhibit "D" to the Hayes certification.

4

deposition, Mr. Walsh acknowledged that assignments are the manner in which mortgages are transferred and that it is important to record assignments in the public records. *Walsh deposition, p. 667.* More importantly, Mr. Walsh admitted that (1) Walsh prepared the assignments on these transactions, *Walsh deposition, p. 670,* (2) assignments were sent by Walsh directly to NHF for execution, *Walsh deposition, p. 671*, (3) after being executed, the assignments were returned by NHF to Walsh directly, *Walsh deposition, pp. 671-672,* (4) upon receipt, Walsh would execute an additional assignment of the loan documents in blank for the benefit of the ultimate purchaser of the loan in the secondary market, *Walsh deposition, p. 672,* (5) Walsh would transmit both assignments to the whole loan buyer of the mortgage, *Walsh deposition, p. 675*, and (6) Walsh expected the whole loan buyer to record the assignments, *Walsh deposition, p. 675.* There has been no testimony in this case that Walsh expected the closing attorneys or the title agent to record the assignments. In fact, Walsh has produced no evidence that the closing attorneys or the title agent came in contact in any way with the assignments. Mr. Walsh admitted that the assignment is not one of the documents identified in Walsh's closing instructions as being transmitted by Walsh to the closing attorneys. *Walsh deposition, p. 674.*[4] Based on these facts, this Court is faced with title claims made by Walsh as a result of the failure to record assignments when Walsh has admitted that it was in possession of the assignments (not Fidelity, the title agent or the closing attorney), and that it was relying on the whole loan purchasers to record the assignments (not Fidelity, the title agent or the closing attorney).

In light of this admitted fact pattern, Mr. Walsh was asked specifically in his deposition about the basis for the company's claims under title policies.

---

[4] The form of closing instruction letter used by Walsh in these transactions is included as Exhibit "C" to the Hayes certification. As can be seen from a review of the letter, there is no reference to an Assignment.

5

Q. Are you aware, Mr. Walsh, that part of your claim in the title claim portion of this case is that Walsh did not get notice of certain tax or foreclosure sales because the assignments to Walsh were not recorded.

A. Yes.

Q. Can you tell me the basis upon which the title company is responsible for the lack of recording of the assignments when you have acknowledged that those assignments never went into the possession of the title company?

A. I can't explain that.

Q. But are you still pursuing that claim on those files?

A. I got to talk to my attorney.

Q. Are you aware of any factual basis upon which you can submit a claim that is based on the lack of recording of an assignment?

A. Again, it's a legal conclusion.

Q. That's not my question. I understand that you'll talk to Mr. Magnanini afterwards as to whether you've got a legal basis. I'm asking you as the 30(b)(6) witness do you have any facts that support a claim against the title company on nonrecorded assignments when those assignments never went to the title company in the first place?

A. No.

***Walsh deposition, p, 676-677.*** After the deposition, Fidelity requested on numerous occasions that Walsh withdraw its title claims resulting from the lack of assignments. Despite the fact that the claims arise from Walsh's own conduct, counsel for Walsh advised that Walsh was not willing to dismiss its title claims, thereby necessitating the filing of this motion for partial summary judgment.

6

### III. ISSUE

Can Walsh make claims under title insurance policies for losses resulting from the failure to record assignments on the 29 properties when Walsh was in control of the assignments and never provided them to the closing attorney or the title agent for recording, instead relying on the secondary market purchasers to record the assignments?

### IV. LEGAL ARGUMENT

#### A. The Summary Judgment Standard

There can be no question that summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a).* An issue is "genuine" only if there is sufficient evidence with which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986); Kaucher v. County of Bucks, 455 F.3d 418, 423 (3rd Cir. 2006).* Furthermore, a factual dispute is only "material" if it might affect the outcome of the case. *Anderson., at 248.*

> The party seeking summary judgment always bears the initial responsibility of informing the District Court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id. at 325.* If this initial burden is met, then the non-moving party bears the burden of demonstrating that there are disputes of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).* Moreover, the non-moving party must

7

produce evidence to support its position, and may not rest on conclusory allegations or bare assertions. *See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).* The function of the Court is not to weigh the evidence, but instead to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).* If there are no such issues, summary judgment is appropriate. *Id. at 251-252.*

It is against this standard that Fidelity's motion for partial summary judgment on the title insurance claims must be gauged and Fidelity respectfully suggests that using this standard, it is entitled to summary judgment on the title claims identified herein.

**B.    Summary judgment must be entered in favor of Fidelity on any title insurance policy claims resulting from unrecorded assignments since Walsh never provided those assignments to the closing attorney or to the title agent for recording.**

As stated earlier, most of the title claims asserted by Walsh result from the fact that Walsh alleges is did not receive notice of certain tax foreclosure sales because it was not the holder of record of the mortgage at the time of the tax foreclosure sale. Instead, the record holder was either NHF or some other entity to which the mortgages had at one point in time been assigned. Walsh contends that it is currently the holder of the mortgages on those properties and that its interests in those properties were divested by the foreclosure tax sales, thereby resulting in a claim under the title insurance policies. These claims must fail as a matter of law due to the fact that, as admitted by Mr. Walsh in his deposition, the lack of recording of the assignments is the result of conduct of Walsh and not any actions or inactions on the part of Fidelity, the closing attorneys or the title agent.

It is the position of Fidelity that due to the conduct of Walsh in controlling the recording or lack of recording of assignments, any claims resulting from the lack of recording are excluded from coverage under exclusion 3(a) of the title insurance policy, which provides as follows:

8

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

\*     \*     \*     \*

3. Defects, liens, encumbrances, adverse claims or other matters:

(a) created, suffered, assumed or agreed to by the insured claimant.

*1992 Loan Policy, Exclusion 3(a).*[5] It is Fidelity's position that as a matter of law, Walsh created and/or suffered the loss it is complaining of due to its decision to not require that assignments be recorded by the closing attorney as part of the closing process. Walsh, knowing the importance of the recordation of assignments in the public records, left it up to its whole loan buyers to record assignments. There simply is no basis for coverage under the policy for this conduct.

New Jersey courts have looked at exclusion 3(a) in analyzing claims made by insureds under title policies. In discussing the word "create", courts have stated that "the word create connotes the idea of knowledge, the performance of some affirmative act by the insured, a conscious or deliberate causation." *Keown v. West Jersey Title and Guaranty Company, 161 N.J.Super. 19, 25, 390 A.2d 715, 718 (App.Div. 1978), citing Feldman v. Urban Commercial, Inc., 87 N.J.Super. 391, 404, 209 A.2d 640, 648 (App.Div. 1965).* On the other hand, the term "suffered" has been interpreted to mean consent with the intent that "what is done is to be done," [citation omitted], and has been deemed synonymous with "permit," which implies the power to prohibit or prevent the claim from arising. *American Savings and Loan v. Lawyers Title Ins.*

---

[5] Although Walsh has not supplied copies of title policies in connection with its title claims, the closing instructions issued by Walsh required the issuance of the ALTA form 1992 lenders title policy. *See exhibit "C" to Hayes certification.* As a result, the provisions of that policy govern the claims being made by Walsh hereunder. A copy of the jacket for the 1992 ALTA loan policy is attached as Exhibit "E" to the Hayes certification.

9

*Co.*, *793 F.2d 780, 784 (6th Cir. 1986).* "'Suffered' as used in a title policy implies the power to prohibit or prevent the defect which has not been exercised although the insured has full knowledge of what is to be done with the intention that it be done." *First American Title Insurance Company v. Kessler, 452 So.2d 35, 39 (D.C. Fla. 1985).*

A review of exclusion 3(a) and the facts of this case shows that Walsh created the very problem it is complaining about in that it controlled the process for the recording of assignments. It did not deliver them to the closing attorney or title agent and instead expected the whole loan buyers to record both the assignment to Walsh and the assignment to the whole loan buyer. Walsh knew the importance of getting assignments recorded and simply left it to the third party whole loan buyers to accomplish the recording of the assignments, thereby creating the very problem about which it now complains. If the assignments were not recorded, they were not recorded because the whole loan buyers did not record them and Walsh had no procedure for following up to be sure that the assignments were recorded.

In addition to "creating" the problem, it is clear that Walsh "suffered" or permitted the problem to occur in that it had full power to preclude the loss from happening by simply tendering the assignments to the closing attorneys with the closing instructions and loan documents and by directing that the assignments be recorded as part of the transaction. Had it done so, the assignments could have been recorded in conjunction with the recording of the mortgages. Instead, it elected not to do so and cannot now complain that it has sustained losses related to the lack of recording of assignments.[6]

---

[6] Note that while there were some delays in the recording of the underlying mortgages, those delays did not result in any of the losses claimed by Walsh on the 29 properties. As can be seen from the chart prepared from the title searches, all 29 of the mortgages to NHF were recorded prior to the foreclosure event.

10

What happened in this case is clear. Walsh directed that the loans be closed in the name of NHF in order to minimize its exposure for any wrongdoing on the part of NHF. Then, despite requiring that NHF execute assignments of the mortgages for the benefit of Walsh, it did not record those assignments but instead executed assignments in blank for the benefit of the whole loan purchasers with the understanding that the purchasers would record both assignments and that Walsh would not be the holder of record of the mortgage for any length of time other than the moment after the NHF to Walsh assignment was recorded and before the Walsh to the secondary market buyer assignment was recorded. By creating this mechanism for recording, it is obvious that Walsh intended to try to limit the amount of time in which the mortgage would actually be in its name so if there were any problems with the loan or its servicing, either NHF or the whole loan purchaser would have the problem, not Walsh. That desire to limit its risk for wrongdoing greatly increased its risk for the very problem which it is now facing.

A title insurance policy simply does insure against the consequences of an insured's own acts and any loss occasioned thereby. ***Feldman, 78 N.J. Super. At 532, 189 A.2d at 474.*** The title claims presented by Walsh as to the 29 identified properties are a classic case of a title problem which the insured permitted to happen and created by its own conduct. This conduct is the type of conduct exclusion 3(a) was intended to cover. As Walsh caused the problems resulting from the lack of recording, Fidelity is entitled to summary judgment on all title claims arising due to the lack of recording of the assignment to Walsh.

## V. CONCLUSION

For all of the foregoing reasons, defendants, Fidelity National Title Insurance Co. of New York and Nations Title Insurance of New York respectfully request that their motion for partial summary judgment be granted and that the proposed summary judgment Order be entered by the Court.

Respectfully submitted,

s/David H. Colvin, Esquire
Edward J. Hayes, Esquire
David H. Colvin, Esquire

Fox Rothschild LLP
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103
(215) 299-2092
(215) 299-2150 (facsimile)

Attorneys for Defendants, Fidelity National Title Insurance Co. of New York and Nations Title Insurance of New York, Inc.

Dated: November 10, 2011