```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEW JERSEY
              CIVIL NO. 97-3496 (DRD)
 3
              ---------------------------
 4     WALSH SECURITIES,                :
       INC.,                            :
 5                                      :
             Plaintiff,                 :
 6                                      :
             v.                         :
 7                                      :
       CRISTO PROPERTY                  :
 8     MANAGEMENT,LTD., a/k/a           :
       G.J.L. LIMITED; DEK             :
 9     HOMES OF NEW JERSEY,             :
       INC.; OAKWOOD                    :
10     PROPERTIES, INC.;                :          COPY
       NATIONAL HOME FUNDING,           :
11     INC.; CAPITAL ASSETS             :
       PROPERTY MANAGEMENT &            :
12     INVESTMENT CO., INC.;            :       CONTINUED
       CAPITAL ASSETS                   :    DEPOSITION UPON
13     PROPERTY MANAGEMENT,             :    ORAL EXAMINATION
       L.L.C.; WILLIAM KANE;           :         OF
14     GARY GRIESER; ROBERT             :    ROBERT C. WALSH
       SKOWRENSKI, II;                  :
15     RICHARD CALANNI;                 :
       RICHARD DI BENEDETTO;            :
16     JAMES R. BROWN; THOMAS           :
       BRODO; ROLAND PIERSON;           :       PAGE 262
17     STANLEY YACKER, ESQ.;            :
       MICHAEL ALFIERI, ESQ.;           :
18     RICHARD PEPSNY, ESQ.;            :
       ANTHONY M. CICALESE,             :
19     ESQ.; LAWRENCE CUZZI;            :
       ANTHONY D'APOLITO; DAP           :
20     CONSULTING, INC.;                :
       COMMONWEALTH LAND                :
21     TITLE INSURANCE CO.;             :
       NATIONS TITLE                    :
22     INSURANCE OF NEW YORK,           :
       INC.;                            :
23                                      :
                                        :
24                                      :
                                        :
25                                      :
                                        :
```



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters



EXHIBIT
D

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

263

```
 1                    :
                      :
 2   FIDELITY NATIONAL     :
     TITLE INSURANCE CO. OF :
 3   NEW JERSEY; COASTAL   :
     TITLE AGENCY; DONNA   :
 4   PEPSNY; WEICHERT      :
     REALTORS and VECCHIO  :
 5   REALTY, INC. D/b/a    :
     MURPHY REALTY BETTER  :
 6   HOMES AND GARDENS,    :
                          :
 7        Defendants.      :
     -------------------------
 8
 9
10
11
12        T R A N S C R I P T of the stenographic
13   notes of HOWARD A. RAPPAPORT, a Notary Public and
14   Certified Shorthand Reporter of the State of
15   New Jersey, Certificate No. XI00416, taken at the
16   offices of MC CARTER & ENGLISH, LLP, Four Gateway
17   Center, Newark, New Jersey, on Friday,
18   April 23, 2010, commencing at 8:35 a.m.
19
20
21
22
23
24
25
```

265

```
 1
 2                    I N D E X
 3
     WITNESS                          PAGE
 4
     ROBERT C. WALSH
 5
     Cross-Examination by Mr. Hayes    266
 6
 7   EXHIBITS     DESCRIPTION        FOR IDENT.
 8
     Robert     Closing instructions      373
 9   Walsh-7
     Robert     Closing service letter    373
10   Walsh-8
     Robert     Letter via e-mail and     409
11   Walsh-9    regular mail dated
                March 5, 2010
12   Robert     Letter via e-mail and     409
     Walsh-10   regular mail dated
13              April 6, 2010
     Robert     Uniform settlement        420
14   Walsh-11   statement
     Robert     Secondary mortgage loan   421
15   Walsh-12
     Robert     Wholesale mortgage        421
16   Walsh-13   commitment
     Robert     Contract for sale of real 433
17   Walsh-14   estate
     Robert     Document entitled,        433
18   Walsh-15   "Fidelity National Title"
     Robert     Review checklist          440
19   Walsh-16
     Robert     HUD 1, Uniform Settlement 440
20   Walsh-17   Statement
     Robert     HUD 1 review form         448
21   Walsh-18
     Robert     Uniform underwritten      448
22   Walsh-19   transmittal summary form
     Robert     Wholesale mortgage        453
23   Walsh-20   commitment
     Robert     WSJ common stock          476
24   Walsh-21   ownership, SEC filing
25
```

264

```
 1   A P P E A R A N C E S:
 2   STONE & MANGANINI
     150 John F. Kennedy Parkway
 3   Short Hills, New Jersey 07078
     BY: DAVID STONE, ESQ.,
 4       AMY WALKER WAGNER, ESQ.,
     For the Plaintiff
 5
     MC CARTER & ENGLISH, LLP
 6   Four Gateway Center
     100 Mulberry Street
 7   Newark, New Jersey 07102-0652
     BY: DAVID R. KOTT, ESQ.,
 8   For Defendant/Third-Party Plaintiff Commonwealth Land
     Title Insurance Company
 9
     FOX, ROTHSCHILD, O'BRIEN & FRANKEL
10   997 Lenox Drive
     Lawrenceville, New Jersey 08648
11   BY: EDWARD J. HAYES, ESQ.,
     For Defendants Nations Title Insurance and
12   Fidelity National Title Insurance
13   METHFESSEL & WERBEL
     3 Ethel Road
14   Suite 300
     Edison, New Jersey 08818
15   BY: MARTIN R. MC GOWAN, ESQ.,
     For Coastal Title Agency
16
17
18
19
20
21
22
23
24
25
```

266

```
 1   R O B E R T   C.   W A L S H, having been previously
 2        sworn, testifies as follows:
 3   CROSS-EXAMINATION (CONTINUING)
 4   BY MR. HAYES:
 5        Q     Good morning, Mr. Walsh.
 6        A     Good morning.
 7        Q     You recall you were sworn at the last
 8   deposition and that oath continues this morning?
 9        A     I do.
10        Q     At the last deposition, Mr. Walsh, you
11   indicated that there were any number of things that
12   you were going to do in response to questions between
13   that deposition and before this morning.
14        Do you recall that?
15        A     I do.
16        Q     Did you take steps to try to answer some
17   of the questions that you could not answer at the
18   last deposition?
19        A     I did.
20        Q     Can you tell me what you did between the
21   last deposition and today to further prepare for
22   today's deposition other than speaking with your
23   attorneys?
24        MR. STONE:  You can answer that
25   question, other than conversations with counsel.
```

2 (Pages 263 to 266)



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

323

1  commitment?
2     A    Yes.
3     Q    And it is that same person who would
4  check everything would also be the person who would
5  take out unnecessary copies?
6     A    Correct.
7     Q    In the years that you worked at Walsh,
8  Mr. Walsh, did you ever see a mass -- I'll use the
9  word "cleansing," and I don't mean it in a derogatory
10  way, just this process that you're talking about, but
11  a mass cleansing of the files in the conference room
12  at Walsh as opposed to in cubicles?
13     A    I believe I saw it many times.
14     Q    And why did that take place?
15     A    If an investor was coming in to look at
16  files, and there were a lot of files, and that they
17  were coming in in a relatively short period of time,
18  the files would be on the table, and people would be
19  taking the file and doing what they needed to do,
20  putting documents in, taking documents out rather
21  than just doing it at their cubicle.
22     Q    So that was a common occurrence?
23     A    It was.
24     Q    And it was generally in relation to
25  someone, an investor, coming in to look at files?

324

1     A    Yes.
2     Q    Mr. Walsh, how was Walsh Securities'
3  profitability determined?  You testified at the last
4  deposition that it wasn't about the number of loans.
5  It was about profitability of Walsh, correct?
6     A    Correct.
7     Q    How was Walsh Securities' profitability
8  determined?
9     A    Under GAAP.
10     Q    What does that mean?
11     A    Generally accepted accounting
12  principles.
13     Q    What made Walsh profitable?
14     A    Selling loans, acquiring loans,
15  controlling expenses.
16     Q    Were all nonperforming loans not
17  profitable?
18     A    Correct.
19     Q    Were all performing loans profitable?
20     A    Not necessarily.
21     Q    Was Walsh Securities' profitability in
22  any way affected by the jobs done by the
23  broker/correspondents?
24     A    Could you be more specific, please?
25     Q    Let me ask you this first.  I've been

325

1  using a couple of terms.
2          Is a broker and a correspondent the same
3  thing as far as you are concerned, or are they
4  different?
5     A    If we use participant, it is easier, and
6  we would be on the same track.
7     Q    Okay.
8          My understanding of the process,
9  Mr. Walsh -- and correct me if I'm wrong -- is that
10  the vast majority of your loans came from
11  participants, correct?
12     A    Correct.
13     Q    Did Walsh do its own origination?
14     A    Very small sense.
15     Q    And a participant would be made aware of
16  the types of loans that Walsh was interested in
17  acquiring, correct?
18     A    Correct.
19     Q    Those were the programs or guidelines
20  that you told Mr. Kott about at the last deposition?
21     A    Correct.
22     Q    And these participants would take a loan
23  application, correct?
24     A    Correct.
25     Q    They would order an appraisal, correct?

326

1     A    Correct.
2     Q    The appraiser would have to be on the
3  Walsh approved list, correct?
4     A    Correct.
5     Q    Walsh would not underwrite or approve a
6  loan that was not accompanied by an approved Walsh
7  appraiser, correct?
8     A    Correct.  There may have been an
9  exception, but correct.
10     Q    What would the exception be?
11     A    I don't know.  There is nothing 100
12  percent in life.  So there may be an exception.
13     Q    Would the participant do the employment
14  verification?
15     A    Walsh would.
16     Q    Would the employment do down payment
17  verification?
18     A    Walsh would.
19     Q    Would the participant gather any
20  documentation from the borrowers, potential
21  borrowers, other than a loan application?
22     A    They would gather the information.
23     Q    What information would they gather in
24  general?  I don't want to get bogged down.
25     A    All the information that is necessary.

17 (Pages 323 to 326)



**Rizman
Rappaport
Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

327

1  They would be getting -- whatever conditions that the
2  underwriter would put on the commitment, the
3  participant would gather that.
4      Q    You're ahead of me. I'm not at
5  commitment yet.
6          What did the participant do other than
7  placing the necessary information into a loan
8  application?
9      A    They would gather certain documentation.
10     Q    What documentation pre commitment would
11 they gather?
12     A    If they were self-employed, they would
13 get certain documentation. If they are a wage
14 earner, they would get their W-2.
15         They get just general type of
16 information depending on what the program would be.
17     Q    Once all the information and
18 documentation was gathered, they would submit it to
19 Walsh for underwriting?
20     A    Correct.
21     Q    Walsh would then review the appraisal?
22     A    Correct.
23     Q    Walsh would verify employment?
24     A    Correct.
25     Q    Walsh would verify assets or deposits

329

1      A    Closing documents are drawn.
2      Q    By whom, by Walsh?
3      A    Correct.
4      Q    Closing documents being all the various
5  loan documents, the mortgage, the notes, the
6  affidavits?
7      A    Correct.
8      Q    And they are sent where?
9      A    Sent to the closing agent -- the
10 attorney or the closing agent.
11     Q    Would Walsh require a signed commitment
12 letter by the participant and the borrower before
13 preparing the closing docs?
14     A    I think it was the participants.
15     Q    So the participant could commit the
16 borrower to go forward in the transaction?
17     A    I think the borrower committed to the
18 participant and the participant committed to us.
19     Q    Closing documents are prepared. They
20 are sent to the closing attorney, correct?
21     A    Correct.
22     Q    Prior to that you receive information
23 from the closing attorney regarding the manner in
24 which the funds should be sent to the closing
25 attorney, generally wire instructions?

328

1  available for the borrower?
2      A    If need be, correct.
3      Q    That was all a function of your pre
4  closing personnel?
5      A    Correct.
6      Q    And assuming that Walsh was satisfied
7  with the package that it received, it would issue a
8  commitment, correct?
9      A    Correct.
10     Q    And that was a form also that Walsh had,
11 a commitment that had certain general requirements
12 and then left space for individualized requirements
13 of a particular loan, correct?
14     A    That is correct.
15     Q    That commitment would go to the
16 participant?
17     A    Correct.
18     Q    And to the extent a commitment had
19 conditions, it is the participant who would see that
20 those conditions are fulfilled, correct?
21     A    Correct.
22     Q    What happened next in the process? You
23 now have a committed to loan.
24     A    Correct.
25     Q    What happens next?

330

1      A    Could you repeat that for me?
2      Q    Sure.
3          After you prepared the closing documents
4  and sent them to the closing attorney, or prior to
5  sending them, would you receive from the closing
6  attorney information on how to transmit the funds to
7  the closing attorney?
8      A    Correct.
9      Q    And you would receive prior to closing
10 the title commitment, correct?
11     A    Correct.
12     Q    Now, are we still in the underwriting
13 department at Walsh, Mr. Walsh, at that point in
14 time, or are we now in some other department?
15     A    We are out of underwriting.
16         I'm assuming, unless the commitment to
17 the participant is now done, there are conditions on
18 the commitment. I'm assuming that they have been
19 filled.
20     Q    I'm assuming if there are problems with
21 those conditions, then it goes back to underwriting
22 to see whether or not an exception would be made?
23     A    Correct.
24     Q    Assuming they are met, underwriting is
25 now done.

18 (Pages 327 to 330)

**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

**66 W. Mt. Pleasant Avenue**
**Livingston, NJ 07039**
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

331

1  A    That is correct.
2  Q    Which department at Walsh is now
3  involved up to the closing?
4  A    The closing department.
5  Q    Now, the closing department is not doing
6  any separate, independent verification. Those were
7  things that the underwriting department did, correct?
8  A    Could you be more specific?
9  Q    Rather than me ask you, tell me what the
10 closing department did from the time it took over a
11 file to the time of closing besides preparing the
12 closing docs.
13 A    And reviewing whatever documents that
14 were necessary to review.
15 Q    Would the closing department be the
16 department that reviewed the title or the
17 underwriting department?
18 A    Closing.
19 Q    Generally, you wouldn't expect to see a
20 title commitment prior to committing to make the
21 loan, correct?
22 A    Correct.
23 Q    So that department would look at the
24 title report?
25 A    Correct.

332

1  Q    Would issue the closing documents?
2  A    Correct.
3  Q    What else would that department do?
4  A    Issue the closing instructions.
5  Q    They would be prepared by that
6  department, correct?
7  A    Correct.
8  Q    And then sent to the closing attorney?
9  A    And the title agent, correct.
10 Q    What else would that department do?
11 A    A range that would get the closing
12 protection letter, arrange their funds to be
13 transferred, and that they would get the package
14 returned to them.
15 Q    So that department's functions start at
16 mortgage commitment and end at the receipt of the
17 documents from closing?
18 A    To my knowledge that's correct.
19 Q    And then from that point forward it's
20 post closing?
21 A    To my knowledge, correct.
22 Q    And is it a condition, Mr. Walsh, or was
23 it a condition of your company that a signed closing
24 protection letter had to be in Walsh Securities'
25 possession before you would fund?

333

1  A    Correct.
2  Q    Were there any exceptions made to that?
3  A    I don't know the answer to that.
4  Q    In your review of the files, either in
5  anticipation of your deposition several years ago or
6  today, did you see any loan files that didn't have
7  closing protection letters in them?
8  A    It's tough to see something that's not
9  there. I saw files that I reviewed, it appeared like
10 they were in there.
11 Q    Did you see any closing protection
12 letters that were not signed?
13 A    I don't recall seeing that.
14 Q    Are you aware, Mr. Walsh, in New Jersey
15 closing protection letters are transaction specific?
16 A    I believe so, yes.
17 Q    Unlike other states where they are
18 issued in general and effective until revoked,
19 correct?
20 A    I don't know the answer to that.
21 Q    Based on your experience around the
22 country, you don't know the way closing protection
23 letters are drawn in other states?
24 A    I do not.
25 Q    Did you see closing protection letters

334

1  in any of the files that were blank as to what the
2  transaction was they were issued for?
3  A    I don't recall.
4  Q    Do you recall if closing protection
5  letters are issued for the actions of a particular
6  individual?
7  A    Yes.
8  Q    And that it's important to be sure that
9  the closing protection letter is actually issued to
10 cover the conduct of the actual person conducting the
11 closing, correct?
12 A    Could you repeat that?
13 Q    Sure. Was it important to Walsh to have
14 a closing protection letter that referenced the
15 actual closing attorney who was conducting the
16 settlement?
17 A    To my knowledge, yes.
18 Q    You believe that was something that was
19 necessary in order to protect Walsh, correct?
20 A    Correct.
21 Q    In general, Mr. Walsh, can you tell me
22 what protection did Walsh believe the closing
23 protection letter afforded it?
24 A    If the approved attorney committed
25 fraud, he did not follow our closing instructions,

19 (Pages 331 to 334)


Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

335

1    did something other than what our closing
2    instructions called for, did something wrong, we were
3    going to be covered to the extent of the letter.
4          That's fraud, but I don't want to get
5    into specifics.
6    Q      We will today.
7    A      I'm sure we will.
8          MR. STONE:  Can we just take a short
9    break?
10         MR. HAYES:  Sure.
11         (Recess at 9:50 a.m.)
12         (Deposition resumes at 10:05 a.m.)
13   Q      Ready to proceed, Mr. Walsh?
14   A      I am.
15   Q      Thank you.
16         Did you believe, Mr. Walsh, that a
17   closing protection letter protected Walsh against any
18   type of fraud committed by a closing agent?
19   A      Yes.
20   Q      Did you believe it protected against any
21   violation of your closing instruction letters?
22         MR. STONE:  Objection to form.
23         You can answer it to the extent it
24   didn't call for a legal conclusion.  Just your own
25   understanding.

337

1    point in time when documents were received back from
2    the attorney, correct?
3    A      Correct.
4    Q      Is that the person, Mr. Walsh, with whom
5    the closing attorney was to communicate regarding any
6    issues?
7    A      Correct.
8    Q      Is that the person that had the ultimate
9    say-so as to whether or not Walsh would fund a loan?
10   A      I'm not sure if I understand the
11   question.
12   Q      Someone at Walsh had to decide whether
13   or not you were satisfied, such that the loan would
14   be funded, correct?
15   A      Closing instructions were sent to the
16   attorney.
17   Q      Right.
18   A      We'll use Yacker, if you don't mind.
19   Q      Fine.
20   A      Closing instructions were sent to
21   Yacker.  We said, do not release the funds until
22   these things are done, follow the instructions.
23   Q      Here's my question.  From my
24   understanding -- correct me if I'm wrong -- in the
25   vast majority of mortgage transactions, the funding

336

1    A      Yeah.
2    Q      Did you ever read a closing protection
3    letter?
4    A      I did.
5    Q      Did you read the ones in this case?
6    A      I did.
7    Q      How many of them did you read?
8    A      Approximately 10.
9    Q      To your knowledge, Mr. Walsh, did anyone
10   from Walsh ever go through all of the loan files to
11   determine -- on the 220 loans, to determine if you
12   had a closing protection letter for all of those
13   files?
14   A      I do not know.
15   Q      Who would know that?
16   A      Fred Schlesinger.
17   Q      Do you have any reason to believe,
18   Mr. Walsh, that any of the loans were closed without
19   a closing protection letter?
20   A      I have no reason to believe they were.
21   Q      We were back in the process of a loan
22   making its way from the initial application with the
23   participant to the sale in the secondary market.
24         We were talking about, I believe, the
25   closing people, which you said took us up to the

338

1    takes place at or after the closing.
2          Is that a correct understanding on my
3    part?
4    A      Correct.
5    Q      Funding does not take place prior to
6    settlement, correct?
7    A      Correct.
8    Q      So the reason funding takes place at or
9    after settlement -- and again, correct me if I'm
10   wrong -- is that you want to be able to insure that
11   your conditions and requirements are met before you
12   leave your money out the door, correct?
13   A      Correct.
14   Q      That's one of the reasons why you
15   require an HUD 1, so that you can determine if the
16   financial terms of the deal match what you expect
17   them to be, correct?
18   A      Correct.
19   Q      And that's why you expect the closing
20   attorney to certify to you that I have fulfilled my
21   obligations under the closing instructions, correct?
22   A      Correct.
23   Q      You expect that to take place before
24   funding, correct?
25   A      Correct.

20 (Pages 335 to 338)



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - Cross

379

1  Q    The HUD lists the buyer and seller, does
2  it not?
3  A    Yes.
4  Q    If in fact the closer had required the
5  conditions to be fulfilled, he or she would see an
6  HUD that has the financial terms and who the parties
7  to the transaction are, correct?
8  A    Correct.
9  Q    And then below that it says, "You are
10 authorized to disburse the loan proceeds only when
11 all of the requirements and conditions have been
12 satisfied."
13      Do you see that?
14 A    I do.
15 Q    Was the closing agent permitted to
16 disburse without having a verbal okay from the
17 funder?
18 A    Could you repeat that, if possible?
19 Q    Sure.
20      The loans had to be funded before the
21 closing agent could disburse, correct?
22 A    Correct.
23 Q    So at some point in time Carolynn is
24 going to be satisfied that she can fund this loan of
25 $165,000, correct?

380

1  A    Correct.
2  Q    And those funds would be likely wired to
3  the closing attorney's account, correct?
4  A    Correct.
5  Q    And the closing attorney was then
6  responsible to disburse the funds, correct?
7  A    Correct.
8  Q    And would it be your understanding,
9  Mr. Walsh, based on your experience, that this should
10 be consistent with the HUD 1?
11 A    Yes.
12 Q    My question is, after the funding took
13 place from Carolynn, was there any further obligation
14 on the part of the closing attorney to get a blessing
15 to disburse the moneys that he had received?
16 A    Could you repeat that one more time?
17 Q    Sure.
18      The closing attorney has now received a
19 wire because Walsh is satisfied to fund the
20 transaction.
21 A    Correct. He probably received it prior
22 to that. He wasn't authorized to disburse it.
23 Q    When he is ready to disburse, my
24 question is, does he need further approval from Walsh
25 before he can disburse after he receives the funds?

381

1  A    I do not know the answer.
2  Q    Who would know that, Mr. Fred
3  Schlesinger?
4  A    Yes.
5  Q    That was not something you asked him
6  after the last deposition?
7  A    I did not.
8  Q    Now, below that section B, Mr. Walsh,
9  there appear to be specific requirements placed into
10 this particular transaction.  Would you agree with
11 me?
12 A    I would.
13 Q    So this part would be tailored to the
14 particular loan involved, correct?
15 A    Correct.
16 Q    Section C says, "Payoff requirements,"
17 and in this one it's blank.
18      What is that section used for?
19 A    I do not know.
20 Q    Section B indicates that there must be
21 satisfactory evidence of hazard insurance, correct?
22 A    Correct.
23 Q    And there needs to be a listing of
24 National Home Funding as the insurance loss payee,
25 correct?

382

1  A    Correct.
2  Q    Why was that not Walsh?
3  A    It is the way procedures were set up.
4  Q    In fact, it was set up in such a way
5  that these loans would in fact be made in the name of
6  National Home Funding, correct, not Walsh?
7       MR. STONE: Object to the form of the
8  question.
9       You can answer.
10 A    Correct, and Walsh supplied the funds.
11 Q    Section E deals with the title insurance
12 requirements, correct?
13 A    Correct.
14 Q    And it requires that a policy be issued
15 in the name of National Home Funding, its successors
16 and or assigns?
17 A    Correct.
18 Q    And it indicates which endorsements are
19 being required, correct?
20 A    It does.
21 Q    Subsection F is, "Additional closing
22 requirements."  Do you see that?
23 A    I do.
24 Q    And then the last page, Mr. Walsh,
25 section G, sets forth the permitted fees and costs of

31 (Pages 379 to 382)



**Rizman**
**Rappaport**
**Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 537

1               UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
2               Civil Action No. 97-cv-3496 (DRD)(MAS)
3   WALSH SECURITIES, INC.,            :
4           Plaintiff,              :  DEPOSITION OF:
5      v.                           : ROBERT C. WALSH
                                        (VOLUME III)
6   CRISTO PROPERTY MANAGEMENT, LTD., :
    a/k/a G.J.L. LIMITED; DEK HOMES
7   OF NEW JERSEY, INC.; OAKWOOD      :
    PROPERTIES, INC.; NATIONAL HOME
8   FUNDING, INC.; CAPITAL ASSETS     :      Certified
    PROPERTY MANAGEMENT & INVESTMENT
9   CO., INC.; CAPITAL ASSETS PROPERTY:     Transcript
    MANAGEMENT, L.L.C.; WILLIAM KANE;
10  GARY GRIESER; ROBERT SKOWRENSKI,  :
    II; RICHARD CALANNI; RICHARD
11  DiBENEDETTO; JAMES R. BROWN;      :
    THOMAS BRODO; ROLAND PIERSON;
12  STANLEY YACKER, ESQ.; MICHAEL     :
    ALFIERI, ESQ.; RICHARD PEPSNY,
13  ESQ.; ANTHONY M. CICALESE, ESQ.;  :
    LAWRENCE CUZZI; ANTHONY D'APOLITO;
14  DAP CONSULTING, INC.; COMMONWEALTH:
    LAND TITLE INSURANCE CO.; NATIONS
15  TITLE INSURANCE OF NEW YORK, INC.;:
    FIDELITY NATIONAL TITLE INSURANCE
16  CO. OF NEW JERSEY; COASTAL TITLE  :
    AGENCY; DONNA PEPSNY; WEICHERT
17  REALTORS and VECCHIO REALTY, INC. :
    d/b/a MURPHY REALTY BETTER HOMES
18  AND GARDENS,                      :
19                                    :
              Defendants.
20  X-------------------------------X
21        TRANSCRIPT of testimony as taken by and
    before CHERYL McGANN, a Certified Court Reporter
22  of the State of New Jersey, at the offices of
    McCARTER & ENGLISH, LLP, Four Gateway Center,
23  Newark, New Jersey, on Friday, September 30, 2011,
    commencing at 9:14 a.m.
24
25  Job No. NJ356367

Page 538

```
 1   A P P E A R A N C E S :
 2   STONE MAGNANINI LLP
     BY:  ROBERT A. MAGNANINI, ESQ.
 3   150 JFK Parkway
     Short Hills, New Jersey  07078
 4   (973) 218-1111
     rmagnanini@stonemagnalaw.com
 5   Attorneys for Plaintiff
 6   McCARTER & ENGLISH, LLP
     BY:  DAVID R. KOTT, ESQ.
 7   Four Gateway Center
     100 Mulberry Street
 8   Newark, New Jersey  07102-0652
     (973) 622-4444
 9   dkott@mccarter.com
     Attorneys for Defendant
10   Commonwealth Land Title Insurance Co.
11   FOX ROTHSCHILD LLP
     BY:  EDWARD J. HAYES, ESQ.
12   997 Lenox Drive
     Building 3
13   Lawrenceville, New Jersey  08543-5231
     (609) 896-3600
14   ejhayes@foxrothschild.com
     Attorneys for Defendants
15   Nations Title Insurance of New York, Inc. and
     Fidelity National Title Insurance Co. of New Jersey
16
17
18
19
20
21
22
23
24
25
```

Page 539

1                          I N D E X
2    WITNESS                   EXAMINATION
3    ROBERT C. WALSH
4        By Mr. Kott:      541,576,606,665,691,715,719,740
         By Mr. Hayes:     563,597,619,667,689,704,722,739
5
                         E X H I B I T S
6
     Number              Description                    Page
7
     Robert     Confidential Settlement Agreement
8    Walsh-22   Bates stamped COM-Cherokee-00303-392    555
9    Robert     Three-page article from July 13, 1997,
     Walsh-23   edition of Sunday Star Ledger           581
10
     Robert     Two-page article from July 10, 1997,
11   Walsh-24   edition of Asbury Park Press            581
12   Robert     File copy of September 29, 1997, letter
     Walsh-25   to Mr. Schlesinger from David R. Kott
13              with certified mail slip attached       583
14   Robert     August 12, 1997, letter Bates stamped
     Walsh-26   COM 01490 from Donna Sullivan to
15              Jeffrey Goodman                         593
16   Robert     September 5, 1997, letter Bates stamped
     Walsh-27   COM 01715 through 16 from Fred Schlesinger
17              to Donna Sullivan                       593
18   Robert     July 28, 1997, letter to Commonwealth from
     Walsh-28   Jeffrey M. Goodman, Latham & Watkins    605
19
     Robert     Fax from John Oberdorf to Dinah Raven
20   Walsh-29   with attached press release Bates stamped
                WSI 0070147-0070149                     608
21
     Robert     January 31, 1997, Quality Control
22   Walsh-30   Memorandum from Veronica Gonzalez-Lehman,
                CC to James Walsh and Peter Trebour
23              Bates stamped WSI 0075078               649
24   Robert     Closing Instructions document Bates
     Walsh-31   stamped SYSW 020142, 20143 and 20141   672
25

Page 540

1              E X H I B I T S (Continued)

2   Number            Description                    Page

3   Robert     Commonwealth Land Title Insurance

    Walsh-32   Company document Bates stamped

4              COM 18304                             732

5   Robert     Document Bates stamped COM/Walsh

    Walsh-33   000668                                733

6

7

8

                    *              *              *

9

                (Exhibits retained by counsel.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 667

1    MR. KOTT:   That's all I have on that.

2    Off the record.

3    (A discussion was held off the record.)

4    FURTHER EXAMINATION BY MR. HAYES:

5    Q.   Mr. Walsh, will you agree with me that

6    assignments are critical documents to evidence

7    ownership of a mortgage?

8    A.   I don't know legally what's the response on

9    that.

10   Q.   Well, based on your years of experience in

11   the mortgage business, sir, you do understand, do

12   you not, that assignments are the manner in which

13   mortgages are transferred?

14   A.   I do.

15   Q.   And do you understand the importance of

16   recording documents?

17   A.   I do.

18   Q.   And do you understand the importance of

19   assignments being recorded so that the public

20   records reflect the current owner of a mortgage

21   obligation?

22   A.   I do.

23   Q.   You understood these loans were all closing

24   in NHF's name, correct?

25   A.   Correct.

1      Q.   And you were asked at at least one, if not

2   both, of the prior depositions why Walsh mandated

3   that these loans be closed in NHF's name, not

4   Walsh's name; and in those prior two depositions,

5   you didn't have an answer for that.

6          Have you been able to determine now, prior to

7   today, why it was done that way?

8      A.   Yes.

9      Q.   Tell us why.

10     A.   It was done like that throughout the whole

11  company.  It wasn't unique to NHF.  It was done for

12  RESPA.  It was done because it became a secondary

13  market transaction, and we believed that it would

14  limit some of our potential risk.

15     Q.   So part of the reason why it was set up this

16  way was so that if NHF had engaged in wrongdoing you

17  would limit your potential liability as the holder

18  of the loan?

19     A.   That was my understanding.

20     Q.   And what was the RESPA violation or RESPA

21  compliance issue that you felt doing it this way

22  required?

23     A.   Yield spread premiums.

24     Q.   Okay, and what effect did this manner of

25  doing business have on the yield spread premium that

Page 669

1   could be charged and/or disclosed on these

2   transactions?

3       A.   The lender did not need to disclose.

4       Q.   And the yield spread premium was a charge to

5   the borrower, correct?

6       A.   No.

7       Q.   What was it?

8       A.   It was a price paid from a company like Walsh

9   that was acquiring the loans.

10      Q.   Did it come out of the loan, Mr. Walsh?

11      A.   Did the borrower pay, no.  It was a premium

12  paid for from Walsh to the correspondent.

13      Q.   But if it had to be disclosed, it would have

14  been disclosed to the borrower; correct?

15      A.   That is correct.

16      Q.   Who would understand more about the financial

17  arrangements that existed between a participant and

18  Walsh?

19      A.   Well, that was HUD's ruling; and that's

20  exactly what we followed was HUD's rulings.

21      Q.   So the loans were in part set up the way in

22  which they were so that you wouldn't have to make

23  that disclosure?

24      A.   We wouldn't make the disclosure.  It wasn't

25  our disclosure to make.

1      Q.   Who would have made the disclosure, NHF?

2      A.   Correct, NHF and all our other

3   correspondents.

4      Q.   That's fine.  And, again, I'm not suggesting --

5      A.   That's fine.

6      Q.   -- that you dealt with NHF differently.

7      A.   Okay.

8      Q.   What I was trying to get at is why Walsh

9   mandated that the loans be closed in NHF's name.

10      A.   Fine.

11      Q.   Who prepared the assignments on the NHF

12   loans?

13      A.   I believe we did.

14      Q.   Okay, and how were those assignments

15   transmitted to the closing attorneys?

16      A.   I don't know the answer.

17      Q.   Would you expect those assignments to be a

18   part of the loan package that was sent to the

19   closing attorney?

20      A.   I don't know if it was the loan package.  I

21   don't know what loan package you're referring to.

22   Was it the closing package?

23      Q.   Yes, sir.

24      A.   Oh, okay.  I'm not sure.

25      Q.   Well, if it was not transmitted as part of

1 the closing package -- again, and I'm going to ask

2 you to draw on your years of experience in the

3 business -- how else would it have been transmitted

4 to the closing attorney?

5     A.  It's possible "NHF" in this case would have

6 sent it there.

7     Q.  Well, would Walsh have prepared it, sent it

8 to NHF, and then NHF would send it to the closing

9 attorney?

10     A.  It's clear it would have been sent to NHF and

11 probably would have been sent to the closing

12 attorney, but it's clear it would have been sent to

13 NHF.

14     Q.  So you would have relied on NHF to deliver

15 that assignment to the closing attorney so that it

16 could be recorded as part of the package?

17     A.  That's not what I'm saying.  I'm saying I

18 don't know.

19     Q.  Well, can you explain for me, Mr. Walsh,

20 why Walsh did not require the recording of the

21 assignment as part of its closing instructions?

22     A.  We got the assignment from NHF, and we

23 assigned that loan in blank to the trust.

24     Q.  So what you're telling me is at some point in

25 time, Walsh sent the assignments to NHF.  NHF would

Page 672

1   execute those assignments and send them back to

2   Walsh?

3       A.   Correct.

4       Q.   And then Walsh would execute an assignment in

5   blank, which could ultimately be used by whoever the

6   acquirer of that loan is?

7       A.   Correct.

8       Q.   So that would explain why Walsh didn't ask

9   the closing attorney to record those assignments,

10  because they didn't go to the closing attorney.

11  They came directly back to you, correct?

12      A.   I don't know the answer to that.

13               (Closing Instructions document Bates

14  stamped SYSW 020142, 20143 and 20141 was received

15  and marked Defendant's Exhibit Robert Walsh-31 for

16  Identification.)

17               Exhibit Robert Walsh 31 is something

18  entitled Closing Instructions by Walsh Securities,

19  Inc. on the first page.  It indicates it's for

20  Rafael Bustos, Sr., at a property 138 Ridge Avenue,

21  Asbury Park, New Jersey, Bates stamped SYSW 020142

22  through 020141.

23      Q.   Mr. Walsh, do you have that document before

24  you?

25      A.   I do.

Page 673

1      Q.   I will represent to you, sir, there's nothing

2   particular about this one transaction, as to why

3   this set of closing instructions was pulled.  It was

4   just a set of closing instructions.

5      A.   Okay.  That's fine.

6      Q.   Do you recognize this as the form of closing

7   instructions that Walsh generated?

8      A.   I do.

9      Q.   Okay, and these would have been generated

10  after the loan commitment had been issued?

11     A.   Correct.

12     Q.   And you would expect these closing

13  instructions to be generated before the loan funded,

14  correct?

15     A.   Correct.

16     Q.   Okay.  And these loan instructions, closing

17  instructions, would be sent to Mr. Yacker; correct?

18     A.   Correct.

19     Q.   Mr. Agel testified in his deposition that

20  Walsh never sent any of the closing instructions to

21  him; that they were, in fact, sent directly to

22  Mr. Yacker.

23          Do you have any reason to disagree with his

24  testimony?

25     A.   The only reason, I think that in Coastal's

1    files we saw these, and so that's my only basis.

2        Q.   Okay.  So you know they were in the files,

3    but you don't know whether they got in the files

4    because after this closing was completed Mr. Yacker

5    may have included them with what he sent Coastal?

6        A.   That's correct.

7        Q.   Under the document section of this closing

8    instruction, the capital letter A, Mr. Walsh, do you

9    see that section?

10       A.   I do.

11       Q.   There's a listing of all the documents that

12   are being transmitted to the closing attorney for

13   use in the transaction.

14            Do you see that?

15       A.   I do.

16       Q.   And do you see that the assignment is not

17   referenced anywhere within that document?

18       A.   I do.

19       Q.   And would you expect, Mr. Walsh, that if the

20   assignment was transmitted to Mr. Yacker on this

21   transaction it would be an identified document here?

22       A.   I do.

23       Q.   Okay, and is this consistent with what you

24   believe happened here in that these assignments went

25   to NHF and then came back directly to Walsh for

1 processing?

2      A.   It would be speculation, but I can understand

3 the logic.

4      Q.   Okay.  Mr. Skowrenski testified that there

5 were occasions when the assignments didn't come in

6 with the loan package but at some point that he

7 might get a large number of assignments to execute.

8           Do you have any reason to disbelieve that

9 testimony?

10     A.   I do.  Based on the files that we looked at,

11 there was assignments in all the files; and they

12 were dated as of that particular date.

13     Q.   When Walsh sold the loan -- a whole loan

14 sale, would it provide the NHF-to-Walsh assignment

15 to the whole loan buyer?

16     A.   Yes, and then Walsh to the whole loan buyer.

17     Q.   So a whole loan buyer would get two

18 assignments; one from NHF to Walsh, one from Walsh

19 to, for example, Cityscape?

20     A.   Yes.

21     Q.   And Walsh would expect the whole loan buyer

22 to record those assignments evidencing its ownership

23 of the loan, correct?

24     A.   Correct.

25     Q.   Okay.  When you bought back loans after the

Page 676

1    fraud was discovered, were there assignments from

2    the whole loan purchaser back to Walsh?

3        A.   I believe so, but I don't know the answer to

4    that.

5        Q.   Where are those documents?

6        A.   I don't know the answer to that.

7        Q.   Is it possible, Mr. Walsh, that the whole

8    loan buyers never recorded the assignments into the

9    whole loan buyer such that you didn't need an

10   assignment back from the whole loan buyer?

11       A.   I don't know the answer to that.

12       Q.   Okay.  Are you aware, Mr. Walsh, that part of

13   your claim in the title claim portion of this case

14   is that Walsh did not get notice of certain tax or

15   foreclosure sales because the assignments to Walsh

16   were not recorded?

17       A.   Yes.

18       Q.   Can you tell me the basis upon which the

19   title company is responsible for the lack of

20   recording of the assignments when you have

21   acknowledged that those assignments never went into

22   the possession of the title company?

23       A.   I can't explain that.

24       Q.   But are you still pursuing that claim on

25   those files?

Page 677

1      A.   I got to talk to my attorney.

2      Q.   Are you aware of any factual basis upon which

3   you can submit a claim that is based on the lack of

4   recording of an assignment?

5      A.   Again, it's a legal conclusion.

6      Q.   That's not my question.  I understand you'll

7   talk to Mr. Magnanini afterwards as to whether

8   you've got a legal basis.

9           I'm asking you as the 30(b)(6) witness do you

10   have any facts that support a claim against the

11   title company on nonrecorded assignments when those

12   assignments never went to the title company in the

13   first place?

14      A.   No.

15                MR. MAGNANINI:  Objection to form.

16                You answered it.

17      Q.   Mr. Walsh, I'm going to show you a document

18   that was previously marked at one of your earlier

19   depositions as Robert Walsh-11.  It is a two-page

20   HUD-1 from the Salvatoriello transaction.

21           Do you see that?

22      A.   Yes, I do.

23      Q.   Okay.  Mr. Walsh, this is a transaction where

24   Dee & Sons was selling the property to the

25   Salvatoriellos; correct?