# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES, INC., | : |
| | : |
| Plaintiff, | : Civil Action No. 97-cv-3496 (DRD)(MAS) |
| | : |
| vs. | : Hon. Dickinson R. Debevoise, U.S.D.J. |
| | : |
| CRISTO PROPERTY MANAGEMENT, | : |
| LTD., a/k/a G.J.L. LIMITED; *et al.*, | : |
| | : |
| Defendants. | : |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

---

STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111

November 10, 2011

*Attorneys for Plaintiff Walsh Securities, Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION .........................................................................................................1

FACTUAL BACKGROUND .........................................................................................2

I.  Walsh Securities, Inc. ...............................................................................................2

II. The Title Insurance Defendants ...............................................................................4

     A. CPLs ....................................................................................................................5

     B. Title Commitments and Title Policies ...............................................................7

III. The Fraudulent Scheme ...........................................................................................9

     A. The Critical Role of Title Insurance Defendants' "Approved Attorneys"
       in the Fraud on Walsh Securities ......................................................................10

        1. The Approved Attorneys Admittedly Failed to Comply with
          WSI's Closing Instructions and Knowingly Transferred WSI's Funds
          to the Conspirators .....................................................................................12

        2. The "Approved Attorneys" Admitted that they Misapplied/Defrauded
          Walsh Securities of its Loan Funds. ...........................................................15

     B. The Title Agent's Actions Facilitated the Fraud ..............................................16

IV. Procedural History of Other Litigation Resulting From The Fraud ......................17

LEGAL ARGUMENT ..................................................................................................19

I. Standard of Review ..................................................................................................19

II. Liability Was Triggered Under The CPLs ..............................................................20

     A. The Approved Attorneys' Repeatedly Admitted That They Were Engaged
       In The Fraud Triggering Liability Under The Title Insurance Defendants'
       CPLs ...................................................................................................................20

     B. WSI Did Not Get What It Bargained For .........................................................24

**III.** <u>**Liability Under the Title Policies**</u> ...............................................................................26

<u>**CONCLUSION**</u> .........................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Freedom Mortg. Corp. v. Burnham Mortg., Inc.,*
    569 F.3d 667 (7th Cir. 2009) ............................................................................ 9

*JP Morgan Chase Bank, N.A. v. FDIC,*
    No. 09-14891, 2011 U.S. Dist. LEXIS 62692 (E.D. Mich. June 10, 2011) ......... 26

*Martin v. Banco Popular de P.R.,*
    379 F. App'x 185 (3d Cir. 2010) ..................................................................... 28

*Martinez v. Wells Fargo Home Mortg., Inc.,*
    598 F.3d 549 (9th Cir. 2010) ...................................................................... 3, 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ...................................................................................... 19

*Stewart Title Guar. Co. v. Greenlands Realty, LLC,*
    58 F. Supp. 2d 370 (D.N.J. 1999) ............................................................. 19, 27

*Tannerfors v. American Fidelity Fire Insurance Co.,*
    397 F. Supp. 141 (D.N.J. 1975) ...................................................................... 29

*United States v. Woods,*
    554 F.3d 611 (6th Cir. 2009) ...................................................................... 3, 14

### <u>State Cases</u>

*Clients' Sec. Fund of the Bar of N.J. v. Sec. Title & Guar. Co.,*
    134 N.J. 358 (1993) ................................................................................. 19, 22

*First American Title Insurance Co. v. Vision Mortgage Corp.,*
    298 N.J. Super. 138 (App. Div. 1997) ........................................................ 24, 25

*Keown v. West Jersey Title & Guaranty Co.,*
    161 N.J. Super. 19 (App. Div. 1978) ............................................................... 19

*Pickett v. Lloyd's,*
    131 N.J. 457 (1993) ....................................................................................... 29

*Sandler v. New Jersey Realty Title Ins. Co.,*
    36 N.J. 471 (1962) ......................................................................................... 29

*Sears Mortgage Corp. v. Rose,*
  134 N.J. 326 (1993) ............................................................................................................*passim*

*Summonte v. First American Title Ins. Co.,*
  180 N.J. Super. 605 (Ch. Div.), *aff'd*, 184 N.J. Super. 96, 445 A.2d 409 (App. Div. 1981),
  *certif. denied*, 89 N.J. 418 (1982) ..............................................................................................29

*Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.,*
  116 N.J. 517 (1989) ....................................................................................................................27

**Federal Rules**

Fed. R. Civ. P. 56(a) ..........................................................................................................................19

**State Statutes**

N.J.S.A. § 17:46B-1(h) ......................................................................................................................21

**Miscellaneous**

2 Joyce Palomar, Title Insurance Law § 20:15 (2010) ...........................................................5, 7, 8

17 Williston on Contracts § 50:10 (4th Ed) ....................................................................................28

Black's Law Dictionary (9th ed. 2009) ............................................................................................27

## INTRODUCTION

This case is about who bears the ultimate cost of a mortgage fraud scheme – the defrauded lender or the insurance company that was paid and promised to protect the lender against the fraud. In New Jersey, it has long been settled that a title insurance company is responsible for the losses of a mortgagor where those losses are caused by the fraud of the title insurance company's approved attorney. Notwithstanding this well-settled law, defendants Commonwealth Land Title Insurance Co., Nations Title Insurance of New York, Inc., and Fidelity National Title Insurance Co. of New York (collectively, "Title Insurance Defendants") have breached their contracts and, from the date of the loss up through the filing of this motion, have steadfastly refused to pay Walsh Securities, Inc. ("WSI") the monies it is owed. This motion for partial summary judgment seeks only to compensate WSI for the damages related to repurchasing fraudulent mortgages.

The losses that are the subject of this motion occurred as a result of a conspiracy perpetrated by convicted felon who siphoned off money from WSI's closings and spread the illicit profits to the Title Insurance Defendants "approved attorneys" and other co-conspirators. Numerous individuals went to prison for their participation in this scheme. The Title Insurance Defendants' "approved attorneys," Stanley Yacker and Anthony Cicalese, however played the most vital role. They were the gatekeepers of the loan proceeds. They had many chances to put an end to the sham transactions that damaged WSI, but they did not.

As a direct result of their actions, approximately 230 mortgages that WSI funded went into default. Because of the closing attorneys' involvement in the scheme, WSI was deprived of (1) a *bona fide* mortgagor, (2) appropriate liens, and (3) the standing to seek foreclosure. In the absence of their fraud, WSI would not have suffered these losses. The Title Insurance

Defendants have breached their obligations to WSI and there is no genuine issue of material fact on this point. They have admitted that their "approved attorneys" had pivotal roles in the scam. These admissions alone should result in liability under the terms of the agreements, which the Title Insurance Companies drafted. Notwithstanding their promises to indemnify, the Title Insurance Defendants have refused to pay. Based upon the foregoing, plaintiff WSI respectfully submits its motion for partial summary judgment on 66 loans that were repurchased by WSI.[1]

## FACTUAL BACKGROUND

### I.      Walsh Securities, Inc.

Walsh Securities was a residential mortgage lender. At the time the fraud began, GF Mortgage was the predecessor company to WSI. WSI was formed in April 1996 through a leverage buyout of GF Mortgage. By the summer of 1997, WSI was receiving approximately 2,200 mortgage loan applications per month, approving about 1,000 quality loans and rejecting 1,200 loans per month. These mortgage loans applications were prepared and sent to WSI by a cross-country network of correspondents and table funded by WSI.[2] (L. Civ. R. 56.1 Statement at ¶ 6).

WSI used a warehouse line of $200 million from Greenwich Capital to table fund the loans at closing. (*Id.*). The loans were then purchased by other whole loan purchasers, such as The Money Store and Cityscape Financial, or by a Trust on behalf of note holders in securities issued by WSI with representations and warranties requiring WSI to repurchase all loans found to be fraudulent or that were not marketable. (*Id.* at ¶ 7). All of the loans at issue in this Motion

---

[1] *See* Exhibit A, chart of repurchased loans.

[2] Table funding is a lending method by which the lender provides the funds at the closing, rather than the loan's originator, and takes an assignment of the loan from the originator. (*See* L. Civ. R. 56.1 at ¶¶ 28-40).

have since been repurchased by WSI as a result of the fraud and due to obligations to repurchase

the loans from the whole loan buyers or the Trust. (*Id.* at ¶ 8).

WSI sent closing instructions with each loan. As further described below, the closing

instructions and the loans were wired to the Title Insurance Defendants' "approved attorneys,"

who were required to certify that they disbursed WSI's moneys in accordance with the closing

instructions. (Ex. B, Commonwealth 138:2-13). WSI's closing instructions required, among

other things, that (1) "[t]wo forms of acceptable identification from all borrowers;" (2) that "[n]o

documents . . . be executed by Power of Attorney unless authorized by Walsh Securities, Inc.;"

(3) the loan be recorded "in the First Lien Position;"[3] (4) a full ALTA Title Policy be issued; and

(5) that "[p]rior to disbursement [the closing attorney] must FAX HUD-1 to the [WSI] Closing

Department." (*See* Ex. C, (Example of WSI's Closing Instructions)). Importantly, the closing

instructions stated that the attorney was "authorized to disburse the loan proceeds *only when all*

*of the requirements and conditions have been satisfied.*" (*Id.* (emphasis added)).

These instructions were important to WSI because they instructed the closing attorney

about the lender's prerequisites to closing the loan and illustrated how all of its loan proceeds

should flow at the closing. Their significance is further underscored by the certifications

required by the HUD-1 Settlement Statement[4] (a document required by WSI's closing

---

[3] According to the Title Insurance Defendants' corporate representative, a valid first lien means
"first lien priority and recorded and not subject to attack." (Ex. B, Commonwealth 137:21-
138:1).

[4] A HUD-1 Settlement Statement is a standard form that settlement agents are required to
compete that sets forth a complete accounting of all transactions relating to the closing. *See
Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 557 (9th Cir. 2010). The settlement
statement should be prepared accurately by the closing attorney in accordance with the lender's
closing instructions. If the HUD-1 is a lie, then the lender is not placed on notice of the
disbursement of the loan proceeds. *E.g., United States v. Woods*, 554 F.3d 611, 613 n.3 (6th Cir.
2009).

instructions), which states: "[t]o the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. *I have caused or will cause the funds to be disbursed in accordance with this statement*." (Ex. D (Sample HUD-1 Settlement Statement) (emphasis added)). These certifications are intended to assure lenders that the transactions were truly arms-length and legitimate. Had WSI known that the closing attorneys would purposefully violate its closing instructions to facilitate the fraud, it would never have wired or authorized the release of its funds.

## II.      The Title Insurance Defendants.

The Title Insurance Defendants are insurance companies that offered and issued closing service protection letters, title commitments, and title policies to lenders throughout the country. (Ex. E, 4th Am. Complaint at ¶¶ 52-54). The closing service protection letter ("CPL"), or closing service letters as they are called by the Title Insurance Defendants (Ex. F, Coastal 30:3-12), and the title commitment were simultaneously issued by the insurance carrier, and were paid from the proceeds of the funds wired by WSI to the "approved attorneys." (Ex. G, Nations 79:11-15; Ex. B, Commonwealth 70:19-71:7).

CPLs are agreements to indemnify a lender for an "approved attorney's" malfeasance or their failure to comply with the lender's closing instructions. (Ex. B, Commonwealth 75:24-77:6; 78:11-14). The title commitment is an agreement by the carrier to issue a title policy if certain conditions are met. (Ex. B, Commonwealth 76:23-77:3). The title policy, like any insurance policy, provides covered risks and protections. (Ex. B, Commonwealth 76:2-4). Generally, national title insurers issue policies and CPLs through local agents. In this case, the Title Insurance Defendants offered and sold their closing services through Monmouth Title and

defendant Coastal Title Agency.[5]  (L. Civ. R. 56.1 Statement at ¶¶ 45-46; Ex. B, Commonwealth

13:15-131:4; Ex. H (Agency Agreements Between Fidelity, Nations and Coastal Title); Ex. V

(Commonwealth Letter to Coastal)).  The Title Insurance Defendants relied heavily on their

agents, in fact, their corporate representative testified that the insurers never knew whether their

agents issued a CPL, a title commitment or a policy until they received payment for those

documents.  (Ex. B, Commonwealth 52:18-53:7).  The Title Insurance Defendants insured WSI

against the very kind of fraud involved here.

WSI, like almost every other mortgage wholesaler, required a CPL on *every* loan that it

funded.[6]  (Ex. A).  Mr. Agel, President of Coastal Title, testified that no mortgage lender would

close on a loan without a CPL.  Corporate representatives of WSI and the Title Insurance

Defendants agreed.  (Ex. L, WSI 22:18-24; Ex. S, 21:10-15).  In addition to the CPLs, the Title

Insurance Defendants also issued title commitments on every property at issue. (*Id.*).  Through

discovery, WSI has located insurance policies on 27 of the properties issued by the Title

Insurance Defendants at issue in this Motion.  (*Id.*; L. Civ. R. 56.1 Statement at ¶ 56).

### A.   CPLs.

"[CPLs] make underwriters contractually responsible for their issuing agents and

approved attorneys' closing errors, fraud, and dishonesty." 2 Joyce Palomar, TITLE INSURANCE

LAW § 20:11 (2010).  The Title Insurance Defendants issued CPLs only to their "approved

attorneys;" distinguished from attorneys who had been disbarred, suspended, or had "a negative

claims history or lack of cooperation." (Ex. B, Commonwealth 57:22-58:19, 83:5-20; *see also*

---

[5] Monmouth Title is not a party to this action.

[6] Each CPL is addressed to "National Home Funding, Inc., its successor and/or assigns."  WSI
was the assignee of National Home Funding ("NHF").  NHF brokered the loans, which were
actually funded by WSI through table-funding, and executed assignments and allonges of the
notes and mortgages to WSI.  (Ex. L, WSI 675:2-24)

Ex. J ("this Company is simply exercising its right as to whom it appoints as an Approved

Attorney"); Ex. N (Memorandum from Fidelity addressed to "Agents and Approved Attorneys")).

As of November 25, 1998, well after their involvement in the fraud had become public, attorneys

Stanley Yacker and Anthony Cicalese were still considered "approved attorneys" by the Title

Insurance Defendants. (*Compare* Ex. J, *with* Ex. K). On all of the loans at issue, the Title

Insurance Defendants issued CPLs through their agents on behalf of the "approved attorneys."

(*See* L. Civ. R. 56.1 Statement ¶¶ 47, 50).

The CPLs at issue in this Motion are nearly identical. For instance, the following is an

excerpt from Fidelity's CPL, but all of the Title Insurance Defendants' CPLs contain the same

language:

Dear Customer:

When title insurance of Fidelity National Title Insurance Company of New York is specified for your protection in connection with the closing of the above described real estate transaction in which you are to be a lender secured by a mortgage of an interest in land, the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with that closing when conducted by the above named Issuing Agent (an agent authorized to issue title insurance for the Company) of Fidelity National Title Insurance Company of New York or the above named Attorney and when such loss arises out of:

1. Failure of the Issuing Agent or Attorney to comply with your written closing instructions to the extent that they relate to: (a) the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such title or lien; or (b) the collection and payment of funds due you; or

2. Fraud of or misapplication by the Issuing Agent or Attorney in handling your funds in connection with the matters set forth in numbered paragraph 1 above.

(*See* Ex. A). No mortgage lender, including WSI, would permit a closing to be funded absent a

CPL and an insurer's commitment to issue a title policy. CPLs provide the comfort to mortgage

lenders that if the "approved attorney" was engaged in fraud, if their loan funds were stolen or

misapplied, or if the moneys were defalcated by the insurer's "approved attorney" and agents,

then the lender would not be left without recourse against the insurer. The CPLs, as seen from

the excerpt above, contain the promise that if the title insurer's "approved attorney" was engaged in fraud with respect to the loan funds, then the insurance company would "reimburse" the lender for the loss that it suffered. The importance of the CPL cannot be overstated, because the lender, unlike the title insurance company, has no relationship with the closing attorney to whom it wires its money. The CPLs have no exclusion for negligence, and unlike the current form of CPL issued by American Land Title Association, the CPL's issued on these properties had no exclusion for fraud by the lender or its assignee. (Ex. M, Fidelity 10:11-15).

The "approved attorneys" are the gatekeepers of the lending funds; they place their license to practice law on the line to ensure that the closing is a legitimate transaction – *i.e.*, a sale of an actual property involving a *bona fide* seller and a *bona fide* purchaser.

**B.     Title Commitments and Title Policies.**

A title commitment is a contract that sets forth the terms that a title insurer is offering to include in a title policy to be issued. J. Palomar, at § 5:29. (Ex. B, Commonwealth 134:10-18; 60:4-10; 76:15-77:6; 77:15-78:4). It is issued at the same time as the CPL, usually "a few weeks before the date scheduled for the closing." *Id.* (Ex. B, Commonwealth 71:2-3).

As with their CPLs, the Title Insurance Defendants relied upon their agents to issue title commitments. (Ex. B, Commonwealth 111:1-14). After the title agent received a request for a title commitment, it should have searched for and evaluated titles, judgments, and taxes and assessments. (Ex. B, Commonwealth 128:22:-129:10). That information would then be used as the basis for the commitment. (Ex. B, Commonwealth 129:7-8). A description of the "proposed insured," the insured's interest in the property, and a general description of the property to be insured would be set forth in Schedule 'A' of the commitment. (Ex. A). If the title agent's search indicated that there was a prior mortgage or other encumbrance on the property, then the

title agent should have identified the potential defects in Schedule 'B' of the commitment, which would set forth the "requirements to be complied with" before the policy would be issued. (Ex. B, Commonwealth 129:5-10; Ex. I, Koch 64:21-65:4). After the closing, the closing attorney should have supplied affidavits of title, satisfaction of liens, or other documents to the agent, who should have verified that were no remaining liens or defects. (Ex. B, Commonwealth 129:11-25; Ex. I, Koch 65:5-8). Assuming those requirements were satisfied, the agent would issue a title policy on behalf of the insurance company. (Ex. B, Commonwealth 129:19-25). The Title Insurance Defendants conceded that those functions were supposed to be performed by their agent, Coastal Title. (Ex. B, Commonwealth 132:6-18; 134:24-135:9). As further described below, however, because of the fraud, Coastal Title did not issue commitments this way.

The Title Insurance Defendants issued title policies after the deed and mortgage were recorded. (Ex. B, Commonwealth 173:8-13). If the policy was paid for but not issued because the deed and mortgage were never filed, then according to the Title Insurance Defendants, coverage for the "approved attorney's" acts would fall under the insurer's CPL.[7] (Ex. B, Commonwealth 173:25-174:6; 77:17-78:14). Even though premiums for title insurance policies were paid for using the proceeds of WSI's funds at closing, and notwithstanding their refusal to even respond to WSI's demand for coverage, the Title Insurance Defendants have not returned any of the premiums they received from WSI. (Ex. G, Nations 13:17-16:1).

Similar to the commitments, the title policies at issue contain both a Schedule 'A' and Schedule 'B'. (Ex. A). According to their policies, as of the date issued, the Title Insurance Defendants insured that the property described in Schedule 'A' was vested in fee simple in the

---

[7] Generally, title insurance is a contract "whereby the insurer is paid one sum in consideration for agreeing to indemnify the insured up to a specified amount against loss caused by encumbrances upon or defects in the title to real property in which the insured has an interest." J. Palomar, at § 1:8.

name of the insured.  (Ex. B, Commonwealth 183:11-19; Ex. A).  Schedule 'A' goes on to state

that the "[i]nsured mortgage" is recorded in the mortgage book of the county clerk's office.  (Ex.

A).  Schedule 'B' of each policy at issue provides for exceptions from coverage; none of which

apply in this instance.  (*Id.*)  Schedule 'B' also notes the following: "This policy insures that the

mortgage set forth under Schedule A hereof is a valid first lien on the property described

therein."  (*Id.*)  According to the Title Insurance Defendants, a valid lien under the title policy is

"a lien recorded in the first position in the land records . . . not subject to some type of attack,

which would fall within the covered risk under the policy."  (Ex. B, Commonwealth 177:20-24).

### III.    The Fraudulent Scheme.

In contrast to a typical real estate transaction, the *atypical* fraudulent transactions in this

case ensued as follows:[8]

> Defendant William Kane ("Kane"), through one of his companies (defendants Cristo Property, GJL Limited, or Oakwood Properties) purchased a house in a low income area for a low price.
>
> The co-conspirators located a potential strawbuyer, and the house was appraised at an inflated value.  A mortgage loan application for the strawbuyer was then prepared by Kane and submitted to WSI.
>
> The loan application was fraught with materially false and misleading information – inflated appraisals, escrow letters stating that the buyer made a down payment, that a second mortgage was made on the property, and that the strawbuyer would own the entire property.
>
> These misstatements and lies were designed to satisfy the loan underwriting criteria and induce WSI into approving the loan.
>
> At the closing, WSI wired the loan proceeds to the Title Insurance Defendants' "approved attorneys."

---

[8] As Chief Judge Easterbrook concisely noted in *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, "[t]he goal of a mortgage-flipping scam is to deceive a potential lender about the value of the collateral."  569 F.3d 667, 669 (7th Cir. 2009).

Knowing that (1) the strawbuyer was not a bona fide purchaser, (2) that no down payment was paid, (3) that the strawbuyer did not own the entire property, and (4) that certain closing expenses would never be paid, the Title Insurance Defendants' "approved attorneys" transmitted WSI's funds to themselves and other co-conspirators.

During the closing transaction, the strawbuyers simultaneously transferred sixty percent of their ownership in the property to defendant Capital Assets, which was an immediate event of default under the WSI mortgage.

(*See* Ex. E, 4th Am. Complaint ¶¶ 59-61; L. Civ. R. 56.1 Statement ¶¶ 11-19, 68-75). Nearly all of the individuals involved in this scheme either pleaded guilty to criminal charges or have judgments entered against them by Walsh Securities.

But of all the crooks involved, the "approved attorneys" played the most vital and necessary role. It is undeniable that without their involvement, WSI's mortgage loans would not have been lost to this fraud. It was only with their participation that the fraud could be completed. In each transaction at issue, the lawyers were "approved attorneys" of the Title Insurance Defendants. (Ex. I, Koch 42:1-7; Ex. N (Fidelity Ex. 5) Memo to "Agents and Approved Attorneys").

## A.   The Critical Role of Title Insurance Defendants' "Approved Attorneys" In The Fraud On Walsh Securities.

It is undisputed that the Title Insurance Defendants issued CPLs to cover the conduct of Stanley Yacker and Anthony Cicalese. (L. Civ. R. 56.1 Statement ¶ 83). Their actions led to Walsh Securities being fraudulently induced to fund the 66 properties that are at issue in this Motion. Their involvement in the fraud began with their association with William Kane. Together with Kane, they bankrolled the entire fraud using WSI's closing funds. Yacker and Cicalese hired the same secretary, Lorraine King, to work exclusively on Kane's closings. She first started with Yacker and when she moved to Cicalese's office, so too did the fraudulent transactions.

According to King, who testified extensively about her involvement in the fraud, even though the strawbuyers were *technically* their clients, they all knew that Kane was *their real client*. (Ex. Q, King 30:17-22, 42:20-43:15; Ex. R, Cicalese 13:12-21). Kane was the *real client* because they benefited from him stealing WSI's closing funds. Both attorneys testified that they knew the transactions were fraudulent yet did not alert WSI or the authorities, and continued to close loans and disburse WSI's funds. (L. Civ. R. 56.1 Statement ¶ 84). The scheme involved Yacker, Cicalese, Coastal Title Agency, and others. (*Id.*; Ex. Q, King 51:2-52:13, 82:11-21) But it was only through Yacker's and Cicalese's involvement that these conspirators were able to defraud WSI of its closing funds.

In open court, between his allocution and testimony at the criminal trial of real estate agents Irene DiFeo and Donna Pepsny (other conspirators), Yacker admitted to participating in numerous fraudulent transactions that involved a calculated scheme to Walsh Securities. (Ex. O (Relevant Portions Yacker's Testimony); L. Civ. R. 56.1 Statement ¶¶ 85-89). He began participating in the fraud closings in or around early 1996. (Ex. Q, King 17:16-18:1; Ex. P, Yacker 13:1-8). Because they were fraudulent transactions from their inception, Yacker had no reason to ensure the closings were legitimate. (*Id.*) Instead, King actually conducted the closings so that he could attend to other business (Ex. P, Yacker 38:14-24; Ex. Q, King 20:2-15), even though she never had formal training in real estate practice. (Ex. Q, King 27:19-24). King testified that while she was employed by Yacker, she solely worked on Kane's matters (Ex. Q, King 30:5-12), in fact, she basically worked for and was paid by Kane. (Ex. Q, King 31:19-22).

Eventually, Cicalese became engaged in the fraud and Ms. King began working for him in early 1997 (Ex. Q, King 38:6-18; Ex. R, Cicalese 13:12-21, 15:8-22). Cicalese allowed King to continue her involvement in the mortgage fraud closings. (Ex. Q, King 39:19:40:14). During

this time, she was still being paid by Kane in addition to her salary from Cicalese. (Ex. Q, King 41:15-19).

**1.      The Approved Attorneys Admittedly Failed To Comply With WSI's Closing Instructions And Knowingly Transferred WSI's Funds To The Conspirators.**

All of Walsh Securities closing instructions directed, among other things, the following, which are commonplace for residential lenders:

(1)      "[t]wo forms of acceptable identification from all borrowers;"

(2)      "[n]o documents . . . be executed by Power of Attorney unless authorized by Walsh Securities, Inc.;"

(3)       the loan be recorded "in the First Lien Position;"

(4)      a full ALTA Title Policy be issued; and

(5)      "[p]rior to disbursement [the closing attorney] must FAX HUD-1 to the [WSI] Closing Department."

(Ex. C, (Fidelity Dep. Ex. 23)).  Additionally, the closing instructions contain a certification that the closing attorney has closed and "*completely disbursed the [loan proceeds] in accordance with these closing instructions.*" (*Id.*)

First, the thrust of WSI's instructions that the borrowers come with two forms of ID and that they sign the closing documents themselves is obvious: it ensures that the purchaser is a *bona fide* buyer.  This requirement was a check against the very issue that arose here.  Yacker, Cicalese and King all testified that the strawbuyers were often not present for the closings.  (Ex. R, Cicalese 132:4-13, 135:1-16, 161:17-25; Ex. Q, King 42:24-43:5, 169:9-22, 250:5-251:15; Ex. P, Yacker 42:9-16).  Yacker testified that he conducted closings without ever meeting or seeing the strawbuyers.  (L. Civ. R. 56.1 Statement ¶ 99; Ex. P, Yacker 42:9-16).  Cicalese testified that he knew that another co-conspirator was actually signing the documents on behalf of the

strawbuyers, (Ex. R, Cicalese 22:9-20), that the closing documents were being falsely notarized, (Ex. R, Cicalese 54:4-19), or forged by King, (Ex. R, Cicalese 36:10-37:24; 138:3-9; Ex. Q, King 118:1-119:3), and that it was Kane who had actually filled out the loan applications. (Ex. R, Cicalese 163:18-22).

Second, as the Title Insurance Defendants' corporate representative, Donna Sullivan, testified, if "the lender required that the lien be recorded in a first lien position and the attorney did not record the documents in time to protect that first lien position and now it's second to some intervening lien, then that would be the type of action or that should be covered by paragraph one" of the CPL. (Ex. B, Commonwealth 220:23-216:4, 217:23-218:5-234:11; Ex. G, Nations 30:22-31:1, 35:18-37:8, 126:13-127:17; Ex. M, Fidelity 79:24-80:15, 99:13-24, 103:13-105:6). Yacker and Cicalese both admitted that they often did not record closing documents involved in the fraudulent transactions. When the FBI raided Cicalese's office, he explained to the authorities that there were multiple closing documents that he had not recorded. (Ex. R, Cicalese 45:7-46:15). He delegated all his responsibilities to record the documents to King, which she did not do. (Ex. R, Cicalese 86:1-87:25, 98:1-99:250). King, despite Cicalese's instructions, also admitted that she was not recording deeds and mortgages. (Ex. Q, King 36:6-13, 37:1-160). King testified that she was instructed to hold the deeds and mortgages "because the way Bill Kane put it, somebody in Monmouth County was becoming suspicious of the influx of property being sold and bought in Asbury Park and Long Branch." (Ex. Q, King 36:6-13). She held on to them until Kane told her to send in a stack of deeds and mortgages "eight to ten inches" high. (Ex. Q, King 37:1-16). Yacker set up the template for the joint venture deeds to Capital Assets that deprived WSI of a *bona fide* purchaser with a 100% interest in the property (L. Civ. R. 56.1 Statement ¶ 117), and provided other necessary false documents, such as fake

escrow letters.  Yacker abrogated his responsibilities as a closing lawyer and turned their completion over to his employee and agent. (Ex. P, Yacker 38:23-39:1).  Yacker testified that even though WSI had provided funds for the recording fees, he needed additional money from Kane before he could record deeds and mortgages because he had depleted his attorney trust account. (Ex. P, Yacker 60:12-62:60).

Finally, the "approved attorneys" for the Title Insurance Defendants admitted that they did not disburse WSI's loan proceeds according to the HUD-1 Settlement Statements[9] as required by WSI's closing instructions.  The HUD-1 Settlement Statements contained material misrepresentations about who prepared and signed the documents, (Ex. Q, King 34:15-35:3, 100:14-18; Ex. P, Yacker 37:16-25), and lies about the existence of second mortgages, (Ex. Q, King 97:7-98:17, 99:18-20, 127:12-128:16, 135:10-12, 170:4-24), and the disbursement of the loan proceeds. (Ex. Q, King 106:16-107:8, 107:25-108:5).  The purpose of the secondary mortgages was to create the appearance that the seller was providing funds to close the transactions. (Ex. Q, King 170:4-180).  King testified that Yacker showed her how to create these phony documents. (*Id.*)  Cicalese admitted that the HUD-1 Settlement Statements contained inaccurate information. (Ex. R, Cicalese 104:3-111:25, 126:8-127:3).  He also admitted that the loan proceeds were often disbursed before the properties were owned by Kane. (Ex. R, Cicalese 49:10-24, 90:2-8, 119:19-120:2, 129:12-131:4, 148:3-20, 171:25-173:24).  King confirmed that Kane was selling properties that he did not own, so Cicalese held back on recording deeds. (Ex. Q, King 36:7-18).

---

[9] A HUD-1 statement is a standard form that settlement agents are required to compete that sets forth a complete accounting of all transactions relating to the closing. *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 557 (9th Cir. 2010).  The settlement statement should be prepared accurately by the closing attorney in accordance with the lender's closing instructions.  If the HUD-1 is a lie, then the lender is not placed on notice of the disbursement of the loan proceeds. *E.g., United States v. Woods*, 554 F.3d 611, 613 n.3 (6th Cir. 2009).

## 2.  The "Approved Attorneys" Admitted That They Misapplied/Defrauded Walsh Securities Of Its Loan Funds.

Knowing that (1) the strawbuyer was not a *bona fide* purchaser, (2) that no down payment was paid, (3) that the strawbuyer did not own the entire property, and (4) that certain closing expenses would never be paid, the Title Insurance Defendants' "approved attorneys" disbursed WSI's funds to themselves and other co-conspirators. (L. Civ. R. 56.1 Statement ¶ 116). Yacker admitted that he allowed his attorney trust account to be set up by Kane and controlled by King and Kane. (Ex. P, Yacker 53:9-17; 60:12-61:15; Ex. Q, King 33:8-20). Essentially, Yacker's attorney trust fund was the collection pot for the conspirators' illicit profits. (Ex. Q, King 131:16-132:8). Yacker admitted that even though Walsh Securities provided the recording funds, closing documents were not being recorded because he had depleted the funds in his attorney trust account and there was no money to pay for the recording fees. (Ex. P, Yacker 64:9-15). He also testified that he lied about the existence of monies being held in escrow. (Ex. P, Yacker 100:19-102:24; Ex. Q, King 171:21-171:10).

Cicalese admitted during his deposition that he learned the transactions were a fraud during the closings, (Ex. R, Cicalese 17:2-15), and he agreed that he was part of a fraud and the misapplication of WSI's funds. (Ex. R, Cicalese 143:5-8). He also conceded that Kane directed him when to disburse closing funds. (Ex. R, Cicalese 171:25-173:24)  King testified that Yacker and Cicalese knew that properties were being sold before the Cristo had purchased them and the proceeds from the sale were then used to pay for the property's purchase. (Ex. Q, King 85:1-86:21). WSI's loan proceeds, in fact, were being used to fund the initial purchase before its purported borrower even had title to the property. (Ex. Q, King 90:18-91:13). King further testified that the Title Insurance Defendants' "approved attorneys" disbursed the mortgage proceeds before documents were properly executed. (Ex. Q, King 91:9-13, 109:18-110:3).

**B.      The Title Agent's Actions Facilitated The Fraud.**

Defendant Coastal Title Agency was the title agent for the Title Insurance Defendants.

(*See* Ex. H; Ex. V).  According to those agency agreements, Coastal Title was expressly

permitted to issue CPLs, title commitments and title policies. (*Id.*; Ex. G, Nations 74:20-75:12).

Pursuant to their arrangements, Coastal Title was compensated based on the number of policies it

issued and the amount of premiums it received for title insurance.  (*Id.*; Ex. M, Fidelity 73:17-

75:8)).  The Title Insurance Defendants terminated their agency relationship with Coastal Title in

or around 2000 (for Commonwealth) and 2003 (for Nations and Fidelity) because of low

remittances.  (*See* Ex. V; Ex. I, Koch 35:16-23; Ex. G, Nations 24:11-15).

Coastal Title facilitated the fraud by agreeing to use a system that would suggest to WSI

that title for each property was clear, when in fact it was not.  (Ex. B, Commonwealth 46:17-

48:9).  Since a title insurance policy is not issued until well after the transaction closes and all of

the requirements in the title commitment are met, the conspirators needed to provide WSI with a

"clear" or "clean" title commitment that did not disclose the fact that Kane still needed to

purchase the property that he was selling so that WSI would table fund the transaction in the

belief that it would have a valid first lien.  Following a lunch requested with Kane, Mr. Agel, the

owner of Coastal, acquiesced in Kane's request to provide WSI with a "clear" or "clean" title

commitment (identified with an "(A)" after Coastal's file number) that did not list legal issues

that needed to be corrected prior to the closing, such as "tax sale certificates, judgments, old

mortgages, [or] bankruptcies."  (Ex. F, Coastal 46-48, 55-56).  Although Kane portrayed this

unusual request as being for the benefit of WSI, Mr. Agel admitted that he never in fact

confirmed this with anyone at WSI or even advised anyone at WSI that the title commitment

upon which they were relying was incomplete.  (Ex. F, Coastal 48:4-14, 154:10-155:14).

Moreover, after Mr. Agel learned that Kane was selling properties before his companies purchased them, Coastal continued to do business with Kane and did not inform WSI about the flip transactions. (Ex. F, Coastal 40:3-42:19, 167:2-18). As Mr. Agel conceded, the documents suggested that Cristo was fee simple owner of the properties when in fact clear title had not yet been transferred to Cristo. (Ex. S, Agel 47:1-49:23).

In what turned out as an attempt to keep the fraud going, Coastal Title accepted $50,000 from Cicalese's trust account in order to record closing documents, including joint venture deeds, for approximately thirty to forty closings between April 7, 1997 and April 9, 1997. (Ex. F, Coastal 45:14-46:4, 186:4-188:14; Ex. S, Agel 40:1-42:25). Mr. Agel also testified that it was highly unusual to file that number of documents over such a short time frame and Coastal has never done it before or since. (*Id.*)

Shockingly, Agel also testified that he advised the underwriters for the Title Insurance Defendants of these activities because these loans were so unusual and had many problems. (Ex. F, Coastal 33:6-34:5). He even testified that he contacted Commonwealth in 1997 about the transactions involved here, (Ex. B, Commonwealth 49:4-18; 50:10-12; 52:5-15), when he discovered that Yacker and Cicalese had not recorded numerous closing documents (Ex. B, Commonwealth 42:8-45:23). Agel further stated that there was another "batch of documents that did not get recorded because things fell apart in terms of their being able to fund things. So those documents went – those original documents went to the FBI." (Ex. B, Commonwealth 105:10-14).

## IV.    Procedural History Of Other Litigation Resulting From The Fraud.

These mortgage loans, a form of commercial paper, were sold and purchased by whole loan purchasers such as The Money Store and Cityscape Financial, with representations and

warranties requiring WSI to repurchase all loans found to be fraudulent. (L. Civ. R. 56.1 Statement ¶ 7). Each of the five securities issued by WSI required that WSI bear the first loss position of 2% of money put up for each security and repurchase any fraudulent loans. Ultimately, Walsh Securities had to repurchase the fraudulent mortgages at issue in this motion and lost its residual value of the securities. (Ex. L, WSI 548:20-549:20).

On February 5, 1999, the Honorable Clarkson S. Fisher, Jr., P.J.Ch. in Monmouth County, entered an Order granting summary judgment and default judgment in favor of plaintiffs, who were strawbuyers in this case, Rafael Bustos, Sr., Yolanda Bustos-Lacy, Amanda Dippolito, Michael Dippolito, Joseph Piscioneri, Hans Juergensen, Ingrid Juergensen, Alicia Juergensen and Ralph Juergensen, against Cristo, NHF, Capital Assets, and county clerks. As such, the court ordered that the deeds, promissory notes, first mortgages, and second mortgages in the names of these individuals were rescinded and cancelled and "declared unenforceable against the plaintiff named in such contract, or against his or her heirs, executors, successors, assigns or transferees." (Ex. W (2/5/99 Order); Ex. L, WSI 552:9-552:25). The Order wiped out WSI's mortgages and deprived it of any possibility of being made whole by the borrowers. This is exactly why WSI demanded a CPL and a title policy prior to funding these loan – because this is *exactly* the situation that was intended to be covered. The properties at issue in this Order are among the hundreds of fraud loans and specifically include several that were repurchased by WSI. (*See* Ex. A).

On October 20, 2000, the Honorable Sidney H. Stein, U.S.D.J. in the Southern District of New York entered an order awarding Cityscape damages in the amount of $4,732,568.93 against WSI for the properties that it should have repurchased pursuant to a Master Agreement for Sale and Purchase of Mortgages as the court held on December 23, 1998. (Ex. X (10/20/00 Order)).

The court previously held that WSI breached the Master Agreement by failing to repurchase 32 loans that were part of this fraudulent scheme because, *inter alia*, the joint venture deeds made the properties unmarketable.  WSI ultimately repurchased these 32 loans as part of a settlement.

## LEGAL ARGUMENT

### I.     Standard Of Review.

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, 'its opponent must do more than simply show that there is some metaphysical doubt as to material facts.'"  *Stewart Title Guaranty Co. v. Greenlands Realty, L.L.C.*, 58 F. Supp. 2d 370, 380 (D.N.J. 1999) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "What the non-moving party must do is go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* (citations omitted).

Title insurance policies are not ordinary contracts.  "[T]hey are contracts of adhesion between parties who are not on an equal footing."  *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 347 (1993); *see also Clients' Sec. Fund of the Bar of N.J. v. Sec. Title & Guar. Co.*, 134 N.J. 358, 371-72 (1993).  "In determining what a policyholder's reasonable expectations are, our courts have applied an objective standard of reasonableness."  *Clients' Sec. Fund*, 134 N.J. at 372.  "The language of the policy should be liberally construed in favor of the insured and strictly construed against the insurer."  *Keown v. West Jersey Title & Guaranty Co.*, 161 N.J. Super. 19, 27 (App. Div. 1978).

## II.   Liability Was Triggered Under The CPLs.

### A.   The Approved Attorneys' Repeatedly Admitted That They Were Engaged In The Fraud Triggering Liability Under The Title Insurance Defendants' CPLs.

The Title Insurance Defendants cannot deny that their "approved attorneys" were essential to the mortgage fraud scheme. Without their involvement, Walsh Securities would not have been defrauded. The so-called "approved attorneys" repeatedly admitted that they were engaged in a massive mortgage fraud. (*E.g.*, Ex. T (Transcript from Stanley Yacker's Plea and Sentencing Hearings); Ex. B, Commonwealth 23:18-27:6; Ex. R, Cicalese 17:8-15, 22:9-20, 36:10-37:19, 143:5-8, 147:25-148:16; Ex. P, Yacker 100:19-102:24, 117:18-118:17, 119:4-121:10, 127:14-24, 128:6-129:17). Even the title agent, Robert Agel, acknowledged that the closings were the product of illicit activity. (Ex. S, Agel 40:1-42:25, 47:1-49:23). These admissions alone triggered liability under the Title Insurance Defendants' CPLs, which promised to "reimburse" WSI for the "actual loss incurred . . . when such loss arises out of . . . [f]ailure of the . . . Attorney to comply with your written closing instructions . . . or [f]raud of or misapplication by the . . . Attorney in handling your funds." (Ex. A).

The Title Insurance Defendants offer their CPLs to persuade lenders to purchase their title policies. (*See, e.g.,* CPL above: "When title insurance of [Fidelity] is specified for your protection in connection with the closing [Fidelity] hereby agrees to reimburse for actual loss . . . ."). *See also* 2 Joyce Palomar, TITLE INSURANCE LAW § 20:15 (2010). The Title Insurance Defendants issued CPLs covering the loan transactions at issue in exchange for a statutorily prescribed $25 fee and having their insurance "specified for . . . protection." (*See* Ex. A). In addition to the fees for the CPL, and premiums for their insurance policies, the Title Insurance Defendants received the additional benefit of selecting the closing attorneys of their

choice. As a matter of law, the Title Insurance Defendants must now be held to account for their

obligations to reimburse the resulting losses caused by their "approved attorneys'" undisputed

involvement in the fraud.

Yacker and Cicalese were the last line of protection for WSI. "Approved attorneys"

perform significant and critical services at real estate closings.[10]  Among other things, they

maintain escrow accounts; remove exceptions to the title according to the title commitment;

disburse all moneys; obtain mortgage payoff statements; and transmit the appropriate funds to

the mortgagee. *See Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 340 (1993).  CPLs create trust

with lenders by holding out the "financial resources of the national title insurance underwriter . . .

to indemnify lenders . . . for the [approved attorney's] errors or dishonesty with escrow or

closing funds." J. Palomar, at § 20:11 (citing *Sears Mortg. Corp. v. Rose*, 134 N.J. 326 (1993)).

Had it known that the Title Insurance Defendants would not honor their promise to reimburse

WSI for losses suffered due to their "approved attorneys'" actions, WSI would not have funded

the loan transactions that are the subject of this litigation.

The law in New Jersey on the responsibility of title insurance companies is long standing

and has not changed despite seismic shifts in the real estate market during the past twenty years.

In *Sears*, the New Jersey Supreme Court held that a title insurance company is liable to a

purchaser for an approved attorney's defalcation, even in the absence of a closing protection

letter.  The attorney in *Sears* "had a longstanding business relationship with Commonwealth,"

the same defendant in the instant matter, and had requested a title policy from Commonwealth to

cover the transaction.  134 N.J. at 334.  But when the closing funds were wired to

Commonwealth's closing attorney, he never sent any funds to pay off the seller's mortgage.  *Id.*

---

[10] By statute, "approved attorneys," are attorneys "upon whose examination of title and report
thereon a title insurance company may issue a policy of title insurance."  N.J.S.A. § 17:46B-1(h).

at 335. Commonwealth informed the buyer that its closing attorney had been suspended from practicing law, but refused to indemnify under its policy, stating that it had "expressly conditioned the issuance of the policy on payment of the [seller's] mortgage." *Id.*

The court ruled that Commonwealth was in the best position to foresee and prevent the approved attorney's defalcations. *Id.* at 347. It noted that lenders routinely require protection against the risk of the closing attorney's misapplication of funds. *Id.* at 349-50 ("That protection is given through a 'closing-protection letter' that insurers issue to the lender.") The New Jersey Supreme Court held that the expectation by the insured that he would be protected was reasonable and that even the defendant Commonwealth, "anticipated and believed [that free title] would be covered by the policy based on the premium." *Id.* at 349. The court thus concluded:

> [A]s evidenced by its practice in protecting institutional lenders, Commonwealth was aware of the risk of defalcation of closing funds by [closing] attorneys. By dealing solely with attorneys rather than with their clients, it enabled the attorney to mislead or harm the purchaser. Commonwealth was in a position either to prevent or to protect against the loss suffered by [the purchaser]. Accordingly, we find that Commonwealth is liable for [the closing attorney's] theft.

*Id.* at 346. In the companion case to *Sears*, the Supreme Court considered a similar issue, one in which the "approved attorney" stole mortgage refinancing funds. *Clients' Security Fund v. Security Title & Guaranty Co.*, 134 N.J. 358 (1993). Unlike *Sears*, in which the court found liability despite the fact that no CPL was issued, the insurer in *Clients' Security Fund* did issue a CPL. The New Jersey Supreme Court affirmed the Appellate Division's ruling "that the closing-protection letter . . . was part of the title-insurance protection purchased," *id.* at 377, and that "under the circumstances liability for the attorney's embezzlement ultimately must be [the title insurer's]." *Id.* at 367. Consequently, the insurer was liable for the loss under the CPL. *Id.* at 378.

Similarly, the CPLs here were specifically intended to protect WSI against the misapplication of funds or fraud by the "approved attorneys," or their failure to comply with WSI's written closing instructions. (*See* Ex. A). Unlike the current form of CPL issued by American Land Title Association, the CPL's issued on these properties had no exclusion for negligence or fraud by the lender or its assignee. (Ex. M, Fidelity 10:11-15). Based on the uncontested record evidence, there is no material question whether Yacker and Cicalese were engaged in fraud – they were –misapplied WSI's loan proceeds – they did – and lied when they certified that they had followed WSI's closing instructions – again, they did. Yacker pleaded guilty to a 10-count indictment, and was sentenced to 18 months in prison and ordered to pay restitution. (*See* Exs. O, P & V).

Yacker admitted that he let the "ringmaster" of the fraud control his attorney trust account. (Ex. P, Yacker 53:9-17; 60:12-61:15; *see also* Ex. Q, King 33:8-20, 131:16-132:8). He did not file deeds and mortgages because he had depleted his trust account, even though WSI provided the requisite recording fees at the closing. (Ex. P, Yacker 64:9-15). And, he conceded that he lied about money being held in escrow. (Ex. P, Yacker 100:19-102:24; Ex. Q, King 171:21-171:10). Cicalese admitted that he was part of a fraud and that he misapplied WSI's loan funds. (Ex. R, Cicalese 17:2-15). He also conceded that he purposefully misrepresented the disbursement of the loan proceeds on the HUD-1 Settlement Statements. (Ex. R, Cicalese 171:25-173:24). Moreover, both Yacker and Cicalese knew that Walsh Securities was funding loans for properties that were not even yet owned by Kane. (Ex. Q, King 85:1-86:21, 90:18-91:13, 109:18-110:3).

Additionally, the Title Insurance Defendants' "approved attorneys" routinely violated WSI's closing instructions in audacious fashion. Rather than following WSI's closing

instructions, Yacker and Cicalese allowed borrowers who they knew were not *bona fide* purchasers to steal mortgage loans and transfer away a majority interest in the properties, which was an act of immediate default under WSI's mortgages. They submitted false documentation, lied on the HUD-1 Settlement Statements, hid the fact that the borrowers did not actually attend the closing or sign the closing documents (or even exist in some cases), and withheld closing proceeds. Because mortgages and deeds were never properly recorded, WSI lost its required first lien position and a title policy was often not issued. Indeed, when asked whether WSI was the first lien holder on all of the properties at issue in this case, Ms. Sullivan further admitted "clearly they were not because certain documents were not recorded." (Ex. G, Nations 30:22-31:1).

Absent the CPLs' stated agreement to indemnify, WSI would not have funded the mortgages and would not have used the Title Insurance Defendants' approved attorneys. In sum, had the Title Insurance Defendants not offered their assurances, WSI would not have fallen victim to this mortgage scam. In light of the admissions by Yacker and Cicalese that they were engaged in a fraud to steal WSI's loan proceeds, and under the clear precedent in New Jersey that controls this case, the court should grant summary judgment in favor of WSI.

**B.    WSI Did Not Get What It Bargained For.**

In *First American Title Insurance Co. v. Vision Mortgage Corp.*, the most recent New Jersey appellate case on this issue, the Appellate Division followed the rulings in *Sears* and *Clients' Security Fund* and concluded that by holding out an attorney as its "approved attorney," the title insurer "put[s] him in the position to steal" from the lender. 298 N.J. Super. 138, 144 (App. Div. 1997). It continued, "the title insurance company [is] in the best position to prevent the loss created by the fraud and defalcation of the Approved Attorney." *Id.*

Strikingly similar to the facts of the case at bar, the approved attorney in *Vision* forged signatures on closing documents and pled guilty to criminal charges. *Id.* at 141, 143. The court framed the question as whether the lender received what it bargained for:

> a bona fide mortgagor with the financial capacity to make the mortgage payments; a first lien on the property subject to foreclosure, if necessary; and the right to seek recovery of a deficiency after foreclosure from the mortgagor. If, despite exhaustion of these remedies, the lender still sustained a loss (for example, as a result of a real estate market trough), that loss would not be related to the Approved Attorney's misconduct and would thus fall outside the scope of the Closing Protection Letter.

*Id.* at 144. Even though Vision received first lien status, and its mortgage was not affected by the fraud, it *"was a sham transaction from the outset." Id.* (emphasis added). The court stated that the closing attorney "and his cohorts stole Vision's money by falsely using the name and financial credentials" of a third party. *Id.* The attorney in *Vision* schemed to defraud the mortgage lender along with two other individuals. *Id.* at 139. They schemed to apply for a mortgage load in the name of a strawbuyer with documents forged at the closing. Similar to the instant case, the lender relied on assurances of the title insurer's CPL. Needless to say, no mortgage payments were ever made. *Id.* at 140. "This guaranteed an *immediate default because there was no bona fide mortgagor* to make the mortgage payments," and eliminated the lender's ability to recoup its losses through foreclosure. *Id.* "[O]f the three remedies for which a lender bargains in a *bona fide* transaction (payment, foreclosure and recovery of any deficiency), only one was available to Vision (foreclosure) as a direct result of the [closing attorney's] fraud." *Id.* Thus, the court concluded, by making the attorney an "approved attorney," "[the title insurer] put him in the position to steal from [the plaintiff lender] by creating this sham transaction. As such, [the plaintiff lender's] losses fell within the expansive coverage of the title insurance policy." *Id.* *Cf. Sears Mortgage Co. v. Rose*, 134 N.J. 326, 344 (1993) ("Commonwealth was in the best

25

position to prevent the loss created by the [approved attorney's] theft. Without question Commonwealth was aware of that risk.").

Squarely in line with the facts in *Vision* (coincidently, decided during the height of the mortgage fraud on WSI), the actions of the "approved attorneys" here demand liability under the CPLs. That was the intent of the bargained-for agreement, and the Title Insurance Defendants should be held to their end of the bargain. The offer (to indemnify WSI for misconduct of their "approved attorneys") was accepted (WSI would not have funded the closing without a CPL) for valuable consideration (by WSI's purchase of the Title Insurance Defendants' policies). *See, e.g., JP Morgan Chase Bank, N.A. v. FDIC*, No. 09-14891, 2011 U.S. Dist. LEXIS 62692, at * 11 (E.D. Mich. June 10, 2011) ("The main purpose of a closing protection letter is to make underwriters contractually responsible for loss caused by their agent's misconduct at closing"). Absent the Title Insurance Defendants' CPLs, WSI would not have funded the mortgages, would not have purchased their insurance policies, would not have used the "approved attorneys," and, in turn, would not have been defrauded.

**III.    Liability Under The Title Policies.**

Of the 66 properties at issue here, WSI has located 27 loan title policies that were issued.[11] (*See* Ex. A). According to the plain language of those policies, the Title Insurance

---

[11] In several instances, the Title Insurance Defendants delegated responsibility to conduct title searches to their agent, Coastal Title. Prior to issuing title policies, based on the Coastal Title's examination, title commitments were issued on the properties at issue that should have identified the requirements for a clear title. Coastal Title, however, presented *clear* title commitments using the suffix (A) instead of providing *accurate* title commitments. (*See, e.g.,* Ex. A; Ex. F, Coastal 46:19-48:9, 166:9-21). The Title Insurance Defendants' admitted that this "obviously . . . facilitated Kane's fraud." (Ex. G, Nations 153:17-154:2) Amazingly, Coastal Title even issued *clear* title commitments on properties that Kane did not even yet own. (Ex. G, Nations 131:13-134:25, 150:14-154:2). It is undisputed that Kane used WSI's loan proceeds to buy many of the properties that he then sold to the strawbuyers, which Coastal undoubtedly knew. (Ex. U, Kane 57:13-19; Ex. G, Nations 132:25-133:21). "If the title company fails to

Defendants promised to insure, *inter alia*, "against loss or damage . . . sustained or incurred by the insured by reason of . . . [u]nmarketability of the title." (*Id.*). Schedule 'A' of each policy sets forth the description of the interest in the land as "Fee Simple"[12] vested in the name of the strawbuyer. (*Id.*) However, the interest in each property was not vested in the strawbuyer because at the same time that the loans closed, the strawbuyers secretly signed a joint venture deed that gave a sixty percent interest in each property to Capital Assets – which was known to both the "approved attorneys" and Coastal Title. (Ex. F, Coastal 147:18-148:19). Despite their admissions that these secret conveyances impacted WSI's mortgage, the Title Insurance Defendants have refused to indemnify WSI under the plain terms of their agreements. (Ex. M, Fidelity 85:13-87:6, 103:13-104:21; Ex. G, Nations 127:9-17).

The policies do not define the phrase "unmarketability of the title." New Jersey courts have uniformly held that

> A marketable title is one that is relatively free from doubt, such that in a suit for specific performance a court would compel the prospective purchaser to accept the title. If it is reasonably probable that the purchaser would be exposed to litigation not of a frivolous nature concerning the title, or would have to bring an action to quiet title, then specific performance would be denied to the prospective seller and the title would be considered unmarketable.

*Keown v. West Jersey Title & Guaranty Co.*, 161 N.J. Super. 19, 23 (App. Div. 1978). *See also Stewart Title Guar. Co. v. Greenlands Realty, LLC*, 58 F. Supp. 2d 370, 382 (D.N.J. 1999) (defining "defect" in title insurance policies as "the want or absence of something necessary for

---

conduct a reasonable title examination or, having conducted such an examination, fails to disclose the results to the insured, then it runs the risk of liability under the policy." *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 116 N.J. 517, 540 (1989).

[12] Black's defines fee simple as "[a]n interest in land that, being the broadest property interest allowed by law, endures until the current holder dies without heirs." Black's Law Dictionary (9th ed. 2009).

completeness or perfection . . . a lack or absence of something essential to the property use for

the purpose for which the thing is to be used.") (citation omitted); *Martin v. Banco Popular de*

*P.R.*, 379 F. App'x 185, 189 (3d Cir. 2010) ("Title is not marketable if there is a reasonable fear

that another entity . . . retains the right to use or transfer the property.")  Similarly, Williston

provides the following definition of marketable title:

> "Merchantable title" or "marketable title" is that title which a reasonable,
> prudent person would accept in the ordinary course of business, after
> being fully apprised of the facts and the applicable law.  Stated otherwise,
> a merchantable or marketable title is that title which enables the record
> owner not only to hold the land, but to hold it in peace and, if he or she
> wishes to sell the land, to be reasonably sure that no flaw or doubt will
> arise to disturb its market value.

17 WILLISTON ON CONTRACTS § 50:10 (4th Ed.).  This is a straightforward case.  The

strawbuyers conveyed a majority interest in these properties to Capital Assets, without WSI's

knowledge or consent.  However, the policies as well as the title commitments describe the

interest in the land as vested in the strawbuyer in fee simple.  Unquestionably, because the deeds

were recorded by the "approved attorneys" or Coastal either *before* or *concurrently with* the WSI

mortgage was recorded, both the strawbuyer *and* Capital Assets could assert viable claims of

interest in the property, even though only a minority portion of that interest would be subject to

WSI's lien.  Therefore, if a potential buyer attempted to purchase a property at issue, it would

require the consent of the *both* the strawbuyer *and* Capital Assets.  Neither could lawfully

convey the property without disclosing the existence of the other's partial interest.  Simply stated,

it cannot be said that title in these properties were "relatively free of doubt."

Title Insurance Defendants did not exclude from coverage the defects that arose from the

strawbuyers' transfer of a majority interest in the properties – despite their knowledge of it –

when they sold their title policies.  (Ex. F, Coastal 148:2-10, 207:1-9).  If the Title Insurance

Defendants wanted to limit the coverage of their policies, then they were required to state those limitations on the face of the agreement *that they drafted*. Their policies contain no such limitations. Title insurance policies "must be interpreted in a way which fulfills the reasonable expectations of the insured." *Summonte v. First American Title Ins. Co.*, 180 N.J. Super. 605, 610 (Ch. Div.), *aff'd*, 184 N.J. Super. 96, 445 A.2d 409 (App. Div. 1981), *certif. denied*, 89 N.J. 418 (1982). WSI's expectation was that the Title Insurance Defendants examined the title records and issued policies covering defects in title now at issue.

Walsh Securities did not expect that the Title Insurance Defendants would act only in their own best interests by accepting premiums paid out of WSI's closing funds, and completely disregarding the interests of their insured.[13] Their liability is certain, as indicated by their admissions that the title was not vested fee simple in the strawbuyer and that the mortgage did not control the entire property, as was contemplated by WSI. Moreover, their own agent filed the joint venture deeds that encumbered the issue properties. (Ex. F, Coastal 109:25-110:6). *See Sandler v. New Jersey Realty Title Ins. Co.*, 36 N.J. 471 (1962) (devisees of insured's land entitled to damages under title insurance policy where the property was partially divested prior to the conveyance to the insured). As a matter of law, therefore, the Title Insurance Defendants should be required to stand by their commitments to indemnify WSI for the losses it incurred due to the unmarketability of title on these properties, which include the mortgage amount, interest and attorneys' fees.

---

[13] It is well settled that an insurance carrier has a fiduciary relationship with its insured and the standard of conduct imposed upon the carrier in its fiduciary relationship is one of good faith and fair dealing with its insured's interests in mind. *Tannerfors v. American Fidelity Fire Insurance Co.*, 397 F. Supp. 141, 158 (D.N.J. 1975); *see also Pickett v. Lloyd's*, 131 N.J. 457, 467 (1993). An insurer must accord the interest of its insured the same faithful consideration it gives its own interests.

## CONCLUSION

For the foregoing reasons, partial summary judgment should be granted in favor of Walsh

Securities, Inc. on the attached properties pursuant to the CPLs and/or title insurance policies

issued by the Title Insurance Defendants.


Respectfully submitted,


_____/s/_____
Robert A. Magnanini
Amy Walker Wagner
Daniel Ian Mee
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ  07078
(973-218-1111)

*Attorneys for Plaintiff Walsh Securities, Inc.*


Dated: November 10, 2011