# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| _____ : | |
| WALSH SECURITIES, INC., : | |
| : | |
| Plaintiff, : | Civil Action No. 97-cv-3496 (DRD)(MAS) |
| : | |
| vs. : | Hon. Dickinson R. Debevoise, U.S.D.J. |
| : | |
| CRISTO PROPERTY MANAGEMENT, : | |
| LTD., a/k/a G.J.L. LIMITED; et al., : | |
| : | |
| Defendants. : | |
| _____ : | |

---

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## PURSUANT TO LOCAL CIVIL RULE 56.1 IN SUPPORT OF
## PLAINTIFF WALSH SECURITIES, INC.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

---

STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111

November 10, 2011

*Attorneys for Plaintiff*
*Walsh Securities, Inc.*

Plaintiff Walsh Securities, Inc. ("WSI") respectfully submits this statement of undisputed material facts pursuant to Local Civil Rule 56.1 in support of its motion for partial summary judgment:

**Background**

1.      In April 1996, WSI became a successor in interest to GF Mortgage Corp., which was two months after the fraud began when Robert Walsh purchased it through a Leveraged Buy-Out.

2.      WSI is a wholesale residential mortgage lender in the business of, among other things, purchasing retail mortgage loans from other mortgage bankers or mortgage brokers, known as correspondents, and packaging those mortgage loans for use as securities in secured transactions or reselling those mortgage loans to whole loan purchasers.

3.      This is an action originally filed July 17, 1997 by WSI to recover damages arising from a fraudulent RICO scheme involving residential real estate in New Jersey.

4.      WSI was defrauded out of an average of 14 loans per month over the course of at least 16 months, for a total of approximately 230 mortgage loans, although during some months as little as 2 fraudulent loans were funded by WSI.

5.      By the summer of 1997, WSI was receiving approximately 2,200 mortgage loan applications per month, approving approximately 1,000 quality loans and rejecting 1,200 loans per month.

6.      These mortgage loans applications were prepared and sent to WSI by a cross-country network of correspondents and table funded by WSI.  WSI used a warehouse line of $200 million from Greenwich Capital to table fund the loans at closing.

7.     The loans were then purchased by other whole loan purchasers, such as The Money Store and Cityscape Financial, or by a Trust on behalf of note holders in securities issued by WSI with representations and warranties requiring WSI to repurchase all loans found to be fraudulent or that were not marketable.

8.     All of the loans at issue in this Motion have since been repurchased by WSI as a result of the fraud and due to obligations to repurchase the loans from the whole loan buyers or the Trust.

9.     On November 7, 1997, after the title insurance companies refused to honor their contractual obligations pursuant to the Closing Service Protection Letters ("CPL"), WSI amended its complaint to name Commonwealth Land Title Insurance Company ("Commonwealth"), Fidelity National Title Insurance Company of New York ("Fidelity") and Nations Title Insurance of New York, Inc. ("Nations") as defendants and are referred to herein collectively as "Title Insurance Defendants".

10.    Defendants Cristo Property Management, Ltd. (a/k/a G.J.L. Limited), DEK Homes, and Oakwood Properties were all owned and controlled by defendant William Kane and referred to herein collectively as "Cristo".

11.    Defendant William Kane ("Kane") was the mastermind of the scheme, acquiring properties and immediately flipping them to strawbuyers funded by WSI.  Kane wore different hats in these fraudulent transactions.  (Ex. U, Kane 160:24-161:1).

12.    Defendant Kane and his employees, such as Defendant Larry Cuzzi, recruited numerous strawbuyers with good credit to purchase the properties by completing mortgage applications and the required documentation, some of which were forged, and submitted it

through National Home Funding ("NHF"), to which Kane paid 1/8 of a point to use NHF's paper and license.

13.     Kane was not an employee under the control of NHF; he was an independent contractor.  (Ex. U, Kane 160:19-23).

14.     Defendant Gary Greiser ("Greiser") owned Capital Assets Property Mgmt. LTD and Capital Assets Co., which received some of the proceeds from each closing and used them to pay pre-existing mortgages.

15.     Defendant Richard Pepsny ("Pepsny") purchased the properties on behalf of Cristo, and was and is an approved attorney by the Title Insurance Companies.  Pepsny would also order some CPLs and title policies and receive some of WSI's funds from the closing proceeds to acquire the properties already sold by Cristo.

16.     Defendants Richard Calanni, Richard DiBenedetto, James Brown, Thomas Brodo and Roland Pierson (collectively, "the Appraisers") were at all relevant times real property appraisers hired by Cristo.  (Ex. U, Kane 37:24-38:2).

17.     Defendants Stanley Yacker ("Yacker") and Anthony M. Cicalese ("Cicalese") were at all relevant times attorneys admitted to practice in New Jersey.

18.     Defendants Yacker and Cicalese, ("the Closing Attorneys") were at all relevant times approved attorneys by the title insurance companies involved in these transactions.

19.     The Closing Attorneys were selected by Capital Assets and/or Cristo to facilitate real property closings involving the mortgage loans originated by Kane using NHF's paper and license and subsequently table funded by WSI.  (Ex. U, Kane 40:18-41:10, 65:8-22, 118:14-119:2).

20.     The Title Insurance Defendants are, and were at all relevant times, title insurance companies that issued CPLs and title insurance policies to WSI, as the mortgage lender and assignee of NHF, which title policies and CPLs, among other things, indemnified WSI against fraud by the Closing Attorneys.

21.     Defendant Coastal Title Agency, Inc. ("Coastal Title") was at all relevant times, a title insurance broker that was selected by Cristo and/or the Closing Attorneys to broker title commitments and title insurance for the real property closings involving mortgage loans originated by NHF and simultaneously sold to WSI.  (Ex. U, Kane 39:19-40:8).

22.     Coastal Title received some of WSI's funds from each closing to pay the premium for the title insurance policies and the CPLs.

23.     None of the premiums were ever refunded to WSI.

24.     The masterminds of the scheme, along with many of the people they recruited to carry out the scheme, pled guilty to criminal charges, were jailed, and have had judgments entered against them by this Court or settled out of this civil action.  (Docket Entry Nos. 234, 290).

25.     The action was first stayed and then administratively terminated from June 9, 1998 until September 30, 2004 pending completion of the criminal prosecutions.

26.     The Fourth Amended Complaint was filed on July 10, 2009.

27.     This motion is only being filed against the Title Insurance Defendants.

**The Role of the Lender**

28.     Correspondents, mortgage bankers and brokers ("Mortgage Bankers") solicit customers interested in taking out mortgage loans to enable them to purchase real property with lenders interested in loaning money.

29.     Many Mortgage Bankers do not utilize their own funds in making the mortgage loans, but agree to sell the mortgage loans to mortgage loan wholesalers or bankers which provide the funds for the borrowers at the time of closings, known as table funding.  (Ex. B, Commonwealth 144:4-14).  In these instances, Mortgage Bankers are paid fees, generally by the borrowers, for originating the mortgage loans so that they can then be sold to other investors.

30.     Mortgage Bankers are licensed by the State of New Jersey under N.J.S.A. § 17:11B-5, *et seq*.

31.     Potential mortgage loan borrowers who cannot obtain traditional financing from "prime" Mortgage Bankers (for example, due to poor credit histories or for investment properties), seek out and use "subprime" Mortgage Bankers who service this segment of the mortgage market.  "Subprime" mortgage loans generally provide for interest rates several percentage points higher than "prime" mortgage loans, to take account of the increased delinquency risk of such mortgage loans.

32.     After potential mortgage loan borrowers have found Mortgage Bankers from whom they will seek to obtain mortgage loans, the mortgage loan application process begins.

33.     The Mortgage Bankers who deal directly with the borrowers are said to "originate" the mortgage loans.

34.     The originating Mortgage Bankers are responsible for ensuring that all necessary paperwork is obtained from prospective borrowers and properly recorded.  Included in this necessary paperwork are the mortgage loan applications, contracts of sale for the underlying properties, credit histories, statements of net worth, pay stubs, appraisals of the underlying properties, identification and other documents.

35.    Originating Mortgage Bankers usually select the appraisers who are also licensed by the State of New Jersey under N.J.S.A. § 45:14F-1, *et seq*. The appraisers are typically paid by the borrowers of the mortgage loans, in this case from the proceeds of the closing funded by WSI.

36.    The appraisal of the real property that is to be mortgaged is supposed to reflect the true market value of the property.  It is relied on by lending institutions, including the mortgage loan wholesalers, to determine how much money to lend to the proposed borrower.

37.    Since mortgage loans are secured by the underlying real properties, it is critical that the appraisals be accurate so that the mortgage loans are properly secured in case of defaults on the mortgage loans.

38.    Originating Mortgage Bankers who initiate mortgage transactions and then sell or transfer their mortgage loans are referred to as correspondents. Correspondents such as NHF often sell their mortgage loans to lenders who are known as wholesalers, such as WSI.

39.    Mortgage wholesalers typically agree to buy the mortgage loans from the correspondents in advance of the closings on the sales of the properties and the underlying mortgage loans. The wholesalers usually fund the mortgage loans with short term lines of credit that they have previously established with large lending institutions called "warehouse lines." The wholesalers then either retain the mortgage loans, resell them individually to other investors, or bundle them with several hundred other mortgage loans and resell them to a Trust by issuing bonds. This practice of bundling mortgage loans for use as collateral and interest for issuing bonds is quite common in the mortgage loan industry and is referred to as the securitization of mortgage loans.

40.     Wholesalers which table fund mortgage loans originated by correspondents arrange for the mortgage loan funds to be deposited into the escrow accounts of closing attorneys, usually prior to or on the day of the closings. The wholesalers provide detailed instructions and pre-conditions to closing attorneys, who are responsible for ensuring that those instructions and pre-conditions are complied with prior to the mortgage funds being released from the closing attorneys' escrow accounts.

### The Role of Title Insurance In Real Estate Transactions

41.     Title insurance is insurance that provides for specified coverage, in return for premiums, for owners of real property or lenders of mortgage loans on real property that protects against certain losses or damages as a result of defects in the titles or encumbrances on the titles of the real properties. Title insurance is usually purchased when real property is purchased or refinanced. In most instances, mortgage lenders require that owners who will be borrowing money to finance their purchases of real property to acquire title insurance coverage that also protects the mortgage loan lenders which will be lending money for the financing of the properties, including a CPL and a Loan Policy of Title Insurance.

42.     CPLs are agreements to indemnify a lender for an "approved attorney's" malfeasance or their failure to comply with the lender's closing instructions.  (Ex. B, Commonwealth 75:24-77:6; 78:11-14).

43.     The title commitment or binder is an agreement by the carrier to issue a title policy if certain conditions are met, which are set forth in Schedule B of the commitment or binder.  (Ex. B, Commonwealth 76:23-77:3). A title commitment is a contract that sets forth the terms that a title insurer is offering to include in a title policy to be issued. 2 Joyce Palomar, Title Insurance Law § 5:29 (2010); (Ex. B, Commonwealth 134:10-18; 60:4-10; 76:15-77:6; 77:15-

78:4).  It is issued at the same time as the CPL, usually "a few weeks before the date scheduled for the closing."  (*Id.*).

       44.     The title policy, like any insurance policy, has covered risks and protections. (*Id.*).

       45.     In many instances, owners or borrowers who seek to purchase title insurance do not deal directly with the companies that provide title insurance, but rather, contact title agents who act as the brokers or middlemen between the title insurance companies and the owners or borrowers. These title agents collect premiums, issue title insurance policies on behalf of the title insurance companies, and may perform other tasks relating to the transfers of interest in the properties, including filing deeds. Title agents may be, and often are, affiliated with more than one title insurance company. Title insurance companies have relationships with multiple title agencies.

       46.     Here, the Title Insurance Defendants entered into agency agreements with Monmouth Title and Coastal Title as a title agent, under which they were granted certain rights to conduct business on behalf of the Title Insurance Defendants.  Pursuant to these agency agreements, the Title Insurance Defendants delegated certain responsibilities, which the title agents undertook to perform on behalf of and for the benefit of the Title Insurance Defendants. The responsibilities delegated to and undertaken by the title agents included the origination of applications for title insurance, the preparation of abstracts, the examination of titles to real estate, the preparation and issuance of commitments, binders, and reports of title, the issuance of policies of title insurance, the issuance of CPLs, and, in some instances, the recording of deeds and mortgages.

47.    As part of the title insurance policies issued to owners who are borrowing money to finance their purchases of real property, title insurance companies typically issue title commitments, CPLs, and Loan Policies for the benefit of the mortgage lenders. In these CPLs, the title insurance companies agree to indemnify the mortgage lenders against loss in connection with, among other things, fraud or misapplication by the approved closing attorneys.  Usually, these CPLs are required by mortgage loan lenders as pre-conditions to providing the mortgage loans.  The title insurance companies, themselves or through an agent, will only issue such closing service protection letters, and provide indemnification against fraud, where the closings are handled by one of the title insurance companies' approved attorneys.

48.    The Title Insurance Defendants issued CPLs only to "approved attorneys," who were distinguished from attorneys who had been disbarred, suspended, "a negative claims history or lack of cooperation."  (Ex. B, Commonwealth 83:5-20; *see also* Ex. J, Koch Ex. 3 "this Company is simply exercising its right as to whom it appoints as an Approved Attorney;" Ex. N, Fidelity Ex. 5 Memorandum from Fidelity addressed to "Agents and Approved Attorneys").

49.    As of the end of June, 1997, after the fraud had become public through several news articles indicating that attorneys Stanley Yacker and Anthony Cicalese were entangled in the mortgage fraud scheme, both were still considered "approved attorneys" by the Title Insurance Defendants.  (Ex. J, K).

50.    On all of the loans at issue, the Title Insurance Defendants issued CPLs to WSI on behalf of Yacker and Cicalese.

51.    The CPLs at issue in this Motion are nearly identical.  For instance, the following is an excerpt from Fidelity's CPL, but all of the Title Insurance Defendants' CPLs contain the same language:

9

Dear Customer:

When title insurance of Fidelity National Title Insurance Company of New York is specified for your protection in connection with the closing of the above described real estate transaction in which you are to be a lender secured by a mortgage of an interest in land, the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with that closing when conducted by the above named Issuing Agent (an agent authorized to issue title insurance for the Company) of Fidelity National Title Insurance Company of New York or the above named Attorney and when such loss arises out of:

1. Failure of the Issuing Agent or Attorney to comply with your written closing instructions to the extent that they relate to: (a) the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such title or lien; or (b) the collection and payment of funds due you; or

2. Fraud of or misapplication by the Issuing Agent or Attorney in handling your funds in connection with the matters set forth in numbered paragraph 1 above.

52.     Unlike the current form of CPL issued by American Land Title Association, the CPL's issued on these properties had no exclusion for fraud by the lender or its assignee. (Ex. M, Fidelity 10:11-15).

53.     CPLs provide the comfort to mortgage lenders that if the "approved attorney" was engaged in fraud, if their loan funds are stolen or misapplied, or if the moneys were defalcated by the insurer's "approved attorney" and agents, then the lender will not be left without recourse against the insurer. "The closing service letter provides certain protections for functions that the closing attorney performs so the coverages are different [from a lender's title policy]." (Ex. B, Commonwealth 76:6-8).

54.     The CPLs contain the promise that if the title insurer's "approved attorney" was engaged in fraud with respect to the loan funds, then the insurance company would "reimburse" the lender for the loss that it suffered. Nowhere in the CPL does it allow the lender to choose a

different closing attorney; rather, the coverage is conditional – "when conducted . . . by the above named Attorney. . . ."

55.     CPLs were issued by Coastal on behalf of the Title Insurance Defendants on these properties.  Each CPL is addressed to "National Home Funding, Inc., its successor and/or assigns."  WSI was the assignee of NHF.  NHF brokered the loans, which were actually funded by WSI through a process known as table-funding, and then executed assignments and allonges of the notes and mortgages to WSI before the closings.  (Ex. L, WSI 675:2-24).

56.     In addition to the CPLs, the Title Insurance Defendants also issued title commitments because they received premiums for the CPLs and policies.  At this time, WSI has located 27 copies of title insurance policies through discovery.  As with their CPLs, the Title Insurance Defendants' relied upon their agent, Coastal Title, to issue title commitments and policies.  (Ex. B, Commonwealth 111:1-17).

57.     After the title agent receives a request for a title commitment, it searches for and evaluates titles, judgments, and taxes and assessments.  (Ex. B, Commonwealth 128:22:-129:4).  That information is then used as "the basis for the commitment."

58.     A description of the "proposed insured," the insured's interest in the property, and a general description of the property to be insured is set forth in Schedule 'A' of the commitment.

59.     If the title agent's search indicates that there is a prior mortgage or other encumbrance on the property, then the title agent should identify the potential defects in Schedule 'B' of the commitment, which sets for the "requirements to be complied with" before the policy will be issued.  (Ex. B, Commonwealth 129:5-10).

60.     After the closing, the "approved attorney" supplies recorded deeds and mortgages, affidavits of title, satisfaction of liens, or other documents required by the agent, who will then verify that there are no intervening liens or defects.  (Ex. B, Commonwealth 129:11-22).  Assuming those requirements have been satisfied, the agent will issue a title policy on behalf of the title insurance company.  (Ex. B, Commonwealth 129:21-25).

61.     The Title Insurance Defendants concede that those functions were supposed to be performed by their agent, Coastal Title.  (Ex. B, Commonwealth 132:12-23; 134:24-135:9).

62.     The Title Insurance Defendants would not issue a title policy until the deed and mortgage were recorded.  (Ex. B, Commonwealth 173:8-13).

63.     If the policy was paid for but not issued because the deed and mortgage were never filed, then according to the Title Insurance Defendants, coverage for the "approved attorney's" acts would fall under the insurer's CPL.  (Ex. B, Commonwealth 173:25-174:6).

64.     Similar to the commitment, the title policies at issue here contain both a Schedule 'A' and Schedule 'B'.  According to the policies, as of the date issued, the Title Insurance Defendants insured that the property described in Schedule 'A' was vested in fee simple in the name of the insured.  (Ex. B, Commonwealth 183:11-19).

65.     Schedule 'A' of the title policy states that the "[i]nsured mortgage" is recorded in the mortgage book of the county clerk's office.

66.     Schedule 'B' of each title policy at issue contains exceptions from coverage.  It is undisputed that none of the exceptions listed in Schedule 'B' render these policies unenforceable by WSI.  Schedule 'B' also notes the following: "This policy insures that the mortgage set forth under Schedule A hereof is a valid first lien on the property described therein."

12

67.     According to the Title Insurance Defendants, a valid lien under the title policy is "a lien recorded in the first position in the land records . . . not subject to some type of attack, which would fall within the covered risk under the policy."  (Ex. B, Commonwealth 177:20-24).

### The Fraudulent Scheme in New Jersey

68.     In contrast to the typical real estate transactions described above, the transactions involved in this lawsuit were fraudulent.

69.     Kane, through one of his companies (Cristo, GJL Limited, or Oakwood Properties) purchased a house in a low income area for a low price, such as at a foreclosure or tax sale.  (4th Am. Complaint ¶¶ 59-61).

70.     The co-conspirators located a potential strawbuyer, and the house was appraised at an inflated value.  (*Id.*).

71.     A mortgage loan application for the strawbuyer was then prepared by Kane or Cristo or the employees and submitted to WSI.  (*Id.*).

72.     The loan application was fraught with materially false and misleading information – inflated appraisal, escrow letters from the approved attorney that the buyer made a down payment which was being held in escrow, that a second mortgage was made on the property, and that the strawbuyer would own the entire property.  (*Id.*).

73.     These misstatements and lies were designed to satisfy the loan underwriting criteria and induce WSI into approving and funding the loan.  (*Id.*).

74.     Kane also paid Defendants Anthony D'Apolito ("D'Apolito"), a sales manager at WSI who brought the loans to WSI, and Kellie O'Neal ("O'Neal"), a closer at WSI, to create or provide the necessary documentation to get the fraudulent loan approved and funded by WSI.

75.     At the closing, unknown to WSI, the strawbuyers executed a joint venture deed, based on a template provided by Yacker, that deeded 60% of the property to Capital Assets, thereby accelerating the mortgage and rendering the property unmarketable.  (Ex. F, Coastal 147:18-148:19).

**The Critical Role of Title Insurance Defendants' "Approved Attorneys" in the Fraud on WSI**

76.     At the closing, WSI wired the loan proceeds to the Title Insurance Defendants' "approved attorneys."   (Ex. B, Commonwealth 138:2-13).

77.     WSI sent closing instructions with each loan to the Title Insurance Defendants' "approved attorneys."

78.     In accordance with the closing instructions, the "approved attorneys" were required to disburse WSI's moneys in accordance with the closing instructions, and certify that they did so.  (Ex. B, Commonwealth 138:2-13).

79.     WSI's closing instructions required, among other things, that (1) "[t]wo forms of acceptable identification from all borrowers must be returned with closing package;" (2) that "[n]o documents . . . be executed by Power of Attorney unless authorized by WSI, Inc.;" (3) the loan be recorded "in the First Lien Position;" (2) a full ALTA Title Policy be issued; and (4) that "[p]rior to disbursement [the closing attorney] must FAX HUD-1 to the [WSI] Closing Department."  (Ex. M, Fidelity 23).

80.     The closing instructions stated that the attorney was "authorized to disburse the loan proceeds only when all of the requirements and conditions have been satisfied."  (Ex. M, Fidelity 23).

81.     The HUD-1 Settlement Statement (a document required by WSI's closing instructions) contains a certification that states: "[t]o the best of my knowledge, the HUD-1

Settlement Statement which I have prepared is a true and accurate account of this transaction.  I

have caused or will cause the funds to be disbursed in accordance with this statement."  (Ex. D,

Fidelity Ex. 22).

82.     The certification is intended as an assurance that the transaction is truly arms-

length and legitimate.

83.     Stanley Yacker and Anthony Cicalese were "approved attorneys," and WSI was

protected by the Title Insurance Defendants' CPLs.   Their actions led to WSI being fraudulently

induced to fund the 66 properties that are at issue in this motion.

84.     Both attorneys testified that they knew the transactions were fraudulent yet did

not alert WSI or the authorities, and continued to close loans and disburse WSI's funds as

proceeds to Kane, Greiser and Pepsny.

85.      Yacker also admitted in his guilty plea that in 1996 and 1997, "Gary Grieser and

others solicited and located persons willing to act as straw buyers in numerous transactions,

whereby mortgage loans would be obtained and the properties acquired in the names of the straw

buyers, even though those individuals had no interest in obtaining such loans or purchasing such

properties."  (Ex. T, Yacker Plea 14).

86.     "After the closing on those properties, each straw buyer conveyed a 60-percent

interest in the given property to Grieser's entity, Capital Assets, in a joint venture arrangement

which left the straw buyer holding a 40 percent interest as co-owner with Capital Assets." (Ex. T,

Yacker Plea 15).

87.     Yacker "prepared the joint venture agreement used in those transactions." (Ex. T,

Yacker Plea 16).  "Yacker also acknowledged that he knew that each of the straw buyers was

being paid for the use of their names and credit histories in obtaining the subject mortgage loans and in acquiring the subject properties." (Ex. T, Yacker Plea 17).

88.     Yacker also committed various fraudulent acts to further the straw buyer scheme, including: (a) issuing false letters regarding nonexistent deposits of funds by purchaser/borrowers, which funds he claimed to be holding in escrow; (b) closing title on the resale portion of flip transactions knowing that the original purchase of the property had not yet closed; and (c) signing and causing straw buyers to sign false and fraudulent closing documents, including HUD-1/RESPA settlement statements which did not truthfully describe receipts and disbursements of funds.  (Ex. T, Yacker Plea 18).

89.     Yacker pleaded guilty "to all 10 counts of an Indictment, which charged him with conspiracy to commit wire fraud and nine counts of wire fraud."  (Ex. T, Yacker Plea 19).   In 2003, Yacker was sentenced to "18 months in prison and ordered ... to pay an unspecified portion of $787,985.00 in restitution."  (Ex. T, Yacker Plea 20).

90.     Kane was able to facilitate the closings on the fraud properties by paying Yacker and Cicalese and demanding that they use Lorraine King, whom Yacker and Cicalese hired as their secretary/paralegal.

91.     According to King, even though the strawbuyers were *technically* the approved attorneys' clients, they all knew that Kane was *their real client*.  (Ex. Q, King 42:20-12; Ex. R, Cicalese 12:10-15; 13:12-21).  Kane was the *real client* because Kane benefited from his illegal scheme.  (Ex. Q, King 30:17-22, 42:20-43:15; Ex. R, Cicalese 13:12-21).

92.     Kane paid King's salary while she was employed by Yacker and Cicalese.  (Ex. Q, King 41:15-19).

16

93.     In or around the beginning of 1996, Yacker began conducting closings for Kane. (Ex. Q, King 17:16-18:1; Ex. P, Yacker 13:1-8).

94.     Yacker tried to defend his participation in the fraud with the defense of the improper practice of law by King who conducted the closings (Ex. P, Yacker 38:14-24; Ex. Q, King 20:2-15), even though she never had formal training in real estate practice (Ex. Q, King 27:19-24).

95.     King testified that while she was employed by Yacker, she solely worked on Kane's matters, (Ex. Q, King 30:5-12), in fact, she worked for and was paid by Kane.  (Ex. Q, King 31:19-22).

96.     King also testified that Kane provided a computer which Yacker accepted to computerize his attorney trust account, which Kane set up, and which Kane and King ultimately controlled.  (Ex. Q, King 33:10-24).

97.     In early 1997, after a dispute between Yacker and Kane which led to Kane withdrawing money from Yacker's trust account, Kane stopped using Yacker to close loans (Ex. P, Yacker 53:9-17).  Approved attorney Cicalese then agreed to serve as closing attorney, and he hired King as his paralegal.  (Ex. Q, King 38:6-18; Ex. R, Cicalese 13:12-21, 15:8-22).

98.     King continued her involvement in the mortgage fraud closings while she was employed by Cicalese.  (Ex. Q, King 39:19:40:14).  During this time, she was also still being paid by Kane in addition to her salary from Cicalese.  (Ex. Q, King 41:15-19).

99.     Yacker, Cicalese and King all testified that the strawbuyers were often not present for the closings.  (Ex. R, Cicalese 132:4-13, 135:1-16, 161:17-25; Ex. Q, King 42:24-43:5, 169:9-22, 250:5-251:15; Ex. P, Yacker 42:9-16).

100.     Cicalese testified that he knew that another co-conspirator was actually signing the documents on behalf of the strawbuyers, (Ex. R, Cicalese 22:9-20), that the closing documents were being falsely notarized, (Ex. R, Cicalese 54:4-19), or forged by King (Ex. R, Cicalese 36:10-37:24,138:3-9; Ex. Q, King 118:1-119:3), and that it was Kane who had actually filled out the loan applications.  (Ex. R, Cicalese 163:18-22).

101.     As the Title Insurance Defendants' corporate representative, Donna Sullivan, testified, if "the lender required that the lien be recorded in a first lien position and the attorney did not record the documents in time to protect that first lien position and now it's second to some intervening lien, then that would be the type of action or that should be covered by paragraph one" of the CPL.  (Ex. B, Commonwealth 215:23-216:4, 217;23-218:5-234:11; Ex. G, Nations 30:22-31:1, 35:18-37:8, 126:13-127:17; Ex. M, Fidelity 79:24-80:15, 99:13-24, 103:13-105:6).

102.     When the FBI raided Cicalese's office, he explained to the authorities that there were multiple closing documents that had not been recorded.  (Ex. R, Cicalese 45:7-46:15).  He had given all of the documents to King to record and he became aware that she was not recording the documents because Kane directed her not to.  (Ex. R, Cicalese 86:1-87:25, 98:1-99:250).

103.     Despite being a paralegal for Yacker and Cicalese, King also admitted that she was not recording deeds and mortgages.  (Ex. Q, King 36:6-13, 37:1-160).  King testified that she was instructed to hold the deeds and mortgages "because the way Bill Kane put it, somebody in Monmouth County was becoming suspicious of the influx of property being sold and bought in Asbury Park and Long Branch."  (Ex. Q, King 36:6-13).

104.     King did not send the deeds and mortgages until Kane told her to that she sent in a stack of deeds and mortgages "eight to ten inches" high.  (Ex. Q, King 37:1-16).

105.     Yacker testified that even though WSI had provided funds at closing for the recording fees, he needed additional money from Kane before he could record deeds and mortgages because he depleted his attorney trust account.  (Ex. P, Yacker 60:12-62:60, 64:9-15).

106.     The "approved attorneys" for the Title Insurance Defendants did not disburse WSI's loan proceeds according to the HUD-1 Settlement Statements as required by the lender's closing instructions.

107.     Yacker also testified that he lied about the existence of monies being held in escrow.  (Ex. P, Yacker 100:19-102:24; Ex. Q, King 171:21-171:10).

108.     King testified that on behalf of Yacker and Cicalese she prepared HUD-1 Settlement Statements (Ex. Q, King 34:15-35:3, 100:14-18; Ex. P, Yacker 37:16-25), that she lied on the HUD-1s about the existence of second mortgages (Ex. Q, King 97:7-98:17, 99:18-20, 127:12-128:16, 135:10-12, 170:4-24), and that she issued disbursements of the loan proceeds from Yacker's and Cicalese's trust accounts according to Kane's direction rather than according to the Settlement Statements.  (Ex. Q, King 106:16-107:8, 107:25-108:5).  The purpose of the secondary mortgages was to create the appearance that the seller was providing funds to close the transactions.  (Ex. Q, King 170:4-180).  She further testified that Yacker showed her how to create these phony documents.  (*Id*.).

109.     Cicalese admitted that the HUD-1 Settlement Statements contained inaccurate information, specifically that balances remained after the closings that were not reflected on the HUD-1.  (Ex. R, Cicalese 104:3-111:25, 126:8-127:3).

110.     Cicalese also admitted that the loan proceeds were often disbursed before the properties were owned by Kane.  (Ex. R, Cicalese 49:10-24, 90:2-8, 119:19-120:2, 129:12-131:4, 148:3-20, 171:25-173:24).

111.     King confirmed that Kane was selling properties that he did not own, so Cicalese did not record deeds.  (Ex. Q, King 36:7-18).

112.     Yacker admitted that he allowed his attorney trust account to be set up by Kane and controlled by King and Kane.  (Ex. P, Yacker 53:9-17; 60:12-61:15; Ex. Q, King 33:8-20).

113.     Essentially, Yacker's trust fund flowed according to Kane's direction so that all the conspirators received their illicit payments.  (Ex. Q, King 131:16-132:8).

114.     Yacker admitted that even though Walsh Securities provided the recording funds, closing documents were not being recorded because he had depleted the funds in his attorney trust account and there was no money to pay for the recording fees. (Ex. P, Yacker 64:9-15).

115.     He also testified that he lied about the existence of monies being held in escrow. (Ex. P, Yacker 100:19-102:24; Ex. Q, King 171:21-171:10).

116.     Cicalese admitted during his deposition that he learned the transactions were a fraud during the closings (Ex. R, Cicalese 17:2-15), and he agreed that he was part of fraud and misapplication of funds involved with WSI's loans. (Ex. R, Cicalese 143:5-8).

117.     Cicalese also conceded that Kane directed him how to disburse closing funds. (Ex. R, Cicalese 171:25-173:24).

118.     King testified that Yacker and Cicalese knew that properties were being closed before the Cristo-to-strawbuyer closing occurred.  (Ex. Q, King 85:1-86:21).  WSI's loan proceeds, in fact, were being used to fund the initial purchase before its purported borrower even had title to the property.  (Ex. Q, King 90:18-91:13).

119.     King further testified that the Title Insurance Defendants' "approved attorneys" disbursed the mortgage proceeds before documents were properly executed.  (Ex. Q, King 91:9-13, 109:18-110:3).

120.     Knowing that (1) the strawbuyer was not a bona fide purchaser, (2) that no down payment was paid, (3) that the strawbuyer did not own the entire property, and (4) that certain closing expenses would never be paid, the Title Insurance Defendants' "approved attorneys" transmitted WSI' funds to themselves and other co-conspirators.  (4th  Am. Complaint ¶¶ 59-61).

121.     At the closing, a sixty percent of the strawbuyers' ownership in the properties was conveyed to Capital Assets, which was an immediate event of default under the WSI mortgage of which the Closing Attorneys were charged with explaining to their clients.  (*Id.*).

122.     Had WSI known that the closing attorneys would purposefully ignore its closing instructions to facilitate a fraud, it would never have wired or authorized the release of its funds.

**The Title Agent's Actions Facilitated the Fraud**

123.     Defendant Coastal Title Agency and Monmouth Title Agency were the title agents for the Title Insurance Defendants.  (Ex. B, Commonwealth 13:15-131:4; Ex. H, Coastal Ex. 6).

124.     According to those agency agreements, Coastal Title was expressly permitted to issue CPLs, title commitments and title policies. (*Id.*; Ex. G, Nations 74:20-75:12).

125.     Pursuant to their arrangements, Coastal Title was compensated based on the number of policies it issued and the amount of premiums it received for title insurance.  (*Id.*; Ex. M, Fidelity 73:17-75:8).

126.     Coastal Title facilitated the fraud by agreeing to use a system that suggested to WSI that title was clear, when in fact it was not.  (Ex. F, Coastal 46:17-48:9).

127.     Coastal's President, Robert Agel, conceded, the title commitments suggested that Cristo was fee simple owner of the properties when in fact clear title had not yet been transferred to Cristo.  (Ex. S, Agel 47:1-49:23).

21

128.    This information was materially misleading because the information hid the fact that the transaction was a flip and a Lender's Title Insurance Policy is not issued until well after the transaction closes and all of the requirements in the title commitment are met.

129.    Following a lunch with Kane and Pepsny, Mr. Agel acquiesced in Kane's and Pepsny's request to provide WSI with a "clear" or "clean" title commitment (identified with an "A" after the CT file number) that did not list legal issues that needed to be corrected prior to closing such as "tax sale certificates, judgments, old mortgages, [or] bankruptcies."  (Ex. F, Coastal 46-48, 55-56).

130.    Although Kane and Pepsny portrayed this unusual request to Mr. Agel as being for the benefit of WSI, so its personnel would not be bogged down with making sure WSI would have clear title, Agel admitted that he never in fact confirmed this with anyone at WSI or even advised anyone at WSI that the title commitment upon which they were relying was incomplete. (Ex. F, Coastal 48, 154-155).

131.    Coastal also failed to record countless deeds and mortgages on these properties, which had been entrusted to it.  Mr. Agel admitted that Coastal had been provided with a batch of deeds and mortgages that needed to be recorded but since he was not provided the funds to file them they were never recorded and they were turned over to the FBI without any notice to WSI. (Ex. F, Coastal 105, 118).  Consequently, these deeds and mortgages have never been identified or recorded.

132.    At the request of Kane and Pepsny, Coastal also accepted a $50,000 check from Cicalese's attorney trust account to record over 200 deeds and mortgages between April 7, 1997 and April 9, 1997 which had not been filed on properties closed up to 14 months before by Yacker.  (Ex. F, Coastal 45:14-46:4, 186-188; Ex. S, Agel 40:1-42:25).

133.    Among these deeds that Coastal recorded were joint-venture deeds in which the straw-buyers deeded 60% of the property to Capital Assets, which was being done unbeknownst to WSI.

134.    Mr. Agel also testified that it was highly unusual to file that amount of documents over such a short time frame and Coastal had never done it before or since.

135.    Mr. Agel testified that he was in daily contact with attorney underwriters for the Title Insurance Defendants because these loans were so unusual and there were so many problems, and he even spoke with Commonwealth's underwriter about the hundreds of documents that had not been recorded.  (Ex. F, Coastal 33-34, 42).

136.    Mr. Agel further testified that he advised the Title Insurance Defendants of his concerns about the closings.  (Ex. S, Agel 49:4-18).

137.    Mr. Agel testified that he contacted Commonwealth in 1997 about the transactions involved here (Ex. F, Coastal 49:4-18; 50:10-12; 52:5-15) when he discovered that Yacker and Cicalese had not recorded numerous deeds and mortgages (Ex. F, Coastal 42:8-45:23).

138.    Although Mr. Agel learned that Kane was selling properties before his companies purchased them, Coastal continued to do business with Kane and did not inform WSI about the flip transactions.  (Ex. F, Coastal 40-42, 167).

139.    The Title Insurance Defendants terminated their agency relationship with Coastal Title in or around 2000 because of low remittances – not because of the fraud.  (Ex. V, COM 23866; Ex. I, Koch 35:16-23; Ex. G, Nations 24:11-15).

**Procedural History of Related Litigation**

140.    These mortgage loans, a form of commercial paper, were, in many cases, sold and purchased by whole loan purchasers such as The Money Store and Cityscape Financial, with representations and warranties requiring WSI to repurchase all loans found to be fraudulent.

141.    WSI had to repurchase the fraudulent mortgages and also lost its residual value of the securities.  (Ex. L, WSI 548:20-549:20).

142.    On February 5, 1999, the Honorable Clarkson S. Fisher, Jr., P.J.Ch. in Monmouth County, entered an Order granting summary judgment and default judgment in favor of Plaintiffs Rafael Bustos, Sr., Yolanda Bustos-Lacy, Amanda Dippolito, Michael Dippolito, Joseph Piscioneri, Hans Juergensen, Ingrid Juergensen, Alicia Juergensen and Ralph Juergensen, and against Cristo, NHF, Capital Assets, and county clerks.  The court ordered that the deeds, promissory notes, first mortgages, and second mortgages in the names of these individuals were rescinded and cancelled and "declared unenforceable against the plaintiff named in such contract, or against his or her heirs, executors, successors, assigns or transferees."  (Ex. W (2/5/99 Order); Ex. L, WSI 552:9-552:25).  The properties at issue in this Order are among the hundreds of fraud loans and specifically include several that were repurchased by WSI.

143.    On October 20, 2000, the Honorable Sidney H. Stein, U.S.D.J. in the Southern District of New York entered an order awarding Cityscape damages in the amount of $4,732,568.93 against WSI for the properties that it should have repurchased pursuant to a Master Agreement for Sale and Purchase of Mortgages as the court held on December 23, 1998. (Ex. X (10/20/00 Order)).   The court previously held that WSI breached the Master Agreement by failing to repurchase 32 loans that were part of the fraudulent land flipping scheme in New

Jersey in part because the 60-40% joint venture deed rendered the properties unmarketable.  WSI

ultimately repurchased these 32 loans as part of a settlement.