# EXHIBIT B

D. SULLIVAN

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No.
97-cv-3496 (DRD) (MAS)

WALSH SECURITIES, INC.,     :
                            :
            Plaintiff,      :
                            :
      vs.                   :     DEPOSITION OF:
                            :     DONNA SULLIVAN
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP CONSULTING,
INC.; COMMONWEALTH LAND TITLE
INSURANCE CO.; NATIONS TITLE
INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE
INSURANCE CO. OF NEW YORK;
COASTAL TITLE AGENCY; DONNA
PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., D/B/A
MURPHY REALTY BETTER HOMES
And GARDENS                  :
                            :
            Defendants.  :
                            :
      - - - - - - - - - - - -

D. SULLIVAN

**Page 2**

1          TRANSCRIPT of the stenographic notes of
2    the proceedings in the above-entitled matter, as
3    taken by and before JANET BAILYN, a Certified
4    Shorthand Reporter and Notary Public of the State of
5    New Jersey, held at the office of STONE & MAGNANINI,
6    150 John F. Kennedy Parkway, Short Hills, New Jersey,
7    on May 27, 2010, commencing at 10:10 in the forenoon.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1    A P P E A R A N C E S :
2
3        STONE & MAGNANINI, LLP
4        BY:  ROBERT MAGNANINI, ESQ.
             DANIEL MEE, ESQ.
             AMY WALKER WAGNER, ESQ.
5        150 John F. Kennedy Parkway
         Short Hills, New Jersey 07078
6        Attorneys for Plaintiff
7        McCARTER & ENGLISH, LLP
         BY:  DAVID R. KOTT, ESQ.
8        Four Gateway Center
         100 Mulberry Street
9        Newark, New Jersey 07102-4056
         Attorneys for Defendant
10       Commonwealth Land Title Insurance Co.
11       FOX ROTHSCHILD, LLP
         BY:  EDWARD J. HAYES, ESQ.
12       2000 Market Street
         Philadelphia, Pennsylvania 19103-3222
13       Attorneys for Defendants Nations Title
         Insurance of New York, Inc. and Fidelity
14       National Title Insurance Co. of New York
15       METHFESSEL & WERBEL
         BY: MARTIN R. McGOWAN, ESQ.
16       3 Ethel Road
         Box 3012
17       Edison, New Jersey
         Attorneys for Defendant
18       Coastal Title Agency
19
20
21
22
23
24
25

**Page 4**

1
                        INDEX
2
     WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
3
     DONNA SULLIVAN
4    BY MR. MAGNANINI   5, 176
     BY MR. MEE      102
5
6
7
8
            E X H I B I T S
9
     NUMBER     DESCRIPTION            PAGE

10   Commonwealth-1  Deposition Notice      5
     Commonwealth-2  Answers to Interrogatories   37
11   Commonwealth-3  Letter dated 7/28/97    103
     Commonwealth-4  Letter dated 8/12/57    104
12   Commonwealth-5  Agreement dated 4/12/89   111
     Commonwealth-6  Letter dated 10/30/96    140
13   Commonwealth-7  Exhibit B          142
     Commonwealth-8  Deed dated 12/16/96     148
14   Commonwealth-9  Deed dated 12/31/96     150
     Commonwealth-10 Deed dated 1/7/97      152
15   Commonwealth-11 Information Sheet      154
     Commonwealth-12 Schedule A          162
16   Commonwealth-13 Invoice dated 10/30/96    162
     Commonwealth-14 Copy of Check 2238      164
17   Commonwealth-15 Summit Bank Spreadsheet
             Dated 5/22/97           166
18   Commonwealth-16 Coastal Title Agency Document
             Dated 10/29/96           168
19   Commonwealth 17 Closing Instructions
             By Walsh Securities       170
20   Commonwealth-6A Signed Copy of Exhibit 6    177
21
22
23
24
25

**Page 5**

1    D O N N A   S U L L I V A N , having been duly sworn by
2    the Notary, testified as follows:
3    DIRECT EXAMINATION BY MR. MAGNANINI:
4        Q.   Good morning, Miss Sullivan.  How are
5    you?
6        A.   Good morning.  Fine thanks.
7        Q.   I am Bob Magnanini, as I told you
8    before.  I am an attorney for Walsh Securities, and
9    with me is Amy Wagner, another Walsh Securities
10   attorney.  You understand you're here as a 30(b)6
11   representative for Commonwealth Land Title Insurance
12   Company?
13       A.   Yes.
14       Q.   And as a 30(b)6 you understand that
15   there's various topics that we're going to cover, and
16   you had the duty to educate yourself so you can
17   answer questions on each of the topics?
18       A.   Correct.
19       Q.   Have you seen the deposition notice that
20   we had sent out?
21       A.   Yes.
22       Q.   Let me just mark that.
23       A.   With the list?
24       Q.   With the topics listed.
25           (Commonwealth-1, Deposition Notice, is

D. SULLIVAN

Page 6

1   received and marked for identification.)
2       Q.   Have you seen that before?
3       A.   Yes.
4       Q.   And I assume you went over that with
5   your attorney and other people at Commonwealth?
6       A.   I did.
7       Q.   Did you also look at documents --
8       A.   Yes.
9       Q.   -- to prepare for the deposition?
10          MR. KOTT:  Excuse me for one second.
11  Let him finish.
12      Q.   Actually I'll flip back.  Have you ever
13  been deposed before?
14      A.   Yes.
15      Q.   Okay.  How many times?
16      A.   I think five, four, five.
17      Q.   In what capacity?
18      A.   Fact witness, just --
19      Q.   On behalf of Commonwealth or personally?
20      A.   One of the companies.
21      Q.   One of the companies.  Okay.  So you're
22  the professional 30(b)6 witness?
23      A.   No, I have never done 30(b)6.
24      Q.   So having done a deposition there are
25  some basic ground rules I'll just go over with you.

Page 7

1   As you know it's a question-and-answer session.  The
2   only -- one of the artificialities of it is it all
3   has to be recorded by the court reporter.  So as Mr.
4   Kott says, if you wait until you let me finish, and
5   sometimes my questions will meander, I will wait
6   until you finish your answer, which I assume will not
7   meander, if Mr. Kott did his job.
8          Also it's your deposition or it's a
9   deposition of Commonwealth, and you're the
10  representative, so any time you want to take a break
11  just let me know and we will take a break.  The only
12  time I would ask you not to take a break is if a
13  question is pending.
14      A.   Okay.
15      Q.   So if you could answer the question and
16  then take a break.  And if you answer the question
17  I'll assume you've understand it.  If you don't
18  understand the question, and the longer in the day it
19  gets the more likely that is to occur, just let me
20  know and I will rephrase it and then you can answer
21  it.
22      A.   Okay.
23      Q.   And that's -- the last basic thing is
24  your answers need to be verbal.
25          Miss Sullivan, what's your position at

Page 8

1   Commonwealth?
2       A.   I'm associate major claims counsel.
3       Q.   So you're actually an attorney?
4       A.   I am.
5       Q.   And where did you go to law school?
6       A.   Pepperdine University, School of Law.
7       Q.   In California?
8       A.   Yes.
9       Q.   Nice views.
10      A.   Yes.
11      Q.   When did you graduate?
12      A.   1983.
13      Q.   And have you always worked for
14  Commonwealth?
15      A.   No.
16      Q.   Could you just briefly trace your job
17  history since law school?
18      A.   I worked for Ticor Title Insurance.
19      Q.   Where were they located?
20      A.   Various locations in New Jersey.
21  Morristown, Hackensack, Newark.  I spent time at each
22  of the three branches.
23      Q.   What was your title or position?
24      A.   I was a title officer.
25      Q.   What does that entail?

Page 9

1       A.   Actually when I started there they
2   taught me how to do everything, judgment searches, I
3   searched titles for a month in the courthouse, and
4   then I would do the abstract of titles, draft the
5   commitment, sometimes attend closings.  Usually for
6   mortgages over a million the bank would require
7   somebody to attend the closing just to markup the
8   commitment and record the documents.
9       Q.   Okay.  Where did you work after Ticor?
10      A.   I worked briefly at a title agency.
11  Century Intercounty Title.
12      Q.   When was that approximately?
13      A.   1990, I believe.
14      Q.   What did you do at Century Title?
15      A.   I was a title officer there also.
16      Q.   Same or similar job responsibilities?
17      A.   Yes.
18      Q.   And I guess you didn't have a long
19  tenure at Century Title?
20      A.   I think I was there six months.
21      Q.   Why did you leave?
22      A.   I was laid off.
23      Q.   And then what did you do job-wise
24  thereafter?
25      A.   Took me a little while, but then I got a

3  (Pages 6 to 9)

D. SULLIVAN

Page 10

1    job as assistant state counsel at Commonwealth.
2        Q.    You said state counsel?
3        A.    Yeah, that's what they called it. We
4    did claims and underwriting at that point so it was
5    like assistant underwriting counsel and assistant
6    claims counsel.
7        Q.    And where did you work physically?
8        A.    Parsippany.
9        Q.    When did you start there?
10       A.    April of '91, I believe.
11       Q.    And you have been at Commonwealth for
12   the last 19 years?
13       A.    No. I was at Commonwealth for nine and
14   a half years. The position changed a little bit
15   because they separated claims and underwriting, and I
16   became the state claims counsel for Commonwealth
17   around '94. I left in 2000. I went to a title
18   agency, ABL Title in Springfield.
19       Q.    Why did you leave?
20       A.    I had an offer that might be better,
21   which I didn't quite follow through, but an
22   opportunity to become a partner in an agency over
23   time, and I was there for about two years and then I
24   left to go to Fidelity.
25       Q.    And how long were you at Fidelity?

Page 11

1        A.    I have been at Fidelity, it will be
2    eight years in July.
3        Q.    What's your -- what position did you
4    start at?
5        A.    At Fidelity? Senior claims counsel.
6        Q.    Okay. What's your current position?
7        A.    Associate major claims counsel.
8        Q.    What is the difference between claims --
9    senior claims counsel and associate major claims
10   counsel?
11       A.    Well, senior claims counsel is part of
12   the general claims department. They had an office in
13   New York with a satellite in New Jersey, which was me
14   and a couple of other attorneys. In January of 2009
15   they closed the claims center in the northeast and
16   moved the claims to other parts of the country. So
17   they eliminated that entire office and position. The
18   only person remaining here was major claims counsel
19   so I was given a job working with major claims
20   counsel.
21       Q.    How does Fidelity define major claims?
22       A.    Exposures over a million. It could also
23   be other complex cases or things maybe with
24   precedential issues or political issues, you know,
25   something more complex than the average claim.

Page 12

1        Q.    And so you -- you're employed by
2    Fidelity but you're representing Commonwealth?
3        A.    It's a complex structure. I even called
4    someone to ask who I'm employed by. Our paychecks
5    come from one entity, supposedly we're rented by
6    another entity, I don't know, but we consider
7    ourselves employees, I guess, of Fidelity National
8    Financial although we hold ourselves out as the
9    Fidelity National Title Group, at least on our
10   letterhead and correspondence, but that entity has no
11   employees I'm told and as --
12       Q.    Fidelity National Title Group has no
13   employees?
14       A.    No employees. That's what I'm told. In
15   my position you're considered an officer of each of
16   the title companies that parent companies own.
17       Q.    How many title companies does Fidelity
18   National Title Group own?
19       A.    I probably couldn't tell you that. I
20   could tell you some of the major ones.
21       Q.    I would appreciate that.
22       A.    Commonwealth -- I will give you full
23   names. Commonwealth Land Title Insurance, Lawyer's
24   Title.
25       Q.    One of the defendants in this case is

Page 13

1    Commonwealth?
2        A.    Yes.
3        Q.    That entity?
4        A.    Yes. There's Chicago Title, Fidelity
5    National Title, Nations Title, some that you don't
6    hear around here, I know Alamo Title, Ticor Title.
7        Q.    No antitrust laws I guess in your
8    business.
9        A.    Well, acquisition of Commonwealth and
10   Lawyers I guess was properly sanctioned by --
11       Q.    By the FTC. So it really has become one
12   amorphous blob, which is what we complained about.
13   Okay.
14             When did Fidelity acquire Commonwealth?
15       A.    December of 2008.
16       Q.    Okay.
17       A.    And actually I'm not sure. Technically
18   it was acquired by Fidelity. I think it was acquired
19   by Chicago Title.
20       Q.    And when did Fidelity acquire Chicago
21   Title? Was it before or after?
22       A.    Before.
23       Q.    Okay. So I didn't understand. Chicago
24   was actually owned by the Fidelity Nations Title
25   Group and then it acquired Commonwealth?

4   (Pages 10 to 13)

VERITEXT REPORTING COMPANY

D. SULLIVAN

Page 14

1    A.    I would have to almost check exactly how
2  it held --
3    Q.    The structure?
4    A.    I would like to say that Fidelity owned
5  Chicago.  That's probably true, but that's something
6  I would have to actually probably confirm --
7    Q.    Okay.
8    A.    -- how it's held.
9    Q.    What is Commonwealth Title's document
10 retention policy?
11   A.    Today?
12   Q.    Today.
13   A.    Today, after the acquisition there was a
14 do not destroy order, so no documents were supposed
15 to be destroyed after the acquisition.  As far as I'm
16 aware that's still in effect.
17   Q.    From December of 2008?
18   A.    Yes.
19   Q.    What was the document retention policy
20 back in the -- I'll define this for you but the time
21 frame of the lawsuit was -- what we've alleged, what
22 plaintiff has alleged, the first frauds occurred in
23 the beginning of 1996, January, February time frame,
24 and they continued through the middle of June of
25 1997.  And so what was Commonwealth's document

Page 15

1  retention policy during that time period?
2    A.    I have not found a retention policy for
3  that period.  I found a memo from 1999.
4    Q.    Okay.  What did that say?
5    A.    That was seven years, and after seven
6  years from the last action taken on the claim file --
7  I'm talking claims department for this -- the file
8  could be -- could or should be destroyed.
9    Q.    When does Commonwealth define a claim as
10 beginning or occurring?
11   A.    As beginning?  There's a strict
12 definition, but obviously when we receive notice of
13 it.  The policy requires notice to be submitted in
14 writing to the company, the home office.
15   Q.    And so if, for example, Walsh Securities
16 sent letters to Commonwealth in July of 1997, that
17 would be the beginning of the claim?
18   A.    Yes.
19   Q.    And then was there anything in the -- do
20 you still have the memo?
21   A.    The memo for?
22   Q.    The document retention policy.
23   A.    From '99?
24   Q.    '99.
25   A.    Yeah, I have a copy of it.

Page 16

1    Q.    Do you have it with you?
2    A.    I do not.
3    Q.    Okay.  Can we get a copy?
4    A.    Sure.
5    Q.    Did the document retention memo say
6  anything about litigation?
7    A.    In connection with the claim?
8    Q.    The claim.  Right.
9    A.    It really deals with claims, so I assume
10 that would include any litigation, so the litigation
11 would be in the claim file.
12   Q.    So Walsh, I believe, amended its
13 complaint in November of 1997 and asserted claims
14 against various entities including Commonwealth.  So
15 those documents, at least as of the 1999 memo, should
16 have been preserved all the way through?
17   A.    Correct.
18   Q.    Okay.  Do you know if any documents
19 relating to the claims or the litigation brought by
20 Walsh Securities have been destroyed?
21   A.    I don't know that any have been
22 destroyed.
23   Q.    What type of documents does Commonwealth
24 have related to the Walsh Securities either claim or
25 litigation?

Page 17

1    A.    From reviewing some of the boxes that
2  were transferred to our office from Commonwealth, we
3  have the original claim file, when the claim letters
4  first came in.
5    Q.    What else is in an initial claim file?
6        MR. KOTT:  In an initial or the?
7    Q.    An initial one I'll start with.
8        MR. KOTT:  I object to the form but you
9  can go ahead and answer.
10   A.    Often the initial claim file is the
11 claim file.  This is more expansive than would fit in
12 one folder, but you would have the claim letter, you
13 would have a copy of the policy or commitment,
14 which -- you know, closing service letter, whatever
15 the claim is being based upon.  If it didn't come in
16 with the claim letter it certainly would have been
17 requested.  If there's litigation you have the
18 pleading, you know, you may have the agent's file
19 attached.  Whatever investigation you had done, the
20 materials would be in there.  You have the initial
21 claim report because there's also a report completed
22 for home office and entered into the claims system.
23 You might have financial information concerning
24 reserves.  It really should encompass whatever you've
25 done in connection with the claim.

5  (Pages 14 to 17)

D. SULLIVAN

Page 18

1    Q.    And have you seen the claim file for
2  Walsh Securities either -- I don't know how you guys
3  would define it -- claim or litigation?
4    A.    I found the initial file. I think after
5  a certain point a lot of things got separated into
6  Redwelds for pleadings and deposition transcripts and
7  correspondence, so it's not, you know, maybe in one
8  file like a smaller claim would be but there are
9  boxes of documents.
10   Q.    Okay. And what else was in the initial
11 claim file that you found?
12   A.    The initial correspondence from Walsh
13 and our responses to Walsh, the retention of McCarter
14 & English documentation, correspondence from McCarter
15 & English to Walsh prior to the filing of the suit.
16 I don't recall if the complaint was in there. It
17 might have been separated in a Redweld. And I don't
18 recall if the policies are in there because obviously
19 this encompassed many transactions and there seems to
20 be separate files set up for a lot of the individual
21 commitments. Sometimes the agent file appears to be
22 attached to those files that were set up for each
23 transaction. There's news articles, there's various
24 charts on the claims, things of that nature.
25   Q.    Okay. You said that a claim file

Page 19

1  generally also has an investigation report?
2    A.    Not a report but whatever materials
3  you've done. I mean, usually when you get a claim,
4  unless it's something that's obviously not covered on
5  its face, you're going to do some -- request some
6  documents or -- either from the insured or from the
7  agent to do your analysis of coverage.
8    Q.    Was there -- are there any notes or --
9  let me just ask this question: What type of
10 investigation did Commonwealth do, based on your
11 review of the file, after it was put on notice by
12 Walsh Securities?
13   A.    I think the initial claim letter came in
14 in July '97. It looks like we followed within two
15 weeks or something -- or less with the request, I
16 believe it was for the loan document -- loan files,
17 because it was not a lot of detail or I don't know --
18 I don't recall even if the policies were attached to
19 the initial claim letter. So we began, you know,
20 requests for documentation so we could begin an
21 investigation.
22   Q.    Okay.
23         (A discussion takes place off the
24 record).
25   Q.    So was there any sort of written notes

Page 20

1  in the Commonwealth file?
2    A.    I think this was very preliminary. I
3  don't recall any written notes. Maybe had a news
4  article that had been circulated, I guess. You had
5  the claim letter, our response to the claim letter,
6  the September -- someone from Walsh brought all the
7  loan files to the office. We had retained McCarter &
8  English I think at that point. McCarter & English
9  sent some requests for additional documents. I don't
10 believe we ever got a response to that. Suit was
11 filed in November, so this all happened in a fairly
12 short period of time.
13   Q.    And you said suit was filed in November.
14 What did Commonwealth do investigation-wise once the
15 suit was filed? Maybe the question is better
16 phrased: Did Commonwealth continue its investigation
17 once the lawsuit was filed?
18   A.    Well, I am assuming that -- and again I
19 have to assume. I'm trying to recall something
20 that's maybe not documented in the file itself, but I
21 am assuming we began a review of some of the loan
22 files. I think we had to gather the agent's files
23 even to begin to get a handle on what properties were
24 involved and what happened. Once we turned it over
25 to McCarter & English they were handling whatever

Page 21

1  review was done, and I guess we were going to find
2  additional information through discovery.
3    Q.    So as far as you know then Commonwealth
4  itself didn't do any further investigation into the
5  claims once the litigation was filed against it?
6    A.    I'm not sure. I think that -- I think
7  there might have been conversations between the
8  company and Coastal Title when they were gathering
9  these files, and then there are different claims that
10 Walsh submitted. Walsh later then submitted claims I
11 think on individual transaction files for unrecorded
12 documents of that nature, and of course we were
13 getting additional files from Coastal Title and
14 reviewing those. And retained counsel actually under
15 reservation to actually cure some of the unrecorded
16 document claims so I don't know if that answers --
17   Q.    What I was trying to determine is: As
18 far as Commonwealth was concerned once the complaint
19 got filed the investigation was turned over to your
20 counsel?
21   A.    I think Walsh never responded I guess to
22 that letter of Mr. Kott's of September, so I think we
23 never got further information from the insured and
24 then the litigation began, and I think, you know,
25 that took on its own life.

6 (Pages 18 to 21)

VERITEXT REPORTING COMPANY

D. SULLIVAN

Page 22

1    Q.   I guess, does the file contain a copy of
2  Mr. Kott's September -- I would assume --
3    A.   Yes.
4    Q.   -- 1997 letter?  Okay.  And then --
5  because you said Walsh Securities did provide all the
6  loan documents to you?
7    A.   They provided loan files, yes.
8    Q.   And when was that?
9    A.   September.
10   Q.   And Mr. Kott -- do you recall what Mr.
11 Kott's letter asked for beyond that?
12   A.   Additional documentation.  I'm not sure
13 if it went toward underwriting procedures.  I'm
14 guessing at this.  So I think I would have to see the
15 letter itself.
16   Q.   But the letter is still in the file?
17   A.   Yes, it is.
18   Q.   And how do you know that or how does --
19 sorry, when I say you, I mean Commonwealth from now
20 on.
21   A.   Okay.
22   Q.   Okay?  I just wanted to get your
23 background, which was just you, and now I'll define
24 you as Commonwealth.
25        How did Commonwealth or how does

Page 23

1  Commonwealth or you know that what Mr. Kott had
2  requested was not provided?
3    A.   I didn't see that in the file and I've
4  asked counsel.
5    Q.   You said that at some point later in
6  time Walsh Securities had asked that Commonwealth
7  investigate the specific loan files concerning
8  unrecorded documents?
9    A.   Yes.
10   Q.   Now, when was that?
11   A.   I believe it was in 1998 that those
12 letters -- there were a series or different letters.
13 It wasn't all in one, you know, claim letter.  I
14 believe they were all in '98.
15   Q.   Who were those letters from?
16   A.   I'm not sure if -- I say Walsh and now
17 I'm not sure.  I think some were from Walsh, but some
18 could have been from a foreclosure firm.
19   Q.   A law firm?
20   A.   Stern Lavinthal.
21   Q.   Stern Lavinthal.  Okay.
22   A.   I don't know if they were both or one or
23 the other.  I think certainly Stern Lavinthal may
24 have had some of them because we did have a lot of
25 communication with Stern Lavinthal in which case I'm

Page 24

1  not sure Stern Lavinthal was representing Walsh at
2  that time so --
3        MR. KOTT:  So you're backtracking that
4  you got claims from Walsh.  Is that what I'm hearing?
5    A.   A little bit, although I'm not sure
6  there weren't some directly from Walsh because I
7  think we got from Walsh and Stern Lavinthal.
8    Q.   I can represent to you that Stern
9  Lavinthal, as far as I know, was retained by Walsh
10 Securities to attempt to foreclose on these
11 properties.
12   A.   Okay.
13   Q.   So letters you would have gotten from
14 Stern Lavinthal would have been on behalf of Walsh
15 Securities.
16        MR. KOTT:  Bob, I would never challenge
17 your representations, but I had a different
18 understanding, and maybe what you said is true, but I
19 had an understanding that Stern Lavinthal was
20 retained by Temple Inland who was servicing these
21 mortgages for Bankers Trust as corporate trustee.
22 But I am not representing that but that's --
23        MR. MAGNANINI:  I know Walsh retained
24 and paid Stern Lavinthal --
25        MR. KOTT:  Okay.

Page 25

1        MR. MAGNANINI:  -- to try and foreclose.
2    Q.   How many loans did they write you about?
3  "You" being Commonwealth again.
4    A.   I don't have the number for that.
5    Q.   What was done as a result of the
6  correspondence or the claims made by Stern Lavinthal?
7    A.   As far as unrecorded documents, we made
8  a decision that while we weren't going to admit
9  liability obviously while the rest of the litigation
10 was ongoing and we had not made any decisions on
11 coverage, we thought it was in the best interest of
12 everyone to, you know, mitigate potential additional
13 exposure by getting these documents on record, if we
14 could, at limited expense.  It would preserve at
15 least the value of the property.  The property
16 couldn't be, you know, conveyed or otherwise financed
17 without the mortgage of record.
18        So we retained counsel, and I don't know
19 if in some instance we were able to locate originals
20 or we had to actually file suit to establish the lien
21 but we did that on a number of cases.
22   Q.   Do you know about how many cases?
23   A.   It's a guess.
24   Q.   Another instruction that we always
25 forget until the witness actually reminds us is:  I

7 (Pages 22 to 25)

VERITEXT REPORTING COMPANY

212-267-6868                            516-608-2400

9ce207e6-66a4-4035-b780-e65560fc2075

D. SULLIVAN

Page 26

1  would ask you not to guess.
2         Does Commonwealth still have the files
3  related to those claims made by Stern Lavinthal?
4     A.   Yes.
5     Q.   You testified previously that documents
6  were recorded.  Were there -- any of those claims was
7  any money paid out on?
8     A.   To my knowledge no money was paid
9  directly to an insured.  Obviously money was paid to
10 retain counsel and money was paid to later record the
11 documents.
12    Q.   Right.  Okay.  That was my question.
13 Was any money paid to any insured?
14    A.   I have not seen that in my research.
15    Q.   So as far as you know all of the claims
16 presented were resolved?
17    A.   Unrecorded document claims?
18    Q.   Unrecorded document claims.
19    A.   Again, I have not gone through, now 13
20 years later, whatever, each of those files.  I'm
21 assuming at the time that we addressed each of them.
22 I don't recall but that's a long time that there
23 were -- that we couldn't resolve, and I don't know
24 what might have come in -- some of this I'm doing
25 from my own recollection of seeing files back then

Page 27

1  when I worked at Commonwealth, but I don't know if
2  there were any left undone.  I think we attempted to
3  get them all done and I don't recall that not being
4  done.
5     Q.   Okay.  That's actually what my next
6  question was, and this is flipping out of the
7  Commonwealth you, back to you as Donna personally.
8  When you were at Commonwealth did you work on the
9  claims made by Walsh Securities?
10    A.   I did.
11    Q.   And what was your -- as a claims
12 officer?
13    A.   A claims counsel, yeah.
14    Q.   Claims counsel.  Okay.  And did you
15 conduct any of the investigation yourself?
16    A.   The limited investigation.  I mean I
17 wrote the letters to Walsh.  I retained the counsel
18 to cure the unrecorded document claims and
19 corresponded with Stern Lavinthal.  I collected the
20 files from Coastal Title, some of them, you know,
21 worked on that going back and forth when a claim
22 letter would come in and we didn't have the file for
23 a particular property so I did work on some of those
24 initially.
25    Q.   Okay.  Then you will recognize some of

Page 28

1  the exhibits later.
2         Did you also meet with your agent,
3  Coastal Title?
4     A.   I don't believe I did.
5     Q.   Who did?
6     A.   I believe I saw something in the file
7  that Nancy Koch did.
8     Q.   And that's K-o-c-h?
9     A.   That's correct.
10    Q.   Does she still work at --
11    A.   No.
12    Q.   -- Fidelity Nations Group?  Do you know
13 where she is?
14    A.   Yes.
15    Q.   Where is she now?
16    A.   Old Republic Title.
17    Q.   Where is that?
18    A.   Parsippany.
19         MR. MAGNANINI:  Off the record.
20         (A discussion takes place off the
21 record.)
22         (A recess takes place.)
23    Q.   Miss Sullivan, what's your understanding
24 of the lawsuit that Walsh Securities has filed
25 against Commonwealth?

Page 29

1     A.   I believe it's for breach of contract
2  for failure to address the claims in a timely
3  fashion.
4     Q.   And so you've seen the Fourth Amended
5  Complaint?
6     A.   I did.
7     Q.   I guess actually you've known about the
8  lawsuit since it was filed back in 1997?
9     A.   I did but I took a ten-year break when I
10 left Commonwealth.
11    Q.   As did we when the judge
12 administratively terminated it.  And then were you
13 aware that this case was sent to mediation in 2006?
14    A.   No.
15    Q.   Okay.  Have you seen any of the
16 documents that were submitted to Commonwealth by
17 Walsh Securities in the course of the mediation?
18    A.   I don't recall seeing that.
19    Q.   Do you recall seeing any correspondence
20 with lists of loans that Walsh has alleged are part
21 of the fraud that were insured by Commonwealth?
22    A.   I've seen initial charts from the early
23 '90s.  You know, I don't know if there's been
24 revisions or which ones you're referring to but I
25 have seen some charts.

8 (Pages 26 to 29)

D. SULLIVAN

Page 30

1    Q.    And are those charts in Commonwealth's
2    files?
3    A.    Yes.
4    Q.    You testified earlier that you spoke to
5    Mr. Kott to prepare for the deposition as a 30(b)6
6    witness.  Who else did you speak with?
7    A.    I spoke to several people in the company
8    to get information that might pertain to some of the
9    questions.  Do you want me to just go through a list?
10    Q.    If you can, please.
11    A.    If I can off the top of my head.  I
12    spoke to Gary Hamm, briefly to Nancy Koch, I spoke to
13    John Waters, Matthew Rini, Larry Feinberg.  I spoke
14    to -- or e-mailed two people in the accounting
15    department in home office whose names I don't recall.
16    I think that's -- and perhaps Vincent Sharkey who I
17    work with.
18    Q.    What is Mr. Sharkey's position?
19    A.    Major claims.  I don't know what his
20    exact title is.  He's not a member of the bar.
21    His -- he is part of the office of the general
22    counsel.
23    Q.    What do you mean when you say he's not a
24    member of the bar?  Is he not an attorney?
25    A.    He was but he resigned his membership.

Page 31

1    Q.    Was -- why did he resign?
2    A.    Part of the agreement with the firm.
3    MR. KOTT:  Are you sure he withdrew with
4    the Supreme Court as an attorney?
5    THE WITNESS:  Am I mischaracterizing it?
6    MR. KOTT:  I think that's what Mr.
7    Magnanini is thinking.
8    A.    He voluntarily --
9    MR. KOTT:  He retired.  He retired from
10    his law firm.  I normally don't do this, Bob, but I
11    think she misspoke and I didn't want you to get --
12    Q.    Right.
13    A.    Not a negative connotation.
14    MR. KOTT:  I think Mr. Sharkey is still
15    a member in good standing of the bar.
16    Q.    Just because of this case every time I
17    see lawyers who aren't members anymore I'm like -- I
18    was just wondering.  What is Mr. Hamm's position?
19    A.    I believe his title is now area counsel.
20    Q.    What does that entail?
21    A.    I'm trying -- well, I think it's a new
22    position.  I'm not sure if it's for Lawyer's Title
23    and Commonwealth.  I believe it may be.  And I think
24    it's an underwriting counsel position.
25    Q.    And Miss Koch you have already testified

Page 32

1    no longer works at Commonwealth?
2    A.    Correct.
3    Q.    She was involved in the original
4    investigation?
5    A.    Yes.
6    Q.    And then Mr. Waters, what is his
7    position?
8    A.    John Waters is -- I'm not sure of the
9    title again, but it's major claims counsel in home
10    office in Jacksonville.
11    Q.    Florida?
12    A.    Yes.
13    Q.    What topics did you speak to Mr. Waters
14    about?  I don't know if you need to refer to the
15    Schedule A.
16    A.    I contacted him -- he was formerly with
17    Commonwealth.  So I contacted him regarding whether
18    there was a claims manual and whether -- as to, you
19    know, what their retention policy might have been.  I
20    think those were the two things that I addressed with
21    him.
22    Q.    Was there a Commonwealth claims manual
23    in 1997?
24    A.    Yes.
25    Q.    Do you still have that?

Page 33

1    A.    I have John's copy on loan.
2    Q.    Okay.  But -- so we could actually
3    request a copy of it or we can get a copy if we
4    requested it?
5    A.    Assuming -- I don't know if there's any
6    privilege issues.
7    MR. KOTT:  Mr. Magnanini, what might be
8    best is if you just write me a letter.
9    MR. MAGNANINI:  That's why I'm asking.
10    MR. KOTT:  Obviously as the witness said
11    we're not agreeing to produce anything.  We will get
12    the letter and we will respond.
13    MR. MAGNANINI:  That's how it works.
14    Okay.
15    Q.    And then you also mentioned a Matt -- I
16    didn't get his last name.
17    A.    Matthew Rini, R-i-n-i.
18    Q.    What is Mr. Rini's position?
19    A.    Again, I don't know his title.  He was
20    part of the claims department.  He was kept on after
21    the claims department closed.  He does some work for
22    home office.  The purpose of me contacting him was
23    that John Waters suggested he might know what
24    happened to the Land America claims website
25    information.  After Land America acquired

9  (Pages 30 to 33)

VERITEXT REPORTING COMPANY

D. SULLIVAN

### Page 34

1  Commonwealth I think they ceased using the
2  Commonwealth manual and they had claims memoranda
3  online, and when we acquired them that website was
4  taken down, but Matt was able to provide me with some
5  of the memos that were on there, which included the
6  memo on the retention of documents in the claims
7  department for Commonwealth.
8     Q.   When did Land America purchase
9  Commonwealth?
10    A.   In December -- oh, Land America
11 purchased Commonwealth, I believe it may have been
12 February of '98, but '98 I think, and again may have
13 been Lawyers purchasing Commonwealth. I am never
14 sure exactly how they're structured, but Land America
15 became I think the holding company for the two.
16    Q.   Then who was Larry Feinberg?
17    A.   Larry Feinberg is regional underwriting
18 counsel for Chicago Title.
19    Q.   I assume responsible for a region that
20 includes New Jersey?
21    A.   Yes.
22    Q.   What did you speak to him about?
23    A.   The changing of the closing protection
24 letter to the closing service letter and the time
25 period that happened in.

### Page 35

1     Q.   What do you mean by that, the changing
2  to the closing protection letter?
3     A.   The closing protection letter was one
4  form of letter, which was later amended, and a new
5  form filed with the Department of Insurance was
6  issued.
7     Q.   When did that occur?
8     A.   August first, '94.
9     Q.   Why was it changed?
10    A.   It was changed in response to some of
11 the decisions in the Sears mortgage case and Klein
12 security fund case. This is again my understanding.
13 There might have been other reasons but...
14    Q.   So in response to court rulings. New
15 Jersey -- I think they're both New Jersey state court
16 cases.
17    A.   Yes.
18    Q.   And what did you speak to Nancy Koch
19 about?
20    A.   I was trying to identify where some of
21 the underwriting memos would have been kept because I
22 have not been able to find a single location for
23 underwriting memos between '94 and when we purchased
24 Commonwealth. There were volumes prior to '94 when
25 one underwriting counsel was in charge of

### Page 36

1  Commonwealth, and then when he left I think Nancy
2  became underwriting counsel, but I can't find one
3  place where I can go and look for underwriting
4  memoranda. So I checked with her to see if she could
5  tell me what happened to them.
6     Q.   Those are Commonwealth underwriting
7  memoranda?
8     A.   Yes.
9     Q.   What do they consist of?
10    A.   Those would have been underwriting memos
11 sent to the branches and agents with regard to
12 various topics that -- you know, instructions maybe
13 on how to deal with specific issues.
14    Q.   So they were actually produced by
15 Commonwealth and sent to their agents?
16    A.   Yes.
17    Q.   Were you able to locate the underwriting
18 memoranda after 1994?
19    A.   Not in one location. She thought there
20 was a binder, which we haven't found. I understand
21 that some memoranda may be filed in the subject
22 matter files along with other materials on that
23 subject. You may find them in there, but I don't
24 have a central location for something. You have to
25 go hunting.

### Page 37

1     Q.   Were you able to determine why there was
2  no central location for the post '94 underwriting
3  memos?
4     A.   She said there was a binder but we have
5  not been able to find that binder. The person that
6  might have been in charge of that binder has also
7  left the company.
8     Q.   And what did you speak to Gary Hamm
9  about?
10    A.   Gary -- I started initially and -- I
11 think I started with him on retention. I discussed
12 the filing of the revised -- the closing service
13 letter. He was looking for some memoranda on that.
14 I'm trying to think what else. Maybe also on the
15 issuing of closing protection letters, closing
16 service letters, the conditions.
17    Q.   The conditions. Okay. As part of your
18 preparation, did you review Commonwealth's Answers to
19 Interrogatories propounded by Walsh Securities?
20    A.   Are these from years ago? I think I
21 looked at one set.
22    Q.   Years ago can be relative. I think
23 they're actually from 2005.
24          (Commonwealth-2, Answers to
25 Interrogatories, is received and marked for

10  (Pages 34 to 37)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

D. SULLIVAN

### Page 38

1  identification.)
2      Q.   Miss Sullivan, I would ask you to look
3  at Exhibit 2, which is Defendant Commonwealth's
4  Response to Plaintiff's First Set of Interrogatories
5  to Title Insurance Defendants.
6      A.   Okay.
7      Q.   Could you turn to page nine? There's a
8  certification. Whose signature is that?
9      A.   Virginia Moran.
10     Q.   Does Miss Moran still work at
11  Commonwealth?
12     A.   No.
13     Q.   Do you know where she is?
14     A.   Yes.
15     Q.   Where is she?
16     A.   She's at a law firm, Purcell Ries. I'm
17  not sure of the full name.
18     Q.   Did you contact her in preparation for
19  this deposition?
20     A.   I did not.
21     Q.   Do you know why she was the Commonwealth
22  person who signed the certification?
23     A.   Well, Virginia was in charge of the
24  claims department in Parsippany and I believe she
25  handled this case.

### Page 39

1      Q.   This case. Okay. Could you turn to
2  page seven, the response to Interrogatory Number 17.
3  It says there that Nancy Koch, who we previously
4  discussed, met with Robert Agel of defendant Coastal
5  Title after the claim was received. And you said --
6  I never asked this specific question. Did you see
7  any notes in the file from Miss Koch's meeting with
8  Mr. Agel?
9      A.   I did not.
10     Q.   Did you discuss Miss Koch's meeting with
11  Mr. Agel as part of your preparation for this
12  deposition?
13     A.   I did not.
14     Q.   Do you know what the purpose of Miss
15  Koch meeting with Mr. Agel was?
16     A.   I would be speculating.
17     Q.   Again, I would ask you not to do that.
18  Miss Koch, though, was involved in the investigation
19  on behalf of Commonwealth?
20     A.   She was agency counsel.
21     Q.   What does that mean?
22     A.   She would be the underwriting counsel
23  that dealt with the agents. I think she was also the
24  agency manager. Actually this was Commonwealth.
25  Right? But it was '97. Yes. So she would have --

### Page 40

1  initially she was underwriting counsel for one brand,
2  but after '94 she was for Commonwealth as well. So
3  she was underwriting counsel, and she was also, I
4  believe, the agency manager. So she would have the
5  relationship with the agent and would be the one who
6  monitored that relationship.
7          So I imagine if a claim came in,
8  obviously she would be advised or aware of it, and I
9  think she was aware of this already from prior
10  articles and information in the papers. So whether
11  she went to meet with him -- again, I'm speculating
12  what exactly the purpose of that.
13     Q.   Okay. And you said there were documents
14  received from Coastal. What were those documents?
15     A.   We were requesting their files for the
16  transaction, you know, the title insurance file.
17     Q.   And so -- do you know if you received
18  all of the files from Coastal?
19     A.   I believe we received most of the files.
20  I'm not sure -- I'm not sure -- I think we received
21  most of them. I'm not sure all of them are in my
22  possession or some of them are. I guess others may
23  have been deposited in whatever the repository, I'm
24  not sure, but I believe that we got the majority of
25  them.

### Page 41

1      Q.   Did you get any other documents from
2  Coastal besides the files related to the loans?
3      A.   Not to my knowledge.
4      Q.   And then the next section of
5  Interrogatory 17 says that Virginia Moran of
6  Commonwealth and Mr. Kott and Mr. McGowan met with
7  Mr. Skowrenski and his attorney, Mr. Schottland.
8  What was the purpose of those meetings?
9      A.   I am assuming this was litigation, but
10  again I wasn't there at the time this happened and I
11  don't believe -- so I think this was in connection
12  with the Skowrenski litigation. It says -- at least
13  it says that in the answer to the Interrogatory.
14     Q.   At Mr. Skowrenski's deposition he
15  testified that that litigation was settled by Coastal
16  Title and Commonwealth for, I believe he testified, a
17  total of $300,000, with Coastal Title paying $250,000
18  and Commonwealth paying 50,000. Is there anything in
19  Commonwealth's files dealing with the Skowrenski
20  litigation?
21     A.   There's information with respect to
22  Commonwealth's settlement and the settlement for
23  50,000. I don't recall seeing anything about
24  Coastal's. That amount is new to me. If there was
25  something there I didn't see it in the file.

11 (Pages 38 to 41)

VERITEXT REPORTING COMPANY

212-267-6868                                            516-608-2400

9ce207e6-66a4-4035-b780-e65560fc2075

D. SULLIVAN

Page 42

1      Q.    Would Commonwealth normally see in its
2  files a settlement by one of its agents if
3  Commonwealth was also involved in the litigation?
4      A.    If it was all part of the same
5  settlement agreement?
6      Q.    Yes.
7      A.    I think -- I am assuming -- I think the
8  settlement agreement is in there so these must have
9  been separate agreements. I am assuming, because I
10  don't think it was part of the documents that I read.
11  So that would be a different circumstance. Obviously
12  if it was all one, it would be in there.
13      Q.    And Commonwealth has retained all of the
14  documents relating to the Skowrenski litigation or
15  settlement?
16      A.    Again, there's a file for that and
17  whether that's all of them, you know, I have to
18  guess.
19      Q.    You don't know at this point?
20      A.    Yeah.
21      Q.    When was that settlement?
22      A.    I don't recall the year.
23      Q.    Okay. Do you know why Commonwealth
24  settled with Skowrenski and his company, NHF, or
25  National Home Funding?

Page 43

1      A.    I would be speculating again.
2      Q.    There's nothing in the file that would
3  inform your answer?
4      A.    I don't recall that I've seen anything
5  that documents why. I mean, obviously it's an amount
6  that's worth some compromise just for the expense of
7  the litigation. If there's other things, you know, I
8  don't know.
9      Q.    Okay. As part of your preparation did
10  you review the title policies or closing protection
11  letters?
12      A.    Not all of them obviously, but I've
13  looked at -- I've looked at commitments, closing
14  service letters. I'm not sure I found policies
15  actually. I guess there are policies issued on some
16  of them and -- maybe in some of the files, but most
17  of the files that we had handy were the unrecorded
18  document claims. They only had commitments in them.
19      Q.    Did you look at any of the other loan
20  files that Walsh Securities had provided?
21      A.    I don't think we have the loan files in
22  our possession any longer. I know they were produced
23  at some point, but we have a series -- we have
24  several, several, maybe 15 boxes that we have been
25  trying to go through, but I don't think the loan

Page 44

1  files are all there.
2      Q.    Okay. And so how many loan files, not
3  the number, by type, does Commonwealth have? You
4  said Walsh Securities had produced some. You said
5  you had received loan files from your agent, Coastal
6  Title.
7      MR. KOTT:  That's not correct. Not loan
8  files.
9      Q.    Sorry.
10      MR. KOTT:  Agency files.
11      Q.    Agency files. Did you receive any other
12  files or docs Commonwealth have any other files
13  relating to these, I'll say, mortgages at issue in
14  this suit?
15      A.    That's the only other source of files
16  that -- from outside parties that we would have had.
17      Q.    You received. Okay. Going back to
18  Exhibit 2, do you know if anybody other than Miss
19  Moran and counsel participated in answering those
20  Interrogatories?
21      A.    I don't know.
22      Q.    This may be difficult but going back to
23  1996, '97 time frame could you explain the structure
24  of Commonwealth?
25      A.    As far as like the hierarchy in the

Page 45

1  claims department or what kind of structure?
2      Q.    In the company. Like which department
3  issued --
4      A.    How we do business?
5      Q.    How you do business.
6      A.    For New Jersey?
7      Q.    For New Jersey, which I assume is
8  different than other parts of the country.
9      A.    I can't speak for other parts because I
10  didn't have exposure to other parts when I was at
11  Commonwealth, but if you're talking about the state
12  structure, there was a state manager and then there
13  was the agency manager and underwriting counsel and
14  they would have support staff.
15      Q.    What did the underwriting counsel do?
16      A.    They might advise the agents or the
17  branches if there were -- if there was a new case or
18  law, you know, that required us to do something
19  different in our underwriting practices, or maybe
20  some types of state regulations for agencies. I
21  guess anything that might have changed that way. So
22  they would update them on things that they should
23  know. They may send out reminder memos. You know,
24  if you see a certain thing is becoming an issue, to
25  remind agents to do a certain practice. If there

12 (Pages 42 to 45)

D. SULLIVAN

Page 46

1  were changes in recordings or affidavits or, you
2  know, whatever, they would want to keep them advised
3  as to how they should be conducting that part of the
4  business.
5          They also provided assistance if an
6  agent or a branch was underwriting a deal that had
7  some kind of questionable matter, whether to insure
8  or how to work with an issue to protect the company
9  and provide insurance, they would discuss that with
10 underwriting counsel. Underwriting counsel usually
11 had to review high liability. Agent usually had an
12 authority limit. If it was above that they would
13 have to get underwriting counsel to approve before
14 insuring that transaction. I think those are --
15     Q.    The basic job functions?
16     A.    Functions, yeah.
17     Q.    Does Commonwealth have any records of
18 communications between -- I won't say generally, but
19 Coastal Title Agency and its underwriting counsel in
20 1996, 1997 time frame?
21     A.    I didn't ask that question. They may
22 have -- I think they have files on each agent and
23 that may deal with agency agreement issues. I'm not
24 sure what would be in that file. As I said, I think
25 for underwriting type memos, I'm not sure that they

Page 47

1  would put that memo in each agent file, that they
2  would keep that more centrally since it went to
3  everyone. So I'm not sure what would be -- I'm sure
4  the agency agreement and certain maybe audit issues
5  or things that pertain particularly to that agent
6  might be in a separate file.
7      Q.    And you had previously testified that
8  there was an agency agreement between Commonwealth
9  and Coastal Title.
10     A.    I don't know if I testified but yes,
11 there was.
12     Q.    I thought you had said that in passing.
13     A.    Okay.
14     Q.    And as we've seen it, the agreement is
15 from 1989?
16     A.    Yes.
17     Q.    Was that agreement ever amended?
18     A.    I believe there might have been a
19 change. It might have been -- I don't know if it was
20 to premium. There might have been. I would have to
21 go back and look. I have retained something from one
22 of the national offices that collects that
23 information for each agent. There was no, like,
24 substantial change to -- you know, as partners or
25 anything like that I saw. It was pretty much

Page 48

1  using that existing '89 agreement.
2      Q.    So that's still in effect today?
3      A.    Yeah.
4      Q.    With maybe -- I believe you had -- an
5  Annex A was a split.
6      A.    You have seen it.
7      Q.    It was -- Mr. Kott produced that.
8      A.    I think that's the limit of what I've
9  seen.
10     Q.    So other than that agreement --
11     A.    Right. I separately contacted the
12 department now that collects the agency agreement
13 files, not the entire file that might be locally, but
14 with respect to agreements, termination letter, stuff
15 like that I have.
16     Q.    And so Commonwealth continues to use
17 Coastal Title as its agent today?
18     A.    I don't believe so. There was a
19 termination letter in 2000 in the file. I believe it
20 was 2000. I would have to check the year. It could
21 have been later than that. It could have been 2004.
22 I would have to check but I saw a termination letter.
23     Q.    And Coastal Title has never been
24 reinstated?
25     A.    It was not in the material that was

Page 49

1  given to me. I could search -- I don't know if they
2  write for one of our other brands. It would be a
3  search of a different...
4      Q.    Did the termination letter say why
5  Coastal Title was terminated?
6      A.    I think it was a mutual termination.
7  There was no stated reason. Well, it's hard to
8  remember. I've read a lot of material in the last,
9  you know -- I would have to look. I don't think it
10 was a cause-type termination. It could have been low
11 remittances, something like that.
12     Q.    Does Commonwealth still have a copy of
13 the termination letter?
14     A.    Yes.
15     Q.    Going back to Commonwealth and 1996,
16 1997, which department issued -- which may not be the
17 right word and feel free to correct me -- title
18 policies and closing protection letters?
19         MR. KOTT: Object to the form.
20     A.    Of the company, the company?
21     Q.    Of the company.
22     A.    The company doesn't issue unless they
23 have a branch office that's dealing directly with
24 writing insurance. Talking about does the agent
25 produce the policy?

13 (Pages 46 to 49)

D. SULLIVAN

Page 50

1    Q.    Policy, right.
2    A.    Closing service letter.
3    Q.    And what department within Commonwealth
4    dealt with the agent such as Coastal Title who
5    produced policies and closing protection letters?
6    A.    Like agency department or the agency
7    manager.
8    Q.    That's what it was called?
9    A.    Yeah, I guess that would be Nancy Koch's
10   operation that would have...
11   Q.    Which department within Commonwealth
12   received payments or payments of premiums for either
13   title policies or closing protection letters?
14   A.    I believe from what I've read that they
15   may have been sending those payments to -- they have
16   an office in I think Louisville, National Processing
17   Center.
18   Q.    Kentucky?
19   A.    Kentucky, yeah.
20   Q.    Louisville, Kentucky.
21   A.    From what I read it looks like that they
22   were sending -- that sometimes they would either send
23   a copy of the policy and maybe NPC would invoice
24   them.  This is not the part of the business I was or
25   am really familiar with.  Obviously it's credited to

Page 51

1    the agency department in New Jersey, but it sounds
2    like it might have been remitted through a central
3    office.
4    Q.    How did Commonwealth know, or maybe
5    track is a better word, what policies or closing
6    protection letters were issued by Coastal Title
7    Agency?
8    A.    I'm trying to remember from some things
9    that I read.  I'm not sure if NPC actually sent out
10   numbered forms or whether just jackets were
11   distributed.  Usually there's some numbering of the
12   policy that they have to account for.  For instance,
13   if you terminate an agent they go back and collect
14   those jackets.
15   Q.    What do you mean by jackets?
16   A.    Policy jacket that has standard terms
17   and conditions, exclusions, covered risks that the
18   commitment or the then later policy are inserted into
19   a jacket usually.
20   Q.    And those jackets had individual numbers
21   on it?
22   A.    That's my belief at that time.  I'm not
23   sure when things got computerized.  Things evolved,
24   but I know there had to be a way, I guess, to track
25   policies and remittances.

Page 52

1    Q.    That's what we have been trying to
2    determine.  Part of it we're having a dispute with
3    counsel about production of documents which are
4    Commonwealth's documents.  Their title policy, their
5    commitments, their closing protection letters and
6    they're issued by -- or I guess it's more proper,
7    they're issued in the name of Commonwealth?
8    A.    Commonwealth doesn't actually -- if they
9    have produced a form, they don't issue the policy.  I
10   believe that policies could be sent to NPC.  I think
11   the only way, at least when I was there, that you
12   could access them is if you actually knew the policy
13   number.  It doesn't apply to commitments.  I probably
14   don't have all the answers on how they track that.  I
15   know in the old days they would be numbered, and you
16   would want to go in and get an accounting for those
17   jackets if you terminated someone and retrieve them.
18   Q.    So you're saying, though, Commonwealth
19   did not know what commitments Coastal Title would
20   issue, you would --
21   A.    For instance, would the manager in New
22   Jersey know what they wrote last month?
23   Q.    Right.
24   A.    They might have seen remittances.  I'm
25   sure they had to track their income, but would they

Page 53

1    know that they issued a policy on X property?  They
2    would not be seeing any of that information.  Now,
3    whether an actual policy was stored in Louisville
4    submitted by the agent, it's possible, but it was not
5    being reviewed or necessarily seen by anybody.  We
6    don't see all the agents' commitments as they write
7    them or even after they write them.
8    Q.    So when is the first time that
9    Commonwealth would know that a title policy had been
10   issued by one of its agents?
11   A.    Probably when they remitted their
12   premium we would know that something --
13          (A discussion takes place off the
14   record).
15   Q.    When was the first time Commonwealth
16   knew that its agent, Coastal Title, had issued a
17   title insurance policy or closing protection letter?
18   A.    On a particular transaction?  Obviously
19   they knew they were issuing them as a regular --
20   Q.    Event.  Right.
21   A.    They remitted a certain amount and we
22   wouldn't in the normal course of business ever have
23   those come into a local office or, you know, watch,
24   you know, what specifically they're insuring or
25   there's not that type of oversight of every

D. SULLIVAN

Page 54

1  transaction by the underwriter.
2      Q.    Okay.  So in some cases if they didn't
3  know -- well, would the underwriter, the Commonwealth
4  underwriter, know what specific properties the title
5  either policy or closing protection letter was issued
6  on?
7      A.    At that time, no.
8      Q.    Okay.  So the first time --
9      A.    Other than it might have been deposited
10 again in that Louisville office, which is probably
11 just a collection site and not somebody reviewing
12 them.
13     Q.    And I have been asking the questions as
14 title policy and closing protection letter.  Was
15 it -- it's the same process for the closing
16 protection letter as the title policy?  The $25 would
17 be remitted for the closing protection letter?
18     A.    It would.  I'm not sure that they were
19 collecting those letters at the time.  I think I read
20 something maybe they later actually assigned
21 numbers to closing service letters, but I'm not sure
22 of that.  So something might have changed with
23 tracking them.  Again, you're not going to see
24 oversight by them by a local office.
25     Q.    Of individual letters?

Page 55

1      A.    Certainly the cost, the $25 charge
2  should have been remitted.
3      Q.    Why was that cost $25?
4      A.    That was -- from what I've read that was
5  what was approved by the State of New Jersey.
6      Q.    And have they ever modified that or
7  increased the amount?
8      A.    Not to my knowledge.
9      Q.    Off the record.
10            (A discussion takes place off the
11 record).
12     Q.    And then which department within
13 Commonwealth would process claims?
14     A.    The claims department.
15     Q.    Okay.  Some of them are going to be
16 easy.  And where was the claims department for
17 Commonwealth in 1996, 1997 that would handle claims
18 from New Jersey?
19     A.    In 1996, 1997 it was in Parsippany.
20 Well, it was always in Parsippany but two different
21 sites, but during '96, '97, it was at the same site
22 where the state manager and agency manager were
23 located.
24     Q.    So at that point the agency manager was
25 co-located with the claims?

Page 56

1      A.    They were in the same office.
2      Q.    And you were actually during that time
3  counsel to both the state manager, the --
4      A.    When -- let's see, no.  When I first
5  started -- maybe I'm getting you confused.  In '96,
6  '97 my only role was state claims counsel.
7      Q.    Just claims counsel?
8      A.    By that point.  It had changed in '94.
9  I didn't do underwriting after May or June of -- am I
10 getting the year right?  '94.  Then I went strictly
11 claims.
12     Q.    Did Commonwealth have direct branches
13 that dealt with individual consumers?
14     A.    They did.
15     Q.    Did they have any in New Jersey?
16     A.    Yes.
17     Q.    Why did you also use agents?
18     A.    I don't know the answer to that.  I
19 mean, I'm sure -- you know, some business reasons,
20 financial.  But...
21     Q.    One of the agent's responsibilities was
22 getting customers for title policies issued by
23 Commonwealth?
24     A.    Remitting premium.
25     Q.    Remitting premium.  Okay.  That's what I

Page 57

1  was getting at.  I wanted to -- I knew there was a
2  bottom line to it.
3      A.    It's a business.
4      Q.    And then could you explain how the
5  process of title insurance is ordered?
6      A.    In the branch or agency situation?
7      Q.    In this case we will limit it to New
8  Jersey in 1996, '97 with an agent like Coastal Title.
9  Not that Marty is the agent but I was pointing in
10 that direction.
11     A.    I think in most instances, and I'm
12 trying to think Coastal because it varies north,
13 south also.
14     Q.    Coastal was considered north?
15     A.    Given that they had Coastal service
16 letters here, and I think the usual source of
17 business is going to be attorneys that do real estate
18 transactions, and the agent will be out trying to
19 solicit business or develop relationships with
20 attorneys so that they have a source of business
21 and --
22     Q.    And these attorneys, do they have to
23 be -- what I've seen on the letters are approved
24 attorneys?
25     A.    Well, I think that term has been

VERITEXT REPORTING COMPANY

D. SULLIVAN

Page 58

1  dropped.  I don't think we refer to them as approved
2  attorneys any longer, but there are certain, I guess,
3  requirements before you can issue a closing service
4  letter to an attorney but they're pretty basic.  They
5  have to be admitted in New Jersey, they have to be
6  not on -- we have an unapproved list for attorneys
7  that, you know, have -- you read the Law Journal and
8  if they have been disbarred or suspended, you know,
9  we add them to the list, or if we have had some
10  other, I guess, negative relationship with them we
11  can choose not to do business with them.  And so they
12  shouldn't be issuing anything to those people.  You
13  know, there are certain parameters for transactions
14  that go along with what they should be issuing a
15  closing service letter, but for the attorney
16  themselves, if they're a member of the bar and, like
17  I said, in New Jersey, you know, familiar with
18  closings in New Jersey, it's a pretty basic
19  requirement, standard.
20      Q.   Did the attorney have to apply to be --
21  I know you don't say approved anymore but back in
22  again '96, '97, how did an attorney --
23      A.   I don't believe there was an application
24  per se or a form or there's not a submission to the
25  underwriter.  They know that -- the agent should know

Page 59

1  that these are the qualifications that -- you know,
2  obviously they have to be a member of the bar.
3      Q.   So back in again 1996, '97, Commonwealth
4  had an unapproved list.  Did it have an approved list
5  of attorneys?
6      A.   No.
7      Q.   Is there an application now for
8  attorneys to be approved?
9      A.   Not to my knowledge.
10      Q.   And so the attorney would then contact
11  the closing or the title agent to obtain title
12  insurance?
13      A.   Yeah.  Usually if they deal -- they
14  already had a relationship with an agent and they got
15  a closing transaction they needed insurance for, then
16  they would usually submit -- often agents would have
17  an order form.  If they were dealing regularly with
18  someone, they would complete an order form or they
19  may call them on the phone.
20      Q.   And then who would order the title
21  commitment?  Would it be the attorney or the closing
22  agent?
23          MR. McGOWAN:  Let me object to the form
24  of the question only because I don't know that you --
25  I don't know that anyone in the north Jersey practice

Page 60

1  considers a title agency the closing agent.  You
2  follow what I'm saying?  Maybe in south Jersey but
3  not up here.
4      Q.   Let me rephrase the question.  So who
5  would order the title commitment initially?  The
6  attorney or the title agent in north Jersey?
7      A.   Well, if you're referring to the
8  commitment, if you're referring to the contract for
9  insurance, it's the attorney that's requesting that
10  on behalf of his client.
11      Q.   Who would request the closing protection
12  letter?
13      A.   Usually the lender would require that.
14      Q.   And how was the -- who would then -- I
15  know the closing protection letter, at least the ones
16  we have seen, were prepared by the title agent.
17          MR. McGOWAN:  Object to the form of that
18  question.  They may have been signed by the title.  I
19  don't know who prepared them.  It might be a form,
20  for example.
21      Q.   You previously testified that on August
22  first, 1994, the closing protection letters were
23  changed?
24      A.   Yes.
25      Q.   And it was a new form, I think you said,

Page 61

1  that was approved by the State of New Jersey.  And
2  so --
3      A.   Do I have the right year?  I'm afraid
4  with all these years.
5      Q.   You do.
6      A.   '94?
7      Q.   Yes.
8      A.   Okay.
9      Q.   If you know.  I am not here to trick
10  you.  You got enough people, if it's off and it's
11  significant they're going to say something.  Was that
12  form, the closing protection letter in 1994, ever
13  modified?
14      A.   After '94?
15      Q.   After '94.  Actually let me just --
16  could it be modified by a title agent?
17      A.   It should not have been.  It was a filed
18  form so...
19      Q.   And could it have been modified by a
20  closing attorney?
21      A.   It should not have been.  They didn't
22  have authority to do that.
23      Q.   Okay.  And authority as Commonwealth's
24  agent?
25      A.   Who?

16  (Pages 58 to 61)

D. SULLIVAN

Page 62

1    Q.   The closing -- the title agent. I keep
2  saying closing. I mean Coastal. I am trying to
3  limit it to this case.
4    A.   Right. There's a form that the company
5  filed with the state. So the agent would not have
6  authority to authorize changes to that.
7    Q.   Okay.
8    (A recess takes place.)
9    Q.   Miss Sullivan, following up from a
10 couple of earlier questions, what were the agency
11 manager's responsibilities at Commonwealth in '96,
12 '97 time frame?
13   MR. McGOWAN: The Commonwealth agency?
14   Q.   Commonwealth agency manager.
15   A.   I am speaking in kind of general terms
16 because it's not a job I ever held but again I
17 think --
18   Q.   Again, I am just asking your testimony
19 on behalf of the company.
20   A.   Right. I think they navigate the
21 relationship with the agent and, you know, they're
22 going to deal with issues with the agency agreement
23 or splits or whether they're getting enough money or,
24 you know, doing enough business, whether -- trying to
25 think. They may coordinate -- I think they have

Page 63

1  audits. Maybe yearly they would have an audit, and
2  I'm sure they were involved, or at least I think --
3  maybe it was a separate department, but I am sure it
4  was coordinating with the agency manager because
5  Nancy kind of wore two hats. She probably did some
6  underwriting, but as the manager function I think
7  that's...
8    Q.   Did Commonwealth maintain records of
9  audits it conducted of title agents?
10   A.   I imagine they -- have I seen them, no,
11 but I imagine that they would keep agent audit
12 records.
13   Q.   What did the audits consist of?
14   A.   I'm not sure when they were instituted
15 or when they ended year-wise, time-wise, but I think
16 they usually did what they called a substantive audit
17 where they might pull a few files and just look at
18 them for underwriting, I guess, and then I believe
19 later -- I'm not sure at this time but -- I'm not
20 sure when that was instituted, but I think they had
21 some actual financial auditors to look at the
22 accounting.
23   Q.   Of the agency?
24   A.   Yeah.
25   Q.   What was involved with looking at the

Page 64

1  underwriting of the -- that you said was done as part
2  of the audit?
3    A.   Again, I'm kind of speculating on these
4  things, but probably -- I would imagine they would
5  look at searches, see how things were raised, the
6  exceptions were raised in the commitment and just I
7  guess quality of underwriting.
8    Q.   So did they actually look at the title
9  agent's files?
10   A.   Just a small sample.
11   Q.   And then you said that one of the
12 responsibilities of the agency manager was to look at
13 remittances. Were there quotas or goals that the
14 title agents had to produce for Commonwealth each
15 month or each year?
16   A.   Again, that probably changed over time
17 and I'm not sure, you know, if -- what might have
18 been a goal. Obviously we want them to remit some
19 business to be worth the servicing of that agent and
20 providing them with underwriting services and
21 everything else but I don't know of any specific
22 quotas.
23   Q.   Okay.
24   A.   Or that any were actually given to an
25 agent at that time. I mean, you know, this is going

Page 65

1  to be an overview of the relationship rather than
2  setting a specific quota.
3    Q.   Does Commonwealth set quotas for agents
4  now?
5    A.   I don't think it's fashioned in that
6  way, like a quota.
7    Q.   Is there an expectation that an agent
8  remit so much money per month or year?
9    A.   Well, I think they have streamlined some
10 of the agency operations, and probably one of the
11 bases for eliminating some were low remittances.
12   Q.   I think that's -- is that what you had
13 testified earlier about the termination of Coastal
14 Title was for low remittances?
15   A.   I said that was a possibility. I think
16 there was something in the termination letter and I
17 didn't recall what. I didn't think it was like
18 substantive for cause about of -- it was either just
19 amicable or possibly for low remittance. I don't
20 know. I think they wrote for more than one company.
21   Q.   Was there a bright-line rule in
22 Commonwealth about how much each title agent had to
23 remit?
24   A.   I am not aware of one.
25   Q.   So how would you determine that an agent

17 (Pages 62 to 65)

D. SULLIVAN

Page 66

1  had low remittances?
2      A.   Well, I think you could still have an
3  idea of what you're getting from different agents and
4  whether it's worthwhile maintaining this relationship
5  and servicing the forms and underwriting other
6  information for you know what your return is.  I just
7  don't know if there was any set number.
8      Q.   And I think earlier when I asked who you
9  had spoken to to prepare for the deposition you said
10  you had contacted two people via e-mail in
11  accounting.
12      A.   Correct.
13      Q.   And why did you contact those people?
14      A.   In your list of questions you had asked
15  questions about the -- what the profits were for '96
16  and '97.
17      Q.   Right.
18      A.   And you had asked I think maybe profits
19  on the particular transactions.  I'm paraphrasing.  I
20  would have to look at your subpoena for the actual
21  wording.  So I contacted someone who would -- gave me
22  income statements for '96 and '97 for Commonwealth.
23      Q.   Did you speak to anybody who -- and I'm
24  not sure what Commonwealth would call NPC now.
25      A.   No, I am not even sure if NPC even

Page 67

1  exists.  I'm not sure if that was kept when we bought
2  them.
3      Q.   Okay.  What does that stand for?
4      A.   I believe it's National Processing
5  Center.
6           (A discussion takes place off the
7  record).
8      Q.   And earlier you said there were
9  parameters -- sorry I'm jumping around a bit -- with
10  closing protection letters?  I think I had asked the
11  question of who orders the closing protection letter
12  and you had said:  Well, the lenders require it, but
13  you said there are -- I believe you said there were
14  parameters.
15      A.   Yeah.  Again, I don't know the time and
16  I haven't memorized every factor.  I think there was
17  a later memo, which actually wasn't from Commonwealth
18  but related companies, that outlined some, but there
19  are certain things, like, it's supposed to be for a
20  single transaction.  We don't issue blanket letters
21  for an attorney to close anything.  You know, it has
22  to be a specific transaction.  Has to be to a lender
23  who has received a commitment.  We don't issue them
24  to usually non-institutional lenders, like a seller
25  take-back, we don't give the seller a closing service

Page 68

1  letter.
2           I'm trying to think of a few other
3  things.  But anyway there are some situations where
4  we don't give the lender's counsel -- if the lender
5  has its own counsel, we don't approve their own
6  attorney or, you know, that's their own counsel,
7  they're responsible for their own counsel's actions.
8  So there's certain requirements, that they be a New
9  Jersey attorney, more specifics, the type of
10  transaction that we would issue.
11      Q.   Are these requirements listed anywhere?
12      A.   Again, I haven't found a memo for the
13  time frame that you're talking about.  In speaking --
14  I think Gary Hamm may have given me a later Lawyer's
15  Title memo, which he thought at that time
16  Commonwealth and Lawyers were part of the same
17  family.  So there may have been a similar memo for
18  Commonwealth.  So, again, that's a guess, but it gave
19  me some of the parameters or refreshed my memory from
20  long ago, and we knew there were certain rules for
21  issuing those letters.
22      Q.   And Commonwealth still has that memo you
23  said?
24      A.   Lawyer's Title.
25      Q.   Lawyer's Title.  Okay.  That's the

Page 69

1  documents that are on loan?
2      A.   That memo, I just got a copy of that
3  memo from Gary Hamm in New Jersey.
4      Q.   Okay.  So you have that memo now?
5      A.   I have that memo.
6      Q.   Who then would order the closing
7  protection letter?
8      A.   Well, the attorney requesting insurance
9  under the usual scenario requested a commitment, and
10  an institutional lender will usually require a
11  closing service letter.  So I think that the agency
12  probably prepared them with the commitment and issued
13  them together.  An attorney may have requested it,
14  but I think it was something that an institutional
15  lender would require.
16      Q.   Who paid for the closing protection
17  letter?
18      A.   Well, it was part of the invoice given
19  and paid by the purchaser, I guess, or if it was a
20  refi, it would be the borrower.
21      Q.   And that's why I guess as I've gone
22  through files there are checks from the closing
23  attorneys, either Stanley Yacker or Anthony Cicalese,
24  to Coastal Title Agency because the premiums were
25  actually paid from the transaction to the title

18  (Pages 66 to 69)

D. SULLIVAN

Page 70

1  agency?
2      A.   Correct.
3      Q.   And then the title agency would remit
4  the premiums?
5      A.   A portion.
6      Q.   A portion?
7      A.   Our split, and maybe for the closing
8  service letter that $25 fee came to us.
9      Q.   That' what my next question was going to
10 be.  Did the title agent ever retain any portion of
11 the $25 fee for the closing protection letter?
12     A.   I believe I read something that they
13 were not supposed to keep.  The agent was not to keep
14 the 25.  That that was a basically for risk and that
15 was supposed to be fully remitted to the company.
16     Q.   Is the closing protection letter then a
17 separate type of insurance?
18     MR. McGOWAN:  What was that again?
19     Q.   Is the closing protection letter a
20 separate type of insurance?
21     A.   It's kind --
22     Q.   I don't know if that's the right
23 terminology.
24     A.   I don't know what "separate" is either.
25 I mean, it's issued in conjunction with the

Page 71

1  commitment.  There's a requirement that it be issued
2  where there's a commitment issued.  It can't be
3  issued independently without a commitment.  So it has
4  some relationship and tie to the commitment.  There
5  is a separate charge for it.  It does have separate
6  coverages that wouldn't be found under the
7  commitment.
8      Q.   Okay.  Just off the record.
9          (A discussion takes place off the
10 record).
11     Q.   You had also said earlier that the
12 closing protection letter is -- was a standard
13 state-approved form.  Correct?
14     A.   Yes.
15     Q.   Was there any difference in the language
16 used by -- for closing protection letters for
17 subprime mortgages as compared to a conventional
18 mortgage?
19     A.   There's only one form of letter at a
20 given time for any loan transaction.
21     Q.   So there wasn't any difference whether
22 it was subprime or jumbo or conventional?
23     A.   No.
24     Q.   Earlier you said you had reviewed
25 different files preparing for the deposition.  Do you

Page 72

1  know if Commonwealth ever made a decision not to
2  provide either title insurance or a closing
3  protection letter on any of the loans that Walsh
4  Securities has at issue in the lawsuit?
5      MR. KOTT:  Object to the form.  I have
6  no idea what you're asking.  I don't know whether
7  that was a valid objection.  I don't understand your
8  question.
9      Q.   The question -- do you understand the
10 question, Miss Sullivan?
11     A.   I think you're asking a question about
12 all the transactions that had already closed and for
13 which you already made claims on the letters.  Right?
14     Q.   Correct.  My question was:  In reviewing
15 the documents at Commonwealth, did you ever come upon
16 an -- I'm not sure that you would even see this, but
17 a loan that Walsh had funded in which Commonwealth
18 had decided or Coastal Title had not agreed to
19 provide either title insurance or a closing
20 protection letter?
21     MR. KOTT:  Objection to the form.
22     A.   I guess I'm trying to understand it.  So
23 you're saying did we --
24     Q.   Ever decline --
25     A.   -- object to issuing a letter and that

Page 73

1  they -- somebody issued the letter anyway and thereby
2  giving rise to your claim?
3      Q.   No.  What I was asking was actually in a
4  broader context was:  In preparing for the deposition
5  did you ever find any documents, letters that
6  Commonwealth declined to issue a title insurance
7  policy, commitment or a closing protection letter?
8      MR. KOTT:  Object to the form.
9      Q.   To any of these -- again, I only care
10 about the loans that were underwritten by Walsh
11 Securities.
12     A.   I don't recall seeing any, no.
13     Q.   Okay.  And then presumably the
14 information you obtained in your investigation or
15 through the litigation -- and by the information I'll
16 focus in on the loan files, did you review the loan
17 files from Walsh Securities?
18     A.   Did I for the purpose of this?
19     Q.   Deposition.
20     A.   No.
21     Q.   Did you review the agency files that
22 Commonwealth had received from Coastal Title for this
23 deposition?
24     A.   I glanced at a couple of them that were
25 attached to the files that I may have either done

19 (Pages 70 to 73)

D. SULLIVAN

Page 74

1  something with -- unrecorded documents or I pulled a
2  couple and just glanced at them for one reason or
3  another.
4      Q.   Do you remember what the property
5  addresses were?
6      A.   No.
7      Q.   How many files?  Maybe how many files
8  did you glance at?
9      A.   Maybe five.
10     Q.   Do you recall if those files had closing
11 protection letters in them?
12     A.   In the Coastal file?  I think they did
13 but I can't say all of them and I -- I believe there
14 were letters in some.
15     Q.   Where else would Commonwealth get the
16 closing protection letters in a case of a litigation
17 like that which Walsh has filed, because I think you
18 had said earlier you guys -- by "you guys" I mean New
19 Jersey sense, Commonwealth didn't receive the title
20 insurance, the commitments or the closing protection
21 letters, you just received a portion of the premiums
22 that were remitted?
23     A.   I know some of the policies may have
24 been sent to NPC.  I don't know if any closing
25 service letters were -- that's something I don't know

Page 75

1  the answer to.  They would not have been sent to
2  somebody in the New Jersey agency department.
3      Q.   So Commonwealth would have had to get
4  the letters from outside of itself?
5      A.   Yeah, I am just not sure -- I'm not sure
6  whether that is a function that NPC performs or not.
7  That would be something I would have to ask.
8      Q.   Well, that was going to be my next
9  question.  Who would you ask to determine that?
10     A.   Well, I guess I would find out if NPC
11 still exists and, you know, I might have to ask
12 around.
13     Q.   Well, I guess you wouldn't know until
14 you determine if NPC exists.
15     A.   I don't know.  You know, either somebody
16 who was involved in closing of the -- not even claim
17 centers.  I could probably ask Gary Hamm actually to
18 see if that's still the practice of the agents to
19 send stuff -- policies to NPC.  Are they still there?
20 Do they collect?
21     Q.   Actually I would ask if you could do
22 that.
23     A.   Okay.
24     Q.   Miss Sullivan, how does the title
25 insurance policy relate to the closing protection

Page 76

1  letter?
2      A.   The policy?  Well, the policy has the
3  named covered risks, you know, and provides certain
4  protections and the -- I am not going to say closing
5  service letter because that's the term for the new
6  form.  The closing service letter provides certain
7  protections for functions that that closing attorney
8  performs so the coverages are different.
9      Q.   Is the closing protection letter
10 considered by Commonwealth a subset of the title
11 insurance policy or it's different, it covers
12 different risks?  Is what I'm understanding you to
13 say?
14     A.   Yes.
15     Q.   So are there different -- I don't know
16 how you would say it -- policies?
17     A.   Well, I think they could overlap because
18 the policy could, you know, insure priority of the
19 lien on the mortgage and the closing protection
20 letter is covering that function also, but the
21 closing service letter is issued while the commitment
22 is issued and sometimes the policy has not been
23 issued.  Maybe certain requirements for a policy set
24 forth on Schedule B-1 haven't been met yet or
25 whatever.  So the commitment -- if, for instance, you

Page 77

1  didn't record the mortgage, you haven't met a
2  requirement for the commitment, you're not entitled
3  to a policy until the commitments are met.  Then you
4  look to the closing service letter and see if that
5  provided the coverage for the closing attorney to
6  establish the first lien.
7      Q.   And that actually was going to be my
8  next series of questions.  How does the closing
9  protection letter, which is I guess now properly the
10 closing service letter, back then it was -- was it
11 the closing protection letter?
12     A.   I think pre-94 it was closing protection
13 letter.  Post-94, the new form, closing service
14 letter.
15     Q.   The -- how does the closing service
16 letter relate to the title commitment?
17     A.   Well, those are -- I think what I was
18 trying to do by example saying that the commitment
19 has certain requirements and if they're not met, then
20 we don't have to issue a policy and insuring, you
21 know, that your first lien when you haven't recorded
22 your documents.  But for the lender or certain
23 instances I guess the purchaser gets protection under
24 the letter, you know, we've covered the function of
25 that attorney for the purpose of establishing the

20  (Pages 74 to 77)

D. SULLIVAN

Page 78

1  lien priority, and if they haven't done that -- the
2  commitment terms had not been met but the claim is
3  really under the provision of the closing service
4  letter.
5      Q.    So if an attorney doesn't record the
6  note, the mortgage, the deed, you would proceed with
7  a claim under the closing service letter?
8          MR. HAYES: Object to the form. Again,
9  you're still talking about recording the note which
10 doesn't happen.
11     Q.    Say they don't record the deed or the
12 mortgage, the claim is then under the closing
13 protection letter?
14     A.    Yes.
15     Q.    And in your example, because the
16 documents haven't been recorded, the title insurance
17 policy should not issue?
18     A.    The terms of the commitment -- the
19 requirements of the commitment haven't been
20 satisfied. The commitment will require the recording
21 of the documents to establish the insured.
22     Q.    And how does Commonwealth know that the
23 requirements have been met to issue the title
24 insurance policy?
25         MR. HAYES: Let me object to the form

Page 79

1  again because Commonwealth is not issuing the policy.
2          MR. KOTT: Same objection.
3      Q.    So the policy is issued by the -- in
4  this case Coastal Title Agency. How does the
5  Commonwealth agent know that the conditions have been
6  met so it would issue the title insurance policy?
7      A.    Well, there are probably more than one
8  requirement set forth on that, but if we're talking
9  specifically for recording documents, usually the
10 attorney would let them know that the deal is closed
11 in some fashion by either remitting the premium,
12 providing affidavits or other things that may be
13 required, and then they should be doing a search of
14 the county records to pick up the recording
15 information for the new documents.
16     Q.    By "they" you mean the title agent?
17     A.    Yes.
18     Q.    And so once they've done the search to
19 pick up that the documents have been filed, then they
20 would issue the title insurance policy?
21     A.    Doing -- if all the other requirements
22 have been met, they would do that. The policy would
23 reflect the date of recording and the recording
24 information for the deed, if there's a deed, and for
25 the mortgage.

Page 80

1      Q.    And who then gets or who then would
2  receive a copy of the title insurance policy?
3      A.    I think the agent would probably send
4  the policy to the attorney who had requested the
5  insurance. Maybe sometimes the attorney may direct
6  him to send a lender's policy to them directly or
7  depending on how long it transpired between the
8  closing the policy, sometimes the lender would call
9  the agent directly. They may ask for the policy, but
10 I think in the normal course it would go back to the
11 attorney that had requested the insurance for
12 distribution to his client, the lender.
13     Q.    So when the lender received the policy
14 they would know that the conditions had been met,
15 that's why the policy was issued?
16     A.    I guess they would feel comfort that
17 they had the insurance that they had requested. So
18 they would, I guess, assume that everything was --
19 taken care of as far as exceptions and recording and
20 that we've removed whatever exceptions that they
21 expected to be removed, you know, following their
22 instructions, the lien satisfied, prior mortgages.
23     Q.    Okay. You said that Commonwealth
24 received a percent of the remittance I think were
25 your words. How was that or what was that

Page 81

1  percentage?
2      A.    My recollection was it was 80/20. We,
3  Commonwealth, received a 20 percent split. I know
4  the agency agreement will -- or if there was an
5  endorsement that would tell you that, but I believe
6  it was 80/20. I don't know if it was altered later.
7      Q.    Why did Commonwealth as the insurance
8  company only receive 20 percent since I would assume
9  the ultimate risk lay with them?
10         MR. HAYES: How much time do you have?
11         MR. McGOWAN: That's the million dollar
12 question. Off the record.
13         (A discussion takes place off the
14 record.)
15     Q.    Actually, Miss Sullivan, if we can go
16 back. Earlier you said -- I believe you testified
17 earlier that sometime after -- in 1998 you had
18 received correspondence from Stern Lavinthal and
19 Commonwealth had retained attorneys to deal with
20 unfiled documents. Who were the attorneys or
21 attorney retained by Commonwealth to handle those?
22     A.    David Golub at Williams, Cleary, Miller
23 & Otley, I think it was the firm name at the time.
24     Q.    Does Commonwealth still use Mr. Golub?
25     A.    The company now employs Mr. Golub. Not

21 (Pages 78 to 81)

D. SULLIVAN

Page 82

1  Commonwealth per se but I guess he's an officer of
2  Commonwealth too.
3      Q.    Going back to our discussion about what
4  I'm calling approved attorneys, which you say isn't
5  the term anymore, but did Commonwealth provide
6  guidelines to the attorney in conjunction with the
7  issuance of a closing protection letter?
8      A.    Did they provide guidelines to the
9  attorney to close the deal?
10     Q.    Right. Mostly I guess, as you said, the
11  closing protection letter was issued to protect the
12  lender, and you had said earlier that Commonwealth
13  had underwriting memoranda that it produced. Did any
14  of the underwriting memoranda, was any of it sent to
15  the closing attorneys to --
16     A.    No.
17     Q.    So all the underwriting memoranda
18  produced by Commonwealth went to its agents?
19     A.    Agents.
20     Q.    Did Commonwealth have any correspondence
21  with the closing attorneys?
22     A.    Not to my knowledge.
23     Q.    You said that at some point you,
24  Commonwealth, had a list of, I think you called it,
25  unapproved attorneys. Is Stanley Yacker -- or I

Page 83

1  guess let me ask that question first. Is Mr. Yacker
2  an unapproved attorney?
3      A.    You know, I almost checked on one of our
4  lists but I didn't check.
5      Q.    Okay. So do you know if Commonwealth
6  ever made a decision to -- I don't know how you --
7  what term -- what would you do to -- what process
8  would Commonwealth follow to decide that an attorney
9  was no longer approved? Let me ask it that way.
10     A.    Well, you know, as I said, they review
11  the Law Journal each week, they look for disbarred or
12  suspended attorneys to add to the list. I think if
13  we had a negative claims history or lack of
14  cooperation, we might choose not to do business with
15  an attorney and add them. I don't know specifically
16  whether these names were added. I know -- yeah, I
17  don't know -- I don't think I've seen anything to
18  that effect. I mean, I would have to look at a list
19  to see. I don't know if I would have a list from
20  back then.
21     Q.    Well, that was going to be my next
22  question. Do you know if the list is cumulative?
23     A.    I believe it's cumulative.
24     Q.    So once you're on you don't get off?
25     A.    Well, you know, I don't know that it's

Page 84

1  impossible. I mean, if you have been disbarred
2  you're not coming off. If you just had a very -- if
3  you were very uncooperative with the claims
4  department but turned around somehow -- I mean, it
5  would depend on the facts of that. It's probably
6  unlikely, but I would say it's not impossible. I
7  believe I've seen somebody come off, one or two.
8      Q.    So without having looked at the list,
9  can you tell me whether -- and I will just list
10  them -- Stanley Yacker, Anthony Cicalese, Richard
11  Pepsny or Mike Alfieri is disapproved?
12     A.    Without looking at the list I can't tell
13  you that, but if any of them were disbarred they're
14  probably on it.
15     Q.    So I think -- do you know if people who
16  turn their law license in would be -- or I don't even
17  know if that's a technical term.
18     A.    They have to be in the Lawyer's Diary to
19  be considered as an attorney. So if they have turned
20  in their law license they're probably not in the
21  Lawyer's Diary. So they probably come off that way,
22  not so much added on the unapproved list, but if they
23  weren't in the Lawyer's Diary they wouldn't be a New
24  Jersey attorney that they should be issuing a letter
25  for.

Page 85

1      Q.    Does Commonwealth still have an approved
2  list from the 1997 time frame or disapproved list,
3  I'm sorry?
4      A.    I don't know. I know the person that
5  maintained it is no longer with the company, but
6  whether those records are still in Parsippany I don't
7  know.
8      Q.    Okay. You could look at the current
9  list though to see if someone --
10     A.    I could ask for the current list. I
11  don't know if they have combined lists now for all
12  brands because I probably have the one issued by
13  Chicago and it may be for all brands so...
14     Q.    I would -- we will add that to our
15  letter.
16          Which function does the attorney
17  representing the purchaser in a real estate closing
18  perform for Commonwealth?
19          MR. HAYES: Object to the form.
20     A.    For Commonwealth? I don't know that
21  they're performing per se for Commonwealth. Are you
22  saying what functions are they performing that we may
23  have liability for under --
24     Q.    We can start with that, yeah.
25          MR. HAYES: Are you saying an attorney

22  (Pages 82 to 85)

D. SULLIVAN

Page 86

1  for the buyer who is also a closing attorney for whom
2  a letter has been issued?
3        MR. MAGNANINI: Yes.
4     A.    Okay. And the letter is issued to cover
5  a lender, so, you know, what you're supposed to be
6  doing, I guess, is complying with the lender's
7  instructions to the extent that they fall within the
8  approved -- I'm looking for a word. Paragraph one of
9  the letter, they have to establish the lien priority
10 of the mortgage, I guess the validity, so, you know,
11 you look to have -- they have to obtain the documents
12 to establish the validity and the priority of the
13 mortgage. I guess there's a second section that I
14 guess if there are funds that are supposed to come
15 back to the lender, I guess for whatever reason,
16 funds are supposed to come back to the lender, I
17 guess there's certain coverage for that. And
18 paragraph two, I think the fraud or misapplication of
19 the funds to the extent that they affect those
20 matters listed in paragraph one, which is the
21 validity and priority of the lien of the mortgage.
22 So they're very limited functions that we believe
23 that we have liability for.
24    Q.    So those -- are there any other -- let
25 me ask that -- functions that Commonwealth has

Page 87

1  liability for based on the actions of the closing
2  attorney?
3        MR. KOTT: Object to the form.
4     A.    I mean, I think it has to fall within
5  the -- those covered actions on the letter. So I
6  guess I would have to see or hear a function and see
7  whether it fits. If they didn't pay off a prior
8  mortgage, then they haven't established the lien
9  priority of the mortgage. Right?
10    Q.    Or the earlier example, they didn't
11 record the documents?
12    A.    Right.
13    Q.    I just have a few more general questions
14 on what is the kind of standard protocol for
15 investigating a claim at Commonwealth. Again, sorry,
16 back in '96, '97, trying to respect Mr. Kott's 13
17 pages of objections to the deposition notice.
18    A.    I haven't discovered any real -- if
19 you're looking for an itemized list, I haven't found
20 that. The claims manual, in fact, says that every
21 investigation is going to differ based on the facts
22 and the nature of the claim. They gave or suggested
23 things that you may want to look for. Look at the
24 agent's file, you know, look at a survey or map
25 relevant to this so -- but it was very general

Page 88

1  because obviously each claim is going to have
2  different issues and what you're looking for would --
3  may be different.
4        Obviously it says you get back to the
5  insured for things that you think you need that will
6  assist you in making a decision on coverage or
7  otherwise address it. Even if you think it's covered
8  you may need additional information from parties.
9  The claims are so diverse you don't have a strict
10 checklist.
11    Q.    Overall for all investigations?
12    A.    Right.
13    Q.    And then does the investigation --
14 Commonwealth's investigation cease upon the filing of
15 a lawsuit or does it continue? I don't think I had
16 asked you that before.
17    A.    Well, I am assuming we may still do some
18 review of things that we have in our possession, but
19 we have retained counsel. So counsel is kind of then
20 spearheading where we go with the case and getting
21 certain information. That's probably limited to what
22 we can get through discovery. Whether we're doing an
23 ongoing review of what is already in our possession,
24 you know, reviewing agent files or loan files, that
25 may be going on but...

Page 89

1     Q.    Does Commonwealth at the conclusion of
2  its investigation, whether it -- because there's a
3  lawsuit or it's done, does it produce a final report
4  or some sort of decision -- I am not sure again --
5     A.    For internal purposes you mean?
6     Q.    For internal purposes. I'm not sure
7  what your terminology would be.
8     A.    I'm trying to remember whether that
9  Commonwealth manual had a form or something and I
10 don't recall specifically. I mean, you know, what we
11 try to do today in the claims system, we call it a
12 closed claim brief. It's not going to be greatly
13 detailed but may give a little information on the
14 closing of the file. It's not something -- I mean,
15 it's an internal suggestion. I don't know that --
16 it's not like a file couldn't be closed without it.
17    Q.    What happens to those closing documents,
18 closed claim brief, if one was produced?
19    A.    Well, it's in the claim system. So as
20 far as I know the claims that are in the system
21 remain on the system, but again these procedures are
22 evolving as they become more computer oriented and
23 years ago you probably wouldn't have that same
24 procedure for entering everything in the computer
25 system.

23  (Pages 86 to 89)

D. SULLIVAN

Page 90

1      Q.   Okay.  Do you know:  Were any of the
2  records from 1996 or 1997 ever computerized by
3  Commonwealth?
4      A.   The financial data is on the system, you
5  know, payment fees and things like that are
6  reflected.  I don't know that we really have -- I
7  would have to look, but I don't know that there's any
8  real entries as far as status updates, that type of
9  thing for -- I think when Commonwealth -- if
10  Commonwealth had a claim system I'm not sure if it's
11  functioning any longer.  I'm speaking of what's been
12  integrated into the Fidelity system so I'm not sure.
13  And this -- being that most of what happened on this
14  file was years ago, I'm not sure that anything could
15  be on their system to put into ours.
16      Q.   The transfer --
17      A.   So -- I'm not sure that there's that
18  much on this.  I don't recall seeing what we call
19  briefs.
20      Q.   Okay.  Who would you use to find out if
21  any of that old Commonwealth information was migrated
22  or could have been migrated?
23      A.   Who would I?  Ask probably start with
24  Matt Rini because he knows a lot about our system.
25      Q.   All right.  We will put that down as

Page 91

1  another follow up.
2      A.   If you're asking me, I have access to
3  the new system to look it up.  I could look up the
4  claim myself and -- because I did go in and look at
5  the financial data to see whether we had ever paid
6  Walsh because you were asking if we paid claims to
7  anybody.
8      Q.   Right.
9      A.   But I don't know if I went into the
10  brief section or not.  I don't recall seeing briefs
11  but I don't know.
12      Q.   Okay.
13      A.   But that's something I could look
14  myself.
15      Q.   Okay.
16      A.   If it was unmigrated data, then Matt
17  might know that.
18      Q.   I will ask you, since you mentioned it,
19  let me just -- I don't know how detailed you're going
20  to be.  How much -- we will flip to the financial
21  stuff since you remember.  How much did Commonwealth
22  collect in fees, or premium is what you would call
23  it, in 1996 and 1997 from Coastal Title Agency?
24      A.   Unfortunately I didn't get an answer to
25  that question.  For one thing I don't have a list of

Page 92

1  the policies.  I need a list of policies issued to
2  Commonwealth to see if there were remittances on the
3  policies, and everything I was looking at had
4  commitment numbers.  There's no tracking by
5  commitments, and I don't think an agent usually
6  remits until the policy is issued.  So I guess to the
7  extent -- or on the files where no policy was issued
8  there probably is no remittance data available.  If
9  there are policies, then I have to identify policy
10  numbers and then try again.
11      Q.   Okay.  And where would you get the
12  policy numbers from?
13      A.   Either the files or maybe somebody has a
14  chart or something.  I don't know if anybody has made
15  a list of policies.  Everything I see says -- has
16  Coastal Title file numbers on it.
17          MR. HAYES:  Are you asking her -- I
18  think Donna is answering your question as though you
19  were asking her on the transactions which are the
20  subject of this lawsuit.
21      A.   That's what you're asking.  Right?
22          MR. HAYES:  I got the impression you
23  were asking overall.
24      Q.   Yeah, my mistake.  I'm going to ask you
25  what you're answering now, and so what I wanted to do

Page 93

1  was, as all trained lawyers are, to ask the general
2  question first.  Do you know -- let me just ask:  How
3  much premium did Commonwealth collect from Coastal
4  Title agency in 1996 and 1997?
5      A.   I don't have that.  I thought you meant
6  for the whole company.  In your --
7      Q.   Let me ask that question then.  How many
8  premium did Commonwealth Land Title Insurance Company
9  collect in 1996 and 1997?
10      A.   I keep saying I don't have that
11  information because I think we're talking apples and
12  oranges a little bit here.  I went and got income
13  statements is what the home office provided me with,
14  which shows operating income, less expenses, and then
15  it has other investment income and some other things.
16  I am not great at reading all this financial stuff
17  but -- so I didn't know if you were looking for
18  operating income because I think you said profits and
19  profits are not premium.  Premium is less -- there's
20  an expense to run the agency, department and
21  everything, and now that I think of it I'm not sure
22  that that doesn't reflect direct operation income too
23  because that I think is -- the whole company's income
24  for the operating income less expenses.  So I'm not
25  sure if that has relevance to what you're looking

24 (Pages 90 to 93)

D. SULLIVAN

Page 94

1  for.
2      Q.   So you got financial documents from the
3  1996, '97 time frame for --
4      A.   For Commonwealth filed I think in
5  Pennsylvania, I think, maybe because that's where the
6  home office was.
7      Q.   And what was Commonwealth's operating
8  income in 1996?
9      MR. KOTT:  Hold on.  Since that deals
10  with financial information I think I can ask you what
11  issue that goes to that's in the case?
12      MR. MAGNANINI:  Well, we've asked about
13  profitability.
14      MR. KOTT:  I know.  That's my question.
15  What does profitability have to do with any issue in
16  the case?
17      MR. MAGNANINI:  We would like to know
18  how much Commonwealth made.
19      MR. KOTT:  I know that's what you want
20  to know, but how is that relevant or could lead to
21  the discovery of relevant information given the
22  complaint in the case?  And the only reason -- I
23  normally don't discuss relevancy objections because I
24  am aware of the federal rules except if you're
25  getting into things like financial information which

Page 95

1  gets into personal and propriety stuff, that's why I
2  was asking.
3      MR. MAGNANINI:  What I'm asking for is
4  because I'm going to -- we're going to raise with
5  Coastal obviously how much money they made from
6  issuing title --
7      MR. KOTT:  That's a different question
8  than the profitability of Commonwealth.
9      MR. MAGNANINI:  I am asking about
10  profitability because that's what Miss Sullivan
11  started talking about.
12      MR. KOTT:  She did, but now -- I don't
13  think --
14      A.   Is that not the question?
15      MR. MAGNANINI:  I think I could ask how
16  profitable -- or I have yet to get any sort of answer
17  so I don't know.  Let me get an answer to a question
18  and then I'll figure out if there's relevance to
19  profitability and then --
20      MR. KOTT:  I didn't say anything -- if
21  you want to ask her how much Coastal remitted, that's
22  fine, but you're asking a question about the
23  profitability of the corporate defendant which raises
24  all sorts of other issues as far as discoverability
25  and things of that nature.

Page 96

1      MR. MAGNANINI:  I understand that,
2  David, although I also -- we've got a bad-faith
3  claim.  Right?  So that would open you to punitive
4  damages if we prevail.  Right?  And the profitability
5  of the company --
6      MR. KOTT:  I wouldn't think so.  I
7  wouldn't think that a bad-faith claim would expose us
8  to punitive damages.
9      MR. MAGNANINI:  Maybe just to the actual
10  loss.
11      MR. KOTT:  Ask the question again.  As I
12  said I am not going to get in the way if you want to
13  ask her what Coastal remitted or things of that
14  nature.  What I'll call case-specific stuff.
15      Q.   I guess, Miss Sullivan, going back to
16  having reviewed the documents that were provided by
17  the home office, you said -- what can you tell me
18  about Commonwealth's operating income in 1996 and
19  1997?
20      A.   The only numbers I tried to memorize
21  were operating income less operating expense, and I
22  believe in '96 it was around 20 million and then in
23  '97 it was like 21.7 million.  There were other
24  operating -- or, I'm sorry, investment income and
25  other income sections, which I'm not sure what they

Page 97

1  represent.  I don't think they go to what your --
2      Q.   No, I am not concerned about that.
3      A.   You're looking for.  So that's the
4  extent.  I just obtained copies of those two
5  documents.
6      Q.   And then when you say minus operating
7  expenses, were those operating expenses -- did they
8  include payments to the title agents?
9      A.   I don't have any --
10      MR. McGOWAN:  Commissions you mean?
11      Q.   Commissions.
12      MR. HAYES:  I will object to the form
13  because they're not commissions.  They're not paid to
14  the agent.  The income is a net to Commonwealth.
15      A.   The premium is the income.  Our split is
16  the income.  The agent retains their portion so
17  that's not income I guess to us.
18      Q.   That's actually in a kind of roundabout
19  way what I was trying to get to.  The income or the
20  details on the documents that you received, that is
21  just income to Commonwealth, it's not --
22      A.   I don't think there's really much of a
23  description of what that operating expense is.
24      Q.   Okay.  And how much was the -- I'm not
25  sure what term -- deduction of --

25  (Pages 94 to 97)

D. SULLIVAN

Page 98

1     A.    Operating expense?
2     Q.    Of operating expense. Excuse me. How
3  much was the operating expense?
4     A.    I didn't memorize all these numbers.
5  I'm sorry.
6     Q.    I don't mean to put you through a memory
7  test.
8     A.    I'm imagining -- I could guess what one
9  was but I don't know for sure. I just got the total
10  profit.
11     Q.    So the total was the 20 million?
12     A.    What I characterize as profits.
13     Q.    Was the 20 million in 1996 and 21.7 --
14  21,700,000 in 1997. Okay. Now, how much of that had
15  been remitted by Coastal Title Agency?
16     A.    I haven't been able to identify the
17  remittances from Coastal and that's a national, like,
18  number. That's a big number that encompasses, you
19  know, all states and everything, so the
20  relationship -- proportion it might be, I would have
21  to calculate.
22     Q.    I will ask the question anyway. How
23  much of those -- the 20 million and the 21.7 million
24  was remitted by Coastal Title Agency on behalf of
25  loans funded by Walsh Securities at issue in this

Page 99

1  case?
2     A.    I don't know. Without policies I
3  can't -- without the numbers of the policies, the
4  identification of the policies, I can't identify what
5  was remitted on those particular files.
6     Q.    How was the money remitted by Coastal
7  Title Agency to Commonwealth?
8     MR. KOTT: You mean check, wire, cash?
9     Q.    Exactly. What method did Commonwealth
10  receive payment from Coastal?
11     A.    I don't know.
12     Q.    Okay. I am only asking because in the
13  files we have checks from --
14     A.    Do you?
15     Q.    -- the closing attorneys to Coastal
16  Title Agency for an amount of premium and $25 for the
17  letter but you didn't -- and they have --
18     A.    Those are made to Coastal.
19     Q.    Those are made to Coastal with the
20  property address and things on it. You didn't get
21  it? That's what the question is.
22     A.    They didn't endorse it over.
23     Q.    And then you didn't get an -- or at
24  least you haven't found a check saying: Enclosed is
25  remittance for these transactions?

Page 100

1     A.    I didn't go through each of the files.
2  That would have taken me a lot of time. I wasn't
3  finding the policies in several of the files anyway.
4  Some of the files just had commitments but given more
5  time or I was -- I didn't know if anybody had
6  identified these transactions. The policies that
7  were -- if they had policy numbers associated with
8  them, charts or anything.
9     Q.    My question was going to be: You said
10  you had received the agency -- back to Commonwealth.
11  You had received the agency files I thought you said.
12     A.    Yeah.
13     Q.    Did you get a chance to look in those
14  files to see if the copies of the remittance checks
15  from the closing attorney to the agent was in their
16  files?
17     A.    From the closing attorney to the agent?
18  I didn't look for that.
19     Q.    How many claims did Commonwealth pay
20  out -- again we will limit it to 1996, 1997 -- based
21  on the closing protection letters?
22     A.    I don't know.
23     MR. HAYES: Is your question in this
24  case or nationwide?
25     Q.    First actually I would limit it to New

Page 101

1  Jersey initially.
2     A.    I don't know.
3     Q.    And then --
4     A.    I don't know if we break down those
5  types of numbers by categories.
6     Q.    That was going to be my next question.
7  Is there any way for you to determine that?
8     A.    I don't think there's anything in the
9  claims system that would identify this as a closing
10  service or closing protection letter claim.
11     Q.    I will just ask the question. But did
12  Commonwealth make any payments on the loans at issue
13  in this case based on the closing protection letters
14  that it issued?
15     MR. KOTT: You mean payments to Walsh
16  Securities?
17     Q.    To Walsh Securities.
18     A.    No, not to my knowledge. I did not see
19  anything in the claims system.
20     Q.    Do you know if Commonwealth made
21  payments to other -- any other entity besides Walsh
22  Securities based on --
23     A.    I ran the other names that were listed
24  in the subpoena notice and did not find any payments
25  to any of those entities. I found some claim files

26  (Pages 98 to 101)

D. SULLIVAN

Page 102

1  but no payments made to any of the entities.
2       Q.    Did Commonwealth issue closing
3  protection letters to Richard Pepsny in 1996 and 1997
4  for any of the loans at issue in this case?
5       A.    I can't answer that. From what I've
6  seen I thought most were identified as either Stanley
7  Yacker or Cicalese, whatever his first name is.
8       Q.    Anthony Cicalese.
9       A.    Anthony Cicalese. I recognize the other
10 names but I don't know -- but something in my reading
11 indicates that maybe we didn't, but I can't state
12 that to a certainty.
13      Q.    That's what my question is. In just
14 reviewing documents to prepare for this, did you see
15 any closing protection letters issued to any of the
16 other two attorneys?
17      A.    Did I see them, no.
18      Q.    Pepsny or Michael Alfieri?
19      A.    No.
20          (A lunch recess takes place.)
21 DIRECT EXAMINATION BY MR. MEE:
22      Q.    I am Daniel Mee. I work with Bob
23 Magnanini here at the firm and he's graciously let me
24 ask you a few questions.
25      A.    Okay.

Page 103

1       Q.    He might smack me around if I ask the
2  wrong questions but I'll probably jump around a
3  little bit before I get my thoughts honed in, but I
4  believe you testified earlier that you had looked at
5  some of the loan files before you came here today.
6       A.    Not loan files. I don't have possession
7  of loan files. To my knowledge I haven't seen those
8  in any of the boxes that were delivered to us. I
9  have files on individual properties that we opened
10 with respect to the smaller claims of unrecorded
11 documents or tax issues and attached to some of them
12 I have copies of the agent's file, not the loan file.
13      Q.    Okay.
14      A.    They were produced to us at one time but
15 I believe they have been -- not in our possession.
16      Q.    I'm going to show you a letter, and I
17 would just like to know if in the process of your
18 review if you looked at this letter, if you recognize
19 the letter?
20      A.    This is the original claim letter, I
21 believe, from Walsh.
22          MR. MEE: Can we mark that.
23          (Commonwealth-3, Letter dated July 28,
24 1997, is received and marked for identification.)
25      Q.    And how about this?

Page 104

1       A.    This is our response to the claim
2  letter.
3          MR. MEE: Can I mark this one too,
4  please.
5          (Commonwealth-4, Letter dated August 12,
6  1997, is received and marked for identification.)
7       Q.    On the bottom of Exhibit 4, is that your
8  signature?
9       A.    Yes.
10      Q.    Do you remember writing that letter?
11      A.    No.
12      Q.    Fair enough. I am not going to put
13 this -- I am not going to put this in as an exhibit,
14 but did you have an opportunity to review the
15 documents produced by McCarter & English in this case
16 from Commonwealth?
17      A.    I'm going to say no because I think that
18 encompasses a huge thing and I didn't do it in
19 preparation for this. Whether I ever saw them in the
20 past --
21      Q.    Do you recognize this letter?
22          MR. KOTT: And the letter, for the
23 record, is a letter dated November 23, 2005 from Dave
24 Kott to Robert Magnanini.
25          MR. MAGNANINI: Enclosing documents.

Page 105

1          MR. KOTT: Enclosing certain documents.
2       A.    Is the question: Do I remember seeing
3  this?
4       Q.    Do you recognize that letter?
5       A.    No.
6       Q.    How about the documents that are behind
7  that letter?
8       A.    I don't have a recollection of them.
9       Q.    Okay. Let me just point out the first
10 page up here and the second page. This document is
11 labeled COM with a lot of zeros and then a nine at
12 the end. That policy number at the top, is that the
13 number that you would have to review in order to
14 determine whether or not a premium was sent to
15 Commonwealth on a policy?
16      A.    Yes, I believe it would be.
17      Q.    So you could cross-reference that number
18 with whatever you have in Commonwealth's electronic
19 system to determine whether or not a premium was sent
20 in?
21      A.    The information that I'm getting is
22 through home office. What I would do is I could
23 provide them with a list of the policy numbers and
24 see if they have information that corresponds to
25 these policy numbers as this looks like a preprinted

27 (Pages 102 to 105)

D. SULLIVAN

Page 106

1  policy number, so I'm assuming that's the right
2  number that they would be looking for.
3      Q.    Thanks. Did Commonwealth request that
4  the files on these Walsh loans at issue here be sent
5  to Nancy Koch from the National Processing Center?
6      A.    I don't know the answer to your
7  question. I know I don't know the answer to it. I
8  think your question is: Were the files -- did
9  Commonwealth request that NPC send files to Nancy
10 Koch?
11     Q.    My understanding is that all of the
12 documents that came through Coastal went to
13 Commonwealth's National Processing Center. Is that
14 right?
15     A.    Meaning their entire file?
16     Q.    Any file on which there was a loan. No?
17     A.    Sounds unlikely to me. I would have
18 thought that NPC only collected policy forms and
19 possibly the closing protection letter form, if they
20 were later assigned by number. I find it unlikely
21 that the whole file would have gone there. Again, I
22 can't state for a fact but that would surprise me.
23     Q.    So of those documents that would have
24 gone to NPC, which you believe include the closing
25 service letter or the closing protection letter --

Page 107

1      MR. KOTT: Objection. She just said she
2  wasn't sure if it included that.
3      A.    The policy. I think they collected
4  copies of the policies and then they invoiced the
5  agent for their remittances, at least that's
6  something in the documents that I read in preparing
7  for this.
8      Q.    Do you know whether the documents that
9  NPC collected were sent to Nancy Koch on the loans at
10 issue in this case?
11     A.    I don't know that.
12     Q.    Is there a way for you to find out?
13     A.    Other than asking Nancy Koch if she
14 remembers? You know, I mean, I can look through the
15 claim file. I'm not sure why they would have been
16 going to Nancy instead of the claims department or
17 that point. If this is as the claim is progressing,
18 I would have thought that would have been something
19 the claims department was interested in more. You
20 know, I don't know. I could -- Nancy is not with the
21 company any longer. I could ask what she recalls. I
22 mean, I could make an inquiry.
23     Q.    Who would you make the inquiry to?
24     A.    Nancy Koch.
25     Q.    Would she be the first person -- the

Page 108

1  first point person to start an investigation?  I'm
2  sorry, let me rephrase.
3          Would she have been the point person on
4  an investigation of the loans at issue in this case?
5      A.    No. The claims department would have,
6  except they could have been running parallel since
7  Nancy was the agency manager and I see that she met
8  with Coastal from what I've read. I don't recall
9  whether she did that at the same time the claim first
10 came in or later. I'm not sure of the timing of
11 that, but once the claim came in claims would have
12 been in charge of it, but, you know, she may have
13 assisted in her role as the agency manager.
14     Q.    And could you determine whether or not
15 the claims department received any information that
16 was with NPC regarding these files, these loans?
17     A.    I could look through the boxes. I
18 didn't look for that or see that. I don't recall
19 seeing a group of policies. I didn't have policy
20 numbers to go to Jacksonville with. I mean, I could
21 look through there and see if I can find somewhere
22 where there's a grouping.
23     Q.    I think we might make that part of our
24 request.
25     A.    Okay.

Page 109

1      Q.    Just to jump around a little bit, what
2  type of due diligence does Commonwealth perform in
3  determining whether or not to enter into an agency
4  agreement?
5      A.    This is difficult again because I've not
6  been in that department, and I'm sure those standards
7  have changed over time. I believe in the agency file
8  there was a short one-page form and it said, you
9  know, something about the reputation of the agency --
10 agents in the industry or whatever. I think there
11 was some limited -- because this agent was signed in
12 1989.
13     Q.    And you're talking about Coastal?
14     A.    Yes. So I don't really know what the
15 standards were in 1989. All I can do is say there's
16 a file and there's very limited sign-up information.
17     Q.    How about in 1996? Do you know what the
18 standard would be for reviewing whether or not to
19 enter into an agency agreement with another company?
20     A.    Actually I can't speak specifically to
21 standards at any given date. I think maybe financial
22 research and other criminal checks. Other things are
23 more -- are required today. I can't even say for
24 '96, but I think, you know, that is -- the
25 investigation of their background is a little more

28  (Pages 106 to 109)

D. SULLIVAN

Page 110

1  detailed than it might have been.
2      Q.   Is there a continuing review process of
3  the agents?
4      A.   Well, there's an audit process. Are you
5  saying like financial or other --
6      Q.   I am speaking in general terms with any
7  agent that Coastal may -- any agent that Commonwealth
8  may deal with.
9      A.   Do they re-review those credentials?
10     Q.   Exactly.
11     A.   Or the background information? I don't
12  know the answer to that.
13     Q.   What are some of the roles that an agent
14  of Commonwealth might perform?
15     A.   Well, the agents -- their functions are
16  usually specified by the agency agreement and --
17     Q.   Let me back up a little bit. What type
18  of agents do you have? Do you have -- do you only
19  deal with agents such as Coastal, or do you have any
20  other agency agreements of any other type of
21  companies?
22     A.   As far as I know the agency agreements
23  are, you know, typical with a title agent. I don't
24  know what other company exactly you're thinking of
25  but --

Page 111

1      Q.   Okay. So what type of roles would say a
2  title agent perform on behalf of Commonwealth?
3          MR. McGOWAN: Back in 1996 in north
4  Jersey?
5          MR. MEE: Yes.
6      A.   The standard functions are to produce
7  title insurance commitments and issue policies on
8  behalf of the company. I mean, that's their primary
9  role is to issue the contracts for the company. And
10  it's our position a lot of their other functions are
11  their own business. If they're doing their own
12  closings or something like that, this is a separate
13  business function. Their relationship with the
14  company is to issue title insurance contracts.
15     Q.   What about closing protection letters?
16     A.   They can issue closing protection
17  letters.
18     Q.   Do you know if Coastal issued title
19  protection letters on behalf of Commonwealth?
20     A.   It's my assumption that they issued all
21  the letters in these files, yes.
22          (Commonwealth-5, Agreement dated April
23  12, 1989, is received and marked for identification.)
24     Q.   Exhibit 5. Do you recognize this
25  document?

Page 112

1      A.   This is an agency agreement between
2  Commonwealth and Coastal Title.
3      Q.   And, for the, record this was entered
4  April 12, 1989?
5      A.   Looks like a 12.
6      Q.   I am going to direct your attention to
7  the first page. Number one, could you just read that
8  to yourself.
9      A.   Okay.
10     Q.   Is Commonwealth claiming that Coastal
11  did not have the authority to issue any of the
12  policies that may be at issue in this case?
13          MR. KOTT: Object to the form.
14          MR. McGOWAN: Can I hear the question
15  again.
16          (The pending question is read by the
17  court reporter.)
18          MR. McGOWAN: Object to form. Go ahead.
19     A.   I haven't seen the policies but it's my
20  understanding that -- actually the function -- does
21  the agent have the ability to issue the policy? Yes.
22     Q.   You slightly changed my question around.
23     A.   I'm sorry.
24     Q.   That's okay. My question is whether or
25  not Commonwealth is claiming that Coastal did not

Page 113

1  have the authority to issue policies.
2      A.   No.
3      Q.   To do -- you're not claiming that.
4  Okay. On page two, F, could you read that to
5  yourself, please.
6      A.   Okay.
7      Q.   Do you know if Coastal did that?
8      A.   Did what?
9      Q.   Did what it says in F.
10     A.   In connection with these transactions or
11  all transactions?
12     Q.   Let's say all transactions.
13     A.   Did they record all papers which should
14  be recorded? I can't say that I know that they did
15  all of that.
16     Q.   Do you know if in these transactions
17  they did that?
18          MR. HAYES: Object to the extent it
19  implies they had an obligation to do it in this
20  transaction since it was a north Jersey closing. You
21  can answer it.
22     A.   I forget the question.
23     Q.   In these transactions did Coastal
24  perform as is stated in Paragraph F on page two?
25          MR. KOTT: Objection.

29 (Pages 110 to 113)

D. SULLIVAN

Page 114

1    MR. McGOWAN: I will object to the form.
2 You can answer.
3    A.   It's my understanding that they didn't
4 close these transactions, but some of the documents
5 may be delivered to them and they were not recorded
6 promptly. May have been delivered to them for the
7 purpose -- for recording and they may have not --
8 they may not have done that promptly.
9    Q.   What is the basis of your understanding?
10   A.   I believe -- I have read a lot of
11 material so I can't give you a document or something
12 that I referred to.
13   Q.   Is that --
14   A.   And I can't -- I know we had unrecorded
15 document claims, but I can't tie them to Coastal
16 either. I don't know.
17   Q.   Let me ask you this: Is that
18 understanding based on your testimony today, or is
19 that based on your preparation for this case, for
20 your testimony here today?
21      MR. HAYES: Object to the form.
22      MR. KOTT: I object to form.
23   Q.   Is your understanding based on the
24 conversations that have taken place right now during
25 your deposition?

Page 115

1    A.   No. During my deposition?
2    Q.   Today.
3    A.   No.
4    Q.   I'm going to direct you to Paragraph I
5 down at the bottom of the same page. That paragraph
6 states: "To forward weekly or frequently, based upon
7 volume, copies of all policies and related commitment
8 vouchers to Commonwealth Land Title Insurance
9 Company," with an address, "to remit to Commonwealth
10 the net premium shown on the monthly statement
11 provided by the National Processing Center. It is
12 the intention of this provision that agents shall be
13 responsible and liable to Commonwealth for the net
14 fees due Commonwealth."
15      And my question is: Do you know if
16 Coastal forwarded copies of policies and other
17 documents to Commonwealth?
18   A.   To NPC? I don't know but they must have
19 sent something over time or they wouldn't have been
20 kept on as an agent. Did they send the documents
21 related to this particular set of files? I don't
22 know.
23   Q.   And what was the procedure -- strike
24 that. What was the procedure if Coastal did not
25 forward these documents to NPC?

Page 116

1    MR. KOTT: Objection to the form.
2    Q.   What steps would Commonwealth take?
3    MR. KOTT: Objection to the form.
4    A.   Again, I am not in the agency
5 department. I am assuming if an agent never properly
6 forwarded documents that were required that somebody
7 would have addressed that issue with them, and if
8 they were going to persist in that, then they would
9 have terminated them but again this is --
10      MR. McGOWAN: Let me interrupt for one
11 second. I thought you were done. This may be part
12 of the problem. Coastal in all great likelihood was
13 submitting and processing deals through this carrier
14 for non-Walsh related -- I mean they were doing a lot
15 of business. So it might be better to ask the
16 witness questions related to the Walsh loans as
17 opposed to just in general because there could be
18 hundreds of loans.
19      MR. MEE: Okay. I think we can narrow
20 that down but I'm focusing in on the agency agreement
21 between the two. So I mean if the extent of her
22 knowledge is only with regard to these Walsh loans or
23 -- I mean, it doesn't sound like she has knowledge.
24      MR. McGOWAN: It doesn't sound like it's
25 going to make any difference. That's fine. Just

Page 117

1 bear that in mind. There's other business going on.
2    Q.   Okay. Well, so with regard to the Walsh
3 loans, do you know if Commonwealth ever checked to
4 find out if the documents were being -- the documents
5 in Coastal's control were ever being delivered to
6 NPC?
7    A.   I don't know.
8    Q.   Is there a way for you to find out?
9    A.   I don't know if you can search NPC
10 records just by the name of the agent. When I worked
11 there years ago you had to have the policy number and
12 then you could request the policy, but they didn't
13 have indexes of other sorts. I think they have
14 indexes by property and other things but whether -- I
15 imagine maybe they index them by agents. Are you
16 saying could I verify if somebody there sent them up
17 here back in 1996? Am I trying to track what was
18 sent here or am I trying to track what they have now?
19   Q.   I'm asking you whether or not
20 Commonwealth ever tracked whether or not Coastal sent
21 those to NPC.
22   A.   On a regular basis or for this?
23   Q.   For these loans, for the Walsh loans.
24   A.   I don't know.
25   Q.   On page three, I'll direct you to

30 (Pages 114 to 117)

## Page 118

1 Paragraph J, which states: "To refer to Commonwealth
2 all title questions and problems deemed doubtful by
3 agent, which may arise in connection with insuring of
4 titles and to follow the directions of Commonwealth
5 with respect to the resolution thereof." I believe
6 this falls under the obligations of the agent.
7     Now, do you know with regard to these
8 loans whether or not Coastal ever referred any
9 questions or problems deemed doubtful to
10 Commonwealth?
11     A.    No.
12     Q.    You don't know?
13     A.    No, I don't know.
14     Q.    Is there a way for you to find out?
15     A.    I don't think so. Often agents would
16 call with a question and they could be answered
17 verbally. Sometimes they would fax a document if
18 there was a question, I don't know, about an easement
19 or something, and underwriting counsel might respond
20 to that and not necessarily keep those faxes on an
21 ongoing basis.
22     Q.    They weren't recorded in the computer
23 system or anything like that?
24     A.    Not back then.
25     Q.    Paragraph N states: "To maintain the

## Page 119

1 agent file register furnished by Commonwealth showing
2 all commitments, binders, reports of title and
3 policies issued and when requested by Commonwealth to
4 furnish a list of all commitments, binders and
5 policies remaining in agent's possession."
6     What's the point of that paragraph?
7     A.    I don't know what the drafter's point of
8 it is, but I would think from a claims perspective,
9 particularly if you have an agency defalcation we
10 like to go in and know what commitments have been
11 issued that might be outstanding. It is a way to
12 track what policies the agents have issued.
13     Q.    Do you know if Commonwealth ever
14 requested Coastal to furnish a list of all
15 commitments, binders and policies in their
16 possession?
17     A.    I don't know.
18     Q.    On page four, Paragraph P, it states:
19 "To permit Commonwealth at any time to examine or
20 audit all books and records, files, securities and
21 other papers and documents of agent relative to title
22 insurance written on behalf of Commonwealth."
23     Do you know if Commonwealth ever audited
24 Coastal's files that pertained to the Walsh loans?
25     A.    Well, they collected the agent's files

## Page 120

1 so they had possession of them and probably reviewed
2 them in that context.
3     Q.    When did they collect them?
4     A.    After the claim.
5     Q.    And do you still have them in your
6 possession?
7     A.    I'm not sure we have all of them. I
8 know we have some of them.
9     Q.    Paragraph T states: Not to do any
10 business in the name of Commonwealth except as
11 specifically authorized herein or as otherwise
12 expressly authorized by Commonwealth in writing." At
13 the bottom of four. I may have read that too
14 quickly.
15     A.    What is the question?
16     Q.    I haven't asked one yet. Did National
17 Home Funding or Robert Skowrenski ever sue
18 Commonwealth?
19     A.    Yes.
20     Q.    What happened with that lawsuit?
21     A.    It was settled.
22     Q.    And did Commonwealth ever pay fees on
23 behalf of Coastal in that settlement?
24     A.    Not to my knowledge. I think the
25 settlement payment was to Skowrenski.

## Page 121

1     Q.    Was there a settlement agreement --
2     A.    Yes.
3     Q.    -- among the parties?
4     A.    Between Commonwealth and Skowrenski, I
5 believe.
6     Q.    Just to go back a little bit, which is
7 Paragraph L on page three, it states: "Agent agrees
8 to be solely liable for all attorneys' fees, court
9 costs, expenses and loss or aggregate of losses
10 resulting from, Λ, fraud, negligence or misconduct of
11 agent, its officers or employees in the performance
12 of its duties as agent of Commonwealth."
13     Do you know what the settlement amount
14 was between Commonwealth and Mr. Skowrenski and NHF?
15     A.    50,000.
16     Q.    Do you know how much Coastal paid in
17 that settlement?
18     A.    Only from what I heard something earlier
19 today from someone else at the table.
20     Q.    Okay. Do you know if there's a common
21 defense agreement among Coastal and Commonwealth in
22 this litigation?
23     A.    No.
24     Q.    You don't know?
25     A.    Not to my knowledge, but I've never

D. SULLIVAN

| Page 122 | Page 124 |
|---|---|

**Page 122**

1  heard of that, no.
2      Q.    Do you know if Commonwealth has
3  initiated a breach of contract action against Coastal
4  under any of these provisions?
5      A.    I believe we have claims against Coastal
6  and I'm not sure what they are. I imagine they're
7  breach of contract.
8      Q.    Has Commonwealth made any demands on
9  Coastal?
10          MR. KOTT: What do you mean? I don't
11  know what that means.
12     Q.    Any demands for fees?
13     A.    Attorneys fees?
14     Q.    Fees, compensation, whatever.
15     A.    We haven't --
16     Q.    With regard to the loans that are at
17  issue in this case, has any demand been made upon
18  Coastal?
19     A.    Not to my knowledge, other than the
20  claims that are in the litigation.
21     Q.    No settlement demand has been --
22     A.    I am not aware of it.
23     Q.    Okay. I'm going to direct you to -- did
24  Commonwealth ask Coastal to reimburse it for the
25  $50,000 paid to Mr. Skowrenski?

**Page 123**

1      A.    I don't know.
2      Q.    On page five, I believe this falls under
3  "Obligations of Commonwealth." It states in
4  Paragraph C: "To pay agent as compensation on
5  transactions originated by agent for services
6  hereunder a commission on the premium paid for title
7  insurance on the following basis." Then there's an
8  exhibit attached. It says, "The minimum premium to
9  Commonwealth shall be $15 for each policy." Why is
10  it only --
11     A.    Let me see.
12     Q.    Why is the minimum payment $15?
13     A.    Probably didn't want to process the
14  paperwork for less than that I guess.
15     Q.    Who decided that amount do you think?
16     A.    I assume that it's a state manager or
17  the national office.
18     Q.    Commonwealth?
19     A.    Maybe NPC. I'm not sure who established
20  that.
21     Q.    Was it Commonwealth or Coastal?
22     A.    I am sure it would have been
23  Commonwealth.
24     Q.    Do you know if Commonwealth paid these
25  commissions to Coastal?

**Page 124**

1      A.    It was never paid in the form of a
2  commission. "Agent shall remit to Commonwealth 20
3  percent of the filed rate chargeable." I think the
4  15 minimum is -- would be if the calculation under
5  this formula didn't come up to $15.
6      Q.    Right. I say commission because that's
7  what it said in Paragraph C. It says, "services
8  hereunder, a commission."
9      A.    It's expressed that way but the money
10  never comes to the underwriter and then they pay them
11  back. They remit and, you know, Exhibit A expresses
12  it more the way I'm saying it, that is, may remit 20
13  percent.
14     Q.    So it's just the difference between
15  remittance and commission?
16     A.    Yeah. I don't know why the choice of
17  wording in the actual agency agreement body.
18     Q.    Do you know if Coastal -- I'm sorry. Do
19  you know if Commonwealth paid Coastal remittance or
20  commissions on any of the Walsh policies?
21          MR. KOTT: Object to the form. I think
22  she said a few times that Commonwealth doesn't pay
23  commissions. She said that a number of times.
24     Q.    I'm just reading Paragraph C which says
25  that the services hereunder, a commission -- I

**Page 125**

1  understand the distinction, but I'm reading -- as
2  part of Paragraph C it says: "Hereunder a
3  commission." So my question stands. Do you know
4  whether or not Commonwealth paid to Coastal a
5  commission or a remittance on any of the Walsh
6  policies at issue in this case?
7      A.    I don't know that Commonwealth ever paid
8  Coastal any commission. I don't -- just because I'm
9  not sure.
10         MR. MEE: Was that an objection.
11         MR. McGOWAN: That's me and David having
12  a secret conversation.
13     Q.    I'm sorry.
14     A.    I'm not sure my knowledge is broad
15  enough to say with certainty they never paid them
16  anything. That wouldn't be the way they would
17  normally conduct business, and they would not take
18  the money in and then pay the agent back a
19  commission. They would accept the remittance. I am
20  assuming that NPC would get the policies, they would
21  see what the percentage was, they would invoice the
22  amount due to the company, and then the amount due to
23  the company would be forwarded to the company.
24     Q.    I am going to ask a broader question
25  then. Did Commonwealth ever pay Coastal anything on

32 (Pages 122 to 125)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

D. SULLIVAN

**Page 126**

1  any of the Walsh policies at issue in this case?
2      A.    Not to my knowledge.
3      Q.    And did Commonwealth receive remittances
4  from Coastal on any of the Walsh loans at issue in
5  this litigation?
6      A.    Again, that's what I was not able to
7  verify with home office until I get the policy
8  numbers.
9      Q.    Switching gears a little bit. What type
10  of real estate closing services are offered by
11  Commonwealth?
12      A.    In its direct operations?
13      Q.    Let's start there, sure.
14          MR. KOTT: When?
15      Q.    1996. We're talking about the time
16  frame '96, '97 here.
17      A.    I know they had branch operations that
18  would insure title. I'm sure they would do reports
19  of title if requested. I think the southern direct
20  operation might have conducted closings.
21      Q.    And what role does a title insurance
22  company play during a real estate closing, generally
23  speaking?
24          MR. HAYES: Object to the form of the
25  question. Underwriter or title insurance agency?

**Page 127**

1  Since both are often referred to as title companies.
2          MR. McGOWAN: Objection. And neither
3  attend the closing, so it depends on what you mean by
4  your question too.
5      Q.    Do you understand my question?
6      A.    Are you asking does a direct operation
7  perform -- what closing functions do they perform,
8  direct op?
9      Q.    I guess my question is: In a real
10  estate closing what is the function of a title
11  insurance company?
12          MR. KOTT: Object to the form.
13          MR. McGOWAN: Object to the form. The
14  agent is not at the real estate closing.
15      Q.    Do you understands my question?
16      A.    If you're talking about north Jersey
17  where the agent is not responsible for the closing,
18  that we've issued a closing service letter to an
19  outside attorney?
20      Q.    Yes.
21      A.    Well, then the outside attorney is
22  responsible for the closing of the transaction and
23  the disbursement of funds and the clearing of liens
24  or whatever is required.
25      Q.    Does it provide assurance to a purchaser

**Page 128**

1  or a loaner that certain things may happen during the
2  course of a real estate closing?
3          MR. KOTT: Objection.
4          MR. McGOWAN: Objection to the form.
5      A.    The closing service letter is the
6  document that provides for what acts of the attorney
7  will be covered and to whom.
8      Q.    And certain of those acts would include
9  things such as that a prior mortgage would be
10  satisfied?
11      A.    If that's what was required by the
12  lender's closing instructions.
13      Q.    With regard to the lender's closing
14  instructions that a HUD would be submitted as well,
15  would that be one of the things that --
16      A.    Would be covered by a closing -- --
17      Q.    If that were part of the closing
18  instructions, let's say?
19      A.    No, I don't think it goes to the
20  priority or the validity of the mortgage or -- the
21  items covered by the closing protection letter.
22      Q.    What type of services are performed by
23  the title agent before closing?
24      A.    Usually they get a request for a title
25  commitment, and they will do appropriate searches of

**Page 129**

1  the title in the county and judgment searches and tax
2  and assessment searches and review those. They put
3  together the commitment under the requirements and
4  the exceptions to title.
5      Q.    Is the commitment put together after
6  those are -- those functions are performed?
7      A.    Yeah, because the information gleaned
8  from those searches is the basis for the commitment.
9  If the search shows there's a prior mortgage, they
10  will raise a prior mortgage in Schedule B.
11      Q.    What about after the closing? What type
12  of functions does the title agent perform?
13      A.    If the matter is closed by an outside
14  attorney under the closing service letter that
15  attorney usually will send back to the title agent
16  maybe affidavits of title or other documents required
17  by the agent in the commitment, or proof of
18  satisfaction of the liens, and the agent will review
19  those. They will run a search in the county to pick
20  up the documents if the attorney sends them for
21  recording, verify there's no intervening liens, issue
22  the policy --
23      Q.    And --
24      A.    -- assuming all those requirements have
25  been satisfied.

33 (Pages 126 to 129)

D. SULLIVAN

Page 130

1    Q.    And these are functions that
2  Commonwealth's agents perform or were supposed to
3  perform?
4    A.    Well, this is a general function of an
5  agent, yeah.
6    Q.    General function of Commonwealth's --
7    A.    Sure.
8    Q.    Okay.  Were these functions performed by
9  Coastal as part of its agency agreement with
10 Commonwealth?
11     MR. McGOWAN:  Object to the form only
12 because she indicated that some of the functions were
13 to be performed by the closing attorney as opposed to
14 the title agency.
15    Q.    The functions you indicated that were
16 supposed to be performed by a title agent, were those
17 functions performed by Coastal on behalf of
18 Commonwealth?
19     MR. KOTT:  Object to form.
20    A.    If their agency relationship with us is
21 -- yeah, I mean they can search the records, they
22 have the ability to clear exceptions on commitments.
23 They have the ability to issue the commitment.  They
24 can take the proofs from the attorney that certain
25 things have been addressed or releases files.  They

Page 131

1  can run down the title for the purpose of seeing that
2  the documents that are supposed to be the basis for
3  insurance are recorded and they have the right under
4  the agreement to issue a policy.
5    Q.    And with regard to the Walsh policies at
6  issue here, was Coastal -- was Coastal Title supposed
7  to perform those agency obligations or functions on
8  behalf of Commonwealth?
9      MR. KOTT:  Object to the form.
10   A.    I haven't seen the policy.  I'm sorry.
11 Repeat that.
12   Q.    Was Coastal Title supposed to perform
13 the functions that you indicated earlier on behalf of
14 Commonwealth with regard to the Walsh loans at issue
15 in this case?
16     MR. KOTT:  Objection.
17   A.    I guess I'm going to say yes, these are
18 the functions -- these are things they had the
19 ability to do for the purpose of -- they have the
20 ability under the agreement to clear liens so they
21 have the ability to do that.  If those things weren't
22 cleared, then they shouldn't have been issuing a
23 policy, but that's a different issue I guess.
24   Q.    Do you know if Commonwealth has ever
25 issued a title policy absent a marked-up commitment?

Page 132

1    A.    Yes.
2    Q.    Is the answer yes, I know, or yes, they
3  have?
4    A.    I'm sure they have just from experience
5  in the industry.
6    Q.    You mentioned earlier certain functions
7  of the title agent such as record searches, title
8  searches, etcetera.  For whose benefit are those
9  searches being conducted?
10   A.    Search is done for -- not for the
11 purpose of distributing to outside parties but as the
12 basis for a title insurance commitment because the
13 agent is required to do a reasonable search to issue
14 a commitment, but the search is not in the normal
15 course distributed to outside parties.  It's not for
16 the benefit of somebody outside the company or the --
17 it's just the basis for the contract that we're going
18 to issue.  We use it for our own purposes.
19   Q.    So would you say that the benefit is for
20 the party paying for the assurance of the policy?
21   A.    No.  I am saying --
22     MR. KOTT:  You answered the question.
23   Q.    If it's not for the assurance of the
24 party paying for the policy, then who is it for?
25   A.    One, I believe it's required by

Page 133

1  regulation that we do a reasonable search, and, two,
2  it benefits the underwriter in that we're insuring
3  something that we have actually looked at and tried
4  to limit our exposure.  If we didn't do a search at
5  all we wouldn't know if there are easements on the
6  property and our policy would be issued exposing us
7  to a great many claims.  So we want to do a
8  reasonable search for our own benefit and then issue
9  the commitment, which is the contract we're offering
10 to the --
11   Q.    Who pays for that?
12   A.    The search?
13   Q.    Yes.
14   A.    It's part of the charge.  It's -- I
15 believe -- I don't know if it's a passed -- I believe
16 on the invoice there's an itemized set fee if that's
17 still the current way.
18   Q.    Well, is it generally the purchaser who
19 pays for this?
20   A.    Yes.
21   Q.    Who ensures the accuracy of the
22 information that is on a title commitment?
23     MR. KOTT:  Objection to the form.
24   Q.    Who's responsibility is it to ensure the
25 accuracy of the information on that -- on the title

34  (Pages 130 to 133)

D. SULLIVAN

Page 134

1 commitment?
2        MR. McGOWAN: Objection.
3        MR. KOTT: Object.
4    Q.   Are you saying ensure the accuracy? Is
5 the agent responsible for making sure the --
6        MR. MEE: What is the objection?
7        MR. KOTT: It assumes that somebody is
8 responsible to ensure that and that's not been
9 established.
10   Q.   Is anybody responsible for assuming that
11 the information on the title commitment is accurate?
12   A.   The commitment is also a contract and
13 the terms of that contract are part of the document.
14 There are certain protections for parties. I think
15 reliance on the commitment if it's inaccurate. I think
16 your question goes beyond to a closing point, whether
17 a requirement of the commitment has to be satisfied
18 and so I can't say there's liability if --
19   Q.   I think we're missing each other here.
20   A.   Okay.
21   Q.   What I'm wondering is: Someone puts
22 together a title commitment.
23   A.   Okay.
24   Q.   Who makes sure or is anybody responsible
25 to make sure that the information that goes on

Page 135

1 that title commitment is accurate?
2    A.   The agent is doing the search work and
3 issuing the commitment so the agent is responsible if
4 there's a defect in that. I mean, the contract is
5 going to govern the agent's responsibility or
6 actually the underwriter's with the insured. Would
7 the agency have some liability to the underwriter?
8 They would under the agency agreement if they did a
9 defective search or missed something in the search.
10   Q.   And who is the recipient of the benefits
11 of the commitment? Let me back up. Is there a
12 beneficiary of a title commitment?
13   A.   You mean a third party? I mean the
14 commitment has the named insured.
15   Q.   Okay. So that --
16   A.   It's a contract though. I don't know
17 the benefit, exactly what you mean by the benefit,
18 but they're offered a contract, which they then meet
19 the requirements and then give the benefit of the
20 policy.
21   Q.   So the proposed insured or the named
22 insured is the proposed beneficiary of the contract
23 under the title commitment?
24   A.   I hate to recharacterize it other than
25 the name that's on the -- the proposed insured.

Page 136

1    Q.   How would you characterize it then?
2    A.   Proposed insured. I don't want to
3 recharacterize it.
4    Q.   What does marking up a title binder
5 mean?
6    A.   My understanding of a marked-up binder
7 is that somebody, it could be a representative of the
8 company if they attended the closing, or in this case
9 the attorney may do this, at the closing they will
10 just take a copy of the commitment and markup what
11 liens they have addressed and they mark them "omit,"
12 or what -- you know, they might mark the description
13 insured, what we're going to insure, what we're going
14 to keep in the policy, what we're going to remove.
15 They date it the date of the closing.
16   Q.   Okay. Is a closing service letter --
17 when is a closing service letter effective?
18   A.   Well, it's effective -- I mean the
19 closing has to take place. I mean, the letter I
20 guess is effective as of the date of the letter, but
21 obviously the closing has to take place, I guess, for
22 some damage to -- the lender has to fund or something
23 in order for, I guess, the claim to be made for the
24 loss. I am not understanding it?
25   Q.   Maybe -- well, you named -- you named

Page 137

1 two dates, the date of the letter or the date of the
2 closing. Is it the date on the letter or the date of
3 the close?
4    A.   Well, the letter is issued, I mean it's
5 a valid --
6    Q.   It's effective as of the date issued?
7    A.   It's a valid document I guess.
8    Q.   And in Commonwealth's -- what would you
9 say is a valid -- how would you define a valid first
10 lien?
11        MR. HAYES: Under the law or under the
12 policy?
13   Q.   How would Commonwealth define a valid
14 first lien?
15        MR. HAYES: Under the law or under the
16 policy? They're different.
17        MR. MEE: I am asking the witness if she
18 has a definition for a first lien.
19        MR. HAYES: Then I object to your
20 question as being overly broad.
21   Q.   Do you have a definition in your mind as
22 to what a valid first lien is?
23   A.   I'm thinking -- off the top of my head I
24 am thinking that it's got to be a lien -- first lien
25 priority and recorded and not subject to attack on a

35 (Pages 134 to 137)

D. SULLIVAN

Page 138

1  variety of bases I guess.
2      Q.    Why would a lender have closing
3  instructions?  What is the purpose of a lender's
4  closing instructions?
5      A.    Well, they want to tell whoever is
6  closing, I guess, what their expectations are,
7  whether they expect it to be a first lien, whether
8  there are certain fees that are due them they want to
9  collect.  I mean, I think there's a whole list of
10  things usually that appear on that, and I assume that
11  the lender -- they're going to be benefitted by that
12  and they want to ensure that the attorney addresses
13  those items.
14      Q.    And does Commonwealth's closing
15  protection letters ensure that a lender's closing
16  instructions are followed?
17      A.    Only to the specified matters in the
18  letter.  The letter details the protections.  Not
19  everything in the closing instructions that the
20  attorney failed to comply with would be covered.
21      Q.    Okay.  What are typical closing
22  instructions issued by a lender?
23          MR. HAYES:  Objection.  Assuming there
24  is.
25          THE WITNESS:  Excuse me?

Page 139

1          MR. HAYES:  Assuming there are.
2      Q.    Assuming there are closing instructions.
3          MR. KOTT:  Typical is what he's
4  objecting to.
5      Q.    Assuming there are closing instructions,
6  what are typical closing instructions by a lender?
7      A.    I'm not sure that I've studied them for
8  all the various things that are unrelated to the
9  title insurance.  I examine them to see whether they
10  require a first lien or loans that are second liens.
11  You know, I didn't usually -- details what some of
12  the fees.  I don't know if there's yield spread
13  premiums, I think some of these charges are detailed
14  on there.
15      Q.    Is a filling out of a HUD-1 form, is
16  that a general requirement of a lender's closing
17  instructions?  Have you ever seen that?
18      A.    I don't know if in general, but I think
19  sometimes they require them to be submitted prior to
20  closing for review.
21      Q.    Do you know what a HUD-1 form is?
22      A.    Yes.
23      Q.    If an attorney filled out a HUD-1 form
24  knowing that it contains certain information that was
25  fraudulent, would that be a violation of a closing

Page 140

1  protection letter?
2      A.    Our position is it would not because the
3  closing protection letter only covers the validity or
4  priority of the lien of the mortgage.
5      Q.    Why don't we take a quick break.
6          (A recess takes place.)
7      Q.    So you stated earlier when the closing
8  protection letter is effective.  When is a title
9  commitment effective?
10      A.    Well, it has an effective date I believe
11  on it.  And, of course, it has to be forwarded to
12  the -- whoever is going to get it, but I think it's
13  effective as of the effective date, which is not
14  necessarily the date it's sent out.
15          (Commonwealth-6, Letter dated October
16  30, 1996, is received and marked for identification
17      Q.    I've marked as Exhibit 6 a closing
18  protection letter dated October 30, 1996.  So the
19  effective date of this policy would be October 30,
20  1996?
21          MR. HAYES:  Object to the form.
22          MR. KOTT:  Object to the form.
23      A.    Yeah, I would say the effective date of
24  this letter is October 30th.
25      Q.    Under file number where it says CT-18724

Page 141

1  and it has a little "a."
2      A.    Yes.
3      Q.    Do you know what that "a" stands for?
4      A.    I don't.
5      Q.    Do you know who issues the file numbers?
6      A.    That's the agency's own file numbering
7  system.
8          MR. KOTT:  CT as in Coastal Title, not
9  Commonwealth Title.
10      Q.    Down at the bottom of this letter it
11  says, New Jersey Land Title Insurance Rating Bureau,
12  and then on the right-hand side it says NJRB6-04 and
13  a date, August first, 1994.  Do you know what that
14  stands for, what that means?
15      A.    The New Jersey Land Title Insurance
16  Rating Bureau is an entity that some of the title
17  companies join, and that entity will submit forms for
18  filing with the Department of Insurance.
19      Q.    Is this an approved form by that entity?
20      A.    Well, the entity is basically a number
21  of underwriters so I guess they agree.  I don't know
22  the actual mechanics of its workings, but I guess
23  they formulate this document and the rating bureau
24  submits it to the Department of Insurance for
25  approval.

36 (Pages 138 to 141)

D. SULLIVAN

Page 142

1      Q.    So this -- would this have been approved
2   by the Department of Insurance?
3      A.    That's what it's representing and this
4   is I guess -- I assume is the filing number and a
5   date.
6           (Commonwealth-7, Exhibit B, is received
7   and marked for identification.)
8      Q.    So if we're looking at this letter here,
9   this closing protection letter, the lender would be
10  National Home Funding Successors and/Or Assigns?
11     A.    Yes.
12     Q.    And Commonwealth would be the company
13  that is agreeing to reimburse National Home Funding,
14  its successors or assigns in connection with any
15  loss?
16     A.    Covered by the letter, yeah.
17     Q.    And that loss would include fraud or
18  misapplication by the issuing agent or attorney in
19  handling funds?
20     A.    In connection with the matters set forth
21  in Paragraph 1 above, yes.
22     Q.    Up at the top of the letter, you see
23  that, it says Audit No. X01-105630?
24     A.    Yes.
25     Q.    Do you know what that means?

Page 143

1      A.    I don't.
2      Q.    Are there any definitions of -- as part
3   of this closing protection letter?
4      A.    The letter is --
5      Q.    Standalone document?
6      A.    Yes.
7      Q.    Up at the top where it says, "National
8   Home Funding, its successors and/or assigns," what
9   does that mean?
10     A.    Usually the commitment issued I guess to
11  the lender also contains similar language, and I
12  think this parallels the commitment language, meaning
13  that it would run to National Home Funding, its
14  successors and/or assigns.
15     Q.    I'm sorry. Just to go back for a
16  second. Jumping around, but the audit number up at
17  the top, who would have done the audit?
18          MR. KOTT: Objection to form.
19     A.    I am not -- I don't know the
20  significance of that number, and I don't know if
21  that's a Commonwealth number at all, so I don't know
22  who would have done an audit because I don't know how
23  to tie that to --
24     Q.    Would Commonwealth have performed audits
25  on closing protection letters?

Page 144

1      A.    No. They would perform an audit
2   periodically of the agent. As I said I don't
3   understand the significance of that so...
4      Q.    Do you, and by you I mean Commonwealth,
5   do you know what table funding is. Have you ever
6   heard that terminology?
7      A.    Yes.
8      Q.    Can you tell me what that means?
9      A.    My understanding is that one lender is
10  the party that I guess requested the commitment and
11  is acting as the lender but the funds that are going
12  to be -- the funding for that transaction is actually
13  coming from I think another lender, a wholesale
14  lender. I'm not sure of the terminology.
15     Q.    I'm going to show you what's been marked
16  as Exhibit 7. It says Exhibit B on the front page
17  because this was actually attached to the Fourth
18  Amended Complaint. I don't know if you had an
19  opportunity to look at the Fourth Amended Complaint
20  filed by Walsh Securities.
21     A.    I did take a look at it.
22     Q.    This would be a closing protection
23  letter issued by Fidelity.
24          MR. HAYES: Is this seven?
25          MR. MEE: Yes.

Page 145

1      Q.    Down at the bottom of this page, as you
2   compare it to what's been marked as Exhibit 8 -- I
3   mean Exhibit 6 --
4      A.    Right.
5      Q.    -- it doesn't show that there's any
6   identification by the NJRB.
7      A.    Right.
8      Q.    What does that mean?
9      A.    This is a Fidelity letter and I'm not
10  sure it has any significance. Well, I guess it's
11  been photocopied so I don't know if it was on the
12  original. I don't know why the filing information
13  doesn't appear on the letter. I don't know if it's
14  required to be on there or whether this is how one
15  entity printed it, one of the title companies printed
16  it. I mean, the form is not printed by the state or
17  the rating bureau so one company might have printed
18  it with that information detailed on it and another
19  not, I don't know, or this could be a copy of some
20  sort.
21     Q.    Does it indicate that that -- I'm sorry,
22  Exhibit 7 is not a letter issued under -- by the
23  entity, the National Land Title Insurance Rating
24  Bureau?
25          MR. KOTT: Objection to the form.

37 (Pages 142 to 145)

9ce207e6-66a4-4035-b780-e65560fc2075

D. SULLIVAN

Page 146

1    Q.    Sorry.  New Jersey Land Title Insurance
2  Rating Bureau?
3          MR. KOTT: Objection.
4    A.    Does it indicate it is not a filed form?
5    Q.    That this letter is not issued by the
6  New Jersey Land Title Insurance Rating Bureau and I
7  mean Exhibit 7.
8          MR. KOTT: Objection to the form.
9          MR. HAYES: Objection to the form.
10   A.    The letter is not issued by the rating
11 bureau, but each company issues its own letters.
12   Q.    Okay.  On the second page of Exhibit
13 7 --
14   A.    Uh-huh.
15   Q.    -- there's a Paragraph F.  Could you
16 just read that to yourself.  And if you look at page
17 two of Exhibit C -- sorry, Exhibit 6, Paragraph F is
18 not on that second page of Exhibit C -- Exhibit 6.
19   A.    Okay, yes.
20   Q.    Do you know what Paragraph F provides?
21         MR. KOTT: Objection to the form.
22   A.    I'm reading it, yes.
23   Q.    And do you know why that provision isn't
24 in Commonwealth's closing protection letter?
25   A.    I believe I do.  I believe this was an

Page 147

1  error in the form.  I understand that the rating
2  bureau submitted an incorrect draft and distributed
3  it I guess to its members, and it was later
4  corrected, but before the effective date of the
5  letter, and distributed with Paragraph F because this
6  is the form filed with the state.
7          MR. KOTT: "This" being -- referring to
8  Exhibit 7. So you believe Exhibit 7 is the form that
9  was filed with the state?
10         THE WITNESS: Correct.
11   Q.    Why didn't -- why did Coastal issue
12 these separate CPLs?
13         MR. KOTT: Objection to the form.
14         MR. McGOWAN: Objection to the form.
15   A.    I would have to say that Coastal issued
16 the form that Fidelity directed. They issued a
17 form -- and I'm not sure of the history of what was
18 given to Coastal with respect to Commonwealth,
19 whether they had an incorrect version, a later
20 corrected version, or I haven't found that out, the
21 history of it, because I believe they have issued --
22 at least on one transaction I've seen a form with F
23 in it.
24   Q.    Okay.
25         MR. HAYES: Off the record.

Page 148

1          (A discussion takes place off the
2  record).
3    Q.    The purpose of title insurance is to
4  insure what?
5    A.    Well, you can request insurance to
6  insure --
7          MR. MAGNANINI: We will withdraw the
8  question.
9          (Commonwealth-8, Deed dated 12/16/96, is
10 received and marked for identification.)
11   Q.    I've put in front of you what's been
12 marked as Exhibit 8, which is a copy of a deed dated
13 December 16, 1996 from Osis Corporation to G.J.L.
14 Limited.  We retrieved this document from the
15 Monmouth County records website.  Up at the top of
16 the document there's a handwritten "R&R to."  Do you
17 know what that would mean?
18   A.    Record and return.
19   Q.    And do you know what G.J.L. Limited is?
20   A.    I don't know.  It's obviously the
21 grantee on the deed.
22   Q.    And the date on this that this property
23 was deeded is December 16.  Is that right?
24   A.    Yes.
25   Q.    And can you tell from this document what

Page 149

1  the sale amount is?
2    A.    Well, recites that the transfer was made
3  for consideration of $1,500.
4    Q.    On the second page there's an insurance
5  title commitment.  It says it's by Commonwealth up at
6  the top and there's a file number CT-18724.  How come
7  that -- how come that file number doesn't have an "a"
8  after it?
9    A.    I don't know.
10   Q.    Okay.  And do you know if this was
11 issued by Coastal?
12   A.    The reason this is in this deed is, I
13 presume, many attorneys will just take the
14 description out of the commitment and insert in the
15 deed in lieu of typing up the description themselves.
16 This is not part of the commitment.  It's something
17 somebody has removed from the commitment and used.
18   Q.    But can you tell down at the bottom
19 whether or not this was issued by Coastal Title, this
20 title commitment?
21   A.    Well, it says it's prepared by an
22 attorney.
23   Q.    I'm sorry, second --
24   A.    Again, this is a page removed from the
25 title commitment and inserted for -- by the attorney.

38  (Pages 146 to 149)

D. SULLIVAN

Page 150

```
1      Q.    Okay.
2            MR. HAYES:  The witness is referring to
3   the second page of the exhibit.
4            (Commonwealth-9, Deed dated 12/31/96, is
5   received and marked for identification.)
6      Q.    What I've given to you, what's been
7   marked as Exhibit 9, is a deed dated December 31,
8   1996 from G.J.L. to Rafael Bustos, Senior.  Can you
9   tell from this document who is the closing attorney
10  on this sale?
11     A.    You can't tell who the closing attorney
12  is.  You can tell who prepared it and who it was
13  recorded and returned to.
14     Q.    Well, can you tell who prepared it up at
15  the top?
16     A.    Richard Pepsny is written in as the
17  preparer.
18     Q.    And the sale amount, do you know what
19  the sale amount is based on this document?
20     A.    Transfer amount was recited as 186,500.
21     Q.    On the second page of this document it
22  appears to be a title insurance commitment issued by
23  Coastal Title, and if you look at the top, again the
24  file number, it says CT-18724(a).  Do you know why
25  that "a" would be there?
```

Page 151

```
1            MR. HAYES:  Object to the form.
2            MR. McGOWAN:  Objection to the form
3   also.
4            MR. KOTT:  Objection.
5      A.    It would be speculation.
6            MR. MAGNANINI:  For the record, this is
7   from Coastal Title.  We can go off the record.
8            (A discussion takes place off the
9   record).
10     Q.    Going back to exhibit -- going back to
11  page two of Exhibit 8, and if you compare the
12  description of this property with that in Exhibit 9
13  it's the same, and if you look at the file number up
14  at the top, does it have the same file number?
15     A.    No.
16     Q.    What is different?
17     A.    Same number but one has an additional
18  letter designation.
19     Q.    Which one?  Is that Exhibit 9?
20     A.    Exhibit 9 has an "a" in it.
21     Q.    Do you know why they used the same
22  number?
23     A.    Again, I could speculate but I don't
24  know why they did.
25     Q.    Would you like to make an educated
```

Page 152

```
1   guess?
2      A.    I can make an educated guess.  I would
3   assume that they're on the same property and they may
4   have used the search work here for the later
5   transaction as well and just updated it.
6      Q.    Okay.
7            (Commonwealth-10, Deed dated 1/7/97, is
8   received and marked for identification.)
9      Q.    I'm handing you what's been marked
10  Exhibit 10, which also comes from Coastal Title's
11  documents.  It's a deed from Rafael Bustos to Capital
12  Assets dated January 7, 1997.  Can you tell who
13  prepared this document?
14     A.    It says it's prepared by Lorraine King.
15     Q.    And this document was supposed to be
16  returned to whom?
17     A.    It states that it was supposed to be
18  recorded and returned to Stanley Yacker.
19     Q.    On the second page of this document,
20  again it's a file number CT-18724(a).  Why wouldn't
21  there be a (b) after that?
22            MR. KOTT:  Objection to the form.
23            MR. McGOWAN:  Same objection.
24     A.    I think Coastal would have to answer
25  that.
```

Page 153

```
1            MR. KOTT:  So the witness has sustained
2   my objection.  I just want to note that.
3            MR. MAGNANINI:  Off the record.
4            (A discussion takes place off the
5   record).
6      Q.    The description of this land and the
7   file number on this insurance -- this title insurance
8   commitment are the same.
9      A.    I'm sorry.  Say that again.
10     Q.    The description of the land --
11     A.    Right.
12     Q.    -- and the file number --
13     A.    Uh-huh.
14     Q.    -- are the same.
15     A.    As?
16     Q.    As the earlier two exhibits, nine and
17  eight.
18     A.    Okay.
19     Q.    Let's go with nine.
20            MR. HAYES:  She's repeatedly said
21  they're not commitments.
22            MR. KOTT:  Is the question:  Is the
23  second page of Exhibit 9 the same as the second page
24  of Exhibit 10?  Is that the question?
25            MR. MEE:  Yes.
```

39 (Pages 150 to 153)

VERITEXT REPORTING COMPANY

D. SULLIVAN

Page 154

1    A.    Appears to be, yes.
2    Q.    Why would they -- why would Coastal have
3 used the same title insurance commitment on both of
4 these transactions?
5         MR. KOTT: Objection to form.
6         MR. McGOWAN: Objection.
7    A.    These are not commitments. These
8 descriptions were extracted from a commitment. I
9 don't know that they were extracted from different
10 commitments.
11    Q.    Why would Coastal Title have extracted
12 the same title insurance commitment to be used in two
13 separate transactions?
14         MR. HAYES: Objection.
15         MR. McGOWAN: Same objection.
16         MR. HAYES: She's testified previously
17 Coastal didn't do this. The attorneys did this who
18 prepared the deeds.
19         (Commonwealth-11, Information Sheet, is
20 received and marked for identification.)
21    Q.    This is a title commitment issued by
22 Commonwealth, or, I'm sorry, issued by Coastal on
23 behalf of Commonwealth. Commitment date at the top
24 of the second page is October 14, 1996. Does this --
25 this looks like a commitment to you?

Page 155

1    A.    Yes, it looks like a commitment and some
2 additional -- a couple of attachments.
3    Q.    On paragraph three there looks to be
4 like there are a few spaces where things are not yet
5 filled in. Why wouldn't that information be filled
6 in at the time of the commitment date?
7         MR. KOTT: Are you referring to
8 paragraph three on Schedule A, counselor?
9    Q.    Paragraph three on CTB1155.
10    A.    I assume it's not completed because the
11 document was not of record. Maybe it was in the
12 process of being recorded or they didn't have -- the
13 commitment date is October 14, which may be behind
14 also, but, in any event, I am assuming this was not
15 of record, this deed, as of the date of the
16 commitment.
17    Q.    And going back to Exhibit 10 -- hang on
18 one second. Exhibit 8, wouldn't a title search of
19 this property have picked up that as of the date
20 October 14 it was owned by Osis Corporation?
21    A.    I'm looking from the deed from Osis
22 to -- the commitment says it's -- a deed or title is
23 in Cristo by deed from Osis Corp.
24    Q.    Why don't you read paragraph three of
25 Schedule A on Exhibit 11 for the record.

Page 156

1    A.    Fee simple interest in the land
2 described in this commitment is owned at the
3 commitment date by Cristo Property Management, LTD by
4 deed from Osis Corp. dated blank recorded blank in
5 the Monmouth County Clerk's/Register's office in deed
6 book blank page blank.
7         I'm trying to tie these together. The
8 commitment date is October 14, '96. It says Cristo
9 is in title. You're giving me a deed dated December
10 of '96 saying Osis is conveying to G.J.L. and what is
11 the question?
12    Q.    Who has ownership on the date of this
13 commitment letter?
14         MR. KOTT: Objection to the form.
15    A.    I don't think I can tell that. Who has
16 title as of the date of the letter?
17    Q.    The date of the commitment.
18         MR. KOTT: Objection to the form. The
19 commitment is dated October 14, 1996 and he's asking
20 you if you can tell who has title as of that date.
21    A.    I can't.
22    Q.    The commitment says that the interest in
23 the land is owned at the date on this commitment date
24 by Cristo Property?
25    A.    Uh-huh.

Page 157

1    Q.    And the commitment date is October 14.
2    A.    Okay. The commitment itself is stating
3 it's owned by Cristo, but it's reciting that it's by
4 a deed that is yet to be dated perhaps or recorded.
5 So if you're asking me: What does the commitment
6 actually state? It says it's owned by Cristo by this
7 but can I tell? I don't have any recording
8 information there that documents that.
9    Q.    I can represent to you that that -- that
10 this property that's identified in Exhibit 8 was not
11 in G.J.L.'s possession until December 16 of 1996.
12 G.J.L. is an alter ego of Cristo. So why would
13 Coastal be issuing a commitment, title commitment,
14 two months prior on a property and stating that it
15 was owned by Cristo on a property that was not owned
16 by Cristo?
17         MR. McGOWAN: Objection. How could she
18 possibly know that Coastal did that? If you want to
19 ask the question ask Coastal.
20         MR. HAYES: Let me object to the form.
21 This witness has not said the date of the commitment
22 is the date that it's issued. She indicated that's
23 the effective date and in her testimony said there
24 could be a difference between the effective date and
25 the date it's actually issued. I am -- if you want

40  (Pages 154 to 157)

D. SULLIVAN

Page 158

1  to ask her why, she can explain to you why that is.
2      MR. MEE: I would still like to see if
3  she can answer the question.
4      Q.   Can you answer the question?
5      MR. KOTT: Do you remember the question?
6      (The pending question is read by the
7  court reporter.)
8      A.   I think I'm going to have to say that
9  Coastal Title would have to answer.
10     Q.   Does that seem unusual to you?
11     A.   Does it seem unusual? I guess aside
12 from the dates, which the dates might be explainable,
13 it seems like maybe they're doing it in advance. And
14 as you say it could have gone into G.J.L. or Cristo.
15 Maybe they decided to take the title in a different
16 name. Is it unusual to see something that's -- well,
17 I guess I shouldn't ask the question.
18     Q.   Do you think it's unusual?
19     A.   What? Excuse me.
20     Q.   Seeing a commitment two months prior to
21 the deed?
22     MR. HAYES: Object. Again, she's not
23 said that's the date it's issued.
24     A.   This is the commitment date, which
25 represents the county board date for searching. It's

Page 159

1  not the current date. County records could be a
2  month, two months behind. It depends on the
3  individual counties and how backlogged they are in
4  getting documents of record, and we can only search
5  up until the point that they have actually recorded
6  up to. So if they're three weeks, four weeks behind
7  we don't issue a commitment with today's date. We
8  only issue this as of the date we were able to search
9  to.
10     Q.   Okay. How about that it was issued
11 without certain -- it was issued with blanks in it.
12 Is that unusual?
13     A.   I've seen commitments in this fashion or
14 about to be recorded. Sometimes you see that in the
15 context of having foreclosures where they're still
16 waiting for the Sheriff's deed to come in and then
17 the property is being transferred. So I have seen it
18 without the recording information. Does it represent
19 a large percentage of the commitments issued? I
20 would say probably no.
21     Q.   I would direct you to CTB 1164. Do you
22 know what this document would be? Do you know what
23 this is?
24     A.   It's an upper court lien search.
25     Q.   Can you tell when it was conducted?

Page 160

1      A.   Again, that is the search to date.
2  That's the date to which they search the records,
3  which may not be the true date, although it's
4  generally much closer to the true date than a county
5  date would be.
6      Q.   Okay. Why would Coastal Title be
7  conducting -- you said an upper court search?
8      A.   Yes.
9      MR. McGOWAN: Same objection.
10     Q.   On Mr. Bustos? On a property not owned
11 but that's being purported to be sold to him -- not
12 owned by Cristo but being purportedly sold to him. I
13 am going to strike that question.
14     Can you tell -- going back to CTB 1164,
15 can you tell when this document was printed? It's in
16 the middle of the page, I believe.
17     A.   Oh, I see, 10/30/96.
18     Q.   So if this property wasn't owned by
19 Cristo Management, why are they conducting -- why is
20 Capital -- Coastal Title conducting an upper court
21 search on Mr. Bustos?
22     MR. McGOWAN: Same objection.
23     A.   Well, Coastal probably could answer
24 this. I'll assume that in the normal course a lender
25 requires you run a judgment search against the

Page 161

1  borrower, purchaser, and in connection with I guess
2  the commitment they've ordered a 20-year search
3  against Mr. Bustos to ensure that there are no
4  judgment liens against him.
5      Q.   Just going back real quick, the date
6  that this was actually sold to Mr. Bustos --
7      MR. KOTT: Referring to Commonwealth-9.
8      A.   Okay.
9      Q.   -- is December 31, 1996.
10     A.   Okay.
11     Q.   Doesn't Exhibit 11 suggest that Cristo
12 owned this property on October 14?
13     A.   I would say owned or about to own based
14 on the fact that there's no deed date, but again
15 that's my assumption of what that means.
16     Q.   Why if the upper court search was
17 conducted or printed on October 30th, why is that --
18 why is that different than the date -- the commitment
19 date on CTB1155?
20     A.   Commitment date is the search date in
21 the county. It's not real, the true date. It
22 doesn't reflect when the commitment was issued,
23 depending on how far behind the board date the county
24 was, so if, for instance, they ordered the search on
25 the 30th and they printed the commitment on the 30th,

41 (Pages 158 to 161)

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

D. SULLIVAN

Page 162

1  we -- maybe the board date was only a week -- or how
2  many weeks is that behind?  This is not -- this is
3  not the date.
4      Q.   Okay.
5          (Commonwealth-12, Schedule A, is
6  received and marked for identification.)
7      Q.   I'm giving you Exhibit 12, which is
8  another copy of Commonwealth's title insurance
9  commitment dated October 14, same file number with
10 the (a) after it.  Is this a marked-up title
11 commitment?
12     A.   It does not look like a marked-up
13 commitment to me.
14     Q.   Okay.
15         (Commonwealth-13, Invoice dated
16 10/30/96, is received and marked for identification.)
17     Q.   I'm giving you what's been marked as 13.
18 It's an invoice from Coastal Title to Stanley Yacker
19 on the same property as identified by the title
20 number.  The date on this document is October 30,
21 1996.  Does this suggest that the title commitment
22 was issued as of October 30, 1996?
23     A.   I think it's the date the invoice was
24 printed.  Whether or not it was issued, I don't know.
25     Q.   How much is the invoice for?

Page 163

1      A.   $1,113 is the total.
2      Q.   And how much of this would have gone to
3  Coastal and how much to Commonwealth, approximately?
4      A.   I don't know if I can do the math in my
5  head and I don't know that -- some of the endorsement
6  charges may be kept by the agent, I'm not sure.  The
7  closing protection letter fee should come to us
8  according to the agency agreement that I saw.  Unless
9  it was amended it would be -- we would get 20
10 percent.  I think the agent keeps --
11         MR. KOTT:  20 percent of what, Donna, of
12 the premium?
13     A.   That's what I'm looking for.  I guess
14 the premium.  Base examination charge -- I am
15 assuming the agent keeps.  These are out of pocket,
16 lien searches.
17     Q.   But there is a charge for the closing
18 service letter?
19     A.   There is.
20     Q.   And is it unusual that an invoice would
21 have been sent for a property not yet in Cristo's
22 possession, not yet owned by Cristo?
23     A.   Well, this is a preparation of a
24 commitment for a future event, so I would think if
25 Coastal thought there was going to be a second

Page 164

1  transaction where there was going to be a sale, that
2  they might prepare the commitment and an invoice and
3  I think that's what they did.
4      Q.   And that would have been -- that would
5  have conformity to the agency agreement between
6  Commonwealth and Coastal?
7      A.   Well, the agency agreement wouldn't
8  control specifically the handling of this
9  transaction.  Are you saying underwriting guidelines?
10     Q.   Yes.
11     A.   Which I haven't been able to find
12 memoranda so I don't know if there was anything at
13 that time.
14     Q.   Do you know how much Commonwealth
15 received on this?
16     A.   Again, it's 20 percent, and I am not
17 trying to do the math in my head at this point, of
18 the premium.
19         MR. HAYES:  The question is:  Do you
20 know how much Commonwealth received?
21     A.   Actually received?  I guess I don't know
22 that at all because I can't trace the -- or I haven't
23 gotten the policy numbers to submit to home office to
24 figure out what was actually received.
25         (Commonwealth-14, Copy of Check 2238, is

Page 165

1  received and marked for identification.)
2      Q.   What I've given to you is a copy of a
3  check from Coastal Title's files.  Can you tell what
4  the amount is in the check?
5      A.   It's $1,113.
6      Q.   So it's likely that Mr. Yacker paid this
7  invoice that's in Exhibit 13.
8      A.   It's for the same amount.  There's
9  nothing on the check to detail what it's for.
10     Q.   Well --
11     A.   Wait, here there is.  Something Bustos.
12 Bustos.
13     Q.   I'm just directing your attention -- for
14 the record the -- on Exhibit 13 the transaction is
15 identified as the Bustos Cristo Property at 138 Ridge
16 Avenue.
17     A.   I think the check says Bustos Senior,
18 138 -- so it's likely it's for the same.
19     Q.   So how much did Coastal -- sorry.  How
20 much did Commonwealth receive based on this invoice?
21     A.   Again, we don't know how much we
22 actually received, if anything, but -- and, again, I
23 assume that we -- what they should have remitted
24 would have been 20 percent of the premium and service
25 letter fee, and I'm not sure that all the other

42  (Pages 162 to 165)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

D. SULLIVAN

Page 166

1  charges -- I believe most of these charges are kept
2  by the agent because they're out-of-pocket expenses.
3  I'm not sure if the ALTA endorsement -- I'm not sure
4  if the ALTA 1 endorsement has a fee in it and if so
5  who is entitled to receive that, whether the agent
6  keeps that or we keep that.
7      Q.    Okay.
8            (Commonwealth-15, Summit Bank
9  Spreadsheet dated 5/22/97, is received and marked for
10 identification.)
11     Q.    What I've given to you as Exhibit 15 are
12 documents received from Mr. Yacker. I direct your
13 attention to the third page, SYS 7083. You see the
14 second entry on January 28, 1997?
15     A.    The third entry I guess. Right?
16     Q.    Yeah. Does that suggest to you that Mr.
17 Yacker paid this invoice from Commonwealth to Coastal
18 with that check identified as Exhibit 14?
19     A.    Yeah, I see the check. Is this -- you
20 know, this is an account statement and I guess the
21 numbers represent disbursements that were made or
22 checks that cleared, and assuming that's the case,
23 then, yes, it looks like this third entry is the
24 check that you have shown me to pay the invoice.
25     Q.    Going down to entry -- looks like 26225,

Page 167

1  it shows that a payment was made to the Monmouth
2  County Clerk for D707.50.
3      A.    I'm not sure -- over here. Okay.
4  26225. Yes.
5      Q.    Can you venture a guess as to what that
6  amount might be for?
7      A.    It would only be a guess.
8      Q.    What would that be?
9      A.    Obviously it's the recording of some
10 documents, but I don't know the total, what that
11 represents.
12     Q.    And then moving down to the next entry
13 it shows that that check has been voided. Can you
14 venture a guess as to why that check may have been
15 voided?
16     A.    No.
17     Q.    And then moving down even further, the
18 same date, it says Monmouth County Clerk record for
19 Bustos Junior, that's an $81 check. Can you venture
20 why that check may have been voided?
21     A.    No.
22     Q.    Can you venture any guess as to why Mr.
23 Yacker would be voiding checks for recording fees?
24     A.    No.
25     Q.    In the course of your investigation did

Page 168

1  you come to find that Mr. Yacker was voiding checks?
2      A.    I am unaware of that. If we reviewed
3  that I don't know.
4      Q.    Okay.
5            (Commonwealth-16, Coastal Title Agency
6  Document dated 10/29/96, is received and marked for
7  identification.)
8      Q.    Could you tell me what Exhibit 16 is?
9            MR. HAYES:  Do you want to venture a
10 guess as to what 17 is?
11     A.    You're asking:  What is this exhibit?
12     Q.    Yes. Do you know why -- what this
13 exhibit is?  What this document is?
14     A.    Appears to be some type of title
15 insurance order perhaps or some kind of document of
16 Coastal Title's.
17     Q.    Up at the top under the number right
18 here, do you know why that "a" would be handwritten?
19           MR. McGOWAN:  Same objection as before.
20 She can't possibly know.
21     A.    I do not.
22     Q.    Down at the bottom where it says,
23 "Recorded By," do you know what that means?
24     A.    No. I'm not sure it means recorded.
25     Q.    Okay. And the simultaneous issue amount

Page 169

1  right there, is that a fee that Commonwealth would
2  have collected?
3      A.    I don't know the answer to that.
4      Q.    How about the premium?
5      A.    Premium, we would have been expecting to
6  receive our split according to the agency agreement.
7      Q.    Do you know what the simultaneous issue
8  amount is for?
9      A.    It's for the issuing a simultaneous
10 policy. For instance, if you issue an owner's
11 policy, they will issue a loaner's. Usually you're
12 getting the first one for the full fee and then you
13 get the second one for $25 because really the
14 liability falls within the larger -- it's not a
15 separate liability, but under an owner's policy you
16 would payout -- any amount you pay on the loan would
17 reduce the owner so...
18     Q.    So this would suggest that a policy was
19 issued?
20     A.    Well, I don't know what this document
21 actually is. But either it was requested or might
22 have been issued. I don't know.
23     Q.    Would this document have been received
24 by Commonwealth?
25     A.    I don't believe so, no.

43  (Pages 166 to 169)

D. SULLIVAN

Page 170

1      (Commonwealth-17, Closing Instructions
2  by Walsh Securities, is received and marked for
3  identification.)
4      Q.   Do you know what this document is?
5      A.   States that it's the closing
6  instructions by Walsh Securities.
7      Q.   If these closing instructions were not
8  followed by Mr. Yacker would Commonwealth provide
9  coverage under its closing protection letter?
10     MR. KOTT:  I object.  And the ground of
11 my objection is this is repetitive.  She's been asked
12 maybe six times and each time she said we provide
13 coverage to the extent it was set forth in the
14 closing protection letter, meaning paragraphs one and
15 two.
16     Q.   Let me --
17     MR. KOTT:  She's been asked that
18 question a whole bunch of times.
19     Q.   I am going to try to clear up the
20 objection.  And maybe I will and maybe I won't.  I've
21 handed you Exhibit 6 and that's the closing
22 protection letter on the closing for the property on
23 Exhibit 17.  So --
24     MR. HAYES:  Can I ask:  Do we have a
25 signed copy of that letter?  Do you know?

Page 171

1      MR. MEE:  That's not signed.
2      MR. HAYES:  What is that?
3      MR. MEE:  That's one is not signed.
4      MR. HAYES:  I am asking:  Do you have a
5  signed copy.  If you don't know, that's fine.
6      MR. MEE:  I don't know off the top of my
7  head.
8      Q.   So, again, this closing protection
9  letter was issued for this closing.  Is that right?
10     A.   Other than the issue that I have that
11 the letter is addressed to National Home Funding and
12 the closing instructions are from Walsh Securities
13 they do appear to pertain to the same property and
14 same attorney to close it.
15     Q.   So let me rephrase then.  If this were
16 the closing protection letter on the sale of this
17 property, if Exhibit 6 were the closing protection
18 letter on the sale of the property on Exhibit 17, and
19 supposing that Mr. Yacker did not follow the closing
20 instructions that are identified on Exhibit 16 -- 17,
21 would Commonwealth provide coverage under its closing
22 protection letter?
23     MR. KOTT:  Fail to follow them in what
24 way, counsel?
25     A.   I am afraid --

Page 172

1      MR. MEE:  General question.
2      A.   Again, this is the same question I
3  think.  This letter, assuming there are not other
4  defenses to the letter, we only provide protection as
5  set forth in paragraphs one and two.
6      Q.   Okay.  Can I direct you to page two on
7  Exhibit 17.  Give me a minute.  If the documents
8  pertaining to the sale of this property to Bustos
9  were not recorded would there be coverage under the
10 closing protection letter?
11     A.   I am not -- I assume -- leaving other
12 defenses to the letter, would this language generally
13 protect for the failure to record the documents?
14     Q.   Not generally.  Specifically with regard
15 to that closing protection letter, if the mortgage
16 and deed on this sale were not recorded would
17 Commonwealth provide coverage under the closing
18 protection letter?
19     MR. KOTT:  Assuming no other defenses to
20 the letter?
21     MR. HAYES:  And assuming the loss
22 sustained as a result of that failure to record?
23     MR. MEE:  Yes.
24     A.   Well, assuming no other defenses, this
25 language insures the lien priority.  So obviously if

Page 173

1  the lien has not been established by recording and
2  there's a loss suffered, then that would fall within
3  the parameters of that protection.
4      Q.   What about under a title -- if a title
5  policy were issued?  What about under a title policy,
6  same situation, the mortgage and the deed were not
7  recorded?
8      A.   It's unlikely the policy would be issued
9  without the deed and mortgage recorded because they
10 usually wait for the recording information to insert
11 in the policy and use the recording date as the date
12 of the policy.  So in most circumstances it wouldn't
13 be issued in that fashion.
14     Q.   Okay.
15     (Commonwealth-18, Final Judgment, is
16 received and marked for identification.)
17     Q.   One follow-up question.  If the premium
18 was paid by Yacker on that policy -- on a policy but
19 a policy was not issued, what would Commonwealth have
20 done with that money?
21     A.   The premium was issued based on the
22 commitment that had been issued to Yacker and you're
23 saying the documents were not recorded?
24     Q.   Yes.
25     A.   I would say that we would not issue a

44 (Pages 170 to 173)

D. SULLIVAN

Page 174

1  policy because the requirements in the commitment
2  haven't been met to record the documents.  That may
3  call into play whether there's coverage for that
4  under the closing service letter.  So I mean I would
5  address that issue if there was a closing service
6  letter that was viable.
7      Q.    Okay.  But a separate question:  With
8  regard to any premiums that were paid on the
9  commitment that were received by Commonwealth, what
10 would Commonwealth have done with those --
11     A.    It's unlikely that Commonwealth itself
12 would have received its portion of the premium if the
13 documents weren't recorded because the policy
14 wouldn't be issued and they usually remit when the
15 policy is issued.
16     Q.    I'm handing you Exhibit 18.  And this is
17 again a document that was retrieved from the Monmouth
18 County Records website.  Are you familiar with tax
19 sales at all?
20     A.    A little, yeah.
21     Q.    Do you know what this document is?
22     A.    A final judgment.  I am assuming Asbury
23 Park must have foreclosed a tax sale certificate.
24     Q.    On the last page it says that G.J.L.
25 Limited is the purchaser of title as of December 16,

Page 175

1  1996.  Do you know why Mr. Bustos is not listed as
2  the last owner?
3      A.    I do not.
4      Q.    Since there was no mortgage or deed ever
5  recorded -- since there was no mortgage or deed ever
6  recorded on this property, was there any way for
7  Walsh Securities to recover on any deficiency of the
8  money that it loaned?
9          MR. KOTT:  Objection to the form.
10     A.    Since there was no mortgage or deed
11 recorded, could they recover on a deficiency?
12     Q.    Of a loan.  Going back to these prior
13 exhibits, Walsh Securities loaned the funds to Bustos
14 to purchase this property.
15         MR. KOTT:  Wasn't the deed to Bustos
16 after this?  Go ahead.
17     Q.    So --
18         MR. KOTT:  So what you're saying is that
19 Bustos took it in 1996.
20         MR. MAGNANINI:  December 31.
21         MR. KOTT:  And what you're saying is if
22 the Bustos deed was not recorded -- what is the rest
23 of it?
24     Q.    What is the remedy to Walsh Securities
25 for having funded that loan?

Page 176

1
2  CONTINUED DIRECT EXAMINATION BY MR. MAGNANINI:
3      Q.    I will just ask the question.  Assuming
4  that, as you said, there's no other defenses and
5  Walsh Securities had suffered a loss, would there be
6  coverage under the CPL for the failure to file the
7  Bustos deed and, therefore, the property is lost due
8  to a tax lien foreclosure?
9      A.    Assuming no other defenses, which could
10 be I guess a myriad of things, we're saying that the
11 deed was not recorded and they were not joined,
12 therefore, in the foreclosure action and --
13     Q.    By "they," you mean Walsh Securities?
14     A.    Yeah.  Whoever is the holder of the
15 indebtedness, I guess.  They would have I think a
16 claim for the failure of the attorney to record to
17 the extent that that actually resulted in the loss.
18 It might be limited to property value.
19     Q.    I didn't ask about the damages.  There's
20 a disagreement among counsel based on the case law
21 about what damages are under the -- are covered by
22 the CPL, whether it's the mortgage, the interest,
23 attorneys' fees, but I think my question was simply
24 that:  If, as we found, the Bustos mortgage was never
25 recorded, and again without getting into the whole

Page 177

1  other defenses or anything, would there be coverage
2  under the CPL for any loss to the lender?
3      A.    Because of the priority of the lien was
4  compromised by the failure of the attorney, I would
5  say that would be a matter that was intended to be
6  protected.
7          MR. KOTT:  By the closing letter.
8      A.    By the closing service letter.
9          (Commonwealth-6A, Signed Copy of Exhibit
10 6, is received and marked for identification.)
11         (A recess takes place.)
12     Q.    Miss Sullivan, if I ask just jump back
13 and wrap up with just a few follow-ups to Mr. Mee's
14 questions.
15         Earlier in the deposition you gave a
16 definition of what a valid first lien is.  Can you
17 define that according to the title policy?
18     A.    Okay.  I think I'm going to use --
19     Q.    If you can.
20     A.    I don't recall exactly what I said
21 before but I would assume it has to be a lien
22 recorded in first position in the land records and,
23 you know, not subject to some type of attack, which
24 would fall within covered risk under the policy.
25     Q.    Is that the same definition that's used

45  (Pages 174 to 177)

D. SULLIVAN

Page 178

1  in, let's say, a definition of law but one that's
2  been developed by courts in the State of New Jersey?
3     A.    No, I just thought that one up. I'm
4  just trying to come up with one to answer your
5  question. I don't know of a specific definition
6  probably by anybody.
7     Q.    I was asking the question actually as a
8  follow up to Mr. Hayes' objection, which was -- the
9  question was: What is a valid first lien? And we
10 asked for Commonwealth's view on that and Mr. Hayes'
11 objection was: Do you mean at law, according to case
12 law, or according to the policy, and is there a
13 difference in your mind?
14    A.    Well, what is a valid first lien is
15 almost going to be speak for itself. What is covered
16 under the policy, you know, still going to be
17 determined by the terms of the policy. So I'm trying
18 to envision a scenario where the lien could be
19 invalid in some fashion, but it doesn't fall within
20 the covered risks of the policy, or it may be an
21 excluded matter so -- you know.
22    Q.    So --
23    A.    I guess I'm having a hard time.
24    Q.    Can you give me an example?
25    A.    I don't know.

Page 179

1     Q.    A lien that's not -- actually let me
2  just phrase the question for you. An example of a
3  lien that's not a valid first lien but is not covered
4  by the policy?
5        MR. HAYES: The purpose of my
6  distinction was that something might not be a valid
7  first lien by looking at it strictly under the law,
8  but can be established as such through the conduct of
9  the title company under the policy. For example, a
10 lien may be established in second position, however, the
11 title company may establish those rates under the
12 policy that the first recorded mortgage is invalid,
13 agree to be subordinated, may have been paid off,
14 etcetera so --
15       MR. MAGNANINI: That's what you were
16 driving at and that's what I didn't know.
17    A.    I think I am off on the wrong track.
18       MR. HAYES: I don't want to mislead.
19    Q.    I was just wondering -- but it doesn't
20 sound like there's a different -- you have a
21 different view of a valid first lien under the
22 policy, under the law or what you would consider a
23 valid first lien?
24    A.    I'm assuming that it's -- that the term
25 almost speaks for itself and...

Page 180

1     Q.    Earlier, Miss Sullivan, you had said
2  that a small number of title commitments are issued
3  without the recording information. Can you estimate
4  what percentage? Is it less than five?
5     A.    This is a wild guess since I don't see a
6  big sample. I would say probably -- I don't know
7  that it would be more than five, but the majority are
8  not going to be sequential like that I would think.
9     Q.    When you were preparing for the
10 deposition did you notice any of the title
11 commitments from one sale to another in any of the
12 documents you may have looked at?
13    A.    I didn't view the documents for that
14 purpose to see the sequencing had changed, no.
15    Q.    Did Commonwealth have a policy that if a
16 premium had been paid but title insurance policy was
17 not issued that the premium -- the agent should
18 return the premium?
19    A.    I don't know that there's any express
20 policy on that.
21    Q.    Was that Commonwealth's expectation,
22 that if a title insurance policy was not issued
23 Commonwealth wouldn't receive its 20 percent of the
24 premium?
25    A.    If a policy wasn't issued I am assuming

Page 181

1  because either the transaction didn't close or if
2  they remitted the premium to the agent I guess it
3  closed, but I guess I don't understand your question.
4  So the transaction closed, the agent was paid but no
5  policy was issued?
6     Q.    Correct.
7     A.    And for what reason I don't know. Did
8  the attorney then decide not to get insurance and no
9  policy is ever issued to bind Commonwealth, you know,
10 or some -- I guess I would have to know -- and I
11 don't know that we have given any specific direction
12 to agents on that.
13    Q.    To the agents. Okay.
14    A.    Although Commonwealth wouldn't expect to
15 have a premium remitted for a policy it didn't issue
16 I would imagine, assuming there was no expectation of
17 coverage. I mean, obviously under a commitment there
18 can still be an expectation that a policy will be
19 issued in the future or something, but, I mean, if
20 we're not going to be bound to any liability under a
21 commitment or a policy, then I guess we don't expect
22 to receive a premium.
23    Q.    During Commonwealth's investigation into
24 the claims submitted by Walsh Securities did
25 Commonwealth learn that -- I think it's over a

46 (Pages 178 to 181)

9ce207e6-66a4-4035-b780-e65560fc2075

D. SULLIVAN

Page 182

1  two-day period, I believe it's April 8 and 9, 1997,
2  Coastal Title recorded approximately 220 mortgages
3  and -- not mortgages, excuse me, deeds related to the
4  properties at issue in this litigation?
5      A.   Did we discover that?
6          MR. HAYES: Let me object to the form.
7  I'm not sure if there's anything establishing those
8  numbers.
9      Q.   And that -- I'm giving you the round
10 numbers. The dates I know. I think so far what I
11 have seen is about 216 deeds and some of them have
12 gone back months, ten months, from the closing that
13 were all recorded April 8 and 9th of 1997.
14     A.   I don't know what might have been known.
15 I am not familiar with that fact even.
16     Q.   In Commonwealth's experience was it out
17 of the ordinary to have a large number of deeds
18 related to -- strike that.
19         Was it out of the ordinary to have deeds
20 recorded ten months after the closing?
21     A.   It was not a preferred way of having
22 things done. Obviously that exposes the company to
23 risk. Assuming there's coverage, you know, it leaves
24 us exposed to intervening liens. Was it common? I
25 would have to say no, that's probably not common.

Page 183

1  Obviously there's recording delays accounting for
2  that but that usually wouldn't run ten months.
3      Q.   Do you recall: During your
4  investigation was there any discussion with Coastal
5  Title about the recording of approximately 200
6  something deeds over two days for some of the
7  closings going back ten months?
8      A.   I don't know.
9      Q.   One question we never did ask. When is
10 the title insurance policy effective?
11     A.   The policy is usually issued with an
12 effective date of the recording date. Well, I don't
13 know what you mean -- I guess that's what you mean by
14 effective. The policy date is the recording date
15 generally in New Jersey.
16     Q.   The recording date of the deed?
17     A.   Or the mortgage.
18     Q.   Or the mortgage?
19     A.   Under the policy.
20     Q.   Do you know: Did Commonwealth ever send
21 a letter to Walsh Securities denying coverage under
22 either the closing service letters or the title
23 policies?
24     A.   I don't believe any denial letter was
25 sent.

Page 184

1      Q.   In preparing for the deposition did you
2  review Walsh Securities' responses to Commonwealth's
3  Interrogatories?
4      A.   I don't think so.
5      Q.   I will show it to Mr. Kott. I am not
6  going to mark it, but if you could take a look, that
7  is a breakdown of the fraud loans that Walsh alleges
8  are part of the fraud and they're all -- the sum
9  total of them, they're actually broken down -- I
10 believe it's the first four pages are Commonwealth.
11         MR. KOTT: The document that Mr.
12 Magnanini has put in front of the witness is a
13 14-page document, eight and a half by 14, and the
14 lower right corner it says, "Exhibit B to Walsh
15 Securities First Supplemental Response to
16 Commonwealth's First Set of Interrogatories."
17     Q.   If you could just take a look, like I
18 said, if you look under the title insurance company.
19     A.   Title insurance amount?
20     Q.   Off the record.
21         (A discussion takes place off the
22 record).
23     Q.   Back on the record. The document, as
24 Mr. Kott pointed out, is Exhibit B to Walsh
25 Securities' Supplemental Responses to Commonwealth's

Page 185

1  First Set of Interrogatories, and it's actually
2  divided into two sections. So it's pages one through
3  seven and then pages eight through fourteen. And if
4  you can -- if you look, the first three and a half
5  pages on each part, as you can see it says, "Title
6  Company." Right?
7      A.   Okay.
8      Q.   And then if you can flip back there's --
9  three and a half pages are loans that either Walsh
10 alleges either closing -- service protection letters
11 or title insurance policies were issued by
12 Commonwealth. Do you have any basis to disagree with
13 what's in Schedule B about the number of loans,
14 properties, the identification that were -- either
15 had Commonwealth issue a CPL or a title insurance
16 policy?
17         MR. KOTT: What's the question? Are you
18 asking her: Does she have any reason to believe that
19 everything in those pages is correct?
20     Q.   Right. Were properties that were
21 insured by Commonwealth.
22     A.   I haven't reviewed this document or
23 compared it to anything so I am not in a position to
24 say that.
25     Q.   What I'm trying to get at is: Of the

47 (Pages 182 to 185)

D. SULLIVAN

Page 186

1  various defenses that have come up I haven't heard a
2  defense that Walsh hasn't identified what properties
3  it alleges were part of the scheme that were insured,
4  and insured I mean either having a CPL or a title
5  insurance policy issued by Commonwealth?
6        MR. KOTT: Let me answer that you have
7  given us information as to what you believe the
8  properties are that were insured by Commonwealth and
9  Commonwealth is responsible for and you have given
10 that in discovery.
11      Q.    What my question actually should be --
12 occasionally we can dance -- is: Has Commonwealth's
13 investigation uncovered information other than what
14 was provided by Walsh Securities about properties
15 that were part of the fraud that either -- that were
16 insured by Commonwealth?
17      A.    So are we aware of other properties that
18 fall within the same kind of scheme that were not
19 identified --
20      Q.    Right.
21      A.    -- by Walsh? I am not aware of them,
22 any.
23      Q.    Do you know if anyone in Commonwealth
24 is? By you, you mean --
25      A.    I don't think there's anyone left.

Page 187

1        Q.    Okay.
2        MR. HAYES: I'm sorry. Is the question:
3  Are there more properties than you have identified?
4  Is that the question?
5        Q.    I wanted to find out -- that was the
6  first part of it. Was there any additional
7  properties other than what Walsh has identified?
8        A.    I just don't have -- I don't know.
9        Q.    Okay. And then during Commonwealth's
10 investigation other than the defenses that were
11 raised -- so during Commonwealth's investigation has
12 it been able to agree or concur with Walsh the
13 properties that Walsh has put forward as being
14 alleged to be part of the scheme? I am not asking
15 this well at all, am I?
16      A.    I'm not sure that I can -- try to say it
17 again.
18      Q.    Are you in a position to dispute that
19 the properties that Walsh alleges are part of the
20 scheme are not part of the fraud scheme that Walsh
21 has made this claim on?
22      A.    I don't have any information on that or
23 I don't know that.
24      Q.    Okay. Did Commonwealth decide not to
25 issue any title insurance policies on properties

Page 188

1  funded by Walsh Securities after 1997?
2        A.    I don't know that they barred them. I
3  know they requested that people contact the office
4  and discuss any -- if they had any pending sales.
5        Q.    That were to be funded by Walsh
6  Securities?
7        A.    Yeah, I believe, yeah.
8        Q.    Do you know if anyone contacted
9  Commonwealth about those?
10      A.    I don't know that.
11      Q.    Where would you find that?
12      A.    I don't know. I think that the person
13 they would have contacted was Nancy Koch, but I'm not
14 sure that I have any records of hers. I wouldn't
15 know where to find out that kind of information.
16      Q.    Has Commonwealth obtained any admissions
17 from any other defendant in the lawsuit during its
18 investigation?
19      MR. KOTT: Sorry?
20      Q.    Has Commonwealth obtained any admissions
21 during its investigation from any other defendants in
22 the lawsuit?
23      A.    Well, I haven't reviewed all the
24 discovery. So I don't know that I'm in a position to
25 answer that.

Page 189

1        Q.    How about Commonwealth's own internal
2  investigation, the documents it may have?
3        A.    Has anybody made an admission?
4        Q.    Yes. Against their interest.
5        A.    I am not aware of any.
6        Q.    Okay. Has Commonwealth agreed to pay
7  any claims on behalf of any defendant in this
8  lawsuit?
9        A.    To my knowledge Commonwealth has not
10 paid any on behalf or to.
11      Q.    On behalf of any other defendant?
12      A.    Any other defendant other than Walsh --
13 well, Walsh is a plaintiff. I guess I am not
14 following.
15      MR. KOTT: Did Commonwealth agree to pay
16 any figures that Coastal had to pay, that Kane had to
17 pay, that any of the other defendants had to pay.
18      A.    I think we've only addressed claims that
19 have been made to us on commitments or service
20 letters. I am not aware that we've paid anything for
21 any other party.
22      Q.    Do you know who those claims were made
23 by? You said earlier you thought it was Stern
24 Lavinthal for Walsh Securities. Were any made by
25 Banker's Trust or Temple Inland or, I will give you

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

9ce207e6-66a4-4035-b780-e65560fc2075

D. SULLIVAN

Page 190

1  another name, Gruntal Financial?
2       A.   Again, there's some confusion. I
3  thought Stern Lavinthal was somehow involved with
4  Banker's and you say that maybe is incorrect so I
5  don't know. I did run a couple of other names
6  through the claim system. I'm not sure -- but no
7  payments were made to those entities. Gruntal
8  Financial, I'm trying to remember. There might have
9  even been claims unrelated to this, might not even
10  have been in New Jersey. I just ran them in the
11  system but I didn't -- any names that I found didn't
12  have any payments made to them.
13       Q.   Has any other defendant in this lawsuit
14  agreed to make payments on behalf of Commonwealth if
15  liability is established against it?
16       A.   Not to my knowledge.
17       Q.   That would make you happy. Thank you,
18  Miss Sullivan, for your time. No further questions.
19       MR. KOTT: On the record. Plaintiff's
20  counsel will be the custodian of all the original
21  exhibits and I assume get all counsel in the room a
22  copy.
23       (The deposition is concluded at 5:40
24  p.m.)
25

Page 191

1            CERTIFICATE.
2
3       I, JANET BAILYN, a Notary Public and
4  Certified Court Reporter of the State of New Jersey,
5  do hereby certify that prior to the commencement of
6  the examination DONNA SULLIVAN was duly sworn by me
7  to testify the truth, the whole truth and nothing but
8  the truth.
9       I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13       I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither
16  a relative nor employee of such attorney or counsel,
17  and that I am not financially interested in the
18  action.
19
20  _____
    Notary Public of the State of New Jersey
21  My commission expires February 3, 2013
        License No. XI00970
22
    Date: June 1, 2010
23
24
25

49 (Pages 190 to 191)