# EXHIBIT F

```
                    UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
                    Civil Action No.
                    97-cv-3496 (DRD) (MAS)

WALSH SECURITIES, INC.,   :
                          :
          Plaintiff,      :
                          :
     vs.                  :    DEPOSITION OF:
                          :    ROBERT AGEL
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP CONSULTING,
INC.; COMMONWEALTH LAND TITLE
INSURANCE CO.; NATIONS TITLE
INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE
INSURANCE CO. OF NEW YORK;
COASTAL TITLE AGENCY; DONNA
PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., D/B/A
MURPHY REALTY BETTER HOMES
And GARDENS               :
                          :
          Defendants.     :
- - - - - - - - - - - -
```

## Page 2

1   TRANSCRIPT of the stenographic notes of
2  the proceedings in the above-entitled matter, as
3  taken by and before JANET BAILYN, a Certified
4  Shorthand Reporter and Notary Public of the State of
5  New Jersey, held at the office of MANNING, CALIENDO &
6  THOMSON, 36 West Main Street, Freehold, New Jersey,
7  on June 23, 2010, commencing at 10:10 in the
8  forenoon.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1  A P P E A R A N C E S :
2
3       STONE & MAGNANINI, LLP
        BY: ROBERT MAGNANINI, ESQ.
4          AMY WALKER WAGNER, ESQ.
        150 John F. Kennedy Parkway
5       Short Hills, New Jersey 07078
        Attorneys for Plaintiff
6
        McCARTER & ENGLISH, LLP
7       BY: DAVID R. KOTT, ESQ.
        Four Gateway Center
8       100 Mulberry Street
        Newark, New Jersey 07102-4056
9       Attorneys for Defendant
        Commonwealth Land Title Insurance Co.
10
        FOX ROTHSCHILD, LLP
11      BY: EDWARD J. HAYES, ESQ.
        2000 Market Street
12      Philadelphia, Pennsylvania 19103-3222
        Attorneys for Defendants Nations Title
13      Insurance of New York, Inc. and Fidelity
        National Title Insurance Co. of New York
14
        MANNING, CALIENDO & THOMSON. P.A.
15      BY: VINCENT P. MANNING, ESQ.
        36 West Main Street
16      Freehold, New Jersey 07728
        Attorneys for National Home Funding
17      And Robert Skowronski
18
19
20
21
22
23
24
25

## Page 4

1              I N D E X
2
   WITNESS     DIRECT CROSS REDIRECT RECROSS
3
   ROBERT AGEL
4    BY MR. MAGNANINI 5
5
6
7          E X H I B I T S
8  NUMBER     DESCRIPTION          PAGE
9
   Coastal-1   Rule 26 Disclosures      69
10 Coastal-2   Stipulation of Dismissal
               with Prejudice        74
11 Coastal-3   Stipulation of Dismissal
               with Prejudice        74
12 Coastal-4   Answer to Fourth Amended Complaint 80
   Coastal-5   Plaintiffs' First Request for
13             Production of Documents to
               Defendant Coastal Title Agency  83
14 Coastal-6   Fidelity Agency Agreement    127
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1       R O B E R T   A G E L, having been duly sworn by the
2  Notary, testified as follows:
3  DIRECT EXAMINATION BY MR. MAGNANINI:
4      Q.   Good morning, Mr. Agel, how are you?
5      A.   Good morning. Fine thanks.
6      Q.   My name is Bob Magnanini. I'm an
7  attorney at a law firm called Stone & Magnanini, and
8  we represent the plaintiff, Walsh Securities,
9  Incorporated, in this case, which as you know started
10 in 1997. So we're deposing you today.
11      As I told you, due to a personal
12 commitment I will have to leave at three, and we will
13 pick it up when it's convenient for you, but you're
14 appearing in your corporate representative capacity.
15 So you understand what that is?
16     A.   Yes, I do.
17     Q.   Have you ever been deposed before?
18     A.   Yes.
19     Q.   How many times?
20     A.   A half a dozen at least.
21     Q.   You're familiar then with the rules?
22     A.   Yes.
23     Q.   I'll just give you a few highlights.
24 It's your deposition so any time you want to take a
25 break, you know, just let me know and we will. I

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

f17ce3f8-8cb1-4d00-a86a-f42576c22bfb

Page 6

1  would ask you if a question is pending to answer it
2  unless it concerns a privilege or something like
3  that. Then you and Mr. McGowan are welcome to step
4  out.
5          And then I guess the three biggest
6  things are: Once I finish talking, then you can
7  start talking, and then I'll let you talk because the
8  court reporter can't transcribe the both of us. And
9  then if you answer one of my questions I will assume
10  you understand it. If you don't understand it, which
11  is more likely as the day goes on, please let me know
12  and we will rephrase it or ask it a different way.
13  And then is there any reason you can't answer
14  questions today truthfully?
15      A.    No.
16      Q.    Okay. That's the old: Are you under
17  the influence of any drugs or alcohol that they used
18  to ask, which I have only had once in my short
19  career.
20          When was Coastal Title founded?
21      A.    1987.
22      Q.    And who were the founders?
23      A.    Myself and a gentleman name Matthew
24  Maguire, M-a-g-u-i-r-e.
25      Q.    And does Mr. Maguire still work at

Page 7

1  Coastal Title?
2      A.    No.
3      Q.    When did he leave?
4      A.    Around 2004. Around 2004.
5      Q.    What type of entity is Coastal Title
6  Agency?
7      A.    Corporation.
8      Q.    A New Jersey corporation?
9      A.    Yes.
10      Q.    And who are its officers?
11      A.    Myself and Michael O'Connell.
12      Q.    What is your position as an officer?
13      A.    I'm the president.
14      Q.    And what about Mr. O'Connell?
15      A.    Vice president.
16      Q.    Do you have any other officers?
17      A.    No.
18      Q.    Who are the directors of Coastal?
19      A.    Same two.
20      Q.    And then who are the shareholders?
21      A.    Same two.
22      Q.    A 50/50 split?
23      A.    Yes.
24      Q.    How many employees does Coastal
25  currently have?

Page 8

1          MR. McGOWAN:  Presently?
2          MR. MAGNANINI:  Presently.
3      A.    Roughly ten.
4      Q.    Did Coastal have the same number of
5  employees -- the time frame we're looking at is 1996
6  through the middle of 1997 for the lawsuit so I'll
7  keep referring back to that.
8      A.    Probably a little more then. I couldn't
9  tell you exactly, it's a long time ago, but it's
10  probably a little more.
11      Q.    And how is Coastal organized as a
12  business? Do you have departments?
13      A.    Not really, it's too small, it's too
14  small. Everyone is cross-trained.
15      Q.    And your position, president, and then
16  Mr. O'Connell is the vice president. Who else do you
17  have in management positions?
18          MR. McGOWAN:  Presently?
19      Q.    Presently.
20      A.    Presently I have one office manager.
21      Q.    And then in 1996, '97 time frame how
22  many management positions did Coastal have?
23      A.    Just one. That would be me.
24      Q.    Just you. Okay. And then who were the
25  employees of Coastal in '96 and '97?

Page 9

1      A.    Wow.
2          MR. McGOWAN:  You can do that, can't
3  you?
4      A.    Well, I can tell you myself, Michael
5  O'Connell, Matthew Maguire.
6      Q.    What was Mr. Maguire's role?
7      A.    Sales.
8      Q.    Do you recall anyone else?
9      A.    A Sally Zappola. At that time it would
10  have been Casalese, her name.
11      Q.    Does she still work at Coastal?
12      A.    No.
13      Q.    What was her position?
14      A.    Administrative.
15      Q.    Who dealt with the closing attorneys or
16  the requests for title insurance or title commitments
17  that you would receive?
18      A.    Mostly me.
19      Q.    Anyone else in the '96, '97 time frame?
20      A.    During that time frame Sally would have
21  done some of that.
22      Q.    Is Coastal licensed by any entity?
23      A.    Yes.
24      Q.    By whom?
25      A.    New Jersey Department of Insurance.

3  (Pages 6 to 9)

Page 10

1      Q.    What type of license or licenses does
2   the agency hold?
3      A.    It's called a producer's license.
4      Q.    And is that for the agency or for
5   yourself?
6      A.    There's one for the agency and then I'm
7   licensed as well.
8      Q.    Anyone else in Coastal licensed?
9      A.    Yes. O'Connell, Maguire was at the
10  time, and Sally would have been.
11     Q.    Anyone else that you know back then?
12     A.    Back then? Probably not.
13     Q.    I think we understood, and we may be
14  wrong, that Sally Zappola was a title officer?
15     A.    Uh-huh.
16     Q.    What does that position entail?
17     A.    You examine titles, you prepare title
18  commitments, review title policies.
19     Q.    Do you know if she ever worked with
20  requests from Cristo Properties or William Kane?
21     A.    She did work on those files, I can tell
22  you that, but she had no dealings directly with them.
23     Q.    Did Lorraine King ever work for
24  Coastal --
25     A.    No.

Page 11

1      Q.    -- as an independent contractor?
2      A.    No.
3      Q.    What title insurance companies did
4   Coastal -- I don't know how you say it -- work with,
5   represent in the '96, '97 time frame?
6      A.    It would have been Commonwealth probably
7   and Fidelity. I don't recall if we had started
8   working with Lawyer's Title at that point.
9      Q.    Do you recall if Coastal worked with
10  Nations Title Insurance Company?
11     A.    Yes, that was a predecessor to Fidelity.
12     Q.    So basically just two title insurance
13  entities?
14     A.    Correct.
15     Q.    What title insurance companies does
16  Coastal work with currently?
17     A.    Lawyer's Title and First American Title.
18           MR. McGOWAN:  Lawyers and what?
19           THE WITNESS:  First American.
20     Q.    Who owns Lawyer's Title Insurance?
21     A.    Currently it's Fidelity National Title.
22     Q.    And First American is an independent
23  entity?
24     A.    Independent publicly traded company.
25     Q.    When did Coastal cease doing business

Page 12

1   with Commonwealth?
2      A.    It was probably around 1998, shortly
3   after this all broke.
4      Q.    And why was the business relationship
5   terminated?
6           MR. KOTT:  Object to the form.
7      A.    A representative of -- just, you know, a
8   sales rep for Commonwealth I believe left
9   Commonwealth and went to Lawyers and we went with
10  him.
11     Q.    You said that Nations was a predecessor
12  of Fidelity?
13     A.    Uh-huh.
14     Q.    Was there a time when you stopped -- by
15  you, I mean Coastal stopped doing business with
16  Fidelity?
17     A.    Yes.
18     Q.    And when was that?
19     A.    You know, I don't recall the date.
20  We -- I am pretty sure we stayed with Fidelity for a
21  little while after this all happened, but I don't
22  recall exactly how long. We went probably another
23  year at least.
24     Q.    Why was that relationship terminated?
25     A.    I believe because of this claim.

Page 13

1      Q.    Why do you believe that, Mr. Agel?
2      A.    You know, conversations that I had with
3   people at Fidelity after we left. It was -- they had
4   said it was the claims. We only really had one.
5      Q.    Who were the conversations with at
6   Fidelity, if you recall?
7      A.    Wow. Because I didn't do that much
8   business with them, I can tell you people that work
9   there, but it's possible who it was. Possibly an Ed
10  Norton, possibly Kevin Carins, C-a-r-i-n-s. That's
11  possible. I don't remember who else was there.
12     Q.    Do you remember Mr. Norton's or Mr.
13  Carins' positions at Fidelity?
14     A.    They were state counsel.
15     Q.    For the record, what does state counsel
16  do?
17     A.    It's an in-house counsel. They're an
18  attorney that handles underwriting questions, things
19  like that.
20     Q.    When did you begin working with Lawyer's
21  Title?
22     A.    Probably around 1998.
23     Q.    And when did Coastal begin working with
24  First American?
25     A.    Probably mid 2000s, maybe.

Page 14

1    Q.    Much more recent?
2    A.    Yes, yes.
3    Q.    Back in '96 and '97 when you were
4  working with -- when Coastal was working with both
5  Commonwealth and either Nations or Fidelity, how did
6  Coastal decide which title company to use to insure
7  any given loan?
8    A.    Simple. Every other one. There was
9  no -- the only time I pick an underwriter is if it's
10  a large commercial transaction. Residentials are
11  split 50/50.
12    Q.    Again, this is back in '96, '97, how did
13  Coastal find its insureds?
14    A.    Excuse me?
15    Q.    I don't know if it's a proper question.
16  I mean Coastal was in the insurance business.
17    A.    Right.
18    Q.    How did you obtain clients for which to
19  get title insurance or closing protection letters or
20  title commitments, whatever you were going to do?
21    A.    We had sales reps on the road and
22  myself, I did it.
23    Q.    Who did either you or the sales reps
24  speak with or meet with?
25    A.    You would solicit the attorneys

Page 15

1  themselves or you would go to, you know, their
2  paralegals. Depends on who controls where the work
3  goes.
4    Q.    Where the work goes. Okay. And what
5  geographic area did Coastal operate in, again, back
6  in 96, '97?
7    A.    All 21 counties.
8    Q.    So throughout the entire state?
9    A.    Yes.
10    Q.    Did you receive a majority of your work
11  from one county?
12    A.    Yeah, you would say most of it would be
13  Monmouth, Ocean, Middlesex. In your general
14  geographic area.
15    Q.    Your backyard?
16    A.    Yes.
17    Q.    When we were deposing Mr. Yacker -- let
18  me ask you first: Do you know who Stanley Yacker is?
19    A.    Yes.
20    Q.    So when we deposed him he had said that
21  he generally used Monmouth Title Agency, but then as
22  we know on a series of these loans he was using
23  Coastal Title Agency. How did -- did you have any
24  conversations with -- and this is you personally
25  first, have conversations with Mr. Yacker to give the

Page 16

1  business to Coastal or how did that occur?
2    A.    No, I did not. That came in really more
3  from -- I guess through Pepsny's office. They would
4  order the original title commitment for when Cristo
5  or whatever company it was was buying the property
6  and then they would -- then the order would come in
7  from Yacker after they got a buyer.
8    Q.    Okay.
9    A.    It's not uncommon for a title company to
10  get orders from strange attorneys because they have
11  back title.
12    Q.    Because you've already done the title
13  work on the first loan?
14    A.    Right.
15    Q.    And I guess Mr. Alfieri, do you know
16  Michael Alfieri?
17    A.    Yes.
18    Q.    I believe you testified that he had a
19  relationship with Coastal Title?
20    A.    Yes.
21    Q.    And so do you still do work with Mr.
22  Alfieri?
23    A.    No.
24    Q.    Do you still do work with Mr. Pepsny?
25    A.    No.

Page 17

1    Q.    Assuming since Mr. Yacker doesn't
2  practice I don't assume --
3    A.    Correct.
4    Q.    And have you ever -- I guess I will just
5  ask: When was the last time you did any work with
6  Mr. Anthony Cicalese?
7    A.    Back in around 1996 or 7, whenever this
8  whole case broke.
9    Q.    I guess as a background question,
10  probably the easiest thing, can you explain to me how
11  title insurance is ordered?
12    A.    Any number of ways. We get orders
13  through the mail, we get orders over the telephone,
14  over the fax machine, today we get them via e-mail,
15  off the website.
16    Q.    Who would they come from?
17    A.    Then I would say 95 percent of them or
18  more would come from an attorney.
19    Q.    So back in 1996, '97, on the loans at
20  issue in this litigation, did they come from Mr.
21  Pepsny or from someone else in his office?
22    A.    No, it would have come from Pepsny. I
23  mean, that would be what we consider our contact.
24    Q.    Do you recall if he had any paralegal or
25  administrators?

5 (Pages 14 to 17)

Page 18

1    A.   He had girls working for him.  I don't
2  recall who they were.
3    Q.   Okay.  Did you ever receive any requests
4  from Mr. Alfieri for title insurance for the
5  properties at issue in this case?
6    A.   I don't think so.  I don't think he ever
7  represented people.  He had his finance business,
8  company that -- Selective Finance I think was the
9  name of the business that did loan some money.  I
10  remember insuring a couple of loans for -- on
11  properties that Cristo or Kane owned.  That was the
12  only time I had any involvement with Michael Alfieri.
13    Q.   And then who at Mr. Yacker's office
14  would contact Coastal?
15    A.   Lory King.  Very rarely spoke to Yacker.
16    Q.   And then what about at Mr. Cicalese's
17  office?
18    A.   You know, he came in towards the end and
19  I don't recall at all.  I don't think he did a lot of
20  these.
21    Q.   Have you ever met Mr. Cicalese?
22    A.   No.
23    Q.   Did you ever speak to him on the phone?
24    A.   Possibly.
25    Q.   Do you know if Lory King made requests

Page 19

1  on behalf of Mr. Cicalese?
2    A.   That I don't recall.
3    Q.   Okay.  I assume -- have you met Lory
4  King?
5    A.   It's possible, yes, maybe once or twice
6  she might have stopped in the office.
7    Q.   Do you recall speaking to her on the
8  phone?
9    A.   Yes.
10    Q.   Okay.  And during that time who was her
11  -- who did she primarily call at Coastal?
12    A.   Pretty much me or with simple things she
13  would call Sally.  Just looking for an endorsement to
14  change, say, a mortgage amount or something.
15    Q.   Sally was more administrative?
16    A.   She handled -- she was a title officer
17  but she handled kind of rudimentary tasks, not
18  complicated title stuff.
19    Q.   And then -- and so I don't know how you
20  would phrase it in your company, but the sales
21  contact for Yacker was you personally?
22    A.   You know, we never had sales contact
23  with Yacker.  I did have sales reps over the years
24  prior going in and trying to get work from him but he
25  always had that relationship with Monmouth Title.  So

Page 20

1  I would have been the contact, but there was not a
2  lot of contact.
3    Q.   And then how about with -- was there a
4  contact person for Cicalese?
5    A.   No.
6    Q.   And so how did the work from Cicalese
7  come into Coastal Title?
8    A.   Probably -- probably by fax or it might
9  have been called in an order.  I don't recall
10  exactly.
11    Q.   Do you recall, had you done any work
12  with Mr. Cicalese prior to these Cristo Property
13  loans that are at issue in this case?
14    A.   I don't think so.
15    Q.   And then as you said you had not done
16  much work, if any, with Mr. Yacker prior to this?
17    A.   Correct.
18    Q.   So once Coastal receives a request
19  for -- is it title insurance or a title commitment
20  that you get a request for?
21    A.   They're interchangeable terms.
22    Q.   I've seen both.  That's why.
23    A.   Yes.
24    Q.   What happens at Coastal?  What do you do
25  once you have gotten this request?

Page 21

1    A.   Well, it's all about process.  It's
2  order, title search, title commitment, rundown for
3  closing, policy.
4    Q.   Okay.  And Coastal would prepare and
5  issue all of the documents in the name of the title
6  companies?
7    A.   Yes.
8    Q.   As their agent?
9    A.   Correct.
10    Q.   And then what about the closing
11  protection letters?  We've seen those issued as well.
12  Were they ordered separately or --
13    A.   No.  That's a matter of course, that
14  they're issued with every title commitment where
15  there is an institutional lender.
16    Q.   I believe Mr. Yacker had said the same
17  thing.  And I've seen on invoices there's always a
18  $25 charge for the closing protection letter.
19    A.   Correct.
20    Q.   And was that set by state board or why
21  $25?
22    A.   That's -- it's the filed rate with the
23  State of New Jersey.  That's what the cost is.  The
24  Insurance Department regulates -- rates for title
25  insurance are regulated along with the closing

6 (Pages 18 to 21)

Page 22

1  protection letter, closing service letter.
2      Q.    And then who would -- once Coastal had
3  done the title search and issued the commitment and
4  done the bring up for the closing, who would you
5  issue your invoice to?
6      A.    Going back a ways but I don't recall
7  if -- I believe it would have gone -- in the
8  beginning it would have gone to Pepsny, but
9  ultimately it should have been paid by Yacker when
10 they closed on -- because they were closing
11 simultaneously when they were buying and selling the
12 property, so they would only really buy the policy on
13 the ultimate purchaser.
14     Q.    Eventually I'll get to the paper but one
15 of the things that I wondered about is: We've seen
16 title commitments on a purchase by one of Mr. Kane's
17 entities, whether it be Cristo or J.G.L. or something
18 with a -- there's a number that says CT and then a
19 series of digits, and then on the sale from Cristo to
20 whoever, say Mr. Bustos, there was the same
21 commitment, the same CT, same number but with a
22 little (a) in parenthesis. What was the significance
23 of the (a)?
24     A.    It just separated the files. One for
25 the Cristo purchase, the other is for the Cristo

Page 23

1  sale.
2      Q.    So as far as you know Cristo only bought
3  title insurance on -- or only paid for title
4  insurance or closing protection letters on the sale
5  of the property?
6      A.    Somebody did. You know, I don't know
7  where the money came from. It came from Stanley
8  Yacker's trust account. So I don't believe they ever
9  submitted closing statements so I wouldn't see where
10 those funds came from.
11     Q.    Okay. And so you just got a check from
12 Mr. Yacker?
13     A.    Correct.
14     Q.    Would you also -- I'll just ask the
15 open-ended question: Would you also receive a check
16 from Mr. Pepsny for the first transaction?
17     A.    Probably in the beginning they did that,
18 but they were interested in saving money and when
19 people flip properties, and, you know, it still goes
20 on to a certain extent, there are people flipping
21 properties, they don't always buy title insurance,
22 the real estate investor. And he was looking for
23 ways to save money, and he just made a decision not
24 to buy the title insurance on his purchase when
25 essentially he was in title for an hour.

Page 24

1      Q.    And on some properties, or in the
2  beginning at least, would someone, be it Mr. Pepsny,
3  Mr. Kane, also order closing protection letters on
4  the purchase of the property along with the title
5  insurance?
6      A.    Only if there was a loan involved where
7  they closed the loan. If they closed and held the
8  property and he got a mortgage from somebody, then
9  there would have been a closing protection letter
10 issued probably.
11     Q.    Okay. I don't know if I asked you this,
12 but did you have a sales contact with -- by you,
13 again, I mean Coastal -- with Mr. Pepsny?
14     A.    Yes, yes, it was -- really it was me.
15 You know, I started doing some business with Michael
16 Alfieri for years before Pepsny went to work for him.
17     Q.    When was the first time you met Mr.
18 Pepsny?
19     A.    Oh, God, sometime in the mid '90s,
20 before this all started.
21     Q.    Was he working for Mr. Alfieri?
22     A.    It was when he was working for Alfieri.
23     Q.    And then -- was anyone else in Coastal
24 involved with dealing with Mr. Pepsny or Mr. Alfieri?
25     A.    Only from the standpoint of doing --

Page 25

1  Maguire would deliver things. You know, he would go
2  and bring them bagels on a Friday or something like
3  that, that type of thing. Sally would have had some
4  dealings with them similar to what she would do with
5  anyone else that we discussed.
6      Q.    Okay. Who pays for the closing
7  protection letter?
8      A.    Normally it's ultimately out of the
9  purchaser's funds. It's really ultimately whoever
10 pays for the title insurance.
11     Q.    So when you would receive payment for
12 the title insurance you would also get payment for
13 the closing protection letter from Mr. Yacker?
14     A.    Yes.
15     Q.    And then how did -- did Mr. Yacker ever
16 wire money to you or were all his payments via check?
17     A.    No, it was all check.
18     Q.    And then how did Mr. Cicalese send
19 Coastal payments?
20     A.    Same thing, checks.
21     Q.    All checks. And in 1996 and 1997 how
22 did Coastal keep its books?
23     A.    Pretty fundamental. It was probably the
24 One-Write system back then probably. I don't think
25 we computerized until after that.

7  (Pages 22 to 25)

Page 26

1    Q.    Do you still have copies of the ledger
2  or the One-Write printouts?
3    A.    No.
4    Q.    Did you ever -- when did you computerize
5  Coastal's books?
6    A.    Probably sometime around 2000.
7    Q.    Did you ever load any of the prior --
8    A.    No.
9    Q.    -- years in?
10   A.    No.
11   Q.    Okay.  What was the purpose of the title
12 commitment in the --
13         MR. McGOWAN:  Excuse me one second.
14 This might be my confusion.  But there's a policy,
15 there's a commitment but there's also something
16 called the binder.
17         THE WITNESS:  That's the commitment.
18         MR. McGOWAN:  That's the commitment?
19         THE WITNESS:  Old-timers call them
20 binders.
21         MR. McGOWAN:  Wiseguy.
22         (A discussion takes place off the
23 record).
24   Q.    Mr. Agel, is there a difference between
25 a title commitment and a title binder?

Page 27

1    A.    No.
2    Q.    So the terms are interchangeable?
3    A.    Yes.
4    Q.    And then what is the purpose then of the
5  title commitment in the real estate closing process?
6    A.    It's to set forth requirements for the
7  attorney or closing agent, whoever that is, to comply
8  with in order to get us to the point where we can
9  issue a title insurance policy.  We set up things to
10 be discharged like mortgages, tax sale certificates,
11 any judgments, things like that.
12         And then Schedule B, Part 2 -- that was
13 Schedule B Section 1.  Schedule B Part 2 would be
14 exceptions to title, like easements, restrictions,
15 setback lines, things like that.
16   Q.    Things that would not be covered by the
17 title insurance policy?
18   A.    Correct.
19   Q.    And then -- so once the requirements of
20 Schedule B, Part 1 were met, then you, Coastal, could
21 go on to issue title insurance?
22   A.    Correct.  Policy.
23   Q.    Title policy.  What if the requirements
24 were not met then?
25   A.    We would not issue the policy.

Page 28

1    Q.    And then once -- how long after closing
2  was a title policy normally issued?
3    A.    Back then because things were not as
4  automated as they are today probably it could take up
5  to six months.
6    Q.    What was the purpose of the title
7  insurance policy?
8    A.    It would insure -- in the case of a
9  lender it would insure that they have a valid first
10 lien.  Essentially that's it.
11   Q.    What do you mean by a valid first lien?
12   A.    That there are no liens or encumbrances
13 that have priority over it.
14   Q.    And then what is -- any other purpose or
15 any other protection that title insurance provides
16 for a lender?
17   A.    Not really, no.
18   Q.    And then title insurance was also issued
19 to the purchaser?
20   A.    Correct.
21   Q.    And what was the purpose of that?
22   A.    That would insure that subject to any
23 exceptions in Schedule B, Section 2 that they were
24 the owner of the fee title subject to only the
25 exceptions in Schedule B, 2.  So if there were

Page 29

1  easements or unrecorded easements that -- things that
2  they're not showing in the public record but that end
3  up showing up and then causing a title problem,
4  that's the coverage that they would get.  They would
5  get a defense by the title insurance company.
6  Whether someone tried to come back and foreclose an
7  old lien or something like that.
8    Q.    And then what defense does the title
9  insurance company actually provide?  They provide an
10 attorney?  Do they pay money?  What do they do?
11   A.    Well, first, they provide a defense.
12 And then ultimately, whether through settlement,
13 negotiations or what, they will make payments.  It's
14 kind of no different than what we're doing here.
15   Q.    And then -- good to know some things are
16 consistent.
17         What is the purpose of a closing
18 protection letter?
19   A.    That is --
20         MR. KOTT:  Objection to form.  Excuse
21 me.  I object to form.
22   Q.    You can answer.
23   A.    It's to protect against the, essentially
24 I would say, malfeasance of the attorney that it's
25 issued against.

8 (Pages 26 to 29)

Page 30

1    Q.    And then who does it protect?
2    A.    It protects the lender.
3    Q.    And then how is -- actually at some
4  point or some people have called the letters closing
5  protection letters and others have called them
6  closing service letters or closing service protection
7  letters. I've seen all three. What were the letters
8  protecting against attorney malfeasance issued in
9  1996 and '97 called?
10   A.    Probably closing protection letters but
11 we're going back. All of those terms are
12 interchangeable. They're the same.
13   Q.    And you said before that there
14 generally -- they're issued along with a title
15 commitment or insurance if there was a lender
16 involved. How did you know who to issue the letter,
17 I guess, as you said, against the attorney?
18   A.    We would issue it on, it would issue and
19 it would cover the actions of the closing attorney.
20   Q.    And that information, of course, was
21 provided to you by the closing attorney himself?
22   A.    Yes.
23   Q.    And then once Coastal received payment
24 for the, I guess, basically the title insurance and
25 the closing protection letter, what happened to the

Page 31

1  money at that point?
2    A.    It would get deposited into our
3  operating account, and we would make our remittance
4  portion into then our premium trust account.
5    Q.    The premium trust account was held by
6  whom?
7    A.    It was exactly what it sounded like. It
8  was -- we held that in trust until we paid the title
9  insurance company, Fidelity or Commonwealth. We
10 would do that when we would report the policy to the
11 underwriter.
12   Q.    And so each time you reported a policy
13 to the underwriter you then remitted payment?
14   A.    Correct. We do that in batches.
15   Q.    Was there a time frame that you did it
16 or --
17   A.    That could be sometimes up to seven or
18 eight months after the closing. If it takes us six
19 months to issue the policy we're not going to remit
20 on it until after the policy is issued.
21   Q.    And so -- but the money then that was
22 due the title companies sat in a trust account?
23   A.    Uh-huh.
24   Q.    And then what did you call the money
25 that you took from the payment? Was that a

Page 32

1  commission to you?
2    A.    Yeah, I guess that would be.
3    Q.    I've seen different terms.
4    A.    It's -- yeah, it's -- part of it is
5  commissions and part of it is for out-of-pocket
6  expenses.
7    Q.    So some are reimbursement and some are
8  payment for services?
9    A.    Yes.
10   Q.    What happened when you remitted the
11 money to the title insurance company? You said you
12 had -- you would also send the policy to the
13 underwriter?
14   A.    Correct, yes.
15   Q.    What happened at the title insurance
16 company at that point?
17   A.    I have no idea.
18   Q.    Did you ever have a policy refused by
19 the title insurance company?
20   A.    Never.
21   Q.    So they basically received the policy
22 and that's how they knew -- let me ask as a general
23 question: How did the title insurance company know
24 what policies you, the agent, were issuing in their
25 name?

Page 33

1    A.    They wouldn't know until we issued
2  unless we called with specific questions on an
3  underwriting issue.
4    Q.    Okay.
5    A.    Which we do a lot.
6    Q.    Do you recall if you had called the
7  title companies with any underwriting issues on these
8  Cristo Property loans?
9    A.    Yes, very often.
10   Q.    Why -- what issues would you call about?
11   A.    There are always issues -- can't say
12 those properties, but with any property, these were
13 all -- in the very beginning they were all distressed
14 properties, foreclosures, tax liens, things like
15 that, bankruptcies, so you just -- you get clearance
16 from your underwriter on what you need to do to get
17 that insured.
18   Q.    Okay. That was an ongoing dialogue?
19   A.    I talked to them every day.
20   Q.    All right.
21   A.    To this day.
22   Q.    Still. Okay. So then I was -- so the
23 title companies would know that there was a potential
24 that they were going to be insuring a certain
25 property because you had called about it and raised

Page 34

1  certain issues?
2      A.    Not a specific property. We would talk
3  about a file and say: I'm insuring a property in
4  Asbury Park, these are the circumstances, what should
5  I do?
6      Q.    Okay. One question I have because I
7  have seen different -- a lot of documents in this
8  case and particularly some from Coastal's file. Was
9  there any magic -- and I'll use that as a generic
10 term -- to your signing a closing protection letter?
11 Some I've seen signed and in some of your files
12 unsigned?
13     A.    That would just be probably because you
14 saw a file copy. If it was unsigned it was probably
15 a file copy. I didn't sign the file copies.
16     Q.    So if there's a file -- a copy of a
17 letter in your files, a closing protection letter had
18 been issued to the attorney?
19     A.    Most likely.
20     Q.    Any reason it wouldn't be?
21     A.    Probably not.
22     Q.    Okay. And then once the seven months
23 has gone by, the title insurance policy has been
24 issued, who do you send the title insurance policy
25 to?

Page 35

1      A.    Probably it would have gone to the local
2  office for them to do their reports to the home
3  office. Then it wasn't computerized, today it is, we
4  remit automatically.
5      Q.    By local office, you mean of the title
6  companies?
7      A.    Yes.
8      Q.    And then -- we deposed a representative
9  of Commonwealth and she had testified she thought
10 there was an entity called the NPC, National
11 Processing Center.
12     A.    Uh-huh.
13     Q.    Somewhere in Kentucky. Do you recall?
14     A.    I do recall something like that. I
15 think that we still would send our remittances -- I
16 call them remittances. It's the batches of policies,
17 I would send them to our local agency rep.
18     Q.    Who was that?
19     A.    Then her name would have been Terry
20 Swope.
21     Q.    On behalf of Commonwealth?
22     A.    I don't know if she was with
23 Commonwealth or she was Lawyers Title. She's out of
24 the picture now too. People change in this business
25 so much. You know what, I don't know if we had a

Page 36

1  representative at Commonwealth, to be honest, because
2  I signed with them with one of their counsel. Roger
3  Blauvelt at the time was their head guy in New Jersey
4  and we had known each other for a while and I signed
5  with him. We might have just sent them up to that
6  office. We might have sent them to the NPC. I don't
7  know.
8      Q.    And what would you send in the batches
9  to Commonwealth, or Fidelity for that matter?
10     A.    Pretty much just the policies. And then
11 what they would do is they would do their reports and
12 they would send us a bill, and we would do a check
13 out of the premium trust account.
14     Q.    Would the checks to the title company be
15 in batches?
16     A.    No. Then there would be just one check.
17 Say it might be for 20 or $30,000.
18     Q.    For a number of --
19     A.    A number of files, yes.
20     Q.    Back to the -- on the closing protection
21 letters, what if the name or the attorney doing the
22 closing changed during the closing process, would
23 Coastal issue another CPL?
24     A.    If we knew about it. If we knew the
25 attorney changed and the lender asked for a new

Page 37

1  closing service letter, then, yes.
2      Q.    But if you didn't know the attorney was
3  changing you would just issue --
4      A.    Yeah, we would have issued the original
5  closing protection letter from the original attorney
6  that ordered it, and then if we didn't know it
7  changed, then we wouldn't have changed the closing
8  service letter.
9      Q.    Okay.
10         MR. MAGNANINI: Off the record.
11         (A discussion takes place off the
12 record).
13     Q.    Back again to the closing protection
14 letter. Is that a standard form of a document?
15     A.    Yes.
16     Q.    And one of the things I've seen is that
17 the closing protection letters were slightly
18 different as between those issued by Coastal for
19 Nations or Fidelity and Commonwealth. There was an
20 additional paragraph on the Nations' and Fidelity's
21 closing protection letters. Why was that?
22     A.    Each --
23         MR. HAYES: Object to the form. There's
24 also a difference between some of the Commonwealth.
25         MR. KOTT: I join in that well-founded

10  (Pages 34 to 37)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

f17ce3f8-8cb1-4d00-a86a-f42576c22bfb

Page 38

1  objection.
2       MR. McGOWAN:  You can answer.
3       A.    Each company files its own forms with
4  the Insurance Department and they can vary.  It's
5  just what the insurance department approves is what
6  we issue.
7       Q.    Okay.  Again, during the deposition of
8  the Commonwealth corporate representative she had
9  suggested that she thought -- Commonwealth thought
10  perhaps that Coastal had issued the wrong closing
11  protection letter on behalf of some of the
12  Commonwealth -- some of the loans that Commonwealth
13  insured because of this different language in there,
14  by mistake I guess.
15       A.    I'm not aware of that.  When we remit
16  policies we remit -- then we remitted copies of our
17  closing protection letters that we issued because at
18  that time they were numbered so they saw what we
19  issued.
20       Q.    The title companies did?
21       A.    Yes, they did.
22       Q.    Okay.  Was there any difference in the
23  language of the closing protection letters if the
24  loan that was being issued was a subprime loan as
25  opposed to a conforming loan?

Page 39

1       A.    I don't think so.  We only had one form
2  for each company.
3       Q.    Do you recall if Coastal ever chose not
4  to issue a title policy or closing protection letter
5  on a loan funded by Walsh Securities?
6       A.    Yes.  When this all started to break and
7  we saw things were not what they should be we stopped
8  issuing policies, commitments, everything.
9       Q.    And that was -- who made that decision
10  at Coastal?
11       A.    I did.  You know, I consulted with
12  underwriters.
13       Q.    The title company underwriters?
14       A.    Yes.  I wouldn't have done it anyway,
15  not when I saw the things that started happening.
16       Q.    And so once things, in your words,
17  started to break, which I will use the end of June
18  1997 time frame, you consulted with underwriters
19  for -- was it then Fidelity and Commonwealth?
20       A.    Yes.
21       MR. HAYES:  Object to the form.  Is the
22  witness acknowledging that's when it started to break
23  in his mind?  Maybe we can ask the witness what
24  started it.
25       Q.    I'll ask the foundational question.  In

Page 40

1  your mind when did this -- the issue that's at the
2  heart of this litigation begin to break?
3       A.    Much earlier in the year.  We discovered
4  that documents were not being recorded.  We weren't
5  being paid on files and, you know, the way our
6  process goes we -- when we get paid, that's right
7  after closing hopefully, and generally it is.  It's
8  within a few weeks after closing we will get a check
9  with documents either to record or -- some attorneys
10  send you documents to record, some do not.  Yacker
11  did not, but he would send his Affidavits of Title,
12  he would send payments, corporate resolutions, all of
13  that.  What we would do there is do the deposit.
14  Break out the remittance.
15       We would then put the file in for what
16  is called the cover record.  That's the next step in
17  the process after the policy, and that's a search to
18  cover the recording of the documents.  You update the
19  search to cover the recording.
20       We didn't generally order those cover
21  records for at least a month after closing because
22  there's, number one, the couple of weeks delay in
23  getting paid.  Number two, there's a delay in
24  recording.  They mail them in and they sit there for
25  two weeks before the county records them.  And then,

Page 41

1  you know, you got to wait for mortgage cancellations
2  to come in and things like that.  So we generally
3  wouldn't order a cover record until at least a month
4  after closing.
5       Sometimes it got to be -- I don't
6  remember the dates, but it was early in 1997, I guess
7  it was, it was cold weather, I remember that, it
8  could have been late '96, we discovered that
9  documents weren't being recorded at all.  So I got in
10  touch with Yacker and he just said:  I don't know,
11  contact Pepsny.  And Pepsny got in touch with -- I
12  guess it was Kane because we -- Yacker didn't have
13  the money to pay transfer taxes, he didn't have the
14  money to pay recording fees and we said these
15  documents have to be recorded.
16       At some point in time, I don't recall
17  when it was, we got documents finally, we did get
18  original documents, and we got money from Kane from
19  one of his companies to pay the recording fees and
20  transfer taxes.  But that came from him.  We then
21  recorded a large amount of documents.  I want to say
22  30 or 40 different transactions we recorded.  And it
23  was during that process I told Pepsny that there was
24  no way that they could do this.  That -- that's when
25  I think they brought Cicalese in saying:  We're not

11 (Pages 38 to 41)

## Page 42

1  going to use Yacker as much because he's not doing
2  what he's supposed to be doing. I think that's --
3  that's my recollection. It's a long time ago. And
4  from there we noticed a couple of times that they
5  actually closed on selling a property before they
6  purchased it.
7       Q.   We've seen that.
8       A.   And that's when we stopped. That's when
9  we said: We're done and, you know, I talked to both
10  my underwriters about it. Commonwealth was my main
11  underwriter at the time but we spoke and we said: No
12  more.
13      Q.   When did you speak with the underwriters
14  at Commonwealth?
15      A.   It would have been probably early '97,
16  early to -- first quarter, say by the end of the
17  first quarter. I don't recall when we recorded those
18  deeds. I want to say it was probably sometime around
19  March.
20      Q.   I think I know what you're referring to.
21  Going through the documents we have there's, I don't
22  know, two to 300 different documents recorded in
23  Monmouth County on April -- I want to say it's the
24  8th and the 9th of April 1997.
25      A.   That's about the right time frame.

## Page 43

1       Q.   Okay. And that's what it says, it's all
2  recorded by Coastal Title Agency.
3       A.   Right.
4       Q.   And that's -- that was one of the topics
5  I was going to get to later was, you know, how the
6  hell did that happen?
7       A.   One of the questions we asked.
8       Q.   As you said, Coastal has been in
9  business for lo on 23 years. Have you ever had a
10  situation like that in any other business transaction
11  you have been in where you have to record maybe two
12  or 300 documents at one time for sales going back
13  almost a year?
14      A.   Never.
15      Q.   And so it's your recollection that after
16  you did those -- the recording of all those deeds
17  Coastal stopped issuing on behalf of Commonwealth or
18  Fidelity title insurance policies and closing
19  protection letters?
20      MR. HAYES: Object to form. I don't
21  think that's what he said.
22      MR. McGOWAN: You can answer the
23  question.
24      Q.   If what I'm saying is wrong tell me.
25      A.   No. We stopped -- essentially we

## Page 44

1  stopped doing business with them.
2       Q.   With -- by "them," you mean Mr. Pepsny,
3  and Mr. Kane, Mr. Cicalese?
4       A.   Right, yes. Pepsny we might have done
5  some work for after that. I'm not certain but it
6  would have been Yacker and Cicalese and Kane.
7       Q.   Let me break down your answer as lawyers
8  always do. You spoke to -- how did it come to your
9  attention that these -- all these various documents
10  were not being filed?
11      A.   When we did our cover records and we saw
12  the documents weren't recorded we contacted -- that's
13  when we contacted Yacker and he brushed us off and we
14  contacted -- that's when he told us to contact
15  Pepsny.
16      Q.   Did you speak to Lorraine King at all
17  about why the files weren't or the documents weren't
18  being recorded?
19      A.   I don't think so. Something that serous
20  I wouldn't have talked to a secretary.
21      Q.   And then did you ever speak to Mr.
22  Yacker after that point?
23      A.   No.
24      Q.   But then you did contact Mr. Pepsny?
25      A.   Yes.

## Page 45

1       Q.   And then when was that, if you can
2  recall?
3       A.   Oh, it would have been within days of or
4  minutes maybe of when I spoke with Yacker.
5       Q.   And did you meet with Mr. Pepsny or did
6  you telephone him?
7       A.   Either/or. I did have a -- one meeting
8  with Pepsny and Kane and I don't -- I don't recall
9  what -- you know, there were so many conversations, I
10  don't remember the sequence. I don't remember
11  whether the conversation about that was when I had
12  lunch with them or whether it was a telephone call.
13  I think it was over the telephone though.
14      Q.   Okay. And what was the substance of
15  your conversation with Mr. Pepsny?
16      A.   We've got a problem. These documents
17  aren't recorded. I've got probably 30, 40 files at
18  least that I've been paid for, documents aren't
19  recorded, we have to get them recorded. And they
20  were pretty diligent in getting the documents
21  together and getting me the money. I seem to recall
22  it was around 50 or $60,000 just for recording and
23  transfer tax fees.
24      Q.   Okay. And that was paid to you by Mr.
25  Pepsny or Mr. Kane directly?

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

f17ce3f8-8cb1-4d00-a86a-f42576c22bfb

Page 46

1    A.    I think it came from Kane.
2    Q.    Was that in the form of a check, do you
3    recall?
4    A.    It would have been a check, I'm sure.
5    Q.    Do you know where Mr. Kane got the
6    money?
7    A.    No.
8    Q.    Off the record.
9         (A discussion takes place off the
10   record).
11   Q.    And you said you had lunch with Mr.
12   Pepsny. When was that, Mr. Agel?
13   A.    I don't recall the date. I recall it
14   was cold weather.
15   Q.    Was anyone else at the lunch?
16   A.    Yes, Kane, Bill Kane.
17   Q.    And what was the -- I'll say the
18   substance of the conversation?
19   A.    That I recall dealt with the issues that
20   were coming up because there were a lot -- at this
21   point when there was a lot of volume, and they were
22   telling me that the processors at the lender were
23   having difficulties. They were getting bogged down
24   in all of the crazy -- I shouldn't say crazy
25   requirements, but all the requirements that we would

Page 47

1    have to clear up the title from when Kane was buying.
2    So there might be tax sale certificates, judgments,
3    old mortgages, bankruptcies. We discussed that a
4    little earlier.
5         So they were saying that that was
6    confusing the people at Walsh. That it was -- that
7    they were just getting bogged down. That people were
8    doing double work trying to clear it all up. Is
9    there any way we can get around and have a clear
10   title commitment for the lender to use. And that's
11   where that "(a)" file came in with the parenthesis.
12   Q.    Okay.
13   A.    Okay. And it was just to make sure
14   that -- it was so that they could review a clear
15   title commitment, and they could just get it clear to
16   close. They would always close and they always
17   cleared everything up on the original title
18   commitment without the suffix on it.
19   Q.    Right.
20   A.    And then, you know, the policy would be
21   issued on that (a) file.
22   Q.    Okay. So Mr. Kane on his or his
23   company's -- on his acquisition of a particular
24   property, that's where they would do all the clearing
25   of the title?

Page 48

1    A.    Correct. We would not issue the other
2    title commitment or policy unless everything was
3    cleared up.
4    Q.    Did you ever speak with any of the
5    processors at Walsh Securities --
6    A.    No.
7    Q.    -- about these issues that Mr. Kane said
8    they were having?
9    A.    Not that I recall, no.
10   Q.    Do you recall speaking with anyone at
11   Walsh Securities?
12   A.    Not to my recollection.
13   Q.    Have you ever met anyone from Walsh
14   Securities?
15   A.    No, I don't think so. It was possible I
16   might have met D'Apolito.
17   Q.    Anthony D'Apolito?
18   A.    Possible. I don't think so. I wouldn't
19   have known him if I fell over him, but I don't think
20   so, but there is a possibility I might have met him.
21   Q.    Where do you think you may have met him,
22   if you did?
23   A.    Maybe at Pepsny's office or either
24   stopping to drop something off at Kane's office.
25   Q.    Okay. What happened after the -- let me

Page 49

1    go back to the lunch meeting you had with Mr. Kane
2    and Mr. Pepsny. What else was discussed at that
3    meeting?
4    A.    Well, you know, we did have concerns
5    about what -- you know, how can you buy these
6    properties for 30,000, whatever it is, and sell it
7    for 100 the next day? And, you know, we were
8    concerned about that. And I had spoken to, at the
9    very least, counsel for Commonwealth about that and,
10   you know, because I was concerned and I wanted them
11   to know what was going on.
12        And what they were telling me is that
13   when he got -- when they signed a contract to buy,
14   they would immediately get like a use and occupancy
15   agreement, start working on them, get them ready to
16   sell during the time period between when they bought
17   and closed and they would market them immediately.
18   It made sense at the time.
19   Q.    By "they," you mean Mr. Kane?
20   A.    Yes.
21   Q.    Did you ever physically go look at any
22   of the properties?
23   A.    No.
24   Q.    Even though it's fairly close. Right?
25   Asbury Park is --

13 (Pages 46 to 49)

Page 50

1    A.   Right.
2    Q.   But you never saw any of the properties
3  physically?
4    A.   No.
5    Q.   Were you concerned at that point that
6  there might be a fraud going on?
7    A.   No.  No.  They gave me all the right
8  answers.  The ones that we thought were legitimate
9  answers.
10    Q.   And you said you spoke to Commonwealth's
11  counsel.  Do you recall who that was?
12    A.   Yes, Nancy Koch.
13    Q.   And when was the first time you spoke
14  with Miss Koch about the -- these Kane properties?
15    A.   I don't recall when.
16    Q.   Was it about the time you started -- you
17  had to record these documents?
18    A.   No, I think it was before that.
19    Q.   It was even before that.  Do you recall
20  whether it was cold or warm?
21    A.   No.  I was in an office and she was in
22  an office.  At that time my office had no windows.
23        MR. McGOWAN:  Off the record.
24        (A discussion takes place off the
25  record).

Page 51

1    Q.   Do you recall if you spoke to Fidelity's
2  counsel about the time you spoke to Miss Koch?
3    A.   No, I don't recall.
4    Q.   If you had spoken to Fidelity's counsel,
5  was there one person at Fidelity that you usually did
6  speak with?
7    A.   If he was there at that time it would
8  have probably been Ed Norton.
9    Q.   Where was Mr. Norton physically located?
10    A.   They moved around a lot.  I couldn't
11  tell you exactly where.  He was in offices all over.
12  He went from Red Bank to White Plains to
13  Pennsylvania.  I mean, he was all over the place so I
14  couldn't tell you exactly.
15    Q.   It was the Tri-State area.  Was he ever
16  in California or somewhere like that?
17    A.   Not that I know of, no.
18    Q.   When was the last time you have spoken
19  to Mr. Norton?
20    A.   I couldn't tell you.  It's a long time.
21    Q.   Long time.  Did you have discussions
22  with any other counsel at Commonwealth?
23    A.   I don't think so.  I doubt it.  It's
24  possible.  If I can give you a couple of names of
25  people that were there over the years.  I don't know

Page 52

1  if they were there at that time though.  Kevin Carins
2  was there and then Gary Hamm, but I don't recall if
3  they were who I would have spoken to.  I do remember
4  conversations with Nancy though.
5    Q.   What was the substance of those
6  conversations with Nancy Koch?
7    A.   Always underwriting questions.  You
8  know, how to clear certain objections or, like I
9  said, in -- the one time that I did talk to her about
10  kind of the procedure, what was going on and that,
11  you know, am I okay here?
12    Q.   And what was her response?
13    A.   She said that it sounds like you're
14  doing the right thing.  Everything seems okay.  So
15  she told me I asked the right questions.
16    Q.   Prior to this whole situation becoming
17  public did Commonwealth ever tell you not to issue a
18  title insurance or a closing protection letter on one
19  of these Kane properties?
20    A.   No.
21    Q.   And same question for Fidelity?
22    A.   Same answer, no.
23    Q.   So after Coastal files all of these
24  documents in March, or as I said I've seen on the
25  recording stamp, it's a little kind of cash register

Page 53

1  receipt is really what it looks like.
2    A.   Right.
3    Q.   April I think -- as I said I think the
4  dates are April 8 or 9 of 1997, did Coastal do any
5  more business with Mr. Yacker?
6    A.   He might have continued or finished
7  closing some other transactions.  I don't recall.
8  Like I said, I thought that's one of the reasons they
9  switched over to Cicalese.
10    Q.   Okay.  So then the way the process would
11  work was Mr. Kane would buy a property, which he was
12  represented by Mr. Pepsny, and then the sale would
13  occur with Mr. Cicalese as the closing attorney?
14    A.   The ultimate sale, yes.
15    Q.   The sale from Mr. Kane's company to a
16  buyer, and so then at that point you were dealing
17  with Mr. Pepsny and Mr. Cicalese?
18    A.   Yes.
19    Q.   Were you aware that Lorraine King had
20  continued working on the Kane sales by working for
21  Mr. Cicalese?
22    A.   I kind of recall that.  I think that
23  would be accurate.
24    Q.   Okay.  Would you like to take a break?
25    A.   Yes.

14  (Pages 50 to 53)

Page 54

1      (A recess takes place.)
2      Q.    Back on the record. Mr. Agel, going
3   back to the discussion that you said that after you
4   found out that these documents weren't being recorded
5   when you did your cover searches, who was the cover
6   search provided to?
7      A.    That's an internal document. That's for
8   us to prepare the title policy from.
9      Q.    Oh, okay. What does it physically look
10  like?
11     A.    It's five or six pieces -- it's a copy
12  of the original title commitment, and then that goes
13  to our searcher at the time and then just attached to
14  that would be copies of the deed and the mortgage
15  that's being insured. That's what they would search
16  to pick those up in the record, and then the searcher
17  would make notes on the commitment, mostly on
18  Schedule B, Section 1 next to, say, if there's a
19  mortgage to be cancelled, they'll tell us whether
20  it's open or cancelled. Same thing if there's a tax
21  sale certificate, something like that.
22     Q.    And were those documents retained in
23  Coastal's files?
24     A.    Yes.
25     Q.    And then what would happen if that

Page 55

1   search showed that there were still mortgages not
2   cancelled or something like that?
3      A.    There would be a letter to that -- in
4   those cases there would be a letter to Pepsny's
5   office saying: We're ready to issue our title
6   policies but these matters are still open of record.
7      Q.    Did you ever send those letters to the
8   lender?
9      A.    No, no.
10     Q.    Why not?
11     A.    They're not responsible for cleaning the
12  title -- for clearing the title objections. They
13  want title objections cleared.
14     Q.    Right. Okay. So the person responsible
15  was the attorneys?
16     A.    Correct.
17     Q.    And you said you would send it to
18  Pepsny. Why wouldn't you send it to Mr. Yacker or
19  Mr. Cicalese?
20     A.    In the beginning -- we probably never
21  sent them to Cicalese because he came in so late. In
22  the beginning we probably would have sent them to
23  Yacker and to Pepsny because that would probably have
24  been one of the things that resulted in that meeting
25  where we were discussing getting that second

Page 56

1   commitment out, the clean commitment. So probably
2   about the time that we did that we would have only
3   sent to Pepsny because he would be responsible for
4   cleaning up any issues with title -- most of the
5   issues with title would be coming out of the --
6      Q.    Purchase by Mr. Kane's company?
7      A.    -- purchase by Mr. Kane's company, yes.
8      Q.    Was Mr. Kane's business model usual for
9   the title work you did where you had a purchase and
10  then a sale at the same time?
11     A.    At the time there were a lot of
12  different companies doing similar things. You know,
13  not as often would they buy and sell the same day,
14  which is why we asked that question, the questions as
15  to: How can you do this?
16     Q.    Right.
17     A.    That was a bit of a red flag, but, no,
18  there were other people doing it all over the place.
19  Some did it same day, some did it over a period of
20  two months, three months.
21     Q.    What percent of title work you were
22  doing encompassed those, I'll say, purchase, fix-up,
23  sale deals?
24     A.    Probably less than one percent of our
25  business.

Page 57

1      Q.    Okay. What was the volume of Coastal's
2   business in 1996?
3      A.    We would have been doing over 200 orders
4   as month, well over.
5      Q.    And so about 2,400 title insurance
6   requests a year?
7      A.    At least. Probably more.
8      Q.    And what was -- what did Coastal -- I
9   will start with: What was the gross income for
10  whatever the amount of business you were doing?
11     A.    Probably three, four million in
12  revenues.
13     Q.    And how much -- was there a percentage
14  that you would remit on the title insurance back to
15  the title insurance companies?
16     A.    Yes. We remitted 15 percent of the
17  premium and the full charge for the closing service
18  letter, the $25.
19     Q.    How much did you remit say in 1996 to
20  Commonwealth and Nations/Fidelity?
21     A.    It would have to be -- it would be a
22  guess but it probably had to be around $400,000.
23     Q.    And then through the first half of 1997
24  about how many title insurance policies did Coastal
25  issue?

15 (Pages 54 to 57)

Page 58

1    A.    Probably half of that total number so
2 maybe 12 -- at least 1,200.
3    Q.    And was the gross income similar for
4 Coastal in 1997?
5    A.    Probably.
6    Q.    As to 1996, what was Coastal's profit
7 then in 1996?
8    A.    I couldn't tell you.
9    Q.    Any idea for 1997?
10   A.    No.
11   Q.    Do you have any documents that would
12 show that at this point?
13   A.    I would be able to come up with all the
14 tax returns somehow probably. I've had the same
15 accountant for 20 something years.
16   Q.    Going back to the issue with the lack of
17 documents being filed, you said you spoke to
18 Commonwealth, you may have spoken to someone at
19 Fidelity, you met with Mr. Pepsny and Mr. Kane. Was
20 there anyone else you spoke to?
21   A.    I tried to speak to Yacker but like I
22 said I was brushed off. I don't think anyone else.
23   Q.    Was there anyone you discussed it with
24 within Coastal?
25   A.    Probably not. That's something -- while

Page 59

1 we're a big agency we're a small business and
2 something that serious I work on. So, no, I wouldn't
3 have let anybody work on that serious stuff.
4    Q.    That's what I was going to ask you. Did
5 Sally work on that at all?
6    A.    I doubt it. No, not -- not something
7 that serious.
8    Q.    When did she leave Coastal?
9    A.    Two years ago.
10   Q.    And then there was -- one other name was
11 Sherry Federer?
12   A.    Yes.
13   Q.    And I've seen her in correspondence to
14 either Mr. Yacker, Cicalese, Pepsny.
15   A.    Uh-huh.
16   Q.    Did she work on this issue that you had?
17   A.    No.
18   Q.    Okay.
19   A.    She was strictly secretarial at the
20 time.
21   Q.    I assume she doesn't work at Coastal
22 anymore?
23   A.    Yes, she does.
24   Q.    She's still there?
25   A.    Yes.

Page 60

1    Q.    And then did you try and contact Walsh
2 Securities at all?
3    A.    No.
4    Q.    Any reason why not?
5    A.    We never really dealt directly with
6 lenders back then.
7    Q.    Do you deal more with lenders now?
8    A.    Yes.
9    Q.    When did that change occur?
10   A.    Over the past three to five years when
11 we have had to adapt our business to changing times
12 and do closings.
13   Q.    Which actually was a future subset but
14 I'll ask it now. We've come to learn there's north
15 Jersey closings and south Jersey closings and Coastal
16 is in Monmouth. What did you consider --
17   A.    At that time we would be north Jersey
18 style.
19   Q.    Back in '96, '97?
20   A.    Yes.
21   Q.    And you're different now?
22   A.    Today there's no north Jersey, south
23 Jersey. The Mason-Dixon line is gone.
24        MR. McGOWAN: Off the record.
25        (A discussion takes place off the

Page 61

1 record).
2    Q.    So nowadays you do closings?
3    A.    Yes.
4    Q.    Did you do any closings in 1996 or 1997?
5    A.    No.
6    Q.    When did you stop doing business with --
7 I'll call the group at that point Mr. Kane or his
8 companies, Mr. Pepsny and then Mr. Cicalese?
9    A.    Cicalese, Kane would have been probably
10 right around that April date when those things got
11 recorded. Right around there. I couldn't give you
12 an exact date. Pepsny, we might have done business
13 with him long -- for a little while longer. He had
14 other real estate clients that he dealt with that he
15 would order other title searches and insurance from
16 us but we stopped not terribly long after that. He
17 and Alfieri probably would have been coincidental
18 with the time he and Alfieri broke up.
19   Q.    Which was after this Kane fraud was made
20 public?
21   A.    Yes, correct.
22   Q.    And so you continued doing business
23 then -- when do you think you stopped doing business
24 with Mr. Cicalese?
25   A.    It had to be -- it had to be sometime in

16  (Pages 58 to 61)

Page 62

1   the very early spring, I presume, of '97, whenever
2   all of this started to go bad in terms of documents
3   not getting recorded, having closings without owning
4   property.
5       Q.   We've seen -- I've seen that, although
6   we have -- and I will get to the paper in a bit, we
7   actually have I think loan closings taking place up
8   until June of 1997.  And I thought Coastal is the
9   title agent on those.
10      A.   Well, it's possible.  We -- I don't
11  recall having any contact with them after say April
12  or so, but it is possible they continued to use the
13  title commitments that were issued.
14      Q.   Okay.
15      A.   And I couldn't even tell you if we were
16  paid on them at this point because we handed all of
17  our files over to -- any pending files I think we
18  turned over to the FBI.
19      Q.   And when was that?
20      A.   Had to be summer of '97.
21      Q.   How did you terminate your business
22  relationship Coastal had with, I'll say, Cicalese and
23  Kane?
24      A.   I never really had a business
25  relationship with Kane.  It was through Pepsny, and I

Page 63

1   just told Pepsny and I -- I don't know if we said
2   anything -- that might be the one time I spoke with
3   Cicalese, I don't know, but I just told them that we
4   can't insure these any more.
5       Q.   Okay.  Did you send him a letter or
6   anything?
7       A.   Probably not.
8       Q.   You told -- what did you tell Mr.
9   Pepsny?
10      A.   That I can't continue to insure these,
11  there's something seriously wrong here.
12      Q.   Do you recall if Mr. Pepsny or Mr.
13  Cicalese said anything?
14      A.   No, not really.
15          MR. KOTT:  You don't recall or they
16  didn't say anything?
17          THE WITNESS:  I don't recall.  I don't
18  recall.
19      Q.   Did you ever speak to Mr. Kane at that
20  point in time?
21      A.   You know, I do recall talking to him on
22  the telephone and -- you know, because I do believe
23  that we had conversation where he said: Listen, I'm
24  legit, I'm doing everything right.  But that was
25  about it.  No, I don't recall having any other

Page 64

1   conversations with him.
2       Q.   Do you recall when that conversation
3   occurred?
4       A.   It was probably after the story broke in
5   the paper, the newspaper story.
6       Q.   And then you said that whatever pending
7   files you had for Mr. Kane or his companies were
8   turned over to the FBI.  What other documents did you
9   give the government?
10      A.   Well, I gave them my entire files.  You
11  know, I gave them everything.  There were more
12  documents where they had not recorded -- that they
13  had not recorded.  They might have gotten two
14  batches, I don't recall, frankly, but there were
15  original documents, like, original deeds and
16  mortgages that we turned over to --
17      Q.   To the government?
18      A.   To the FBI, yes.
19      Q.   When you said that they had gotten you
20  these additional documents, were they for sales that
21  occurred after you already recorded all of these
22  documents that were recorded in April?
23      A.   I think, I am not certain but I think
24  so.
25      Q.   Do you remember how many properties were

Page 65

1   involved in those?
2       A.   No.
3       Q.   Did you ever get your documents back
4   from the government?
5       A.   I don't think so.  I don't recall.
6       Q.   Were you interviewed by the government?
7       A.   Yes.
8       Q.   And did you ever testify before a grand
9   jury?
10      A.   No.
11      Q.   How many times were you interviewed?
12      A.   Once.
13      Q.   When was that?
14      A.   Probably in the springtime of '97.  It
15  was Alan Leibman.
16      Q.   Actually were you interviewed after the
17  story was public or before that?
18      A.   You know, I don't recall.  That I
19  couldn't tell you.  I was also interviewed by Larry
20  Willis and Tom Jobs.
21      Q.   From the FBI?
22      A.   Yes.  That happened first, and then I
23  went in to see Alan Leibman after that.
24      Q.   Do you know who produced -- once the
25  civil litigation was filed who produced documents on

Page 66

1  behalf of Coastal Title?  Was it a law firm?
2      A.    Yes, Ansell, Zaro, Grimm & Aaron at the
3  time.
4      Q.    Do you know anything about how the
5  documents were given to them or how they were
6  produced?
7      A.    Yeah, I delivered all of my files -- I
8  don't know -- it must have been -- they got files
9  copied. I recall that.  They got files copied.  I
10 met one of the attorneys at a copy place in Ocean
11 Township on Route 35 on a weekend to do it.  And
12 there were copies made.  I remember it was very
13 expensive and I guess -- yes, we had documents that
14 were --
15     Q.    The files -- we actually have a
16 repository of documents relating to these fraudulent
17 loans.  The documents from Coastal Title are -- they
18 have a Bates stamp number at the bottom and they're
19 labeled CTA, CTB, CTC, CTD, CTE.  Do you have any
20 idea why they were organized that way?
21     A.    No.
22     Q.    I'll ask counsel.
23          MR. McGOWAN: It wasn't done by him and
24 it wasn't done by us.
25     Q.    That's why -- it's an odd system and I

Page 67

1  thought there's got to be some logic behind it.
2      A.    No, they handled getting all of that
3  done.
4      Q.    Okay.
5          MR. MAGNANINI: And then do you have the
6  document request?
7      Q.    While Miss Wagner is getting that out,
8  after -- after this Kane fraud became public, did you
9  ever speak with Mr. Pepsny?
10     A.    I -- probably, yes.
11     Q.    About the frauds?
12     A.    I wouldn't have -- I wouldn't exactly
13 categorize it about frauds.
14     Q.    About the Kane properties?
15     A.    About those properties, yes, I would
16 have, yes, because -- I don't recall if I spoke to
17 him after the story had hit the paper, the first
18 story hit the paper because the reporter had called
19 me a few times so I knew something was up.  So I
20 might have spoken to him about that beforehand,
21 before the story came out, but I did speak to him
22 during that time period.  I couldn't tell you if it
23 was after the story hit the paper or if it was
24 before.
25     Q.    Was it several conversations it sounds

Page 68

1  like?
2      A.    Probably a few.  You know, we did a lot
3  of business together so we spoke fairly often.
4      Q.    What was the substance of the
5  conversations about the Kane properties?
6      A.    You know, he was also just saying they
7  were legit, that this is all BS, the story, and
8  that's it.  That's essentially it.  They were just
9  trying to defend what they were doing.
10     Q.    After the conversations with Mr. Pepsny
11 did you have any further conversations with attorneys
12 for Commonwealth or Fidelity?
13     A.    I don't think so.  Other than, you know,
14 the processing of things for the claims when the
15 claims finally started to hit.
16     Q.    And then some of the other people that
17 at least Walsh Securities alleges were involved in
18 this was a gentleman named Gary Grieser.
19     A.    Right.
20     Q.    And --
21     A.    I remember the name.
22     Q.    And his company was called Capital
23 Assets Property Management?
24     A.    Yes.
25     Q.    Did you have any business dealings with

Page 69

1  Mr. Grieser or his property management company?
2      A.    No.
3      Q.    And then, Mr. Agel, I am going to have
4  marked as exhibit Coastal Exhibit 1, and that's just
5  something the court reporter will put a stamp on, and
6  we will have this piece of paper, Rule 26
7  Disclosures, which were provided by Mr. McGowan's
8  firm on behalf of Coastal Title and I just ask you to
9  take a look at it.
10          (Coastal-1, Rule 26 Disclosures, is
11 received and marked for identification.)
12     Q.    I would ask you to take a look at that
13 and let me know if you have seen it before.
14     A.    Not to my recollection.
15     Q.    And I would ask you to go to the second
16 page and under A, it says -- there's a list of
17 disclosure of individuals who may have information
18 about the issues in the lawsuit, and we already
19 discussed the first two people and the fourth, and
20 you had said you had never met Mr. Walsh?
21     A.    Correct, I have not met him.
22     Q.    And that had brought us to number six,
23 Mr. Grieser, and my question was:  Had you ever had
24 any business dealings with Mr. Grieser or his
25 companies, Capital Assets Property Management?

18 (Pages 66 to 69)

Page 70

1    A.    Other than I can tell you he did -- I do
2    remember that he bought some properties that we would
3    have insured, but I have never had any direct
4    dealings with him.
5    Q.    Individually?  Do you know -- had you
6    ever spoken to him?
7    A.    I don't think so.
8    Q.    Okay.  Did you ever hear from Mr. Kane
9    or Mr. Pepsny that Mr. Grieser was working with Mr.
10   Kane?
11   A.    Yes.
12   Q.    And who told you that?
13   A.    It would have been Pepsny.
14   Q.    What did he tell you about Mr. Grieser?
15   A.    Well, when all these things were going
16   on, you know, we had questions, you know, the
17   transfers into Capital Assets and the ultimate buyers
18   or out of the ultimate buyers into Capital Assets
19   and --
20   Q.    Talking about those joint venture deeds?
21   A.    Yes.
22   Q.    The 60/40 split?
23   A.    Yeah.  You know I had asked about those
24   because we were -- wanted to know what we should to
25   insuring.  Do we insure what we are committed to

Page 71

1    insure or are we insuring Capital Assets and the
2    joint tenant or tenant in common.  So, you know, I
3    was aware of Capital Assets.  I did ask what -- asked
4    Pepsny what was going on and he said they're the
5    property management company, that they manage some
6    properties, collect the rents and all that.
7    Q.    Who were you insuring?  Was it the buyer
8    or the buyer and Capital Assets?
9    A.    No, it was -- we checked -- that I'm
10   pretty sure came from Yacker too was that we were to
11   insure the deed that went with the purchase money
12   mortgage, just the straw buyer, so to speak.
13   Q.    And then -- so that's the -- the straw
14   buyer was the deed that was insured and then although
15   some of the documents we have seen filed there's also
16   this subsequent deed from the buyer to the buyer and
17   Capital Assets.
18   A.    Uh-huh.
19   Q.    And so was that again a usual event for
20   you to file -- to have a closing insure a buyer and a
21   lender for title insurance and then have a subsequent
22   transfer of the property in this joint venture?
23   A.    You know, we had seen it.  It was not
24   common, but frankly it didn't at that time scare me
25   much because I had invested in the '80s before the

Page 72

1    tax laws changed in partnerships, real estate
2    partnerships for tax advantages, and, you know, I was
3    a tenant in common with that property guy so it
4    didn't seem -- it didn't seem crazy.  Cost me a lot
5    of money to get out of it, but that was thanks to the
6    change in the tax laws.
7    Q.    Mr. Reagan?
8    A.    Yes.
9    Q.    And then you said that you knew Mr.
10   Grieser actually had purchased some properties that
11   you insured?
12   A.    Yeah, I thought he did, yes.
13   Q.    And then were there any issues or any
14   unusual events surrounding Mr. Grieser's purchases?
15   A.    I don't think so.  One of them I thought
16   was supposed to be a personal residence and it was
17   down on the ocean, but they did everything they were
18   supposed to do.  They cleared up the titles, did what
19   they had to do.  No, nothing seemed unusual.
20   Q.    And then the third person listed on page
21   two under Section A is Robert Skowrenski, II.  Who is
22   Mr. Skowrenski?
23   A.    My knowledge of him is that he was the
24   owner of National Home Funding.
25   Q.    And what was National Home Funding?

Page 73

1    A.    They were I guess the mortgage broker.
2    Q.    Did Mr. Kane work for National Home
3    Funding?
4    A.    I understand that he did.  I only found
5    that out later on after this was all done and over.
6    Q.    So what was your understanding of Mr.
7    Kane in 1996 and 1997?
8    A.    That he was the Cristo Property
9    Management guy that bought, rehabilitated and sold.
10   Q.    And then at some point there was a suit
11   between National Home Funding and Coastal Title.
12   Correct?
13   A.    Yes.
14   Q.    And what was the basis of that lawsuit?
15   A.    I don't recall.  Probably better to
16   ask Mr. McGowan exactly what that was.
17   Q.    What happened with that lawsuit?
18   A.    I know it was settled.
19   Q.    And do you know the settlement terms?
20   A.    I don't remember.  It's a long time ago.
21   MR. KOTT:  On that subject, I provided
22   this morning off the record to Mr. Magnanini a copy
23   of the release running from the plaintiff, Robert
24   Skowrenski, versus Commonwealth and Coastal to -- the
25   release runs to Commonwealth.  I also provided him a

19  (Pages 70 to 73)

Page 74

1  copy of the Stipulation of Dismissal filed with the
2  clerk as to Commonwealth.
3       MR. McGOWAN:  And I also provided to
4  Mr. Magnanini the release and the final stipulation
5  of dismissal in connection with that lawsuit as well.
6       MR. KOTT:  Because we have no secrets
7  unlike other parties in this.
8       MR. McGOWAN:  Because we believe in full
9  disclosure.
10      MR. MAGNANINI:  I'll keep my comments
11  off the record.  If you can mark this.
12      (Coastal-2, Stipulation of Dismissal, is
13  received and marked for identification.)
14      Q.   Mr. Agel, I would ask you to take a look
15  at what's been marked as Exhibit 2, and then I'll
16  have the court reporter mark Exhibit 3.
17      (Coastal-3, Stipulation of Dismissal, is
18  received and marked for identification.)
19      A.   Okay.
20      Q.   Mr. Agel, what I've shown you as Exhibit
21  2 is a Settlement and Stipulation of Dismissal in a
22  lawsuit entitled:  Robert Skowrenski, II versus
23  Coastal Title Agency and Commonwealth Land Title
24  Insurance Company.  And as Exhibit 3 the Stipulation
25  of Dismissal and Release in the same lawsuit.

Page 75

1  Exhibit 2 is as to Commonwealth and Exhibit 3 is to
2  Coastal.  And you said you didn't recall the
3  substance of the lawsuit.  Do you recall why the
4  lawsuit was settled?
5      A.   Not offhand other than the fact that I
6  just wanted it over with.
7      Q.   How much did Coastal pay -- on the
8  second page of the release it says that they -- Mr.
9  Skowrenski was paid $325,000.  How much of that did
10  Coastal Title pay?
11     A.   None.  That was from my carrier I
12  assume.  I don't think I wrote a check.
13     Q.   And then --
14      MR. McGOWAN:  Let me just say that this
15  was -- this was paid under a general liability policy
16  so Mr. Agel -- it's not like a malpractice policy
17  where he gets to okay it or understand it or
18  anything.  It's a decision made not by him and really
19  not by me.  It's made by the carrier.
20     Q.   Flipping back to Exhibit 1, the Rule 26
21  Disclosure.  So whatever payment was made by Coastal
22  Title was actually made by the policy of insurance
23  issued by Summit Risk Services?
24     A.   Yes.
25     Q.   Is that correct?

Page 76

1      A.   Yes.
2      Q.   Okay.  Do you know how much money, if
3  any, Commonwealth paid?
4      A.   Not until I saw this.  I don't even know
5  if that's what they paid.  I don't know if there's
6  anything else but no.
7      Q.   Was there any claim between or by
8  Commonwealth against Coastal to indemnify
9  Commonwealth for any money Commonwealth may have
10  paid?
11     A.   No.
12     Q.   Sorry for that convoluted question.
13     A.   No problem.
14     Q.   Were you ever deposed in that lawsuit?
15     A.   No.
16     Q.   And so prior to the problem with Mr.
17  Kane's property becoming public, had you done any
18  business with Mr. Skowrenski or NHF?
19     A.   No.
20     Q.   Did Coastal do any work with mortgage
21  brokers directly at that time?
22     A.   Not directly at that time.
23     Q.   It does so now?
24     A.   Yes.
25     Q.   And when did that start?

Page 77

1      A.   Within the last three to five years.
2      Q.   And then did Coastal have any
3  interactions with any appraisers?  And this is the
4  1996, '97 time frame.
5      A.   No.
6      Q.   Had you ever met or spoken with Mr.
7  Richard Calanni?
8      A.   No.
9      Q.   How about Richard DiBenedetto?
10     A.   No.
11     Q.   James R. Brown?
12     A.   No.
13     Q.   Thomas Brodo?
14     A.   No.
15     Q.   Or Roland Pierson?
16     A.   No.
17     Q.   And you said you may have met Mr.
18  D'Apolito at some point?
19     A.   Possibly but, you know what, it could
20  have been a picture in the newspaper because I
21  remember seeing his name when this started to break.
22  So if I had to say I met him it was just like a
23  chance meeting.  It wasn't anything else.
24     Q.   And then what companies did Mr. Kane own
25  that you knew of?

VERITEXT  REPORTING  COMPANY

212-267-6868                                    516-608-2400

f17ce3f8-8cb1-4d00-a86a-f42576c22bfb

Page 78

1      A.    I knew of Cristo Property Management and
2  then he had a fictitious name, G.J.L. Limited.  I
3  think it was limited.
4      Q.    It was.  Correct.
5      A.    And I saw in some of the documents here
6  Oakwood Homes, but I don't ever recall seeing that in
7  any of my files, but it's because most everything
8  went through Cristo and G.J.L. so the ones I'm
9  familiar with are Cristo and G.J.L.
10     Q.    Okay.  In your files would you see if
11 there were second mortgages?
12     A.    If they're recorded.  If they're
13 recorded, yes.
14     Q.    But as part of the closing process you
15 wouldn't normally see --
16     A.    No.
17     Q.    Okay.
18     A.    No, we were never at closings.
19     Q.    And then were you familiar with an
20 entity called DEK Homes of New Jersey?
21     A.    Yeah, I've seen that name.  It could be
22 just from this stuff but I've seen it.
23     Q.    Did you know if Mr. Kane was involved in
24 DEK back in the 1996 to mid 1997 time frame?
25     A.    No.

Page 79

1      Q.    How about an entity known as Dinaso &
2  Sons?
3      A.    Yes, I recall that name.
4      Q.    What was that?
5      A.    That was one of Pepsny's clients that
6  was buying properties.
7      Q.    And did they also rehabilitate and sell
8  as far as you knew?
9      A.    I think so, yes.
10     Q.    Did you ever meet anyone from Dinaso &
11 Sons?
12     A.    No.
13     Q.    Did you ever meet a man named John
14 Dinaso?
15     A.    No.
16     Q.    How about a man named William Epp?
17     A.    No.
18     Q.    Did you ever meet a man named Lawrence
19 Cuzzi, C-u-z-z-i?
20     A.    No.
21     Q.    Did you ever meet anybody who worked at
22 Capital Assets Property Management?
23     A.    No.
24     Q.    Mr. Agel, I'm going to have marked as
25 exhibit four Coastal's Answer to the Fourth Amended

Page 80

1  Complaint filed by Walsh Securities.  And I would
2  like you to take a look at that.
3            (Coastal-4, Answer to Fourth Amended
4  Complaint, is received and marked for
5  identification.)
6      Q.    Mr. Agel, as I said, what's been parked
7  as Exhibit 4 is Coastal's Answer to Walsh Securities'
8  Fourth Amended Complaint, which was filed July 24 of
9  2009.  I would ask you to take a look at this and let
10 me know if you have ever seen it before.
11     A.    Possibly.  I don't recall.
12     Q.    Did you have any involvement with -- in
13 answering the complaint of Walsh Securities?
14     A.    Possibly.  I don't really recall though.
15     Q.    You can flip back -- Mr. Agel the
16 questions I have are on page 16 of 28 if you look up
17 top under.  There's a first separate defense.  You
18 see that?  Second, third --
19     A.    Yes.
20     Q.    -- and fourth?  The second separate
21 defense of Coastal alleges that recovery is barred by
22 the negligent conduct and the conduct of its agents,
23 employees and officers.  What factual information
24 does Coastal have to support that defense?
25     A.    The negligent --

Page 81

1            MR. McGOWAN:  Of the plaintiff.
2      A.    Of the plaintiff?  Negligence of the
3  plaintiff?
4      Q.    Right.
5      A.    I don't know that I have anything in
6  writing.  You know, it's -- I don't know.
7      Q.    And then on the -- if you look on what
8  is listed as the third, fourth and fifth separate
9  defense it says that the Amended Complaint against
10 this defendant is barred by the act of its agent,
11 employees, and I believe it says "offers," but I
12 believe it's officers.  On the third, fourth and
13 fifth defense.  What -- again, same thing, what
14 factual basis does Coastal have to support those
15 affirmative defenses?
16            MR. McGOWAN:  You're going to be able to
17 answer the question.  Let me just object to the form
18 of the question.  There's a million different things
19 that have occurred in this case factually and
20 otherwise and this gentleman may not be privy to.
21     Q.    You're here just as Coastal's corporate
22 rep.  That's all I'm asking.  You don't -- you didn't
23 have to memorize everything that's occurred in the
24 case.  What do you have now?
25     A.    Other than the fact that employees and

Page 82

1  officers of the company have been charged and found
2  or pled guilty to involvement in the scheme, to me
3  right then and there they were -- they through their
4  officers and agents are aware of the fraud.
5      Q.    What officers of Walsh Securities
6  were --
7      A.    DeMola and D'Apolito.
8      Q.    Do you know --
9      A.    And I believe there was another
10  processor up there that was found guilty or pled
11  guilty.
12     Q.    Correct.  Do you know if Miss DeMola was
13  an officer of Walsh Securities?
14     A.    I believe she was.
15     Q.    What is the basis of your belief?
16     A.    That -- newspaper articles or some
17  things that I have read in this case.
18     Q.    And was Mr. D'Apolito an officer of
19  Walsh Securities?
20     A.    I don't think he was an officer.  I
21  think he was an employee.
22     Q.    Anything else, sir?
23     A.    No.
24     Q.    We're done with that pile of paper
25  there.

Page 83

1          (Coastal-5, Plaintiffs' First Request
2  for Production of Documents to Defendant Coastal
3  Title Agency, is received and marked for
4  identification.)
5      Q.    Mr. Agel, I ask you to look at what's
6  been marked as Coastal Exhibit Number 5, which is
7  Walsh Securities' First Request For Production of
8  Documents.  That's dated August 15, 2008.
9      A.    Okay.
10     Q.    There's a whole bunch of legal
11  definitions and things.  The requests I would
12  actually ask you to look at are on pages ten through
13  15.
14     A.    Okay.
15     Q.    You testified earlier that your files
16  were copied by your initial counsel, the Ansell firm?
17     A.    Yes.
18     Q.    And did they copy any other documents of
19  Coastal other than the files related to each of the
20  transactions?
21     A.    I don't think so.
22     Q.    And then did you produce any other
23  documents other than the files -- one question I
24  would ask you about that is:  You said there were
25  some pending transaction files which you provided to

Page 84

1  the FBI in the summer of 1997.  Were they copied by
2  the Ansell firm?
3      A.    No, I think those were original files
4  that I turned over at that point.  I either did that
5  or I gave them to Commonwealth.  I don't recall, but
6  I'm pretty sure it all went to the FBI.
7      Q.    And then in this litigation Fidelity had
8  produced about eight boxes of files, which I
9  understand came from Coastal.
10     A.    Uh-huh.
11     Q.    And did Coastal provide copies of its
12  files to Fidelity or send the originals to Fidelity?
13     A.    I think we would have provided originals
14  and we would have kept the photocopy.
15     Q.    What about for Commonwealth?
16     A.    Same thing.
17     Q.    So you sent the original files to the
18  title insurance company?
19     A.    That's generally our procedure with a
20  claim so yes.
21     Q.    When were you first notified of a claim?
22     A.    Probably in the summer of '97.  I guess
23  when people started to default on mortgages and
24  foreclosures started.
25     Q.    And how was Coastal alerted that there's

Page 85

1  a claim pending?
2      A.    The attorney for whoever the claimant is
3  would send a letter to us and to the -- generally to
4  the title insurance underwriter at their
5  headquarters.  It's clear in the policy how you file
6  a claim.  The same in the closing service letter.
7      Q.    What happens at Coastal when a notice of
8  a claim is received?
9      A.    We contact the underwriter immediately.
10     Q.    And then what happens?
11     A.    We generally turn our file over to them.
12     Q.    And then does Coastal participate in an
13  investigation of the claim?
14     A.    To a certain extent.  I mean, we would
15  cooperate and we -- if they need us to do some
16  research work or something like that we do it.
17     Q.    But otherwise the claim process is
18  handled by the title insurance company?
19     A.    Yes, either by their claims counsel
20  and/or their outside counsel.
21     Q.    Was that process followed with these
22  Kane properties?
23     A.    Yes.
24     Q.    Were you interviewed by counsel for the
25  title companies?

22  (Pages 82 to 85)

Page 86

1    A.    No.
2    Q.    Was anyone at Coastal interviewed by
3  counsel for the title companies?
4    A.    No.
5    Q.    Did you speak with counsel for the title
6  companies while they were investigating the claim?
7    A.    I don't recall.  Possibly but I don't
8  recall.
9    Q.    So other than -- after receiving the
10  claim and turning over the original files, did
11  Coastal have any involvement in investigating the
12  claims related to the Kane properties?
13    A.    No.  No, most of those claims were by
14  lenders.
15    Q.    And do you know what the title companies
16  did to investigate those claims?
17    A.    No.
18    Q.    Did Coastal keep a correspondence file?
19    A.    No, not separate correspondence files.
20    Q.    And you had a separate ledger system to
21  record the payments in and transfers from the
22  operating account to the trust account and payments
23  out to the title companies?
24    A.    Well, we would have a check register or
25  we had it.

Page 87

1    Q.    Now it's all electronic?
2    A.    Now it's all electronic, yes.
3    Q.    Do you still have a copy of the check
4  registers -- I didn't ask you that -- from 1996 or
5  1997?
6    A.    In all likelihood, no.
7    Q.    What documents would you have from that
8  time period, that '96 to '97?
9    A.    Relating to what?
10    Q.    Related to the business operations of
11  Coastal Title.
12    A.    Tax returns probably.
13    Q.    Anything else?
14    A.    Not really, no.
15    Q.    Do you recall receiving this document
16  request that's been marked as Coastal Exhibit 5?
17    A.    Not really, no.
18    Q.    Do you recall if you searched for any
19  documents in response to this in 2008?
20    A.    We probably did.  I mean, there's -- I
21  have had correspondence and conversations with Mr.
22  McGowan.
23    Q.    I don't want you to reveal what you
24  discuss with your attorney.
25    A.    I'm just saying yes.

Page 88

1    Q.    You have.  Okay.  Did Coastal produce
2  any documents to its counsel in 2008?
3    A.    No, because we don't have much left in
4  terms of that.  In terms of what you're looking for
5  here.
6    Q.    When Coastal received notice of the
7  claims relating to the Kane Cristo Properties, did it
8  do its own investigation?
9    A.    Back in '96, '97?
10    Q.    Yes.
11    A.    Investigation into what?
12    Q.    Into the claims that were being made.
13    A.    No, no, not really.  Once it became a
14  claim it shifted over to the underwriter, and if they
15  had questions we would answer questions and -- but by
16  turning our entire file over to them they've got
17  everything that we did.
18    Q.    Was this the largest group of claims
19  Coastal had received?
20    A.    Oh, yes.
21    Q.    And did you do any other investigation
22  not related to the claims once you were put on notice
23  of the problems with the Kane properties?
24    A.    Only what we discussed earlier in terms
25  of trying to find out what was going on with these

Page 89

1  people, what they were doing and how they were
2  getting these properties bought and sold the same
3  day.
4    Q.    And as a result of that investigation
5  did you make any notes or draft any sort of memoranda
6  or anything like that?
7    A.    No.
8    Q.    Does Coastal have a document retention
9  policy?
10    A.    Well, we have to keep our title files
11  for 15 years after closing.
12    Q.    After closing.  Okay.
13    A.    Which we do.  And otherwise I retain my
14  tax returns.  I do have my -- all of my bank records
15  for the last probably ten years at least.  But there
16  was a time period that we were scanning them, we had
17  a computer crash and they are gone.
18    Q.    Do you have any bank records from the
19  1996, '97 time frame?
20    A.    Probably not.  They would have been
21  scanned and lost in that crash.
22    Q.    The horrors of the electronic age.
23    A.    Uh-huh.
24    Q.    Is there any other document retention
25  policy that Coastal has besides the 15 years, the

23  (Pages 86 to 89)

Page 90

1  bank records and the taxes?
2      A.   No. I should say none other than any
3  correspondence or anything that happens in a file
4  remains in that file and if it's scanned -- I mean,
5  if somebody leaves their lunch order in a file it's
6  scanned.
7      Q.   So all your files are now electronically
8  maintained?
9      A.   Yes.
10     Q.   Did you scan any of the files that you
11 had prior to your going electronic or getting a
12 computer system?
13     A.   Yes.
14     Q.   You say you gave the original of those
15 pending files to the FBI. Did you keep a copy
16 anywhere?
17     A.   We -- it's possible. I don't know. I
18 don't know if we had time to do that at that time.
19 So we made a lot of photocopies over that summer, and
20 I don't know if we made copies of those files.
21     Q.   Does Coastal have copies of any of those
22 files still?
23     A.   The files that are -- that were pending,
24 so to speak?
25     Q.   Right. That were pending.

Page 91

1      A.   I don't know. There's no way for me to
2  find out what files would be pending.
3      Q.   What about copies of the actual files
4  that were produced in this litigation?
5      A.   We should. We should.
6      MR. McGOWAN: But he doesn't.
7      Q.   When you say you should, do you know if
8  you do?
9      A.   I need file numbers to verify it. These
10 files -- the original files that were scanned are on
11 disk and there's no electronic index of that so I
12 can't tell -- I can't tell those files without having
13 a file number. If you said to me: Do you have file
14 number CT 18732, I can go to the disk that has that
15 and I can look.
16     Q.   That's what I was going to say. If I
17 sent Mr. McGowan a letter you can actually tell me if
18 you have these files still?
19     A.   I can try to.
20     Q.   That's all I can ask is that you try.
21     MR. McGOWAN: While you're looking, let
22 me put on the record what I told counsel, sub rosa
23 all counsel and the client, there were original files
24 that were produced by us in connection with the
25 Skowrenski matter. They were produced to counsel for

Page 92

1  Mr. Skowrenski in that case. And those files can no
2  longer be had, and they were misplaced or otherwise
3  made unavailable while they were in the possession of
4  that attorney. I physically delivered them from
5  Coastal Title Agency to that attorney who at the time
6  was in this very building and --
7      MR. MAGNANINI: Which shall remain
8  nameless.
9      MR. McGOWAN: Now they're gone. So when
10 you ask him if he has the files, are you saying you
11 might have those --
12     THE WITNESS: Those I probably would not
13 have on disk because we didn't do that project until
14 after 2000.
15     MR. MAGNANINI: How many files did you
16 give during that litigation, Marty?
17     MR. McGOWAN: Boxes.
18     THE WITNESS: It was a lot of files.
19     MR. McGOWAN: Remember you had all the
20 boxes out in the hall.
21     A.   It was a lot.
22     Q.   Okay.
23     A.   Maybe six of those like that.
24     Q.   Those big banker --
25     MR. McGOWAN: Like three or four long

Page 93

1  boxes of individual property files in the box.
2      Q.   Were they every file that Coastal had
3  gotten title insurance for that involved National
4  Home Funding?
5      A.   I don't know. It's possible but I don't
6  know.
7      Q.   Has Coastal been involved in any
8  lawsuits as a defendant since 1996 concerning
9  allegations of fraud or breach of contract --
10     A.   No.
11     Q.   -- relating to title insurance policies?
12     A.   So other than this lawsuit and the Skowrenski lawsuit
13 there's been no other ones?
14     A.   None.
15     Q.   Okay. When you said before, Mr. Agel,
16 that you personally had been involved in six
17 depositions, I believe is what you said. What were
18 those -- why were you being deposed?
19     A.   Mostly expert witness.
20     Q.   In what --
21     A.   In fact, all expert witness. Cases
22 where I am an expert witness.
23     Q.   In what capacity?
24     A.   On land titles.
25     Q.   That's all I have on this. Why don't we

24  (Pages 90 to 93)

Page 94

1  take a lunch break here and then we will come back.
2       (A discussion takes place off the
3  record).
4       (A lunch recess takes place.)
5       Q.   Mr. Agel, one of the things I forgot to
6  ask you earlier is:  What did you do to prepare for
7  the deposition as Coastal's corporate representative?
8       A.   I met with Mr. McGowan and Mr. Aaron.
9       Q.   Did you review any documents?
10      A.   I got a letter that you sent requesting
11 documents but it came in very late.
12      Q.   Did you have a chance to look for any
13 other documents in that letter?
14      A.   Yes.
15      Q.   Did you locate any?
16      A.   No.
17      Q.   Are you still looking for documents?
18      A.   I only got it the other day so I have
19 not looked in the last -- I didn't look today.
20      Q.   So --
21      A.   If you go through it I can tell you what
22 I know I don't have and what I can't get.
23      Q.   Let me just do that with you.  I am not
24 going to mark it as an exhibit but, Mr. Agel, if you
25 take a look at the letter that I had sent, if you

Page 95

1  tell me which -- if you could just tell us what
2  numbers or categories that you may have responsive
3  documents?
4       A.   Well, I can tell you number one, policy
5  and procedure manuals, I don't have any.  I don't
6  have any.
7       Q.   Do you have any now?
8       A.   No.
9       Q.   Actually, sorry about this.  I was going
10 to ask this stuff later, but do you get any policy or
11 procedure manuals from the title companies?
12      A.   They have them, yes, I'm sorry, I've got
13 those books.  We rarely use them.
14      Q.   And so how far back do the books go?
15      A.   You get one when you sign and you never
16 hear from them again about it.
17      Q.   And do you still have the book you would
18 have received from Commonwealth?
19      A.   No.
20      Q.   How about the one from Nations?
21      A.   No.
22      Q.   One from Fidelity?
23      A.   No.
24      Q.   And then I assume you got a new book
25 from Lawyer's Title.

Page 96

1       A.   Probably, but, you know, that's -- these
2  are a long time ago so people don't use them.  You've
3  got the agency agreements.
4       Q.   Right.  From Mr. Hayes and Mr. Kott.
5       A.   I don't recall a termination letter
6  between us, between Commonwealth and Coastal.  I
7  just -- I don't recall one at all and I'm sure there
8  was something but that was a mutual termination.
9       Q.   You say mutual.  Did you write a letter
10 to Commonwealth?
11      A.   I don't recall.
12      Q.   I believe -- because I think during the
13 Commonwealth 30(b)6 deposition their representative
14 had said she believed she saw a termination letter in
15 Commonwealth's file.
16      A.   It could be.  I just wouldn't keep it
17 this long.  That I wouldn't keep this long.
18 Approved/disapproved attorney list.  I don't recall
19 if they go back that far.  This case might be the
20 genesis of approved and not approved attorney lists,
21 but if I had them I am under strict orders not to
22 share those with anybody.
23      Q.   Where do you get them from?
24      A.   They would come from the underwriter.
25 From either Commonwealth or Fidelity.

Page 97

1       Q.   Again, when we did Commonwealth's
2  deposition they said that they had them -- their
3  approval or disapproved, I guess --
4       A.   It was mostly a non-approved list is
5  what you would call it.
6       Q.   A non-approved list?
7       A.   Yes.
8       Q.   Those were attorneys that they would not
9  issue insurance for?
10      A.   That's right.
11      Q.   Okay.  And what I understood from
12 Commonwealth was they were chronological.  They just
13 kept them -- they would add people to them year after
14 year.
15      A.   Yes.  And then they would take people
16 off too.
17      Q.   If they became approved again?
18      A.   Right.
19      Q.   And then do you have the approved list
20 from --
21      A.   No.
22      Q.   -- 1996, '97?
23      A.   No.
24      Q.   Do you recall if Mr. Yacker was ever on
25 the -- put on the disapproved list?

25  (Pages 94 to 97)

VERITEXT  REPORTING  COMPANY

Page 98

```
 1      A.   No, I don't recall, but I can tell you
 2  that if he got on the list I would have made a call
 3  to Commonwealth about it to find out why and whether
 4  I can or cannot do business with him.  They all had a
 5  policy and -- had a policy that says:  We will do
 6  business with these people on a case-by-case basis.
 7      Q.   I assumed, maybe incorrectly, that if
 8  someone was disapproved they were just off limits,
 9  you would never do business with them?
10      A.   Not necessarily.
11      Q.   Okay.
12      A.   I don't think he was ever on it because
13  I never recall making a phone call.  He got on it
14  after.
15      Q.   Right.
16      A.   Yeah.
17      Q.   And then -- but if someone was on the
18  disapproved attorney list, was it your -- Coastal's
19  decision to work with them or it was the title
20  company's decision?
21      A.   It would be -- if I wanted to work with
22  them for some reason I would call and ask.
23      Q.   And who would you call?  The
24  underwriter?
25      A.   I would call the underwriter.  I would
```

Page 99

```
 1  call, in Commonwealth's case, Nancy Koch.
 2      Q.   Who would you call in Fidelity's case?
 3      A.   Whoever counsel was at the time, say, Ed
 4  Norton, Kevin Carins.
 5      Q.   If they said it was all right to work
 6  with that attorney, then you could?
 7      A.   Yes, but, you know, in this case -- I
 8  can only think of one case where I ever asked.
 9  Something totally unrelated to this.
10      Q.   And do you recall if Mr. Cicalese was
11  ever on the disapproved list?
12      A.   After?
13      Q.   After.
14      A.   Certainly after.  I would think not
15  before because I would have recalled making phone
16  calls or not do business with him.
17      Q.   How long back do you keep the
18  disapproved lists?
19      A.   I discard -- we keep them now
20  electronically, but I delete when I get a new one
21  because they're updated.  They update the full list
22  and give you just a list of new attorneys.  So I
23  would delete it or toss it when I get the new one.
24      Q.   How often is that done?
25      A.   Somewhat less than monthly.  Probably I
```

Page 100

```
 1  would say every other month, quarterly, at least
 2  quarterly, I believe.
 3      Q.   All right.  You said you are under
 4  instructions not to disclose?
 5      A.   It's right in our memos that we get from
 6  the underwriter, do not disclose.
 7      Q.   We won't ask you for those then.  We
 8  will discuss, if there's any relevance, from title
 9  company's counsel.  Okay.
10      A.   Let's see.  I have no -- I have the
11  correspondence with Walsh Securities or its
12  attorneys.  Let's see.  The communications -- the
13  title companies, you know, 99 percent of what we did
14  especially back then was on the telephone.
15      Q.   Okay.
16      A.   A little better now with e-mail.
17      Q.   There's not any written record?
18      A.   Right.  I have no joint defense
19  agreements.
20          MR. McGOWAN:  I can personally stipulate
21  there's no defense agreement.
22          MR. KOTT:  Can you read that back?
23          (The requested portion is read by the
24  court reporter.)
25      A.   Coastal Title's file relating to agency
```

Page 101

```
 1  relationship with -- to title insurance defendants,
 2  that's the contract.  That's the only thing.  All
 3  payments on premiums received.  That's impossible.  I
 4  just don't have.
 5      Q.   The records from back then --
 6      A.   The records from back then, I don't keep
 7  them that long.  Same thing with the general ledger.
 8  Once again I can't identify the title insurance
 9  policies without file numbers because I don't have an
10  electronic record of that.  I have not offered to pay
11  any settlement with anyone.  I haven't offered to.
12      Q.   By that I mean Coastal Title.
13      A.   Coastal Title Agency has not -- you have
14  gotten the settlement agreement and I cannot put my
15  hands on our policy, you know, the E&O policy.  I'm
16  sure --
17          MR. McGOWAN:  I think I will be able to
18  get that for you.
19      Q.   According to the 26 disclosures your
20  attorneys have that so we will get that from them.
21      A.   That's everything.
22      Q.   Okay.  Good.  Other than this letter,
23  Mr. Agel, did you review any documents to prepare for
24  today's deposition?
25      A.   No.  We did review some of them -- you
```

Page 102

1  know, some of the title commitments that you had,
2  that type of thing, not much though.
3      Q.    Did you speak to anybody at Coastal to
4  prepare for this deposition?
5      A.    No.
6      Q.    It's always the problem, you take a
7  break and you eat something and you think of things
8  you should have asked.  You were saying that --
9  earlier that there were a couple of pending files on
10  some of the Kane transactions.  What did you mean by
11  "pending"?
12     A.    Open files that they had not closed on
13  purchasing or selling, properties that he was -- I
14  guess you would call it his pipeline of properties
15  that he was building up to fix and sell.
16     Q.    So the properties he had acquired but
17  not closed on?
18     A.    Correct.
19     Q.    Were there any properties for whatever
20  reason that Cristo or J.G.L. or one of Mr. Kane's
21  companies had purchased and then sold and title
22  insurance was never issued on?
23     A.    I don't recall.  At the end we probably
24  did not issue.  Once this started to break we stopped
25  issuing -- I was under instruction: Just don't issue

Page 103

1  anything, don't issue policies.  So there are
2  probably files that did close that were done properly
3  probably that we didn't issue policies on, but that
4  was kind of when all hell broke loose and we were
5  producing documents for people.
6      Q.    What then happens to -- because as I
7  understood the title process once the closing
8  occurred Coastal was sent money, I assume at that
9  point, by, say, Mr. Cicalese?
10     A.    Uh-huh.
11     Q.    For the closing protection letter and
12  the title insurance.  What happened to that money if
13  it was not -- if the title policy was not issued?
14     A.    We still -- right away when we did the
15  -- when we did our deposit we would still immediately
16  break out the premium for the underwriter so they
17  got -- they would have I think gotten paid because
18  when we got paid -- if we got paid we would assign a
19  policy number to it and it already had a number on
20  the closing protection letter so that money was
21  separately -- that was held separately and, you know,
22  I actually don't even have that account anymore
23  because we don't remit that way anymore.  We just we
24  remit everything electronically, and we remit the
25  minute that we're paid because the computes give you

Page 104

1  a policy number and all of that right away so that's
2  all done electronically.
3      Q.    Now, what I was wondering was: Were
4  there any, in other words, I guess, premiums for the
5  title insurance or was it a premium for the closing
6  protection letter?  Is that what you called it or
7  just a payment?
8      A.    I don't think they call it a premium.  I
9  can't remember what it's called, but I don't think
10  it's called a premium.
11     Q.    Were there any premiums for title
12  insurance policies, for lack of a better term,
13  payment for the CPL that were -- that were made to
14  the title insurance companies for policies that were
15  not issued?
16     A.    I don't know.  I don't know.
17     Q.    Do you recall if there were any payments
18  to the title insurance companies for the CPL but not
19  a payment for a title insurance policy since that
20  policy was not issued?
21     A.    That couldn't happen.  We remit at the
22  same time.  Those get remitted together.
23     Q.    Okay.  Do you recall: Was money ever
24  returned to Coastal from either Commonwealth or
25  Fidelity for policies that weren't issued?

Page 105

1      A.    No.
2      Q.    One of the other things you said or you
3  testified to earlier was after you had this large
4  batch of closing documents that had not been filed
5  you received what you thought were two other batches,
6  I think was your term, of documents that needed to be
7  filed.  When did you -- when did Coastal receive
8  those documents?
9      A.    I don't know.  I don't even know if it
10  was two.  I know that we got a batch of documents
11  that did not get recorded because things fell apart
12  in terms of their being able to fund things.  So
13  those documents went -- those original documents went
14  to the FBI.
15     Q.    Okay.  Do you recall who forwarded you,
16  you being Coastal, the documents?
17     A.    No.
18     Q.    And who was going to fund the filing for
19  all those documents?
20     A.    Well, my assumption at the time was that
21  it would be Kane because he did the last group that
22  we asked him to record, but, you know, it never got
23  that far because things fell apart.
24     Q.    And you said Mr. Kane paid by check for
25  the total amount of the filing.  Do you recall was it

27 (Pages 102 to 105)

## Page 106

1 a company check or a personal?
2    A.   It would have been a company check, I am
3 sure. Which company I don't know.
4    Q.   That was my next question. Did they pay
5 Coastal for anything else?
6    A.   No.
7    Q.   Did -- when Coastal was filing those
8 variety of documents, did Mr. Kane ever instruct
9 Coastal not to file any of the mortgages?
10    A.   No.
11    Q.   Were mortgages filed with the closing
12 documents?
13    A.   Meaning that group that I recorded?
14    Q.   Yes.
15    A.   Yeah, it was deeds and mortgages and --
16 it was deeds and then purchase money mortgages, yeah.
17    Q.   We have seen on some -- some we have,
18 some mortgages we haven't found.
19    A.   I'm thinking that was not something that
20 I recorded and some of them could be that those were
21 properties that he closed on before he sold it
22 because I think when he did that he paid cash for the
23 properties. He didn't mortgage a lot of those
24 because he did do some properties where he bought
25 them and took title before he flipped them to the

## Page 107

1 last buyer.
2    Q.   I've seen that. Did Mr. -- or did you
3 ever have any discussions with Mr. Kane about where
4 he got the money to purchase these properties?
5    A.   No. Well, actually it might not have
6 been him, I don't think it was him, it was Pepsny but
7 you can see where it came from. You -- and that's
8 classic with anyone that flips properties if they do
9 them simultaneously, you use B's money, B's closing
10 money to pay A's closing money. That still happens
11 today.
12    Q.   Outside of this group of Kane
13 transactions with this -- with the flip, has Coastal
14 been involved in any other flips that had any type of
15 fraud in them?
16    A.   You know, I think that there was one
17 that we insured. It was some attorney in Elizabeth
18 maybe and a mortgage company. I don't remember their
19 names but Target Mortgage maybe was the name of it.
20 They did -- they had some issues but, you know, those
21 just closed. That was just -- that was not -- there
22 was never a claim involved and never a lawsuit
23 involved with that, but there was an attorney, I
24 think his attorney name was Kloud, who was disbarred
25 over that. But that would be it.

## Page 108

1    Q.   Speaking of disbarred attorneys, have
2 you had any -- when was the last time you spoke to
3 Mr. Yacker?
4    A.   Probably the day I asked for the
5 recording fees back in 1997.
6    Q.   I understand he's working in the title
7 agency business.
8    A.   I heard that. I heard that. That used
9 to be a haven for disbarred attorneys. Don't ask me.
10 I don't sign them. That's their clients.
11    Q.   But you haven't spoken to him. The
12 other follow up was: You had said about the joint
13 venture deeds between the buyer and -- Capital Assets
14 and the buyer that you had some familiarity with them
15 because of your investing in the 1980s, and I think
16 you had said that up until they changed the tax laws,
17 which I believe occurred in 1986?
18    A.   Yes.
19    Q.   And then prior to this group of Kane
20 properties and that ended with this joint venture
21 deed, had you had any or had Coastal had any
22 experience with joint ventures like this, deeding
23 away 60 percent of the security interest in that
24 intermediate time between the change of the tax laws
25 in '86 and '96?

## Page 109

1    A.   Not to my knowledge. Not that I
2 recollect, no.
3    Q.   And then did the joint venture deeds
4 cause Coastal any concern because -- this is a
5 layman's question. It seems to me you're impairing
6 the security of the lender by giving away 60 percent
7 of the property.
8    A.   No, we were insuring that they had a
9 first lien. They had a first lien. We don't insure
10 the enforceability of the mortgage. We don't insure
11 anything beyond its first lien status. So we -- they
12 had first liens so, no. There was really -- we
13 didn't really question it. I thought it was odd but
14 we're insuring first lien, they had first liens.
15 Those deeds went on after the purchase money
16 mortgages.
17    Q.   Did you have any discussions with the
18 underwriters at Commonwealth or Nations/Fidelity,
19 I'll call it, about the joint venture deeds?
20    A.   I don't think so.
21    Q.   Why not?
22    A.   Just didn't seem important at the time.
23    Q.   Because it was after --
24    A.   It was a post, it was post policy.
25    Q.   Do you recall if you received -- well,

28 (Pages 106 to 109)

Page 110

1  if you would have filed the joint venture deeds you
2  would have had those in your files.
3      A.    If they were recorded with that group,
4  yes, because those were really the only ones that we
5  recorded.  Up until that point Yacker was recording
6  them.  Or I assumed Yacker was recording them.
7      Q.    Do you recall any conversations with Mr.
8  Yacker or Miss King in which they said that Mr. Kane
9  had instructed them not to record the deeds and
10 mortgages?
11     A.    No.
12     Q.    Mr. Agel, is there any due diligence
13 involved on behalf of title companies before they
14 sign an agreement with Coastal to be their agent?
15     A.    There should be.  What they do I don't
16 know, but I have not signed up with underwriters that
17 just sent me contracts in the mail, which that has
18 happened.
19     Q.    What information did Coastal provide
20 Commonwealth before it became an approved agent?
21     A.    Probably E&O coverage.  You know,
22 Commonwealth was a good company, still is, probably
23 E&O type coverage, filled out an application,
24 probably gave them references, that type of things.
25 We had an interview.

Page 111

1      Q.    And then the same question for Nations.
2  I guess that's who you signed up with initially.
3      A.    Yes.  Actually that one we signed up
4  with because the fellow that ran the northeast for
5  them had been a former superior of mine at Lawyer's
6  Title, and I don't remember the process but, you
7  know, we did -- I had known him for ten, fifteen
8  years before we signed up.
9      Q.    Was there anything additionally required
10 when Nations became Fidelity by Fidelity?
11     A.    Probably just a contract amendment,
12 change the name of the underwriter.
13     Q.    And then did Coastal perform any
14 diligence on the title insurance company on the other
15 side before becoming an agent?
16     A.    I wouldn't call it due diligence.  I
17 know who -- I've been doing this a long time.  I know
18 who the good underwriters are.  I know what my
19 requirements are because we do a large commercial
20 business.  I want underwriters with lots of assets.
21     Q.    Mr. Agel, Commonwealth-5 from the
22 deposition of May 27, 2010 so I'll just use the same
23 thing, and it's a document Bates stamped COM 0000001
24 to 8.
25         Mr. Agel, you said at that time -- I'll

Page 112

1  go to the end first -- was that Coastal's business
2  relationship with Commonwealth was terminated -- I
3  believe you said was a mutual --
4      A.    I believe so.
5      Q.    What was Coastal's reason for ending the
6  relationship with Commonwealth?
7      A.    Dealing with Lawyer's Title.
8      Q.    Okay.
9      A.    To deal with Lawyer's Title.
10     Q.    To deal with Lawyer's Title?
11     A.    Yes.
12     Q.    Okay.
13     A.    And I think the reason they gave me on
14 their end, which is normal, is that they had minimum
15 remittance requirements and, you know, we weren't --
16 I couldn't -- had no interest in meeting them because
17 I was dealing with Lawyer's Title.
18     Q.    Okay.  So when you terminated the
19 relationship with Commonwealth, Coastal was using
20 Lawyer's Title and Fidelity?
21     A.    Yes.  We probably used Fidelity for a
22 little while longer.  We went exclusively with
23 Lawyer's Title for a while, and I don't remember when
24 that occurred.
25     Q.    Okay.  I would ask you:  On Commonwealth

Page 113

1  Exhibit 5, do you recognize this document?
2      A.    Yes.
3      Q.    And what is it?
4      A.    It's my agency agreement.
5      Q.    And then Paragraph 1 says that
6  Commonwealth hereby designates and appoints agent as
7  its representative or agent for the territory
8  mentioned below under terms and conditions specified
9  herein and it says:  Freehold and the County of
10 Monmouth.  Did you do -- you issued title insurance
11 policies for Commonwealth beyond Freehold and the
12 County of Monmouth.  Correct?
13     A.    Yes.  This dealt with where you could
14 have your office.
15     Q.    Okay.
16     A.    Office locations.
17     Q.    And your obligations to Commonwealth are
18 contained in paragraph two?
19     A.    Yes.
20         MR. McGOWAN:  Bob, you can ask him any
21 questions you want.  The document will speak for
22 itself, but you can ask him what his understanding is
23 but that's the objection.
24     Q.    On -- if you turn to paragraph two,
25 subparagraph F.

Page 114

1    A.   Right.
2    Q.   That appointed you as an agent to record
3  all papers that should be recorded, and you said
4  initially I believe this morning that at least
5  with -- as to the Kane Cristo Properties that you
6  believed the attorneys were recording the documents?
7    A.   Correct.
8    Q.   And then in 1996 and 1997 did Coastal
9  record documents for closings or was it usually done
10 by attorneys?
11   A.   Normally done by attorneys.  Some
12 attorneys would send the documents to us to record
13 for them.  We would walk them into the County Clerk's
14 office for them since we're right here.  We were
15 right here at the time.  That paragraph that you're
16 talking about, 2F, deals with agents -- more with
17 agents that do closings.
18   Q.   Okay.  So you didn't think that applied
19 to Coastal?
20   A.   If I were doing closings it would apply
21 to when I'm doing closings.  It was always understood
22 between us and every agent, every north Jersey style
23 agent and their underwriter that we don't do
24 closings, so if we do the closing we comply with this
25 of course.

Page 115

1    Q.   Okay.  Let me ask that question then.
2  What percentage of purchases for which you issue
3  title insurance did Coastal file papers at the
4  request of the attorneys?  And again this is back in
5  1996 and the first half of 1997.
6    A.   It wasn't a large percentage I'm sure.
7  That came about -- us recording documents was more
8  of a service to the attorneys.  You know, another
9  service that we could provide.  Our rates are
10 regulated.  I am certainly not going to sell my good
11 looks so we try to sell service.
12   Q.   Prior to that, that mass filing, had you
13 recorded any documents for Mr. Yacker?
14   A.   No, I don't think so.
15   Q.   And prior to the -- that filing that we
16 spoke about, had you filed any documents for Mr.
17 Cicalese?
18   A.   I don't think so, no.
19   Q.   And then once Mr. Cicalese was the
20 buyer's, for lack of a better term, attorney, did you
21 file documents for him?
22   A.   I don't think so.
23   Q.   But you're not sure?
24   A.   I am not certain, no.
25   Q.   Okay.  Did Commonwealth ever contact

Page 116

1  Coastal and -- to determine whether you had not
2  forwarded the necessary documents to Commonwealth?  I
3  don't know if I'm asking that right.
4    A.   I understand.  No, because really the
5  only documents we ever forwarded to them were the
6  policies and the closing service letters and any
7  endorsements to the policy that were issued.
8    Q.   Okay.  Would Coastal have done --
9  modified the documents in any way that it was filing
10 on behalf of the attorneys?
11   A.   No.  Other than putting our "Record and
12 Return" stamp on it, we would on -- we would have it
13 recorded and returned to us.  Anything that we're
14 responsible for recording, we record and return to
15 our location to make sure it's recorded and done.
16   Q.   Would Coastal ever put its stamp over
17 the lender's name so instead of it being returned and
18 recorded to lender it would come to Coastal?
19   A.   Yes, absolutely, yes.
20   Q.   Why was that?
21   A.   Because if we're responsible for
22 recording we want the document returned to us, and
23 then we return it or we send it out to either the
24 attorney or it's possible we might have sent policies
25 directly to Walsh Securities.  And what we would do

Page 117

1  is we would send the original policies with the
2  original documents to whoever they would go back to,
3  but if we're responsible for recording it comes back
4  to us.
5    Q.   Okay.  What happened with that large
6  filing of closing documents that Coastal did?  Were
7  they all returned to Coastal?
8    A.   Yes.
9    Q.   And then what did Coastal do with them?
10   A.   I believe they ended up with the FBI.  I
11 think that's one of the things that we turned over.
12 I am certain that I got all of the -- if you want to
13 call it -- bookkeeping behind that to them, to the
14 FBI, and I am certain we still would have had those
15 documents probably.
16   Q.   So even though they were recorded by the
17 county April 8th or 9th, you believe you didn't send
18 them back to either Walsh Securities or to the
19 attorney or --
20   A.   The more -- I don't know.  I couldn't
21 answer that with any certainty.
22   Q.   But you could have turned them over to
23 the FBI?
24   A.   That would be what I would figure we
25 did.  Definitely.

30 (Pages 114 to 117)

Page 118

1    Q.    And same set of questions for the other
2  batch or batches of closing documents you received,
3  did Coastal file those?
4    A.    I don't think -- that second batch, so
5  to speak, that did not -- they didn't get recorded.
6  I never got money for them.  I was not advancing it.
7    Q.    So at that point Coastal had those
8  documents --
9    A.    Correct.
10   Q.    In its files and those were given --
11   A.    Those were definitely given to the FBI.
12   Q.    Okay.  Other than the original files you
13 sent to Commonwealth did Commonwealth ever request
14 documents relating to the Kane Cristo Properties from
15 Coastal?
16   A.    I don't think so, no.
17   Q.    Never during the time that these
18 purchase and sales were ongoing?
19   A.    No, that never.
20   Q.    What about Nations or Fidelity?
21   A.    Same thing.
22   Q.    On page three of subsection two is --
23 subparagraph J, that's what you were discussing
24 before, that whenever you had questions or problems
25 deemed doubtful you would call the underwriters to

Page 119

1  discuss it with the agents?
2    A.    Yes.
3    Q.    And then on further down there's
4  subparagraph N.
5    A.    Uh-huh.
6    Q.    And it says: "To maintain agent's file
7  register furnished by Commonwealth."  Did Coastal
8  maintain such a register?
9    A.    Yeah, that really is a policy register
10 we would get.  When we would order policies we would
11 have to -- then we would have to order policy jackets
12 from them.  They would give us a register and what we
13 would do is when we assigned the policy to a file we
14 would just write in that register the file number
15 that went with that policy.
16   Q.    What happened to the register?
17   A.    Oh, after a certain amount of time we
18 would have destroyed it.  It meant nothing to us.
19 It's useless to us frankly.
20   Q.    Did your initial attorneys ever discuss
21 retaining documents because of an ongoing civil suit
22 or anything like that.  I don't want to know
23 what they told you. -
24   A.    I understand.
25   Q.    If you got a letter or memos like

Page 120

1  document retention because there's litigation or
2  there's a criminal proceeding or something like that.
3    A.    I don't recall, but the only thing that
4  I would have thought about saving would be things
5  related to that case, to Cristo.
6    Q.    Okay.
7    A.    Files.
8    Q.    That's why I was asking about this
9  register.  Kind of tracking what was done when.
10   A.    That's strictly giving you what file
11 number went with what policy.  That's what a register
12 is.
13   Q.    And then flipping over to page four,
14 subsection P, allows Commonwealth to examine or audit
15 all books and records.  During the 1996 to mid 1997
16 did Commonwealth ever audit or request to audit
17 Coastal's books and records?
18   A.    I don't recall but if they did it -- we
19 get audited on a regular basis by our underwriters.
20 It wasn't as prevalent but now it's done annually,
21 but it was done then.  I couldn't tell you if it was
22 done during that time period.  And their audit powers
23 were strictly on title insurance related matters.
24 Audit title files, escrow files, premium trust
25 accounts, that type of thing.

Page 121

1    Q.    Not your internal business records or
2  anything like that?
3    A.    No.
4    Q.    Do you recall if there were any audits
5  conducted during that time frame by Nations or
6  Fidelity?
7    A.    No.
8    Q.    What was involved with an audit from the
9  title company?  Would they come to your office or --
10   A.    They would come to the office.
11   Q.    And they would review documents?
12   A.    Yes, they would review my title files.
13 They would take a sampling of files and review them,
14 review the underwriting, review everything in it.
15 Just review the file, mostly the underwriting, to
16 make sure we are underwriting properly.
17   Q.    And then what was the result of the
18 audit?  Did you -- did they make recommendations to
19 you?  Did you hear back from the title company?
20   A.    Very rarely.  Very rarely.  Never any
21 bad reports.
22   Q.    And on four, I guess it's subparagraph
23 T, it says not to do any business in the name of
24 Commonwealth except as specifically authorized herein
25 or otherwise expressly authorized by Commonwealth in

31 (Pages 118 to 121)

Page 122

1  writing. What does that mean?
2      A.   I couldn't hold myself out as being a
3  representative of Commonwealth Title for anything
4  other than the issuance of the title policy.
5      Q.   What else could you hold yourself out
6  as?
7      A.   I suppose I could probably try to do
8  something terrible and -- but I guess there are a
9  whole myriad of things, but I am not allowed to bind
10  my title insurance underwriters to anything other
11  than issuing a title policy.
12      Q.   A policy. Okay. And then if you could
13  turn back to page three, Mr. Agel, it says
14  subparagraph L, the agent agrees to be solely liable
15  for all attorneys' fees, court costs, expenses and
16  loss or aggregate losses resulting from, and then
17  there's a little (a) and in parenthesis (fraud),
18  negligence, with a star, or MISCONDUCT OF AGENT, all
19  caps, its officers or employees in the performance of
20  its duties as AGENT of COMMONWEALTH, and agent and
21  Commonwealth are all capitalized, and then: Did
22  Commonwealth ever make a claim against Coastal under
23  the agreement under paragraph L?
24      A.   No. There was a threat of a -- actually
25  it wasn't even a threat of that. I got a letter from

Page 123

1  them I think that said to put my carrier on notice
2  that they were coming after me and I made a big stink
3  about it and they backed off.
4      Q.   When was that?
5      A.   I don't recall when. During relatively
6  early stages of this, I recall that, after the claims
7  started coming in.
8      Q.   Do you still have a copy of the letter?
9      A.   No.
10      Q.   Do you recall who it was from?
11      A.   That would have been from Nancy Koch.
12      Q.   Did you converse with Miss Koch about
13  that?
14      A.   No, no, I went over her head. I wasn't
15  a happy camper.
16      Q.   Who did you speak to at Commonwealth?
17      A.   It wasn't Commonwealth. I went to
18  Lawyer's Title because they bought Commonwealth by
19  the time that all happened so I went directly there.
20      Q.   Who did you speak to at Lawyer's Title?
21      A.   His name was Ron Owen.
22      Q.   What was his position?
23      A.   He was a senior vice president and I
24  think he ran the northeast.
25      Q.   And what did he tell you?

Page 124

1      A.   "I'll take care of it." I was a very
2  big remitter and, you know, my -- I said to them: Do
3  you want to lose a half million dollar a year agent
4  over this and their answer was no.
5          (A discussion takes place off the
6  record).
7      Q.   Before you filed -- you made that -- I
8  don't know what to call it -- the filing of those
9  various papers that had not been filed by Mr. Yacker
10  did you speak with anyone at Commonwealth, or I'm not
11  sure who it was, Nations or Fidelity at that point in
12  time, about doing the filing?
13      A.   I don't recall. It is very possible.
14  It's very possible, and in all likelihood it would
15  have been just Commonwealth.
16      Q.   Why just Commonwealth?
17      A.   I did most of my business through them
18  at the time.
19      Q.   Okay. Another thing I noticed, and we
20  weren't quite sure how the business was handed out,
21  but the loans at issue here are -- Mr. Kott or Mr.
22  Hayes, one of the two will object, but they're about
23  50/50, like half of them were Commonwealth and then
24  there's a Nations/Fidelity, but so you would have
25  more likely called Commonwealth than Fidelity is what

Page 125

1  you think?
2      A.   I think so, yeah. It's possible I
3  called Fidelity but they -- at that time they didn't
4  have great -- they didn't have as much -- I don't
5  want to say control but they didn't have -- their
6  underwriting standards at the time were not as
7  stringent, put it that way.
8      Q.   This is the natural lawyer tendency.
9  When you divided up the loans knowing Fidelity's
10  underwriting standards weren't as stringent, would
11  Coastal send certain loans to Fidelity as opposed to
12  Commonwealth?
13      A.   No.
14      Q.   On page five of the Exhibit 5 from
15  Commonwealth, Mr. Agel, there's a subparagraph in the
16  middle of the page which says: To pay agent as
17  compensation on transactions originated by agent for
18  services hereunder a commission on the premium paid
19  for title insurance on the following basis, and then
20  there's a: See Exhibit A. Did Coastal negotiate
21  Exhibit A with Commonwealth?
22      A.   No, that was pretty standard with every
23  title agency in the state. And they're pretty
24  standard to this day.
25      Q.   So the 20 percent filed rate was a

VERITEXT REPORTING COMPANY

Page 126

1  standard remittance back then?
2      A.   Yes, pretty standard, yeah.
3      Q.   Is it the same now?
4      A.   Now we remit a little less actually.
5      Q.   Why is that?
6      A.   Ask your -- ask the underwriters. They
7  came in and they sold us.
8      Q.   What does the last sentence of Exhibit A
9  mean?
10     A.   With title insurance you pay a premium
11 on the higher of the mortgage amount or purchase
12 price, and then there's a charge of $20 to issue
13 either the owner's or mortgage policies, which in
14 most case is a mortgage policy, simultaneously with
15 the owners.  So you pay $20 just for a work charge,
16 so to speak, to type that policy.
17     Q.   On page five, subparagraph E, it states:
18 To pay agent as compensation for services in
19 producing commitments, binders and final reports of
20 title, conducting settlements or otherwise servicing
21 matters of title insurance originating by or through
22 the offices of Commonwealth a fee to be agreed upon
23 between Commonwealth and agent.
24     A.   If they had an office that was out of
25 state and had a customer buying something and --

Page 127

1  somewhere in New Jersey, say, that office could
2  contact me and ask me to do the work, and then they
3  would negotiate a rate with me that might be better
4  than the 80/20 split.  They might say:  I'll give it
5  to you if you give me 40 percent.
6      Q.   Okay.
7      A.   That was so I could do business with
8  other -- that's standard language.  You will find
9  that in every contract at that time.  So I could do
10 business with another Commonwealth office somewhere
11 else.  A direct operation.
12     Q.   Did any of the Kane, Cristo purchase,
13 sales come to you via another Commonwealth office?
14     A.   No.
15     Q.   What about any from Nations or Fidelity?
16     A.   No.
17          (Coastal-6, Fidelity Agency Agreement,
18 is received and marked for identification.)
19     Q.   Mr. Agel, I'll ask you if you have seen
20 before what we've marked as Coastal Exhibit 6?
21     A.   Yes.
22     Q.   And what is it?
23     A.   It's my agency agreement with Fidelity
24 National Title.
25     Q.   And on -- starting on Bates stamp 13008

Page 128

1  there's a document, it's titled:  TRW Title Insurance
2  of New York, Inc.  Was that the entity with which
3  Coastal first became a title agent?
4      A.   Yes.
5      Q.   And then at some point did TRW Title
6  Insurance of New York become Nations Title Insurance?
7      A.   That's correct, yes.
8      Q.   And then -- so beginning on Bates stamp
9  13017 there's an agreement assigning the agency
10 agreement from Nations Title Insurance of New York to
11 Fidelity National Title Insurance Company.
12     A.   On 17?
13     Q.   Right.
14     A.   Yeah.
15     Q.   So that's when as, you said before,
16 Nations and Fidelity had merged?
17     A.   Correct, yes, where Fidelity purchased
18 Nations.
19     Q.   Purchased Nations, okay.  And then
20 turning back to the first page, Bates stamp FY 13000
21 on -- under Paragraph 2A2 there's that requirement to
22 maintain the policy register, again, similar to that
23 of Commonwealth.
24     A.   Exact same.
25     Q.   And so -- that's what I was going to

Page 129

1  ask.  Did you maintain it in the same --
2      A.   Exact same fashion.
3      Q.   -- fashion?  Okay.  And then under
4  Section 2, subparagraph A, subsection 7 --
5      A.   Right.
6      Q.   -- it says:  The agent Coastal was
7  required to obtain Fidelity National Title's approval
8  prior to funds being held under escrow and indemnity
9  agreement.  Were there any -- why was that?  Let me
10 ask that first.
11     A.   If there was an open judgment say that
12 was being contested by the seller, you know, we would
13 try -- still try to accommodate people where if
14 they're contesting it, say, they're appealing it, so
15 we would ask for an escrow to be held.  If a judgment
16 is say $10,000 we might say if we hold $20,000 you
17 have to have it cleared up by a certain date.  So I
18 would need to clear that with any underwriter or this
19 one specifically, put it in the contract, but we
20 would always -- if we ever held an escrow we contact
21 our underwriter to see what they thought.
22     Q.   What would happen if the -- in your
23 example a judgment was not cleared up by the time you
24 needed to have it cleared up?
25     A.   There have been times that we've used

33 (Pages 126 to 129)

VERITEXT REPORTING COMPANY

Page 130

1  that money and paid the judgment off. We might
2  deposit it in court. We would do any number of
3  things. Maybe we would give them more time if they
4  showed that they were diligently pursuing their
5  appeal type of thing.
6      Q.    And would you have issued title
7  insurance --
8      A.    Yes.
9      Q.    -- at the closing and you just hold this
10 in escrow --
11     A.    Correct.
12     Q.    -- until it was cleared up? Was that
13 done -- earlier you had testified that at least
14 initially the properties that Mr. Kane and his
15 companies were obtaining were distressed, I think was
16 your word, and you had said foreclosures, tax sales,
17 all sorts of things like that. Did Coastal obtain
18 escrow money from Mr. Kane, Mr. Yacker or Mr.
19 Cicalese or Mr. Pepsny even to hold until any of
20 those problems were cleared up?
21     A.    No, I don't recall, but if it was
22 anybody it would be -- it would have been Pepsny
23 because his closings were the ones where you would
24 have to clean up the title, so to speak, but we
25 didn't hold -- up until a few years ago we never

Page 131

1  held -- title companies never really held a lot of
2  escrow money. We never held -- it would say hold in
3  escrow, but the attorneys would generally hold the
4  escrow.
5      Q.    Oh, okay.
6      A.    As per agreement those -- we could
7  demand payment or deposit in court, that type of
8  thing.
9      Q.    Would you -- if the attorney was going
10 to hold the money in escrow would you still have
11 called the title company's underwriters?
12     A.    Yes.
13     Q.    And then how would you certify or check
14 that the agent or the attorney was actually holding
15 the money in escrow?
16     A.    Well, you would sometimes take it at
17 face value that they're an approved attorney. They
18 generally will give us -- I don't know if they did
19 them -- but a cover letter that says: We closed,
20 here are the documents, here's the check, we're
21 holding $20,000 in escrow for this item.
22     Q.    Okay. Then under -- on page 13000
23 still, Section 2B, there's a list of negative
24 covenants, which the agent agrees not to do certain
25 things. Number five says: Alter any title assurance

Page 132

1  or other form furnished by company or commit company
2  to any particular interpretation of provision or
3  terms of title assurance. Why is that in this
4  agreement?
5      A.    I think that's probably in the end a
6  better question for a title insurance representative.
7      Q.    The title company? What did you
8  understand that Section 5 to mean?
9      A.    Well, on title insurance forms they're
10 all approved -- policies, commitments, endorsements
11 are all approved by the Department of Insurance.
12 Every company files their forms with the Department
13 of Insurance and you can't deviate from those forms.
14 So I interpret that as saying I can't alter the terms
15 and conditions of a title policy, title commitment,
16 closing service letter.
17     Q.    Any of that?
18     A.    I have to issue exactly the form that's
19 filed with and approved by the Department of
20 Insurance.
21     Q.    Okay. And in the subsection three or
22 section three it says: Responsibility of Company,
23 which I assume from the contract is Fidelity National
24 Title?
25     A.    Correct, yes.

Page 133

1      Q.    And so Subsection F says: The company
2  shall furnish its insured closing service letter to
3  each of agent's qualified customers requesting same.
4  What did that mean to you?
5      A.    In the very beginning the closing
6  service letters were issued directly by the
7  underwriter. We would have to call and ask for them.
8  It became so burdensome with an agency our size that
9  they would give us a supply where that -- where you
10 would see sometimes signed by two people, signed by
11 an employee of Fidelity and then signed by generally
12 me. But that's -- in the beginning when closing
13 service letters first came about we were -- we had to
14 call and ask for them.
15     Q.    When you say, "in the beginning," when
16 was that?
17     A.    I couldn't tell you. It's a long time.
18 Man, I'm telling you it's a long time.
19         MR. MAGNANINI:  Off the record.
20         (A discussion takes place off the
21 record).
22     Q.    And then three, Subsection A, says: The
23 company shall furnish to the agent without cost the
24 then currently approved forms of title insurance
25 which agent is authorized to issue hereunder. So

34  (Pages 130 to 133)

VERITEXT REPORTING COMPANY

f17ce3f8-8cb1-4d00-a86a-f42576c2bfb

Page 134

1  that's what -- that's all the forms that the title
2  company --
3      A.    Yeah, the policies, endorsements,
4  commitment jackets, things like that.
5      Q.    And then Subsection B says that the
6  company shall provide the agent with any relevant
7  company manuals, underwriting bulletins and/or
8  instructions which may now or hereafter be issued by
9  the company. And that's what you said you got the
10 initial manual when you signed up?
11     A.    Yes.
12     Q.    Did the title insurance companies issue
13 underwriting bulletins?
14     A.    Yes.
15     Q.    How did you receive those?
16     A.    Then either by fax or mail.
17     Q.    What did Coastal do with them?
18     A.    The important ones we would keep and get
19 them into our computer system, if we had it at the
20 time, which was word processing probably at that
21 time. And otherwise -- the memo itself would get
22 tossed. We would say -- for example, if it was a new
23 requirement for -- as things changed over the years,
24 the transfer tax changes, mansion tax, things like
25 that, we would create that into a -- one of our

Page 135

1  standard exceptions that we would put into the
2  commitment.
3      Q.    Into the commitment itself?
4      A.    Yeah.
5      Q.    How was -- for Fidelity and Nations --
6  Fidelity National, what were the underwriting
7  bulletins? Were they designated with numbers or did
8  they have date and months on them or how did they
9  come to you?
10     A.    Probably both.
11     Q.    Do you remember receiving underwriting
12 bulletins during the 1996, mid '97 time frame?
13     A.    We probably got some.
14     Q.    Do you recall what the topics were?
15     A.    No.
16     Q.    And then C says: The company is
17 responsible for remitting payment of all premium
18 taxes. What does that mean?
19     A.    There's a premium tax in New Jersey.
20 I'm sure in every state. So out of that 15 percent
21 that I would remit to them they would have to pay the
22 premium tax to the State of New Jersey. It's like a
23 sales tax.
24     Q.    It just alleviated the agent from having
25 to make the payment?

Page 136

1      A.    Yes.
2      Q.    Okay. And then D is: Determine all
3  underwriting questions submitted by the agent.
4      A.    Right.
5      Q.    And that's what we had discussed. Were
6  all the questions you submitted to Nations/Fidelity
7  or Commonwealth telephonic or verbal?
8      A.    Telephone, yes.
9      Q.    Section 6 deals with allocation of
10 losses. Did Fidelity or Nations make any claim
11 against Coastal as a result of the -- this litigation
12 or any other claims?
13     A.    No.
14     Q.    Okay. On any -- I understand from
15 counsel for the title insurance companies that after
16 this civil litigation was filed and the various
17 criminal investigation was going on there were
18 several claims made by other entities, either
19 Banker's Trust or Temple Inland entities, which may
20 have held mortgages either because they were put in
21 securities or before Walsh Securities had repurchased
22 them. Was Coastal involved in any of the
23 investigation of the claims process responding to any
24 of those claims?
25     A.    Not really, no.

Page 137

1      Q.    When you say not really --
2      A.    Just getting files to the -- to
3  Commonwealth or Fidelity. That's all. We didn't
4  have any other dealings with them on that, on those
5  claims.
6      Q.    What happened when you terminated your
7  agreement with Fidelity National?
8      A.    We went our separate ways.
9      Q.    Did you return all of the documents to
10 them?
11     A.    Yeah, we would -- we would continue to
12 close out files that we had with them, issue
13 policies, and then when we were through all that we
14 would return the inventory.
15     Q.    And then after you had terminated your
16 agency agreement with them, did Fidelity ever contact
17 Coastal and ask for anything, any other documents,
18 information, anything like that?
19     A.    You know, I don't recall that, no.
20     Q.    And then if you could turn to page
21 13005, down at the bottom it says: "Agent." Is that
22 your signature?
23     A.    Yes.
24     Q.    And then on this -- on page 13005 it
25 says "Rider" and it says under 5A, "Compensation."

Page 138

1  It says: If during any calendar year agent remits an
2  amount greater than, and $100,000 is written in
3  there, company will pay agent a bonus of five percent
4  of the net remittance over, I assume it's, $100,000?
5      A.    Of remittance, yes.
6      Q.    Did you negotiate that?
7      A.    You know --
8      Q.    There's a series of numbers that are
9  crossed out.
10     A.    No. I think that was volunteered.
11     Q.    And then I didn't see a bonus provision,
12 I'll call it, in the Commonwealth agreement. Was
13 there such a bonus for remittance over a certain
14 amount with Commonwealth?
15     A.    No.
16     Q.    So I'll have to ask the lawyer question.
17 So wasn't it in your economic interest to assign more
18 policies to Fidelity since they were going to pay you
19 a bonus over a certain amount?
20     A.    You know, that's kind of complicated
21 because Commonwealth was a much better company and,
22 you know, I'm selling a product and, no, not
23 necessarily. I would rather get a little less for a
24 better product and make it up on volume, so to speak.
25 And, no, no, not necessarily.

Page 139

1      Q.    Okay. Thank you, Mr. Agel, for today.
2  It's three o'clock. We have to break now.
3          MR. KOTT: Mr. Magnanini, will you be
4  the custodian of the original exhibits today and send
5  them?
6          MR. MAGNANINI: I will send them to
7  everyone.
8          (The deposition is adjourned at 3:02
9  p.m.)
10
11 _____
12          ROBERT AGEL
13 Subscribed and sworn to before me
14 this _____ day of _____, 2010.
15
16 _____
17          Notary Public
18
19
20
21
22
23
24
25

Page 140

1              CERTIFICATE.
2
3          I, JANET BAILYN, a Notary Public and
4  Certified Court Reporter of the State of New Jersey,
5  do hereby certify that prior to the commencement of
6  the examination ROBERT AGEL was duly sworn by me to
7  testify the truth, the whole truth and nothing but
8  the truth.
9          I DO FURTHER CERTIFY that the foregoing
10 is a true and accurate transcript of the testimony as
11 taken stenographically by and before me at the time,
12 place and on the date hereinbefore set forth.
13         I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17 and that I am not financially interested in the
18 action.
19
20 _____
   Notary Public of the State of New Jersey
21 My commission expires February 3, 2013
      License No. XI00970
22
   Date: June 28, 2010
23
24
25

**A**

Aaron 66:2 94:8
able 58:13 81:16
  101:17 105:12
above-entitled 2:2
absolutely 116:19
accommodate
  129:13
account 23:8 31:3,4
  31:5,22 36:13
  86:22,22 103:22
accountant 58:15
accounts 120:25
accurate 53:23
  140:10
acknowledging
  39:22
acquired 102:16
acquisition 47:23
act 81:10
action 1:2 140:15
  140:18
actions 30:19
actual 91:3
adapt 60:11
add 97:13
additional 37:20
  64:20
additionally 111:9
adjourned 139:8
administrative
  9:14 19:15
administrators
  17:25
advancing 118:6
advantages 72:2
Affidavits 40:11
affirmative 81:15
age 89:22
Agel 1:6 4:3 5:4
  13:1 26:24 46:12
  54:2 69:3 74:14
  74:20 75:16 79:24
  80:6,15 83:5
  93:15 94:5,24
  101:23 110:12

111:21,25 122:13
125:15 127:19
139:1,12 140:6
agency 1:17 4:13
  4:14 7:6 10:2,4,6
  15:21,23 35:17
  43:2 59:1 74:23
  83:3 92:5 96:3
  100:25 101:13
  108:7 113:4
  125:23 127:17,23
  128:9 133:8
  137:16
agent 21:8 27:7
  32:24 62:9 81:10
  110:14,20 111:15
  113:6,7 114:2,22
  114:23 122:14,18
  122:20,20 124:3
  125:16,17 126:18
  126:23 128:3
  129:6 131:14,24
  133:23,25 134:6
  135:24 136:3
  137:21 138:1,3
agents 80:22 82:4
  114:16,17 119:1
agent's 119:6 133:3
aggregate 122:16
ago 8:9 42:3 59:9
  73:20 96:2 130:25
agreed 126:22
agreement 4:14
  49:15 100:21
  101:14 110:14
  113:4 122:23
  127:17,23 128:9
  128:10 129:9
  131:6 132:4 137:7
  137:16 138:12
agreements 96:3
  100:19
agrees 122:14
  131:24
Alan 65:15,23
alcohol 6:17

alerted 84:25
Alfieri 1:13 16:15
  16:16,22 18:4,12
  24:16,21,22,24
  61:17,18
allegations 93:9
alleges 68:17 80:21
alleviated 135:24
allocation 136:9
allowed 122:9
allows 120:14
alter 131:25 132:14
Amended 4:12
  79:25 80:3,8 81:9
amendment 111:11
American 11:17,19
  11:22 13:24
amount 19:14
  41:21 57:10
  105:25 119:17
  126:11 138:2,14
  138:19
AMY 3:4
and/or 85:20 134:7
annually 120:20
Ansell 66:2 83:16
  84:2
answer 4:12 6:1,9
  6:13 29:22 38:2
  43:22 44:7 52:22
  79:25 80:3,7
  81:17 88:15
  117:21 124:4
answering 80:13
answers 50:8,9
Anthony 1:13,14
  17:6 48:17
anybody 59:3
  79:21 96:22 102:3
  130:22
anymore 59:22
  103:22,23
anyway 39:14
apart 105:11,23
appeal 130:5
appealing 129:14

appearing 5:14
application 110:23
applied 114:18
apply 114:20
appointed 114:2
appoints 113:6
appraisers 77:3
approval 97:3
  129:7
approved 96:20,20
  97:17,19 110:20
  131:17 132:10,11
  132:19 133:24
Approved/disap...
  96:18
approves 38:5
April 42:23,24 53:3
  53:4 61:10 62:11
  64:22 117:17
area 15:5,14 51:15
articles 82:16
Asbury 34:4 49:25
asked 24:11 36:25
  43:7 52:15 56:14
  70:23 71:3 99:8
  102:8 105:22
  108:4
asking 81:22 116:3
  120:8
assets 1:8,9 68:23
  69:25 70:17,18
  71:1,3,8,17 79:22
  108:13 111:20
assign 103:18
  138:17
assigned 119:13
assigning 128:9
assume 6:9 17:2
  19:3 59:21 75:12
  95:24 103:8
  132:23 138:4
assumed 98:7
  110:6
Assuming 17:1
assumption 105:20
assurance 131:25

132:3
attached 54:13
attention 44:9
attorney 5:7 13:18
  17:18 27:7 29:10
  29:24 30:8,17,19
  30:21 34:18 36:21
  36:25 37:2,5
  53:13 85:2 87:24
  92:4,5 96:18,20
  98:18 99:6 107:17
  107:23,24 115:20
  116:24 117:19
  131:9,14,17
  140:14,16
attorneys 3:5,9,12
  3:16 9:15 14:25
  16:10 40:9 55:15
  66:10 68:11 97:8
  99:22 100:12
  101:20 108:1,9
  114:6,10,11,12
  115:4,8 116:10
  119:20 122:15
  131:3
audit 120:14,16,16
  120:22,24 121:8
  121:18
audited 120:19
audits 121:4
August 83:8
authorized 121:24
  121:25 133:25
automated 28:4
automatically 35:4
aware 38:15 53:19
  71:3 82:4
A's 107:10
a/k/a 1:7

**B**

B 4:7 5:1 27:12,13
  27:13,20 28:23,25
  54:18 134:5
back 8:7 10:11,12
  14:3,12 15:5

16:11 17:7,19
22:6 25:24 28:3
29:6 30:11 36:20
37:13 43:12 49:1
54:2,3 57:14
58:16 60:6,19
65:3 75:20 78:24
80:15 88:9 94:1
95:14 96:19 99:17
100:14,22 101:5,6
108:5 115:4 117:2
117:3,18 121:19
122:13 126:1
128:20
**backed** 123:3
**background** 17:9
**backyard** 15:15
**bad** 62:2 121:21
**bagels** 25:2
**BAILYN** 2:3 140:3
**bank** 51:12 89:14
89:18 90:1
**banker** 92:24
**Banker's** 136:19
**bankruptcies** 33:15
47:3
**barred** 80:21 81:10
**basically** 11:12
30:24 32:21
**basis** 73:14 81:14
82:15 98:6 120:19
125:19
**batch** 105:4,10
118:2,4
**batches** 31:14
35:16 36:8,15
64:14 105:5 118:2
**Bates** 66:18 111:23
127:25 128:8,20
**becoming** 52:16
76:17 111:15
**beginning** 22:8
23:17 24:2 33:13
55:20,22 128:8
133:5,12,15
**behalf** 19:1 35:21

38:11 43:17 66:1
69:8 110:13
116:10
**belief** 82:15
**believe** 12:8,25
13:1 16:18 21:16
22:7 23:8 63:22
74:8 81:11,12
82:9,14 93:17
96:12 100:2
108:17 112:3,4
114:4 117:10,17
**believed** 96:14
114:6
**better** 1:19 73:15
100:16 104:12
115:20 127:3
132:6 138:21,24
**beyond** 109:11
113:11
**big** 59:1 92:24
123:2 124:2
**biggest** 6:5
**bill** 36:12 46:16
**bind** 122:9
**binder** 26:16,25
**binders** 26:20
126:19
**bit** 56:17 62:6
**Blauvelt** 36:3
**board** 21:20
**Bob** 5:6 113:20
**bogged** 46:23 47:7
**bonus** 138:3,11,13
138:19
**book** 95:17,24
**bookkeeping**
117:13
**books** 25:22 26:5
95:13,14 120:15
120:17
**bottom** 66:18
137:21
**bought** 23:2 49:16
70:2 73:9 89:2
106:24 123:18

**box** 93:1
**boxes** 84:8 92:17
92:20 93:1
**breach** 93:9
**break** 5:25 39:6,17
39:22 40:2,14
44:7 53:24 77:21
94:1 102:7,24
103:16 139:2
**bring** 22:4 25:2
**Brodo** 1:12 77:13
**broke** 12:3 17:8
61:18 64:4 103:4
**broker** 73:1
**brokers** 76:21
**brought** 41:25
69:22
**Brown** 1:12 77:11
**brushed** 44:13
58:22
**BS** 68:7
**building** 92:6
102:15
**bulletins** 134:7,13
135:7,12
**bunch** 83:10
**burdensome** 133:8
**business** 8:12 11:25
12:4,15 13:8
14:16 16:1 18:7,9
24:15 35:24 43:9
43:10 44:1 53:5
56:8,25 57:2,10
59:1 60:11 61:6
61:12,22,23 62:21
62:24 68:3,25
69:24 76:18 87:10
98:4,6,9 99:16
108:7 111:20
112:1 121:1,23
124:17,20 127:7
127:10
**Bustos** 22:20
**buy** 22:12 23:21,24
49:5,13 53:11
56:13

**buyer** 16:7 53:16
71:7,8,12,14,16
71:16,20 107:1
108:13,14
**buyers** 70:17,18
**buyer's** 115:20
**buying** 16:5 22:11
47:1 79:6 126:25
**B's** 107:9,9

## C

**C** 3:1 135:16
**Calanni** 1:11 77:7
**calendar** 138:1
**CALIENDO** 2:5
3:14
**California** 51:16
**call** 19:11,13 26:19
31:24 33:10 35:16
45:12 61:7 97:5
98:2,13,22,23,25
99:1,2 102:14
104:8 109:19
111:16 117:13
118:25 124:8
133:7,14 138:12
**called** 5:7 10:3 20:9
26:16 30:4,5,9
33:2,6,25 35:10
40:16 67:18 68:22
78:20 104:6,9,10
124:25 125:3
131:11
**calls** 99:16
**camper** 123:15
**cancellations** 41:1
**cancelled** 54:19,20
55:2
**capacity** 5:14 93:23
**Capital** 1:8,9 68:22
69:25 70:17,18
71:1,3,8,17 79:22
108:13
**capitalized** 122:21
**caps** 122:19
**care** 124:1

**career** 6:19
**Carins** 13:10,13
52:1 99:4
**carrier** 75:11,19
123:1
**Casalese** 9:10
**case** 5:9 17:8 18:5
20:13 28:8 34:8
81:19,24 82:17
92:1 96:19 99:1,2
99:7,8 120:5
126:14
**cases** 55:4 93:21
**case-by-case** 98:6
**cash** 52:25 106:22
**categories** 95:2
**categorize** 67:13
**cause** 109:4
**causing** 29:3
**cease** 11:25
**Center** 3:7 35:11
**certain** 23:20 33:24
34:1 44:5 52:8
64:23 85:14
115:24 117:12,14
119:17 125:11
129:17 131:24
138:13,19
**certainly** 99:14
115:10
**certainty** 117:21
**certificate** 54:21
140:1
**certificates** 27:10
47:2
**Certified** 2:3 140:4
**certify** 131:13
140:5,9,13
**chance** 77:23 94:12
**change** 19:14 35:24
60:9 72:6 108:24
111:12
**changed** 36:22,25
37:7,7 72:1
108:16 134:23
**changes** 134:24

**changing** 37:3
   60:11
**charge** 21:18 57:17
   126:12,15
**charged** 82:1
**check** 23:11,15
   25:16,17 36:12,16
   40:8 46:2,4 75:12
   86:24 87:3 105:24
   106:1,2 131:13,20
**checked** 71:9
**checks** 25:20,21
   36:14
**chose** 39:3
**chronological**
   97:12
**Cicalese** 1:14 17:6
   18:21 19:1 20:4,6
   20:12 25:18 41:25
   44:3,6 53:9,13,17
   53:21 55:19,21
   59:14 61:8,9,24
   62:22 63:3,13
   99:10 103:9
   115:17,19 130:19
**Cicalese's** 18:16
**circumstances** 34:4
**civil** 1:2 65:25
   119:21 136:16
**claim** 12:25 76:7
   84:20,21 85:1,6,8
   85:13,17 86:6,10
   88:14 107:22
   122:22 136:10
**claimant** 85:2
**claims** 13:4 68:14
   68:15 85:19 86:12
   86:13,16 88:7,12
   88:18,22 123:6
   136:12,18,23,24
   137:5
**classic** 107:8
**clean** 56:1 130:24
**cleaning** 55:11 56:4
**clear** 47:1,8,9,14,15
   52:8 85:5 129:18

**clearance** 33:15
**cleared** 47:17 48:3
   55:13 72:18
   129:17,23,24
   130:12,20
**clearing** 47:24
   55:12
**clerk** 74:2
**Clerk's** 114:13
**client** 91:23
**clients** 14:18 61:14
   79:5 108:10
**close** 47:16,16
   49:24 103:2
   137:12
**closed** 22:10 24:7,7
   42:5 49:17 102:12
   102:17 106:21
   107:21 131:19
**closing** 9:15 14:19
   21:3,10,18,25
   22:1,4,10 23:4,9
   24:3,9 25:6,13
   27:5,7 28:1 29:17
   30:4,6,6,10,19,21
   30:25 31:18 34:10
   34:17 36:20,22,22
   37:1,5,7,13,17,21
   38:10,17,23 39:4
   40:7,8,21 41:4
   43:18 52:18 53:7
   53:13 57:17 71:20
   78:14 85:6 89:11
   89:12 103:7,11,20
   104:5 105:4
   106:11 107:9,10
   114:24 116:6
   117:6 118:2 130:9
   132:16 133:2,5,12
**closings** 60:12,15
   60:15 61:2,4 62:3
   62:7 78:18 114:9
   114:17,20,21,24
   130:23
**Coastal** 1:17 4:13
   6:20 7:1,5,18,24

8:4,11,22,25 9:11
9:22 10:8,24 11:4
11:9,16,25 12:15
13:23 14:4,6,13
14:16 15:5,23
16:1,19 18:14
19:11 20:7,18,24
21:4 22:2 24:13
24:23 25:19,22
27:20 30:23 36:23
37:18 38:10 39:3
39:10 43:2,8,17
52:23 53:4 57:8
57:24 58:4,24
59:8,21 60:15
62:8,22 66:1,17
69:4,8 73:11,24
74:23 75:2,7,10
75:21 76:8,20
77:2 80:21,24
81:14 83:2,6,19
84:9,11,25 85:7
85:12 86:2,11,18
87:11,16 88:1,6
88:19 89:8,25
90:21 92:5 93:2,7
96:6 100:25
101:12,13 102:3
103:8 104:24
105:7,16 106:5,7
106:9 107:13
108:21 109:4
110:14,19 111:13
112:19 114:8,19
115:3 116:1,8,16
116:18 117:6,7,9
118:3,7,15 119:7
122:22 125:11,20
127:20 128:3
129:6 130:17
134:17 136:11,22
137:17
**Coastal's** 26:5 34:8
   54:23 57:1 58:6
   79:25 80:7 81:21
   94:7 98:18 112:1

**112:5** 120:17
**Coastal-1** 4:9 69:10
**Coastal-2** 4:10
   74:12
**Coastal-3** 4:11
   74:17
**Coastal-4** 4:12 80:3
**Coastal-5** 4:12 83:1
**Coastal-6** 4:14
   127:17
**coincidental** 61:17
**cold** 41:7 46:14
   50:20
**collect** 71:6
**COM** 111:23
**come** 16:6 17:16,18
   17:20,22 20:7
   29:6 41:2 44:8
   58:13 60:14 94:1
   96:24 116:18
   121:9,10 127:13
   135:9
**comes** 117:3
**coming** 46:20 56:5
   123:2,7
**commencement**
   140:5
**commencing** 2:7
**comments** 74:10
**commercial** 14:10
   111:19
**commission** 32:1
   125:18 140:21
**commissions** 32:5
**commit** 132:1
**commitment** 5:12
   16:4 20:19 21:2
   21:14 22:3,21
   26:12,15,17,18,25
   27:5 30:15 47:10
   47:15,18 48:2
   54:12,17 56:1,1
   132:15 134:4
   135:2,3
**commitments** 9:16
   10:18 14:20 22:16

**39:8** 62:13 102:1
   126:19 132:10
**committed** 70:25
**common** 71:2,24
   72:3
**Commonwealth**
   1:15 3:9 11:6
   12:1,8,9 14:5 31:9
   35:9,21,23 36:1,9
   37:19,24 38:8,9
   38:12,12 39:19
   42:10,14 43:17
   49:9 51:22 52:17
   57:20 58:18 68:12
   73:24,25 74:2,23
   75:1 76:3,8,9,9
   84:5,15 95:18
   96:6,10,13,25
   97:12 98:3 104:24
   109:18 110:20,22
   112:2,6,19,25
   113:6,11,17
   115:25 116:2
   118:13,13 119:7
   120:14,16 121:24
   121:25 122:3,20
   122:21,22 123:16
   123:17,18 124:10
   124:15,16,23,25
   125:12,15,21
   126:22,23 127:10
   127:13 128:23
   136:7 137:3
   138:12,14,21
**Commonwealth's**
   50:10 96:15 97:1
   99:1
**Commonwealth-5**
   111:21
**communications**
   100:12
**companies** 11:3,15
   21:6 31:22 33:7
   33:23 35:6 38:20
   41:19 56:12 57:15
   61:8 64:7 69:25

77:24 85:25 86:3
86:6,15,23 95:11
100:13 102:21
104:14,18 110:13
130:15 131:1
134:12 136:15
**company** 11:10,24
14:6 16:5,9 18:8
19:20 29:5,9 31:9
32:11,16,19,23
36:14 38:3 39:2
39:13 53:15 56:6
56:7 68:22 69:1
71:5 74:24 82:1
84:18 85:18 106:1
106:2,3 107:18
110:22 111:14
121:9,19 128:11
132:1,1,7,12,22
133:1,23 134:2,6
134:7,9 135:16
138:3,21
**company's** 47:23
98:20 100:9
131:11
**compensation**
125:17 126:18
137:25
**complaint** 4:12
80:1,4,8,13 81:9
**complicated** 19:18
138:20
**comply** 27:7 114:24
**computer** 89:17
90:12 134:19
**computerize** 26:4
**computerized**
25:25 35:3
**computes** 103:25
**concern** 109:4
**concerned** 49:8,10
50:5
**concerning** 93:8
**concerns** 6:2 49:4
**conditions** 113:8
132:15

**conduct** 80:22,22
**conducted** 121:5
**conducting** 126:20
**conforming** 38:25
**confusing** 47:6
**confusion** 26:14
**connection** 74:5
91:24
**consider** 17:23
60:16
**consistent** 29:16
**consulted** 39:11,18
**CONSULTING**
1:14
**contact** 17:23 18:14
19:21,22 20:1,2,4
24:12 41:11 44:14
44:24 60:1 62:11
85:9 115:25 127:2
129:20 137:16
**contacted** 44:12,13
44:14
**contained** 113:18
**contested** 129:12
**contesting** 129:14
**continue** 63:10
137:11
**continued** 53:6,20
61:22 62:12
**contract** 49:13 93:9
101:2 111:11
127:9 129:19
132:23
**contractor** 11:1
**contracts** 110:17
**control** 125:5
**controls** 15:2
**convenient** 5:13
**conversation** 45:11
45:15 46:18 63:23
64:2
**conversations** 13:2
13:5 15:24,25
45:9 52:4,6 64:1
67:25 68:5,10,11
87:21 110:7

**converse** 123:12
**convoluted** 76:12
**cooperate** 85:15
**copied** 66:9,9 83:16
84:1
**copies** 26:1 34:15
38:16 54:14 66:12
84:11 90:20,21
91:3
**copy** 34:14,15,16
54:11 66:10 73:22
74:1 83:18 87:3
90:15 123:8
**corporate** 5:14
38:8 40:12 81:21
94:7
**corporation** 7:7,8
**correct** 11:14 17:3
20:17 21:9,19
23:13 27:18,22
28:20 31:14 32:14
48:1 55:16 61:21
69:21 73:12 75:25
78:4 82:12 102:18
113:12 114:7
118:9 128:7,17
130:11 132:25
**correspondence**
59:13 86:18,19
87:21 90:3 100:11
**cost** 21:23 72:4
133:23
**costs** 122:15
**counsel** 13:14,15
13:17 36:2 49:9
50:11 51:2,4,22
66:22 83:16 85:19
85:20,24 86:3,5
88:2 91:22,23,25
99:3 100:9 136:15
140:14,16
**counties** 15:7
**county** 15:11 40:25
42:23 113:9,12
114:13 117:17
**couple** 18:10 40:22

42:4 51:24 102:9
**course** 21:13 30:20
114:25
**court** 1:1 6:8 69:5
74:16 100:24
122:15 130:2
131:7 140:4
**covenants** 131:24
**cover** 30:19 40:16
40:18,19,20 41:3
44:11 54:5,5
131:19
**coverage** 29:4
110:21,23
**covered** 27:16
**CPL** 36:23 104:13
104:18
**crash** 89:17,21
**crazy** 46:24,24 72:4
**create** 134:25
**criminal** 120:2
136:17
**Cristo** 1:6 10:20
16:4 18:11 20:12
22:17,19,25,25
23:2 33:8 73:8
78:1,8,9 88:7
102:20 114:5
118:14 120:5
127:12
**CROSS** 4:2
**crossed** 138:9
**cross-trained** 8:14
**CT** 22:18,21 91:14
**CTA** 66:19
**CTB** 66:19
**CTC** 66:19
**CTD** 66:19
**CTE** 66:19
**currently** 7:25
11:16,21 133:24
**custodian** 139:4
**customer** 126:25
**customers** 133:3
**Cuzzi** 1:14 79:19
**C-a-r-i-n-s** 13:10

**C-u-z-z-i** 79:19

---

## D

**D** 136:2
**DAP** 1:14
**date** 12:19 46:13
61:10,12 129:17
135:8 140:12,22
**dated** 83:8
**dates** 41:6 53:4
**DAVID** 3:7
**day** 6:11 33:19,21
49:7 56:13,19
89:3 94:18 108:4
125:24 139:14
**days** 45:3
**deal** 60:7 112:9,10
**dealing** 24:24 53:16
112:7,17
**dealings** 10:22 25:4
68:25 69:24 70:4
137:4
**deals** 56:23 114:16
136:9
**dealt** 9:15 46:19
60:5 61:14 113:13
**decide** 14:6
**decision** 23:23 39:9
75:18 98:19,20
**deed** 54:14 71:11
71:14,16 108:21
**deeding** 108:22
**deeds** 42:18 43:16
64:15 70:20
106:15,16 108:13
109:3,15,19 110:1
110:9
**deemed** 118:25
**default** 84:23
**defend** 68:9
**defendant** 3:9 4:13
81:10 83:2 93:8
**defendants** 1:20
3:12 101:1
**defense** 29:5,8,11
80:17,21,24 81:9

81:13 100:18,21
defenses 81:15
definitely 117:25
  118:11
definitions 83:11
DEK 78:20,24
delay 40:22,23
delete 99:20,23
deliver 25:1
delivered 66:7 92:4
demand 131:7
DeMola 82:7,12
department 9:25
  21:24 38:4,5
  132:11,12,19
departments 8:12
Depends 15:2
deposed 5:17 15:20
  35:8 76:14 93:18
deposing 5:10
  15:17
deposit 40:13
  103:15 130:2
  131:7
deposited 31:2
deposition 1:5 5:24
  38:7 94:7 96:13
  97:2 101:24 102:4
  111:22 139:8
depositions 93:17
DESCRIPTION
  4:8
designated 135:7
designates 113:6
destroyed 119:18
determine 116:1
  136:2
deviate 132:13
dialogue 33:18
DiBENEDETTO
  1:11 77:9
difference 26:24
  37:24 38:22
different 6:12
  29:14 32:3 34:7
  37:18 38:13 41:22

42:22 56:12 60:21
  81:18
difficulties 46:23
digits 22:19
diligence 110:12
  111:14,16
diligent 45:20
diligently 130:4
Dinaso 79:1,10,14
direct 4:2 5:3 70:3
  127:11
directly 10:22
  45:25 60:5 76:21
  76:22 116:25
  123:19 133:6
directors 7:18
disapproved 97:3
  97:25 98:8,18
  99:11,18
disbarred 107:24
  108:1,9
discard 99:19
discharged 27:10
disclose 100:4,6
disclosure 69:17
  74:9 75:21
disclosures 4:9
  69:7,10 101:19
discovered 40:3
  41:8
discuss 87:24 100:8
  119:1,20
discussed 25:5 47:3
  49:2 58:23 69:19
  88:24 136:5
discussing 55:25
  118:23
discussion 26:22
  37:11 46:9 50:24
  54:3 60:25 94:2
  124:5 133:20
discussions 51:21
  107:3 109:17
disk 91:11,14 92:13
dismissal 4:10,11
  74:1,5,12,17,21

74:25
distressed 33:13
  130:15
DISTRICT 1:1,1
divided 125:9
document 37:14
  54:7 67:6 87:15
  89:8,24 111:23
  113:1,21 116:22
  120:1 128:1
documents 4:13
  21:5 34:7 40:4,9
  40:10,18 41:9,15
  41:17,18,21 42:21
  42:22 43:12 44:9
  44:12,17 45:16,18
  45:20 50:17 52:24
  54:4,22 58:11,17
  62:2 64:8,12,15
  64:20,22 65:3,25
  66:5,13,16,17
  71:15 78:5 83:2,8
  83:18,23 87:7,19
  88:2 94:9,11,13
  94:17 95:3 101:23
  103:5 105:4,6,8
  105:10,13,13,16
  105:19 106:8,12
  114:6,9,12 115:7
  115:13,16,21
  116:2,5,9 117:2,6
  117:15 118:2,8,14
  119:21 121:11
  131:20 137:9,17
doing 11:25 12:15
  24:15,25 29:14
  36:21 42:1,2 44:1
  47:8 52:14 56:12
  56:18,22 57:3,10
  61:6,22,23 63:24
  68:9 89:1 111:17
  114:20,21 124:12
dollar 124:3
DONNA 1:17
double 47:8
doubt 51:23 59:6

doubtful 118:25
dozen 5:20
draft 89:5
DRD 1:2
drop 48:24
drugs 6:17
due 5:11 31:22
  110:12 111:16
duly 5:1 140:6
duties 122:20
D'Apolito 1:14
  48:16,17 77:18
  82:7,18
D/B/A 1:18

          E
E 3:1,1 4:7 5:1,1
  126:17
earlier 40:3 47:4
  83:15 88:24 94:6
  102:9 105:3
  130:13
early 41:6 42:15,16
  62:1 123:6
easements 27:14
  29:1,1
easiest 17:10
eat 102:7
economic 138:17
Ed 13:9 51:8 99:3
EDWARD 3:11
eight 31:18 84:8
either 14:5,23 40:9
  48:23 59:14 84:4
  85:19 96:25
  104:24 116:23
  117:18 126:13
  134:16 136:18,20
Either/or 45:7
electronic 87:1,2
  89:22 90:11 91:11
  101:10
electronically 90:7
  99:20 103:24
  104:2
Elizabeth 107:17

employee 82:21
  133:11 140:14,16
employees 7:24 8:5
  8:25 80:23 81:11
  81:25 122:19
encompassed 56:22
encumbrances
  28:12
ended 108:20
  117:10
endorsement 19:13
endorsements
  116:7 132:10
  134:3
enforceability
  109:10
ENGLISH 3:6
entail 10:16
entire 15:8 64:10
  88:16
entities 11:13 22:17
  136:18,19
entitled 74:22
entity 7:5 9:22
  11:23 35:10 78:20
  79:1 128:2
Epp 79:16
escrow 120:24
  129:8,15,20
  130:10,18 131:2,3
  131:4,10,15,21
especially 100:14
ESQ 1:12,13,13,14
  3:3,4,7,11,15
essentially 23:25
  28:10 29:23 43:25
  68:8
estate 23:22 27:5
  61:14 72:1
event 71:19
events 72:14
Eventually 22:14
exact 61:12 128:24
  129:2
exactly 8:9 12:22
  20:10 31:7 51:11

51:14 67:12 73:16
132:18
**examination** 5:3
140:6
**examine** 10:17
120:14
**example** 129:23
134:22
**exceptions** 27:14
28:23,25 135:1
**exclusively** 112:22
**Excuse** 14:14 26:13
29:20
**exhibit** 69:4,4
74:15,16,20,24
75:1,1,20 79:25
80:7 83:6 87:16
94:24 113:1
125:14,20,21
126:8 127:20
**exhibits** 139:4
**expenses** 32:6
122:15
**expensive** 66:13
**experience** 108:22
**expert** 93:19,21,22
**expires** 140:21
**explain** 17:10
**expressly** 121:25
**extent** 23:20 85:14
**E&O** 101:15
110:21,23
**e-mail** 17:14
100:16

**F**

**F** 3:4 113:25 133:1
**face** 131:17
**fact** 75:5 81:25
93:21
**factual** 80:23 81:14
**factually** 81:19
**fairly** 49:24 68:3
**familiar** 5:21 78:9
78:19
**familiarity** 108:14

**far** 23:2 79:8 95:14
96:19 105:23
**fashion** 129:2,3
**fax** 17:14 20:8
134:16
**FBI** 62:18 64:8,18
65:21 84:1,6
90:15 105:14
117:10,14,23
118:11
**February** 140:21
**Federer** 59:11
**fee** 28:24 126:22
**fees** 41:14,19 45:23
108:5 122:15
**fell** 48:19 105:11,23
**fellow** 111:4
**fictitious** 78:2
**Fidelity** 1:16 3:13
4:14 11:7,11,21
12:12,16,20 13:3
13:6,13 14:5 31:9
36:9 37:19 39:19
43:18 51:5 52:21
58:19 68:12 84:7
84:12,12 95:22
96:25 104:25
111:10,10 112:20
112:21 118:20
121:6 124:11,25
125:3,11 127:15
127:17,23 128:11
128:16,17 129:7
132:23 133:11
135:5,6 136:10
137:3,7,16 138:18
**Fidelity's** 37:20
51:1,4 99:2 125:9
**fifteen** 111:7
**fifth** 81:8,13
**figure** 117:24
**file** 34:3,8,14,15,15
34:16 40:15 47:11
47:21 71:20 85:5
85:11 86:18 88:16
90:3,4,5 91:9,13

91:13 93:2 96:15
100:25 101:9
106:9 115:3,21
118:3 119:6,13,14
120:10 121:15
**filed** 21:22 44:10
58:17 65:25 71:15
74:1 80:1,8 105:4
105:7 106:11
110:1 115:16
124:7,9 125:25
132:19 136:16
**files** 10:21 22:24
34:11,17 36:19
38:3 40:5 44:17
45:17 52:23 54:23
62:17,17 64:7,10
66:7,8,9,15 78:7
78:10 83:15,19,23
83:25 84:3,8,12
84:17 86:10,19
89:10 90:7,10,15
90:20,22,23 91:2
91:3,10,10,12,18
91:23 92:1,1,10,15
92:18 93:1 102:9
102:12 103:2
110:2 118:10,12
120:7,24,24
121:12,13 132:12
137:2,12
**filing** 105:18,25
106:7 115:12,15
116:9 117:6 124:8
124:12
**filled** 110:23
**final** 74:4 126:19
**finally** 41:17 68:15
**finance** 18:7,8
**financially** 140:17
**find** 14:13 88:25
91:2 98:3 127:8
**Fine** 5:5
**finish** 6:6
**finished** 53:6
**firm** 5:7 66:1 69:8

83:16 84:2
**first** 4:12 11:17,19
11:22 13:24 15:18
15:25 16:13 23:16
24:17 28:9,11
29:11 42:16,17
50:13 57:23 65:22
67:17 69:19 80:17
83:1,7 84:21
109:9,9,11,12,14
109:14 112:1
115:5 128:3,20
129:10 133:13
**five** 54:11 60:10
77:1 125:14
126:17 131:25
138:3
**fix** 102:15
**fix-up** 56:22
**flag** 56:17
**flip** 23:19 80:15
107:13
**flipped** 106:25
**flipping** 23:20
75:20 120:13
**flips** 107:8,14
**follow** 108:12
**followed** 85:21
**following** 125:19
**follows** 5:2
**foreclose** 29:6
**foreclosures** 33:14
84:24 130:16
**foregoing** 140:9
**forenoon** 2:8
**forgot** 94:5
**form** 12:6 29:20,21
37:14,23 39:1,21
43:20 46:2 81:17
132:1,18
**former** 111:5
**forms** 38:3 132:9
132:12,13 133:24
134:1
**forth** 27:6 140:12
**forwarded** 105:15

116:2,5
**found** 54:4 73:4
82:1,10 106:18
**foundational** 39:25
**founded** 6:20
**founders** 6:22
**four** 3:7 57:11
79:25 92:25
120:13 121:22
**fourth** 4:12 69:19
79:25 80:3,8,20
81:8,12
**FOX** 3:10
**frame** 8:5,21 9:19
9:20 11:5 31:15
39:18 42:25 77:4
78:24 89:19 121:5
135:12
**frankly** 64:14
71:24 119:19
**fraud** 50:6 61:19
67:8 82:4 93:9
107:15 122:17
**frauds** 67:11,13
**fraudulent** 66:16
**Freehold** 2:6 3:16
113:9,11
**Friday** 25:2
**full** 57:17 74:8
99:21
**fund** 105:12,18
**fundamental** 25:23
**funded** 39:5
**Funding** 1:8 3:16
72:24,25 73:3,11
93:4
**funds** 23:10 25:9
129:8
**furnish** 133:2,23
**furnished** 119:7
132:1
**further** 68:11 119:3
140:9,13
**future** 60:13
**FY** 128:20

**G**

G 5:1
GARDENS 1:19
Gary 1:10 52:2
  68:18
Gateway 3:7
general 15:13
  32:22 75:15 101:7
generally 15:21
  30:14 40:7,20
  41:2 84:19 85:3
  85:11 131:3,18
  133:11
generic 34:9
genesis 96:20
gentleman 6:23
  68:18 81:20
geographic 15:5,14
getting 40:23 45:20
  45:21 46:23 47:7
  55:25 62:3 67:2,7
  89:2 90:11 137:2
girls 18:1
give 5:23 15:25
  51:24 61:11 64:9
  92:16 99:22
  103:25 119:12
  127:4,5 130:3
  131:18 133:9
given 14:7 66:5
  118:10,11
giving 109:6 120:10
go 15:1 25:1 27:21
  49:1,21 62:2
  69:15 91:14 94:21
  95:14 96:19 112:1
  117:2
God 24:19
goes 6:11 15:3,4
  23:19 40:6 54:12
going 14:20 19:24
  22:6 30:11 31:19
  33:24 42:1,21
  43:5,12 49:11
  50:6 52:10 54:2
  58:16 59:4 69:3

70:15 71:4 79:24
  81:16 88:25 90:11
  91:16 94:24 95:9
  105:18 115:10
  128:25 131:9
  136:17 138:18
good 5:4,5 29:15
  101:22 110:22
  111:18 115:10
gotten 20:25 64:13
  64:19 93:3 101:14
  103:17
government 64:9
  64:17 65:4,6
grand 65:8
great 125:4
greater 138:2
Grieser 1:10 68:18
  69:1,23,24 70:9
  70:14 72:10
Grieser's 72:14
Grimm 66:2
gross 57:9 58:3
group 61:7 88:18
  105:21 106:13
  107:12 108:19
  110:3
guess 6:5 16:3,15
  17:4,9 30:17,24
  32:3 38:14 41:6
  41:12 57:22 66:13
  73:1 84:22 97:3
  102:14 104:4
  111:2 121:22
  122:8
guilty 82:2,10,11
guy 36:3 72:3 73:9
G.J.L 1:7 78:2,8,9

**H**

H 4:7
half 5:20 57:23
  58:1 115:5 124:3
  124:23
hall 92:20
Hamm 52:2

handed 62:16
  124:20
handled 19:16,17
  67:2 85:18
handles 13:18
hands 101:15
happen 43:6 54:25
  104:21 129:22
happened 12:21
  30:25 32:10,15
  48:25 65:22 73:17
  103:12 110:18
  117:5 119:16
  123:19 137:6
happening 39:15
happens 20:24 85:7
  85:10 90:3 103:6
  107:10
happy 123:15
haven 108:9
Hayes 3:11 37:23
  39:21 43:20 96:4
  124:22
head 36:3 123:14
headquarters 85:5
hear 70:8 95:16
  121:19
heard 108:8,8
heart 40:2
held 2:5 24:7 31:5,8
  103:21 129:8,15
  129:20 131:1,1,2
  136:20
hell 43:6 103:4
hereinbefore
  140:12
hereunder 125:18
  133:25
higher 126:11
highlights 5:23
Hills 3:5
hit 67:17,18,23
  68:15
hold 10:2 122:2,5
  129:16 130:9,19
  130:25 131:2,3,10

holding 131:14,21
home 1:8 3:16 35:2
  72:24,25 73:2,11
  93:4
Homes 1:19 78:6
  78:20
honest 36:1
hopefully 40:7
horrors 89:22
hour 23:25

**I**

idea 32:17 58:9
  66:20
identification
  69:11 74:13,18
  80:5 83:4 127:18
identify 101:8
II 1:11 72:21 74:22
immediately 49:14
  49:17 85:9 103:15
impairing 109:5
important 109:22
  134:18
impossible 101:3
income 57:9 58:3
Incorporated 5:9
incorrectly 98:7
indemnify 76:8
indemnity 129:8
independent 11:1
  11:22,24
index 4:1 91:11
individual 93:1
Individually 70:5
individuals 69:17
influence 6:17
information 30:20
  69:17 80:23
  110:19 137:18
initial 83:16 119:20
  134:10
initially 111:2
  114:4 130:14
Inland 136:19
institutional 21:15

instruct 106:8
instructed 110:9
instruction 102:25
instructions 100:4
  134:8
insurance 1:15,16
  1:17 3:9,13,13
  9:16,25 11:3,10
  11:12,15,20 14:16
  14:19 17:11 18:4
  20:19 21:24,25
  23:3,4,21,24 24:5
  25:10,12 27:9,17
  27:21 28:7,15,18
  29:5,9 30:15,24
  31:9 32:11,15,19
  32:23 34:23,24
  38:4,5 43:18
  52:18 57:5,14,15
  57:24 61:15 71:21
  74:24 75:22 84:18
  85:4,18 93:3,11
  97:9 101:1,8
  102:22 103:12
  104:5,12,14,18,19
  111:14 113:10
  115:3 120:23
  122:10 125:19
  126:10,21 128:1,6
  128:6,10,11 130:7
  132:6,9,11,13,20
  133:24 134:12
  136:15
insure 14:6 28:8,9
  28:22 63:4,10
  70:25 71:1,11,20
  109:9,10
insured 33:17
  38:13 54:15 70:3
  71:14 72:11
  107:17 133:2
insureds 14:13
insuring 18:10
  33:24 34:3 70:25
  71:1,7 109:8,14
interactions 77:3

interchangeable
  20:21 27:2 30:12
interest 108:23
  112:16 138:17
interested 23:18
  140:17
intermediate
  108:24
internal 54:7 121:1
interpret 132:14
interpretation
  132:2
interview 110:25
interviewed 65:6
  65:11,16,19 85:24
  86:2
inventory 137:14
invested 71:25
investigate 86:16
investigating 86:6
  86:11
investigation 85:13
  88:8,11,21 89:4
  136:17,23
investing 108:15
INVESTMENT
  1:9
investor 23:22
invoice 22:5
invoices 21:17
involved 24:6,24
  30:16 65:1 68:17
  78:23 93:3,7,16
  107:14,22,23
  110:13 121:8
  136:22
involvement 18:12
  80:12 82:2 86:11
in-house 13:17
issuance 122:4
issue 17:20 18:5
  20:13 21:5 22:5
  27:9,21,25 30:16
  30:18,18 31:19
  33:3 36:23 37:3
  38:6 39:4 40:1

48:1 52:17 55:5
  57:25 58:16 59:16
  97:9 102:24,25
  103:1,3 115:2
  124:21 126:12
  132:18 133:25
  134:12 137:12
issued 21:11,14
  22:3 24:10 28:2
  28:18 29:25 30:8
  30:14 31:20 33:1
  34:18,24 37:4,18
  38:10,17,19,24
  47:21 62:13 75:23
  102:22 103:13
  104:15,20,25
  113:10 116:7
  130:6 133:6 134:8
issues 33:7,10,11
  34:1 46:19 48:7
  56:4,5 69:18
  72:13 107:20
issuing 32:24 39:8
  43:17 102:25
  122:11
item 131:21

_____

J

J 3:11 118:23
jackets 119:11
  134:4
James 1:11 77:11
JANET 2:3 140:3
Jersey 1:1 2:5,6 3:5
  3:8,16 7:8 9:25
  21:23 36:3 60:15
  60:15,17,22,23
  78:20 114:22
  127:1 135:19,22
  140:4,20
Jobs 65:20
John 3:4 79:13
join 37:25
joint 70:20 71:2,22
  100:18 108:12,20
  108:22 109:3,19

110:1
judgment 129:11
  129:15,23 130:1
judgments 27:11
  47:2
July 80:8
June 2:7 39:17 62:8
  140:22
jury 65:9
J.G.L 22:17 102:20

_____

K

Kane 1:10 10:20
  18:11 24:3 41:12
  41:18 44:3,6 45:8
  45:25 46:1,5,16
  46:16 47:1,22
  48:7 49:1,19
  50:14 52:19 53:11
  53:20 58:19 61:7
  61:9,19 62:23,25
  63:19 64:7 67:8
  67:14 68:5 70:8
  70:10 73:2,7
  77:24 78:23 85:22
  86:12 88:7,23
  102:10 105:21,24
  106:8 107:3,12
  108:19 110:8
  114:5 118:14
  127:12 130:14,18
Kane's 22:16 48:24
  53:15 56:6,7,8
  76:17 102:20
keep 8:7 25:22
  74:10 86:18 89:10
  90:15 96:16,17
  99:17,19 101:6
  134:18
Kennedy 3:4
Kentucky 35:13
kept 84:14 97:13
Kevin 13:10 52:1
  99:4
kind 19:17 29:14
  52:10,25 53:22

103:4 120:9
  138:20
King 10:23 18:15
  18:25 19:4 44:16
  53:19 110:8
Kloud 107:24
knew 32:22 36:24
  36:24 67:19 72:9
  77:25 78:1 79:8
know 5:9,25,25
  6:11 10:11,19
  11:4 12:7,19 13:2
  14:15 15:1,18,22
  16:15 18:18,25
  19:19,22 23:2,6,6
  23:19 24:11,15
  25:1 29:15 30:16
  32:23 33:1,23
  35:22,25,25 36:7
  37:2,6 39:11 40:5
  41:1,10 42:9,20
  42:22 43:5 45:9
  46:5 47:20 49:4,5
  49:7,10,11 51:17
  51:25 52:8,11
  56:12 63:1,3,21
  63:22 64:11 65:18
  65:24 66:4,8 68:2
  68:6,13 69:13
  70:5,16,16,23,24
  71:2,23 72:2
  73:18,19 76:2,4,5
  77:19 78:23 80:10
  81:5,6,6 82:8,12
  86:15 90:17,18,20
  91:1,7 93:5,6
  94:22 96:1 99:7
  100:13 101:15
  102:1 103:21
  104:16,16 105:9,9
  105:10,22 106:3
  107:16,20 110:16
  110:21 111:7,17
  111:17,18 112:15
  115:8 116:3
  117:20 119:22

124:2,8 129:12
  131:18 137:19
  138:7,20,22
knowing 125:9
knowledge 72:23
  109:1
known 36:4 48:19
  79:1 111:7
Koch 50:12,14 51:2
  52:6 99:1 123:11
  123:12
Kott 3:7 12:6 29:20
  37:25 63:15 73:21
  74:6 96:4 100:22
  124:21 139:3

_____

L

L 5:1 122:14,23
labeled 66:19
lack 58:16 104:12
  115:20
land 1:15 3:9 74:23
  93:24
language 38:13,23
  127:8
large 14:10 41:21
  105:3 111:19
  115:6 117:5
largest 88:18
Larry 65:19
late 41:8 55:21
  94:11
law 5:7 66:1
Lawrence 1:14
  79:18
laws 72:1,6 108:16
  108:24
lawsuit 8:6 69:18
  73:14,17 74:5,22
  74:25 75:3,4
  76:14 93:12,12
  107:22
lawsuits 93:8
lawyer 125:8
  138:16
lawyers 11:18 12:9

35:23 44:7
**Lawyer's** 11:8,17
11:20 13:20 95:25
111:5 112:7,9,10
112:17,20,23
123:18,20
**layman's** 109:5
**learn** 60:14
**leave** 5:12 7:3 59:8
**leaves** 90:5
**ledger** 26:1 86:20
101:7
**left** 12:8 13:3 88:3
**legal** 83:10
**legit** 63:24 68:7
**legitimate** 50:8
**Leibman** 65:15,23
**lender** 21:15 28:9
28:16 30:2,15
36:25 46:22 47:10
55:8 71:21 109:6
116:18
**lenders** 60:6,7
86:14
**lender's** 116:17
**letter** 21:18 22:1,1
24:9 25:7,13
29:18 30:16,25
34:10,17,17 37:1
37:5,8,14 38:11
39:4 52:18 55:3,4
57:18 63:5 85:3,6
91:17 94:10,13,25
96:5,9,14 101:22
103:11,20 104:6
119:25 122:25
123:8 131:19
132:16 133:2
**letters** 14:19 21:11
23:4 24:3 30:4,5,6
30:7,7,10 36:21
37:17,21 38:17,23
43:19 55:7 116:6
133:6,13
**Let's** 100:10,12
**liability** 75:15

**liable** 122:14
**license** 10:1,3
140:21
**licensed** 9:22 10:7
10:8
**licenses** 10:1
**lien** 28:10,11 29:7
109:9,9,11,14
**liens** 28:12 33:14
109:12,14
**likelihood** 87:6
124:14
**limited** 1:7 78:2,3
**limits** 98:8
**line** 60:23
**lines** 27:15
**list** 69:16 96:18
97:4,6,19,25 98:2
98:18 99:11,21,22
131:23
**listed** 72:20 81:8
**Listen** 63:23
**lists** 96:20 99:18
**litigation** 17:20
40:2 65:25 84:7
91:4 92:16 120:1
136:11,16
**little** 8:8,10 12:21
22:22 47:4 52:25
61:13 100:16
112:22 122:17
126:4 138:23
**LLP** 3:3,6,10
**lo** 43:9
**load** 26:7
**loan** 14:7 16:13
18:9 24:6,7 38:24
38:24,25 39:5
62:7
**loans** 15:22 17:19
18:10 20:13 33:8
38:12 66:17
124:21 125:9,11
**local** 35:1,5,17
**locate** 94:15
**located** 51:9

**location** 116:15
**locations** 113:16
**logic** 67:1
**long** 8:9 12:22 28:1
42:3 51:20,21
61:13,16 73:20
92:25 96:2,17,17
99:17 101:7
111:17 133:17,18
**longer** 61:13 92:2
112:22
**look** 49:21 54:9
69:9,12 74:14
80:2,9,16 81:7
83:5,12 91:15
94:12,19,25
**looked** 94:19
**looking** 8:5 19:13
23:22 88:4 91:21
94:17
**looks** 53:1 115:11
**loose** 103:4
**Lorraine** 10:23
44:16 53:19
**Lory** 18:15,25 19:3
**lose** 124:3
**loss** 122:16
**losses** 122:16
136:10
**lost** 89:21
**lot** 18:19 20:2 33:5
34:7 46:20,21
51:10 56:11 68:2
72:4 90:19 92:18
92:21 106:23
131:1
**lots** 111:20
**lunch** 45:12 46:11
46:15 49:1 90:5
94:1,4
**L.L.C** 1:10

**M**

**M** 1:13
**machine** 17:14
**magic** 34:9

**Magnanini** 3:3,3
4:4 5:3,6,7 8:2
37:10 67:5 73:22
74:4,10 92:7,15
133:19 139:3,6
**Maguire** 6:24,25
9:5 10:9 25:1
**Maguire's** 9:6
**mail** 17:13 40:24
110:17 134:16
**main** 2:6 3:15
42:10
**maintain** 119:6,8
128:22 129:1
**maintained** 90:8
**majority** 15:10
**making** 98:13
99:15
**malfeasance** 29:24
30:8
**malpractice** 75:16
**man** 79:13,16,18
133:18
**manage** 71:5
**management** 1:6,9
1:10 8:17,22
68:23 69:1,25
71:5 73:9 78:1
79:22
**manager** 8:20
**MANNING** 2:5
3:14,15
**mansion** 134:24
**manual** 134:10
**manuals** 95:5,11
134:7
**March** 42:19 52:24
**mark** 74:11,16
94:24
**marked** 69:4,11
74:13,15,18 79:24
80:4 83:3,6 87:16
127:18,20
**market** 3:11 49:17
**Marty** 92:16
**MAS** 1:2

**Mason-Dixon**
60:23
**mass** 115:12
**matter** 2:2 21:13
36:9 91:25
**matters** 55:6
120:23 126:21
**Matthew** 6:23 9:5
**McCARTER** 3:6
**McGowan** 6:3 8:1
8:18 9:2 11:18
26:13,18,21 38:2
43:22 50:23 60:24
66:23 73:16 74:3
74:8 75:14 81:1
81:16 87:22 91:6
91:17,21 92:9,17
92:19,25 94:8
100:20 101:17
113:20
**McGowan's** 69:7
**mean** 12:15 14:16
17:23 24:13 28:11
35:5 44:2 49:19
51:13 85:14 87:20
90:4 101:12
102:10 122:1
126:9 132:8 133:4
135:18
**Meaning** 106:13
**meant** 119:18
**meet** 14:24 45:5
79:10,13,18,21
**meeting** 45:7 49:1,3
55:24 77:23
112:16
**memo** 134:21
**memoranda** 89:5
**memorize** 81:23
**memos** 100:5
119:25
**mentioned** 113:8
**merged** 128:16
**met** 18:21 19:3
24:17 27:20,24
48:13,16,20,21

58:19 66:10 69:20
69:21 77:6,17,22
94:8
**Michael** 1:13 7:11
9:4 16:16 18:12
24:15
**mid** 13:25 24:19
78:24 120:15
135:12
**middle** 8:6 125:16
**Middlesex** 15:13
**million** 57:11 81:18
124:3
**mind** 39:23 40:1
**mine** 111:5
**minimum** 112:14
**minute** 103:25
**minutes** 45:4
**MISCONDUCT**
122:18
**misplaced** 92:2
**mistake** 38:14
**model** 56:8
**modified** 116:9
**money** 18:9 23:7,18
23:23 25:16 29:10
31:1,21,24 32:11
41:13,14,18 45:21
46:6 71:11 72:5
76:2,9 103:8,12
103:20 104:23
106:16 107:4,9,10
107:10 109:15
118:6 130:1,18
131:2,10,15
**Monmouth** 15:13
15:21 19:25 42:23
60:16 113:10,12
**month** 40:21 41:3
57:4 100:1
**monthly** 99:25
**months** 28:5 31:18
31:19 34:22 56:20
56:20 135:8
**morning** 5:4,5
73:22 114:4

**mortgage** 19:14
24:8 41:1 54:14
54:19 71:12 73:1
76:20 106:23
107:18,19 109:10
126:11,13,14
**mortgages** 27:10
47:3 55:1 64:16
78:11 84:23 106:9
106:11,15,16,18
109:16 110:10
136:20
**moved** 51:10
**Mulberry** 3:8
**MURPHY** 1:19
**mutual** 96:8,9
112:3
**myriad** 122:9
**M-a-g-u-i-r-e** 6:24

**N**

**N** 3:1 119:4
**name** 5:6 6:23 9:10
18:9 21:5 32:25
35:19 36:21 59:10
68:21 77:21 78:2
78:21 79:3 107:19
107:24 111:12
116:17 121:23
123:21
**named** 68:18 79:13
79:16,18
**nameless** 92:8
**names** 51:24
107:19
**Nancy** 50:12 52:4,6
99:1 123:11
**National** 1:8,16
3:13,16 11:21
35:10 72:24,25
73:2,11 93:3
127:24 128:11
129:7 132:23
135:6 137:7
**Nations** 1:15 3:12
11:10 12:11 14:5

37:19,20 95:20
111:1,10 118:20
121:5 124:11
127:15 128:6,10
128:16,18,19
135:5 136:10
**Nations/Fidelity**
57:20 109:18
124:24 136:6
**natural** 125:8
**necessarily** 98:10
138:23,25
**necessary** 116:2
**need** 33:16 85:15
91:9 129:18
**needed** 105:6
129:24
**negative** 131:23
**negligence** 81:2
122:18
**negligent** 80:22,25
**negotiate** 125:20
127:3 138:6
**negotiations** 29:13
140:13,15
**net** 138:4
**never** 19:22 32:20
43:14 50:2 55:20
60:5 62:24 69:20
70:3 78:18 95:15
98:9,13 102:22
105:22 107:22,22
118:6,17,19
121:20 130:25
131:1,2
**new** 1:1,16,17 2:5,6
3:5,8,13,13,16 7:8
9:25 21:23 36:3
36:25 78:20 95:24
99:20,22,23 127:1
128:2,6,10 134:22
135:19,22 140:4
140:20
**Newark** 3:8
**newspaper** 64:5
77:20 82:16

**NHF** 76:18
**non-approved** 97:4
97:6
**normal** 112:14
**normally** 25:8 28:2
78:15 114:11
**north** 60:14,17,22
114:22
**northeast** 111:4
123:24
**Norton** 13:10 51:8
51:9,19 99:4
**Norton's** 13:12
**Notary** 2:4 5:2
139:17 140:3,20
**notes** 2:1 54:17
89:5
**notice** 85:7 88:6,22
123:1
**noticed** 42:4 124:19
**notified** 84:21
**nowadays** 61:2
**NPC** 35:10 36:6
**number** 4:8 8:4
17:12 22:18,21
36:18,19 40:22,23
58:1 66:18 69:22
83:6 91:13,14
95:4 103:19,19
104:1 119:14
120:11 130:2
131:25
**numbered** 38:18
**numbers** 91:9 95:2
101:9 135:7 138:8

**O**

**O** 5:1
**Oakwood** 1:7 78:6
**object** 12:6 29:21
37:23 39:21 43:20
81:17 124:22
**objection** 29:20
38:1 113:23
**objections** 52:8
55:12,13

**obligations** 113:17
**obtain** 14:18 129:7
130:17
**obtaining** 130:15
**occupancy** 49:14
**occur** 16:1 53:13
60:9
**occurred** 64:3,21
81:19,23 103:8
108:17 112:24
**ocean** 15:13 66:10
72:17
**odd** 66:25 109:13
**offered** 101:10,11
**offers** 81:11
**offhand** 75:5
**office** 2:5 8:20 16:3
17:21 18:13,17
19:6 35:2,3,5 36:6
48:23,24 50:21,22
50:22 55:5 113:14
113:16 114:14
121:9,10 126:24
127:1,10,13
**officer** 7:12 10:14
19:16 82:13,18,20
**officers** 7:10,16
80:23 81:12 82:1
82:4,5 122:19
**offices** 51:11
126:22
**Oh** 24:19 45:3 54:9
88:20 119:17
131:5
**okay** 6:16 8:24 15:4
16:8 18:3 19:3,10
21:4 23:11 24:11
25:6 26:11 33:4
33:18,22 34:6,22
37:9 38:7,22 43:1
45:14,24 47:12,13
47:22 48:25 52:11
52:14 53:10,24
54:9 55:14 57:1
59:18 62:14 63:5
67:4 70:8 74:19

75:17 76:2 78:10
78:17 83:9,14
88:1 89:12 92:22
93:15 97:11 98:11
100:9,15 101:22
104:23 105:15
112:8,12,18,25
113:15 114:18
115:1,25 116:8
117:5 118:12
120:6 122:12
124:19 127:6
128:19 129:3
131:5,22 132:21
136:2,14 139:1
**old** 6:16 29:7 47:3
**Old-timers** 26:19
**once** 6:6,18 19:5
20:18,25 22:2
27:19 28:1 30:23
34:22 39:16 65:12
65:24 88:13,22
101:8 102:24
103:7 115:19
**ones** 50:8 78:8
93:13 110:4
130:23 134:18
**One-Write** 25:24
26:2
**ongoing** 33:18
118:18 119:21
**open** 54:20 55:6
102:12 129:11
**open-ended** 23:15
**operate** 15:5
**operating** 31:3
86:22
**operation** 127:11
**operations** 87:10
**opposed** 38:25
125:11
**order** 16:4,6 20:9
21:2 24:3 27:8
40:20 41:3 61:15
90:5 119:10,11
**ordered** 17:11

21:12 37:6
**orders** 16:10 17:12
17:13 57:3 96:21
**organized** 8:11
66:20
**original** 16:4 37:4,5
41:18 47:17 54:12
64:15,15 84:3,17
86:10 90:14 91:10
91:23 105:13
117:1,2 118:12
139:4
**originals** 84:12,13
**originated** 125:17
**originating** 126:21
**outside** 85:20
107:12
**out-of-pocket** 32:5
**Owen** 123:21
**owned** 18:11
**owner** 28:24 72:24
**owners** 126:15
**owner's** 126:13
**owning** 62:3
**owns** 11:20
**o'clock** 139:2
**O'Connell** 7:11,14
8:16 9:5 10:9

---

**P**

**P** 3:1,1,15 120:14
**page** 4:8 69:16
72:20 75:8 80:16
118:22 120:13
122:13 125:14,16
126:17 128:20
131:22 137:20,24
**pages** 83:12
**paid** 22:9 23:3 31:8
40:5,6,23 45:18
45:24 62:16 75:9
75:15 76:3,5,10
103:17,18,18,25
105:24 106:22
125:18 130:1
**paper** 22:14 62:6

64:5 67:17,18,23
69:6 82:24
**papers** 114:3 115:3
124:9
**paragraph** 37:20
113:5,18,24
114:15 122:23
128:21
**paralegal** 17:24
**paralegals** 15:2
**parenthesis** 22:22
47:11 122:17
**Park** 34:4 49:25
**parked** 80:6
**Parkway** 3:4
**part** 27:12,13,20
32:4,5 78:14
**participate** 85:12
**particular** 47:23
132:2
**particularly** 34:8
**parties** 74:7 140:15
**partnerships** 72:1
72:2
**pay** 29:10 41:13,14
41:19 75:7,10
101:10 106:4
107:10 125:16
126:10,15,18
135:21 138:3,18
**payment** 25:11,12
30:23 31:13,25
32:8 75:21 104:7
104:13,19 131:7
135:17,25
**payments** 25:16,19
29:13 40:12 86:21
86:22 101:3
104:17
**pays** 25:6,10
**pending** 6:1 62:17
64:6 83:25 85:1
90:15,23,25 91:2
102:9,11
**Pennsylvania** 3:12
51:13

**people** 13:3,8 18:7
23:19,20 30:4
35:24 47:6,7
51:25 56:18 68:16
69:19 84:23 89:1
96:2 97:13,15
98:6 103:5 129:13
133:10
**Pepsny** 1:13,18
16:24 17:21,22
22:8 23:16 24:2
24:13,16,18,24
41:11,11,23 44:2
44:4,15,24 45:5,8
45:15,25 46:12
49:2 53:12,17
55:18,23 56:3
58:19 59:14 61:8
61:12 62:25 63:1
63:9,12 67:9
68:10 70:9,13
71:4 107:6 130:19
130:22
**Pepsny's** 16:3
48:23 55:4 79:5
**percent** 17:17
56:21,24 57:16
100:13 108:23
109:6 125:25
127:5 135:20
138:3
**percentage** 57:13
115:2,6
**perform** 111:13
**performance**
122:19
**period** 49:16 56:19
67:22 87:8 89:16
120:22
**person** 20:4 51:5
55:14 72:20
**personal** 5:11
72:16 106:1
**personally** 15:24
19:21 93:16
100:20

**Philadelphia** 3:12
**phone** 18:23 19:8
98:13 99:15
**photocopies** 90:19
**photocopy** 84:14
**phrase** 19:20
**physically** 49:21
50:3 51:9 54:9
92:4
**pick** 5:13 14:9
54:16
**picture** 35:24 77:20
**piece** 69:6
**pieces** 54:11
**Pierson** 1:12 77:15
**pile** 82:24
**pipeline** 102:14
**place** 26:22 37:11
46:9 50:24 51:13
54:1 56:18 60:25
62:7 66:10 94:2,4
124:5 133:20
140:12
**Plains** 51:12
**plaintiff** 1:4 3:5 5:8
73:23 81:1,2,3
**Plaintiffs** 4:12 83:1
**please** 6:11
**pled** 82:2,10
**point** 11:8 27:8
30:4 31:1 32:16
41:16 44:22 46:21
50:5 53:16 58:12
61:7 62:16 63:20
73:10 77:18 84:4
103:9 110:5 118:7
124:11 128:5
**policies** 10:18
32:24 35:16 36:10
38:16 39:8 43:18
55:6 57:24 93:11
101:9 103:1,3
104:12,14,25
113:11 116:6,24
117:1 119:10
126:13 132:10

134:3 137:13
138:18
**policy** 21:3 22:12
26:14 27:9,17,22
27:23,25 28:2,7
31:10,12,19,20
32:12,18,21 34:23
34:24 39:4 40:17
47:20 48:2 54:8
75:15,16,22 85:5
89:9,25 95:4,10
98:5,5 101:15,15
103:13,19 104:1
104:19,20 109:24
116:7 119:9,11,13
119:15 120:11
122:4,11,12
126:14,16 128:22
132:15
**portion** 31:4
100:23
**position** 7:12 8:15
9:13 10:16 123:22
**positions** 8:17,22
13:13
**possession** 92:3
**possibility** 48:20
**possible** 13:9,11
19:5 48:15,18
51:24 62:10,12
90:17 93:5 116:24
124:13,14 125:2
**possibly** 13:9,10
18:24 77:19 80:11
80:14 86:7
**post** 109:24,24
**potential** 33:23
**powers** 120:22
**practice** 17:2
**predecessor** 11:11
12:11
**Prejudice** 4:10,11
**premium** 31:4,5
36:13 57:17
103:16 104:5,8,10
120:24 125:18

**premiums** 101:3
104:4,11
**prepare** 10:17 21:4
54:8 94:6 101:23
102:4
**Presently** 8:1,2,18
8:19,20
**president** 7:13,15
8:15,16 123:23
**presume** 62:1
**pretty** 12:20 19:12
25:23 36:10 45:20
71:10 84:6 125:22
125:23 126:2
**prevalent** 120:20
**price** 126:12
**primarily** 19:11
**printouts** 26:2
**prior** 19:24 20:12
20:16 26:7 52:16
76:16 90:11
108:19 115:12,15
129:8 140:5
**priority** 28:13
**privilege** 6:2
**privy** 81:20
**probably** 8:8,10
10:12 11:6 12:2
12:22 13:22,25
17:10 20:8,8
23:17 24:10 25:23
25:24 26:6 28:4
30:10 34:13,14,21
35:1 42:15,18
45:17 51:8 55:20
55:22,23 56:1,24
57:7,11,22 58:1,5
58:14,25 61:9,17
63:7 64:4 65:14
67:10 68:2 73:15
84:22 87:12,20
89:15,20 92:12
96:1 99:25 102:23
103:2,3 108:4

110:21,22,24
111:11 112:21
117:15 122:7
132:5 134:20
135:10,13
**problem** 29:3 45:16
76:13,16 102:6
**problems** 88:23
118:24 130:20
**procedure** 52:10
84:19 95:5,11
**proceeding** 120:2
**proceedings** 2:2
**process** 21:1 27:5
36:22 40:6,17
41:23 53:10 78:14
85:17,21 103:7
111:6 136:23
**processing** 35:11
68:14 134:20
**processor** 82:10
**processors** 46:22
48:5
**produce** 83:22 88:1
**produced** 65:24,25
66:6 84:8 91:4,24
91:25
**producer's** 10:3
**producing** 103:5
126:19
**product** 138:22,24
**Production** 4:13
83:2,7
**profit** 58:6
**project** 92:13
**proper** 14:15
**properly** 103:2
121:16
**properties** 1:7
10:20 18:5,11
23:19,21 24:1
33:12,14 49:6,22
50:2,14 52:19
64:25 67:14,15
68:5 70:2 71:6
72:10 79:6 85:22

86:12 88:7,23
89:2 102:13,14,16
102:19 106:21,23
106:24 107:4,8
108:20 114:5
118:14 130:14
**property** 1:6,8,9
16:5 20:12 22:12
23:5 24:4,8 33:8
33:12,25 34:2,3
42:5 47:24 53:11
62:4 68:23 69:1
69:25 71:5,22
72:3 73:8 76:17
78:1 79:22 93:1
109:7
**protect** 29:23 30:1
**protecting** 30:8
**protection** 14:19
21:11,18 22:1
23:4 24:3,9 25:7
25:13 28:15 29:18
30:5,6,10,25
34:10,17 36:20
37:5,13,17,21
38:11,17,23 39:4
43:19 52:18
103:11,20 104:6
**protects** 30:2
**provide** 29:9,9,11
84:11 110:19
115:9 134:6
**provided** 30:21
54:6 69:7 73:21
73:25 74:3 83:25
84:13
**provides** 28:15
**provision** 132:2
138:11
**public** 2:4 29:2
52:17 61:20 65:17
67:8 76:17 139:17
140:3,20
**publicly** 11:24
**purchase** 22:16,25
23:24 24:4 56:6,7

56:9,22 71:11
106:16 107:4
109:15 118:18
126:11 127:12
**purchased** 42:6
72:10 102:21
128:17,19
**purchaser** 22:13
28:19
**purchaser's** 25:9
**purchases** 72:14
115:2
**purchasing** 102:13
**purpose** 26:11 27:4
28:6,14,21 29:17
**pursuing** 130:4
**put** 40:15 69:5
88:22 91:22 97:25
101:14 116:16
123:1 125:7
129:19 135:1
136:20
**putting** 116:11
**P.A** 3:14
**p.m** 139:9

---
### Q
**qualified** 133:3
**quarter** 42:16,17
**quarterly** 100:1,2
**question** 6:1 14:15
17:9 23:15 32:23
34:6 39:25 43:23
52:21 56:14 69:23
76:12 81:17,18
83:23 106:4 109:5
109:13 111:1
115:1 132:6
138:16
**questions** 6:9,14
13:18 33:2 43:7
52:7,15 56:14
70:16 80:16 88:15
88:15 113:21
118:1,24 136:3,6
**quite** 124:20

**R**

**R** 1:11 3:1,7 5:1,1
  77:11
**raised** 33:25
**ran** 111:4 123:24
**rarely** 18:15 95:13
  121:20,20
**rate** 21:22 125:25
  127:3
**rates** 21:24 115:9
**read** 82:17 100:22
  100:23
**ready** 49:15 55:5
**Reagan** 72:7
**real** 23:22 27:5
  61:14 72:1
**really** 8:13 13:4
  16:2 22:12 24:14
  25:9 28:17 53:1
  60:5 62:24 63:14
  75:18 80:14 87:14
  87:17 88:13
  109:12,13 110:4
  116:4 119:9 131:1
  136:25 137:1
**REALTORS** 1:18
**REALTY** 1:18,19
**reason** 6:13 34:20
  60:4 98:22 102:20
  112:5,13
**reasons** 53:8
**recall** 9:8 11:7,9
  12:19,22 13:6
  17:24 18:2,19
  19:2,7 20:9,11
  22:6 33:6 35:13
  35:14 39:3 41:16
  42:17 45:2,8,21
  46:3,13,13,19
  48:9,10 50:11,15
  50:19 51:1,3 52:2
  53:7,22 62:11
  63:12,15,17,18,21
  63:25 64:2,14
  65:5,18 66:9
  67:16 73:15 75:2

75:3 78:6 79:3
  80:11,14 84:5
  86:7,8 87:15,18
  96:5,7,11,18
  97:24 98:1,13
  99:10 102:23
  104:17,23 105:15
  105:25 109:25
  110:7 120:3,18
  121:4 123:5,6,10
  124:13 130:21
  135:14 137:19
**recalled** 99:15
**receipt** 53:1
**receive** 9:17 15:10
  18:3 23:15 25:11
  105:7 134:15
**received** 30:23
  32:21 69:11 74:13
  74:18 80:4 83:3
  85:8 88:6,19
  95:18 101:3 105:5
  109:25 118:2
  127:18
**receives** 20:18
**receiving** 86:9
  87:15 135:11
**recess** 54:1 94:4
**recognize** 113:1
**recollect** 109:2
**recollection** 42:3
  43:15 48:12 69:14
**recommendations**
  121:18
**record** 13:15 26:23
  29:2 37:10,12
  40:9,10,16 41:3
  43:11 46:8,10
  50:17,23,25 54:2
  54:16 55:6 60:24
  61:1 73:22 74:11
  86:21 91:22 94:3
  100:17 101:10
  105:22 110:9
  114:2,9,12 116:11
  116:14 124:6

133:19,21
**recorded** 40:4 41:9
  41:15,21,22 42:17
  42:22 43:2 44:12
  44:18 45:17,19,19
  54:4 61:11 62:3
  64:12,13,21,22
  78:12,13 105:11
  106:13,20 110:3,5
  114:3 115:13
  116:13,15,18
  117:16 118:5
**recording** 40:18,19
  40:24 41:14,19
  43:16 45:22 52:25
  108:5 110:5,6
  114:6 115:7
  116:14,22 117:3
**records** 40:21,25
  44:11 89:14,18
  90:1 101:5,6
  120:15,17 121:1
**recovery** 80:21
**RECROSS** 4:2
**red** 51:12 56:17
**REDIRECT** 4:2
**references** 110:24
**referring** 8:7 42:20
**refused** 32:18
**register** 52:22
  86:24 119:7,8,9
  119:12,14,16
  120:9,11 128:22
**registers** 87:4
**regular** 120:19
**regulated** 21:25
  115:10
**regulates** 21:24
**rehabilitate** 79:7
**rehabilitated** 73:9
**reimbursement**
  32:7
**related** 83:19 86:12
  87:10 88:22 120:5
  120:23
**relating** 66:16 87:9

88:7 93:11 100:25
  118:14
**relationship** 12:4
  12:24 16:19 19:25
  62:22,25 101:1
  112:2,6,19
**relative** 140:14,16
**relatively** 123:5
**release** 73:23,25
  74:4,25 75:8
**relevance** 100:8
**relevant** 134:6
**remain** 92:7
**remains** 90:4
**remember** 13:11,12
  18:10 41:6,7
  45:10,10 52:3
  64:25 66:12 68:21
  70:2 73:20 77:21
  92:19 104:9
  107:18 111:6
  112:23 135:11
**remit** 31:19 35:4
  38:15,16 57:14,19
  103:23,24,24
  104:21 126:4
  135:21
**remits** 138:1
**remittance** 31:3
  40:14 112:15
  126:1 138:4,5,13
**remittances** 35:15
  35:16
**remitted** 31:13
  32:10 38:16 57:16
  104:22
**remitter** 124:2
**remitting** 135:17
**rents** 71:6
**rep** 12:8 35:17
  81:22
**rephrase** 6:12
**report** 31:10
**reported** 31:12
**reporter** 2:4 6:8
  67:18 69:5 74:16

100:24 140:4
**reports** 35:2 36:11
  121:21 126:19
**repository** 66:16
**represent** 5:8 11:5
**representative** 5:14
  12:7 35:8 36:1
  38:8 94:7 96:13
  113:7 122:3 132:6
**represented** 18:7
  53:12
**reps** 14:21,23 19:23
**repurchased**
  136:21
**request** 4:12 20:18
  20:20,25 67:6
  83:1,7 87:16
  115:4 118:13
  120:16
**requested** 100:23
**requesting** 94:10
  133:3
**requests** 9:16 10:20
  18:3,25 57:6
  83:11
**required** 111:9
  129:7
**requirement**
  128:21 134:23
**requirements** 27:6
  27:19,23 46:25,25
  111:19 112:15
**research** 85:16
**residence** 72:16
**Residentials** 14:10
**resolutions** 40:12
**responding** 136:23
**response** 52:12
  87:19
**Responsibility**
  132:22
**responsible** 55:11
  55:14 56:3 116:14
  116:21 117:3
  135:17
**responsive** 95:2

restrictions 27:14
result 89:4 121:17
  136:11
resulted 55:24
resulting 122:16
retain 89:13
retained 54:22
retaining 119:21
retention 89:8,24
  120:1
return 116:12,14
  116:23 137:9,14
returned 104:24
  116:13,17,22
  117:7
returns 58:14
  87:12 89:14
reveal 87:23
revenues 57:12
review 10:18 47:14
  94:9 101:23,25
  121:11,12,13,14
  121:14,15
Richard 1:11,11,13
  77:7,9
Rider 137:25
right 14:17 16:14
  33:20 40:6 42:25
  43:3 44:4 47:19
  49:24 50:1,7
  52:14,15 53:2
  55:14 56:16 61:10
  61:11 63:24 68:19
  81:4 82:3 90:25
  96:4 97:10,18
  98:15 99:5 100:3
  100:5,18 103:14
  104:1 114:1,14,15
  116:3 128:13
  129:5 136:4
Risk 75:23
road 14:21
Robert 1:6,10 3:3
  3:17 4:3 72:21
  73:23 74:22
  139:12 140:6

Roger 36:2
Roland 1:12 77:15
role 9:6
Ron 123:21
rosa 91:22
ROTHSCHILD
  3:10
Roughly 8:3
Route 66:11
rudimentary 19:17
Rule 4:9 69:6,10
  75:20
rules 5:21
rundown 21:2
running 73:23
runs 73:25

——————— S ———————
S 3:1 4:7
sale 22:19 23:1,4
  27:10 47:2 53:12
  53:14,15 54:21
  56:10,23
sales 9:7 12:8 14:21
  14:23 19:20,22,23
  24:12 43:12 53:20
  64:20 118:18
  127:13 130:16
  135:23
Sally 9:9,20 10:10
  10:14 19:13,15
  25:3 59:5
sampling 121:13
sat 31:22
save 23:23
saving 23:18 120:4
saw 34:14 38:18
  39:7,15 44:11
  50:2 76:4 78:5
  96:14
saying 41:25 43:24
  47:5 55:5 68:6
  87:25 92:10 102:8
  132:14
says 22:18 43:1
  69:16 75:8 81:9

81:11 98:5 113:5
  113:9 119:6
  121:23 122:13
  125:16 129:6
  131:19,25 132:22
  133:1,22 134:5
  135:16 137:21,25
  137:25 138:1
scan 90:10
scanned 89:21 90:4
  90:6 91:10
scanning 89:16
scare 71:24
Schedule 27:12,13
  27:13,20 28:23,25
  54:18
scheme 82:2
search 21:2 22:3
  40:17,19 54:6,15
  55:1
searched 87:18
searcher 54:13,16
searches 54:5 61:15
second 26:13 55:25
  69:15 75:8 78:11
  80:18,20 118:4
secretarial 59:19
secretary 44:20
secrets 74:6
section 27:13 28:23
  54:18 72:21 129:4
  131:23 132:8,22
  136:9
securities 1:3 5:8
  39:5 48:5,11,14
  60:2 68:17 80:1,7
  80:13 82:5,13,19
  83:7 100:11
  116:25 117:18
  136:21,21
security 108:23
  109:6
see 23:9 65:23
  78:10,15 80:18
  100:10,12 107:7
  125:20 129:21

133:10 138:11
seeing 77:21 78:6
seen 20:22 21:11,17
  22:15 30:7 32:3
  34:7,11 37:16
  42:7 52:24 59:13
  62:5,5 69:13
  71:15,23 78:21,22
  80:10 106:17
  107:2 127:19
Selective 18:8
sell 49:6,16 56:13
  79:7 102:15
  115:10,11
seller 129:12
selling 22:11 42:5
  102:13 138:22
send 25:18 32:12
  34:24 35:15,17
  36:8,12 40:10,11
  40:12 55:7,17,18
  63:5 84:12 85:3
  114:12 116:23
  117:1,17 125:11
  139:4,6
senior 123:23
sense 49:17
sent 36:5,6 55:21
  55:22 56:3 84:17
  91:17 94:10,25
  103:8 110:17
  116:24 118:13
sentence 126:8
separate 80:17,20
  81:8 86:19,20
  137:8
separated 22:24
separately 21:12
  103:21,21
sequence 45:10
series 15:22 22:19
  138:8
serious 59:2,3,7
seriously 63:11
serous 44:19
service 22:1 30:6,6

37:1,8 57:17 85:6
  115:8,9,11 116:6
  132:16 133:2,6,13
services 32:8 75:23
  125:18 126:18
servicing 126:20
set 21:20 27:6,9
  118:1 140:12
setback 27:15
settled 73:18 75:4
settlement 29:12
  73:19 74:21
  101:11,14
settlements 126:20
seven 31:17 34:22
share 96:22
shareholders 7:20
Sherry 59:11
shifted 88:14
short 3:5 6:18
Shorthand 2:4
shortly 12:2
show 58:12
showed 55:1 130:4
showing 29:2,3
shown 74:20
side 111:15
sign 34:15 95:15
  108:10 110:14
signature 137:22
signed 34:11 36:2,4
  49:13 110:16
  111:2,3,8 133:10
  133:10,11 134:10
significance 22:22
signing 34:10
similar 25:4 56:12
  58:3 128:22
simple 14:8 19:12
simultaneously
  22:11 107:9
  126:14
sir 82:22
sit 40:24
situation 43:10
  52:16

**six** 28:5 31:18
54:11 69:22 92:23
93:16
**size** 133:8
**Skowrenski** 1:11
3:17 72:21,22
73:24 74:22 75:9
76:18 91:25 92:1
93:12
**slightly** 37:17
**small** 8:13,14 59:1
**sold** 73:9 89:2
102:21 106:21
126:7
**solely** 122:14
**solicit** 14:25
**somebody** 23:6
24:8 90:5
**Somewhat** 99:25
**Sons** 79:2,11
**sorry** 76:12 95:9,12
**sort** 89:5
**sorts** 130:17
**sounded** 31:7
**sounds** 52:13 67:25
south 60:15,22
**speak** 14:24 18:23
42:13 44:16,21
48:4 51:6 58:21
63:19 67:9,21
71:12 86:5 90:24
102:3 113:21
118:5 123:16,20
124:10 126:16
130:24 138:24
**speaking** 19:7
48:10 108:1
**specific** 33:2 34:2
**specifically** 121:24
129:19
**specified** 113:8
**split** 7:22 14:11
70:22 127:4
**spoke** 18:15 42:11
44:8 45:4 50:10
50:13 51:1,2

58:17,20 63:2
67:16 68:3 108:2
115:16
**spoken** 49:8 51:4
51:18 52:3 58:18
67:20 70:6 77:6
108:11
**spring** 62:1
**springtime** 65:14
**stages** 123:6
**stamp** 52:25 66:18
69:5 116:12,16
127:25 128:8,20
**stamped** 111:23
**standard** 37:14
125:22,24 126:1,2
127:8 135:1
**standards** 125:6,10
**standpoint** 24:25
**Stanley** 1:12 15:18
23:7
**star** 122:18
**start** 6:7 49:15 57:9
76:25
**started** 5:9 11:7
24:15,20 39:6,15
39:17,22,24 50:16
62:2 68:15 77:21
84:23,24 102:24
123:7
**starting** 127:25
**state** 2:4 13:14,15
15:8 21:20,23
125:23 126:25
135:20,22 140:4
140:20
**statements** 23:9
**states** 1:1 126:17
**status** 109:11
**stayed** 12:20
**stenographic** 2:1
**stenographically**
140:11
**step** 6:3 40:16
**stink** 123:2
**stipulate** 100:20

**stipulation** 4:10,11
74:1,4,12,17,21
74:24
**Stone** 3:3 5:7
**stop** 61:6
**stopped** 12:14,15
19:6 39:7 42:8
43:17,25 44:1
61:16,23 102:24
**stopping** 48:24
**story** 64:4,5 65:17
67:17,18,21,23
68:7
**strange** 16:10
**straw** 71:12,13
**Street** 2:6 3:8,11,15
**strict** 96:21
**strictly** 59:19
120:10,23
**stringent** 125:7,10
**stuff** 19:18 59:3
78:22 95:10
**style** 60:18 114:22
**sub** 91:22
**subject** 28:22,24
73:21
**submitted** 23:9
136:3,6
**subparagraph**
113:25 118:23
119:4 121:22
122:14 125:15
126:17 129:4
**subprime** 38:24
**Subscribed** 139:13
**subsection** 118:22
120:14 129:4
132:21 133:1,22
134:5
**subsequent** 71:16
71:21
**subset** 60:13
**substance** 45:14
46:18 52:5 68:4
75:3
**suffix** 47:18

**suggested** 38:9
**suit** 73:10 119:21
**summer** 62:20 84:1
84:22 90:19
**Summit** 75:23
**superior** 111:5
**supply** 133:9
**support** 80:24
81:14
**suppose** 122:7
**supposed** 42:2
72:16,18
**sure** 12:20 46:4
47:13 71:10 84:6
96:7 101:16 106:3
115:6,23 116:15
121:16 124:11,20
135:20
**surrounding** 72:14
**switched** 53:9
**Swope** 35:20
**sworn** 5:1 139:13
140:6
**system** 25:24 66:25
86:20 90:12
134:19

**T**

**T** 4:7 5:1 121:23
**take** 5:24 28:4
53:24 69:9,12
74:14 80:2,9 94:1
94:25 97:15 102:6
121:13 124:1
131:16
**taken** 2:3 140:11
**takes** 26:22 31:18
37:11 46:9 50:24
54:1 60:25 94:2,4
124:5 133:20
**talk** 6:7 34:2 52:9
**talked** 33:19 42:9
44:20
**talking** 6:6,7 63:21
70:20 114:16
**Target** 107:19

**tasks** 19:17
**tax** 27:10 33:14
45:23 47:2 54:20
58:14 72:1,2,6
87:12 89:14
108:16,24 130:16
134:24,24 135:19
135:22,23
**taxes** 41:13,20 90:1
135:18
**telephone** 17:13
45:6,12,13 63:22
100:14 136:8
**telephonic** 136:7
**tell** 8:9 9:4 10:21
13:8 43:24 51:11
51:14,20 52:17
54:19 58:8 62:15
63:8 65:19 67:22
70:1,14 91:12,12
91:17 94:21 95:1
95:1,4 98:1
120:21 123:25
133:17
**telling** 46:22 49:12
133:18
**Temple** 136:19
**ten** 8:3 83:12 89:15
111:7
**tenant** 71:2,2 72:3
**tendency** 125:8
**term** 34:10 104:12
105:6 115:20
**terminate** 62:21
**terminated** 12:5,24
112:2,18 137:6,15
**termination** 96:5,8
96:14
**terms** 20:21 27:2
30:11 32:3 62:2
73:19 88:4,4,24
105:12 113:8
132:3,14
**terrible** 122:8
**terribly** 61:16
**territory** 113:7

Terry 35:19
testified 5:2 16:18
  35:9 83:15 105:3
  130:13
testify 65:8 140:7
testimony 140:10
Thank 139:1
thanks 5:5 72:5
thing 17:10 21:17
  25:3,20 52:14
  54:20 81:13 84:16
  101:2,7 102:2
  111:23 118:21
  120:3,25 124:19
  130:5 131:8
things 6:6 13:18
  19:12 22:15 25:1
  27:9,11,15,16
  28:3 29:1,15
  33:14 37:16 39:7
  39:15,16 41:2
  55:24 56:12 61:10
  68:14 70:15 81:18
  82:17 83:11 94:5
  102:7 105:2,11,12
  105:23 110:24
  117:11 120:4
  122:9 130:3,17
  131:25 134:4,23
  134:24
think 10:13 18:6,6
  18:8,19 20:14
  25:24 35:15 39:1
  41:25 42:2,20
  43:21 44:19 45:13
  46:1 48:15,18,19
  48:21 50:18 51:23
  53:3,3,22 58:22
  61:23 62:7,17
  64:23,23 65:5
  68:13 70:7 72:15
  75:12 78:3 79:9
  82:20,21 83:21
  84:3,13 96:12
  98:12 99:8,14
  101:17 102:7

103:17 104:8,9
105:6 106:22
107:6,16,24
108:15 109:20
112:13 114:18
115:14,18,22
117:11 118:4,16
123:1,24 125:1,2
130:15 132:5
132:10
thinking 106:19
third 72:20 80:18
  81:8,12
Thomas 1:12 77:13
THOMSON 2:6
  3:14
thought 35:9 38:9,9
  50:8 53:8 62:8
  67:1 72:12,15
  105:5 109:13
  120:4 129:21
threat 122:24,25
three 5:12 6:5 30:7
  56:20 57:11 60:10
  77:1 92:25 118:22
  122:13 132:21,22
  133:22 139:2
time 5:24 8:5,9,21
  9:9,19,20 10:10
  11:5 12:14 14:9
  17:5 18:12 19:10
  24:17 31:12,15
  36:3 38:18 39:18
  41:16 42:3,11,25
  43:12 49:16,18
  50:13,16,22 51:2
  51:7,18,20,21
  52:1,9 54:13 56:2
  56:10,11 59:20
  60:17 61:18 63:2
  63:20 66:3 67:22
  71:24 73:20 76:21
  76:22 77:4 78:24
  87:8 89:16,19
  90:18,18 92:5
  96:2 99:3 104:22

105:20 108:2,24
109:22 111:17,25
114:15 118:17
119:17 120:22
121:5 123:19
124:12,18 125:3,6
127:9 129:23
130:3 133:17,18
134:20,21 135:12
140:11
times 5:19 42:4
  60:11 65:11 67:19
  129:25
title 1:15,15,16,17
  3:9,12,13 4:13
  6:20 7:1,5 9:16,16
  10:14,17,18 11:3
  11:8,10,12,15,17
  11:17,20,21 13:21
  14:6,19,20 15:21
  15:23 16:4,9,11
  16:12,19 17:11
  18:4 19:16,18,25
  20:7,19,19 21:2,2
  21:5,14,24 22:3
  22:16 23:3,3,21
  23:24,25 24:4
  25:10,12 26:11,25
  26:25 27:5,9,14
  27:17,21,23 28:2
  28:6,15,18,24
  29:3,5,8 30:14,24
  31:8,22 32:11,15
  32:19,23 33:7,23
  34:23,24 35:5,23
  36:14 38:20 39:4
  39:13 40:11 43:2
  43:18 47:1,10,15
  47:17,25 48:2
  52:18 54:8,12
  55:5,12,12,13
  56:4,5,9,21 57:5
  57:14,15,24 61:15
  62:9,13 66:1,17
  69:8 71:21 73:11
  74:23,23 75:10,22

83:3 84:18 85:4
85:18,25 86:3,5
86:15,23 87:11
89:10 92:5 93:3
93:11 95:11,25
98:19 100:8,13
101:1,8,12,13
102:1,21 103:7,12
103:13 104:5,11
104:14,18,19
106:25 108:6
110:13 111:6,14
112:7,9,10,17,20
112:23 113:10
115:3 120:23,24
121:9,12,19 122:3
122:4,10,11
123:18,20 125:19
125:23 126:10,20
126:21 127:24
128:1,3,5,6,10,11
130:6,24 131:1,11
131:25 132:3,6,7
132:9,15,15,24
133:24 134:1,12
136:15
titled 128:1
titles 10:17 72:18
  93:24
Title's 100:25
  129:7
today 5:10 6:14
  17:14 28:4 35:3
  60:22 94:19
  107:11 139:1,4
today's 101:24
told 5:11 41:23
  44:14 52:15 63:1
  63:3,8 70:12
  91:22 119:23
Tom 65:20
top 80:17
topics 43:4 135:14
toss 99:23
tossed 134:22
total 58:1 105:25

totally 99:9
touch 41:10,11
Township 66:11
tracking 120:9
traded 11:24
transaction 14:10
  23:16 43:10 83:25
transactions 41:22
  53:7 83:20 102:10
  107:13 125:17
transcribe 6:8
transcript 2:1
  140:10
transfer 41:13,20
  45:23 71:22
  134:24
transfers 70:17
  86:21
tried 29:6 58:21
Tri-State 51:15
true 140:10
trust 23:8 31:4,5,8
  31:22 36:13 86:22
  120:24 136:19
truth 140:7,7,8
truthfully 6:14
TRW 128:1,5
try 60:1 91:19,20
  115:11 122:7
  129:13,13
trying 19:24 47:8
  68:9 88:25
turn 85:11 113:24
  122:13 137:20
turned 62:18 64:8
  64:16 84:4 117:11
  117:22
turning 86:10
  88:16 128:20
twice 19:5
two 7:19,21 11:12
  40:23,25 42:22
  43:11 56:20 59:9
  64:13 69:19 72:21
  105:5,10 113:18
  113:24 118:22

124:22 133:10
**type** 7:5 10:1 25:3
102:2 107:14
110:23,24 120:25
126:16 130:5
131:7

**U**

**Uh-huh** 10:15
12:13 31:23 35:12
59:15 71:18 84:10
89:23 103:10
119:5
**ultimate** 22:13
53:14 70:17,18
**ultimately** 22:9
25:8,9 29:12
**unavailable** 92:3
**uncommon** 16:9
**understand** 5:15
6:10,10 73:4
75:17 84:9 108:6
116:4 119:24
132:8 136:14
**understanding**
73:6 113:22
**understood** 10:13
97:11 103:7
114:21
**underwriter** 14:9
31:11,13 32:13
33:16 42:11 85:4
85:9 88:14 96:24
98:24,25 100:6
103:16 111:12
114:23 129:18,21
133:7
**underwriters** 39:12
39:13,18 42:10,13
109:18 110:16
111:18,20 118:25
120:19 122:10
126:6 131:11
**underwriting**
13:18 33:3,7 52:7
121:14,15,16

125:6,10 134:7,13
135:6,11 136:3
**UNITED** 1:1
**unrecorded** 29:1
**unrelated** 99:9
**unsigned** 34:12,14
**unusual** 72:14,19
**update** 40:18 99:21
**updated** 99:21
**use** 14:6 34:9 39:17
42:1 47:10 49:14
62:12 95:13 96:2
107:9 111:22
**useless** 119:19
**usual** 56:8 71:19
**usually** 51:5 114:9

**V**

**valid** 28:9,11
**value** 131:17
**variety** 106:8
**various** 44:9 124:9
136:16
**vary** 38:4
**VECCHIO** 1:18
**venture** 70:20
71:22 108:13,20
109:3,19 110:1
**ventures** 108:22
**verbal** 136:7
**verify** 91:9
**versus** 73:24 74:22
**vice** 7:15 8:16
123:23
**VINCENT** 3:15
**volume** 46:21 57:1
138:24
**volunteered** 138:10
**vs** 1:5

**W**

**Wagner** 3:4 67:7
**wait** 41:1
**walk** 114:13
**WALKER** 3:4
**Walsh** 1:3 5:8 39:5
47:6 48:5,11,13

60:1 68:17 69:20
80:1,7,13 82:5,13
82:19 83:7 100:11
116:25 117:18
136:21
**want** 5:24 41:21
42:18,23 55:13
87:23 111:20
113:21 116:22
117:12 119:22
124:3 125:5
**wanted** 49:10 70:24
75:6 98:21
**warm** 50:20
**wasn't** 35:3 66:23
66:24 77:23 115:6
120:20 122:25
123:14,17 138:17
**way** 6:12 40:5
41:24 47:9 53:10
66:20 91:1 103:23
116:9 125:7
**ways** 17:12 22:6
23:23 137:8
**weather** 41:7 46:14
**website** 17:15
**weekend** 66:11
**weeks** 40:8,22,25
**WEICHERT** 1:18
**welcome** 6:3
**well-founded** 37:25
**went** 12:9,9,22
24:16 51:12 65:23
71:11 78:8 84:6
105:13,13 109:15
112:22 119:15
120:11 123:14,17
123:19 137:8
**weren't** 40:4 41:9
44:12,17,17 54:4
104:25 112:15
124:20 125:10
**West** 2:6 3:15
**we're** 5:10 8:5
29:14 30:11 31:19
41:25 42:9 55:5

59:1,1 82:24
103:25 109:14
114:14 116:13,21
117:3 131:20
**we've** 21:11 22:15
42:7 45:16 60:14
62:5 127:20
129:25
**White** 51:12
**William** 1:10 10:20
79:16
**Willis** 65:20
**windows** 50:22
**wire** 25:16
**Wiseguy** 26:21
**witness** 4:2 11:19
26:17,19 39:22,23
63:17 92:12,18
93:19,21,22
**wondered** 22:15
**wondering** 104:3
**word** 130:16
134:20
**words** 39:16 104:4
**work** 6:25 9:11
10:21,23 11:4,16
13:8 15:2,4,10
16:13,21,24 17:5
19:24 20:6,11,16
24:16 44:5 47:8
53:11 56:9,21
59:2,3,5,16,21
73:2 76:20 85:16
98:19,21 99:5
126:15 127:2
**worked** 10:19 11:9
79:21
**working** 11:8 13:20
13:23 14:4,4 18:1
24:21,22 49:15
53:20,20 70:9
108:6
**wouldn't** 23:9 33:1
34:20 37:7 39:14
41:3 44:20 48:18
55:18 59:2 67:12

67:12 78:15 96:16
96:17 111:16
**Wow** 9:1 13:7
**write** 96:9 119:14
**writing** 81:6 122:1
**written** 100:17
138:2
**wrong** 10:14 38:10
43:24 63:11
**wrote** 75:12

**X**

**X** 4:7
**XI00970** 140:21

**Y**

**Yacker** 1:12 15:17
15:18,25 16:7
17:1 18:15 19:21
19:23 20:16 21:16
22:9 23:12 25:13
25:15 40:10 41:10
41:12 42:1 44:6
44:13,22 45:4
53:5 55:18,23
58:21 59:14 71:10
97:24 108:3 110:5
110:6,8 115:13
124:9 130:18
**Yacker's** 18:13
23:8
**yeah** 15:12 32:2,4
37:4 66:7 70:23
72:12 78:21 98:16
106:15,16 119:9
125:2 126:2
128:14 134:3
135:4 137:11
**year** 12:23 40:3
43:13 57:6 97:13
97:14 124:3 138:1
**years** 19:23 24:16
26:9 43:9 51:25
58:15 59:9 60:10
77:1 89:11,15,25
111:8 130:25
134:23