**York** 1:16,17 3:13
  3:13 128:2,6,10

### Z

**Zappola** 9:9 10:14
**Zaro** 66:2

### $

**$10,000** 129:16
**$100,000** 138:2,4
**$20** 126:12,15
**$20,000** 129:16
  131:21
**$25** 21:18,21 57:18
**$30,000** 36:17
**$325,000** 75:9
**$400,000** 57:22
**$60,000** 45:22

### 0

**0000001** 111:23
**07078** 3:5
**07102-4056** 3:8
**07728** 3:16

### 1

**1** 27:13,20 54:18
  69:4 75:20 113:5
**1,200** 58:2
**10:10** 2:7
**100** 3:8 49:7
**12** 58:2
**127** 4:14
**13000** 128:20
  131:22
**13005** 137:21,24
**13008** 127:25
**13017** 128:9
**15** 57:16 83:8,13
  89:11,25 135:20
**150** 3:4
**16** 80:16
**17** 128:12
**18732** 91:14
**19103-3222** 3:12
**1980s** 108:15
**1986** 108:17

**1987** 6:21
**1996** 8:5,21 17:7,19
  25:21 30:9 57:2
  57:19 58:6,7 61:4
  73:7 77:4 78:24
  87:4 89:19 93:8
  97:22 114:8 115:5
  120:15 135:12
**1997** 5:10 8:6 25:21
  39:18 41:6 42:24
  53:4 57:23 58:4,9
  61:4 62:8 73:7
  78:24 84:1 87:5
  108:5 114:8 115:5
  120:15
**1998** 12:2 13:22

### 2

**2** 27:12,13 28:23,25
  74:15,21 75:1
  129:4
**2A2** 128:21
**2B** 131:23
**2F** 114:16
**2,400** 57:5
**20** 36:17 58:15
  125:25
**200** 57:3
**2000** 3:11 26:6
  92:14
**2000s** 13:25
**2004** 7:4,4
**2008** 83:8 87:19
  88:2
**2009** 80:9
**2010** 2:7 111:22
  139:14 140:22
**2013** 140:21
**21** 15:7
**23** 2:7 43:9
**24** 80:8
**26** 4:9 69:6,10
  75:20 101:19
**27** 111:22
**28** 80:16 140:22

### 3

**3** 74:16,24 75:1
  140:21
**3:02** 139:8
**30** 41:22 45:17
**30(b)6** 96:13
**30,000** 49:6
**300** 42:22 43:12
**35** 66:11
**36** 2:6 3:15

### 4

**4** 80:7
**40** 41:22 45:17
  127:5

### 5

**5** 4:4 83:6 87:16
  113:1 125:14
  132:8
**5A** 137:25
**50** 45:22
**50/50** 7:22 14:11
  124:23

### 6

**6** 127:20 136:9
**60** 108:23 109:6
**60/40** 70:22
**69** 4:9

### 7

**7** 17:7 129:4
**74** 4:10,11

### 8

**8** 53:4 111:24
**8th** 42:24 117:17
**80** 4:12
**80s** 71:25
**80/20** 127:4
**83** 4:13
**86** 108:25

### 9

**9** 53:4
**9th** 42:24 117:17
**90s** 24:19

**95** 17:17
**96** 8:25 9:19 11:5
  14:3,12 15:6 41:8
  60:19 87:8 88:9
  108:25
**97** 8:21,25 9:19
  11:5 14:3,12 15:6
  17:19 30:9 42:15
  60:19 62:1,20
  65:14 77:4 84:22
  87:8 88:9 89:19
  97:22 135:12
**97-cv-3496** 1:2
**99** 100:13

Page 141

```
              UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
              Civil Action No.
              97-cv-3496 (DRD) (MAS)
```

WALSH SECURITIES, INC.,   :
                          :
              Plaintiff,  :
                          :    VOLUME II
          vs.             :    DEPOSITION OF:
                          :    ROBERT AGEL
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP CONSULTING,
INC.; COMMONWEALTH LAND TITLE
INSURANCE CO.; NATIONS TITLE
INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE
INSURANCE CO. OF NEW YORK;
COASTAL TITLE AGENCY; DONNA
PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., D/B/A
MURPHY REALTY BETTER HOMES
And GARDENS              :
                         :
              Defendants. :
                         :
  - - - - - - - - - - - -

## Page 142

1     TRANSCRIPT of the stenographic notes of
2   the proceedings in the above-entitled matter, as
3   taken by and before JANET BAILYN, a Certified
4   Shorthand Reporter and Notary Public of the State of
5   New Jersey, held at the office of MANNING, CALIENDO &
6   THOMSON, 36 West Main Street, Freehold, New Jersey,
7   on August 5, 2010, commencing at 10:25 in the
8   forenoon.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 143

1   APPEARANCES:
2
3       STONE & MAGNANINI, LLP
4         BY: ROBERT MAGNANINI, ESQ.
            AMY WALKER WAGNER, ESQ.
          150 John F. Kennedy Parkway
5         Short Hills, New Jersey 07078
          Attorneys for Plaintiff
6
        McCARTER & ENGLISH, LLP
7         BY: DAVID R. KOTT, ESQ.
          Four Gateway Center
8         100 Mulberry Street
          Newark, New Jersey 07102-4056
9         Attorneys for Defendant
          Commonwealth Land Title Insurance Co.
10
        METHFESSEL & WERBEL
11        BY: MARTIN R. McGOWAN, ESQ.
          3 Ethel Road Box 3012
12        Edison, New Jersey 08818
          Attorneys for Defendant
13        Coastal Title Agency
14      FOX ROTHSCHILD, LLP
          BY: IRINA B. ELGART, ESQ.
15        P.O. Box 5231
          Princeton, New Jersey 08543-5231
16        997 Lenox Drive
          Lawrenceville, New Jersey 08648-2311
17        Attorneys for Defendants, Nations Title
          Insurance of New York, Inc. and Fidelity
18        National Title Insurance Company
          Of New York
19
20
21
22
23
24
25

## Page 144

1
2                    INDEX
3   WITNESS      DIRECT CROSS  REDIRECT RECROSS
    ROBERT AGEL
4     BY MR. MAGNANINI  145        264
      BY MR. KOTT        252        267
5
6
7            E X H I B I T S
8   NUMBER      DESCRIPTION           PAGE
9   Coastal-7   Invoice dated 12/9/96      155
    Coastal-8   Letter dated 1/14/97       156
10  Coastal-9   Letter dated 4/9/97        156
    Coastal-10  Letter dated 1/28/97       156
11  Coastal-11  Copy of Check              156
    Coastal-12  Deed                  156
12  Coastal-13  Letter dated 7/15/97       156
    Coastal-14  Letter dated 5/29/97       157
13  Coastal-15  Copy of Check dated 4/19/97   185
14
15
16
17
18
19
20
21
22
23
24
25

## Page 145

1   R O B E R T  A G E L, having been duly sworn by the
2   Notary, testified as follows:
3   DIRECT EXAMINATION BY MR. MAGNANINI:
4     Q.   Good morning, Mr. Agel.  How are you?
5     A.   Fine thanks.  How are you?
6     Q.   Good.  First question:  Did you get a
7   chance to review your transcript?
8     A.   No.
9     Q.   Normally you ask the question in case
10  there's something you want to change.  Do you have
11  anything you recall you answered that you want to
12  change an answer to or add something?
13    A.   No.
14    Q.   Then we can just proceed.  I have a
15  couple of follow-up questions so we will be less
16  coherent than usual jumping ahead.
17        MR. McGOWAN:  I talked with personal
18  counsel late yesterday afternoon and indicated to him
19  that at least the beginning portion of this
20  deposition will be a continuation of the corporate
21  dep and that there may or may not come a point where
22  we're ready to go into the other.  Because of some
23  miscommunication, I don't know, I thought he was
24  going to be available this afternoon if we got to
25  this point, he is not, but he's authorized me to

2 (Pages 142 to 145)

Page 146

1  proceed with that on the theory maybe we can be done
2  with it today.
3      Q.   If that's good for you, Mr. Agel, we
4  will knock it out.
5      A.   Yes.
6      Q.   Okay.  One of the questions we had asked
7  you, we had sent you that letter and you said you
8  looked at it and that you probably didn't have any
9  documents, but you said you were going to look for
10  any other responsive documents.  Did you find
11  anything --
12      A.   No.
13      Q.   -- else?  Okay.  And then one of the
14  questions I wasn't clear on:  Do you still have any
15  of the non-approved attorney lists from either
16  Commonwealth or Fidelity?
17      A.   From that time period?
18      Q.   From that time period.
19      A.   No.
20      Q.   Okay.  I guess because Lawyer's Title
21  owns Commonwealth, you still have Lawyer's Title --
22  not anymore.  Okay.  You're right.  Fidelity owns
23  Commonwealth.
24      A.   There's no more Lawyer's Title.
25      Q.   All right.  One of the jump-around

Page 147

1  questions.  Yesterday we deposed Mr. Pepsny and so he
2  recalls having conversations with you about certain
3  things.  One of the questions I had asked him about
4  though was that when Coastal Title did that filing
5  of -- it turned out to be -- 150 different deeds and
6  mortgages back in April of '97, a number of the deeds
7  that were filed were what I'll call joint venture
8  deeds; that is, they were a deed from the straw buyer
9  of Kane's -- the property purchased by Mr. Kane's
10  company and it divided 60 percent of that property
11  and gave that to Capital Assets Property Management
12  Company, which was, as we said, Mr. Grieser's
13  company, and 40 percent to the mortgagee.  And
14  those --
15          MR. McGOWAN:  Not the mortgagee.
16          MR. MAGNANINI:  The mortgagor.
17          MR. McGOWAN:  Right.
18      Q.   Those deeds were recorded along with
19  these other deeds, and I had asked Mr. Pepsny if he
20  had ever had any discussions with you about those
21  joint venture deeds.  Do you recall ever discussing
22  those joint venture deeds with Mr. Pepsny?
23      A.   I don't recall whether it was Pepsny or
24  Yacker.  I did talk to someone about them because I
25  wanted to know what they were all about, but I

Page 148

1  couldn't tell you whether it was Yacker or Pepsny.
2      Q.   Do you recall talking to anybody about
3  those deeds needed to be filed along with all of
4  these other documents?
5      A.   No.  I needed to know who I was
6  insuring, whether I was insuring the original
7  mortgagor or whether they were insuring the -- we
8  were insuring the second deed.
9      Q.   The 60/40 split?
10      A.   Correct.
11      Q.   And who did -- who were you ultimately
12  insuring?
13      A.   The original purchaser, the purchase
14  money mortgagor.
15      Q.   And how did you determine that?
16      A.   Through asking either Yacker or Pepsny.
17  I don't recall which one.
18      Q.   That one of the attorneys told you?
19      A.   Yes.
20      Q.   Okay.  Because of all the various
21  documents we have seen, we have seen title
22  commitments issued on the Kane Company purchase of
23  the property and then, as we talked about, the title
24  commitment with the capital A in parenthesis --
25      A.   Right.

Page 149

1      Q.   -- on the sale, but I had not seen any
2  commitments issued at all on any of those joints
3  venture deeds.
4      A.   No.
5      Q.   Okay.  When did you first learn about
6  the joint venture deeds?
7      A.   I couldn't tell you.  I don't recall
8  exactly when.
9      Q.   One of the things we discovered when we
10  were preparing for Mr. Pepsny's deposition was that
11  he would order title commitments for the straw buyers
12  even though he represented Kane's company, which had
13  purchased the property from someone and then was
14  selling it to the straw buyer.  We have a number of
15  documents, they're kind of preprinted order forms
16  from law offices of Michael Alfieri -- Michael
17  Alfieri to Coastal.  One of the things circled on the
18  bottom, title search, bring down, flood.
19          Why was Mr. Pepsny's office ordering
20  title commitments for the buyers if he was
21  representing the seller?
22      A.   I have no idea.  I don't recall that.  I
23  recall the orders coming in from Yacker.
24      Q.   That's what we had seen, but as I said
25  we started going through -- you find some amazing

Page 150

1　things in 150,000 pieces of paper.
2　　　　MR. MAGNANINI:　Off the record a minute.
3　　　　(A discussion takes place off the
4　record).
5　　Q.　Mr. Agel, I would like to show you what
6　was marked as King -- which was at Lorraine King's
7　deposition -- King-6, and I will represent to you
8　that we actually had the order form from Mr.
9　Alfieri's office requesting the title run.　And as
10　you can see it's for a title insurance closing
11　protection letter and the various searches that you
12　would do, and then in turn we found this invoice
13　issued by I assume you, one of Coastal Title's
14　invoices.
15　　A.　Yes.
16　　Q.　And it was issued to Mr. Pepsny for --
17　excuse me for a minute -- for -- it's actually
18　property that was eventually purchased by a woman
19　named Jill Montanye 1017-1019 Bangs Avenue in Asbury
20　Park.　So I was just trying to sort out why Mr.
21　Pepsny was ordering title on things for the buyers
22　and then Coastal was -- you were doing what you
23　should have been doing, you got a request, you did
24　the work, you sent them an invoice and then -- but it
25　was different than, you know, some of the ones which

Page 151

1　were ordered by Mr. Yacker or Mr. Cicalese who were
2　representing the straw buyer.
3　　A.　Right.
4　　Q.　Do you have any idea why Mr. Pepsny, who
5　was representing the seller, would have been ordering
6　the title?
7　　A.　No.
8　　Q.　Okay.　Bizarre.　And then one of the
9　other documents we have is actually a closing
10　protection letter with -- that was actually issued to
11　Mr. Pepsny as the approved attorney.　And it's not
12　for the acquisition of a property by Mr. Kane's
13　companies.　It's for the sale of the property to the
14　straw buyer, and so I would like to show you an
15　exhibit that was previously marked as King-5.　I ask
16　you to take a look at that and see if you recognize
17　the document or the form of document.
18　　A.　Yes.
19　　Q.　What is it?
20　　A.　It's a closing service letter.
21　　Q.　Issued by Coastal Title?
22　　A.　Coastal Title Agency, yes.
23　　Q.　And it's issued to whom?
24　　A.　To National Home Funding.　I guess you
25　would say insuring the actions of Pepsny.

Page 152

1　　Q.　And so, again, I was trying to determine
2　why Mr. Pepsny who told us he only represented Mr.
3　Kane's companies in the sale would be listed as the
4　closing agent for the buyer, Miss Montanye, on this
5　1017-1019 Bangs Avenue.
6　　A.　I don't know.
7　　Q.　Who prepared the closing service letters
8　at Coastal Title?
9　　A.　It would be a secretary.　I couldn't
10　tell you who.
11　　Q.　Who --
12　　A.　I had a lot of employees back then.
13　　Q.　When you would review the -- what did
14　you do to review the closing service letter before
15　you sent it out?
16　　A.　Nothing.
17　　Q.　So you're -- basically you would get it,
18　sign it and then send it out the door?
19　　A.　Right.
20　　Q.　And then I think we asked you this
21　before, but this came actually from Coastal Title's
22　production.　You can see by the Bates stamp CTC.
23　　A.　Yes.
24　　Q.　The reason it's not signed is because
25　this was a file copy?

Page 153

1　　A.　File copy, correct.
2　　Q.　Okay.　One of the thing Mr. Pepsny had
3　testified to was that I guess initially Mr. Kane
4　ordered or I guess Mr. Pepsny ordered closing title
5　insurance for title commitments for the Kane
6　purchases, and then they would also order them for
7　the sale and so -- and what I recall you testifying
8　was that because of I guess a request by Mr. Pepsny
9　or Mr. Kane about confusion at the lender you would
10　issue the commitment on the purchase of the property
11　with all the requirements that were needed to get
12　clean title and then the title insurance commitment
13　on the sale would be issued in a clean form?
14　　A.　Yes.
15　　Q.　Is that -- I got that correct?　Okay.
16　If the -- the lender would get a copy of the
17　commitment, correct, as part of the mortgage
18　application packet?
19　　　　MR. KOTT:　Excuse me.　When you refer to
20　the lender, are you referring to National Home or
21　Walsh or both or just generically?
22　　　　MR. MAGNANINI:　Just generically.
23　　A.　Yes.　Not as part of the application.
24　It would be after.
25　　Q.　Afterwards.　Right.　It was something

Page 154

1    I've seen in all the loan packets from Walsh
2    Securities. How would the lender know if there were
3    any problems with the underlying title because the
4    lender never got the first -- actually I should ask
5    that foundational question.
6         Did the lender receive a copy of the
7    first title commitment for the purchase of the
8    property by Mr. Kane or his companies?
9         A.   I don't know.
10        Q.   Okay. So if they -- if the lender
11   didn't receive the first title commitment how would
12   they know if there were any problems with the title
13   because the commitment they received, the one with
14   the (A) on it showed the title was more or less
15   clean?
16        A.   They wouldn't I guess.
17        Q.   And Mr. Pepsny said I guess his firm did
18   the work to clean up the title on the original
19   commitment and then -- and, therefore, at least a
20   corollary, but Mr. Pepsny wouldn't have known this,
21   my question to you is: What title cleanup work did
22   the closing attorney have to do? And the closing
23   attorney on the ultimate sale being Mr. Yacker or Mr.
24   Cicalese.
25        A.   I guess they would be doing the -- you

Page 155

1    know, paying off any taxes, handling essentially the
2    mortgage closing I guess.
3         Q.   Okay. But all of the underlying -- the
4    work, as Mr. Pepsny said, that was related to the tax
5    sales, the way Mr. Kane acquired the property,
6    foreclosures, all of that, that work was all done by
7    Mr. Pepsny?
8         A.   Correct.
9         Q.   That would explain why we have seen a
10   number of letters directed from Coastal Title to Mr.
11   Pepsny asking questions about, you know, requirements
12   that have not been cleaned up on the title
13   commitments.
14        A.   Correct.
15        Q.   Do you recall sending -- did Coastal
16   send letters to Mr. Yacker or Mr. Cicalese to clean
17   up requirements?
18        A.   I don't know. I don't recall.
19        Q.   Okay.
20        MR. MAGNANINI: Off the record for a
21   second.
22        (A discussion takes place off the
23   record).
24        (Coastal-7, Invoice dated 12/9/1996, is
25   received and marked for identification.)

Page 156

1         (Coastal-8, Letter dated January 14,
2    1997, is received and marked for identification.)
3         (Coastal-9, Letter dated April 9, 1997,
4    is received and marked for identification.)
5         (Coastal-10, Letter dated January 28,
6    1997, is received and marked for identification.)
7         (Coastal-11, Copy of Check, is received
8    and marked for identification.)
9         (Coastal-12, Deed, is received and
10   marked for identification.)
11        (Coastal-13, Letter dated 7/15/97, is
12   received and marked for identification.)
13        Q.   Mr. Agel, what I've done is introduced
14   exhibits, Coastal Title Exhibits 7 through 13. The
15   first one I have got listed as Exhibit 7 is a
16   document produced by Coastal Title Bates stamped CTB
17   2784, which is an invoice to Stanley Yacker dated
18   12/9/1996 from Coastal Title for title insurance,
19   closing service letter and various searches on a
20   property known as 515 7th Avenue in Asbury Park, New
21   Jersey. And then what we've marked as Coastal
22   Exhibit 8 is Bates stamped CTB 2779, which is a
23   letter from Coastal Title Agency dated January 14,
24   1997 to Mr. Pepsny regarding 515 7th Avenue. And
25   then what we have marked as Coastal Exhibit 9 is

Page 157

1    another letter from Coastal Title Agency dated April
2    9, 1997 to Mr. Pepsny, again regarding 515 7th Avenue
3    in Asbury Park, and then what you've got marked as
4    Exhibit 10 is a January 28, 1997 letter from Coastal
5    Title Agency Bates stamped CTB 2778 from yourself to
6    Mr. Pepsny, again regarding the same property. And
7    then what you've got as Exhibit 11 is a check from
8    Mr. Yacker's trust account to -- as you see, made out
9    January 31, 1997 payable to Coastal Title in the
10   amount of $1,206 and no cents. And that's from again
11   Coastal's files, Bates stamped CTB 2892. And then
12   what you've got as Exhibit 11 is -- Exhibit 12 is a
13   deed of sale between Arnold Faulhaber, Junior and
14   Claudia Faulhaber to G.J.L. Limited transferring
15   interest in 515 7th Avenue in Asbury Park for $77,500
16   dated June 3, 1997 from Coastal's files Bates stamped
17   CTB 28372838. And then Exhibit 13 is another letter
18   from Coastal Title Agency dated July 15, 9997 to Mr.
19   Yacker from Sally Zappola regarding 515 7th Avenue.
20   And then if we can go off the record for a second.
21        (A discussion takes place off the
22   record).
23        (Coastal-14, Letter dated May 29, 1997,
24   is received and marked for identification.)
25        Q.   Mr. Agel, I would like to show what's

5 (Pages 154 to 157)

Page 158

1  been marked as Coastal Exhibit 14, which is another
2  letter from Coastal Title Agency to Mr. Pepsny
3  regarding 515 7th Avenue from Christine LaFrance
4  dated May 29, 1997 and ask you to take a look at that
5  group of documents.
6      Other than these documents, Mr. Agel, do
7  you have any independent recollection of the
8  transaction regarding 515 7th Avenue in Asbury Park?
9      A.  No.
10     Q.  And then -- but if you take a look at
11  Exhibit 7, that's an invoice issued by Coastal Title
12  Agency in the normal course of business?
13     A.  Correct, yes.
14     Q.  Anything look out of the ordinary?
15     A.  No.
16     Q.  Okay.  So this was a request -- the
17  invoice is based on a request I assume from Mr.
18  Yacker for title insurance and searches for 515 7th
19  Avenue?
20     A.  Presumably.
21     Q.  And then the title number, CT 18904 with
22  that (A) in parenthesis and so this was -- do you
23  know if a title commitment was issued on the purchase
24  of 515 7th Avenue?
25     A.  On the (A) file.  (A) part of it or on

Page 159

1  the original part of it?
2      Q.  On the original part of it.
3      A.  I can only assume yes without looking at
4  a file.
5      Q.  That's why the (A) is there?
6      A.  Right.
7      Q.  Okay.  And then if you turn to Exhibit
8  8, which is the January 14, 1997 letter, I would ask
9  if you have seen this document before?
10     A.  Not before today.
11     Q.  You don't recall?
12     A.  I don't recall before today.
13     Q.  And then it appears to be a letter from
14  yourself to Mr. Pepsny.  What was the purpose of this
15  letter?
16     A.  They might have asked for that
17  recognizance to be removed from the title insurance
18  commitment and this was the answer saying no
19  essentially.
20     Q.  And then do you recall if Mr. Pepsny
21  responded to this letter --
22     A.  No, I don't recall that.
23     Q.  -- at this time?
24     A.  No.
25     Q.  Okay.  If you can go to Exhibit 10 then,

Page 160

1  which is the -- I'm sorry, Exhibit 9.  Actually if
2  you could turn to Exhibit 11.  They're slightly out
3  of order.  That's the check from Mr. Yacker's trust
4  account to Coastal Title for the $1,206 payable on
5  the invoice.
6      A.  Yes.
7      Q.  Number seven.  And again it came from
8  your files.  What would happen had you received a
9  payment from Mr. Yacker on one of these properties?
10     A.  As I said last time we would put it in
11  the system for a cover record and, you know, probably
12  this date, January 31st, cover record requests
13  ultimately would have gone to the searcher probably
14  sometime towards mid March because we had the
15  recording backlog we talked about last time.
16     Q.  Right.
17     A.  And so we would have probably put that
18  in for cover record around mid March, probably got it
19  back sometime -- back then I bet it was probably
20  beginning to middle of April.
21     Q.  Okay.
22     A.  And then from there we would have
23  started -- if everything had been done properly, we
24  would have started the process of issuing a policy.
25     Q.  Okay.  What happened with the actual

Page 161

1  proceeds of the check because you've invoiced Mr.
2  Yacker for I assume work -- some work you have
3  already done, some expenses you have already
4  incurred --
5      A.  Right.
6      Q.  -- with searches, but some of it is for
7  work I guess to be done in the future.
8      A.  Not really.  No, that's not the way it
9  works.  The payment is for -- we do work after the
10  file is paid but it's -- that's all part of the filed
11  rates with the State of New Jersey.  You're charged I
12  think in this case 90 or $100, $105 for the basic
13  examination.  That covers everything that we do in
14  terms of the search, examination of the title, all
15  those letters, the cover record, production of the
16  policy.
17     Q.  Okay.  So once you received the check
18  you would just deposit it and then --
19     A.  Right.
20     Q.  -- pay yourself and then some amount
21  would go into your trust account.  Is that correct?
22     A.  Premium trust account.  Premium trust
23  for the underwriters.
24     Q.  To pay the title insurance companies
25  themselves?

6 (Pages 158 to 161)

Page 162

1    A.    Correct.
2    Q.    I think on -- what ends up happening on
3  this one is that no title policy, or at least we
4  can't find a title insurance policy. What happened
5  if you -- if Coastal Title -- or I'm not sure -- if
6  Coastal Title did not issue a title insurance policy
7  on behalf of one of the title companies, what happens
8  to the money you were -- Coastal Title was paid?
9    A.    We still -- when we're paid we assign a
10  policy number to the file and it still gets paid over
11  to the underwriter.
12    Q.    So what happens if for whatever reason
13  the policy is never issued?  Does the underwriter,
14  and by the underwriter I keep saying, the title
15  insurance company --
16    A.    Same thing.
17    Q.    Do they return the money to you to be
18  returned to the purchaser?
19    A.    No, because my understanding is they've
20  got the liability.  They certainly have the liability
21  to the lender for the mortgage policy.  We would --
22  in many cases -- not in many cases, in most cases, if
23  not all, we're bound to issue the mortgage policy
24  even if the attorney didn't do his job and clean up
25  the title.

Page 163

1    Q.    Okay.  So the lender is still insured,
2  it's the actual individual purchaser who doesn't get
3  a policy?
4    A.    Correct.
5    Q.    And is the lender insured through the
6  closing service letter that's issued as well as the
7  policy or through both?
8    A.    Well, through both.  One covers the
9  actions of the attorney or whoever the closing
10  service letter is issued on.  Could be a title
11  company.  One -- that covers the attorney's actions,
12  whether he runs away with the money, doesn't do all
13  of the cleaning up of the title objections.  And the
14  other is the policies -- is for if you don't have a
15  first lien essentially.  Say those judgments were
16  still open and there was a lien.
17    Q.    In a case like this, the -- I will say
18  one of the more egregious examples because I think
19  the closing occurs January 31st of '97, but I think
20  when we get back to the deed, which is Exhibit 13, if
21  you take a look at Exhibit 13, G.J.L., Mr. Kane's
22  d/b/a for Cristo Property Management Company, didn't
23  actually acquire the property until June 3 of '97.
24  So he actually buys this property five months after
25  he's sold it.  What would happen I guess

Page 164

1  search-wise -- I will say title commitment-wise in a
2  case like this?  I assume Mr. Pepsny's put in a
3  request for a title commitment on the purchase and
4  then the sale has got a title commitment number CT
5  18904(A).  I am assuming CT 18904 was the title
6  commitment request on the purchase by Kane, but the
7  purchase itself doesn't conclude until June 3rd of
8  '97.  So these guys are closing the sale in January
9  31st of '97 but they're not buying the property until
10  June 3rd of '97.  What would happen when you ran the
11  searches on this kind of property?
12    A.    Well, we wouldn't pick up -- we wouldn't
13  pick up the deed.
14    Q.    The deed --
15    A.    What you do is you run Faulhaber.
16    Q.    The owner of the property at that time?
17    A.    Correct.  Yes, you would run him out
18  looking for the deed out of Faulhaber.  Not seeing
19  the deed on record, you don't go any further.  I
20  think you're going to see here a letter at some
21  point -- letter dated in July that we found the deed
22  into G.J.L. but no deed out of G.J.L.
23    Q.    That's a letter we've got listed as
24  Exhibit 13.
25    A.    Correct.

Page 165

1    Q.    Okay.  So the invoice is actually dated
2  to Mr. Yacker December 9 of '96.
3    A.    Right.
4    Q.    So they must have put in a request
5  obviously before the closing for the title work?
6    A.    Yeah, sometime prior to December 9th
7  they would put in the request, yes.
8    Q.    So you invoiced them, and then you would
9  have told them that they had no -- or you had not
10  found a deed from Faulhaber, the owners of the
11  property, to J.G.L. or G.J.L., I keep screwing that
12  up?
13    A.    Yeah, probably, yes.
14    Q.    And then what else?  Was there anything
15  else that would have been different from a normal
16  title commitment record search if, in fact, somebody
17  is selling a property months before they actually
18  have possession of it?
19    A.    I'm not sure I understand.
20    Q.    When you ran the searches -- I guess I
21  want to say a normal, but in a closing in which the
22  buyer owns the property --
23    MR. McGOWAN:  Sort of like it's supposed
24  to be.
25    Q.    A normal course of things, the way at

7 (Pages 162 to 165)

Page 166

1  least I bought houses, is there anything different
2  that would come up in the searches because G.J.L. did
3  not own the property until June when you ran searches
4  in, I assume, December or January of '97?
5      A.   No, but that was no different than all
6  of the previous ones that we had done.  Remember we
7  did the search for Pepsny.
8      Q.   Right.
9      A.   We did the commitment for Pepsny saying
10 this is what needs to be cleared up.  We would then
11 get that second order in for the ultimate -- well,
12 straw buyer and we would do the commitment, the clean
13 commitment, so to speak.
14     Q.   The second one?
15     A.   Yes.
16     Q.   With the (A).
17     A.   Always with the understanding that they
18 were closing and buying these things before they sold
19 them.  We didn't find out about them doing this
20 selling before they bought until probably around this
21 time, late in the first quarter of '97 probably.
22     Q.   Okay.
23     A.   Maybe even after that possibly.
24     Q.   And so this letter that's Exhibit 13 is
25 actually July 15?

Page 167

1      A.   Right.
2      Q.   Do you recall having any discussions
3  with Mr. Yacker or Mr. Pepsny once you found out that
4  the property had been sold in January but not
5  purchased until June?
6      A.   I don't know if it was specifically on
7  this file, but we did find that they were closing on
8  some properties, the sale to the straw buyer,
9  after -- or before they purchased the property and,
10 yes, I spoke to -- I am certain we called Yacker, and
11 it would have been me, and I got the usual:  Call
12 Pepsny or Kane.  And I spoke -- vividly remember
13 speaking with Pepsny about it and saying:  This can't
14 happen, we can't do this.  We can't insure.
15     Q.   What was Mr. Pepsny's response?
16     A.   I won't -- we won't let them do that.
17 So he gave me an assurance that it would never happen
18 again but apparently and obviously it did.
19     Q.   Do you recall if Mr. Pepsny ever told
20 you that he thought the dates on deeds that he
21 prepared were being changed by other people, either
22 Yacker's office or Kane?
23     A.   I don't recall that.
24     Q.   As we deposed him yesterday we found a
25 number of deeds which again were sold either in June

Page 168

1  but the buy doesn't occur until September, and he
2  disclaimed any knowledge of that and -- until after
3  the -- these frauds became public.  But you recall
4  talking to him about it before that time?
5      A.   Yes.
6      Q.   And his saying that it wouldn't happen
7  again?
8      A.   Yes.
9      Q.   And then I guess if we can just go back
10 to these exhibits, Mr. Agel, Exhibit 9 is a letter
11 from Sheri Federer of Coastal Title to Richard Pepsny
12 dated April 9, 1997.  Who was Sherry Federer?
13     A.   She was a typist in the office.
14     Q.   And would she have sent this letter out
15 at your direction or someone else's?
16     A.   No, no, she would have done this on her
17 own.
18     Q.   Because she had seen that this -- well,
19 what does this letter say?
20     A.   We're attempting to clear up old files
21 and we can't issue the policy in this case because
22 there was an open mortgage.
23     Q.   And then if you take a look at what's
24 been marked as Coastal Exhibit 10, the letter dated
25 January 28, 1997, that's actually from you?

Page 169

1      A.   Yes.
2      Q.   And again this came from Coastal's
3  production and it was not signed.  Was that because
4  this was a file copy?
5      A.   Correct.
6      Q.   And what does this letter say?
7      A.   Well, he must have given us proofs on a
8  bankruptcy and so we, therefore, omitted to -- any
9  questions we had raised regarding the bankruptcy of
10 that seller and then we are telling him that there
11 are three items that need to be disposed of, open
12 mortgages and a tax sale certificate, the open
13 recognizance and then judgments that are actually
14 against the seller.
15     Q.   And those are the items that are
16 referred to the in the other Coastal letters in the
17 exhibits?
18     A.   Yes.
19     Q.   Okay.  And the last one, just to clear
20 up, is Exhibit 14, which is the May 29? 1997 letter
21 from Christine LaFrance.  Who was Miss LaFrance?
22     A.   She was a title officer at our company.
23     Q.   Is she still there?
24     A.   No.
25     Q.   And then -- this is dated May 29, 1997,

8 (Pages 166 to 169)

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

Page 170

1   which is actually I guess about four months after the
2   closing but the week before Mr. Kane's company
3   acquires title to the property.  Why is she asking
4   for the escrow at this point in time?
5       A.    Because I presume that he called up
6   saying:  We want to close on the sale of this
7   property or the purchase of the property, can you
8   tell me what I need to do in order to get insurable
9   title?
10      Q.    And so what Miss LaFrance is saying is
11  because there's liens and judgments, Coastal Title
12  requires the escrow be held.  Who would actually hold
13  the escrow?
14      A.    Probably Pepsny.
15      Q.    Did Coastal hold escrow for -- back in
16  '96, '97 for issues like this that needed to be
17  cleared up?
18      A.    Yes, we did.
19      Q.    Did you ever hold any escrow accounts
20  for any of the Kane purchases or sales?
21      A.    No, I don't think so.
22      Q.    Now, did this raise any red flags with
23  Coastal since I guess it -- that's what I presume
24  too, that Pepsny wanted to close on the purchase but
25  you had already got an application, had done

Page 171

1   searches, were trying to get mortgages for the sale
2   of the property?
3       A.    Right.  I can tell what I think
4   happened -- and I'm pretty sure this would be the
5   case -- is I am certain we had two files.  We would
6   have an actual physical file, 18904, and we would
7   have a separate physical file for 18904(A).  Probably
8   in January when that file, 18904, was paid, that went
9   into the system for the cover record, etcetera, and
10  the two files were separated.
11          So when Christine was working on this
12  she probably didn't know -- in fact, I am certain she
13  wouldn't know that the other file had closed.
14      Q.    Right.  That the property had already
15  been sold?
16      A.    Right.
17      Q.    And she was still working on the
18  purchase?
19      A.    She would have no idea because she
20  continued the searches and you don't see deeds.
21      Q.    Okay.  And then in this case at least
22  what we can find from searching the deed from G.J.L.
23  to the purchaser, which I want to -- is I guess
24  Viscardo, and the mortgage of Walsh Securities were
25  never recorded as far as we can tell.  Is there any

Page 172

1   way that you can determine from the files you have
2   whether or not the deed or mortgage were ever
3   recorded?
4       A.    No, not -- not at all.  Those -- after
5   this broke those original documents that were not
6   recorded ended up with the FBI.
7       Q.    So any of the originals that Coastal
8   had, I guess there's no way they could be recorded?
9       A.    Not without -- well, no, we were
10  finished.  At that point we were finished, and when
11  the files were turned over to the FBI everything came
12  to a screeching halt.
13      Q.    So this then is a property on which
14  Walsh Securities loaned money and gave a mortgage,
15  the mortgage was executed, the property was sold, the
16  property was then purchased, the deed was finally
17  recorded showing G.J.L. having ownership of the
18  property but the deed to the seller and the mortgage
19  of Walsh Securities were never recorded.  So what is
20  Walsh Securities' recourse with this?  This is why
21  you have the closing protection letter and the title
22  insurance I guess.
23      A.    Yes.  I guess that's why we have this
24  lawsuit going too.
25      Q.    Right.  Do you know how many original

Page 173

1   documents or original files you turned over to the
2   FBI --
3       A.    I don't recall.
4       Q.    -- back in '97?  So I guess as far as
5   you would know any of the originals in those files
6   were never recorded, the deeds and mortgages?
7       A.    Probably not recorded.  I don't know.  I
8   never searched it after that.
9       Q.    Okay.  And that probably explains why we
10  have been -- as we have been searching we haven't
11  found in a number of cases any recorded mortgages or
12  deeds --
13      A.    Right.
14      Q.    -- for these properties.  Right.  Okay.
15  If -- Mr. Pepsny would order a title commitment on
16  the original purchase and Coastal would get paid at
17  that closing.  Correct?
18      A.    In the beginning I'm pretty sure that
19  was the case.  I think one of the reasons -- I don't
20  think that Kane and his companies bought title
21  insurance on their purchase after a while.  They were
22  trying to save some money I guess.  So, no, I don't
23  think they purchased title insurance on the original
24  file.  I don't think they did.
25      Q.    I guess what I'm trying to figure out

9 (Pages 170 to 173)

Page 174

1    is: It almost seems to me that Coastal was doing --
2    if you were doing a search for the purchase and a
3    search for the sale there were kind of overlaps, even
4    though you are getting paid for two distinct
5    transactions. And then if you were only getting paid
6    on the sale you would actually -- seems to me Coastal
7    was doing more work by having to run the searches on
8    the original purchase as well as on the sale. So it
9    seemed to me like -- I wasn't sure it made economic
10   sense.
11       A.    Well, what you would do on the second
12   file is -- all you do is update from the original
13   work, the original commitment, so you're just
14   updating. So the costs are much less and, yeah,
15   it -- these were very -- these were not big money
16   makers for us.
17       Q.    I think when we look back at the files,
18   the (A) in parenthesis came into use, at least as far
19   as we can tell, in June of 1996. Do you have any
20   idea why it started then because we've seen
21   transactions involving Mr. Kane's companies going
22   back to 1995 and the ones involving Walsh Securities
23   actually didn't come into existence until April of
24   '96, so they actually were involved with Walsh's
25   predecessor, a company called GF or Gruntal

Page 175

1    Financial.
2            Do you know why June of '96 was the
3    beginning of the use of the (As) on the title
4    numbers?
5        A.    I don't know why it was that specific
6    date. It all related back to the duplication of work
7    me where Pepsny was doing the work, Yacker said he
8    was doing some work and then Walsh Securities or GF
9    couldn't understand what was going on.
10       Q.    Did you ever speak to anybody at Walsh
11   or GF about whether they were having -- they were
12   confused about what was going on, or was that just
13   information relayed to you by Mr. Kane?
14       A.    It was relayed to us either by Kane or
15   Pepsny or them.
16       Q.    Okay. We haven't gotten documents from
17   Commonwealth yet or not all of them but we've only
18   found so far 17 title insurance policies issued by
19   Commonwealth or I guess issued by Coastal Title on
20   behalf of Commonwealth. And I was trying to sort
21   that out in the time frame of things.
22           Mr. Kane, as I said, or his companies
23   started buying and selling these properties probably
24   in 1995 at least. For this lawsuit I am interested
25   in 1996 or June of '97 and so transactions were

Page 176

1    occurring and on -- in some months there were
2    significant numbers of transactions based on -- I
3    know you had estimated last time that you closed --
4    did about 200 closings a month and we went back and
5    looked. And I think in April of 1997 Mr. Kane's
6    companies sold about 20 properties and I guess about
7    28 in May -- sorry, it's 1996, not 1997. So April of
8    1996 they sold 20 properties and May was about 28.
9    So based on your number of 200, that was about ten
10   percent of or 14 percent of what you were closing
11   that month.
12       A.    When I said 200, number one, that's an
13   average for the year.
14       Q.    Okay.
15       A.    Your volumes change dramatically from
16   month to month. Winter months we might have done a
17   hundred orders. Spring months when business always
18   picks up we might have done 400. So I gave you an
19   average is what that was.
20       Q.    And --
21       A.    Plus there were also other search files,
22   like we don't do just title insurance, we do title
23   searching. So that could have been another 50 or 75
24   files each month too.
25       Q.    So the number of Kane transactions

Page 177

1    initially -- like I said when I looked at that, I
2    said this is kind of substantial at least for those
3    months, 20 or 28 closings, but those closings
4    occurred in 1996, and as I said we've seen
5    transactions back I think into February or maybe
6    January of '96 forward, but I've been trying to
7    determine why there's only 17 title insurance
8    policies issued by Commonwealth, and of the 17, eight
9    of them actually are issued after April of 1997,
10   after you had to file all these deeds and whatnot.
11       A.    Uh-huh.
12       Q.    Do you have any explanation why?
13       A.    Why only 17?
14       Q.    It might be -- do you have any
15   recollection why the policies weren't being issued or
16   they were issued and we just don't have copies of
17   them?
18       A.    We stopped issuing policies after a
19   while because we were told to by Commonwealth and by
20   Fidelity, just stop doing everything, we're not doing
21   anything on these files anymore.
22       Q.    And when was that, Mr. Agel?
23       A.    I can't give you an exact date. It was
24   after everything -- after all hell broke loose, so to
25   speak. After we realized that this was a problem.

10 (Pages 174 to 177)

Page 178

1    Q.    And was that before it was public
2 knowledge or after that time?
3    A.    Probably right around the same time.
4    Q.    Okay. So you received directives not to
5 issue any more title insurance policies --
6    A.    Right.
7    Q.    -- in the June, July '97 time frame?
8    A.    Probably around then. Maybe sooner but
9 I don't think it was a lot sooner.
10    Q.    Do you have any explanation then why
11 policies would not have been issued from February '96
12 forward or they were and we just don't have copies of
13 them?
14    A.    I'm thinking you didn't get copies.
15    Q.    But there's nothing systemic you recall
16 that you were told by either Commonwealth or
17 Fidelity: We're not going to issue title insurance
18 policies in 1996 or the beginning of 1997?
19    A.    No, no.
20    Q.    Okay. You said just before that you
21 told Mr. Pepsny at one point that there's something
22 wrong here so we're not going to issue any more
23 policies. Do you recall when that conversation was?
24    A.    No.
25    Q.    Do you recall having any conversation

Page 179

1 with anyone at Walsh Securities about what you told
2 Mr. Pepsny?
3    A.    Never.
4    Q.    Was there any reason why not?
5    A.    I never had contact with anyone at Walsh
6 Securities. We weren't the closing agent so we
7 wouldn't deal with the lender.
8    Q.    Okay. Do you recall if anyone from
9 Walsh Securities ever contacted you as the title
10 agent?
11    A.    No.
12    Q.    Did you ever speak to anyone named Fred
13 Schlessinger?
14    A.    I know who he is, but, no, I don't think
15 so.
16    Q.    How about Art Garber?
17    A.    No.
18    Q.    Or Arnold Cohen?
19    A.    No.
20    Q.    Have you ever spoken to Bob Walsh?
21    A.    No.
22    Q.    How about Jim Walsh?
23    A.    No.
24    Q.    Betty Ann DeMola?
25    A.    No.

Page 180

1    Q.    Kelly O'Neill?
2    A.    No.
3    Q.    You said you may have met Mr. D'Apolito
4 at some point?
5    A.    Possibly.
6    Q.    Okay. I guess the other two people
7 whose names have come up from Walsh Securities was a
8 fellow named Paul Del Rosso --
9    A.    No.
10    Q.    -- who was a head underwriter. Or Peter
11 Trebour?
12    A.    No.
13    Q.    Quality control. One of the things we
14 discussed earlier, Mr. Agel, was Coastal's
15 involvement when claims came in from Walsh Securities
16 on these policies. And you testified, I believe in a
17 nutshell, that you had turned over your files to the
18 title companies.
19    A.    Correct.
20    Q.    And then I guess -- I think I had asked
21 you whether you were ever interviewed by the title
22 companies as part of their -- or do you know if the
23 title companies conducted an investigation of the
24 claims?
25    A.    I don't know. I assume so.

Page 181

1    Q.    Were you ever interviewed by any of the
2 underwriters or in-house attorneys or outside counsel
3 for the title companies?
4    A.    I don't think so, no.
5    Q.    Did you do any -- Coastal Title do any
6 sort of investigation on your own?
7    A.    No, not after -- no.
8    Q.    So you didn't interview anybody or take
9 notes or --
10    A.    No.
11    Q.    -- any of that stuff. Okay. What is
12 Coastal's protocol for investigating a claim when it
13 comes in?
14    A.    What we do is turn the file over to the
15 underwriter immediately. It's contractual between
16 us. And I turn it over and we don't know half the
17 time what happens in a claim.
18    Q.    Is it usual for you to be -- or to
19 answer questions from the title companies or the
20 underwriters in a claim?
21    A.    It happens, yes.
22    Q.    And how is that done? Telephonically?
23    A.    Yes.
24    Q.    What happens if the -- if there's a
25 lawsuit, if the insured sues either Coastal or the

11 (Pages 178 to 181)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

3e478b50-37d1-4229-9354-18292c3c480e

Page 182

1  title company? Does the claim investigation continue
2  or does it stop at that point?
3      A.    You're the first one for me.
4      Q.    Okay. Do you know what happened to --
5  well, you said Coastal did not conduct an
6  investigation. Do you know what happened to the
7  investigation at the title company level once the
8  lawsuit was filed?
9      A.    No.
10     Q.    So you never discussed that with them?
11     A.    No.
12     Q.    What about there was the lawsuit we
13  discussed between NHF and Coastal and Commonwealth?
14  Did Coastal conduct any sort of internal
15  investigation as a result of that lawsuit or those
16  claims?
17     A.    No.
18     Q.    Do you know if Commonwealth undertook an
19  investigation?
20     A.    No, I don't.
21     Q.    So you were not contacted by
22  Commonwealth to provide information about the NHF
23  lawsuit?
24     A.    No.
25     Q.    And you said that that case was settled

Page 183

1  by a payment from your carrier and some by
2  Commonwealth. Do you know if Commonwealth paid any
3  portion of its share on -- of the money Commonwealth
4  paid on Coastal's behalf --
5      A.    I don't think so.
6      Q.    -- in the NHF suit? Did Commonwealth
7  pay Coastal any money as a result of the Walsh
8  lawsuit?
9      A.    No.
10     Q.    How about any of the underlying
11  properties? Was any money refunded from Commonwealth
12  to Coastal Title?
13     A.    No.
14     Q.    During our last deposition you said you
15  had spoken to the underwriters for Commonwealth and
16  Fidelity on a regular basis regarding the Kane
17  transactions, and you said the underwriter, the
18  in-house counsel I am more used to calling her, is
19  Miss Koch from Commonwealth or was Miss Koch. Did
20  you ever meet her in person?
21     A.    Yes. Not about these files but I've met
22  her many times.
23     Q.    Okay. And then that was going to be my
24  next --
25     A.    Sorry.

Page 184

1      Q.    That's okay. When was the last time you
2  spoke to Miss Koch?
3      A.    I couldn't tell you; it's a long time.
4      Q.    Do you recall when she left
5  Commonwealth?
6      A.    I think it's in the last few years.
7      Q.    Coastal had ceased doing business with
8  Commonwealth?
9      A.    Correct.
10     Q.    I guess after this whole --
11     A.    Correct.
12     Q.    -- thing broke. Mr. Agel, previously we
13  were discussing Coastal Title being told by the title
14  companies not to issue these title insurance
15  policies. Do you recall discussing with Miss Koch or
16  anyone from Fidelity whether you should tell the
17  lender, Walsh Securities, what you uncovered with
18  these properties?
19     A.    No.
20     Q.    Do you recall them ever telling you not
21  to tell Walsh Securities what had happened?
22     A.    No.
23     Q.    Did you have a fiduciary duty to inform
24  Walsh Securities who was the insured of what was
25  going on?

Page 185

1          MR. KOTT: I object to the form of the
2  question.
3          MR. McGOVERN: I object to the form of
4  that also. Legal conclusion but you can answer it.
5      Q.    I am asking for your understanding.
6      A.    No.
7      Q.    We had talked prior about the cover
8  searches. And when we went back and looked at the
9  deeds recorded by Coastal Title in April of 1997 some
10  of them stretched back as far as closings from June
11  of 1996. Do you know why it took so long to uncover
12  this pattern that Mr. Yacker had not been filing the
13  deeds or mortgages as required?
14         MR. McGOWAN: Number one, I think that
15  was asked and answered last time, but you can go
16  ahead and answer if you can. I don't know how he
17  knows what Yacker was doing.
18     A.    I don't know.
19     Q.    My question to you is: Since you
20  were -- since Coastal Title was doing the bring down
21  searches, why did it take so long for Coastal to
22  determine that deeds and mortgages weren't being
23  filed?
24     A.    I don't know. I don't recall. I can
25  tell you that we -- once we found out we contacted

12 (Pages 182 to 185)

Page 186

1  them. I don't think -- I don't recall it happening
2  in 1996. I only recall it happening late '96, early
3  '97.
4      Q.   I'm saying June -- based on what was
5  filed by Coastal Title and recorded it was your --
6  like I said it was about 150 deeds and mortgages
7  recorded April 8th and 9th in Monmouth County.
8      A.   I thought that was in '97.
9      Q.   In '97 it was, but some of the deeds and
10  mortgages that were being recorded were from closings
11  in June of '96.
12     A.   That's possible.
13     Q.   And -- but I was just trying to figure
14  out why there was a ten-month lag between closings
15  and deeds not being filed and then --
16     A.   You would be shocked at how many
17  attorneys don't record deeds on time.
18     Q.   But in numbers like this?
19     A.   This was a very small percentage of our
20  business so I didn't pay that much attention.
21     Q.   Okay.
22          (A recess takes place.)
23     Q.   Mr. Agel, continuing on. Last time we
24  discussed, Mr. Agel, Mr. Kane had given you a check
25  for 50 to 60,000 to cover the recording fees and

Page 187

1  taxes and various things like that. We actually came
2  upon --
3          (Coastal-15, Copy of Check, is received
4  and marked for identification.)
5      Q.   Mr. Agel, speaking of trust accounts, I
6  show you what we've marked as Exhibit 15, which is a
7  check, and as I said this came up in our discussions
8  last time about the payment of what you thought was
9  between 50 and $60,000. And if you look at the
10  actual check here it's a payment of 50,000 to Coastal
11  Title Agency and I think that says "escrow
12  account" --
13     A.   Uh-huh, yes, it does.
14     Q.   -- on the check. Did Coastal Title
15  Agency have an escrow account?
16     A.   Yes.
17     Q.   Is that your -- where Coastal Title
18  regularly received payments from attorneys?
19     A.   No.
20     Q.   And this is actually -- while it says
21  Cicalese 488 on the bottom it's actually a
22  treasurer's check from Summit Bank and it's dated
23  April 1 of 1997.
24          Does this refresh your recollection of
25  whether you received a check from Mr. Kane or

Page 188

1  possibly Mr. Cicalese on behalf of Mr. Kane?
2      A.   It does now, yes.
3      Q.   Do you think this was the check to pay
4  all the recording fees?
5      A.   It had to be.
6      Q.   Was there any other reason Coastal Title
7  would have received a treasurer's check from an
8  attorney for, I'll say, a regular closing, a regular
9  residential closing?
10     A.   Not unless we were holding an escrow.
11     Q.   And you earlier testified that the
12  escrows were held by the lawyers on the Kane Company
13  transactions.
14     A.   Correct.
15     Q.   Okay. Sorry about jumping around.
16  Going back to the documents that you gave to the FBI,
17  was there -- why did Coastal Title turn over the
18  original documents as opposed to a copy to the FBI?
19     A.   I don't recall. I really don't recall.
20     Q.   And you cannot record copies of the
21  deeds and mortgages?
22     A.   No.
23     Q.   Last time we spoke, Mr. Agel, you
24  testified that you thought officers of Walsh
25  Securities were involved in the fraud and you cited

Page 189

1  to the fact that Betty Ann DeMola, who you thought
2  was an officer based on newspaper accounts, had pled
3  guilty to something. Do you know what the charges
4  were against Miss DeMola?
5      A.   No.
6      Q.   Do you know what she actually pled
7  guilty to?
8      A.   I don't recall.
9      Q.   You also had testified that before these
10  frauds became public you were contacted by a reporter
11  at some point?
12     A.   Yes.
13     Q.   Do you recall whether -- the reporter
14  was from what paper?
15     A.   The Asbury Park Press.
16     Q.   Do you remember the name of the
17  reporter?
18     A.   Yes, Nancy Shields.
19     Q.   And then did you have any discussions
20  with Miss Shields?
21     A.   Yes.
22     Q.   And what did you discuss with her?
23     A.   Just the -- we had recorded all of those
24  deeds and she wanted to -- you know, I guess
25  background information on it, and I don't recall

13 (Pages 186 to 189)

VERITEXT REPORTING COMPANY

Page 190

1  exactly what we discussed there or what I told her.
2  It was so long ago.
3      Q.   Did you ever get a copy of her notes or
4  a transcript of what you said or anything like that?
5      A.   No.
6      Q.   Do you recall if you were quoted in the
7  paper?
8      A.   I think once.
9      Q.   When you spoke to Miss Shields were you
10 still doing business with Mr. Kane and Mr. Pepsny and
11 I guess at that point Cicalese?
12     A.   Probably.
13     Q.   Did you speak to Kane or Pepsny or
14 Cicalese about being contacted by the reporter?
15     A.   You know, I remember talking to them but
16 I don't remember whether it was after or before the
17 story hit the paper. I just don't remember.
18     Q.   Do you remember the substance of the
19 conversations?
20     A.   Well, at the time I thought they were
21 still good guys and I told them that I'm sorry you
22 have to deal with this and that kind of thing really.
23     Q.   Did they give you any assurances or tell
24 you anything?
25     A.   Yes. They gave me assurance that they

Page 191

1  were on the up and up and they were the real deal and
2  this was all fabrication on the press's part.
3      Q.   And then you also had said you had met
4  with the FBI at some point.
5      A.   Yes. Yes.
6      Q.   And do you recall when that was?
7      A.   Sometime in early '97 I think it was. I
8  don't know for sure.
9      Q.   In 1997 or 1998 time frame-wise --
10     A.   There were a couple of -- once was with
11 the agent Tom Jobs, and the other time was with
12 actually the U.S. Attorney Alan Leibman.
13     Q.   And so do you recall that being before
14 the frauds became public or after?
15     A.   Jobs was before and Leibman was
16 definitely after.
17     Q.   When did you meet with -- was it just
18 Tom Jobs or someone else?
19     A.   No, Larry Willis, he was the county
20 prosecutor.
21     Q.   Prosecutor?
22     A.   Or not prosecutor. He was the
23 investigator.
24     Q.   For the Monmouth County Prosecutor's
25 Office.

Page 192

1      A.   Right.
2      Q.   When did you meet with them?
3      A.   Like I said, I think either late '96,
4  early '97. I am not 100 percent certain. That was
5  before the story broke in the paper. I'm almost
6  positive.
7      Q.   Was it before you recorded all these
8  deeds and mortgages?
9      A.   You know, I don't recall. I think it
10 was after.
11     Q.   After that. Okay. What was the purpose
12 of that meeting?
13     A.   They were interviewing me, gathering
14 information on their investigation.
15     Q.   Did they tell you you were a subject or
16 a target of the investigation?
17     A.   They told me I was not.
18     Q.   Okay. Off the record.
19          (A discussion takes place off the
20 record).
21     Q.   What did you discuss at the meeting with
22 them?
23     A.   Oh, God, just -- it's -- kind of what
24 we're doing here, the whole process. It can almost
25 be a carbon copy of the last two times we met.

Page 193

1      Q.   So the title process?
2      A.   Yes.
3      Q.   And how the transactions were occurring?
4      A.   Right.
5      Q.   And things like that. And then I assume
6  it was after that meeting that you turned over these
7  original documents to them?
8      A.   Yeah, I'm sure it was. I am certain it
9  was.
10     Q.   Okay. And that was sometime after this
11 -- the frauds became public?
12     A.   Yes. When we turned over the documents?
13     Q.   Right.
14     A.   I'm sure that was after this became
15 public.
16     Q.   Do you recall if you received a subpoena
17 from the U.S. Attorney's Office to turn over the
18 documents?
19     A.   I don't recall.
20     Q.   Who handled that for you?
21     A.   My attorney, Jim Aaron.
22     Q.   Mr. Agel, what were Coastal's profits
23 for the last three years?
24     A.   These last three years?
25     Q.   I'll expand the question if necessary

14  (Pages 190 to 193)

VERITEXT REPORTING COMPANY

Page 194

1  but I'll start with that.
2      A.   Next to zero.
3      Q.   When was the prior year that Coastal was
4  profitable?
5      A.   Well, I shouldn't say zero.  We had a
6  profit last year, miniscule, maybe $50,000.  The two
7  prior years I think we did show losses, and then
8  prior to that I guess the last profitable year was
9  2007.
10     Q.   And what were Coastal's profits at that
11  time?
12     A.   Probably around $200,000.
13     Q.   Has the profits -- did they fluctuate
14  through the 2000s --
15     A.   Yes.
16     Q.   -- or have they been somewhat
17  consistent -- what was the most profitable Coastal
18  was in the 2000s?
19     A.   Two and a half, $3 million.
20     Q.   And what year was that?
21     A.   If I had to pick a year it would have
22  been 2005.
23     Q.   Okay.  Mr. Agel, I'll ask you to take a
24  look at two documents, which we had previously
25  marked, which I believe are exhibits King-3 and

Page 195

1  King-4.
2      A.   Yes.
3      Q.   And they're again from the deposition of
4  Lorraine King.  And I ask you just to take a look at
5  the two of them.
6      A.   Okay.
7      Q.   My first question is:  Other than the
8  handwriting covering the two title insurance
9  commitments, these were title insurance commitments
10  issued by Coastal Title?
11     A.   Correct.
12     Q.   And then do you recognize any of the
13  handwriting on either exhibit King-3 or exhibit
14  King-4?
15     A.   Yes.
16     Q.   Whose handwriting do you recognize?
17     A.   The handwriting in the top right.
18     Q.   And you're pointing to King-3?
19     A.   On King-3 and King-4, the one on the
20  right says, "RD Rose 7/18," and the "CR 8/5," that's
21  an employee.  I don't know which employee that was.
22  I can't remember.  I just know that that's how we did
23  that.  That meant -- RD Rose 7/18 was that was run
24  down -- our searcher's name was Rose and it was run
25  down on 7/18.

Page 196

1      Q.   On July 18?
2      A.   Yes.  And the other one, the CR, that's
3  when the cover record would have been ordered.
4      Q.   On August 5?
5      A.   August 5, yes, or it would have gone
6  into the system for cover on August 5.
7      Q.   And on King-3 there's a series of other
8  things, checks?
9      A.   Yes.
10     Q.   Jill Montanye.  Do you recognize any of
11  those other --
12     A.   Yes.  Those are my searcher's notes.
13  Where they did the -- in this case it's the cover
14  record.  These are essentially the same thing.  But,
15  yeah, that's my searcher's notes.  They write down,
16  they look in the index and they -- that's the deed
17  book or mortgage book and page 6166, recording date.
18     Q.   On King-3?
19     A.   Yes.  And down on the bottom are the two
20  deeds.
21     Q.   The 5589?
22     A.   Dash 39 and 45, yes.
23     Q.   Okay.  And then what is the series of
24  checks on the left-hand side, do you know?
25     A.   Those are the books that the searcher

Page 197

1  ran judgments, liens, that's just significance, that
2  they checked those books for any liens that might
3  have been intervening between the date of the rundown
4  and the date of the original commitment and the date
5  of closing -- and date of recording of the documents.
6      Q.   Okay.  And then the document that's
7  listed on or as exhibit King-3, that says File Number
8  CT-17767 so that's the Coastal Title title number?
9      A.   Yes.
10     Q.   Okay.  And then the exhibit King-4 has
11  got the same number with the capital A?
12     A.   Correct.
13     Q.   King-3 was for the purchase and King-4
14  was for the sale?
15     A.   Correct.
16     Q.   Why is -- the commitment date on both
17  King-3 and King-4 is June 16, 1996.  Why is that the
18  same?
19     A.   You know, it might be -- sometimes they
20  order the title work for both transactions the same
21  time.
22     Q.   Who would have ordered it?  Mr. Pepsny?
23     A.   The original file would have been
24  definitely Pepsny.  The second file must have been --
25  it should have been Yacker but I couldn't tell you

15 (Pages 194 to 197)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

3e478b50-37d1-4229-9354-18292c3c480e

Page 198

1   for sure.
2       Q.   It may not have been?
3       A.   It may not have been.
4       Q.   So the commitment date was always the
5   date that the commitment was ordered?
6       A.   No.  No, that's the date that we can
7   search through in County Hall of Records.
8       Q.   Up through June 16, '96?
9       A.   That's the furthest we could search that
10  property at that time.
11      Q.   Both King-3 and King-4 have the
12  handwritten date of 7/8/96 on it --
13      A.   Yes.
14      Q.   -- next to the commitment date.  Do you
15  know what that date was?
16      A.   That would be the date probably of the
17  rundown.  That would be the next date where if we ran
18  it down -- say we ran it down July 18, Monmouth
19  County back then was about ten days behind in
20  indexing so that's the date we searched through.
21      Q.   Through.  Okay.  So that was the same
22  date for both the purchase and the sale?
23      A.   Correct.  But they might have used --
24  it's a different commitment.  So, yeah, they might
25  have run them both down the same day.

Page 199

1       Q.   The proposed insured on King-3, the
2   purchaser is Cristo Property?
3       A.   Right.
4       Q.   The proposed insured on King-4 is Jill
5   Montanye.  Somebody wrote Jill Montanye's name on
6   King-3.  Do you know why that would have been done?
7       A.   Because they picked up the deed into her
8   on there so they went and they ran Jill Montanye on
9   mortgages, that's why.
10      Q.   That's what that is there.
11      A.   These -- down here at the bottom, the D
12  and the M, that's deed and mortgage.  So they ran
13  the -- originally they ran Freidman who was owner.
14      Q.   The original owner?
15      A.   And they picked up book 5589, page 39.
16  That would have been the deed probably into Cristo.
17  They then would have run Cristo and that's when they
18  picked the deed into Montanye.  And that's just
19  the searcher's -- internal notes essentially.
20      Q.   These were deeds then that Coastal filed
21  because of the April 8, 1997 date?
22      A.   Yeah, probably.
23      Q.   Okay.  And then one thing I guess I'm
24  somewhat confused on is the King Exhibit 3 in
25  paragraph -- actually let me ask this question first.

Page 200

1   Paragraph two, there's two -- an A and a B and little
2   empty boxes for the ALTA residential and nothing is
3   checked in paragraph two on King Exhibit 3 for the
4   purchase but 2(a), the first box is checked,
5   Residential Title Insurance Policy, One- to
6   Four-Family Residences on the same title commitment
7   which is King-4.  Why was that?
8       A.   That is just probably a mistake.
9   Something might not have been entered into the
10  computer properly because the computer would
11  automatically choose -- we put in whether it's a
12  commercial or residential property.  The ALTA owner,
13  that's only issued on commercial properties.  So
14  somebody didn't fill in whether it was a commercial
15  or a residential property on this one.
16      Q.   On the purchase, on King-3?
17      A.   Right.
18      Q.   Okay.  And then going down to paragraph
19  three and it says:  Fee simple interest on King-3 and
20  the land is own by Norman Freidman and Arline,
21  A-r-l-i-n-e, Freidman as of -- I guess what I viewed
22  it as the commitment date of June 16, '96?
23      A.   As of that date.  Correct.
24      Q.   And then on King-4, which is the sale to
25  Miss Montanye, paragraph three, the fee simple says

Page 201

1   the property is owned by Cristo Property Management
2   on the same date so I don't know, am I
3   misunderstanding this?
4       A.   No, you're not.
5       Q.   Okay.  The open-ended question:  Why or
6   how -- why is the title commitment showing that the
7   Freidmans own the property at the same time Cristo
8   owns the property?
9       A.   It goes back to the conversations with
10  Pepsny and Kane about getting the clean commitments
11  to the lender.
12      Q.   So the title insurance commitment that
13  was going to the lender is King-4?
14      A.   Yes.
15      Q.   And then is there any reason why
16  paragraph three, it says it's owned by Cristo from
17  the Freidmans and it says dated blank, records blank,
18  but on paragraph three on King-3 it says the deed
19  dated January 23, 1982 recorded February 13, 1986,
20  that deed information is not filled in in paragraph
21  three on King-4?
22      A.   Yeah, because the deed wasn't recorded.
23      Q.   Is there anything unusual about that?
24      A.   Yes.
25      Q.   And so normally these title insurance

                                16 (Pages 198 to 201)

Page 202

1  commitments would have the deed information filled
2  in?
3       A.    Correct.
4       Q.    And was it Mr. Kane's properties -- I
5  assume a lot of them didn't have the deeds filled
6  in --
7       A.    Correct.
8       Q.    -- because of this. Did you have any
9  other clients in which you had the same kind of issue
10 where the deeds were not -- deed information was not
11 filled in?
12      A.    No.
13      Q.    And it's only because the deed from the
14 Freidmans to Cristo Property had not been recorded
15 already?
16      A.    Correct.
17      Q.    On King-4 there's these little symbols
18 under paragraph four. Do you know what they are?
19      A.    Yes, that's -- that was the cover
20 record. They're looking for the deeds from Cristo to
21 Montanye and the mortgage from Montanye to National
22 Home Funding. The "N" with a line through it, that's
23 searcher's lingo for "none."
24      Q.    "None"?
25      A.    Yes.

Page 203

1       Q.    So there's no deed and no mortgage
2  recorded at that time?
3       A.    Right.
4       Q.    And then the number off to the
5  right-hand side, 7/64?
6       A.    You know, I don't know. I just don't
7  remember. It's been a long time since we did
8  searches this way. I never did these searches, I
9  hired people to do them so -- I don't remember. We
10 do it all by computer now.
11      Q.    That's what I thought and I just
12 couldn't fathom what that number represented.
13      A.    I'm with you.
14      Q.    Okay. I guess on that note we will take
15 a lunch break then.
16           (A lunch recess takes place.)
17      Q.    Mr. Agel, I ask you to look a what was
18 mark as King Exhibit 23 --
19      A.    Uh-huh.
20      Q.    -- which purports to be a memorandum
21 from Lory King to Sally dated March 26, 1997, Re:
22 Binders needed, and ask you to take a look at this
23 and let me know if you have seen this before.
24      A.    I have seen memoranda like this. I
25 don't know if I saw this one in particular.

Page 204

1       Q.    This is actually Bates stamped FY 8932,
2  which is produced by Fidelity as opposed to Nations
3  Title. Do you have any idea how Fidelity obtained a
4  copy of this memo?
5       A.    It would apparently have been in our
6  file.
7       Q.    And so what was the purpose of Miss King
8  sending Sally this memo?
9       A.    This would be the order for the title,
10 title commitment.
11      Q.    Okay. Is this generally how they came
12 in from Mr. Kane's sales, a group of them at a time?
13      A.    Not always a group at a time. Some came
14 in individually, some came in like this.
15      Q.    So I've seen -- we've seen the order for
16 the purpose -- from Mr. Alfieri's office and I think
17 I'm fairly sure by March of 1997 Mr. Kane had begun
18 using Mr. Cicalese although Miss King continued to
19 work on Mr. Kane's transactions whether she was at
20 Yacker's office or Cicalese. So she's sending this
21 then over. And do you recall: How would Mr. Yacker
22 send you correspondence requesting a title binder be
23 ordered?
24      A.    I think the same way.
25      Q.    Just in a memo form like this?

Page 205

1       A.    Yeah, I think so.
2       Q.    Would a copy of this memo go in each of
3  these --
4       A.    Yes.
5       Q.    -- files?
6       A.    Yes.
7       Q.    Mr. Agel, I'm going to show you three
8  exhibits that were previously marked in the
9  deposition of Lorraine King. They're King-16, which
10 is a mortgage between Walsh Securities and Alphonse
11 and Elaine Salvatoriello for the purpose of
12 purchasing a property at 155 Chelsea Avenue in Long
13 Branch, and attached to that is the deed between
14 Salvatoriellos and Capital Assets, which I have been
15 calling the joint venture deed, the 60/40, which is
16 also dated July 26 of 1996, and then there's also a
17 deed between Cristo Property and the Salvatoriellos
18 dated July 26, 1996 and all of these are Bates
19 stamped SYSW 4519 through 4525, and they were all
20 produced by Mr. Yacker.
21           And then while you look at that I will
22 also introduce an exhibit King-17 from Miss King's
23 deposition, which is also from Mr. Yacker's files
24 Bates stamped SYSW 4516 through 4518. And that is a
25 letter from the City of Long Branch dated May 13,

Page 206

1    1997 enclosing another letter dated April 18, 1997
2    from the tax assessor to Mr. Yacker.
3          And then the last exhibit is King-18,
4    which is again produced from Mr. Yacker's files,
5    Bates stamped SYSW 4536 through 4546, and this is a
6    document for recording Mr. Yacker sent to the
7    Monmouth County Clerk I believe on February 10, 1997.
8    And these are documents again with the -- concerning
9    the sale of the 155 Chelsea Avenue between Cristo and
10   the Salvatoriellos and ask you just to take a look at
11   those.
12      A.    Okay.
13      Q.    I ask you: Do you have any recollection
14   beyond looking at these documents for any issues
15   concerning the sale of 155 Chelsea Avenue?
16      A.    No.
17      Q.    And do you recall seeing the mortgage
18   before this date, what is marked as King-16?
19      A.    No.
20      Q.    Was there any reason you would see that
21   as part of your file on the property?
22      A.    If I had worked on it, on that file at
23   that time, sure, I would have seen it.
24      Q.    The mortgage would have been in --
25      A.    If recorded, yes.

Page 207

1       Q.    If recorded. Okay. And then this deed,
2    if you turn to the second page of Exhibit 16, SYSW
3    4520, that's the joint venture deed --
4       A.    Right.
5       Q.    -- as you said. Would those be in your
6    file?
7       A.    Probably if we recorded it, yes. I
8    probably would have picked it up in the search if we
9    didn't record it.
10      Q.    If it had been recorded you would have
11   picked it up.
12      A.    Uh-huh.
13      Q.    And then if you could turn to the page
14   that's Bates stamp SYSW 04523.
15      A.    Right.
16      Q.    And this is the deed date July 26, 1996
17   between Cristo and the Salvatoriellos, the -- there's
18   a paragraph typed in at the bottom that says: "Being
19   the same premises conveyed to the grantor herein by
20   deed from D&Sons Construction Corp. dated August 9,
21   1995 and intended to be recorded in the Monmouth
22   County Clerk's Office simultaneously herewith and
23   immediately prior hereto."
24          Do you have any idea why that was put on
25   this deed? It's not something we have seen on all

Page 208

1    the other deeds.
2       A.    I don't know why it was put on this one
3    and not other ones, but that's pretty normal language
4    to find in a deed that -- when you had one of these
5    flip transactions.
6       Q.    So this would indicate to you that
7    D&Sons is the original owner of the property?
8       A.    Right.
9       Q.    And then they were going to deed it to
10   Cristo who's already sold it to the Salvatoriellos?
11      A.    Yes.
12      Q.    These are instructions to the clerk?
13      A.    No, that's just the recital as to how
14   you took title to the property or how Cristo took
15   title to the property.
16      Q.    And then if you could take a look at
17   what's marked as King-17. So I guess according to
18   that Cristo got title from D&Sons Construction?
19      A.    Yes.
20      Q.    Okay. And then if you take a look at
21   King-17, I would ask you to let me know if you have
22   ever seen this --
23      A.    No.
24      Q.    -- before today? And then did Coastal
25   Title ever receive copies of correspondence from the

Page 209

1    tax assessor that were sent to counsel?
2       A.    No.
3       Q.    Would counsel contact Coastal if they
4    received a copy of correspondence similar to Exhibit
5    17?
6       A.    Meaning Yacker or Pepsny?
7       Q.    Right.
8       A.    I would have liked them to.
9       Q.    Do you recall them ever doing that?
10      A.    No.
11      Q.    This attached letter, April 18, says
12   there was no record of transferring title from D&Sons
13   Construction to Cristo.
14          Now, Mr. Pepsny testified yesterday he
15   became aware of this occurring because some of the
16   original sellers were still being contacted by the
17   tax assessor or people like that and title had never
18   been transferred so he said that was an indication to
19   his law firm that the deeds had not been recorded.
20      A.    Right.
21      Q.    Do you recall any discussion with Mr.
22   Pepsny about that?
23      A.    No.
24      Q.    So do you recall anything about any of
25   the cover searches on 155 Chelsea that you could not

18 (Pages 206 to 209)

Page 210

1  locate the deed from D&Sons to Cristo?
2      A.    No.
3      Q.    If you take a look at King Exhibit 18,
4  as I said it's a memorandum to record documents from
5  Mr. Yacker. Have you ever seen this group of
6  documents before?
7      A.    I've seen this form. I wouldn't
8  particularly remember -- I wouldn't remember this
9  one. I wouldn't remember individual ones but I have
10  seen that form.
11      Q.    Okay. And then -- this form was used by
12  Mr. Yacker to send documents to the -- to the county
13  clerk for recording.
14      A.    Yes.
15      Q.    Okay. And then in the documents that
16  Mr. Yacker sent in for recording there was no deed
17  from D&Sons Construction to Cristo. And I'll
18  represent to you we've done searches at the County
19  Clerk's office and the deed from D&Sons to Cristo was
20  never recorded. Even as of last --
21      MS. WAGNER: Last month.
22      Q.    How does a failure to record the deed
23  transferring property from D&Sons to Cristo impact
24  the deed transferring the property from Cristo to
25  Salvatoriello?

Page 211

1      MR. KOTT: I object to the form.
2      MR. McGOWAN: You can answer if you can.
3      A.    It impacts it by making it useless
4  essentially. The title is still vested -- would be
5  vested in D&Sons at that time.
6      Q.    And so as we said we just have learned
7  that it still -- apparently the deed was never
8  transferred to Cristo so the Salvatoriellos never
9  actually took title to the property?
10      A.    They had color of title. They would
11  have a claim to title. They would have -- you know,
12  you would have to get that deed out of D&Sons in
13  order to get them insurable title. But these -- I
14  shouldn't say all of them, but a lot of these have
15  been cleaned up through the foreclosure process.
16  There were orders, you know, recording copies of
17  deeds as a part of an order, and mortgages, things
18  like that.
19      Q.    When you talk about the foreclosure
20  process, was that after the frauds became public?
21      A.    Yes.
22      Q.    Okay. So not during the foreclosure
23  process when Mr. Kane was acquiring properties?
24      A.    Right, right.
25      Q.    Okay. So how does the lack of deed

Page 212

1  between D&Sons and Cristo impact Walsh Securities
2  which was the lender?
3      MR. KOTT: Object to the form.
4      MS. ELGART: Objection.
5      MR. McGOWAN: You can answer.
6      A.    They have an outstanding interest in the
7  property of D&Sons.
8      Q.    Again, as we discussed, that's why we
9  have title insurance policies.
10      MR. KOTT: Object to the form.
11      MS. ELGART: Objection.
12      Q.    That they would make a claim under?
13      MR. McGOWAN: You can answer.
14      A.    That's why they have -- in the end I
15  think that was more of a closing service letter.
16      Q.    Action that was covered by the closing
17  service letter?
18      A.    Right. We did not issue -- I could
19  guaranty you I did not issue a policy on that file if
20  we didn't pick up a deed out of D&Sons. I can
21  guaranty it.
22      Q.    So even though a title insurance policy
23  was never issued, the closing protection letter is
24  still valid?
25      MR. KOTT: Object to the form.

Page 213

1      MR. McGOWAN: You can answer.
2      MS. ELGART: Objection.
3      A.    That's above my pay grade. Military
4  terms.
5      MR. KOTT: The witness sustained my
6  objection.
7      MR. MAGNANINI: Actually he didn't. He
8  said his wife would know, not him.
9      Q.    Okay. Like a case like this when you
10  said -- I may be repeating myself -- for 155 Chelsea
11  since -- if you had picked up that there was no deed
12  from D&Sons Construction to Cristo, you would not
13  have issued a title insurance policy, even though
14  Coastal Title had been paid for it at closing?
15      A.    Correct, yes.
16      Q.    And even though the closing protection
17  letter had been paid for as well?
18      A.    Right.
19      Q.    And so I'm still -- you just kept the
20  money or what would happen?
21      A.    No. It got paid over to Commonwealth or
22  Fidelity. Remember we segregated that money, we
23  assigned the policy number and we remitted on it. I
24  mean, they would have been paid.
25      Q.    I understand that, but if you came upon

19 (Pages 210 to 213)

Page 214

1 something like this where you could not issue title
2 insurance because of this deed that's never recorded,
3 so as far as you're concerned title still vests in
4 D&Sons and never vested with Cristo despite them
5 selling it?
6     A.    No insurable title vested in them.
7     Q.    And so if a title insurance policy
8 couldn't be issued, wouldn't the title insurance
9 companies be obligated to refund the money?
10         MR. KOTT:  Object to the form.
11         MS. ELGART:  Objection.
12     A.    I don't think so.
13         MR. KOTT:  Can I ask the witness a
14 question?  I think what Mr. Magnanini is asking you
15 is:  If you don't issue a policy, in that situation
16 you have been paid, do you send that money to the
17 title insurance companies where you don't issue a
18 policy or do you return it to the --
19         THE WITNESS:  No, it goes to the
20 insurer, it goes to Commonwealth or Fidelity.
21         MR. KOTT:  Even where no policy was
22 issued?
23         THE WITNESS:  Right.  Because in the end
24 we're still asking for objections to be cleared.
25 That is an objection that could be cleared.  You saw

Page 215

1 those letters to Pepsny saying:  Open mortgages.  If
2 it had gone that far -- remember this was at the time
3 when this thing started to fall apart.  Everybody
4 stopped doing everything on these files.  So they
5 stopped clearing up any objections and so we just --
6 that's when we stopped issuing policies, but if this
7 had been ongoing they would have -- presumably they
8 would have cleared this up like they cleared up every
9 other objection.
10     Q.    By obtaining the deed from D&Sons to
11 Cristo?
12     A.    That's right.
13     Q.    Okay.  And so then you've already paid
14 the title insurance companies.  Once that objection
15 is cleared you just issue the policy?
16     A.    Correct.
17     Q.    Okay.  I'm just having -- I'm so used to
18 having money -- especially in a residential consumer
19 type of thing the money would be refunded, but you're
20 saying if in the end you determined you could not
21 issue the title policy the title insurance company
22 kept the money?
23     A.    Or we would go one step further at times
24 and we might put that in the policy as an exception
25 to title.

Page 216

1     Q.    Still issue a policy?
2     A.    And have an exception.  We've done that
3 many times.  You finally just give up on the attorney
4 doing his job properly.  I hate to disparage
5 attorneys but --
6     Q.    It comes with the job.
7     A.    No, we get disparaged too but I will put
8 that in as an exception.  We will put a letter out
9 that says:  Here's your policy, here's the exception,
10 give us proof that it's been properly cleared and we
11 will do an endorsement to omit it.  That's when we
12 finally just give up.
13         So these policies probably would have
14 been issued at some point with an exception in it,
15 but it all stopped, everything came to a stop.
16     Q.    Okay.  And it came to a stop because you
17 were directed not to issue the policies?
18     A.    In the end, yes.
19     Q.    So just so I clear it out of my head,
20 outside of Mr. Kane's companies' transactions have
21 you ever had a situation where you have returned the
22 money you were paid for the title insurance or
23 closing protection letter to the closing lawyer?
24     A.    To the attorney?
25     Q.    To the attorney to give back because

Page 217

1 title insurance couldn't -- I guess where I'm
2 confused, I mean, as I said before as soon as you --
3 there's a lender involved, you get a request for
4 title insurance, the closing protection letter is
5 issued.  That's paid for.  You've done a number of
6 searches and there's a basic search charge of 105.
7 That's for services rendered, but if no policy ever
8 gets issued, the $875 on that example, have you ever
9 had a situation where it was returned from the title
10 company to you and then returned to the closing
11 attorney?
12     A.    No.
13     Q.    Okay.  Off the record.
14         (A discussion takes place off the
15 record).
16     Q.    Mr. Agel, I've shown you a series of
17 exhibits that we've used at Commonwealth's 30(b)6
18 depositions and they were on May 27th and they're
19 marked Commonwealth Exhibit 8 through Commonwealth
20 18, and I'll just go through and identify them for
21 the record.
22         Commonwealth Exhibit 8 is a deed between
23 Osis Corporation and G.J.L. Limited dated December
24 19, 1996 transferring title to 138 Ridge Avenue in
25 Asbury Park and prepared by Mark Steinberg.  And then

Page 218

1  Exhibit 9 is a deed which is actually from Coastal's
2  files, Exhibit 9, CTB 1198 to 1200, which is a deed
3  dated December 31, 1996 between G.J.L. Limited and
4  Rafael Bustos Senior conveying 138 Ridge. Exhibit 10
5  is again from Coastal's files, Bates stamped CTB 1202
6  to 1204, which is the joint venture deed, as I have
7  been calling it, from Mr. Bustos conveying 60 percent
8  interest in 138 Ridge Avenue to Capital Assets
9  Property Management and 40 percent to Mr. Bustos
10  dated January 7, 1997.
11       MR. McGOWAN: The last two exhibits you
12  said a deed from Coastal. What you mean is from the
13  Coastal Bates stamping.
14       MR. MAGNANINI: Produced by Coastal,
15  Marty, yes.
16       Q.  And then the next, Exhibit 11, also was
17  produced by Coastal. It's Bates stamped CTB 1154
18  through 1166, which is a title insurance policy.
19       A.  No, this is a commitment.
20       Q.  Title insurance commitment from
21  Commonwealth Land Title Insurance Company. Exhibit
22  12 is also from -- produced by Coastal, Bates stamped
23  CTB 1188 to 1192, which is Commonwealth title
24  insurance commitment with an (A) in it. So on the
25  sale from Coastal to Mr. Bustos.

Page 219

1       Exhibit 13 is an invoice from Coastal
2  Title Agency to Stanley Yacker dated October 30, 1996
3  for title insurance policy, closing service letter
4  and searches on 138 Ridge Avenue produced by Coastal
5  Title and Bates stamped CTB 1150 and 1151. And then
6  the next exhibit is actually listed as 6(A).
7       A.  Right.
8       Q.  Do you have that? That's a closing
9  service letter to National Home Funding, its
10  successors and assigns. The Re is: Stanley Yacker
11  as attorney on the transaction of 138 Ridge Avenue
12  and that's produced from -- that's actually from
13  Walsh Securities wire transfer. That's what that
14  stands for, 505 and 506. And then we had -- the next
15  exhibit is Commonwealth number 15 which is a copy of
16  Mr. Yacker's trust fund and ledger, Bates stamped
17  SYSW 7085 through 70 -- sorry. I guess it's 7083 to
18  7086. Just out of order.
19       And the next exhibit was Commonwealth
20  number 14, which was Bates stamped CTB 11 -- or 1205
21  and it's a check from Mr. Yacker to Coastal Title.
22  And the next exhibit is Commonwealth 16, which was
23  from Coastal's file as well as, as you see, CTB 1234,
24  and then the next item was Commonwealth 17, which was
25  produced by Walsh Securities, Bates stamped 44744 to

Page 220

1  44746 and is the closing instructions from Walsh
2  Securities. And then the last is Commonwealth 18,
3  which is the final judgment on a tax lien on the
4  property at 138 Ridge Avenue, which I believe we got
5  from the Superior Court in the County of Monmouth
6  which was filed --
7       A.  You got this off the county website.
8       Q.  Yes. And so that was filed July 31,
9  2002. Mr. Agel, I ask you to take a look at this
10  compilation of documents. I guess you've had a
11  chance to review it.
12       On the Commonwealth Exhibit 8 what does
13  the "R and R" mean on the top right-hand written in?
14       A.  Record and return.
15       Q.  So that means this deed had been filed
16  by the offices of Michael Alfieri and would be
17  returned to them?
18       A.  Correct.
19       Q.  And so this -- this deed shows that
20  G.J.L. Limited acquired 138 Ridge on December 19,
21  1996?
22       A.  Correct.
23       MR. KOTT: Is that a 19 or 16?
24       THE WITNESS: Looks like a 16.
25       Q.  It might be December 16. How much did

Page 221

1  G.J.L. Limited purchase this property for?
2       A.  It says $1,500 and payment of all
3  outstanding taxes, sewer charges and interest.
4       Q.  Turning to the next exhibit,
5  Commonwealth-9, this "R and R" means this deed was
6  supposed to be returned to Mr. Yacker?
7       A.  Correct.
8       Q.  And it was prepared by Mr. Pepsny?
9       A.  Yes.
10       Q.  As the seller's attorney?
11       A.  Yes.
12       Q.  And what is the sale price?
13       A.  $186,500.
14       Q.  And so that two weeks after it was
15  purchased for $1,500 --
16       A.  It wasn't purchased for $1,500. Plus
17  the outstanding sewer and tax bills, and I've seen
18  this before, and I've seen those numbers be huge,
19  enormous numbers. You can look on a closing
20  statement and figure out what it was. It was not
21  $1,500. They gave her $1,500 and paid off all the
22  debts. So that could be anywhere from $1,500 and
23  186. I am sure it wasn't 186 though.
24       Q.  At Coastal would you get copies of the
25  HUD-1, the closing statement for the purchases that

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

3e478b50-37d1-4229-9354-18292c3c480e

Page 222

1   Mr. Kane made?
2       A.   You know, I don't remember if we did or
3   didn't.  We love to get them, we prefer to get them,
4   we beg for them, but we don't always get them, and I
5   just don't remember if we got HUDs from them.
6       Q.   It wasn't -- I guess while it was
7   preferred it wasn't required?
8       A.   That's correct.
9       Q.   You couldn't make it mandatory?
10      A.   No.
11      Q.   On the Exhibit No. 8 there's a -- well,
12  there's both a stamp from County of Monmouth and then
13  there's a copy of the receipt filing.
14      A.   Yeah.  That's on the final judgment
15  you're talking about?
16      Q.   No.  On the initial -- the one from Osis
17  to G.J.L.
18      A.   Yeah.  And what was the question?
19      Q.   This shows that this deed was filed by
20  or filed with Monmouth County.  Correct?
21      A.   Yes.
22      Q.   And then the next deed, which is Exhibit
23  No. 9, does not have either the Monmouth County stamp
24  or the receipt showing the payment of the fees.
25      A.   Correct.

Page 223

1       Q.   And I guess my question is:  Would you
2   have -- this deed came from Coastal's files.  Would
3   you have unrecorded deeds or you retained copies of
4   deeds that were to be filed?
5       A.   We retained copies of everything we
6   filed.  This probably is one of the ones where maybe
7   the original went to the FBI.
8       Q.   Well, it's from December of '96.  I was
9   wondering if it was one of the ones that had been
10  filed in April of '97.
11      A.   It's possible.  You would have to go on
12  line and see.
13      Q.   Okay.  Miss Wagner is pointing out to me
14  that this deed was never filed transferring ownership
15  from G.J.L. to the Bustos.
16      A.   It's my recollection there were a fair
17  amount of deeds that were not recorded, that just
18  didn't get recorded.
19      Q.   Even beyond the large group that you
20  filed?
21      A.   Yes.
22      Q.   And even from the time period prior to
23  you filing those deeds?
24      A.   I don't know what time period they would
25  be from, when we closed them.  I do remember that

Page 224

1   there were more deeds that were supposed to be
2   recorded that did not get recorded for similar
3   reasons -- not similar, for the same reasons as the
4   previous batch, the one that we recorded, that large
5   batch that we recorded.
6       Q.   Right.
7       A.   There were more that had the same
8   problem where Yacker didn't have money in his trust
9   account to pay transfer taxes and recording fees.
10      Q.   Did you have any discussions with Mr.
11  Yacker or Mr. Pepsny about those, the deeds that you
12  weren't able to record?
13      A.   The second group?  Probably but I don't
14  recall.
15      Q.   Did you ever file a second -- actually
16  last time when we talked I thought you said that
17  there might have been another batch.
18      A.   Yes, I think there was and this could be
19  part of that batch.
20      Q.   So they were filed by Coastal?
21      A.   The first batch, yes, they were all
22  filed by Coastal.
23      Q.   And then was a second batch of deeds and
24  mortgages filed by Coastal?
25      A.   I don't think so.  I think we were

Page 225

1   trying to get those deeds.  That was right around the
2   time that everything blew up and we just pretty much
3   washed our hands of doing business with them at that
4   point.
5       Q.   So other than that $50,000 payment that
6   you recalled, which may have come from Mr. Cicalese,
7   you never got paid money by Mr. Cicalese or Mr.
8   Pepsny or Mr. Kane to file any other batch of deeds?
9       A.   No.
10      Q.   That may explain why Exhibit 9 was never
11  filed.  Then if you take a look at Commonwealth
12  Exhibit 10, which was the joint venture deed?
13      A.   Yes.
14      Q.   That's prepared by Lorraine King.  Is
15  there anything improper about having a non-attorney
16  prepare a deed?
17      A.   I think it's incredibly unusual.  You
18  know, I guess that would be up to a judge whether
19  it's the unauthorized practice of law.
20      Q.   In your experience you don't see that --
21      A.   We see it.
22      Q.   -- too often?
23      A.   I sold a house a couple of years ago and
24  I prepared the deed.  I mean, anyone can prepare a
25  document.  Just a question of whether you charge and

VERITEXT  REPORTING  COMPANY

212-267-6868                                      516-608-2400

3e478b50-37d1-4229-9354-18292c3c480e

Page 226

1  you give legal advice while doing it.  It's unusual
2  but it's not --
3      Q.   She was receiving $250 a closing.
4      A.   I think she would have a problem then.
5      Q.   Why would this deed -- do you know why
6  would this have record and return to Mr. Yacker?
7      A.   I don't know.
8      Q.   If you can go to the next exhibit, which
9  is the title commitment, and the date on that is
10 October 14, 1996.  And then this one, again the file
11 number is CT 18724 with an (A) in parenthesis.  So
12 that's showing that this was the commitment on the
13 sale to Mr. Bustos?
14     A.   Right.
15     Q.   When you ran the searches at this point,
16 October 14, 1996, that would have shown that Osis
17 Corp. still owned the property since the deed didn't
18 transfer until December 16?
19     A.   Yes.  That would be in the file without
20 the (A).
21     Q.   Okay.  And then -- so on the file with
22 the (A) you wouldn't annotate that -- you would have
23 this paragraph three which has got --
24     A.   The blanks.
25     Q.   -- the blanks in it because at that

Page 227

1  point in time Cristo doesn't have possession --
2      A.   Correct.
3      Q.   -- of the property.  Mr. Agel, if you
4  can flip to CTB 1159, in that exhibit there's a list
5  of exceptions.
6      A.   Yes.
7      Q.   Down at the bottom it says,
8  "Countersigned By," it says "Authorized Signatory."
9  Who would sign that?
10     A.   Me.
11     Q.   So again because this is a file copy I
12 assume it's not signed?
13     A.   Correct.
14     Q.   On the next page as well there's the
15 ALTA endorsement form number one.  Says
16 "Countersigned By."
17     A.   Also me.
18     Q.   And I assume on 1161, the environmental
19 protection letter.
20     A.   Correct.
21     Q.   You would sign all of these?
22     A.   Yes.  These are specimens of what would
23 be attached to the final policy.
24     Q.   Okay.  So before the final title policy
25 issued I guess you would be able to fill in the

Page 228

1  missing spaces in paragraph three?
2      A.   Correct.
3      Q.   But not until you had actually seen that
4  the deed had been filed?
5      A.   Correct.
6      Q.   The deed between Osis and Cristo?
7      A.   Correct.
8      Q.   Another "what if" question.  On Exhibit
9  11, page 1157, if you have a chance.
10     A.   Same.
11     Q.   That you had.
12     A.   Okay.
13     Q.   It says under C-1, "You must have the
14 deed by Cristo to the proposed insureds."  What if in
15 the interim between Cristo buying the property Osis
16 sold it to someone else and Cristo had already then
17 sold it to Bustos.  What happens to Bustos at that
18 point?
19     A.   They got a big problem.  They don't own
20 it.  I mean, they have got legal remedies against
21 Osis, I mean, but -- actually not Osis.
22     Q.   It would be against Cristo.
23     A.   Against Cristo, and Cristo would have a
24 basis to sue them.
25     Q.   Would they also have remedy through the

Page 229

1  title policy?
2      A.   If we had issued a policy with no
3  exceptions, yes.
4      Q.   What happens if it occurred while you
5  were still -- you had issued a title commitment but
6  not a policy?
7          MR. KOTT:  I object to the form.
8          MS. ELGART:  Objection.
9          MR. McGOWAN:  You can answer it.
10     A.   You know, I don't know what would
11 happen.  I have never seen it happen.
12     Q.   Okay.  And then the lender would have
13 recourse through the closing service letter if they
14 already lent money to Bustos on the sale from -- or
15 the purchase from Bustos to Cristo?
16         MR. KOTT:  Excuse me.  Object to the
17 form.
18         MS. ELGART:  Objection.
19         MR. McGOWAN:  You can answer.
20     A.   Possibly.
21     Q.   Why possibly?
22     A.   Because once again that's above my pay
23 grade.  That's just -- that's in the claims
24 department.  That's way beyond us.
25     Q.   And then Commonwealth Exhibit 12, is

23 (Pages 226 to 229)

Page 230

1  this called a marked-up title commitment?
2      A.    No.  This is what -- we looked at this
3  earlier on another file.  This is the work product
4  for the searchers.  They're doing a cover record.
5      Q.    What is a marked-up title commitment?
6      A.    That's when a title officer or the
7  attorney, depends on who is at the closing, marks up
8  the title commitment to show that the requirements
9  have been met, that, for instance, everything in
10  Schedule B, Section 1 would be marked "omit" as long
11  as everything in Schedule B, all requirements, were
12  complied with.  And you would -- in this case we
13  would omit everything -- probably items one through
14  five on Schedule B, Section 2 and the other items
15  would remain as exceptions.
16      Q.    As exceptions.  Okay.  Could you issue
17  title insurance if you did not receive the marked-up
18  title commitment back from the closing attorney?
19      A.    We rarely get marked-up title
20  commitments.
21      Q.    You rarely receive them?
22      A.    To this day.
23      Q.    Okay.  So you just -- even if it's not
24  marked up you go ahead and run your cover searches
25  and then issue your title insurance policy?

Page 231

1      A.    Yes.
2            (A discussion takes place off the
3  record).
4      Q.    On Exhibit 12, Mr. Agel, requirements
5  under D.  It says: "You must tell us in writing the
6  name of anyone not referred to in this commitment who
7  will get an interest in the land or who will make a
8  loan on the land.  We may then take additional
9  requirements or exceptions."
10            And my question is:  The joint venture
11  deeds that we had talked about earlier, did that --
12  did you know about those prior to issuing the
13  commitment or do they somehow violate what's being
14  requested here.
15            MR. KOTT:  I object to the form.
16            MR. McGOWAN:  I object to the form as
17  well.
18            MS. ELGART:  Objection.
19      Q.    It's a compound question but you can
20  answer.
21      A.    We didn't know about the second deed.
22  We didn't know about the second deed until after they
23  were recorded, when they first started recording
24  them.
25      Q.    So initially Mr. Yacker I would assume

Page 232

1  as the buyer's attorney or Mr. Pepsny as the seller's
2  attorney, nobody discussed with you that at the
3  closing the straw buyer would convey 60 percent of
4  their interest in the property to a -- another
5  entity?
6      A.    Correct.
7      Q.    So under D, they should have revealed
8  that to you?
9      A.    Yes.
10      Q.    What would have happened if they
11  revealed it at that time?
12      A.    We would have called for the deed -- we
13  would make it a requirement that the deed get
14  recorded, that we search those people.  That we do --
15  and conceivably that we insure them.  It's just part
16  of the information gathering process that we -- we
17  don't know what we would do unless we got that
18  answer.
19      Q.    Because you didn't learn it, what
20  happened -- or what did you do once you learned about
21  it, once you had to file these -- those deeds in
22  April of '97?
23      A.    Well, I think there were deeds into --
24  the joint venture deeds.  I think that there were
25  joint venture deeds recorded prior to '97.  I think

Page 233

1  they did them -- they didn't do them simultaneously
2  at first.
3      Q.    Why not?  Do you know?
4      A.    I don't know.  But we did not -- we
5  called and we asked -- that's when we asked what was
6  going on.  What are we insuring?  Are we insuring the
7  joint venture deed or are we insuring the deed into
8  the purchase money mortgagors.
9      Q.    Who did you have that conversation with?
10      A.    That would probably have been Yacker.
11      Q.    And do you recall if Mr. Yacker
12  responded or did he direct you to Mr. Pepsny?
13      A.    No.  In that case I am pretty sure he
14  responded directly.  He had to get back to me.  I
15  don't know who he spoke to but he did not get back to
16  me -- he didn't tell me on that telephone
17  conversation.
18      Q.    Would it have been more expensive for
19  Kane to insure the joint venture and the individual
20  buyers as opposed to just the individual buyer?
21      A.    I don't think so, not materially.  A few
22  dollars.
23      Q.    Can you think of any reason why they
24  told you not to insure the joint venture other than
25  them not wanting it to --

24  (Pages 230 to 233)

Page 234

1    A.   No.
2    Q.   -- be known?  Okay.  I ask you to take a
3  look at Exhibit 13 and tell me what that is.
4    A.   That's an invoice issued by Coastal
5  Title Agency to Stanley Yacker on 138 Ridge Avenue in
6  Asbury Park.
7    Q.   Okay.  And that's a form you regularly
8  used in the course of your business?
9    A.   Yes.
10    Q.   If you could take a look at Exhibit 6
11  (A).
12    A.   Yes.
13    Q.   And tell me what that is.
14    A.   That's a closing service letter.
15         MR. KOTT:  I object to the form.
16         MS. ELGART:  Objection.
17         MR. McGOWAN:  You can answer.
18    A.   Closing service letter.
19    Q.   And then if you go to the second page
20  that Bates stamped WSWT 506, is that your signature
21  on the bottom?
22    A.   It could be -- yeah.  It's evolved over
23  the years.
24    Q.   Did you sign these letters by hand or it
25  was a stamp?

Page 235

1    A.   No.  Everything would have been signed
2  by hand.
3    Q.   Do you know why the closing service
4  letters we've seen or some that we've seen, I'll say,
5  from either Fidelity or Nations had a Subparagraph F
6  on the second page?
7    A.   I don't recall what that said.
8    Q.   Okay.  Do you know why the forms of
9  closing protection letters were different between
10  Fidelity and Commonwealth?
11         MR. KOTT:  Object to the form.
12         MS. ELGART:  Objection.
13         MR. McGOWAN:  You can answer.
14    A.   Every company files their own forms with
15  the Department of Insurance, and while they're fairly
16  uniform they vary slightly.
17    Q.   So it wasn't unusual that each of the
18  letters weren't exactly the same?
19    A.   Not unusual at all.
20    Q.   The date of this closing service letter
21  is October 30, 1996.  And as we've seen from
22  Commonwealth Exhibit 8, the deed -- G.J.L. did not
23  obtain title until December 16 of 1996.  Did the
24  issuance of this letter, the closing letter, before
25  the acquisition of the property by G.J.L. create any

Page 236

1  problems?
2         MR. KOTT:  Object to form.
3         MS. ELGART:  Objection.
4         MR. McGOWAN:  You can answer.
5    A.   No, not at all.
6    Q.   Because this is insuring the lender
7  against, as you said before, the malfeasance of the
8  closing attorney?
9         MR. KOTT:  Object to form.
10         MS. ELGART:  Objection.
11         MR. McGOWAN:  You can answer.
12    A.   Yes.
13    Q.   If you will skip ahead to exhibit
14  Commonwealth 15.  This -- I'll represent to you it's
15  a printout from Mr. Yacker's trust account, which was
16  kept manually but subsequently digitalized by the
17  federal government.  And so -- actually if you go to
18  the last page of the exhibit, which is Bates stamp
19  7084, you will see the handwritten --
20    A.   I see it.
21    Q.   And then if you can take a look on the
22  third page, which is 7083, and look on the second
23  entry under 138 Ridge Avenue, it's the GL account.
24  ID is 26050.  Do you see that where it says "title
25  fees"?

Page 237

1    A.   Yes.
2    Q.   And so that's a payment to Coastal Title
3  of $1,113 for -- actually I guess pursuant to the
4  invoice that we showed you as one of the prior
5  exhibits?
6    A.   Yes.
7    Q.   And then if you look down there's
8  another payment.  It's under that GL account on D
9  column, it's the fifth line down.  It's number 2625
10  and it says, Monmouth County Clerk, Bustos Junior,
11  and it says, 707.50.  Do you know what that payment
12  would be for?
13    A.   RTF is realty transfer fees.
14    Q.   So that was the recording --
15    A.   No, the realty transfer tax.
16    Q.   The tax.  Okay.
17    A.   The next line is recording fees.
18    Q.   The line that says --
19    A.   26250.
20    Q.   The $81?
21    A.   Correct.
22    Q.   And then if you take a look underneath
23  each of those lines there's a cancellation, a voiding
24  of the check, the realty transfer fee, of 707.50 and
25  then a check voiding of the $81 of recording fees.

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

3e478b50-37d1-4229-9354-18292c3c480e

Page 238

1  And so do you know why Mr. Yacker would void the
2  checks for the transfer fees and the recording fees?
3          MS. ELGART: Objection as to form.
4      A.   I could only guess.
5      Q.   And you don't know -- do you recall
6  having any discussions about Mr. Yacker about why he
7  wasn't filing the deeds?
8      A.   No. I tried to. He just avoided me.
9      Q.   Did you have any discussions with Mr.
10 Pepsny or Mr. Kane that Yacker had cut checks but
11 then cancelled or voided them and that's why -- and
12 never filed the deeds?
13     A.   No, and until I saw this I never knew
14 that he was voiding deeds -- or checks, excuse me.
15     Q.   Voiding the checks for the filing.
16     A.   Yeah, I had no idea that was happening.
17         MR. McGOWAN: You thought he wasn't
18 writing them in the first place?
19         THE WITNESS: Yes, that's what I
20 thought.
21     Q.   It's an odd -- you agree it's an odd
22 thing to do?
23     A.   Very.
24     Q.   At the closing you prepared the checks
25 for everybody. He clearly sent you the check, he

Page 239

1  sent money to Mr. Kane and Mr. Pepsny, and for some
2  reason all of these transfer and recording checks are
3  voided.
4      A.   Yes.
5      Q.   But you never had any discussions with
6  anybody about it back then?
7      A.   No, no, this is the first time I've seen
8  that checks were ever even written.
9      Q.   Can you take a look at -- on 7084, that
10 line nine is the payment to Coastal for the title
11 insurance, the searches and the closing protection
12 letter, 1,113.
13     A.   Correct.
14     Q.   For some reason he's also listed the
15 realty transfer fee and the recording fees?
16     A.   Right.
17     Q.   And then -- okay. If you can take a
18 look at Exhibit 14, that again -- that's actually
19 from your -- Coastal's records, the check from Mr.
20 Yacker for the $1,113. Did Coastal retain copies of
21 all of the payment checks it received?
22     A.   It was normal practice, yes.
23     Q.   Where were these checks kept?
24     A.   This would have been in the file.
25     Q.   In the file with everything?

Page 240

1      A.   Yes.
2      Q.   Okay. You didn't keep them in some
3  other file that you had copied?
4      A.   No.
5      Q.   So this was just part of the files you
6  had copied?
7      A.   Correct.
8      Q.   And then if you take a look at what we
9  had marked as Commonwealth 16, which was produced
10 from Coastal's files, and it's Bates stamped CTB 1234
11 and just tell me what that is.
12     A.   That's our file copy of the summary of
13 the transaction. It just tells what is happening.
14 It's an order for Stanley Yacker, owners and
15 mortgage, purchase price, mortgage amount, the
16 seller's name, buyer's name, the lender and then the
17 property location.
18     Q.   And where was this document maintained?
19     A.   This was in the file. This would be the
20 first piece of paper that we generate on an order.
21     Q.   So was this the cover page?
22     A.   This would be at the bottom.
23     Q.   And then if you can go to Commonwealth
24 Exhibit 17.
25     A.   Yes.

Page 241

1      Q.   On the first page of Exhibit 17 it says
2  under B, "Conditions to be satisfied prior to
3  disbursement of loan proceeds," and it says, "All
4  liens, judgments, mortgages must be satisfied at
5  closing." How would the lender know what liens,
6  judgments and mortgages to be satisfied at closing
7  there were?
8      A.   Through the title commitment.
9      Q.   Okay. And who would do the -- these
10 were instructions to the closing attorney?
11     A.   Right.
12     Q.   So this was -- these are instructions
13 from Walsh Securities to Mr. Yacker to complete these
14 requirements before he disbursed the funds?
15     A.   Right.
16     Q.   Do you understand that Walsh Securities
17 was table funding these loans?
18     A.   I don't know what that is.
19     Q.   That they were -- even though the loans
20 were brokered by National Home Funding who dealt with
21 the individual and got all the privacy statement and
22 things like that, the money was actually wired
23 directly by Walsh Securities to the closing attorney
24 at the closing table?
25     A.   No, I wasn't aware of that.

26 (Pages 238 to 241)

## Page 242

1  Q.   On liens, judgments and mortgages to be
2  satisfied, if they're not listed on the title
3  commitment how would the lender know what was
4  necessary to be satisfied?
5  A.   I don't think they would know.
6  Q.   So the -- that double commitment, if the
7  lender only saw the title commitment for the sale of
8  the property and not the purchase, it wouldn't know
9  what issues were outstanding related to the property?
10  A.   Not if they didn't see that first
11  commitment.
12  Q.   The first commitment.  And then,
13  Mr. Agel, on the third page of that, which is 47746,
14  is a -- the settlement agent is listed as Stanley
15  Yacker.  And this shows how the payment is being
16  applied.  Would you ever get a copy of this sheet?
17  A.   No, we never did, not on these.
18  Q.   How about the closing instructions?
19  A.   No.
20  Q.   Did you ever get a copy of that?
21  A.   No.
22  Q.   Do you get them on other transactions?
23  A.   Sometimes.
24  Q.   Is there any rhyme or reason why you get
25  some and not others?

## Page 243

1  A.   We're not the settlement agent.  They
2  generally only go to the settlement agent.
3  Q.   So if you were doing the closing --
4  A.   Then we will get the closing
5  instructions, yeah.
6  Q.   And then -- but otherwise in the normal
7  course you don't receive them from the closing
8  attorney?
9  A.   Very rarely.
10  Q.   Okay.  Why do you receive them?
11  A.   Generally on commercial transactions.
12  Q.   Okay.  And then if you can go to what's
13  been marked as Commonwealth 18, which as I said is a
14  printout from the county website showing that 138
15  Ridge Avenue was actually -- remained in G.J.L.
16  Limited's name and was sold in a tax sale on and
17  final judgment entered July 31 of 2002.  Are you
18  familiar with tax sales?
19  A.   Yes.
20  Q.   And then is this document -- I don't
21  want to say standard, but this is the document that's
22  entered showing that the tax sale has been concluded.
23  A.   Yes, the final judgment and the tax --
24  foreclosure, excuse me.
25  Q.   And so as a result of this final

## Page 244

1  judgment G.J.L. is no longer in possession of the
2  property?
3  MR. McGOWAN:  There's a difference
4  between ownership and possession.
5  A.   They no longer own it.
6  Q.   They no longer own it so it's now owned
7  by the city of Asbury Park?
8  A.   As of August 23, 2002 it was, yes.
9  Q.   And then Asbury Park is free to sell it?
10  A.   Yes.
11  Q.   Do you know why -- because we have these
12  deeds from G.J.L. to Mr. Bustos.  Do you know why Mr.
13  Bustos is not listed as the owner on last tax
14  duplicate or last owner I guess is a simpler way of
15  saying it?
16  A.   Because his deed wasn't recorded.
17  Q.   Okay.  The deed from G.J.L. to Bustos?
18  A.   Correct.
19  Q.   Okay.  And so do you know if the
20  mortgage was ever recorded from Walsh Securities to
21  Mr. Bustos?
22  A.   I doubt it.  I don't know but I would
23  doubt it.
24  Q.   But if the deed was never recorded from
25  G.J.L. to Mr. Bustos there was no way for Walsh

## Page 245

1  Securities to foreclose on this property?
2  MR. KOTT:  Can I have that question back
3  again.
4  (The pending question is read by the
5  court reporter.)
6  A.   No, that's not the case.  Many of these
7  mortgages were foreclosed and properties sold.  What
8  they did, and it happens a lot, not just Asbury Park
9  and Cristo Property.  If the documents aren't
10  recorded, then the bank brings an action and asks to
11  have a lien placed on the property as part of their
12  foreclosure.  They can do that and they have done it.
13  I have insured probably dozens of properties that
14  that's happened on.
15  Q.   Do you know if that happened on the
16  Cristo --
17  A.   It did happen on some, I know that, yes.
18  Q.   Who was the -- do you know who got the
19  lien?
20  A.   Various lenders.  Some were Cityscape,
21  some were Banker's Trust.  Those are the only ones I
22  recall at this point but there might be others, but
23  those are the only ones that I have seen were
24  Cityscape and Banker's Trust.
25  Q.   Were you involved in that at all?

27 (Pages 242 to 245)

Page 246

1    A.    No, just insuring sales of them out of
2  the bank. Say if the bank -- after the bank
3  completed the foreclosure.
4    Q.    And obtained title?
5    A.    Right. They would then sell the
6  property and I happen to do a big foreclosure
7  business so we would just insure the sales out.
8    Q.    Out of the entity who obtained title?
9    A.    Yes.
10    Q.    Going back to the closing instructions,
11  Exhibit 17, is there an industry standard for closing
12  instructions?
13        MR. KOTT: Object to the form.
14        MS. ELGART: Objection.
15        MR. McGOWAN: As do I. This man is here
16  as a corporate -- representative of a corporation,
17  he's not here as an expert witness. But he can
18  answer the question.
19    Q.    Or are there essential elements to
20  closing instructions?
21        MR. KOTT: Same objection.
22        MS. ELGART: Objection.
23    A.    I couldn't answer that question anyway.
24  I just don't know.
25    Q.    You just don't know. Okay.

Page 247

1        (A recess takes place.)
2    Q.    A few more questions, Mr. Agel. Were
3  you ever contacted by any of the straw buyers of
4  these properties?
5    A.    No.
6    Q.    When we took a look at the transactions
7  that Mr. Kane's companies selling the properties
8  there were 51 sales between April second and June 5,
9  1997. Do you recall when you told either Mr. Kane,
10  Pepsny or I guess at that point Mr. Cicalese when you
11  would no longer be doing business with them?
12    A.    It was probably sometime in June.
13  Probably. I think.
14    Q.    And that's the best --
15    A.    Best guess.
16    Q.    -- that you have? The last couple of
17  questions. Last time we talked about approved
18  attorneys or unapproved attorneys, as you called
19  them, on the list. I think you had testified that if
20  an attorney was unapproved you could ask the title
21  company for an exception if you wanted to work with
22  them?
23    A.    Correct.
24    Q.    And I think you also had testified as
25  far as you knew neither Yacker, Cicalese, Pepsny or

Page 248

1  Alfieri were unapproved until after this whole thing
2  broke?
3    A.    Correct.
4    Q.    And then I think you said you
5  continued -- you had stopped doing work with Yacker
6  before these frauds were made public?
7    A.    Yes.
8    Q.    And then you -- did you do any work with
9  Mr. Cicalese after the frauds were made public?
10    A.    I don't think so, no.
11    Q.    And then I think you testified that you
12  did do some work with Mr. Pepsny for a while up until
13  the time, I think you said, you thought he left Mr.
14  Alfieri?
15    A.    Yes.
16    Q.    Okay. Which Mr. Pepsny testified
17  yesterday that was November of '97 he got an
18  opportunity to leave. Do you recall: Did you
19  continue to do business with Mr. Alfieri?
20    A.    Probably for a while after that. I
21  don't know -- I don't recall when we stopped doing
22  business with Michael.
23    Q.    Was it in the '90s or --
24    A.    I think it was in the 2000s. I think it
25  was a couple of years later.

Page 249

1    Q.    Do you recall if you did any business
2  with Mr. Pepsny after he left the firm of what was
3  Alfieri & Pepsny?
4    A.    It's possible but it wasn't much. I
5  doubt it. It's possible but I don't think so.
6    Q.    And then on the -- the closing
7  protection letters cover actions of approved
8  attorneys. Could Coastal suggest to the title
9  companies certain attorneys should be approved?
10    A.    We could request it. You know, it's
11  pretty standard practice that if you're in the green
12  section of the Law Diary, then you're an approved
13  attorney.
14    Q.    I believe that's what Miss Sullivan
15  testified at Commonwealth, if you had a license you
16  were --
17    A.    You were approved.
18    Q.    You were approved. Okay. I guess I
19  should ask the question: Back in '96, '97 was there
20  or did you have a definition for an approved
21  attorney, or was it that they were licensed and not
22  on the unapproved list?
23    A.    That's correct. If you're in that green
24  section of the Law Diary and you're not on the
25  unapproved list, you're approved.

28  (Pages 246 to 249)

VERITEXT REPORTING COMPANY

Page 250

```
1       Q.   Okay.  Did Coastal decide to use an
2    attorney or did the title company, or did the
3    attorney come to Coastal?
4       A.   I don't follow you.
5       Q.   Well, I guess part of it -- how did you
6    get -- how did attorneys know to use Coastal Title
7    Agency?
8       A.   I had sales reps on the road and just
9    through reputation over the years.
10      Q.   And your sales rep would go and meet
11   attorneys?
12      A.   Yes.
13      Q.   They advertised your services --
14      A.   Yes.
15      Q.   -- I guess.  And so attorneys would call
16   you for closings, not the other way around?
17      A.   Correct, that's right.
18      Q.   Do you know if the title companies
19   provide any instructions or guidelines?  I think you
20   said you got these notebooks from the title companies
21   when you were an approved agent.  Do you know if the
22   title companies provided something similar to the
23   attorneys?
24      A.   I don't think so.
25      Q.   It was just there were many more
```

Page 251

```
1    approved attorneys than there were title agents.  Is
2    that --
3       A.   Yes.
4       Q.   Could Coastal recommend to the title
5    companies that a certain attorney be unapproved or
6    disapproved?
7       A.   If we had problems with an attorney we
8    would let our underwriter know, and that it had to be
9    big problems.
10      Q.   And then what would happen?
11      A.   I guess they would -- I don't know
12   actually.  They would do an investigation I assume
13   and decide whether they wanted them on their approved
14   list or not.
15      Q.   So if you had problems with an attorney
16   and you spoke to the title company -- or the
17   underwriters at the title companies, they could come
18   down on the unapproved list?
19      A.   Yes.
20      Q.   And if they didn't you could still work
21   with them?
22      A.   Correct.
23      Q.   Do you recall:  Did Coastal after the
24   frauds became public ever suggest to the title
25   companies that -- I'll give you the list -- Mr.
```

Page 252

```
1    Yacker, Mr. Cicalese, Mr. Pepsny or Mr. Alfieri be
2    unapproved or disapproved attorneys?
3       A.   No, I don't think we did -- no, I didn't
4    do that.
5       Q.   Do you recall if after the frauds became
6    public that the list you got with unapproved
7    attorneys had any of those four on them?
8       A.   Definitely had Yacker and Cicalese.  I
9    don't recall whether Pepsny or Alfieri got on it.
10      Q.   Do you recall it being on a list from
11   Commonwealth or Fidelity or both?
12      A.   Probably both.  I don't remember.
13   Definitely Commonwealth, I know that, but I don't
14   know about Fidelity.
15      Q.   Okay.  That's all I have.
16   CROSS-EXAMINATION BY MR. KOTT:
17      Q.   Mr. Agel, we've met a few times
18   informally but let me introduce myself.  I'm David
19   Kott, and I represent the defendant Commonwealth Land
20   Title Insurance Company.  Okay?
21      A.   Yes.
22      Q.   I have a very short amount of
23   questioning for you.  I want to ask you some
24   questions about after the fraud was discovered.
25   Okay?
```

Page 253

```
1           You said in response to one of
2    Mr. Magnanini's questions, and this is a rough
3    paraphrase, I just want to get you back to that
4    subject, that a lot of these problems were taken care
5    of or dealt with.  Do you remember that testimony?
6       A.   Yes.
7       Q.   And you also talked about Cityscape and
8    Banker's Trust and some activities that dealt with
9    that.  Do you remember that testimony?
10      A.   Yes.
11      Q.   That's what I want to ask you about.
12   First of all, are those two things the same subject
13   or are they different subjects?
14      A.   I think they're different subjects.
15      Q.   Explain more the first subject to us,
16   that these things were taken care of after the frauds
17   were discovered.  What were you referring to?
18      A.   Just clearing up title objections.
19      Q.   What I want you to do is to translate --
20   I want you to take title talk and put it into lay
21   terms, if you could.  So go ahead.
22      A.   We could be here a while.  It would be
23   paying off judgments, getting -- in the one case we
24   had here where we wanted that recognizance
25   discharged.  That would be the case for -- like, just
```

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

3e478b50-37d1-4229-9354-18292c3c480e

Page 254

1  ironically I happen to know this fellow that was the
2  seller and he had been arrested and put his
3  property -- it was a general recognizance so it's a
4  lien against all of your real estate. He -- we
5  needed that property released from the recognizance
6  in order to insure it. There were other judgments
7  against him, money suits where he had been sued and
8  we needed the property released from that judgment or
9  it would need to be paid off and discharged. Those
10 type of things.
11     Q.   Is this a situation where the closing
12 has occurred and there's some lien on the property
13 that has not been taken care of at the closing?
14     A.   The situation we're in right now?
15     Q.   No, no, what you just referred to.
16     A.   No. These are situations where they
17 probably -- not probably. Where they did clear them,
18 they did pay things off. They just didn't get us the
19 documentation.
20     Q.   Does that include some of the liens
21 we're talking about in this case?
22     A.   Yes, it should be, yes.
23     Q.   Now, the other thing, you had mentioned
24 about Banker's Trust and Cityscape. Can you tell us
25 in lay terms what you were talking about?

Page 255

1      A.   Yeah, in those cases they were --
2  Cityscape and Banker's Trust were -- I assumed that
3  they were lenders that bought these loans from Walsh
4  Securities.
5      Q.   And I will represent to you that there's
6  been some discovery in this case indicating that
7  those lenders did purchase some of these loans from
8  Walsh.
9      A.   Right.
10         MR. MAGNANINI: Let me just clarify the
11 record. Cityscape was a whole loan purchased. They
12 purchased loans. Banker's Trust was a trustee for
13 loans that Walsh Securities securitized. So Walsh
14 issued I think about a billion five in five different
15 securities so they were a trustee and a purchaser.
16     Q.   So go ahead.
17     A.   So what would happen in those cases, and
18 in particular probably this one right here, Bustos on
19 138 Ridge, the deed and the mortgage into Bustos --
20 the Bustos deed and then the Bustos mortgage were not
21 recorded. When the loans defaulted the lender
22 started foreclosure, discovered that the deed and
23 mortgage were not recovered and their lien had not
24 been properly perfected. So they made a motion to
25 the court to have a lien -- their lien imposed as a

Page 256

1  first lien on the property so that they could
2  continue on and foreclose the property, get it back
3  ultimately on the market.
4      Q.   Did that happen with a number of the
5  loans we're talking about in this case as far as you
6  know?
7      A.   Yes. It happened with quite a few. I
8  don't know how many. Just from one -- loans or
9  properties that I insured when they sold after this
10 happened.
11     Q.   Now, you might not know the answer to
12 this question but let me ask it: Cityscape and
13 Banker's Trust in those situations I assume would
14 have had a lawyer representing them in the mortgage
15 foreclosure. Is that correct?
16     A.   Correct.
17     Q.   Do you know who hired that lawyer? And
18 what I mean by that is: Do you know whether either
19 Commonwealth or Fidelity or Nations hired a lawyer
20 for Banker's Trust or for Cityscape or whether they
21 hired their own lawyers and did it?
22     A.   I don't know.
23     Q.   Okay. Mechanically the closing -- do
24 you call it closing protection letter or closing
25 service letter?

Page 257

1      A.   Closing service letter.
2      Q.   Now, I'm going to take you back and
3  switch the time period. I'm going to take you back
4  to the time of these loans when your company was
5  dealing with it. What was it called then in your
6  lingo?
7      A.   Well, we would call it an AA letter, an
8  approved attorney letter. That was just our lingo
9  though. It became closing service letter sometime in
10 the late -- in the late '90s. Sometime around this
11 time.
12     Q.   So closing service letter?
13     A.   Yes.
14     Q.   Okay. Mechanically in your office with
15 respect to these loans, physically how did you get
16 the closing service letters? And what I'm asking is:
17 Did you print them off a computer? Did you print
18 them yourself? Were they sent to you by the title
19 insurance company?
20     A.   In the beginning they would come from
21 the title company. We would get a batch of them.
22 They were pre-numbered and we would -- the
23 old-fashioned way have to type the name of the
24 attorney and then all the pertinent information.
25 That didn't last very long. They took the control

30 (Pages 254 to 257)

Page 258

1  numbers away probably in less than a year, and they
2  were installed on our computer systems.
3      Q.   Is that the case when we're talking
4  about the time period here?
5      A.   Yes.
6      Q.   And how would they get installed in your
7  computer system?  Let me tell you what I'm driving at
8  just so you know.  In some of the loans that -- in
9  some of the Commonwealth loans that Coastal was the
10 agent in this time period there are different
11 approved attorney forms.  Some have one additional
12 paragraph and others don't, and I'm trying to figure
13 out how that would have occurred.  All out of your
14 agency.
15     A.   Probably we were exhausting a supply
16 that we already had.  Or I would have to see them to
17 tell you whether they were preprinted or they were
18 installed in the computer.  But if they were
19 installed in the computer, those would have been
20 forms that we got directly from either Commonwealth
21 or Fidelity.
22     Q.   But can you help us -- assume as true
23 just for my question, just assume it is true that in
24 this time period there are different forms for the
25 Commonwealth letters.

Page 259

1      A.   Right.
2      Q.   And I was trying to figure out how that
3  would happen.
4          MR. MAGNANINI:  David, are you saying
5  different forms within Commonwealths forms, within
6  Commonwealth letters themselves?
7      Q.   If we look at the Commonwealth in this
8  case -- and by Commonwealth, the ones you would have
9  issued letters under Commonwealth's name.
10     A.   Right.
11     Q.   There's different forms, and one of the
12 differences is one of the forms has an extra
13 paragraph that the others did not and that's -- I was
14 trying to see if you could help me with how that
15 could occur.
16     A.   It could have happened.  I need to see
17 those letters in order to give you a good answer, but
18 my guess is is that the ones that had the extra
19 paragraph or didn't, whichever, one of them -- one
20 was a form that was a preprinted form that we would
21 have to fill in information on it in the typewriter.
22 The other one was in the computer.  So when -- we
23 would exhaust all of our forms, the preprinted forms
24 that they gave us.
25     Q.   Even if they had issued a new form,

Page 260

1  would you still use the old form?
2      A.   We could have and it could have been by
3  mistake, that's possible.
4      Q.   Let me call your attention to exhibit
5  Commonwealth 6(A) from the March -- sorry, May 27,
6  2010 deposition of a representative of Commonwealth
7  who was Donna Sullivan and it's Bates stamped WSWT
8  000505.  It's a two-page document.
9          Can you tell whether that one was off
10 the computer or whether that was one of the --
11     A.   This is off the computer definitely.
12     Q.   And how would they get on your computer?
13 That is, how would this form get on your computer?
14 That is, did it go directly from a Commonwealth
15 computer to you or how did that work?
16     A.   No.  It would have been coming in
17 through our software -- we all use approved software
18 providers for the title industry and it would have
19 come from that provider.  They all have agreements
20 with the underwriters as to the use and installation
21 of their forms.
22     Q.   Again, even though I represent
23 Commonwealth this is not something I know.  Does
24 Commonwealth hire somebody to give you software?
25     A.   No.

Page 261

1      Q.   How does that work?
2      A.   What they do is they have -- I guess
3  they would have -- my provider right now I'll use an
4  example.  Title Support Software, TSS.  They have I
5  guess licensing agreements with Commonwealth and all
6  the other companies to sell their -- not sell but to
7  install their forms.  They have written a package, a
8  software package specific to title insurance.  They
9  need those forms from the various underwriters in
10 order to install.
11         So what they do between Commonwealth and
12 TSS I don't know.  All I know is that TSS and every
13 other provider I have had since we had computers
14 would come and install that package which includes
15 the closing service letter.
16     Q.   Was TSS your service provider back at
17 the time --
18     A.   No.
19     Q.   -- you were involved with these loans?
20     A.   No.
21     Q.   Did you have a service provider at the
22 time you had these loans?
23     A.   Yes.
24     Q.   Did it operate essentially the way you
25 just described TSS's operation with you?

**Page 262**

1    A.    Yes.
2    Q.    And do you know the mechanics of how TSS
3  would get the Commonwealth documents?
4    A.    No.
5    Q.    I have one more subject for you, and
6  again I'm going to paraphrase just to get you back
7  there. You said -- and this is my use of the term.
8  You said if there was a break in the title you would
9  not insure the title. And I realize "break in the
10  title" may not be the right word but you know what
11  I'm referring to?
12    A.    Yes.
13    Q.    Could you explain that to us in lay
14  terms?
15    A.    That would be where there would be the
16  case here where the deed into G.J.L., the seller, was
17  not recorded, something like that. Just using it in
18  these terms, it's dealing where they ended up
19  closing -- selling properties before they bought
20  them. That would be -- it was a good term, a break
21  in the chain of title.
22    Q.    And in that situation, if I understand
23  your testimony, you would have been paid but you
24  would have transmitted that to the underwriter
25  anyway?

**Page 263**

1    A.    Yes.
2    Q.    And the reason you would have
3  transmitted it to the underwriter anyway was the
4  assumption based on your many years in the industry
5  that that problem would be cured and then ultimately
6  a policy would be issued?
7    A.    Yes. It would either be cured or I
8  would put it in as an exception.
9    Q.    Right. And to the extent they were not
10  cured in this case, was that because this fraud
11  became public and everything blew up?
12    A.    Correct.
13    Q.    When you say you would have put it in
14  with an exception, what do you mean by that?
15    A.    In this case -- in G.J.L. we would have
16  put into the owner's policy, possibly the loan
17  policy, I don't know if we would have put it in the
18  loan because of the closing service letter, but we
19  would have put: Subject to the outstanding interest
20  of G.J.L. Limited and said that because of a lack of
21  a deed from G.J.L. into Bustos.
22    Q.    And if -- withdrawn. When you sent that
23  to your client -- here would your client be the
24  lawyer?
25    A.    Yes.

**Page 264**

1    Q.    When you sent the policy to the lawyer,
2  would the lawyer be able to take action that would
3  end up with that exception being removed?
4    A.    Yes.
5    Q.    How would the lawyer do that?
6    A.    You would record the deed in this case.
7  That would be the proper -- record the deed and then
8  possibly get a corrective deed from G.J.L. into
9  Bustos and then record or rerecord the deed and
10  rerecord the mortgage so that there would be proper
11  sequence.
12    Q.    Full circle from where I started. After
13  these frauds became public when you talked about
14  Cityscape and you talked about Banker's Trust, do you
15  know whether some unrecorded earlier deeds were
16  recorded during the foreclosure process? That is,
17  somebody chased them down and got them recorded?
18    A.    I do believe so, yes.
19    Q.    To solve that problem. Right?
20    A.    Yes.
21    Q.    Thank you. I don't have any further
22  questions.
23    MS. ELGART: I have no questions.
24  REDIRECT EXAMINATION BY MR. MAGNANINI:
25    Q.    Just to follow up then. What happened

**Page 265**

1  when the form of the closing service letter changed,
2  the title company changed the form? The title
3  companies would provide it to your software provider?
4    A.    Yes.
5    Q.    And then were you instructed -- was
6  Coastal Title instructed to destroy old versions,
7  delete old versions?
8    A.    Yeah. You would either -- we are
9  getting again above my pay grade but it's -- we would
10  get a disk or a -- today we download them over the
11  Internet, which is still something I don't know
12  about, but we would then put the disk in and it would
13  do whatever it did. It would modify the forms or it
14  would delete, whatever it did, I don't know exactly
15  what it did.
16    Q.    The reason I was following up, Mr. Agel,
17  is you said you thought you could have issued some
18  closing service letters in a different format by
19  mistake.
20    A.    Yes.
21    Q.    And I would have thought that if the
22  title company had given you new ones you would have
23  just discarded the old ones and gone from there.
24    A.    No. They made sure -- especially if you
25  take a look at this one it has an audit number on it.

VERITEXT REPORTING COMPANY
212-267-6868                516-608-2400
3e478b50-37d1-4229-9354-18292c3c480e

Page 266

1    Q.    6(A)?
2    A.    Yes.
3    Q.    Where is the audit number?
4    A.    Top right. We had to account for this.
5    Q.    And is this one of the examples that --
6  with the audit number that came preprinted?
7    A.    No, this is not preprinted.
8    Q.    So your computer would generate a
9  different audit number for each CSL?
10   A.    Yes.
11   Q.    And that way the tight company knew what
12 letters --
13   A.    That's right.
14   Q.    Okay. And one last question as a follow
15 up to what Mr. Kott said. I think you had said you
16 would -- you started answering his second to last
17 question that said: We would not include it in the
18 loan because of the CSL?
19   A.    I think I said we may not.
20   Q.    What did you mean by that in lay
21 people's terms?
22   A.    If it was an exception that was related
23 to the attorney's work but the attorney did something
24 wrong, in this case record the deed, we may not be --
25 I would try to put it in the mortgage policy. I

Page 267

1  would put it in and if asked to omit it, we would
2  have to get clearance -- I would have to get
3  clearance from the underwriter.
4    Q.    Because it concerned a mistake by the
5  closing attorney?
6    A.    Yes.
7    Q.    Okay. I think that's all I have.
8  RECROSS EXAMINATION BY MR. KOTT:
9    Q.    Are you an attorney?
10   A.    No.
11   Q.    Are you familiar with all of the New
12 Jersey cases that interpret closing service letters?
13   A.    No.
14   Q.    So when you say -- when you said, and I
15 am going to paraphrase, if it was a mistake of an
16 attorney then it would be under the closing service
17 letter, do you know whether all mistakes of attorneys
18 are covered by the closing service letter or just
19 certain types of mistakes?
20   A.    I don't know.
21   Q.    As to what the closing service letter
22 actually covers, that you would leave to judges and
23 lawyers?
24   A.    Yes.
25   Q.    Thank you. I have no further questions.

Page 268

1         (The deposition is concluded at 3:42
2  p.m.)
3
4
5  _____
6              ROBERT AGEL
7  Subscribed and sworn to before me
8  this _____ day of _____, 2010.
9
10             Notary Public
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 269

1         CERTIFICATE.
2
3         I, JANET BAILYN, a Notary Public and
4  Certified Court Reporter of the State of New Jersey,
5  do hereby certify that prior to the commencement of
6  the examination ROBERT AGEL was duly sworn by me to
7  testify the truth, the whole truth and nothing but
8  the truth.
9         I DO FURTHER CERTIFY that the foregoing
10 is a true and accurate transcript of the testimony as
11 taken stenographically by and before me at the time,
12 place and on the date hereinbefore set forth.
13        I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17 and that I am not financially interested in the
18 action.
19
20 _____
   Notary Public of the State of New Jersey
21 My commission expires February 3, 2013
      License No. XI00970
22
   Date: August 9, 2010
23
24
25

                              33  (Pages 266 to 269)

**A**

**AA** 257:7
**Aaron** 193:21
**able** 224:12 227:25
  264:2
**above-entitled**
  142:2
**account** 157:8
  160:4 161:21,22
  187:12,15 224:9
  236:15,23 237:8
  266:4
**accounts** 170:19
  187:5 189:2
**accurate** 269:10
**acquire** 163:23
**acquired** 155:5
  220:20
**acquires** 170:3
**acquiring** 211:23
**acquisition** 151:12
  235:25
**action** 141:2 212:16
  245:10 264:2
  269:15,18
**actions** 151:25
  163:9,11 249:7
**activities** 253:8
**actual** 160:25 163:2
  171:6 187:10
**add** 145:12
**additional** 231:8
  258:11
**advertised** 250:13
**advice** 226:1
**afternoon** 145:18
  145:24
**Agel** 141:6 144:3
  145:4 146:3 150:5
  156:13 157:25
  158:6 168:10
  177:22 180:14
  184:12 186:23,24
  187:5 188:23
  193:22 194:23
  203:17 205:7

217:16 220:9
227:3 231:4
242:13 247:2
252:17 265:16
268:6 269:6
**agency** 141:17
  143:13 151:22
  156:23 157:1,5,18
  158:2,12 187:11
  187:15 219:2
  234:5 250:7
  258:14
**agent** 152:4 179:6
  179:10 191:11
  242:14 243:1,2
  250:21 258:10
**agents** 251:1
**ago** 190:2 225:23
**agree** 238:21
**agreements** 260:19
  261:5
**ahead** 145:16
  185:16 230:24
  236:13 253:21
  255:16
**Alan** 191:12
**Alfieri** 141:13
  149:16,17 220:16
  248:1,14,19 249:3
  252:1,9
**Alfieri's** 150:9
  204:16
**Alphonse** 205:10
**ALTA** 200:2,12
  227:15
**amazing** 149:25
**amount** 157:10
  161:20 223:17
  240:15 252:22
**AMY** 143:4
**Ann** 179:24 189:1
**annotate** 226:22
**answer** 145:12
  159:18 181:19
  185:4,16 211:2
  212:5,13 213:1

229:9,19 231:20
232:18 234:17
235:13 236:4,11
246:18,23 256:11
259:17
**answered** 145:11
  185:15
**answering** 266:16
**ANTHONY** 141:13
  141:14
**anybody** 148:2
  175:10 181:8
  239:6
**anymore** 146:22
  177:21
**anyway** 246:23
  262:25 263:3
**apart** 215:3
**apparently** 167:18
  204:5 211:7
**appears** 159:13
**application** 153:18
  153:23 170:25
**applied** 242:16
**approved** 151:11
  247:17 249:7,9,12
  249:17,18,20,25
  250:21 251:1,13
  257:8 258:11
  260:17
**April** 147:6 156:3
  157:1 160:20
  168:12 174:23
  176:5,7 177:9
  185:9 186:7
  187:23 199:21
  206:1 209:11
  223:10 232:22
  247:8
**Arline** 200:20
**Arnold** 157:13
  179:18
**arrested** 254:2
**Art** 179:16
**Asbury** 150:19
  156:20 157:3,15

158:8 189:15
217:25 234:6
244:7,9 245:8
**asked** 146:6 147:3
  147:19 152:20
  159:16 180:20
  185:15 233:5,5
  267:1
**asking** 148:16
  155:11 170:3
  185:5 214:14,24
  257:16
**asks** 245:10
**assessor** 206:2
  209:1,17
**Assets** 141:8,9
  147:11 205:14
  218:8
**assign** 162:9
**assigned** 213:23
**assigns** 219:10
**assume** 150:13
  158:17 159:3
  161:2 164:2 166:4
  180:25 193:5
  202:5 227:12,18
  231:25 251:12
  256:13 258:22,23
**assumed** 255:2
**assuming** 164:5
**assumption** 263:4
**assurance** 167:17
  190:25
**assurances** 190:23
**attached** 205:13
  209:11 227:23
**attempting** 168:20
**attention** 186:20
  260:4
**attorney** 146:15
  151:11 154:22,23
  162:24 163:9
  188:8 191:12
  193:21 216:3,24
  216:25 217:11
  219:11 221:10

230:7,18 232:1,2
236:8 241:10,23
243:8 247:20
249:13,21 250:2,3
251:5,7,15 257:8
257:24 258:11
266:23 267:5,9,16
269:14,16
**attorneys** 143:5,9
  143:12,17 148:18
  181:2 186:17
  187:18 216:5
  247:18,18 249:8,9
  250:6,11,15,23
  251:1 252:2,7
  267:17
**attorney's** 163:11
  193:17 266:23
**audit** 265:25 266:3
  266:6,9
**August** 142:7 196:4
  196:5,6 207:20
  244:8 269:22
**authorized** 145:25
  227:8
**automatically**
  200:11
**available** 145:24
**Avenue** 150:19
  152:5 156:20,24
  157:2,15,19 158:3
  158:8,19,24
  205:12 206:9,15
  217:24 218:8
  219:4,11 220:4
  234:5 236:23
  243:15
**average** 176:13,19
**avoided** 238:8
**aware** 209:15
  241:25
**A-r-l-i-n-e** 200:21
**a/k/a** 141:7

**B**

**B** 143:14 144:7

145:1 200:1
230:10,11,14
241:2
**back** 147:6 152:12
160:19,19 163:20
168:9 170:15
173:4 174:17,22
175:6 176:4 177:5
185:8,10 188:16
198:19 201:9
216:25 230:13
233:14,15 239:6
245:2 246:10
249:19 253:3
256:2 257:2,3
261:16 262:6
**background**
189:25
**backlog** 160:15
**BAILYN** 142:3
269:3
**Bangs** 150:19 152:5
**bank** 187:22
245:10 246:2,2,2
**Banker's** 245:21,24
253:8 254:24
255:2,12 256:13
256:20 264:14
**bankruptcy** 169:8
169:9
**based** 158:17 176:2
176:9 186:4 189:2
263:4
**basic** 161:12 217:6
**basically** 152:17
**basis** 183:16 228:24
**batch** 224:4,5,17,19
224:21,23 225:8
257:21
**Bates** 152:22
156:16,22 157:5
157:11,16 204:1
205:18,24 206:5
207:14 218:5,13
218:17,22 219:5
219:16,20,25

234:20 236:18
240:10 260:7
**beg** 222:4
**beginning** 145:19
160:20 173:18
175:3 178:18
257:20
**begun** 204:17
**behalf** 162:7
175:20 183:4
188:1
**believe** 180:16
194:25 206:7
220:4 249:14
264:18
**best** 247:14,15
**bet** 160:19
**BETTER** 141:19
**Betty** 179:24 189:1
**beyond** 206:14
223:19 229:24
**big** 174:15 228:19
246:6 251:9
**billion** 255:14
**bills** 221:17
**binder** 204:22
**Binders** 203:22
**Bizarre** 151:8
**blank** 201:17,17
**blanks** 226:24,25
**blew** 225:2 263:11
**Bob** 179:20
**book** 196:17,17
199:15
**books** 196:25 197:2
**bottom** 149:18
187:21 196:19
199:11 207:18
227:7 234:21
240:22
**bought** 166:1,20
173:20 255:3
262:19
**bound** 162:23
**box** 143:11,15
200:4

**boxes** 200:2
**Branch** 205:13,25
**break** 203:15 262:8
262:9,20
**bring** 149:18
185:20
**brings** 245:10
**BRODO** 141:12
**broke** 172:5 177:24
184:12 192:5
248:2
**brokered** 241:20
**BROWN** 141:12
**business** 158:12
176:17 184:7
186:20 190:10
225:3 234:8 246:7
247:11 248:19,22
249:1
**Bustos** 218:4,7,9,25
223:15 226:13
228:17,17 229:14
229:15 237:10
244:12,13,17,21
244:25 255:18,19
255:20,20 263:21
264:9
**buy** 168:1
**buyer** 147:8 149:14
151:2,14 152:4
165:22 166:12
167:8 232:3
233:20
**buyers** 149:11,20
150:21 233:20
247:3
**buyer's** 232:1
240:16
**buying** 164:9
166:18 175:23
228:15
**buys** 163:24

———————
**C**
———————
**C** 143:1
**CALANNI** 141:11

**CALIENDO** 142:5
**call** 147:7 167:11
250:15 256:24
257:7 260:4
**called** 167:10 170:5
174:25 230:1
232:12 233:5
247:18 257:5
**calling** 183:18
205:15 218:7
**cancellation** 237:23
**cancelled** 238:11
**capital** 141:8,9
147:11 148:24
197:11 205:14
218:8
**carbon** 192:25
**care** 253:4,16
254:13
**carrier** 183:1
**case** 145:9 161:12
163:17 164:2
168:21 171:5,21
173:19 182:25
196:13 213:9
230:12 233:13
245:6 253:23,25
254:21 255:6
256:5 258:3 259:8
262:16 263:10,15
264:6 266:24
**cases** 162:22,22,22
173:11 255:1,17
267:12
**ccased** 184:7
**Center** 143:7
**cents** 157:10
**certain** 147:2
167:10 171:5,12
192:4 193:8 249:9
251:5 267:19
**certainly** 162:20
**certificate** 169:12
269:1
**Certified** 142:3
269:4

**certify** 269:5,9,13
**chain** 262:21
**chance** 145:7
220:11 228:9
**change** 145:10,12
176:15
**changed** 167:21
265:1,2
**charge** 217:6
225:25
**charged** 161:11
**charges** 189:3
221:3
**chased** 264:17
**check** 144:11,13
156:7 157:7 160:3
161:1,17 186:24
187:3,7,10,14,22
187:25 188:3,7
219:21 237:24,25
238:25 239:19
**checked** 197:2
200:3,4
**checks** 196:8,24
238:2,10,14,15,24
239:2,8,21,23
**Chelsea** 205:12
206:9,15 209:25
213:10
**choose** 200:11
**Christine** 158:3
169:21 171:11
**Cicalese** 141:14
151:1 154:24
155:16 187:21
188:1 190:11,14
204:18,20 225:6,7
247:10,25 248:9
252:1,8
**circle** 264:12
**circled** 149:17
**cited** 188:25
**city** 205:25 244:7
**Cityscape** 245:20
245:24 253:7
254:24 255:2,11

256:12,20 264:14
Civil 141:2
claim 181:12,17,20
  182:1 211:11
  212:12
claims 180:15,24
  182:16 229:23
clarify 255:10
Claudia 157:14
clean 153:12,13
  154:15,18 155:16
  162:24 166:12
  201:10
cleaned 155:12
  211:15
cleaning 163:13
cleanup 154:21
clear 146:14 168:20
  169:19 216:19
  254:17
clearance 267:2,3
cleared 166:10
  170:17 214:24,25
  215:8,8,15 216:10
clearing 215:5
  253:18
clearly 238:25
clerk 206:7 208:12
  210:13 237:10
Clerk's 207:22
  210:19
client 263:23,23
clients 202:9
close 170:6,24
closed 171:13 176:3
  223:25
closing 150:10
  151:9,20 152:4,7
  152:14 153:4
  154:22,22 155:2
  156:19 163:6,9,19
  164:8 165:5,21
  166:18 167:7
  170:2 172:21
  173:17 176:10
  179:6 188:8,9

197:5 212:15,16
212:23 213:14,16
216:23,23 217:4
217:10 219:3,8
220:1 221:19,25
226:3 229:13
230:7,18 232:3
234:14,18 235:3,9
235:20,24 236:8
238:24 239:11
241:5,6,10,23,24
242:18 243:3,4,7
246:10,11,20
249:6 254:11,13
256:23,24,24
257:1,9,12,16
261:15 262:19
263:18 265:1,18
267:5,12,16,18,21
closings 176:4
  177:3,3 185:10
  186:10,14 250:16
Coastal 141:17
  143:13 147:4
  149:17 150:13,22
  151:21,22 152:8
  152:21 155:10,15
  156:14,16,18,21
  156:23,25 157:1,4
  157:9,18 158:1,2
  158:11 160:4
  162:5,6,8 168:11
  168:24 169:16
  170:11,15,23
  172:7 173:16
  174:1,6 175:19
  181:5,25 182:5,13
  182:14 183:7,12
  184:7,13 185:9,20
  185:21 186:5
  187:10,14,17
  188:6,17 194:3,17
  195:10 197:8
  199:20 208:24
  209:3 213:14
  218:12,13,14,17

218:22,25 219:1,4
219:21 221:24
224:20,22,24
234:4 237:2
239:10,20 249:8
250:1,3,6 251:4
251:23 258:9
265:6
Coastal's 157:11,16
  169:2 180:14
  181:12 183:4
  193:22 194:10
  218:1,5 219:23
  223:2 239:19
  240:10
Coastal-10 144:10
  156:5
Coastal-11 144:11
  156:7
Coastal-12 144:11
  156:9
Coastal-13 144:12
  156:11
Coastal-14 144:12
  157:23
Coastal-15 144:13
  187:3
Coastal-7 144:9
  155:24
Coastal-8 144:9
  156:1
Coastal-9 144:10
  156:3
Cohen 179:18
coherent 145:16
color 211:10
column 237:9
come 145:21 166:2
  174:23 180:7
  225:6 250:3
  251:17 257:20
  260:19 261:14
comes 181:13 216:6
coming 149:23
  260:16
commencement

269:5
commencing 142:7
commercial 200:12
  200:13,14 243:11
commission 269:21
commitment
  148:24 153:10,12
  153:17 154:7,11
  154:13,19 158:23
  159:18 164:3,4,6
  165:16 166:9,12
  166:13 173:15
  174:13 197:4,16
  198:4,5,14,24
  200:6,22 201:6,12
  204:10 218:19,20
  218:24 226:9,12
  229:5 230:1,5,8
  230:18 231:6,13
  241:8 242:3,6,7
  242:11,12
commitments
  148:22 149:2,11
  149:20 153:22
  155:13 195:9,9
  201:10 202:1
  230:20
commitment-wise
  164:1
Commonwealth
  141:15 143:9
  146:16,21,23
  175:17,19,20
  177:8,19 178:16
  182:13,18,22
  183:2,2,3,6,11,15
  183:19 184:5,8
  213:21 214:20
  217:19,19,22
  218:21,23 219:15
  219:19,22,24
  220:2,12 225:11
  229:25 235:10,22
  236:14 240:9,23
  243:13 249:15
  252:11,13,19

256:19 258:9,20
258:25 259:6,7,8
260:5,6,14,23,24
261:5,11 262:3
Commonwealths
  259:5
Commonwealth's
  217:17 259:9
Commonwealth-9
  221:5
companies 151:13
  152:3 154:8
  161:24 162:7
  173:20 174:21
  175:22 176:6
  180:18,22,23
  181:3,19 184:14
  214:9,17 215:14
  216:20 247:7
  249:9 250:18,20
  250:22 251:5,17
  251:25 261:6
  265:3
company 143:18
  147:10,12,13
  148:22 149:12
  162:15 163:11,22
  169:22 170:2
  174:25 182:1,7
  188:12 215:21
  217:10 218:21
  235:14 247:21
  250:2 251:16
  252:20 257:4,19
  257:21 265:2,22
  266:11
compilation 220:10
complete 241:13
completed 246:3
complied 230:12
compound 231:19
computer 200:10
  200:10 203:10
  257:17 258:2,7,18
  258:19 259:22
  260:10,11,12,13

260:15 266:8
**computers** 261:13
**conceivably** 232:15
**concerned** 214:3
  267:4
**concerning** 206:8
  206:15
**conclude** 164:7
**concluded** 243:22
  268:1
**conclusion** 185:4
**Conditions** 241:2
**conduct** 182:5,14
**conducted** 180:23
**confused** 175:12
  199:24 217:2
**confusion** 153:9
**consistent** 194:17
**Construction**
  207:20 208:18
  209:13 210:17
  213:12
**CONSULTING**
  141:14
**consumer** 215:18
**contact** 179:5 209:3
**contacted** 179:9
  182:21 185:25
  189:10 190:14
  209:16 247:3
**continuation**
  145:20
**continue** 182:1
  248:19 256:2
**continued** 171:20
  204:18 248:5
**continuing** 186:23
**contractual** 181:15
**control** 180:13
  257:25
**conversation**
  178:23,25 233:9
  233:17
**conversations**
  147:2 190:19
  201:9

**convey** 232:3
**conveyed** 207:19
**conveying** 218:4,7
**copied** 240:3,6
**copies** 177:16
  178:12,14 188:20
  208:25 211:16
  221:24 223:3,5
  239:20
**copy** 144:11,13
  152:25 153:1,16
  154:6 156:7 169:4
  187:3 188:18
  190:3 192:25
  204:4 205:2 209:4
  219:15 222:13
  227:11 240:12
  242:16,20
**corollary** 154:20
**Corp** 207:20
  226:17
**corporate** 145:20
  246:16
**corporation** 217:23
  246:16
**correct** 148:10
  153:1,15,17 155:8
  155:14 158:13
  161:21 162:1
  163:4 164:17,25
  169:5 173:17
  180:19 184:9,11
  188:14 195:11
  197:12,15 198:23
  200:23 202:3,7,16
  213:15 215:16
  220:18,22 221:7
  222:8,20,25 227:2
  227:13,20 228:2,5
  228:7 232:6
  237:21 239:13
  240:7 244:18
  247:23 248:3
  249:23 250:17
  251:22 256:15,16
  263:12

**corrective** 264:8
**correspondence**
  204:22 208:25
  209:4
**costs** 174:14
**counsel** 145:18
  181:2 183:18
  209:1,3 269:14,16
**Countersigned**
  227:8,16
**county** 186:7
  191:19,24 198:7
  198:19 206:7
  207:22 210:12,18
  220:5,7 222:12,20
  222:23 237:10
  243:14
**couple** 145:15
  191:10 225:23
  247:16 248:25
**course** 158:12
  165:25 234:8
  243:7
**court** 141:1 220:5
  245:5 255:25
  269:4
**cover** 160:11,12,18
  161:15 171:9
  185:7 186:25
  196:3,6,13 202:19
  209:25 230:4,24
  240:21 249:7
**covered** 212:16
  267:18
**covering** 195:8
**covers** 161:13
  163:8,11 267:22
**CR** 195:20 196:2
**create** 235:25
**Cristo** 141:6
  163:22 199:2,16
  199:17 201:1,7,16
  202:14,20 205:17
  206:9 207:17
  208:10,14,18
  209:13 210:1,17

210:19,23,24
  211:8 212:1
  213:12 214:4
  215:11 227:1
  228:6,14,15,16,22
  228:23,23 229:15
  245:9,16
**CROSS** 144:2
**CROSS-EXAMI...**
  252:16
**CSL** 266:9,18
**CT** 158:21 164:4,5
  226:11
**CTB** 156:16,22
  157:5,11,17 218:2
  218:5,17,23 219:5
  219:20,23 227:4
  240:10
**CTC** 152:22
**CT-17767** 197:8
**cured** 263:5,7,10
**cut** 238:10
**CUZZI** 141:14
**C-1** 228:13

| D |
| --- |

**D** 199:11 231:5
  232:7 237:8
**DAP** 141:14
**Dash** 196:22
**date** 160:12 175:6
  177:23 196:17
  197:3,4,4,5,16
  198:4,5,6,12,14
  198:15,16,17,20
  198:22 199:21
  200:22,23 201:2
  206:18 207:16
  226:9 235:20
  269:12,22
**dated** 144:9,9,10,10
  144:12,12,13
  155:24 156:1,3,5
  156:11,17,23
  157:1,16,18,23
  158:4 164:21

165:1 168:12,24
  169:25 187:22
  201:17,19 203:21
  205:16,18,25
  206:1 207:20
  217:23 218:3,10
  219:2
**dates** 167:20
**David** 143:7 252:18
  259:4
**day** 198:25 230:22
  268:8
**days** 198:19
**deal** 179:7 190:22
  191:1
**dealing** 257:5
  262:18
**dealt** 241:20 253:5
  253:8
**debts** 221:22
**December** 165:2,6
  166:4 217:23
  218:3 220:20,25
  223:8 226:18
  235:23
**decide** 250:1
  251:13
**deed** 144:11 147:8
  148:8 156:9
  157:13 163:20
  164:13,14,18,19
  164:21,22 165:10
  171:22 172:2,16
  172:18 196:16
  199:7,12,16,18
  201:18,20,22
  202:1,10,13 203:1
  205:13,15,17
  207:1,3,16,20,25
  208:4,9 210:1,16
  210:19,22,24
  211:7,12,25
  212:20 213:11
  214:2 215:10
  217:22 218:1,2,6
  218:12 220:15,19

221:5 222:19,22
223:2,14 225:12
225:16,24 226:5
226:17 228:4,6,14
231:21,22 232:12
232:13 233:7,7
235:22 244:16,17
244:24 255:19,20
255:22 262:16
263:21 264:6,7,8
264:9 266:24
**deeds** 147:5,6,8,18
147:19,21,22
148:3 149:3,6
167:20,25 171:20
173:6,12 177:10
185:9,13,22 186:6
186:9,15,17
188:21 189:24
192:8 196:20
199:20 202:5,10
202:20 208:1
209:19 211:17
223:3,4,17,23
224:1,11,23 225:1
225:8 231:11
232:21,23,24,25
238:7,12,14
244:12 264:15
**defaulted** 255:21
**defendant** 143:9,12
252:19
**Defendants** 141:20
143:17
**definitely** 191:16
197:24 252:8,13
260:11
**definition** 249:20
**Del** 180:8
**delete** 265:7,14
**DeMola** 179:24
189:1,4
**dep** 145:21
**department** 229:24
235:15
**depends** 230:7

**deposed** 147:1
167:24
**deposit** 161:18
**deposition** 141:5
145:20 149:10
150:7 183:14
195:3 205:9,23
260:6 268:1
**depositions** 217:18
**described** 261:25
**DESCRIPTION**
144:8
**despite** 214:4
**destroy** 265:6
**determine** 148:15
152:1 172:1 177:7
185:22
**determined** 215:20
**Diary** 249:12,24
**DiBENEDETTO**
141:11
**difference** 244:3
**differences** 259:12
**different** 147:5
150:25 165:15
166:1,5 198:24
235:9 253:13,14
255:14 258:10,24
259:5,11 265:18
266:9
**digitalized** 236:16
**direct** 144:2 145:3
233:12
**directed** 155:10
216:17
**direction** 168:15
**directives** 178:4
**directly** 233:14
241:23 258:20
260:14
**disapproved** 251:6
252:2
**disbursed** 241:14
**disbursement**
241:3
**discarded** 265:23

**discharged** 253:25
254:9
**disclaimed** 168:2
**discovered** 149:9
252:24 253:17
255:22
**discovery** 255:6
**discuss** 189:22
192:21
**discussed** 180:14
182:10,13 186:24
190:1 212:8 232:2
**discussing** 147:21
184:13,15
**discussion** 150:3
155:22 157:21
192:19 209:21
217:14 231:2
**discussions** 147:20
167:2 187:7
189:19 224:10
238:6,9 239:5
**disk** 265:10,12
**disparage** 216:4
**disparaged** 216:7
**disposed** 169:11
**distinct** 174:4
**DISTRICT** 141:1,1
**divided** 147:10
**document** 151:17
151:17 156:16
159:9 197:6 206:6
225:25 240:18
243:20,21 260:8
**documentation**
254:19
**documents** 146:9
146:10 148:4,21
149:15 151:9
158:5,6 172:5
173:1 175:16
188:16,18 193:7
193:12,18 194:24
197:5 206:8,14
210:4,6,12,15
220:10 245:9

262:3
**doing** 150:22,23
154:25 166:19
174:1,2,7 175:7,8
177:20,20 184:7
185:17,20 190:10
192:24 209:9
215:4 216:4 225:3
226:1 230:4 243:3
247:11 248:5,21
**dollars** 233:22
**Donna** 141:17
260:7
**door** 152:18
**double** 242:6
**doubt** 244:22,23
249:5
**download** 265:10
**dozens** 245:13
**dramatically**
176:15
**DRD** 141:2
**Drive** 143:16
**driving** 258:7
**duly** 145:1 269:6
**duplicate** 244:14
**duplication** 175:6
**duty** 184:23
**D&Sons** 207:20
208:7,18 209:12
210:1,17,19,23
211:5,12 212:1,7
212:20 213:12
214:4 215:10
**D'Apolito** 141:14
180:3
**d/b/a** 141:18
163:22

**E**
**E** 143:1,1 144:7
145:1,1
**earlier** 180:14
188:11 230:3
231:11 264:15
**early** 186:2 191:7

192:4
**economic** 174:9
**Edison** 143:12
**egregious** 163:18
**eight** 177:8
**either** 146:15
148:16 167:21,25
175:14 178:16
181:25 192:3
195:13 222:23
235:5 247:9
256:18 258:20
263:7 265:8
**Elaine** 205:11
**elements** 246:19
**ELGART** 143:14
212:4,11 213:2
214:11 229:8,18
231:18 234:16
235:12 236:3,10
238:3 246:14,22
264:23
**else's** 168:15
**employee** 195:21
195:21 269:14,16
**employees** 152:12
**empty** 200:2
**enclosing** 206:1
**ended** 172:6 262:18
**endorsement**
216:11 227:15
**ends** 162:2
**ENGLISH** 143:6
**enormous** 221:19
**entered** 200:9
243:17,22
**entity** 232:5 246:8
**entry** 236:23
**environmental**
227:18
**escrow** 170:4,12,13
170:15,19 187:11
187:15 188:10
**escrows** 188:12
**especially** 215:18
265:24

**ESQ** 141:12,13,13
  141:14 143:3,4,7
  143:11,14
**essential** 246:19
**essentially** 155:1
  159:19 163:15
  196:14 199:19
  211:4 261:24
**estate** 254:4
**estimated** 176:3
**etcetera** 171:9
**Ethel** 143:11
**eventually** 150:18
**everybody** 215:3
  238:25
**evolved** 234:22
**exact** 177:23
**exactly** 149:8 190:1
  235:18 265:14
**examination** 145:3
  161:13,14 264:24
  267:8 269:6
**example** 217:8
  261:4
**examples** 163:18
  266:5
**exception** 215:24
  216:2,8,9,14
  247:21 263:8,14
  264:3 266:22
**exceptions** 227:5
  229:3 230:15,16
  231:9
**excuse** 150:17
  153:19 229:16
  238:14 243:24
**executed** 172:15
**exhaust** 259:23
**exhausting** 258:15
**exhibit** 151:15
  156:15,22,25
  157:4,7,12,12,17
  158:1,11 159:7,25
  160:1,2 163:20,21
  164:24 166:24
  168:10,24 169:20

187:6 195:13,13
197:7,10 199:24
200:3 203:18
205:22 206:3
207:2 209:4 210:3
217:19,22 218:1,2
218:4,16,21 219:1
219:6,15,19,22
220:12 221:4
222:11,22 225:10
225:12 226:8
227:4 228:8
229:25 231:4
234:3,10 235:22
236:13,18 239:18
240:24 241:1
246:11 260:4
**exhibits** 156:14,14
168:10 169:17
194:25 205:8
217:17 218:11
237:5
**existence** 174:23
**expand** 193:25
**expenses** 161:3
**expensive** 233:18
**experience** 225:20
**expert** 246:11
**expires** 269:21
**explain** 155:9
225:10 253:15
262:13
**explains** 173:9
**explanation** 177:12
178:10
**extent** 263:9
**extra** 259:12,18

---

**F**

**F** 143:4 235:5
**fabrication** 191:2
**fact** 165:16 171:12
189:1
**failure** 210:22
**fair** 223:16
**fairly** 204:17

235:15
**fall** 215:3
**familiar** 243:18
267:11
**far** 171:25 173:4
174:18 175:18
185:10 214:3
215:2 247:25
256:5
**fathom** 203:12
**Faulhaber** 157:13
157:14 164:15,18
165:10
**FBI** 172:6,11 173:2
188:16,18 191:4
223:7
**February** 177:5
178:11 201:19
206:7 269:21
**federal** 236:17
**Federer** 168:11,12
**fee** 200:19,25
237:24 239:15
**fees** 186:25 188:4
222:24 224:9
236:25 237:13,17
237:25 238:2,2
239:15
**fellow** 180:8 254:1
**Fidelity** 141:16
143:17 146:16,22
177:20 178:17
183:16 184:16
204:2,3 213:22
214:20 235:5,10
252:11,14 256:19
258:21
**fiduciary** 184:23
**fifth** 237:9
**figure** 173:25
186:13 221:20
258:12 259:2
**file** 152:25 153:1
158:25 159:4
161:10 162:10
167:7 169:4 171:6

171:7,8,13 173:24
174:12 177:10
181:14 197:7,23
197:24 204:6
206:21,22 207:6
212:19 219:23
224:15 225:8
226:10,19,21
227:11 230:3
232:21 239:24,25
240:3,12,19
**filed** 147:7 148:3
161:10 182:8
185:23 186:5,15
199:20 220:6,8,15
222:19,20 223:4,6
223:10,14,20
224:20,22,24
225:11 228:4
238:12
**files** 157:11,16
160:8 168:20
171:5,10 172:1,11
173:1,5 174:17
176:21,24 177:21
180:17 183:21
205:5,23 206:4
215:4 218:2,5
223:2 235:14
240:5,10
**filing** 147:4 185:12
222:13 223:23
238:7,15
**fill** 200:14 227:25
259:21
**filled** 201:20 202:1
202:5,11
**final** 220:3 222:14
227:23,24 243:17
243:23,25
**finally** 172:16
216:3,12
**Financial** 175:1
**financially** 269:17
**find** 146:10 149:25
162:4 166:19

167:7 171:22
208:4
**Fine** 145:5
**finished** 172:10,10
**firm** 154:17 209:19
249:2
**first** 145:6 149:5
154:4,7,11 156:15
163:15 166:21
182:3 195:7
199:25 200:4
224:21 231:23
233:2 238:18
239:7 240:20
241:1 242:10,12
253:12,15 256:1
**five** 163:24 230:14
255:14,14
**flags** 170:22
**flip** 208:5 227:4
**flood** 149:18
**fluctuate** 194:13
**follow** 250:4
264:25 266:14
**following** 265:16
**follows** 145:2
**follow-up** 145:15
**foreclose** 245:1
256:2
**foreclosed** 245:7
**foreclosure** 211:15
211:19,22 243:24
245:12 246:3,6
255:22 256:15
264:16
**foreclosures** 155:6
**foregoing** 269:9
**forenoon** 142:8
**form** 150:8 151:17
153:13 185:1,3
204:25 210:7,10
210:11 211:1
212:3,10,25
214:10 227:15
229:7,17 231:15
231:16 234:7,15

235:11 236:2,9
238:3 246:13
259:20,20,25
260:1,13 265:1,2
**format** 265:18
**forms** 149:15 235:8
235:14 258:11,20
258:24 259:5,5,11
259:12,23,23
260:21 261:7,9
265:13
**forth** 269:12
**forward** 177:6
178:12
**found** 150:12
164:21 165:10
167:3,24 173:11
175:18 185:25
**foundational** 154:5
**four** 143:7 170:1
202:18 252:7
**Four-Family** 200:6
**FOX** 143:14
**frame** 175:21 178:7
**frame-wise** 191:9
**fraud** 188:25
252:24 263:10
**frauds** 168:3
189:10 191:14
193:11 211:20
248:6,9 251:24
252:5 253:16
264:13
**Fred** 179:12
**free** 244:9
**Freehold** 142:6
**Freidman** 199:13
200:20,21
**Freidmans** 201:7
201:17 202:14
**Full** 264:12
**fund** 219:16
**funding** 141:8
151:24 202:22
219:9 241:17,20
**funds** 241:14

**further** 164:19
215:23 264:21
267:25 269:9,13
**furthest** 198:9
**future** 161:7
**FY** 204:1

_____
**G**
_____

**G** 145:1
**Garber** 179:16
**GARDENS** 141:19
**GARY** 141:10
**Gateway** 143:7
**gathering** 192:13
232:16
**general** 254:3
**generally** 204:11
243:2,11
**generate** 240:20
266:8
**generically** 153:21
153:22
**getting** 174:4,5
201:10 253:23
265:9
**GF** 174:25 175:8,11
**give** 177:23 190:23
216:3,10,12,25
226:1 251:25
259:17 260:24
**given** 169:7 186:24
265:22
**GL** 236:23 237:8
**go** 145:22 157:20
159:25 161:21
164:19 168:9
185:15 205:2
223:11 226:8
230:24 234:19
236:17 240:23
243:2,12 250:10
253:21 255:16
260:14
**God** 192:23
**goes** 201:9 214:19

214:20
**going** 145:24 146:9
149:25 164:20
172:24 174:21
175:9,12 178:17
178:22 183:23
184:25 188:16
200:18 201:13
205:7 208:9 233:6
246:10 257:2,3
262:6 267:15
**good** 145:4,6 146:3
190:21 259:17
262:20
**gotten** 175:16
**government** 236:17
**grade** 213:3 229:23
265:9
**grantor** 207:19
**green** 249:11,23
**GRIESER** 141:10
**Grieser's** 147:12
**group** 158:5 204:12
204:13 210:5
223:19 224:13
**Gruntal** 174:25
**guaranty** 212:19,21
**guess** 146:20
151:24 153:3,4,8
154:16,17,25
155:2 161:7
163:25 165:20
168:9 170:1,23
171:23 172:8,22
172:23 173:4,22
173:25 175:19
176:6 180:6,20
184:10 189:24
190:11 194:8
199:23 200:21
203:14 208:17
217:1 219:17
220:10 222:6
223:1 225:18
227:25 237:3
238:4 244:14

247:10,15 249:18
250:5,15 251:11
259:18 261:2,5
**guidelines** 250:19
**guilty** 189:3,7
**guys** 164:8 190:21
**G.J.L** 141:7 157:14
163:21 164:22,22
165:11 166:2
171:22 172:17
217:23 218:3
220:20 221:1
222:17 223:15
235:22,25 243:15
244:1,12,17,25
262:16 263:15,20
263:21 264:8

_____
**H**
_____

**H** 144:7
**half** 181:16 194:19
**Hall** 198:7
**halt** 172:12
**hand** 234:24 235:2
**handled** 193:20
**handling** 155:1
**hands** 225:3
**handwriting** 195:8
195:13,16,17
**handwritten**
198:12 236:19
**happen** 160:8
163:25 164:10
167:14,17 168:6
213:20 229:11,11
245:17 246:6
251:10 254:1
255:17 256:4
259:3
**happened** 160:25
162:4 171:4 182:4
182:6 184:21
232:10,20 245:14
245:15 256:7,10
259:16 264:25
**happening** 162:2

186:1,2 238:16
240:13
**happens** 162:7,12
181:17,21,24
228:17 229:4
245:8
**hate** 216:4
**head** 180:10 216:19
**held** 142:5 170:12
188:12
**hell** 177:24
**help** 258:22 259:14
**hereinbefore**
269:12
**hereto** 207:23
**herewith** 207:22
**Hills** 143:5
**hire** 260:24
**hired** 203:9 256:17
256:19,21
**hit** 190:17
**hold** 170:12,15,19
**holding** 188:10
**Home** 141:8 151:24
153:20 202:22
219:9 241:20
**HOMES** 141:19
**house** 225:23
**houses** 166:1
**HUDs** 222:5
**HUD-1** 221:25
**huge** 221:18
**hundred** 176:17

_____
**I**
_____

**ID** 236:24
**idea** 149:22 151:4
171:19 174:20
204:3 207:24
238:16
**identification**
155:25 156:2,4,6
156:8,10,12
157:24 187:4
**identify** 217:20
**II** 141:5,11

immediately
    181:15 207:23
impact 210:23
    212:1
impacts 211:3
imposed 255:25
improper 225:15
include 254:20
    266:17
includes 261:14
incredibly 225:17
incurred 161:4
independent 158:7
index 144:1 196:16
indexing 198:20
indicate 208:6
indicated 145:18
indicating 255:6
indication 209:18
individual 163:2
    210:9 233:19,20
    241:21
individually 204:14
industry 246:11
    260:18 263:4
inform 184:23
informally 252:18
information 175:13
    182:22 189:25
    192:14 201:20
    202:1,10 232:16
    257:24 259:21
initial 222:16
initially 153:3
    177:1 231:25
install 261:7,10,14
installation 260:20
installed 258:2,6,18
    258:19
instance 230:9
instructed 265:5,6
instructions 208:12
    220:1 241:10,12
    242:18 243:5
    246:10,12,20
    250:19

insurable 170:8
    211:13 214:6
insurance 141:15
    141:16,17 143:9
    143:17,18 150:10
    153:5,12 156:18
    158:18 159:17
    161:24 162:4,6,15
    172:22 173:21,23
    175:18 176:22
    177:7 178:5,17
    184:14 195:8,9
    200:5 201:12,25
    212:9,22 213:13
    214:2,7,8,17
    215:14,21 216:22
    217:1,4 218:18,20
    218:21,24 219:3
    230:17,25 235:15
    239:11 252:20
    257:19 261:8
insure 167:14
    232:15 233:19,24
    246:7 254:6 262:9
insured 163:1,5
    181:25 184:24
    199:1,4 245:13
    256:9
insureds 228:14
insurer 214:20
insuring 148:6,6,7
    148:8,12 151:25
    233:6,6,7 236:6
    246:1
intended 207:21
interest 157:15
    200:19 212:6
    218:8 221:3 231:7
    232:4 263:19
interested 175:24
    269:17
interim 228:15
internal 182:14
    199:19
Internet 265:11
interpret 267:12

intervening 197:3
interview 181:8
interviewed 180:21
    181:1
interviewing
    192:13
introduce 205:22
    252:18
introduced 156:13
investigating
    181:12
investigation
    180:23 181:6
    182:1,6,7,15,19
    192:14,16 251:12
investigator 191:23
INVESTMENT
    141:9
invoice 144:9
    150:12,24 155:24
    156:17 158:11,17
    160:5 165:1 219:1
    234:4 237:4
invoiced 161:1
    165:8
invoices 150:14
involved 174:24
    188:25 217:3
    245:25 261:19
involvement
    180:15
involving 174:21
    174:22
in-house 181:2
    183:18
IRINA 143:14
ironically 254:1
issuance 235:24
issue 153:10 162:6
    162:23 168:21
    178:5,17,22
    184:14 202:9
    212:18,19 214:1
    214:15,17 215:15
    215:21 216:1,17
    230:16,25

issued 148:22 149:2
    150:13,16 151:10
    151:21,23 153:13
    158:11,23 162:13
    163:6,10 175:18
    175:19 177:8,9,15
    177:16 178:11
    195:10 200:13
    212:23 213:13
    214:8,22 216:14
    217:5,8 227:25
    229:2,5 234:4
    255:14 259:9,25
    263:6 265:17
issues 170:16
    206:14 242:9
issuing 160:24
    177:18 215:6
    231:12
item 219:24
items 169:11,15
    230:13,14

J
JAMES 141:11
JANET 142:3
    269:3
January 156:1,5,23
    157:4,9 159:8
    160:12 163:19
    164:8 166:4 167:4
    168:25 171:8
    177:6 201:19
    218:10
Jersey 141:1 142:5
    142:6 143:5,8,12
    143:15,16 156:21
    161:11 267:25
    269:4,20
Jill 150:19 196:10
    199:4,5,8
Jim 179:22 193:21
job 162:24 216:4,6
Jobs 191:11,15,18
John 143:4
joint 147:7,21,22

149:6 205:15
    207:3 218:6
    225:12 231:10
    232:24,25 233:7
    233:19,24
joints 149:2
judge 225:18
judges 267:22
judgment 220:3
    222:14 243:17,23
    244:1 254:8
judgments 163:15
    169:13 170:11
    197:1 241:4,6
    242:1 253:23
    254:6
July 157:18 164:21
    166:25 178:7
    196:1 198:18
    205:16,18 207:16
    220:8 243:17
jumping 145:16
    188:15
jump-around
    146:25
June 157:16 163:23
    164:7,10 166:3
    167:5,25 174:19
    175:2,25 178:7
    185:10 186:4,11
    197:17 198:8
    200:22 247:8,12
Junior 157:13
    237:10
J.G.L 165:11

K
Kane 141:10
    148:22 153:3,5,9
    154:8 155:5 164:6
    167:12,22 170:20
    173:20 175:13,14
    175:22 176:25
    183:16 186:24
    187:25 188:1,12
    190:10,13 201:10

204:17 211:23
222:1 225:8
233:19 238:10
239:1 247:9
**Kane's** 147:9,9
149:12 151:12
152:3 163:21
170:2 174:21
176:5 202:4
204:12,19 216:20
247:7
**keep** 162:14 165:11
240:2
**Kelly** 180:1
**Kennedy** 143:4
**kept** 213:19 215:22
236:16 239:23
**kind** 149:15 164:11
174:3 177:2
190:22 192:23
202:9
**King** 150:6 195:4
199:24 200:3
203:18,21 204:7
204:18 205:9
210:3 225:14
**King's** 150:6
205:22
**King-16** 205:9
206:18
**King-17** 205:22
208:17,21
**King-18** 206:3
**King-3** 194:25
195:13,18,19
196:7,18 197:7,13
197:17 198:11
199:1,6 200:16,19
201:18
**King-4** 195:1,14,19
197:10,13,17
198:11 199:4
200:7,24 201:13
201:21 202:17
**King-5** 151:15
**King-6** 150:7

knew 238:13
247:25 266:11
**knock** 146:4
**know** 145:23
147:25 148:5
150:25 152:6
154:2,9,12 155:1
155:11,18 158:23
160:11 167:6
171:12,13 172:25
173:5,7 175:2,5
176:3 179:14
180:22,25 181:16
182:4,6,18 183:2
185:11,16,18,24
189:3,6,24 190:15
191:8 192:9
195:21,22 196:24
197:19 198:15
199:6 201:2
202:18 203:6,6,23
203:25 208:2,21
211:11,16 213:8
222:2 223:24
225:18 226:5,7
229:10,10 231:12
231:21,22 232:17
233:3,4,15 235:3
235:8 237:11
238:1,5 241:5,18
242:3,5,8 244:11
244:12,19,22
245:15,17,18
246:24,25 248:21
249:10 250:6,18
250:21 251:8,11
252:13,14 254:1
256:6,8,11,17,18
256:22 258:8
260:23 261:12,12
262:2,10 263:17
264:15 265:11,14
267:17,20
**knowledge** 168:2
178:2
**known** 154:20

156:20 234:2
**knows** 185:17
**Koch** 183:19,19
184:2,15
**Kott** 143:7 144:4
153:19 185:1
211:1 212:3,10,25
213:5 214:10,13
214:21 220:23
229:7,16 231:15
234:15 235:11
236:2,9 245:2
246:13,21 252:16
252:19 266:15
267:8

**L**

**L** 145:1
**lack** 211:25 263:20
**LaFrance** 158:3
169:21,21 170:10
**lag** 186:14
**land** 141:15 143:9
200:20 218:21
231:7,8 252:19
**language** 208:3
**large** 223:19 224:4
**Larry** 191:19
**late** 145:18 166:21
186:2 192:3
257:10,10
**law** 149:16 209:19
225:19 249:12,24
**LAWRENCE**
141:14
**Lawrenceville**
143:16
**lawsuit** 172:24
175:24 181:25
182:8,12,15,23
183:8
**lawyer** 216:23
256:14,17,19
263:24 264:1,2,5
**lawyers** 188:12
256:21 267:23

**Lawyer's** 146:20
146:21,24
**lay** 253:20 254:25
262:13 266:20
**learn** 149:5 232:19
**learned** 211:6
232:20
**leave** 248:18
267:22
**ledger** 219:16
**left** 184:4 248:13
249:2
**left-hand** 196:24
**legal** 185:4 226:1
228:20
**Leibman** 191:12,15
**lender** 153:9,16,20
154:2,4,6,10
162:21 163:1,5
179:7 184:17
201:11,13 212:2
217:3 229:12
236:6 240:16
241:5 242:3,7
255:21
**lenders** 245:20
255:3,7
**Lenox** 143:16
**lent** 229:14
**letter** 144:9,10,10
144:12,12 146:7
150:11 151:10,20
152:14 156:1,3,5
156:11,19,23
157:1,4,17,23
158:2 159:8,13,15
159:21 163:6,10
164:20,21,23
166:24 168:10,14
168:19,24 169:6
169:20 172:21
205:25 206:1
209:11 212:15,17
212:23 213:17
216:8,23 217:4
219:3,9 227:19

229:13 234:14,18
235:20,24,24
239:12 256:24,25
257:1,7,8,9,12
261:15 263:18
265:1 267:17,18
267:21
**letters** 152:7
155:10,16 161:15
169:16 215:1
234:24 235:4,9,18
249:7 257:16
258:25 259:6,9,17
265:18 266:12
267:12
**level** 182:7
**liability** 162:20,20
**license** 249:15
269:21
**licensed** 249:21
**licensing** 261:5
**lien** 163:15,16
220:3 245:11,19
254:4,12 255:23
255:25,25 256:1
**liens** 170:11 197:1
197:2 241:4,5
242:1 254:20
**liked** 209:8
**Limited** 141:7
157:14 217:23
218:3 220:20
221:1 263:20
**Limited's** 243:16
**line** 202:22 223:12
237:9,17,18
239:10
**lines** 237:23
**lingo** 202:23 257:6
257:8
**list** 227:4 247:19
249:22,25 251:14
251:18,25 252:6
252:10
**listed** 152:3 156:15
164:23 197:7

219:6 239:14
242:2,14 244:13
**lists** 146:15
**little** 200:1 202:17
**LLP** 143:3,6,14
**loan** 143:1 231:8
241:3 255:11
263:16,18 266:18
**loaned** 172:14
**loans** 241:17,19
255:3,7,12,13,21
256:5,8 257:4,15
258:8,9 261:19,22
**locate** 210:1
**location** 240:17
**long** 184:3 185:11
185:21 190:2
203:7 205:12,25
230:10 257:25
**longer** 244:1,5,6
247:11
**look** 146:9 151:16
158:4,10,14
163:21 168:23
174:17 187:9
194:24 195:4
196:16 203:17,22
205:21 206:10
208:16,20 210:3
220:9 221:19
225:11 234:3,10
236:21,22 237:7
237:22 239:9,18
240:8 247:6 259:7
265:25
**looked** 146:8 176:5
177:1 185:8 230:2
**looking** 159:3
164:18 202:20
206:14
**Looks** 220:24
**loose** 177:24
**Lorraine** 150:6
195:4 205:9
225:14
**Lory** 203:21

**losses** 194:7
**lot** 152:12 178:9
202:5 211:14
245:8 253:4
**love** 222:3
**lunch** 203:15,16
**L.L.C** 141:10

**M**

**M** 141:13 199:12
**Magnanini** 143:3,3
144:4 145:3
147:16 150:2
153:22 155:20
213:7 214:14
218:14 255:10
259:4 264:24
**Magnanini's** 253:2
**Main** 142:6
**maintained** 240:18
**makers** 174:16
**making** 211:3
**malfeasance** 236:7
**man** 246:15
**Management** 141:6
141:9,10 147:11
163:22 201:1
218:9
**mandatory** 222:9
**MANNING** 142:5
**manually** 236:16
**March** 160:14,18
203:21 204:17
260:5
**mark** 203:18
217:25
**marked** 150:6
151:15 155:25
156:2,4,6,8,10,12
156:21,25 157:3
157:24 158:1
168:24 187:4,6
194:25 205:8
206:18 208:17
217:19 230:10,24
240:9 243:13

**marked-up** 230:1,5
230:17,19
**market** 256:3
**marks** 230:7
**MARTIN** 143:11
**Marty** 218:15
**MAS** 141:2
**materially** 233:21
**matter** 142:2
**McCARTER** 143:6
**McGOVERN**
185:3
**McGOWAN**
143:11 145:17
147:15,17 165:23
185:14 211:2
212:5,13 213:1
218:11 229:9,19
231:16 234:17
235:13 236:4,11
238:17 244:3
246:15
**mean** 213:24 217:2
218:12 220:13
225:24 228:20,21
256:18 263:14
266:20
**Meaning** 209:6
**means** 220:15
221:5
**meant** 195:23
**Mechanically**
256:23 257:14
**mechanics** 262:2
**meet** 183:20 191:17
192:2 250:10
**meeting** 192:12,21
193:6
**memo** 204:4,8,25
205:2
**memoranda** 203:24
**memorandum**
203:20 210:4
**mentioned** 254:23
**met** 180:3 183:21
191:3 192:25

230:9 252:17
**METHFESSEL**
143:10
**Michael** 141:13
149:16,16 220:16
248:22
**mid** 160:14,18
**middle** 160:20
**Military** 213:3
**million** 194:19
**miniscule** 194:6
**minute** 150:2,17
**miscommunication**
145:23
**missing** 228:1
**mistake** 200:8
260:3 265:19
267:4,15
**mistakes** 267:17,19
**misunderstanding**
201:3
**modify** 265:13
**money** 148:14
162:8,17 163:12
172:14 173:22
174:15 183:3,7,11
213:20,22 214:9
214:16 215:18,19
215:22 216:22
224:8 225:7
229:14 233:8
239:1 241:22
254:7
**Monmouth** 186:7
191:24 198:18
206:7 207:21
220:5 222:12,20
222:23 237:10
**Montanye** 150:19
152:4 196:10
199:5,8,18 200:25
202:21,21
**Montanye's** 199:5
**month** 176:4,11,16
176:16,24 210:21
**months** 163:24

165:17 170:1
176:1,16,17 177:3
**morning** 145:4
**mortgage** 153:17
155:2 162:21,23
168:22 171:24
172:2,14,15,18
196:17 199:12
202:21 203:1
205:10 206:17,24
240:15,15 244:20
255:19,20,23
256:14 264:10
266:25
**mortgagee** 147:13
147:15
**mortgages** 147:6
169:12 171:11
173:6,11 185:13
185:22 186:6,10
188:21 192:8
199:9 211:17
215:1 224:24
241:4,6 242:1
245:7
**mortgagor** 147:16
148:7,14
**mortgagors** 233:8
**motion** 255:24
**Mulberry** 143:8
**MURPHY** 141:19

**N**

**N** 143:1 202:22
**name** 189:16
195:24 199:5
231:6 240:16,16
243:16 257:23
259:9
**named** 150:19
179:12 180:8
**names** 180:7
**Nancy** 189:18
**National** 141:8,16
143:18 151:24
153:20 202:21

219:9 241:20
**Nations** 141:15
  143:17 204:2
  235:5 256:19
**necessary** 193:25
  242:4
**need** 169:11 170:8
  254:9 259:16
  261:9
**needed** 148:3,5
  153:11 170:16
  203:22 254:5,8
**needs** 166:10
**neither** 247:25
  269:13,15
**never** 154:4 162:13
  167:17 171:25
  172:19 173:6,8
  179:3,5 182:10
  203:8 209:17
  210:20 211:7,8
  212:23 214:2,4
  223:14 225:7,10
  229:11 238:12,13
  239:5 242:17
  244:24
**new** 141:1,16,17
  142:5,6 143:5,8
  143:12,15,16,17
  143:18 156:20
  161:11 259:25
  265:22 267:11
  269:4,20
**Newark** 143:8
**newspaper** 189:2
**NHF** 182:13,22
  183:6
**nine** 239:10
**non-approved**
  146:15
**non-attorney**
  225:15
**normal** 158:12
  165:21,25 208:3
  239:22 243:6
**normally** 145:9

201:25
**Norman** 200:20
**Notary** 142:4 145:2
  269:3,20
**note** 203:14
**notebooks** 250:20
**notes** 142:1 181:9
  190:3 196:12,15
  199:19
**Notrary** 268:10
**November** 248:17
**number** 144:8
  147:6 149:14
  155:10 158:21
  160:7 162:10
  164:4 167:25
  173:11 176:9,12
  176:25 185:14
  197:7,8,11 203:4
  203:12 213:23
  217:5 219:15,20
  226:11 227:15
  237:9 256:4
  265:25 266:3,6,9
**numbers** 175:4
  176:2 186:18
  221:18,19 258:1
**nutshell** 180:17

------------

**O**

**O** 145:1
**OAKWOOD** 141:7
**object** 185:1,3
  211:1 212:3,10,25
  214:10 229:7,16
  231:15,16 234:15
  235:11 236:2,9
  246:13
**objection** 212:4,11
  213:2,6 214:11,25
  215:9,14 229:8,18
  231:18 234:16
  235:12 236:3,10
  238:3 246:14,21
  246:22
**objections** 163:13

214:24 215:5
  253:18
**obligated** 214:9
**obtain** 235:23
**obtained** 204:3
  246:4,8
**obtaining** 215:10
**obviously** 165:5
  167:18
**occur** 168:1 259:15
**occurred** 177:4
  229:4 254:12
  258:13
**occurring** 176:1
  193:3 209:15
**occurs** 163:19
**October** 219:2
  226:10,16 235:21
**odd** 238:21,21
**office** 142:5 149:19
  150:9 167:22
  168:13 191:25
  193:17 204:16,20
  207:22 210:19
  257:14
**officer** 169:22
  189:2 230:6
**officers** 188:24
**offices** 149:16
  220:16
**Oh** 192:23
**okay** 146:6,13,20
  146:22 148:20
  149:5 151:8 153:2
  153:15 154:10
  155:3,19 158:16
  159:7,25 160:21
  160:25 161:17
  163:1 165:1
  166:22 169:19
  171:21 173:9,14
  175:16 176:14
  178:4,20 179:8
  180:6 181:11
  182:4 183:23
  184:1 186:21

188:15 192:11,18
  193:10 194:23
  195:6 196:23
  197:6,10 198:21
  199:23 200:18
  201:5 203:14
  204:11 206:12
  207:1 208:20
  210:11,15 211:22
  211:25 213:9
  215:13,17 216:16
  217:13 223:13
  226:21 227:24
  228:12 229:12
  230:16,23 234:2,7
  235:8 237:16
  239:17 240:2
  241:9 243:10,12
  244:17,19 246:25
  248:16 249:18
  250:1 252:15,20
  252:25 256:23
  257:14 266:14
  267:7
**old** 168:20 260:1
  265:6,7,23
**old-fashioned**
  257:23
**omit** 216:11 230:10
  230:13 267:1
**omitted** 169:8
**once** 161:17 167:3
  182:7 185:25
  190:8 191:10
  215:14 229:22
  232:20,21
**ones** 150:25 166:6
  174:22 208:3
  210:9 223:6,9
  245:21,23 259:8
  259:18 265:22,23
**ongoing** 215:7
**open** 163:16 168:22
  169:11,12 215:1
**open-ended** 201:5
**operate** 261:24

**operation** 261:25
**opportunity** 248:18
**opposed** 188:18
  204:2 233:20
**order** 149:11,15
  150:8 153:6 160:3
  166:11 170:8
  173:15 197:20
  204:9,15 211:13
  211:17 219:18
  240:14,20 254:6
  259:17 261:10
**ordered** 151:1
  153:4,4 196:3
  197:22 198:5
  204:23
**ordering** 149:19
  150:21 151:5
**orders** 149:23
  176:17 211:16
**ordinary** 158:14
**original** 148:6,13
  154:18 159:1,2
  172:5,25 173:1,16
  173:23 174:8,12
  174:13 188:18
  193:7 197:4,23
  199:14 208:7
  209:16 223:7
**originally** 199:13
**originals** 172:7
  173:5
**Osis** 217:23 222:16
  226:16 228:6,15
  228:21,21
**outside** 181:2
  216:20
**outstanding** 212:6
  221:3,17 242:9
  263:19
**overlaps** 174:3
**owned** 201:1,16
  226:17 244:6
**owner** 164:16
  199:13,14 200:12
  208:7 244:13,14

owners 165:10
  240:14
ownership 172:17
  223:14 244:4
owner's 263:16
owns 146:21,22
  165:22 201:8
O'Neill 180:1

**P**

P 143:1,1
package 261:7,8,14
packet 153:18
packets 154:1
page 144:8 196:17
  199:15 207:2,13
  227:14 228:9
  234:19 235:6
  236:18,22 240:21
  241:1 242:13
paid 161:10 162:8
  162:9,10 171:8
  173:16 174:4,5
  183:2,4 213:14,17
  213:21,24 214:16
  215:13 216:22
  217:5 221:21
  225:7 254:9
  262:23
paper 150:1 189:14
  190:7,17 192:5
  240:20
paragraph 199:25
  200:1,3,18,25
  201:16,18,20
  202:18 207:18
  226:23 228:1
  258:12 259:13,19
paraphrase 253:3
  262:6 267:15
parenthesis 148:24
  158:22 174:18
  226:11
Park 150:20 156:20
  157:3,15 158:8
  189:15 217:25

234:6 244:7,9
  245:8
Parkway 143:4
part 153:17,23
  158:25 159:1,2
  161:10 180:22
  191:2 206:21
  211:17 224:19
  232:15 240:5
  245:11 250:5
particular 203:25
  255:18
particularly 210:8
parties 269:15
pattern 185:12
Paul 180:8
pay 161:20,24
  183:7 186:20
  188:3 213:3 224:9
  229:22 254:18
  265:9
payable 157:9
  160:4
paying 155:1
  253:23
payment 160:9
  161:9 183:1 187:8
  187:10 221:2
  222:24 225:5
  237:2,8,11 239:10
  239:21 242:15
payments 187:18
pending 245:4
people 167:21
  180:6 203:9
  209:17 232:14
people's 266:21
Pepsny 141:13,18
  147:1,19,22,23
  148:1,16 150:16
  150:21 151:4,11
  151:25 152:2
  153:2,4,8 154:17
  154:20 155:4,7,11
  156:24 157:2,6
  158:2 159:14,20

166:7,9 167:3,12
  167:13,19 168:11
  170:14,24 173:15
  175:7,15 178:21
  179:2 190:10,13
  197:22,24 201:10
  209:6,14,22 215:1
  221:8 224:11
  225:8 232:1
  233:12 238:10
  239:1 247:10,25
  248:12,16 249:2,3
  252:1,9
Pepsny's 149:10,19
  164:2 167:15
percent 147:10,13
  176:10,10 192:4
  218:7,9 232:3
percentage 186:19
perfected 255:24
period 146:17,18
  223:22,24 257:3
  258:4,10,24
person 183:20
personal 145:17
pertinent 257:24
Peter 180:10
physical 171:6,7
physically 257:15
pick 164:12,13
  194:21 212:20
picked 199:7,15,18
  207:8,11 213:11
picks 176:18
piece 240:20
pieces 150:1
PIERSON 141:12
place 150:3 155:22
  157:21 186:22
  192:19 203:16
  217:14 231:2
  238:18 247:1
  269:12
placed 245:11
Plaintiff 141:4
  143:5

pled 189:2,6
Plus 176:21 221:16
point 145:21,25
  164:21 170:4
  172:10 178:21
  180:4 182:2
  189:11 190:11
  191:4 216:14
  225:4 226:15
  227:1 228:18
  245:22 247:10
pointing 195:18
  223:13
policies 163:14
  175:18 177:8,15
  177:18 178:5,11
  178:18,23 180:16
  184:15 212:9
  215:6 216:13,17
policy 160:24
  161:16 162:3,4,6
  162:10,13,21,23
  163:3,7 168:21
  200:5 212:19,22
  213:13,23 214:7
  214:15,18,21
  215:15,21,24
  216:1,9 217:7
  218:18 219:3
  227:23,24 229:1,2
  229:6 230:25
  263:6,16,17 264:1
  266:25
portion 145:19
  183:3
positive 192:6
possession 165:18
  227:1 244:1,4
possible 186:12
  223:11 249:4,5
  260:3
possibly 166:23
  180:5 188:1
  229:20,21 263:16
  264:8
practice 225:19

239:22 249:11
predecessor 174:25
prefer 222:3
preferred 222:7
premises 207:19
Premium 161:22
  161:22
prepare 225:16,24
prepared 152:7
  167:21 217:25
  221:8 225:14,24
  238:24
preparing 149:10
preprinted 149:15
  258:17 259:20,23
  266:6,7
Press 189:15
press's 191:2
presumably 158:20
  215:7
presume 170:5,23
pretty 171:4 173:18
  208:3 225:2
  233:13 249:11
previous 166:6
  224:4
previously 151:15
  184:12 194:24
  205:8
pre-numbered
  257:22
price 221:12
  240:15
Princeton 143:15
print 257:17,17
printout 236:15
  243:14
prior 165:6 185:7
  194:3,7,8 207:23
  223:22 231:12
  232:25 237:4
  241:2 269:5
privacy 241:21
probably 146:8
  160:11,13,17,18
  160:19 165:13

166:20,21 170:14
171:7,12 173:7,9
175:23 178:3,8
190:12 194:12
198:16 199:16,22
200:8 207:7,8
216:13 223:6
224:13 230:13
233:10 245:13
247:12,13 248:20
252:12 254:17,17
255:18 258:1,15
**problem** 177:25
224:8 226:4
228:19 263:5
264:19
**problems** 154:3,12
236:1 251:7,9,15
253:4
**proceed** 145:14
146:1
**proceedings** 142:2
**proceeds** 161:1
241:3
**process** 160:24
192:24 193:1
211:15,20,23
232:16 264:16
**produced** 156:16
204:2 205:20
206:4 218:14,17
218:22 219:4,12
219:25 240:9
**product** 230:3
**production** 152:22
161:15 169:3
**profit** 194:6
**profitable** 194:4,8
194:17
**profits** 193:22
194:10,13
**proof** 216:10
**proofs** 169:7
**proper** 264:7,10
**properly** 160:23
200:10 216:4,10

255:24
**properties** 141:7
160:9 167:8
173:14 175:23
176:6,8 183:11
184:18 200:13
202:4 211:23
245:7,13 247:4,7
256:9 262:19
**property** 141:6,8,9
147:9,10,11
148:23 149:13
150:18 151:12,13
153:10 154:8
155:5 156:20
157:6 163:22,23
163:24 164:9,11
164:16 165:11,17
165:22 166:3
167:4,9 170:3,7,7
171:2,14 172:13
172:15,16,18
198:10 199:2
200:12,15 201:1,1
201:7,8 202:14
205:12,17 206:21
208:7,14,15
210:23,24 211:9
212:7 218:9 220:4
221:1 226:17
227:3 228:15
232:4 235:25
240:17 242:8,9
244:2 245:1,9,11
246:6 254:3,5,8
254:12 256:1,2
**proposed** 199:1,4
228:14
**prosecutor** 191:20
191:21,22
**Prosecutor's**
191:24
**protection** 150:11
151:10 172:21
212:23 213:16
216:23 217:4

227:19 235:9
239:11 249:7
256:24
**protocol** 181:12
**provide** 182:22
250:19 265:3
**provided** 250:22
**provider** 260:19
261:3,13,16,21
265:3
**providers** 260:18
**public** 142:4 168:3
178:1 189:10
191:14 193:11,15
211:20 248:6,9
251:24 252:6
263:11 264:13
268:10 269:3,20
**purchase** 148:13,22
153:10 154:7
158:23 164:3,6,7
170:7,24 171:18
173:16,21 174:2,8
197:13 198:22
200:4,16 221:1
229:15 233:8
240:15 242:8
255:7
**purchased** 147:9
149:13 150:18
167:5,9 172:16
173:23 221:15,16
255:11,12
**purchaser** 148:13
162:18 163:2
171:23 199:2
255:15
**purchases** 153:6
170:20 221:25
**purchasing** 205:12
**purports** 203:20
**purpose** 159:14
192:11 204:7,16
205:11
**pursuant** 237:3
**put** 160:10,17

164:2 165:4,7
200:11 207:24
208:2 215:24
216:7,8 253:20
254:2 263:8,13,16
263:17,19 265:12
266:25 267:1
**p.m** 268:2
**P.O** 143:15

---

**Q**

**Quality** 180:13
**quarter** 166:21
**question** 145:6,9
154:5,21 185:2,19
193:25 195:7
199:25 201:5
214:14 222:18
223:1 225:25
228:8 231:10,19
245:2,4 246:18,23
249:19 256:12
258:23 266:14,17
**questioning** 252:23
**questions** 145:15
146:6,14 147:1,3
155:11 169:9
181:19 247:2,17
252:24 253:2
264:22,23 267:25
**quite** 256:7
**quoted** 190:6

---

**R**

**R** 141:11 143:1,7
143:11 145:1,1
220:13,13 221:5,5
**Rafael** 218:4
**raise** 170:22
**raised** 169:9
**ran** 164:10 165:20
166:3 197:1
198:17,18 199:8
199:12,13 226:15
**rarely** 230:19,21
243:9
**rates** 161:11

**RD** 195:20,23
**read** 245:4
**ready** 145:22
**real** 191:1 254:4
**realize** 262:9
**realized** 177:25
**really** 161:8 188:19
190:22
**REALTORS**
141:18
**realty** 141:18,19
237:13,15,24
239:15
**reason** 152:24
162:12 179:4
188:6 201:15
206:20 233:23
239:2,14 242:24
263:2 265:16
**reasons** 173:19
224:3,3
**recall** 145:11
147:21,23 148:2
148:17 149:7,22
149:23 153:7
155:15,18 159:11
159:12,20,22
167:2,19,23 168:3
173:3 178:15,23
178:25 179:8
184:4,15,20
185:24 186:1,2
188:19,19 189:8
189:13,25 190:6
191:6,13 192:9
193:16,19 204:21
206:17 209:9,21
209:24 224:14
233:11 235:7
238:5 245:22
247:9 248:18,21
249:1 251:23
252:5,9,10
**recalled** 225:6
**recalls** 147:2
**receipt** 222:13,24

receive 154:6,11
  208:25 230:17,21
  243:7,10
received 154:13
  155:25 156:2,4,6
  156:7,9,12 157:24
  160:8 161:17
  178:4 187:3,18,25
  188:7 193:16
  209:4 239:21
receiving 226:3
recess 186:22
  203:16 247:1
recital 208:13
recognizance
  159:17 169:13
  253:24 254:3,5
recognize 151:16
  195:12,16 196:10
recollection 158:7
  177:15 187:24
  206:13 223:16
recommend 251:4
record 150:2,4
  155:20,23 157:20
  157:22 160:11,12
  160:18 161:15
  164:19 165:16
  171:9 186:17
  188:20 192:18,20
  196:3,14 202:20
  207:9 209:12
  210:4,22 217:13
  217:15,21 220:14
  224:12 226:6
  230:4 231:3
  255:11 264:6,7,9
  266:24
recorded 147:18
  171:25 172:3,6,8
  172:17,19 173:6,7
  173:11 185:9
  186:5,7,10 189:23
  192:7 201:19,22
  202:14 203:2
  206:25 207:1,7,10

207:21 209:19
  210:20 214:2
  223:17,18 224:2,2
  224:4,5 231:23
  232:14,25 244:16
  244:20,24 245:10
  255:21 262:17
  264:16,17
recording 160:15
  186:25 188:4
  196:17 197:5
  206:6 210:13,16
  211:16 224:9
  231:23 237:14,17
  237:25 238:2
  239:2,15
records 198:7
  201:17 239:19
recourse 172:20
  229:13
recovered 255:23
RECROSS 144:2
  267:8
red 170:22
REDIRECT 144:2
  264:24
refer 153:19
referred 169:16
  231:6 254:15
referring 153:20
  253:17 262:11
refresh 187:24
refund 214:9
refunded 183:11
  215:19
regarding 156:24
  157:2,6,19 158:3
  158:8 169:9
  183:16
regular 183:16
  188:8,8
regularly 187:18
  234:7
related 155:4 175:6
  242:9 266:22
relative 269:14,16

relayed 175:13,14
released 254:5,8
remain 230:15
remained 243:15
remedies 228:20
remedy 228:25
remember 166:6
  167:12 189:16
  190:15,16,17,18
  195:22 203:7,9
  210:8,8,9 213:22
  215:2 222:2,5
  223:25 252:12
  253:5,9
remitted 213:23
removed 159:17
  264:3
rendered 217:7
rep 250:10
repeating 213:10
reporter 142:4
  189:10,13,17
  190:14 245:5
  269:4
represent 150:7
  210:18 236:14
  252:19 255:5
  260:22
representative
  246:16 260:6
represented 149:12
  152:2 203:12
representing
  149:21 151:2,5
  256:14
reps 250:8
reputation 250:9
request 150:23
  153:8 158:16,17
  164:3,6 165:4,7
  217:3 249:10
requested 231:14
requesting 150:9
  204:22
requests 160:12
required 185:13

222:7
requirement
  232:13
requirements
  153:11 155:11,17
  230:8,11 231:4,9
  241:14
requires 170:12
rerecord 264:9,10
Residences 200:6
residential 188:9
  200:2,5,12,15
  215:18
respect 257:15
responded 159:21
  233:12,14
response 167:15
  253:1
responsive 146:10
result 182:15 183:7
  243:25
retain 239:20
retained 223:3,5
return 162:17
  214:18 220:14
  226:6
returned 162:18
  216:21 217:9,10
  220:17 221:6
revealed 232:7,11
review 145:7
  152:13,14 220:11
rhyme 242:24
Richard 141:11,11
  141:13 168:11
Ridge 217:24 218:4
  218:8 219:4,11
  220:4,20 234:5
  236:23 243:15
  255:19
right 146:22,25
  147:17 148:25
  151:3 152:19
  153:25 159:6
  160:16 161:5,19
  165:3 166:8 167:1

171:3,14,16
  172:25 173:13,14
  178:3,6 192:1
  193:4,13 195:17
  195:20 199:3
  200:17 203:3
  207:4,15 208:8
  209:7,20 211:24
  211:24 212:18
  213:18 214:23
  215:12 219:7
  224:6 225:1
  226:14 239:16
  241:11,15 246:5
  250:17 254:14
  255:9,18 259:1,10
  261:3 262:10
  263:9 264:19
  266:4,13
right-hand 203:5
  220:13
road 143:11 250:8
ROBERT 141:6,10
  143:3 144:3 268:6
  269:6
ROLAND 141:12
Rose 195:20,23,24
Rosso 180:8
ROTHSCHILD
  143:14
rough 253:2
RTF 237:13
run 150:9 164:15
  164:17 174:7
  195:23,24 198:25
  199:17 230:24
rundown 197:3
  198:17
runs 163:12

S

S 143:1 144:7
sale 149:1 151:13
  152:3 153:7,13
  154:23 157:13
  164:4,8 167:8

169:12 170:6
171:1 174:3,6,8
197:14 198:22
200:24 206:9,15
218:25 221:12
226:13 229:14
242:7 243:16,22
**sales** 155:5 170:20
204:12 243:18
246:1,7 247:8
250:8,10
**Sally** 157:19 203:21
204:8
**Salvatoriello**
205:11 210:25
**Salvatoriellos**
205:14,17 206:10
207:17 208:10
211:8
**satisfied** 241:2,4,6
242:2,4
**save** 173:22
**saw** 203:25 214:25
238:13 242:7
**saying** 159:18
162:14 166:9
167:13 168:6
170:6,10 186:4
215:1,20 244:15
259:4
**says** 187:11,20
195:20 197:7
200:19,25 201:16
201:17,18 207:18
209:11 216:9
221:2 227:7,8,15
228:13 231:5
236:24 237:10,11
237:18 241:1,3
**Schedule** 230:10,11
230:14
**Schlessinger**
179:13
**screeching** 172:12
**screwing** 165:11
**search** 149:18

161:14 165:16
166:7 174:2,3
176:21 198:7,9
207:8 217:6
232:14
**searched** 173:8
198:20
**searcher** 160:13
196:25
**searchers** 230:4
**searcher's** 195:24
196:12,15 199:19
202:23
**searches** 150:11
156:19 158:18
161:6 164:11
165:20 166:2,3
171:1,20 174:7
185:8,21 203:8,8
209:25 210:18
217:6 219:4
226:15 230:24
239:11
**searching** 171:22
173:10 176:23
**search-wise** 164:1
**second** 148:8
155:21 157:20
166:11,14 174:11
197:24 207:2
224:13,15,23
231:21,22 234:19
235:6 236:22
247:8 266:16
**secretary** 152:9
**section** 230:10,14
249:12,24
**securities** 141:3
154:2 171:24
172:14,19,20
174:22 175:8
179:1,6,9 180:7
180:15 184:17,21
184:24 188:25
205:10 212:1
219:13,25 220:2

241:13,16,23
244:20 245:1
255:4,13,15
**securitized** 255:13
**see** 150:10 151:16
152:22 157:8
164:20 171:20
206:20 219:23
223:12 225:20,21
236:19,20,24
242:10 258:16
259:14,16
**seeing** 164:18
206:17
**seen** 148:21,21
149:1,24 154:1
155:9 159:9
168:18 174:20
177:4 203:23,24
204:15,15 206:23
207:25 208:22
210:5,7,10 221:17
221:18 228:3
229:11 235:4,4,21
239:7 245:23
**segregated** 213:22
**sell** 244:9 246:5
261:6,6
**seller** 149:21 151:5
169:10,14 172:18
254:2 262:16
**sellers** 209:16
**seller's** 221:10
232:1 240:16
**selling** 149:14
165:17 166:20
175:23 214:5
247:7 262:19
**send** 152:18 155:16
204:22 210:12
214:16
**sending** 155:15
204:8,20
**Senior** 218:4
**sense** 174:10
**sent** 146:7 150:24

152:15 168:14
206:6 209:1
210:16 238:25
239:1 257:18
263:22 264:1
**separate** 171:7
**separated** 171:10
**September** 168:1
**sequence** 264:11
**series** 196:7,23
217:16
**service** 151:20
152:7,14 156:19
163:6,10 212:15
212:17 219:3,9
229:13 234:14,18
235:3,20 256:25
257:1,9,12,16
261:15,16,21
263:18 265:1,18
267:12,16,18,21
**services** 217:7
250:13
**set** 269:12
**settled** 182:25
**settlement** 242:14
243:1,2
**seven** 160:7
**sewer** 221:3,17
**share** 183:3
**sheet** 242:16
**Sheri** 168:11
**Sherry** 168:12
**Shields** 189:18,20
190:9
**shocked** 186:16
**short** 143:5 252:22
**Shorthand** 142:4
**show** 150:5 151:14
157:25 187:6
194:7 205:7 230:8
**showed** 154:14
237:4
**showing** 172:17
201:6 222:24
226:12 243:14,22

**shown** 217:16
226:16
**shows** 220:19
222:19 242:15
**side** 196:24 203:5
**sign** 152:18 227:9
227:21 234:24
**Signatory** 227:8
**signature** 234:20
**signed** 152:24
169:3 227:12
235:1
**significance** 197:1
**significant** 176:2
**similar** 209:4 224:2
224:3 250:22
**simple** 200:19,25
**simpler** 244:14
**simultaneously**
207:22 233:1
**situation** 214:15
216:21 217:9
254:11,14 262:22
**situations** 254:16
256:13
**skip** 236:13
**SKOWRENSKI**
141:11
**slightly** 160:2
235:16
**small** 186:19
**software** 260:17,17
260:24 261:4,8
265:3
**sold** 163:25 166:18
167:4,25 171:15
172:15 176:6,8
208:10 225:23
228:16,17 243:16
245:7 256:9
**solve** 264:19
**somebody** 165:16
199:5 200:14
260:24 264:17
**somewhat** 194:16
199:24

soon 217:2
sooner 178:8,9
sorry 160:1 176:7
    183:25 188:15
    190:21 219:17
    260:5
sort 150:20 165:23
    175:20 181:6
    182:14
spaces 228:1
speak 166:13
    175:10 177:25
    179:12 190:13
speaking 167:13
    187:5
specific 175:5
    261:8
specifically 167:6
specimens 227:22
split 148:9
spoke 167:10,12
    184:2 188:23
    190:9 233:15
    251:16
spoken 179:20
    183:15
Spring 176:17
stamp 152:22
    207:14 222:12,23
    234:25 236:18
stamped 156:16,22
    157:5,11,16 204:1
    205:19,24 206:5
    218:5,17,22 219:5
    219:16,20,25
    234:20 240:10
    260:7
stamping 218:13
standard 243:21
    246:11 249:11
stands 219:14
Stanley 141:12
    156:17 219:2,10
    234:5 240:14
    242:14
start 194:1

started 149:25
    160:23,24 174:20
    175:23 215:3
    231:23 255:22
    264:12 266:16
State 142:4 161:11
    269:4,20
statement 221:20
    221:25 241:21
STATES 141:1
Steinberg 217:25
stenographic 142:1
stenographically
    269:11
step 215:23
STONE 143:3
stop 177:20 182:2
    216:15,16
stopped 177:18
    215:4,5,6 216:15
    248:5,21
story 190:17 192:5
straw 147:8 149:11
    149:14 151:2,14
    166:12 167:8
    232:3 247:3
Street 142:6 143:8
stretched 185:10
stuff 181:11
subject 192:15
    253:4,12,15 262:5
    263:19
subjects 253:13,14
Subparagraph
    235:5
subpoena 193:16
Subscribed 268:7
subsequently
    236:16
substance 190:18
substantial 177:2
successors 219:10
sue 228:24
sued 254:7
sues 181:25
suggest 249:8

251:24
suit 183:6
suits 254:7
Sullivan 249:14
    260:7
summary 240:12
Summit 187:22
Superior 220:5
supply 258:15
Support 261:4
supposed 165:23
    221:6 224:1
sure 162:5 165:19
    171:4 173:18
    174:9 191:8 193:8
    193:14 198:1
    204:17 206:23
    221:23 233:13
    265:24
sustained 213:5
switch 257:3
sworn 145:1 268:7
    269:6
symbols 202:17
system 160:11
    171:9 196:6 258:7
systemic 178:15
systems 258:2
SYSW 205:19,24
    206:5 207:2,14
    219:17

_____

T

T 144:7 145:1
table 241:17,24
take 151:16 158:4
    158:10 163:21
    168:23 181:8
    185:21 194:23
    195:4 203:14,22
    206:10 208:16,20
    210:3 220:9
    225:11 231:8
    234:2,10 236:21
    237:22 239:9,17
    240:8 253:20

257:2,3 264:2
    265:25
taken 142:3 253:4
    253:16 254:13
    269:11
takes 150:3 155:22
    157:21 186:22
    192:19 203:16
    217:14 231:2
    247:1
talk 147:24 211:19
    253:20
talked 145:17
    148:23 160:15
    185:7 224:16
    231:11 247:17
    253:7 264:13,14
talking 148:2 168:4
    190:15 222:15
    254:21,25 256:5
    258:3
target 192:16
tax 155:4 169:12
    206:2 209:1,17
    220:3 221:17
    237:15,16 243:16
    243:18,22,23
    244:13
taxes 155:1 187:1
    221:3 224:9
telephone 233:16
Telephonically
    181:22
tell 148:1 149:7
    152:10 170:8
    171:3,25 174:19
    184:3,16,21
    185:25 190:23
    192:15 197:25
    231:5 233:16
    234:3,13 240:11
    254:24 258:7,17
    260:9
telling 169:10
    184:20
tells 240:13

ten 176:9 198:19
ten-month 186:14
term 262:7,20
terms 161:14 213:4
    253:21 254:25
    262:14,18 266:21
testified 145:2
    153:3 180:16
    188:11,24 189:9
    209:14 247:19,24
    248:11,16 249:15
testify 269:7
testifying 153:7
testimony 253:5,9
    262:23 269:10
Thank 264:21
    267:25
thanks 145:5
theory 146:1
thing 153:2 162:16
    184:12 190:22
    196:14 199:23
    215:3,19 238:22
    248:1 254:23
things 147:3 149:9
    149:17 150:1,21
    165:25 166:18
    175:21 180:13
    187:1 193:5 196:8
    211:17 241:22
    253:12,16 254:10
    254:18
think 152:20
    161:12 162:2
    163:18,19 164:20
    170:21 171:3
    173:19,20,23,24
    174:17 176:5
    177:5 178:9
    179:14 180:20
    181:4 183:5 184:6
    185:14 186:1
    187:11 188:3
    190:8 191:7 192:3
    192:9 194:7
    204:16,24 205:1

212:15 214:12,14
224:18,25,25
225:17 226:4
232:23,24,25
233:21,23 242:5
247:13,19,24
248:4,10,11,13,24
248:24 249:5
250:19,24 252:3
253:14 255:14
266:15,19 267:7
**thinking** 178:14
**third** 236:22
  242:13
**THOMAS** 141:12
**THOMSON** 142:6
**thought** 145:23
  167:20 186:8
  187:8 188:24
  189:1 190:20
  203:11 224:16
  238:17,20 248:13
  265:17,21
**three** 169:11
  193:23,24 200:19
  200:25 201:16,18
  201:21 205:7
  226:23 228:1
**tight** 266:11
**tile** 148:23
**time** 146:17,18
  159:23 160:10,15
  164:16 166:21
  168:4 170:4
  175:21 176:3
  178:2,3,7 181:17
  184:1,3 185:15
  186:17,23 187:8
  188:23 190:20
  191:9,11 194:11
  197:21 198:10
  201:7 203:2,7
  204:12,13 206:23
  211:5 215:2
  223:22,24 224:16
  225:2 227:1

232:11 239:7
247:17 248:13
257:3,4,11 258:4
258:10,24 261:17
261:22 269:11
**times** 183:22
  192:25 215:23
  216:3 252:17
**title** 141:15,15,16
  141:17 143:9,13
  143:17,18 146:20
  146:21,24 147:4
  148:21 149:11,18
  149:20 150:9,10
  150:21 151:6,21
  151:22 152:8
  153:4,5,12,12
  154:3,7,11,12,14
  154:18,21 155:10
  155:12 156:14,16
  156:18,18,23
  157:1,5,9,18
  158:2,11,18,21,23
  159:17 160:4
  161:14,24 162:3,4
  162:5,6,6,7,8,14
  162:25 163:10,13
  164:1,3,4,5 165:5
  165:16 168:11
  169:22 170:3,9,11
  172:21 173:15,20
  173:23 175:3,18
  175:19 176:22,22
  177:7 178:5,17
  179:9 180:18,21
  180:23 181:3,5,19
  182:1,7 183:12
  184:13,13,14
  185:9,20 186:5
  187:11,14,17
  188:6,17 193:1
  195:8,9,10 197:8
  197:8,20 200:5,6
  201:6,12,25 204:3
  204:9,10,22
  208:14,15,18,25

209:12,17 211:4,9
211:10,11,13
212:9,22 213:13
213:14 214:1,3,6
214:7,8,17 215:14
215:21,21,25
216:22 217:1,4,9
217:24 218:18,20
218:21,23 219:2,3
219:5,21 226:9
227:24 229:1,5
230:1,5,6,8,17,18
230:19,25 234:5
235:23 236:24
237:2 239:10
241:8 242:2,7
246:4,8 247:20
249:8 250:2,6,18
250:20,22 251:1,4
251:16,17,24
252:20 253:18,20
257:18,21 260:18
261:4,8 262:8,9
262:10,21 265:2,2
265:6,22
**Title's** 150:13
  152:21
**today** 146:2 159:10
  159:12 208:24
  265:10
**told** 148:18 152:2
  165:9 167:19
  177:19 178:16,21
  179:1 184:13
  190:1,21 192:17
  233:24 247:9
**Tom** 191:11,18
**top** 195:17 220:13
  266:4
**transaction** 158:8
  219:11 240:13
**transactions** 174:5
  174:21 175:25
  176:2,25 177:5
  183:17 188:13
  193:3 197:20

204:19 208:5
216:20 242:22
243:11 247:6
**transcript** 142:1
  145:7 190:4
  269:10
**transfer** 219:13
  224:9 226:18
  237:13,15,24
  238:2 239:2,15
**transferred** 209:18
  211:8
**transferring**
  157:14 209:12
  210:23,24 217:24
  223:14
**translate** 253:19
**transmitted** 262:24
  263:3
**treasurer's** 187:22
  188:7
**Trebour** 180:11
**tried** 238:8
**true** 258:22,23
  269:10
**trust** 157:8 160:3
  161:21,22,22
  187:5 219:16
  224:8 236:15
  245:21,24 253:8
  254:24 255:2,12
  256:13,20 264:14
**trustee** 255:12,15
**truth** 269:7,7,8
**try** 266:25
**trying** 150:20 152:1
  171:1 173:22,25
  175:20 177:6
  186:13 225:1
  258:12 259:2,14
**TSS** 261:4,12,12,16
  262:2
**TSS's** 261:25
**turn** 150:12 159:7
  160:2 181:14,16
  188:17 193:17

207:2,13
**turned** 147:5
  172:11 173:1
  180:17 193:6,12
**Turning** 221:4
**two** 171:5,10 174:4
  180:6 192:25
  194:6,19,24 195:5
  195:8 196:19
  200:1,1,3 218:11
  221:14 253:12
**two-page** 260:8
**type** 215:19 254:10
  257:23
**typed** 207:18
**types** 267:19
**typewriter** 259:21
**typist** 168:13

### U

**Uh-huh** 177:11
  187:13 203:19
  207:12
**ultimate** 154:23
  166:11
**ultimately** 148:11
  160:13 256:3
  263:5
**unapproved**
  247:18,20 248:1
  249:22,25 251:5
  251:18 252:2,6
**unauthorized**
  225:19
**uncover** 185:11
**uncovered** 184:17
**underlying** 154:3
  155:3 183:10
**underneath** 237:22
**understand** 165:19
  175:9 213:25
  241:16 262:22
**understanding**
  162:19 166:17
  185:5
**undertook** 182:18

**underwriter**
162:11,13,14
180:10 181:15
183:17 251:8
262:24 263:3
267:3
**underwriters**
161:23 181:2,20
183:15 251:17
260:20 261:9
**uniform** 235:16
**UNITED** 141:1
**unrecorded** 223:3
264:15
**unusual** 201:23
225:17 226:1
235:17,19
**update** 174:12
**updating** 174:14
**use** 174:18 175:3
250:1,6 260:1,17
260:20 261:3
262:7
**useless** 211:3
**usual** 145:16
165:15 167:11
181:18
**U.S** 191:12 193:17

_____
**V**

**valid** 212:24
**various** 148:20
150:11 156:19
187:1 245:20
261:9
**vary** 235:16
**VECCHIO** 141:18
**venture** 147:7,21
147:22 149:3,6
205:15 207:3
218:6 225:12
231:10 232:24,25
233:7,19,24
**versions** 265:6,7
**vested** 211:4,5
214:4,6

**vests** 214:3
**viewed** 200:21
**violate** 231:13
**Viscardo** 171:24
**vividly** 167:12
**void** 238:1
**voided** 238:11
239:3
**voiding** 237:23,25
238:14,15
**VOLUME** 141:5
**volumes** 176:15
**vs** 141:5

_____
**W**

**Wagner** 143:4
210:21 223:13
**WALKER** 143:4
**Walsh** 141:3
153:21 154:1
171:24 172:14,19
172:20 174:22
175:8,10 179:1,5
179:9,20,22 180:7
180:15 183:7
184:17,21,24
188:24 205:10
212:1 219:13,25
220:1 241:13,16
241:23 244:20,25
255:3,8,13,13
**Walsh's** 174:24
**want** 145:10,11
165:21 170:6
171:23 243:21
252:23 253:3,11
253:19,20
**wanted** 147:25
170:24 189:24
247:21 251:13
253:24
**wanting** 233:25
**washed** 225:3
**wasn't** 146:14
174:9 201:22
221:16,23 222:6,7

235:17 238:7,17
241:25 244:16
249:4
**way** 155:5 161:8
165:25 172:1,8
203:8 204:24
229:24 244:14,25
250:16 257:23
261:24 266:11
**website** 220:7
243:14
**week** 170:2
**weeks** 221:14
**WEICHERT**
141:18
**went** 171:8 176:4
185:8 199:8 223:7
**WERBEL** 143:10
**weren't** 177:15
179:6 185:22
224:12 235:18
**West** 142:6
**we're** 145:22 162:9
162:23 168:20
177:20 178:17,22
192:24 214:24
243:1 254:14,21
256:5 258:3
**we've** 156:21
164:23 174:20
175:17 177:4
187:6 204:15
210:18 216:2
217:17 235:4,4,21
252:17
**whatnot** 177:10
**whichever** 259:19
**wife** 213:8
**WILLIAM** 141:10
**Willis** 191:19
**Winter** 176:16
**wire** 219:13
**wired** 241:22
**withdrawn** 263:22
**witness** 144:2 213:5
214:13,19,23

220:24 238:19
246:17
**woman** 150:18
**wondering** 223:9
**word** 262:10
**work** 150:24
154:18,21 155:4,6
161:2,2,7,9 165:5
174:7,13 175:6,7
175:8 197:20
204:19 230:3
247:21 248:5,8,12
251:20 260:15
261:1 266:23
**worked** 206:22
**working** 171:11,17
**works** 161:9
**wouldn't** 154:16,20
164:12,12 168:6
171:13 179:7
210:7,8,9 214:8
226:22 242:8
**write** 196:15
**writing** 231:5
238:18
**written** 220:13
239:8 261:7
**wrong** 178:22
266:24
**wrote** 199:5
**WSWT** 234:20
260:7

_____
**X**

**X** 144:7
**XI00970** 269:21

_____
**Y**

**Yacker** 141:12
147:24 148:1,16
149:23 151:1
154:23 155:16
156:17 157:19
158:18 160:9
161:2 165:2 167:3
167:10 175:7
185:12,17 197:25

204:21 205:20
206:2,6 209:6
210:5,12,16 219:2
219:10,21 221:6
224:8,11 226:6
231:25 233:10,11
234:5 238:1,6,10
239:20 240:14
241:13 242:15
247:25 248:5
252:1,8
**Yacker's** 157:8
160:3 167:22
204:20 205:23
206:4 219:16
236:15
**yeah** 165:6,13
174:14 193:8
196:15 198:24
199:22 201:22
205:1 222:14,18
234:22 238:16
243:5 255:1 265:8
**year** 176:13 194:3
194:6,8,20,21
258:1
**years** 184:6 193:23
193:24 194:7
225:23 234:23
248:25 250:9
263:4
**yesterday** 145:18
147:1 167:24
209:14 248:17
**York** 141:16,17
143:17,18

_____
**Z**

**Zappola** 157:19
**zero** 194:2,5

_____
**S**

**$1,113** 237:3
239:20
**$1,206** 157:10
160:4
**$1,500** 221:2,15,16

221:21,21,22
**$100** 161:12
**$105** 161:12
**$186,500** 221:13
**$200,000** 194:12
**$250** 226:3
**$3** 194:19
**$50,000** 194:6
225:5
**$60,000** 187:9
**$77,500** 157:15
**$81** 237:20,25
**$875** 217:8

**0**
**000505** 260:8
**04523** 207:14
**07078** 143:5
**07102-4056** 143:8
**08543-5231** 143:15
**08648-2311** 143:16
**08818** 143:12

**1**
**1** 187:23 230:10
**1,113** 239:12
**1/14/97** 144:9
**1/28/97** 144:10
**10** 157:4 159:25
168:24 206:7
218:4 225:12
**10:25** 142:7
**100** 143:8 192:4
**1017-1019** 150:19
152:5
**105** 217:6
**11** 157:7,12 160:2
218:16 219:20
228:9
**1150** 219:5
**1151** 219:5
**1154** 218:17
**1157** 228:9
**1159** 227:4
**1161** 227:18
**1166** 218:18
**1188** 218:23

**1192** 218:23
**1198** 218:2
**12** 157:12 218:22
229:25 231:4
**12/9/1996** 155:24
156:18
**12/9/96** 144:9
**1200** 218:2
**1202** 218:5
**1204** 218:6
**1205** 219:20
**1234** 219:23 240:10
**13** 156:14 157:17
163:20,21 164:24
166:24 201:19
205:25 219:1
234:3
**138** 217:24 218:4,8
219:4,11 220:4,20
234:5 236:23
243:14 255:19
**14** 156:1,23 158:1
159:8 169:20
176:10 219:20
226:10,16 239:18
**145** 144:4
**15** 157:18 166:25
187:6 219:15
236:14
**150** 143:4 147:5
186:6
**150,000** 150:1
**155** 144:9 205:12
206:9,15 209:25
213:10
**156** 144:9,10,10,11
144:11,12
**157** 144:12
**16** 197:17 198:8
200:22 207:2
219:22 220:23,24
220:25 226:18
235:23 240:9
**17** 175:18 177:7,8
177:13 209:5
219:24 240:24

**241:1** 246:11
**18** 196:1 198:18
206:1 209:11
210:3 217:20
220:2 243:13
**185** 144:13
**186** 221:23,23
**18724** 226:11
**18904** 158:21 164:5
171:6,8
**18904(A)** 164:5
171:7
**19** 217:24 220:20
220:23
**1982** 201:19
**1986** 201:19
**1995** 174:22 175:24
207:21
**1996** 174:19 175:25
176:7,8 177:4
178:18 185:11
186:2 197:17
205:16,18 207:16
217:24 218:3
219:2 220:21
226:10,16 235:21
235:23
**1997** 156:2,3,6,24
157:2,4,9,16,23
158:4 159:8
168:12,25 169:20
169:25 176:5,7
177:9 178:18
185:9 187:23
191:9 199:21
203:21 204:17
206:1,1,7 218:10
247:9
**1998** 191:9

**2**
**2** 230:14
**2(a)** 200:4
**20** 176:6,8 177:3
**200** 176:4,9,12
**2000s** 194:14,18

**248:24**
**2002** 220:9 243:17
244:8
**2005** 194:22
**2007** 194:9
**2010** 142:7 260:6
268:8 269:22
**2013** 269:21
**23** 201:19 203:18
244:8
**252** 144:4
**26** 203:21 205:16
205:18 207:16
**26050** 236:24
**2625** 237:9
**26250** 237:19
**264** 144:4
**267** 144:4
**27** 260:5
**27th** 217:18
**2778** 157:5
**2779** 156:22
**2784** 156:17
**28** 156:5 157:4
168:25 176:7,8
177:3
**28372838** 157:17
**2892** 157:11
**29** 157:23 158:4
169:20,25

**3**
**3** 143:11 157:16
163:23 199:24
200:3 269:21
**3rd** 164:7,10
**3:42** 268:1
**30** 219:2 235:21
**30(b)6** 217:17
**3012** 143:11
**31** 157:9 218:3
220:8 243:17
**31st** 160:12 163:19
164:9
**36** 142:6
**39** 196:22 199:15

**4**
**4/19/97** 144:13
**4/9/97** 144:10
**40** 147:13 218:9
**400** 176:18
**44744** 219:25
**44746** 220:1
**45** 196:22
**4516** 205:24
**4518** 205:24
**4519** 205:19
**4520** 207:3
**4525** 205:19
**4536** 206:5
**4546** 206:5
**47746** 242:13
**488** 187:21

**5**
**5** 142:7 196:4,5,6
247:8
**5/29/97** 144:12
**50** 176:23 186:25
187:9
**50,000** 187:10
**505** 219:14
**506** 219:14 234:20
**51** 247:8
**515** 156:20,24
157:2,15,19 158:3
158:8,18,24
**5231** 143:15
**5589** 196:21 199:15

**6**
**6** 234:10
**6(A)** 219:6 260:5
266:1
**60** 147:10 218:7
232:3
**60,000** 186:25
**60/40** 148:9 205:15
**6166** 196:17

**7**
**7** 156:14,15 158:11

218:10
**7th** 156:20,24
   157:2,15,19 158:3
   158:8,18,24
**7/15/97** 144:12
   156:11
**7/18** 195:20,23,25
**7/64** 203:5
**7/8/96** 198:12
**70** 219:17
**707.50** 237:11,24
**7083** 219:17 236:22
**7084** 236:19 239:9
**7085** 219:17
**7086** 219:18
**75** 176:23

───────── **8** ─────────
**8** 156:22 159:8
   199:21 217:19,22
   220:12 222:11
   235:22
**8th** 186:7
**8/5** 195:20
**8932** 204:1

───────── **9** ─────────
**9** 156:3,25 157:2
   160:1 165:2
   168:10,12 207:20
   218:1,2 222:23
   225:10 269:22
**9th** 165:6 186:7
**90** 161:12
**90s** 248:23 257:10
**96** 165:2 170:16
   174:24 175:2
   177:6 178:11
   186:2,11 192:3
   198:8 200:22
   223:8 249:19
**97** 147:6 163:19,23
   164:8,9,10 166:4
   166:21 170:16
   173:4 175:25
   178:7 186:3,8,9
   191:7 192:4

223:10 232:22,25
   248:17 249:19
**97-cv-3496** 141:2
**997** 143:16
**9997** 157:18