# EXHIBIT G

Donna Sullivan

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No.
97-cv-3496 (DRD) (MAS)

WALSH SECURITIES, INC.,      :
                             :
            Plaintiff,       :
                             :
      vs.                    :      DEPOSITION OF:
                             :      DONNA SULLIVAN
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP
CONSULTING INC.; COMMONWEALTH
LAND TITLE INSURANCE CO.;
NATIONS TITLE INSURANCE OF
NEW YORK, INC.; FIDELITY
NATIONAL TITLE INSURANCE CO.
OF NEW YORK, INC.; COASTAL
TITLE AGENCY; DONNA PEPSNY;
WEICHERT REALTORS; and VECCHIO
REALTY, INC., d/b/a MURPHY
REALTY BETTER HOMES AND
GARDENS                      :
            Defendants. :
                             :
  - - - - - - - - - - - -

Donna Sullivan

## Page 2

```
1                TRANSCRIPT of the stenographic notes of
2    the proceedings in the above-entitled matter, as
3    taken by and before JANET BAILYN, a Certified
4    Shorthand Reporter and Notary Public of the State of
5    New Jersey, held at the office of STONE & MAGNANINI,
6    150 John F. Kennedy Parkway, Short Hills, New Jersey,
7    on September 27, 2011, commencing at 10:05 in the
8    forenoon.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1    A P P E A R A N C E S:
2
3       STONE & MAGNANINI, LLP
        BY:  DANIEL MEE, ESQ.
4            -and-
             AMY WALKER WAGNER, ESQ.
5       150 John F. Kennedy Parkway
        Short Hills, New Jersey 07078
6       Attorneys for Plaintiff
7       McCARTER & ENGLISH, LLP
        BY:  DAVID R. KOTT, ESQ.
8       Four Gateway Center
        100 Mulberry Street
9       Newark, New Jersey 07102-4056
        Attorneys for Defendant
10      Commonwealth Land Title Insurance Co.
11      FOX ROTHSCHILD, LLP
        BY:  EDWARD HAYES, ESQ.
12      P.O. Box 5231
        Princeton, New Jersey 08543-5231
13      997 Lenox Drive
        Lawrenceville, New Jersey 08648-2311
14      Attorneys for Defendants, Nations
        Title Insurance of New York, Inc. and
15      Fidelity National Title Insurance
        Co. of New York
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1                        INDEX
2    WITNESS     DIRECT CROSS REDIRECT RECROSS
3    DONNA SULLIVAN
     BY MR. MEE     6
     BY MS. WAGNER        148
4
5
6
7
8                     EXHIBITS
9    NUMBER    DESCRIPTION        PAGE
```

```
     Nations-1  Plaintiff Walsh Securities,
                Inc.'s Notice of 30(b)6
10              Deposition of Defendant
11              Nations Title Insurance
                Of New York, Inc.         9
12   Nations-2  Answer to Fourth Amended
                Complaint, Separate Defenses,
13              Answers to Cross Claims,
                Cross Claim, Third Party
14              Compliant and Jury Demand    28
     Nations-3  Letter dated July 28, 1997   40
15   Nations-4  Letter dated August 11, 1997  42
     Nations-5  Letter dated September 5, 1997  46
16
     Nations-6  Closing Service Letter dated
17              July 10, 1996            108
     Nations-7  Deed dated July 25, 1996  111
18   Nations-8  Deed dated July 25, 1996  113
     Nations-9  Commitment for Title Insurance  117
19   Nations-10 Mortgage dated July 25, 1996  119
     Nations-11 Deed dated July 25, 1996  123
20   Nations-12 Deed dated July 25, 1996  123
     Nations-13 Deed dated July 25, 1996  125
21   Nations-14 Deed dated July 25, 1996  125
     Nations-15 Coastal Title Agency Document  127
22   Nations-16 Fidelity National Title
                Insurance Company Owner's
23              Information Sheet         127
     Nations-17 Invoice dated 7/10/96     128
24   Nations-17B Document Entitled, Important
                 Notice and Disclosure     129
25   Nations-18 Loan Policy of Title Insurance  130
```

## Page 5

```
1    Nations-20  Document from Current Status, Inc.  137
     Nations-21  Document from Current Status, Inc.  137
2    Nations-22  Copy of Check from Stanley Yacker  140
     Nations-23  Letter dated 7/17/96        141
3    Nations-24  Closing Instructions by
                 Walsh Securities           143
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Donna Sullivan

Page 6

1  D O N N A  S U L L I V A N, having been duly sworn by
2  the Notary, testified as follows:
3  DIRECT EXAMINATION BY MEE:
4      Q.   Welcome back.
5      A.   Good morning.
6      Q.   I'm Daniel Mee with Stone & Magnanini.
7  We represent Walsh Securities. With me is Amy Wagner
8  also from my firm. I know you have been here a
9  couple of times already but just to go over some of
10  the ground rules once again. With the court reporter
11  we will try not to speak over each other. Verbal
12  answers, that type of thing.
13          If you need a break, just let me know.
14  I just ask that a question not be pending at the time
15  that you request a break.
16      A.   Okay.
17      Q.   And that's it. So how is it that you
18  became the 30(b)6 witness for Commonwealth, Nations
19  and Fidelity?
20      A.   I was asked to be the 30(b)6. I had
21  some knowledge obviously of Commonwealth because I
22  was -- although it was very distant memory, I have
23  knowledge more of the operations and, you know, the
24  parties who worked there and that type of thing for
25  Commonwealth having worked there when this claim

Page 7

1  first came in.
2          I've worked for Fidelity for the last
3  nine years now, and most of the claims department and
4  I think the people that were involved in this are no
5  longer with the company. There's a senior claims
6  attorney handling it, but I probably have more
7  familiarity with the -- maybe with the agent function
8  so they decided they wanted to select me for this
9  also.
10      Q.   Were you ever employed by Nations?
11      A.   No.
12      Q.   Have you ever acted as a 30(b)6 witness
13  for Nations in any other litigation?
14      A.   No. And I just want to say I think
15  Nations was an active company, so to some extent
16  maybe I was an officer because I think I'm considered
17  an officer for any of the entities held by FNF,
18  Fidelity National Financial, the parent company. So
19  I might have had authority but I was not an employee
20  per se of Nations.
21      Q.   So it's a division -- is Nations a
22  division of Fidelity?
23      A.   In July of 2010 Nations merged into
24  Fidelity and is no longer an active company.
25      Q.   And then --

Page 8

1      A.   Prior to that it was held by Fidelity
2  National Title Insurance Company.
3      Q.   And when did it become held by Fidelity?
4      A.   Fidelity National Title Insurance of New
5  York acquired Nations on April first, 1996. Later --
6  I don't know if it was a merger but Fidelity National
7  Title Insurance of New York, I guess the stock was
8  transferred. Fidelity National Title Insurance
9  Company, sister company, the Nations stock was
10  transferred to that sister company and then it merged
11  as I said in July of 2010.
12      Q.   Does Fidelity currently hold all of the
13  liabilities for Nations, anything that occurred in
14  1996 or 1997?
15      A.   Well, they owned them. They acquired
16  them in April of '96. To my knowledge they have a
17  liability. I haven't seen an issue raised to that,
18  that they don't.
19      Q.   Did you have any conversations with
20  anyone who worked for Nations in 1996 or 1997 about
21  this case?
22      A.   I don't believe that I -- since they
23  were acquired by Fidelity in '96 they really were not
24  operated as a separate -- although they remained an
25  active company, the management, the claims department

Page 9

1  were really the same people. So I don't know that
2  I've spoken to anybody that actually was an employee
3  of Nations.
4      Q.   Okay.
5          (Nations-1, Notice of Deposition, is
6  received and marked for identification.)
7      Q.   I'm handing you what's been marked as
8  Nations-1. It's the Notice of Deposition for the
9  30(b)6 witness for Nations Title Insurance of New
10  York. Did you review this notice of deposition?
11      A.   I did.
12      Q.   When were you first notified that you
13  would be the 30(b)6 witness for Nations?
14      A.   More than a year ago, I think.
15      Q.   And if you turn to page -- well, it's
16  after page three. It's actually Schedule A. There
17  you go. Thanks. This is a list of topics or areas
18  of inquiry that we wanted to ask you questions on in
19  your deposition today. As a 30(b)6 witness you're
20  required to educate yourself on certain issues
21  concerning the company. And I just want to run
22  through some of these and ask you what you did to
23  educate yourself on these topics.
24          So number three it states: "Since
25  January 1996 the company's organizational structure,

3  (Pages  6  to  9)

VERITEXT  REPORTING  COMPANY

8be467d8-735c-4213-860a-f6c4bff07d99

Donna Sullivan

Page 10

1  the roles and responsibilities of personnel and
2  officers in its various departments."
3        Who did you speak to in order to
4  familiarize yourself with that topic?
5     A.    I spoke to Keith Weller, Chris Marra,
6  Larry Feinberg.
7     Q.    Sorry. Could you say that again?
8     A.    Chris Marra, Keith Weller, and I think I
9  spoke to Larry but that was pretty secondary.
10    Q.    And where are Mr. Weller, Marra and
11 Feinberg today?
12    A.    They're all employees of the company.
13 Keith Weller is state counsel in Pennsylvania. Chris
14 Marra had left the company for a while but rejoined a
15 couple of months ago and he's working out of
16 Pennsylvania. And Larry Feinberg is in New Jersey.
17 I think it's East Brunswick. I'm not sure.
18    Q.    Were they working for -- I'm just going
19 to say Nations/Fidelity in 1996 and 1997?
20    A.    Keith I believe -- Keith was working for
21 Fidelity I believe in '96 and '97. Chris I think
22 came to the company in 2002 or -- yeah, I believe
23 2002. Larry had been with Chicago Title so when
24 Chicago and Fidelity became one family, which I
25 believe was somewhere around 2000, I'm not sure of

Page 11

1  the exact date of that, he would have had some
2  knowledge although he was not a Fidelity employee.
3     Q.    Did any of these individuals have any
4  active role in this litigation? Do they -- let me
5  rephrase -- let me strike that.
6        How many times did you talk to these
7  fellows?
8     A.    I talked to Keith at least twice and
9  Chris at least twice.
10    Q.    And Larry?
11    A.    Larry I think I talked to once maybe
12 last summer when I was first preparing for this.
13    Q.    You say at least twice for Chris and for
14 Keith. More than five times or --
15    A.    In preparation for this?
16    Q.    Yes.
17    A.    Not more than five, no.
18    Q.    Back to Schedule A. Number five, it
19 states: "The total number and process of issuing
20 closing service letters by the company or its agent
21 in connection with the real property transactions at
22 issue in this litigation."
23        Who did you speak to in order to
24 familiarize yourself with that topic?
25    A.    Chris Marra and Roberta DeFelice.

Page 12

1     Q.    Who is Roberta?
2     A.    Roberta, I believe she has some type of
3  accounting function in Pennsylvania but she could
4  track remittances.
5     Q.    Was she able to track the remittances of
6  the policies and closing protection letters in this
7  litigation?
8     A.    I asked her to run one chart that I --
9  well, this is not just Nations. This was Nations and
10 Fidelity but some of the Nations files are on the
11 same chart, and I asked her to run -- I think there
12 were 80 something on that particular chart. So I
13 asked her to run those and see if she could find any
14 remittance information for them. And I forget how
15 many she found, maybe 20 or 19, something like that.
16    Q.    Did you produce that chart?
17    A.    I didn't -- I don't even know -- I don't
18 know who produced that chart. I'm not sure where
19 that -- there was a chart in the file that listed a
20 lot of the numbers. It was not a chart that I
21 created.
22    Q.    Okay. I guess the better question to
23 make this a little more streamlined would be to ask:
24 In reviewing these topics who did you -- in all of
25 these topics who did you have conversations with?

Page 13

1     A.    Okay. Mr. Hayes, Keith Weller, Chris
2  Marra, Larry Feinberg, Roberta DeFelice, Matthew
3  Reeney. I had some e-mail exchange with I think it's
4  Robert Schmidlin, S-c-h-m-i-d-l-i-n, and I think the
5  other man's name is Clancey. He was also at
6  Commonwealth. He produced similar I think financial
7  information so I may have the last name wrong but it
8  is in the other deposition also.
9     Q.    Was his first name Clancey or last name
10 Clancey?
11    A.    I don't know. But Clancey was in it.
12    Q.    Okay. At number six on Schedule A it
13 states: "The total number and process of issuing
14 title insurance policies issued by the company or its
15 agents in connection with real property transactions
16 at issue in this litigation."
17        Do you know the total number of title
18 policies that were issued by the company?
19    A.    For Nations -- I don't know the total
20 number. I know there were policy numbers listed on
21 the chart that I sought remittance information on. I
22 had asked Roberta to give me copies of policies that
23 matched those along with the remittance numbers. She
24 couldn't come up with remittance numbers and copies
25 of some of the policies that matched the policy

4 (Pages 10 to 13)

Donna Sullivan

Page 14

1  numbers on the chart, and I think some of them
2  actually didn't seem to match the property, so I'm
3  not real sure where those numbers came from. And I'm
4  not sure if the agent issued some policies that we
5  didn't get copies of or remittances, so I don't know
6  that I can give you a total number of what the agent
7  issued.
8      Q.   Can you estimate for Nations?
9      A.   I can't really.
10     Q.   More than five?
11     A.   No, I didn't distinguish it well from
12  the Fidelity on the same chart, so I don't recall how
13  many policies she actually gave me that were Nations.
14  I'm sure there was at least one, but I don't know
15  that there was five.
16     Q.   So you had a total of 81, I think you
17  testified?
18     A.   Some of those were Fidelity, some of --
19  most of those were Fidelity.
20     Q.   So out of the total 81 how many policies
21  do you recall?
22     A.   For Nations?
23     Q.   For both.
24     A.   I think it might have been around 20.
25     Q.   Okay. And number seven on Schedule A --

Page 15

1      A.   And I should say I have remittance
2  information on 20. I think she did have some
3  remittances without a policy number based on a
4  commitment. So again it could be 20 that have
5  remittances. It could have been fewer that had the
6  policy copies.
7      Q.   Okay. At number seven it states:
8  "Since January of '96 the policies and procedures for
9  issuing closing service protection letters including
10  communications with brokers, agents and attorneys as
11  well as the issuance of binders and commitments."
12         Were you able to track how many closing
13  service protection letters were issued by Nations
14  pertaining to the properties at issue in this case?
15     A.   No. The only thing I could identify was
16  on which files of those 80 we received the $25 fee
17  for issuing the closing service letter, and some of
18  those they had a policy remittance amount and the
19  closing service amount, and where she was able to
20  give me the policies and she had a copy of the CSL
21  she gave me that.
22     Q.   Were they the same number? In other
23  words, did you have the same number of -- you said
24  you had about 20 out of the 81 policies. Did you
25  have like 20 out of the 81 closing service letters?

Page 16

1      A.   No.
2         MR. HAYES: Let me object to the form.
3  I think she said she thought there were about 20
4  policies but less than that in remittances.
5         THE WITNESS: The reverse.
6         MR. MEE: The reverse.
7      A.   She did have some remittances without
8  policies, which is unusual to me, so I don't remember
9  exactly how many policies. And there were a couple
10  of files where I know there was a remittance for the
11  policy amount but she didn't have the $25 fee, and I
12  don't know why she didn't get the $25 fee because
13  presumably a letter was issued, but she didn't get a
14  copy of it and didn't get the fee on a couple of
15  them.
16     Q.   So were there less $25 fees than there
17  were remittances for policies?
18     A.   Yes. For the insurance premium
19  remittance, yes.
20     Q.   Okay. Was that also contained in the
21  chart?
22     A.   I just have handwritten notes next to --
23  I reproduced a copy of a chart I found in the file to
24  send her and she just handwrote some figures next to
25  it on what she could find from her system.

Page 17

1      Q.   Do you know when that chart was
2  prepared?
3      A.   I don't recall. It was a chart I took
4  from one of the claim files.
5         MR MEE: If we don't have that I think
6  we're going to make that part of a request to get
7  that document.
8      Q.   Schedule A at number eight, it says:
9  "Since January 1, 1996 the company's policies and
10  procedures for evaluating qualifications of closing
11  agents and closing attorneys and contracts and/or
12  agreements including Robert Agel at Coastal Title
13  Agency Inc. Stan Yacker, Michael Alfieri, Richard
14  Pepsny and Anthony Cicalese."
15         Who did you speak with in order to
16  familiarize yourself with that topic?
17     A.   Chris Marra.
18     Q.   Is that it?
19     A.   Yes.
20     Q.   Turning the page to number 12, it
21  states: "The company's underwriting memoranda and
22  any loan issued in connection with the real property
23  transaction at issue in this litigation."
24         Did you review any of the company's
25  underwriting memoranda in preparation for this

5  (Pages 14 to 17)

Donna Sullivan

Page 18

1 deposition?
2     A.   Yes.
3     Q.   Do you know whether or not those were
4 produced?
5     A.   Let me see. I'm sorry. Let me reread
6 this number 12. Company's underwriting memoranda on
7 any loan issued in connection with real property
8 transactions. I'm not sure what all that means. As
9 far as underwriting memos except to the extent there
10 was an e-mail about the participants in these loans.
11 I have looked at general underwriting memoranda and
12 there was I think something issued by underwriting
13 counsel with respect to the parties here. Other than
14 that I'm not sure there's underwriting memos specific
15 to the loans in this.
16     Q.   And you reviewed that in advance of this
17 deposition?
18     A.   I did.
19     Q.   Do you know whether or not you produced
20 any of those underwriting memoranda that you
21 reviewed?
22     A.   The general underwriting memoranda?
23     Q.   Both. Any underwriting memoranda that
24 you reviewed in advance of this deposition, do you
25 know whether or not they were produced?

Page 19

1     A.   I don't know.
2          MR. MEE: Okay. We're going to make a
3 request for that as well, Ed.
4     Q.   At number 15 it states: "Since January
5 1, 1996 the company's procedures regarding its claims
6 review process and its process to approve or deny
7 coverage for policy claims at issue in this
8 litigation."
9          Was there a claims manual for Nations?
10     A.   Not to my knowledge.
11     Q.   Was there one for Fidelity?
12     A.   At that time in '96, '97 I'm told there
13 was only a California Western Regional Manual, and
14 that was not used in New Jersey.
15     Q.   So how were -- well, let me strike that.
16 Were there any guidelines for claims counsel or
17 anyone in the claims office for reviewing claims?
18     A.   I don't know for -- these claims came in
19 in '97, '98. I don't know specifically for those
20 years.
21     Q.   For Nations or for Fidelity?
22     A.   Or for Fidelity.
23     Q.   Is there currently a claims manual?
24     A.   Yes.
25     Q.   And then at 16 it states: "Since

Page 20

1 January 1, 1996 any policy claims resolved or paid to
2 any entity on the loans at issue in this litigation
3 including but not limited to Walsh Securities,
4 Gruntal Financial, Temple Inland or Bankers Trust.
5 Who did you speak to to familiarize yourself with
6 that topic?
7     A.   I spoke with Ed and I also researched
8 some of that myself.
9     Q.   I don't want to know about
10 conversations -- substance of conversations that you
11 had with your counsel but did you -- were you able to
12 determine whether or not any entity was paid on loans
13 that are at issue in this litigation?
14     A.   I don't know that -- I don't know loans
15 that are part of this litigation. I'm going to say
16 no, I don't think any that were part of this
17 litigation.
18     Q.   Were other -- if you don't know --
19     A.   I don't know.
20     Q.   Were --
21          MR. HAYES: Why don't you just tell
22 counsel the one that you're aware of that was
23 resolved, and then he can determine whether it's part
24 of the litigation so there's no confusion about your
25 answer.

Page 21

1     A.   I don't know the loan number or the file
2 number obviously, but it was the one where the
3 borrower's name was Harris and Ames I believe was the
4 plaintiff in litigation.
5     Q.   Okay.
6     A.   And there was a payment made to Ames.
7     Q.   And was that the only payment that
8 you're aware of on loans concerning Walsh Securities?
9     A.   The only payment to -- yes.
10     Q.   Now, at number 17 it states: "The
11 identity of all properties for which the company
12 claims it corrected mistakes in title or lien
13 priority on behalf of Walsh Securities or any other
14 interested party."
15          With whom did you speak in order to
16 familiarize yourself with that topic?
17     A.   Ed, and obviously I reviewed what we had
18 in our files.
19     Q.   Were you able to determine whether or
20 not the company was able to correct mistakes in title
21 or lien priority on behalf of Walsh Securities?
22     A.   I did not see that the company did that.
23     Q.   At 19 it states: "The documents
24 reviewed by the company in connection with its
25 investigation or review of any claims by Walsh

6 (Pages 18 to 21)

Donna Sullivan

Page 22

1  Securities including those referenced in paragraph 16
2  of the schedule."
3         Was there an investigation file as part
4  of -- file as part of this litigation, a -- I guess I
5  should say like a claims investigation file?
6      A.    Well, there are many files given the
7  size of this litigation and the number of properties
8  involved, so there's more than one file, but there
9  are files that include some investigation -- that
10 evidence investigation.
11     Q.    Is there a particular individual who's
12 the custodian of those documents, would be considered
13 the custodian of those documents?
14     A.    The documents that I've reviewed are in
15 my office.
16         MR. KOTT:  Off the record.
17         (A discussion takes place off the
18 record).
19     Q.    Moving on to number 21.  "All facts and
20 circumstances concerning the company's decision
21 regarding the nonpayment of title insurance and
22 closing protection letter claims" -- I'm sorry --
23 "closing service letter claims in connection with the
24 real estate transaction at issue in this litigation."
25         With whom did you speak in order to

Page 23

1  familiarize yourself with that topic?
2      A.    Again, I discussed this with Ed and I've
3  reviewed the files I have.
4      Q.    Number 24, it says:  "The company's
5  interactions or communications with any other
6  defendants in this litigation."
7         Did you speak to anybody about that
8  topic?
9      A.    I might have briefly discussed with Ed
10 but -- yeah, Ed.
11     Q.    Anybody else?
12     A.    No.
13     Q.    Do you know whether or not there have
14 been any communications between the company and any
15 other defendant in this litigation aside from
16 Commonwealth and Fidelity?
17     A.    Interaction or communications with any
18 other defendant?  Well, obviously there's been with
19 Coastal, some settlement communications I assume that
20 went along with that.  Not that I reviewed all those
21 but I know that they exist and I am not familiar with
22 any other communications with other defendants.
23     Q.    Was there any litigation between Nations
24 and Robert Skowrenski or NHF?
25     A.    I don't believe so.

Page 24

1         MR. HAYES:  Other than the crossclaim in
2  this case?
3         MR. MEE:  Yes, sorry.  I was referring
4  to litigation that Commonwealth was involved in.  I
5  wasn't aware --
6      A.    I don't believe that Fidelity or Nations
7  was involved in that type of litigation.
8      Q.    Okay.  Number 27, "The termination of
9  Coastal Title Agency as the company's agent and the
10 basis for that termination."
11         When was Coastal Title Agency terminated
12 as --
13     A.    I believe it was terminated in December
14 of '03.  Certainly notice of termination was sent in
15 November '03 but I think it was in effect December.
16     Q.    Who made that decision to terminate
17 Coastal?
18     A.    I don't know.  The parties that
19 terminated them were the state office in New Jersey
20 and -- in 2003.  I don't know if it was Kevin Cairns
21 or Chris Marra who signed the letter.
22     Q.    Were you part of that decision-making
23 process?
24     A.    No.
25     Q.    On page four at 29, it states:  "The

Page 25

1  company's fees, commissions, bonuses, contracts,
2  agreements or other special compensation paid to any
3  of the defendants in this litigation by the company
4  or any of the company's affiliates relating to the
5  title insurance at issue in this litigation."
6         With whom did you speak in order to
7  familiarize yourself with that topic?
8      A.    I don't know that I spoke to anyone on
9  this.  I reviewed the agency agreement and agency
10 file.
11     Q.    Were you able to determine how much was
12 paid to Coastal Title Agency on the -- as
13 compensation on the properties at issue in this
14 litigation?
15     A.    No, I cannot.  I didn't have any
16 payments made to Coastal that are specific to this
17 property -- to these properties.
18     Q.    Number 30 it says:  "The company's
19 profit on the title insurance policies issued in
20 connection with the real property transactions at
21 issue in this litigation."
22         Were you able to determine the amount of
23 profit on the policies that you said you were able to
24 find?
25     A.    To the extent the remittance reflects --

7 (Pages 22 to 25)

VERITEXT REPORTING COMPANY

Donna Sullivan

| Page 26 |
| --- |

1  and I'm not sure if that's profit but that's
2  certainly income. I have the limited remittance
3  information that is on that chart that I mentioned
4  previously.
5      Q.   At number 32 it says: "The company's
6  document retention policy."
7          Was there a retention policy for
8  Nations?
9      A.   At that time I don't know if there was
10 any policy, although I think the state regulation
11 would require you to keep title insurance files for
12 15 years.
13     Q.   Do you know whether or not any documents
14 were destroyed during the course of this litigation?
15     A.   I don't know that.
16     Q.   You had mentioned that you met with
17 Mr. Hayes in order to prepare for this deposition.
18 Did you meet with any other attorneys?
19     A.   To prepare for this, no.
20     Q.   How many times did you meet with
21 Mr. Hayes?
22     A.   Once.
23     Q.   When was that?
24     A.   Yesterday.
25     Q.   For how long?

| Page 27 |
| --- |

1      A.   Maybe two hours, two and a half hours.
2      Q.   Did you meet with any potential experts
3  in this case?
4      A.   No.
5      Q.   Do you know whether or not the company
6  has retained an expert in this case?
7      A.   Yes.
8      Q.   What is his name?
9          MR. HAYES: Objection.
10         MS. WAGNER: You can answer.
11         MR. HAYES: No, she can't answer.
12         MR. MEE: Why not?
13         MR. HAYES: Because you will learn the
14 experts consistent with Judge Magistrate Shipp's
15 order the same way we have waited.
16     Q.   What documents did you review aside from
17 the ones we just went over? Are there any other
18 documents that you reviewed in preparation of this
19 deposition?
20     A.   That's a broad -- documents, obviously I
21 reviewed what files I possess, a couple of copies of
22 letters that were provided to me by counsel. I had
23 gone through the claims system to look on whether I
24 could track payments made to other entities as we
25 discussed. What other documents? Certain documents

| Page 28 |
| --- |

1  in connection with the responses here, the
2  underwriting memoranda, the retention policies, those
3  documents I mentioned.
4      Q.   Did you review the company's responses
5  to Interrogatories?
6      A.   I think I looked at them quickly and
7  most of them referred to I think the repositories.
8      Q.   Probably the same for the request to
9  produce documents, I would imagine. Did you look at
10 that?
11     A.   I don't recall.
12     Q.   How about the company's Answer to the
13 Fourth Amended Complaint?
14     A.   I'm sure I looked at that at one point.
15         (Nations-2, Answer to Fourth Amended
16 Complaint, is received and marked for
17 identification.)
18     Q.   You have been handed what's been marked
19 Nations-2 at the top. It's the company's Answer to
20 the Fourth Amended Complaint, Separate Defenses,
21 Answer to Crossclaims, Crossclaim, Third-Party
22 Complaint and Jury Demand. I direct you to page 15.
23 At the top you will see it states: "First
24 Affirmative Defense." These are the -- well, let me
25 start, this is the Answer on behalf of both Nations

| Page 29 |
| --- |

1  and Fidelity?
2      A.   Yes.
3      Q.   Can you just briefly explain why there
4  was a single answer for both companies?
5      A.   I don't know the date of this document
6  but I'm assuming at this point the parent company of
7  Fidelity had acquired Commonwealth.
8      Q.   Okay. And so at page 15, the First
9  Affirmative Defense, it states: Answering,
10 defendants have no liability to plaintiff under the
11 closing service letters because, A, the closing
12 letters were not issued to plaintiff."
13         What is the basis for that contention?
14     A.   Well, letters themselves are written to
15 National Home Funding and it says -- well, I guess
16 its successors and assigns.
17     Q.   Does the company not include Walsh
18 Securities as its successors and assigns?
19     A.   I think they consider the successors and
20 assigns to be limited to the -- well, I think it's
21 kind of tied together with the language of the letter
22 so I'm not sure. The closing letters were not issued
23 to the plaintiff. I think there are -- in the letter
24 itself it calls, you know, for title insurance
25 specified for your protection, which is not to Walsh.

8 (Pages 26 to 29)

Donna Sullivan

Page 30

1    I think the closing letters -- in the actual language
2    on the letter it could be really to the successor to
3    NHF who is making the loan at the time of closing.
4    So I'm not sure I have -- I'm not sure -- the answer
5    is they may not consider Walsh a successor, and I'm
6    not sure if I can express the basis.
7       Q.    Is it that -- let me rephrase.  If a
8    closing service letter is issued to -- let's take
9    away National Home Funding, but to another company
10   and it says:  Company X and it successors and
11   assigns -- strike that.
12         Let's move on to B.  B states: "The
13   closing service letters do not protect against the
14   type of conduct alleged by the plaintiff."
15         What's the basis for that contention?
16      A.    The language in the letter itself
17   protects against certain acts that affect the
18   validity or the priority of the mortgage to be
19   insured, and the acts that plaintiff are making
20   claims with respect to do not fall within the
21   coverage language in that letter.
22      Q.    Is it the company's position that Walsh
23   Securities was the first lien holder in all of the
24   properties at issue in this case?
25      A.    Well, clearly they were not because

Page 31

1    certain documents were not recorded.
2       Q.    At C it states:  "The closing service
3    letters are invalid on their face in that they did
4    not make references to a particular transaction."
5         What is the basis for that contention?
6       A.    I'm not familiar with that but I am
7    assuming each closing service letter has to specify
8    the property, the transaction and the reference, and
9    I don't know if there are certain ones that were not
10   completed and didn't specify the transaction.  I
11   haven't reviewed all the closing service letters.
12      Q.    So does the closing service letter
13   protect the actions of a particular attorney or is it
14   the particular property or is it the particular
15   transaction?
16      A.    Can you repeat that?
17      Q.    I will ask the court reporter to read
18   that one.
19         (The pending question is read by the
20   court reporter.)
21         MR. HAYES:  Object to the form of the
22   question in that it implies that the answer would be
23   only one of those.
24         MR. KOTT:  I join in the objection.  I
25   also object because it's a compound question.

Page 32

1       A.    I don't think it's protecting any of
2    those parties.  It may be providing coverage with
3    respect to the property and cover certain actions by
4    the attorney.
5       Q.    So is it covering the action -- is it
6    covering the transaction or is it covering the
7    attorney or is it covering the property?
8         MR. HAYES:  Same objection as before.
9         MR. KOTT:  Join.
10      A.    I think the letter speaks for itself.
11   It's providing certain coverage when there's a title
12   insurance commitment provided and it's insuring that
13   the attorney complies with the closing instructions
14   to the extent that they affect the validity and
15   priority of the mortgage.
16      Q.    At D it says:  "The closing service
17   letters are invalid on their face in that they are
18   not dated."
19         What is the basis for that contention?
20      A.    I assume there must be some letters that
21   are not dated, but again I have not reviewed each of
22   those letters and I don't know that for...
23      Q.    And down at the bottom, F, it says:
24   "The closing service letters were induced by fraud."
25         What is the basis for that contention?

Page 33

1       A.    I assume that it refers to the fact that
2    NHF was participating or allegedly participating and
3    some Walsh Securities employees were allegedly
4    participated in the fraud or had knowledge that this
5    was going on and were induced to issue these letters
6    to insure without having that information disclosed
7    to us.
8       Q.    Coastal Title Agency was the issuing
9    party of the closing service letters.  Is that right?
10      A.    For most of the transactions.
11      Q.    So who would have induced Coastal Title
12   Agency to issue the closing service letters?
13      A.    Well, they would have been requested.
14      Q.    By whom?
15      A.    By the closing attorney usually.
16      Q.    At the Second Affirmative Defense it
17   states:  "Plaintiff did not rely upon closing service
18   letters in completing the mortgage transactions
19   complained of in the Fourth Amended Complaint."
20         What is the basis for that contention?
21      A.    Well, I have to -- I'm guessing at these
22   and --
23         MR. HAYES:  Don't guess.  If you don't
24   know say you don't know.
25      A.    I don't know.

9 (Pages 30 to 33)

Donna Sullivan

---

Page 34

1    Q.    I guess that was another instruction I
2  should have given you at the beginning, which is that
3  if I ask you a question and you respond I'm going to
4  assume, and since it's all written down, you're under
5  oath, we're all going to assume that you understand
6  the question and that you can answer the question.
7  So I would ask you not to guess on any responses.
8         The next page, the Fourth Affirmative
9  Defense states: "The plaintiff is charged with
10  knowledge and conduct of its officers, agents and/or
11  employees in this matter.  Plaintiff's officers,
12  agents and/or employees participated in the scheme
13  alleged in the Fourth Amended Complaint."
14         What is the basis for that contention?
15    A.    Well, I assume -- well, again, I assume
16  it has to do with the pleas, allocution statements of
17  several defendants in this action that -- either
18  admissions of certain acts of employees of Walsh or
19  other parties that alleged Walsh employees' actions
20  in connection with the fraud.
21    Q.    Anything else?
22    A.    I don't know.
23    Q.    The Fifth Affirmative Defense says:
24  "Plaintiff's claims arise from the conduct of
25  individuals and/or entities over which answering

---

Page 35

1  defendants had no control."
2         What is the basis for that contention?
3    A.    Again, I was not a party to drafting
4  this but I assume it refers to actions of NHF, the
5  attorneys or other parties that have -- and Walsh's
6  own -- Walsh is the plaintiff but other parties that
7  we have no control over.
8    Q.    The Sixth Affirmative Defense says:
9  "Plaintiff's claims against answering defendant are
10  barred by contributory and/or comparative
11  negligence."  Strike that.
12         Moving on to the Eighth Affirmative
13  Defense.  "The claims asserted by plaintiff do not
14  arise under the title insurance policies in each
15  transaction pleaded in the Fourth Amended Complaint.
16  Plaintiff maintains a valid first mortgage lien on
17  the subject premises."
18         Did Nations conduct an investigation to
19  determine whether or not plaintiff maintains a valid
20  first mortgage lien on the subject premises?
21    A.    I know they have done some search work
22  and I believe it encompasses all these files, but I'm
23  not positive of that.  And I think certainly some of
24  them have -- had first liens and have actually been
25  foreclosed I believe, but I'm not sure that every

---

Page 36

1  property has a first lien.
2    Q.    So do you know whether there are
3  properties on -- do you know -- of these subject
4  premises do you know whether plaintiff does not hold
5  a valid first lien on a certain number of properties?
6  That was a confusing question.
7         MR. HAYES:  Let me object anyway,
8  whether confusing or not, unless you're going to
9  identify the subject premises about which your
10  question is addressed since I think you guys have
11  acknowledged finally that's it's not all of the 220
12  files on which you're actually contending there's a
13  title problem.
14         MR. MEE:  Thank you.  But I'm going to
15  go back to what Mr. Kott said on Saturday, which is
16  we all know how to object and I would appreciate it
17  if you would keep your objections to form or
18  privilege rather than give speaking objections and
19  advising the witness through your speaking objection.
20    Q.    So back to the question.  Plaintiff --
21  the second part of this affirmative defense states:
22  "Plaintiff maintains a valid first mortgage lien on
23  the subject premises."
24         To which subject premises are you
25  referring to in this affirmative defense?

---

Page 37

1    A.    I can't specify which properties of all
2  the properties.  I'm not sure if you're talking about
3  Nations or Fidelity, but even so I haven't looked at
4  each property and have in my mind which property it
5  applies to and which it doesn't.  I believe there are
6  some properties that Walsh does have a first lien on.
7    Q.    That are the subject of this litigation?
8    A.    I believe so.
9    Q.    Under the Ninth Affirmative Defense it
10  states: "Plaintiff has failed to join the borrowers
11  as necessary parties to this action.  The borrowers
12  have executed notes in favor of plaintiff agreeing to
13  repay the sums of money due to plaintiff.  Plaintiff
14  should be required to exhaust the collateral prior to
15  moving forward with this litigation."
16         What is the basis for that contention?
17    A.    Well, I assume that there must be some
18  notes from borrowers where we have not waived
19  deficiency actions and we haven't determined your
20  losses, if you haven't exhausted your ability to
21  pursue a note.
22    Q.    If Walsh has a valid closing service
23  letter claim against the company, does it state
24  anywhere in the closing service letter that Walsh
25  must first exhaust their claims against note holders?

---

10  (Pages 34 to 37)

VERITEXT REPORTING COMPANY

Donna Sullivan

Page 38

1        MR. HAYES:  Object to the form.  You can
2    answer.
3        A.    Not that specific language but I would
4    have to review the letter and see if there's -- what
5    else it says.  Plus I think there's probably some
6    language that you have to suffer an actual loss that
7    may be tied to the policy's conditions, terms and
8    conditions also, so I think you would have to
9    establish an actual loss.
10       Q.    So does the -- are you stating that the
11   policy has that language in it?
12       A.    I'm trying to recall the policy language
13   but certainly there's exclusions where the insured
14   hasn't suffered a loss.  I mean Exclusion 3, I don't
15   know if it's C or D, where you have no loss I think
16   but I think that's a prerequisite of any recovery is
17   that you have to establish what your loss is and
18   mitigate your damages.  If you have a note to pursue
19   I would think that you would have to pursue that.
20       Q.    We can put that aside for the time
21   being.
22       A.    Okay.
23       Q.    You stated before that you were the
24   custodian of all the documents that pertained to the
25   company.  Where -- I'm sorry, was that -- did I

Page 39

1    misspeak?
2        A.    To this claim obviously, not to all
3    documents of Nations obviously.
4        Q.    I apologize.  Right.  Yes.  Who did you
5    get those documents from?
6        A.    From my review they were already in the
7    office.  The claim is being handled by another
8    attorney in our office.
9        Q.    Who is that other attorney?
10       A.    Vincent Sharkey.
11       Q.    And you gave those files to Mr. Hayes at
12   some point?
13       A.    What files?
14       Q.    The Nations files.
15       A.    The -- our claim files?
16       Q.    Yes.  Yes.
17       A.    I don't know if Ed has been given our
18   claim files.
19       Q.    So you don't know whether or not those
20   have been produced as part of this litigation?
21       A.    No, I don't know.
22       Q.    Do you know whether or not they have
23   been reviewed by counsel in order to produce them as
24   part of this litigation?
25       A.    I don't know.

Page 40

1        MR. MEE:  Okay.  We're going to make
2    that as part of our request as well, Ed.
3        Q.    You stated before that you had reviewed,
4    maybe briefly, but our Request For the Production of
5    Documents.  Were you able to find any documents
6    responsive to those requests?
7        A.    I think I reviewed the response to
8    Interrogatories.  I'm not sure if I reviewed the
9    response to a document request.
10       Q.    Okay.  Sorry.  Were documents produced
11   by Nations and Fidelity separately or in combination?
12       A.    I don't know.  I assume they were done
13   together but I don't know.
14            (Nations-3, Letter dated July 28, 1997,
15   is received and marked for identification.)
16       Q.    You have been handed what's been marked
17   Nations-3.  It's a letter dated July 28, 1997 from
18   Jeffrey Goodman at Latham & Watkins to Kevin S.
19   Cairns, C-a-i-r-n-s, as Nations Title Insurance of
20   New York's underwriting counsel.
21            Did you review this letter in
22   preparation of your deposition today?
23       A.    I did look at it, yes.
24       Q.    I know you had mentioned Kevin Cairns
25   earlier.  Is he still with Nations?

Page 41

1        A.    No.
2        Q.    Or Fidelity, I should say?
3        A.    No.
4        Q.    When did he leave?
5        A.    I believe he left in 2003.
6        Q.    Where is he now?
7        A.    First American.
8        Q.    On page three of the letter there's a
9    schedule, it's Schedule A.  It's a list of various
10   properties.  Do you know what affirmative steps the
11   company took to investigate these particular
12   properties?
13       A.    I believe at one point they requested
14   the files certainly from Coastal.  I think also
15   from -- was it Monmouth Title?  What is the other
16   agent?  I believe the initial investigation they were
17   requesting those files from Bob Agel, and I think,
18   you know, suit ensued fairly rapidly.  I think they
19   requested additional documents from Latham & Watkins
20   or Walsh.  I don't know if any of the letters were
21   direct, but I think they were waiting for the loan
22   files and different documentation to review.
23       Q.    As part of that investigation did
24   Nations ever determine whether or not Walsh
25   Securities had valid title claims on these

Donna Sullivan

Page 42

1  properties?
2       MR. HAYES:  Object to the form.  You may
3  answer.
4       A.   I'm going to say no because the title
5  claims, valid claims would presume that there would
6  be coverage for them, that they were not participants
7  in the fraud or there would not be some other
8  defenses, which was part of what the litigation is
9  about, and also as we mentioned before those
10 allocation statements and that pointed to Walsh's
11 involvement in the fraud.  So I don't -- I don't
12 think there was a coverage decision made such that
13 would say that you have a valid claim.  Were there
14 actual title defects or problems with some of the
15 title, yes.
16      Q.   So just you did make -- come to some
17 conclusion or the company came to some conclusion on
18 title defects?
19      A.   I think they were aware that some
20 documents were unrecorded, yes.
21           (Nations-4, Letter dated August 11,
22 1997, is received and marked for identification.)
23      Q.   Before we get to this next document I
24 have one other question on that last document.  Did
25 the company ever advise Walsh that it had concluded

Page 43

1  that there were title defects on any of those
2  properties?
3       A.   I'm sorry, I don't know what that means.
4  I believe they sent out letters in response to some
5  of the claims reserving rights with respect to the
6  fact that there may not be coverage.  So I think they
7  were writing letters also to Stern Lavinthal, not to
8  Walsh.  So I think there was some discussion
9  obviously of the issues with the title and how title
10 was vested and whether they -- there were mortgages
11 on it, and I think there were communications between
12 the parties on that, but there was not an admission
13 of liability.
14      Q.   Was there ever an acknowledgement that
15 apart from whatever basis you had for denying the
16 claim that there were, in fact, title issues with
17 these properties?
18      A.   Can you tell me what "title issues"
19 means other than what I've said?
20      Q.   Title defect.  No.  What I'm asking you
21 is whether or not the company ever acknowledged to
22 wash that there were defects in title apart from
23 denial of coverage?
24           MR. HAYES:  Object to the form.
25      A.   I'm sorry, I don't understand.  Again,

Page 44

1  we both know that there were unrecorded documents and
2  there were communications regarding the fact that
3  there were unrecorded documents.  So to the extent
4  that's an acknowledgement that there's a title issue,
5  I think that's done, but to my knowledge there was no
6  admission of coverage or liability and that -- in
7  those letters.
8       Q.   Okay.  Did you ever notify Walsh
9  Securities of any title issues that you uncovered?
10      A.   That they had not made a claim on you
11 mean?  Not to my knowledge.
12      Q.   Moving along to the next document,
13 Nations-4, this is a letter dated September 5, 1997
14 to Maria Filippelli, Senior Claims Counsel for
15 Nations Title and it's from Fred Schlesinger.
16      A.   I think we're reading different letters.
17      Q.   I'm sorry.  I apologize.
18           MR. MEE:  Off the record for a second.
19           (A discussion takes place off the
20 record).
21      Q.   Going back to Nations-4.  It's an August
22 11, 1997 letter from Miss Maria Filippelli, Vice
23 President, Senior Claims Counsel to Nations and at
24 the top it says "Fidelity National Title," so I
25 assume at that point Miss Filippelli --

Page 45

1       A.   I think the claims department operated
2  for both companies out of one department.  There was
3  only one claims office I believe for both companies
4  at the time.
5       Q.   So how did that -- how did that happen?
6  I mean, did Nations have an office that folks from
7  Fidelity just moved into or...
8       A.   I think it might have been -- and I
9  don't know this for a fact although I assume that
10 Fidelity had its operations and that the Nations
11 claims were -- after they were acquired were handled
12 out of that site.
13      Q.   So it's the same --
14      A.   Two Park -- Two Park was a Fidelity
15 office I believe.  I don't believe that was a Nations
16 office so...
17      Q.   So did the -- going back to Nations-3,
18 did the 106 Apple Street in Tinton Falls, did that
19 cease to exist?
20      A.   No.  That was Fidelity's state office in
21 New Jersey and as you can see that's underwriting
22 counsel.  This is a claims office I assume in the New
23 York regional claims center.
24      Q.   So I guess my -- what I'm trying to
25 figure out:  Did the letterhead just change and

12  (Pages 42 to 45)

Donna Sullivan

Page 46

1    everybody stayed in their same spot or what happened?
2         A.    I think this was a problem. I think
3    Nations continued as an active company but you
4    couldn't always get your support staff to put letters
5    on the correct letterhead sometimes. We had multiple
6    brands and if they don't change the letterhead in the
7    tray or something, so I'm not sure. Is this -- does
8    this specify what company she's writing for? She
9    could have been writing for Fidelity because I think
10   the claim letters came in for Fidelity and Nations.
11   So either she could be really responding to a letter
12   on a Fidelity claim or could have just used the
13   Fidelity letterhead in responding to a Nations claim.
14   I don't know. She doesn't reference the company
15   here.
16        (Nations-5, Letter dated September 5,
17   1997, is received and marked for identification.)
18        Q.    So this is -- what's been marked as
19   Exhibit 5 is the September 5, 1997 letter from Fred
20   Schlesinger at Walsh Securities to Maria Filippelli,
21   Senior Claims Counsel to Nations. In the middle
22   paragraph it states that: "I am enclosing copies of
23   a total of 31 mortgage loan files for which Nations
24   issued closing service letters to Walsh Securities."
25        Do you know whether or not those claims

Page 47

1    files were actually received?
2         A.    The loan files?
3         Q.    Yes.
4         A.    I don't have copies of them but I assume
5    they were.
6         Q.    Do you know whether or not they were
7    reviewed by claims counsel?
8         A.    I assume they were.
9         Q.    When was the last time that they were
10   reviewed by claims counsel?
11        A.    I don't know.
12        Q.    Further along in the letter it states:
13   "Please be advised that the closing attorneys for
14   these transactions knowingly and fraudulently
15   violated the closing preconditions imposed by Walsh
16   Securities by transmitting the mortgage loan proceeds
17   despite knowing that the following preconditions,
18   among others, were not met," and then it lists four
19   different preconditions.
20        Did you do an investigation or did the
21   company do an investigation as to these
22   preconditions, as to whether or not these
23   preconditions were met?
24        A.    I think that we may have inquired what
25   "preconditions" means. I don't know if those were

Page 48

1    part of the closing instructions or I am assuming
2    that.
3         Q.    So, for example, for "i" it says:
4    "There were no bona fide sales contracts or bona fide
5    sales prices for the prop question properties at
6    issue."
7         Do you know who would have done an
8    investigation on that issue?
9         A.    I believe by this or shortly after this
10   the litigation ensued, and I'm sure whatever was
11   done, investigation was done through counsel. You're
12   asking did a claims administrator in September of '97
13   try to investigate this on their own?
14        Q.    Was someone with the company charged
15   with investigating these issues in 1997, yeah.
16        A.    Well, I don't know about these specific
17   issues. Obviously somebody was charged with handling
18   the claim, but I don't think they investigated these
19   specific issues before the litigation ensued and then
20   it was in the hands of counsel.
21        Q.    Who was charged with investigating the
22   claim?
23        A.    I think the claims administrator.
24   Initially although Maria Filippelli's name is on some
25   of the earlier letters, I don't see her name. In

Page 49

1    most of the file I see a Todd Pajonas.
2         MR. HAYES: P-a-j-o-n-a-s, first name
3    Todd, T-o-d-d.
4         A.    Seemed to handle it initially and
5    then --
6         Q.    Where is Mr. Pajonas now?
7         A.    I don't know. And then I believe
8    sometime during '98 and certainly by December of '98
9    the handling of the claim had been transferred to
10   Arnold Bottalico.
11        Q.    Do you know how to spell that one?
12        A.    I will try. B-o-t-t-a-l-i-c-o.
13        Q.    Where is Mr. Bottalico?
14        A.    I believe he lives still in New York.
15   I'm not sure if he's employed at the moment.
16        Q.    I had asked you before whether or not
17   there was a claims manual for Nations in '96, '97 and
18   I believe you said that you were not able to find
19   one. Do you have any claims manuals from Nations?
20        A.    I have not seen any from Nations. What
21   I said earlier, I think Fidelity had that California
22   Western manual. That's what I was advised in my
23   research. That was not used here. I know later --
24   certainly when I came to the company in 2002 they
25   didn't have their own claims manual but they gave the

13  (Pages 46 to 49)

Donna Sullivan

Page 50

1  claims administrator a claims guide, an outside
2  publication as a resource, and at what point they
3  started distributing that to claims administrators I
4  don't know. I know it was done by the time I started
5  here in 2002. So if it was done in '97 or 8, I don't
6  know.
7      Q.    So how were claims processed and
8  investigated if there was no manual? How did the
9  company investigate claims?
10     A.    Well, I guess to a certain extent
11 there's some logic in it that, you know, you would
12 have to get a -- gather information that you need and
13 look at the insurance or CSL, commitments, whatever,
14 that we had issued and see if it fits within the
15 parameters of coverage. And obviously when we're
16 sued we retain counsel to assist us in that defense
17 and review of claims.
18     Q.    Outside of litigation though was there a
19 hierarchy? I mean who did folks report to?
20     A.    Yeah, I understand that at the time
21 there was a claim center manager, and I believe it
22 was Al Yorio at the time this claim first came in. I
23 believe he was the claims center manager in the late
24 '90s, so I think he may have been -- and I think he
25 was copied on some correspondence so I believe he was

Page 51

1  the claims center manager.
2      Q.    Where is Mr. Yorio now?
3      A.    I believe he had gone to a title agency
4  in New York, in the city. I'm not sure where he is
5  today.
6      Q.    So with each claim that came in it would
7  be up to Mr. Yorio to decide how the investigation
8  would be conducted?
9      A.    Well, the claim would be assigned to a
10 claims administrator, and I think that he would work
11 and, you know, report up to that claims center
12 manager. And if it was a significant claim, which
13 this had a significant number of properties involved,
14 he would probably, you know, not act without some
15 involvement of the claims center manager at least on
16 significant issues.
17     Q.    How often were they to report up?
18     A.    I don't know that.
19     Q.    Were they to fill out any reports?
20     A.    I don't know back at that date.
21     Q.    Did they draft any memoranda?
22     A.    There are some communications between
23 counsel and Mr. Yorio and senior claims.
24     Q.    You say counsel. You mean outside
25 counsel?

Page 52

1      A.    Al Yorio and we had I think a regional
2  claims counsel and general counsel.
3      Q.    Were those produced? Do you know?
4      A.    I didn't see the production. I don't
5  know.
6          MR. MEE: I will probably make a request
7  for that as well.
8          MR. HAYES: And we'll probably refuse to
9  produce that on the basis of privilege and work
10 product but we can talk about that.
11     Q.    Do you know whether or not as part of
12 the investigation the adjuster was to go out and
13 interview individuals as part of the claims
14 investigation such as Stanley Yacker, Richard Pepsny,
15 Michael Alfieri, Bob Agel?
16     A.    I know the claims administrator met with
17 Bob Agel. I don't know that he's charged with the
18 duty to meet any of the parties. I don't believe he
19 met with any other parties. And, again, we had
20 counsel pretty early on and it was in litigation, so
21 if there were any meetings with parties other than
22 defendants other than Bob Agel.
23     Q.    Were there any written notes or
24 memoranda from the adjuster's meeting with Mr. Agel?
25     A.    There's a handwritten memo and notes --

Page 53

1  or I don't know if it's a memo but notes of the
2  meeting with Bob Agel.
3      Q.    Do you know when that is dated?
4      A.    He met with them I think February 6,
5  '98.
6          MR. MEE: We will ask for that too.
7      Q.    Who had the ultimate decision-making
8  responsibility at Nations for determining whether or
9  not a claim was insurable?
10     A.    Whether a claim was covered? I'm
11 assuming you mean covered.
12     Q.    Yes, sorry, I am not fluent in the
13 insurance lingo. Yes, covered, thanks.
14     A.    I am not sure they ever see it, but I
15 would assume that general counsel -- or I'm not sure
16 who is chief claims counsel in the country but
17 obviously there's a top. I'm not sure that -- you
18 know, whether or not they weighed in I don't know,
19 but you start at the bottom, and I'm sure at this
20 level those decisions were made with the claims
21 center manager.
22     Q.    Who would that have been for Walsh's
23 claims?
24     A.    Al Yorio I think was the claims center
25 manager.

14 (Pages 50 to 53)

Donna Sullivan

Page 54

1    Q.    Once litigation was initiated was there
2  any further investigation done inhouse by the
3  company?
4    A.    I think they did do some title searches
5  during the litigation.
6    Q.    Is that all?
7    A.    I can't say -- I am assuming they may
8  have gone through loan files, but I don't have
9  records of that.
10    Q.    Who collected the documents from Coastal
11  Title Agency?
12    A.    I think at that meeting -- I don't know
13  if they picked them up. Todd Pajonas, I don't think
14  he physically took the files. Maybe Kevin Cairns
15  collected files or Maureen Crowley was agency rep or
16  manager and she may have picked them up.
17    Q.    Was there an audit conducted of the
18  Coastal files?
19          MR. HAYES: Object to the form. You can
20  answer.
21    A.    Again, I don't know what you mean -- you
22  mean an audit? What does "audit" mean? Prior -- did
23  they audit Coastal regularly? Did they audit the
24  files once they got them? You mean just review them?
25    Q.    Let me back up. Does the company ever

Page 55

1  audit its agents?
2    A.    Yes.
3    Q.    And how so?
4    A.    I was told that they had three types of
5  audits. Corporate audit, I guess, which was done at
6  the home office, but I'm not sure how often that
7  occurred or really what that entailed. They did an
8  agency-type review audit and looked at their
9  licensing and policy issuing and remitting and
10  whether -- how many employees, what is their source
11  of business. Those types of things I was told were
12  done every other year at that point. There can be an
13  underwriting audit and I'm told that underwriting
14  counsel would pick a couple of agents a year and then
15  sample a few files and review them for the
16  underwriting content and, you know, whether things
17  were being properly set up.
18    Q.    So how often did the company audit
19  Coastal Title?
20    A.    That I don't know. I can't tell from
21  the file.
22    Q.    Were there any audit reports from their
23  audits of Coastal?
24    A.    In the agency file there were a couple
25  of financial-type audits.

Page 56

1    Q.    When were those conducted?
2    A.    I think -- they're after the date that
3  these claims came in. I think they were in early
4  2000 but I'm not sure.
5    Q.    Who was the point person at Nations for
6  any questions that Coastal may have had?
7    A.    I don't know if Nations -- you know,
8  prior to the acquisition in April of '96 I don't know
9  who Nations people were. After April first, '96, I
10  believe it was handled out of the Fidelity state
11  office and Kevin Cairns would have been the person
12  initially while he was employed there.
13    Q.    When the company terminated Coastal
14  Title did it -- did the company go to Coastal's
15  offices and review files to collect documents, to
16  conduct an audit?
17    A.    Yeah -- yes, I'm sure they went and they
18  accounted for whatever policies and do the final
19  remittance and, you know, take -- I think they take
20  whatever evidence that they're writing for the
21  company out of there since they're no longer going to
22  be writing for the company.
23    Q.    Is there memoranda to that effect?
24    A.    I think there's a memo and it may even
25  be in the termination notice, you know, that we're

Page 57

1  going to come to the office and collect things. So I
2  don't know if there's anything -- there's probably a
3  final accounting on policies that might be in the
4  agency file.
5    Q.    Was there a memo on Nations
6  investigation of Coastal after these claims were made
7  by Walsh Securities?
8    A.    I'm sorry. Was there a memo -- say that
9  again.
10          (The pending question is read by the
11  court reporter.)
12    A.    I'm sure there were internal memos
13  regarding the nature of the claim and the
14  investigation, like I said, between the claims
15  administrator and claims center manager. That type
16  of thing.
17    Q.    Did you see those in your review of the
18  documents?
19    A.    Yes.
20    Q.    So they do exist. You said there may
21  be.
22    A.    There are some memos regarding this
23  claim to higher-up people in the company including
24  the claims center manager.
25    Q.    When was the first time that -- strike

15 (Pages 54 to 57)

Donna Sullivan

Page 58

1  that. In the company's investigation of -- or I
2  shouldn't say investigation. Strike that.
3         In the company's audit of Coastal's
4  files, whenever the company looked at Coastal's
5  files, were there closing service letters and title
6  policies in those files?
7         MR. HAYES: Object to the form. You can
8  answer.
9     A.   I don't have a wide sample of the files
10 in the office. In the files I looked at, you're
11 asking me were there policies or closing service
12 letters? I think there probably were some policy --
13 a few. I don't know specifically but I believe there
14 were some closing service letters and some policies
15 or commitments certainly.
16    Q.   And the company made a request to
17 Coastal to obtain its files relating to this
18 litigation?
19    A.   Yes.
20    Q.   Is that the only place that the company
21 found policies and closing service letters? I mean,
22 did the company have copies of those itself?
23    A.   The company -- I don't know any center
24 that collected policies per se although they sent
25 with the remittance apparently -- in most instances

Page 59

1  they would send a copy of the policy. So when I
2  requested the remittance information and I asked
3  them: Do you have copies of the policies? They said
4  we have, you know, some, and they were able to give
5  me copies that they had. And, again, it was only a
6  small percentage of that number on the chart but they
7  did have some policies that were forwarded to the
8  office with the remittances.
9     Q.   So I think you are honing in on what I'm
10 asking. Was there like a National Processing Center
11 for Nations and Fidelity like there was for
12 Commonwealth?
13    A.   No, I don't know at that time that there
14 was any national office but I think they were --
15 where they were remitting was probably more to a
16 state agency department, and they were submitting
17 copies of maybe those policies with remittances to
18 the state office.
19    Q.   So there was no -- there's no like
20 central clearing house?
21    A.   Not like an NPC like Commonwealth had,
22 not at that time.
23    Q.   Where was the state office that Coastal
24 would have been sending its remittances and policies
25 to?

Page 60

1     A.   And I'm not sure if they went directly
2  to this Tinton Falls address. Fidelity in New Jersey
3  is -- had a close relationship with the Fidelity
4  offices in Pennsylvania. They had the same regional
5  manager. So whether the accounting was sent directly
6  into Pennsylvania where Roberta DeFelice is today or
7  whether it went into Tinton Falls, I'm not sure.
8     Q.   So if Nations wanted to make a request
9  for like the policies that were issued in certain --
10 on certain properties it could look inhouse for those
11 policies?
12    A.   The most success I have had is with
13 Roberta and having her go over the numbers on the
14 chart. I couldn't find a national source for that.
15    Q.   If an insured had called you up and
16 said: I don't have a copy of my policy, can I get a
17 copy of my policy, would Nations have been able to do
18 that?
19    A.   I don't know that they could. If they
20 had the policy number maybe they could do what I'm
21 doing today and actually that was true of
22 Commonwealth as well. They had to know the policy
23 number.
24    Q.   So is it like a bar to whether or not
25 there's coverage if you have your policy number or

Page 61

1  don't have your policy number?
2     A.   Obviously we have to have a copy of a
3  policy to assess what the coverage is. So I can say
4  in the past we have some insureds that could not
5  produce a policy, and I am not saying for Nations but
6  for some companies and you couldn't honor a claim
7  until we could -- unless they could find a policy or
8  some evidence of what we agreed to insure.
9     Q.   Would proof of remittance be --
10    A.   It wouldn't give you the terms of the
11 policy.
12    Q.   So I'm just curious, if I had my
13 homeowner's policy in my house and my house burned
14 down and I couldn't find a copy of my homeowner's
15 policy because my house burned down along with
16 everything in it and I called up my insurance company
17 and I said: I have a homeowner's policy with you but
18 I have no idea what the policy number is --
19    A.   It's not homeowners, first of all, but
20 if you lost your policy we might say: Well, do you
21 know where you got your title insurance? From an
22 agent or an office? Because the agent may index the
23 properties they have insured by property address or
24 by the name of someone so you could check with your
25 agent, you could check with the attorney that

16  (Pages 58 to 61)

8be467d8-735c-4213-860a-f6c4bff07d99

Donna Sullivan

Page 62

1   represented you at the closing and see if he has a
2   copy of the policy.
3       Q.   Does the company have any way to link up
4   the person's name with the policy or the property
5   with the policy?
6       A.   With computerization and what they have
7   today maybe they could do it, but they could not do
8   it back then.
9       Q.   How about with the closing service
10  letter?
11      A.   No.  Less.
12      Q.   So if an insured -- let's not use the
13  house example, but if like an insured's company
14  burned down to the ground and all of their closing
15  service letters burned down with it, is that a bar to
16  whether there's coverage under the closing service
17  letter?
18      A.   You can't prove you have a contract.
19      Q.   So the company doesn't retain a copy of
20  the policy or the closing service letter?
21      A.   At that time the company may not have
22  received the policy or if you're talking about a
23  commitment, a closing service letter, certainly they
24  might not have received that if a policy had not been
25  issued.  If we knew what the policy number is we

Page 63

1   might be able to track it.  I don't know if they
2   could have searched it in some other fashion at that
3   time.  I know Commonwealth we couldn't, and I'm sorry
4   to use that example, but that speaks for my history,
5   and I think if you knew the commitment number,
6   Roberta could pull something by commitment number.
7   And, again, I'm saying what is available to her today
8   and I'm assuming that was available back in '96.
9       Q.   Even though the --
10      A.   '97.
11      Q.   -- the closing service letter identifies
12  the name of the insured and the property and the
13  attorney there is no other way to find it unless the
14  insured has a copy of the closing service letter.  Is
15  that what you're saying?
16      A.   I don't think anyone tracked by closing
17  service letter alone.  If we received a remittance or
18  a copy of a closing service letter it would come in
19  with the policy.
20      Q.   Okay.  Does the company have insurance
21  coverage on any of the claims at issue in this case?
22      A.   Again, we have underwriter's for
23  catastrophic losses.
24      Q.   Is this considered a catastrophic loss?
25      A.   Or exposure.  You put them on notice of

Page 64

1   the claim I guess -- I think if the combined suit
2   alleges a loss in excess of ten million, I think that
3   might be the threshold.
4       Q.   Did the company put its carrier on
5   notice?
6       A.   There are carriers on notice, yes.
7       Q.   What was the name of Nations carrier?
8       A.   You know, I would be guessing.  I think
9   there are a few names there.  I'm not sure which is
10  which.
11      Q.   Are they tiered?  Is that what it is?
12      A.   I'm sorry?
13      Q.   Is it tiered coverage?  In other words,
14  when you say there may be multiple insurance
15  companies --
16      A.   No.  I mean we have different companies
17  involved here that had their own separate
18  underwriters so I'm not sure who is Commonwealth, who
19  is Fidelity, who is Nations, but I believe they each
20  had their own underwriters that were put on notice.
21      Q.   Can you recall the names of those?
22      A.   I know Lloyd's is for one company.  I
23  don't know if there's CNA or AIG.  I haven't really
24  examined the policies.
25      Q.   Do you know whether or not AIG was

Page 65

1   placed on notice?
2       A.   All the underwriters for the companies
3   were placed on notice.
4       Q.   You had mentioned AIG and then you said
5   I think, I'm not sure --
6       A.   I'm not sure of the names.  Lloyd's I'm
7   sure is one of them.  I'm not sure of the names of
8   the others.  I've seen I think paperwork with AIG's
9   name on it, so I'm not sure if they're one of them
10  but I know each of the companies have given notice.
11      Q.   How many are there, do you think?
12      A.   How many are there?
13      Q.   How many insurance carriers are there?
14      A.   I think there are three separate ones
15  for -- each company had their own.
16      Q.   And do you have a copy of that notice
17  letter to --
18      A.   I believe they're in the file.
19          MR. MEE:  We will make a request for
20  that.
21      A.   Or certainly some communications.
22      Q.   And has the carrier paid anything on
23  this litigation?
24      A.   Not to my knowledge.
25      Q.   Any attorneys' fees or anything like

17 (Pages 62 to 65)

Donna Sullivan

Page 66

1  that?
2      A.   No.
3      Q.   Has the carrier denied coverage?
4      A.   I don't believe so.
5      Q.   Did Nations or did the company have an
6  insurance policy covering the actions of it agents
7  separate and apart from the -- like I don't know if
8  there's a separate provision or anything like that?
9      A.   I am not really familiar with the policy
10 coverage.
11         MR. MEE:   Okay.  I think we will make a
12 request for the policies as well.  Off the record.
13         (A recess takes place.)
14     Q.   I believe as part of your testimony for
15 Commonwealth you stated that this was considered a
16 major claims case.  Does Nations have that name for
17 this case as well?
18     A.   Keep in mind that Nations has merged
19 into Fidelity, but, yes, it's designated as a major
20 claim.
21     Q.   Is there a major claims division within
22 Fidelity?
23     A.   Yes.
24     Q.   Is that the division that's handling
25 this case?

Page 67

1      A.   Yes.
2      Q.   And who is the head of the major claims
3  division?
4      A.   That's a good question.
5      Q.   I have a better question.
6      A.   Okay.
7      Q.   Who do you report to?
8      A.   I report to David Eizenman in New York.
9      Q.   Who is --
10     A.   E-i-z-e-n-m-a-n.  And I have to say they
11 changed our titles about a week ago and I don't
12 recall what his title is, but he is a supervisor of
13 five major claims counsel in the northeast.
14     Q.   And what's your title?  Did your title
15 change?
16     A.   Yes.
17     Q.   What was your title and what is it now?
18     A.   It was associate major claims counsel
19 and they have done away with "associate."  It's not a
20 promotion but I'm major claims counsel.
21     Q.   Structurally has anything changed?
22     A.   Well, Mr. Eizenman is new to the company
23 and so his supervisory role is a little bit
24 different.  And I think he may report directly to
25 general counsel for the parent company.

Page 68

1      Q.   Is there any other major claims counsel
2  working on this case?
3      A.   Vincent Sharkey is assigned the case.
4  It's not my case.
5      Q.   I'm sorry.  Just to understand, like,
6  the corporate structure, are you parallel to him, is
7  he above you or below you?  How does that work?
8      A.   We're now -- I don't report to him.  We
9  report to the same boss.  I have my own claims load
10 so I don't report to him.  We're more parallel, if
11 parallel is the right word.
12     Q.   So this case is actually his case?
13     A.   Correct.
14     Q.   So how is it that you're here as the
15 30(b)6 witness?
16     A.   One, because of my role at Commonwealth
17 years ago and my familiarity somewhat with the
18 processes that went on back then.  Until I guess -- I
19 don't know if it's a year ago I actually -- when the
20 claims center first closed in 2009 I worked for Mr.
21 Sharkey at that point for a year.  So I did work with
22 him a little bit, you know, on this claim and his
23 other claims.  But I think I'm the witness more
24 because of my role at the inception at Commonwealth.
25     Q.   When did Mr. Sharkey come on to

Page 69

1  Fidelity?
2      A.   It was after 2005.  I'm not sure if it
3  was 2006 or 7.  I don't recall what year.
4      Q.   So do you -- you report -- on this case
5  does he report to Mr. Eizenman?
6      A.   Correct.
7      Q.   And you report to Mr. Sharkey on how the
8  deposition went?
9      A.   He will be aware of, you know, what
10 happened, but I don't technically report to him under
11 the company structure.
12     Q.   All right.  Right.  Did he once have all
13 the files and then give them to you?
14     A.   We're in the same office so -- and we
15 actually have all the files in an office between the
16 two of us so we can each access them.
17     Q.   Mutual assured destruction.  And why is
18 it that Nations/Fidelity defines this as a major
19 claims case?
20     A.   Because the exposure was over a million
21 or the suit alleged damage is over a million.
22     Q.   Is that written somewhere, how to define
23 a major claims case?
24     A.   I don't know if there was a memo to that
25 effect somewhere, and in the last week or so we also

18  (Pages  66 to 69)

Donna Sullivan

Page 70

1    received an e-mail from Mr. Eizenman saying that he
2    thought we were only going to get claims with alleged
3    damages over 2.5 million in the future in the major
4    claims department, but we haven't seen anything from
5    home office to that effect. So I don't know, some of
6    it is just -- but there may be a memo about the one
7    million. I'm just not sure where it is.
8        Q.    If this case -- if the major claims
9    counsel decides that it's -- that it's the $2.5
10   million exposure will this case get transferred to
11   another --
12       A.    No, no.
13       Q.    How much has Nations or Fidelity
14   determined the exposure to be in this case?
15       A.    Are you talking about the alleged
16   damages?
17       Q.    Well, do you have a potential exposure
18   amount of this case?
19       A.    Only something, you know, developed
20   through counsel. I mean our risk assessment you're
21   asking me?
22       Q.    Is Nations required to put together a
23   risk assessment?
24       A.    I mean we're always in the claims
25   department trying to assess what our risk was because

Page 71

1    home office doesn't want to be surprised.
2        Q.    So has there been a risk assessment on
3    this case?
4        A.    Those are formal words, risk assessment,
5    but certainly we've analyzed the claim and --
6        Q.    Was that done back in '96, '97 -- '96 to
7    like 2000, was there a risk assessment back then?
8        A.    I'm sure it was pretty hard to do
9    initially, but I'm sure there was some type of
10   evaluation even if it was with less information.
11   Over time it has probably evolved.
12       Q.    Did you review any memoranda to that
13   effect, any kind of -- I mean, did you review any
14   risk assessment memoranda?
15       A.    Yes.
16       Q.    Were those documents produced?
17       A.    It was prepared by counsel.
18       Q.    Anything prepared inhouse?
19       A.    I don't know that I've reviewed anything
20   recently that was inhouse, and I'm not sure anything
21   real old went to actual numbers.
22       Q.    The risk assessment prepared by counsel,
23   when was that prepared?
24       A.    I think within the last nine months.
25       Q.    Prior to Mr. Sharkey who was in charge

Page 72

1    of investigating the Nations -- I'm sorry -- I should
2    say Walsh Securities claims involving Nations?
3        A.    Immediately prior to him I believe Ken
4    Aran may have had it and I'm not sure how long Ken
5    had it.
6        Q.    Where is Mr. Aran now?
7        A.    He's in our New York office.
8        Q.    And prior to Mr. Aran?
9        A.    Arnold Bottalico I think had it.
10       Q.    And prior to Mr. Bottalico?
11       A.    Todd Pajonas.
12       Q.    Anyone prior to Mr. Pajonas?
13       A.    I mean I see Maria Filippelli's name on
14   some of these, but I don't see much of her name in
15   the files or any investigation.
16       Q.    Is there any reason why it was
17   transferred from Mr. Aran to --
18       A.    I think because it was New Jersey. When
19   they hired Mr. Sharkey they transferred some of the
20   New Jersey matters over to him since he's a New
21   Jersey attorney, or anyway -- voluntarily gave up his
22   license so when I say attorney --
23       Q.    Of course. Like corporate counsel. I
24   understand. Which division within -- what is the
25   name of the division within Nations or Fidelity that

Page 73

1    collected the premiums and payments or remittances
2    from policies and fees from closing service letters?
3        A.    I'm not sure there's a title but
4    obviously there's a state agency manager, a state
5    agency operation that would have been in charge of
6    supervising the agents and evaluated based I guess on
7    their agency's remittances, that type of thing. So
8    it would have gone I believe to that state office and
9    again whether accounting, whether actually some of
10   that went directly to Pennsylvania I don't know, but
11   it would have been attributed to the New Jersey
12   office.
13       Q.    Would that have been Miss Filippelli?
14       A.    No, she was in the claims department.
15   Kevin Cairns, then later Chris Marra was in New
16   Jersey production operation.
17       Q.    As a title insurance company did -- what
18   type of services did the company provide prior to
19   closing? It's a very broad question I understand,
20   but what services did the title company, title
21   insurance company provide during closing
22   transactions?
23            MR. HAYES: These transactions or just
24   general?
25       Q.    Generally, I'm sorry.

19 (Pages 70 to 73)

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

8be467d8-735c-4213-860a-f6c4bff07d99

Donna Sullivan

Page 74

1    A.    Again, you're talking in a situation
2  where we have an agent?
3    Q.    Yes.
4    A.    So the title company is not really
5  providing any services other than some type of
6  support for the agent. If the agent had an
7  underwriting question they could contact underwriting
8  counsel for assistance, but the company is not
9  preparing documents or doing search work or anything
10  related to a specific closing.
11    Q.    And if the agent had a question, was
12  there an intake form that someone would fill out for
13  the company?
14    A.    I don't believe so. I believe they
15  would just -- if they had a question they would just
16  get on the phone or fax something up to the
17  underwriting counsel.
18    Q.    So it was fairly informal?
19    A.    Yes.
20    Q.    What type of products or services would
21  the agent be able to provide or sell?
22    A.    It's specified in their agency
23  agreement. They have the right to issue commitments
24  and write title insurance. They can issue a closing
25  service letter in connection with the commitment.

Page 75

1  Their closing function, if they have a closing
2  function, or a search work unrelated to title
3  commitment or policy, that would be their own
4  business and not covered by the agency agreement.
5    Q.    Anything else covered by the agency
6  agreement?
7    A.    I would have to read the language in the
8  agreement, but obviously that's their primary
9  function is to write insurance. They have the
10  ability to remove exceptions based on, you know,
11  proofs that they may have required in issuing a
12  policy.
13    Q.    And would the company's agent hire
14  someone to do the search work or would the agent do
15  the search work?
16    A.    That can vary from agent to agent. Some
17  agents employ staff searchers. I think the majority
18  probably didn't. They probably would call an
19  independent searcher in the county where the property
20  was located.
21    Q.    Do you know whether Coastal Title Agency
22  hired someone to do the search work or whether it did
23  it itself?
24    A.    No, I don't recall.
25    Q.    If the title agency was doing its own

Page 76

1  search work, was that part of the agency agreement
2  that would be written down anywhere?
3    A.    Well, they wouldn't -- they would be
4  doing that for the purpose of issuing a title
5  insurance commitment and they're writing the
6  commitment on behalf of the company, but it seems a
7  little difficult to separate them, but if they
8  committed some error in the search, I mean I think
9  they would be responsible for that independently.
10    Q.    I know this question --
11    A.    Although to the company, again, the
12  search is not usually distributed to -- is not done
13  for the benefit of a third party.
14    Q.    I know we have asked you this in your
15  capacity as the Commonwealth 30(b)6 but what is the
16  purpose of an -- or what is a marked-up title
17  commitment?
18    A.    What is the purpose?
19    Q.    What is it? Let's start with: What is
20  it?
21    A.    Well, someone at closing -- I am not
22  saying it's authorized by the company, I mean, but
23  generally a marked-up commitment that people look at
24  is going to be a commitment that's been updated in
25  handwriting with what matters are to be insured

Page 77

1  following closing, which matters are to be omitted
2  from the final policy, so you will have somebody go
3  down the requirements and either write "omit" if they
4  have all been satisfied and the exceptions, still
5  write which ones will stay in. If there's easements
6  affecting the property which ones may come off. For
7  instance, a mortgage that's being paid off. So they
8  will mark it to reflect the way they want title to be
9  insured.
10    Q.    What's the point of marking it up?
11    A.    If the title company is marking it up it
12  may be that the lender has asked for that and
13  sometimes in a direct operation the title company
14  will go and mark up the binder for the lender. The
15  parties want somebody from the title company there
16  that can bind the company.
17    Q.    Is that the -- are you referring to the
18  north/south distinction when you say the title
19  company would mark it up? Is that what you're
20  referring to?
21    A.    I guess -- I don't think this applies to
22  an attorney marking it up, although to the extent it
23  affects priority it could be covered in a different
24  means, maybe by a closing service letter or
25  something.

Donna Sullivan

Page 78

```
1       Q.    Who puts the actual document together,
2    the commitment, who drafts that?
3       A.    In this case the title agent would have
4    done that.
5       Q.    How do they do that?
6       A.    The title agent would request searches
7    from the county records, upper court searches, tax
8    and assessment searches from the municipality and
9    they will analyze that and draft a commitment, what
10   things need to be satisfied, requirements for the
11   recording of documents, you know, what the county
12   search showed, different easements or restrictions
13   that affect the property would be set up in Schedule
14   B so that's how --
15      Q.    So they get a bunch of documents from
16   whoever is doing the search or maybe they're doing
17   the search, and then they use those documents to
18   determine what it looks like?
19      A.    What we're willing to insure, what
20   things have to be addressed before we will insure.
21   They set up the requirements.
22      Q.    Is that the same for the closing service
23   letter?
24            MR. HAYES: Object to the form.
25      Q.    Let me rephrase.  You testified that
```

Page 79

```
1    it's the agent that puts together the commitment.  Is
2    that the same for the closing service letter?
3       A.    Are you asking: Does the agent issue
4    the closing service letter?
5       Q.    Who drafts it?
6       A.    The agent.  I mean not the actual text
7    but who it's addressed to and what transaction is
8    covered.  Not obviously the actual coverage, which is
9    a filed form.
10      Q.    And then who does that go to?
11      A.    It goes out with the commitment and to
12   whoever they're sending -- I guess if the closing
13   attorney requested the package it may go to the
14   closing attorney who will forward it to the lender.
15   If they ask them to send it directly to the lender,
16   they may send a copy of the commitment and the
17   closing service letters directly to the lender.
18      Q.    Do you know if Coastal sent it to the
19   closing attorneys in this case?
20      A.    I'm not sure.  I believe they did.
21      Q.    If the title agent knew that there was
22   misinformation contained in the commitment would that
23   trigger coverage by the title company?
24            MR. KOTT: Object to the form.
25            MR. HAYES: Object.
```

Page 80

```
1       A.    I think we're bound to the insured by
2    the terms of the contract, whether that's the
3    commitment and closing service letter or the policy.
4    I mean, we would have to analyze what our liability
5    to the insured.  I'm not sure what misinformation is
6    in the commitment that you're referring to, whether
7    it's going to cause a loss covered by the contract.
8       Q.    How about with regard to the closing
9    service letter, if the -- strike that.
10            Does the company believe that a closing
11   should occur if the lender's closing instructions are
12   not followed?
13      A.    I don't know what its belief is.
14   Obviously we have certain coverages with respect to
15   the closing instructions and only certain issues are
16   going to be covered by that closing protection
17   letter.  Are you saying are we okay with agents
18   disregarding closing instructions assuming they get
19   them?  I mean, no, I mean, but I don't know that
20   that's a basis for liability and I don't know the
21   surrounding facts.  I mean I would have to understand
22   each case I think.
23      Q.    Is there -- who defines the terms under
24   the closing protection letter?
25            MR. HAYES: Object to the form.
```

Page 81

```
1            MR. KOTT: I think I do too.
2       Q.    Who defines the terms?  There are
3    certain terms listed in the closing protection
4    letter.  Does any -- I mean, are they defined within
5    the closing protection letter?
6       A.    I don't think there's a definition
7    section in the closing service letter, you know, so
8    I'm going to leave it at that.  The closing service
9    letter is -- I guess I'll leave it at that.
10      Q.    Did Nations ever permit its agents to
11   issue commitments and closing protection letters
12   with -- on the same property with separate
13   designations using the A in parenthesis?
14      A.    Did they allow them?  Is that what your
15   question is?
16      Q.    Yes.
17      A.    I don't have any information on whether
18   they had underwriting directions with respect to that
19   at that time and again I'm referring to Nations.
20      Q.    With regard to the title policy is there
21   a standard fee associated with each policy?
22      A.    No.
23      Q.    Or premium, I should say?
24      A.    The premium is based on filed rates.
25   There's filings.  You have to calculate the rate
```

21 (Pages 78 to 81)

Donna Sullivan

Page 82

1 based on the amount of insurance.
2    Q.    Has Nations ever experienced a higher
3 loss with regard to sub prime loans?
4    A.    I am not in a position to -- I don't
5 have numbers on that.
6    Q.    The company has never done an evaluation
7 as to whether or not title policies issued on sub
8 prime loans have a higher loss experience than on
9 standard or -- standard loans?
10   A.    I am not aware of it.
11   Q.    Do you know if there are post-closing
12 searches conducted by the title agent?
13   A.    Yes, normally there would be to pick up
14 the recording information for the documents that
15 we're going to list on the policy as the insured
16 mortgage or the vesting deed.
17   Q.    How do they know when to do the
18 post-closing search?
19   A.    They kind of guess.  They have an idea
20 of how far behind the county records are and if they
21 know that they're backlogged two months they might
22 send it in two months from when they think the
23 closing took place, and normally they will know the
24 closing is taking place if the attorney orders a
25 rundown or if they send, you know, a post-closing

Page 83

1 package with affidavits of title, the premium, things
2 like that, then they will know a closing took place.
3    Q.    Why did Nations use agents, title agents
4 as opposed to issuing closing service letters and
5 commitments by itself?
6    A.    I don't know -- we're talking about
7 Nations, not pre-acquisition, I guess you're talking
8 about.
9    Q.    In the 1996 to '97 time frame why were
10 they using agents?
11   A.    I don't know.  That's how they were
12 structured.  I don't know.  Maybe they didn't want to
13 set up direct operations, but I don't know the reason
14 that they set it up that way.
15   Q.    Fidelity uses title agents as well?
16   A.    Fidelity uses mostly agents.  They have
17 at least one direct operation I think.
18   Q.    So why did that company use title
19 agents?
20   A.    Why did Fidelity use title agents?  I'm
21 assuming they like that structure.  Maybe they don't
22 want the overhead of direct employees, but I don't
23 have the financial analysis.  I'm assuming there's
24 some financial benefit to having agents maybe as
25 opposed to branches, but you take in less premium but

Page 84

1 you have less overhead.  So I don't know.  I'm not
2 sure why different companies have different
3 structures.
4    Q.    What was the --
5    A.    Most of them have a lot of agents
6 though.  I think most of them are primarily agent
7 based.  A couple have a few direct operations.
8    Q.    When you say you take less premium, why
9 do you take less premium?
10   A.    If you're a direct operation you receive
11 the whole premium.  If you're working through an
12 agency network then the agent is only remitting a
13 small proportion of the premium.
14   Q.    Why are they only remitting a small
15 portion of the premium?
16   A.    I guess that's what the market bears.
17 If they have the negotiating strength they get a
18 better split.
19   Q.    Today what is the split generally, the
20 market split?
21   A.    I don't see it today so I don't know if
22 it's going in one direction or another, but I
23 wouldn't be surprised, anywhere between 80/20, 85/15
24 I would think it would be.
25   Q.    Why is it so high?  You don't have to

Page 85

1 answer that.  That's okay.
2          When the company decides to use an agent
3 and -- does it conduct an investigation of the
4 agent's company?
5    A.    If it has an existing -- I'm sure they
6 do some investigation.  I can't speak specifically
7 for '96.  '96 the agent Coastal was an existing agent
8 that came over -- you know, through the acquisition
9 but normally they do credit checks I think on the
10 principals.  They might do a criminal check.  If
11 they're an operating agency there's probably some
12 word of mouth in the industry.  If they have a good
13 reputation, a bad reputation.  Obviously they have to
14 be licensed.  So they're going to look at certain
15 criteria, how much work -- if they're an existing
16 agent how much work can they generate?  Are they
17 worth having as an agent?
18   Q.    Were there monthly or annual checks or
19 inquiries as to how much the company was receiving
20 from its agents?
21   A.    Well, I'm sure -- there are tallies for
22 how much premium is remitted by an agent, and I don't
23 know if it's quarterly but certainly there are yearly
24 statistics.
25   Q.    Is there like a quota for maintaining an

22  (Pages 82 to 85)

Donna Sullivan

Page 86

1   agent, a premium quota?
2       A.   Again, I'm sure it's changed over the
3   years. There may be. It may be more so today than
4   in the past.
5       Q.   Did you ever see any documents
6   referencing how much Coastal was remitting to Nations
7   in '96 or '97?
8       A.   I don't know if I saw Nations. I saw
9   Fidelity.
10      Q.   How much was it remitting to Fidelity in
11  '96 or '97?
12      A.   A little over 100,000.
13      Q.   Annually?
14      A.   Yes.
15      Q.   I'm handing you what's already been
16  marked as Coastal-6. It looks like the first portion
17  of this document -- it's already been marked but this
18  document starts at page FY 013000 through FY 013019.
19  It appears to be Fidelity's agency agreement with
20  Coastal Title. And then at 13008 is TRW Agency
21  agreement with Coastal and then at 13017 it appears
22  to be Nations Title Agency agreement with Coastal
23  Title.
24           MR. HAYES: Object to that last
25  characterization. I think 13017 indicates it's an

Page 87

1   assignment.
2            MR. MEE: Thank you, that's correct.
3   It's an assignment.
4       Q.   Well, you can -- maybe we can clear this
5   up. At 13008 it says TRW Title Insurance up at the
6   top. Do you know who or what TRW Title Insurance
7   was?
8       A.   I'm trying to look and think of the
9   company history, but I believe TRW was the
10  predecessor -- either it was a name change to Nations
11  or it was a company acquired by Nations.
12      Q.   Okay. And so going back to 13017, the
13  Assignment, is that Nations assuming the agreement
14  between TRW and Coastal?
15      A.   13017?
16      Q.   Yes.
17      A.   No, it looks like an assignment from
18  Nations of the agency agreement to Fidelity, isn't
19  it?
20      Q.   You're right actually.
21           MR. MEE: Off the record for a second.
22           (A discussion takes place off the
23  record).
24      Q.   So at 13008, was this the operating
25  agency agreement between Nations and Coastal around

Page 88

1   1996 and 1997?
2       A.   Yes, I believe it was.
3       Q.   Give me one second, please.
4            (A discussion takes place off the
5   record).
6       Q.   Down at the bottom of 13009, Report of
7   Premiums, it states: "Agent shall mail to principal
8   on or before the 15th day of each month a report and
9   form prescribed or approved by principal of all title
10  insurance policies and endorsements issued during the
11  preceding calendar month. Said report shall be
12  accompanied by agent's remittance to principal of the
13  portion of the premiums to which principal is
14  entitled."
15           Do you know whether or not that was done
16  by Coastal Title Agency?
17      A.   I don't.
18      Q.   Would this be a way of tracking which
19  policies and endorsements that were issued to Walsh
20  Securities in that time frame?
21      A.   If there's a report that exists that
22  reflects which policy numbers issued. I don't know
23  if this is a report that's just going to give you
24  policy numbers and remittance, whether it's going to
25  give you copies or say who the insured is or anything

Page 89

1   like that. I don't know because it's not specifying
2   that. I am not aware of -- you know, if these
3   records exist. As I have said I have contacted the
4   person who is in charge of tracking the remittances
5   and she gave me information for some of the policies
6   in this time period. So I don't know if this
7   information is incorporated into her records because
8   obviously she has some remittance information for the
9   period but --
10      Q.   Did you see any of these reports?
11      A.   I don't recall seeing anything -- so
12  this is prior to November of '96. This was only in
13  effect until I guess November of '96. So I don't
14  recall if I've seen anything -- you know, reports
15  before that date.
16      Q.   And at 13010 next to Record Retention it
17  says: "Agent shall maintain in a manner and form as
18  prescribed or approved by the principal all
19  supporting documents which enable agent to issue a
20  commitment binder or policy together with all books
21  of account, files, documents, correspondence and
22  records of all kinds which at any time shall be kept
23  by agent or come into agent's possession or under
24  agent's control relating to the transactions
25  conducted by agent on behalf of the principal."

23  (Pages 86 to 89)

Donna Sullivan

Page 90

1    Do you know whether or not Coastal Title
2  Agency kept its files and documents in accordance
3  with this record retention policy?
4    A.   Again, this is prior to November of '96
5  so I'm not sure what was done at that point. I'm
6  assuming they complied with the statutory period of
7  15 years in any event, and certainly when files were
8  requested of Coastal in connection with a claim most
9  of them were provided. I don't know that all were
10  provided but files tend to get lost in title
11  agencies. So I'm assuming that -- whether they
12  specifically complied with this or not I can't say
13  but they were holding on to files and...
14    Q.   Was there anyone at Nations who was in
15  charge of keeping up the relationship with Coastal
16  Title Agency, like there's a Nancy Koch for
17  Commonwealth who I think you testified was in charge
18  of maintaining that relationship. Was there anyone
19  at Nations responsible for that?
20    A.   I think Maureen Crowley was an agency
21  representative or I don't know if her title was
22  manager, and I think -- I'm not sure when she started
23  with the company. She may not have been there when
24  it was first acquired. And Kevin Cairns may have
25  worn all hats, agency and state counsel, initially,

Page 91

1  because I think that office in New Jersey was started
2  at once. So I'm not sure. I think he may have had
3  some in the beginning and certainly when Maureen came
4  on board and I think Maureen -- I think she may have
5  signed the '96 agency agreement at Fidelity so maybe
6  she was there right at the beginning.
7    Q.   Nancy Koch testified she looked at the
8  Coastal Title documents and she was surprised at the
9  way they were kept. Were there any communications
10  that you saw between Miss Crowley or Mr. Cairns with
11  Coastal Title to that effect?
12    MR. HAYES: Object to the form of the
13  question. You can answer.
14    A.   I don't know that I've seen any
15  communications between Maureen and Kevin.
16    Q.   How about memoranda?
17    A.   I don't recall, and I'm not sure what
18  you mean by the way the files were kept, but I don't
19  recall any memoranda about the way the files were
20  kept.
21    Q.   Did Nations ever have a policy statement
22  about insuring flips on properties?
23    A.   Not to my knowledge. I'm sorry. Did
24  you say ever?
25    Q.   Yes.

Page 92

1    A.   Not at the time of these transactions.
2  I haven't seen anything at the time these
3  transactions took place.
4    Q.   Did that change at some point?
5    A.   I believe in the 2000s, 2003, there
6  might have been a memo written on Fidelity which
7  dealt with flip transactions.
8    Q.   Who was that written by?
9    A.   What is his name? I'll have to think of
10  this name. I'm not sure if he passed on some
11  information from home office. Ron Maass. I think it
12  might have been written by Ron Maass.
13    Q.   Was Walsh Securities referenced in that
14  memo?
15    A.   No, it was more general memo on
16  flipping.
17    Q.   And was that -- that was a change in
18  policy?
19    A.   I think there had been some federal
20  issued policy or requirements and I think about
21  reporting transactions that were within, I don't
22  know, a six-month period or something. I think in
23  connection with that document a memo was sent out.
24    MR. MEE: We might make a request for
25  that document as well.

Page 93

1    MR. HAYES: Tell me what that has to do
2  with this litigation.
3    MR. MEE: I'm sorry. Relevance?
4    MR. HAYES: No. I think things that
5  happened seven or eight years after have no bearing
6  on the case and is probably outside the scope of what
7  you're entitled to but we can talk about that off the
8  record rather than on the record.
9    MR. MEE: Sure.
10    Q.   What is the company's policy currently
11  on insuring flips?
12    A.   I don't know that they have a strict
13  position. Obviously they have to comply with
14  whatever government regulations or requirements
15  exist. It's obviously a practice that is of concern
16  to us. There are such thing as legitimate flips, but
17  I think that probably underwriting counsel would want
18  to be involved in reviewing that but --
19    Q.   How does it get to underwriting counsel?
20    A.   An agent or whoever is insuring the
21  transaction if it's a direct operation would have to
22  contact underwriting counsel.
23    Q.   How would the agent know?
24    MR. HAYES: The agent know what?
25    A.   I think if the agent did a title search

24 (Pages 90 to 93)

Donna Sullivan

Page 94

1  and saw title vested in one and knew it was going to
2  X and then Y because they were ultimately to insure
3  Y, they would know.
4      Q.   How about any policy statements
5  regarding uncovering fraud in a real estate closing?
6  Has the company ever issued any policy statements
7  regarding uncovering fraud, any directives, things to
8  look out for?
9      A.   I think -- the company, you mean
10 Fidelity I guess or --
11     Q.   I mean this is obviously somewhat of an
12 issue because I don't know -- I know that Nations was
13 subsumed by Fidelity at some point, but up until
14 fairly recently they were still operating as Nations.
15 So if you can answer the question, I mean, whether or
16 not it's -- if the parent is Fidelity then I would
17 say --
18     A.   I don't know that Nations -- I don't
19 know about anything issued on Nations. I don't know
20 of any underwriting memoranda. Fidelity had very
21 few. I don't know if it was -- if there was anything
22 on fraud. I mean obviously there was the flipping
23 memo that I mentioned. There are a few memos on
24 things I know that were not fraud. After 2009 or '10
25 management of the Fidelity agents kind of merged into

Page 95

1  the Chicago people so that the Chicago underwriting
2  counsel now includes the Fidelity and -- agents on
3  all their distributions and they have a lot more
4  memos so I know they're sending things out over the
5  last year or so. I don't know what they send because
6  I am not privy to each of the memos.
7      Q.   Who do they go to? Who have those memos
8  gone to? Agents?
9      A.   Yeah, they would go to agents.
10     Q.   Not approved attorneys?
11     A.   I don't -- no, that wouldn't be a normal
12 practice. I am not aware that Chicago send anything
13 to attorneys.
14     Q.   Did Nations have an approved attorney
15 list?
16     A.   Nations or Fidelity. What I've
17 discovered in my research was an internal memo at
18 Fidelity that attached two lists that I don't know
19 were ever distributed because I just don't have
20 evidence of that. And that they were unsure of how
21 the attorney names were added to that list.
22     Q.   Was that considered an unapproved list
23 like --
24     A.   They were attorneys that allegedly we
25 would not want to do business with. So I'm not sure

Page 96

1  if someone issued those lists prior to Kevin Cairns
2  or Chris Marra. I'm not sure if they were ever
3  distributed. I know after that they didn't want to
4  distribute them because they weren't sure of the
5  origination of them, but they would send out -- I saw
6  a couple of memos where they had specific parties
7  that they would tell the agents: If you get any
8  deals with this party, then contact our office.
9      Q.   Back in 1996 and 1997 did
10 Nations/Nations, Fidelity issue an unapproved list to
11 their title agents?
12     A.   I don't know.
13     Q.   How would the company check on whether
14 or not the closing attorney was, let's say, barred?
15     A.   How would the --
16     Q.   Company?
17     A.   Company check on --
18     Q.   Approved attorney was barred in New
19 Jersey.
20     A.   Well, the agency is doing the closing so
21 you're asking how the agent would check or would --
22 the underwriter is not conducting -- is not issuing
23 the title commitment, the closing service letter.
24     Q.   The closing service letter provides that
25 the actions of X attorney are covered pursuant to

Page 97

1  this letter. How would Nations/Nations/Fidelity know
2  whether or not that attorney was barred in New Jersey
3  let's say.
4          MR. HAYES: Object to the form. She
5  indicated to you the problem with the question is
6  you're asking how Nations would check on a document
7  that's not issued by Nations.
8      Q.   How would the agent check?
9      A.   Again, this is a hypothetical. One, I
10 don't know if those lists that I've seen were ever
11 issued. They may have been and I just don't have the
12 transmittal memo. And, two, there's a Lawyer's Diary
13 which gives you generally who is admitted in the
14 state although it's obviously not up to the minute on
15 who has been disbarred.
16     Q.   Was it ever a concern to the company
17 that lawyers who may not have been barred were listed
18 as approved attorneys?
19     A.   Again, I can't tell you exactly what was
20 issued then and I don't have anybody to ask that
21 question to, to pose that question to.
22     Q.   Were there any company directives to the
23 title agents to check to see whether or not these
24 attorneys were barred?
25     A.   To check to see if they were admitted to

25  (Pages 94 to 97)

Donna Sullivan

Page 98

1  the bar? I haven't seen any memos in what I have
2  been able to accumulate. Now, I'm told that the
3  Fidelity office, the state office moved and a lot of
4  things didn't seem to make it to the next office. I
5  don't know. I don't know what was there at the time
6  and I don't have a way to verify what was issued back
7  in '96 and '97.
8      Q.    So is it possible that back in 1996 and
9  1997 Nations -- Nations' and Fidelity's title agents
10  could have been issuing closing service letters for
11  attorneys that were not permitted to practice law in
12  the state?
13          MR. HAYES: Objection.
14      A.    Was it permitted? You said possible? I
15  mean I don't know. I guess it's possible but I hope
16  it wasn't. I don't know what instructions -- I can't
17  verify what instructions had been given to them.
18      Q.    Was there someone within the company who
19  was charged with monitoring what the -- what the
20  company's agents were doing?
21      A.    Okay. Well, there's -- I don't know --
22  we're not in every agent's office all the time.
23  Obviously there's a state manager that has some
24  overall responsibility for what's going on in the
25  state, and underwriting counsel, I guess initially at

Page 99

1  that time it was Kevin Cairns around '96.
2      Q.    So how often would the company check in
3  on its agents?
4      A.    I was told that they did this type of
5  agent review every other year and they picked a
6  handful of agents to do underwriting audits each
7  year. They would sample a couple of files but they
8  were only picking, you know, a certain number of
9  agents so I don't know how often they did Coastal. I
10  don't have records of that.
11      Q.    To a certain extent the agent was left
12  to its own free devices?
13      A.    The agents often have a lot of
14  independence, sure. They're writing title all the
15  time that we don't see every transaction that they're
16  writing.
17      Q.    When was the -- what was the policy or
18  what was the procedure at the company if the company
19  determined that an agent was doing something it
20  wasn't supposed to be doing?
21      A.    You always had the ability under the
22  agency agreement to terminate them.
23      Q.    Did the company ever terminate an agent
24  for doing something that it wasn't supposed to be
25  doing?

Page 100

1      A.    I don't have a specific example but I'm
2  sure that they have. Actually I probably have
3  specifics. If they stole money, if they stole escrow
4  funds, there's probably some -- you know.
5      Q.    Was Coastal -- was the Coastal Title
6  Agency arrangement terminated for that reason,
7  because Coastal was doing something it shouldn't have
8  been doing?
9      A.    The termination letter does not state a
10  cause. It just says under the Provision 8A of the
11  agency agreement. I think it was mutual. It might
12  have been mutual. It doesn't state any cause, and I
13  don't think it was reported as cause to the state
14  because we report termination of the agent's
15  relationship to the Department of Insurance and I
16  don't think that reported any causal...
17      Q.    And was that letter issued by Fidelity?
18      A.    I believe it was, yes.
19          MR. MEE: We're going to make a request
20  for the letter terminating Nations- Nations/Fidelity
21  agency agreement. Maybe I should just refer to it as
22  the company. We're also going to make a request for
23  the memos that Miss Sullivan had indicated regarding
24  the approved attorney list or unapproved attorney
25  list that she wasn't sure whether or not they were

Page 101

1  submitted.
2      Q.    Not to belabor this point one more time
3  but do you know whether or not the company considered
4  all attorneys in New Jersey approved until they were
5  disbarred?
6      A.    Do I know in 1996 or seven what the
7  company considered?
8      Q.    Let me rephrase. Did the company
9  consider all attorneys in New Jersey approved until
10  they were disbarred?
11      A.    Again, I can't find memoranda related to
12  that at that time period so I can't state that to a
13  fact.
14      Q.    Do you know whether or not the company
15  was still -- let me rephrase. When was the last time
16  the company issued a closing service letter on behalf
17  of Stanley Yacker, Anthony Cicalese, Richard Pepsny
18  or Michael Alfieri?
19      A.    The last date? I don't know.
20      Q.    Do you know if it is still issuing
21  closing service letters on behalf of Richard Pepsny?
22      A.    They may be for Richard Pepsny.
23      Q.    What about Mr. Cicalese?
24      A.    I believe the other three are on the
25  unapproved list, which is now being issued as one

26  (Pages 98 to 101)

VERITEXT REPORTING COMPANY

Donna Sullivan

Page 102

1  document from Chicago Title. So you would have seen
2  it -- as with Commonwealth, I think they're all
3  issued as -- you know, for all companies from one
4  source so I think those other three were all on the
5  unapproved list.
6      Q.    Were these four attorneys considered
7  approved by the company in '96 and '97?
8      A.    I don't know of any list to compare it
9  to. I assume if Coastal had no advice not to, that
10 they were acting appropriately in issuing letters to
11 those attorneys.
12     (A recess takes place.)
13     Q.    Earlier I believe you testified about
14 that you had done some kind of investigation and
15 determined that there were -- that the company had
16 received some remittances for policies that were
17 never issued. Am I characterizing that correctly?
18     A.    It appeared that we received some
19 remittances where we just had the commitment number
20 so I don't know if the policy had been issued. We
21 didn't have a copy of the policy because the person
22 who ran the search ran them on both Coastal's file
23 numbers and policy numbers.
24     Q.    So when the remittance was received by
25 the company would a policy be generated at that

Page 103

1  point?
2      A.    Well, the policy is generated by the
3  agent so -- used to be that an agent would not remit
4  until they issued the policy, and I have kind of
5  conflicting information on this. Chris Marra said
6  that Coastal did not remit until somebody from their
7  office actually went to Coastal's office and looked
8  at what policies they had issued and prepared the
9  remittance sheet and got the check, although I'm told
10 by Roberta that she has some remittances where we
11 don't have a copy of the policy and she thought there
12 had been a change, that they were supposed to -- they
13 were trying to get them to remit I think in a shorter
14 period of time than waiting for the policies because
15 you have to wait for cover records and everything
16 else. So I don't know if they -- it appears they may
17 have remitted on some commitments, but I don't have a
18 breakdown of how many or -- you know I just have what
19 is on that chart, which is what she found the
20 remittances for.
21     Q.    And so for -- is it Dave Marra?
22     A.    Chris Marra.
23     Q.    Chris Marra, when was that that he went
24 to Coastal and --
25     A.    I think any point during the year if

Page 104

1  they had not been received anything from Coastal in a
2  while I think they would send the agency rep down
3  there to see -- Coastal would make copies of the
4  policies and put them in a box for whatever
5  underwriter that they were writing for or something.
6  You know, this is what I've been told, and that our
7  representative would go down and pull the Fidelity
8  policies out of the box and write the remittance
9  information and then I guess Bob would cut them a
10 check.
11     Q.    Now, you had stated before that you
12 weren't able to find a company claims manual for the
13 '96, '97 period of time?
14     A.    Right.
15     Q.    Was there a corporate policy to set a
16 reserve on claims?
17     A.    I don't have any regulations. I mean I
18 don't have anything that was instructive to the
19 claims people at that time.
20     Q.    Was there a reserve set by Nations on
21 this claim?
22     A.    I don't recall if there was -- I think
23 at some point there were some reserves on files.
24     Q.    Presently you know --
25     A.    I don't know if it was set by Nations.

Page 105

1  I don't know at what point it was set.
2      Q.    I don't know how to ask this next
3  question because I'm not sure -- do you know: At any
4  point in time were there two separate reserves,
5  whether there was one for Walsh's claims against
6  Fidelity and Walsh's claims against Nations?
7      A.    I think, yes, the claims -- they opened
8  a couple of claim files and they opened -- and then
9  they would put several Coastal files into each claim,
10 but they were breaking them down as to underwriter
11 and policy year and agent because they were trying to
12 keep the like ones together so that they could
13 distinguish which entities would be incurring the
14 expense or the loss.
15     Q.    So it sounds like there are multiple
16 reserves?
17     A.    I don't know that there are today but
18 there were multiple files opened, and I believe there
19 may have been multiple reserves at one time.
20     Q.    Was that done by Nations or you're not
21 sure?
22     A.    Again, since the companies were really
23 being operated by the same, you know, parties -- I
24 mean --
25     Q.    So by the time the claims rolled in, by

27 (Pages 102 to 105)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

8be467d8-735c-4213-860a-f6c4bff07d99

Donna Sullivan

Page 106

1  the time --
2      A.    To the extent that the claim was opened
3  by Nations' policies, I guess you would be saying it
4  was a Nations reserve, and if the claim was opened on
5  Fidelity, then the reserve would be against Fidelity.
6      Q.    At any point were those reserves rolled
7  into a single reserve?
8      A.    Looks like to me the researches are in
9  one file today. I'm not sure when or how that
10 happened.
11     Q.    When you say reserves are in one file,
12 does that mean there's a reserve for all of Walsh's
13 claims, a single reserve, or are there still multiple
14 reserves?
15     A.    Well, there's expense and loss reserves.
16     Q.    Okay. Was it customary for the company
17 to set up reserves on claims?
18     A.    Yeah, I would say that you would usually
19 set a reserve. Obviously you set an expense reserve
20 based on anticipated cost and loss on anticipated --
21 you know, or what you thought could be the exposure,
22 you know, there's kind of an art, you know.
23     Q.    What about major claims? Are reserves
24 set on all major claims?
25     A.    I mean, if you think there's going to be

Page 107

1  no loss you probably have zero loss reserve. If
2  you're going to have if you're in litigation, you're
3  necessarily going to have an expense reserve.
4      Q.    Is there a loss reserve for this case?
5      A.    Yes.
6      Q.    What is the amount?
7          MR. HAYES: Object. And instruct you
8  not to answer. Work product. You're not entitled to
9  it.
10         MR. MEE: Okay. I am asking for the
11 fact of the amount of the reserve. I'm not asking
12 for any communications that you and your client may
13 have had as dealing with how to calculate that
14 amount.
15         MR. HAYES: Same objection. You're not
16 entitled to that information in my opinion under New
17 Jersey law.
18         MR. MEE: I think we're going to have to
19 call the judge.
20         MR. HAYES: You're going to have to.
21         MR. MEE: Off the record until we get
22 that set up.
23         (A discussion takes place off the
24 record).
25     Q.    Did you review any particular properties

Page 108

1  listed on Walsh's letter from July 28, 1997 marked as
2  Nations-3 in advance of this deposition to prepare?
3      A.    I'm sorry. Did I review what files?
4  Coastal's?
5      Q.    Let me show you the letter. On
6  Nations-3, if you look at the last page there's a
7  list of properties, and I was wondering whether or
8  not you reviewed any of the files on these properties
9  to prepare for this deposition?
10     A.    No, I don't have copies in our office of
11 the Coastal files for any of these properties.
12     Q.    Did you review any closing service
13 letters or anything like that pertaining to these
14 properties?
15     A.    Not specific to these properties.
16 Obviously I have looked at some closing service
17 letters in connection with the litigation.
18         (Nations-6, Closing Service Letter dated
19 July 10, 1996, is received and marked for
20 identification.)
21     Q.    I'm handing you what's been marked as
22 Nations-6. It's a closing service letter dated July
23 10, 1997 -- I'm sorry, 1996, from Nations Title. Who
24 would have made a request for this type of letter?
25     A.    A closing service letter would normally

Page 109

1  be requested by the attorney who orders the title
2  insurance commitment.
3      Q.    And on the first page after National
4  Home Funding it says: Its successors and/or its
5  assigns. What does the company interpret that to
6  mean?
7      A.    I think the company interprets that to
8  mean National Home Funding or anyone they assign this
9  loan commitment to that would be funding the
10 transaction.
11     Q.    There's a file number halfway down the
12 page. It says CT-17765 and then (A), capital A. Do
13 you know why Coastal Title is using this type of file
14 number?
15         MR. HAYES: Objection.
16         MR. KOTT: I object as well.
17         MR. HAYES: You can answer the question.
18     A.    I saw something in the notes of the
19 meeting with Bob Agel that it was a pre-sell
20 commitment. Again, those were notes taken at a
21 meeting and whether that's actually -- that's what
22 they report Bob Agel said it was for.
23     Q.    Which meeting notes are you referring
24 to?
25     A.    Todd Pajonas, Kevin Cairns and Maureen

28  (Pages 106 to 109)

Donna Sullivan

Page 110

1  Crowley met with Bob Agel in February of 1998.
2      Q.   I think we already requested that. Does
3  this document cover a particular -- this particular
4  transaction, or does it cover this particular lawyer
5  or the particular premises?
6          MR. HAYES: I object to the form. You
7  can answer, Miss Sullivan.
8      A.   Well, it states that the issuing agent
9  or attorney whose conduct is covered is Richard
10 Pepsny of the law office of Michael Alfieri. And,
11 I'm sorry, did you say what property? It's giving a
12 street address. I don't know why it doesn't give a
13 town or any further information but it is stating a
14 street address and what I assume is the borrower's
15 name.
16     Q.   If Michael Alfieri were the actual
17 closing attorney on this property as opposed to
18 Richard Pepsny, would it be the company's position
19 that there's no coverage under this closing letter?
20     A.   I guess I don't know what position they
21 have taken on that in the past and what position they
22 would take on it.
23     Q.   And this was -- this document was
24 prepared by Coastal?
25     A.   It says -- yeah, on the second page,

Page 111

1  issuing office, Coastal Title.
2      Q.   And who would Coastal have sent this to?
3      A.   Normally it would go out with the
4  commitment, but if the attorney said: Send it
5  directly to the lender, they might have done that. I
6  don't know what the instructions were to Coastal.
7          (Nations-7, Deed dated May 6, 1996, is
8  received and marked for identification.)
9      Q.   I've handed you what's been marked as
10 Nations-7, which appears to be a deed dated July 25,
11 1996 from Citicorp North America to Cristo Property
12 Management. Can you tell from this document when it
13 was recorded?
14     A.   It looks like a county stamp on the
15 first page -- although it's not legible. May 6, 19
16 something. I have to look at the last -- I can't see
17 any book or page.
18     Q.   Try CT 3474.
19     A.   This is clearer. Recorded May 6, 1997.
20 Has an instrument number. I don't see a book and
21 page but it has an instrument number.
22     Q.   Do you have any knowledge as to why this
23 document was recorded so long after the deed was
24 made?
25     A.   No.

Page 112

1      Q.   Do you know if back in 1996 whether it
2  was solely paper deeds that were being filed? Were
3  electronic copies being filed?
4      A.   I don't think there was electronic
5  filing at that time.
6      Q.   So --
7      A.   But I can't say positively. I don't
8  believe there was.
9      Q.   What was the process of recording these
10 deeds?
11     A.   Well, you would take it down to the
12 county clerk's office or mail it, however you were
13 going to transmit it, and they would stamp it, you
14 know, recorded with the instrument number. Beyond
15 that I'm not sure. I believe it goes into a stack
16 and the county will copy them and put them into a
17 binder format, and I believe they were still doing
18 that in '96 but I am not positive, because different
19 counties also changed over at different times so I'm
20 not sure.
21     Q.   At page 3472 up at the top, the
22 description -- the commitment number is CT 7765
23 without the capital A. Do you have any knowledge as
24 to why there's no capital A in parenthesis on this
25 document?

Page 113

1      A.   No.
2      Q.   Can you tell whether or not this portion
3  of the deed was prepared by Coastal Title?
4      A.   I assume that this description is taken
5  out of the title insurance commitment that Coastal
6  provided. I don't think Coastal prepared the deed.
7          (Nations-8, Deed dated July 25, 1996, is
8  received and marked for identification.)
9      Q.   I'm handing you what's been marked as
10 Nations-8, which appears to be a deed also dated July
11 25, 1996, from Cristo Property Management to George
12 Leodis. Do you know why Coastal's stamp is at the
13 top of this document?
14     A.   I don't know.
15     Q.   Directing your attention to CT 3470, are
16 you able to tell when this document was recorded?
17     A.   Looks like May 6, 1997.
18     Q.   Going back to the first page, it states
19 down at the bottom: "Being the same premises
20 conveyed to the grantor herein by deed from Bristol
21 Oaks, LP dated July 25, 1996 in which deed is
22 intended to be recorded simultaneously herewith."
23         I'm going to also direct your attention
24 back to this deed right here.
25     A.   I'm sorry. You asked why Coastal's name

29 (Pages 110 to 113)

VERITEXT REPORTING COMPANY

Donna Sullivan

## Page 114

1  was here?
2      Q.   Yes.
3      A.   I don't know.  There's an R&R next to it
4  so it could be record and return to Coastal.
5      Q.   Why would Coastal have wanted these
6  documents to be recorded and returned to it?
7      A.   Coastal did the recording.  They might
8  have wanted to see them come back and know that they
9  were actually recorded.
10     Q.   I'm going to direct your attention to
11 Nations-7.  The deed here on Nations-7 appears to be
12 from Citicorp to Cristo and then on Nations-8 it says
13 at the bottom that Cristo received it from Bristol
14 Oaks, LP.  I'm just curious.  Do you think there's an
15 error here in the way the deed is drafted?  Down at
16 the bottom.
17     A.   Well, I mean they look like the same
18 property so it could be an error in the recital.
19     Q.   Was this a document that Coastal Title
20 Agency would have reviewed before it recorded it?
21     A.   I'm not sure what review they did.
22     Q.   And then on looking at Nations-8 on the
23 second page, the top, the commitment says CT-17765,
24 which appears to be the same property as Nations-6
25 but they carry different file numbers.  Do you see

## Page 115

1  that?
2          MR. MEE:  We will go off the record
3  right now and let the witness excuse herself.
4          (A discussion takes place off the
5  record.)
6          (A telephonic discussion takes place
7  with Magistrate Judge John Shipp).
8      Q.   The question is whether or not the
9  closing service letter would cover the transaction of
10 this deed marked Nations-8 since they carry different
11 file numbers?
12     A.   Well, I'm not sure.  This is a deed
13 into -- into Leodis and I assume that Leodis is the
14 borrower or proposed borrower on the commitment.  I
15 don't know that we would differentiate between the
16 letter designation.  It appears to be the same
17 property.  Although it's not a full address there's
18 an address with the same street address in Neptune on
19 the deed.  So the deed and the closing service letter
20 appear to be for the same property and the commitment
21 reference is the same except for the A.
22     Q.   Would the title agent have picked up on
23 the fact that on Nations-8 that there was a different
24 deed going to Cristo?  In other words, if you look --
25 this is a little confusing but if you look at

## Page 116

1  Nations-8 it's Cristo to Leodis.
2      A.   Uh-huh.
3      Q.   But down here it says:  By deed from
4  Bristol to Cristo.  In other words, the grantor is
5  Cristo here.  On this document, however, Nations-7,
6  it states that Cristo received the property from
7  Citicorp.  Is that something the title agent would
8  have picked up on?
9      A.   When they were recording?
10     Q.   No, when they were preparing these
11 documents.
12         MR. HAYES:  Object to the form of the
13 question, because I don't think you have established
14 with this witness that they prepared the documents.
15         MR. MEE:  The witness stated that the
16 title agent prepared Nations-6.
17     Q.   So in preparation of Nations-6 would
18 they have been aware of the fact that it was deeded
19 from Citigroup to Cristo rather than from Bristol to
20 Cristo?
21     A.   I don't know what their title commitment
22 showed.  It seems like if these deeds were being
23 simultaneously recorded, they weren't on record at
24 the time of the commitment.  So I don't know whether
25 the commitment would have shown that Citicorp was in

## Page 117

1  title.  I don't know.
2          (Nations-9, Commitment for Title
3  Insurance, is received and marked for
4  identification.)
5      Q.   I've handed to you what's been marked as
6  Nations-9.  It's a title commitment from Nations.  If
7  you look at the second page, CT 3416, it says
8  says:  Effective date, May 21, 1996.  Do you know
9  whether or not that was the date that Commonwealth --
10 I'm sorry, the date that Coastal Title prepared this
11 document?
12     A.   No, I doubt it was.
13     Q.   You say "doubt."  What do you think --
14     A.   Normally they would use the effective
15 date of their search work, which was the last date
16 they were able to search to any county records as to
17 the effective date of the commitment.
18     Q.   So Coastal either conducted a search or
19 someone conducted a search on behalf of Coastal up
20 through May 21, 1996?
21     A.   That's what I would assume.
22     Q.   Down at the bottom under paragraph two
23 it states that the title to the fee simple estate or
24 interest in the land described or referred to,
25 etcetera, vested in Marjorie Hawk.  How come it

30 (Pages 114 to 117)

Donna Sullivan

Page 118

1  doesn't say Citigroup?
2      A.   Well, I'm assuming that this is what the
3  county records showed as of that date. This
4  doesn't -- this was correct, this recital. Citicorp
5  didn't take title until July -- deed dated July of
6  '96, whenever it was delivered.
7      Q.   You're referring to Nations-7. Do you
8  mean that Cristo didn't take title until July --
9      A.   I mean that it says: Being the same
10 premises conveyed to the grantor, which is Citicorp,
11 by deed from Bristol Oaks dated July 28, 1996.
12     Q.   Should it have said -- going back to
13 Nations-9 should it have said Bristol Oaks?
14     A.   I don't know what the records reflected.
15 It should say what the records reflect, and if this
16 was what the records reflected, and I don't know when
17 Bristol Oaks took title.
18     Q.   At page -- staying with Nations-9, going
19 to page 3418. This is the Schedule B to which you
20 were referring to earlier in your deposition.
21     A.   "Requirements" section of the
22 commitment?
23     Q.   Why don't we go back. This portion of
24 the commitment would have been drafted by who?
25     A.   Coastal would have drafted the

Page 119

1  commitment.
2      Q.   And what would they have done in order
3  to draft this portions of the commitment?
4      A.   They would have reviewed the title
5  search and set up the requirements in order to insure
6  into the insured.
7      Q.   And there are certain requirements --
8  well, strike that. At -- on the same page, 3418, at
9  C, paragraph C, it says: A deed from sheriff of
10 Monmouth County to Bristol Oaks.
11           (Nations-10, Mortgage dated July 25,
12 1996, is received and marked for identification.)
13     Q.   I have handed you what's been marked as
14 Nations-10, which is a mortgage from Walsh Securities
15 to George Leodis. Do you know why Coastal would have
16 put its stamp on top of Walsh Securities' name at the
17 top of that document on the first page?
18     A.   I am assuming that -- I am aware through
19 even my depositions that there were a lot of
20 unrecorded documents that were delivered to Coastal
21 for recording. So Coastal may have may have, taken
22 record all those documents that the attorney had not
23 recorded and they may have, you know, stamped it with
24 their name to record and return the documents to them
25 since they were the ones that were sending them for

Page 120

1  recording and wanted obviously to have a record that
2  they were recorded.
3      Q.   Did Nations have a policy regarding
4  recording documents by its agents?
5      A.   Not to my knowledge. I don't know if
6  there was any instructions to agents regarding that.
7      Q.   Can you tell by this document whether or
8  when Walsh Securities would be considered of record?
9      A.   This document does not run to the
10 benefit of Walsh Securities. The mortgage is to
11 National Home Funding.
12     Q.   Can you tell when National Home Funding
13 would have been on record?
14     A.   It's recorded May 6 of '97.
15     Q.   Can you -- would the company have taken
16 issue with Coastal recording this mortgage nearly ten
17 months after it was executed?
18     A.   I don't think that Coastal was
19 responsible for the delay so I'm not sure what issue
20 the company would have with Coastal.
21     Q.   Coastal took the initiative of recording
22 the document. Right? As it appears from the top?
23     A.   It appears they recorded it, and how
24 exactly it came about I'm not sure.
25     Q.   Would that have been something the

Page 121

1  company would have wanted its title agent to report
2  to the company, that it was holding a mortgage that
3  was executed ten months earlier?
4          MR. KOTT: I object to the form.
5  Assuming a fact not in evidence.
6          MR. HAYES: Objection.
7      A.   I believe under normal course an agent
8  is going to find some of their documents that they're
9  going to insure have not been recorded. I don't
10 think that they report all of those individually, you
11 know, to the underwriter. If there's a pattern or
12 practice they may report it.
13     Q.   In this -- on this particular property,
14 the documents you have looked at so far, it appears
15 that they were all executed in July -- on July 25,
16 1996, and that Coastal at some point as well it
17 appears that Coastal recorded the documents so one
18 might assume that Coastal was in possession of it on
19 May 6 of 1997.
20          Would the company have wanted Coastal to
21 report to the company that it was in possession of
22 all these deeds and mortgages that were dated ten
23 months earlier?
24          MR. HAYES: Objection. You may answer.
25     A.   I'm not sure I can speak to whoever was

31 (Pages 118 to 121)