# EXHIBIT I

N. KOCH

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No.
97-cv-3496 (DRD) (MAS)

WALSH SECURITIES, INC.,      :
                             :
          Plaintiff,         :
                             :
     vs.                     :      DEPOSITION OF:
                             :      NANCY KOCH
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP CONSULTING,
INC.; COMMONWEALTH LAND TITLE
INSURANCE CO.; NATIONS TITLE
INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE
INSURANCE CO. OF NEW YORK;
Coastal Title Agency; DONNA
PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., D/B/A
MURPHY REALTY BETTER HOMES
And GARDENS                  :
                             :
          Defendants.        :
     - - - - - - - - - - - -

N. KOCH

## Page 2

```
1          TRANSCRIPT of the stenographic notes of
2   the proceedings in the above-entitled matter, as
3   taken by and before JANET BAILYN, a Certified
4   Shorthand Reporter and Notary Public of the State of
5   New Jersey, held at the office of STONE & MAGNANINI,
6   150 John F. Kennedy Parkway, Short Hills, New Jersey,
7   on November 11, 2010, commencing at 10:10 in the
8   forenoon.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1   APPEARANCES:
2
3      STONE & MAGNANINI, LLP
       BY:  ROBERT MAGNANINI, ESQ.
4      150 John F. Kennedy Parkway
       Short Hills, New Jersey 07078
5      Attorneys for Plaintiff
6      McCARTER & ENGLISH, LLP
       BY:  DAVID R. KOTT, ESQ.
7      Four Gateway Center
       100 Mulberry Street
8      Newark, New Jersey 07102-4056
       Attorneys for Defendant
9      Commonwealth Land Title Insurance Co.
10     FOX ROTHSCHILD, LLP
       BY:  EDWARD J. HAYES, ESQ.
11     2000 Market Street
       Philadelphia, Pennsylvania 19103-3222
12     Attorneys for Defendants Nations Title
       Insurance of New York, Inc. and Fidelity
13     National Title Insurance Co. of New York
14     METHFESSEL & WERBEL
       BY:  MARTIN R. McGOWAN, ESQ.
15     3 Ethel Road
       Box 3012
16     Edison, New Jersey 08818
       Attorneys for Defendant
17     Coastal Title Agency
18
19
20
21
22
23
24
25
```

## Page 4

```
1                      INDEX
2
3   WITNESS      DIRECT CROSS REDIRECT RECROSS
    NANCY KOCH
4     BY MR. MAGNANINI 5         85
      BY MR. McGOWAN       81
5     BY MR. KOTT          84
6
7
                   E X H I B I T S
8
    NUMBER     DESCRIPTION         PAGE
9
    Koch-1     Claims Manual          22
10  Koch-2     Letter dated September 29, 2000 33
    Koch-3     Legal Bulletin dated
11             November 25, 1998      40
    Koch-4     Legal Bulletin dated
12             July 9, 1999           42
    Koch-5     Final Judgment         71
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1   N A N C Y  K O C H, with offices at Old Republic
2   National Title Insurance Company, 119 Cherry Hill
3   Road, Parsippany, New Jersey, having been duly sworn
4   by the Notary, testified as follows:
5   DIRECT EXAMINATION BY MR. MAGNANINI:
6       Q.   Good morning, Miss Koch.
7       A.   Good morning.
8       Q.   Can I call you Nancy?
9       A.   Nancy is fine.
10      Q.   Thank you, Nancy, for coming today.  As
11  I mentioned on the phone Stone & Magnanini, which is
12  myself and Mr. Mee here, represent Walsh Securities
13  Inc., and we've asked you to appear simply as a fact
14  witness.
15           I understand that you had some
16  involvement in the events that are part of our
17  complaint either prior to or after the fraud was
18  uncovered, and as I said earlier Walsh -- just for
19  the record, Walsh Securities, Inc. has declared or
20  filed for Chapter 11 bankruptcy protection.  We are
21  actually not retained, but I understand we're going
22  to be retained, but since we had scheduled your
23  deposition so long ago I thought we would just go
24  ahead with it.
25           Let me just ask you:  Have you ever been
```

2  (Pages 2 to 5)

N. KOCH

Page 6

1  deposed before?
2      A.    I have.
3      Q.    How many times?
4      A.    A lot.
5      Q.    Okay.  And I'll just give you the basic
6  rules then.  It's your deposition.  Any time you want
7  to take a break feel free to do so.  I would ask you
8  not to take a break while a question is pending.  Any
9  time -- I assume you're represented by Mr. Kott?
10     A.    Yes.
11     Q.    Any time you want to consult with your
12 counsel just let me know and we will stop, and then
13 as long as you answer the question I'll assume you
14 have understood it.  As this wears on the questions
15 may become less intelligible.  So, please, if you
16 don't understand one let me know and I'll rephrase
17 it.  And then a couple of documents you may or may
18 not have seen but we will just show you.  That's kind
19 of the basics of it.
20     A.    Okay.
21     Q.    And then could you tell me:  Where do
22 you work now?
23     A.    Old Republic National Title Insurance
24 Company.
25     Q.    And when did you leave Commonwealth Land

Page 7

1  Title Insurance?
2      A.    January of 2009.
3      Q.    When did you start working for
4  Commonwealth?
5      A.    It's a tortured story.
6      Q.    As is this case.
7      A.    Technically Commonwealth -- would have
8  been when Commonwealth acquired Trans America Title
9  Insurance Company who was my employer at that time
10 and that was maybe 1990?
11     Q.    Okay.
12     A.    So I started in the title industry in
13 1987.
14     Q.    Working for Trans America?
15     A.    Started with Trans America Title
16 Insurance Company.
17     Q.    Where was your office located?
18     A.    Parsippany, New Jersey.
19     Q.    And you're an attorney?
20     A.    I am.
21     Q.    When did you graduate law school?
22     A.    1984.
23     Q.    I guess -- where did you go to law
24 school?
25     A.    Rutgers Camden.

Page 8

1      Q.    Where did you go to college?
2      A.    Douglas College, Rutgers University.
3      Q.    Where did you work between 1984 and
4  1987?
5      A.    Dilts, D-i-l-t-s, Delancy & Welsh in
6  Somerville, which is a small firm.
7      Q.    What did you do there?
8      A.    A little of everything.  I was an
9  associate.
10     Q.    Okay.  General practice.  And then where
11 did you go after Dilts?
12     A.    I freelanced for three months, and then
13 I came to work for Trans America Title.
14     Q.    Okay.  And what was the first position
15 you held at Trans America?
16     A.    Assistant state counsel, I think.
17     Q.    What did that entail?  What were your
18 responsibilities?
19     A.    Providing underwriting support to agents
20 handling some claims.  Some regulatory work.
21     Q.    How long were you an assistant state
22 counsel?
23     A.    It was years.  I don't remember the
24 exact timing.
25     Q.    So when you began working for

Page 9

1  Commonwealth that was still your title?
2      A.    No.  I was -- by then I was probably
3  division counsel.  Again, I don't remember the exact
4  timing.
5      Q.    What does a division counsel do?
6      A.    I had responsibility for underwriting
7  for Maine to Virginia, not including New York.
8      Q.    And what did you do -- what did being
9  responsible for that area consist of?
10     A.    Provided underwriting support to the
11 agents in those states, did some claims, work mostly
12 New Jersey, some regulatory work in all those states.
13     Q.    And what position did you hold after
14 division counsel?
15     A.    I went back to state counsel, and then
16 in I think '98 I became agency manager and
17 underwriting counsel.  I said '98.  Correct?
18     Q.    Yes.
19     A.    Which is the position I held until 2009.
20     Q.    When you went back to being a state
21 counsel, was that for a specific state?
22     A.    New Jersey.
23     Q.    For New Jersey.  Okay.  And did you have
24 the same responsibilities, just --
25     A.    Yes.

3  (Pages 6 to 9)

bf5f60ac-c450-452f-a5eb-a31816b35d59

N. KOCH

---

Page 10

1    Q.    -- in a more limited geographic scope?
2    A.    Yes.
3    Q.    And at some point when you were the
4 agency manager and underwriting counsel, were you
5 involved with an investigation into claims made by
6 Walsh Securities?
7    A.    Yes.
8    Q.    And then let me just run through the
9 list of names and I'll see if you have any
10 familiarity with them.
11        Are you familiar with a fellow named
12 William Kane?
13    A.    Only through the Walsh matter.
14    Q.    Did you ever interview him or speak to
15 him?
16    A.    Never.
17    Q.    How about Gary Grieser?
18    A.    Through this matter.
19    Q.    Did you ever speak to him or interview
20 him?
21    A.    No.
22    Q.    Larry Cuzzi?
23    A.    That name is not familiar to me.
24    Q.    How about -- there were five appraisers
25 Walsh alleges were involved in the fraud.  One was

---

Page 11

1 named Richard DiBenedetto.
2    A.    Only from newspaper reports.
3    Q.    So you never spoke to him or interviewed
4 him?
5    A.    No.
6    Q.    Richard Calanni?
7    A.    It doesn't sound familiar to me.
8    Q.    James Brown?
9    A.    That does not sound familiar to me.
10    Q.    Roland Pierson.
11    A.    No.
12    Q.    Or Thomas Brodo?
13    A.    Doesn't sound familiar to me.
14    Q.    Did you ever speak to Anthony D'Apolito
15 who was a former Walsh Securities employee?
16    A.    Not that I can recall, no.
17    Q.    How about Kelly O'Neill?
18    A.    Not that I recall, no.
19    Q.    Did you meet and speak with anyone from
20 Walsh Securities during the investigation?
21    A.    Not that I recall.
22    Q.    There were also two realtors who were
23 involved in originally getting purchasers to act as
24 what we've alleged were straw buyers and they were
25 Irene DeFeo and Donna Pepsny.

---

Page 12

1    A.    I don't recall speaking to either of
2 them, no.
3    Q.    Did you speak to -- there were four
4 attorneys that Walsh Securities has alleged were
5 involved.  One was Stanley Yacker.
6    A.    I don't believe I spoke to Mr. Yacker.
7 I know his name.
8    Q.    And then another one was Anthony
9 Cicalese.
10    A.    Same, answer, I don't believe I spoke to
11 him.
12    Q.    And then the other -- another one was
13 Michael Alfieri.
14    A.    Yes.
15    Q.    Have you ever spoken to him?
16    A.    Not about Walsh.
17    Q.    And then the other attorney was Richard
18 Pepsny.
19    A.    Yes, same, I never spoke to him but I
20 know the name.  I don't recall speaking to him.
21    Q.    There were -- Mr. Kane had a number of
22 companies.  I don't know if you ever as part of the
23 investigation came upon anything related to Cristo
24 Properties?
25    A.    Only through this claim.

---

Page 13

1    Q.    And then G.J.L. Limited.
2    A.    That does not sound familiar.
3    Q.    Oakwood Properties.
4    A.    I don't remember that name.
5    Q.    DEK Homes.
6    A.    I don't remember that name.
7    Q.    And then there was -- early on in the
8 acquisition of the properties there was a company
9 called D&Sons.
10    A.    I don't remember that.
11    Q.    And then two people -- too other names
12 you may have come upon were William Epp or Donozo?
13    A.    Doesn't ring a bell.
14        MR. MAGNANINI:  Off the record.
15        (A discussion takes place off the
16 record.
17    Q.    And then we previously deposed Mr. Agel,
18 and I assume you're familiar with him?
19    A.    Yes.
20    Q.    And when did you first meet Mr. Agel?
21    A.    I don't remember.
22    Q.    He was an agent for Commonwealth among
23 other title insurance companies I think since 1989.
24 Did you have any involvement with Mr. Agel's becoming
25 an agent of Commonwealth?

---

4  (Pages 10 to 13)

N. KOCH

Page 14

1    A.   No, not that I recall.
2    Q.   And then Mr. Agel had testified that
3  during the 1996, '97, that's really the time period
4  we're initially concerned with, that Mr. Kane's
5  companies were acquiring properties and then selling
6  them to buyers and that was -- the transaction, the
7  second transaction, was financed by Walsh Securities.
8  Mr. Agel said that he would call you actually
9  regularly to discuss different things with the --
10 guess problems with the properties and getting clear
11 title to them.  Was that part of your job in 1996,
12 '97 to answer questions from agents?
13    MR. KOTT: I object to the form.
14    Q.   It's a long-winded preface.  I
15 apologize.
16    A.   You're asking me was it my
17 responsibility to answer underwriting questions for
18 our agents in my time frame?
19    Q.   Yes.
20    A.   That was part of my job, yes.
21    Q.   How was Commonwealth organized in 1996,
22 '97?  Were there other people who dealt with
23 underwriting questions from agents?
24    A.   Yes.
25    Q.   And what department were they in?

Page 15

1    A.   Underwriting.
2    Q.   Same.  Okay.  And then were they
3  attorneys too?
4    A.   Yes.
5    Q.   And who were they?
6    A.   1996 and seven.  I don't know if Kevin
7  Cairns was there yet or not.  I don't remember what
8  year he was hired.  I think Donna Sullivan was still
9  there or was there.  I don't remember anyone else.
10    Q.   Okay.  And I may have some documents
11 that may help refresh your recollection I'll get to
12 in a bit.
13    Do you recall any of the substance -- I
14 am sure -- let me ask you:  Do you recall any of the
15 conversations with Mr. Agel about any of the
16 properties -- let me strike that.
17    Do you recall the substance of any of
18 the conversations you had with Mr. Agel concerning
19 his underwriting questions?
20    A.   Not specifically.
21    Q.   Generally?
22    A.   I know Bob called me for underwriting
23 support occasionally.
24    MR. McGOWAN: I'm sorry?
25    A.   Bob called for underwriting support

Page 16

1  occasionally.
2    Q.   What kind of underwriting support did
3  you provide?
4    A.   I don't have a specific recollection.  I
5  can give you an idea of what generally agents ask
6  about.
7    Q.   Sure.
8    A.   Whether we can pass on a judgment,
9  whether we can give affirmative insurance for an
10 easement, how to deal with an encroachment.  I mean,
11 there are hundreds of thousands of issues.
12    Q.   That can come up in a transfer of
13 property?
14    A.   Yes.
15    MR. KOTT:  Off the record.
16    (A discussion takes place off the
17 record).
18    Q.   How did you first learn about the claims
19 of Walsh Securities?
20    A.   I don't remember.
21    Q.   And did Commonwealth conduct an
22 investigation into those claims?
23    A.   Yes.
24    Q.   And who was involved with the
25 investigation?

Page 17

1    A.   Me, whoever was at the claims department
2  at the time, maybe Ginger Moran.  I'm sure there were
3  others.  I don't remember.
4    Q.   How do you or how does or how did
5  Commonwealth at that time period investigate claims?
6    A.   I was not claims counsel at the time.
7  So I can tell you what I recall about this one, but I
8  didn't often get involved in claims investigation at
9  this point in time.
10    Q.   Okay.  What do you recall about this
11 investigation?
12    A.   I know that I went to Bob's office.
13    Q.   Bob Agel?
14    A.   Bob Agel's office.
15    Q.   We have a lot of Bobs in this case.
16    A.   Bob Agel's office to review files, to
17 look at the files that I believe had been segregated
18 for us, and the reason I was chosen was partly
19 because I was the agency manager and partly because I
20 was a lawyer and partly because I was the only one
21 available on short notice.
22    Q.   I know how that works.  And what did
23 reviewing the files involve?
24    A.   I remember pulling random files out to
25 try to get a handle on what was going on, what the

5  (Pages 14 to 17)

bf5f60ac-c450-452f-a5eb-a31816b35d59

N. KOCH

## Page 18

1  files looked like, what documentation was in them,
2  trying to understand how the transactions were going
3  down. I believe I spoke to Bob and then we took the
4  files as I recall.
5      Q.   I believe Mr. Agel said that he had made
6  copies of them but I think you took the original ones
7  he said. What happened after you take the files,
8  Nancy, or in this case when you took the files?
9      A.   I don't remember specifically. They
10 would have gone to the claims department?
11     Q.   And what involvement did you have in the
12 investigation once the files got to the claims
13 department?
14     A.   Only answering questions that the claims
15 department might have about what I might know about
16 the matter.
17     Q.   Okay.
18     A.   Or seeking information for them.
19     Q.   Did you prepare any written summary of
20 your findings?
21     A.   I don't remember.
22     Q.   Okay. Which is my next question. Do
23 you have any documents related to your investigation?
24     A.   I do not.
25     Q.   Okay.

## Page 19

1          MR. MAGNANINI: Off the record.
2          (A discussion takes place off the
3  record).
4      Q.   What was your conclusion from your
5  participation in the investigation?
6      A.   My conclusion was I didn't like the way
7  the files looked. I did not have enough time to
8  really -- you know, in that day to really get my mind
9  completely wrapped around it, but I knew that it
10 didn't -- the files did not look good.
11     Q.   Why did they not look good to you?
12     A.   Well, it appeared that these were a
13 series of flip transactions, and at that point in
14 time flips were not something we were insuring --
15 well, we probably did a few but we were not actively
16 insuring them.
17     Q.   And did it appear that all the files you
18 looked at were flip transactions?
19     A.   The ones I looked at.
20     Q.   Was there anything else that concerned
21 you about the paper in the files?
22     A.   I don't remember.
23     Q.   And you said you spoke to Mr. Agel about
24 this?
25     A.   I think I did.

## Page 20

1      Q.   Do you recall what you discussed or what
2  he told you?
3      A.   I don't.
4      Q.   Did you speak to anyone else at Coastal
5  Title?
6      A.   Probably.
7      Q.   Did you make any notes or memos of that?
8      A.   Not that I recall.
9      Q.   And then -- off the record.
10         (A discussion takes place off the
11 record).
12     Q.   So after -- you went down and you
13 reviewed the files in Coastal's offices in Freehold?
14     A.   Yes.
15     Q.   And then the files were transferred to
16 Commonwealth. Where were your offices at that point?
17     A.   Parsippany.
18     Q.   Still in Parsippany. Okay. And then
19 how long did the investigation continue while at -- I
20 mean how long -- let me just ask: How long did
21 Commonwealth's investigation continue into the claims
22 of Walsh Securities?
23     A.   I don't know.
24     Q.   When was the last time you had any
25 involvement in the investigation?

## Page 21

1      A.   It's years ago. I don't remember
2  exactly when and it would be peripheral.
3      Q.   Okay. By that you mean just answering
4  questions as they arose?
5      A.   Exactly.
6      Q.   And then who handled the investigation
7  by Commonwealth?
8      A.   Whichever claims counsel was assigned to
9  it.
10     Q.   Did the investigation end at some point?
11     A.   I assume.
12     Q.   Why do investigations -- or how did it
13 end or why do they end normally? That's an
14 objectionable question.
15     A.   How they end? I would say that a
16 conclusion is made as to liability or what we're
17 going to do, what the company is going to do about
18 the claim. That's typically how they end. There's
19 no more information to obtain.
20     Q.   Do you know what the conclusion of the
21 investigation into the Walsh Securities claims were?
22     A.   I'm trying to remember whether I know
23 this or not. I don't know what the official
24 conclusion was. I don't recall that. I probably did
25 know but I don't remember it now.

6  (Pages 18 to 21)

N. KOCH

### Page 22

1  Q.   So you recall that there was some
2  official conclusion to the investigation?
3  A.   I'm sure they took a position, I'm sure
4  the company took a position, yes.
5  Q.   And what happens when the company takes
6  an official position?  Is the insured notified?
7  A.   Again, I'm not claims counsel, but I
8  would expect that, yes.
9  Q.   I am just going to show you a
10 Commonwealth claims manual, Nancy, which was produced
11 by Mr. Kott's office.
12      (Koch-1, Claims Manual, is received and
13 marked for identification.)
14 Q.   Actually let me just ask you this,
15 Nancy:  You said you didn't have any documents
16 relating to the investigation.  Do you have any
17 documents relating to the Walsh Securities
18 litigation?
19 A.   Besides the subpoena?
20 Q.   Right.
21 A.   I have copies of Donna Sullivan and Bob
22 Agel's deposition transcripts.
23 Q.   Those were provided for you to prepare
24 for this?
25 A.   By my counsel, yes.

### Page 23

1  Q.   Did you review any documents to prepare?
2  A.   Couple -- two closing service letters, a
3  memorandum about not doing business with some of the
4  players in this transaction and another memo from --
5  having to do with closing service letters.
6  Q.   The memorandum about not doing business,
7  was that issued by Fidelity or was there one by
8  Commonwealth?
9  A.   That was by Commonwealth.
10 Q.   If you can take a look at what we've
11 marked as Koch Exhibit 1, which is a document -- it's
12 entitled, "Commonwealth Claims Manual," and you will
13 see at the bottom lower right a Bates stamp COM
14 23869, and I believe the last page is COM 24003.
15 That just means it was produced by Commonwealth's
16 counsel.  I ask you just to take a look at this and
17 let me know if you have seen this before today.
18 A.   I have.
19 Q.   And was this a copy of the claims manual
20 that you worked within the -- I guess it's dated
21 1/97.
22 A.   I was not claims counsel at the time.
23 So I would have a copy of it as manager, but it was
24 on my shelf.
25 Q.   As the manager what were your

### Page 24

1  responsibilities for dealing with agents?
2  A.   When our rep would bring in a prospect I
3  would be the ultimate decision-maker as to whether to
4  sign that agent or not and be involved in the whole
5  process through that.  I was responsible for the
6  economic progress of the department, managing the
7  staff, cancellation of agents, terminations,
8  auditing.  I didn't do the auditing.
9  Q.   But you were responsible for it?
10 A.   I was responsible for it getting done.
11 Q.   How big was your department?
12 A.   Not big enough.
13 Q.   Okay.
14 A.   In 1996 and seven I probably had four or
15 five people on my staff.
16 Q.   To do all the tasks?
17 A.   Yes.
18 Q.   And then if I could ask you a question,
19 on the first page there, which is Bates stamp COM
20 23869, it says in the third paragraph:  "This manual
21 is intended for use by Commonwealth Land Title
22 Insurance Company and the following affiliate
23 companies," and the fourth one down is entitled,
24 Commonwealth Land title Insurance Company of New
25 Jersey.  Was there a separate Commonwealth of New

### Page 25

1  Jersey?
2  A.   Yes.
3  Q.   And was that a subsidiary of
4  Commonwealth?
5  A.   Yes.
6  Q.   Do you know why there was a separate one
7  for New Jersey?
8  A.   Yes.
9  Q.   Why was that?
10      (A discussion takes place off the
11 record).
12 A.   In I think it was 1994, but I'm not
13 positive of that, Commonwealth acquired Reliance, I
14 think it was, or maybe Commonwealth -- Commonwealth
15 acquired Continental Title Insurance Company and
16 Industrial Valley Title Insurance Companies.
17 Continental Title Insurance Company was a domestic
18 underwriter meaning that it was formed in New Jersey.
19 It was a New Jersey underwriter.  The company decided
20 at some point in time that the Continental name did
21 not indicate the strength of being part of the
22 Commonwealth family, so we changed the name of
23 Continental to Commonwealth Land Title Insurance
24 Company of New Jersey.
25 Q.   Okay.  So did you work for that entity

bf5f60ac-c450-452f-a5eb-a31816b35d59

N. KOCH

Page 26

1 or actual --
2     A.   I managed that entity, yes.
3     Q.   You managed it?
4     A.   As well as Trans Nation and
5 Commonwealth.
6     Q.   Okay. I just had a couple of questions
7 on this. Since the edition date -- how often were
8 these published?
9     A.   I have no idea. I assume.
10    Q.   I believe since this edition date was
11 1/97 and Walsh Securities made its claims in July of
12 1997 and this is what was produced we thought this
13 was the operative claims manual at the time?
14    A.   I don't know. I assume.
15    Q.   If you could turn to page what is Bates
16 stamped COM 23882, it's actually page ten. It
17 says -- of this manual, it says -- it details --
18 says: "Subject: Claim Processing." And it says,
19 "Major Claims," and the first sentence says, "The
20 claims department directly supervises claims
21 determined to be major claims."
22         Was the Walsh Securities claim a major
23 claim?
24    A.   Yes.
25    Q.   And why was -- how was it delineated

Page 27

1 major?
2     A.   The dollar amount of the potential loss
3 was large and the nature of the claim was fraud.
4     Q.   In order to be a major claim did it have
5 to be both or could it be an either/or?
6     A.   It was up to the claims counsel's
7 determination.
8     Q.   Okay. Did you have any involvement in
9 that decision?
10    A.   No.
11    Q.   If you can just flip to what is listed
12 as Exhibit 20, which is COM 23977?
13         MR. KOTT: I think you misspoke. You
14 referred to it as Exhibit 20.
15    Q.   Sorry, David, it's Exhibit 20 within
16 Koch-1. So each of these things has a little exhibit
17 number on the front of them. And Exhibit 20 is
18 actually COM 23976. I did make a mistake. I put one
19 more seven in there. And then Exhibit 20 is listed
20 as a defalcation checklist. What was the purpose of
21 this, Nancy?
22    A.   Again, I wasn't claims counsel. I can
23 guess.
24    Q.   Okay. I'm just trying to figure out if
25 these were used for -- these checklists were used

Page 28

1 during the conduct of investigations.
2     A.   I don't know.
3         MR. KOTT: Hold on. That's fine.
4     A.   I don't know.
5     Q.   And then on -- if you could flip back to
6 Exhibit 16 in Koch-1, which is COM 23945. And it's
7 entitled Exhibit 16, "Claim Evaluation/File Contents
8 Checklist," and I know you weren't the claim counsel
9 for the Walsh Securities claim but were these
10 evaluations or checklists completed for each claim?
11    A.   I don't know.
12    Q.   Did you ever see one completed for Walsh
13 Securities?
14    A.   No, I never saw one, no.
15    Q.   If one was completed would it have been
16 retained?
17    A.   I assume.
18    Q.   What was Commonwealth's, in the general
19 manner, record retention policy?
20    A.   I don't remember.
21         MR. MAGNANINI: Off the record.
22         (A discussion takes place off the
23 record).
24    Q.   Let me ask you a few questions about the
25 very beginning of the manual, Nancy. On page COM

Page 29

1 23874, it says -- the subject says: "Investigation
2 and Reporting of Claims." And it says,
3 "Acknowledgement of notice of claims." How was that
4 actually -- how was that done by Commonwealth in '96,
5 '97?
6     A.   I don't know.
7     Q.   So you didn't send out any letters
8 acknowledging claims?
9     A.   No.
10    Q.   They would have come from the claims
11 counsel?
12    A.   Yes.
13    Q.   And did you have any involvement in the
14 investigation of potential coverage?
15    A.   At the request of the claims counsel,
16 yes.
17    Q.   And what involvement or what did you do?
18    A.   It would be factfinding. Whatever they
19 needed me to try to get for them I would try to get
20 them for. If it was files, if it was information.
21    Q.   That was the going to Coastal and
22 looking at the files?
23    A.   Exactly.
24    Q.   One of the questions we had asked Donna
25 Sullivan, she was the corporate representative who

8  (Pages 26 to 29)

N. KOCH

Page 30

1 testified on behalf of Commonwealth, we were trying
2 to track down copies of the title insurance policies,
3 the commitments, closing protection letters, and
4 she -- and I might be mistaken but I believe she said
5 that they would be transferred and end up at the NPC,
6 the National Processing Center --
7      A.   Yes.
8      Q.   -- in Louisville.  Did you have any
9 involvement in sending documents there or dealing
10 with the NPC?
11      A.   I didn't personally send things to them
12 generally.  I had staff that took care of that, and I
13 did deal with NPC somewhat regularly.
14      Q.   And does NPC still exist?
15      A.   Not to my knowledge.
16      Q.   Okay.
17      A.   You know what, I don't know, I don't
18 know.
19      Q.   What was NPC's purpose?
20      A.   They were the repository for policies
21 and they also -- for issued policies and closing
22 service letters and also were the forms supplier when
23 we supplied paper forms.
24      Q.   Okay.  Mr. Agel had testified about
25 that, that the things used to come in with a specific

Page 31

1 number and each one had to be accounted for.
2      A.   Yes.
3      Q.   Things like that.  When did you change
4 from -- when did Commonwealth, sorry, change from the
5 paper forms to, I guess, computer-generated forms?
6      A.   We had not changed as of 2009.
7      Q.   Okay.
8      A.   Well, no, we -- I think we were still
9 doing paper in 2009.
10      Q.   So back in '96, '97, the policies and
11 closing service protection letters issued by Coastal
12 Title Agency were actually -- were paper forms
13 provided by Commonwealth?
14      A.   No.
15      Q.   Okay.  I didn't get that right then.
16      A.   The policies were, the policy jackets
17 were.  We had not gone electronic with those yet, but
18 agents were able to issue closing service letters off
19 of their computer systems.
20      Q.   And title commitments?
21      A.   Paper jackets from us.
22      Q.   From you?  At the risk of you not
23 knowing this, I'll ask the question since I got you
24 sitting here, on page COM 23875 under "Agent Policy
25 Verification," it -- the second paragraph says that

Page 32

1 claims counsel must obtain a policy from NPC.  You
2 see the end of the first sentence into the second?
3 Did you have any involvement in obtaining policies
4 from NPC related to the Walsh Securities claims?
5      A.   I don't think so.
6      Q.   How would NPC send copies of policies?
7 Were they paper or were they electronic?
8      A.   My recollection is at that time it was
9 most often faxed.  If we requested a policy they
10 would fax it.  That's my recollection.  We could get
11 them in paper, but usually it was one policy and they
12 could fax it.
13      Q.   Okay.  After an investigation is
14 concluded what happens to the documents that are part
15 of the investigation?
16      A.   I don't know.
17      Q.   Do you know if as a result of the
18 investigation the claims made by Walsh Securities
19 were ever denied?
20      A.   I think they were but I'm not positive
21 of that.
22      Q.   Do you recall ever seeing any
23 correspondence to that effect?
24      A.   I probably did.  I don't remember it.
25      Q.   We have never seen it.

Page 33

1      A.   I probably did but I don't remember.
2           (Koch-2, Letter dated September 29,
3 2000, is received and marked for identification.) .
4      Q.   Nancy, I would like you to take a look
5 at what we've marked as Koch-2, which is a letter
6 from Commonwealth to Coastal Title and ask if -- it's
7 also Bates stamped as you see COM 2386 and ask if you
8 have ever seen this before?
9      A.   Yes.
10      Q.   And I assume that's your signature?
11      A.   It is.
12      Q.   The -- for my own edification, after the
13 Esquire you have a CTP initials.
14      A.   Yes.
15      Q.   What does that stand for?
16      A.   Certified title professional.
17      Q.   And is that a state designation?
18      A.   It's a professional designation.
19      Q.   How do you get that?
20      A.   It's done by the New Jersey Land Title
21 Association and it takes into account experience,
22 publication, teaching, you know.
23      Q.   That you know what you're doing more or
24 less.  And then is this a letter that you sent to
25 Coastal Title?

9  (Pages 30 to 33)

bf5f60ac-c450-452f-a5eb-a31816b35d59

N. KOCH

Page 34

1    A.    Yes.
2    Q.    And it was terminating the relationship
3  with Coastal Title agency?
4    A.    Yes.
5    Q.    And then in the second paragraph it
6  says, that Cris, C-r-i-s, Franco will be contacting
7  you to arrange to retrieve your supply of
8  Commonwealth and to provide a termination audit.  Do
9  you know if a termination audit was performed on
10  Coastal Title agency?
11    A.    I don't remember.  I assume it was.  I
12  don't remember.
13    Q.    What does a termination audit include?
14    A.    Accounting for the forms, making sure
15  that the premium remittances that we expect have been
16  made or will be made, collecting our manuals.
17    Q.    And then what kind of manuals did you
18  provide the title agents?
19    A.    The only one I can remember at that time
20  frame was the "Frequently Asked Title Questions"
21  manual or book, although before my time there were
22  manuals that Bob might have had.  I don't know.
23    Q.    And what were in the manuals?
24    A.    The "Frequently Asked Title Questions"
25  book were a series of underwriting releases answering

Page 35

1  a specific title question.  The other manuals I don't
2  know because I don't know which ones he may or may
3  not have had.
4    Q.    The "Frequently Asked Questions" manual
5  was I guess to -- a resource in the first instance
6  that the title agent would look at before calling
7  you?
8    A.    Yes.
9    Q.    Before calling Commonwealth, I mean to
10  say?
11    A.    Yes.
12    Q.    And then do you recall ever hearing
13  there were any problems or issues raised as a result
14  of the termination audit with Coastal Title?
15    A.    I don't remember.
16    Q.    Why did Commonwealth -- it says the
17  termination was a mutual decision.  Why did
18  Commonwealth want to terminate the agency
19  relationship?
20    A.    Bob was very loyal to Lawyer's Title and
21  we were not getting a lot of business from him and
22  felt that there was no sense to continue the
23  relationship.
24    Q.    Did it have anything to do with the
25  Walsh Securities claims or litigation?

Page 36

1    A.    That certainly played in the back of my
2  mind.
3    Q.    Has Commonwealth done any business with
4  Coastal Title since the termination?
5    MR. KOTT:  Would you read the question
6  back.
7    (The pending question is read by the
8  court reporter.)
9    Q.    That's up to the time you left, Nancy.
10    A.    I don't think so.  I don't remember any.
11    Q.    How did the termination with Coastal
12  come about?
13    A.    Sorry?
14    MR. KOTT:  Off the record.
15    (A discussion takes place off the
16  record.)
17    Q.    How did the termination with -- of
18  Coastal Title agency come about?
19    A.    I don't remember specifically.  We would
20  review our agency relationships monthly in a
21  department meeting, and at some point in time we
22  probably looked at Coastal and said we need to
23  terminate this because it's not -- it's costing us
24  more than -- to maintain the relationship than to
25  have it, I think.

Page 37

1    Q.    That's what I was wondering.  The
2  relationship had not been profitable or had become
3  less profitable?
4    A.    Yes.
5    Q.    And was Commonwealth's relationship with
6  Coastal profitable in 1996 or '97?
7    A.    Probably.  I don't recall the numbers.
8    Q.    Let me ask, just because the whole title
9  insurance industry is still a little odd to me, not
10  to David or Ed, but I as I understand it Walsh
11  Securities or at the closing on a loan funded by
12  Walsh Securities a closing lawyer, either Mr. Yacker
13  or Mr. Cicalese, would pay Coastal Title Agency a
14  certain amount of money for title policy, closing
15  service protection letter was particularly listed and
16  searches and things like that.
17    How did Commonwealth, which actually
18  issues the insurance policy, get paid?  Money was
19  remitted from Coastal, the agent, to Commonwealth?
20    MR. KOTT:  Object to the form.
21    Q.    Or was money remitted from --
22    A.    If I can correct one thing, we did not
23  issue the policies.  The policies were issued by
24  Coastal Title or the agent, whichever agent it is.
25    MR. KOTT:  So the witness has sustained

10  (Pages 34 to 37)

N. KOCH

Page 38

1  my objection.
2          MR. MAGNANINI:  I'm glad someone knows
3  what's going on.
4      A.    It would be reported to us and remitted
5  to us periodically.  So it was up to the agent to
6  make that report and remit the money to us.
7      Q.    And did you see those reports, Nancy, in
8  your management role?
9      A.    Occasionally, yes.
10      Q.    And then if I can go back, you said you
11  were kind of the end of the line or the
12  decision-maker on whether an agent should become an
13  agent of Commonwealth.
14      A.    Yes.
15      Q.    And what did you have to do to become a
16  title agent with Commonwealth?
17      A.    We had an application form.  We had --
18  this is in the '96, '97 area.
19      Q.    Right.
20      A.    We had an application form.  We did a
21  credit check.  The agency representative or I would
22  do an interview with the agent to talk to them and
23  get a handle on their experience.  About half the
24  time we would do a pre-sign audit.
25      Q.    What did that consist of?

Page 39

1      A.    If the agent did closings -- if the
2  agent did closings, then we would look at their
3  escrow account.  And we would do a spot-check on some
4  underwriting files to see if they looked regular.
5      Q.    Okay.  So once Mr. Agel and Coastal
6  Title are now an agent of Commonwealth you provide
7  them with the forms and a resource for questions, but
8  the title agent does the searches, does the issuance
9  of the policies and the closing service protection
10  letters and -- I don't want to say all that sort of
11  thing.
12      A.    They obtain the searches and issue the
13  commitments and the policies, yes.
14      Q.    And --
15      A.    And examine them.
16      Q.    And the amount of money that's paid to
17  Commonwealth is laid out in the agency agreement?
18      A.    Yes.
19      Q.    And is that a statutory amount?
20      A.    No, it's by contract.
21      Q.    It's by contract.  Okay.  What were the
22  upfront costs then to Commonwealth to having an agent
23  like Coastal?
24      A.    My and my staff's salary and overhead
25  for our office.  The cost of forms, providing forms,

Page 40

1  the cost of maintaining audit staff and all of the
2  company overhead.
3      Q.    Okay.  And that's why -- off the record.
4          (A discussion takes place off the
5  record).
6      Q.    Most of the premium paid was actually
7  then retained by the title agent?
8      A.    Right.  A larger portion was retained by
9  the agent, yes.
10      Q.    Do you know how much or -- how much
11  Commonwealth made on the loans that were part of the
12  Walsh Securities claims?
13      A.    I do not.
14          (Koch-3, Legal Bulletin dated 11/25/98,
15  is received and marked for identification.)
16      Q.    Nancy, if you can take a look at what we
17  marked as Koch Number 3.  It's a document that was
18  produced by Commonwealth's counsel and is Bates
19  stamped COM 24180 through 24217.  It's titled:
20  "Legal Bulletin" at the top dated November 25, 1998
21  and purports to be from you.
22      A.    Yes.
23      Q.    I just ask if you had seen this before
24  today?
25      A.    Yes.

Page 41

1      Q.    And as part of your responsibilities in
2  1998 did you prepare legal bulletins?
3      A.    Yes.
4      Q.    And what was the purpose of the legal
5  bulletins?
6      A.    To communicate with our agents.
7      Q.    Okay.  And who drafted the legal
8  bulletin?
9      A.    It depends.  This one probably was in my
10  secretary's computer and I tweaked it and then she
11  produced it probably.
12      Q.    Okay.  And so these were more or less a
13  form?
14      A.    This one went out periodically and it
15  was just updated.
16      Q.    As issues arose in the field.  That's
17  what it seemed to be but you tell me.
18      A.    As attorneys were added or just to give
19  them the most updated list.
20      Q.    And then the subject matter here of the
21  legal bulletin is:  "Non-Approved Attorneys List and
22  Closing Attorney Criteria."  How often were these
23  bulletins issued with the non-approved attorneys
24  list?
25      A.    It was periodic.  There was no set time.

11  (Pages 38 to 41)

N. KOCH

Page 42

1    Q.    And I will ask you the question: How
2  did you become an approved attorney?
3    A.    We didn't have approved attorneys.
4    Q.    So all attorneys were approved unless
5  you were not approved?
6    A.    All attorneys who met our criteria were
7  approved unless you were non-approved.
8    Q.    What were the criteria --
9        MR. KOTT: Do you want to take a moment
10 to review this document?  If you need to you can, if
11 you don't need to you don't have to.
12   A.    It's missing the criteria page.
13   Q.    Sorry.  We actually have another one
14 from '99 which has got the criteria.  This one I
15 guess doesn't have it.
16   A.    They were always the same.
17        (Koch-4, Legal Bulletin dated July 9,
18 1999, is received and marked for identification.)
19   Q.    Nancy, we have given you what's marked I
20 believe Koch Exhibit 4, which is a Legal Bulletin.
21 The Non-Approved Attorneys List dated July 9 of 1999.
22   A.    Yes.
23   Q.    And then does this have the closing
24 attorneys' criteria on it?
25   A.    Yes.

Page 43

1    Q.    And where is that?
2    A.    COM 24222.
3    Q.    And which is entitled:  "Criteria For
4  Closing Attorneys"?
5    A.    Correct.
6    Q.    So as long as you met that criteria you
7  were an approved attorney?
8    A.    You were allowed to have a closing
9  service letter issued on you, yes.
10   Q.    Thank you for that.  And then flipping
11 back to the Koch Exhibit 3, the November 25, 1998, we
12 went through the list of attorneys and the four
13 attorneys that Walsh Securities has made allegations,
14 none of those were included in the non-approved
15 attorneys list.
16        How long did it take Commonwealth to put
17 someone on the non-approved list?  And I guess I'll
18 ask an objectionable double question:  What were the
19 criteria for that?
20   A.    How long it took, it depends.  What were
21 the criteria?  Claims experience, lack of
22 cooperation, disciplinary action in the Law Journal
23 involving suspension or mishandling of funds or real
24 estate transactions.
25   Q.    Who made the decision that an attorney

Page 44

1  was now not approved?
2    A.    Usually me.
3    Q.    And then when I looked at Koch Number 4,
4  the July 9, 1999 Legal Bulletin, there are two
5  attorneys that we had made allegations about, Stanley
6  Yacker and Anthony Cicalese, are included in the not
7  approved list.  Why were they included in the list?
8    A.    I don't recall specifically.  Probably
9  because of the Walsh claim.
10   Q.    Okay.  And then I notice that Mr. --
11 neither Mr. Alfieri nor Mr. Pepsny were included in
12 the non-approved list.  Did Commonwealth review them
13 or --
14   A.    Sorry.
15   Q.    When we looked at the list, the other
16 two attorneys that Walsh Securities had made
17 allegations were involved in the fraud were Michael
18 Alfieri and Richard Pepsny but they were not included
19 on the non-approved list, and I don't know if you
20 know why that was.
21   A.    I don't remember.
22   Q.    What happened if a title agent used an
23 attorney that was on the non-approved attorneys list?
24   A.    If we found out we told them to cut it
25 out.  An agent could call me and ask to do business

Page 45

1  with an attorney on our non-approved list and I might
2  occasionally authorize that.
3    Q.    Do you recall if anyone ever called
4  asking to do business with Mr. Yacker or Mr. Cicalese
5  after?
6    A.    I don't remember that.
7    Q.    As to Mr. Yacker and Mr. Cicalese being
8  on this non-approved attorneys list, was that done by
9  Commonwealth or was it a request from Coastal?
10   A.    I don't remember.
11   Q.    Nancy, if you could flip back to Koch
12 Number 3.  Down at the bottom of the first page, COM
13 24180.
14   A.    Yes.
15   Q.    It says -- fifth paragraph down says:
16 "We continue to experience problems caused by closing
17 attorneys who fail to comply with the lender's
18 instructions and our Schedule B requirements."
19        What type of problems would occur if a
20 closing attorney failed to comply with the lender's
21 instructions and your Schedule B requirements?
22   A.    You want examples?
23   Q.    I do.
24   A.    An attorney fails to timely record a
25 mortgage so an intervening lien -- a deed or mortgage

12  (Pages 42 to 45)

212-267-6868                                    516-608-2400

bf5f60ac-c450-452f-a5eb-a31816b35d59

N. KOCH

Page 46

1  so an intervening lien might hit. Often an
2  attorney -- not often but occasionally an attorney
3  would fail to timely return closing documentation to
4  a lender and the lender would come to us to rectify
5  that, so then we would have to spend time and effort
6  dealing with that attorney to get that work taken
7  care of.
8      Q.   Any other?
9      A.   There are --
10     Q.   Numerous?
11     A.   Numerous, yes.
12     Q.   Okay. Did Coastal ever report any
13 warning signs or problems with any of the attorneys
14 involved in the Walsh Securities claims?
15     A.   I don't remember it.
16         MR. KOTT: Can you read back that
17 answer.
18         (The last answer is read by the court
19 reporter.)
20     Q.   Do you remember a discussion with
21 Coastal about deeds or documents not being recorded
22 either during the '96, '97 time frame or during your
23 investigation into Walsh Securities claims?
24     A.   I don't remember --
25         MR. KOTT: Excuse me. I object to the

Page 47

1  form. Go ahead.
2      A.   I don't remember specific conversations.
3      Q.   Did you have any general discussions?
4      A.   I don't remember them. I believe I did
5  have a conversation, but I don't remember it.
6      Q.   One of the things we found as we've done
7  our own investigation was that there were a number of
8  closings in which the documents were just never
9  recorded and they built up. About April of 1997
10 Coastal Title Agency actually recorded about 300
11 deeds and mortgages to try and straighten out the
12 paperwork. Was that a usual event for the title
13 agents to record deeds and mortgages?
14     A.   Some agents recorded documents as an
15 accommodation for their attorney customers. I don't
16 think that's what was going on here, but yes.
17     Q.   And then had you ever come upon an
18 instance where you had one agent recording 300 or so
19 documents at one time for transactions that had been
20 closed months prior?
21     A.   I don't remember another one.
22     Q.   Did you have a discussion with Mr. Agel
23 about that?
24     A.   I don't remember it. I don't remember
25 it.

Page 48

1      Q.   Was that -- I will call it a mass
2  filing -- ever discussed during the investigation
3  that you conducted?
4      A.   I don't remember it.
5         (A recess takes place.)
6      Q.   This was marked as Commonwealth Number
7  3. And I'll ask you to take a look. It's from the
8  deposition -- as I said, Donna Sullivan was the
9  30(b)6 witness for Commonwealth and it's a letter
10 from an attorney at Latham & Watkins, which
11 represented Walsh Securities at the time, dated July
12 28, 1997. As you can see it cc's Miss Sullivan on
13 the -- it's addressed to Commonwealth Land Title
14 Insurance Company. It says, "Donna Sullivan Esquire
15 via telecopy" on the second page. Have you ever seen
16 this letter before?
17     A.   I don't remember it.
18     Q.   When you went -- as you can see it's a
19 four-page document. There's two pages putting
20 Commonwealth on notice of claims of Walsh Securities
21 and there's -- there's a Schedule A attached which
22 lists -- it actually lists Walsh Securities' loan
23 number, the borrower, the closing date of the
24 transaction, the loan amount, the correspondent
25 closing agent, and I believe these lists were broken

Page 49

1  down. As you can see all of these loans were insured
2  by Commonwealth.
3         When you went to Coastal Title how did
4  you know what loans to look at?
5      A.   I asked Bob to have the files that
6  Commonwealth was involved on -- involved in set
7  aside.
8      Q.   And Mr. Agel knew what you were talking
9  about?
10     A.   Well, we had had a whole conversation,
11 yes.
12     Q.   Before you went down there?
13     A.   Yes. You know what, let me take that
14 back. I don't remember when it was. I know at some
15 point in time I said to him: I need you to segregate
16 the files so I can come see them, and when I got
17 there there were boxes of files.
18     Q.   How did Commonwealth first find out
19 about these claims? Was it from the claim --
20     A.   I don't remember.
21         MR. KOTT: Excuse me. I object to the
22 form of the question because how did Commonwealth --
23 I am not producing her as a 30(b)6.
24     Q.   Right. How did you find out about it,
25 Nancy? The only reason I'm asking, Walsh Securities

13  (Pages 46 to 49)

N. KOCH

---

Page 50

1  had actually filed a complaint in federal court July
2  17th of '97 naming attorneys, naming people -- naming
3  Coastal Title Agency, and then I believe the claim
4  letter as you see here of July 28 were sent after
5  that.
6      A.    I don't remember.
7      Q.    And then did you have a discussion with
8  Mr. Agel before going to Coastal Title Agency?
9      A.    I'm sure I did.  I know I didn't just
10 show up unannounced.
11     Q.    And then did you take any notes of your
12 discussions with Mr. Agel or make any interview
13 memos?
14     A.    No.
15     Q.    Do you recall ever having -- after that
16 one time you went to Coastal Title Agency, did you
17 ever go back to Coastal Title Agency for any
18 involvement with the Walsh Securities claims?
19     A.    Not that I recall.
20     Q.    Do you recall ever receiving any files
21 or documents from Coastal Title after your initial
22 visit to them?
23     A.    Not that I recall.
24     Q.    Nancy, I'll show you what we previously
25 marked at the Commonwealth 30(b)6 dep Exhibit 6A,

---

Page 51

1  which is a closing service letter dated October 30,
2  1996 issued for Stanley Yacker for a transaction
3  involving a Rafael Bustos, Senior at 138 Ridge Avenue
4  in Asbury Park.  Have you ever seen this letter
5  before today?
6      A.    I might have seen it -- this may have
7  been the one that was provided to me to review.
8      Q.    Okay.  And these are -- this form of
9  letter was what you testified earlier was produced by
10 the closing -- by Coastal Title Agency off their
11 computers?
12     A.    It appears to be, yes.
13     Q.    One of the questions we have had
14 throughout was under the file number on the first
15 page, which is Bates stamped WSWT 000505, which I'll
16 tell you was produced by Walsh Securities, these were
17 part of their wire transfer files, which is what that
18 stands for, it says there's a file number CT 18724
19 and then there's an (A) in parenthesis.  Do you know
20 what the (A) stands for?
21     A.    I do not.
22     Q.    Did you have any discussion with Mr.
23 Agel about the (A) or how they denominated their
24 closing service letters?
25     A.    Not that I recall.

---

Page 52

1      Q.    Mr. Agel had testified that the initial
2  purchase transaction was given a file number and then
3  to limit confusion the subsequent sale transaction by
4  one of Mr. Kane's entities was given an A on it and I
5  guess the question is:  Mr. Agel had said that he
6  had -- had recalled having discussions with you about
7  different issues involving title insurance with the
8  properties at issue in the litigation.  Do you recall
9  if he ever told you that they were with the sale or
10 with the purchase of a property which was
11 subsequently going to be flipped?
12     A.    I don't remember that.
13     Q.    Do you recall if Mr. Agel ever told you
14 that at some point it appears as if or at some point
15 he became aware that Mr. Kane or his entities were
16 purchasing the properties to be sold with the money
17 from the subsequent sale of the properties?
18     A.    I don't remember him telling me that.
19     Q.    Did you ever have any conversations with
20 either Mr. Alfieri or Mr. Pepsny about the same
21 thing?  Mr. Pepsny testified that at some point he
22 realized that the sale of the property was being used
23 to pay for the purchase of the property.
24     A.    I don't recall any such conversation.
25     Q.    Nancy, earlier you said you were

---

Page 53

1  designated by the New Jersey Land Title Insurance
2  Rating Bureau, CTB --
3      A.    New Jersey Land Title Association.
4      Q.    Association.  Okay.  I thought that was
5  the same -- what is the New Jersey Land Title
6  Insurance Rating Bureau?
7      A.    The Title Act allows title insurers to
8  form a rating bureau to do forms and rate filings for
9  its members and the rating bureau is that entity.
10     Q.    And each title company has a
11 representation on the rating bureau?
12     A.    Every member company has representation
13 on the rating bureau, yes.
14     Q.    And were you the representative for
15 Commonwealth?
16     A.    I was one of the representatives for
17 Commonwealth, yes.
18     Q.    And then this -- one of the things we've
19 come upon is this closing service letter here has got
20 paragraphs one and two and under Conditions and
21 Exclusions there's listed A to E.  During the same --
22 how were these forms I guess approved for use?
23     MR. KOTT:  Excuse me.  Approved by whom?
24     Q.    For -- just by the title insurance
25 companies.

---

N. KOCH

Page 54

1      A.    For the rating bureau?
2      Q.    For the rating bureau?
3      A.    The rating bureau would make a forms
4  filing with the New Jersey Department of Banking and
5  Insurance, the Department of Banking and Insurance
6  would do whatever review process they have and they
7  would approve the form.
8      Q.    And then the form was used by -- did it
9  have to be used by all the title companies?
10     A.    All members had to use it unless they
11 had a deviation filing, yes.
12     Q.    And a deviation filing was with the
13 bureau or with the --
14     A.    State of New Jersey.
15     Q.    State of New Jersey.  If I could show
16 you, Nancy -- again, this is from the prior
17 Commonwealth 30(b)6 deposition.  It was marked as
18 Exhibit 7.  It's actually another closing service
19 letter.  This one is on behalf of Fidelity Title
20 Insurance Company.  And one of the -- the initial
21 question I had was:  The Exhibit 6A, the Commonwealth
22 closing service letter, the very bottom on the first
23 page, Bates stamped WSWT 505, it says:  New Jersey
24 Land Title Insurance Rating Bureau and then there's a
25 NJRB 604, and then there's a date 8/1/94.  Do you see

Page 55

1  that?
2      A.    Yes.
3      Q.    The Fidelity closing service letter,
4  which is Exhibit 7, does not have that on the bottom.
5  Is that required or was it not required?
6      A.    I would say not required.
7      Q.    And then one of the other differences is
8  that Fidelity letter, which is marked as Exhibit 7
9  there, it has under Conditions and Exclusions a
10 paragraph F.
11     A.    Yes.
12     Q.    Where Commonwealth closing service
13 letter, Exhibit 6A, does not have a paragraph F.  Do
14 you have any knowledge when paragraph F was added to
15 the closing service letters?
16     A.    I don't remember.
17     Q.    Do you know why -- I believe both of
18 them -- as you can see Exhibit 6A, the Commonwealth
19 letter, was dated October 30, 1996 and the Fidelity
20 letter, Exhibit 7, is dated October 25, 1996 -- why
21 each of the title insurance closing service letters
22 are different?
23     A.    I don't know why.  I don't know why.
24     Q.    Do you -- you said you don't know why.
25 Do you have an idea?  I don't want you to guess but

Page 56

1  if you have some knowledge since you were on the
2  board.
3      A.    It was a mistake is my -- I'm not sure
4  of that, but I think it was a mistake on Mr. Agel's
5  part.
6      Q.    And the mistake being the issuance of
7  Exhibit 6A without a paragraph F?
8      A.    Correct.
9      Q.    You said Mr. Agel would produce and
10 issue the letters from his computers.  Who checked
11 that at Commonwealth?  Did you -- you said
12 Commonwealth did audits and things like that.  Was
13 the type of forms issued reviewed and checked?
14     A.    I'm not sure that the auditor would get
15 that specific.
16     Q.    And how did Mr. Agel get or how did
17 Coastal Title Agency get the documents to send out?
18 Did they receive them from Commonwealth is my
19 question?
20     MR. KOTT:  What documents are you
21 referring to?
22     Q.    The closing service letters.  Because
23 you said something like the commitment, there was a
24 paper binder that was sent to them.
25     A.    I don't specifically remember how we

Page 57

1  handled this particular form change, but I do
2  remember how we did them generally, and what we would
3  do is we would send a memo out to the agent saying
4  the forms have changed, this is the nature of the
5  change, this is the deadline for you making the
6  change, implementing the change, and either here is a
7  small supply of the forms in case you can't get --
8  you need the paper before, or here's how you can get
9  the forms from NPC, and then it was up to them to
10 have their computer systems changed.
11     Q.    Did the different closing service
12 letters factor in your decision to terminate Coastal
13 Title Agency?
14     A.    Not that I recall.
15     Q.    Was it the general nature of the
16 litigation among other financials?
17     A.    I don't -- yeah.
18     Q.    In an effort to save paper, Nancy, I
19 would like you to take a look at what we have had
20 marked as Commonwealth Exhibit 8.  Earlier, Nancy,
21 you said you had gone to Coastal Title Agency and
22 looked at the various files and you said there was
23 something not right about them.  Do you recall what
24 was not right about them?  I'm not sure -- I am not
25 quoting you, I'm just paraphrasing.

N. KOCH

Page 58

1    A.    I remember that it was clear that there
2  were flip transactions going on and that they
3  involved a lot of similar same parties. I have a
4  vague recollection of there being partial transfers
5  in some of these. I don't remember the exact details
6  of it, but I remember seeing something along those
7  lines and saying: That's odd.
8    Q.    What do you mean, a partial transfer?
9    A.    I have this vague recollection that the
10  grantor was conveying less than a full interest to
11  somebody else, like a percent interest in the real
12  estate to somebody else.
13    Q.    Right. Another long-winded
14  introduction, I apologize, but one of the allegations
15  that Walsh has made as part of the fraud was at the
16  closing the buyer would convey 60 percent of the
17  interest in the property to an entity called Capital
18  Assets Property Management, which was owned by Gary
19  Grieser, who I asked you about earlier, and those
20  were some of the deeds also that Coastal Title had
21  recorded. So you recall seeing those deeds, what we
22  call the joint venture deeds, in the files that
23  Coastal had?
24    A.    Again, I don't have a specific
25  recollection, but I knew that was something that

Page 59

1  didn't -- that seemed odd.
2    Q.    To say the least. Okay. And then on
3  this, what we have got listed as Commonwealth -- what
4  is it?
5    A.    Eight.
6    Q.    Eight. On the second page there's the
7  description of the property. Where does this come
8  from since it says Commonwealth Land Title Insurance
9  up top?
10    A.    It looks like it's the description page
11  from a title insurance commitment issued by Coastal
12  Title Agency.
13    Q.    And then -- and then there's no
14  commitment number as you can see on the second page
15  of the exhibit. When was the commitment number
16  issued?
17    A.    It depended on the agent.
18    Q.    Okay. And there's a file number, which
19  CT I will represent to you is Coastal Title. That's
20  what we have seen throughout the documents. The --
21  that's assigned by Coastal Title themselves, the file
22  number, and that's different than the commitment
23  number?
24    A.    We stopped using commitment numbers
25  years and years ago. I don't remember ever having

Page 60

1  formal commitment numbers.
2    Q.    So Commonwealth -- even though it was on
3  the form, Commonwealth didn't use it?
4    A.    This was generated by Coastal's system
5  so I don't know why they had that on there.
6    Q.    Do you recall when Commonwealth stopped
7  using commitment numbers?
8    A.    It was before they acquired Trans Nation
9  so it was before my time.
10    Q.    Like the '80s?
11    A.    I have no idea.
12    Q.    Okay. Off the record.
13        (A discussion takes place off the
14  record).
15    Q.    Nancy, if you can take a look at what we
16  have marked as Commonwealth-9. Like I said we're
17  reusing exhibits, and this I'll represent to you is a
18  sale from G.J.L. Limited, which you said you didn't
19  recall but I'll tell you that was one of the -- it
20  was the alter ego of Cristo Property management,
21  which was owned by William Kane. So Mr. Kane and his
22  companies, either Cristo or G.J.L. would purchase a
23  property. In Exhibit 8 you can see that was
24  purchased from Osis Corporation for $1,500 on
25  December 16 of '96 and then on December 31 of '96

Page 61

1  there's a deed from G.J.L. to Mr. Bustos. If you
2  actually flip back to exhibit -- Commonwealth Exhibit
3  6A, I believe that was the closing service letter for
4  the Bustos transaction. I apologize if you have
5  already answered the question, but on exhibit
6  Commonwealth-8, if you look at the -- which is the
7  purchase from G.J.L. Limited from Osis, the file
8  number on the second page is CT 18724, which you said
9  was assigned by Coastal Title Agency, and then on
10  Exhibit 9 on the second page is title insurance --
11  description of the property and it says -- the file
12  number there is CT 18724(A). And I know you said you
13  didn't know what the A was or hadn't discussed it.
14        Did you -- I'll ask this as a -- did
15  Commonwealth have any policy about flip properties?
16  You said you were unhappy they were doing them
17  although you said Commonwealth insured some flips
18  but...
19    A.    I don't remember when we put something
20  out about staying away from them and in what format
21  that went. Whether it was under the red flags of
22  fraud I don't remember. So I don't remember the
23  timing, whether it was before this or after this.
24  However, I do know by this time if someone was
25  calling me and saying: I have this scenario, how

16  (Pages 58 to 61)

N. KOCH

Page 62

1  about it?  I would be saying:  It sounds like a flip,
2  we need to scratch the surface harder.
3       Q.    And do you recall any of those
4  conversations with Mr. Agel?
5       A.    I don't.
6       Q.    Do you recall when the -- any
7  conversations with the auditors that you managed
8  about audits of Coastal Title Agency and whether they
9  thought there were flips going on with these
10  commitments at issue, some with the number and then
11  the same number with an A?
12       A.    I don't remember that.
13       Q.    While at Commonwealth do you recall any
14  other scenarios similar to that where a title agency
15  would issue a commitment with a number and then the
16  same number but with some sort of suffix on it or
17  something like that?
18       A.    Yes.
19       Q.    And when would that occur?
20       A.    There are a number of scenarios.  One
21  might be where a mortgage is securing three different
22  properties in three different counties and they may
23  have a main file number for property -- for the first
24  property and then the one in another county would be
25  A and B or etcetera, to delineate the searches on the

Page 63

1  various properties.
2       Q.    Okay.  So it wasn't unheard of?
3       A.    No.
4       Q.    And then had you ever seen it other than
5  with Coastal Title where the properties were being
6  flipped?
7       A.    Using the A designation?
8       Q.    Yes, or something like that.
9       A.    I don't remember that.
10       Q.    Nancy, if you can take a look at number
11  ten, which is a deed dated January 7, 1997, which as
12  you see is a week after the sale from G.J.L. to Mr.
13  Bustos.  It's actually Bates stamped at the bottom as
14  you see CTB 1202 through 1204.  And that, I'll
15  represent to you, is from Coastal Title.  Why there's
16  a B we have never been able to figure that out but
17  they produced documents CT A through E.
18           This is a deed -- as you see it's from
19  Mr. Bustos conveying 60 percent of the property to
20  Capital Assets as I had discussed.  Were these the
21  type of deeds you saw in the files at Coastal?
22       A.    Probably, yes.
23       Q.    And the deed is prepared by Lorraine E.
24  King.  Can a paralegal prepare deeds?
25           MR. KOTT:  Objection to the form.

Page 64

1       A.    I think preparing a deed is the practice
2  of law.  I suppose a paralegal can do it under the --
3  no.  I don't think they can.  I don't know though.  I
4  don't think they can.
5       Q.    Nancy, if you can take a look at what
6  was marked as Commonwealth Exhibit 11, which is Bates
7  stamped CTB 1188 through 1192.  Previously marked
8  Commonwealth Exhibit 12, not 11.  Nancy, I will just
9  ask:  What is this?
10       A.    It looks like the schedules to a title
11  insurance commitment.
12       Q.    Who would prepare this?
13       A.    Coastal Title Agency.
14       Q.    Do you recognize any of the handwriting
15  on the first page, CTB 1188?
16       A.    I don't.
17       Q.    And then after Schedule A and with the
18  description, the third page is CTB 1190, which goes
19  over to CTB 1191, what is the purpose of Schedule B,
20  Section 1?
21       A.    Schedule B-1 identifies the requirements
22  that need to be met in order for our policy to be
23  issued.
24       Q.    And then the last page of the document
25  is CTB 1192, which is Schedule B, Section 2.  What is

Page 65

1  the purpose of that?
2       A.    Those are the items that will be
3  exceptions to title in our policy unless
4  satisfactorily addressed.
5       Q.    And who was responsible for meeting the
6  requirements of schedule B, Section 1?
7       A.    Typically the closing attorney or
8  settlement agent.
9       Q.    So in these transactions it would have
10  been Mr. Yacker or Mr. Cicalese for the closing
11  agents?
12       A.    Assuming they were the closing attorney,
13  yes.
14       Q.    And who was responsible for
15  satisfying -- if it's the right word -- the sections
16  in Schedule B, Section 2?
17       A.    Typically the buyer's attorney who is
18  usually the settlement agent.
19       Q.    Okay.  What happened or what would
20  happen if one of the requirements of the Schedule B,
21  Section 1 was not satisfied?
22       A.    It depends on which requirement and the
23  scenario that we're under.
24       Q.    Okay.  So there's no general prohibition
25  that if one is not satisfied there's no title policy

17  (Pages 62 to 65)

bf5f60ac-c450-452f-a5eb-a31816b35d59

N. KOCH

Page 66

1 issued or something like that? Each one is situation
2 dependent?
3     A.    Yes.
4     Q.    Next one in this long line was marked
5 Commonwealth Exhibit 13. Nancy, I would ask you to
6 take a look at what we previously marked as
7 Commonwealth Exhibit 13, which is an invoice from
8 Coastal Title Agency to Stanley Yacker, and as you
9 can see on the first page, it's Bates stamped CTB
10 1150 and 1151, on page 1150 it says, "Transaction" on
11 the upper right and it says, "Property," again,
12 Bustos, 138 Ridge Avenue, Asbury Park. And I would
13 ask you if you had seen this document before today?
14     A.    I don't remember it.
15     Q.    Did you ever see the invoices that
16 Coastal Title issued to the closing agents or the
17 attorneys?
18     A.    In passing, sure.
19     Q.    How would you see them?
20     A.    If I did an underwriting audit of theirs
21 I would be in the file, and there might be an invoice
22 in there that I would see that it's in the file.
23     Q.    Did you ever do any underwriting audits
24 of Coastal Title Agency?
25     A.    I did.

Page 67

1     Q.    When were they conducted?
2     A.    I don't remember.
3     Q.    I got to keep asking.
4     A.    That's fine.
5     Q.    And then on this invoice, which totals
6 $1,113, this money was paid by Mr. Yacker to Coastal
7 Title Agency at the closing. How much of this amount
8 would be paid to Commonwealth?
9     A.    Whatever the contractual commission
10 split was of the premium and then we get -- got the
11 $25 closing service letter fee, if there is one.
12 Yes, there is, if that was paid.
13     Q.    And then any of the other costs that are
14 listed here go to Commonwealth?
15     A.    No. I think the -- everything, the exam
16 and the searches, photocopies, all of those would
17 have gone to Coastal.
18     Q.    Why don't we take a break.
19         (A recess takes place.)
20     Q.    Nancy, this was marked at Commonwealth's
21 dep as Exhibit 15. What I will represent to you is
22 it is a printout from Stanley Yacker's trust account
23 and the first two -- it's Bates stamped SYSW 7085 --
24 actually 7083 through 7086. The first two pages are
25 just an electronic printout. And I represent that

Page 68

1 this actually relates to the 138 Ridge Avenue
2 transaction that the other documents you've seen
3 refer to. And I would ask you: Have you seen this
4 document before today?
5     A.    I don't think so.
6     Q.    There was nothing -- or do you recall if
7 there was anything from Mr. Yacker in the Coastal
8 files that you looked at?
9     A.    I don't have a specific recollection.
10 There could have been correspondence but I don't --
11 you know, title correspondence, but I don't
12 specifically recall.
13     Q.    If you can look at the third page of the
14 exhibit, 7083, if you look down on the second to last
15 events, there's an RFT. It says on the account
16 description that it's a check to Monmouth County for
17 707.50, which is then voided, and there's another
18 check to Monmouth County Clerk. It says, "Record."
19 And that's also voided. Why would an attorney void
20 filing fee checks?
21         MR. KOTT: Objection to the form.
22     A.    I have no idea.
23     Q.    That will bring us to our next -- we're
24 getting there.
25     A.    Okay.

Page 69

1     Q.    This is document Exhibit Commonwealth
2 16, which is Bates stamped CTB 1234, which again was
3 produced by Coastal Title Agency. And I would ask
4 you just to take a look at that. And do you know
5 what this is?
6     A.    No.
7     Q.    Had you ever seen a document like this
8 before today?
9     A.    I could have. Certainly if it came from
10 Coastal's title file I would have seen something like
11 that when I went through the file if they kept these
12 in their file.
13     Q.    But this was not a document that you saw
14 regularly?
15     A.    I don't even know what it is.
16     Q.    Okay. This one, Nancy, was marked
17 Commonwealth Number 17. It's closing instructions by
18 Walsh Securities and as you can see the closing date
19 is dated December 31, 1996, and it's Bates stamped
20 WSI, 44744 through 746. Would you see closing
21 instructions in the Coastal Title Agency's files?
22     A.    I don't remember.
23     Q.    If Mr. Yacker, the closing lawyer, did
24 not follow these instructions would that lead to a
25 claim against Commonwealth?

18  (Pages 66 to 69)

N. KOCH

Page 70

1    MR. KOTT: Hold on. Can I have the
2 question back.
3    (The pending question is read by the
4 court reporter.)
5    MR. KOTT: I object. And in what way?
6 What instructions? Which part of the instructions?
7    Q.    That's what I'm asking. If there was a
8 violation of the closing instructions issued by the
9 lender, would that lead to an -- or could that lead
10 to a claim against Commonwealth?
11    MR. KOTT: Object to the form.
12    A.    It could lead to a claim.
13    Q.    And then what would happen if -- at that
14 point once a claim was filed if the closing
15 instructions had not been followed?
16    A.    Presumably the claims department would
17 handle the claim.
18    Q.    That's part of an investigation?
19    A.    I would guess.
20    Q.    Do you recall seeing any of these
21 closing instructions in the files?
22    A.    I don't recall.
23    Q.    You said during the investigation you
24 didn't speak with Mr. Yacker. Did you speak to
25 anyone from his office?

Page 71

1    A.    I don't believe so.
2    Q.    Lorraine King?
3    A.    I don't remember speaking to her.
4    Q.    Looking at the closing instructions, in
5 this particular case this property, the -- appears
6 that the deed was never recorded. Would that be a
7 violation of the closing instructions?
8    MR. KOTT: Object to the form.
9    A.    Not literally. I suppose indirectly.
10    Q.    What do you mean by that?
11    A.    I don't see anywhere in these
12 directions -- in these instructions that say: Record
13 a deed. I do see in the instructions going to title
14 insurance requirements where they say they require a
15 full policy delivered within 30 days. And the way
16 that a policy would be delivered in 30 days is if the
17 deed was recorded since that presumably was a
18 requirement in our commitment.
19    Q.    Okay. Nancy, I'll just show you this.
20    (Koch-5, Final Judgment, is received and
21 marked for identification.)
22    Q.    Just to wrap up the stack, Nancy, that's
23 been marked as Koch Number 5, which is a Final
24 Judgment with the City of Asbury Park versus, as you
25 see, Block 92, Lot 35, 138 Ridge Avenue. So even

Page 72

1 though the property had been sold by G.J.L. Limited
2 to Rafael Bustos, Senior, as you see the deed was
3 apparently never recorded and, therefore, when the
4 Monmouth -- or when Asbury Park foreclosed on the
5 property it was in the name of G.J.L.
6    So in this case when the deed was never
7 filed at all, would that trigger coverage under the
8 closing service letter?
9    A.    It could.
10    Q.    Okay. Why do you say "it could"?
11    A.    I mean, it depends on what the closing
12 instructions were and what the claim is. I mean,
13 there are any number of scenarios you could come up
14 with where perhaps it would trigger a claim under the
15 closing service letter.
16    Q.    If you could flip back to Exhibit 6A.
17 That was the Commonwealth closing service letter. In
18 this case with the -- having seen the closing
19 instructions and having seen that the deed wasn't
20 recorded, would this closing service letter that's
21 Exhibit 6A provide coverage for the attorney's
22 failure to comply with the written closing
23 instructions?
24    MR. KOTT: Objection to the form.
25    A.    I honestly don't know. I don't know.

Page 73

1    Q.    Because each claim is
2 situation-specific?
3    A.    Yeah, and, you know, I am not a claims
4 counsel anymore so it's been a long time since I've
5 done claims. I mean, I suppose. I don't know.
6    Q.    Okay. I have some red writing of the
7 things I forgot to ask you. Other than your counsel,
8 I don't want you to divulge any discussions, did you
9 speak to anyone to prepare for the deposition today?
10    A.    No.
11    Q.    I think Donna Sullivan when she
12 testified on behalf of Commonwealth, she had -- did
13 she speak to you to prepare for that deposition?
14    A.    She might have called me, yes.
15    Q.    What did you talk about?
16    A.    No recollection.
17    Q.    And then --
18    A.    I'm sorry, I do have a recollection. We
19 talked about underwriting memoranda and where they
20 would have been in the Parsippany office. That's one
21 thing we talked about.
22    Q.    What did you recall about that?
23    A.    When I was there we maintained binders
24 that kept all of the underwriting memoranda from
25 probably the beginning of time chronologically. We

19 (Pages 70 to 73)

N. KOCH

Page 74

1  also kept a set alphabetically in what we called the
2  Legal A to Z, which was a set of lateral files so...
3      Q.    Were they still there when you left in
4  2009?
5      A.    I believe they were.
6      Q.    And then Mr. Agel had said, I think I
7  told you earlier, that he thought he had
8  conversations with you throughout 1996, '97 relating
9  to the properties that eventually were at issue in
10  this litigation.  Do you recall when those
11  conversations started --
12          MR. KOTT:  Object to the form.
13      Q.    -- with Mr. Agel?
14          MR. KOTT:  Object to the form.
15      A.    I don't even recall the conversations.
16  I'm sorry.
17      Q.    Okay.  Would he call you on -- other
18  than these properties, which I know you don't even
19  know what the properties are, but would he call you
20  on a regular basis or how would you categorize your
21  discussions with him?
22      A.    As needed.  If he needed my advice on
23  something he would call me.
24      Q.    Were they always initiated by Coastal
25  Title?

Page 75

1      A.    Always is a lot.  I mean I'm sure I
2  called him.
3      Q.    Mostly?
4      A.    Mostly they were initiated by Bob, sure.
5      Q.    Okay.  And then I think earlier you said
6  you looked at a memo from Commonwealth about not
7  doing business with the players you said in preparing
8  for the deposition.  Who was the drafter of that
9  memo?  Do you recall?
10      A.    I think it was me.
11      Q.    When was it from?
12      A.    I don't remember.
13      Q.    Who did it -- or what was the substance
14  of it?
15          MR. KOTT:  Excuse me.  I'm late with my
16  objection.  I objected to one of the earlier
17  questions, about three or four, because I'm not sure
18  she testified earlier that they do not do business
19  with Walsh but whatever she testified to earlier.
20      Q.    I think you said --
21      A.    I know what the memo said.
22      Q.    If you can give me the substance.
23      A.    It basically said if they had
24  transactions involving certain parties, and I know
25  one was Cristo, they had to call my office in order

Page 76

1  to get approval to insure.
2      Q.    Who was that memo sent to?
3      A.    Agents and offices.
4      Q.    Did it also list Walsh Securities?
5      A.    It could have.
6      Q.    Okay.  But you're not sure?
7      A.    I am not positive.  I think it could
8  have, yes.
9      Q.    And then earlier, and I don't know if
10  this is a business thing, but what dollar amount is
11  determined to be a major claim, if it's something
12  that's --
13      A.    I don't know.  I mean, I think I
14  remember the manual saying 100,000, but that's only
15  because I think that's what that manual says.
16      Q.    In '97?
17      A.    Yeah, I don't know.
18      Q.    What I have, Nancy, are three documents,
19  they're title insurance commitments.  It's for a
20  separate property, not for the 138 Ridge, but before
21  we were discussing how Coastal Title would issue a
22  file number without an A or just a number which was
23  on the purchase and then a -- the same number with
24  the letter A afterwards, and I would like you just to
25  take a look at those two.  And they have been

Page 77

1  previously marked, as you see.  The first document is
2  King Exhibit 3.  That was from the deposition of
3  Lorraine King.  And it's a commitment letter dated
4  June 16, 1996 for file number CT 17767.  What Mr.
5  Agel -- actually the second document is King Exhibit
6  4, which is a title insurance commitment, and the
7  file number is CT 17767(A), and the commitment date
8  is June 16, 1996 and it's for the -- they're both for
9  the same property, which is 1017-1019 Bangs Avenue.
10  What Mr. Agel had testified to was that the first
11  document, which is King Exhibit 3, was actually
12  prepared for the purchase of the property by Cristo
13  Property, and as you see it says in paragraph three
14  it's fee simple interest, owned on June 16, 1996 by
15  Norman and Arline Freidman, husband and wife.  Yet on
16  the second commitment, which is King Exhibit 4, also
17  dated June 16, 1996 it says that the property is
18  owned by Cristo Property Management by deed from
19  Norman Freidman and Arline Freidman.
20          And in your experience have you come
21  upon, while at Commonwealth, any commitment similar
22  to this where there's a commitment for the same piece
23  of property at the same day with two different
24  owners?
25      A.    I don't remember seeing any from another

N. KOCH

Page 78

1  agent.
2      Q.    Do you recall discussing these during
3  the investigation that you did?
4      A.    With Bob?
5      Q.    With Bob Agel.
6      A.    Sorry. I don't remember specifically
7  discussing it with him during this investigation. I
8  might have but...
9      Q.    Did you speak to anybody in Commonwealth
10  about this?
11      A.    Yes.
12      Q.    And who did you talk to about the
13  dueling commitments, I'll call them?
14      A.    Probably claims, the claims department,
15  somebody over there. Probably with Rick Wilson who
16  was my boss.
17      Q.    What was his position?
18      A.    He was either division or regional
19  manager, and I don't know which one. I don't
20  remember what word they used.
21      Q.    What was the substance of those
22  conversations with Mr. Wilson?
23      A.    I was just explaining to him what I had
24  found in those files.
25      Q.    Was this something -- I won't say

Page 79

1  normal, but outside the ordinary course of how
2  business was usually conducted?
3      A.    Yes.
4      Q.    And then one other document I would like
5  you to take a look at. We had marked it as King
6  Exhibit 7. It's a -- it's the actual deed from July
7  25th, it's dated, 1996, as you see at the top from
8  Norman and Arline Freidman to Cristo Property for the
9  sale of 1017-1019 Bangs Avenue for 28,000.
10          Do you know why the title commitment
11  that's King Number 4 would say that the property was
12  owned by Cristo Property Management on June 16, 1996
13  when they didn't get the property deeded to them
14  until July 25, 1996?
15      A.    I don't have a good explanation for
16  that.
17          (A discussion takes place off the
18  record).
19      Q.    One of the things that Mr. Agel had
20  said, the reason he used the two different
21  commitments, the CT 17767 in King-3 and the CT
22  17767(A) in King-4, was to avoid confusion so that
23  the mortgage bank would get the commitments with the
24  As, which were clean commitments, and then the actual
25  problems or what needed to be cleaned up on the title

Page 80

1  would be handled on the files without the As. And I
2  think he agreed that the bank then wouldn't know if
3  there were any problems with the title.
4          Was that outside the normal course of
5  how Commonwealths agents did business?
6      A.    Yes.
7          MR. McGOWAN: I don't really have
8  anything. I will have one or two if you want to
9  think about what you want to do.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 81

1  CROSS-EXAMINATION BY MR. McGOWAN:
2      Q.    You were provided in preparation for
3  today's deposition with the deposition transcripts of
4  Mr. Agel's testimony?
5      A.    Yes.
6      Q.    And he was there for I think two days.
7  Did you have both of those transcripts?
8      A.    I had several volumes.
9      Q.    My recollection is, and I think you were
10  asked about this earlier, is that Mr. Agel had
11  indicated at one point or another during -- while
12  these transactions were going on he had called you up
13  and sort of explained to you what was happening and
14  you told him to just continue processing in the way
15  he had been. That at least is my recollection of his
16  testimony. Do you recall reading that in the
17  transcripts?
18      A.    I do recall reading that.
19      Q.    Do you recall that -- those types of
20  conversations with Mr. Agel?
21      A.    I do not.
22      Q.    Can you sit here today and tell me that
23  that didn't occur, or are you simply saying you don't
24  recall it?
25      A.    I can't say that he never spoke to me.

21  (Pages 78 to 81)

N. KOCH

Page 82

1 I can tell you it surprised me that that was the
2 content of the conversation.
3    Q.    When is the first time you recall
4 becoming aware that these transactions involved what
5 you referred to as flips?
6    A.    I don't remember.
7    Q.    Was it before you went down and actually
8 physically looked at the files?
9    A.    Yes.
10    Q.    It was.  Okay.  And how did you become
11 aware of it?  Forgetting about when, but how did you
12 become aware that these transactions involved what
13 you referred to as flips?
14    A.    I don't remember.
15    Q.    Your indication was there was a time
16 when some sort of memo went out that said:  We are no
17 longer doing flips from a title insurance standpoint?
18    A.    We definitely put something out.  I
19 don't remember whether it was:  These are the red
20 flags of fraud, flip-style transactions, or whether
21 we said we're not doing flips.
22    Q.    All right.  As a practical matter though
23 I think your testimony was, whether or not some sort
24 of official edict had been issued, as a practical
25 matter you all were against insuring flips.  Is that

Page 83

1 correct?
2    A.    Yes.
3    Q.    Had that always been the case?
4    A.    Probably not.
5    Q.    Do you know why there was a
6 disinclination on the part of Commonwealth to have
7 title insurance transactions involving flips?
8    A.    Because many of them appeared to be
9 fraudulent or questionable.
10    Q.    Okay.  Other than these transactions
11 that were running through Coastal Title Agency, back
12 at the same period of time did you have another title
13 agency that used Commonwealth in Monmouth County back
14 in the late '90s?
15    A.    Yes.
16    Q.    Do you know whether or not that other --
17 how many?
18    A.    For Commonwealth?  The brand
19 Commonwealth?
20    Q.    Yes.
21    A.    In Monmouth County?
22    Q.    Yes.
23    A.    I mean, I can think of one off the top
24 of my head because they're in Freehold.  I'm sure
25 that there were -- there was at least one other.

Page 84

1    Q.    My point is:  Two or three others
2 besides Coastal?
3    A.    Yes.
4    Q.    Were any of them involved in
5 transactions that had flips at or about the same
6 period of time, if you know?
7    A.    I don't know.
8    Q.    And Mr. Magnanini asked you this before.
9 You weren't familiar with any of the names involved
10 here, were you, like Cristo Property Management?
11 From years passed I am talking about.
12    A.    Prior to '96?
13    Q.    Prior to all this.
14    A.    No.
15    Q.    So Gary Grieser and Kane and none of
16 those names mean anything to you from beforehand?
17    A.    I don't think so, no.
18    Q.    All right.  I have nothing else.
19 CROSS-EXAMINATION BY MR. KOTT:
20    Q.    You said in response to one of Mr.
21 McGowan's questions, and I am going to paraphrase
22 what you said, that you were surprised about what Mr.
23 Agel said in his deposition that he said that was a
24 conversation he had with you.  Do you remember that
25 testimony?

Page 85

1    A.    Yes.
2    Q.    Why were you surprised when you read
3 what Mr. Agel said his conversation was with you?
4    A.    I knew at that point in time that we
5 were not approving these types of flips because we
6 were worried about them, and it would surprise me
7 that I would say:  It sounds like you're doing the
8 right thing.
9    Q.    Thank you, I have no further questions.
10 REDIRECT EXAMINATION BY MR. MAGNANINI:
11    Q.    I want to follow up on one other thing.
12 Mr. Agel said he thought he received a letter from
13 Commonwealth about the Walsh Securities lawsuit and
14 he said it was a threatening letter, threatening some
15 sort of potential litigation, and I asked him what
16 happened to it, and he said he had called someone at
17 Commonwealth and it had gone away.
18       Did you have any involvement with
19 sending out a letter to Coastal about -- or after the
20 Walsh Securities litigation was initiated, I'll say?
21    A.    I would have been consulted on it.  You
22 know, if claims thought that we should go back
23 against the agent on this claim, the claims
24 department would have consulted with me.  Because of
25 the nature of this claim it would have been above me

22  (Pages 82 to 85)

bf5f60ac-c450-452f-a5eb-a31816b35d59

N. KOCH

Page 86

1  also.  My boss and his bosses would have also been
2  involved.  I don't remember the specifics of it, but
3  I know that we had that conversation and I do
4  remember Bob going over my head on it.
5       Q.    Okay.  So he did receive a letter?
6       A.    I think he did.  I don't specifically --
7  I know that he was very angry and went to Ron in
8  Pittsburgh and...
9       Q.    Who is Ron?
10      A.    Ron Owen was a senior vice president,
11 upper level manager.
12      Q.    And did you have any discussions with
13 Ron or --
14      A.    I don't know if I spoke to Ron or if
15 Rick did.  I don't know.
16      Q.    When you said you spoke to Mr. Wilson
17 after your investigation, did you have any
18 recommendations or give him any -- your views on what
19 you had seen?
20      A.    I think it was just factual.  I think at
21 that point in time I was telling him what I was
22 seeing in the files.  You know, what I had seen and I
23 think that was it.
24      Q.    I don't think I have anything else.
25 Thank you very much.

Page 87

1       A.    You're welcome.
2       MR. KOTT:  Mr. Magnanini or his office
3  will be the custodian of the exhibits from today's
4  deposition.
5       MR. MAGNANINI:  We will send those
6  around as per our usual agreement.
7       (The deposition is concluded at 2:16
8  p.m.)
9
10
11 _____
12       NANCY KOCH
13 Subscribed and sworn to before me
14 this _____ day of _____, 2010.
15
16
17 _____
18       Notary Public
19
20
21
22
23
24
25

Page 88

1              CERTIFICATE.
2
3       I, JANET BAILYN, a Notary Public and
4  Certified Court Reporter of the State of New Jersey,
5  do hereby certify that prior to the commencement of
6  the examination NANCY KOCH was duly sworn by me to
7  testify the truth, the whole truth and nothing but
8  the truth.
9       I DO FURTHER CERTIFY that the foregoing
10 is a true and accurate transcript of the testimony as
11 taken stenographically by and before me at the time,
12 place and on the date hereinbefore set forth.
13      I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17 and that I am not financially interested in the
18 action.
19
20 _____
21 Notary Public of the State of New Jersey
   My commission expires February 3, 2013
22      License No. XI00970
23 Date:  November 12, 2010
24
25

N. KOCH

## A

**able** 31:18 63:16
**above-entitled** 2:2
**accommodation** 47:15
**account** 33:21 39:3 67:22 68:15
**accounted** 31:1
**Accounting** 34:14
**accurate** 88:10
**Acknowledgement** 29:3
**acknowledging** 29:8
**acquired** 7:8 25:13 25:15 60:8
**acquiring** 14:5
**acquisition** 13:8
**act** 11:23 53:7
**action** 1:2 43:22 88:15,18
**actively** 19:15
**actual** 26:1 79:6,24
**added** 41:18 55:14
**addressed** 48:13 65:4
**advice** 74:22
**affiliate** 24:22
**affirmative** 16:9
**Agel** 13:17,20 14:2 14:8 15:15,18 17:13 18:5 19:23 30:24 39:5 47:22 49:8 50:8,12 51:23 52:1,5,13 56:9,16 62:4 74:6 74:13 77:5,10 78:5 79:19 81:10 81:20 84:23 85:3 85:12
**Agel's** 13:24 17:14 17:16 22:22 56:4 81:4
**agency** 1:17 3:17

9:16 10:4 17:19 31:12 34:3,10 35:18 36:18,20 37:13 38:21 39:17 47:10 50:3,8,16 50:17 51:10 56:17 57:13,21 59:12 61:9 62:8,14 64:13 66:8,24 67:7 69:3 83:11 83:13
**Agency's** 69:21
**agent** 13:22,25 24:4 31:24 35:6 37:19 37:24,24 38:5,12 38:13,16,22 39:1 39:2,6,8,22 40:7,9 44:22,25 47:18 48:25 57:3 59:17 65:8,18 78:1 85:23
**agents** 8:19 9:11 14:12,18,23 16:5 24:1,7 31:18 34:18 41:6 47:13 47:14 65:11 66:16 76:3 80:5
**ago** 5:23 21:1 59:25
**agreed** 80:2
**agreement** 39:17 87:6
**ahead** 5:24 47:1
**Alfieri** 1:13 12:13 44:11,18 52:20
**allegations** 43:13 44:5,17 58:14
**alleged** 11:24 12:4
**alleges** 10:25
**allowed** 43:8
**allows** 53:7
**alphabetically** 74:1
**alter** 60:20
**America** 7:8,14,15 8:13,15

**amount** 27:2 37:14 39:16,19 48:24 67:7 76:10
**angry** 86:7
**answer** 6:13 12:10 14:12,17 46:17,18
**answered** 61:5
**answering** 18:14 21:3 34:25
**Anthony** 1:13,14 11:14 12:8 44:6
**anybody** 78:9
**anymore** 73:4
**apologize** 14:15 58:14 61:4
**apparently** 72:3
**appear** 5:13 19:17
**appeared** 19:12 83:8
**appears** 51:12 52:14 71:5
**application** 38:17 38:20
**appraisers** 10:24
**approval** 76:1
**approve** 54:7
**approved** 42:2,3,4 42:5,7 43:7 44:1,7 53:22,23
**approving** 85:5
**April** 47:9
**area** 9:9 38:18
**Arline** 77:15,19 79:8
**arose** 21:4 41:16
**arrange** 34:7
**Asbury** 51:4 66:12 71:24 72:4
**aside** 49:7
**asked** 5:13 29:24 34:20,24 35:4 49:5 58:19 81:10 84:8 85:15
**asking** 14:16 45:4

49:25 67:3 70:7
**Assets** 1:8,9 58:18 63:20
**assigned** 21:8 59:21 61:9
**assistant** 8:16,21
**associate** 8:9
**Association** 33:21 53:3,4
**assume** 6:9,13 13:18 21:11 26:14 28:17 33:10 34:11
**Assuming** 65:12
**attached** 48:21
**attorney** 7:19 12:17 41:22 42:2 43:7 43:25 44:23 45:1 45:20,24 46:2,2,6 47:15 48:10 65:7 65:12,17 68:19 88:14,16
**attorneys** 3:5,8,12 3:16 12:4 15:3 41:18,21,23 42:3 42:4,6,21,24 43:4 43:12,13,15 44:5 44:16,23 45:8,17 46:13 50:2 66:17
**attorney's** 72:21
**audit** 34:8,9,13 35:14 38:24 40:1 66:20
**auditing** 24:8,8
**auditor** 56:14
**auditors** 62:7
**audits** 56:12 62:8 66:23
**authorize** 45:2
**available** 17:21
**Avenue** 51:3 66:12 68:1 71:25 77:9 79:9
**avoid** 79:22
**aware** 52:15 82:4

82:11,12
**a/k/a** 1:7

## B

**B** 4:7 45:18,21 62:25 63:16 64:19 64:25 65:6,16,20
**back** 9:15,20 28:5 31:10 36:1,6 38:10 43:11 45:11 46:16 49:14 50:17 61:2 70:2 72:16 83:11,13 85:22
**BAILYN** 2:3 88:3
**Bangs** 77:9 79:9
**bank** 79:23 80:2
**Banking** 54:4,5
**bankruptcy** 5:20
**basic** 6:5
**basically** 75:23
**basics** 6:19
**basis** 74:20
**Bates** 23:13 24:19 26:15 33:7 40:18 51:15 54:23 63:13 64:6 66:9 67:23 69:2,19
**becoming** 13:24 82:4
**began** 8:25
**beginning** 28:25 73:25
**behalf** 30:1 54:19 73:12
**believe** 12:6,10 17:17 18:3,5 23:14 26:10 30:4 42:20 47:4 48:25 50:3 55:17 61:3 71:1 74:5
**bell** 13:13
**BETTER** 1:19
**big** 24:11,12
**binder** 56:24
**binders** 73:23

**bit** 15:12
**Block** 71:25
**board** 56:2
**Bob** 15:22,25 17:13
  17:14,16 18:3
  22:21 34:22 35:20
  49:5 75:4 78:4,5
  86:4
**Bobs** 17:15
**Bob's** 17:12
**book** 34:21,25
**borrower** 48:23
**boss** 78:16 86:1
**bosses** 86:1
**bottom** 23:13 45:12
  54:22 55:4 63:13
**Box** 3:15
**boxes** 49:17
**brand** 83:18
**break** 6:7,8 67:18
**bring** 24:2 68:23
**Brodo** 1:12 11:12
**broken** 48:25
**Brown** 1:12 11:8
**built** 47:9
**bulletin** 4:10,11
  40:14,20 41:8,21
  42:17,20 44:4
**bulletins** 41:2,5,23
**bureau** 53:2,6,8,9
  53:11,13 54:1,2,3
  54:13,24
**business** 23:3,6
  35:21 36:3 44:25
  45:4 75:7,18
  76:10 79:2 80:5
**Bustos** 51:3 61:1,4
  63:13,19 66:12
  72:2
**buyer** 58:16
**buyers** 11:24 14:6
**buyer's** 65:17
**B-1** 64:21

**C**

**C** 3:1 5:1,1
**Cairns** 15:7
**Calanni** 1:11 11:6
**call** 5:8 14:8 44:25
  48:1 58:22 74:17
  74:19,23 75:25
  78:13
**called** 13:9 15:22
  15:25 45:3 58:17
  73:14 74:1 75:2
  81:12 85:16
**calling** 35:6,9 61:25
**Camden** 7:25
**cancellation** 24:7
**Capital** 1:8,9 58:17
  63:20
**care** 30:12 46:7
**case** 7:6 17:15 18:8
  57:7 71:5 72:6,18
  83:3
**categorize** 74:20
**caused** 45:16
**cc's** 48:12
**Center** 3:7 30:6
**certain** 37:14 75:24
**certainly** 36:1 69:9
**CERTIFICATE**
  88:1
**Certified** 2:3 33:16
  88:4
**certify** 88:5,9,13
**change** 31:3,4 57:1
  57:5,6,6
**changed** 25:22 31:6
  57:4,10
**Chapter** 5:20
**check** 38:21 68:16
  68:18
**checked** 56:10,13
**checklist** 27:20
  28:8
**checklists** 27:25
  28:10
**checks** 68:20

**Cherry** 5:2
**chosen** 17:18
**chronologically**
  73:25
**Cicalese** 1:14 12:9
  37:13 44:6 45:4,7
  65:10
**City** 71:24
**Civil** 1:2
**claim** 12:25 21:18
  26:18,22,23 27:3
  27:4 28:7,8,9,10
  44:9 49:19 50:3
  69:25 70:10,12,14
  70:17 72:12,14
  73:1 76:11 85:23
  85:25
**claims** 4:9 8:20
  9:11 10:5 16:18
  16:22 17:1,5,6,8
  18:10,12,14 20:21
  21:8,21 22:7,10
  22:12 23:12,19,22
  26:11,13,19,20,20
  26:21 27:6,22
  29:2,3,8,10,15
  32:1,4,18 35:25
  40:12 43:21 46:14
  46:23 48:20 49:19
  50:18 70:16 73:3
  73:5 78:14,14
  85:22,23
**clean** 79:24
**cleaned** 79:25
**clear** 14:10 58:1
**Clerk** 68:18
**closed** 47:20
**closing** 23:2,5 30:3
  30:21 31:11,18
  37:11,12,14 39:9
  41:22 42:23 43:4
  43:8 45:16,20
  46:3 48:23,25
  51:1,10,24 53:19

54:18,22 55:3,12
  55:15,21 56:22
  57:11 58:16 61:3
  65:7,10,12 66:16
  67:7,11 69:17,18
  69:20,23 70:8,14
  70:21 71:4,7 72:8
  72:11,15,17,18,20
  72:22
**closings** 39:1,2 47:8
**Coastal** 1:17 3:17
  20:4 29:21 31:11
  33:6,25 34:3,10
  35:14 36:4,11,18
  36:22 37:6,13,19
  37:24 39:5,23
  45:9 46:12,21
  47:10 49:3 50:3,8
  50:16,17,21 51:10
  56:17 57:12,21
  58:20,23 59:11,19
  59:21 61:9 62:8
  63:5,15,21 64:13
  66:8,16,24 67:6
  67:17 68:7 69:3
  69:21 74:24 76:21
  83:11 84:2 85:19
**Coastal's** 20:13
  60:4 69:10
**collecting** 34:16
**college** 8:1,2
**COM** 23:13,14
  24:19 26:16 27:12
  27:18 28:6,25
  31:24 33:7 40:19
  43:2 45:12
**come** 13:12 16:12
  29:10 30:25 36:12
  36:18 46:4 47:17
  49:16 53:19 59:7
  72:13 77:20
**coming** 5:10
**commencement**
  88:5

**commencing** 2:7
**commission** 67:9
  88:21
**commitment** 56:23
  59:11,14,15,22,24
  60:1,7 62:15
  64:11 71:18 77:3
  77:6,7,16,21,22
  79:10
**commitments** 30:3
  31:20 39:13 62:10
  76:19 78:13 79:21
  79:23,24
**Commonwealth**
  1:15 3:9 6:25 7:4
  7:7,8 9:1 13:22,25
  14:21 16:21 17:5
  20:16 21:7 22:10
  23:8,9,12 24:21
  24:24,25 25:4,13
  25:14,14,22,23
  26:5 29:4 30:1
  31:4,13 33:6 34:8
  35:9,16,18 36:3
  37:17,19 38:13,16
  39:6,17,22 40:11
  43:16 44:12 45:9
  48:6,9,13,20 49:2
  49:6,18,22 50:25
  53:15,17 54:17,21
  55:12,18 56:11,12
  56:18 57:20 59:3
  59:8 60:2,3,6 61:2
  61:15,17 62:13
  64:6,8 66:5,7 67:8
  67:14 69:1,17,25
  70:10 72:17 73:12
  75:6 77:21 78:9
  83:6,13,18,19
  85:13,17
**Commonwealths**
  80:5
**Commonwealth's**
  20:21 23:15 28:18

37:5 40:18 67:20
**Commonwealth-8** 61:6
**Commonwealth-9** 60:16
**communicate** 41:6
**companies** 12:22 13:23 14:5 24:23 25:16 53:25 54:9 60:22
**company** 5:2 6:24 7:9,16 13:8 21:17 22:4,5 24:22,24 25:15,17,19,24 40:2 48:14 53:10 53:12 54:20
**complaint** 5:17 50:1
**completed** 28:10,12 28:15
**completely** 19:9
**comply** 45:17,20 72:22
**computer** 31:19 41:10 57:10
**computers** 51:11 56:10
**computer-genera...** 31:5
**concerned** 14:4 19:20
**concerning** 15:18
**concluded** 32:14 87:7
**conclusion** 19:4,6 21:16,20,24 22:2
**Conditions** 53:20 55:9
**conduct** 16:21 28:1
**conducted** 48:3 67:1 79:2
**confusion** 52:3 79:22
**consist** 9:9 38:25

**consult** 6:11
**consulted** 85:21,24
**CONSULTING** 1:14
**contacting** 34:6
**content** 82:2
**Contents** 28:7
**Continental** 25:15 25:17,20,23
**continue** 20:19,21 35:22 45:16 81:14
**contract** 39:20,21
**contractual** 67:9
**conversation** 47:5 49:10 52:24 82:2 84:24 85:3 86:3
**conversations** 15:15,18 47:2 52:19 62:4,7 74:8 74:11,15 78:22 81:20
**convey** 58:16
**conveying** 58:10 63:19
**cooperation** 43:22
**copies** 18:6 22:21 30:2 32:6
**copy** 23:19,23
**corporate** 29:25
**Corporation** 60:24
**correct** 9:17 37:22 43:5 56:8 83:1
**correspondence** 32:23 68:10,11
**correspondent** 48:24
**cost** 39:25 40:1
**costing** 36:23
**costs** 39:22 67:13
**counsel** 6:12 8:16 8:22 9:3,5,14,15 9:17,21 10:4 17:6 21:8 22:7,25 23:16,22 27:22

28:8 29:11,15 32:1 40:18 73:4,7 88:14,16
**counsel's** 27:6
**counties** 62:22
**county** 62:24 68:16 68:18 83:13,21
**couple** 6:17 23:2 26:6
**course** 79:1 80:4
**court** 1:1 36:8 46:18 50:1 70:4 88:4
**coverage** 29:14 72:7,21
**credit** 38:21
**Cris** 34:6
**Cristo** 1:6 12:23 60:20,22 75:25 77:12,18 79:8,12 84:10
**criteria** 41:22 42:6 42:8,12,14,24 43:3,6,19,21
**CROSS** 4:2
**CROSS-EXAMI...** 81:1 84:19
**CT** 51:18 59:19 61:8,12 63:17 77:4,7 79:21,21
**CTB** 53:2 63:14 64:7,15,18,19,25 66:9 69:2
**CTP** 33:13
**custodian** 87:3
**customers** 47:15
**cut** 44:24
**Cuzzi** 1:14 10:22
**C-r-i-s** 34:6

— D —

**DAP** 1:14
**date** 26:7,10 48:23 54:25 69:18 77:7 88:12,22

**dated** 4:10,10,11 23:20 33:2 40:14 40:20 42:17,21 48:11 51:1 55:19 55:20 63:11 69:19 77:3,17 79:7
**David** 3:6 27:15 37:10
**day** 19:8 77:23 87:14
**days** 71:15,16 81:6
**deadline** 57:5
**deal** 16:10 30:13
**dealing** 24:1 30:9 46:6
**dealt** 14:22
**December** 60:25,25 69:19
**decided** 25:19
**decision** 27:9 35:17 43:25 57:12
**decision-maker** 24:3 38:12
**declared** 5:19
**deed** 45:25 61:1 63:11,18,23 64:1 71:6,13,17 72:2,6 72:19 77:18 79:6
**deeded** 79:13
**deeds** 46:21 47:11 47:13 58:20,21,22 63:21,24
**defalcation** 27:20
**Defendant** 3:8,16
**Defendants** 1:20 3:12
**DeFeo** 11:25
**definitely** 82:18
**DEK** 13:5
**Delancy** 8:5
**delineate** 62:25
**delineated** 26:25
**delivered** 71:15,16
**denied** 32:19

**denominated** 51:23
**dep** 50:25 67:21
**department** 14:25 17:1 18:10,13,15 24:6,11 26:20 36:21 54:4,5 70:16 78:14 85:24
**depended** 59:17
**dependent** 66:2
**depends** 41:9 43:20 65:22 72:11
**deposed** 6:1 13:17
**deposition** 1:5 5:23 6:6 22:22 48:8 54:17 73:9,13 75:8 77:2 81:3,3 84:23 87:4,7
**description** 4:8 59:7,10 61:11 64:18 68:16
**designated** 53:1
**designation** 33:17 33:18 63:7
**details** 26:17 58:5
**determination** 27:7
**determined** 26:21 76:11
**deviation** 54:11,12
**DiBENEDETTO** 1:11 11:1
**differences** 55:7
**different** 14:9 52:7 55:22 57:11 59:22 62:21,22 77:23 79:20
**Dilts** 8:5,11
**DIRECT** 4:2 5:5
**directions** 71:12
**directly** 26:20
**disciplinary** 43:22
**discuss** 14:9
**discussed** 20:1 48:2 61:13 63:20
**discussing** 76:21

N. KOCH

78:2,7
discussion 13:15
  16:16 19:2 20:10
  25:10 28:22 36:15
  40:4 46:20 47:22
  50:7 51:22 60:13
  79:17
discussions 47:3
  50:12 52:6 73:8
  74:21 86:12
disinclination 83:6
DISTRICT 1:1,1
division 9:3,5,14
  78:18
divulge 73:8
document 23:11
  40:17 42:10 48:19
  64:24 66:13 68:4
  69:1,7,13 77:1,5
  77:11 79:4
documentation
  18:1 46:3
documents 6:17
  15:10 18:23 22:15
  22:17 23:1 30:9
  32:14 46:21 47:8
  47:14,19 50:21
  56:17,20 59:20
  63:17 68:2 76:18
doing 23:3,6 31:9
  33:23 61:16 75:7
  82:17,21 85:7
dollar 27:2 76:10
domestic 25:17
Donna 1:17 11:25
  15:8 22:21 29:24
  48:8,14 73:11
Donozo 13:12
double 43:18
Douglas 8:2
drafted 41:7
drafter 75:8
DRD 1:2
dueling 78:13

duly 5:3 88:6
D&Sons 13:9
D'Apolito 1:14
  11:14
D-i-l-t-s 8:5
D/B/A 1:18

――――――――
E
――――――――
E 3:1,1 4:7 53:21
  63:17,23
earlier 5:18 51:9
  52:25 57:20 58:19
  74:7 75:5,16,18
  75:19 76:9 81:10
early 13:7
easement 16:10
economic 24:6
Ed 37:10
edict 82:24
edification 33:12
Edison 3:16
edition 26:7,10
EDWARD 3:10
effect 32:23
effort 46:5 57:18
ego 60:20
Eight 59:5,6
either 5:17 12:1
  37:12 46:22 52:20
  57:6 60:22 78:18
either/or 27:5
electronic 31:17
  32:7 67:25
employee 11:15
  88:14,16
employer 7:9
encroachment
  16:10
ENGLISH 3:6
entail 8:17
entities 52:4,15
entitled 23:12
  24:23 28:7 43:3
entity 25:25 26:2
  53:9 58:17

Epp 13:12
escrow 39:3
ESQ 1:12,13,13,14
  3:3,6,10,14
Esquire 33:13
  48:14
estate 43:24 58:12
etcetera 62:25
Ethel 3:15
evaluations 28:10
Evaluation/File
  28:7
event 47:12
events 5:16 68:15
eventually 74:9
exact 8:24 9:3 58:5
exactly 21:2,5
  29:23
exam 67:15
examination 5:5
  85:10 88:6
examine 39:15
examples 45:22
exceptions 65:3
Exclusions 53:21
  55:9
Excuse 46:25 49:21
  53:23 75:15
exhibit 23:11 27:12
  27:14,15,16,17,19
  28:6,7 42:20
  43:11 50:25 54:18
  54:21 55:4,8,13
  55:18,20 56:7
  57:20 59:15 60:23
  61:2,2,5,10 64:6,8
  66:5,7 67:21
  68:14 69:1 72:16
  72:21 77:2,5,11
  77:16 79:6
exhibits 60:17 87:3
exist 30:14
expect 22:8 34:15
experience 33:21

38:23 43:21 45:16
  77:20
expires 88:21
explained 81:13
explaining 78:23
explanation 79:15

――――――――
F
――――――――
F 2:6 3:4 55:10,13
  55:14 56:7
fact 5:13
factfinding 29:18
factor 57:12
factual 86:20
fail 45:17 46:3
failed 45:20
fails 45:24
failure 72:22
familiar 10:11,23
  11:7,9,13 13:2,18
  84:9
familiarity 10:10
family 25:22
fax 32:10,12
faxed 32:9
February 88:21
federal 50:1
fee 67:11 68:20
  77:14
feel 6:7
fellow 10:11
felt 35:22
Fidelity 1:16 3:12
  23:7 54:19 55:3,8
  55:19
field 41:16
fifth 45:15
figure 27:24 63:16
file 51:14,18 52:2
  59:18,21 61:7,11
  62:23 66:21,22
  69:10,11,12 76:22
  77:4,7
filed 5:20 50:1
  70:14 72:7

files 17:16,17,23,24
  18:1,4,7,8,12 19:7
  19:10,17,21 20:13
  20:15 29:20,22
  39:4 49:5,16,17
  50:20 51:17 57:22
  58:22 63:21 68:8
  69:21 70:21 74:2
  78:24 80:1 82:8
  86:22
filing 48:2 54:4,11
  54:12 68:20
filings 53:8
Final 4:12 71:20,23
financed 14:7
financially 88:17
financials 57:16
find 49:18,24
findings 18:20
fine 5:9 28:3 67:4
firm 8:6
first 8:14 13:20
  16:18 24:19 26:19
  32:2 35:5 45:12
  49:18 51:14 54:22
  62:23 64:15 66:9
  67:23,24 77:1,10
  82:3
five 10:24 24:15
flags 61:21 82:20
flip 19:13,18 27:11
  28:5 45:11 58:2
  61:2,15 62:1
  72:16
flipped 52:11 63:6
flipping 43:10
flips 19:14 61:17
  62:9 82:5,13,17
  82:21,25 83:7
  84:5 85:5
flip-style 82:20
follow 69:24 85:11
followed 70:15
following 24:22

N. KOCH

follows 5:4
foreclosed 72:4
foregoing 88:9
forenoon 2:8
Forgetting 82:11
forgot 73:7
form 14:13 37:20
  38:17,20 41:13
  47:1 49:22 51:8
  53:8 54:7,8 57:1
  60:3 63:25 68:21
  70:11 71:8 72:24
  74:12,14
formal 60:1
format 61:20
formed 25:18
former 11:15
forms 30:22,23
  31:5,5,12 34:14
  39:7,25,25 53:8
  53:22 54:3 56:13
  57:4,7,9
forth 88:12
found 44:24 47:6
  78:24
four 3:7 12:3 24:14
  43:12 75:17
fourth 24:23
four-page 48:19
FOX 3:10
frame 14:18 34:20
  46:22
Franco 34:6
fraud 5:17 10:25
  27:3 44:17 58:15
  61:22 82:20
fraudulent 83:9
free 6:7
Freehold 20:13
  83:24
freelanced 8:12
Freidman 77:15,19
  77:19 79:8
Frequently 34:20

34:24 35:4
front 27:17
full 58:10 71:15
funded 37:11
FUNDING 1:8
funds 43:23
further 85:9 88:9
  88:13

G

GARDENS 1:19
Gary 1:10 10:17
  58:18 84:15
Gateway 3:7
general 8:10 28:18
  47:3 57:15 65:24
generally 15:21
  16:5 30:12 57:2
generated 60:4
geographic 10:1
getting 11:23 14:10
  24:10 35:21 68:24
Ginger 17:2
give 6:5 16:5,9
  41:18 75:22 86:18
given 42:19 52:2,4
glad 38:2
go 5:23 7:23 8:1,11
  38:10 47:1 50:17
  67:14 85:22
goes 64:18
going 5:21 17:25
  18:2 21:17,17
  22:9 29:21 38:3
  47:16 50:8 52:11
  58:2 62:9 71:13
  81:12 84:21 86:4
good 5:6,7 19:10,11
  79:15
graduate 7:21
grantor 58:10
Grieser 1:10 10:17
  58:19 84:15
guess 7:23 14:10
  23:20 27:23 31:5

35:5 42:15 43:17
  52:5 53:22 55:25
  70:19
G.J.L 1:7 13:1
  60:18,22 61:1,7
  63:12 72:1,5

H

H 4:7 5:1
half 38:23
handle 17:25 38:23
  70:17
handled 21:6 57:1
  80:1
handling 8:20
handwriting 64:14
happen 65:20
  70:13
happened 18:7
  44:22 65:19 85:16
happening 81:13
happens 22:5 32:14
harder 62:2
HAYES 3:10
head 83:24 86:4
hearing 35:12
held 2:5 8:15 9:19
help 15:11
hereinbefore 88:12
Hill 5:2
Hills 2:6 3:4
hired 15:8
hit 46:1
hold 9:13 28:3 70:1
HOME 1:8
Homes 1:19 13:5
honestly 72:25
hundreds 16:11
husband 77:15

I

idea 16:5 26:9
  55:25 60:11 68:22
identification
  22:13 33:3 40:15

42:18 71:21
identifies 64:21
II 1:11
implementing 57:6
include 34:13
included 43:14
  44:6,7,11,18
including 9:7
INDEX 4:1
indicate 25:21
indicated 81:11
indication 82:15
indirectly 71:9
Industrial 25:16
industry 7:12 37:9
information 18:18
  21:19 29:20
initial 50:21 52:1
  54:20
initially 14:4
initials 33:13
initiated 74:24 75:4
  85:20
instance 35:5 47:18
instructions 45:18
  45:21 69:17,21,24
  70:6,6,8,15,21
  71:4,7,12,13
  72:12,19,23
insurance 1:15,16
  1:17 3:9,12,13 5:2
  6:23 7:1,9,16
  13:23 16:9 24:22
  24:24 25:15,16,17
  25:23 30:2 37:9
  37:18 48:14 52:7
  53:1,6,24 54:5,5
  54:20,24 55:21
  59:8,11 61:10
  64:11 71:14 76:19
  77:6 82:17 83:7
insure 76:1
insured 22:6 49:1
  61:17

insurers 53:7
insuring 19:14,16
  82:25
intelligible 6:15
intended 24:21
interest 58:10,11
  58:17 77:14
interested 88:17
intervening 45:25
  46:1
interview 10:14,19
  38:22 50:12
interviewed 11:3
introduction 58:14
investigate 17:5
investigation 10:5
  11:20 12:23 16:22
  16:25 17:8,11
  18:12,23 19:5
  20:19,21,25 21:6
  21:10,21 22:2,16
  29:1,14 32:13,15
  32:18 46:23 47:7
  48:2 70:18,23
  78:3,7 86:17
investigations
  21:12 28:1
INVESTMENT
  1:9
invoice 66:7,21
  67:5
invoices 66:15
involve 17:23
involved 10:5,25
  11:23 12:5 16:24
  17:8 24:4 44:17
  46:14 49:6,6 58:3
  82:4,12 84:4,9
  86:2
involvement 5:16
  13:24 18:11 20:25
  27:8 29:13,17
  30:9 32:3 50:18
  85:18

VERITEXT REPORTING COMPANY

**involving** 43:23
51:3 52:7 75:24
83:7
**Irene** 11:25
**issuance** 39:8 56:6
**issue** 31:18 37:23
39:12 52:8 56:10
62:10,15 74:9
76:21
**issued** 23:7 30:21
31:11 37:23 41:23
43:9 51:2 56:13
59:11,16 64:23
66:1,16 70:8
82:24
**issues** 16:11 35:13
37:18 41:16 52:7
**items** 65:2

**J**

**J** 3:10
**jackets** 31:16,21
**James** 1:11 11:8
**JANET** 2:3 88:3
**January** 7:2 63:11
**Jersey** 1:1 2:5,6 3:4
3:8,16 5:3 7:18
9:12,22,23 24:25
25:1,7,18,19,24
33:20 53:1,3,5
54:4,14,15,23
88:4,20
**job** 14:11,20
**John** 2:6 3:4
**joint** 58:22
**Journal** 43:22
**judgment** 4:12 16:8
71:20,24
**July** 4:12 26:11
42:17,21 44:4
48:11 50:1,4 79:6
79:14
**June** 77:4,8,14,17
79:12

**K**

**K** 5:1
**Kane** 1:10 10:12
12:21 52:15 60:21
60:21 84:15
**Kane's** 14:4 52:4
**keep** 67:3
**Kelly** 11:17
**Kennedy** 2:6 3:4
**kept** 69:11 73:24
74:1
**Kevin** 15:6
**kind** 6:18 16:2
34:17 38:11
**King** 63:24 71:2
77:2,3,5,11,16
79:5,11
**King-3** 79:21
**King-4** 79:22
**knew** 19:9 49:8
58:25 85:4
**know** 6:12,16 12:7
12:20,22 15:6,22
17:12,22 18:15
19:8 20:23 21:20
21:22,23,25 23:17
25:6 26:14 28:2,4
28:8,11 29:6
30:17,17,18 32:16
32:17 33:22,23
34:9,22 35:2,2
40:10 44:19,20
49:4,13,14 50:9
51:19 55:17,23,23
55:24 60:5 61:12
61:13,24 64:3
68:11 69:4,15
72:25,25 73:3,5
74:18,19 75:21,24
76:9,13,17 78:19
79:10 80:2 83:5
83:16 84:6,7
85:22 86:3,7,14
86:15,22

**knowing** 31:23
**knowledge** 30:15
55:14 56:1
**knows** 38:2
**Koch** 1:6 4:3 5:6
23:11 40:17 42:20
43:11 44:3 45:11
71:23 87:12 88:6
**Koch-1** 4:9 22:12
27:16 28:6
**Koch-2** 4:10 33:2,5
**Koch-3** 4:10 40:14
**Koch-4** 4:11 42:17
**Koch-5** 4:12 71:20
**Kott** 3:6 4:5 6:9
14:13 16:15 27:13
28:3 36:5,14
37:20,25 42:9
46:16,25 49:21
53:23 56:20 63:25
68:21 70:1,5,11
71:8 72:24 74:12
74:14 75:15 84:19
87:2
**Kott's** 22:11

**L**

**lack** 43:21
**laid** 39:17
**Land** 1:15 3:9 6:25
24:21,24 25:23
33:20 48:13 53:1
53:3,5 54:24 59:8
**large** 27:3
**larger** 40:8
**Larry** 10:22
**late** 75:15 83:14
**lateral** 74:2
**Latham** 48:10
**law** 7:21,23 43:22
64:2
**LAWRENCE** 1:14
**lawsuit** 85:13
**lawyer** 17:20 37:12
69:23

**Lawyer's** 35:20
**lead** 69:24 70:9,9
70:12
**learn** 16:18
**leave** 6:25
**left** 36:9 74:3
**legal** 4:10,11 40:14
40:20 41:2,4,7,21
42:17,20 44:4
74:2
**lender** 46:4,4 70:9
**lender's** 45:17,20
**letter** 4:10 33:2,5
33:24 37:15 43:9
48:9,16 50:4 51:1
51:4,9 53:19
54:19,22 55:3,8
55:13,19,20 61:3
67:11 72:8,15,17
72:20 76:24 77:3
85:12,14,19 86:5
**letters** 23:2,5 29:7
30:3,22 31:11,18
39:10 51:24 55:15
55:21 56:10,22
57:12
**level** 86:11
**liability** 21:16
**License** 88:21
**lien** 45:25 46:1
**limit** 52:3
**limited** 1:7 10:1
13:1 60:18 61:7
72:1
**line** 38:11 66:4
**lines** 58:7
**list** 10:9 41:19,21
41:24 42:21 43:12
43:15,17 44:7,7
44:12,15,19,23
45:1,8 76:4
**listed** 27:11,19
37:15 53:21 59:3
67:14

**lists** 48:22,22,25
**literally** 71:9
**litigation** 22:18
35:25 52:8 57:16
74:10 85:15,20
**little** 8:8 27:16 37:9
**LLP** 3:3,6,10
**loan** 37:11 48:22,24
**loans** 40:11 49:1,4
**located** 7:17
**long** 5:23 6:13 8:21
20:19,20,20 43:6
43:16,20 66:4
73:4
**longer** 82:17
**long-winded** 14:14
58:13
**look** 17:17 19:10,11
23:10,16 33:4
35:6 39:2 40:16
48:7 49:4 57:19
60:15 61:6 63:10
64:5 66:6 68:13
68:14 69:4 76:25
79:5
**looked** 18:1 19:7,18
19:19 36:22 39:4
44:3,15 57:22
68:8 75:6 82:8
**looking** 29:22 71:4
**looks** 59:10 64:10
**Lorraine** 63:23
71:2 77:3
**loss** 27:2
**lot** 6:4 17:15 35:21
58:3 71:25 75:1
**Louisville** 30:8
**lower** 23:13
**loyal** 35:20
**L.L.C** 1:10

**M**

**M** 1:13
**Magnanini** 2:5 3:3
3:3 4:4 5:5,11

13:14 19:1 28:21
38:2 84:8 85:10
87:2,5
**main** 62:23
**Maine** 9:7
**maintain** 36:24
**maintained** 73:23
**maintaining** 40:1
**major** 26:19,21,22
27:1,4 76:11
**making** 34:14 57:5
**managed** 26:2,3
62:7
**management** 1:6,9
1:10 38:8 58:18
60:20 77:18 79:12
84:10
**manager** 9:16 10:4
17:19 23:23,25
78:19 86:11
**managing** 24:6
**manner** 28:19
**manual** 4:9 22:10
22:12 23:12,19
24:20 26:13,17
28:25 34:21 35:4
76:14,15
**manuals** 34:16,17
34:22,23 35:1
**marked** 22:13
23:11 33:3,5
40:15,17 42:18,19
48:6 50:25 54:17
55:8 57:20 60:16
64:6,7 66:4,6
67:20 69:16 71:21
71:23 77:1 79:5
**Market** 3:11
**MARTIN** 3:14
**MAS** 1:2
**mass** 48:1
**matter** 2:2 10:13,18
18:16 41:20 82:22
82:25

**McCARTER** 3:6
**McGOWAN** 3:14
4:4 15:24 80:7
81:1
**McGowan's** 84:21
**mean** 16:10 20:20
21:3 35:9 58:8
71:10 72:11,12
73:5 75:1 76:13
83:23 84:16
**meaning** 25:18
**means** 23:15
**Mee** 5:12
**meet** 11:19 13:20
**meeting** 36:21 65:5
**member** 53:12
**members** 53:9
54:10
**memo** 23:4 57:3
75:6,9,21 76:2
82:16
**memoranda** 73:19
73:24
**memorandum** 23:3
23:6
**memos** 20:7 50:13
**mentioned** 5:11
**met** 42:6 43:6 64:22
**METHFESSEL**
3:14
**Michael** 1:13 12:13
44:17
**mind** 19:8 36:2
**mishandling** 43:23
**missing** 42:12
**misspoke** 27:13
**mistake** 27:18 56:3
56:4,6
**mistaken** 30:4
**moment** 42:9
**money** 37:14,18,21
38:6 39:16 52:16
67:6
**Monmouth** 68:16

68:18 72:4 83:13
83:21
**monthly** 36:20
**months** 8:12 47:20
**Moran** 17:2
**morning** 5:6,7
**mortgage** 45:25,25
62:21 79:23
**mortgages** 47:11
47:13
**Mulberry** 3:7
**MURPHY** 1:19
**mutual** 35:17

___

## N

**N** 3:1 5:1,1
**name** 10:23 12:7,20
13:4,6 25:20,22
72:5
**named** 10:11 11:1
**names** 10:9 13:11
84:9,16
**naming** 50:2,2,2
**Nancy** 1:6 4:3 5:8,9
5:10 18:8 22:10
22:15 27:21 28:25
33:4 36:9 38:7
40:16 42:19 45:11
49:25 50:24 52:25
54:16 57:18,20
60:15 63:10 64:5
64:8 66:5 67:20
69:16 71:19,22
76:18 87:12 88:6
**Nation** 26:4 60:8
**National** 1:8,16
3:13 5:2 6:23
30:6
**Nations** 1:15 3:12
**nature** 27:3 57:4,15
85:25
**need** 36:22 42:10
42:11 49:15 57:8
62:2 64:22
**needed** 29:19 74:22

74:22 79:25
**neither** 44:11 88:13
88:15
**never** 10:16 11:3
12:19 28:14 32:25
47:8 63:16 71:6
72:3,6 81:25
**New** 1:1,16,17 2:5
2:6 3:4,8,12,13,16
5:3 7:18 9:7,12,22
9:23 24:24,25
25:7,18,19,24
33:20 53:1,3,5
54:4,14,15,23
88:4,20
**Newark** 3:8
**newspaper** 11:2
**NJRB** 54:25
**non-approved**
41:21,23 42:7,21
43:14,17 44:12,19
44:23 45:1,8
**normal** 79:1 80:4
**normally** 21:13
**Norman** 77:15,19
79:8
**Notary** 2:4 5:4
87:18 88:3,20
**notes** 2:1 20:7
50:11
**notice** 17:21 29:3
44:10 48:20
**notified** 22:6
**November** 2:7 4:11
40:20 43:11 88:22
**NPC** 30:5,10,13,14
32:1,4,6 57:9
**NPC's** 30:19
**number** 4:8 12:21
27:17 31:1 40:17
44:3 45:12 47:7
48:6,23 51:14,18
52:2 59:14,15,18
59:22,23 61:8,12

62:10,11,15,16,20
62:23 63:10 69:17
71:23 72:13 76:22
76:22,23 77:4,7
79:11
**numbers** 37:7
59:24 60:1,7
**Numerous** 46:10
46:11

___

## O

**O** 5:1
**Oakwood** 1:7 13:3
**object** 14:13 37:20
46:25 49:21 70:5
70:11 71:8 74:12
74:14
**objected** 75:16
**objection** 38:1
63:25 68:21 72:24
75:16
**objectionable**
21:14 43:18
**obtain** 21:19 32:1
39:12
**obtaining** 32:3
**occasionally** 15:23
16:1 38:9 45:2
46:2
**occur** 45:19 62:19
81:23
**October** 51:1 55:19
55:20
**odd** 37:9 58:7 59:1
**office** 2:5 7:17
17:12,14,16 22:11
39:25 70:25 73:20
75:25 87:2
**offices** 5:1 20:13,16
76:3
**official** 21:23 22:2
22:6 82:24
**Okay** 6:5,20 7:11
8:10,14 9:23 15:2
15:10 17:10 18:17

18:22,25 20:18
21:3 24:13 25:25
26:6 27:8,24
30:16,24 31:7,15
32:13 39:5,21
40:3 41:7,12
44:10 46:12 51:8
53:4 59:2,18
60:12 63:2 65:19
65:24 68:25 69:16
71:19 72:10 73:6
74:17 75:5 76:6
82:10 83:10 86:5
**Old** 5:1 6:23
**once** 18:12 39:5
70:14
**ones** 18:6 19:19
35:2
**operative** 26:13
**order** 27:4 64:22
75:25
**ordinary** 79:1
**organized** 14:21
**original** 18:6
**originally** 11:23
**Osis** 60:24 61:7
**outside** 79:1 80:4
**overhead** 39:24
40:2
**Owen** 86:10
**owned** 58:18 60:21
77:14,18 79:12
**owners** 77:24
**O'Neill** 11:17

**P**
**P** 3:1,1
**page** 4:8 23:14
24:19 26:15,16
28:25 31:24 42:12
45:12 48:15 51:15
54:23 59:6,10,14
61:8,10 64:15,18
64:24 66:9,10
68:13

**pages** 48:19 67:24
**paid** 37:18 39:16
40:6 67:6,8,12
**paper** 19:21 30:23
31:5,9,12,21 32:7
32:11 56:24 57:8
57:18
**paperwork** 47:12
**paragraph** 24:20
31:25 34:5 45:15
55:10,13,14 56:7
77:13
**paragraphs** 53:20
**paralegal** 63:24
64:2
**paraphrase** 84:21
**paraphrasing**
57:25
**parenthesis** 51:19
**Park** 51:4 66:12
71:24 72:4
**Parkway** 2:6 3:4
**Parsippany** 5:3
7:18 20:17,18
73:20
**part** 5:16 12:22
14:11,20 25:21
32:14 40:11 41:1
51:17 56:5 58:15
70:6,18 83:6
**partial** 58:4,8
**participation** 19:5
**particular** 57:1
71:5
**particularly** 37:15
**parties** 58:3 75:24
88:15
**partly** 17:18,19,20
**pass** 16:8
**passed** 84:11
**passing** 66:18
**pay** 37:13 52:23
**pending** 6:8 36:7
70:3

**Pennsylvania** 3:11
**people** 13:11 14:22
24:15 50:2
**Pepsny** 1:13,18
11:25 12:18 44:11
44:18 52:20,21
**percent** 58:11,16
63:19
**performed** 34:9
**period** 14:3 17:5
83:12 84:6
**periodic** 41:25
**periodically** 38:5
41:14
**peripheral** 21:2
**personally** 30:11
**Philadelphia** 3:11
**phone** 5:11
**photocopies** 67:16
**physically** 82:8
**piece** 77:22
**Pierson** 1:12 11:10
**Pittsburgh** 86:8
**place** 13:15 16:16
19:2 20:10 25:10
28:22 36:15 40:4
48:5 60:13 67:19
79:17 88:12
**Plaintiff** 1:4 3:5
**played** 36:1
**players** 23:4 75:7
**please** 6:15
**point** 10:3 17:9
19:13 20:16 21:10
25:20 36:21 49:15
52:14,14,21 70:14
81:11 84:1 85:4
86:21
**policies** 30:2,20,21
31:10,16 32:3,6
37:23,23 39:9,13
**policy** 28:19 31:16
31:24 32:1,9,11
37:14,18 61:15

64:22 65:3,25
71:15,16
**portion** 40:8
**position** 8:14 9:13
9:19 22:3,4,6
78:17
**positive** 25:13
32:20 76:7
**potential** 27:2
29:14 85:15
**practical** 82:22,24
**practice** 8:10 64:1
**preface** 14:14
**premium** 34:15
40:6 67:10
**preparation** 81:2
**prepare** 18:19
22:23 23:1 41:2
63:24 64:12 73:9
73:13
**prepared** 63:23
77:12
**preparing** 64:1
75:7
**president** 86:10
**presumably** 70:16
71:17
**previously** 13:17
50:24 64:7 66:6
77:1
**pre-sign** 38:24
**printout** 67:22,25
**prior** 5:17 47:20
54:16 84:12,13
88:5
**probably** 9:2 19:15
20:6 21:24 24:14
32:24 33:1 36:22
37:7 41:9,11 44:8
63:22 73:25 78:14
78:15 83:4
**problems** 14:10
35:13 45:16,19
46:13 79:25 80:3

**proceedings** 2:2
**process** 24:5 54:6
**processing** 26:18
30:6 81:14
**produce** 56:9
**produced** 22:10
23:15 26:12 40:18
41:11 51:9,16
63:17 69:3
**producing** 49:23
**professional** 33:16
33:18
**profitable** 37:2,3,6
**progress** 24:6
**prohibition** 65:24
**properties** 1:7
12:24 13:3,8 14:5
14:10 15:16 52:8
52:16,17 61:15
62:22 63:1,5 74:9
74:18,19
**property** 1:6,8,9
16:13 52:10,22,23
58:17,18 59:7
60:20,23 61:11
62:23,24 63:19
66:11 71:5 72:1,5
76:20 77:9,12,13
77:17,18,23 79:8
79:11,12,13 84:10
**prospect** 24:2
**protection** 5:20
30:3 31:11 37:15
39:9
**provide** 16:3 34:8
34:18 39:6 72:21
**provided** 9:10
22:23 31:13 51:7
81:2
**providing** 8:19
39:25
**Public** 2:4 87:18
88:3,20
**publication** 33:22

published 26:8
pulling 17:24
purchase 52:2,10
  52:23 60:22 61:7
  76:23 77:12
purchased 60:24
purchasers 11:23
purchasing 52:16
purports 40:21
purpose 27:20
  30:19 41:4 64:19
  65:1
put 27:18 43:16
  61:19 82:18
putting 48:19
p.m 87:8

**Q**

question 6:8,13
  18:22 21:14 24:18
  31:23 35:1 36:5,7
  42:1 43:18 49:22
  52:5 54:21 56:19
  61:5 70:2,3
questionable 83:9
questions 6:14
  14:12,17,23 15:19
  18:14 21:4 26:6
  28:24 29:24 34:20
  34:24 35:4 39:7
  51:13 75:17 84:21
  85:9
quoting 57:25

**R**

R 1:11 3:1,6,14
Rafael 51:3 72:2
raised 35:13
random 17:24
rate 53:8
rating 53:2,6,8,9,11
  53:13 54:1,2,3,24
read 36:5,7 46:16
  46:18 70:3 85:2
reading 81:16,18

real 43:23 58:11
realized 52:22
really 14:3 19:8,8
  80:7
realtors 1:18 11:22
REALTY 1:18,19
reason 17:18 49:25
  79:20
recall 11:16,18,21
  12:1,20 14:1
  15:13,14,17 17:7
  17:10 18:4 20:1,8
  21:24 22:1 32:22
  35:12 37:7 44:8
  45:3 50:15,19,20
  50:23 51:25 52:8
  52:13,24 57:14,23
  58:21 60:6,19
  62:3,6,13 68:6,12
  70:20,22 73:22
  74:10,15 75:9
  78:2 81:16,18,19
  81:24 82:3
recalled 52:6
receive 56:18 86:5
received 22:12 33:3
  40:15 42:18 71:20
  85:12
receiving 50:20
recess 48:5 67:19
recognize 64:14
recollection 15:11
  16:4 32:8,10 58:4
  58:9,25 68:9
  73:16,18 81:9,15
recommendations
  86:18
record 5:19 13:14
  13:16 16:15,17
  19:1,3 20:9,11
  25:11 28:19,21,23
  36:14,16 40:3,5
  45:24 47:13 60:12
  60:14 68:18 71:12

79:18
recorded 46:21
  47:9,10,14 58:21
  71:6,17 72:3,20
recording 47:18
RECROSS 4:2
rectify 46:4
red 61:21 73:6
  82:19
REDIRECT 4:2
  85:10
refer 68:3
referred 27:14 82:5
  82:13
referring 56:21
refresh 15:11
regional 78:18
regular 39:4 74:20
regularly 14:9
  30:13 69:14
regulatory 8:20
  9:12
related 12:23 18:23
  32:4
relates 68:1
relating 22:16,17
  74:8
relationship 34:2
  35:19,23 36:24
  37:2,5
relationships 36:20
relative 88:14,16
releases 34:25
Reliance 25:13
remember 8:23 9:3
  13:4,6,10,21 15:7
  15:9 16:20 17:3
  17:24 18:9,21
  19:22 21:1,22,25
  28:20 32:24 33:1
  34:11,12,19 35:15
  36:10,19 44:21
  45:6,10 46:15,20
  46:24 47:2,4,5,21

47:24,24 48:4,17
  49:14,20 50:6
  52:12,18 55:16
  56:25 57:2 58:1,5
  58:6 59:25 61:19
  61:22,22 62:12
  63:9 66:14 67:2
  69:22 71:3 75:12
  76:14 77:25 78:6
  78:20 82:6,14,19
  84:24 86:2,4
remit 38:6
remittances 34:15
remitted 37:19,21
  38:4
rep 24:2
rephrase 6:16
report 38:6 46:12
reported 38:4
reporter 2:4 36:8
  46:19 70:4 88:4
Reporting 29:2
reports 11:2 38:7
repository 30:20
represent 5:12
  59:19 60:17 63:15
  67:21,25
representation
  53:11,12
representative
  29:25 38:21 53:14
representatives
  53:16
represented 6:9
  48:11
Republic 5:1 6:23
request 29:15 45:9
requested 32:9
require 71:14
required 55:5,5,6
requirement 65:22
  71:18
requirements
  45:18,21 64:21

65:6,20 71:14
resource 35:5 39:7
response 84:20
responsibilities
  8:18 9:24 24:1
  41:1
responsibility 9:6
  14:17
responsible 9:9
  24:5,9,10 65:5,14
result 32:17 35:13
retained 5:21,22
  28:16 40:7,8
retention 28:19
retrieve 34:7
return 46:3
reusing 60:17
review 17:16 23:1
  36:20 42:10 44:12
  51:7 54:6
reviewed 20:13
  56:13
reviewing 17:23
RFT 68:15
Richard 1:11,11,13
  11:1,6 12:17
  44:18
Rick 78:15 86:15
Ridge 51:3 66:12
  68:1 71:25 76:20
right 22:20 23:13
  31:15 38:19 40:8
  49:24 57:23,24
  58:13 65:15 66:11
  82:22 84:18 85:8
ring 13:13
risk 31:22
Road 3:15 5:3
ROBERT 1:10 3:3
Roland 1:12 11:10
role 38:8
Ron 86:7,9,10,13
  86:14
ROTHSCHILD

3:10
**rules** 6:6
**run** 10:8
**running** 83:11
**Rutgers** 7:25 8:2

**S**

**S** 3:1 4:7
**salary** 39:24
**sale** 52:3,9,17,22
60:18 63:12 79:9
**satisfactorily** 65:4
**satisfied** 65:21,25
**satisfying** 65:15
**save** 57:18
**saw** 28:14 63:21
69:13
**saying** 57:3 58:7
61:25 62:1 76:14
81:23
**says** 24:20 26:17,17
26:18,18,19 29:1
29:1,2 31:25 34:6
35:16 45:15,15
48:14 51:18 54:23
59:8 61:11 66:10
66:11 68:15,18
76:15 77:13,17
**scenario** 61:25
65:23
**scenarios** 62:14,20
72:13
**schedule** 45:18,21
48:21 64:17,19,21
64:25 65:6,16,20
**scheduled** 5:22
**schedules** 64:10
**school** 7:21,24
**scope** 10:1
**scratch** 62:2
**searches** 37:16 39:8
39:12 62:25 67:16
**second** 14:7 31:25
32:2 34:5 48:15
59:6,14 61:8,10

68:14 77:5,16
**secretary's** 41:10
**Section** 64:20,25
65:6,16,21
**sections** 65:15
**securing** 62:21
**Securities** 1:3 5:12
5:19 10:6 11:15
11:20 12:4 14:7
16:19 20:22 21:21
22:17 26:11,22
28:9,13 32:4,18
35:25 37:11,12
40:12 43:13 44:16
46:14,23 48:11,20
48:22 49:25 50:18
51:16 69:18 76:4
85:13,20
**see** 10:9 23:13
28:12 32:2 33:7
38:7 39:4 48:12
48:18 49:1,16
50:4 54:25 55:18
59:14 60:23 63:12
63:14,18 66:9,15
66:19,22 69:18,20
71:11,13,25 72:2
77:1,13 79:7
**seeing** 32:22 58:6
58:21 70:20 77:25
86:22
**seeking** 18:18
**seen** 6:18 23:17
32:25 33:8 40:23
48:15 51:4,6
59:20 63:4 66:13
68:2,3 69:7,10
72:18,19 86:19,22
**segregate** 49:15
**segregated** 17:17
**selling** 14:5
**send** 29:7 30:11
32:6 56:17 57:3
87:5

**sending** 30:9 85:19
**senior** 51:3 72:2
86:10
**sense** 35:22
**sent** 33:24 50:4
56:24 76:2
**sentence** 26:19 32:2
**separate** 24:25 25:6
76:20
**September** 4:10
33:2
**series** 19:13 34:25
**service** 23:2,5
30:22 31:11,18
37:15 39:9 43:9
51:1,24 53:19
54:18,22 55:3,12
55:15,21 56:22
57:11 61:3 67:11
72:8,15,17,20
**set** 41:25 49:6 74:1
74:2 88:12
**settlement** 65:8,18
**seven** 15:6 24:14
27:19
**shelf** 23:24
**short** 2:6 3:4 17:21
**Shorthand** 2:4
**show** 6:18 22:9
50:10,24 54:15
71:19
**sign** 24:4
**signature** 33:10
**signs** 46:13
**similar** 58:3 62:14
77:21
**simple** 77:14
**simply** 5:13 81:23
**sit** 81:22
**sitting** 31:24
**situation** 66:1
**situation-specific**
73:2
**SKOWRENSKI**

1:11
**small** 8:6 57:7
**sold** 52:16 72:1
**somebody** 58:11,12
78:15
**Somerville** 8:6
**somewhat** 30:13
**sorry** 15:24 27:15
31:4 36:13 42:13
44:14 73:18 74:16
78:6
**sort** 39:10 62:16
81:13 82:16,23
85:15
**sound** 11:7,9,13
13:2
**sounds** 62:1 85:7
**speak** 10:14,19
11:14,19 12:3
20:4 70:24,24
73:9,13 78:9
**speaking** 12:1,20
71:3
**specific** 9:21 16:4
30:25 35:1 47:2
56:15 58:24 68:9
**specifically** 15:20
18:9 36:19 44:8
56:25 68:12 78:6
86:6
**specifics** 86:2
**spend** 46:5
**split** 67:10
**spoke** 11:3 12:6,10
12:19 18:3 19:23
81:25 86:14,16
**spoken** 12:15
**spot-check** 39:3
**stack** 71:22
**staff** 24:7,15 30:12
40:1
**staff's** 39:24
**stamp** 23:13 24:19
**stamped** 26:16 33:7

40:19 51:15 54:23
63:13 64:7 66:9
67:23 69:2,19
**stand** 33:15
**standpoint** 82:17
**stands** 51:18,20
**Stanley** 1:12 12:5
44:5 51:2 66:8
67:22
**start** 7:3
**started** 7:12,15
74:11
**state** 2:4 8:16,21
9:15,20,21 33:17
54:14,15 88:4,20
**states** 1:1 9:11,12
**statutory** 39:19
**staying** 61:20
**stenographic** 2:1
**stenographically**
88:11
**Stone** 2:5 3:3 5:11
**stop** 6:12
**stopped** 59:24 60:6
**story** 7:5
**straighten** 47:11
**straw** 11:24
**Street** 3:7,11
**strength** 25:21
**strike** 15:16
**subject** 26:18 29:1
41:20
**subpoena** 22:19
**Subscribed** 87:13
**subsequent** 52:3,17
**subsequently** 52:11
**subsidiary** 25:3
**substance** 15:13,17
75:13,22 78:21
**suffix** 62:16
**Sullivan** 15:8 22:21
29:25 48:8,12,14
73:11
**summary** 18:19

supervises 26:20
supplied 30:23
supplier 30:22
supply 34:7 57:7
support 8:19 9:10
  15:23,25 16:2
suppose 64:2 71:9
  73:5
sure 15:14 16:7
  17:2 22:3,3 34:14
  50:9 56:3,14
  57:24 66:18 75:1
  75:4,17 76:6
  83:24
surface 62:2
surprise 85:6
surprised 82:1
  84:22 85:2
suspension 43:23
sustained 37:25
sworn 5:3 87:13
  88:6
system 60:4
systems 31:19
  57:10
SYSW 67:23

**T**

T 4:7
take 6:7,8 18:7
  23:10,16 33:4
  40:16 42:9 43:16
  48:7 49:13 50:11
  57:19 60:15 63:10
  64:5 66:6 67:18
  69:4 76:25 79:5
taken 2:3 46:6
  88:11
takes 13:15 16:16
  19:2 20:10 22:5
  25:10 28:22 33:21
  36:15 40:4 48:5
  60:13 67:19 79:17
talk 38:22 73:15
  78:12

talked 73:19,21
talking 49:8 84:11
tasks 24:16
teaching 33:22
Technically 7:7
telecopy 48:15
tell 6:21 17:7 41:17
  51:16 60:19 81:22
  82:1
telling 52:18 86:21
ten 26:16 63:11
terminate 35:18
  36:23 57:12
terminating 34:2
termination 34:8,9
  34:13 35:14,17
  36:4,11,17
terminations 24:7
testified 5:4 14:2
  30:1,24 51:9 52:1
  52:21 73:12 75:18
  75:19 77:10
testify 88:7
testimony 81:4,16
  82:23 84:25 88:10
Thank 5:10 43:10
  85:9 86:25
theirs 66:20
thing 37:22 39:11
  52:21 73:21 76:10
  85:8,11
things 14:9 27:16
  30:11,25 31:3
  37:16 47:6 53:18
  56:12 73:7 79:19
think 8:16 9:16
  13:23 15:8 18:6
  19:25 25:12,14
  27:13 31:8 32:5
  32:20 36:10,25
  47:16 56:4 64:1,3
  64:4 67:15 68:5
  73:11 74:6 75:5
  75:10,20 76:7,13

76:15 80:2,9 81:6
  81:9 82:23 83:23
  84:17 86:6,20,20
  86:23,24
third 24:20 64:18
  68:13
Thomas 1:12 11:12
thought 5:23 26:12
  53:4 62:9 74:7
  85:12,22
thousands 16:11
threatening 85:14
  85:14
three 8:12 62:21,22
  75:17 76:18 77:13
  84:1
time 6:6,9,11 7:9
  14:3,18 17:2,5,6,9
  19:7,14 20:24
  23:22 25:20 26:13
  32:8 34:19,21
  36:9,21 38:24
  41:25 46:5,22
  47:19 48:11 49:15
  50:16 60:9 61:24
  73:4,25 82:3,15
  83:12 84:6 85:4
  86:21 88:11
timely 45:24 46:3
times 6:3
timing 8:24 9:4
  61:23
title 1:15,15,16,17
  3:9,12,13,17 5:2
  6:23 7:1,8,12,15
  8:13 9:1 13:23
  14:11 20:5 24:21
  24:24 25:15,16,17
  25:23 30:2 31:12
  31:20 33:6,16,20
  33:25 34:3,10,18
  34:20,24 35:1,6
  35:14,20 36:4,18
  37:8,13,14,24

38:16 39:6,8 40:7
  44:22 47:10,12
  48:13 49:3 50:3,8
  50:16,17,21 51:10
  52:7 53:1,3,5,7,7
  53:10,24 54:9,19
  54:24 55:21 56:17
  57:13,21 58:20
  59:8,11,12,19,21
  61:9,10 62:8,14
  63:5,15 64:10,13
  65:3,25 66:8,16
  66:24 67:7 68:11
  69:3,10,21 71:13
  74:25 76:19,21
  77:6 79:10,25
  80:3 82:17 83:7
  83:11,12
titled 40:19
today 5:10 23:17
  40:24 51:5 66:13
  68:4 69:8 73:9
  81:22
today's 81:3 87:3
told 20:2 44:24
  52:9,13 74:7
  81:14
top 40:20 59:9 79:7
  83:23
tortured 7:5
totals 67:5
track 30:2
Trans 7:8,14,15
  8:13,15 26:4 60:8
transaction 14:6,7
  23:4 48:24 51:2
  52:2,3 61:4 66:10
  68:2
transactions 18:2
  19:13,18 43:24
  47:19 58:2 65:9
  75:24 81:12 82:4
  82:12,20 83:7,10
  84:5

transcript 2:1
  88:10
transcripts 22:22
  81:3,7,17
transfer 16:12
  51:17 58:8
transferred 20:15
  30:5
transfers 58:4
trigger 72:7,14
true 88:10
trust 67:22
truth 88:7,7,8
try 17:25 29:19,19
  47:11
trying 18:2 21:22
  27:24 30:1
turn 26:15
tweaked 41:10
two 11:22 13:11
  23:2 44:4,16
  48:19 53:20 67:23
  67:24 76:25 77:23
  79:20 80:8 81:6
  84:1
type 45:19 56:13
  63:21
types 81:19 85:5
typically 21:18
  65:7,17

**U**

ultimate 24:3
unannounced
  50:10
uncovered 5:18
understand 5:15,21
  6:16 18:2 37:10
understood 6:14
underwriter 25:18
  25:19
underwriting 8:19
  9:6,10,17 10:4
  14:17,23 15:1,19
  15:22,25 16:2

34:25 39:4 66:20
66:23 73:19,24
**unhappy** 61:16
**unheard** 63:2
**UNITED** 1:1
**University** 8:2
**updated** 41:15,19
**upfront** 39:22
**upper** 66:11 86:11
**use** 24:21 53:22
54:10 60:3
**usual** 47:12 87:6
**usually** 32:11 44:2
65:18 79:2

**V**

**vague** 58:4,9
**Valley** 25:16
**various** 57:22 63:1
**VECCHIO** 1:18
**venture** 58:22
**Verification** 31:25
**versus** 71:24
**vice** 86:10
**views** 86:18
**violation** 70:8 71:7
**Virginia** 9:7
**visit** 50:22
**void** 68:19
**voided** 68:17,19
**volumes** 81:8
**vs** 1:5

**W**

**Walsh** 1:3 5:12,18
5:19 10:6,13,25
11:15,20 12:4,16
14:7 16:19 20:22
21:21 22:17 26:11
26:22 28:9,12
32:4,18 35:25
37:10,12 40:12
43:13 44:9,16
46:14,23 48:11,20
48:22 49:25 50:18

51:16 58:15 69:18
75:19 76:4 85:13
85:20
**want** 6:6,11 35:18
39:10 42:9 45:22
55:25 73:8 80:8,9
85:11
**warning** 46:13
**wasn't** 27:22 63:2
72:19
**Watkins** 48:10
**way** 19:6 70:5
71:15 81:14
**wears** 6:14
**week** 63:12
**WEICHERT** 1:18
**welcome** 87:1
**Welsh** 8:5
**went** 9:15,20 17:12
20:12 41:14 43:12
48:18 49:3,12
50:16 61:21 69:11
82:7,16 86:7
**WERBEL** 3:14
**weren't** 28:8 84:9
**we're** 5:21 14:4
21:16 60:16 65:23
68:23 82:21
**we've** 5:13 11:24
23:10 33:5 47:6
53:18
**whichever** 21:8
37:24
**wife** 77:15
**William** 1:10 10:12
13:12 60:21
**Wilson** 78:15,22
86:16
**wire** 51:17
**witness** 4:2 5:14
37:25 48:9
**wondering** 37:1
**word** 65:15 78:20
**work** 6:22 8:3,13

8:20 9:11,12
25:25 46:6
**worked** 23:20
**working** 7:3,14
8:25
**works** 17:22
**worried** 85:6
**wouldn't** 80:2
**wrap** 71:22
**wrapped** 19:9
**writing** 73:6
**written** 18:19 72:22
**WSI** 69:20
**WSWT** 51:15
54:23

**X**

**X** 4:7
**XI00970** 88:21

**Y**

**Y** 5:1
**Yacker** 1:12 12:5,6
37:12 44:6 45:4,7
51:2 65:10 66:8
67:6 68:7 69:23
70:24
**Yacker's** 67:22
**yeah** 57:17 73:3
76:17
**year** 15:8
**years** 8:23 21:1
59:25,25 84:11
**York** 1:16,17 3:12
3:13 9:7

**Z**

**Z** 74:2

**$**

**$1,113** 67:6
**$1,500** 60:24
**$25** 67:11

**0**

**000505** 51:15
**07078** 3:4
**07102-4056** 3:8
**08818** 3:16

**1**

**1** 23:11 64:20 65:6
65:21
**1/97** 23:21 26:11
**10:10** 2:7
**100** 3:7
**100,000** 76:14
**1017-1019** 77:9
79:9
**11** 2:7 5:20 64:6,8
**11/25/98** 40:14
**1150** 66:10,10
**1151** 66:10
**1188** 64:7,15
**119** 5:2
**1190** 64:18
**1191** 64:19
**1192** 64:7,25
**12** 64:8 88:22
**1202** 63:14
**1204** 63:14
**1234** 69:2
**13** 66:5,7
**138** 51:3 66:12 68:1
71:25 76:20
**15** 67:21
**150** 2:6 3:4
**16** 28:6,7 60:25
69:2 77:4,8,14,17
79:12
**17** 69:17
**17th** 50:2
**17767** 77:4 79:21
**17767(A)** 77:7
79:22
**18724** 51:18 61:8
**18724(A)** 61:12
**19103-3222** 3:11
**1984** 7:22 8:3
**1987** 7:13 8:4

**1989** 13:23
**1990** 7:10
**1994** 25:12
**1996** 14:3,11,21
15:6 24:14 37:6
51:2 55:19,20
69:19 74:8 77:4,8
77:14,17 79:7,12
79:14
**1997** 26:12 47:9
48:12 63:11
**1998** 4:11 40:20
41:2 43:11
**1999** 4:12 42:18,21
44:4

**2**

**2** 64:25 65:16
**2:16** 87:7
**20** 27:12,14,15,17
27:19
**2000** 3:11 4:10 33:3
**2009** 7:2 9:19 31:6
31:9 74:4
**2010** 2:7 87:14
88:22
**2013** 88:21
**22** 4:9
**2386** 33:7
**23869** 23:14 24:20
**23874** 29:1
**23875** 31:24
**23882** 26:16
**23945** 28:6
**23976** 27:18
**23977** 27:12
**24003** 23:14
**24180** 40:19 45:13
**24217** 40:19
**24222** 43:2
**25** 4:11 40:20 43:11
55:20 79:14
**25th** 79:7
**28** 48:12 50:4
**28,000** 79:9

**29** 4:10 33:2

**3**

**3** 3:15 40:17 43:11
45:12 48:7 77:2
77:11 88:21
**30** 51:1 55:19 71:15
71:16
**30(b)6** 48:9 49:23
50:25 54:17
**300** 47:10,18
**3012** 3:15
**31** 60:25 69:19
**33** 4:10
**35** 71:25

**4**

**4** 42:20 44:3 77:6
77:16 79:11
**40** 4:11
**42** 4:12
**4474** 69:20

**5**

**5** 4:4 71:23
**505** 54:23

**6**

**6A** 50:25 54:21
55:13,18 56:7
61:3 72:16,21
**60** 58:16 63:19
**604** 54:25

**7**

**7** 54:18 55:4,8,20
63:11 79:6
**707.50** 68:17
**7083** 67:24 68:14
**7085** 67:23
**7086** 67:24
**71** 4:12
**746** 69:20

**8**

**8** 57:20 60:23
**8/1/94** 54:25
**80s** 60:10
**81** 4:4
**84** 4:5
**85** 4:4

**9**

**9** 4:12 42:17,21
44:4 61:10
**90s** 83:14
**92** 71:25
**96** 29:4 31:10 38:18
46:22 60:25,25
84:12
**97** 14:3,12,22 29:5
31:10 37:6 38:18
46:22 50:2 74:8
76:16
**97-cv-3496** 1:2
**98** 9:16,17
**99** 42:14