# EXHIBIT M

## Donna Sullivan

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No.
97-cv-3496 (DRD) (MAS)

WALSH SECURITIES, INC.,    :
                           :
          Plaintiff,       :
                           :
     vs.                   :    DEPOSITION OF:
                           :    DONNA SULLIVAN
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP
CONSULTING INC.; COMMONWEALTH
LAND TITLE INSURANCE CO.;
NATIONS TITLE INSURANCE OF
NEW YORK, INC.; FIDELITY
NATIONAL TITLE INSURANCE CO.
OF NEW YORK, INC.; COASTAL
TITLE AGENCY; DONNA PEPSNY;
WEICHERT REALTORS; and VECCHIO
REALTY, INC., d/b/a MURPHY
REALTY BETTER HOMES AND
GARDENS                    :
          Defendants.      :
                           :
 - - - - - - - - - - - -

Donna Sullivan

## Page 2

```
 1          TRANSCRIPT of the stenographic notes of
 2   the proceedings in the above-entitled matter, as
 3   taken by and before JANET BAILYN, a Certified
 4   Shorthand Reporter and Notary Public of the State of
 5   New Jersey, held at the office of STONE & MAGNANINI,
 6   150 John F. Kennedy Parkway, Short Hills, New Jersey,
 7   on September 28, 2011, commencing at 9:30 in the
 8   forenoon.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   A P P E A R A N C E S :
 2
 3      STONE & MAGNANINI, LLP
        BY:  DANIEL MEE, ESQ.
 4           -and-
        AMY WALKER WAGNER, ESQ.
 5      150 John F. Kennedy Parkway
        Short Hills, New Jersey 07078
 6      Attorneys for Plaintiff
 7      McCARTER & ENGLISH, LLP
        BY:  DAVID R. KOTT, ESQ.
 8      Four Gateway Center
        100 Mulberry Street
 9      Newark, New Jersey 07102-4056
        Attorneys for Defendant
10      Commonwealth Land Title Insurance Co.
11      FOX ROTHSCHILD, LLP
        BY:  EDWARD HAYES, ESQ.
12      P.O. Box 5231
        Princeton, New Jersey 08543-5231
13      997 Lenox Drive
        Lawrenceville, New Jersey 08648-2311
14      Attorneys for Defendants, Nations
        Title Insurance of New York, Inc. and
15      Fidelity National Title Insurance
        Co. of New York
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX
 2
     WITNESS      DIRECT CROSS REDIRECT RECROSS
 3
     DONNA SULLIVAN
 4   BY MR. MEE    5
 5
 6
 7      E X H I B I T S
 8   NUMBER      DESCRIPTION        PAGE
 9   Fidelity-1   Notice of 30(b)6 Deposition     8
     Fidelity-2   Answers to Interrogatories      9
10   Fidelity-3   Disclosures            13
     Fidelity-4   Letter dated 7/28/97      17
11   Fidelity-5   Memo dated 8/12/97        22
     Fidelity-6   Letter dated 9/5/97     33
12   Fidelity-7   Letter dated 4/20/99      36
     Fidelity-8   Letter dated 8/26/99      38
13   Fidelity-9   Letter dated 11/22/99     42
     Fidelity-10  Form 10-K           57
14   Fidelity-11  Closing Service Letter
              Dated 10/30/96        78
15   Fidelity-12  Coastal Title Agency Document   82
     Fidelity-13  Deed dated 10/23/96      82
16   Fidelity-14  Deed dated 11/13/96      83
     Fidelity-15  Deed dated 11/13/96      85
17   Fidelity-16  Mortgage dated 11/13/96    86
     Fidelity-17  Coastal Invoice dated 10/30/96 88
18   Fidelity-18  Copy of Check from
              Stanley Yacker         89
19   Fidelity-19  Fidelity Commitment       90
     Fidelity-20  Fidelity Commitment       90
20   Fidelity-21  Loan Policy of Title Insurance  98
     Fidelity-22  HUD-1             101
21   Fidelity-23  Closing Instructions
              By Walsh Securities      102
22   Fidelity-24  Letter dated 6/16/97     105
     Fidelity-25  Letter dated 6/4/97     105
23   Fidelity-26  Letter dated 7/8/97     105
24
25
```

## Page 5

```
 1   D O N N A   S U L L I V A N, having been duly sworn by
 2   the Notary, testified as follows:
 3   DIRECT EXAMINATION BY MR. MEE:
 4      Q.   Good morning, welcome back.
 5      A.   Thank you.
 6      Q.   Since this is the second day of your
 7   testimony this week and probably fourth day overall
 8   I'll skip the general ground rules that we've talked
 9   about.
10      A.   Okay.
11      Q.   I assume you remember all of them.  The
12   most important one of course, if you need a break
13   just let me know.
14      A.   Thanks.
15      Q.   As long as a question isn't pending.  As
16   you heard before, we were having a conversation among
17   counsel about your prior testimony, and I just would
18   like to put on the record our agreement, which is
19   that to the extent that your testimony overlaps with
20   your testimony from yesterday, specifically with
21   regards to any of your background information,
22   general information about how commitments are issued,
23   how closing service letters are issued, title
24   policies are issued, etcetera, I won't follow up --
25   I'll try not to follow up with any additional
```

VERITEXT REPORTING COMPANY

212-267-6868                516-608-2400

59ad69d2-fad8-443e-ad57-85669d44d9cb

Donna Sullivan

Page 6

1  questions on that. Do you understand what I mean by
2  that?
3      A.   Yes.
4      Q.   And to the extent that all of those
5  topics also overlap with your testimony from
6  Commonwealth, I'll assume that general background
7  information with regards to those topics and your
8  employment with Fidelity, Nations and Commonwealth
9  will be the same. Do you understand what I mean by
10 that?
11     A.   Yes.
12     Q.   To the extent that we receive documents
13 from counsel after your testimony here today that may
14 be inconsistent with your testimony from yesterday
15 and today, we are going to reserve the right to
16 question you about that again in the future if
17 necessary. Do you understand what I mean by that?
18     A.   Yes.
19     Q.   Is there anything that you would like to
20 change from your prior testimony before we get going
21 today?
22     A.   No.
23         MR. MEE:  And, counsel, is there
24 anything that you would like to place on the record?
25         MR. HAYES:  I think just so that we're

Page 7

1  clear, the understanding is if Miss Sullivan were
2  asked those questions again today in her capacity as
3  a 30(b)6 with Fidelity you can expect that she would
4  have given the same testimony in those areas that we
5  talked about, thereby avoiding the need to ask them
6  again.
7         MR. MEE:  Mr. Kott, do you have
8  anything?
9         MR. KOTT:  Well, this is not my deponent
10 but I have no objection to what counsel has
11 previously agreed upon.
12     Q.   And so I guess that will be a good way
13 to start. Is there any distinction between the way
14 Nations or Fidelity handled the claims that are at
15 issue in this case?
16     A.   I believe since Fidelity acquired
17 Nations in '96 that they have been handled in the
18 same fashion by the same office.
19     Q.   Did you do anything yesterday to prepare
20 for your deposition today?
21     A.   No, nothing yesterday other than appear
22 here.
23     Q.   Did you -- you didn't review any
24 additional documents?
25     A.   I did not.

Page 8

1      Q.   Did you speak to counsel yesterday?
2      A.   No, I think we -- no.
3      Q.   I understand that you worked for
4  Commonwealth for a while. At what point did your
5  employment change from Commonwealth over to Fidelity?
6      A.   I left Commonwealth in August of 2000
7  and I actually went to a title agency for 22 months
8  before I went to Fidelity in July of 2002.
9      Q.   It wasn't Coastal Title Agency, was it?
10     A.   It was not.
11     Q.   I had to ask.
12         MR. HAYES:  Off the record.
13         (A discussion takes place off the
14 record).
15         (Fidelity-1, Deposition Notice, is
16 received and marked for identification.)
17     Q.   I'm handing you what's been marked as
18 Fidelity-1, which is the Notice of 30(b)6 deposition
19 for Fidelity. Did you review this document before
20 your deposition today?
21     A.   Yes.
22     Q.   And you had indicated yesterday that you
23 spoke to a number of individuals about these topics.
24 Did you speak to any other individuals regarding
25 specifically Fidelity topics?

Page 9

1      A.   No.
2      Q.   So you didn't prepare any differently
3  for Nations than you did for Fidelity?
4      A.   It was the same preparation.
5         (Fidelity-2, Answers to Interrogatories,
6  is received and marked for identification.)
7      Q.   I'm handing you what's been marked as
8  Fidelity-2. This is Fidelity's and Nations'
9  Responses to Plaintiff's Interrogatories signed by
10 Kenneth Aran dated November 22, 2005. Did you review
11 these in advance of your deposition here today?
12     A.   I know I reviewed some responses. I'm
13 assuming it was for Fidelity. Well, yes, because
14 this is both Fidelity and Nations.
15     Q.   At interrogatory number 11 on page five
16 it states:  "Set forth each and every fact that
17 supports the affirmative defenses you have pled to
18 the allegations raised in this lawsuit."
19         And the response is part way down.
20 "Insofar as such persons were involved in the alleged
21 actionable conduct there is no coverage under any
22 closing service letters that may have been issued by
23 defendants. The extent of that involvement will be
24 discovered through the discovery process and this
25 response will be supplemented if necessary?"

3 (Pages 6 to 9)

Donna Sullivan

Page 10

1    Is there any additional information that
2  you can add to that response presently?
3    A.    I think in addition to the conduct of
4  Walsh under the closing service letters I think the
5  conduct of National Home Funding is also an issue
6  because Walsh couldn't receive any higher rights
7  under the closing service letter than National Home
8  Funding did. It's an assignor and if National Home
9  Funding was guilty of fraudulent conduct they
10 wouldn't be entitled to protection.
11    Q.    Are there specific exclusions for fraud
12 within the closing service letter?
13    A.    For fraud of the party for whom the
14 insurance is given?  I don't know that it's
15 specifically stated in the closing service letter.
16    Q.    The second paragraph states:
17 "Furthermore, the actions alleged to have been
18 engaged in by the parties are not covered under the
19 terms and conditions of the closing service letters,
20 which closing service letters show on their face that
21 they were not issued to plaintiff."
22    That first part of that sentence, the
23 actions alleged are not covered specifically.  What
24 actions alleged are not covered?
25    A.    I think -- again, I'm not sure the exact

Page 11

1  language in the Complaint, but I think what you're
2  alleging is the conduct of the attorneys in not
3  having legitimate bona fide purchasers of the
4  property, of inflating -- getting appraisals with
5  inflated values in this overall scheme such that
6  Walsh if it had to foreclose on its lien wouldn't
7  recover fully the debt.
8    Q.    The next paragraph states: "It is
9  further believed that Walsh Securities has suffered
10 no damages as a result of the alleged actionable
11 conduct," and then it continues on.  Is it still the
12 position of Fidelity that Walsh Securities has
13 suffered no damages?
14    A.    What is any of the "alleged actionable
15 conduct"?  I'm not sure what "actionable" means in
16 that sentence.  Well, I believe that Walsh may have
17 suffered some damages, but whether it's based on
18 their own conduct or conduct that's not covered by
19 the CSL or any policies -- I don't know if that was a
20 complete sentence, but I think -- again, I think
21 Walsh has probably suffered some loss, but it may
22 have been caused by their own conduct or conduct not
23 covered.
24    Q.    Has the company done any evaluation as
25 to what losses Walsh has suffered?

Page 12

1    A.    I think they're trying to, you know,
2  through the litigation itself identify what files
3  Walsh actually claims to have suffered a loss on.
4    Q.    At Interrogatory Number 17 on page six
5  it says: "Identify each and every meeting,
6  interaction or conversation you had with any other
7  defendant, provide a synopsis of said meeting,
8  interaction or conversation."
9    The response given is that this -- let
10 me just fast forward past the objection.  "Without
11 waiving any objections defendants had a meeting on
12 February 6, 1998 with Robert Agel of Coastal Title."
13    Is that the meeting to which you were
14 referring to yesterday?
15    A.    Yes.
16    Q.    Do you know whether or not those meeting
17 notes were produced?
18    A.    I don't know.  It sounds like from prior
19 conversations here at this table that they may have
20 been produced, assuming the attachment to whatever
21 letter you received was --
22    Q.    Were there any other meetings that
23 Fidelity had with Robert Agel that were recorded?
24    A.    I don't have -- I don't have
25 documentation of any other meetings or the content of

Page 13

1  meetings.
2    Q.    At number -- at Interrogatory Number 19
3  it says: "Identify each and every fact related to
4  the title insurance services you provided for the
5  real property closing involving mortgage loans
6  originated by defendant, National Home Funding, and
7  subsequently sold to Walsh Securities, including but
8  not limited to the identity of the codefendant which
9  selected or retained you as the title insurer for the
10 transaction."
11    In your response and the company's
12 response it states: "Without waiving any objection
13 defendants are unaware who selected defendants as the
14 title insurer."
15    Is that still Fidelity's position today?
16    A.    Can I have a moment to read it?  Well, I
17 think if I understand what is being said is that
18 other defendants selected Coastal Title as the title
19 agent and Coastal selected our company as the
20 underwriter.  I think that's true.
21    Q.    Okay.
22    (Fidelity-3, Disclosures, is received
23 and marked for identification.)
24    Q.    I've handed you what's been marked as
25 Fidelity-3, which is Defendants Fidelity's and

4  (Pages 10 to 13)

VERITEXT REPORTING COMPANY

Donna Sullivan

Page 14

1   Nations's Initial Disclosures pursuant to Rule
2   26(a)1, which is dated November 28, 2005 and signed
3   by -- I don't know if I should attempt that one --
4   Anthony Argiropoulos. Let me just spell it for you.
5   A-r-g-i-r-o-p-o-u-l-o-s.
6           (A discussion takes place off the
7   record).
8       Q.   On the second page it states:
9   "Individuals having discoverable information," and it
10  identifies three different individuals: Arnold
11  Bottalico, B-o-t-t-a-l-i-c-o, Maureen Crowley Unsinn,
12  U-n-s-i-n-n, and Kevin Cairns. Is there anybody else
13  that has discoverable information for Fidelity or
14  Nations apart from the individuals that you
15  identified in your deposition yesterday?
16          MR. KOTT: I object to the form.
17      A.   All right. Discoverable information.
18  That's a big --
19      Q.   Why don't we limit it to the individuals
20  within Fidelity or Nations.
21      A.   That dealt with the agent and retrieved
22  information with respect to the claim?
23      Q.   Apart from the individuals you
24  identified yesterday within the company, is there
25  anybody else who is not listed here who could be

Page 15

1   included on this list of individuals with
2   discoverable information?
3       A.   I don't know if that encompasses, you
4   know, claims center managers. You know what I mean?
5   I'm not sure how broad that gets. I don't know if
6   Ken Aran was on the list. He was a claims
7   administrator at one point. Debra Smith was the
8   claims center manager. So whether she had any
9   involvement, you know, in the claim or reports I
10  don't know.
11      Q.   How about specifically with regards to
12  claims investigations?
13      A.   I don't know what that encompasses.
14  People did search work for us on different
15  properties. I don't know if you're interested in the
16  names of title searchers.
17      Q.   Were they within Fidelity?
18      A.   No, they were independent. I don't have
19  all their names because they're different in
20  different counties. So I guess I'm having a hard
21  time --
22      Q.   We will exclude them. How about just
23  the folks that are with Fidelity.
24      A.   I think I've given you all the claims
25  administrators that I know that handled the files. I

Page 16

1   don't know. I don't know who else would fit within
2   that category.
3       Q.   Yesterday you had testified that Vincent
4   Sharkey is an, I guess, coequal to you. He is also a
5   major claims attorney?
6       A.   Well, probably he's senior in a way to
7   me but not in title and not in the same chain,
8   obviously. He's got more experience.
9       Q.   Not in ranking of the company hierarchy?
10      A.   I don't report to him. Right.
11      Q.   How long has he been with Fidelity?
12      A.   Again, I don't recall the exact year he
13  came. I know it's after 2005 and I think -- I don't
14  think it's more than five years so may have been
15  2006, 2007. I don't recall when he first started.
16  It was January but I can't remember what year.
17      Q.   And at one point was Fidelity -- did
18  Fidelity acquire Commonwealth?
19      A.   Again, it's -- the actual structure of
20  the acquisition I'm not sure, but Commonwealth became
21  an entity owned by one of our companies in December
22  of 2008.
23      Q.   Which company was that?
24      A.   I think I might have testified to this a
25  year ago and I don't know that I recall if --

Page 17

1       Q.   That's fine. Did -- is Mr. Sharkey also
2   handling the Commonwealth portion of the claims?
3       A.   Yes.
4       Q.   So he is -- he has all the files and
5   he's reviewed all the claims?
6       A.   He has all the files that are in our
7   possession, the company's possession, related to
8   these -- this litigation.
9       Q.   Specifically with regards to Fidelity
10  was a document hold ever issued by the company for
11  documents relating to this litigation?
12      A.   There's not a specific document hold
13  that I'm aware of but there are retention -- there's
14  a retention policy I think in 2004 that said any
15  matters in litigation you have to continue to hold
16  those documents, and as I said before for New Jersey
17  there's a 15-year statutory requirement to hold.
18      Q.   Did that retention policy specifically
19  identify this litigation?
20      A.   No.
21          (Fidelity-4, Letter dated July 28, 1997,
22  is received and marked for identification.)
23      Q.   I've handed you what's been marked
24  Fidelity-4, which is a letter dated July 28, 1997 to
25  Kevin Cairns, C-a-i-r-n-s, from Jeffrey Goodman at

5 (Pages 14 to 17)

Donna Sullivan

Page 18

1  Latham & Watkins. Do you recognize this letter?
2    A.   Yes.
3    Q.   On the third page -- fourth page there's
4  a schedule of properties specifically concerning this
5  litigation. Did you review any of these property
6  files or claims files?
7    A.   I looked at --
8    Q.   Go ahead.
9    A.   I looked at -- I think I had maybe nine
10  or ten Coastal files on the properties which I looked
11  at. I don't recall specifically which ones they were
12  but I just took a look to get a general...
13    Q.   Do you recall the names of those files,
14  like, individuals, borrowers on those files?
15    A.   Let me see. Maybe Juergensen but some
16  of these had multiple loans so I'm not sure
17  specifically. Might have been a Bustos-Lacy file in
18  there. I wasn't trying to memorize them so I just
19  took a look through them.
20    Q.   Right. I understand. When this letter
21  came in with these properties, who would this have
22  gone to aside from Kevin Cairns? How would Kevin
23  Cairns have dealt with this?
24    A.   Kevin would have contacted the claims
25  department I'm sure.

Page 19

1    Q.   Who was in charge of the claims
2  department?
3    A.   I don't know if he sent it directly. I
4  think Al Yorio. Again, this is what I have been
5  trying to investigate and I'm not sure of the exact
6  year but I think Al Yorio was the claims center
7  manager at that time, and so whether he went directly
8  to Al or contacted somebody else in the claims
9  department I don't know, but I think Maria Filippelli
10  responded to some of the --
11    Q.   And you were not able to determine
12  whether or not Al Yorio was the claims manager under
13  the claims made by Walsh?
14    A.   That was the best guess of the people
15  that I spoke to. I did see Al Yorio's -- that he was
16  copied on or sent certain things. I can't remember
17  if it was specifically in July of '97 when the claim
18  first came in or it could have been '98. So I'm not
19  sure specifically if he was there when the claim came
20  in.
21    Q.   And did Al Yorio have a Fidelity claims
22  manual by which to --
23    A.   I have been told that there was no
24  Fidelity claims manual used in this region at that
25  time.

Page 20

1    Q.   So apart from Mr. Yorio's background and
2  knowledge as to how to deal with claims when they
3  came into Fidelity, was there any procedure by which
4  he was required to follow -- that he was required to
5  follow by the company for estimating claims?
6    A.   I don't know if there was some other
7  source or guideline on claims handling such as was
8  used, you know, later, but I have to say that
9  investigation in any claims manual is a very kind of
10  loose description of what has to be done because the
11  claims -- the investigation varies tremendously from
12  one claim to another depending on the nature of the
13  claim.
14    Q.   Did you see any guidelines, not a claims
15  manual specifically, but did you see any guidelines
16  or policies dating back to 1997, 1998 for Fidelity?
17    A.   I don't have any type of guidelines
18  specifically within the claims department. I know
19  that in later years they used an outside claims guide
20  produced by an outside, you know, publisher, but I
21  don't know if it was used in 1997.
22    Q.   So you have no record of any kind of
23  manual, policy or guidelines from 1997 or 1998?
24    A.   No.
25    Q.   Did Fidelity ever conclude its

Page 21

1  investigation on the Walsh claims?
2    A.   Again, I think the investigation goes on
3  through discovery, and I think that continued through
4  the depositions and other means.
5    Q.   I am handing you what's been marked as
6  Nations-4, which is a letter from Miss Filippelli,
7  F-i-l-i-p-p-e-l-l-i, Vice President and Senior Claims
8  Counsel with Fidelity as the letterhead -- on a
9  Fidelity letterhead. It's dated August 11, 1997.
10  Down at the bottom there are two individuals that are
11  courtesy copied, Keith Weller and Albert Gibboni. Do
12  you know who those folks are?
13    A.   Yes. Keith Weller -- I mentioned
14  yesterday Keith Weller is regional underwriting -- or
15  now his title might be state underwriting counsel
16  for -- in Pennsylvania. Al Gibboni actually I
17  believe was -- may have been the state manager and
18  actually maybe a name that you're interested in. I
19  think he signed the agency agreement, if I recall
20  correctly, and I think -- I'm not sure what his role
21  was after they hired Kevin Cairns. He might have
22  been senior to Kevin Cairns.
23    Q.   Looking at the date, August 11, 1997,
24  are you able to tell whether or not this letter was
25  in response to the claims letter sent to Nations, the

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

59ad69d2-fad8-443e-ad57-85669d44d9cb

Donna Sullivan

Page 22

1    claims letter sent to Fidelity or a response on
2    behalf of both companies?
3        A.   My presumption would have been that it
4    was for Fidelity because it's on Fidelity letterhead,
5    but I'm not sure if there was a separate letter for
6    Nations.
7            (Fidelity-5, Memo dated August 12, 1997,
8    is received and marked for identification.)
9        Q.   I'm handing you what's been marked as
10   Fidelity-5. Up at the top -- I'm sorry. It says --
11   this has a Bates number of W-P00220. It's a
12   memorandum issued to "Agents and Approved Attorneys"
13   from William A. Liske, L-i-s-k-e, dated August 12,
14   1997. Who is William Liske?
15       A.   I think it's William Liska. I believe
16   that he is -- I believe he's an underwriting counsel
17   and I think he's up in Connecticut. Yeah. So I'm
18   not sure who his distribution would be to.
19       Q.   At the top it says: "To Agents and
20   Approved Attorneys." I believe you testified
21   yesterday that Fidelity did not have an approved or
22   unapproved attorney list.
23       A.   What I stated was what I discovered is
24   that they had two lists of names. There was an
25   internal memo saying:  Here we have two lists, you

Page 23

1    know, with names. We don't know what the source or
2    the reason for these names to be on this list. Does
3    anybody inside know why these people are on the list?
4    Because they didn't want to put out a list when they
5    didn't know the basis for attorneys' names being on
6    the list and I was told by Kevin -- not Kevin, Chris
7    Marra that they did not produce the list during the
8    time period, and I don't think they even produced a
9    list -- I think it was started in 2002 and he was
10   there through 2010. I'm not sure that Fidelity ever
11   put out a list the way the other company did although
12   they did send some individual memos with regard to
13   attorneys that they had encountered problems with or
14   that they were concerned about and that they
15   requested that if they had any deals with them that
16   the agents contact the state office.
17       Q.   Do you know whether or not this was sent
18   by Fidelity to Walsh Securities?
19       A.   This memo?
20       Q.   Yes.
21       A.   I doubt it.
22       Q.   Do you know if Walsh was given any
23   notice of this decision by Fidelity?
24       A.   One, I don't know the scope of this, I
25   don't know whether this was -- I don't know if Bill

Page 24

1    had a role at that point that would -- that he would
2    be distributing, you know, nationwide or whether this
3    was a distribution in Connecticut. I don't know what
4    his title was at that time.
5        Q.   Well, up at the top it says that he's
6    vice president and division --
7        A.   Division --
8        Q.   Division counsel.
9        A.   Well, maybe it was -- I'm not sure what
10   division so maybe -- I don't know what the source of
11   this. Maybe it covered this region.
12       Q.   And if I might read halfway down it
13   says: "Pending further investigation by our claims
14   department as to the extent of this apparent scam, no
15   binders, commitments or title insurance policies
16   should be issued to Walsh Securities, Inc. covering
17   property in any state without the prior approval of
18   Fidelity. Likewise, titles involving any of the
19   other parties mentioned in the article should be
20   scrutinized before issuing any commitments or
21   policies."
22           Why did Fidelity take two different
23   positions as to Walsh Securities than with the other
24   parties?
25           MR. HAYES: Let me raise two objections

Page 25

1    here. Number one as to the form of the question;
2    number two, I will not permit much more questioning
3    about this particular memorandum particularly since
4    the Court has ruled that Walsh has no ability to
5    bring a claim based on this memorandum and refusing
6    to allow you to amend your claim to include it. So
7    to the extent you're able to tie this into the claims
8    that are in the case I will permit some additional
9    limited questioning but not beyond that.
10           MR. KOTT: And I object to the form of
11   the question.
12           (A discussion takes place off the
13   record.)
14           MR. MEE: I think that this goes to the
15   issue of bad faith, which is still a claim within our
16   Complaint, to the extent that the title companies
17   treated Walsh any differently than they would in
18   normal practice and procedure. Also the proximity of
19   the date of this memorandum to the other
20   correspondence I think is indicative of just that.
21   So I mean unless there is a basis for a privilege,
22   then I think we can continue this questioning.
23           MR. HAYES: As I said I disagree with
24   your response. I will permit some limited questions
25   but I can tell you right now it's not going to go any

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

59ad69d2-fad8-443e-ad57-85669d44d9cb

Donna Sullivan

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  further because I don't need a privilege objection to
2  preclude you from asking questions about an issue
3  that the Court has already ruled is not in this case.
4  So let's see how far it goes.
5       MR. MEE: I disagree but let's see how
6  far it goes. I agree with that part.
7       (The last question is read by the court
8  reporter.)
9       A.   Let me see if I can understand your
10  question. Why were we taking a different position
11  with Walsh than who?
12       Q.   Well, as part of the paragraph that I
13  just read --
14       A.   I am not familiar with it.
15       Q.   Why don't you take a moment to read it
16  then.
17       MR. HAYES: Don't speculate in your
18  answer. You either know or you don't.
19       MR. MEE: Ed --
20       MR. HAYES: That's an instruction that
21  I'm permitted to have.
22       MR. MEE: Hang on. I gave that
23  instruction yesterday. That instruction still stands
24  today. I'll direct her now and then we can be done
25  with that. I am not asking her to speculate. I'm

**Page 27**

1  asking her if she has knowledge or if she has a
2  position of the company as a 30(b)6 witness.
3       MR. HAYES: I am reminding her not to
4  speculate.
5       MR. MEE: I would ask that you not
6  remind her anymore.
7       MR. HAYES: You can ask but I have the
8  right to do it.
9       MR. MEE: I don't think that you do.
10       MR. HAYES: We will disagree about that.
11       A.   Your question is: Are we treating --
12  did Fidelity or why did Fidelity treat Walsh
13  different than other defendants?
14       Q.   My question is --
15       MR. MEE: Why don't you read it again.
16       (The pending question is read by the
17  court reporter.)
18       A.   Okay. I don't know if they did, and if
19  they did I don't know why.
20       Q.   If you read that second paragraph,
21  again, it states that Fidelity will -- no longer
22  wants its agents to issue binders, commitments or
23  title insurance policies to Walsh.
24       A.   Without approval.
25       Q.   Without approval. That last sentence in

**Page 28**

1  the second paragraph states that the agent should
2  scrutinize before issuing any commitments or policies
3  if they were identified in the New Jersey articles.
4       A.   I don't know why there's a distinction.
5       Q.   Do you know whether or not Fidelity
6  issued any closing service letters or commitments on
7  behalf of the attorneys identified in the New Jersey
8  Asbury Park articles after this memorandum was
9  issued?
10       MR. KOTT: Objection to the form.
11       A.   I don't know.
12       Q.   Is there a way for you to determine
13  that?
14       A.   I don't think there's a way for me to
15  know what all the agents at various offices might
16  have issued definitively.
17       Q.   How about specifically with regards to
18  Coastal Title?
19       A.   I don't even know that I could
20  identify -- unless Coastal reported the CSLs we
21  wouldn't necessarily know who they issued them to,
22  and if they did report them, you know, I would have
23  to scan every -- I guess every letter that Coastal
24  ever issued to see who they were issued to.
25       Q.   Would Fidelity be able to determine

**Page 29**

1  whether or not any binders or commitments or
2  insurance policies were being issued to Walsh after
3  this memo?
4       A.   We didn't keep track of what commitments
5  are issued. The policy -- if there was a policy
6  issued to Walsh, I don't know if there's an
7  ability -- I think I had a problem searching by name
8  any system of Fidelity for that time. Certainly for
9  an earlier time period while Walsh was still in
10  existence probably.
11       Q.   Was Fidelity concerned about its
12  liability as to the Walsh claims when this memorandum
13  was issued?
14       A.   It appears that they were. I'm sorry.
15  Maybe you should repeat that question. I'm not sure
16  I heard it.
17       (The pending question is read by the
18  court reporter.)
19       A.   Obviously I guess they were concerned
20  with the alleged fraud scheme and what repercussions
21  it might have to the company.
22       Q.   Do you know whether or not Fidelity
23  issued any commitments, title policies, binders or
24  CSLs to National Home Funding after the issuance of
25  this memorandum?

8  (Pages 26 to 29)

Donna Sullivan

Page 30

1    A.   I don't.
2    Q.   Prior to issuing this memo had Fidelity
3  reviewed any of Walsh's files or looked for any of
4  the policies that it had issued or closing service
5  letters that it had issued to Walsh?
6    A.   I don't know.
7    Q.   Take a look back at Nations-4.  The date
8  on that letter is August 11 and it states: "We are
9  in the process of gathering all of the title files.
10 Please send us copies of all the lenders' files so
11 that we may properly investigate these claims."
12         With that letter in front of you and
13 with this memorandum dated one day later, are you
14 able to determine whether or not Fidelity had
15 reviewed any of Walsh's files or looked at any of the
16 policies or CSLs in the company's possession when
17 this memorandum was issued?
18    A.   I still can't tell whether they reviewed
19 any of them.  Obviously they were requesting or
20 trying to gather all the files I assume that were
21 listed on the claim letter.  Whether they reviewed
22 any individual ones prior to that I don't know.
23    Q.   Do you think that Fidelity was simply
24 relying on the articles in the Asbury Park Press when
25 it issued this memo?

Page 31

1    A.   I don't know.
2    Q.   Since 1997 has Fidelity ever issued any
3  other memorandum like this?
4    A.   I believe there was a memo from the
5  state office with respect to some of the parties
6  involved in the transactions and Walsh.
7    Q.   Besides Walsh.  I'm directing my
8  question more towards any other lenders.  Has the
9  company ever issued a memo like this regarding any
10 other lender besides Walsh since 1997?
11    A.   I'm sure they have.  I can't state
12 specifically a name of a lender, but I'm sure that
13 there have been other instances where a lender had
14 been put on a list.
15    Q.   Did you review any of those memos?
16    A.   No.
17    Q.   Who would you ask in order to find that
18 out?
19    A.   Again, it's become very difficult, one,
20 because I don't know that we have everything from the
21 Fidelity state office from them having moved from one
22 office to another, and I think I have what remains a
23 collection of what they do have.  I'm not sure that
24 there's any lenders in the few letters that I've
25 seen.  I've seen some attorneys I know but I'm not

Page 32

1  sure if I've seen any lenders on the limited number
2  of memos that I've seen.
3    Q.   So were there some -- do you think
4  there's some files missing from when the state office
5  closed or was relocated?
6    A.   I think it's possible that some of the
7  underwriting files or, you know, state office
8  operations that are -- I mean, not claim files or
9  files we're insuring property, but some of the files
10 kept by the state underwriting counsel, state
11 manager, I understand that some of those may have
12 been lost in one of the moves.
13    Q.   So --
14    A.   Or cleaning out.  I'm not sure.
15    Q.   Do you know whether or not any of the
16 Walsh claims files were cleaned out?
17    A.   I'm saying it was not a claims office
18 and it was not obviously Coastal's office, so it
19 would not have impacted the claims files or the
20 Coastal's underwriting file.
21    Q.   So sitting here today you're not aware
22 of any other memo -- most specifically you're not
23 aware specifically of any other memos from the
24 company directed at lenders in New Jersey informing
25 agents to no longer issue binders or commitments or

Page 33

1  title insurance policies to those lenders?
2         MR. HAYES:  Objection to the form.
3  That's not what the memo says.  You can answer.
4    A.   I am not aware of any other memos
5  specifically barring agents or suggesting that they
6  can't insure unless they have home office approval.
7  That again I haven't searched current underwriting,
8  but I am not aware of anything from my investigation
9  of this file or that time period.
10    Q.   Okay.
11         (Fidelity-6, Letter dated September 5,
12 1997, is received and marked for identification.)
13    Q.   You have been handed what's been marked
14 as Fidelity-6.  It's a letter dated September 5, 1997
15 from Fred Schlesinger at Walsh Securities to Maria
16 Filippelli.  Did you review this letter in advance of
17 your testimony here today?
18    A.   I have seen it, yes.
19    Q.   Do you know if in September of 1997 if
20 Miss Filippelli was in charge of the Walsh claims
21 investigation?
22    A.   I don't know.  I've seen her name on a
23 few of these letters, but it appeared to me that
24 there was another claims administrator working on the
25 files.

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

59ad69d2-fad8-443e-ad57-85669d44d9cb

Donna Sullivan

Page 34

1    Q.    Did you ever see any correspondence from
2  Fidelity to Walsh indicating to whom they should be
3  directing their correspondence?
4    A.    I don't recall.
5    Q.    Do you know if there was -- if you take
6  a look at the second page, there's a list of 75
7  loans.  Do you know if Fidelity conducted any
8  subsequent investigation after receiving this letter
9  particularly with regards to the loans identified
10 here?
11    A.    I mean, I can't recognize the loans
12 identified here by these numbers but certainly
13 Fidelity had done -- again, can you repeat that
14 question?
15         (The pending question is read by the
16 court reporter.)
17    A.    Well, I am sure they began, you know, an
18 investigation of the claim and looking through these
19 files.
20    Q.    Who would have done that?
21    A.    I think it was Todd Pajonas.
22    Q.    Did you talk to Mr. Pajonas about the --
23    A.    I did not.
24    Q.    On the front page as part of the letter
25 it states that -- from Mr. Schlesinger: "I am

Page 35

1  enclosing copies of a total of 75 mortgage loan
2  files."
3         Would Fidelity have been able to
4  determine from those loan files whether or not
5  policies and closing service letters were issued by
6  the company?
7    A.    I'm not sure that those loan files all
8  include closing service letters and policies.
9    Q.    Do you know how many did?
10   A.    I don't.
11    Q.    Was there ever an accounting as to how
12 many of these enclosed -- had with them closing
13 service letters or policies?
14   A.    I believe that we may have list now --
15 specific to these files on this chart?  I mean, I
16 can't say with respect to these exact files, but I
17 think we have identified closing service letters that
18 have been provided that can be matched up to a file.
19 I'm not sure that encompasses all of them.
20   Q.    So in 1997 or 1998 did anybody put
21 together a list that identified closing service
22 letters or policies issued with regards to these 75
23 loans?
24   A.    I don't recall -- from looking through
25 it I don't recall if there was a list that had that

Page 36

1  information on it.
2    Q.    I don't mean to belabor it, but you
3  don't recall whether or not you saw something or arc
4  you telling me that there's no such list?
5    A.    I don't recall seeing a list.  There are
6  a lot of lists in all these files.  I am not always
7  sure who the source of them was, you know, what the
8  year was, when they were done, that type of thing.
9  And if we get a claim naturally we try to look for
10 the documents that are the basis of the claim.  So a
11 natural investigation would be to look for the
12 closing service letter or the policy or commitment
13 and closing service letter.
14    Q.    Okay.
15         (Fidelity-7, Letter dated April 20,
16 1999, is received and marked for identification.)
17    Q.    You have been handed what's been marked
18 Fidelity-7.  It's a letter dated April 20, 1999 from
19 Stephen Innamorato at Equity Rewards, which I believe
20 was the subsequent company to Walsh Securities, I
21 think there was a name change, to Mr. Bottalico.  In
22 the second paragraph down it states: "It is my
23 understanding that representatives at Fidelity
24 National Title Insurance Company of New York
25 previously obtained from Latham & Watkins copies of

Page 37

1  the approximately 400 loan files originated by
2  National Home Funding.
3         Do you know who was reviewing those 400
4  loan files back in 1999?
5    A.    I was not aware they received 400 files
6  but I don't know, maybe they did.  Who was reviewing
7  the files that were received in -- I'm sorry, in
8  1999?
9    Q.    Yes.
10   A.    By 1999 the claim had been transferred
11 to Arnold Bottalico, so I assume that he was handling
12 the claim and doing whatever investigation was being
13 done at that point.
14   Q.    On the next page it states: "Please
15 also be advised that upon further review it appears
16 that title to the properties for both of the subject
17 loans is not presently in the names of the
18 borrowers."
19         The subject loans I think that are
20 referred to are the ones that are at the top of the
21 letter.  I ask that you just read the rest of that
22 paragraph.  It's a bit long.
23   A.    Okay.
24   Q.    Do you know if there was an
25 investigation conducted as to whether or not title in

10  (Pages 34 to 37)

Donna Sullivan

| Page 38 |
|---|

1  these two properties was in the borrower's name?
2      A.    I don't recall specifically this
3  property, but I believe that they would have reviewed
4  any files where there was an allegation that the
5  documents were not recorded.
6          MR. MEE:  Can you read back that last
7  part?
8          (The last answer is read by the court
9  reporter.)
10         (Fidelity-8, Letter dated August 26,
11  1999, is received and marked for identification.)
12     Q.    You have been handed what's been marked
13  as Fidelity-8.  It's a letter dated August 26, 1999
14  from Mr. Magnanini at Latham & Watkins to Mr.
15  Bottalico.  Down at the bottom of the first paragraph
16  it states: "As you can see a total of 75 files were
17  sent to your office on property which title insurance
18  was issued by Fidelity National Title Insurance.  31
19  complete files were sent to Nations Title Insurance
20  for properties against which it issued title
21  insurance.  Therefore, it appears that your office
22  has already received all of the relevant files
23  concerning the various title claims made by Walsh
24  Securities almost two years ago."
25         What additional files was Fidelity

| Page 39 |
|---|

1  seeking two years after Walsh made its claim?
2      A.    Well, I think some of these claims were
3  still coming in a year, a year and a half after the
4  original claims came in.  I don't think the claims
5  with regard to the unrecorded documents were all
6  made, you know, at the time of the first claims.  So
7  I don't know if Arnold knew he had the claims for --
8  that corresponded or the loan files that corresponded
9  with the newer claims that were coming in.
10         So, again, I don't know for sure, he may
11  have been asking for those files at that date because
12  a year and a half later he was receiving new claim
13  letters and without enclosures so I'm not sure if he
14  knew that he had all the files for those
15  transactions.
16     Q.    What other files would the -- apart from
17  the loan files, what other files would Fidelity have
18  needed in order to determine whether or not Walsh's
19  claims were valid?
20         MR. HAYES:  Which claims at this point
21  are you talking about, Mr. Mee?
22         MR. MEE:  As of the date of this letter.
23         MR. HAYES:  Do you want to show the
24  witness the August 19, 1999 letter that this is in
25  response so she can see what claims are being talked

| Page 40 |
|---|

1  about?
2          MR. MEE:  You know what, I guess we
3  don't have it.
4          MR. HAYES:  Then I object to the form of
5  the question.  You can answer it if you can.
6          (The pending question is read by the
7  court reporter.)
8      A.    Certainly they needed the loan files.
9  They also needed or they would have wanted to see
10  Coastal's files, and maybe they had those already,
11  and they wouldn't have been asking Walsh for them.
12  As far as they might have needed other documentation,
13  I don't know that they were looking for other files.
14     Q.    What other documentation?
15     A.    Well, I think there was a lot of
16  confusion at this point.  They were getting separate
17  claim letters from Walsh and Bankers Trust, and
18  during this time period I don't think that he
19  actually knew who was the holder of the indebtedness,
20  who was making the claim and who had, you know, the
21  apparent standing to make the claim.
22     Q.    Could Fidelity have evaluated the claim
23  regardless of who was entitled to the coverage by
24  this point?  Could Fidelity have evaluated the bona
25  fides of the claim?

| Page 41 |
|---|

1          MR. HAYES:  Object to the form.  You can
2  answer it.
3          MR. KOTT:  I also object to the form.
4      A.    I mean, obviously they could look to see
5  if there was a title defect.  They couldn't assess
6  whether there was coverage for the title defect, but
7  they could have assessed whether there's a problem in
8  unrecorded documents.
9      Q.    Are you saying that they could have
10  assessed whether there were unrecorded documents?
11  Would that have triggered coverage?
12     A.    No.
13     Q.    So my question is:  At this point
14  assuming that these loan files were sent what other
15  documents were necessary to determine whether or not
16  coverage was triggered?
17         MR. HAYES:  Objection.  Asked and
18  answered.  You can answer it.
19     A.    Well, obviously they needed to see
20  assignments, who actually was the holder of the
21  indebtedness.
22     Q.    Isn't that a determination as to who
23  ultimately gets the coverage?
24     A.    And, of course, there were still the
25  overall fraud and whether or not that would preclude

11  (Pages 38 to 41)

Donna Sullivan

Page 42

1   anybody from recovering.
2       Q.   But simply from a coverage standpoint,
3   whether or not coverage was triggered by the closing
4   service letter or the policy, apart from who was
5   entitled to the coverage, would they -- would
6   Fidelity have been able to determine whether or not
7   coverage was triggered by having these files?
8           MR. HAYES: Object to the form. Asked
9   and answered.
10      Q.   You can answer.
11      A.   Again, you can't separate whether
12  there's coverage for a claim if you can't identify
13  whether an exclusion or some other type of defense
14  under the contract that was issued by the company is
15  triggered and fraud obviously would be a defense. If
16  you're asking me is it -- does the failure to record
17  a document of an interest that's to be insured
18  typically a matter that might be covered by a
19  contract, you know, it may be covered under the
20  closing service letter assuming there are no defenses
21  to it, but you can't say there's coverage if you
22  haven't fully investigated the parties that are
23  making the claim.
24      Q.   Aside from the -- strike that. Okay.
25          (Fidelity-9, Letter dated November 22,

Page 43

1   2005, is received and marked for identification.)
2       Q.   You have in front of you what's marked
3   as Fidelity-9. It's the November 22, 2005 letter
4   from Mr. Argiropoulos to Mr. Magnanini enclosing an
5   index or a schedule, I should say, of documents
6   produced by Fidelity and Nations. Do you know
7   whether or not Fidelity is in possession of any other
8   documents that aren't reflected in this schedule that
9   should be -- that should have been produced as part
10  of this litigation?
11      A.   I don't know.
12      Q.   You can put that one aside. I believe
13  you testified that -- you had testified yesterday
14  that for Nations you were able to determine certain
15  payments, certain premium payments and certain fees
16  received for closing service letters and policies
17  with regards to the properties here. Were you able
18  to locate or determine whether or not any fees or
19  premiums were paid for Fidelity properties --
20  sorry -- on Fidelity policies?
21      A.   I did the search or the search that I
22  requested for remittance was done on a chart that
23  included both Nations and Fidelity. So some of the
24  response -- I think I got about 20 responses with
25  respect to remittances, and some of those were on

Page 44

1   Fidelity.
2       Q.   Thanks. I remember that. At any point
3   did Fidelity end its investigation of Walsh's claims?
4           MR. KOTT: I didn't hear the question.
5   Could you read it back?
6           (The pending question is read by the
7   court reporter.)
8       A.   I guess to some extent that goes on
9   today in the context of the litigation, discovery.
10      Q.   There was -- at one point in time there
11  was a stay of this case because there were -- of the
12  civil case during the pendency of the criminal
13  investigation and trials and whatnot. Did Fidelity
14  continue its investigation of Walsh's claims
15  throughout that stay?
16      A.   Obviously they would have been limited
17  by the stay but whether they -- they may have done
18  some title searches or something during that period.
19      Q.   Anything else besides title searches?
20      A.   I don't know.
21      Q.   Have you seen any documents that would
22  suggest that there were -- there was continuing
23  investigation by Fidelity during that period?
24      A.   I don't recall. I forgot what years
25  those were that the stay was.

Page 45

1       Q.   I think it was 2001 to 2005.
2           MR. WAGNER: It was around that. We
3   would have to check.
4       A.   I think there was some search work being
5   done. I don't know what else was being done at that
6   point.
7       Q.   Now, I know you had testified that there
8   was no claims manual at the time. There may or may
9   not have been some guidelines. Was it Fidelity's
10  policy to advise the insured whether or not the --
11  its investigation was continuing or whether or not it
12  had ceased at any point?
13          MR. KOTT: I object to the form.
14      A.   Was it their policy? I guess I can't
15  express what their policy was at the time.
16      Q.   Because you don't know what their policy
17  was?
18      A.   I don't know what their policy was. I'm
19  assuming if a matter is in litigation there's no real
20  need to advise with respect to the litigation.
21      Q.   How about today, if -- is there any
22  policy by the company, whether it's in a manual or
23  guidelines or memorandum, what have you, is there any
24  kind of policy as to whether or not to keep the
25  insured advised of the company's investigation?

12  (Pages 42 to 45)

Donna Sullivan

Page 46

1    A.   I think there may be something about
2  keeping them advised as to the investigation.
3    Q.   Such as what?
4    A.   If you get a claim in, for instance, you
5  have a certain amount of time that they suggest you
6  acknowledge the claim and if you -- I think there may
7  be -- different states have regulations on keeping
8  the insured current, so it may vary depending on the
9  state you're in.
10    Q.   Outside --
11    A.   I don't know if there are specific
12  timelines that are set by the claims department for
13  doing that.
14    Q.   At any point in time did Fidelity set a
15  reserve on Walsh's claims?
16    A.   I believe reserves were set at one time,
17  yes.
18    Q.   When were those reserves set?
19    A.   I don't recall what year they were set.
20    Q.   Were there multiple reserves?
21    A.   At one time I believe there were
22  multiple reserves, but I believe they have been --
23  the files have been consolidated to one main file.
24    Q.   When there were multiple reserves how
25  many reserves were there?

Page 47

1    A.   I'm -- it's a guess.  I am not supposed
2  to guess.
3    Q.   Well, more than one obviously?
4    A.   Not for each individual transaction.  I
5  don't think it would have been more than eight files
6  that were originally set up for groups of underlying
7  files.
8    Q.   So potentially eight separate reserves?
9    A.   It may have been.
10    Q.   What was the purpose of setting the
11  reserve?
12    A.   I don't know the purpose of it.
13    Q.   Is it -- I mean, is it corporate policy?
14  Is it something they do -- that the company does for
15  every claim that comes in?
16    A.   Well, you would make I guess a risk
17  assessment and might reserve for that, or you might
18  reserve because you have mediation coming forward and
19  you want to reserve the amount that you think you
20  might be willing to offer at that mediation.  I think
21  it's varied from company to company and over time,
22  the rules on that.
23    Q.   Is there a distinction between major
24  claims and minor claims as to whether or not to set a
25  reserve?

Page 48

1    A.   No.
2    Q.   So there are reserves set for minor
3  claims as well?
4    A.   Sure.
5    Q.   Who at the company is part of the
6  decision-making process for setting a reserve?
7    A.   Well, usually the claims administrator.
8    Q.   Which is who in this case?
9    A.   Today it's Vincent Sharkey.
10    Q.   And --
11    A.   I'm sorry.  It would be the claims
12  administrator and usually the claims administrator
13  only has a certain amount of authority, so if it's
14  above that you would usually have to do that in
15  consultation with somebody higher up.
16    Q.   And who would that be higher up?
17    A.   In this case I think Vince would have to
18  get approval from probably -- well, I mean if it's
19  within his authority he can do it himself obviously.
20  If it was higher up he would probably next to
21  David Eizenman.
22    Q.   Do you know whether or not this was
23  within Mr. Sharkey's approval range or did he have to
24  go to Eizenman?
25    A.   I don't think that Vincent set the

Page 49

1  present reserves but --
2    MR. HAYES:   I don't want you to discuss
3  the amount of his authority.
4    THE WITNESS:   Okay.
5    A.   But --
6    MR. MEE:   First of all, that is an
7  improper direction to the client.  I am not asking
8  her for the amount.  I had not even actually planned
9  on asking that question but it's a great question.
10  Maybe I should.  Anyway, but it's an improper
11  objection.  The fact of whether or not Mr. Sharkey
12  has a certain range of authority is a mere fact.
13  There's nothing at all privileged about that number.
14    MR. HAYES:   Mr. Mee, if you're not
15  entitled to know the amount, and we believe that the
16  Court will ultimately rule in this case, you're not
17  going to get it in the back door by asking whether or
18  not the amount that was set in this case was outside
19  of Mr. Sharkey's authority.  So I made a perfectly
20  legitimate statement to my client not to mistakenly
21  blurt out the amount of Mr. Sharkey's authority
22  because it ties into what we said yesterday.  If
23  ultimately Judge Shipp rules you're entitled to it,
24  you're entitled to it, but you're not going to get it
25  indirectly today.

13 (Pages 46 to 49)

Donna Sullivan

Page 50

1     MR. MEE: It's absolutely incorrect, I
2  think you know that as well as Mr. Kott and I think
3  that it's not a back door way of getting the answer.
4  Whether or not it may indicate what the range of that
5  ultimate reserve is, that's reading tea leaves but
6  the fact of whether or not someone has authority to
7  set a specific number is quite different than the
8  number that it was set at.  So --
9     MR. HAYES: For the third time today we
10 will agree to disagree, but the same instruction has
11 been given to the client.
12    MR. KOTT: Since Mr. Mee dragged me into
13 this fight, I agree with Mr. Hayes.  I didn't want my
14 silence to be construed as agreeing with Mr. Mee.
15    MR. MEE: I assumed that you didn't.
16    Q.   Do you know who set the reserve for
17 Walsh's claims?
18    A.   I don't recall.
19    Q.   Prior to Mr. Sharkey who held his
20 position?
21    A.   As claims administrator, Ken Aran,
22 A-r-a-n.
23    Q.   And do you know whether or not Mr. Aran
24 set the reserve at issue in this case?
25    A.   I don't believe so.

Page 51

1     Q.   Who was Mr. Aran's superior?
2     A.   Of course that was a different time and
3  a different structure in the company at that point.
4  Eizenman wasn't an employee.  So I would think that
5  Ken reported to Gary Urquhart.
6     Q.   Do you know if he set the reserve in
7  this case?
8     A.   Ken?
9     Q.   Either Mr. Aran or Mr. Urquhart.
10    A.   I believe it was set before their time.
11    Q.   Prior to Mr. Urquhart who held that
12 position?
13    A.   Well, it's not holding the same position
14 exactly, but the claims administrator was Arnold
15 Bottalico.
16    Q.   Do you know whether Mr. Bottalico set
17 the claims reserve?
18    A.   He may have.
19    Q.   Has the claims --
20    A.   I'm not sure of the exact year but it
21 might have been during his...
22    Q.   What year would that have been?
23    A.   That Arnold handled the claim?
24    Q.   No, that Mr. Bottalico was there.
25    A.   Well, I believe Ken took over the file

Page 52

1  in 2005.  I know he started with the company in 2005
2  and I think he took over the claim maybe in December
3  of '05, so assuming it was before that point.
4     Q.   And who was Mr. Bottalico's superior?
5     A.   I believe the claims center manager,
6  Debra Smith, and --
7     Q.   Do you know whether or not she set the
8  reserve in this case?
9     A.   I think the claims administrator would
10 have done it.  Whether he would have gotten authority
11 from her I don't know.
12    Q.   Do you know whether or not the claims
13 reserve has ever changed throughout this litigation?
14    A.   Yes.
15    Q.   Do you know whether or not it's
16 increased or decreased?
17    A.   Yes.
18    Q.   Has it increased?
19    A.   No.
20    Q.   Has it decreased?
21    A.   Yes.
22    Q.   Aside from the -- Mr. Bottalico, Mr.
23 Sharkey's position, I know they've changed so I can't
24 reference their title, but claims administrator, I
25 think you said, who else -- aside from counsel, who

Page 53

1  else would have been involved in that -- in the
2  decision to set the reserve?
3     A.   You know what, I guess I'm going to have
4  to change because I threw Debra Smith's name in there
5  and she was a claims center manager but only from
6  2002 going forward, so it could have been reserved
7  even prior to her being the claims center manager.
8  And prior to her I think Gary Urquhart was the claims
9  center manager for two years.  It could have been
10 done during his time frame.  Before that I'm not sure
11 if it was Al Yorio or if there was somebody else in
12 between.  But I think it probably would have been
13 done at that level of authority.  I don't think it
14 would have gone higher than that at that point.
15    Q.   If the reserve changed over a period of
16 time would that have dictated whether or not the case
17 was handled by the major claims division?
18    A.   No.  Are you saying -- is that a
19 hypothetical?
20    Q.   No.  My question is: If, let's say, the
21 reserve is set below a certain amount, does that
22 dictate whether or not it's handled by major claims?
23    A.   No.  Once it's in major claims I
24 think -- usually it will stay there.  I don't know if
25 there's any set policy but...

14  (Pages 50 to 53)

Donna Sullivan

Page 54

1    Q.    Would an attorney have been involved in
2  setting the reserve or just the decision by -- or is
3  it just the decision by the claims administrator?
4         MR. HAYES: Object to the form in that
5  it implies the claims administrator is not an
6  attorney.
7    A.    The claims administrators are attorneys.
8    Q.    I guess the question is: Would outside
9  counsel have been involved in setting the reserve or
10  is that decision made inhouse?
11        MR. KOTT: I object based on
12  attorney/client privilege.
13        MR. HAYES: Same objection. Don't
14  answer the question.
15        MR. MEE: Wait. You're instructing --
16  why don't we -- I don't know, maybe the question is
17  unclear.
18        MR. HAYES: You're asking whether or not
19  an outside attorney was involved in the reserve
20  decision. You're not entitled to know that
21  information because that's a privileged communication
22  between the client and the attorney, the outside
23  attorney. You now know that it was set internally by
24  claims administrators who were attorneys. You're not
25  entitled to know that the outside attorney

Page 55

1  participated in that process.
2         MS. WAGNER: One of the things that
3  Judge Shipp specifically asked us to let him know,
4  and maybe you're going to file a motion to seal and
5  submit something under seal to him about this --
6         MR. KOTT: I had not thought about that.
7  That may be a good idea.
8         MS. WAGNER: Whether or not an attorney
9  set the reserve or whether it was a corporate
10  official. So we're trying to tease out exactly who
11  was involved.
12        MR. HAYES: You already know that an
13  attorney was involved in setting the reserve.
14  Corporate official in the case law means a corporate
15  official who is not an attorney. The reserves in
16  this case were set by attorneys and that's what this
17  witness has just testified to. Whether or not
18  outside counsel was also involved in the setting of
19  the reserve we don't think has anything to do with
20  the issue.
21        MS. WAGNER: So it's an attorney
22  admitted in New Jersey that set these reserves?
23        MR. HAYES: I don't know where they're
24  admitted but they're attorneys.
25        MS. WAGNER: Acting in the scope of

Page 56

1  their job as an attorney? Were they inhouse counsel?
2         MR. HAYES: They're attorneys who are
3  administering claims for the company, not as outside
4  counsel, as employees of the company.
5         MR. MEE: I think she asked whether or
6  not they're inhouse counsel. Whether or not they
7  are -- if they provide a role within the company as
8  counsel to the company or whether or not their role
9  is specifically in adjusting claims.
10        MR. HAYES: I think they do both. They
11  provide advice and counsel to the company in the way
12  in which they administer the claims.
13    Q.    Getting back to the questioning. Apart
14  from being a claims adjuster what other roles did Mr.
15  Bottalico provide? What other roles did he play
16  within the company?
17    A.    Well, I think that was his primary role
18  to review and investigate claims, to make a decision
19  whether to settle them, pay them.
20    Q.    Was he within the office of general
21  counsel within the company?
22    A.    He's with -- he was within the claims
23  department.
24    Q.    Is that separate than general counsel's
25  department?

Page 57

1    A.    The claims center manager reports to
2  general counsel, but I don't know if it's considered
3  part of that department.
4    Q.    Who else do they report to, the claims
5  center manager?
6    A.    She reported -- at least during my
7  tenure here she's reported directly to the general
8  counsel for the title group.
9    Q.    Do you know whether or not the company
10  was following its normal course of business in
11  determining whether or not to set a reserve or --
12  when it set the reserve?
13    A.    Yeah, I guess you can characterize that
14  they were analyzing the claim, and I assume for
15  whatever reason they believed that that would be a
16  reserve that should be set for that file. I don't
17  know the actual basis, but we shouldn't be setting
18  reserves randomly so it should have been his
19  assessment.
20        (Fidelity-10, Form 10-K, is received and
21  marked for identification.)
22    Q.    I'm handing you what's marked as
23  Fidelity-10. It is the form 10-K annual report to
24  the U.S. Securities and Exchange Commission for the
25  fiscal year ending December 31, 2010. Is it the

15 (Pages 54 to 57)

Donna Sullivan

Page 58

1  company's policy to report in its annual filings
2  major litigation that's going on with the company?
3      A.   I am not familiar with the reports.
4      Q.   Do you know whether or not the Walsh
5  Securities claims are identified as litigation in
6  the -- in Fidelity's Form 10-K?
7          MR. KOTT:  Excuse me, Miss Sullivan,
8  before you answer just give us a break first.
9          MR. HAYES:  Can you point out, Mr. Mee,
10  where this is within the scope of your 30(b)6 notice?
11          MR. MEE:  If we can go off the record
12  for a second.
13          (A discussion takes place off the
14  record).
15          MR. MEE:  Let's go back on the record.
16  Mr. Hayes asked where within the notice, the 30(b)6
17  notice, was this line of questioning, this topic of
18  questioning identified.  I think there are several
19  parts.  Number three, number 18, number 21, 22, 26,
20  28, 30.
21          MR. HAYES:  Can you point out to me
22  where in any of those there's any reference to the
23  company's policy with respect to the reporting of
24  claims in its 10-K?  Three has to do with its
25  organizational structure.  That's not the question

Page 59

1  you asked.
2          MR. MEE:  You know what, let's cut this
3  short.  I'm going to withdraw that question and I'll
4  ask another one.
5      Q.   Do you know whether or not Walsh
6  Securities is identified in this 10-K filing?
7      A.   I don't.
8      Q.   If you go to page -- it's 39 up at the
9  top right-hand corner here and down at the bottom it
10  starts with item number three, "Legal Proceedings,"
11  continues on to the next page, which is page 40.
12  It's also identified as page 18.  Can you just
13  quickly review or take your time and review, read
14  that portion underneath "Legal Proceedings."
15          MR. KOTT:  Off the record.
16          (A discussion takes place off the
17  record).
18      Q.   I think it actually continues on to page
19  41 as well.  You might want to look at page 41, it
20  continues on there.  Has the corporate secretary or
21  corporate counsel ever directed questions to you
22  about the company's filings?
23          MR. KOTT:  Object to the question.
24  Attorney/client privilege.
25      Q.   Are you involved in any -- give me a

Page 60

1  moment.
2          (A recess takes place.)
3      Q.   We're back on the record.  I can't
4  remember if a question was pending.  Have you had an
5  opportunity to read through the "Legal Proceedings"
6  portion?
7      A.   I looked at pages 39 to 41.
8      Q.   Do you see Walsh Securities identified?
9      A.   I don't.
10      Q.   Generally speaking, procedurally
11  speaking, are the claims adjusters -- do the claims
12  adjusters keep the company advised as to litigation
13  that's going on, to advise the company the reserve
14  amount or settlement amount so that the company is
15  able to determine whether or not that should be
16  incorporated within its SEC filings?
17          MR. HAYES:  Object to the form of the
18  question as it implies that any of the things you
19  mentioned are the basis upon which an item is
20  included in the filing.  You can answer it, Miss
21  Sullivan.
22      A.   The company has access to its own
23  reserve information in home office, and home office
24  does contact the claims administrators on a regular
25  basis to make inquiries if there are things that

Page 61

1  would have to be reported.
2      Q.   Apart from -- well, including or apart
3  from this litigation have you ever been asked to give
4  them any information regarding -- or would you or,
5  let's say, Mr. Sharkey ever be asked to give
6  information with regards to corporate filings?
7      A.   Again, we're given -- we receive e-mails
8  from home office which set forth certain parameters
9  that if a claim falls within them we should advise
10  them of that fact.
11      Q.   What parameters are those?
12      A.   I don't have those memorized, but
13  something that's in the nature that would be reported
14  for filing.
15      Q.   Could you give me an example of some of
16  those parameters?
17      A.   I think they probably have a dollar
18  figure amount that it exceeds.  I'm not sure what
19  else offhand.
20      Q.   So based on the document, on the 10-K,
21  was it the company's determination that the Walsh
22  Securities case does not fit within those parameters?
23          MR. KOTT:  Object to the form.
24      A.   That would be an assumption on my part.
25  I am not aware of the decision.

16 (Pages 58 to 61)

Donna Sullivan

Page 62

1    Q.   Do you know whether or not Walsh
2  Securities fits within those parameters?
3    A.   I don't recall all the parameters
4  offhand so I can't say.
5    Q.   Who would be the individual that
6  would --
7    A.   Although my expectation is that our
8  dollar assessment of the claim may not exceed the
9  limit.
10   Q.   Who would be the individual who would
11 determine whether or not this litigation fell within
12 those parameters?
13   A.   Well, I think the claims administrator
14 would have to report it, and certainly home office
15 would make the final decision as to whether it's
16 reported.
17   Q.   At one point earlier you testified that
18 the claims reserve had changed.  When was the last
19 time that it changed?
20   A.   I don't recall.
21   Q.   Do you recall whether or not it's been
22 since -- it's changed since 2005?
23   A.   I don't believe the loss reserve has,
24 but I couldn't state positively, but I don't believe
25 the loss reserve has changed.

Page 63

1    Q.   When I was asking my question earlier I
2  didn't -- I guess I should have separated the two.
3  Has the loss reserve ever changed?
4    A.   Yes.
5    Q.   When was the most recent time that the
6  loss reserve changed?
7    A.   Again, that's what I was really
8  referring to in your earlier question.  I think it
9  was before Ken Aran handled the file, which was -- he
10 start handling it I believe in December '05.
11   Q.   Do you know if it changed between 1999
12 and/or 2000 and '05?
13   A.   I can't recall.
14   Q.   Do you know if it changed between 1997
15 and 2000?
16   A.   I don't remember the time frame.
17       MR. MEE:   Off the record.
18       (A discussion takes place off the
19 record).
20   Q.   I had asked you yesterday whether or not
21 Fidelity has insurance coverage over the claims at
22 issue in this case and you had indicated that you did
23 -- that Fidelity did or Nations.  Just to be clear is
24 there separate coverage for the Fidelity claims?
25   A.   I'm not sure what the merger did.  I'm

Page 64

1  assuming that probably didn't change anything but
2  there were separate policies for the separate
3  companies.
4    Q.   And you didn't recall yesterday who the
5  carrier was.  Do you recall today?
6    A.   No.
7    Q.   Okay.  How about:  Do you know whether
8  or not the attorneys' fees have been paid by the
9  carrier in this case?
10   A.   I don't believe they have paid anything.
11   Q.   Have you reviewed a copy of the notice
12 letter to the carrier?
13   A.   I can't say that I didn't look at it.  I
14 don't recall specifically.
15       MR. MEE:   We will make a request for
16 that if we didn't yesterday.
17   Q.   Yesterday we briefly had gone over
18 whether or not there was somebody in like a Nancy
19 Koch position who went and looked at Bob Agel's
20 documents, and I had mentioned that she had been
21 concerned about the appearance of the documents and
22 her testimony was -- actually I'll quote:  "My
23 conclusion was I didn't like the way the files
24 looked.  I did not have enough time to really -- you
25 know, in that day to really get my mind completely

Page 65

1  wrapped around it, but I knew that it -- the files
2  did not look good."
3       And I was wondering if in -- if you had
4  seen any notations like that as part of Fidelity's
5  investigation of Coastal's files.
6    A.   Did I see -- I didn't see any notes of
7  parties from the state office with respect to what
8  they saw in Bob's files, and I think they actually
9  met with Bob with the claims administrator, which was
10 different than the Commonwealth situation, so whereas
11 Todd Pajonas wrote down some notes, I haven't seen
12 anything from Kevin Cairns to Maureen Crowley who
13 were there.
14   Q.   Anything with regards to the appearance
15 of the files?
16   A.   I don't recall verbatim what the note
17 said.  I know that they asked Bob some questions and
18 Bob gave some information, some different facts about
19 the transactions, but I don't recall if there was any
20 like conclusion:  Oh, this looks bad.  I'm not sure
21 that anything like that was on that.
22   Q.   Who was the point person at Fidelity for
23 the Coastal relationship?
24   A.   Again, I think Kevin -- I think Kevin
25 Cairns was state manager or state counsel.  I think

17  (Pages 62 to 65)

VERITEXT REPORTING COMPANY

Donna Sullivan

Page 66

1   Maureen Crowley was an agency representative. I'm
2   not sure if Al Gibboni was also the more senior
3   person that might have been involved. He did seem to
4   sign this the agency agreement. I don't see his
5   name in much though.
6       Q.    If Mr. Agel had a question about whether
7   or not to issue a closing service letter or policy or
8   a commitment on behalf of Fidelity, who would he have
9   called?
10      A.    I assume he would have called Kevin
11  Cairns who was counsel.
12      Q.    Did you talk to Kevin about whether or
13  not any conversations --
14      A.    I did not talk to Kevin.
15      Q.    The determination of whether or not this
16  was a major claim, when was that decision made?
17      A.    I think when we hired Ken Aran who was
18  going to be kind of the resident major claims
19  counsel. Prior to that time we only had two major
20  claims counsel for the country so the structure has
21  changed quite a bit in the last, you know, several
22  years. So Ken joined the company I think in June or
23  July of '05, and it appears that this file was
24  transferred to him by December of '05.
25      Q.    So prior to that it wouldn't have been

Page 67

1   considered a major claim?
2       A.    It was handled within the claims center.
3       Q.    Which division within Fidelity would
4   have received payments for premiums? Who -- my
5   understanding is that Coastal would have received
6   premium payments of fees for the policies on closing
7   service letters. Which department at Fidelity --
8       A.    Similar to Nations. I think those
9   payments or the income would have been attributed to
10  the New Jersey state operation and whether the
11  payments physically went into that office, and they
12  may have, I don't know. Obviously the recordkeeping
13  I'm getting is from Pennsylvania.
14      Q.    Do claims investigations automatically
15  cease once the company hires outside counsel?
16      A.    No.
17      Q.    Are interviews generally conducted
18  during claims investigations?
19      A.    Interviews of parties to the litigation?
20  I assume that would have been -- I assume that would
21  be done in the context of the litigation,
22  depositions.
23      Q.    Apart from Bob Agel in 1998 did the
24  company interview any other individuals that were
25  involved with these properties?

Page 68

1       A.    I don't recall seeing that other than
2   Bob Agel who was our agent, we had a different
3   relationship with.
4       Q.    What about the closing attorneys,
5   approved attorneys?
6       A.    I don't recall seeing any interview
7   information.
8       Q.    Who would know that? Whether or not
9   interviews were conducted of any approved attorneys?
10      A.    I didn't see records of it in the claim
11  file or I don't recall seeing records in the claim
12  file, but presumably claims administrators at that
13  time would know. Possibly Kevin Cairns.
14      Q.    I'm just going to ask you a few general
15  questions and then we can either -- I will keep going
16  as long as I can. Just let me know when you want to
17  take a break for lunch.
18          Does every lender require a closing
19  protection letter?
20      A.    I would say no, but certain states they
21  don't issue them at all and -- but I would say the
22  majority of commercial institutional lenders are
23  going to ask for one if it's going to be closed by an
24  attorney.
25      Q.    And why? Do you have any knowledge as

Page 69

1   to why they would request one?
2       A.    Because there are some coverages under a
3   closing service letter with respect to the lender's
4   funds or lien priority that wouldn't be covered by
5   the commitment or policy if it's issued -- wouldn't
6   be covered I guess by the commitment. I would have
7   to think about the policy and all the different
8   scenarios, but certainly might not be covered by the
9   commitment.
10      Q.    How much do lenders pay for the closing
11  service letter?
12      A.    The file --
13          MR. HAYES: Let me just object to the
14  form. You can answer.
15      A.    Well, okay. You're saying who pays --
16  the charge for the closing service letter is $25,
17  which is a rate approved by the Department of
18  Insurance.
19      Q.    Is it set by the Department of
20  Insurance?
21      A.    Yeah. We can't deviate from that
22  amount.
23      Q.    I believe I asked you a similar question
24  yesterday. If Fidelity's agent, that being Coastal,
25  knew that there was certain misinformation contained

18   (Pages 66 to 69)

Donna Sullivan

Page 70

1   in any of the closing documents that had been
2   presented to the lender, in this case Walsh, do you
3   believe that that would cover -- that would trigger
4   coverage under the closing service letter, commitment
5   or the title policy?
6           MR. HAYES: Object to the form. You can
7   answer.
8       A.   I think the contract -- the commitment,
9   closing service letter, they're contracts that speak
10  for themselves as to what would be covered. Just
11  giving misinformation, I don't know that falls within
12  the coverage of -- or knowing of misinformation, I
13  don't know that that falls within the coverage of
14  those documents. I mean, they define the
15  relationship of this company with the lender.
16      Q.   Would it trigger liability for the
17  company as to the actions of its agent?
18          MR. HAYES: Object to the form.
19      A.   The agent has specific functions that
20  are covered by the agency agreement, which go to the
21  issuing of commitments and policies and the writing
22  of insurance. If they're conducting closings or have
23  other functions that are outside of the scope of the
24  agency agreement or, you know, our position would be
25  that they're not covered by -- or the company is not

Page 71

1   responsible for those actions.
2       Q.   I'm specifically asking the question
3   with regards to the documents that are prepared by
4   the company's agent, not the actions outside of that.
5       A.   So you're saying --
6       Q.   If -- let me rephrase the question. If
7   the company's agent knew that there was
8   misinformation contained in the documents that it
9   prepared and knew were going to be sent to a lender,
10  would that trigger liability?
11      A.   I don't know if it would be liability.
12  Extra-contractual liability? I guess I don't know
13  the answer to that.
14      Q.   Does the agent have any other role
15  besides -- and I'm speaking with regard to the agency
16  agreement. Does it have any other role with the
17  company than issuing policies, commitments and
18  closing service letters?
19      A.   Does it have any other, I'm sorry,
20  relationship with the company? Does it have any --
21      Q.   Within the confines of the agency
22  agreement, the specific role that's given to the
23  title agent is what?
24      A.   They have the ability to, you know,
25  prepare title insurance commitments, to set the

Page 72

1   requirements for the insurance, to remove those
2   requirements or exceptions upon certain proofs and
3   issue a policy.
4       Q.   Are they as part of that responsibility
5   also to insure the accuracy of the information
6   contained in those documents?
7       A.   I think they have a responsibility to
8   the company obviously if they're negligent in
9   preparing those documents and it results in a loss to
10  the company under the -- whatever insurance is
11  issued.
12      Q.   I'm handing you what's been marked as
13  Coastal6, which is an agreement between Fidelity and
14  Coastal Title Agency. On the first page it is dated
15  the first of November 1996. This document goes from
16  FY 013000 to 13019. I think we're going to just look
17  at the first few pages that go to 13007. At 13006 --
18  I should go back a little bit.
19          Was this the agency agreement that
20  was -- was this the agency agreement that was in
21  place between Fidelity and Coastal at the time of --
22  for 1996 and 1997?
23      A.   It appears to be signed in November of
24  '96. So for the remainder of '96 and '97 it appears
25  to be the contract.

Page 73

1       Q.   At page 13006 at the top it says
2   "Schedule A." Item five is deleted in its entirety
3   and replaced as follows: "Compensation: Agent shall
4   pay company 17 percent of gross premiums on all title
5   insurances issued by agent if the liability is less
6   than one million dollars. On all title insurances
7   greater than one million dollars agent shall remit 15
8   percent of gross premium." Insurances, I assume --
9   does that mean policies?
10      A.   Yes, I would assume it means policies.
11      Q.   Does that cover closing service letters
12  or -- I guess that's in a different part.
13      A.   Right. This is -- a closing service
14  letter has a different fee?
15      Q.   That goes straight to the company?
16      A.   Correct.
17      Q.   So is the agent's compensation based
18  purely on the number of policies it issues?
19      A.   This rider is dated January of '99.
20      Q.   It looks like on page 13005, looks like
21  it's similar language. Although it's undated looks
22  like maybe it was made part -- you have to go back to
23  13004 and it says: "See attached rider." The next
24  page is the rider.
25      A.   Okay.

19 (Pages 70 to 73)

Donna Sullivan

Page 74

1    Q.   So I guess through 1999 -- well, it's
2  similar language so my question is still: Was the
3  agent's compensation based solely on the number of
4  policies that were issued?
5    A.   First of all, the agent will receive,
6  you know, the premium payment and endorsement fees,
7  whatever, directly and they will hold on to that and
8  remit the company's percentage, which in this case
9  looks like it was 17 percent, and this paragraph
10  provides for a bonus if the total remittances to the
11  company are over 100,000.  Gives them a certain
12  percentage of that amount over 100,000.
13    Q.   Do you know if Coastal ever received any
14  bonus for remittances greater than 100,000?
15    A.   I believe at least two years they
16  exceeded remittances of 100,000, so I believe there
17  was probably a bonus paid.
18    Q.   What years?
19    A.   I believe '96 and '97.  I don't have or
20  haven't seen information for every year that they
21  were an agent.
22    Q.   So going back, the agent would get more
23  money if they issued more policies?
24    A.   They would get five percent of the
25  excess remittances over 100,000.

Page 75

1    Q.   Right.  So up to $100,000 in
2  remittances.  If they issued more policies they would
3  get more money up to 100,000 and then beyond that
4  they would get a bonus of five percent?
5        MR. HAYES: Object to the form.
6    A.   Certainly they make more money the more
7  policies they issue, and, yes, the company would give
8  them a bonus if they remitted more than 100,000.
9    Q.   So did the company have any policies in
10  place for insuring that agents weren't churning out
11  policies?
12        MR. HAYES: Object to the form.
13    A.   They had certain audit procedures which
14  I spoke of yesterday.
15    Q.   What were those again?
16    A.   I was told there were three different
17  forms of audits.  Corporate audit, which I don't
18  really know the substance of.  I assume it was done
19  by home office.
20    Q.   Is that annual?  Was that an annual
21  audit?
22    A.   I don't know for that one.  We had an
23  agency review audit, which was done at that time I
24  think every other year.  And you could have an
25  underwriting audit, which would be underwriting

Page 76

1  counsel going in and reviewing a sample of files just
2  for their underwriting content.
3    Q.   Aside from those audits were there any
4  other policies?
5    A.   Sorry.  Policies for?
6    Q.   Policies set up by the company to ensure
7  that the agent was not churning -- for lack of a
8  better word, churning policies?
9    A.   Okay.  I don't know -- I don't
10  understand.
11    Q.   Issuing policies, you know.
12    A.   Clearly if they were selling insurance
13  that's, you know, why they were an agent, and we
14  would hope that they were writing as much insurance
15  as they could in a legitimate fashion.
16    Q.   Do you know what the bonus amount that
17  Coastal received in '96 or '97 was?
18    A.   I didn't see anything specific to that,
19  but I believe the remittances were less than 120,000,
20  so it would be less than 20,000 that was over the
21  hundred thousand.  So I think the maximum would have
22  been five percent of 20,000.
23    Q.   And I think you testified to this
24  yesterday, that sometime after 2000 the Nations part
25  of Fidelity ceased doing business, ceased operating

Page 77

1  with Coastal.  Is that the same for Fidelity?
2    A.   Yeah, they were -- I think it was the
3  end of 2003 and they were -- we had one office, state
4  office, that was working with Coastal for Fidelity
5  and Nations, so it would have been termination for
6  both.
7    Q.   Who would have been conducting the
8  audits of the -- what position was it?  Claims
9  adjuster or whoever it was, who would be doing the
10  audit for the title agent?
11    A.   The underwriting audit?
12    Q.   You named several various audits.
13    A.   I believe there was a corporate audit
14  and it may be done by home office.  I don't have any
15  real detail on that.  The agent review audit that was
16  done every other year was probably done either by the
17  state manager or the agency rep.  I don't know if --
18  that Maureen Crowley might have been doing it or
19  whether Kevin Cairns, later Chris Marra might have
20  done it.
21    Q.   The corporate audit that's done by, you
22  said, home office --
23    A.   Chris Marra told me there was a
24  corporate audit, but I didn't have any detail on it.
25    Q.   Were all title agents -- did all title

VERITEXT REPORTING COMPANY

Donna Sullivan

Page 78

1  agents get a corporate audit or was it just Coastal?
2      A.   No, I am assuming it would have been for
3  all. I don't think that Coastal was singled out from
4  other agents.
5      Q.   Okay. Off the record.
6           (A discussion takes place off the
7  record).
8           (A recess takes place.)
9      Q.   You testified earlier today that one of
10 the files that you reviewed -- that you recall
11 reviewing was the Juergensen file.  Is that right?
12     A.   That name sounds familiar.  I am not
13 positive.
14          (Fidelity-11, Closing Service Letter
15 dated 10/30/96, is received and marked for
16 identification.)
17     Q.   I have handed you what's been marked as
18 Fidelity-11. It's a closing service letter dated
19 October 30, 1996 concerning the transaction involving
20 Alicia Juergensen. File number for Coastal was
21 CT-18718(A). Do you know if this is the Juergensen
22 file you reviewed?
23     A.   I don't know if this is it.
24     Q.   I have to ask you: Do you know why the
25 capital A is there after the Coastal title number?

Page 79

1      A.   Again, we know they were doing separate
2  commitments on the same property for different
3  transactions. I don't recall specifically which the
4  "A" represents.
5      Q.   Okay. Down the page, paragraphs one and
6  two, those set forth what exactly?
7      A.   Do you want me to read them? I mean --
8  are they covered actions?
9      Q.   Yes.
10     A.   It's hard to do it without reading it
11 because obviously --
12     Q.   Why don't we go through -- we will break
13 it down a little bit. If we go through -- what does
14 1(a) cover?
15     A.   "Failure of the issuing agent to comply
16 with your written closing instructions to the extent
17 that they relate to: (A), the title to said interest
18 in land and the validity enforceability and priority
19 of the lien of said mortgage on said interest in
20 land, including the obtaining of documents and the
21 disbursement of funds necessary to establish such
22 title or lien, or (b), the collection and payment of
23 funds due you."
24     Q.   So what does 1(a) mean? What does that
25 cover?

Page 80

1      A.   It means if the lender is given
2  instructions that the attorney hasn't complied with
3  and the failure to comply results in the lien not
4  being valid, enforceable as a -- well, priority lien,
5  there could be second liens or first liens that the
6  lender was -- had given instructions for, but if the
7  attorney fails the comply with the instructions and
8  it comprises the enforceability and priority of the
9  lien.
10     Q.   Can you give an example of when there
11 might be coverage under 1(a)?
12     A.   For instance, if the lender requires
13 that they record the mortgage in first lien position
14 and the attorney either fails to record or records
15 late and an intervening lien is recorded ahead of it.
16     Q.   Anything else?
17     A.   Maybe they -- I don't know, this might
18 be required by the commitment too, maybe requires two
19 parties to sign the mortgage and only one does and
20 the mortgage is not enforceable.
21     Q.   What about 1(b)? Can you give me an
22 example of what would be covered?
23     A.   Rarely see that come into play, but I
24 guess there can be an instance where there's supposed
25 to be funds that come back from the closing to the

Page 81

1  lender, that it wasn't a net funding, and they were
2  supposed to receive some funds back and didn't
3  receive them from the attorney.
4      Q.   And 2? How about 2? Can you give an
5  example?
6      A.   Perhaps the attorney steals the funds
7  that he's holding in escrow and doesn't pay off a
8  prior mortgage and that impairs the priority of the
9  mortgage to the insured.
10     Q.   Any other examples?
11     A.   I mean, I guess you could -- I'm
12 hard-pressed to find another.
13     Q.   It says: "In handling your funds."
14 What if he used your -- what if he used the lender's
15 money for something else that wasn't set forth in the
16 closing instructions, would that fall within number
17 two?
18          MR. HAYES: Objection to the form. You
19 can answer it.
20     A.   I'm not sure I understand it well enough
21 to answer but obviously whatever he does -- whatever
22 fraud the attorney is guilty of in handling the funds
23 has to go to the validity or enforceability of the
24 mortgage, as the second paragraph is tied to the
25 coverage of the first.

21 (Pages 78 to 81)

Donna Sullivan

Page 82

```
 1      Q.   Okay?
 2           (Fidelity-12, Coastal Document, is
 3  received and marked for identification.)
 4      Q.   I'm handing you what's been marked as
 5  Fidelity-12. I think I gave you a couple of
 6  documents that looked like this yesterday. Do you
 7  know what this document is?
 8      A.   I said yesterday that I don't know. It
 9  resembles an order, but I don't think you would
10  usually have premium information on that so I am not
11  really sure what the document is.
12      Q.   The date on the order is October 29,
13  1996. If that date were in advance of a mortgage
14  being issued how would the title agent know what the
15  premium amount would be?
16      A.   They would know what the proposed amount
17  of insurance is, and the amount of the premium would
18  be based on the amount of insurance.
19      Q.   Okay.
20           (Fidelity-13, Deed dated 10/23/96, is
21  received and marked for identification.)
22      Q.   I'm handing you what's been marked as
23  Fidelity-13. It's a deed between Elaine Smalls and
24  Cristo Property dated October 23, 1996. It looks
25  like this deed was recorded on April 9, 1997. Do you
```

Page 83

```
 1  see that at the bottom of the page?
 2      A.   Yes, I do.
 3      Q.   Can you tell who recorded this deed? I
 4  direct your attention at the bottom of the first
 5  page.
 6      A.   Well, it has Coastal's stamp. It's not
 7  marked "R&R," but that may mean to who it was
 8  recorded and returned.
 9      Q.   Okay. You might want to keep that one.
10           (Fidelity-14, Deed dated November 13,
11  1996, is received and marked for identification.)
12      Q.   I'm handing you what's been marked as
13  Fidelity-14, which is a deed dated November 13th
14  between Cristo Property and Alicia Juergensen. Do
15  you see the stamp at the top of the document that
16  says, "Coastal Title Agency"?
17      A.   I do.
18      Q.   Can you tell whether Coastal recorded
19  this deed?
20      A.   Again, it's not marked -- well, actually
21  there's an R&R on the side so it probably was Coastal
22  that sent it for recording.
23      Q.   On the left side of the document on the
24  first page it shows it was recorded on April -- is
25  that 9, 1997?
```

Page 84

```
 1      A.   Yes.
 2      Q.   Flipping back to Fidelity-13, can you
 3  tell which deed was recorded first and which one was
 4  recorded second? You can also take a look at the
 5  instrument number.
 6      A.   That's what I'm doing. So the deed from
 7  Elaine Smalls to Cristo was recorded first.
 8      Q.   Again, going back to Fidellity-12, at
 9  the top -- I asked you about the date that this
10  document was prepared. At the top it says October
11  29, 1996. Now that you see Fidelity-13, which is
12  dated October 23, 1996 -- strike that question.
13           If Coastal was in possession of
14  Fidelity-13 and Fidelity-14 and was the party that
15  actually recorded the -- these two deeds, were they
16  under any obligation to report that to Fidelity?
17      A.   That they recorded two deeds? No.
18      Q.   It appears to be a flip transaction
19  based on the two documents.
20      A.   I have not discovered any memorandum,
21  underwriting memorandum, that would have required
22  them to do that at that time.
23      Q.   Would Coastal have been aware of
24  Fidelity's policy regarding insuring flip
25  transactions at that time?
```

Page 85

```
 1      A.   I'm not sure --
 2           MR. HAYES: Let me object to the form.
 3  You can answer.
 4      A.   I'm not sure if there was a policy with
 5  regard to flip transactions at that time.
 6      Q.   Was Fidelity insuring flip transactions
 7  at the time or you don't know?
 8      A.   I know. And like I had before there are
 9  some legitimate flip transactions, not all are
10  illegal, if illegal is the correct word.
11           (Fidelity-15, Deed dated November 13,
12  1996, is received and marked for identification.)
13      Q.   I'm handing you what's been marked as
14  Fidelity-15, which is a deed between Alicia
15  Juergensen and to Capital Assets. It's a 60/40 split
16  giving Capital Assets 60 percent interest in the
17  property. The deed is dated 13th of November 1996.
18  Can you tell who filed this or who recorded this
19  document?
20      A.   It appears that Coastal sent it for
21  recording.
22      Q.   Do you know -- at the bottom of the page
23  there's a stamp. Can you tell when this was filed?
24      A.   April 9, 1997.
25      Q.   And now that you have Fidelity-13, 14,
```

22 (Pages 82 to 85)