# EXHIBIT O

1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CRIMINAL NO. 01-47

UNITED STATES OF AMERICA,

VS.

IRENE DI FEO and DONNA PEPSNY,

    Defendants.

VOLUME 1
TESTIMONY OF:

STANLEY YACKER

Newark, New Jersey
April 30, 2002

B E F O R E:   HONORABLE ALFRED M. WOLIN, USDJ

Pursuant to Section 753 Title 28 United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above-entitled proceedings.

JACQUELINE KASHMER
Official Court Reporter

JACQUELINE KASHMER, C.S.R.
OFFICIAL COURT REPORTER
P. O. Box 12
Pittstown, NJ 08867
(973) 297-4889

COM 00994

Yacker - Direct 57

1  A. Definitely not. I don't think she had that much
2  money in her lifetime.
3  Q. What purpose was served by your office issuing an
4  escrow letter indicating that you're holding $25,000 in
5  escrow on this transaction?
6  A. The purpose would be so that the lender would think
7  that Tiffany Harris actually plunked $25,000 into my trust
8  account and I was holding it there on her behalf.
9  Q. Was that false and misleading?
10 A. It was false and misleading, yes.
11 Q. Take a look at Exhibit 911.
12 A. Okay.
13 Q. This is an escrow letter that says regarding
14 Papayiannis, please be advised that I'm holding in escrow a
15 check in the amount of $46,000 pertaining to the above
16 matter. Did the buyers provide you with $46,000 pertaining
17 to this transaction?
18 A. The answer is no, but can I go back and revisit my
19 answer to the previous question?
20 Q. Surely.
21 A. Okay. In both of these, I don't say I'm holding
22 the money in escrow. I say that I'm holding a check in
23 escrow, and it was generally my practice, because I was aware
24 of the function and purpose and nature of escrow letters, if
25 I was holding a check, then I said it was a check. If the

```
 1  check was put into my trust account, it then became funds and
 2  I would say that I'm holding "X" dollars in my trust account.
 3      Q.   Do you have Exhibit 812 in front of you, Mr.
 4  Yacker?
 5      A.   I do.
 6      Q.   Was it your understanding that a lender receiving
 7  Exhibit 812 from your office would be led to believe that
 8  Tiffany Harris had provided you with $25,000?
 9      A.   Yes.
10      Q.   Was that false and misleading?
11      A.   Yes.
12      Q.   Exhibit 911, do you have that in front of you?
13      A.   Yes, I do.
14      Q.   Is it your understanding that a lender receiving
15  911 would be led to believe that the buyers had provided you
16  with $46,000 as a deposit in this transaction?
17      A.   Yes.
18           MR. BALLAROTTO:  Judge, I object to that, your
19  Honor.  I'm sorry, but I have to object because he was just
20  explaining the difference between money in the escrow and a
21  check in the escrow and I'm not sure that he's adequately
22  laid a basis to make it a conclusion that it's false and
23  fraudulent.
24           THE COURT:  I'm going to overrule your objection.
25  You'll have the opportunity on cross examination to ask him
```

COM 01051

1 know how the buyer can be led to believe something unless the
2 witness tells us who said what in the context.
3     THE COURT: I'll sustain the objection. Again, lay
4 a foundation. You may engage in this area of inquiry.
5     Q. Mr. Yacker, let's go back to closings where second
6 mortgages were involved. Were there a number of those?
7     A. Yes, there were.
8     Q. Were there discussions about the second mortgages
9 at closing with any of the buyers?
10     A. Yes, there were.
11     Q. Did you make any statements to buyers about the
12 obligation reflected in that second mortgage?
13     A. Yes, I did.
14     Q. What representations did you make to buyers?
15     A. Well, that the second mortgages were there to show
16 where the rest of the money was coming from between the
17 original contract price and the price that was inflated by
18 Bill Kane. It had to show that it was coming from some
19 place, some of it from an also inflated deposit and the rest
20 of it was from a second mortgage so that in effect the
21 numbers would balance.
22     Q. Were other representations made to the buyers by
23 anyone else participating in the closings?
24     A. Well, some more were made by me, and that if they
25 weren't aware of these second mortgages, some of them were,

Yacker - Direct 64

1  but the majority were not, then they would be taken up right
2  then and there with Bill Kane, you know, I don't know
3  anything about the second mortgage, nobody ever told me, I
4  don't agree to it. Remarks such as that would be made right
5  there at the closing table, and I would take the issue up
6  again right then and there with Bill Kane.
7  Q. Did you have any understanding from discussions
8  that you had with Bill Kane about whether in his transactions
9  there was an intention to collect on the second mortgage?
10 A. By and large, there was not an intention to
11 collect. By and large, he did intend to collect in some of
12 them. Usually if the buyer was coming out of the closing
13 with cash, somehow it was Bill Kane's theory if he was coming
14 out with cash, then he could afford to pay at least something
15 toward the second mortgage.
16 Q. Did you ever advise buyers that they need not pay
17 the second mortgage?
18 A. Yes, I did.
19 Q. Did that ever happen when the buyer objected to the
20 second mortgage?
21 A. Yes.
22 Q. Were the second mortgages ever reduced?
23 A. Some were reduced. Some were forgiven altogether.
24 Q. What was the event that triggered in your
25 experiences the reduction of the second mortgage?

COM 01057

1 back at closing?
2     A. It does happen on some occasions but --
3     Q. That wasn't my question, Mr. Yacker.
4     A. I'm sorry.
5     Q. Let me ask the question again and please listen to
6 my question. Was it your understanding in these transactions
7 as we've defined them that it was acceptable or not
8 acceptable to Walsh Securities for buyers to receive money
9 back at closing?
10     A. Not acceptable.
11     Q. Notwithstanding your understanding that it was not
12 acceptable, did you participate in closings under these
13 circumstances where buyers got money back at closing?
14     A. Yes, I did.
15     Q. Did you make any efforts in certain of those
16 closings, Mr. Yacker, to conceal the fact that the buyer was
17 getting money back from the closing?
18     A. Yes.
19     Q. I've put several documents in front of you, sir.
20 I'm just going to identify them for the record first before
21 we proceed further.
22     You have Exhibits 334 and 331 in front of you?
23     A. Yes.
24     Q. And the companion exhibits 1135 and 1131 in front
25 of you. Is that correct, sir?