# EXHIBIT P

```
                    UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
                    Civil Action No.
                    97-cv-3496 (DRD) (MAS)

WALSH SECURITIES, INC.,   :
                          :
            Plaintiff,    :
                          :
     vs.                  :    DEPOSITION OF:
                          :    STANLEY YACKER
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP CONSULTING,
INC.; COMMONWEALTH LAND TITLE
INSURANCE CO.; NATIONS TITLE
INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE
INSURANCE CO. OF NEW YORK;
Coastal Title Agency; DONNA
PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., D/B/A
MURPHY REALTY BETTER HOMES
And GARDENS               :
                          :
            Defendants.   :
                          :
   - - - - - - - - - - - -
```

**Page 2**

1       TRANSCRIPT of the stenographic notes of
2  the proceedings in the above-entitled matter, as
3  taken by and before JANET BAILYN, a Certified
4  Shorthand Reporter and Notary Public of the State of
5  New Jersey, held at the office of STONE & MAGNANINI,
6  150 John F. Kennedy Parkway, Short Hills, New Jersey,
7  on June 1, 2010, commencing at 9:56 in the forenoon.

**Page 4**

INDEX

WITNESS        DIRECT CROSS REDIRECT RECROSS

STANLEY YACKER
BY MR. MAGNANIN   5      241, 297
BY MS. WAGNER      50
BY MR. KOTT          193           291
BY MR. HAYES        213
BY MR. McGOWAN             235

EXHIBITS

NUMBER   DESCRIPTION              PAGE

Yacker-1   Letter dated 1/6/97        179
Yacker-2   Letter dated 9/4/96        179
Yacker-3   Deed dated 7/25/96         179
Yacker-4   Deed dated 9/4/96          179
Yacker-5   Plaintiff's Certified
           Responses and Objections   235
Yacker-6   Letter dated 7/5/96        249
Yacker-7   Memo dated 7/26/96
           to Rick Pepsny             261
Yacker-8   Memo dated 7/26/96
           to Mr. Grieser             261

**Page 3**

APPEARANCES:

STONE & MAGNANINI, LLP
BY: ROBERT MAGNANINI, ESQ.
    AMY WALKER WAGNER, ESQ.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
Attorneys for Plaintiff

McCARTER & ENGLISH, LLP
BY: DAVID R. KOTT, ESQ.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056
Attorneys for Defendant
Commonwealth Land Title Insurance Co.

FOX ROTHSCHILD, LLP
BY: EDWARD J. HAYES, ESQ.
2000 Market Street
Philadelphia, Pennsylvania 19103-3222
Attorneys for Defendants Nations Title
Insurance of New York, Inc. and Fidelity
National Title Insurance Co. of New York

METHFESSEL & WERBEL
BY: MARTIN R. McGOWAN, ESQ.
3 Ethel Road
Box 3012
Edison, New Jersey 08818
Attorneys for Defendant
Coastal Title Agency

**Page 5**

1  S T A N L E Y  Y A C K E R, residing at 6 Swimming
2  River Court, Barnegat, New Jersey, having been duly
3  sworn by the Notary, testified as follows:
4  DIRECT EXAMINATION BY MR. MAGNANINI:
5       Q.   Good morning, Mr. Yacker.
6       A.   Good morning.
7       Q.   I am Bob Magnanini as you know.  I
8  represent the plaintiff, Walsh Securities, in this
9  case, and we've asked you here for a deposition
10  today.  There's also counsel, Mr. Kott, from McCarter
11  & English for Commonwealth Land Title, and Mr. Hayes
12  for Nations and Fidelity and he's from Fox
13  Rothschild, and Mr. McGowan from Coastal Title
14  Agency.  And Amy Wagner will be in here as well
15  directing me.
16       A.   Okay.
17       Q.   And so I assume you've been deposed
18  before?
19       A.   I have.
20       Q.   Do you need me to go over the ground
21  rules with you?
22       A.   It wouldn't hurt.
23       Q.   Okay.  I'll tell you the basics.  As you
24  well know only one of us can be transcribed at the
25  same time.  So if you let me finish my question I'll

2 (Pages 2 to 5)

Page 6

1   let you finish your answer, even though we'll
2   eventually be talking over each other.
3       As you were just sworn in, the testimony
4   you are giving is under oath, the same as it is in
5   court, and it's your deposition so other than the
6   court reporter I think you're the most important
7   person in the room. So any time you want to take a
8   break just let me know. And I assume you don't have
9   counsel today?
10      A.   No, I don't.
11      Q.   The biggest thing is if you answer a
12  question I'll believe that you understood it. If you
13  don't understand my question, please ask me to
14  rephrase or tell me you don't understand and we will
15  go back there.
16      And then I guess the last basic
17  instruction is always: are you taking any -- are you
18  under the influence of any drugs or alcohol that
19  would prevent you from truthfully answering questions
20  this morning?
21      A.   Well, I take six different medications,
22  but I don't feel under the influence of any of them.
23      Q.   Okay. All right. Just the benefits of
24  living in America in 2010.
25      A.   The benefits of old age.

Page 7

1       Q.   You said you were deposed before,
2   Mr. Yacker.
3       A.   Yes.
4       Q.   How many times?
5       A.   Not all that many but maybe five or six.
6       Q.   Were you ever deposed in conjunction
7   with the Walsh Securities versus Cristo Property
8   case?
9       A.   No, I don't think so. I'm not
10  absolutely positive but I don't think so.
11      Q.   Okay. And I understand that you
12  testified at a trial of Irene DeFeo and Donna Pepsny.
13  Is that correct?
14      A.   Yes.
15      Q.   Have you testified at any other trials?
16      A.   No.
17      Q.   Just for quick background, where did you
18  attend college?
19      A.   Rutgers University in New Brunswick.
20      Q.   When did you graduate?
21      A.   1959.
22      Q.   And where did you attend law school?
23      A.   In between came a tour of military duty
24  and law school was Rutgers Newark.
25      Q.   When did you graduate?

Page 8

1       A.   1963.
2       Q.   And then as usual, quick employment,
3   what did you do after you graduated?
4       A.   I clerked for a Superior Court judge in
5   Monmouth County, Judge Knight, with a K, for one year
6   and then joined an attorney in Matawan as his
7   associate in 1964.
8       Q.   Who was that?
9       A.   His name was Vincent DeMaio.
10      Q.   And how long were you associated with
11  Mr. DeMaio?
12      A.   15 years.
13      Q.   Did you eventually become a partner with
14  him?
15      A.   Not exactly. A form of partner but
16  mostly in name.
17      Q.   And then where did you go after you left
18  Mr. DeMaio?
19      A.   I joined two other local attorneys in a
20  true partnership also in Matawan.
21      Q.   Who were those individuals?
22      A.   Louis Granata and James Cleary.
23      Q.   And what was the name of that firm?
24      A.   Yacker, Granata & Cleary.
25      Q.   How long were you partners with

Page 9

1   Mr. Granata and Mr. Cleary?
2       A.   Mr. Cleary, let's see, about five years.
3   He left the firm. And Mr. Granata, let's see, about
4   16 years, thereabouts, give or take a little.
5       Q.   So Mr. Granata left sometime in the
6   mid-1990s?
7       A.   No. I left -- well, physically I left
8   the building we were in but we split --
9       Q.   You split?
10      A.   Yes.
11      Q.   And then you were a solo practitioner?
12      A.   Yes, I was.
13      Q.   From -- how long were you a solo?
14      A.   Well, I started in February of '96 up
15  until, I believe it was, February of 2002.
16      Q.   And what happened in February of 2002?
17      A.   The Supreme Court terminated my --
18  disbarred me, I guess.
19      Q.   And what was the name of your law firm
20  when you were a solo practitioner?
21      A.   Just my name?
22      Q.   Stanley Yacker?
23      A.   Attorney, yes.
24      Q.   How many employees did you have in your
25  solo firm?

3 (Pages 6 to 9)

Page 10

1      A.    It varied. Let's see. Never had any
2  lawyers work for me, associates or otherwise, and I
3  think at any given time the most I had was two
4  secretaries.
5      Q.    Were they the same two secretaries the
6  entire time?
7      A.    No. No. You are still restricting your
8  questions to my solo --
9      Q.    Your solo firm, yes.
10      A.    When I started I had one secretary, that
11  was Lorraine King, who I called Lory. Lorraine at
12  some point or another had a helper, I wasn't counting
13  her as one, because she was kind of a part-time young
14  lady, and I can't remember her name, but she was
15  helping Lorraine because she was just kind of swamped
16  but it didn't last very long, maybe a couple of
17  months. The other main one was Carol Davis. She
18  joined me -- I can't really say -- sometime in 1996,
19  spring or summer.
20      Q.    What were her responsibilities?
21      A.    She was my -- what you would expect of a
22  normal secretary. She was a receptionist, she was a
23  secretary, she did -- she prepared legal documents,
24  she did filing, just an all around legal secretary I
25  would say. She was not a paralegal.

Page 11

1      Q.    Did Miss Davis work on any of the
2  closings involving properties purchased or sold by
3  William Kane or his companies?
4      A.    No, except in the most incidental way,
5  maybe copying a couple of papers, that kind of thing,
6  but other than that, no, she did not.
7      Q.    So then the closings with Mr. Kane
8  involved just Lorraine King?
9      A.    No. They started out involving a young
10  lady who was a secretary before I became a solo.
11      Q.    Who was that?
12      A.    Her name was Paula, last name was Rolen,
13  R-o-l -- are you a baseball fan? Same as the third
14  baseman.
15      Q.    As Jimmy?
16      A.    No, not Jimmy.
17      MR. HAYES: Scott.
18      A.    There's a baseball fan. I think it's
19  spelled the same way.
20      MR. HAYES: R-o-l-e-n.
21      A.    I'm not sure, but her name was Rolen.
22  Still is, by the way.
23      Q.    So when did you begin closing loans that
24  involved William Kane?
25      A.    Probably around October maybe of '95, a

Page 12

1  little earlier, maybe September, October of '95.
2      Q.    About how many loans did you close that
3  involved Mr. Kane before you and Mr. Granata split?
4      A.    A small number. I want to say about
5  ten.
6      Q.    Do you know who the mortgagor was for
7  those loans or the lender?
8      A.    I don't know.
9      Q.    What was Mr. Kane's role in the
10  closings?
11      A.    He was -- well, he kind of was a control
12  freak. I think I can say everything, but mainly he
13  was the seller of the properties that I was closing
14  on, or one of his corporations.
15      Q.    Corporations?
16      A.    Yeah.
17      Q.    Do you recall the name of his
18  corporation?
19      A.    Just one. He had a couple of others. I
20  recall D&Sons.
21      Q.    Did Mr. Kane work for National Home
22  Funding --
23      A.    I don't know.
24      Q.    -- at that time?
25      A.    I don't know at any time.

Page 13

1      Q.    How did you meet Mr. Kane?
2      A.    He was introduced to me by a realtor
3  that I had been working with locally from time to
4  time. Her name was Irene DeFeo.
5      Q.    And when did you first meet Mr. Kane?
6      A.    Probably a little before the first
7  closing. Again, I wish I can pinpoint the date but
8  it was sometime mid to late 1995.
9      Q.    And do you recall anything about the
10  first meeting with him?
11      A.    We didn't really meet. Might have
12  spoken to him over the phone. If he came into the
13  office it was maybe to drop off some papers or
14  something. We didn't sit down at a table and have
15  any kind of a meeting.
16      Q.    Okay. Do you recall a mortgage bank
17  known as Selective Finance?
18      A.    Yes.
19      Q.    Does that trigger any memories that
20  Selective may have been involved?
21      A.    Maybe, but my memory is so fuzzy after
22  all these years. It does sound familiar though.
23      Q.    Mr. Yacker, switching gears for a
24  minute, do you have any documents left over from your
25  days as a solo practitioner?

4  (Pages 10 to 13)

Page 14

1   A.   Nothing.  The FBI was like a group of
2   locusts and they took everything in sight.
3   Q.   Have they ever offered to return the
4   documents to you?
5   A.   They have, and, I don't know, it was
6   many, many years later, a wild guess maybe around
7   2004.  I declined.  I had no place to put them and
8   they said that they were either going to shred them
9   or whatever.  They gave me a couple of alternatives,
10  but then another person, whose name escapes me at the
11  moment but who I knew, asked if I had any objection
12  if he -- he had some use for the files.  He was doing
13  tax foreclosure work and if I had any objection if he
14  took them and I said no.  And apparently he worked
15  something out with the custodians of the documents.
16  They were in some big warehouse in Newark and he took
17  them.
18  Q.   So as far as you know then your
19  documents were not destroyed?
20  A.   As far as I know.  They could have been.
21  I don't know if that final thing worked out or not.
22  I just got a call from the FBI if I had any
23  objections if he were able to make use of them and I
24  said no.
25  Q.   Do you recall how this person found out

Page 15

1   that the FBI was offering to return your documents?
2   A.   No.  It's just somebody that I knew.  He
3   knew of my situation, if I could call it that, and he
4   raised it with me.  No, I don't know.
5   Q.   But you don't recall his name at all?
6   A.   No.  No, I don't.
7   Q.   Mr. Yacker, as I said I represent Walsh
8   Securities.  Have you ever met Robert Walsh?
9   A.   Never.
10  Q.   How about his brother James Walsh?
11  A.   No.
12  Q.   His sister Betty Ann DeMola?
13  A.   No.
14  Q.   A fellow named Art Gilgar?  He was their
15  chief operating officer.
16  A.   No.
17  Q.   Arnold Cohen?
18  A.   No.
19  Q.   Peter Trebour?
20  A.   No.
21  Q.   Have you ever met Fred Schlessinger?
22  A.   If you're using the word met in the
23  loosest sense.  I wouldn't be able to know if he was
24  sitting across from me.  I never met him physically.
25  I spoke to him maybe once or twice over the phone.

Page 16

1   Maybe -- that's about it.
2   Q.   What was the nature of those
3   conversations?
4   A.   I don't remember, but I do remember
5   speaking with him because it was lawyer to lawyer.
6   Q.   Did he call you or did you call --
7   A.   I don't remember.
8   Q.   But you have never met him personally?
9   A.   Not face to face.
10  Q.   Do you know Kelly O'Neill?
11  A.   Only by name, and all that was acquired
12  after the fact, so to speak.
13  Q.   Okay.  How about a person named Anthony
14  D'Apolito?
15  A.   Same thing.  Only by name, although his
16  name would have crossed my brain before, I mean,
17  during all of this, not strictly afterwards, but I
18  never met him.  I don't know what he looks like or
19  anything.
20  Q.   When you say -- it's an interesting
21  term -- his name would have crossed your brain --
22  A.   I would hear it come up in conversation
23  maybe by Lorraine, Lory, my secretary.  I don't know
24  where or how but it's a name that -- I don't know how
25  else to say it.  It's in my memory bank.

Page 17

1   Q.   Okay.  But you don't remember meeting
2   him in person.
3   A.   I'm almost sure I did not.  If I did it
4   was so casual that I have since forgotten.
5   Q.   Okay.  Mr. Yacker, did you -- I know
6   Walsh Securities funded a number of loans by wiring
7   money to your trust account, but did anyone at Walsh
8   Securities ever pay you any money personally, not
9   through wires to your trust account?
10  A.   No.
11  Q.   And did you ever pay anyone at Walsh
12  Securities any money?
13  A.   Well, no.
14  Q.   Other than returning --
15  A.   No.
16  Q.   -- funds that may have been wired to
17  you.
18  A.   I assumed that was the rest.  I'm sorry.
19  I should have let you finish.
20  Q.   Which actually caused me to complete my
21  thought.  Do you know if or have you ever heard that
22  Walsh Securities funded construction loans?
23  A.   No, I can't say that I have heard that,
24  if they did or didn't.  I don't remember the question
25  ever coming up or the fact ever coming up.

5  (Pages 14 to 17)

Page 18

1    Q.    During 1997 do you recall ever hearing
2  whether Walsh Securities was going to merge with
3  another entity?
4    A.    No. All that, again, I'm going to put
5  in my after-the-fact department. I acquired a lot of
6  that gossip, so I don't know, but, yes, I did hear it
7  but only after the fact.
8    Q.    Jumping back to your solo business, did
9  you have any special licenses other than being an
10 attorney?
11   A.    Like what?
12   Q.    I don't know?
13   A.    Drove a car. In the field of law you
14 mean?
15   Q.    Anything like title insurance.
16   A.    Well, yeah, I was an approved attorney.
17 I'm kind of dating myself. They don't really use
18 that procedure very much any more.
19   Q.    Except in Pennsylvania.
20   A.    They might. Okay. I was an approved
21 attorney for a few title companies. I couldn't even
22 list them for you. Maybe three or four.
23   Q.    One of them was Commonwealth Land Title
24 Insurance?
25   A.    It might have been; I don't know.

Page 19

1    Q.    Do you recall if one was also Nations
2  Title Insurance Company?
3          MR. KOTT:  Object to the form.
4    A.    No, I don't recall.
5    Q.    And then -- I will give you another
6  title insurance company's name because they're
7  involved in the case. Fidelity Title Insurance.
8    A.    I did work for Fidelity. I don't know
9  if I was actually an approved attorney. Kind of lost
10 some of its significance in the later years so I
11 don't know if I went through the formality of being
12 quote, unquote approved by them, but I did work
13 closings for Fidelity and probably for Nations too
14 when I think about it.
15   Q.    How did you become an approved attorney?
16   A.    A little bit like a Catch-22. You
17 needed some kind of experience to get it but you
18 couldn't get it without experience. One of those
19 kind of things. I don't know. It involved filling
20 out a form and you sent it into the -- I always dealt
21 with the local, not the national company, local
22 abstract or local branch. And they would either
23 approve or disapprove it. I never got rejected from
24 one of those. They didn't seem to require a heck of
25 a lot and some of them gave you a nice little

Page 20

1  certificate, it was about letter-size, and it said
2  approved attorney with Commonwealth, let's say,
3  others just said you're approved.
4    Q.    What did it mean that you were an
5  approved attorney?
6    A.    I am not really sure. Let me think.
7  Oh, unless I was approved certain title companies
8  would not do business with me.
9    Q.    Okay. So without you having been
10 approved by the title company you could not close a
11 loan on which they were going to issue title
12 insurance?
13   A.    That is correct. And there might have
14 been a couple of lenders that would take kind of the
15 same position. From the lender's standpoint we don't
16 want you working on any loan that we're giving if
17 you're not an approved attorney with a title company,
18 but as I say it's lost a lot of its significance in
19 later years.
20   Q.    When you say later years, what time
21 frame are you talking about?
22   A.    I couldn't tell you. I've been
23 practicing since 1964 so I don't know.
24   Q.    Okay. But you were -- the time frame
25 we're interested in and that is the focus of this

Page 21

1  litigation is 1996 and 1997.
2    A.    I think the significance of it had sort
3  of faded long before that, but I couldn't even begin
4  to pinpoint it.
5    Q.    Are you familiar with the closing
6  protection letters?
7    A.    Yes. They used to be called approved
8  attorney letters. That shows you how it's gravitated
9  from that to a different focus. But, yeah, I am
10 familiar with it.
11   Q.    That's what I was going to ask you.
12 They still in 1996 or '97 -- I don't want to say
13 still as in today, but they had the approved attorney
14 language in it?
15   A.    I don't know when the change occurred.
16 Maybe it was a gradual thing, I don't know, but it
17 used to be called approved attorney letter. Now,
18 with or without modification, I don't even know, that
19 is called a closing service letter, CSL we call it,
20 but I don't know too much else.
21   Q.    Going back to 1996 and 1997, what was
22 your salary from your solo practice, Mr. Yacker? Or
23 did you have a salary? Let me ask that question
24 first.
25   A.    I didn't have -- wait a minute. No, I

6  (Pages 18 to 21)

Page 22

1    didn't have a salary. I was drawing a very modest
2    figure of, I don't know, maybe six or $700 a week,
3    and the rest kind of depended on what was there by
4    the way of business.
5       Q.    Did you bonus yourself at the end of the
6    year?
7       A.    No. I mean not by design or anything,
8    no.
9       Q.    So your -- I guess you're saying your
10   annual salary was between 30 and $35,000 in 1996 and
11   1997?
12      A.    By way of draw, yes. If there was a
13   particular matter that I worked on that was
14   significantly -- I don't know how to say --
15   rewarding, you know, I would take out an amount for
16   myself.
17      Q.    So what was your -- do you recall what
18   you filed as taxable income in '96 or '97?
19      A.    No, I have no idea.
20      Q.    Other than Miss King and Miss Davis did
21   you work with anyone else in your practice?
22      A.    No.
23      Q.    And what type of -- or did you provide
24   any training for Miss King or Miss Davis?
25      A.    Yes.

Page 23

1       Q.    And what was that?
2       A.    Well, which one are we referring to?
3       Q.    We will stick with Miss King since she
4    was actually involved in the closings.
5       A.    She was very bright, very quick learner,
6    very loyal, but I guess her training was mostly
7    on-the-job training, and initially it was not through
8    me. I don't even know how she was hired. I didn't
9    hire her. Remember she dates back to -- at that
10   point it was Yacker & Granata.
11      Q.    So she was hired by Mr. Granata?
12      A.    No, just not by me. I don't know how
13   she was hired.
14      Q.    How big was Yacker & Granata
15   attorney-wise?
16      A.    Well, originally there were three of us.
17   Then when one partner left there was two. From time
18   to time we would have an associate or two. I don't
19   think we ever had more than -- I don't think we ever
20   had more than one associate at a time but -- so maybe
21   two lawyers and an associate.
22      Q.    And was Miss Davis an employee of
23   Yacker --
24      A.    Yacker & Granata, no, she was not.
25      Q.    Why did Miss -- did any other

Page 24

1    employees -- let me ask that question -- come with
2    you when you and Mr. Granata split?
3       A.    No, just Lory.
4       Q.    Why did she go with you?
5       A.    I just kind of was impressed again with
6    her ability, her intelligence, her loyalty. And I
7    told her that -- see initially when we split,
8    Mr. Granata and I, we continued in the same office.
9    It was a large three-story Victorian house that had
10   been converted to an office. It was rather lovely as
11   far as work surroundings go, it was pretty, and I
12   continued to function there even though we had
13   officially separated, but it was awkward as all get
14   out. You know, it just didn't work and I just
15   figured one of us really should separate physically.
16   And when I did that I spoke to Lory and asked her if
17   she was interested in coming along with me and she
18   said she was.
19      Q.    What was Miss King's salary in '96?
20      A.    I can't remember. And, again, I did not
21   hire her so I would have no recollection of what her
22   original --
23      Q.    What did you pay her?
24      A.    When she did come along with me?
25      Q.    When she came along with you.

Page 25

1       A.    It was a somewhat modest hourly rate.
2    It certainly wasn't less than she was getting before.
3    Maybe a modest increase, but I couldn't be sure. I
4    would say an hourly rate that was maybe something
5    just under $10 an hour. I don't really know, but it
6    soon evolved into a system when she was doing pretty
7    much all of Bill Kane's work into sort of like by the
8    job.
9       Q.    When --
10      A.    Which suited her, by the way, because it
11   gave her a certain amount of flexibility and it just
12   seemed to work better.
13      Q.    When did that occur that she was doing
14   predominantly Mr. Kane's work?
15      A.    Probably not too long after we moved.
16   So I would have to say sometime in '96 but I can't
17   remember exactly.
18      Q.    I may have asked you this already but
19   what were Miss King's responsibilities when --
20   actually I guess I didn't -- when she first came over
21   with you?
22      A.    Again, she was what I previously
23   described as the typical secretary. She did
24   everything. I had nobody else to do it. I mean,
25   right from answering the phones to taking dictation

7 (Pages 22 to 25)

Page 26

1  or whatever, just being a legal secretary in a small
2  office.
3      Q.   And what was your -- what did your
4  practice consist of when you physically left the
5  Victorian office?
6      A.   I had a general practice.  It's hard to
7  say.  I did a fair amount of real estate always, but
8  I usually approached it from the more -- I don't know
9  how to say it, more intellectual basis.  I worked on
10 cases, many by referral, it was just the reputation
11 that I had acquired, they were intricate,
12 complicated.  They weren't suitable for a:  Take out
13 a form from New Jersey practice and fill in the names
14 and numbers and file it someplace.  And I loved the
15 challenge.  And I loved that part of real estate.
16 And, you know, some of the decision were reported and
17 became noteworthy adding to the -- to the bar I
18 guess.  And I loved all that stuff.  So I sort of --
19 I can't say it was my specialty or anything.  I just
20 did quite a bit of it but more on the -- I don't
21 know, an attorney would call me, typical case, and
22 say:  These people backed out of the contract, we
23 want to sue them for specific performance and I don't
24 know how to go about it, would you be interested in
25 taking the case?  That kind of thing.

Page 27

1      Q.   Okay.
2      A.   And as I said I got a lot of those by
3  referral.
4      Q.   So it was both real estate closings but
5  also litigation involving real estate?
6      A.   Yeah, and I can't really break it down
7  by time except in terms of appeal to me, that was
8  something that I really enjoyed doing.
9      Q.   Did you have any other -- I don't want
10 to say specialty area but --
11     A.   Yes, zoning and planning.  That's kind
12 of related to real estate in an indirect way, but
13 that was truly my first love.  I had written
14 published articles in zoning and planning, Law
15 Journal, legal municipality's journal, things like
16 that.
17     Q.   Who were your representative clients
18 when you began your solo practice if you had
19 something?
20     A.   I just don't remember.  It wasn't like
21 General Motors or something.
22     Q.   They were individuals?
23     A.   Local clients.  Again, a lot of them on
24 the basis of referrals.  Some with people like Irene
25 DeFeo who was nice enough to refer matters to me

Page 28

1  along with other attorneys, but I was on her list,
2  let's say, things like that.
3      Q.   And those are -- Miss DeFeo would refer
4  real estate closings?
5      A.   Yes, she would.
6      Q.   Do you know someone named Donna Pepsny?
7      A.   Yes.
8      Q.   Did she also refer real estate closings
9  to you?
10     A.   Yeah, but in a different way than Irene.
11 Irene I had worked with long before this whole Bill
12 Kane affair.  Donna was strictly an outgrowth of the
13 Bill Kane affair.
14     Q.   What do you mean by:  "An outgrowth of
15 the Bill Kane affair"?
16     A.   For one thing she was related by
17 marriage to Rick Pepsny who, for many of the deals I
18 was involved with, was Bill Kane's lawyer.
19     Q.   Did you know Mr. Pepsny before --
20     A.   No, I did not.  I did it again.
21     Q.   Before, as you said, the Bill Kane
22 issue?
23     A.   What did I call it?  Affair.  Sounds
24 almost lurid, doesn't it?  No, I did not.
25     Q.   And you said Mr. Pepsny was Mr. Kane's

Page 29

1  attorney?
2      A.   Yes.
3      Q.   Did he represent both Mr. Kane's
4  companies and him personally?
5      A.   I don't know.
6      Q.   What interaction did you have with Mr.
7  Pepsny?
8      A.   I would work with him the same as two
9  lawyers on opposite sides of a routine closing, a
10 seller and a buyer.
11     Q.   And Mr. Pepsny was always representing
12 the seller?
13     A.   I have to answer that in two different
14 ways.  I don't recall him ever representing the
15 buyer, but he was not the only one who represented
16 the seller.  Sometimes it was just some other
17 attorney.  I don't know why it would be someone other
18 than Pepsny but sometimes it was.
19     Q.   And when you say he was not the
20 attorney, you mean the attorney for Mr. Kane or his
21 companies?
22     A.   Yeah, whoever the seller was, yeah.
23     Q.   But he would -- even though he didn't
24 represent the seller, he was still involved in the
25 transaction?

8 (Pages 26 to 29)

a51af0f5-da6e-4c57-b258-d4af925f36ff

Page 30

1     A.    I don't know.  I don't know.  I just
2  know there were on occasion other lawyers involved
3  that were not Pepsny, who worked himself for another
4  lawyer.  He was like an associate of another lawyer.
5     Q.    Do you know who that is?
6     A.    Yes, I do recall, Alfieri.
7     Q.    Michael Alfieri?
8     A.    There's two Alfieris in Matawan, and I
9  forget which one he is but Michael sounds right.
10    Q.    Have you ever met Mr. Alfieri?
11    A.    Yes.
12    Q.    Was that while you were involved in the
13 Kane affair -- was it prior to the -- as you termed
14 it, the Kane affair?
15    A.    No, it was not.
16    Q.    It was during the Kane affair?
17    A.    Yes.
18    Q.    And where did you meet Mr. Alfieri?
19    A.    At his office initially.  One of the
20 very early closings was there at his office.
21    Q.    And was he the closing attorney for the
22 seller?
23    A.    Well, he was nominally, but I think
24 that's pretty much the point where Rick Pepsny just
25 kind of took over on this particular transaction

Page 31

1  anyway.
2     Q.    When you say Pepsny, Mr. Pepsny took
3  over the transaction, did you understand -- well, who
4  was Mr. Kane's attorney when you went to this closing
5  or his corporation's attorney?
6     A.    He didn't have one.
7     Q.    Mr. Kane didn't --
8     A.    Let me think.  No, it would have been
9  Mr. Pepsny, yeah.
10    Q.    Okay.  Do you know if Mr. Alfieri was
11 ever Mr. Kane or his corporation's attorney?
12    A.    Well, as I say, nominally he was.
13    Q.    What do you mean by nominally?
14    A.    Well, I would get word that the seller's
15 attorney is Mr. Alfieri or Mr. Alfieri's office,
16 nothing official that he wore a sign that said:  I'm
17 the attorney of record or something.
18    Q.    Was Mr. Alfieri ever at any of the
19 closings or was it always Mr. Pepsny?  Compound
20 question.
21    A.    If he was it was very isolated or very
22 minor.  I didn't consider him a player of
23 significance, I guess.
24    Q.    Mr. Pepsny was a player of significance?
25    A.    Yes.  I'm coining a lot of phrases this

Page 32

1  morning.
2     Q.    Did you do any closings in which Mr.
3  Kane or his corporations were the seller that
4  involved an attorney named Terry Finkelstein?
5     A.    The answer is no, but I do recall his
6  name coming up somehow, some way, but I'm drawing a
7  total blank on that.
8     Q.    How was it that you were chosen by Mr.
9  Kane to participate as the closing attorney for the
10 buyer?
11    A.    I wasn't in these earlier matters.  It
12 was -- it was Irene that had referred the matter to
13 me and she -- I say presumably because I wasn't
14 present -- said to the buyer, if you don't have an
15 attorney I am in a position to recommend somebody who
16 I have confidence in who is local, that kind of
17 thing, but it was through her.
18    Q.    So Miss DeFeo was the realtor for the
19 buyer and recommended you as the closing attorney?
20    A.    One of the realtors involved, listing
21 realtor, selling realtor, I don't really know what
22 her function was with her company, but, yes, she was
23 involved.
24    Q.    It just happened that Mr. Kane was or
25 his corporations were the sellers?

Page 33

1     A.    Well, yeah.  She had referred other
2  matters to me, but whenever the first one was, yes,
3  it just happened that he was the seller.  She spoke
4  of him in such glowing terms.  I mean, she had done a
5  couple of deals with him before and thought he was
6  the greatest thing since sliced bread.
7     Q.    What did Miss DeFeo tell you about Mr.
8  Kane?
9     A.    That he -- at that time he was doing
10 more of fixer-uppers and selling them.  D&Sons was
11 actually a construction company, as I understood it,
12 and he would do work on the houses after he had
13 acquired them and then sell them, and he was astute
14 enough I think to know just where to put the right
15 improvements in a house to maximize the appeal to a
16 buyer while minimizing his expenditures.  There's a
17 certain art to that and he was very good at it.  And
18 as I say Irene was almost gaga over his ability to
19 present or wind up with a very saleable product.
20    Q.    Where was he rehabilitating these
21 properties?
22    A.    Fairly local.  I would say in northern
23 Monmouth and southern Middlesex Counties.  The line,
24 by the way, runs right through -- right between what
25 was my office at the time in Matawan and Pepsny's

9  (Pages 30 to 33)

Page 34

1    office at the time in -- he was on Route 34. In
2    other words, he was Middlesex County and I was
3    Monmouth County, but geographically it gives you an
4    idea. We were right on that border.
5        Q.    The Route 34 corridor?
6        A.    That's right. As long as we're coining
7    phrases.
8        Q.    Just jumping back to your office
9    structure, whose responsibility was it to maintain
10   the attorney trust account?
11       A.    Well, it's my responsibility as an
12   attorney.
13       Q.    Did you handle the actual input of the
14   data in the ledger or who did that?
15       A.    Well, I don't know what you mean, input
16   of data. We had ledger cards for every separate
17   matter. We had the One Write system. I forgot the
18   company that leads the way in that sort of thing, but
19   by writing the check it simultaneously got entered in
20   the daily journal and also on the client's card to
21   which it pertained. If I was writing the checks I
22   did them. If Lory was writing the checks, just to
23   facilitate things she would write them but follow the
24   same procedure and then give me the checks to sign.
25       Q.    Did Miss Davis ever write checks?

Page 35

1        A.    Oh, yeah -- well, yeah, I think -- the
2    answer is yes, but I think by that time we had become
3    more automated. They were done on the computer but
4    it was basically the same system.
5        Q.    That was going to be my next question.
6    When did you automate your solo practice?
7        A.    I don't remember. To this day I am kind
8    of computer illiterate so it wasn't a major thing for
9    me.
10       Q.    Did there come a point in time -- you
11   said earlier that the FBI and the government came in
12   like locusts, I think was your description.
13       A.    Yes. Worse than locusts.
14       Q.    Did there come a time when they actually
15   automated your trust ledger or your cash
16   disbursement --
17       A.    That they automated? What do you mean,
18   the FBI?
19       Q.    Yes.
20       A.    I don't understand the question.
21       Q.    What we've seen in some of the documents
22   produced a computer printout of your attorney trust
23   account, I guess what was a ledger, and I believe you
24   had it in a handwritten format, but I think it was
25   put into an electronic format by the government for

Page 36

1    ease of use.
2        A.    I wasn't even aware they did that.
3            MR. HAYES: I think Miss King testified
4    Mr. Kane did that.
5            MR. MAGNANINI: That Mr. Kane --
6            MR. HAYES: Mr. Kane arranged for the
7    automation of his systems. I think that's what she
8    testified to.
9        Q.    That's actually a good point. Who paid
10   for your computer automation for your solo practice?
11       A.    I don't know. I mean a lot of bills I
12   paid without -- because they were due and they were
13   presented without knowing all the intricacies of it.
14   I can't answer that question. I don't know.
15       Q.    So in 1997 was your business -- your
16   solo practice automated? Did you use computers by
17   the end of '97?
18       A.    I don't know. I don't know.
19       Q.    Whose responsibility was it to maintain
20   the cash disbursements journal?
21       A.    Well, again, as the attorney it's my
22   responsibility.
23       Q.    Who actually filled it out every day?
24       A.    I don't know if we did it every day, but
25   it would be either me, or as I say when Lory did it

Page 37

1    to save me some time, I always had the final
2    authority to write a check or -- I mean to sign a
3    check or not sign a check. I would have to say Lory.
4        Q.    Did Miss King ever sign checks?
5        A.    Not to my knowledge. That would be
6    something that would be like instant recoil for me.
7        Q.    So all the checks from Stanley Yacker,
8    Attorney-At-Law were all signed by you?
9        A.    Yes.
10       Q.    Whose job was it to prepare the closing
11   documents for a real estate closing?
12       A.    Depends on the transaction I guess.
13   Most of the time a whole package would come from the
14   lender usually the day before, the night before, the
15   morning of the closing, and --
16       Q.    Who would prepare the HUD-1 form?
17       A.    Until Lory -- she got to be very, very
18   good at it -- got the hang of it, I would take a
19   blank HUD-1 and fill in all the numbers except for
20   things that I didn't know until actually the date of
21   closing, there were a few of those things, and she
22   would add those to my list, and then she had a
23   program that did it on the computer, and she would
24   put it in its final form based upon the numbers that
25   I gave her.

Page 38

1    Q.    That was going to be my next question.
2  The forms we have seen are either typed or
3  computer-generated.
4    A.    Yes, computer-generated.
5    Q.    I haven't seen any handwritten ones.
6    A.    I don't know if Lory saved them or not.
7  She may have just discarded them. I didn't see any
8  purpose in saving them. I'll occasionally -- I
9  should make it past tense. I would occasionally come
10 across a file with a handwritten thing in there that
11 was never discarded. It didn't matter to me one way
12 or the other, but it wasn't important that we save
13 the handwritten ones.
14   Q.    Whose responsibility was it to review
15 and comply with closing instructions from the
16 lenders?
17   A.    Well, again, "responsibility" is kind of
18 a funny word. Ultimately it's all my responsibility,
19 but as Lory got better and better at it and she got
20 so familiar with the instructions, she probably knew
21 them by heart, she just kind of took that over and I
22 had confidence in her ability.
23   Q.    And then after a closing did you forward
24 deeds for recording to the county?
25   A.    Again, go back to your word, I was

Page 39

1  responsible for doing it. Physically Lory did that.
2    Q.    On the transactions involving Mr. Kane
3  or his corporations, I think at one point you may
4  have testified that Mr. Pepsny's office actually
5  forwarded deeds to the county for recording.
6    A.    I don't think so. Today you mean or in
7  some earlier testimony?
8    Q.    Some earlier testimony. No, not today.
9    A.    Oh, what did I allegedly say then?
10   Q.    That Mr. Pepsny's office had actually
11 forwarded the deeds from the closing to the Monmouth
12 County Clerk's office.
13   A.    Not that I recall. If he did there
14 probably was a good reason for it. I don't know.
15   Q.    Okay. What was your regular practice as
16 to a regular -- or just a real estate closing, if you
17 could just describe what you do with a real estate
18 closing.
19   A.    Well, all right. To boil it down -- I
20 mean I could do it in a half hour, I'm sure you don't
21 want that.
22   Q.    No.
23   A.    But it would be initial direct contact
24 between me and the attorney on the other side.
25 Sometimes I was representing the seller, sometimes

Page 40

1  the buyer. There was a fair amount of time spent on
2  the contract, getting it out of attorney review. I
3  think you've heard that expression, make the realtors
4  happy. They're all nervous until they get the thing
5  ironed out. So it was a fair amount of time spent
6  doing that, getting the contract finalized. That's
7  something that I always thought, and I still do,
8  requires a lawyer's skill and effort.
9         Then there was a period of time when
10 contingencies had to be met like home inspections,
11 things like that. I wouldn't necessarily get
12 directly involved in that. And then there was a
13 period of time when an application was done to a
14 lender. I wouldn't get involved in that either.
15 That was usually done by the realtor. And a period
16 of time waiting to see whether they got their
17 mortgage or not.
18        And the next dose of work -- well, if
19 the deal became firm, a search -- a title binder was
20 ordered. Again, perhaps my secretary did that.
21 That's kind of routine. I didn't feel that I had to
22 get involved in that at all times but -- and then
23 once a closing date was set hopefully, and the bank
24 was notified of the date that was chosen and could
25 they or could they not be ready on that date with the

Page 41

1  documents and of course with the money, and if they
2  were we closed.
3         I would typically sit in as the closing
4  attorney. I had much more direct contact with my
5  clients -- what are we calling this one? A typical
6  closing?
7    Q.    Typical.
8    A.    Typical one. I had more contact with
9  clients than the Bill Kane matters. Post-closing I
10 would almost always rely on the secretary to get the
11 right things in the right places with the right
12 checks other than me signing the checks, because it
13 is kind of a mechanical thing, and the good ones were
14 good at it and that would be the same in Kane and
15 non-Kane closings. So that's more or less
16 mechanically what I do or what I did.
17   Q.    Actually, I guess to figure out where I
18 was going with this, how were the Kane closings
19 different? Was there any attorney review of a
20 contract?
21   A.    In the initial ones, the ones that I did
22 primarily when I was not a solo, there was client
23 contact pretty much like the typical closings.
24   Q.    And at some point that changed I'm
25 assuming from your answer?

11 (Pages 38 to 41)

Page 42

```
 1    A.   Yes. I don't know why or how, it just
 2  did. These people were not my clients. I had --
 3  some of them I didn't even know or speak to or
 4  anything. They were just people that were buying
 5  this particular property. I don't know how and where
 6  they came about or how they got to the position of a
 7  buyer of one of Bill Kane's properties but they were
 8  there.
 9    Q.   So the buyers, some of them you never
10  met or saw?
11    A.   Some of them I never met or saw, but if
12  I did -- again, it may be, you know, after the fact
13  that some judge or court will impute that I was their
14  lawyer but I didn't feel like their lawyer. I wasn't
15  paid by them. I didn't negotiate contracts. They
16  were already signed by the time they were --
17    Q.   Sent to you?
18    A.   Yeah, sent to me.
19    Q.   Whose lawyer did you believe you were?
20    A.   I believed I was like a closing agent
21  for the bank or -- for the lender.
22    Q.   Was that because you had spoken to the
23  lender or it was because of the position you were in
24  where you didn't know or hadn't met the buyer?
25    A.   I don't know if it's --
```

Page 43

```
 1    Q.   Or a combination of both.
 2    A.   It's hard for me to articulate but let
 3  me try again. It's a little bit like in today's
 4  world what would be a refinance of a property. The
 5  person refinancing their mortgage deals with a
 6  mortgage company or maybe a bank, same purpose,
 7  though, to refinance their mortgage. And in the vast
 8  amount of cases they're not represented by attorneys.
 9  They used to be, that's something else that has kind
10  of evolved over the years, but lenders seem to almost
11  encourage that. It keeps their fees and expenses
12  down and it devolves upon the attorney or sometimes
13  the title company to facilitate the transaction for
14  the bank to have somebody to send the papers to to be
15  able to have funds wired in or a bank check sent to
16  the attorney's trust account and disbursements being
17  made and the right things getting recorded in the
18  right way and --
19    Q.   Well, who paid you, Mr. Yacker, for
20  these later Kane closings, as you've described them?
21    A.   I was paid by Bill Kane and it shows
22  that way on the HUD.
23    Q.   Paid by the seller?
24    A.   By the seller, yes, that's probably a
25  better way of putting it. And -- but he also paid a
```

Page 44

```
 1  lot of their other closing costs, the buyer's closing
 2  costs.
 3    Q.   Did the buyers pay any closing costs
 4  that you know of?
 5    A.   They might have. Again, I don't recall
 6  the nitty-gritty of the transactions but he
 7  definitely paid some of their closing costs.
 8    Q.   You said earlier you felt as if you were
 9  the attorney for the lender. Were you an approved
10  attorney for -- again we will focus it down to Walsh
11  Securities?
12    A.   I don't even know. Nobody ever
13  raised --
14    Q.   I'm sorry?
15    A.   Nobody ever raised the point to me.
16    Q.   I have never seen that Walsh Securities
17  had approved attorneys. The title company --
18    A.   I don't know what you have seen, but I
19  just don't know the answer to your question.
20    Q.   Okay. You were approved by some title
21  companies. Is that what you said?
22    A.   Oh, yeah, like I said, a few of them and
23  just kind of lost its importance.
24    Q.   Did there come a point in the William
25  Kane closings that you stopped attending the
```

Page 45

```
 1  closings?
 2    A.   Oh, the answer is yes. But I don't know
 3  if it's something you can just kind of define, it
 4  just kind of evolved.
 5    Q.   How did that or why did it evolve like
 6  that?
 7    A.   Well, again, Lory became better and
 8  better at it, but she also became more involved with
 9  Bill Kane as far as communicating back and forth.
10  Everything was done by him, through him, authorized
11  by him, facilitated by him. He was everywhere.
12    Q.   Was he paying Miss King as well?
13    A.   To my knowledge, yes. Miss King was
14  getting paid from my fee, which Bill Kane was paying
15  $100.
16    Q.   Do you know if Mr. Kane paid Miss King
17  directly?
18    A.   He didn't at first. And -- what do you
19  mean by directly?
20    Q.   Other than $100 from the fee paid to you
21  as the closing attorney.
22    A.   Yes, she was received another hundred
23  dollars from him. I guess he took it out of the net
24  proceeds of sale.
25    Q.   So she would receive $200 for each
```

                                    12  (Pages 42 to 45)

Page 46

1  closing she did?
2     A.   Yes.
3     Q.   Do you know if that amount ever
4  increased?
5     A.   Not to my knowledge.
6     Q.   How did you communicate with people in
7  your office? You said at some point you were
8  automated. Did you have e-mail or --
9     A.   Definitely not e-mail. Lory may have
10 communicated by e-mail. As bad as I was with
11 computers that's how good she was. She may have sent
12 e-mails back and forth to people that she would have
13 to deal with. Maybe like Walsh. I'm not sure.
14 Definitely not by me.
15    Q.   And when -- you said earlier that the
16 government came and seized your books and records.
17 Did they also take your computers?
18    A.   They did. And --
19    Q.   Did they ever return them?
20    A.   See, there again I don't know because it
21 wasn't significant to me. I know they had a lot of
22 problems with the password and Lory had to somehow
23 help them gain access to what was in there. But
24 either because of the passage of time or just wasn't
25 my thing, my recollection is very dim on all of that.

Page 47

1     Q.   And you testified earlier that Miss King
2  would handle the disbursements at the end of the
3  closing. What were the disbursements in a normal --
4  or typical closing I believe is a term you used?
5     A.   A typical closing there were
6  disbursements for the title company, disbursements --
7     Q.   What were they for?
8     A.   The title binder and the title
9  insurance.
10    Q.   Okay. Was there also a separate
11 disbursement for the closing protection letter?
12    A.   It was built into the title company's
13 bill I believe.
14    Q.   How did you know how much to disburse to
15 the title company?
16    A.   We would get a bill from them, an
17 invoice, or if somehow they forgot or overlooked
18 them, Lory would call them and get that information.
19    Q.   Was that usual that they would overlook
20 an invoice?
21    A.   No, I was speaking almost
22 hypothetically. I don't know if they ever overlooked
23 an invoice.
24    Q.   What were the other disbursements in a
25 typical --

Page 48

1     A.   Recording fees.
2     Q.   Who were they paid to?
3     A.   The clerk of the county, usually
4  Monmouth. I shouldn't say that. The clerk of the
5  county where the property was located.
6     Q.   Okay.
7     A.   Realty transfer fee, the sale payee,
8  county clerk, realtor's commission, if there was a
9  realtor. Give me some others and I'll tell you yes
10 or no. That's all that comes to my mind.
11    Q.   What we have seen on the HUD, we have
12 seen origination fees to the mortgage broker.
13    A.   Okay.
14    Q.   As well as to the lender.
15    A.   Okay.
16    Q.   And then there's standard taxes and
17 water, sewage fees we have seen like that. We have
18 also seen on the HUD-1s a payment to the seller's
19 attorney, which is generally Mr. Pepsny.
20    A.   Yes.
21    Q.   And that was paid by whom?
22    A.   By the seller. By Kane or his
23 corporation.
24    Q.   And you had -- one thing we've seen that
25 I'll show you a little later on is we've seen a lot

Page 49

1  of checks to, as you said, Monmouth County, for
2  example, recording deeds and mortgages and then the
3  checks were subsequently voided. Do you recall why
4  that seemed to be part of the Kane transactions?
5     A.   No, I don't recall that ever happening.
6     Q.   Did you always file the deed and
7  mortgages on the Kane transactions as immediately
8  after the closing --
9     A.   Well, immediately is kind of -- as soon
10 as possible after the closing, yes.
11    Q.   One of the things, again I'll show you
12 some documents later, is actually a series of deeds
13 and mortgages that are all recorded by Coastal Title
14 Agency over a two-day period in April of '97 even
15 though some of the closings occurred ten months
16 earlier. Do you recall why that happened? Why
17 Coastal Title is filing the deeds from closings that
18 had occurred that long prior?
19    A.   Not as I sit here trying to think about
20 it. If it pops into my mind I'll let you know but
21 no, I don't.
22    Q.   Okay. We will show you some -- would
23 you like to take a break, Mr. Yacker?
24    A.   No, I would like to keep going.
25    Q.   I do need a short break.

13 (Pages 46 to 49)

Page 50

```
 1          (A recess takes place.)
 2  DIRECT EXAMINATION BY MS. WAGNER:
 3      Q.   Mr. Yacker, my name is Amy Wagner and I
 4  also represent Walsh Securities?
 5      A.   Nice to meet you, Amy.
 6      Q.   Thank you.  At some point Miss King left
 7  your employment.  Correct?
 8      A.   Yes.
 9      Q.   Do you remember when that was?
10      A.   I'm going to have to give you a bit of a
11  range because it was kind of a gradual sort of a
12  thing, but I would say sometime between mid '97 --
13  1997 and mid '98?  Very approximate.
14      Q.   Do you know who she went to work for in
15  mid '97?
16      A.   I do know, and I'm going to preface this
17  by saying:  Remember that distinction whether I knew
18  it at the time or found out after the fact, I believe
19  I knew it at the time, another attorney named Mr.
20  Cicalese.
21      Q.   Anthony Cicalese?
22      A.   Yes.
23      Q.   Do you know why she went to work for Mr.
24  Cicalese?
25      A.   She would have to answer that.  I don't
```

Page 51

```
 1  know.
 2      Q.   You said that her leaving your office
 3  was a gradual change over the course of a year.
 4  During that time what kind of work did she continue
 5  to perform for you?
 6      A.   Well, it was almost exclusively devoted
 7  to -- all that thing we were talking about before,
 8  computer printouts and trust accounts and all that
 9  kind of stuff.
10      Q.   So you believe over that course of the
11  year she was maintaining your bookkeeping?
12      A.   No, she was trying to find, among other
13  things, a hole in the trust account.
14      Q.   Can you explain the hole in the trust
15  account?
16      A.   I wish I could but I can just give you
17  some thoughts on it.  Mr. Kane, I think by design,
18  although I doubt if he would ever admit that, saw to
19  it that he was overpaid in all the matters that he
20  would get proceeds of sale as seller.  Occasionally
21  if they happened in the same day, let's say, three
22  transactions, there would be one check for him,
23  meaning the sum total of those three closings.  I
24  would have preferred it be individual for a lot of
25  reasons, but as I alluded to before he in almost a
```

Page 52

```
 1  scary sort of way controlled everything including the
 2  amount that he was owed and I think he caught Lory in
 3  an unguarded moment and she overpaid him.
 4      Q.   So you believe he probably caught Miss
 5  King in an awkward position?
 6      A.   Oh, yes, yes.
 7      Q.   And he was dictating to her how much to
 8  prepare his checks out of the proceeds?
 9      A.   Yes.
10      Q.   And you believe that at some point he
11  probably instructed her to draft a check that was
12  larger than what he was actually entitled to?
13      A.   Yes.
14      Q.   Was she ever able to find the hole in
15  the account?
16      A.   She worked on it a lot of hours.  But
17  what was scary and very troubling to me is that it
18  resulted in a couple of bounced checks out of the
19  trust account, which is -- any attorney can tell you
20  is a nightmare.
21      Q.   Who were these checks bounced to?
22      A.   They were routine checks that would
23  normally come out of the trust account.  We gave a
24  whole list before of typical payees.  I think they
25  were relatively small amounts.  One might have been a
```

Page 53

```
 1  title company bill or whatever.  There were just a
 2  couple of them and they were very small, and I was
 3  tremendously upset when I found out.  And Bill Kane,
 4  temporarily anyway, gave me some money to cover the
 5  shortage, but as you probably are aware it triggers a
 6  whole bunch of action by the state, not the least of
 7  which is the Office of Attorney Ethics, and she was
 8  working to figure all of that out.
 9          We pretty much had it located but Kane
10  vigorously denied it, you know, I haven't been
11  overpaid because he controlled the trust account in
12  effect with his computer printout, the thing I am
13  very vague about.  It was hard to dispute him.  He
14  had all the inside knowledge and I certainly didn't.
15  And Lory was kind of in between what I would know and
16  what Kane knew, but she stayed on primarily for that
17  reason to try and work all that out.
18      Q.   During this time had you stopped doing
19  closings for Mr. Kane?
20      A.   I believe so.  I'm not sure but I think
21  so.
22      Q.   Do you know if when Miss King went to
23  work for Mr. Cicalese if she continued to work on Mr.
24  Kane's closings there?
25      A.   I don't know.
```

14 (Pages 50 to 53)

Page 54

1    Q.   Do you know if Mr. Cicalese took over
2 handling Bill Kane's closings?
3    A.   I don't know that either.  I just know
4 he was in there someplace.
5    Q.   Other than Walsh Securities what
6 mortgage companies did you usually work with?
7    A.   After all this time I don't think I
8 could give you any kind of a list.  Somebody
9 mentioned Selective and that rang a bell.  Other than
10 that you would have to give me a couple of for
11 instances and I'll say if they sound familiar or not
12 but I couldn't give you a list.
13    Q.   Okay.  What was your connection to --
14 did you have any connection to Walsh Securities?
15    A.   None whatsoever.
16    Q.   Did you have a particular contact at
17 Walsh Securities that you dealt with?
18    A.   Never.  Let's just say no.  Never say
19 never.
20    Q.   Do you know what percentage of your real
21 estate closing business was Mr. Kane's closings?
22    A.   No.
23    Q.   Do you know if the majority of Mr.
24 Kane's closings involved Walsh Securities as the
25 lender?

Page 55

1    A.   I don't know.
2    Q.   But you are familiar with Walsh
3 Securities in connection with the Bill Kane closings?
4    A.   Yes.
5    Q.   Now, did you say that you believe you
6 met Mr. Kane through Irene DeFeo in 1995?
7    A.   Not I believe, I did.
8    Q.   And you believe he was in the business
9 of buying homes, remodeling them, reselling them?
10    A.   Well, among other things.  I don't know
11 if he did things beyond those that I was familiar
12 with but I guess my answer is yes.
13    Q.   Did you know him to be in any other kind
14 of business?
15    A.   No.
16    Q.   And I think you testified in a trial
17 involving Miss DeFeo and Miss Pepsny that DeFeo and
18 Kane had given you sort of the inside track to
19 representing the buyers involved in Mr. Kane's sales?
20    A.   I don't recall testifying to that and I
21 can't really say if my testimony would be the same or
22 different today.  I just don't recall.
23    Q.   Do you have any reason to believe your
24 testimony back then would have been inaccurate?
25    A.   If I said it back then, no, I don't have

Page 56

1 any reason to believe it was inaccurate.  Looking
2 back now I just draw a blank on that.
3    Q.   I think you had described Mr. Kane as a
4 control freak?
5    A.   Did I use that expression?
6    Q.   I wrote down "control freak."  I think
7 you did say that.
8    A.   Okay, yes.
9    Q.   How else would you describe Mr. Kane?
10    A.   Give me -- I don't know.  Give me some
11 examples and I'll tell you if they fit or not.
12    Q.   Was he smooth?
13    A.   Yes.
14    Q.   Did he come across as being sincere?
15    A.   Yes.
16    Q.   And is that sort of lulled you into
17 working with him?
18    A.   I guess it was a combination of things.
19 One was again Irene's glowing -- what's the word I'm
20 looking for?
21    Q.   Endorsement?
22    A.   Endorsement, thank you, of him.  And he
23 was a bundle of energy.  He was always, in his little
24 world anyway, on top of things and he was willing to
25 go here, drive there, drop this off, pick this up,

Page 57

1 deliver this, call this.  He was -- he liked being in
2 the middle of everything.
3    Q.   You testified that one of Mr. Kane's
4 companies was D&Sons?
5    A.   Correct.
6    Q.   Were you familiar with Cristo
7 Properties?
8    A.   Yes.
9    Q.   Was that also one of Mr. Kane's
10 properties?
11    A.   Well, later on it became his primary
12 one.  D&Sons for whatever reason just kind of faded
13 from the picture and almost all the Walsh closings
14 in -- again, I can't really draw a line but certainly
15 by the spring of '96 were through Cristo Properties.
16    Q.   Do you know why it changed from D&Sons
17 to Cristo?
18    A.   No.
19    Q.   Do you know Robert Skowrenski?
20    A.   Only in name, and the same caveat as
21 before, I am not really sure if I acquired the
22 knowledge of the name before or after the fact but,
23 yes, the name does sound familiar.
24    Q.   So you never met Mr. Skowrenski?
25    A.   Not to my knowledge.

15  (Pages 54 to 57)

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

Page 58

1    Q.    And you don't recall ever speaking to
2  him on the phone?
3    A.    I do not recall ever speaking to him on
4  the phone.
5    Q.    Are you familiar with the name of the
6  company National Home Funding?
7    A.    Yes.
8    Q.    How are you familiar with that?
9    A.    I would see the name on the HUD or other
10  documents at times, but I don't quite know how they
11  fit into the picture.
12    Q.    Did you ever have any communications
13  with National Home Funding?
14    A.    Not to my knowledge.
15    Q.    Nobody from National Home Funding ever
16  appeared at a closing.  Correct?
17    A.    Not that I know of.
18    Q.    And I think you testified that you were
19  not familiar with Mr. Kane working for National Home
20  Funding?
21    A.    Was not, no.  You know, I don't know if
22  he did or didn't but I wasn't familiar with it.
23    Q.    Would you be surprised to know that he
24  was also a loan originator for National Home Funding?
25    A.    I wouldn't be -- well, maybe -- no, I

Page 59

1  wouldn't be surprised but that's only because of the
2  image I had of Mr. Kane having multiple fingers in
3  multiple pies.  So I guess I wouldn't be surprised.
4  I wouldn't know that.
5    Q.    Would you think it was a conflict for
6  him to be a loan originator on a loan for a property
7  that he was also the seller?
8    A.    I have no idea.  I can't answer that.
9    Q.    You had testified that you had done some
10  loan closings for Mr. Kane back in 1995.
11    A.    Correct.
12    Q.    Were those loan closings different than
13  the ones that are at issue in this case?
14    A.    Well, we talked a little bit about that.
15  To the extent that I can group them all together,
16  which is always a little dangerous, but they were
17  different in that I had a direct attorney/client
18  relationship with the buyer/borrower, which I did not
19  have or certainly did not always have with -- we will
20  call -- the later closings.
21    Q.    When do you think that these "later
22  closings" started to occur?
23    A.    Oh, we talked about that too before.
24    Q.    Early 1996?
25    A.    Not early, no.  Mid '96.  And again

Page 60

1  that's a very approximate answer.  I can't be any
2  more precise.
3    Q.    Have you heard of the name of a company
4  call G.F. Mortgage?
5    A.    No.
6    Q.    Would you say it was in early 1997 when
7  you stopped working with Mr. Kane?
8    A.    No, later.
9    Q.    Do you remember roughly when?
10    A.    Same answer as before, mid '97 in an
11  imprecise sort of way.
12    Q.    And why exactly did you stop working
13  with Mr. Kane?
14    A.    I think the main reason is when that
15  problem with the trust account erupted, which is
16  probably the best word I can use, I was terribly
17  upset, terribly concerned about it and I wanted to be
18  repaid as soon as possible and he did in two
19  different ways.  One way I mentioned that he
20  immediately gave me -- I don't remember how much it
21  was, it was less than $2,000, that I can put right
22  into my trust account so I wouldn't bounce any more
23  checks of any denomination.  And the other way is he
24  gave me a large sum of money -- I believe the amount
25  was about 50,000, but he gave me a large chunk of it

Page 61

1  just so I could pay some things that weren't getting
2  paid like recording fees and things like that that
3  were sort of gumming up the works.
4        So he had an interest in seeing the
5  wheels start turning again.  So to me it certainly
6  constituted an admission that he dishonestly or
7  otherwise wound up with my trust money and certainly
8  had to pay it back, but he also declared war, almost
9  in those terms, through Lory.  She was the poor
10  person in the middle.  You know, this is it, like
11  he's -- I don't know, I felt like I became a marked
12  man.  Maybe should have somebody start my car in the
13  morning or something.  It wasn't a comfortable
14  feeling, and I guess it was right around that time or
15  shortly afterwards we did nothing together.
16    Q.    Do you recall how big the hole was in
17  your trust account?
18    A.    I want to say around $50,000.
19    Q.    So did this $52,000 fill up the hole and
20  resolve the problem?
21    A.    Did I say 52,000?
22    Q.    You said he gave you $2,000 immediately
23  and then he gave you another 50,000.
24    A.    No, he gave me a big chunk.  What he
25  gave me stopped the bleeding, you know, even piddling

16 (Pages 58 to 61)

Page 62

1  checks from bouncing, and the other chunk was enough
2  to get recording fees paid, realty transfer fees paid
3  because with a hole in your trust account you
4  couldn't pay anything, and I didn't have the
5  wherewithal, even if I was inclined to, to pay these
6  myself.
7      Q.   Was this a separate trust account set up
8  specifically for the Kane closings?
9      A.   No. It was a general trust account.
10 But to answer your question, later on I did have
11 another trust account, I think that might have been
12 on the advice of the Office of Attorney Ethics,
13 they -- they're strict and they have a job to do, but
14 on some matters they can be very stern. And what I
15 didn't realize -- I became a little annoyed later but
16 they were working in cooperation with the FBI. I
17 mean, they were demanding things from me through
18 their auspices as Office of Attorney Ethics, and I
19 guess -- I only know what I think -- spoon feeding it
20 all to the FBI which annoyed me. What was your
21 original question again? I'm sorry.
22     Q.   If you had a separate trust account.
23     A.   The answer is yes, I did, and it was as
24 I recall now, at the direction, if not the
25 insistence, of the O --

Page 63

1      Q.   OAE?
2      A.   Yeah. I have to work the initials out
3  in my mind.
4      Q.   But between 1996 and 1997 when you were
5  primarily doing these Kane closings, you only had one
6  trust account?
7      A.   Yes.
8      Q.   And the hole that had developed in the
9  trust account was approximately 50,000?
10     A.   To the best of my recollection.
11     Q.   And Mr. Kane had given you $2,000 when
12 you had immediately realized this, and do you recall
13 roughly how much he gave you to help cover recording
14 costs and filing fees?
15     A.   You mean the second check or the first
16 check?
17     Q.   The second check.
18     A.   No. It was a good chunk. It was more
19 than 2,000 and less than $52,000. I don't remember.
20 It was a lot of money.
21     Q.   Do you know how much you owed in
22 recording fees around that time?
23     A.   No, I don't remember.
24     Q.   Would that have been around April of
25 1997?

Page 64

1      A.   I see -- or I think I see what you're
2  leading up to, that maybe that was the big box that
3  sat there -- it might have been but I'm really,
4  really speculating on that. I just don't know.
5      Q.   Miss King had testified that Mr. Kane
6  had told her not to file deeds and that that is why
7  the large box had accrued. Do you have any
8  information about that?
9      A.   No, I don't, and I really think the
10 answer is what I just speculated before even though
11 it's pure speculation. Deeds weren't getting
12 recorded or the instruments weren't getting recorded
13 because there was no money to pay for them even
14 though theoretically the money had been withheld for
15 that purpose.
16     Q.   Did Walsh Securities provide the funds
17 that were wired into your account for the closings?
18     A.   I assume they did. I have no direct
19 knowledge to the contrary.
20     Q.   Did National Home Funding ever provide
21 funds that were wired to your account?
22     A.   Don't know.
23     Q.   But you do have a recollection that
24 Walsh Securities was providing you funds?
25     A.   Oh, yes.

Page 65

1      Q.   Do you recall Mr. Kane using any other
2  company besides Walsh Securities during this time?
3      A.   No, I don't recall.
4      Q.   You've heard of Cristo Properties and
5  D&Sons?
6      A.   Yes.
7      Q.   Have you heard of Oakwood Properties?
8      A.   Yes, but I don't know in what context.
9  It's a name that crossed my desk.
10     Q.   Are you familiar with it in connection
11 with Mr. Kane?
12     A.   Yes.
13     Q.   What about DEK Homes?
14     A.   Same thing as Oakwood. I remember the
15 name. And it had to do with Bill Kane, but I don't
16 quite remember the fit.
17     Q.   How about G.J.L. Limited?
18     A.   No. I am not saying there was one or
19 wasn't but I don't recall.
20     Q.   Have you heard of William Epp?
21     A.   Yes. Yes. And he goes back to the
22 D&Sons days, and I don't quite recall why or how but
23 he was associated with Kane in some fashion through
24 D&Sons. Let me be clear. It's just a name. I don't
25 think I ever met the gentleman or spoke to him.

17  (Pages 62 to 65)

Page 66

1    Q.   Have you heard of Capital Assets?
2    A.   Yes.
3    Q.   What do you know about Capital Assets?
4    A.   Everything I would like to forget. That
5  was a company related to -- in some fashion to Mr.
6  Grieser. I don't know if his name has come up this
7  morning or not.
8    Q.   Gary Grieser?
9    A.   Yes.
10   Q.   What kind of company was it?
11   A.   I haven't the foggiest idea. Well, by
12 its name -- I knew what the initials stood for. Let
13 me see if I can figure it out. Capital Assets
14 Management. It was a real estate type company I
15 assume.
16   Q.   Did they have any role in the Kane
17 closings?
18   A.   Not directly.
19   Q.   How did they have a role indirectly?
20   A.   Because Mr. Grieser had some sort of a
21 relationship with Mr. Kane, the details of which I do
22 not know, but they were involved together in some way
23 on some of these transactions.
24   Q.   Have you heard of Larry Cuzzi?
25   A.   How do you spell the last name?

Page 67

1    Q.   C-u-z-z-i.
2    A.   I probably -- the answer is yes. I
3  probably in my mind pronounced it as Cuzzi, but yes,
4  but I don't know why or in what connection or how but
5  I've heard the name.
6    Q.   Do you recall doing any closings for Mr.
7  Cuzzi?
8    A.   No.
9    Q.   Are you familiar with Selective Finance?
10 I believe you testified --
11   A.   I did testify to that and the answer is
12 yes.
13   Q.   Do you recall what you knew about
14 Selective Finance?
15   A.   Yes. I believe they were the lender,
16 directly or indirectly, in some of the earlier, let's
17 call it 1995, Kane transactions.
18   Q.   Did Mr. Alfieri and Mr. Pepsny have any
19 relationship to Selective Finance?
20   A.   Only what I heard, you know, secondhand
21 but I'm certainly willing to share it with you. The
22 answer is yes, but I don't know why or how. I think
23 Mr. Alfieri more so than Mr. Pepsny.
24   Q.   Why Mr. Alfieri more so?
25   A.   I don't know. It was his law firm.

Page 68

1  They are in the same building and the rest of it I
2  guess is not really very official. Things that I
3  heard almost gossipy and I don't remember from whom
4  or when or where or anything, but I just heard it
5  around, you know.
6    Q.   Mr. Alfieri's and Mr. Pepsny's law
7  office was located in the same building as Selective?
8    A.   Yes, it was.
9    Q.   Have you heard of Vinnie Appelgate?
10   A.   Yes. I believe he worked for Selective.
11   Q.   Did you ever have any dealings with him?
12   A.   Yes. He was the broker, but not real
13 estate broker, he was a mortgage broker in a couple
14 of these early deals.
15   Q.   And what was the context in which you
16 would have communications with Mr. Appelgate?
17   A.   Hardly at all except he was involved in
18 a couple of these transactions.
19   Q.   And I believe you testified you didn't
20 know Mr. Cicalese. Correct?
21   A.   No -- I mean yes, correct.
22   Q.   I think earlier you had said that you
23 didn't recognize the name Terry Finkelstein.
24   A.   No. I want to try to be as clear as I
25 can. I know the name. I know he's a lawyer in

Page 69

1  Middlesex County. It may be I had transactions with
2  him unrelated to Bill Kane in any way. I mean he was
3  almost like a local realtor, not that far away, and I
4  think just by law of averages I might have bumped
5  across him on the same transaction but uneventful, I
6  think.
7    Q.   So you don't know him as one of Mr.
8  Kane's lawyers?
9    A.   I don't, no.
10   Q.   Are you aware -- so you're not aware
11 that he represented Mr. Kane in some of the closings
12 in which you were involved?
13   A.   Not that I recall.
14   Q.   Do you recall Miss DeFeo ever implying
15 to you that you shouldn't ask questions about Mr.
16 Kane's closings?
17   A.   Can you be more specific? I am
18 intrigued by your question to tell you the truth.
19   Q.   You had testified about, I guess, some
20 concerns you had early on with things that were
21 occurring in some of Mr. Kane's closings and Miss
22 DeFeo had basically told you: Don't rock the boat
23 and that Mr. Finkelstein wouldn't ask questions of
24 Mr. Kane. Do you recall that?
25   A.   Kind of comparing me to him kind of

18 (Pages 66 to 69)

Page 70

1  thing?
2      Q.   Correct.
3      A.   I don't recall, no.  It sounds
4  interesting but -- and I might have said it at the
5  time.  As I sit here today I don't recall.
6          MS. WAGNER:  I am not going to mark this
7  as an exhibit but just to see if I can refresh
8  Mr. Yacker's recollection, I'm going to show him a
9  portion of his testimony in the matter of U.S. versus
10 Irene DeFeo and Donna Pepsny on April 30, 2002 in
11 Newark.
12     A.   I don't do too well without my glasses.
13 Can you read --
14     Q.   I can read it, sure.
15         MR. KOTT:  What page.
16     Q.   Page 25 to 26.  This is what we have
17 marked as Volume I.  Starting on line 20 on page 25.
18 You were asked:  "Did either Bill Kane or Irene DeFeo
19 say anything to you about the questions that you were
20 asking about the deposits and other entries?"
21         You had answered:  "Well, Bill was
22 making attempts to answer my questions.  Irene said,
23 You shouldn't be asking any questions.  It's all
24 pretty clear.  And then she made a reference to the
25 this other attorney that we had both had -- that we

Page 71

1  had both occasion to talk about, this Terry
2  FInkelstein, said he wouldn't be asking these
3  questions.
4          "Question:  Well, when Irene DeFeo said
5  to you that Terry Finkelstein wouldn't be asking
6  these questions, what did you understand her to mean?
7          "Answer:  That I shouldn't be asking
8  those questions or otherwise, you know, I wasn't --
9          "Question:  Otherwise you weren't what?
10         "Answer:  Cooperating, I guess, or
11 playing the game I guess.
12         "Question:  What did you do?
13         "Answer:  I stopped asking the
14 questions."
15         Does that refresh your recollection as
16 to Mr. Terry Finkelstein?
17     A.   I am -- not really -- but hearing you
18 say the words, it sounds like something that could
19 have taken place but, no, as I sit here today, I
20 don't remember.
21     Q.   Okay.
22     A.   I don't know how to put this.  I hear
23 you reading it back and I don't disagree with what
24 you said.  It sounds like something I could have
25 said, but I don't have any independent recollection.

Page 72

1      Q.   How did Miss DeFeo let you know about
2  matters that she was referring to you?  Did she fax
3  information to you?
4      A.   Oh, any number of ways.  Before Bill
5  Kane I had closed, oh, I don't know, maybe a half a
6  dozen matters with her.  And we developed -- I mean
7  we just started -- I don't remember how the first
8  deal started but I liked the way she operated.  She
9  was full of energy, and she was like a real
10 go-getter, and we had the kind of relationship, it
11 could have been -- she could have faxed it, she could
12 have called, she could have dropped it off.  We
13 communicated well I thought.
14     Q.   Did it change your -- her manner of
15 communicating client -- let me rephrase that.
16         Did the manner in which she communicated
17 with you regarding referrals change once you started
18 getting these Kane deals?
19     A.   Did her manner of dealing with me
20 change?
21     Q.   As far as notifying you about clients?
22     A.   I would say, again only because of the
23 nature of Bill Kane, she receded more into the
24 background because, again, he was one of these
25 hands-on control freaks and it was just almost

Page 73

1  natural that he would handle everything.
2      Q.   I don't want a guess.  How did you
3  become alerted to people that were going to be
4  purchasing properties from Kane that you were going
5  to need to close?
6      A.   These were ones that she was involved in
7  as the broker?
8      Q.   In general on any of them.
9      A.   Well, later on I wouldn't get alerted at
10 all.  It was all done through Lory.  She would
11 compile a monthly list of matters that were in the
12 hopper, so to speak, and it was Walsh's intention to
13 close as many of these as -- by the end of the month
14 as possible.
15     Q.   You mean Mr. Kane's intention, not
16 Walsh's?
17     A.   No, Walsh's.
18     Q.   Walsh's intention to close by the end of
19 the month?
20     A.   Again, some of that is secondhand.  I
21 don't know for sure.  I have already testified I had
22 little or no contact with Walsh but that's the way I
23 understood it.
24     Q.   Who do you recall telling you that Walsh
25 Securities wanted to close as many loans as possible

19 (Pages 70 to 73)

Page 74

1  by the end of the month?
2     A.   I don't know.  It was just out there.
3     Q.   So did --
4     A.   Who I heard it from or when or where.
5     Q.   Did Mr. Kane approach Lory King about
6  loans that needed to close and who the buyers were?
7     A.   Yes.
8     Q.   So at some point Miss DeFeo stopped
9  being so involved and Mr. Kane took over
10 communicating directly with your office?
11    A.   Assuming she was involved with that
12 particular deal to begin with.  Otherwise she
13 wouldn't be communicating at all.  I mean, there were
14 ways that Kane acquired buyers that I have no
15 knowledge of.  I just don't know.
16    Q.   Do you have any knowledge about Kane
17 acquiring buyers and how he did it?
18    A.   Other than the ones that would come
19 through Irene, and there was another broker whose
20 name came up, Donna Pepsny, no, I wouldn't.
21    Q.   But do you think that he obtained buyers
22 elsewhere besides through Miss Pepsny and Miss DeFeo?
23    A.   Yes.
24    Q.   Do you recall if Miss DeFeo was
25 typically the listing or the selling realtor in these

Page 75

1  transactions?
2     A.   That's interesting.  No, I don't recall.
3  I just recall one incident that has a bearing on your
4  question.  There arose kind of an open dispute
5  between DeFeo and Kane about whether or not he was
6  going to give her the listing or listings for
7  properties that he had just closed on.  She was
8  anxious to get those so she could find buyers.
9     Q.   Those are instances where she wanted to
10 list his properties?
11    A.   Yes.
12    Q.   Do you recall if Miss Pepsny was the
13 listing or the selling realtor in these transactions?
14    A.   She was involved in some.  She could
15 have been either but I don't recall.  I don't think
16 she was as forceful as Irene about getting, you know,
17 future listings on the same properties, but I don't
18 really know that for sure.
19    Q.   At the time did you know that Miss
20 Pepsny was Rick Pepsny's wife?
21    A.   Oh, yes.  Apart from the fact it's the
22 same name and it's a rather unusual name, but yes.
23    Q.   Did you ever have any dealings with them
24 at the same time together?
25    A.   I'm sure I did but I can't recall any

Page 76

1  particular instances.  Where he was the attorney for
2  Bill Kane and she was the realtor?  I think so but
3  I'm not sure.
4     Q.   Now, was it in 1996 when you met Donna
5  Pepsny?
6     A.   I can't pinpoint it but I would guess
7  yes.
8          MR. KOTT:  You said you would guess yes?
9          THE WITNESS:  I would guess yes.
10         MR. KOTT:  Does that mean you believe it
11 to be correct?  You know there's a difference in the
12 law between guesses and your best recollection.
13    A.   My best recollection is yes.  Yes, I do
14 know.
15    Q.   Was that at a loan closing?
16    A.   And what was the question?  Whether I
17 met her?
18    Q.   When you met Miss Pepsny.
19    A.   No, I think I first met her when she
20 came into my office to drop off some papers on a
21 closing she was involved in.
22    Q.   Would it have been a closing involving
23 Mr. Kane?
24    A.   I don't know.  Can I say I assume?  I
25 assume yes, but I'm not sure.

Page 77

1     Q.   Did you testify at Miss DeFeo's trial?
2     A.   I did.  You just read some of my
3  testimony.
4     Q.   And you also testified at Miss Pepsny's?
5     A.   They were a joint trial.
6     Q.   What was the time frame at issue in your
7  testimony at that trial?
8     A.   You mean when I went to court?
9     Q.   No.  The time frame for the frauds that
10 were at issue that Miss Pepsny and Miss DeFeo were
11 getting prosecuted for.
12    A.   I can't be sure but I assume right
13 around the times we were discussing, late '95, early
14 and mid '96.  That's the best I can do.
15    Q.   I think in that trial you had
16 distinguished between frauds that Miss DeFeo and Miss
17 Pepsny were involved with as compared to frauds that
18 Mr. Kane and Mr. Grieser were involved in.  Would
19 that be correct?
20    A.   I might have.  Maybe.  I don't know.
21    Q.   Do you think Miss DeFeo and Miss Pepsny
22 were involved in the scheme in which Mr. Kane and Mr.
23 Grieser were involved?
24    A.   Possibly but I don't really know
25 directly.

20  (Pages 74 to 77)

Page 78

1    Q.    In short, could you just sum up what
2  your testimony was against Miss Pepsny and Miss
3  DeFeo?
4    A.    I'm going to have to preface it with a
5  little bit of background because it might help
6  explain my answer. I was testifying on that trial as
7  a cooperating witness, what the implications of that
8  term are, and so I guess -- I don't know how to say
9  this without it sounding kind of shady and I don't
10  mean it to, but I was testifying to questions that
11  the government wanted to hear or about which the
12  government wanted to hear. So in that sense it was
13  kind of structured, and I was little really racking
14  my brain to think of anything that I could tell of
15  useful -- of use for the prosecutor dealing with
16  Irene and Donna. I mean, I was really stretching to
17  find things.
18        I can give you one silly example, and
19  I'm sure it popped up in the transcript because I
20  remember saying it and I felt a little uncomfortable
21  doing it. In moments that I would chat with my
22  secretary Lory, just that informal chatting, Irene's
23  name might come up and we kind of had like an inside
24  joke. We referred to her as the crisis lady and it
25  had to do with personality. I mean she was just a

Page 79

1  bundle of nerves and energy and she had the habit at
2  the closing -- and these are closings that did not
3  necessarily have anything to do with Bill Kane, just
4  her personality at the closing, which is truly at the
5  last minute she would find all kinds of little things
6  wrong with the way the closing was proceeding. Maybe
7  it had to do with the inspection that the seller had
8  done or with tiny little things. And what it did it
9  put the whole deal in kind of jeopardy because it was
10  in danger of just kind of blowing sky-high for silly
11  little things, like the seller left some food in the
12  refrigerator, and she was not closing until that was
13  taken care of. Things like that. But it was so
14  petty and so silly, and yet the prosecutor jumped on
15  it as if it was so enlightening, and he wanted me to
16  relate it to the jury and so I did. And I just bring
17  that up as an example of the silly little things.
18        But by way of background to the
19  question, if I did say it, it would be in the context
20  of trying to tell the prosecutor what he wanted to
21  hear, not lying certainly, telling the truth but
22  phrasing it in ways that put a smile on his face.
23    Q.    And when you called her the crisis lady,
24  you were implying that she caused the crisis?
25    A.    Yes, absolutely.

Page 80

1    Q.    And what she was doing wasn't
2  necessarily wrong, she was pointing out problems.
3  Correct?
4    A.    I didn't say it was wrong. It was
5  something he seized on and wanted me to relate it to
6  the court and I did.
7    Q.    So the government portrayed something
8  that she was doing as wrong when in your opinion you
9  didn't see --
10    A.    No, no -- finish your question.
11    Q.    In your opinion you didn't see it as
12  anything wrong?
13    A.    No, I have to correct that. I don't
14  know if they were trying to portray it as wrong or
15  right, but it was something that they considered very
16  juicy, that they were anxious to have the jury hear.
17  That's the way I looked at it, and again my feeling
18  is I thought the whole thing was silly.
19    Q.    How would you describe a legitimate real
20  estate flip?
21    A.    I'm glad you used the word "legitimate"
22  because I think flips have gotten a bad name over the
23  years. By and large they are of suspicious origin
24  maybe, I don't know, but a legitimate flip is where a
25  party or a person is buying a property with the

Page 81

1  intention of -- well, the more legitimate ones,
2  fixing it up and selling it, which is what I
3  testified was some of the earlier Bill Kane ones, but
4  otherwise they kind of already know they have a buyer
5  before they have acquired title from the seller. And
6  the object is to resell it as soon as possible so you
7  don't bear unnecessary carrying costs like, you know,
8  taxes and interest on any borrowed funds, that kind
9  of thing.
10        And the real artistry in a legitimate
11  flip now comes in when you don't want the seller, if
12  you can help it, to know that you're reselling it at
13  a higher price because then he has misgivings that
14  maybe he didn't get enough for the house. The same
15  thing is true in the reverse. You don't want the
16  buyer to know how little you paid for the property
17  before you sold it to them. It's more a kind of
18  image thing than anything else, but that's how I
19  would described a legitimate flip.
20    Q.    There is nothing wrong with a legitimate
21  flip, is there?
22    A.    You can turn on the TV and see on one of
23  the cable channels, it's called Flip This House. So
24  there's nothing wrong with it.
25    Q.    And it can improve property values in an

21 (Pages 78 to 81)

Page 82

1  area?
2      A.   Yes, it could.
3      Q.   I know you testified that at some point
4  you believe Mr. Kane was doing legitimate flips of
5  properties?
6      A.   Oh, yes.
7      Q.   At what point do you think that that
8  changed?
9      A.   I don't know and I can't pinpoint a date
10  and time, but I think it was the more he got involved
11  with Gary Grieser. I think the more it -- it was
12  susceptible to that kind of treatment.
13      Q.   Do you recall when he got involved with
14  Gary Grieser?
15      A.   Again, I would have to give you a real
16  broad date but certainly not in '95. Mid '96 maybe.
17      Q.   And how were Mr. Kane's flips with Mr.
18  Grieser different from what you described as a
19  legitimate flip?
20      A.   Well, he added a very important element
21  which changed a lot of things. He tried, I guess by
22  way of getting him extra leverage or whatever, to buy
23  the property he was flipping with money coming in
24  from the person who was being flipped to. What do
25  you call them? Flippee? And that was the biggest

Page 83

1  difference.
2      MR. McGOWAN:  That was Grieser's
3  innovation?
4      THE WITNESS:  I don't know.
5      (A discussion takes place off the
6  record).
7      Q.   You just testified that when Mr. Kane
8  got involved with Gary Grieser that an important
9  element to his flips was added, and that's when he
10  was purchasing a property he was simultaneously
11  closing a property so that he could then use the
12  proceeds from that closing to then pay for the
13  property he was purchasing and selling. Correct?
14      A.   Yes.
15      Q.   What was your role with respect to these
16  closings? Did you have any role with respect to Mr.
17  Kane buying the properties?
18      A.   No, not at all.
19      Q.   That was handled by Rick Pepsny?
20      A.   I assume so. I don't know. In other
21  words, I assume there were contracts and dealings
22  between the original seller and the Kane and Pepsny
23  but I don't know for sure.
24      Q.   Would Mr. Pepsny, or whoever his closing
25  lawyer had been, prepare that deed?

Page 84

1      A.   Yes. Which deed now? I'm sorry.
2      Q.   It's all very confusing.
3      A.   No, it's not. Just tell me which deed.
4      Q.   The deed from the sale from the
5  legitimate seller to Mr. Kane's company.
6      A.   No. The legitimate seller's attorney
7  would prepare that deed, which is normally the
8  custom.
9      Q.   Okay. Would that deed at some point
10  have been provided to your office?
11      A.   No, I don't think so.
12      Q.   Would Mr. Kane's lawyer be responsible
13  for filing that deed?
14      A.   Oh, no. At some point, yes, ideally on
15  the date of closing that deed should be in my office,
16  the deed we've just been referring to, whether it's
17  by messenger or whatever.
18      Q.   In these instances was it usually Mr.
19  Kane's practice to bring documents like that to your
20  office?
21      A.   Yes, it was. Can I just go back for the
22  sake of clarity? The ideal way to do it -- I think
23  we're talking about legitimate flips -- to do it in
24  the same office, if not the same room at the same
25  time, and, again, you can preserve what I was talking

Page 85

1  about before about the buyer not wanting to get
2  envious or jealous, nor the seller for that matter,
3  but there's got to be a way for the deed to go from
4  here to there in time to be workable, which was I
5  think at the beginning everybody's intention and
6  design, but, as you're probably about to ask with
7  your subsequent questions, it degenerated from that.
8      Q.   And I'll get to that.
9      A.   Okay.
10      Q.   There was then a deed prepared with
11  respect to the transaction from Mr. Kane to the buyer
12  who your office represented. Correct?
13      A.   Correct.
14      Q.   Who would have prepared that?
15      A.   Rick Pepsny.
16      Q.   And whose responsibility would it be to
17  file that deed and the deed that the -- between the
18  original seller and Mr. Kane?
19      A.   The buyer's attorney, if there is such a
20  thing. If not -- I'm going to call this person a
21  settlement agent, which is more or less what I
22  fancied myself in a lot of these Kane dealings.
23      Q.   Now, I know there's a subsequent deed
24  which I'll get to in a moment.
25      A.   Okay.

22 (Pages 82 to 85)

VERITEXT REPORTING COMPANY

212-267-6868                516-608-2400

a51af0f5-da6e-4c57-b258-d4af925f36ff

Page 86

1    Q.    Did you -- while you were doing all
2  these closings, did you ever hear the term straw
3  buyer used?
4    A.    Oh, yes.
5    Q.    Did Mr. Kane use that term?
6    A.    I heard it used by a lot of people
7  including myself, but the answer is yes, he did.
8    Q.    And how would you describe a straw
9  buyer?
10   A.    Well, it's sort of like describing flip.
11 There is a way that it's got a legitimate connotation
12 and there's a way that it's got an illegitimate
13 connotation, but you can use straw buyers or straw
14 persons in non-real estate matters as a word -- legal
15 word of art.
16     In olden days, and I can't remember the
17 particular instance, but there was a way to transfer
18 property from A to B by going through a straw person.
19 It was almost required to do it right. It's almost
20 archaic, but it's not that long ago when that used to
21 be an acceptable practice.
22     So straw buyer, again, can have a bad
23 connotation, it can have a good connotation, but it
24 originated I think maybe more from Grieser than from
25 Kane, but it could have been either one. And that

Page 87

1  was because -- I don't know the details of it but
2  there was like a quota system, and I know you have
3  already asked me and are probably going to ask me
4  again, was this Walsh-generated or Kane-generated? I
5  don't know. I believe it might have been a little of
6  both, but there was a monthly quota system somehow
7  where you wanted to do as much as possible within the
8  month but not too much. And the "not too much"
9  referred to these buyers all the time buying up
10 properties. So the concept of straw buyer was born.
11   Q.    Now, in the legitimate world --
12   A.    Yes.
13   Q.    -- a straw buyer wouldn't be obtaining a
14 mortgage. Correct?
15   A.    Might. Why not? In the legitimate
16 world? Yes, if it was disclosed and agreeable and
17 understandable to the lender, yeah, I could see that.
18   Q.    How could a straw buyer purchase --
19 obtain a mortgage?
20   A.    Almost like a trustee. They acquired in
21 their name so it could be held for somebody else.
22 Again, this is either going to be workable in the
23 eyes of a lender or not workable or maybe workable
24 under some circumstances. The lender is kind of key
25 to all this as to whether this is something, you

Page 88

1  know, foreign to them.
2    Q.    Or whether it's legitimate or
3  acceptable?
4    A.    Well, yeah, yeah.
5    Q.    Did you ever have any conversations with
6  anyone at Walsh Securities about whether or not Walsh
7  Securities would accept providing a purchase money
8  mortgage to a straw buyer?
9    A.    No. But from the totality of the
10 circumstances, just the way they handled the
11 transactions up to that point, it was easy to infer
12 that they wouldn't object. I mean, they knew at this
13 point -- I was going to call you Amy. I forgot your
14 last name.
15   Q.    Wagner.
16   A.    Miss Wagner, we knew at this point that
17 Walsh had allowed closings with buyers on more than
18 one occasion. These people weren't accumulating
19 properties like little kids accumulate baseball
20 trading cards. They were buying them to dispose of
21 them. And so I think Walsh, had they stopped to
22 think about it, and maybe they did, this sort of
23 thing was happening anyway with or without straw
24 buyers, but it gave the impression to people like me
25 that they wouldn't have had any objections to straw

Page 89

1  buyers.
2    Q.    Let me take a brief break.
3      (A recess takes place.)
4  DIRECT EXAMINATION BY MR. MAGNANINI:
5    Q.    Mr. Yacker, do you know a person named
6  Mr. Dinaso?
7    A.    Wasn't I asked that before?
8    Q.    D-i-n-a-s-o.
9    A.    Wasn't he the one from D&Sons? If it
10 is, yes, I knew of him. Never met him?
11   Q.    How about a fellow named Mike Lucy,
12 L-u-c-i or L-u-c-y?
13   A.    No, doesn't sound familiar.
14   Q.    Previously you testified that Mr. Kane
15 was always delivering documents. What kind of
16 documents was he --
17   A.    Could be anything. Surveys, title
18 binders, checks, I don't know. Could be anything.
19   Q.    All the documents were related to Mr.
20 Kane's closings?
21   A.    Yes.
22   Q.    And then also earlier you had testified
23 that at some point Miss King had become so familiar
24 with the closing instructions she had more or less
25 memorized them?

23 (Pages 86 to 89)

Page 90

1    A.    That's right.
2    Q.    And so one of the things that popped
3  into my head:  Isn't it true every closing
4  instruction is different depending on the loan?
5    A.    Yes and no.  Potentially they can differ
6  in minor respects, but all from the same lender tend
7  to follow a basic format and that's what I found with
8  Walsh.
9    Q.    So that --
10   A.    Differences would be minor.
11   Q.    And generally the same requirements were
12  in each set of closing instructions?
13   A.    Generally, yes.
14   Q.    When we were talking previously about
15  the steps in a real estate closing, you had said you
16  would order a title binder and title insurance.  When
17  you did that, did you always order a closing
18  protection letter as well?
19        MR. KOTT:  Objection to the form.
20   A.    I want to say yes, but I think as long
21  as there was a lender involved it was almost
22  understood that it was standard to do that.  So had I
23  not mentioned it at all I think the title company
24  would have done it automatically, or at least asked
25  me:  Do you want a closing protection letter?  I

Page 91

1  mean, that's how common it was.
2    Q.    When you say when there was a lender
3  involved, if it was an individual homeowner selling
4  the property, you wouldn't necessarily get a closing
5  protection letter?
6    A.    I wouldn't be ordering a binder if it
7  was a seller.
8    Q.    Okay.  But what about --
9    A.    How about a buyer with a cash deal
10  maybe?
11   Q.    Right.
12   A.    I wouldn't necessarily be getting a
13  closing protection letter.
14   Q.    But standard practice for a lender like
15  Walsh Securities was to get a closing protection
16  letter?
17   A.    Yes.
18   Q.    And then I believe earlier you testified
19  that at some point Mr. Kane became involved with a
20  man named Gary Grieser?
21   A.    Yes.
22   Q.    And when did that occur?
23   A.    I've been asked that and I can't really
24  pin it down.  Sometime in 1996.
25   Q.    What was Mr. Grieser's role or

Page 92

1  relationship with Mr. Kane?
2    A.    They shared some ventures together
3  involving Walsh as a lender.  I really don't know
4  what else.  They were not partners in the same
5  business but they sort of informally partnered out
6  different little things.
7    Q.    And how do you know this?
8    A.    Grieser would come around fortuitously
9  at around three o'clock-ish on a closing date -- that
10  was when typically Walsh would release the wires --
11  looking for some money and Bill Kane frequently told
12  us, Lory primarily but me too if I cared to know, how
13  he wanted his proceeds as seller divided up.  It's
14  almost as if he said:  Well, instead of paying me my
15  7,000, I owe the milkman 500, pay him 500 and me
16  6,500.  As long as he directed it and as long as it
17  was within his limit as money coming from the
18  transaction it was okay with me.  Anyway Grieser
19  frequently was one of those persons.
20   Q.    So money that Walsh had wired to you to
21  close the loan the proceeds were sometimes
22  distributed to Mr. Grieser?
23   A.    Yes.
24   Q.    But at Mr. Kane's direction?
25   A.    Absolutely.

Page 93

1    Q.    And did you ever distribute the funds to
2  close a loan prior to the loan closing?
3    A.    That -- that requires some explanation I
4  guess.  The object of course -- not the object, I'll
5  say the requirement, of course, is for the loan to
6  close before we distribute anything.
7    Q.    Right.
8    A.    And in the earlier ones we followed that
9  strictly, but Bill Kane, and I have to add he was
10  very good at this, would nibble a little each time.
11  He would push Lory mostly, and I felt sorry for her
12  because she was under a lot of pressure exerted by
13  him.  What he would do is:  The earlier ones he would
14  come running in at three o'clock half out of breath
15  or whatever, here's your deed, and we would have all
16  the checks and everything written out already, and
17  then he turned over the deed and there were some
18  related papers, Affidavit of Title, stuff like that.
19  And he would pick up checks that were either to him
20  or through him, and that was the end of that phase of
21  the transaction.
22        But, again, he would nibble a little bit
23  at a time.  He would call at about five to three and
24  said:  I'm going to be a little bit late, can you
25  hold everything for me?  Of course we can, Bill, and

Page 94

1 the next time it would be a little further than that.
2 We closed but the deed is being held by Rick for some
3 minor thing unrelated to whatever, and -- in other
4 words, each time there was another excuse to stretch
5 the envelope a little bit further. And it's
6 unfortunate because it's wrong.
7        But to get back to your question, yes,
8 there were -- what was the question?
9    Q.    There were times where you were actually
10 disbursing money that Walsh had sent to you to close
11 a loan prior to the loan closing?
12    A.    Yeah.  We tried not to and there were
13 ways we relied on verbal assurances, like, for
14 example, Rick would call and say, yes, we just
15 closed, I have the deed, we just have to get it over
16 to you. And if you remember me saying we weren't
17 that far apart geographically, maybe he could send a
18 runner over or something so you can treat it as
19 closed and except for the matter of, you know, me
20 getting the deed over to you, and maybe he would fax
21 over a copy, whatever, to kind of reassure us.
22        I think if I can just gratuitously add a
23 comment there probably would be a better way to do
24 that if you wanted to play those kind of games with
25 kind of like an escrow agent or somebody that

Page 95

1 could -- the deed would exist, it would be signed, it
2 would be delivered but delivered in escrow, and the
3 guy would hold onto it until the money could --
4 changed hands, you know, because to do it like we
5 wound up doing near the end of things was wrong, I
6 mean, not to mention the skating on thin ice. You're
7 talking about trust accounts and money where there's
8 a fiduciary responsibility.
9    Q.    Was there ever an occurrence where when
10 the money had been disbursed but for whatever reason
11 there was no closing?
12    A.    There may have been one example of that.
13 I can't remember except I think it may have happened
14 once but I don't know time or any details. And as
15 long as you mentioned that, I always kept in the back
16 of my mind, hardly as justification but it was some
17 comfort, that if all hell broke loose, I could send
18 Walsh's money back to them if I had to, but that's
19 again -- it's like playing with fire.
20    Q.    How could you have done that?
21    A.    Their own instructions say:  If for any
22 reason something is wrong or something you don't like
23 or even I think their instructions included a burden
24 on us to be a little suspicious as something that
25 bothers you about this, don't close it, send our

Page 96

1 money back. You know, that kind of thing. To the
2 extent we issued checks, again, you got to rely on
3 people sometimes, although it's more comforting if
4 you do it through their lawyer, hey, I will give this
5 to your lawyer if he promises to hold it until he
6 absolutely gets a phone call from me that I've been
7 funded or whatever. That kind of thing. There are
8 ways to do it with more assurance than we did.
9    Q.    Did you ever send any checks to Mr.
10 Pepsny and ask him to hold them until you received
11 certain documents and told him to release them?
12    A.    Yes. And I will tell you why I
13 remember. This was also part of the -- you were out
14 for most of this -- the hole that developed in my
15 trust account. He was issued for must have been
16 about 15 closings, not all in one day, over a period
17 of maybe a week, all in the amount of $650, which was
18 his standard fee without embellishment or deduction,
19 and I called him as a fellow attorney and what I
20 thought was a friend: Hold these checks because
21 there's a hole in my trust account. If you go to the
22 bank and cash them they're going to bounce and he
23 did.
24    Q.    He cashed them?
25    A.    No, he held them.

Page 97

1    Q.    Okay.
2    A.    Later on he found some way -- and I
3 don't know the details on this so I don't want to be
4 too specific. He found some way to time it just
5 right when maybe some monies came into my trust
6 account. I don't know how he knew but probably
7 through Bill Kane because, like I said, he had his
8 fingers into everything.
9    Q.    Right.
10    A.    To realize, well, Yacker hasn't
11 authorized this but I know there's enough money in
12 his trust account now and he put in those checks. I
13 had gotten ticked off. I never really sat down and
14 discussed it with him, but I didn't like that at all.
15    Q.    Did you meet any of the straw buyers at
16 these closings?
17    A.    I don't think so, no. Later on I got to
18 hear some of their names. Most of the multiple ones,
19 the people that closed on seven, eight, ten different
20 matters were straw buyers.
21    Q.    Do you know if anybody, I guess from
22 your office, probably would be Lorraine King, told
23 them that they would never have to make a mortgage
24 payment?
25    A.    No, I would have no knowledge one way or

25 (Pages 94 to 97)

Page 98

1  the other. The answer is still no, but I just can't
2  see her saying that. Maybe she did, maybe she
3  didn't. Doesn't sound like her, though.
4      Q.   Do you know if anybody dealing with Miss
5  King told the straw buyers they would have no
6  responsibility for the note even though they were
7  signing it?
8      A.   I wouldn't know.
9      Q.   I guess if you actually never met the
10 straw buyers you don't even know who these people
11 were?
12     A.   I do not, no.
13     Q.   Do you know if Miss King asked for
14 identification from them?
15     A.   If it was required she probably did. If
16 not I don't know. It wasn't as common as it is
17 today. Now it's demanded by most banks to not only
18 get identification but copy it and submit it back
19 with the closing papers, that kind of thing.
20 Particular bank I could think of now got away from
21 copying the --
22         MR. McGOWAN: Description?
23     A.   No, IDs because they thought it might be
24 improperly used as a form of profiling, racially or
25 otherwise, and they would just ask the closing agent,

Page 99

1  whoever that was, to sign some sort of a
2  certification but it's pretty detailed. This is
3  currently. What document did you rely on? What was
4  the expiration of date of the document? Was it a
5  driver's license or something else, that kind of
6  thing, and sign in almost like affidavit form, but in
7  those days it just wasn't a form of emphasis.
8      Q.   It was not your standard procedure?
9      A.   To answer your question, no, I don't
10 know if she required it. I don't think she did.
11     Q.   Were you aware that there were false
12 leases created in connection with the mortgages that
13 Walsh Securities funded?
14     A.   After the fact I heard, you know, like
15 rumors to that effect, but at the time I didn't even
16 know leases were prepared or relied on or requested
17 or anything.
18     Q.   Do you know whether the straw buyers
19 were purchasing these properties as their primary
20 residence or as an investment property?
21     A.   Well, it was obvious in all the cases of
22 multiple buyers that they couldn't live in more than
23 one place primarily. So in that case I assumed they
24 were buying them as investment, and I probably
25 assumed that in all cases but I don't really know.

Page 100

1      Q.   Okay. Did you have any involvement in
2  preparing the lease documents that were used in the
3  transactions that Walsh Securities funded?
4      A.   No. As I said I wasn't even aware that
5  they were being required or submitted or whatever,
6  but no, I did not.
7      Q.   Kelly O'Neill, who you said you had not
8  met but you heard of, she had testified that she
9  prepared an escrow letter representing that you were
10 holding money in escrow when in fact you weren't.
11 Are you aware of that?
12     A.   Yes.
13         MR. KOTT: Is he aware that she
14 testified to that?
15     Q.   Her testimony.
16     A.   No, I am not aware she testified; I am
17 aware that it became a problem or point of focus.
18     Q.   Tell me what you know about that.
19     A.   I was asked initially on these Kane
20 matters to prepare an escrow letter. I was not
21 holding funds in escrow, and I remembered some
22 language from an escrow letter many years before in a
23 totally unrelated matter, just happened to stick in
24 my mind, where to demonstrate good faith a check was
25 being held by the escrow agent, whoever it was, and I

Page 101

1  don't even know if it was a bank check. I mean it
2  was subject to collection like any personal check
3  would be but at least it showed something.
4      Also it became important for me to try and
5  not important but significant for me to try and
6  figure out was the bank requiring this for either of
7  two reasons. Either to show that the buyer was a
8  serious buyer and not just a window shopper or to
9  show where the source of the money was coming from
10 and to me it didn't seem to be either.
11     If they were interested in where the
12 source of the money was coming from they had other
13 ways to do that, which were much more effective, you
14 know, show me the bankbook that it was taken out of
15 if you wrote a personal check, and if they saw a big
16 sum, show me how it got in there. Banks can get
17 very, very inquisitive about those sort of things.
18 And Walsh, to my perception, didn't seem to care.
19     But anyway I devised what was a
20 carefully worded letter that I wasn't holding the
21 money in escrow, I was holding a check in escrow.
22 Now is it parsing words? Sure. I mean, it reminds
23 me a little bit -- I will try to refer to something
24 political in a nonpartisan way. It reminds me of
25 Clintonesque, depending on what the definition of

26 (Pages 98 to 101)

Page 102

1  "is" is. It was kind of cutesy, but at least it told
2  the situation exactly what it was. So, yes, I would
3  use that as a method.
4      Later on I was given forms that were not
5  prepared by me, prepared either by Walsh or National
6  Home Funding, I'm not sure which, for me to sign and
7  it was their language, not mine, and so I signed
8  that. It didn't seem like I was violating anything
9  factually, but, yeah, it was trying to be cute.
10     Q.   In each of the Kane transactions did you
11 actually receive a separate check?
12     A.   That's something else. Simultaneously
13 with this thought process that I was going through, I
14 said to Bill: Give me a check. I am only going to
15 hold it anyway and he did. And at the end the check
16 would go back to him and then he would give me
17 another one, and it got a little bit silly. And so
18 he would give me a check and I would just hold it and
19 use it for like the next transaction. And let me
20 just finish because it's all tied in. Later on we
21 devised a better system. He had left back a
22 significant sum of money, I want to say around
23 $20,000, unusual because these guys were so hungry
24 for their cut.
25     Q.   They would clean it out?

Page 103

1      A.   They descended upon you and grabbed with
2  both hands. He left in for whatever reason about
3  $20,000, and I don't remember whose idea it was but
4  he and I kind of created this alternative. We will
5  use that money as if I'm holding the money in escrow
6  because if you want to I can set aside the $6,000
7  figure, whatever the deposit was, and earmark that
8  for Mr. Lieber or whoever it was, and that will be
9  the money I was holding. In other words, very
10 artificial but I thought it was geared to meet a
11 situation which I thought was artificial.
12     Q.   The check -- going back to the checks
13 that Mr. Kane gave you, were they ever filled out?
14     A.   Oh, yeah, it wasn't just a blank check,
15 it was filled out and signed. It may have been his
16 check. I'm not sure.
17     Q.   And did he provide you with a separate
18 check for each individual closing?
19     A.   We started doing it that way, and,
20 again, just because of the silliness of it, there
21 must be a way to do the same thing in a little more
22 streamlined fashion and that's what we did.
23     Q.   So you eventually went to just one check
24 and then eventually to this $20,000 that was in the
25 account?

Page 104

1      A.   Uh-huh. See, I don't know,
2  Mr. Magnanini, as I sit here today, what Walsh's, you
3  know, purpose was in that requirement. I don't know
4  if they know. Maybe something they kind of
5  inherited, goes with the trade or the industry, but I
6  would have liked to have known: Why do you want this
7  information because it might have then -- might have
8  then told me how I should react to it.
9      Q.   Did you ever think that Walsh Securities
10 as the mortgage bank wanted to know how much money
11 had already been put down because they were only
12 loaning a certain percentage of the value of the
13 property?
14     A.   Yes, I did. Like I said, there's two
15 main reasons. One is they want to know that the
16 buyer is more than a window shopper, and, two, they
17 want to know where the money is coming from.
18     Q.   And what happened after these closings,
19 the money was -- was the check just returned to Mr.
20 Kane?
21     A.   Yes, the check was returned to Mr. Kane,
22 and Mr. Kane in effect would absorb the deposit that
23 I should have been holding. Instead of turning it
24 over to him, I gave him his check back and he got
25 that much less bottom line on the HUD.

Page 105

1      Q.   On the.
2      -- from the full sale price?
3      A.   Exactly.
4      Q.   Do you recall that at some point in time
5  Walsh Securities instead of just accepting an escrow
6  letter from a closing agent or a closing attorney
7  like yourself, required that the letter also include
8  a copy of the check and a deposit slip showing that
9  the money had been deposited into your trust account?
10     A.   No. I wish it had. That would have
11 been more meaningful to me, but, no, I don't recall
12 that at all.
13     Q.   What would you have done had that been
14 required?
15     A.   Well, I have a chance to self-serve a
16 little bit and try to look back to what I would have
17 done. I would like to be able to say I would have
18 reacted differently because they're now interested in
19 knowing am I actually holding money, and I would have
20 to react in some way that wouldn't make a sham out of
21 that purpose. I didn't really know what Walsh's
22 purpose was.
23     Q.   Did that matter?
24     A.   Yeah.
25     Q.   I know it mattered to you in

27 (Pages 102 to 105)

Page 106

1 rationalizing this --
2     A.    If I am going to start doing those kind
3 of things I might have as well phony up a check or as
4 I think somebody tried to do on one occasion phony up
5 one of my letterheads and use it as an escrow letter,
6 but within the -- what I've referred to before as
7 Clintonesque, within the Clintonesque limits, I tried
8 to be candid about it.
9     Q.    Do you know where Miss O'Neill got your
10 letterhead to create this phony escrow letter?
11     A.    I don't know if she's the one. I don't
12 know. I just heard maybe second or thirdhand that it
13 was done. I don't know any details.
14     Q.    Do you know how anybody would have
15 gotten your letterhead to -- while Mr. Kane was in
16 your office?
17     A.    No, but, you know, on any communication
18 I send, even a fax cover sheet -- well, here's one
19 right here -- there's a place where you can copy it,
20 cutting and pasting and make a letterhead out of it.
21 That's what I assume.
22     Q.    All of the escrow letters you sent to --
23 who did you send the escrow letters to?
24     A.    I don't know. Whoever requested them.
25 I assume it would be Walsh, but I didn't physically

Page 107

1 do the sending.
2     Q.    Did you -- even though you weren't
3 holding the money in the trust account, you sent the
4 escrow letters to Walsh Securities. Did you sign
5 each of the letters or did you have a stamp?
6     A.    I don't recall. Lory, except in the
7 most formal circumstances of things that had to be
8 notarized or witnessed in a very formal way, would
9 often sign my name and put her initials after it or
10 something similar to that, and I knew it and I
11 trusted her on that. So it could have been her. If
12 not, it could have been me but I have no distinct
13 recollection.
14     Q.    Do you know if she ever signed your name
15 without your initials?
16     A.    No, I don't know, but she would normally
17 do it to protect herself, I guess, so that nobody
18 would think: Gees, you're trying to make yourself
19 look like Mr. Yacker. That's just my thinking, but,
20 no, I don't know any instance.
21     Q.    Did Mr. Kane pay you for preparing the
22 fraudulent escrow letters?
23     A.    No.
24     Q.    Nothing in addition to the --
25     A.    Absolutely not.

Page 108

1     Q.    -- closing amount? Okay. Do you know
2 James Brown? Not the singer, the appraiser.
3     A.    Only by name.
4     Q.    Had you ever met Richard DiBenedetto?
5     A.    I don't think so but I knew him by name
6 because he was local. He was Monmouth County, in
7 other words. I don't know if I ever had a deal, a
8 non-Bill Kane deal, let's say, where his appraisal
9 was involved, but I knew him as a local appraiser,
10 not personally though.
11     Q.    How about --
12     A.    Never to meet.
13     Q.    Never met him?
14     A.    No.
15     Q.    Do you know or did you know Thomas
16 Brodo?
17     A.    No, not at all.
18     Q.    How about Roland Pierson?
19     A.    Yes, I knew the name, and I believe he
20 was also a local realtor but I did know him.
21     Q.    Do you recall doing any or being
22 involved with any matters with him other than the
23 Kane real estate deals?
24     A.    Roland Pierson? I might have. It would
25 have to go way, way back, like, maybe 20, 30 years,

Page 109

1 and, again, it might have been in his capacity as a
2 realtor. I seem to know him more as a realtor than
3 an appraiser.
4     Q.    And the last appraiser involved in this
5 is named Richard Calanni.
6     A.    Okay.
7     Q.    Have you met him?
8     A.    No.
9     Q.    Do you know him?
10     A.    Again, just by name and after the fact.
11     Q.    While you were doing the closings on
12 behalf of Mr. Kane, were you aware that the
13 appraisers were inflating the value of the
14 properties?
15     A.    No, and I never was until -- well, I
16 will guess and say after the fact.
17     Q.    When did you become aware?
18     A.    I guess when the story broke, quote
19 unquote, there was a big front-page article in the
20 local paper with a picture of a house all boarded up
21 and everything and it was something: Would you pay
22 150,000 for this? It was kind of a sensationalist
23 type of article. And in there they mentioned that
24 somebody actually with a license appraised this thing
25 for a lot more money, and that's when it came to

VERITEXT REPORTING COMPANY

Page 110

1  light. Also many months later I went through the
2  boxes and boxes of material that the FBI had actually
3  seized with my attorney --
4      Q.   From you or from other people?
5      A.   Primarily from me. In fact, I think
6  exclusively from me. To see if there were things
7  there that I needed by way of defense for the trial
8  because they took everything, and that's when I saw
9  in there things -- I guess they were always in my
10 file but I never paid any attention to them. Like, I
11 never had an appraisal in my file ever. But I think
12 things like the 1003 -- that's the application you
13 fill out for your loan where I saw people with menial
14 jobs reporting, I don't know, 30, $40,000 worth of
15 income, crazy, and I was -- it's not that I
16 couldn't -- shouldn't have known this but I was
17 learning it for the first time.
18     Q.   You had earlier testified that Mr.
19 Kane -- you viewed him as somebody who bought
20 properties and fixed them up and sold them.
21     A.   Yes. Very initial stages, yes.
22     Q.   Right. Did he continue to do this as
23 you did more and more real estate deals with him
24 throughout '96 and '97?
25     A.   Yes, but it became very rare, few and

Page 111

1  far between, but I can remember one in -- locally,
2  Matawan Borough, I can't remember the guy's name, but
3  it was a matter where he did some work on the house
4  in conjunction with the actual transaction.
5      Q.   And the "he" being Mr. Kane?
6      A.   Yes, "he" being Mr. Kane. But they were
7  rare.
8      Q.   That he actually did any work on --
9      A.   That I am aware of him doing any work
10 on, yes.
11     Q.   During the time that you were doing the
12 real estate closings with Mr. Kane, were you aware
13 that the appraisers were appraising the property as
14 if they had been repaired?
15     A.   No.
16     Q.   Did you ever provide the appraisers with
17 comparable sales to use in their appraisals?
18     A.   No. You can ask all -- further
19 questions along this line, but I had no contact with
20 the appraisers in any sense, directly or indirectly.
21     Q.   Do you know if Miss King ever provided
22 comparable sale information to any appraisers?
23     A.   I would guess no, but I don't know for
24 sure.
25     Q.   Because Mr. Calanni I believe may have

Page 112

1  testified that he had contacted your office to get
2  close sales information to use in his current
3  appraisals, but you don't have any recollection of
4  that?
5      A.   No, I do not.
6      Q.   And from your testimony it sounds like
7  that would be very unusual?
8      A.   Yes.
9      Q.   And out of the ordinary?
10     A.   Yes.
11     Q.   Okay. Mr. Yacker, you had testified
12 that you had never met the straw buyers or you didn't
13 attend the closings. Do you know if Miss King ever
14 met any of the straw buyers?
15     A.   Yes, I would say in almost all
16 instances, if not all, but yes.
17     Q.   How do you know that Lory King met with
18 the straw buyers?
19     A.   Not direct but only from like
20 surrounding circumstances. I'm sure there were a few
21 occasions when I was present but not sitting at the
22 closing table. I was doing something else in the
23 office, and I might have seen the people come in and
24 go out, not even to be introduced to them but -- and
25 just, you know, Lory and I would communicate with

Page 113

1  each other. She might have said: I did three back
2  to back to back with Jones today, okay? You know,
3  that kind of thing, but I can't cite you a direct
4  answer to that question.
5      Q.   Okay. We have had -- some of the straw
6  buyers have testified that they had only purchased
7  one loan but subsequently found out four had been
8  closed in their name and -- you know, or they have
9  testified they didn't sign these papers or they
10 didn't participate in the closings. And so I'm
11 wondering if at some point in the process of closing
12 loans for Mr. Kane he was just delivering paper to
13 your office and there weren't any individuals
14 participating at all.
15     A.   He worked that out with Lory. And
16 similar to the way he would nibble a little bit at a
17 time to try to get you to -- well, you did it
18 yesterday and I'm just asking for a little bit more
19 today, and, again, he was very good at that. He
20 would try to say to Lory, you know, I'll get these
21 things notarized, I'll bring them back first thing in
22 the morning, and he was trying to create the illusion
23 of doing just that. And I think maybe he did in a
24 few of those transactions somehow get a notary from
25 someplace to notarize. And then came the time when

29 (Pages 110 to 113)

Page 114

1   he would come, I didn't get a chance to see a notary
2   but I saw them sign and just add -- he was very good
3   at it. So he nibbled and nibbled a little bit at a
4   time, but I don't think Lory would ever sign their
5   names. I don't know. I just think she would know
6   better than that.
7       I do remember one incident, which is not
8   a direct answer to your question, but it might be
9   enlightening, Lory was very disturbed one day when
10  she had insisted, rightly so, that the people come
11  here to sign, and somebody came and she didn't ask
12  them for identification and turned out that it was
13  somebody totally different. They just masqueraded as
14  the straw buyer and she was very upset about that to
15  me. I remember her saying, I feel stupid to be so
16  naive and to be duped by an actor. So I know she was
17  upset about it, and if it was at all possible I don't
18  think she wanted to stretch the limits of propriety
19  at all in that respect, but having said that I don't
20  know what she did or didn't do.
21      Q.   Do you recall the names or the name of
22  the person who came masquerading as someone else?
23      A.   No.
24      Q.   Was it Larry Cuzzi?
25      A.   It could have been but I never met Larry

Page 115

1   Cuzzi so it wouldn't have had any impact on me. It
2   could have been.
3       Q.   Do you recall who he was supposed to be?
4       A.   Lieber.
5       Q.   David Lieber -- Liebler?
6       A.   Yeah.
7       Q.   How did you know? Miss King told you
8   that?
9       A.   The very next day, yeah, she was irked
10  and I sense she was a little bit mad at me too, I
11  don't exactly know why, but that I kind of put her in
12  that situation.
13      Q.   Are you aware that Miss King testified
14  she did sign the name of borrowers when Mr. Kane
15  asked her to?
16      A.   No. And I would be surprised except to
17  the extent that, again, he was so effective at this
18  that I think he just either overwhelmed her or put so
19  much pressure on her.
20      Q.   On Miss King?
21      A.   Miss King, yes.
22          MR. MAGNANINI: Off the record.
23          (A discussion takes place off the
24  record).
25      Q.   How were the closings scheduled for Mr.

Page 116

1   Kane's --
2       A.   How? I don't know exactly what you mean
3   by how. Be a little more specific.
4       Q.   Was there a calendar system in your
5   office or did Mr. Kane just call up and say: We've
6   got another closing to do?
7       A.   There was a loose calendar system that
8   Lory kept. She somehow assembled a list, usually
9   during the early part of the month, of things that
10  were in the hopper, so to speak. I don't know how
11  they got to be in the hopper, but she would make a
12  list and, among other things, it told her what to do
13  at certain stages. Should I be ordering a title
14  binder now? That sort of thing. And at some point
15  she would hear from a combination of Walsh that, yes,
16  they were ready to close in the sense of funding it
17  and sending us a package, and she would certainly
18  hear from Bill Kane that he was ready and she just
19  kind of put it all together and it got scheduled.
20      Q.   During 1996 and the beginning of 1997
21  when you were a solo what percentage of your practice
22  were these closings for Bill Kane?
23      A.   Well, I was asked that before I think
24  while you were in hiatus. It was a significant
25  percentage, but I don't know even in terms of like

Page 117

1   50/50 or something like that. I certainly had other
2   real estate matters totally apart from Bill Kane and
3   I would probably say Bill -- I can't estimate. It
4   was a significant portion of my real estate matters.
5       Q.   For the other real estate matters you
6   had, did Lorraine King do all the closing work or did
7   you do all those?
8       A.   There was a period when we soloed, we
9   started -- it was just she and I and so, yeah, I had
10  other closings and she did them. She needed in the
11  early months a little more guidance than she later
12  did. As I think I mentioned she was very bright and
13  picked up very fast.
14      Q.   I guess my question was: On those other
15  real estate closings, you participated in them as
16  well as Miss King?
17      A.   Oh, yes. Oh, yes.
18      Q.   So it was only the Kane ones that you
19  weren't involved in the actual closing process?
20      A.   Yes.
21      Q.   At the closings was there typically a
22  double closing? By that I mean, there was a straw
23  buyer purchasing a property from Mr. Kane's companies
24  and then there was a transfer by the buyer to a joint
25  venture that was comprised of Mr. Grieser's company,

30  (Pages 114 to 117)

Page 118

```
 1   you mentioned before Capital Assets Property
 2   Management and the straw buyer?
 3       A.   Yes.
 4       Q.   And could you explain how that occurred?
 5       A.   Yes. The straw buyers, I guess when
 6   they were recruited as straw buyers, and I know they
 7   got paid and I've heard various estimates of a
 8   thousand, 2,000, but I don't know the nitty-gritty of
 9   those -- of those inner transactions.
10       Q.   Why were they paid, Mr. Yacker?
11       A.   Because what they were doing was lending
12   their name and supposedly their good credit to a
13   transaction that without them would have had to be
14   done by somebody who would probably be a repeat that
15   Walsh for whatever reason rejected or didn't want,
16   and, again, I'm not sure why as far as that goes. So
17   they were being paid.
18       Q.   Do you know that Walsh would have
19   rejected or not wanted them?
20       A.   Yeah, but, again, I'm getting a lot of
21   this secondhand. Again, the flavor I was getting was
22   that -- I don't know if it was a limitation on the --
23   well, I don't know, but they just wanted to do so
24   many with any one person before it -- before bells
25   and whistles went off. I don't know why.
```

Page 119

```
 1       Q.   Where did you get that information?
 2       A.   I don't know. It was just kind of in
 3   the air. I don't know from who and when and how.
 4       Q.   So at the closing there were -- how many
 5   deeds were then produced?
 6       A.   Well, there was the initial deed from
 7   the seller to Kane's company, deed prepared by Pepsny
 8   from Kane's company to the buyer, straw or otherwise,
 9   and in the straw buyer cases there was an additional
10   deed from the -- additional deed from the straw
11   buyers to themselves and also to CAPMI.
12       Q.   And that's Capital Assets Property
13   Management?
14       A.   Yes, because straw buyers had no
15   motivation in fixing up or renting out, if it was
16   rentable, the properties, and, like its name implied,
17   CAPMI was going to be like the manager.
18       Q.   Were all those deeds then recorded?
19       A.   In the typical situation, yes, and it
20   was important to have them recorded, you know, in the
21   same sequence, pretty much the sequence that I just
22   recited.
23       Q.   Would the deeds be recorded in that
24   sequence even if Mr. Kane didn't own the property
25   initially? So that, as an example, Mr. Kane was
```

Page 120

```
 1   going to purchase a property, he had not purchased
 2   it, he sold it to a straw buyer, the straw buyer
 3   deeded 60 percent to CAPMI, kept 40 percent. And as
 4   a result of that sale transaction closing Mr. Kane
 5   had money to then actually purchase the property that
 6   he had already sold. And so when that sequence were
 7   the deeds still recorded as a seller to Mr. Kane or
 8   his companies, Mr. Kane to the straw buyer, the straw
 9   buyer to the joint venture?
10       A.   The answer is yes, but I am not really
11   sure I understand why you're asking the question.
12       Q.   Well, what we've seen in the files, and
13   again I'll pull this out for you, is that there are
14   certain deals that we see that Mr. Kane or Cristo or
15   J.G.L., whatever his corporate entity or alter ego
16   was, had not actually purchased the property?
17       A.   We talked about that.
18       Q.   Right. So that in that case when he had
19   not made a purchase and would the deeds be recorded
20   in that same order a third party seller to Kane, Kane
21   to straw buyer, straw buyer to joint venture?
22       A.   Yes, that was the objective but the more
23   Kane, through probably a sense of greed, wanted to do
24   all this without putting his own fresh money in, it
25   put a strain on the system of doing it in that order,
```

Page 121

```
 1   but, yes, it should be done in that order for title
 2   reasons, if nothing else. You don't want to sell a
 3   piece of property before you have got it.
 4       Q.   That's what I was going to say. How
 5   could you actually close a loan to sell a piece of
 6   property that you don't own?
 7       A.   Okay. If you're asking a rhetorical
 8   question I agree.
 9       Q.   You can't?
10       A.   No.
11       Q.   Or you shouldn't. Okay. Mr. Yacker,
12   who drafted the joint venture contract?
13       A.   There's been some talk about that and I
14   think the FBI for whatever reason zeroed in -- the
15   U.S. Attorney's office, I guess I should say, and
16   they tried to create some sort of a -- my impression
17   anyway, some sort of a rift between Lory and I over
18   that, and I think maybe there's some method to their
19   madness, but the actual facts were this: Lory --
20   well, in the first place the idea was bounced off of
21   me. I said yes, you guys can do that. It was
22   bounced off of me by either Kane or Grieser or either
23   or both. Definitely one of those two.
24       Q.   Why did you say they could?
25       A.   Oh, because I saw no problem with it.
```

Page 122

1    Walsh in its packages from the past didn't seem to
2    put any emphasis, if at all, on what happens after
3    the loan. It's frequent that banks put in what is
4    now referred to as a due on sale clause, that if you
5    sell, it doesn't violate -- it's not a default but it
6    could trigger the entire mortgage becoming due if the
7    bank doesn't feel happy about it.
8    Q.    That clause is in there.
9    A.    Is it?
10   Q.    Yes, in all the Walsh documents.
11   A.    I didn't know that, but it didn't seem,
12   for whatever reason, to be of concern of Walsh.
13   Whether I read too much into that or not, I don't
14   know, but the object of -- if CAPMI was going to
15   manage these properties, they wanted to make sure
16   they had a certain amount of control and a certain
17   amount of ownership interest. The straw buyers
18   didn't care because they really weren't buying it to
19   be -- you know, as an investment. They had already
20   earned their money, $1,000 or whatever, for agreeing
21   to function as straw buyers.
22          Anyway, back to your question, they met
23   with Lory on a Saturday. I just don't think they
24   wanted to bother me, but the U.S. Attorney's theory
25   was that they were secretly plotting all this behind

Page 123

1    my back and we got into a dispute: Well, did I draft
2    it or did Lory. Actually it was a combination of
3    both. I had dug out for Lory an old joint venture
4    agreement that I had used for two guys who were
5    buying a piece of real estate together. One was kind
6    of the money man and the other guy was like the
7    handyman, and they just wanted to put their thoughts
8    on a simple little agreement. And the beauty of it
9    was its simplicity. It was about three pages long.
10   And I said to Lory: Here's a form of one because I
11   knew she was going to meet with those guys and she
12   actually met at my offices. I wasn't around, it was
13   a Saturday when I sometimes was in but not this
14   Saturday. They just felt more comfortable doing
15   it -- I wasn't offended or anything. It was saving
16   me some time, and I think she did a cut-and-paste
17   kind of a job.
18          She took my basic draft and took the
19   facts as Bill and Gary gave it to her and drew up an
20   agreement, which she may have gotten back to me after
21   and said: Here's what I came up with, is it okay?
22   I'm not sure. But I think that's what she did, but
23   it just seemed, for whatever it's worth, that they
24   were trying to create an artificial rift between Lory
25   and I over this silly little agreement.

Page 124

1    Q.    About who produced it?
2    A.    Yeah.
3    Q.    Why was that?
4    A.    I don't know. Like we were trying to
5    hide something, and I think maybe it was to their
6    advantage to build some internal strife between Lory
7    and I.
8    Q.    When was the last time you have spoken
9    to Miss King?
10   A.    A long, long time ago. She had some
11   problems, Gary Grieser-related, after she left my
12   employ and asked me if I would help her out with them
13   and I said sure. And I did spend quite a bit of
14   time. She was my old secretary. I never charged her
15   or anything. I didn't expect her to pay and she
16   didn't expect to pay, but we had to spend some time
17   together because of that. Basically she was accused
18   in a Grieser-related transaction of stealing somebody
19   else's property. It's a long story, but it had
20   nothing to do with the Kane closings or anything, and
21   I helped her out on that, and that's probably the
22   last time I spoke to her.
23   Q.    And that was a separate civil lawsuit?
24   A.    Yeah. She was being -- it may have come
25   up in a criminal context. I don't remember. If it

Page 125

1    came up in a criminal context it was quasi-criminal
2    in the municipal court, like some sort of a trespass
3    or something on Lory's part. They later dropped all
4    the charges, but it gave Lory a lot of grief and
5    consternation.
6    Q.    When was that?
7    A.    I would say six months maybe after she
8    left my employ.
9    Q.    So sometime in 1998?
10   A.    No, not that late. '97 maybe.
11   Q.    So you haven't spoken to her for the
12   last 13 years?
13   A.    No, sad to say I haven't. I think --
14   the answer is no, but I think she kind of -- I don't
15   know if she really blames me for not -- but I think
16   she feels that there's more I could have done I guess
17   by way of supervision to avoid all of this happening
18   and to a degree she's probably right.
19   Q.    What could you have done?
20   A.    Supervised better. Like I didn't
21   know -- if she signed other people's names, I would
22   have said, don't you dare do that. I mean, there's
23   civil implications, criminal implications. You don't
24   want to get involved, things like that, almost
25   fatherly kind of advice. I knew how good she was but

32   (Pages 122 to 125)

Page 126

1 I didn't realize the enormous pressures that she was
2 under.
3     Q.    Did you prepare the deeds?
4     A.    Which deeds?
5     Q.    From Mr. Kane or his corporate entities
6 to the straw buyer.
7     A.    No, Lory prepared those beyond the
8 original model, which we created. It was just a
9 matter of inserting dates and names and stuff so she
10 prepared those.
11         MS. WAGNER: Did Rick Pepsny prepare
12 those or Miss King?
13     Q.    From Kane to the straw buyer.
14     A.    Oh, from Kane to the straw buyer. No.
15 Rick Pepsny did. I thought you were talking about
16 the joint venture. Rick did in almost every
17 instance.
18     Q.    Were there any deeds that you or Miss
19 King prepared?
20     A.    I don't think so.
21     Q.    What about the -- was there a deed
22 produced as part of the joint venture agreement
23 deeding the property from the straw buyer --
24     A.    Yes. Those are the ones I thought you
25 were referring to as part of your question.

Page 127

1 That's the one where I created a model and Lory used
2 my model for all the future transactions of that
3 type.
4     Q.    Okay. And Miss King signed those deeds.
5 Do you recall ever signing any of the deeds?
6     A.    I might have, but the design was that
7 she would. See, because she did it simultaneously.
8 While everybody was sitting around the table she
9 would say to the straw buyers: You signed all this
10 thing, and now you have got to sign this thing
11 putting it in the hands of the three of you and she
12 had it right there, so it would be natural for her to
13 notarize those signatures.
14     Q.    Were those deeds from the straw buyer to
15 the joint venture and joint venture agreement
16 ever sent back to Walsh Securities?
17     A.    I doubt it.
18     Q.    Why?
19     A.    I didn't think it was their concern.
20     Q.    So even though they were giving away 60
21 percent of the security that underlay the mortgage
22 you didn't think it was the lender's concern that
23 that had just occurred?
24     A.    No.
25         MR. HAYES: Let me object to the form.

Page 128

1     Q.    It's kind of a convoluted question.
2     A.    They were not giving it away, number
3 one, and they still retained an interest. They were
4 adding another party but they were still liable on
5 the note.
6     Q.    Earlier I thought you testified they
7 weren't really buying the property, they didn't have
8 an interest?
9     A.    That's right. They didn't care whether
10 they had an interest in it or not.
11     Q.    So Walsh Securities was then getting a
12 purchaser that didn't -- it wasn't -- they weren't a
13 bona fide purchaser, they didn't care about making
14 payments on the note is what you're saying?
15         MR. KOTT: I object to the form.
16     A.    Well, I don't know what they cared about
17 or didn't care about, but that was not their
18 expectation, no, to own property. They realized, I
19 hope, that they were, mechanically anyway, signing an
20 IOU to pay this money.
21     Q.    Did you ever -- did you ever explain to
22 any of them, straw buyers, about their obligations
23 under the note and mortgage?
24     A.    No, I did not, but I think as an
25 essential ingredient in what I've just said is

Page 129

1 nobody, certainly not me, thought the property was
2 worth just a fraction of what Walsh was willing to
3 lend on it.
4     Q.    So you thought the property was as
5 valuable as what the appraisals claimed?
6     A.    I had no reason to think otherwise. I
7 don't think I ever gave it that specific --
8     Q.    Thought?
9     A.    -- thought process, but I had no reason
10 to think otherwise, not until I saw that article in
11 the Asbury Park Press. I think that was my first
12 wake up.
13     Q.    You said earlier that the straw buyers
14 received cash payments of, I think you said, 1,000 to
15 $2,000?
16     A.    That's my understanding. I did not
17 witness any of that.
18     Q.    Did you ever make any payments to any of
19 the straw buyers?
20     A.    No.
21     Q.    Do you know if Miss King did?
22     A.    I don't know but I would doubt it.
23     Q.    Did you know the straw buyers were
24 receiving payments during the -- while you were
25 closing these transactions for Mr. Kane or his

33 (Pages 126 to 129)

Page 130

1  companies?
2     A.    I know it was set up that they would be
3  paid for the use of their names and their credit.
4     Q.    When did you first learn that?
5     A.    I think from the time it was set up.
6     Q.    So actually in 1996 in the beginning --
7     A.    Yes.
8     Q.    -- of these transactions?  You said that
9  you did other real estate closings as well.
10    A.    Yes.
11    Q.    Was it usual for the seller to pay the
12  buyer's closing costs in those other real estate
13  transactions?
14    A.    I will say somewhat unusual but
15  definitely not unprecedented.
16    Q.    Did you record that differently on the
17  HUD-1s when the seller was paying the buyer's closing
18  costs?
19    A.    It was certainly not our intention to
20  hide it, but I want you to try to understand that the
21  HUD-1 is a predesignated form approved by the HUD
22  people.  Housing --
23    Q.    And Urban Development.
24    A.    Okay.  And some of the words in there
25  are not as precise as they could be or as flexible as

Page 131

1  they could be to meet every situation.  So some of
2  the labels in there are kind of pre-chosen like
3  whether I'm an attorney or a closing agent or a
4  little bit of either or a little bit neither.  It
5  didn't always fit the right description, but the
6  intent certainly was to disclose it on the HUD and
7  not mislead or hide anything from anybody.  And in my
8  own biased way I think we did that to the best of our
9  ability.
10    Q.    Do you think you did that on the Kane
11  closings as well?
12    A.    Oh, yeah.  Yeah.
13    Q.    And how?
14    A.    Well, the -- my fee was on there and I'm
15  not sure but it should have been in the seller's
16  closing as seller paying for it.  If it was in the
17  buyer's, maybe that was misleading.  I don't know.
18  The other attorney involved would be Pepsny and he's
19  not always on there.  Yes, he was always on there,
20  but in the standard transaction sometimes the seller
21  gets paid outside of closing, those famous initials,
22  POC, Paid Outside Closing, and it's disclosed that
23  way.  But when all the dust settled Bill Kane paid
24  for the -- his own attorney and he paid that portion
25  at least of the buyer's closing fees, and it was our

Page 132

1  intent to convey that on the HUD itself.
2     Q.    If the buyers in the Kane transactions
3  had paid any of the closing fees they would have
4  given a check to you?
5     A.    No.  Oh, if they paid it?  Yes, they had
6  a bottom line to come up with and, yes, they would
7  have had to have given it to me.
8         MR. KOTT:  By check?  The question is:
9  They would have given you a check.
10        THE WITNESS:  Yes.
11    A.    I think in most instances it was set up
12  so that they wouldn't have to come up with anything.
13  Either it was a wash or maybe even they got back a
14  few dollars, but the design of so many of these was
15  that they wouldn't have to come up with anything.  A
16  lot of them didn't have it to come up with.
17    Q.    That was going to be my next question.
18  Having looked at your ledgers and things, I have
19  never seen any check from a straw buyer to you for
20  any sort of closing.
21    A.    From the straw buyers, I would have to
22  say no, they didn't -- the deal was they weren't
23  going to pay anything.  They were going to get money,
24  walk out and go about their business.
25    Q.    Did you ever acknowledge any documents

Page 133

1  that Mr. Kane -- the closings involving Mr. Kane
2  selling properties to the straw buyers?
3     A.    I doubt it.  I might have.  Like a
4  couple of isolated instances but I don't recall.
5     Q.    Did you authorize Miss King to
6  acknowledge documents?
7     A.    Oh, yes.  That would have been typical
8  or standard.
9     Q.    Did you ever forge any notarizations on
10  closing documents?
11    A.    No.
12    Q.    Do you know if Ms. -- you said actually
13  there was the event where they were signed by someone
14  else and then brought to Miss King --
15    A.    Yeah, but that doesn't mean --
16    Q.    -- to notarize?
17    A.    Brought to her, yeah.  I didn't witness
18  that, I heard about it.
19    Q.    And you heard about that from her?
20    A.    I don't remember.
21    Q.    Do you know if Miss King was ever paid
22  any money by Mr. Grieser for these closings?
23    A.    I personally don't know.  I would tend
24  to doubt it but I don't know.
25    Q.    Who determined which closing lawyer to

34  (Pages 130 to 133)

Page 134

1  use on Mr. Kane's transactions?
2      A.   Well, do you mean his lawyer?
3      Q.   Or his -- or the lawyer for the straw
4  buyer.
5      A.   I don't think the straw buyer had any
6  lawyer.
7      Q.   Well, the buyer's lawyer then.
8  According to the HUD-1, throughout these transactions
9  we have always seen Mr. Pepsny's name representing
10  either Mr. Kane or his companies, I will say to keep
11  it general, and then on the buyer's side there were
12  two closing lawyers that we have seen involved,
13  yourself -- a few other minors ones. It was yourself
14  and Mr. Cicalese predominantly.
15      A.   Okay.
16      Q.   Who made the decision on whether to use
17  Mr. Yacker or Mr. Cicalese?
18      A.   Obviously -- I shouldn't say obviously
19  but it wasn't me. That would be a bit presumptuous
20  of me. I don't know.
21      Q.   When you had this dispute with Mr. Kane
22  about the trust account --
23      A.   Yes.
24      Q.   -- issue, how many more closings did you
25  do after that issue came to light?

Page 135

1      A.   A few. And I remember they were very
2  strained and very awkward but there were some that I
3  guess were pending and that we had to finish up and
4  take care of.
5      Q.   And so after the trust account issue
6  surfaced Mr. Kane ceased doing business with you?
7      A.   He openly declared war on me.
8      Q.   What do you mean by --
9      A.   This is it, it's over, that language to
10  that effect and he did it mostly through Lory. Like,
11  this poor girl, among other things, had to be the
12  messenger between Kane and me. Mostly through her.
13  He may have said something to me directly too. I
14  don't know.
15      Q.   Do you know -- and did Miss King leave
16  your employment at that time and go work for Mr.
17  Cicalese or was she still employed partially by you
18  and partially by --
19      A.   I'm not sure. There was a point in time
20  when she started doing some work for Mr. Cicalese but
21  I don't know when and --
22      Q.   Those were the same Kane closings?
23      A.   I assume they were, yeah.
24      Q.   When did Miss King leave your employ for
25  good?

Page 136

1      A.   I don't know. As I say there was a
2  period of time as I related to --
3      Q.   Miss Wagner?
4      A.   -- miss Wagner. I'm sorry.
5      Q.   That's why I'm here.
6      A.   Okay. When she hung around, I don't
7  mean that in a derogatory sense, but she was around
8  to try to resolve that monetary dispute in our trust
9  account.
10      Q.   And during that time, Mr. Yacker, was
11  she your employee?
12      A.   No. Again it was kind of awkward. She
13  was doing it almost as a favor to me and that's all
14  she was working on. She had her own little desk in
15  my office. I didn't set it up for this purpose, it
16  just wasn't being used, and she would come in on her
17  own time and stay as long as she thought she was able
18  to and worked strictly on that. And when she ran out
19  of time -- she had two young children at home -- she
20  would say, I'll be back in a day or two to do some
21  more. Very unstructured. I didn't pay her. Again,
22  I was doing her some favors with her other legal
23  problems, and maybe it was considered a tradeoff, but
24  she wasn't on my payroll any longer.
25      Q.   Was she able to finally resolve the

Page 137

1  issues with your trust account?
2      A.   No.
3      Q.   Why not?
4      A.   I don't know.
5      Q.   Was she able to at least identify --
6      A.   Yes.
7      Q.   -- what the problems were?
8      A.   We both thought it was a particular
9  transaction in either Asbury Park or Long Branch and
10  Mr. Kane was coming out not so coincidently with the
11  right amount, about 52, 54,000, something around
12  there, and we both believed that he got paid twice
13  for that.
14      Q.   Was that one transaction or a group
15  of --
16      A.   No, this was one transaction. He denied
17  it. And he basically said: Prove it. And again he
18  controlled in a freaky sort of way the computer
19  printouts and the trust account. That used to bother
20  Lory. Why does he have to know everything about our
21  trust account? She was much more concerned about it
22  than I was, and sure enough that chicken came home to
23  roost. He did know plenty about our trust account
24  and he wasn't telling us anything that would be a
25  help for how the shortage occurred.

35  (Pages 134 to 137)

Page 138

1    Q.   Could Mr. Kane input information into
2  your trust account or he was just able to monitor it?
3    A.   He somehow was responsible for helping
4  Lory set up a computerized trust account. Again, I
5  know very little about computers, little more I
6  should hope about trust accounts, but I don't know
7  how it was done. He had his own accountant and when
8  I started to rely on his own accountant to help me
9  out so I could collect money from his boss, so to
10 speak, he sent me a bill which I never paid.
11   Q.   The accountant did?
12   A.   Yes. You're taking up my time for this,
13 that and the other thing, you better pay me or I am
14 not going to do any more work for you. I mean, it
15 was brutal.
16        (A recess takes place.)
17   Q.   Mr. Yacker, while you're looking, what
18 I've given you is deposition exhibits that marked
19 King's deposition on April 30, of 2010 marked King
20 exhibits three through thirteen, and I would ask you
21 just to take a look through those documents.
22   A.   All right. I did briefly.
23   Q.   Have you seen these documents before?
24   A.   I probably have but I don't have any
25 specific recollection.

Page 139

1    Q.   On the document entitled King-3, which
2  is a title insurance commitment, Schedule A --
3    A.   Is this the one right on top?
4    Q.   The one right on top. Right.
5    A.   I see, King-3.
6    Q.   Do you recognize the handwriting on
7  that?
8    A.   No, I do not. It's just not mine.
9    Q.   Okay. Where did you receive the title
10 insurance commitments from?
11   A.   Where? From -- in most, but not all,
12 cases from Coastal Title.
13   Q.   And who owned Coastal Title?
14   A.   I don't know.
15   Q.   Who did you work with at Coastal Title?
16   A.   I didn't work with anyone.
17   Q.   You didn't ever discuss anything with
18 anyone at Coastal Title?
19   A.   That's correct.
20   Q.   Who interacted from your office with
21 Coastal Title?
22   A.   It would be Lory, if it was anybody, and
23 a lot of Bill Kane who wasn't from my office but that
24 sort of answers your question.
25   Q.   Did Mr. Kane work at Coastal Title as

Page 140

1  far as you know?
2    A.   As far as I know, no.
3    Q.   Who was responsible for selecting
4  Coastal to handle the title work?
5    A.   It was not me, and again just what I'm
6  trying to put together from the surrounding
7  circumstances, I would say Bill Kane but that's
8  without any strong conviction.
9    Q.   So that's a guess?
10   A.   Yes.
11   Q.   And what was Coastal Title Agency's role
12 in the Kane transactions?
13   A.   They would supply at our request, or
14 maybe Bill Kane would do it directly, I don't know,
15 it was not me, a title binder and ultimately title
16 insurance in a particular piece of property.
17   Q.   Did they also provide closing protection
18 letters?
19   A.   I believe they did but I don't know. As
20 I sit here today, I don't know.
21   Q.   So Coastal would send documents to your
22 office?
23   A.   No. Specifically they would send --
24 well, what I'm looking at here, King-3, title binder.
25   Q.   Okay. And then was that delivered by

Page 141

1  Mr. Kane or sent by Coastal?
2    A.   Could have been either.
3    Q.   Did you send any documents to Coastal
4  Title Agency?
5    A.   Personally, no.
6    Q.   Do you know if Miss King did?
7    A.   Yes.
8    Q.   And what documents would she send to
9  them?
10   A.   Typically she would send them their
11 check.
12   Q.   So they would send you an invoice --
13   A.   Yes.
14   Q.   -- to get the check? What else did she
15 send?
16   A.   Title companies require different
17 things. Most of them want to see a copy of the HUD.
18 It's just helpful to them. And probably copy of the
19 mortgage, the original of which was to be recorded,
20 probably a copy of the deed related to the mortgage,
21 and I don't know if there are other little special
22 documents that were not typical of every single
23 closing. I will throw this one out: A survey
24 affidavit, she would send that along too. Everything
25 that they ought to have.

Page 142

1    Q.    Did Miss King send all the necessary
2 documents to Coastal Title?
3    A.    Yes. I thought that was your question.
4    Q.    My follow up was going to be: Did you
5 ever receive a call from Coastal Title asking for any
6 additional documents?
7    A.    Not that I knew of. But if it happened
8 it wouldn't be unusual. I mean any time I send
9 anything to anybody I run the chance they're going to
10 say: Hey, you forgot to include this but -- because
11 people don't remember all the time.
12    Q.    But you don't have any recollection --
13    A.    Specific instances, no.
14    Q.    Did Coastal ever raise any questions
15 about the Kane real estate transactions?
16    A.    Like what?
17    Q.    Any calls to you or any discussions with
18 you about the properties, the way the sales occurred.
19    A.    Not that I recall.
20    Q.    Do you know a Robert Agel?
21    A.    Know him by name and I did run across
22 him in a totally unrelated transaction, nothing to do
23 with Kane directly or indirectly. It was just a
24 title dispute involving our township where he
25 testified -- I don't know -- as a title person, sort

Page 143

1 of like an expert witness. So I did meet him on that
2 one occasion.
3    Q.    When was that?
4    A.    Couldn't tell you but before any of this
5 Kane stuff.
6    Q.    So before 1996?
7    A.    Yes.
8    Q.    Going back to King-3, what is the
9 purpose of this title insurance commitment?
10    A.    What it does, it tells the user of it,
11 in this case it was our firm, that provided that you
12 remove the so-called -- let me go back. Provided
13 that you comply with the requirements in Schedule B
14 and the exceptions in Schedule B2, they will commit
15 or issue a title policy or title policies in the
16 stated amount.
17    Q.    And who provided the information that
18 the title agent had asked for in Schedule B?
19    A.    Well, the standard affidavit of title,
20 be it a seller's or a mortgagor's affidavit of title,
21 is designed to answer all the -- what's the word?
22 Boilerplate requirements set forth in Schedule B.
23 And I guess I excluded that in my list of documents
24 that Lory would send to Coastal. One would be a
25 seller's affidavit of title that I don't think I

Page 144

1 mentioned. And that in and of itself is usually
2 designed to meet the boilerplate requirements of
3 Schedule B.
4    If there's something unusual -- a lis
5 pendens that had been filed or something on the
6 property we would have to address that separately.
7 And same thing with the exceptions, the exceptions
8 had to be either not applicable or removed in some
9 way, shape or form and then the transaction was
10 eligible to have title insurance issued.
11    Q.    To have insurance issued?
12    A.    Yes.
13    Q.    And on the Requirements, Subsection D?
14    A.    D?
15    Q.    D.
16    A.    As in David. I don't see that. Mine
17 ends with Section B2.
18    Q.    Sorry. Go back to Schedule 1 --
19 Schedule B, Section 1.
20    A.    I got you. Okay.
21    Q.    Under "Requirements," D?
22    A.    Small d.
23    Q.    Small d. It says: "You must tell us in
24 writing the name of anyone not referred to in this
25 commitment who will get an interest in the land or

Page 145

1 who will make a loan on the land. We may then make
2 additional requirements or exceptions."
3    And earlier you had testified about the
4 joint venture deeds, that you didn't think the lender
5 would be concerned about them. With this requirement
6 here that it says you had to tell the title company
7 in writing the name of anyone not referred to in this
8 commitment who will receive an interest in the land,
9 CAPMI, Capital Assets Property Management Inc., was
10 receiving a 60 percent interest in the land. Was the
11 title company or title agent ever notified that CAPMI
12 was getting 60 percent interest in the land?
13    MR. HAYES:  Object to form.
14    MR. KOTT:  Objection to form.
15    MR. McGOWAN:  Object to form.
16    A.    Can I answer with a "but"? The answer
17 is no, but I don't think it was the intent of that
18 paragraph D to call for that. In other words, CAPMI
19 would be taking subject to whatever is in this
20 binder. They weren't asking directly or indirectly
21 to be insured under it in any way, shape or form so I
22 didn't think it applied.
23    Q.    And actually as Miss Wagner is pointing
24 out to me --
25    A.    Is she hitting you in the ribs with her

37  (Pages 142 to 145)

Page 146

1  elbow?
2       Q.    King Exhibit 4 is actually, if you turn
3  to that, that's the title insurance commitment for
4  the sale from --
5       A.    Kin Exhibit 4. I got it.
6       Q.    Okay.
7            MS. WAGNER: It's the third to last
8  page.
9       A.    I see the same clause. You want to
10 refer to that D-2?
11      Q.    That's what I was referring to.
12      A.    It says the same thing except it's not
13 checked.
14      Q.    What does it mean if it's checked?
15      A.    I don't know. I didn't mark this binder
16 up.
17      Q.    That's what I was going to ask you.
18      A.    I don't know. Just by way of further
19 explanation, marked-up binders are much more common
20 in my experience in New York than they are in New
21 Jersey, and when I would attend a closing in an
22 official capacity and -- at a bank and they would ask
23 me: Would you mark up this binder please? And I
24 would say to the party who wanted it marked: Tell me
25 what you want me to say and I'll say it. I wouldn't

Page 147

1  otherwise know how to mark up a binder. It's just
2  not that common.
3       Q.    It's not that common in New Jersey real
4  estate practice?
5       A.    Yeah. For example, do you put "omit" or
6  do you put "not applicable"? I mean, lots of ways
7  you can do these things.
8       Q.    Going back to Subsection D of Schedule
9  B1, doesn't this require that the deed actually that
10 the title insurance commitment is being issued on is
11 the ultimate deed or the final deed?
12      A.    No, no, I don't think so. I think it's
13 just insuring the buyer designated in the binder and
14 the lender, if there is one designated in the binder,
15 and maybe this would be a good example: If there's
16 two lenders, each one would have to be mentioned in
17 the binder if they expect to be insured under this,
18 and if I added another lender without telling them
19 initially, I would have to tell them when I marked up
20 the binder. Otherwise they wouldn't be insured.
21      Q.    Why then wouldn't you have to add
22 Capital Assets?
23      A.    Unless they're demanding insurance
24 Coastal doesn't care, presumably. I didn't ask them
25 this question but they don't give a hoot.

Page 148

1       Q.    But you don't know that?
2       A.    No, I don't.
3       Q.    Mr. Yacker, if you will flip back to
4  King Number 6.
5       A.    Okay.
6       Q.    I would ask you to take a look at this,
7  which purports to be an invoice from Coastal Title
8  Agency, and then if you look at the lower right-hand
9  corner, Mr. Yacker, there's a CTC Bates stamp number.
10      A.    What does Bates stamp mean?
11      Q.    It's a sequence of letters and numbers
12 that we affix to documents.
13      A.    For your own internal purposes?
14      Q.    Right. To show who produced the
15 documents.
16      A.    Okay.
17      Q.    So CT stands for Coastal Title so that
18 just tells you this came from Coastal Title's files.
19           MR. KOTT: Let the record reflect Mr.
20 Stone has entered the room.
21           (A discussion takes place off the
22 record).
23      Q.    This came from Coastal Title. I'm
24 actually trying to read the -- I didn't bring my
25 reading glasses?

Page 149

1       A.    That makes two of us.
2       Q.    Can you see this, Mr. Yacker?
3       A.    More or less closing service letter. Is
4  that what you're going to direct my attention to?
5       Q.    No.
6       A.    No?
7       Q.    What I wanted to start off and ask you
8  is: Up top it's addressed to Richard J. Pepsny,
9  Esquire. Why would Mr. Pepsny order the title in
10 this case if he's representing Mr. Kane, the seller
11 or Kane's corporations?
12      A.    He wouldn't but most title companies in
13 my experience, and I think Coastal would be included,
14 make it a habit, certainly good practice, of
15 supplying a copy of the binder to the seller's
16 attorney. It's very useful to him.
17           MR. KOTT: Let me just object to the
18 form of the question insofar as it's stated that he
19 was representing the seller because Mr. Pepsny would
20 have been also representing the purchaser on the
21 first transaction, meaning he would have represented
22 Mr. Kane initially as a purchaser and thereafter as
23 the seller.
24      A.    Except I don't know that. I assume he
25 would have. Whatever took place from the original

38 (Pages 146 to 149)

Page 150

1  owner to Mr. Kane, I don't know that -- what part
2  Pepsny, if any, played in that.
3       MR. KOTT: But if Pepsny were
4  representing Mr. Kane or a Kane company when they
5  acquired the company, then he might have ordered
6  insurance from Coastal and there would be a bill from
7  Coastal. Right?
8       THE WITNESS: Yes.
9       Q.   And that's actually a valid point. So,
10 Mr. Yacker, if you could flip back to both King
11 Exhibit 3 --
12      A.   I got it.
13      Q.   -- and you've got King Exhibit 4?
14      A.   Yes.
15      Q.   And if you will take a look at the King
16 Exhibit 3, which is the acquisition of the property
17 by Mr. Kane from Norman Freedman and Arline Freedman.
18      A.   Yes, I see it.
19      Q.   You see that in paragraph three? If you
20 look at the final number in the upper right-hand
21 corner under the RD --
22      A.   I see.
23      Q.   The file number is CT17767. You see
24 that?
25      A.   Yes.

Page 151

1       Q.   Now, I ask you to take a look at King
2  Number 4, which is the sale from Mr. Kane's entity --
3       A.   Right.
4       Q.   -- to Jill Montanye. The file number
5  there on the sale is CT 17767 with an A.
6       A.   I do see that.
7       Q.   Do you know why this file number on the
8  second commitment has an A on it?
9       A.   I have no idea or opinion as to
10 Coastal's internal procedures, but I would assume
11 because it's related to the first transaction.
12      Q.   And then if you look at the invoice, the
13 invoice is -- then it says underneath -- we're back
14 to King-6. It says CT 17767 with the A.
15      A.   Right.
16      Q.   So the invoice we presume relates to the
17 second sale from Mr. Kane's entities to Miss
18 Montanye.
19      A.   I would assume so, yeah.
20      Q.   And then, furthermore, if you look at
21 the -- beneath the title number it says: Amount of
22 insurance, it says fee amount, $210,000, which is the
23 same amount you will see on King-4 --
24      A.   Yes.
25      Q.   -- in the right-hand column. And then

Page 152

1  beneath that it says: Mortgage amount 157,500, which
2  is the same amount as you see on King-4 as well.
3       A.   Okay.
4       Q.   So presuming that the information on
5  Coastal's documents are correct, why would Mr. Pepsny
6  be ordering a title binder on a property he's selling
7  as opposed to you on behalf of the buyer?
8       A.   I don't know that he did.
9       MR. HAYES: Let me just object to the
10 form. That implies that he did.
11      A.   That was my answer more or less. I
12 don't know that he did. I sneaked it in before the
13 objection or after the objection? Anyway that's my
14 answer. I don't know that he did.
15      Q.   Going down through the -- through this
16 invoice there's a -- the fourth line down says:
17 Closing Service Letter, $25.
18      A.   I see that.
19      Q.   Was that standard on the invoices you
20 received from Coastal Title relating to the Kane real
21 estate transactions?
22      A.   I never did any survey of it, but, yes,
23 I would assume it's standard, yes, it doesn't
24 surprise me to see it there.
25      Q.   If Mr. Pepsny had ordered the -- if he

Page 153

1  had ordered the title binder, would his name be on
2  the closing protection letter?
3       A.   That's a good question. I don't think
4  there's any rule or presumption as to whose name goes
5  on the closing protection letter. I think it's a
6  matter of the -- of somebody requesting it from
7  Coastal or a title company like Coastal and Coastal
8  issuing it as per the request.
9       Q.   Well, the letter itself, as you said
10 before, was standard issue, I would say, with lenders
11 involved, and what was the purpose of the closing
12 protection letter?
13      MR. KOTT: Object to the form.
14      A.   I can just give you my understanding of
15 it. It is to insure that the -- insure that the
16 person or entity, for lack of a better word I'm going
17 to say, in charge of the closing is doing it properly
18 and if he or it does it improperly, it's very
19 possible it will result in liability for which
20 Coastal Title would be responsible. But before you
21 ask your next question, I can think of instances, and
22 I am not necessarily speaking about Kane matters,
23 where a title company is informed: Handling this
24 closing is going to be attorney so and so. And then
25 the title company is told, well, the attorney is not

Page 154

```
 1   going to be handling it, the title company is going
 2   to be handling it, which does happen sometimes, by
 3   the way, and they would change the closing service
 4   letter because of that request.
 5        Q.    Do you recall any of the closing service
 6   letters that were involved with the Kane, shorthand,
 7   real estate transactions ever having the person
 8   listed being changed so was it ever Mr. Pepsny --
 9        A.    No, I don't recall, but I was kind of
10   adding my answer to your question, that I wouldn't be
11   surprised or consider it unusual if it were changed
12   and that's to support my answer when I said it's up
13   to the person ordering the binder who they want
14   designated as the closing -- the person in charge of
15   the closing and to so inform the title company, and
16   they would issue, I assume, the closing protection
17   letter accordingly.
18             There might be a case -- now, I don't
19   know the internal workings of Coastal or even any
20   other title company despite the fact that I work for
21   one now, whether there's a situation where they would
22   say:  I'm sorry, we won't issue one in this case or
23   we won't change it to your designated substitute
24   because of something we think is wrong with that.
25   Maybe they do that, maybe they don't, I don't know,
```

Page 155

```
 1   but I think way too much emphasis is being placed on
 2   it.  It's not a big deal in my opinion.
 3        Q.    Isn't the point of the closing
 4   protection letter to protect the lender against the
 5   fraud or mistake of the closing attorney?
 6        A.    To protect --
 7             MR. KOTT:  I object to the form.
 8             MR. HAYES:  Object to the form.  If you
 9   know.
10        A.    I don't know.  Thank you.  I don't know.
11             MR. HAYES:  Remember the ground rules,
12   Mr. Yacker, you don't have to guess, you don't have
13   to speculate.  If you don't know an answer your
14   answer is:  "I don't know."
15        A.    Well, I truly don't know.
16        Q.    I would ask you then to turn to King-5.
17        A.    Got it.
18        Q.    Okay.  So this closing service letter is
19   to National Home Funding as you see up there and its
20   successors or assigns.  As you see up --
21        A.    Uh-huh.
22        Q.    And then the "Re:" Says: "Closing
23   service letter, issuing agent or attorney whose
24   conduct is covered:  Richard J. Pepsny Esquire."
25        A.    Okay.
```

Page 156

```
 1        Q.    And so was Mr. Pepsny the closing
 2   attorney for whom in this transaction?
 3        A.    He was the closing attorney, I assume,
 4   for the transaction between Kane or his entity and
 5   who -- whatever was the original owner who sold to
 6   Kane.  That's what I would assume.
 7        Q.    And then the transaction that's listed
 8   in this closing letter is the premises 1017-1019
 9   Bangs Avenue to Jill Montanye.  Did you represent
10   Miss Montanye in this --
11        A.    I don't know.  It might have been one of
12   these situations when I did or one of the ones when
13   they just had no attorney.  I don't know.
14        Q.    Let's go to King-12.  Mr. Yacker, you're
15   listed as -- if you turn to the second page.
16        A.    I have it.
17        Q.    On the HUD you're listed as the
18   settlement agent.
19        A.    No, I'm listed under:  Attorneys' fees,
20   line 1107.
21        Q.    On the second page.
22        A.    Yes.
23        Q.    And then I would ask you to go down to
24   the bottom of the page beneath the borrower and the
25   seller.
```

Page 157

```
 1        A.    Yes.
 2        Q.    There's a settlement agent --
 3        A.    Yes.
 4        Q.    -- line and your name is beneath that.
 5   Correct?
 6        A.    Yes.
 7        Q.    Why were you listed as the settlement
 8   agent?
 9        A.    Because that's what I thought my job
10   was, as settlement agent, as I've indicated before,
11   and that's one of those instances where I was
12   speaking about before, HUD in its wisdom has
13   designated at as the label that belongs on this form.
14   It wasn't my choice of words as I am sure you know.
15        Q.    It comes on the form?
16        A.    Right.
17        Q.    And then you're indicated on this -- on
18   line 1107 as attorneys' fees?
19        A.    Yes.  And as you see it's in the
20   seller's column, he paid me, which is just the way we
21   disclosed it.
22        Q.    And then I see that the -- in the
23   borrower's funds at settlement the $692.21 on the
24   second page.
25        A.    I don't know where --
```

40 (Pages 154 to 157)

Page 158

1    Q.   I'm at the bottom of page two in the
2  second to last column.
3    A.   I got you.
4    Q.   Where did that money come from to
5  satisfy those --
6    A.   Looking at it right now I don't know.
7  On its face it implies that the buyer came up with
8  some money.
9    Q.   You previously testified that the buyers
10  didn't --
11    A.   No.  Can I take that back?
12    Q.   Your previous testimony?
13    A.   The last statement.
14    MR. HAYES:  Note that the witness is now
15  looking at the first page of the HUD, which addresses
16  which monies the buyers bring to the closing as
17  opposed to the second page.
18    THE WITNESS:  Talk about reading my mind
19  you're.  Pretty good.  I am a little nervous now.
20    A.   On the first page that would tell how
21  much the borrower is bringing over and above the
22  mortgage that he's getting or she or they.
23    Q.   And that's the total on the bottom of
24  the first page under line 0.3, cash from borrower?
25    A.   Well --

Page 159

1    Q.   That 200,891.11?
2    A.   It should be the difference between
3  line -- it's a little fuzzy.  About a third of the
4  way down, gross amount due from borrower, whatever
5  that figure is.
6    MR. HAYES:  120 and 220.
7    A.   Minus the borrower's credits and she
8  would owe the difference but it looks to be -- I
9  don't know, I didn't do the math, but it should be
10  the difference between the gross amount due from the
11  buyer and the net amount due from the buyer -- I mean
12  minus the buyer's costs equals the net amount due
13  from the buyer.
14    Q.   As I look at this the -- under amounts
15  paid by or on behalf of borrower, again on the first
16  page under column J, it says: "Depositor earnest
17  money." How much is that?
18    A.   Looks to be $20,000.
19    Q.   And where did that money come from?  Was
20  that one of the escrow letters you had sent to Walsh
21  Securities?
22    A.   It could have been.
23    Q.   Do you recall if Miss Montanye ever gave
24  you $20,000 to --
25    A.   I do not recall it but I doubt it.

Page 160

1    Q.   And in the next line down it says:
2  "Principal amount of new loan."  That I assume is the
3  mortgage that's funded by Walsh Securities?
4    A.   Yes.
5    Q.   That $150,000?
6    A.   Yes.
7    Q.   And then the third line says:  "Existing
8  loan taken subject to" and how much is that?
9    A.   Looks to be 30,000.  30,000 it looks
10  like.
11    Q.   Where did that money come from or what
12  is that?
13    A.   Apparently there is secondary financing
14  here from the -- I would assume from the seller.
15    Q.   Do you recall if the Kane real estate
16  transactions generally involved second mortgages on
17  the properties?
18    A.   I don't know about generally but they
19  sometimes did, yes.
20    Q.   Who prepared the second mortgages?
21    A.   Probably we did, meaning our office.
22    Q.   Why would you prepare a second mortgage
23  for -- you didn't prepare the first mortgage?
24    A.   No.  Because Walsh would have an
25  interest in a mortgage being signed that they

Page 161

1  prepared.  They would want their own language in
2  there.  They're the one getting the money or getting
3  payments over a period of time.
4    Q.   Who was the entity getting the payments
5  on the second mortgage?
6    A.   Normally it would be the seller
7  taking -- what we call taking back a mortgage.
8    Q.   If you turn to page -- exhibit King-11.
9    A.   Got it.
10    Q.   And then if you take a look at that
11  document, let me know if you have seen that before.
12    A.   No, I haven't seen it before.  We had
13  various second mortgage forms in our office in what
14  we called a form file.  Some of them were what we
15  call short form, some extended form, but I don't
16  recall seeing this one, and I am not saying we didn't
17  prepare it.  I just don't recall seeing this form.
18    Q.   And then it says -- if you go to the
19  third section of this it says under payments, it
20  says, "I will make my monthly payment at," it says,
21  "25 Oakwood Drive, Parlin, NJ."
22    A.   Right.
23    Q.   Do you know whose address that was?
24    A.   Probably Bill Kane's but I'm not sure.
25    Q.   Were you ever at his house?  Mr. Kane

41  (Pages 158 to 161)

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

a51af0f5-da6e-4c57-b258-d4af925f36ff

Page 162

1  has testified that that was his address so...
2      A.    Okay.  I don't think so but there's this
3  thought in the back of my mind that maybe in a very
4  perfunctory way I dropped something off there or
5  something.  But otherwise my answer is no.
6      Q.    So turning back to King-12, the $20,000
7  deposit or earnest money was never paid?
8      A.    Again, in a symbolic sort of way it was
9  held by me, returned to the giver and -- but she got
10  credit for it or the buyer got credit for it as if
11  she had paid it.
12      Q.    But no amount of money ever changed
13  hands?
14      A.    Between seller and buyer, I don't think
15  so.
16      Q.    Why did Mr. Kane give you a check for
17  the deposit or earnest money if it was just going to
18  reduce the amount of money he would get?
19      A.    I don't know.  You would have to ask Mr.
20  Kane that, but I assume that was all figured into his
21  mind as to what he expected to get out of this
22  closing.
23      Q.    And then if you could take a look,
24  Mr. Yacker, going back to the invoice, which I
25  believe was King-6?

Page 163

1      A.    Yes.
2      Q.    And the total amount on the invoice is
3  $1,290?
4      A.    I don't see that.
5      Q.    Right there.
6      A.    I see it.
7      Q.    If you can look at -- again, turning
8  back to King-12, the HUD-1 form, and tell me if
9  that's the same amount of money on line 1108 where it
10  says: "Title insurance to Coastal Title Agency."
11      A.    1,290, yes.
12      Q.    Mr. Yacker, if you can go back to
13  King-5, the closing protection letter.
14      A.    Yes.
15      Q.    You've seen these documents before?
16      A.    Yes.
17      Q.    And then if you could read number one
18  and number two to yourself on the first page.
19      A.    Okay.
20      Q.    And looking at paragraph number one
21  which says: "The failure of the issuing agent or
22  attorney to comply with written closing
23  instructions."  Do you believe that the actions of
24  your office, by that I mean you and Miss King in
25  conjunction with the Kane real estate transactions,

Page 164

1  failed to comply with Walsh Securities' closing
2  instructions?
3          MR. KOTT:  Object to form.
4          MR. HAYES:  Object to form.
5      A.    I have no opinion on that.  I don't
6  know.  I would like to think we did comply with the
7  instructions at least in the spirit but I can't
8  express an opinion.  I don't know if I should be.
9      Q.    Looking at number two, let's go back to
10  that, it says, "Fraud or misapplication of the
11  attorney in handling your funds."  Do you believe
12  that the actions of your law office, again, I mean
13  you or Miss King in conjunction with the Kane real
14  estate transactions, were the fraud or misapplication
15  of you, the attorney, in handling the funds of Walsh
16  Securities?
17          MR. HAYES:  Object to form.
18          MR. KOTT:  Objection to form.
19      A.    I don't know.
20      Q.    You previously testified you gave out --
21  you disbursed funds from closings before the closings
22  occurred.
23      A.    Disbursed funds -- well, no the closings
24  had occurred; it was before the wire hit I guess.
25      Q.    How would you have the funds to disburse

Page 165

1  before Walsh had wired you the money?
2      A.    I wouldn't.
3      Q.    So how then would you disburse the
4  funds?
5      A.    Well, okay.
6      Q.    You previously testified that you
7  disbursed funds before closings occurred to Mr. Kane
8  and Mr. Grieser.
9          MR. HAYES:  To be fair, because it was a
10  little confusing, but I think his testimony was he
11  disbursed before he had gotten the deed on the
12  seller-to-Kane transaction.
13          MR. MAGNANINI:  That was his answer.
14      Q.    But my question was:  Had you disbursed
15  funds to Mr. Kane or Mr. Grieser prior to closing and
16  you said -- you gave the example of Mr. Kane
17  nibbling --
18      A.    Yes.
19      Q.    -- and going on.  I thought you had said
20  at the end of that that you had actually --
21      A.    I guess I'm having trouble with:  When
22  precisely does a closing occur is the problem I'm
23  having.
24      Q.    We're back to --
25      A.    What "is" is.  I don't know.

42 (Pages 162 to 165)

Page 166

1    Q.    We will keep going. I've got some more
2  paper. You can put King-5 aside right now. And then
3  if you look at King-7?
4    A.    What is King-7?
5    Q.    King-7 is a deed between Norman Freedman
6  and Arline Freedman.
7    A.    I have it. Thank you. Okay.
8    Q.    What is the date of that deed,
9  Mr. Yacker?
10   A.    Appears to be July 25 of '96.
11   Q.    Okay. If you could then look at exhibit
12 King-8, which is the following thing, which is a deed
13 between Cristo Property Management, LTD and
14 handwritten Jill A, then typed, Montanye.
15   A.    Okay.
16   Q.    Is that your handwriting with the Jill
17 A?
18   A.    Doesn't appear to be. I can't be quite
19 as sure when you look at printing but I don't think
20 it is.
21   Q.    Is that Miss King's?
22   A.    I don't know.
23   Q.    Would you recognize Miss King's
24 handwriting?
25   A.    No. I happen to be notoriously bad at

Page 167

1  recognizing other people's signatures or handwriting.
2  I'm just not good at it.
3    Q.    What is the date of that second deed,
4  King Exhibit 8?
5    A.    July 25, '96.
6    Q.    That's the same date as the prior
7  exhibit, King-7?
8    A.    Yes.
9    Q.    And then if you could take a look at
10 then Exhibit Number 9?
11   A.    Yes.
12   Q.    That is a deed between Jill Montanye and
13 then -- and Jill Montanye and Capital Assets Property
14 Management, an Investment Company?
15   A.    Yes. We have been referring to as the
16 third deed.
17   Q.    Yes. That says at the top it's prepared
18 by Lorraine E. King.
19   A.    Right.
20   Q.    Can a secretary legally prepare a deed?
21   A.    That calls for a legal conclusion. I
22 have my own thinking on the matter but -- do you want
23 me to answer that?
24   Q.    That's why I asked you the question.
25 The other -- why I am asking it is: The first deed,

Page 168

1  King-7, is prepared by Mark Steinberg, who I assume
2  represented the Freedmans in the sale to Mr. -- or to
3  Cristo Property. Then the second deed is prepared by
4  attorney Pepsny on behalf of Cristo Property. And
5  the third deed though is prepared not by you as the
6  attorney but my by Miss King as your secretary.
7    A.    Look, I sound like I'm talking from the
8  podium now, going back to my teaching days, but I've
9  always believed and there's a case that says
10 preparation of a deed as opposed to, let's say,
11 preparation of a contract is particularly intricate
12 and involves the practice of law, and I think that
13 particular case, in re somebody or other, it was a
14 real estate firm that was preparing deeds and was
15 sanctioned for the improper -- unauthorized practice
16 of law. And I think it got up to the New Jersey
17 Supreme Court and they upheld that principle that,
18 yes, at least as far as deeds are concerned it's the
19 unauthorized practice of law. Everybody taking
20 notes?
21       MR. McGOWAN: We already knew all that.
22   A.    I will bet. But anyhow I have always
23 felt, for what it's worth, that when a secretary is
24 acting on behalf of her boss she in effect an
25 extension of him and that it's not the practice of

Page 169

1  law. And so to answer your question, yes, I think
2  it's okay. Somebody else might have a different
3  opinion. End of discourse.
4    Q.    Did the ethics committee raise that with
5  you about Miss King providing or preparing deeds?
6    A.    No, not that I recall. There was plenty
7  of other things though.
8    Q.    And then what is the date of that deed
9  in King Exhibit 9?
10   A.    It speaks for itself. Where the heck is
11 it?
12   Q.    It's the first line.
13   A.    July 25, '96.
14   Q.    So that was the same day as the other
15 two deeds?
16   A.    Yes.
17   Q.    And then whose job was it to file and
18 record the deeds with, in this case, Monmouth County?
19   A.    Job is ultimately mine. I'm
20 responsible, but Lory would take care of that for me.
21 She's done it many, many times.
22   Q.    Why then does -- if you look up top it
23 says, "R and R to," on all three deeds and instead of
24 your name -- and actually if you look on King-8 you
25 can see it's a sticker that's put over something that

43 (Pages 166 to 169)

Page 170

1    says Coastal Title Agency.
2        A.    Okay.
3        Q.    If you look in King Exhibit 7, Coastal
4    Title Agency is in the upper right. On King-8 and 9
5    it's in the upper left. If it was your job or
6    Lorraine King's job to record the deeds at the close
7    of the transaction, why is Coastal Title recording
8    the deed and having it returned to them?
9        A.    Personally I think you're trying to read
10   way too much into that. The title company has an
11   interest in seeing that the deed or mortgage or both
12   come back to them so it kind of triggers the
13   paperwork involved in issuing a title policy both to
14   the owner and the lender. The attorney for the buyer
15   has an interest in seeing it come back to him or her
16   or them so that they know it was received and
17   recorded and they would normally forward a copy on to
18   Coastal in this case.
19       So I think it's of trivial importance as
20   to whether it goes back to Coastal or the attorney
21   for the buyer in this case, and if Coastal would have
22   asked me, and I doubt if they did, do you mind if it
23   comes back to us, I would have said, if you insist,
24   okay. I would prefer it come back to me but it's not
25   a big deal.

Page 171

1        Q.    Do you recall Coastal ever asking you?
2        A.    No, I do not.
3        Q.    I ask you then to compare -- take a look
4    now at King Exhibit 10, which is --
5        A.    Ten. Okay.
6        Q.    Once you have had a chance to review
7    that, if you compare that with the deed that's listed
8    as King Exhibit 9.
9        A.    All right. They're both dated the same.
10   I don't know -- what am I comparing them for?
11       Q.    On -- could you tell me why King Exhibit
12   10 has got -- I don't want to say a stamp, a printing
13   at least in the upper left-hand corner that says:
14   "Record and return to Stanley Yacker, Esquire," and
15   it says, "Deed bargain and sale" and then --
16       A.    Right.
17       Q.    -- exhibit King-9 which was actually
18   filed with Monmouth County, unlike exhibit King-10,
19   has actually got your name replaced with the Coastal
20   Title sticker?
21       A.    No, I don't know why.
22       Q.    Well, did you file this deed?
23       A.    I don't know.
24       Q.    Why was the deed filed -- it says, if
25   you look in the stamp on King-9 and on the upper

Page 172

1    right-hand corner, it says, County of Monmouth and it
2    says date --
3        A.    Yes.
4        Q.    -- 4/8/97.
5        A.    Okay.
6        Q.    And then if you look at the bottom of
7    King-9, there's a copy of a receipt from the clerk's
8    office, instrument number, recorded on April 8, 1997
9    and recording fees. Why was the deed -- actually you
10   can go back to King-7 and King-8, and you will see
11   the same stamps, County of Monmouth, and the same
12   receipts. And finally if you look in the middle of
13   the pages at the top of King-7, King-8 and 9, there's
14   a bar code put on by the County of Monmouth that says
15   for King Exhibit 7 the number is 070166. And for
16   King Exhibit 8 it's 070167, and for King Exhibit 9
17   it's 070168, sequential numbers. Why were all three
18   deeds filed on April 8, 1997 if the closing occurred
19   July 25 of 1996?
20       A.    I don't know. I certainly don't think
21   it's a good practice or design to record something
22   several months later unless it was part of that
23   famous little box that everybody was referring to
24   before, a whole bunch of deeds getting recorded in
25   April of '97. I don't know. I guess my answer is I

Page 173

1    don't know.
2        Q.    Well, was it your practice to not record
3    deeds for nine months after a closing?
4        A.    No, it was not.
5        Q.    Well, this happened in this case and we
6    can keep going through the paperwork, it happened in
7    a number of these Kane real estate transactions. Did
8    this happen in any of your -- the other real estate
9    transactions that you said you closed that were not
10   William Kane transactions in 1996 and 1997, this long
11   delay in recording deeds?
12       A.    Not that I know of. It's a loose
13   practice that's certainly not to be encouraged.
14       Q.    Did you have the money in your trust
15   account to record the deeds after each of these
16   transactions closed?
17       A.    Well, the design was that I certainly
18   had the money for it. If it's part of that series of
19   transactions that I was referring to before, I didn't
20   have the money to pay recording fees. I had a minus
21   figure in my trust account.
22       Q.    When was -- when did that minus figure
23   in your trust account come to your attention?
24       A.    Again, I can't recall. It was prior to
25   the spring of '97. I can't recall any more than

44 (Pages 170 to 173)

Page 174

1  that. Prior to the spring of '97.
2       MR. KOTT:  You mean at some point prior
3  to the spring of 1997 but you cannot say at what
4  point?
5       THE WITNESS:  That is correct.
6       Q.    Was it -- can you say:  Was it 1997 or
7  1996?  I thought you had testified previously that it
8  was 1997 and this closing occurred in July of 1996,
9  and as you can see from the Clerk's office receipts
10 on the bottom the total recording fees for all three
11 deeds was $72.  $24 each deed.  So that's what I
12 was --
13      MR. HAYES:  Except there were transfer
14 taxes.
15      A.    There were transfer taxes and there were
16 other things related to the deeds like the mortgages.
17      Q.    Were the mortgages recorded?
18      A.    Oh, no, I wouldn't record a mortgage
19 without a deed.  That's a problem, you're mortgaging
20 property you don't own.
21      Q.    That's what I'm saying.  Finish your
22 answer.
23      A.    It's designed to be recorded
24 simultaneously.
25      Q.    And that's what my question was.  Were

Page 175

1  the mortgages recorded?
2       A.    On purpose, yes.  I don't know how else
3  I could answer the question.
4       Q.    Can you then explain why we have never
5  been able to find any of the mortgages recorded?
6       MR. HAYES:  Object to the form.  It
7  implies that none of the mortgages were recorded.
8       A.    No, I can't.
9       Q.    Mr. Yacker, if you can pull out King
10 Exhibit 13 still in this pile.
11      A.    Okay.
12      Q.    I would like you to just take a look at
13 King-13.
14      A.    Yes.
15      Q.    And if you can go to the third page.  At
16 the lower left-hand corner there's a signature.  What
17 name is that?
18      A.    The typing says Stanley Yacker.
19      Q.    And how about the signature above?
20      A.    Well, it is not mine but it appears to
21 say Stanley Yacker.
22      Q.    There's a little --
23      A.    That's probably Lory's initials.
24      Q.    Is that -- was that how Miss King would
25 sign your name?

Page 176

1       A.    Apparently, yes.
2       Q.    Was Miss King authorized by Walsh
3  Securities to sign the closing instructions on your
4  behalf?
5       A.    I don't know.
6       Q.    Then if you can turn to the last page
7  there on this fees and costs, it says -- the column
8  in the middle of the page, it says:  Amounts
9  collected, to be collected from borrower, and if you
10 look at the bottom of the page, I will read it for
11 you, it says, "Total to be collected/deducted,
12 $6,224.21."  Was this money collected from the
13 borrower?
14      MR. KOTT:  Object to the form.
15      A.    I don't know.
16      Q.    I thought you had earlier testified that
17 you didn't receive any checks or any money from any
18 of the borrowers.
19      A.    Yeah.
20      Q.    By borrower I mean the straw buyer.
21      A.    I understand.  I personally didn't
22 receive money from the buyer.  Whether the buyer paid
23 it to somebody else, I don't know.
24      Q.    Who else would they have paid it to?
25      A.    To Lory if it was somebody other than

Page 177

1  me, if anybody.
2       Q.    If they had paid Miss King what would
3  she have done with --
4       A.    Deposited it into the trust account.
5       Q.    So we should be able to find it in the
6  trust account?
7       A.    If, in fact, it occurred, yeah.  I don't
8  think she appropriated it or misappropriated it.
9       Q.    So if it is not in the trust account
10 it's likely --
11      A.    She didn't get paid.
12      Q.    She didn't get paid?
13      A.    Right.
14      Q.    Miss King testified that Mr. Kane had
15 actually given her identification to submit with the
16 loans.  Did she ever mention that to you?
17      A.    Can you repeat that question, please?
18      Q.    Miss King, Lory King, had testified that
19 Mr. Kane actually just provided her with
20 identification or copies of identification to submit
21 with the loans and she never obtained any
22 identification from the buyers.  Did you know that?
23      A.    I don't think I knew one way or the
24 other.  It was never discussed with me or anything,
25 no.

VERITEXT  REPORTING  COMPANY

212-267-6868                                516-608-2400
a51af0f5-da6e-4c57-b258-d4af925f36ff

Page 178

1  Q.  Mr. Yacker, going back to King-13, in
2  the front page, on the first page after the listing
3  of the -- says A, Documents, after it lists a series
4  of documents, it says -- there's a sentence that
5  begins: "Return all original documents referenced
6  above and certified copies of those documents that
7  are to be recorded within 24 hours after the closing
8  to Walsh Securities, Inc. post closing."
9       Were the documents that were filed, in
10 fact, returned or certified copies of documents to
11 be recorded returned to Walsh Securities post
12 closing, after the closing?
13 A.  That was certainly our objective, yes.
14 Q.  Do you know if it happened?
15 A.  In this particular case, no, I don't.
16 Q.  Do you know if the three deeds that were
17 filed on July 25 of -- or actually filed on April 8
18 of 1997 were returned to Walsh Securities?
19 A.  No, I don't know.
20 Q.  Do you know if the mortgage on this
21 property at 1017 Bangs Avenue was ever recorded?
22 A.  Personal direct knowledge, no, I don't,
23 I assume it was.
24 Q.  Why would you assume that?
25 A.  Because it was important to record the

Page 179

1  mortgage with the deeds, and the deeds, although it's
2  a substantial number of months later, got recorded.
3  Q.  Why is it important to record the
4  mortgage with the deeds?
5  A.  Well, we just touched on that before.
6  Otherwise you would be perhaps mortgaging property
7  you don't own, maybe.
8  Q.  Are there any other reasons?  Why is it
9  important for a lender to have a mortgage recorded?
10 A.  Well, so that they establish a certain
11 priority as opposed to perhaps later mortgages or
12 liens or judgments, anything like that.  They want to
13 make sure they have priority.
14 Q.  I think we're done with that pile.
15      (Yacker-1, Letter dated 1/6/97, is
16 received and marked for identification.)
17      (Yacker-2, Letter dated 9/4/96, is
18 received and marked for identification.)
19      (Yacker-3, Deed dated 7/25/96, is
20 received and marked for identification.)
21      (Yacker-4, Deed dated 9/4/96, is
22 received and marked for identification.)
23 Q.  Mr. Yacker, if you can take a look at
24 what we've marked as four exhibits.
25 A.  Okay.

Page 180

1  Q.  The Stanley Yacker Number 1 is a letter
2  to you from Coastal Title Agency.  Stanley Yacker
3  Number 2 is a letter from a law firm called Hack,
4  Piro, O'Day to Richard J. Pepsny.  And Stanley Yacker
5  Number 3 is a deed between Cristo Property on July
6  25, 1996 and George T. Leodis.  And then exhibit
7  number Stanley Yacker-1 is a deed that's got your
8  stamp, I assume, up top, prepared by John F. Lanahan,
9  Esquire dated September 4, 1996.  Let me know when
10 you have had a chance to look at this.
11 A.  I kind of glanced at all of them.  It
12 would take much longer for me to just read them.
13 Okay.  I've glanced at them.
14 Q.  If you look at Stanley Yacker Number 1,
15 which is a letter from Coastal Title Agency dated
16 January 6 of 1997, I would ask if you have ever seen
17 this letter before?
18 A.  I don't think so.  I certainly don't
19 recall seeing it.
20 Q.  And then do you recall getting any
21 similar letters from Coastal saying that they were
22 unable to issue a title policy at this time because
23 of the deed and mortgage may not have been recorded?
24 A.  No.
25 Q.  And then I would ask you then to flip

Page 181

1  back to Stanley Yacker Number 3.
2  A.  Okay.
3  Q.  Which is a deed prepared by Richard
4  Pepsny dated on July 25, 1996 between Cristo Property
5  Management and George T. Leodis.  Was Mr. Leodis one
6  of the straw buyers?
7  A.  Could have been.  The name strikes a
8  familiar chord.
9  Q.  And then do you recall that both he and
10 his wife, Anna Leodis, purchased a number of
11 properties from Mr. Kane's companies that were funded
12 by Walsh Securities?
13 A.  No, I don't.
14 Q.  And the date on the deed, Stanley Yacker
15 Number 3 between Cristo Property and Mr. Leodis is
16 what?
17 A.  July 25, 1996.
18 Q.  So that's when Cristo sold the property
19 to Mr. Leodis?
20 A.  Appears to indicate that.
21 Q.  And then if you can take a look at
22 Stanley Yacker Number 2.
23 A.  Okay.
24 Q.  It's a letter I'm fairly sure you
25 haven't seen before, and again down at the bottom the

VERITEXT REPORTING COMPANY

212-267-6868                         516-608-2400

a51af0f5-da6e-4c57-b258-d4af925f36ff

Page 182

1  Bates number is NT, which is Nations Title, 723 and
2  724, but it's a letter from Hack, Piro, O'Day to Mr.
3  Pepsny writing to confirm a new closing date on a
4  sale of 768 State Street, Perth Amboy, New Jersey.
5      A.   All right.
6      Q.   You see that?
7      A.   Yes, I do.
8      Q.   And then looking at the deed in Stanley
9  Yacker Number 3 again -- sorry about flipping back
10 and forth.
11     A.   Okay.
12     Q.   What is the property that's being
13 conveyed by -- from Cristo Property to Mr. Leodis?
14     A.   768 State Street.
15     Q.   In Perth Amboy?
16     A.   Yes.
17     Q.   Okay. . And then if you go back to then
18 Stanley Yacker Number 4.
19     A.   Yes.
20     Q.   What is the date of the deed conveying
21 768 State Street in Perth Amboy from Citicorp North
22 America, Inc. to Cristo Property?
23     A.   September 4, 1996.
24     Q.   Okay. How was Mr. Kane able to convey
25 768 State Street to Mr. Leodis on July 25, 1996 if he

Page 183

1  didn't acquire the property until September 4 of
2  1996?
3      A.   I have no idea.
4      Q.   And then the second to last paragraph on
5  the first page of Stanley Yacker Number 4, do you see
6  that?
7      A.   Say it again, please.
8      Q.   If you take a look at the second to last
9  paragraph on the first page of Stanley Yacker Number
10 4, it says: Being the same premises, that is 768
11 State Street in Perth Amboy being conveyed by deed to
12 Citicorp from Bristol Oaks, LP on August 2, 1996. So
13 we were confused on how Mr. Kane could sell or convey
14 title to a property on July 25th when there was
15 actually two owners prior, Bristol Oaks, LP owned the
16 property on that date and did not convey it to
17 Citicorp until August 2nd, and then Citicorp did not
18 convey it to Mr. Kane until September 4, if this
19 closing with Mr. Leodis occurred on July 25th?
20     A.   I don't know.
21     Q.   If you could turn back to Stanley Yacker
22 Number 1, you see in the "Re" in the letter from
23 Coastal Title it says -- beneath the address, it
24 says, Leodis/Bristol Oaks --
25     A.   Yes.

Page 184

1      Q.   -- LP? Did you ever do a closing with
2  Bristol Oaks, LP?
3      A.   Not to my recollection.
4      Q.   What was done by your office in response
5  to this letter from Coastal?
6      A.   I'm drawing a total blank. I don't
7  know. Nothing that I'm aware of as I sit here today.
8  Refers to a request by me, apparently somebody on my
9  behalf.
10     Q.   Right. To issue a title policy?
11     A.   Yes.
12     Q.   Do you recall if anyone or you followed
13 up with Monmouth County or looked in your files to
14 determine whether a deed and mortgage had been
15 recorded?
16     A.   No, I don't.
17     Q.   What would have been your standard
18 practice had you received a letter like this?
19     A.   Fortunately I didn't get too many of
20 these, if any, but standard practice would be to go
21 back to the file and see what is what. Is there a
22 deed sitting in there that was never recorded? Does
23 it refer to by way of covering letter to a deed being
24 sent to the county for recording in which case maybe
25 it got lost in transmission. I don't know. I would

Page 185

1  certainly investigate it by digging out the original
2  file and taking a look.
3      Q.   Did you ever do any follow up to the
4  closings Miss King did on behalf of these Kane real
5  estate transactions? Did you ever look through the
6  files to ascertain whether the deeds were there or
7  had been filed or the mortgages had been filed?
8      A.   You know, a couple of isolated
9  instances, very isolated, I would get a call from
10 somebody, this was after Lory had left my employ,
11 claiming pretty much like this, you know, we never
12 got this, we never got that, and I would go to the
13 file and see a deed sitting there or whatever it is
14 they were looking for, and if it was something that I
15 could control by way of it still being valid and
16 effective but unrecorded I would do it.
17          In one instance, and this would have to
18 be later in '97 after the breaking story I refer to
19 it as, the glaring headlines in the local newspaper,
20 I was told, because I did try to give this my
21 attention and I can't remember names or properties or
22 towns even, and was told they wouldn't record the
23 deed or the mortgage because in light of what they
24 had seen or heard or been told, it was considered
25 part of a fraudulent transaction, and they wouldn't

47 (Pages 182 to 185)

Page 186

1  touch it with a ten-foot pole.
2      Q.   Who told you that?
3      A.   Somebody at the Clerk's office.
4      Q.   Do you recall which county?
5      A.   No. I believe it was Monmouth, but, no,
6  I don't recall more than that. Monmouth was
7  certainly the primary county. Middlesex might have
8  been a close second. It surprised me, shocked me a
9  little bit. I felt kind of powerless but these were
10 maybe two, three very isolated instances. Other than
11 that I would have to answer no to your question, the
12 question being: Did I ever go back to a file and try
13 to correct these.
14     Q.   Actually my question was: During the
15 time that your office was doing these closings, did
16 you ever check on the files that were being closed by
17 Miss King?
18     A.   Only if there was need to. I don't know
19 what else to say. Probably no except where there was
20 a specific case where we were asked to -- like,
21 apparently that -- that letter seems to ask for --
22 you know, the one from Coastal or the one from Hack,
23 Piro.
24         As I look at these papers that you just
25 handed me, Yacker -1, 2, 3 and 4, other than the name

Page 187

1  George Leodis being familiar, one that I've heard
2  before, it doesn't ring any familiarity bells at all.
3      Q.   What you just mentioned that you tried
4  to file some deed or mortgage with Monmouth County --
5      A.   Yes.
6      Q.   -- and you said it was after this story
7  broke.
8      A.   Which is around June of '97.
9      Q.   And when did you stop doing the closings
10 for Mr. Kane's transactions?
11     A.   Before then except for one or two
12 matters that were still hanging. We had to finish
13 them. But before June of '97.
14     Q.   Was it early in '97?
15     A.   What was early in '97?
16     Q.   The last closings you did for Mr. Kane.
17     A.   No. I think it was -- as I said, we did
18 a couple after June of '97 that were pending. One
19 was a property in Perth Amboy as I recall.
20         MR. KOTT: Mr. Magnanini, my very rough
21 back-of-the-envelope computation tells me that you
22 have gone at least five hours but not more than six
23 hours with this witness and I can tell you at least
24 Mr. Hayes and I have some questioning for him and I
25 think Mr. McGowan may or may not. I don't have a

Page 188

1  problem with you at some point breaking, letting us
2  do questioning. If we finish and there's still more
3  time, then letting you pick up, which is at least the
4  way the lawyers in this room have done it, but I just
5  wanted to remind you you need to be a little
6  conscious of the time.
7          MR. MAGNANINI: That's a valid point.
8  Off the record.
9          (A discussion takes place off the
10 record).
11     Q.   Mr. Yacker, what I would like to show
12 you to establish some dates, and I am not going to
13 put these into -- in as exhibits, but I would like to
14 take a look at two loan files we have. Again, there
15 are Bates numbers on them. These were produced by
16 Walsh Securities and what they are is -- the first
17 one is a loan to Julio Crespo and Cruz Crespo for
18 purchase of 335 Watson Avenue in Perth Amboy. And
19 it's got you listed as Stanley Yacker, Esquire, and
20 the date on this is February 27 of 1996. And I would
21 like you to take a look at that and then -- the
22 reason I'm doing this is I'll represent to you that
23 having gone through thousands of pages of paper that
24 is the earliest loan file that we found that you have
25 been the closing attorney on involving a Kane real

Page 189

1  estate transaction.
2      A.   Really? February of '96.
3      Q.   That was financed by Walsh Securities.
4      A.   Oh, okay.
5      Q.   Now, I know you testified earlier that
6  you had done work for Mr. Kane back in 1995.
7      A.   Yes.
8      Q.   That I'll represent is the earliest that
9  we found.
10     A.   All right. And I have independent
11 recollection somewhat of this file.
12     Q.   And actually as Miss Wagner correctly
13 elbows me, it's -- actually the entity providing the
14 funding is not at that time Walsh Securities, it's
15 actually G.F. Mortgage, which stood for Gruntal
16 Financial. Do you recognize the name Gruntal
17 Financial?
18     A.   Not at all.
19     Q.   Why is that loan familiar to you in any
20 way?
21     A.   Because I just liked the people. They
22 definitely were not straw buyers. They were flesh
23 and blood. And I certainly was their attorney, and I
24 had a normal -- what I say typical attorney/client
25 relationship.

48 (Pages 186 to 189)

Page 190

1    Q.    What do you mean by a typical
2  attorney/client relationship?  I mean --
3    A.    I had rapport with my clients.  I sat
4  down, we discussed fees, we discussed the contract, I
5  had some -- I don't know, just more direct control
6  over the matter.
7    Q.    You explained the transaction to them?
8    A.    Yeah, definitely.  Sat in the closing
9  from top to bottom, explained the documents, answered
10  the questions like you would expect a responsible
11  attorney to do.
12        MR. HAYES:  Can I just ask:  Does this
13  change Mr. Yacker's recollection of when he first
14  handled a Kane deal, or does he still think he
15  handled them earlier but for a lender other than
16  Walsh?
17        THE WITNESS:  I handled them earlier but
18  for a lender other than Walsh, and I believe the
19  lender was Selective, but I can't be sure of that,
20  and those would be late in '95 and maybe very early
21  in '96.
22        MR. HAYES:  Thank you.
23    Q.    And then, Mr. Yacker, I would ask you
24  then to since you know the Crespos --
25    A.    Yes.

Page 191

1    Q.    -- in an interesting bit of cosmic
2  Doppelgangery, I will represent to you, again going
3  through lots of files, the latest date in which we
4  found a loan that was funded by Walsh Securities that
5  was sold by Mr. Kane or one of his entities and in
6  which you were the closing attorney is actually Julio
7  and Cruz Crespo.
8    A.    The same people.
9    Q.    Same people.  And it's dated April 17 of
10  1997.
11    A.    Okay.  I would have guessed that that
12  would have been the one that I was trying to put
13  around mid '97.  In other words, I thought it was
14  later than this, but, yes, I do remember that and
15  that probably was the last one.
16    Q.    Do you remember:  Did the Crespos
17  actually attend that closing?
18    A.    Oh, yeah.  Loved the people.  They were
19  just so nice.  They later made all kinds of
20  complaints against me, but -- unfortunately, but,
21  yes, I do remember.  They had a daughter that was
22  just so charming and she just kind of exuded
23  sweetness.  She was maybe 14, 15 years old.
24    Q.    But other than those loans, I haven't
25  found anything that you -- that were part of a Kane

Page 192

1  real estate transaction that was funded by Walsh
2  Securities or its predecessor and I haven't found
3  anything outside that date.  So does that refresh
4  your recollection about when you were a closing
5  lawyer for these Kane real estate transactions?
6    A.    Yes.
7    Q.    So that's -- so you didn't close any
8  loans then in June of '96?
9        MR. HAYES:  '97.
10    Q.    '97, sorry.
11    A.    Yeah.  I thought I did but -- and I do
12  remember Cristo being at least, if not the last one,
13  one of the last ones.  Yes, it does refresh my
14  recollection.  I am willing to stand by what these
15  things show on the surface as far as dates go.
16    Q.    Going all the way back then, why were
17  you contacting Monmouth County in June or July of
18  1997 about filing deeds or mortgages if the last
19  closing was April of '97?
20    A.    I had to have gotten a request from
21  somebody that they never got their deed or their
22  title policy or their entitled to, went to the file, found it, and I am
23  entitled to, went to the file, found it, and I am
24  assuming it was the deed and a mortgage and they were
25  complete and properly witnessed and notarized and

Page 193

1  everything, dates were a little stale to record them
2  and that's when the clerk told me that they weren't
3  going to.  And the gist of the words, they said --
4  and I don't remember the person's name was:  In light
5  of what's been going on or something like that, they
6  consider this evidence of a fraud and they didn't
7  want to touch it, which needless to say did not
8  please me.
9    Q.    At this point I'll cede time to the
10  other counsel in the room.
11  CROSS-EXAMINATION BY MR. KOTT:
12    Q.    Mr. Yacker, my name is David Kott.  We
13  met before.  I represent one of the title companies,
14  Commonwealth Land Title Insurance Company.  I don't
15  have that many questions for you.
16        I wanted to get a little information
17  about your background.  What year did you become a
18  licensed lawyer in New Jersey?
19    A.    1963.
20    Q.    And where did you go to law school?
21    A.    I think I testified to before Rutgers
22  Law School.
23    Q.    And when did you start doing real estate
24  work?
25    A.    Pretty much from the start.  When I

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

a51af0f5-da6e-4c57-b258-d4af925f36ff

Page 194

1  finished my clerkship with Judge Knight in Freehold I
2  joined a local Matawan attorney, which I also
3  testified to, his name was DeMaio, Vincent DeMaio.
4  My kind of guy. He was a Harvard Law School graduate
5  and did some teaching at NYU, what I would call a
6  scholarly type guy, and I became associated with him
7  and that would be summer of '64 when I finished my
8  judicial clerkship. And pretty much from the
9  start -- he did some real estate and I started doing
10 it under his auspices.
11      Q.    Was that primarily residential real
12 estate?
13      A.    Yes.
14      Q.    And were you a residential real estate
15 attorney from 1964, let's say, up until about 1996?
16      A.    You mean solely?
17      Q.    No, did you do residential --
18      A.    Yes.
19      Q.    By 1995, 9996 you would have had
20 approximately 30 years experience doing residential
21 real estate law?
22      A.    Yes.
23      Q.    And would that have included
24 representing both buyers and sellers?
25      A.    Yes.

Page 195

1      Q.    Would that also have included doing some
2  representation of lenders for residential real
3  estate? Some?
4      A.    Representation of lenders? No, I don't
5  think so. Maybe but certainly not to any great
6  extent.
7      Q.    Can you estimate for me, just a rough
8  estimate, how many residential real estate closings
9  you would have done up until about 1995?
10     A.    No. It would vary. I think in a --
11 what I would consider a good year, maybe 100. So
12 about two a week and that would be, you know, a good
13 year. Slow years, I don't know, could be anything
14 from 15, 20. Other than those parameters I couldn't
15 really put a number on it. Significant number I
16 would say.
17     Q.    Over 2,000?
18     A.    No, I don't think so, that would be
19 high.
20     Q.    Okay. And you also did some other kinds
21 of legal work that were not residential real estate
22 closings but were related to real estate. Correct?
23     A.    Yes. And like I said before the more
24 challenging the better, legally challenging.
25     Q.    Tell us that kind of work, if you could.

Page 196

1      A.    Oh, I don't know. These were -- like I
2  said before, most of these were referrals from other
3  lawyers because it was out of the ordinary for them
4  and they didn't quite know how to handle it. One was
5  a fight between two neighbors over 15 inches of land
6  between them. That also became a leading case, went
7  all the way to the Supreme Court about abolishing the
8  hostility requirement in New Jersey, one of the last
9  states to do it. That kind of stuff.
10           Another one involved the efficacy of the
11 time of the essence notice. That was in Bergen
12 County. Referral from a New York attorney. That
13 kind of thing.
14           I mentioned before by virtue of a Judge
15 Lane appointment involved real estate issues growing
16 out of an apartment complex constructed in Matawan
17 that later went broke.
18     Q.    Judge Lane was a judge in Monmouth
19 County?
20     A.    He was.
21     Q.    And in that matter he appointed you as
22 his trustee. Is that correct?
23     A.    No. As -- let's see. I don't know what
24 you mean -- as a trustee, I guess, yeah.
25     Q.    Let me try it this way: Were you a

Page 197

1  court appointed trustee appointed by Judge Lane?
2      A.    Yes.
3      Q.    And in the law we sometimes refer to
4  trustees as fiduciaries?
5      A.    Yes.
6      Q.    Fiduciary is a high degree of
7  responsibility. Correct?
8      A.    I would say so.
9      Q.    Referring to your civic things as it
10 relates to the law, were you a member of the Board of
11 Bar Examiners?
12     A.    Yes, I was.
13     Q.    Who appointed you to that?
14     A.    New Jersey Supreme Court.
15     Q.    And about what years were you a member
16 of the Board of Bar Examiners?
17     A.    Roughly from 1981 to 1991.
18     Q.    Were you one of the longest serving
19 Board of Bar Examiners in the history of New Jersey?
20     A.    One of them, yeah.
21     Q.    For those who are not lawyers, the Board
22 of Bar Examiners decides who gets licensed as a
23 lawyer in New Jersey and who does not get licensed.
24 Is that correct?
25     A.    For some reason I want to correct that a

50 (Pages 194 to 197)

Page 198

1   little bit.
2       Q.   Go ahead.
3       A.   We decide strictly analytically, you
4   know, who passes the bar exam and who doesn't.
5   Somebody might pass the bar exam and still not become
6   a lawyer for other reasons.
7       Q.   And before you were appointed to be a
8   bar examiner, did you have other activities relating
9   to who would pass the bar and who would not?
10      A.   Yes. I was something called a reader,
11  which is like a bar examiner's assistant.
12      Q.   What did you do as a reader?
13      A.   I would read a tremendous amount of
14  examination books and assign a preliminary grade to
15  them subject to my supervising bar examiner's
16  approval, concurrence, whatever you want to call it.
17      Q.   The books that you were reading, were
18  those the answers to the bar examination filled out
19  by the applicants to the bar? So what would happen
20  is the bar exam would be given and even before you
21  were on the Board of Bar Examiners you would be one
22  of the people who would read the answers and grade
23  them. Correct?
24      A.   Correct.
25      Q.   Did you have any involvement with ethics

Page 199

1   committees?
2       A.   Yes.
3       Q.   Tell us about that.
4       A.   I was appointed, again also by the New
5   Jersey Supreme Court, to the Monmouth County Ethics
6   Committee.
7       Q.   And that was at some point before 1995?
8       A.   Oh, way before, it was around '68 to
9   '71, around there.
10      Q.   Had you ever been publicly disciplined
11  before 1996 by the Supreme Court?
12      A.   No.
13      Q.   Had you ever been disciplined at all by
14  the Supreme Court before 1996?
15      A.   My answer is no, but I want to answer it
16  a little bit more carefully because I did have
17  something called a fee dispute.
18      Q.   That's not discipline. Right?
19      A.   That's why I'm trying to be very careful
20  with my answer. No, I never had been.
21      Q.   And you've also -- before 1996 you also
22  taught in the area of real estate?
23      A.   I taught real estate law, I taught
24  Business Law 1 and 2. I taught something called
25  Business Organizations, which is like advanced

Page 200

1   Business Law and I taught Criminal Justice.
2       Q.   You seem to be a modest person but
3   you're also under oath here so you need to answer
4   this question: Would it be fair to say that by 1995
5   you would have been one of the most respected real
6   estate lawyers in that central New Jersey area?
7       A.   Modesty or not, no, I don't think so.
8   Again, I think I was respected for exactly the image
9   that I valued and that is being a scholarly person
10  but I don't know. There are plenty of lawyers who
11  were more experienced and respected than I was in the
12  field of real estate I think.
13      Q.   How about --
14      A.   Modesty aside.
15      Q.   Putting modesty aside, but being under
16  oath, by 1996 how was your reputation for honesty?
17      A.   I think it was pretty good.
18      Q.   I have a couple of questions about a
19  lawyer named Anthony Cicalese. Was he ever your
20  partner?
21      A.   Never.
22      Q.   Did you ever have any professional
23  affiliation with him?
24      A.   No. I don't know what he looks like
25  even.

Page 201

1       Q.   So to the extent you ever dealt with
2   Cicalese, would he be a lawyer on the other side of
3   the deal, meaning representing someone else?
4       A.   No, I never did that either. In other
5   words, our paths never crossed legally, socially or
6   any other way.
7       Q.   How about Mr. Pepsny? Was he ever a
8   partner of yours or any professional affiliation with
9   him?
10      A.   Between him and me?
11      Q.   Yes.
12      A.   No. But our paths did cross on many
13  legal matters.
14      Q.   But that would be he was a lawyer on the
15  opposite side?
16      A.   Correct.
17      Q.   Kind of like an adversary?
18      A.   Yes, although -- kind of like an
19  adversary, yes.
20      Q.   How about Mr. Alfieri? Ever have any
21  professional relationship with him such as being in
22  the law practice together?
23      A.   Definitely not together. I recall
24  perhaps one transaction with him that might have been
25  non-Kane related. If I did it was very routine and

51 (Pages 198 to 201)

Page 202

1  very non-memorable if it happened at all.
2      Q.   Let me show you -- I am not going the
3  mark it but it's Plaintiff's Certified Answers and
4  Objections to Commonwealth's First Set of
5  Interrogatories addressed to plaintiff, Walsh
6  Securities.  And they've attached a list where the
7  list had on it a number of loans.  And there's a
8  column as to who the closing attorney is, and I'll
9  represent to you your name appears on a number of
10 these loans and so does Mr. Cicalese.
11     A.   All right.
12     Q.   As far as you know, did Cicalese also
13 close loans that were Kane loans where Walsh was the
14 lender?
15     A.   Yes.
16     Q.   Do you have any way of determining what
17 loans you would have closed and what loans Cicalese
18 would have closed?
19     A.   I don't know what you mean any way of
20 determining.  If you showed me a file and I looked at
21 it, I can tell whether it was mine or his, yeah.
22     Q.   Is that about the only way?  You would
23 need to look at some files?
24     A.   Yeah.  I'm sorry, yes.
25     Q.   With respect to the straw buyers on the

Page 203

1  Kane loans, did they, in fact, sign notes?
2      A.   I don't know.  I believe that they did
3  but I'm not sure.
4      Q.   And why are you not sure about that?
5      A.   I have no recollection of preparing one.
6  But then I had no recollection of doing any work on
7  that mortgage I was shown either so I just don't
8  know.
9      Q.   If you were to close a transaction that
10 had a mortgage, would you normally expect to see a
11 note?
12     A.   Absolutely.
13     Q.   And if you did not see a note on the
14 Kane loan, is that something that would stick out in
15 your mind?
16     A.   Well, what do you mean if I did not see
17 a note?
18     Q.   Well, you would have a file in your
19 office.  Right?
20     A.   Yes.
21     Q.   And in a typical real estate file there
22 would be some things that would be common to every
23 file.  Correct?
24     A.   Yes.
25     Q.   One of the things might be a HUD-1?

Page 204

1      A.   Uh-huh.
2      Q.   Another would be a deed or a couple of
3  deeds?
4      A.   Yes.
5      Q.   Another would be a mortgage?
6      A.   Yes.
7      Q.   Another would be a note?
8      A.   Yes.
9      Q.   Assuming there's a lender involved.
10 Right?
11     A.   Yes.
12     Q.   So that's what I was asking.  If on some
13 of your Kane deals you looked at the file and there
14 was no note, that's something that would stick out in
15 your mind.  Right?
16     A.   Yes, but I just want to qualify it in
17 this way:  It's important because you have to show
18 value.  And if there's ever a foreclosure proceeding
19 or something akin to that you have got to be able to
20 show that value, at least promissorily speaking, in
21 the form of a note was given for the mortgage.  But
22 it didn't have the same significance as a mortgage,
23 and when you framed your question about going through
24 files, a little light went on in my head.  It was
25 often my practice, just to keep the copying down,

Page 205

1  when I sent documents back to a lender after the
2  closing, like in these cases back to Walsh, my
3  secretary would make copies of certain crucial
4  documents.  I considered the deed crucial, I
5  considered the mortgage crucial.  I did not consider
6  the note crucial so it's -- crucial in the sense that
7  I should have a copy of it.  So it's possible in some
8  of these old files that I wouldn't have made a copy
9  of a note.
10     Q.   Let me ask:  If you sent --
11     A.   Excuse me.  A copy of the note.
12     Q.   If you sent documents back to a lender,
13 let's talk about Walsh and you did not send a note
14 back, would you expect to hear from the lender?
15     A.   Absolutely.
16     Q.   Why?
17     A.   Because again it goes hand in hand with
18 the mortgage.  In the event that it was necessary for
19 them to prove value in a foreclosure proceeding or
20 something of that type they would certainly want
21 that.
22     Q.   Do you ever remember Walsh contacting
23 your office at all saying they didn't get documents
24 from you?
25     A.   No, but I'm going -- you don't like me

52 (Pages 202 to 205)

Page 206

1  to speculate. It's likely.
2       MR. MAGNANINI: Remember the ground
3  rules.
4       A.   No.
5       Q.   Okay. Do you ever remember Walsh
6  contacting your office and saying that they didn't
7  receive some funds as a result of the closing that
8  they thought they had coming to them?
9       A.   No.
10      Q.   You gave some testimony, and I'm going
11 to do a rough paraphrase, but I want you to fix my
12 paraphrase because I'm not sure I have it right. You
13 gave some testimony earlier this morning that Walsh
14 had an intention to close a lot of loans at the end
15 of the month.
16      A.   Yes.
17      Q.   Do you remember that?
18      A.   I do.
19      Q.   Tell us more about that.
20      A.   I wish I could. I think I used the
21 expression, which I'm going to use again, it was just
22 in the air. It's hard for me to pinpoint a
23 particular person or event where I was told that or a
24 letter that I got to that effect. It was just
25 something -- things are just kind of known or

Page 207

1  understood, and I wish I could do better than that
2  but I can't.
3       Q.   Well, was that something you had not
4  experienced with other lenders?
5       A.   Correct, I had not experienced that with
6  other lenders.
7       Q.   Are you aware of any business reason why
8  a lender like Walsh would want to close a number of
9  loans at the end of the month? I am asking you
10 because you've been in this business a long time.
11      A.   Well, the reason would be that they had
12 the money to loan and you don't make -- like that
13 older commercial, you don't make any money by turning
14 down loans, and they were anxious to loan it, but as
15 to why it became on their books a fiscal kind of a
16 monthly thing, I don't know, but it did, just like a
17 car salesman has to sell a certain amount of Chevies
18 every month to meet his quota, I assume it's the same
19 sort of thing.
20      Q.   With respect -- getting back to the list
21 I showed you before.
22      A.   Okay.
23      Q.   On one of the pages there's seven loans
24 to a Mario Cuzzi, Junior.
25      A.   All right.

Page 208

1       Q.   Beginning with 625401.
2       A.   What are those numbers?
3       Q.   That's the loan file number?
4       A.   Okay.
5       Q.   Ending with 623306. In your experience
6  have you ever seen a single lender within a short
7  period of time make this number of loans to a
8  particular borrower?
9            MR. MAGNANINI: Objection to the form.
10      A.   Only Walsh itself, like with Liebler and
11 a couple of others that --
12      Q.   That's what I'm asking. In your 30
13 approximately years of doing this work was Walsh the
14 only lender you had seen making this many loans to an
15 individual borrower?
16      A.   For sure, yes, but they weren't happy
17 about it.
18      Q.   Why do you say that?
19      A.   Again, I'm getting this not exactly out
20 of the air but secondhand from things that Bill Kane
21 told me, maybe Gary Grieser. That's why they had to
22 look for straw buyers. They kept getting the same
23 ones all the time. I guess they didn't want to have
24 the same ones all the time.
25      Q.   And this is what I'm not getting. If

Page 209

1  Walsh was making the loans in this number of
2  individuals why would Grieser or Kane need to use
3  straw buyers? That is, they could have just used
4  anybody. Right?
5       A.   Well, again, that's why it was told to
6  me, although secondhand, that they didn't want to
7  make any more than they already had to any one
8  particular buyer.
9       Q.   And there was something you said, and
10 again correct me if I'm wrong, if my characterization
11 is wrong, but that Walsh knew these straw buyers were
12 straw buyers, and I don't know that you said that.
13 That was the impression I took away from it.
14      A.   Let me see if --
15           MR. MAGNANINI: Object to the form.
16      Q.   I am not representing you said that.
17 That's what I interpreted you were saying.
18      A.   Yeah, directly or indirectly they knew
19 there were straw buyers just by the number of them.
20 They weren't buying them to occupy the house. And,
21 by the way, there was a form, which hasn't been
22 discussed here, and a rather standard form, an
23 affidavit of occupancy that was part of the Walsh
24 package, and I mean, how could they -- I am asking
25 rhetorically, how could they ask a buyer to sign one

53 (Pages 206 to 209)

Page 210

1  of these things when they knew he's buying eight
2  homes? It just didn't make any sense to me.
3      Q.    The affidavit of occupancy, that was a
4  document that Walsh required?
5      A.    It was in their package, yes, and they
6  required that it be signed and sent back.
7          MR. KOTT: Can I get the Kane dep
8  exhibits you used.
9          MR. MAGNANINI: King.
10         MR. KOTT: King, I'm sorry.
11     Q.    Referring to King-13, in the first page,
12 paragraph A, Documents, there's something that says
13 "Occupancy Affidavit."
14     A.    That's the one.
15     Q.    Okay.
16     A.    And that is a fairly standard form
17 amongst the lenders.
18     Q.    With respect to the straw buyers, let's
19 just assume for a moment they signed the note, let's
20 just assume that.
21     A.    Okay.
22     Q.    Would they be legally obligated to pay
23 under the note to the lender?
24     A.    To the lender? I thought we were
25 talking about the second mortgages in the -- Walsh's

Page 211

1  mortgages, there's always a note that went along with
2  the mortgage.
3      Q.    We weren't tracking before and it's my
4  fault. Earlier when I was asking you questions about
5  the note, would there always be a note signed by the
6  borrower obligating the borrower to pay Walsh?
7      A.    Absolutely.
8      Q.    And would that note always be returned
9  to Walsh?
10     A.    Yes. Sometimes two copies/ that's how
11 important it was to them. They wanted the original
12 and a certified copy.
13     Q.    So earlier when you and I had the back
14 and forth about the note, you were referring to a
15 different note?
16     A.    Yes, I was, I'm sorry.
17     Q.    My fault. So Walsh would have always
18 received on all these loans a note executed by the
19 borrower requiring the borrower to pay Walsh back the
20 amount of the loan?
21     A.    Yes, they would have. And, again, it's
22 important to prove value if it should ever become
23 necessary.
24     Q.    So even though these were straw buyers
25 they still would have executed a document that would

Page 212

1  have legally required them to pay Walsh back on the
2  note. Is that correct?
3      A.    Yes.
4      Q.    So I'm not sure I see -- maybe they
5  weren't. Was Walsh hurt by the straw buyer? Did
6  they have a valid and collectable note?
7          MS. WAGNER: Objection to form.
8          MR. MAGNANINI: Objection to form.
9      A.    Let me think. I don't know if I can
10 answer that question. I remember saying, and I
11 certainly stand by this, they seemed decidedly
12 unconcerned as to whether the buyers were buying to
13 move into the house or buying to use -- ugly sounding
14 word -- flip it or whatever. They just didn't seem
15 to care.
16     Q.    And you say that because they received
17 all the occupancy affidavits?
18     A.    Partly for that, and again it was just
19 kind of a mood that was created. They didn't seem to
20 be concerned to the point -- until Mr. Magnanini
21 corrected me, I wasn't even sure there was a "due on
22 sale" clause in the mortgage. I believe there
23 probably was. The fact that I don't even know to
24 this day kind of indicates to me that it wasn't
25 important to them.

Page 213

1      Q.    I have no further questions, but I think
2  Mr. Hayes does.
3  CROSS-EXAMINATION BY MR. HAYES:
4      Q.    Good afternoon, Mr. Yacker. I represent
5  Fidelity and Nations?
6      A.    Yes, sir.
7      Q.    Mr. Yacker, Mr. Magnanini had placed
8  before you the three deeds in the transaction.
9      A.    Yes.
10     Q.    And will you agree with me, sir, that
11 while those transactions were related, they were, in
12 fact, separate transactions?
13         MR. MAGNANINI: Objection to form.
14     A.    It's a matter of terminology. I don't
15 know. They certainly were related. I wouldn't use
16 the term separate transactions.
17     Q.    For example, from the standpoint of Mr.
18 McGowan's client, the title agency who is insuring
19 the transaction --
20     A.    Yes.
21     Q.    -- does that agency care, based on your
22 experience in the business, what its buyer does with
23 the property after it buys it?
24     A.    Well, I kind of addressed that before.
25 My answer is no, they don't.

54  (Pages 210 to 213)

Page 214

1    Q.    From a standpoint of a joint venture
2  deed being given after the buyer acquires title to
3  the property, that's not going to have an impact on
4  the title insurance issued to the buyer. Correct?
5    A.    That is correct.
6    Q.    And to the extent the buyer would want
7  to mortgage the property to someone else after the
8  fact, that's not going to have an impact on the
9  buyer's title insurance. Correct?
10   A.    Correct. If I could just add to that by
11 way of, I don't know what -- I only know one bank
12 ever, it was Chemical Bank in New York, that put
13 something in their mortgage, and they wouldn't waive
14 it, my client was incensed about it, you couldn't put
15 another mortgage on the property after you borrowed
16 from them. But they wouldn't waive it and finally I
17 said to them: I can't get rid of it, take the deal
18 or borrow money someplace else and he took it but
19 wasn't happy.
20   Q.    Do you recall in these particular
21 transactions Walsh had a prohibition against
22 secondary financing unless it approved it?
23   A.    I don't remember one way or the other
24 but they certainly were aware that we engaged in
25 secondary financing and didn't seem to sabotage the

Page 215

1  transactions.
2    Q.    Due on sale clause, Mr. Yacker, is an
3  option for the lender to call the loan in the event
4  of a sale. Correct?
5    A.    Correct.
6    Q.    It is not mandated. Correct?
7    A.    Correct.
8    Q.    It is simply something that would permit
9  the bank to decide if it chose to call its loan or to
10 transfer the property?
11   A.    Yes.
12   Q.    And do you recall, Mr. Yacker, in 1996
13 and 1997 were there certain federal laws that limited
14 the ability of a lender to invoke a due on sale
15 clause regardless of whether or not it existed in the
16 loan documents?
17      MR. MAGNANINI: Objection to the form.
18   A.    I hate to admit my ignorance but no, I
19 don't recall. I had done quite a bit of research on
20 that issue but many years ago, maybe in the '80s, on
21 when and under what circumstances you could invoke a
22 due on sale clause. I think a husband was putting
23 his wife on the deed with him and it created a
24 technical violation, if you want to say, of due on
25 sale clause maybe, and I couldn't get the bank to

Page 216

1  waive it. Silly things like that, but, no, I am not
2  aware of that law, frankly.
3    Q.    And if Walsh wished to preclude one of
4  its borrowers from conveying an interest in the
5  property it could have required that in its closing
6  instructions, couldn't it?
7      MR. MAGNANINI: Objection to the form.
8    Q.    Much the same way it could prohibit
9  secondary financing in its closing instructions?
10   A.    Yes.
11   Q.    And did you see anything at all in any
12 closing instructions that you ever received from
13 Walsh that would have precluded these joint venture
14 deeds?
15   A.    Secondary financing or joint venture?
16   Q.    Joint venture. Did you ever see any
17 prohibition in any of the closing instruction letters
18 supplied by Walsh in any of these loans that would
19 have precluded the borrower from entering into a
20 joint venture deed?
21   A.    No, I didn't.
22   Q.    Over the years, Mr. Yacker, have you had
23 an opportunity to see closing instruction letters
24 from different lenders besides Walsh?
25   A.    Yes, I have.

Page 217

1    Q.    And would you agree with me, sir, that
2  those closing instruction letters vary by the
3  particular lender?
4    A.    Yes.
5    Q.    Some are as short as a few pages and
6  some are many, many, many pages?
7    A.    Some are even shorter than a few pages.
8  One page. The answer is yes.
9    Q.    And some are more detailed than others
10 in requiring what happens at the closing?
11   A.    Yes.
12   Q.    And you indicated in response to one of
13 Mr. Magnanini's questions that you felt the Walsh
14 closing instruction letter wanted you to be
15 suspicious. Did I paraphrase what you said
16 correctly?
17   A.    Yes, there was something.
18   Q.    Why don't we do this: Why don't you
19 take a look at King-13, because I tried to find
20 something in that document, sir, that asked you to be
21 suspicious, and the only thing I saw was that if
22 it didn't close when it was scheduled you should
23 notify them.
24   A.    All right. Perhaps you're right.
25   Q.    It's not my testimony. Why don't you

55 (Pages 214 to 217)

Page 218

1   take a look and see if you see anything at all in the
2   closing instructions that tell you to be suspicious?
3       A.   No. No, I do not.
4       Q.   And Mr. Magnanini had asked you about
5   some of the fees and costs and how they were paid.
6   Do you recall those questions that pertained to the
7   closing instructions?
8       A.   Yes.
9       Q.   Would you agree with me, sir, that many
10  of the fees and costs that were to be collected from
11  the borrower in Walsh transactions were, in fact,
12  already deducted by Walsh from the loan proceeds
13  before they were forwarded to you?
14      A.   Yes. Otherwise I would be sending Walsh
15  a check after the closing.
16      Q.   And you never had to do that, did you?
17      A.   No, I never did.
18      Q.   Because when Walsh wanted to be paid it
19  took its fees right out of the money before they sent
20  it to you?
21      A.   Which I might add is common. That's a
22  common practice.
23           MR. MAGNANINI: Objection to the form.
24      Q.   If you would take a look at the HUD on
25  that package of documents that you had, sir.

Page 219

1       A.   Yes.
2       Q.   And directing your attention to the
3   left-hand side of the first page, which talks about
4   the borrowers' --
5       A.   Yes.
6       Q.   -- monies, am I correct, sir, that the
7   HUD-1 indicates that the amounts paid are by or on
8   behalf of borrower?
9       A.   Yes.
10      Q.   It doesn't require that the money just
11  be paid by the borrower. Correct? They can be paid
12  on their behalf?
13      A.   Yes. And I think I referred to one of
14  the questions, yes, that it's unusual but not
15  unprecedented I think was the word I used as far as
16  the seller paying a portion of the buyer's legal
17  costs, open and disclosed on the HUD.
18      Q.   Did you believe in signing the HUD-1
19  that had the language, "Amount paid by or in behalf
20  of the borrowers," that the monies could only be paid
21  by the borrower?
22      A.   No, I did not believe that.
23      Q.   And, in fact, have you been involved in
24  transactions over the years, Mr. Yacker, where when
25  the lender wanted to insure that the monies were paid

Page 220

1   by the borrower it was a condition of the closing
2   instructions that the monies be shown as coming from
3   the borrower, not from the seller?
4       A.   No, I can't say that I ever came cross
5   that.
6       Q.   Did you ever come across closing
7   instructions where the source of the funds had to be
8   shown to the lender before you could close?
9       A.   The source of what funds?
10      Q.   The source of the funds that the
11  borrower was putting in the deal. For example, if it
12  was a gift there needed to be a gift letter?
13      A.   Yes. Yes. More so in -- well, the
14  answer is yes.
15      Q.   And do you ever recall seeing anything
16  in any of the Walsh closing instructions that
17  required you to investigate where the borrower's
18  monies were coming from?
19      A.   No, but if I can just switch gears
20  slightly, that question did come up on the form of
21  escrow letter. It might have been promulgated by
22  National Home Funding, I don't recall, but that issue
23  did come up. They wanted to know the source of the
24  buyer's deposit money.
25      Q.   National Home Funding did?

Page 221

1       A.   Yes. And they gave me a pre -- is that
2   redundant? Pre-prepared form that I was to get the
3   buyers to sign.
4       Q.   The monies that were generated by the
5   sale of the property from Cristo to the borrowers
6   after paying the various costs of the deal would
7   result in certain proceeds?
8       A.   Correct.
9       Q.   Payable to Mr. Kane. Correct?
10      A.   To the seller, yes.
11      Q.   Or his company?
12      A.   Yes.
13      Q.   And as far as you were concerned those
14  monies, the proceeds were able to be distributed by
15  Mr. Kane in any way he saw fit. Correct?
16      A.   Absolutely. It was his money. I think
17  I could use the example: He could pay the milkman as
18  long as he authorized it.
19      Q.   And if Walsh wished to limit the manner
20  in which the seller wanted to distribute funds, could
21  it have done so in its closing instructions?
22      A.   I can't answer that. I don't know.
23      Q.   Do you recall seeing anything at all in
24  any closing instruction that you received from Walsh
25  that in any way limited what the seller could do with

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

a51af0f5-da6e-4c57-b258-d4af925f36ff

Page 222

1  its funds?
2      A.   No, I did not.
3      Q.   Do you recall seeing anything in any
4  closing instructions that required you to notify
5  Walsh as to how the seller was distributing his
6  funds?
7      A.   No.
8      Q.   And what you did was in some respects
9  facilitate Mr. Kane's distribution of those funds by
10  instead of cutting him one check from the sale of a
11  property, you would divide those proceeds up and
12  issue separate checks.  Is that correct?
13      A.   That's exactly what happened.
14      Q.   And that was always at Mr. Kane's
15  direction as to how his money was going to be
16  distributed?
17      A.   That is correct.
18      Q.   And I think you indicated at one point
19  in time Mr. Kane actually left some money in your
20  account?
21      A.   Yes, he did.
22      Q.   There was some testimony at one point in
23  time, Mr. Yacker, that at some point Coastal Title
24  learned about all of these deeds not being recorded.
25      A.   Yes.

Page 223

1      Q.   To use a legal phrase, Mr. Agel flipped
2  out and said that you can't close all of these
3  transactions and not record the documents and that,
4  in fact, Coastal then came and got all of the
5  documents that had not been recorded and took them
6  for recording?
7      A.   Excuse me.  What prefaced your question?
8  There's some testimony?
9      Q.   There has been some testimony to that
10  effect.  My question is:  Do you have any
11  recollection at all of hearing anything about that,
12  that Mr. Agel or someone from Coastal had, in fact,
13  learned after the fact that the deeds were not
14  recorded and came to get them so that they would be
15  recorded?
16      A.   Yes.  And in a very indirect sort of
17  way.  I had no direct conversation with Mr. Agel by
18  phone, by mail or anything like that.  So it would
19  have come from Coastal, whoever, and what I was
20  hoping for, because I couldn't get anywhere with Mr.
21  Kane, he was stonewalling me, that sooner or later he
22  would realize the nightmare that could be created by
23  a bunch of deeds sitting around unrecorded and feel
24  the pressure to, at least to the extent of the
25  recording fees, help me finance that because he had

Page 224

1  already taken my money in other ways and that's
2  exactly what happened.
3      Q.   Did your dispute with Mr. Kane get to
4  the point where you filed suit against him?
5      A.   Yes.
6      Q.   When was that?
7      A.   Shortly after I learned about it and I
8  learned about it by bouncing a couple of trust
9  checks.
10      Q.   And was that case settled?
11      A.   I can't answer it in the way you phrase
12  it.
13      Q.   What was the outcome of that case?
14      A.   Okay.  My complaint was dismissed
15  without opposition from me because I couldn't come up
16  with the proof that I needed to show that he was paid
17  twice.  Again, all the information was in Mr. Kane's
18  control or his accountant, and other than sending me
19  a bill I never got any cooperation from the
20  accountant and so it -- I let it go for lack of proof
21  or lack of things I thought I could prove.
22      Q.   Was that before or after he had paid the
23  monies you testified about previously?
24      A.   Well, there's a couple -- he immediately
25  paid, I think I testified, something under a couple

Page 225

1  of thousand right away just to cover a few checks
2  that were already written and not covered.  And then
3  he paid another sum, which I can't recall but
4  somewheres between a couple of thousand and the
5  54,000 that I thought he owed that I thought he was
6  overpaid, and I don't know if he paid something else
7  to cover the recording fees.  No.  What I think he
8  might have done -- I'm not sure but I think he might
9  have given that money to Coastal so they could record
10  the deeds.  I'm not sure.  My recollection of that is
11  a little fuzzy, but there was two or three separate
12  ways that he paid me back some of the money.
13      Q.   With all the time that's passed,
14  Mr. Yacker, is it fair to say that you don't have a
15  specific recollection of any of these closings?
16      A.   I think it varies.  Like the Crespos I
17  recall more specifically than others.  They were very
18  personable people that I dealt with on a direct
19  basis.  It's hard to say.
20      Q.   Sitting here today, you wouldn't be able
21  to testify at which closings people attended or
22  documents were just delivered.  Correct?
23      A.   That's generally true.  I have specific
24  recollection of isolated things here and there all
25  over the place but basically that's true.

57 (Pages 222 to 225)

Page 226

1    Q.    Sitting here today, you wouldn't be able
2  to tell us when the -- call it the mechanism for
3  representing that escrow monies were in your
4  possession changed from one form to another. Would
5  that be a fair statement?
6    A.    Yes, partly because of passage of time
7  and party because I briefly mentioned -- I sound like
8  I'm psychoanalyzing myself, but I tried all these
9  years to block it out of my mind. They're not
10  pleasant memories to me.
11    Q.    And, sitting here today, you wouldn't be
12  able to say which transactions had disbursements
13  prior to any particular deed coming in. Is that a
14  fair statement?
15    A.    Yes. It's possible if -- possible if my
16  recollection were refreshed with documents or other
17  things that it might come back to me little by the
18  little, but generally speaking, yes, it's a fair
19  statement.
20    Q.    And did you testify, Mr. Yacker, that to
21  the best of your recollection you did, in fact,
22  comply with the closing instructions that were
23  supplied by Walsh on the transactions?
24    A.    I don't know if I can answer that yes or
25  no. I felt that I complied with the spirit of the

Page 227

1  closing instructions, and if there were deviations
2  they either were very minor or things which Walsh
3  didn't -- for whatever reason didn't seem to care
4  that much about.
5    Q.    Let me ask you this: To the best of
6  your recollection, did you return to Walsh all of the
7  documents that it asked to be signed and returned?
8    A.    Yes.
9    Q.    To the best of your knowledge, was a HUD
10  faxed to the closing department at Walsh as required
11  by the HUD-1 before making disbursement -- by the
12  closing instructions before making disbursements?
13    A.    Repeat the whole question.
14    Q.    Sure. To the best of -- you have 13 in
15  front of you, again, the closing instructions,
16  Mr. Yacker.
17    A.    Yeah, I will get it, yes.
18    Q.    About a little more than half of the way
19  down, two-thirds, it says: "Prior to disbursement
20  you must fax HUD-1 to the closing department," and it
21  gives a phone number, "to obtain approval to
22  disburse." Do you see that?
23    A.    Yes.
24    Q.    Is it your experience, Mr. Yacker, that
25  a lender requires the HUD-1 to be forwarded to it

Page 228

1  before it will fund the loan?
2    A.    My experience is some did and some
3  didn't.
4    Q.    Do you recall what Walsh's procedure
5  was?
6    A.    Well, it's written here that they would
7  want it, but they didn't press it I guess is the best
8  way for me to put it.
9    Q.    Why do you say that?
10    A.    Because I don't remember us sending in
11  the HUD in advance and -- number one, and I never
12  remember having a problem getting a wire, and we
13  never dealt with things like funding numbers although
14  other banks do.
15    Q.    Based on your recollection, Mr. Yacker,
16  despite the fact that Walsh required in its closing
17  instructions that it have a completed HUD-1 before
18  funding, it would fund the loan without it?
19    A.    Yes.
20    Q.    There are also requirements in this
21  document, sir, that hazard insurance policy be
22  provided. To the best of your recollection was that
23  done?
24    A.    Best of my recollection is it was done
25  but I have to add a caveat. That was one of the many

Page 229

1  fingers that Bill Kane had in his many pies. He
2  insisted on handling the insurance part of it, and on
3  many occasions he would do that himself, but with
4  that qualification, to the best of my recollection it
5  was done.
6    Q.    And do you recall a lot of the insurance
7  handled through an agent by the name of Rice?
8    A.    I remember the name, I don't know
9  Mr. Rice.
10    Q.    You don't recall Walsh ever complaining
11  to you or hearing from Lory that Walsh was
12  complaining to her that they weren't getting a hazard
13  policy?
14    A.    No, I do not. I do not recall.
15    Q.    There's a requirement in here that a
16  title insurance policy be issued insuring Walsh in
17  first lien position.
18    A.    Yes.
19    Q.    Are you aware of that requirement?
20    A.    Yes, very standard.
21    Q.    To the best of your knowledge, was that
22  complied with?
23    A.    I can't say. A title insurance policy
24  is issued several weeks later even in a closing that
25  runs very smoothly. We know there were some that

58 (Pages 226 to 229)

Page 230

1  were never issued for various reasons but the design
2  and intent was to comply with that certainly.
3      Q.    And, to the best of your knowledge,
4  Mr. Yacker, did the fees that were placed on the
5  HUD-1 and charged in the transaction match what Walsh
6  said could or could not be charged?
7          MR. MAGNANINI:  Objection to the form.
8      A.    I don't understand by could or could not
9  be charged.
10     Q.    Take a look at the third page.  It
11 indicates what fees and costs are permitted in the
12 transaction.
13     A.    Oh, yes.
14     Q.    My question to you is:  Did you use this
15 particular instruction to prepare the HUD-1?
16     A.    Yes.
17     Q.    And did you follow these fees in the
18 HUD-1?
19     A.    To the best of my recollection, yes, we
20 did.
21     Q.    Do you recall ever receiving any
22 objection at all from Walsh about the way in which
23 you were conducting closings?
24     A.    No.  The only reason I'm hesitating is
25 because much later I did get a letter from Walsh.  It

Page 231

1  seemed to be almost like a form letter, I don't
2  remember from whom, listing several matters, perhaps
3  a dozen or more, for which they had not received
4  title policies yet.
5      Q.    Was that before or after the article in
6  the Asbury Park Press?
7      A.    I would say after.
8      Q.    Do you have any recollection, sitting
9  here today, Mr. Yacker, what those 12 loans were?
10     A.    No, just a bunch of names and maybe they
11 used loan numbers.
12     Q.    What did you do in response to that
13 inquiry?
14     A.    Nothing.
15     Q.    And you also testified in response to
16 one of Mr. Magnanini's questions at some point in
17 time you were going through the files and saw the
18 1003s.
19     A.    Yes.
20     Q.    And that in looking at those 1003s it
21 raised concerns with you as to how these loans could
22 be approved based on the income that was included in
23 the 1003s?
24     A.    Well, I wouldn't use the word concern.
25 This was long after the fact.

Page 232

1      Q.    I understand.
2      A.    I wasn't really concerned about it at
3  that point.
4      Q.    It raised an issue with you how these
5  loans could have been approved based on the
6  information in the 1003s?
7      A.    To the point I was shocked, yes.
8      Q.    And is it your understanding, sir, that
9  the 1003 is a document that is supposed to be
10 reviewed by a lender to determine whether or not a
11 borrower qualifies for a loan?
12         MR. MAGNANINI:  Objection to the form.
13     A.    Yes.
14     Q.    And did you notice in your review of the
15 files, Mr. Yacker, that the vast majority of the
16 title commitments that were issued in this case
17 identified Cristo as the property owner but
18 identified it without any recording information or
19 dates of deeds of acquisition of title?
20     A.    Yes, or -- either that or they used a --
21     Q.    To be recorded?
22     A.    Device or something like that.  Can I go
23 back to your previous question about the 1003s?
24     Q.    Yes.
25     A.    I believe, and this would be standard,

Page 233

1  1003s are required to be re-executed at the closing
2  and sent back with other closing documents.  I didn't
3  comb this list again to see if it's required, but I
4  never cared to look at it, it didn't concern me.  So
5  if they were in the files it was just a document that
6  they signed.  In fact, I rarely would discuss that
7  with the buyers because it was kind of personal.  I
8  didn't want --
9      Q.    I understand.  My question wasn't
10 whether you looked at them.  My question is:  Would
11 you have expected a lender to look at it based on
12 your experience in the industry?
13     A.    Oh, yes, my answer was yes.  I didn't
14 want you to think:  Well, hadn't you seen those
15 things anyway?
16     Q.    That's not my question.
17     A.    Okay.  I didn't want you to think that.
18     Q.    Based on your experience in the industry
19 is it unusual for title commitments to show that the
20 purported owner of the property doesn't have a
21 recorded deed or that his or her interest in the
22 property is to be recorded?
23     A.    Well --
24     Q.    Putting aside the Kane transactions.
25     A.    Yes, it's unusual.  It would indicate,

VERITEXT REPORTING COMPANY

212-267-6868                      516-608-2400

a51af0f5-da6e-4c57-b258-d4af925f36ff