# EXHIBIT Q

L. KING

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No.
97-cv-3496 (DRD) (MAS)

WALSH SECURITIES, INC.,    :
                           :
          Plaintiff,       :
                           :
     vs.                   :     DEPOSITION OF:
                           :     LORRAINE KING
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP CONSULTING,
INC.; COMMONWEALTH LAND TITLE
INSURANCE CO.; NATIONS TITLE
INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE
INSURANCE CO. OF NEW YORK;
COASTAL TITLE AGENCY; DONNA
PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., D/B/A
MURPHY REALTY BETTER HOMES
And GARDENS                :
                           :
          Defendants.      :
                           :
- - - - - - - - - - - - -

L. KING

## Page 2

```
 1              TRANSCRIPT of the stenographic notes of
 2   the proceedings in the above-entitled matter, as
 3   taken by and before JANET BAILYN, a Certified
 4   Shorthand Reporter and Notary Public of the State of
 5   New Jersey, held at the office of STONE & MAGNANINI,
 6   150 John F. Kennedy Parkway, Short Hills, New Jersey,
 7   on April 30, 2010, commencing at 11:20 in the
 8   forenoon.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES:
 2
 3        STONE & MAGNANINI, LLP
          BY: AMY WALKER WAGNER, ESQ.
 4        150 John F. Kennedy Parkway
          Short Hills, New Jersey 07078
 5        Attorneys for Plaintiff
 6        McCARTER & ENGLISH, LLP
          BY: DAVID R. KOTT, ESQ.
 7        Four Gateway Center
          100 Mulberry Street
 8        Newark, New Jersey 07102-4056
          Attorneys for Defendant
 9        Commonwealth Land Title Insurance Co.
10        FOX ROTHSCHILD, LLP
          BY: EDWARD J. HAYES, ESQ.
11        2000 Market Street
          Philadelphia, Pennsylvania 19103-3222
12        Attorneys for Defendants Nations Title
          Insurance of New York, Inc. and Fidelity
13        National Title Insurance Co. of New York
14        RICHARD CALANNI
          1 Old Farm Road
15        Tinton Falls, New Jersey 07724
          Defendant Pro Se
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                   INDEX
 2   WITNESS    DIRECT  CROSS  REDIRECT  RECROSS
 3   LORRAINE KING
 4    BY MS. WAGNER       5
      BY MR. CALANNI      8
 5
 6
 7              EXHIBITS
 8   NUMBER      DESCRIPTION           PAGE
 9   King-1      Subpoena            11
     King-2      Attachment B, Documents
10               to be Seized          60
     King-3      Schedule A, Title
11               Insurance Commitment   72
     King-4      Schedule A, Title
12               Insurance Commitment   72
     King-5      Closing Service Letter
13               Dated 7/11/96         77
     King-6      Invoice dated 7/11/96  77
14   King-7      Deed                 77
     King-8      Deed                 77
15   King-9      Deed                 77
     King-10     Deed                 94
16   King-11     Secondary Mortgage Loan  97
     King-12     HUD-1                97
17   King-13     Closing Instructions,
                 Walsh Securities      97
18   King-14     Memo dated 7/26/96    104
     King-15     Stanley Yacker-Cash
19               Disbursements Journal  105
     King-16     Mortgage, Alphonse
20               Salvatoriello        111
     King-17     Letter dated 5/13/97  111
21   King-18     Documents for Recording  111
     King-19     Letter dated 7/30/96  111
22   King-20     Mortgage             115
23
24
25
```

## Page 5

```
 1   LORRAINE KING, residing at 171 First
 2   Street, Keyport, New Jersey, having been duly sworn
 3   by the Notary, testified as follows:
 4   DIRECT EXAMINATION BY MS. WAGNER:
 5      Q.   Good morning, Miss King.
 6      A.   Good morning.
 7      Q.   Your name is Lorraine King.  Correct?
 8      A.   Yes, it is.
 9      Q.   I just want to first introduce myself.
10   My name is Amy Walker Wagner.  I'm with the law firm
11   of Stone & Magnanini, and we represent Walsh
12   Securities in this civil litigation against a number
13   of defendants, which you're not a defendant.
14   Correct?
15      A.   I have not been served with any papers
16   so I guess not.
17      Q.   I'll represent to you that you're not a
18   defendant.
19      A.   Okay, I am not a defendant.
20      Q.   Have you ever been deposed before?
21      A.   No.
22      Q.   Mr. Calanni, who is sitting here to my
23   right, he needs to ask you some questions because I
24   believe he needs to leave early.
25           MR. CALANNI: Yes.
```

2 (Pages 2 to 5)

L. KING

## Page 6

1           MS. WAGNER: I just want to go over some
2    basic ground rules before I turn it over to you, if
3    that's all right with you.
4           MR. CALANNI: Absolutely.
5       Q.    When any of us asks you a question, if
6    you could just please answer audibly because the
7    court reporter can't take down a nod of the head.
8    You understand that?
9       A.    Yes, I do.
10      Q.    When I ask you a question, if you could
11   just wait until I finish the question before you try
12   answering. We may get into like a conversational
13   style where you may anticipate what I'm going to ask
14   you and start to answer before I finish. And I will
15   promise to do the same thing for you. Is that okay?
16      A.    That's okay.
17      Q.    You're under oath here today. Anything
18   you say is admissible in court. Do you understand
19   that?
20      A.    Yes, I do.
21      Q.    If you need to take a break at any time
22   please let us know. We will just ask that you finish
23   answering the question before we take a break. Okay?
24      A.    Okay.
25      Q.    Some of the attorneys here may make

## Page 7

1    objections. If they make an objection, unless for
2    some reason you're told not to answer a question you
3    can go ahead and answer the question. Okay?
4       A.    Yes.
5       Q.    Are you represented by an attorney
6    today?
7       A.    No.
8       Q.    If you don't understand a question that
9    any of us asks, please ask us to rephrase it. If you
10   answer the question we're going to assume that you
11   understood the question. Okay?
12      A.    Yes.
13      Q.    Are you on any drugs or medication today
14   that would interfere with your ability to answer
15   questions?
16      A.    No.
17      Q.    Do you have any questions?
18      A.    Considering how this was a very long
19   time ago and there are questions that you might ask
20   that I don't remember at the moment, however, if I
21   have the ability to write them down and think about
22   them, is that a possibility?
23          MS. WAGNER: What do you all think?
24          MR. HAYES: I think we should just have
25   Miss King testify as to what she remembers. And Miss

## Page 8

1    King should understand that an "I don't remember" or
2    an "I don't know" answer is just as acceptable if
3    that's your state of mind.
4           THE WITNESS: That's fine.
5           MR. HAYES: I don't know that we want
6    you out doing research after the deposition is over.
7           MS. WAGNER: I agree.
8       A.    I am trying to be as truthful and
9    forthcoming with information as I possibly can.
10   That's all. Fine.
11      Q.    I will turn it over to Richard Calanni
12   so he can ask some questions.
13          MR. CALANNI: Thank you.
14   CROSS-EXAMINATION BY MR. CALANNI:
15      Q.    Hello, Lori.
16      A.    Hi.
17      Q.    Do you remember faxing me over
18   information of closings when I was doing my
19   appraisals?
20      A.    Your name does sound familiar.
21      Q.    Richard Calanni. And my company at the
22   time was TF Appraisals.
23      A.    I don't recognize the company name; I do
24   recognize your name.
25      Q.    Okay.

## Page 9

1       A.    There is a very good possibility I did
2    fax you over closing information or title information
3    on possible closings, but I faxed to a lot of people
4    a lot of information.
5       Q.    Okay.
6       A.    I'm sorry. What was your part in this?
7       Q.    Real estate appraising.
8       A.    You were real estate appraising.
9       Q.    It was TF Appraisals, Richard Calanni.
10      A.    Again, I probably did fax you
11   information in the beginning. I believe you were one
12   of the appraisers in the beginning.
13      Q.    I don't know when the beginning was so I
14   couldn't say that.
15      A.    1996.
16      Q.    Okay. Let me go on. Did you fax over
17   information on closings that you were aware had
18   fraudulent information to appraisers?
19      A.    No.
20      Q.    Then did you and myself at any time ever
21   meet or sit down to plan a conspiracy against Walsh
22   Securities or any other lender?
23      A.    No. No, I don't even --
24      Q.    You don't really have to go on.
25      A.    Okay.

3  (Pages 6 to 9)

L. KING

### Page 10

```
 1     Q.   And at the time you were sending
 2 appraisers information or faxing information over to
 3 appraisers were you working for Stanley Yacker?
 4     A.   Yes.
 5     Q.   Okay.  That's all the questions I have
 6 to ask, Lori.  Thank you for allowing me to be first
 7 and have a safe trip back home.
 8     A.   Thank you very much.
 9 CONTINUED DIRECT EXAMINATION BY MS. WAGNER:
10     Q.   Okay, Miss King.  I just wanted to mark
11 as an exhibit the subpoena for today's deposition for
12 Miss King as King-1.
13          (King-1, Subpoena, is received and
14 marked for identification.)
15     Q.   Is this the subpoena that you received
16 for which you appeared today?
17     A.   Yes.
18     Q.   And I just wanted to indicate that it
19 said that the time was to start at ten, and I do
20 understand that you had some difficulties getting
21 here today and we're glad that you were able to make
22 it.  Thank you.
23     A.   Yes, I did have difficulties getting
24 here.
25     Q.   You stated that you're not represented
```

### Page 11

```
 1 by counsel today.  Did you meet with any attorney to
 2 prepare for this deposition?
 3     A.   No.  I did not know I needed to.
 4     Q.   Did you do anything to prepare for this
 5 deposition today?
 6     A.   I tried to remember events as they
 7 happened.  I did look at the deposition and see that
 8 I was to bring documentation; however, I did not have
 9 any documents in my possession.
10     Q.   Did you ever have documentation in your
11 possession?
12     A.   No.  The FBI took it all.
13     Q.   Okay.  What kind of documents did the
14 FBI take from your files?
15     A.   They took the documents from Stanley
16 Yacker's office because I never had any at my home or
17 anything.  All the documentation was in his office.
18 And I believe they took all the files and the
19 computer that I worked on while I was in his office.
20 They took everything, I believe.
21     Q.   Did you help prepare any of the
22 documents that were to be taken by the government?
23     A.   Yes, I did.
24     Q.   What I mean by that is:  Did you help
25 gather together documents that were in response to a
```

### Page 12

```
 1 subpoena?
 2     A.   No.
 3     Q.   So --
 4     A.   No.  There was no notice that they were
 5 coming to take the documents and the computer.
 6     Q.   So what happened?  Were you there?
 7     A.   No, I was not at the office, and I
 8 received a call, I believe, from Stanley Yacker that
 9 the FBI had raided his office and taken everything.
10     Q.   Okay.
11     A.   We were unaware that they were coming.
12     Q.   At some point you also worked with
13 Anthony Cicalese?
14     A.   Yes, I did.
15     Q.   Was his office similarly raided?
16     A.   I don't know.  I don't think so.  I
17 think -- I don't know how Anthony's information got
18 to the FBI, let's put it that way.  I know it was not
19 raided in a similar manner.
20     Q.   Okay.  I don't know the answer.  That's
21 why I'm asking you.
22     A.   Okay.
23     Q.   Do you know if there was a subpoena
24 issued to him to produce documents?
25     A.   I don't know.
```

### Page 13

```
 1     Q.   Were you working -- I'm sorry.  Were you
 2 working with Mr. Cicalese at the time?
 3     A.   Yes.  However, there were some open
 4 files at Mr. Yacker's office that were not completely
 5 finished while I was working with Mr. Cicalese so I
 6 was spending a small amount of time in Mr. Yacker's
 7 office while working with Mr. Cicalese.
 8     Q.   Okay.  I'll get into that in a little
 9 bit more detail in a moment.
10          Did you have any discussions or
11 conversations with anybody about attending this
12 deposition today?
13     A.   Other than my family?
14     Q.   Yes.
15     A.   No.
16     Q.   Okay.  And none of your family was
17 involved in anything --
18     A.   No.
19     Q.   -- involving these fraudulent
20 allegations?
21     A.   No.
22     Q.   Did you go to college?
23     A.   I had some college.
24     Q.   Where was that?
25     A.   Brookdale Community College.
```

4 (Pages 10 to 13)

L. KING

Page 14

```
 1    Q.   How far did you get?
 2    A.   I just took a couple of classes.
 3    Q.   What was your focus in college, like a
 4  major?
 5    A.   I didn't have one.
 6    Q.   Do you have any other professional
 7  licenses or qualifications?
 8    A.   I am a certified massage therapist.
 9    Q.   Did you get any -- did you go to any
10  paralegal school?
11    A.   No.
12    Q.   What was your first job after Brookdale
13  Community College?
14    A.   I went to Brookdale while I was working.
15  It was not full time.
16    Q.   Where were you working?
17    A.   I don't remember.
18    Q.   Was it in real estate?
19    A.   No.
20    Q.   Was it for an attorney?
21    A.   No, no.
22    Q.   Let me ask you this:  At what point did
23  you start working for an attorney?
24    A.   1992, February.
25    Q.   And with who was that?
```

Page 15

```
 1    A.   That was with Yacker & Granata, and
 2  their address was Main Street, Matawan.
 3    Q.   Did you work for either one of them
 4  primarily?
 5    A.   I primarily worked for Stanley Yacker
 6  and as a receptionist for the entire firm, but I did
 7  type letters and certifications and briefs for Mr.
 8  Yacker and Ann Zacardi.
 9    Q.   At some point did they move from the
10  Main Street, Matawan location?
11    A.   Yes.  I was working part time, from I
12  believe 12 to five, starting in 1992.  When Yacker &
13  Granata divorced, they split their partnership up.
14  That's when I went with Mr. Yacker more on a
15  full-time basis and we moved to Highway 34.
16    Q.   And is that where you were working with
17  Mr. Yacker in 1996 and 1997, or did he have a
18  subsequent office?
19    A.   No, that was on Route 34.  I want to say
20  there were two locations.  We moved from one place to
21  another but they were both on 34.  In 1996 is when we
22  ended up further down on Route 34.  I don't remember
23  the street address.  I believe we shared office space
24  with someone else when we first left the Main Street
25  location and then we -- Mr. Yacker arranged for
```

Page 16

```
 1  office space at another location that was strictly
 2  ours, and that is where the closings were processed.
 3    Q.   At the second location?
 4    A.   At the second location.
 5    Q.   So did he have a specific space that was
 6  set up for real estate closings?
 7    A.   No.  There was his office and my office.
 8    Q.   Okay.  How did you obtain your position
 9  with Mr. Yacker?
10    A.   With Yacker & Granata in the original --
11  originally?
12    Q.   Yes.
13    A.   Okay.  I was going through a divorce and
14  one of the attorneys in the firm, Robyn Wernik,
15  W-e-r-n-i-k, was a pro bono attorney for women
16  through a woman's group.  I went to a meeting.  I met
17  Robyn, Robyn and I started the process of my divorce.
18  She said I needed to get a job part time at least and
19  offered to have me come in and interview for the
20  position of receptionist at her firm because they
21  were looking for someone, and that's how I came to be
22  at Yacker & Granata.
23    Q.   Did you start -- was your original title
24  a receptionist?
25    A.   Yes.
```

Page 17

```
 1    Q.   At what point did that title change?
 2    A.   When we moved to -- when Yacker &
 3  Granata split and we moved to the first location just
 4  as Yacker, Stanley Yacker.
 5    Q.   What did your new title become?
 6    A.   Secretary.
 7    Q.   Did your job duties change any?
 8    A.   Yes.  I then handled all the
 9  correspondence, all of the filings for any court
10  appearances, telephone calls, answer phones, make
11  calls, copy, file, fax.  There was just me and him.
12    Q.   Okay.  When you moved in 1996 to the
13  other location on Route 34, did you have any other
14  employees at that time?
15    A.   No.
16    Q.   So during the time of 1996 to at least
17  part of '97 did you work with anyone else in that
18  office?
19    A.   Okay.  After the closings through Bill
20  Kane just grew and grew and grew I could not handle
21  all the duties so we hired another woman, Carol, I
22  think her last name was Davis, to handle the regular
23  routines of answering the telephones, typing and
24  filing, and then I focused solely on the real estate
25  closings, the Bill Kane closings.  Let's put it that
```

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

1    way.
2        Q.    Did you handle other real estate
3    closings or just the Bill Kane closings?
4        A.    In the beginning I think I did maybe
5    four or five regular closings with Mr. Yacker but it
6    was -- it was more of a: You type this. I would
7    give him a blank HUD statement, he would fill it out.
8    He processed all the paperwork and all I did was type
9    it up. I was not in any way, shape or form a real
10   estate secretary. I did not know anything about them
11   and just did what he told me to do. After I strictly
12   went to the Bill Kane closings, then Carol and Mr.
13   Yacker handled the other closings. We called them
14   the normal closings.
15       Q.    How did you learn how to handle real
16   estate closings?
17       A.    From Mr. Yacker.
18       Q.    So did you sit in and observe?
19       A.    No. He would do the closing and then
20   bring the paperwork out, and then I would make the
21   appropriate copies and disburse the funds on the
22   ledger, handwritten ledger, and he would sign the
23   checks, and then I would mail them to wherever they
24   had to go.
25       Q.    Okay. At some point did you start

1    participating in the closings themselves?
2        A.    Which closings?
3        Q.    The William Kane closings.
4        A.    Yes. Well, yes and no. In the
5    beginning there were some straw people, they called
6    them, the straw buyers. He would bring them in and
7    then they would sign the documents, and I would take
8    them and process them and disburse funds and Mr.
9    Yacker was not there.
10       Q.    Okay. Did Mr. Yacker know that you were
11   doing this with Mr. Kane?
12       A.    Yes.
13       Q.    Did Mr. Yacker instruct you to do this?
14       A.    I don't know if it was an: Okay, Lor,
15   here you go, you go handle this. In the beginning it
16   was he would sit in with the people and then he would
17   be busy with other things. So I would go in and just
18   make sure all the documents were signed on the right
19   lines, so forth. And then he was not present.
20       Q.    So you must have seen Mr. Yacker do this
21   to understand what documents needed to be signed and
22   what to explain to people. Right?
23       A.    After about the first five, yes, there
24   were certain lines that needed to be signed and I had
25   them all tagged with little notes, sign here, sign

1    here, sign here, sign here.
2        Q.    Why don't you explain to me exactly what
3    you would do with these straw buyers that Mr. Kane
4    would bring in, to the best of your recollection.
5        A.    All I remember is that the documents
6    would be overnighted or hand-delivered by Bill. We
7    would meet, and then page by page the documents would
8    be signed by the buyer. There might be anywhere from
9    one to three closing packages for each person. They
10   would come in, they would sign and then they would
11   leave, and I would process the paperwork, make all
12   the copies and then overnight the documents back to
13   the bank. As soon as the bank got their documents,
14   then I believe they released the money and then
15   disbursements would happen.
16       Q.    Do you happen to remember what banks
17   were involved in the Kane closings?
18       A.    Walsh. I don't remember if there was
19   another bank. By the time I got into processing all
20   the documents and sitting in on the closings and
21   signing all the papers and so forth, it was Walsh by
22   that time. I don't know if there was another bank
23   involved.
24       Q.    Okay. I'm going to go into this a
25   little bit more later and show you some documents

1    that might help you remember more details.
2             Did you have any other day-to-day
3    responsibilities at Mr. Yacker's office once you
4    started working on the Kane closings?
5        A.    I don't believe so.
6        Q.    Do you recall around what time these
7    Kane closings began?
8        A.    The year?
9        Q.    Yes. And month.
10       A.    The year and month. When Yacker &
11   Granata were together they had a real estate
12   secretary, Paula Roland. I believe she did the very
13   early closings that were normal. I would have to say
14   around the time of the split up, and I don't remember
15   when that was, what month, I don't remember, but it
16   was in 1996.
17       Q.    Okay. Do you think it was early 1996?
18       A.    I don't remember.
19       Q.    Do you know anyone from Walsh
20   Securities?
21       A.    I believe I met Betty Ann at Bill's
22   party.
23       Q.    And when was this party?
24             MR. KOTT: Excuse me for one moment.
25   When you say, "Bill's party," are you referring to

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

Page 22

1  William Kane, K-a-n-e.
2        THE WITNESS:  Yes.
3        MR. KOTT:  Thank you.
4     A.    I would say around Christmas time, New
5  Year's eve.  They had a big party and everybody came.
6     Q.    To the best of your recollection, who
7  was "everybody"?
8     A.    Bill and Yvonne.
9     Q.    Kane.  Correct?
10    A.    Kane.  Gary Grieser.  Larry -- I'm
11 trying to think of what his last name is.
12    Q.    Larry Cuzzi?
13    A.    Yeah, Larry Cuzzi was there.  There was
14 a lot of people I did not know.  I don't
15 remember if Stanley showed up.  Some of Gary
16 Grieser's staff showed up.  There was one girl I used
17 to talk to a lot.
18    Q.    Do you remember her name?
19    A.    Nope.
20    Q.    Anybody else that you can think of at
21 that time?
22    A.    There were some people from National
23 Home -- the broker, National -- the mortgage broker.
24    Q.    Skowrenski?
25    A.    No, it was a woman from National Home.

Page 23

1  I don't remember.
2     Q.    Was Mr. Skowrenski there?
3     A.    I don't know Mr. Skowrenski.
4     Q.    Was this the first time that you had met
5  Miss DeMola?
6     A.    Betty Ann?
7     Q.    Yes.
8     A.    Yes, but I had spoken to her over the
9  phone a couple of times.
10    Q.    What had you spoken to Betty DeMola
11 about on the phone?
12    A.    About upcoming closings, if she needed
13 information.
14    Q.    Would she call you or you would call
15 her?
16    A.    I don't remember.
17    Q.    So you only spoke to Betty Ann DeMola
18 with respect to loan closings if Betty Ann needed
19 information?
20    A.    Yes.
21    Q.    Or if you needed information?
22    A.    Either way.  If I needed information or
23 Betty Ann needed information.
24    Q.    Did you ever contact the account
25 executives for information at Walsh Securities?

Page 24

1     A.    I don't remember.
2     Q.    Do you know Anthony D'Apolito?
3     A.    That names sounds familiar.
4     Q.    Do you recall ever speaking to him?
5     A.    I don't recall but it may or may not
6  have been.  I mostly spoke with Bill.  Bill Kane was
7  the go-between.  I believe whatever they needed
8  document-wise or information from my side of things
9  he would ask and get the information back to them.  I
10 did not have a lot of contact with Walsh.
11    Q.    Can you think of an example of why you
12 would have had to speak with Betty Ann DeMola about
13 the closings?
14    A.    I don't remember.
15    Q.    Okay.  Have you ever spoken to Bob Walsh
16 or Robert Walsh?
17    A.    I don't believe so.
18    Q.    Have you ever spoken with Jim Walsh?
19    A.    No.
20    Q.    Have you ever spoken with Fred
21 Schlesinger?
22    A.    No.
23    Q.    Have you ever spoken with Art Gilgar?
24    A.    No.
25    Q.    Have you ever spoken with Peter Trebour?

Page 25

1     A.    No.
2     Q.    Have you ever spoken with Paul Del
3  Russo -- Del Rosso, I'm sorry?
4     A.    No.
5     Q.    Have you ever spoken to Kelly O'Neill?
6     A.    That name sounds familiar.
7     Q.    Do you know why that name sounds
8  familiar?
9     A.    I don't remember why but I know I've
10 spoken to her.
11    Q.    Did you speak to her before the news
12 broke about the William Kane frauds that were going
13 on?
14    A.    Yes, I believe I spoke to her -- can I
15 ask a question?
16    Q.    What is your question?
17    A.    About her physical characteristic.  Do
18 you know if she was a blond?
19    Q.    She worked at Walsh Securities and was
20 young at the time.
21    A.    She was young.  And then I think she got
22 in trouble and she didn't work there anymore.  Or her
23 employment ended with Walsh Securities.  So I know I
24 spoke to her, if this is the same person.
25    Q.    Did you speak to her while she was still

7 (Pages 22 to 25)

L. KING

## Page 26

1  employed at Walsh Securities?
2      A.    Yes.
3      Q.    Or after?
4      A.    Yes.  No, I spoke to her while she was
5  at Walsh Securities.
6      Q.    Do you know why you would have spoken to
7  her?
8      A.    About the closings.  If this is the
9  person I'm trying to remember, then I spoke to her
10  more often than I did Betty Ann about the closings
11  and the documents that were coming through.
12      Q.    Can you think of the context in which
13  you would speak to her about the closings or the
14  documents?
15      A.    I want to say it was -- if there was a
16  missing document out of the package, I need this one
17  signed, what closings were coming up, who are we
18  preparing for.  That kind of thing.
19      Q.    Do you know if Miss O'Neill prepared any
20  documents that you needed for these closings?
21      A.    I don't know who prepared the documents
22  on Walsh's side.
23      Q.    Do you know if Miss O'Neill prepared any
24  fake leases to be put into these packages?
25      A.    Leases, meaning?

## Page 27

1      Q.    Demonstrating that these properties were
2  rented out.
3      A.    No, I believe the leases came from Gary
4  Grieser's office.
5      Q.    Why do you think they came from Gary
6  Grieser's office?
7      A.    Because he was supposed to be the
8  property manager of all of these properties.
9      Q.    Shouldn't the leases have come from the
10  seller?
11      A.    The seller or the buyer.
12      Q.    In a normal closing do you believe that
13  the leases would have come from the seller of the
14  property indicating that they were already leased?
15      A.    If they were already leased.  That would
16  be normal.
17      Q.    And do you think this was abnormal, the
18  way these leases were provided to you?
19      A.    I didn't know.  No one sat down to me
20  and said:  This is how a normal goes, this is how a
21  Bill Kane goes.  I did not know because I had never
22  had any formal training in real estate processing.  I
23  did not know where the leases -- there were people in
24  these properties, where they should have come from.
25      Q.    Okay.  So your conversations with Miss

## Page 28

1  O'Neill didn't seem out of the ordinary to you?
2      A.    No.
3      Q.    Did you feel that you were discussing
4  anything with Miss O'Neill that was improper?
5      A.    No.
6      Q.    Do you feel that you ever discussed
7  anything with Miss DeMola that was improper?
8      A.    No.
9      Q.    So you were just -- when you were
10  speaking with somebody from Walsh Securities like
11  Betty Ann DeMola or Kelly O'Neill it was just in the
12  ordinary course of performing what you believed to be
13  a normal loan closing?
14      A.    Yes.
15      Q.    Let me go back to your employment at Mr.
16  Yacker's office.  At what point did you leave your
17  full-time employment with Mr. Yacker?
18      A.    It kind of evolved.  I was working a lot
19  of hours trying to perform the normal duties and
20  process all the Bill Kane closings when we decided
21  that I needed help, and then Carol came and I believe
22  she worked a full day.  And then my hours for that
23  cut down and I was still processing the Bill Kane
24  documents, which was a full-time job all in itself.
25  Then sometime, I would say in 1997, I'm guessing

## Page 29

1  because I would have to look at the documents to see
2  when Anthony Cicalese started coming into the
3  picture, and then I would split my time between
4  Mr. Yacker's office and Anthony's office.
5      Q.    So what do you mean that Mr. Cicalese
6  came into the picture?
7      A.    I don't know who hired Anthony, but my
8  guess is they wanted to phase out Mr. Yacker and
9  bring in Anthony because he was a friend of Gary
10  Grieser's, I believe.
11      Q.    Who is "they" that would be phasing out
12  Mr. Yacker?
13      A.    That would be the Gary Grieser, Bill
14  Kane combination.
15      Q.    Had Mr. Yacker done anything wrong that
16  they wanted to phase out?
17      A.    Not that I was aware of.
18      Q.    Do you believe it's just because Mr.
19  Grieser was friends with Mr. Cicalese that he wanted
20  to give him the business?
21      A.    That could be.
22      Q.    Do you know why they had you keep
23  working on these loans for -- with Mr. Cicalese?
24      A.    Because I was familiar with how to
25  process them and because I asked Bill Kane if I

8 (Pages 26 to 29)

VERITEXT REPORTING COMPANY
212-267-6868                    516-608-2400
3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

| Page 30 | Page 32 |
|---|---|
| 1  needed to start looking for another job, and he said:<br>2  No, I'll have you work with Anthony on these<br>3  closings, so I started working with Anthony on the<br>4  closings.<br>5      Q.    So if Mr. Yacker was your employer why<br>6  would you be asking Mr. Kane if you needed to be<br>7  looking for other employment?<br>8      A.    Because by that time I was working under<br>9  Mr. Yacker but solely for Bill Kane closings.  So if<br>10  Mr. Yacker already had Carol working full time on his<br>11  other things and he lost the Bill Kane closings, then<br>12  I would need to look for another job.<br>13      Q.    Did Mr. Yacker have any other real<br>14  estate closings going on?<br>15      A.    I believe so.  I don't know who they<br>16  are.<br>17      Q.    But you didn't handle any closings other<br>18  than Mr. Kane's closings?<br>19      A.    Yes, exactly.<br>20      Q.    Would you say that Mr. Kane was your<br>21  client?<br>22      A.    Yes.<br>23      Q.    What companies did Mr. Kane have?<br>24      A.    Cristo Properties and I believe Oakwood<br>25  Properties.  There might have been a third one but I | 1  check?<br>2      A.    No, it came out of the disbursements at<br>3  the end of the closing.<br>4      Q.    Would this $200 have been reflected on<br>5  the HUD-1?<br>6      A.    From Mr. Yacker's side it was included<br>7  in the document fees.  From Bill's side, I don't<br>8  know.  I don't know if -- I would have to -- I would<br>9  have to look at a HUD statement to see.<br>10      Q.    I'll show you one in a moment.<br>11      A.    Okay, that's fine.<br>12      Q.    How did you communicate with Mr. Yacker<br>13  and Mr. Kane and Mr. Grieser during this time?<br>14      A.    Well, I was in Mr. Yacker's office so I<br>15  would speak to him while he was in the office.  By<br>16  Bill, mostly by cell phone, and then he would come to<br>17  the office and we would discuss things in the office.<br>18  Gary I did not speak to as much, but I did go to his<br>19  offices if I needed to speak to him.<br>20      Q.    Where was his office located?<br>21      A.    West Bergen Place, Red Bank, New Jersey.<br>22      Q.    Did you go there often?<br>23      A.    Not often.<br>24      Q.    Were all of the loan closings at<br>25  Mr. Yacker's office? |

| Page 31 | Page 33 |
|---|---|
| 1  don't remember that name.<br>2      Q.    Did you do loan closings for D&Sons?<br>3      A.    That sounds familiar.  If I did it was<br>4  only in the very beginning.  I believe that was the<br>5  first one.  Then it went to Oakwood.  Then it went to<br>6  Cristo.  I believe that's how the name change went.<br>7      Q.    Do you know why the name changed?<br>8      A.    No.<br>9      Q.    In 1996 what was your salary when you<br>10  were working for Mr. Yacker?<br>11      A.    I think 8.50 an hour.  I think I started<br>12  out at eight dollars an hour and got a 50 cent raise,<br>13  and then I would be paid by the closing.  As my<br>14  duties with Mr. Yacker changed from doing all his<br>15  full-time work to just the Bill Kane closings, then I<br>16  was paid by the closing.<br>17      Q.    And no longer by the hour?<br>18      A.    Regularly, no.<br>19      Q.    How much were you paid by the closing?<br>20      A.    I was paid $200.  100 from Mr. Yacker's<br>21  side of his fees and 100 from Bill Kane's side of<br>22  fees.<br>23      Q.    And were you paid by check or cash?<br>24      A.    By check.<br>25      Q.    Did each of them write you a separate | 1      A.    I don't want to say all of them.  I<br>2  would have to try and remember where the other<br>3  ones -- there was a big conference table that we sat<br>4  at.  I would have to remember where that place was.<br>5      Q.    We will come back to that at the end and<br>6  see if during our conversation you have a<br>7  recollection.<br>8              Whose job was it to maintain<br>9  Mr. Yacker's attorney trust account?<br>10      A.    Mine.  And then Bill decided that we<br>11  needed to be computerized so he brought in an<br>12  accountant, and I believe we loaded up a software<br>13  program because before that it was all by hand.  I<br>14  remember the password.  I don't remember the program.<br>15  The accountant's first name I believe was Bill.  And<br>16  in the beginning Bill Kane had the accountant do the<br>17  data entry of all past closing information.  And then<br>18  I was allowed to do data entry.  And then after that<br>19  I did most of the entries and disbursements.  This is<br>20  with Mr. Yacker.  With Anthony Cicalese he did his<br>21  own.<br>22      Q.    Okay.  So you also maintained the cash<br>23  disbursement journal?<br>24      A.    Yes.<br>25      Q.    Did you write checks for Mr. Yacker? |

L. KING

Page 34

1     A.    Yes.
2     Q.    Did you write all of his checks or did
3  Carol write some checks?
4     A.    She might have written some checks, but
5  I wrote all the ones for Bill Kane closings.
6     Q.    Did Mr. Yacker personally sign these
7  checks?
8     A.    Yes.
9     Q.    If an instance ever arose where you
10 needed to sign Mr. Yacker's name, did you put your
11 initials after it?
12    A.    Yes.
13    Q.    Did you always do that?
14    A.    Yes.
15    Q.    I know you had said that at least at the
16 beginning Mr. Yacker prepared the HUD-1 statements.
17    A.    Yes.
18    Q.    Did that become your responsibility at
19 some point?
20    A.    Yes.  When I don't know.
21    Q.    Was it early on in the Kane closings?
22    A.    I would say about three or four months
23 into it.
24    Q.    How did you learn how to fill out a
25 HUD-1 statement?

Page 35

1     A.    By observing what he did.
2     Q.    When you say "he," you mean Mr. Yacker?
3     A.    Mr. Yacker.
4     Q.    If you had a question about how to fill
5  something out, would you have gone to Mr. Yacker?
6     A.    Yes.
7     Q.    Were you delegated with reviewing and
8  complying with closing instructions that were sent to
9  you by the lender?
10    A.    Did I review each document with the
11 person?
12    Q.    No.  When you received the closing
13 packet you should have also received closing
14 instructions.  Correct?
15    A.    Yes.
16    Q.    Did you personally review those closing
17 instructions yourself?
18    A.    Not always.
19    Q.    Why not?
20    A.    Closing instructions included what was
21 needed to be returned with the packet.  I believe
22 Bill Kane reviewed them and made sure that I had all
23 the documents I needed to send back with the package
24 such as title information, whatever else is needed in
25 the closing packet.  I don't remember.

Page 36

1     Q.    Okay.  Were you responsible for
2  forwarding deeds for recording?
3     A.    Yes.
4     Q.    Where did you send them?
5     A.    To Monmouth County Courthouse.
6     Q.    When did you send them for recording?
7     A.    I was -- in the beginning I was sending
8  them out shortly after the closing happened.  And
9  then I was instructed to hold some because the way
10 Bill Kane put it, somebody in Monmouth County was
11 becoming suspicious of the influx of property being
12 sold and bought in Asbury Park and Long Branch.  So
13 he had me hold documents aside and not forward them.
14    Q.    Do you remember when that was?
15    A.    No.  If I looked at the documents I
16 could tell you exactly.
17    Q.    Could it have been in the summer of
18 1996?
19    A.    No.  I want to say it was more fall '96.
20    Q.    Okay.  Do you recall when -- at some
21 point they must have been sent in for recording.
22 Correct?
23    A.    At some point.
24    Q.    Do you recall when?
25    A.    I don't remember when.

Page 37

1     Q.    Would you be responsible at that point
2  for sending them in?
3     A.    Yes, but then again I was waiting for
4  Bill to give me the go ahead to send them in.  I
5  remember there was a stack of them.
6     Q.    When you say a stack, how many is a
7  stack?
8     A.    I had a box full.
9     Q.    And what you just gestured with your
10 hand was about a foot high.  Correct?
11    A.    A good eight to ten inches.
12    Q.    And these were just deeds?
13    A.    Just deeds.
14    Q.    What about mortgages?  Were you
15 responsible for forwarding mortgages for recording?
16    A.    Yes.
17    Q.    When did you do that?
18    A.    It might have been -- they were probably
19 in the box too because they got sent as a pack.  All
20 the checks for the fees were written out for the
21 recording fees so it would be the deeds, the
22 mortgages, the flip deed and then the third deed.
23 There were like three deeds back to back and the
24 mortgage.
25    Q.    Let's just take a brief break.

L. KING

| Page 38 | Page 40 |
|---|---|
| 1          (A recess takes place.) | 1   Hanover, and he asked me if I would work on other |
| 2      Q.   Miss King, we just finished going | 2   things.  He did not have a lot of clients but he |
| 3   through basically an overview of your employment with | 3   asked if I would do some secretarial work for his |
| 4   Mr. Yacker.  I just want to do the same thing with | 4   regular clients, so I agreed, and I would be paid per |
| 5   respect to Anthony Cicalese. | 5   diem.  I would go up once a week, twice a week to do |
| 6          Can you recall roughly when you began | 6   his other secretarial work. |
| 7   working for Mr. Cicalese? | 7      Q.   Where was his main office that you were |
| 8      A.   In 1997.  January, February maybe. | 8   working out of? |
| 9      Q.   And the reason you went to work with Mr. | 9      A.   He was downstairs below Gary on West |
| 10   Cicalese was at Mr. Kane's request.  Correct? | 10   Bergen, Red Bank, and then he had office space in |
| 11      A.   Yes. | 11   East Hanover. |
| 12      Q.   How did Mr. Yacker feel about you going | 12      Q.   What kind of work was performed out of |
| 13   to work for Mr. Cicalese? | 13   the Red Bank office? |
| 14      A.   I'm sure he wasn't happy.  We didn't | 14      A.   Strictly Bill Kane closings. |
| 15   discuss it much. | 15      Q.   Did Mr. Cicalese do any other real |
| 16      Q.   Did you discuss it at all? | 16   estate work besides Mr. Kane's closings? |
| 17      A.   I did tell him that Bill Kane and Gary | 17      A.   I think I remember doing one in the East |
| 18   Grieser decided to use another attorney. | 18   Hanover office for a friend of Anthony's because he |
| 19      Q.   Did he ask you why? | 19   didn't like doing real estate.  In fact, he didn't |
| 20      A.   He might have, but I didn't know why | 20   like being a lawyer. |
| 21   other than the fact that I knew that Anthony and Gary | 21      Q.   Are you still in touch with Mr. |
| 22   had been friends. | 22   Cicalese? |
| 23      Q.   Did Mr. Yacker have any conversations | 23      A.   Oh, I haven't -- no. |
| 24   with Mr. Kane around this time? | 24      Q.   When was the last time you think you |
| 25      A.   I don't remember.  I'm sure he did, but | 25   spoke with him? |

| Page 39 | Page 41 |
|---|---|
| 1   I don't know what the conversation was. | 1      A.   I would say 1997.  I didn't work for |
| 2      Q.   Do you know if Mr. Yacker ever spoke to | 2   Anthony too much longer after Bill Kane closings |
| 3   Mr. Grieser? | 3   stopped. |
| 4      A.   I don't know. | 4      Q.   Do you recall when that was? |
| 5      Q.   After you had left Mr. Yacker's office | 5      A.   When the Bill Kane closings stopped? |
| 6   you did some work still for Mr. Yacker with respect | 6      Q.   Yes. |
| 7   to the Kane closings.  Correct? | 7      A.   When the FBI came in and took all the |
| 8      A.   Yes. | 8   documents.  That was in 1997, I would say summertime, |
| 9      Q.   Did you also do work on his trust | 9   June, July. |
| 10   account during that time? | 10      Q.   So there weren't any additional loans in |
| 11      A.   Whatever needed wrapping up I believe | 11   the pipeline that you closed after the government -- |
| 12   from the closings that were still in progress at his | 12      A.   No. |
| 13   office.  I want to say that we had a separate account | 13      Q.   -- investigation started? |
| 14   for the Bill Kane closings so that it did not -- was | 14      A.   No. |
| 15   not commingled with his other regular closings. | 15      Q.   What was your salary while you worked |
| 16      Q.   So you think there was a separate trust | 16   for Mr. Cicalese? |
| 17   account? | 17      A.   I still got the hundred dollars from |
| 18      A.   I think so. | 18   Anthony's side.  Maybe 125 by then.  I got a little |
| 19      Q.   What was your title while you worked for | 19   raise.  125.  And then 125 from Bill's side. |
| 20   Mr. Cicalese? | 20      Q.   When you say Bill, you're referring to |
| 21      A.   Secretary. | 21   Bill Kane? |
| 22      Q.   Did you have any secretarial duties? | 22      A.   Bill Kane, I'm sorry. |
| 23      A.   In the beginning it was mostly the Bill | 23      Q.   Did you receive any hourly rate other |
| 24   Kane closings, and then when Anthony left Gary | 24   than the per diem when you did additional work up in |
| 25   Grieser's office, Anthony had another office in East | 25   East Hanover? |

11 (Pages 38 to 41)

L. KING

Page 42

1     A.    No.
2     Q.    What was your per diem rate? Do you
3   recall?
4     A.    A hundred dollars a day.
5     Q.    Did it take you a full day to handle a
6   real estate closing with all the paperwork involved?
7     A.    I don't remember how long it would take.
8     Q.    Could you do more than one in a day?
9     A.    Who are we talking about?  Are we
10  talking about Bill Kane closings or normal closings?
11    Q.    A Bill Kane closing.
12    A.    A Bill Kane closing.  It would be hard
13  to say how long it took me to process one because I
14  was not just processing one at a time.  I had a stack
15  that I would go through and make sure all the
16  documents were signed in the proper places and then
17  certain pages needed to be copied a certain amount of
18  times and some didn't and because everybody needed
19  copies of different things out of the closing packet.
20    Q.    Okay.  When you started working for Mr.
21  Cicalese, did you still consider Bill Kane to be your
22  client?
23    A.    We both did.
24    Q.    Okay.  So technically when you worked
25  for Mr. Yacker and Mr. Cicalese, the "straw buyer"

Page 43

1   was on paper your client.  Correct?
2     A.    Correct.
3     Q.    In reality, though, Bill Kane was your
4   client?
5     A.    Correct.
6     Q.    Who else knew about that?
7     A.    Knew about what?
8     Q.    That Mr. Kane was really your client.
9   Obviously Mr. Kane knew?
10    A.    Mr. Kane.
11    Q.    Mr. Grieser?
12    A.    Mr. Grieser, all of the staff at Mr.
13  Grieser's office, Mr. Yacker, myself, Larry Cuzzi,
14  National Home, the mortgage broker.  Those are the
15  ones I know for certain.
16    Q.    And who at National Home Funding?
17    A.    I can't remember their names over there.
18    Q.    Do you remember their positions?
19    A.    Well, one was the broker and then there
20  was a secretary.  I don't remember their names.  They
21  were on Route 33 in Freehold, I want to say.
22    Q.    Was the secretary there, was her last
23  name Dinnono?
24    A.    I don't know.
25    Q.    And the broker was a woman?

Page 44

1     A.    I don't remember.
2     Q.    You stated while you worked for Mr.
3   Cicalese that he maintained his own attorney trust
4   account.
5     A.    Yes.
6     Q.    Did he also maintain his cash
7   disbursement journal?
8     A.    Yes.
9     Q.    Did you ever write any checks for him?
10    A.    No.
11    Q.    Mr. Cicalese was the only one that wrote
12  checks in his office?
13    A.    Yes.
14    Q.    Did you prepare the closing documents at
15  Mr. Cicalese's office?
16    A.    I don't quite remember.  I don't think
17  so because Anthony had a computer program that was
18  better than Mr. Yacker's, so I believe he did the
19  closing documents.
20    Q.    So even though he didn't like the real
21  estate closings he handled the closings documents?
22    A.    Yeah.  He was getting paid to do it.
23    Q.    Well, so was Mr. Yacker.
24    A.    Yes.
25    Q.    Did Mr. Cicalese handle the closings for

Page 45

1   the Kane properties?
2     A.    Yes.
3     Q.    Did you participate in the closing in
4   any way?
5     A.    Only if he had a question on a document.
6   I didn't sit and speak with the straw buyer.
7     Q.    So would Mr. Cicalese have been
8   responsible for reviewing and complying with Walsh
9   Securities' closing instructions?
10    A.    I think we all three had -- I want to
11  say by the time Anthony came into the picture it was
12  all down pat what was needed for the closing
13  instructions.  There was the list and then Bill Kane
14  brought his documents from National Home, from the
15  real estate people, whatever was needed from
16  everybody, it happened to get there.  Bill Kane would
17  pick up things from people and bring them so that we
18  had everything we needed.  I don't even know -- by
19  this time we all knew what was needed in the packets.
20  I don't really believe each closing instruction was
21  gone over and check-marked and lines drawn through
22  and -- it may not have even been gone over because
23  everybody knew what documents were needed for these
24  packets.
25    Q.    Were you responsible for forwarding the

VERITEXT REPORTING COMPANY

212-267-6868                                           516-608-2400

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

Page 46

1  deeds for recording while you worked for Mr.
2  Cicalese?
3      A.   I know I made the copies and I got them
4  ready, and again as we got closer towards the summer
5  of 1997, I don't -- I don't know if we held back any
6  deeds or not.
7      Q.   At any time while you worked for Mr.
8  Cicalese do you recall holding back deeds?
9      A.   I don't recall.
10     Q.   Do you have any knowledge about when
11 they would have been sent in?
12     A.   I know Anthony tried to do the right
13 thing and not hold back deeds or anything, but a
14 reason for holding back a deed is that towards the
15 end there we were selling properties that Cristo
16 didn't even own yet, so if we filed a deed and we're
17 missing a transfer someplace, they didn't want me to
18 file them.
19     Q.   And was that while you were working for
20 Mr. Cicalese or also while you were working for Mr.
21 Yacker?
22     A.   I believe both places, Yacker and
23 Cicalese.
24     Q.   Do you know when deeds were supposed to
25 be sent for recording?

Page 47

1      A.   When?  As soon after the closing as
2  possible.
3      Q.   Did you know that at the time?
4      A.   Yes.
5      Q.   Going back to Mr. Yacker, in real estate
6  transactions like these did Mr. Yacker usually
7  represent the buyer or the seller?
8          MR. KOTT:  Are you talking about the
9  fraudulent loans in this case?
10     Q.   No, in general.  In real estate
11 transactions.
12     A.   In Bill Kane closings or all closings?
13     Q.   In any closings.
14     A.   He would represent sometimes buyers and
15 sometimes sellers.
16     Q.   And Mr. Cicalese basically only
17 represented Mr. Kane?
18     A.   Kane.
19     Q.   In the Kane transactions, do you know
20 who represented the seller according to the
21 paperwork?
22         MR. KOTT:  I'm sorry to interrupt.
23 Seller on which?  You have the flip transactions, you
24 have -- there were a few closings.  Are you referring
25 to one closing in particular in the series of

Page 48

1  closings?
2          MS. WAGNER:  Generally in the closings I
3  think they pretty much all were represented -- the
4  seller was all represented by one attorney.
5          MR. KOTT:  Right.  But in the closings
6  when Kane acquired the property or the closings when
7  the straw buyer acquired it or the closings when the
8  joint venture acquired it?  That's what I mean.
9  Which closing are you referring to?  That's why I was
10 confused.
11         MS. WAGNER:  I understand.
12     Q.   Did the closing -- you mentioned before
13 that there were usually three different closings
14 going on.
15     A.   Yes.
16     Q.   Did they all occur at the same time in
17 the same office?
18     A.   Yes.  However, Rick Pepsi was
19 representing Bill Kane.
20     Q.   In what capacity?
21     A.   As his attorney to -- Rick would
22 represent Bill Kane to buy the property from wherever
23 Bill got the property, from a foreclosure list, from
24 tax records.  I truly don't know where they got all
25 the properties from, but I know some were

Page 49

1  foreclosures.  So Rick Pepsny would represent Bill on
2  the buy and then turn around and represent him from
3  the sell to the straw buyer, and we would represent
4  the straw buyer.
5      Q.   So Mr. Pepsny actually earned closing
6  fees twice in one day in most instances?
7      A.   I don't have information on the buy but
8  I'm sure, yes.  I only received from Mr. Pepsny's
9  office I believe the deed coming from Cristo or Bill
10 Kane's company to the straw buyer.  That's how I
11 would get two to three deeds happening all at the
12 same time.  It would be seller to Bill Kane's
13 interest, Bill Kane to straw buyer, and then the
14 straw buyer to a joint deed with a Gary Grieser
15 company.  So that would be three.
16     Q.   I'm going to come back to that.
17     A.   That's fine.
18     Q.   I just want to go step-by-step through
19 the whole closing process.
20     A.   That's fine.
21     Q.   Can you describe your relationship with
22 National Home Funding?
23     A.   I would send them copies of closing
24 documents and from them -- I don't remember the
25 documents I would have to get from them.  And then

13  (Pages 46 to 49)

L. KING

| Page 50 | Page 52 |
|---|---|
| 1 there was one time that their files were a complete<br>2 mess that I went over and helped them organize.<br>3 Everybody had a property file that I made sure all<br>4 the documents that they said they needed to have in<br>5 their files in case they were investigated, all the<br>6 documents needed to be there. So I had to go through<br>7 all their files to kind of fill in the missing pieces<br>8 and make sure that copies of everything was in their<br>9 file that I had in my files that they needed.<br>10     Q. Were these files on properties that had<br>11 already closed?<br>12     A. Yes.<br>13     Q. Why did they think they would be<br>14 investigated?<br>15     A. I have no idea.<br>16     Q. But that was your understanding that<br>17 they were worried about being investigated?<br>18     A. That's what they told me. That's what<br>19 Bill Kane told me.<br>20     Q. Do you recall when that was? Was it one<br>21 occasion?<br>22     A. It was only one occasion.<br>23     Q. Do you remember when it was?<br>24     A. No.<br>25     Q. In 1997? | 1 real estate people, Irene DeFeo and Donna Pepsny.<br>2 Then of course Rick Pepsny. National Home Funding,<br>3 me, Yacker, Anthony, Coastal Title people. I think<br>4 that's it for now.<br>5     Q. And Larry Cuzzi?<br>6     A. And Larry Cuzzi, of course Larry Cuzzi.<br>7 I don't know exactly where he came into the whole<br>8 story, but he was there from the beginning. I think<br>9 he was associated with Gary Grieser somehow.<br>10     Q. How did you meet Mr. Cuzzi?<br>11     A. I met Larry Cuzzi as David Lieber, and<br>12 it was a good two months before I found out his real<br>13 name was Larry Cuzzi.<br>14     Q. So you understood Mr. Cuzzi to be David<br>15 Lieber?<br>16     A. Yeah. Who was one of the first straw<br>17 buyers.<br>18     Q. And this would have been while you were<br>19 working for Mr. Yacker?<br>20     A. Yes.<br>21     Q. Did you ever know Mr. Cuzzi by any other<br>22 name beside Mr. Lieber?<br>23     A. Until one day somebody spilled the beans<br>24 to me and said that it was -- his name was Larry.<br>25     Q. Who was it that spilled the beans to |

| Page 51 | Page 53 |
|---|---|
| 1     A. I don't remember.<br>2     Q. How would you describe your relationship<br>3 with William Kane?<br>4     A. I was in contact with him a lot. He was<br>5 the ringmaster.<br>6     Q. What do you mean by that?<br>7     A. He found all the parties to go along<br>8 with this scheme. He was the boss.<br>9     Q. And who were all the parties involved in<br>10 the scheme?<br>11     A. I might miss a few but I'll do my best.<br>12 Of course there was Gary Grieser, he was the property<br>13 manager company that was supposed to maintain and<br>14 take care of the properties once they were purchased<br>15 by the straw buyers, to rent out, to fix up, to do<br>16 construction on. Then there was Mr. Calanni who I<br>17 didn't have much contact with. I don't know if I<br>18 ever met him before today or not. Maybe once or<br>19 twice, but Bill mostly spoke to the building<br>20 inspectors, appraisers. There was another one. I<br>21 don't know what part they had in it, what they were<br>22 actually needed for, but I know they were out there.<br>23     Q. When you say another one, another<br>24 appraiser?<br>25     A. Another appraiser. Then there were the | 1 you?<br>2     A. I want to say somebody in Gary Grieser's<br>3 office. I don't remember who it was. It was like a<br>4 secretary.<br>5     Q. Do you recall how long after your first<br>6 interaction with him that you found out that his name<br>7 was really Larry Cuzzi?<br>8     A. Oh, it was a good month and a half, two<br>9 months. In the beginning I didn't have much<br>10 interaction with him, and then one day somebody, a<br>11 secretary, called up and said, Oh, I'm sending over<br>12 Larry with some documents. And I said, Oh, you mean<br>13 David? No, his name is Larry. So when he got there<br>14 I was a little pissed. I said, Hi, Larry, and his<br>15 face like just dropped and I'm like, you know, you<br>16 guys don't have to lie to me. So I got little pissed<br>17 off and I told Bill Kane about it too.<br>18     Q. Why would he have been bringing over<br>19 documents to you?<br>20     A. They were always bringing documents back<br>21 and forth, whether it was a -- you know, closing<br>22 documents or paperwork, they needed copies of -- you<br>23 know, the final closing documents. Paperwork was<br>24 always going back and forth.<br>25     Q. And when you say "they," are you talking |

14 (Pages 50 to 53)

VERITEXT REPORTING COMPANY

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

Page 54

1  about National Home Funding or William Kane's office?
2      A.    William Kane's office, Gary Grieser's
3  office, National Home Funding needed their documents.
4      Q.    Who did you think Lieber or Cuzzi worked
5  for at that time?
6      A.    I thought Bill Kane, but then I thought
7  maybe Gary Grieser because he was a straw buyer and
8  Gary was the one who came up with most of the straw
9  buyers.  A lot of the straw buyers were friends of
10 Gary's or relatives or ex's or whatever.  That was my
11 impression.
12     Q.    Can you tell me to the best of your
13 ability what a straw buyer is?
14     A.    A straw buyer was a person who got paid
15 for the use of their name to be on paper only for
16 these flips, because Gary couldn't own more than four
17 or five properties and they needed different names on
18 the documents.
19     Q.    Why is that?
20     A.    I don't know.  That's what I was told by
21 Bill Kane.
22     Q.    Was that because it would have raised
23 suspicion do you think?
24     A.    I don't know their reasoning.
25     Q.    When did you first hear the term "straw

Page 55

1  buyer"?
2      A.    Bill Kane was the first one who
3  mentioned it to me, and it was, I would say, about
4  four or five months into the closings.
5      Q.    With the first Lieber closing, would
6  that have been closed by Mr. Yacker or you?
7      A.    Yes.
8      Q.    By Mr. Yacker?
9      A.    Yes.
10     Q.    Would there have been multiple loans
11 closed on that day?
12     A.    Maybe one or two.
13     Q.    Did you at some point close loans for
14 the so-called Mr. Lieber?
15     A.    There might have been one towards the
16 end of his like allotment.  I think he did three or
17 four maybe.  I don't know.  I can't remember without
18 looking at the documents.
19     Q.    You used the term allotment.  Was
20 there -- what does that mean?
21     A.    It means, like I explained with Gary
22 Grieser, he could only have his name on a certain
23 amount.
24     Q.    Was that Mr. Grieser or Mr. Kane that
25 told you that?

Page 56

1      A.    Mr. Kane.  Gary didn't talk a lot.
2      Q.    Before you said you didn't believe you
3  had ever met Robert Skowrenski.  Is that correct?
4      A.    I don't believe so but if I saw his face
5  I might recognize him.
6      Q.    Do you recognize the name?
7      A.    No.  Then again I am not so good with
8  names.
9      Q.    I think some people called him Robbie
10 Skowrenski.  Does that sound familiar?
11     A.    Robbie?  Robbie sounds familiar.
12     Q.    Do you remember in what context?
13     A.    No.  Robbie.
14     Q.    Before you mentioned a number of people
15 that knew about the scheme.  I will go through each
16 of them and let me know if you think they knew about
17 the straw buyers.  You believe Mr. Grieser knew about
18 the straw buyers?
19     A.    Yes.
20     Q.    Do you believe Mr. Calanni knew about
21 the straw buyers?
22     A.    I don't think.
23     Q.    You don't know?
24     A.    I don't know.
25     Q.    Irene DeFeo?

Page 57

1      A.    I would want to say yes.
2      Q.    Did Donna Pepsny know about the straw
3  buyers?
4      A.    Yes.
5      Q.    Did Richard Pepsny know about the straw
6  buyers?
7      A.    Yes.
8      Q.    Did National Home Funding know about the
9  straw buyers?
10     A.    I don't know.
11     Q.    Did Mr. Yacker know about the straw
12 buyers?
13     A.    Yes.
14     Q.    Did Mr. Cicalese know about the straw
15 buyers?
16     A.    Yes.
17     Q.    Did Coastal Title know about the straw
18 buyers?
19     A.    I don't know.
20     Q.    And I guess Larry Cuzzi you would say
21 would know about the straw buyers?
22     A.    Big yes.
23     Q.    Well, it's one o'clock now.  Let's try
24 and take a 20-minute lunch break.  Is that okay?
25           (A lunch recess takes place.)

15  (Pages 54 to 57)

L. KING

Page 58

1    Q.    Do you know if Dave Lieber, the real
2  David Lieber, ever was a purchaser of any of these
3  properties?
4    A.    I never met the real David Lieber. I
5  believe he was a friend of Larry Cuzzi's, and I don't
6  know if he ever knew they used his name or not.
7    Q.    Okay. Have you ever heard of Shaggy?
8    A.    No.
9    Q.    Are you aware that Mr. Kane was involved
10  in this sort of fraud in Brooklyn?
11    A.    I found out afterwards.
12    Q.    When you say afterward --
13    A.    After my association with Mr. Kane was
14  ended.
15    Q.    What did you hear about it?
16    A.    That he was under investigation for the
17  same type of scam in Brooklyn and in Florida.
18    Q.    Who did you hear this from?
19    A.    Someone who wasn't supposed to tell me.
20    Q.    Who was that?
21    A.    An FBI agent.
22    Q.    When closing funds were wired were they
23  wired by Walsh Securities directly into the closing
24  attorney's trust account?
25    A.    Yes.

Page 59

1    Q.    And were the funds wired from Walsh
2  Securities?
3    A.    I believe that's where they came from.
4    Q.    They weren't wired from National Home
5  Funding?
6    A.    No.
7        (King-2, Attachment B, Document to be
8  Seized, is received and marked for identification.)
9    Q.    Miss King, what you're being handed is a
10  document titled: Attachment B, Documents to Be
11  seized. It was produced by Mr. Yacker and the Bates
12  stamp is SYSW 005187 through 5189. I assume you have
13  never seen this document before?
14    A.    No, I have not.
15    Q.    It's related to documents to be seized
16  at the office of Mr. Yacker and at the office of Mr.
17  Yacker. Does that look like the office address that
18  you most recently worked at?
19    A.    Yes.
20    Q.    729 Highway 34 in Matawan?
21    A.    Yes.
22    Q.    Under number 1A it says: "The sellers
23  or purchasers of real property where William Kane,
24  Cristo Property Management, D&Sons Inc., G.J.L.
25  Limited, Oakwood Properties, or DEK Homes of New

Page 60

1  Jersey." Do you recognize those names?
2    A.    Some of them.
3    Q.    Which ones don't you recognize?
4    A.    G.J.L. Limited, and I don't believe I
5  ever did any closings under the DEK Homes of New
6  Jersey.
7    Q.    Okay. Under B it lists: "The mortgage
8  banks providing funding for the borrowers were Walsh
9  Securities, Inc. National Home Funding Inc. and/or
10  Selective Funding Finance, LTD." Did you ever deal
11  with Selective Finance?
12    A.    No.
13    Q.    As you previously testified National
14  Home Funding never provided funding for any of the
15  borrowers. Correct?
16    A.    No.
17    Q.    Below that under Section C it lists a
18  number of property purchasers. Do you recognize any
19  of these names?
20    A.    Some I do not recognize.
21    Q.    Do you recognize the majority of these
22  names?
23    A.    Yes, I do.
24    Q.    And the reason that you recognize the
25  majority of these names is because you were closing

Page 61

1  multiple loans for all of these names?
2    A.    Yes.
3    Q.    Other than Mr. Cuzzi did you know any of
4  these people personally?
5    A.    No.
6    Q.    Do you know, as you sit here, whether
7  any of these people other than Mr. Cuzzi ever came to
8  any of the loan closings?
9    A.    I believe I met a Jill Montanye. I
10  don't know. In the beginning I didn't do the
11  closings so I didn't sit there with them.
12    Q.    But other than Jill Montanye and
13  Lawrence Cuzzi you're not sure whether you met any of
14  these people personally?
15    A.    No.
16    Q.    Under number two it appears they were
17  looking for documents related to transactions in
18  which property interests were conveyed to Capital
19  Assets Property Management, an investment company.
20  Of the Kane loans that you closed did all of --
21  excuse me. Did all of the Kane loans that you closed
22  involve transfers of interest to Capital Assets?
23    A.    Not all of them.
24    Q.    A majority of them?
25    A.    I would say the majority.

16  (Pages 58 to 61)

L. KING

Page 62

1    Q.    Did you ever close any of the so-called
2 Kane loans that you believed to be legitimate?
3    A.    I believe there were a few in the very
4 beginning that were legitimate, that people bought
5 property from Bill Kane. I don't remember their
6 names. In the beginning there was a couple who had
7 bought an -- I want to say like a three- or
8 four-family house that they were going to renovate
9 and rent out. I don't remember her name.
10   Q.    Other than a few in the beginning, the
11 vast majority of them would you say were fraudulent?
12   A.    Yes.
13   Q.    Have you ever heard of Michael Alfieri?
14   A.    The name sounds familiar.
15   Q.    Do you recall why it sounds familiar?
16   A.    No.
17   Q.    Under number 5B it lists real estate
18 appraisers and includes Richard Calanni, Thomas
19 Brodo, James Brown, and Richard DiBenedetto. You met
20 Mr. Calanni today. Have you ever spoken with Thomas
21 Brodo?
22   A.    I don't have it here. I don't remember
23 a Mr. Brodo.
24   Q.    The second page isn't there with --
25   A.    I have a B.

Page 63

1    Q.    5188.
2    A.    No. Unless I missed something. Oh, I'm
3 sorry. My mistake. Richard DiBenedetto and Richard
4 Calanni. Thomas Brodo, I don't recall him. And
5 James Brown, I don't recall him either.
6    Q.    Do you recall why Richard DiBenedetto
7 sounds familiar to you?
8    A.    No. I didn't have much to do with the
9 real estate appraisers. They weren't people who I
10 would normally talk to because they didn't have a
11 part in my documents.
12   Q.    Mr. Calanni had asked you some questions
13 about providing him with some comparables that he
14 could use in his appraisals. He was looking -- let
15 me just go back a second.
16        My understanding is that Mr. Calanni's
17 previous testimony is that he needed more current
18 comparables in order to do his appraisals and so he
19 had contacted your office to find out about recent
20 loan closings that he -- that wouldn't be on the MLS
21 yet that he would be able to use as comparables. Do
22 you have any specific recollection of providing him
23 with this information?
24   A.    No.
25   Q.    Would it have been unusual for an

Page 64

1 appraiser to contact your office and ask for this
2 sort of information?
3    A.    Yes.
4    Q.    Have you ever heard of Roland Pierson?
5    A.    No.
6    Q.    Were you aware in 1996 and 1997 before
7 the federal and local governments got involved in
8 this case that the appraisers were over inflating the
9 values of the homes they were appraising?
10   A.    I didn't know what they did.
11   Q.    Did you have any reason to believe that
12 the purchase price of these properties was inflated?
13   A.    Well, of course I did because I would
14 see the deed come from Rick Pepsny for 50, 70,
15 $80,000 and then the new mortgage would come through
16 at 190, 200, around that area, but I don't know how
17 they came up with those figures.
18   Q.    Did you ever think that they were able
19 to purchase -- that Kane was able to purchase these
20 properties at such a low price because he was getting
21 them through foreclosures or tax sales?
22   A.    That's the way I was told that he got
23 them, and that's the reason -- because I asked Bill
24 one day, I'm like, there's a big difference here, of
25 course, and he said, Well, what we were going to do

Page 65

1 with that money was get the actual value of the
2 property and then take out enough so that we could
3 fix them up and rent them.
4    Q.    Okay. So you didn't have any reason to
5 think that these properties weren't worth 190 or
6 $200,000 other than the fact that there was that
7 difference there?
8    A.    I don't know anything about real estate.
9    Q.    Do you have any recollection of telling
10 any appraiser that Calanni or that Kane was the
11 seller on any of these properties?
12   A.    Say that again. Do I have any
13 recollection --
14   Q.    Of any of these appraisers who had
15 called your office, do you have any recollection of
16 telling any of them that Kane was the seller, William
17 Kane was the seller of these properties?
18   A.    I don't recall having any kind of that
19 conversation with any appraiser.
20   Q.    Do you recall telling anyone at Walsh
21 Securities that William Kane was the seller of these
22 properties?
23   A.    I don't think I would have said anything
24 like that. That Bill Kane was selling these
25 properties? That would not have been part of the

17  (Pages 62 to 65)

L. KING

1  conversation I would have had with a bank person.  I
2  recall mostly calling or speaking to a bank person
3  about documents.  That would have been my
4  conversation with them, what documents were needed,
5  what do we have to do to get the closing done, what
6  are you missing, what do you need.
7      Q.   So to the best of your knowledge the
8  bank people like Walsh Securities would only know who
9  the seller of the property was based on what was
10  on --
11     A.   On the documents.
12     Q.   -- the documents?
13     A.   And Bill's -- Bill Kane's relationship
14  with someone at the bank.  That's all I would know.
15     Q.   What was Bill Kane's relationship with
16  somebody at the bank?
17     A.   My understanding, not factual, my
18  understanding is that he worked very closely with
19  Walsh Securities to get the funding for these
20  closings.  He was always in contact with someone at
21  Walsh Securities, whether it be Betty Ann or...
22     Q.   What did he tell you about that?
23     A.   He was at Walsh Securities a lot.  I
24  don't recall actual conversations, but he was there a
25  lot.  They were trying to build a portfolio of

1  properties so that they could go public and sell
2  stock.  That's the way Bill -- Bill Kane explained it
3  to me one time because I asked him -- it had to have
4  been really '97.
5      Q.   When you say, "they were trying to build
6  a portfolio" --
7      A.   Bill Kane and Gary Grieser because I
8  asked them what was the rush because everything was
9  always rush, rush, rush, you know, you never could
10  get anything done properly because as soon as the
11  last batch closed at the end of the month, because he
12  said that Walsh Securities needed to loan out a
13  certain amount of money each month in order to get
14  their funding.  So at the end of the month is when
15  the closings would happen and that -- I asked him one
16  time, I'm like, what's the big rush?  We started out
17  with maybe like five to ten closings a month and then
18  it jumped to like 15 and 20, and it was getting
19  insane.  And I was like:  Why?  What's the reason for
20  all the closings?  Like we have to have 200
21  properties minimum in order for us -- and he is in
22  business for two years in order for us to go public
23  and sell stock, which I don't know if that was the
24  truth or not.  I don't know anything about stocks.  I
25  don't know anything about property management or

1  anything like that, but that's the way he explained
2  it to me.
3      Q.   Let me just take a step back.  What
4  would you describe as a typical flip?
5      A.   A typical flip.  I may miss some parts
6  but let me try and remember.  Okay.  Let's see.
7      Q.   This is a typical Kane flip.  Right?
8      A.   Yeah.  They were the only kind I knew.
9  It would start out with Bill calling me and I would
10  make a list of properties that he had his eye on.  So
11  I would write down the properties and their addresses
12  and then I -- I'm going to miss some pieces here, I
13  know it.  I would make a list and send it to Rick
14  Pepsny to verify that's what he had because I was
15  always talking to Rick and Rick's office.  So I would
16  send him the list, and then we would start gathering
17  the documents needed for the closing such as title,
18  real estate contract, information from National Home
19  Funding.  And then as we got closer to the closing he
20  would tell me, yes, this one goes through, this
21  doesn't.  You know, he would give me the breakdown of
22  which exactly ones would happen.  Coastal would get
23  their title stuff together and then documents would
24  come from Walsh, get signed.
25         Then I would go through them, make sure

1  everything was in the packet, send back to Walsh.
2  Bill would go over disbursements with me.  I would
3  write checks.  And then I would make copies, get the
4  package ready for overnight because Walsh needed them
5  back within a day or two, and then I would finish
6  making the copies, get the documents ready for
7  filing.  If I was at a point where they could be
8  filed I would send them off to Freehold for -- or
9  Bill Kane would have somebody take them out to
10  Freehold to get filed because after a while there
11  were so many, to stick them in an envelope and paying
12  postage, he would have somebody take them out.  Maybe
13  Larry.
14     Q.   Larry Cuzzi?
15     A.   Yeah.  And take them out to Freehold for
16  filing and then start all over again for the next
17  month.  I know I missed some steps in there, but at
18  one point I knew I would get a deed from Rick going
19  from the original buyer into one of Bill Kane's
20  companies, either that or I would get a copy of a
21  filed deed so that I could pick up that date from the
22  day that Bill Kane bought it and then flipped it.
23     Q.   So were some of Bill Kane's properties
24  purchased prior to the loan closings that you
25  participated in?

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

Page 70

1    A.    Some, most of them.
2    Q.    So most of the properties were already
3  owned by Kane --
4    A.    Yes.
5    Q.    -- before you did the loan closing?
6    A.    Yes.
7    Q.    Now, you said you were always talking to
8  Rick Pepsny's office?
9    A.    Uh-huh.
10   Q.    Why was that?
11   A.    To find out if he actually closed on his
12 side for the property that Bill Kane had scheduled
13 for closing for that month and to get documents from
14 him because Coastal would bring them the title work.
15   Q.    You also said that you would get
16 information from NHF.  What kind of information did
17 you get to get from NHF?
18   A.    Mortgage application.
19   Q.    Did they send you documents such as a
20 copy of Social Security cards and driver's licenses?
21   A.    Sometimes I got that information.
22   Q.    You then said that Coastal would get the
23 title stuff together?
24   A.    Yes.
25   Q.    Who would contact Coastal about getting

Page 71

1  the title information together?
2    A.    Sometimes I would, sometimes I would I
3  believe Rick's office would because they needed title
4  information for their buy from the original seller,
5  make sure it was clear title.
6    Q.    So sometimes Rick Pepsny would order
7  title documents for a closing that you were
8  participating in?
9    A.    Yes.
10         (King-3, Schedule A, Title Insurance
11 Commitment, is received and marked for
12 identification.)
13         (King-4, Schedule A, Title Insurance
14 Commitment, is received and marked for
15 identification.)
16   Q.    King-3 and King-4 are two title
17 insurance commitments from Commonwealth Title
18 Insurance Company that came out of documents produced
19 to the repository by Michael Schotlin, and the top of
20 the box referenced that they're related to Coastal
21 Title.  None of the documents in the box were Bates
22 stamped.  Both of these relate to property located at
23 1017-1019 Bangs, B-a-n-g-s, Avenue in Asbury Park,
24 New Jersey.
25         MR. HAYES:  It can't be.  They can't be

Page 72

1  for the same property.
2          MS. WAGNER:  Why is that?
3          MR. HAYES:  Because one refers to land
4  in Neptune and one refers to land in Asbury Park.
5          MS. WAGNER:  That's just the cover page.
6  If you look at the next page on the one that refers
7  to Neptune it's actually referring to property in
8  Asbury Park.
9          MR. HAYES:  I don't see any addresses at
10 all on King-3.
11         MS. WAGNER:  On page two it says right
12 above the note:  "Said premises are commonly known as
13 1017-1019 Bangs Avenue.
14         MR. HAYES:  I see what you're saying.
15         MS. WAGNER:  And at the top it has the
16 same file number as the first page.
17         MR. HAYES:  In light of the fact that
18 they weren't marked, how do we know that Schedule A
19 on King-4 goes with the rest of the package since on
20 its face -- I'm looking to see if the rest of the
21 pages have a file number on them anywhere.
22         MS. WAGNER:  They all have the same file
23 number.
24         MR. HAYES:  One is 17767 and one is A.
25 Right?

Page 73

1          MS. WAGNER:  The second one -- King-4 is
2  A and that -- what I was going to explain with these
3  two documents, and I'll show them to you in just a
4  second, Miss King, it appears that CT-17767, which is
5  King-3, is a title commitment for the transaction
6  between the Freidmans, F-r-e-i-d-m-a-n, and Cristo
7  Property, and the one that is King-4, which is
8  CT-17767A --
9          MR. HAYES:  Is the flip.
10         MS. WAGNER:  -- is the flip.
11         MR. HAYES:  Okay.
12   Q.    And I will just represent in looking
13 through the files it appeared that when there's an A
14 it was usually the same property and it was part of a
15 flip but you can look through the documents.
16         MR. HAYES:  It's troubling to see
17 documents that don't have Bates stamps on them in all
18 these files.
19   Q.    Okay.  Passing you what's been marked as
20 exhibit three and exhibit four, if you can just take
21 a look at those and see if they look like documents
22 that you're familiar with, not that you necessarily
23 remember these specific ones.
24         Okay.  Miss King, you have taken an
25 opportunity to look at these two documents.  Would

19 (Pages 70 to 73)

VERITEXT REPORTING COMPANY

212-267-6868                                   516-608-2400

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

Page 74

1  you agree with my representation that King-3 appears
2  to be for the loan transaction between Norman and
3  Arline Freidman and Cristo Property Management?
4      A.   Yes.
5      Q.   And that King-4 appears to be for the
6  transaction between Cristo Property and Jill
7  Montanye?
8      A.   Yes.
9      Q.   And what makes you think that?
10     A.   The names correspond.  It does give the
11  original owner with a book and page number for the
12  deed from the Freidmans to Cristo Property and then
13  the Cristo Property, which does not have a book and
14  page number because that deed has not been recorded
15  yet, would go into Jill Montanye.
16     Q.   Do you see that both of these have the
17  same commitment date as June 16, 1996?
18     A.   Yes.
19     Q.   And do you recognize these to be
20  so-called marked-up title commitments?
21     A.   I have never seen the markings on here,
22  but, yes, they are marked up.
23     Q.   Did you ever write on title insurance
24  commitments like this?
25     A.   No.

Page 75

1      Q.   Do you recognize the initials on these?
2      A.   No, I don't.  Let me look a little
3  closer here.  The only thing that stands out to me is
4  the initial underneath the fee simple number three,
5  it has a W with a line underneath of it, which could
6  possibly be Bill Kane, his initial in the very
7  beginning.  After a while he just did a little thingy
8  after that.  He changed his initial.  I do not know
9  who marked up the rest of the pages and checked off
10  anything.
11     Q.   Do you recognize any of the handwriting?
12     A.   No, I don't.
13     Q.   Would you agree that the handwriting
14  looks similar on the two?
15     A.   Yes.
16     Q.   On King-4 under number three it states,
17  "The fee simple interest in the land described in
18  this commitment is owned at the commitment date by
19  Cristo Property Management, LTD.  Is that correct?
20     A.   That's what it states.
21     Q.   Do you believe that was the case back
22  then given that both of these documents have the same
23  commitment date?
24     A.   I don't know what to believe.
25     Q.   Okay.  Do you have any knowledge who

Page 76

1  would have ordered these title insurance commitments
2  on this property for Jill Montanye?
3      A.   I don't know who ordered this.
4          (King-5, Closing Service Letter dated
5  July 11, 1996, is received and marked for
6  identification.)
7          (King-6, Invoice dated 7/11/96, is
8  received and marked for identification.)
9          (King-7, Deed dated 7/25/96, is received
10  and marked for identification.)
11         (King-8, Deed, is received and marked
12  for identification.)
13         (King-9, Deed, is received and marked
14  for identification.)
15     Q.   Miss King, I'm handing you what's been
16  marked exhibit King-5, King-6, King-7, King-8 and
17  King-9.
18         King-5 is a closing protection letter,
19  closing service letter dated July 11, 1996 from
20  Commonwealth Land Title on the same property at Bangs
21  Avenue that we were just discussing.
22         King-6 is an invoice dated July 11, 1996
23  from Coastal Title Agency to Richard Pepsny.
24         King-7 is the deed dated July 25, 1996
25  between the Freidmans and Cristo Property.

Page 77

1          King-8 is a deed dated July 25, 1996
2  between Cristo Property and Jill Montanye.
3          And King-9 is a deed dated July 25, 1996
4  between Jill Montanye and Joe Montanye and Capital
5  Assets, which conveyed a 40 percent interest to Jill
6  Montanye and 60 percent to Capital Assets.
7          Each of those documents is Bates stamped
8  from the Coastal Title document production in the
9  repository.
10         Miss King, do you agree that the file
11  number on the closing service letter, which is marked
12  King-5, is the same file number as we just looked at
13  on the title insurance commitment where it indicates
14  the proposed insured is Jill Montanye?
15     A.   Yes.
16     Q.   It says on the reference line on the
17  first page that the issuing agent or attorney whose
18  conduct is covered is Richard J. Pepsny.  Are you
19  familiar with closing service letters?
20     A.   No.
21     Q.   Do you understand the purpose behind a
22  closing service letter?
23     A.   No.
24     Q.   Do you have any reason to know why Mr.
25  Pepsny's name would be on this?

20  (Pages 74 to 77)

VERITEXT REPORTING COMPANY

212-267-6868                                     516-608-2400

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

Page 78

1    A.    No.
2    Q.    Okay. The next document, which is
3    King-6, it's an invoice to Richard Pepsny. Have you
4    ever seen a document like this?
5    A.    I have seen documents like this.
6    Q.    Can you tell from looking at this who
7    would have ordered this title search?
8    A.    No, I don't know who ordered this title
9    search.
10    Q.    This is also for Bangs Avenue and it
11    also has the same title number. Correct?
12    A.    Correct.
13    Q.    Do you have any idea why it's addressed
14    to Richard Pepsny?
15    A.    I do not know.
16    Q.    King-7 is a deed prepared by Mark A.
17    Steinberg, Esquire. Do you know Mr. Steinberg?
18    A.    No.
19    Q.    Have you ever met him?
20    A.    Not that I'm aware of.
21    Q.    Have you ever heard of his name?
22    A.    No.
23    Q.    Now, that deed is dated July 25, 1996
24    and at the bottom there's a stamp from the Monmouth
25    County Clerk's office dated April 8, 1997. Do you

Page 79

1    see that?
2    A.    Yes.
3    Q.    The next document, King-8, is a deed
4    dated July 25 -- also dated July 25, 1996, which was
5    prepared by Richard J. Pepsny, Esquire. The stamp at
6    the bottom from the Monmouth County Clerk's office is
7    also dated April 8, 1997. And it appears to have
8    been, if you look at the instrument number, recorded
9    right after King-7. Do you agree?
10    A.    I agree.
11    Q.    And then if you look at King-9, which is
12    a deed dated July -- also July 25, 1996, that was
13    prepared by you. Is that correct?
14    A.    Yes.
15    Q.    And it's dated by the clerk's office
16    April 8, 1997 and appears to have been filed right
17    after the first two. Is that correct?
18    A.    That's correct.
19    Q.    Does this look like a typical flip
20    transaction to you?
21    A.    Yes, it does.
22    Q.    Why is that?
23    A.    Well, you've got your deed going from
24    the original seller to Cristo Properties and then the
25    Cristo Properties into the straw buyer, and then the

Page 80

1    deed from the straw buyer into a joint venture with
2    Capital Assets.
3    Q.    Do you have any idea why it took about
4    ten months for these to get filed with the Monmouth
5    County Clerk's office?
6    A.    Well, this could have been one of those
7    that Bill told me to hold on to so they didn't hit
8    the county all at one time. And then at one point he
9    had someone come and pick them all up and take them
10    out to the county, so, therefore, they would have
11    been filed one right after the other. I do remember
12    that I would put on the deed the order that they
13    needed to be filed in. Like file this deed first,
14    file this deed second on yellow sticky notes. They
15    were all over the deeds.
16    Q.    Why was that?
17    A.    So that they would be in order from one
18    to another to another to another.
19    Q.    Why did that matter?
20    A.    Well, you wouldn't want the Capital
21    Assets to be filed before the Cristo Property one.
22    Q.    If the Capital Assets one was filed
23    before the Cristo Property one, who would have the
24    deed to the property?
25    A.    I have no idea.

Page 81

1    Q.    Would it be whoever was filed last?
2    A.    I have no idea.
3    Q.    Who would have prepared these deeds?
4    A.    I'm assuming that Mr. Steinberg prepared
5    the first deed, Rick Pepsny the second, King-8, and I
6    did King-9 for the joint venture deed.
7    Q.    Did you actually type these up yourself?
8    A.    The joint venture deed?
9    Q.    Did you type up the joint venture deed?
10    A.    Yes.
11    Q.    And you would have no way of knowing
12    whether these other deeds were typed up by these
13    people?
14    A.    I have no idea.
15    Q.    Why are they marked with Coastal Title
16    Agency's address at the top of each one?
17    A.    I have no idea.
18    Q.    Would these have gone to Coastal Title
19    for filing?
20    MR. KOTT: Can you read the question
21    back?
22    (The pending question is read by the
23    court reporter.)
24    A.    I don't know who picked them up.
25    Q.    What role did Coastal Title Agency play

L. KING

## Page 82

1  in the closing process?
2      A.    They got their check. I don't know. I
3  just -- whenever they called me for a question I
4  would answer them. And, of course, we needed the
5  title insurance. I know I needed that for the
6  closing but after that I don't know.
7      Q.    Do you know what role Coastal Title
8  Agency performed in the so-called scheme?
9      A.    No, just that we needed the title
10 insurance documents because I needed the description.
11     Q.    Well, before I think you had described
12 them as part of Bill Kane's ring?
13     A.    Uh-huh.
14     Q.    With him as the ringmaster?
15     A.    Uh-huh.
16     Q.    Why would you put them in the so-called
17 ring?
18     A.    Because Bill gathered all the people
19 together that he needed in order for these deals to
20 go through. He knew what needed to be done to buy
21 and resell these properties.
22     Q.    Do you know what Coastal Title Agency
23 did for Bill Kane?
24     A.    No.
25     Q.    He never told you?

## Page 83

1      A.    No. I just know that we had to have the
2  title insurance as part of the closing documents
3  because I needed the description to add to my deed.
4  I don't know what their role was. All I know is that
5  we needed them as part of the closing documents.
6      Q.    Do you know what role a title agency
7  plays in providing title insurance?
8      A.    I do now.
9      Q.    What do you understand now?
10     A.    That you really need to have clear title
11 in order to buy and sell properties and that there
12 are stipulations that need to be met on the insurance
13 policy in order for that closing to happen. A
14 checklist.
15     Q.    And you didn't -- nobody explained that
16 to you at the time?
17     A.    No, no. It's called "clear the title."
18 And I have never had to deal with that even in normal
19 closings because Mr. Yacker always handled that side
20 of things when he did normal closings.
21     Q.    Now, when you did one of the Kane
22 closings, would any of these documents that were
23 marked King-5, King-6, King-7, King-8, King-9 be part
24 of your closing documents?
25     A.    Probably out of any of them King-8,

## Page 84

1  which would be a copy of the deed going from Cristo
2  Properties into the straw buyer.
3      Q.    At the closing would you have had
4  King-7, which was the deed from the original seller
5  to Cristo Property?
6      A.    Not necessarily. I wouldn't necessarily
7  have that. I might get it later from Rick Pepsny's
8  office so that they could all be filed in order, but
9  I wouldn't necessarily have that for a closing.
10     Q.    Were there occasions where Rick Pepsny
11 took a while to provide you with these original
12 deeds?
13     A.    Oh, yes. Oh, yeah.
14     Q.    Can you elaborate on that?
15     A.    Well, when -- remember when I said that
16 Bill would come along and say, okay, these are the
17 closings that we're going to do this month. For
18 whatever reason it didn't happen, say, for example,
19 in this case here, I'm looking at a title commitment
20 dated June 16, which means that this would probably
21 be on my list for the June end-of-month closings.
22 However, because Rick couldn't get his side closed
23 first by the end of June, it would be pushed to July
24 so that would be the delay in not closing in June, if
25 Rick couldn't get his side done by the end of June.

## Page 85

1      Q.    Did there come a point in time -- I
2  think you had mentioned before that Mr. Pepsny didn't
3  get his side done before the
4  Cristo-to-the-straw-buyer closing occurred.
5      A.    That happened a couple times.
6      Q.    Do you recall the circumstances
7  surrounding when that happened?
8      A.    Not specifics. I did not know. You see
9  this whole thing was a work in progress. It started
10 out very legitimately in the beginning and then as
11 any greed comes into things it kind of got out of
12 hand. And Bill was greedy and he wanted to make the
13 money and he wasn't going to wait. So because Bill
14 in the very beginning would not tell the players, the
15 ring, who was doing what, we started making major
16 mistakes like closing on properties that he didn't
17 own already. And because Rick wasn't on the ball, I
18 come to find out later on his secretary, I don't
19 remember her name, young girl, I worked with her a
20 lot, she would change dates on deeds, backdate them
21 so it would flow on paper. However, document-wise he
22 didn't own these properties.
23          So after Rick found out that she was
24 backdating or forward dating deeds he flipped. I
25 think she got fired and that's when we started

VERITEXT REPORTING COMPANY

L. KING

<table>
<tr><td align="right">Page 86</td></tr>
</table>

1   communicating a little better, and I started writing
2   lists, and I don't know if you ever found it in
3   there. The FBI said they never found my list, but
4   they were all over the place because I tried to be a
5   little organized. I made my list of properties and I
6   made checklists as to what was needed for each
7   closing. Checklist from this, this and this, and I
8   would fax it to the players. I faxed it to Rick, I
9   faxed it to Bill, I faxed it to Gary, I faxed it to
10   National Home Funding, I faxed it to everybody I
11   thought had to have a part in this that I was aware
12   of so that we didn't close on properties we didn't
13   own already.
14       Q.   Would you have faxed it to Walsh
15   Securities?
16       A.   I don't know if they were on my list. I
17   think I assumed Bill would deal with them because I
18   didn't really deal -- I wasn't in contact with Walsh
19   Securities on a regular basis. It was only when
20   there was a problem where they needed documents for a
21   closing would I speak to someone at Walsh.
22       Q.   Now, tell me more about the document
23   that's marked King-9. It's the deed transferring
24   property from Jill Montanye to Jill Montanye and
25   Capital Assets.

<table>
<tr><td align="right">Page 87</td></tr>
</table>

1       A.   This was a Gary Grieser, Bill Kane
2   invention because Capital Assets needed to have a
3   solid interest in these properties. Again, we
4   come -- this was all like explained to me afterwards.
5   Hindsight is 50/50, 20/20. Now I see it from a
6   distance, and it was explained to me why he needed
7   this, whether it's the truth or not, this is what was
8   told to me.
9           These -- this joint venture deed was
10   developed much, much later. The joint venture didn't
11   come into play until after a good six, seven months
12   of doing flips, because then they decided they wanted
13   to do this public stock thing and they needed to have
14   a valid interest in the properties in order to garner
15   these 200 properties. So, therefore, they had -- Mr.
16   Yacker -- Bill Kane and Mr. Yacker sat down and drew
17   up a joint venture agreement that from that point on
18   would be part of the closing package that was signed,
19   although that would not go to Walsh Securities. They
20   wouldn't see the joint venture. That would be held
21   aside and filed after these two deeds, which is
22   King-7 and King-8. So these here deeds were probably
23   held in the box because Bill Kane didn't want
24   Monmouth County flooded with deeds. And then when
25   there was that eight, nine, ten-inch stack going on,

<table>
<tr><td align="right">Page 88</td></tr>
</table>

1   Bill Kane I guess got in trouble and somebody said:
2   We got to get these deeds filed. So if you notice
3   there's probably a lot of deeds that are dated April
4   the 8th, 1997.
5       Q.   I think you're right about that.
6       A.   Yeah. So this deed number King-9 is an
7   afterthought.
8       Q.   Was it prepared on July 25, 1996?
9       A.   Probably not because by this time in
10   1996 I might have held -- I was probably holding back
11   deeds at Bill Kane's instruction, and then when they
12   came up with this joint venture thing, idea,
13   whatever, he probably said, Okay, go through the
14   deed -- go through your pile and make up that deed,
15   that joint venture deed, and attach it to them so
16   that they're filed one after the other.
17       Q.   Do you know how much money the straw
18   buyer got for signing -- purportedly signing off on
19   this joint venture agreement?
20       A.   I don't know exactly how much they got.
21   I was never told. A thousand, couple thousand, I
22   don't know how much they were paid. It wasn't paid
23   out of the trustee disbursements.
24       Q.   Who paid it?
25       A.   I don't know. I don't know if Bill Kane

<table>
<tr><td align="right">Page 89</td></tr>
</table>

1   paid it or Gary Grieser paid it. I don't know who
2   paid it.
3       Q.   Now, is it your understanding that some
4   of these people didn't even know that their name was
5   being put on some of these documents?
6       A.   I have no idea.
7       Q.   You previously testified that these
8   people weren't always at -- these straw buyers
9   weren't always at a closing. Is that correct?
10       A.   That's correct.
11       Q.   So who would have been signing their
12   name at the closing?
13       A.   I would give the documents to Bill Kane
14   and he would bring them back signed.
15       Q.   Did he physically leave the office?
16       A.   Yes, he did.
17       Q.   For how long?
18       A.   All afternoon. I would get them back
19   maybe the next day.
20       Q.   So he could have been going and
21   having --
22       A.   He could have possibly been going to
23   meet these people and getting their information.
24       Q.   What do you think happened?
25       MR. HAYES: Objection.

23  (Pages 86 to 89)

VERITEXT REPORTING COMPANY

L. KING

Page 90

1        MR. KOTT: Objection to form.
2        MR. HAYES: You can answer the question.
3     A.    I can speculate all you want. I can say
4  that I speculate that he took them out to his car and
5  signed them or had someone else sign them.
6     Q.    Do you have any firsthand knowledge that
7  he did this?
8     A.    No, I did not see him sign papers.
9     Q.    Did he ever tell you what he was doing
10 with the papers?
11    A.    No, he did not.
12    Q.    Did he ever tell you he was going to
13 have these people sign the papers?
14    A.    I don't recall any words that said: Oh,
15 I'm going to do this with these papers. He would
16 just say: Get them ready and I'll take them and get
17 them signed.
18    Q.    Did these loans ever fund before the
19 papers came back signed?
20    A.    Of course they did. The reason being is
21 that the papers would come overnight or Bill would
22 pick them up directly from Walsh and bring them to me
23 so I could pull together all the pieces for the
24 closing that needed to get done and signed and ready
25 to get sent back.

Page 91

1        Three o'clock was the magic hour because
2  that's when Walsh Securities would fund by electronic
3  trustee account. So we would get the money and then
4  the documents would leave the office, come back
5  signed, I would get them ready, copies made to
6  whoever needed copies, the originals all got back --
7  put back in a box or envelope and shipped overnight
8  the next day.
9     Q.    Were funds ever disbursed before you got
10 the signed documents back?
11    A.    Oh, yes. As soon as that three o'clock
12 time came in, Bill Kane was right there and Gary
13 Grieser.
14    Q.    What happened?
15    A.    And Gary would tell me how to split out
16 and disburse the funds, who got what.
17    Q.    And you knew that the funds were not
18 supposed to be disbursed until the loan documents
19 were sent back. Correct?
20    A.    I suppose I should have known that.
21       MS. WAGNER: I am not going to have you
22 mark this, I am just going to show it to the witness.
23 I'll give you guys a copy.
24    Q.    Do you know what an Affidavit of
25 Consideration or Exemption or Partial Exemption is?

Page 92

1     A.    No.
2     Q.    Do you recall preparing anything called
3  an Affidavit of Consideration or Exemption?
4     A.    I might have. I don't know. There were
5  so many documents. I signed it as a notary. I don't
6  remember typing it though.
7     Q.    But you wouldn't know what this is?
8     A.    No, I have no idea what this is. I was
9  just told to sign it and I did.
10    Q.    Going back to King-9, you had said that
11 you would not have provided this to Walsh Securities.
12 Why not?
13    A.    Because I was told they only needed this
14 one.
15    Q.    Which is King-8?
16    A.    King-8.
17    Q.    Who told you that?
18    A.    Probably Bill Kane.
19    Q.    I'm going to ask you to speculate, but
20 do you think that Walsh Securities would want to know
21 about the deed that's marked Kane-9?
22       MR. HAYES: Objection.
23    A.    I would speculate that they would not
24 want to see that.
25    Q.    Or at least that they would want to know

Page 93

1  about the existence of such a deed, don't you think?
2     A.    I have no idea what Walsh Securities
3  would want to know or not know other than the other
4  deed.
5        MR. HAYES: "The other deed" being
6  King-8?
7     A.    King-8 showing that Jill Montanye was
8  the owner of the property.
9     Q.    Now, you previously stated that you
10 recognized the name Jill Montanye and I think that
11 you did meet her.
12    A.    I might have.
13       (King-10, Deed dated 7/25/96, is
14 received and marked for identification.)
15       MR. HAYES: Can we put on the record,
16 since we didn't mark the prior document, that the
17 document that was shown to Miss King previously, the
18 affidavit, has a Bates stamp of CTC3709.
19    Q.    I've handed you a deed dated July 25,
20 1996 between Jill Montanye and Jill Montanye and
21 Capital Assets, which is Bates stamped CTC3706
22 through 3708. In my review the first two pages
23 appear to be the same as King-9 except that it has an
24 additional page. Can you just take a look at it.
25 Does this appear to be the full document?

L. KING

Page 94

1    A.    Yes.
2    Q.    And on the last page, this has your
3  notary stamp. Correct?
4    A.    Yes.
5    Q.    Is that your signature?
6    A.    Yes.
7    Q.    And it's dated July 25, 1996. Correct?
8    A.    Yes.
9    Q.    Do you know if Jill Montanye was there
10  that day when she signed this?
11    A.    No, I can't state that I know that for a
12  fact.
13    Q.    Okay. But you do believe that it wasn't
14  done -- it wasn't prepared on July 25, 1996, correct,
15  since this is a joint venture agreement -- correct?
16    A.    Okay. You want to rephrase that so I
17  get it straight?
18    Q.    Sure. Previously you had testified that
19  the joint venture agreements didn't start until I
20  believe a couple of months after this date in July of
21  '96?
22    A.    Right.
23    Q.    And that you didn't think that the
24  document I showed you that was marked King-9, which
25  appears to be the filed version of this deed, which

Page 95

1  is marked King-10, that you didn't think that it was
2  entered into on July 25th. Is that correct?
3    A.    I want to remember that the joint
4  ventures happened later so either I got her to sign
5  this or -- I can't remember.
6    Q.    I am not trying to get you into trouble.
7    A.    I'm trying to remember when the joint
8  ventures came into play because I know they weren't
9  in play in the very beginning and if so -- I don't
10  remember this, how they were able to get this one. I
11  don't remember how this one worked. I know -- I'm
12  pretty sure that the joint ventures didn't come in
13  until later on. I don't remember when. I don't
14  remember when the joint ventures came into play. I
15  can't explain at this moment.
16    Q.    Okay. And on the third page of King-10
17  it indicates that consideration for this agreement
18  was under $100. Is that correct?
19    A.    That's what it states.
20    Q.    But it's your understanding from what
21  you were told that they certainly gave the straw
22  buyers more than $100?
23    MR. HAYES: I'm going to object to the
24  form. I think she said that they were paid money to
25  use their name in the first place, not for the deed

Page 96

1  here. That's my recollection.
2    Q.    What is your recollection of what the
3  straw buyers were paid and for what?
4    A.    They were paid before the closing
5  documents for use of their name and their credit to
6  put properties in their name. So they would each get
7  two or three because of whoever not wanting to see
8  too many properties in one name. It wasn't in
9  particular for this deed. It was an overall fee that
10  they got paid for use of their name for whatever
11  documents needed to be signed.
12    Q.    And do you know what they were provided
13  for entering into this deed --
14    A.    I have no idea.
15    Q.    -- the joint venture?
16    A.    I have no idea what they were provided
17  for that deed.
18    MS. WAGNER: I want to take a break for
19  a moment.
20    (A recess takes place.)
21    (King-11, Secondary Mortgage Loan, is
22  received and marked for identification.)
23    (King-12, HUD-1, is received and marked
24  for identification.)
25    (King-13, Closing Instructions by Walsh

Page 97

1  Securities, is received and marked for
2  identification.)
3    Q.    Miss King, I'm handing you what's been
4  marked King-11. It's titled, "Secondary Mortgage
5  Loan." And it's Bates stamped WS 1037662 through
6  663.
7          Have you ever seen a document like this
8  before?
9    A.    I've seen them.
10    Q.    What is it?
11    A.    It says, "Secondary Mortgage Loan." I
12  don't know why the -- "they" meaning Bill Kane and
13  Gary Grieser determined that there was a secondary
14  mortgage loan needed for this package, but they did
15  and it was part of the closing documents that people
16  signed.
17    Q.    And is this something that would have
18  been sent to Walsh Securities?
19    A.    No.
20    Q.    It wasn't?
21    A.    No.
22    Q.    Is this something that would be filed
23  with the county clerk?
24    A.    No.
25    Q.    Do you know why?

25 (Pages 94 to 97)

L. KING

## Page 98

1      A.   No.
2      Q.   Was it because you weren't told to file
3  it?
4      A.   I was told: Don't file it. It's not
5  dated. It was --
6           MR. HAYES: Let me object to the form of
7  the question in that it implies to this witness that
8  a promissory note is recorded. You can answer, I'm
9  sorry.
10     A.   I don't know why they determined that
11 this needed, this piece of paper, to be added to the
12 closing documents. It was never dated. It was just
13 signed and it was just added to the file. I don't
14 know why.
15     Q.   What were you told with respect to
16 filing it?
17     A.   "Don't file it."
18     Q.   Under number three on the first page it
19 says: "I will make my monthly payment at 25 Oakwood
20 Drive, Parlin, New Jersey."
21          Do you know what person or company is at
22 that address?
23     A.   Bill Kanc's home address.
24     Q.   I'm going to hand you what's been marked
25 King-12. It's a HUD-1 Uniform Settlement Statement

## Page 99

1  Bates stamped WS 1037660 through 661 for loan number
2  619473 for the property on Bangs Avenue that we have
3  been discussing. B-a-n-g-s. Can you just take a
4  moment to look it over.
5           On the first page it indicates in
6  Section H that the settlement agent is Stanley
7  Yacker, Esquire.
8      A.   Yes.
9      Q.   And the settlement date is July 25,
10 1996. Is that correct?
11     A.   Yes.
12     Q.   Under the "Summary of Borrower's
13 Transaction" it states that "The existing loans taken
14 subject to $30,000."
15          Would that be the $30,000 secondary
16 mortgage loan that we looked at in King-11?
17     A.   That could be possible.
18     Q.   Would the secondary mortgage loan
19 typically be recorded on the HUD-1?
20     A.   Probably.
21     Q.   On the second page, the line marked 1101
22 states: "Settlement or closing fee to Rick Pepsny
23 for $650." And then on line 1107, it states,
24 "Attorneys fees to Stanley Yacker for $650."
25          Can you just explain to me what is

## Page 100

1  different between the settlement or closing fee and
2  the attorney's fees?
3      A.   Explain the difference how? One went to
4  Rick and one went to Stanley.
5      Q.   But why does it say settlement or
6  closing fee to Rick Pepsny, but on the prior page it
7  says settlement agent is Mr. Yacker?
8      A.   I have no idea. Closing fee maybe to
9  Rick.
10     Q.   Both of these fees fall under the
11 column: "Paid from seller's funds at settlement."
12 Do you see that?
13     A.   Yes.
14     Q.   Was there -- was it typical that the
15 seller paid both attorneys fees?
16     A.   I guess. This is how they showed me how
17 to fill out this HUD statement so that's what I
18 followed and did.
19     Q.   Would it have been --
20     A.   The seller meaning Cristo Property?
21     Q.   Correct.
22     A.   So in essence Bill Kane paid Rick Pepsny
23 and Stanley Yacker.
24     Q.   That's what you're saying this says to
25 you?

## Page 101

1      A.   That's what it says to me.
2      Q.   Have you heard of seller's paying
3  closing costs?
4      A.   I have no idea. This is a Bill Kane
5  deal. They said pay this one and put it on this line
6  and that's what I did.
7      Q.   So you don't have any -- you don't have
8  any knowledge about whether this is unusual in real
9  estate closings?
10     A.   I have no idea.
11     Q.   Do you see anywhere on this HUD-1 where
12 it indicates any money going to the straw buyer?
13     A.   No, that would not show on here.
14     Q.   On the second page, line 1105, it has a
15 document preparation fee of $100. Would that go to
16 you?
17     A.   That went to me.
18     Q.   Does it indicate on here anywhere the
19 other hundred dollars that you got?
20     A.   No, that would have come out of
21 Mr. Yacker's, the 1107, line 1107 fee.
22     Q.   So he would share $100 of his attorney's
23 fees with you?
24     A.   Yes.
25     Q.   Now, turn to King-13. It's the closing

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

## Page 102

1  instructions by Walsh Securities on the Bangs Avenue
2  address that we have been discussing. It's Bates
3  stamped WS 1037604 through 606. I didn't give it to
4  you, I'm sorry.
5         Does this look like the closing
6  instructions you would receive from Walsh Securities?
7      A.   Yes.
8      Q.   On the last page it has Stanley Yacker's
9  signature with what appears to be initials after
10 that.
11     A.   That would be me.
12     Q.   So in this instance you signed on his
13 behalf?
14     A.   Yes.
15     Q.   And you indicated that with your
16 initials?
17     A.   Yes.
18     Q.   And by signing, the settlement agent was
19 acknowledging that he had closed and completely
20 disbursed the above-referenced loan in accordance
21 with the closing instructions. Is that correct?
22     A.   That's what it states.
23     Q.   Is that what happened?
24         MR. KOTT: I object to the form of the
25 question. Is the question: Was there any violation

## Page 103

1  of these closing instructions?
2         MS. WAGNER: Yes.
3         MR. KOTT: Okay.
4      Q.   Was it closed and completely disbursed
5  in accordance with the closing instructions?
6      A.   Probably not.
7      Q.   Did you ever tell anyone at Walsh
8  Securities that either you or Mr. Yacker were not
9  following their closing instructions?
10     A.   No, I had no contact with Walsh
11 Securities regarding that.
12         (King-14, Memo dated 7/26/96, is
13 received and marked for identification.)
14     Q.   I'm handing you what's been marked as
15 King-14. It's a memorandum from you at Stanley
16 Yacker's office to Mary at National Home Funding,
17 Bates stamp SYSW 006949, and it's from Mr. Yacker's
18 document production. Do you recognize this document?
19     A.   Yes.
20     Q.   What is it?
21     A.   This is one of the lists of documents
22 that I would have sent to National Home Funding and
23 that's what it says. These are the ones that closed
24 and the amounts wired into National Home Funding's
25 account for their fees as broker.

## Page 104

1      Q.   And on here it indicates under -- for
2  1017-1019 Bangs Avenue an amount of $6,675. Is that
3  correct?
4      A.   Yes, that's what it says.
5      Q.   If you turn back to King-12, the HUD-1
6  settlement statement, do you know what this $6,675
7  would have come from on the settlement statement?
8      A.   Off the top of my head I don't know how
9  I arrived at that figure, but if you give me a minute
10 I'll figure it out.
11     Q.   Okay.
12     A.   Can I write on something? I can't
13 remember how they arrived at these figures. Most of
14 the time Bill Kane gave me figures to send people
15 money. Okay? Number 811, National Home Funding POC,
16 I can't remember what POC stands for. Don't ask.
17     Q.   Okay.
18     A.   But that was a fee that was paid to
19 National Home Funding that was included in that
20 $5,250. I don't remember what that is.
21         (King-15, Stanley Yacker - Cash
22 Disbursement Journal, is received and marked for
23 identification.)
24     Q.   This document is King-15. It says at
25 the top that it's the Stanley Yacker cash

## Page 105

1  disbursements journal for the period from July 1,
2  1996 to July 31, 1996, and it's Bates stamped SYSW
3  006901 through 6918. Does this look familiar to you?
4      A.   No.
5      Q.   You have never seen a report like this?
6      A.   No.
7      Q.   Once Mr. Yacker got his new computer
8  software to be able to start recording cash
9  disbursements had you ever seen a printed out report
10 from that software?
11     A.   No. I didn't -- I didn't print out
12 listings.
13         MR. HAYES: Can we try to establish
14 whether she was there when this was printed out?
15 This may have been after she was gone.
16     Q.   I think this was printed out, according
17 to the top left of every page, on July 17, 1997,
18 which would have been after you worked for Mr.
19 Yacker. Correct?
20     A.   Yes. I didn't print this out.
21     Q.   Although you did not print this document
22 out, do you know if this could have been printed from
23 that new software that he got?
24     A.   It could have been but I never printed
25 out anything like this.

VERITEXT REPORTING COMPANY

212-267-6868                                   516-608-2400

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

## Page 106

1    Q.    Is this the kind of information that you
2    would enter into that software?
3    A.    The information I entered in would have
4    been the amount of money that was wired in from Walsh
5    Securities and then disbursement of checks
6    afterwards. So each line item references a
7    disbursement.
8    Q.    On page 12 of the document, it ends in
9    Bates number 6912, if you could turn to page 12.
10   A.    Okay.
11   Q.    It shows a couple of disbursements on
12   July 25th related to 1017-1019 Bangs.
13   A.    Okay.
14   Q.    One disbursement is to CAPMI?
15   A.    CAMPI.
16   Q.    Do you know who that is?
17   A.    CAPMI. Capital Assets Property
18   Management. Those are the initials.
19   Q.    It shows that a disbursement for
20   $55,500. Do you know why they were getting a
21   disbursement of $55,500?
22   A.    I have no idea. Bill Kane gave me that
23   amount to say: Pay Gary Grieser that amount and
24   that's what I did.
25   Q.    And then further down for Richard Pepsny

## Page 107

1    there's a number of job IDs associated with a
2    disbursement for him but among them is one for the
3    Bangs Avenue property in the amount of $27,591.10.
4    Do you have any idea why that amount would have been
5    disbursed to Richard Pepsny?
6    A.    I have no idea. Again, Bill Kane gave
7    me all the figures to pay to whoever was to get
8    money.
9    Q.    On page 14 there's another disbursement
10   to Richard Pepsny for $650 related to this property,
11   which happens to be the same amount as the fee listed
12   in the settlement charges on the HUD-1. Do you
13   agree?
14   A.    I agree.
15   Q.    It also shows a couple of voided checks
16   to the Monmouth County Clerk. Do you have any
17   recollection of why a check would be voided to the
18   Monmouth County Clerk?
19   A.    Nope.
20   Q.    On page 15 there's three different
21   disbursements totalling over $15,000 to Murphy Realty
22   for the Bangs Avenue property. Do you know why
23   Murphy Realty would be getting a disbursement?
24   A.    I do not know.
25   Q.    Was it typical to disburse monies to a

## Page 108

1    real estate firm?
2    A.    In a Bill Kane closing anybody could get
3    money. I'm serious. Whatever he decided that
4    somebody needed to get paid it would come out of the
5    proceeds of sale from one of these flips.
6    Q.    On page 17 it indicates $200 was
7    disbursed to you.
8    A.    That's correct.
9    Q.    And on the last page, page 18, for that
10   same property it indicates $698 was disbursed to
11   Stanley Yacker.
12   A.    That is correct.
13   Q.    How did $698 get disbursed to him? Do
14   you know?
15   A.    Well, you have to go back to the HUD
16   statement. I don't have the exact figures but I can
17   tell you in theory how it goes. I got my hundred,
18   Yacker got his 650 and whatever was left over from
19   the recording fees on line 1201, it was listed as
20   $150 but of course recording fees don't come to that
21   amount. So whatever was left over from the recording
22   fees was tacked on to his fee and that's what he got.
23   Q.    But this loan wasn't recorded until
24   April of 1997.
25   A.    I said in theory.

## Page 109

1    Q.    I understand.
2    A.    And to boot this check was voided so
3    technically --
4    Q.    The check to the Monmouth County Clerk
5    was voided?
6    A.    Yes.
7    Q.    There were two checks to the Monmouth
8    County Clerk, one for $775 and one for $77?
9    A.    Exactly, because one is the tax, sales
10   tax, and one was the recording fees. I believe they
11   had to be separate checks, and whatever was left over
12   from the recording fees out of that $150 went to
13   Yacker.
14   Q.    On page seven there was a disbursement
15   to William Kane dated July 23, 1996 on this property
16   for $28,000.
17   A.    Okay.
18   Q.    Do you have any idea why a few days
19   before the closing William Kane would have received
20   $28,000?
21   A.    That money was probably taken from the
22   cash reserve that Bill had in Mr. Yacker's trust
23   account because he left some money in there and
24   that's what he needed to give to Rick Pepsny to buy
25   the property originally from -- through Rick Pepsny

28 (Pages 106 to 109)

L. KING

## Page 110

1  because it's $28,000 and the buying price was $28,000
2  from the original deed, King-7.
3  Q.   Okay.  Thank you, that helps.
4       (A discussion takes place off the
5  record).
6       (King-16, Mortgage, is received and
7  marked for identification.)
8       (King-17, Letter dated May 13, 1997, is
9  received and marked for identification.)
10      (King-18, Documents for Recording, is
11 received and marked for identification.)
12      (King-19, Letter dated July 30, 1996, is
13 received and marked for identification.)
14 Q.   I show you what's been marked King-16.
15 It is a mortgage Bates stamped SYSW 04519, and the
16 last page in this packet is SYSW 04525.  It appears
17 to be a mortgage for Alphonse Salvatoriello and
18 Elaine Salvatoriello for a property located at 155
19 Chelsea Avenue in Long Branch in addition to several
20 other documents such as the deed indicating the 60/40
21 joint venture, the Affidavit of Consideration or
22 exemption, the deed between Cristo and the
23 Salvatoriellos and that's it.  Did you close this
24 loan?
25 A.   Probably.  My name is on it.

## Page 111

1  Q.   It's dated July 26, 1996.  Is that
2  correct?
3  A.   That's correct.
4  Q.   So this is at least a second loan that
5  you closed on that date.  Right?
6  A.   That's correct.
7  Q.   Now, this one was recorded with the
8  Monmouth County Clerk's office on February 26, 1997.
9  Do you see that?
10 A.   Yes.
11 Q.   Any idea why that one would have been
12 recorded in February?
13 A.   I have no idea.
14 Q.   Do you know why on the front page where
15 it says: "When recorded mail to Walsh Securities,"
16 and that's scribbled out.
17 A.   I have no idea.
18 Q.   What does R and R mean?  Right above
19 where it says Stanley Yacker on the first page.
20 A.   Something -- record and return.  Record
21 and return.
22 Q.   So this was changed from recording and
23 mailing back to Walsh Securities to recording and
24 mailing back to Mr. Yacker.  Correct?
25 A.   Yes.

## Page 112

1  Q.   Does the deed on the second page here
2  appear to be the joint venture deed?
3  A.   Yes, that's correct.
4  Q.   And that was prepared by you?
5  A.   Yes.
6  Q.   And on the same day the deed prepared by
7  Richard Pepsny between Cristo and the Salvatoriellos
8  was also filed.  Correct?
9  A.   Correct.
10 Q.   Does this also appear to be a typical
11 flip for Mr. Kane?
12 A.   Yes, it does.
13 Q.   The next document is marked King-17.
14 It's a letter to Mr. Yacker from the City of Long
15 Branch tax assessor.  It's Bates stamped SYSW 04516.
16 The last page doesn't have a Bates stamp but the
17 second page is 4517.  The last page is a photocopy of
18 the -- I'm sorry, the last page is Bates stamped
19 4518.  And this is a letter dated May 13, 1997 and
20 indicating the office did not have a record of a deed
21 transferring title from D&Sons Construction Company
22 to Cristo Property Management, and apparently the
23 assessor's staff had been calling his office,
24 Mr. Yacker's office, for a month to try to get a copy
25 of the deed.  Were you working for Mr. Yacker around

## Page 113

1  this time?
2  A.   I would say sporadically.  This is the
3  first time I'm seeing these letters or hearing about
4  any mixup in the deeds.
5  Q.   But do you have any idea what would have
6  happened?
7  A.   You want my speculated guess?
8  Q.   Yes.
9  A.   Speculating --
10 MR. HAYES:  I will object to any
11 speculation but go ahead, Miss King.
12 A.   My nearest guess is that when Bill
13 bought the property Rick put the deed into Cristo
14 Property Management and not D&Sons.  Because all the
15 paperwork was sent up as Cristo Properties, through
16 National Home Funding, through Walsh Securities,
17 through all the documentation for Cristo Properties
18 to buy it, and Rick filed the original buy that Bill
19 Kane, as Cristo Property and/or D&Sons, bought from
20 the original foreclosure person.  So Rick did the
21 deed under D&Sons and then flipped it under Cristo
22 Properties.  So there's the missing deed.  So all he
23 had to do was prepare a deed transferring title from
24 D&Sons to Cristo Properties there would have been
25 the missing person, but I think that there was so

29 (Pages 110 to 113)

L. KING

## Page 114

1 much going on that it got very confusing when Bill
2 changed names, when Bill Kane changed names and went
3 from D&Sons to Cristo Properties.
4       (King-20, Mortgage, is received and
5 marked for identification.)
6    Q.   Just so you don't have to speculate I'm
7 going to hand you King-18, 19 and 20. If you can
8 take a look at those.
9       King-18 is a letter from Stanley Yacker
10 dated February 10, 1997 to Monmouth County clerk
11 regarding documents for recording. It's Bates
12 stamped SYSW 04536 through 4546. King-19 is a letter
13 from Stanley Yacker to Norwest Mortgage regarding
14 D&Sons Construction/Dinaso Bates stamped SYSW 04556
15 through four 558, and it's dated July 30, 1996. And
16 King-20 is a mortgage between D&Sons Construction and
17 Dinaso and Community Home Mortgage Corporation that
18 appears to have been cancelled on either August 1,
19 1996 or December 9, 1996, and it's Bates stamped SYSW
20 04526 through 4529.
21       MR. HAYES: Let's go off the record for
22 a minute.
23       (A discussion takes place off the
24 record).
25    Q.   Miss King, while I recognize you don't

## Page 115

1 have any personal recollection of this, does looking
2 at these documents help you understand what happened
3 in the chain of the recording of the deeds?
4    A.   I'm confused.
5       MR. HAYES: Off the record.
6       (A discussion takes place off the
7 record).
8    Q.   These documents don't help you
9 understand what happened any more?
10       MR. HAYES: The answer is no?
11    Q.   Is your answer no?
12    A.   The answer is no. Can I say something
13 here? The answer is no because I only sent this, the
14 monies, apparently to pay off this mortgage. Whoever
15 put this mortgage through -- Rick, Rick did it, I can
16 tell just by the R/R thing at the top. It would be
17 the only reason I would have it returned to
18 Mr. Yacker's office, that somebody put his address on
19 there. That's not my stamp. If I were going to do
20 it I would have done it "record and return." This
21 says R/R. So I did not touch this document. Okay?
22 So that's why it's like unfamiliar to me. All I know
23 is I was directed to make payment to pay off this
24 mortgage, and as for the missing deed between D&Sons,
25 which looks like is this, that would have been Rick's

## Page 116

1 responsibility to make up that deed to go from
2 D&Sons. Rick did this.
3    Q.   Do you know why Mr. Yacker's office
4 would have been paying off the D&Sons mortgage?
5    A.   Because Bill had money in Yacker's
6 account. That's the only answer. Bill had money in
7 Yacker's account to pay off this so that he could
8 flip it further.
9    Q.   Okay. Were you aware that there were
10 phony leases created in connection with --
11    A.   Oh, I'm sure there were.
12    Q.   Why do you say that?
13    A.   Do we have a copy of a lease?
14    Q.   Yes.
15    A.   Can I see one?
16       MR. HAYES: Miss King, while she's
17 looking for that, can I just caution you to be
18 careful as to things you knew at the time versus
19 things that you now suspect as a result of all that
20 you have learned. You understand what I'm saying?
21       THE WITNESS: All I learned today or
22 learned over the past 14 years?
23       MR. HAYES: Well, over the past 14 years
24 up until today. I just don't know that you answered
25 that question that you were aware at the time that

## Page 117

1 there were phony leases. I got the impression from
2 your answer --
3       THE WITNESS: I knew there were phony
4 leases but I would need to see one to help you
5 determine who created them. You guys taught me a lot
6 of lessons.
7    Q.   I am not marking this as an exhibit but
8 this is several leases Bates stamped WS 1032968
9 through WS 1032975. I'm going to show it to counsel
10 first. It's on the 155 Chelsea Avenue property.
11 After you take a look at them let me know if these
12 lease refresh your recollection.
13    A.   State your question again.
14       MS. WAGNER: Can you read it back.
15       (The pending question is read by the
16 court reporter.)
17    A.   Was I aware? I don't remember for sure.
18 I never saw them. These I never saw. Shall I
19 speculate?
20    Q.   No. Were leases ever part of your
21 closing packet?
22    A.   Oh, I don't remember.
23    Q.   Did you ever assist in preparing any
24 false documents?
25    A.   Yes, I did.

VERITEXT REPORTING COMPANY
212-267-6868                              516-608-2400

L. KING

Page 118

```
 1    Q.   What did you prepare?
 2    A.   I signed documents at Bill's request,
 3  let's put it that way, so that the documents could be
 4  sent back to Walsh immediately because they wanted
 5  their documents back of course.
 6    Q.   In what capacity did you sign these
 7  documents?
 8    A.   As the straw buyer.  Bill said that he
 9  had all the documentation from these people and it
10  was okay and we need the documents signed so do it.
11    Q.   Did you sign or help prepare any other
12  false documents?
13    A.   I processed so many papers I don't know
14  what was false and what was real after a while.
15  We're talking 200 closings here, massive amounts of
16  paperwork.  I don't know what was real and what was
17  fake after a while.
18    Q.   So Mr. Kane knew that you were doing
19  this?
20    A.   Yes, Mr. Kane knew I was doing it.
21    Q.   Did anyone else know that you were
22  preparing false documents?
23    A.   Mr. Yacker knew.  I'm sure Larry Cuzzi
24  knew.  I am sure Gary Grieser knew.  Anthony Cicalese
25  knew.  But he stopped it.  He wouldn't allow me to
```

Page 119

```
 1  sign any documents.  He tried to, you know, do the
 2  right thing by insisting upon seeing a person come to
 3  his office.  He took that control.
 4    Q.   Anyone else that you can think of?
 5    A.   Not off the top of my head.
 6    Q.   What about anyone at Coastal Title?
 7    A.   I don't know if they were aware or not.
 8    Q.   What about Walsh Securities?
 9    A.   I don't know if they were aware or not.
10    Q.   So you have no firsthand knowledge about
11  whether anyone at Coastal Title knew?
12    A.   No.
13    Q.   And no firsthand knowledge about whether
14  anyone at Walsh Securities knew?
15    A.   No.
16    Q.   Did you ever prepare any letters on
17  behalf of Mr. Yacker representing that you were
18  holding a check in escrow?
19    A.   Yes.
20    Q.   Can you tell me about that?
21    A.   I was told to write up this letter
22  saying that we had a check in escrow for
23  representing -- representing a deposit towards
24  property.
25    Q.   And what was, in fact, the truth?
```

Page 120

```
 1    A.   It was a paper -- a piece of paper that
 2  had a check number on it, had an amount written in
 3  but it was never going to see a bank, and I held it
 4  with that letter that said:  I'm holding a deposit.
 5    Q.   Was it even a check?
 6    A.   Yeah, it was a check.  I don't remember
 7  whose check it was.  It might have been Bill Kane's
 8  check.  Maybe it was Bill Kane's check that he was
 9  given a deposit by the buyer.
10    Q.   What did you do with the check?
11    A.   I gave it back to Bill after the closing
12  happened.
13    Q.   Did you ever deposit any checks that you
14  received into escrow like that?
15    A.   Maybe like one or two.  When he got his
16  money back and he was, like, this is a pain, so let's
17  just eliminate that step.  So I held the check in my
18  hand and then I gave it back to him.
19    Q.   Who knew that you were doing this?
20    A.   Mr. Yacker because he's the one who told
21  me how to draft the letter so that it would appear
22  legal.
23    Q.   Why did it matter?
24    A.   Because in the beginning I think Mr.
25  Yacker truly wanted to do the right thing.  This is
```

Page 121

```
 1  what we need in order to do the next step and write
 2  this letter and we will hold his check, and we will
 3  put it in the file, and then when the closing happens
 4  we will give him back his check.  Well, it started to
 5  snowball and mushroom so fast that Bill couldn't get
 6  me the checks fast enough, and after a while that
 7  step just went by the wayside.
 8    Q.   I'm going to show you a document that
 9  I'm not going to mark as an exhibit.  It's Bates
10  stamped WS 103297.  A letter on Mr. Yacker's
11  letterhead to National Home Funding regarding a
12  property at 155 Chelsea Avenue.  This letter states
13  that Mr. Yacker is holding in escrow a check in the
14  amount of 22,000 pertaining to the above matter.  I
15  think this is a typo.  It says:  "Please be advised
16  that five percent is borrower's own funds and five
17  percent is a gift from relatives."  Probably meant to
18  say 50 percent.
19        Does that look like a check or a letter
20  that you would have drafted?
21    A.   At his instruction, yes.
22    Q.   Are your initials on that letter?
23    A.   No.  Yes, I'm LK but this is a stamp
24  signature.
25    Q.   And why would you have written a letter
```

VERITEXT REPORTING COMPANY

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

Page 122

1  indicating that part of the money is the borrower's
2  own funds and part of the money is a gift from
3  relatives?
4      A.   I have no idea.
5      Q.   Did you just do it because you were told
6  to?
7      A.   Yes.
8      Q.   You don't have any knowledge that the
9  funds would have been --
10     A.   Been deposited?
11     Q.   Or any knowledge that the funds were a
12  gift.
13     A.   I have no idea where that money came
14  from.
15     Q.   I'm going to show you a document that
16  purports to be a gift letter Bates stamped WS
17  1032977.  Would you have seen a document like this
18  before drafting a letter to National Home Funding
19  stating that funds were in escrow?
20     A.   No, I have never seen this letter
21  before.
22     Q.   Did anyone ever pay you anything in
23  addition to what you've already testified to?
24     A.   No.
25     Q.   When you attended -- when you held a

Page 123

1  closing who was normally there?
2      A.   In the beginning?
3      Q.   In the beginning.
4      A.   In the beginning it would have been Mr.
5  Yacker, the buyer and Bill Kane.  Then after a while
6  it was myself, the buyer and Bill Kane.  And then it
7  evolved to just me giving the documents to Bill Kane
8  and the documents coming back signed.
9      Q.   Now, when you said -- in the instances
10  where the buyer was present, do you know for certain
11  that the buyer was who they represented themselves to
12  be?
13     A.   No, I am not certain of that at all.
14     Q.   Why is that?
15     A.   I never asked for any identification
16  because the identification process would have been
17  handled through National Home Funding because they
18  would have needed copies of driver's license and
19  whatever else, documentation they needed for
20  identification.
21     Q.   And Mr. Yacker never told you that he
22  needed to confirm identification?
23     A.   No.
24     Q.   Did Mr. Yacker ever confirm
25  identification?

Page 124

1      A.   No.
2      Q.   What happened at Mr. Cicalese's office
3  with the loan closings?
4      A.   I have no idea if he ever asked for
5  identification either.
6      Q.   Did you attend loan closings with him?
7      A.   No.
8      Q.   So you don't know if he did ask for
9  identification?
10     A.   Well, I was in the office.  I just was
11  not in attendance in the conference room.  I was
12  there if he needed copies of anything, you know,
13  runner, but I wasn't sitting in on the closing.
14     Q.   If he had required identification would
15  you have made a copy of it?
16     A.   Yes.
17     Q.   That would have been placed in the file?
18     A.   Yes.
19     Q.   How were the closings scheduled?
20     A.   According to what Walsh would fund that
21  month and what was ready according to Rick Pepsny.
22     Q.   And so who would contact you about
23  scheduling a closing?
24     A.   Bill Kane.
25     Q.   So Bill Kane coordinated all of the

Page 125

1  closings?
2      A.   Yes.
3      Q.   And I think you testified, correct me if
4  I'm wrong, that there typically was a double closing
5  where the property was being sold -- well, strike
6  that.
7           Were there double closings where Kane or
8  one of his companies was purchasing a property and
9  then it was being sold to one of the straw buyers?
10     A.   Yes.
11     Q.   Did that happen often?
12     A.   On paper it happened often.  Rick Pepsny
13  would handle the buy for Bill Kane from the real
14  legitimate person who was selling the property.
15  Sometimes he would do that in the morning and then
16  our paperwork would arrive in the afternoon and he
17  would have his deed ready to go.  So sometimes it did
18  happen that way, but more often times than not, I
19  don't know when Rick closed on properties, if it was
20  before I got my documentation or after.
21     Q.   Okay.  Are you aware of anyone else
22  preparing escrow letters using Mr. Yacker's
23  stationery?
24     A.   No, I don't think so.
25     Q.   Have you ever heard -- were you aware

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

3746f082-94c0-4d19-8151-85c8c5da55f9

L. KING

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  that Kelly O'Neill claims to have prepared an escrow
2  letter on Mr. Yacker's stationery?
3     A.  I have no knowledge of that.
4     Q.  Is there any way that anyone else would
5  have gotten Mr. Yacker's letterhead?
6     A.  It's very easy to do. All you need is
7  one copy of a letterhead such as this. I sent off
8  memos and faxes to Bill and Rick and a lot of people,
9  so all you had to do was cut it off, type your own
10  letter, make a photocopy and there you've got a
11  letter.
12     Q.  But this is speculation. Correct?
13     A.  Speculation. No firsthand knowledge of
14  anyone using Mr. Yacker's letterhead to form any
15  letters.
16     Q.  Once Cicalese came into the picture, how
17  was it determined whether Yacker or Cicalese would be
18  the closing attorney?
19     A.  Bill Kane determined that.
20     Q.  Do you have any idea how he picked
21  between them?
22     A.  I have no idea.
23     Q.  In either event you would have been the
24  one doing the closing?
25     A.  I would have been processing the

**Page 127**

1  paperwork.
2     Q.  That's right, because for Yacker you
3  would have performed the closing and for Mr. Cicalese
4  you would have just processed the paperwork?
5     A.  Yes.
6     Q.  Do you know what it means to be an
7  approved closing agent or closing attorney?
8     A.  No idea what that means.
9     Q.  So you don't know how someone becomes
10  authorized to perform a loan closing?
11     A.  No.
12     Q.  Were you aware that notes and mortgages
13  were not regularly being recorded for Walsh
14  Securities?
15     MR. KOTT: Object to the form.
16     A.  The promissory notes are we referring
17  to?
18     Q.  Yes.
19     A.  I have already said I know that they
20  were not recorded, and the secondary mortgages were
21  not recorded, and the mortgages between the straw
22  buyer and Capital Assets were not recorded.
23     Q.  Do you know why?
24     A.  No.
25     Q.  Were you told not to record them?

**Page 128**

1     A.  Yes.
2     Q.  By who?
3     A.  By Bill Kane.
4     Q.  And was Mr. Yacker aware of this?
5     A.  I don't know.
6     Q.  What about Mr. Cicalese?
7     A.  I don't know.
8     Q.  Would Walsh Securities have known?
9     A.  I don't know.
10     Q.  Do you know if anyone other than you and
11  Mr. Kane knew?
12     A.  I believe Gary Grieser knew. Mr. Yacker
13  might have known about the joint venture deed because
14  he had to have helped draft it, but the promissory
15  note, I don't know if he knew about that, and the
16  second mortgage, I don't know whose idea that was.
17     Q.  Who provided money to -- strike that. I
18  think you testified that you were not involved in
19  sending the giant stack of deeds to the county
20  collection office. Right?
21     A.  No. I can speculate where it went
22  though after looking at the documents, who did it.
23     Q.  Why is it you can speculate after
24  looking at the documents?
25     A.  You remember how we said that on the

**Page 129**

1  left-hand corner of a deed I would put R -- "return
2  and record to Stanley Yacker"? If you will look at
3  exhibit King-10, I prepared this document, "record
4  and return Stanley Yacker" with the address. For
5  exhibits 9, 8, 7 says, Coastal Title Agency in the
6  corner where it says -- should have been "return and
7  record to Stanley Yacker."
8     Q.  And these are the ones that are dated
9  April -- that were filed on April 8, 1997?
10     A.  1997. Correct. I believe that when
11  Rick prepared a deed from Cristo Properties, or
12  whatever Bill Kane name he was using, into the straw
13  buyer he had the R and R go back to Stanley, because
14  if you can look in the very top corner of King-8, you
15  will see an S, part of a three and MA, Matawan, which
16  leads me to believe that that stack was recorded by
17  Coastal.
18     Q.  Because it looks like some sort of
19  sticker was placed over Mr. Yacker's return address?
20     A.  Yes. He had a gold sticker. See here?
21     MR. KOTT: What exhibit number and what
22  page?
23     THE WITNESS: We're talking exhibit
24  King-18, the SYSW 04544, which is a copy of the deed
25  prepared by Richard Pepsny from Cristo Properties to

L. KING

| Page 130 |
|---|
| 1  Alphonse and Elaine Salvatoriello.  Up in the |
| 2  left-hand corner you will see, "R and R, Stanley |
| 3  Yacker, Esquire." |
| 4    Q.  Thank you.  So when the closing occurred |
| 5  Mr. Kane directed you how to disburse the funds? |
| 6    A.  That's correct. |
| 7    Q.  Did it ever follow any type of pattern |
| 8  as to how you were supposed to disburse the funds? |
| 9  And what I'm asking, I mean from your recollection |
| 10  back then. |
| 11    A.  Everyone got paid according to the HUD |
| 12  statement.  Like National Home Funding got their |
| 13  money, Murphy Realty, the realtor got their |
| 14  commission check.  Whatever was left over after all |
| 15  the disbursements were made that needed to be made, |
| 16  let's put it that way, on the second page, National |
| 17  Home Funding, Rick, Yacker, me, Coastal Title, |
| 18  whatever was left over got split between Bill Kane |
| 19  and Gary Grieser as Capital Assets. |
| 20    Q.  And would some of that money be used to |
| 21  pay off the first purchase in the chain? |
| 22    A.  That's where Rick Pepsny got his money |
| 23  from, that wire transfer, that humongous wire |
| 24  transfer for over $400,000, that's what he used to |
| 25  pay off the properties that just closed or were going |

| Page 131 |
|---|
| 1  to close and that was on page 12 of exhibit King-15, |
| 2  SYSW 006912. |
| 3    Q.  Is this something you knew at the time? |
| 4    A.  Knew what? |
| 5    Q.  That this was happening, or is it |
| 6  something you've learned over the course of 14 years? |
| 7    A.  That I knew what?  That -- |
| 8    Q.  The way the funds were being disbursed. |
| 9    A.  That Gary Grieser got money, Bill Kane |
| 10  got money, Rick Pepsny got money? |
| 11    Q.  Yes. |
| 12    A.  Afterwards?  The seller gets the money, |
| 13  all of the money, and let them deal with whoever they |
| 14  have to pay after I'm done writing out my check to |
| 15  them. |
| 16    Q.  That's how it should be? |
| 17    A.  That's how it should be, but Bill Kane, |
| 18  instead of me giving him one check and having me |
| 19  disburse the money to whoever he needed to do, again, |
| 20  he made a shortcut and said, Okay, the money is here, |
| 21  this is how I want you to send the money to:  I want |
| 22  you to write a check to Gary Grieser for this amount |
| 23  for this property, and Rick Pepsny needs this much to |
| 24  pay off the original buy.  And it was just a Bill |
| 25  Kane way of, again, shortening the process instead of |

| Page 132 |
|---|
| 1  me writing a check to Bill Kane and having him wait |
| 2  to deposit the money in his account and then have to |
| 3  write out a check and have them wait for that |
| 4  deposit. It's coming from a trust -- an attorney |
| 5  trust account. |
| 6    Q.  And Mr. Yacker knew you were doing this? |
| 7    A.  Yes, Mr. Yacker was aware I was doing |
| 8  this. |
| 9    Q.  At least because he had to sign all of |
| 10  these checks.  Correct? |
| 11    A.  That's correct. |
| 12    Q.  Now, how did Mr. Yacker benefit from |
| 13  these transactions? |
| 14    A.  Well, he was getting his fee for each |
| 15  closing which was 600, $700.  Now that may not seem |
| 16  like a lot one at a time, but when you're talking |
| 17  ten, 15 closings in a month, it's a nice chunk of |
| 18  change.  And there was the promise of more to come |
| 19  from Bill Kane until he brought in Anthony. |
| 20    Q.  So he benefited from the volume? |
| 21    A.  Financially. |
| 22    Q.  He benefited financially from the |
| 23  volume? |
| 24    A.  Yes. |
| 25    Q.  Did Mr. Yacker also benefit because he |

| Page 133 |
|---|
| 1  wasn't having to perform these closings, he had you |
| 2  do them? |
| 3    A.  Of course. |
| 4    Q.  Because he could be working on something |
| 5  else? |
| 6    A.  Of course. |
| 7    Q.  Do you have any firsthand knowledge as |
| 8  to how Richard Pepsny benefited from these |
| 9  transactions? |
| 10    A.  I have no firsthand knowledge other than |
| 11  the checks that I wrote to him that are in the |
| 12  accounting. |
| 13    Q.  Have you ever heard of Robert Agel, |
| 14  A-g-e-l? |
| 15    A.  It doesn't sound familiar, but I did not |
| 16  know a lot of the last names of people. |
| 17    Q.  Did you have any dealings with Coastal |
| 18  Title Agency? |
| 19    A.  Only in connection with: When am I |
| 20  going to get my title, you know, reports?  I believe |
| 21  I added them to the list of people I faxed my list |
| 22  to. |
| 23    Q.  When you say your list, the list of |
| 24  missing documents? |
| 25    A.  No, the list of properties that were |

34  (Pages 130 to 133)

L. KING

| Page 134 |
|---|
| 1  going to come up for closing. |
| 2      Q.    Do you know what Coastal Title's role |
| 3  was in the fraud? |
| 4      A.    I just knew they prepared the title |
| 5  insurance documents that were needed to go along with |
| 6  everything. |
| 7      Q.    Okay. Have you ever heard of |
| 8  Commonwealth Land Title Insurance Company? |
| 9      A.    No. |
| 10     Q.    Have you ever heard of Nations Title |
| 11  Insurance of New York? |
| 12     A.    No. |
| 13     Q.    Have you ever heard of Fidelity National |
| 14  Title Insurance Company of New York? |
| 15     A.    No. |
| 16     Q.    Did anyone at Walsh Securities ever pay |
| 17  you any money? |
| 18     A.    No. |
| 19     Q.    Did you ever pay anyone at Walsh |
| 20  Securities any money? |
| 21     A.    No. |
| 22     Q.    Did you ever do any closings for |
| 23  construction loans? Do you know what that is? |
| 24     A.    No, so I guess not. |
| 25     Q.    Were all of the loans that you did |

| Page 135 |
|---|
| 1  closings for, did they all involve purchase money |
| 2  mortgages? |
| 3      A.    Whatever that means. You have to |
| 4  explain, I'm sorry, I don't know what that term |
| 5  means. |
| 6      Q.    All the closings that you performed for |
| 7  the Kane properties, they all involved first |
| 8  mortgages, to your knowledge? |
| 9      A.    To my knowledge, yes. |
| 10     Q.    And then there were also these second |
| 11  mortgages that were never recorded? |
| 12     A.    Yes. |
| 13     Q.    Have you ever heard of DAP Consulting, |
| 14  D-A-P? |
| 15     A.    No. |
| 16     Q.    So you don't have any knowledge whether |
| 17  anyone at Walsh Securities knew about the false |
| 18  escrow letters. Correct? |
| 19     A.    No. |
| 20     Q.    And you have no knowledge of anyone at |
| 21  Walsh Securities knowing about the joint venture |
| 22  closings? |
| 23     A.    No. |
| 24     Q.    And you have no knowledge of anyone at |
| 25  Walsh Securities knowing about the fact that Kane was |

| Page 136 |
|---|
| 1  at least on some occasions using Walsh Securities' |
| 2  funds to pay off the properties that he was |
| 3  purchasing? |
| 4      A.    I'm sorry. That got a little confusing. |
| 5      Q.    I understand. Let me rephrase that. Do |
| 6  you have any knowledge of anyone at Walsh Securities |
| 7  knowing that Kane was using funds that were being |
| 8  disbursed by Walsh Securities to pay for his original |
| 9  purchase from legitimate sellers? |
| 10     A.    I understand. No, I do not know of |
| 11  anyone at Walsh Securities that might have known that |
| 12  Bill used their funds to pay off the first buy. |
| 13     Q.    Have you ever given a statement to |
| 14  federal or state authorities in connection with the |
| 15  acts alleged in these frauds? |
| 16     A.    Yes. |
| 17     Q.    How many statements did you give? |
| 18     A.    I spent quite a bit of time with the FBI |
| 19  and the assistant attorney general's office and, of |
| 20  course, court. |
| 21     Q.    And you were represented by counsel at |
| 22  that time. Right? |
| 23     A.    Yes. |
| 24     Q.    And was your attorney from the federal |
| 25  public defender's office? |

| Page 137 |
|---|
| 1      A.    Yes. |
| 2      Q.    Was it Tonianne BonGiovanni? |
| 3      A.    Yes. |
| 4      Q.    Can you recall the time frame in which |
| 5  you met with the FBI and the U.S. attorney's office? |
| 6      A.    I think it was about a week after they |
| 7  raided his office. They called me up and said: We |
| 8  need to speak to you. I said: Yeah, I figured you |
| 9  did. |
| 10     Q.    And when did you stop cooperating with |
| 11  the government? |
| 12     A.    I never stopped cooperating with the |
| 13  government. |
| 14     Q.    Are you still meeting with the |
| 15  government? |
| 16     A.    No. My association with them I guess |
| 17  ended the day I was sentenced. |
| 18     Q.    I have it. I can find it. |
| 19     A.    I don't remember the day I was |
| 20  sentenced. It was in 2002, 2003. |
| 21     Q.    And you pled guilty. Correct? |
| 22     A.    Yes. |
| 23     Q.    Were you ever charged for any criminal |
| 24  acts by the state or counties? |
| 25     A.    I believe there was one thing out in a |

35 (Pages 134 to 137)

VERITEXT REPORTING COMPANY

L. KING

Page 138

1  town because, again, Gary Grieser, he -- I was also
2  an antiques collector and he had a piece of property
3  on Broadway in Long Branch, and he said, The guy
4  hasn't paid me, go clean it out.
5      So I came with my van and I started
6  cleaning out, and I started taking stuff out of the
7  building, and the man showed up and said, What are
8  you doing with my stuff? And I said, Well, Gary told
9  me to come clean it out. And he said, It's still my
10  stuff. Okay. Well, come to find out Gary Grieser
11  never got an eviction notice to remove any property
12  from his building so I gave the man back his stuff
13  and he dropped the charges.
14      Q.  Other than that, have you been charged
15  with any other crimes?
16      A.  I can't remember. I doubt it. Speeding
17  tickets, maybe. Safety belt tickets.
18      Q.  That's not a crime.
19      A.  Oh, well.
20      Q.  Did you commit any other criminal acts
21  that were dismissed as a result of your plea
22  agreement?
23      A.  I think I was only charged -- well,
24  there was a whole list of charges, but the agreement
25  was one count of conspiracy to commit wire fraud.

Page 139

1      Q.  Okay. So because you pled, the
2  government didn't pursue additional charges?
3      A.  No.
4      MR. KOTT: Yes?
5      A.  Yes.
6      Q.  Is that correct?
7      A.  I don't remember --
8      Q.  Because you pled, the government didn't
9  pursue any additional charges against you?
10      MR. KOTT: Is that correct?
11      Q.  Is that correct?
12      A.  Yes.
13      Q.  And you cooperated with the government.
14  Correct?
15      A.  Yes.
16      Q.  And for that cooperation you received a
17  5K letter. Correct?
18      A.  Yes.
19      Q.  Did you testify at any trials?
20      A.  No.
21      Q.  Do you recall if it's correct that in
22  your sentence the court departed 13 levels?
23      A.  Yes.
24      Q.  Which is apparently because of
25  significant cooperation?

Page 140

1      A.  Yes.
2      Q.  And were you placed on probation for
3  three years?
4      A.  Yes.
5      Q.  And six months of that was essentially
6  house arrest?
7      A.  Yes.
8      Q.  Did you have 100 community hours,
9  community service hours?
10      A.  Yes.
11      Q.  And you did not have to pay any
12  restitution. Correct?
13      A.  No restitution but there was a $1,000
14  fine.
15      Q.  Has your probation ended?
16      A.  Yes.
17      Q.  Do you know when it ended?
18      A.  2006.
19      Q.  What are you doing now?
20      A.  Currently I am unemployed but my
21  profession was an embroiderer.
22      Q.  What about massage therapy?
23      A.  I do that once in a while. Not too much
24  anymore because when I left -- we left to go to
25  Delaware in 2004, and because I thought it was going

Page 141

1  to be financially better for us. However, it was not
2  because the job that I had been promised did not
3  arrive and I was unemployed for two months while I
4  was first down there. And then it was not
5  financially feasible for me to stay there so we moved
6  back. And when I moved down there I closed up my
7  massage office up here and those clients went
8  elsewhere so...
9      Q.  What address are you at now?
10      A.  My mailing address is the 171 1st
11  Street. I am currently house sitting our church
12  parsonage because it was empty for a year and it was
13  showing signs of break-ins. So we're in our church
14  parsonage for a year.
15      Q.  What is the address?
16      A.  41 Osborne Street, Keyport.
17      Q.  The ZIP code?
18      A.  07735.
19      Q.  And what is your phone number?
20      A.  My cell phone number is (732)497-7007.
21      Q.  Is that the best way to reach you?
22      A.  Yes.
23      Q.  Do you own your own home?
24      A.  No.
25      Q.  Are you married?

L. KING

Page 142

1    A.   No.
2    Q.   Are you renting that other address?
3    A.   I give a donation.
4    Q.   For the --
5    A.   For the parsonage.
6    Q.   What about the 1st Street?
7    A.   I lived with my mom.
8    Q.   Is that still the best place to reach
9  you by mail?
10   A.   Yes, because I don't know how long I'm
11 going to be at this other place.  If they get a
12 minister in that needs the building we have two weeks
13 to get out.
14   Q.   And over the course of time have you
15 learned anything in addition to what you've already
16 testified to today?
17   A.   Regarding this whole case?
18   Q.   Yes.
19   A.   No, I kind of severed all ties with
20 anyone associated with this situation.
21      MS. WAGNER:  Can we just take a break?
22      (A recess takes place.)
23      MS. WAGNER:  Due to the time we're going
24 to adjourn today's deposition and reconvene on May
25 14, 2010 at 9 a.m.  Miss King has agreed to reappear

Page 143

1  on that date.
2       MR. KOTT:  For the original deposition
3  exhibits today, Ms. Wagner will be the custodian of
4  those but can we ask that you send photocopies.
5       MS. WAGNER:  Yes, that's fine.
6       (The deposition is adjourned at 5:11
7  p.m.)
8
9
10  _____
11       LORRAINE KING
12  Subscribed and sworn to before me
13  this _____ day of _____, 2010.
14
15  _____
16       Notary Public
17
18
19
20
21
22
23
24
25

Page 144

1           CERTIFICATE.
2
3        I, JANET BAILYN, a Notary Public and
4  Certified Court Reporter of the State of New Jersey,
5  do hereby certify that prior to the commencement of
6  the examination LORRAINE KING was duly sworn by me to
7  testify the truth, the whole truth and nothing but
8  the truth.
9        I DO FURTHER CERTIFY that the foregoing
10 is a true and accurate transcript of the testimony as
11 taken stenographically by and before me at the time,
12 place and on the date hereinbefore set forth.
13       I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17 and that I am not financially interested in the
18 action.
19
20       _____
         Notary Public of the State of New Jersey
21       My commission expires February 3, 2013
         License No. XI00970
22
         Date:  May 3, 2010
23
24
25

37  (Pages 142 to 144)

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

L. KING

**A**

**ability** 7:14,21
54:13
**able** 10:21 63:21
64:18,19 95:10
105:8
**abnormal** 27:17
**above-entitled** 2:2
**above-referenced**
102:20
**Absolutely** 6:4
**acceptable** 8:2
**account** 23:24 33:9
39:10,13,17 44:4
58:24 91:3 103:25
109:23 116:6,7
132:2,5
**accountant** 33:12
33:16
**accountant's** 33:15
**accounting** 133:12
**accurate** 144:10
**acknowledging**
102:19
**acquired** 48:6,7,8
**action** 1:2 144:15
144:18
**acts** 136:15 137:24
138:20
**actual** 65:1 66:24
**add** 83:3
**added** 98:11,13
133:21
**addition** 110:19
122:23 142:15
**additional** 41:10,24
93:24 139:2,9
**address** 15:2,23
59:17 81:16 98:22
98:23 102:2
115:18 129:4,19
141:9,10,15 142:2
**addressed** 78:13
**addresses** 68:11

72:9
**adjourn** 142:24
**adjourned** 143:6
**admissible** 6:18
**advised** 121:15
**affidavit** 91:24
92:3 93:18 110:21
**afternoon** 89:18
125:16
**afterthought** 88:7
**afterward** 58:12
**Agel** 133:13
**agency** 1:17 76:23
81:25 82:8,22
83:6 129:5 133:18
**Agency's** 81:16
**agent** 58:21 77:17
99:6 100:7 102:18
127:7
**ago** 7:19
**agree** 8:7 74:1
75:13 77:10 79:9
79:10 107:13,14
**agreed** 40:4 142:25
**agreement** 87:17
88:19 94:15 95:17
138:22,24
**agreements** 94:19
**ahead** 7:3 37:4
113:11
**Alfieri** 1:13 62:13
**allegations** 13:20
**alleged** 136:15
**allotment** 55:16,19
**allow** 118:25
**allowed** 33:18
**allowing** 10:6
**Alphonse** 4:19
110:17 130:1
**amount** 13:6 42:17
55:23 67:13 104:2
106:4,23,23 107:3
107:4,11 108:21
120:2 121:14

131:22
**amounts** 103:24
118:15
**Amy** 3:3 5:10
**and/or** 60:9 113:19
**Ann** 15:8 21:21
23:6,17,18,23
24:12 26:10 28:11
66:21
**answer** 6:6,14 7:2,3
7:10,14 8:2 12:20
17:10 82:4 90:2
98:8 115:10,11,12
115:13 116:6
117:2
**answered** 116:24
**answering** 6:12,23
17:23
**Anthony** 1:13,14
12:13 24:2 29:2,7
29:9 30:2,3 33:20
38:5,21 39:24,25
41:2 44:17 45:11
46:12 52:3 118:24
132:19
**Anthony's** 12:17
29:4 40:18 41:18
**anticipate** 6:13
**antiques** 138:2
**anybody** 13:11
22:20 108:2
**anymore** 25:22
140:24
**apparently** 112:22
115:14 139:24
**appear** 93:23,25
112:2,10 120:21
**appearances** 17:10
**appeared** 10:16
73:13
**appears** 61:16 73:4
74:1,5 79:7,16
94:25 102:9
110:16 114:18

**application** 70:18
**appraisals** 8:19,22
9:9 63:14,18
**appraiser** 51:24,25
64:1 65:10,19
**appraisers** 9:12,18
10:2,3 51:20
62:18 63:9 64:8
65:14
**appraising** 9:7,8
64:9
**appropriate** 18:21
**approved** 127:7
**April** 2:7 78:25
79:7,16 88:3
108:24 129:9,9
**area** 64:16
**Arline** 74:3
**arose** 34:9
**arranged** 15:25
**arrest** 140:6
**arrive** 125:16 141:3
**arrived** 104:9,13
**Art** 24:23
**Asbury** 36:12
71:23 72:4,8
**aside** 36:13 87:21
**asked** 29:25 40:1,3
63:12 64:23 67:3
67:8,15 123:15
124:4
**asking** 12:21 30:6
130:9
**asks** 6:5 7:9
**assessor** 112:15
**assessor's** 112:23
**Assets** 1:8,9 61:19
61:22 77:5,6 80:2
80:21,22 86:25
87:2 93:21 106:17
127:22 130:19
**assist** 117:23
**assistant** 136:19
**associated** 52:9

107:1 142:20
**association** 58:13
137:16
**assume** 7:10 59:12
**assumed** 86:17
**assuming** 81:4
**attach** 88:15
**Attachment** 4:9
59:7,10
**attend** 124:6
**attendance** 124:11
**attended** 122:25
**attending** 13:11
**attorney** 7:5 11:1
14:20,23 16:15
33:9 38:18 44:3
48:4,21 77:17
126:18 127:7
132:4 136:19,24
144:14,16
**attorneys** 3:5,8,12
6:25 16:14 99:24
100:15
**attorney's** 58:24
100:2 101:22
137:5
**audibly** 6:6
**August** 114:18
**authorities** 136:14
**authorized** 127:10
**Avenue** 71:23
72:13 76:21 78:10
99:2 102:1 104:2
107:3,22 110:19
117:10 121:12
**aware** 9:17 29:17
58:9 64:6 78:20
86:11 116:9,25
117:17 119:7,9
125:21,25 127:12
128:4 132:7
**A-g-e-l** 133:14
**a.m** 142:25
**a/k/a** 1:7

VERITEXT REPORTING COMPANY

L. KING

**B**
**B** 4:7,9 59:7,10
  60:7 62:25
**back** 10:7 20:12
  24:9 28:15 33:5
  35:23 37:23,23
  46:5,8,13,14 47:5
  49:16 53:20,24
  63:15 68:3 69:1,5
  75:21 81:21 88:10
  89:14,18 90:19,25
  91:4,6,7,10,19
  92:10 104:5
  108:15 111:23,24
  117:14 118:4,5
  120:11,16,18
  121:4 123:8
  129:13 130:10
  138:12 141:6
**backdate** 85:20
**backdating** 85:24
**BAILYN** 2:3 144:3
**ball** 85:17
**Bangs** 71:23 72:13
  76:20 78:10 99:2
  102:1 104:2
  106:12 107:3,22
**bank** 20:13,13,19
  20:22 32:21 40:10
  40:13 66:1,2,8,14
  66:16 120:3
**banks** 20:16 60:8
**based** 66:9
**basic** 6:2
**basically** 38:3
  47:16
**basis** 15:15 86:19
**batch** 67:11
**Bates** 59:11 71:21
  73:17 77:7 93:18
  93:21 97:5 99:1
  102:2 103:17
  105:2 106:9
  110:15 112:15,16

  112:18 114:11,14
  114:19 117:8
  121:9 122:16
**beans** 52:23,25
**becoming** 36:11
**began** 21:7 38:6
**beginning** 9:11,12
  9:13 18:4 19:5,15
  31:4 33:16 34:16
  36:7 39:23 52:8
  53:9 61:10 62:4,6
  62:10 75:7 85:10
  85:14 95:9 120:24
  123:2,3,4
**behalf** 102:13
  119:17
**believe** 5:24 9:11
  11:18,20 12:8
  15:12,23 20:14
  21:5,12,21 24:7
  24:17 25:14 27:3
  27:12 28:21 29:10
  29:18 30:15,24
  31:4,6 33:12,15
  35:21 39:11 44:18
  45:20 46:22 49:9
  56:2,4,17,20 58:5
  59:3 60:4 61:9
  62:3 64:11 71:3
  75:21,24 94:13,20
  109:10 128:12
  129:10,16 133:20
  137:25
**believed** 28:12 62:2
**belt** 138:17
**benefit** 132:12,25
**benefited** 132:20
  132:22 133:8
**Bergen** 32:21 40:10
**best** 20:4 22:6
  51:11 54:12 66:7
  141:21 142:8
**better** 1:19 44:18
  86:1 141:1

**Betty** 21:21 23:6,10
  23:17,18,23 24:12
  26:10 28:11 66:21
**big** 22:5 33:3 57:22
  64:24 67:16
**Bill** 17:19,25 18:3
  18:12 20:6 22:8
  24:6,6 27:21
  28:20,23 29:13,25
  30:9,11 31:15,21
  32:16 33:10,15,16
  34:5 35:22 36:10
  37:4 38:17 39:14
  39:23 40:14 41:2
  41:5,20,21,22
  42:10,11,12,21
  43:3 45:13,16
  47:12 48:19,22,23
  49:1,9,12,13
  50:19 51:19 53:17
  54:6,21 55:2 62:5
  64:23 65:24 66:13
  66:15 67:2,2,7
  68:9 69:2,9,19,22
  69:23 70:12 75:6
  80:7 82:12,18,23
  84:16 85:12,13
  86:9,17 87:1,16
  87:23 88:1,11,25
  89:13 90:21 91:12
  92:18 97:12 98:23
  100:22 101:4
  104:14 106:22
  107:6 108:2
  109:22 113:12,18
  114:1,2 116:5,6
  118:8 120:7,8,11
  121:5 123:5,6,7
  124:24,25 125:13
  126:8,19 128:3
  129:12 130:18
  131:9,17,24 132:1
  132:19 136:12
**Bill's** 21:21,25 32:7

  41:19 66:13 118:2
**bit** 13:9 20:25
  136:18
**blank** 18:7
**blond** 25:18
**Bob** 24:15
**BonGiovanni**
  137:2
**bono** 16:15
**book** 74:11,13
**boot** 109:2
**borrowers** 60:8,15
**borrower's** 99:12
  121:16 122:1
**boss** 51:8
**bottom** 78:24 79:6
**bought** 36:12 62:4
  62:7 69:22 113:13
  113:19
**box** 37:8,19 71:20
  71:21 87:23 91:7
**Branch** 36:12
  110:19 112:15
  138:3
**break** 6:21,23
  37:25 57:24 96:18
  142:21
**breakdown** 68:21
**break-ins** 141:13
**brief** 37:25
**briefs** 15:7
**bring** 11:8 18:20
  19:6 20:4 29:9
  45:17 70:14 89:14
  90:22
**bringing** 53:18,20
**Broadway** 138:3
**Brodo** 1:12 62:19
  62:21,23 63:4
**broke** 25:12
**broker** 22:23,23
  43:14,19,25
  103:25
**Brookdale** 13:25

  14:12,14
**Brooklyn** 58:10,17
**brought** 33:11
  45:14 132:19
**Brown** 1:12 62:19
  63:5
**build** 66:25 67:5
**building** 51:19
  138:7,12 142:12
**business** 29:20
  67:22
**busy** 19:17
**buy** 48:22 49:2,7
  71:4 82:20 83:11
  109:24 113:18,18
  125:13 131:24
  136:12
**buyer** 20:8 27:11
  42:25 45:6 47:7
  48:7 49:3,4,10,13
  49:14 54:7,13,14
  55:1 69:19 79:25
  80:1 84:2 88:18
  101:12 118:8
  120:9 123:5,6,10
  123:11 127:22
  129:13
**buyers** 19:6 20:3
  47:14 51:15 52:17
  54:9,9 56:17,18
  56:21 57:3,6,9,12
  57:15,18,21 89:8
  95:22 96:3 125:9
**buying** 110:1
**B-a-n-g-s** 71:23
  99:3

**C**
**C** 3:1 60:17
**Calanni** 1:11 3:14
  4:4 5:22,25 6:4
  8:11,13,14,21 9:9
  51:16 56:20 62:18
  62:20 63:4,12
  65:10

L. KING

Page 3

| | | | |
|---|---|---|---|
| **Calanni's** 63:16 | **certify** 144:5,9,13 | 42:21,25 44:3,11 | 47:25 48:9,12 | 84:21 101:9 |
| **call** 12:8 23:14,14 | **chain** 115:3 130:21 | 44:25 45:7 46:2,8 | 49:5,19,23 53:21 | 118:15 124:3,6,19 |
| **called** 18:13 19:5 | **change** 17:1,7 31:6 | 46:20,23 47:16 | 53:23 55:5 58:22 | 125:1,7 132:17 |
| 53:11 56:9 65:15 | 85:20 132:18 | 57:14 118:24 | 58:23 60:25 66:5 | 133:1 134:22 |
| 82:3 83:17 92:2 | **changed** 31:7,14 | 126:16,17 127:3 | 68:17,19 70:5,13 | 135:1,6,22 |
| 137:7 | 75:8 111:22 114:2 | 128:6 | 71:7 76:4,18,19 | **Coastal** 1:17 52:3 |
| **calling** 66:2 68:9 | 114:2 | **Cicalese's** 44:15 | 77:11,19,22 82:1 | 57:17 68:22 70:14 |
| 112:23 | **characteristic** | 124:2 | 82:6 83:2,5,13,24 | 70:22,25 71:20 |
| **calls** 17:10,11 | 25:17 | **circumstances** 85:6 | 84:3,9,24 85:4,16 | 76:23 77:8 81:15 |
| **CAMPI** 106:15 | **charged** 137:23 | **City** 112:14 | 86:7,21 87:18 | 81:18,25 82:7,22 |
| **cancelled** 114:18 | 138:14,23 | **civil** 1:2 5:12 | 89:9,12 90:24 | 119:6,11 129:5,17 |
| **capacity** 48:20 | **charges** 107:12 | **claims** 126:1 | 96:4,25 97:15 | 130:17 133:17 |
| 118:6 | 138:13,24 139:2,9 | **classes** 14:2 | 98:12 99:22 100:1 | 134:2 |
| **Capital** 1:8,9 61:18 | **check** 31:23,24 | **clean** 138:4,9 | 100:6,8 101:3,25 | **code** 141:17 |
| 61:22 77:4,6 80:2 | 32:1 82:2 107:17 | **cleaning** 138:6 | 102:5,21 103:1,5 | **collection** 128:20 |
| 80:20,22 86:25 | 109:2,4 119:18,22 | **clear** 71:5 83:10,17 | 103:9 108:2 | **collector** 138:2 |
| 87:2 93:21 106:17 | 120:2,5,6,7,8,8,10 | **clerk** 97:23 107:16 | 109:19 117:21 | **college** 13:22,23,25 |
| 127:22 130:19 | 120:17 121:2,4,13 | 107:18 109:4,8 | 120:11 121:3 | 14:3,13 |
| **CAPMI** 106:14,17 | 121:19 130:14 | 114:10 | 123:1 124:13,23 | **column** 100:11 |
| **car** 90:4 | 131:14,18,22 | **clerk's** 78:25 79:6 | 125:4 126:18,24 | **combination** 29:14 |
| **cards** 70:20 | 132:1,3 | 79:15 80:5 111:8 | 127:3,7,7,10 | **come** 16:19 20:10 |
| **care** 51:14 | **checked** 75:9 | **client** 30:21 42:22 | 130:4 132:15 | 27:9,13,24 32:16 |
| **careful** 116:18 | **checklist** 83:14 | 43:1,4,8 | 134:1 | 33:5 49:16 64:14 |
| **Carol** 17:21 18:12 | 86:7 | **clients** 40:2,4 141:7 | **closings** 8:18 9:3,17 | 64:15 68:24 80:9 |
| 28:21 30:10 34:3 | **checklists** 86:6 | **close** 55:13 62:1 | 16:2,6 17:19,25 | 84:16 85:1,18 |
| **case** 47:9 50:5 64:8 | **checks** 18:23 33:25 | 86:12 110:23 | 17:25 18:3,3,5,12 | 87:4,11 90:21 |
| 75:21 84:19 | 34:2,3,4,7 37:20 | 131:1 | 18:13,14,16 19:1 | 91:4 95:12 101:20 |
| 142:17 | 44:9,12 69:3 | **closed** 41:11 50:11 | 19:2,3 20:17,20 | 104:7 108:4,20 |
| **cash** 31:23 33:22 | 106:5 107:15 | 55:6,11 61:20,21 | 21:4,7,13 23:12 | 119:2 132:18 |
| 44:6 104:21,25 | 109:7,11 120:13 | 67:11 70:11 84:22 | 23:18 24:13 26:8 | 134:1 138:9,10 |
| 105:8 109:22 | 121:6 132:10 | 102:19 103:4,23 | 26:10,13,17,20 | **comes** 85:11 |
| **caution** 116:17 | 133:11 | 111:5 125:19 | 28:20 30:3,4,9,11 | **coming** 12:5,11 |
| **cell** 32:16 141:20 | **check-marked** | 130:25 141:6 | 30:14,17,18 31:2 | 26:11,17 29:2 |
| **cent** 31:12 | 45:21 | **closely** 66:18 | 31:15 32:24 34:5 | 49:9 123:8 132:4 |
| **Center** 3:7 | **Chelsea** 110:19 | **closer** 46:4 68:19 | 34:21 39:7,12,14 | **commencement** |
| **certain** 19:24 42:17 | 117:10 121:12 | 75:3 | 39:15,24 40:14,16 | 144:5 |
| 42:17 43:15 55:22 | **Christmas** 22:4 | **closing** 4:12,17 9:2 | 41:2,5 42:10,10 | **commencing** 2:7 |
| 67:13 123:10,13 | **chunk** 132:17 | 18:19 20:9 27:12 | 44:21,21,25 47:12 | **commingled** 39:15 |
| **certainly** 95:21 | **church** 141:11,13 | 28:13 31:13,16,19 | 47:12,13,24 48:1 | **commission** 130:14 |
| **CERTIFICATE** | **Cicalese** 1:14 12:13 | 32:3 33:17 35:8 | 48:2,5,6,7,13 55:4 | 144:21 |
| 144:1 | 13:2,5,7 29:2,5,19 | 35:12,13,16,20,25 | 60:5 61:8,11 | **commit** 138:20,25 |
| **certifications** 15:7 | 29:23 33:20 38:5 | 36:8 42:6,11,12 | 63:20 66:20 67:15 | **commitment** 4:11 |
| **certified** 2:3 14:8 | 38:7,10,13 39:20 | 42:19 44:14,19 | 67:17,20 69:24 | 4:12 71:11,14 |
| 144:4 | 40:15,22 41:16 | 45:3,9,12,20 47:1 | 83:19,20,22 84:17 | 73:5 74:17 75:18 |

VERITEXT REPORTING COMPANY

L. KING

Page 4

75:18,23 77:13
84:19
**commitments**
71:17 74:20,24
76:1
**commonly** 72:12
**Commonwealth**
1:15 3:9 71:17
76:20 134:8
**communicate**
32:12
**communicating**
86:1
**community** 13:25
14:13 114:17
140:8,9
**companies** 30:23
69:20 125:8
**company** 8:21,23
49:10,15 51:13
61:19 71:18 98:21
112:21 134:8,14
**comparables** 63:13
63:18,21
**complete** 50:1
**completely** 13:4
102:19 103:4
**complying** 35:8
45:8
**computer** 11:19
12:5 44:17 105:7
**computerized**
33:11
**conduct** 77:18
**conference** 33:3
124:11
**confirm** 123:22,24
**confused** 48:10
115:4
**confusing** 114:1
136:4
**connection** 116:10
133:19 136:14
**consider** 42:21

**consideration**
91:25 92:3 95:17
110:21
**Considering** 7:18
**conspiracy** 9:21
138:25
**construction** 51:16
112:21 114:16
134:23
**Construction/Di...**
114:14
**Consulting** 1:14
135:13
**contact** 23:24 24:10
51:4,17 64:1
66:20 70:25 86:18
103:10 124:22
**contacted** 63:19
**context** 26:12 56:12
**CONTINUED** 10:9
**contract** 68:18
**control** 119:3
**conversation** 33:6
39:1 65:19 66:1,4
**conversational**
6:12
**conversations**
13:11 27:25 38:23
66:24
**conveyed** 61:18
77:5
**cooperated** 139:13
**cooperating** 137:10
137:12
**cooperation** 139:16
139:25
**coordinated** 124:25
**copied** 42:17
**copies** 18:21 20:12
42:19 46:3 49:23
50:8 53:22 69:3,6
91:5,6 123:18
124:12
**copy** 17:11 69:20

70:20 84:1 91:23
112:24 116:13
124:15 126:7
129:24
**corner** 129:1,6,14
130:2
**Corporation**
114:17
**correct** 5:7,14 22:9
35:14 36:22 37:10
38:10 39:7 43:1,2
43:5 56:3 60:15
75:19 78:11,12
79:13,17,18 89:9
89:10 91:19 94:3
94:7,14 95:2,18
99:10 100:21
102:21 104:3
105:19 108:8,12
111:2,3,6,24
112:3,8,9 125:3
126:12 129:10
130:6 132:10,11
135:18 137:21
139:6,10,11,14,17
139:21 140:12
**correspond** 74:10
**correspondence**
17:9
**costs** 101:3
**counsel** 11:1 117:9
136:21 144:14,16
**count** 138:25
**counties** 137:24
**county** 36:5,10
78:25 79:6 80:5,8
80:10 87:24 97:23
107:16,18 109:4,8
111:8 114:10
128:19
**couple** 14:2 23:9
62:6 85:5 88:21
94:20 106:11
107:15

**course** 28:12 51:12
52:2,6 64:13,25
82:4 90:20 108:20
118:5 131:6 133:3
133:6 136:20
142:14
**Courthouse** 36:5
**cover** 72:5
**covered** 77:18
**created** 116:10
117:5
**credit** 96:5
**crime** 138:18
**crimes** 138:15
**criminal** 137:23
138:20
**Cristo** 1:6 30:24
31:6 46:15 49:9
59:24 73:6 74:3,6
74:12,13 75:19
76:25 77:2 79:24
79:25 80:21,23
84:1,5 100:20
110:22 112:7,22
113:13,15,17,19
113:21,24 114:3
129:11,25
**Cristo-to-the-str...**
85:4
**CROSS** 4:2
**CROSS-EXAMI...**
8:14
**CTC3706** 93:21
**CTC3709** 93:18
**CT-17767** 73:4
**CT-17767A** 73:8
**current** 63:17
**currently** 140:20
141:11
**custodian** 143:3

**cut** 28:23 126:9
**Cuzzi** 1:14 22:12
22:13 43:13 52:5
52:6,6,10,11,13
52:14,21 53:7
54:4 57:20 61:3,7
61:13 69:14
118:23
**Cuzzi's** 58:5

**D**

**DAP** 1:14 135:13
**data** 33:17,18
**date** 69:21 74:17
75:18,23 94:20
99:9 111:5 143:1
144:12,22
**dated** 4:13,13,18,20
4:21 76:4,7,9,19
76:22,24 77:1,3
78:23,25 79:4,4,7
79:12,15 84:20
88:3 93:13,19
94:7 98:5,12
103:12 109:15
110:8,12 111:1
112:19 114:10,15
129:8
**dates** 85:20
**dating** 85:24
**Dave** 58:1
**David** 3:6 52:11,14
53:13 58:2,4
**Davis** 17:22
**day** 28:22 42:4,5,8
49:6 52:23 53:10
55:11 64:24 69:5
69:22 89:19 91:8
94:10 112:6
137:17,19 143:13
**days** 109:18
**day-to-day** 21:2
**deal** 60:10 83:18
86:17,18 101:5
131:13

L. KING

dealings 133:17
deals 82:19
**December** 114:19
decided 28:20
    33:10 38:18 87:12
    108:3
deed 4:14,14,15,15
    37:22,22 46:14,16
    49:9,14 64:14
    69:18,21 74:12,14
    76:9,11,13,24
    77:1,3 78:16,23
    79:3,12,23 80:1
    80:12,13,14,24
    81:5,6,8,9 83:3
    84:1,4 86:23 87:9
    88:6,14,14,15
    92:21 93:1,4,5,13
    93:19 94:15,25
    95:25 96:9,13,17
    110:2,20,22 112:1
    112:2,6,20,25
    113:13,21,22,23
    115:24 116:1
    125:17 128:13
    129:1,11,24
deeds 36:2 37:12
    37:13,21,23 46:1
    46:6,8,13,24
    49:11 80:15 81:3
    81:12 84:12 85:20
    85:24 87:21,22,24
    88:2,3,11 113:4
    115:3 128:19
defendant 3:8,15
    5:13,18,19
defendants 1:20
    3:12 5:13
defender's 136:25
DeFeo 52:1 56:25
DEK 59:25 60:5
Del 25:2,3
Delaware 140:25
delay 84:24

delegated 35:7
DeMola 23:5,10,17
    24:12 28:7,11
Demonstrating
    27:1
departed 139:22
deposed 5:20
deposit 119:23
    120:4,9,13 132:2
    132:4
deposited 122:10
deposition 1:5 8:6
    10:11 11:2,5,7
    13:12 142:24
    143:2,6
describe 49:21 51:2
    68:4
described 75:17
    82:11
description 4:8
    82:10 83:3
detail 13:9
details 21:1
determine 117:5
determined 97:13
    98:10 126:17,19
developed 87:10
DiBENEDETTO
    1:11 62:19 63:3,6
diem 40:5 41:24
    42:2
difference 64:24
    65:7 100:3
different 42:19
    48:13 54:17 100:1
    107:20
difficulties 10:20
    10:23
Dinaso 114:17
Dinnono 43:23
DIRECT 4:2 5:4
    10:9
directed 115:23
    130:5

directly 58:23
    90:22
disburse 18:21 19:8
    91:16 107:25
    130:5,8 131:19
disbursed 91:9,18
    102:20 103:4
    107:5 108:7,10,13
    131:8 136:8
disbursement
    33:23 44:7 104:22
    106:5,7,14,19,21
    107:2,9,23 109:14
disbursements
    4:19 20:15 32:2
    33:19 69:2 88:23
    105:1,9 106:11
    107:21 130:15
discuss 32:17 38:15
    38:16
discussed 28:6
discussing 28:3
    76:21 99:3 102:2
discussion 110:4
    114:23 115:6
discussions 13:10
dismissed 138:21
distance 87:6
DISTRICT 1:1,1
divorce 16:13,17
divorced 15:13
document 26:16
    32:7 35:10 45:5
    59:7,10,13 77:8
    78:2,4 79:3 86:22
    93:16,17,25 94:24
    97:7 101:15
    103:18,18 104:24
    105:21 106:8
    112:13 115:21
    121:8 122:15,17
    129:3
documentation
    11:8,10,17 113:17

118:9 123:19
    125:20
documents 4:9,21
    11:9,13,15,22,25
    12:5,24 19:7,18
    19:21 20:5,7,12
    20:13,20,25 26:11
    26:14,20,21 28:24
    29:1 35:23 36:13
    36:15 41:8 42:16
    44:14,19,21 45:14
    45:23 49:24,25
    50:4,6 53:12,19
    53:20,22,23 54:3
    54:18 55:18 59:10
    59:15 61:17 63:11
    66:3,4,11,12
    68:17,23 69:6
    70:13,19 71:7,18
    71:21 73:3,15,17
    73:21,25 75:22
    77:7 78:5 82:10
    83:2,5,22,24
    86:20 89:5,13
    91:4,10,18 92:5
    96:5,11 97:15
    98:12 103:21
    110:10,20 114:11
    115:2,8 117:24
    118:2,3,5,7,10,12
    118:22 119:1
    123:7,8 128:22,24
    133:24 134:5
document-wise
    24:8 85:21
doing 8:6,18 19:11
    31:14 40:17,19
    85:15 87:12 90:9
    118:18,20 120:19
    126:24 132:6,7
    138:8 140:19
dollars 31:12 41:17
    42:4 101:19
donation 142:3

**Donna** 1:17 52:1
    57:2
double 125:4,7
doubt 138:16
downstairs 40:9
draft 120:21
    128:14
drafted 121:20
drafting 122:18
drawn 45:21
DRD 1:2
drew 87:16
**Drive** 98:20
driver's 70:20
    123:18
dropped 53:15
    138:13
drugs 7:13
Due 142:23
duly 5:2 144:6
duties 17:7,21
    28:19 31:14 39:22
D&Sons 32:2 59:24
    112:21 113:14,19
    113:21,24 114:3
    114:14,16 115:24
    116:2,4
D'Apolito 1:14
    24:2
D-A-P 135:14
D/B/A 1:18

_____

**E**

E 3:1,1 4:7 5:1
early 5:24 21:13,17
    34:21
earned 49:5
East 39:25 40:11
    40:17 41:25
easy 126:6
EDWARD 3:10
eight 31:12 37:11
    87:25
either 15:3 23:22
    63:5 69:20 95:4

103:8 114:18
124:5 126:23
**elaborate** 84:14
**Elaine** 110:18
130:1
**electronic** 91:2
**eliminate** 120:17
**embroiderer**
140:21
**employed** 26:1
**employee** 144:14
144:16
**employees** 17:14
**employer** 30:5
**employment** 25:23
28:15,17 30:7
38:3
**empty** 141:12
**ended** 15:22 25:23
58:14 137:17
140:15,17
**ends** 106:8
**end-of-month**
84:21
**ENGLISH** 3:6
**enter** 106:2
**entered** 95:2 106:3
**entering** 96:13
**entire** 15:6
**entries** 33:19
**entry** 33:17,18
**envelope** 69:11
91:7
**escrow** 119:18,22
120:14 121:13
122:19 125:22
126:1 135:18
**ESQ** 1:12,13,13,14
3:3,6,10
**Esquire** 78:17 79:5
99:7 130:3
**essence** 100:22
**essentially** 140:5
**establish** 105:13

**estate** 9:7,8 14:18
16:6 17:24 18:2
18:10,16 21:11
27:22 30:14 40:16
40:19 42:6 44:21
45:15 47:5,10
52:1 62:17 63:9
65:8 68:18 101:9
108:1
**eve** 22:5
**event** 126:23
**events** 11:6
**everybody** 22:5,7
42:18 45:16,23
50:3 86:10
**eviction** 138:11
**evolved** 28:18
123:7
**exact** 108:16
**exactly** 20:2 30:19
36:16 52:7 68:22
88:20 109:9
**examination** 5:4
10:9 144:6
**example** 24:11
84:18
**excuse** 21:24 61:21
**executives** 23:25
**exemption** 91:25
91:25 92:3 110:22
**exhibit** 10:11 73:20
73:20 76:16 117:7
121:9 129:3,21,23
131:1
**exhibits** 129:5
143:3
**existence** 93:1
**existing** 99:13
**expires** 144:21
**explain** 19:22 20:2
73:2 95:15 99:25
100:3 135:4
**explained** 55:21
67:2 68:1 83:15

87:4,6
**ex's** 54:10
**eye** 68:10

---
### F

**F** 2:6 3:4
**face** 53:15 56:4
72:20
**fact** 38:21 40:19
65:6 72:17 94:12
119:25 135:25
**factual** 66:17
**fake** 26:24 118:17
**fall** 36:19 100:10
**Falls** 3:15
**false** 117:24 118:12
118:14,22 135:17
**familiar** 8:20 24:3
25:6,8 29:24 31:3
56:10,11 62:14,15
63:7 73:22 77:19
105:3 133:15
**family** 13:13,16
**far** 14:1
**Farm** 3:14
**fast** 121:5,6
**fax** 9:2,10,16 17:11
86:8
**faxed** 9:3 86:8,9,9,9
86:10,14 133:21
**faxes** 126:8
**faxing** 8:17 10:2
**FBI** 11:12,14 12:9
12:18 41:7 58:21
86:3 136:18 137:5
**feasible** 141:5
**February** 14:24
38:8 111:8,12
114:10 144:21
**federal** 64:7 136:14
136:24
**fee** 75:4,17 96:9
99:22 100:1,6,8
101:15,21 104:18
107:11 108:22

132:14
**feel** 28:3,6 38:12
**fees** 31:21,22 32:7
37:20,21 49:6
99:24 100:2,10,15
101:23 103:25
108:19,20,22
109:10,12
**Fidelity** 1:16 3:12
134:13
**figure** 104:9,10
**figured** 137:8
**figures** 64:17
104:13,14 107:7
108:16
**file** 17:11 46:18
50:3,9 72:16,21
72:22 77:10,12
80:13,14 98:2,4
98:13,17 121:3
124:17
**filed** 46:16 69:8,10
69:21 79:16 80:4
80:11,13,21,22
81:1 84:8 87:21
88:2,16 94:25
97:22 112:8
113:18 129:9
**files** 11:14,18 13:4
50:1,5,7,9,10
73:13,18
**filing** 17:24 69:7,16
81:19 98:16
**filings** 17:9
**fill** 18:7 34:24 35:4
50:7 100:17
**final** 53:23
**Finance** 60:10,11
**financially** 132:21
132:22 141:1,5
144:17
**find** 63:19 70:11
85:18 137:18
138:10

**fine** 8:4,10 32:11
49:17,20 140:14
143:5
**finish** 6:11,14,22
69:5
**finished** 13:5 38:2
**fired** 85:25
**firm** 5:10 15:6
16:14,20 108:1
**first** 5:1,9 10:6
14:12 15:24 17:3
19:23 23:4 31:5
33:15 52:16 53:5
54:25 55:2,5
72:16 77:17 79:17
80:13 81:5 84:23
93:22 95:25 98:18
99:5 111:19 113:3
117:10 130:21
135:7 136:12
141:4
**firsthand** 90:6
119:10,13 126:13
133:7,10
**five** 15:12 18:5
19:23 54:17 55:4
67:17 121:16,16
**fix** 51:15 65:3
**flip** 37:22 47:23
68:4,5,7 73:9,10
73:15 79:19
112:11 116:8
**flipped** 69:22 85:24
113:21
**flips** 54:16 87:12
108:5
**flooded** 87:24
**Florida** 58:17
**flow** 85:21
**focus** 14:3
**focused** 17:24
**follow** 130:7
**followed** 100:18
**following** 103:9

L. KING

follows 5:3
foot 37:10
foreclosure 48:23
113:20
foreclosures 49:1
64:21
foregoing 144:9
forenoon 2:8
form 18:9 90:1
95:24 98:6 102:24
126:14 127:15
formal 27:22
forth 19:19 20:21
53:21,24 144:12
forthcoming 8:9
forward 36:13
85:24
forwarding 36:2
37:15 45:25
found 51:7 52:12
53:6 58:11 85:23
86:2,3
four 3:7 18:5 34:22
54:16 55:4,17
73:20 114:15
four-family 62:8
FOX 3:10
frame 137:4
fraud 58:10 134:3
138:25
frauds 25:12
136:15
fraudulent 9:18
13:19 47:9 62:11
Fred 24:20
Freehold 43:21
69:8,10,15
Freidman 74:3
Freidmans 73:6
74:12 76:25
friend 29:9 40:18
58:5
friends 29:19 38:22
54:9

front 111:14
full 14:15 28:22
30:10 37:8 42:5
93:25
full-time 15:15
28:17,24 31:15
fund 90:18 91:2
124:20
funding 1:8 43:16
49:22 52:2 54:1,3
57:8 59:5 60:8,9
60:10,14,14 66:19
67:14 68:19 86:10
103:16,22 104:15
104:19 113:16
121:11 122:18
123:17 130:12,17
Funding's 103:24
funds 18:21 19:8
58:22 59:1 91:9
91:16,17 100:11
121:16 122:2,9,11
122:19 130:5,8
131:8 136:2,7,12
further 15:22
106:25 116:8
144:9,13
F-r-e-i-d-m-a-n
73:6

G
G 5:1
GARDENS 1:19
garner 87:14
Gary 1:10 22:10,15
27:3,5 29:9,13
32:18 38:17,21
39:24 40:9 49:14
51:12 52:9 53:2
54:2,7,8,16 55:21
56:1 67:7 86:9
87:1 89:1 91:12
91:15 97:13
106:23 118:24
128:12 130:19

131:9,22 138:1,8
138:10
Gary's 54:10
Gateway 3:7
gather 11:25
gathered 82:18
gathering 68:16
general 47:10
Generally 48:2
general's 136:19
gestured 37:9
getting 10:20,23
44:22 64:20 67:18
70:25 89:23
106:20 107:23
132:14
giant 128:19
gift 121:17 122:2
122:12,16
Gilgar 24:23
girl 22:16 85:19
give 18:7 29:20
37:4 68:21 74:10
89:13 91:23 102:3
104:9 109:24
121:4 136:17
142:3
given 75:22 120:9
136:13
giving 123:7 131:18
glad 10:21
go 6:1 7:3 9:16,24
13:22 14:9 18:24
19:15,15,17 20:24
28:15 32:18,22
37:4 40:5 42:15
49:18 50:6 51:7
56:15 63:15 67:1
67:22 68:25 69:2
74:15 82:20 87:19
88:13,14 101:15
108:15 113:11
114:21 116:1
125:17 129:13

134:5 138:4
140:24
goes 27:20,21 68:20
72:19 108:17
going 6:13 7:10
16:13 20:24 25:12
30:14 38:2,12
47:5 48:14 49:16
53:24 62:8 64:25
68:12 69:18 73:2
79:23 84:1,17
85:13 87:25 89:20
89:22 90:12,15
91:21,22 92:10,19
95:23 98:24
101:12 114:1,7
115:19 117:9
120:3 121:8,9
122:15 130:25
133:20 134:1
140:25 142:11,23
gold 129:20
good 5:5,6 9:1
37:11 52:12 53:8
56:7 87:11
gotten 126:5
government 11:22
41:11 137:11,13
137:15 139:2,8,13
governments 64:7
go-between 24:7
Granata 15:1,13
16:10,22 17:3
21:11
greed 85:11
greedy 85:12
grew 17:20,20,20
Grieser 1:10 22:10
29:13,19 32:13
38:18 39:3 43:11
43:12 49:14 51:12
52:9 54:7 55:22
55:24 56:17 67:7
87:1 89:1 91:13

97:13 106:23
118:24 128:12
130:19 131:9,22
138:1,10
Grieser's 22:16
27:4,6 29:10
39:25 43:13 53:2
54:2
ground 6:2
group 16:16
guess 5:16 29:8
57:20 88:1 100:16
113:7,12 134:24
137:16
guessing 28:25
guilty 137:21
guy 138:3
guys 53:16 91:23
117:5
G.J.L 1:7 59:24
60:4

H
H 4:7 99:6
half 53:8
hand 33:13 37:10
85:12 98:24 114:7
120:18
handed 59:9 93:19
handing 76:15 97:3
103:14
handle 17:20,22
18:2,15 19:15
30:17 42:5 44:25
125:13
handled 17:8 18:13
44:21 83:19
123:17
handwriting 75:11
75:13
handwritten 18:22
hand-delivered
20:6
Hanover 40:1,11
40:18 41:25

VERITEXT REPORTING COMPANY

L. KING

Page 8

happen 20:15,16
67:15 68:22 83:13
84:18 125:11,18
happened 11:7
12:6 36:8 45:16
85:5,7 89:24
91:14 95:4 102:23
113:6 115:2,9
120:12 124:2
125:12
happening 49:11
131:5
happens 107:11
121:3
happy 38:14
hard 42:12
HAYES 3:10 7:24
8:5 71:25 72:3,9
72:14,17,24 73:9
73:11,16 89:25
90:2 92:22 93:5
93:15 95:23 98:6
105:13 113:10
114:21 115:5,10
116:16,23
head 6:7 104:8
119:5
hear 54:25 58:15
58:18
heard 58:7 62:13
64:4 78:21 101:2
125:25 133:13
134:7,10,13
135:13
hearing 113:3
held 2:5 46:5 87:20
87:23 88:10 120:3
120:17 122:25
Hello 8:15
help 11:21,24 21:1
28:21 115:2,8
117:4 118:11
helped 50:2 128:14
helps 110:3

hereinbefore
144:12
Hi 8:16 53:14
high 37:10
Highway 15:15
59:20
Hills 2:6 3:4
Hindsight 87:5
hired 17:21 29:7
hit 80:7
hold 36:9,13 46:13
80:7 121:2
holding 46:8,14
88:10 119:18
120:4 121:13
home 1:8 10:7
11:16 22:3,25
43:14,16 45:14
49:22 52:2 54:1,3
57:8 59:4,16 60:9
60:14 68:18 86:10
98:23 103:16,22
103:24 104:15,19
113:16 114:17
121:11 122:18
123:17 130:12,17
141:23
homes 1:19 59:25
60:5 64:9
hour 31:11,12,17
91:1
hourly 41:23
hours 28:19,22
140:8,9
house 62:8 140:6
141:11
HUD 18:7 32:9
100:17 108:15
130:11
HUD-1 4:16 32:5
34:16,25 96:23
98:25 99:19
101:11 104:5
107:12

humongous 130:23
hundred 41:17
42:4 101:19
108:17

I

idea 50:15 78:13
80:3,25 81:2,14
81:17 88:12 89:6
92:8 93:2 96:14
96:16 100:8 101:4
101:10 106:22
107:4,6 109:18
111:11,13,17
113:5 122:4,13
124:4 126:20,22
127:8 128:16
identification
10:14 59:8 71:12
71:15 76:6,8,10
76:12,14 93:14
96:22,24 97:2
103:13 104:23
110:7,9,11,13
114:5 123:15,16
123:20,22,25
124:5,9,14
IDs 107:1
II 1:11
immediately 118:4
implies 98:7
impression 54:11
117:1
improper 28:4,7
inches 37:11
included 32:6
35:20 104:19
includes 62:18
INDEX 4:1
indicate 10:18
101:18
indicated 102:15
indicates 77:13
95:17 99:5 101:12
104:1 108:6,10

indicating 27:14
110:20 112:20
122:1
inflated 64:12
inflating 64:8
influx 36:11
information 8:9,18
9:2,2,4,11,17,18
10:2,2 12:17
23:13,19,21,22,23
23:25 24:8,9
33:17 35:24 49:7
63:23 64:2 68:18
70:16,16,21 71:1
71:4 89:23 106:1
106:3
initial 75:4,6,8
initials 34:11 75:1
102:9,16 106:18
121:22
insane 67:19
insisting 119:2
inspectors 51:20
instance 34:9
102:12
instances 49:6
123:9
instruct 19:13
instructed 36:9
instruction 45:20
88:11 121:21
instructions 4:17
35:8,14,17,20
45:9,13 96:25
102:1,6,21 103:1
103:5,9
instrument 79:8
insurance 1:15,16
1:17 3:9,12,13
4:11,12 71:10,13
71:17,18 74:23
76:1 77:13 82:5
82:10 83:2,7,12
134:5,8,11,14

insured 77:14
interaction 53:6,10
interest 49:13
61:22 75:17 77:5
87:3,14
interested 144:17
interests 61:18
interfere 7:14
interrupt 47:22
interview 16:19
introduce 5:9
invention 87:2
investigated 50:5
50:14,17
investigation 41:13
58:16
investment 1:9
61:19
invoice 4:13 76:7
76:22 78:3
involve 61:22 135:1
involved 13:17
20:17,23 42:6
51:9 58:9 64:7
128:18 135:7
involving 13:19
Irene 52:1 56:25
issued 12:24
issuing 77:17
item 106:6

J

J 3:10 77:18 79:5
James 1:11 62:19
63:5
JANET 2:3 144:3
January 38:8
Jersey 1:1 2:5,6 3:4
3:8,15 5:2 32:21
60:1,6 71:24
98:20 144:4,20
Jill 61:9,12 74:6,15
76:2 77:2,4,5,14
86:24,24 93:7,10
93:20,20 94:9

| | | | | |
|---|---|---|---|---|
| **Jim** 24:18 | 43:3,8,9,10 45:1 | 142:19 | **King-6** 4:13 76:7 | 51:22 52:7,21 |
| **job** 14:12 16:18 | 45:13,16 47:12,17 | **King** 1:6 4:3 5:5,7 | 76:16,22 78:3 | 53:15,21,23 54:20 |
| 17:7 28:24 30:1 | 47:18,19 48:6,19 | 7:25 8:1 10:10,12 | 83:23 | 54:24 55:17 56:16 |
| 30:12 33:8 107:1 | 48:22 49:13 50:19 | 38:2 59:9 73:4,24 | **King-7** 4:14 76:9 | 56:23,24 57:2,5,8 |
| 141:2 | 51:3 53:17 54:6 | 76:15 77:10 93:17 | 76:16,24 78:16 | 57:10,11,14,17,19 |
| **Joe** 77:4 | 54:21 55:2,24 | 97:3 113:11 | 79:9 83:23 84:4 | 57:21 58:1,6 61:3 |
| **John** 2:6 3:4 | 56:1 58:9,13 | 114:25 116:16 | 87:22 110:2 | 61:6,10 64:10,16 |
| **joint** 48:8 49:14 | 59:23 61:20,21 | 142:25 143:11 | **King-8** 4:14 76:11 | 65:8 66:8,14 67:9 |
| 80:1 81:6,8,9 87:9 | 62:2,5 64:19 | 144:6 | 76:16 77:1 79:3 | 67:23,24,25 68:13 |
| 87:10,17,20 88:12 | 65:10,16,17,21,24 | **King-1** 4:9 10:12 | 81:5 83:23,25 | 68:21 69:17 72:18 |
| 88:15,19 94:15,19 | 67:2,7 68:7 69:9 | 10:13 | 87:22 92:15,16 | 75:8,24 76:3 |
| 95:3,7,12,14 | 69:22 70:3,12 | **King-10** 4:15 93:13 | 93:6,7 129:14 | 77:24 78:8,15,17 |
| 96:15 110:21 | 75:6 82:23 83:21 | 95:1,16 129:3 | **King-9** 4:15 76:13 | 81:24 82:2,5,6,7 |
| 112:2 128:13 | 87:1,16,23 88:1 | **King-11** 4:16 96:21 | 76:17 77:3 79:11 | 82:22 83:1,4,4,6 |
| 135:21 | 88:25 89:13 91:12 | 97:4 99:16 | 81:6 83:23 86:23 | 85:8 86:2,16 |
| **journal** 4:19 33:23 | 92:18 97:12 | **King-12** 4:16 96:23 | 88:6 92:10 93:23 | 88:17,20,22,25,25 |
| 44:7 104:22 105:1 | 100:22 101:4 | 98:25 104:5 | 94:24 | 89:1,4 91:24 92:4 |
| **July** 41:9 76:5,19 | 104:14 106:22 | **King-13** 4:17 96:25 | **knew** 38:21 43:6,7 | 92:7,20,25 93:3,3 |
| 76:22,24 77:1,3 | 107:6 108:2 | 101:25 | 43:9 45:19,23 | 94:9,11 95:8,11 |
| 78:23 79:4,4,12 | 109:15,19 112:11 | **King-14** 4:18 | 56:15,16,17,20 | 96:12 97:12,25 |
| 79:12 84:23 88:8 | 113:19 114:2 | 103:12,15 | 58:6 68:8 69:18 | 98:10,14,21 104:6 |
| 93:19 94:7,14,20 | 118:18,20 123:5,6 | **King-15** 4:18 | 82:20 91:17 | 104:8 105:22 |
| 95:2 99:9 105:1,2 | 123:7 124:24,25 | 104:21,24 131:1 | 116:18 117:3 | 106:16,20 107:22 |
| 105:17 106:12 | 125:7,13 126:19 | **King-16** 4:19 110:6 | 118:18,20,23,24 | 107:24 108:14 |
| 109:15 110:12 | 128:3,11 129:12 | 110:14 | 118:24,25 119:11 | 111:14 115:22 |
| 111:1 114:15 | 130:5,18 131:9,17 | **King-17** 4:20 110:8 | 119:14 120:19 | 116:3,24 117:11 |
| **jumped** 67:18 | 131:25 132:1,19 | 112:13 | 128:11,12,15 | 118:13,16,21 |
| **June** 41:9 74:17 | 135:7,25 136:7 | **King-18** 4:21 | 131:3,4,7 132:6 | 119:1,7,9 123:10 |
| 84:20,21,23,24,25 | **Kane's** 30:18 31:21 | 110:10 114:7,9 | 134:4 135:17 | 124:8,12 125:19 |
| ——————— | 38:10 40:16 49:10 | 129:24 | **know** 6:22 8:2,5 | 127:6,9,19,23 |
| **K** | 49:12 54:1,2 | **King-19** 4:21 | 9:13 11:13 12:16 | 128:5,7,9,10,15 |
| **K** 5:1 | 66:13,15 69:19,23 | 110:12 114:12 | 12:17,18,20,23,25 | 128:16 133:16,20 |
| **Kane** 1:10 17:20,25 | 82:12 88:11 98:23 | **King-2** 4:9 59:7 | 18:10 19:10,14 | 134:2,23 135:4 |
| 18:3,12 19:3,11 | 120:7,8 | **King-20** 4:22 114:4 | 20:22 21:19 22:14 | 136:10 140:17 |
| 20:3,17 21:4,7 | **Kane-9** 92:21 | 114:16 | 23:3 24:2 25:7,9 | 142:10 |
| 22:1,9,10 24:6 | **keep** 29:22 | **King-3** 4:10 71:10 | 25:18,23 26:6,19 | **knowing** 81:11 |
| 25:12 27:21 28:20 | **Kelly** 25:5 28:11 | 71:16 72:10 73:5 | 26:21,23 27:19,21 | 135:21,25 136:7 |
| 28:23 29:14,25 | 126:1 | 74:1 | 27:23 29:7,22 | **knowledge** 46:10 |
| 30:6,9,11,20,23 | **Kennedy** 2:6 3:4 | **King-4** 4:11 71:13 | 30:15 31:7 32:8,8 | 66:7 75:25 90:6 |
| 31:15 32:13 33:16 | **Keyport** 5:2 141:16 | 71:16 72:19 73:1 | 34:15,20 38:20 | 101:8 119:10,13 |
| 34:5,21 35:22 | **kind** 11:13 26:18 | 73:7 74:5 75:16 | 39:1,2,4 43:15,24 | 122:8,11 126:3,13 |
| 36:10 38:17,24 | 28:18 40:12 50:7 | **King-5** 4:12 76:4 | 45:18 46:3,5,12 | 133:7,10 135:8,9 |
| 39:7,14,24 40:14 | 65:18 68:8 70:16 | 76:16,18 77:12 | 46:24 47:3,19 | 135:16,20,24 |
| 41:2,5,21,22 | 85:11 106:1 | 83:23 | 48:24,25 51:17,21 | 136:6 |
| 42:10,11,12,21 | | | | |

L. KING

Page 10

known 72:12 91:20
 128:8,13 136:11
KOTT 3:6 21:24
 22:3 47:8,22 48:5
 81:20 90:1 102:24
 103:3 127:15
 129:21 139:4,10
 143:2
K-a-n-e 22:1

L

L 5:1
land 1:15 3:9 72:3
 72:4 75:17 76:20
 134:8
Larry 22:10,12,13
 43:13 52:5,6,6,11
 52:13,24 53:7,12
 53:13,14 57:20
 58:5 69:13,14
 118:23
law 5:10
Lawrence 1:14
 61:13
lawyer 40:20
leads 129:16
learn 18:15 34:24
learned 116:20,21
 116:22 131:6
 142:15
lease 116:13 117:12
leased 27:14,15
leases 26:24,25
 27:3,9,13,18,23
 116:10 117:1,4,8
 117:20
leave 5:24 20:11
 28:16 89:15 91:4
ledger 18:22,22
left 15:24 39:5,24
 105:17 108:18,21
 109:11,23 130:14
 130:18 140:24,24
left-hand 129:1
 130:2

legal 120:22
legitimate 62:2,4
 125:14 136:9
legitimately 85:10
lender 9:22 35:9
lessons 117:6
letter 4:12,20,21
 76:4,18,19 77:11
 77:22 110:8,12
 112:14,19 114:9
 114:12 119:21
 120:4,21 121:2,10
 121:12,19,22,25
 122:16,18,20
 126:2,10,11
 139:17
letterhead 121:11
 126:5,7,14
letters 15:7 77:19
 113:3 119:16
 125:22 126:15
 135:18
let's 12:18 17:25
 37:25 57:23 68:6
 114:21 118:3
 120:16 130:16
levels 139:22
license 123:18
 144:21
licenses 14:7 70:20
lie 53:16
Lieber 52:11,15,22
 54:4 55:5,14 58:1
 58:2,4
light 72:17
Limited 1:7 59:25
 60:4
line 75:5 77:16
 99:21,23 101:5,14
 101:21 106:6
 108:19
lines 19:19,24
 45:21
list 45:13 48:23

68:10,13,16 84:21
 86:3,5,16 133:21
 133:21,23,23,25
 138:24
listed 107:11
 108:19
listings 105:12
lists 60:7,17 62:17
 86:2 103:21
litigation 5:12
little 13:8 19:25
 20:25 41:18 53:14
 53:16 75:2,7 86:1
 86:5 136:4
lived 142:7
LK 121:23
LLP 3:3,6,10
loaded 33:12
loan 4:16 23:18
 28:13 31:2 32:24
 61:8 63:20 67:12
 69:24 70:5 74:2
 91:18 96:21 97:5
 97:11,14 99:1,16
 99:18 102:20
 108:23 110:24
 111:4 124:3,6
 127:10
loans 29:23 41:10
 47:9 55:10,13
 61:1,20,21 62:2
 90:18 99:13
 134:23,25
local 64:7
located 32:20 71:22
 110:18
location 15:10,25
 16:1,3,4 17:3,13
locations 15:20
long 7:18 36:12
 42:7,13 53:5
 89:17 110:19
 112:14 138:3
 142:10

longer 31:17 41:2
look 11:7 29:1
 30:12 32:9 59:17
 72:6 73:15,21,21
 73:25 75:2 79:8
 79:11,19 93:24
 99:4 102:5 105:3
 114:8 117:11
 121:19 129:2,14
looked 36:15 77:12
 99:16
looking 16:21 30:1
 30:7 55:18 61:17
 63:14 72:20 73:12
 78:6 84:19 115:1
 116:17 128:22,24
looks 75:14 115:25
 129:18
Lor 19:14
Lori 8:15 10:6
Lorraine 1:6 4:3
 5:7 143:11 144:6
lost 30:11
lot 9:3,4 22:14,17
 24:10 28:18 40:2
 51:4 54:9 56:1
 66:23,25 85:20
 88:3 117:5 126:8
 132:16 133:16
low 64:20
lunch 57:24,25
L.L.C 1:10

M

M 1:13
MA 129:15
magic 91:1
Magnanini 2:5 3:3
 5:11
mail 18:23 111:15
 142:9
mailing 111:23,24
 141:10
main 15:2,10,24
 40:7

maintain 33:8 44:6
 51:13
maintained 33:22
 44:3
major 14:4 85:15
majority 60:21,25
 61:24,25 62:11
making 69:6 85:15
man 138:7,12
management 1:6,9
 1:10 59:24 61:19
 67:25 74:3 75:19
 106:18 112:22
 113:14
manager 27:8
 51:13
manner 12:19
mark 10:10 78:16
 91:22 93:16 121:9
marked 10:14 59:8
 71:11,14 72:18
 73:19 74:22 75:9
 76:5,8,10,11,13
 76:16 77:11 81:15
 83:23 86:23 92:21
 93:14 94:24 95:1
 96:22,23 97:1,4
 98:24 99:21
 103:13,14 104:22
 110:7,9,11,13,14
 112:13 114:5
marked-up 74:20
Market 3:11
marking 117:7
markings 74:21
married 141:25
Mary 103:16
MAS 1:2
massage 14:8
 140:22 141:7
massive 118:15
Matawan 15:2,10
 59:20 129:15
matter 2:2 80:19

VERITEXT REPORTING COMPANY

L. KING

120:23 121:14
**McCARTER** 3:6
**mean** 11:24 29:5
  35:2 48:8 51:6
  53:12 55:20
  111:18 130:9
**meaning** 26:25
  97:12 100:20
**means** 55:21 84:20
  127:6,8 135:3,5
**meant** 121:17
**medication** 7:13
**meet** 9:21 11:1 20:7
  52:10 89:23 93:11
**meeting** 16:16
  137:14
**Memo** 4:18 103:12
**memorandum**
  103:15
**memos** 126:8
**mentioned** 48:12
  55:3 56:14 85:2
**mess** 50:2
**met** 16:16 21:21
  23:4 51:18 52:11
  56:3 58:4 61:9,13
  62:19 78:19 83:12
  137:5
**Michael** 1:13 62:13
  71:19
**mind** 8:3
**Mine** 33:10
**minimum** 67:21
**minister** 142:12
**minute** 104:9
  114:22
**missed** 63:2 69:17
**missing** 26:16
  46:17 50:7 66:6
  113:22,25 115:24
  133:24
**mistake** 63:3
**mistakes** 85:16
**mixup** 113:4

**MLS** 63:20
**mom** 142:7
**moment** 7:20 13:9
  21:24 32:10 95:15
  96:19 99:4
**money** 20:14 65:1
  67:13 85:13 88:17
  91:3 95:24 101:12
  104:15 106:4
  107:8 108:3
  109:21,23 116:5,6
  120:16 122:1,2,13
  128:17 130:13,20
  130:22 131:9,10
  131:10,12,13,19
  131:20,21 132:2
  134:17,20 135:1
**monies** 107:25
  115:14
**Monmouth** 36:5,10
  78:24 79:6 80:4
  87:24 107:16,18
  109:4,7 111:8
  114:10
**Montanye** 61:9,12
  74:7,15 76:2 77:2
  77:4,4,6,14 86:24
  86:24 93:7,10,20
  93:20 94:9
**month** 21:9,10,15
  53:8 67:11,13,14
  67:17 69:17 70:13
  84:17 112:24
  124:21 132:17
**monthly** 98:19
**months** 34:22
  52:12 53:9 55:4
  80:4 87:11 94:20
  140:5 141:3
**morning** 5:5,6
  125:15
**mortgage** 4:16,19
  4:22 22:23 37:24
  43:14 60:7 64:15

70:18 96:21 97:4
  97:11,14 99:16,18
  110:6,15,17 114:4
  114:13,16,17
  115:14,15,24
  116:4 128:16
**mortgages** 37:14
  37:15,22 127:12
  127:20,21 135:2,8
  135:11
**move** 15:9
**moved** 15:15,20
  17:2,3,12 141:5,6
**Mulberry** 3:7
**multiple** 55:10 61:1
**Murphy** 1:19
  107:21,23 130:13
**mushroom** 121:5

---

**N**

N 3:1 5:1,1
**name** 5:7,10 8:20
  8:23,24 17:22
  22:11,18 25:6,7
  31:1,6,7 33:15
  34:10 43:23 52:13
  52:22,24 53:6,13
  54:15 55:22 56:6
  58:6 62:9,14
  77:25 78:21 85:19
  89:4,12 93:10
  95:25 96:5,6,8,10
  110:25 129:12
**names** 24:3 43:17
  43:20 54:17 56:8
  60:1,19,22,25
  61:1 62:6 74:10
  114:2,2 133:16
**National** 1:8,16
  3:13 22:22,23,25
  43:14,16 45:14
  49:22 52:2 54:1,3
  57:8 59:4 60:9,13
  68:18 86:10
  103:16,22,24

104:15,19 113:16
  121:11 122:18
  123:17 130:12,16
  134:13
**Nations** 1:15 3:12
  134:10
**nearest** 113:12
**necessarily** 73:22
  84:6,6,9
**need** 6:21 26:16
  30:12 66:6 83:10
  83:12 117:4
  118:10 121:1
  126:6 137:8
**needed** 11:3 16:18
  19:21,24 23:12,18
  23:21,22,23 24:7
  26:20 28:21 30:1
  30:6 32:19 33:11
  34:10 35:21,23,24
  39:11 42:17,18
  45:12,15,18,19,23
  50:4,6,9 51:22
  53:22 54:3,17
  63:17 66:4 67:12
  68:17 69:4 71:3
  80:13 82:4,5,9,10
  82:19,20 83:3,5
  86:6,20 87:2,6,13
  90:24 91:6 92:13
  96:11 97:14 98:11
  108:4 109:24
  123:18,19,22
  124:12 130:15
  131:19 134:5
**needs** 5:23,24
  131:23 142:12
**neither** 144:13,15
**Neptune** 72:4,7
**never** 11:16 27:21
  58:4 59:13 60:14
  67:9 74:21 82:25
  83:18 86:3 88:21
  98:12 105:5,24

117:18,18 120:3
  122:20 123:15,21
  135:11 137:12
  138:11
**new** 1:1,16,17 2:5,6
  3:4,8,12,13,15 5:2
  17:5 22:4 32:21
  59:25 60:5 64:15
  71:24 98:20 105:7
  105:23 134:11,14
  144:4,20
**Newark** 3:8
**news** 25:11
**NHF** 70:16,17
**nice** 132:17
**nine** 87:25
**nod** 6:7
**Nope** 22:19 107:19
**normal** 18:14 21:13
  27:12,16,20 28:13
  28:19 42:10 83:18
  83:20
**normally** 63:10
  123:1
**Norman** 74:2
**Norwest** 114:13
**notary** 2:4 5:3 92:5
  94:3 143:16 144:3
  144:20
**note** 72:12 98:8
  128:15
**notes** 2:1 19:25
  80:14 127:12,16
**notice** 12:4 88:2
  138:11
**number** 4:8 5:12
  56:14 59:22 60:18
  61:16 62:17 72:16
  72:21,23 74:11,14
  75:4,16 77:11,12
  78:11 79:8 88:6
  98:18 99:1 104:15
  106:9 107:1 120:2
  129:21 141:19,20

---

L. KING

| O | | | | |
|---|---|---|---|---|
| **O** 5:1 | 137:5,7 141:7 | 87:14 121:1 | 95:16 98:18 99:5 | 117:20 122:1,2 |
| **Oakwood** 1:7 | **offices** 32:19 | **ordered** 76:1,3 | 99:21 100:6 | 129:15 |
| 30:24 31:5 59:25 | **Oh** 40:23 53:8,11 | 78:7,8 | 101:14 102:8 | **Partial** 91:25 |
| 98:19 | 53:12 63:2 84:13 | **ordinary** 28:1,12 | 105:17 106:8,9 | **participate** 45:3 |
| **oath** 6:17 | 84:13 90:14 91:11 | **organize** 50:2 | 107:9,20 108:6,9 | **participated** 69:25 |
| **object** 95:23 98:6 | 116:11 117:22 | **organized** 86:5 | 108:9 109:14 | **participating** 19:1 |
| 102:24 113:10 | 138:19 | **original** 16:10,23 | 110:16 111:14,19 | 71:8 |
| 127:15 | **okay** 5:19 6:15,16 | 69:19 71:4 74:11 | 112:1,16,17,17,18 | **particular** 47:25 |
| **objection** 7:1 89:25 | 6:23,24 7:3,11 | 79:24 84:4,11 | 129:22 130:16 | 96:9 |
| 90:1 92:22 | 8:25 9:5,16,25 | 110:2 113:18,20 | 131:1 | **parties** 51:7,9 |
| **objections** 7:1 | 10:5,10 11:13 | 131:24 136:8 | **pages** 42:17 72:21 | 144:15 |
| **observe** 18:18 | 12:10,20,22 13:8 | 143:2 | 75:9 93:22 | **partnership** 15:13 |
| **observing** 35:1 | 13:16 16:8,13 | **originally** 16:11 | **paid** 31:13,16,19,20 | **parts** 68:5 |
| **obtain** 16:8 | 17:12,19 18:25 | 109:25 | 31:23 40:4 44:22 | **party** 21:22,23,25 |
| **Obviously** 43:9 | 19:10,14 20:24 | **originals** 91:6 | 54:14 88:22,22,24 | 22:5 |
| **occasion** 50:21,22 | 21:17 24:15 27:25 | **Osborne** 141:16 | 89:1,1,2 95:24 | **Passing** 73:19 |
| **occasions** 84:10 | 32:11 33:22 36:1 | **overall** 96:9 | 96:3,4,10 100:11 | **password** 33:14 |
| 136:1 | 36:20 42:20,24 | **overnight** 20:12 | 100:15,22 104:18 | **pat** 45:12 |
| **occur** 48:16 | 57:24 58:7 60:7 | 69:4 90:21 91:7 | 108:4 130:11 | **pattern** 130:7 |
| **occurred** 85:4 | 65:4 68:6 73:11 | **overnighted** 20:6 | 138:4 | **Paul** 25:2 |
| 130:4 | 73:19,24 75:25 | **overview** 38:3 | **pain** 120:16 | **Paula** 21:12 |
| **offered** 16:19 | 78:2 84:16 88:13 | **owned** 70:3 75:18 | **paper** 43:1 54:15 | **pay** 101:5 106:23 |
| **office** 2:5 11:16,17 | 94:13,16 95:16 | **owner** 74:11 93:8 | 85:21 98:11 120:1 | 107:7 115:14,23 |
| 11:19 12:7,9,15 | 103:3 104:11,15 | **o'clock** 57:23 91:1 | 120:1 125:12 | 116:7 122:22 |
| 13:4,7 15:18,23 | 104:17 106:10,13 | 91:11 | **papers** 5:15 20:21 | 130:21,25 131:14 |
| 16:1,7,7 17:18 | 109:17 110:3 | **O'Neill** 25:5 26:19 | 90:8,10,13,15,19 | 131:24 134:16,19 |
| 21:3 27:4,6 28:16 | 115:21 116:9 | 26:23 28:1,4,11 | 90:21 118:13 | 136:2,8,12 140:11 |
| 29:4,4 32:14,15 | 118:10 125:21 | 126:1 | **paperwork** 18:8,20 | **paying** 69:11 101:2 |
| 32:17,17,20,25 | 131:20 134:7 | | 20:11 42:6 47:21 | 116:4 |
| 39:5,13,23,25 | 138:10 139:1 | **P** | 53:22,23 113:15 | **payment** 98:19 |
| 40:7,10,13,18 | **Old** 3:14 | **P** 3:1,1 | 118:16 125:16 | 115:23 |
| 43:13 44:12,15 | **once** 21:3 40:5 | **pack** 37:19 | 127:1,4 | **pending** 81:22 |
| 48:17 49:9 53:3 | 51:14,18 105:7 | **package** 26:16 | **paralegal** 14:10 | 117:15 |
| 54:1,2,3 59:16,17 | 126:16 140:23 | 35:23 69:4 72:19 | **Park** 36:12 71:23 | **Pennsylvania** 3:11 |
| 63:19 64:1 65:15 | **ones** 33:3 34:5 | 87:18 97:14 | 72:4,8 | **people** 9:3 19:5,16 |
| 68:15 70:8 71:3 | 43:15 60:3 68:22 | **packages** 20:9 | **Parkway** 2:6 3:4 | 19:22 22:14,22 |
| 78:25 79:6,15 | 73:23 103:23 | 26:24 | **Parlin** 98:20 | 27:23 45:15,17 |
| 80:5 84:8 89:15 | 129:8 | **packet** 35:13,21,25 | **parsonage** 141:12 | 52:1,3 56:9,14 |
| 91:4 103:16 111:8 | **open** 13:3 | 42:19 69:1 110:16 | 141:14 142:5 | 61:4,7,14 62:4 |
| 112:20,23,24 | **opportunity** 73:25 | 117:21 | **part** 9:6 15:11 | 63:9 66:8 81:13 |
| 115:18 116:3 | **order** 63:18 67:13 | **packets** 45:19,24 | 16:18 17:17 51:21 | 82:18 89:4,8,23 |
| 119:3 124:2,10 | 67:21,22 71:6 | **page** 4:8 20:7,7 | 63:11 65:25 73:14 | 90:13 97:15 |
| 128:20 136:19,25 | 80:12,17 82:19 | 62:24 72:5,6,11 | 82:12 83:2,5,23 | 104:14 118:9 |
| | 83:11,13 84:8 | 72:16 74:11,14 | 86:11 87:18 97:15 | 126:8 133:16,21 |
| | | 77:17 93:24 94:2 | | |

VERITEXT REPORTING COMPANY

L. KING

Pepsi 48:18
Pepsny 1:13,18
  49:1,5 52:1,2 57:2
  57:5 64:14 68:14
  71:6 76:23 77:18
  78:3,14 79:5 81:5
  84:10 85:2 99:22
  100:6,22 106:25
  107:5,10 109:24
  109:25 112:7
  124:21 125:12
  129:25 130:22
  131:10,23 133:8
Pepsny's 49:8 70:8
  77:25 84:7
percent 77:5,6
  121:16,17,18
perform 28:19
  127:10 133:1
performed 40:12
  82:8 127:3 135:6
performing 28:12
period 105:1
person 20:9 25:24
  26:9 35:11 54:14
  66:1,2 98:21
  113:20,25 119:2
  125:14
personal 115:1
personally 34:6
  35:16 61:4,14
pertaining 121:14
Peter 24:25
phase 29:8,16
phasing 29:11
Philadelphia 3:11
phone 23:9,11
  32:16 141:19,20
phones 17:10
phony 116:10
  117:1,3
photocopies 143:4
photocopy 112:17
  126:10

physical 25:17
physically 89:15
pick 45:17 69:21
  80:9 90:22
picked 81:24
  126:20
picture 29:3,6
  45:11 126:16
piece 98:11 120:1
  138:2
pieces 50:7 68:12
  90:23
Pierson 1:12 64:4
pile 88:14
pipeline 41:11
pissed 53:14,16
place 15:20 32:21
  33:4 38:1 57:25
  86:4 95:25 96:20
  110:4 114:23
  115:6 142:8,11,22
  144:12
placed 124:17
  129:19 140:2
places 42:16 46:22
Plaintiff 1:4 3:5
plan 9:21
play 81:25 87:11
  95:8,9,14
players 85:14 86:8
plays 83:7
plea 138:21
please 6:6,22 7:9
  121:15
pled 137:21 139:1,8
POC 104:15,16
point 12:12 14:22
  15:9 17:1 18:25
  28:16 34:19 36:21
  36:23 37:1 55:13
  69:7,18 80:8 85:1
  87:17
policy 83:13
portfolio 66:25

  67:6
position 16:8,20
positions 43:18
possession 11:9,11
possibility 7:22 9:1
possible 9:3 47:2
  99:17
possibly 8:9 75:6
  89:22
postage 69:12
premises 72:12
preparation 101:15
prepare 11:2,4,21
  44:14 113:23
  118:1,11 119:16
prepared 26:19,21
  26:23 34:16 78:16
  79:5,13 81:3,4
  88:8 94:14 112:4
  112:6 126:1 129:3
  129:11,25 134:4
preparing 26:18
  92:2 117:23
  118:22 125:22
present 19:19
  123:10
pretty 48:3 95:12
previous 63:17
previously 60:13
  89:7 93:9,17
  94:18
price 64:12,20
  110:1
primarily 15:4,5
print 105:11,20,21
printed 105:9,14
  105:16,22,24
prior 69:24 93:16
  100:6 144:5
pro 3:15 16:15
probably 9:10
  37:18 83:25 84:20
  87:22 88:3,9,10
  88:13 92:18 99:20

  103:6 109:21
  110:25 121:17
probation 140:2,15
problem 86:20
proceedings 2:2
proceeds 108:5
process 16:17 19:8
  20:11 28:20 29:25
  42:13 49:19 82:1
  123:16 131:25
processed 16:2
  18:8 118:13 127:4
processing 20:19
  27:22 28:23 42:14
  126:25
produce 12:24
produced 59:11
  71:18
production 77:8
  103:18
profession 140:21
professional 14:6
program 33:13,14
  44:17
progress 39:12
  85:9
promise 6:15
  132:18
promised 141:2
promissory 98:8
  127:16 128:14
proper 42:16
properly 67:10
properties 1:7 27:1
  27:8,24 30:24,25
  45:1 46:15 48:25
  50:10 51:14 54:17
  58:3 59:25 64:12
  64:20 65:5,11,17
  65:22,25 67:1,21
  68:10,11 69:23
  70:2 79:24,25
  82:21 83:11 84:2
  85:16,22 86:5,12

  87:3,14,15 96:6,8
  113:15,17,22,24
  114:3 125:19
  129:11,25 130:25
  133:25 135:7
  136:2
property 1:6,8,9
  27:8,14 36:11
  48:6,22,23 50:3
  51:12 59:23,24
  60:18 61:18,19
  62:5 65:2 66:9
  67:25 70:12 71:22
  72:1,7 73:7,14
  74:3,6,12,13
  75:19 76:2,20,25
  77:2 80:21,23,24
  84:5 86:24 93:8
  99:2 100:20
  106:17 107:3,10
  107:22 108:10
  109:15,25 110:18
  112:22 113:13,14
  113:19 117:10
  119:24 121:12
  125:5,8,14 131:23
  138:2,11
proposed 77:14
protection 76:18
provide 84:11
provided 27:18
  60:14 92:11 96:12
  96:16 128:17
providing 60:8
  63:13,22 83:7
public 2:4 67:1,22
  87:13 136:25
  143:16 144:3,20
pull 90:23
purchase 64:12,19
  64:19 130:21
  135:1 136:9
purchased 51:14
  69:24

VERITEXT REPORTING COMPANY
212-267-6868                              516-608-2400

L. KING

purchaser 58:2
purchasers 59:23
   60:18
purchasing 125:8
   136:3
purportedly 88:18
purports 122:16
purpose 77:21
pursue 139:2,9
pushed 84:23
put 12:18 17:25
   26:24 34:10 36:10
   80:12 82:16 89:5
   91:7 93:15 96:6
   101:5 113:13
   115:15,18 118:3
   121:3 129:1
   130:16
p.m 143:7

_____

**Q**

qualifications 14:7
question 6:5,10,11
   6:23 7:2,3,8,10,11
   25:15,16 35:4
   45:5 81:20,22
   82:3 90:2 98:7
   102:25,25 116:25
   117:13,15
questions 5:23 7:15
   7:17,19 8:12 10:5
   63:12
quite 44:16 136:18

_____

**R**

R 1:11 3:1,6 5:1,1
   111:18,18 129:1
   129:13,13 130:2,2
raided 12:9,15,19
   137:7
raise 31:12 41:19
raised 54:22
rate 41:23 42:2
reach 141:21 142:8
read 81:20,22

117:14,15
ready 46:4 69:4,6
   90:16,24 91:5
   124:21 125:17
real 9:7,8 14:18
   16:6 17:24 18:2,9
   18:15 21:11 27:22
   30:13 40:15,19
   42:6 44:20 45:15
   47:5,10 52:1,12
   58:1,4 59:23
   62:17 63:9 65:8
   68:18 101:8 108:1
   118:14,16 125:13
reality 43:3
really 9:24 43:8
   45:20 53:7 67:4
   83:10 86:18
realtor 130:13
REALTORS 1:18
Realty 1:18,19
   107:21,23 130:13
reappear 142:25
reason 7:2 38:9
   46:14 60:24 64:11
   64:23 65:4 67:19
   77:24 84:18 90:20
   115:17
reasoning 54:24
recall 21:6 24:4,5
   36:20,24 38:6
   41:4 42:3 46:8,9
   50:20 53:5 62:15
   63:4,5,6 65:18,20
   66:2,24 85:6
   90:14 92:2 137:4
   139:21
receive 41:23 102:6
received 10:13,15
   12:8 35:12,13
   49:8 59:8 71:11
   71:14 76:5,8,9,11
   76:13 93:14 96:22
   96:23 97:1 103:13

104:22 109:19
   110:6,9,11,13
   114:4 120:14
   139:16
receptionist 15:6
   16:20,24
recess 38:1 57:25
   96:20 142:22
recognize 8:23,24
   56:5,6 60:1,3,18
   60:20,21,24 74:19
   75:1,11 103:18
   114:25
recognized 93:10
recollection 20:4
   22:6 33:7 63:22
   65:9,13,15 96:1,2
   107:17 115:1
   117:12 130:9
reconvene 142:24
record 93:15 110:5
   111:20,20 112:20
   114:21,24 115:5,7
   115:20 127:25
   129:2,3,7
recorded 74:14
   79:8 98:8 99:19
   108:23 111:7,12
   111:15 127:13,20
   127:21,22 129:16
   135:11
recording 4:21
   36:2,6,21 37:15
   37:21 46:1,25
   105:8 108:19,20
   108:21 109:10,12
   110:10 111:22,23
   114:11 115:3
records 48:24
RECROSS 4:2
Red 32:21 40:10,13
REDIRECT 4:2
reference 77:16
referenced 71:20

references 106:6
referring 21:25
   41:20 47:24 48:9
   72:7 127:16
refers 72:3,4,6
reflected 32:4
refresh 117:12
regarding 103:11
   114:11,13 121:11
   142:17
regular 17:22 18:5
   39:15 40:4 86:19
regularly 31:18
   127:13
relate 71:22
related 59:15 61:17
   71:20 106:12
   107:10
relationship 49:21
   51:2 66:13,15
relative 144:14,16
relatives 54:10
   121:17 122:3
released 20:14
remember 7:20 8:1
   8:17 11:6 14:17
   15:22 20:5,16,18
   21:1,14,15,18
   22:15,18 23:1,16
   24:1,14 25:9 26:9
   31:1 33:2,4,14,14
   35:25 36:14,25
   37:5 38:25 40:17
   42:7 43:17,18,20
   44:1,16 49:24
   50:23 51:1 53:3
   55:17 56:12 62:5
   62:9,22 68:6
   73:23 80:11 84:15
   85:19 92:6 95:3,5
   95:7,10,11,13,14
   104:13,16,20
   117:17,22 120:6
   128:25 137:19

138:16 139:7
remembers 7:25
remove 138:11
renovate 62:8
rent 51:15 62:9
   65:3
rented 27:2
renting 142:2
rephrase 7:9 94:16
   136:5
report 105:5,9
reporter 2:4 6:7
   81:23 117:16
   144:4
reports 133:20
repository 71:19
   77:9
represent 5:11,17
   47:7,14 48:22
   49:1,2,3 73:12
representation
   74:1
represented 7:5
   10:25 47:17,20
   48:3,4 123:11
   136:21
representing 48:19
   119:17,23,23
request 38:10
   118:2
required 124:14
research 8:6
resell 82:21
reserve 109:22
residing 5:1
respect 23:18 38:5
   39:6 98:15
response 11:25
responsibilities
   21:3
responsibility
   34:18 116:1
responsible 36:1
   37:1,15 45:8,25

L. KING

**rest** 72:19,20 75:9
**restitution** 140:12
140:13
**result** 116:19
138:21
**return** 111:20,21
115:20 129:1,4,6
129:19
**returned** 35:21
115:17
**review** 35:10,16
93:22
**reviewed** 35:22
**reviewing** 35:7
45:8
**Richard** 1:11,11,13
3:14 8:11,21 9:9
57:5 62:18,19
63:3,3,6 76:23
77:18 78:3,14
79:5 106:25 107:5
107:10 112:7
129:25 133:8
**Rick** 48:18,21 49:1
52:2 64:14 68:13
68:15 69:18 70:8
71:6 81:5 84:7,10
84:22,25 85:17,23
86:8 99:22 100:4
100:6,9,22 109:24
109:25 113:13,18
113:20 115:15,15
116:2 124:21
125:12,19 126:8
129:11 130:17,22
131:10,23
**Rick's** 68:15 71:3
115:25
**right** 5:23 6:3
19:18,22 46:12
48:5 68:7 72:11
72:25 79:9,16
80:11 88:5 91:12
94:22 111:5,18

119:2 120:25
127:2 128:20
136:22
**ring** 82:12,17 85:15
**ringmaster** 51:5
82:14
**Road** 3:14
**Robbie** 56:9,11,11
56:13
**Robert** 1:10 24:16
56:3 133:13
**Robyn** 16:14,17,17
**Roland** 1:12 21:12
64:4
**role** 81:25 82:7
83:4,6 134:2
**room** 124:11
**Rosso** 25:3
**ROTHSCHILD**
3:10
**roughly** 38:6
**Route** 15:19,22
17:13 43:21
**routines** 17:23
**rules** 6:2
**runner** 124:13
**rush** 67:8,9,9,9,16
**Russo** 25:3
**R/R** 115:16,21

**—— S ——**
**S** 3:1 4:7 129:15
**safe** 10:7
**Safety** 138:17
**salary** 31:9 41:15
**sale** 108:5
**sales** 64:21 109:9
**Salvatoriello** 4:20
110:17,18 130:1
**Salvatoriellos**
110:23 112:7
**sat** 27:19 33:3
87:16
**saw** 56:4 117:18,18
**saying** 72:14

100:24 116:20
119:22
**says** 59:22 72:11
77:16 97:11 98:19
100:7,24 101:1
103:23 104:4,24
111:15,19 115:21
121:15 129:5,6
**scam** 58:17
**Schedule** 4:10,11
71:10,13 72:18
**scheduled** 70:12
124:19
**scheduling** 124:23
**scheme** 51:8,10
56:15 82:8
**Schlesinger** 24:21
**school** 14:10
**Schotlin** 71:19
**scribbled** 111:16
**Se** 3:15
**search** 78:7,9
**second** 16:3,4
62:24 63:15 73:1
73:4 80:14 81:5
99:21 101:14
111:4 112:1,17
128:16 130:16
135:10
**secondary** 4:16
96:21 97:4,11,13
99:15,18 127:20
**secretarial** 39:22
40:3,6
**secretary** 17:6
18:10 21:12 39:21
43:20,22 53:4,11
85:18
**Section** 60:17 99:6
**Securities** 1:3 4:17
5:12 9:22 21:20
23:25 25:19,23
26:1,5 28:10 45:9
58:23 59:2 60:9

65:21 66:8,19,21
66:23 67:12 86:15
86:19 87:19 91:2
92:11,20 93:2
97:1,18 102:1,6
103:8,11 106:5
111:15,23 113:16
119:8,14 127:14
128:8 134:16,20
135:17,21,25
136:1,6,8,11
**Security** 70:20
**see** 11:7 29:1 32:9
33:6 64:14 68:6
72:9,14,20 73:16
73:21 74:16 79:1
85:8 87:5,20 90:8
92:24 96:7 100:12
101:11 111:9
116:15 117:4
120:3 129:15,20
130:2
**seeing** 113:3 119:2
**seen** 19:20 59:13
74:21 78:4,5 97:7
97:9 105:5,9
122:17,20
**seized** 4:10 59:8,11
59:15
**Selective** 60:10,11
**sell** 49:3 67:1,23
83:11
**seller** 27:10,11,13
47:7,20,23 48:4
49:12 65:11,16,17
65:21 66:9 71:4
79:24 84:4 100:15
100:20 131:12
**sellers** 47:15 59:22
136:9
**seller's** 100:11
101:2
**selling** 46:15 65:24
125:14

**send** 35:23 36:4,6
37:4 49:23 68:13
68:16 69:1,8
70:19 104:14
131:21 143:4
**sending** 10:1 36:7
37:2 53:11 128:19
**sent** 35:8 36:21
37:19 46:11,25
90:25 91:19 97:18
103:22 113:15
115:13 118:4
126:7
**sentence** 139:22
**sentenced** 137:17
137:20
**separate** 31:25
39:13,16 109:11
**series** 47:25
**serious** 108:3
**served** 5:15
**service** 4:12 76:4
76:19 77:11,19,22
140:9
**set** 16:6 144:12
**settlement** 98:25
99:6,9,22 100:1,5
100:7,11 102:18
104:6,7 107:12
**seven** 87:11 109:14
**severed** 142:19
**Shaggy** 58:7
**shape** 18:9
**share** 101:22
**shared** 15:23
**shipped** 91:7
**Short** 2:6 3:4
**shortcut** 131:20
**shortening** 131:25
**Shorthand** 2:4
**shortly** 36:8
**show** 20:25 32:10
73:3 91:22 101:13
110:14 117:9

121:8 122:15
**showed** 22:15,16
94:24 100:16
138:7
**showing** 93:7
141:13
**shown** 93:17
**shows** 106:11,19
107:15
**side** 24:8 26:22
31:21,21 32:6,7
41:18,19 70:12
83:19 84:22,25
85:3
**sign** 18:22 19:7,25
19:25 20:1,1,10
34:6,10 90:5,8,13
92:9 95:4 118:6
118:11 119:1
132:9
**signature** 94:5
102:9 121:24
**signed** 19:18,21,24
20:8 26:17 42:16
68:24 87:18 89:14
90:5,17,19,24
91:5,10 92:5
94:10 96:11 97:16
98:13 102:12
118:2,10 123:8
**significant** 139:25
**signing** 20:21 88:18
88:18 89:11
102:18
**signs** 141:13
**similar** 12:19 75:14
**similarly** 12:15
**simple** 75:4,17
**sit** 9:21 18:18 19:16
45:6 61:6,11
**sitting** 5:22 20:20
124:13 141:11
**situation** 142:20
**six** 87:11 140:5

**Skowrenski** 1:11
22:24 23:2,3 56:3
56:10
**small** 13:6
**snowball** 121:5
**Social** 70:20
**software** 33:12
105:8,10,23 106:2
**sold** 36:12 125:5,9
**solely** 17:24 30:9
**solid** 87:3
**somebody** 28:10
36:10 52:23 53:2
53:10 66:16 69:9
69:12 88:1 108:4
115:18
**someplace** 46:17
**soon** 20:13 47:1
67:10 91:11
**sorry** 9:6 13:1 25:3
41:22 47:22 63:3
98:9 102:4 112:18
135:4 136:4
**sort** 58:10 64:2
129:18
**sound** 8:20 56:10
133:15
**sounds** 24:3 25:6,7
31:3 56:11 62:14
62:15 63:7
**so-called** 55:14
62:1 74:20 82:8
82:16
**space** 15:23 16:1,5
40:10
**speak** 24:12 25:11
25:25 26:13 32:15
32:18,19 45:6
86:21 137:8
**speaking** 24:4
28:10 66:2
**specific** 16:5 63:22
73:23
**specifics** 85:8

**speculate** 90:3,4
92:19,23 114:6
117:19 128:21,23
**speculated** 113:7
**Speculating** 113:9
**speculation** 113:11
126:12,13
**Speeding** 138:16
**spending** 13:6
**spent** 136:18
**spilled** 52:23,25
**split** 15:13 17:3
21:14 29:3 91:15
130:18
**spoke** 23:17 24:6
25:14,24 26:4,9
39:2 40:25 51:19
**spoken** 23:8,10
24:15,18,20,23,25
25:2,5,10 26:6
62:20
**sporadically** 113:2
**stack** 37:5,6,7
42:14 87:25
128:19 129:16
**staff** 22:16 43:12
112:23
**stamp** 59:12 78:24
79:5 93:18 94:3
103:17 112:16
115:19 121:23
**stamped** 71:22 77:7
93:21 97:5 99:1
102:3 105:2
110:15 112:15,18
114:12,14,19
117:8 121:10
122:16
**stamps** 73:17
**stands** 75:3 104:16
**Stanley** 1:12 4:18
10:3 11:15 12:8
15:5 17:4 22:15
99:6,24 100:4,23

102:8 103:15
104:21,25 108:11
111:19 114:9,13
129:2,4,7,13
130:2
**start** 6:14 10:19
14:23 16:23 18:25
30:1 68:9,16
69:16 94:19 105:8
**started** 16:17 21:4
29:2 30:3 31:11
41:13 42:20 67:16
85:9,15,25 86:1
121:4 138:5,6
**starting** 15:12
**state** 2:4 8:3 94:11
117:13 136:14
137:24 144:4,20
**stated** 10:25 44:2
93:9
**statement** 18:7
32:9 34:25 98:25
100:17 104:6,7
108:16 130:12
136:13
**statements** 34:16
136:17
**states** 1:1 75:16,20
95:19 99:13,22,23
102:22 121:12
**stating** 122:19
**stationery** 125:23
126:2
**stay** 141:5
**Steinberg** 78:17,17
81:4
**stenographic** 2:1
**stenographically**
144:11
**step** 68:3 120:17
121:1,7
**steps** 69:17
**step-by-step** 49:18
**stick** 69:11

**sticker** 129:19,20
**sticky** 80:14
**stipulations** 83:12
**stock** 67:2,23 87:13
**stocks** 67:24
**Stone** 2:5 3:3 5:11
**stop** 137:10
**stopped** 41:3,5
118:25 137:12
**story** 52:8
**straight** 94:17
**straw** 19:5,6 20:3
42:25 45:6 48:7
49:3,4,10,13,14
51:15 52:16 54:7
54:8,9,13,14,25
56:17,18,21 57:2
57:5,9,11,14,17
57:21 79:25 80:1
84:2 88:17 89:8
95:21 96:3 101:12
118:8 125:9
127:21 129:12
**street** 3:7,11 5:2
15:2,10,23,24
141:11,16 142:6
**strictly** 16:1 18:11
40:14
**strike** 125:5 128:17
**stuff** 68:23 70:23
138:6,8,10,12
**style** 6:13
**subject** 99:14
**subpoena** 4:9 10:11
10:13,15 12:1,23
**Subscribed** 143:12
**subsequent** 15:18
**Summary** 99:12
**summer** 36:17 46:4
**summertime** 41:8
**suppose** 91:20
**supposed** 27:7
46:24 51:13 58:19
91:18 130:8

L. KING

sure 19:18 35:22 38:14,25 42:15 49:8 50:3,8 61:13 68:25 71:5 94:18 95:12 116:11 117:17 118:23,24
surrounding 85:7
suspect 116:19
suspicion 54:23
suspicious 36:11
sworn 5:2 143:12 144:6
SYSW 59:12 103:17 105:2 110:15,16 112:15 114:12,14,19 129:24 131:2

**T**
T 4:7
table 33:3
tacked 108:22
tagged 19:25
take 6:7,21,23 11:14 12:5 19:7 37:25 42:5,7 51:14 57:24 65:2 68:3 69:9,12,15 73:20 80:9 90:16 93:24 96:18 99:3 114:8 117:11 142:21
taken 2:3 11:22 12:9 73:24 99:13 109:21 144:11
takes 38:1 57:25 96:20 110:4 114:23 115:6 142:22
talk 22:17 56:1 63:10
talking 42:9,10 47:8 53:25 68:15 70:7 118:15 129:23 132:16

taught 117:5
tax 48:24 64:21 109:9,10 112:15
technically 42:24 109:3
telephone 17:10
telephones 17:23
tell 36:16 38:17 54:12 58:19 66:22 68:20 78:6 85:14 86:22 90:9,12 91:15 103:7 108:17 115:16 119:20
telling 65:9,16,20
ten 10:19 37:11 67:17 80:4 132:17
ten-inch 87:25
term 54:25 55:19 135:4
testified 5:3 60:13 89:7 94:18 122:23 125:3 128:18 142:16
testify 7:25 139:19 144:7
testimony 63:17 144:10
TF 8:22 9:9
Thank 8:13 10:6,8 10:22 22:3 110:3 130:4
theory 108:17,25
therapist 14:8
therapy 140:22
thing 6:15 26:18 38:4 46:13 75:3 85:9 87:13 88:12 115:16 119:2 120:25 137:25
things 19:17 24:8 30:11 32:17 40:2 42:19 45:17 83:20 85:11 116:18,19

thingy 75:7
think 7:21,23,24 12:16,17 17:22 18:4 21:17 22:11 22:20 24:11 25:21 26:12 27:5,17 31:11,11 39:16,18 40:17,24 44:16 45:10 48:3 50:13 52:3,8 54:4,23 55:16 56:9,16,22 64:18 65:5,23 74:9 82:11 85:2 85:25 86:17 88:5 89:24 92:20 93:1 93:10 94:23 95:1 95:24 105:16 113:25 119:4 120:24 121:15 125:3,24 128:18 137:6 138:23
third 30:25 37:22 95:16
Thomas 1:12 62:18 62:20 63:4
thought 54:6,6 86:11 140:25
thousand 88:21,21
three 20:9 34:22 37:23 45:10 48:13 49:11,15 55:16 62:7 73:20 75:4 75:16 91:1,11 96:7 98:18 107:20 129:15 140:3
tickets 138:17,17
ties 142:19
time 6:21 7:19 8:22 9:20 10:1,19 13:2 13:6 14:15 15:11 16:18 17:14,16 20:19,22 21:6,14 22:4,21 23:4 25:20 29:3 30:8

30:10 32:13 38:24 39:10 40:24 42:14 45:11,19 46:7 47:3 48:16 49:12 50:1 54:5 67:3,16 80:8 83:16 85:1 88:9 91:12 104:14 113:1,3 116:18,25 131:3 132:16 136:18,22 137:4 142:14,23 144:11
times 23:9 42:18 85:5 125:18
Tinton 3:15
title 1:15,15,16,17 3:9,12,13 4:10,11 9:2 16:23 17:1,5 35:24 39:19 52:3 57:17 68:17,23 70:14,23 71:1,3,5 71:7,10,13,16,17 71:21 73:5 74:20 74:23 76:1,20,23 77:8,13 78:7,8,11 81:15,18,25 82:5 82:7,9,22 83:2,6,7 83:10,17 84:19 112:21 113:23 119:6,11 129:5 130:17 133:18,20 134:4,8,10,14
titled 59:10 97:4
Title's 134:2
today 6:17 7:6,13 10:16,21 11:1,5 13:12 51:18 62:20 116:21,24 142:16 143:3
today's 10:11 142:24
told 7:2 18:11 50:18,19 53:17 54:20 55:25 64:22 80:7 82:25 87:8

88:21 92:9,13,17 95:21 98:2,4,15 119:21 120:20 122:5 123:21 127:25 138:8
Tonianne 137:2
top 71:19 72:15 81:16 104:8,25 105:17 115:16 119:5 129:14
totalling 107:21
touch 40:21 115:21
town 138:1
training 27:22
transaction 73:5 74:2,6 79:20 99:13
transactions 47:6 47:11,19,23 61:17 132:13 133:9
transcript 2:1 144:10
transfer 46:17 130:23,24
transferring 86:23 112:21 113:23
transfers 61:22
Trebour 24:25
trials 139:19
tried 11:6 46:12 86:4 119:1
trip 10:7
trouble 25:22 88:1 95:6
troubling 73:16
true 144:10
truly 48:24 120:25
trust 33:9 39:9,16 44:3 58:24 109:22 132:4,5
trustee 88:23 91:3
truth 67:24 87:7 119:25 144:7,7,8
truthful 8:8

VERITEXT REPORTING COMPANY
212-267-6868                516-608-2400