L. KING

try 6:11 33:2 57:23
  68:6 105:13
  112:24
trying 8:8 22:11
  26:9 28:19 66:25
  67:5 95:6,7
turn 6:2 8:11 49:2
  101:25 104:5
  106:9
twice 40:5 49:6
  51:19
two 15:20 49:11
  52:12 53:8 55:12
  61:16 67:22 69:5
  71:16 72:11 73:3
  73:25 75:14 79:17
  87:21 93:22 96:7
  109:7 120:15
  141:3 142:12
type 15:7 18:6,8
  58:17 81:7,9
  126:9 130:7
typed 81:12
typical 68:4,5,7
  79:19 100:14
  107:25 112:10
typically 99:19
  125:4
typing 17:23 92:6
typo 121:15

_____ U _____

Uh-huh 70:9 82:13
  82:15
unaware 12:11
underneath 75:4,5
understand 6:8,18
  7:8 8:1 10:20
  19:21 48:11 77:21
  83:9 109:1 115:2
  115:9 116:20
  136:5,10
understanding
  50:16 63:16 66:17
  66:18 89:3 95:20

understood 7:11
  52:14
unemployed
  140:20 141:3
unfamiliar 115:22
Uniform 98:25
UNITED 1:1
unusual 63:25
  101:8
upcoming 23:12
use 38:18 54:15
  63:14,21 95:25
  96:5,10
usually 47:6 48:13
  73:14
U.S 137:5

_____ V _____

valid 87:14
value 65:1
values 64:9
van 138:5
vast 62:11
VECCHIO 1:18
venture 48:8 80:1
  81:6,8,9 87:9,10
  87:17,20 88:12,15
  88:19 94:15,19
  96:15 110:21
  112:2 128:13
  135:21
ventures 95:4,8,12
  95:14
verify 68:14
version 94:25
versus 116:18
violation 102:25
voided 107:15,17
  109:2,5
volume 132:20,23
vs 1:5

_____ W _____

W 75:5
Wagner 3:3 4:4 5:4

5:10 6:1 7:23 8:7
  10:9 48:2,11 72:2
  72:5,11,15,22
  73:1,10 91:21
  96:18 103:2
  117:14 142:21,23
  143:3,5
wait 6:11 85:13
  132:1,3
waiting 37:3
Walker 3:3 5:10
Walsh 1:3 4:17
  5:11 9:21 20:18
  20:21 21:19 23:25
  24:10,15,16,18
  25:19,23 26:1,5
  28:10 45:8 58:23
  59:1 60:8 65:20
  66:8,19,21,23
  67:12 68:24 69:1
  69:4 86:14,18,21
  87:19 90:22 91:2
  92:11,20 93:2
  96:25 97:18 102:1
  102:6 103:7,10
  106:4 111:15,23
  113:16 118:4
  119:8,14 124:20
  127:13 128:8
  134:16,19 135:17
  135:21,25 136:1,6
  136:8,11
Walsh's 26:22
want 5:9 6:1 8:5
  15:19 26:15 33:1
  36:19 38:4 39:13
  43:21 45:10 46:17
  49:18 53:2 57:1
  62:7 80:20 87:23
  90:3 92:20,24,25
  93:3 94:16 95:3
  96:18 113:7
  131:21,21
wanted 10:10,18

29:8,16,19 85:12
  87:12 118:4
  120:25
wanting 96:7
wasn't 38:14 58:19
  85:13,17 86:18
  88:22 94:13,14
  96:8 97:20 108:23
  124:13 133:1
way 12:18 18:1,9
  23:22 27:18 36:9
  45:4 64:22 67:2
  68:1 81:11 118:3
  125:18 126:4
  130:16 131:8,25
  141:21
wayside 121:7
week 40:5,5 137:6
weeks 27:18 36:9
WEICHERT 1:18
went 14:14 15:14
  16:16 18:12 31:5
  31:5,6 38:9 50:2
  100:3,4 101:17
  109:12 114:2
  121:7 128:21
  141:7
weren't 41:10 59:4
  63:9 65:5 72:18
  89:8,9 95:8 98:2
Wernik 16:14
West 32:21 40:9
we're 7:10 10:21
  46:16 84:17
  118:15 129:23
  141:13 142:23
William 1:10 19:3
  22:1 25:12 51:3
  54:1,2 59:23
  65:16,21 109:15
  109:19
wire 130:23,23
  138:25
wired 58:22,23

59:1,4 103:24
  106:4
witness 4:2 8:4
  22:2 91:22 98:7
  116:21 117:3
  129:23
woman 17:21 22:25
  43:25
woman's 16:16
women 16:15
words 90:14
work 15:3 17:17
  25:22 30:2 31:15
  38:9,13 39:6,9
  40:1,3,6,12,16
  41:1,24 70:14
  85:9
worked 11:19
  12:12 15:5 25:19
  28:22 39:19 41:15
  42:24 44:2 46:1,7
  54:4 59:18 66:18
  85:19 95:11
  105:18
working 10:3 13:1
  13:2,5,7 14:14,16
  14:23 15:11,16
  21:4 28:18 29:23
  30:3,8,10 31:10
  38:7 40:8 42:20
  46:19,20 52:19
  112:25 133:4
worried 50:17
worth 65:5
wouldn't 63:20
  80:20 84:6,9
  87:20 92:7 118:25
wrapping 39:11
write 7:21 31:25
  33:25 34:2,3 44:9
  68:11 69:3 74:23
  104:12 119:21
  121:1 131:22
  132:3

L. KING

| | | | | |
|---|---|---|---|---|
| **writing** 86:1 131:14 132:1 | 129:7 130:3,17 132:6,7,12,25 | **$28,000** 109:16,20 110:1,1 | **1032977** 122:17 | 105:2,2 109:15 110:12 111:1 |
| **written** 34:4 37:20 120:2 121:25 | **Yacker's** 11:16 13:4,6 21:3 28:16 | **$30,000** 99:14,15 **$400,000** 130:24 | **1037604** 102:3 **1037660** 99:1 | 114:15,19,19 **1997** 15:17 28:25 |
| **wrong** 29:15 125:4 | 29:4 31:20 32:6 | **$5,250** 104:20 | **1037662** 97:5 | 38:8 41:1,8 46:5 |
| **wrote** 34:5 44:11 133:11 | 32:14,25 33:9 34:10 39:5 44:18 | **$55,500** 106:20,21 **$6,675** 104:2,6 | **104** 4:18 **105** 4:19 | 50:25 64:6 78:25 79:7,16 88:4 |
| **WS** 97:5 99:1 102:3 117:8,9 121:10 | 101:21 102:8 103:16,17 109:22 | **$650** 99:23,24 107:10 | **11** 4:9 76:5,19,22 **11:20** 2:7 | 105:17 108:24 110:8 111:8 |
| 122:16 | 112:24 115:18 | **$698** 108:10,13 | **1101** 99:21 | 112:19 114:10 |
| **W-e-r-n-i-k** 16:15 | 116:3,5,7 121:10 125:22 126:2,5,14 | **$700** 132:15 **$77** 109:8 | **1105** 101:14 **1107** 99:23 101:21 | 129:9,10 |
| | 129:19 | **$775** 109:8 | 101:21 | |
| **X** | **Yacker-Cash** 4:18 | **$80,000** 64:15 | **111** 4:20,20,21,21 | **2** |
| **X** 4:7 | **yeah** 22:13 44:22 | | **115** 4:22 | **20** 67:18 114:7 |
| **XI00970** 144:21 | 52:16 68:8 69:15 | **0** | **12** 15:12 106:8,9 | **20-minute** 57:24 |
| | 84:13 88:6 120:6 | **005187** 59:12 | 131:1 | **20/20** 87:5 |
| **Y** | 137:8 | **006901** 105:3 | **1201** 108:19 | **200** 64:16 67:20 |
| **Yacker** 1:12 10:3 | **year** 21:8,10 | **006912** 131:2 | **125** 41:18,19,19 | 87:15 118:15 |
| 12:8 15:1,5,8,12 | 141:12,14 | **006949** 103:17 | **13** 110:8 112:19 | **2000** 3:11 |
| 15:14,17,25 16:9 | **years** 67:22 116:22 | **04516** 112:15 | 139:22 | **2002** 137:20 |
| 16:10,22 17:2,4,4 | 116:23 131:6 | **04519** 110:15 | **14** 107:9 116:22,23 | **2003** 137:20 |
| 18:5,13,17 19:9 | 140:3 | **04525** 110:16 | 131:6 142:25 | **2004** 140:25 |
| 19:10,13,20 21:10 | **Year's** 22:5 | **04526** 114:20 | **15** 67:18 107:20 | **2006** 140:18 |
| 28:17 29:8,12,15 | **yellow** 80:14 | **04536** 114:12 | 132:17 | **2010** 2:7 142:25 |
| 30:5,9,10,13 | **York** 1:16,17 3:12 | **04544** 129:24 | **150** 2:6 3:4 | 143:13 144:22 |
| 31:10,14 32:12 | 3:13 134:11,14 | **04556** 114:14 | **155** 110:18 117:10 | **2013** 144:21 |
| 33:20,25 34:6,16 | **young** 25:20,21 | **07078** 3:4 | 121:12 | **22,000** 121:14 |
| 35:2,3,5 38:4,12 | 85:19 | **07102-4056** 3:8 | **16** 74:17 84:20 | **23** 109:15 |
| 38:23 39:2,6 | **Yvonne** 22:8 | **07724** 3:15 | **17** 105:17 108:6 | **25** 76:24 77:1,3 |
| 42:25 43:13 44:23 | | **07735** 141:18 | **171** 5:1 141:10 | 78:23 79:4,4,12 |
| 46:21,22 47:5,6 | **Z** | | **17767** 72:24 | 88:8 93:19 94:7 |
| 52:3,19 55:6,8 | **Zacardi** 15:8 | **1** | **18** 108:9 | 94:14 98:19 99:9 |
| 57:11 59:11,16,17 | **ZIP** 141:17 | **1** 3:14 105:1 114:18 | **19** 114:7 | **25th** 95:2 106:12 |
| 83:19 87:16,16 | | **1A** 59:22 | **190** 64:16 65:5 | **26** 111:1,8 |
| 99:7,24 100:7,23 | **$** | **1st** 141:10 142:6 | **19103-3222** 3:11 | |
| 103:8 104:21,25 | **$1,000** 140:13 | **10** 114:10 | **1992** 14:24 15:12 | **3** |
| 105:7,19 108:11 | **$100** 95:18,22 | **100** 3:7 31:20,21 | **1996** 9:15 15:17,21 | **3** 144:21,22 |
| 108:18 109:13 | 101:15,22 | 140:8 | 17:12,16 21:16,17 | **30** 2:7 110:12 |
| 111:19,24 112:14 | **$15,000** 107:21 | **1017-1019** 71:23 | 31:9 36:18 64:6 | 114:15 |
| 112:25 114:9,13 | **$150** 108:20 109:12 | 72:13 104:2 | 74:17 76:5,19,22 | **31** 105:2 |
| 118:23 119:17 | **$200** 31:20 32:4 | 106:12 | 76:24 77:1,3 | **33** 43:21 |
| 120:20,25 121:13 | 108:6 | **1032968** 117:8 | 78:23 79:4,12 | **34** 15:15,19,21,22 |
| 123:5,21,24 | **$200,000** 65:6 | **103297** 121:10 | 88:8,10 93:20 | 17:13 59:20 |
| 126:17 127:2 | **$27,591.10** 107:3 | **1032975** 117:9 | 94:7,14 99:10 | **3708** 93:22 |
| 128:4,12 129:2,4 | | | | |

VERITEXT REPORTING COMPANY

L. KING

Page 20

| 4 | | 77 4:13,13,14,14,15 |
|---|---|---|
| **40** 77:5 | | **8** |
| **41** 141:16 | | **8** 4:4 78:25 79:7,16 |
| **4517** 112:17 | | 129:5,9 |
| **4518** 112:19 | | **8th** 88:4 |
| **4529** 114:20 | | **8.50** 31:11 |
| **4546** 114:12 | | **811** 104:15 |

| 5 | | 9 |
|---|---|---|
| **5** 4:4 | | **9** 114:19 129:5 |
| **5B** 62:17 | | 142:25 |
| **5K** 139:17 | | **94** 4:15 |
| **5/13/97** 4:20 | | **96** 36:19 94:21 |
| **5:11** 143:6 | | **97** 4:16,16,17 17:17 |
| **50** 31:12 64:14 | | 67:4 |
| 121:18 | | **97-cv-3496** 1:2 |
| **50/50** 87:5 | | |
| **5188** 63:1 | | |
| **5189** 59:12 | | |
| **558** 114:15 | | |

| 6 |
|---|
| **60** 4:10 77:6 |
| **60/40** 110:20 |
| **600** 132:15 |
| **606** 102:3 |
| **619473** 99:2 |
| **650** 108:18 |
| **661** 99:1 |
| **663** 97:6 |
| **6912** 106:9 |
| **6918** 105:3 |

| 7 |
|---|
| **7** 129:5 |
| **7/11/96** 4:13,13 |
| 76:7 |
| **7/25/96** 76:9 93:13 |
| **7/26/96** 4:18 103:12 |
| **7/30/96** 4:21 |
| **70** 64:14 |
| **72** 4:11,12 |
| **729** 59:20 |
| **732)497-7007** |
| 141:20 |

Case 2:97-cv-03496-DRD-JAD   Document 478-41   Filed 11/10/11   Page 4 of 55 PageID: 6839

Page 145

```
              UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
              Civil Action No.
              97-cv-3496 (DRD) (MAS)

WALSH SECURITIES, INC.,    :
                           :
         Plaintiff,        :
                           :    VOLUME II
      vs.                  :    DEPOSITION OF:
                           :    LORRAINE KING
CRISTO PROPERTY MANAGEMENT,
LTD., a/k/a G.J.L. LIMITED;
OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.;
CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO.,
INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT, L.L.C.; WILLIAM
KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI;
RICHARD DiBENEDETTO; JAMES R.
BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD
PEPSNY, ESQ.; ANTHONY M.
CICALESE, ESQ.; LAWRENCE CUZZI;
ANTHONY D'APOLITO; DAP CONSULTING,
INC.; COMMONWEALTH LAND TITLE
INSURANCE CO.; NATIONS TITLE
INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE
INSURANCE CO. OF NEW YORK;
COASTAL TITLE AGENCY; DONNA
PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., D/B/A
MURPHY REALTY BETTER HOMES
And GARDENS               :
                          :
         Defendants.  :
                          :
 - - - - - - - - - - - - -
```

L. KING

## Page 146

1    TRANSCRIPT of the stenographic notes of
2  the proceedings in the above-entitled matter, as
3  taken by and before JANET BAILYN, a Certified
4  Shorthand Reporter and Notary Public of the State of
5  New Jersey, held at the office of STONE & MAGNANINI,
6  150 John F. Kennedy Parkway, Short Hills, New Jersey,
7  on May 14, 2010, commencing at 9:00 in the forenoon.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 148

INDEX

WITNESS        DIRECT  CROSS  REDIRECT  RECROSS

LORRAINE KING
  BY MS. WAGNER  149        241, 266
  BY MR. HAYES     176             258
  BY MR. KOTT      218             260
  BY Mr. McGOWAN        235        264

E X H I B I T S
NUMBER      DESCRIPTION              PAGE
King-21   Fidelity National Title
            Schedule A-4        145
King-22   Affidavit of Title        149
King-23   Memo dated 3/26/97      165
King-24   Transcript dated 10/29/99  167
King-25   Coastal Invoice dated 1/9/97  242
King-26   HUD-1                   242
King-27   Invoice dated 12/19/96    243
King-28   HUD-1                   243
King-29   Deeds                  245

## Page 147

1  A P P E A R A N C E S :
2
3      STONE & MAGNANINI, LLP
         BY:  AMY WALKER WAGNER, ESQ.
4      150 John F. Kennedy Parkway
         Short Hills, New Jersey 07078
5      Attorneys for Plaintiff
6      McCARTER & ENGLISH, LLP
         BY:  DAVID R. KOTT, ESQ.
7      Four Gateway Center
         100 Mulberry Street
8      Newark, New Jersey 07102-4056
         Attorneys for Defendant
9      Commonwealth Land Title Insurance Co.
10     FOX ROTHSCHILD, LLP
         BY:  EDWARD J. HAYES, ESQ.
11     2000 Market Street
         Philadelphia, Pennsylvania 19103-3222
12     Attorneys for Defendants Nations Title
         Insurance of New York, Inc. and Fidelity
13     National Title Insurance Co. of New York
14     METHFESSEL & WERBEL
         BY:  MARTIN R. McGOWAN, ESQ.
15     3 Ethel Road
         Box 3012
16     Edison, New Jersey 08818
         Attorneys for Defendant
17     Coastal Title Agency
18
19
20
21
22
23
24
25

## Page 149

1    L O R R A I N E  K I N G, having been duly sworn by
2  the Notary, testified as follows:
3  DIRECT EXAMINATION BY MS. WAGNER:
4    Q.    Good morning, Miss King.  Thank you very
5  much for coming back today.
6    A.    You're welcome.
7    Q.    I wanted to start by going over one more
8  loan?
9        (King-21, Fidelity National Title
10 Documents, is received and marked for
11 identification.)
12   Q.    Miss King, I'm handing you what's been
13 marked King-21.  I believe it's been produced by
14 Fidelity National Title, Bates stamped FY 004778
15 through FY 004809, and it's related to property
16 located at 26 Institute Street, Freehold, New Jersey.
17 If you can just take a look at that.
18       (King-22, Affidavit of Title, is
19 received and marked for identification.)
20   A.    Okay.
21   Q.    Do you notice anything unusual about
22 these deeds?
23   A.    Well, from what I can see the only thing
24 I did was the third deed going from this person
25 Hristov into the joint venture.  And that Rick did

2 (Pages 146 to 149)

L. KING

| Page 150 |
|---|

1    the deed going from Cristo Properties into this
2    Hristov.
3        Q.    And the deed that Mr. Pepsny did going
4    from Cristo to Hristov was dated December 31, 1996?
5        A.    Okay.
6        Q.    And then the deed that you prepared
7    between Hristov and herself and Capital Assets, which
8    we have been calling the joint venture deed, that's
9    dated January 7, 1997.  Correct?
10       A.    Right.
11       Q.    And then the Bargain and Sale Deed
12   prepared by Scott J. Basen, B-a-s-e-n, Esquire
13   between Howard and Nan Bernstein and Cristo Property
14   is dated January 23, 1997.  Is that correct?
15   Actually the first legal-size page there.  Keep going
16   after that.
17       A.    This one here?
18       Q.    Yes.
19       A.    Okay.
20       Q.    So that's dated, would you agree, about
21   23 days after the deed in which Cristo was selling
22   the property to Hristov?
23       A.    This is the first time I'm seeing these
24   deeds so forgive me.
25       Q.    That's fine, take your time.

| Page 151 |
|---|

1        A.    I agree that the date says January 23,
2    1997, the Bargain and Sale Deed going from Bernstein
3    to Cristo.
4        Q.    So does it appear to you from looking at
5    these deeds that when Cristo sold the property to
6    Hristov Cristo Properties didn't own them?
7        A.    I would agree to that.
8        Q.    If you can turn to the page that's Bates
9    stamped FY 004802.  It's towards the end.
10       A.    Okay.
11       Q.    Is that the signature page to what is
12   probably the mortgage?
13       A.    Mortgage, yes.
14       Q.    And is that your signature there
15   notarizing --
16       A.    Yes.
17       Q.    Do you have any recollection of Miss
18   Hristov appearing before you that day?
19       A.    I do not have any recollection of her
20   being there.
21       Q.    Do you know if this is one of the ones
22   where you didn't meet?
23       A.    It was probably.  I say that because it
24   was late in December, and by that time the pattern
25   had been established that Bill Kane would just take

| Page 152 |
|---|

1    the documents and have them signed and then returned
2    and I would notarize them afterwards.
3        Q.    Do you recall if you would have had any
4    involvement in having these filed with Monmouth
5    County?
6        A.    No.  It looks like they were filed April
7    of '97 in association with that stack of files,
8    deeds, mortgages, such, that were accumulated and it
9    was also returned to Coastal Title.
10       Q.    On the one that is titled Bargain and
11   Sale Deed --
12       A.    Yes.
13       Q.    -- dated January 23, at the top there am
14   I right in saying that that indicates that it was
15   filed on February third, '97?
16       A.    Yes.
17       Q.    Is there any reason why that one would
18   be filed in February versus April?
19       A.    I can speculate.
20       Q.    Okay.  I am not going to ask you to
21   speculate.
22       A.    I don't know.  I don't know why it was
23   filed at that time.
24       Q.    Okay.  I'm going to hand you what's been
25   marked King-22, and it's a document produced by

| Page 153 |
|---|

1    Fidelity, Bates stamped FY 008887 through 8896.
2    Please take a look at it and let me know if you're
3    familiar with this transaction.
4        A.    Okay.
5        Q.    So this appears to contain a deed dated
6    April 5, 1997 that you prepared between Wesley and
7    Donna Wright and Wesley and Donna Wright and Capital
8    Assets.  Is that correct?
9        A.    Yes.
10       Q.    Is that your signature at the top?
11       A.    Yes.
12       Q.    And then the document appears a couple
13   of pages later to have been signed by Wesley and
14   Donna Wright?
15       A.    Yes.
16       Q.    And is that Anthony Cicalese's
17   signature?
18       A.    Yes.
19       Q.    Do you recognize that as his signature?
20       A.    Yes.
21       Q.    Why would he have signed this instead of
22   you?
23       A.    Because Anthony was present at that
24   closing, and he sat with the clients and did the
25   closing documents, and then after he signed

3  (Pages 150 to 153)

VERITEXT REPORTING COMPANY

L. KING

Page 154

1  everything and they signed everything, then he would
2  give me the paperwork to just go over and make sure
3  that everything was correct before we sent it off for
4  the mortgage company. That's why my handwriting
5  underneath says: "Anthony Cicalese, Attorney-At-Law,
6  State of New Jersey."
7      Q.  So that's your handwriting?
8      A.  I wrote in "Anthony Cicalese,
9  Attorney-At-Law," but I wrote that in after Anthony
10 signed the papers because he didn't have a stamp that
11 said Anthony Cicalese, Attorney-At-Law.
12     Q.  If you could turn to the last page in
13 this document, it belongs to a deed dated March 31,
14 1997 between Cristo Property and Wesley and Donna
15 Wright and there's a signature of Richard J. Pepsny,
16 Esquire. Did you also write in "Attorney-At-Law
17 State of New Jersey"?
18     A.  Yes.
19     Q.  And why would you have written that for
20 Mr. Pepsny?
21     A.  Probably just a force of habit.
22     Q.  Would he have been present at this
23 closing?
24     A.  No. He would have prepared this deed
25 beforehand and given it to Bill Kane or somehow

Page 155

1  gotten it to Anthony Cicalese.
2      Q.  Now, you have previously testified that
3  at the beginning, I believe, Mr. Cicalese shared an
4  office with Gary Grieser. Is that correct?
5      A.  He was downstairs. He wasn't in the
6  same offices as Gary Grieser. Gary was on the second
7  floor, Anthony was on the first floor.
8      Q.  Okay. At some point he moved his
9  main practice to East Hanover?
10     A.  He had kept a separate office in East
11 Hanover originally, but for these closings he wanted
12 to be closer and more available so he rented office
13 space downstairs from Gary Grieser.
14     Q.  And that's the location where you worked
15 primarily. Correct?
16     A.  Yes.
17     Q.  And can you describe the layout of the
18 office?
19     A.  I can't recall.
20     Q.  Did you have your own office?
21     A.  No. There was maybe a cubicle.
22     Q.  Did Mr. Cicalese have an office there?
23     A.  I believe it was open.
24     Q.  Was there a conference room?
25     A.  I have to think about this. I don't

Page 156

1  remember.
2      Q.  So when Mr. Cicalese was doing these
3  closings, I think you testified that you were not
4  attending the closings. Is that correct?
5      A.  Correct.
6      Q.  Were you in the same room?
7      A.  I don't recall if there was a -- a
8  separate conference room or if it was a table set
9  aside where he would sit with the clients, and then I
10 would be at my cubicle, and if he needed copies of
11 anything I would be available and he would be able to
12 call me.
13     Q.  So did you see him actually meeting with
14 clients?
15     A.  Yes.
16     Q.  Do you know if he ever checked for
17 identification?
18     A.  I do not know that.
19     Q.  Do you know -- do you have any knowledge
20 that these people were indeed who actually signed the
21 papers?
22     A.  I do not know that.
23     Q.  Did you ever meet Susan Grieser?
24     A.  I don't believe so.
25     Q.  Do you know who Susan Grieser is?

Page 157

1      A.  By the last name I'm assuming that it
2  was somebody related to Gary Grieser.
3      Q.  Did you know that Susan Grieser was a
4  notary?
5      A.  No.
6      Q.  Had you ever seen anyone using her
7  notary stamp?
8      A.  No.
9      Q.  You stated that after some period of
10 time you strictly handled the Bill Kane closings when
11 you worked for Yacker. Is that correct?
12     A.  Yes.
13     Q.  And the "normal closings" were handled
14 by Carol and Mr. Yacker?
15     A.  Yes.
16     Q.  And Mr. Yacker approved of you handling
17 these Bill Kane closings by yourself?
18     A.  Yes.
19     Q.  You had stated the last time that you
20 believe there might have been somewhere else that you
21 had done some of the Bill Kane closings when you were
22 working for Yacker. You said it was a place with a
23 big conference room table. Do you have any
24 recollection where that might have been?
25     A.  I have been trying to think about that.

4 (Pages 154 to 157)

L. KING

| Page 158 |
|---|

1  I don't recall if Bill had separate offices, so it
2  could have been there, or it could have been at Gary
3  Grieser's in Red Bank.
4       Q.    When you were meeting with people who
5  were signing loan documents in these Kane closings,
6  did you explain to these individuals what the
7  documents were that they were signing?
8       A.    No.
9       Q.    What did you do?
10      A.    I would sit at the table, at the
11 conference table, and just tell them where to sign.
12      Q.    Did they ever ask you any questions?
13      A.    No.
14      Q.    So in over 200 closings nobody ever
15 asked you any questions?
16      A.    No.
17      Q.    When you attended what you've called
18 normal closings were the documents explained to the
19 people who were signing them?
20      A.    Usually in normal closings I was not
21 present. I would be available but it usually was
22 held in a separate room like a conference room with a
23 door that was closed, and then if they needed any
24 copies, then I would be called to make copies or get
25 information or whatever, but I was not involved in

| Page 159 |
|---|

1  those closings.
2       Q.    When you did these Bill Kane closings,
3  did you provide -- for the people who were signing
4  the documents did you provide them with a copy of the
5  documents they signed?
6       A.    No.
7       Q.    Why not?
8       A.    They didn't ask and I wasn't told to
9  give them.
10      Q.    And besides sending the documents that
11 Walsh Securities had requested in their closing
12 instructions to Walsh Securities, who else received
13 copies of the closing documents?
14      A.    I kept a copy for the office, I believe
15 Bill Kane received a copy, National Home Funding
16 received a copy, a copy of the deed would be made for
17 Rick and the HUD. I don't know who else would have
18 received it. I believe I sent an original and copy
19 to Walsh, kept a copy for us, Bill, and then Rick
20 would get a copy of the deed and HUD. I believe a
21 copy of the mortgage and the deed would be sent to
22 Coastal or whoever the title agency was but we mostly
23 dealt with Coastal. That's all I can remember at the
24 moment.
25      Q.    Do you know why you guys dealt mostly

| Page 160 |
|---|

1  with Coastal?
2       A.    I do not know why.
3       Q.    Do you know who made the decision to
4  work with Coastal?
5       A.    I do not know.
6       Q.    When you sent copies of all the closing
7  documents to these various parties, did all of them
8  get copies of the joint venture deeds?
9       A.    No.
10      Q.    Who didn't get copies?
11      A.    Walsh did not, Coastal did not. I don't
12 believe Home National Funding -- National Home
13 Funding did not. I believe that was just copied for
14 our records and Capital Assets and Bill Kane.
15      Q.    You have previously testified that
16 towards the end Kane was selling properties that
17 Cristo didn't even own yet. Is that correct?
18      A.    Yes.
19      Q.    In your previous testimony we also
20 talked about the funding of these closings. Is it
21 correct that only Walsh Securities funded these Kane
22 closings?
23      A.    As far as I was aware the money just
24 came from Walsh Securities.
25      Q.    And is it correct that National Home

| Page 161 |
|---|

1  Funding never provided any funding for these loans?
2       A.    No, they did not, I don't believe.
3       Q.    You don't believe that they provided any
4  money?
5       A.    No.
6       Q.    Okay.
7       A.    The money would be wired into the trust
8  account and that's where all our funding came from
9  for this.
10      Q.    You had also previously stated that
11 funds were quote unquote probably not disbursed in
12 accordance with the closing -- Walsh Securities'
13 closing instructions. Why do you think they probably
14 were not disbursed?
15      A.    Because Bill Kane made it up as he went
16 along. He -- like I said, he would tell me who to
17 send funds to.
18      Q.    Do you believe that any of the Kane
19 closings were -- that the funds were disbursed in
20 accordance with the Walsh Securities' closing
21 instructions?
22           MR. KOTT: Objection to form.
23      A.    Say that again.
24      Q.    Sure. Do you believe that funds were
25 disbursed properly in any of the Kane closings?

5 (Pages 158 to 161)

L. KING

---

**Page 162**

1    MR. KOTT: Same objection.
2    Q.    When I say properly, I mean in
3    accordance with Walsh Securities' closing
4    instructions?
5    MR. KOTT: Same objection.
6    A.    In the beginning for the few that were
7    done without me that I know that these people were
8    definitely legitimate buyers, I believe those were
9    funded properly, and maybe the first couple with Bill
10   and his buyer, but then shortcuts started happening.
11   So, therefore, I can say that they were not funded
12   properly.
13   Q.    Do you have any sense of the time in
14   which that happened? Month and year?
15   A.    Without looking at documents it's very
16   hard to say.
17   Q.    When you were participating in the Kane
18   closings, is it correct that you knew that phony
19   leases were submitted to Walsh Securities?
20   A.    At some point the second leases were
21   made up, yes.
22   Q.    Last time you had mentioned another -- a
23   number of people that were involved in Bill Kane's
24   quote, unquote ring. You mentioned Irene DeFeo. Can
25   you describe what her involvement was with Kane?

---

**Page 163**

1    A.    She was the real estate agent. I don't
2    know her exact role. I don't know if she looked for
3    straw buyers, misrepresented the whole buying
4    process. I just know that she got her fee.
5    Q.    You also mentioned Donna Pepsny. What
6    was her involvement?
7    A.    Same thing. She was a real estate agent
8    and Rick's wife.
9    Q.    Can you describe Rick Pepsny's
10   involvement?
11   A.    He was the attorney representing Cristo
12   Properties, or whatever name Bill Kane used, to buy
13   properties.
14   Q.    Do you have any knowledge as to what he
15   knew about the frauds?
16   A.    I would just discuss the closings with
17   him, what was coming up, what was closing on our end.
18   I don't know what he and Bill discussed.
19   Q.    Can you describe the involvement of
20   National Home Funding?
21   A.    They were the mortgage brokers. They
22   had to -- I was told this, they had to broker between
23   the buyer and the bank. They couldn't just go from
24   Walsh Securities to buyer. They had to process the
25   mortgage applications.

---

**Page 164**

1    Q.    And do you know what they knew about the
2    frauds?
3    A.    No, I do not.
4    Q.    Did you ever have any conversations with
5    them about the frauds?
6    A.    No.
7    Q.    Can you describe Coastal Title's
8    involvement?
9    A.    I just know that you have to have title
10   insurance and the paperwork just was brought to me to
11   process. I never spoke to anyone there per se except
12   for to say: I need title work on this, or this is
13   the list that's coming up of total properties that
14   are going to be processed this month or next month.
15   Q.    What was Larry Cuzzi's involvement?
16   A.    He worked very heavily with Bill Kane
17   and Gary Grieser. I do not know what his position
18   was. I don't even know who he directly worked for
19   but he was always around. He ran a lot of paperwork
20   around.
21   Q.    And what was Gary Grieser's involvement?
22   A.    Gary was president of Capital Assets,
23   which was explained to me was a property maintenance
24   company, that they were going to manage all of these
25   properties that were being bought; hence, the need

---

**Page 165**

1    for the joint venture agreement and the joint venture
2    deed so that they would be able to say that they
3    owned all of these properties that they were
4    managing.
5    Q.    And do you know what Gary Grieser knew
6    about the frauds?
7    A.    I never really had a much of a
8    conversation with him about these. He always came
9    with Bill. Bill did most of the talking and Gary
10   would sit there and wait for his check.
11   Q.    Was Gary Grieser present at closings?
12   A.    No.
13   Q.    So when did he come with William Kane?
14   A.    After the money would get deposited in
15   the trust account.
16   Q.    And was that before or after the
17   closings?
18   A.    After.
19   MS. WAGNER: I just want to take a brief
20   break to find a document.
21   (A recess takes place.)
22   (King-23, Memorandum dated 3/26/97, is
23   received and marked for identification.)
24   Q.    Miss King, I'm handing you what's been
25   marked King-23. It's Bates stamped FY 008932.

---

6 (Pages 162 to 165)

L. KING

## Page 166

1   Does this look familiar to you?
2   A.   Yes.
3   Q.   Can you tell me what it is?
4   A.   This is a memo from me to Sally. Says,
5   "Binders needed," so I'm figuring it's to Coastal,
6   and it's one of my memos that I sent out regularly to
7   people about what was coming up for mortgage and that
8   I would need binders, title binders, for the
9   following properties. I don't know whose handwriting
10  is on that, who made notes after I sent it off.
11  That's not my handwriting.
12  Q.   Would this have been sent to anybody
13  other than Sally?
14  A.   I don't recall. Probably not.
15  Q.   Now, you had previously testified that
16  you prepared lists like this about upcoming closings
17  to help keep everything straight.
18  A.   Yes.
19  Q.   Is that correct? And you faxed them to
20  Rick Pepsny, Bill Kane, Gary Grieser and National
21  Home Funding. Is that correct?
22  A.   Yes.
23  Q.   Would they all get different lists?
24  A.   Not necessarily. I -- if I recall
25  correctly I would put in the "to," the reference

## Page 167

1   "to," everybody who would get it, that memo.
2        (King-24, Transcript dated 10/29/99, is
3   received and marked for identification.)
4   Q.   Miss King, I'm going to hand you what's
5   been marked King-24. Is that a transcript of your
6   plea in the case by the United States of America
7   against you?
8   A.   Yes.
9   Q.   Do you believe that everything you
10  stated under oath that day was true to the best of
11  your understanding?
12  A.   Yes.
13  Q.   On page 33 starting on line 15 the Court
14  asked you: "In order to conceal that circumstance,
15  did you in 1996 and 1997 alter deeds and change their
16  dates so that the closings would appear to have
17  occurred in the correct order?" And you responded:
18  "Yes, sir." Is that correct?
19  A.   Yes.
20  Q.   And you stated that you discussed this
21  with Mr. Yacker. Is that correct?
22  A.   Yes.
23  Q.   And that you made those changes with his
24  approval. Is that correct?
25  A.   Yes.

## Page 168

1   Q.   Do you know how often you altered dates
2   on deeds?
3   A.   I don't know how often. It was probably
4   when the deeds were not in succession.
5   Q.   Would you have only altered dates on the
6   deeds that you prepared?
7   A.   No.
8   Q.   Would you alter dates on deeds that Rick
9   Pepsny prepared?
10  A.   Towards the end, yes.
11  Q.   And when you say towards the end, was
12  that when you were working for Mr. Cicalese?
13  A.   No. Yacker.
14  Q.   And Mr. Yacker knew this?
15  A.   Yes, he did.
16  Q.   Did he ask you to do this?
17  A.   He said that the deeds needed to be in
18  order. To do whatever I had to do to make that
19  happen pretty much.
20  Q.   At the bottom of page 33 going on to
21  page 44 the Court had asked you about your
22  involvement in notarizing signatures of persons that
23  were not present at the closing. Is that correct?
24  Q.   What page?
25  Q.   The bottom of 33 to top of 34.

## Page 169

1   A.   Okay, yes.
2   Q.   And in some of those instances you
3   believe that the buyer's signatures were forged on
4   the documents?
5   A.   Yes.
6   Q.   And that's consistent with what you've
7   testified to us?
8   A.   Yes.
9   Q.   You also responded to the Court's
10  question about discussing with Mr. Yacker the subject
11  of improperly notarizing signatures. Is that
12  correct?
13  A.   Yes, I did.
14  Q.   And what did you discuss with him?
15  A.   I told him exactly what was going on,
16  that Bill Kane was taking documents and having them
17  signed, that the people were not present, that I told
18  him about the Larry Cuzzi, David Lieber situation and
19  he didn't say stop, he didn't say, don't do it, I
20  want to see the people. So it was like: Just do
21  what you got to do to get the closings done pretty
22  much.
23  Q.   Did he seem to care?
24  A.   I don't know. I don't know what he was
25  feeling.

7 (Pages 166 to 169)

L. KING

| Page 170 | Page 172 |
|---|---|
| 1   Q.   Did you bring it to his attention<br>2 because you were concerned about it?<br>3      A.   Yes, I did.<br>4      Q.   On page 34 between lines 12 and 17 is it<br>5 correct that you told the Court that in 1996 and 1997<br>6 you prepared second mortgages for buyers of various<br>7 properties when you knew that the second mortgages<br>8 were not going to be recorded and it was solely to<br>9 create the appearance that the seller was providing<br>10 funds to close a transaction?<br>11      A.   Yes.<br>12      Q.   Did you discuss this with Mr. Yacker?<br>13      A.   Yes.<br>14      Q.   What did he say?<br>15      A.   He's the one who showed me how to create<br>16 them, and there really was no explanation to me why<br>17 we needed a second mortgage.  He just said:  You need<br>18 this second mortgage.<br>19      Q.   Did someone in your office type up the<br>20 second mortgage?<br>21      A.   I think it was like a form that I just<br>22 filled in names, like one of the exhibits, I believe,<br>23 you showed me.  It was just:  Use this, put their<br>24 name in and just hold it in the file.<br>25      Q.   I'm showing you what is marked King-11. | 1      A.   Yes.<br>2      Q.   And Mr. Yacker was aware of this?<br>3      A.   Yes, he prepared them.  I mean he<br>4 prepared the first one, the wording.<br>5      Q.   He prepared the wording of the first<br>6 phony escrow letter?<br>7      A.   Yes.<br>8      Q.   And he knew you were continuing to use<br>9 that wording on subsequent escrow letters?<br>10      A.   Yes.<br>11      Q.   Do you recall when in 1997 Mr. Yacker<br>12 became the subject of an investigation by the New<br>13 Jersey Attorney Ethics Office?<br>14      A.   In relation to these closings?<br>15      Q.   Yes.<br>16      A.   When the FBI raided his office.<br>17      Q.   Were you still working for Mr. Yacker<br>18 then?<br>19      A.   There wasn't much left for me to do<br>20 there.  Maybe I was there like once every two weeks<br>21 just to finish going through paperwork, but I was<br>22 mostly working with Anthony at that point.<br>23      Q.   According to your plea Mr. Yacker asked<br>24 you to go through various files and remove deeds and<br>25 second mortgages because they weren't documents that |

| Page 171 | Page 173 |
|---|---|
| 1      A.   Yes.<br>2      Q.   Is this an example of a second mortgage<br>3 you're discussing?<br>4      A.   Yes.<br>5      Q.   Did you fill in that information?<br>6      A.   No, that's not my handwriting.<br>7      Q.   Do you recognize the handwriting?<br>8      A.   No, I do not.<br>9      Q.   You previously testified that the<br>10 address on there for the second mortgage holder is<br>11 Kane's home address.<br>12      A.   Yes.<br>13      Q.   And you believe this to be a fraudulent<br>14 document.  Correct?<br>15      A.   I don't know what to believe at this<br>16 point.  I don't know why they needed second<br>17 mortgages.  They just said they needed it for the<br>18 file, hold it aside with the explanation if we need<br>19 to file it later we have it in the file.  I mean, you<br>20 know, through the Court -- through the county.<br>21      Q.   The Court also asked you at the bottom<br>22 of page 34 about your preparation of escrow letters<br>23 on Mr. Yacker's letterhead that falsely represented<br>24 to mortgage lenders that Mr. Yacker was holding funds<br>25 in escrow on particular closings.  Is that correct? | 1 were recorded and that -- is that correct?<br>2      A.   That he asked me, yes.<br>3      Q.   And was that days before the state<br>4 ethics representatives were scheduled to review those<br>5 files?<br>6      A.   I want to say it might have been like a<br>7 week before.<br>8      Q.   If you weren't regularly working for him<br>9 at this point what were the circumstances around<br>10 which he asked you to come back and do this?<br>11      A.   He would call me.<br>12      Q.   Did he tell you he was being<br>13 investigated?<br>14      A.   No.  He just said, you know, I need to<br>15 have you go through the files, take out this and<br>16 this.  I don't know why.<br>17      Q.   Did you have any later conversations<br>18 with him about why he had you doing that?<br>19      A.   No.<br>20      Q.   In your plea on page 36 you also agreed<br>21 that you had assisted in arranging for proceeds of<br>22 closings to be disbursed to the seller and another<br>23 person prior to the actual closings taking place.  Is<br>24 that correct?<br>25      A.   Yes. |

8  (Pages 170 to 173)

L. KING

Page 174

1  Q.   And in this instance the seller was
2  either Bill Kane or one of his companies. Correct?
3      A.   Yes.
4      Q.   And when the Court said "another
5  person," there were actually multiple people that the
6  funds could have been disbursed to. Is that correct?
7      A.   Yes.
8      Q.   And the Court also asked you about
9  whether these were proceeds taken from loan monies
10 that had been wire transferred to Mr. Yacker to be
11 held until closing. Is that correct?
12     A.   Yes.
13     Q.   And these were monies that had been wire
14 transferred to Mr. Yacker from Walsh Securities?
15     A.   Yes.
16     Q.   You had also discussed this with Mr.
17 Yacker and he approved of you arranging for the
18 premature disbursement of these closing proceeds. Is
19 that correct?
20     A.   Yes.
21     Q.   And Mr. Yacker signed checks prematurely
22 disbursing these proceeds. Correct?
23     A.   Yes.
24     Q.   The Court also asked you about your
25 first meeting with representatives of the FBI and the

Page 175

1  United States Attorney's Office to discuss these
2  matters. Is that correct?
3      A.   Yes.
4      Q.   And apparently prior to that meeting Mr.
5  Yacker telephoned you and asked you not to reveal
6  what you knew about the activities of his office. Is
7  that correct?
8      A.   Yes, he did.
9      Q.   It also says that Mr. Yacker told you,
10 among other things, not to reveal what you knew.
11 What were these other things?
12     A.   He wanted me to not give more
13 information than they asked for basically. And he
14 said be truthful but you don't have to tell them
15 everything you know. So that's what he wanted to
16 share with me.
17         There was another file that was not
18 pertaining to Bill Kane closings at all. It was a
19 separate file that had been dragging on for like two
20 years that we were waiting on documentation for and
21 so forth. And I think he was referring to that, but
22 I don't recall the name of the people, such a long
23 time ago, but that was a file he was concerned about.
24     Q.   Was it a real estate closing?
25     A.   It was.

Page 176

1      Q.   Do you remember anything about it?
2      A.   I don't. I just remember that it was
3  like a trouble file that we couldn't get a back deed
4  or something from someone or we couldn't clear title
5  or -- it was something.
6      Q.   Was it something that had started in his
7  previous firm?
8      A.   Yeah, or had started when we just moved
9  to Matawan away from Yacker & Granata. It was a very
10 old closing. It had to do I think with a woman who
11 wanted to buy a house. She had some handicapped
12 children and she couldn't get a loan so the mother
13 wanted -- mother offered to have the mortgage in her
14 name but she was worried about her credit or
15 something. So after she agreed she refused to come
16 in and sign some documents. So it hung on forever
17 and ever while we tried to work it out with this
18 woman, but it was not anything related to Bill Kane.
19     Q.   I don't have any further questions right
20 now.
21 CROSS-EXAMINATION BY MR. HAYES:
22     Q.   Good morning, Miss King.
23     A.   Good morning.
24     Q.   As you know, my name is Ed Hayes. I
25 represent Fidelity National Title Insurance Company

Page 177

1  and Nations Title Insurance Company. If you don't
2  understand any of my questions let me know and I will
3  be happy to rephrase them for you. Okay?
4      A.   Yes.
5      Q.   Miss King, do you believe that Ms.
6  DeMola at Walsh Securities was aware of what was
7  going on in these transactions?
8      A.   I believe, but I did not have any direct
9  conversations with her regarding that.
10     Q.   And can you tell me what it is that
11 causes you to believe she knew what was going on?
12     A.   This is not firsthand knowledge you
13 understand.
14     Q.   Understood.
15     A.   But she was always in contact with Bill
16 Kane and she was his contact at Walsh Securities for
17 processing the mortgage papers or the approval person
18 that needed to approve the mortgages that were set up
19 for these properties. I don't know if she knew there
20 were straw buyers, I cannot say that for a fact, but
21 if you're in the mortgage company business and you
22 have the rate of mortgages going out from your bank
23 at the rate these properties went through, I would --
24 as a mortgage person I would examine it a lot closer
25 than a normal real estate buy. We had multiple

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

aa89dd8d-34d2-4e7a-b838-9eca61bee5ac

L. KING

| Page 178 |
|---|
| 1 names, multiple properties for each name on people |
| 2 who were making $30,000 a year holding hundreds and |
| 3 hundreds of thousands of dollars of mortgage.  I |
| 4 would think that that would be a humongous red flag. |
| 5     Q.     Did Mr. Kane at any time tell you that |
| 6 Ms. DeMola was involved in the approval of the loans? |
| 7     A.     Not directly. |
| 8     Q.     What do you mean by that, not directly? |
| 9     A.     Well, he never came to me and said: |
| 10 Betty Ann is the one who is at Walsh Securities |
| 11 approving all these loans.  He never said that.  He |
| 12 just referred to Walsh Securities as Walsh and Betty |
| 13 Ann as Betty Ann and that if there was a problem with |
| 14 a file he would have to talk to Betty Ann about it or |
| 15 mortgage or anything at Walsh. |
| 16     Q.     So your belief based on your |
| 17 conversations with Mr. Kane was that whenever an |
| 18 issue or problem arose with a Walsh loan he would |
| 19 communicate with Ms. DeMola to deal with it or get it |
| 20 resolved? |
| 21     A.     Yes. |
| 22     Q.     You also testified in your first day of |
| 23 your deposition that Mr. Kane spent a lot of time at |
| 24 Walsh.  Is that correct? |
| 25     A.     Yes, he was there quite often, meaning |

| Page 179 |
|---|
| 1 in the beginning of the month not as much but as the |
| 2 time towards the end of the month came closer he |
| 3 would be spending a day, two days at Walsh. |
| 4     Q.     And how do you know that? |
| 5     A.     I would call him to find out where he |
| 6 was because I would need something for one of the |
| 7 closings, and he would tell me that he was at Walsh. |
| 8     Q.     Did you ever hear him say or anyone else |
| 9 say in your presence that he actually had a desk at |
| 10 Walsh? |
| 11     A.     No, I did not know that. |
| 12     Q.     Do you know exactly what Mr. Kane's |
| 13 relationship was with NHF? |
| 14     A.     National Home Funding? |
| 15     Q.     Yes, ma'am. |
| 16     A.     I do not know other than the fact that |
| 17 they were the mortgage broker. |
| 18     Q.     Did you believe he was employed by NHF? |
| 19     A.     I thought Bill Kane worked for himself. |
| 20     Q.     Do you recall when the HUD-1s were |
| 21 prepared in relation to the day of closing? |
| 22     A.     I'm just going to run through the |
| 23 sequence of events, okay? to help me remember. |
| 24     Q.     Right. |
| 25     A.     Bill Kane would give me a list of |

| Page 180 |
|---|
| 1 properties, order the title work, I would -- |
| 2 pertaining to the HUD, I would say as soon as he knew |
| 3 the figures, because he would give me all those |
| 4 figures, the property buy, the mortgage amount, and |
| 5 what everybody's fees would be so that I could start |
| 6 filling in a HUD statement.  As soon as he would give |
| 7 me all those figures, then I would start working on |
| 8 the HUDs. |
| 9     Q.     Do you recall if you had the Walsh |
| 10 closing instructions prior to your completion of the |
| 11 HUD?  And the reason I ask you is that the closing |
| 12 instructions actually include within them a listing |
| 13 of the fees that Walsh said was permitted, and if you |
| 14 want you can take a look at King-13, which was a copy |
| 15 of the closing instructions, and see if that helps |
| 16 refresh your recollection. |
| 17          If you look at the third page, ma'am, |
| 18 you will see there's a topic titled:  "Fees and |
| 19 Costs." |
| 20     A.     I can't remember when I would have |
| 21 received those figures.  I might have started working |
| 22 on the HUD statements as soon as he gave me his |
| 23 information and then finalized it as soon as I got |
| 24 the closing instructions. |
| 25     Q.     Is it clear in your mind, ma'am, that |

| Page 181 |
|---|
| 1 you would not have finalized a HUD before having |
| 2 these closing instructions? |
| 3     A.     Or a copy of this last page. |
| 4     Q.     Right. |
| 5     A.     Yes. |
| 6     Q.     And were those HUDs faxed to Walsh at |
| 7 some point in time? |
| 8     A.     Those HUDs? |
| 9     Q.     Yes, ma'am. |
| 10     A.     No. |
| 11     Q.     Because the reason I ask you is that the |
| 12 closing instructions say that prior to disbursements |
| 13 the HUDs must be faxed to the closing department. |
| 14     A.     No, I don't believe I ever faxed them. |
| 15 I think they were just included with the closing |
| 16 package when they were returned. |
| 17     Q.     Do you believe, ma'am, that HUD was |
| 18 actually -- I'm sorry, Walsh was actually funding |
| 19 these loans before they even had a HUD-1? |
| 20     A.     Sure they were.  They didn't receive the |
| 21 HUD statement until I would send back the package to |
| 22 Walsh. |
| 23     Q.     Ma'am, if you would just take a look at |
| 24 the first page of King-13, Section A, that contains |
| 25 the list of documents.  Do you see that? |

10 (Pages 178 to 181)

L. KING

### Page 182

1    A.   Yes.
2    Q.   Were these documents that were supplied
3  to you by Walsh or by NHF?
4    A.   I don't know where the rest of these
5  documents would have come from.
6    Q.   And would you insure on each transaction
7  that each of the documents that are listed under
8  category A were signed and returned in the package to
9  Walsh?
10    A.   I can only say what I sent back to them.
11  I don't know where the rest of the pieces would have
12  come from.
13    Q.   Which of these items would you have sent
14  back?
15    A.   The copy of the mortgage, the HUD,
16  sometimes I would have the insurance company -- the
17  hazard insurance. I don't know what an NTC of right
18  to copy appraisal is. I don't know what a T-I-L
19  disclosure is. I would just send back the copies
20  that Walsh would send to me, the mortgage, copy of
21  the deed, copy of the mortgage, let's say that. I
22  wouldn't send them back a filed copy yet unless it
23  were filed through the county and then back to me,
24  but they would get a copy of the mortgage and the
25  HUD.

### Page 183

1    Q.   Well, this document says that Walsh is
2  providing you or Mr. Yacker, the closing attorney,
3  with all of the documents listed in paragraph A. You
4  see that?
5    A.   I see that.
6    Q.   In your recollection, ma'am, was Walsh
7  Securities, in fact, supplying all of the documents
8  that are listed in A?
9    A.   Well, not knowing much about mortgages,
10  okay, there were a lot of documents in the mortgage
11  package that was sent to us from Walsh.
12    Q.   Let me ask you this then: Without doing
13  a specific document-by-document analysis, all of the
14  documents that were sent to you by Walsh, were all of
15  those documents signed, whatever they might be, and
16  returned to Walsh?
17    A.   Yes.
18    Q.   Did Walsh ever communicate with you at
19  any time on any of the transactions and say: Miss
20  King, on the Smith deal we didn't get a HUD or we
21  didn't get a T-I-L, or we didn't get an appraisal?
22  Do you recall any conversations at all like that?
23    A.   There could have been, but whatever was
24  sent to me I pretty much had signed or signed, copied
25  and sent back to them. I would prepare the HUD so

### Page 184

1  that would be my part of things. Copy of the deed,
2  that would have been my part of things unless it
3  wasn't in the package to begin with. I pretty much
4  sent them back everything that they sent to me.
5    Q.   So, to the best of your recollection,
6  they would have gotten back on every loan whatever it
7  is they sent you for signature?
8    A.   Yes.
9    Q.   And under B, ma'am, there are conditions
10  to be satisfied. You see that?
11    A.   Yes.
12    Q.   Do you recall if they varied by loan?
13    A.   That pretty much is what was on most of
14  the closing documents.
15    Q.   And what do you recall being done to be
16  sure that these conditions were satisfied?
17    A.   Well, I would insert the legal
18  description from the title binder I would receive
19  from Coastal into the mortgage. I don't know about
20  liens, judgments and mortgages, if anything had to be
21  satisfied.
22    Q.   Well, do you recall ever being given
23  numbers by Mr. Kane or anyone that were necessary to
24  pay off mortgages or pay off liens or pay off
25  judgments so that the title to the property was clean

### Page 185

1  for the new transaction?
2    A.   He didn't specifically say to me: Okay,
3  I need this amount of money out of this property to
4  be sent to this bank for payoff. There were a few in
5  the beginning, I believe the one that was a previous
6  exhibit with D&Sons, but for the most part, no, I
7  don't remember him saying to me: Okay, this is a
8  payoff that needs to be sent to this mortgage
9  company.
10    Q.   If payments are made, would they have
11  been reflected by you on the HUD-1?
12        MR. KOTT: You mean payments to
13  creditors?
14    Q.   Creditors.
15    A.   Creditors? It would have been.
16    Q.   And that would have been sent back to
17  Walsh as part of the package?
18    A.   Yeah.
19    Q.   It indicates: "Provide original hazard
20  insurance declaration page with one year's paid
21  receipt." Do you believe that was satisfied in all
22  of the loans?
23    A.   I don't know because I never -- I can't
24  say I never. In the beginning I would receive, I
25  believe, a copy of the first page and a paid receipt

11 (Pages 182 to 185)

L. KING

## Page 186

1  from the insurance agent. I want to say Ed Rice. I
2  think that was the agent's name for the insurance,
3  but then after a while I never received them either,
4  and again another shortcut. It would be one more
5  step eliminated that, say, the insurance agent had to
6  send me a copy and I would have to hold up all my
7  documents to send that off to the -- you know, to
8  Walsh, whereas Bill probably said: Oh, I'll take
9  care of it, and maybe he circumvented that situation
10  by taking the declaration page up to Walsh himself.
11  I don't know.
12     Q.   Do you recall ever receiving a call from
13  Walsh saying that they had not received a hazard
14  insurance policy declaration page on a transaction?
15     A.   I don't recall that being one of the
16  calls I would receive.
17     Q.   The next line indicates: "The title to
18  reflect this mortgage in the amount of $150,000." Do
19  you know what that means?
20     A.   I believe I would make a copy of the
21  first and second page of the title binder to be
22  included with the package.
23     Q.   In this case it asks the borrower's name
24  to be amended. Would that have been done?
25     A.   It might have been.

## Page 187

1     Q.   And then it says next: "No exceptions."
2  Do you know what that means?
3     A.   Do what I say above.
4     Q.   C is blank here with respect to payoff
5  requirements. Do you see that?
6     A.   Yes.
7     Q.   And then D talks -- in more detail about
8  hazard insurance requirements.
9     A.   Yes.
10     Q.   Do you see that?
11     A.   Uh-huh, yes.
12     Q.   And to the extent you didn't handle that
13  you expected Mr. Kane must have handled it?
14     A.   Yes.
15     Q.   And then the next section, E, deals with
16  title insurance. To your knowledge, ma'am, was title
17  insurance provided to Walsh on all of these
18  transactions?
19     A.   I believe so.
20     Q.   And then under F, "Additional closing
21  requirements, two forms of acceptable identification
22  from all borrowers must be returned with the closing
23  package." Do you see that?
24     A.   Yes.
25     Q.   Now, I believe you testified earlier

## Page 188

1  that you don't know what, if any, identification was
2  required by anyone. Correct?
3     A.   Correct.
4     Q.   And when you handled the closings you
5  didn't require any identification. Right?
6     A.   I did not ask for any.
7     Q.   Do you have any idea what was sent back
8  to Walsh in these packages?
9        MR. KOTT: As far as identification?
10     Q.   Identification, yes, ma'am.
11     A.   I remember a few making copies of
12  driver's licenses in the beginning. I never really
13  gave it much thought because Bill never made a big
14  deal of it. He was, like -- you know, he never came
15  to me and said: Oh, we need to get copies of this.
16  I was provided with a copy of a driver's license and
17  Social Security card, it's not that I went to a
18  person and said: Okay, I need your ID now. In the
19  beginning there were copies of driver's licenses, I
20  believe --
21     Q.   Do you recall --
22     A.   -- that I saw. On the repeat properties
23  I think Bill told me: You don't need it because they
24  already have it, you know, it was obtained at the
25  first closing.

## Page 189

1     Q.   Do you recall at any time Walsh calling
2  you and complaining that they had not received the
3  acceptable forms of identification for borrowers?
4     A.   I don't think I would have received that
5  kind of a call. I don't recall receiving it. I
6  think that if there was a problem with identification
7  they would have gone directly to Bill Kane.
8     Q.   And Mr. Kane never indicated to you
9  Walsh had any problems with --
10     A.   No.
11     Q.   -- the way in which identification was
12  being --
13     A.   No.
14     Q.   -- documented in the loans?
15     A.   No.
16     Q.   The next thing under F says: "No
17  documents may be executed by power-of-attorney unless
18  authorized by Walsh Securities." Do you recall any
19  transaction where a power-of-attorney was used?
20     A.   I don't recall.
21     Q.   The last page, ma'am, is the fees and
22  costs section. And it talks about the amount that's
23  being wired to you and it lists the amount of fees
24  that are to be paid and to who. Do you see that?
25     A.   Yes.

12 (Pages 186 to 189)

L. KING

Page 190

1    Q.   Would you be sure, ma'am, that those
2    disbursements as set forth in this sheet were made as
3    part of the transaction?
4    A.   Yes, these figures would have been put
5    on the HUD.
6    Q.   And would have been returned to Walsh or
7    to National Home Funding depending on who the
8    recipient of those monies were.  Correct?
9    A.   Yes.
10   Q.   And after all of the fees and expenses
11   associated with the particular closing were paid
12   there was a certain sum of money left over in the
13   transaction.  Correct?
14   A.   Yes.
15   Q.   And those monies would be divided in a
16   manner in which Mr. Kane would tell you.  Correct?
17   A.   Yes.
18   Q.   And those monies were in essence the
19   seller's proceeds on the sale of what I'll call the
20   second transaction in the three?
21   A.   Yes.
22   Q.   And those monies belonged to the seller.
23   Correct?
24   A.   Yes.
25   Q.   Do you recall at any time, since there

Page 191

1    were no limitations in these closing instructions in
2    how those monies were divided, at any time being told
3    by anyone at Walsh that there were limits or
4    restrictions on how the seller's proceeds could be
5    distributed?
6    A.   No.
7    Q.   Is there anything in the closing
8    instructions here, ma'am, which indicates that the
9    buyer of the property in deal two could not convey an
10   interest in that property to someone else?
11   A.   No.
12   Q.   Did anyone from Walsh ever indicate to
13   you that there was some type of prohibition which
14   precluded their borrower from conveying an interest
15   in the property to someone else?
16   A.   No.
17   Q.   And I believe you testified, ma'am, that
18   for the first months these joint venture
19   deeds didn't even exist.  Correct?
20   A.   I would say the first couple of months,
21   yes.
22   Q.   I think in your deposition you said
23   about six or seven months into this they came up with
24   the joint venture concept.  Correct?
25   A.   Yes, I believe.

Page 192

1    Q.   So would it be your best recollection,
2    Miss King, that for the first six or seven months'
3    worth of transactions, whatever they were, there
4    wasn't even a joint venture deed as part of the
5    transaction?
6    A.   Yes.
7    Q.   And that what happened is at some point
8    in time when the deeds were held, joint venture deeds
9    were prepared to go along with those earlier
10   transactions.  Correct?
11   A.   Yes.
12   Q.   And with respect to that recording that
13   took place in 2007, the mass recording I'll call it,
14   and you pointed out that there appears to be a
15   Coastal Title sticker on the documents that were
16   recorded.  Do you recall that testimony?
17   A.   Yes, but it was 1997.
18   Q.   1997.  Do you have any recollection at
19   all of being told by Mr. Kane that Coastal found out
20   that all of these deeds had not been recorded and for
21   lack of a better term raised hell about that fact and
22   required that they be recorded?  Do you recall
23   anything like that?
24   A.   I just know that it created a big mess
25   and that they needed to be recorded right away and

Page 193

1    someone came and got the box and took it away.
2    Q.   And your belief, based on your review of
3    the documents at the last deposition, was that
4    Coastal had something to do with the recording of
5    those documents.  Correct?
6    A.   Yes, I believe so.
7    Q.   But you don't have a recollection of
8    being told by anyone that Coastal was requiring that
9    these documents be recorded as opposed to being held?
10   A.   I just know that they needed to get
11   recorded and they came and got the box.  Someone came
12   and got the box.  I don't recall who did.
13   Q.   Would I be correct, ma'am, that you have
14   no way at this point in time, some 13 or 14 years
15   after, of knowing when the legitimate deals stopped
16   and the fraudulent deals started?
17   A.   I don't know.
18   Q.   And would it be fair to say, ma'am, that
19   sitting here today you would have no way of knowing
20   when buyers actually stopped appearing at closing?
21   A.   I don't remember.
22   Q.   And you would have no idea which
23   transactions you fraudulently acknowledged the
24   documents?
25   A.   I don't know.

13  (Pages 190 to 193)

L. KING

Page 194

1  Q.   And you would have no way of knowing
2  today which transactions had disbursements before the
3  closing even took place?
4  A.   No.
5  Q.   That would be correct, you wouldn't have
6  any way of knowing?
7  A.   I would not know.
8  Q.   Okay. And you also testified, I think,
9  ma'am, at the last deposition that's Mr. Kane would
10 often leave his proceeds in Mr. Yacker's trust
11 account. Correct?
12 A.   Not often. In the beginning he did
13 because he didn't ask for them to be disbursed, but
14 then as the properties accumulated and he needed the
15 funds to be distributed, as he would tell me to, to
16 Rick Pepsny, Gary Grieser and himself, then there
17 were no -- there was no holding of money. It was
18 being all disbursed.
19 Q.   But during the time period when the
20 monies were being held, would there be any way for
21 you to know when a disbursement was made as to
22 whether it was his money from a prior deal or money
23 from a current loan?
24 A.   No.
25 Q.   Because you weren't involved in the

Page 195

1  bookkeeping process at that time with respect to how
2  money was being disbursed and where it was being
3  applied. Is that a fair statement?
4  A.   I know that I had access to the trust
5  account to write checks out, but I don't recall
6  reconciling the account so I don't know -- I don't
7  remember how much money was set aside. At one point
8  we decided to separate the checking accounts out so
9  monies could have been commingled with the first
10 account so I have no --
11 Q.   Right. My question is: Although you
12 were involved in issuance of the checks --
13 A.   Right.
14 Q.   -- you at no point in time sat down and
15 said: Okay, this money is coming from the Kane
16 holdover funds, this money is coming from the
17 Montanye closing, this money is coming form the Smith
18 closing, you were told to write a check and you wrote
19 it?
20 A.   Yes.
21 Q.   You testified in your prior deposition
22 when Mr. Cicalese was involved he was trying to do
23 things right. Correct?
24 A.   Yes.
25 Q.   And do I get the impression from your

Page 196

1  testimony earlier today that when Mr. Cicalese
2  handled the closing people were present at the
3  closing?
4  A.   Yes.
5  Q.   And while you don't know whether or not
6  they were actually the people they were supposed to
7  be, somebody was present?
8  A.   Yes.
9  Q.   And you couldn't testify that they
10 weren't the people they were supposed to be.
11 Correct?
12 A.   Correct.
13 Q.   And on the disbursements for those
14 transactions, the Cicalese transactions, to the best
15 of your knowledge, were those disbursements done
16 after the closing had been completed?
17 A.   Yes.
18 Q.   In your opinion, ma'am, were those
19 transactions handled properly?
20 A.   As properly as they could be at that
21 point in time.
22 Q.   Were they handled in accordance with the
23 Walsh closing instructions?
24 A.   Depending on the conditions and so
25 forth. Again, I don't know about the hazard

Page 197

1  insurance because I don't believe I ever saw that at
2  Cicalese's office either. I cannot say for certain
3  because I didn't do the closing and just processed
4  the paperwork at that point.
5  Q.   But you also couldn't say that any of
6  them were done in violation of the closing
7  instructions, the Cicalese transactions. Is that
8  correct?
9  A.   Yes.
10 Q.   It got somewhat confusing in your prior
11 deposition, through no fault of your own, when there
12 was testimony about the reason why all of these
13 properties were being accumulated. Initially your
14 statement was that Walsh was trying to build a
15 portfolio of properties so they could go public. And
16 then later you indicated that Kane was doing that. I
17 would like to try to clear up that testimony.
18 Do you recall some discussion with Mr.
19 Kane about accumulating properties for the purpose of
20 going public?
21 A.   Yes.
22 Q.   Was that something Mr. Kane was trying
23 to do, something Walsh was trying to do, something
24 Kane and Walsh together were trying to do? What do
25 you recall about that?

14 (Pages 194 to 197)

VERITEXT REPORTING COMPANY

L. KING

Page 198

1     A.    That must have been a mistake on my part
2  referencing Walsh Securities with the accumulation of
3  the properties. I probably meant to say that Gary
4  Grieser as Capital Assets and Bill Kane were trying
5  to build a portfolio, not Walsh Securities.
6     Q.    Okay. Do you ever recall hearing that
7  Walsh was in the middle of some type of merger and
8  needed to have a certain number of loans to make it
9  more attractive for that merger?
10    A.    I don't have knowledge of that.
11    Q.    You testified that Mr. Kane informed you
12 that Walsh needed to loan out a certain amount of
13 money each month. Do you recall that testimony?
14    A.    Yes.
15    Q.    What do you recall, as best as you can
16 all these years later, him saying to you about
17 Walsh's need to loan a certain amount of money each
18 month?
19    A.    Just that they had a certain amount of
20 money that they needed to loan out every month and
21 that we had to get closings done by that time so that
22 they -- their money would be used.
23    Q.    Do you ever recall in any of your
24 conversations with Ms. DeMola her indicating to you
25 that any particular transaction had to close before

Page 199

1  the end of the month?
2     A.    No, I have no knowledge of that. I did
3  not speak to her about those issues.
4     Q.    Many of the HUD-1s indicated that Mr.
5  Pepsny was being paid as the closing agent on the
6  middle deal. Do you recall Ms. Wagner asking you the
7  last time why Mr. Pepsny was getting the closing
8  agent fee on the settlement sheet?
9     A.    I don't know why he was put on that
10 line.
11    Q.    I understand that but do you remember --
12    A.    Yes, I remember that question, yes.
13    Q.    Do you recall ever receiving a phone
14 call from Walsh wanting to know why someone was being
15 paid to act as the closing attorney when that person
16 was not the closing attorney identified on a closing
17 service letter?
18    A.    No. If they had I would have corrected
19 it from that point forward, if they had told me where
20 they needed it to be put.
21    Q.    Is there any doubt in your mind, ma'am,
22 that Walsh got a HUD-1 from every single settlement?
23    A.    They got a HUD-1, yes.
24    Q.    And that that HUD-1 would have been sent
25 back to Walsh within a day or two after the closing?

Page 200

1     A.    It would have been included with the
2  closing package.
3     Q.    And their mandate was that documents be
4  back I believe within 24 hours of the closing. Did
5  you attempt to get documents back within 24 hours?
6     A.    I attempted so, yes.
7     Q.    Were there cases when the documents
8  didn't get back --
9     A.    Yes.
10    Q.    Was there ever an objection raised to
11 you by Walsh that you weren't getting documents back
12 in a timely fashion?
13    A.    I recall a couple of times, like, it
14 would be two days later.
15    Q.    Would you get a call from someone at
16 Walsh about that?
17    A.    I want to say yes. I don't recall who
18 would have called me. It would have been: Where are
19 our documents at?
20    Q.    Were the majority of conversations that
21 you had with anyone at Walsh with Kelly?
22    A.    Kelly O'Neill?
23    Q.    Yes, ma'am.
24    A.    I remember talking to her.
25    Q.    Do you believe you spoke to her more

Page 201

1  than you spoke to Miss DeMola?
2     A.    Yes.
3     Q.    Other than Kelly and Miss DeMola do you
4  recall conversations with anyone else at Walsh?
5     A.    I might have. I don't remember names.
6     Q.    But the two you do remember are Kelly
7  and DeMola?
8     A.    I spoke to Kelly more than I did Miss
9  DeMola.
10         MR. KOTT:  Can we take a break?
11         (A recess takes place.)
12    Q.    I put before you Exhibit 4 from the
13 first day of your deposition, which is a title
14 insurance commitment. Is my recollection correct
15 that you testified that the handwriting on this
16 document is not yours?
17    A.    That's correct.
18    Q.    Do you recall, ma'am, if this document
19 is one of the documents that would have been included
20 in the package that was sent back to Walsh after the
21 closing?
22    A.    Yes. This would have been the type of
23 document that I would have received from the title
24 insurance company that would have been included with
25 the mortgage papers.

15 (Pages 198 to 201)

VERITEXT REPORTING COMPANY

L. KING

Page 202

1    Q.    And when you say from the title
2  insurance company, you mean Coastal Title?
3    A.    It was mostly Coastal who sent me
4  titles, yes.
5    Q.    Were there other companies that sent you
6  titles on the Kane deals that you could recall?
7    A.    In the beginning I want to say Global.
8    Q.    Global was that?
9    A.    Maybe, but mostly Coastal.
10    Q.    When you received the document from
11  Coastal or Global, would I be correct it didn't have
12  the handwriting on it?
13    A.    That's correct.
14    Q.    But your recollection is that when it
15  got sent to Walsh it had the handwriting on it.
16  Correct?
17    A.    No.
18    Q.    It did not?
19    A.    It would not have any writing on it.
20    Q.    Okay. And Walsh would get a copy of the
21  HUD-1 such as marked on King-12. Correct?
22    A.    Correct.
23    Q.    And that would show all of the
24  disbursements that were going out on the transaction.
25  Correct?

Page 203

1    A.    Correct.
2    Q.    And it would show a certain sum of money
3  to the seller after the transaction took place.
4  Correct?
5    A.    Correct.
6    Q.    And the disbursements that Mr. Kane
7  directed would have been disbursements of those
8  monies at the bottom right-hand line of the HUD-1.
9  Correct?
10    A.    Correct.
11    Q.    And the information on the second page
12  of the HUD-1 regarding fees and expenses and costs
13  that were allowed to be paid, they would come either
14  from Mr. Kane or from the closing instructions
15  supplied by Walsh. Correct?
16    A.    Correct.
17    Q.    And you would be sure that the closing
18  instructions provided by Walsh as to the money that
19  was allowed to be paid would be followed. Correct?
20    A.    Say that again.
21    Q.    Sure. Part of what you would do is you
22  would look at the closing instructions, which had on
23  the third page a listing of the fees that could be
24  paid, and you would be sure that those fees were
25  properly listed on the HUD-1?

Page 204

1    A.    Yes.
2    Q.    Correct? Now, during the first day of
3  your deposition, and I have sensed, and correct me if
4  I'm wrong, but you have actually gained a little more
5  of your memory having had the opportunity to not only
6  talk about this but see some documents. Is that a
7  fair statement?
8    A.    Yes, that's fair.
9    Q.    And that in response to Ms. Wagner's
10  question as to whether or not the closing
11  instructions were followed, your testimony was they
12  probably were not. Correct?
13    A.    Yes, that's correct.
14    Q.    And part of your justification for them
15  probably not being followed was at least in the
16  day -- the first day of your deposition was Mr. Kane
17  was telling you how to disburse monies. Correct?
18    A.    Correct.
19    Q.    And we have now taken a look at the
20  closing instruction letters, or at least one of them,
21  and the monies that are being distributed at the
22  direction of Mr. Kane, I think you will now agree
23  with me, were part of the seller's proceeds.
24  Correct?
25    A.    Correct.

Page 205

1    Q.    And that the closing instructions that
2  were marked as King-13 from before didn't in any way
3  limit or prohibit the way in which the seller's
4  proceeds could be disbursed. Correct?
5    A.    Correct.
6    Q.    So making those disbursements in the way
7  that Mr. Kane indicated did not violate the closing
8  instructions, did it?
9    A.    I guess not.
10    Q.    And we talked a little bit about the
11  documents that were listed on the closing
12  instructions, and your testimony was that while you
13  don't remember which of these documents were in the
14  package or not, what you are able to say, sitting
15  here today, is: Whatever documents came to me in the
16  package from Walsh got signed and returned back to
17  them. Are you able to say that with any confidence?
18    A.    Yes.
19    Q.    And that if there were any deals at all
20  in which documents were not supplied and you received
21  a call from anyone about them they would have been
22  timely supplied. Are you able to say that?
23    A.    Yes.
24    Q.    So as far as you're concerned, sitting
25  here today now having the opportunity to look in some

16 (Pages 202 to 205)

L. KING

Page 206

1  detail over the closing instructions, you believe
2  that the closing instructions pertaining to documents
3  were complied with. Correct?
4      A.   Yes.
5      Q.   We talked a little bit about the
6  conditions that were in paragraph B, and again I know
7  the last time you testified that there probably were
8  violations, you didn't do the type of detailed review
9  of the closing instructions that you and I did today.
10         Sitting here now, looking at B, to the
11  best of your knowledge, ma'am, were the conditions of
12  paragraph B complied with in all of the transactions?
13     A.   As well as I could comply with them. I
14  would not have access to the insurance declarations
15  page, which I mentioned.
16     Q.   Right. But you have no reason to
17  believe, do you, ma'am, that those insurance pages
18  weren't supplied to Walsh?
19     A.   I do not know whether they were or were
20  not.
21     Q.   But you would have expected that if they
22  weren't someone from Walsh would have been contacting
23  you saying: Lorraine, I got your package here, where
24  is the hazard insurance?
25     A.   They wouldn't have called me.

Page 207

1      Q.   Who would they have called?
2      A.   Bill Kane.
3      Q.   Okay. And you don't ever recall Mr.
4  Kane saying to you: Walsh is complaining they're not
5  getting hazard policies?
6      A.   No.
7      Q.   But you would certainly expect if Walsh
8  didn't get one and that was a problem they would tell
9  somebody. Wouldn't you expect that?
10     A.   I would expect they would tell Bill
11  Kane.
12     Q.   As a responsible mortgage lender who
13  didn't get something that was required in their
14  closing instructions. Correct?
15     A.   Correct.
16     Q.   Item C is blank so let's move to D.
17  Again, it's the same thing with the hazard insurance.
18  As far as you know, whatever hazard insurance
19  requirements there were were met in these closings.
20  Correct?
21     A.   As far as I know.
22     Q.   So, sitting here today, you could not
23  say that the failure to comply with hazard
24  insurance requirement was something that would
25  constitute a breach of the closing instructions.

Page 208

1  Correct?
2      A.   Correct.
3      Q.   And as to the title insurance
4  requirements, to the best of your knowledge, ma'am,
5  did you fulfill all of the title insurance
6  requirements as part of the transactions?
7      A.   To the best of my knowledge, I included
8  the title policy with the closing documents and sent
9  them along.
10     Q.   So, sitting here today, you don't have
11  any reason to believe that paragraph E of the closing
12  instructions were violated. Correct?
13     A.   No.
14     Q.   That's correct?
15     A.   Correct.
16     Q.   And F, we're talking about the two forms
17  of acceptable identification. As far as you know
18  whatever Walsh wanted was supplied under subparagraph
19  F?
20     A.   As far as I know, yes.
21     Q.   So, sitting here today, you couldn't say
22  that the closing instructions were violated under
23  paragraph F, could you?
24     A.   Other than the disbursement of funds
25  before the documents were closed, that's correct.

Page 209

1      Q.   Okay. And then let's talk about G and
2  then I will get back to that with you. Under G, as
3  far as you know, ma'am, every requirement set forth
4  in paragraph G on these transactions was fulfilled.
5  Correct?
6      A.   Correct.
7      Q.   That was correct?
8      A.   Yes.
9      Q.   Now, let's talk about the circumstances
10  where monies were disbursed before the closings took
11  place. Are you able to tell me, sitting here today,
12  whether there are any other breaches of the
13  closing -- of the closing instructions than the early
14  disbursement of funds?
15     A.   I am not aware of any other ones, no.
16     Q.   Now, let's focus on that one breach.
17  Are you able to tell me, sitting here today, any
18  transaction on which that took place?
19     A.   Most of them. I would receive the
20  documents from Walsh, I would separate them out or
21  tag them with sticky notes on the side where each
22  page that needed a signature would have been signed.
23  Then someone would have showed up and signed them, or
24  Bill Kane would have had someone take them and have
25  them signed by persons unknown and brought back to

17  (Pages 206 to 209)

L. KING

Page 210

1  me, but as soon as the money was wired into the
2  account at three o'clock, because that's when the
3  wires hit, Bill would show up and tell me how to
4  break out the bottom line because he would know how
5  much he was going to get on each closing for the
6  HUD statement. And then checks would be written at
7  that point shortly after three o'clock, as soon as
8  the money was in the trust account.
9      Q.    Now, what is it that Walsh needed before
10 it would fund the loans?
11     A.    Oh, I don't know all the pieces. I
12 don't know everything that they would need. I know
13 they would need things from National Home Funding and
14 the title -- they would get a title commitment before
15 they got a binder, but I don't know all the pieces
16 that Walsh would need. Bill always took care of
17 those.
18     Q.    Did the disbursements prior to closing
19 take place early on in the transactions?
20     A.    No. In the beginning we waited until
21 the documents were signed.
22     Q.    Do you know how long that carried on?
23     A.    A couple of months, but then again
24 another shortcut, you know, oh, let's just get the
25 money disbursed and then we will get the documents

Page 211

1  signed.
2      Q.    Were monies ever disbursed, ma'am, when
3  a transaction didn't close?
4      A.    I believe there was one.
5      Q.    Do you recall any of the specifics of
6  that transaction?
7      A.    I don't know what went wrong with the
8  deal, but we got the money and had to wire it
9  back.
10     Q.    When the checks were issued to Walsh for
11 the monies that it was supposed to get back, or were
12 any checks issued to Walsh I guess is the proper
13 question?
14     A.    There was just one deal I think that
15 just didn't happen correctly. Not that they didn't
16 all happen incorrectly, but it just -- I don't think
17 Bill could obtain the property at all and the
18 mortgage went through, so I believe we wired the
19 money back.
20     Q.    Was Walsh deducting its fees from the
21 amount of money that was being wired into Mr. Yacker's
22 trust account, or were you sending back checks in the
23 package with the Walsh commitment fee and other fees
24 that it was supposed to receive?
25     A.    No, I did not send money to Walsh.

Page 212

1      Q.    So when this particular sheet indicated
2  that a tax service fee, a commitment fee, a courier
3  fee was going to Walsh, to the best of your
4  recollection, were they deducted from the amount of
5  proceeds that were wired to you?
6      A.    I don't remember.
7      Q.    Is it possible, ma'am, that checks were
8  actually cut to Walsh?
9      A.    I don't remember writing any checks to
10 Walsh.
11     Q.    Other than the one transaction that you
12 believe the monies may have been disbursed and the
13 deal didn't actually close -- strike that.
14         How do you believe, ma'am, if at all,
15 Walsh was harmed by the fact that the monies were
16 disbursed a day or two prior to the loan documents
17 actually being signed?
18     A.    How was Walsh harmed?
19         MS. WAGNER: Objection.
20     Q.    You can answer.
21     A.    Well, they were loaning money out to
22 people who didn't know they were borrowing, that the
23 whole process was built on lies.
24     Q.    That's a different question. You're
25 answering a different question so let me try to make

Page 213

1  my question a little clearer.
2      A.    Let's make it clear.
3      Q.    The fact that they were loaning money to
4  people who either didn't know they were borrowing it
5  or, as you testified previously, who clearly in your
6  mind didn't qualify for the loans that they were
7  getting, that's not the question I'm asking you.
8      A.    Okay.
9      Q.    Because I think you testified previously
10 when I asked you about Miss DeMola the fact that
11 people were getting all these loans that they
12 probably didn't qualify for, you would have expected
13 Walsh to figure that out, correct, as a responsible
14 mortgage lender?
15         MS. WAGNER: Objection.
16     A.    I don't know much about the banking
17 industry. I don't know their protocols. I just know
18 personally that if I were in that position I would
19 certainly want to get more involved and find out why
20 one person owns five properties based on their
21 income, which if you look at the mortgage application
22 which came from National Home Funding as the broker,
23 would have seen and asked questions as to how is this
24 person going to pay all these mortgages based on
25 their salary or income.

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

aa89dd8d-34d2-4e7a-b838-9eca61bee5ac

L. KING

Page 214

1    Q.    My question to you deals solely with the
2  fact that the disbursements took place prior to
3  papers actually being signed by the borrowers.  Can
4  you tell me first what the length of time was between
5  the disbursement and when the papers were actually
6  signed?
7    A.    I would say within a 24-hour period, not
8  that Walsh would have received them back within 24
9  hours but they would have been signed within 24
10  hours.
11    Q.    Understood.  So at most you're talking
12  about checks being given to Mr. Kane, Mr. Grieser,
13  whoever else 24 hours prior to the loan documents
14  actually being signed.  Correct?
15    A.    Give or take, yes.
16    Q.    Give or take how much?
17    A.    24 to 48 hours.
18    Q.    So I want to find a date that you're
19  comfortable with saying with some certainty.  Would
20  you agree with me then that no disbursements were
21  made any sooner than 48 hours before the documents
22  were signed?
23    A.    Okay.  Say that again.
24    Q.    Sure.
25    A.    That got a little confusing.

Page 215

1    Q.    That's because that's the way I ask
2  questions, in a confusing fashion?
3    A.    Then you need to clarify.
4    Q.    What I'm trying to find out is:  What is
5  the longest period of time that you believe passed
6  between an early disbursement and the actual
7  execution of loan documents?
8    A.    I would say the maximum would have been
9  48 hours.
10    Q.    Okay.  And are you able to say that the
11  vast majority of them where that happened, the
12  documents were signed within 24 hours of the
13  disbursement?
14    A.    The majority, yes.
15    Q.    And were all the disbursements, ma'am,
16  made by check?
17    A.    Yes.
18    Q.    So if, for example, the documents were
19  not signed by the borrowers, you were in a position
20  where payment on all of those checks could have been
21  stopped.  Correct?  Could have been?
22    A.    Could have been but except for that one
23  the mortgages went through.
24    Q.    Right.  I understand that.  What I'm
25  asking you is:  If they had not gone through, by

Page 216

1  issuing checks you were in a position where payment
2  on those checks could have been stopped if you needed
3  to return the monies back to Walsh?
4    A.    Some checks, yes; some checks no.
5    Q.    Tell me why some checks no.
6    A.    Disbursement usually happened right away
7  to Rick Pepsny, Capital Assets, and Bill Kane.  In
8  the beginning maybe I had written out individual
9  checks per property.  However, as things again got
10  short-circuited, one check would have been disbursed
11  with a lump of say three or four properties.  So if I
12  cancelled that check or stopped payment on that check
13  then everything would have --
14    Q.    But you could have stopped payment and
15  then reissued a check for all the transactions that
16  went through.
17    A.    That check was already cashed.
18    Q.    Cashed?
19    A.    By Bill Kane, Gary Grieser, Rick Pepsny.
20    Q.    How do you know when they cashed their
21  checks?
22    A.    They were greedy.  They want their
23  money.
24    Q.    I understand that.
25    A.    I don't know.

Page 217

1    Q.    They were getting their checks after
2  three o'clock --
3    A.    Yes.
4    Q.    -- on a particular day because funding
5  didn't happen prior to that.  Correct?
6    A.    Yes.
7    Q.    Do you know for a fact whether they
8  deposited the checks the same day, the next day or a
9  couple of days later?  I'm asking what you know.
10    A.    No, I do not know that.
11    Q.    So in light of the fact that every one
12  of these transactions but one the documents were
13  actually executed, and the packages were sent back to
14  Walsh with everything that was supposed to be in them
15  in them, what I'm asking you is:  How was Walsh
16  harmed by the fact that the disbursement took place
17  24 hours before the documents were signed?
18    MS. WAGNER:  Objection.
19    A.    I don't know.  How are they harmed?
20    Q.    I don't believe they were, but I am not
21  a witness in this case so I'm asking you if you
22  believe they were harmed by that limited fact of
23  disbursement 24 hours prior to the signature on
24  documents.
25    A.    I just know that the documents should

19 (Pages 214 to 217)

VERITEXT REPORTING COMPANY

L. KING

| Page 218 |
| --- |

1  have been signed before the disbursements.
2      Q.    I understand that.
3      A.    But I don't know how they would have
4  been harmed.
5      Q.    In light of the fact that there were 220
6  loans, ma'am, and these loans took place 13 and 14
7  years ago, are you confident that you can in fact say
8  which transaction had that happen on it?
9      A.    No, I cannot say that.
10     Q.    At this point in time you would be
11  guessing based on what you understood the general
12  practice to be during that period of time.  Correct?
13     A.    Yes.
14     Q.    I think that's all I have for now.
15  Thank you, ma'am.
16  CROSS-EXAMINATION BY MR. KOTT:
17     Q.    Miss King, my name is David Kott.  We
18  have met a few times.  I represent one of the title
19  companies, a company called Commonwealth Land Title
20  Insurance Company, which is a title insurance company
21  that insured some of these loans.  And the same
22  instructions that Ms. Wagner and Mr. Hayes gave you
23  will apply to my questions.  And because I'm going
24  third you may find me jumping around a little.
25          The transcript of your deposition was

| Page 219 |
| --- |

1  printed up, your first deposition, which was taken in
2  this case on April 30, 2010.  Have you seen that?
3      A.    No.
4      Q.    Okay.  I want to call your attention to
5  page 49, and I'm going to read it to you and then I'm
6  going to allow you to read it to yourself, beginning
7  line 21.
8          "Question:  Can you describe your
9  relationship with National Home Funding?
10         "Answer:  I would send them copies of
11  closing documents and from them -- I don't remember
12  the documents I would have to get from them.  And
13  then there was one time that their files were a
14  complete mess that I went over and helped them
15  organize.  Everybody had a property file that I made
16  sure all the documents that they said they needed to
17  have in their files in case they were investigated,
18  all the documents needed to be there.  So I had to go
19  through all their files to kind of fill in the
20  missing pieces and make sure that copies of
21  everything was in their files that I had in my files
22  that they needed.
23         "Question:  Were these files on
24  properties that had already closed?
25         "Answer:  Yes."

| Page 220 |
| --- |

1          I'm going to hand to you the transcript
2  and let you read that to yourself and then I'm going
3  to ask you questions about that.
4      A.    Okay.
5      Q.    When you went -- did you actually go to
6  National Home Funding's office?
7      A.    Yes.
8      Q.    And was that in Freehold at the time, do
9  you remember?
10     A.    Yes.  On 33 I believe.
11     Q.    Okay.  My first question is:  Did that
12  occur before the frauds in this case became public?
13     A.    Yes.
14     Q.    And who asked you to go there?
15     A.    Bill Kane.
16     Q.    Bill Kane.  What exactly did Mr. Kane
17  ask you to do?
18     A.    The closings happened at such a rate it
19  was just very hard to keep up with all the paperwork
20  and to make sure that everybody got copies of
21  everything they needed.  And I guess, speculating,
22  Bill found that their files were not complete or
23  updated with everything they needed to have in their
24  files that I might have in my files at the attorney's
25  office.  So he asked me to go over, and he said in

| Page 221 |
| --- |

1  case there's an investigation that they have all the
2  documents that they needed in their files because
3  they needed complete files.
4      Q.    Well, how did Mr. Kane know what was in
5  National Home Funding's files?
6      A.    I would guess that he was there also.
7      Q.    Was it your impression at that time that
8  Mr. Kane somehow was associated with National Home
9  Funding?
10     A.    Yes, he worked closely with them.
11     Q.    When you say he worked closely, was it
12  your impression that he was somehow an employee or an
13  agent of National Home Funding?  I am asking what
14  your impression was at the time.
15     A.    I don't know what his relationship was
16  with them.  He never said.  He never told me.
17     Q.    When you went to National Home Funding
18  were there employees of National Home Funding there?
19  For instance, was there a receptionist?
20     A.    I don't recall.
21     Q.    Did anybody from National Home Funding
22  know you were in their offices looking at their
23  files?
24     A.    I believe they did.
25     Q.    And as far as you know, did Mr. Kane

20 (Pages 218 to 221)

VERITEXT REPORTING COMPANY

L. KING

### Page 222

1  arrange for you to look at the National Home Funding
2  files?
3      A.   Yes.
4      Q.   Were you ever asked to do anything
5  similar to that for Coastal Title?
6      A.   No.
7      Q.   Were you ever asked to do anything
8  similar to that for any other broker or company
9  besides National Home Funding?
10     A.   No.
11     Q.   Was it your impression at the time that
12  Mr. Kane wanted that done because he was concerned
13  that there might be a law enforcement investigation
14  at some point and he wanted the files to look in a
15  proper fashion?
16     A.   I would agree with that.
17     Q.   In your first deposition, and I'll show
18  you if you want what you're referring to, you talked
19  about going to a Christmas or a New Year's party that
20  was given by Bill Kane.
21     A.   Yes.
22     Q.   Do you remember when that was, that is,
23  which Christmas season that was?
24     A.   1996.
25     Q.   And where was that party?

### Page 223

1      A.   I don't even remember.
2      Q.   Do you remember whether it was at a
3  restaurant or a country club as opposed to someone's
4  home?
5      A.   Oh, it was a hall, a banquet hall.  It
6  was a big room.
7      Q.   And in this case, this Walsh lawsuit
8  we're talking about, you have had an opportunity to
9  look at some papers that show who is sued by Walsh
10  Securities.  Correct?
11     A.   Yes.
12     Q.   Gary Grieser was sued, a guy named Larry
13  Cuzzi was sued.  A number of individuals were sued.
14  Correct?
15     A.   Correct.
16     Q.   Were many of those individuals at that
17  Christmas party?
18     A.   Yes.
19     Q.   Can you tell me who of the people who
20  were alleged -- withdrawn.
21          Can you tell me whether Ms. DeMola was
22  at that Christmas party?
23     A.   Yes, she was.
24     Q.   Was that the first time you had ever met
25  her?

### Page 224

1      A.   Yes.
2      Q.   Was that the only time you had met her?
3      A.   Yes.
4      Q.   Was she the only one there from Walsh
5  Securities, to your knowledge?
6      A.   To my knowledge, but I wouldn't know
7  anyone else.
8      Q.   Were there people there other than the
9  people involved in the frauds in these loans?
10     A.   I would not know that.
11     Q.   Was there anybody there that you knew
12  who was not involved in the frauds?
13     A.   I don't know.
14     Q.   My question is inartful.  Let me try it
15  a different way.  As far as you know, thinking back
16  on who was at that party, was everyone at that party
17  involved in the frauds we're talking about in this
18  lawsuit?
19     A.   I would say a lot of the people that
20  were involved with this situation were there, but
21  there were a lot of people I didn't know also that
22  were there.
23     Q.   Okay.  Did you speak with Miss DeMola at
24  that party?
25     A.   Just briefly as an introduction:  This

### Page 225

1  is so and so, this is so and so.
2      Q.   Was that the first time you had spoken
3  with her, or had you spoken with her earlier in
4  connection with the loans?
5      A.   I recall speaking with her a couple of
6  times on the phone, not a lot of conversations, just
7  about loan documents, but...
8      Q.   I was doing a timing thing.  At the
9  Christmas party, was that the first time you had ever
10  spoken to her, or had you spoken to her over the
11  phone before that?
12     A.   I don't remember.
13     Q.   When you were introduced to her, were
14  you introduced to her as Betty DeMola of Walsh
15  Securities?
16     A.   Betty Ann.
17     Q.   Betty Ann of Walsh Securities?
18     A.   Yes.
19     Q.   Did she tell you what she was doing
20  there?
21     A.   No.
22     Q.   Did anyone tell you why Betty Ann DeMola
23  was there?
24     A.   No.
25     Q.   But you had known at that time that

21 (Pages 222 to 225)

L. KING

| Page 226 | Page 228 |
|---|---|

**Page 226**

1  Betty Ann DeMola and Bill Kane were very close?
2     A.   They were together, yes.
3     Q.   And that they worked together a lot.
4  Right?
5     A.   Yes.
6     Q.   And that, in fact, Kane was often up at
7  Walsh Securities with Betty Ann DeMola. Is that
8  true?
9     A.   Yes.
10    Q.   And in particular he was there very
11 heavily at the end of various months. Correct?
12    A.   Yes.
13    Q.   And that's because there was an
14 incentive at Walsh to have a significant number of
15 loans close at the end of the month. Is that true?
16    A.   Yes.
17    Q.   Now, I want to come back to you speaking
18 to Ms. DeMola about loans. That would be over the
19 telephone?
20    A.   Yes.
21    Q.   And when she would call you, she would
22 ask for information or ask for documents? You tell
23 me.
24    A.   Probably documents or information. I
25 don't recall exact conversations. There were only a

**Page 227**

1  few.
2     Q.   Did she tell you why she was calling?
3  That is, why she was calling rather than Kelly
4  O'Neill or one of the clerical people from Walsh?
5     A.   No.
6     Q.   If I were to tell you that Miss DeMola
7  was the national sales manager, meaning the head
8  person for marketing at Walsh, would you now be
9  surprised that she would be calling you on those
10 loans instead of one of the clerical people such as
11 Kelly O'Neill?
12    A.   I did not know what her title was.
13    Q.   I know. That's what I said, if I were
14 to now tell you.
15    A.   Yes, if she was -- I would not know what
16 her job description would be at Walsh. Saying
17 national sales, I don't know what that would entail
18 but --
19    Q.   Would you be surprised -- withdrawn.
20 Did she tell you when she called what her title or
21 her job responsibilities were at Walsh?
22    A.   No.
23    Q.   She just called and said: This is Betty
24 Ann DeMola from Walsh, and then you had the
25 conversation about what she needed from you?

**Page 228**

1     A.   Yes.
2     Q.   What I'm asking you is: We now know
3  that Betty Ann DeMola's title was national sales
4  manager and that she had a group of people who worked
5  for her and she was in charge of sales at the
6  company. Now that you know that, are you surprised
7  that she was calling you asking for that information
8  instead of one of the clerical people such as Kelly
9  O'Neill?
10    A.   It now makes me question why she called
11 me because as you're saying she's a manager. I was a
12 secretary. Secretaries don't talk to management.
13    Q.   In your experience with legitimate real
14 estate closings --
15    A.   Yes.
16    Q.   -- did you ever have that situation
17 where a manager called you asking for some clerical
18 kind of piece of information?
19    A.   I never was in that kind of position.
20 It was always attorney to manager or attorney to
21 whoever needed to be dealt with.
22    Q.   So in your honest transactions --
23 withdrawn. In your honest transactions was there
24 ever a time that a manager from a lender called you
25 looking for documents and things of that nature?

**Page 229**

1     A.   No.
2     Q.   The only time that occurred was with
3  Miss DeMola. Is that true?
4     A.   Yes.
5     Q.   I'm going to hand to you your first
6  deposition again, and I'm going to ask you to read to
7  yourself a question and an answer and then I'm going
8  to ask you about that.
9     MR. KOTT: I'm handing to the witness
10 the transcript of her first deposition and I'm going
11 to ask her to read beginning at page 84, line six
12 through -- I'm sorry, beginning at page 85, line six
13 through line 13.
14    Q.   Just read that to yourself, and then I'm
15 going to ask you a question about it.
16    A.   Okay.
17    Q.   In this somewhat long answer, and I am
18 not criticizing you for a long answer, there's
19 nothing wrong with it, you talk about faxing things
20 to National Home Funding.
21    A.   Yes.
22    Q.   Tell me about that.
23    A.   Well, just as I faxed a list with
24 reference to exhibit King-23, a memorandum about the
25 properties that were going to close on a major list

L. KING

Page 230

1  that I would have typed up, I would send them one
2  also to give them notice that these properties were
3  closing.
4      Q.    When you did that was there ever a time
5  that you found out that Mr. Kane had a copy of the
6  fax you sent to National Home Funding in his
7  possession or otherwise knew about it?  What I'm
8  asking is:  You would fax something to National Home
9  Funding.  Was there ever a time that Mr. Kane knew
10 about that or either had it or knew about it or
11 talked to you about it?
12     A.    My list?
13     Q.    Yes.
14     A.    I sent lists to everybody.
15     Q.    No, no, but the list you would send to
16 National Home Funding, whatever that specific list
17 was, did Mr. Kane ever know about that list?
18     A.    Yes, he knew.
19     Q.    And how did he know about it?
20     A.    Because I believe I put everybody's name
21 up at the top.
22     Q.    So you addressed it to everyone?
23     A.    I addressed it to everyone.
24     Q.    In your first deposition you had talked
25 about Walsh needing to close loans at the end of the

Page 231

1  month, and you said something:  So Walsh could get
2  its funding.  Do you remember that testimony?  I'm
3  paraphrasing it.
4      A.    I recall.
5      Q.    What did you mean by Walsh getting its
6  funding?
7      A.    Well, I imagine they got their money
8  from somewhere that they had to spend.
9      Q.    Did you ever have any conversations with
10 anyone who told you that, or is that something you're
11 just assuming based on your knowledge of the
12 industry?
13     A.    Based on my knowledge.
14     Q.    In response to some of Mr. Hayes'
15 questions you were asked about borrower's
16 identifications, meaning license and things of that
17 nature.
18     A.    Yes.
19     Q.    My first question is:  Did Walsh ever
20 call you and ask for identifications?
21     A.    No.
22     Q.    To your knowledge, did Walsh ever call
23 anyone from your law firm, Mr. Yacker or any of the
24 other people at the law firm?
25     A.    No.

Page 232

1      Q.    And you said to Mr. Hayes, again
2  paraphrasing, that if there was a question about an
3  identification Walsh would probably go directly to
4  Bill Kane.  Do you remember that?
5      A.    Yes.
6      Q.    Why would they go directly to Bill Kane?
7      A.    Because he and Gary Grieser would have
8  set up the straw buyer.
9      Q.    Okay.  Meaning that --
10     A.    They would have contacted the person who
11 would have been the straw buyer and obtained
12 legitimate or illegitimate documentation for
13 identification from them.
14     Q.    I understand that, but why would Walsh
15 go to Bill Kane instead of to you or somebody else to
16 get identification if Walsh needed it?
17     A.    Because Bill Kane was the one who was in
18 control of all the people.
19     Q.    Right.  And that's the same Bill Kane
20 who was close with Betty DeMola and would be often up
21 in the Walsh offices?
22     A.    Yes.
23     Q.    You sent documents after the loans would
24 close to Walsh?
25     A.    Yes.

Page 233

1      Q.    Would anybody else from Mr. Yacker's
2  office do that or the loans -- withdrawn.
3           On the loans we're talking about in this
4  case, were you the only one from Mr. Yacker's office
5  who would do that?
6      A.    Yes.
7      Q.    So as far as you know any documents that
8  would have been sent to Walsh would have been sent by
9  you personally.  Correct?
10     A.    Correct.
11     Q.    Are you aware of Walsh ever calling Mr.
12 Yacker or anyone in the office besides you looking
13 for documents?
14     A.    I would not know that.
15     Q.    That's what I was asking:  Are you aware
16 of it?  For instance --
17     A.    No.
18     Q.    -- did Mr. Yacker ever come to you and
19 say:  Walsh called, they need this document, please
20 get it to them?
21     A.    No.
22     Q.    So let me ask you the question again.
23 Are you aware of Walsh ever calling anyone else in
24 Mr. Yacker's office besides you to get documents?
25     A.    No, I am not aware of it.

23 (Pages 230 to 233)

L. KING

Page 234

1    Q.    Did Walsh ever call you and ask for
2  documents or anything else and you did not provide it
3  to them?
4    A.    There might have been a couple of times
5  that I did not have documents that I could have
6  provided.
7    Q.    Did you tell Walsh that?
8    A.    I would tell Bill Kane that.
9    Q.    And did Walsh ever follow up a second
10  time with you and say: We asked you for the
11  documents, where are they?
12    A.    No.
13    Q.    So did you infer from that that Mr. Kane
14  dealt with Walsh on the missing documents?
15    A.    Yes.
16    Q.    You feel pretty good about that, I mean?
17    A.    I am confident that Bill would have
18  taken care of it.
19    Q.    You said in your deposition that Mr.
20  Kane was the ringmaster of this fraud?
21    A.    Yes.
22    Q.    Is that ringmaster the same thing as
23  ringleader or mastermind?
24    A.    Yes.
25    Q.    I have no further questions but I think

Page 235

1  Mr. McGowan does.
2    (A discussion takes place off the
3  record).
4  CROSS-EXAMINATION BY MR. McGOWAN:
5    Q.    Miss King, I represent Coastal Title
6  Agency, and I had an opportunity briefly -- I wasn't
7  at your deposition the last time but I looked at the
8  transcript so I'm going to try not to duplicate too
9  much.
10    You were asked last time if you knew the
11  name of a fellow by the name of Robert Agel, and I
12  think your answer last time was you really had not
13  heard that name. Is that accurate?
14    A.    At that point my memory was not as well
15  as it is now because of looking at all the documents.
16    Q.    Because you looked at all the stuff.
17  Contemporaneously back at the time all of this was
18  going down, did you know who -- if someone were to
19  say to you: Bob Agel called, would you know who that
20  was?
21    A.    I had not heard the name in a long time.
22  Yes, I probably would associate it with Coastal.
23    Q.    Who is he? Do you know? Associated
24  with Coastal?
25    A.    Yes.

Page 236

1    Q.    Do you know in what capacity he is
2  associated with Coastal?
3    A.    No, I don't recall.
4    Q.    The fraud loans, the 220 loans that
5  we're here talking about, was each and every one of
6  them put through Coastal, or you thought there might
7  be another title agency?
8    A.    I remember Global but the majority of
9  them came from Coastal.
10    Q.    And how did that come about? Do you
11  know? Why Coastal as opposed to any other title
12  agency?
13    A.    I have no idea.
14    Q.    Do you know whether or not Mr. Kane had
15  prior dealings with Coastal Title Agency before
16  coming to NHF and before coming to your attention?
17    A.    I don't know.
18    Q.    Did you ever speak with Mr. Agel at
19  Coastal Title during the course of these frauds?
20    A.    I might have.
21    Q.    Do you remember whether you did or not?
22    A.    Not specifics.
23    Q.    Secretarial types over at Coastal Title,
24  do you recall ever speaking with them on the phone as
25  opposed to Mr. Agel?

Page 237

1    A.    I must have because I have got a memo
2  here addressed to Sally.
3    Q.    That would be Sally?
4    A.    That would be Sally.
5    Q.    That memorandum looks to me like -- an
6  awful lot like it's going to the title agency?
7    A.    Yes.
8    Q.    So Sally would be an employee there, and
9  from time to time probably you talked to Sally on the
10  phone. Right?
11    A.    Probably.
12    Q.    Was it Kane's direction -- let me ask
13  you this: Did Mr. Yacker have a relationship with
14  Coastal Title before these frauds came along, if you
15  know?
16    A.    I don't know.
17    Q.    So what was the connection between these
18  loans and Coastal Title agency?
19    A.    I don't know.
20    Q.    Could it have been Mr. Kane?
21    A.    Mr. Kane was the one who directed
22  Coastal to send me binders.
23    Q.    You would submit whatever information
24  Coastal Title needed, and then they would send you a
25  binder. Is that right?

24  (Pages 234 to 237)

L. KING

Page 238

1    A.    No.
2    Q.    Or did NHF submit the information to
3  Coastal Title?
4    A.    I don't know who submitted their
5  information.
6    Q.    I'm sorry?
7    A.    I don't know who submitted original
8  information.
9    Q.    So these binders just came out of thin
10 air?
11   A.    I don't know who told them to send them.
12 I would just tell them what properties I was working
13 on for Bill Kane.
14   Q.    Ever heard the phrase "marked-up title
15 binder"? Ever heard that phrase?
16   A.    Maybe.
17   Q.    Kind of like the one you were shown
18 before?
19   A.    Yes.
20   Q.    Got marks all over it, that's why it's
21 called "marked-up title binder." Right?
22   A.    Okay.
23   Q.    How, the one you were shown before,
24 those marks were not yours?
25   A.    No, they weren't.

Page 239

1    Q.    Who would they have been if they were
2  not yours?
3    A.    I do not know.
4    Q.    What is a -- tell us -- give us the
5  benefit of your expertise. What is a marked-up title
6  binder? How does it come about?
7    A.    I don't know.
8    Q.    You would receive the binder from
9  Coastal Title, and then what is the next interaction
10 you would have with Coastal Title after receiving the
11 binder?
12   A.    I would take it and put it in a file
13 pertaining to that property. And then when it was
14 time to do the deed, I would take out the property
15 description, insert it into the deed and mortgage and
16 take it and --
17   Q.    And there would be a closing. Right?
18   A.    And there would be a closing.
19   Q.    After the closing, what interaction, if
20 any, would you have with Coastal Title?
21   A.    I would make a copy of the deed and the
22 mortgage and send it to Coastal.
23   Q.    Whose obligation was it to file the deed
24 and the mortgage?
25   A.    It was mine.

Page 240

1  Q.    Mr. Yacker's office or Mr. Pepsny.
2  Okay. In a legitimate mortgage transaction when the
3  deed was filed right after the closing, the
4  old-fashioned way, and you sent a copy of the deed
5  and the mortgage over to the title agency, what would
6  happen when the filed deed was returned to your
7  office?
8    A.    I would make a copy of the face page
9  showing the filing with the book and the page number
10 and send that to the title company.
11   Q.    At which point you -- would you get
12 anything back from them?
13   A.    I don't recall.
14   Q.    Would you get a policy as opposed to the
15 binder?
16   A.    I don't recall.
17   Q.    Okay.
18   A.    I didn't do many normal closings.
19   Q.    Other than the interactions that you've
20 described to us between yourself and either
21 Mr. Yacker's office and Coastal Title, the phone
22 calls, the messages, the receipt of the binder,
23 etcetera, are you aware of any other involvement of
24 Coastal Title with respect to these fraudulent loans?
25   A.    No.

Page 241

1    Q.    Are you aware of whether or not Coastal
2  Title was involved in the fraud on an insider basis
3  as opposed to just being the title company that
4  issued binders on fraudulent transactions?
5    A.    I have no knowledge of that.
6    Q.    I'm done.
7         (A recess takes place.)
8  REDIRECT EXAMINATION BY MS. WAGNER:
9    Q.    Miss King, I'm going to show you a
10 document. I am not going to mark it as an exhibit
11 right now. I just want to know if you have ever seen
12 a document like this. It's marked FY 004838.
13   A.    Okay.
14   Q.    Have you ever seen a document like this?
15   A.    No.
16   Q.    Have you ever dealt with Sherry Federer
17 in the policy department at Coastal Title?
18   A.    Again, I don't know everybody's name. I
19 can't recall everybody's name but I don't -- I don't
20 remember speaking to her about this at all.
21   Q.    The memo before was addressed to Sally.
22 Right?
23   A.    To Sally, uh-huh.
24   Q.    Did you have other conversations with
25 Sally that you recall?

25 (Pages 238 to 241)

VERITEXT REPORTING COMPANY

L. KING

Page 242

1    A.    I probably spoke to her as a contact at
2  Coastal.
3    Q.    Do you recall Sally ever calling or
4  anyone else at Coastal ever calling you to follow up
5  on documentation?
6    A.    They could have.  Nothing you know
7  stands out in my mind.
8         (King-25, Coastal Invoice, is received
9  and marked for identification.)
10         (King-26, HUD-1, is received and marked
11  for identification.)
12    Q.    Miss King, I'm handing you what's been
13  marked King-25.  It's an invoice from Coastal Title,
14  Bates Stamped FY 004854, and a HUD-1, Bates stamped
15  FY 00954.  That's marked King-26.  I think I asked
16  you about this in the last deposition.  Do you recall
17  seeing invoices like this, what is marked King-25?
18    A.    Yeah, I remember seeing invoices come
19  through.  They didn't quite look like this.
20    Q.    Do you see on there underneath "Item"
21  where there's a notation for closing service letter
22  and that the charge was $25?
23    A.    I see that.
24    Q.    And the total is $1,002.  Correct?
25    A.    Yes.

Page 243

1    Q.    And if you turn to the HUD-1 on the
2  second page, line 1104 it shows $1,002 payable to
3  Coastal Title for the title insurance binder.
4  Correct?
5    A.    Yes.
6    Q.    And you don't see that $25 listed
7  anywhere else.  Right?
8    A.    No.
9    Q.    So presumably since it's the same amount
10  as the total on the invoice that that included the
11  title -- the closing service letter.  Correct?
12    A.    I would assume so, yes.
13    Q.    And that was for a property that Anthony
14  Cicalese closed.  Right?
15    A.    Yes.  I did not do this HUD.
16         (King-27, Invoice dated 12/19/96, is
17  received and marked for identification.)
18         (King-28, HUD-1, is received and marked
19  for identification.)
20    Q.    Miss King, going back to King-26, do you
21  recognize that as Mr. Cicalese's signature?  It's the
22  HUD-1.
23    A.    Yes, that is his signature.
24    Q.    I'm handing you what's been marked as
25  King Exhibit 27 and King-28.  King-27 is Bates

Page 244

1  stamped FY 004737 and King-28 is FY 004820 through
2  4821.  They're also an invoice and a HUD-1.  And the
3  invoice is addressed to Stanley Yacker.
4    A.    Okay.
5    Q.    And he's listed as the settlement agent
6  on the HUD-1.  Correct?
7    A.    Yes.
8    Q.    And similar to the ones with Cicalese,
9  Mr. Cicalese, the invoice notes an item of closing
10  service letter for $25.  Correct?
11    A.    Yes.
12    Q.    And a total of $926.00?
13    A.    Yes.
14    Q.    And then on the second page of the HUD-1
15  under 1108 for title insurance to Coastal Title
16  Agency it shows $926.00.  Is that correct?
17    A.    Yes.
18    Q.    And no other notation for the closing
19  service letter?
20    A.    No.
21    Q.    So you would assume that the $25 for the
22  closing service letter is included in that 926.
23  Right?
24    A.    Yes.
25    Q.    Was this something that you prepared,

Page 245

1  this HUD-1?
2    A.    Yes.
3    Q.    And you signed on behalf of Mr. Yacker?
4    A.    Yes.
5         (King-29, Deeds, is received and marked
6  for identification.)
7    Q.    Miss King, I'm handing you what's been
8  marked as Exhibit King 29.  It's a series of deeds
9  and mortgage, a balloon rider, Bates stamped FY
10  004257 through 4273.  Can you tell if this was a
11  closing that was performed by Mr. Yacker and Mr.
12  Cicalese in addition to the one that's Mr. Pepsny's?
13  If you look at the deed that you prepared, on the top
14  left corner it's got the Suite 104.
15    A.    Yeah, that's Anthony's suite number and
16  the font is different on this so that would be from
17  Anthony's office.
18    Q.    Anthony Cicalese?
19    A.    Yes.
20    Q.    On the very last page of this series of
21  documents is the signature page for the family rider.
22  It's notarized by Susan Grieser.  Do you see that?
23    A.    Yes.
24    Q.    Does that signature look familiar to
25  you?

26  (Pages 242 to 245)

L. KING

| Page 246 | Page 248 |
|---|---|
| 1　A.　No. | 1　be the person who was the borrower. |
| 2　Q.　Do you know why Susan Grieser would have | 2　Q.　Correct. |
| 3　been notarizing one of Mr. Cicalese's loans? | 3　A.　Yes, they portrayed themselves as the |
| 4　A.　I have no idea. | 4　borrower. |
| 5　Q.　And you testified that you never met | 5　Q.　And in many instances you believed they |
| 6　Susan Grieser? | 6　really weren't the borrower. Correct? |
| 7　A.　I don't believe I have. | 7　A.　No, I believe that they were the |
| 8　　　MS. WAGNER: I am not going to mark this | 8　borrower. But not asking for identification to prove |
| 9　as an exhibit, but I just wanted to show Miss King | 9　that I had no way of knowing whether that person was |
| 10　some of the documents that are referenced in closing | 10　truly the borrower or not. |
| 11　instructions since she didn't seem to be familiar | 11　Q.　Well, for example, David Lieber. |
| 12　with, like, what a T-I-L disclosure was and see if | 12　A.　Yes. |
| 13　she recognizes the document. | 13　Q.　At the time you believed that he was |
| 14　　　MR. KOTT: Put the Bates stamp numbers | 14　David Lieber. Correct? |
| 15　on the record. | 15　A.　Yes, that's correct. |
| 16　　　MS. WAGNER: Sure. The first one for | 16　Q.　In hindsight you now know that he was |
| 17　some reason is cut off but it's WS 1008743. I think | 17　Mr. Cuzzi. |
| 18　the first page might be 8742. And it goes through WS | 18　A.　Correct. |
| 19　1008804. | 19　Q.　So the closing instructions in those |
| 20　Q.　After you take a look at them, if you | 20　instances that indicated the borrower being David |
| 21　can just let us know if they look familiar and you | 21　Lieber, he was not, in fact, the borrower that |
| 22　have seen them. | 22　appeared before you? |
| 23　A.　I skipped over a lot of pages and just | 23　A.　No. |
| 24　hit the ones that needed signatures for the most | 24　Q.　And in the instances where nobody |
| 25　part. Sorry to say. I never really read them or | 25　appeared before you, you have no reason to know that |

| Page 247 | Page 249 |
|---|---|
| 1　looked at them because I didn't think I had to. Some | 1　those people were truly the borrowers on those loans. |
| 2　of the documents do look familiar, others I have no | 2　Correct? |
| 3　idea. | 3　A.　I have no idea who the borrower was who |
| 4　Q.　Do the ones that people signed look | 4　signed the documents, whether they were the actual |
| 5　familiar to you? | 5　borrower or someone else. |
| 6　A.　Yes. | 6　Q.　And in the instances where you also |
| 7　Q.　On the top of all the closing | 7　signed on behalf of the borrower at Mr. Kane's |
| 8　instructions, as you will see in the one you have in | 8　request, you had not met the person whose name was on |
| 9　your hand, it indicates the borrower's name. Is that | 9　those closing documents. Correct? |
| 10　correct? | 10　A.　Correct, if they had not come to the |
| 11　A.　Yes. | 11　office. |
| 12　Q.　And is it correct that you have | 12　Q.　So in those instances would you agree |
| 13　testified that in many instances the borrower did not | 13　that you had not followed the closing instructions |
| 14　know that they were the actual borrower at these | 14　because the borrower was not confirmed? |
| 15　closings? | 15　　　MR. HAYES: Object to the form of the |
| 16　　　MR. HAYES: Object to the form of the | 16　question. It implies it's her duty to confirm who |
| 17　question. I don't think that's what she said. | 17　the borrower actually was or wasn't. Also -- |
| 18　Q.　Were there instances where the person | 18　　　MR. KOTT: I join in that objection. |
| 19　whose name was on -- that was on the closing | 19　Assumes the closing instructions required that of the |
| 20　documents was not the borrower that appeared before | 20　closing attorney. |
| 21　you when you entered into the closings? | 21　　　MR. McGOWAN: I join. |
| 22　A.　Let me get this straight. | 22　Q.　You can answer. |
| 23　Q.　I'm sorry. I am not making it clear. | 23　　　MR. HAYES: Do you remember the |
| 24　A.　What you're trying to say is if we are | 24　question? |
| 25　sure the person who showed up portrayed themselves to | 25　A.　Not with all these objections. Say it |

27 (Pages 246 to 249)

L. KING

| Page 250 |
| --- |

1  again.
2      (The pending question is read by the
3  court reporter.)
4      A.    Still trying to get my mind around --
5      Q.    Let me restate the question. On the
6  second page under, "Additional closing requirements,"
7  paragraph F, do you believe that the reason why Walsh
8  Securities was requiring acceptable identification
9  was that you were supposed to confirm that the person
10 who was signing the closing documents was indeed that
11 person?
12     A.    I agree that identification was needed.
13     Q.    And do you agree that the reason why no
14 documents may be executed by power-of-attorney unless
15 authorized by Walsh Securities, Inc. is because that
16 individual that was the borrower was supposed to then
17 themselves sign the documents?
18     A.    Yes, I agree that they should have
19 signed the documents themselves.
20     Q.    So in that case, given that there was no
21 confirmation that the borrower was the individual
22 signing the closing documents, would you agree that
23 the closing instructions were not followed?
24     MR. KOTT: Object to the form.
25     A.    I would have to agree.

| Page 251 |
| --- |

1      Q.    Would you also agree that Walsh
2  Securities -- strike that. Would you also agree that
3  you never informed Walsh Securities that you were
4  signing on behalf of borrowers?
5      MR. KOTT: Did she say that?
6      Q.    Did you ever tell anyone at Walsh
7  Securities?
8      A.    That I signed --
9      Q.    That you were signing on behalf of
10 borrowers.
11     A.    Closing documents?
12     Q.    Yes.
13     A.    Not them. But notarizing, etcetera, no,
14 I did not have a conversation with Walsh Securities
15 about signing at all any of the documents.
16     Q.    Did you ever have any conversations with
17 anyone at Walsh Securities that you had signed the
18 borrower's name in certain instances?
19     A.    No.
20     Q.    Did you ever have any conversations with
21 anyone at Walsh Securities about borrowers signing
22 their name on closing documents outside of your
23 presence?
24     A.    No.
25     Q.    On the last page of the closing

| Page 252 |
| --- |

1  instructions, is there a place for the closing
2  attorney to sign?
3      A.    Settlement agent?
4      Q.    Yes.
5      A.    Yes.
6      Q.    And by signing this are they
7  acknowledging that they have closed and completely
8  disbursed the loan in accordance with the closing
9  instructions?
10     A.    Yes.
11     Q.    So if the closing attorney or the
12 settlement agent isn't the one actually closing,
13 disbursing or signing this document, would you agree
14 that it wasn't done in accordance with the closing
15 instructions?
16     A.    I would have to agree.
17     Q.    Previously when you were asked about
18 what type of harm Walsh Securities suffered, you're
19 not an expert in the mortgage industry. Correct?
20     A.    Not at all.
21     Q.    You're not even an expert in real estate
22 closings. Correct?
23     A.    Not at all.
24     Q.    You stated, I believe, that Walsh
25 Securities was harmed in that it loaned money to

| Page 253 |
| --- |

1  people that didn't even know they were borrowing
2  money. Is that correct?
3      A.    Yes.
4      Q.    And that this whole process was built on
5  lies. Is that correct?
6      A.    That's correct.
7      Q.    Do you believe Mr. Kane is a dishonest
8  person?
9      MR. KOTT: Object to the form. Actually
10 I withdraw the objection.
11     A.    I would say that Bill Kane is very
12 manipulative and dishonest, yes.
13     Q.    You testified that he told you on
14 multiple occasions about being at Walsh Securities or
15 talking to Betty Ann DeMola. Do you know in fact
16 that on those instances when he said he was at Walsh
17 Securities that he was at Walsh Securities?
18     A.    Most of the time he could say he was
19 wherever he wanted to be. However, I do remember
20 that there were times that he would call me from
21 Walsh and ask me questions pertaining to a property
22 that they had questions on, that he would relay the
23 information back to the person he was talking to at
24 that point, at that moment.
25     Q.    How many times a month do you think he

28 (Pages 250 to 253)

L. KING

Page 254

1  was at Walsh Securities office?
2      A.    I have no idea.
3      Q.    You talked about Ms. DeMola being at the
4  Christmas party in 1996?
5      A.    Yes.
6      Q.    Was everyone, to your knowledge, at that
7  Christmas party involved in these frauds?
8      A.    I don't know.  A lot of people were
9  there so I don't know.
10      Q.    Do you think that just because they were
11  at that party they were involved in the frauds?
12      A.    I have no idea.  I don't know.
13      Q.    Do you have any firsthand knowledge that
14  Ms. DeMola was involved in the frauds?
15      A.    Not firsthand knowledge, no.
16      Q.    And what knowledge do you have that Ms.
17  DeMola was involved in the frauds?
18      A.    Some conversations on the phone, her
19  calling and asking for information.
20      Q.    What kind of information was she asking
21  for?
22      A.    It wasn't a lot of phone call
23  conversation.  Just questions about mortgages,
24  where's papers.  I don't recall specifics.  I just
25  recall that I spoke to her a couple of times about

Page 255

1  documents.
2      Q.    And why would that lead you to believe
3  that she knew about the frauds?
4      A.    Because she worked very closely with
5  Bill.
6          MR. KOTT:  Bill Kane?
7      A.    Bill Kane.
8      Q.    And you know that because that's what
9  Bill Kane told you.  Correct?
10      A.    I know what because Bill Kane told me
11  what?
12      Q.    That Betty Ann worked closely with Bill
13  Kane.  You know that because that's what Mr. Kane
14  told you?
15      A.    Yes.
16      Q.    Did Betty Ann ever tell you that she
17  worked closely with Mr. Kane?
18      A.    No.
19      Q.    Do you have any idea whether Miss DeMola
20  called other closing attorneys' offices?
21      A.    I have no knowledge of that.
22      Q.    So you don't know whether it's unusual
23  for Ms. DeMola to have been calling you.  Correct?
24      A.    I do not know.
25      Q.    Do you know why a lender requires title

Page 256

1  insurance?
2      A.    No.
3      Q.    Are you aware that Betty Ann DeMola has
4  no authority to approve loans?
5      A.    No.
6      Q.    You believe she had authority to approve
7  loans based on what Mr. Kane stated, though.  Right?
8      A.    Again, I don't know the mortgage process
9  and who was supposed to approve what or anything.  I
10  just know he worked with her.
11      Q.    Did you ever personally have any
12  conversations with Ms. DeMola about getting closings
13  done by the end of the month?
14      A.    No.
15      Q.    Did you ever speak to anybody at Walsh
16  Securities about the false escrow letters?
17      A.    No.
18      Q.    Do you know if anybody at Walsh
19  Securities knew that the escrow letters were not true
20  and accurate?
21      A.    I don't know that.
22      Q.    Do you know if anyone at Walsh
23  Securities knew about the joint venture closings?
24      A.    I don't know that.
25      Q.    You don't know if anybody at Walsh

Page 257

1  Securities knew about the joint venture closings?
2      A.    I don't know if Walsh Securities knew
3  about them or not.
4      Q.    And you don't know whether anyone at
5  Walsh Securities knew that funds were being used to
6  pay for Kane's purchase on the same day he was also
7  selling the property.  Correct?
8      A.    No.
9      Q.    You never had any conversations with
10  anyone at Walsh Securities letting them know that you
11  were preparing false escrow letters?
12      A.    No.
13      Q.    Or that you were preparing joint
14  venturer deeds?
15      A.    No.
16      Q.    And you never informed anyone at Walsh
17  Securities that Kane was using proceeds from their
18  loans to pay for properties he was simultaneously
19  purchasing.  Correct?
20      A.    No, that's correct.
21      Q.    Your conversations with Ms. DeMola were
22  limited to questions relating to documents.  Correct?
23      A.    I believe so, yes.
24      Q.    Not about documents being fake.
25  Correct?

29 (Pages 254 to 257)

VERITEXT REPORTING COMPANY

L. KING

### Page 258

1    A.    No.
2    Q.    With respect to your conversations with
3  Kelly O'Neill, were they about documents also?
4    A.    Yes.
5    Q.    Did you have any conversations with Miss
6  O'Neill about documents being fake?
7    A.    No.
8    Q.    Did you ever have any conversations with
9  Ms. DeMola or Kelly O'Neill about the joint venturer
10 deeds?
11   A.    No.
12   Q.    I don't have anymore questions.
13 RECROSS-EXAMINATION BY MR. HAYES:
14   Q.    Miss King, are you table to tell us
15 sitting here today which of the 220 loans you signed
16 the borrowers name to?
17   A.    I can't tell you that right now.
18   Q.    And is my recollection correct from the
19 first day of your deposition that the occasions on
20 which you did that Mr. Kane had informed you that the
21 borrowers had already signed the documents, but there
22 was a need to get documents to Walsh right away so
23 you were asked to sign their names so that the
24 documents could get to Walsh before he got the
25 documents to you?  Is that the way that went down?

### Page 259

1    A.    Okay.  Go through that again.
2    Q.    Sure.  My recollection, I may be wrong
3  so don't allow me to put words in your mouth, was
4  that when you testified at your prior day's
5  deposition about the occasions on which you signed
6  the borrower's name to documents it was so that those
7  documents could be forwarded to Walsh immediately.
8  Is that correct?
9    A.    Correct.
10   Q.    And that what Mr. Kane had said to you
11 was he already had the documents signed by the
12 borrower, but needed you to get those out because he
13 had not gotten the signed documents to you yet.  Do
14 you recall that?
15   A.    No.
16   Q.    In your deposition, ma'am, and again
17 sometimes deposition testimony bounces all over the
18 place, page 118.  They were talking about what
19 documents you prepared and your answer to that was:
20 "I signed documents at Bill's request, let's put it
21 that way, so the documents could be sent back to
22 Walsh immediately because they wanted their documents
23 back of course."
24        And then the question was: "In what
25 capacity did you sign those documents?

### Page 260

1         "Answer:  As the straw buyer.  Bill said
2  that he had all the documentation from these people
3  and it was okay and we need the documents signed so
4  do it."
5    A.    Okay.
6    Q.    What did you mean by that?
7    A.    The documentation that he had was
8  identification.
9    Q.    Okay.
10   A.    That they were actual people that --
11   Q.    So when you said that, what you meant
12 was that he had their ID?
13   A.    ID.
14   Q.    Not that they had the loan documents
15 signed?
16   A.    No.
17   Q.    By --
18   A.    Correct.
19   Q.    Do you recall on how many occasions you
20 did that?
21   A.    No, I don't.
22   Q.    That's all I have.  Thank you, ma'am.
23 RECROSS-EXAMINATION BY MR. KOTT:
24   Q.    What Ms. Walker had questioned you on,
25 that were not marked as exhibits, WSI 008742 through

### Page 261

1  008804, which apparently was for the Laurie Hristov
2  loan.  I just have a couple of questions about those.
3  May I look over your shoulder?  Would that make you
4  nervous?
5    A.    Sure.
6    Q.    Referring to page WSI 008744.  That's
7  the third page of the closing instructions.  Is that
8  correct?
9    A.    Yes.
10   Q.    And it's got the name Stanley Yacker in
11 the lower left?
12   A.    Yes.
13   Q.    Was that signed by you?
14   A.    Yes.
15   Q.    And in the line where you signed his
16 name it says "Settlement Agent"?
17   A.    Yes.
18   Q.    Would this document, this three-page
19 closing instructions, have been returned to Walsh
20 Securities after the closing?
21   A.    Yes.
22   Q.    Okay.  I want to call your attention to
23 the HUD-1 statement, which is WSI 008779 and WSI
24 008780.  This is the HUD statement for that loan.
25   A.    Yes.

30  (Pages 258 to 261)

L. KING

Page 262

1    Q.    It's two pages.  Is that correct?
2    A.    Correct.
3    Q.    And on the second page, line 101, you
4  see that?
5    A.    Yes.
6    Q.    It's a payment of $650 to Richard
7  Pepsny.
8    A.    Correct.
9    Q.    And the form indicates that Mr. Pepsny
10  was the settlement agent.
11    A.    It says that on the HUD.
12    Q.    And would Walsh Securities have also
13  received this two-page HUD statement?
14    A.    That's correct.
15    Q.    So looking at these documents would it
16  be fair to say that Walsh Securities would have
17  received from your office a document in which Mr.
18  Yacker signed as the settlement agent, but in which
19  Mr. Pepsny was paid a fee as the settlement agent?
20    A.    That's correct.
21    Q.    And did that occur in a great many of
22  the transactions we're talking about in this lawsuit?
23    A.    It probably did.
24    Q.    My question to you is this:  Did anybody
25  at Walsh Securities on any of the 220 loans that

Page 263

1  we're talking about in this case ever call you up and
2  say:  We don't understand why Mr. Yacker is -- we
3  don't understand why Mr. Yacker's signature appears
4  both on the closing instructions and on the HUD
5  statement as the settlement agent when the HUD
6  statement indicates a payment of a fee to Mr. Pepsny
7  for being the settlement agent?
8    A.    No, I did not receive any calls like
9  that.
10    Q.    Do you know whether Mr. Yacker or anyone
11  else in the law firm received that phone call from
12  Walsh Securities?
13    A.    I don't know that.  However, if Mr.
14  Yacker had received it or I had received it, then I
15  would have asked Mr. Yacker how to fix that.  I just
16  went by a master HUD that Mr. Yacker probably had
17  written out by hand and that was my form.
18    Q.    I wasn't asking your knowledge.  I was
19  asking whether Walsh ever called you and said
20  something is not kosher here, what's going on?
21    A.    No.
22    Q.    Do you know whether Walsh ever called
23  Mr. Yacker or anyone else in the law firm and said to
24  him something is not kosher here with respect to who
25  the settlement agent is, what's going on?

Page 264

1    A.    I never received the phone call like
2  that and I don't know if he ever did.
3    Q.    That's all I was asking.  Thank you.  I
4  have no further questions.
5  RECROSS-EXAMINATION MR. McGOWAN:
6    Q.    I want to show you this other HUD-1
7  statement that counsel brought out before.  I don't
8  know whether you marked it or not.  This one.
9         MS. WAGNER:  I think it was marked.
10    Q.    26 Institute Street, Freehold.
11         MR. HAYES:  King-28.
12    Q.    Let me show you 28, the second page of
13  28.  Would you agree with me that on the line 1101
14  there's a closing fee to Richard Pepsny of 650?  On
15  1107 there's an attorney's fee to Stanley Yacker of
16  650?
17    A.    Yes, I agree.
18    Q.    Why is that?
19    A.    Because Mr. Yacker got paid on the -- on
20  the buyer's side and Rick got paid on the seller's
21  side from Cristo.
22    Q.    Well, okay.  On this RESPA though
23  they're all in the last column, which is paid from
24  seller's funds at settlement.  Right?
25    A.    That's right.

Page 265

1    Q.    Pepsny and Yacker are both in that same
2  column?
3    A.    Yes.
4    Q.    But you're saying that this HUD reflects
5  the -- a prior transaction?
6    A.    No.
7    Q.    What are you telling me?
8    A.    Bill Kane paid for the attorney's fee to
9  Rick Pepsny for drawing up the documents going from
10  Cristo into the straw buyer.
11    Q.    Okay.
12    A.    And then Yacker got paid --
13    Q.    Closed from the straw buyer?
14    A.    Closed -- got his money from closing the
15  loan.
16    Q.    This form would have been sent to Walsh
17  as well, would it not?
18    A.    Yes, it would have.
19    Q.    Walsh ever ask you the same question I
20  did?
21    A.    No.
22    Q.    Do you know whether Walsh ever asked
23  anybody in the law firm the same question I just did?
24    A.    That I don't know.
25    Q.    Because this -- what you're telling me

L. KING

Page 266

1  is that this indicates two different transactions
2  basically, does it not?
3      A.   All I know is they told me to pay Rick
4  and pay Yacker.
5      Q.   Okay. I am done. Anyone else?
6  CONTINUED REDIRECT EXAMINATION BY MS. WAGNER:
7      Q.   I have one for the record. Miss King,
8  looking at that document, that HUD-1 you were just
9  looking at for 26 Institute Street, on line 1101 can
10 you read for me what it states?
11     A.   "Settlement or closing fee to Richard
12 Pepsny."
13     Q.   It doesn't say settlement agent, does
14 it?
15     A.   No.
16     Q.   And then line 1107, what does it state?
17     A.   "Attorney's fees to Stanley Yacker."
18     Q.   You prepared this HUD-1. Correct?
19     A.   Correct.
20     Q.   You didn't have any training in real
21 estate closings. Correct?
22     A.   That's correct.
23     Q.   You didn't go to law school?
24     A.   No, no.
25     Q.   Did Mr. Cicalese prepare his own HUD-1s?

Page 267

1      A.   Yes, he did.
2      Q.   And he was a lawyer. Correct?
3      A.   That's correct.
4      Q.   And he presumably had some training how
5  to perform a real estate closing?
6      A.   Yes.
7      Q.   If you can look back at King-26, the
8  HUD-1 for 317 Sumner Avenue, which Mr. Cicalese was
9  the settlement agent. Do you have that?
10     A.   Yes, I have it.
11     Q.   On the second page can you read what it
12 says for 1107?
13     A.   "Attorney's fees to Anthony M. Cicalese,
14 PC."
15     Q.   And that's for $550. Correct?
16     A.   That's correct.
17     Q.   And that's paid from the borrower's
18 funds line. Correct?
19     A.   That's correct.
20     Q.   And then line 11 -- I'm sorry -- 1204 it
21 says, Michael Alfieri, Esquire. Correct?
22     A.   Correct.
23     Q.   And that's 650 paid from seller's funds
24 at settlement. Correct?
25     A.   Correct.

Page 268

1      Q.   And you don't happen to have any
2  personal knowledge about the impropriety of a seller
3  paying a buyer's closing costs, do you?
4      A.   No.
5      Q.   I don't have any further questions.
6  RECROSS EXAMINATION BY MR. HAYES:
7      Q.   I will be very brief, ma'am. Take the
8  two settlement sheets, 26 and 28. You have them
9  before you?
10     A.   Yes, I do.
11     Q.   Put them both to the second page. And
12 I'm going to direct your attention to the upper
13 portion of the HUD, ma'am, the particular line, 801.
14 Do you see on one of these transactions the loan
15 origination fee, which is the fee charged to the
16 borrower for the loan he or she is getting, in one of
17 those transactions it was paid by the buyer and the
18 other transaction it was paid by the seller. You see
19 that?
20     A.   That's correct.
21     Q.   And if you look at line 811 on the
22 King-26, do you see the commitment fee, which is the
23 fee that Walsh charged the borrower for purposes of
24 issuing a mortgage commitment, and that transaction
25 was paid by the seller, not by the borrower?

Page 269

1      A.   I see that.
2      Q.   And if you look on the other one, ma'am,
3  that fee is actually on line 810, and in that case a
4  commitment fee was paid to National by the buyer.
5  Correct?
6      A.   Correct.
7      Q.   Now, both of these HUDs would have gone
8  to Walsh. Correct?
9      A.   Correct.
10     Q.   Did you ever get a call from anyone at
11 Walsh saying: Why is the seller paying commitment
12 fees?
13     A.   I did not get any phone calls.
14     Q.   Do you recall, ma'am, that the closing
15 instruction letters mandated that those commitment
16 fees be paid by the buyer, not by the seller?
17     A.   Yes, that's what the closing
18 instructions say.
19     Q.   So Walsh had within a day or two after
20 settlement a document indicating that at least one
21 portion of its closing instructions had not been
22 followed. Correct?
23     A.   Correct.
24     Q.   But you don't recall ever receiving any
25 contact whatsoever from Walsh questioning why that

32 (Pages 266 to 269)

L. KING

Page 270

```
 1   was?
 2       A.   No.
 3       Q.   And you never had a conversation with
 4   Mr. Yacker or Mr. Cicalese in which they said:  Walsh
 5   wants an explanation as the why we're ignoring their
 6   closing instructions?
 7       A.   No.
 8       Q.   That's all I have.
 9           MR. KOTT:  I have no further questions
10   happily for you.
11           MS. WAGNER:  I have nothing further.
12           MR. HAYES:  Thank you, ma'am, you're
13   free to leave before somebody changes their mind.
14           (The deposition is concluded at 2:30
15   p.m.)
16
17
18   _____
             LORRAINE KING
19   Subscribed and sworn to before me
20   this _____ day of _____, 2010.
21
22   _____
23           Notary Public
24
25
```

Page 271

```
 1           CERTIFICATE.
 2
 3       I, JANET BAILYN, a Notary Public and
 4   Certified Court Reporter of the State of New Jersey,
 5   do hereby certify that prior to the commencement of
 6   the examination LORRAINE KING was duly sworn by me to
 7   testify the truth, the whole truth and nothing but
 8   the truth.
 9       I DO FURTHER CERTIFY that the foregoing
10   is a true and accurate transcript of the testimony as
11   taken stenographically by and before me at the time,
12   place and on the date hereinbefore set forth.
13       I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of any
15   of the parties to this action, and that I am neither
16   a relative nor employee of such attorney or counsel,
17   and that I am not financially interested in the
18   action.
19
20   _____
     Notary Public of the State of New Jersey
21   My commission expires February 3, 2013
         License No. XI00970
22
     Date:  May 17, 2010
23
24
25
```

33  (Pages 270 to 271)

L. KING

**A**

**able** 156:11 165:2 205:14,17,22 209:11,17 215:10
**above-entitled** 146:2
**acceptable** 187:21 189:3 208:17 250:8
**access** 195:4 206:14
**account** 161:8 165:15 194:11 195:5,6,10 210:2 210:8 211:22
**accounts** 195:8
**accumulated** 152:8 194:14 197:13
**accumulating** 197:19
**accumulation** 198:2
**accurate** 235:13 256:20 271:10
**acknowledged** 193:23
**acknowledging** 252:7
**act** 199:15
**action** 145:2 271:15 271:18
**activities** 175:6
**actual** 173:23 215:6 247:14 249:4 260:10
**addition** 245:12
**Additional** 187:20 250:6
**address** 171:10,11
**addressed** 230:22 230:23 237:2 241:21 244:3
**Affidavit** 148:11 149:18
**Agel** 235:11,19

236:18,25
**agency** 145:17 147:17 159:22 235:6 236:7,12,15 237:6,18 240:5 244:16
**agent** 163:1,7 186:1 186:5 199:5,8 221:13 244:5 252:3,12 261:16 262:10,18,19 263:5,7,25 266:13 267:9
**agent's** 186:2
**ago** 175:23 218:7
**agree** 150:20 151:1 151:7 204:22 214:20 222:16 249:12 250:12,13 250:18,22,25 251:1,2 252:13,16 264:13,17
**agreed** 173:20 176:15
**agreement** 165:1
**air** 238:10
**Alfieri** 145:13 267:21
**alleged** 223:20
**allow** 219:6 259:3
**allowed** 203:13,19
**alter** 167:15 168:3
**altered** 168:1,5
**amended** 167:6
**America** 167:6
**amount** 180:4 185:3 186:18 189:22,23 198:12 198:17,19 211:21 212:4 243:9
**AMY** 147:3
**analysis** 183:13
**Ann** 178:10,13,13 178:14 225:16,17

225:22 226:1,7 227:24 228:3 253:15 255:12,16 256:3
**answer** 212:20 219:10,25 229:7 229:17,18 235:12 249:22 259:19 260:1
**answering** 212:25
**Anthony** 145:13,14 153:16,23 154:5,8 154:9,11 155:1,7 172:22 243:13 245:18 267:13
**Anthony's** 245:15 245:17
**anybody** 166:12 221:21 224:11 233:1 256:15,18 256:25 262:24 265:23
**anymore** 258:12
**apparently** 175:4 261:1
**appear** 151:4 167:16
**appearance** 170:9
**appeared** 247:20 248:22,25
**appearing** 151:18 193:20
**appears** 153:5,12 192:14 263:3
**application** 213:21
**applications** 163:25
**applied** 195:3
**apply** 218:23
**appraisal** 182:18 183:21
**approval** 167:24 177:17 178:6
**approve** 177:18

256:4,6,9
**approved** 157:16 174:17
**approving** 178:11
**April** 152:6,18 153:6 219:2
**arose** 178:18
**arrange** 222:1
**arranging** 173:21 174:17
**aside** 156:9 171:18 195:7
**asked** 158:15 167:14 168:21 171:21 172:23 173:2,10 174:8,24 175:5,13 213:10 213:23 220:14,25 222:4,7 231:15 234:10 235:10 242:15 252:17 258:23 263:15 265:22
**asking** 199:6 213:7 215:25 217:9,15 217:21 221:13 228:2,7,17 230:8 233:15 248:8 254:19,20 263:18 263:19 264:3
**asks** 186:23
**Assets** 145:8,9 150:7 153:8 160:14 164:22 198:4 216:7
**assisted** 173:21
**associate** 235:22
**associated** 190:11 221:8 235:23 236:2
**association** 152:7
**assume** 243:12 244:21
**Assumes** 249:19

256:4,6,9
**assuming** 157:1 231:11
**attempt** 200:5
**attempted** 200:6
**attended** 158:17
**attending** 156:4
**attention** 170:1 219:4 236:16 261:22 268:12
**attorney** 163:11 172:13 183:2 199:15,16 228:20 228:20 249:20 252:2,11 271:14 271:16
**attorneys** 147:5,8 147:12,16 255:20
**attorney's** 175:1 220:24 264:15 265:8 266:17 267:13
**Attorney-At-Law** 154:5,9,11,16
**attractive** 198:9
**authority** 256:4,6
**authorized** 189:18 250:15
**available** 155:12 156:11 158:21
**Avenue** 267:8
**aware** 160:23 172:2 177:6 209:15 233:11,15,23,25 240:23 241:1 256:3
**awful** 237:6
**A-4** 148:10
**a/k/a** 145:7

**B**

**B** 148:8 184:9 206:6,10,12
**back** 149:5 173:10 176:3 181:21 182:10,14,19,22

L. KING

182:23 183:25
184:4,6 185:16
188:7 199:25
200:4,5,8,11
201:20 205:16
209:2,25 211:9,11
211:19,22 214:8
216:3 217:13
224:15 226:17
235:17 240:12
243:20 253:23
259:21,23 267:7
**BAILYN** 146:3
271:3
**balloon** 245:9
**bank** 158:3 163:23
177:22 185:4
**banking** 213:16
**banquet** 223:5
**Bargain** 150:11
151:2 152:10
**based** 178:16 193:2
213:20,24 218:11
231:11,13 256:7
**Basen** 150:12
**basically** 175:13
266:2
**basis** 241:2
**Bates** 149:14 151:8
153:1 165:25
242:14,14 243:25
245:9 246:14
**beginning** 155:3
162:6 179:1 185:5
185:24 188:12,19
194:12 202:7
210:20 216:8
219:6 229:11,12
**behalf** 245:3 249:7
251:4,9
**belief** 178:16 193:2
**believe** 149:13
155:3,23 156:24
157:20 159:14,18

159:20 160:12,13
161:2,3,18,24
162:8 167:9 169:3
170:22 171:13,15
177:5,8,11 179:18
181:14,17 185:5
185:21,25 186:20
187:19,25 188:20
191:17,25 193:6
197:1 200:4,25
206:1,17 208:11
211:4,18 212:12
212:14 215:5
217:20,22 220:10
221:24 230:20
246:7 248:7 250:7
252:24 253:7
255:2 256:6
257:23
**believed** 248:5,13
**belonged** 190:22
**belongs** 154:13
**benefit** 239:5
**Bernstein** 150:13
151:2
**best** 167:10 184:5
192:1 196:14
198:15 206:11
208:4,7 212:3
**better** 145:19
192:21
**Betty** 178:10,12,13
178:14 225:14,16
225:17,22 226:1,7
227:23 228:3
232:20 253:15
255:12,16 256:3
**big** 157:23 188:13
192:24 223:6
**Bill** 151:25 154:25
157:10,17,21
158:1 159:2,15,19
160:14 161:15
162:9,23 163:12

163:18 164:16
165:9,9 166:20
169:16 174:2
175:18 176:18
177:15 179:19,25
186:8 188:13,23
189:7 198:4 207:2
207:10 209:24
210:3,16 211:17
216:7,19 220:15
220:16,22 222:20
226:1 232:4,6,15
232:17,19 234:8
234:17 238:13
253:11 255:5,6,7
255:9,10,12 260:1
265:8
**Bill's** 259:20
**binder** 184:18
186:21 210:15
237:25 238:15,21
239:6,8,11 240:15
240:22 243:3
**binders** 166:5,8,8
237:22 238:9
241:4
**bit** 205:10 206:5
**blank** 187:4 207:16
**Bob** 235:19
**book** 240:9
**bookkeeping** 195:1
**borrower** 191:14
247:13,14,20
248:1,4,6,8,10,20
248:21 249:3,5,7
249:14,17 250:19
250:21 259:12
268:16,23,25
**borrowers** 187:22
189:3 214:3
215:19 249:1
251:4,10,21
258:16,21
**borrower's** 186:23

231:15 247:9
251:18 259:6
267:17
**borrowing** 212:22
213:4 253:1
**bottom** 168:20,25
171:21 203:8
210:4
**bought** 164:25
**bounces** 259:17
**box** 147:15 193:1
193:11,12
**breach** 207:25
209:16
**breaches** 209:12
**break** 165:20
201:10 210:4
**brief** 165:19 268:7
**briefly** 224:25
235:6
**bring** 170:1
**BRODO** 145:12
**broker** 163:22
179:17 213:22
222:8
**brokers** 163:21
**brought** 164:10
209:25 264:7
**BROWN** 145:12
**build** 197:14 198:5
**built** 212:23 253:4
**business** 177:21
**buy** 163:12 176:11
177:25 180:4
**buyer** 162:10
163:23,24 191:9
232:8,11 260:1
265:10,13 268:17
269:4,16
**buyers** 162:8 163:3
170:6 177:20
193:20
**buyer's** 169:3
264:20 268:3

**buying** 163:3
**B-a-s-e-n** 150:12

———————
**C**
———————
**C** 147:1 187:4
207:16
**CALANNI** 145:11
**call** 156:12 173:11
179:5 186:12
189:5 190:19
192:13 199:14
200:15 205:21
219:4 226:21
231:20,22 234:1
253:20 254:22
261:22 263:1,11
264:1 269:10
**called** 158:17,24
200:18 206:25
207:1 218:19
227:20,23 228:10
228:17,24 233:19
235:19 238:21
255:20 263:19,22
**calling** 150:8 189:1
227:2,3,9 228:7
233:11,23 242:3,4
254:19 255:23
**calls** 186:16 240:22
263:8 269:13
**cancelled** 216:12
**capacity** 236:1
259:25
**Capital** 145:8,9
150:7 153:7
160:14 164:22
198:4 216:7
**card** 188:17
**care** 169:23 186:9
210:16 234:18
**Carol** 157:14
**carried** 210:22
**case** 167:6 186:23
217:21 219:2,17
220:12 221:1

VERITEXT  REPORTING  COMPANY

L. KING

223:7 233:4
250:20 263:1
269:3
**cases** 200:7
**cashed** 216:17,18
216:20
**category** 182:8
**causes** 177:11
**Center** 147:7
**certain** 190:12
197:2 198:8,12,17
198:19 203:2
251:18
**certainly** 207:7
213:19
**certainty** 214:19
**CERTIFICATE**
271:1
**Certified** 146:3
271:4
**certify** 271:5,9,13
**change** 167:15
**changes** 167:23
270:13
**charge** 228:5
242:22
**charged** 268:15,23
**check** 165:10
195:18 215:16
216:10,12,12,15
216:17
**checked** 156:16
**checking** 195:8
**checks** 174:21
195:5,12 210:6
211:10,12,22
212:7,9 214:12
215:20 216:1,2,4
216:4,5,9,21
217:1,8
**children** 176:12
**Christmas** 222:19
222:23 223:17,22
225:9 254:4,7

**Cicalese** 145:14
154:5,8,11 155:1
155:3,22 156:2
168:12 195:22
196:1,14 197:7
243:14 244:8,9
245:12,18 266:25
267:8,13 270:4
**Cicalese's** 153:16
197:2 243:21
246:3
**circumstance**
167:14
**circumstances**
173:9 209:9
**circumvented**
186:9
**Civil** 145:2
**clarify** 215:3
**clean** 184:25
**clear** 176:4 180:25
197:17 213:2
247:23
**clearer** 213:1
**clearly** 213:5
**clerical** 227:4,10
228:8,17
**clients** 153:24
156:9,14
**close** 170:10 198:25
211:3 212:13
226:1,15 229:25
230:25 232:20,24
**closed** 158:23
208:25 219:24
243:14 252:7
265:13,14
**closely** 221:10,11
255:4,12,17
**closer** 155:12
177:24 179:2
**closing** 153:24,25
154:23 159:11,13
160:6 161:12,13

161:20 162:3
163:17 168:23
174:11,18 175:24
176:10 179:21
180:10,11,15,24
181:2,12,13,15
183:2 184:14
187:20,22 188:25
190:11 191:1,7
193:20 194:3
195:17,18 196:2,3
196:16,23 197:3,6
199:5,7,15,16,16
199:25 200:2,4
201:21 203:14,17
203:22 204:10,20
205:1,7,11 206:1
206:2,9 207:14,25
208:8,11,22
209:13,13 210:5
210:18 219:11
230:3 239:17,18
239:19 240:3
242:21 243:11
244:9,18,22
245:11 246:10
247:7,19 248:19
249:9,13,19,20
250:6,10,22,23
251:11,22,25
252:1,8,11,12,14
255:20 261:7,19
261:20 263:4
264:14 265:14
266:11 267:5
268:3 269:14,17
269:21 270:6
**closings** 155:11
156:3,4 157:10,13
157:17,21 158:5
158:14,18,20
159:1,2 160:20,22
161:19,25 162:18
163:16 165:11,17

166:16 167:16
169:21 171:25
172:14 173:22,23
175:18 179:7
188:4 198:21
207:19 209:10
220:18 228:14
240:18 247:15,21
252:22 256:12,23
257:1 266:21
**club** 223:3
**Coastal** 145:17
147:17 148:12
152:9 159:22,23
160:1,4,11 164:7
166:5 184:19
192:15,19 193:4,8
202:2,3,9,11
222:5 235:5,22,24
236:2,6,9,11,15
236:19,23 237:14
237:18,22,24
238:3 239:9,10,20
239:22 240:21,24
241:1,17 242:2,4
242:8,13 243:3
244:15
**column** 264:23
265:2
**come** 165:13
173:10 176:15
182:5,12 203:13
226:17 233:18
236:10 239:6
242:18 249:10
**comfortable** 214:19
**coming** 149:5
163:17 164:13
166:7 195:15,16
195:17 236:16,16
**commencement**
271:5
**commencing** 146:7
**commingled** 195:9

**commission** 271:21
**commitment**
201:14 210:14
211:23 212:2
268:22,24 269:4
269:11,15
**Commonwealth**
145:15 147:9
218:19
**communicate**
178:19 183:18
**companies** 174:2
202:5 218:19
**company** 154:4
164:24 176:25
177:1,21 182:16
185:9 201:24
202:2 218:19,20
218:20 222:8
228:6 240:10
241:3
**complaining** 189:2
207:4
**complete** 219:14
220:22 221:3
**completed** 196:16
**completely** 252:7
**completion** 180:10
**complied** 206:3,12
**comply** 206:13
207:23
**conceal** 167:14
**concept** 191:24
**concerned** 170:2
175:23 205:24
222:12
**concluded** 270:14
**conditions** 184:9,16
196:24 206:6,11
**conference** 155:24
156:8 157:23
158:11,22
**confidence** 205:17
**confident** 218:7

234:17
**confirm** 249:16
250:9
**confirmation**
250:21
**confirmed** 249:14
**confusing** 197:10
214:25 215:2
**connection** 225:4
237:17
**consistent** 169:6
**constitute** 207:25
**CONSULTING**
145:14
**contact** 177:15,16
242:1 269:25
**contacted** 232:10
**contacting** 206:22
**contain** 153:5
**contains** 181:24
**Contemporaneo...**
235:17
**CONTINUED**
266:6
**continuing** 172:8
**control** 232:18
**conversation** 165:8
227:25 251:14
254:23 270:3
**conversations**
164:4 173:17
177:9 178:17
183:22 198:24
200:20 201:4
225:6 226:25
231:9 241:24
251:16,20 254:18
256:12 257:9,21
258:2,5,8
**convey** 191:9
**conveying** 191:14
**copied** 160:13
183:24
**copies** 156:10

158:24,24 159:13
160:6,8,10 182:19
188:11,15,19
219:10,20 220:20
**copy** 159:4,14,15
159:16,16,18,19
159:20,21 180:14
181:3 182:15,18
182:20,21,22,24
184:1 185:25
186:6,20 188:16
202:20 230:5
239:21 240:4,8
**corner** 245:14
**correct** 150:9,14
153:8 154:3 155:4
155:15 156:4,5
157:11 160:17,21
160:25 162:18
166:19,21 167:17
167:18,21,24
168:23 169:12
170:5 171:14,25
173:1,24 174:2,6
174:11,19,22
175:2,7 178:24
188:2,3 190:8,13
190:16,23 191:19
191:24 192:10
193:5,13 194:5,11
195:23 196:11,12
197:8 201:14,17
202:11,13,16,21
202:22,25 203:1,4
203:5,9,10,15,16
203:19 204:2,3,12
204:13,17,18,24
204:25 205:4,5
206:3 207:14,15
207:20 208:1,2,12
208:14,15,25
209:5,6,7 213:13
214:14 215:21
217:5 218:12

223:10,14,15
226:11 233:9,10
242:24 243:4,11
244:6,10,16
247:10,12 248:2,6
248:14,15,18
249:2,9,10 252:19
252:22 253:2,5,6
255:9,23 257:7,19
257:20,22,25
258:18 259:8,9
260:18 261:8
262:1,2,8,14,20
266:18,19,21,22
267:2,3,15,16,18
267:19,21,22,24
267:25 268:20
269:5,6,8,9,22,23
**corrected** 199:18
**correctly** 166:25
211:15
**costs** 180:19 189:22
203:12 268:3
**counsel** 264:7
271:14,16
**country** 223:3
**county** 152:5
171:20 182:23
**couple** 153:12
162:9 191:20
200:13 210:23
217:9 225:5 234:4
254:25 261:2
**courier** 212:2
**course** 236:19
259:23
**court** 145:1 167:13
168:21 170:5
171:20,21 174:4,8
174:24 250:3
271:4
**Court's** 169:9
**create** 170:9,15
**created** 192:24

**credit** 176:14
**creditors** 185:13,14
185:15
**Cristo** 145:6 150:1
150:4,13,21 151:3
151:5,6 154:14
160:17 163:11
264:21 265:10
**criticizing** 229:18
**CROSS** 148:2
**CROSS-EXAMI...**
176:21 218:16
235:4
**cubicle** 155:21
156:10
**current** 194:23
**cut** 212:8 246:17
**Cuzzi** 145:14
169:18 223:13
248:17
**Cuzzi's** 164:15

_____

**D**

**D** 187:7 207:16
**DAP** 145:14
**date** 151:1 214:18
271:12,22
**dated** 148:11,12,12
148:13 150:4,9,14
150:20 152:13
153:5 154:13
165:22 167:2
243:16
**dates** 167:16 168:1
168:5,8
**David** 147:6 169:18
218:17 248:11,14
248:20
**day** 151:18 167:10
178:22 179:3,21
199:25 201:13
204:2,16,16
212:16 217:4,8,8
257:6 258:19
269:19 270:20

**days** 150:21 173:3
179:3 200:14
217:9
**day's** 259:4
**deal** 178:19 183:20
188:14 191:9
194:22 199:6
211:8,14 212:13
**dealings** 236:15
**deals** 187:15
193:15,16 202:6
205:19 214:1
**dealt** 159:23,25
228:21 234:14
241:16
**December** 150:4
151:24
**decided** 195:8
**decision** 160:3
**declaration** 185:20
186:10,14
**declarations**
206:14
**deducted** 212:4
**deducting** 211:20
**deed** 149:24 150:1
150:3,6,8,11,21
151:2 152:11
153:5 154:13,24
159:16,20,21
165:2 176:3
182:21 184:1
192:4 239:14,15
239:21,23 240:3,4
240:6 245:13
**deeds** 148:14
149:22 150:24
151:5 152:8 160:8
167:15 168:2,4,6
168:8,17 172:24
191:19 192:8,8,20
245:5,8 257:14
258:10
**Defendant** 147:8

L. KING

147:16
**Defendants** 145:20
147:12
**DeFeo** 162:24
**definitely** 162:8
**DeMola** 177:6
178:6,19 198:24
201:1,3,7,9
213:10 223:21
224:23 225:14,22
226:1,7,18 227:6
227:24 229:3
232:20 253:15
254:3,14,17
255:19,23 256:3
256:12 257:21
258:9
**DeMola's** 228:3
**department** 181:13
241:17
**depending** 190:7
196:24
**deposited** 165:14
217:8
**deposition** 145:5
178:23 191:22
193:3 194:9
195:21 197:11
201:13 204:3,16
218:25 219:1
222:17 229:6,10
230:24 234:19
235:7 242:16
258:19 259:5,16
259:17 270:14
**describe** 155:17
162:25 163:9,19
164:7 219:8
**described** 240:20
**description** 148:9
184:18 227:16
239:15
**desk** 179:9
**detail** 187:7 206:1

**detailed** 206:8
**DiBENEDETTO**
145:11
**different** 166:23
212:24,25 224:15
245:16 266:1
**direct** 148:2 149:3
177:8 268:12
**directed** 203:7
237:21
**direction** 204:22
237:12
**directly** 164:18
178:7,8 189:7
232:3,6
**disburse** 204:17
**disbursed** 161:11
161:14,19,25
173:22 174:6
194:13,18 195:2
205:4 209:10
210:25 211:2
212:12,16 216:10
252:8
**disbursement**
174:18 194:21
208:24 209:14
214:5 215:6,13
216:6 217:16,23
**disbursements**
181:12 190:2
194:2 196:13,15
202:24 203:6,7
205:6 210:18
214:2,20 215:15
218:1
**disbursing** 174:22
252:13
**disclosure** 182:19
246:12
**discuss** 163:16
169:14 170:12
175:1
**discussed** 163:18

167:20 174:16
**discussing** 169:10
171:3
**discussion** 197:18
235:2
**dishonest** 253:7,12
**distributed** 191:5
194:15 204:21
**DISTRICT** 145:1,1
**divided** 190:15
191:2
**document** 152:25
153:12 154:13
165:20 171:14
183:1 201:16,18
201:23 202:10
233:19 241:10,12
241:14 246:13
252:13 261:18
262:17 266:8
269:20
**documentation**
175:20 232:12
242:5 260:2,7
**documented**
189:14
**documents** 149:10
152:1 153:25
158:5,7,18 159:4
159:5,10,13 160:7
162:15 169:4,16
172:25 176:16
181:25 182:2,5,7
183:3,7,10,14,15
184:14 186:7
189:17 192:15
193:3,5,9,24
200:3,5,7,11,19
201:19 204:6
205:11,13,15,20
206:2 208:8,25
209:20 210:21,25
212:16 214:13,21
215:7,12,18

217:12,17,24,25
219:11,12,16,18
221:2 225:7
226:22,24 228:25
232:23 233:7,13
233:24 234:2,5,11
234:14 235:15
245:21 246:10
247:2,20 249:4,9
250:10,14,17,19
250:22 251:11,15
251:22 255:1
257:22,24 258:3,6
258:21,22,24,25
259:6,7,11,13,19
259:20,21,22,25
260:3,14 262:15
265:9
**document-by-do...**
183:13
**doing** 156:2 173:18
183:12 197:16
225:8,19
**dollars** 178:3
**Donna** 145:17
153:7,7,14 154:14
163:5
**door** 158:23
**doubt** 199:21
**downstairs** 155:5
155:13
**dragging** 175:19
**drawing** 265:9
**DRD** 145:2
**driver's** 188:12,16
188:19
**due** 210:5
**duly** 149:1 271:16
**duplicate** 235:8
**duty** 249:16
**D&Sons** 185:6
**D'APOLITO**
145:14
**D/B/A** 145:18

| E |
|---|
**E** 147:1,1 148:8
149:1 187:15
208:11
**earlier** 187:25
192:9 196:1 225:3
**early** 209:13
210:19 215:6
**East** 155:9,10
**Ed** 176:24 186:1
**Edison** 147:16
**EDWARD** 147:10
**either** 174:2 186:3
197:2 203:13
213:4 230:10
240:20
**eliminated** 186:5
**employed** 179:18
**employee** 221:12
237:8 271:14,16
**employees** 221:18
**enforcement**
222:13
**ENGLISH** 147:6
**entail** 227:17
**entered** 247:21
**escrow** 171:22,25
172:6,9 256:16,19
257:11
**ESQ** 145:12,13,13
145:14 147:3,6,10
147:14
**Esquire** 150:12
154:16 267:21
**essence** 190:18
**established** 151:25
**estate** 163:1,7
175:24 177:25
228:14 252:21
266:21 267:5
**etcetera** 240:23
251:13
**Ethel** 147:15
**ethics** 172:13 173:4

L. KING

events 179:23
everybody 167:1
  219:15 220:20
  230:14
everybody's 180:5
  230:20 241:18,19
exact 163:2 226:25
exactly 169:15
  179:12 220:16
examination 149:3
  241:8 266:6 268:6
  271:6
examine 177:24
example 171:2
  215:18 248:11
exceptions 187:1
executed 189:17
  217:13 250:14
execution 215:7
exhibit 185:6
  201:12 229:24
  241:10 243:25
  245:8 246:9
exhibits 170:22
  260:25
exist 191:19
expect 207:7,9,10
expected 187:13
  206:21 213:12
expenses 190:10
  203:12
experience 228:13
expert 252:19,21
expertise 239:5
expires 271:21
explain 158:6
explained 158:18
  164:23
explanation 170:16
  171:18 270:5
extent 187:12

——————— F ———————
F 146:6 147:4
  187:20 189:16

208:16,19,23
  250:7
face 240:8
fact 177:20 179:16
  183:7 192:21
  212:15 213:3,10
  214:2 217:7,11,16
  217:22 218:5,7
  226:6 248:21
  253:15
failure 207:23
fair 193:18 195:3
  204:7,8 262:16
fake 257:24 258:6
false 256:16 257:11
falsely 171:23
familiar 153:3
  166:1 245:24
  246:11,21 247:2,5
family 245:21
far 160:23 188:9
  205:24 207:18,21
  208:17,20 209:3
  221:25 224:15
  233:7
fashion 200:12
  215:2 222:15
fault 197:11
fax 230:6,8
faxed 166:19 181:6
  181:13,14 229:23
faxing 229:19
FBI 172:16 174:25
February 152:15
  152:18 271:21
Federer 241:16
fee 163:4 199:8
  211:23 212:2,2,3
  262:19 263:6
  264:14,15 265:8
  266:11 268:15,15
  268:22,23 269:3,4
feel 234:16
feeling 169:25

fees 180:5,13,18
  189:21,23 190:10
  203:12,23,24
  211:20,23 266:17
  267:13 269:12,16
fellow 235:11
Fidelity 145:16
  147:12 148:10
  149:9,14 153:1
  176:25
figure 213:13
figures 180:3,4,7
  180:21 190:4
figuring 166:5
file 170:24 171:18
  171:19,19 175:17
  175:19,23 176:3
  178:14 219:15
  239:12,23
filed 152:4,6,15,18
  152:23 182:22,23
  240:3,6
files 152:7 172:24
  173:5,15 219:13
  219:17,19,21,21
  219:23 220:22,24
  220:24 221:2,3,5
  221:23 222:2,14
filing 240:9
fill 171:5 219:19
filled 170:22
filling 180:6
finalized 180:23
  181:1
financially 271:17
find 165:20 179:5
  213:19 214:18
  215:4 218:24
fine 150:25
finish 172:21
firm 176:7 231:23
  231:24 263:11,23
  265:23
first 150:15,23

155:7 162:9 172:4
  172:5 174:25
  178:22 181:24
  185:25 186:21
  188:25 191:18,20
  192:2 195:9
  201:13 204:2,16
  214:4 219:1
  220:11 222:17
  223:24 225:2,9
  229:5,10 230:24
  231:19 246:16,18
  258:19
firsthand 177:12
  254:13,15
five 213:20
fix 263:15
flag 178:4
floor 155:7,7
focus 209:16
follow 234:9 242:4
followed 203:19
  204:11,15 249:13
  250:23 269:22
following 166:9
follows 149:2
font 245:16
force 154:21
foregoing 271:9
forenoon 146:7
forever 176:16
forged 169:3
forgive 150:24
form 161:22 170:21
  195:17 247:16
  249:15 250:24
  253:9 262:9
  263:17 265:16
forms 187:21 189:3
  208:16
forth 175:21 190:2
  196:25 209:3
  271:12
forward 199:19

forwarded 259:7
found 192:19
  220:22 230:5
four 147:7 216:11
FOX 147:10
fraud 234:20 236:4
  241:2
frauds 163:15
  164:2,5 165:6
  220:12 224:9,12
  224:17 236:19
  237:14 254:7,11
  254:14,17 255:3
fraudulent 171:13
  193:16 240:24
  241:4
fraudulently
  193:23
free 270:13
Freehold 149:16
  220:8 264:10
fulfill 208:5
fulfilled 209:4
fund 210:10
funded 160:21
  162:9,11
funding 145:8
  159:15 160:12,13
  160:20 161:1,1,8
  163:20 166:21
  179:14 181:18
  190:7 210:13
  213:22 217:4
  219:9 221:9,13,17
  221:18,21 222:1,9
  229:20 230:6,9,16
  231:2,6
Funding's 220:6
  221:5
funds 161:11,17,19
  161:24 170:10
  171:24 174:6
  194:15 195:3
  208:24 209:14

257:5 264:24
267:18,23
**further** 176:19
234:25 264:4
268:5 270:9,11
271:9,13
**FY** 149:14,15 151:9
153:1 165:25
241:12 242:14,15
244:1,1 245:9

**G**
**G** 149:1 209:1,2,4
**gained** 204:4
**GARDENS** 145:19
**Gary** 145:10 155:4
155:6,6,13 157:2
158:2 164:17,21
164:22 165:5,9,11
166:20 194:16
198:3 216:19
223:12 232:7
**Gateway** 147:7
**general** 218:11
**getting** 199:7
200:11 207:5
213:7,11 217:1
231:5 256:12
268:16
**give** 154:2 159:9
175:12 179:25
180:3,6 214:15,16
230:2 239:4
**given** 154:25
184:22 214:12
222:20 250:20
**Global** 202:7,8,11
236:8
**go** 154:2 163:23
172:24 173:15
192:9 197:15
219:18 220:5,14
220:25 232:3,6,15
259:1 266:23
**goes** 246:18

**going** 149:7,24
150:1,3,15 151:2
152:20,24 164:14
164:24 167:4
168:20 169:15
170:8 172:21
177:7,11,22
179:22 197:20
202:24 210:5
212:3 213:24
218:23 219:5,6
220:1,2 222:19
229:5,6,7,10,15
229:25 235:8,18
237:6 241:9,10
243:20 246:8
263:20,25 265:9
268:12
**good** 149:4 176:22
176:23 234:16
**gotten** 155:1 184:6
259:13
**Granata** 176:9
**great** 262:21
**greedy** 216:22
**Grieser** 145:10
155:4,6,13 156:23
156:25 157:2,3
164:17 165:5,11
166:20 194:16
198:4 214:12
216:19 223:12
232:7 245:22
246:2,6
**Grieser's** 158:3
164:21
**group** 228:4
**guess** 205:9 211:12
220:21 221:6
**guessing** 218:11
**guy** 223:12
**guys** 159:25
**G.J.L** 145:7

**H**

**H** 148:8
**habit** 154:21
**hall** 223:5,5
**hand** 152:24 167:4
220:1 229:5 247:9
263:17
**handicapped**
176:11
**handing** 149:12
165:24 229:9
242:12 243:24
245:7
**handle** 187:12
**handled** 157:10,13
187:13 188:4
196:2,19,22
**handling** 157:16
**handwriting** 154:4
154:7 166:9,11
171:6,7 201:15
202:12,15
**Hanover** 155:9,11
**happen** 168:19
211:15,16 217:5
218:8 240:6 268:1
**happened** 162:14
192:7 215:11
216:6 220:18
**happening** 162:10
**happily** 270:10
**happy** 177:3
**hard** 162:16 220:19
**harm** 252:18
**harmed** 212:15,18
217:16,19,22
218:4 252:25
**Hayes** 147:10 148:4
176:21,24 218:22
231:14 232:1
247:16 249:15,23
258:13 264:11
268:6 270:12
**hazard** 182:17
185:19 186:13

187:8 196:25
206:24 207:5,17
207:18,23
**head** 227:7
**hear** 179:8
**heard** 235:13,21
238:14,15
**hearing** 198:6
**heavily** 164:16
226:11
**held** 146:5 158:22
174:11 192:8
193:9 194:20
**hell** 192:21
**help** 166:17 179:23
**helped** 219:14
**helps** 180:15
**hereinbefore**
271:12
**Hills** 146:5 147:4
**hindsight** 248:16
**hit** 210:3 246:24
**hold** 170:24 171:18
186:6
**holder** 171:10
**holding** 171:24
178:2 194:17
**holdover** 195:16
**home** 145:8 159:15
160:12,12,25
163:20 166:21
171:11 179:14
190:7 210:13
213:22 219:9
220:6 221:5,8,13
221:17,18,21
222:1,9 223:4
229:20 230:6,8,16
**HOMES** 145:19
**honest** 228:22,23
**hours** 200:4,5
214:9,10,13,17,21
215:9,12 217:17
217:23

**house** 176:11
**Howard** 150:13
**Hristov** 149:25
150:2,4,7,22
151:6,18 261:1
**HUD** 159:17,20
180:2,6,11,22
181:1,17,21
182:15,25 183:20
183:25 190:5
210:6 243:15
261:24 262:11,13
263:4,5,16 265:4
268:13
**HUDs** 180:8 181:6
181:8,13 269:7
**HUD-1** 148:13,14
181:19 185:11
199:22,23,24
202:21 203:8,12
203:25 242:10,14
243:1,18,22 244:2
244:6,14 245:1
261:23 264:6
266:8,18 267:8
**HUD-1s** 179:20
199:4 266:25
**humongous** 178:4
**hundreds** 178:2,3
**hung** 176:16

**I**
**ID** 188:18 260:12
260:13
**idea** 188:7 193:22
236:13 246:4
247:3 249:3 254:2
254:12 255:19
**identification**
149:11,19 156:17
165:23 167:3
187:21 188:1,5,9
188:10 189:3,6,11
208:17 232:3,13
232:16 242:9,11

L. KING

243:17,19 245:6
248:8 250:8,12
260:8
**identifications**
231:16,20
**identified** 199:16
**ignoring** 270:5
**II** 145:5,11
**illegitimate** 232:12
**imagine** 231:7
**immediately** 259:7
259:22
**implies** 249:16
**impression** 195:25
221:7,12,14
222:11
**improperly** 169:11
**impropriety** 268:2
**inartful** 224:14
**incentive** 226:14
**include** 180:12
**included** 181:15
186:22 200:1
201:19,24 208:7
243:10 244:22
**income** 213:21,25
**incorrectly** 211:16
**INDEX** 148:1
**indicate** 191:12
**indicated** 189:8
197:16 199:4
205:7 212:1
248:20
**indicates** 152:14
185:19 186:17
191:8 247:9 262:9
263:6 266:1
**indicating** 198:24
269:20
**individual** 216:8
250:16,21
**individuals** 158:6
223:13,16
**industry** 213:17

231:12 252:19
**infer** 234:13
**information** 158:25
171:5 175:13
180:23 203:11
226:22,24 228:7
228:18 237:23
238:2,5,8 253:23
254:19,20
**informed** 198:11
251:3 257:16
258:20
**Initially** 197:13
**insert** 184:17
239:15
**insider** 241:2
**instance** 174:1
221:19 233:16
**instances** 169:2
247:13,18 248:5
248:20,24 249:6
249:12 251:18
253:16
**Institute** 149:16
264:10 266:9
**instruction** 204:20
269:15
**instructions** 159:12
161:13,21 162:4
180:10,12,15,24
181:2,12 191:1,8
196:23 197:7
203:14,18,22
204:11 205:1,8,12
206:1,2,9 207:14
207:25 208:12,22
209:13 218:22
246:11 247:8
248:19 249:13,19
250:23 252:1,9,15
261:7,19 263:4
269:18,21 270:6
**insurance** 145:15
145:16,17 147:9

147:12,13 164:10
176:25 177:1
182:16,17 185:20
186:1,2,5,14
187:8,16,17 197:1
201:14,24 202:2
206:14,17,24
207:17,18,24
208:3,5 218:20,20
243:3 244:15
256:1
**insure** 182:6
**insured** 218:21
**interaction** 239:9
239:19
**interactions** 240:19
**interest** 191:10,14
**interested** 271:17
**introduced** 225:13
225:14
**introduction**
224:25
**investigated** 173:13
219:17
**investigation**
172:12 221:1
222:13
**INVESTMENT**
145:9
**invoice** 148:12,13
242:8,13 243:10
243:16 244:2,3,9
**invoices** 242:17,18
**involved** 158:25
162:23 178:6
194:25 195:12,22
213:19 224:9,12
224:17,20 241:2
254:7,11,14,17
**involvement** 152:4
162:25 163:6,10
163:19 164:8,15
164:21 168:22
240:23

**Irene** 162:24
**issuance** 195:12
**issue** 178:18
**issued** 211:10,12
241:4
**issues** 199:3
**issuing** 216:1
268:24
**item** 207:16 242:20
244:9
**items** 182:13

---
**J**
---

**J** 147:10 150:12
154:15
**JAMES** 145:11
**JANET** 146:3
271:3
**January** 150:9,14
151:1 152:13
**Jersey** 145:1 146:5
146:6 147:4,8,16
149:16 154:6,17
172:13 271:4,20
**job** 227:16,21
**John** 146:6 147:4
**join** 249:18,21
**joint** 149:25 150:8
160:8 165:1,1
191:18,24 192:4,8
256:23 257:1,13
258:9
**judgments** 184:20
184:25
**jumping** 218:24
**justification** 204:14

---
**K**
---

**K** 149:1
**Kane** 145:10
151:25 154:25
157:10,17,21
158:5 159:2,15
160:14,16,21
161:15,18,25

162:17,25 163:12
164:16 165:13
166:20 169:16
174:2 175:18
176:18 177:16
178:5,17,23
179:19,25 184:23
187:13 189:7,8
190:16 192:19
194:9 195:15
197:16,19,22,24
198:4,11 202:6
203:6,14 204:16
204:22 205:7
207:2,4,11 209:24
214:12 216:7,19
220:15,16,16
221:4,8,25 222:12
222:20 226:1,6
230:5,9,17 232:4
232:6,15,17,19
234:8,13,20
236:14 237:20,21
238:13 253:7,11
255:6,7,9,10,13
255:13,17 256:7
257:17 258:20
259:10 265:8
**Kane's** 162:23
171:11 179:12
237:12 249:7
257:6
**keep** 150:15 166:17
220:19
**Kelly** 200:21,22
201:3,6,8 227:3
227:11 228:8
258:3,9
**Kennedy** 146:6
147:4
**kept** 155:10 159:14
159:19
**kind** 189:5 219:19
228:18,19 238:17

254:20
**King** 145:6 148:3
  149:4,12 165:24
  167:4 176:22
  177:5 183:20
  192:2 218:17
  235:5 241:9
  242:12 243:20,25
  245:7,8 246:9
  258:14 266:7
  270:18 271:6
**King-11** 170:25
**King-12** 202:21
**King-13** 180:14
  181:24 205:2
**King-21** 148:10
  149:9,13
**King-22** 148:11
  149:18 152:25
**King-23** 148:11
  165:22,25 229:24
**King-24** 148:12
  167:2,5
**King-25** 148:12
  242:8,13,17
**King-26** 148:13
  242:10,15 243:20
  267:7 268:22
**King-27** 148:13
  243:16,25
**King-28** 148:14
  243:18,25 244:1
  264:11
**King-29** 148:14
  245:5
**knew** 162:18
  163:15 164:1
  165:5 168:14
  170:7 172:8 175:6
  175:10 177:11,19
  180:2 224:11
  230:7,9,10,18
  235:10 255:3
  256:19,23 257:1,2

257:5
**know** 151:21
  152:22,22 153:2
  156:16,18,19,22
  156:25 157:3
  159:17,25 160:2,3
  160:5 162:7 163:2
  163:2,4,18 164:1
  164:9,17,18 165:5
  166:9 168:1,3
  169:24,24 171:15
  171:16,20 173:14
  173:16 175:15
  176:24 177:2,19
  179:4,11,12,16
  182:4,11,17,18
  184:19 185:23
  186:7,11,19 187:2
  188:1,14,24
  192:24 193:10,17
  193:25 194:7,21
  195:4,6 196:5,25
  199:9,14 206:6,19
  207:18,21 208:17
  208:20 209:3
  210:4,11,12,12,15
  210:22,24 211:7
  212:22 213:4,16
  213:17,17 216:20
  216:25 217:7,9,10
  217:19,25 218:3
  221:4,15,22,25
  224:6,10,13,15,21
  227:12,13,15,17
  228:2,6 230:17,19
  233:7,14 235:18
  235:19,23 236:1
  236:11,14,17
  237:15,16,19
  238:4,7,11 239:3
  239:7 241:11,18
  242:6 246:2,21
  247:14 248:16,25
  253:1,15 254:8,9

254:12 255:8,10
  255:13,22,24,25
  256:8,10,18,21,22
  256:24,25 257:2,4
  257:10 263:10,13
  263:22 264:2,8
  265:22,24 266:3
**knowing** 183:9
  193:15,19 194:1,6
  248:9
**knowledge** 156:19
  163:14 177:12
  187:16 196:15
  198:10 199:2
  206:11 208:4,7
  224:5,6 231:11,13
  231:22 241:5
  254:6,13,15,16
  255:21 263:18
  268:2
**known** 225:25
**kosher** 263:20,24
**Kott** 147:6 148:5
  161:22 162:1,5
  185:12 188:9
  201:10 218:16,17
  229:9 246:14
  249:18 250:24
  251:5 253:9 255:6
  260:23 270:9

---
**L**
---

**L** 149:1
**lack** 192:21
**Land** 145:15 147:9
  218:19
**Larry** 164:15
  169:18 223:12
**late** 151:24
**Laurie** 261:1
**law** 222:13 231:23
  231:24 263:11,23
  265:23 266:23
**LAWRENCE**
  145:14

**lawsuit** 223:7
  224:18 262:22
**lawyer** 267:2
**layout** 155:17
**lead** 255:2
**leases** 162:19,20
**leave** 194:10
  270:13
**left** 172:19 190:12
  245:14 261:11
**legal** 184:17
**legal-size** 150:15
**legitimate** 162:8
  193:15 228:13
  232:12 240:2
**lender** 207:12
  213:14 228:24
  255:25
**lenders** 171:24
**length** 214:4
**letter** 172:6 199:17
  242:21 243:11
  244:10,19,22
**letterhead** 171:23
**letters** 171:22
  172:9 204:20
  256:16,19 257:11
  269:15
**letting** 257:10
**let's** 182:21 207:16
  209:1,9,16 210:24
  213:2 259:20
**license** 188:16
  231:16 271:21
**licenses** 188:12,19
**Lieber** 169:18
  248:11,14,21
**liens** 184:20,24
**lies** 212:23 253:5
**light** 217:11 218:5
**limit** 205:3
**limitations** 191:1
**limited** 145:7
  217:22 257:22

**limits** 191:3
**line** 167:13 186:17
  199:10 203:8
  210:4 219:7
  229:11,12,13
  243:2 261:15
  262:3 264:13
  266:9,16 267:18
  267:20 268:13,21
  269:3
**lines** 170:4
**list** 164:13 179:25
  181:25 229:23,25
  230:12,15,16,17
**listed** 182:7 183:3,8
  203:25 205:11
  243:6 244:5
**listing** 180:12
  203:23
**lists** 166:16,23
  189:23 230:14
**little** 204:4 205:10
  206:5 213:1
  214:25 218:24
**LLP** 147:3,6,10
**loan** 149:8 158:5
  174:9 176:12
  178:18 184:6,12
  194:23 198:12,17
  198:20 212:16
  214:13 215:7
  225:7 252:8
  260:14 261:2,24
  265:15 268:14,16
**loaned** 252:25
**loaning** 212:21
  213:3
**loans** 161:1 178:6
  178:11 181:19
  185:22 189:14
  198:8 210:10
  213:6,11 218:6,6
  218:21 224:9
  225:4 226:15,18

L. KING

227:10 230:25
232:23 233:2,3
236:4,4 237:18
240:24 246:3
249:1 256:4,7
257:18 258:15
262:25
**located** 149:16
**location** 155:14
**long** 175:22 210:22
229:17,18 235:21
**longest** 215:5
**look** 149:17 153:2
166:1 180:14,17
181:23 203:22
204:19 205:25
213:21 222:1,14
223:9 242:19
245:13,24 246:20
246:21 247:2,4
261:3 267:7
268:21 269:2
**looked** 163:2 235:7
235:16 247:1
**looking** 151:4
162:15 206:10
221:22 228:25
233:12 235:15
262:15 266:8,9
**looks** 152:6 237:5
**Lorraine** 145:6
148:3 206:23
270:18 271:6
**lot** 164:19 177:24
178:23 183:10
224:19,21 225:6
226:3 237:6
246:23 254:8,22
**lower** 261:11
**lump** 216:11
**L.L.C** 145:10

——————————
**M**
**M** 145:13 267:13
**MAGNANINI**

146:5 147:3
**main** 155:9
**maintenance**
164:23
**major** 229:25
**majority** 200:20
215:11,14 236:8
**making** 178:2
188:11 205:6
247:23
**manage** 164:24
**management** 145:6
145:9,10 228:12
**manager** 227:7
228:4,11,17,20,24
**managing** 165:4
**mandate** 200:3
**mandated** 269:15
**manipulative**
253:12
**manner** 190:16
**March** 154:13
**mark** 241:10 246:8
**marked** 149:10,13
149:19 152:25
165:23,25 167:3,5
170:25 202:21
205:2 241:12
242:9,10,13,15,17
243:17,18,24
245:5,8 260:25
264:8,9
**marked-up** 238:14
238:21 239:5
**Market** 147:11
**marketing** 227:8
**marks** 238:20,24
**MARTIN** 147:14
**MAS** 145:2
**mass** 192:13
**master** 263:16
**mastermind** 234:23
**Matawan** 176:9
**matter** 146:2

**matters** 175:2
**maximum** 215:8
**ma'am** 179:15
180:17,25 181:9
181:17,23 183:6
184:9 187:16
188:10 189:21
190:1 191:8,17
193:13,18 194:9
196:18 199:21
200:23 201:18
206:11,17 208:4
209:3 211:2 212:7
212:14 215:15
218:6,15 259:16
260:22 268:7,13
269:2,14 270:12
**McCARTER** 147:6
**McGOWAN**
147:14 148:5
235:1,4 249:21
264:5
**mean** 162:2 171:19
172:3 178:8
185:12 202:2
231:5 234:16
260:6
**meaning** 178:25
227:7 231:16
232:9
**means** 186:19
187:2
**meant** 198:3
260:11
**meet** 151:22 156:23
**meeting** 156:13
158:4 174:25
175:4
**memo** 148:11 166:4
167:1 237:1
241:21
**memorandum**
165:22 229:24
237:5

**memory** 204:5
235:14
**memos** 166:6
**mentioned** 162:22
162:24 163:5
206:15
**merger** 198:7,9
**mess** 192:24 219:14
**messages** 240:22
**met** 207:19 218:18
223:24 224:2
246:5 249:8
**METHFESSEL**
147:14
**Michael** 145:13
267:21
**middle** 198:7 199:6
**mind** 180:25
199:21 213:6
242:7 250:4
270:13
**mine** 239:25
**misrepresented**
163:3
**missing** 219:20
234:14
**mistake** 198:1
**moment** 159:24
253:24
**money** 160:23
161:4,7 165:14
185:3 190:12
194:17,22,22
195:2,7,15,16,17
198:13,17,20,22
203:2,18 210:1,8
210:25 211:8,19
211:21,25 212:21
213:3 216:23
231:7 252:25
253:2 265:14
**monies** 174:9,13
190:8,15,18,22
191:2 194:20

195:9 203:8
204:17,21 209:10
211:2,11 212:12
212:15 216:3
**Monmouth** 152:4
**Montanye** 195:17
**month** 162:14
164:14,14 179:1,2
198:13,18,20
199:1 226:15
231:1 253:25
256:13
**months** 191:18,20
191:23 192:2
210:23 226:11
**morning** 149:4
176:22,23
**mortgage** 151:12
151:13 154:4
159:21 163:21,25
166:7 170:17,18
170:20 171:2,10
171:24 176:13
177:17,21,24
178:3,15 179:17
180:4 182:15,20
182:21,24 183:10
184:19 185:8
186:18 201:25
207:12 211:18
213:14,21 239:15
239:22,24 240:2,5
245:9 252:19
256:8 268:24
**mortgages** 152:8
170:6,7 171:17
172:25 177:18,22
183:9 184:20,24
213:24 215:23
254:23
**mother** 176:12,13
**mouth** 259:3
**move** 207:16
**moved** 155:8 176:8

Mulberry 147:7
multiple 174:5
  177:25 178:1
  253:14
MURPHY 145:19

_____
        N
_____
N 147:1 149:1,1
name 157:1 163:12
  170:24 175:22
  176:14,24 178:1
  186:2,23 218:17
  230:20 235:11,11
  235:13,21 241:18
  241:19 247:9,19
  249:8 251:18,22
  258:16 259:6
  261:10,16
named 223:12
names 170:22
  178:1 201:5
  258:23
Nan 150:13
national 145:8,16
  147:13 148:10
  149:9,14 159:15
  160:12,12,25
  163:20 166:20
  176:25 179:14
  190:7 210:13
  213:22 219:9
  220:6 221:5,8,13
  221:17,18,21
  222:1,9 227:7,17
  228:3 229:20
  230:6,8,16 269:4
Nations 145:15
  147:12 177:1
nature 228:25
  231:17
necessarily 166:24
necessary 184:23
need 164:12,25
  166:8 170:17
  171:18 173:14

179:6 185:3
188:15,18,23
198:17 210:12,13
210:16 215:3
233:19 258:22
260:3
needed 156:10
  158:23 166:5
  168:17 170:17
  171:16,17 177:18
  192:25 193:10
  194:14 198:8,12
  198:20 199:20
  209:22 210:9
  216:2 219:16,18
  219:22 220:21,23
  221:2,3 227:25
  228:21 232:16
  237:24 246:24
  250:12 259:12
needing 230:25
needs 185:8
neither 271:13,15
nervous 261:4
never 161:1 164:11
  165:7 178:9,11
  185:23,24 186:3
  188:12,13,14
  189:8 221:16,16
  228:19 246:5,25
  251:3 257:9,16
  264:1 270:3
new 145:1,16,17
  146:5,6 147:4,8
  147:12,13,16
  149:16 154:6,17
  172:12 185:1
  222:19 271:4,20
Newark 147:8
NHF 179:13,18
  182:3 236:16
  238:2
normal 157:13
  158:18,20 177:25

240:18
notarize 152:2
notarized 245:22
notarizing 151:15
  168:22 169:11
  246:3 251:13
notary 146:4 149:2
  157:4,7 270:23
  271:3,20
notation 242:21
  244:18
notes 146:1 166:10
  209:21 244:9
notice 149:21 230:2
NTC 182:17
number 148:9
  162:23 198:8
  223:13 226:14
  240:9 245:15
numbers 184:23
  246:14

_____
        O
_____
O 149:1
OAKWOOD 145:7
oath 167:10
Object 247:16
  249:15 250:24
  253:9
objection 161:22
  162:1,5 200:10
  212:19 213:15
  217:18 249:18
  253:10
objections 249:25
obligation 239:23
obtain 211:17
obtained 188:24
  232:11
occasions 253:14
  258:19 259:5
  260:19
occur 220:12
  262:21
occurred 167:17

229:2
offered 176:13
office 146:5 155:4
  155:10,12,18,20
  155:22 159:14
  170:19 172:13,16
  175:1,6 197:2
  220:6,25 233:2,4
  233:12,24 240:1,7
  240:21 245:17
  249:11 254:1
  262:17
offices 155:6 158:1
  221:22 232:21
  255:20
oh 186:8 188:15
  210:11,24 223:5
okay 149:20 150:5
  150:19 151:10
  152:20,24 153:4
  155:8 161:6 169:1
  177:3 179:23
  183:10 185:2,7
  188:18 194:8
  195:15 198:6
  202:20 207:3
  209:1 213:8
  214:23 215:10
  219:4 220:4,11
  224:23 229:16
  232:9 238:22
  240:2,17 241:13
  244:4 259:1 260:3
  260:5,9 261:22
  264:22 265:11
  266:5
old 176:10
old-fashioned
  240:4
once 172:20
ones 151:21 209:15
  244:8 246:24
  247:4
open 155:23

opinion 196:18
opportunity 204:5
  205:25 223:8
  235:6
opposed 193:9
  223:3 236:11,25
  240:14 241:3
order 167:14,17
  168:18 180:1
organize 219:15
original 159:18
  185:19 238:7
originally 155:11
origination 268:15
outside 251:22
owned 165:3
owns 213:20
o'clock 210:2,7
  217:2
O'Neill 200:22
  227:4,11 228:9
  258:3,6,9

_____
        P
_____
P 147:1,1
package 181:16,21
  182:8 183:11
  184:3 185:17
  186:22 187:23
  200:2 201:20
  205:14,16 206:23
  211:23
packages 188:8
  217:13
page 148:9 150:15
  151:8,11 154:12
  167:13 168:20,21
  168:24 170:4
  171:22 173:20
  180:17 181:3,24
  185:20,25 186:10
  186:14,21 189:21
  203:11,23 206:15
  209:22 219:5
  229:11,12 240:8,9

L. KING

243:2 244:14
245:20,21 246:18
250:6 251:25
259:18 261:6,7
262:3 264:12
267:11 268:11
**pages** 153:13
206:17 246:23
262:1
**paid** 185:20,25
189:24 190:11
199:5,15 203:13
203:19,24 262:19
264:19,20,23
265:8,12 267:17
267:23 268:17,18
268:25 269:4,16
**papers** 154:10
156:21 177:17
201:25 214:3,5
223:9 254:24
**paperwork** 154:2
164:10,19 172:21
197:4 220:19
**paragraph** 183:3
206:6,12 208:11
208:23 209:4
250:7
**paraphrasing**
231:3 232:2
**Parkway** 146:6
147:4
**part** 184:1,2 185:6
185:17 190:3
192:4 198:1
203:21 204:14,23
208:6 246:25
**participating**
162:17
**particular** 171:25
190:11 198:25
212:1 217:4
226:10 268:13
**parties** 160:7

271:15
**party** 222:19,25
223:17,22 224:16
224:16,24 225:9
254:4,7,11
**passed** 215:5
**pattern** 151:24
**pay** 184:24,24,24
213:24 257:6,18
266:3,4
**payable** 243:2
**paying** 268:3
269:11
**payment** 215:20
216:1,12,14 262:6
263:6
**payments** 185:10
185:12
**payoff** 185:4,8
187:4
**PC** 267:14
**pending** 250:2
**Pennsylvania**
147:11
**people** 156:20
158:4,19 159:3
162:7,23 166:7
169:17,20 174:5
175:22 178:1
196:2,6,10 212:22
213:4,11 223:19
224:8,9,19,21
227:4,10 228:4,8
231:24 232:18
247:4 249:1 253:1
254:8 260:2,10
**Pepsny** 145:13,18
150:3 154:15,20
163:5 166:20
168:9 194:16
199:5,7 216:7,19
240:1 262:7,9,19
263:6 264:14
265:1,9 266:12

**Pepsny's** 163:9
245:12
**perform** 267:5
**performed** 245:11
**period** 157:9
194:19 214:7
215:5 218:12
**permitted** 180:13
**person** 149:24
173:23 174:5
177:17,24 188:18
199:15 213:20,24
227:8 232:10
247:18,25 248:1,9
249:8 250:9,11
253:8,23
**personal** 268:2
**personally** 213:18
233:9 256:11
**persons** 168:22
209:25
**pertaining** 175:18
180:2 206:2
239:13 253:21
**Philadelphia**
147:11
**phone** 199:13 225:6
225:11 236:24
237:10 240:21
254:18,22 263:11
264:1 269:13
**phony** 162:18
172:6
**phrase** 238:14,15
**piece** 228:18
**pieces** 182:11
210:11,15 219:20
**PIERSON** 145:12
**place** 157:22
165:21 173:23
192:13 194:3
201:11 203:3
209:11,18 210:19
214:2 217:16

218:6 235:2 241:7
252:1 259:18
271:12
**Plaintiff** 145:4
147:5
**plea** 167:6 172:23
173:20
**please** 153:2 233:19
**point** 155:8 162:20
171:16 172:22
173:9 181:7 192:7
193:14 195:7,14
196:21 197:4
199:19 210:7
218:10 222:14
235:14 240:11
253:24
**pointed** 192:14
**policies** 207:5
**policy** 186:14 208:8
240:14 241:17
**portfolio** 197:15
198:5
**portion** 268:13
269:21
**portrayed** 247:25
248:3
**position** 164:17
213:18 215:19
216:1 228:19
**possession** 230:7
**possible** 212:7
**power-of-attorney**
189:17,19 250:14
**practice** 155:9
218:12
**precluded** 191:14
**premature** 174:18
**prematurely**
174:21
**preparation** 171:22
**prepare** 183:25
266:25
**prepared** 150:6,12

153:6 154:24
166:16 168:6,9
170:6 172:3,4,5
179:21 192:9
244:25 245:13
259:19 266:18
**preparing** 257:11
257:13
**presence** 179:9
251:23
**present** 153:23
154:22 158:21
165:11 168:23
169:17 196:2,7
**president** 164:22
**presumably** 243:9
267:4
**pretty** 168:19
169:21 183:24
184:3,13 234:16
**previous** 160:19
176:7 185:5
**previously** 155:2
160:15 161:10
166:15 171:9
213:5,9 252:17
**primarily** 155:15
**printed** 219:1
**prior** 173:23 175:4
180:10 181:12
194:22 195:21
197:10 210:18
212:16 214:2,13
217:5,23 236:15
259:4 265:5 271:5
**probably** 151:12,23
154:21 161:11,13
166:14 168:3
186:8 198:3
204:12,15 206:7
213:12 226:24
232:3 235:22
237:9,11 242:1
262:23 263:16

L. KING

**problem** 178:13,18
  189:6 207:8
**problems** 189:9
**proceedings** 146:2
**proceeds** 173:21
  174:9,18,22
  190:19 191:4
  194:10 204:23
  205:4 212:5
  257:17
**process** 163:4,24
  164:11 195:1
  212:23 253:4
  256:8
**processed** 164:14
  197:3
**processing** 177:17
**produced** 149:13
  152:25
**prohibit** 205:3
**prohibition** 191:13
**proper** 211:12
  222:15
**properly** 161:25
  162:2,9,12 196:19
  196:20 203:25
**properties** 145:7
  150:1 151:6
  160:16 163:12,13
  164:13,25 165:3
  166:9 170:7
  177:19,23 178:1
  180:1 188:22
  194:14 197:13,15
  197:19 198:3
  213:20 216:11
  219:24 229:25
  230:2 238:12
  257:18
**property** 145:6,8,9
  149:15 150:13,22
  151:5 154:14
  164:23 180:4
  184:25 185:3

191:9,10,15
  211:17 216:9
  219:15 239:13,14
  243:13 253:21
  257:7
**protocols** 213:17
**prove** 248:8
**provide** 159:3,4
  185:19 234:2
**provided** 161:1,3
  187:17 188:16
  203:18 234:6
**providing** 170:9
  183:2
**public** 146:4
  197:15,20 220:12
  270:23 271:3,20
**purchase** 257:6
**purchasing** 257:19
**purpose** 197:19
**purposes** 268:23
**put** 166:25 170:23
  190:4 199:9,20
  201:12 230:20
  236:6 239:12
  246:14 259:3,20
  268:11
**p.m** 270:15

_____
**Q**
_____

**qualify** 213:6,12
**question** 169:10
  195:11 199:12
  204:10 211:13
  212:24,25 213:1,7
  214:1 219:8,23
  220:11 224:14
  228:10 229:7,15
  231:19 232:2
  233:22 247:17
  249:16,24 250:2,5
  259:24 262:24
  265:19,23
**questioned** 260:24
**questioning** 269:25

**questions** 158:12
  158:15 176:19
  177:2 213:23
  215:2 218:23
  220:3 231:15
  234:25 253:21,22
  254:23 257:22
  258:12 261:2
  264:4 268:5 270:9
**quite** 178:25
  242:19
**quote** 161:11
  162:24

_____
**R**
_____

**R** 145:11 147:1,6
  147:14 149:1,1
**raided** 172:16
**raised** 192:21
  200:10
**ran** 164:19
**rate** 177:22,23
  220:18
**read** 219:5,6 220:2
  229:6,11,14
  246:25 250:2
  266:10 267:11
**real** 163:1,7 175:24
  177:25 228:13
  252:21 266:20
  267:5
**really** 165:7 170:16
  188:12 235:12
  246:25 248:6
**REALTORS**
  145:18
**REALTY** 145:18
  145:19
**reason** 152:17
  180:11 181:11
  197:12 206:16
  208:11 246:17
  248:25 250:7,13
**recall** 152:3 155:19
  156:7 158:1

166:14,24 172:11
  175:22 179:20
  180:9 183:22
  184:12,15,22
  186:12,15 188:21
  189:1,5,18,20
  190:25 192:16,22
  193:12 195:5
  197:18,25 198:6
  198:13,15,23
  199:6,13 200:13
  200:17 201:4,18
  202:6 207:3 211:5
  221:20 225:5
  226:25 231:4
  236:3,24 240:13
  240:16 241:19,25
  242:3,16 254:24
  254:25 259:14
  260:19 269:14,24
**receipt** 185:21,25
  240:22
**receive** 181:20
  184:18 185:24
  186:16 209:19
  211:24 239:8
  263:8
**received** 149:10,19
  159:12,15,16,18
  165:23 167:3
  180:21 186:3,13
  189:2,4 201:23
  202:10 205:20
  214:8 242:8,10
  243:17,18 245:5
  262:13,17 263:11
  263:14,14 264:1
**receiving** 186:12
  189:5 199:13
  239:10 269:24
**receptionist** 221:19
**recess** 165:21
  201:11 241:7
**recipient** 190:8

**recognize** 153:19
  171:7 243:21
**recognizes** 246:13
**recollection** 151:17
  151:19 157:24
  180:16 183:6
  184:5 192:1,18
  193:7 201:14
  202:14 212:4
  258:18 259:2
**reconciling** 195:6
**record** 235:3
  246:15 266:7
**recorded** 170:8
  173:1 192:16,20
  192:22,25 193:9
  193:11
**recording** 192:12
  192:13 193:4
**records** 160:14
**RECROSS** 148:2
  268:6
**RECROSS-EXA...**
  258:13 260:23
  264:5
**red** 158:3 178:4
**REDIRECT** 148:2
  241:8 266:6
**reference** 166:25
  229:24
**referenced** 246:10
**referencing** 198:2
**referred** 178:12
**referring** 175:21
  222:18 261:6
**reflect** 186:18
**reflected** 185:11
**reflects** 265:4
**refresh** 180:16
**refused** 176:15
**regarding** 177:9
  203:12
**regularly** 166:6
  173:8

L. KING

reissued 216:15
related 149:15
  157:2 176:18
relating 257:22
relation 172:14
  179:21
relationship 179:13
  219:9 221:15
  237:13
relative 271:14,16
relay 253:22
remember 156:1
  159:23 176:1,2
  179:23 180:20
  185:7 188:11
  193:21 195:7
  199:11,12 200:24
  201:5,6 205:13
  212:6,9 219:11
  220:9 222:22
  223:1,2 225:12
  231:2 232:4 236:8
  236:21 241:20
  242:18 249:23
  253:19
remove 172:24
rented 155:12
repeat 188:22
rephrase 177:3
reporter 146:4
  250:3 271:4
represent 176:25
  218:18 235:5
representatives
  173:4 174:25
represented 171:23
representing
  163:11
request 249:8
  259:20
requested 159:11
require 188:5
required 188:2
  192:22 207:13

249:19
requirement
  207:24 209:3
  266:3
requirements
  187:5,8,21 207:19
  208:4,6 250:6
requires 255:25
requiring 193:8
  250:8
resolved 178:20
RESPA 264:22
respect 187:4
  192:12 195:1
  240:24 258:2
  263:24
responded 167:17
  169:9
response 204:9
  231:14
responsibilities
  227:21
responsible 207:12
  213:13
rest 182:4,11
restate 250:5
restaurant 223:3
restrictions 191:4
return 216:3
returned 152:1,9
  181:16 182:8
  183:16 187:22
  190:6 205:16
  240:6 261:19
reveal 175:5,10
review 173:4 193:2
  206:8
Rice 186:1
Richard 145:11,11
  145:13 154:15
  262:6 264:14
  266:11
Rick 149:25 159:17
  159:19 163:9
  166:20 168:8

194:16 216:7,19
  264:20 265:9
  266:3
Rick's 163:8
rider 245:9,21
right 150:10 152:14
  176:19 179:24
  181:4 182:17
  188:5 192:25
  195:11,13,23
  206:16 215:24
  216:6 226:4
  232:19 237:10,25
  238:21 239:17
  240:3 241:11,22
  243:7,14 244:23
  256:7 258:17,22
  264:24,25
right-hand 203:8
ring 162:24
ringleader 234:23
ringmaster 234:20
  234:22
Road 147:15
Robert 145:10
  235:11
ROLAND 145:12
role 163:2
room 155:24 156:6
  156:8 157:23
  158:22,22 223:6
ROTHSCHILD
  147:10
run 179:22

——————
S
——————

S 147:1 148:8
salary 213:25
sale 150:11 151:2
  152:11 190:19
sales 227:7,17
  228:3,5
Sally 166:4,13
  237:2,3,4,8,9
  241:21,23,25

242:3
sat 153:24 195:14
satisfied 184:10,16
  184:21 185:21
saw 188:22 197:1
saying 152:14
  185:7 186:13
  198:16 206:23
  207:4 214:19
  227:16 228:11
  265:4 269:11
says 151:1 154:5
  166:4 175:9 183:1
  187:1 189:16
  261:16 262:11
  267:12,21
Schedule 148:10
scheduled 173:4
school 266:23
Scott 150:12
se 164:11
season 222:23
second 155:6
  162:20 170:6,7,17
  170:18,20 171:2
  171:10,16 172:25
  186:21 190:20
  203:11 234:9
  243:2 244:14
  250:6 262:3
  264:12 267:11
  268:11
Secretarial 236:23
Secretaries 228:12
secretary 228:12
section 181:24
  187:15 189:22
Securities 145:3
  159:11,12 160:21
  160:24 161:12,20
  162:3,19 163:24
  174:14 177:6,16
  178:10,12 183:7
  189:18 198:2,5

223:10 224:5
  225:15,17 226:7
  250:8,15 251:2,3
  251:7,14,17,21
  252:18,25 253:14
  253:17,17 254:1
  256:16,19,23
  257:1,2,5,10,17
  261:20 262:12,16
  262:25 263:12
Security 188:17
see 149:23 156:13
  169:20 180:15,18
  181:25 183:4,5
  184:10 187:5,10
  187:23 189:24
  204:6 242:20,23
  243:6 245:22
  246:12 247:8
  262:4 268:14,18
  268:22 269:1
seeing 150:23
  242:17,18
seen 157:6 213:23
  219:2 241:11,14
  246:22
seller 170:9 173:22
  174:1 190:22
  203:3 268:2,18,25
  269:11,16
seller's 190:19
  191:4 204:23
  205:3 264:20,24
  267:23
selling 150:21
  160:16 257:7
send 161:17 181:21
  182:19,20,22
  186:6,7 211:25
  219:10 230:1,15
  237:22,24 238:11
  239:22 240:10
sending 159:10
  211:22

VERITEXT REPORTING COMPANY

L. KING

sense 162:13
sensed 204:3
sent 154:3 159:18
 159:21 160:6
 166:6,10,12
 182:10,13 183:11
 183:14,24,25
 184:4,4,7 185:4,8
 185:16 188:7
 199:24 201:20
 202:3,5,15 208:8
 217:13 230:6,14
 232:23 233:8,8
 240:4 259:21
 265:16
separate 155:10
 156:8 158:1,22
 175:19 195:8
 209:20
sequence 179:23
series 245:8,20
service 199:17
 212:2 242:21
 243:11 244:10,19
 244:22
set 156:8 177:18
 190:2 195:7 209:3
 232:8 271:12
settlement 199:8,22
 244:5 252:3,12
 261:16 262:10,18
 262:19 263:5,7,25
 264:24 266:11,13
 267:9,24 268:8
 269:20
seven 191:23 192:2
share 175:16
shared 155:3
sheet 190:2 199:8
 212:1
sheets 268:8
Sherry 241:16
Short 146:6 147:4
shortcut 186:4

210:24
shortcuts 162:10
Shorthand 146:4
shortly 210:7
short-circuited
 216:10
shoulder 261:3
show 202:23 203:2
 210:3 222:17
 223:9 241:9 246:9
 264:6,12
showed 170:15,23
 209:23 247:25
showing 170:25
 240:9
shown 238:17,23
shows 243:2 244:16
side 209:21 264:20
 264:21
sign 158:11 176:16
 250:17 252:2
 258:23 259:25
signature 151:11
 151:14 153:10,17
 153:19 154:15
 184:7 209:22
 217:23 243:21,23
 245:21,24 263:3
signatures 168:22
 169:3,11 246:24
signed 152:1
 153:13,21,25
 154:1,10 156:20
 159:5 169:17
 174:21 182:8
 183:15,24,24
 205:16 209:22,23
 209:25 210:21
 211:1 212:17
 214:3,6,9,14,22
 215:12,19 217:17
 218:1 245:3 247:4
 249:4,7 250:19
 251:8,17 258:15

258:21 259:5,11
 259:13,20 260:3
 260:15 261:13,15
 262:18
significant 226:14
signing 158:5,7,19
 159:3 250:10,22
 251:4,9,15,21
 252:6,13
similar 222:5,8
 244:8
simultaneously
 257:18
single 199:22
sir 167:18
sit 156:9 158:10
 165:10
sitting 193:19
 205:14,24 206:10
 207:22 208:10,21
 209:11,17 258:15
situation 169:18
 186:9 224:20
 228:16
six 191:23 192:2
 229:11,12
skipped 246:23
SKOWRENSKI
 145:11
Smith 183:20
 195:17
Social 188:17
sold 151:5
solely 170:8 214:1
somebody 157:2
 196:7 207:9
 232:15 270:13
someone's 223:3
somewhat 197:10
 229:17
soon 180:2,6,22,23
 210:1,7
sooner 214:21
sorry 181:18

229:12 238:6
 246:25 247:23
 267:20
space 155:13
speak 199:3 224:23
 236:18 256:15
speaking 225:5
 226:17 236:24
 241:20
specific 183:13
 230:16
specifically 185:2
specifics 211:5
 236:22 254:24
speculate 152:19
 152:21
speculating 220:21
spend 231:8
spending 179:3
spent 178:23
spoke 164:11
 200:25 201:1,8
 242:1 254:25
spoken 225:2,3,10
 225:10
stack 152:7
stamp 154:10 157:7
 246:14
stamped 149:14
 151:9 153:1
 165:25 242:14,14
 244:1 245:9
stands 242:7
Stanley 145:12
 244:3 261:10
 264:15 266:17
start 149:7 180:5,7
started 162:10
 176:6,8 180:21
 193:16
starting 167:13
state 146:4 154:6
 154:17 173:3
 266:16 271:4,20

stated 157:9,19
 161:10 167:10,20
 252:24 256:7
statement 180:6
 181:21 195:3
 197:14 204:7
 210:6 261:23,24
 262:13 263:5,6
 264:7
statements 180:22
states 145:1 167:6
 175:1 266:10
stenographic 146:1
stenographically
 271:11
step 186:5
sticker 192:15
sticky 209:21
STONE 146:5
 147:3
stop 169:19
stopped 193:15,20
 215:21 216:2,12
 216:14
straight 166:17
 247:22
straw 163:3 177:20
 232:8,11 260:1
 265:10,13
Street 147:7,11
 149:16 264:10
 266:9
strictly 157:10
strike 212:13 251:2
stuff 235:16
subject 169:10
 172:12
submit 237:23
 238:2
submitted 162:19
 238:4,7
subparagraph
 208:18
Subscribed 270:19

VERITEXT REPORTING COMPANY

L. KING

subsequent 172:9
succession 168:4
sued 223:9,12,13
  223:13
suffered 252:18
suite 245:14,15
sum 190:12 203:2
Sumner 267:8
supplied 182:2
  203:15 205:20,22
  206:18 208:18
supplying 183:7
supposed 196:6,10
  211:11,24 217:14
  250:9,16 256:9
sure 154:2 161:24
  181:20 184:16
  190:1 203:17,21
  203:24 214:24
  219:16,20 220:20
  246:16 247:25
  259:2 261:5
surprised 227:9,19
  228:6
Susan 156:23,25
  157:3 245:22
  246:2,6
sworn 149:1 270:19
  271:6

_____
T
T 148:8
table 156:8 157:23
  158:10,11 258:14
tag 209:21
take 149:17 150:25
  151:25 153:2
  165:19 173:15
  180:14 181:23
  186:8 201:10
  209:24 210:19
  214:15,16 239:12
  239:14,16 246:20
  268:7
taken 146:3 174:9

204:19 219:1
  234:18 271:11
takes 165:21
  201:11 235:2
  241:7
talk 178:14 204:6
  209:1,9 228:12
  229:19
talked 160:20
  205:10 206:5
  222:18 230:11,24
  237:9 254:3
talking 165:9
  200:24 208:16
  214:11 223:8
  224:17 233:3
  236:5 253:15,23
  259:18 262:22
  263:1
talks 187:7 189:22
tax 212:2
telephone 226:19
telephoned 175:5
tell 158:11 161:16
  166:3 173:12
  175:14 177:10
  178:5 179:7
  190:16 194:15
  207:8,10 209:11
  209:17 210:3
  214:4 216:5
  223:19,21 225:19
  225:22 226:22
  227:2,6,14,20
  229:22 234:7,8
  238:12 239:4
  245:10 251:6
  255:16 258:14,17
telling 204:17
  265:7,25
term 192:21
testified 149:2
  155:2 156:3
  160:15 166:15

169:7 171:9
  178:22 187:25
  191:17 194:8
  195:21 198:11
  201:15 206:7
  213:5,9 246:5
  247:13 253:13
  259:4
testify 196:9 271:7
testimony 160:19
  192:16 196:1
  197:12,17 198:13
  204:11 205:12
  231:2 259:17
  271:10
Thank 149:4
  218:15 260:22
  264:3 270:12
thin 238:9
thing 149:23 163:7
  189:16 207:17
  225:8 234:22
things 175:10,11
  184:1,2 195:23
  210:13 216:9
  228:25 229:19
  231:16
think 155:25 156:3
  157:25 161:13
  170:21 175:21
  176:10 178:4
  181:15 186:2
  188:23 189:4,6
  191:22 194:8
  204:22 211:14,16
  213:9 218:14
  234:25 235:12
  242:15 246:17
  247:1,17 253:25
  254:10 264:9
thinking 224:15
third 149:24
  152:15 180:17
  203:23 218:24

261:7
THOMAS 145:12
thought 179:19
  188:13 236:6
thousands 178:3
three 190:20 210:2
  210:7 216:11
  217:2
three-page 261:18
time 150:23,25
  151:24 152:23
  157:10,19 162:13
  162:22 175:23
  178:5,23 179:2
  181:7 183:19
  189:1 190:25
  191:2 192:8
  193:14 194:19
  195:1,14 196:21
  198:21 199:7
  206:7 214:4 215:5
  218:10,12 219:13
  220:8 221:7,14
  222:11 223:24
  224:2 225:2,9,25
  228:24 229:2
  230:4,9 234:10
  235:7,10,12,17,21
  237:9,9 239:14
  248:13 253:18
  271:11
timely 200:12
  205:22
times 200:13
  218:18 225:6
  234:4 253:20,25
  254:25
timing 225:8
title 145:15,15,16
  145:17 147:9,12
  147:13,17 148:10
  148:11 149:9,14
  149:18 152:9
  159:22 164:9,12

166:8 176:4,25
  177:1 180:1
  184:18,25 186:17
  186:21 187:16,16
  192:15 201:13,23
  202:1,2 208:3,5,8
  210:14,14 218:18
  218:19,20 222:5
  227:12,20 228:3
  235:5 236:7,11,15
  236:19,23 237:6
  237:14,18,24
  238:3,14,21 239:5
  239:9,10,20 240:5
  240:10,21,24
  241:2,3,17 242:13
  243:3,3,11 244:15
  244:15 255:25
titled 152:10
  180:18
titles 202:4,6
Title's 164:7
today 149:5 193:19
  194:2 196:1
  205:15,25 206:9
  207:22 208:10,21
  209:11,17 258:15
told 159:8 163:22
  169:15,17 170:5
  175:9 188:23
  191:2 192:19
  193:8 195:18
  199:19 221:16
  231:10 238:11
  253:13 255:9,10
  255:14 266:3
top 152:13 153:10
  168:25 230:21
  245:13 247:7
topic 180:18
total 164:13 242:24
  243:10 244:12
training 266:20
  267:4

VERITEXT REPORTING COMPANY

L. KING

transaction 153:3
170:10 182:6
185:1 186:14
189:19 190:3,13
190:20 192:5
198:25 202:24
203:3 209:18
211:3,6 212:11
218:8 240:2 265:5
268:18,24
transactions 177:7
183:19 187:18
192:3,10 193:23
194:2 196:14,14
196:19 197:7
206:12 208:6
209:4 210:19
216:15 217:12
228:22,23 241:4
262:22 266:1
268:14,17
transcript 146:1
148:12 167:2,5
218:25 220:1
229:10 235:8
271:10
transferred 174:10
174:14
tried 176:17
trouble 176:3
true 167:10 226:8
226:15 229:3
256:19 271:10
truly 248:10 249:1
trust 161:7 165:15
194:10 195:4
210:8 211:22
truth 271:7,7,8
truthful 175:14
try 197:17 212:25
224:14 235:8
trying 157:25
195:22 197:14,22
197:23,24 198:4

215:4 247:24
250:4
turn 151:8 154:12
243:1
two 172:20 175:19
179:3 187:21
191:9 199:25
200:14 201:6
208:16 212:16
262:1 266:1 268:8
269:19
two-page 262:13
type 170:19 191:13
198:7 201:22
206:8 252:18
typed 230:1
types 236:23
T-I-L 182:18
183:21 246:12

**U**
uh-huh 187:11
241:23
underneath 154:5
242:20
understand 177:2
177:13 199:11
215:24 216:24
218:2 232:14
263:2,3
understanding
167:11
understood 177:14
214:11 218:11
United 145:1 167:6
175:1
unknown 209:25
unquote 161:11
162:24
unusual 149:21
255:22
upcoming 166:16
updated 220:23
upper 268:12
use 170:23 172:8

usually 158:20,21
216:6

**V**
varied 184:12
various 160:7
170:6 172:24
226:11
vast 215:11
VECCHIO 145:18
venture 149:25
150:8 160:8 165:1
165:1 191:18,24
192:4,8 256:23
257:1
venturer 257:14
258:9
versus 152:18
violate 205:7
violated 208:12,22
violation 197:6
violations 206:8
VOLUME 145:5
vs 145:5

**W**
Wagner 147:3
148:4 149:3
165:19 199:6
212:19 213:15
217:18 218:22
241:8 246:8,16
264:9 266:6
270:11
Wagner's 204:9
wait 165:10
waited 210:20
waiting 175:20
Walker 147:3
260:24
Walsh 145:3
159:11,12,19
160:11,21,24
161:12,20 162:3
162:19 163:24

174:14 177:6,16
178:10,12,12,15
178:18,24 179:3,7
179:10 180:9,13
181:6,18,22 182:3
182:9,20 183:1,6
183:11,14,16,18
185:17 186:8,10
186:13 187:17
188:8 189:1,9,18
190:6 191:3,12
196:23 197:14,23
197:24 198:2,5,7
198:12 199:14,22
199:25 200:11,16
200:21 201:4,20
202:15,20 203:15
203:18 205:16
206:18,22 207:4,7
208:18 209:20
210:9,16 211:10
211:12,20,23,25
212:3,8,10,15,18
213:13 214:8
216:3 217:14,15
223:7,9 224:4
225:14,17 226:7
226:14 227:4,8,16
227:21,24 230:25
231:1,5,19,22
232:3,14,16,21,24
233:8,11,19,23
234:1,7,9,14
250:7,15 251:1,3
251:6,14,17,21
252:18,24 253:14
253:16,17,21
254:1 256:15,18
256:22,25 257:2,5
257:10,16 258:22
258:24 259:7,22
261:19 262:12,16
262:25 263:12,19
263:22 265:16,19

265:22 268:23
269:8,11,19,25
270:4
Walsh's 198:17
want 165:19 169:20
173:6 180:14
186:1 200:17
202:7 213:19
214:18 216:22
219:4 222:18
226:17 241:11
261:22 264:6
wanted 149:7
155:11 175:12,15
176:11,13 208:18
222:12,14 246:9
253:19 259:22
wanting 199:14
wants 270:5
wasn't 155:5 159:8
172:19 184:3
192:4 235:6
249:17 252:14
254:22 263:18
way 189:11 193:14
193:19 194:1,6,20
205:2,3,6 215:1
224:15 240:4
248:9 258:25
259:21
week 173:7
weeks 172:20
WEICHERT
145:18
welcome 149:6
went 161:15 177:23
188:17 211:7,18
215:23 216:16
219:14 220:5
221:17 258:25
263:16
WERBEL 147:14
weren't 172:25
173:8 194:25

L. KING

| | | | | |
|---|---|---|---|---|
| 196:10 200:11 206:18,22 238:25 248:6 | **Wright** 153:7,7,14 154:15 | **years** 175:20 193:14 198:16 218:7 | **1008743** 246:17 **1008804** 246:19 **101** 262:3 | **21** 219:7 **218** 148:5 **220** 218:5 236:4 |
| **Wesley** 153:6,7,13 154:14 | **write** 154:16 195:5 195:18 | **year's** 185:20 222:19 | **104** 245:14 **11** 267:20 | 258:15 262:25 **23** 150:14,21 151:1 |
| **we're** 208:16 223:8 224:17 233:3 236:5 262:22 263:1 270:5 | **writing** 202:19 212:9 **written** 154:19 210:6 216:8 263:17 | **York** 145:16,17 147:12,13 | **1101** 264:13 266:9 **1104** 243:2 **1107** 264:15 266:16 267:12 | 152:13 **235** 148:5 **24** 200:4,5 214:8,9 214:13,17 215:12 |
| **whatsoever** 269:25 | **wrong** 204:4 211:7 | **$** | **1108** 244:15 | 217:17,23 |
| **wife** 163:8 | 229:19 259:2 | **$1,002** 242:24 | **118** 259:18 | **24-hour** 214:7 |
| **William** 145:10 165:13 | **wrote** 154:8,9 195:18 | 243:2 **$150,000** 186:18 | **12** 170:4 **12/19/96** 148:13 | **241** 148:4 **242** 148:12,13 |
| **wire** 174:10,13 211:8 | **WS** 246:17,18 **WSI** 260:25 261:6 | **$25** 242:22 243:6 244:10,21 | 243:16 **1204** 267:20 | **243** 148:13,14 **245** 148:14 |
| **wired** 161:7 189:23 210:1 211:18,21 212:5 | 261:23,23 | **$30,000** 178:2 **$550** 267:15 **$650** 262:6 | **13** 193:14 218:6 229:13 **14** 146:7 193:14 | **258** 148:4 **26** 149:16 264:10 266:9 268:8 |
| **wires** 210:3 | **X** | **$926.00** 244:12,16 | 218:6 | **260** 148:5 |
| **withdraw** 253:10 | **X** 148:8 | | **145** 148:10 | **264** 148:5 |
| **withdrawn** 223:20 227:19 228:23 233:2 | **XI00970** 271:21 **Y** | **0** **004257** 245:10 **004737** 244:1 | **149** 148:4,11 **15** 167:13 **150** 146:6 147:4 | **266** 148:4 **27** 243:25 **28** 264:12,13 268:8 |
| **witness** 148:2 217:21 229:9 | **Yacker** 145:12 157:11,14,16,22 | **004778** 149:14 **004802** 151:9 | **165** 148:11 **167** 148:12 | **29** 245:8 |
| **woman** 176:10,18 | 167:21 168:13,14 | **004809** 149:15 | **17** 170:4 271:22 | **3** |
| **wording** 172:4,5,9 | 169:10 170:12 | **004820** 244:1 | **176** 148:4 | **3** 147:15 271:21 |
| **words** 259:3 | 171:24 172:2,11 | **004838** 241:12 | **19103-3222** 147:11 | **3/26/97** 148:11 |
| **work** 160:4 164:12 176:17 180:1 | 172:17,23 174:10 174:14,17,21 | **004854** 242:14 **008742** 260:25 | **1996** 150:4 167:15 170:5 222:24 | 165:22 **30** 219:2 |
| **worked** 155:14 157:11 164:16,18 | 175:5,9 176:9 183:2 231:23 | **008744** 261:6 **008779** 261:23 | 254:4 **1997** 150:9,14 | **3012** 147:15 **31** 150:4 154:13 |
| 179:19 221:10,11 226:3 228:4 255:4 | 233:12,18 237:13 244:3 245:3,11 | **008780** 261:24 **008804** 261:1 | 151:2 153:6 154:14 167:15 | **317** 267:8 **33** 167:13 168:20 |
| 255:12,17 256:10 | 261:10 262:18 | **008887** 153:1 | 170:5 172:11 | 168:25 220:10 |
| **working** 157:22 168:12 172:17,22 | 263:2,10,14,15,16 263:23 264:15,19 | **008932** 165:25 **00954** 242:15 | 192:17,18 | **34** 168:25 170:4 171:22 |
| 173:8 180:7,21 238:12 | 265:1,12 266:4,17 270:4 | **07078** 147:4 **07102-4056** 147:8 | **2** **2:30** 270:14 | **36** 173:20 |
| **worried** 176:14 | **Yacker's** 171:23 | **08818** 147:16 | **200** 158:14 | **4** |
| **worth** 192:3 | 194:10 211:21 | | **2000** 147:11 | **4** 201:12 |
| **wouldn't** 182:22 194:5 206:25 207:9 224:6 | 233:1,4,24 240:1 240:21 263:3 **Yeah** 176:8 185:18 | **1** **1/9/97** 148:12 **10/29/99** 148:12 | **2007** 192:13 **2010** 146:7 219:2 270:20 271:22 | **4273** 245:10 **44** 168:21 **48** 214:17,21 215:9 |
| | 242:18 245:15 **year** 162:14 178:2 | 167:2 **100** 147:7 | **2013** 271:21 | **4821** 244:2 |

L. KING

| | | | | |
|---|---|---|---|---|
| **49** 219:5 | | | | |
| **5** | | | | |
| **5** 153:6 | | | | |
| **6** | | | | |
| **650** 264:14,16 267:23 | | | | |
| **7** | | | | |
| **7** 150:9 | | | | |
| **8** | | | | |
| **801** 268:13 **810** 269:3 **811** 268:21 **84** 229:11 **85** 229:12 **8742** 246:18 **8896** 153:1 | | | | |
| **9** | | | | |
| **9:00** 146:7 **926** 244:22 **97** 152:7,15 **97-cv-3496** 145:2 | | | | |

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400