# EXHIBIT T

2

1          THE COURT:  This is the matter of United States

2    versus Stanley Yacker.  I'll take appearances please.

3          MR. LEIBMAN:  Good morning, your Honor.  Alain

4    Leibman, Assistant United States Attorney, for the

5    government.

6          MR. LUSTBERG:  Lawrence S. Lustberg and Timothy

7    Susanna from Gibbons, Del Deo on behalf of defendant Stanley

8    Yacker, and, of course, Mr. Yacker is present.

9          THE COURT:  All right.  Good morning to all of you.

10   You have certain papers you'd like to hand up to the Court,

11   Mr. Lustberg?

12         MR. LUSTBERG:  Your Honor, I'll hand to the Court

13   at this time, I'm handing a waiver of indictment which has

14   been executed in open court today, original plea agreement,

15   original Information, and an original Rule 11 form which has

16   also been executed by both Mr. Yacker and myself in open

17   court here today.

18         THE COURT:  Okay.  I understand, Mr. Lustberg, that

19   your client wants to retract his prior plea of not guilty

20   and enter a plea of guilty to certain counts of the

21   indictment and to an Information.  Is that correct?

22         MR. LUSTBERG:  That's correct, your Honor.

23         THE COURT:  All right.  May I make inquiry of your

24   client?

25         MR. LUSTBERG:  You may, Judge.

COM 00913

3

1          THE COURT:  Please swear him.

2               S T A N L E Y   Y A C K E R, Sworn

3    EXAMINATION BY THE COURT:

4    Q.    All right.  Good morning, Mr. Yacker.  My name is

5    Judge Wolin.

6    A.    Good morning, Judge.

7    Q.    We've met before.  I'm going to ask you several

8    questions in order to ascertain whether your plea is a

9    knowing and voluntary plea of guilty.  If at any time I ask

10   you a question and you don't understand it, ask me to repeat

11   it.  I'll be pleased to do so.

12          If at any time you want to confer with your

13   attorney, Mr. Lustberg, before you answer, you certainly may

14   do that as well.  Do you understand that?

15   A.    Yes, I do.  Thank you.

16          THE COURT:  Mr. Lustberg, you and Mr. Susanna may

17   be seated unless you choose to stand.

18          MR. LUSTBERG:  I'll stand with Mr. Yacker, Judge.

19          THE COURT:  All right.  That's your pleasure.

20   Q.    Mr. Yacker, how old are you, sir?

21   A.    64.

22   Q.    All right.  And how far did you go in school?  Well,

23   you're a lawyer, so, I take it you have probably 23 years of

24   education?

25   A.    Thereabouts, yes.

4

1   Q.    Okay.  As you stand before me today, are you under the

2   influence of either alcohol or drugs?

3   A.    No, sir.

4   Q.    Suffering from any physical or any type of emotional

5   condition that would prevent you from discussing this matter

6   with Mr. Lustberg or answering any questions of the Court?

7   A.    No, except I'm having a little trouble hearing you.

8   That could be me.  I'm not sure.

9   Q.    All right.  How about now?

10  A.    Much better.

11          THE COURT:  Do we also have a volume on our system,

12  Gail?

13          THE CLERK:   No, we don't.

14  Q.    Okay.  Have you had an opportunity to read the

15  indictment as well as the Information in this case?

16  A.    Yes, I have.

17  Q.    And did you understand each of those documents and the

18  counts that you're pleading guilty to?

19  A.    Yes.

20  Q.    Did you also have an opportunity to discuss them with

21  Mr. Lustberg?

22  A.    Yes.

23  Q.    All right.  And did he explain to you what the

24  government would have to prove if you were to go to trial on

25  either the counts of the indictment or what is contained in

1    the Information?

2    A.    Yes.

3    Q.    All right.  And did you also have the opportunity to

4    discuss with Mr. Lustberg what defenses you could raise if

5    you wanted to contest those counts in both the indictment

6    and the Information?

7    A.    Yes.

8    Q.    Did he also discuss with you the potential penalties

9    that could be imposed both under the statute as well as

10   under the Sentencing Guidelines?

11   A.    Yes.

12   Q.    Did he also discuss with you what's known as your

13   constitutional rights and privileges?

14   A.    Yes.

15   Q.    For example, your right to an attorney?

16   A.    Yes.

17   Q.    Your right to a trial by jury?

18   A.    Yes.

19   Q.    Your right to confrontation and cross examination of

20   witnesses?

21   A.    Yes.

22   Q.    The privilege to remain silent if you chose not to

23   testify, you understand that the government would not be

24   able to comment to the jury that you chose to or elected to

25   remain silent?

6

1   A.    Yes.

2   Q.    Okay.  Now, knowing that you have all those

3   constitutional rights and privileges, do you wish to

4   relinquish them in order to go forward with your plea here

5   today?

6   A.    Yes, I do.

7   Q.    Okay.  Certain documents have been handed up to the

8   Court that I want to discuss with you.  The first document

9   is a waiver of indictment.  That certainly pertains to the

10  Information and you understand what is contained in the

11  Information was not submitted to the grand jury, will not be

12  submitted to the grand jury and you're going to proceed by

13  way of Information.  Is that correct?

14  A.    Yes.

15  Q.    And you signed that, it says 1/14.  Isn't today 1/15?

16  A.    Yes.

17        MR. LUSTBERG:  It is.  I put the wrong date, Judge.

18        THE COURT:  So, can I cross that out, Mr. Lustberg?

19        MR. LUSTBERG:  Absolutely, your Honor.  I

20  apologize.

21        THE COURT:  And write 1/15.  That's all right.

22  Q.    You signed this today in open court, sir?

23  A.    Yes, I did.

24  Q.    All right.  You read it before you signed it?

25  A.    Yes, I did.

COM 00917

1   Q.    And you had an opportunity to discuss it with your

2   counsel, Mr. Lustberg?

3   A.    Yes.

4   Q.    Can I assume that when you affixed your signature,

5   that you did so voluntarily, meaning of your own free will,

6   and knowingly, meaning you understood that which you were

7   doing?

8   A.    Yes.

9   Q.    All right.  Let the record indicate that I, too, have

10  subscribed my signature as the judicial officer assigned to

11  this matter and I'll file it with the Clerk of the Court.

12          MR. LUSTBERG:  Your Honor, when you get to the Rule

13  11 form, I would --

14          THE COURT:  You have the same problem, Mr.

15  Lustberg?

16          MR. LUSTBERG:  I had the same calendar problem then

17  as I had a few minutes earlier with the waiver.

18          THE COURT:  There's an old saying, being a day late

19  and a dollar short.  I hope that's not you.

20          MR. LEIBMAN:  No.  I can assure you I wasn't trying

21  to preserve some obscure legal issue.

22  Q.    Mr. Yacker, the next document that I have in front of

23  me is an application for permission to enter a plea of

24  guilty.  It's a several page document and --

25          THE COURT:  And, once again, I'm going to change

8

1    the date, Mr. Lustberg.

2         MR. LUSTBERG:  On the last two pages, Judge.

3    Q.   On page seven, where your signature purportedly

4    appears, is that your signature on page seven, Mr. Yacker?

5    A.   Yes, it is.

6    Q.   All right.  And before you signed this document, did

7    you have the opportunity to read it?

8    A.   Yes.

9    Q.   Did you understand it?

10   A.   Yes.

11   Q.   In the event you had any questions, did you pose those

12   questions to Mr. Lustberg and did he answer any of your

13   questions to your satisfaction?

14   A.   Yes and yes.

15   Q.   Okay.  There's a couple that I would like to go over,

16   if I may.  I'd like to go over to entry number eight and it

17   says "I've received a copy of the superseding indictment and

18   the Information.  I've read them", and it says you

19   understand the charge to be committed wire fraud and

20   conspiracy to commit wire fraud.  Is that correct?

21   A.   Yes.

22   Q.   Going over to entry number 24, it indicates that you

23   face by way of statute a maximum of 55 years imprisonment on

24   the superseding indictment and Information and a maximum

25   fine equal to the greatest of $2,750,000 or twice the gross

9

1    amount of any pecuniary gain that any persons derived from

2    the offenses or twice the gross amount of any pecuniary loss

3    sustained by any victims of the offenses.  Is that correct?

4    A.    Yes.

5    Q.    You understand that you'll be assessed $100 for each

6    felony, and I believe I saw something there were 11, and

7    it's going to be about an $1100 assessment?

8    A.    Yes.

9    Q.    Is that correct?

10         MR. LUSTBERG:  Yes.

11   A.    Yes, Judge.

12   Q.    Going over to number 37, it indicates that there is a

13   plea agreement, and it says in exchange for your plea of

14   guilty to counts one to ten of the superseding indictment

15   and the one count Information, the government will not

16   initiate any further criminal charges and in exchange for

17   your cooperation the government will move for a sentencing

18   guideline departure pursuant to 5K1.1.  Is that your

19   understanding of the plea agreement?

20   A.    Yes.

21   Q.    Once again, when you signed this document, did you do

22   so voluntarily and knowingly as I've defined those terms for

23   you?

24   A.    Yes, I did.

25   Q.    I have in front of me a plea agreement which I am

1   seeing for the first time, so, I'm going to ask you certain

2   questions about it.   Going over to page seven of that

3   agreement, there's a signature that purports to be your

4   signature under date of January 11 of this year.   Is that,

5   in fact, your signature?

6   A.      Yes.

7   Q.      And did you sign it on that date?

8   A.      Yes.

9   Q.      All right.   And going back to the face page of the

10  document, it's dated January 9 of this year, and it's on the

11  stationery of the United States Attorney for the District of

12  New Jersey.   On page one in the first paragraph it indicates

13  the charges that are pending against you.   Have you had an

14  opportunity to read that?

15  A.      Yes.

16  Q.      And the government says to you in that paragraph what

17  you're pleading guilty to and says that the scope of the

18  protection that they've offered you in that paragraph is

19  limited to the criminal activity that you've revealed to the

20  United States Attorney as of the date of this agreement,

21  which would be January 11.   Correct?

22  A.      Yes.

23  Q.      You understand that?

24  A.      Yes.

25  Q.      And they say that if the judgment of conviction was

11

1   set aside for any reason, they could bring any charges

2   against you that are not time barred by any Statute of

3   Limitations as of the date of agreement, which would be

4   January 11, notwithstanding the expiration of the statute as

5   of that date.   Correct?

6   A.    Yes.

7   Q.    And it says that you agree to waive any statute of

8   limitations with respect to any crime that otherwise would

9   expire after you signed the agreement.   True?

10  A.    Yes.

11  Q.    The next paragraph speaks of your cooperation and it

12  speaks about the type of cooperation that you may be called

13  upon to provide.   Correct?

14  A.    Yes.

15  Q.    And the government has indicated in the plea agreement

16  in the second paragraph when it speaks of substantial

17  assistance, says to you that whether you render substantial

18  assistance is something for the United States Attorney to

19  determine.   You don't determine it.   I don't determine it.

20  Mr. Lustberg doesn't determine it.   You understand that?

21  A.    Yes, I do.

22  Q.    And the purport of that paragraph is that if you do

23  render substantial assistance, at the time of sentence the

24  government will move before this Court for a downward

25  departure based upon that substantial assistance.   Correct?

1   A.    Yes.

2   Q.    Going over to page three, the first full paragraph on

3   that page speaks about that if you should withdraw from this

4   agreement, it sets forth the various means by which you

5   could withdraw from the agreement.   The government says it

6   will then no longer be bound to file a motion pursuant to

7   5K1.1 but you will not be able to withdraw from your guilty

8   plea here today.   Correct?

9   A.    Yes.

10  Q.    And further, that they could prosecute you based upon

11  information you gave them for perjury, false swearing,

12  obstruction of justice, no statute of limitations would

13  apply and they can use any statements made against you.   You

14  would not be able to suppress them.   Correct?

15  A.    Yes.

16  Q.    You understand that you're going to be sentenced under

17  the Sentencing Guidelines?

18  A.    Yes.

19  Q.    Okay.   And you've already gone over what the statutory

20  exposure is, and I'll talk to you about the Sentencing

21  Guidelines shortly.   And it indicates that over on page four

22  in the last full paragraph, that you agree to make full

23  restitution for all losses resulting from the offenses of

24  conviction or from the matters that are charged against you.

25  Correct?

1    A.    One moment, your Honor.

2    Q.    Sure.  I'm on the last paragraph on page four.  And it

3    lists the names of certain purchasers there who are in count

4    one of the superseding indictment.  Is that correct?

5    A.    Yes.

6    Q.    Okay.  The United States Attorney reserves the right,

7    going over to page five, to take a position with respect to

8    the appropriate sentence to be imposed upon you at the time

9    of sentence.  Do you understand that?

10    A.    Yes.

11    Q.    You and the United States Attorney have entered into

12    certain stipulations and you understand that this Court is

13    not bound by those stipulations.  Generally, I'm

14    hard-pressed not to agree with them but there have been

15    times when, but most times the Court does go along with the

16    stipulations that have been entered into.  Anything that you

17    have not stipulated to, you understand is reserved that you

18    can argue at the time of sentence, and if the United States

19    Attorney was to receive additional evidence that it found to

20    be credible and was materially in conflict with any

21    stipulation, then they say they won't be bound by the

22    stipulation, but all other stipulations shall remain in full

23    force and effect and, once again, you will not be able to

24    withdraw your plea of guilty.  Do you understand that?

25    A.    Yes.

1   Q.    On five, at the bottom of page five it talks about

2   waiver of appeal and post sentencing rights.  Have you had

3   an opportunity to discuss that provision with Mr. Lustberg?

4   A.    Yes.

5   Q.    And do you understand it?

6   A.    Yes.

7   Q.    Under other provisions it says this agreement is

8   limited to the United States Attorney's Office for the

9   District of New Jersey and cannot bind any other prosecuting

10  authority.   Correct?

11  A.    Yes.

12  Q.    Also, this plea was reached without regard to any

13  civil or administrative matters that could be brought

14  against you by the United States government or any other

15  agency such as the State of New Jersey agency or the Supreme

16  Court of New Jersey in charge of attorney discipline.

17  Correct?

18  A.    Yes.

19  Q.    All right.  And lastly, it says this agreement

20  constitutes the full and complete agreement between you and

21  the United States Attorney and supersedes any previous

22  agreements between you, it's in writing and you understand

23  it can only be modified in writing.   Is that correct?

24  A.    Yes.

25  Q.    Okay.  Anybody make you any promises that are not

1   contained in this agreement?

2   A.    No.

3   Q.    Anybody attempt to intimidate you, exercise any type

4   of duress upon you to enter into this agreement?

5   A.    No.

6   Q.    Are you satisfied with the services of your counsel,

7   Mr. Lustberg?

8   A.    Yes.

9   Q.    Can I once again infer that when you signed this

10  agreement, you did so voluntarily and knowingly as I've

11  defined those terms?

12  A.    Yes.

13          THE COURT:  You know, Mr. Lustberg, we have a

14  procedural problem that I'd just like to have you assist me

15  with.

16          MR. LUSTBERG:  Okay.

17          THE COURT:  Was Mr. Yacker ever arraigned on the

18  superseding indictment?

19          MR. LUSTBERG:  Yes.

20          THE COURT:  He was?  We did that?

21          MR. LUSTBERG:  Actually --

22          MR. LEIBMAN:  No.  We were going to do it at the

23  time of trial, your Honor.  That's true.

24          MR. LUSTBERG:  I forgot.  That's right.  We decided

25  not to do that.

16

1        THE COURT:  Would you like to interject?

2        MR. LUSTBERG:  Yes, your Honor.  I had forgotten

3    that there was a superseding indictment, although we

4    consistently made reference to it in these papers.  We

5    received a copy of that indictment.  We would waive any

6    reading of it.  As of today, of course, Mr. Yacker is

7    entering a plea of guilty to all counts of the superseding

8    indictment.

9        THE COURT:  Well, first I'll enter a not guilty

10   plea for him.  Then I'll, how do you say it --

11       MR. LUSTBERG:  Retract.

12       THE COURT:  I'll go fast forward.

13       THE DEFENDANT:  May I have a moment, your Honor?

14       THE COURT:  Sure.

15       (There is a discussion off the record.)

16       THE DEFENDANT:  Thank you, your Honor.

17   Q.   Well, Mr. Yacker, I think we have solved any

18   procedural error that may exist.  I take it that you would

19   waive any --

20   A.   Yes.

21   Q.   -- claim of error?

22   A.   Yes, your Honor.

23   Q.   Okay.  Thank you. I want to talk about the Sentencing

24   Guidelines for a moment.  You understand that -- excuse me.

25   One other thing I did want to discuss with you.  We spoke

1   about stipulations.  Do you remember when talking about your

2   plea agreement and attached to your plea agreement is a

3   schedule and it indicates that the guideline applicable to

4   each of the above counts is United States Sentencing

5   Guideline 2F1.1 and paragraph two indicates that all the

6   counts in the superseding indictment and the Information are

7   grouped together into a single group and they're going to be

8   determined largely on the basis of the total amount of loss,

9   the total amount of loss is not less than five million and

10  not more than 20 million, the offenses involve more than

11  minimal planning; also, stipulated that you abused the

12  position of private trust and used the special skill in a

13  manner that significantly facilitated the commission of the

14  relevant criminal activity.  You've in paragraph six

15  accepted responsibility and you've timely notified

16  authorities for acceptance of responsibility and timely

17  notifying authorities, you'll be given a three point

18  departure in your sentence.

19        THE COURT:  Do you know, Mr. Lustberg, what level

20  of offense he's going to be?

21        MR. LUSTBERG:  We really don't, Judge.  If you look

22  at paragraph three of the stipulations --

23        THE COURT:  I saw it.

24        MR. LUSTBERG:  -- there's a range in there and

25  depending on where the Court ends up within that range --

1          THE COURT:  Well --

2          MR. LUSTBERG:  There's a --

3          THE COURT:  Just for purposes of this proceeding

4    here today, 2F1 would be a base offense level of six and if

5    he were more than five million, would be 14 and more than 20

6    million would be 16, so --

7          MR. LUSTBERG:  No, no, it can't be more than 20

8    million, so, it's either 14 or 15.

9          THE COURT:  Okay.  He'd be a 14 or 15, so, figure

10   15 to six would be 21, and minimal planning would be 23, two

11   for that would be 23, and position of private trust --

12         MR. LUSTBERG:  Two more.

13         THE COURT:  So that would be a maximum of 25, minus

14   three would be 22, so, the maximum he could be is a level

15   22.  Is that correct?

16         MR. LUSTBERG:  That's right.

17         THE COURT:  With a criminal history category of

18   one.

19         MR. LUSTBERG:  Correct.

20         THE COURT:  With an exposure of 41 to 51 months.

21   Is that correct?

22         MR. LUSTBERG:  That's correct.

23   Q.    You understand that, Mr. Yacker?

24   A.    Yes.

25   Q.    And the last two pages or the last two paragraphs of

1    the plea agreement speak about waiving your right to file an

2    appeal or any collateral attack if you are sentenced within

3    the guideline level that we've all been speaking of.

4         All right.  Going over to the Sentencing

5    Guidelines, you understand that the sentencing -- first of

6    all, have you had an opportunity to discuss the Sentencing

7    Guidelines with Mr. Lustberg?

8    A.    Yes, I have.

9    Q.    Did he explain the structure of the Sentencing

10   Guidelines to you?  We look at your conduct in relation to

11   the type of offense that occurred.

12   A.    Yes.

13   Q.    Okay.  And once again, your criminal history is an

14   important factor in the application of the Sentencing

15   Guidelines.  And you indicate that you have no criminal

16   history.  Correct?

17   A.    That is correct.

18   Q.    All right.  After today I'm going to order a

19   presentence report.  I know nothing about your background, I

20   know nothing about your employment history, social,

21   education, and after that presentence report is received,

22   both you and Mr. Lustberg will have an opportunity to move

23   the Court if you think something is factually incorrect.

24   It's my responsibility prior to sentencing to hold a hearing

25   and to make factual determinations and I will do that.

1          Now, we all think today that you are at the level

2    that we just discussed.  I don't know what the probation

3    department is going to come back with.  Generally they're

4    very close to what we have discussed here today.  I don't

5    know whether the increase will be 14 or 15 as Mr. Lustberg

6    indicated, but I want you to understand you'll not be able

7    to withdraw your plea on the ground that anyone's prediction

8    as to the guideline range proved to be inaccurate.  Do you

9    understand that?

10   A.    Yes.

11   Q.    Also, at the time of sentence, the Court will follow

12   the sentencing procedures set forth in the guidelines.  I

13   want you to understand that the guidelines may require you

14   to serve a period of time of imprisonment as well as a fine

15   or both.  Do you understand?

16   A.    Yes.

17   Q.    And if you are imprisoned, you will not be paroled at

18   any time prior to the completion of your sentence which is

19   actually imposed upon you except for good time credits

20   earned, if any.  Do you understand that?

21   A.    Yes.

22   Q.    Also, if you are imprisoned, I will impose a term of

23   supervised release and if you're to violate the terms and

24   conditions of your supervised release, and if I were to find

25   that did occur by a preponderance of the credible evidence,

21

1   you could be returned to prison.  Do you understand?

2   A.    Yes.

3   Q.    Okay.  Both you and the government have the right to

4   appeal any sentence that is imposed upon you subject to the

5   provisions in your plea agreement.  Okay?

6   A.    Yes.

7   Q.    I now want to ask you certain questions in order to

8   establish a factual basis for the acceptance of your plea

9   and I want to know if you've had an opportunity to review a

10  memorandum that was forwarded to me by Mr. Leibman on or

11  about January 14th of this year.  A copy was likewise

12  forwarded to your counsel, Mr. Lustberg.  Have you had an

13  opportunity to see that?

14  A.    Yes, I have.

15  Q.    All right.  Before I go to the specific factual

16  questions, it indicates that you're being charged with a

17  violation of Section 371 of Title 18 of the United States

18  Code as well as Section 1343 dealing with wire fraud, and

19  have you had an opportunity to look over the elements of

20  those offenses and do you accept them as being the elements

21  that the government must prove in order to find you guilty

22  of these offenses?

23  A.    Yes.

24  Q.    Okay.  And, once again, you've had an opportunity to

25  look at the questions for the factual basis for your plea?

1    A.   Yes.

2    Q.   All right.  Am I correct, sir, that at least since

3    prior to 1995, and continuing through 1997 and beyond, you

4    were an attorney at law of the state of New Jersey subject

5    to the ethics rules concerning attorneys?

6    A.   Yes.

7    Q.   And among other obligations, did those ethics rules

8    require you to represent clients with reasonable diligence?

9         MR. LUSTBERG:  Judge, the way we had worked this

10   allocution out, if it's okay with the Court, if you could go

11   through the entire list that's there, then he'll answer do

12   we want to answer --

13   A.   Okay to number two.

14        MR. LUSTBERG:  -- yes, and that would be likewise

15   the case when we get to number five.

16        THE COURT:  Okay.  Among other obligations, did

17   those ethics rules require you to represent clients with

18   reasonable diligence, to sufficiently explain the matter to

19   permit the client to make informed decisions, to consult

20   with their client concerning the means of achieving the

21   objective of the representation, should probably be "your

22   client" rather than "their client".

23        MR. LUSTBERG:  Yes.

24        THE COURT:  To disclose in writing the basis or

25   rate of legal fees within a reasonable time after commencing

1   the representation, to avoid conflicts between the interests

2   of one client and the interests of another client, a third

3   person, or your own interest, and to forebear from knowingly

4   making a false statement of material fact or law to a third

5   person and from engaging in conduct involving dishonesty,

6   fraud, deceit or misrepresentation?

7   A.    Yes.

8   Q.    Okay.  And did you act with Irene DiFeo and Donna

9   Pepsny, among others, to engage in a scheme to defraud and

10  to obtain money and property by means of false and

11  fraudulent pretenses, representations and promises involving

12  persons whom you represented in connection with their

13  purchases of homes in 1995 and 1996?

14  A.    Yes.

15  Q.    And in doing so, did you also violate the ethics rules

16  concerning attorneys?

17  A.    Yes.

18  Q.    With respect to the transactions described in counts

19  two through ten of the indictment, did you commit at least

20  one or more of the following fraudulent acts with respect to

21  each:  A, cause purchasers to sign critical closing

22  documents in blank; B, misrepresent the nature and interest

23  rate of the mortgage loan for which the purchaser had

24  qualified, by failing to adequately explain the nature and

25  consequences of the balloon first mortgage and the fact that

1  tax payments were not included in the first mortgage

2  payment, and the amount of the resulting monthly payment; C,

3  fail to disclose prior problems and unperformed repairs

4  involving the same seller; D, fail to disclose to purchasers

5  that as a result of the purchaser's minimal down payment and

6  the fraudulent increase of the purchase price, the seller

7  would require the purchaser to execute at closing and become

8  responsible for an additional second mortgage loan, thereby

9  increasing the purchaser's monthly mortgage obligations; E,

10  conceal the fact that some purchasers received funds out of

11  closing to make repairs, by issuing checks to the purchasers

12  in the names of other persons or entities; F, cause the

13  falsification of numerous documents related to the

14  transaction, including HUD-1/RESPA settlement statements

15  which disguised the true nature and details of the

16  transaction; G, fail to advise your purchaser-clients to

17  abandon the closing when it was in their best interest to do

18  so and, in fact, encourage or pressure them to complete the

19  closing under those circumstances, even after acknowledging

20  in at least one instance that the purchasers' signatures on

21  a contract of sale had apparently been forged or falsified;

22  H, in one instance create a fictitious sale of a property to

23  a purchaser's relative who would then convey the property to

24  the actual purchaser, in order to justify a false increase

25  in the final purchase price of the home and to inflate the

25

1    amount of the mortgage loan available for the transaction;

2    I, create the false appearance in the mortgage loan file

3    that debts of the purchasers were paid off as part of the

4    closing as required by a lender by photocopying checks

5    written by the purchasers which you returned to them; J,

6    fail to promptly provide purchasers with copies of documents

7    related to their closing; and K, fail to record deeds to

8    establish and protect the purchasers' interest in their

9    properties?

10   A.    Yes.

11   Q.    Okay.  In regard to the Information, in 1996 and '97,

12   did Gary Grieser and others solicit and locate persons

13   willing to act as straw buyers in numerous transactions

14   whereby mortgage loans would be obtained and the properties

15   acquired in the names of the straw buyers, even though those

16   persons actually had no interest in obtaining such loans or

17   purchasing such properties?

18   A.    Yes.

19   Q.    After the closing on those properties, did each straw

20   buyer convey 60 percent interest in the given property to

21   Grieser's entity, Capital Assets, in a joint venture

22   arrangement which left the straw buyer holding a 40 percent

23   interest as co-owner with Capital Assets?

24   A.    Yes.

25   Q.    Did you, with the assistance of Lorraine King, your

26

1   legal secretary, prepare the joint venture agreement used in

2   those transactions?

3   A.    Yes.

4   Q.    Did you know that each of the straw buyers was being

5   paid for the use of their names and credit histories in

6   obtaining the subject mortgage loans and in acquiring the

7   subject properties?

8   A.    Yes.

9   Q.    Did you commit the following fraudulent acts to

10  further the straw buyers' scheme; A, issue and cause to be

11  issued false letters regarding nonexistent deposits of funds

12  by purchasers or borrowers which funds you claimed to be

13  holding in escrow?

14  A.    Yes.

15  Q.    B -- I'll do them all as we did answer five, B, close

16  title on the resale portion of flip transactions, knowing

17  that the original purchase of the property had not yet

18  closed; and C, sign and cause straw buyers to sign false and

19  fraudulent closing documents, including HUD-1/RESPA

20  settlement statements which did not truthfully describe

21  receipts and disbursement of funds and affidavits which

22  falsely asserted that the straw buyer would be residing in

23  the subject property?

24  A.    Yes.

25  Q.    11, did you do all these things, it says knowingly and

1  willfully, I'm going to add voluntarily as well,

2  voluntarily, meaning of your own free will, and knowingly,

3  meaning you understood that what you were doing, and

4  willfully, meaning with the intent to bring about the act

5  that did in fact occur?

6  A.    Yes.

7  Q.    Have you provided other details and information to law

8  enforcement officials which you have not been asked about

9  today?

10 A.    Yes.

11        THE COURT:  I understand, Mr. Leibman, that the

12 United States is prepared to prove at trial that the funds

13 for the closings addressed by Mr. Yacker were transmitted by

14 wire transfer from outside New Jersey to a bank account of

15 Stanley Yacker in New Jersey.  Is that correct?

16        MR. LEIBMAN:  That's correct, your Honor.

17        THE COURT:  Mr. Lustberg, in the discovery that you

18 have had the opportunity to review, you also agree that the

19 United States could prove at trial that the funds for the

20 closings that were addressed by Mr. Yacker were, in fact,

21 transmitted by wire transfer from outside New Jersey to a

22 bank account of Mr. Yacker in New Jersey?

23        MR. LUSTBERG:  Yes, your Honor.

24        THE COURT:  Are there any other questions that the

25 government would like the Court to pose in order to fulfill

28

1   the obligation to assert a factual basis?

2        MR. LEIBMAN:  No, your Honor.  We believe the Court

3   has established a sufficient factual basis.

4   Q.   All right.  Mr. Yacker, why are you entering your plea

5   of guilty here today?

6   A.   Because I am guilty and I am interested in cooperating

7   to the extent that I can.

8        THE COURT:  All right.  Mr. Lustberg, are you

9   satisfied that this plea is entirely voluntary and that it's

10  being entered by the defendant with full knowledge of all of

11  his rights and all of his responsibilities?

12       MR. LUSTBERG:  Yes, your Honor.

13       THE COURT:  The Court would like to make the

14  following findings of fact.  I find that Mr. Yacker is

15  competent to enter his plea, that he's possessed of adequate

16  counsel and the charges set forth, both the counts of the

17  superseding indictment and the Information are both

18  adequately and adequately stated.

19       I'm satisfied that Mr. Yacker understands the

20  elements of the offenses to which he has pleaded guilty and

21  that his pleas to those offenses and counts and Information

22  are voluntary.  I've discussed his plea with him, as well as

23  the plea agreement.  I'm satisfied that he understands both

24  as well as his constitutional rights which he's waived in a

25  knowing and voluntary manner.

29

1        I'm satisfied that he understands the penalties

2    that could be imposed both under the statute as well as

3    under the Sentencing Guidelines.  Lastly, I'm satisfied that

4    there is a factual basis for the entry of the plea and I

5    make that finding by the standard of evidence beyond a

6    reasonable doubt.

7        I'll direct that the plea be entered.  I'll

8    adjudicate him guilty of the offenses set forth in his

9    superseding indictment as well as the Information and I'll

10   direct that a presentence report be prepared.  I need a date

11   of sentence.

12       THE CLERK:    May 14.

13       MR. LEIBMAN:  Your Honor, the government would

14   anticipate that Mr. Yacker may be testifying in future

15   proceedings, the Pepsny-DiFeo trial, for example, or future

16   Gary Grieser proceedings.  If it is acceptable to the Court,

17   I would ask that we not hold to a firm and fast sentencing

18   date at this point.

19       THE COURT:  At this point it's an artificial date.

20   Mr. Leibman, have we scheduled the Pepsny and DiFeo trial?

21       MR. LEIBMAN:  Not pending this proceeding yet, your

22   Honor.  I had some brief discussion with your clerk about

23   potential dates.

24       THE CLERK:  I set it down for April 16.

25       MR. LEIBMAN:  Very good, your Honor.  I'll inform

1   defense counsel for the other defendants.

2       THE COURT:  All right.  That will be fine.  All

3   right.  Is there anything else for the Court to be concerned

4   with today?

5       THE DEFENDANT:  One moment, Judge.

6       THE COURT:  Sure.

7       THE DEFENDANT:  Thank you, your Honor.

8       THE COURT:  All right.  Mr. Leibman, although the

9   sentence date may be artificial because of other matters, is

10  there any reason why probation cannot start on the

11  presentence report?

12      MR. LEIBMAN:  There's no reason they can't start,

13  your Honor.  One area that's often problematic is when they

14  ask for the defendant's version of the offense, we often

15  find that defendants awaiting trial try to retain that as

16  potential impeachment material.

17      THE COURT:  I think what I'll instruct the

18  probation department is to do all segments of the

19  presentence report except for defendant's understanding of

20  the offense.

21      MR. LEIBMAN:  Thank you, your Honor.

22      THE COURT:  All right.  Is there anything else, Mr.

23  Lustberg?

24      MR. LUSTBERG:  No, Judge.  Thank you.

25      THE COURT:  All right.  I thank you and Mr. Yacker

31

1    for your cooperation.

2          THE DEFENDANT:  Thank you, Judge.

3          THE COURT:  I take it there's no release problem.

4          MR. LEIBMAN:  No, there's not, your Honor.  Bail is

5    already established.  It's a personal recog bond.  That's

6    fine.

7          THE COURT:  All right.  Court will be in recess.

8          (Whereupon, the proceedings are adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

```
1              IN THE UNITED STATES DISTRICT COURT
               THE DISTRICT OF NEW JERSEY
2              Criminal No. 01-47
               Criminal No. 02-25
3

    UNITED STATES OF AMERICA
4

5              V.                   Sentencing
                                    Transcript of
6                                   Proceedings

7   STANLEY YACKER,
               DEFENDANT.
8   ------------------------------

9                          Newark, New Jersey
                           June 15, 2003
10

11   B E F O R E:   HONORABLE ALFRED WOLIN,
                    UNITED STATES DISTRICT JUDGE
12

13
         A P P E A R A N C E S:
14
    ALAIN LEIBMAN, AUSA
15  For the Government.

16  LAWRENCE S. LUSTBERG, ESQ.
    AND:  TIMOTHY S. SUSANIN, ESQ.
17  For the Defendant.

18
```

Pursuant to Section 753 Title 28 United States Code,  the
following transcript is certified to be an accurate record as
taken stenographically in the above-entitled proceedings.

*Lynne Johnson*
LYNNE JOHNSON
Official Court Reporter


              LYNNE JOHNSON, CSR, CM
         Official U.S. District Court Reporter
              P.O. Box 6822
         Lawrenceville, New Jersey     08648
              973-645-2513

2.

1        THE COURT:   Good morning.   I  will take

2   appearances, please.

3        MR. LEIBMAN:   Alain Leibman, Assistant United

4   States Attorney for the government.

5        MR. LUSTBERG:   Good morning.   Lawrence S. Lustberg

6   and Timothy Susanin from Gibbons, DelDeo on behalf of

7   defendant Stanley Yacker.

8        THE COURT:   Be seated.   Mr. Lustberg, I acknowledge

9   receipt from you, a sentencing memorandum, about an inch and

10  a half thick.

11       I have had an opportunity to read it more than once

12  and many of the letters that were appended to it, letters

13  from many people that I have interacted with during my

14  career, particularly Chief Justice Wilentz.

15       With nothing more said, I will hear from you, sir.

16  Your client is -- is he a 21 with a one to start?

17       MR. LUSTBERG:   That's correct, Judge.   He, his

18  guideline range is 37 to 46 months prior.

19       THE COURT:   Do you have any concerns about

20  guideline that you want to bring to my attention that I have

21  to resolve?

22       MR. LUSTBERG:   No, your Honor.   Because this was a

23  plea, all of the guidelines were subject of stipulations.   We

24  had certain substantive but not guidelines related objections

25  to the presentence report, each and every one of those was in

3

1  fact incorporated into the final version of the presentence

2  report so there are no issues with respect to the presentence

3  report either way, and no objections at all to the guidelines

4  calculations set forth in that report.

5           THE COURT:  And then I will hear from you on

6  sentence.

7           MR. LUSTBERG:  Thank you, Judge.

8           As the Court is aware, there is a motion for a

9  downward departure that has been filed by the government, and

10  that provides the Court with discretion.

11           This is a case, most respectfully, in which the

12  sentencing is a difficult one.

13           On the one hand, the offense here is admittedly a

14  serious one, made more so because even though Mr. Yacker

15  profited so little from it financially, it was motivated by a

16  financial desperation and engendered a really horrific breach

17  of professional responsibility which he will forever have to

18  come to terms with.

19           On the other hand, all of that must be weighed

20  against two factors.  The first is the matter in which he

21  reacted to the offense which the government has correctly

22  characterized as cooperating substantially with the

23  government's prosecution, including attending numerous

24  proffer sessions, attempting even prior to that, to craft a

25  plea agreement that would have been a global one and would

4

1  have avoided the necessity for trial all together, but when

2  that didn't work out, testifying on the Court's behalf at

3  trial and of course, I am aware there is some legitimate

4  criticisms of the way that testimony went, particularly on

5  cross examination.  I think the excerpts that we provided to

6  the Court from that trial demonstrated that Mr. Yacker's

7  testimony was substantively accurate, and did persuade the

8  jury and at least in part and as a result there were

9  convictions.

10         THE COURT:  I guess the bottom line is, as the

11  government indicates in the sentencing, in its sentencing

12  memorandum in support of the 5 (k) application, Mr. Yacker's

13  testimony was accepted by the jury and as you indicate was

14  persuasive to them and convictions were obtained.

15         MR. LUSTBERG:  When you analyze it, it goes down

16  point by point and admits to each of the breaches here,

17  false, forged signatures, false closing statements, each of

18  those matters was addressed by Mr. Yacker and fully admitted,

19  both at his plea, and ultimately on the stand as well.  So

20  the government's motion, of course we join in and we believe

21  is correct, and it ought to be granted, not only because of

22  course the Court wants to reward and incentivize (sic) people

23  for bringing that type of assistance to the government, but

24  also because in this case it demonstrates that what Mr.

25  Yacker was really trying to do was to undue, to the extent he

5

1    could, the effects of his misconduct which he so candidly

2    admitted at the time of his plea.

3            In addition, all of his misdeeds have to be weighed

4    against his entire life.  The Supreme Court has made clear

5    that at sentencing, even under the guidelines regime, it is

6    the Court's duty to weigh the individual offender, and who he

7    is and why he did what he did, and to try to understand the

8    whole person.

9            Here, one can only wonder at the acts that Mr.

10   Yacker committed because they were so out of character for

11   what he, the way he behaved for his entire lengthy career, as

12   an attorney.  That career was characterized by not only

13   highly competent service to his clients, but really almost

14   uniquely caring.

15           When you read the letters from clients, not high-

16   faluting people, not important citizens, certainly, not the

17   chief justice of the New Jersey Supreme Court, but just

18   people he served day in and day out, they characterize what

19   he did as above and beyond lawyering and moving over to the

20   area of genuine caring and compassionate friendship.

21           I believe that, having come to know Stanley Yacker,

22   your Honor, because Stanley Yacker is, to use a word that my

23   grandmother would use under these circumstances, is just a

24   mench, he is a guy who means what he says, he is genuine, he

25   is sincere, he is a good man, and his goodness just stands in

1 stark contrast to the acts that made up this case.  That

2 isn't, the goodness doesn't explain those acts, it doesn't

3 excuse those acts, but it just puts them in a context which

4 they deserve to be put in, and when the Court passes sentence

5 because of course you are passing sentence not only on the

6 offense but on the offender as well.  Mr. Yacker's career in

7 addition to his service to client's was characterized by his

8 generous devotion of time to the bench and the bar, and

9 particularly as a bar examiner in which he spent countless

10 months and hours working on, and that led over to a process

11 where he would really teach and mentor younger members of

12 this profession, people who would become lawyers, and give of

13 himself in that way as well.

14   And the letters that we provided to the Court are

15 not only people in retrospect saying now we know this man is

16 being sentenced but the contemporaneous ones, at a time when

17 this prosecution was not within the realm of anyone's

18 conception.  They showed the genuineness of how people felt

19 toward Mr. Yacker and the kind of truly giving of himself

20 that we see in his background.

21   All of them reflect the reality of this man,

22 Stanley Yacker.  In some ways, you know, he was really a

23 giant in the legal profession, someone who people looked up

24 to.  And in others, he was just a humble, and is, a humble,

25 everyday, small-town lawyer, a really fine, gentle soul, a

1  person who has never acted self importantly, but rather,

2  always, at least with me and I think you see it in the

3  letters, self deprecating and genuine.  And more than

4  anything, perhaps the tragedy of this case is that this was a

5  man who loved and respected the profession of the law.  He

6  truly did.  You know, to this day, he is enthusiastic about

7  legal issues, wanting to talk about them and think about them

8  and combine the intellectuality of the law with the everyday

9  practice of it in a way that really few of us do at times.

10        And it is so sad that as a result of this he will

11  forever be barred from that practice, and so really whatever

12  the Court does today, in a lot of ways, is really adding on

13  to the worst punishment that he ever could have received and

14  that he received already, which is he is no longer a

15  practicing attorney.

16        Today Stanley Yacker is left without a means of

17  really supporting himself although he has been attempting to

18  work.  He obviously stands here in poor health, having had a

19  quadruple bypass operation just last year.  He is disgraced

20  in the eyes of his clients and the profession that he loved

21  so much, and now, of course, he stands to lose his liberty.

22  Obviously, he recognizes, and I do as well, that he must be

23  punished for what he did.

24        We would ask that all of this be considered when

25  your Honor crafts that punishment and that the Court do

8

1    justice that tempers justice with mercy.

2            Thank you.

3            THE COURT:  All right.  Mr. Yacker, I will hear

4    from you, sir.

5            THE DEFENDANT:  I will be very brief, your Honor.

6    I am a little bit nervous.  I truly regret having disgraced

7    so many people.  I start with my family because they are

8    important to me.  I have disgraced them.  I have disgraced

9    the public.  I have disgraced the profession which is, as

10   Larry said, something that, and I wouldn't put it in the past

11   sense, something that I love and continue to love, even

12   though I do greatly miss the ability to practice it as I

13   always had for so long.

14           I particularly feel sorry for the clients because

15   clients did and know that I can't put in the present tense, I

16   don't have clients presently, but they did always mean a lot

17   to me.  I just can't explain other than what I have already

18   said to your Honor in court, you know, how all this came

19   about, only that it is an aberration.  It was fueled by

20   insecurity and uncertainty, and I am sure, although it is

21   hard to realize it at the time, that an element of greed

22   enters into it.

23           But what Larry said also is true.  I profited so

24   little, I think one of the defense attorneys even said that

25   the fees that I charged were very modest even in their day,

9

1   so it wasn't that so much.  You tend to lose some of your

2   ability to reason, rationalizations take over when, I don't

3   know, it just all seems so easy at the time, and when the

4   lender is actually instead of, you know, policing a closing,

5   is actually in some ways part of it, it is almost like a bad

6   Henny Youngman joke, you know, "Take my money, please."  It

7   is not an excuse, but I just want your Honor to know what

8   possibly caused me at the time to lose my ability to reason,

9   and to transgress the way that I have.

10          I am well aware that these constitute crimes

11  against the United States, against the clients that I served,

12  and I just want your Honor to be aware of that.

13          Thank you.

14          THE COURT:  All right.  Thank you very kindly.

15          Mr. Leibman, I will hear from you on the motion, if

16  you choose.  Your memo is very explicit as to the motion

17  itself.  I am going to let, whatever other comments you have

18  to present to the Court.

19          MR. LEIBMAN:  Your Honor, I will rely on the

20  memorandum which I know the Court has carefully read and ask

21  the Court to grant that motion.

22          I have no other substantive comments to make unless

23  the Court has questions.  I did want to make the Court aware

24  as I made counsel aware this morning that one of the victims

25  in the case, Mr. Joseph Donald, is present in court and asked

10

1    that I pass on his request to the Court, that he be permitted

2    to address some remarks to the Court.

3         I did explain to Mr. Donald that his written victim

4    impact statement was already before the Court. I know the

5    Court has read it from a prior proceeding in this series of

6    cases. But I am duty-bound to pass on that request to your

7    Honor.

8         THE COURT: Where is Mr. Donald? Mr. Donald, if

9    you would like to step up to the podium, you may. I will

10   hear from you briefly, sir.

11        Right up front.

12        MR. DONALD: I thank you for taking the time to

13   hear my remarks. It will take the Court perhaps three

14   minutes to hear what I have to say. I have written remarks

15   to keep them succinct. They read as follows:

16        As a Christian, one of the crucial and fundamental

17   aspects of my fight deals with forgiveness. My religion

18   would be nothing if indeed there is no forgiveness. And

19   unforgiving Christians is as much an oxymoron as as is this

20   particular Christian to a round scare.

21        To this end, while it hasn't been I am compelled to

22   forgive Mr. Yacker for the hurts and complications that he is

23   responsible for creating in my life. However, the crucial

24   point for me was to resolve the distinction between the

25   spiritual and the civil, between the sin and the crime, which

11

1 are not always the same thing. While the Christian is to

2 forgive all things, that doesn't necessarily mean that all

3 things do not come with legal consequences. They do.

4 As a consequence, while I forgive, at the same time

5 I respect the rights and needs for civil law and punishment.

6 Since Mr. Yacker's total disregard and contempt for my

7 family's safety, I have never received an apology from him or

8 any acknowledgement that he expressed remorse through his

9 actions. His obfuscation of truth and integrity has

10 permitted greed to foreshadow his obligation to provide the

11 requisite contractual, professional legal services to my wife

12 and me.

13 As his clients, both my wife and I had our lives

14 completely rearranged in a very negative way. This is a

15 result of part of that -- this is a result of the part that

16 Mr. Yacker played in defrauding us in the purchase of a house

17 in Long Branch in 1995. However, the greater crime that may

18 never be remedied in this life is the fact that my wife died

19 in 1996, believing that she was at fault for the financially

20 embarrassed predicament and complex set of circumstances in

21 which we found ourselves.

22 While I am not qualified to understand all of the

23 nuances of this criminal case, it is my desire as a victim of

24 Mr. Yacker's crimes that he receive a sentence from this

25 Court that is commensurate with his crimes and the U.S.

1  Sentencing Guidelines.  It is also my desire that in the full

2  interest of justice, that Mr. Yacker's sentence should

3  reflect an appropriate dispensation of punishment that

4  reflects the legal consequences that stem from his own

5  acknowledgement of his guilt for all of the charges that were

6  brought against him.

7          In finality, I am truly grateful to the U.S.

8  Attorney's office in Newark and all of the agencies of law

9  enforcement that include by name Larry Willis, Special Agent,

10  Tom Joseph, and the Assistant United States Attorney, Alain

11  Leibman, for the enforcement of law, and that which is

12  brought us thus far in this case.

13          Furthermore I am asking this Court to be just as

14  vigilant and prudent in insuring that the many man hours and

15  resources that have been expended to date in the interest of

16  justice are not lost, but are reflected in the annals of

17  history in what can be considered as a just outcome to this

18  case.  Thank you.

19          THE COURT:  All right.  Thank you, Mr. Donald.

20          The government has made an application to the Court

21  pursuant to Sentencing Guidelines 5 (k) 1.1.  And before I

22  can grant that application, I have to be satisfied that Mr.

23  Yacker has provided substantial assistance in the

24  investigation and prosecution of another or others who have

25  committed an offense.  Only if I make that finding may I

13

1    consider a downward departure.

2         The Third Circuit Court of Appeals has in its

3    jurisprudence indicated certain findings that I must

4    consider.

5         First of all, I must evaluate the significance and

6    usefulness of Mr. Yacker's assistance, taking into

7    consideration the government's valuation of the assistance

8    rendered.   To that extent, I am satisfied that Mr. Yacker was

9    useful, and was significant in assisting the government not

10   only in the proffers prior to the trial before the Court, but

11   he did in fact testify before the Court.

12        The second prong indicates that the testimony must

13   be truthful, complete, and reliable, as provided by Mr.

14   Yacker.   And I did find his testimony to be truthful,

15   complete, and reliable.

16        The third prong, the Court is asked to look at the

17   nature and extent of the defendant's assistance.   I am

18   satisfied that his assistance was forthcoming.   There are

19   many, many documents for him to review with the government's

20   in proffer sessions and I am satisfied that he has satisfied

21   that prong.

22        The fourth prong is not relevant, and the Court

23   need not ponder all the prongs.   And the fifth is the

24   timeliness of his assistance and I am satisfied that his

25   assistance was timely.   Therefore, I will grant the

14

1  application of the government.

2       Today's proceeding calls upon the Court to exercise

3  its responsibility in the case that portrays the frailty of

4  many in our society who, when confronted with advancing

5  years, either in age or of their practice, and a potential

6  loss of income, permit the insecurity and uncertainty as to

7  their financial viability to overpower their good judgment.

8       By all accounts, Stanley Yacker, prior to his

9  involvement in these criminal proceedings, was a model

10  practitioner.  He loved the law and truly cared about his

11  clients.  And as indicated by the letters contained in the

12  sentencing memorandum submitted by Mr. Lustberg, many of

13  those clients became his personal friends.

14       I found it interesting that the clock in his office

15  was without hands, and that speaks volumes as to his lack of

16  concern about billable hours.  The devil incarnate of current

17  legal compensation.  His pro bono activities and service both

18  in and out of the profession were exemplary and merit

19  consideration.

20       I note that he was a state bar examiner for a

21  number of years, became chairman of that committee.  And

22  attained a national reputation in the state bar examiners

23  organization.  I believe he also served a term with his local

24  ethnics committee.  So he did serve the profession.  There

25  are many, many letters that indicate that he was of great

15

1   assistance to other practitioners, and many of the letters

2   indicated his, through his love for sports, he coached many

3   local community teams. I remember baseball was one of them.

4          In his personal life Mr. Yacker has always been

5   kind and considerate to others with great emphasis directed

6   towards his family. By all reports, he lived modestly,

7   without pretense, and as his wife stated, he would never

8   willingly hurt anyone. The numerous letters written on Mr.

9   Yacker's behalf give credence to this assessment. Yet Mr.

10  Donald, he did hurt people. People like you were hurt.

11  People who vested him with their trust and confidence. It is

12  because of his betrayal, and the unfolding course of events

13  that he stands before this Court, as Mr. Lustberg indicated

14  in his sentencing memorandum as a humbled man, in poor

15  health, and in a dire financial condition.

16         I have already determined that he is entitled to a

17  significant downward departure for his cooperation with the

18  government. Setting the measure of his punishment is

19  particularly difficult when weighed in terms of the human

20  disarray that has occurred. Anger, distrust, depression,

21  adverse credit ratings, bankruptcies, foreclosures, and

22  disgruntled family relationships will survive long after his

23  period of incarceration, has been served.

24         Consideration of these victims, and the feelings

25  expressed in their victim impact statements, and the

16

1    statement of Mr. Donald here today, must be respected, cannot

2    be overlooked.  For the Court, this is a tragic case.  The

3    unraveling of a distinguished career is painful to all

4    concerned.  It is particularly distressing when it involves a

5    lawyer who by virtue of his license is vested with the mantle

6    of trust and respectability.  The Court is satisfied that in

7    the past years Mr. Yacker has experienced the pain of shame.

8    A pain that will survive any punishment this Court can

9    impose.

10          While I am satisfied that you will never practice

11   law again, nor injure another client, the sentence imposed

12   today must be of such consequence that it would deter others

13   who face similar challenges in their golden years of practice

14   and lack the moral fortitude to just say no.

15          Mr. Yacker, if you will please rise.

16          Pursuant to the Sentencing Reform Act of 1984, and

17   particularly Section 5 (k) 1.1 it is the judgment of the

18   Court Mr. Yacker that you are hereby committed to the custody

19   of the Bureau of Prisons to be imprisoned for a term of 18

20   months.  I am departing six levels.  On each count, each of

21   counts one through ten.  On docket number 01-00047, and count

22   1 of docket 02 -- 0025 to be served concurrently.  For a

23   total term of 18 months.

24          Upon release from imprisonment you shall be placed

25   on supervised release for a term of three years.  This term

17

1   consists of three years on each counts of one through ten of

2   the indictment that I mentioned and count 1 of the

3   information, all such terms to run concurrently.

4        Within 72 hours of your release from the custody of

5   the Bureau of Prisons you shall report in person to the

6   probation office in the district to which you are released.

7   You shall provide the United States probation officer full

8   disclosure of your financial records to include yearly income

9   tax returns upon request of the United States probation

10  office.

11       You will also cooperate with the probation officer

12  in the investigation of your financial dealings, and shall

13  provide truthful monthly statements of your income.  You will

14  be prohibited from incurring any new credit charges or

15  opening additional lines of credit without the approval of

16  your probation officer unless you are in compliance with the

17  payment schedule through your restitution obligation, shall

18  not encumber or liquidate interests in any assets unless it

19  is in direct service of that restitution obligation or

20  otherwise has the express approval the Court.

21       Also ordered that you shall make restitution in the

22  total amount of $787,985.  The court will waive the interest.

23  Payment shall be made to U. S. Treasury and forwarded to the

24  clerk of the Court in Trenton for proportionate distribution

25  to victims who are listed in the presentence report, and I am

18

1   not going to enumerate all of those victims.   But Mr. Donald,

2   you are listed for $21,560.

3       The amounts ordered represent the total amounts due

4   to the victims for these losses.   Your restitution obligation

5   shall not be affected boy any restitution payments made by

6   other defendants in this case except that no further payment

7   shall be required after the sums of the amounts actually paid

8   by all defendants has fully satisfied these losses.

9       The following defendants in the following cases may

10  be subject to restitution orders to the same victims for the

11  same losses.   They being Irene DeFeo and Donna Pepsney.   The

12  restitution is due immediately.   It is recommended that you

13  participate in the Bureau of Prisons inmate financial

14  responsibility program.

15      In the event your restitution is not paid prior to

16  the commencement of supervision you shall satisfy the amount

17  due in monthly installments of no less than $350 to commence

18  30 days after your release from confinement.

19      You will also notify the United States Attorney for

20  this district within 30 days of any change of mailing or

21  residence address that occurs while any portion of the

22  restitution remains unpaid.

23      I find that you do not have the ability to pay a

24  fine.   I will waive the fine in this case.   Further ordered

25  that you shall pay to the United States a total special

19

1    assessment of $100 per count for a total of $1100 which shall

2    be due immediately.

3          I want to advise you that you have a right to

4    appeal this sentence pursuant to 18 United States Code

5    section 3742, and Mr. Lustberg will advise you of your

6    appellate rights.

7          Are there any other applications before I determine

8    whether there will be voluntary surrender?

9          MR. LUSTBERG:  No, your Honor.  I was going to

10   request voluntary surrender.  I was also going to request

11   that the Court recommend, understanding that your Honor has

12   no ability to to force, with the bureau of prisons, that Mr.

13   Yacker serve his sentence at Allenwood.

14         THE COURT:  Mr. Leibman.

15         MR. LEIBMAN:  No objection to the voluntary

16   surrender or the request for Allenwood.

17         THE COURT:  I will grant both applications.  I

18   would like the surrender to be accomplished within six weeks.

19   Anything else?

20         MR. LUSTBERG:  We are happy to surrender sooner

21   than six weeks.

22         THE COURT:  Well.

23         MR. LUSTBERG:  I know it takes the Bureau of

24   prisons some time.

25         THE COURT:  Takes about six weeks.  All right.

20

1   That completes the sentence of the Court.

2           MR. LEIBMAN:   Thank you very much, your Honor.

3           THE COURT:   Okay.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25