# EXHIBIT U

## Page 1

WILLIAM KANE

Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
 2
 3            CIVIL ACTION NO: 97-cv-3496(DRD)(MAS)
 4
 5    WALSH SECURITIES, INC.,
 6               Plaintiff,
 7    vs.
 8    CRISTO PROPERTY MANAGEMENT ET AL.,
 9               Defendants.
      _____/
10
11
12                     2701 N. Rocky Point Dr.
                       Suite 1200
13                     Tampa, FL 33607
                       October 5, 2011
14                     10:36 a.m. to 5:08 p.m.
15
16    VIDEOTAPE DEPOSITION OF WILLIAM KANE
17
18
19        Taken on behalf of the Plaintiff before PHILIP
20    RYAN, RPR, Court Reporter, Notary Public in and
21    for the State of Florida at Large, pursuant to
22    Plaintiff's Notice of Taking Deposition in the
23    above cause.
24
25
```

## Page 2

WILLIAM KANE

Page 2

```
 1    APPEARANCES:
 2    ROBERT A. MAGNANINI, ESQUIRE
      Stone & Magnanini, LLP
 3    150 John F. Kennedy Parkway
      Fourth Floor
 4    Short Hills, NJ 07078
      (973) 218-1111
 5
 6              Attorney for Plaintiffs
 7    DAVID KOTT, ESQUIRE
      McCarter & English, LLP
 8    100 Mulberry Street
      PO Box 652
 9    Newark, NJ 07101-0652
      (973) 849-4012
10    (via telephone and Mobile Depo)
                Attorney for Defendant
11              Commonwealth Land
                Title Insurance Company
12
      EDWARD J. HAYES, ESQUIRE
13    Fox & Rothschild, LLP
      2000 Market Street
14    20th Floor
      Philadelphia, PA 19103-3222
15    (215) 299-2000
      (via telephone and Mobile Depo)
16
17              Attorney for Defendants Nations Title
                and Fidelity National Title
18    ALSO PRESENT:
                LaJuana Pruitt, videographer
19
20                     INDEX
21    DIRECT EXAMINATION:                    PAGE
      BY MR. MAGNANINI                        10
22    CROSS-EXAMINATION
      BY MR. HAYES                           158
23    BY MR. KOTT                            205
      REDIRECT EXAMINATION
24    BY MR. MAGNANINI                       243
      RECROSS-EXAMINATION
25    BY MR. HAYES                           263
      BY MR. KOTT                            268
```

## Page 3

WILLIAM KANE

Page 3

```
 1                  EXHIBIT INDEX
 2                                             PAGE
      Exhibit WK 1
 3    Document Bates stamped WK002671           61
      through 2674.
 4
      Exhibit WK 2
 5    Document Bates stamped WK002675           63
      through 2681.
 6
      Exhibit WK 3
 7    Document Bates stamped WK010183           66
      through 010232
 8
      Exhibit WK  4
 9    Series of deeds and mortgages            72
      relating to Joanna White
10
      Exhibit WK 5
11    Document Bates stamped WK004271           76
      through 4286
12
      Exhibit WK 6
13    Document Bates stamped WK015522           81
      through 015544.
14
      Exhibit WK 7
15    Deed.                                     86
      Exhibit WK 8
16    Document Bates stamped CI000007105        90
      through 7076.
17    Exhibit WK 9
18    Document Bates stamped PR 000285.         93
19
      Exhibit WK 10
20    Document Bates stamped WK019609 and       94
      9610.
21
      Exhibit WK 11
22    Document Bates stamped WK00153            98
      through 157.
23
      Exhibit  12
24    Memo from Lory King to National Home     102
      Funding, Attn. Mary, dated July 26
25    1996.
```

## Page 4

WILLIAM KANE

Page 4

```
 1    Exhibit WK 13
      Memo from Lory King to Gary Grieser,     104
 2    dated July 26, 1996.
 3    Exhibit WK 14
      Memo from Lory King to Rick Pepsny,      105
 4    dated July 26, 1996.
 5    Exhibit WK 15
      Memo from Lory to Sally, dated March     107
 6    26, 1997, subject Binders Needed.
 7    Exhibit  WK 16
      Document Bates stamped CI000002733.      108
 8
 9    Exhibit WK 17
      Document Bates stamped CI000008790       109
      Fax cover sheet.
10
      Exhibit WK 18
11    Letter to Anthony Cicalese, Esq.         112
      from Sally Zappola, dated 6/4/97.
12
      Exhibit WK 19
13    Letter from Robert Agel to Stanley       113
      Yacker, Esq., dated 6/16/97.
14
      Exhibit WK 20
15    Letter from Stanley Yacker to            114
      Coastal Title Agency, Inc., dated
16    July 8, 1997.
17    Exhibit  WK 21
      Document Bates stamped WK0009            120
18    through 12.
19    Exhibit WK  22
      Document Bates stamped WK19050           123
20    through 19122.
21    Exhibit WK 23
      Document Bates stamped SYSW006901        124
22    through 6918.
23    Exhibit WK 24
      Document Bates stamped WK19124           127
24    through 19155.
25
```

WILLIAM KANE

Page 37

1   appraisals were completed?
2       A.   We would then put it in the package and
3   take the deal up and get it closed with the bank.
4       Q.   Okay.  Were there -- were there times
5   when deals closed without written appraisals?
6       A.   Yes.
7       Q.   And how often did that occur?
8       A.   That wasn't that often.  It was far and
9   few between.
10      Q.   Okay.  And could you explain how a deal
11  or a land property transaction could close without
12  a written appraisal?
13      A.   The -- somebody in the bank would call
14  the appraiser who was doing the property and the
15  appraiser would have to say the appraisal will be
16  there tomorrow or the next day and give them an
17  exact value on what they were bringing it in at.
18      Q.   Okay.  And did you ever have an instance
19  when a property was closed on with a verbal
20  appraisal but the written appraisal did not match
21  what was verbally told to the bank?
22      A.   I'm not 100 percent sure on that.  I
23  don't remember that.
24      Q.   Okay.  And then who paid the appraisers?
25      A.   I did.  It probably came right out at

WILLIAM KANE

Page 38

1   closing, if anything.  If not, then I would have
2   paid them out of my office.
3       Q.   Okay.  And then how many people worked
4   in Cristo Properties' offices?
5       A.   At one point I had, I think, 12 or 13
6   people on the road.  There was probably about 40
7   people.
8       Q.   Okay.  And when you say "12 or 13 people
9   on the road," what did you mean by that?
10      A.   People going out, fixing up houses,
11  getting them ready for appraisals, meeting
12  appraisers.  Some stuff I had kept in-house where
13  I didn't turn around and sell it.  So they would
14  take care of those properties.
15      Q.   Okay.  So that -- so you were also doing
16  rehabilitating properties, I guess, or --
17      A.   Correct.
18      Q.   -- fixing them up?
19      And then what other types of employees did you
20  have in Cristo?
21      A.   We had people who were considered
22  buyers.  Their job was to go out and find the
23  properties, deal with the realtors, find the right
24  properties, make sure it's going to appraise what
25  we needed it to appraise for, and then come in and

WILLIAM KANE

Page 39

1   negotiate for the company with the sellers.
2       Q.   Okay.  And how would they know that it
3   would appraise for what it needed to appraise for?
4       A.   They I guess in the end got to know the
5   appraiser.  So they would call the appraiser or
6   call me.  And if the appraiser gave them a hard
7   time, I'd call the appraiser and go over it with
8   him.
9       Q.   Okay.  So if an appraiser told you, you
10  could never get a value that you needed on a
11  property, would you buy that property?
12      A.   Probably not.
13      Q.   Okay.
14      A.   Or if it was too late and I got stuck
15  with it, that's why we have stuff in the
16  portfolio, you know, where it -- we had a lot of
17  title problems on stuff because -- so that's how
18  we had wound up with portfolio stuff.
19      Q.   Okay.  And that's -- that was actually
20  bringing me to my next part of the people involved
21  with this were -- what title agency company did
22  you deal with?
23      A.   It was Coastal Title.
24      Q.   And who chose them?
25      A.   Rick Pepsny.

WILLIAM KANE

Page 40

1       Q.   And do you know why?
2       A.   I'm just assuming there was a
3   relationship with them already.
4       Q.   Okay.  And then what was Coastal Title
5   Agency's part in the land transaction?
6       A.   Well, they were to run title, make sure
7   it's clear title and then issue the title
8   insurance policies to the bank.
9       Q.   Okay.  And would a bank close on -- on
10  the mortgage loans without the title insurance
11  policies?
12      A.   No, they had to have the policies.
13      Q.   Okay.  And then did you ever deal
14  with -- with Coastal Title Agency?
15      A.   I had lunch with him one Christmas, but
16  other than that, there was no one-on-one.
17  Everything went through either Pepsny or Yacker.
18      Q.   Okay.  By Mr. Pepsny, you've said he's
19  an attorney.  Who is -- who's Mr. Yacker?
20      A.   Mr. Yacker was the attorney that
21  represented Capital Assets and the straw buyers.
22      Q.   Okay.  And so -- and at some point, what
23  we've seen is that Mr. Yacker stops doing real
24  estate closings and Mr. Anthony Cicalese starts
25  doing them.  And it appears that that happens in

WILLIAM KANE

Page 41

```
1   the beginning of 1997.
2        Was Mr. Cicalese also representing the Capital
3   Assets and the straw buyers?
4        A.    Yes.
5        Q.    And how did it come that he began to
6   represent those two parties?
7        A.    He was a friend of Gary Grieser's.  And
8   I believe that Gary was getting it cheaper, if I'm
9   not mistaken, than Yacker was charging.  And he
10  was just -- wanted to switch.
11       Q.    Okay.  And then we've also deposed a
12  woman named Lorraine King.  Do you know who she
13  is?
14       A.    Yes.  She was the paralegal who actually
15  closed over at Yacker's office.
16       Q.    Okay.  And how did you come to know Miss
17  King?
18       A.    From Stanley's office.
19       Q.    Okay.  I believe she testified that she
20  viewed you as her employer.  Is that -- you paid
21  her to -- to close these deals?
22       A.    Yeah.
23       Q.    And what happened when Mr. Yacker
24  stopped closing the transactions and Mr. Cicalese
25  started closing the transactions?
```

WILLIAM KANE

Page 42

```
1        A.    Lory left Yacker's office and went over
2   to Cicalese's office.
3        Q.    And Mr. Cicalese testified that without
4   Miss King working on the transactions, he would
5   not get that business.  Is that more or less
6   accurate?
7        A.    That's possible, yeah.
8        Q.    Okay.  And so what did Mr. Yacker
9   actually do at the real estate closings?
10       A.    Nothing.
11       Q.    Okay.  And that -- that was because Miss
12  King actually conducted the closings?
13       A.    Exactly.
14       Q.    Okay.  And then how about Mr. Cicalese,
15  what was his involvement at the closings?
16       A.    Lory did the closings, Anthony Cicalese
17  did more of the back end or after work, making
18  sure the checks were cut and who they went to,
19  where at Yacker's office, Lory did all that.
20       Q.    Okay.  And then we also had deposed
21  Mr. Yacker, and he had testified that his trust
22  account was manually done until about 1996 when he
23  said that you had purchased a computer system for
24  him and Miss King kind of took over and ran his
25  trust account.
```

WILLIAM KANE

Page 43

```
1        Is that accurate?
2        A.    Yes.
3        Q.    Okay.  And I'll show you some documents
4   later, Mr. Kane.  I'm just trying to get
5   everything down about who was all involved in the
6   fraud.
7        But I notice that in your records that you had
8   produced in the litigation -- and I presume also
9   to the government -- there was a copy of Mr. -- a
10  printout of Mr. Yacker's trust account.  And there
11  was also a printout of Mr. Cicalese and
12  Mr. Pepsny's trust accounts.
13       How was it that you came to have copies of
14  their trust account printouts in your records?
15       A.    To make sure where the money was going
16  and who was getting what.
17       Q.    Okay.  So to check up on -- on the
18  attorneys involved?
19       A.    Correct.
20       Q.    Okay.  I think I've covered all the
21  various groups of people in there.  And then --
22  oh, I guess our last group of Defendants is
23  actually the title insurance companies.  Did you
24  ever have any dealings directly or indirectly with
25  anyone from Coastal -- or sorry, not Coastal --
```

WILLIAM KANE

Page 44

```
1   Commonwealth Land Title Insurance Company, Nations
2   Title Insurance of New York, or Fidelity National
3   Title Insurance?
4        A.    What do you mean?
5        Q.    Any -- any discussions with -- about any
6   of the transactions with anybody from --
7        A.    No.
8        Q.    -- any title company?
9        A.    No.
10       Q.    Okay.
11       A.    Just all the mail they sent me.
12       Q.    Okay.  And -- and then there's two other
13  companies I think I need to ask you about.  We've
14  seen Cristo Property Management, Ltd., was your --
15  was the formal name of your company.  What was
16  GJL?
17       A.    That was just another name under -- what
18  we were doing was, we were going to set up
19  different names.  There was a guy by the name of
20  Lloyd Corsi I dealt with when I was buying houses,
21  and he said what you want to do is keep only so
22  many names under a company.  This way, people
23  don't see you buying a lot and increase pricings
24  in the area.
25       Q.    When you're purchasing the properties?
```

Page 57

1  venturer has the same number but with a little
2  capital A in parentheses.
3      Do you know -- and Mr. Agel had testified that
4  he was trying to keep the title policy clean for
5  the mortgage bank so that the problems were
6  involved in the first transaction -- the third
7  party to yourself -- and then the sale from Cristo
8  to the joint venturer was then a cleaner
9  transaction.
10     A.   Okay.
11     Q.   And do you recall any discussion about
12  that?
13     A.   The only discussion that I remember
14  briefly and it's vaguely is that, you know, we
15  were closing 99.9 percent of the properties,
16  selling them before we were closing them.
17     Q.   Okay.  So you were actually selling them
18  before they were purchased?
19     A.   Correct.
20     Q.   Okay.  And that was creating some of the
21  title problems, I'm sure?
22     A.   Yes.
23     Q.   Okay.  And then who came up with the
24  idea of having the two policies with the same
25  number, one just designated with the --

Page 58

1      A.   That, I'm not sure.
2      Q.   Okay.  Do you recall any discussions
3  with Mr. Pepsny about that?
4      A.   Not to my recollection.  It's 14 years.
5  I've gotten old.
6      Q.   All right.  Mr. Kane, why don't we -- I
7  show you a document here.
8          MR. MAGNANINI:  Can we go off the video
9  for a second?
10         THE VIDEOGRAPHER:  Sure.  We are going
11  off the record.  The time is approximately
12  11:33 a.m.
13             (Short break.)
14         THE VIDEOGRAPHER:  We're back on the
15  record at 11:40.
16         THE WITNESS:  They just put us on hold.
17         THE VIDEOGRAPHER:  Oh, they did.
18         THE WITNESS:  Yeah.
19         THE VIDEOGRAPHER:  Shall we go off the
20  record?
21         MR. MAGNANINI:  I guess we can.
22         THE VIDEOGRAPHER:  Off the record at
23  11:40.
24             (Short break.)
25         THE VIDEOGRAPHER:  We're back on the

Page 59

1      record at 11:42.
2  BY MR. MAGNANINI:
3      Q.   Mr. Kane, before I -- I show you Exhibit
4  WK 1, I have one more question.  Earlier you said
5  that Walsh Securities, the mortgage bank, would
6  only loan on residential properties which were
7  considered one to four families; is that correct?
8      A.   Correct.
9      Q.   Okay.  And then were the straw buyers
10  actually going to move into the properties that
11  they were buying?
12     A.   No.
13     Q.   And what was to happen to the -- the
14  properties once they were purchased by the straw
15  buyers?
16     A.   They were to be rented.
17     Q.   Okay.  And then so, so -- in the loan
18  application packets, I guess again to reflect to
19  the mortgage bank underwriter or somebody that the
20  property was habitable and was already being
21  rented, there were leases in some of the
22  properties?
23     A.   Correct.
24     Q.   And who prepared the leases?
25     A.   Usually my office.

Page 60

1      Q.   Okay.  And how were they prepared?  Were
2  people actually renting the properties --
3      A.   No.
4      Q.   -- at that time?
5      A.   No.
6      Q.   Okay.  And how were the leases then
7  prepared?
8      A.   We'd pick a name from the phone book or
9  something and prepare a lease.
10     Q.   Okay.  And how was the amount of the
11  rent determined?
12     A.   Determined by the mortgage amount.  So
13  if it was going to be, you know, $1,500, either it
14  would be a little bit more or a little bit less,
15  because they only counted 75 percent of the rental
16  amount.
17     Q.   Okay.  Okay.  And then I guess the last
18  document that I'm going to get to and show you,
19  but I'll just ask you about was we've seen -- and
20  we've actually seen recorded and sometimes
21  recorded ahead of the mortgage issue by Walsh
22  Securities -- these joint venture agreements.
23  What was their purpose?
24     A.   That purpose was to protect Gary, so the
25  people couldn't go around and sell the houses

WILLIAM KANE

Page 65

1   packet once the loan was closed?
2       A.   Well, they kept it in their office in
3   case bank orders came in or the banking
4   department, they had them in their office.
5       Q.   Okay.  Oh, as a requirement for their
6   license?
7       A.   Correct.
8       Q.   Okay.  And then one last -- I keep --
9   I'll be saying this for a while, and I apologize
10  up-front, but another aspect of these transactions
11  that we've seen have been the -- the documents,
12  the closings would occur in the name of National
13  Home Funding.  And why was that?
14      A.   To be honest, I'm not 100 percent sure
15  of that.  But National, the way they set it up,
16  they got paid more if they closed under their name
17  and then assigned the loans or whatever.  They did
18  what they called table funding.
19      Q.   What is table funding?
20      A.   That's where it closes under the, you
21  know, National's name but really Walsh puts the
22  money up.
23      Q.   Okay.
24      A.   Or Greenwich Capital or whatever.
25      Q.   And I'll represent to you that Greenwich

WILLIAM KANE

Page 66

1   Capital was a warehouse line for Walsh Securities,
2   and at every closing, the money was Walsh
3   Securities' money that was then wired to either
4   Mr. Yacker or Mr. Cicalese.
5       And my question was, are you aware of any of
6   these, these fraud loans that were closed with
7   NHF's money?
8       A.   No, none of them.
9       Q.   And so the closing always occurred with
10  money from Walsh Securities, and then the notes,
11  mortgage, deeds, whatever, were assigned by
12  National Home Funding to Walsh Securities?
13      A.   Correct.
14      Q.   And did you have any involvement with
15  the assignments from NHF to Walsh Securities?
16      A.   No.
17      Q.   Okay.  That was all handled by
18  Mr. Skowrenski or someone at NHF?
19      A.   Correct.
20      Q.   Okay.
21          MR. MAGNANINI:  And then I'd like, Phil,
22      if you would mark this as WK 3.
23      (Whereupon, Exhibit WK 3 was marked for
24  identification.)
25  BY MR. MAGNANINI:

WILLIAM KANE

Page 67

1       Q.   And, Mr. Kane, for the record, I'll
2   state that this is a set of documents that came
3   from your file as well.  As you can see, they are
4   Bates stamped WK 10183 and through 10232.  And the
5   first document on top is a Fidelity National Title
6   Insurance Company of New York.  And it says
7   CT-19995(A).  And then it says transaction, Joanna
8   M. White, premises 933 Bangs Avenue.
9   Is that the document you have in front of you?
10      A.   Yes.
11      Q.   Okay.  I'd ask you just to go through
12  this, and I'll represent to you that this entire
13  group of documents was in one file folder in the
14  documents that you had produced.  Sorry,
15  Mr. Kane.
16      A.   That's okay.
17      Q.   What I had wanted to do, what is this --
18  this group of documents?
19      A.   Well, first something from the title
20  insurance company, I guess the policy.  And then
21  on the back you have the survey and then the loan
22  application, the leases.
23      Q.   And these were the -- who completed the
24  loan application?  Was it the straw buyer or
25  someone in your --

WILLIAM KANE

Page 68

1       A.   My office.
2       Q.   Okay.  And then who prepared the leases?
3       A.   My office.
4       Q.   Okay.  And then on Bates stamp WK10203
5   and 4, there's a loan submission sheet.
6       A.   Okay.
7       Q.   What is this document?
8       A.   Well, this we submitted to the bank
9   showing them -- we had to have the -- the
10  application formally typed.  And so we had this
11  program that we would use to calculate the LTV --
12  loan to value -- how much they were going to lend,
13  and the borrower's expenses.  So if we had to
14  adjust their income, we could use this to tell us
15  what we needed.
16      Q.   Okay.  And why was it necessary to
17  calculate the loan to value?
18      A.   Depending on how much they were
19  lending.  Sometimes they were lending 80 percent,
20  sometimes the bank only lent 75 percent.
21      Q.   It depended on the program?
22      A.   On the program with the bank, yeah.
23      Q.   Okay.  And then if you flip to pages
24  WK10213 and 214, there is a secondary mortgage
25  loan form, and I believe this is what we had

WILLIAM KANE

Page 117

```
1   was, the premiums for the -- for the insurance
2   policies.  That was always deducted out, and that
3   was a net, and we worked off the net number.
4       Q.    Okay.  And so at the end of the day, you
5   thought you had --
6       A.    Covered it, yeah.
7       Q.    Right.  And then -- and what, what
8   happened as a result of this dispute about, about
9   the money?
10      A.    If -- to my -- best of my recollection,
11  this was after the case was started, which was I
12  believe --
13      Q.    Yeah, it certainly --
14      A.    -- these papers came out on June 29th
15  with the newspapers.  June 20th was somewhere
16  around the 10th was the subpoenas from the
17  Monmouth County.
18      Q.    Correct.
19      A.    And then right in that period there, it
20  was the Friday before July 4th of that year, that
21  Tom Joaks and the FBI got involved that Friday.
22  And then at that point, I had no contact with
23  anybody else.
24      Q.    Okay.  So that's what I was going to --
25  my next question was, did you ever speak to
```

WILLIAM KANE

Page 118

```
1   Mr. Yacker or Mr. Pepsny, who's copied, or
2   Mr. Agel about this issue?
3       A.    No.
4       Q.    Okay.  Mr. Kane, how long do these
5   fraudulent transactions go on for?  When do you
6   recall them beginning?
7       A.    It would have started with D & Son's
8   into DEK.  So I'm going to say middle to late '95,
9   whenever the first deals through DEK were done.
10      Q.    Okay.
11      A.    And there might have been some D & Son's
12  deals in there also.  So that would have been the
13  very beginning.
14      Q.    And were those -- so those were deals
15  were actually done when Walsh Securities was owned
16  and operated by Gruntal Financial?
17      A.    Right.
18      Q.    Back in 1995.  So Gruntal was through
19  Walsh Securities, his d/b/a was actually table
20  funding those loans?
21      A.    Yes.
22      Q.    And then at some point in April of 1996,
23  Robert Walsh buys Walsh Securities, but the loans
24  had already been going in --
25      A.    Yes.
```

WILLIAM KANE

Page 119

```
1       Q.    -- through Gruntal --
2       A.    Yes.
3       Q.    -- through DEK
4       A.    Yes.
5       Q.    Or D & Son's.  Okay.
6       And then as far as I've seen, the last loans
7   are done the very beginning of June 1997.
8       A.    Okay.
9       Q.    And so I don't know if you have an
10  independent recollection of that.
11      A.    Well, I remember that at the end, it
12  would have been June, that probably would have
13  been the last day of the month and then the
14  beginning of the next month, and then somewhere
15  between the 10th or whatever, at that point in
16  time, there was already news reporters, you know,
17  going around, and you knew something was coming
18  out.
19      Q.    Okay.  And do you recall once you --
20  once the news reporters were asking and the
21  subpoenas had been served by Monmouth County, do
22  you recall closing any more loans?
23      A.    No.
24      Q.    -- through Walsh Securities?
25      A.    No.
```

WILLIAM KANE

Page 120

```
1       Q.    Okay.
2       MR. MAGNANINI:  And then I'd ask if you
3   could mark this, Phil, as WK 21.
4       (Whereupon, Exhibit WK 21 was marked for
5   identification.)
6       Q.    I don't know if it will help my next
7   question, but I'll try.  Mr. Kane, if you can take
8   a look at what we've marked as WK 21, which is
9   four pages which were produced by you, as you see,
10  WK 9 through 12.
11      Could you tell me, have you seen this document
12  before?
13      A.    No.  I mean, we might have done it for
14  something.  I don't know when it was produced.  I
15  don't know whether we produced it for my attorneys
16  or -- or what.
17      Q.    What I was going to ask you about it was
18  how did you keep track internally of -- of all the
19  loans that you had closed, all the properties you
20  had purchased, the properties you had sold, of the
21  payments that needed to be made on them?  How was
22  that --
23      A.    Well, as far as payments to be made on
24  them, that was out of my hands when they went over
25  to Grieser.
```

Page 157

```
 1    a break?
 2         THE WITNESS:  No.
 3         MR. MAGNANINI:  He wants to get done.
 4              CROSS-EXAMINATION
 5   BY MR. HAYES:
 6    Q.    This is Ed Hayes.  I represent Nations
 7   Title and Fidelity National Title.  Although I
 8   know Mr. Magnanini was providing you with some
 9   instructions prior to the start of the deposition,
10   the only one that I want to repeat is to try to
11   allow me to finish asking my question,
12   particularly in light of the fact that we're doing
13   this over the phone.  It will make it very
14   difficult for us to hear your answers and
15   difficult for the court reporter to take us both
16   down if we're both speaking at the same time.
17        Is that okay with you?
18    A.    Yes, sir.
19    Q.    Mr. Kane, what, if anything, did you do
20   to prepare for this deposition?
21    A.    Nothing.
22    Q.    Did you meet with Mr. Magnanini?
23    A.    I met him this morning.
24    Q.    Did you have conversations with him
25   regarding the subject matter of the deposition?
```

Page 158

```
 1    A.    Just to the fact that we'd be going over
 2   stuff.  Nothing -- we didn't talk about anything
 3   in particular at all.  We had a cup of coffee for
 4   10 minutes, 15 minutes maybe, 20 minutes, and then
 5   I followed him out here.
 6    Q.    Do you recall, Mr. Kane, being deposed
 7   in this case back in 1997, two days?
 8    A.    I remember one day.  If you say it's
 9   two, yes.
10    Q.    Was April and May of 2007, I believe.
11         MR. MAGNANINI:  Ed, you had said 1997.
12         MR. HAYES:  Oh, I'm sorry.  2007.
13   BY MR. HAYES:
14    Q.    There's some indication that the court
15   reporter sent you a copy of the transcripts from
16   each of those days of the depositions.  Do you
17   recall receiving them?
18    A.    Anything's possible.
19    Q.    Do you recall reviewing them at any
20   time?
21    A.    No.
22    Q.    Is it fair to say that you've reviewed
23   nothing in connection with this case for the last
24   three or four years at a minimum?
25    A.    That's correct.
```

Page 159

```
 1    Q.    Would it be fair to say that your
 2   recollection of the events was probably better in
 3   2007 than they are today, Mr. Kane?
 4    A.    A hundred percent.
 5    Q.    Did I hear you testify initially that
 6   you actually had a real estate franchise,
 7   Mr. Kane?
 8    A.    That is correct.
 9    Q.    Were you a licensed real estate broker?
10    A.    That is correct.
11    Q.    And then at some point in time when you
12   got involved in the rehabilitation of homes, did
13   you obtain either a mortgage solicitor's or
14   mortgage originator's license?
15    A.    Mortgage solicitor's license.
16    Q.    Initially I believe you were placing
17   loans through Selective as opposed to NHF?
18    A.    That is correct.
19    Q.    At that time, sir, did you have your
20   license through Selective?
21    A.    No, sir.
22    Q.    Did you have a license independently at
23   that point in time?
24    A.    No, sir.
25    Q.    Did you have any license at all when you
```

Page 160

```
 1   were with Selective?
 2    A.    No.  And can I clarify something?
 3    Q.    Sure.
 4    A.    I didn't work for Selective at that
 5   point in time.  They did the loans for us, just
 6   like I was an independent person.  So I never got
 7   paid or had a solicitor's license or had a desk
 8   there.
 9    Q.    And you testified previously that at
10   some point in time you recognized that you could
11   get a better deal with NHF by placing the loans
12   through NHF.  Is that a fair statement?
13    A.    That's a fair statement.
14    Q.    And from the point in time when you
15   obtained your license through NHF, did all of the
16   loans that you were involved with, Mr. Kane, get
17   submitted through NHF?
18    A.    Yes, sir.
19    Q.    And you testified in the prior
20   deposition on numerous occasions that you worked
21   for NHF.  Did you consider yourself to work for
22   that entity?
23    A.    I was an independent contractor, yes.
24    Q.    Now, is it fair to say that in these
25   transactions, Mr. Kane, you wore different hats?
```

Page 161

1    A.    That is correct.
2    Q.    And with one hat, you were the principal
3  of Cristo Property; correct?
4    A.    Yes, sir.
5    Q.    And Cristo Property was the entity that
6  was going out and finding properties to buy that
7  would ultimately be flipped, correct?
8    A.    Yes, sir.
9    Q.    Was the intent at the beginning,
10  Mr. Kane, that properties would be bought at a
11  certain price, they would be improved or
12  rehabilitated in some way and then sold to third
13  parties at a profit?
14    A.    Yes, sir.
15    Q.    And Mr. Grieser's role in this was to
16  actually rehabilitate the properties?
17    A.    Yes, sir.
18    Q.    And your role was to find the properties
19  that would be purchased for rehabilitation
20  purposes?
21    A.    Yes, sir.
22    Q.    And whose job was it, Mr. Kane, to find
23  the buyers?
24    A.    Mr. Grieser's.
25    Q.    And did I understand your testimony

Page 162

1  correctly that you would find a particular
2  property, determine what the cost to rehabilitate
3  it would be, and then based on that cost plus the
4  profit that you hoped to make, a sale price would
5  be determined?
6        MR. MAGNANINI:  Objection to form.  You
7    can answer, though.
8        THE WITNESS:  Yes.  Adding in money for
9    Gary and for the construction, yes.
10  BY MR. HAYES:
11    Q.    And then you would go out to see whether
12  or not appraisals would warrant that sale price;
13  correct?
14    A.    Correct.
15    Q.    Now, with all of the activities that you
16  engaged in of finding properties and purchasing
17  properties, you were acting as William Kane, a
18  principal of Cristo Property; correct?
19    A.    I would assume.  That might be a
20  technical question.  I'm not aware whether I can
21  answer or not but --
22    Q.    From the standpoint of what hat you were
23  wearing in finding properties and acquiring the
24  properties, that hat was a Cristo hat, was it not?
25    A.    Correct.

Page 163

1    Q.    And in connection with the mortgage
2  monies that were necessary for the third parties
3  to buy the property, you did play some role in
4  that process as a mortgage solicitor; correct?
5    A.    Correct.
6    Q.    And in that process, you would, to
7  summarize, put together the loan package that was
8  necessary to submit to Walsh?
9    A.    Correct.
10    Q.    And that would include a loan
11  application, the employment information, asset
12  information, correct?
13    A.    Correct.
14    Q.    And when you were putting that
15  information together, you were wearing your hat as
16  an independent contractor for NHF; correct?
17    A.    Correct.
18        MR. MAGNANINI:  Objection to form.
19        MR. HAYES:  While the package was -- I'm
20    sorry, Bob?
21        MR. MAGNANINI:  Yeah.  I was just
22    objecting to the form, Ed.
23  BY MR. HAYES:
24    Q.    The loan package that was submitted to
25  Walsh was submitted on behalf of NHF; correct,

Page 164

1  Mr. Kane?
2    A.    Correct.
3    Q.    And can I assume, Mr. Kane, that you
4  expected someone at Walsh to review the
5  information that was contained in the loan package
6  to see whether or not it met guidelines?
7    A.    Correct.
8    Q.    And those guidelines were guidelines
9  that you had received from personnel at Walsh so
10  that you would know what loan packages they had
11  available; correct?
12    A.    Correct, yes.
13    Q.    Did you understand, Mr. Kane, that Walsh
14  had certain underwriting guidelines?
15    A.    Correct, yes.
16    Q.    And do you recall testifying in your
17  prior deposition that you had submitted loans to
18  Walsh that did not meet their underwriting
19  standards?
20    A.    Probably said that, yes.
21    Q.    And do you recall testifying previously
22  that those loans got processed anyway?
23    A.    I don't remember my testimony.  But if
24  they got processed, either -- we must have made
25  them fit their guidelines.