**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Defendant
    Commonwealth Land Title
    Insurance Company

|  |  |
|---|---|
| WALSH SECURITIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> CRISTO PROPERTY MANAGEMENT, LTD., a/k/a G.J.L. LIMITED, et al., <br><br> Defendants. | UNITED STATES DISTRICT COURT <br> FOR THE DISTRICT OF NEW JERSEY <br><br> Civil Action No. 97-cv-3496 (DRD)(MAS) <br><br> Hon. Dickinson R. Debevoise, U.S.S.D.J. <br> Hon. Michael A. Shipp, U.S.M.J. <br><br> **STATEMENT OF UNDISPUTED MATERIAL FACTS FILED PURSUANT TO LOCAL CIVIL RULE 56.1** |

Defendant Commonwealth Land Title Insurance Company ("Commonwealth") submits this Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in support of its motion for partial summary judgment:

1. Walsh alleges that it was injured by unlawful acts engaged in by a number of individuals and entities, other than Commonwealth, who arranged inflated appraisals and flip sales in order to procure mortgage loans to phony borrowers who transferred some or all of the proceeds to the malefactors. A number of loans were "purchased by Walsh Securities from NHF [(a named defendant, now dismissed from this matter)] for amounts ranging up to eight times the preceding sales prices of the properties at issue." (*See* Fourth Am. Compl. ¶ 36 [document 302].)

2. Walsh alleges that it "was induced to purchase these mortgage loans form NHF based on fraudulent misrepresentations contained in the mortgage loan applications, including

ME1 12525388v.1

-2-

appraisals of the properties at issue.  The proceeds from [Walsh's] mortgage loans would, among other things, be distributed among RICO defendants as their illicit profits." (*See* Fourth Am. Compl. ¶ 36.)

3. Certain of Walsh's own senior management and employees pleaded guilty to charges related to this scheme, with its National Sales Manager, Betty Ann DeMola, who is the sister of Walsh's principal owner, pleading guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. §371.  (*See* Certification of Sara F. Merin ("Merin Certif."), Ex. J: Transcript of the Plea of Elizabeth Ann DeMola 17: 21-22:8 (Sept. 5, 2005); *see also* Merin Certif., Ex. K: Transcript of the Plea of Kellie O'Neill (Oct. 29, 1999) 15:22-16:3, 28:24-32:11, 38:15-23, 39:11-40:5(Oct. 29, 1999) (Ms. O'Neill was a loan processor at Walsh who pled guilty to conspiracy and wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 371); Ex. L: Transcript of the Plea of Anthony D'Apolito (Dec. 23, 1998) 11:14-21, 27:10-34:25 (Mr. D'Apolito was an account executive at Walsh who pled guilty to conspiracy to commit wire fraud and wire fraud).

4. Walsh seeks to impose on Commonwealth and the other Title Insurance Defendants damages resulting from the termination of an Agreement of Merger between Walsh and Resource Bankshares Mortgage Group, Inc. ("RBMG") dated as of April 18, 1997 and/or for losses from Walsh's diminution in value due to the fraud.  (*See* Fourth Am. Compl. ¶¶ 65, 100; Merin Certif., Ex. M: Pl.'s Certified Resps. & Objections to Def./Third-Party Pl. Commonwealth Land Title Ins. Co.'s First Set of Interrogs. Addressed to Pl. Walsh Securities, Inc. at Resp. to Interrog. No. 6.)

-3-

5.  The fraud first became public in early July 1997.  (*See* Merin Certif., Ex. B: William Conroy, Nancy Shields & John T. Ward, "How Could Appraisals Be So Off?" *Asbury Park Sunday Press* (July 6, 1997).)

6.  On April 18, 1997, Resource Bancshares Mortgage Group, Inc. and Walsh entered into a merger agreement, but they mutually agreed to terminate that agreement on November 3, 1997.  (*See* Merin Certif., Ex. A: Dep. of Robert Walsh (Apr. 9 & 23, 2010 & Sept. 30, 2011) ("R. Walsh Dep.") 609:17-610:10; Ex. C: Press Release, "Resource Bancshares Mortgage Group, Inc. and Walsh Securities Jointly Report Termination of Merger Agreement" (Nov. 3, 1997).)

7.  The merger agreement was terminated in part because Walsh could not produce its financial statements for 1996 and 1997, as their accountants refused to certify the statements, explaining that this was because of the fraud and Walsh's inability to potentially repurchase those loans, as they were not really sure what Walsh's financial statements would look like.  (*See* Merin Certif., Ex. A: Walsh Dep. 135:25-136:11-25, 633:20-635:2.)

8.  The Agreement of Merger provided, in essence, that RBMG would create a subsidiary and Walsh would merge with that subsidiary and be the surviving entity as a wholly owned subsidiary of RBMG.  (*See* Merin Certif., Ex. D: Agreement of Merger.)

9.  The consideration for the merger was entirely in RBMG shares, so the *shareholders* of Walsh would have exchanged their Walsh shares for RBMG shares – no consideration would have passed to Walsh itself under the Agreement of Merger.  (*See* Merin Certif., Ex. D: Agreement of Merger, Section 2.02.)

10. Walsh is seeking coverage under the closing service letters, alleging breach of contract, breach of the duty of good faith and fair dealing, and seeking consequential damages along with costs and attorneys' fees. (*See* Fourth Am. Compl. ¶¶ 92-100; "Prayer for Relief.")

11. The claims at issue in this motion are those against title insurance companies that issued title insurance policies and/or closing service letters to NHF and other entities, which Walsh would receive once it funded the loans. (*See* Fourth Am. Compl. ¶ 93; Merin Certif., Ex. A: R. Walsh Dep. at 22:13-17; *see, e.g.*, Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF.)

12. National Home Funding was the party to whom the closing protection letters were issued, per Walsh's specific instructions. (*See* Merin Certif., Ex. A: R. Walsh Dep. at 419:25-420:6-10.)

13. Each closing service letter was an individual contract between Commonwealth and mortgage originator NHF. (*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF.)

14. Defendant Commonwealth Land Title Insurance Company ("Commonwealth") issued a portion of the closing service letters at issue. (*See, e.g.*, Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF.)

15. The closing service letters issued were standard, state-approved forms. (*See, e.g.*, Merin Certif., Ex. D: 30(b)(6) Deposition of Donna Sullivan as a Corporate Representative of Commonwealth (May 27, 2010) 71.)

16. The closing service letters provide in part,

> When title insurance of Commonwealth [] is specified for your protection in connection with the closing of the above described real estate transaction in which you are to be a lender secured by a mortgage of an interest in land, the Company, subject to the

-4-

>Conditions and Exclusions set forth below, hereby agrees to ***reimburse you for actual loss incurred by you in connection with that closings*** (sic) when conducted by the above named Issuing Agent (an agent authorized to issue title insurance for the Company) of [Commonwealth] or the above named Attorney and when such loss arises out of:
>
>1. Failure of the Issuing Agent or Attorney to comply with your written closing instructions to the extent that they relate to: (a) the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such title or lien, or (b) the collection and payment of funds due to you; or
>
>2. Fraud of or misapplication by the Issuing Agent or Attorney in handling your funds in connection with the matters set forth in numbered paragraph 1 above.

(*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF (emphasis added).)

17. The closing service letters only provided coverage for "the actual loss incurred by you in connection with that closing[]" subject to certain conditions and are expressly limited to situations "[w]hen title insurance of Commonwealth Land Title Insurance Company is specified for your protection in connection with the closing of the above described real estate transactions in which you are to be a lender secured by a mortgage of an interest in land[.]" (*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF.)

18. The closing service letters provide that "any liability of the Company for loss incurred by you in connection with closings of real estate transactions by an Issuing Agent or Attorney shall be limited to the protection provided by this letter" and expressly state that "[t]he protection under this Letter is limited to the closing on the premises described in the caption of this letter." (*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF at 2.)

19. Thus, each closing service letter applied only to the single real estate transaction on which it was issued, was limited to a lender secured by a mortgage of an interest in land (as opposed to other security instruments), and was limited to coverage of the conduct of a specific issuing agent or attorney (in the example provided by Plaintiffs, Mr. Yacker). (*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF; Merin Certif., Ex. E: Summary Chart of Fraudulent Loans Provided by Walsh in the Supplemental Exhibit B to its First Supplemental Responses & Objections to Commonwealth's First Set of Interogs. (Feb. 27, 2006) ("Summary of Loans").)

20. Walsh first made a claim to Commonwealth under the closing service letters by letter dated July 28, 1997, which was received by Commonwealth on August 12, 1997. (*See* Merin Certif., Ex. F: Letter from Jeffrey M. Goodman of Latham & Watkins to Commonwealth Land Title Ins. Co. (July 28, 1997); Ex. A: R. Walsh Dep. 587:13-19.)

21. Commonwealth responded to the July 28, 1997 letter putting it on notice of the claims by letter dated August 12, 1997, seeking additional information and explaining that Commonwealth was unable to process Walsh's claim at the time due to the July 28 letter containing no "detail as to how the closing attorneys violated the closing instructions, how such violation caused a loss to Walsh or the amount of the loss." (*See* Merin Certif., Ex. G: Letter from Donna M. Sullivan of Commonwealth to Jeffrey M. Goodman of Latham & Watkins (Aug. 12, 1997).)

22. By letter dated September 5, 2011, Fred H. Schlesinger of Walsh responded to Commonwealth's request for addition information by providing information on 113 mortgage loan files on which it alleged the closing attorneys committed fraud. (*See* Merin Certif., Ex. H:

Letter from Fred H. Schlesinger of Walsh to Donna M. Sullivan of Commonwealth (Sept. 5, 1997).)

23. An additional request by Commonwealth, by way of its attorney, David R. Kott of McCarter & English, was sent on September 29, 1997 seeking detailed information as to the individual loans, the individual frauds alleged, and the Walsh employees with knowledge as to the alleged "acts, events and/or circumstances which [Walsh] contend[s] gives rise to coverage and the date that the employee acquired the knowledge." (*See* Merin Certif., Ex. I: Letter from David R. Kott of McCarter & English to Fred Schlesinger of Walsh (Sept. 29, 1997).)

24. Walsh filed the First Amended Complaint, adding the title insurance companies as defendants in this matter, without responding to the September 29, 1997 letter. (*See* Merin Certif., Ex. A: Walsh Dep. 587:25-589:18.)

> Respectfully submitted,
>
> **McCARTER & ENGLISH, LLP**
>
> Attorneys for Defendant/
> Third-Party Plaintiff Commonwealth
> Land Title Insurance Company
>
> By:   *s/David R. Kott*
>         David R. Kott
>         A Member of the Firm

Dated:  November 10, 2011