**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Defendant
  Commonwealth Land Title
  Insurance Company

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,

Plaintiff,

v.

CRISTO PROPERTY MANAGEMENT,
LTD., A/K/A G.J.L. Limited, ET AL.,

Defendants.

Civil Action No. 97-cv-3496 (DRD)(MAS)

Hon. Dickinson R. Debevoise, U.S.S.D.J.
Hon. Michael A. Shipp, U.S.M.J.

**CERTIFICATION OF
SARA F. MERIN IN SUPPORT OF
COMMONWEALTH LAND TITLE
INSURANCE COMPANY'S MOTIONS FOR
PARTIAL SUMMARY JUDGMENT**

**SARA F. MERIN,** hereby certifies as follows:

1.      I am an attorney at law of the State of New Jersey and am associated with the firm

of McCarter & English, LLP, attorneys for Defendant Commonwealth Land Title Insurance

Company ("Commonwealth"). I make this Certification in support of Commonwealth's Brief in

Support of its Motion for Partial Summary Judgment Dismissing Plaintiff's Claims for Damages

Resulting from Loss of Merger and/or For Its Own Diminution in Value and Commonwealth's

Brief in Support of its Motion for Partial Summary Judgment Dismissing, with Prejudice, the

Bad Faith Claims Asserted at Paragraphs 98 to 100 of the Fourth Amended Complaint. I am

fully familiar with the facts and information set forth herein.

ME1 12500999v.1

2.      Attached hereto as **Exhibit A** is a true and accurate copy of relevant portions of the transcript of the April 9 & 23, 2010 and September 30, 2011, 30(b)(6) deposition of Robert Walsh.

3.      Attached hereto as **Exhibit B** is a true and accurate copy of a newspaper article by William Conroy, Nancy Shields and John T. Ward entitled, "How Could Appraisals Be So Off?" from the July 6, 1997 *Asbury Park Sunday Press*.

4.      Attached hereto as **Exhibit C** is a true and accurate copy of a November 3, 1997 press release entitled, "Resource Bancshares Mortgage Group, Inc. and Walsh Securities Jointly Report Termination of Merger Agreement[.]"

5.      Attached hereto as **Exhibit D** is a true and accurate copy of Agreement of Merger between Walsh Securities, Inc. and Resource Bankshares Mortgage Group, Inc.

6.      Attached hereto as **Exhibit E** is a true and accurate copy of a summary chart of fraudulent loans provided by Walsh in the Supplemental Exhibit B to its First Supplemental Responses & Objections to Commonwealth's First Set of Interrogatories, dated February 27, 2006.

7.      Attached hereto as **Exhibit F** is a true and accurate copy of a letter from Jeffrey M. Goodman of Latham & Watkins to Commonwealth Land Title Ins. Co., dated July 28, 1997.

8.      Attached hereto as **Exhibit G** is a true and accurate copy of a letter from Donna M. Sullivan of Commonwealth to Jeffrey M. Goodman of Latham & Watkins, dated August 12, 1997.

9.      Attached hereto as **Exhibit H** is a true and accurate copy of a letter from Fred H. Schlesinger of Walsh to Donna M. Sullivan of Commonwealth, dated September 5, 1997.

10.     Attached hereto as **Exhibit I** is a true and accurate copy of a letter from David R. Kott of McCarter & English to Fred Schlesinger of Walsh, dated Sept. 29, 1997.

11.     Attached hereto as **Exhibit J** is a true and accurate copy of relevant excerpts from the transcript of the September 9, 2005 plea hearing of Elizabeth Ann DeMola in *United States v. DeMola*.

12.     Attached hereto as **Exhibit K** is a true and accurate copy of relevant excerpts from the October 29, 1999 plea hearing of Kellie O'Neill in *United States v. King & O'Neill*.

13.     Attached hereto as **Exhibit L** is a true and accurate copy of relevant excerpts from the December 23, 1998 plea hearing of Anthony D'Apolito in *United States v. D'Apolito*.

14.     Attached hereto as **Exhibit M** is a true and accurate copy of Plaintiff's Certified Responses & Objections to Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Co.'s First Set of Interrogatories. Addressed to Plaintiff Walsh Securities, Inc., dated October 15, 2005, without attachments.


I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


SARA F. MERIN

Dated:  November 10, 2011

# EXHIBIT A

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2          CIVIL NO. 97-3496 (DRD)

 3     ----------------------------
       WALSH SECURITIES,
 4     INC.,                       :

 5          Plaintiff,             :

 6          v.                     :

 7     CRISTO PROPERTY             :
       MANAGEMENT,LTD., a/k/a      :
 8     G.J.L. LIMITED; DEK         :
       HOMES OF NEW JERSEY,        :
 9     INC.; OAKWOOD               :
       PROPERTIES, INC.;           :
10     NATIONAL HOME FUNDING,      :
       INC.; CAPITAL ASSETS        :
11     PROPERTY MANAGEMENT &       :
       INVESTMENT CO., INC.;       :
12     CAPITAL ASSETS              :
       PROPERTY MANAGEMENT,        :
13     L.L.C.; WILLIAM KANE;       :
       GARY GRIESER; ROBERT        :
14     SKOWRENSKI, II;             :
       RICHARD CALANNI;            :
15     RICHARD DI BENEDETTO;       :
       JAMES R. BROWN; THOMAS      :
16     BRODO; ROLAND PIERSON;      :
       STANLEY YACKER, ESQ.;       :
17     MICHAEL ALFIERI, ESQ.;      :
       RICHARD PEPSNY, ESQ.;       :
18     ANTHONY M. CICALESE,        :
       ESQ.; LAWRENCE CUZZI;       :
19     ANTHONY D'APOLITO; DAP      :
       CONSULTING, INC.;           :
20     COMMONWEALTH LAND           :
       TITLE INSURANCE CO.;        :
21     NATIONS TITLE               :
       INSURANCE OF NEW YORK,      :
22     INC.;                       :
                                   :
23                                 :
                                   :
24                                 :
                                   :
25                                 :
```

COPY

DEPOSITION UPON
ORAL EXAMINATION
       OF
ROBERT C. WALSH


**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

FIDELITY NATIONAL  :
TITLE INSURANCE CO. OF  :
NEW JERSEY; COASTAL  :
TITLE AGENCY; DONNA  :
PEPSNY; WEICHERT  :
REALTORS and VECCHIO  :
REALTY, INC. D/b/a  :
MURPHY REALTY BETTER  :
HOMES AND GARDENS,  :

       Defendants.  :
--------------------------

    T R A N S C R I P T  of the stenographic
notes of HOWARD A. RAPPAPORT, a Notary Public and
Certified Shorthand Reporter of the State of
New Jersey, Certificate No. XI00416, taken at the
offices of MC CARTER & ENGLISH, LLP, Four Gateway
Center, Newark, New Jersey, on Friday,
April 9, 2010, commencing at 9:35 a.m.

---

A P P E A R A N C E S:
STONE & MAGNANINI
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
BY: ROBERT A. MAGNANINI, ESQ.,
    AMY WALKER WAGNER, ESQ.,
For the Plaintiff

MC CARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-0652
BY: DAVID R. KOTT, ESQ.,
For Defendant/Third-Party Plaintiff Commonwealth Land
Title Insurance Company

FOX, ROTHSCHILD, O'BRIEN & FRANKEL
997 Lenox Drive
Lawrenceville, New Jersey 08648
BY: EDWARD J. HAYES, ESQ.,
For Defendants Nations Title Insurance and
Fidelity National Title Insurance
METHFESSEL & WERBEL
3 Ethel Road
Suite 300
Edison, New Jersey 08818
BY: MARTIN R. MC GOWAN, ESQ.,
For Coastal Title Agency

---

I N D E X

WITNESS                          PAGE

ROBERT C. WALSH
  Direct examination by Mr. Kott        6
  Cross-Examination by Mr. Hayes       172

EXHIBITS      DESCRIPTION          FOR IDENT.
Robert        Notice to take oral        5
Walsh-1       deposition of plaintiff
              Walsh Securities
Robert        Fourth amended complaint   5
Walsh-2
Robert        Letter dated April 3,      5
Walsh-3       1998 from Walsh
              Securities to William T.
              Lutz
Robert        Letter dated July 3, 1997  107
Walsh-4
Robert        Letter dated July 30,      108
Walsh-5       1996
Robert        Agreement of settlement    110
Walsh-6

---

    (Exhibits marked for identification
Robert Walsh-1, Notice to take oral deposition of
plaintiff Walsh Securities; Robert Walsh-2, Fourth
amended complaint; Robert Walsh-3, Letter dated
April 3, 1998 from Walsh Securities to William T.
Lutz.)

    MR. KOTT:  Before we swear the witness,
I had marked for identification exhibit Robert
Walsh-1, which is a notice to take oral deposition of
plaintiff Walsh Securities, Inc. which I served on
Mr. Magnanini.

    Robert Walsh-2 is the fourth amended
complaint that is filed as document 302, filed with
the clerk electronically on 07/10/2009.  Attached to
it is document number 302-2, electronically filed the
same day, which are the exhibits.

    Exhibit Robert Walsh-3 is an April 3,
1998 letter and its enclosures written by Fred H.
Schlesinger, vice president and general counsel of
Walsh Securities, Inc., to William T. Lutz, Esquire,
Sedwick Law Firm, apparently making a claim under a
mortgage bankers bond.

    MR. MAGNANINI:  Do you have copies of
those?  I didn't bring any.

    MR. KOTT:  Yes.

2 (Pages 2 to 5)

---



Rizman
Rappaport
Dillon & Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

22

1  A  A straw buyer really has no real
2  interest in buying the property. The straw buyer is
3  really being utilized for their credit position, that
4  they have the ability to qualify for a loan. They
5  have no intention whatsoever of occupying the
6  property or being part of the property.
7      They are being paid a fee in order to
8  loan their credit to the transaction, in order to get
9  an approved mortgage.
10  Q  You also referred to a closing
11  protection letter?
12  A  Correct.
13  Q  I understand among the claims that Walsh
14  Securities makes in this case are claims against the
15  title insurance defendants under the closing
16  protection letters?
17  A  That is correct.
18  Q  And I think you said that before Walsh
19  would fund these loans, it would receive the closing
20  protection letters from the title insurance
21  defendants?
22  A  That's correct, or the agent, but yes.
23  Q  Or the agent being Coastal?
24  A  Right.
25  Q  Okay.

23

1      How did Mr. Kane get involved with Walsh
2  Securities? Or how did Walsh Securities gets
3  involved with Mr. Kane?
4  A  It is our belief that Mr. D'Apolito
5  introduced -- someone introduced Mr. Kane to
6  Mr. D'Apolito. We believe that there was a circle of
7  people, and we believe that there was a relationship
8  that was being developed prior to loans actually
9  coming into Walsh Securities. And the relationship
10  started, I believe, with Mr. Kane through
11  Mr. D'Apolito.
12  Q  What was Mr. D'Apolito's position with
13  the company?
14  A  He was a sales person.
15  Q  Who was his boss?
16  A  Bette Ann DeMola.
17  Q  And what was Ms. DeMola's title?
18  A  She was national sales manager.
19  Q  What were Ms. DeMola's responsibilities
20  in that position?
21  A  The branch managers of all the branches
22  reported to Ms. DeMola, and the sales people in
23  New Jersey reported to her.
24  Q  With respect to National Home Funding,
25  how did they get involved with Walsh, or how did

24

1  Walsh get involved in National Home Funding?
2  A  I believe 1995, and I don't remember the
3  specific date National Home Funding became an
4  approved correspondent, participant we called them.
5      I believe Mr. Skowrenski -- I'm not sure
6  if it was Mr. D'Apolito that introduced
7  Mr. Skowrenski to the company, I believe that was the
8  case, and he signed the participation agreement --
9  the participant agreement, and he was approved.
10  Q  Would Bette Ann DeMola need to have been
11  involved in the approval of National Home Funding?
12  A  No.
13  Q  Would she have any involvement in the
14  approval of National Home Funding?
15  A  Specifically National Home Funding or
16  any participant?
17  Q  Any participant.
18  A  The answer is no. The answer would be
19  she may have accounts that she had for an extended
20  period of time. She was in the business a long time,
21  and she may bring in accounts.
22      I'm a little vague on what you are
23  referring to as did she have any involvement.
24      The transaction would be, a sales person
25  would bring in an application and it would go through

25

1  the individual department that was responsible for
2  approving new participants.
3  Q  Would Bette Ann DeMola have any
4  involvement with that? That's all I'm asking.
5  A  No, I understand.
6  Q  Yes.
7  A  I'm being a little hazy, because the
8  answer is no, unless it was some of her accounts that
9  was being brought into the company.
10  Q  Okay.
11      When did you first meet Mr. Kane?
12  A  I don't remember, Mr. Kott. It could
13  have been --
14      MR. MAGNANINI: By him, you mean him
15  personally?
16      MR. KOTT: Yes.
17  Q  When did you, Robert Walsh personally,
18  meet Mr. Kane the first time?
19  A  I don't remember.
20  Q  How many times, approximately, have you
21  yourself met Mr. Kane?
22  A  Just define, please, met.
23  Q  Been in his presence.
24  A  Walked past him, saw him?
25  Q  Yes.

7 (Pages 22 to 25)



Rizman
Rappaport

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS

Walsh — direct

134

1    A    I had a general counsel, correct, and I
2    had an additional attorney on names.
3    Q    What were their names, Mr. Schlesinger
4    and who else?
5    A    Brian Graham, or I'm not sure he was on
6    staff at the time.
7    Q    Why were no lawyers present in that
8    meeting?
9    A    I don't know.
10   Q    The articles in the Asbury Park Press,
11   did you say they were after the subpoena from the
12   Monmouth County prosecutor?
13   A    Yes.
14   Q    There were a significant number of
15   articles in the Press, the Asbury Park Press, is that
16   correct?
17   A    That is correct.
18   Q    And there was, very early in that
19   process, very early in the process, there was a back
20   and forth between Walsh's attorney, Mr. Chertoff, and
21   Skowrenski's attorney, Mr. Schottland, is that
22   correct?
23   A    I'm not sure if it was early on, but,
24   yes, there was.
25   Q    In those articles in the Asbury Park

135

1    Press, Mr. Schottland stated that you, Robert Walsh
2    personally, were either involved in the frauds or
3    aware of the frauds, is that correct?
4    A    It's possible.
5    Q    I'm asking your best recollection.
6    A    I don't specifically remember sitting
7    here.
8    Q    Do you remember any articles in the
9    Press that suggested that you, Robert Walsh
10   personally, were either aware of the frauds or
11   involved in the frauds?
12   A    Yes.
13   Q    And about what was the time frame of
14   those articles?
15   A    As you mentioned before, there was a lot
16   of articles.
17   Q    Okay.
18   A    So I don't remember a time frame.
19   Q    Would they be within the first month of
20   the first article appearing in the Asbury Park Press?
21   A    I don't believe so.
22   Q    In connection with the Resource merger,
23   that merger was not completed, is that correct?
24   A    That's correct.
25   Q    And was that because Resource called it

136

1    off or your company called it off?
2    A    It was mutual.  But during the period of
3    time, 1997, we had six-month financial statements
4    audited by Peat Marwick and in 1996 we had audited
5    financial statements done by Peat Marwick.
6         Sometime I think in August of 1997 they
7    issued a letter to us stating that we can no longer
8    rely on those statements because of the fraud, our
9    inability to potentially purpose these loans, and not
10   sure -- repurchase these loans, and not really sure
11   what our financial statements would look like.
12        The merger was basically put on hold
13   from that period on.
14   Q    Okay.
15        When you say it was both Resource, what
16   was on your side, meaning the Walsh side?
17   A    We couldn't get our lawyer's financial
18   statements, the drop dead date was sometime in
19   November, and the November date came and went.
20   Q    Do you have any knowledge as to whether
21   Resource wanted to complete the merger or did not
22   want to complete the merger, other than what you've
23   been told by people from Resource?
24   A    I believe they wanted to complete the
25   merger.

137

1    Q    Correct me if I'm wrong.  I thought it
2    was Walsh Securities' position that Resource backed
3    out of the merger because of the publicity arising
4    out of the fraud?
5    A    It was a combination of that.  It was
6    the financial statements that put things on hold.
7    Q    Right.
8    A    It then became the Press, the articles,
9    our business started to drop off dramatically.  We
10   were not the same company.
11        So as the cycle changed and the business
12   started dropping off, the RBMG position was they
13   wanted the financial statements.
14   Q    Do you know anything about RB --
15   Resource's position on whether the merger would close
16   or whether the merger would not close, other than
17   what you have been told by Resource?
18   A    I do not.
19   Q    Why in the fourth amended complaint was
20   Kellie O'Neill not sued?
21   A    We just didn't believe she had any
22   resources.
23   Q    With respect to the agreement we went
24   over before, or the letter, the Citiscape letter,
25   Robert Walsh Exhibit 5, do you know what I'm

35 (Pages 134 to 137)

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

262

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW JERSEY
         CIVIL NO. 97-3496 (DRD)

    --------------------------------
WALSH SECURITIES,                  :
INC.,                              :
                                   :
         Plaintiff,                :
                                   :
    v.                             :
                                   :
CRISTO PROPERTY                    :
MANAGEMENT, LTD., a/k/a            :
G.J.L. LIMITED; DEK               :
HOMES OF NEW JERSEY,               :
INC.; OAKWOOD                      :
PROPERTIES, INC.;                  :
NATIONAL HOME FUNDING,             :
INC.; CAPITAL ASSETS               :
PROPERTY MANAGEMENT &              :
INVESTMENT CO., INC.;             :          CONTINUED
CAPITAL ASSETS                     :       DEPOSITION UPON
PROPERTY MANAGEMENT,               :       ORAL EXAMINATION
L.L.C.; WILLIAM KANE;              :             OF
GARY GRIESER; ROBERT               :       ROBERT C. WALSH
SKOWRENSKI, II;                    :
RICHARD CALANNI;                   :
RICHARD DI BENEDETTO;              :
JAMES R. BROWN; THOMAS             :
BRODO; ROLAND PIERSON;             :          PAGE 262
STANLEY YACKER, ESQ.;              :
MICHAEL ALFIERI, ESQ.;             :
RICHARD PEPSNY, ESQ.;              :
ANTHONY M. CICALESE,               :
ESQ.; LAWRENCE CUZZI;              :
ANTHONY D'APOLITO; DAP             :
CONSULTING, INC.;                  :
COMMONWEALTH LAND                  :
TITLE INSURANCE CO.;               :
NATIONS TITLE                      :
INSURANCE OF NEW YORK,             :
INC.;                              :
                                   :
                                   :
                                   :
                                   :
                                   :
```

COPY

**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

---263---

```
 1              :
 2   FIDELITY NATIONAL     :
     TITLE INSURANCE CO. OF :
 3   NEW JERSEY; COASTAL   :
     TITLE AGENCY; DONNA    :
 4   PEPSNY; WEICHERT       :
     REALTORS and VECCHIO   :
 5   REALTY, INC. D/b/a     :
     MURPHY REALTY BETTER   :
 6   HOMES AND GARDENS,     :
 7      Defendants.        :
     ------------------------
 8
 9
10
11
12          T R A N S C R I P T of the stenographic
13   notes of HOWARD A. RAPPAPORT, a Notary Public and
14   Certified Shorthand Reporter of the State of
15   New Jersey, Certificate No. XI00416, taken at the
16   offices of MC CARTER & ENGLISH, LLP, Four Gateway
17   Center, Newark, New Jersey, on Friday,
18   April 23, 2010, commencing at 8:35 a.m.
19
20
21
22
23
24
25
```

---264---

```
 1   A P P E A R A N C E S:
 2   STONE & MANGANINI
     150 John F. Kennedy Parkway
 3   Short Hills, New Jersey 07078
     BY:  DAVID STONE, ESQ.,
 4        AMY WALKER WAGNER, ESQ.,
     for the Plaintiff
 5
     MC CARTER & ENGLISH, LLP
 6   Four Gateway Center
     100 Mulberry Street
 7   Newark, New Jersey 07102-0652
     BY:  DAVID R. KOTT, ESQ.,
 8   for Defendant/Third-Party Plaintiff Commonwealth Land
     Title Insurance Company
 9
     FOX, ROTHSCHILD, O'BRIEN & FRANKEL
10   997 Lenox Drive
     Lawrenceville, New Jersey  08648
11   BY:  EDWARD J. HAYES, ESQ.,
     for Defendants Nations Title Insurance and
12   Fidelity National Title Insurance
13   METHFESSEL & WERBEL
     3 Ethel Road
14   Suite 300
     Edison, New Jersey 08818
15   BY:  MARTIN R. MC GOWAN, ESQ.,
     for Coastal Title Agency
16
17
18
19
20
21
22
23
24
25
```

---265---

```
 1
 2                I N D E X
 3   WITNESS                    PAGE
 4   ROBERT C. WALSH
 5
 6   Cross-Examination by Mr. Hayes     266
 7   EXHIBITS    DESCRIPTION     FOR IDENT.
 8
 9   Robert    Closing instructions      373
     Walsh-7
     Robert    Closing service letter    373
10   Walsh-8
     Robert    Letter via e-mail and     409
11   Walsh-9   regular mail dated
               March 5, 2010
12   Robert    Letter via e-mail and     409
     Walsh-10  regular mail dated
13             April 6, 2010
     Robert    Uniform settlement        420
14   Walsh-11  statement
     Robert    Secondary mortgage loan   421
15   Walsh-12
     Robert    Wholesale mortgage        421
16   Walsh-13  commitment
     Robert    Contract for sale of real 433
17   Walsh-14  estate
     Robert    Document entitled,        433
18   Walsh-15  "Fidelity National Title"
     Robert    Review checklist          440
19   Walsh-16
     Robert    HUD 1, Uniform Settlement 440
20   Walsh-17  Statement
     Robert    HUD 1 review form         448
21   Walsh-18
     Robert    Uniform underwritten      448
22   Walsh-19  transmittal summary form
     Robert    Wholesale mortgage        453
23   Walsh-20  commitment
     Robert    WSI common stock          476
24   Walsh-21  ownership, SEC filing
25
```

---266---

```
 1    R O B E R T  C.  W A L S H, having been previously
 2                  sworn, testifies as follows:
 3   CROSS-EXAMINATION (CONTINUING)
 4   BY MR. HAYES:
 5      Q     Good morning, Mr. Walsh.
 6      A     Good morning.
 7      Q     You recall you were sworn at the last
 8   deposition and that oath continues this morning?
 9      A     I do.
10      Q     At the last deposition, Mr. Walsh, you
11   indicated that there were any number of things that
12   you were going to do in response to questions between
13   that deposition and before this morning.
14            Do you recall that?
15      A     I do.
16      Q     Did you take steps to try to answer some
17   of the questions that you could not answer at the
18   last deposition?
19      A     I did.
20      Q     Can you tell me what you did between the
21   last deposition and today to further prepare for
22   today's deposition other than speaking with your
23   attorneys?
24            MR. STONE:  You can answer that
25   question, other than conversations with counsel.
```

2 (Pages 263 to 266)

**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

419

1  question.
2      A    Our residual values.
3      Q    Your residual values are not as a
4  successor or an assignee of the loan, are they, sir?
5          MR. STONE: Objection to form.
6          You can answer.
7      A    I'm not sure. The loans went into the
8  trust. The trust owned the loans.
9          We had beneficial ownership within the
10 trust as part of the residual.
11     Q    Not as an assignee or successor of the
12 loan. You agree with me on that?
13         MR. STONE: Object to the form of the
14 question.
15     A    I really don't know how to answer that.
16     Q    In your opinion, Mr. Walsh, did National
17 Home Funding have some culpability for the fraud?
18     A    We know that Billy Kane absolutely did,
19 and we know that he was delivering the paper under
20 National Home Funding.
21     Q    My question is, will you agree with me
22 that National Home Funding has culpability in the
23 fraud?
24     A    We believe so.
25     Q    National Home Funding is the party to

420

1  whom the closing protection letters were issued,
2  correct?
3          MR. STONE: Objection to form. It calls
4  for a legal conclusion.
5          You can answer.
6      A    Correct.
7      Q    In fact, it was Walsh Securities'
8  specific direction that those letters be issued to
9  NHF, not to Walsh, correct?
10     A    Correct.
11     Q    Walsh could have required the closing
12 service letters to be issued directly to Walsh,
13 correct?
14     A    I don't know the answer to that. I
15 don't know how it works.
16     Q    What is it that you think would preclude
17 you from making a condition of the grant of your loan
18 and your funding of the loan that the closing service
19 letter be issued in the name of Walsh Securities?
20         MR. STONE: Objection, asked and
21 answered.
22         You can answer it again.
23     A    I'm not sure.
24         (Exhibits marked for identification
25 Robert Walsh-11, Uniform settlement statement;

421

1  Robert Walsh-12, Secondary mortgage loan;
2  Robert Walsh-13, Wholesale mortgage commitment.)
3      Q    Mr. Walsh, I place before you an HUD 1
4  marked as Walsh-11. Again, we are still on the 155
5  Chelsea Avenue transaction.
6          (Exhibit handed to the witness.)
7      Q    Do you have it before you?
8      A    I do.
9      Q    You see that this document indicates a
10 different borrower than was referenced in the prior
11 documents?
12     A    I do.
13     Q    Do you have any idea how the interest in
14 the property got from Messrs. Skowrenski and
15 D'Apolito to the Salvatoriellos?
16     A    I don't.
17     Q    This indicates the settlement agent on
18 this transaction is Mr. Yacker?
19     A    That's correct.
20     Q    The closing service letter was issued
21 for Mr. Pepsny, correct?
22     A    A closing protection letter was issued.
23     Q    On this particular transaction --
24     A    I don't know what else is in the file.
25     Q    Well, if you like, I will be happy to go

422

1  through and let you look through the file. There is
2  no additional closing protection letter in the
3  documents produced by Walsh.
4      A    I accept that.
5      Q    So is it someone's responsibility,
6  Mr. Walsh, to check at Walsh to be sure the person
7  for whom the letter is issued is actually the closing
8  attorney?
9      A    Yes.
10     Q    And the person at Walsh would know,
11 prior to funding on this transaction, that they have
12 a closing service letter for someone different than
13 the settlement agent, wouldn't they?
14         MR. STONE: Object to the form of the
15 question. Calls for speculation.
16         You can answer.
17     A    It appears like there is two different
18 people.
19     Q    Not that it appears that.
20         The information was available to Walsh
21 prior to the time of funding to see that the person
22 who was conducting the closing was not the person for
23 whom the letter was issued, isn't that correct?
24     A    Correct.
25     Q    And this HUD 1 shows right on it the

41 (Pages 419 to 422)

**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 537

```
 1            UNITED STATES DISTRICT COURT
             DISTRICT OF NEW JERSEY
 2           Civil Action No. 97-cv-3496 (DRD)(MAS)
 3  WALSH SECURITIES, INC.,              :
 4            Plaintiff,                 :   DEPOSITION OF:
 5       v.                              : ROBERT C. WALSH
                                             (VOLUME III)
 6  CRISTO PROPERTY MANAGEMENT, LTD., :
    a/k/a G.J.L. LIMITED; DEK HOMES
 7  OF NEW JERSEY, INC.; OAKWOOD         :
    PROPERTIES, INC.; NATIONAL HOME
 8  FUNDING, INC.; CAPITAL ASSETS        :
    PROPERTY MANAGEMENT & INVESTMENT
 9  CO., INC.; CAPITAL ASSETS PROPERTY:
    MANAGEMENT, L.L.C.; WILLIAM KANE;
10  GARY GRIESER; ROBERT SKOWRENSKI,     :
    II; RICHARD CALANNI; RICHARD
11  DiBENEDETTO; JAMES R. BROWN;         :
    THOMAS BRODO; ROLAND PIERSON;
12  STANLEY YACKER, ESQ.; MICHAEL        :
    ALFIERI, ESQ.; RICHARD PEPSNY,
13  ESQ.; ANTHONY M. CICALESE, ESQ.;     :
    LAWRENCE CUZZI; ANTHONY D'APOLITO;
14  DAP CONSULTING, INC.; COMMONWEALTH:
    LAND TITLE INSURANCE CO.; NATIONS
15  TITLE INSURANCE OF NEW YORK, INC.;:
    FIDELITY NATIONAL TITLE INSURANCE
16  CO. OF NEW JERSEY; COASTAL TITLE     :
    AGENCY; DONNA PEPSNY; WEICHERT
17  REALTORS and VECCHIO REALTY, INC. :
    d/b/a MURPHY REALTY BETTER HOMES
18  AND GARDENS,                         :
19                                       :
               Defendants.
20  X-------------------------------X
21          TRANSCRIPT of testimony as taken by and
    before CHERYL McGANN, a Certified Court Reporter
22  of the State of New Jersey, at the offices of
    McCARTER & ENGLISH, LLP, Four Gateway Center,
23  Newark, New Jersey, on Friday, September 30, 2011,
    commencing at 9:14 a.m.
24
25  Job No. NJ356367
```

Condensed
Copy

Page 538

```
1  A P P E A R A N C E S :
2  STONE MAGNANINI LLP
     BY: ROBERT A. MAGNANINI, ESQ.
3  150 JFK Parkway
     Short Hills, New Jersey 07078
4  (973) 218-1111
     rmagnanini@stonemagnalaw.com
5  Attorneys for Plaintiff
6  McCARTER & ENGLISH, LLP
     BY: DAVID R. KOTT, ESQ.
7  Four Gateway Center
     100 Mulberry Street
8  Newark, New Jersey 07102-0652
     (973) 622-4444
9  dkott@mccarter.com
     Attorneys for Defendant
10  Commonwealth Land Title Insurance Co.
11  FOX ROTHSCHILD LLP
     BY: EDWARD J. HAYES, ESQ.
12  997 Lenox Drive
     Building 3
13  Lawrenceville, New Jersey 08543-5231
     (609) 896-3600
14  ejhayes@foxrothschild.com
     Attorneys for Defendants
15  Nations Title Insurance of New York, Inc. and
     Fidelity National Title Insurance Co. of New Jersey
16
17
18
19
20
21
22
23
24
25
```

Page 539

```
1        I N D E X
2  WITNESS        EXAMINATION
3  ROBERT C. WALSH
4    By Mr. Kott:   541,576,606,665,691,715,719,740
     By Mr. Hayes:  563,597,619,667,689,704,722,739
5
6        E X H I B I T S
7  Number    Description       Page
   Robert   Confidential Settlement Agreement
8  Walsh-22  Bates stamped COM-Cherokee-00303-392  555
9  Robert   Three-page article from July 13, 1997,
   Walsh-23  edition of Sunday Star Ledger    581
10
   Robert   Two-page article from July 10, 1997,
11 Walsh-24  edition of Asbury Park Press   581
12 Robert   File copy of September 29, 1997, letter
   Walsh-25  to Mr. Schlesinger from David R. Kott
13         with certified mail slip attached   583
14 Robert   August 12, 1997, letter Bates stamped
   Walsh-26  COM 01490 from Donna Sullivan to
15         Jeffrey Goodman         593
16 Robert   September 5, 1997, letter Bates stamped
   Walsh-27  COM 01715 through 16 from Fred Schlesinger
17         to Donna Sullivan      593
18 Robert   July 28, 1997, letter to Commonwealth from
   Walsh-28  Jeffrey M. Goodman, Latham & Watkins  605
19
   Robert   Fax from John Oberdorf to Dinah Raven
20 Walsh-29  with attached press release Bates stamped
           WSI 0070147-0070149      608
21
   Robert   January 31, 1997, Quality Control
22 Walsh-30  Memorandum from Veronica Gonzalez-Lehman,
           CC to James Walsh and Peter Trebour
23         Bates stamped WSI 0075078      649
24 Robert   Closing Instructions document Bates
   Walsh-31  stamped SYSW 020142, 20143 and 20141 672
25
```

Page 540

```
1        E X H I B I T S (Continued)
2  Number      Description        Page
3  Robert    Commonwealth Land Title Insurance
   Walsh-32  Company document Bates stamped
4        COM 18304           732
5  Robert    Document Bates stamped COM/Walsh
   Walsh-33  000668         733
6
7
8
          *    *    *
9
        (Exhibits retained by counsel.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 541

```
1  R O B E R T  C.  W A L S H, residing at
2  46 Laura Lane, Morristown, New Jersey 07960, having
3  been duly sworn, testified as follows:
4  CONTINUED EXAMINATION BY MR. KOTT:
5    Q. Mr. Walsh, do you remember the instructions I
6  gave you for your earlier depositions?
7    A. Yes, sir.
8    Q. Do you need me to go over them?
9    A. No, that's fine.
10   Q. Just let me remind you of one instruction.
11  If I ask you a question and you do not understand
12  it, will you tell me?
13   A. Yes, I will.
14   Q. So if you answer a question, we will assume
15  understood it. Is that okay with you?
16   A. That's fine. Thank you.
17   Q. What, if anything, have you done to prepare
18  for today's deposition session?
19   A. Reviewed documents, reviewed my deposition,
20  spoke to Jim Walsh, spoke to Fred Schlesinger,
21  looked at files. I believe I prepared very well.
22   Q. Okay. What documents did you look at?
23   A. I looked at loan files. I looked at
24  appraisals. I looked at closing instructions. I
25  looked at basically the loan file.
```

2 (Pages 538 - 541)

Page 586

1 some type of wild speculation about what it is that
2 I knew or not. Mr. Schottland was sent a letter by
3 Mr. Chertoff putting him on notice that if he
4 continued this it would be bad for him. So I'm
5 not really sure if you're taking a look at
6 Mr. Schottland and trying to determine that we don't
7 have to pay or we need more information.
8    Q. No, my question was a little different.
9       Can you understand, given what Mr. Schottland
10 alleged in the newspapers, why a title insurance
11 company would want to know whether the senior
12 management, including you, were aware of the frauds
13 or were involved in the frauds before they became
14 public?
15       MR. MAGNANINI: Objection to form.
16    A. I think that's acceptable. I think I
17 understand now what you're saying.
18    Q. And what's the answer to the question?
19    A. I think it's acceptable.
20    Q. Why is it acceptable?
21    A. They're looking to do their due diligence and
22 understand.
23    Q. Okay.
24    A. But also I'll give you a follow-up on that.
25 Why did it take from July when this first hit the

Page 587

1 paper until September 29th to ask that question?
2    Q. Okay.
3    A. It's a rhetorical statement. I'm not asking
4 you, as you're an attorney.
5    Q. Okay. Do you know whether there were other
6 correspondence between the September 29 letter --
7 well, what's the date of those articles again?
8    A. The first, I think you said July 10th maybe.
9    Q. Uh-huh.
10       MR. MAGNANINI: The second one was --
11    A. July 13th and July 10th.
12       MR. MAGNANINI: -- July 10th.
13    Q. But if I'm correct that the first claim was
14 made July 28th, that would be the first time
15 Commonwealth would be aware of the claims being
16 made; right?
17    A. I guess. It's a full 60 days after the fact
18 that that came out. It's a full 65, 70 days since
19 the articles.
20    Q. Okay. Well, actually, as to when it's
21 received, it's marked received in the Commonwealth
22 Claims Department on August 12, 1997; correct?
23    A. We don't know. I personally can't tell you
24 what that means.
25    Q. All right. After Walsh Securities received

Page 588

1 the September 29, 1997, letter and before the First
2 Amended Complaint was filed in November of 1997
3 adding the title insurance companies, did Walsh
4 Securities respond to the September 29 letter and
5 provide the information requested?
6    A. Sitting here today, Mr. Kott, I don't know
7 the answer to that.
8    Q. Okay. Well, in one of your depositions you
9 said you wanted to go back and look at the files on
10 what I'll call the bad faith.
11    A. Yes.
12    Q. And I assume you did that after that
13 deposition where you said you needed to go back and
14 look at some dates and correspondence, right?
15    A. I probably did, yes, if I said I would do it.
16    Q. All right, and you're here as a -- this is a
17 little unfair to us for you to say you're not sure.
18 But would it be fair to say that your company never
19 responded to the September 29, 1997, letter?
20       MR. MAGNANINI: Well, objection to form;
21 and just for the record, his last deposition was
22 April 23, 2010.
23       MR. KOTT: Okay. Then withdraw all my
24 comments.
25    Q. Would it be fair to say that, as far as you

Page 589

1 know, your company never responded to the September
2 29, 1997, letter?
3    A. I don't know either way, yes.
4    Q. Okay. Well, how are we going to find that
5 out if you --
6    A. Do you have records that could help me? Are
7 you saying that there's no records that Commonwealth
8 has that we responded to this?
9    Q. Well, I will represent to you this letter was
10 sent by me.
11    A. Yes, I understand that.
12    Q. And I'll represent to you that there was no
13 response; and the next event that occurred, as far
14 as I know, was the filing of the First Amended
15 Complaint adding the title insurance companies as
16 defendants.
17    A. I would then take your statement. I don't --
18 I wouldn't challenge it.
19    Q. Okay. Now, are you aware that this case,
20 this lawsuit, was delayed because a request by a
21 party or by the United States Attorney for a stay of
22 the lawsuit?
23    A. I am.
24    Q. And that was a very long delay, is that
25 correct?

14 (Pages 586 - 589)

Page 606

1  A. I don't know the answer to that.
2  Q. Did the stay in the litigation that was
3  imposed by the court impact your ability in any way
4  to conduct the type of investigation into Skowrenski
5  and NHF's conduct that you would have liked to have
6  conducted?
7  A. We continued to do an investigation. Were we
8  is able to do a hundred percent of what we chose to
9  do, I don't believe so, no.
10  Q. And, in particular, you were not in a
11  position to take any depositions in that case,
12  correct, because of the stay?
13  A. That is correct.
14  Q. You were without the ability to put one of
15  the people that you believed was a key participant
16  in the case under oath during that period of time,
17  correct?
18      MR. MAGNANINI: Objection to form, but
19  you can answer.
20  A. Correct.
21      MR. HAYES: Okay. Thank you.
22      MR. KOTT: Just a few others on that.
23  FURTHER EXAMINATION BY MR. KOTT:
24  Q. Your sister, Betty Ann Demola, was indicted;
25  is that correct?

Page 607

1  A. That is correct.
2  Q. And she would not have given a deposition
3  without taking the Fifth Amendment until after her
4  guilty plea, correct?
5      MR. MAGNANINI: Objection to form.
6  A. I don't know firsthand. I can't speculate.
7  Chances are yes.
8  Q. Okay, and we had talked about the internal
9  investigation done by the Latham firm; is that
10  correct?
11  A. I believe we have, yes.
12  Q. The Latham firm actually took written witness
13  statements as to who was involved in the fraud and
14  wrote a report to Walsh Securities?
15  A. Michael Chertoff gave us a letter stating
16  that he believed no senior management was involved
17  with the fraud.
18  Q. All right. When, if ever, was that letter
19  given to the title companies?
20  A. I don't know the answer to that.
21  Q. Was it given as part of this lawsuit?
22  A. I don't know the answer to that.
23  Q. Okay. And, in fact, you're aware that in
24  this lawsuit your lawyers have taken the position
25  that the title companies are not allowed to see the

Page 608

1  witness statements? Are you aware of that?
2  A. I am, yes.
3      MR. KOTT: I'm ready for a break. Are
4  you ready?
5      THE WITNESS: Yes.
6      MR. KOTT: We'll take a break. Thank
7  you.
8      (A short recess was taken.)
9      MR. KOTT: Will you mark this.
10      (Fax from John Oberdorf to Dinah Raven
11  with attached press release Bates stamped WSI
12  0070147 through 0070149 was received and marked
13  Defendant's Exhibit Robert Walsh-29 for
14  Identification.)
15      MR. KOTT: I have marked as Exhibit
16  Robert Walsh-29 a fax from John Oberdorf to Dinah
17  Raven that has attached to it I'll call it a press
18  release Bates stamped WSI 0070147 through 0070149.
19  Q. Mr. Walsh, that was a document prepared by
20  Walsh Securities. Are you generally familiar with
21  that document?
22      MR. MAGNANINI: Objection to the form.
23  I don't know if it was prepared by Walsh
24  Securities.
25  Q. I'm sorry, produced by Walsh Securities.

Page 609

1      MR. MAGNANINI: Okay.
2  A. I am.
3  Q. And was Mr. Oberdorf an outside lawyer who
4  was representing Walsh in connection with the merger
5  with Resource?
6  A. Yes.
7  Q. Do you know who this Dinah Raven is?
8  A. No. I just looked at it right now. The name
9  does not strike me.
10  Q. Mr. Oberdorf says that he's attaching the
11  final press release --
12  A. Can I go back.
13  Q. Yes. Go ahead, sure.
14  A. It appears to me it's from her to John.
15  Q. Okay, thank you for the correction. I agree
16  with the correction.
17      And she says, "Attached is the final press
18  release jointly released by RBMG and Walsh today at
19  9:07 a.m." Correct?
20  A. Correct.
21  Q. And can you, in fact, confirm that the
22  document attached, the two pages, is a joint press
23  release of Resource and Walsh?
24  A. The only thing I'll stipulate is I don't know
25  if this was the actual one, but it was very close to

19 (Pages 606 - 609)

Page 610

1 it. I haven't had a chance to read it and compare
2 it to something else.
3    Q. What else would you compare it to?
4    A. I don't know. It looks like it's right. If
5 that's the question, it appears like it, yes.
6    Q. And in the second paragraph, Mr. Herbert, who
7 is an employee of RBMG, states that RBMG and Walsh
8 have mutually agreed to terminate the merger
9 agreement; is that correct?
10    A. That is correct.
11    Q. What do the words "mutually agreed" mean?
12    A. In this context or in a general context?
13    Q. This context is fine.
14    A. This was a transaction where -- you mind me
15 giving you the answer, or you just want that
16 snapshot?
17    Q. No. Go ahead, you can.
18    A. This was a transaction that we could not
19 produce our financial statements, and I guess the
20 press release could have said RBMG did not go
21 forward because Walsh couldn't produce the financial
22 statements. And in a perfect world, and if we just
23 had lawyers working on the transaction, that's
24 probably what would have been said.
25    Was I in favor of not going forward with this

Page 611

1 agreement? No, I wanted this agreement to happen,
2 so it's a press release. It's going out to the
3 general public. I'm not taking the position that
4 I'm really upset at this particular time, but I'm
5 really upset at this particular time.
6    Q. But I can -- and I'll pull it out if I want,
7 in one of your earlier deposition when I asked you
8 the question without reference to this press
9 release, you said the merger agreement was
10 terminated by mutual agreement.
11    A. I did, that's correct. And it was terminated
12 by mutual agreement. I'm now giving you my response
13 to "mutually agreed" means.
14    Q. Okay. What financial statements are you
15 referring to? What period or things of that nature?
16    A. The 1996 financial statements and the 1997
17 financial statements that were produced. Peat
18 Marwick had to produce a comfort letter stating that
19 here are the financial statements to RBMG. They had
20 given certified statements for 1996, and they had
21 given it for the first six months of 1997; and they
22 pulled that, and they said you can no longer rely on
23 them on the basis that we were not buying back the
24 loans and they believed that that was a material
25 impact on our financial capabilities.

Page 612

1    Q. In this document it states that RBMG remains
2 committed to completing the pending merger with
3 Resource Bancshares.
4    Is that a separate merger?
5    A. It is. It was a tri-party agreement,
6 Mr. Kott, and that was a merger that still went on.
7    Q. How much in advance of this press release did
8 you come to the conclusion that you were not going
9 to be able to consummate the merger?
10    A. I don't know a specific date, but I could
11 tell you it was definitely before this. We were
12 working very hard up to this date to try to get it
13 done. We were trying to get the ability to buy back
14 loans. So I can't tell you the specific date when I
15 believed this was not going to happen.
16    Q. Whenever that date was, was the plan then to
17 continue to operate Walsh as it was operated before
18 that?
19    MR. MAGNANINI: Objection to form.
20    Do you mean after the merger?
21    MR. KOTT: Yeah.
22    A. After this date?
23    Q. No. You get to the point where you're not
24 going to -- you now know you're not going to do the
25 merger with Resource, so my question was what are

Page 613

1 you going to do with Walsh at that point?
2    A. I'm going to continue to operate it and
3 continue to try to fix it.
4    Q. Right, okay. In the same type of business
5 you were in before you entered into the merger?
6    A. That is correct.
7    Q. That's what I was asking.
8    In November -- I'll pick the date this was --
9 in November of 1997, was Walsh operating?
10    A. Yes, we were.
11    Q. Were you making loans?
12    A. Yes, we were.
13    Q. What was the volume of the loans?
14    A. I don't have that information, but it was
15 down significantly.
16    Q. Okay, and where did you get the funding to do
17 the loans?
18    A. I don't recall at that particular date.
19    Q. What should I call somebody like National
20 Home Funding? Should I call it a correspondent or a
21 broker? What should I call them?
22    A. Correspondent is fine.
23    Q. Okay. In November of 1997, were you getting
24 the loans from correspondents?
25    A. Yes, we were.

20 (Pages 610 - 613)

Page 630

1 saying. Their position is that's what they say.
2  Q. I understand. My question to you is, A, do
3 you disagree with it; B, if you disagree with it,
4 did Walsh respond to this in any way? Because if
5 Walsh did, we have not seen it.
6  A. This is back in 1997. This is in October of
7 '97. Let's take 97-4. 97-4 was securitized in June
8 30th. I think it was June 30th, so this is a date
9 that's two or three months after that. Smith Barney
10 did a complete review of 97-4 two months prior to
11 that, so I don't know if I agree with that or if I
12 agree with Smith Barney. So I don't know what kind
13 of cratered in the two-month period from when Smith
14 Barney signed off on it to when this report was
15 done.
16  Q. Who commissioned AGS to do this report, do
17 you know?
18  A. We did I think in connection with Smith
19 Barney.
20  Q. The next paragraph on this page says, "The
21 loan files are characterized by minimal
22 documentation. Often the documentation contained in
23 the file is insufficient to allow an independent
24 review of the underwriting decision. Based upon the
25 documents in the file, it is often difficult to

Page 631

1 determine if the underwriter adequately addressed
2 the risks associated with the loan."
3  Do you agree with that comment?
4  A. Again, sitting here today, it's kind of
5 difficult to go back. Prior to this -- two months
6 prior to this, Smith Barney did a $300 million
7 security.
8  Q. Take a look at the next-to-last paragraph on
9 that page, if you would, Mr. Walsh, which reads,
10 "AGS reviewed the loans suspected to be fraudulently
11 originated by National Home Funding."
12  Now, do you know -- first, that seems to
13 imply to me that there were more loans looked at as
14 part of this review than just the NHF loans.
15  Do you know the magnitude of loans that AGS
16 reviewed in reaching this conclusion?
17  A. I don't recall, no.
18  Q. Do you believe it was more than just the 220
19 fraud loans?
20  A. Yes, I do.
21  Q. And it goes on to say, "The majority of the
22 loans were fraudulently conceived and assembled in
23 such a manner that detection was unlikely."
24  Do you see that?
25  A. I do.

Page 632

1  Q. And then it goes on to say, "However, a more
2 thorough analysis of the loan files and basic risk
3 management procedures may have identified this
4 fraudulent trend at an earlier time."
5  Do you see that?
6  A. I do.
7  Q. Do you disagree with that last sentence?
8  A. Well, I agree with two things that's
9 definitely here, that in such a manner detection was
10 unlikely. I agree with that. I agree that "may
11 have" -- and, again, anybody can sit back after the
12 event and say may have prevented it. It doesn't go
13 on to say that they would have definitely prevented
14 it.
15  Q. In one of the prior depositions -- actually,
16 in the first deposition, you were asked if you were
17 aware of any changes that were made in Walsh's
18 business operations after discovery of the fraud.
19  Do you recall being asked that question?
20  A. I do.
21  Q. All right. Preliminarily you indicated you
22 weren't aware of what they were, but you would
23 check. And then, in fact, when you came back at the
24 second deposition, the change that you identified
25 was that there was a change in post closing that we

Page 633

1 needed to follow up more carefully with the
2 recording of documents.
3  Do you recall giving that testimony?
4  A. I do.
5  Q. Okay. Sitting here today, another year or so
6 later, have you discovered any other changes that
7 were made in the way in which Walsh conducted its
8 business that resulted from the discovery of the
9 fraud?
10  A. Sitting here today, I don't recall.
11  Q. Since the last deposition and this
12 deposition, was that an issue you looked into at
13 all?
14  A. No, it was not.
15  Q. If I can take you back for a minute to the
16 RBS question and the statements, Mr. Walsh.
17  A. The RBMG?
18  Q. Yes.
19  A. Okay.
20  Q. I believe what you said was that in essence
21 your accountants had indicated that the 1996 and the
22 first months of 1997 statements were no longer
23 reliable. Is that a fair statement?
24  A. Yes, it is.
25  Q. And that they were unwilling to certify

25 (Pages 630 - 633)

Page 634

1 statements because Walsh was not in a position to
2 buy back the loans, correct?
3   A.  That's correct.
4   Q.  Was there any other reason they weren't
5 willing to certify the statements?
6   A.  It was our inability to repurchase the loans.
7   Q.  Did the fraud have anything to do with their
8 level of discomfort with the accuracy of your
9 statements?
10   A.  In regards to the ability to repurchase the
11 loans.
12   Q.  I'm saying separate and apart from that.
13   A.  No.  No, I need to continue.
14   Q.  Sure, sorry.
15   A.  The inability to repurchase the loans they
16 believed was going to have a negative impact on the
17 company.  They believed because of the fraud that
18 you could not rely on these because they didn't know
19 on a going-forward basis what the company would look
20 like, so you couldn't rely on past performance of
21 the statements.  They pulled 1996 because there was
22 loans that were originated in 1996.  '97, it's
23 obvious why they pulled 1997.  So the premise of why
24 the statements were pulled was our inability to fund
25 the loans and the repercussions going forward to

Page 635

1 what the company would look like for the inability
2 to fund those loans.
3   Q.  As part of the analysis, did the accountants
4 take into consideration the Rhode Island fraud?
5   A.  I don't think so.
6   Q.  How large was that fraud, Mr. Walsh?
7   A.  You're testing memory.  If you have something
8 here, that would be great; but I think the Rhode
9 Island -- I'm not even sure when that was identified.
10 It's been too long.  I apologize.
11   Q.  Did Walsh have to repurchase any of the
12 fraudulent loans from the Rhode Island matter?
13   A.  I don't believe so.
14   Q.  Why not?
15   A.  I'm not sure what the fraud was or what was
16 caused by it.  I don't recall the transaction.  I
17 know there was a Rhode Island fraud, but I don't
18 know the magnitude of it or what was the outcome,
19 but I do not recall repurchasing any loans.
20   Q.  Was there --
21        MR. MAGNANINI:  I'm just going to object
22 to the whole line of Rhode Island fraud questions
23 'cause it's not covered in the Notice.
24        MR. HAYES:  I think it's clearly within
25 the issue of the merger.  This has to do with the

Page 636

1 merger and whether or not this witness' testimony is
2 credible on the basis for the merger falling
3 through, but I'll finish my Rhode Island questions.
4   Q.  Mr. Walsh, was there ever any discussion of
5 reissuing the financial statements for '96 and '97,
6 taking out the fraud loans and the business that was
7 booked as a result of those loans?
8   A.  Yes.
9   Q.  And why was that not done?
10   A.  It was done, but it wasn't done by Peat
11 Marwick.
12   Q.  Why wasn't it done by Peat Marwick.
13   A.  I don't know if Peat Marwick did it on paper,
14 but it was never published by Peat Marwick.  I don't
15 know what the outcome of that was.
16   Q.  Was a request made to Peat Marwick to in
17 essence certify recast financial statements, such
18 that he would have had financial statements upon
19 which the deal could have gone forward?
20   A.  I believe at that time, Peat was not
21 interested until we repurchased the loans to address
22 that.
23   Q.  And as of that point in time, what demands
24 had been made upon Walsh to repurchase loans?
25   A.  A lot.  The security had made the demands;

Page 637

1 the whole loan buyers had made the demands.  We had
2 identified the approximate $25 million, give or
3 take.  We set up reserves to handle that.  I think
4 we set up an additional $10 million reserves, and
5 they just did not feel comfortable if we were not
6 able to repurchase those loans what we would look on
7 an ongoing basis.
8   Q.  So you ultimately set up a reserve that was
9 more than what you ultimately needed to repurchase
10 these loans?
11   A.  No.  No, not at all.  We had an additional
12 reserve.  One of the things that is our basis to our
13 claims is not only the whole loans that were
14 repurchased but the residuals.  We had booked value
15 on the residuals based upon certain assumptions.
16 When the fraud loans became evident, we had to write
17 down a reserve against our residuals, so there was
18 an economic loss associated with our residuals based
19 upon the losses that were being incurred.  So we did
20 have to set up a reserve, additional reserve for the
21 residuals.
22   Q.  Is the amount of the residual that you could
23 collect under any security impacted by the
24 performance of all of the loans in that security?
25   A.  Absolutely, yes.

26 (Pages 634 - 637)

# EXHIBIT B



**INDEX**

Business ........... B1
Classified ......... I-1
Computing ........ C4
Editorials ......... C2
Impact ............. C1
Lotteries .......... A2
Movies ............. E4
Obituaries ........ A22
Puzzles ............ E4
Real Estate ....... G1
Section X .......... E6
Seniority .......... C5
Travel ............. F1

# ASBURY ● PARK SUNDAY PRESS

PRICE $1.00

JULY 6, 1997

**● Business**

Have mouse, will travel. Area businesses use the Internet to increase tourism. SECTION B

**SportsSunday**

Larry Doby is honored for his contributions to baseball. SECTION H

**● The Local Front**

Fighting fires is a way of life for 43 men in Asbury Park. SECTION AA

**Essentials**

Pitch your scale. Ditch the diet. Local authors advise us to lighten up. SECTION D

**SHORE CAST**

Sunny, pleasant. Highs, 77-84. Water quality: All beaches open. Ultraviolet Index: 7. Ranges from 0-2 (little danger) to 10 and up (danger range). WEATHER, A2

---

*ONE APPRAISER USED IN DEALS ADMITS POSSIBLY BEING DUPED*

# How could appraisals be so off?

By WILLIAM CONROY, NANCY SHIELDS and JOHN T. WARD • STAFF WRITERS

HOW COULD appraisers justify mortgages on dozens of Asbury Park and Long Branch properties at prices that rocketed up almost overnight?

The answer to that question may be key to understanding a series of transactions involving at least 73 properties, mostly multifamily houses, that began in the two cities in June 1996. Statewide, the number of properties bought and then quickly resold for huge profits by a Shore-based real estate management company may exceed 200.

One appraiser who did some of the Asbury Park house estimates admitted last week he might have been misled into overvaluing them. He said he was "saddened" at the realization that what he thought was a genuine groundswell of interest in revitalizing the troubled city may be something entirely different.

"I'm clean," said Richard Calanni in a 45-minute interview on the street outside his Tinton Falls home. "I don't bend the rules or play games."

The soaring house prices and other details disclosed by a 10-week Asbury Park Press investigation, outlined in articles beginning last Sunday, triggered a probe by Monmouth County Prosecutor John Kaye. He called the resale prices on the homes "at least exaggerated" and "probably fraudulent."

The buyers of the rental properties at these prices could not have received the mortgage loans they got without an appraisal that showed the properties were worth at least the amount lent. In almost all cases, the amount lent was between 70 and 75 percent of the purchase price. That is why the appraisals are a key link in the chain, and why real estate professionals have said one of the biggest mysteries is the question of how appraisals were obtained to justify the loans.

Calanni, one of the appraisers on some of the 60 properties in Asbury



## House of cards

FOLLOWING THE DEAL

Park, said Friday that he performed his job properly, in accordance with accepted procedure.

But Calanni conceded that he could have been fooled into overestimating the value of the properties he appraised because he based his figures on earlier property sales that were — unbeknownst to him — orchestrated by the same companies.

The 60 properties were bought and sold between June 1996 and February. Calanni said he appraised some of the later deals, but he would not give a precise time period. Early in the interview, Calanni defended the values he arrived at for the properties, repeating several times that they were based on "comparable sales" of similar properties in Asbury Park.

But Calanni was shown a chart of all 60 Asbury Park transactions that were reviewed by the Press. He was told that all the properties were bought and sold by Cristo Property Management Ltd., Union Beach, and that Capital Assets Property Management & Investment Co. Inc. got a 60 percent share of each for less than $100.

As he studied the chart, Calanni acknowledged that the comparable sales he had used to arrive at his appraised

Please see Appraiser, page A11

M6, JULY 6, 1991

House of Cards                    FOLLOWING THE DEAL

'I TRULY BELIEVED ... INVESTORS WERE GOING TO REVITALIZE THE TOWN.'

# Appraiser may have been fooled



## More questions about real estate deals




A story of questionable real estate transactions uncovered by the Asbury Park Press is being investigated by law enforcement agencies at the county, state and federal levels. Last Sunday the Press detailed 73 questionable property deals in Asbury Park and Long Branch. During the past week, the Press found records for similar transactions involving properties in four Shore communities. In the table below, the bought for shows the price Cristo paid for the property. Sold for shows the price Cristo received for it. Percentage difference shows the magnitude of Cristo's profit. Mortgage is the amount of loan money received through National Home Funding and other banks.

| Address | Cristo bought for | Cristo sold for | Percentage difference | Mortgage |
|---|---|---|---|---|
| 101 Herbert St., Red Bank | $93,000 | $151,000 | 63.0% | $101,500 |

### DEVELOPMENTS OF THE PAST WEEK

| Address | Cristo bought for | Cristo sold for | Percentage difference | Mortgage |
|---|---|---|---|---|
| 28 Blaine Ave., Seaside Heights | $70,000 | $148,000 | 111.4% | $103,500 |



*□ Staff writer Lawrence Arnold contributed to this story.*

# EXHIBIT C

P. 01

# Facsimile Cover Sheet

**To:** John Oberdorff
**Company:** St John & Wayne
**Phone:** 201 491 3600
**Fax:** 201 491 3407

**From:** Dinah Raven
**Company:** RBMG
**Phone:** 741-3896
**Fax:** 741-3334

**Date:** 11/3/97
**Pages including this cover page:** 3

Attached is the final press release jointly released by RBMG and Walsh to day at 9:07 AM.

Regards,

Dinah


DEFENDANT'S
EXHIBIT
Robert Welsh  29
9/30/11   cm

WSI 0070147

Resource Bancshares Mortgage Group, Inc.
Steven F. Herbert
(803) 741-3539


Distribution Instructions:  US2 and IRW
Circuit:  US2
Time of Release:  November 3, 1997; 9:07 AM


## RESOURCE BANCSHARES MORTGAGE GROUP, INC. AND WALSH SECURITIES JOINTLY REPORT TERMINATION OF MERGER AGREEMENT

COLUMBIA, South Carolina and Parsippany, New Jersey,  November 3, 1997 / PR Newswire / -- Resource Bancshares Mortgage Group, Inc. ("RBMG") (NASDAQ: REMI) and Walsh Securities ("Walsh") announced today that they have mutually agreed to terminate their merger agreement.  On April 18, 1997, RBMG and Walsh entered into a merger agreement pursuant to which RBMG, subject to approval by shareholders of RBMG and satisfaction of other terms and conditions, was to have acquired all of the outstanding shares of Walsh.

"RBMG and Walsh have mutually agreed to terminate the merger agreement," stated Steven F. Herbert, Senior Executive Vice President and Chief Financial Officer of RBMG.  Mr. Herbert further stated, "RBMG remains committed to completing its pending merger with Resource Bancshares Corporation and expects to close the RBC merger in the fourth quarter of 1997."

"At this time, Walsh Securities will pursue its growth plans independently," stated Robert C. Walsh, President and Chief Executive Officer.  "We will continue to focus our growth through opportunities in the sub-prime market."

Walsh Securities is a privately held company that buys, securitizes and sells residential and consumer loans and the servicing rights associated with them.  The company bundles sub-prime mortgages, which subsequently are resold in the financial markets at a profit to large mortgage handlers.

Resource Bancshares Corporation is a financial services company that originates and purchases, sells and services small ticket equipment leases and originates for investors and services commercial mortgages.

WSI 0070148

Resource Bancshares Mortgage Group, Inc., is engaged in the business of mortgage banking, which consists primarily of the origination and purchase (through a nationwide network of correspondents, brokers, and retail offices), sale and servicing of residential, single-family, first-mortgage loans and the purchase and sale of servicing rights associated with such loans.

/CONTACT:   Steven F. Herbert, Resource Bancshares Mortgage Group, Inc. (803) 741-3539 /

WSI 0070149

# EXHIBIT D

Execution Copy

## AGREEMENT OF MERGER

AGREEMENT OF MERGER, dated as of April 18, 1997 (this "<u>Agreement</u>"), among RESOURCE BANCSHARES MORTGAGE GROUP, INC., a Delaware corporation ("<u>RBMG</u>"), CAROLINA MERGER SUB, INC., a Delaware corporation and a wholly owned subsidiary of RBMG ("<u>Merger Sub</u>"), WALSH HOLDING CO., INC., a Delaware corporation ("<u>WSI</u>"), and ROBERT C. WALSH, the principal stockholder of WSI (the "<u>Principal Stockholder</u>").

## W I T N E S S E T H:

WHEREAS, the Boards of Directors of RBMG, Merger Sub and WSI have determined that it is consistent with and in furtherance of their respective long-term business strategies and fair to and in the best interests of their respective companies and stockholders to combine their respective businesses in a merger transaction as set forth in this Agreement (the "<u>Reorganization</u>");

WHEREAS, to induce RBMG to enter into this Agreement, the Principal Stockholder desires to enter into this Agreement for the purposes of making certain representations and warranties to RBMG;

WHEREAS, in furtherance of the Reorganization, the Board of Directors of WSI has adopted this Agreement and the Merger (as hereinafter defined), as contemplated by this Agreement, and has recommended that the holders of Class A Common Stock, par value $.01 per share, of WSI ("<u>WSI Common Stock</u>") vote to adopt this Agreement and the terms of the Merger as contemplated by this Agreement;

WHEREAS, in furtherance of the Reorganization, a special committee of the Board of Directors of RBMG (the "<u>Special Committee</u>") has recommended that this Agreement and the Merger, as contemplated by this Agreement, be approved, and the Board of Directors of RBMG has approved this Agreement and the Merger and has recommended that the holders of common stock, par value $.01 per share, of RBMG ("<u>RBMG Common Stock</u>") vote to adopt this Agreement and the terms of the Merger as contemplated by this Agreement;

WHEREAS, the existing stockholders of WSI (collectively, "<u>WSI Stockholders</u>") and Greenwich Capital Financial Products, Inc., as the holder of a warrant to purchase shares of WSI Class B Common Stock (the "<u>Warrantholder</u>"), have entered into an indemnification agreement (the "<u>Indemnification Agreement</u>"), dated the date hereof, for the purposes of making certain representations and warranties and providing certain indemnification to RBMG;

WS2000002376

WHEREAS, certain of the WSI Stockholders have entered into a proxy agreement (the "Proxy Agreement"), dated the date hereof, pursuant to which such stockholders, among other things, have granted an irrevocable proxy to RBMG to vote certain of the outstanding shares of the WSI Common Stock in favor of the approval of this Agreement and the Merger contemplated hereby, upon the terms and subject to the conditions set forth therein;

WHEREAS, the parties hereto intend that the Merger shall be accounted for as a "pooling of interests" for financial reporting purposes under applicable United States accounting rules and the accounting standards of the United States Securities and Exchange Commission (the "SEC"); and

WHEREAS, for United States federal income tax purposes, it is intended that the Merger qualify as a reorganization under the provisions of Section 368(a) of the United States Internal Revenue Code of 1986, as amended (the "Code"), and the Treasury regulations thereunder (the "Regulations");

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, the parties hereto agree as follows:

## ARTICLE I

## THE MERGER

SECTION 1.01.  Formation of Merger Subsidiary.  RBMG has formed Merger Sub as a wholly owned subsidiary of RBMG.  Merger Sub has been formed solely to facilitate the Merger and shall conduct no business or activity other than in connection with the Merger.

SECTION 1.02.  The Merger.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the Delaware General Corporation Law ("DGCL"), at the Effective Time, Merger Sub shall be merged with and into WSI (the "Merger").  As a result of the Merger, the separate corporate existence of Merger Sub shall cease and WSI shall continue as the surviving corporation of the Merger as a wholly owned subsidiary of RBMG (the "Surviving Corporation").

SECTION 1.03.  Closing.  Unless this Agreement shall have been terminated and the Merger herein contemplated shall have been abandoned pursuant to Section 8.01, subject to the satisfaction or waiver of the conditions set forth in Article VII, the consummation of the Reorganization shall take place as promptly as practicable (and in any event within three business days) after satisfaction or waiver of the conditions set forth in Article VII, including that the transaction be accounted for as a pooling of interests, at the closing (the "Closing") to be held at the

2

offices of King & Spalding, 120 West 45th Street, New York, New York 10036-4003, unless another date, time or place is agreed to by RBMG and WSI.

SECTION 1.04. Effective Time. At the time of the Closing and subject to the satisfaction or, if permissible, waiver of the conditions set forth in Article VII, the parties shall cause the Merger to be consummated by filing a certificate of merger (the "Certificate of Merger") with the Secretary of State of the State of Delaware in such form as required by, and executed in accordance with the relevant provisions of, the DGCL (the date and time of such filing, or such later date or time as set forth therein, being the "Effective Time").

SECTION 1.05. Effect of the Merger. At the Effective Time, the effect of the Merger shall be as provided in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, except as otherwise provided herein, all the property, rights, privileges, powers and franchises of WSI and Merger Sub shall vest in WSI as the Surviving Corporation, and all debts, liabilities and duties of WSI and Merger Sub shall become the debts, liabilities and duties of WSI as the Surviving Corporation. As of the Effective Time, the Surviving Corporation shall be a direct wholly owned subsidiary of RBMG.

SECTION 1.06. Certificate of Incorporation; Bylaws; Directors and Officers of Surviving Corporation. Unless otherwise agreed by RBMG and WSI before the Effective Time, at the Effective Time:

(a)     The Certificate of Incorporation and the Bylaws of WSI, as in effect immediately prior to the Effective Time, shall be the Certificate of Incorporation and the Bylaws of the Surviving Corporation until thereafter amended as provided by Law and such Certificate of Incorporation or Bylaws;

(b)     The officers of WSI immediately prior to the Effective Time shall continue to serve in their respective offices of the Surviving Corporation from and after the Effective Time, in each case until their successors are elected or appointed and qualified or until their resignation or removal. If, at the Effective Time, a vacancy shall exist in any office of the Surviving Corporation, such vacancy may thereafter be filled in the manner provided by Law and the Certificate of Incorporation and Bylaws of the Surviving Corporation; and

(c)     The directors of Merger Sub immediately prior to the Effective Time shall continue to serve as directors of the Surviving Corporation from and after the Effective Time, in each case until their successors are elected or appointed and qualified or until their resignation or removal. If, at the Effective Time, a vacancy shall exist on the Board of Directors of the Surviving Corporation, such vacancy may thereafter be filled in the manner provided by Law and the Certificate of Incorporation and Bylaws of the Surviving Corporation.

SECTION 1.07. Amended Certificate of Incorporation and Amended Bylaws of RBMG. Immediately prior to the Effective Time, RBMG shall cause the Certificate of Incorporation

3

of RBMG to be amended pursuant to amendments substantially in the form attached hereto as Exhibit 1.07 (the "Amended Certificate of Incorporation") and the Bylaws of RBMG to be amended to provide that the corporate headquarters of RBMG shall be located in Columbia, South Carolina. The Amended Certificate of Incorporation of RBMG shall provide, among other things, that (i) the authorized capital stock of RBMG shall consist of 100,000,000 shares of RBMG Common Stock, 12,000,000 shares of Class B Common Stock of RBMG, par value $.01 per share ("RBMG Class B Common Stock"), and 5,000,000 shares of preferred stock, par value $.01 per share ("RBMG Preferred Stock") and (ii) the name of RBMG shall be BCA Financial Corp.

## ARTICLE II

## CONVERSION OF SECURITIES; EXCHANGE OF CERTIFICATES

SECTION 2.01. Conversion of Securities. The manner and basis of converting the securities of WSI and Merger Sub, respectively, at the Effective Time, by virtue of the Merger, shall be as hereinafter set forth in this Article II.

SECTION 2.02. Conversion of Shares. Each share of WSI Common Stock and each share of WSI Class B common stock, par value $.01 per share of WSI (the "WSI Class B Common Stock"), issued and outstanding immediately before the Effective Time (excluding those owned by RBMG or any wholly owned subsidiary of RBMG) and all rights in respect thereof, shall, at the Effective Time, without any action on the part of any holder thereof, forthwith cease to exist and be converted into and become exchangeable for (i) 175, 164.30 shares of RBMG Common Stock (such ratio of the shares of WSI Common Stock and WSI Class B Common Stock to shares of RBMG Common Stock being referred to as the "Exchange Ratio") and (ii) the right (the "Escrow Stock Right" and collectively, the "Escrow Stock Rights") to receive on a deferred basis and pursuant to the terms of the Escrow Trust Agreement (as hereinafter defined) 19,462.70 additional shares of RBMG Common Stock (such ratio of the shares of WSI Common Stock and WSI Class B Common Stock to shares of RBMG Common Stock being referred to as the "Escrow Stock Ratio"). Notwithstanding the immediately preceding sentence, if the acquisition (the "RBC Acquisition") of Resource Bancshares Corporation ("RBC") occurs prior to the Effective Time pursuant to the terms of that certain Agreement of Merger (the "RBC Merger Agreement"), dated as of the date hereof, among RBMG, RBC and RBC Merger Sub, Inc., then the Exchange Ratio shall be 192,460.50 and the Escrow Stock Ratio shall be 21,384.50. Any fractional shares of WSI Common Stock or WSI Class B Common Stock surrendered by a Holder shall be converted into shares of RBMG Common Stock in accordance with the applicable Exchange Ratio and Escrow Stock Ratio set forth above. Commencing immediately after the Effective Time, each certificate which, immediately prior to the Effective Time, represented issued and outstanding shares of WSI Common Stock and WSI Class B Common Stock (collectively, the "Shares"), shall evidence ownership of RBMG Common Stock on the basis hereinbefore set forth, but subject to the limitations set forth in this Article II.

4

WS2000002379

SECTION 2.03.  Cancellation of Treasury Shares.  At the Effective Time, each share of WSI Common Stock owned by WSI or any other wholly owned subsidiary of WSI immediately prior to the Effective Time shall be canceled and retired and no shares of stock or other securities of RBMG or the Surviving Corporation or any other corporation shall be issuable, and no payment or other consideration shall be made, with respect thereto.

SECTION 2.04.  Conversion of Common Stock of Merger Sub into Common Stock of the Surviving Corporation.  At the Effective Time, each share of common stock, par value $.01 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time, and all rights in respect thereof, shall, without any action on the part of RBMG, forthwith cease to exist and be converted into one validly issued, fully paid and nonassessable share of common stock, par value $.01 per share, of the Surviving Corporation (the "New WSI Common Stock").  Immediately after the Effective Time and upon surrender by RBMG of the certificate representing the shares of the common stock of Merger Sub, the Surviving Corporation shall deliver to RBMG an appropriate certificate or certificates representing the New WSI Common Stock created by conversion of the common stock of Merger Sub owned by RBMG.

SECTION 2.05.  Exchange of Shares Other than Treasury Shares.  (a) Subject to Section 2.05(b) and the other terms and conditions hereof, at or prior to the Effective Time, RBMG shall appoint an exchange agent to effect the exchange of Shares for RBMG Common Stock in accordance with the provisions of this Article II (the "Exchange Agent").  From time to time after the Effective Time, RBMG shall deposit, or cause to be deposited, certificates representing RBMG Common Stock for conversion of Shares in accordance with the provisions of Section 2.02 hereof (such certificates, together with any dividends or distributions with respect thereto, being herein referred to as the "Exchange Fund").  Commencing immediately after the Effective Time and until the appointment of the Exchange Agent shall be terminated, each holder of a certificate or certificates theretofore representing Shares may surrender the same to the Exchange Agent, and, after the appointment of the Exchange Agent shall be terminated, any such holder may surrender any such certificate to RBMG.  Such holder shall be entitled upon such surrender to receive in exchange therefor a certificate or certificates representing the number of full shares of RBMG Common Stock (together with the applicable Escrow Stock Rights) into which the Shares theretofore represented by the certificate or certificates so surrendered shall have been converted in accordance with the provisions of Section 2.02 hereof, together with a cash payment in lieu of fractional shares, if any, in accordance with Section 2.07 hereof, and all such shares of RBMG Common Stock shall be deemed to have been issued at the Effective Time.  Until so surrendered and exchanged, each outstanding certificate which, prior to the Effective Time, represented issued and outstanding Shares shall be deemed for all corporate purposes of RBMG, other than the payment of dividends and other distributions, if any, to evidence ownership of the number of full shares of RBMG Common Stock and Escrow Stock Rights into which the Shares theretofore represented thereby shall have been converted at the Effective Time.  Unless and until any such certificate theretofore representing Shares is so surrendered, no dividend or other distribution, if any, payable to the holders of record of RBMG Common Stock as of any date subsequent to the Effective Time shall be paid to the holder of such certificate in respect thereof.  Upon the surrender of any such certificate theretofore representing

5

WS2000002380

Shares, however, the record holder of the certificate or certificates representing shares of RBMG Common Stock issued in exchange therefor shall receive from the Exchange Agent or from RBMG, as the case may be, payment of the amount of dividends and other distributions, if any, which as of any date subsequent to the Effective Time and until such surrender shall have become payable with respect to such number of shares of RBMG Common Stock and Escrow Stock Rights ("Presurrender Dividends"). No interest shall be payable with respect to the payment of Presurrender Dividends upon the surrender of certificates theretofore representing Shares. After the appointment of the Exchange Agent shall have been terminated, such holders of RBMG Common Stock and Escrow Stock Rights which have not received payment of Presurrender Dividends shall look only to RBMG for payment thereof. Notwithstanding the foregoing provisions of this Section 2.05, risk of loss and title to such certificates representing Shares shall pass only upon proper delivery of such certificates to the Exchange Agent, and neither the Exchange Agent nor any party hereto shall be liable to a holder of Shares for any RBMG Common Stock or dividends or distributions thereon delivered to a public official pursuant to any applicable abandoned property, escheat or similar law or to a transferee pursuant to Section 2.06 hereof.

(b)      Prior to the Effective Time, RBMG, the Escrow Agent, the Warrantholder, the "Stockholder Representative" and the "Independent Committee" (as such terms are hereinafter defined) shall enter into an escrow trust agreement substantially in the form as attached hereto as Exhibit 2.05(b) (the "Escrow Trust Agreement") in order to establish an escrow of shares of RBMG Common Stock to be available to satisfy any RBMG Losses (as defined in the Indemnification Agreement) as a result of a breach by WSI of any representation, warranty, covenant or agreement contained herein, as more fully described in the attached form of Escrow Trust Agreement. Approval of this Agreement and the Merger by the WSI Stockholders shall constitute approval of the escrow trust contemplated by the Escrow Trust Agreement and the appointment of the Escrow Agent and the Stockholder Representative. At the Effective Time, RBMG shall deposit with the Escrow Agent that number of whole shares of RBMG Common Stock (rounding up to the nearest whole share) equal to the product obtained by multiplying (i) the applicable Escrow Stock Ratio by (ii) the total number of issued and outstanding shares of WSI Common Stock and WSI Class B Common Stock at the Effective Time. After the Effective Time, RBMG shall deposit with the Escrow Agent such additional shares of RBMG Common Stock as may be required under the circumstances set forth in Section 2(b) of the Escrow Trust Agreement. Such shares of RBMG Common Stock shall be held by the Escrow Agent and distributed to the WSI Stockholders or the Warrantholder, as applicable, or applied to fund any RBMG Losses in accordance with the terms of the Escrow Trust Agreement. For purposes of this Agreement, "Independent Committee" shall mean such persons as determined by the RBMG Board of Directors on or prior to the Closing; "Stockholder Representative" shall mean Robert C. Walsh (or such other person as determined by the WSI Board of Directors on or prior to the Closing); and "Escrow Agent" shall mean a bank which shall be mutually selected by RBMG, the Warrantholder and the Stockholder Representative prior to the Closing.

(c)      Each outstanding share of WSI Common Stock or WSI Class B Common Stock as to which a written notice of election to demand the appraisal of such shares is filed

6

in accordance with Section 262 of the DGCL, at or prior to the Stockholders' Meetings and not withdrawn at or prior to the Stockholders' Meetings and which is not voted in favor of the Merger shall not be converted into or represent a right to receive RBMG Common Stock hereunder unless and until the holder shall have failed to perfect, or shall have effectively withdrawn his or her right to appraisal of or payment of his or her WSI Common Stock or WSI Class B Common Stock under Section 262 of the DGCL, at which time his or her shares shall be converted into RBMG Common Stock as set forth in Section 2.02 in accordance with Section 2.05(a). All such shares of WSI Common Stock or WSI Class B Common Stock as to which such demand for appraisal is so filed and not withdrawn at or prior to the time of such vote and which are not voted in favor of the Merger are herein called "Dissenting Stock". WSI shall give RBMG prompt notice of its receipt of any written demands for appraisal rights or withdrawal of such demands. WSI shall not voluntarily make any payment with respect to any demands for appraisal rights and shall not, except with the prior written consent of RBMG, settle or offer to settle any such demands. Each holder of WSI Common Stock or WSI Class B Common Stock that becomes entitled, pursuant to the provisions of Section 262 of the DGCL, to payment for his or her shares of WSI Common Stock or WSI Class B Common Stock under the provisions of said Section, shall receive payment therefor from RBMG and such shares shall be canceled.

SECTION 2.06. Stock Transfer Books. (a) At the Effective Time, the stock transfer books of WSI with respect to Shares shall be closed, and there shall be no further registration of transfers of Shares thereafter on the records of such stock transfer books. In the event of a transfer of ownership of Shares that is not registered in the stock transfer records of WSI, at the Effective Time, a certificate or certificates representing the number of full shares of RBMG Common Stock (together with the applicable Escrow Stock Rights) into which such Shares shall have been converted shall be issued to the transferee together with a cash payment in lieu of fractional shares, if any, in accordance with Section 2.07 hereof, and a cash payment in the amount of Presurrender Dividends, if any, in accordance with Section 2.05 hereof, if the certificate or certificates representing such Shares is or are surrendered as provided in Section 2.05 hereof, accompanied by all documents required to evidence and effect such transfer and by evidence of payment of any applicable stock transfer tax.

(b) Notwithstanding anything to the contrary herein, certificates surrendered for exchange by any person constituting a Pooling Affiliate of WSI shall not be exchanged until RBMG shall have received from such person an affiliate letter as provided in Section 6.05(a).

SECTION 2.07. No Fractional Share Certificates. (a) No scrip or fractional share certificate for RBMG Common Stock shall be issued upon the surrender for exchange of certificates evidencing Shares, and an outstanding fractional share interest shall not entitle the owner thereof to vote, to receive dividends or to any rights of a stockholder of RBMG or of the Surviving Corporation with respect to such fractional share interest.

7

WS2000002382

(b)     RBMG shall pay to the Exchange Agent an amount in cash sufficient for the Exchange Agent to pay each holder of Shares an amount in cash equal to the product obtained by multiplying (i) the fractional share interest to which such holder would otherwise be entitled (after taking into account all shares of WSI Common Stock and WSI Class B Common Stock, as the case may be, held at the Effective Time by such holder) by (ii) the arithmetic average of the closing prices for a share of RBMG Common Stock on the Nasdaq National Market (the "NMS") for each of the ten trading days immediately prior to the Effective Time.

(c)     As soon as practicable after the determination of the amount of cash, if any, to be paid to holders of Shares with respect to any fractional share interests, the Exchange Agent shall make available such amounts, net of any required withholding, to such holders of WSI Common Stock and WSI Class B Common Stock, subject to and in accordance with the terms of Section 2.05 hereof.

(d)     Any portion of the Exchange Fund which remains undistributed for six months after the Effective Time shall be delivered to RBMG, and any holder of Shares who has not theretofore complied with the provisions of this Article II shall thereafter look only to RBMG for satisfaction of their claims for RBMG Common Stock (together with the applicable Escrow Stock Rights) or any cash in lieu of fractional shares of RBMG Common Stock and any Presurrender Dividends.

SECTION 2.08.  Conversion of Dissenting Stock.  If prior to or after the Effective Time any stockholder of WSI shall fail to perfect, or shall effectively withdraw or lose, his or her right to appraisal of and payment for his or her shares of Dissenting Stock under Section 262 of the DGCL, the Dissenting Stock of such holder shall be treated for purposes of this Article II like any other shares of outstanding WSI Common Stock or WSI Class B Common Stock.

SECTION 2.09.  WSI Warrant.  If, immediately prior to the Effective Time, the WSI Warrant shall remain outstanding, then, to the extent the Warrantholder would otherwise be permitted to purchase shares of WSI Class B Common Stock (the "WSI Warrant Shares") under the WSI Warrant (without regard to the restrictions set forth in Section 3.1 of the WSI Warrant Agreement), RBMG shall issue to the Warrantholder the "RBMG Warrant" (as hereinafter defined), which will provide for the right to acquire such number of shares of RBMG Class B Common Stock (the "RBMG Warrant Shares") as would be equal to the total number of shares of RBMG Common Stock (including, for this purpose, shares of RBMG Common Stock represented by the Escrow Stock Rights) which the Warrantholder would have been entitled to receive as of the Effective Time pursuant to Section 2.02 hereof in exchange for the WSI Warrant Shares (based on the assumption that the WSI Warrant Shares were outstanding immediately prior to the Effective Time).

SECTION 2.10.  Certain Adjustments.  If between the date of this Agreement and the Effective Time, the outstanding shares of RBMG Common Stock, WSI Common Stock or WSI Class B Common Stock shall be changed into a different number of shares by reason of any reclassification, recapitalization, split-up, combination or exchange of shares, or any dividend payable in stock or

8

WS2000002383

other securities shall be declared thereon with a record date within such period, the Exchange Ratio and the Escrow Stock Ratio established pursuant to the provisions of Section 2.02 hereof shall be adjusted accordingly to provide to the holders of RBMG Common Stock, WSI Common Stock and WSI Class B Common Stock the same economic effect as contemplated by this Agreement prior to such reclassification, recapitalization, split-up, combination, exchange or dividend.

SECTION 2.11.  Transmittal Procedures.  As soon as reasonably practicable after the Effective Time, RBMG will instruct the Exchange Agent to mail appropriate and customary transmittal materials (which shall specify that delivery shall be effected, and risk of loss and title to the certificates theretofore representing Shares shall pass, only upon proper delivery of such certificates to the Exchange Agent) to each holder of record of Shares.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF WSI
## AND THE PRINCIPAL STOCKHOLDER

WSI and the Principal Stockholder hereby, jointly and severally, represent and warrant to RBMG that:

SECTION 3.01.  Organization and Qualification; Subsidiaries.  Each of WSI and each Subsidiary of WSI (the "WSI Subsidiaries") has been duly organized and is validly existing and in good standing (to the extent applicable) under the laws of the jurisdiction of its incorporation or organization, as the case may be, and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.  Each of WSI and each WSI Subsidiary is duly qualified or licensed to do business, and is in good standing (to the extent applicable), in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except for such failures to be so qualified or licensed and in good standing that would not, individually or in the aggregate, have a WSI Material Adverse Effect.  For purposes of this Agreement, "WSI Material Adverse Effect" means any change in or effect on the business of WSI and the WSI Subsidiaries that is, or is reasonably likely to be, materially adverse to the business, assets (including intangible assets), liabilities (contingent or otherwise), condition (financial or otherwise) or results of operations of WSI and the WSI Subsidiaries taken as a whole.

SECTION 3.02.  Certificate of Incorporation and Bylaws.  The copies of WSI's and each WSI Subsidiary's Certificate of Incorporation and Bylaws that are attached to Section 3.02 of the Disclosure Schedule delivered to RBMG prior to the execution of (and forming part of) this Agreement (the "WSI Disclosure Schedule"), are complete and correct copies thereof.  Each such Certificate of Incorporation and Bylaws are in full force and effect.  Neither WSI nor any WSI Subsidiary is in violation of any of the provisions of their respective Certificate of Incorporation or Bylaws.

9

WS2000002384

SECTION 3.03. Capitalization. The authorized capital stock of WSI consists of 1,250 shares of WSI Common Stock and 1,250 shares of WSI Class B Common Stock. As of the date hereof, (i) 75 shares of WSI Common Stock were issued and outstanding, all of which were validly issued, fully paid and nonassessable, (ii) 24.99 shares of WSI Common Stock and WSI Class B Common Stock are reserved for issuance pursuant to an outstanding warrant, (iii) no shares of WSI Class B Common Stock were issued and outstanding, and (iv) no shares of WSI Common Stock or WSI Class B Common Stock were held in the treasury of WSI or by the WSI Subsidiaries. Each of the WSI Stockholders owns, of record, the number of shares of WSI Common Stock set forth in Section 3.03 of the WSI Disclosure Schedule. Section 3.03 of the WSI Disclosure Schedule also sets forth all options, warrants or other rights, agreements, arrangements or commitments entitling any WSI Stockholder to acquire any shares of WSI capital stock. Except as described in Section 3.03 of the WSI Disclosure Schedule, there are no options, warrants or other rights, agreements, arrangements or commitments of any character to which WSI or any WSI Subsidiary is a party or by which WSI or any WSI Subsidiary is bound relating to the issued or unissued capital stock of WSI or any WSI Subsidiary or obligating WSI or any WSI Subsidiary to issue or sell any shares of capital stock of, or other equity interests in, WSI or any WSI Subsidiary, and no shares of capital stock of WSI are reserved for issuance or sale. Except as set forth in Section 3.03 of the WSI Disclosure Schedule, there are no outstanding contractual obligations of WSI or any WSI Subsidiary to repurchase, redeem or otherwise acquire any shares of WSI Common Stock or any capital stock of any WSI Subsidiary. Except as disclosed in Section 3.03 of the WSI Disclosure Schedule, each outstanding share of capital stock of each WSI Subsidiary is duly authorized, validly issued, fully paid and nonassessable and owned of record and beneficially by WSI free and clear of all security interests, liens, claims, pledges, options, rights of first refusal, agreements, limitations on WSI's or such other WSI Subsidiary's voting rights, charges and other encumbrances of any nature whatsoever. Except as set forth in Section 3.03 of the WSI Disclosure Schedule, there are no outstanding contractual obligations of WSI or any WSI Subsidiary requiring it to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise), in, any WSI Subsidiary or any other person.

SECTION 3.04. Authority Relative to this Agreement. WSI has all necessary corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the Merger (other than the approval of this Agreement and the Merger contemplated hereby by the holders of a majority of the outstanding shares of WSI Common Stock entitled to vote with respect thereto at the WSI Stockholders' Meeting (the "WSI Stockholder Vote") and the filing and recordation of the Certificate of Merger as required by the DGCL). The execution and delivery of this Agreement by WSI and the consummation by WSI of the Merger contemplated hereby have been duly and validly authorized by all necessary corporate action, and no other corporate proceedings on the part of WSI are necessary to authorize this Agreement or to consummate the Merger (other than the WSI Stockholder Vote and the filing and recordation of the Certificate of Merger as required by the DGCL). The board of directors of WSI has approved the execution, delivery and performance of this Agreement and the Merger and other transactions provided for herein in accordance with the requirements of the DGCL. This Agreement has been duly executed and delivered by WSI and the Principal Stockholder and, assuming the due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of

10

WSI and the Principal Stockholder, enforceable against WSI and the Principal Stockholder in accordance with its terms.

SECTION 3.05. No Conflict; Required Filings and Consents. (a) The execution and delivery of this Agreement by WSI and the Principal Stockholder do not, and the performance by WSI and the Principal Stockholder of their respective obligations hereunder and the consummation of the Merger will not, (i) conflict with or violate any provision of the Certificate of Incorporation or Bylaws of WSI or any equivalent organizational documents of any WSI Subsidiary, (ii) assuming that all consents, approvals, authorizations and permits described in Section 3.05(b) have been obtained and all filings and notifications described in Section 3.05(b) have been made, conflict with or violate any Law applicable to WSI, any WSI Subsidiary or the Principal Stockholder or by which any property or asset of WSI, any WSI Subsidiary or the Principal Stockholder is bound or affected or (iii) except as set forth in Section 3.05(a) of the WSI Disclosure Schedule, result in any breach of or constitute a default (or an event which with the giving of notice or lapse of time or both would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or other encumbrance on any property or asset of WSI, any WSI Subsidiary or the Principal Stockholder pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which would either, individually or in the aggregate, (A) have a WSI Material Adverse Effect nor (B) prevent or materially delay the performance by WSI of its obligations pursuant to this Agreement or the consummation of the Merger. As used in this Agreement, "Law" means any federal, state or local statute, law, ordinance, regulation, rule, code, order, other requirement or rule of law of the United States or any other jurisdiction, including, without limitation, the Federal Truth in Lending Act, the Real Estate Settlement Procedures Act, the Equal Credit Opportunity Act, the Home Mortgage Disclosure Act, the Fair Credit Reporting Act, the Fair Housing Act, and any other similar act or law.

(b)     The execution and delivery of this Agreement do not, and the performance by WSI and the Principal Stockholder of their respective obligations hereunder or the consummation of the Merger will not, require any consent, approval, authorization or permit of, or filing by WSI, any WSI Subsidiary or the Principal Stockholder with, or notification by WSI, any WSI Subsidiary or the Principal Stockholder to, any United States federal, state or local or any foreign governmental, regulatory or administrative authority, agent or commission or any court, tribunal or arbitral body (a "Governmental Entity"), except (i) the premerger notification requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder (the "HSR Act"), the filing and recordation of the Certificate of Merger as required by the DGCL, and as set forth in Section 3.05(b) of the WSI Disclosure Schedule and (ii) where failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not (A) prevent or materially delay the performance by WSI of its obligations pursuant to this Agreement or the consummation of the Merger or (B) individually or in the aggregate, have a WSI Material Adverse Effect.

11

WS2000002386

SECTION 3.06.   Permits; Compliance with Laws.   Each of WSI and the WSI Subsidiaries is in possession of all franchises, grants, authorizations, licenses, establishment registrations, permits, easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Entity, necessary for WSI or any WSI Subsidiary to own, lease and operate its properties and to purchase, originate and sell non-conforming mortgage loans secured by residential properties or otherwise to carry on its business as it is now being conducted (the "WSI Permits"), except where the failure to have any WSI Permits would not, individually or in the aggregate, have a WSI Material Adverse Effect, and, as of the date of this Agreement, no suspension or cancellation of any of the WSI Permits is pending or, to the knowledge of WSI, threatened. Neither WSI nor any WSI Subsidiary is in conflict with, or in default or violation of, (i) any Law applicable to WSI or any WSI Subsidiary or by which any property or asset of WSI or any WSI Subsidiary is bound or affected or (ii) any WSI Permits, except in the case of clauses (i) and (ii) for any such conflicts, defaults or violations that would not, individually or in the aggregate, have an  WSI Material Adverse Effect.

SECTION 3.07.   Financial Statements.

(a)   (i)   The financial statements (including, in each case, any notes thereto) of the predecessors to each of the WSI Subsidiaries for the period from the date of inception (June 14, 1993) through December 31, 1994, for the year ended December 31, 1995 and for the three months ended March 31, 1996, and (ii) the audited consolidated financial statements (including, in each case, any notes thereto) of WSI for the period from the date of inception (April 1, 1996) through December 31, 1996 (including statements of income, stockholders' equity and cash flows and balance sheets as of April 1, 1996 and December 31, 1996), each as contained in Section 3.07 of the WSI Disclosure Schedule, were prepared from, and are in accordance with, the books and records of WSI, which books and records are maintained in accordance with United States generally accepted accounting principles ("U.S. GAAP") applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto).  The financial statements contained in Section 3.07 of the WSI Disclosure Schedule each present fairly, in all material respects, the consolidated financial position of WSI and the consolidated WSI Subsidiaries, or their predecessors, as appropriate, as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein (subject, in the case of unaudited statements to normal and recurring year end adjustments).  The audited consolidated balance sheet of WSI as of December 31, 1996 which is contained in Section 3.07 of the WSI Disclosure Schedule is hereinafter referred to as the "1996 Balance Sheet."

(b)   Except as and to the extent set forth or reserved against on the 1996 Balance Sheet, none of WSI or any WSI Subsidiary has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), except for liabilities or obligations incurred in the ordinary course of business since January 1, 1997 that would not, individually or in the aggregate, have a WSI Material Adverse Effect.

(c)   The mortgage loans (the "Mortgage Loans") set forth in Section 3.07(c) of the WSI Disclosure Schedule have an aggregate value as of the date hereof of at least

12

$33,230,921, which equals the value of the Mortgage Loans as reflected on the 1996 Balance Sheet ($37,105,715) less the reserve with respect to such loans reflected on the 1996 Balance Sheet ($3,874,795).

SECTION 3.08. <u>Absence of Certain Changes or Events</u>. (a) Since January 1, 1997, except as set forth in Section 3.08 of the WSI Disclosure Schedule, WSI and the WSI Subsidiaries have conducted their businesses only in the ordinary course and in a manner consistent with past practice and, since such date, there has not been (i) any WSI Material Adverse Effect , (ii) any event that could reasonably be expected to prevent or materially delay the performance of its obligations pursuant to this Agreement and the consummation of the Merger by WSI, (iii) any change by WSI in its accounting methods, principles or practices, (iv) any declaration, setting aside or payment of any dividend or distribution in respect of the shares of WSI Common Stock or WSI Class B Common Stock or any redemption, purchase or other acquisition of any of WSI's securities or (v) any increase in the compensation or benefits or establishment of any bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing, stock option (including, without limitation, the granting of stock options, stock appreciation rights, performance awards or restricted stock awards), stock purchase or other employee benefit plan, or any other increase in the compensation payable or to become payable to any executive officers of WSI or any WSI Subsidiary except in the ordinary course of business consistent with past practice.

(b) Except as set forth in Section 3.08 of the WSI Disclosure Schedule, and except as to events, developments or conditions that have not had and are not reasonably likely to have a WSI Material Adverse Effect, since January 1, 1997, there have not been with respect to WSI (i) any extraordinary losses suffered or any damage, destruction, loss or casualty to property or assets of WSI with an aggregate value of more than $200,000, whether or not covered by insurance, (ii) any assets mortgaged, pledged or made subject to any lien, charge or other encumbrance, (iii) any liability or obligation (absolute, accrued or contingent) incurred except in the ordinary course of business, (iv) any claims, liabilities or obligations (absolute, accrued or contingent) paid, discharged or satisfied, other than the payment, discharge or satisfaction in the ordinary course of business consistent with past practice of claims, liabilities and obligations reflected or reserved against in the 1996 Balance Sheet or incurred in the ordinary course of business consistent with past practice since January 1, 1997, (v) any guaranteed checks, notes or accounts receivable which have been written off as uncollectible, except write-offs in the ordinary course of business consistent with past practice, (vi) any write-down of the value of any asset or investment on the books or records of WSI, except for depreciation and amortization taken in the ordinary course of business consistent with past practice, (vii) any cancellation of any debts or waiver of any claims or rights of substantial value, or sale, transfer or other disposition of any properties or assets (real, personal or mixed, tangible or intangible) of substantial value, except, in each such case, in transactions in the ordinary course of business consistent with past practice and which in any event do not exceed $50,000 in the aggregate, (viii) any single capital expenditure or commitment in excess of $200,000 for additions to property or equipment or aggregate capital expenditures and commitments in excess of $200,000 for additions for property or equipment, (ix) any increase of any reserves for contingent liabilities (excluding any adjustment to bad debt reserves in the ordinary course of business consistent with past practice), (x)

13

WS2000002388

any transactions entered into other than in the ordinary course of business, (xi) any agreements to do any of the foregoing or (xii) any other events, developments or conditions of any character that have had or are reasonably likely to have a material adverse effect on the assets, liabilities, results of operations, financial conditions or business of WSI.

SECTION 3.09.  Employee Benefit Plans; Labor Matters.  (a)  With respect to each employee benefit plan, program, arrangement and contract (including, without limitation, any "employee benefit plan", as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) maintained or contributed to by WSI or any WSI Subsidiary, or with respect to which WSI or any WSI Subsidiary could incur liability under Section 4069, 4212(c) or 4204 of ERISA (the "WSI Benefit Plans"), WSI has delivered or made available to RBMG a true and correct copy of (i) such WSI Benefit Plan and the most recent summary plan description related to each WSI Benefit Plan for which a summary plan description is required, (ii) each trust agreement or other funding arrangement relating to such WSI Benefit Plan, (iii) the most recent annual report (Form 5500) filed with the Internal Revenue Service (the "IRS"), (iv) the most recent actuarial report or financial statement relating to a WSI Benefit Plan and (v) the most recent determination letter issued by the IRS with respect to each WSI Benefit Plan qualified under Section 401(a) of the Code.

(b)     Each WSI Benefit Plan has been administered in all material respects in accordance with its terms and all contributions required to be made under the terms of any of the WSI Benefit Plans as of the date of this Agreement have been timely made or have been reflected on the 1996 Balance Sheet.  Except as set forth in Section 3.09(b) of the WSI Disclosure Schedule, with respect to the WSI Benefit Plans, no event has occurred and, to the knowledge of WSI, there exists no condition or set of circumstances in connection with which WSI or any WSI Subsidiary could be subject to any liability under the terms of such WSI Benefit Plans, ERISA, the Code or any other applicable Law which would individually or in the aggregate have a WSI Material Adverse Effect.

(c)     Except as set forth in Section 3.09(c) of the WSI Disclosure Schedule, neither WSI nor any WSI Subsidiary is a party to any collective bargaining or other labor union contract applicable to persons employed by WSI or any WSI Subsidiary and no collective bargaining agreement is being negotiated by WSI or any WSI Subsidiary.  As of the date of this Agreement, there is no labor dispute, strike or work stoppage against WSI or any WSI Subsidiary pending or, to the knowledge of WSI, threatened which may interfere with the respective business activities of WSI or any WSI Subsidiary, except where such dispute, strike or work stoppage would not have a WSI Material Adverse Effect.  As of the date of this Agreement, to the knowledge of WSI, none of WSI, any WSI Subsidiary, or any of their respective representatives or employees has committed any unfair labor practice in connection with the operation of the respective businesses of WSI or any WSI Subsidiary, and there is no charge or complaint against WSI or any WSI Subsidiary by the National Labor Relations Board or any comparable governmental agency pending or threatened in writing, except where such unfair labor practice, charge or complaint would not have a WSI Material Adverse Effect.

14

WS2000002389

(d)    WSI has delivered to RBMG true and complete copies of (i) all employment agreements with officers of WSI and each WSI Subsidiary, (ii) all severance plans, agreements, programs and policies of WSI and each WSI Subsidiary with or relating to their respective employees, and (iii) all plans, programs, agreements and other arrangements of WSI and each WSI Subsidiary with or relating to their respective employees which contain "change of control" provisions.

(e)    Except as provided in Section 3.09(e) of the WSI Disclosure Schedule or as otherwise required by Law, no WSI Benefit Plan provides retiree medical or retiree life insurance benefits to any person.

SECTION 3.10.  Accounting and Tax Matters.  (a) Neither WSI nor any of its affiliates has taken or agreed to take any action (other than actions contemplated by this Agreement) that would prevent the Merger from qualifying for "pooling of interests" accounting treatment under applicable U.S. GAAP, including, without limitation, applicable SEC accounting standards, or would prevent the Merger from constituting a transaction qualifying under Section 368(a) of the Code.  WSI is not aware of any agreement, plan or other circumstance that would prevent the Merger from so qualifying under Section 368(a) of the Code.

(b)    The representations and warranties made in WSI's letter of compliance with pooling of interests criteria relating to the Merger and addressed to KPMG Peat Marwick LLP ("KPMG") will be true and correct as of the date of such letter.

SECTION 3.11.  Material Contracts.  Section 3.11 of the WSI Disclosure Schedule contains a true and complete list of the following (hereinafter referred to as the "WSI Material Contracts"):

(a)    All bonds, debentures, notes, mortgages, indentures or guarantees to which WSI or any WSI Subsidiary is a party or by which any of their respective assets is bound;

(b)    All loans and credit commitments to WSI or any WSI Subsidiary which are outstanding, together with a brief description of such commitments and the name of each financial institution granting the same;

(c)    All contracts or agreements which limit or restrict WSI, any WSI Subsidiary or any of their respective affiliates from engaging in any business in any jurisdiction or that limit any third party from engaging in competition with WSI or any WSI Subsidiary;

(d)    All contracts and commitments (other than those described in subparagraphs (a), (b), or (c) of this Section 3.11) which relate to the business of WSI or any WSI Subsidiary or by which any of their respective assets may be bound

15

WS2000002390

involving an annual commitment or annual payment by any party thereto of more than $200,000 individually; and

(e)     All contracts, agreements, arrangements or understandings between WSI or any WSI Subsidiary and any stockholder, officer or director of WSI or any WSI Subsidiary, or any person with whom any such stockholder, officer or director has any direct or indirect relation by blood, marriage or adoption, or any entity in which any such person owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the NMS and less than 5% of the stock of which is beneficially owned by all such persons).

True and complete copies of all WSI Material Contracts, including all amendments thereto, have been made available to RBMG. The WSI Material Contracts are valid and enforceable in accordance with their respective terms with respect to WSI or the WSI Subsidiary which is a party thereto, and, to the knowledge of WSI, are valid and enforceable in accordance with their respective terms with respect to each other party thereto. There is not under any of the WSI Material Contracts any existing breach, default or event of default by WSI or any WSI Subsidiary or event that with notice or lapse of time or both would constitute a breach, default or event of default by WSI or any WSI Subsidiary, nor does WSI know of, and neither of WSI nor any WSI Subsidiary has received notice of, or made a claim with respect to, any breach or default by any other party thereto.

SECTION 3.12. Litigation. (a) Except as disclosed in Section 3.12(a) of the WSI Disclosure Schedule, there are no suits, claims, actions, investigations, inquiries or proceedings of any nature by any person that are pending or, to WSI's knowledge, threatened (i) against or otherwise involving, directly or indirectly, WSI or any of the WSI Subsidiaries, or any of their respective properties (including, without limitation, any such matter with respect to Taxes), or (ii) against or otherwise involving, directly or indirectly, any officer, director, employee, stockholder or agent of WSI or any WSI Subsidiary, including, without limitation, any derivative actions that have been requested, that, with respect to either of (i) or (ii) above, if finally determined adversely, individually or in the aggregate, is reasonably likely to have a WSI Material Adverse Effect.

(b)     Except as disclosed in Section 3.12(b) of the WSI Disclosure Schedule, there is no suit, claim, action, proceeding or investigation pending or, to the knowledge of WSI, threatened against WSI or any WSI Subsidiary before any Governmental Entity that, individually or in the aggregate, is reasonably likely to have a WSI Material Adverse Effect and to the knowledge of WSI, there are no existing facts or circumstances that would be reasonably likely to result in a suit, claim, action, proceeding or investigation that, individually or in the aggregate, is reasonably likely to have a WSI Material Adverse Effect. Except as disclosed in Section 3.12(b) of the WSI Disclosure Schedule, neither WSI nor any WSI Subsidiary is subject to any outstanding order, writ, injunction or decree which, insofar as can be reasonably foreseen, individually or in the aggregate, would have a WSI Material Adverse Effect.

16

WS2000002391

SECTION 3.13. Environmental Matters. Except as disclosed in Section 3.13 of the WSI Disclosure Schedule or as would not, individually or in the aggregate, have a WSI Material Adverse Effect:

(i)     WSI and the WSI Subsidiaries (i) are in compliance with all applicable Environmental Laws, (ii) hold all required Environmental Permits and (iii) are in compliance with their respective Environmental Permits. All past noncompliance with Environmental Laws or Environmental Permits has been resolved without any pending, ongoing or future obligation, cost or liability, and there is no requirement proposed for adoption or implementation under any Environmental Law or Environmental Permit that is reasonably expected to have a WSI Material Adverse Effect.

(ii)     There is no claim, litigation or proceeding pending or threatened pursuant to an Environmental Law against WSI, any WSI Subsidiary, or any real property currently or, to the knowledge of WSI and the WSI Subsidiaries, formerly owned, leased or occupied by WSI or any WSI Subsidiary, and there are no circumstances that can reasonably be expected to form the basis of any such claim, including without limitation with respect to any off-site disposal location presently or formerly used by WSI or any WSI Subsidiary.

(iii)     None of the real property currently or, to the knowledge of WSI and the WSI Subsidiaries, formerly owned, leased or occupied by WSI or any WSI Subsidiary is listed or, to the knowledge of WSI and the WSI Subsidiaries, proposed for listing on the "National Priorities List" under CERCLA, as updated through the date hereof, the "Comprehensive Environmental Response, Compensation, and Liability Information System," or any similar list of sites in the United States or any other jurisdiction requiring investigation or cleanup of Hazardous Materials.

For purposes of this Agreement:

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended as of the date hereof.

"Environmental Law" means any federal, state or local statute, law, ordinance, regulation, rule, code or order of the United States or any other jurisdiction and any enforceable judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to pollution or protection of the environment or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials, as in effect as of the date of this Agreement.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under or issued pursuant to any applicable Environmental Law.

"Hazardous Material" means (a) any petroleum, petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials or polychlorinated biphenyls

17

WS2000002392

or (b) any chemical, material or substance defined or regulated as toxic or hazardous or as a pollutant or contaminant or waste under any applicable Environmental Law.

SECTION 3.14.  Intellectual Property.  Except as set forth in Section 3.14 of the WSI Disclosure Schedule, or as would not, individually or in the aggregate, have a WSI Material Adverse Effect, WSI and the WSI Subsidiaries own or possess adequate licenses or other valid rights to use all patents, patent rights, trademarks rights, trade names, trade dress, trade name rights, copyrights, service marks, trade secrets, applications for trademarks and for service marks, know-how and other proprietary rights and information used or held for use in connection with the respective businesses of WSI and the WSI Subsidiaries as currently conducted, and WSI is unaware of any assertion or claim challenging the validity of any of the foregoing.  Except as set forth in Section 3.14 of the WSI Disclosure Schedule, the conduct of the respective businesses of WSI and the WSI Subsidiaries as currently conducted does not conflict in any way with any patent right, license, trademark, trademark right, trade dress, trade name, trade name right, service mark or copyright of any third party that, individually or in the aggregate, would have a WSI Material Adverse Effect.  To the knowledge of WSI, there are no infringements of any proprietary rights owned by or licensed by or to WSI or any WSI Subsidiary that, individually or in the aggregate, would have a WSI Material Adverse Effect.

SECTION 3.15.  Taxes.  Except as set forth in Section 3.15 of the WSI Disclosure Schedule, (a) WSI and each of the WSI Subsidiaries have timely filed or shall timely file all returns and reports required to be filed by them with any taxing authority with respect to Taxes for any period ending on or before the Effective Time, taking into account any extension of time to file granted to or obtained on behalf of WSI and the WSI Subsidiaries, (b) all Taxes shown to be payable on such returns or reports that are due prior to the Effective Time have been paid or shall be paid, (c) as of the date hereof, no deficiency for any amount of Tax has been asserted or assessed by a taxing authority against WSI or any of the WSI Subsidiaries and (d) WSI and each of the WSI Subsidiaries have provided adequate reserves in the 1996 Balance Sheet for any Taxes that have not been paid, whether or not shown as being due on any returns.  As used in this Agreement, "Taxes" shall mean any and all taxes, fees, levies, duties, tariffs, imposts and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any government or taxing authority, including, without limitation, taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value-added or gains taxes; and license, registration and documentation fees.

SECTION 3.16.  Pooling Affiliates.  Section 3.16 of the WSI Disclosure Schedule sets forth the names and addresses of those persons who are, in WSI's reasonable judgment, "affiliates" within the meaning of Rule 145 of the rules and regulations promulgated under the Securities Act of 1933, as amended (together with the rules and regulations promulgated thereunder, the "Securities Act") or applicable SEC Accounting Releases with respect to pooling-of-interests accounting treatment (each such person, a "Pooling Affiliate") of WSI.

WS2000002393

SECTION 3.17. Real Property. Section 3.17(a)(i) of the WSI Disclosure Schedule lists all Leased Real Property of WSI. Each of the Leases is in full force and effect and conveys to WSI a valid and subsisting leasehold estate. The Leased Real Property is not subject to any liens, security interests or other encumbrances except (i) as disclosed in Section 3.17(a)(ii) of the WSI Disclosure Schedule and (ii) Permitted Encumbrances. Except for real property owned by WSI as a result of foreclosure proceedings relating to loans reflected on its 1996 Balance Sheet and as more particularly described in Section 3.17(a)(iii) of the WSI Disclosure Schedule, WSI owns no real property.

SECTION 3.18. Brokers. No broker, finder or investment banker (other than National Westminster Bank Plc ("NatWest") and Donaldson Lufkin & Jenrette Securities Corporation ("DLJ")) is entitled to any brokerage, finder's or other fee or commission in connection with the Merger based upon arrangements made by or on behalf of WSI. WSI has heretofore made available to RBMG complete and correct copies of all agreements among WSI, NatWest and DLJ pursuant to which such firm would be entitled to any payment relating to the Merger.

SECTION 3.19. Insurance. All of the policies relating to insurance maintained by WSI or any WSI Subsidiary with respect to its property and the conduct of its business (or any comparable policies entered into as a replacement therefor) are in full force and effect and neither WSI nor any Subsidiary has received any notice of cancellation with respect thereto and such policies are adequate to insure the property of WSI and the WSI Subsidiaries and to meet the requirements for the conduct of their respective businesses.

SECTION 3.20. Mortgage Banking Licenses and Qualifications. (a) Except as set forth on Section 3.20 to the WSI Disclosure Schedule, WSI (or an affiliate of WSI performing the origination or servicing of mortgages, as the case may be) (i) has all certifications, authorizations, licenses, permits and other approvals necessary to conduct its current mortgage banking business and (ii) is in good standing under all applicable federal, state and local laws and regulations thereunder as a mortgage lender, except where the failure to have such certifications, authorizations, licenses, permits or approvals or to be in good standing would not individually or in the aggregate have a WSI Material Adverse Effect.

(b)     Neither WSI nor any WSI Subsidiary is a party to any mandatory or optional forward delivery requirement relating to mortgage loans.

SECTION 3.21. Loan Portfolio. (a) Except as set forth in Section 3.21 of the WSI Disclosure Schedule, all mortgage loans held for WSI's or any WSI Subsidiary's account ("WSI Mortgage Loans"), are owned by WSI, free and clear of any Encumbrances other than Encumbrances in favor of WSI's lender banks pursuant to warehouse lines of credit and other financing facilities. The mortgage or deed of trust securing each such WSI Mortgage Loan or an assignment thereof has been duly recorded or submitted for recordation in due course in the appropriate filing office in the name of WSI as mortgagee, except where the failure to so record would not have a WSI Material Adverse Effect. WSI has not released any security for any WSI Mortgage Loan except upon receipt

19

WS2000002394

of reasonable consideration for such release, or accepted prepayment of any such WSI Mortgage Loan which has not been promptly applied to such WSI Mortgage Loan except where the failure to receive such reasonable consideration or to so apply such prepayment would not have a WSI Material Adverse Effect.

(b)     Except as set forth in Section 3.21 of the WSI Disclosure Schedule, all documentation prepared in connection with WSI Mortgage Loans and other mortgage loans WSI has committed to fund have been prepared, in all material respects, in accordance with applicable laws and regulations.

SECTION 3.22.   Loan Files.  (a) Except as set forth in Section 3.22 of the WSI Disclosure Schedule, the loan documents and loan files maintained by WSI or any WSI Subsidiary or any custodian or servicer with respect to the WSI Mortgage Loans (i) contain originals (or where permitted by the terms of the applicable Mortgage Servicing Agreement, contain true and, in all material respects, correct copies) of the documents relating to each Mortgage Loan, and (ii) are being maintained, in all material respects, in compliance with applicable laws and regulations, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws and, to the extent applicable, the requirements of the investor acquiring such Mortgage Loan and the requirements of the governmental or private insurer insuring such Mortgage Loan, if any, in effect at the time such insurance was obtained.

(b)     The terms of the mortgage note, bond, deed of trust or mortgage relating to any WSI Mortgage Loan have not been impaired, waived, altered or modified in any respect from the date of their origination except by a written instrument that has been duly recorded or submitted for recordation in due course, if recordation is necessary to protect the interests of the owner thereof, the terms of which have been approved, to the extent required, by the relevant investor and insurer (if any) and title insurer (to the extent required by the relevant policy) and are reflected in the loan documents included in the applicable loan files. Except as reflected in the loan documents maintained in the applicable loan files, no mortgagor has been released from its obligations under the applicable WSI Mortgage Loan.

SECTION 3.23.   Mortgage Servicing Agreements.  WSI has previously made available to RBMG true and complete copies of all mortgage servicing agreements to which WSI or any WSI Subsidiary is a party (the "Mortgage Servicing Agreements"). Except as set forth in Section 3.23 to the WSI Disclosure Schedule, all the Mortgage Servicing Agreements are (a) valid and binding obligations of WSI or a WSI Subsidiary and, to the knowledge of WSI, of all the other parties thereto, and (b) in full force and effect and are enforceable in accordance with their respective terms. Except as disclosed on Schedule 3.23 the of WSI Disclosure Schedule, there is no default which individually or in the aggregate would have a WSI Material Adverse Effect or, to the knowledge of WSI, claim of default by any party under any such Mortgage Servicing Agreements and, to the knowledge of WSI, no event has occurred which with the passage of time or the giving of notice or both would constitute an event of default by any party under any such Mortgage Servicing Agreements. There is no pending or, to the knowledge of WSI, threatened cancellation of any

20

WS2000002395

Mortgage Servicing Agreement and all Mortgage Servicing Agreements are being performed in accordance with all applicable rules and regulations, except where the failure to be so performed would not, individually or in the aggregate, have a WSI Material Adverse Effect. Except as set forth in Section 3.23 of the WSI Disclosure Schedule, neither WSI nor any WSI Subsidiary is a servicer or subservicer with respect to any mortgage loan for its own account or for others and has no liability, direct, indirect or contingent, related to the servicing of any mortgage loan in any securitization.

SECTION 3.24.  No Indemnification or Reimbursement Requests.  Except as set forth in Section 3.24 of the WSI Disclosure Schedule, neither WSI nor any WSI Subsidiary is subject to any outstanding repurchase, indemnification or reimbursement requests made pursuant to the provisions of any mortgage servicing rights purchase and sale agreements or mortgage loan purchase and sale agreements pursuant to which WSI or any WSI Subsidiary shall have conveyed any mortgage loans ("WSI Sold Loans"), except where such repurchase, indemnification or reimbursement requests pursuant to such agreements would not have a WSI Material Adverse Effect.

SECTION 3.25.  Custodial Accounts.  Unless otherwise prohibited by law or an executed escrow waiver, servicers for WSI and each WSI Subsidiary collect all escrows related to the WSI Mortgage Loans.  Except as set forth in Section 3.25 of the WSI Disclosure Schedule, all escrow accounts have been maintained by servicers for WSI and each WSI Subsidiary and, to the knowledge of WSI, all prior servicers, in accordance in all material respects, with all applicable laws, rules, regulations and requirements.  Servicers for WSI or a WSI Subsidiary, as the case may be, have credited to the account for mortgagors all interest required to be paid on any escrow account in accordance with applicable laws, rules, regulations and requirements.  All escrow, custodial and suspense accounts related to the WSI Mortgage Loans are held by servicers for WSI and a WSI Subsidiary.

SECTION 3.26.  Servicing Sales and Mergers.  Except as set forth in Section 3.26 of the WSI Disclosure Schedule, neither WSI nor any WSI Subsidiary is a party to any contract or agreement (a) to acquire servicing rights in a "bulk" transaction or (b) to sell servicing rights in a "bulk" transaction or on a flow basis.  Except as set forth in Section 3.26 of the WSI Disclosure Schedule, since December 31, 1996, neither WSI nor any WSI Subsidiary has sold any servicing rights.

SECTION 3.27.  Advances.  Except as set forth in Section 3.27 of the WSI Disclosure Schedule, there are no pooling, participation, servicing or other agreements to which WSI or any WSI Subsidiary is a party which obligate WSI or any WSI Subsidiary to make servicing advances for principal and interest payments with respect to defaulted or delinquent mortgage loans.

SECTION 3.28.  Single Family Loans.  Except as set forth in Section 3.28 of the WSI Disclosure Schedule, all the WSI Mortgage Loans are valid and existing and are secured by single family (i.e., one to four family) residential real property.  Except as set forth in Section 3.28 of the WSI Disclosure Schedule, to the extent that a WSI Mortgage Loan is secured by property other than a single family residential property, such WSI Mortgage Loan is not pledged under WSI's or a WSI

WS2000002396

Subsidiary's warehouse lines of credit except as permitted thereby, and no WSI Mortgage Loan has been sold to any person where WSI or such WSI Subsidiary has any recourse obligation, except as set forth in Section 3.24 of the WSI Disclosure Schedule.

SECTION 3.29.  ARM Adjustments.  Except as set forth in Section 3.29 of the WSI Disclosure Schedule, with respect to each WSI Mortgage Loan where the interest rate is not fixed for the term of the loan, to the knowledge of WSI, the servicers for WSI and/or a WSI Subsidiary have, since the date WSI or a WSI Subsidiary acquired such loan, and all prior servicers have (a) properly and accurately entered into its system all data required to service the WSI Mortgage Loan in accordance with all regulations, (b) properly and accurately adjusted the mortgage interest rate on each interest adjustment date, (c) properly and accurately adjusted the monthly payment on each payment adjustment date, (d) properly and accurately calculated the amortization of principal and interest on each payment adjustment date, in each case in compliance with all applicable laws, rules and regulations and the related mortgage documents, and (e) executed and delivered any and all necessary notices required under, and at such times and in a form that complies with, all applicable laws, rules and regulations and the terms of the related mortgage documents regarding the interest rate and payment adjustments.

SECTION 3.30.  WSI Sold Loans.  The representations and warranties made by WSI or any WSI Subsidiary in connection with any sale of mortgage loans or any securitization of mortgage loans were true and correct in all material respects at the time such representations and warranties were made, except where the failure to be so true and correct, individually or in the aggregate, would not have a WSI Material Adverse Effect.

SECTION 3.31.  Mortgage Insurance.  Except as set forth in Section 3.31 of the WSI Disclosure Schedule, each WSI Mortgage Loan that is indicated in the loan file to be insured by private mortgage insurance is so insured, WSI or a WSI Subsidiary has complied with applicable provisions of the insurance, the insurance is in full force and effect with respect to each such WSI Mortgage Loan, and, to the knowledge of WSI, there does not exist any event or condition which, but for the passage of time or the giving of notice or both, can result in a revocation of any such insurance or constitute adequate grounds for the applicable insurer to refuse to provide insurance payments thereunder.

SECTION 3.32.  Insurance.  Except as set forth in Section 3.32 of the WSI Disclosure Schedule, each WSI Mortgage Loan has been covered by a policy of hazard insurance and, to the extent required by any laws, rules and regulations applicable to such WSI Mortgage Loan, flood insurance, all in a form usual and customary in the industry and which is in full force and effect, except where the failure to obtain such insurance would not have a WSI Material Adverse Effect.

SECTION 3.33.  Title Insurance.  Each WSI Mortgage Loan is, and each WSI Sold Loan was at the time of sale, covered by an ALTA lender's title insurance policy or other generally acceptable form of policy of insurance (or by opinion of counsel if appropriate in the particular locality), and each such title insurance policy is issued by a title insurer qualified to do business in the

WS2000002397

jurisdiction where the collateral securing such loan is located, and insures the originator and its successors and assigns as to the first or second priority lien of the mortgage, as appropriate, in the original principal amount of the WSI Mortgage Loan or WSI Sold Loan except where the failure to obtain such title insurance would not have a WSI Material Adverse Effect. With respect to WSI Mortgage Loans, WSI or the applicable WSI Subsidiary, as assignee of the originator's rights, is an insured under such lender's title insurance policy, and such lender's policy is in full force and effect. Neither WSI nor any WSI Subsidiary nor to the knowledge of WSI, any servicer nor any prior servicer, has performed any act or omission which would impair the coverage of such lender's policy.

SECTION 3.34. Condemnation. Except as set forth in Section 3.34 of the WSI Disclosure Schedule, neither WSI nor any WSI Subsidiary has any notice of or knowledge of any proceeding pending or threatened for the partial or total condemnation of any of the collateral securing any of the WSI Mortgage Loans, and neither WSI nor any WSI Subsidiary has any notice or knowledge that all or any part of such collateral has been or will be condemned, except where such condemnation would not have a WSI Material Adverse Effect.

SECTION 3.35. Disclosure. No representation or warranty by WSI and the Principal Stockholder in this Agreement and no statement contained in the WSI Disclosure Schedule or any certificate delivered by WSI or the Principal Stockholder to RBMG pursuant to this Agreement when taken together as a whole contains any untrue statement of a material fact or omits any material fact necessary to make the statements herein or therein not misleading.

SECTION 3.36. Regulatory Approvals. WSI is not aware of any reason why the regulatory approvals required to be obtained by it to consummate the transactions contemplated hereby would not be satisfied within the time frame customary for transactions of the nature contemplated hereby.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF RBMG

RBMG hereby represents and warrants to WSI and the Principal Stockholder that:

SECTION 4.01. Organization and Qualification; Subsidiaries. Each of RBMG and each Subsidiary of RBMG (the "RBMG Subsidiaries") has been duly organized and is validly existing and in good standing (to the extent applicable) under the laws of the jurisdiction of its incorporation or organization, as the case may be, and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. Each of RBMG and each RBMG Subsidiary is duly qualified or licensed to do business, and is in good standing (to the extent applicable), in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except for such failures to be so qualified or licensed and in good standing that would not, individually or in the

23

WS2000002398

aggregate, have a RBMG Material Adverse Effect. For purposes of this Agreement, "RBMG Material Adverse Effect" means any change in or effect on the business of RBMG and the RBMG Subsidiaries that is, or is reasonably likely to be, materially adverse to the business, assets (including intangible assets), liabilities (contingent or otherwise), condition (financial or otherwise) or results of operations of RBMG and the RBMG Subsidiaries taken as a whole.

SECTION 4.02.  Certificate of Incorporation and Bylaws.  The copies of RBMG's Certificate of Incorporation and Bylaws that are incorporated by reference as Exhibits to RBMG's Form 10-K for the period ending December 31, 1996 (the "RBMG 1996 10-K") are complete and correct copies thereof.  Such Certificate of Incorporation and Bylaws are in full force and effect. RBMG is not in violation of any of the provisions of its Certificate of Incorporation or Bylaws.

SECTION 4.03  Capitalization.  The authorized capital stock of RBMG consists of (i) 25,000,000 shares of RBMG Common Stock and (ii) 5,000,000 shares of RBMG Preferred Stock. As of the date hereof, 20,255,080 shares of RBMG Common Stock were issued and outstanding, all of which were validly issued, fully paid and nonassessable, (ii) no shares of RBMG Common Stock were held in the treasury of RBMG or by the RBMG Subsidiaries, (iii) 3,614,536 shares of RBMG Common Stock were reserved for future issuance pursuant to agreements or arrangements under Section 4.03 of the Disclosure Schedule delivered by RBMG to WSI prior to the execution of (and forming a part of) this Agreement (the "RBMG Disclosure Schedule").  Except for (a) options granted pursuant to agreements or arrangements described in Section 4.03 of the RBMG Disclosure Schedule, (b) the merger agreements described in Section 4.03 of the RBMG Disclosure Schedule and (c) the rights agreement described in Section 4.03 of the RBMG Disclosure Schedule, there are no options, warrants or other rights, agreements, arrangements or commitments of any character to which RBMG is a party or by which RBMG is bound obligating RBMG or any RBMG Subsidiary to issue or sell any shares of capital stock of, or other equity interests in, RBMG or any RBMG Subsidiary.  Between January 1, 1997 and the date of this Agreement, options for an aggregate of 323,500 shares of RBMG Common Stock have been awarded under the Omnibus Stock Award Plan and 23,528 shares of restricted RBMG Common Stock have been issued under the Employment Agreement between RBMG and David W. Johnson, Jr.  As of the date hereof, no shares of RBMG Preferred Stock are issued and outstanding.  All shares of RBMG Common Stock subject to issuance as aforesaid, upon issuance prior to the Effective Time on the terms and conditions specified in the instruments pursuant to which they are issuable, will be duly authorized, validly issued, fully paid and nonassessable.  Except as set forth in Section 4.03 of the RBMG Disclosure Schedule, there are no material outstanding contractual obligations of RBMG or any RBMG Subsidiary to repurchase, redeem or otherwise acquire any shares of RBMG Common Stock or any capital stock of any RBMG Subsidiary.  Except as disclosed in Section 4.03 of the RBMG Disclosure Schedule, each outstanding share of capital stock of each RBMG Subsidiary is duly authorized, validly issued, fully paid and nonassessable and each such share owned by RBMG or another RBMG Subsidiary is free and clear of all security interests, liens, claims, pledges, options, rights of refusal, agreements, limitations on RBMG's or such other RBMG Subsidiary's voting rights, charges and other encumbrances of any nature whatsoever, except where the failure to own such shares free and clear would not, individually or in the aggregate, have an RBMG Material Adverse Effect.  Except as set forth in Section 4.03 of

24

the RBMG Disclosure Schedule, there are no material outstanding contractual obligations of RBMG or any RBMG Subsidiary to provide funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any RBMG Subsidiary or any other person.

SECTION 4.04. <u>Authority Relative to this Agreement</u>. RBMG has all necessary corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and thereunder and to consummate the Merger (other than the approval of this Agreement and the Merger contemplated hereby and the Amended Certificate of Incorporation by the holders of a majority of the outstanding shares of RBMG Common Stock at the RBMG Stockholders' Meeting (the "<u>RBMG Stockholder Vote</u>") and the filing and recordation of the Certificate of Merger as required by the DGCL). The execution and delivery of this Agreement by RBMG and the consummation by RBMG of the Merger contemplated hereby have been duly and validly authorized by all necessary corporate action, and no other corporate proceedings on the part of RBMG are necessary to authorize this Agreement, or to consummate the Merger (other than the RBMG Stockholder Vote and the filing and recordation of the Certificate of Merger as required by the DGCL). The board of directors of RBMG has approved the execution, delivery and performance of this Agreement and the Merger and the other transactions provided for herein in accordance with the DGCL. This Agreement has been duly executed and delivered by RBMG and, assuming the due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of RBMG, enforceable against RBMG in accordance with its terms.

SECTION 4.05. <u>No Conflict; Required Filings and Consents</u>. (a) The execution and delivery of this Agreement by RBMG does not, and the performance by RBMG of its obligations hereunder and the consummation of the Merger will not, (i) conflict with or violate any provision of the Certificate of Incorporation or Bylaws of RBMG or any equivalent organizational documents of any RBMG Subsidiary, (ii) assuming that all consents, approvals, authorizations and permits described in Section 4.05(b) have been obtained and all filings and notifications described in Section 4.05(b) have been made, conflict with or violate any Law applicable to RBMG or any RBMG Subsidiary or by which any property or asset of RBMG or any RBMG Subsidiary is bound or affected or (iii) except as set forth in Section 4.05(a) of the RBMG Disclosure Schedule, result in any breach of or constitute a default (or an event which with the giving of notice or lapse of time or both would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or other encumbrance on any property or asset of RBMG or any RBMG Subsidiary pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which would neither, individually or in the aggregate, (A) have a RBMG Material Adverse Effect nor (B) prevent or materially delay the performance by RBMG of its obligations pursuant to this Agreement or the consummation of the Merger.

(b)      The execution and delivery of this Agreement does not, and the performance by RBMG of its obligations hereunder and thereunder and the consummation of the Merger will not, require any consent, approval, authorization or permit of, or filing by RBMG with

25

or notification by RBMG to, any Governmental Entity or any other Person, except (i) for applicable requirements of the Securities Exchange Act of 1934, as amended (together with the rules and regulations promulgated thereunder, the "Exchange Act"), the Securities Act, state securities or "blue sky" laws ("Blue Sky Laws"), the rules and regulations of the NMS, state takeover laws, the premerger notification requirements of the HSR Act, the filing of the Certificate of Merger as required by the DGCL and as set forth in Section 4.05(b) of the RBMG Disclosure Schedule, and (ii) where failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not (A) prevent or materially delay the performance by RBMG of its obligations pursuant to this Agreement or the consummation of the Merger or (B) individually or in the aggregate, have a RBMG Material Adverse Effect.

SECTION 4.06.  Permits; Compliance with Laws.  Each of RBMG and the RBMG Subsidiaries is in possession of all franchises, grants, authorizations, licenses, establishment registrations, permits, easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Entity, necessary for RBMG or any RBMG Subsidiary to own, lease and operate its properties and to purchase, originate and sell conforming and non-conforming mortgage loans secured by residential properties or otherwise to carry on its business as it is now being conducted (the "RBMG Permits"), except where the failure to possess any RBMG Permits would not, individually or in the aggregate, have an RBMG Material Adverse Effect, and, as of the date of this Agreement, no suspension or cancellation of any of the RBMG Permits is pending or, to the knowledge of RBMG, threatened.  Neither RBMG nor any RBMG Subsidiary is in conflict with, or in default or violation of, (i) any Law applicable to RBMG or any RBMG Subsidiary or by which any property or asset of RBMG or any RBMG Subsidiary is bound or affected or (ii) any RBMG Permits, except in the case of clauses (i) and (ii) for any such conflicts, defaults or violations that would not, individually or in the aggregate, have an RBMG Material Adverse Effect.

SECTION 4.07.  SEC Filings; Financial Statements.  (a) RBMG has timely filed all forms, reports and documents required to be filed by it with the SEC since January 1, 1994 through the date of this Agreement (collectively and as amended, the "RBMG Reports").  Each RBMG Report (i) was prepared in all material respects in accordance with the requirements of the Securities Act or the Exchange Act, as the case may be, and (ii) did not at the time it was filed contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.  No RBMG Subsidiary is subject to the periodic reporting requirements of the Exchange Act or required to file any form, report or other document with the SEC, the NMS or any stock exchange.

(b)     Each of the consolidated financial statements (including, in each case, any notes thereto) contained in the RBMG Reports or Section 4.07(b) of the RBMG Disclosure Schedule were prepared in accordance with U.S. GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and each presented fairly, in all material respects, the consolidated financial position of RBMG and the consolidated RBMG Subsidiaries as at the respective dates thereof and for the respective periods indicated therein, except

26

as otherwise noted therein (subject, in the case of unaudited statements, to normal and recurring year-end adjustments which were not and are not expected, individually or in the aggregate, to have a RBMG Material Adverse Effect).

(c)      Except as and to the extent set forth or reserved against on the consolidated balance sheet of RBMG and its Subsidiaries as reported in the RBMG Reports, including the notes thereto, and in Section 4.07(c) of the RBMG Disclosure Schedule, none of RBMG or any RBMG Subsidiary has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) that would be required to be reflected on a balance sheet or in notes thereto prepared in accordance with U.S. GAAP, except for liabilities or obligations incurred in the ordinary course of business since January 1, 1997 that would not, individually or in the aggregate, have a RBMG Material Adverse Effect.

SECTION 4.08.  Absence of Certain Changes or Events.  (a)  Since January 1, 1997, except as contemplated by or as disclosed in this Agreement, or as set forth in Section 4.08(a) of the RBMG Disclosure Schedule or as disclosed in any RBMG Report filed since January 1, 1997, RBMG and the RBMG Subsidiaries have conducted their businesses only in the ordinary course and in a manner consistent with past practice and, since such date, there has not been (i) any RBMG Material Adverse Effect, (ii) any event that could reasonably be expected to prevent or materially delay the performance of its obligations pursuant to this Agreement and the consummation of the Merger by RBMG, (iii) any material change by RBMG in its accounting methods, principles or practices, (iv) any declaration, setting aside or payment of any dividend or distribution in respect of the shares of RBMG Common Stock, except for dividends in amounts consistent with past practice, or any redemption, purchase or other acquisition of any of RBMG's securities or (v)  except in the ordinary course of business consistent with past practice, any material increase in the compensation or benefits or establishment of any bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing, stock option (including, without limitation, the granting of stock options, stock appreciation rights, performance awards or restricted stock awards), stock purchase or other employee benefit plan, or any other increase in the compensation payable or to become payable to any executive officers of RBMG or any RBMG Subsidiary.

(b)      Except as set forth in Section 4.08(b) of the RBMG Disclosure Schedule, and except as to events, developments or conditions that have not had and are not reasonably likely to have an RBMG Material Adverse Effect, since January 1, 1997, there have not been with respect to RBMG (i) any extraordinary losses suffered or any damage, destruction, loss or casualty to property or assets of RBMG with an aggregate value of more than $200,000, whether or not covered by insurance, (ii) any assets mortgaged, pledged or made subject to any lien, charge or other encumbrance except those so mortgaged, pledged or made subject to any lien, charge or other encumbrance in the ordinary course of business, (iii) any liability or obligation (absolute, accrued or contingent) incurred except in the ordinary course of business, (iv) any claims, liabilities or obligations (absolute, accrued or contingent) paid, discharged or satisfied, other than the payment, discharge or satisfaction in the ordinary course of business consistent with past practice of claims, liabilities and obligations reflected or reserved against in the financial statements in the RBMG Reports or incurred

27

WS2000002402

in the ordinary course of business consistent with past practice since January 1, 1997, (v) any guaranteed checks, notes or accounts receivable which have been written off as uncollectible, except write-offs in the ordinary course of business consistent with past practice, (vi) any write-down of the value of any asset or investment on the books or records of RBMG, except for depreciation and amortization taken in the ordinary course of business consistent with past practice, (vii) any cancellation of any debts or waiver of any claims or rights of substantial value, or sale, transfer or other disposition of any properties or assets (real, personal or mixed, tangible or intangible) of substantial value, except, in each such case, in transactions in the ordinary course of business consistent with past practice and which in any event do not exceed $50,000 in the aggregate, (viii) any single capital expenditure or commitment in excess of $1,000,000 for additions to property or equipment or aggregate capital expenditures and commitments in excess of $1,000,000 for additions to property or equipment, (ix) any increase of any reserves for contingent liabilities (excluding any adjustment to bad debt reserves in the ordinary course of business consistent with past practice), (x) any transactions entered into other than in the ordinary course of business, (xi) any agreements to do any of the foregoing or (xii) any other events, developments or conditions of any character that have had or are reasonably likely to have an RBMG Material Adverse Effect.

SECTION 4.09.  Accounting and Tax Matters.  (a) Neither RBMG nor, to the knowledge of RBMG, any of its Subsidiaries has taken or agreed to take any action (other than actions contemplated by this Agreement) that would prevent the Merger from qualifying for "pooling of interests" accounting treatment under applicable U.S. GAAP, including, without limitation, applicable SEC accounting standards, or would prevent the Merger from constituting a transaction qualifying under Section 368(a) of the Code.  RBMG is not aware of any agreement, plan or other circumstance that would prevent the Merger from so qualifying under Section 368(a) of the Code.

(b)      The representations and warranties made in RBMG's letter of compliance with pooling of interests criteria relating to the Merger and addressed to Price Waterhouse LLP will be true as of the date of such letter.

SECTION 4.10.  Pooling Affiliates.  Section 4.10 of the RBMG Disclosure Schedule sets forth the names and addresses of those persons who are, in RBMG's reasonable judgment, Pooling Affiliates of RBMG.

SECTION 4.11.  Opinion of Financial Advisor.  Prudential Securities Incorporated ("Prudential") has delivered to the board of directors of RBMG its written opinion to the effect that, as of the date of this Agreement, the terms of the Merger are fair from a financial point of view to RBMG and its stockholders.  Prudential has authorized the inclusion of its opinion in the Joint Proxy Statement (as defined in Section 6.01) and RBMG shall promptly, after the date of this Agreement, deliver a signed copy of such opinion to WSI.

SECTION 4.12.  Brokers.  No broker, finder or investment banker (other than Prudential) is entitled to any brokerage, finder's or other fee or commission in connection with the Merger based upon arrangements made by or on behalf of RBMG.  RBMG has heretofore made

28

WS2000002403

available to WSI complete and correct copies of all agreements between RBMG and Prudential pursuant to which such firm would be entitled to any payment relating to the Merger.

SECTION 4.13. Mortgage Banking Licenses and Qualifications. (a) Except as set forth on Section 4.13 to the RBMG Disclosure Schedule, RBMG (or a Subsidiary of RBMG performing the origination or servicing of mortgages, as the case may be) (i) has all certifications, authorizations, licenses, permits and other approvals necessary to conduct its current mortgage banking business and (ii) is in good standing under all applicable federal, state and local laws and regulations thereunder as a mortgage lender and servicer, except where the failure to have such certificates, authorizations, licenses, permits or approvals or to be in good standing would not, individually or in the aggregate, have a RBMG Material Adverse Effect.

(b)     There is no pending or, to the knowledge of RBMG, threatened cancellation or material reduction of any mortgage sale agreement to which RBMG or any RBMG Subsidiary is a party, and the obligations of RBMG or any RBMG Subsidiary under each such mortgage sale agreement are being performed by RBMG or such RBMG Subsidiary, as the case may be, in all material respects in accordance with its terms.

SECTION 4.14. Disclosure. No representation or warranty by RBMG in this Agreement and no statement contained in the RBMG Disclosure Schedule or any certificate delivered by RBMG to WSI pursuant to this Agreement when taken together as a whole contains any untrue statement of a material fact or omits any material fact necessary to make the statements herein or therein not misleading.

SECTION 4.15. Regulatory Approvals. RBMG is not aware of any reason why the regulatory approvals required to be obtained by it to consummate the transactions contemplated hereby would not be satisfied within the time frame customary for transactions of the nature contemplated hereby.

ARTICLE V

COVENANTS

SECTION 5.01. Conduct of Business by WSI Pending the Closing. WSI agrees that, between the date of this Agreement and the Effective Time, except as set forth in Section 5.01 of the WSI Disclosure Schedule or as expressly contemplated by any other provision of this Agreement, unless RBMG shall otherwise agree in writing, which agreement shall not be unreasonably withheld or delayed, (x) except for the contemplated sale of a substantial portion of WSI's loan production through securitization transactions, whole loan sales and other loan sales in the ordinary course of business, the respective businesses of WSI and the WSI Subsidiaries shall be conducted only in, and WSI and the WSI Subsidiaries shall not take any action except in, the ordinary course of business consistent with past practice and (y) WSI shall use its reasonable efforts to keep available the services of such of the current officers, significant employees and consultants of WSI and the WSI

29

Subsidiaries and to preserve the current relationships of WSI and the WSI Subsidiaries with such of the customers, suppliers and other persons with which WSI and the WSI Subsidiaries have significant business relations in order to preserve substantially intact its business organization. By way of amplification and not limitation, except as set forth in Section 5.01 of the WSI Disclosure Schedule or as expressly contemplated by any other provision of this Agreement, neither WSI nor any WSI Subsidiary shall, between the date of this Agreement and the Effective Time, directly or indirectly, do, or agree to do, any of the following without the prior written consent of RBMG, which consent shall not be unreasonably withheld or delayed:

> (a)     amend or otherwise change its Certificate of Incorporation or Bylaws or equivalent organizational documents;

> (b)     issue, sell, pledge, dispose of, grant, transfer, lease, license, guarantee or encumber, or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license or encumbrance of, (i) any shares of capital stock of WSI or any WSI Subsidiary of any class, or securities convertible into or exchangeable or exercisable for any shares of such capital stock, or any options, warrants or other rights of any kind to acquire any shares of such capital stock, or any other ownership interest (including, without limitation, any phantom interest), of WSI or any WSI Subsidiary (except for the issuance of a maximum of 24.99 shares of WSI Class B Common Stock issuable to the Warrantholder pursuant to the WSI Warrant and the shares of WSI Common Stock issuable upon conversion of the WSI Class B Common Stock underlying the WSI Warrant); (ii) any property or assets of WSI or any WSI Subsidiary, except in the ordinary course of business; or (iii) any property or assets of WSI or any WSI Subsidiary in an aggregate amount not in excess of $250,000, except sales, pledges and transfers of loans and servicing rights in the ordinary course of business.

> (c)     (i) acquire (including, without limitation, by merger, consolidation, or acquisition of stock or assets) any interest in any corporation, partnership, other business organization or person or any division thereof or any assets, other than acquisitions of assets (excluding the acquisition of a business or substantially all of the stock or assets thereof) in the ordinary course of business consistent with past practice, and any acquisitions for consideration, calculated as of the date of execution of the definitive agreement for any such acquisition, that is not, in the aggregate for all such acquisitions, in excess of $250,000; (ii) incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any person for borrowed money, except for (A) indebtedness for borrowed money incurred in the ordinary course of business and consistent with past practice or incurred to refinance outstanding indebtedness for borrowed money existing on the date of this Agreement, (B) other indebtedness for borrowed money with a maturity of not more than one year in a principal amount not, in the aggregate, in excess of $5,000,000 or (C) indebtedness for borrowed money incurred to finance acquisitions permitted by clause (i) of this paragraph (c); (iii) terminate, cancel or request any material change in, or agree to any material change in, any WSI Material Contract or enter into any contract or agreement material to the business, results of operations or financial condition of WSI and the WSI Subsidiaries taken as a whole, in either case other than in the

30

ordinary course of business, consistent with past practice; (iv) make or authorize any capital expenditure, other than capital expenditures in the ordinary course of business consistent with past practice that are not, in the aggregate, in excess of $200,000 for WSI and the WSI Subsidiaries taken as a whole; or (v) enter into or amend any contract, agreement, commitment or arrangement that, if fully performed, would not be permitted under this Section 5.01(c);

(d)     declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock, except that any wholly owned WSI Subsidiary may pay dividends or make other distributions to WSI or any other wholly owned WSI Subsidiary;

(e)     reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock;

(f)     increase the compensation payable or to become payable to its officers or employees, except for increases in accordance with past practices in salaries or wages of employees or officers of WSI or any WSI Subsidiary, or grant any rights to severance or termination pay to, or enter into any employment or severance agreement which provides benefits upon a change in control of WSI or any WSI Subsidiary that would be triggered by the Reorganization with, any director, officer or other employee of WSI or any WSI Subsidiary, who is not currently entitled to such benefits from the Reorganization, or establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, officer or employee of WSI or any WSI Subsidiary, except for the "Key Employee Agreements" (as defined in Section 7.03(f) hereof) and the "Employee Agreements" (as defined in Section 7.03(g) hereof);

(g)     take any action with respect to accounting policies or procedures, other than actions in the ordinary course of business and consistent with past practices or as required by U.S. GAAP;

(h)     make any tax election or settle or compromise any material federal, state or local United States income tax liability, or any income tax liability of any other jurisdiction, other than those made in the ordinary course of business consistent with past practice and those for which specific reserves have been recorded on the 1996 Balance Sheet and only to the extent of such reserves; or

(i)     authorize or enter into any formal or informal agreement or otherwise make any commitment to do any of the foregoing.

SECTION 5.02   Conduct of Business by RBMG Pending the Closing.  RBMG agrees that, between the date of this Agreement and the Effective Time, except as set forth in Section 5.02 of the RBMG Disclosure Schedule or as expressly contemplated by any other provision of this

31

Agreement, unless WSI shall otherwise agree in writing, which agreement shall not be unreasonably withheld or delayed, (x) the respective businesses of RBMG and the RBMG Subsidiaries shall be conducted only in, and RBMG and the RBMG Subsidiaries shall not take any action except in, the ordinary course of business consistent with past practice and (y) RBMG shall use its reasonable efforts to keep available the services of such of the current officers, significant employees and consultants of RBMG and the RBMG Subsidiaries and to preserve the current relationships of RBMG and the RBMG Subsidiaries with such of the customers, suppliers and other persons with which RBMG or any RBMG Subsidiary has significant business relations in order to preserve substantially intact its business organization. By way of amplification and not limitation, except as set forth in Section 5.02 of the RBMG Disclosure Schedule or as expressly contemplated by any other provision of this Agreement, neither RBMG nor any RBMG Subsidiary shall, between the date of this Agreement and the Effective Time, directly or indirectly, do, or agree to do, any of the following without the prior written consent of WSI, which consent shall not be unreasonably withheld or delayed:

(a) amend or otherwise change its Certificate of Incorporation or Bylaws or equivalent organizational documents except as set forth in the RBC Merger Agreement;

(b) issue, sell, pledge, dispose of, grant, transfer, lease, license, guarantee or encumber, or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license or encumbrance of, (i) any shares of capital stock of RBMG or any RBMG Subsidiary of any class, or securities convertible into or exchangeable or exercisable for any shares of such capital stock, or any other options, warrants or other rights of any kind to acquire any shares of such capital stock, or any other ownership interest (including, without limitation, any phantom interest), of RBMG or any RBMG Subsidiary (except for the issuance of (A) a maximum of 1,723,087 shares of RBMG Common Stock issuable pursuant to options outstanding on the date of this Agreement, (B) the issuance of shares of RBMG Common Stock pursuant to the merger agreements described in Section 4.03 of the RBMG Disclosure Schedule, (C) the issuance of preferred stock purchase rights pursuant to the rights agreement described in Section 4.03 of the RBMG Disclosure Schedule, (D) the issuance of options to acquire RBMG Common Stock and the issuance of shares pursuant thereto (which options shall be issued at fair market value and otherwise in accordance with normal practices of RBMG, or, in the case of options issued to Edward J. Sebastian, Robert C. Walsh or David W. Johnson, Jr., such options shall be approved by the Board of Directors of RBMG) and (E) the issuance of RBMG Common Stock pursuant to the Stock Investment Plan and the Dividend Reinvestment and Stock Purchase Plan); or (ii) any property or assets of RBMG or any RBMG Subsidiary, except in the ordinary course of business and except any property or assets of RBMG or any RBMG Subsidiary in an aggregate amount not in excess of $1,000,000;

(c) (i) acquire (including, without limitation, by merger, consolidation or acquisition of stock or assets) any interest in any corporation, partnership, other business organization or person or any division thereof or any assets, other than acquisitions of assets (excluding the acquisition of a business or substantially all of the stock or assets thereof) in the ordinary course of business consistent with past practice, and any acquisitions for consideration, calculated as of the date

32

WS2000002407

of execution of the definitive agreement for any such acquisition, that is not, in the aggregate for all such acquisitions, in excess of $1,000,000; (ii) incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any person for borrowed money, except for (A) indebtedness or obligations for borrowed money incurred in the ordinary course of business and consistent with past practice or incurred to refinance outstanding indebtedness for borrowed money existing on the date of this Agreement, (B) other indebtedness or obligations for borrowed money with a maturity of not more than one year in a principal amount not, in the aggregate, in excess of $5,000,000 or (C) indebtedness for borrowed money incurred to finance acquisitions permitted by clause (i) of this paragraph (c); (iii) terminate, cancel or request any material change in, or agree to any material change in, any contract or agreement material to the business, results of operations or financial condition of RBMG and the RBMG Subsidiaries taken as a whole (a "RBMG Material Contract") or enter into any contract or agreement which would be a RBMG Material Contract, in either case other than in the ordinary course of business, consistent with past practice; (iv) make or authorize any capital expenditure, other than capital expenditures in the ordinary course of business consistent with past practice that are not, in the aggregate, in excess of $1,000,000 for RBMG and the RBMG Subsidiaries taken as a whole; or (v) enter into or amend any contract, agreement, commitment or arrangement that, if fully performed, would not be permitted under this Section 5.01(c);

(d)     declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock, except (i) for any dividends not in excess of $.03 per share of RBMG Common Stock for any calendar quarter and (ii) that any RBMG Subsidiary may pay dividends or make other distributions to RBMG or any other RBMG Subsidiary;

(e)     reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock other than in connection with the RBC Acquisition;

(f)     increase the compensation payable or to become payable to its officers or employees, except for increases in accordance with past practices in salaries or wages of employees or officers of RBMG or any RBMG Subsidiary, or grant any rights to severance or termination pay to, or enter into any employment or severance agreement which provides benefits upon a change in control of RBMG or any RBMG Subsidiary that would be triggered by the Reorganization with, any director, officer or other employee of RBMG or any RBMG Subsidiary, who is not currently entitled to such benefits from the Reorganization, or establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, officer or employee of RBMG or any RBMG Subsidiary;

(g)     make any tax election or settle or compromise any material federal, state or local United States income tax liability, or any income tax liability of any other jurisdiction,

33

other than those made in the ordinary course of business consistent with past practice and those for which specific reserves have been recorded in the financial statements in the RBMG Reports and only to the extent of such reserves;

(h)   take any action with respect to accounting policies or procedures, other than actions in the ordinary course of business and consistent with past practices or as required by U.S. GAAP; or

(i)   authorize or enter into any formal or informal agreement or otherwise make any commitment to do any of the foregoing.

SECTION 5.03.  Cooperation; Steering Committee.  Upon the execution and delivery of this Agreement, WSI and RBMG shall establish a committee (the "Steering Committee") for the purpose of, to the extent permitted by applicable Laws, facilitating the efficient combination of the respective businesses of WSI and RBMG as promptly as practicable following the Effective Time. The Steering Committee shall consist of the following individuals: Edward J. Sebastian, David W. Johnson, Jr., Robert C. Walsh and James Walsh.  The Steering Committee shall be dissolved as of the Effective Time.

SECTION 5.04.  Notices of Certain Events.  Each of RBMG and WSI shall give prompt notice to the other of (i) any notice or other communication from any person alleging that the consent of such person is or may be required in connection with the Merger; (ii) any notice or other communication from any Governmental Entity in connection with the Merger; (iii) any actions, suits, claims, investigations or proceedings commenced or, to its knowledge, threatened against, relating to or involving or otherwise affecting WSI, RBMG, the WSI Subsidiaries or the RBMG Subsidiaries that relate to the consummation of the Merger; (iv) the occurrence of a default or event that, with the giving of notice or lapse of time or both, will become a default under any WSI Material Contract or any RBMG Material Contracts; and (v) any change that is reasonably likely to result in a WSI Material Adverse Effect or a RBMG Material Adverse Effect or is reasonably likely to delay or impede the ability of any of WSI or RBMG to perform its respective obligations pursuant to this Agreement and to effect the consummation of the Merger.

SECTION 5.05.  Access to Information; Confidentiality.  (a)  Except as required pursuant to any confidentiality agreement or similar agreement or arrangement to which WSI or RBMG or any of the WSI Subsidiaries or RBMG Subsidiaries is a party or pursuant to applicable Law or the regulations or requirements of any stock exchange or other regulatory organization with whose rules a party hereto is required to comply, from the date of this Agreement to the Effective Time, WSI and RBMG shall (and shall cause the WSI Subsidiaries and the RBMG Subsidiaries, respectively, to): (i) provide to the other (and its officers, directors, employees, accountants, consultants, legal counsel, agents and other representatives (collectively, "Representatives")) access at reasonable times upon prior notice to its and its Subsidiaries' officers, employees, agents, properties, offices and other facilities and to the books and records thereof and (ii) furnish promptly such information concerning its and its Subsidiaries' business, properties, contracts, assets, liabilities

34

and personnel as the other party or its Representatives may reasonably request. No investigation conducted pursuant to this Section 5.05 shall affect or be deemed to modify any representation or warranty made in this Agreement.

(b)     The parties hereto shall comply with, and shall cause their respective Representatives to comply with, all of their respective obligations under the Confidentiality Agreement dated February, 1997, (the "Confidentiality Agreement") by and among WSI, RBC and RBMG with respect to the information disclosed pursuant to this Section 5.05.

SECTION 5.06.  No Solicitation of Transactions.  (a) Each of RBMG and WSI shall not, directly or indirectly, and shall instruct its officers, directors, employees, subsidiaries, agents or advisors or other representatives (including, without limitation, any investment banker, attorney or accountant retained by it) not to, directly or indirectly, solicit, initiate or knowingly encourage (including by way of furnishing non-public information), or take any other action knowingly to facilitate, any inquiries or the making of any proposal or offer (including, without limitation, any proposal or offer to its shareholders) that constitutes, or may reasonably be expected to lead to, any Competing Transaction, or enter into or maintain or continue discussions or negotiate with any person in furtherance of such inquiries or to obtain a Competing Transaction, or agree to or endorse any Competing Transaction, or authorize or permit any of the officers, directors or employees of such party or any of its subsidiaries, or any investment banker, financial advisor, attorney, accountant or other representative retained by such party or any of such party's subsidiaries, to take any such action; provided, however, that nothing contained in this Section 5.06 shall prohibit the Board of Directors of RBMG from furnishing information to, or entering into discussions or negotiations with, any person in connection with an unsolicited (from the date of this Agreement) proposal by such person to acquire RBMG pursuant to a merger, consolidation, share exchange, tender offer, exchange offer, business combination or other similar transaction or to acquire all or substantially all of the assets of RBMG or any of its subsidiaries, if, and only to the extent that, such Board of Directors, after consultation with outside legal counsel (which may include its regularly engaged outside legal counsel), determines in good faith that such action is required for such Board of Directors to comply with its duties to its stockholders imposed by applicable Law.  Each of RBMG and WSI shall promptly notify the other if any proposal or offer, or any inquiry or contact with any person with respect thereto, regarding a Competing Transaction is made.  Nothing contained in this Section 5.06 shall prohibit the Board of Directors of RBMG from complying with Rule 14e-2 promulgated under the Exchange Act with regard to a tender or exchange offer.

(b)     A "Competing Transaction" means any of the following involving RBMG or WSI, as the case may be (other than the Merger contemplated by this Agreement and the RBC Acquisition): (i) a merger, consolidation, share exchange, business combination or other similar transaction, (ii) any sale, lease, exchange, transfer or other disposition of 15 percent or more of the assets of RBMG and the RBMG Subsidiaries taken as a whole or 15 percent or more of the assets of WSI and the WSI Subsidiaries taken as a whole, as the case may be, or (iii) a tender offer or exchange offer for 15 percent or more of the outstanding voting securities of such party.

35

WS2000002410

SECTION 5.07. <u>Letters of Accountants</u>. Each of WSI and RBMG shall use all reasonable efforts to cause to be delivered to the other a "comfort" letter of each of KPMG and Price Waterhouse LLP, respectively, each such letter dated and delivered as of the date the Registration Statement (as defined in Section 6.01) shall have become effective and as of the Effective Time, and addressed to WSI and RBMG, respectively, in form and substance reasonably satisfactory to the recipient thereof and reasonably customary in scope and substance for letters delivered by independent public accountants in connection with a merger such as is contemplated by this Agreement.

SECTION 5.08. <u>Plan of Reorganization</u>. This Agreement is intended to constitute a "plan of reorganization" within the meaning of Section 1.368-2(g) of the income tax regulations promulgated under the Code. From and after the date of this Agreement, each party hereto shall use all reasonable efforts to cause the Merger to qualify, and shall not, without the prior written consent of the other parties hereto, knowingly take any actions or cause any actions to be taken which could prevent the Merger from qualifying as a reorganization under the provisions of Section 368(a) of the Code. WSI agrees to use its reasonable best efforts to acquire from each holder of five percent of its Common Stock the stockholder tax certificate substantially in the form contained in Exhibit 5.08. Such certificate shall form the basis of any opinion of counsel regarding the tax treatment of the Merger. In the event that counsel is unable to issue its opinion to the effect that the Merger will qualify as a reorganization under the provisions of Section 368(a) of the Code as described in Section 7.02(c) hereof, then the parties hereto agree to negotiate in good faith to restructure the Merger in order that such opinion can be issued. Following the Effective Time, and consistent with any such consent, none of the Surviving Corporation, WSI, RBMG, nor any of their affiliates shall knowingly take any action or knowingly cause any action to be taken which would cause the Merger to fail to qualify as a reorganization under Section 368(a) of the Code.

SECTION 5.09. <u>Subsequent Financial Statements</u>. Prior to the Effective Time RBMG shall promptly deliver to WSI copies of each RBMG Report filed by RBMG with the SEC. Prior to the Effective Time, WSI shall promptly deliver to RBMG copies of all monthly financial reports prepared by WSI and copies of all other financial and other information regarding WSI and its subsidiaries reasonably requested by RBMG.

SECTION 5.10. <u>Control of Operations</u>. Nothing contained in this Agreement shall give WSI, directly or indirectly, the right to control or direct the operations of RBMG or the RBMG Subsidiaries prior to the Effective Time. Nothing contained in this Agreement shall give RBMG, directly or indirectly, the right to control or direct the operations of WSI or the WSI Subsidiaries prior to the Effective Time. Prior to the Effective Time, each of WSI and RBMG shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

SECTION 5.11. <u>Further Action; Consents; Filings</u>. Upon the terms and subject to the conditions hereof, each of the parties hereto shall use all reasonable efforts to (i) take, or cause to be taken, all appropriate action, and do, or cause to be done, all things necessary, proper or

WS2000002411

advisable under applicable Law or otherwise to consummate and make effective the Merger, (ii) obtain from Governmental Entities any consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained or made by WSI, RBMG, or the Surviving Corporation or any of their subsidiaries in connection with the authorization, execution and delivery of this Agreement and the consummation of the Merger and (iii) make all necessary filings, and thereafter make any other required or appropriate submissions, with respect to this Agreement and the Merger required under (A) the rules and regulations of the NMS, (B) the Securities Act, the Exchange Act and any other applicable federal or state securities Laws, (C) the HSR Act and (D) any other applicable Law. The parties hereto shall cooperate and consult with each other in connection with the making of all such filings, including by providing copies of all such documents to the non-filing parties and their advisors prior to filing. No party shall consent to any voluntary extension of any statutory deadline or waiting period or to any voluntary delay of the consummation of the Merger at the behest of any Governmental Entity without the consent and agreement of the other parties hereto, which consent shall not be unreasonably withheld or delayed. The Principal Stockholder further agrees to execute and deliver on behalf of himself and the WSI Stockholders all agreements contemplated hereby, including but not limited to the Escrow Trust Agreement, the Registration Rights Agreement (as hereinafter defined), and the Stockholders Agreement (as hereinafter defined).

SECTION 5.12.  Pooling.  From and after the date of this Agreement, none of the parties hereto, or any of their respective Subsidiaries, shall knowingly take any action, or knowingly fail to take any action, other than actions which such parties are required to take or abstain from taking pursuant to this Agreement or the Ancillary Agreements, which action or failure to act is reasonably likely to jeopardize the treatment of the Merger as a "pooling of interests" for accounting purposes.  From and after the date of this Agreement, each of the parties hereto shall take all reasonable actions necessary to cause the Merger to be characterized as a pooling of interests for accounting purposes.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

SECTION 6.01.  Registration Statement; Joint Proxy Statement.  (a) As promptly as practicable after the execution of this Agreement, RBMG and WSI shall jointly prepare and RBMG shall file with the SEC a document or documents that will constitute (i) the prospectus forming part of the registration statement on Form S-4 of RBMG (together with all amendments thereto, the "Registration Statement"), in connection with the registration under the Securities Act of the RBMG Common Stock to be issued to WSI's stockholders pursuant to the Merger and (ii) the Joint Proxy Statement with respect to the Merger relating to the special meeting of each of RBMG's stockholders (the "RBMG Stockholders' Meeting") and WSI's stockholders (the "WSI Stockholders' Meeting" and together with the RBMG Stockholders' Meeting, the "Stockholders' Meetings"), to be held to consider approval of this Agreement and the Merger contemplated hereby (such document, together with any amendments thereto, the "Joint Proxy Statement").  Copies of the Joint Proxy Statement

37

shall be provided to the NMS in accordance with the rules of such market. Each of the parties hereto shall use all reasonable efforts to cause the Registration Statement to become effective as promptly as practicable, and, prior to the effective date of the Registration Statement, the parties hereto shall take all action required under any applicable Laws in connection with the issuance of shares of RBMG Common Stock pursuant to the Merger. WSI and RBMG, as the case may be, shall furnish all information concerning WSI and RBMG as the other party may reasonably request in connection with such actions and the preparation of the Registration Statement and Joint Proxy Statement. As promptly as practicable after the effective date of the Registration Statement, the Joint Proxy Statement shall be mailed to the stockholders of RBMG and WSI. Each of the parties hereto shall cause the Joint Proxy Statement to comply as to form and substance in all material respects with the applicable requirements of (i) the Exchange Act and (ii) the Securities Act.

(b)    (i) The Joint Proxy Statement shall include the approval of the Merger and recommendation of the Special Committee and of the Board of Directors of RBMG to RBMG's stockholders that they vote in favor of approval of this Agreement and the Merger contemplated hereby; provided, however, that the Board of Directors of RBMG may, at any time prior to the Effective Time, withdraw, modify or change any such recommendation to the extent that the Board of Directors of RBMG determines in good faith, after consultation with outside legal counsel (who may be RBMG's regularly engaged outside legal counsel), that such withdrawal, modification or change of its recommendation is required by its fiduciary duties to RBMG's stockholders under applicable Law and prior to such determination any person (other than WSI) shall have made a public announcement or otherwise communicated with RBMG with respect to a Competing Transaction that, as determined by the Board of Directors of RBMG after consulting with its outside legal counsel (who may be its regularly retained outside counsel) and financial advisors, contains terms more favorable to the stockholders of RBMG than those provided for in the Reorganization. In addition, the Joint Proxy Statement shall include the opinion of Prudential referred to in Section 4.11.

(ii)    The Joint Proxy Statement shall include the approval of the Merger and recommendation of the Board of Directors of WSI to WSI's stockholders that they vote in favor of approval of this Agreement and the Merger contemplated hereby.

(c)    No amendment or supplement to the Joint Proxy Statement or the Registration Statement shall be made without the approval of RBMG and WSI, which approval shall not be unreasonably withheld or delayed. Each of the parties hereto shall advise the other parties hereto, promptly after it receives notice thereof, of the time when the Registration Statement has become effective or any supplement or amendment has been filed, of the issuance of any stop order, of the suspension of the qualification of the RBMG Common Stock issuable in connection with the Merger for offering or sale in any jurisdiction, or of any request by the SEC or the NMS for amendment of the Joint Proxy Statement or the Registration Statement or comments thereon and responses thereto or requests by the SEC for additional information.

(d)    The information supplied by WSI for inclusion in the Registration Statement and the Joint Proxy Statement shall not, at (i) the time the Registration Statement is filed

38

WS2000002413

with the SEC, (ii) if different, the time the Registration Statement is declared effective, (iii) the time the Joint Proxy Statement (or any amendment thereof or supplement thereto) is first mailed to the stockholders of RBMG and WSI, (iv) the time of the RBMG Stockholders' Meeting, (v) the time of the WSI Stockholders' Meeting and (vi) the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. If at any time prior to the Effective Time, any event or circumstances relating to WSI or any WSI Subsidiary, or their respective officers or directors, should be discovered by WSI that as a result of which it is necessary to amend or supplement the Registration Statement or Joint Proxy Statement in order that the Registration Statement or Joint Proxy Statement will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which they were made, WSI shall promptly inform RBMG.

(e)     The information supplied by RBMG for inclusion in the Registration Statement and Joint Proxy Statement shall not, at (i) the time the Registration Statement is filed with the SEC, (ii) if different, the time the Registration Statement is declared effective, (iii) the time the Joint Proxy Statement (or any amendment thereof or supplement thereto) is first mailed to the stockholders of RBMG and WSI, (iv) the time of the RBMG Stockholders' Meeting, (v) the time of the WSI Stockholders' Meeting and (vi) the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. If, at any time prior to the Effective Time, any event or circumstances relating to RBMG or any RBMG Subsidiary, or their respective officers or directors, should be discovered by RBMG that as a result of which it is necessary to amend or supplement the Registration Statement or Joint Proxy Statement in order that the Registration Statement or Joint Proxy Statement will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which they were made, RBMG shall promptly inform WSI. All documents that RBMG is responsible for filing with the SEC in connection with the Merger will comply as to form in all material respects with the applicable requirements of the Securities Act and the Exchange Act.

SECTION 6.02.  Stockholders' Meetings.  RBMG shall call and hold the RBMG Stockholders' Meeting as promptly as practicable for the purpose of voting upon the approval of this Agreement and the Merger contemplated hereby and the Amended Certificate of Incorporation. WSI shall call and hold the WSI Stockholders' Meeting as promptly as practicable for the purpose of voting upon the approval of the Agreement and the Merger contemplated hereby, and each of RBMG and WSI shall use its reasonable efforts to hold the Stockholders' Meetings on the same day and as soon as practicable after the date on which the Registration Statement becomes effective. RBMG shall use its reasonable efforts to solicit from its stockholders proxies in favor of the approval of this Agreement and the Merger contemplated hereby and the Amended Certificate of Incorporation pursuant to the Joint Proxy Statement, and shall take all other action necessary or advisable to secure the vote or consent of stockholders required by the DGCL or applicable NMS requirements to obtain

39

such approval, except to the extent that the Board of Directors of RBMG determines in good faith after consultation with outside legal counsel (who may be RBMG's regularly engaged outside legal counsel) that the withdrawal, modification or change of its recommendation is required by its fiduciary duties to RBMG's stockholders under applicable Law and prior to such determination any person (other than WSI) shall have made a public announcement or otherwise communicated to RBMG with respect to a Competing Transaction that, as determined by the Board of Directors of RBMG after consulting with its outside legal counsel (who may be its regularly retained outside legal counsel) and financial advisors, contains terms more favorable to the stockholders of RBMG than those provided for in the Reorganization. WSI shall use its reasonable efforts to solicit from its stockholders proxies in favor of the approval of this Agreement and the Merger contemplated hereby pursuant to the Joint Proxy Statement and shall take all other action necessary or advisable to secure the vote or consent of stockholders required by the DGCL to obtain such approval. Each of the parties hereto shall take all other reasonable action necessary or advisable to promptly and expeditiously secure any vote or consent of stockholders required by applicable Law and RBMG's and WSI's Certificate of Incorporation and Bylaws to effect the Merger.

SECTION 6.03. Employee Benefits Matters. (a) Except as otherwise provided herein, each of the WSI Benefit Plans and the RBMG Benefit Plans (as defined below) in effect as of the Effective Time shall be maintained in effect with respect to the employees or former employees of WSI and the WSI Subsidiaries and of RBMG and the RBMG Subsidiaries, respectively, who are covered by such benefit plans immediately prior to the Closing Date until RBMG otherwise determines at or after the Effective Time; provided, however, that nothing contained herein shall limit any reserved right in any such WSI Benefit Plan or RBMG Benefit Plan, as the case may be, to amend, modify, suspend, revoke or terminate any such plan. "RBMG Benefit Plans" means employee benefit plans, programs, arrangements and contracts (including, without limitation, any "employee benefit plan", as defined in Section 3(3) of ERISA) maintained or contributed to by RBMG or any RBMG Subsidiary, or with respect to which WSI or any WSI Subsidiary could incur liability under Section 4069, 4212(c) or 4204 of ERISA.

(b) Prior to the Effective Time, the Steering Committee shall develop short and long-term incentive compensation arrangements for RBMG which are to be implemented after the Effective Time and make appropriate adjustments, if any, to the performance goals, target awards and any other relevant criteria under the incentive compensation plans of WSI and RBMG that are in effect as of the Effective Time to take the Reorganization into account. In addition, the Steering Committee shall conduct a review of WSI's and RBMG's respective benefit plans following the execution of this Agreement in order to coordinate the provision of benefits after the Effective Time and to eliminate duplicate benefits, including, without limitation, through the establishment by RBMG of replacement benefit plans (the "RBMG Replacement Plans"). Each participant in any WSI Benefit Plan or RBMG Benefit Plan that is replaced by a RBMG Replacement Plan shall receive credit for purposes of eligibility to participate, vesting, benefit accrual and eligibility to receive benefits under any RBMG Replacement Plan for service credited for the corresponding purpose under such benefit plan; provided, however, that such crediting of service shall not operate to duplicate any benefit to any such participant of the funding of any such benefit.

40

WS2000002415

WS2000002416

(c)     With respect to any WSI Benefit Plan or RBMG Benefit Plan under which the delivery of WSI Common Stock or RBMG Common Stock, as the case may be, is required upon payment of benefits, grant of awards or exercise of options (the "Stock Plans"), RBMG shall take all corporate action necessary or appropriate to (i) obtain stockholder approval with respect to such plan to the extent such approval is required for purposes of the Code or other applicable Law, or to enable such plan to comply with Rule 16b-3 promulgated under the Exchange Act, (ii) reserve for issuance under such plan or otherwise provide a sufficient number of shares of RBMG Common Stock for delivery upon payment of benefits, grant of awards or exercise of options under such plan and (iii) as soon as practicable after the Effective Time, file registration statements on Form S-3 or Form S-8, as appropriate (or any successor or other appropriate forms), with respect to the shares of RBMG Common Stock subject to such plan to the extent such registration statement is required under applicable law, and RBMG shall use its reasonable efforts to maintain the effectiveness of such registration statements (and maintain the current status of the prospectuses contained therein) for so long as such benefits and grants remain payable and such options remain outstanding. With respect to those individuals who subsequent to the Merger will be subject to the reporting requirements under Section 16(a) of the Exchange Act, RBMG shall administer the Stock Plans, where applicable, in a manner that complies with Rule 16b-3 promulgated under the Exchange Act.

(d)     Without limiting the applicability of the foregoing each of the parties hereto shall take all actions as are necessary to ensure that WSI shall not be, at the Effective Time, bound by any options, stock appreciation rights, warrants or other rights or agreements which would entitle any person, other than RBMG, to own any capital stock of the Surviving Corporation or to receive any payment in respect thereof, and all WSI Benefit Plans conferring any rights with respect to Shares or other capital stock of WSI shall be deemed hereby to be amended to be in conformity with this Section 6.03.

SECTION 6.04. Executive Officers. At the Effective Time (i) Edward J. Sebastian shall hold the position of Chairman and Chief Executive Officer of RBMG, (ii) Robert C. Walsh shall hold the position of President of RBMG and (iii) David W. Johnson, Jr. shall hold the position of Vice Chairman of RBMG and Managing Director of RBMG's prime mortgage lending operations. If any of such persons is unable or unwilling to hold such offices as set forth above, his successor shall be selected by the Board of Directors of RBMG in accordance with its Bylaws.

SECTION 6.05. Pooling Affiliates. (a) WSI shall use its reasonable efforts to deliver or cause to be delivered to RBMG, prior to the Effective Time, an Affiliate Letter in the form attached hereto as Exhibit 6.05(a) (the "WSI Affiliate Letter"), executed by each of the Pooling Affiliates of WSI.

(b)     RBMG shall use its reasonable efforts to deliver or cause to be delivered to WSI, prior the Effective Time, an Affiliate Letter in the form attached hereto as Exhibit 6.05(b) (the "RBMG Affiliate Letter"), executed by each of the Pooling Affiliates of RBMG.

41

WS2000002417

SECTION 6.06.  Directors' and Officers' Indemnification.  (a) The Certificate of Incorporation of WSI and the Certificate of Incorporation of RBMG and the Bylaws of WSI and RBMG, as the case may be, shall contain the indemnification provisions that are set forth, as of the date of this Agreement, in the Certificate of Incorporation of WSI, the Certificate of Incorporation of RBMG and the Bylaws of WSI and RBMG, as the case may be, which provisions shall not be amended, repealed or otherwise modified for a period of six years from the Effective Time in any manner that would affect adversely the rights thereunder of individuals who at or at any time prior to the Effective Time were directors, officers, employees, fiduciaries or agents of WSI or RBMG, respectively.

(b)     This Section 6.06 is intended to be for the benefit of, and shall be enforceable by, the indemnified parties, their heirs and personal representatives and shall be binding on WSI and RBMG and their respective successors and assigns.

(c)     Notwithstanding anything to the contrary contained herein, RBMG and the Surviving Corporation shall, and RBMG shall cause the Surviving Corporation to, assume and perform all obligations of WSI arising under any indemnification agreement entered into prior to the date hereof between WSI and certain officers and directors of WSI.

(d)     From and after the Effective Time, RBMG agrees that it shall indemnify and hold harmless each present and former director and officer of WSI and RBMG determined as of the Effective Time (the "Indemnified Parties"), against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities (collectively, "Costs") incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, to the fullest extent that WSI and RBMG would have been permitted under Delaware law, and their respective charter documents (each as in effect on the date hereof) to indemnify such Indemnified Parties (and RBMG shall also advance expenses as incurred to the fullest extent permitted under applicable Law; provided, however, that the Indemnified Party to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined pursuant to a final, non-appealable judgment by a court of competent jurisdiction that such Indemnified Party is not entitled to indemnification).

(e)     To the extent paragraph (d) shall not serve to indemnify and hold harmless any Indemnified Party, for a period of six years after the date hereof, RBMG shall, subject to the terms set forth herein, indemnify and hold harmless, to the fullest extent permitted under applicable Law (and RBMG shall also advance expenses as incurred to the fullest extent permitted under applicable Law; provided, however, that the Indemnified Party to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such Indemnified Party is not entitled to indemnification), each Indemnified Party against any Cost incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to the transactions contemplated by this

42

WS2000002418

Agreement; provided, further, however, that RBMG shall not be required to indemnify any Indemnified Party pursuant hereto if it shall be determined that the Indemnified Party acted in bad faith and not in a manner such Indemnified Party believed to be in or not opposed to the best interests of WSI or RBMG, as the case may be.

(f)     Any Indemnified Party wishing to claim indemnification under paragraphs (d) or (e) of this Section 6.06, upon learning of any such claim, action, suit, proceeding or investigation, shall promptly notify RBMG thereof, but the failure to so notify shall not relieve RBMG of any liability it may have to such Indemnified Party except to the extent that such failure materially prejudices RBMG. In the event of any such claim, action, suit, proceeding or investigation (whether arising before or after the Effective Time), (i) RBMG shall have the right to assume the defense thereof and RBMG shall not be liable to such Indemnified Parties for any legal expenses of other counsel or any other expenses subsequently incurred by such Indemnified Parties in connection with the defense thereof, except that if RBMG elects not to assume such defense or counsel for the Indemnified Parties advises that there are issues which raise conflicts of interest between RBMG and the Indemnified Parties, the Indemnified Parties may retain counsel satisfactory to them, and RBMG shall pay all reasonable fees and expenses of such counsel for the Indemnified Parties promptly as statements therefor are received; provided, however, that RBMG shall be obligated pursuant to this paragraph (f) to pay for only one firm of counsel for all Indemnified Parties in any jurisdiction unless the use of one counsel for such Indemnified Parties would present such counsel with a conflict of interest, (ii) the Indemnified Parties shall cooperate in the defense of any such matter and (iii) RBMG shall not be liable for any settlement effected without its prior written consent; and provided further, however, that RBMG shall not have any obligation hereunder to any Indemnified Party when and if a court of competent jurisdiction shall ultimately determine, and such determination shall have become final, that the indemnification of such Indemnified Party in the manner contemplated hereby is prohibited by applicable Law. Notwithstanding the foregoing, if such indemnity is not available with respect to any Indemnified Party, then RBMG and the Indemnified Party shall contribute to the amount payable in such proportion as is appropriate to reflect relative faults and benefits.

(g)  .   If RBMG or any of its successors or assigns (i) shall consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any individual, corporation or other entity, then and in each such case, proper provisions shall be made so that the successors and assigns of RBMG shall assume all of the obligations set forth in this Section 6.06.

SECTION 6.07.  No Shelf Registration.  RBMG shall not be required to amend or maintain the effectiveness of the Registration Statement for the purpose of permitting resale of the shares of RBMG Common Stock received pursuant hereto by the persons who may be deemed to be "affiliates" of WSI or RBMG within the meaning of Rule 145 promulgated under the Securities Act.

SECTION 6.08.  Public Announcements.  The initial press release concerning the Reorganization shall be a joint press release and, thereafter, WSI and RBMG shall consult with each

43

WS2000002419

other before issuing any press release or otherwise making any public statements with respect to this Agreement or the Reorganization and shall not issue any such press release or make any such public statement without the prior written approval of the other parties hereto, except to the extent that RBMG may be required by applicable Law or the requirements of the NMS, in which case RBMG shall use its reasonable efforts to consult with WSI before issuing any such release or making any such public statement.

SECTION 6.09.  NMS Additional Listing.  Each of the parties hereto shall use its reasonable efforts to obtain, prior to the Effective Time, approval for additional listing on the NMS, effective upon the official notice of issuance, of the shares of RBMG Common Stock into which the Shares will be converted pursuant to Article II hereof.

SECTION 6.10.  Blue Sky.  Each of the parties hereto shall use all reasonable efforts to obtain, prior to the Effective Time, all necessary blue sky permits and approvals required under Blue Sky Laws to permit the distribution of the shares of RBMG Common Stock to be issued in accordance with the provisions of the Agreement.

SECTION 6.11.  Headquarters.  WSI and RBMG agree that the Bylaws of RBMG will provide that the corporate headquarters of RBMG shall be located in Columbia, South Carolina.

SECTION 6.12.  Post-Merger RBMG Board of Directors.  At the Effective Time, the total number of persons serving on the Board of Directors of RBMG shall be eight and shall be those six persons set forth on Exhibit 6.12 hereto (unless otherwise agreed in writing by WSI and RBMG prior to the Effective Time) and two additional persons to be nominated by Edward J. Sebastian and David W. Johnson, Jr. and approved by the RBMG Board of Directors, including approval of a majority of Messrs. John C. Baker, Stuart M. Cable, Boyd M. Guttery, and John O. Wolcott.

ARTICLE VII

CONDITIONS TO THE MERGER

SECTION 7.01.  Conditions to the Obligations of Each Party to Consummate the Merger.  The obligations of the parties hereto to consummate the Merger, or to permit the consummation of the Merger, are subject to the satisfaction or, if permitted by applicable Law, waiver of the following conditions:

(a)  the Registration Statement shall have been declared effective by the SEC under the Securities Act and no stop order suspending the effectiveness of the Registration Statement shall have been issued by the SEC and no proceeding for that purpose shall have been initiated by the SEC and not concluded or withdrawn;

44

(b)      each of this Agreement and the Merger and the Amended Certificate of Incorporation of RBMG shall have been duly approved by the requisite vote of stockholders of RBMG, in accordance with the DGCL and the NMS;

(c)      each of the Agreement and the Merger shall have been duly approved by the requisite vote of the stockholders of WSI, in accordance with the DGCL;

(d)      no court of competent jurisdiction shall have issued or entered any order, writ, injunction or decree, and no other Governmental Entity shall have issued any order, which is then in effect and has the effect of making the Merger illegal or otherwise prohibiting its consummation;

(e)      any waiting period (and any extension thereof) applicable to the consummation of the Reorganization under the HSR Act or any other applicable competition, merger control or similar Law shall have expired or been terminated;

(f)      all consents, approvals and authorizations legally required to be obtained to consummate the Reorganization shall have been obtained from all Governmental Entities, except where the failure to obtain any such consent, approval or authorization would not result in a change in or have an effect on the business of WSI or RBMG that is, or is reasonably likely to be, materially adverse to the business, assets (including intangible assets), liabilities (contingent or otherwise), condition (financial or otherwise) or results of operations of RBMG and its respective subsidiaries, taken as a whole;

(g)      all permits or approvals required by state securities or Blue Sky Laws to carry out the transactions contemplated hereby shall have been received;

(h)      the shares of RBMG Common Stock into which the Shares will be converted pursuant to Article II hereof, the shares of RBMG Common Stock issuable pursuant to the Escrow Stock Rights and the shares of RBMG Common Stock issuable upon the exercise of the RBMG Warrant pursuant to Section 2.09 hereof shall have been authorized for listing on the NMS, subject to official notice of issuance;

(i)      RBMG or WSI shall have obtained one or more commitments reasonably satisfactory to the Chief Executive Officer of RBMG and the Chief Executive Officer of WSI which provide a warehouse facility for the sub-prime business of at least $300 million from and after the Effective Time; and

(j)      Both RBMG and WSI shall have been advised in writing, as of the Effective Time, by Price Waterhouse LLP, that, in accordance with U.S. GAAP, based upon discussions with officials responsible for financial and accounting matters and information furnished to Price Waterhouse LLP, Price Waterhouse LLP concurs with management's conclusion that no conditions relating to RBMG or WSI exist that would preclude RBMG's accounting for the Merger

45

WS2000002421

as a "pooling of interests," and RBMG and WSI shall have been advised in writing, as of the Effective Time, by KPMG Peat Marwick that based upon inquiries and their examination of the financial statements of WSI they are not aware of any conditions relating to WSI that would preclude the use of "pooling of interests" accounting in connection with the Merger.

SECTION 7.02.  Conditions to the Obligations of WSI.  The obligations of WSI to consummate the Merger, or to permit the consummation of the Merger, are subject to the satisfaction or, if permitted by applicable Law, waiver of the following further conditions:

(a)   each of the representations and warranties of RBMG contained in this Agreement that is qualified by materiality shall be true and correct on and as of the Effective Time as if made at and as of the Effective Time (other than representations and warranties which address matters only as of a certain date which shall be true and correct as of such certain date) and each of the representations and warranties that is not so qualified shall be true and correct in all material respects on and as of the Effective Time as if made at and as of the Effective Time (other than representations and warranties which address matters only as of a certain date which shall be true and correct in all material respects as of such certain date), in each case except as contemplated or permitted by this Agreement, and WSI shall have received a certificate of the Chairman or President and Chief Financial Officer of RBMG to such effect;

(b)   RBMG shall have performed or complied in all material respects with all material agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Effective Time and WSI shall have received a certificate of the Chairman or President and Chief Financial Officer of RBMG to that effect;

(c)   St. John & Wayne, L.L.C. or King & Spalding shall have issued its opinion, such opinion dated on or about the Effective Time and on or about the date that is two business days prior to the date the Proxy Statement is first mailed to stockholders of RBMG, addressed to WSI, and reasonably satisfactory to it, based upon customary representations of WSI and RBMG and customary assumptions, to the effect that the Merger will be treated for federal income tax purposes as a reorganization qualifying under the provisions of Section 368(a) of the Code and that the stockholders of WSI will recognize no gain or loss upon the receipt of shares of RBMG Common Stock in exchange for shares of WSI Common Stock or WSI Class B Common Stock in the Merger, which opinion shall not have been withdrawn or modified in any material respect;

(d)   RBMG shall have executed an employment agreement in substantially the form as attached hereto as Exhibit 7.02(d), pursuant to which Robert C. Walsh shall serve as President of RBMG;

(e)   RBMG shall have executed the Stockholders Agreement in substantially the form as attached hereto as Exhibit 7.02(e) (the "Stockholders Agreement");

46

WS2000002422

(f)    RBMG shall have executed the Registration Rights Agreement in substantially the form as attached hereto as Exhibit 7.02(f) (the "Registration Rights Agreement");

(g)    RBMG shall have executed the Stock Purchase Warrant in substantially the form as attached as Exhibit 7.02(g) (the "RBMG Warrant") (if the WSI Warrant is then outstanding);

(h)    The Escrow Agent, RBMG and the Independent Committee shall have executed the Escrow Trust Agreement; and

(i)    RBMG shall have received the written resignations of such members of the Board of Directors of RBMG so as to permit the reconstitution of the Board in accordance with Section 6.12 hereof.

SECTION 7.03.  Conditions to the Obligations of RBMG.  The obligations of RBMG to consummate the Merger, or to permit the consummation of the Merger, are subject to the satisfaction or, if permitted by applicable Law, waiver of the following further conditions:

(a)    each of the representations and warranties of WSI and the Principal Stockholder contained in this Agreement that is qualified by materiality shall be true and correct on and as of the Effective Time as if made at and as of the Effective Time (other than representations and warranties which address matters only as of a certain date which shall be true and correct as of such certain date) and each of the representations and warranties that is not so qualified shall be true and correct in all material respects on and as of the Effective Time as if made on and as of such date (other than representations and warranties which address matters only as of a certain date which shall be true and correct in all material respects as of such certain date), in each case except as contemplated or permitted by this Agreement, and RBMG shall have received a certificate of the Principal Stockholder and the Chairman or President and Chief Financial Officer of WSI to such effect;

(b)    WSI and the Principal Stockholder shall have performed or complied in all material respects with all material agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Effective Time and RBMG shall have received a certificate of the Principal Stockholder and the Chairman or President and Chief Financial Officer of WSI to that effect;

(c)    The WSI Stockholders (who are parties thereto) shall have executed the Stockholders Agreement;

(d)    The WSI Stockholders (including the Warrantholder) shall have executed the Registration Rights Agreement;

47

WS2000002423

(e)     The Escrow Agent, the Warrantholder and the Stockholder Representative shall have executed the Escrow Trust Agreement;

(f)     Each of the key employees of WSI listed in Exhibit 7.03(f) shall have executed an employment agreement in substantially the form as attached hereto as Exhibit 7.03(f)-1 (collectively, the "Key Employee Agreements") and a Noncompetition Agreement in substantially the form as attached hereto as Exhibit 7.03(f)-2 (collectively the "Noncompetition Agreements");

(g)     Each of the employees of WSI set forth in Exhibit 7.03(g) shall have executed an employment agreement in substantially the form as attached hereto as Exhibit 7.03(g) (collectively, the "Employee Agreements"); and

(h)     The Warrantholder shall have surrendered the WSI Warrant (if then outstanding) in exchange for the RBMG Warrant and terminated the Warrantholders Agreements (as defined in the Indemnification Agreement).

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

SECTION 8.01.   Termination.   This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, notwithstanding any requisite adoption and approval of this Agreement, as follows:

(a)     by mutual written consent duly authorized by the Board of Directors of WSI and RBMG;

(b)     by WSI or RBMG, if the Effective Time shall not have occurred on or before November 1, 1997; provided, however, that the right to terminate this Agreement under this Section 8.01(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have caused, or resulted in, the failure of the Effective Time to occur on or before such date; provided, further, however, that, if any action is required to be taken either (i) pursuant to Section 5.12 in order to cure any problem which is curable which caused the Merger to fail to be characterized as a "pooling of interests" for accounting purposes or (ii) pursuant to Section 5.08 in order to cure any problem which is curable which caused the Merger to fail to qualify as a reorganization under the provisions of Section 368(a) of the Code, and such failure, as the case may be, was the sole reason that the Merger could not be consummated on or prior to November 1, 1997, this Agreement may not be terminated pursuant to this clause (b) unless the Effective Time shall not have occurred on or before December 1, 1997;

48

WS2000002424

(c)    by WSI or RBMG, if any Governmental Order, writ, injunction or decree preventing the consummation of any of the Merger shall have been entered by any court of competent jurisdiction and shall have become final and nonappealable;

(d)    by WSI if (i) in accordance with the proviso to Section 6.01(b), the Board of Directors of RBMG withdraws, modifies or changes its recommendation of this Agreement and the Merger in a manner adverse to WSI or its stockholders or shall have resolved to do so, (ii) the Board of Directors of RBMG shall have recommended to the stockholders of RBMG a Competing Transaction or shall have resolved to do so, or (iii) a tender offer or exchange offer for 15 percent or more of the outstanding shares of capital stock of RBMG is commenced and the Board of Directors of RBMG fails to recommend against acceptance of such tender offer or exchange offer by its stockholders (including by taking no position with respect to the acceptance of such tender offer or exchange offer by its stockholders);

(e)    by WSI or RBMG, (i) if this Agreement and the Merger shall fail to receive the requisite votes for approval at the RBMG Stockholders' Meeting or any adjournment or postponement thereof or (ii) if this Agreement and the Merger shall fail to receive the requisite votes for approval at the WSI Stockholders' Meeting or any adjournment or postponement thereof;

(f)    by RBMG, if the Board of Directors of RBMG shall withdraw, modify or change its recommendation of the approval of this Agreement and the Merger and the Board of Directors of RBMG determines, following consultation with outside legal counsel (who may be RBMG's regularly engaged outside legal counsel), that failure to take such action would be inconsistent with its duties to its stockholders under applicable Law and prior to such determination any person (other than WSI) shall have made a public announcement or otherwise communicated with RBMG with respect to a Competing Transaction that, as determined by the Board of Directors of RBMG after consultation with its outside legal counsel (who may be its regularly engaged outside legal counsel) and financial advisors, contains terms more favorable to the stockholders of RBMG than those provided for in the Reorganization; provided, however, that RBMG may not terminate this Agreement pursuant to this Section 8.01(f) until three business days have lapsed following delivery to WSI of written notice of such determination of RBMG; provided further, however, that such termination under this Section 8.01(f) shall not be effective until RBMG has made payment to WSI of the amounts required to be paid pursuant to Section 8.05(b); or

(g)    by WSI or RBMG, if the closing price per share of RBMG Common Stock, as reported by the NMS, for a period of 10 consecutive trading days during the period from the date hereof until the last trading day prior to the RBMG Stockholders' Meeting is less than $12.00.

SECTION 8.02.  Effect of Termination.  Except as provided in Section 9.01, in the event of termination of this Agreement pursuant to Section 8.01, this Agreement shall forthwith become void, there shall be no liability under this Agreement on the part of any of WSI or RBMG or any of their respective officers or directors, and all rights and obligations of each party hereto shall

49

WS2000002425

cease, subject to the remedies of the parties hereto set forth in Sections 8.05(a), (b), (c) and (d); provided, however, that nothing herein shall relieve any party hereto from liability for the wilful or intentional breach of any of its representations and warranties or the wilful or intentional breach of any of its covenants or agreements set forth in this Agreement.

SECTION 8.03. Amendment. This Agreement may be amended by the parties hereto by action taken by such party in the case of the Principal Stockholder or by or on behalf of their respective Board of Directors in the case of WSI and RBMG at any time prior to the Effective Time; provided, however, that no amendment may be made (except such amendments that have received the requisite stockholder approval and such amendments as are permitted to be made without WSI stockholder approval or RBMG stockholder approval under the DGCL) that would (i) reduce the amount or change the type of consideration into which each share of WSI Common Stock shall be converted upon consummation of the Merger, (ii) change any terms of this Agreement in a manner that would materially and adversely affect WSI or RBMG, as the case may be, or WSI's stockholders or RBMG's stockholders, as the case may be, or (iii) change any term of the Certificate of Incorporation of WSI or RBMG except as contemplated hereby. This Agreement may not be amended except by an instrument in writing signed by the parties hereto.

SECTION 8.04. Waiver. At any time prior to the Effective Time, any party hereto may (a) extend the time for or waive compliance with the performance of any obligation or other act of any other party hereto or (b) waive any inaccuracy in the representations and warranties contained herein or in any document delivered pursuant hereto. Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby.

SECTION 8.05. Fees and Expenses. (a) Except as set forth in this Section 8.05, all Expenses incurred in connection with this Agreement and the Merger shall be paid by the party incurring such Expenses, whether or not the Merger is consummated; provided, however, that all Expenses related to (i) regulatory filing fees pursuant to the HSR Act and (ii) printing, filing and mailing the Registration Statement and the Joint Proxy Statement and all SEC and other regulatory filing fees incurred in connection with the Registration Statement and the Joint Proxy Statement shall be borne equally by WSI and RBMG. "Expenses", as used in this Agreement, shall include all reasonable out-of-pocket expenses (including, without limitation, all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its affiliates) and regulatory filing fees incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of its obligations pursuant to this Agreement and the consummation of the Merger.

(b)     RBMG agrees that, if:

(i)     RBMG shall terminate this Agreement pursuant to Section 8.01(f),

(ii) (A) WSI shall terminate this Agreement pursuant to Section 8.01(d) and (B) at the time of such termination, there shall exist a Competing Transaction with respect to RBMG; or

50

(iii) (A) WSI shall terminate this Agreement pursuant to Section 8.01(e), (B) prior to the RBMG Stockholders Meeting, RBMG shall have furnished information to, or entered into discussions or negotiations with, any person or entity with respect to a Competing Transaction involving RBMG and RBMG shall not have reaffirmed its recommendation to its stockholders with respect to the transactions contemplated in this Agreement by the time of the RBMG Stockholders Meeting and (C) within 12 months thereafter, RBMG shall enter into a definitive agreement with respect to any Competing Transaction or any Competing Transaction shall be consummated,

then, in the case of (i), contemporaneous with such termination, in the case of (ii) promptly (but in no event later than 10 days) after such termination, or, in the case of (iii), promptly after such entering into of such definitive agreement or such consummation, RBMG shall pay to WSI an amount equal to the sum of Ten Million Dollars ($10,000,000), which amount is inclusive of all WSI's Expenses (the "RBMG Termination Fee").

(c)   Any payment required to be made pursuant to Section 8.05(b) shall be made to WSI not later than two business days after delivery to RBMG of notice of demand for payment and shall be made by wire transfer of immediately available funds to an account designated by WSI in the notice of demand for payment delivered pursuant to this Section 8.05(c).

(d)   In the event that RBMG shall fail to pay the RBMG Termination Fee, the amount of any such RBMG Termination Fee shall be increased to include the cost and expenses actually incurred or accrued by WSI (including, without limitation, fees and expenses of counsel) in connection with collection on and enforcement of this Section 8.05, together with interest on such unpaid RBMG Termination Fee, commencing on the date that such RBMG Termination Fee became due, at a rate equal to the rate of interest publicly announced by Citibank, N.A., from time to time, in the city of New York, from time to time, at such bank's base rate plus two percent.

## ARTICLE IX

## GENERAL PROVISIONS

SECTION 9.01.   Non-Survival of Representations and Warranties.   The representations and warranties in this Agreement shall terminate at the Effective Time or upon the termination of this Agreement pursuant to Section 8.01, as the case may be; provided, however, that the representations, warranties, covenants and indemnity obligations of the WSI Stockholders pursuant to the Indemnity Agreement shall not terminate at the Effective Time and shall survive the Effective Time for the relevant period set forth therein. Each party agrees that, except for the representations and warranties contained in this Agreement, including the WSI Disclosure Schedule and the RBMG Disclosure Schedule, no party hereto has made any other representation and warranties, and each party hereby disclaims any other representations and warranties made by itself or any of its officers, directors, employees, agents, financial and legal advisors or other representatives, with respect to the execution and delivery of this Agreement or the Merger

51

contemplated herein, notwithstanding the delivery or disclosure to any other party or any party's representatives of any documentation or other information with respect to any one or more of the foregoing.

SECTION 9.02. Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by telecopy or facsimile, by registered or certified mail (postage prepaid, return receipt requested) or by a nationally recognized courier service to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.02):

(a)     if to WSI:

Walsh Holding Co., Inc.
4 Campus Drive
Parisppany, New Jersey 07054
Attention: Robert C. Walsh
Telecopier: (201) 538-0574

with a copy to:

St. John & Wayne, L.L.C.
Two Penn Plaza East
Newark, New Jersey 07105
Attention: John J. Oberdorf, Esq.
Telecopier: (201) 491-3402

(b)     if to RBMG or Merger Sub:

Resource Bancshares Mortgage Group, Inc.
7909 Parklane Road
Columbia, South Carolina 29223
Attention: David W. Johnson, Jr.
Telecopier: (803) 741-3708

with a copy to:

King & Spalding
191 Peachtree Street
Atlanta, Georgia 30303
Attention: Russell B. Richards, Esq.
Telecopier: (404) 572-5100

52

WS2000002428

SECTION 9.03. <u>Certain Definitions</u>. For purposes of this Agreement, the following terms have the following meanings:

(a)     "<u>affiliate</u>" has the meaning specified in Rule 144 promulgated by the SEC under the Securities Act;

(b)     "<u>Ancillary Agreements</u>" means the Indemnity Agreement, the Escrow Trust Agreement, the Registration Rights Agreement, the Key Employee Agreements, the Noncompetition Agreements, the Employee Agreements and the Stockholders Agreement;

(c)     "<u>Beneficial Owner</u>" with respect to any shares of capital stock means a person who shall be deemed to be the beneficial owner of such shares (i) which such person or any of its affiliates or associates (as such term is defined in Rule 12b-2 promulgated under the Exchange Act) beneficially owns, directly or indirectly, (ii) which such person or any of its affiliates or associates has, directly or indirectly, (A) the right to acquire (whether such right is exercisable immediately or subject only to the passage of time), pursuant to any agreement, arrangement or understanding or upon the exercise of consideration rights, exchange rights, warrants or options, or otherwise, or (B) the right to vote pursuant to any agreement, arrangement or understanding, or (iii) which are beneficially owned, directly or indirectly, by any other persons with whom such person or any of its affiliates or associates or person with whom such person or any of its affiliates has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of any shares of capital stock;

(d)     "<u>Business Day</u>" means any day in which the principal offices of the SEC in Washington, D.C. are open to accept filings; in the case of determining a date when any payment is due, any day on which banks are not required or authorized by law or executive order to close in the City of New York, USA;

(e)     "<u>$</u>" means United States Dollars;

(f)     "<u>Governmental Order</u>" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Entity;

(g)     "<u>Knowledge</u>" means, with respect to any matter in question, that the principal stockholders, the executive officers of WSI or RBMG, as the case may be, (i) have actual knowledge of such matter or (ii) after due investigation, should have known of such matter;

(h)     "<u>Lease</u>" means each lease of Leased Real Property, wherein WSI is the tenant (including all amendments, consents for alterations and documents regarding variations and evidence of commencement dates and expiration dates);

(i)     "<u>Leased Real Property</u>" means the real property leased by WSI, as tenant, together with, to the extent leased by WSI, all buildings and other structures, facilities or

53

WS2000002429

improvements currently or hereafter located thereon, all fixtures and improvements thereon, and all easements, licenses, rights and appurtenances relating to the foregoing;

      (j)    "Permitted Encumbrances" means (a) liens for Taxes and assessments not yet payable, and (b) imperfections of title, liens, security interests and other encumbrances the existence of which, individually and in the aggregate, do not have a WSI Material Adverse Effect;

      (k)    "Person" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including, without limitation, a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association, entity or government or political subdivision, agency or instrumentality of a government;

      (l)    "Subsidiary" or "Subsidiaries" of any person means any corporation, limited liability company, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary of such person) owns, directly or indirectly, more than 50 percent of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation of other legal entity;

      (m)    "WSI Warrant" means the warrant of the Warrantholder to purchase 24.99 shares of WSI Class B Common Stock issued pursuant to a Warrant Agreement (the "Warrant Agreement"), dated April 18, 1996, between the Warrantholder and WSI.

    SECTION 9.04.  Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Reorganization is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the paries as closely as possible in a mutually acceptable manner to the fullest extent permitted by applicable Law in order that the Merger may be consummated as originally contemplated to the fullest extent possible.

    SECTION 9.05.  Assignment; Binding Effect; Benefit.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties hereto.  Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, heirs and executors and permitted assigns.  Notwithstanding anything contained in this Agreement to the contrary, other than Section 6.06, nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties hereto or their respective successors, heirs and executors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

WS2000002430

SECTION 9.06.  Incorporation of Exhibits.  The WSI Disclosure Schedule, the RBMG Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein and made a part of this Agreement for all purposes as if fully set forth herein.

SECTION 9.07.  Specific Performance.  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or in equity.

SECTION 9.08.   Governing Law.  Except to the extent that the Laws of the jurisdiction of organization of any party hereto, or any other jurisdiction, are mandatorily applicable to the Merger or to matters arising under or in connection with this Agreement, this Agreement shall be governed by the Laws of the State of New York.

SECTION 9.09.  Consent to Jurisdiction; Venue.  (a) Each of the parties hereto irrevocably submits to the exclusive jurisdiction of the state courts of New York and to the jurisdiction of the United States District Court for the Southern District of New York, for the purpose of any action or proceeding arising out of or relating to this Agreement and each of the parties hereto irrevocably agrees that all claims in respect to such action or proceeding may be heard and determined exclusively in any New York state or federal court sitting in the City of New York. Each of the parties hereto agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto irrevocably consents to the service of any summons and complaints and any other process in any other action or proceeding relating to the Merger, on behalf of itself or its property, by the personal delivery of copies of such process to such party. Nothing in this Section 9.09 shall affect the right of any party hereto to serve legal process in any other manner permitted by Law.

SECTION 9.10.  Headings.  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 9.11.  Counterparts.  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

SECTION 9.12.  Entire Agreement.  This Agreement (including the Exhibits, the WSI Disclosure Schedule, the RBMG Disclosure Schedule, the Confidentiality Agreement and the Ancillary Agreements) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the parties with respect thereto.  No addition to or modification of any provision of this Agreement shall be binding upon any party hereto unless made in writing and signed by all parties hereto.

WS2000002431

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**WALSH HOLDING CO., INC.**

By: _____
      Name: Robert C. Walsh
      Title: Chairman of the Board, Chief Executive Officer & President

**RESOURCE BANCSHARES MORTGAGE GROUP, INC.**

By: _____
      Name: Edward J. Sebastian
      Title: Chairman of the Board and Chief Executive Officer

**CAROLINA MERGER SUB, INC.**

By: _____
      Name: Edward J. Sebastian
      Title: President

      _____
      Robert C. Walsh

ATL_339708.15
WS2009002432

# EXHIBIT E

FEB-27-2006 13:08 From:                              To:0410471060586558000  P.2/16

# BOIES, SCHILLER & FLEXNER LLP

150 JOHN F KENNEDY PARKWAY • 4TH FLOOR • SHORT HILLS NJ 07078 • PH 973.218 1111 • FAX 973 218 1106

February 27, 2006

To All Counsel and Pro Se Defendants (Via Facsimile)

Re:   *Walsh Securities, Inc. v. Cristo Property Management, Ltd., et al.*
      <u>Civ. No. 97-3496(WGB)</u>

Dear Sir/Madam:

Enclosed please find Exhibit B to Walsh's Securities, Inc.'s First Supplemental Responses and Objections to Commonwealth Land Title Insurance Company's First Set of Interrogatories. This chart replaces the chart which was attached to our responses dated February 24, 2006.

Very truly yours,

Robert A. Magnanini

RAM/r
Enclosures

NEW YORK     WASHINGTON DC     FLORIDA     CALIFORNIA     NEW HAMPSHIRE     NEW JERSEY
www.bsfllp.com

FEB-27-2006 13:08 From:                                    To:04104710605065S0000   P.3/16

**Walsh Securities**
**Summary of Fraud Loans**

| Loan No. | Borrower | Closing Date | Street No | Street Address | City | State Code | Zip | Purchase Price | Walsh Loan Amount | Total Loans | Interest @ 12.0% (5-30) Vül Bas 3-31.65) | Other 2nd Mtg. Money | Deposit Due | Cash Due | Loan Orgn. Fee to National | Conv. Fee to Agent | Atty. Fees Paid to ? | Silard/ Fees Closing Paid to Fees | Asst. Attny. Paid to Fees | Paid Fees To | Paid by | Cash to Amount | Title | Appraisal Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 622172 | ASPAR, RAYMOND | 10/15/1996 | 35 | Springdale Avenue | Verona | NJ | 07167 | 150,000 | 112,500 | 216,039 | 326,039 | 23,000 | 13,000 | 977 | 300 | 600 | Yadar | 600 | 600 | Pepsy | 600 | Yadar | S | 1,255 | 124,369 | 450 |
| 622309 | Ala, James | 10/22/1996 | 222 | Hamilton Place | Paterson | NJ | 07601 | 115,000 | 88,250 | 165,080 | 252,519 | 20,250 | 11,500 | 2,392 | 300 | 600 | Pepsy | 600 | Yadar | S | 1,200 | 94,225 | 400 |
| 622354 | Ala, James | 10/22/1996 | 222 | Barnhart Avenue | Jersey City | NJ | 07304 | 115,000 | 90,250 | 166,569 | 256,363 | 20,250 | 13,500 | 197 | 300 | 600 | Pepsy | 600 | Yadar | S | 1,203 | 112,271 | 400 |
| 622281 | AMADOR, JOSEPH L. | 11/21/1996 | 113 | West Bergen Place | Red Bank | NJ | 07701 | 80,000 | 90,000 | 197,716 | 302,774 | 29,400 | 13,000 | 191 | 300 | 600 | Yadar | 600 | Pepsy | S | 1,000 | 115,500 | 450 |
| 622171 | APGAR, RAYMOND C. | 11/01/1996 | 704 | Pine Street | Asbury Park | NJ | 07712 | 120,000 | 112,500 | 217,294 | 293,540 | 22,200 | 112,300 | 1,279 | 300 | 600 | Yadar | 600 | Pepsy | S | 1,255 | 126,874 | 450 |
| 622174 | APGAR, RAYMOND C. | 10/03/1996 | 83 | Jefferson Street | Paterson | NJ | 07522 | 96,250 | 195,309 | 195,309 | 252,615 | 17,250 | 85,250 | 648 | 300 | 600 | Pepsy | 600 | Yadar | S | 1,265 | 128,954 | 450 |
| 622176 | APGAR, RAYMOND C. | 10/16/1996 | 245 | Princeton Avenue | Jersey City | NJ | 07305 | 125,000 | 90,250 | 180,635 | 274,086 | 19,795 | 12,900 | 663 | 300 | 600 | Pepsy | 600 | Yadar | S | 951 | 121,125 | 450 |
| 622293 | APGAR, RAYMOND C. | 11/07/1996 | KK3 | Summerfield Avenue | Asbury Park | NJ | 07712 | 112,500 | 112,500 | 217,001 | 323,501 | 22,500 | 16,000 | 5,515 | 300 | 600 | Pepsy | 600 | Yadar | S | 552 | 117,723 | 450 |
| 622243 | BATZ, DEREK A | 9/20/1996 | 405 | Third Avenue | Bradley Heights | NJ | 07201 | 185,000 | 148,000 | 205,481 | 332,461 | 37,000 | 8,473 | 300 | 600 | Chelsea | 600 | Pepsy | S | 1,194 | 143,223 | 450 |
| 618341 | BALOGH JR., RONALD C. | 9/20/1996 | 157 | Van Horne Street | Jersey City | NJ | 07308 | 125,000 | 93,750 | 183,710 | 274,566 | 18,750 | 12,380 | 711 | 300 | 600 | Pepsy | 600 | Chelsea | S | 1,200 | 105,072 | 450 |
| 619542 | BALOGH JR., RONALD C. | 9/20/1996 | 372 | Orchid Avenue | Long Branch | NJ | 07740 | 70,000 | 90,000 | 173,623 | 263,803 | 18,000 | 12,000 | 702 | 300 | 600 | Pepsy | 600 | Yadar | S | 888 | 89,243 | 450 |
| 619546 | BALOGH JR., RONALD C. | 9/20/1996 | 251 | WILBUR RAY AVENUE | Long Branch | NJ | 07740 | 90,000 | 90,000 | 173,623 | 263,803 | 18,000 | 12,000 | 702 | 300 | 600 | Pepsy | 600 | Yadar | S | 9751 | 88,345 | 450 |
| 619544 | BALOGH JR., RONALD C. | 9/20/1996 | 222 | Orchid Avenue | Long Branch | NJ | 07740 | 90,000 | 90,000 | 173,623 | 263,803 | 18,000 | 12,000 | 702 | 300 | 600 | Pepsy | 600 | Yadar | S | 948 | 95,531 | 450 |
| 619548 | BALOGH JR., RONALD C. | 9/20/1996 | 629 | 20th Street | Irvington | NJ | 07111 | 150,000 | 131,000 | 168,372 | 258,552 | 20,250 | 13,300 | 745 | 300 | 600 | Pepsy | 600 | Yadar | S | 743 | 93,519 | 450 |
| 622317 | BREHENY, STEVEN R. | 11/21/1996 | 39 | Otre Hills Road | Edison | NJ | 08830 | 416,000 | 373,390 | 730,453 | 1,055,852 | 41,500 | 35,000 | 3,507 | 300 | 600 | Pepsy | 600 | Yadar | S | 1,600 | 111,658 | 450 |
| 622425 | BUSTOS, SR., RAFAEL | 11/07/1996 | 330 | Ridge Avenue | Asbury Park | NJ | 07712 | 134,000 | 120,000 | 235,143 | 335,143 | 20,100 | 13,603 | 3,022 | 300 | 600 | Pepsy | 600 | Yadar | S | 2,072 | 136,163 | 450 |
| 622426 | BUSTOS, SR., RAFAEL | 10/31/1996 | 135 | Ridge Avenue | Asbury Park | NJ | 07712 | 195,000 | 136,675 | 269,600 | 405,643 | 27,970 | 16,900 | 894 | 300 | 600 | Pepsy | 600 | Yadar | S | 1,170 | 115,653 | 450 |
| 622528 | BUSTOS, SR., RAFAEL | 11/07/1996 | KK4 | Emory Avenue | Asbury Park | NJ | 07712 | 200,000 | 150,000 | 283,335 | 433,335 | 30,000 | 20,000 | 1,590 | 300 | 600 | Pepsy | 600 | Yadar | S | 1,352 | 108,053 | 450 |
| 622524 | BUSTOS, RONALDO YIDARIO | 11/07/1996 | 1312 | Washington Avenue | Asbury Park | NJ | 07712 | 172,000 | 129,000 | 248,631 | 377,631 | 28,400 | 17,200 | 1,775 | 300 | 600 | Pepsy | 600 | Yadar | S | 1,258 | 166,097 | 0 |
| 624178 | CAMPOLI, DEBRA | 11/07/1996 | 43 | Fourth Avenue | Freehold | NJ | 07721 | 115,000 | 104,300 | 221,165 | 305,686 | 25,000 | 13,500 | 1,022 | 350 | 600 | Pepsy | 600 | Yadar | S | 1,264 | 144,721 | 450 |
| 624180 | CAMPOLI, DEBRA | 12/11/1996 | 45 | Flexible Street | Freehold | NJ | 07728 | 115,000 | 93,100 | 175,562 | 272,582 | 25,000 | 13,300 | 1,025 | 300 | 600 | Pepsy | 600 | Yadar | S | 1,195 | 122,204 | 450 |
| 622860 | CHRISTIAWAL, GREHICH | 4/27/1997 | 29 | Pearl Street | Long Branch | NJ | 07740 | 142,000 | 128,000 | 259,776 | 376,540 | 32,400 | 16,200 | 1,353 | 350 | 600 | Pepsy | 600 | Yadar | S | 1,222 | 137,343 | 450 |
| 619758 | COSARES, NICHOLAS | 6/26/1996 | 622 | Asbury Avenue | Asbury Park | NJ | 07712 | 110,000 | 88,250 | 209,670 | 319,826 | 32,000 | 13,300 | 300 | 640 | Pepsy | 640 | Cholsoo | S | 1,043 | 168,501 | 450 |
| 619959 | COSARES, NICHOLAS | 8/21/1996 | 112 | Swell Avenue | Long Branch | NJ | 07740 | 110,000 | 78,000 | 190,504 | 322,481 | 32,000 | 13,300 | 698 | 350 | Pepsy | 600 | Yadar | S | 834 | 85,518 | 0 |
| 622451 | CRESPO, CRUZ | 4/25/1997 | 559 | Grove Street | Perth Amboy | NJ | 08881 | 130,000 | 120,000 | 166,010 | 265,500 | 32,500 | 420 | 350 | Pepsy | 600 | Chelsea | S | 730 | 63,916 | 450 |
| 623455 | CRUZ JR., NARDO | 11/22/1996 | 302 | Third Avenue | Asbury Park | NJ | 07712 | 204,000 | 533,000 | 296,125 | 449,125 | 30,500 | 20,400 | 1,162 | 4,500 | 600 | Pepsy | 600 | Yadar | S | 950 | 177,343 | 450 |
| 623540 | CRUZ, PATRICIA | 12/30/1996 | 82 | Barront Avenue | Asbury Park | NJ | 07712 | 204,000 | 178,550 | 243,344 | 355,944 | 30,500 | 17,830 | 1,268 | 4,351 | 600 | Pepsy | 600 | Yadar | S | 1,459 | 170,416 | 450 |
| 623560 | CRUZ, PATRICIA | 12/30/1996 | 29 | Abbolon Avenue | Jersey City | NJ | 07304 | 132,000 | 64,000 | 248,029 | 248,029 | 24,000 | 12,000 | 1,263 | 4,158 | 600 | Pepsy | 600 | Yadar | S | 1,081 | 107,752 | 450 |
| 623582 | DASILVA, PAUL | 5/29/1997 | 17 | Main Street | Long Branch | NJ | 07740 | 132,000 | 92,400 | 176,282 | 270,632 | 24,400 | 13,200 | 1,025 | 3,405 | 600 | Pepsy | 600 | Yadar | S | 1,021 | 111,372 | 450 |
| 623832 | DASILVA, PAUL | 5/28/1997 | 396 | Chelton Line | Long Branch | NJ | 07740 | 100,000 | 90,000 | 186,333 | 220,565 | 23,710 | 0 | 3,716 | 600 | Chelsea | 680 | Pepsy | S | 838 | 86,033 | 450 |
| 622617 | DASILVA, PAUL | 5/30/1997 | 62 | River Street | Red Bank | NJ | 07701 | 100,000 | 40,000 | 153,126 | 261,176 | 37,500 | 0 | 4,571 | 600 | Chelsea | 680 | Pepsy | S | 931 | 76,600 | 450 |

1 of 14

Exhibit B to Walsh Securities' First Supplemental Responses to Commonwealth's First Set of Interrogatories

FEB-27-2006 13:09 From: To:8410471060586558000 P.4/16

# Walsh Securities
## Summary of Fraud Loans

| Loan No. | Borrower | Closing Date | Street No | Street Address | City | State | Zip Code | Purchase Price | Walsh Loan Amount | Interest @ 12.0% (5-30-97 thru 3-31-06) | Total Loss | Other 2nd Mtg. | Deposit Money | Cash Due | Loan Orgn. Fees | Com. Fee to National | Atty. Fees Paid to Agent | Sttlmnt/ Closing Fees Paid To | Amnt. Paid for Atty. Fees | Atty. Fees Paid To | Paid By | Title Ins. Amount | Cash to Seller | Appraisal Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 624170 | DELIYSKI, DIMITAR D. | 12/31/1996 | 340 | Franklin Place | Plainfield | NJ | 07060 | 195,000 | 136,500 | 263,298 | 399,798 | 39,000 | 19,500 | 1,042 | 4,778 | 350 | 650 | Pepsny | 650 | Yacker | S | 1,255 | 153,351.74 | 450 |
| 626825 | DEMARINES, ERIN | 3/31/1997 | 35 | Fisk Street | Jersey City | NJ | 07307 | 115,000 | 86,250 | 166,369 | 252,619 | 28,750 | 0 | 4,194 | 3,019 | 350 | 680 | Pepsny | 680 | Cicalese | S | 899 | 111,296.20 | 450 |
| 622858 | DEVINCENZO, DONALD | 11/19/1996 | 102.5 | Oxoola Avenue | Neptune | NJ | 07753 | 124,000 | 93,000 | 179,390 | 272,390 | 18,600 | 12,400 | 1,044 | 2,790 | 300 | 650 | Pepsay | 650 | Yacker | S | 969 | 104,604.28 | 450 |
| 622861 | DEVINCENZO, DONALD | 11/18/1996 | 328 | Fisher Avenue | Neptune | NJ | 07753 | 156,000 | 117,000 | 225,684 | 342,684 | 23,400 | 15,600 | 1,147 | 3,510 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,101 | 132,220.00 | 450 |
| 622013 | DICARO JR., LOUIS | 10/16/1996 | 11 | Abbottsford Avenue | Long Branch | NJ | 07740 | 120,000 | 84,000 | 162,029 | 246,029 | 24,000 | 12,000 | 796 | 2,940 | 300 | 650 | Pepsny | 650 | Yacker | S | 975 | 99,615.07 | 400 |
| 622018 | DICARO JR., LOUIS | 10/24/1996 | 1315 | Springwood Avenue | Asbury Park | NJ | 07712 | 150,000 | 105,000 | 202,537 | 307,537 | 30,000 | 15,000 | 646 | 3,675 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,064 | 125,538.88 | 400 |
| 622054 | DICARO JR., LOUIS | 11/22/1996 | 1041 | Bangs Avenue | Asbury Park | NJ | 07712 | 105,000 | 73,500 | 141,776 | 215,276 | 21,000 | 10,500 | 863 | 2,572 | 300 | 650 | Pepsny | 650 | Yacker | S | 923 | 87,877.62 | 400 |
| 622008 | DIDONNA JR., THOMAS J | 12/30/1996 | 24 | Knoll Place | Newark | NJ | 07106 | 140,000 | 105,000 | 202,537 | 307,537 | 21,000 | 14,000 | 4,771 | 375 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,049 | 116,674.51 | 400 |
| 622009 | DIDONNA JR., THOMAS J | 10/18/1996 | 708 | First Avenue | Asbury Park | NJ | 07712 | 164,500 | 128,375 | 243,768 | 370,143 | 0 | 0 | 0 | 0 | 0 | 0 | N/A | 0 | Yacker | N/A | 0 | 0.00 | 0 |
| 622010 | DIDONNA JR., THOMAS J | 12/30/1996 | 246 | Bayside Drive | Highlands | NJ | 07732 | 189,000 | 141,750 | 273,425 | 415,175 | 28,350 | 18,900 | 742 | 4,961 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,321 | 158,752.75 | 400 |
| 622547 | DIDONNA JR., THOMAS J | 11/8/1996 | 1914 | Northeast Central Avenue | Seaside Park | NJ | 08752 | 185,000 | 138,750 | 267,638 | 406,388 | 27,750 | 18,500 | 1,718 | 4,162 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,203 | 158,400.03 | 450 |
| 626822 | DIFRANCESCO, ANN | 3/31/1997 | 274 | Central Avenue | Long Branch | NJ | 07740 | 122,000 | 97,600 | 188,263 | 285,863 | 24,400 | 0 | 4,595 | 3,416 | 350 | 680 | Pepsny | 680 | Cicalese | S | 983 | 118,504.75 | 450 |
| 624695 | DIPPOLITO, AMANDA | 1/23/1997 | 24 | Webster Avenue | Seaside Heights | NJ | 08751 | 168,500 | 117,950 | 227,518 | 345,468 | 33,700 | 16,850 | 1,407 | 4,128 | 350 | 650 | Pepsny | 650 | Yacker | S | 1,157 | 143,671.54 | 0 |
| 625059 | DIPPOLITO, AMANDA | 2/21/1997 | 1230 | Arlington Avenue | Plainfield | NJ | 07060 | 128,000 | 87,500 | 168,781 | 256,281 | 27,700 | 12,800 | 1,234 | 3,281 | 300 | 680 | Pepsny | 650 | Yacker | S | 1,054 | 107,896.76 | 450 |
| 624694 | DIPPOLITO, MICHAEL | 1/23/1997 | 503 | Ridge Avenue | Asbury Park | NJ | 07712 | 163,000 | 114,100 | 220,090 | 334,190 | 32,600 | 16,300 | 1,395 | 3,994 | 350 | 650 | Pepsny | 650 | Yacker | S | 1,181 | 138,380.50 | 450 |
| 626827 | FANIA JR., ANTHONY W. | 3/31/1997 | 161 | Clark Street | Jersey City | NJ | 07307 | 168,000 | 132,000 | 254,618 | 386,618 | 36,000 | 0 | 5,810 | 4,620 | 0 | 680 | Pepsny | 680 | Cicalese | S | 1,172 | 171,163.00 | 450 |
| 627900 | FANIA JR., ANTHONY W. | 4/30/1997 | 1010 | Bangs Avenue | Asbury Park | NJ | 07712 | 160,000 | 120,000 | 231,471 | 351,471 | 40,000 | 0 | 5,387 | 4,200 | 0 | 680 | Pepsny | 680 | Cicalese | S | 1,111 | 5,387.27 | 450 |
| 626849 | FREEDEN, BARBARA | 3/31/1997 | 25 | Williams Street | East Orange | NJ | 07019 | 136,000 | 102,000 | 196,750 | 298,750 | 34,000 | 0 | 4,751 | 3,570 | 0 | 680 | Pepsny | 680 | Cicalese | S | 1,043 | 132,072.24 | 450 |
| 627422 | FREEDEN, JAMES B. | 5/28/1997 | 826 | Center Street | Union Beach | NJ | 07735 | 80,000 | 84,000 | 123,451 | 187,451 | 16,000 | 0 | 3,472 | 2,240 | 300 | 680 | Pepsny | 680 | Cicalese | S | 430 | 59,941.96 | 450 |
| 626019 | FUSCO, FRED | 5/30/1997 | 118-20 | Plainfield Avenue | Plainfield | NJ | 07060 | 142,000 | 106,500 | 205,430 | 311,930 | 35,500 | 0 | 4,948 | 3,728 | 0 | 680 | Pepsny | 680 | Cicalese | S | 1,073 | 102,220.00 | 450 |
| 627948 | FUSCO, FRED | 4/30/1997 | 729 | West Third Street | Plainfield | NJ | 07060 | 107,000 | 80,250 | 154,796 | 235,046 | 28,750 | 0 | 3,983 | 2,809 | 300 | 680 | Pepsny | 680 | Cicalese | S | 1,133 | 78,431.58 | 450 |
| 628045 | FUSCO, FRED | 5/13/1997 | 253 | Myrtle Avenue | Neptune | NJ | 07753 | 105,000 | 78,750 | 151,902 | 230,652 | 26,250 | 0 | 4,405 | 2,756 | 0 | 680 | Pepsny | 680 | Cicalese | S | 924 | 75,523.22 | 450 |
| 628551 | GUZMAN, VICTOR | 5/29/1997 | 253 | Pine Street | Jersey City | NJ | 07307 | 75,000 | 56,250 | 108,502 | 164,752 | 18,750 | 0 | 3,172 | 1,969 | 0 | 680 | Pepsny | 680 | Cicalese | S | 818 | 53,659.50 | 450 |
| 624174 | HRISTOV, LAURE | 12/31/1996 | 28 | Blaine Avenue | Seaside Heights | NJ | 08751 | 148,000 | 103,600 | 199,836 | 303,436 | 29,600 | 14,800 | 1,031 | 3,626 | 350 | 650 | Pepsny | 650 | Yacker | S | 1,073 | 124,782.56 | 450 |
| 624176 | HRISTOV, LAURE | 12/31/1996 | 609 | Third Avenue | Asbury Park | NJ | 07712 | 190,000 | 133,000 | 256,547 | 389,547 | 38,000 | 19,000 | 1,041 | 4,655 | 350 | 650 | Pepsny | 650 | Yacker | S | 1,220 | 161,164.83 | 450 |
| 621717 | HRISTOV, PLAMEN | 10/16/1996 | 1409 | Mattison Avenue | Neptune | NJ | 07712 | 130,000 | 97,500 | 188,070 | 285,570 | 19,500 | 13,000 | 881 | 3,900 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,185 | 107,494.43 | 400 |
| 621719 | HRISTOV, PLAMEN | 10/16/1996 | 450 | Hendrickson Avenue | Long Branch | NJ | 07740 | 125,000 | 94,125 | 181,560 | 275,685 | 18,376 | 12,500 | 863 | 3,765 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,058 | 103,309.72 | 400 |
| 621720 | HRISTOV, PLAMEN | 10/15/1996 | 1004 | Hack Street | Asbury Park | NJ | 08853 | 150,000 | 112,500 | 217,004 | 329,504 | 22,500 | 15,000 | 1,002 | 4,500 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,080 | 0.00 | 0 |
| 622014 | JUERGENSEN, ALICIA | 10/21/1996 | 1014 | Second Avenue | Asbury Park | NJ | 07712 | 130,000 | 97,500 | 188,070 | 285,570 | 19,500 | 13,000 | 674 | 3,412 | 300 | 650 | Pepsny | 650 | Yacker | S | 894 | 108,094.26 | 400 |
| 622015 | JUERGENSEN, ALICIA | 10/30/1996 | 1292 | Washington Avenue | Asbury Park | NJ | 07712 | 150,000 | 112,500 | 217,004 | 329,504 | 22,500 | 15,000 | 423 | 3,938 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,080 | 125,233.27 | 400 |
| 622022 | JUERGENSEN, ALICIA | 10/16/1996 | 1200 | Monroe Avenue | Asbury Park | NJ | 07712 | 142,000 | 106,500 | 205,430 | 311,930 | 21,300 | 14,200 | 919 | 3,728 | 300 | 650 | Pepsay | 650 | Yacker | S | 1,252 | | 400 |
| 622416 | JUERGENSEN, RALPH | 11/8/1996 | 49 | Second Avenue | Long Branch | NJ | 07740 | 200,000 | 150,000 | 289,336 | 439,336 | 30,000 | 20,000 | 1,806 | 5,250 | 300 | 650 | Pepsny | 650 | Yacker | S | 1,080 | 188,716.72 | 0 |
| 625095 | JUERGENSEN, RALPH | 1/30/1997 | 29 | Westervelt Avenue | Jersey City | NJ | 07306 | 156,000 | 110,250 | 212,664 | 322,914 | 39,150 | 16,800 | 1,072 | 4,134 | 300 | 680 | Pepsay | 650 | Yacker | S | 1,157 | 140,998.62 | 450 |

2 of 14

Exhibit B to Walsh Securities' First Supplemental Responses to Commonwealth's First Set of Interrogatories

FEB-27-2006 13:09 From:                                   To:04104710605965550000   P.5/16

## Watch Securities
## Summary of Fraud Loans

| Loan No. | Borrower | Closing Date | Street No.-Street Address | City | Zip | State | Purchase Price | Watch Loan Amount | Interest @ 12.5% (5-30) 91 thru 3- (31-60) | Total Loss | Other 2nd Mtg. | Deposit Mong | Due | Legal Cash Fees | Lesst Orgs. Fees | Conv. Fee to National Agent | Atty. Fees Paid to | Deposit / Closing Fees Paid To | Amant Pd Int-Srvs Atty. Fees/Pd Fees To | Paid Int. By | Title Amount Seller | Cash to Seller | Appraised Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Exhibit B to Walsh Securities' First Supplemental Responses to Commonwealth's First Set of Interrogatories

3 of 14

FEB-27-2006 13:18 From:                    To:04104710605065550000  P.6/15

**Walsh Securities**
**Summary of Fraud Loans**

Exhibit B to Walsh Securities First Supplemental Responses to Commonwealth's First Set of Interrogatories

*[Large, densely-printed financial spreadsheet; individual cell values are largely illegible at this resolution. Column headers include: Loan No./Borrower, Closing Date, Street No./Street Address, City, State/Zip Code, Purchase Price, Walsh Loan Amount, 1st Mtg., 2nd Mtg., Total Loss, Other 2nd Mtg. Money, Deposit Due, Cash Orig. Fee, Loan Orig. Fees, Adj. Com./Data Reduced/Agent, Adj. Free Paid to Prime/Agent, Attorney Closing Fee Paid to Prime, Assoc. Paid for Any. Foreclosure Title, Title Field By, Cash to James/Butler, Appraised.]*

4 of 14

Welsh Securities
Summary of Fraud Loans

| Loan No. | Borrower | Closing Date | Street No | Street Address | City | Zip State Code | Purchase Price | Welsh Loans | Interest @ 12.9% 9/1/98-2/1/98 thru 8-31-00 | Total Loss | Other 2nd Mtg. Money | Deposit Money Due | Loan Comm. Fees | Loan Fee NJ Broad Agent | Atty. Closing Fees | Shred Closing Atty. Hold | Amt. Paid Per Atty. Forefraud To | Amt. Paid By / Amount | Title Ins. | Cash to Seller | Appraisal Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 623204 | GUZZI JR, MARIO | 11/22/1996 | 378 | West Columbus Avenue | Long Branch | NJ 07740 | 122,500 | 91,875 | 177,220 | 259,095 | 16,376 | 12,250 | 916 | 300 | 650 Yackar | 650 Pepmy | | $ | 1,328 | 102,231.54 | 450 |
| 623207 | GUZZI JR, MARIO | 11/22/1996 | 604 | Grand Avenue | Asbury Park | NJ 07712 | 134,500 | 145,875 | 291,362 | 427,237 | 29,175 | 19,450 | 1,075 | 300 | 650 Yackar | 650 Pepny | | $ | 1,158 | 196,135.25 | 450 |
| 623210 | GUZZI JR, MARIO | 11/22/1996 | 701 | Fourth Avenue | Asbury Park | NJ 07712 | 135,000 | 117,000 | 225,884 | 342,884 | 23,400 | 1,560 | 907 | 300 | 650 Yackar | 650 Pepny | | $ | 1,096 | 128,405.00 | 450 |
| 623202 | GUZZI SR, MARIO | 11/22/1996 | 616 | Washington Avenue | Asbury Park | NJ 07712 | 140,000 | 135,000 | 202,537 | 307,537 | 21,000 | 14,000 | 906 | 300 | 650 Yackar | 650 Pepny | | $ | 1,147 | 117,398.03 | 450 |
| 623205 | GUZZI SR, MARIO | 11/22/1996 | 612 | Seventh Avenue | Asbury Park | NJ 07712 | 168,000 | 126,000 | 243,044 | 369,044 | 25,200 | 16,500 | 1,200 | 750 | 650 Yackar | 750 Pepny | | $ | 1,263 | 142,271.00 | 450 |
| 623208 | GUZZI SR, MARIO | 11/27/1996 | 509 | First Avenue | Asbury Park | NJ 07712 | 126,500 | 90,750 | 174,505 | 265,000 | 18,000 | 12,900 | 916 | 300 | 650 Yackar | 650 Pepny | | $ | 975 | 101,916.25 | 450 |
| 623206 | GUZZI, LAWRENCE M | 3/17/1997 | 40 | Pineland Avenue | Pineland | NJ 07080 | 121,000 | 64,500 | 110,561 | 176,051 | 50,765 | 12,900 | 916 | 300 | 650 Cadmus | 650 Yackar | | $ | 944 | 107,603.50 | 450 |
| 623204? | GUZZI, PATRICIA | 3/31/1997 | 117 | North Street | Pineland | NJ 07080 | 118,000 | 159,000 | 237,576 | 396,820 | 32,500 | 11,800 | 1,025 | 300 | 650 Cadmus | 650 Pepny | | $ | 1,006 | 83,281.00 | 450 |
| 623430 | DAVIS, JOHN | 3/20/1997 | 28 | Ford Drive | Matawan | NJ 07747 | 159,000 | 138,000 | 158,820 | 297,240 | 52,165 | 16,000 | 0 | 300 | 650 Cadmus | 650 Pepny | | $ | 1,037 | 61,286.00 | 450 |
| 623428 | DE LA R, RALPH JOSEPH | 5/30/1997 | 251 | Pine Street | Jersey City | NJ 07305 | 76,000 | 62,000 | 115,735 | 176,735 | 15,000 | 0 | 3,286 | 300 | 650 Pepny | 650 Bariber Tech | | $ | 839 | 18,281.50 | 480 |
| 623417 | DELVISH, DIMITAR G | 12/31/1996 | 553A | South Pearl Street | Red Bank | NJ | 142,000 | 36,000 | 160,094 | 267,094 | 28,000 | 14,000 | 1,030 | 0 | 0 N/A | 0 N/A | | N/A | 0 | 116,908.35 | 0 |
| 623451 | DELVISH, DIMITAR G | 1/31/1997 | 732 | Leighton Avenue | Red Bank | NJ 07701 | 147,000 | 102,502 | 198,408 | 301,386 | 29,450 | 14,700 | 1,630 | 300 | 650 Pepny | 650 Pepny | | $ | 1,095 | 124,645.41 | 450 |
| 623488 | DICARO JR, LOUIS | 1/17/1997 | 511 | Asbury Avenue | Asbury Park | NJ | 222,000 | 135,400 | 299,730 | 435,150 | 44,000 | 22,500 | 4,940 | 350 | 650 Atlet | 650 Pepny | | $ | 1,467 | 190,669.00 | 450 |
| 623480 | DICARO JR, LOUIS | 1/17/1997 | 105 | West Bigelow Street | Newark | NJ 07105 | 93,000 | 66,000 | 122,334 | 208,534 | 19,600 | 9,000 | 423 | 300 | 650 Cadmus | 650 Pepny | | $ | 871 | 62,848.00 | 450 |
| 623493 | DIPOLITO, AMANDA | 1/20/1997 | 245 | Clark Street | Jersey City | NJ 07305 | 118,000 | 68,500 | 158,328 | 241,526 | 23,500 | 11,800 | 1,083 | 300 | 650 Cadmus | 650 Pepny | | $ | 1,144 | 90,185.50 | 450 |
| 623477 | DIPOLITO, AMANDA | 1/29/1997 | 444A | Third Fourth Street | Pineland | NJ 07080 | 175,000 | 47,500 | 608,761 | 256,261 | 23,000 | 12,500 | 1,063 | 300 | 650 Yackar | 650 Pepny | | $ | 1,029 | 105,307.25 | 450 |
| 623404 | DIPOLITO, MICHAEL | 1/20/1997 | 704 | East Sixth Street | Pineland | NJ 07080 | 228,000 | 38,500 | 260,551 | 428,451 | 41,600 | 20,000 | 194 | 350 | 650 Yackar | 650 Yackar | | $ | 1,253 | 137,020.00 | 450 |
| 623425 | DIPOLITO, MICHAEL | 1/20/1997 | 541 | West Fifth Street | Pineland | NJ 07080 | 127,000 | 38,000 | 271,441 | 286,531 | 23,000 | 12,700 | 1,064 | 150 | 653 Yackar | 650 Pepny | | $ | 961 | 107,135.75 | 450 |
| 623424 | DIPOLITO, MICHAEL | 1/20/1997 | 941 | West Fifth Street | Pineland | NJ 07080 | 85,000 | 38,500 | 206,000 | 280,225 | 23,000 | 11,800 | 1,059 | 300 | 650 Yackar | 650 Pepny | | $ | 1,000 | 135,170.00 | 450 |
| 623389 | DOSSANTOS, LUIS | 5/29/1997 | 220 | Washington Street | Trenton | NJ 08611 | 85,000 | 66,250 | 165,320 | 256,322 | 23,500 | 13,600 | 1,417 | 300? | 650 Cadmus | 650 Yackar | | $ | 989 | 99,169.50 | 450 |
| 623342 | HANA JR, ANTHONY W | 5/9/1997 | 1205 | Herb Street | Asbury Park | NJ 07712 | 100,000 | 70,000 | 144,609 | 218,809 | 25,000 | 14,700 | 0 | 0 | 650 Cadmus | 650 Pepny | | $ | 911 | 53,662.50 | 450 |
| 623184 | FREEDEN, BARBARA | 5/7/1997 | 45 | 65th Street | West New York | NJ 07093 | 143,000 | 107,250 | 206,877 | 314,127 | 28,700 | 14,350 | 1,525 | 300? | 650 Pepny | 650 Cadmus | | $ | 941 | 2,777.00 | 450 |
| 623103 | FREEDEN, GLENN R | 4/25/1997 | 10 | Bradley Street | Neptune | NJ 07753 | 110,000 | 82,500 | 158,135 | 241,535 | 27,500 | 0 | 0 | 0 | 650 Pepny | 650 Cadmus | | $ | 1,113 | 187,130.00 | 450 |
| 623261 | FREEDEN, JAMES B | 4/14/1997 | 303 | First Avenue | Asbury Park | NJ 07712 | 155,000 | 85,000 | 263,369 | 372,560 | 31,600 | 0 | 6,892 | 0 | 650 Pepny | 650 Cadmus | | $ | 1,113 | 194,993.39 | 450 |
| 623261 | FREEDEN, PETER A | 4/25/1997 | 404 | Bergh Street | Asbury Park | NJ 07712 | 140,000 | 112,000 | 216,039 | 328,039 | 28,000 | 0 | 5,330 | 300 | 632 Pepny | 650 Cadmus | | $ | 1,046 | 105,076.31 | 450 |
| 624175 | GOVIANI, VICTOR | 12/31/1996 | 9 | Post Avenue | Pineland | NJ 07080 | 92,000 | 133,055 | 202,055 | 23,000 | 0 | 4,156 | 300? | 650 Pepny | 650 Yackar | | $ | 883 | 89,334.50 | 450 |
| 624197 | KRISTOV, LAURE | 12/31/1996 | 20 | Choncel Street | Glassier Heights | NJ | 175,000 | 122,500 | 238,793 | 236,293 | 35,000 | 17,500 | 1,205 | 0 | 650 Pepny | 650 Yackar | | $ | 1,063 | 148,343.65 | 450 |
| 623045 | JUERGENSEN, ALICIA | 11/13/1996 | 1032 1/4 | Sharon Avenue | Freehold | NJ 07728 | 90,000 | 66,000 | 116,523 | 182,723 | 18,800 | 9,400 | 2,503 | 350? | 650 Pepny | 650 Yackar | | $ | 926 | 78,753.37 | 450 |
| 624174 | JUERGENSEN, HANS | 12/31/1997 | 110 | Liberty Street | Long Branch | NJ 07740 | 100,000 | 107,100 | 293,364 | 389,464 | 27,000 | 14,000 | 1,406 | 300 | 650 Pepny | 650 Yackar | | $ | 1,185 | 152,540.10 | 450 |
| 624172 | JUERGENSEN, HANS | 12/31/1997 | 62 | Sherman Avenue | Jersey City | NJ 07307 | 143,000 | 101,500 | 205,785 | 297,285 | 29,960 | 14,950 | 1,327 | 350 | 650 Pepny | 650 Yackar | | $ | 1,091 | 125,565.37 | 450 |
| 624174 | JUERGENSEN, HANS | 12/31/1997 | 307 | Virginia Avenue | Jersey City | NJ 07305 | 168,000 | 117,500 | 226,841 | 344,441 | 33,600 | 16,600 | 1,406 | 350 | 650 Pepny | 650 Yackar | | $ | 1,053 | 122,099.50 | 450 |
| 623053 | JUERGENSEN, HANS | 10/31/1997 | 58 | Third Street | Newark | NJ 07107 | 76,000 | 52,500 | 101,258 | 153,758 | 15,000 | 7,500 | 1,012 | 300 | 650 Pepny | 650 Yackar | | $ | 803 | 62,193.25 | 450 |

5 of 14

Exhibit B to Welsh Securities First Supplemental Responses to Commonwealth's First Set of Interrogatories

FEB-27-2006 13:18 From:                          To:04104710605060550000   P.8/16

**Welsh Securities**
**Summary of Fraud Loans**

Exhibit B to Welsh Securities' First Supplemental Responses to Commonwealth's First Set of Interrogatories

**Walsh Securities**
**Summary of Fraud Loans**

| Loan No, Borrower | Closing Date | Street No. | Street Address | City | Zip Code | State | Purchase Price | Walsh Loan Amount | Interest @ 12.5% 5/3-3 97 thru 3 34-96 | Total Loss 2nd Mtg | Offset Money | Deposit Cash Due | Less Orig. Fees | Comm. Fee to National Agent | Atty. Fees -Paid to | Stand Closing Fees Paid to | Amnt. Paid to Atty -Paid to | Fees/Paid To | Paid Ins. By | Title Amount Seller | Cash to Seller | Appraisal Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 61783 COSARES, NICHOLAS | 5/29/1996 | 50 | South Fifth Avenue | Long Branch | 07701 | NJ | 120,000 | 90,000 | 173,603 | 253,603 | 75 | | 16,000 | 437 | 4,050 | 0 | N/A | 700 Yocher | 0 N/A | N/A | 0 | 0.00 | 0.00 |
| 61764 COSARES, NICHOLAS | 5/30/1996 | 125 | Elmwood Avenue | Long Branch | 07701 | NJ | 90,000 | 135,000 | 260,404 | 395,404 | | 18,000 | 31,920 | 0 | 0 | 600 Kates | 0 No HUD | 700 Yocher | No H | S | 1,000 | 193,137.59 | 0 |
| 61810 COSARES, NICHOLAS | 6/26/1996 | 26 | Avenue Of Two Rivers | Rumson | 07760 | NJ | 180,000 | 132,000 | 243,166 | 445,166 | | | 33,120 | 0 | 0 | | 600 Pepsny | 0 No HUD | 600 Yocher | S | 815 | 10,205.63 | 0 |
| 61477 DROSOVICH, TAMO | 2/27/1996 | 325 | Wilson Avenue | Perth Amboy | 06801 | NJ | 180,000 | 195,000 | 215,635 | 310,635 | 15,500 | | 31,200 | 2,565 | 250 | | 600 Pepsny | 0 Py 2 HUD | OPT 2 HUD MP 2 | S | 0 | 100,022.303 | 0 |
| 61456 GREISER, GARY D. | 2/29/1996 | 1702 | Elk Street | Piscataway | 07710 | NJ | 165,000 | 165,000 | 205,255 | 250,255 | | 46,500 | 0 | 0 | | | Py 2 HUD | OPT 2 HUD MP 2 | | S | 0 | 1 | 0.00 |
| 61434 GREISER, GARY D. | 2/27/1996 | 430 | East 24th Street | Paterson | 07504 | NJ | 126,000 | 90,000 | 195,204 | 292,204 | | 1,000 | 42,000 | 0 | 250 | | 900 Bte | | 900 Pepsny | N/A | | 007 | 132,223.04-575 | 0 |
| 61430 GREISER, GARY D. | 3/15/1996 | 44 | Abbottsford Avenue | Long Branch | 07249 | NJ | 131,000 | 135,000 | 290,404 | 395,404 | | 68,000 | 353 | 0 | 250 | | 750 Py | 1,000 Perona | 750 Defendants | | 357 | 125,447.25 9,000 | |
| 61432 GREISER, GARY D. | 3/29/1996 | 626 | Fifth Avenue | Asbury Park | 07712 | NJ | 200,000 | 140,000 | 270,049 | 410,049 | | 60,000 | 835 | 700 | | | 750 Pepsny | 1,000 Perona | | B | 1,405 | 131,165.81 1,000 | |
| 61440 GREISER, GARY D. | 2/29/1996 | 915 | Fifth Avenue | Asbury Park | 07712 | NJ | 200,000 | 140,000 | 270,049 | 410,049 | | 60,000 | 777 | 700 | | | 750 Pepsny | 1,000 Perona | | B | 1,425 | 131,166.81 1,000 | |
| 61770 LEDOIS, ANNA | 5/31/1996 | 1902 | Bangs Avenue | Asbury Park | 07712 | NJ | 80,000 | 112,500 | 217,004 | 329,504 | 22,500 | | 15,000 | 265 | 3,375 | | 600 Adms | 0 N/A | 700 Yocher | N/A | 995 | 126,892.09 700 | |
| 61772 LEDOIS, ANNA | 5/29/1996 | 124 | Leighton Avenue | Red Bank | | NJ | 140,000 | 105,000 | 202,337 | 307,537 | | | | 265 | 3,150 | | 0 N/A | 0 N/A | 0 N/A | N/A | 0 | 0.00 | 0 |
| 61774 LEDOIS, ANNA | 5/31/1996 | 703 | Comstock Avenue | Long Branch | 07740 | NJ | 150,000 | 135,000 | 260,404 | 395,404 | 31,500 | | 13,620 | 255 | 4,050 | | 600 Adms | 0 N/A | 700 Yocher | S | 1,105 | 137,205.43 0 | |
| 61948 LEDOIS, GEORGE T | 7/29/1996 | 708 | State Street | Perth Amboy | 08861 | NJ | 186,000 | 123,750 | 238,904 | 362,454 | 24,750 | | 16,500 | 805 | 4,331 | | 600 Pepsny | 0 N/A | 650 Yocher | S | 1,185 | 135,527.49-450 | |
| 61944 LEDOIS, GEORGE T | 7/24/1996 | 5 | Sherwood Avenue | Long Branch | 07740 | NJ | 150,000 | 100,000 | 193,603 | 293,603 | 15,000 | | 12,500 | 724 | 3,150 | | 600 Pepsny | 0 N/A | 650 Yocher | S | 965 | 93,604.34 450 | |
| 61950 MUELLER, DAVID A. | 6/27/1996 | 128 | Leighton Avenue | Red Bank | | NJ | 118,000 | 118,000 | 227,836 | 252,836 | 17,250 | | 11,500 | 0 | 0 | | 0 N/A | 0 N/A | 0 N/A | N/A | 0 | 0.00 | 0 |
| 64321 LEBLER, DAVID A. | 6/27/1996 | 1000 | Fourth Avenue | Red Bank | 07712 | NJ | 135,000 | 93,750 | 181,000 | 274,054 | 18,750 | | 12,500 | 483 | 2,812 | | 660 Pepsny | 600 Yocher | | S | 983 | 94,712.66 450 | |
| 64731 LEBLER, DAVID A. | 6/27/1996 | 140-148 | Seventh Avenue | Plainfield | 07060 | NJ | 225,000 | 180,833 | 289,336 | 439,336 | 82,500 | | 22,500 | 504 | 4,500 | | 660 Pepsny | 600 Yocher | | S | 1,355 | 34,103.50 450 | |
| 64732 LEBLER, DAVID A. | 6/27/1996 | 120 | Riverside Drive | Red Bank | 07728 | NJ | 150,000 | 120,000 | 231,471 | 363,471 | 25,500 | | 0 | 0 | 0 | | 0 N/A | 0 N/A | | N/A | 0 | 0.00 | 0 |
| 64729 LEBLER, DAVID A. | 6/28/1996 | 143-150 | Sixth Avenue | Long Branch | 07728 | NJ | 170,000 | 118,500 | 228,677 | 347,677 | 0 | | 0 | 0 | 0 | | 0 N/A | 0 N/A | | N/A | 0 | 0.00 | 0 |
| 61476 LEBLER, DAVID A. | 6/28/1996 | 1295 | Ocean Avenue Unit 2 | Sea Bright | | NJ | 282,000 | 231,250 | 435,274 | 644,924 | 44,250 | | 0 | 0 | 0 | | 0 N/A | 0 N/A | | N/A | 0 | 0.00 | 0 |
| 61472 MONTANYE, ATLA | 7/29/1996 | 313 | Sewell Avenue | Asbury Park | 07712 | NJ | 150,000 | 112,500 | 217,004 | 329,504 | 22,500 | | 15,000 | 847 | 3,936 | | 650 Pepsny | 650 Yocher | | S | 1,600 | 124,778.00 450 | |
| 61714 HAGEDON/ALAMEDA | 10/26/1996 | 62 | Chelsea Avenue | Maple | | NJ-NJ | 230,000 | 165,000 | 318,572 | 483,577 | 33,000 | | 22,000 | 672 | 5,775 | | 650 Pepsny | 650 Yocher | | S | 1,235 | 80,137.93 450 | |
| 61687 LICARI, ANNA | 4/20/1996 | 34 | Park Road | Monmouth Beach | | NJ | 90,000 | 97,700 | 473,503- | 363,603- | 63,000 | | 655- 3,000- | 72 | 334 | | 650 Pepsny | 650 Yocher | | S | 671 | 0.00 450+ | |
| | | | | | | | | | | | | 187,700 | 53,500 | 9,000 | 227 | 334 | | 750 Yocher | | 0 N/A | | |

**TOTALS:** 23,879,000 | 4,539,055 | 15,701,845 | 59,279,484

Exhibit B to Walsh Securities' First Supplemental Responses to Commonwealth's First Set of Interrogatories

# EXHIBIT F

Sullivan
9702735

# LATHAM & WATKINS
## ATTORNEYS AT LAW
ONE NEWARK CENTER
NEWARK, NEW JERSEY 07101-3174
TELEPHONE (201) 639-1234
FAX (201) 639-7298

PAUL R. WATKINS (1899-1973)
DANA LATHAM (1898-1974)

**CHICAGO OFFICE**
SEARS TOWER, SUITE 5800
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 876-7700
FAX (312) 993-9767

**HONG KONG OFFICE**
23RD FLOOR
STANDARD CHARTERED BANK BUILDING
4 DES VOEUX ROAD CENTRAL, HONG KONG
TELEPHONE + 852-2905-6400
FAX + 852-2905-6940

**LONDON OFFICE**
ONE ANGEL COURT
LONDON EC2R 7HJ ENGLAND
TELEPHONE + 44-171-374 4444
FAX + 44-171-374 4460

**LOS ANGELES OFFICE**
633 WEST FIFTH STREET, SUITE 4000
LOS ANGELES, CALIFORNIA 90071-2007
TELEPHONE (213) 485-1234
FAX (213) 891-8763

**MOSCOW OFFICE**
113/1 LENINSKY PROSPECT, SUITE C200
MOSCOW, RUSSIA 117198
TELEPHONE + 7-503 956-5555
FAX + 7-503 956-5556

**NEW YORK OFFICE**
885 THIRD AVENUE, SUITE 1000
NEW YORK, NEW YORK 10022-4802
TELEPHONE (212) 906-1200
FAX (212) 751-4864

**ORANGE COUNTY OFFICE**
650 TOWN CENTER DRIVE, SUITE 2000
COSTA MESA, CALIFORNIA 92626-1925
TELEPHONE (714) 540-1235
FAX (714) 755-8290

**SAN DIEGO OFFICE**
701 "B" STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8197
TELEPHONE (619) 236-1234
FAX (619) 696-7419

**SAN FRANCISCO OFFICE**
505 MONTGOMERY STREET, SUITE 1900
SAN FRANCISCO, CALIFORNIA 94111-2562
TELEPHONE (415) 391-0600
FAX (415) 395-8095

**TOKYO OFFICE**
INFINI AKASAKA, MINATO-KU
TOKYO 107, JAPAN
TELEPHONE +813-3423-3970
FAX +813-3423-3971

**WASHINGTON, D.C. OFFICE**
1001 PENNSYLVANIA AVE., N.W., SUITE 1300
WASHINGTON, D.C. 20004-2505
TELEPHONE (202) 637-2200
FAX (202) 637-2201

July 28, 1997

**MAIL RECEIVED**
**AUG 1 2 1997**
**CLAIMS DEPT.**
**CLTIC**

## VIA U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Commonwealth Land Title Insurance Company
8 Penn Center
Philadelphia, PA  19103

Re:   Claims Based On Closing Service Letters to Walsh Securities Inc.
      As Successors And/Or Assigns To National Home Funding, Inc.

To Whom It May Concern:

The purpose of this letter is to put you on notice that our client Walsh Securities Inc. ("Walsh Securities") has retained us to seek recovery for losses or claims covered by Closing Service Letters issued by Commonwealth Land Title Insurance Company to Walsh Securities as the successors and/or assigns of National Home Funding, Inc. in a series of real estate transactions.  These losses or claims arise out of activities by closing attorneys ("Attorneys") whose conduct is covered by your Closing Service Letters.  The losses or claims arise out of:

1. Failure of the Attorneys to comply with Walsh Securities' written closing instructions relating to the collection of payments and funds due to Walsh Securities, and/ or

2. Fraud of or misapplication by the Attorneys in handling Walsh Securities' funds in connection with the collection of payments and funds due to Walsh Securities.

Commonwealth Land Title Insurance Company
July 28, 1997
Page

       The Attorneys and the closings or transactions covered by this letter are described in Schedule A which is attached to this letter. Because Walsh Securities is still investigating certain mortgage loan transactions, Walsh Securities reserves its right to supplement this notice letter and the list of closing attorneys and the closings or transactions described in Schedule A with additional closing attorneys and closings or transactions insured by Commonwealth Land Title Insurance Company.

       Please contact me to discuss Walsh Securities' recovery of funds owed to it.

Sincerely,

Jeffrey M. Goodman*
of LATHAM & WATKINS

Attachment

cc:    Walsh Securities Inc.

     Donna Sullivan, Esq. (**Via Telecopy**)
     Commonwealth Land Title Insurance Company

*Admitted in New York State Only

## Schedule A

| Loan # | Borrower | Date | Orig. | Originator | Amount | Attorney | Date | Amount | Title Co. | Policy # | # | Address | Street | City | St | Amount | Zip | Title |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 619464 | LEEDS, GEORGE T | 24-Jul-96 | | NATIONAL HOME | 82500 | STANLEY YACKER, ESQ. | 23-Aug-96 | 70000 | COMMONWEALTH | C117852 | 402 | RIDGE AVENUE | 1114 MONROE AVE | ASBURY PARK | NJ | $16,500.00 | 07712 | COASTAL |
| 619467 | SALVATORELLO | 24-Jul-96 | | NATIONAL HOME | 81000 | STANLEY YACKER, ESQ. | 30-Sep-96 | 108000 | COMMONWEALTH | C117851 | | | | ASBURY PARK | NJ | $15,500.00 | 07712 | COASTAL |
| 619475 | MONTANTE, ALLA N. | 25-Jul-96 | | NATIONAL HOME | 81000 | STANLEY YACKER, ESQ. | 30-Sep-96 | | COMMONWEALTH | C117765-A | 523 | 1114 MONROE AVE | | ASBURY PARK | NJ | $16,200.00 | 07712 | COASTAL |
| 619593 | SALVATORELLO | 26-Jul-96 | | NATIONAL HOME | 93750 | STANLEY YACKER, ESQ. | 23-Aug-96 | 75000 | COMMONWEALTH | C117853 | 711 | ROOSEVELT AVE | | ABERDEEN | NJ | $18,750.00 | 07735 | COASTAL TITLE |
| 619590 | SALVATORELLO | 20-Aug-96 | | NATIONAL HOME | 93750 | STANLEY YACKER, ESQ. | 23-Aug-96 | 70000 | COMMONWEALTH | C117756-A | 1300 | 7TH AVE | NEPTUNE | NJ | $18,750.00 | 07204 | COASTAL TITLE |
| 619940 | BALOGH JR, RONALD C. | 20-Aug-96 | | NATIONAL HOME | 90000 | STANLEY YACKER, ESQ. | 23-Aug-96 | 72000 | COMMONWEALTH | C117766-A | 272 | CENTRAL AVE | | LONG BRANCH | NJ | $18,000.00 | 07740 | COASTAL TITLE |
| 619946 | BALOGH, RONALD C. JR | 20-Aug-96 | | NATIONAL HOME | 90000 | STANLEY YACKER, ESQ. | 23-Aug-96 | 72000 | COMMONWEALTH | C117269 | 251 | WILBUR RAY AVENUE | LONG BRANCH | NJ | $18,000.00 | 07740 | COASTAL TITLE |
| 619944 | BALOGH JR, RONALD C. | 20-Aug-96 | | NATIONAL HOME | 90000 | STANLEY YACKER, ESQ. | 23-Aug-96 | 72000 | COMMONWEALTH | C117900A | 222 | CENTRAL AVE | | LONG BRANCH | NJ | $18,000.00 | 07740 | COASTAL TITLE |
| 619949 | BALOGH JR, RONALD C. | 20-Aug-96 | | NATIONAL HOME | 101250 | STANLEY YACKER, ESQ. | 23-Aug-96 | 50000 | COMMONWEALTH | C117954A | 529 | 20TH STREET | | IRVINGTON | NJ | $22,750.00 | 07111 | COASTAL TITLE |
| 619957 | LEEDS, GEORGE T | 20-Aug-96 | | NATIONAL HOME | 81250 | STANLEY YACKER, ESQ. | 23-Aug-96 | 25000 | COMMONWEALTH | C117956A | 408 | 20TH STREET | | IRVINGTON | NJ | $16,250.00 | 07106 | COASTAL TITLE |
| 620112 | HRISTOV, PLAMEN | 16-Oct-96 | | NATIONAL HOME | 87500 | STANLEY YACKER, ESQ. | 17-Jan-97 | 130000 | COMMONWEALTH | C117837A | 19 | ABBOTTSFORD AVE | LONG BRANCH | NJ | $17,500.00 | 07740 | COASTAL TITLE |
| 621313 | HRISTOV, PLAMEN | 16-Oct-96 | | NATIONAL HOME | 97500 | STANLEY YACKER, ESQ. | 27-Jan-97 | 100000 | COMMONWEALTH | C117792A | 1409 | MATTISON AVENUE | NEPTUNE | NJ | $19,000.00 | 07712 | COASTAL TITLE |
| 622025 | ALA, JAMES | 22-Oct-96 | | NATIONAL HOME | 101250 | STANLEY YACKER, ESQ. | 17-Jan-97 | 135000 | COMMONWEALTH | CT-18513 | 622 | BRAHMALL AVENUE | JERSEY CITY | NJ | $20,200.00 | 07304 | COASTAL TITLE |
| 622058 | DEVINCENZO, DONALD | 14-Nov-96 | | NATIONAL HOME | 93000 | STANLEY YACKER, ESQ. | 17-Jan-97 | 124000 | COMMONWEALTH | CT-18550A | 1025 | OXONIA AVENUE | NEPTUNE | NJ | $19,000.00 | 07753 | COASTAL TITLE |
| 24173 | OWENS, THOMAS | 31-Dec-96 | | NATIONAL HOME | 101250 | STANLEY YACKER, ESQ. | 17-Jan-97 | 135000 | COMMONWEALTH | CT-18801A | 191 | HERBERT ST | RED BANK | NJ | $19,750.00 | 07701 | COASTAL TITLE |
| 619354 | SR, DERRICK MORRIS | | | NATIONAL HOME | 84500 | STANLEY YACKER, ESQ. | | 110000 | COMMONWEALTH | C117818 | 1017 | 9TH STREET | | | NJ | $16,900.00 | 07753 | COASTAL TITLE |
| 624111 | VISCUSO, BRIAN | 20-Dec-96 | | NATIONAL HOME | 114500 | STANLEY YACKER, ESQ. | 07-Mar-97 | | COMMONWEALTH | C117619 | 1117 | 1117 ASBURY AVE | ASBURY PARK | NJ | $37,400.00 | 07712 | COASTAL TITLE |
| 624116 | CAMPOLI, DEBRA | 31-Dec-96 | | NATIONAL HOME | 113430 | STANLEY YACKER, ESQ. | 07-Mar-97 | 10000 | COMMONWEALTH | C119039A | 43 | FRANKLIN AVE | SEASIDE | NJ | | 07751 | COASTAL TITLE |
| 624498 | KITCHOVITCH, I.M./OSMH | 23-Jan-97 | | NATIONAL HOME | 81000 | STANLEY YACKER, ESQ. | 07-Mar-97 | 140000 | COMMONWEALTH | C119020A | 342 | RANDOLPH AVENUE | JERSEY CITY | NJ | | 07305 | COASTAL TITLE |
| 626590 | CUZZA, PATRICIA | 31-Jan-97 | | NATIONAL HOME | 82400 | STANLEY YACKER, ESQ. | 07-Mar-97 | 18000 | COMMONWEALTH | C119271A | 35 | MC ADOO AVE | JERSEY CITY | NJ | $23,300.00 | 07304 | COASTAL TITLE |
| 626425 | DEMARKEN, ERIN | 31-Mar-97 | | NATIONAL HOME | 85250 | STANLEY YACKER, ESQ. | 27-Jan-97 | 113000 | COMMONWEALTH | C118501A | 35 | RESS STREET | | ELIZABETH | NJ | $16,500.00 | 07201 | COASTAL TITLE |
| 626808 | PELARDIS, TZANIDOS | 11-Mar-97 | | NATIONAL HOME | 84300 | ANTHONY N. OCALESE | 27-Jan-97 | 112000 | COMMONWEALTH | C119042A | 1003 | 908 3RD AVE | | ELIZABETH | NJ | $16,900.00 | 07201 | COASTAL TITLE |
| 626817 | PELARDIS, ANTHONY W. | 31-Mar-97 | | NATIONAL HOME | 133330 | ANTHONY N. OCALESE | 27-Jan-97 | 160000 | COMMONWEALTH | CT-18621A | 181 | 3RD STREET | JERSEY CITY | NJ | $26,500.00 | 07302 | COASTAL TITLE |
| 626944 | FREDECK, BARBARA | 31-Mar-97 | | NATIONAL HOME | 102000 | ANTHONY N. OCALESE | 27-Jan-97 | 130000 | COMMONWEALTH | CT-18685A | 81 | WILLIAM STREET | EAST ORANGE | NJ | $37,000.00 | 07019 | COASTAL TITLE |
| 626951 | WHITE, JOANNA M. | 11-Apr-97 | | NATIONAL HOME | 80000 | ANTHONY N. OCALESE | 27-Jan-97 | 150000 | COMMONWEALTH | C118757 | 31 | CLERK ST | HIGHLANDS | NJ | $20,200.00 | 07732 | COASTAL TITLE |
| 627425 | WRIGHT, WESLEY | 15-Apr-97 | | NATIONAL HOME | 129375 | ANTHONY N. OCALESE | 27-Jan-97 | 172500 | COMMONWEALTH | CT-18655A | 1115 | FIFTH STREET | ASBURY PARK | NJ | $25,875.00 | 07753 | COASTAL TITLE |
| 627435 | SENTOW, MILLIE | 15-Apr-97 | | NATIONAL HOME | 80000 | ANTHONY N. OCALESE | 27-Jan-97 | 173000 | COMMONWEALTH | CT-18567A | 1703 | BANGS AVE | NEPTUNE | NJ | | 07753 | COASTAL TITLE |
| 627545 | DELUA, RALPH JOSEPH | 30-Apr-97 | | NATIONAL HOME | 133330 | ANTHONY N. OCALESE | 27-Jan-97 | 160000 | COMMONWEALTH | CT-18564A | 429 | EAST 6TH STREET | PLAINFIELD | NJ | $39,500.00 | 07060 | COASTAL TITLE |
| 627097 | VILARDI, JANICE | 07-May-97 | | NATIONAL HOME | 115500 | ANTHONY N. OCALESE | 27-Jan-97 | 154000 | COMMONWEALTH | CT-19531A | 1228 | MONTICELLO AVE | JERSEY CITY | NJ | $36,500.00 | 07305 | COASTAL TITLE |
| 627061 | FUSCO, FRED | 13-May-97 | | NATIONAL HOME | 78250 | ANTHONY N. OCALESE | 27-Jan-97 | 105000 | COMMONWEALTH | CT-30276A | 253 | NEPTUNE AVE | NEPTUNE TWP | NJ | $29,750.00 | 07753 | COASTAL TITLE |
| 626598 | WRIGHT, BONNIE M. | 23-May-97 | | NATIONAL HOME | 87900 | ANTHONY N. OCALESE | 27-Jan-97 | 118000 | COMMONWEALTH | CT-18556A | | CATCHET | | JERSEY CITY | NJ | $18,000.00 | 07305 | COASTAL TITLE |
| 627472 | FREDECK, JAMES B. | 29-May-97 | | NATIONAL HOME | 64000 | ANTHONY N. OCALESE | 27-Jan-97 | 128000 | COMMONWEALTH | CT-18622A | 1025 | PASSAIC STREET | UNION BEACH | NJ | $26,250.00 | 07735 | COASTAL TITLE |
| 627420 | VECCHIO, KEVIN J. | 31-May-97 | | NATIONAL HOME | 133330 | ANTHONY N. OCALESE | 27-Jan-97 | 150000 | COMMONWEALTH | C 18821A | 101 | BALDWIN STREET | NEW | NJ | $28,250.00 | 06901 | COASTAL TITLE |
| 626243 | BATZ, ROBIN K. | 31-Mar-97 | | NATIONAL HOME | 140000 | ANTHONY N. OCALESE | 27-Jan-97 | 185000 | COMMONWEALTH | CT-20202A | 406 | 406 THIRD AVE | ASBURY PARK | NJ | $37,000.00 | 07712 | COASTAL TITLE |
| 626551 | GUZMAN, VICTOR | 29-May-97 | | NATIONAL HOME | 56250 | ANTHONY N. OCALESE | 27-Jan-97 | 75000 | COMMONWEALTH | CT-18981-A | 253 | PINE STREET | JERSEY CITY | NJ | $11,750.00 | 07207 | COASTAL TITLE |
| 626542 | DASILVA, PAUL | 29-May-97 | | NATIONAL HOME | 71250 | ANTHONY N. OCALESE | 27-Jan-97 | 95000 | COMMONWEALTH | CT-18981A | 127 | LIPPINCOTT AVENUE | LONG BRANCH | NJ | $23,750.00 | 07740 | COASTAL TITLE |
| 626455 | KELEHER, JOHN GLENN | 04-Jun-97 | | NATIONAL HOME | 123750 | ANTHONY N. OCALESE | 27-Jan-97 | 165000 | COMMONWEALTH | CT-20042A | 283 | ARLINGTON AVENUE | JERSEY CITY | NJ | $30,250.00 | 07208 | COASTAL TITLE |
| 626574 | VELARDI, MARIE | 30-Apr-97 | | NATIONAL HOME | 141375 | ANTHONY N. OCALESE | 27-Jan-97 | 265 | COMMONWEALTH | CT-19982A | 265 | ARLINGTON AVENUE | JERSEY CITY | NJ | $38,250.00 | 07305 | COASTAL TITLE |
| 626631 | LAXIG, JORGE | 06-Jun-97 | | NATIONAL HOME | 71250 | ANTHONY N. OCALESE | 27-Jan-97 | 95000 | COMMONWEALTH | CT-18988 | 91 | COLES ST | PLAINFIELD | NJ | $23,750.00 | 07302 | COASTAL TITLE |
| 626019 | FUSCO, FRED | 30-May-97 | | NATIONAL HOME | 166500 | ANTHONY N. OCALESE | 27-Jan-97 | 118,20 | COMMONWEALTH | CT-19425 | 118-20 | PLAINFIELD AVE | PLAINFIELD | NJ | $35,500.00 | 07060 | COASTAL TITLE |
| 624723 | PELARDIS, GEORGE | 31-Jan-97 | | NATIONAL HOME | 102000 | STANLEY YACKER, ESQ. | 04-Jun-97 | 147000 | COMMONWEALTH | CT-18908A | 65 | ROOSEVELT AVENUE | JERSEY CITY | NJ | $29,300.00 | 07305 | COASTAL TITLE |
| 624174 | HRISTOV, PLAMEN | 24-Jan-97 | | NATIONAL HOME | 112500 | STANLEY YACKER, ESQ. | 30-Sep-96 | 150000 | Commonwealth Tit | CT-18775A | 999 | NEPTUNE AVE | JERSEY CITY | NJ | $17,250.00 | 07712 | COASTAL TITLE |
| 619477 | MONTANTE, ALLA N. | 25-Jul-96 | | NATIONAL HOME | 93375 | STANLEY YACKER, ESQ. | 30-Sep-96 | 14000 | Commonwealth Tit | CT-18787A | 1094 | PRINCETON AVENUE | ASBURY PARK | NJ | $18,750.00 | 07712 | COASTAL TITLE |
| 625708 | APOGAR, RAYMOND D.C. | 25-Jan-97 | | NATIONAL HOME | 112500 | STANLEY YACKER, ESQ. | 30-Sep-96 | 150000 | Commonwealth Tit | CT-18813A | 1004 | 1004 4TH AVENUE | NEWARK | NJ | $17,250.00 | 07860 | COASTAL TITLE |
| 620966 | APOGAR, RAYMOND | 15-Oct-96 | | NATIONAL HOME | 33750 | STANLEY YACKER, ESQ. | 12-Jan-97 | 140000 | Commonwealth Tit | CT-18198A | 24 | VAN HORNE ST | JERSEY CITY | NJ | $18,750.00 | 07304 | COASTAL TITLE |
| 623174 | HRISTOV, PLAMEN | 14-Oct-96 | | NATIONAL HOME | 112500 | STANLEY YACKER, ESQ. | 12-Jan-97 | 110000 | Commonwealth Tit | CT-18117A | 157 | JEFFERSON AVENUE | JERSEY CITY | NJ | $17,750.00 | 07721 | COASTAL TITLE |
| 623208 | DIODONA, THOMAS J. JR | 15-Oct-96 | | NATIONAL HOME | 93750 | STANLEY YACKER, ESQ. | 12-Jan-97 | 125000 | Commonwealth Tit | CT-18117A | 2348 | PRINCETON AVENUE | JERSEY CITY | NJ | $18,750.00 | 07305 | COASTAL TITLE |
| 620911 | DICKSON, M. THOMAS J. | 15-Oct-96 | | NATIONAL HOME | 136071 | STANLEY YACKER, ESQ. | 12-Jan-97 | 150000 | Commonwealth Tit | CT-18117A | 1094 | 904 THIRD AVENUE | LONG BRANCH | NJ | $25,500.00 | 07740 | COASTAL TITLE |
| 622009 | RIZZUTO, LORETTA | 15-Oct-96 | | NATIONAL HOME | 139575 | STANLEY YACKER, ESQ. | 12-Jan-97 | 148000 | Commonwealth Tit | CT-18213A | 467 | HENDRICKSON AVENUE | ASBURY PARK | NJ | $26,500.00 | 07712 | COASTAL TITLE |
| 622010 | RIZZUTO, LORETTA | 15-Oct-96 | | NATIONAL HOME | 139375 | STANLEY YACKER, ESQ. | 12-Jan-97 | 165000 | Commonwealth Tit | CT-18225A | 706 | 706 1ST AVENUE | ASBURY PARK | NJ | $27,500.00 | 07713 | COASTAL TITLE |
| 622001 | ABERGRENSEN, ALICIA | 15-Oct-96 | | NATIONAL HOME | 100000 | STANLEY YACKER, ESQ. | 12-Jan-97 | 125000 | Commonwealth Tit | CT-18118A | 706 | 706 SECOND AVENUE | ASBURY PARK | NJ | $22,500.00 | 07712 | COASTAL TITLE |
| 622020 | RIZZUTO, LORETTA | 15-Oct-96 | | NATIONAL HOME | 97500 | STANLEY YACKER, ESQ. | 12-Jan-97 | 130000 | Commonwealth Tit | CT-18118A | 819 | 810 THIRD AVENUE | ASBURY PARK | NJ | $22,500.00 | 07712 | COASTAL TITLE |
| 622002 | ABERGRENSEN, ALICIA | 15-Oct-96 | | NATIONAL HOME | 100000 | STANLEY YACKER, ESQ. | 12-Jan-97 | 125000 | Commonwealth Tit | CT-18133A | 1814 | 809 THIRD AVENUE | ASBURY PARK | NJ | $19,000.00 | 07712 | COASTAL TITLE |
| 622011 | RIZZUTO, LORETTA | 21-Oct-96 | | NATIONAL HOME | 97500 | STANLEY YACKER, ESQ. | 30-Jan-97 | 130000 | Commonwealth Tit | CT-18142NA | 1014 | 817 FIRST AVENUE | ASBURY PARK | NJ | | 07712 | COASTAL TITLE |
| 622014 | ABERGRENSEN, ALICIA | 21-Oct-96 | | NATIONAL HOME | 97600 | STANLEY YACKER, ESQ. | 30-Jan-97 | | Commonwealth Tit | CT-18144NA | | 11TH SECOND AVE | PATERSON | NJ | $19,000.00 | 07712 | COASTAL TITLE |
| 622020 | ALA, JAMES | 22-Oct-96 | | NATIONAL HOME | 82500 | STANLEY YACKER, ESQ. | 12-Jan-97 | 110000 | Commonwealth Tit | CT-18137A | 222 | HAMILTON PLACE | ASBURY PARK | NJ | | 07501 | COASTAL TITLE |
| 622016 | DICARO JR, LOUIS | 24-Oct-96 | | NATIONAL HOME | 105000 | STANLEY YACKER, ESQ. | 12-Jan-97 | 150000 | Commonwealth Tit | CT-18231A | 1315 | 1313 SPRINGWOOD AVE | ASBURY PARK | NJ | $22,500.00 | 07712 | COASTAL TITLE |

Page 1

| CLAIM # | SALES/BORROWER INITIALS | CLOSING DATE | LOAN AMT | CLOSING/SETTLEMENT AGENT | FUNDING DATE | POLICY TYPE | POLICY # | POLICY NO/COMMITMENT # | PROPERTY ADDRESS | PROPERTY CITY | STATE | ZIP | UNDERWRITER | ORIG FACE AMT | UNDERWRITTEN/ISSUED BY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 620115 | JUERGENSEN, RITA | 30-Oct-96 | 112500 | NATIONAL HOME | STANLEY YACKER, ESQ | 17000 | COMMONWEALTH TA | CT-18370(A) | 1262 | 1292 WASHINGTON | ASBURY PARK | NJ | 07712 | $22,500.00 | COASTAL TITLE |
| 620594 | BUSTOS-LACH, YOLANDA | 05-Nov-96 | 120000 | NATIONAL HOME | STANLEY YACKER, ESQ | 17000 | COMMONWEALTH TA | CT-18178A | 1311 | 1313 WASHINGTON | ASBURY PARK | NJ | 07712 | $25,500.00 | COASTAL TITLE |
| 620522 | BUSTOS, JR, RAFAEL | 06-Nov-96 | 106500 | NATIONAL HOME | STANLEY YACKER, ESQ | 14000 | COMMONWEALTH TA | CT-18722(A) | 20 | 20-22 RIDGE AVENUE | ASBURY PARK | NJ | 07712 | $21,300.00 | COASTAL TITLE |
| 620625 | BUSTOS, SR, RAFAEL | 06-Nov-96 | 103500 | NATIONAL HOME | STANLEY YACKER, ESQ | 13000 | COMMONWEALTH TA | CT-18716A | 509 | 509 RIDGE AVENUE | ASBURY PARK | NJ | 07712 | $20,700.00 | COASTAL TITLE |
| 620627 | BUSTOS, SR, RAFAEL | 06-Nov-96 | 144500 | NATIONAL HOME | STANLEY YACKER, ESQ | 13000 | COMMONWEALTH TA | CT-18717(A) | 510 | 510 SEVENTH AVENUE | ASBURY PARK | NJ | 07712 | $28,500.00 | COASTAL TITLE |
| 620584 | REILLY, BRIAN G | 06-Nov-96 | 91500 | NATIONAL HOME | STANLEY YACKER, ESQ | 12000 | COMMONWEALTH TA | CT-18167A | 126 | UNION AVENUE | LONG BRANCH | NJ | 07740 | $18,300.00 | COASTAL TITLE |
| 620537 | REILLY, BRIAN G | 06-Nov-96 | 102500 | NATIONAL HOME | STANLEY YACKER, ESQ | 15000 | COMMONWEALTH TA | CT-18156A | 1043 | 1043 SUMMERFIELD AVE | ASBURY PARK | NJ | 07712 | $21,450.00 | COASTAL TITLE |
| 620341 | GIDDONIA, THOMAS J | 08-Nov-96 | 138700 | NATIONAL HOME | STANLEY YACKER, ESQ | 18000 | COMMONWEALTH TA | CT-18717(A) | 1814 | NORTH EAST CENTRAL | SEASIDE PARK | NJ | 08752 | $27,000.00 | COASTAL TITLE |
| 620261 | AMADOR, JOSEPH L | 08-Nov-96 | 112500 | NATIONAL HOME | STANLEY YACKER, ESQ | 15000 | COMMONWEALTH TA | CT-18554A | 704 | 704 PINE STREET | ASBURY PARK | NJ | 07712 | $23,000.00 | COASTAL TITLE |
| 622661 | DEVRACENZO, DONALD | 18-Nov-96 | 117000 | NATIONAL HOME | STANLEY YACKER, ESQ | 16000 | COMMONWEALTH TA | CT-18163A | 78 | FISHER AVENUE | NEPTUNE | NJ | 07712 | $23,000.00 | COASTAL TITLE |
| 622649 | PECKHNELL, JOSEPH | 21-Nov-96 | 135000 | NATIONAL HOME | STANLEY YACKER, ESQ | 18000 | COMMONWEALTH TA | CT-18073A | 405 | 405 SEWALL AVENUE | ASBURY PARK | NJ | 07712 | $27,300.00 | COASTAL TITLE |
| 622654 | ALI, JAMES | 21-Nov-96 | 100500 | NATIONAL HOME | STANLEY YACKER, ESQ | 16000 | COMMONWEALTH TA | CT-18373A | 113 | WEST BEGGIN PLACE | RED BANK | NJ | 07701 | $120,400.00 | COASTAL TITLE |
| 622637 | REILLY, BRIAN G | 23-Nov-96 | 100500 | NATIONAL HOME | STANLEY YACKER, ESQ | 10000 | COMMONWEALTH TA | CT-18467A | 1273 | 1275 WASHINGTON | ASBURY PARK | NJ | 07712 | $18,000.00 | COASTAL TITLE |
| 722054 | DICATO JR, LOUIS | 23-Nov-96 | 73500 | NATIONAL HOME | STANLEY YACKER, ESQ | 27-Mar-97 | COMMONWEALTH TA | CT-18229(A) | 1041 | 1041 BANGS STREET | ASBURY PARK | NJ | 07712 | $15,500.00 | COASTAL TITLE |
| 23844 | CUIZZA, LAWRENCE M | 30-Dec-96 | 124400 | NATIONAL HOME | STANLEY YACKER, ESQ | 30-Jan-97 | COMMONWEALTH TA | CT-18184A | 305 | 305 SECOND AVENUE | ASBURY PARK | NJ | 07061 | $25,881.00 | COASTAL TITLE |
| 624170 | DELITVER, DMITAR D | 31-Dec-96 | 185000 | NATIONAL HOME | STANLEY YACKER, ESQ | 30-Jan-97 | COMMONWEALTH TA | CT-18188A | 340 | FRANKLIN PL | PLAINFIELD | NJ | 07061 | $39,000.00 | COASTAL TITLE |
| 624494 | OWENS, THOMAS | 17-Jan-97 | 102500 | NATIONAL HOME | ANTHONY DICALESE | 30-Jan-97 | COMMONWEALTH TA | CT-18153A | 512 | SEWALL AVENUE | ASBURY PARK | NJ | 07712 | $31,100.00 | COASTAL TITLE |
| 619959 | CASCIARI, NICHOLAS J | 17-Jan-97 | 102000 | NATIONAL HOME | ANTHONY DICALESE | 27-Mar-97 | COMMONWEALTH TA | CT-18183A | 213 | BAYSIDE DRIVE | HIGHLANDS | NJ | 07732 | $18,300.00 | COASTAL TITLE |
| 622610 | DIDYOMA JR, THOMAS J | 21-Aug-97 | 77000 | NATIONAL HOME | STANLEY YACKER | 07-Mar-97 | COMMONWEALTH TA | CT-17909 | 738 | JACKSON STREET | FREEHOLD | NJ | 07728 | $15,400.00 | COASTAL TITLE |
| 624100 | CAMPOLI, DEBRA | 30-Dec-96 | 93100 | NATIONAL HOME | STANLEY YACKER | 07-Mar-97 | COMMONWEALTH TA | CT-17907A | 745 | 158 MADISON AVENUE | ASBURY PARK | NJ | 07712 | $18,500.00 | COASTAL TITLE |
| 622626 | BUSTOS JR, RAFAEL | 31-Dec-96 | 138871 | NATIONAL HOME | STANLEY YACKER | 07-Mar-97 | COMMONWEALTH TA | CT-18077A | 608 | 158 RIDGE AVENUE | ASBURY PARK | NJ | 07712 | $130,000.00 | COASTAL TITLE |
| 624116 | HRISTOV, LAURIE | 31-Dec-96 | 133500 | NATIONAL HOME | STANLEY YACKER, ESQ | 07-Mar-97 | COMMONWEALTH TA | CT-18084A | 515 | 515 7TH AVE | ASBURY PARK | NJ | 07712 | $30,700.00 | COASTAL TITLE |
| 624050 | VOGGARLI, SUSAN | 13-Jan-97 | 115000 | NATIONAL HOME | STANLEY YACKER, ESQ | 07-Mar-97 | COMMONWEALTH TA | CT-18819A | 513 | 30 DEWITT AVENUE | ASBURY PARK | NJ | 07712 | $27,000.00 | COASTAL TITLE |
| 624117 | DICKMAN, LAWRENCE | 13-Jan-97 | 201000 | NATIONAL HOME | ANTHONY DICALESE | 07-Mar-97 | COMMONWEALTH TA | CT-18558A | 1110 | BELMONT AVENUE | LONG BRANCH | NJ | 07740 | $41,700.00 | COASTAL TITLE |
| 624440 | PICKOWSKI, JOSEPH | 17-Jan-97 | 70000 | NATIONAL HOME | STANLEY YACKER | 07-Mar-97 | COMMONWEALTH TA | CT-18849A | 136 | JAMES ST | LONG BRANCH | NJ | 07740 | $14,000.00 | COASTAL TITLE |
| 624456 | OWENS, THOMAS | 17-Jan-97 | 180000 | NATIONAL HOME | ANTHONY DICALESE | 27-Mar-97 | COMMONWEALTH TA | CT-18187A | 63 | 1010 5TH AVENUE | ASBURY PARK | NJ | 07712 | $33,000.00 | COASTAL TITLE |
| 624095 | DIPPOLITO, MICHAEL | 23-Jan-97 | 114100 | NATIONAL HOME | ANTHONY DICALESE | 04-Mar-97 | COMMONWEALTH TA | CT-18072A | 29 | 503 RIDGE AVENUE | ASBURY PARK | NJ | 07713 | $33,700.00 | COASTAL TITLE |
| 624069 | PELAKOS, GEORGE | 23-Jan-97 | 177600 | NATIONAL HOME | ANTHONY DICALESE | 04-Mar-97 | COMMONWEALTH TA | CT-18942A | 24 | WEBSTER AVENUE | SEASIDE | NJ | 08811 | $27,721.00 | COASTAL TITLE |
| 622550 | PELAKOS, GEORGE | 23-Jan-97 | 90000 | NATIONAL HOME | STANLEY YACKER, ESQ | 07-Mar-97 | COMMONWEALTH TA | CT-18593A | 59 | W 3RD ST | PLAINFIELD | NJ | 07063 | $17,000.00 | COASTAL TITLE |
| 622040 | PICKOWSKI, JOSEPH | 24-Jan-97 | 123750 | NATIONAL HOME | STANLEY YACKER | 27-Mar-97 | COMMONWEALTH TA | CT-18673A | 656 | 656 BATHY STREET | ASBURY PARK | NJ | 07712 | $24,750.00 | COASTAL TITLE |
| 622607 | CUZA, PATRICIA | 20-Feb-97 | 84000 | NATIONAL HOME | ANTHONY DICALESE | 27-Mar-97 | COMMONWEALTH TA | CT-18000A | 512 | BELMONT AVENUE | JERSEY CITY | NJ | 07304 | $48,300.00 | COASTAL TITLE |
| 622614 | SOUTHERN, CARMEN | 11-Mar-97 | 80700 | NATIONAL HOME | ANTHONY DICALESE | 23-Apr-97 | COMMONWEALTH TA | CT-18928A | 203 | RICHMOND STREET | PLAINFIELD | NJ | 07060 | $16,700.00 | COASTAL TITLE |
| 622647 | PICKOWSKI, CLYDE ANN | 23-Jan-97 | 121000 | NATIONAL HOME | ANTHONY DICALESE | 27-Jan-97 | COMMONWEALTH TA | CT-18639A | 1274 | CENTRAL AVE | LONG BRANCH | NJ | 07740 | $24,000.00 | COASTAL TITLE |
| 620350 | KEULA, KENNETH J | 02-Apr-97 | 90000 | NATIONAL HOME | ANTHONY DICALESE | 27-Jun-97 | COMMONWEALTH TA | CT-18498A | 756 | EAST 2ND STREET | LONG BRANCH | NJ | 07751 | $20,000.00 | COASTAL TITLE |
| 622762 | CHRISTIANO, STEPHEN | 03-Apr-97 | 108750 | NATIONAL HOME | ANTHONY DICALESE | 23-Jun-97 | COMMONWEALTH TA | CT-20104A | 29 | PEARL ST | PLAINFIELD | NJ | 07751 | $23,250.00 | COASTAL TITLE |
| 627000 | ZANCA, ALLAN A | 28-Apr-97 | 99750 | NATIONAL HOME | STANLEY YACKER, ESQ | 27-Jun-97 | COMMONWEALTH TA | CT-20101A | 1010 | 1010 BANGS AVENUE | ASBURY PARK | NJ | 07712 | $14,000.00 | COASTAL TITLE |
| 627744 | FARIA JR, ANTHONY W | 30-Apr-97 | 100500 | NATIONAL HOME | STANLEY YACKER | 23-Jun-97 | COMMONWEALTH TA | CT-20008 | 1010 | W 3RD ST | PLAINFIELD | NJ | 07060 | $126,750.00 | COASTAL TITLE |
| 620017 | FUROGI, FRED | 30-Apr-97 | 96600 | NATIONAL HOME | STANLEY YACKER | 27-Jun-97 | COMMONWEALTH TA | CT-20273A | 83 | RIVER ST | RED BANK | NJ | 07701 | $32,000.00 | COASTAL TITLE |
| 620074 | RAINA, JORGE | 30-May-97 | 33760 | NATIONAL HOME | ANTHONY DICALESE | 27-Jun-97 | COMMONWEALTH TA | CT-19817A | 126 | LAUREL AVE | LONG BRANCH | NJ | 07740 | $11,100.00 | COASTAL TITLE |
| 622300 | CUZZI JR, MARIO | 23-May-97 | 15000 | NATIONAL HOME | STANLEY YACKER, ESQ | 21-Jun-97 | COMMONWEALTH TA | CT-19788A | 302 | 3RD AVE | NEPTUNE CITY | NJ | 07736 | $39,100.00 | COASTAL TITLE |
| 629553 | JUERGENSEN, RALPH | 30-Jun-97 | 110250 | NATIONAL HOME | STANLEY YACKER, ESQ | 07-Mar-97 | COMMONWEALTH TA | CT-19831A | 305 | ARLINGTON AVENUE | JERSEY CITY | NJ | 07000 | $374,100.00 | COASTAL TITLE |
| 625569 | DIPPOLITO, AMANDA | 11-Feb-97 | 830000 | NATIONAL HOME | STANLEY YACKER | 14-Mar-97 | COMMONWEALTH TA | CT-19823(A) | 1230 | BUNK AVENUE | PLAINFIELD | NJ | 07060 | $177,000.00 | COASTAL TITLE |
| 624174 | FRISINDO, LAURIE | 24-Feb-97 | 10000 | NATIONAL HOME | STANLEY YACKER | 14-Mar-97 | COMMONWEALTH TA | CT-19811(A) | 28 | BUNK AVENUE | SEASIDE | NJ | 08751 | $29,800.00 | COASTAL TITLE |
| 629113 | JUERGENSEN, RALPH P | 04-Nov-96 | 15000 | NATIONAL HOME | Stanley Yacker Esq. | 17-Jun-97 | COMMONWEALTH TA | CT-18219(A) | 49 | DIVISION LN | LONG BRANCH | NJ | 07712 | $30,000.00 | COASTAL TITLE |
| 629813 | DUSEVA, PAUL | 30-May-97 | 82500 | NATIONAL HOME | ANTHONY DICALESE | 27-Jun-97 | COMMONWEALTH TA | CT-19549 | 398 | DIVISION LN | LONG BRANCH | NJ | 07740 | $27,500.00 | COASTAL TITLE |

# EXHIBIT G

COMMONWEALTH . . .   TITLE INSURANCE COMPANY
90 East Halsey Road | Parsippany, NJ 07054 | 201-515-0033 | fax 201-515-0190

 **Commonwealth**

August 12, 1997

Latham & Watkins
One Newark Center
Newark, NJ  07101-3174

Attention:  Jeffrey M. Goodman, Esq.

RE:     Walsh Securities, Inc.
        Our Claim No. 97-0-2735

Dear Mr. Goodman:

Receipt is acknowledged of your letter of claim on behalf of Walsh Securities, Inc., dated July 28, 1997.

We are presently unable to assess Walsh's claim as your letter does not provide any detail as to how the closing attorneys violated the closing instructions, how such violation caused a loss to Walsh or the amount of the loss.  Please provide copies of the closing service letters, closing instructions for each transaction, specifics as to how the instructions were violated and how the violations caused a loss to Walsh, and the amount of loss.  Upon receipt of such information, we will respond to Walsh's claim.

Very truly yours,


Donna M. Sullivan
State Claims Counsel

DMS:fec

COM 01490

# EXHIBIT H



# WALSH SECURITIES, INC.

CORPORATE OFFICE
4 CAMPUS DRIVE, PARSIPPANY, NJ 07054
PHONE (201) 538-9300 • FAX (201) 538-7968
1-800-225-8058

September 5, 1997



**VIA HAND DELIVERY**

Donna M. Sullivan, Esq.
State Claims Counsel
Commonwealth Land Title Insurance Company
90 East Halsey Road
Parsippany, NJ 07054

RE:     Walsh Securities, Inc., Commonwealth Claim No. 97-0-2735

Dear Ms. Sullivan:

I am responding to your request for additional information, dated August 12, 1997, concerning the above-referenced claim.

With respect to our claim against Commonwealth Land Title Insurance Company ("Commonwealth"), I am enclosing copies of a total of 113 mortgage loan files for which Commonwealth issued closing service letters to Walsh Securities, Inc. indemnifying Walsh Securities, Inc. against, among other things, loss arising out of fraud committed by the closing attorneys. Please be advised that the closing attorneys for these transactions knowingly and fraudulently violated the closing pre-conditions imposed by Walsh Securities Inc. by transmitting the mortgage loan proceeds despite knowing that the following pre-conditions, among others, were not met: i) there were no bona fide sales contracts or bona fide sales prices for the properties at issue, ii) the buyers/borrowers had not paid downpayments or deposits for the properties at issue, iii) there were no bona fide second mortgages on the properties at issue; and iv) the buyers/borrowers had not paid certain closing costs. In addition, the closing attorneys fraudulently certified on HUD-1 settlement statements required by the United States Department of Housing and Urban Development that all the closing pre-conditions imposed by Walsh Securities, Inc. were met, when in fact, the closing attorneys knew that they had not been met.

We reserve our right to supplement or revise this list of fraudulently obtained mortgage loans if additional information becomes available.

Please contact me should you have any questions or require additional materials. Thank you for your prompt attention to our claim.

Sincerely,

Fred H. Schlesinger

COM 01715

## COMMONWEALTH LOANS (113)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 618726 | 619473 | 619475 | 619477 | 619484 | 619487 | 619589 | 619590 | 619941 |
| 619485 | 619488 | 619942 | 619946 | 619948 | 619949 | 619957 | 619959 | 621714 |
| 621716 | 621717 | 621719 | 621720 | 622008 | 622009 | 622010 | 622011 | 622013 |
| 622014 | 622015 | 622016 | 622017 | 622018 | 622019 | 622020 | 622022 | 622023 |
| 622025 | 622054 | 622416 | 622417 | 622522 | 622525 | 622525 | 622527 | 622525 |
| 622547 | 622549 | 622550 | 622654 | 622657 | 622658 | 622661 | 622694 | 622858 |
| 622861 | 623309 | 623845 | 623846 | 623848 | 624170 | 624172 | 624173 | 624174 |
| 624176 | 624178 | 624180 | 624181 | 624260 | 624486 | 624490 | 624494 | 624694 |
| 624695 | 624696 | 624697 | 624698 | 624923 | 625048 | 625050 | 625055 | 625059 |
| 625401 | 625014 | 626019 | 625822 | 626824 | 626825 | 626825 | 625827 | 625847 |
| 626848 | 626849 | 626850 | 627290 | 627355 | 627422 | 627425 | 627430 | 627952 |
| 627900 | 627948 | 627997 | 628045 | 628243 | 628399 | 628550 | 628951 | 628552 |
| 628855 | 628932 | 628997 | 629031 | 629074 | | | | |

COM 01716

# EXHIBIT I

SEP 3 0 1997

# COPY

**McCARTER & ENGLISH**
ATTORNEYS AT LAW
FOUR GATEWAY CENTER
100 MULBERRY STREET
P.O. BOX 652
NEWARK, N.J. 07101-0652

(201) 622-4444

September 29, 1997

BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Re:  Walsh Securities, Inc.
     Commonwealth Claim No. 97-0-2735

Mr. Fred Schlesinger
Walsh Securities, Inc.
Corporate Office
4 Campus Drive
Parsippany, New Jersey  07054

Dear Mr. Schlesinger:

        We have been retained to represent Commonwealth Land
Title Insurance Company with respect to your claim.  However, in
order for Commonwealth to evaluate and respond to your claim, we
need additional information.  Accordingly, please provide the
following information with respect to the above referenced claim:

        1.   As to each loan, identify the name, address and
position/title of any employee of Walsh Securities, including but
not limited to Robert Walsh, having knowledge of the acts, events
and/or circumstances which you contend gives rise to coverage and
the date that the employee acquired the knowledge;

        2.   As to each loan, identify the precise act or
omission you claim gives rise to coverage;

COM 01712

Mr. Fred Schlesinger
September 29, 1997
Page 2

     3.   Explain in _detail_ the current status of _each_ of the loans identified in your letter dated September 5, 1997. That is, identify what loans, if any, are in default and what loans, if any, are in foreclosure, etc.;

     4.   As to _each_ loan, identify the attorney who closed the loan (if it would be an attorney other than the attorney listed on the chart you supplied to Commonwealth with your September 5, 1997 letter to Donna Sullivan, Esq.);

     5.   As to _each_ loan, identify the in-house person(s) who reviewed the loans prior to closing with Walsh Securities;

     6.   As to _each_ loan, identify the specific fraudulent statement listed on the HUD-1 settlement statement;

     7.   As to _each_ loan, identify and define what is meant by the term "closing pre-conditions imposed by Walsh Securities, Inc." and identify and attach any "closing pre-conditions" that were not followed;

     8.   As to _each_ loan explain how the violations of "closing pre-conditions" caused a loss to Walsh Securities and specify the amount of loss;

     9.   As to _each_ loan, identify and supply any written underwriting standards that would apply to the loan; and

     10.   Confirm that you have forwarded the _entire_ mortgage loan file for _each_ of the Commonwealth loans identified in your letter dated September 5, 1997. If you have not forwarded the complete loan files, identify those documents which have been removed and/or withheld from the loan file.

     Upon receipt of such information, we will respond to your claim.

                       Very truly yours,

                       David R. Kott

DRK/yt
bcc:  Donna M. Sullivan, Esq.

MB4:226579.1

COM 01713

# EXHIBIT J

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
 2                        CRIMINAL NO. 02-448
     UNITED STATES OF AMERICA              :
 3                        Plaintiff,       :
     -vs-                                  :
 4                                         :
     ELIZABETH ANN DEMOLA,                 :
 5                                         :
                                           : PLEA HEARING
 6                        Defendant        :
     - - - - - - - - - - - - - - - - -:
 7                             Newark, New Jersey
                               September 9, 2005
 8   B E F O R E:

 9        THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.

10   A p p e a r a n c e s:

11   UNITED STATES ATTORNEY-NEWARK
     CHRISTOPHER J. CHRISTIE
12   Attorneys for Plaintiff-USA
     970 Broad Street
13   Newark, New Jersey 07102
     BY: LISA ROSE, AUSA
14

15   DECOTIIS, FITZPATRICK, COLE & WISLER, LLP
     Attorneys for Defendant-DeMola
16   Glenpointe Centre West
     500 Frank W. Burr Boulevard
17   Teaneck, New Jersey 07666
     BY: JEFFREY D. SMITH, ESQ.
18

     ALSO PRESENT
19   ^

20   _____
          Pursuant to Section 753 Title 28 United States Code,
21   the following transcript is certified to be an accurate
     record as taken stenographically in the above-entitled
22   proceedings.

23
                         Ralph F. Florio
24                       Official Court Reporter

25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

2

1               I N D E X

2

3

4    WITNESSES:                                    PAGES:

5    ELIZABETH ANN DEMOLA                              4

6

7

8

9            E X H I B I T S

10   NUMBER          DESCRIPTION          PAGE

11   SEE ATTACHED INDEXING

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE COURT:  Good afternoon.  We are here in the

2    matter of the United States v Elizabeth DeMola.

3          May I have counsel's appearances, please.

4          MS. ROSE:  Good afternoon, your Honor.  Assistant

5    U.S. Attorney, Lisa Rose, appearing on behalf of the

6    government.

7          MR. SMITH:  Good afternoon, your Honor, Jeffrey

8    Smith from the firm of DeCotiis, Fitzpatrick, Cole & Wisler,

9    for Ms. Elizabeth DeMola.

10          THE COURT:  We'll swear you in Ms. DeMola.

11          THE DEFENDANT:  Yes, your Honor.

12          MS. GUILLOTY:  Would you raise your right-hand.

13          THE DEFENDANT:  Yes, I do.

14          THE COURT:   Thank you.

15

16

17

18

19

20

21

22

23

24

25

1   documents with Ms. DeMola.  I assume that you've showed her

2   the letter written to me that is dated September 21, 2004,

3   correct?

4          MR. SMITH:  Yes, your Honor.

5          THE COURT:  I am about to ask Ms. DeMola the

6   questions now, but just for the record, set forth what other

7   documents you and she have reviewed, if you would.

8          MR. SMITH:  Your Honor, in connection with

9   preparation of the plea agreement, the indictment and the

10  package that the government sent to the Court, which I guess

11  was originally in January 2004 and it was followed up by

12  September 2004 letter.

13         THE COURT:  Okay.

14         MR. SMITH:  Yes.

15         THE COURT:  All right.  Ms. DeMola, you've looked

16  over the questions that begin on page 3 of that September 21,

17  letter, under the section, factual basis for the plea.  I am

18  prepared to ask you those questions now.  Are you ready to

19  answer them?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Okay.  In 1996 and 1997, were you the

22  national sales manager at and with your brothers and an

23  entity called Greenwich Capital, a shareholder of Walsh

24  Securities, Inc., a company engaged primarily in the business

25  of purchasing and funding residential mortgage loans with its

1  main office in Parsippany, New Jersey and with numerous

2  branch offices throughout the United States?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Did your duties include overseeing the

5  sales force in Parsippany and in branch offices, and

6  expediting closings of loans, particularly in the latter

7  portion of each month.

8          THE DEFENDANT:  Yes.

9          THE COURT:  Did you also give direction on occasion

10 to loan processors such as Kellie O'Neill in regard to

11 particular loans?

12         THE DEFENDANT:  Yes.

13         THE COURT:  I couldn't hear you?

14         THE DEFENDANT:  Yes.

15         THE COURT:  In performing your duties did you

16 strive to meet or exceed monthly quotas for closed loans and

17 to increase the company's loan production volume, at least in

18 part to enhance the company's prospects of concluding a

19 merger with another loan company from which-- which you and

20 other shareholders would benefit financially?

21         THE DEFENDANT:  Yes.  I was a sale manager and that

22 was my job.  Yes.

23         THE COURT:  Generally did Walsh Securities close

24 loans with the funds provided by an entity called Greenwich

25 Capital which caused those funds to be wire transferred into

19

1  New Jersey from accounts outside of New Jersey?

2           THE DEFENDANT:  I didn't know where the accounts

3  were, but yes.

4           THE COURT:  Did Walsh Securities acquire loans from

5  mortgage originators such as National Home Funding and

6  Selective Finance, with offices in Monmouth County, New

7  Jersey, which loans Walsh Securities then funded?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Did an individual named William Kane

10 work at National Home Funding and also buy and sell

11 properties on loans which Walsh Securities purchased from

12 National Home Funding and Selective Finance?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Did you at some point become aware that

15 there were fraudulent documents used to support loans made by

16 Walsh Securities, including those set forth below?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And yet acted with others and with a

19 conscious purpose of avoiding learning the truth toward the

20 end that the loans were closed:

21          (a) the use of second mortgages which were designed

22 to match shortfalls in the funds available to the borrowers,

23 but which were not intend to be filed or collected upon;

24          (b) the use of appraisals whose valuations were

25 inaccurate and were used to qualified borrowers and,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          (c) the use of appraisals which valued properties

2    in their "as is" condition when many of the subject

3    properties required substantial improvement?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Yes?

6          THE DEFENDANT:  Ah, ah.  Yes.

7          THE COURT:  Specifically, did you, (a), concur in

8    the funding of loans without first having obtained an

9    accurate written appraisal?

10         THE DEFENDANT:  Referrals, yes.

11         THE COURT:  Did you concur in decisions improperly

12   to eliminate underwriting conditions that were not met?

13         THE DEFENDANT:  Yes.

14         THE COURT:  And did you direct persons at Walsh to

15   participate in efforts with respect to closed funded loans

16   which were to be reviewed by representatives of Greenwich

17   Capital, which efforts included altering certain documents in

18   those files and placing other documents, such as written

19   appraisals, in the files?

20         THE DEFENDANT:  Yes.  After the verbals we would

21   get the written ones and put them in the files.

22         THE COURT:  Are you aware that in July and August

23   1997 Walsh Securities sent communications to third parties,

24   as described in Counts 2 through 4 of the indictment, which

25   failed to fully and accurately apprise those parties of your

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  knowledge and activities as a member of the management of

2  Walsh Securities?

3            THE DEFENDANT:  I am aware now, yes.

4            THE COURT:  I am sorry?

5            THE DEFENDANT:  I am aware now, yes.

6            THE COURT:  Did you do all of these things

7  deliberately and intentionally, and not by reason of

8  ignorance mistake or accident?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Ms. Rose, is there an independent

11  factual basis for the culpability of Ms. DeMola on the

12  conspiracy charge?

13           MS. ROSE:  Yes, there is your Honor.

14           THE COURT:  Let's hear it.

15           MS. ROSE:  The government would be able to prove,

16  if we had to go to trial, that the defendant did conspire

17  with others to commit wire fraud.  And we'll be able to do so

18  by calling witnesses, including but not limited to

19  coconspirators.

20           THE COURT:  Thank you.  Okay.

21           Ms. DeMola, one last question.  How do you now

22  plead to the charged, guilty or not guilty?

23           THE DEFENDANT:  Guilty.

24           THE COURT:  I make the following findings

25  concerning Ms. DeMola.

22

1          I find that she is fully competent and capable of

2     entering an informed plea.  I find that she's aware of the

3     nature and the charges and consequences of the plea.  That

4     her plea of guilty is knowing and voluntary.  And that it is

5     supported by an independent basis in fact containing the

6     essential elements of the offense.  I therefore accept this

7     plea of guilty, and Ms. DeMola is now adjudged guilty of the

8     offense charged against her.

9          The next steps in this matter will be the

10    preparation of a Presentence Report.  For that purpose

11    they'll come a point where you will be interviewed, Ms.

12    DeMola.  And Mr. Smith your attorney may be present if you

13    wish at that time.  You and Mr. Smith will have an

14    opportunity to review a draft the Presentence Report.  If

15    there are matters that you wish to file objections to, you'll

16    have an opportunity to do that.

17         I will review the final Presentence Report and

18    resolve any disputes either factually or on the time that I

19    sentence you.

20         We will have a sentencing date on this?

21         MS. GUILLOTY:  Yes.

22         MS. ROSE:  We would ask this case would be placed

23    on administrative, perhaps a sentencing date first for status

24    purposes instead?

25         THE COURT:  Why don't we give it a sentencing date

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA :            Criminal

                 v.            :      Nos.

LORRAINE KING and             :       TRANSCRIPT OF
KELLIE O'NEILL,                         PROCEEDINGS
                              :
            Defendant.
------------------------x

                         Newark, New Jersey
                         October 29, 1999

BEFORE:

       THE HON. ALFRED M. WOLIN, U.S.D.J.

                         Reported by:
                         CHARLES P. McGUIRE, C.S.R.
                         Official Court Reporter

       Pursuant to Section 753, Title 28, United States Code,
       the following transcript is certified to be an
       accurate record as taken stenographically in the above
       entitled proceedings.

                    _____
                    CHARLES P. McGUIRE, C.S.R.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

2

1   APPEARANCES:

2       ALAIN LEIBMAN, Assistant U.S. Attorney,
        On Behalf of the Government

3
        TONIANNE J. BONGIOVANNI, First Assistant Public
4       Defender,
        On Behalf of Defendant King

5
        BENNETT, BONNEY & GILBERTI, ESQS.,
6       BY: ROBERT S. BONNEY, JR., ESQ.,
        On Behalf of Defendant O'Neill

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

CHARLES P. McGUIRE, C.S.R.
OFFICIAL COURT REPORTER

15

1          THE COURT:  And as I go over to the signature page,

2   Ms. O'Neill, it looks like that you signed your plea agreement

3   on July 22nd, 1998.  Is that correct?

4          DEFENDANT O'NEILL:  Yes.

5          THE COURT:  And, Ms. King, it looks like you've

6   probably signed yours on August 27th, 1999; is that correct?

7          DEFENDANT KING:  Yes, sir.

8          THE COURT:  Okay.

9          Did each of you read these plea agreements before

10  you signed them?

11         DEFENDANT O'NEILL:  Yes.

12         DEFENDANT KING:  Yes, sir.

13         THE COURT:  And did you understand them?

14         DEFENDANT O'NEILL:  Yes.

15         DEFENDANT KING:  Yes.

16         THE COURT:  If you had any questions pertaining to

17  the plea agreement, did you pose those questions to your

18  respective counsel, and did your counsel give you a

19  satisfactory explanation?

20         DEFENDANT O'NEILL:  Yes, sir.

21         DEFENDANT KING:  Yes.

22         THE COURT:  On page one, it indicates that you're

23  being charged with a violation of 18, United States Code,

24  section 1343, and violation of 18, United States Code, section

25  371, which, as you know, is a conspiracy statute, and 1343 is

16

1    a wire fraud statute.   Correct?

2               DEFENDANT KING:   Yes.

3               DEFENDANT O'NEILL:   Yes, sir.

4               THE COURT:   And the Government says to each of you

5    that if you enter a plea of guilty and you're sentenced, they

6    will not initiate any further proceedings for you arising from

7    or related to fraudulent mortgage loans during the years 1996

8    and 1997 involving properties located in the District of New

9    Jersey.   Is that correct?

10              DEFENDANT O'NEILL:   Yes.

11              DEFENDANT KING:   Yes.

12              THE COURT:   And they also indicate that the scope of

13   the protection that is offered to you is further limited to

14   criminal activity that each of you has revealed to the United

15   States Attorney.   Is that correct?

16              DEFENDANT O'NEILL:   Yes.

17              DEFENDANT KING:   Yes.

18              THE COURT:   Going over to the second page, it's

19   entitled Cooperation.

20              You understand that this is a cooperating plea

21   agreement?

22              DEFENDANT O'NEILL:   Yes.

23              DEFENDANT KING:   Yes.

24              THE COURT:   And that it sets forth the type of

25   cooperation in the first paragraph that may be requested of

28

1    Court will impose upon you.

2                DEFENDANT O'NEILL:  Yes.

3                DEFENDANT KING:  Yes.

4                THE COURT:  Lastly, I repeat:  Any stipulation or

5    agreement between you and the Government as to what the

6    applicable facts are are not binding on this Court if the

7    presentence investigation report or other sources persuade the

8    Court of their inaccuracy.  You understand that.

9                DEFENDANT O'NEILL:  Yes.

10               DEFENDANT KING:  Yes, sir.

11               THE COURT:  I'd now like to talk to you about a

12   factual basis for the acceptance of your plea.

13               Bear with me for a moment.

14               Ms. O'Neill, through counsel, have you had an

15   opportunity to review a memorandum that was sent to me with

16   potential questions that may be posed to you at this hearing?

17               DEFENDANT O'NEILL:  Yes.

18               THE COURT:  And I believe that it starts on page

19   five of that memorandum; is that correct?

20               DEFENDANT O'NEILL:  Yes.

21               THE COURT:  And, Mr. Bonney, does she have a copy of

22   it?

23               MR. BONNEY:  She does, Your Honor.

24               THE COURT:  Ms. O'Neill, is it correct that in 1996

25   and '97 that you were employed as a loan processor at Walsh

1    Securities, Inc., a wholesale mortgage lender with offices in

2    Parsippany, New Jersey?

3              DEFENDANT O'NEILL:  Yes.

4              THE COURT:  And would I be correct that your duties

5    included, A, reviewing the documents submitted by mortgage

6    originators and others in support of mortgage loan

7    applications?

8              DEFENDANT O'NEILL:  Yes.

9              THE COURT:  B, that you were preparing Walsh

10   Securities loan commitment letters following review of those

11   applications by the company's underwriters?

12             DEFENDANT O'NEILL:  Yes.

13             THE COURT:  And going to question number three, did

14   the commitment letters typically set forth certain conditions

15   which had to be met before a given mortgage loan could close?

16             DEFENDANT O'NEILL:  Yes, sir.

17             THE COURT:  And did an individual by the name of

18   Betty Ann Demola, the sales manager at Walsh Securities, on

19   various occasions direct that mortgage loans which you

20   processed be approved and funded without Walsh Securities

21   having received a written appraisal report?

22             DEFENDANT O'NEILL:  Yes, sir.

23             THE COURT:  Did Paul Del Rosso, the underwriting

24   department manager, and other underwriters approve mortgage

25   loan applications even though the loan application documents

1   included items such as pay stubs and I.R.S. forms W-2 which

2   you and they agreed were false or fake-looking?

3          DEFENDANT O'NEILL:  Yes.

4          THE COURT:  Did you in 1996, at the request of a

5   person buying and selling real properties, prepare fictitious

6   leases in connection with mortgage loan applications submitted

7   to and later approved by Walsh Securities?

8          DEFENDANT O'NEILL:  Yes, sir.

9          THE COURT:  Were those fictitious leases designed to

10  show that the multi-family properties that were the subject of

11  the loan applications were occupied by rent-paying tenants and

12  therefore would generate rental income?

13         DEFENDANT O'NEILL:  Yes, sir.

14         THE COURT:  Did you in 1996 at the request of the

15  same person prepare escrow letters falsely representing that

16  the attorney named in the letter was holding specific funds in

17  escrow on behalf of the buyer?

18         DEFENDANT O'NEILL:  Yes, sir.

19         THE COURT:  Now, at some other time, were you asked

20  by Betty Ann Demola to participate with other Walsh employees

21  in combing through closed files which were shortly to be

22  reviewed by representatives of Greenwich Capital, which funded

23  loans for Walsh Securities, in order to alter some of the

24  documents then in those files or to place documents, such as

25  written appraisals, in those files?

31

1          DEFENDANT O'NEILL:  Yes, sir.

2          THE COURT:  Did the persons present during portions

3     of the file-cleaning process include Demola?

4          DEFENDANT O'NEILL:  Yes.

5          THE COURT:  President Robert Walsh?

6          DEFENDANT O'NEILL:  Yes.

7          THE COURT:  Vice president James Walsh?

8          DEFENDANT O'NEILL:  Yes.

9          THE COURT:  And Mr. Del Rosso?

10         DEFENDANT O'NEILL:  Yes, sir.

11         THE COURT:  In 1996 and 1997, did you accept

12    payments from various mortgage originators and others on a per

13    loan application basis for numerous mortgage loans which you

14    processed at Walsh Securities?

15         DEFENDANT O'NEILL:  Yes.

16         THE COURT:  And did you do all of these things

17    knowingly and willfully, and by "knowingly," you understood

18    that which you were doing; correct?

19         DEFENDANT O'NEILL:  Yes.

20         THE COURT:  And "willfully" meaning you had an

21    intent to do the things you were doing --

22         DEFENDANT O'NEILL:  Yes, sir.

23         THE COURT:   -- and understood what you were doing;

24    correct?

25         DEFENDANT O'NEILL:  Yes, sir.

1           THE COURT:  Have you provided other details and

2    information to law enforcement officials which you have not

3    been asked about today?

4           DEFENDANT O'NEILL:  Yes, sir.

5           THE COURT:  And I take it, Mr. Bonney, you're

6    satisfied that the United States would be prepared to prove at

7    trial that the funds for the loan closings addressed by

8    Ms. O'Neill's plea of guilty were transmitted by wire transfer

9    from outside New Jersey to bank accounts of closing attorneys

10   in New Jersey; is that correct?

11          MR. BONNEY:  I am, Your Honor, yes.

12          THE COURT:  Any other questions, Mr. Leibman, that

13   you would like the Court to engage in to supplement the plea

14   to the information?

15          MR. LEIBMAN:  No, Your Honor.

16          Thank you.

17          THE COURT:  I didn't think so, but I thought I'd

18   give you the opportunity.

19          Ms. King, likewise, have you had an opportunity to

20   review a memorandum with certain questions to be asked of you

21   that was addressed to your counsel and addressed to the Court?

22          DEFENDANT KING:  Yes, sir.

23          THE COURT:  Okay.  Am I correct that since early

24   1993, you were employed as a legal secretary by Stanley

25   Yacker, an attorney who practiced in Matawan, New Jersey, and

38

1            DEFENDANT KING:  Yes.

2            THE COURT:  Ms. Bongiovanni, are you satisfied that

3    the United States would be able to prove at trial that the

4    funds for the closings addressed by Ms. King were transmitted

5    by wire transfer from New York to a bank account of Mr. Yacker

6    in New Jersey?

7            MS. BONGIOVANNI:  Yes, I am, Your Honor.

8            THE COURT:  Any further questions to supplement the

9    factual basis of the plea?

10           MR. LEIBMAN:  No, Your Honor.

11           THE COURT:  Okay.

12           As to each of the Defendants here today:

13           Why are you entering your plea of guilty,

14   Ms. O'Neill?

15           DEFENDANT O'NEILL:  Excuse me.  I didn't hear you.

16           THE COURT:  Why are you entering your plea of

17   guilty?

18           DEFENDANT O'NEILL:  Because what I did was wrong.

19           I'm sorry.

20           Because what I did was wrong.

21           THE COURT:  Okay.  So what you're saying is, you're

22   guilty of the offense.

23           DEFENDANT O'NEILL:  Yes.

24           THE COURT:  Ms. King?

25           DEFENDANT KING:  I am guilty also of these --

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

39

1    things.

2                    THE COURT:  Okay.

3                    Mr. Bonney and Ms. Bongiovanni, are you each

4    satisfied that this plea is entirely voluntary and is being

5    entered by your client with full knowledge of all of her

6    rights and all of her responsibilities?

7                    MR. BONNEY:  I am, Your Honor.

8                    MS. BONGIOVANNI:  Yes, Your Honor.

9                    THE COURT:  The Court would like to engage in the

10   following fact-finding.

11                   I find that each of these Defendants is competent to

12   enter her plea; that each is possessed of adequate counsel,

13   and the charges that are set forth in the information are both

14   adequately and accurately stated.

15                   I'm satisfied that each of these Defendants

16   understands the elements of the offense that has brought about

17   her plea, and that each plea is voluntary.

18                   There has been a discussion of the plea with each of

19   the Defendants, as well as the plea agreement.  I am satisfied

20   they understand them, as well as their constitutional rights,

21   which each has waived in a knowing and voluntary manner.

22                   I'm satisfied that each understands the penalties

23   that could be imposed, both under the statute as well as the

24   sentencing guidelines.

25                   Lastly, I'm satisfied there is a factual basis for

40

1    the entry of each plea, and I make that finding by the

2    standard of evidence of beyond a reasonable doubt.

3              I'll direct that the plea be entered.

4              I'll adjudicate each of these Defendants guilty of

5    the offense set forth in the respective informations.

6              I'll direct that a presentence report be prepared.

7              I need a date of sentence.

8              THE COURT CLERK:  January 19th at 9:30.

9              THE COURT:  Okay.

10             I understand, Mr. Leibman, this may be potentially

11   an artificial date of sentence, but we'll set it for purposes

12   of the record.

13             MR. LEIBMAN:  Yes, Your Honor.

14             THE COURT:  All right.  As to each individual's

15   release status, I understand this is their first appearance,

16   Mr. Leibman?

17             MR. LEIBMAN:  That's correct, Your Honor.

18             I've discussed the matter of bail with both counsel,

19   and we've all had the benefit of the Pretrial Services

20   Office's reports.

21             What the Government is asking for, Your Honor, and I

22   believe we have agreement on this, is a $10,000 personal

23   recognizance bond for each Defendant, no travel restrictions

24   being necessary.

25             In the case of Ms. King, there are some ancillary

CHARLES P. McGUIRE, C.S.R.
OFFICIAL COURT REPORTER

# EXHIBIT L

1

2   ORIGINAL          UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
3

4
      UNITED STATES OF AMERICA      : TRANSCRIPT OF
5                                   : PROCEEDINGS
      VS.                           :
6                                   :
      ANTHONY D'APOLITO             : Martin Luther King
7     ------------------------------ Building
                                      50 Walnut Street
8                                     Newark, NJ  07102
                                    December 23, 1998
9                                     10:10 a.m.

10    B E F O R E:

11        THE HONORABLE ALFRED M. WOLIN

12    A P P E A R A N C E S:

13        U.S. DEPARTMENT OF JUSTICE
          UNITED STATES ATTORNEY'S OFFICE
14        BY:  ROBERT M. HANNA, ESQ.
          Assistant United States Attorney
15        District of New Jersey

16        CHAMLIN, ROSEN, ULIANO & WITHERINGTON, ESQS.
          BY:  CHARLES J. ULIANO, ESQ.
17        Attorneys for Defendant, Anthony D'Apolito

18    Reported By:

19        NADINE C. FUSCO, C.S.R., R.P.R.

20

21

22

23

24

25

2

1

2          THE COURT:  Good morning.  I will take

3     appearances, please.

4          MR. HANNA:  Good morning, Judge.

5     Robert Hanna, Assistant U.S. Attorney for the

6     United States.

7          MR. ULIANO:  Charles Uliano, appearing

8     for Anthony D'Apolito.

9          THE COURT:  All right.  I understand,

10    Mr. Uliano, that your client wishes to enter a

11    plea of guilty to a two-count Information; is that

12    correct?

13         MR. ULIANO:  Yes.

14         THE COURT:  Do you have certain papers

15    that you would like to hand up to the court?

16         MR. ULIANO:  Yes, your Honor, I have.

17    I just wanted to formally execute them.

18         THE COURT:  You certainly may.

19         MR. ULIANO:  And the original

20    Information.

21         THE COURT:  Mr. Uliano, may I make

22    inquiry of Mr. D'Apolito?

23         MR. ULIANO:  Absolutely, your Honor.

24         THE COURT:  Will Mr. D'Apolito please

25    be sworn?

5 BECKER FARM ROAD
ROSELAND, N.J.  07068
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J.  07724
732-542-8330

3

1

2      A N T H O N Y   J A Y   D'A P O L I T O, having been

3      duly sworn, testifies as follows:

4                    MR. D'APOLITO:   Anthony Jay D'Apolito.

5      D-'-a-p-o-l-i-t-o.

6                    THE COURT:   All right.   Good morning,

7      Mr. D'Apolito.   I'm Judge Wolin.   I'm going to ask

8      you several questions in order to ascertain

9      whether your plea is a voluntary plea of guilty.

10                    Do you understand that?

11                    MR. D'APOLITO:   Yes.   If I should ask

12     you any question, and you don't understand it,

13     please ask me to repeat it.   I will be pleased to

14     do that.   If, at any time, I ask you a question

15     and you want to consult with your counsel, you may

16     do that as well.

17                    Do you understand that?

18                    MR. D'APOLITO:   Yes.

19                    THE COURT:   How old are you, sir?

20                    MR. D'APOLITO:   35.

21                    THE COURT:   How far did you go in

22     school?

23                    MR. D'APOLITO:   13 years.

24                    THE COURT:   Are you under the influence

25     of either alcohol or drugs?

5 BECKER FARM ROAD
ROSELAND, N.J.  07068
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST.
EATONTOWN, N.J.  07724
732-542-8330

11

1

2    here?

3                    MR. D'APOLITO:  Yes.

4                    THE COURT:  Did you read what Mr.

5    Uliano wrote?

6                    MR. D'APOLITO:  Yes.

7                    THE COURT:  Do you accept it as if you

8    had written it with your own hand?

9                    MR. D'APOLITO:  Yes.

10                   THE COURT:  Is it true?

11                   MR. D'APOLITO:  Yes.

12                   THE COURT:  I want to go over just a

13   few of the entries.

14                   Going over to entry number eight, it

15   indicates that the charge here in Count One is the

16   conspiracy to commit wire fraud in violation of

17   federal statute, and then the substantive offense

18   of wire fraud in violation of other federal

19   statutes.  Those are the charges as you understand

20   them; correct?

21                   MR. D'APOLITO:  Yes.

22                   THE COURT:  Going over to entry number

23   24, it indicates that for each of those charges

24   you face a term of five years imprisonment, a

25   maximum $250,000, so if you were put that

5 BECKER FARM ROAD
ROSELAND, N.J. 07088
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J. 07724
732-542-8330

27

1

2          THE COURT:  And, lastly, I will repeat

3    that I'm not bound by the stipulations or

4    agreements that you've entered into by the

5    government if I find that they're inaccurate or

6    the pre-sentence report indicates to me they're

7    inaccurate.

8          Do you understand that?

9          MR. D'APOLITO:  Yes.

10          THE COURT:  I would now like to discuss

11   with you, if I may, the factual basis for the

12   entering of your plea.

13          Have you had an opportunity to review

14   the memorandum that was forwarded to this court --

15          MR. D'APOLITO:  Yes.

16          THE COURT:  -- dated December 22nd,

17   1998, and a copy went to your counsel, Mr.

18   Uliano?

19          MR. D'APOLITO:  Yes.

20          THE COURT:  Am I correct, sir, that

21   during 1996 and 1997 you were employed as an

22   account executive at Walsh Securities Inc., a

23   wholesale mortgage lender with offices in

24   Parsippany, New Jersey?

25          MR. D'APOLITO:  Yes.

5 BECKER FARM ROAD
ROSELAND, N.J.  07068
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J. 07724
732-542-8330

28

1

2             THE COURT:    Did Walsh Securities pay

3    you a base salary and commissions based upon the

4    total principal amount of closed mortgage loans

5    you generated and, on occasion, bonuses for

6    meeting certain targets set by Walsh Securities?

7             MR. D'APOLITO:   Yes.

8             THE COURT:   Did you generally

9    understand that underwriting decisions as to

10   mortgage loans were based, at least in part, on

11   information contained in the mortgage application,

12   supporting documentation submitted with the

13   application, and appraisal reports on the

14   property?

15            MR. D'APOLITO:   Yes.

16            THE COURT:   In early 1996, did you, by

17   agreement and understanding with various persons

18   including William Kane, prepare fictitious leases

19   and take other actions in connection with mortgage

20   applications submitted to and later approved by

21   Walsh Securities?

22            MR. D'APOLITO:   Yes.

23            THE COURT:   Were those fictitious

24   leases designed to show that the multi-family

25   properties that were the subject of the mortgage

29

1      application were occupied by rent-paying tenants

2      and therefore would generate rental income?

3              MR. D'APOLITO:  Yes.

4              THE COURT:   Did you generally

5      understand that in 1996 and 1997 numerous mortgage

6      applications accompanied by similiarly fictitious

7      leases and other false supporting documents, such

8      as fraudulent pay stubs and IRS Forms W-2, were

9      used to generate mortgage loans by Walsh

10     Securities which were funded by Greenwich Capital?

11             MR. D'APOLITO:  Yes.

12             THE COURT:   Did you also at that time

13     generally understand -- and I'm speaking about

14     1996 and 1997 --  that the transactions generating

15     those mortgage loans were, quote, "land flips,"

16     close quote.  That is, the properties that secured

17     the loans had been purchased or were under

18     contract to be purchased by William Kane and other

19     persons and entities at a relatively low price and

20     were resold shortly thereafter to another at a

21     significantly higher price?

22             MR. D'APOLITO:  Yes.

23             THE COURT:   Did you accept payments

24     from William Kane in connection with hundreds of

5 BECKER FARM ROAD
ROSELAND, N.J.  07068
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J.  07724
732-542-8330

30

1

2      fraudulent land flip transactions that generated

3      mortgage loans for Walsh Securities?

4                    MR. D'APOLITO:  Yes.

5                    THE COURT:  In early 1997, did you

6      forge notarizations on various closing documents

7      for a number of fraudulent land flips?

8                    MR. D'APOLITO:  Yes.

9                    THE COURT:  In early 1997 did Betty Ann

10     Demola, the national sales manager of Walsh

11     Securities, direct you to alert William Kane that

12     a loan reviewer from Greenwich Capital intended to

13     examine properties that secured recent mortgage

14     loans, and did you then relay Demola's message

15     that, in substance, Kane should make the

16     properties look lived-in prior to the arrival of

17     the reviewer?

18                   MR. D'APOLITO:  Yes.

19                   THE COURT:  Did Betty Ann Demola direct

20     that loans for which you were the account

21     executive be approved and funded based upon verbal

22     representations of market value by an appraiser,

23     without having received a written appraisal

24     report?

25                   MR. D'APOLITO:  Yes.

5 BECKER FARM ROAD
ROSELAND, N.J. 07068
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J. 07724
732-542-8330

31

1

2          THE COURT:   With regard to loans for

3   which you were the account executive, did Betty

4   Ann Demola direct loan underwriters to overlook

5   suspicious loan application documents such as pay

6   stubs and IRS Forms W-2?

7          MR. D'APOLITO:   Yes.

8          THE COURT:   Did you prepare the

9   fictitious leases identified in overt act

10  paragraph 28(a) of Count 1 and in Count 2 of the

11  Information?

12         MR. D'APOLITO:   Yes.

13         THE COURT:   Have you had an opportunity

14  to look over at paragraph 28(a) of Count 1 and

15  Count 2?

16         MR. D'APOLITO:   Yes.

17         THE COURT:   Did you do all of these

18  things that we just discussed voluntarily, meaning

19  of your own free will?

20         MR. D'APOLITO:   Yes.

21         THE COURT:   Did you do them knowingly,

22  meaning you understood that which you were doing?

23         MR. D'APOLITO:   Yes.

24         THE COURT:   Did you do them willfully,

25  meaning you intended to bring about the result

5 BECKER FARM ROAD
ROSELAND, N.J.   07068
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J.   07724
732-542-8330

32.

1    that occurred?

2            MR. D'APOLITO:  Yes.

3            THE COURT:  Any further questions, Mr.

4    Hanna, in order to secure the factual basis?

5            MR. HANNA:  No, your Honor.

6            THE COURT:  I take it that if this

7    matter were to go to trial, that the government

8    would be able to prove that the wire fraud was

9    accomplished by the use of interstate wire

10   communications in furtherance of the fraud or

11   scheme?

12           MR. D'APOLITO:  Yes.

13           THE COURT:  And, Mr. Uliano, I take it

14   that you're satisfied that the government could

15   prove that?

16           MR. ULIANO:  Yes, sir, they can.

17           THE COURT:  Why are you entering your

18   plea of guilty here today?

19           MR. D'APOLITO:  Because I'm guilty.

20           THE COURT:  Mr. Uliano, are you

21   satisfied that the plea here is entirely voluntary

22   and it's being entered by your client with full

23   knowledge of his rights and all of his

24   responsibilities?

5 BECKER FARM ROAD
ROSELAND, N.J.  07068
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J.  07724
732-542-8330

33

1

2          MR. ULIANO:  Yes, sir.

3          THE COURT:  The court would like to

4     make the following findings of fact.

5          I find that Mr. D'Apolito is competent,

6     possesses adequate counsel, and the charge set

7     forth in the two counts of the Information are

8     accurate -- accurately and adequately stated.

9          I'm satisfied that Mr. D'Apolito

10    understand the elements of the offense.  I find

11    that this plea is a voluntary plea.  There's been

12    a discussion of both the plea and the plea

13    agreement.  I'm satisfied that he understands the

14    plea agreement as well as his constitutional

15    rights that he's waived in a knowing and voluntary

16    manner.

17         I'm satisfied Mr. D'Apolito understands

18    the penalties that could be imposed, both under

19    the statute as well as the sentencing guidelines.

20         Lastly, I'm satisfied there's a factual

21    basis for the entry of this plea and I make that

22    finding by a preponderance of the evidence.  I'll

23    direct that the plea be entered as to the counts

24    contained in the Information.  I'll adjudicate him

25    guilty of those offenses as well.

5 BECKER FARM ROAD
ROSELAND, N.J.  07068
873-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J.  07724
732-542-8330

34

1

2          I'll direct that a pre-sentence report

3     be prepared.  March 16th -- the sentencing will be

4     on March 16th at 10:30.

5          Are there any other matters the court

6     should take up?

7          MR. ULIANO:  Just the matter of the

8     $10,000 personal recognizance bond, and just that

9     there are no travel restrictions necessary.

10         THE COURT:  No travel restrictions.

11    Okay.

12         I take it that you consent, Mr. Hanna?

13         MR. HANNA:  Yes.

14         MR. ULIANO:  I take it that you

15    consent, Mr. Uliano?

16         MR. ULIANO:  Yes, I do.

17         THE COURT:  Let the record indicate

18    that I will sign an order of release.  Bail is

19    fixed at $10,000 and a non-secured appearance bond

20    and I'll file it with the clerk.

21         All right.  That completes the

22    proceedings.  I thank everybody for their

23    cooperation.

24         MR. D'APOLITO:  Thank you, your Honor.

25         MR. ULIANO:  Thank you, your Honor.

5 BECKER FARM ROAD
ROSELAND, N.J. 07068
973-740-1100

DOERNER & GOLDBERG, INC.
CERTIFIED SHORTHAND REPORTERS

2 INDUSTRIAL WAY WEST
EATONTOWN, N.J. 07724
732-542-8330

# EXHIBIT M

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WALSH SECURITIES, INC., | : Civil Action No. CV 97-3496 (WGB) |
| Plaintiff, | : Hon. William G. Bassler |
| v. | : |
| CRISTO PROPERTY MANAGEMENT, LTD., a/k/a G.J.L. LIMITED, et al. | : |
| Defendants. | : |

**PLAINTIFF'S CERTIFIED RESPONSES AND OBJECTIONS TO
DEFENDANT/THIRD-PARTY PLAINTIFF COMMONWEALTH LAND TITLE
INSURANCE COMPANY'S FIRST SET OF INTERROGATORIES ADDRESSED
TO PLAINTIFF WALSH SECURITIES, INC.**

Robert A. Magnanini (RM 7356)
Christopher Iannicelli (CI 7904)
BOIES, SCHILLER & FLEXNER LLP
150 John F. Kennedy Parkway, Fourth Floor
Short Hills, NJ 07078
973-218-1111

Attorneys for Plaintiff
Walsh Securities, Inc.

Plaintiff, Walsh Securities, Inc. ("Walsh Securities"), by its undersigned attorney, hereby responds and objects to Defendant Commonwealth Land Title Insurance Company's ("Commonwealth") First Set of Interrogatories (the "Interrogatories"), as follows:

## GENERAL OBJECTIONS

1. Walsh Securities objects to the Interrogatories to the extent that they purport to impose obligations and require procedures beyond those set forth in the Federal Rules of Civil Procedure and the local rules or orders of this Court.

2. Walsh Securities objects to the Interrogatories to the extent the information sought is unreasonably cumulative or duplicative or obtainable from other sources that are more convenient, less burdensome, or less expensive, as provided by the Federal Rules of Civil Procedure.

3. Walsh Securities objects to the Interrogatories to the extent that they are vague, ambiguous, overly broad, unduly burdensome, seek irrelevant information or are not reasonably calculated to lead to the discovery of admissible evidence.

4. Walsh Securities objects to the Interrogatories to the extent that they purport to require the identification of information or documents protected by the attorney-client privilege, the work-product doctrine or any other applicable privilege, statute, law, or rule. Walsh Securities hereby claims such privileges and protections to the extent implicated by the Interrogatories and excludes privileged information from its responses. Any disclosure of such protected or privileged information is inadvertent and not intended to waive those privileges or protections. Inadvertent disclosure or

1

identification of any privileged or protected document or information shall not constitute waiver of any privilege, work-product protection, or immunity, or any other ground for objecting to discovery of the document or information. If the disclosure or identification of any such document or information is deemed to be a waiver of any right or privilege, the waiver shall be a limited waiver pertaining to that document or information only.

5.  Walsh Securities objects to the Interrogatories to the extent that they purport to require the disclosure or identification of documents not presently within the possession, custody, or control of Walsh Securities.

6.  Walsh Securities objects to the Interrogatories insofar as they seek the identification of documents or disclosure of information equally accessible to Defendant and/or in Defendant's exclusive possession, custody, or control.

7.  Walsh Securities objects to the Interrogatories insofar as they do not identify with reasonable particularity the documents and information Defendant seeks.

8.  In making these objections, Walsh Securities does not in any way waive or intend to waive, but rather preserves and intends to preserve:

a.  all rights to object on any ground to the competency, relevancy, materiality, and admissibility of any information or document that may be disclosed or identified in response to the Interrogatories or the subject matter thereof;

b.  all rights to object on any ground to the use of any information or document that may be disclosed or identified in response to the Interrogatories or the subject matter thereof, in any subsequent proceeding, including the trial of this or any other action; and

2

c.      all rights to object on any ground to any request for further responses to these or any other discovery requests.

9.      Walsh Securities reserves the right to make any use of, or to introduce at any hearing and at trial, documents or information responsive to the Interrogatories but discovered subsequent to the date of Walsh Securities' responses and initial disclosure, including, but not limited to, any documents or information obtained during discovery.

10.     Walsh Securities' discovery and investigation of the facts relevant to this case are ongoing and Walsh Securities' responses to the Interrogatories are made to the best of its present knowledge, information, and belief.  Walsh Securities reserves the right to amend and/or supplement its responses, which are subject to such additional or different information as discovery or further investigation may disclose.

11.     All of the General Objections set forth herein are incorporated into each of the individual responses set forth below and have the same force and effect as if fully set forth therein.

SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

Interrogatory No. 1:

**With respect to paragraph 95 of the Third Amended Complaint, as to each loan, set forth the identity of the closing attorney, and set forth in detail as to each loan, each act of fraud and/or each act of misapplication of the closing attorney.**

Response to Interrogatory No. 1:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad and unduly

3

burdensome.  Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Since February 1996, defendants Kane, Cristo Property/G.J.L. Ltd, Oakwood Properties, DEK Homes of NJ, NHF, Capital Assets, Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri, Richard Pepsny, Cicalese, Cuzzi, D'Apolito, DAP Consulting, DiFeo, Donna Pepsny and Coastal Agency (collectively, "the RICO defendants") have been engaged in a pattern of racketeering activity which has resulted in approximately two hundred twenty mortgage loans being purchased by Walsh Securities from NHF for amounts ranging up to eight times the preceding sales prices of the properties at issue.

In regards to the approximately two hundred twenty mortgage loans referenced above, the Closing Attorneys (Defendants Yacker and Cicalese jointly), together with Defendants Alfieri and Richard Pepsny, were selected by Defendants Kane, Grieser, Capital Assets and/or Cristo Property/G.J.L. Ltd. to facilitate the real property closing involving the aforementioned loans originated by NHF and later sold to Walsh Securities.

The table set-forth as Exhibit A hereto identifies, *inter alia*, each loan at issue and the closing attorney involved.

The specific acts of fraud and/or misapplication by the Closing Attorneys are set forth at length in, including but not limited to, Paragraphs 22, 38-39, 59-65 and 95 of Plaintiff's Third Amended Complaint and therefore will not be repeated herein.

Interrogatory No. 2:

**Identify each and every document that supports your answer to the immediately preceding Interrogatory.**

4

<u>Response to Interrogatory No. 2</u>:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Moreover, by seeking the identification of each and every document Plaintiff relies upon to support its response and the underlying factual basis of its allegation, Defendant seeks the identification of information protected from production by the work-product privilege. Accordingly, Walsh Securities will not specifically identify such responsive documents. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Documents potentially responsive to Defendant's Interrogatory are available for inspection in the document repository at the offices of Boies, Schiller & Flexner LLP, Counsel for Plaintiff Walsh Securities, Inc. located at 150 John F. Kennedy Parkway, 4th Floor, Short Hills, New Jersey 07078.

<u>Interrogatory No. 3</u>:

**For each mortgage loan identified in response to Interrogatory No. 1, set forth the name of and address of any third party to whom the mortgage loan was assigned, the date of the assignment and the amount of consideration paid to Walsh for the assignment.**

<u>Response to Interrogatory No. 3</u>:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

5

Documents potentially responsive to Defendant's Interrogatory are available for inspection in the document repository at the offices of Boies, Schiller & Flexner LLP, Counsel for Plaintiff Walsh Securities, Inc. located at 150 John F. Kennedy Parkway, 4th Floor, Short Hills, New Jersey 07078.

Interrogatory No. 4:

**Set forth all facts (not legal conclusions) that support the allegation contained in paragraph 40 of the Third Amended Complaint that plaintiff Walsh Securities "remains liable for a substantial portion of the value" of the mortgage loans fraudulently obtained by certain of the defendants.**

Response to Interrogatory No. 4:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Walsh Securities, a wholesale mortgage banker, remained liable for a substantial portion of the value of the loans at issue because Walsh Securities was the loss leader on many of the loans at issue which were securitized in five Real Estate Investment Trusts ("REITS") issued by Walsh Securities. As the loss leader, once it was discovered that the subject loans were the product of fraud and that the borrowers could not pay the remaining balance of the mortgages, Walsh Securities fulfilled its obligations by repurchasing approximately $10,000,000.00 of the loans that had been sold as part of the REITS and were used as collateral for the notes issued in the securitizations. Also, prior to the discovery of the fraud, many of the subject loans were purchased by whole loan buyers such as The Money Store and Cityscape Financial Corp. pursuant to whole

6

loan sale agreements.  Pursuant to these whole loan sales agreements with whole loan buyers, Walsh Securities issued representations and warranties in connection with each of the loans sold requiring Walsh Securities to repurchase any loans which were the product of fraud. Accordingly, once the fraud was discovered, Walsh Securities repurchased as many loans as it could from the whole loan buyers because of its obligations pursuant to the representations and warranties.

Interrogatory No. 5:

   **Identify any and all documents that support your response to the immediately proceeding Interrogatory.**

Response to Interrogatory No. 5:

   In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Moreover, by seeking the identification of each and every document Plaintiff relies upon to support its response and the underlying factual basis of its allegation, Defendant seeks the identification of information protected from production by the work-product privilege.  Accordingly, Walsh Securities will not specifically identify such responsive documents.  Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

   Documents potentially responsive to Defendant's Interrogatory are available for inspection in the document repository at the offices of Boies, Schiller & Flexner LLP, Counsel for Plaintiff Walsh Securities, Inc. located at 150 John F. Kennedy Parkway, 4th Floor, Short Hills, New Jersey 07078.

Interrogatory No. 6:

**Set forth all facts (not legal conclusions) that support the allegation contained in paragraph 40 of the Third Amended Complaint that the fraud allegedly perpetrated against Walsh Securities ". . . has injured the business reputation of Walsh Securities and caused Walsh Securities to lose a substantial amount of business and profits."**

Response to Interrogatory No. 6:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

The fraud perpetrated on Walsh Securities that is the subject of this action injured the business reputation of Walsh Securities and led to the loss of Walsh Securities' line of credit which it needed to fund new mortgage loans. The fraud also made it impossible to obtain a new line of credit and to continue to sell whole loans. The fraud also caused the termination of the merger of Walsh Securities and Resource Bancshares Mortgage Group. The fraud also prevented Walsh Securities from obtaining new investors or merger partners and the mortgage banking business of Walsh Securities finally collapsed, resulting in the loss of jobs for over 250 employees and the closing of 14 offices causing Walsh Securities to lose a substantial amount of business and profits.

Interrogatory No. 7:

**Identify any and all documents that support your response to the immediately preceding Interrogatory.**

Response to Interrogatory No. 7:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Moreover, by seeking the identification of each and every document

8

Plaintiff relies upon to support its response and the underlying factual basis of its allegation, Defendant seeks the identification of information protected from production by the work-product privilege.   Accordingly, Walsh Securities will not specifically identify such responsive documents.  Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Documents potentially responsive to Defendant's Interrogatory are available for inspection in the document repository at the offices of Boies, Schiller & Flexner LLP, Counsel for Plaintiff Walsh Securities, Inc. located at 150 John F. Kennedy Parkway, 4th Floor, Short Hills, New Jersey 07078.

Interrogatory No. 8:

**If you contend that defendants Anthony D'Apolito and/or DAP Consulting, Inc. engaged in fraud or other intentional wrongful conduct, set forth each and every fact (not legal conclusions) that supports your contention.**

Response to Interrogatory No. 8:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

The specific acts of fraud and/or other intentional wrongful conduct by Anthony D'Apolito and/or DAP Consulting, Inc. are set forth at length in, including but not limited to, Paragraphs 24, 38-39, 59-65 and 73 of Plaintiff's Third Amended Complaint and therefore will not be repeated herein.

Interrogatory No. 9:

**Identify any and all documents that support your response to the immediately preceding Interrogatory.**

9

<u>Response to Interrogatory No. 9</u>:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Moreover, by seeking the identification of each and every document Plaintiff relies upon to support its response and the underlying factual basis of its allegation, Defendant seeks the identification of information protected from production by the work-product privilege.  Accordingly, Walsh Securities will not specifically identify such responsive documents.  Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Documents potentially responsive to Defendant's Interrogatory are available for inspection in the document repository at the offices of Boies, Schiller & Flexner LLP, Counsel for Plaintiff Walsh Securities, Inc. located at 150 John F. Kennedy Parkway, 4th Floor, Short Hills, New Jersey 07078.

<u>Interrogatory No. 10</u>:

**If you contend that defendants National Home Funding, Inc. and/or Robert Skowrenski, II engaged in fraud or other intentional wrongful conduct, set forth each and every fact (not legal conclusion) that supports your contention.**

<u>Response to Interrogatory No. 10</u>:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

The specific acts of fraud and/or other intentional wrongful conduct by National Home Funding, Inc. and/or Robert Skowrenski, II are set forth at length in,

10

including but not limited to, Paragraphs 38-39, 59, 64-65 and 73 of Plaintiff's Third Amended Complaint and therefore will not be repeated herein.

Interrogatory No. 11:

**Identify any and all documents that support your response to the immediately preceding Interrogatory.**

Response to Interrogatory No. 11:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Moreover, by seeking the identification of each and every document Plaintiff relies upon to support its response and the underlying factual basis of its allegation, Defendant seeks the identification of information protected from production by the work-product privilege. Accordingly, Walsh Securities will not specifically identify such responsive documents. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Documents potentially responsive to Defendant's Interrogatory are available for inspection in the document repository at the offices of Boies, Schiller & Flexner LLP, Counsel for Plaintiff Walsh Securities, Inc. located at 150 John F. Kennedy Parkway, 4th Floor, Short Hills, New Jersey 07078.

Interrogatory No. 12:

**If you contend that defendant William Kane engaged in fraud or other intentional wrongful conduct, set forth each and every fact (not legal conclusion) that supports your contention.**

Response to Interrogatory No. 12:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly

burdensome. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

The specific acts of fraud and/or other intentional wrongful conduct by William Kane are set forth at length in, including but not limited to, Paragraphs 38-39 and 59-64 of Plaintiff's Third Amended Complaint and therefore will not be repeated herein.

Interrogatory No. 13:

**Identify any and all documents that support your response to the immediately preceding Interrogatory.**

Response to Interrogatory No. 13:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Moreover, by seeking the identification of each and every document Plaintiff relies upon to support its response and the underlying factual basis of its allegation, Defendant seeks the identification of information protected from production by the work-product privilege. Accordingly, Walsh Securities will not specifically identify such responsive documents. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Documents potentially responsive to Defendant's Interrogatory are available for inspection in the document repository at the offices of Boies, Schiller & Flexner LLP, Counsel for Plaintiff Walsh Securities, Inc. located at 150 John F. Kennedy Parkway, 4th Floor, Short Hills, New Jersey 07078.

Interrogatory No. 14:

12

Set forth the current corporate status of plaintiff Walsh Securities, Inc., including but not limited to whether it has been dissolved and/or is still an active corporation, and the names and addresses of any and all former or current officers, directors and/or shareholders.

Response to Interrogatory No. 14:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Walsh Securities is the dba of Walsh Holding Co., Inc. which has not been dissolved and is being restored to an active Delaware Corporation through the payment of $174.90 in back corporate taxes. Walsh Securities' current and sole shareholder is Robert Walsh.

Interrogatory No. 15:

Set forth the date, time, and place of any meetings between any member of Walsh Securities, Inc. Senior Management (including but not limited to Robert C. Walsh) and William Kane and the substance of what was discussed at such meetings.

Response to Interrogatory No. 15:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. In particular the phrase "Senior Management" is vague and undefined. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

In or about approximately early June 1997, Walsh Securities received a subpoena seeking documents and information related to Walsh Securities' employee

13

Anthony D'Apolito and indicating that properties which had previously been represented to Walsh Securities as being purchased, rehabilitated and resold by William Kane and Gary Grieser had not been rehabilitated.  Walsh Securities' employees visited some of the subject properties and determined that they indeed had not been rehabilitated as claimed by William Kane or Gary Grieser and advised Elizabeth Ann Demola, Walsh Securities' National Sales Manager and Mr. D'Apolito's supervisor, of the receipt of the subpoena and that some of the properties at issue had never been rehabilitated.  Ms. Demola thereafter demanded a meeting with William Kane, Gary Grieser and Anthony D'Apolito to discuss these issues. The meeting was held in approximately mid-June 1997 and was attended by William Kane, Gary Grieser, Anthony D'Apolito, Elizabeth Ann Demola and Robert Walsh.  William Kane, Gary Grieser and Anthony D'Apolito unsuccessfully attempted to convince Robert Walsh and Elizabeth Ann Demola that the properties had indeed been rehabilitated as claimed and that the subsequent purchase price was the fair market value of the properties.  Robert Walsh ended the meeting by stating that Walsh Securities would not fund any more loans in which Cristo Properties/G.J.L. Ltd. Was the seller and which were brought into Walsh Securities through NHF by Mr. D'Apolito. Nonetheless, after the conclusion of the meeting, William Kane approached Robert Walsh and offered Walsh Securities the opportunity to purchase $3,000,000.00 worth of additional loans – an offer which Robert Walsh immediately rejected.

Interrogatory No. 16:

Set forth all facts (not legal conclusions) that support any claims that defendant Commonwealth Land Title Insurance Company is liable for any losses sustained by plaintiff.

Response to Interrogatory No. 16:

14

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

The specific facts that support Plaintiff's claims against Commonwealth Land Title Insurance Company are set forth at length in, including but not limited to, Paragraphs 35, 56-59, 64 and 93-98 of Plaintiff's Third Amended Complaint and therefore will not be repeated herein.

Interrogatory No. 17:

**Identify each and every document that supports your answers to the immediately preceding Interrogatory.**

Response to Interrogatory No. 17:

In addition to the foregoing general objections, Walsh Securities objects specifically to this Interrogatory on the grounds that it is overbroad, vague and unduly burdensome. Moreover, by seeking the identification of each and every document Plaintiff relies upon to support its response and the underlying factual basis of its allegation, Defendant seeks the identification of information protected from production by the work-product privilege. Accordingly, Walsh Securities will not specifically identify such responsive documents. Subject to, as limited by, and without waiving the foregoing general objections and specific objections, Walsh Securities responds:

Documents potentially responsive to Defendant's Interrogatory are available for inspection in the document repository at the offices of Boies, Schiller & Flexner LLP, Counsel for Plaintiff Walsh Securities, Inc. located at 150 John F. Kennedy Parkway, 4th Floor, Short Hills, New Jersey 07078.

15

DATED this 15th day of October, 2005

As to Objections:

BOIES, SCHILLER & FLEXNER LLP

Robert A. Magnanini (RM 7356)
Christopher Iannicelli (CI 7904)

Attorneys for Plaintiff
Walsh Securities, Inc.

16