# EXHIBIT 10

```
 1                  UNITED STATES DISTRICT COURT
 2                     DISTRICT OF NEW JERSEY
 3
 4
    WALSH SECURITIES, INC.,
 5                                      Action No. CV 97-3496 (WGB)
 6            Plaintiff,                Hon. William G. Bassler
 7   vs.
 8
    CRISTO PROPERTY MANAGEMENT, LTD.,
 9   a/k/a G.J.L. LIMITED, DEK HOMES OF
    NEW JERSEY, INC., OAKWOOD PROPERTIES,
10   INC., NATIONAL HOME FUNDING, INC., CAPITAL
    ASSETS PROPERTY MANAGEMENT &
11   INVESTMENT Co., Inc., CAPITAL ASSETS
    PROPERTY MANAGEMENT, L.L.C., WILLIAM
12   KANE, GARY GRIESER, ROBERT SKOWRENSKI, III,
    RICHARD CALANNI, RICHARD DiBENEDETTO,
13   JAMES R. BROWN, THOMAS BRODO, ROLAND
    PIERSON, STANLEY YACKER, ESQ., MICHAEL
14   ALFIERI, ESQ., RICHARD PEPSNY, ESQ.,
    ANTHONY M. CICALESE, ESQ., LAWRENCE
15   CUZZI, ANTHONY D'APOLITO, DAP CONSULTING,
    INC., COMMONWEALTH LAND AND TITLE INSURANCE
16   CO., NATIONS TITLE INSURANCE OF NEW YORK,
    INC., FIDELITY NATIONAL INSURANCE CO.
17   OF NEW YORK, COASTAL TITLE AGENCY,
    STEWART TITLE GUARANTY COMPANY,
18   IRENE DIFEO, DONNA PEPSNY, WEICHERT
    REALTORS, AND VECCHIO REALTY, INC. D/B/A
19   MURPHY REALTY BETTER HOMES and GARDENS.
20           Defendants.
21   _____/ Volume II, Pages 132-258
22
    DEPOSITION OF:      WILLIAM KANE.
23
    DATE/TIME:          May 4, 2007; 9:30 a.m.
24
    PLACE:              Kanabay Court Reporters
25                      Feather Sound Square, Suite 19
                        Clearwater, Florida
```

Page 209

1  A. No.
2  Q. I believe because he had told us at one point that
3  he recalled on a couple of occasions prior to Cristo to a
4  straw buyer sale being completed, he had gone to the bank
5  with you or Mr. Grieser and withdrawn funds from his trust
6  account to give to you or Mr. Grieser.
7      Do you recall that?
8  A. Yes.
9  Q. And that sometimes occurred prior to the actual
10 transaction from Cristo to the straw buyer closing?
11 A. 99.9 percent of the time.
12 Q. What did -- on the HUD statements on the closings,
13 there's a variety of closing costs for each of these straw
14 buyers. Who actually paid the closing costs?
15 A. It would come off the top. So it would come out
16 of the funds wired in from Walsh Securities.
17 Q. What were those closing costs that had to be paid
18 outside of payments to you and Mr. Grieser and Mr. Yacker?
19 A. You'd have recording fees. I don't know if the
20 appraisals were on there or not on there, you know, the
21 legal fees, Rick's legal fees, Yacker's legal fees.
22 Q. Did Mr. Pepsny ever get paid anything extra beyond
23 his legal fees for either the acquisition by Cristo or the
24 sale by Cristo?
25 A. No, sir.

Page 210

1  Q. So he just benefitted from the volume of the --
2  A. Right. Because don't forget, he got double
3  because he got the purchase and the sale.
4  Q. I see. Did you ever have a conversation with
5  either Mr. DiBenedetto or Mr. Calanni in which you told them
6  you had a desk at Walsh Securities?
7  A. That was a joke just because I would be up there
8  at the end of the month all the time with my loans. And I
9  would sit there until they were done if there were any
10 problems or anything. So that was just a standing joke.
11 Q. And Mr. Calanni had asked you before about these
12 10 appraisals that were, I guess, cause for concern with
13 him. I believe at some point he testified that he tried to
14 talk to you about the appraisals and you had threatened him
15 and said don't get involved or leave the appraisals alone.
16     Do you recall that conversation?
17     MR. CALANNI: I never said that Bill Kane
18 threatened me.
19     MR. KOTT: Mr. Calanni, there's one rule. You
20 have to let the lawyer finish the question before
21 you speak objections, so the court reporter can get
22 his whole question --
23     MR. MAGNANINI: Yes, otherwise it gets chopped
24 up.
25     MR. CALANNI: My apologies. I didn't --

Page 211

1  BY MR. MAGNANINI:
2  Q. Okay. That was question. Do you recall any
3  conversations with Mr. Calanni about these 10 loans that
4  were kicked back or something like that?
5      MR. CALANNI: Can I object now? I never said
6  Bill Kane threatened me in any way. I did say that
7  we had a discussion about 10 appraisals that were
8  kicked back, and Kellie first called me on it and
9  then Bill. But there was never a statement. I
10 never said that Bill Kane ever threatened me or we
11 ever had a conversation near that.
12 BY MR. MAGNANINI:
13 Q. Well, you can answer the question, Mr. Kane.
14     Do you recall --
15 A. No, I don't recall the conversation, no.
16 Honestly, sir, I don't even remember the 10 appraisals. I'm
17 sure it happened. I just don't remember.
18     MR. CALANNI: All right. That's all.
19 BY MR. MAGNANINI:
20 Q. Okay. Mr. Kane, did you -- how did you come upon
21 these straw buyers that were listed on the loans that Walsh
22 Securities were funding?
23 A. Gary Grieser arranged that.
24 Q. And do you know how he went about locating people?
25 A. In the beginning it was friends of his. Then he

Page 212

1  had an older gentleman that used to work for him before
2  Larry Cuzzi.
3  Q. Who is that, the older gentleman?
4  A. If I heard his name, I could tell you. He owned a
5  restaurant up north someplace, and him and Gary went back a
6  long time from Roselle Park -- he had a restaurant in
7  Roselle Park. And I forgot his name. And they were
8  actually --
9      I apologize?
10 Q. Thomas -- Thomas Leotis?
11 A. No, he's not on any of the loan papers. He never
12 did a loan himself. He worked for Gary, and he would
13 advertise in the newspapers and different things.
14     And then after him, Gary brought on Larry Cuzzi;
15 and then after Larry, it was his secretary that was getting
16 buyers.
17 Q. What was her name?
18 A. Long time, sir. If you said it, I'd remember it,
19 but it's been a long time.
20 Q. Yes, because we saw advertisements from an Anna
21 Leotis about this great opportunity to buy an investment
22 property with no money down and be a part owner in this real
23 estate.
24 A. Was Anna Leotis --
25 Q. She is --

Page 217

1    MR. McGOWAN: He's starting to become senile.
2    MR. MAGNANINI: You're never going to walk out
3    of here kicking yourself. It's even worse if you're
4    an associate like Ms. Patel because when she goes
5    back, there's always some smart guy that tells her
6    why didn't you ask this, why didn't you ask --
7        (Laughter.)
8  BY MR. MAGNANINI:
9    Q. But, Mr. Kane, I'd like to talk about the
10 acquisition and the turnover of the properties. These sales
11 have been described, especially in the papers, as flips.
12       And is there anything per se wrong or illegal with
13 flipping a property?
14   A. Not to my knowledge, no.
15   Q. And when Walsh Securities -- did Walsh Securities
16 have a flip program?
17   A. Not that I know of.
18   Q. And how did you learn about what Walsh Securities
19 programs were?
20   A. They would come through Selective Financing in the
21 beginning and then D'Apolito and Anthony Ispisiano.
22   Q. So you either got the information from a mortgage
23 broker or Walsh's loan officer D'Apolito --
24   A. That's correct.
25   Q. -- about what programs they offered? Okay.

Page 218

1        How did these transactions differ from a typical
2  flip?
3    A. A legitimate flip?
4    Q. A legitimate flip.
5    A. Okay.
6    Q. Rather than a typical. I'll sustain your
7  objection.
8    A. On a true flip, the house, we would have went in,
9  done the work, whatever had to be done, and then market the
10 house and sell it, and not occupy it.
11   Q. And then the difference with these properties, the
12 sale is prior to the renovation occurring?
13   A. Correct.
14   Q. And I guess you've also testified that the sale
15 occurred prior to you actually buying or acquiring title to
16 the property?
17   A. Correct.
18   Q. So the money that was used to fund the sale from
19 Walsh Securities that one of the straw buyers purchased,
20 that money was also used to pay the entity or person that
21 sold the property to Cristo?
22   A. Correct.
23   Q. So the money that would get wired in for a
24 standard transaction would get divided up. After you paid
25 closing costs and legal fees, who would get the money?

Page 219

1    A. Well, we'll just take one particular deal. Let's
2  say it was a norm where we didn't own it first. So if
3  $100,000 is coming in and we're paying $35,000 for the
4  purchase, plus the closing costs for the purchase, that
5  should have went over to Mr. Pepsny's office; and then the
6  balance was -- you know, there was no set scenario. You
7  know, let's say there was $20,000 left over, or $50,000,
8  whatever the number was. You figured there was x-amount of
9  dollars in construction, and I'd give Gary more and I'd take
10 less. It was never a set number that had to be done.
11   Q. Okay. And then Mr. Grieser would use at least
12 some of the money to pay the mortgages on the existing
13 loans; correct?
14   A. That is correct, sir.
15   Q. And what did you use the money for?
16   A. Well, I was running the office, used it for down
17 payment. After we started going, it would be used for down
18 payments or other houses, paying my office staff salary and
19 living expenses and lawyers at the end.
20   Q. How much did you pay your lawyers at the end?
21   A. They got me good. I don't remember the exact
22 number. I remember your filing that you, of course, did
23 that time cost me about $150,000 for that first one when you
24 filed the original lawsuit, that Klienfeld or whatever.
25 That was about $150,000.

Page 220

1    Q. Okay. That -- yes, they were from New York. That
2  was the original case in July of '97.
3    A. Correct. And then the legal fees, I had
4  Sorentino, I had Washore (phonetic), Calpagno with all the
5  code enforcement and different problems all around. I
6  couldn't even put a number on the legal fee. It was up
7  there though.
8    Q. More than $500,000?
9    A. Yes.
10   Q. More than $1 million?
11   A. No, I don't think so. No.
12   Q. Did you ever invest -- I don't want to say
13 invest -- but put any of the proceeds or the money that was
14 generated between 1995 and 1997 in any offshore account?
15   A. No, sir.
16   Q. My assumption is that when you resolved these
17 matters with the federal government they went through your
18 finances with a --
19   A. -- fine tooth comb.
20   Q. And then what assets do you own today?
21   A. Nothing.
22   Q. And the house is in your wife's name you
23 testified?
24   A. Yes, sir.
25   Q. Do you own any businesses?