UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC., :
:
    Plaintiff, :  Civil Action No. 97-cv-3496 (DRD)(MAS)
:
vs. :  Hon. Dickinson R. Debevoise, U.S.D.J.
:
CRISTO PROPERTY MANAGEMENT, :
LTD., a/k/a G.J.L. LIMITED; et al., :
:
    Defendants. :

**PLAINTIFF WALSH SECURITIES, INC.'S COUNTERSTATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1**

STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111
*Attorneys for Plaintiff Walsh Securities, Inc.*

Pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1 of the Local Rules for the District of New Jersey, Plaintiff Walsh Securities, Inc. ("Plaintiff" or "WSI") hereby submits its responses to Defendants' Fidelity National Title Insurance Co. of New York ("Fidelity") and Nations Title Insurance of New York, Inc.'s ("Nations") (collectively "Title Insurance Defendants")[1] statement of undisputed material facts and Plaintiff's counterstatement of material facts requiring denial of the Title Insurance Defendants motion for partial summary judgment as to WSI's title claims.

**PLAINTITFF'S RESPONSES TO DEFENDANTS'
LOCAL RULE 56.1 STATEMENT**

1. Walsh has submitted claims under title insurance policies on 39 properties. Certification of Edward J. Hayes ¶2 ("Hayes Certification"); exhibit "A" to Hayes certification.

**RESPONSE:**

Disputed. In July 28, 1997, WSI put the Title Insurance Defendants on notice of losses and claims associated with over 200 properties for which WSI table funded the loans. (Certification of Amy Walker Wagner ("Wagner Cert."), Exs. 1-3). The claims arose out of the activities of the Title Insurance Defendants' approved attorneys and was covered by the Closing Service Protection Letters, which are part and parcel of the title policies. Pursuant to this Court's July 22, 2010 Order, WSI detailed its specific claims under the title insurance policies for 39 of the properties that were repurchased by WSI. (Hayes Cert., Ex. A).

2. Walsh contends that it sustained losses as the assignee of National Home Funding on certain mortgages as a result of its rights being extinguished by third party foreclosure tax sales of the subject properties. Hayes certification ¶3; exhibit "A" to Hayes certification.

**RESPONSE:**

---

[1] Defendant Commonwealth Land Title Insurance Company ("Commonwealth") filed a statement in lieu of a brief adopting and incorporating the Statement of Undisputed Materials Facts filed by Fidelity and Nations.

1

Disputed. WSI is the assignee of National Home Funding on certain mortgages and it sustained losses on some mortgages, in part, as a result of its rights being extinguished through third party foreclosure tax sales on those properties. (Wagner Cert., Ex. 4, Skowrenski Dep. at 53, 171; Hayes Cert. Ex. A).

3. The basis for some of Walsh's claims under the title policies is that assignments of the mortgages to Walsh were not recorded in the public records and that, as a result, Walsh did not receive notice of those foreclosure tax sales thereby precluding it from taking action to protect its interest in the properties. Hayes certification ¶3; exhibit "A" to Hayes certification.

**RESPONSE:**

Disputed. Defendants' statement mischaracterizes the basis of WSI's claims under the title policies. WSI has not asserted that the Title Insurance Defendants were responsible for recording the assignments. The fact that some of the assignments of the mortgages to WSI were not recorded in the public records and that, as a result, WSI did not receive notice of those foreclosure tax sales thereby precluding it from taking action to protect its interest in the properties is merely part of the overall basis for those title claims. Plaintiff's title claims are also premised on loss or damage sustained or incurred by WSI as assignee of National Home Funding, including but not limited to, by reason of title to the estate or interest described in Schedule A of the Title Commitment being vested other than as stated therein; defect in or lien or encumbrance on the title; unmarketability of the title; and the invalidity or unenforceability of the lien of the insured mortgage upon the title. (Hayes Cert., Ex. A).

4. Upon receipt of those claims, counsel for Fidelity caused title searches to be conducted on the various properties to determine the validity of the claims being presented by Walsh. Hayes certification ¶4.

**RESPONSE:**

2

Plaintiff objects to the inclusion of this statement as a purported "undisputed material fact" because counsel's action in causing title searches to be conducted is not itself relevant to the issues raised by the Title Insurance Defendants' motion.

5. The information supplied by those title searches on 29 of the 39 properties is reflected in the chart attached as exhibit "B" to the Hayes certification. Hayes certification ¶5; exhibit "B" to Hayes certification.

**RESPONSE:**

Plaintiff objects to the inclusion of the chart attached as Exhibit "B" to the Hayes Certification that does not append any supporting documentation or identify Bates numbers for where they are located in Defendants' voluminous document production.

6. Those searches confirmed that as to 29 of the 39 properties, at the time of the tax foreclosure sales, the public records did not reflect assignments to Walsh. Exhibit "B" to Hayes certification.

**RESPONSE:**

Plaintiff objects to the inclusion of the chart attached as Exhibit "B" to the Hayes Certification that does not append any supporting documentation or identify Bates numbers for where they are located in Defendants' voluminous document production. Furthermore, the title searches produced by the Title Insurance Defendants demonstrate that some assignments to WSI were recorded before they were assigned to a third-party. (*See*, *e.g.*, Wagner Cert., Exs. 5-6).

7. A loan transaction with Walsh would start with the taking of a loan application by a participant/mortgage broker. Deposition of Robert C. Walsh (Apr. 9 & 23, 2010 & Sept. 30, 2011), p. 325 ("Walsh deposition").

**RESPONSE:**

It is undisputed that the vast majority of loan transactions with WSI would start with the taking of a loan application by a participant/mortgage broker.

8. The participant would gather all of the documentation necessary for the underwriting of the loan. Walsh deposition, p. 326-327.

3

**RESPONSE:**

It is undisputed that the participant/mortgage broker would gather all of the information and documentation necessary to submit the loan to WSI for underwriting.

9. The participant would also order an appraisal of the subject property. Walsh deposition, p. 325-326.

**RESPONSE:**

It is undisputed that the participant/mortgage broker would also order an appraisal of the subject property.

10. Once the loan package was completed, it would be forwarded to Walsh for underwriting. Walsh deposition, p. 327.

**RESPONSE:**

It is undisputed that once the loan package was completed, it would be forwarded to WSI for underwriting.

11. If Walsh was satisfied with the package, it would issue a commitment for the loan to the participant. Walsh deposition, p. 328.

**RESPONSE:**

It is undisputed that if WSI was satisfied with the package and it met WSI's requirements, it would issue a commitment for the loan to the participant and it was the participant's responsibility to ensure any conditions on the commitment were fulfilled.

12. Walsh would then prepare the loan documents. Walsh deposition, p. 329.

**RESPONSE:**

It is undisputed that after underwriting was completed, WSI would then prepare the loan documents. (Hayes Cert., Ex. D, Walsh Dep. at 330-331).

13. At this point, the closing department at Walsh would get involved in the transaction. Walsh deposition, p. 331.

4

**RESPONSE:**

It is undisputed that the next step was for the closing department at WSI to get involved in the transaction.

14. The closing department would issue closing instructions and would arrange for the transfer of funds to the closing attorney. Walsh deposition, p. 331.

**RESPONSE:**

It is undisputed that the closing department would, among other things, issue closing instructions to the title insurance company's approved agent, the closing attorney, and arrange for the transfer of funds to the closing attorney. (Hayes Cert., Ex. D, Walsh Dep. at 331-332).

15. Walsh required that all of the loans in this case be closed in the name of NHF. Walsh deposition, p. 382.

**RESPONSE:**

It is undisputed that it was the standard procedure at WSI for all loans to be closed in the name of the participant while WSI supplied the closing funds directly to the closing attorney (table funding). (Wagner Cert., Ex. 4, Skowrenski Dep. At 53; Hayes Cert., Ex. C at 3). For the properties at issue in this case, they were closed in the name of NHF, the participant.

16. It also required that the title insurance be issued in the name of NHF. Walsh deposition, p. 382.

**RESPONSE:**

It is undisputed that WSI required that the title insurance be issued in the name of the participant, its successors, and/or assigns. For the properties at issue in this case, the title insurance was to be issued in the name of "NATIONAL HOME FUNDING, INC., Its successors, and/or Assigns." (Hayes Cert., Ex. C at 2).

17. Walsh decided to structure the deals in this manner in an effort to limit its liability for wrongdoing by NHF. Walsh deposition, p. 668.

**RESPONSE:**

Disputed. Defendants' statement mischaracterizes the corporate representative's testimony, which speaks for itself. WSI did not structure the deals in this manner in an effort to limit its liability for wrongdoing by NHF. It was company policy that loans were to be closed in the participant's name for disclosure purposes under the Real Estate Settlement Procedures Act (RESPA). (Hayes Cert., Ex. D, Walsh Dep. at 668). As a result, participants, including NHF, would be responsible for making RESPA disclosures. (Hayes Cert., Ex. D, Walsh Dep. at 670).

18. Walsh agrees that assignments are the manner in which mortgages are transferred and that it is important to record assignments. Walsh deposition, p. 667.

**RESPONSE:**

It is undisputed that WSI agrees that assignments are the manner in which mortgages are transferred and that assignments should be recorded.

19. Walsh prepared the assignments on these transactions. Walsh deposition, p, 670.

**RESPONSE:**

It is undisputed that the corporate representative stated that he believed WSI prepared the assignments on these transactions. As is clear from the face of an assignment, the assignments could not be recorded until they were completed with information concerning the recording of the deeds and mortgages, which could only be completed by the acquirer in the secondary market because they were promptly sold by WSI to the secondary market or were securitized. (Wagner Cert., Ex. 7, Walsh Dep. at 341-342; Wagner Cert., Exs. 5-6).

20. Assignments were sent by Walsh directly to NHF for execution. Walsh deposition, p.671.

**RESPONSE:**

6

It is undisputed that assignments were sent by WSI directly to NHF for execution.

21. After execution, assignments were returned by NHF to Walsh directly. Walsh deposition, pp. 671-672.

**RESPONSE:**

It is undisputed that after execution, assignments were returned by NHF to WSI directly.

22. Upon receipt of the assignment, Walsh would execute an additional assignment of the loan documents in blank for the benefit of the ultimate purchaser of the loan in the secondary market. Walsh deposition, p. 672.

**RESPONSE:**

It is undisputed that upon receipt of the assignment, WSI would execute an additional assignment of the loan documents in blank for the benefit of the ultimate acquirer of the loan in the secondary market.

23. Walsh transmitted both assignments to the whole loan buyer of the mortgage. Walsh deposition, p. 675.

**RESPONSE:**

It is undisputed that WSI transmitted both assignments to the whole loan buyer of the mortgage.

24. Walsh expected the whole loan buyer to record the assignments. Walsh deposition, p. 675.

**RESPONSE:**

It is undisputed that WSI expected the whole loan buyer to record the assignments.

25. Walsh did not include the assignments in the closing instructions as one of the documents transmitted by Walsh to the closing attorneys. Walsh deposition, p. 674.

**RESPONSE:**

Disputed. Defendants' statement mischaracterizes the corporate representative's testimony. It is undisputed that with respect to the loan discussed at the deposition, that WSI did

7

not include the assignment in the closing instructions as one of the documents transmitted by WSI to the closing attorneys.

26. Walsh could not point to any facts which would support a claim against Fidelity on unrecorded assignments when those assignments were never delivered to the title company for recording. Walsh deposition, p. 676-677.

**RESPONSE:**

It is undisputed that WSI has not made any claim against the Title Insurance Defendants for their failure to record assignments.

### PLAINTITFF'S COUNTERSTATEMENT OF MATERIAL FACTS

1. In April 1996, two months after the fraud began, Walsh Securities became a successor in interest to GF Mortgage Corp. (Wagner Cert., Ex. 7, Walsh Dep. at 43).

2. On the early loans at issue in this fraud, GF Mortgage Corp. was the lender. As is evident from the title searches produced by the Title Insurance Defendants, GF Mortgage also closed loans in the participant's name, such as NHF. (*See*, *e.g.*, Wagner Cert., Ex. 6).

3. Properties at issue in this litigation contain a Joint Venture Deed whereby, with the assistance of the closing attorney, the purchaser/strawbuyer fraudulently and secretly conveyed a 60% interest in the property to Capital Assets Property Management, Inc. ("Capital Assets"), unbeknownst to WSI. (Wagner Cert., Ex. 8, Yacker Dep. at 117-118).

4. The interest in each of these properties was not properly vested in the strawbuyer because, at the same time that the loans closed, the strawbuyers gave away a sixty percent interest in each property to Capital Assets – which was known to both the "approved attorneys" and Coastal Title Agency. (Wagner Cert., Ex. 8, Yacker Dep. at 117-118; Wagner Cert., Ex. 9, Coastal Dep. at 147-148).

8

5. The recorded documents reflect that the Joint Venture Deeds were recorded by the closing attorneys and Coastal Title Agency, all of whom were the agents of the Title Insurance Defendants. (*See*, *e.g.*, Wagner Cert., Ex. 10(A)-(U)).

6. By virtue of the Joint Venture Deeds being recorded prior to the mortgages, the Title Insurance Defendants admit "it was a prior conveyance of an interest in the property such that the mortgage being made couldn't encumber the entire property because it was not signed by all the owners. . . . An interest in a property had been conveyed to another party who didn't sign the mortgage, so the mortgage was not effective to encumber the interest of the party that didn't sign it." (Wagner Cert., Ex. 11, Fidelity Dep. at 103-104).

7. Out of the 29 properties raised in this motion, 21 were recorded before the mortgages and clearly raise title claims.

    (A) 506 Asbury Avenue

    (B) 1324 Asbury Avenue

    (C) 1032-34 Bangs Avenue

    (D) 56 Bank Street

    (E) 181 Clerk Street

    (F) 303 Comstock Avenue

    (G) 30 Dewitt Avenue

    (H) 326 Fisher Avenue

    (I) 101 Herbert Street

    (J) 89 Jefferson

    (K) 1422 Mattison Avenue

    (L) 222 Monticello Avenue

      (M) 253A South Pearl Street

      (N) 205 River Street

      (O) 1507 Summerfield Avenue

      (P) 126 Union Avenue

      (Q) 701 First Avenue

      (R) 603 First Avenue

      (S) 612 First Avenue

      (T) 305 Second Avenue

      (U) 409 Sixth Avenue.

(Wagner Cert., Ex. 10(A)-(U)).

    8.    On February 5, 1999, the Honorable Clarkson S. Fisher, Jr., P.J.Ch. in Monmouth County, entered an Order granting summary judgment and default judgment in favor of plaintiffs, who were strawbuyers in this case, Rafael Bustos, Sr., Yolanda Bustos-Lacy, Amanda Dippolito, Michael Dippolito, Joseph Piscioneri, Hans Juergensen, Ingrid Juergensen, Alicia Juergensen and Ralph Juergensen, against Cristo, NHF, Capital Assets, and county clerks.  As such, the court ordered that the deeds, promissory notes, first mortgages, and second mortgages in the names of these individuals were rescinded and cancelled and "declared unenforceable against the plaintiff named in such contract, or against his or her heirs, executors, successors, assigns or transferees."  (Wagner Cert., Ex. 12 (2/5/99 Order)).

    9.    Pursuant to Judge Fisher's Order, two of the properties that are the subject of this motion were rescinded, cancelled, and declared unenforceable.  Those properties are 1422 Mattison Avenue, Asbury Park, NJ (loan #622863) and 1032-34 Bangs Avenue, Asbury Park, NJ (loan #622645).  (Wagner Cert., Ex. 12 at ¶¶ z, ff).

10. On October 20, 2000, the Honorable Sidney H. Stein, U.S.D.J. in the Southern District of New York entered an order awarding Cityscape damages in the amount of $4,732,568.93 against WSI for the properties that it should have repurchased pursuant to a Master Agreement for Sale and Purchase of Mortgages. (Wagner Cert., Ex. 13 (10/20/00 Order)). The court previously held, on June 8, 2000, that WSI breached the Master Agreement by failing to repurchase 32 loans that were part of this fraudulent scheme because, *inter alia*, the joint venture deeds made the properties unmarketable. (*Id.*). WSI ultimately repurchased these 32 loans as part of a settlement. (Wagner Cert., Ex. 7, Walsh Dep. at 552).

Dated: December 22, 2011

Respectfully submitted,

/s/Robert A. Magnanini
Robert A. Magnanini
Amy Walker Wagner
Daniel Ian Mee
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ  07078
(973) 218-1111
*Attorneys for Plaintiff Walsh Securities, Inc.*