UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES, INC., : | |
| : | |
| Plaintiff, : | Civil Action No. 97-cv-3496 (DRD)(MAS) |
| : | |
| vs. : | Hon. Dickinson R. Debevoise, U.S.D.J. |
| : | |
| CRISTO PROPERTY MANAGEMENT, : | |
| LTD., a/k/a G.J.L. LIMITED; et al., : | |
| : | |
| Defendants. : | |

**PLAINTIFF WALSH SECURITIES, INC.'S COUNTERSTATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1**

STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111
*Attorneys for Plaintiff Walsh Securities, Inc.*

Dated: December 22, 2011

Pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1 of the Local Rules for the District of New Jersey, Plaintiff Walsh Securities, Inc. ("Plaintiff" or "Walsh") hereby submits its responses to Defendants Commonwealth Land Title Insurance Company's ("Commonwealth"), Fidelity National Title Insurance Co. of New York's ("Fidelity") and Nations Title Insurance of New York, Inc.'s ("Nations") (collectively "Title Insurance Defendants")[1] statement of undisputed material facts requiring denial of the Title Insurance Defendants' separately filed motions for partial summary judgment as to Walsh's damages and as to Walsh's claims that the Title Insurance Defendants breached their fiduciary duties. In further response to Defendants' statements below, Plaintiff relies on and incorporates by reference its Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment. (Doc. [478-2]).

## PLAINTITFF'S RESPONSES TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT

1. Walsh alleges that it was injured by unlawful acts engaged in by a number of individuals and entities, other than Commonwealth, who arranged inflated appraisals and flip sales in order to procure mortgage loans to phony borrowers who transferred some or all of the proceeds to the malefactors. A number of loans were "purchased by Walsh Securities from NHF [(a named defendant, now dismissed from this matter)] for amounts ranging up to eight times the preceding sales prices of the properties at issue." (*See* Fourth Am. Compl. ¶ 36 [document 302].)

**RESPONSE:**

Disputed. Walsh also alleges that the Title Insurance Defendants breached their duties of good faith and fair dealing, thereby injuring Plaintiff. (Fourth Am. Compl., Doc. [302]).

2. Walsh alleges that it "was induced to purchase these mortgage loans from NHF based on fraudulent misrepresentations contained in the mortgage loan applications, including appraisals of the properties at issue. The proceeds from [Walsh's] mortgage loans would, among other things, be distributed among RICO defendants as their illicit profits." (*See* Fourth Am. Compl. ¶ 36.)

**RESPONSE:**

---

[1] Defendants Fidelity and Nations filed a statement in lieu of a brief adopting and incorporating the Statement of Undisputed Materials Facts filed by Commonwealth.

1

Disputed.  Walsh was induced to purchase mortgages based on the collective actions of all of the defendants in this case.

3. Certain of Walsh's own senior management and employees pleaded guilty to charges related to this scheme, with its National Sales Manager, Betty Ann DeMola, who is the sister of Walsh's principal owner, pleading guilty to conspiracy to commit wire fraud, in violation of 18 US.C. §371. (*See* Certification of Sara F. Merin ("Merin Certif."), Ex. J: Transcript of the Plea of Elizabeth Ann DeMola 17: 21-22:8 (Sept. 5, 2005); *see also* Merin Certif., Ex. K: Transcript of the Plea of Kellie O'Neill (Oct. 29, 1999) 15:22-16:3, 28:24-32: 11, 38:15-23, 39: 11-40:5(Oct. 29, 1999) (Ms. O'Neill was a loan processor at Walsh who pled guilty to conspiracy and wire fraud in violation of 18 US.C. § 1343 and 18 US.C. § 371); Ex. L: Transcript of the Plea of Anthony D' Apolito (Dec. 23, 1998) 11: 14-21,27: 10-34:25 (Mr. D'Apolito was an account executive at Walsh who pled guilty to conspiracy to commit wire fraud and wire fraud).

**RESPONSE:**

Disputed.  These were employees of Walsh's and Defendants point to nothing in the record demonstrating they were "senior management."  Plaintiff also disputes that Betty Ann DeMola pleaded guilty to "charges related to this scheme."  Her plea testimony speaks for itself.  Also disputed as to Mr. D'Apolito being an "account executive."  He was a salesman.

4. Walsh seeks to impose on Commonwealth and the other Title Insurance Defendants damages resulting from the termination of an Agreement of Merger between Walsh and Resource Bankshares [sic] Mortgage Group, Inc. ("RBMG") dated as of April 18, 1997 and/or for losses from Walsh's diminution in value due to the fraud. (*See* Fourth Am. Compl. ¶¶ 65, 100; Merin Certif., Ex. M: Pl.'"s Certified Resps. & Objections to Def./Third-Party Pl. Commonwealth  Land Title Ins. Co.' s First Set of Interrogs. Addressed to Pl. Walsh Securities, Inc. at Resp. to Interrog. No. 6.)

**RESPONSE:**

Undisputed but Plaintiff adds the following:  The Title Insurance Defendants were or should have been on notice on April 21, 1997 of the merger based on the press release that was issued on that date.  (Certification of Jeffrey A. Shooman ("Shooman Certif."), Ex. 7).

5. The fraud first became public in early July 1997. (*See* Merin Certif., Ex. B: William Conroy, Nancy Shields & John T. Ward, "How Could Appraisals Be So Off?" Asbury Park Sunday Press (July 6, 1997).)

**RESPONSE:**

2

Undisputed, but Plaintiff adds the following: The Title Insurance Defendants' agent, Coastal Title, and their "approved attorneys" knew or should have known about the fraud prior to it becoming public. (Certification of Robert A. Magnanini to Walsh's Motion for Partial Summary Judgment ("Magnanini Certif.") (Doc. [478-5]), Ex. B at 46:17-48:9; Ex. F at 45:14-48:14, 154:10-155:14, 186:4-188:14; Ex. S at 41:1-42:25; *see also* Ex. P (Yacker's testimony generally); Ex. Q (King's testimony generally); Ex. R. (Cicalese's testimony generally)).

6.   On April 18, 1997, Resource Bancshares Mortgage Group, Inc. and Walsh entered into a merger agreement, but they mutually agreed to terminate that agreement on November 3, 1997. (*See* Merin Certif., Ex. A: Dep. of Robert Walsh (Apr. 9 & 23, 2010 & Sept. 30, 2011) ("R. Walsh Dep.") 609:17-610:10; Ex. C: Press Release, "Resource Bancshares Mortgage Group, Inc. and Walsh Securities Jointly Report Termination of Merger Agreement" (Nov. 3, 1997).)

**RESPONSE:**

Undisputed.

7.   The merger agreement was terminated in part because Walsh could not produce its financial statements for 1996 and 1997, as their accountants refused to certify the statements, explaining that this was because of the fraud and Walsh's inability to potentially repurchase those loans, as they were not really sure what Walsh's financial statements would look like. (*See* Merin Certif., Ex. A: Walsh Dep. 135:25-136:11-25,633:20-635:2.)

Undisputed but Plaintiff adds the following: With respect to Walsh's inability to repurchase certain loans, some of those loans were the subject of a lawsuit brought by Cityscape against WSI in the Southern District of New York. In a transcript of an opinion by Hon. Sidney Stein dated June 8, 2000, Judge Stein ordered that WSI repurchase certain of the fraud loans – 32 in all – at issue in this case. (Shooman Certif., Ex. 8, Transcript of Decision of Hon. Sidney H. Stein, U.S.D.J. (S.D.N.Y)). By way of background, on June 30, 1996, WSI entered into a master agreement for the sale and purchase of mortgages. (*Id.* at 3). WSI sold Cityscape seven pools of residential home mortgage for $128 million. (*Id.*) As part of their agreement, Cityscape had the right to request that WSI repurchase loans if the representations and warranties were breached. (*Id.* at 3-4). Cityscape alleged that these

promises were breached because of the fraud loans. (*Id.* at 4). Judge Stein in granted summary judgment to Cityscape on the 32 New Jersey fraud loans at issue there and at issue in the case at bar.

**RESPONSE:**

8. The Agreement of Merger provided, in essence, that RBMG would create a subsidiary and Walsh would merge with that subsidiary and be the surviving entity as a wholly owned subsidiary of RBMG. (*See* Merin Certif., Ex. D: Agreement of Merger.)

**RESPONSE:**

Undisputed.

9. The consideration for the merger was entirely in RBMG shares, so the shareholders of Walsh would have exchanged their Walsh shares for RBMG shares – no consideration would have passed to Walsh itself under the Agreement of Merger. (*See* Merin Certif., Ex. D: Agreement of Merger, Section 2.02.)

**RESPONSE:**

Disputed. The swap of shares would have directly benefited Walsh, the company itself, as a corporate entity. Walsh was not to dissolve; indeed, as stated in paragraph 8, Walsh was to become a wholly owned subsidiary of RBMG. Nothing in the record indicates that Walsh as a corporate entity would not have benefited from the merger. In fact, Walsh would have been a thriving, vibrant subsidiary of RBMG had the fraud not occurred and the merger been consummated. Such goodwill, though perhaps unquantifiable, would have flowed to Walsh that can certainly be characterized as consideration. *See, e.g.*, *Barfield v. Commerce Bank, N.A.*, 484 F.3d 1276, 1279 (10th Cir. 2007); *Idbeis v. Witchita Surgical Specialists, P.A.*, 112 P.3d 81, 90 (Kan. 2005) (holding that unquantifiable consideration such as goodwill may suffice to sustain a contract).

10. Walsh is seeking coverage under the closing service letters, alleging breach of contract, breach of the duty of good faith and fair dealing, and seeking consequential damages along with costs and attorneys' fees. (*See* Fourth Am. Compl. ¶¶ 92-100; "Prayer for Relief")

**RESPONSE:**

4

Undisputed, but Plaintiff adds the following: WSI is also seeking coverage under Defendants' title insurance policies. The Title Insurance Defendants have never produced an accounting of the number of policies issued by Coastal Title, or the amount of premiums paid for using WSI's mortgage funds. (Magnanini Certif., Ex. E; Ex. B at 219:3-13; Ex. G at 35:18-36:1, 36:20-37:8).

11. The claims at issue in this motion are those against title insurance companies that issued title insurance policies and/or closing service letters to NHF and other entities, which Walsh would receive once it funded the loans. (*See* Fourth Am. Compl. ¶ 93; Merin Certif, Ex. A: R. Walsh Dep. at 22:13-17; *see, e.g.*, Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF.)

**RESPONSE:**

Disputed. WSI table funded the loans in this case prior to the Title Insurance Defendants issuing their title insurance policies. In fact, the money used to pay the premiums on those policies came directly from WSI's mortgage funds. (Magnanini Certif., Ex. E; Shooman Certif., Ex. 10).

12. National Home Funding was the party to whom the closing protection letters were issued, per Walsh's specific instructions. (*See* Merin Certif, Ex. A: R. Walsh Dep. at 419:25-420:6-10.)

**RESPONSE:**

Disputed. This is a legal conclusion; the CPL speaks for itself. Furthermore, the CPL was specifically issued to "National Home Funding, Inc. *its successors and/or assigns*" and therefore contemplated that it was issued to not solely National Home Funding. (Magnanini Cert. Ex. L, WSI 675:2-24) Coastal Title was aware that NHF was not funding the mortgages.

13. Each closing service letter was an individual contract between Commonwealth and mortgage originator NHF. *(See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF.)

**RESPONSE:**

Disputed. This is a legal conclusion; the CPL speaks for itself. Again, the CPL was issued to "National Home Funding, Inc. *its successors and/or assigns*" and therefore contemplated that NHF

5

was not the sole recipient. (Magnanini Certif., Ex. L, WSI 675:2-24) The CPL does not specifically prohibit a successor and/or assignee from becoming the party in interest to its assurances.

14. Defendant Commonwealth Land Title Insurance Company ("Commonwealth") issued a portion of the closing service letters at issue. (*See, e.g.*, Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF.)

**RESPONSE:**

Undisputed.

15. The closing service letters issued were standard, state-approved forms. (*See, e.g.*, Merin Certif, Ex. D: 30(b)(6) Deposition of Donna Sullivan as a Corporate Representative of Commonwealth (May 27, 2010) 71.)

**RESPONSE:**

Disputed. Ms. Sullivan did not testify that the CPL was a "state-approved" form and the implication that the New Jersey Land Title Insurance Rating Bureau is a state institution. Ms. Sullivan testified as follows:

Q. Down at the bottom of this letter it says, New Jersey Land Title Insurance Rating Bureau, and then on the right-hand side it says NJRB6-04 and a date, August first, 1994. Do you know what that stands for, what that means?

A. The New Jersey Land Title Insurance Rating Bureau is an entity that some of the title companies join, and that entity will submit forms for filing with the Department of Insurance.

Q. Is this an approved form by that entity?

A. Well, the entity is basically a number of underwriters so I guess they agree. I don't know the actual mechanics of its workings, but I guess they formulate this document and the rating bureau submits it to the Department of Insurance for approval.

Q. So this -- would this have been approved by the Department of Insurance?

A. That's what it's representing and this is I guess -- I assume is the filing number and a date.

(Magnanini Certif., Ex. B at 141:10-142:5). Though official-sounding, the NJ Land Title Insurance Rating Bureau is essentially the lobbying arm of the title insurance industry. The members of the NJ Land Title Insurance Rating Bureau include: Commonwealth and Fidelity. (*See e.g.*,

6

http://www.stewart.com/microsites/105/docs/RateManual06-15-2011.pdf).  Defendants have not

supplied any proof that the State "approves" the CPL.

16.     The closing service letters provide in part,

> When title insurance of Commonwealth [] is specified for your protection in connection with the closing of the above described real estate transaction in which you are to be a lender secured by a mortgage of an interest in land, the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with that closings (sic) when conducted by the above named Issuing Agent (an agent authorized to issue title insurance for the Company) of [Commonwealth] or the above named Attorney and when such loss arises out of:
>
> 1. Failure of the Issuing Agent or Attorney to comply with your written closing instructions to the extent that they relate to: (a) the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such title or lien, or (b) the collection and payment of funds due to you; or
>
> 2. Fraud of or misapplication by the Issuing Agent or Attorney in handling your funds in connection with the matters set forth in numbered paragraph 1 above.

(*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF (emphasis added).)

**RESPONSE:**

   Undisputed.

17.     The closing service letters only provided coverage for "the actual loss incurred by you in connection with that closing[]" subject to certain conditions and are expressly limited to situations "[w]hen title insurance of Commonwealth Land Title Insurance Company is specified for your protection in connection with the closing of the above described real estate transactions in which you are to be a lender secured by a mortgage of an interest in land[.]" (*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF.)

**RESPONSE:**

   Disputed.  This is a legal conclusion; the CPL speaks for itself.  It is misleading to state that the

closing protection letters ("CPLs") "*only*" provide for certain coverage.  This is a suggestion on the

part of the Defendants that damages are somehow cabined in this case.  But this is a breach of contract

7

action against the Defendants, and Plaintiff is entitled to all remedies associated with those breaches, including but not limited to damages as set forth in *Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 340 (1993), *Clients' Sec. Fund v. Security Title & Guaranty Co.*, 134 N.J. 358 (1993), and *First American Title Co. v. Vision Mortgage*, 298 N.J. Super. 138 (App. Div. 1997), punitive damages for the bad faith nature of the denial of Plaintiff's policy claims, and all consequential damages flowing from those breaches.

18. The closing service letters provide that "any liability of the Company for loss incurred by you in connection with closings of real estate transactions by an Issuing Agent or Attorney shall be limited to the protection provided by this letter" and expressly state that "[t]he protection under this Letter is limited to the closing on the premises described in the caption of this letter." (*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF at 2.)

**RESPONSE:**

Undisputed.

19. Thus, each closing service letter applied only to the single real estate transaction on which it was issued, was limited to a lender secured by a mortgage of an interest in land (as opposed to other security instruments), and was limited to coverage of the conduct of a specific issuing agent or attorney (in the example provided by Plaintiffs, Mr. Yacker). (*See* Pls.' Fourth Am. Compl., Ex. A: Sample Commonwealth Closing Service Letter to NHF; Merin Certif., Ex. E: Summary Chart of Fraudulent Loans Provided by Walsh in the Supplemental Exhibit B to its First Supplemental Responses & Objections to Commonwealth's First Set of Interogs. (Feb. 27, 2006) ("Summary of Loans").)

**RESPONSE:**

Disputed. This is a legal conclusion; the CPLs speak for themselves. *See Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 340 (1993); *Clients' Sec. Fund v. Security Title & Guaranty Co.*, 134 N.J. 358 (1993); *First American Title Co. v. Vision Mortgage*, 298 N.J. Super. 138 (App. Div. 1997). Plaintiffs add that the denial of coverage under the CPLs must be viewed in the aggregate, as Defendants chose to obviously treat them wholesale as opposed to individually because they denied coverage on *every single property on which a claim was submitted*.

20.     Walsh first made a claim to Commonwealth under the closing service letters by letter dated July 28, 1997, which was received by Commonwealth on August 12, 1997. (*See* Merin Certif., Ex. F: Letter from Jeffrey M. Goodman of Latham & Watkins to Commonwealth Land Title Ins. Co. (July 28, 1997); Ex. A: R. Walsh Dep. 587:13-19.)

**RESPONSE:**

Disputed.  Sufficient evidence has not been submitted that establishes when Commonwealth received the letter sent by WSI on July 28, 1997.  One could speculate that Commonwealth received the letter before it stamped the letter received on August 12.

21.     Commonwealth responded to the July 28, 1997 letter putting it on notice of the claims by letter dated August 12, 1997, seeking additional information and explaining that Commonwealth was unable to process Walsh's claim at the time due to the July 28 letter containing no "detail as to how the closing attorneys violated the closing instructions, how such violation caused a loss to Walsh or the amount of the loss." (*See* Merin Certif., Ex. G: Letter from Donna M. Sullivan of Commonwealth to Jeffrey M. Goodman of Latham & Watkins (Aug. 12, 1997).)

**RESPONSE:**

Undisputed, but Plaintiff adds the following:  On August 12, 1997, Fidelity issued a Memorandum to its "Agents and Approved Attorneys" stating that "no binders, commitments or title insurance policies should be issued to Walsh Securities, Inc., covering property in any state, without the prior approval of Fidelity."  (Magnanini Certif., Ex. N).

22.     By letter dated September 5, 2011, Fred H. Schlesinger of Walsh responded to Commonwealth's request for addition information by providing information on 113 mortgage loan files on which it alleged the closing attorneys committed fraud. (*See* Merin Certif., Ex. H: Letter from Fred H. Schlesinger of Walsh to Donna M. Sullivan of Commonwealth (Sept. 5, 1997).)

**RESPONSE:**

Undisputed.

23.     An additional request by Commonwealth, by way of its attorney, David R. Kott of McCarter & English, was sent on September 29, 1997 seeking detailed information as to the individual loans, the individual frauds alleged, and the Walsh employees with knowledge as to the alleged "acts, events and/or circumstances which [Walsh] contend[s] gives rise to coverage and the date that the employee acquired the knowledge." (*See* Merin Certif., Ex. I: Letter from David R. Kott of McCarter & English to Fred Schlesinger of Walsh (Sept. 29, 1997).)

9

**RESPONSE:**

Undisputed, but Plaintiff adds the following: The Title Insurance Defendants had made no attempt to retrieve the files of their agent, Coastal Title, by September 29, 1997. In fact, they did not even interview Coastal's President, Robert Agel, until February 2, 1998. (Shooman Certif., Ex. 6). By that point, Mr. Agel had turned over to the F.B.I. original deeds and mortgages that were never recorded. (*Id.* at FT/NT 0007; e.g., Agel 62:5-20, 64:6-65:5, 83:22-84:6).

24. Walsh filed the First Amended Complaint, adding the title insurance companies as defendants in this matter, without responding to the September 29, 1997 letter. (*See* Merin Certif., Ex. A: Walsh Dep. 587:25-589:18.)

**RESPONSE:**

Disputed. The statement mischaracterizes the testimony cited.

### PLAINTITFF'S COUNTERSTATEMENT OF MATERIAL FACTS

1. The Title Insurance Defendants did not except the intervening joint venture deeds from their title policies. (Shooman Certif., Exs. 1-K; 2-M; 3-M, Title Insurance Defendants' title policies).

2. The Title Insurance Defendants conducted title searches prior to issuing their title policies. (Magnanini Certif., Ex. B, Commonwealth 79:3-15).

3. The Title Insurance Defendants wrote their title policies and therefore the policies should be strictly construed in favor of WSI and against the Defendants.

2. In addition, Plaintiff incorporates by reference its Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment as though fully set forth herein. (*See* Document [478-2]).

10

Dated: December 22, 2011						Respectfully submitted,

<u>/s/Robert A. Magnanini</u>
Robert A. Magnanini
Amy Walker Wagner
Daniel Ian Mee
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ  07078
(973) 218-1111
*Attorneys for Plaintiff Walsh Securities, Inc.*