# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES, INC., | Civil Action No. 97-cv-3496 (DRD)(MAS) |
| Plaintiff, | Hon. Dickinson R. Debevoise, U.S.S.D.J. |
| v. | Hon. Michael A. Shipp, U.S.M.J. |
| CRISTO PROPERTY MANAGEMENT, LTD., a/k/a G.J.L. LIMITED, et al., | **Motion Day: January 18, 2012** |
| Defendants. | |

## DEFENDANT COMMONWEALTH LAND TITLE INSURANCE COMPANY'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Defendant
Commonwealth Land Title
Insurance Company

Of Counsel
    David R. Kott
    Steven A. Beckelman
On the Brief
    David R. Kott
    Steven A. Beckelman
    Sara F. Merin
    Max Twine

ME1 12734176v.1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT...........................................................................1

ARGUMENT ...................................................................................................3

I.  Because the Named Insured, NHF, Has No Right of Recovery
    Under the Closing Service Letters, There Can Be No Recovery
    By Its Assignee, WSI ...........................................................................3

II. WSI's Involvement In and Knowledge of the Fraud Precludes
    Coverage Under the Closing Service Letters ........................................5

    A.  WSI Was Involved In and Had Knowledge of the Fraud...........6

    B.  The Fraudulent Conduct of WSI Officers and Employees
        is Imputed to WSI ...................................................................6

        1.  Under the Law of Agency, the Knowledge of
            WSI's Employees is Imputed to WSI...............................7

        2.  Application of Imputation is Consistent with New
            Jersey Law .................................................................. 11

        3.  Knowledge of the Fraud is Imputed to WSI and
            Bars Insurance Coverage ............................................. 13

        4.  The Adverse Interest Exception Does Not Apply to
            this Case Because the Fraudulent Actors Did Not
            Entirely Abandon WSI's Interest................................... 15

    C.  No Coverage Exists Because WSI was Engaged in the
        Fraud..................................................................................... 19

        1.  The Title Insurance Defendants Owed WSI No
            Duties, Because WSI Concealed Its Engagement in
            the Fraud ..................................................................... 19

        2.  WSI and NHF Violated Their Duties of Good
            Faith and Fair Dealing, Voiding Any Title
            Insurance Coverage..................................................... 222

MEI 12734176v.1

3.      As a Matter of Public Policy Under New Jersey
        Law, WSI Is Barred From Recovering for Losses
        Caused by Its Own Wrongful Acts ............................... 255

III.    This is a Pure Contract Action: the Title Insurance Defendants
        Are Not Alleged to Have in Any Way Participated in the Fraud ..... 266

IV.     The *In Pari Delicto* Doctrine Bars Plaintiff's Claim ......................... 27

V.      Only the Title Insurance Defendants are Entitled to Summary
        Judgment ........................................................................................... 29

VI.     All of WSI's Uncited or Insufficiently Cited Statements of
        Purported Fact Should be Disregarded ............................................. 30

CONCLUSION ...................................................................................................... 31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Amboy Nat. Bank v. Generali-U.S. Branch*,
  930 F. Supp. 1053 (D.N.J. 1996) .................................................................. 4, 5

*Baena v. KPMG LLP*,
  453 F.3d 1 (1st Cir. 2006) .......................................................................... 10

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985) .................................................................................. 27

*Caldwell Trucking PRP Group v. Spaulding Composites Co., Inc.*,
  890 F. Supp. 1247 (D.N.J. 1995) ............................................................... 4, 5

*Cuciak v. Prison Health Care Serv.*, Inc.,
  No. 05-cv-1860, 2006 WL 1228582 (D.N.J. May 5, 2006). ................................3

*FDIC v. Mortgage Zone, Inc.*,
  No. 08-CV-3369, 2010 U.S. Dist. LEXIS 108594 (E.D.N.Y. 2010) ................ 14

*Forman v. Salzano (In re Norvergence, Inc.)*,
  405 B.R. 709 (Bankr. D.N.J. 2009) ............................................................. 28

*Gold v. Old Republic Nat'l Title Ins. Co. (In re Taneja)*,
  No. 08-13293, 2010 Bankr. LEXIS 4203 (Bankr. E.D. Va. 2010) ................... 14

*McNeillab, Inc. v. North River Ins. Co.*,
  645 F. Supp. 525 (D.N.J. 1986) .................................................................. 25

*National Credit Union Administration v Ticor Title Insurance Company*,
  873 F. Supp. 718 (D. Mass. 1995) .......................................................... 13, 14

*In re Parmalat Sec. Litig.*,
  659 F. Supp. 2d 504 (S.D.N.Y. 2009) ......................................................... 10

*USACM Liquidating Trust v. Deloitte & Touche, LLP*,
  764 F. Supp. 2d 1210, 122 (D. Nev. 2011)................................................ 10, 16

*Walsh Securities, Inc. v. Cristo Property Mgmt., Ltd.*,
  No. 97-cv-3496 (D.N.J. Dec. 16, 2009) (slip op. ) ......................................... 26

ME1 12734176v.1

*Walsh Securities, Inc. v. Cristo Property Mgmt., Ltd.,*
   No. 97-cv-3496 (D.N.J. Mar. 28, 2007) ............................................................... 26

## STATE CASES

*Bondi v. Citigroup,*
   _ N.J. Super. _, 2011 WL 6412064
   (App. Div. Dec. 22, 2011)........................................... 8, 9, 10, 15, 17, 28

*Center v. Hampton Affiliates, Inc.,*
   488 N.E.2d 828 (N.Y. 1985)................................................................. 16

*City of Cape May v. Dash,*
   No. A-1613-06T1, 2008 N.J. Super. Unpub. LEXIS 1624
   (App. Div. 2008) ....................................................................... 28

*Feldman v. Urban Commercial, Inc.,*
   87 N.J. Super. 391 (App. Div. 1965) ..................................................... 22

*Gallagher v. New England Mut. Life Ins. Co.,*
   19 N.J. 14 (1955)........................................................................... 22

*General Accident Ins. Co. v. New York Marine and Gen. Ins. Co.,*
   320 N.J. Super. 546 (App. Div. 1999) .................................................. 4, 5

*Gerrold v. Penn Title Ins. Co.,*
   271 N.J. Super. 50 (App. Div. 1994) .................................................... 4, 5

*Hollingsworth v. Lederer,*
   125 N.J. Eq. 193 (E. & A. 1939)............................................................8

*Kirschner v. KPMG LLP,*
   938 N.E.2d 941 (N.Y. 2010)........................................... 9, 11, 17, 18

*Marx v. Jaffe,*
   92 N.J. Super. 143 (App. Div. 1966) .................................................... 28

*Merchants Indem. Corp. v. Eggleston,*
   37 N.J. 114 (1962)........................................................................ 22

*NCP Litig. Trust v. KPMG LLP,*
   187 N.J. 353 (2006)................................................................. 8, 9, 11

MEI 12734176v.1

*NCP Litigation Trust v. KPMG*,
    399 N.J. Super. 606 (Law Div. 2007)......................................................... 15, 16

*Pioneer National Title Ins. Co. v. Lucas*,
    155 N.J. Super. 332 (App. Div.), *aff'd o.b.*,
    78 N.J. 320 (1978).............................................. 19, 20, 21, 22, 23, 24

*R.C. Search Co. v. Torre*,
    No. A-1669-07T2, 2009 N.J. Super. Unpub. LEXIS 305
    (App. Div. 2009) ................................................................................ 28

*Ryan v. Motor Credit Co.*,
    132 N.J. Eq. 398 (E. & A. 1942)........................................................ 28

*Sears Mortgage Corp. v. Rose*,
    134 N.J. 326 (1993).......................................................................... 23

*Weir v. City Title Ins. Co.*,
    125 N.J. Super. 23 (App. Div. 1973) ........................................ 22, 23, 24

**STATE STATUTES**

N.J.S.A 17:46B-35b ................................................................................ 28

**RULES**

Federal Rule of Civil Procedure 56(c) ............................................... 30, 31

Federal Rule of Civil Procedure 56(f)............................................. 3, 29, 30

Local Civil Rule 56.1 ..................................................................... 4, 30, 31

**OTHER AUTHORITIES**

6B Appleman § 4252  (1979 & 1986 Supp.) ......................................... 25

6B Appleman § 4255 (1979 & 1986 Supp.) .......................................... 25

11 *Moore's Federal Practice* § 56.90................................................. 30, 31

11 *Moore's Federal Practice* § 56.161 ................................................... 30

*Restatement (Third), Agency*, § 5.03 ..................................................... 13

- v -

## PRELIMINARY STATEMENT

This brief, along with a Responsive Statement of Material Facts and a Supplemental Statement of Disputed Material Facts, is submitted on behalf of Defendant Commonwealth Land Title Insurance Company ("Commonwealth") in opposition to the motion for partial summary judgment filed by Plaintiff Walsh Securities Inc. ("WSI") seeking damages from WSI's alleged repurchase of sixty-six fraudulent loans. Extensive facts show that WSI had knowledge of and, in fact, was deeply involved in the fraud at issue. Specifically, WSI's officers and shareholders, Robert Walsh, James Walsh, and Betty Ann DeMola along with its employees Anthony D'Apolito and Kellie O'Neill all knew of and were actively involved in the fraud alongside National Home Funding ("NHF"), its owner Robert Skowrenski II, and its employee William Kane. Despite the existence of these facts, WSI and NHF's involvement is absent from WSI's papers. Now, WSI is seeking to obtain compensation for its own wrongdoing. Under New Jersey law, however, insurance coverage simply does not exist.

WSI's motion for partial summary judgment should be denied for any one of a number of independent reasons. First, the named insured, NHF, has no right of recovery under the closing service letters due to its extensive involvement in the fraud, precluding any recovery by its assignee, WSI. Second, WSI's knowledge of and involvement in the fraud – through its officers and employees – precludes

coverage. WSI's concealment of its knowledge and involvement in the fraud voided any duties of Commonwealth – or those of the other title insurers, Fidelity National Title Insurance Company and Nations Title Insurance of New York, named as defendants in this case (collectively, "Title Insurance Defendants"). WSI and NHF violated their duties of good faith and fair dealing, and, as a matter of public policy, WSI cannot obtain insurance proceeds to recover for losses caused by its own wrongful acts. Third, this is a pure breach of contract action alleging that the Title Insurance Defendants have declined to pay damages owed under insurance policies – no wrongful conduct or participation in the fraud has been or can be imputed to the Title Insurance Defendants. The Title Insurance Defendants – including Commonwealth – are therefore the only entities in this lawsuit that are entirely innocent of the fraudulent scheme. Fourth, the wrongful conduct of WSI's employees is imputed to WSI itself. Finally, and factually, all of WSI's uncited statements in its Statement of Uncontested Material Facts should be disregarded, as a statement without citation is insufficient to support a summary judgment decision. Any one of these five reasons is sufficient to support the denial of WSI's summary judgment motion; in tandem they demonstrate unequivocally that summary judgment in WSI's favor is not warranted here.

In addition to the arguments raised herein, Commonwealth joins – in its entirety, as applicable – in the brief submitted by Fidelity National Title Insurance

Company in opposition to WSI's motion for partial summary judgment. *See*

*Cuciak v. Prison Health Care Serv.*, Inc., No. 05-cv-1860, 2006 WL 1228582, *1,

n.1 (D.N.J. May 5, 2006).

Further, based on the arguments presented herein, Commonwealth requests

that this Court search the record pursuant to Federal Rule of Civil Procedure 56(f)

and find that summary judgment is warranted for the Title Insurance Defendants,

because NHF employee William Kane and WSI employees Anthony D'Apolito

and Kellie O'Neill were all indisputably intimately involved in the fraud due to

their criminal convictions.

## ARGUMENT

## I.    BECAUSE THE NAMED INSURED, NHF, HAS NO RIGHT OF RECOVERY UNDER THE CLOSING SERVICE LETTERS, THERE CAN BE NO RECOVERY BY ITS ASSIGNEE, WSI

The Closing Service Letters were issued to NHF, and WSI is merely an

assignee.  The law of assignment dictates that an assignee cannot have greater

rights than the assignor.  Thus, WSI cannot have any rights greater than NHF.

Because NHF was a participant in the scheme, NHF had no protection under the

closing service letters.  WSI, therefore, also has no protection under the letters.

All of the closing service letters issued by the Title Insurance Defendants

were issued to "National Home Funding, Inc., its successors and/or assigns, as

their interest may appear[.]"  (*See* Commonwealth's Supplemental Statement of

Disputed Material Facts Filed Pursuant to Local Civil Rule 56.1 ("56.1 Statement of Facts") ¶ 293.)  WSI is not named in any of the letters.  (*See, e.g.,* 56.1 Statement of Facts ¶ 293.)  Thus, NHF is the named insured on all of the closing service letters.  (*See* 56.1 Statement of Facts ¶ 293.)  WSI alleges that NHF was actively engaged in the fraud.  (*See, e.g.* 56.1 Statement of Facts ¶ 15.)

WSI is thus an assignee of any rights under the closing service letters.  *See Gerrold v. Penn Title Ins. Co.*, 271 N.J. Super. 50 (App. Div. 1994).  An assignee "succeeds to the rights and privileges, as well as to the disabilities of the assignor."  *Id.* at 54.  Thus, the assignee of the benefits of an insurance policy obtains at most the same – not greater – rights to that policy's benefits as the assignor.  *Caldwell Trucking PRP Group v. Spaulding Composites Co., Inc.*, 890 F. Supp. 1247 (D.N.J. 1995); *see also Amboy Nat. Bank v. Generali-U.S. Branch*, 930 F. Supp. 1053, 1059 (D.N.J. 1996); *General Accident Ins. Co. v. New York Marine and Gen. Ins. Co.*, 320 N.J. Super. 546, 554 (App. Div. 1999).

In the mortgage context, in *Gerrold*, the Court held that an assignee was not entitled to coverage by a title insurance company for a loss resulting from the assignor's failure to pay the mortgage proceeds to the borrower.  *Gerrold, supra,* 271 N.J. Super. at 56.  The Court concluded that, because the plaintiff's status was that of an assignee, the plaintiff was subject "to the rights and privileges, as well as

- 4 -

to the disabilities" of the assignor. *Id.* at 54 (citing *Byram Holding Co. v. Bogren*, 2 N.J. Super. 331, 336 (Ch. Div. 1949)).

Since NHF was a perpetrator of the fraud underlying WSI's claimed loss, there was no coverage under the closing service letters for any loss caused by such fraud. (*See* 56.1 Statement of Facts ¶¶ 292-324 (setting out NHF's involvement in the fraud as an entity and through its owner Robert Skowrenski II and employee William Kane), ¶¶ 325-341 (how NHF benefitted from the fraud). Since, as an assignee of NHF, WSI's rights can rise no higher than the rights of NHF, and NHF cannot recover from any title insurance defendant under the closing service letters, WSI is similarly precluded from recovery. *See Gerrold*, *supra*, 271 N.J. Super. at 54; *Amboy Nat. Bank*, *supra*, 930 F. Supp. at 1059; *Caldwell Trucking PRP Group*, *supra*, 890 F. Supp. 1247; *General Accident Ins. Co.*, *supra*, 320 N.J. Super. at 554.

## II.    WSI'S INVOLVEMENT IN AND KNOWLEDGE OF THE FRAUD PRECLUDES COVERAGE UNDER THE CLOSING SERVICE LETTERS

Extensive evidence shows that WSI, its principals, and its employees were also involved in the fraudulent scheme that caused WSI's alleged losses. Thus, even if WSI was not barred from recovery as an assignee of the contract from NHF (which it is, *see* Point I, *supra*), coverage is excluded under the scope and terms of the closing service letters for WSI's own involvement in the fraud.

- 5 -

## A.    WSI Was Involved In and Had Knowledge of the Fraud

WSI, through its officers and a number of employees, were involved in and aware of the fraud.  (*See* 56.1 Statement of Facts ¶¶ 18-59 (setting out President and C.E.O. Robert Walsh's involvement and knowledge of the fraud); ¶¶ 60-85 (Vice President James Walsh's involvement and knowledge); ¶¶ 86-224 (National Sales Manager Betty Ann DeMola's involvement and knowledge); ¶¶ 225-47 (Anthony D'Apolito's involvement and knowledge); ¶¶ 248-67 (Kellie O'Neill's involvement and knowledge); ¶¶ 268-91 (WSI's institutional involvement and knowledge).)  Further, WSI benefitted from the fraud.  (*See* 56.1 Statement of Facts ¶¶ 342-44 (setting out how WSI benefitted from the fraud).)

## B.    The Fraudulent Conduct of WSI Officers and Employees is Imputed to WSI

The Court should deny WSI's motion for summary judgment because WSI employees engaged in fraudulent conduct and had knowledge of the wrongful actions of other defendants that must be imputed to WSI, barring WSI's claims against the Title Insurance Defendants.

A number of WSI's employees – including the CEO, his own sister, Betty Ann Demola, and brother, James Walsh, as well as WSI employees D'Apolito and O'Neill – were involved in the mortgage fraud scheme that is the basis of WSI's suit.  (*See* 56.1 Statement of Facts ¶¶ 18-267.)  Under well-established principles of agency law, the fraudulent conduct and knowledge of these employees is

imputed to WSI, because the agents were acting within the general scope of their employment when they participated in or knew of the fraud.

The presumption that the acts and knowledge of an agent are imputed to a principal applies generally to insurance and specifically to the title insurance context, as demonstrated below.[1]

WSI asserts only breach of contract against the Title Insurance Defendants and does not assert that they had any knowledge of the fraudulent scheme. In fact it is evident that WSI had knowledge of the irregularities in the loans being purchased from NHF but nonetheless continued to purchase loans from NHF and WSI was obviously aware that NHF was seeking closing protection letters and policies of title insurance from the Title Insurance Defendants, without disclosing to the Title Insurance Defendants its knowledge of the irregularities.

Therefore, even if it be assumed *arguendo* the insurance companies had any fault, WSI's claims would be barred by the doctrine of in pari delicto.

### 1. *Under the Law of Agency, the Knowledge of WSI's Employees is Imputed to WSI*

A corporation acts and has knowledge through its officers and employees and the knowledge or actions of even a single employee are attributed or imputed

---

[1]Plaintiff cannot avoid imputation on the basis of the "adverse interest exception," because the WSI employees did not totally abandon the interests of WSI. (*See*56.1 Statement of Facts ¶¶ 18-291.)  In fact, WSI benefitted from the fraud by reselling or securitizing the mortgages at a profit and would have continued to do so had the fraud not been discovered by others. (*See*56.1 Statement of Facts ¶¶ 325-41.).

to the corporation itself. "The imputation doctrine is derived from common law rules of agency. . . . Pursuant to those common law rules, a principal is deemed to know facts that are known to its agent." *NCP Litig. Trust v. KPMG LLP*, 187 N.J. 353, 366 (2006) ("*NCP I*").[2] *See also Restatement (Third), Agency, Section 5.03, comment A:* ("This section states the general principle that a principal is charged with notice of facts that an agent knows or has reason to know.")

"[U]nder longstanding New Jersey law," the "vicarious knowledge and ultimate responsibility for the wrongdoing of officers and directors is imputable" to a corporation. *Bondi v. Citigroup*, _ N.J. Super. _, 2011 WL 6412064, *9 (App. Div. Dec. 22, 2011) (approved for publication). *See also Hollingsworth v. Lederer*, 125 N.J. Eq. 193 (E. & A. 1939) ("If ***any*** officer or agent acting within the general scope of his powers acquires knowledge of a particular fact while committing a fraud upon a third person in a matter pertaining to the business of the corporation, although the fraud is perpetrated for his own benefit, the corporation will be imputable with such knowledge, as well as with knowledge of the fraud . . . .") (emphasis supplied).

---

[2]*NCP I* only modified the imputation doctrine for cases of auditor negligence. *See NCP I, supra*, 187 N.J. at 372; *see also Bondi, infra*, 2011 WL 6412064 at *11 (noting that while *NCP I* represents the Supreme Court's most recent discussion of imputation, "it is not a definitive treatment of the issue"). The exception that *NCP I* created does not apply to this case.

Where imputation applies, it acts "as a bar to a claim or series of claims." *Bondi, supra*, 2011 WL 6412064 at \*12.  In *Bondi*, the court squarely rejected the plaintiff's argument that *NCP I* stands for the proposition that the fraud of a plaintiff's own agent "operates only as an apportionment of damages rule." *Ibid.* (noting that "the discussion in *NCP I* must be considered in the atypical context in which the rule arose in that case").

The rule of imputation is the product of important policy considerations. "By allocating the risk of injury to the principal, the imputation doctrine 'creates incentives for a principal to choose agents carefully and to use care in delegating functions to them.'" *NCP I, supra*, 187 N.J. at 367 (citing *Restatement (Third) of Agency, § 5.03 cmt. B*).  "Because the principal cannot avoid responsibility through ignorance, imputation also 'encourages a principal to develop effective procedures for the transmission of material facts, while discouraging practices that isolate the principal or co-agents from facts known to an agent.'" *Ibid.*

For the purposes of determining when an agent acts within the scope of his authority, courts generally look to the *means* employed, not the *end* the agent sought to bring about.  Where an agent carries out the "everyday activities" of his corporate principal, his conduct falls within the scope of his corporate authority. *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 951 (N.Y. 2010).

- 9 -

In *Bondi, supra*, 2011 WL 6412064 at *13, the Appellate Division cites with

apporval *In re Parmalat Sec. Litig.*, 659 F. Supp. 2d 504, 518 (S.D.N.Y. 2009), in

which the court held that the plaintiff's fraudulent agents were acting within the

scope of their employment because "the preparation, approval and oversight of

financial statements are ordinary functions of management." In *USACM*

*Liquidating Trust v. Deloitte & Touche, LLP*, the court held that the fraudulent

agents acted within the scope of their authority because "[t]he movement of

corporate assets and decisions about which investments to make, which creditors to

pay, and what information to disclose are ordinary functions of management which

typically would be attributed to the company." 764 F. Supp. 2d 1210, 1222 (D.

Nev. 2011); *see also Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) ("The

approval and oversight of such statements is an ordinary function of management

that is done on the company's behalf, which is typically enough to attribute

management's actions to the company itself.").

The reason it is appropriate to take a broad view of what falls within a

fraudulent agent's scope of employment is that a more restrictive standard would

eviscerate the imputation doctrine. *USACM Liquidating Trust, supra*, 764 F. Supp.

2d at 1222. "Corporations cannot insulate themselves from liability simply by

proclaiming that their agents are not authorized to commit illegal acts, and thus any

such acts are not imputable to the corporation." *Id.* at 1223.

- 10 -

In this case, each and every fraudulent act by a WSI employee was accomplished by and through these employees' "every day activities" at WSI. (*See, e.g.* 56.1 Statement of Facts ¶¶ 18-291.) Because WSI's agents acted fraudulently, or learned about the fraud, through "ordinary" channels of business, the fraud falls within the scope of their employment and is imputed to WSI. *See Kirschner, supra*, 938 N.E.2d at 951.

## 2. *Application of Imputation is Consistent with New Jersey Law*

*NCP I* provides that imputation may be invoked by third parties that have been defrauded by corporate agents when the corporation or its representatives seeks to recover from the third party. *NCP I, supra*, 187 N.J. at 367. The Title Insurance Defendants were victims of the fraud here, because WSI was a participant in the fraud, and it concealed its knowledge – at all times – from the Title Insurance Defendants.

Here, WSI's employees and officers were part of a conspiracy that defrauded the Title Insurance Defendants, because WSI was aware of the fraud – and participated in it – throughout the fraud's pendency. (*See, e.g.* 56.1 Statement of Facts ¶¶ 18-291 (setting out the involvement of WSI's agents and WSI's institutional acts and knowledge).). Two WSI employees pled guilty to involvement in the scheme and Betty Anne DeMola, the sister of WSI CEO Robert Walsh pled guilty to a related offense. Moreover, even apart from such

- 11 -

admissions, it is apparent that WSI's senior management was at least aware of

facts strongly suggesting that the NHF loans were fraudulent but continued to

purchase the loans and seek closing service letters and title insurance on the NHF

loans thereafter.  For example, by letter dated January 31, 1997, WSI's warehouse

lender, Greenwich Capital, informed James Walsh, a member of WSI's

management and brother of principal Robert Walsh, that, based on a review of a

number of loans closed by Yacker or Cicalese and sold by Cristo Property

Management or its subsidiary, GJL Ltd., the transactions were mostly flips and

were all highly questionable.  (*See* 56.1 Statement of Facts ¶¶ 64-67.)  That letter

alone – leaving aside the prior and ongoing participation of WSI employees in the

scheme – put WSI on explicit notice that those loans were highly questionable:

> Given the credit history and life style of the borrowers,
> the fact that the deposits with the attorney were never
> verified as being the borrower's own funds (or that the
> borrowers had any verified assets), and the flip nature of
> the transactions, I believe that there is a good chance that
> these are no down payment purchase transactions and
> possibly are straw buyers used to facilitate very large
> cash back transactions to Cristo Property Management.

(*See* 56.1 Statement of Facts ¶ 67.)  WSI, however, never notified the Title

Insurance Defendants of that letter or of any potential problems with the loans.

(*See* 56.1 Statement of Facts ¶ 69.)  WSI, in fact continued to purchase loans from

NHF, the source identified as problematic by Greenwich, and was aware that NHF

was seeking title insurance coverage and closing protection letters on loans

originated by NHF after the date of the Greenwich letter. (*See* 56.1 Statement of

Facts ¶¶ 85, 281; *see* Magnanini Certif., Ex. A.)  Thus, through its direct

participation in the fraudulent scheme and its failure to notify the Title Insurance

Defendants once it received a documentary warning about the scheme from its

warehouse lender, WSI participated in concealment of material facts that defrauded

the Title Insurance Defendants.

### 3. *Knowledge of the Fraud is Imputed to WSI and Bars Insurance Coverage*

Insurance coverage will be denied where, as here, the insured's agent has

any facts which, if known, would have caused the insurer not to issue a policy and

the insured's agent's knowledge is imputed to the insured.  The Restatement

(Third), Agency, illustrates the rule:

> A, the Executive Vice President of P Corporation,
> purchases a liability-insurance policy on P Corporation's
> behalf issued by T Corporation. The policy application
> completed by A states that the applicant, P Corporation,
> knows of no present condition that would give rise to a
> claim under the policy. A knows of such a condition.
> Notice of the condition known by A is imputed to P
> Corporation. Under the substantive law of insurance, T
> Corporation may avoid the policy.

*Restatement (Third), Agency, Section 5.03, Illustration 12* (citing *Affiliated FM Ins.*

*Co. v. Kushner Cos.,* 265 N.J. Super. 454, 470 (Law Div. 1993)).

The rule applies with equal force in the title insurance context.  In *National*

*Credit Union Administration v Ticor Title Insurance Company*, 873 F. Supp. 718

- 13 -

(D. Mass. 1995), an officer and director of a credit union, acting on behalf of a trust agreed that the trust would purchase commercial real estate and grant the sellers a first mortgage. The board of the credit union, unaware of the first mortgage, subsequently agreed to a loan, believing it was secured by a first mortgage. The title insurer then issued a policy listing the credit union's mortgage as a first mortgage, though certain of its agents knew otherwise. The National Credit Union Administration ("NCUA") sued the title insurer seeking a declaratory judgment that the title insurance policy was in full force. The court held that NCUA could not recover. "[U]nder Restatement (Second) of Agency, § 282(2)(a), despite their adverse interest, the knowledge of the officers should be imputed to [the credit union]. Any other legal conclusion would be inequitable because it would allow the [credit union] to insulate itself from its agents' knowledge and acquire an asset from [the title insurer], an innocent party." *Id.* at 727. *See also, FDIC v. Mortgage Zone, Inc.*, No. 08-CV-3369, 2010 U.S. Dist. LEXIS 108594 (E.D.N.Y. 2010) (defendant title insurer relieved of liability for failure to obtain title insurance because lender plaintiff was imputed with knowledge of its fraudulent agent); *Gold v. Old Republic Nat'l Title Ins. Co. (In re Taneja)*, No. 08-13293, 2010 Bankr. LEXIS 4203 (Bankr. E.D. Va. 2010) (defendant title insurer relieved of liability because the fraud of the predecessor's agent was imputed to the plaintiff).

- 14 -

**4.    *The Adverse Interest Exception Does Not Apply to this Case Because the Fraudulent Actors Did Not Entirely Abandon WSI's Interest***

Because WSI's officers and agents were aware of the fraud, participated in the fraud, ***and*** hid their knowledge and participation from the title insurance companies, WSI can avoid imputation only if the conduct of WSI's employees is covered by the "adverse interest" exception to imputation.

New Jersey requires a showing of "total abandonment" before a plaintiff can avail itself of the adverse interest exception. *Bondi, supra,* 2011 WL 6412064 at *11. The *Bondi* court set forth the requirements for satisfying the adverse interest exception in New Jersey:

> In order to prevail. . . .[plaintiff] must establish as a matter of law that the fraudulent actions of the corporate insiders constituted a total abandonment of their corporate responsibilities. In addition, this court must find as a matter of law that no benefit accrued to the corporation through the [fraudulent acts]. . . . or that any benefit was so transitory as to be illusory.

*Ibid.*

"The adverse interest exception stands for the proposition that an agent's conduct will not be imputed to the principal if the agent has totally abandoned his principal's interest." *NCP Litigation Trust v. KPMG*, 399 N.J. Super. 606, 628 (Law Div. 2007) (*NCP II*). In other words, the adverse interest exception "cannot be invoked merely because [the agent] has a conflict of interest or because he is not

- 15 -

acting primarily for his principal." *Center v. Hampton Affiliates, Inc.,* 488 N.E.2d 828, 830 (N.Y. 1985) (cited in *NCP II*).

"Courts generally require total abandonment to invoke the adverse interest exception because '[t]his rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases – ***outright theft or looting or embezzlement*** – where the insider's misconduct benefits only himself or a third party . . . ." *USACM Liquidating Trust, supra,* 764 F. Supp. 2d at 1218 (citing *Kirschner, supra,* 938 N.E.2d at 952) (emphasis added).

In order to prevail on its summary judgment motion, WSI must affirmatively demonstrate that the adverse interest exception applies as a matter of law, because "the burden of showing that the adverse interest exception applies falls upon the party seeking to invoke it." *NCP II, supra,* 399 N.J. Super. at 628 (citing *Beck v. Deloitte & Touche,* 144 F.3d 732, 737 (11th Cir. 1998)).

WSI may argue that, given the ultimate unraveling of its finances, the officers and employees who participated in or knew of the fraud acted "adversely" to WSI. That argument is without merit. "[T]he mere fact that insider fraud results in bankrupting the corporation should not dictate a conclusion that along the way the company or its shareholders did not receive substantial benefits, even if only enjoyed for a finite period pending the bankruptcy, and so the imputation principle

- 16 -

should still apply." *Bondi, supra,* 2011 WL 6412064 at *13. *See also Kirschner,*

*supra,* 938 N.E.2d at 468 ("[t]he mere fact that a corporation is forced to file for

bankruptcy does not determine whether its agents' conduct was, at the time it was

committed, adverse to the company. . . ."). Indeed, adversity must be judged from

the time at which the fraudulent acts occurred, not the date of litigation. *See ibid.*

("When considering whether an agent's acts were a fraud on the principal

prompted by 'selfish' motives, it is immaterial that it has turned out that it would

have been better for the agent to have acted differently."); *see also Restatement*

*(Third), Agency § 5.04, Comment C* ("the fact that an action taken by an agent has

unfavorable results for the principal does not establish that the agent acted

adversely").

In this case, the wrongful and criminal conduct of WSI officers and

employees directly benefited WSI, because WSI profited by selling fraudulent

mortgages on the secondary market. William Kane testified that he met with Betty

Ann DeMola and James Walsh in late 1996 or early 1997 to discuss how WSI

could accommodate the volume of loans Kane was generating. (*See* 56.1

Statement of Facts ¶ 219) Kane also testified that WSI benefitted from

accommodating his loans because it was selling a higher volume of loans on the

secondary market. (*See* 56.1 Statement of Facts ¶ 325).) The greater the number

of loans, the more money WSI made by passing these loans off on subsequent

- 17 -

buyers. (*See* 56.1 Statement of Facts ¶¶ 332-40 (Robert Walsh's description of why WSI was profitable and his explanation as to why the nonperformance of that loan did not affect the profit that WSI made on the sale of the loan).[3]

Ironically, the *only* "harm" suffered by WSI in connection with these loans resulted from ***discovery*** of the fraud ***by others***. Had the fraudulent scheme not been uncovered, WSI would not have suffered a single dollar in losses, and instead would have continued to profit conceal its knowledge and profit handsomely (albeit illegitimately).This is significant because "any harm from the discovery of the fraud – rather than from the fraud itself – does not bear on whether the adverse interest exception applies." *Kirschner, supra,* 938 N.E.2d at 469.  The *Kirschner* Court aptly articulated the sound policy grounds for this rule:

> The disclosure of corporate fraud nearly always injures the corporation.  If that harm could be taken into account, a corporation would be able to invoke the adverse interest exception and disclaim virtually every corporate fraud— even a fraud undertaken for the corporation's benefit—as soon as it was discovered and no longer helping the company.

*Ibid.*

Because WSI bears the burden of establishing the adverse interest exception, and the record, which includes admissions by WSI that it resold the fraudulent

---

[3]Ample evidence also exists that Robert Skowrenski, William Kane, and NHF participated in the fraud and that NHF benefitted from the fraud due to the volume of loans generated. (*See* 56.1 Statement of Facts ¶¶ 294-315 (Skowrenski's participation), ¶¶ 316-24 (Kane's participation); ¶¶ 342-44 (NHF's benefit).)

- 18 -

mortgages at a profit, negates the possibility that WSI's employees completely
abandoned WSI's interest, summary judgment for WSI is inappropriate.

**C.      No Coverage Exists Because WSI was Engaged in the Fraud**

Closing service letters are, needless to say, intended to protect *innocent*
lenders.  WSI's involvement in and knowledge of the fraud, discussed above,
demonstrates that it was *not* an innocent lender and therefore is not entitled to
coverage under the closing service letters.

*1.      The Title Insurance Defendants Owed WSI No Duties, Because WSI
Concealed Its Engagement in the Fraud*

NHF and WSI engaged in the fraudulent scheme, precluding WSI from any
recovery.  WSI and NHF, despite having knowledge of and participating in the
fraud, lulled the Title Insurance Defendants into issuing closing service letters,
commitments, and/or policies without full knowledge of the risks they were
assuming by writing those contracts.  This concealment voids any coverage that
may have existed under the policies.

In *Pioneer National Title Ins. Co. v. Lucas*, 155 N.J. Super. 332, 338 (App.
Div.), *aff'd o.b.*, 78 N.J. 320 (1978), the Appellate Division found that persons who
defrauded a title insurer could not recover on a policy by claiming that, had the
title insurer exercised due diligence, the fraud would have been uncovered. *Id.* at
342-43.  In *Pioneer*, the insured had been made aware of a likely title defect
created over one hundred years in the past on a parcel of land that she believed she

- 19 -

owned. *Id.* at 335. The insured then began the process of obtaining title insurance but never informed the title insurer about the defect or the more thorough search that was needed to uncover the title defect. *Id.* at 335-36. Accordingly, the title company only performed a standard sixty year search and then issued a title insurance policy. *Id.* at 336. When an action to quiet title was filed, the title insurer tendered a return of premium, and when it was refused, sued to rescind the policy. *Id.* at 337. The trial court found in the insured's favor and the Appellate Division reversed and ordered that the policy be rescinded. *See id.* at 337-38.

The Appellate Division found that, "[t]hrough deliberate concealment, accompanied by half-truths, defendants set a trap for [the title insurer]." *Id.* at 342. Based on this finding, it rejected the defendants' arguments that the title insurer was negligent and would have uncovered the defect through the exercise of due care. *Ibid.* The court explained, "[o]ne who engages in the kind of conduct here involved may not urge that his victim should have been more circumspect or astute." *Ibid.* (explaining that, "[e]ven if [the title insurer] negligently searched [defendant's] title, it violated no duty toward defendants in the context of the facts disclosed by this record"). In short, "[s]urely a person thus led into a trap owes no duty to the one who did the trapping." *Id.* at 342-43 (quoting *Parker v. Title & Trust Co.*, 233 F.2d 505 (9th Cir.), *reh. denied*, 237 F.2d 423 (9th Cir. 1956)).

- 20 -

Here, NHF – to whom the closing service letters were issued – *and WSI* had knowledge of and participated in the fraudulent scheme. (*See, e.g.,* 56.1 Statement of Facts ¶¶ 294-324 (detailing NHF, Kane and Skowrenski's knowledge of and participation in the scheme); ¶¶ 18-291 (detailing WSI, Robert Walsh, James Walsh, DeMola, D'Apolito, and O'Neill's knowledge of and participation in the scheme).) This knowledge, however, was never conveyed to the Title Insurance Defendants at the time the closing service letters were issued or at any point prior to the institution of this lawsuit. (*See, e.g.,* 56.1 Statement of Facts ¶¶ 288 (no response was provided by WSI to the September 29, 1997 Letter from Commonwealth seeking additional information regarding the fraud in order to evaluate WSI's claims).) Instead, just as in *Pioneer, supra,* WSI and NHF set a trap for the Title Insurance Defendants, intentionally lulling them into insuring the fraudulent loans, to provide a safety-net for WSI in the event its fraudulent scheme unraveled. The Title Insurance Defendants – WSI's victims – therefore owe no duty to WSI as its malfeasance prevented a meeting of the minds on the title insurance contracts. *See Pioneer Nat'l Title Ins. Co., supra,* 155 N.J. Super. at 342-43.

**2.      *WSI and NHF Violated Their Duties of Good Faith and Fair Dealing, Voiding Any Title Insurance Coverage***

NHF and WSI breached the duty of good faith that they owed to the Title Insurance Defendants.  Both were aware of the full scope of the fraud, yet they never conveyed this knowledge to the Title Insurance Defendants.  In fact, the only entities in any way involved with the title insurance contracts ***without knowledge*** of the frauds were the Title Insurance Defendants themselves.

New Jersey recognizes an insured's obligation of good faith and fair dealing toward title insurance companies.  "[A]n insurance contract, including one of title insurance, requires the highest degree of good faith and fair dealing between the parties." *Pioneer Nat'l Title Ins. Co.*, *supra*, 155 N.J. Super. at 338; *see also Weir v. City Title Ins. Co.*, 125 N.J. Super. 23, 29-31 (App. Div. 1973); *Feldman v. Urban Commercial, Inc.*, 87 N.J. Super. 391, 408 (App. Div. 1965) ("Plaintiff was required to act in the utmost good faith in dealing with [the title insurance company].  He failed to do so with the intent . . . that it would be lulled into a sense of security and issue the policy without consideration of the vital point involved.  Such conduct bears all of the earmarks of fraud from which equity will relieve." (citations omitted)); *Gallagher v. New England Mut. Life Ins. Co.*, 19 N.J. 14, 20 (1955) ("[c]ontracts of insurance are contracts of utmost good faith").

Under New Jersey law, good faith is required of the insured as well as the insurer.  *Merchants Indem. Corp. v. Eggleston*, 37 N.J. 114, 122 (1962).  Namely,

- 22 -

the insured has an affirmative duty "to advise the insurer of such matters that he knows might influence the insurer in entering into or declining the risk, at least where such facts are not of record and are not discoverable therefrom by the insurer." *Pioneer*, *supra*, 155 N.J. Super. at 338-39 (citing *Gallagher*, *supra*, 19 N.J. 14 (1955) and *Weir*, *supra*, 125 N.J. Super. 23); *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 347 (1993) ("The prospective insured must not misrepresent or conceal information concerning risks entailed in coverage under an insurance policy.").

A failure to make such disclosures voids coverage under the policy. "To avoid the policy the insurer may show a concealment constituting a designed and intentional withholding of a fact material to the risk, which the insured in honesty and good faith should have communicated to the insurer." *Pioneer*, *supra*, 155 N.J. Super. at 339. As discussed above, in *Pioneer*, the policy was voided due to the insured and her attorney's deliberate failure to disclose a defect in title. *See id.* at 338-43. Similarly, in *Weir*, *supra*, the court explained, "[i]nsurance policies are traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option." *Weir*, *supra*, 125 N.J. Super. at 29 (quoting *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316-17 (1928)).

- 23 -

For example, like in *Pioneer*, discussed above, in *Weir v. City Title Insurance Co.*, the Appellate Division held that the insurer was entitled to cancel the policy and avoid the payment of insurance proceeds due to the insured's failure to disclose a known risk. 125 N.J. Super. at 31. The insured and his attorney became aware of a title defect but did not timely notify the insurer, which issued the policy based on its erroneous belief that it was fully apprised of all title risks. *Id.* at 26-28. The Court held that the insured was obligated to "bring the matter to the attention of and make full disclosure to the defendant." *Id.* at 30. It explained, "[t]he defect was manifestly material to the risk that plaintiff sought to have defendant undertake, and fair dealing demanded no less." *Ibid.*

Here, the Title Insurance Defendants entered into contracts with NHF to provide limited insurance in connection with the mortgage closings on certain real property. (*See, e.g.,* Magnanini Certif., Ex. A.) NHF and its assignee WSI violated their duty to advise the Title Insurance Defendants "of such matters that [they] [knew] might influence the insurer in entering into or declining the risk" as the "facts [were] not of record and [were] not discoverable therefrom by the insurer." *Pioneer, supra*, 155 N.J. Super. at 338-39. As a result, NHF and WSI were in violation of the heightened standard of good faith and fair dealing applicable to title insurance contracts and are ineligible to receive any coverage under the contracts. *See Pioneer*, 155 N.J. Super. at 338.

- 24 -

**3.     As a Matter of Public Policy Under New Jersey Law, WSI Is Barred From Recovering for Losses Caused by Its Own Wrongful Acts**

WSI is barred as a matter of public policy from recovering for losses attributed to its own wrongful acts in perpetrating the fraud at issue here.  "Public policy strongly condemns, and thus disallows, any insurance against a criminal act or omission."  *McNeillab, Inc. v. North River Ins. Co.,* 645 F. Supp. 525, 552 (D.N.J. 1986) (citing *Ruvolo v. American Cas. Co.*, 39 N.J. 490, 189 A.2d 204 (1963)); *see also* Appleman, 6B Ins. Law. & Practice § 4252 (1979) ("[a]s a general rule, one cannot insure himself against the consequences of his willful acts, committed with the intent to commit injury").  Further, "[m]ost states also disallow insurance for intentional, reckless, and grossly negligent acts or omissions on similar public policy grounds . . . ."  *McNeillab, Inc., supra*, 645 F. Supp. at 552 (citing Annot., *Liability Insurance as Covering Accident, Damage, or Injury due to Wanton or Wilful Misconduct or Gross Negligence*, 20 ALR 3d 320 (1968 & 1985 Supp.); 6B Appleman § 4252 at 4-7, § 4255 at 45-46 & n. 53 (1979 & 1986 Supp.); 11 Couch § 44:275 at 426-29 (1982 & 1985 Supp.).  Here, as explained above, WSI knowingly and intentionally engaged in the fraudulent conduct for which it now claims to have suffered losses.  It is therefore not an innocent party and is seeking – contrary to longstanding, accepted public policy – to recover insurance proceeds for the consequences of its own illegal acts.  This is simply not permitted under New Jersey law.  *See, e.g., McNeillab, Inc., supra*, 645 F. Supp. at 552.

- 25 -

## III.   THIS IS A PURE CONTRACT ACTION: THE TITLE INSURANCE DEFENDANTS ARE NOT ALLEGED TO HAVE IN ANY WAY PARTICIPATED IN THE FRAUD

Plaintiff's claims against the Title Insurance Defendants sound solely in contract. *See Walsh Securities, Inc. v. Cristo Property Mgmt., Ltd.*, No. 97-cv-3496 (D.N.J. Dec. 16, 2009) (slip op. at 8-13) (dismissing the Title Insurance Defendants' third-party complaint for contribution after finding that the claims against the title insurers were "essentially contractual in nature" and therefore cannot form the basis for the tort-based claim of contribution); *Walsh Securities, Inc. v. Cristo Property Mgmt., Ltd.*, No. 97-cv-3496 (D.N.J. Mar. 28, 2007) (dismissing the Title Insurance Defendants' tort-based third-party claims against Coastal Title Agency, Inc., whom they alleged violated its agency agreement, due to WSI's claims against the Title Insurance Defendants sounding only in contract). Plaintiff's counsel has even acknowledged this fact in the brief submitted in support of the motion to dismiss third-party claims against Robert Walsh. (*See, e.g.* Br. in Supp. of Robert Walsh's Mot. to Dismiss Third-Party Compl. 7 [document 327-1] ("Nowhere in Walsh Securities' Fourth Amended Complaint has it alleged that Commonwealth or Fidelity/Nations engaged in a tort.").)

WSI did not name any of the Title Insurance Defendants as RICO defendants in any of their complaints. *See, e.g.,* Fourth Am. Compl. [document 302]. Thus, WSI has not alleged that any of the Title Insurance Defendants either

- 26 -

engaged in the fraud or that the fraud can be imputed to the Title Insurance Defendants through actions of others. *See ibid.* In short, WSI is seeking to hold the Title Insurance Defendants liable for damages from the fraudulent acts that caused WSI's losses despite the Title Insurance Defendants being innocent of any tortious conduct. (*See* 56.1 Statement of Facts ¶¶ 18-324 (setting out the involvement of WSI and NHF in the fraud).)

Despite this, in its brief, WSI discusses its assertions that Coastal Title Agency Inc. ("Coastal") was involved in the fraud. (*See, e.g.,* WSI's Br. in Supp. of Mot. for Partial Summ. J. 16-17, 26 n.11, 26-28 [document 478-1].) Coastal, in its Rule 30(b)(6) deposition, denied that its actions were fraudulent (*see, e.g.* Commonwealth's Responsive Statement of Material Facts ¶¶ 135-38), but – despite WSI's discussion – Coastal's involvement (or lack thereof) in the fraud is *wholly irrelevant* given the fact that this is purely a contract action.

## IV.   THE *IN PARI DELICTO* DOCTRINE BARS PLAINTIFF'S CLAIM

The Fourth Amended Complaint alleges no tortious conduct by the Title Insurance Defendants. *See, supra*, Point III. However, if Plaintiff argues in reply that the imputation doctrine is unavailable to Commonwealth because Commonwealth was *itself* actually or vicariously at fault, then the *in pari delicto* doctrine nevertheless bars plaintiff's claim.

ME1 12734176v.1

*In pari delicto* comes from the Latin *in pari delicto potior est condition defendentis*, which means "in the case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). The doctrine mandates that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim. *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 739 (Bankr. D.N.J. 2009). *See also Ryan v. Motor Credit Co.*, 132 N.J. Eq. 398 (E. & A. 1942) (refusing to allow plaintiff to recover under New Jersey Small Loan Statute because plaintiff conspired with defendant in fraudulent scheme to circumvent law); *Marx v. Jaffe*, 92 N.J. Super. 143 (App. Div. 1966) (refusing plaintiff's recovery of loan amount on grounds that contract was illegal); *R.C. Search Co. v. Torre*, No. A-1669-07T2, 2009 N.J. Super. Unpub. LEXIS 305, *19-20 (App. Div. 2009) (the doctrine of *in pari delicto* barred plaintiff's recovery of money allegedly owed under a contract deemed illegal under N.J.S.A 17:46B-35b); *City of Cape May v. Dash*, No. A-1613-06T1, 2008 N.J. Super. Unpub. LEXIS 1624, *36-37 (App. Div. 2008) (where lease was deemed illegal, plaintiff could not recover damages for mutual mistake because parties were *in pari delicto*). "In the corporate context, a manager's misconduct is usually imputed to the corporation." *Bondi, supra*, 2011 WL 6412064 at *10 (citing *Wright v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2010)).

Because the fraud of its agents is imputed to WSI, any alleged fault by the title companies cannot be the basis of liability – under the doctrine of *in pari delicto* – where both parties are at fault, the position of the defending party is the better one.

## V.   ONLY THE TITLE INSURANCE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT

Here, given the guilty pleas and other admissions of WSI's officers and employees, as well as the fact that WSI received a benefit from its resale or securitization of the mortgages, WSI cannot prevail.  The extraordinary record in this case supports summary judgment in favor of Commonwealth, but not WSI. *See* Fed. R. Civ. P. 56(f).  Here the requisites for imputation to WSI of the knowledge of its employees are undisputed.  A number of employees of WSI participated in a scheme which benefitted both themselves and WSI.  WSI was on written notice that mortgage loans it was purchasing from NHF were tainted and suspect but (i) did not disclose that knowledge to the title companies and (ii) continued to purchase mortgages from the suspect source and seek to obtain closing service letters and title insurance policies on the tainted loans.  WSI benefited through sale at a profit of the tainted loans.  WSI can not now seek to enforce the closing service letters and title policies in these circumstances as a matter of law.

ME1 12734176v.1

Federal Rule of Civil Procedure 56(f) permits a court to *sua sponte* "grant summary judgment for a nonmovant" or "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(1), (f)(3). The only prerequisite for this action is that the parties be provided "notice and a reasonable time to respond." *See* Fed. R. Civ. P. 56(f); 11 *Moore's Federal Practice* § 56.161[3].

Here, it is uncontested that NHF employee William Kane and WSI employees Anthony D'Apolito and Kellie O'Neill were all essential players in the fraud at issue. (*See* 56.1 Statement of Facts ¶¶ 316-24 (Kane), ¶¶ 225-47 (D'Apolito); ¶¶ 248-67 (O'Neill).) Based on the arguments presented within this brief, Commonwealth requests that this Court review the record and find that summary judgment is warranted for the Title Insurance Defendants due to the absence of any disputed facts that NHF employee Kane and WSI employees D'Apolito and O'Neill were all intricately involved in the fraud. *See* Fed. R. Civ. P. 56(f).

## VI. ALL OF WSI'S UNCITED OR INSUFFICIENTLY CITED STATEMENTS OF PURPORTED FACT SHOULD BE DISREGARDED

A number of WSI's purported facts within its Statement of Undisputed Material Facts and its brief in support of its motion for partial summary judgment are not cited and should therefore be disregarded by this Court. *See* Fed. R. Civ. P. 56(c); L. Civ. R. 56.1; 11 *Moore's Federal Practice* § 56.90 (Matthew Bender 3d

- 30 -

Ed.). Similarly, certain of WSI's statements cite only to the Fourth Amended Complaint for support, and this citation is not competent evidence sufficient to support summary judgment, so those statements should also be disregarded. *See* Fed. R. Civ. P. 56(c); L. Civ. R. 56.1; 11 *Moore's Federal Practice* § 56.90 (Matthew Bender 3d Ed.). In support of this argument, Commonwealth hereby incorporates the explanation set out at paragraphs one and sixty-nine of its Responsive Statement of Material Facts.

## **CONCLUSION**

In sum, WSI's motion for partial summary judgment should be denied in its entirety for any one of the many independent reasons set out above. The named insured, NHF, has no right of recovery under the closing service letters due to its extensive involvement in the fraud, precluding any recovery by its assignee, WSI. WSI's knowledge of and involvement in the fraud – through its officers and employees – also precludes coverage. This matched with the fact that this is a pure contract action against the Title Insurance Defendants, against whom no involvement in the fraud has been (or can be) alleged similarly precludes recovery. No coverage is available, because WSI's employees' wrongful conduct is imputed to WSI itself – and, if the Court searches the record, this also demonstrates that summary judgment should be awarded to the Title Insurance Defendants. Further, WSI has failed to offer sufficient factual support for its arguments due to the

- 31 -

myriad of uncited statements in its Statement of Uncontested Material Facts.  Each
of these reasons alone supports the denial of WSI's partial summary judgment
motion; when viewed together, they demonstrate that WSI's motion is wholly
without merit and should be denied in its entirety and that summary judgment
should be awarded to the Title Insurance Defendants.

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

Attorneys for Defendant
 Commonwealth Land Title
 Insurance Company

By: *s/David R. Kott*
  David R. Kott
   A Member of the Firm

Dated:  December 23, 2011

- 32 -

ME1 12734176v.1