**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Defendant
    Commonwealth Land Title
    Insurance Company

|  |  |
|---|---|
| | UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF NEW JERSEY |
| WALSH SECURITIES, INC., | Civil Action No. 97-cv-3496 (DRD)(MAS) |
| Plaintiff, | Hon. Dickinson R. Debevoise, U.S.S.D.J.<br>Hon. Michael A. Shipp, U.S.M.J. |
| v. | |
| CRISTO PROPERTY MANAGEMENT,<br>LTD., a/k/a G.J.L. LIMITED, et al., | **SUPPLEMENTAL STATEMENT OF<br>DISPUTED MATERIAL FACTS FILED<br>PURSUANT TO LOCAL CIVIL RULE 56.1** |
| Defendants. | |

       Defendant Commonwealth Land Title Insurance Company ("Commonwealth") submits this Supplemental Statement of Disputed Material Facts Pursuant to Local Civil Rule 56.1 in support of its opposition to the motion for partial summary judgment filed by Plaintiff Walsh Securities, Inc. ("WSI" or "Plaintiff"):

**A.**    **General Background**

       1.    Robert Walsh was President and Chief Executive Officer of WSI. (*See* Certification of Sara F. Merin in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Merin Certif."), Ex. A: Copies of Three Lulling Letters, dated July 3, 10, & 24, 1997 (The Lulling Letters") (listing Robert Walsh as President and CEO of WSI).)

2.      Robert Walsh was also the principal shareholder of WSI.  (*See* Merin Certif., Ex. B: Form S-4, Resource Bancshares Mortgage Group Inc. – RBMG (June 13, 1997) ("RBMG S-4 (June 13, 1997)") 145.)

3.      James Walsh was the Vice President, Director of Underwriting and Operations at WSI and Robert Walsh and Betty Ann DeMola's brother.  (*See* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997) 146-147; Ex. C: Dep. of Elizabeth Ann DeMola (June 11 and 21, 2010) ("DeMola Dep.") 13.)

4.      James Walsh was also a shareholder of WSI.  (*See* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997) 145.)

5.      Betty Ann DeMola is Robert and James Walsh's sister and was the National Sales Manager for WSI and a shareholder of the company.  (*See* Merin Certif., Ex. D: Transcript of Plea Hearing, *United States v. DeMola*, No. 02-448 (Sept. 9, 2005) ("DeMola Plea") 17-18.)  She had knowledge of and was a participant in the fraud.  (*See* Merin Certif., Ex. D: DeMola Plea 18-21.)

6.      Anthony D'Apolito "was an employee of [WSI] who was responsible for transmitting to [WSI] mortgage loans orginated at NHF. . . . He admitted to receiving $90,000 from NHF and $10,000 directly from Kane" for his role in the scheme.  D'Apolito owned and controlled an entity called DAP Consulting, Inc.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4.)  DeMola was D'Apolito's supervisor.  (*See* Merin Certif., Ex. F: Dep. of William (Oct. 5, 2011) ("Kane 2011 Dep.") 234.)

7.      Kellie O'Neill "was a [loan] processor at [WSI] responsible for clearing conditions placed on loans by underwriters[.]"  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4.)  She was actively involved in the scheme and pled guilty to federal charges stemming

-2-

from that involvement in the fraud. (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4;

Ex. G: Tr. of Proceedings, *United States v. King & O'Neill* (Oct. 29, 1999) ("O'Neill Plea Tr.")

13.)

8.      William Kane owned and controlled Cristo Property Management, Ltd., a/k/a

G.J.L. Limited, DEK Homes of New Jersey, Inc., and Oakwood Properties, Inc. and was an

employee of National Home Funding, Inc. (*See* Merin Certif., Ex. E: Letter from Fred H.

Schlesinger, Vice President & General Counsel of Walsh Securities, Inc. to William T. Lutz,

Esq. regarding Proof of Loss (Apr. 3, 1998) ("WSI Fidelity Ins. Proof of Loss") 2, 3; Ex. F: Kane

2011 Dep. 239 (same); Ex. H: Dep. of William Kane (Apr. 19 & May 4, 2007) ("Kane 2007

Dep.") 25, 27 (same).)

9.      Robert Skowrenski, II owned and controlled National Home Funding, Inc.

("NHF"). (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 2, 3.)

10.     Gary Greiser owned and controlled Capital Assets Property Management &

Investment Co., Inc. and Capital Assets Property Management, LLC. (*See* Merin Certif., Ex. E:

WSI Fidelity Ins. Proof of Loss 2, 3.)

11.     Richard Calanni, Richard DiBenedetto, James Brown, Thomas Brodo, and Roland

Pierson were the appraisers involved in the fraudulent scheme. (*See* Merin Certif., Ex. E: WSI

Fidelity Ins. Proof of Loss 3.)

12.     Stanley Yacker, Esq., Michael Alfieri, Esq., Richard Pepsny, Esq., and Anthony

Cicalese, Esq., were the closing attorneys involved in the fraudulent scheme. (*See* Merin Certif.,

Ex. E: WSI Fidelity Ins. Proof of Loss 3-4.)

13.     Lawrence Cuzzi "was an employee of Capital Assets until March or April, 1997."

In that capacity, "he solicited buyers for the properties, including his own family members, and

received a commission for each 'buyer'." (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4.)

14.    Coastal Title Agency, Inc. was title insurance broker operated by Robert Agel and sold the closing service letters, title insurance commitments, and title insurance policies at issue in this lawsuit. (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 5.)

15.    WSI alleges that all of the individuals and entities above – with the exception of the Walsh siblings – were involved in the fraudulent scheme that ran from 1996 to 1997 in which properties were given falsely inflated appraisals – upon which WSI financed mortgage loans – and were then "flipped" and re-sold – sometimes in as little as a day – for up to eight times the immediately preceding sales prices. (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 5.)

16.    As set forth below, facts uncovered during discovery demonstrate that Robert Walsh, James Walsh, and Betty Ann DeMola also knew of and were involved in the fraudulent scheme. (*See infra*, sections entitled "Robert Walsh," "James Walsh," and "Betty Ann Demola.")

17.    Commonwealth, Nations Title Insurance of New York, Inc., and Fidelity National Title Insurance Company of New York, Inc. issued closing service letters on the properties involved in the fraud. (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4-5.) None of these entities are implicated in any of the RICO allegations set out in Plaintiff's Fourth Amended Complaint, nor – at any time – is or was any part in or knowledge of the fraudulent scheme alleged against Commonwealth, Nations, or Fidelity. (*See* Fourth Am. Compl. [document 302].)

**B.    Walsh's Employees and Officers Were Involved in and/or Had Knowledge of the Fraudulent Scheme**

**Robert Walsh**

18.    Robert Walsh, the President and C.E.O. of WSI, had knowledge of the fraud and was involved in covering it up.  For example, Robert Walsh signed lulling letters in July 1997, which were sent to third parties including Champ Meyercord of Greenwich Capital – WSI's warehouse lender, which indicated that WSI had no knowledge of the frauds and downplayed any negative impact of the frauds.  (*See, e.g.* Merin Certif., Ex. A: The Three Lulling Letters; *see also* DeMola Plea at 20-21 (discussing awareness and intentional nature of her acts regarding the lulling letters); Ex. A: The Three Lulling Letters (listing Robert Walsh as President and CEO of WSI).)

19.    The lulling letters formed a basis for DeMola's indictment, and Robert Walsh admitted to physically signing them.  (*See* Merin Certif., Ex. I: Dep. of Robert Walsh (Apr. 9, 2010, Apr. 23, 2010, & Sept. 30, 2011) ("R. Walsh Dep.) 743-44.)

20.    Betty Ann DeMola – Robert's sister – disclaimed responsibility for the lulling letters – testifying that she thinks the lulling letters were signed by Robert Walsh or that they went out under his name.  (*See* Merin Certif., Ex. C: DeMola Dep. 129.)

21.    Moreover, testimony exists implicating Robert Walsh as being involved in the fraud itself.  Robert Skowrenski, II, testified about a newspaper article that stated, "In most cases, the loans were brokers by National Home Funding in Freehold.  Michael Schottland, a lawyer who represents Robert Skowrenski, president of National Home Funding, does not believe the president of Walsh Securities is a victim.  Walsh is behind the whole thing said Schottland.  He's now trying to distance himself from this because it looks so unpleasant, so unseemly."  Skowrenski explained that Schottland was one of the attorneys he retained to

-5-

represent him in connection with these matters, the Walsh referred to in the article is Robert

Walsh, and "behind the whole thing" referred to the Asbury Park flipping scheme. (*See* Merin

Certif., Ex. J: Dep. of Robert Skowrenski, II (May 25, 2010) ("Skowrenski Dep.") 10.)

22.     Similarly, Kellie O'Neill, a loan processor at WSI who pled guilty to federal

charges arising from her role in the fraudulent scheme, testified that she believed Robert Walsh

was aware of the improper acts going on at WSI related to the fraud. (Merin Certif., Ex. K: Dep.

of Kellie O'Neill, Day One (Dec. 20, 2007) ("O'Neill First Dep.") 70; Ex. G: O'Neill Plea Tr.

31.)

23.     O'Neill testified that this belief was based on a number of facts that she believed

made it clear that something was wrong with some of the loans, including the close relationship

that Robert Walsh had with his sister Betty Ann DeMola and his brother Jim Walsh; the

meetings that Betty Ann DeMola had with the participants in the scheme, namely Gary Grieser,

Bill Kane, Anthony D'Apolito, and Robert Skowrenski, telling them specifically how to do the

loans and the appraisals; having the appraisers come up to the office, Mr. DiBenedetto being one

of them; the fact that head underwriter Paul Del Rosso questioned a couple of times the pay

stubs, the W-2s; and the fact that DeMola requested that O'Neill contact William Kane – the

mastermind of the fraudulent scheme –  and tell Kane to get curtains and lamps and make the

houses that were shells look like someone was living in the homes. (*See* Merin Certif., Ex. K:

O'Neill First Dep. 64.)

24.     O'Neill also testified that she believed that Robert Walsh was aware that DeMola

was waiving conditions on the loans. (*See* Merin Certif., Ex. K: O'Neill First Dep. 57.)

25.     Kane, who Robert Walsh classified as the "mastermind" of the fraud, met with

Robert Walsh frequently. (*See* Merin Certif., Ex. L: Dep. of Richard DiBenedetto (Jan. 3 & May

1, 2007) ("DiBenedetto Dep.") 89-90; Ex. F: Kane 2011 Dep. 129 (Kane met with Walsh about

10 times).)

26.     Richard Pepsny, an attorney involved in the fraud, met with Robert Walsh

regarding handling mortgage foreclosures for WSI. (*See* Merin Certif., Ex. M: Deposition of

Richard Pepsny (Aug. 4, 2010) 56.)

27.     Richard DiBenedetto also testified that Robert Walsh was involved in the fraud,

explaining, when Robert Walsh was talking with Richard DiBenedetto and William Kane in

Atlantic City, it was obvious that Kane frequently dealt with Robert Walsh face to face. "They

were buddies obviously." DiBenedetto stated that Robert Walsh is going to sell his company and

is going to be on the Forbes 100 and out of all the people in Atlantic City he chooses to hang out

with Bill Kane. That was not because they had mutual interests or because they were friends and

family but because they were deep involved in this. When Betty Ann DeMola gets on the phone

and says that Kane has a perfect payment history and you need to get the appraisals up or you'll

cut him off, they are involved in it. When DiBenedetto was with the United States Attorney,

DeMola called him up and said that she knows that he was not appraising anymore but that they

had to put together a list of the kicked-off appraiser list and he said she could kick him off. (*See*

Merin Certif., Ex. L: DiBenedetto Dep. 89-90; Ex. N: Tr. of Proceedings, *United States v.*

*DiBenedetto*, No. 98-427 (Dec. 2, 1998) 11-12, 37.)

28.     DiBenedetto also testified that, "Bill Kane always had Betty Ann and Robert

Walsh wrapped around his fingers. If you ever had a question to do with his loans he was the

only client I ever had who dealt with Walsh Securities and say, get Robert Walsh on the phone,

Betty Ann, they would just vouch for his tremendous character and his deals were absolutely

tremendous. They did it nonstop." "As Brodo described to me later . . . nothing would be done .

-7-

. . on the house except for the front and stuff like that. So invariably they would call up Walsh and call up Betty Ann, and . . . you would need somebody to vouch for the fact that this person had a perfect payment history, . . . it just boggled the senses. But . . . it was well planned, well calculated, and it worked for a period of time." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 66-67.)

29.     Robert Walsh pressured DeMola to have high numbers, which DeMola achieved through participation in the fraud. (*See* Merin Certif., Ex. O: First Dep. of Anthony D'Apolito (Jan. 17, 2007) ("D'Apolito First Dep.") 63-64; Ex. F: Kane 2011 Dep. 224.)

30.     Robert Walsh – along with DeMola and O'Neill – told DiBenedetto that Walsh was not looking at the appraisals. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 116.)

31.     DiBenedetto also testified that Robert Walsh sought to reassure him in substance that no difficulties would result from the fraudulent loans, because many of those loans had been sold by WSI and because the purchasers of those loans were not likely to become aware of their problems. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 88.)

32.     DiBenedetto testified that he believed DeMola, D'Apolito, O'Neill and Robert Walsh were all involved in the scheme, that Robert Walsh obviously knew about the underwriting problems all along, and that Robert Walsh, Jim Walsh, and DeMola were aware of the straw buyers. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 266-70.)

33.     Robert Walsh planned to give RBMG stock to D'Apolito when the merger went through. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 480.)

34.     DiBenedetto also testified that he "talked firsthand to Bob Walsh [about the fraud] and got it out of Bob Walsh's mouth straight and it was not good. Bob Walsh did not respond like he thought Walsh was going to respond. It was basically like it was going to be handled.

Kane called Bob Walsh on the carpet and just wanted to tell him not that Walsh was going to turn them in which you'd think he would have responsibility to do socially, ethically and every other way but he does not turn them in but just says he's going to turn them off.  He did that because he was greedy and wanted to get $360 million.  Grieser puts up against the wall and says he's not going to pay Grieser's mortgages and then Robert Walsh agrees to do more and then Robert Walsh does more.  Whatever Robert Walsh did through April, May and June he did with full knowledge of everybody.  He does not know how many Robert Walsh was doing during those months but it was a long time and several months and now Robert Walsh knows full well that he is cheating and Robert Walsh knows that Walsh is closing with no money down and there are other companies doing it too.  Robert Walsh knows that Walsh is right in the middle of the conspiracy."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 304-05.)

***Involvement with File Cleaning***

35.     Robert Walsh – along with DeMola – put a group of WSI employees in a conference room to "clean" closed files.  They instructed employees to go through closed-out files to clean them up by taking some documents out and putting others in, and provided a list of items that had to be removed from the files.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57-58; Ex. P: Dep. of Kellie O'Neill, Day Two (Mar. 23, 2010) ("O'Neill Second Dep.") 30-34.)

36.     Robert Walsh did not deny that file cleansing occurred at WSI, and explained that it was a common occurrence that was generally related to an investor coming in to look at files. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 323-24.)

37.     The upper management – Jim Walsh, Art Gilgar, and Robert Walsh – did not want anything in the files with DeMola's name on it.  (*See* Merin Certif., Ex. P: O'Neill Second Dep. 37-38.)

38.     During this cleaning of files, Robert Walsh was in and out of the conference

room; O'Neill testified that she thought he came into the room while the files were being cleaned

to monitor the progress of the cleaning.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57-58; Ex.

P: O'Neill Second Dep. 30-31, 33-35, 66.)

39.     Because Robert Walsh was in and out of the conference room during the file

cleaning, it was O'Neill's impression that Robert Walsh knew what was happening in that room

on that day.  (*See* Merin Certif., Ex. P: O'Neill Second Dep. 66; 69-70.)

40.     Despite this, Robert Walsh testified that, before the fraud was uncovered, he

recalled being told that appraisals were substantially overstating the value of certain properties.

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 361-62.)

***Meetings with Key Fraud Players***

41.     Robert Walsh had conversations with Bill Kane and Robert Skowrenski before

the frauds became public.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 63.)

42.     A few months before the fraud was uncovered, there was a meeting between

DeMola, Kane, D'Apolito, and Grieser at WSI, which Robert Walsh stopped in on.  (*See* Merin

Certif., Ex. O: D'Apolito First Dep. 68, 172; Ex. L: DiBenedetto Dep. 63-67.).)

43.     The meeting was in response to WSI telling Kane that they could not do the

Cristo deals anymore and that they had to stop the fraudulent scheme.  For a year the loans were

performing, paying 12%, and the file looked okay, but if WSI stopped doing the deals, the fraud

would be exposed showing that the loans were fraudulent.  That is why Kane and Greiser went to

WSI.  At that meeting, Greiser told Robert Walsh that WSI had stopped funding the loans so

Greiser is going to stop paying.  At that point Robert Walsh decided to continue funding

Greiser's loans with full knowledge of what was going on.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 58-62.)

44.     In the meeting, Greiser told Robert Walsh that WSI must fund the loans, because, if Walsh did not fund them, all of the other 140 to 200 loans would go under.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 63.)

45.     Despite the meeting with Greiser and Kane where the scheme was explained, Walsh knew what was going on the whole time.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 58-62.)

46.     Robert Walsh funded the loans, because he wanted to keep everything running smoothly until the merger between Walsh and Resource Bankshares Mortgage Group ("RBMG") was completed.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 60)

47.     After that meeting, D'Apolito testified that WSI funded about five more loans that were in the pipeline.  (Merin Certif., Ex. O: D'Apolito First Dep. 173-74.)

48.     Robert Walsh approved closing those five loans that were in the pipeline.  After the meeting, Robert Walsh said that there were a bunch of loans in the pipeline and that WSI should close five for the end of the month and make sure the payments come in and then WSI would proceed from there.  (Merin Certif., Ex. O: D'Apolito First Dep. 174-75.)

49.     Early in the morning on the day after the subpoenas were issued, Robert Walsh met with the masterminds of the fraud – William Kane, Gary Greiser, and Anthony D'Apolito – in a meeting in which his sister, Betty Ann DeMola, was also supposed to be present.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. at 135; *see also* Merin Certif., Ex. H: Kane 2007 Dep. 87-88; Ex. Q: Dep. of Gary D. Greiser (Jan. 16, 2007) ("Greiser Dep.") 43.)

50.     At the meeting, Kane explained to Robert Walsh what was going on, how the deals were done, and why the prosecutors were looking at them." (*See* Merin Certif., Ex. H: Kane 2007 Dep. 88-89.)

51.     By way of Greiser's account of the meeting, Greiser told them that he was there "again" to explain the mechanics of the scheme.  Robert Walsh listened to it and basically made that statement -- Robert Walsh said:  "It's our money and it is not fraud unless we say it's fraud." (*See* Merin Certif., Ex. Q: Greiser Dep. 43-44.)

52.     Gary Greiser testified that he disclosed the entirety of the fraud to Robert Walsh and that he was fully aware of the fraud after that point.  In his guilty plea, Greiser explained that he wanted to make sure that the higher-ups in the company knew about what was going on, reasoning that, if they continued to fund him and said there was no fraud, then Greiser guessed he was not doing anything wrong, since it was their money.  (*See* Merin Certif., Ex. Q: Greiser Dep. 29-30 (Greiser discussing his March 28, 2001 plea in *United States of America v. Gary Grieser*).)

53.     Greiser also explained that he went up to Robert Walsh to make it very clear what was going on with the fraudulent scheme, because he was told by people below him that WSI was aware of the scheme and that some of WSI's people supplied the paperwork for the scheme. (*See* Merin Certif., Ex. Q: Greiser Dep. 29-30.)

54.     Similarly, Kane testified that Robert Walsh said that, ". . . unless he [Robert] cries victim, there would be no victim, so that we should all talk together and stay together." (*See* Merin Certif., Ex. F: Kane 2011 Dep. at 210; *see also id.* at 136-37 (same); Ex.  H: Kane 2007 Dep. 89 (stating that Robert Walsh's comment was, "[o]nly if I claim a victim, then the government can claim a victim."); Ex. Q: Greiser Dep. 29-30 (same).)

55.    Kane testified that he understood Robert Walsh's statement regarding "no victim" to mean that if Robert and WSI were not crying foul, than no one could do anything about the fraud.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 210; *see also* Merin Certif., Ex. Q: Greiser Dep. 44 (same).)

56.    WSI had a full-time, in-house general counsel: Fred Schlesinger.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 173; Ex. I: Robert Walsh Dep. 580.)

57.    Notably, no lawyers were present at this meeting despite it occurring the morning after the subpoenas were issued.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. at 135; Ex. H: Kane 2007 Dep. 87-88; Ex. Q: Greiser Dep. 43.)

58.    Robert Walsh and William Kane also discussed the RBMG merger during a convention in Atlantic City, where Walsh disclosed that he was selling WSI for a lot of money. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 58-59.)

59.    During a court hearing, the Assistant United States Attorney prosecuting the federal case against DeMola implicated Robert Walsh squarely at the center of this scheme, culminating in the sending of the lulling letters "to the merger partner and to the warehouse credit facility" to "keep them in line, keep them on track" and keep the fraud "moving forward to the end":

> What you'll hear at trial if this matter goes forward and what the jury will hear, is that Walsh Securities[,] which was founded in 1996, was founded with one of two purposes in mind.  There are documents to support this and witnesses will testify. . . . There are memorandum and other evidence to suggest that when Robert Walsh took this company out of Donaldson Lufkin and Jenette where it was a subsidiary or entity and brought it out on its own, he either wanted to conduct an initial public offering, taking it public and cash out that way or find a merger partner.  So from day one the whole objective was to cash out their interest.  This whole scheme was founded on those notions: Take our interest in this

modest privately held entity, make it bigger, make it more successful and cash out. . . .

*     *     *

Robert Walsh was the idea guy, the big picture guy. James Walsh the marketing guy, the secondary loan guy. He would find people to buy Walsh's loans. He was involved in what we call securitizations, where loans are pooled and sold in share interests to large institutional investors for the most part. Betty Ann DeMola day-to-day, week-to-week, month-to-month was the driving force in these sales.

*     *     *

But Walsh's objective was not the fee income on the loans. It was not the points that were charged. Or not the premiums they would get for selling loans. Their idea was to increase inventory. Take this little nothing company that was spun off DLJ and make it a big company, an attractive company for an IPO and an attractive company for a merger. That was the whole objective.

*     *     *

In early 1997, they find a merger partner. Success was on the horizon. The big idea, Robert Walsh['s] idea is about to come to fruition. They find a company in South Carolina, Resource Bank Shares Mortgage Group, RBMG, that's prepared to essentially merge with Walsh. . . . Walsh will disappear, there will be a new entity created in the South Carolina Mortgage Company.

Through 1997 the fraud continues. Your Honor will hear about meetings. And a number of cooperating witnesses have already implicated Robert Walsh, James Walsh and Betty Ann DeMola in this fraud. They put them at meetings where fraud is discussed. They put them in places where these things are on the table. This proceeds through 1997. Things are going swimmingly as far as the conspirators are concerned. Until in late of June 1997, the Asbury Park Press prints the first of 35 stories perhaps, 40 stories. What they call the House of Cards, because quite aptly this whole pyramidal scheme with Walsh at the top.

The first story comes out about decrepit houses that are overvalued backed by Walsh mortgages and that puts, according to the indictment, the conspirators into a frenzy how to keep alive the merger.

-14-

Now one way that Walsh had been making loans, in fact the only way Walsh had been able to make the loans is with a funding source called Greenwich Capital, a company in Connecticut not involved in the scheme. They were the warehouse credit facility. They provided the money, Walsh has the money wire transferred to make the loans.

The vision, the goal, the objective is in sight, it's close at hand, but now it starts slipping away. Now the merger, the cash-out, which will put the money in each of their pockets, bonuses, salaries far beyond what they're earning now, positions with a substantial company with one of the largest mortgage lenders in the country, now that's starting to ebb away. There's a risk that's going to slip away after all of this work and everything that's gone on, these [lulling] letters then follow.

(*See* Merin Certif., Ex. R: Motions, *United States v. DeMola*, No. 02-508 (Sept. 12, 2003) 32-37.)

**James Walsh**

60.     Testimony exists implicating James Walsh, the Vice President of WSI, in the fraud.  For example, O'Neill testified that, because of the close relationship that Robert Walsh had with his sister DeMola and his brother Jim Walsh, the meetings that DeMola had with Gary Grieser, Bill Kane, Anthony D'Apolito, Robert Skowrenski, DeMola's telling them specifically how to do the loans, the appraisals, and having the appraisers come up to the office, Mr. DiBenedetto being one of them, that they – including Jim Walsh – knew something was not right with some of those loans.  (*See* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997) 145 (James Walsh was the Vice President of WSI; Ex. K: O'Neill First Dep. 69.)

61.     O'Neill further explained that James Walsh "knew what was going on.  Betty Ann DeMola, J[ames] [Walsh] and Bob [Walsh] were all very close knit family and it was a family run business."  O'Neill assumed that James Walsh would know anything that DeMola knew. (*See* Merin Certif., Ex. K: O'Neill First Dep. 69.)

-15-

62.     DiBenedetto also testified that he believed that Jim Walsh – with others at Walsh– was involved in the scheme. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 266-67.)

63.     DiBenedetto explained that he thought Jim Walsh – along with Robert Walsh and DeMola – knew about the straw buyers, and that "[i]f you have a bunch of straw buyers spread over 200 properties it is a problem.  If you have straw buyers who sold their credit to Grieser that's a gigantic problem, because now you have 200 mortgages and they did the deed back to Grieser.  If the securitization of loans got not only Walsh loans but loans of 50 other companies it would have been Walsh had a high default rate versus some of the other companies at the time that were spread out over the 200 different loans.  It is bad business if you do Gary Grieser had 220 loans at Capital Assets." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 269-70.)

***January 1997 Letter From Greenwich Capital Alerting WSI of a Likely Fraud***

64.     Months before the fraud became public, on January 31, 1997, Greenwich Capital, WSI's warehouse lender, sent James Walsh and another individual at WSI a letter alerting them to a potential fraud involving "loans closed in the name of National Home Funding." (*See* Merin Certif., Ex. S: Letter from Don Lawson of Greenwich Capital Markets, Inc. to James Walsh and Arnold Cohn of WSI (Jan. 31, 1997) ("Jan. 31, 1997 Greenwich Letter").)

65.     The letter explained that, on "January 29 and 30[, 1997, Don Lawson of Greenwich Capital Markets, Inc.] reviewed 17 loans from a universe of loans closed by one of two closing agents (Yacker or Cicalese)[.]" (*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter 1.)

66.     That review set out troubling facts surrounding the 17 loans, namely similar parties involved, questionable appraisals, the same buyers – of questionable financial stability – buying more than one property, questionable underwriting, and more:

All loans closed in the name of National Home Funding. All loans were purchase money transactions with the seller of the properties being Cristo Property Management or its subsidiary, GJL Ltd. All but one purchase transaction was a flip (seller acquiring concurrently with resale). The one exception was a property acquired 2 months previously. Of the 17 properties, 3 were probably recently foreclosed REO (the seller to Cristo being Fleet or Ocwyn). The other 14 properties were acquired by Cristo (GJL) from individual property owners per the title work in the file.

All properties were appraised by Richard Calanni (15) or Thomas Brodo (2). The only remodeling or rehab mentioned in the 17 appraisals was a new roof on one property. All properties were rated as average condition with no repairs required. Even though most of the properties were 2-4 units[] virtually all were vacant per the appraiser. I could find no reference to Cristo's acquisition or acquisition cost in the file.

The 17 loans are to 8 borrowers who are buying multiple investment properties from Cristo (usually 4 per each borrower). 7 of the 8 borrowers currently rent as their primary residence at $500 to $800 per month and these 7 have apparently never owned real estate. All loans were done under the no income verification program. 2 borrowers had prior bankruptcies, although they both stated they had not had prior bankruptcies on their loan application. One borrower had no prior credit history. None of the loan applications had the name of the interviewr at National Home (person taking loan application) on the loan application. No file had verification of funds to close in the file other than a letter from the closing agent saying he was holding a check for the deposit. 6 of the 8 borrowers had no assets listed on the loan application other than the deposit with the attorney. The other 2 listed a bank account each, one with $5300 and the other with $1900. Neither of these accounts were verified. Keep in mind each borrower needs around $60K to $80K in down payments to close their 4 transactions.

(*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter 1.)

67.    Based on these findings, the letter from Greenwich Capital alerted WSI to a

possible fraud:

Given the credit history and life style of the borrowers, the fact that the deposits with the attorney were never verified as being the borrower's own funds (or that the borrowers had any verified assets), and the flip nature of the transactions, I believe that there is

-17-

> a good chance that these are no down payment purchase
> transactions and possibly are straw buyers used to facilitate very
> large cash back transactions to Cristo Property Management.

(*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter 2.)

68.    Greenwich Capital then requested that James Walsh and Arnold Cohn call

Greenwich Capital at their "earliest convenience to discuss these loans and this originator in

detail." (*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter 2.)

69.    James Walsh testified that he did not recall what was done in response to

Greenwich Capital's notifying WSI of these problems apart from WSI no longer using the

flagged appraisers.  (*See* Merin Certif., Ex. I: James Walsh Dep. 152.)

**_File Cleaning_**

70.    James Walsh was in the room during the file cleaning process discussed above

when "they were taking apart those loans." (*See* Merin Certif., Ex. K: O'Neill First Dep. 58-59,

69.)

71.    DeMola testified that she thought that James Walsh sat in on the scrubbing of

files, but that she does not think he was there for all of the file cleaning.  She explained that if

anyone would go in, it would be him.  (*See* Merin Certif., Ex. C: DeMola Dep. 281-82.)

72.    O'Neill testified that James Walsh was among those who "did not want

[DeMola's] signature on anything" in the files.  (*See* Merin Certif., Ex. P: O'Neill Second Dep.

37-38.)

73.    O'Neill also explained that she assumes James Walsh – along with Robert Walsh

and DeMola – knew exactly what was on the list of information to be scrubbed from the files,

since they were in and out of the room where the file cleansing was occurring.  (*See* Merin

Certif., Ex. P: O'Neill Second Dep. 39.)

-18-

***Meetings with Key Players in the Fraud & Related Decisions***

74.     James Walsh also had lunch with key players in the fraud during which the fraud was discussed.  Specifically, Kane had lunch with James Walsh once in "December 1996 or January or February 1997[,]" and DeMola, D'Apolito, and Grieser were also present.  Either DeMola or James Walsh organized the meeting, which was about the type of loans that could and could not be done.  Kane believed there was a problem with the loan-to-value ratio of the loan, and WSI wanted a down payment or an escrow letter where he had to have the down payment down and then the second mortgage.  Kane explained that "that is why you will see a lot of deals that had 100% financing between the first and the second.  And the other one starting up where the requirements come in, and we had to have an escrow letter from the attorney." (*See* Merin Certif., Ex. F: Kane 2011 Dep. 139-140, 228.)

75.     Regarding that meeting, Kane testified, that the lunch meeting took place due to issues raised by Greenwich when it noticed that the same escrow letters were being used on multiple transactions and due to delays that were occurring in the loan approval process:

> Q.     Sure.  Your testimony at the prior deposition was you had lunch with Ms. DeMola and Jim Walsh, that Ms. DeMola did most of the talking, that Ms. DeMola indicated how important it was to continue to get your loans approved.
>
> A.     Ok.
>
> Q.     And Greenwich had raised a problem with these escrow letters because they noticed the same escrow letters were being used on more than one transaction.  And that is why the structure of the deals changed from one that had escrow letters to one that had secondary mortgages.  Does that sound right to you?
>
> A.     Now it sounds correct, yes.  And I think we actually went from an 80% loan to value to a 75% loan to value, which is –
>
> Q.     Am I correct, Mr. Kane, that lenders like to see that buyers have money in the deal?

A.     That is correct.

Q.     And the way in which the money in the deals was evidenced before the meeting was through the phony escrow letters; correct?

A.     Correct.

Q.     The buyer had no money in these deals; correct?

A.     Correct.

Q.     And Greenwich noticed that several of the escrow letters on these deals were identical; correct?

A.     Ok.  I'm going to go by that, yes.

*Q.     And the way in which that issue was dealt with was not to get legitimate escrow letters, were to ensure that the buyers actually had enough money, but it was done in such a way that we would simply substitute second mortgages for the escrow letters; correct?*

*A.     Correct.*

*Q.     And this was discussed in the presence of Ms. DeMola and in the presence of James Walsh; correct?*

*The witness: I believe so, yes.*

*Q.     And you recall testifying that shortly after that meeting, all of the problems with Greenwich went away and the loans started getting approved again?*

*A.     Now I remember, yes.*

(*See* Merin Certif., Ex. F: Kane 2011 Dep. 171-73 (emphasis added).)

76.     Gary Greiser testified that he explained his role in the scheme to James Walsh before an approximately mid-June 1997 lunch with D'Apolito and DeMola: "Before we went to lunch I sat down.  I talked to Jimmy Walsh.  I explained to him what I was doing with the joint ventures, how it was going.  How we were controlling it.  I said, 'If I tell them and they still fund me, then it's okay, it's legitimate.'  Betty Ann wasn't there.  D'Apolito, Betty Ann and myself

ME1 12641821v.1

went out to lunch and D'Apolito said, 'You know, Gary just laid out this whole thing to Jim.'"
(*See* Merin Certif., Ex. Q: Greiser Dep. 31-32, 141.)

77.    In this discussion, Greiser believes he was specific that the loans were in the names of the borrowers who had a joint venture and who would then transfer the property or 60% of the interest in the property to his company Capital Assets. (*See* Merin Certif., Ex. Q: Greiser Dep. 37.)

78.    Additionally, Jim Walsh told another appraiser, Richard Calanni, to increase the values he placed on the Walsh properties during a conversation that "took place long before the fraud broke." (*See* Merin Certif., Ex. T: Dep. of Richard Calanni (Jan. 1 & 22, 2007) ("Calanni Dep.") 74-75, 126.)

79.    Specifically, Jim Walsh expressed a view that Calanni's appraisals might be too high, but then Jim Walsh suggested Calanni use an appraisal method – the income approach – that might result in an even higher appraisal. (*See* Merin Certif., Ex. T: Calanni Dep. 100, 273-74.)

*Ignorance of Explicit Warnings Regarding Problems with National Home Funding Loans*

80.    WSI issued a "Quality Control Memorandum" on January 31, 1997, regarding an audit by Greenwich Capital of National Home Funding loans, on which James Walsh was copied. (*See* Merin Certif., Ex. U: WSI Quality Control Memorandum regarding Greenwich Capital Audit (Jan. 31, 1997).)

81.    Peter Trebour, who worked in quality control and was also copied on the January 31 memorandum, testified that he would expect that, in response to that memorandum, additional care would have been exercised before underwriting and funding any National Home Funding

-21-

loans going forward. (*See* Merin Certif., Ex. V: Dep. of Peter Trebour (Sept. 24, 2011) ("Trebour Dep.") 85-86.)

82.     Trebour testified that, as James Walsh was cc'ed on the January 31, 1997 memorandum, he would have expected that James Walsh received the memorandum. (*See* Merin Certif., Ex. V: Trebour Dep. 86.)

83.     Trebour did not recall if he did anything to ensure that NHF was looked at differently going forward, but he would have expected there to be some change in the way NHF files were looked at, namely that the NHF-originated loans would be given more scrutiny than other loans. (*See* Merin Certif., Ex. V: Trebour Dep. 86-87.)

84.     Trebour also testified that he would have suspected there to be some suspicion going forward as to whether or not NHF properties actually involved legitimate and completed rehabilitation. (*See* Merin Certif., Ex. V: Trebour Dep. 87.)

85.     Trebour did not know what was put in place between January and the next five months regarding NHF, and, after counsel represented that NHF submitted similar fraudulent loans for another five months with the same packages, the same boarded up properties, and the same lack of documentation and that those loans got approved and funded, Trebour testified that surprised him after reading the January 31, 1997 memorandum. (*See* Merin Certif., Ex. V: Trebour Dep. 87-88.)

**Betty Ann DeMola**

86.     Betty Ann DeMola was the National Sales Manager for WSI. (*See* Merin Certif., Ex. D: DeMola Plea at 17-18.)

***DeMola was a Shareholder of WSI***

87.     Betty Ann DeMola was a shareholder of WSI.  (*See, e.g.,* Merin Certif, Ex. W:

Walsh Holding Co., Inc. Stock Certificate of Elizabeth Ann DeMola (Apr. 30, 1996) ("DeMola

Stock Certificate"); Ex. D: DeMola Plea 17-18.)

88.     WSI listed DeMola as a shareholder in a securities filing related to WSI's planned

merger with RBMG.  (*See* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997) 145 (listing DeMola

as owning shares of WSI Class A Common Stock in a section entitled, "WSI Common Stock

Ownership by Management & Principal Stockholders").)

89.     WSI produced a stock certificate issued to DeMola as a shareholder of Walsh

Holding Co., Inc.  (*See* Merin Certif., Ex. W: DeMola Stock Certificate).

90.     In her Noncompete and Confidentiality Aggreement with RBMG, DeMola is

referred to as a shareholder of WSI.  (*See* Merin Certif., Ex. X: Noncompete and Confidentiality

Agreement Between RBMG and DeMola (Apr. 18, 1997) ("DeMola Noncompete Agreement") ¶

1.)

91.     Robert Walsh testified in a deposition unrelated to this case that DeMola was a

shareholder of WSI.  (*See* Merin Certif., Ex. Y: Deposition of Robert Walsh, *Cityscape Corp. v.

Walsh Securities, Inc.*, S.D.N.Y. Docket No. 98-cv-223 (Mar. 24, 1999) 14.)

92.     In her guilty plea before the Honorable Katherine S. Hayden, U.S.D.J., on

September 9, 2005, DeMola admitted that she was a shareholder of WSI:

> THE COURT:          Okay.  In 1996 and 1997, were you the
> national sales manager at and with your brothers and an entity
> called Greenwich Capital, a shareholder of Walsh Securities, Inc.,
> a company engaged primarily in the business of purchasing and
> funding residential mortgage loans with its main office in
> Parsippany, New Jersey and with numerous branch offices
> throughout the United States?
>
> THE DEFENDANT:  Yes.

(*See* Merin Certif., Ex. D: DeMola Plea at 17-18.)

93.     DeMola also admitted in her guilty plea that she was a member of the management of WSI.  (*See* Merin Certif., Ex. D: DeMola Plea at 20-21.)

94.     In her Noncompete and Confidentiality Aggreement with RBMG, DeMola is referred to as an officer of WSI.  (*See* Merin Certif., Ex. X: DeMola Noncompete Agreement ¶ 1.)

***Active Participation in the Fraudulent Scheme***

95.     DeMola knew that Kane owned Cristo Properties and was affiliated with NHF, and Kane testified that he believes DeMola knew that he originated the loans and was working for Skowrenski, because Kane believes his name was on all the applications.  All of this information was in the files.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 252-53; Ex. F: Kane 2011 Dep. 224-25 (stating that Kane told DeMola that he owned Cristo).)

96.     Kane testified that, three is no doubt in his mind that DeMola was at least aware that he was selling all of these properties.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 205.)

97.     D'Apolito testified that DeMola "knew what was going on[,]" explaining that he told her that he lived down at the shore and the properties were not worth as much as WSI was being told they were worth.  He told her that the appraisals were wrong and that she needed to look into it.  In response, DeMola told him to shut up.  He explained that she did not care, so he "did shut up, figuring he told [DeMola]."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 58-59; 65 (same), 84-85 (same).)

98.     Because of DeMola's response that D'Apolito should "shut up," he concluded in his mind that she was already aware that there were problems with the appraisals and just did not want to hear it from him.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 102-03.)

99.     D'Apolito testified that he told DeMola that they never fixed the houses up,

explaining that, "in the beginning they used to do the right thing and do repairs and fix the house

and rent it out. Then they got greedy. They'd have a guy that is dead that used to do the work

that he met in jail. His name is John Kasair from Staten Island that was friends with Billy Kane.

They did the front of the house and the appraisers took pictures of the inside and outside.

[DeMola] waived in the guidelines that they did not have to do interior photos. He asked

[DeMola] what she was doing and she told him to shut up. That's why he figured he would not

get in trouble." (*See* Merin Certif., Ex. Z: Dep. of Anthony D'Apolito (Sept. 17, 2010)

("D'Apolito Second Dep.") 25-26.)

100.    D'Apolito further testified that he told DeMola

> everything. I told her that there was straw buyers. I said, none of
> these houses are habitable. They're not fixing them up. That was
> my main concern. Straw buyers weren't really my main concern.
> If the houses were fixed up, they were going to rent them. So who
> cares. You can buy a property and still deed my 60 percent.
> There's nothing really wrong with this. But there is something
> wrong with it when you do that an I don't fix the property and
> lease it out. I mean, if I want to buy a piece of property and give
> Mr. Calanni 60 percent to manage that property and take care of it,
> that's on me. But we're collecting rent. So 40 percent is my
> credit, but we're making sure out of that 60 percent he's making
> the payments, he's renting it out, he's taking care of the property.
> Whenever there is damage to it, he is taking care of it. To me, that
> is not really a straw buyer. They made up that word, but they came
> out. So that wasn't my concern. My concern was, the houses were
> all pieces of shit. You wouldn't put your worst enemy in. Some of
> them were gutted.

(*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 90-91.)

101.    DeMola met with Kane without D'Apolito and "knew everything." (*See* Merin

Certif., Ex. O: D'Apolito First Dep. 59.)

102.    According to D'Apolito, DeMola knew about the phony leases, because "we" talked about it, and she used to tell him, "just get the leases." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 60.)

103.    DeMola also knew that the escrow letters were false and fraudulent. D'Apolito testified that he knew that DeMola was aware that the escrow letters were false or fraudulent but that she did not care, because he was present for conversations between DeMola and Kane on the topic. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 60; Ex. L: DiBenedetto Dep. 240.)

104.    DeMola was aware that Cristo Properties would purchase a house and then sell the house to somebody who had a joint venture with Capital Assets and immediately assign the property to Capital Assets. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 61.)

105.    DeMola "without a doubt" knew that the homes were not being repaired. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 125.)

106.    Similarly, DeMola was aware of what fraudulent actions Kane and Skowrenski were committing. (*See* Merin Certif., Ex. K:O'Neill First Dep. 54.)

107.    Before the fraud became public, DiBenedetto had a discussion with DeMola concerning a large portfolio of WSI loans that were made to particular land flippers, and which DiBenedetto believed involved borrowers who had little or no equity in the property, and DeMola responded in substance that she was unconcerned because WSI was going to be sold for a lot of money. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 81-82 (discussing the content of his plea hearing).)

108.    Anthony Cicalese also testified that he also informed DeMola of problems with the loans towards the beginning of the time in which the fraud was occurring: "Well, there was a point in time where, you know, that the procedures that were being used to close these properties

-26-

didn't exactly sit right with me and I called [DeMola], because she was the one that I was referred to that I needed to speak to over there, and who was constantly on the phone with either Lori or myself, and about when these deals would come. So I called her and asked her if she was aware of, you know, the way the properties were being flipped and whatnot at the closings and she said, yes, this is the way that we have been doing it. Just go ahead and do it, because I was worried about disbursing the funds." (*See* Merin Certif., Ex. AA: Dep. of Anthony M. Cicalese (Sept. 29, 2010) ("Cicalese Dep.") 28-29.)

109.    Cicalese further explained that, "[b]asically, I was a little concerned that at the closings they were – they were basically selling off 60 percent of the property to Capital Assets, and there was no paperwork indicating that sale to [WSI], who was the lender who had an interest, you know, now in only 40 percent of a property that they had an interest in 100 percent of before and they told me they were okay with that . . . "; "they" refers to DeMola. (*See* Merin Certif., Ex. AA: Cicalese Dep. 156.)

110.    DeMola knew about the straw buyers. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 269-270.)

111.    DeMola was aware that WSI was funding loans before the written appraisals arrived at the bank, and Kane testified that he knew this, because appraisers had to call the value into her, and he recalls sitting in James Brown's office (an appraiser) and Brown called DeMola with the value. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 116-17.)

112.    DeMola also knew that certain of the W2s and pay stubs were false. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 117.)

113.    DeMola agreed to falsify documents being used in connection with the loans. For example, one borrower was listed as working for a car company. Quality control was done after

-27-

the loan closed, and someone called the car company to verify the borrower's income and current employment status, but was told that the borrower was not working there.  DeMola spoke to D'Apolito, Kane also believes he spoke to DeMola afterwards and told her the problem would be resolved.  Larry Cuzzi, who was an ex-car salesman from the car company had somebody at the company call quality control back and say the guy was there and that the guy worked there. DeMola was aware that this was untrue.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 102.)

114.    In 1996, DiBenedetto had a discussion with DeMola who told him that WSI was going to use money orders to make the loans current: "Ms. DeMola stated, in substance, that she would have the loans brought current so they could be sold by Walsh, and the loans would be paid current by having them paid down with money orders which were not traceable." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 51-52 (discussing his statements at page 33 of the transcript of his May 26, 2005 plea hearing in *United of America v. Richard DiBenedetto*), 269-70.)

115.    D'Apolito explained that he was present for discussions on how the fraud worked that took place between Kane and DeMola, namely that

> Cristo would go and contract and buy a property.  What they would do is find investors that Capital Assets had found with excellent credit and you're allowed to have up to four mortgages so they would get somebody and pay them $2,000 per mortgage. So they would get $8,000 to sign the mortgage papers and be responsible.  These people were fully aware of everything that was going on.  They knew they were just signing the houses.  Cristo would buy them and sell them to these people.  These people in turn were to sign the deed for a dollar to Capital Assets for Capital Assets to maintain the property.  Basically they were "straw buyers".  But the people knew what was going on and were well aware of it.  They wanted their money and they knew they were just selling their credit for money.  Capital Assets would then manage the property, rent them out, make the mortgage payments and do everything.

(*See* Merin Certif., Ex. O: D'Apolito First Dep. 61-62.)

-28-

116.    DeMola would go to the closing department and have a loan funded.  If for some reason something was missing, she would just say "get it to me right away[,]" because she needed to fund the loan to reach her sales number.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 122-23.)

117.    Kane used to meet with DeMola frequently – at least once a week.  During this time, DeMola would tell Kane exactly what he needed to do for this program.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 193.)

118.    Kane and DeMola would go over deals, and where there was a problem on the deals, Kane would push her to get them resolved and she helped them overcome obstacles.  "On the last night of the month [DeMola] would have a candy party, where, you know, she would just be with the whip out to get the deals processed."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 66-67.)

119.    Kane explained that, he would go over the deals with DeMola because, if the underwriters had a problem and Del Rosso was busy, they – meaning he and D'Apolito or he and O'Neill or he and the underwriter – would go to DeMola with it.  He stated that, "[DeMola] was involved in our deals."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 67.)

120.    Kane's ordinary practice was for O'Neill, an underwriter, or D'Apolito to tell DeMola about a problem with a loan and then push DeMola to get it resolved.  Kane testified as to one instance specifically: the borrower had too many loans out already.  That deal specifically was one of the homes that Grieser was buying for himself using somebody else's name.  It was in the very beginning.  D'Apolito pushed DeMola and got DeMola to override the underwriting guidelines on that issue so they were able to close the deal.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 68-69.)

-29-

121.    It would be hard to approximate on how many occasions DeMola had the underwriting guidelines overwritten so a deal could close.  He could not give an exact number.  It could have been one to 20 or one to 30.  He is not sure.  Each was individual.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 69.)

122.    The reason DeMola would override the underwriting guidelines on some of Kane's loans was that DeMola wanted the numbers for the sales volume, but overriding also meant that she may have found another source to place the loan.  "Just because they are dealing with Bank A and there are a lot of deals with Bank A DeMola could have went in and found out other ways to do it through other lenders or places where they would place the loan afterwards.  They were the bank, so DeMola could have changed her own guidelines.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 70-71.)

123.    DeMola also vouched for Kane to move his loans through: Kane "was the only client [DiBenedetto] ever had who dealt with Walsh Securities and sa[id], get Robert Walsh on the phone, Betty Ann, they would just vouch for [Kane's] tremendous character and [Kane's] deals were absolutely tremendous.  They did it nonstop."  "Nothing would be done on the house except the front and stuff like that.  So invariably they would call up Walsh and call up Betty Ann, and, you know, you would need somebody to vouch for the fact that this person had a perfect payment history, you know, it just boggled the senses.   But you know, it was well planned, well calculated, and it worked for a period of time."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 66-67.)

124.    NHF loans were being closed quicker than any other loans; anytime an NHF loan came in it rose to the top.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 115.)

125.     Non-NHF or non-fraud loans usually took three to five days turnaround, but the NHF loan time period was on the lower side, three days.  Toward the end of the month any loan could close in a day.  DeMola needed to make her numbers and she would do it.  All processed, underwritten and closed in one day. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 117.)

126.     DeMola and O'Neill knew that D'Apolito was getting bribes from Kane to bring the loans in, because D'Apolito told them.  O'Neill was part of the fraud, and D'Apolito told DeMola, with whom he was very close and used to tell everything.  D'Apolito explained that he did not want DeMola to get in trouble, but she "basically blew [him] off." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 186.)

127.     DiBenedetto explained that he and his partners were buying the properties with their own money, fixing them up with their own money, selling the properties to third parties, and the third parties were being processed as borrowers for Walsh. "During that time D'Apolito and [O'Neill] made them pay $1,000 per house and splitting it with [DeMola].  If they wanted to close a house, they had five houses they wanted to sell D'Apolito would want $1,000 and got it in order to fund them immediately.  Kane was getting funding even though Kane obviously had not done anything to the house yet.  He bought it with his own money and was not using Walsh money and fixing the house up and then selling it and was giving Walsh a clean deal.  The way they operated Walsh it was sort of like a criminal organization type thing.  D'Apolito used to call it vigorish.  He was not too happy with it but he had to do business.  D'Apolito wanted $1,000, and Kellie wanted $1,000 even though she was just processing it.  The people were stupid enough to get the checks in their name." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 118-19.)

128.     DiBenedetto testified that, before plans for the sale of WSI, he questioned DeMola as to what would happen when the payments stopped and the loans went into default,

and DeMola stated in substance ". . . that the loans would be spread out among different purchasers minimizing the exposure to [WSI] and then at worst, [WSI] would tie up the matters and extend its civil litigation." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 53 (discussing his statements at page 33 and 34 of the transcript of his plea hearing).)

129.    None of the scheme's participants were "scammed" by Kane; they all – including DeMola – knew what they were getting involved with. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 214.)

***Cover-Up Before Greenwich Capital's Inspection of Properties Involved in the Fraud***

130.    DeMola agreed to conceal the true conditions of properties from representatives of Walsh's warehouse credit facility. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 103.)

131.    D'Apolito testified that DeMola met with Kane, Greiser, D'Apolito, with Jim Walsh, Robert Walsh, and Paul Del Rosso coming in and out, because DeMola "felt the heat. The shit was going to hit the fan." D'Apolito testified that when both brothers were out he remembers DeMola saying something about thinking that Greenwich Capital, WSI's warehouse lender, was going to come down and start looking at some of the properties. So DeMola told them to go buy cheap blinds and put them in the windows and make the houses look like they're lived in. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 68-69.)

132.    The purpose of the instruction to make the houses look lived in was so that Greenwich Capital – which was doing a ride by and was not knocking on doors – would think that the houses were lived in when in fact they were not lived in. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 69-70.)

133.    At the meeting, DeMola panicked. "She said, 'I'll take care of it. I'll take care of it. We can still do loans. Give me to the end of the day.' That is when [DeMola] told [Greiser

and Kane] to make the houses look livable.  Then, [] , she sweet talked Robert and []she lied to [them] and said [Greiser and Kane would] they'll make the payments.  I guess like another five loans went through.  They were happy, pacified and the payment came up." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 74.)

134.    Just before Greenwich Capital came down, DeMola told D'Apolito to tell Kane to make the properties looked lived in.  DeMola had received a phone call, so she knew Greenwich was coming.  The properties were in mainly Long Branch and Asbury Park, but there may have been a couple in Hazlet or the Keyport area.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 186.)

135.    DeMola told the person which properties to go to.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 186.)

136.    DeMola also instructed that fake mail should be put in the mailboxes of the specified properties.  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 73-74.)

137.    O'Neill testified similarly, explaining that "[w]hat I remember -- from what I remember today, they were all at the end of the office having a big conversation.  They called me down.  I went down.  [DeMola] had stated to me that somebody was going to go do a drive-by inspection of a house.  I don't remember who said the house was just a shell, . . . but I was to get Kane on the phone, call him, get there, get some curtains, lights, whatever, put up, so it looked like somebody was living in it.  That I do recall." (*See* Merin Certif., Ex. P: O'Neill Second Dep. 45-46; *id.* at 63 (same); Ex. K: O'Neill First Dep. 36 (same).)

138.    O'Neill reached out to D'Apolito to get in touch with Kane or Grieser to make sure that the properties being inspected by Greenwich Capital looked lived in.  O'Neill reached

out to him to get in touch with Kane or Grieser to make sure places looked lived in. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 126.)

139.     After receiving instruction from DeMola, O'Neill called Kane with the instruction to clean up the houses. She also believes she contacted Skowrenski. (*See* Merin Certif., Ex. K: O'Neill First Dep. 55.)

140.     Kane similarly testified that "There was a day when a representative from Greenwich Capital showed up at their office. [He] do[es not] remember the timeframe. It might have been November, December of [] 1996. . . . And [the representative] wanted to go and look at houses . . . properties that they had put loans on. [DeMola] called us up there [to the WSI Parsippany office]. . . . I went up there with Anthony D'Apolito. [DeMola] gave us the list of homes; and [DeMola] wanted our crews to get out there, look at the properties, make sure that there are curtains up, no boards on the windows, and make sure that they looked good for a drive-by appearance. She had the quality control girl take [the Greenwich representative] out to lunch to stall for time, and that was it." (*See* Merin Certif., Ex. H: Kane 2007 Dep. 103.)

141.     The call from DeMola giving Kane a list of homes came in November or December 2006. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 200-01.)

142.     DeMola gave Kane a list of approximately ten houses. Kane took North Jersey and Grieser took South Jersey, and they sent their crews out to do what had to be done. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 104.)

143.     The properties on DeMola's list all had leases on them. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 250.)

144.   One of the reasons the houses needed to be looked at was that the basis for the loans was that the houses were going to be leased out to provide the investor-owners with the money to pay the mortgage. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 217.)

145.   Kane and Greiser arranged to have the properties made to look lived in and in okay condition, per DeMola's instruction. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 104, 105.)

146.   Once their task was done, Kane and Greiser reported back to Betty Ann that it was done and it was ok to send the Greenwich Capital person to see the houses. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 104-05.)

147.   Kane also testified that, if that phone call had not come in and Greenwich had gone out and looked at properties and saw that they were boarded up and not lived in, it would have put an end to the whole fraudulent scheme. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 201-02.)

### *Improper Interactions with Underwriters & Underwriting Standards*

148.   During her allocution, DeMola testified that she improperly took part in decisions to eliminate underwriting decisions:

> THE COURT: Did you concur in decisions improperly to eliminate underwriting conditions that were not met?
>
> THE DEFENDANT:  Yes.

(*See* Merin Certif., Ex. D: DeMola Plea 20.)

149.   There were disputes between underwriting and sales about whether a loan should close. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 131.)

150.   While DeMola was not an underwriter, as long as she signed off then it was fine because she was DeMola, who was Robert's sister.  Specifically, because DeMola was the sister of the president of the company, if she wanted to do something, the other employees would not

complain about it or even question her at all.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 58.)

151.    DeMola, to D'Apolito's understanding, had the authority to approve loans from an underwriting standpoint.  D'Apolito stated that he believed this to be the case, because DeMola did in fact approve loans from an underwriting standpoint.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 106-07.)

152.    WSI's underwriting guidelines were designed by Paul Del Rosso, but DeMola would change them whenever she wanted to make the loans she needed to get done – including those in this case – comply.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 89-90.)

153.    Even though Del Rosso was the head of underwriting and DeMola was in charge of sales, DeMola would be involved in underwriting decisions, because she needed the deals to go through – she needed the volume.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 67.)

154.    DeMola changed the underwriting standards, because she "was in sales.  She wanted to [make the] numbers. . . .  She would do whatever it took to get a loan done.  [I]f . . . the guidelines read [that the borrower] needed three pay stubs but the guy only had one, they wouldn't wait to make the loan until [he] got paid another month.  He got paid every week.  She would get it done with just the one pay stub."  the guy had enough pay stubs but she would just get it done with the one pay stub."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 90.)

155.    D'Apolito described the process by which DeMola would review and obtain approval for loans: a loan would get turned down

> [b]ecause they couldn't meet the guidelines of what they set.  It was Kell[ie] O'Neill's job to put all the paperwork in and get it in order.  She would turn it and just give it right over to the cubicle to the underwriter.  Then the underwriter would go through it, and check all the . . . information.  And she would say that that debt ratio was 35, [] 40 percent debt ratio, debt-to-income ratio.  And

-36-

the guidelines said it had to be 38.  So it's up to [DeMola] if [DeMola] wants to make an exception.  Something that minute she may not have had the authority but [DeMola] and Paul [Del Rosso] could do that.

But if they were at 45, 50 percent debt ratio after the income docs come in, they just can't afford the loan.  Then they would turn it down, and the loan doesn't happen, unless they can go out.  Then they would send out conditions saying, is there a co-signer?  Is there another job?  Is there income that we don't know about[?]  They would go back and ask that.  And if there was, then fine.  If it was a part-time job that was only like a month or two months, they probably wouldn't count it.  But if it was at least six months to a year, . . . they would take it.  Even if it is a letter from the employer, because they pay them cash.  They would take that and then make the exception.  But if they didn't want to accept that's where [DeMola] and [Del Rosso] may get into an argument.

Here is a letter.  She's been here taking care of this woman's kid for $500 a month every month for the last four years.  And, . . . [Del Rosso] would go, but we can't approve that kind of income.  Maybe [DeMola] would bring [James Walsh] in and she would get it, and they would either approve it or deny it.

(*See* Merin Certif., Ex. Z: D'Apolito Second Day 60-61.)

156.   " [T]he underwriting guidelines were designed by [] Del Rosso and [DeMola] would change them whenever she wanted to make whatever loan she needed to get done [fit]." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 90.)

157.   DeMola would sometimes waive underwriting requirements for the files involved in this litigation and for other files.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 142-43.)

158.   DeMola did not have the authority to waive conditions – that was solely an underwriter's job – but Robert Walsh was aware DeMola was waiving conditions.  (*See* Merin Certif., Ex. P: O'Neill Second Dep. 36.)

159.   D'Apolito only saw DeMola ask for permission to waive underwriting requirements a few times, and she went to James Walsh.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 143.)

MEI 12641821v.1

160.    Before the fraud ever became public, DeMola "direct[ed] underwriters to overlook suspicious loan application documents such as pay stubs and IRS forms W-2." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 97 (discussing his statement to Judge Wolin in at plea hearing); Ex. BB: Transcript of Plea Hearing, United States v. D'Apolito,  (Dec. 23, 1998) ("D'Apolito Plea") 31.)

161.    DeMola did not have to explain to the underwriters why they should overlook loan application documents that looked suspicious; "she was [DeMola]. She can tell them whatever and they would just do it." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 98.)

162.    For example, a suspicious pay stub would be one that looked as if it did not match what the income needed to be.  There, DeMola would change the loan to a stated income and tell "her" to overlook the pay stub and get rid of it.  "Stated income" refers to the no income verification loan.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 98.)

163.    DeMola had control over the underwriting standards.  If she changed the standards, "there was a memo that went out that said:  From now on we can do loans like this, this, and this.  That's it.  Once it changed, that was it.  Unless [DeMola] changed it again.  If there was one that didn't meet the guidelines, they would send it to [DeMola].  [DeMola] would put the signature on it and that was it. It was passed.  There were still guidelines they were all going by, but [DeMola] would make exceptions." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 105.)

164.    DeMola allowed Kane's loans to be closed before an appraisal was done, which was "without a doubt" a violation of WSI's procedures, and DeMola overrode Paul Del Rosso. When D'Apolito asked DeMola how she was closing this if she did not know the appraised value, she would say that she got a verbal, he would tell her that the verbal did not indicate the

condition of the house, and she would tell him not to worry about it.  It did not matter to him because it made his report look good.  These were his accounts but he would question her.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 91.)

165.   DeMola was signing off on conditions to get the loans into closing despite signing off on conditions being an underwriter's job, not DeMola's.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57.)

166.   Del Rosso did question some of the pay stubs and W-2s that did not look correct, but at times, DeMola told Del Rosso to go ahead with the mortgage anyway.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 47-48.)

167.   Kane testified that, it was his impression that DeMola could overrule Del Rosso "with her persuasion," meaning that DeMola had to go in and justify whatever she was seeking to do to Del Rosso.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 118-19.)

168.   It is a fair statement, according to Paul Del Rosso, that DeMola bullied people within the office.  (*See* Merin Certif., Ex. CC: Dep. of Paul Del Rosso (Sept. 24, 2011) ("Del Rosso Dep.") 118.)

169.   Del Rosso testified that DeMola tried to bully him into making exceptions to allow certain loans to go through.  (*See* Merin Certif., Ex. CC: Del Rosso Dep. 119.)

170.   Del Rosso explained that, if DeMola was bullying him and asking him to approve a loan that did not meet the guidelines and he felt that the bullying was inappropriate, he believes the issue would be referred higher up the chain to let others deal with it.  (*See* Merin Certif., Ex. CC: Del Rosso Dep. 120.)

171.   When there were disagreements between DeMola wanting to close a loan and Del Rosso, the underwriter regarding underwriting a loan, "almost 10 times out of 10 [DeMola]

would win." "[DeMola] would get her way." (*See* Merin Certif,, Ex. Z: D'Apolito Second Day 56.)

172.    Robert Walsh testified that he could not think of a reason why DeMola would be interacting with underwriters outside of the ordinary course of business during the day or interacting at any time as part of her job with closing attorneys or people who worked with them. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 138.)

***Improper Interactions & Actions with Appraisers***

173.    DeMola was aware that appraisers were putting in false appraisals for the loans in this lawsuit, because she met with the appraisers, even at WSI, and told them what to do. D'Apolito was there once when that occurred.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 83.)

174.    O'Neill testified that DeMola was aware of the false appraisals before the fraud become public, as O'Neill remembers DiBenedetto coming to the WSI office and also remembers a memorandum that went out specifically addressing how the appraisals had to be done, what the house was initially worth, and all the repairs that had to be done to the home. (*See* Merin Certif., Ex. K: O'Neill First Dep. 40.)

175.    Specifically, D'Apolito testified that he heard DeMola tell the appraisers not to take any interior photos, because DeMola knew she got it approved and that they did not need them.  She instructed that "we" did not care what the inside looked like, and if there was any work that had to be done, the appraisers should not mention it.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 83-84.)

176.    DeMola's instruction to the appraisers not to take interior photos occurred within a couple months of the first fraudulent loans being done.  That is when Brodo and DiBenedetto

-40-

came to the WSI office, and DeMola talked to them about it. Then D'Apolito told Skowrenski and Skowrenski told Rich Calanni. He does not think James Brodo was in the picture because DeMola did not even like Brodo. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 177.)

177.    DeMola also instructed the appraisers to use prior deals that Walsh had closed for purposes of comparables for new appraisals and specifically instructed the appraisers as to which comparables to use. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 112.)

178.    D'Apolito explained that, in some cases "it was ones from this case to comp out the ones from this case...you could do that legally." "In a lot of cases that she needed desk review and they couldn't get it to match up, they would take it from another appraisal that was from Asbury Park, which was a fraudulent deal, to comp it out." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 113.)

179.    DeMola told Brodo, an appraiser, that if he did not do appraisals in the amount DeMola desired, he would not get appraisal assignments in the future on Walsh loans. (*See* Merin Certif., Ex. DD: Dep. of Thomas Brodo (April 24, 2007) ("Brodo Dep.") 26.)

180.    During her allocution, DeMola admitted that she improperly concurred in the funding of loans without obtaining accurate written appraisals:

> THE COURT: Specifically, did you, (a), concur in the funding of loans without first having obtained an accurate written appraisal?
>
> THE DEFENDANT: Referrals, yes.
>
> \*        \*        \*
>
> THE COURT: And did you direct persons at Walsh to participate in efforts with respect to closed funded loans which were to be reviewed by representatives of Greenwich Capital, which efforts included altering certain documents in those files and placing other documents, such as written appraisals, in the files?
>
> THE DEFENDANT: Yes. After the verbals we would get the written ones and put them in the files.

-41-

(*See* Merin Certif., Ex. D: DeMola Plea 20.)

181.    Similarly, D'Apolito gave sworn testimony that DeMola "direct[ed] that loans for which [D'Apolito] [was] the account executive be approved and funded based upon verbal representations of market value by an appraiser, without having received a written appraisal report." (*See* Merin Certif., Ex. BB: D'Apolito Plea 30.)

182.    O'Neill testified as to the same during her allocution:

> THE COURT: And did an individual by the name of Betty Ann Demola, the sales manager at Walsh Securities, on various occasions direct that mortgage loans which you processed be approved and funded without Walsh Securities having received a written appraisal report?
>
> DEFENDANT O'NEILL: Yes, sir.

(*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29; Ex. K: O'Neill First Dep. 42.)

183.    Brodo explained that DeMola asked him to change appraisals; at times DeMola would call saying that an appraisal number he gave Kane or was submitted in a written appraisal did not work with a particular deal.  (*See* Merin Certif., Ex. DD: Brodo Dep. 74-75.)

184.    Brodo stated that the conversations with DeMola about changing numbers related to both verbal and written appraisals.  (*See* Merin Certif., Ex. DD: Brodo Dep. 102-03.)

185.    Where Brodo had only given DeMola a verbal appraisal, and he agreed to DeMola's request to change the number, he could have just written the higher number on the form or "made some changes that would justify that number.  There is a process of adjustments where you come down to at least three comparables."  This is how he would come up with the right number.  He was able to do this, because he had not yet physically finished the form.  "It was all on the computer, so even if it had been printed out, you could easily print it out again."  (*See* Merin Certif., Ex. DD: Brodo Dep. 103.)

186.   Where Brodo had already provided DeMola with a written appraisal, DeMola had the hard copy of that appraisal in her possession, and she asked him to change it, "normally [they] would ask for that old appraisal back, and then give her a replacement one." (*See* Merin Certif., Ex. DD: Brodo Dep. 103-04.)

187.   The replacements for the written appraisals that had been changed per DeMola's request did not indicate that the replacement was a rescission or that the replacement in any way contained any alterations. Because of this, if someone were to look at the second version of the appraisal, that person would not know that there previously had been a lower number on the same appraisal. (*See* Merin Certif., Ex. DD: Brodo Dep. 104.)

188.   DeMola also requested that DiBenedetto raise appraisals: DeMola "would say the six appraisals were 100, 120, 130, 140 and 150 and [she] would say she needs another 30, 35, 40 because she has to cover the closing costs of these people and the down payment of these people, there would be a bit of back and forth or something like that." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 50; *see also id.* at 126-127 (discussing a specific example where DeMola contacted him to tell him the appraisal needed to be $50,000 higher and provided him with comparables); *id.* at 131 (after he stopped working for WSI, DeMola requested that he raise certain appraisals that he had previously done).)

189.   DeMola or others at WSI also asked DiBenedetto to do appraisals after the loans closed, and there were circumstances where DiBenedetto was of the belief the loan had already closed and he was asked to change that appraisal afterwards. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 129-30.)

190.   DeMola verbally abused appraisers to cause them to increase their appraisals. For example, appraiser Thomas Brodo was asked by Judge Wolin at his plea hearing, "At various

-43-

times in 1996 and 1997, did Betty Ann DeMola of Walsh Securities verbally abuse you in an effort to cause you to raise the appraised values you assigned to the properties as to which Walsh was lending money, and did she state in substance that if you could not bring in the figure she desired, then you would not get appraisal assignments on Walsh loans?" The answer that Brodo gave was: "She did, and that's true, your Honor." (*See* Merin Certif., Ex. DD: Brodo Dep. 26 (confirming the testimony from his plea hearing).)

191.    DeMola would call Brodo and verbally abuse him at the end of the month. (*See* Merin Certif., Ex. DD: Brodo Dep. 72.)

192.    Brodo stated that it would not be unusual for someone to call and want to discuss the amounts of appraisals but that DeMola "was quite a bit more verbal about her displeasure with the numbers than some other people on that.  It was partially her nature.  [He] thinks she was just that kind of abusive person." (*See* Merin Certif., Ex. DD: Brodo Dep. 72-73.)

193.    Similarly, DiBenedetto, another appraiser, testified that, in 1995 and 1996 DeMola verbally abused him in an effort to cause him to raise the value at which he appraised a particular property and described this as a common occurrence.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 50.).)

194.    DiBenedetto testified that, in his experience as an appraiser, it was unusual that a lender would call him as an appraiser and say to him, as DeMola did, that he needed to raise the value at which he appraised a particular property.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 50-51.)

195.    Notably, Robert Walsh testified – as the 30(b)(6) witness for WSI – that, to his knowledge, there would never be any reason that DeMola would interact with an appraiser.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 93.)

***File Cleansing***

196.     O'Neill was "asked by Betty Ann DeMola to participate with other Walsh employees in combing through closed files which were shortly to be reviewed by representatives of Greenwich Capital, which funded loans for Walsh Securities, in order to alter some of the documents then in those files or to place documents, such as written appraisals, in those files[,]" and DeMola was present "during portions of the file-cleaning process." (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29-30.)

197.     DeMola called a meeting of a group of WSI employees, they went into a conference room, and were given a list of items that had to be in the files and items that had to be taken out of the files. They were instructed too go through batches of loans and to make the loan files conform with the written list they were given, which specified what had to be in the loan and what should not be in the loan. (*See* Merin Certif., Ex. K: O'Neill First Dep. 52.)

198.     DeMola gave the instruction to the employees cleaning the files – who included some people from underwriting and closers – to make sure that they followed what was on the paperwork she gave them that stated what should be in a file and what should be removed. (*See* Merin Certif., Ex. K: O'Neill First Dep. 73; Ex. P: O'Neill Second Dep. 64.)

199.     O'Neill had never before seen a paper like the one she was given for the file cleansing. It was not a checklist normally used in determining what documents should be in a file. (*See* Merin Certif., Ex. K: O'Neill First Dep. 73-74.)

200.     In the file cleansing, notes from the underwriters were taken out, and, where any commitment letters had gone out with DeMola's signature on them, her signing to waive conditions was taken out. (*See* Merin Certif., Ex. K: O'Neill First Dep. 56.)

-45-

201.    O'Neill specifically remembers removing from the files all underwriting approvals that had DeMola's signature on them.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 74.)

202.    O'Neill explained that they did not want evidence of DeMola waiving any conditions at all in the file, because they did not want anything coming back to DeMola and it was not DeMola's job to sign off on conditions – that was the underwriters' job.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57; Ex. P: O'Neill Second Dep. 37-38, 67-68.)

203.    Additional alterations during the file cleansing included that some files needed escrow letters.  Also, "[f]iles that were closed without appraisals.  The appraisals had to be there by the time they got there so Kellie was calling up the appraisers and letting them know. . . . Kellie would call the appraisers and ask the appraisers to send appraisals for loans that had already been closed."  O'Neill told D'Apolito that DeMola was aware of that and instructed her to do it.  He believes Del Rosso also knew. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 93-94.)

204.    At her deposition, DeMola testified that she did not remember whether she directed persons at Walsh to participate in efforts with respect to closed funded loans which were to be reviewed by representatives of Greenwich Capital which efforts included altering certain documents in those files and placing other documents such as written appraisals in the files.  (*See* Merin Certif., Ex. C: DeMola Dep. 124-25.)

***Indictment & Admitting Involvement in the Fraud by Sending Lulling Letters***

205.    DeMola was indicted, in part, for, with her "co-consiprators[,] [seeking] for their benefit to preserve the proposed merger with RBMG and the warehouse credit line with Greenwich Capital – both of which were threatened by law enforcement investigation and the

ME1 12641821v.1

press disclosures of the allegations of fraud – by causing [WSI] to issue false, lulling communications to outside parties concerning the nature and scope of the fraud and the purported lack of involvement of management personnel at [WSI].  In those communications and by other means, [WSI] falsely ascribed sole blame for the fraud to persons outside the company and to lower-level employees of the company." (*See* Merin Certif., Ex. EE: Indictment, *United States of America v. DeMola*, No. 02-508 ("DeMola Indictment") at Count 1 ¶¶ 13, 15(e), 15(f), 15(g), 15(h); Count 2 ¶¶1-2.)

206.    The factual recitation of the allegations within the federal indictment against DeMola alleged:

> 6.    From in or around 1996 to at least as late as in or around August 1997, in the District of New Jersey and elsewhere, defendant
>
> ### ELIZABETH A. DEMOLA
>
> knowingly and wil[l]fully combined, conspired, confederated, and agreed with others to commit an offense against the United States, that is, to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and to do so by means of interstate wire communications, contrary to 18 U.S.C. § 1343.
>
> ### OBJECTS OF THE CONSPIRACY
>
> 7.    The objects of the conspiracy included: (a) allowing various co-conspirators to benefit from fraudulently participating in sales of properties utilizing falsified transaction documents; and (b) allowing Walsh Securities to fraudulently increase its inventory of mortgage loans; to the anticipated benefit of defendant **ELIZABETH A. DEMOLA** and other co-conspirators.
>
> ### MEANS AND METHODS OF THE CONSPIRACY
>
> 8.    In furtherance of the conspiracy, defendant **ELIZABETH A. DEMOLA** and her co-conspirators sought to cause Walsh Securities to fund an increasing number of mortgage loans initiated by various mortgage originators and others, including persons

participating in fraudulent land flips.  Their purpose in doing so was to enlarge Walsh Securities' inventory of mortgage loans to permit Walsh Securities to profitably securitize its loan pools. **DEMOLA** and her co-conspirators planned thereby to make Walsh Securities appear financially more successful and attractive, in order to benefit themselves by facilitating either an initial public offering of the company's stock or an acquisition by, or merger with, another mortgage company.

9.      In order to facilitate fraudulent land flipping activity and to generate the resulting mortgage loans for Walsh Securities, defendant **ELIZABETH A. DEMOLA** and her co- conspirators took the following actions, among others:

a.      accepting kickbacks from land flippers in connection with the processing of fraudulent mortgage applications and related documents on properties sold by such persons;

b.      preparing fictitious leases designed to show that multi-family properties which were the subject of loan applications were occupied by rent-paying tenants and therefore would appear to generate rental income sufficient to support a mortgage loan;

c.      agreeing to have the fraudulent land flipping seller and others create second mortgage documents in order to conceal the absence of actual down payments by buyers;

d.      approving and funding loans knowing that buyers had not made the down payments reflected in the loan documents;

e.      preparing fictitious attorney escrow letters showing non-existent down payments by buyers;

f.      pressuring appraisers to inflate their valuations of properties to justify higher mortgage loans;

g.      pressuring and demanding that loan originators and others submit their loan applications and related documents to Walsh Securities, particularly towards the end of each month;

h. .    improperly eliminating underwriting conditions which were not met;

i.      directing loan underwriters and others to overlook suspicious loan applications and supporting documentation;

-48-

j.      approving and funding loans without first having obtained an accurate, written appraisal;

k.      approving, funding, reselling and securitizing loans supported by appraisals they knew contained inflated market values and other false information;

l.      approving, funding, reselling and securitizing loans supported by escrow letters and second mortgages which were not genuine;

m.      approving, funding, reselling and securitizing loans knowing that mortgage payments would be made not by the buyer-borrower but by co-conspirators; and

n.      directing and participating in the purging of documents from loan files and the alteration of documents in loan files.

10.     When Greenwich Capital sought to have its representatives inspect various properties which stood as the collateral for Walsh Securities' mortgage loans, defendant **ELIZABETH A. DEMOLA** and her co-conspirators took steps to forestall those inspections and to conceal problems with the properties by, among other things, causing persons to temporarily and cosmetically cover up defects in the properties and physically delaying inspections by a Greenwich Capital representative in order to allow that concealment activity to be completed.

11.     As a result of the increased loan volume generated through the fraudulent land flipping activity, in or around early 1997, the principals of Walsh Securities were able to induce Resource Bancshares Mortgage Group, Inc. ("RBMG"), a large South Carolina mortgage company, to enter into an agreement to merge with Walsh Securities. Under the terms of the proposed merger, shareholders of Walsh Securities, including defendant **ELIZABETH A. DEMOLA,** were to receive substantial and valuable shareholdings in RBMG when the merger was concluded. In addition, **DEMOLA** was to become an Executive Vice-President of the merged entity, with a substantial salary, as well as bonuses, commissions, and benefits.

12.     Beginning in or around late June 1997 the fraudulent land flipping activity and the corresponding number of mortgage loans funded by Walsh Securities began to decline, as the result of a law

enforcement investigation into the fraudulent activity and a series of newspaper articles concerning the allegations.

13.     Defendant **ELIZABETH A. DEMOLA** and her co-conspirators sought for their benefit to preserve the proposed merger with RBMG and the warehouse credit line with Greenwich Capital -- both of which were threatened by the law enforcement investigation and the press disclosures of the allegations of fraud -- by causing Walsh Securities to issue false, lulling communications to outside parties concerning the nature and scope of the fraud and the purported lack of involvement of management personnel at Walsh Securities. In those communications and by other means, Walsh Securities falsely ascribed sole blame for the fraud to persons outside the company and to lower-level employees of the company.

14.     For a period of time defendant **ELIZABETH.A. DEMOLA** and her co-conspirators were able through these communications and other means to successfully delay action by RBMG and Greenwich Capital which would have threatened the financial windfall anticipated by **DEMOLA** and her co-conspirators. Ultimately, however, and despite those efforts, RBMG terminated the proposed merger and Greenwich Capital terminated its warehouse line of credit.

## OVERT ACTS

15.     In furtherance of the conspiracy and in order to effect the objects thereof, defendant **ELIZABETH A. DEMOLA** and her co-conspirators caused the following overt acts to be committed in the District of New Jersey and elsewhere:

a.     In 1996 and 1997 **DEMOLA** instructed lower-level employees at Walsh Securities to approve and fund mortgage loans without written appraisals.

b.     In 1996 and 1997 **DEMOLA** caused Greenwich Capital Markets on various occasions to wire transfer, through various bank accounts outside New Jersey into attorneys' bank accounts in New Jersey, monies to fund mortgage loans being approved and funded on the basis of falsified documents.

c.     In January 1997 **DEMOLA** participated in meetings at Walsh Securities with co-conspirators to discuss fraudulent loan activity.

d.      In June 1997 **DEMOLA** participated in meetings at Walsh Securities with co-conspirators to discuss fraudulent loan activity.

e.      On or about July 3, 1997 **DEMOLA** caused a letter, sent from Walsh Securities to Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

f.      On or about July 10, 1997 **DEMOLA** caused a letter, sent from Walsh Securities to parties including Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

g.      On or about July 24,1997 **DEMOLA** caused a letter, sent from Walsh Securities to parties including Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

h.      On or about August 27, 1997 **DEMOLA** caused a letter, sent from Walsh Securities to parties including RBMG and Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

All in violation of Title 18, United States Code, Section 371.

(*See* Merin Certif., Ex. EE: DeMola Indictment at Count 1 ¶¶ 6-15.)

207.   Counts two through four of DeMola's indictment also alleged, based on the allegations set out in Count One, that DeMola engaged in wire fraud with respect to the July 3, July 10, and August 27, 1997 lulling letters. (*See* Merin Certif., Ex. EE: DeMola Indictment at Count II.)

208.   In her guilty plea to conspiracy to commit wire fraud, DeMola admitted to having knowledge of the fraud, participating in the fraud, and sending "lulling letters" in July and August 1997. (*See* Merin Certif., Ex. D: DeMola Plea 18-21.)

209.   DeMola admitted that WSI closed loans with funds provided by Greenwich Capital, acquired loans from mortgage originators including NHF, and knew that William Kane

worked at NHF and also bought and sold properties on loans that WSI bought from entities

including NHF.  (*See* Merin Certif., Ex. D: DeMola Plea 18-20.)

      210.    Specifically as to her sending lulling letters, at her allocution, DeMola admitted as

follows:

> THE COURT: Are you aware that in July and August 1997 Walsh Securities sent communications to third parties, as described in Counts 2 through 4 of the indictment, which failed to fully and accurately apprise those parties of your knowledge and activities as a member of the management of Walsh Securities?
>
> THE DEFENDANT:  I am aware now, yes.
>
> THE COURT: I am sorry?
>
> THE DEFENDANT:  I am aware now, yes.
>
> THE COURT: Did you do all of these things deliberately and intentionally, and not by reason of ignorance mistake or accident?
>
> THE DEFENDANT:  Yes.

(*See* Merin Certif., Ex. D: DeMola Plea 20-21.)

ME1 12641821v.1

### *Benefit From the Fraud*

211.    Every time WSI made a loan, DeMola made money on it.  (*See* Merin Certif., Ex. C: DeMola Dep. 145; *see also* Ex. Z: D'Apolito Second Dep. 61 (DeMola wanted every loan coming in, to close, because she was paid based on that).)

212.    DeMola benefited from the loans through higher sales volume.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 230.)

213.    As to DeMola's financial arrangement with the company, DeMola did not have any responsibility for whether the loans ultimately performed. (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 106.)

214.    Allowing the loans to close before the written appraisal is received allowed DeMola's production numbers to look better.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 226.)

215.    If the fraudulent scheme was brought to an end, DeMola would not have had the same volume of loans in her portfolio.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 202.)

216.    DeMola benefitted from the Kane loans, because she got paid commission on all the loans that closed.  She had a high salary plus a commission on every loan.  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 87, 106.)

217.    DeMola also had "every reason to be sure that loans continued to get approved not only because [DeMola] would make money, but because it created an income flow for loans to be repaid."  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 108.)

218.    D'Apolito testified that he would see [DeMola] going in there to beg, "because she needed every loan closed for her commission".  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 62.)

-53-

219.   At the luncheon with James Walsh, Kane, D'Apolito, and Grieser, DeMola told James Walsh at that she wanted to continue to fund the loans. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 230.)

220.   DeMola had an incentive to be aware this was going on and allow it to go on, because she was getting pressure from Robert Walsh just like in any sales company that she had to have the numbers, she was getting the numbers, and she did not care how she got them. She did not think anything of it or thought nothing would ever go wrong. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 63-64; Ex. F: Kane 2011 Dep. 224.)

221.   DeMola was enthusiastic about the RBMG merger. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 226.)

222.   DeMola testified at her plea hearing that she stood to benefit financially from the merger of WSI with RBMG and that increased loan production volume enhanced WSI's prospects of concluding the merger. (*See* Merin Certif., Ex. D: DeMola Plea at 18.)

223.   DeMola, Del Rosso, D'Apolito, and DeMola's two sons-in-law who were the other two sales reps were getting shares in stock. D'Apolito never received any of the stock benefits, but when the merger went through, he was supposed to get $150,000 in shares and then $300,000 in stock options. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 80; Ex. O: D'Apolito First Dep. 88-89.)

224.   D'Apolito believed that he, as an employee of WSI, was going to get compensation as a result of the RBMG acquisition, because it was a portion of what DeMola was receiving, he was the top sales representative at WSI, and DeMola probably wanted to keep him quiet. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 81.)

ME1 12641821v.1

**Anthony D'Apolito**

225.    D'Apolito was intricately involved in the fraudulent scheme and was wholly aware of Kane's involvement.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 205.)

226.    D'Apolito was "employed as an account executive at [WSI.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 27.)

227.    DeMola was D'Apolito's supervisor.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 234.)

228.    D'Apolito was paid by WSI "a base salary and commissions based upon the total principal amount of closed mortgage loans [he] generated and, on occasion, bonuses for meeting certain targets set by [WSI.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 28.)

229.    D'Apolito pled guilty to a two-count felony of conspiracy to commit wire fraud and the substantive offense of wire fraud. (*See* Merin Certif., Ex. BB: D'Apolito Plea 11, 15, 32.)

230.    At his allocution, D'Apolito testified that he knowingly and willfully engaged in the fraudulent scheme here.  (*See* Merin Certif., Ex. BB: D'Apolito Plea 30-31.)

231.    D'Apolito understood "that underwriting decisions as to mortgage loans were based, at least in part[,] on information contained in the mortgage application, supporting documentation submitted with the application, and appraisal reports on the property[.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 28.)

232.    D'Apolito admitted to, "[i]n early 1996 . . ., by agreement and understanding with various persons including William Kane, prepar[ing] fictitious leases and tak[ing] other actions in connection with mortgage applications submitted to and later approved by [WSI.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 28.)

233.   The "fictitious leases [were] designed to show that the multi-family properties that were the subject of the mortgage applications were occupied by rent-paying tenants and therefore would generate rental income[.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 28-29.)

234.   D'Apolito understood "that in 1996 and 1997 numerous mortgage applications accompanied by similar fictitious leases and other false supporting documents, such as fraudulent pay stubs and IRS Forms W-2, were used to generate mortgage loans by [WSI] which were funded by Greenwich Capital[.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 29.)

235.   D'Apolito also understood that, in 1996 and 1997, "the transactions generating those mortgage loans were [] 'land flips[.'']  That is, the properties that secured the loans had been purchased or were under contract to be purchased by William Kane and other persons and entities at a relatively low price and were resold shortly thereafter to another at a significantly higher price[.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 29.)

236.   Kane would sit with O'Neill and D'Apolito at WSI and get his loans closed.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 129.)

237.   D'Apolito also admitted to, "[i]n early 1997, . . . forg[ing] notarizations on various closing documents for a number of fraudulent land flips."  (*See* Merin Certif., Ex. BB: D'Apolito Plea 30.)

238.   Regarding his forging notarizations, D'Apolito testified that he "saw the people sign the documents, but [] thought as a notary it was a conflict of interest for [him] to sign it as Anthony D'Apolito because [he] worked for Walsh.  So [Grieser] gave [him] . . . [Grieser's wife Sue's notary] . . . [he] took it and signed her name and stamped it."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 97.)

-56-

239.    D'Apolito admitted that DeMola and O'Neill reached out to him with a list of properties in the Long Branch and Asbury Park area and instructed him to contact Kane and tell Kane to make those properties "look lived in" before a representative of Greenwich Properties came down to inspect them.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 126, 171; Ex. BB: D'Apolito Plea 30-31.)

240.    As part of his involvement in this fraudulent scheme, D'Apolito "accept[ed] payments from William Kane in connection with hundreds of fraudulent land flip transactions that generated mortgage loans for [WSI.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 29-30.)

241.    Kane made $10,000 or $20,000 in cash payments to D'Apolito as part of the fraudulent scheme at the WSI office, and Skowrenski of NHF also made cash payments to D'Apolito.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 235.)

242.    Kane also paid D'Apolito additional money to draft fraudulent leases.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 235.)

243.    D'Apolito admitted that he received "$300 per loan that closed" from Robert Skowrenski of NHF.  (*See* Merin Cert., Ex. O: D'Apolito First Dep. 184.)

244.    D'Apolito stated that he "took all the money [paid to him through the fraudulent scheme]. [Kane] paid [him] by check. [D'Apolito] didn't hide it. It wasn't cash. [D'Apolito] would take it and put it through DAP, Inc. [D'Apolito] filed taxes on it and everything. It was DAP Consulting, Inc. [He] treated it as a consulting fee." D'Apolito added, "[t]he government was trying to get me on tax evasion but couldn't because I paid taxes on that money. I didn't hide it." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 185.)

245.    D'Apolito explained that the checks were written on whatever checking account Kane had. "Even if [Kane] gave [him] cash, [he would] put it through the business account.

Most of the time it was always a check. It was out of Cristo. Sometimes [Kane's] checks bounced. But they came from [Kane] all the time." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 185.)

246.     Kane explained how he paid D'Apolito: "[t]he bank paid a commission to National Home Funding based on the rate of the mortgage." Thus, the higher the interest rate, the more money would be paid to National Home Funding. "So that went to National Home Funding. [Skowrenski] took a piece of it, [D'Apolito] took a piece of it, and then [Kane] got the balance." Kane then paid D'Apolito for taking the loans to Walsh Securities. He paid "usually in the beginning [with] cash. And then [D'Apolito] opened up a company, and then [Kane] was paying him through his company." (*See* Merin Certif., Ex. F: Kane 2011 Dep. 51, 52; *see also id.* at , 103-04 (admitting that paid money to D'Apolito and that Kane paid money to D'Apolito).)

247.     DiBenedetto explained that, on each deal, "D'Apolito would want $1000[.]" (*See* Merin Certif., Ex. L: DiBenedetto Dep. 119.)

**Kellie O'Neill**

248.     O'Neill was intricately involved in the fraudulent scheme and was aware of Kane's involvement. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 205.)

249.     O'Neill was employed as a loan processor at WSI during 1996 and 1997. (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29.)

250.     O'Neill's duties at WSI included "reviewing the documents submitted by mortgage originators and others in support of mortgage loan applications" and "preparing [WSI] loan commitment letters following review of those applications by [WSI's] underwriters. (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29.)

251.    "[T]he commitment letters typically set forth certain conditions which had to be met before a given mortgage loan could close[.]"  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29.)

252.    O'Neill pled guilty to conspiracy to commit wire fraud based on her involvement in the fraudulent scheme at issue here in exchange for an agreement with the Government that it would "not initiate further charges against her regarding fraudulent mortgage loans" and that she would cooperate with the Government.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 11-12, 38.)

253.    O'Neill testified that she knowingly and willfully engaged in all of the fraudulent actions to which she admitted during her allocution.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 31.)

254.    DeMola "on various occasions direct[ed] that mortgage loans which [O'Neill] processed be approved and funded without [WSI] having received a written appraisal.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29.)

255.    "Paul Del Rosso, the underwriting department manager, and other underwriters[,] approve[d] mortgage loan applications even though the loan application documents included items such as pay stubs and I.R.S. forms W-2 which [O'Neill] and they agreed were false or fake-looking[.]  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29-30.)

256.    O'Neill admitted that she, "in 1996, at the request of a person buying and selling real properties, prepare[d] fictitious leases in connection with mortgage loan applications submitted to and later approved by [WSI.]"  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 30.)

257.    The person "buying and selling real properties" who requested that she prepare the fictitious leases was William Kane.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 48.)

-59-

258.    O'Neill further admitted that the "fictitious leases [were] designed to show that the multi-family properties that were the subject of the loan applications were occupied by rent-paying tenants and therefore would generate rental income." (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 30.)

259.    O'Neill testified that she recalled "getting the names out of the phone book." (*See* Merin Certif., Ex. P: O'Neill Second Dep. 22-23; Ex. Z: D'Apolito Second Dep. 67.)

260.    O'Neill admitted that, "in 1996[,] at the request of the same person[, she] prepare[d] escrow letters falsely representing that the attorney named in the letter was holding specific funds in escrow on behalf of the buyer. (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 30.)

261.    O'Neill explained that she prepared the false escrow letter, "because Kane told her that [he] could not get a hold of Stanley Yacker and that Yacker had the money and that Kane just needed the escrow letter put into the file." (*See* Merin Certif., Ex. K: O'Neill First Dep. 50-51.)

262.    At another time, O'Neill and other WSI employees were asked by DeMola to "comb[] through closed files which were shortly to be reviewed by representatives of Greenwich Capital, which funded loans for [WSI], in order to alter some of the documents in those files or to place documents, such as written appraisals, in those files[.]" (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 30-31; *see also* Ex. K: O'Neill First Dep. 56-58, 71-74 (discussing how the file cleaning occurred and what was done).)

263.    O'Neill further admitted to "accept[ing] payments from various mortgage originators and others on a per loan application basis for numerous mortgage loans which [she] processed at [WSI]" in 1996 and 1997. (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 31.)

264.    Kane paid O'Neill per loan. "In the beginning it was like $100 or $150. And then it came a point, I believe, we would give the money directly to D'Apolito, and then he was taking care of her." (*See* Merin Certif., Ex. H: Kane 2007 Dep. 172; Ex. F: Kane 2011 Dep. 53; *id.* at 236 (stating that he paid O'Neill $100 to $200 per deal to help get his loans through); Ex. P: O'Neill Second Dep. 29 (same).)

265.    Kane explained that he paid O'Neill to actually process every loan package: "[O'Neill] got paid on every deal because we had to get our deals put ahead of time, and problems she'd catch, different things. So it was every deal." (*See* Merin Certif., Ex. H: Kane 2007 Dep. 172-73.)

266.    Kane also paid O'Neill extra money for creating fictitious leases. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 236.)

267.    DiBenedetto testified that, on each deal, "Kellie wanted $1000" even though she was just processing the loan. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 118-19.)

**Walsh Securities, as an Entity, Knew of the Scheme & Made it Possible**

268.    WSI's procedures made the fraud possible: "You talk to any appraiser out there in Jersey, say the same thing, Walsh Securities, no money down, no closing costs, no due diligence, and everybody knew about it." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 67.)

269.    Despite this testimony as to the importance of reliable loans for the long-term success of WSI, a report issued by AGS Financial on October 9, 1997: "Walsh established operations by selling loans in the whole loans market. Once Walsh shifted to securitization executions, the underwriting guidelines, due diligence, quality control and post closing reviews provided by the whole loan buyer were eliminated. Walsh has been very slow to develop these functions internally and the quality of mortgage loan underwriting has deteriorated." (*See* Merin

Certif., Ex. FF: Walsh Securities, Inc.: Results of Operational Review, AGS Financial (Oct. 9, 1997) ("Operational Review of WSI") 4.)

270. The report further stated that, "[t]he loan files are characterized by minimal documentation. Often the documentation contained in the file is insufficient to allow for an independent review of the underwriting decision." (*See* Merin Certif., Ex. FF: Operational Review of WSI 4.)

271. WSI conducted review appraisals of loan files, but those review appraisals were never put in the loan files that were given to purchasers; the review appraisals were only kept in WSI's quality control files. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 277-78, 293.)

272. "[T]he easier you made it for people, the better chance of you getting the business, obviously, and . . . that's what Walsh did. They . . . made it easy for the appraisals. They made it easy for the escrow letters. They made the whole process very seamless. So . . . if you had no money and all you had to do is get a corrupt lawyer, . . . you're set with no money down, no closing costs, . . . you can run the table[.]" (*See* Merin Certif., Ex. L: DiBenedetto Dep. 332.)

273. An underwriter at WSI by the name of Acevedo was removed by WSI from the underwriting function on NHF loans, because she was being too strict in requiring that the loans coming from NHF complied with WSI's guidelines. As explained by Kane, "[s]he was making our lives miserable at the time, yes." (*See* Merin Certif., Ex. F: Kane 2011 Dep. 167-68.)

274. WSI was aware of problems with the closing attorneys long before news of the fraud broke. WSI's in-house counsel, Fred Schlesinger, discovered that – around the time that Kane met with DeMola, James Walsh, and Robert Walsh to resolve problems with Greenwich Capital – deeds and mortgages were not being recorded by the closing attorneys, and WSI

-62-

learned of this because the buyers of the loans in the secondary market were asking for documents. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 173-74, 177; *see also id.* at 178-79 (agreeing that WSI's in-house corporate counsel was aware – prior to the publication of newspaper articles in June 1997 uncovering the fraud – that deeds and mortgages were not being recorded).)

275.    Schlesinger "was going crazy on this issue" to the point that Stanley Yacker, one of the closing attorneys involved in the fraud, "was avoiding him[.]" (*See* Merin Certif., Ex. F: Kane 2011 Dep. 174.)

276.    The reason for Schlesinger's concern was that, secondary market purchasers want to have in their possession a series of assignments that show that the mortgage was transferred from NHF to WSI to the secondary market purchaser, but because some transactions did not get recorded by Yacker for six or more months, WSI could not provide these documents to the secondary market purchasers.  For the same reason, WSI could not produce a final title policy to the secondary market.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 175-76.)

277.    Thus, Schlesinger or someone else at WSI was getting dunned from the secondary market as to the whereabouts of the documents.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 177.)

278.    Schlesinger, as a result, reached out to Yacker to determine why WSI did not have recorded documents, and, in the end, money was provided to Yacker or Coastal so that all of the mortgages could be recorded.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 177.)

279.    As a result, between April 7 and 9, 1997, Yacker recorded a large number of previously unrecorded mortgages.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 87-89.)

280.   Further, unrecorded documents should be a red-flag to a mortgage lender, because, until the mortgage is recorded, the lender is at risk of being divested of its mortgage on the property. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 177-78.)

281.   Despite the problems with Yacker's closings being known by WSI, Yacker closed at least one more property for NHF that is involved in this lawsuit after it was discovered that he had not recorded mortgages and he was caused to record the unrecorded mortgages: 206 Sherman Street in Perth Amboy was closed on April 25, 1997. (*See* Merin Certif., Ex. GG: HUD-1 Uniform Settlement Statement, Loan No. 625402 to Cruz and Julio Crespo for 206 Sherman Street, Perth Amboy, NJ (Apr. 25, 1997).)

282.   Furthermore, testimony implicates WSI in the scheme at an early date: "Walsh says that it did not know anything, it's all baloney. . . ." They could not sell the company "because the entire company was cancer from the ground up. 90, 80 percent of their loans, cancer. No more credibility in the marketplace. You cannot go in the marketplace now with all the people circling around." WSI "collapsed because they weren't going to be allowed to do its scheme anymore. Walsh's programs were a precursor for the rest of the scheme. The big scheme was the flipping part where a person could use the proceeds from a mortgage loan to pay the buyer, to put the cart before the horse." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 86-88.)

283.   DiBenedetto testified that he knew that WSI knew the escrow letters were fake and that WSI was giving loans with no money down: "You're funding at the end of the month X amount of loans. $50 million in loans. If [$]20 or $30 million of purchases . . . that is a red flag. The mortgage companies . . . normally have 80 or 85 percent refinance. Maybe 15 percent. Especially on sub-prime. People will not want to put this money down. Especially back then. . . . Maybe 10 percent. Ninety/ten. The second red flag. People will not put down the excess

-64-

money and pay the interest rate. Doesn't make sense. The third red flag, they have underwriters

on staff. They're putting the excess money down and paying the high interest rate and they have

good credit. Like the whole thing doesn't make any sense. To think that Walsh wouldn't have

known . . . – it just wouldn't make sense." He added, "Why would the person with a 700 FICA

score pay 11 percent and put 20 percent down? Doesn't make any sense, right?" (*See* Merin

Certif., Ex. L: DiBenedetto Dep. 226-28.)

284.    WSI's wholesale lender, Greenwich Capital, alerted WSI to a possible fraud, in

January 1997, setting out the facts leading it to believe a fraud was taking place that involved at a

minimum Cristo, Calanni, and Brodo, and concluding that, based on those facts:

> Given the credit history and life style of the borrowers, the fact that
> the deposits with the attorney were never verified as being the
> borrower's own funds (or that the borrowers had any verified
> assets), and the flip nature of the transactions, I believe that there is
> a good chance that these are no down payment purchase
> transactions and possibly are straw buyers used to facilitate very
> large cash back transactions to Cristo Property Management.

(*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter.)

285.    Despite receiving the letter, WSI continued to work with both Cristo Property

Management and appraiser Brodo. (*See*, e.g., Magnanini Certif., Ex. A-65 (Commitment

demonstrates WSI worked with Cristo after January 1997); *See* Merin Certif., Ex. DD: Brodo

Dep.47-48 (Brodo's stopped doing appraisals related to the fraud in April 1997 and did not know

the reason why he stopped).)

286.    WSI also never timely informed Commonwealth of the possible fraud following

receipt of that January 31, 1997; Commonwealth was first notified of the fraud in July 1997,

when it made its insurance claim. (*See, e.g.,* Merin Certif., Ex. HH: Letter from Jeffrey M.

Goodman of Latham & Watkins to Commonwealth Land Title Ins. Co. (July 28, 1997) (notice of

the fraud was first provided in July 1997).)

287.   WSI's first claim to Commonwealth under the Closing Service Letters was dated July 28, 1997, and received by Commonwealth on August 12, 1997. (*See* Merin Certif., Ex. HH: Letter from Jeffrey M. Goodman of Latham & Watkins to Commonwealth Land Title Ins. Co. (July 28, 1997); Ex. I: Robert Walsh Dep. 587:13-19.)

288.   While a small amount of information was exchanged by WSI and Commonwealth, WSI never responded to Commonwealth's September 29, 1997 letter requesting additional information that would permit Commonwealth to "evaluate and respond" to WSI's claim. (*See* Merin Certif., Ex. II: Letter from David R. Kott of McCarter & English to Fred Schlesinger of Walsh (Sept. 29, 1997) ("Sept. 29, 1997 Letter to WSI") 1-2.)

289.   WSI unquestionably received the Sept. 29, 1997 letter, as it produced a copy of that letter in this lawsuit as document number WS2000001280. (*See* Merin Certif., Ex. II: Sept. 29, 1997 Letter to WSI.)

290.   Of particular note, no response was received to the September 29, 1997 letter's request for detailed information "as to each loan" requesting identification of "the name, address and position/title of any employee of [WSI], including but not limited to Robert Walsh, having knowledge of the acts, events and/or circumstances which [WSI] contend[s] gives rise to coverage and the date that the employee acquired the knowledge[.]" (*See* Merin Certif., Ex. II: Sept. 29, 1997 Letter to WSI 1.)

291.   Similarly, no response was received to the September 29, 1997 letter's request for, "[a]s to each loan, identif[ication of] the specific in-house person(s) who reviewed the loans prior to closing with [WSI.]" (*See* Merin Certif., Ex. II: Sept. 29, 1997 Letter to WSI 2.)

## C.   National Home Funding Was Involved in the Scheme

**NHF was the "Real Lender"**

292.   Robert Walsh testified – as WSI's 30(b)(6) witness – that all of the deals with NHF were structured so that it would be NHF that would order the appraisal rather than Walsh. ***This was because NHF was the real lender.*** All of Walsh's participants ordered their own appraisals. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 124.)

293.   All of the closing service letters on the loans at issue in this lawsuit were issued to NHF. (*See e.g.,* Certification of Robert A. Magnanini in Support of Plaintiff's Motion for Partial Summary Judgment, Ex. A (containing copies closing service letters for 62 of 66 loans).)

**Robert Skowrenski, II Worked in Tandem With William Kane, the Scheme's Mastermind**

294.   Robert Skowrenski, II was the owner of National Home Funding. (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 2, 3.)

295.   NHF and Skowrenski were actively involved in the fraudulent scheme. (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 6; Ex. O: D'Apolito First Dep. 53 (Skowrenski "without a doubt" was aware that the scheme in which he was participating was fraudulent); Ex. H: Kane 2007 Dep. 139 (Skowrenski knew "everything that was going on"); Ex. F: Kane 2011 Dep. 194 (same); *id.* at 236 (same).)

296.   Skowrenski "without a doubt" was aware that the leases in the fraudulent transactions were fictional, and Skowrenski was aware of the 60/40 transfers. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 251; Ex. F: Kane 2011 Dep. 238.)

297.   WSI stated that Kane was an employee of NHF. (*See* Merin Certif., Ex. E: Proof of Loss 3 ("**Kane** also is a licensed mortgage solicitor for, and an employee of, NHF" (emphasis in original)).)

-67-

298.     Kane worked for NHF as a solicitor. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 25, 27 (explaining that he worked for NHF instead of just using NHF's services, because that allowed him to eliminate an added fee on each loan to another person at NHF); Ex. F: Kane 2011 Dep. 239.)

299.     Robert Walsh, in his 30(b)(6) deposition, testified that Kane was the "mastermind" of the fraud. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 21.)

300.     Skowrenski provided Kane with the list from which Kane chose the appraisers involved in the scheme. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 240.)

301.     When Kane picked those appraisers, he was doing so in his capacity as an employee of NHF. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 240.)

302.     In its claim to its fidelity insurer for coverage related to the frauds at issue here, WSI stated that NHF and Skowrenski were at the heart of the fraudulent scheme:

> The **RICO Perpetrators** [(defined to include both Skowrenski and NHF)] carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraiser (referred to as the **NHF/Cristo Property Enterprise**"). The **NHF/Cristo Property Enterprise**, was formed to, among other things, turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. These loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. The **RICO Perpetrators** also engaged in a "mini-scam" wherein the value of the property was fraudulently inflated so that the buyer was able to secure a mortgage for 100% of the purchase price of the property. Presumably, this was initially done to create a market by inflating prices in Asbury Park.
>
> The **NHF/Cristo Property Enterprise** relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by **NHF**, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and **NHF**, with the understanding by members of the **NHF/Cristo Property Enterprise** that Walsh Securities would rely on the fraudulent

-68-

> applications in deciding whether to accept mortgage loans
> originated by the **NHF/Cristo Property Enterprise**.  Apart from
> other illicit profits received, **Skowrenski**, through **NHF**, received
> fees from these transactions in excess of one million dollars.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 6 (emphasis in original).)

303.    WSI also stated to its fidelity insurer that NHF was responsible for obtaining

falsely-inflated appraisals and "flipping" properties:

> **Kane**, acting through **Cristo Property and/or NHF**, usually
> purchased distressed properties from the bona fide owner, usually
> for $10,000 to $45,000.  He then had the properties appraised by
> licensed appraisers.  In almost all instances, the property was
> appraised by **Calanni, DiBenedetto, Brown, Brodo** or **Pierson**.
> Such appraisals were in all instances for amounts falsely inflated
> above what the properties were actually worth.  These appraisals
> were for amounts up to eight times the actual value of the
> properties.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 7 (emphasis in original).)

304.    NHF compiled the loan applications and submitted them to WSI, through

D'Apolito, whom it was bribing:

> Mortgage loan applications for borrowers/buyers of the properties
> were then compiled by the **NHF/Cristo Properties Enterprise**
> and submitted, through **D'Apolito**, to Walsh Securities.  **D'Apolito**
> received payments of $100,000.00 from **NHF** and **Kane**, some of
> which was paid directly to **D'Apolito** and some to his newly
> created corporation, **DAP Consulting**.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 7 (emphasis in original); Ex. D:

DeMola Plea 19 (WSI acquired loans from mortgage originators including NHF).)

305.    NHF and Skowrenski paid D'Apolito "in excess of $10,000.00" in bribes as part

of the scheme:

> **D'Apolito** received these mortgage loan applications from **NHF**
> and transmitted or caused them to be transmitted to his employer,
> Walsh Securities, to induce Walsh Securities to finance the
> mortgage loans.  In exchange for transmitting or causing to
> transmit the applications to Walsh Securities, **D'Apolito**, through

> **DAP Consulting**, received cash payments totaling at least
> $90,000.00 from **Kane**, through **Cristo Property**, and received
> cash payments in excess of $10,000.00 from **Skowrenski**, through
> **NHF**. The payments were designed to, and did, corrupt
> **D'Apolito**, to place him in a conflict of interest and cause him to
> breach his obligations to Walsh Securities. The payments from
> **NHF** and **Cristo Property** to **D'Apolito** were unknown by, and
> not disclosed to, Walsh Securities.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 9 (emphasis in original); Ex. F: Kane 2011 Dep. 235.)

306.    Kane paid Skowrenski a half a point for any loans that Kane brought to him, which was unethical. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 52.)

307.    Specifically, the payment arrangement between Skowrenski and Kane was that "Skowrenski was getting paid from Kane a half a point out of the proceeds on every loan besides what Skowrenski made on the loans." "If there was a $100,000 loan, he was getting $500. If it was a $200,000 loan he would get paid cash a thousand dollars. However amount of loans – he would do all the paperwork and everything would come in from Kane. Then [Skowrenski] would take all the paperwork and put it all together in the package the way it needed to be." "To go to Walsh. He would either FedEx them. Or if I was heading up there that day, he would give them to me and I would bring up the loans and give them to Kellie O'Neill, who was the processor for National Home Funding working for Walsh. They had processors and they had underwriters. So the processors worked directly with the mortgage companies telling them what paperwork they had, what paperwork they needed, what was missing or if it was a full package and it went to Underwriting." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 51-52; *id.* at 129 (stating that Skowrenski got a half point plus NHF charged three points on every loan, and Skowrenski called this "the price of doing business").)

308.   Skowrenski and Kane worked together.  D'Apolito explained – using an example – how their payment arrangement worked:

> You're an attorney.  You have an escrow account.  That money gets funded into your escrow account.  On the closing documents it says who gets the money.
>
> Well, it has to fund through the mortgage company.  So like the points, all that stuff, those fees – that would get paid to the mortgage company.  The money that would go to Kane would be the house that they bought from Cristo Property Management.
>
> So the fees that [Skowrenski] charged all went to him.  Then he would pay back [Kane] whatever fees that [Kane] wanted.  It was an agreement that they had.  Like the appraisal fee went back to [Kane].  So[Skowrenski] would give [Kane] a check . . . for that fee.  But all the points [Skowrenski] would keep and the half a point that [Kane] was paying him would all come out of the fees that [Skowrenski] got.
>
> [D'Apolito] believe[s] if there were three points charged in every loan, because that is how [Kane] had it, he was letting [Skowrenski] keep a half point of that" . . . "three.  Then there were points on the back end because they up-sold the rates.
>
> So [Skowrenski] was making a half point from [Kane] and then [Skowrenski] was making the back end points that came from [WSI] because . . . the rate was supposed to be seven percent or eight percent and they took it to ten percent.
>
> So [Skowrenski] wasn't dumb.  He was getting money.  He wasn't being a glutton.  [Kane's] money out of the points he got back minus the half and the back end points he was paying the 2,000 and stuff like that.  So this way nobody took money out of their pockets.  It all really came from [WSI].

(*See* Merin Certif., Ex. O: D'Apolito First Dep. 158-59.)

309.   Kane explained that, "[t]he bank paid a commission to [NHF] based on the rate of the mortgage."  Thus, the higher the interest rate, the more money would be paid to NHF.  That commission "went to [NHF.]  [Skowrenski] took a piece of it, D'Apolito took a piece of it, and then [Kane] got the balance."  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 51.)

310. Kane's compensation to Skowrenski resulted in Skowrenski probably making over a million dollars from doing Kane's loans. (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 48.)

311. Skowrenski and/or NHF paid D'Apolito $300 per loan. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 184.)

312. Cash payments of $2,000.00 were made to every borrower, and some were made at the NHF office. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 98-99.)

313. Skowrenski or Kane actually put together each fraudulent loan package that was then forwarded to WSI. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 104.)

314. Kane explained that, as to his business dealings with WSI, he worked for NHF. He or one of his people would identify a house and go to contract on it. They would then call Grieser or another gentleman that worked for Grieser at the time named Mr. Cuzzi, and Cuzzi would bring in a straw buyer, they would process the paperwork for the straw buyer, and they would then bring the paperwork to WSI to get the loan done. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 62.)

315. Skowrenski purged NHF's files after the Monmouth County Prosecutor served Walsh with a subpoena, but before it served Skowrenski or NHF. Namely, in Skowrenski's Freehold office, Skowrenski, Kane, D'Apolito, "his girlfriend, his girlfriend's sister and another gentleman that [Skowrenski] had working for him," purged the files, "going through file by file, pulling papers out, putting them in the shredder. And then they moved all the files out of the office." (*See* Merin Certif., Ex. H: Kane 2007 Dep. 140-41; Ex. F: Kane 2011 Dep. 239.)

**William Kane**

316.   Kane was at the heart of the fraudulent scheme.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 1-13 (explaining the scheme and detailing Kane's involvement).)

317.   Kane was an employee of NHF.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 3.)

318.   Kane engaged in his fraudulent acts through NHF:

> **Kane**, acting through **Cristo Property and/or NHF**, usually purchased distressed properties from the bona fide owner, usually for $10,000 to $45,000.  He then had the properties appraised by licensed appraisers.  In almost all instances, the property was appraised by **Calanni, DiBenedetto, Brown, Brodo** or **Pierson**.  Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth.  These appraisals were for amounts up to eight times the actual value of the properties.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 7 (emphasis in original).)

319.   Kane received money from the proceeds of each loan.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 137.)

320.   Skowrenski paid Kane the difference between what Skowrenski charged and what was charged to the borrower or the back end that came back on the rate.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 30.)

321.   Kane paid D'Apolito – a WSI employee – "at least $90,000.00" to participate in the fraudulent scheme.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 9; Ex. F: Kane 2011 Dep. 235.)

322.   Kane also paid Kellie O'Neill – a WSI employee – for her "assistance in facilitating the processing of loans on [] properties [involved in the scheme] and in creating false documents to further the loan applications[.]"  (*See* Merin Certif., Ex. JJ: Plea, *United States v. Kane* (June 14, 2002) ("Kane Guilty Plea") 22.)

323.    Kane also "agree[d] and act[ed] with one or more principals and officers of Walsh Securities to falsify documents in connection with loans and to conceal the true conditions of properties from representatives of Walsh's warehouse credit facility, among other activities[.]" (*See* Merin Certif., Ex. JJ: Kane Guilty Plea 22.)

324.    Kane also acted with the attorneys Richard Pepsny and Stanley Yacker to carry out the fraud.  (*See* Merin Certif., Ex. JJ: Kane Guilty Plea 20-21.)

## D.    Walsh Securities Benefitted from the Fraudulent Scheme

325.    Walsh benefitted from continuing to fund the fraudulent loans even after discovering that the loans were fraudulent:

> Q.    And the benefit to Walsh of doing this is that it would have increased loans that it could make more money on; correct?
>
> A.    Correct.
>
> Q.    Because he could sell those increased number of loans on the secondary market; correct?
>
> A.    Correct.
>
> Q.    And by "secondary market," you mean people like underwriters who package at a securitization for people who just buy single loans; correct?
>
> A.    I believe so, yes, sir.

(*See* Merin Certif., Ex. F: Kane 2011 Dep. 230.)

326.    The fraudulent scheme was going to help Walsh because of "greed." "All [DeMola] had to do was cross from here to here . . . and she made the decision to step over the line.  As soon as she stepped over the line, they got tremendous riches and wealth. . . .  They got the loan and got the chance to sell the company for a gigantic amount of money." This was possible, because "[s]ub-prime is now different."  At the present time sub-prime is 10-15% of the market but back then it was 2%.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 244.)

-74-

327.    WSI was not a long-term venture.  For almost the entirety of WSI's existence, its sale was contemplated: Robert Walsh had started thinking about selling WSI within two months of acquiring WSI.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 125-26.)

328.    The RBMG merger was going to be a financial windfall for WSI's shareholders. (*See, e.g.,* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997); Ex. D: DeMola Plea 18.)

329.    WSI made an attractive merger candidate for RBMG – it was a strategic fit and WSI was making a lot of money.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 126.)

330.    The "profitability of the loans that [DeMola] was putting on the books was something that would have been attractive to RBMG.  Number of loans is meaningless.  Doing $96 million or $98 million a month was meaningless.  It is how much money you were producing.  That was really what it was all about."  "In terms of money you were producing on a mortgage loan as long as it's current that's considered profitable."  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 126-27.)

331.    WSI was profitable; it was selling loans, acquiring loans, controlling expenses. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 324.)

332.    Specifically, WSI was profitable for two reasons, the first being "the whole loan sale . . . to people like The Money Store.  Walsh had a weighted average price that it paid the participants of 101 and Walsh would be selling the loan to The Money Store between 105 and 106.  Walsh sold The Money Store approximately $200 million so that was roughly eight to $10 million profitability on loans sold to The Money Store."  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 349.)

333.    WSI made its money on the sale of a loan, ***and the subsequent nonperformance of that loan did not affect the profit that Walsh made on the sale of that loan as an individual loan***. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 350 (emphasis added).)

334.    In whole loan sales, the performance of the loan only indirectly impacted profitability in the long term, because if the WSI loans did not perform, The Money Store (for example) would stop buying loans from WSI: "[i]f [WSI]'s performance was bad, The Money Store would have cut [WSI] off.  [WSI] would not have been able to do business with them. There would have been no profitability associated with The Money Store." (*See* Merin Certif., Ex. I: Robert Walsh Dep. 349-50.)

335.    A secondary market purchaser would have an expectation that approximately one and a half percent of the loans might be bad or fraudulent, so the secondary purchaser would not necessarily conclude that WSI was acting improperly if one and a half percent of the loans came in and were a problem. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 350-51.)

336.    WSI was also profitable due to the money it made in securities. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 351.)

337.    Robert Walsh, at his 30(b)(6) deposition, explained how Walsh made its money in securities:

> The basis in [the WSI] loans is still 101.  [WSI] has the option of selling it as whole loans and getting cash consideration of between 105 and 106.
>
> So for purposes of this demonstration, why don't we use 105 to make it simple.
>
> [WSI] ha[s] a universe of loans, and let's stick with $100 million to make it again simple[.]

*        *        *

[WSI] ha[d] two choices: [it] can sell those loans and make $4 million in cash, pass on the risk of the performance to somebody else. Or [WSI] can retain that risk and put [its] capital at risk on the performance of those loans.

If the loans do not perform [WSI] [is] going to lose money, and [WSI] is going to lose a substantial amount of money.

If the loans perform accordingly the way [WSI] anticipate[s] them to perform, [WSI will] make more money than selling as a whole loan.

The hundred million worth of loans [WSI] sell[s] into its trust. The trust then has an underwriter, and let's just use DLJ as an example.

*       *       *

[DLJ] did security 9711 and 972 [and DLJ is Donaldson, Lufkin and Jenrette.]

The $1 million would be identified by [WSI] as going into the security.

DLJ would sign an underwriting agreement with [WSI].

DLJ would come in and review the hundred million dollars to make sure it understood the characteristics because they were going to sell the bonds.

They would do a complete underwrite on the hundred million dollars to make sure they met the quality of the characteristics of the rating agency.

They would do a 20 percent sampling on the appraisals.

They were then satisfied, they would present it to Standard and Poor's . . . .

S&P would put it through the S&P model based upon the characteristic of the loan. They would state [] how many of the bonds would be sold for double A, which obviously is a more attractive rate for Walsh to be selling the loan at.

They would break out the components to a single A and they would go down to a triple B, all investment grade quality.

> A small slither of the bonds would become double B and that would be the formation of the security.
>
> Now, on the hundred million dollars worth of securities that are now being sold, the proceeds of all this translates into 98 cents on the dollar that [WSI] is going to receive.
>
> So [WSI] had the option of making $4 million in cash by selling to The Money Store on the low side, or taking 98 cents and having a negative $3 million by doing a security.
>
> There is a $7 million swing between doing a whole loan sale and a security.

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 351-54.)

      338.    Robert Walsh went on to explain that the 98 percent he referred to was on the face value of the loan.  He added, regarding the IO,

> Now [WSI's] residual on this hundred million dollars on an economic basis, cash, has got $7 million for cash associated into the security on $100 million of seven percent.
>
> So [WSI] has to feel very, very comfortable about the performance of the security or Walsh is not going to do that.  We are going to take the cash.
>
> [WSI] now owns something called the residual piece of the security as well as something called an IO piece of the security.
>
> Let's deal with the IO piece first that's a simpler piece to understand.
>
> If the security holders are looking to receive a seven percent coupon, weighted average, to all investors, and the average coupon on the portfolio is ten percent, there is 300 basis points annualized of availability of [] excess interest on these particular loans.
>
> The servicer who is going to service these loans in this particular case is Temple Inland.  That's all they do for a living, is service loans, and they do it very efficiently.  [WSI] has to pay them 50 basis points to service those loans.
>
> We now have Bankers Trust, which is the trustee.  They are now going to charge us 20 basis points to be the master trustee.

Now we are down to 230 basis points of the interest only
component. [WSI] get[s] to keep that, so on [WSI's] side of the
equation, 230 basis points annualized of the loan in a portfolio.

[If there is a bad loan Walsh does not get that interest.] That bad
loan goes away. [WSI] [does not] get that interest. This is only on
the IO right now. [WSI] [does not] get that. [WSI] only get[s]
paid on the IO if the interest and principal is paid by the borrower.

It is really a huge incentive for [WSI] to be putting loans into the
security that [WSI] know[s] are going to perform, or [WSI] feel[s]
very strongly are going to perform.

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 354-55.)

339.   Addressing the residual, Robert Walsh explained,

The residual piece [WSI] own[s]. The residual can be extremely
valuable, and that is why people are into securities.

Now all the value of what's going to happen in the future lies with
the residual. If any of the loans are in default and there are losses,
unfortunately, the residual is the first piece that takes the loss.

So if you have a universe of $100 million which is spread over a
vast amount of loans – that's why you are diversifying your risk by
going into different states, the losses that are taking place go first
to the residual loans.

Any fraud that takes place goes to the residual holder. Any of the
particular losses within the security is going to the residual holder.

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 356.)

340.   As for the profits made, Robert Walsh went on to explain,

Now lets go back to the IO portion for a second. The IO portion is
subordinated against all of the securities of top. They are going to
be the last to get compensated.

The IO does not get any cash until there is a five percent built-in or
$5 million cushion against the entire security.

[WSI] ha[d] already put in $2 million, which was the 98 percent.
[WSI] have $2 million in something called the over
collateralization account.

Now we have to build up $3 million, which we are building up rapidly because of the IO portion.

So what we are able to do on this structure, which is GAAP, [] we are able to present value the future value stream of the income that we are going to be getting less an assumption of losses associated with [WSI's] overall hundred million dollars and come up with a net present value and allowed to book that for accounting purposes.

On average, [WSI was] allowed to book about a 107 price on [its] loans, [] based on those calculations. So [WSI] w[as] able to book a 107 price and that's part of [WSI's] profitability.

On this part of the transaction, for book purposes [WSI] w[as] able to book $6 million in gain on sale.

[WSI] ha[s] the gain on sale in cash and [it] ha[s] the gain on sale of securities.

Now [WSI] ha[s] to monitor on a quarterly basis the residual performance. [] [I]f the residual performance is doing well, [WSI] [is] able to take in a portion of that IO back into income, because [WSI] [is] building up [the] over collateralization account quickly.

If the performance is bad, [WSI] ha[s] to write down [its] residual because the loss assumption is wrong.

So that is how [WSI] make[s] money. That is how on a quarterly basis profitability is reported[.]

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 356-58.)

341.    The ultimate plan was to get a lot of mortgages in and then sell the company (As opposed to securitize the mortgages) before the mortgages became a problem. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 38-39.)

**E.    National Home Funding Benefitted from the Fraudulent Scheme**

342.    NHF benefited from Kane's employment and the fraudulent loans due to the volume of loans: "Skowrenski was generating in volume and Skowrenski's company could show that they were doing big numbers." (*See* Merin Certif., Ex. H: Kane 2007 Dep. 28.)

343.    Kane originated more of the NHF loans that were sold to WSI than anyone else at NHF.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 240; Ex. J: Skowrenski Dep. 38 (Kane was a big producer for NHF).)

344.    "The advantage to NHF showing big numbers is you can get different banks.  You can go to different banks when you do certain volume."  Kane stated that he believes "at one point Skowrenski had talked about being a national wholesaler himself where you would get more back end money from the banks and they would pay you."  (*See* Merin Certif., Ex. H: Kane 2007  Dep. 28.)

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

Attorneys for Defendant
   Commonwealth Land Title
   Insurance Company


By:    *s/David R. Kott*
       David R. Kott
       A Member of the Firm

Dated:  December 23, 2011

ME1 12641821v.1