# Exhibit A

Reed SmithRSSI At 07/26/02 10:19:38 AM Page 5

 **WALSH SECURITIES**

4 CAMPUS DRIVE, PARSIPPANY, NEW JERSEY 07054
PHONE (201) 538-9500 • FAX (201) 858-7968

Robert C. Walsh
*President and CEO*

CC: *Sheldon*
*Bill by*
*Jay L*

July 3, 1997

Mr. Champ Meyercord
Greenwich Capital Markets
600 Steamboat Road
Greenwich, CT 06830

Dear Champ:

Recent articles in the Asbury Park Press indicate that there may be irregularities in a number of transactions in Asbury Park area real estate properties on which Walsh Securities holds mortgages. These transactions appear to involve approximately 73 properties, and were originated by one correspondent broker.

In response to these articles, Walsh Securities has begun a comprehensive review of all loans originated by the correspondent broker to verify their characteristics, and to determine possible loss exposure. We believe that the loans identified in the articles were all originated from this single correspondent, and that any loss exposure is isolated to loans purchased from that correspondent. Furthermore, the loans described in the articles comprise approximately 40% of the 202 loans originated by the correspondent with $21.7 million in gross loan amounts. Although the article does not allege problems with most of the loans originated by the correspondent, we believe that it is prudent to review all 202 loans originated from that correspondent during the period that ranges from June 1996 to May 1997.

Accordingly, a team of Walsh employees and outside consults, including the national accounting firm Deloitte and Touche, has begun to review each of the 202 loans to determine their individual characteristics and the susceptibility to loss. Walsh has also engaged Michael Chertoff, Esq. of the firm of Latham & Watkins to conduct an internal investigation. At the time the mortgages were originated, the borrowers appeared credit worthy based on the financial information presented, and the loans were supported by valuation appraisals performed by state licensed real estate appraisers. Nevertheless, we have ordered new independent appraisals on each of the properties, to be performed by an appraisal firm that has no previous connections to the underlying transactions. These appraisals will verify the value of the properties on which the loans were made.

001



Read SmithRSSN At 07/26/02 10:19:38 AM Page 6



This loss mitigation team will also consider what legal procedures should be undertaken to protect our interests in the loans and underlying properties.

Walsh Securities is pledged to mitigate any potential losses in cooperation with Temple-Inland Mortgage, the Loan Servicer of record. Our Management intends to act promptly to:

- Notify all legally liable borrowers;
- Move to obtain the appointment of a Receiver of Rents;
- Assess the true market value of each property;
- Secure and insure each property as needed
- Determine appropriate levels of loan loss reserves to be carried by Walsh Securities;
- Determine, with counsel, all available avenues of recovery.

Going forward, we have taken steps to tighten our underwriting procedures and quality control, and have adopted directives designed to avoid a recurrence of the type of problem described in the news articles.

Walsh Securities has voluntarily taken an unallocated reserve in the second quarter of approximately 5 million dollars, based upon the facts available to us at this time.

We also intend to cooperate fully with, and seek the assistance of, law enforcement authorities who are reviewing the underlying transactions. We are distressed that we may have been unwittingly victimized by a fraud; if we have, we are determined to take whatever measures are necessary to obtain recompense.

Finally, we have also undertaken an in-depth review of certain loans in Providence, Rhode Island, which are described by the Asbury Park Press news articles. These loans relate to properties which were evidently purchased and resold at widely disparate prices. The approximately 60 loans in question total $4.5 million in gross loan amount. Based on an early review of several loan files, it appears that these were properties that were rehabilitated, and that appraisals supporting the value and the rehabilitation had been secured. The preliminary review suggests that these loans do not share the same characteristics as the New Jersey loans described in the news articles, but we will continue to conduct our in-depth verification.

Walsh Securities is a national secondary market purchaser, and the 202 mortgage loans originated by the correspondent we are examining represent approximately 2% of the total mortgage loans purchased and originated by Walsh Securities during this period.

002



We are committed to resolving this issue in a manner that reflects our sense of responsibility to our business associates and the communities in which we operate. Walsh Securities stands behind the bonds which it has issued. Attached is a schedule identifying the bonds and the loans distribution among the bonds.

We will provide you with additional information as it becomes available.

Sincerely,

Robert C. Walsh

003

Reed SmithRSSM At 07/26/02 10:19:38 AM Page 8

## NHF - statistics

- total of 202 loans, for a total original balance of $21,703,075
- average original balance of $107,441
- average appraised value at origination of $143,950
- 81 NIV's, with a total original balance of $7,883,650
- weighted average original note rate of 12.223%
- weighted average seasoning of 10 months
- all loans have been sold, none are inventory

## Credit Grade breakout

| | | |
|---|---|---|
| A | 6 loans | $823,250 |
| A- | 185 loans | $19,822,825 |
| B | 6 loans | $535,500 |
| B- | 5 loans | $521,500 |

## Investor concentration:

| | | |
|---|---|---|
| 97-4 | 45 loans | $4,431,000 |
| 97-3 | 12 loans | $1,395,975 |
| 97-2 | 34 loans | $3,391,850 |
| 97-1 | 51 loans | $5,754,875 |
| 96-1 | 18 loans | $2,197,750 |
| wholeloan sale1 | 25 loans | $2,575,250 |
| wholeloan sale2 | 17 loans | $1,954,575 |

## County concentration

| | | |
|---|---|---|
| Essex | 9 loans | $828,350 |
| Hudson | 23 loans | $2,244,700 |
| Mercer | 1 loan | $56,250 |
| Middlesex | 3 loans | $314,050 |
| Monmouth | 128 loans | $14,299,125 |
| Ocean | 5 loans | $571,350 |
| Passaic | 3 loans | $283,800 |
| Union | 18 loans | $1,801,200 |
| Unknown | 12 loans | $1,304,250 |

eed SmithRSSM At 07/26/02 10:19:38 AM Page 9

SEN* BY:                        7-10-97 ;  13:01 ;      Walsh Securities•          203 628 3650:# 2/ 3



**WALSH SECURITIES**

# MEMORANDUM

Date:          July 10, 1997

To:            Distribution

From:          Robert C. Walsh

Subject:       UPDATE STATUS OF INTERNAL REVIEW

This memo is intended to keep you abreast of developments with regard to Walsh Securities' internal review of loans made over the past year in and around Asbury Park, New Jersey that were or may have been fraudulent.

On July 3, 1997, Michael Chertoff, Esq. of Latham & Watkins began his internal investigation and as of Monday, July 6, 1997 both he, members of his firm and the firm of Deloitte & Touche have been on site in pursuit of the investigation.

As part of our ongoing investigation, the Company and the Investigative Team have identified and suspended an account executive of the Company for actions taken in connection with his involvement in the properties purchased by Cristo Properties and resold to the Company's borrowers at inflated prices.  This account executive has been cooperative to date with the investigation and has not implicated any of the Company's loan correspondents other than National Home Funding.  The Investigative Team is continuing its in-depth review of all 389 loans originated by National Home Funding and has identified an additional 27 loans having characteristics similar to the 202 loans initially identified by the Company as being Cristo Properties transactions.

The Company's intention is to repurchase all loans it identifies as being part of the Cristo Properties transactions, whether currently performing or not, included in all securitizations and whole loan sales to date.  The process of complete identification of this universe of loans is underway through the involvement of Deloitte & Touche and is proceeding as expeditiously as possible.  The Company has been advised by counsel to complete its investigation prior to commencing a repurchase transaction.  The Company anticipates collateralizing the financing to complete the repurchase with its residual interests in the securitization transactions, having a loss adjusted value of approximately $70 million.  The Company appreciates the urgency of completing the repurchase transaction as quickly as possible and is moving aggressively in this regard.

In addition to pursuing the investigation of those loans and parties involved in the Cristo Properties transactions, the Company and the Investigative Team are identifying those persons and entities that have played a roll in the fraudulent transactions for purposes of commencing proceedings to recover damages against these parties.  In this regard, the Company has made a demand to National Home Funding to repurchase the subject loans in accordance with the terms of the loan purchase agreement between the Company and National Home Funding.

2305

Reed SmithRSSM At 07/26/02 10:19:56 AM Page 10



**WALSH SECURITIES**

The Company has also reviewed its 1,882 active correspondents (which have produced $1.6 billion dollars of loans) in an effort to identify any of these correspondents who have originated, since the inception of their relationship with Walsh, more than $2,000,000 of non-owner occupied investment property (a characteristic of the loans under investigation). Management has identified 5 correspondents in this category and begun to review these loans to see if any of the other characteristics applied such as: a recent unexplainable resale at higher price, a high concentration in specific zip codes, a single management company for the loans. This universe includes the loans previously described by us in Providence, R.I. and Management's preliminarily findings are that these loans do not possess similar characteristics.

We will continue to analyze our entire production based upon these characteristics to determine if any further loan exposure exists.

The Company is committed in its resolve to complete its pending investigation as comprehensively and quickly as possible and to repurchase from its securitization and whole loan sales those loans which were or may have been fraudulent. During this process, the Company will maintain contact with investors in its securitizations as to the progress of the investigation and work with the rating agencies to address any concerns they may have.

2306

Reed Smith RSSM At 07/26/02 10:19:36 AM Page 11



# WALSH SECURITIES

4 CAMPUS DRIVE, PARSIPPANY, NEW JERSEY 07054
PHONE (201) 538-9300 • FAX (201) 538-7968

Robert C. Walsh
*President and CEO*

TO:         Champ Meyercord - Greenwich

FROM:       Robert C. Walsh, President

DATE:       July 24, 1997

SUBJECT:    Current status of internal and independent reviews

The purpose of this release is to provide an update to interested parties concerning Walsh Securities' efforts to ensure that the recent fraudulent actions perpetrated on Walsh Securities were isolated and that Walsh Securities is taking steps to ensure that all fraudulent loans are repurchased with no loss to investors.

Walsh Securities is in the process of engaging an investment banking firm as advisor to assist in the following:

-Secure financing for Walsh's repurchase of the loans identified as being part of any fraudulent transaction, whether currently performing or delinquent. The company appreciates the importance of completing this repurchase and anticipates that the repurchase (including reimbursement to investors of any premiums paid) will be completed by August 25, 1997. The affected securities are Walsh 1996-1, 1997-1, 1997-2, 1997-3 and 1997-4.

-The banker will advise Walsh on the formation and structure of Walsh's next mortgage backed security issue.

-The banker and Walsh will be working with the rating agencies and insurers on this new issue, as well as to reaffirm ratings on all outstanding securities.

-Finally, the banker will coordinate the engagement of a third party that will independently re-underwrite 100% of the mortgages which will be the collateral for this new issue.

The proposed merger with Resource Bancshares Mortgage Grup, Inc. remains on track pending the outcome of the internal investigation. Equally important, all existing warehouse facilities to Walsh Securities remain in place. Additional warehouse facilities

6656



Reed SmithRSM At 07/26/02-10:19:36 AM Page 12



have been negotiated to provide liquidity for anticipated production growth.

In our July 3, 1997 correspondence, Walsh announced the hiring of Michael Chertoff, former US Attorney for New Jersey, and his firm, Latham and Watkins, to conduct an internal investigation. The firm immediately hired Deloitte and Touche to review Walsh's policies and practices, as well as each loan that was, or potentially may have been, included in this scheme. Independently, a team of Walsh employees is also conducting a comprehensive internal review of policies and procedures.

Mr. Chertoff expects Deloitte to substantially complete its review by August 8th. In the interim, his firm has taken a variety of actions on Walsh's behalf, including exploration of possible recovery avenues and providing recommendations on improving and enhancing Walsh's origination process.

On July 17, 1997, Latham and Watkins filed suit on behalf of Walsh Securities against a variety of individuals and companies that allegedly conspired to defraud Walsh. In that regard, Mr. Chertoff stated that "Although our investigation is not complete and we are continuing the process, we have identified certain persons and entities against which Walsh has filed suit in Federal District Court in Newark, NJ, alleging, among other things, federal RICO violations."

In that original July 3rd correspondence, Walsh noted certain actions that it intended to act on promptly. Since then, Walsh has taken the following steps:

1. Temple-Inland Mortgage, as servicer of record, has notified all legally liable borrowers of the intent to accelerate the notes and foreclose on the subject properties due to the borrower's default of the loan terms.

2. Temple Inland's New Jersey foreclosure counsel, Laventhal and Horvath, is moving forward the legal process allowing the appointment of a rent receiver on the properties.

3. Separate from the efforts of Latham and Watkins, Walsh has hired an independent property management to do a collateral review and evaluation, including full, independent appraisals to determine minimum and maximum recovery potentials. This review should be completed by August 1, 1997. The property manager will also provide property maintenance services as needed.

4. Temple-Inland is confirming that each property is appropriately insured against fire damage.

5. The company has, where appropriate, notified certain Errors and Omissions and Fidelity Bond carriers of potential claims against lawyers, title companies and closing agents involved in the subject transactions.

6657

eed SmithRSSM At 07/26/02 10:19:36 AM Page 13



6.  Walsh has pledged to cooperate and work with municipalities, as well as individual borrowers, to mitigate any potential losses.

Although ongoing, the scope of the investigations is exhaustive. Thus far we believe these fraudulent loan practices to be isolated to a core of central players that are named in our July 17, 1997 lawsuit (attached). We will continue with our review and disseminate any new information. Walsh believes the potential recovery from sources other than property liquidation (insurance recoveries, rent receipts and borrower recoveries) is substantial.

While the recent activities have required the attention of our senior staff, we have not lost our focus on our core business; production to date remains brisk. We believe that the events of the past few weeks and the results over the next several weeks will make Walsh Securities a better and stronger company.

6659

# Exhibit B

# Morningstar® Document Research℠

# FORM S-4

## RESOURCE BANCSHARES MORTGAGE GROUP INC - RBMG

**Filed: June 13, 1997 (period: )**

Registration of securities issued in business combination transactions

164

WSI COMMON STOCK OWNERSHIP BY MANAGEMENT
AND PRINCIPAL STOCKHOLDERS

The following table sets forth certain information known to WSI with
respect to beneficial ownership of the WSI Class A Common Stock as of May 31,
1997, by (i) each stockholder who is known by WSI to own beneficially more than
5% of the WSI Class A Common Stock; (ii) the Chief Executive Officer and the
three other executive officers of WSI; (iii) each director; and (iv) all
executive officers and directors of WSI as a group.

AMOUNT AND NATURE OF BENEFICIAL OWNERSHIP

| BENEFICIAL OWNERS | NUMBER OF SHARES OF WSI CLASS A COMMON STOCK | PERCENT OF TOTAL WSI CLASS A COMMON STOCK OUTSTANDING PRIOR TO THE WSI MERGER(1) | SHARES OF RBMG COMMON STOCK BENEFICIALLY OWNED AFTER THE WSI MERGER |
|---|---|---|---|
| Robert C. Walsh............<br>c/o Walsh Holding Co., Inc.<br>4 Campus Drive<br>Parsippany, New Jersey<br>07054 | 49.56 | 49.56% | 9,645,714 |
| Greenwich Capital Financial Products, Inc.(3)..........<br>600 Steamboat Road<br>Greenwich, Connecticut<br>06830 | 24.99(3) | 24.99 | 4,863,729 |
| Melissa C. Walsh............<br>1996 Trust<br>c/o Walsh Holding Co., Inc.<br>4 Campus Drive<br>Parsippany, New Jersey<br>07054 | 5 | 6.67 | 973,135 |
| Stephanie E. Walsh...........<br>1996 Trust<br>c/o Walsh Holding Co., Inc.<br>4 Campus Drive<br>Parsippany, New Jersey<br>07054 | 5 | 6.67 | 973,135 |
| James Walsh.................<br>c/o Walsh Holding Co., Inc.<br>4 Campus Drive<br>Parsippany, New Jersey<br>07054 | 5 | 6.67 | 973,135 |
| Elizabeth Ann Demola.........<br>c/o Walsh Holding Co., Inc.<br>4 Campus Drive<br>Parsippany, New Jersey<br>07054 | 5 | 6.67 | 973,135 |
| Arnold Cohn.................<br>All directors and executive officers as a group (4 persons)................. | .5<br><br>70.06 | *<br><br>93.4 | 97,314<br><br>13,635,568 |

AMOUNT AND NATURE OF BENEFICIAL OWNERSHIP

| BENEFICIAL OWNERS | PERCENT OF TOTAL RBMG COMMON STOCK OUTSTANDING AFTER THE WSI MERGER(2) | SHARES OF RBMG COMMON STOCK OUTSTANDING AFTER THE WSI MERGER AND THE RBC MERGER | PERCENT OF RBMG COMMON STOCK OUTSTANDING AFTER THE WSI MERGER AND THE RBC MERGER |
|---|---|---|---|
| Robert C. Walsh.............<br>c/o Walsh Holding Co., Inc.<br>4 Campus Drive | 24.29% | 10,598,158 | 24.29% |

|  |  |  |  |
|---|---|---|---|
| Parsippany, New Jersey 07054 |  |  |  |
| Greenwich Capital Financial Products, Inc.(3)......... | 12.25 | 5,343,987 | 12.25% |
| 600 Steamboat Road Greenwich, Connecticut 06830 |  |  |  |
| Melissa C. Walsh............ | 2.5 | 1,069,225 | 2.5% |
| 1996 Trust c/o Walsh Holding Co., Inc. 4 Campus Drive Parsippany, New Jersey 07054 |  |  |  |
| Stephanie E. Walsh.......... | 2.5 | 1,069,225 | 2.5% |
| 1996 Trust c/o Walsh Holding Co., Inc. 4 Campus Drive Parsippany, New Jersey 07054 |  |  |  |
| James Walsh................. | 2.5 | 1,069,225 | 2.5% |
| c/o Walsh Holding Co., Inc. 4 Campus Drive Parsippany, New Jersey 07054 |  |  |  |
| Elizabeth Ann Demola........ | 2.5 | 1,069,225 | 2.5% |
| c/o Walsh Holding Co., Inc. 4 Campus Drive Parsippany, New Jersey 07054 |  |  |  |
| Arnold Cohn................. | * | 106,923 | *% |
| All directors and executive officers as a group (4 persons).................. | 34.33 | 14,981,981 | 34.33% |

- --------------

* Less than one percent.

(1) Based on an aggregate of 75 shares of WSI Class A Common Stock issued and outstanding as of May 31, 1997, plus, for Greenwich, 24.99 shares of WSI Class A Common Stock issuable upon conversion of the WSI Class B Common Stock issuable upon exercise of the WSI Warrant. The WSI Class B Common Stock is convertible into WSI Class A Common Stock on a one-for-one basis.

(2) Assumes that the WSI Warrant is exercised prior to the WSI Effective Time and that Greenwich receives shares of RBMG Common Stock.

(3) Includes 24.99 shares of WSI Class A Common Stock issuable upon conversion of shares of WSI Class B Common Stock issuable upon the exercise of the WSI Warrant.

145

165

### DIRECTORS AND EXECUTIVE OFFICERS

The following information is presented with respect to individuals other than current directors and executive officers of RBMG who will serve as directors or executive officers of RBMG effective as of the WSI Effective Time.

| NAME | AGE | POSITION |
| ---- | --- | -------- |
| Robert C. Walsh.................... | 45 | President and Director of RBMG; Chairman of the Board; President and Chief Executive Officer of WSI |
| James Walsh....................... | 47 | Director of RBMG; Vice President, Director of Underwriting and Operations of WSI |
| John J. Oberdorf.................. | 50 | Director |
| William Biggs..................... | 60 | Director |

ROBERT C. WALSH.  Robert C. Walsh has been Chairman of the Board, President and Chief Executive Officer of WSI since its formation in April 1996. He had been Managing Director of GF Mortgage Corp. (predecessor of Walsh Securities, Inc.) and the Walsh Securities Division of Gruntal & Co. since 1991 and was instrumental in founding and organizing the current residential, non-conforming mortgage loan operations of WSI. From 1984 to 1991, Robert C. Walsh served in various senior management positions at Carteret Savings Bank, ultimately serving as its President and Chief Executive Officer. From 1982 to 1984 he served as President of R.C. Walsh & Company. From 1981 to 1982 he served as Executive Vice President at Reserve Financial Management Corporation. From 1974 to 1981, he served in several capacities as Vice President for J.L. Kislak Mortgage Corporation.

JAMES WALSH.  James Walsh has been Vice President of WSI since April 1996. From April 1989 to April 1996, as Senior Vice President of Donaldson Lufkin & Jenrette's Real Estate Division, James Walsh oversaw all aspects of the residential mortgage securitization, servicing brokerage, and mortgage banking services. In his capacity as head of Residential Mortgage Transactions, James Walsh was responsible for the trading of over $100 billion in mortgage servicing rights including selling ten mortgage banking entities. He was instrumental in the formation of Quality Mortgage and other non-conforming mortgage loan originators which totaled over $5 billion in originations over the last five years. James Walsh was President and founder of a newly formed loss mitigation company specializing in servicing non-conforming mortgage loan mortgages located in Austin, Texas. Prior to DLJ, he was instrumental in building the mortgage banking department at Bear Stearns & Company into a primary market force. During the nineteen months from 1987 to 1989 that James Walsh was at Bear Stearns, the mortgage banking department traded approximately $20 billion in mortgage servicing rights.

JOHN J. OBERDORF.  John J. Oberdorf is a nominee to become a director of RBMG commencing at the WSI Effective Time. Mr. Oberdorf has been a Member of the law firm of St. John & Wayne, L.L.C., legal counsel to WSI, since 1990. From 1983 until 1990, Mr. Oberdorf was a partner in the law firm of Kraft & Hughes, the predecessor to St. John & Wayne, L.L.C. Mr. Oberdorf served as Senior Vice President and General Counsel to First National Bank of New Jersey from 1980 to 1983.

WILLIAM BIGGS.  Mr. Biggs has been Chairman of the Board and Chief Executive Officer of the Skylake State Bank since March 1981. From March 1967 to March 1981, Mr. Biggs was President and Chief Operating Officer of J.L. Kislak Mortgage Corporation.

146

166

EXECUTIVE COMPENSATION

The following table sets forth certain information concerning the annual and long-term compensation paid and accrued during calendar 1996 to Robert C. Walsh, WSI's Chairman and Chief Executive Officer, and James Walsh, WSI's Vice President of Underwriting and Operations.

SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION(1) | SALARY | BONUS | OTHER ANNUAL COMPENSATION | ALL OTHER COMPENSATION |
| --- | --- | --- | --- | --- |
| Robert C. Walsh................................... President, Chief Executive Officer and Director | $350,000 | $500,000 | $11,363(2) | $1,433(3) |
| James Walsh....................................... Vice President, Director of Underwriting and Operations | $150,000 | $300,000 | $   -- | $   -- |

- ---------------

(1) Considers payments made to such executive officers by the Predecessors prior to their acquisition by WSI in April 1996.
(2) Includes car allowance for 1996.
(3) Matching contribution to 401(k) Plan.

EMPLOYMENT AGREEMENTS

Robert C. Walsh is a party to an employment agreement with WSI (the "Current Walsh Employment Agreement") which provides for his services as the Chief Executive Officer and President of WSI. The Current Walsh Employment Agreement has a three year term which is automatically extended unless terminated by either party on 30 days' prior written notice. The Current Walsh Employment Agreement further provides for an annual base salary of $350,000 subject to cost-of-living adjustments and an annual bonus equal to 5% of WSI's pre-tax profit (as defined in the Current Walsh Employment Agreement). The Current Walsh Employment Agreement also provides for the payment to Robert C. Walsh of approximately three times his annual base salary upon termination in the event of certain change of control events. In accordance with the terms of a certain employment agreement dated as of April 18, 1997 by and among Robert C. Walsh, WSI and RBMG (the "Walsh Employment Agreement"), the Current Walsh Employment Agreement will be terminated effective upon the WSI Effective Time and substituted with the Walsh Employment Agreement. See "The WSI Merger -- Certain Agreements in Connection with the WSI Merger -- Walsh Employment Agreement" for a description of the Walsh Employment Agreement.

THE CHARTER AMENDMENTS

GENERAL

In connection with the RBC Merger and the WSI Merger, the RBMG Board has unanimously declared advisable and approved and adopted the RBC Amendment and the WSI Amendment, respectively. The approval and adoption of the RBC Amendment by the RBMG Stockholders is contingent upon the approval and adoption of the RBC Merger Agreement, the RBC Merger and the RBC Stock Issuance by the RBMG Stockholders. Similarly, the approval and adoption of the WSI Amendment by the RBMG Stockholders is contingent upon the approval and adoption of the WSI Merger Agreement, the WSI Merger and the WSI Stock Issuance by the RBMG Stockholders. However, the approval and adoption of the RBC Amendment by the RBMG Stockholders is not contingent upon the approval and adoption of the WSI Amendment by the RBMG Stockholders, and the approval and the adoption of the WSI Amendment by the RBMG Stockholders is not contingent upon the approval and adoption of the RBC Amendment by the RBMG Stockholders. Copies of the RBC Amendment and the WSI Amendment are attached to this Joint Proxy Statement/Prospectus as Annexes C and D, respectively, and

147

Powered by Morningstar Document Research℠

Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF NEW JERSEY
                CIVIL NO. 97-3407 (DRD)
 3

 4     ----------------------------        ORIGINAL
       WALSH SECURITIES,            :
 5     INC.,                        :
                                    :
 6          Plaintiff,              :     DEPOSITION UPON
                                    :     ORAL EXAMINATION
 7          v.                      :            OF
                                    :     ELIZABETH ANN
 8     CRISTO PROPERTY              :         DEMOLA
       MANAGEMENT,LTD.,             :
 9     et al,                       :

10     ----------------------------

11

12

13

14              T R A N S C R I P T  of the stenographic

15     notes of HOWARD A. RAPPAPORT, a Notary Public and

16     Certified Shorthand Reporter of the State of

17     New Jersey, Certificate No. XI00416, taken at the

18     offices of MC CARTER & ENGLISH, LLP, Four Gateway

19     Center, Newark, New Jersey, on Friday,

20     June 11, 2010, commencing at 9:45 a.m.

21

22

23

24

25
```



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 2

```
1    A P P E A R A N C E S:

2    STONE & MAGNANINI
     150 John F. Kennedy Parkway
3    Short Hills, New Jersey 07078
     BY:  ROBERT A. MAGNANINI, ESQ.,
4         AMY WALKER WAGNER, ESQ.,
     For the Plaintiff
5
     MC CARTER & ENGLISH, LLP
6    Four Gateway Center
     100 Mulberry Street
7    Newark, New Jersey 07102-0652
     BY:  DAVID R. KOTT, ESQ.,
8    For Commonwealth Land Title Insurance Company

9    FOX, ROTHSCHILD, O'BRIEN & FRANKEL
     997 Lenox Drive
10   Lawrenceville, New Jersey  08648
     BY:  EDWARD J. HAYES, ESQ.,
11   For Nations Title Insurance and
     Fidelity National Title Insurance
12
     METHFESSEL & WERBEL
13   3 Ethel Road
     Suite 300
14   Edison, New Jersey 08818
     BY:  MARTIN R. MC GOWAN, ESQ.,
15        MATTHEW L. RACHMIEL
     For Coastal Title Agency
16

17

18

19

20

21

22

23

24

25
```



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

Page 13

1          I really have all of this out of my
2     mind.
3          Q     Did Walsh Securities ever pay fees for
4     any other lawyers you had?
5          A     No.
6          Q     Did anyone ever pay fees for lawyers you
7     had other than you?
8          A     Yes.
9          Q     Who was that?
10         A     In 2000 -- do I answer the whole
11    question?
12         Q     You need to give a complete and truthful
13    answer - hold on, another instruction.
14               Any question you're asked, you need to
15    give not only a truthful answer, but a complete
16    answer.
17               Do you understand that?
18         A     Yes.  I didn't know if I was talking too
19    much.
20               In 2002 my brother Robert and my brother
21    Jimmy each gave $25,000 towards my legal fees.  I
22    gave over 50.
23               The following year they each gave
24    25,000, I gave over 50.
25               The rest of the legal fees I paid



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

Page 124

1    purpose of avoiding learning the truth that there

2    were appraisals used which valued properties in their

3    as is condition when many of the subject properties

4    required substantial improvement?

5        A       I didn't.  I didn't know there was an as

6    is until after I was made aware of it after the fact.

7                I didn't even know these people.  I

8    didn't make a nickel from it.  So draw your own

9    conclusions how I wound up here.

10               I never saw the letters.  I never wrote

11   the letters.

12               Do you want me to go on and on?

13       Q       Did you direct persons at Walsh to

14   participate in efforts with respect to closed funded

15   loans which were to be reviewed by representatives of

16   Greenwich Capital, which efforts included altering

17   certain documents in those files and placing other

18   documents such as written appraisals in the files?

19       A       Could I read it?

20       Q       I'm asking you a question.

21       A       Say it again, I'm sorry.

22       Q       Did you direct persons at Walsh to a

23   participate in efforts with respect to closed funded

24   loans which were to be reviewed by representatives of

25   Greenwich Capital, which efforts included altering


**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

Page 125

1    certain documents in those files and placing other

2    documents such as written appraisals in the files?

3        A        I don't remember.

4                 MR. MAGNANINI:  I'll object to the whole

5    line, asked and answered.

6        Q        You say you don't remember?

7        A        I don't remember.

8        Q        Did you testify under oath -- withdrawn.

9                 When you testified before Judge Hayden

10   about your involvement with these frauds, did you

11   testify truthfully?

12       A        Um, I'll take the Fifth on that.

13       Q        I asked you earlier whether you were

14   aware that fraudulent loans were being made by Walsh

15   Securities, and you're taking the fifth as to that,

16   is that correct?

17       A        I didn't know --

18       Q        No, stay with me.

19       A        I'm sorry.

20       Q        Were you aware -- earlier I had asked

21   you whether you were aware that fraudulent loans were

22   being made by Walsh Securities, and you took the

23   Fifth amendment.

24                Do you remember that?

25       A        Yes, I do remember that.



**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

Page 129

1       Q       After you got indicted did you see the
2   letters?
3       A       Yes.
4       Q       Was one of them a July 3, 1997 letter?
5       A       I don't remember the dates.
6       Q       Let me show you exhibit Demola-7 --
7       A       I believe you have them.  But I didn't
8   have anything to do with them.
9       Q       Let me show you Exhibit 7.  Is that one
10  of the three lulling letters?
11              (Exhibit handed to the witness.)
12      A       I don't really know.  I'm sure it is,
13  but I don't know.
14      Q       Were any of the lulling letters signed
15  by Robert Walsh?
16      A       I think they all were.
17      Q       Or they all went out under his name?
18      A       That's correct.
19      Q       You just told me you had nothing to
20  do --
21      A       I really didn't have anything --
22      Q       Let me finish.
23              You just told me you had nothing to do
24  with the lulling letters?
25      A       That's correct.



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - cross

Page 145

1      Q      I understand.

2              You were in the business of loaning

3   money, were you not?

4      A      I was in the business of bringing files

5   in.  I wasn't in the business of giving out the

6   loans.  I wasn't.

7      Q      Was Walsh in the business of loaning

8   money?

9      A      That's correct.

10     Q      Every time Walsh Securities made a loan,

11  Bette Ann made money on, did she not?

12     A      That's correct.

13     Q      So was there no benefit at all to you to

14  speaking to Mr. Kane about loaning him money for all

15  these properties he was purchasing?

16             MR. MAGNANINI:  Objection.

17     A      We weren't loaning him the money.  We

18  were loaning the borrowers.  Our underwriters

19  qualified the borrowers to buy his house.

20     Q      My question is, why did you not have

21  discussions with Mr. Kane about loaning him money

22  when he was purchasing properties?

23     A      We didn't give him money to purchase the

24  property.

25     Q      I understand you didn't.



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

256

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2              CIVIL NO. 97-3407 (DRD)

 3       ---------------------------
                                    :
 4       WALSH SECURITIES,          :
         INC.,                      :          CONTINUED
 5                                  :       DEPOSITION UPON
              Plaintiff,            :       ORAL EXAMINATION
 6                                  :             OF
              v.                    :       ELIZABETH ANN
 7                                  :          DEMOLA
         CRISTO PROPERTY            :
 8       MANAGEMENT,LTD.,           :
         et al,                     :
 9                                  :

10       ---------------------------
```

# ORIGINAL

```
13              T R A N S C R I P T  of the stenographic

14       notes of HOWARD A. RAPPAPORT, a Notary Public and

15       Certified Shorthand Reporter of the State of

16       New Jersey, Certificate No. XI00416, taken at the

17       offices of STONE & MAGNANINI, 150 John F. Kennedy

18       Parkway, Short Hills, New Jersey, on Monday,

19       June 21, 2010, commencing at 11:15 a.m.
```



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 257

```
 1   A P P E A R A N C E S:

 2   STONE & MAGNANINI
     150 John F. Kennedy Parkway
 3   Short Hills, New Jersey 07078
     BY:  ROBERT A. MAGNANINI, ESQ.,
 4        AMY WALKER WAGNER, ESQ.,
     For the Plaintiff

 5
     MC CARTER & ENGLISH, LLP
 6   Four Gateway Center
     100 Mulberry Street
 7   Newark, New Jersey 07102-0652
     BY:  DAVID R. KOTT, ESQ.,
 8   For Commonwealth Land Title Insurance Company

 9   FOX, ROTHSCHILD, O'BRIEN & FRANKEL
     997 Lenox Drive
10   Lawrenceville, New Jersey  08648
     BY:  EDWARD J. HAYES, ESQ.,
11   For Nations Title Insurance and
     Fidelity National Title Insurance
12
     METHFESSEL & WERBEL
13   3 Ethel Road
     Suite 300
14   Edison, New Jersey 08818
     BY:  MARTIN R. MC GOWAN, ESQ.,
15   For Coastal Title Agency

16

17

18

19

20

21

22

23

24

25
```



Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - cross

Page 281

1    Q     Is there something causing you to

2  believe that your brother sat in on scrubbing?

3    A     No, but I think he did, but not all of

4  them.

5          He would be more the one that was -- if

6  anyone would go in, he would.

7    Q     Here's what I'm trying to find out.

8    A     I'm sorry, tell me what you're trying to

9  find out.

10   Q     It may be the way I ask my question.

11         You were adamant that your brother

12  Robert would not have been involved at all in the

13  scrub.  Stay with me for a minute.

14         When I asked you about your brother

15  James, you said, well, he wouldn't scrub, but he may

16  very well have been in during a scrubbing.  I'm

17  paraphrasing that.

18         Do you recall saying that?

19   A     Yes, I do.

20   Q     What I'm trying to find out is whether

21  you recall ever being at a scrubbing and seeing your

22  brother James there, whether at some point in time

23  you had a discussion with your brother James about

24  him being present during a scrubbing, whether you

25  heard rumors that your brother was present at the

**Rizman Rappaport Dillon&Rose,LLC** Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola — cross

Page 282

1   scrubbing, or whether you are just assuming that

2   because of who he was within the company, he may have

3   been there at a scrubbing or something else.

4           Do you understand my question?

5       A       Now, I do.

6       Q       What I'm trying to find out is, what is

7   it that you are basing your belief that he may have

8   been involved in a scrubbing?

9       A       Because of what you just said I assumed

10  he was there, because he would know the documents.

11  Robert doesn't have knowledge of what the documents

12  are in the file.  He doesn't.  So that's why I say

13  absolutely not.

14          Like if you knew Robert you would laugh,

15  he doesn't know what's in the files at all.  But

16  Jimmy was secondary, and Jimmy had knowledge of what

17  belonged in the files.

18      Q       You're assuming because of what his job

19  was he might have been there at a scrubbing?

20      A       That's absolutely correct.

21      Q       How about Fred Schlesinger, would he

22  have ever been at a scrubbing to your knowledge?

23      A       He might have been.

24      Q       How about Arnold Cohn, would he have

25  been in a scrubbing?

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Exhibit D

1

1                      IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY

2                      CRIMINAL NO. 02-448
UNITED STATES OF AMERICA     :

3                  Plaintiff,  :

-vs-                     :

4                             :

ELIZABETH ANN DEMOLA,        :

5                           :

                     : PLEA HEARING

6                   Defendant  :

7    – – – – – – – – – – – – – – – – – – – – – :
                  Newark, New Jersey
                  September 9, 2005

8    B E F O R E:

9          THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.

10   A p p e a r a n c e s:

11   UNITED STATES ATTORNEY-NEWARK
CHRISTOPHER J. CHRISTIE

12   Attorneys for Plaintiff-USA
970 Broad Street

13   Newark, New Jersey 07102
BY: LISA ROSE, AUSA

14

15   DECOTIIS, FITZPATRICK, COLE & WISLER, LLP
Attorneys for Defendant-DeMola

16   Glenpointe Centre West
500 Frank W. Burr Boulevard

17   Teaneck, New Jersey 07666
BY: JEFFREY D. SMITH, ESQ.

18

ALSO PRESENT

19   ^

20   ─────────────────────────────────────────
       Pursuant to Section 753 Title 28 United States Code,

21   the following transcript is certified to be an accurate
record as taken stenographically in the above-entitled

22   proceedings.

23

                              ─────────────────

24                     Ralph F. Florio
                  Official Court Reporter

25

17

1   documents with Ms. DeMola.   I assume that you've showed her

2   the letter written to me that is dated September 21, 2004,

3   correct?

4           MR. SMITH:  Yes, your Honor.

5           THE COURT:  I am about to ask Ms. DeMola the

6   questions now, but just for the record, set forth what other

7   documents you and she have reviewed, if you would.

8           MR. SMITH:  Your Honor, in connection with

9   preparation of the plea agreement, the indictment and the

10   package that the government sent to the Court, which I guess

11   was originally in January 2004 and it was followed up by

12   September 2004 letter.

13           THE COURT:  Okay.

14           MR. SMITH:  Yes.

15           THE COURT:  All right.  Ms. DeMola, you've looked

16   over the questions that begin on page 3 of that September 21,

17   letter, under the section, factual basis for the plea.  I am

18   prepared to ask you those questions now.  Are you ready to

19   answer them?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Okay.  In 1996 and 1997, were you the

22   national sales manager at and with your brothers and an

23   entity called Greenwich Capital, a shareholder of Walsh

24   Securities, Inc., a company engaged primarily in the business

25   of purchasing and funding residential mortgage loans with its

18

1    main office in Parsippany, New Jersey and with numerous

2    branch offices throughout the United States?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Did your duties include overseeing the

5    sales force in Parsippany and in branch offices, and

6    expediting closings of loans, particularly in the latter

7    portion of each month.

8           THE DEFENDANT:  Yes.

9           THE COURT:  Did you also give direction on occasion

10   to loan processors such as Kellie O'Neill in regard to

11   particular loans?

12          THE DEFENDANT:  Yes.

13          THE COURT:  I couldn't hear you?

14          THE DEFENDANT:  Yes.

15          THE COURT:  In performing your duties did you

16   strive to meet or exceed monthly quotas for closed loans and

17   to increase the company's loan production volume, at least in

18   part to enhance the company's prospects of concluding a

19   merger with another loan company from which-- which you and

20   other shareholders would benefit financially?

21          THE DEFENDANT:  Yes.  I was a sale manager and that

22   was my job.  Yes.

23          THE COURT:  Generally did Walsh Securities close

24   loans with the funds provided by an entity called Greenwich

25   Capital which caused those funds to be wire transferred into

19

1   New Jersey from accounts outside of New Jersey?

2           THE DEFENDANT:  I didn't know where the accounts

3   were, but yes.

4           THE COURT:  Did Walsh Securities acquire loans from

5   mortgage originators such as National Home Funding and

6   Selective Finance, with offices in Monmouth County, New

7   Jersey, which loans Walsh Securities then funded?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Did an individual named William Kane

10  work at National Home Funding and also buy and sell

11  properties on loans which Walsh Securities purchased from

12  National Home Funding and Selective Finance?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Did you at some point become aware that

15  there were fraudulent documents used to support loans made by

16  Walsh Securities, including those set forth below?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And yet acted with others and with a

19  conscious purpose of avoiding learning the truth toward the

20  end that the loans were closed:

21          (a) the use of second mortgages which were designed

22  to match shortfalls in the funds available to the borrowers,

23  but which were not intend to be filed or collected upon;

24          (b) the use of appraisals whose valuations were

25  inaccurate and were used to qualified borrowers and,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

20

1              (c) the use of appraisals which valued properties

2    in their "as is" condition when many of the subject

3    properties required substantial improvement?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Yes?

6              THE DEFENDANT:  Ah, ah.  Yes.

7              THE COURT:  Specifically, did you, (a), concur in

8    the funding of loans without first having obtained an

9    accurate written appraisal?

10             THE DEFENDANT:  Referrals, yes.

11             THE COURT:  Did you concur in decisions improperly

12   to eliminate underwriting conditions that were not met?

13             THE DEFENDANT:  Yes.

14             THE COURT:  And did you direct persons at Walsh to

15   participate in efforts with respect to closed funded loans

16   which were to be reviewed by representatives of Greenwich

17   Capital, which efforts included altering certain documents in

18   those files and placing other documents, such as written

19   appraisals, in the files?

20             THE DEFENDANT:  Yes.  After the verbals we would

21   get the written ones and put them in the files.

22             THE COURT:  Are you aware that in July and August

23   1997 Walsh Securities sent communications to third parties,

24   as described in Counts 2 through 4 of the indictment, which

25   failed to fully and accurately apprise those parties of your

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

21

1  knowledge and activities as a member of the management of

2  Walsh Securities?

3            THE DEFENDANT:  I am aware now, yes.

4            THE COURT:  I am sorry?

5            THE DEFENDANT:  I am aware now, yes.

6            THE COURT:  Did you do all of these things

7  deliberately and intentionally, and not by reason of

8  ignorance mistake or accident?

9            THE DEFENDANT:  Yes.

10            THE COURT:  Ms. Rose, is there an independent

11  factual basis for the culpability of Ms. DeMola on the

12  conspiracy charge?

13            MS. ROSE:  Yes, there is your Honor.

14            THE COURT:  Let's hear it.

15            MS. ROSE:  The government would be able to prove,

16  if we had to go to trial, that the defendant did conspire

17  with others to commit wire fraud.  And we'll be able to do so

18  by calling witnesses, including but not limited to

19  coconspirators.

20            THE COURT:  Thank you.  Okay.

21            Ms. DeMola, one last question.  How do you now

22  plead to the charged, guilty or not guilty?

23            THE DEFENDANT:  Guilty.

24            THE COURT:  I make the following findings

25  concerning Ms. DeMola.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

# Exhibit E



**WALSH SECURITIES, INC.**

CORPORATE OFFICE
4 CAMPUS DRIVE, PARSIPPANY, NJ 07054
PHONE (201) 538-9300 • FAX (201) 538-7968
1-800-225-8038

April 3, 1998

William T. Lutz, Esq.
Sedwick, Detert, Moran & Arnold
59 Maiden Lane, 41st Floor
New York, NY 10038-4502

Re:     Proof of Loss

Dear Mr. Lutz:

      I write in response to your letter of September 4, 1997 to Fred H. Schlesinger, Esq. concerning the submission of a proof of loss to Sedwick, Detert, Moran & Arnold in connection with Mortgage Bankers Bond No. OC943-95-604-0156 issued to Walsh Holding Co., Inc. for the period April 18, 1997 to April 18, 1998. Per your instructions, we have provided the following information requested in your letter as well as requests made during your meeting at Walsh Securities, Inc. ("Walsh Securities") on January 9, 1998.

1.    <u>Date of Discovery</u>. On or about June 12, 1997, Walsh Securities was served by the Monmouth County Prosecutor's Office with several Subpoenas Duces Tecum at Walsh Securities' corporate headquarters located at 4 Campus Dr., Parsippany, N.J. Copies of the Subpoenas are attached hereto as Exhibit "1".

2.    <u>Identification of officer or employee who discovered loss.</u> - Fred H. Schlesinger, Walsh's Vice President and General Counsel, first became aware of the loss when he was interviewed by two investigators from the Monmouth County Prosecutor's at Walsh Securities' corporate headquarters.

3.    <u>Amount of actual or potential loss.</u> - To date, Walsh Securities has received repurchase demands from investors on approximately twenty-five million dollars worth of loans. These repurchase demands have come from Bankers Trust (Security), The Money Store and Cityscape. Walsh Securities is contractually obligated to repurchase of the loans for which such demands have been made by Bankers Trust and The Money Store. Cityscape has commenced an action against Walsh Securities to recover its loss with reference to said loans. Two million dollars worth of said loans have already been repurchased by Walsh Securities to date. Walsh Securities is working with the investors concerning the remaining loans.





Walsh Securities estimates the actual present value of the properties securing the two million dollars worth of loans already repurchased to be approximately $800,000 in the aggregate, leaving a loss of $1,200,000.00 to date. Walsh Securities estimates the actual present values of the properties that are the subject of remaining twenty-three million dollars in outstanding loans to be approximately 50% of the total loan value, leaving an additional loss to Walsh Securities of approximately twelve and one-half million dollars. In addition, if Walsh Securities is not able to repurchase all or any portion of the remaining loans that are subject of repurchase demands, then it is obligated pursuant to its contract with the investors to hold harmless and indemnify the investors from any loss and is further obligated to defend the investors in any legal action against the mortgage holder in connection with said loans. Walsh Securities conservatively estimates its total losses on the loans will be approximately $13,700,000.

In addition, to date Walsh Securities has incurred approximately $500,000.00 in legal fees and another $500,000.00 in accounting fees in connection with the NHF/Cristo property fraud. The foregoing estimate of potential loss does not include additional legal fees, accounting fees and costs of litigation to be incurred by Walsh specifically in connection with the civil litigation Walsh has brought against the responsible parties in the fraud and in continuing to cooperate with the ongoing investigations by the United States Attorneys Office. In addition, although this cannot be quantified, the fraud caused merger negotiations between Walsh and Resource Bancshares Mortgage Group ("RBMG"), a public entity, to collapse. RBMG originally offered approximately $400 million to purchase Walsh Securities.

4.   <u>Narrative of Facts and Circumstances Known to Date.</u>

   (a)   <u>The Perpetrators</u>

   Cristo Property Management, Ltd., a/k/a G.J.L. Limited is a New Jersey corporation and is owned and controlled by Kane.

   DEK Homes of New Jersey, Inc. is a New Jersey corporation and is owned and controlled by Kane.

   Oakwood Properties, Inc. is a New Jersey corporation and is owned and controlled by Kane. (All Kane entities will be referred to hereafter as "Cristo Property".)

   National Home Funding, Inc. ("NHF") is a New Jersey corporation is owned and controlled by Skowrenski.

   Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, L.L.C. (referred to as "Capital Assets"), are New Jersey corporations and are owned and controlled by Grieser.

2



William J. Kane ("Kane") owns and controls **Cristo Property**. Kane also is a licensed mortgage solicitor for, and an employee of, **NHF**. An unrelated RICO lawsuit alleging a similar real estate fraud has been filed against Kane in New York.

Gary Grieser ("Grieser") owns **Capital Assets**. He is a former owner of a night club, tanning salon and several other short term businesses.

Robert Skowrenski, II, ("Skowrenski") owns **NHF** and is a long-time associate of **D'Apolito**.

(b)    The Appraisers

Richard Calanni ("Calanni") is a licensed real estate appraiser in New Jersey and is associated with TF Certified Real Estate Appraisals.

Richard DiBenedetto ("DiBenedetto") is a licensed real estate appraiser in New Jersey and is associated with Eastern States Appraisal Services.

James R. Brown ("Brown") is a licensed real estate appraiser in New Jersey and is associated with Professional Evaluators of Union.

Thomas Brodo ("Brodo") is a licensed real estate appraiser in New Jersey.

Roland J. Pierson ("Pierson") is a licensed real estate appraiser in New Jersey.

Calanni, DiBenedetto, Brown, Brodo and Pierson (collectively, "the Appraisers"), were real property appraisers hired by **NHF** and **Cristo Property**.

(c)    The Attorneys

Stanley Yacker, Esq., ("Yacker") is an attorney admitted to practice in New Jersey. He claimed his secretary actually completed the closing paperwork and he was unaware of what was happening. He is currently under investigation by the New Jersey Supreme Court.

Michael Alfieri, Esq., ("Alfieri") is an attorney admitted to practice in New Jersey. He founded Selective Finance, a mortgage brokerage firm at which **D'Apolito** worked.

Richard Pepsny, Esq., ("Pepsny") is an attorney admitted to practice in New Jersey and is a partner of **Alfieri**.

Anthony M. Cicalese, Esq., ("Cicalese") is an attorney admitted to practice in New Jersey. He leased office space from **Capital Assets** and handled some landlord/tenant matters for them. He gradually replaced **Yacker** as the closing attorney of choice.

3



Yacker and Cicalese (jointly, "the Closing Attorneys") were approved attorneys by the title insurance companies involved in each transaction. The **Closing Attorneys**, together with **Alfieri** and **Pepsny**, were selected by **NHF**, **Capital Assets** and/or **Cristo Property** to facilitate real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

(d)    <u>Other Individuals and Entities</u>

**Lawrence J. Cuzzi**, ("**Cuzzi**") was an employee of **Capital Assets** until March or April, 1997. As such, he solicited buyers for the properties, including his own family members, and received a commission for each "buyer". He left **Capital Assets** on bad terms and **Grieser** has since tried to blame this "misunderstanding" on **Cuzzi**.

**Anthony D'Apolito** ("**D'Apolito**") was an employee of Walsh Securities who was responsible for transmitting to Walsh Securities mortgage loans originated at **NHF**. He had previously worked with **Skowrenski** at Selective Finance which was operated by **Alfieri**. He also met **Kane**, who specialized in flipping properties from distressed sellers or properties which were renovated, while at Selective Finance. **D'Apolito** admitted to receiving $90,000.00 from **NHF** and $10,000 directly from **Kane** for placing their mortgages with Walsh.

**DAP Consulting, Inc.** ("**DAP Consulting**") is a New Jersey corporation owned and controlled by **D'Apolito**. **D'Apolito**, through **DAP Consulting**, was paid $90,000.00 from **NHF** for placing loans with Walsh and helping to see that loans were underwritten.

**Kellie O'Neal** ("**O'Neal**") was a processor at Walsh Securities responsible for clearing conditions placed on the loans by underwriters. She was friendly with **D'Apolito**, **Kane** and **Skowrenski** and reportedly lived beyond her means. **O'Neal** asked to be notified of each NHF loan which came into Walsh Securities and cleared the conditions allowing the NHF loans to close.

(e)    <u>The Title Insurance Companies</u>

**Commonwealth Land Title Insurance Company, Inc.** ("**Commonwealth Title**") is a Pennsylvania corporation.

**Nations Title Insurance of New York Inc.** ("**Nations Title**") is a New York corporation.

**Fidelity National Title Insurance Company of New York, Inc.** ("**Fidelity Title**") is a New York corporation.

4



Commonwealth Title, Nations Title and Fidelity Title are title insurance companies that issued closing settlement letters to Walsh Securities, as the mortgage lender, which letters, among other things, indemnified Walsh Securities against fraud by the Closing Attorneys.

(f)    The Title Agencies

Coastal Title Agency, Inc. ("Coastal Agency") is a New Jersey corporation operated by Robert Agel and is a title insurance broker that was selected by NHF, Capital Assets, Cristo Property, and/or the Closing Attorneys to broker title insurance for the real property closings involving mortgage loans originated by NHF and subsequently sold to Walsh Securities.

### The Mortgage Loan Frauds

Since early 1996, Cristo Property, NHF, Capital Assets, Kane, Grieser, Skowrenski, Calanni, DiBenedetto, Brown, Brodo, Pierson, Yacker, Alfieri, Pepsny, Cicalese, Cuzzi, D'Apolito, DAP Consulting and Coastal Agency (collectively, "the RICO Perpetrators") have been engaged in a pattern of racketeering activity throughout the State of New Jersey, including in Monmouth, Essex, Union and Hudson Counties, where certain of the properties are located which has resulted in approximately two hundred twenty mortgage loans being purchased by Walsh Securities from NHF for amounts ranging up to eight times the preceding sales prices of the properties at issue. Walsh Securities was induced to purchase these mortgage loans from NHF by D'Apolito who brokered the loans to Walsh Securities based on fraudulent misrepresentations contained in the mortgage loan applications, including appraisals of the properties at issue. The proceeds from Walsh Securities' mortgage loans would, among other things, be distributed among the RICO Perpetrators as their illicit profits.

The participants in the frauds arranged to obtain mortgage loans by artificially inflating the apparent values of the underlying properties, and by deceiving Walsh Securities into financing the mortgage loans based on these inflated values. The values were inflated through the participants' practice of purchasing the properties, and then quickly reselling or "flipping" the properties. These subsequent resales took place immediately or very soon after the first purchases. In some instances, the resales even took place the same day as the first purchases. In all these "flips," the real properties at issue were resold for up to eight times the immediately preceding sales prices. On the days of the closings, the Closing Attorneys would fraudulently transfer the mortgage loan proceeds provided by Walsh Securities to themselves and certain of the other RICO Perpetrators, even though the pre-conditions imposed by Walsh Securities for the transfer of such proceeds had not been met.

With respect to these fraudulently obtained mortgage loans, the Title Insurance Companies issued to Walsh Securities, as the mortgage lender, closing service letters which require the Title Insurance Companies to reimburse Walsh Securities for losses arising out of the fraudulent actions of the Closing Attorneys. Samples of the Closing Service Letters are

5



attached as Exhibits 2, 3 and 4. Both of the **Closing Attorneys, Yacker** and **Cicalese,** were specifically approved to handle closings by the **Title Insurance Companies.**

### "The NHF/Cristo Property" Enterprise

The **RICO Perpetrators** carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraisers (referred to as "the **NHF/Cristo Property Enterprise").** The **NHF/Cristo Property Enterprise,** was formed to, among other things, turn real property into illicit profits generated by mortgage loan proceeds financed by Walsh Securities, and to engage in other activities. Those loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. The **RICO Perpetrators** also engaged in a "mini-scam" wherein the value of the property was fraudulently inflated so that the buyer was able to secure a mortgage for 100% of the purchase price of the property. Presumably, this was initially done to create a market by inflating prices in Asbury Park.

The **NHF/Cristo Property Enterprise** relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by NHF, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and NHF, with the understanding by members of the **NHF/Cristo Property Enterprise** that Walsh Securities would rely on the fraudulent applications in deciding whether to accept the mortgage loans originated by the **NHF/Cristo Property Enterprise.** Apart from other illicit profits received, Skowrenski, through NHF, received fees from these transactions in excess of one million dollars.

Unknown to Walsh Securities, the buyer/borrowers had secretly and fraudulently agreed to convey, after the closing on the resale of the real properties, a majority percentage of the ownership of each real property to a member of the **NHF/Cristo Property Enterprise.** These secret and fraudulent conveyances constituted an act of default under the mortgage loans.

### The Overall Pattern

**Kane,** acting through **Cristo Property,** purchased real property located in New Jersey in, among other places, Monmouth, Essex, Union and Hudson Counties. The properties were initially located in Asbury Park and the surrounding area which had a surplus of dilapidated properties in need of renovations. By concentrating the properties in one area, the **Appraisers** could presumably use each sale to increase the valuations of subsequent properties. As the scheme continued, properties in other urban areas were also purchased.

**Kane, Grieser,** and/or **Cuzzi** identified, through personal contacts, advertisements, and other means, individuals who were willing to buy these properties from **Cristo Property** and sign the mortgage loans. As the scheme continued, more buyer/borrowers were needed. The



RICO Perpetrators then expanded their search for borrower/buyers with good credit history. Cuzzi enlisted his family members who then told their acquaintances. The RICO Perpetrators placed ads in some local newspapers, and enlisted some buyers by their lavish spending of easy profits made in the booming real estate market. Cuzzi also enlisted buyers from his softball league and co-employees from a local car dealership. Subsequent borrower/buyers were enlisted by other borrower/buyers or by other employees of Capital Assets. Typically, these properties were purchased as purported investment vehicles to be used as rental properties. Many of the properties, however, were abandoned and could not be rented.

The borrower/buyers did not usually see the properties but were sometimes shown pictures of renovated properties. Initially, the borrower/buyers paid a fee to cover "closing costs", provided proof of income and other necessary paperwork, had a credit check run and signed closing documents. As the scheme continued, however, buyers who could not afford a $1,000 payment for "closing costs" or "application fees" still participated as long as they had a clean credit history. They were then paid from $1,000 to $4,000 for each transaction. The scheme initially involved blocks of four "investment properties" but was later reduced to one property per borrower/buyer.

Kane, acting through Cristo Property and/or NHF, usually purchased distressed properties from the bona fide owner, usually for $10,000 to $45,000. He then had the properties appraised by licensed appraisers. In almost all instances, the property was appraised by Calanni, DiBenedetto, Brown, Brodo or Pierson. Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

Mortgage loan applications for the borrowers/buyers of the properties were then compiled by the NHF/Cristo Property Enterprise and submitted, through D'Apolito, to Walsh Securities. D'Apolito received payments of $100,000.00 from NHF and Kane, some of which was paid directly to D'Apolito and some to his newly created corporation, DAP Consulting.

These payments caused D'Apolito to divide his loyalties and cause Walsh to underwrite essentially worthless loans. After the loans were underwritten, O'Neal would receive the loans and clear the conditions placed on the loan. She was the processor for almost every NHF loan and verified employment and deposits, which were her responsibilities, and also cleared other conditions such as obtaining appraisals which was beyond her level of responsibility. However, instead of returning the loan package and appraisal to the underwriter, she would exceed her authority by clearing all conditions necessary for the loan to close. It seems her involvement in the scheme allowed the RICO Perpetrators to circumvent the checks in the loan process. These applications were falsified in several material respects in order to induce Walsh Securities to finance mortgage loans well in excess of the true values of the properties. Such false information included:

7



(i)     The applications included appraisals of the properties which were fraudulently inflated.

(ii)    The applications included purported sales prices of the properties which reflected the fraudulent appraised values as opposed to the true values or sales prices of the properties.

(iii)   The applications typically contained signed leases for the properties indicating that the properties would be income producing when, in fact, the properties were not leased.

(iv)    The applications indicated that the buyers had provided the seller, **Cristo Property**, down payments for the properties, typically 10% of the sales price, when, in fact, no down payments were ever requested or provided.  The second mortgage and down payment usually totaled 25% of the purchase price so the buyer was only required to obtain a mortgage for 75% of the appraised value of the property.

(v)     The applications typically indicated that the seller, **Cristo Property**, had provided the buyers second mortgage loans in the properties, when, in fact, no bona fide second mortgages were provided and no second mortgage loan payments were ever made or intended to be made.  These purported second mortgage loans were often never recorded by the **Closing Attorneys**, further evidencing that they were not bona fide second mortgages.

(vi)    The applications included representations that the buyers would own the entire properties, when, in fact, it was agreed prior to the sales that the buyers would transfer after the sales a sixty percent interest in the properties to **Capital Assets** under secret Joint Venture Agreements.  The buyers would forward the mortgage coupon books to **Capital Assets** which would make the mortgage payments.

(vii)   The applications indicated that the buyers would pay certain closing expenses, when, in fact, such expenses were paid by the seller, **Cristo Property**.  In fact, the buyers bought the properties without paying any moneys to the seller, **Cristo Property**.  The seller also paid the buyer's attorney's fees even though the attorneys claimed to represent the buyer.  The buyers actually received money at or shortly after the closing usually in the form of a cashiers check.

(viii)  The applications typically contained other false information about the real estate transactions designed to present them as better credit risks.  Several buyers who reviewed the closing documents pointed out "inconsistencies" in the applications including their ages, income amounts, length of time at current residences and other inaccuracies.  The buyers claimed they were told these "typos" would be corrected.  One buyer admitted he was unemployed for a year and did not know where his proof of income or employment came from.

8



However, he did sign various documents and provided his social security number for a credit check. Most of the buyers did not receive copies of the documents and did not try to get copies after they received their checks.

D'Apolito received these mortgage loan applications from NHF and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans. In exchange for transmitting or causing to transmit the applications to Walsh Securities, D'Apolito, through DAP Consulting, received cash payments totaling at least $90,000.00 from Kane, through Cristo Property, and received cash payments in excess of $10,000.00 from Skowrenski, through NHF. The payments were designed to, and did, corrupt D'Apolito, place him in a conflict of interest and cause him to breach his obligations to Walsh Securities. The payments from NHF and Cristo Property to D'Apolito were unknown by, and not disclosed to, Walsh Securities, which was misled into believing that D'Apolito was acting as a faithful employee.

On the days of the closings, the Closing Attorneys would fraudulently transmit to themselves and certain other RICO Perpetrators, including Cristo Property, the proceeds of the mortgage loans illicitly obtained from Walsh Securities. The Closing Attorneys transmitted those funds even though they were aware that one or all of the following requirements and pre-conditions to the mortgage loans, among others, were not met: (1) the borrowers and Cristo Property had not entered into a bona fide sales contract with a bona fide sales price as required for closing; (2) the borrowers had not paid the downpayment or deposit required for closing; (3) Cristo Property and the borrowers had not entered into a bona fide second mortgage as required for closing; and (4) the borrowers had not paid certain closing expenses required for closing. In addition, the Closing Attorneys, in furtherance of the fraud, falsely certified at the time of the closings that the above mentioned pre-conditions to closing, imposed by Walsh Securities, had been met. These false certifications were made on HUD-1 settlement statements required by the United States Department of Housing and Urban Development.

The Closing Attorneys, along with Pepsny and Alfieri, also furthered the fraud by preparing and recording or causing to be recorded various deeds involved in these transactions. These deeds included the deeds covering the sales to Cristo Property, the deeds from Cristo Property to the borrowers, and the deeds conveying an interest in sixty percent of the properties from the borrowers to Capital Assets.

Typically, around the date designated to close these properties, the purchasers signed Powers of Attorney (Exhibit 5), secret Joint Venture Agreements with Capital Assets (Exhibit 6) and deeds which conveyed sixty percent of the ownership in the properties to Capital Assets. These deeds conveying a sixty percent ownership interest were then filed or caused to be filed by either the Closing Attorneys or Coastal Agency. The Joint Venture Agreements and deeds were never disclosed to Walsh Securities. Such conveyances constituted a default under the terms and conditions of Walsh Securities' mortgage loans. Indeed, Walsh Securities would not

9



have financed the mortgage loans had it been aware of the plans to reconvey interest in the properties. (Exhibit 7).

Capital Assets then collected the rents, if any, from the rental of these properties and pooled them, using funds from the pooled rents to pay Walsh Securities the mortgage loan payments when due and to pay other expenses of the properties. In addition, on information and belief, as in a classic pyramid fraud, funds from new mortgage loans were secretly used to make interest and principle payments on older loans. In this way, the NHF/Cristo Property Enterprise misled Walsh Securities into believing that none of the loans originated by the NHF/Cristo Property Enterprise were delinquent. In fact, as further evidence of a classic pyramid fraud relying on new transactions to continue to fund the older transactions, most of the properties that were claimed to be renovated were never renovated and thus could not be rented. Additionally, at other properties which contained individuals who could have been renters, no attempts were made to collect rent from those individuals who were living in the properties.

<u>Variations on the Scam</u>

Some borrowers/buyers were induced to invest $1,000.00 in a real estate trust or other corporation on the promises by Cuzzi that the borrowers/buyers would receive a return of $6,000.00 and a later opportunity to participate in an Initial Public Offering of Capital Assets. Cuzzi had these purchasers execute secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney and provide their names and social security numbers. Cuzzi was an employee of Capital Assets and was paid a fee for each mortgage loan.

Another variation included simply obtaining the purchasers' names and social security numbers. Instead of attending closings, the purchasers signed blank papers which were then returned to the Closing Attorneys. The purchasers also executed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital Assets and Powers of Attorney in exchange for payments of $1,000.00 to $3,000.00 per purchased property. Capital Assets then purportedly managed the property including making all necessary payments, including mortgage loan payments. One buyer, on at least one occasion on behalf of the NHF/Cristo Property Enterprise, traveled to upstate New York to deliver closing papers which were signed by purchasers, notarized by the buyer, and then returned to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings. One purchaser claimed she tried to renege on the agreement after signing the papers but later received a mortgage coupon book which she forwarded to Capital Assets and a check which she cashed.

Cicalese traveled to New York to deliver closing papers which were signed by the purchasers and then returned by Cicalese to Capital Assets, Cuzzi and/or Grieser without the purchasers attending any closings. Instead of attending closings, the purchasers simply signed the secret Joint Venture Agreements, deeds conveying sixty percent of the properties to Capital

10



Assets and Powers of Attorney which were then returned to the **Closing Attorneys.** Also, many of the signatures on the loan document are different from each other and appear to have been forged. [The signatures are also different on different loans for the same buyer.] **Capital Assets** then purportedly managed the property including making all necessary payments, including mortgage loan payments.

Since on or about June 30, 1997, certain of these properties have become delinquent in the payment of the mortgage loans. Due to the inflated amounts of the appraisals, Walsh Securities will be unable to recoup the full amounts of the outstanding mortgage loans when and if it forecloses on the properties.

### An Example: 1017-1019 Bangs Avenue, Asbury Park, New Jersey

**Kane,** acting through **Cristo Property,** purchased 1017-1019 Bangs Avenue, Asbury Park, New Jersey on July 25, 1996 for $28,000.00, (Exhibit 8), which property was fraudulently appraised by **Brown** for $200,000.00. (Exhibit 9).

On that same day, July 25, 1996, **Cristo Property** sold 1017-1019 Bangs Avenue, Asbury Park, New Jersey for $200,000.00 to an individual borrower/buyer with the initials J.M. In fact, the sales contract was not a bona fide contract because J.M. never intended to pay that amount for the property and **Cristo Property** never intended to receive that amount for the property. The deed for that fraudulent transaction was prepared by **Pepsny** and filed by **Coastal Agency.**

A mortgage loan on the property, in J.M.'s name, was originated by **NHF.** (Exhibit 10). Walsh Securities, based on the fraudulent misrepresentations contained in the loan application, financed the mortgage loan in the amount of $150,000.00. A down payment in the amount of $20,000.00 was purportedly provided by J.M. to **Cristo Property.** (Exhibit 11). In fact, no down payment was ever made.

J.M.'s mortgage loan application contains a "gift letter" from defendant **Cuzzi** which states that he is the brother-in-law of J.M. This gift letter is supposed to evidence a gift of $10,500.00 towards the purchase of the property, and, upon information and belief, said gift was never made, nor was the gift that was to be part of the down payment ever given to the seller.

A second mortgage loan for $30,000 at a 6% interest rate was purportedly given by **Cristo Property** to J.M. (Exhibit 12). In fact, the second mortgage was not a bona fide second mortgage loan because **Cristo Property** never intended to receive payment from J.M. for that loan and J.M. never intended to make payment for that loan. Moreover, the second mortgage loan was never recorded.



Yacker was the closing attorney on this mortgage loan, and transmitted the loan proceeds to himself and to other members of the NHF/Cristo Property Enterprise, including Cristo Property. Yacker transmitted such funds even though he knew that the following pre-conditions, among others, to the closing imposed by Walsh Securities were not met: (1) there was no bona fide sales contract or bona fide sales price; (2) J.M. had not paid a downpayment or deposit; (3) there was no bona fide second mortgage; (4) J.M. had not paid certain closing costs; and (5) J.M. had not obtained tenants for the property. (Exhibit 13). Yacker certified on a HUD-1 settlement statement required by the United States Department of Housing and Urban Development that all closing pre-conditions were met, when, in fact, he knew that they were not met. (Exhibit 14).

Prior to the closing, Commonwealth Title issued a closing statement letter to Walsh Securities, which requires Commonwealth Title to reimburse Walsh Securities for loss arising out of fraud or misapplication by Yacker, an attorney approved by Commonwealth Title to perform closings. After the closing, Yacker caused Coastal Agency to file a deed transferring a sixty percent interest in the property to Capital Assets. (Exhibit 15).

There are over two hundred and twenty instances of transactions similar to the two outlined above. As the scheme was uncovered, the RICO Perpetrators sought to blame each other for "these troubled times." (Exhibit 16). Currently, Walsh Securities has instituted litigation against the parties involved in the scheme and is moving forward with discovery while continuing to assist the U.S. Attorney's office in their investigations.

5.    Identification of officer or employee most familiar with this matter/Contact Person. Fred H. Schlesinger, Walsh Securities' Vice President and General Counsel.

6.    Identity of Walsh Securities' employee involved in fraud. - Anthony D'Apolito.

7.    Steps which Walsh Securities has taken or will take to reduce or mitigate its loss. Mr. D'Apolito was terminated in July 1997 when Walsh Securities learned he had been actively involved in the fraud. Walsh has also had at least half the properties that are the subject of the fraud boarded up and secured to prevent further deterioration. In addition, since the fraud was discovered, Walsh has revamped its underwriting, quality control and post-closing procedures to provide for tighter internal controls that will prevent possible future frauds such as this one from occurring. Furthermore, Walsh has brought legal action against 28 defendants which participated in the fraud or initially refused to insure and indemnify Walsh Securities for the dishonest acts of the Closing Attorneys to recover damages. The lawsuit has been filed in the United States District Court for the District of New Jersey and is entitled Walsh Securities, Inc. v. Cristo Property Management, et al., Docket No.: CV-97-3496 (WGB).



8.   <u>Identification of Insuring Clause under which Walsh Securities is Seeking Coverage.</u>

The insuring clauses under which Walsh Securities seeks coverage is Insuring Clause 1(a), "dishonest acts by any **Employee of the Assured**," Insuring Clause 5, "Forged Documents", Insuring Clause 7, "Claims Expense" for accountants' expenses, Insuring Clause 8, "Reimbursement to Assured for Legal Expense of Directors, Officers and Partners", as well as requesting Indemnification for Defense of Counterclaims for "Court Costs and Attorneys' Fees" and "any other Bond Provision determined to apply" of Mortgage Bankers Bond No. OC943-95-604-0156.

Additionally, at the January 9, 1998 meeting at Walsh Securities, you verbally requested that Walsh Securities detail its recovery to date and potential recovery. To date, Walsh Securities has been unable to recover any money on any of the mortgage loans. Walsh Securities believes it has a strong probability of recovery against the Title Insurance Companies under New Jersey law which are solvent and which one title insurance company not named in the civil suit in Federal District Court has already expressed a willingness to discuss settlement. Walsh Securities also believes it will recover some restitution from the RICO Perpetrators. It is currently unknown how much Walsh Securities will recover, but Walsh Securities will update this Proof of Loss as new information becomes available.

Sincerely Yours,

Fred H. Schlesinger
Vice President
and General Counsel



JAN-16-1998  16:06        WALSH SECURITIES                    P.06/10

## SUBPOENA TO TESTIFY

# Superior Court of New Jersey

## LAW DIVISION (CRIMINAL)

### MONMOUTH COUNTY



STATE OF NEW JERSEY
COUNTY OF MONMOUTH          ss          Case No.  97C-010-06

GRAND JURY

Duces Tecum

To   WALSH SECURITIES

4 CAMPUS DRIVE

PARSIPPANY NEW JERSEY

You are hereby commanded by the MONMOUTH COUNTY GRAND JURY sitting in the Grand Jury Room at the

Monmouth County Court House, Court Street, Freehold, New Jersey, to produce records in the case of the State of New

Jersey  vs. _____ an investigation _____

_____, 19 97

by _____ June 23 _____

You are ordered without prepayment of witness fee to produce the following records:

Mortgage for Alicia Juergensen, loan # 622022, for property identified

as 1200 Monroe Avenue, Asbury Park, N.J. to include but not limited to

mortgage application, income verification, appraisal review, employment

verification, tax returns, insurance certification and deed.

In lieu of appearance, please contact Det. Larry Willis, Monmouth County

Prosecutor's Office (908) 409-7554

Failure to produce the said records will subject you to the penalties as provided by law.

_Jane P Clayton_

**Deputy Clerk, Superior Court**

_John Kaye_

**MONMOUTH COUNTY PROSECUTOR**

**BRING THIS
SUBPOENA WITH YOU**

## SUBPOENA TO TESTIFY

# Superior Court of New Jersey

## LAW DIVISION (CRIMINAL)

## MONMOUTH COUNTY



STATE OF NEW JERSEY          ss      Case No.   97C-010-06
COUNTY OF MONMOUTH                   GRAND JURY
                                     Duces Tecum

To  WALSH SECURITIES

    4 CAMPUS DRIVE

    PARSIPPANY  NEW JERSEY

You are hereby commanded by the MONMOUTH COUNTY GRAND JURY sitting in the Grand Jury Room at the

Monmouth County Court House, Court Street, Freehold, New Jersey, to produce records in the case of the State of New

Jersey  vs.  an investigation

_____, 19 97

by  June 23

You are ordered without prepayment of witness fee to produce the following records:

Mortgage for Jill Montanye, Loan # 619473 for property identified as
1017-1019 Bangs Avenue, Ashury Park, N.J to include but not limited to
mortgage application, income verification, appraisal review, employment
verification, tax returns, insurance verification/certification and deed.
In lieu of appearance please contact Det. Larry Willis at 409-7554

Monmouth County Prosecutor's Office

Failure to produce the said records will subject you to the penalties as provided by law.

*Jane Q Clayton*

**Deputy Clerk, Superior Court**

*John Kaye*

**MONMOUTH COUNTY PROSECUTOR**

**BRING THIS
SUBPOENA WITH YOU**

JAN-16-1998  16:07        WALSH SECURITIES                           P.08/10

## SUBPOENA TO TESTIFY

# Superior Court of New Jersey

### LAW DIVISION (CRIMINAL)

### MONMOUTH COUNTY



STATE OF NEW JERSEY     ss     Case No.  97C-010-06
COUNTY OF MONMOUTH                GRAND JURY
                                  Duces Tecum

To   WALSH SECURITIES

     4 CAMPUS DRIVE

     PARSIPPANY, NEW JERSEY

You are hereby commanded by the MONMOUTH COUNTY GRAND JURY sitting in the Grand Jury Room at the

Monmouth County Court House, Court Street, Freehold, New Jersey, to produce records in the case of the State of New

Jersey  vs. _____ an investigation _____

by _____ June 23 _____, 19 97

You are ordered without prepayment of witness fee to produce the following records:

Mortgage for Alicia Juergensen, loan # 622645 for property identified

as 1032-34 Bangs Avenue, Asbury Park, N.J. to include but not limited to

mortgage application, income verification, appraisal review, employment

verification, tax returns, insurance certification and deed.

In lieu of appearance, please contact Det. Larry Hillis, Monmouth County

Prosecutor's Office (908) 409-7554

Failure to produce the said records will subject you to the penalties as provided by law.

_Jane Q. Clayton_

Deputy Clerk, Superior Court

_John Kaye_

MONMOUTH COUNTY PROSECUTOR

BRING THIS
SUBPOENA WITH YOU

JAN-16-1998  16:07      WALSH SECURITIES                    P.09/10

## SUBPOENA TO TESTIFY

# Superior Court of New Jersey

## LAW DIVISION (CRIMINAL)

### MONMOUTH COUNTY



STATE OF NEW JERSEY        ss    Case No. 96C-010-06
COUNTY OF MONMOUTH               GRAND JURY
                                 Duces Tecum

To  WALSH SECURITIES

    4 CAMPUS DRIVE

    PARSIPPANY NEW JERSEY


You are hereby commanded by the MONMOUTH COUNTY GRAND JURY sitting in the Grand Jury Room at the

Monmouth County Court House, Court Street, Freehold, New Jersey, to produce records in the case of the State of New

Jersey vs. _____ an investigation _____

_____, 19 97

by _____ June 23 _____

You are ordered without prepayment of witness fee to produce the following records:

Mortgage for Jill Montanye, loan # 619588 for property at 404 Emory Avenue

Asbury Park, N.J.  to include but not limited to mortgage application

income verification, appraisal review, employment verification, tax records

insurance certification and deed.

In lieu of appearance, please contact Det. Larry Willis, MCPO, (908)

409-7554.

Failure to produce the said records will subject you to the penalties as provided by law.


*Jane A Clayton*

Deputy Clerk, Superior Court


*John Kaye*

MONMOUTH COUNTY PROSECUTOR

**BRING THIS
SUBPOENA WITH YOU**

JAN-16-1998  16:07      WALSH SECURITIES                           P.10/10

## SUBPOENA TO TESTIFY

# Superior Court of New Jersey

## LAW DIVISION (CRIMINAL)

### MONMOUTH COUNTY



| | | |
|---|---|---|
| STATE OF NEW JERSEY | ss | Case No.  97C-010-06 |
| COUNTY OF MONMOUTH | | GRAND JURY |
| | | Duces Tecum |

To  WALSH SECURITIES

<u>4 CAMPUS DRIVE</u>

<u>PARSIPPANY, NEW JERSEY  07054</u>

You are hereby commanded by the MONMOUTH COUNTY GRAND JURY sitting in the Grand Jury Room at the

Monmouth County Court House, Court Street, Freehold, New Jersey, to produce records in the case of the State of New

Jersey  vs.  <u>An investigation</u>

by  <u>June 23</u>                                                        , 19<u>97</u>

You are ordered without prepayment of witness fee to produce the following records:

ALL MORTGAGE LOAN FILES FOR THE FOLLOWING: THOMAS OWENS, DAVID A. LIEBLER,

ALICIA JUERGENSEN, ALPHONSE & ELAINE SALVATORIELLO, ANNA & THOMAS G. LEODIS, PAMELA RICIGLIANO,

JOSEPH L. AMADOR, MARIO CUZZI, JR., JOSEPH PISCIONERI, RAYMOND AFGAR, JILL MONTANYE, MICHAEL DIPPOLITO,

RAFAEL BUSTOS, SR., GEORGE T. LEODIS, BRIAN G. REILLY, MARIO CUZZI, SR., LOUIS DICARO, SUSAN VICARDO,

PLAMEN HRISTOV, KIMBERLY E. POWELL, RALPH JUERGENSEN, DEBRA CAMPOLI, DITIMAR DELIYSKI, JOSEPH

PISCIONERI, LORETTA RIZZUTO, THOMAS J. KAREN DIDONNA, LAWRENCE M. CUZZI, ANN DEFRANCESCO, LAURIE

HRISTOV, YOLANDA C. BUSTOS-LACY

Failure to produce the said records will subject you to the penalties as provided by law.



_Jane O Clayton_

Deputy Clerk, Superior Court

6-12-97

_John Kaye_

MONMOUTH COUNTY PROSECUTOR

BRING THIS
SUBPOENA WITH YOU

TOTAL P.10



RECYCLED

ALL-STATE® LEGAL  800-222-0510  (ED11)

**nonwealth**
Title Insurance Company

No.

Date:  December 19, 1996

): National Home Funding, Inc., its successors and/or
   assigns, as their interest may appear
   3443 Highway 9 North
   Freehold, New Jersey 07728
   Attention: Closing Department

:: Closing Service Letter
   Issuing Agent or Attorney whose conduct is covered:
   Stanley Yacker, Esquire
   330 Highway 34, Suite 3
   Matawan, NJ   07747

   File No:
   Transaction:
   Premises:

ear Customer:

hen title insurance of Commonwealth Land Title Insurance Company is specified for your
rotection in connection with the closing of the above described real estate transaction
n which you are to be a lender secured by a mortgage of an interest in land, the
ompany, subject to the Conditions and Exclusions set forth below, hereby agrees to re-
mburse you for actual loss incurred by you in connection with that closings when con-
lucted by the above named Issuing Agent (an agent authorized to issue title insurance
'or the Company) of Commonwealth Land Title Insurance Company or the above named Attorney
nd when such loss arises out of:

. Failure of the Issuing Agent or Attorney to comply with your written closing instruc-
  tions to the extent that they relate to: (a) the title to said interest in land or
  the validity, enforceability and priority of the lien of said mortgage on said
  interest in land, including the obtaining of documents and the disbursement of funds
  necessary to establish such title or lien, or (b) the collection and payment of funds
  due you; or

!. Fraud of or misapplication by the Issuing Agent or Attorney in handling your funds in
  connection with the matters set forth in numbered paragraph 1 above.

:f you are a lender protected under the foregoing paragraph, your borrower in connection
/ith a loan secured by a mortgage on a one-to-four family dwelling, which is the prin-
:ipal residence of the borrower, shall be protected, but only to the extent of the fore-
joing paragraph 2, as if this letter were addressed to your borrower. If you are a pur-
:haser of a one-to-four family dwelling, including a condominium unit, which is your
)rincipal residence, and are paying cash for the purchase, you are protected, but only
:o the extent of the foregoing paragraph 2.

*IEW JERSEY LAND TITLE*
*INSURANCE RATING BUREAU*

NJRB 6-04
8/1/94

IDITIONS AND EXCLUSIONS

The Company will not be liable to you for loss arising out of:

1. Failure of the Attorney to comply with your closing instructions which require require title insurance protection inconsistent with that set forth in the title insurance binder or commitment issued by the Company. Instructions which require the removal of specific exceptions to title or compliance with the requirements contained in said binder or commitment shall not be deemed to be inconsistent.

2. Loss or impairment of your funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except such as shall result from failure of the Issuing Agent or Attorney to comply with your written closing instructions to deposit the funds in a bank which you designated by name.

3. Mechanics' and materialmen's liens in connection with a construction loan transaction, except to the extent that protection against such liens is afforded by a title insurance binder, commitment or policy of the Company.

. If the closing is to be conducted by an Issuing Agent or Attorney, a title insurance binder or commitment for the issuance of a policy of title insurance of the Company must have been received by you prior to the transmission of your final closing instructions to the Attorney.

. When the Company shall have reimbursed you pursuant to this letter, it shall be subrogated to all rights and remedies which you would have had against any person or property had you not been so reimbursed. Liability of the Company for such reimbursement shall be reduced to the extent that you have knowingly and voluntarily impaired the value of such right of subrogation.

). Any liability of the Company for loss incurred by you in connection with closings of real estate transactions by an Issuing Agent or Attorney shall be limited to the protection provided by this letter. However, this letter shall not affect the protection afforded by a title insurance binder, commitment or policy of the Company.

:. Claims shall be made promptly to the Company at its office at 8 Penn Center, Philadelphia, Pennsylvania 19103. When the failure to give prompt notice shall prejudice the Company, then liability of the Company hereunder shall be reduced to the extent of such prejudice.

THIS LETTER DOES NOT APPOINT THE ABOVE NAMED ATTORNEY AS AN AGENT OF COMMONWEALTH LAND TITLE INSURANCE COMPANY.

The protection under this Letter is limited to the closing on the premises described in the caption of this Letter.

Commonwealth Land Title Insurance Company

BY: _____
Robert F. Koel, President
Coastal Title Agency, Inc.
Agent

NJRB 6-04
8/1/94

NEW JERSEY LAND TITLE
INSURANCE RATING BUREAU



Title Insurance of New York Inc.
wsbury Avenue, Red Ban~ NJ 07701
:908) 219-8540

                                              Date:

: National Home Funding, Inc., its successors and/or its
  assigns
  3443 Highway 9 North
  Freehold, NJ  07728
  Attention: Closing Department

          RE: Closing Service Letter
              Issuing Agent or Attorney whose conduct is covered:
              Richard J. Pepsny, Esquire
              Law Office of Michael A. Alfieri
              187 Route 34
              Matawan, NJ  07747

  File No:
ansaction:

  Premises:

ar Customer:

en title insurance of Nations Title Insurance of New York Inc. ("Company") is specified
r your protection  in connection  with the closing of the above  described real  estate
ansaction  in which  you are to be a  lender secured  by a  mortgage of an  interest in
ind,  the Company,  subject to  the Conditions  and Exclusions set ·forth below,  hereby
jrees to reimburse you for actual loss incurred by you in connection  with that  closing
en  conducted  by the  above named Issuing Agent  (an agent  authorized to  issue title
isurance for the Company) of Nations Title Insurance of New York Inc. or the above named
:torney and when such loss arises out of:

. Failure of the Issuing Agent or Attorney to comply with your written closing instruc-
  tions to the extent that  they relate to:  (a) the title to said interest  in land or
  the  validity,  enforceability and  priority  of the  lien of said  mortgage on  said
  interest in land, including the obtaining of documents and the documents and the dis-
  bursement of funds  necessary to establish such title or lien; or  (b) the collection
  and payment of funds ·due you; or

. Fraud of or misapplication by the Issuing Agent or Attorney in handling your funds in
  connection with the matters set forth in numbered paragraph 1 above.

f you are a lender protected under the foregoing paragraph, your borrower in connection
ith a loan secured by a mortgage on a one-to-four family dwelling, which is the princi-
il residence of the borrower, shall be protected,  but only to the  extent of the fore-
)ing paragraph 2, as if this letter were addressed to your borrower. If you  are a pur-
iaser of  a one-to-four  family dwelling, including a  condominium unit,  which is your
~incipal residence,  and are paying cash for the purchase,  you are protected, but only
) the extent of the foregoing paragraph 2.

)NDITIONS AND EXCLUSIONS

. The Company will not be liable to you for loss arising out of:

1. Failure of the Attorney to comply with your closing instructions which require require title insurance protection inconsistent with that set forth in the title insurance binder or commitment issued by the Company. Instructions which require the removal of specific exceptions to title or compliance with the requirements contained in said binder or commitment shall not be deemed to be inconsistent.

2. Loss or impairment of your funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except such as shall result from failure of the Issuing Agent or Attorney to comply with your written closing instructions to deposit the funds in a bank which you designated by name.

3. Mechanics' and materialmen's liens in connection with a construction loan transaction, except to the extent that protection against such liens is afforded by a title insurance binder, commitment or policy of the Company.

If the closing is to be conducted by an Issuing Agent or Attorney, a title insurance binder or commitment for the issuance of a policy of title insurance of the Company must have been received by you prior to the transmission of your final closing instructions to the attorney.

When the Company shall have reimbursed you pursuant to this letter, it shall be subrogated to all rights and remedies which you would have had against any person or property had you not been so reimbursed. Liability of the Company for such reimbursement shall be reduced to the extent that you have knowingly and voluntarily impaired the value of such right of subrogation.

Any liability of the Company for loss incurred by you in connection with closings of real estate transactions by an Issuing Agent or Attorney shall be limited to the protection provided by this letter. However, this letter shall not affect the protection afforded by a title insurance binder, commitment or policy of the Company.

Claims shall be made promptly to the Company at its office at 6800 College Blvd., Suite 700, Overland Park, Kansas 66211. When the failure to give prompt notice shall prejudice the Company, then liability of the Company hereunder shall be reduced to the extent of such prejudice.

Liability under this letter is limited to the amount of insurance committed for and is subject to all of the Conditions and Stipulations of the policy or policies committed to be issued by the Company. Any payment of loss under this letter shall constitute a payment under the policy.

THIS LETTER DOES NOT APPOINT THE ABOVE NAMED ATTORNEY AS AN AGENT OF NATIONS TITLE INSURANCE OF NEW YORK INC.

The protection under this Letter is limited to the closing on the premises described in the caption of this letter.

Sincerely,

Robert F. Agel, President
Coastal Title Agency, Inc.
Agent

ISSUING OFFICE:
COASTAL TITLE AGENCY, INC.
P.O. BOX 740
FREEHOLD, NEW JERSEY 07728
(908) 308-1660

RECYCLED

ALL-STATE LEGAL 800-222-0510   ED1

National Title
ιΕ COMPANY OF NEW YORK
Avenue / New York, New York 10016 / (212) 481-5858 / Fax: (212) 481-8747

Date:  October 25, 1996

National Home Funding, Inc., its successors and/or
assigns, as their interest may appear

Attention: Closing Department

RE: Closing Service Letter
Issuing Agent or Attorney whose conduct is covered:
Stanley Yacker, Esquire

330 Highway 34, Suite 3
Matawan, NJ   07747

File No:
ansaction:

Premises:

ar Customer:

en title insurance of Fidelity National Title Insurance Company of New York is
ecified for your protection in connection with the closing of the above described real
tate transaction in which you are to be a lender secured by a mortgage of an interest
land, the Company, subject to the Conditions and Exclusions set forth below, hereby
rees to reimburse you for actual loss incurred by you in connection with that closing
en conducted by the above named Issuing Agent (an agent authorized to issue title
surance for the Company) of Fidelity National Title Insurance Company of New York or
e above named Attorney and when such loss arises out of:

Failure of the Issuing Agent or Attorney to comply with your written closing instruc-
tions to the extent that they relate to: (a) the title to said interest in land or
the validity, enforceability and priority of the lien of said mortgage on said
interest in land, including the obtaining of documents and the disbursement of funds
necessary to establish such title or lien; or (b) the collection and payment of funds
due you; or

Fraud of or misapplication by the Issuing Agent or Attorney in handling your funds in
connection with the matters set forth in numbered paragraph 1 above.

' you are a lender protected under the foregoing paragraph, your borrower in connection
th a loan secured by a mortgage on a one-to-four family dwelling, which is the prin-
pal residence of the borrower, shall be protected, but only to the extent of the fore-
)ing paragraph 2, as if this letter were addressed to your borrower. If you are a pur-
laser of a one-to-four family dwelling, including a condominium unit, which is your
·incipal residence, and are paying cash for the purchase, you are protected, but only
) the extent of the foregoing paragraph 2.

)NDITIONS AND EXCLUSIONS

. The Company will not be liable to you for loss arising out of:

!ity CSL -- Page 2

. Failure of the Attorney to comply with your closing instructions which require title insurance protection inconsistent with that set forth in the title insurance binder or commitment issued by the Company. Instructions which require the removal of specific exceptions to title or compliance with the requirements contained in said binder or commitment shall not be deemed to be inconsistent.

:. Loss or impairment of your funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except such as shall result from failure of the Issuing Agent or Attorney to comply with your written closing instructions to deposit the funds in a bank which you designated by name.

}. Mechanics' and materialmen's liens in connection with a construction loan transaction, except to the extent that protection against such lien is afforded by a title insurance binder, commitment or policy of the Company.

If the closing is to be conducted by an Issuing Agent or Attorney, a title insurance binder or commitment for the issuance of a policy of title insurance of the Company must have been received by you prior to the transmission of your final closing instructions to the attorney.

When the Company shall have reimbursed you pursuant to this letter, it shall be subrogated to all rights and remedies which you would have had against any person or property had you not been so reimbursed. Liability of the Company for such reimbursement shall be reduced to the extent that you have knowingly and voluntarily impaired the value of such right of subrogation.

Any liability of the Company for loss incurred by you in connection with closings of real estate transactions by an Issuing Agent or Attorney shall be limited to the protection provided by this letter. However, this letter shall not affect the protection afforded by a title insurance binder, commitment or policy of the Company.

Claims shall be made promptly to the Company at its office at 2 Park Avenue, New York, N.Y. 10016. When failure to give prompt notice shall prejudice the Company, then liability of the Company hereunder shall be reduced to the extent of such prejudice.

Liability under this letter is limited to the amount of insurance committed for and is subject to all of the Conditions and Stipulations of the policy or policies committed to be issued by the Company. Any payment of loss under this letter shall constitute a payment under the policy.

IS LETTER DOES NOT APPOINT THE ABOVE NAMED ATTORNEY AS AN AGENT OF FIDELITY NATIONAL TLE INSURANCE COMPANY OF NEW YORK.

e protection under this Closing Service Letter is limited to the closing on the emises described in the caption of this Letter.

Fidelity National Title Insurance Company of New York

BY: _____

Robert F. Age, President
Coastal Title Agency, Inc.
Agent

RECYCLED

ED11

ALL-STATE® LEGAL 800-222-0510

# POWER OF ATTORNEY

This Power of Attorney is made on

**BETWEEN**      ALICIA JUERGENSEN

**AND**      CAPITAL ASSETS PROPERTY MANAGEMENT &
INVESTMENT CO., INC.
10 WEST BERGEN PLACE, SUITE 104
RED BANK, NEW JERSEY 07701

**GRANT OF AUTHORITY.** I appoint you to act as my Agent to do each and every act which I could personally do for the following use and purpose  full authority to sell any property of which I am a part-owner, consistent with the terms of a Joint Venture Agreement dated                  . The sale shall be for such price and under such terms as my attorney-in-fact may determine in his absolute discretion.

**POWERS.** I give you all the power and authority which I may legally give to you. You may revoke this Power of Attorney or appoint a new Agent in your place. I approve and confirm all that You or your substitute may lawfully do on my behalf.

**SIGNATURES.** By signing below, I acknowledge that I have received a copy of this Power of Attorney and that I understand its terms.

Witnessed by:

_____       _____

RECYCLED

ALL-STATE LEGAL  800-222-0510  B31

# THIS JOINT VENTURE AGREEMENT

made this

BETWEEN:

Anil I           ,1997

AND:

CAPITAL ASSETS PROPERTY MANAGEMENT &
INVESTMENT CO., LLC  (Hereinafter "Capital Assets")
10 WEST BERGEN PLACE, SUITE 201
RED BANK, NEW JERSEY  07701

WITNESSETH THAT the parties wish to enter into a form of Joint venture to be known as.

and CAPITAL ASSETS, a Joint Venture, (also designated herein as the "Business"), and to be located at:

10 WEST BERGEN PLACE, SUITE 201
RED BANK, NEW JERSEY  07701

NOW THEREFORE, IT IS AGREED AS FOLLOWS:

1.    The function of Capital Assets and its contribution to the Joint Venture is to manage, improve, maintain and rent real property in the State of New Jersey as per this agreement. The function and contribution of.                    is to contribute his good name and credit to the Joint Venture.

2.    The parties recognize that all data of the business and any other information are the property of the partnership and may be confidential in nature.  This information will not be disclosed to the public indiscriminately.

3.    The parties shall divide the profits (or losses) of the business in the following proportion or ratio:

/1997  12:63    8001-717-67.12          CAPITAL ASSET.                      PAGE  04

Capital Assets     60%

40%

The above ratio shall specifically be reflected in all deeds and other evidence of title; i.e.,
Capital Assets as to a 60"s interest and                         as to a  40% interest,
pursuant to agreement dated April 1, 1997         and designated as          and
CAPITAL ASSETS, a Joint Venture

4.     In the event that either party wishes to buy out the interest of the other party on
any particular property, the same 60-40 ratio shall be used to determine the value.
However, Capital Assets shall have the sole right to retain a licensed appraiser for the
purpose of setting the value

5.     The parties understand that Capital Assets shall have total control of all
properties, including the absolute right to obtain financing, and to determine what
properties are bought and sold, for what price, and under what terms and conditions.
They shall cooperate with each other in order to further the purposes of the Joint Venture.

6.                          shall have the right to attend all closings where property
is being purchased and receive a minimum of $1,000.00 per transaction from Capital
Assets for a minimum of four (4) closings.

7.     None of the parties hereto shall sell, convey, pledge, encumber or assign their
interest in the Joint Venture to any other person or entity

8.     By separate instrument of even date herewith.                      shall
execute a durable POWER OF ATTORNEY to Capital Assets giving the latter full
authority to sell any property and to sign any deeds or other papers consistent with the
terms of the within agreement

7  12:31   . 900 747 r.200                  CAPITA  ASSETS                          PAGE  05

9.      The parties acknow t.k.  that                        represents the business entity

known as Capital Assets and s t                             The said

T s specifically has been inf ned of his right to retain separate counsel of his own

choosing and at his own experi e.

10.   This agreement shall tal e effect on the date first above written.

IN WITNESS WHEREOF  the parties have signed this agreement on the indicated date.

                                    CAPITAL ASSETS PROPERTY
                                    MANAGEMENT & INVESTMENT CO.,
                                    LLC.

                        Hy

RECYCLED

ALL-STATE® LEGAL  800-222-0510  ©D11

# ANTHONY M. CICALESE, P.C.
### ATTORNEY AT LAW

**72·Eagle Rock Avenue, Building Two**
**P.O. Box 358**
**East Hanover, New Jersey 07936**

ANTHONY M. CICALESE
MEMBER
NEW JERSEY & FLORIDA BARS

MICHAEL G. KARLIS
OF COUNSEL

PHONE: (201) 515-0788
FAX: (201) 515-0812
E-MAIL ADDRESS: acicales@ix.netcom.com

April 2, 1997

Mr. Stephen Christiano
292 Brentwood Drive
North Tonawanda, New York 14120

Dear Mr. Christiano:

Enclosed please find the closing documents for the property that you have agreed to purchase under the terms of your joint venture agreement with Capital Assets. It is important that the enclosed documents be returned immediately upon your receipt and your completion of executing the enclosed documents. These papers must be signed by you in any and all of the areas where your name appears, as well as in any place referring to "the borrower, the applicant, the deponent or the grantor." Please take the time to make sure that you have examined each page individually for the place or places where your signature may be required. Some of the documents will require you to sign in more than one place on the same page while others will require you to sign in the middle, at the top or at the bottom of the page.

Please also note that where indicated several of the documents require that they be NOTARIZED. This means that they must be signed by a licensed Notary Public in the State of New York. If the documents are not witnessed, and duly notarized, they are of absolutely no use to any one. Please take caution to have witnessed the documents that require a witness to sign next to your signature. The notary can do this for you as well.

If you have any questions regarding the signing of these documents please do not hesitate to call me at (908) 450-0740 or (201) 515-0788. I will be happy to clarify any of your questions. I am your attorney for the purposes of closing this purchase of property. It is my duty to counsel you in this purchase. You must understand that by signing these documents you become responsible for the loan on this property. Should Capital Assets fail to meet its obligations under the terms of your agreement with them, it is you and you alone, that the bank will hold responsible for this loan. It is my understanding that all of this has already been explained to you by one of Capital Assets

representatives and that you are ready to go forward with the transaction.  As long as you understand that fact, and feel comfortable with it, then you may go ahead and execute the documents.  You are free to consult with another lawyer if you wish or feel the need to do so.

I have also enclosed a FedEx return packet.  All that you need to do is sign the documents, place the completed packet in the return FedEx Envelope, seal it, and call FedEx to schedule a pick up or drop it off at their nearest location.  The cost of the return will be billed to me.  Thank you for your cooperation.

Very truly yours,

Anthony M. Cicalese

# CAPITAL ASSETS
## PROPERTY MANAGEMENT & INVESTMENT CO., LLC.
### 10 WEST BERGEN PLACE, SUITE 201, RED BANK, NEW JERSEY 07701
### TEL: 747-7771      FAX: 747-8780

## JOINT VENTURE

### ITEMS NEEDED

1.  Copy of drivers license ✓
2.  Copy of registration
3.  Most current pay stub
4.  1994-1995 and/or 1995-1996  W2 forms
5.  Most current bank statement ( checking and/or savings) ✓
6.  Home phone number ✓
7.  Business phone number and address ✓
8.  Job Title and Position ✓
9.  Social Security number ✓
10. Marriage Status ✓
11. Own or Rent ✓
12. Application Fee

AUG-14-97 06:26 PM   MAIL.BOXES.ETC.767          7166917510              P.05

# Capital Assets
## Property Management & Investment Co., Inc.

RE:   29 Pearl Street
       Long Branch, New Jersey

It is Capital Assets Property Management Company's intention to have the above referenced property out of Mr. Steven Christiano's name within three (3) years of signing of closing documents.  Within the three (3) years, the property will be sold or transferred into Capital Assets Property Management Company's name.

_____          _____
STEVEN CHRISTIANO                    GARY GRIESER JR.
                                     CAPITAL ASSETS PROPERTY MGMT. CO.

10 West Bergen Place, Suite 201
Red Bank, New Jersey 07701

RECYCLED

ALL-STATE® LEGAL  800-222-0510

070166

*RAR*  3

PREPARED BY: _[signature]_

MARK A. STEINBERG, ESQUIRE

Coastal Title Agency, Inc.
21 West Main Street • PO Box 340
Freehold, NJ 07728
1-800-521-0378

3

| COUNTY OF MONMOUTH | |
|---|---|
| CONSIDERATION | 28,000 |
| RTF | 98   add'l RTF |
| DATE 21897 | BY 20 |

**DEED**

This Deed is made on JULY 25TH , 1996.

BETWEEN   NORMAN FREIDMAN and ARLINE FREIDMAN, husband and wife,

whose address is 19 A Winthrop Road, Jamesburg, NJ 08831,

referred to as the Grantor,

AND    CHRISTO PROPERTY MANAGEMENT, LTD.,

whose address is 592 Rt 34, Matawan, NJ 07747

referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

Transfer of Ownership. The Grantor grants and conveys (transfers ownership of) the property described below to the Grantee. This transfer is made for the sum of TWENTY EIGHT THOUSAND AND 00/100 ($28,000.00) DOLLARS.

The Grantor acknowledges receipt of this money.

Tax Map Reference.   (N.J.S.A. 46:15-2.1) Municipality of City of Asbury Park, Block No. 64  Lot No. 7   Account No.
[   ] No property tax identification number is available on the date of this Deed.  (Check box if applicable).

Property.  This property  consists  of the land and all the buildings and structures on the land in the  City of  Asbury Park , County of Monmouth and State of New Jersey.  The legal description is:

SEE SCHEDULE "A" ATTACHED HERETO AND MADE PART HEREOF

BEING the same premises  conveyed to the said NORMAN FREIDMAN and ARLINE FREIDMAN, husband  and wife, by Deed of BARRY GRASSMAN and BARBARA GRASSMAN, husband and wife, dated January 23, 1982, and recorded in the Monmouth County Clerk's office on February 13, 1986 in the Monmouth County Clerk's office in book 4632 of Deeds for said county at page 421.

CLERK'S OFFICE
MONMOUTH COUNTY
NEW JERSEY

INSTRUMENT NUMBER
1997038155

RECORDED ON
Apr 08, 1997
2:09:08 PM
BOOK OR-5887 PAGE
Total Pages: 3

COUNTY RECORDING FEES         $70.00
DEDICATED TRUST FUND COMMISSION  $2.00
COUNTY REALTY TRANSFER FEES     $28.03
STATE REALTY TRANSFER FEES      $69.77
TOTAL                          $120.00

D3 5587-36
R 4/8/97

**COMMONWEALTH LAND
TITLE INSURANCE COMPANY**
A Reliance Group Holdings Company

### TITLE INSURANCE COMMITMENT

Commitment No.

File No. CT-17767.

## DESCRIPTION

ALL that certain tract, lot and parcel of land lying and being in the City of Asbury Park, County of Monmouth and state of New Jersey, being more particularly described as follows:

Known and designated as Lot Number Two Hundred and Eight (208) on Map of West Asbury Park, made by William H. DrNyse, Civil Engineer:

Beginning at a point in the northerly line of Bangs Avenue, distant two hundred (200) feet westerly from the northwesterly corner of Bangs Avenue and Langford Street; thence

1. westerly along the northerly line of Bangs Avenue fifty (50) feet; thence

2. northerly and at right angles to Bangs Avenue, or nearly so, one hundred (100) feet; thence

3. easterly, and parallel with Bangs Avenue, fifty (50) feet; thence

4. southerly, and again at right angles to Bangs Avenue, or nearly so, one hundred (100) feet to the place of Beginning.

Said premises are commonly known as 1017-1019 Bangs Avenue, Asbury Park, New Jersey.

NOTE:  Being Lot(s) 7, Block 64, Tax Map of the City of Asbury Park.

Issued By:
COASTAL TITLE AGENCY, INC.
P.O. Box 740, 21 W. Main Street, Suite 2, Freehold, NJ 07728
(908) 308-1660  (800) 521-0378  (908) 775-5543  FAX #(908) 308-1881

**Promises by Grantor.** The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor.)

**Signatures.** The Grantor signs this Deed as of the date at the top of the first page.

Witnessed by:

_____
MARK A. STEINBERG

_____
NORMAN FREIDMAN

_____
ARLINE FREIDMAN


STATE OF NEW JERSEY, COUNTY OF MONMOUTH SS.:

I CERTIFY that on JULY 25TH          , 1996, NORMAN FREIDMAN and ARLINE FREIDMAN, husband and wife, personally came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):

(a) is named in and personally signed this Deed;
(b) signed, sealed and delivered this Deed as his or her act and deed; and
(c) made this Deed for $28,000.00 as the full and actual consideration paid or to be paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5).

_____
MARK A. STEINBERG
An Attorney at Law of New Jersey


RECORD AND RETURN TO:

RICHARD J. PEPSNY, ESQUIRE
187 HIGHWAY NO. 34
MATAWAN NJ 07747

ALL-STATE LEGAL 800-222-0510   6311   RECYCLED



070167

Coastal Title Agency, Inc.
21 West Main Street • PO Box 740
Freehold, NJ 07728
1-800-521-0378

Prepared by: _____
Richard J. Pepsny, Esq.

## DEED

COUNTY OF MONMOUTH
CONSIDERATION  200,000
RTF  701   add'l RTF  75
DATE  4/8/97  BY  78

This Deed is made on, JULY 25TH, 1996,

BETWEEN:

Cristo Property Management, LTD

a corporation in the state of New Jersey, having its principal office at 25 Oakwood Drive, Parlin, New Jersey referred to as the Grantor,

AND:

Jill A. Montanye

whose post office address is 1917-1019 Bangs Avenue, Asbury Park, NJ

referred to as Grantee.

The word "Grantee" shall mean all Grantees listed above.

Transfer of Ownership. The Grantor grants and conveys (transfers ownership of) the property described below to the Grantee. This transfer is made for the sum of ($200,000.00). The Grantor acknowledges receipt of this money.

Tax Map Reference. (N.J.S.A.46:15-1.1) Municipality of Asbury Park
Block No.   64          Lot No.  7          Account no.

No Property tax identification number is available on the date of this Deed. (check box if applicable.)

Property. The Property consists of the land and all the buildings and structures on the land in the CITY of ASBURY PARK County of MONMOUTH and State of New Jersey. The legal description is:

SEE ATTACHED SCHEDULE FOR LEGAL DESCRIPTION.

BEING THE SAME PREMISES CONVEYED TO THE GRANTOR HEREIN BY DEED FROM NORMAN FREIDMAN AND ARLINE FREIDMAN DATED July 25, 1996 INWHICH DEED IS INTENDED TO BE RECORDED SIMULTANEOUSLY HEREWITH.

CLERK'S OFFICE
MONMOUTH COUNTY
NEW JERSEY
INSTRUMENT NUMBER
1997038156
RECORDED ON
Apr 08, 1997
2:09:09 PM
BOOK OR5589 PAGE 39
Total Pages: 3

COUNTY RECORDING FEES   $20.00
STATE RECORDING   $2.00
DEDICATED TRUST FUND COMMISSION   $200.20
COUNTY REALTY TRANSFER FEES   $497.80
STATE REALTY TRANSFER FEES   $675.00
REALTY TRANSFER FEES — RTF8   $797.00
TOTAL   $797.00

DB 5589-39
↳ 4/12/97

COMMONWEALTH LAND
TITLE INSURANCE COMPANY
A Reliance Group Holdings Company

**TITLE INSURANCE COMMITMENT**

Commitment No.

File No. CT-17767(A)

## DESCRIPTION

ALL that certain tract, lot and parcel of land lying and being in the Township of Neptune, County of Monmouth and state of New Jersey, being more particularly described as follows:

Known and designated as Lot Number Two Hundred and Eight (208) on Map of West Asbury Park, made by William H. DrNyse, Civil Engineer:

Beginning at a point in the northerly line of Bangs Avenue, distant two hundred (200) feet westerly from the northwesterly corner of Bangs Avenue and Langford Street; thence

1.  westerly along the northerly line of Bangs Avenue fifty (50) feet; thence

2.  northerly and at right angles to Bangs Avenue, or nearly so, one hundred (100) feet; thence

3.  easterly, and parallel with Bangs Avenue, fifty (50) feet; thence

4.  southerly, and again at right angles to Bangs Avenue, or nearly so, one hundred (100) feet to the place of Beginning.

Said premises are commonly known as 1017-1019 Bangs Avenue, Asbury Park, New Jersey.

NOTE: Being Lot(s) 7, Block 64, Tax Map of the City of Asbury Park.

Issued By:
COASTAL TITLE AGENCY, INC.
P.O. Box 740, 21 W. Main Street, Suite 2, Freehold, NJ 07728
(908) 308-1660  (800) 521-0378  (908) 775-5543  FAX #(908) 308-1881

Promises by Grantor. The Grantor promises that the Grantor
has done no act to encumber the property. This promise is called
a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise
means that the Grantor has not allowed anyone else to obtain any
legal rights which affect the property (such as by making a
mortgage or allowing a judgment to be entered against the Grantor).

Signatures. This Deed is signed and attested to by the
Grantor's proper corporate officers as of the date at the top of
the first page. Its corporate seal is affixed.

COMMONLY KNOWN AS: 1017-1019 BANGS AVENUE, ASBURY PARK, NEW JERSEY

Attested by:

By:.............................(SEAL)
WILLIAM KANE, PRESIDENT/SECRETARY

STATE OF NEW JERSEY:
COUNTY OF MIDDLESEX                    ss.

BE IT REMEMBERED, that on this 25TH day of JULY      1996,
before the subscriber, personally appeared WILLIAM KANE, who I am
satisfied is the President   and Secretary   of Cristo Property
Management LTD. the corporation named in and which executed the
within instrument, and who knows the corporate seal of the said
corporation and I having first made known to him the contents of
said instrument, he acknowledged that the same was signed by him as
such officer of said corporation, sealed with its corporate seal
and delivered by him as his voluntary act and deed and the
voluntary act and deed of the said corporation, made by virtue of
authority from its Board of Directors, and the full and actual
consideration paid or to be paid for the transfer of title is
$200,000.00. (Such consideration is defined in N.J.S.A. 46:15-5.)

Richard O. Pepsny
Attorney at Law State of New Jersey



WHEN RECORDED MAIL

WALSH SECURITIES, II
4 CAMPUS DRIVE
PARSIPPANY, NJ  0705

Loan Number : 619473

**COASTAL TITLE AGENCY, INC.**
21 WEST MAIN STREET
P.O. BOX 740
FREEHOLD, NJ 07728



070169

[SPACE ABOVE THIS LINE FOR RECORDING DATA]

# MORTGAGE

THIS MORTGAGE (" Security Instrument") is given on            July      25,  1996
The mortgagor is  JILL A. MONTANYE, UNMARRIED

("Borrower"). This Security Instrument is given to

NATIONAL HOME FUNDING

,which is organized and existing
under the laws of  NEW JERSEY                    , and whose principal office and mailing address is
3443 HIGHWAY 9-N HOLIDAY PLAZA, FREEHOLD, NJ 07728

("Lender"). Borrower owes Lender the principal sum of
One Hundred Fifty Thousand Dollars And 00/100

Dollars (U.S.$    150,000.00 ). This debt is evidenced by Borrower's note dated the same date as this Security
Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on
August    1, 2011    . This Security Instrument secures to Lender: (a) the repayment of the debt
evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all
other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the
performance of Borrower's covenants and agreements under this Security Instrument and the Note. This Security
Instrument and the Note secured hereby are subject to modification (including changes in the interest rate, the due date,
and other terms and conditions), as defined in New Jersey Laws 1985, ch. 353, § 1 et seq., and upon such modification,
shall have the benefit of the lien priority provisions of that law. The maximum principal amount secured by this Security
Instrument is $   150,000.00   . For these purposes, Borrower does hereby mortgage, grant and convey to Lender the
following described property located in  MONMOUTH                    County, New Jersey:
SEE LEGAL DESCRIPTION ATTACHED HERETO

CLERK'S OFFICE
MONMOUTH COUNTY
NEW JERSEY

INSTRUMENT NUMBER
1997038158
RECORDED ON
Apr 08, 1997
2:09:11 PM
BOOK/MB-6166 PG4563
Total Pages: 10

COUNTY RECORDING    $31.00
FEES
DEDICATED TRUST     $2.00
FUND COMMISSION
TOTAL               $33.00     which has the address of 1017-1019 BANGS AVENUE              ASBURY PARK
                                                          [Street]                           [City]

New Jersey    07712        ("Property Address");    * THE NOTE THIS SECURITY INSTRUMENT SECURES CONTAINS
              [Zip Code]                              PROVISIONS FOR A BALLOON PAYMENT.  THE ENTIRE PRINCIPAL
                                                     BALANCE OF THE LOAN AND UNPAID INTEREST IS PAYABLE
                                                     IN FULL AT MATURITY.
NEW JERSEY-Single Family -Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3031 9/90 (page 1 of 6 pages)

Eastern
Softwar
ITEM 1924 (9012)

*MB 6166-563*

*DC 4/8/97*

**COMMONWEALTH LAND**
**TITLE INSURANCE COMPANY**
**A Reliance Group Holdings Company**

**TITLE INSURANCE COMMITMENT**

Commitment No.

File No. CT-17767(A)

## DESCRIPTION

ALL that certain tract, lot and parcel of land lying and being in the Township of Neptune, County of Monmouth and state of New Jersey, being more particularly described as follows:

Known and designated as Lot Number Two Hundred and Eight (208) on Map of West Asbury Park, made by William H. DrNyse, Civil Engineer:

Beginning at a point in the northerly line of Bangs Avenue, distant two hundred (200) feet westerly from the northwesterly corner of Bangs Avenue and Langford Street; thence

1. westerly along the northerly line of Bangs Avenue fifty (50) feet; thence

2. northerly and at right angles to Bangs Avenue, or nearly so, one hundred (100) feet; thence

3. easterly, and parallel with Bangs Avenue, fifty (50) feet; thence

4. southerly, and again at right angles to Bangs Avenue, or nearly so, one hundred (100) feet to the place of Beginning.

Said premises are commonly known as 1017-1019 Bangs Avenue, Asbury Park, New Jersey.

NOTE: Being Lot(s) 7, Block 64, Tax Map of the City of Asbury Park.

Issued By:
COASTAL TITLE AGENCY, INC.
P.O. Box 740, 21 W. Main Street, Suite 2, Freehold, NJ 07728
(908) 308-1660   (800) 521-0378   (908) 775-5543   FAX #(908) 308-1881

# BALLOON RIDER

LOAN # 619473

(Full Repayment Required at Maturity)

THIS BALLOON RIDER is made this 25TH       day of  July    , 1996            , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Note to  NATIONAL HOME FUNDING

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

1017-1019 BANGS AVENUE, ASBURY PARK, NJ 07712

(Property Address)

The interest rate stated on the Note is called the "Note Rate". The date of the Note is called the "Note Date". I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive payments under the Note is called the "Note Holder".

The Note is a Balloon Note which means that the amount of my monthly payment is insufficient to repay the Note in full by Maturity. Therefore, the final payment will be significantly larger than the other payments under the Note.

I understand that the Lender is under no obligation to refinance the Note or to modify the Note or reset the Note Rate or to extend the Note Maturity Date or the Maturity Date of this Security Instrument, and that I will have to repay the Note from my own resources or find a Lender willing to lend me the money to repay the Note.

I further understand that should I not repay the Note on or before the Maturity Date, I will be in default, and the Lender will have the right to exercise all of its rights against me because of my default, including the right to foreclosure of the Security Instrument, or other remedies permitted by law.

BY SIGNING BELOW, BORROWER accepts and agrees to the terms and covenants contained in this Balloon Rider.

_____ (Seal)
JILL A. MONTANYE                                      -Borrower

_____ (Seal)
                                                     -Borrower

_____ (Seal)
                                                     -Borrower

_____ (Seal)
                                                     -Borrower

Balloon Rider                                                    (3-2-95) IC-22205-11

# 1-4 FAMILY RIDER
### Assignment of Rents

Loan Number: 619473

THIS 1-4 FAMILY RIDER is made this 25th day of July, 1996 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

NATIONAL HOME FUNDING

(the "Lender")

of the same date and covering the property described in the Security Instrument and located at:

1017-1019 BANGS AVENUE, ASBURY PARK, NJ 07712

[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains, and curtain rods, attached mirrors, cabinets, panelling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property".

B. USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C. SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D. RENT LOSS INSURANCE. Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Uniform Covenant 5.

E. "BORROWER'S RIGHT TO REINSTATE" DELETED. Uniform Covenant 18 is deleted.

MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac Uniform Instrument          Form 3170 9/90 (page 1 of 2 pages)

Eastern
Software
Systems  ITEM 1790 (9410)

F. BORROWER'S OCCUPANCY. Unless Lender and Borrower otherwise agree in writing, the first sentence in Uniform Covenant 6 concerning Borrower's occupancy of the Property is deleted. All remaining covenants and agreements set forth in Uniform Covenant 6 shall remain in effect.

G. ASSIGNMENT OF LEASES. Upon Lender's request, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.  Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to paragraph 21 of the Security Instrument and; (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Uniform Covenant 7.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in pages 1 and 2 of this 1-4 Family Rider.

_JILL A. MONTANYE_ _____ (Seal)
                                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Form 3170 9/90 (page 2 of 2 pages)

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.
2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the escrow items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the note.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender

requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any

Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT -- Uniform Covenants 9/90 (page 3 of 6 pages)

condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance by Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, required immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of:(a) 5 days (or such other period as applicable law may

Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT -- Uniform Covenants 9/90  (page 4 of 6 pages)

specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. No Claim of Credit for Taxes. Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

**24. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☐ Adjustable Rate Rider     ☐ Condominium Rider     ☒ 1-4 Family Rider

☐ Graduated Payment Rider     ☐ Planned Unit Development Rider     ☐ Biweekly Payment Rider

☒ Balloon Rider     ☐ Rate Improvement Rider     ☐ Second Home Rider

☒ Other(s) [specify]   LEGAL DESCRIPTION

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ (Seal)
JILL A. MONTANYE   -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

STATE OF NEW JERSEY,
Monmouth    County ss:

On this 25th day of July , 1996 , before me, the subscriber, personally appeared JILL A. MONTANYE

who, I am satisfied, is the person(s) named in and who executed the within instrument, and thereupon she acknowledged that she signed, sealed and delivered the same as her act and deed, for the purposes therein expressed.

_____
Notary Public

LORRAINE E. KING
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Feb. 21, 2001

This Instrument was prepared by: AMY REDMOND

Receipt of a true copy of this instrument, provided without charge, is hereby acknowledged.
Witness:

_____ (Seal)
JILL A. MONTANYE   -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

Form 3031 9/90 (page 6 of 6 pages)



RECYCLED

ALL-STATE®LEGAL 800-222-0510 • E011

**STANLEY YACKER**
ATTORNEY AT LAW
330 HIGHWAY 34, SUITE 3
P.O. BOX 991
MATAWAN, NEW JERSEY   07747

TELEPHONE (908) 566-9300
FAX (908) 290-2477

PLEASE REPLY TO:
MATAWAN OFFICE

CRANBURY - MONROE AREA OFFICE
RABINOWITZ, GRANATA, WEINER & YACKER
252 Applegarth Road
CRANBURY, NEW JERSEY   08512
PHONE (609) 655-4302 - FAX (609) 655-2511

July 17, 1996

National Home Funding, Inc.
3443 Route 9 North
Freehold, NJ   07728

RE:   JILL A. MONTANYE
1017-1019 BANGS AVENUE, ASBURY PARK

Dear Sir/Madam:

Please be advised that I am holding in escrow a check in the amount of $20,000.00 pertaining to the above matter.  Please be advised that 5% is borrower's own funds and 5% is a gift from relatives.

Thank you for your cooperation.

Very truly yours,

/s/ *Stanley Yacker*
STANLEY YACKER

SY/lk

WS1 037701



# SECONDARY MORTGAGE LOAN

### THIS PROMISSORY NOTE IS SUBJECT TO THE
### PROVISIONS OF THE SECONDARY MORTGAGE LOAN ACT

_____ 19___        _Asbury Park_ New Jersey
                                        City

_1017-1019 Bangs Ave  Asbury Park, NJ 07712_
Property Address              City           State        Zip Code

**1. BORROWER'S PROMISE TO PAY**
   In return for a loan that I have received, I promise to pay U.S. $ _30,000.00_
(this amount will be called "principal"), plus interest, to the order of the Lender. The Lender is
_____ I understand that the Lender may
transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive
payments under this Note will be called the "Note Holder."

**2. INTEREST**
   I will pay interest at a yearly rate of _6_ %.  _Interest Only_
   Interest will be charged on that part of principal which has not been paid. Interest will be charged
beginning on __8-1__ 19_96_ and continuing until the full amount of principal has
been paid.

**3. PAYMENTS**
   I will pay principal and interest by making payments each month of U.S. $ _150.00_
   I will make my payments on the _1st_ day of each month beginning on __8-1__ 19_96_. I will
make these payments every month until I have paid all of the principal and interest and any other charges
described below, that I may owe under this Note. If, on __7-31-2001__ I still owe amounts under
this Note, I will pay all these amounts, in full, on that date.
   I will make my monthly payment at _25 Oakwood Drive  Parlin, NJ_ .
_____ or at a different place if required by the Note Holder.

**4. BORROWER'S FAILURE TO PAY AS REQUIRED**
   (A) Notice From Note Holder
   If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written
notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must
be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the
date on which it is delivered to me.
   (B) Default
   If I do not pay the overdue amount by the date stated in the notice described in (A) above. I will be in
default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal
which has not been paid and all the interest that I owe on that amount.
   Even if at a time when I am in default, the Note Holder does not require me to pay immediately in full as
described above, the Note Holder will still have the right to do so if I am in default at a later time.
   (C) Payment of Note Holder's Costs and Expenses
   If the Note Holder has required me to pay immediately in full as described above, the Note Holder will
have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law.
These expenses include for example reasonable attorneys fees.

**5. THIS NOTE SECURED BY A MORTGAGE**
   In addition to the protections given to the Note Holder under this Note, a Mortgage dated
_____19_____ protects the Note Holder from possible losses
which might result if I do not keep the promises which I make in this Note. That Mortgage describes how and
under what conditions I may be required to make immediate payment in full of all amounts that I owe under
this Note.

**6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE**
   I have the right to make payments of principal at any time before they are due. A payment of principal
only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am
doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only
part of the unpaid principal is known as a "partial prepayment"

WSI 037662

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

**7. BORROWER'S WAIVERS**

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor") (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers."

**8. GIVING OF NOTICES**

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in the Note.

NOTICE TO BORROWER

READ THIS PROMISSORY NOTE BEFORE YOU SIGN.
DO NOT SIGN THIS PROMISSORY NOTE IF IT CONTAINS BLANK SPACES.
THIS PROMISSORY NOTE IS SECURED BY A SECONDARY MORTGAGE ON YOUR REAL
PROPERTY.

Witness:

_____   _____(Seal)
                                    Borrower

_____   _____(Seal)
                                    Borrower

                          _____(Seal)
                                    Borrower

WS1 037663

RECYCLED

ED11

ALL-STATE® LEGAL   306-227-0610

**This Lease** _15th_ day of _July_ _96_, between

_Jill A. Montagna_

hereinafter referred to as LANDLORD, and

_Robert and Bill_

hereinafter jointly, severally and collectively referred to as TENANT.

**Witnesseth,** that the Landlord hereby leases to the Tenant, and the Tenant hereby hires and takes

from the Landlord

in the building known as _1017-1019 Dewey Ave_

to be used and occupied by the Tenant _as No. 4_

and for no other purpose, for a term to commence on _X - 1_ 19 _96_ and to end

on _7 - 1 -_ 19 _97_ unless sooner terminated as hereinafter provided, at the ANNUAL RENT of

_$9,300.00_

all payable in equal monthly instalments in advance on the first day of each and every calendar month during said term,

except the first instalment, which shall be paid upon the execution hereof.

**THE TENANT JOINTLY AND SEVERALLY COVENANTS:**

**FIRST.—**That the Tenant will pay the rent as above provided.

**SECOND.—**That, throughout said term the Tenant will take good care of the demised premises, fixtures and appurtenances, and all alterations, additions and improvements to either; make all repairs in and about the same necessary to preserve them in good order and condition, which repairs shall be, in quality and class, equal to the original work; promptly pay the expense of such repairs; suffer no waste or injury; give prompt notice to the Landlord of any fire that may occur; execute and comply with all laws, rules, orders, ordinances and regulations at any time issued or in force (except those requiring structural alterations), applicable to the demised premises or to the Tenant's occupation thereof, of the Federal, State and Local Governments, and of each and every department, bureau and official thereof, and of the New York Board of Fire Underwriters; permit at all times during usual business hours, the Landlord and representatives of the Landlord to enter the demised premises for the purpose of inspection, and to exhibit them for purposes of sale or rental; suffer the Landlord to make repairs and improvements to all parts of the building, and to comply with all orders and requirements of governmental authority applicable to said building or to any occupation thereof; suffer the Landlord to erect, use, maintain, repair and replace pipes and conduits in the demised premises and to the floors above and below; forever indemnify and save harmless the Landlord for and against any and all liability, penalties, damages, expenses and judgments arising from injury during said term to person or property of any nature, occasioned wholly or in part by any act or acts, omission or omissions of the Tenant, or of the employees, guests, agents, assigns or undertenants of the Tenant and also for any matter or thing growing out of the occupation of the demised premises or of the streets, sidewalks or vaults adjacent thereto; permit, during the six months next prior to the expiration of the term the usual notice "To Let" to be placed and to remain unmolested in a conspicuous place upon the exterior of the demised premises; repair, at or before the end of the term, all injury done by the installation or removal of furniture and property; and at the end of the term, to quit and surrender the demised premises with all alterations, additions and improvements in good order and condition.

**THIRD.—**That the Tenant will not disfigure or deface any part of the building, or suffer the same to be done, except so far as may be necessary to affix such trade fixtures as are herein consented to by the Landlord; the Tenant will not obstruct, or permit the obstruction of the street or the sidewalk adjacent thereto; will not do anything, or suffer anything to be done upon the demised premises which will increase the rate of fire insurance upon the building or any of its contents, or be liable to cause structural injury to said building; will not permit the accumulation of waste or refuse matter, and will not, without the written consent of the Landlord first obtained in each case, either sell, assign, mortgage or transfer this lease, underlet the demised premises or any part thereof, permit the same or any part thereof to be occupied by anybody other than the Tenant and the Tenant's employees, make any alterations in the demised premises, use the demised premises or any part thereof for any purpose other than the one first above stipulated, or for any purpose deemed extra hazardous on account of fire risk, nor in violation of any law or ordinance. That the Tenant will not obstruct or permit the obstruction of the light, halls, stairway or entrances to the building, and will not erect or inscribe any sign, signals or advertisements unless and until the style and location thereof have been approved by the Landlord; and if any be erected or inscribed without such approval, the Landlord may remove the same. No water cooler, air conditioning unit or system or other apparatus shall be installed or used without the prior written consent of Landlord.

**IT IS MUTUALLY COVENANTED AND AGREED, THAT**

**FOURTH.—**If the demised premises shall be partially damaged by fire or other cause without the fault or neglect of Tenant, Tenant's servants, employees, agents, visitors or licensees, the damages shall be repaired by and at the expense of Landlord and the rent until such repairs shall be made shall be apportioned according to the part of the demised premises which is usable by Tenant. But if such partial damage is due to the fault or neglect of Tenant, Tenant's servants, employees, agents, visitors or licensees, without prejudice to any other rights and remedies of Landlord and without prejudice to the rights of subrogation of Landlord's insurer, the damages shall be repaired by Landlord but there shall be no apportionment or abatement of rent. No penalty shall accrue for reasonable delay which may arise by reason of adjustment of insurance on the part of Landlord and/or Tenant, and for reasonable delay on account of "labor troubles", or any other cause beyond Landlord's control, if the demised premises be totally damaged or be rendered wholly untenantable by fire or other cause, and if Landlord shall decide not to restore or not to rebuild the same, or if the building shall be so damaged that Landlord shall decide to demolish it or to rebuild it, then or in any of such events Landlord may, within ninety (90) days after such fire or other cause, give Tenant a notice in writing of such decision, which notice shall be given as in Paragraph Twelve hereof provided, and thereupon the term of this lease shall expire by lapse of time upon the third day after such notice is given, and Tenant shall vacate the demised premises and surrender the same to Landlord. If Tenant shall not be in default under this lease then, upon the termination of this lease under the conditions provided for in the sentence immediately preceding, Tenant's liability for rent shall cease as of the day following the casualty. Tenant hereby expressly waives the provisions of Section 227 of the Real Property Law and agrees that the foregoing provisions of this Article shall govern and control in lieu thereof. If the damage or destruction be due to the fault or neglect of Tenant the debris shall be removed by, and at the expense of, Tenant.

**FIFTH.—**If the whole or any part of the premises hereby demised shall be taken or condemned by any competent authority for any public use or purpose then the term hereby granted shall cease from the time when possession of the part so taken shall be required for such public purpose and without apportionment of award, the Tenant hereby assigning to the Landlord all right and claim to any such award, the current rent, however, in such case to be apportioned.

**SIXTH.—**If, before the commencement of the term, the Tenant be adjudicated a bankrupt, or make a "general assignment", or take the benefit of any insolvent act, or if a Receiver or Trustee be appointed for the Tenant's property, or if the estate of the Tenant hereunder be transferred or pass to or devolve upon any other person or corporation, or if the Tenant shall default in the performance of any agreement by the Tenant contained in any other lease to the Tenant by the Landlord or by any corporation of which an officer of the Landlord is a Director, this lease shall thereby, at the option of the Landlord, be terminated and in that case, neither the Tenant nor anybody claiming under the Tenant shall be entitled to go into possession of the demised premises, if after the commencement of the term, any of the events mentioned above in this subdivision shall occur, or if Tenant shall really default in fulfilling any of the covenants of this lease, other than the covenants for the payment of rent or "additional rent", or if the demised premises become vacant or deserted, the Landlord may give to the Tenant ten days' notice of intention to end the term of this lease, and thereupon at the expiration of said ten days' (if said condition which was the basis of said notice shall continue to exist) the term under this lease shall expire as fully and completely as if that day were the date herein definitely fixed for the expiration of the term and the Tenant will then quit and surrender the demised premises to the Landlord, but the Tenant shall remain liable as hereinafter provided.

WS1 037699

REPAIRS
ORDINANCES AND VIOLATIONS
ENTRY
INDEMNIFY LANDLORD
MOVING INJURY SURRENDER
NEGATIVE COVENANTS
OBSTRUCTION SIGNS
AIR CONDITIONING
FIRE CLAUSE
EMINENT DOMAIN
LEASE NOT IN EFFECT
DEFAULTS
TEN DAY NOTICE

THE TENANT FURTHER COVENANTS:

**IF A FIRST FLOOR**

TWENTY-SECOND.—If the demised premises or any part thereof consist of a store, or of a first floor, or of any part thereof, the Tenant will keep the sidewalk and curb in front thereof clean at all times and free from snow and ice, and will keep insured in favor of the Landlord all plate glass therein and furnish the Landlord with policies of insurance covering the same.

**INCREASED FIRE INSURANCE RATE**

TWENTY-THIRD.—If by reason of the conduct upon the demised premises of a business not herein permitted, or if by reason of the improper or careless conduct of any business upon or use of the demised premises, the fire insurance rate shall at any time be higher than it otherwise would be, then the Tenant will reimburse the Landlord, as additional rent hereunder, for that part of all fire insurance premiums hereafter paid out by the Landlord which shall have been charged because of the conduct of such business not so permitted, or because of the improper or careless conduct of any business upon or use of the demised premises, and will make such reimbursement upon the first day of the month following such outlay by the Landlord; but this covenant shall not apply to a period beyond the expiration date of this lease, first above specified, in any action or proceeding wherein the Landlord and Tenant are parties, a schedule or "make up" of rate for the building on the demised premises, purporting to have been issued by New York Fire Insurance Exchange, or other body making fire insurance rates for the demised premises, shall be prima facie evidence of the facts therein stated and of the several items and charges included in the fire insurance rate then applicable to the demised premises.

**WATER RENT**

**SEWER**

TWENTY-FOURTH.—If a separate water meter be installed for the demised premises, or any part thereof, the Tenant will keep the same in repair and pay the charges made by the municipality or water supply company for or in respect to the consumption of water, as and when bills therefor are rendered. If the demised premises, or any part thereof, be supplied with water through a meter which supplies other premises, the Tenant will pay to the Landlord, as and when bills are rendered therefor, the Tenant's proportionate part of all charges which the municipality or water supply company shall make for all water consumed through said meter, as indicated by said meter. Such proportionate part shall be fixed by apportioning the respective charges according to floor area against all of the rentable floor area in the building (exclusive of the basement) which shall have been occupied during the period of the respective charges, taking into account the period that each part of such area was occupied. Tenant agrees to pay as additional rent the Tenant's proportionate part, determined as aforesaid, of the sewer rent or charge imposed or assessed upon the building of which the premises are a part.

**ELECTRIC CURRENT**

TWENTY-FIFTH.—That the Tenant will purchase from the Landlord, if the Landlord shall so desire, all electric current that the Tenant requires at the demised premises, and will pay the Landlord for the same, as the amount of consumption shall be indicated by the meter furnished therefor. The price for said current shall be the same as that charged for consumption similar to that of the Tenant by the company supplying electricity in the same community. Payments shall be due as and when bills shall be rendered. The Tenant shall comply with the rules, regulations and contract provisions as those prescribed by said company for a consumption similar to that of the Tenant.

**SPRINKLER SYSTEM**

TWENTY-SIXTH.—If there now is or shall be installed in said building a "sprinkler system" the Tenant agrees to keep the appliances therein in the demised premises in repair and good working condition, and if the New York Board of Fire Underwriters or the New York Fire Insurance Exchange or any bureau, department or official of the State or local government requires or recommends that any changes, modifications, alterations or additional sprinkler heads or other equipment be made or supplied by reason of the Tenant's business, or the location of partitions, trade fixtures, or other contents of the demised premises, or if such changes, modifications, alterations, additional sprinkler heads or other equipment in the demised premises are necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate as fixed by said Exchange, or by any Fire Insurance Company, the Tenant will at the Tenant's own expense, promptly make and supply such changes, modifications, alterations, additional sprinkler heads or other equipment. As additional rent hereunder the Tenant will pay to the Landlord, annually in advance, throughout the term $................ toward the contract price for sprinkler supervisory service.

**SECURITY**

TWENTY-SEVENTH.—The sum of $................ Dollars is deposited by the Tenant herein with the Landlord herein as security for the faithful performance of all the covenants and conditions of the lease by the said Tenant. If the Tenant faithfully performs all the covenants and conditions on his part to be performed, then the sum deposited shall be returned to said Tenant.

**NUISANCE**

TWENTY-EIGHTH.—This lease is granted and accepted on the essentially understood and agreed condition that the Tenant will conduct his business in such a manner, both as regards noise and kindred nuisances, as will in no wise interfere with, annoy, or disturb any other tenants, in the conduct of their several businesses, or the landlord in the management of the building; under penalty of forfeiture of this lease and consequential liquidated damages.

**BROKERS COMMISSIONS**

TWENTY-NINTH.—The Landlord hereby recognizes ................ as the broker who negotiated and consummated this lease with the Tenant herein, and agrees that if, as, and when the Tenant exercises the option, if any, contained herein to renew this lease, or fails to exercise the option, if any, contained therein to cancel this lease, the Landlord will pay to said broker a further commission in accordance with the rules and commission rates of the Real Estate Board in the community. A sale, transfer, or other disposition of the Landlord's interest in said lease shall not operate to defeat the Landlord's obligation to pay the said commission to the said broker. The Tenant herein hereby represents to the Landlord that the said broker is the sole and only broker who negotiated and consummated this lease with the Tenant.

**WINDOW CLEANING**

THIRTIETH.—The Tenant agrees that it will not require, permit, suffer or allow the cleaning of any window, or windows, in the demised premises from the outside (within the meaning of Section 202 of the Labor Law) unless the equipment and safety devices required by law, ordinance, regulation or rule, including, without limitation, Section 202 of the New York Labor Law, are provided and used, and unless the rules, or any supplemental rules of the Industrial Board of the State of New York are fully complied with; and the Tenant hereby agrees to indemnify the Landlord, Owner, Agent, Manager and/or Superintendent, as a result of the Tenant's requiring, permitting, suffering, or allowing any window, or windows in the demised premises to be cleaned from the outside in violation of the requirements of the aforesaid laws, ordinances, regulations and/or rules.

**VALIDITY**

THIRTY-FIRST.—The invalidity or unenforceability of any provision of this lease shall in no way affect the validity or enforceability of any other provision thereof.

**EXECUTION & DELIVERY OF LEASE**

THIRTY-SECOND.—In order to avoid undue delay, this lease has been prepared and submitted to the Tenant for signature with the understanding that it shall not bind the Landlord unless and until it is executed and delivered by the Landlord.

**EXTERIOR OF PREMISES**

THIRTY-THIRD.—The Tenant will keep clean and polished all metal, trim, marble and stonework which are a part of the exterior of the premises, using such materials and methods as the Landlord may direct, and if the Tenant shall fail to comply with the provisions of this paragraph, the Landlord may cause such work to be done at the expense of the Tenant.

**PLATE GLASS**

THIRTY-FOURTH.—The Landlord shall replace at the expense of the Tenant any and all broken glass in the skylights, doors and walls in and about the demised premises. The Landlord may insure and keep insured all plate glass in the skylights, doors and walls in the demised premises, for and in the name of the Landlord and bills for the premiums therefor shall be rendered by the Landlord to the Tenant at such times as the Landlord may elect, and shall be due from and payable by the Tenant when rendered, and the amount thereof shall be deemed to be, and shall be paid as, additional rent.

**WAR EMERGENCY**

THIRTY-FIFTH.—This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in nowise be affected, impaired or excused because Landlord is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repairs, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of governmental preemption in connection with a National Emergency declared by the President of the United States or in connection with any rule, order or regulation of any department or subdivision thereof of any government agency by reason of the conditions of supply and demand which have been or are affected by war or other emergency.

THE LANDLORD COVENANTS:

**QUIET POSSESSION**

FIRST.—That if and so long as the Tenant pays the rent and "additional rent" reserved hereby, and performs and observes the covenants and provisions hereof, the Tenant shall quietly enjoy the demised premises, subject, however, to the terms of this lease, and to the mortgages above mentioned, provided however, that this covenant shall be conditioned upon the retention of title to the premises by Landlord.

**ELEVATOR**

**HEAT**

SECOND.—Subject to the provisions of Paragraph "Fourteenth" above the Landlord will furnish the following respective services: (a) Elevator service, if the building shall contain an elevator or elevators, on all days except Sundays and holidays, from ........ A.M. to ........ P.M. and on Saturdays from ........ A.M. to ........ P.M.; (b) Heat, during the same hours on the same days in the cold season in each year.

And it is mutually understood and agreed that the covenants and agreements contained in the within lease shall be binding upon the parties hereto and upon their respective successors, heirs, executors and administrators.

In Witness Whereof, the Landlord and Tenant have respectively signed and sealed these presents the day and year first above written.

..................................... [L. S.]
Landlord

In Presence of:

..................................... [L. S.]
Tenant

WSI 037700

# This Lease

_15th_ day of _Jul,_ ~ ~ ~ between

_Jill A. Mountif_

hereinafter referred to as LANDLORD, and

_Gregoria Piatta_

hereinafter jointly, severally and collectively referred to as TENANT.

**Witnesseth,** that the Landlord hereby leases to the Tenant, and the Tenant hereby hires and takes

from the Landlord

in the building known as _1017-1019 BANG AVE._

to be used and occupied by the Tenant _AS Apt. 3_

and for no other purpose, for a term to commence on _7 - 1_ 19 _96_, and to end

on _7 - 31 -_ 19 _97_, unless sooner terminated as hereinafter provided, at the ANNUAL RENT of

_$8,100.00_

all payable in equal monthly instalments in advance on the first day of each and every calendar month during said term,

except the first instalment, which shall be paid upon the execution hereof.

THE TENANT JOINTLY AND SEVERALLY COVENANTS:

FIRST.—That the Tenant will pay the rent as above provided.

**REPAIRS**

SECOND.—That, throughout said term the Tenant will take good care of the demised premises, fixtures and appurtenances, and all alterations, additions and improvements to either; make all repairs in and about the same necessary to preserve them in good order and condition, which repairs shall be, in quality and class, equal to the original work; promptly pay the expense of such repairs; suffer no waste or injury; give prompt notice to the Landlord of any fire that may occur; execute and comply with all laws, rules, orders, ordinances and regulations at any time issued or in force (except those requiring structural alterations), applicable to the demised premises or to the Tenant's occupation thereof, of the Federal, State and Local Government, and of each and every department, bureau and official thereof, and of the New York Board of Fire Underwriters; permit at all times during usual business hours, the Landlord and representatives of the Landlord to enter the demised premises for the purpose of inspection, and to exhibit them for purposes of sale or rental; suffer the Landlord to make repairs and improvements to all parts of the building, and to comply with all orders and requirements of governmental authority applicable to said building or to any occupation thereof; suffer the Landlord to erect, use, maintain, repair and replace pipes and conduits in the demised premises and to the floors above and below; forever indemnify and save harmless the Landlord for and against any and all liability, penalties, damages, expenses and judgments arising from injury during said term to person or property of any nature, occasioned wholly or in part by any act or acts, omission or omissions of the Tenant, or of the employees, guests, agents, assigns or undertenants of the Tenant and also for any matter or thing growing out of the occupation of the demised premises or of the streets, sidewalks or vaults adjacent thereto; permit, during the six months next prior to the expiration of the term the usual notice "To Let" to be placed and to remain unmolested in a conspicuous place upon the exterior of the demised premises; repair, at or before the end of the term, all injury done by the installation or removal of furniture and property; and at the end of the term, to quit and surrender the demised premises with all alterations, additions and improvements in good order and condition.

**ORDINANCES AND VIOLATIONS**

**ENTRY**

**INDEMNIFY LANDLORD**

**MOVING INJURY SURRENDER**

THIRD.—That the Tenant will not disfigure or deface any part of the building, or suffer the same to be done, except so far as may be necessary to affix such trade fixtures as are herein consented to by the Landlord; the Tenant will not obstruct, or permit the obstruction of the street or the sidewalk adjacent thereto; will not do anything, or suffer anything to be done upon the demised premises which will increase the rate of fire insurance upon the building or any of its contents, or be liable to cause structural injury to said building; will not permit the accumulation of waste or refuse matter, and will not, without the written consent of the Landlord first obtained in each case, either sell, assign, mortgage or transfer this lease, underlet the demised premises or any part thereof, permit the same or any part thereof to be occupied by anybody other than the Tenant and the Tenant's employees, make any alterations in the demised premises, use the demised premises or any part thereof for any purpose other than one first above stipulated, or for any purpose deemed extra hazardous on account of fire risk, nor in violation of any law or ordinance. That the Tenant will not obstruct or permit the obstruction of the light, halls, stairway or entrances to the building, and will not erect or inscribe any sign, signals or advertisements unless and until the style and location thereof have been approved by the Landlord; and if any be erected or inscribed without such approval, the Landlord may remove the same. No water cooler, air conditioning unit or system or other apparatus shall be installed or used without the prior written consent of Landlord.

**NEGATIVE COVENANTS**

**OBSTRUCTION SIGNS**

**AIR CONDITIONING**

IT IS MUTUALLY COVENANTED AND AGREED, THAT

FOURTH.—If the demised premises shall be partially damaged by fire or other cause without the fault or neglect of Tenant, Tenant's servants, employees, agents, visitors or licensees, the damages shall be repaired by and at the expense of Landlord and the rent until such repairs shall be made shall be apportioned according to the part of the demised premises which is usable by Tenant. But if such partial damage is due to the fault or neglect of Tenant, Tenant's servants, employees, agents, visitors or licensees, without prejudice to any other rights and remedies of Landlord and without prejudice to the rights of subrogation of Landlord's insurer, the damages shall be repaired by Landlord but there shall be no apportionment or abatement of rent. No penalty shall accrue for reasonable delay which may arise by reason of adjustment of insurance on the part of Landlord and/or Tenant, and for reasonable delay on account of "labor troubles", or any other cause beyond Landlord's control. If the demised premises are totally damaged or are rendered wholly untenantable by fire or other cause, and if Landlord shall decide not to restore or not to rebuild the same, or if the building shall be so damaged that Landlord shall decide to demolish it or to rebuild it, then or in any of such events Landlord may, within ninety (90) days after such fire or other cause, give Tenant a notice in writing of such decision, which notice shall be given as in Paragraph Twelve hereof provided, and thereupon the term of this lease shall expire by lapse of time upon the third day after such notice is given, and Tenant shall vacate the demised premises and surrender the same to Landlord. If Tenant shall not be in default under this lease then, upon the termination of this lease under the conditions provided for in the sentence immediately preceding, Tenant's liability for rent shall cease as of the day following the casualty. Tenant hereby expressly waives the provisions of Section 227 of the Real Property Law and agrees that the foregoing provisions of this Article shall govern and control in lieu thereof. If the damage or destruction be due to the fault or neglect of Tenant the debris shall be removed by, and at the expense of, Tenant.

**FIRE CLAUSE**

FIFTH.—If the whole or any part of the premises hereby demised shall be taken or condemned by any competent authority for any public use or purpose then the term hereby granted shall cease from the time when possession of the part so taken shall be required for such public purpose and without apportionment of award, the Tenant hereby assigning to the Landlord all right and claim to any such award, the current rent, however, in such case to be apportioned.

**EMINENT DOMAIN**

SIXTH.—If, before the commencement of the term, the Tenant be adjudicated a bankrupt, or makes a "general assignment," or take the benefit of any insolvent act, or if a Receiver or Trustee be appointed for the Tenant's property, or if this lease or the estate of the Tenant hereunder be transferred or pass to or devolve upon any other person or corporation, or if the Tenant shall default in the performance of any agreement by the Tenant contained in any other lease to the Tenant by the Landlord or by any corporation of which an officer of the Landlord is a Director, this lease shall thereby, at the option of the Landlord, be terminated and in that case, neither the Tenant nor anybody claiming under this Tenant shall be entitled to go into possession of the demised premises. If after the commencement of the term, any of the events mentioned above in this subdivision shall occur, or if Tenant shall make default in fulfilling any of the covenants of this lease, other than the covenants for the payment of rent or "additional rent" or if the demised premises become vacant or deserted, the Landlord may give to the Tenant ten days' notice of intention to end the term of this lease, and thereupon at the expiration of said ten days' (if said conditions which was the basis of said notice shall continue to exist) the term under this lease shall expire as fully and completely as if that day were the date herein definitely fixed for the expiration of the term and the Tenant will then quit and surrender the demised premises to the Landlord, but the Tenant shall remain liable as hereinafter provided.

**LEASE NOT IN EFFECT**

**DEFAULTS**

**TEN DAY NOTICE**

WS1 037697

THE TENANT FURTHER C... ...

**IF A FIRST FLOOR**
TWENTY-SECOND.—If the demised premises or any part thereof consist of a store, or of a first floor, or of any part thereof, the Tenant will keep the sidewalk and curb in front thereof clean at all times and free from snow and ice, and will keep insured in favor of the Landlord, all plate glass therein and furnish the Landlord with policies of insurance covering the same.

**INCREASED FIRE INSURANCE RATE**
TWENTY-THIRD.—If by reason of the conduct upon the demised premises of a business not herein permitted, or by reason of the improper or careless conduct of any business upon or use of the demised premises, the fire insurance rate shall at any time be higher than it otherwise would be, then the Tenant will reimburse the Landlord, as additional rent hereunder, for that part of all fire insurance premiums hereafter paid out by the Landlord which shall have been charged because of the conduct of such business and so permitted or carried on in the demised premises, and will make such reimbursement under the first day of the month following such notice by the Landlord; but this covenant shall not apply to a premium for any period beyond the expiration date of this lease, first above specified, in any action or proceeding wherein the Landlord and Tenant are parties, a schedule or "make up" of rate for the building on the demised premises, purporting to have been issued by New York Fire Insurance Exchange, or other body making fire insurance rates for the demised premises, shall be prima facie evidence of the facts therein stated and of the several items and charges included in the fire insurance rate then applicable to the demised premises.

**WATER RENT**
TWENTY-FOURTH.—If a separate water meter be installed for the demised premises, or any part thereof, the Tenant will keep the same in repair and pay the charges made by the municipality or water supply company for or in respect to the consumption of water, as and when bills therefor are rendered. If the demised premises, or any part thereof, be supplied with water through a meter which supplies other premises, the Tenant will pay to the Landlord, as and when bills are rendered therefor, the Tenant's proportionate part of all charges which the municipality or water supply company shall make for all water consumed through said meter, as indicated by said meter. Such proportionate part shall be fixed by apportioning the respective charges according to floor area against all of the rentable floor area in the building (exclusive of the basement) which shall have been occupied during the period of the respective charges, taking into account the period that each part of such area was occupied. The Tenant agrees to pay as additional rent the Tenant's proportionate part, determined as aforesaid, of the sewer rent or charge imposed or assessed upon the building of which the premises are a part.

**SEWER**

**ELECTRIC CURRENT**
TWENTY-FIFTH.—That the Tenant will purchase from the Landlord, if the Landlord shall so desire, all electric current that the Tenant requires at the demised premises, and will pay the Landlord for the same, as the amount of consumption shall be indicated by the meter furnished therefor. The price for said current shall be the same as that charged for consumption similar to that of the Tenant by the company supplying electricity in the same community. Payments shall be due as and when bills shall be rendered. The Tenant shall comply with the rules, regulations and contract provisions as those prescribed by said company for a consumption similar to that of the Tenant.

**SPRINKLER SYSTEM**
TWENTY-SIXTH.—If there now is or shall be installed in said building a "sprinkler system" the Tenant agrees to keep the appliances thereto in the demised premises in repair and good working condition, and if the New York Board of Fire Underwriters or the New York Fire Insurance Exchange or any bureau, department or official of the State or local government requires or recommends that any changes, modifications, alterations or additional sprinkler heads or other equipment be made or supplied by reason of the Tenant's business, or the location of partitions, trade fixtures, or other contents of the demised premises, or if such changes, modifications, alterations, additional sprinkler heads or other equipment in the demised premises are necessary to prevent the imposition of a penalty or charges against the full allowance for a sprinkler system in the fire insurance rate as fixed by said Exchange, or by any Fire Insurance Company, the Tenant will at the Tenant's own expense, promptly make and supply such changes, modifications, alterations, additional sprinkler heads or other equipment. As additional rent hereunder the Tenant will pay to the Landlord, annually in advance, throughout the term $................ toward the contract price for sprinkler supervisory service.

**SECURITY**
TWENTY-SEVENTH.—The sum of.............................................................................................Dollars is deposited by the Tenant herein with the Landlord herein as security for the faithful performance of all the covenants and conditions of the lease by the said Tenant. If the Tenant faithfully performs all the covenants and conditions on his part to be performed, then the sum deposited shall be returned to said Tenant.

**NUISANCE**
TWENTY-EIGHTH.—This lease is granted and accepted on the especially understood and agreed condition that the Tenant will conduct his business in such a manner, both as regards noise and kindred nuisances, as will in no wise interfere with, annoy, or disturb any other tenants, in the conduct of their several businesses, or the landlord in the management of the building; under penalty or forfeiture of this lease and consequential damages.

**BROKERS COMMISSIONS**
TWENTY-NINTH.—The Landlord hereby recognizes.........................................................................as the broker who negotiated and consummated this lease with the Tenant herein, and agrees that if, as, and when the Tenant exercises the option, if any, contained herein to renew this lease, or fails to exercise the option, if any, contained therein to cancel this lease, the Landlord will pay to said broker a further commission in accordance with the rules and commission rates of the Real Estate Board in the community, a sale, transfer, or other disposition of the Landlord's interest in said lease shall not operate to defeat the Landlord's obligation to pay the said commission to the said broker. The Tenant herein hereby represents to the Landlord that the said broker is the sole and only broker who negotiated and consummated this lease with the Tenant.

**WINDOW CLEANING**
THIRTIETH.—The Tenant agrees that it will not require, permit, suffer, nor allow the cleaning of any window, or windows, in the demised premises from the outside (within the meaning of Section 202 of the Labor Law) unless the equipment and safety devices required by law, ordinance, regulation or rule, including, without limitation, Section 202 of the New York Labor Law, are provided and used, and unless the rules, or any supplemental rules of the Industrial Board of the State of New York are fully complied with; and the Tenant hereby agrees to indemnify the Landlord, Owner, Agent, Manager and/or Superintendent, as a result of the Tenant's requiring, permitting, suffering, or allowing any window, or windows in the demised premises to be cleaned from the outside in violation of the requirements of the aforesaid laws, ordinances, regulations and/or rules.

**VALIDITY**
THIRTY-FIRST.—The invalidity or unenforceability of any provision of this lease shall in no way affect the validity or enforceability of any other provision hereof.

**EXECUTION & DELIVERY OF LEASE**
THIRTY-SECOND.—In order to avoid delay, this lease has been prepared and submitted to the Tenant for signature with the understanding that it shall not bind the Landlord unless and until it is executed and delivered by the Landlord.

**INTERIOR OF PREMISES**
THIRTY-THIRD.—The Tenant will keep clean and polished all metal, trim, marble and stonework which are a part of the exterior of the premises, using such materials and methods as the Landlord may direct, and if the Tenant shall fail to comply with the provisions of this paragraph, the Landlord may cause such work to be done at the expense of the Tenant.

**PLATE GLASS**
THIRTY-FOURTH.—The Landlord shall replace at the expense of the Tenant any and all broken glass in the skylights, doors and walls in and about the demised premises. The Landlord may insure and keep insured all plate glass in the skylights, doors and walls in the demised premises, for and in the name of the Landlord and bills for the premiums therefor shall be rendered by the Landlord to the Tenant at such times as the Landlord may elect, and shall be due from and payable by the Tenant when rendered, and the amount thereof shall be deemed to be, and shall be paid as, additional rent.

**WAR EMERGENCY**
THIRTY-FIFTH.—This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in nowise be affected, impaired or excused because Landlord is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repairs, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of governmental preemption in connection with a National Emergency declared by the President of the United States or in connection with any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.

THE LANDLORD COVENANTS

FIRST.—That if and so long as the Tenant pays the rent and "additional rent" reserved hereby, and performs and observes the covenants and provisions hereof, the Tenant shall quietly enjoy the demised premises, subject, however, to the terms of this lease, and to the mortgages above mentioned, provided however, that this covenant shall be conditioned upon the retention of title to the premises by Landlord.

SECOND.—Subject to the provisions of Paragraph "Fourteenth" above the Landlord will furnish the following respective services: (a) Elevator service, if the building shall contain an elevator or elevators, on all days except Sundays and holidays, from ........ A.M. to ........ P.M. and on Saturdays from ........ A.M. to ........ P.M.; (b) Heat, during the same hours on the same days in the cold season in each year.

And it is mutually understood and agreed that the covenants and agreements contained in the within lease shall be binding upon the parties hereto and upon their respective successors, heirs, executors and administrators.

In Witness Whereof, the Landlord and Tenant have respectively signed and sealed these presents the day and year first above written.

_____ [L. S.]
Landlord

In Presence Of:

_____ [L. S.]
Tenant

**This Lease** ........ day of Junt ......., between

*Jill A. Moniquye*

hereinafter referred to as LANDLORD, and

hereinafter jointly, severally and collectively referred to as TENANT.

**Witnesseth,** that the Landlord hereby leases to the Tenant, and the Tenant hereby hires and takes

from the Landlord

in the building known as *1017-10    Bange Av*

to be used and occupied by the Tenant AS Apt 1

and for no other purpose, for a term to commence on    8 - 1    19 86, and to end

on    7 - 31    1978, unless sooner terminated as hereinafter provided, at the ANNUAL RENT of

$ 1200.00

all payable in equal monthly instalments in advance on the first day of each and every calendar month during said term,

except the first instalment, which shall be paid upon the execution hereof.

THE TENANT JOINTLY AND SEVERALLY COVENANTS:

FIRST.—That the Tenant will pay the rent as above provided.

REPAIRS

SECOND.—That, throughout said term the Tenant will take good care of the demised premises, fixtures and appurtenances, and all alterations, additions and improvements to either; make all repairs to and about the same necessary to preserve them in good order and condition, which repairs shall be, in quality and class, equal to the original work; promptly

ORDINANCES AND VIOLATIONS

ENTRY

INDEMNIFY LANDLORD

THIRD.—That the Tenant will not disfigure or deface any part of the building, or suffer the same to be done, except

MOVING INJURY SURRENDER

NEGATIVE COVENANTS

OBSTRUCTION SIGNS

AIR CONDITIONING

IT IS MUTUALLY COVENANTED AND AGREED, THAT

FOURTH.—If the demised premises shall be partially damaged by fire or other cause without the fault or neglect of Tenant,

FIRE CLAUSE

FIFTH.—If the whole or any part of the premises hereby demised shall be taken or condemned by any competent authority

EMINENT DOMAIN

LEASE NOT IN EFFECT

SIXTH.—If, before the commencement of the term, the Tenant be adjudicated a bankrupt, or make a "general assignment,"

DEFAULTS

TEN DAY NOTICE

WSI 037695

THE TENANT FURTHER COVENANTS:

**IS A FIRST FLOOR**

TWENTY-SECOND.—If the demised premises or any part thereof consist of a store, or of a first floor, or of any part thereof, the Tenant will keep the sidewalk and curb in front thereof clean at all times and free from snow and ice, and will keep insured in favor of the Landlord, all plate glass therein and furnish the Landlord with policies of insurance covering the same.

**INCREASED FIRE INSURANCE RATE**

TWENTY-THIRD.—If by reason of the conduct upon the demised premises of a business not herein permitted, or it by reason of the improper or careless conduct of any business upon or use of the demised premises, the fire insurance rate shall in any time be higher than it otherwise would be, then the Tenant will reimburse the Landlord, as additional rent hereunder, for that part of all fire insurance premiums hereafter paid out by the Landlord which shall have been charged because of the conduct of such business not so permitted, or because of the improper or careless conduct of any business upon or use of the demised premises, and will make such reimbursement upon the first day of the month following such outlay by the Landlord; but this covenant shall not apply to a premium for any period beyond the expiration date of this lease, first above specified. In any action or proceeding wherein the Landlord and Tenant are parties, a schedule or "make up" of risk for the building on the demised premises, purporting to have been issued by New York Fire Insurance Exchange, or other body making fire insurance rates for the demised premises, shall be prima facie evidence of the facts therein stated and of the several items and charges included in the fire insurance rate then applicable to the demised premises.

**WATER RENT**

TWENTY-FOURTH.—If a separate water meter be installed for the demised premises, or any part thereof, the Tenant will keep the same in repair and pay the charges made by the municipality or water supply company for or in respect to the consumption of water, as and when bills therefor are rendered. If the demised premises, or any part thereof, be supplied with water through a meter which supplies other premises, the Tenant will pay to the Landlord, as and when bills are rendered therefor, the Tenant's proportionate part of all charges which the municipality or water supply company shall make for all water consumed through said meter, as indicated by said meter. Such proportionate part shall be fixed by apportioning the respective charge according to floor area against all of the rentable floor area in the building (inclusive of the basement) which shall have been occupied during the period of the respective charges, taking into account the period that each part of such area was occupied. Tenant agrees to pay as additional rent the Tenant's proportionate part, determined as aforesaid, of the sewer rent or charge imposed or assessed upon the building of which the premises are a part.

**SEWER**

**ELECTRIC CURRENT**

TWENTY-FIFTH.—That the Tenant will purchase from the Landlord, if the Landlord shall so desire, all electric current that the Tenant requires at the demised premises, and will pay the Landlord for the same, as the amount of consumption shall be indicated by the meter furnished therefor. The price for said current shall be the same as that charged for consumption similar to that of the Tenant by the company supplying electricity in the same community. Payments shall be due as and when bills shall be rendered. The Tenant shall comply with like rules, regulations and contract provisions as those prescribed by said company for a consumption similar to that of the Tenant.

**SPRINKLER SYSTEM**

TWENTY-SIXTH.—If there now is or shall be installed in said building a "sprinkler system" the Tenant agrees to keep the appliances thereto in the demised premises in repair and good working condition, and if the New York Board of Fire Underwriters or the New York Fire Insurance Exchange or any bureau, department or official of the State or local government requires or recommends that any changes, modifications, alterations or additional sprinkler heads or other equipment be made or supplied by reason of the Tenant's business, or the location of partitions, trade fixtures, or other contents of the demised premises, or if such changes, modifications, alterations, additional sprinkler heads or other equipment in the demised premises are necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate as fixed by said Exchange, or by any Fire Insurance Company, the Tenant will at the Tenant's own expense, promptly make and supply such changes, modifications, alterations, additional sprinkler heads or other equipment. As additional rent hereunder the Tenant will pay to the Landlord, annually in advance, throughout the term $............... toward the contract price for sprinkler supervisory service.

**SECURITY**

TWENTY-SEVENTH.—The sum of..............................................Dollars is deposited by the Tenant herein with the Landlord as security for the faithful performance of all the covenants and conditions of the lease by the said Tenant. If the Tenant faithfully performs all the covenants and conditions on his part to be performed, then the sum deposited shall be returned to said Tenant.

**NUISANCE**

TWENTY-EIGHTH.—This lease is granted and accepted on the especially understood and agreed condition that the Tenant will conduct his business in such a manner, both as regards noise and kindred nuisances, as will in no wise interfere with, annoy, or disturb any other tenants, in the conduct of their several business, or the landlord in the management of the building; under penalty of forfeiture of this lease and consequential damages.

**BROKERS COMMISSIONS**

TWENTY-NINTH.—The Landlord hereby recognizes ...........................................................as the broker who negotiated and consummated this lease with the Tenant herein, and agrees that if, as, and when the Tenant exercises the option, if any, contained herein to renew this lease, or fails to exercise the option, if any, contained therein to cancel this lease, the Landlord will pay to said broker a further commission in accordance with the rules and commission rates of the Real Estate Board in the community. A sale, transfer, or other disposition of the Landlord's interest in said lease shall not operate to defeat the Landlord's obligation to pay the said commission to the said broker. The Tenant herein hereby represents to the Landlord that the said broker is the sole and only broker who negotiated and consummated this lease with the Tenant.

**WINDOW CLEANING**

THIRTIETH.—The Tenant agrees that it will not require, permit, suffer, nor allow the cleaning of any window, or windows, in the demised premises from the outside (within the meaning of Section 202 of the Labor Law) unless the equipment and safety devices required by law, ordinance, regulation or rule, including, without limitation, Section 202 of the New York Labor Law, are provided and used, and unless the rules, or any supplemental rules of the Industrial Board of the State of New York are fully complied with; and the Tenant hereby agrees to indemnify the Landlord, Owner, Agent, Manager and/or Superintendent, as a result of the Tenant's requiring, permitting, suffering, or allowing any window, or windows in the demised premises to be cleaned from the outside in violation of the requirements of the aforesaid laws, ordinances, regulations and/or rules.

**VALIDITY**

THIRTY-FIRST.—The invalidity or unenforceability of any provision of this lease shall in no way affect the validity or enforceability of any other provision hereof.

**EXECUTION & DELIVERY OF LEASE**

THIRTY-SECOND.—In order to avoid delay, this lease has been prepared and submitted to the Tenant for signature with the understanding that it shall not bind the Landlord unless and until it is executed and delivered by the Landlord.

**EXTERIOR OF PREMISES**

THIRTY-THIRD.—The Tenant will keep clean and polished all metal, trim, marble and stonework which are a part of the exterior of the premises, using such materials and methods as the Landlord may direct, and if the Tenant shall fail to comply with the provisions of this paragraph, the Landlord may cause such work to be done at the expense of the Tenant.

**PLATE GLASS**

THIRTY-FOURTH.—The Landlord shall replace at the expense of the Tenant any and all broken glass in the skylights, doors and walls in and about the demised premises. The Landlord may insure and keep insured all plate glass in the skylights, doors and walls in the demised premises, for and in the name of the Landlord and bills for the premiums therefor shall be rendered by the Landlord to the Tenant at such times as the Landlord may elect, and shall be due from and payable by the Tenant when rendered, and the amount thereof shall be deemed to be, and shall be paid as, additional rent.

**WAR EMERGENCY**

THIRTY-FIFTH.—This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in nowise be affected, impaired or excused because Landlord is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repairs, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of governmental preemption in connection with a National Emergency declared by the President of the United States or in connection with any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.

THE LANDLORD COVENANTS

**QUIET POSSESSION**

FIRST.—That if and so long as the Tenant pays the rent and "additional rent" reserved hereby, and performs and observes the covenants and provisions hereof, the Tenant shall quietly enjoy the demised premises, subject, however, to the terms of this lease, and to the mortgages above mentioned, provided however, that this covenant shall be conditioned upon the retention of title to the premises by Landlord.

**ELEVATOR**

SECOND.—Subject to the provisions of Paragraph "Fourteenth" above the Landlord will furnish the following respective services: (a) Elevator service, if the building shall contain an elevator or elevators, on all days except Sundays and holidays, from ......A.M. to ......P.M.; and on Saturdays from ......A.M. to ......P.M.; (b) Heat, during the same hours on the same days in the cold season in each year.

**HEAT**

And it is mutually understood and agreed that the covenants and agreements contained in the within lease shall be binding upon the parties hereto and upon their respective successors, heirs, executors and administrators.

**In Witness Whereof,** the Landlord and Tenant have respectively signed and sealed these presents the day and year first above written.

.......................................................... [L. S.]
Landlord

In Presence Of:

.......................................................... [L. S.]
Tenant

WSI 037696

RECYCLED

ALL-STATE® LEGAL 800-222-0510 11/03

HUD A UNIFORM SETTLEMENT STAT A

| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | | SETTLEMENT STATEMENT |
|---|---|---|

| 1. TYPE OF LOAN | 6. File Number: | 7. Loan Number: 619473 |
|---|---|---|
| 1. _ FHA   2. _ FMHA   3. X CONV. UNINS. 4. _ VA   5. _ CONV. INS. | 8. Mortgage Insurance Case Number: | |

2. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.   NOTE: TIN = Taxpayer's Identification Number.

| D. NAME AND ADDRESS OF BORROWER: ILL MONTANTE        1017 | E. NAME, ADDRESS AND TIN OF SELLER: CRISTO PROPERTY MANAGEMENT | F. NAME AND ADDRESS OF LENDER: National Home Funding Inc. 3443 Route 9 North Freehold, NJ   07728 |
|---|---|---|

| G. PROPERTY LOCATION: 1017-1019 BANGS AVENUE ASBURY PARK, NJ | H. SETTLEMENT AGENT: NAME AND TIN Stanley Yacker, Esq. | PLACE OF SETTLEMENT: 330 State Highway No. 34 P.O. Box 991 Matawan, New Jersey 07747 |
|---|---|---|
| | I. SETTLEMENT DATE: 07/25/96 | |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract sales price | 200,000.00 | 401. Contract sales price | 200,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (ln 1400) | 692.21 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes        to  07/31 | 151.56 | 406. City/town taxes        to  07/31 | 151.56 |
| 107. County taxes          to | | 407. County taxes          to | |
| 108. Assessments           to | | 408. Assessments           to | |
| 109. SEWER ADJUSTMENT TO 7/31 | 47.34 | 409. SEWER ADJUSTMENT TO 7/31 | 47.34 |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 200,891.11 | 420. GROSS AMOUNT DUE TO SELLER | 200,198.90 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| 201. Deposit or earnest money | 20,000 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 150,000 | 502. Settlement charges to seller (ln 1400) | 13,069.24 |
| 203. Existing loan(s) taken subject to | 30,000 | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes        to | | 510. City/town taxes        to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments           to | | 512. Assessments           to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 200,000 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 13,069.24 |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER | | 600. CASH AT SETTLEMENT TO/FROM SELLER | |
| 301. Gross amount due from borrower (ln 120) | 200,891.11 | 601. Gross amount due to seller (ln 420) | 200,198.90 |
| 302. Less amts paid by/for borrower (ln 220) | 200,000 | 602. Less reduct in amt due seller (ln 520) | 13,069.24 |
| 303. CASH FROM BORROWER | 200,891.11 | 603. CASH TO SELLER | 187,129.66 |

SUBSTITUTE FORM 1099 SELLER STATEMENT

The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. SELLER INSTRUCTION – If this real estate was your principal residence, file Form 2119 for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide the settlement agent with your correct taxpayer identification number. If you do not provide the settlement agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

CRISTO PROPERTY MANAGEMENT                           WS1 037660

## L.  SETTLEMENT CHARGES

Page 2

| | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $   200,000.00      @   % = | Division of commission (line 700) as follows: | 0.00 | | |
| 701. $                          to | | | | |
| 702. $                          to | | | | 0.00 |
| 703. Commission paid at Settlement | | | | |
| 704. | | | | |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | | | 5,250.00 |
| 801. Loan origination fee   3.5% | | | | |
| 802. Loan discount             % | | | | |
| 803. Appraisal fee            to NATIONAL HOME POC $450 | | | | |
| 804. Credit report           to | | | | |
| 805. Lender's inspection fee | | | | |
| 806. Mortgage insurance application fee to | | | | |
| 807. Assumption fee | | | | |
| 808. Tax Service Fee | | | 72.00 | |
| 809. COMMITMENT FEE TO WALSH | | | 250.00 | |
| 810. COMMITMENT FEE TO NATIONAL | | | | 300.00 |
| 811. NATIONAL HOME FUNDING POC $1125 | | | | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | | | |
| 901. Interest from 07/25 to 07/31 @ $   49.31/day | | | 345.21 | |
| 902. Mortgage insurance premium for      months to | | | | |
| 903. Hazard insurance premium for   years to | | | 25.00 | |
| 904. Courier to Walsh | | | | 1,021.74 |
| 905. 3RD QTR TAXES $781.74 & SEWER $240 | | | | |
| 1000. RESERVES DEPOSITED WITH LENDER | | | | |
| 1001. Hazard insurance            months @ $ | per month | | | |
| 1002. Mortgage insurance          months @ $ | per month | | | |
| 1003. City property taxes         months @ $ | per month | | | |
| 1004. County property taxes       months @ $ | per month | | | |
| 1005. Annual assessments          months @ $ | per month | | | |
| 1006.                             months @ $ | per month | | | |
| 1007.                             months @ $ | per month | | | |
| 1008.                             months @ $ | per month | | | |
| 1100. TITLE CHARGES | | | | 650.00 |
| 1101. Settlement or closing fee   to Rick Pepsny | | | | |
| 1102. Abstract or title search    to | | | | |
| 1103. Title examination           to | | | | |
| 1104. Title insurance binder      to | | | | 100.00 |
| 1105. Document preparation        to | | | | |
| 1106. Notary fees                 to | | | | 650.00 |
| 1107. Attorney's fees             to Stanley Yacker | | | | |
|        (includes above item numbers: ) | | | | 1,290.00 |
| 1108. Title insurance             to COASTAL TITLE AGENCY | | | | |
|        (includes above item numbers: ) | | | | |
| 1109. Lender's coverage           $ | | | | |
| 1110. Owner's coverage            $ 200,000.00 | | | | |
| 1111. | | | | |
| 1112. | | | | |
| 1113. | | | | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | | | 150.00 |
| 1201. Recording Fees: Deed $        100.00;Mortgage $        50.00;Releases $ | | | | |
| 1202. City/county tax/stamps: Deed $            ; Mortgage $ | | | | 775.00 |
| 1203. State tax/stamps:     Deed $    200,000.00 ; Mortgage $ | | | | |
| 1204. | | | | |
| 1205. | | | | |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | | | 375.00 |
| 1301. Survey to CURRENT STATUS | | | | |
| 1302. Pest inspection to | | | | 50.00 |
| 1303. Notice of Settlement | | | | 25.00 |
| 1304. Overnight to Walsh | | | | 2,432.50 |
| 1305. ED RICH INSURANCE | | | | |
| 1306. | | | | |
| 1400. TOTAL SETTLEMENT CHARGES (enter on lines 103, Section J and 502, Section K) | | | 692.21 | 13,069.24 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower:  _____         Seller:  _____
           JILL MONTANYE                                CRISTO PROPERTY MANAGEMENT

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent _____          Date 07/25/96
                  Stanley Yacker, Esq.

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

WSI 037661

RECYCLED

EDH

ALL-STATE LEGAL SUPPLY CO.   1-800-222-0510

Coastal Title Agency, Inc.
31 West Main Street • PO Box 740
Freehold, NJ 07728
1-800-5214376

070168

Prepared by: ~~LORRAINE B. KING~~

RTR

# DEED

COUNTY OF MONMOUTH
CONSIDERATION
RTF  *Exempt*   add'l RTF
DATE  4/8/97  BY  ID

**This Deed,** made this 25TH  day of  JULY , 1996

Between  JILL A. MONTANYE · located at1017-1019 BANGS AVENUE, ASBURY PARK, N.J.herein designated as Grantor

And  JILL A. MONTANYE   & CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT, CO., INC.

JILL A. MONTANYE   AS  TO 40% INTEREST AND  CAPITOL ASSESTS PROPERTY MANAGEMENT & INVESTMENT, CO., INC. AS TO 60% INTEREST

located at 10 WEST BERGEN PLACE, SUITE 104, RED BANK, NEW JERSEY  07701 herein designated as the Grantee;

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

·Transfer of Ownership. The Grantor grants and conveys (transfers ownership of) the property· described below to the Grantee.· This transfer is made for the sum of  UNDER ONE HUNDRED DOLLARS.  The Grantor acknowledges receipt of this money.

Tax Map.Reference. (*N.J.S.A*. 46:15-1.1)  Municipality of  ASBURY PARK
Block  64       Lot 7       Account No.

_____ No Property tax identification number is available on the date of this Deed.  (Check this box if applicable.)

Property.  The Property consists of the land and all the buildings and structures on the land in the CITY OF ASBURY PARK,  County of MONMOUTH, the State of New Jersey, and is commonly known as 1017-1019 BANGS AVENUE ASBURY PARK, NEW JERSEY  The legal description is:

SEE ATTACHED SCHEDULE FOR LEGAL DESCRIPTION.

THE GRANTOR WILL WARRANT, SECURE AND FOREVER DEFEND THE TITLE TO THE SUBJECT PROPERTY.

CLERK'S OFFICE
MONMOUTH COUNTY
NEW JERSEY
INSTRUMENT NUMBER
1997038157
RECORDED ON
Apr 08, 1997
2:09:10 PM
BOOK:OR-5589,PG:45
Total Parcel 4

COUNTY RECORDING   $22.00
FEES
DEDICATED TRUST-   $2.00
FUND COMMISSION
TOTAL   $24.00

*n.o.5589-45*

**COMMONWEALTH LAND
TITLE INSURANCE COMPANY**
 A Reliance Group Holdings Company.

**TITLE INSURANCE COMMITMENT**

Commitment No.

File No. CT-17767(A)

## DESCRIPTION

ALL that certain tract, lot and parcel of land lying and being in the Township of Neptune, County of Monmouth and state of New Jersey, being more particularly described as follows:

Known and designated as Lot Number Two Hundred and Eight (208) on Map of West Asbury Park, made by William H. DrNyse, Civil Engineer:

Beginning at a point in the northerly line of Bangs Avenue, distant two hundred (200) feet westerly from the northwesterly corner of Bangs Avenue and Langford Street, thence

1.  westerly along the northerly line of Bangs Avenue fifty (50) feet; thence

2.  northerly and at right angles to Bangs Avenue, or nearly so, one hundred (100) feet; thence

3.  easterly, and parallel with Bangs Avenue, fifty (50) feet; thence

4.  southerly, and again at right angles to Bangs Avenue, or nearly so, one hundred (100) feet to the place of Beginning.

Said premises are commonly known as 1017-1019 Bangs Avenue, Asbury Park, New Jersey.

NOTE:  Being Lot(s) 7, Block 64, Tax Map of the City of Asbury Park.

Issued By:
COASTAL TITLE AGENCY, INC.
P.O. Box 740, 21 W. Main Street, Suite 2, Freehold, NJ 07728
(908) 308-1660  (800) 521-0378  (908) 775-5543  FAX #(908) 308-1881

In a deed dated ___JULY 25th, 1996___, transferring real property identified as Block No. ____64____

Lot No. __7__ located at _1017-1019 BANGS AVENUE, ASBURY PARK, N.J._
<span>(Street Address, Municipality, County)</span>

___MONMOUTH COUNTY___ and annexed hereto.

**(2) CONSIDERATION** (See Instruction #6)

Deponent states that, with respect to deed herein annexed, the actual amount of money and the monetary value of any other thing of value constituting the entire compensation paid or to be paid for the transfer of title to the lands, tenements or other realty, including the remaining amount of any prior mortgage to which the transfer is subject or which is to be assumed and agreed to be paid by the grantee and any other lien or encumbrance thereon not paid, satisfied or removed in connection with the transfer of title is $_____

**(3) FULL EXEMPTION FROM FEE** Deponent claims that this deed transaction is fully exempt from the Realty Transfer Fee imposed by c.49, P.L. 1968, for the following reason(s): Explain in detail. (See Instruction #7.) Mere reference to exemption symbol is not sufficient.

___CONSIDERATION UNDER ONE HUNDRED DOLLARS___

**(4) PARTIAL EXEMPTION FROM FEE** NOTE: *All boxes below apply to grantor(s) only. ALL BOXES IN APPROPRIATE CATEGORY MUST BE CHECKED. Failure to do so will void claim for partial exemption. (See Instructions #8 and #9)*

Deponent claims that this deed transaction is exempt from the increased portion of the Realty Transfer Fee imposed by c.176, P.L. 1975 for the following reason(s):

**a) SENIOR CITIZEN** (See Instruction #8)
- ☐ Grantor(s) 62 yrs. of age or over.*
- ☐ One or two-family residential premises.
- ☐ Owned and occupied by grantor(s) at time of sale.
- ☐ No joint owners other than spouse or other qualified exempt owners.

**b) BLIND** (See Instruction #8)
- ☐ Grantor(s) legally blind.*
- ☐ One or two-family residential premises.
- ☐ Owned and occupied by grantor(s) at time of sale.
- ☐ No joint owners other than spouse or other qualified exempt owners.

**DISABLED** (See Instruction #8)
- ☐ Grantor(s) permanently and totally disabled.*
- ☐ One or two-family residential premises.
- ☐ Receiving disability payments.
- ☐ Owned and occupied by grantor(s) at time of sale.
- ☐ Not gainfully employed.
- ☐ No joint owners other than spouse or other qualified exempt owners.

*IN THE CASE OF HUSBAND AND WIFE, ONLY ONE GRANTOR NEED QUALIFY.

**c) LOW AND MODERATE INCOME HOUSING** (See Instruction #8)
- ☐ Affordable According to H.U.D. Standards.
- ☐ Meets Income Requirements of Region.
- ☐ Reserved for Occupancy.
- ☐ Subject to Resale Controls.

**d) NEW CONSTRUCTION** (See Instruction #9)
- ☐ Entirely new improvement.
- ☐ Not previously used for any purpose.
- ☐ Not previously occupied.

Deponent makes this Affidavit to induce the County Clerk or Register of Deeds to record the deed and accept the fee submitted herewith in accordance with the provisions of c. 49, P.L. 1968.

Subscribed and sworn to before me this
day of _____ 19__

Name of Deponent (type above line)

1017-1019 Bangs Avenue
Asbury Park, N.J.
Address of Deponent

___JILL A. MONTANYE___
Name of Grantee (type above line)

SAME
Address of Grantor at Time of Sale

LORRAINE E. KING
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Feb. 21, 20__

FOR OFFICIAL USE ONLY This space for use of County Clerk or Register of Deeds.
Instrument Number _____ County _____
Deed Number _____ Book _____ Page _____
Deed Dated _____ Date Recorded _____

IMPORTANT - BEFORE COMPLETING THIS AFFIDAVIT, PLEASE READ THE INSTRUCTIONS ON THE REVERSE SIDE HEREOF.
This form is prescribed by the Director, Division of Taxation in the Department of the Treasury, as required by law, and may not be altered or amended without the approval of the Director.
ORIGINAL — White copy to be retained by County.
DUPLICATE — Yellow copy to be forwarded by County to Division of Taxation on partial exemption from fee (N.J.A.C. 18:16—8.12).
TRIPLICATE — Pink copy is your file copy.

**Promises by Grantor.** The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to Grantor's acts" (*N.J.S.A.* 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

**Signatures.** This Deed is signed and attested to by the Grantor who has hereunto set their hand and seal the day and year first above written.

**Signed, Sealed and Delivered**
in the presence of

_____          _____
                                          JILL A. MONTANYE

STATE OF NEW JERSEY        }
                           }   SS
COUNTY OF MONMOUTH         }

**Be it Remembered, that on**       JULY 25TH        , 1996, before me, the subscriber, a Notary Public of New Jersey, personally appeared   JILL A. MONTANYE, who I am satisfied, are the persons named in and who executed the within Instrument, and thereupon they acknowledged that they signed, sealed and delivered the same as their act and deed, for the uses and purposes therein expressed, and that the full and actual consideration paid or to be paid for the transfer of title to realty evidenced by the within deed, as such consideration is defined in N.J.S.A. 46:15-5, is UNDER ONE HUNDRED DOLLARS.

_____
LORRAINE E. KING
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Feb. 21, 200_

ALL-STATE LEGAL SUPPLY CO.   1-800-222-0510   BD-11

# LOWENSTEIN, SANDLER, KOHL, FISHER & BOYLAN

A PROFESSIONAL CORPORATION

COUNSELLORS AT LAW

65 LIVINGSTON AVENUE

ROSELAND, NEW JERSEY

07068-1791

TELEPHONE (201) 992-8700

FACSIMILE (201) 992-5820

SOMERVILLE OFFICE

TELEPHONE (908) 526-3300

FACSIMILE (908) 526-0173

July 23, 1997

**By Fax**

Robert Magnanini, Esq.
Latham & Watkins
One Newark Center
Newark, New Jersey 07101

Re:    Capital Assets Property Management & Investment Co.

Dear Mr. Magnanini:

      I enclose a copy of the letter sent by Capital Assets to investors last week.  After I spoke with you on the telephone, I called Capital Assets to inquire about the meeting referenced in the fifth paragraph.  I was told that a letter was supposed to be sen out within five to ten days of the enclosed letter.  I pointed out that it was now five to ten days after July 15th.  I was told that the next letter should be coming out by the end of the week..  I'll send you a copy when (if) we receive it.  Don't hold your breath.

                    Very truly yours,

                    R. Scott Thompson

Enc.
cc: David Lopez, Esq. (w/enc.)

04/03/960411888.01

9925920    P.01

# Capital Assets
## Property Management & Investment Co., Inc.

July 15, 1997

You are undoubtedly aware of the news article which recently appeared in the Asbury Park Press and various televised newscasts which tainted our joint venture program. · The joint ventures program was originally designed to purchase a group of approximately 1000 properties.  Once each property had been rehabilitated and fully leased, the group of properties would be placed in a REIT and sold to Wall Street with 40% of ownership would go as profit to you.

Unfortunately, the adverse publicity and baseless innuendo generated by the articles preclude any such successful remarketing of the properties and virtually eliminates any potential return of investment.  This type of tabloid slanderous journalism leaves us with little recourse short of a class action suit and reorganization of our original plans.

Despite any continued questionable publicity, our intention has always been to fulfill our obligations and honor our commitment to our investors.  We are writing this letter to ask for your assistance through these troubled times and help by answering the following questions.

1.  Who was the representative that got you involved?
2.  How much money did you receive for each house under your name?  We paid $4000 per house for use of your name and credit, is that what you received?
3.  Did you pay the independent representative any money to become part of the program?  If so, how much money?  Why did you pay anything?  Who was the heck made out to?
4.  Has all money that has been promised to you been paid?  If not, how much is still owed?
5.  Please explain what the representative told you at signing of the Joint Venture Agreement?
6.  Did you personally sign all of the Closing documents?

We will be having a meeting to discuss options and our reorganization plans.  We will be sending you a letter within 5 to 10 days to setup the time and place of meeting.

Please use this document to write your answers and return this letter to us as quickly as possible.  Thank you in advance for your cooperation and assistance.

Very truly yours,

CAPITAL ASSETS PROPERTY
& INVESTMENT CO., INC.

---

**10 West Bergen Place, Suite 201**
**Red Bank, New Jersey 07701**

**908-747-7771**
**Fax 908-747-8780**

# Exhibit F

WILLIAM KANE

Page 1

1          UNITED STATES DISTRICT COURT

           DISTRICT OF NEW JERSEY

2

3      CIVIL ACTION NO: 97-cv-3496(DRD)(MAS)

4

5   WALSH SECURITIES, INC.,

6              Plaintiff,

7   vs.

8   CRISTO PROPERTY MANAGEMENT ET AL.,

9              Defendants.

    _____/

10

11

12                        2701 N. Rocky Point Dr.

                          Suite 1200

13                        Tampa, FL 33607

                          October 5, 2011

14                        10:36 a.m. to 5:08 p.m.

15

16      VIDEOTAPE DEPOSITION OF WILLIAM KANE

17

18

19      Taken on behalf of the Plaintiff before PHILIP

20   RYAN, RPR, Court Reporter, Notary Public in and

21   for the State of Florida at Large, pursuant to

22   Plaintiff's Notice of Taking Deposition in the

23   above cause.

24

25

# WILLIAM KANE

**Page 2**

1 APPEARANCES:
2 ROBERT A. MAGNANINI, ESQUIRE
   Stone & Magnanini, LLP
3 150 John F. Kennedy Parkway
   Fourth Floor
4 Short Hills, NJ 07078
   (973) 218-1111
5
       Attorney for Plaintiffs
6
7 DAVID KOTT, ESQUIRE
   McCarter & English, LLP
8 100 Mulberry Street
   PO Box 652
9 Newark, NJ 07101-0652
   (973) 849-4012
10 (via telephone and Mobile Depo)
       Attorney for Defendant
11    Commonwealth Land
       Title Insurance Company
12
   EDWARD J. HAYES, ESQUIRE
13 Fox & Rothschild, LLP
   2000 Market Street
14 20th Floor
   Philadelphia, PA 19103-3222
15 (215) 299-2000
   (via telephone and Mobile Depo)
16
       Attorney for Defendants Nations Title
17    and Fidelity National Title
18 ALSO PRESENT:
       LaJuana Pruitt, videographer
19
       INDEX
20
             PAGE
21 DIRECT EXAMINATION:
   BY MR. MAGNANINI          10
22 CROSS-EXAMINATION
   BY MR. HAYES              158
23 BY MR. KOTT               205
   REDIRECT EXAMINATION
24 BY MR. MAGNANINI          243
   RECROSS-EXAMINATION
25 BY MR. HAYES              263
   BY MR. KOTT               268

**Page 4**

1 Exhibit WK 13
   Memo from Lory King to Gary Grieser,   104
2 dated July 26, 1996.
3 Exhibit WK 14
   Memo from Lory King to Rick Pepsny,   105
4 dated July 26, 1996.
5 Exhibit WK 15
   Memo from Lory to Sally, dated March   107
6 26, 1997, subject Binders Needed.
7 Exhibit WK 16
   Document Bates stamped C1000002733.   108
8
   Exhibit WK 17
9 Document Bates stamped C1000008790   109
   Fax cover sheet.
10
   Exhibit WK 18
11 Letter to Anthony Cicalese, Esq.   112
   from Sally Zappola, dated 6/4/97.
12
   Exhibit WK 19
13 Letter from Robert Agel to Stanley   113
   Yacker, Esq., dated 6/16/97.
14
   Exhibit WK 20
15 Letter from Stanley Yacker to   114
   Coastal Title Agency, Inc., dated
16 July 8, 1997.
17 Exhibit WK 21
   Document Bates stamped WK0009   120
18 through 12.
19 Exhibit WK 22
   Document Bates stamped WK19050   123
20 through 19122.
21 Exhibit WK 23
   Document Bates stamped SYSW006901   124
22 through 6918.
23 Exhibit WK 24
   Document Bates stamped WK19124   127
24 through 19155.
25

**Page 3**

1       EXHIBIT INDEX
2             PAGE
   Exhibit WK 1
3 Document Bates stamped WK002671   61
   through 2674.
4
   Exhibit WK 2
5 Document Bates stamped WK002675   63
   through 2681.
6
   Exhibit WK 3
7 Document Bates stamped WK010183   66
   through 010232
8
   Exhibit WK 4
9 Series of deeds and mortgages   72
   relating to Joanna White
10
   Exhibit WK 5
11 Document Bates stamped WK004271   76
   through 4286
12
   Exhibit WK 6
13 Document Bates stamped WK015522   81
   through 015544.
14
   Exhibit WK 7
15 Deed.   86   86
16 Exhibit WK 8
   Document Bates stamped C1000007105   90
17 through 7076.
18 Exhibit WK 9
   Document Bates stamped PR 000285.   93
19
   Exhibit WK 10
20 Document Bates stamped WK019609 and   94
   9610.
21
   Exhibit WK 11
22 Document Bates stamped WK00153   98
   through 157.
23
   Exhibit 12
24 Memo from Lory King to National Home   102
   Funding, Attn. Mary, dated July 26
25 1996.

**Page 5**

1       MR. MAGNANINI:  My appearance is, I'm
2 Robert Magnanini, M-A-G-N-A-N-I-N-I, of Stone
3 & Magnanini, LLP, for Plaintiff, Walsh
4 Securities, Inc.  And then in New Jersey is
5 Amy Wagner, also of Stone & Magnanini, also
6 for Plaintiff, Walsh Securities.
7       David, you or Ed go now.
8       MR. KOTT:  My appearance is David Kott,
9 K-O-T-T, McCarter & English, LLP for the
10 Defendant, Commonwealth Land Title Insurance
11 Company.
12       MR. HAYES:  Edward Hayes, H-A-Y-E-S, for
13 Defendants, Nations Title and Fidelity
14 National Title.
15       MR. MAGNANINI:  Okay.  Good.  That's all
16 we have then.
17       And we have the deponent Mr. William Kane
18 here as well.  Did you want to swear him, I
19 guess?
20       MR. KOTT:  Yes.  No, we should do that on
21 the video.  So, we're not on the video now,
22 are we, Mr. Ryan?
23       COURT REPORTER:  No, we're not.
24       MR. MAGNANINI:  No.
25       MR. KOTT:  But we're on the record?

2 (Pages 2 - 5)

WILLIAM KANE

Page 50

1    A.   Yes, I believe it was an S-corporation.
2    Q.   Okay.  And then did you receive any
3  money from Oakwood?
4    A.   It -- yeah, it would have been the same
5  way, an S-corporation.
6    Q.   Okay.  And then I believe you testified
7  earlier you didn't make any money from DEK, which
8  is why you --
9    A.   Correct.
10    Q.   -- left.  Okay.
11    So all of the money you made came from the --
12  the sale of the property to the straw buyer and
13  getting paid to you; is that correct?
14    A.   Correct.
15    Q.   Did you make any other money --
16    MR. KOTT:  Object to the form.
17    Mr. Magnanini, I object to the form.
18  BY MR. MAGNANINI:
19    Q.   Okay.  Did you -- did you receive any
20  money any other way related to the sale of these
21  properties?
22    A.   I don't understand what you mean by "any
23  other way."
24    Q.   Other than when the property was sold
25  and you got paid on the higher sale price, was

Page 51

1  there any other way from mortgage interest rates
2  or points or --
3    A.   Yes.
4    Q.   -- any of those --
5    A.   That's what I got from National Home
6  Funding.
7    Q.   Okay.  And could you describe that for
8  me?
9    A.   Yes.  We -- the bank paid a commission
10  to National Home Funding based on the rate of the
11  mortgage.
12    Q.   Okay.  And by that, you mean the higher
13  the interest rate, the more money would be paid to
14  National Home Funding?
15    A.   Correct.
16    Q.   Okay.
17    A.   So that went to National Home Funding.
18  Robbie took a piece of it, D'Apolito took a piece
19  of it, and then I got the balance.
20    Q.   Okay.  So it was in your economic
21  interest to make sure -- or to try and get loans
22  at the highest interest rate available?
23    A.   Yes.
24    Q.   And were there any other ways or
25  channels that you made money related to the sale

Page 52

1  of these properties?
2    A.   Not to my recollection.
3    Q.   Okay.  And then did you pay
4  Mr. D'Apolito for taking the loans to Walsh
5  Securities?
6    A.   Yes.
7    Q.   Okay.  And how, how did you pay him?
8    A.   Usually in the beginning cash.  And then
9  he opened up a company, and then I was paying him
10  through his company.
11    Q.   Okay.  We've seen -- we've actually sued
12  his company, which is called DAP, Inc.  And did
13  you pay DAP, Inc. in cash or checks or both?
14    A.   I believe it was checks.  Probably both.
15    Q.   Okay.  And how much did you pay
16  Mr. D'Apolito in total?
17    A.   I don't even remember.
18    Q.   Okay.  How was the amount Mr. D'Apolito
19  to be paid determined?
20    A.   I believe he got a percentage or a flat
21  fee.  It's, it's so long, 14 years, I don't --
22    Q.   Don't remember which; okay.
23    And then there was one other person that was
24  at Walsh Securities named Kellie O'Neill.  Did you
25  know Miss O'Neill?

Page 53

1    A.   Yes.
2    Q.   And who was she?
3    A.   She was a processor.
4    Q.   Okay.  And what does a processor do?
5    A.   She gets the file ready.  The processor
6  gets the file ready to go to an underwriter to get
7  signed off.  So the processor makes sure
8  everything is there and everything adds up and is
9  sweet and clean going to the underwriter.
10    Q.   Okay.  And by, "sweet and clean," you
11  mean it's got all the necessary documentation to
12  get the loan approved?
13    A.   Correct.
14    Q.   Okay.  And was Miss O'Neill paid for her
15  work?
16    A.   Yes, she was.
17    Q.   And who was she paid by?
18    A.   She was paid by myself, usually cash.
19    Q.   Okay.
20    A.   And it was per deal.  I don't think she
21  got a percentage.  I don't remember the exact
22  price.  It may have been $100 a deal.  I'm not
23  sure.
24    Q.   Okay.  Per actually loans she processed?
25    A.   Correct.

14 (Pages 50 - 53)

WILLIAM KANE

Page 86

1    (Whereupon, Exhibit WK 7 was marked for
2  identification.)
3    Q.   Mr. Kane, I'd ask you to take a look at
4  this. And, again, I'm not sure you'll be familiar
5  with all of these documents, but I'll represent to
6  you that this is documents we got from the clerk
7  at Monmouth County when we were looking at the
8  line of title on how things were recorded.
9    And, as you see, this involves 1304 Asbury
10  Avenue in Asbury Park up top. And if you take a
11  look at the first page, it shows that the deed
12  between the Odoms and JGL (sic), Limited, your
13  company, was executed on December 2nd, 1996,
14  similar to the HUD form that you saw in Exhibit
15  Number 6.
16    And then if you go to the next document, which
17  is four pages back, this is a deed made on
18  November 22nd of 1996 between JGL (sic), Limited
19  and Mr. Cuzzi --
20    A.   Okay.
21    Q.   -- selling the property. And, again,
22  that's -- this date is actually different than
23  even the date in the HUD one, which was November
24  29th. But this deed is dated November 22nd. Is
25  there any explanation for why the deed is a week

Page 87

1  before the closing and the sale is, of course --
2  other than what you said before, the sale here is
3  a close that has occurred prior to the purchase by
4  JGL (sic) .Inartful question, I apologize.
5    A.   That's okay. The sale, you know, we
6  sold it before we bought it and Rick with have
7  been just trying to, you know, get ahead on the
8  deeds. I'm not sure why.
9    Q.   And then who was -- who was responsible
10  for preparing and filing the deeds? Did you have
11  anything to do with that?
12    A.   No.
13    Q.   So who was that left to?
14    A.   Rick and Lory King did it.
15    Q.   Miss King working for the closing
16  attorneys, Mr. Yacker and Mr. Cicalese?
17    A.   Yes.
18    Q.   Okay. And, Mr. Kane, I'll represent to
19  you on the third page of that -- that deed with
20  the November 22nd, 1996, date, you see -- if you
21  go there, you'll see the clerk's office of
22  Monmouth County recording an instrument number,
23  and it's recorded on April 8th of 1997. And I'll
24  represent to you about that time a large number of
25  deeds, joints venture agreements, mortgages were

Page 88

1  recorded by Coastal Title by Mr. Agel.
2    Q.   Is this about the time that -- to make up for
3  Mr. Yacker not recording --
4    A.   Yes.
5    Q.   -- property deeds and things, that
6  everything was filed?
7    A.   Yes.
8    Q.   Okay. And then the next page of this is
9  actually, I believe, a deed pursuant to the joint
10  venture agreement. I'd ask you to look at that
11  and see if you've seen a document like this
12  before?
13    A.   Yes.
14    Q.   Okay. And is that what it -- what the
15  document actually is?
16    A.   Yes.
17    Q.   And so this -- this 60/40 deed is also
18  recorded on -- as you see in the upper right-hand
19  corner, on April 8th of 1997; is that correct?
20    A.   Yes.
21    Q.   And then I'd ask you to take a look at
22  the third page in that group of -- or actually,
23  sorry, the fourth page of that group of deed
24  documents. And you see there's a little receipt
25  tape at the bottom. It says clerk's office,

Page 89

1  Monmouth County, New Jersey, with an instrument
2  number beginning 1997.
3    A.   Yeah.
4    Q.   And ending in 142, also recorded April
5  8th, 1997. And then I'd ask you to flip to the
6  next page. And this is the mortgage between
7  National Home Funding and Mario Cuzzi, Jr., which,
8  of course, was table funded by Walsh Securities
9  and assigned to Walsh Securities. But this
10  instrument number on the mortgage is actually
11  1997038143. So it's actually recorded after the
12  60/40 deed.
13    Do you recall if there were any discussions
14  about how the documents needed to be recorded or
15  in what order they should be recorded?
16    A.   I don't remember specific who. I know
17  that it was probably more Lory, Yacker, and
18  Pepsny --
19    Q.   Coordinating.
20    A.   Coordinating on how it had to be
21  recorded.
22    Q.   Okay. Do you know why in this case that
23  the mortgage was recorded after the 60/40 deed?
24    A.   No.
25    Q.   Okay. Good. We're done with that,

23 (Pages 86 - 89)

WILLIAM KANE

Page 102

1 was probably Gary.
2 Q. Gary Grieser?
3 A. Yeah.
4 Q. Did they receive money, any payments
5 beyond what the --
6 A. No.
7 Q. -- the policies were?
8 A. No.
9 MR. MAGNANINI: Okay. If I can show you
10 what we've marked as WK 12, Phil.
11 (Whereupon, Exhibit WK 12 was marked for
12 identification.)
13 Q. Mr. Kane, what I'll represent to you is
14 that this is a document produced by Stanley
15 Yacker, one of the closing attorneys in this case,
16 which is why the Bates stamp is SYSW 6949. In
17 other words, as you see that sticky on it, the
18 copy is -- it was used at a deposition of Lorraine
19 King as an exhibit. And this is to -- from Miss
20 King to National Home Funding, attention Mary,
21 memo dated July 26, 1996. Have you seen any
22 documents like this before?
23 A. Probably, yeah.
24 Q. And what was the purpose of these
25 documents?

Page 103

1 A. This is just showing how much National
2 Home Funding got gross on each loan wired in to
3 them.
4 Q. And why was National Home Funding being
5 paid on these loans?
6 A. Well, they were the table funder, and
7 that's whose name it was going under, and that's
8 how he made extra money was on the -- the interest
9 rate, what we spoke about earlier.
10 Q. Okay. Right. Okay. So that money
11 would go to NHF?
12 A. Right.
13 Q. And then did you have to pay them
14 anything?
15 A. They took their piece out of it.
16 Q. Okay.
17 A. They took an additional piece for
18 D'Apolito out of it, and then I got the balance.
19 Q. Okay. So National Home Funding, did
20 they pay money to Mr. D'Apolito?
21 A. Yes.
22 Q. Okay. And how do you know that?
23 A. Robbie had told me.
24 Q. Mr. Skowrenski?
25 A. Yes.

Page 104

1 Q. Okay. And then -- and you had paid
2 Mr. D'Apolito.
3 A. Correct.
4 Q. As well and so forth.
5 MR. MAGNANINI: Okay. Okay. If we can
6 then flip to Kane exhibit -- I should probably
7 keep this together, but Number 13, Phil.
8 (Whereupon, Exhibit WK 13 was marked for
9 identification.)
10 Q. Mr. Kane, I'd ask you to look at WK 13,
11 which is a document produced by Mr. Yacker, as you
12 see the SYSW 6951 Bates stamped and used, as you
13 can see by the sticky, in Mr. Yacker's
14 deposition. And it's a memo also dated July 26th,
15 1996 from Miss King to yourself.
16 Have you seen this document before?
17 A. Yeah. This is going to Gary Grieser
18 though, and this is shown --
19 Q. I'm sorry, to Gary Grieser.
20 A. Make sure we got the right one.
21 Q. Yeah.
22 A. Yeah, this is -- I've seen them --
23 showing him what, you know, the money went into
24 his account and what accounts it was for.
25 MR. MAGNANINI: Okay. So this memo would

Page 105

1 be sent by Miss King. So -- well, let me just
2 show you the next. If you can take a look at
3 what we've marked as WK 14.
4 A. Okay.
5 (Whereupon, Exhibit WK 14 was marked for
6 identification.)
7 Q. And then this is another document
8 produced by Mr. Yacker, SYSW 6950. And it's from
9 Miss King to Mr. Pepsny on July 26th. Have you
10 seen this document or documents similar to this
11 before?
12 A. Uh-huh.
13 Q. And what was the purpose of this
14 document?
15 A. This is to let Rick know what properties
16 we closed on and how much he had for each
17 property --
18 Q. Okay.
19 A. -- to proceed with closing.
20 Q. Do you recognize the handwriting on
21 the -- to the right of the column of numbers?
22 A. No, I don't.
23 Q. Okay. So it was, at least as according
24 to these three memorandum all dated by -- on July
25 26, 1996, and all containing information on the

27 (Pages 102 - 105)

WILLIAM KANE

Page 126

1   Q.   On the first page there's a variety of
2   payments to you, as you see. Is that -- that's
3   from the sale of those properties listed on the
4   right-hand column; is that correct?
5       A.   Yeah. It's just -- I mean, the numbers
6   don't add up. I wouldn't think -- I wouldn't be
7   getting a check for $695.
8       Q.   And 92 cents?
9       A.   Yeah.
10      Q.   Although in the entries directly below
11  yours, there's -- Mr. Yacker is getting a check
12  for $700 --
13      A.   He would get that for his payment. I
14  apologize.
15      Q.   For each closing?
16      A.   Correct.
17      Q.   Okay. And then if you -- the other
18  question I have, Mr. Kane, if you can flip to the
19  last page, 18 of 18, it says Bates stamp
20  SYSW6918. There's a -- do you see the handwriting
21  on the -- to the right of the right-hand column,
22  it's T/I and T/O. Do you recognize that
23  handwriting?
24      A.   No.
25      Q.   Do you know what T/I or T/O stands for?

Page 127

1       A.   T/O sounds like trust to operating. I
2   don't know what T/I would be.
3       Q.   I thought it was transfer in and
4   transfer out.
5       A.   Could be.
6       Q.   You're not familiar with this --
7       A.   No.
8       Q.   -- at all?
9       A.   No.
10      Q.   Okay. And do you have any idea why
11  money would be transferred in and transferred out
12  on different properties within Mr. Yacker's trust
13  account?
14      A.   No.
15          MR. MAGNANINI:  And then, Phil, if you
16  could do WK 24.
17      (Whereupon, Exhibit WK 24 was marked for
18  identification.)
19      Q.   And, Mr. Kane, I show you what's been
20  marked as WK 24, which, as you see, is another
21  series of documents produced by you, Bates stamped
22  WK19124 through 19155. And it appears at the top
23  to be a trust account for Michael A. Alfieri,
24  Esquire. How did you come to have a copy of
25  Mr. Alfieri's trust account in your files?

Page 128

1       A.   Well, Rick probably gave it to me for
2   the money coming in. Now that I see this, they've
3   marked -- when the money came in from Stanley
4   Yacker's office or Cicalese's office into the
5   Cristo dummy account they called it, where --
6       Q.   Okay.
7       A.   And then they would disburse out of that
8   dummy account to the different properties.
9       Q.   Who came up with the name Cristo dummy
10  account?
11      A.   Pepsny.
12      Q.   I was intrigued by that. Okay.
13  Were there other Cristo accounts that he had?
14      A.   Not to my knowledge. He might have, I
15  don't know.
16      Q.   Okay. Do you know if -- did you have
17  any input or involvement with Mr. Pepsny or
18  Mr. Alfieri's trust account?
19      A.   No.
20      Q.   Do you know if Miss King had any
21  involvement with their trust account?
22      A.   No.
23      Q.   No? Okay. So both -- Miss King did
24  have involvement in inputting things and cutting
25  checks, you said, from the closing attorneys,

Page 129

1   Mr. Cicalese's and Mr. Yacker's accounts?
2       A.   Yes.
3       Q.   Okay. Mr. Kane, you've testified that
4   you had paid money to Mr. D'Apolito and Miss
5   O'Neill from Walsh Securities. Did you pay any
6   money or give anything of value to anyone else at
7   Walsh Securities?
8       A.   No.
9       Q.   Okay. And do you know Robert Walsh?
10      A.   Yes.
11      Q.   And how did you come to meet him?
12      A.   By being up at Walsh Securities.
13      Q.   And why were you at Walsh Securities?
14      A.   To sit with Kellie and D'Apolito and get
15  my loans closed.
16      Q.   Okay. Were you an employee of Walsh
17  Securities?
18      A.   No.
19      Q.   Did you have a desk or an office at
20  Walsh Securities?
21      A.   No.
22      Q.   Okay. How many times have you met
23  Robert Walsh?
24      A.   Ten, maybe.
25      Q.   And how many substantive discussions did

33 (Pages 126 - 129)

WILLIAM KANE

Page 130

1  you have with him other than saying hi, hello or
2  something in the hall?
3      A.   Well, just only real one substance was
4  two times.  Once when I had somebody that I wanted
5  to bring up to there to possibly buy or joint
6  venture, and then another time when he was telling
7  me about his merger or whatever.
8      Q.   Okay.
9      A.   And --
10     Q.   The first time you said you had a buyer
11 to buy Walsh Securities?
12     A.   Right.  I had gotten somebody through --
13 and I don't even remember the whole thing.  But,
14 you know, I'd given everything over to Robert on
15 this guy that was hoping to buy a mortgage
16 company.
17     Q.   Okay.  Do you remember who the buyer to
18 be was?
19     A.   I forgot the name.
20     Q.   Okay.  And what happened with that?
21     A.   Nothing.
22     Q.   Do you remember ever speaking with any
23 attorneys from Walsh Securities about it?
24     A.   It's possible.  I might have.  I
25 don't -- I don't know.

Page 131

1      Q.   Okay.  And then I believe you testified
2  last time that, that at some point, as you said
3  and as you testified today, at some point in June
4  of 1997, the press was poking around, subpoenas
5  had been issued.  When did you learn that there
6  was an investigation into these loans?
7      A.   I had known a month prior to that, that
8  there was an investigation going in when the state
9  police visited me out of New York.
10     Q.   Why out of New York, Mr. Kane?
11     A.   Because I had some mortgages out of New
12 York that went bad, and they were trying to
13 connect me with some people out of New York at one
14 point.  And so New York was involved in it.  And
15 they got together with the state police in New
16 Jersey and came in and visited me.  So at that
17 point, we knew something was going on.  I had
18 hired an attorney by that already.
19     And then the next time everything actually
20 came into light was -- I forget the exact date,
21 but it was my son's graduating from kindergarten,
22 and I got a call from Betty Ann about 5:00,
23 at nighttime, somewhere around there, that they
24 had been serving subpoenas on a bunch of
25 properties.

Page 132

1      Q.   Okay.  Betty Ann, you mean Betty Ann
2  Demola?
3      A.   Betty Ann Demola, yes.
4      Q.   And who was she?
5      A.   Robert's sister.
6      Q.   And what position did she have at Walsh
7  Securities?
8      A.   She was in charge of the sales.
9  D'Apolito and the other salespeople nationwide
10 worked under her.
11     Q.   Oh, reported to her?
12     A.   Yes.
13     Q.   Okay.  And then -- so at that point you
14 just said -- who were the subpoenas issued by that
15 she was calling to ask you about?
16     A.   Monmouth County.
17     Q.   Okay.  And had you received subpoenas
18 from Monmouth County?
19     A.   No.
20     Q.   What did, what did you do after you
21 retained counsel and had been visited by the -- I
22 guess just the state police?
23     A.   It was state, it was FBI, New York.
24 There might have been a Monmouth County there, I'm
25 not sure.  There was about eight guys that came

Page 133

1  into my office that day.
2      Q.   What office was this?
3      A.   On Highway 35 and -- was it Key Port or
4  Union Beach.
5      Q.   Was it Cristo Properties' office?
6      A.   Cristo Properties, yes, sir.
7      Q.   And then did you give any statements or
8  --
9      A.   No.
10     Q.   -- or anything at that point?  Okay.
11     And then did you know Monmouth County was
12 going to issue subpoenas?
13     A.   No.
14     Q.   Okay.  And did you hear about -- how did
15 you first hear about the subpoenas issued to Walsh
16 Securities?
17     A.   I believe Betty Ann or D'Apolito, one of
18 them called me.
19     Q.   Okay.  And did you consult with your
20 attorney?
21     A.   Yes.
22     Q.   All right.  And without going into the
23 discussions themselves, what was the result of --
24 of talking with your attorney?  Did you --
25     A.   Get as much information and keep your

34 (Pages 130 - 133)

WILLIAM KANE

Page 134

1 mouth shut.
2    Q.   Okay. And then at some point did you --
3 did you speak to the Monmouth County
4 investigators?
5    A.   My attorney reached out to them the next
6 day.
7    Q.   And then what was Miss Demola asking you
8 about? Why was she calling you about the
9 subpoenas?
10   A.   I mean, it's a long time ago to get into
11 exactly conversations and everything else.
12 Basically, what was going on, what condition the
13 houses were in, were they bad, were they occupied,
14 why are they looking at these houses, what's
15 wrong, what's going on, you know, things like
16 that.
17   Q.   Okay.
18   A.   Again, this is all just recollection,
19 guys. It's not --
20   Q.   Yeah. It's 14 years. I understand
21 that.
22        And so were you able to -- did you give her
23 any answers at -- when you spoke to her?
24   A.   No.
25   Q.   And then what happened thereafter?

Page 135

1    A.   There was a meeting the next morning --
2 I believe it was the next morning -- up in
3 Parsippany, very early in the morning. It was
4 about six or seven o'clock in the morning. We
5 were meeting with -- I think the guy's name was
6 Art something or other.
7    Q.   I'll suggest Art Gilgar.
8    A.   Art Gilgar.
9    Q.   Okay.
10   A.   And Betty Ann was supposed to be there.
11 So myself, D'Apolito, Anthony D'Apolito and Gary
12 Grieser drove up together.  Betty Ann -- Betty Ann
13 Demola was not there.  I believe Mr. Gilgar was
14 there, and Mr. Walsh was there.
15   Q.   Okay.
16   A.   We never even went into an office or
17 anything. We sat down -- or we stood in a corner,
18 basically. At one point we walked, I believe,
19 into Art's office and we went over the, you know,
20 what was going on -- excuse me -- and Mr. Walsh
21 basically said, you know, there won't be any
22 problems because we're not claiming victims. So
23 there's nothing they can do.
24   Q.   Okay. And did you expect Mr. Walsh to
25 be at this meeting?

Page 136

1    A.   No.
2    Q.   Okay. Do you know why he was there?
3    A.   No.
4    Q.   What else -- when you -- what else was
5 discussed at the meeting, when you said "we
6 discussed"?
7    A.   I was there, basically, per my
8 attorneys, to get whatever information I could on
9 our side to find out what was going on, what they
10 were looking for, and who was involved, and how
11 the bank was going to react.
12   Q.   Okay. And you said you were at the
13 meeting with Mr. Grieser?
14   A.   Correct.
15   Q.   What did he say in substance at the
16 meeting? ·
17   A.   You know, he kind of twisted Walsh a
18 little bit about, you know, continuously going
19 forward that -- about his mortgage payments, that
20 if he didn't get money from Robert, he couldn't
21 make the mortgage payments, which was going to
22 make things worse. And Gary was just out in the
23 field on that.
24   Q.   Okay. And then what did Mr. Walsh say
25 in substance? I'm not asking for specifics.

Page 137

1    A.   Basically, you know, in a nice way, he
2 said forget it, you know?
3    Q.   And then what did Mr. Gilgar say during
4 the meeting, if you recall?
5    A.   I don't remember. I think he was just
6 more quiet than anything.
7    Q.   Okay. And then after that meeting,
8 which was the day or so after the subpoenas, did
9 you -- were you able to close any more loans
10 with --
11   A.   No.
12   Q.   -- Walsh Securities?
13   Okay. And then did you ever speak to Robert
14 Walsh at any time thereafter, after that meeting?
15   A.   No. I think there was one or two phone
16 calls to find out who his attorney was. And his
17 attorneys was going to talk to my attorney and --
18 but there was never any substance conversations.
19   Q.   Okay. One of the appraisers, Richard
20 DiBenedetto, had testified at his deposition --
21 and I'll -- just let me lay the story out and you
22 can say if it's true or not -- was that
23 Mr. DiBenedetto had testified that approximately a
24 year after he had completed the last of the
25 appraisals that he had done, that you had called

35 (Pages 134 - 137)

WILLIAM KANE

Page 138

1 him at about three in the morning in Atlantic
2 City, with Mr. Walsh with you, both of you being
3 drunk. Mr. Walsh having hit his elbow on your car
4 and cursing in the background.
5     And you told Mr. DiBenedetto, don't worry
6 about those appraisals. Mr. Walsh has just sold
7 his company for hundreds of millions of dollars,
8 and everything's going to be okay.
9     And my question is: Did that conversation
10 ever occur?
11   A.   No.
12   Q.   Okay. Have you ever been to Atlantic
13 City?
14   A.   Once, with Gary Grieser.
15   Q.   Okay.
16   A.   And that was before this. And I've
17 never socialized with Mr. Walsh.
18   Q.   Okay. Are you familiar with James
19 Walsh?
20   A.   Yes.
21   Q.   And who is James Walsh?
22   A.   Robert Walsh's brother.
23   Q.   Okay. And did he work at Walsh
24 Securities?
25   A.   Yes.

Page 139

1   Q.   And what was his position there?
2   A.   He, at the time I guess, would sell the
3 loans after we wrote them and Walsh underwrote
4 them.
5   Q.   Okay. What we've seen as secondary
6 marketing. And did you ever have any meetings
7 with Mr. Walsh?
8   A.   I had lunch with him once.
9   Q.   And do you recall where that was?  --
10   A.   It was an Italian restaurant somewhere
11 close to their office.
12   Q.   Okay. And then -- who was at that
13 meeting?
14   A.   It was myself, James Walsh, Betty Ann, I
15 believe, Anthony D'Apolito, and Gary Grieser.
16   Q.   Okay. And what was the purpose of the
17 meeting?
18   A.   Honestly, I forget.
19   Q.   Okay. Do you remember who orchestrated
20 or organized it?
21   A.   I think it was Betty Ann and Jimmy, just
22 trying to -- if I'm not mistaken, it was about the
23 type of loans that we could do and couldn't do.
24 As we're thinking, just some certain things are
25 coming to my mind. I think there was a problem

Page 140

1 with the LTV. And they wanted a down payment or
2 an escrow letter where we had to have the down
3 payment down and then the second mortgage. That's
4 why you'll see a lot of deals that had 100 percent
5 financing, you know, between the first and the
6 second.
7   Q.   The second?
8   A.   And then the other one starting up where
9 their requirements come in, and we had to have an
10 escrow letter from the attorney.
11   Q.   Okay. And from what I've seen from
12 looking through the files, the earlier loans all
13 had escrow letters, and then they went to the
14 secondary --
15   A.   Okay.
16   Q.   -- financing. Do you remember when this
17 meeting occurred?
18   A.   No. It must have been in March or
19 something of -- started in '97. So it was a
20 couple of months before the -- problem arose.
21   Q.   Okay. In 1997?
22   A.   Yes, sir.
23   Q.   Okay. Did you ever tell Jim Walsh that
24 Cristo was buying properties after they closed the
25 deals?

Page 141

1   A.   No.
2   Q.   Did you go into any of the specifics of
3 the --
4   A.   No.
5   Q.   -- transactions with him?
6   A.   No.
7   Q.   Okay. And then did you ever meet or
8 discuss anything with Jim, with Jim Walsh after
9 that meeting?
10   A.   I don't believe anything of substance.
11 Not that I can think of.
12   Q.   Okay. And then did you ever give
13 anything of value to Paul Del Russo?
14   A.   No.
15   Q.   Do you know who Mr. Del Russo is?
16   A.   Yes.
17   Q.   And who is he?
18   A.   He was the quality control underwriter.
19   Q.   The underwriter at Walsh Securities?
20   A.   Right. He was the head underwriter, I
21 guess.
22   Q.   Okay. And did you have any interactions
23 with Mr. Del Russo?
24   A.   When we had problem deals.
25   Q.   What would occur?

36 (Pages 138 - 141)

WILLIAM KANE

**Page 166**

1 your deposition from April 19th of 2007. On page
2 34, Mr. Kott asked you the following question:
3 "Were part of the cash payments to either
4 Mr. D'Apolito or Ms. O'Neill to have them arrange
5 to get loans approved, which otherwise would not
6 meet the Walsh underwriting standards?
7 And your response was:
8 "That was expected, yes, sir."
9 Do you have any reason to disagree with that
10 testimony?
11   A.   No, if that's what I said.
12      MR. MAGNANINI:  That's what you said.
13 BY MR. HAYES:
14   Q.   Now, Miss Demola was the National sales
15 manager for Walsh?
16   A.   Yes.
17   Q.   You understood her to be an officer of
18 Walsh, did you not?
19   A.   Yes.
20   Q.   And you testified in your prior
21 deposition that you would regularly go over deals
22 with Miss Demola.  Do you recall that?
23   A.   With her and, and Paul.  But it wasn't a
24 regular thing with deals.  And, again, maybe it
25 was.  I'm just not 1,000 percent sure to answer

**Page 167**

1 that.  What did I say back then?
2   Q.   You said that you would go over deals
3 with Miss Demola.
4   A.   Okay.
5   Q.   Now, Mr. Del Russo was the underwriting
6 person; correct?
7   A.   Quality control, from my recollection,
8 is that if there was an overflow in underwriting
9 or they picked X amount of deals to go to quality
10 control.
11   Q.   What did you understand Mr. Del Russo's
12 job function to be at Walsh?
13   A.   What I just said.  If -- he would -- if
14 underwriting was backed up, he would take deals or
15 quality control.
16   Q.   Who did you believe the head underwriter
17 was at Walsh?
18   A.   Under him, there was another girl.  I
19 forget her name.
20   Q.   Do you recall a woman by the name of
21 Acevedo who was a underwriter at Walsh?
22   A.   Possibly, yeah.
23   Q.   Do you recall at one point in time
24 Ms. Acevedo was removed from the underwriting
25 function on NHF loans?

**Page 168**

1   A.   Yes.
2   Q.   Do you recall that she was removed
3 because she was being too strict or stringent in
4 requiring that the guidelines be complied with on
5 the loans that were coming in from NHF?
6   A.   She was making our lives miserable at
7 the time, yes.
8   Q.   So the response from Walsh to that was
9 to remove her from reviewing the NHF loans;
10 correct?
11   A.   Correct.  Whether NHF or mine, I don't
12 know which ones but, yes.
13   Q.   Can you explain to me, Mr. Kane, why you
14 were dealing with the National sales manager on
15 underwriting issues for the NHF loans?
16      MR. MAGNANINI:  Objection to form.
17      THE WITNESS:  Well -- and when I would
18 talk to Betty Ann, it was only maybe because
19 D'Apolito wasn't there or whatever.  But I
20 would go to D'Apolito and D'Apolito would go
21 to her, who they were all in the same office.
22 So D'Apolito wanted his numbers to get his
23 commissions for the month.  Everybody wants to
24 have their numbers on their board.  So that's
25 what it was about.  If you notice, a lot of

**Page 169**

1   our deals were done at the end of the month.
2 BY MR. HAYES:
3   Q.   Now, Mr. Walsh testified that deals in
4 New Jersey don't typically close at the end of the
5 month as opposed to other times of the month.
6 Would you disagree with that testimony?
7      MR. MAGNANINI:  Objection to form.  I
8 don't know if he said that, but you can
9 answer.
10      THE WITNESS:  What I can say is that we
11 put the pressure on D'Apolito, which is why we
12 did a lot of our deals at the end of the month
13 so he could make his numbers and make his
14 commissions.
15 BY MR. HAYES:
16   Q.   And Miss Demola used to have candy
17 parties at the end of the month so she could make
18 her numbers; correct?
19   A.   Without a doubt.
20   Q.   You understood that her compensation was
21 based in part on the volume of the loans also?
22   A.   Correct.
23   Q.   Whenever you had a problem, it went from
24 D'Apolito to Demola, that deal somehow got
25 processed, did it not?

43 (Pages 166 - 169)

WILLIAM KANE

**Page 170**

1  A.  In one form or another, the house closed
2  either then or the next day or the following day,
3  yes.
4  Q.  Now, do you recall, Mr. Kane, a point in
5  time where Greenwich was having a problem with
6  some of the NHF loans?
7  A.  From my recollection, it wasn't NHF
8  loans, it was another guy's loans.  But the only
9  problem I ever knew about the NHF loans were right
10  at the end when subpoenas came in.
11  Q.  Well, you testified in your prior
12  deposition, Mr. Kane, that there was a point in
13  time when because Greenwich had a problem with the
14  loans, there was a delay in getting the loans
15  approved.  Does that help refresh your
16  recollection at all?
17  A.  Not really.
18  Q.  Do you recall testifying that Greenwich
19  had noticed that the same escrow letters were
20  being used for different deals?
21  A.  If that's what I said, then that's what
22  I'll go by.  I'll stick by, you know -- that
23  deposition was five years ago.
24  Q.  May I ask that you answer the question I
25  clearly want as to whether or not your recollection

**Page 171**

1  at that point in time would be better than today
2  because my belief is that in fact your
3  testimony -- or your recollection would have been
4  better back then.
5  A.  Hundred percent, and that's what I'll go
6  by.
7  Q.  Now, what you testified in the prior
8  deposition, sir, was that the Greenwich issues and
9  the delays that were taking place in the loans is
10  what caused the luncheon meeting at LG's.
11  Does that sound right to you?
12  A.  It could be possible, yeah.  I mean, if
13  you can bring up a little bit more to reflect my
14  memory, it would be good.
15  Q.  Sure.  Your testimony at the prior
16  deposition was you had lunch with Miss Demola and
17  Jim Walsh, that Miss Demola did most of the
18  talking, that Miss Demola indicated how important
19  it was to continue to get your loans approved.
20  A.  Okay.
21  Q.  And Greenwich had raised a problem with
22  these escrow letters because they noticed the same
23  escrow letters were being used on more than one
24  transaction.  And that's why the structure of the
25  deals changed from one that had escrow letters to

**Page 172**

1  ones that had secondary mortgages.
2  Does that sound right to you?
3  A.  Now it sounds correct, yes.  And I think
4  we actually went from an 80 percent loan to value
5  to a 75 percent loan to value, which is --
6  Q.  Am I correct, Mr. Kane, that lenders
7  like to see that buyers have money in the deal?
8  A.  That is correct.
9  Q.  And the way in which the money in the
10  deals was evidenced before that meeting was
11  through the phony escrow letters; correct?
12  A.  Correct.
13  Q.  The buyer had no money in these deals;
14  correct?
15  A.  Correct.
16  Q.  And Greenwich noticed that several of
17  the escrow letters on these deals were identical;
18  correct?
19  A.  Okay.  I'm going to go by that, yes.
20  Q.  And the way in which that issue was
21  dealt with was not to get legitimate escrow
22  letters, were to ensure that the buyers actually
23  had enough money, but it was done in such a way
24  that we would simply substitute second mortgages
25  for the escrow letters; correct?

**Page 173**

1  A.  Correct.
2  Q.  And this was discussed in the presence
3  of Miss Demola and in the presence of James Walsh;
4  correct?
5  MR. MAGNANINI:  Objection to form.
6  THE WITNESS:  I believe so, yes.
7  BY MR. HAYES:
8  Q.  And do you recall testifying that
9  shortly after that meeting, all the problems with
10  Greenwich went away and the loans started getting
11  approved again?
12  A.  Now I remember, yes.
13  Q.  And that meeting was late December or so
14  of 1996?
15  A.  I don't remember when it was, sir.
16  Q.  Am I correct, sir, that it was well
17  before the subpoena meeting that you had with
18  Robert Walsh?
19  A.  Yes.
20  Q.  Now, what you also testified was around
21  that same time, Mr. Kane, the in-house lawyer at
22  Walsh -- who I will represent to you was Fred
23  Schlesinger -- discovered that the deeds and
24  mortgages weren't being recorded; correct?
25  A.  Correct.

44 (Pages 170 - 173)

WILLIAM KANE

Page 174

1  Q.  And would it be fair to say he was going
2  crazy on this issue?
3  A.  Yes.  At some point when Stanley Yacker
4  was avoiding him, yes.
5  Q.  And I believe you testified in response
6  to Mr. Magnanini's question was that the problem that
7  Mr. Schlesinger was having was that the buyers of
8  these loans in the secondary market were asking
9  for documents; correct?
10  A.  Correct.
11  Q.  Now, am I correct, Mr. Kane, that the
12  way this works is that NHF would originate a loan,
13  that Walsh directed the loan to be put in NHF's
14  name, the mortgage was assigned from NHF to Walsh,
15  and then Walsh would sell that paper in the
16  secondary market; correct?
17  A.  That sounds correct.
18  MR. MAGNANINI:  Objection to form.
19  THE WITNESS:  That sounds correct to me.
20  BY MR. HAYES:
21  Q.  And based on your understanding of the
22  business, the buyer in the secondary market wants
23  to see that it's got a recorded mortgage; correct?
24  A.  Correct.
25  Q.  And you understand the importance of a

Page 175

1  mortgage being recorded; correct?
2  A.  Correct.
3  Q.  And am I correct that a buyer in the
4  secondary market also wants to see that there's a
5  title insurance policy insuring the priority of
6  the insured mortgage?
7  A.  Correct.
8  Q.  And am I correct that the buyer in the
9  secondary market wants to have in its possession a
10  series of assignments that shows that the mortgage
11  is being transferred from NHF to Walsh to the
12  secondary market purchaser; correct?
13  A.  Correct.
14  Q.  And as a result of these desires on the
15  part of the secondary market purchaser, it's not
16  unusual for a secondary market purchaser to
17  contact a company such as Walsh and say, hey, this
18  deal closed several months ago.  Where's my
19  recorded mortgage?
20  A.  Correct.
21  Q.  And where's my title policy?
22  A.  Right.
23  Q.  And in this particular case, you know
24  from some of the papers that Mr. Magnanini showed
25  you this morning, there were some transactions

Page 176

1  that didn't get recorded for six or more months
2  because of Mr. Yacker's problems; correct?
3  A.  Correct.
4  Q.  So that Walsh was not in a position when
5  it sold those loans to supply a recorded mortgage
6  in the secondary market; correct?
7  MR. MAGNANINI:  Objection to form.
8  THE WITNESS:  Correct.
9  BY MR. HAYES:
10  Q.  And because the documents had never been
11  recorded, Walsh was not in a position to produce a
12  final title policy to the buyer in the secondary
13  market because there was no recording information
14  on the insured mortgage; correct?
15  MR. MAGNANINI:  Same objection.  You can
16  answer.
17  THE WITNESS:  I believe so, yes.
18  BY MR. HAYES:
19  Q.  And you understand, do you not,
20  Mr. Kane, there's a difference between a title
21  commitment or a title binder and the final title
22  policy?
23  A.  Yes.
24  Q.  And what you were getting prior to these
25  deals closing was a title commitment or a title

Page 177

1  binder, not a title policy; correct?
2  A.  That I believe, yes.
3  Q.  So what you understood was happening
4  with Mr. Schlesinger was that he or someone at
5  Walsh was getting dunned from the secondary market
6  as to where all the documents are; correct?
7  A.  Correct.
8  Q.  And that that was causing him to reach
9  out to Yacker to determine why they didn't have
10  recorded documents, correct?
11  A.  Correct.
12  Q.  And, ultimately, it got him to a point
13  where he was crazy about this issue; correct?
14  MR. MAGNANINI:  Objection to form.
15  THE WITNESS:  Correct.
16  BY MR. HAYES:
17  Q.  And what ended up happening after that
18  is the money was provided to Mr. Yacker or to
19  Coastal so that all of those documents could be
20  recorded; correct?
21  A.  Correct.
22  Q.  Mr. Kane, based on your years in the
23  business, would you expect something like
24  unrecorded documents to be a red flag at a lender?
25  MR. MAGNANINI:  Objection to form.

45 (Pages 174 - 177)

WILLIAM KANE

Page 178

1    THE WITNESS: Yes.
2 BY MR. HAYES:
3    Q.   And you would understand, would you not,
4 that a lender would be aware that until such time
5 as its mortgage is recorded, it's at risk of being
6 divested of its mortgage on the property?
7    A.   Correct.
8    Q.   If the people at Walsh were to testify
9 that they knew nothing about the fact that deeds
10 and mortgages were not recorded until after the
11 articles hit the Asbury Press, would you agree
12 with that testimony?
13    A.   Can I ask you to repeat that?
14    Q.   Sure.  If people at Walsh were to
15 testify that until such time as the newspaper
16 articles came out in June of 1997, they had no
17 idea mortgages indeed were not being recorded,
18 would you disagree with that testimony?
19    MR. MAGNANINI: Objection to form.  You
20 can answer.
21    THE WITNESS: Yes.
22 BY MR. HAYES:
23    Q.   Do you agree that at least one person at
24 Walsh, their in-house corporate counsel, was aware
25 that deeds and mortgages were not being recorded?

Page 179

1    A.   Yes.
2    Q.   Mr. Kane, if I could ask you for a
3 moment to focus on the time period when the
4 Monmouth County prosecutor issued the subpoena to
5 Walsh.  And I believe you testified you had gotten
6 a phone call from Ms. Demola once Walsh was served
7 with the subpoena; correct?
8    A.   Corrects.  I don't remember whether the
9 initial call, phone call was D'Apolito or Betty
10 Ann, but we did have conversations, yes.
11    Q.   Okay.  But at some point in time you got
12 a call from Miss Demola saying, hey, I need to
13 know if these properties are occupied, I need to
14 know if the properties have been rehabilitated,
15 and I need to know if these loans are bad;
16 correct?
17    A.   I don't remember if that's the specific
18 questions that were asked.  I can't answer that.
19    Q.   Did she ask you if the properties were
20 occupied?
21    A.   I'd have to go back to previous
22 testimony, to be honest with you, sir.  That was,
23 you know, 13, 14 years ago.  And this -- that
24 caught me off guard but didn't catch me off guard,
25 and I was on my way to actually my son's

Page 180

1 graduation that night.  And to say if she asked if
2 they were occupied, not occupied, I don't remember
3 specifically.  My initial --
4    Q.   Do you recall, Mr. Kane, she called you
5 several times at your son's graduation?
6    A.   Yes.  It was out of control on the
7 amount of calls I was getting, yes.
8    Q.   And, sir, the subpoenas that were issued
9 in this case made no mention of the condition of
10 properties, the occupancy of properties.  It
11 simply indicated certain records were to be
12 supplied.
13    If Miss Demola asked you about the question of
14 occupancy or rehabilitation, would you have any
15 idea how she would even know that's a potential
16 issue?
17    A.   If she asked me, I'm not sure.
18    Q.   Did you testify, Mr. Kane, that prior to
19 Walsh funding the loans, you were using a company
20 called Continental Mortgage?
21    A.   That's correct, sir.
22    Q.   Were they table funding loans for you
23 also?
24    A.   I believe so.
25    Q.   Were Walsh and Continental Mortgage

Page 181

1 table funding at the same time?
2    A.   No, not that I know.  I mean, I didn't
3 do any loans through Continental that went to
4 Walsh.
5    Q.   At some point in time you stopped using
6 Continental and started using Walsh; correct?
7    A.   Correct.
8    Q.   And why did you shift from Continental
9 to Walsh?
10    A.   Because Continental was taking 30, 60,
11 90, 120 days, where Walsh, with the higher
12 interest rate, you could close -- in the beginning
13 it was a week, 10 days.
14    Q.   So it was easier to get deals through
15 Walsh?
16    A.   Yes.
17    MR. MAGNANINI: Objection to form.
18 BY MR. HAYES:
19    Q.   Mr. Kane, if you would, would you take a
20 look at the package that Mr. Magnanini had marked
21 WK 3?
22    MR. MAGNANINI: Mr. Kane, can I see that
23 for a second?
24    THE WITNESS: I have it here, sir.
25 BY MR. HAYES:

46 (Pages 178 - 181)

WILLIAM KANE

Page 194

1    Q.   You also testified at your prior
2  deposition, Mr. Kane, that Mr. Skowrenski knew
3  everything that was going on.  Do you recall that
4  testimony?
5    A.   Yes, sir.
6    Q.   Any doubt in your mind, Mr. Kane, that
7  Mr. Skowrenski was actively involved in this
8  fraud?
9        MR. MAGNANINI:  Objection to form.
10        THE WITNESS:  He was actively involved.
11  BY MR. HAYES:
12    Q.   He was aware that false leases were
13  being prepared?
14    A.   Yes.
15    Q.   He was aware that 100 percent of the
16  leases were falsified?
17    A.   Yes.
18    Q.   And, in fact, after a subpoena came in,
19  you personally viewed Mr. Skowrenski and his
20  girlfriend and others purging files for fear of
21  what might be found in them; correct?
22    A.   Yes.
23    Q.   Mr. Kane, very few of these properties
24  were actually tenanted; correct?
25    A.   Were actually what?

Page 195

1    Q.   Had tenants in them.
2    A.   I would say you're correct, yes.
3    Q.   And if Walsh had done any due diligence
4  with respect to the leases that were submitted as
5  part of the loan package, it would have learned
6  that there were no tenants in these properties;
7  correct?
8    A.   If there was a site visit, yeah.
9    Q.   Or if there was a phone call placed to
10  determine if a tenant was occupying the property;
11  correct?
12    A.   Correct.
13    Q.   There would have been no way for Walsh
14  to actually get in touch with any of these
15  tenants; correct?
16    A.   Correct.
17    Q.   Several of the leases that were
18  prepared, Mr. Kane, were actually prepared with a
19  date that was well before the dates of the
20  agreements for sale with the ultimate purchaser.
21  Do you recall that?
22    A.   We -- if it is that way, it probably had
23  to be done that way for guidelines.
24    Q.   How does a person that doesn't own a
25  property, Mr. Kane, enter into a lease to lease it

Page 196

1  to a third party?
2        MR. MAGNANINI:  Objection to form.
3        THE WITNESS:  They can't.
4  BY MR. HAYES:
5    Q.   Now, if Walsh had within its file leases
6  that show that the ultimate straw buyer had leased
7  the property to a third party months before the
8  straw buyer actually buys the property, that would
9  be a red flag, wouldn't it?
10    A.   Correct.
11        THE VIDEOGRAPHER:  Mr. Hayes, I have five
12  minutes left on my tape.
13        MR. HAYES:  Do you want to change?
14        THE VIDEOGRAPHER:  Certainly.
15        MR. HAYES:  You're the boss.
16        THE VIDEOGRAPHER:  Okay.  We're going off
17  the record.  The time is approximately
18  3:24 p.m.
19        (Short break.)
20        THE VIDEOGRAPHER:  We're back on the
21  record.  The time is approximately 3:31 p.m.
22  BY MR. HAYES:
23    Q.   Mr. Kane, are you ready to go forward?
24    A.   Yes, I am, sir.
25    Q.   And during the break, sir, did you have

Page 197

1  a chance to pick up 18, 19 and 20?
2    A.   Yes, I did, sir.
3    Q.   And would you agree with me that 18 and
4  19 are letters from Coastal Title Agency saying
5  they had not been paid for the title policies;
6  correct?
7    A.   Yes, sir.
8    Q.   And Mr. Yacker's excuse for that was he
9  claimed that you were overpaid and that you were
10  going to take care of it; correct?
11    A.   Correct, sir.
12    Q.   And when he references the $50,000, am I
13  correct, Mr. Kane, that $50,000 was solely the sum
14  of money that was necessary for getting the deeds
15  and mortgages recorded and paying whatever
16  transfer taxes were associated with it; correct?
17    A.   And the title policies, yes, sir.
18    Q.   Well, let me ask you this:  If you paid
19  the $50,000 and that included the title policies,
20  why was Mr. Yacker saying you were going to pay
21  these properties?  Were these different
22  properties?
23    A.   From my understanding, these are
24  different properties.
25    Q.   And is my understanding correct that you

50 (Pages 194 - 197)

WILLIAM KANE

**Page 198**

1 did not pay, after this letter, any monies to
2 Coastal for title policies on these properties,
3 correct?
4    A.   That is correct.
5    Q.   You disagreed with Mr. Yacker's
6 assertion that you had been overpaid; correct?
7    A.   Correct.
8    Q.   And am I correct, sir, that you have no
9 evidence in fact, Coastal was paid the
10 premiums for the title policies on these
11 properties; correct?
12    A.   Correct.
13    Q.   Mr. Kane, I'm finished with those
14 documents.  You can put them down.
15    You testified about the -- this loan where the
16 gentleman either had been fired recently or wasn't
17 employed there and Mr. Cuzzi made a phone call
18 that got the loan through; correct?
19    A.   Yes, sir.
20    Q.   Do you recall testifying in your prior
21 deposition that Ms. Demola was aware that that
22 phone call was false?
23    A.   I don't --
24    MR. MAGNANINI:  Objection to form.
25    THE WITNESS:  I don't remember.  But,

**Page 199**

1    again, I go back to my previous testimony
2    stance.
3 BY MR. HAYES:
4    Q.   Well, let me read it to you.  It's the
5 April 19 deposition again, where you referenced
6 one specific thing that you recall was the guy who
7 worked for the car company.
8    A.   Correct.
9    Q.   You said: "Larry Cuzzi, who was an
10 ex-car salesman from this place, had somebody
11 there who handled the situation."
12    And you were asked: "What do you mean by
13 that?"
14    And you answered: "Got them to call back and
15 say that the guy was there, that the guy worked
16 there."
17    And the next question was: "Okay.  And Betty
18 Ann was aware that that was untrue?"
19    And your answer was: "Yes."
20    Do you have any reason to disbelieve that
21 testimony today, Mr. Kane?
22    A.   No, sir.
23    Q.   And the next question was: "Did Betty
24 Ann also agree to conceal the true conditions of
25 properties from representatives of Walsh's

**Page 200**

1 warehouse facility?"
2    And your answer was: "That is correct."
3    Q.   Do you have any reason to believe that that
4 testimony was incorrect at the time you gave it?
5    A.   No, sir.
6    Q.   In response to Mr. Magnanini's question
7 about the people from Greenwich coming to look at
8 properties, you indicated that Mr. D'Apolito had
9 called you with respect to a list of properties
10 that needed to be made lived in.
11    Do you recall that testimony?
12    A.   From then or now?
13    Q.   Do you recall giving that testimony
14 earlier today?
15    A.   Okay, yeah.
16    Q.   Now, my question, sir, is back in 2007
17 when you gave a deposition, you were very specific
18 that that phone call came from Miss Demola.  Let
19 me read you your testimony.
20    "There was a day when a representative from
21 Greenwich Capital showed up at their office.  I
22 don't remember the time frame.  It might have been
23 November, December of '06."  And then you say:
24 "1996, I apologize.  And he wanted to go and look
25 at houses.  Betty Ann, you know, properties that

**Page 201**

1 they had put loads on.  Betty Ann called us up
2 there.  I went up there with D'Apolito.  She gave
3 us the list of homes, and she wanted our crews to
4 get out there, look at the properties, make sure
5 that there were curtains up, no boards on windows,
6 and make sure that they looked good for a drive-by
7 appearance.  She had the quality control girl take
8 him out to lunch to stall for time."
9    And having heard that testimony from 2007,
10 Mr. Kane, do you have any reason to believe that
11 that testimony was not correct that the call came
12 from Miss Demola?
13    A.   No, I don't.
14    Q.   And that you were probably mistaken
15 today when you said that call came from
16 Mr. D'Apolito?
17    A.   Correct.
18    MR. MAGNANINI:  Objection to form.
19 BY MR. HAYES:
20    Q.   Would it be fair to say, Mr. Kane, that
21 if that phone call had not come in and Greenwich
22 had gone out and looked at properties and saw that
23 they were boarded up and not lived in, that that
24 would have brought this whole scheme to an end?
25    MR. MAGNANINI:  Objection to form.

51 (Pages 198 - 201)

WILLIAM KANE

<table>
<tr><td>

**Page 202**

1      THE WITNESS: Probably.
2  BY MR. HAYES:
3      Q.   And if that scheme was brought to an
4  end, Miss Demola would not have had the same
5  volume of loans in her portfolio; correct?
6      MR. MAGNANINI: Objection to form.
7      THE WITNESS: Correct.
8  BY MR. HAYES:
9      Q.   In fact, there were later problems where
10  Greenwich had had some properties that had been
11  appraised by Mr. DiBenedetto and saw that there
12  were problems with the values?
13      MR. MAGNANINI: Objection to form.
14  BY MR. HAYES:
15      Q.   Is that correct?
16      A.   I'm assuming. If I said it earlier, I
17  don't remember.
18      Q.   Do you recall Miss Demola being involved
19  in sort of smoothing over the problems that were
20  created by DiBenedetto's appraisal so that more
21  deals could close?
22      MR. MAGNANINI: Objection to form.
23  DiBenedetto bought the loan back.
24      THE WITNESS: If I said it earlier, I
25  don't remember, you know. It's possible.

</td><td>

**Page 204**

1      Q.   Would you have expected people at Walsh
2  to have an appreciation for that conflict of
3  interest?
4      MR. MAGNANINI: Objection to form.
5      THE WITNESS: Yeah.
6  BY MR. HAYES:
7      Q.   But it never stopped them from
8  processing any of the loans on the properties you
9  were selling; correct?
10      A.   Correct. I don't know whether my name
11  was on the applications or not.
12      Q.   Well, Cristo was in the title as the
13  seller, wasn't it?
14      A.   Yes, but I don't know whether my name
15  was on the mortgage application.
16      Q.   Well, your name wouldn't have been on
17  the mortgage application, would it, Mr. Kane, as
18  the seller?
19      A.   I would have been as the originator.
20      Q.   NHF would have been listed on all of
21  them, wouldn't they?
22      A.   And then you have a personal interview,
23  which I would have signed.
24      Q.   Showing your involvement in some way;
25  correct?

</td></tr>
<tr><td>

**Page 203**

1  BY MR. HAYES:
2      Q.   And do you recall testifying that
3  because of what Miss Demola had instructed you to
4  do, that Greenwich had received a false impression
5  of the conditions of properties?
6      A.   I don't remember --
7      MR. MAGNANINI: Objection to form.
8      A.   -- testifying to that, but if I did,
9  then that's correct.
10  BY MR. HAYES:
11      Q.   Did Miss Demola ever express to you any
12  concern, Mr. Kane, that you were selling so many
13  of these properties to buyers that Walsh was
14  funding?
15      A.   Not to my recollection.
16      Q.   Did she ever express to you any concerns
17  that since you were the mortgage solicitor here
18  and the seller, that there might be some conflict
19  of interest that needed to be addressed?
20      A.   Not to my recollection.
21      MR. MAGNANINI: Objection to form.
22  BY MR. HAYES:
23      Q.   Do you see what that conflict of
24  interest might be, Mr. Kane?
25      A.   Yes.

</td><td>

**Page 205**

1      A.   Correct.
2      Q.   And there is no doubt in your mind, is
3  there, Mr. Kane, that Miss Demola at least was
4  aware that you were selling all these properties?
5      MR. MAGNANINI: Objection to form.
6      THE WITNESS: I would agree.
7  BY MR. HAYES:
8      Q.   No question that Mr. D'Apolito was aware
9  of it; correct?
10      A.   Hundred percent.
11      Q.   No question that Miss O'Neill was aware
12  of it?
13      A.   Hundred percent.
14      MR. MAGNANINI: Objection to form.
15  BY MR. HAYES:
16      Q.   No question that Mr. D'Apolito was
17  intricately involved in the fraud?
18      A.   Hundred percent.
19      Q.   No question Miss O'Neill was intricately
20  involved in the fraud?
21      A.   Hundred percent.
22      Q.   And based on your testimony from before,
23  Mr. Kane, while she may not have known all of the
24  details, any question Miss Demola was aware of the
25  fraud?

</td></tr>
</table>

52 (Pages 202 - 205)

WILLIAM KANE

Page 210

1 that Robert's comment was, quote, "Only if I claim
2 a victim, then the government can claim a victim,"
3 period, close quote.
4    Isn't that what Robert stated to you?
5       MR. MAGNANINI: Objection to form.
6       THE WITNESS: Yes.
7 BY MR. KOTT:
8    Q.   Isn't that what Robert stated to you?
9    A.   Yes, sir.
10   Q.   And, in fact, what Robert said was that
11 unless Walsh Securities cries that it is a victim,
12 then there would be no victim, and we should all
13 talk together and stay together.
14   Isn't that what Robert Walsh said to you at
15 that meeting?
16   A.   Yes, sir.
17       MR. MAGNANINI: Objection to form.
18 BY MR. KOTT:
19   Q.   And what you thought Robert meant by
20 that was that if Robert and Walsh were not crying
21 foul, then nobody could do anything; isn't that
22 correct.
23       MR. MAGNANINI: Objection to form.
24       THE WITNESS: Correct.
25 BY MR. KOTT:

Page 211

1    Q.   But you thought, when you heard Robert
2 say that, was that you should all stick together,
3 and they should all communicate together; correct?
4       MR. MAGNANINI: Objection to form.
5       THE WITNESS: Correct.
6 BY MR. KOTT:
7    Q.   And, in fact, after that meeting broke
8 up, Robert Walsh called you a few additional
9 times; correct?
10   A.   To my recollection now, yes.
11   Q.   And Robert -- you decided not to talk
12 with Robert Walsh on the advice of your attorney;
13 correct?
14   A.   Correct.
15   Q.   Now, I think you said to Mr. Magnanini
16 or Mr. Hayes -- but you correct me if I'm wrong --
17 today I think you said you also discussed the
18 merger with Robert Walsh?
19   A.   Yes. That was going back, yeah.
20   Q.   Was that the merger that Walsh
21 Securities was going to do with something called
22 RBMG, a bank in South Carolina?
23   A.   Yeah.
24   Q.   What was your discussion with Robert
25 Walsh about that?

Page 212

1    A.   He had said that they were putting a
2 deal together with this other bank -- excuse me --
3 and he was telling us about it, that he was
4 working on.  And actually I bought stock through
5 somebody else through that company.
6    Q.   Right.  And did Robert Walsh tell you
7 why he was talking with you, Mr. Kane, about that
8 merger?
9    A.   I don't remember.  I don't know if I
10 answered that last time.  I just don't remember
11 now.
12   Q.   Okay.  All right.  Let me switch gears.
13 I'm done with Robert Walsh.  Let me move over to
14 Betty Ann Demola; okay?  So I have some questions
15 about her.
16   Her position was National sales manager;
17 right?
18   A.   Yes, sir.
19   Q.   And you considered her to be a senior
20 officer of Walsh at the time you were dealing with
21 her?
22   A.   Yes, sir.
23   Q.   And at the time you were dealing with
24 her, you believed that Betty Ann was an owner of
25 Walsh Securities; is that correct?

Page 213

1    A.   I believe so, yeah.
2    Q.   And Betty Ann falsified documents;
3 correct?
4       MR. MAGNANINI: Objection to form.
5       THE WITNESS: I don't remember her
6    falsifying documents.  If I said that before,
7    it must be true, but I don't specifically
8    remember any documents, per se.
9 BY MR. KOTT:
10   Q.   When say if you said it before, you mean
11 in your deposition?
12   A.   Yes, sir.
13   Q.   Let me call your attention to your
14 deposition, page 102.
15   Question: "When you gave this testimony and
16 you referred to one or more principals of Walsh,
17 who were you referring to?"
18   Answer: "Betty Ann."
19   Question: "Betty Ann Demola?"
20   Answer: "Yes."
21   So you did testify in your last deposition
22 that Betty Ann Demola was involved in falsifying
23 documents; correct?
24   A.   If that's what I said last time, yes.
25   Q.   And you --

54 (Pages 210 - 213)

WILLIAM KANE

Page 214

1    MR. MAGNANINI: Objection to form.
2  BY MR. KOTT:
3    Q.   You agree with me that if you said it
4  last time, it's true; correct?
5    A.   Correct.
6    MR. MAGNANINI: Objection to form.
7  BY MR. KOTT:
8    Q.   Because you were sworn to tell the truth
9  before your last two depositions; correct?
10   A.   Correct.
11   Q.   Now, you were also aware that Betty
12 falsified both W-2 -- I'm sorry.  You were
13 aware -- withdrawn.
14   Betty Ann was also aware that certain W-2s and
15 certain pay stubs were falsified; is that correct?
16   A.   Again, recollection, I'm not 100 percent
17 sure.  It would have to go back to my last
18 testimony.
19   Q.   Fair enough.  Any time you want to do
20 that, I have it handy here.
21   MR. MAGNANINI: They're just going to
22   read it to you.
23   THE WITNESS:  You don't have to read it
24   to me like I said.
25   MR. MAGNANINI: Objection to the whole

Page 215

1  line of questions.
2    THE WITNESS:  Whatever I said, I mean, I
3    would never take back what I said last time
4    because it was truthful and...
5  BY MR. KOTT:
6    Q.   Okay.  So let me read it to you.  Page
7  117.
8    Question: "Was Betty Ann Demola aware that
9  certain of the W-2s and pay stubs were false?"
10   Answer: "Yes, sir."
11   Now, I want to come back, and I'm going to
12 call this the subject of having the houses look
13 like they're lived in.  Do you know what I'm
14 referring to?
15   A.   I believe I do, if --
16   Q.   Okay.  Let me tell what you I'm
17 referring to.  Do you remember there was a day
18 when a representative of Greenwich showed up at
19 the Walsh Securities office in November or
20 December of 1996?
21   A.   Yes.
22   Q.   And that that representative wanted to
23 go to look at some houses; correct?
24   MR. MAGNANINI: Objection to form.
25   THE WITNESS:  I believe so, yes.

Page 216

1  BY MR. KOTT:
2    Q.   And Betty Ann gave you a list of the
3  houses and wanted your crews to go up there, look
4  at the properties, make sure there were curtains
5  up and no boards on the window, and make sure they
6  looked good for a drive-by appearance; correct?
7    A.   Yes, I believe so.  And I believe she
8  had had a problem with somebody else at that time,
9  yes.
10   Q.   Right.  And, in fact, Betty Ann had the
11 quality control person at Walsh, another employee
12 of Walsh, take the Greenwich representative to
13 lunch to stall him so your crews would have a
14 chance to have the houses looked in; right?
15   A.   I believe so, yes.
16   Q.   And, in fact, you had actually went that
17 day up, drove from Monmouth County up to
18 Parsippany to Walsh Securities to talk with Betty
19 Ann about that; right?
20   A.   If that's what I said, yes.
21   Q.   Okay.  And Betty Ann said she wanted
22 this done because she did not want to have any
23 problems with the loans; correct?
24   A.   Probably, yes.
25   MR. MAGNANINI: Objection to form.

Page 217

1  BY MR. KOTT:
2    Q.   And after your crews got the houses
3  fixed up, you reported that to Betty Ann that it
4  was okay to send the Greenwich person out to look
5  at those houses; correct?
6    A.   Probably, yes.
7    Q.   That's because you got it done and the
8  houses looked lived in and in okay condition;
9  right?
10   A.   If that's what I said, yes, sir.
11   Q.   And that was so Greenwich would receive
12 a false impression of the condition of the
13 properties; correct?
14   MR. MAGNANINI: Objection to form.
15   THE WITNESS:  Correct.
16 BY MR. KOTT:
17   Q.   And the reason the houses needed to be
18 looked in, one of the reasons was that the basis
19 for the loans was that the houses were going to be
20 leased out so the investor owners would have the
21 money to pay the mortgage; correct?
22   A.   That is correct.
23   Q.   And that occurred, the Greenwich
24 situation, having the houses looked in, occurred
25 well in advance of the Monmouth County criminal

55 (Pages 214 - 217)

WILLIAM KANE

Page 222

1  Q.  Okay.  So it -- but it was Betty Ann who
2  interacted with the head of underwriting, Del
3  Russo, to get that underwriting requirement
4  waived; is that correct?
5  A.  Yes.
6  Q.  And, in fact, in the real estate world,
7  appraisals are in writing; is that correct?
8  A.  Correct.
9  Q.  And, in fact, there were times where
10  Betty Ann would go to Del Russo and have the
11  requirement for a written appraisal waived; is
12  that true?
13  A.  Correct.
14     MR. MAGNANINI:  Objection to form.
15  BY MR. KOTT:
16  Q.  Now let's talk about your meeting with
17  Betty Ann a little more.  You were up there about
18  two to three times a month; is that correct?
19  A.  Correct.
20  Q.  And you would almost always visit Walsh
21  at the end of each month; correct?
22  A.  Correct.
23  Q.  You were at Walsh at a minimum more than
24  25 times; correct?
25  A.  Correct.

Page 223

1  Q.  And at these visits that you had to
2  Walsh Securities, you would interact with Miss
3  Demola; is that true?
4  A.  Correct.
5     MR. MAGNANINI:  Objection to form.
6  BY MR. KOTT:
7  Q.  In fact, you met her regularly when you
8  went up there; correct?
9  A.  Correct.
10  Q.  And when you would meet with Miss
11  Demola, you would go over your deals with Miss
12  Demola; is that true?
13     MR. MAGNANINI:  Objection to form.
14     THE WITNESS:  To this time, I don't
15     remember sitting, going over specific deals
16     with her.  Just maybe we talked about volume.
17     Again, I'd reflect back to my previous
18     testimony.
19  BY MR. KOTT:
20  Q.  Sure.  And let me read you that.  Page
21  66 and 67 of your deposition.
22     Question: "With respect to your interactions
23  with Betty Ann Demola, could you tell us about
24  that, please?"
25     The answer you gave was: "With Betty Ann, we

Page 224

1  would go over the deal.  If there were problems on
2  the deals, we'd push her to get them resolved and
3  help us overcome obstacles.  On the last night of
4  the month, she would have a candy party.  She
5  would just be with the whip out to get the deals
6  processed."
7     That was the testimony you gave in your
8  deposition.
9  A.  Okay.
10  Q.  And you stand by that, right?
11  A.  Correct.
12  Q.  Now, the importance of the end of the
13  month -- I'm sorry.  The importance about the end
14  of the month -- and I think you talked about this
15  earlier today -- was because of sales quotas;
16  right?
17  A.  Correct.
18  Q.  Betty Ann would have a sales quota and
19  she needed to meet her numbers each month;
20  correct?
21  A.  Yes.
22  Q.  And, in fact, Betty Ann knew that you
23  owned Cristo; is that true?
24  A.  Correct.
25  Q.  She knew that you owned Cristo because

Page 225

1  you told her that; correct?
2  A.  Correct.
3  Q.  And at one point you invited her to come
4  to Cristo's offices to see them; right?
5  A.  Correct.
6  Q.  And Betty Ann was aware that you were
7  taking cash out of the properties because she was
8  aware of the fact that you were selling the
9  properties; is that true?
10     MR. MAGNANINI:  Objection to form.
11     THE WITNESS:  Correct.
12  BY MR. KOTT:
13  Q.  And Betty Ann knew that you were
14  affiliated with National Home Funding and
15  Mr. Skowrenski, correct?
16  A.  Yes.
17  Q.  And Betty Ann was aware that Walsh was
18  funding loans before written appraisals arrived at
19  Walsh; is that true?
20  A.  Correct.
21  Q.  You know that because you were sitting
22  with one of these appraisers, Mr. Brown, when he
23  called her and told her he would not have the
24  written appraisal to her by the closing date,
25  correct?

57 (Pages 222 - 225)

WILLIAM KANE

Page 226

1      MR. MAGNANINI: Objection to form.
2      THE WITNESS: Correct.
3 BY MR. KOTT:
4      Q.   And, in fact, allowing loans to close
5 before the written appraisal is received allowed
6 Betty Ann's numbers, production numbers, to look
7 better; correct?
8      A.   If you look at it that way, yes.
9      Q.   And, in fact, Betty Ann also told you of
10 the merger with RBMG; is that correct?
11     A.   Probably, if that's what I testified.
12     Q.   Calling your attention to page 71 just
13 to refresh your recollection on that, sir.  I'm
14 not seeing it, but I will come back to it at
15 another point when I question again.
16     Would you agree that Betty Ann was
17 enthusiastic about the merger?
18     MR. MAGNANINI: Objection to form.
19     THE WITNESS: Of course.
20 BY MR. KOTT:
21     Q.   What did you say? I'm sorry, sir.
22     A.   Yes.
23     Q.   Did Mr. Hayes found for me what I
24 couldn't find in my notes.  Page 72 of the
25 deposition.

Page 227

1      Question: "Are you familiar with the possible
2 merger that did not happen between Walsh
3 Securities and a South Carolina company called
4 Resource Bancshares?"
5      Answer: "Yes, sir."
6      Question: "How do you know about that?"
7      Answer: "Betty Ann had told me about it and"
8 --
9      Question: "When?"
10     Answer: "Betty Ann and D'Apolito had told me
11 about it."
12     A.   Then that's what I go by.
13     Q.   I want to now talk about a different
14 Walsh shareholder named James Walsh.  And
15 Mr. Hayes asked you a lot of questions about a
16 luncheon you had with James Walsh, and I don't
17 want to go over that again.
18     But that restaurant, that was at a restaurant
19 up by Walsh Securities called LG's?
20     MR. MAGNANINI: Objection to form.
21     THE WITNESS: Okay.  I don't remember the
22 name but --
23 BY MR. KOTT:
24     Q.   Okay.  Was it a restaurant up by Walsh
25 Securities somewhere in the Parsippany area?

Page 228

1      A.   Yes.
2      Q.   And that was the luncheon where you
3 discussed with James Walsh the issue that
4 Mr. Hayes talked with you about with the escrow
5 letters and changing to second mortgages, correct?
6      A.   Correct.
7      Q.   The only other thing I want to ask you
8 about that was -- well, a couple of other things.
9 You wanted that lunch because you were having
10 trouble at that time getting the loans through
11 Walsh, correct?
12     A.   I believe so, yes.
13     Q.   And now let me ask you about the timing
14 of that lunch.  That lunch would have been in
15 December 1996, or January or February of 1997; is
16 that correct?
17     A.   Correct.
18     Q.   And in addition to Betty Ann telling
19 James of the volume that you were doing, and she
20 wanted it to continue, Betty Ann also said that
21 we, we being Walsh, have to find a way to
22 accommodate the situation, correct?
23     MR. MAGNANINI: Objection to form.
24     THE WITNESS: If that's what I said
25     previously, yes, sir.

Page 229

1 BY MR. KOTT:
2      Q.   Okay.  And just -- I just want to make
3 sure whoever is listening to this, that they get
4 it right at the same time.
5      So when you said in your deposition -- just
6 give me a moment.
7      A.   Take your time.
8      Q.   Page 80.  Question: "Why would James
9 Walsh need to be at that meeting?"
10     Answer: "I'm not sure.  At the time, I mean,
11 it was arranged.  I don't know whether it was
12 because it was his -- I'm assuming because it was
13 his responsibility to fill the loans."
14     Question: "Okay.  And what -- when you said
15 Betty Ann was doing most of the talking, what was
16 she saying?  I'm not asking verbatim, obviously."
17     Answer: "Right."
18     Question: "But, actually, what was she
19 telling Mr. Walsh?"
20     Answer: "I believe telling him that, you
21 know, the amount of volume we do, that there's a
22 lot of buyers there, and she wanted to continue
23 the volume.  That would be the gist of it
24 basically.  And we have to find a way to
25 accommodate it."

58 (Pages 226 - 229)

WILLIAM KANE

Page 230

1  So you'll stand by that testimony given about
2  four and a half years ago; correct?
3  A.  Yes, sir.
4  Q.  And Betty Ann also told James at that
5  luncheon that she wanted to continue to fund the
6  loans; correct?
7  MR. MAGNANINI:  Objection to form.
8  THE WITNESS:  I believe so, yes.
9  BY MR. KOTT:
10  Q.  And what was in it for Betty Ann was
11  that Betty Ann would then have the sales volume, a
12  higher sales volume; correct?
13  A.  Correct.
14  Q.  And the benefit to Walsh of doing this
15  is it would have increased loans that it could
16  make more money on; correct?
17  A.  Correct.
18  Q.  Because it could sell those increased
19  number of loans on the secondary market; correct?
20  A.  Correct.
21  Q.  And by "secondary market," we mean
22  people like underwriters who package them as a
23  securitization for people who just buy single
24  loans; correct?
25  A.  I believe so, yes, sir.

Page 231

1  Q.  Okay.  I want to talk about Fred
2  Schlesinger, the general counsel.  Remember
3  Mr. Hayes had asked you questions about
4  Mr. Schlesinger being crazy because the mortgages
5  were not being recorded by Mr. Yacker.  Do you
6  remember that line of questions just a little
7  while ago by Mr. Hayes?
8  A.  Yes, sir.
9  Q.  And you also testified earlier to a
10  luncheon you had with Mr. Agel, and I think you
11  said Mr. Pepsny, but a luncheon with Mr. Agel
12  where there was a discussion of the need to get
13  those mortgages recorded; correct?
14  A.  They were reflecting my memory.  I don't
15  remember what the meeting was about, but I'm sure
16  that's what it was.
17  Q.  Okay.
18  A.  Again, if we go back to my previous
19  testimony.
20  Q.  Okay.  Just give me one moment, sir, if
21  you would.
22  Okay.  Calling your attention, I'll read to
23  you from page 159, beginning at 159.
24  Question:  "And the one time you met Mr. Agel,
25  refresh my recollection, what was that all about?"

Page 232

1  Answer:  "It was around Christmastime.  It was
2  a meeting that -- I don't know whether either
3  Robert or Bob Agel had set it up or Rick Pepsny
4  had set it up.  We had gone to a restaurant I
5  believe in New Brunswick."
6  Question:  "Uh-huh."
7  Answer:  "Okay.  It was more of, I guess, for
8  Rick to introduce me to Mr. Agel but it was also
9  after our last meeting last week, sitting and
10  thinking, it was Mr. Agel to get Rick on the right
11  track for the way the deals were coming through.
12  I guess at one point -- this is going back to the
13  gist of the meeting -- is that the deal -- I guess
14  Yacker didn't file the deeds right away."
15  Question:  "Right."
16  Answer:  "So they were all sitting in Yacker's
17  office or Pepsny's office, whatever, and then
18  Schlesinger went crazy.  So we had to get the
19  deals, you know, in.  That's when I paid the money
20  to Mr. Agel, to get the deals filed.  After he
21  received the deals, I guess the deals go -- credit
22  got put in, he noticed that the dates on the deeds
23  we were selling before we bought."
24  Now, let me come back --
25  MR. MAGNANINI:  Objection to form.  You

Page 233

1  didn't read it properly.
2  MR. KOTT:  I'm sorry.  Let me -- which
3  lines did I not read properly?
4  THE WITNESS:  You said page 160, line 8.
5  MR. KOTT:  Let me read it again.
6  BY MR. KOTT:
7  Q.  Question:  "Uh-huh."
8  Answer:  "Okay.  It was more of a -- I guess
9  for Rick to introduce me to Mr. Agel, but it was
10  also, after our meeting last week sitting and
11  thinking, it was Mr. Agel to get Rick on the right
12  track for the way the deals were coming through.
13  I guess at one point -- this is going back to the
14  gist of the meeting -- is that the deal, I guess
15  Yacker didn't file the deals right away."
16  Now, Mr. Kane, I want to take you back.  You
17  have a luncheon around Christmastime.  And that
18  would have been December of 1996; is that correct?
19  A.  Correct.
20  Q.  And that would have been about six or
21  seven months before the deals became public in the
22  newspaper -- I'm sorry.  That would have been six
23  or seven months before the frauds became public in
24  the Asbury Park Press and other newspapers;
25  correct?

59 (Pages 230 - 233)

WILLIAM KANE

Page 234

1    A.   Correct.
2    Q.   And part of the reason for that meeting
3 was that Mr. Schlesinger was going crazy that the
4 deeds were not being recorded; is that correct?
5    A.   I'm taking my word for it last time.
6    Q.   That's what you said last time, sir.
7    A.   Okay, okay.
8    Q.   Well, you say "okay." I just read it to
9 you, didn't I?
10   A.   Yes.  So that's it then.  That's what
11 the meeting was for.
12   Q.   Switch gears.  I want to talk about
13 another Walsh employee, D'Apolito.  Who was
14 Mr. D'Apolito's supervisor?
15   A.   Betty Ann Demola.
16   Q.   Who hired Mr. D'Apolito?
17   A.   I'm assuming Betty Ann.
18   Q.   You made cash payments to Mr. D'Apolito.
19 for doing a variety of improper things; correct?
20   A.   Correct.
21   Q.   You made 10 or $20,000 in cash payments
22 to him; correct?
23   A.   Correct.
24   Q.   The reason you did that was to get
25 everything taken care of as far as your loans were

Page 235

1 concerned; correct?
2    A.   Correct.
3    Q.   In fact, Bobby Skowrenski of National
4 Home Funding, also made cash payments to
5 Mr. D'Apolito; correct?
6    A.   Correct.
7    Q.   And in addition to doing -- withdraw
8 it.
9    Mr. D'Apolito at Walsh Securities, in addition
10 to doing improper things at the office, also
11 drafted phony leases for you; correct?
12   A.   Correct.
13   Q.   You paid him extra money for that;
14 right?
15   A.   Correct.
16   Q.   I want to ask you about a different
17 Walsh Securities employee, Kellie O'Neill.  You
18 know Miss O'Neill; correct?
19   A.   Correct.
20   Q.   She worked for Walsh Securities,
21 correct?
22   A.   Correct.
23   Q.   She knew Betty Ann Demola; is that
24 correct?
25   A.   Correct.

Page 236

1    Q.   You made cash payments to Miss O'Neill,
2 correct?
3    A.   Correct.
4    Q.   You paid her $100 -- or $200 per deal to
5 help get your deals through; correct?
6    A.   Correct.
7    Q.   You paid her extra for creating phony
8 leases; right?
9    A.   Correct.
10   Q.   In fact, all the leases in this lawsuit,
11 the ones that are the loans we're talking about,
12 were phony; correct?
13   A.   Correct.
14   Q.   All right.  I have a few -- I'm going to
15 move off Walsh Securities for a moment and ask you
16 about National Home Funding and Mr. Skowrenski.
17   A.   Okay.
18   Q.   Mr. Skowrenski, I think you told
19 Mr. Hayes, was aware of the frauds; correct?
20   A.   Correct.
21   Q.   Mr. Skowrenski knew everything that was
22 going on with respect to these?
23   A.   Correct.  We lost you.  We lost him.
24 Hello?  Hello?
25       THE VIDEOGRAPHER:  Off the record at

Page 237

1 4:12.
2       (The court reporter read the requested
3 questions and answers.)
4    MR. KOTT:  Let's go on the stenographic
5 record.  Because I want to see if counsel can
6 agree.  Mr. Hayes, Miss Wagner and I are in
7 Mr. Magnanini's office in Short Hills, and
8 there was a power failure while I was
9 questioning and everything went off.
10   The court reporter has read back to us
11 off the record where I was in my questioning.
12 And I've asked the videographer to see where
13 she was on the video.  And what I wanted to
14 know, the videographer knows what the last
15 complete question and answer was.  So I
16 consent to having the videographer erase
17 everything after that, which will be a partial
18 question probably.  But we can only do that if
19 Mr. Magnanini and Mr. Hayes consent to that.
20   MR. MAGNANINI:  What is the -- you're
21 shaking your head.
22   THE VIDEOGRAPHER:  No, he said -- it's
23 not a partial question.  He answered -- he
24 asked him a question, and he said yes.  And
25 then that's when we lost him.

60 (Pages 234 - 237)

WILLIAM KANE

**Page 238**

1    MR. KOTT: Oh, okay. So it won't look
2 funny on the video? Was the video running
3 there with nothing happening?
4    THE VIDEOGRAPHER: Yes, because we didn't
5 know where you were.
6    MR. KOTT: For how long?
7    THE VIDEOGRAPHER: Maybe a minute.
8    MR. KOTT: Okay. Can we take that minute
9 out, Bob? That's my question.
10    MR. HAYES: Yeah, I'm fine with that.
11    THE VIDEOGRAPHER: Okay just give me a
12 moment, please. We are back on the record.
13 The time is 4:32 p.m.
14    MR. KOTT: Mr. Kane, we had a little bit
15 of a technological problem. I'm going to ask
16 the court reporter to read back what he has
17 beginning with my question that Mr. Skowrenski
18 was aware of the frauds. Beginning there, if
19 the court reporter would read back for us.
20    (The court reporter read the requested
21 questions and answers.)
22    Q.   My next question, Mr. Kane -- are you
23 ready for me?
24    A.   I'm ready.
25    Q.   Mr. Skowrenski knew that the leases were

**Page 239**

1 phony; is that correct?
2    A.   Correct.
3    Q.   When Mr. Skowrenski received a criminal
4 subpoena from one of the prosecutors, he purged
5 his files; is that correct?
6    A.   Correct.
7    Q.   You worked at National Home Funding as a
8 loan originator, correct?
9    A.   Solicitor, correct.
10    Q.   And as a solicitor, that means you had a
11 license that was called a solicitor's license,
12 correct?
13    A.   I believe so, yes.
14    Q.   And -- but you needed to work for
15 Mr. Skowrenski because he had a -- either a
16 mortgage broker or a mortgage banker's license;
17 correct?
18    A.   Correct.
19    Q.   And only a mortgage broker or a mortgage
20 banker could solicit mortgage applications;
21 correct?
22    A.   Correct.
23    Q.   You were paid by Mr. Skowrenski's
24 company, National Home Funding; correct?
25    A.   Correct.

**Page 240**

1    Q.   With respect to the loans that National
2 Home Funding sold to Walsh, was National Home
3 Funding the largest company that sold loans to
4 Walsh? And what I mean by that is, did National
5 Loan Funding originate more of Walsh's loans than
6 any other mortgage company?
7    A.   That, I couldn't answer, unless --
8    Q.   Did you originate more of the National
9 Home Funding loans that were sold to Walsh than
10 anyone else at National Home Funding?
11    A.   Correct.
12    Q.   It was you, William Kane, who picked the
13 appraisers; is that correct?
14    A.   I was given the ones on their list and
15 picked from them; correct.
16    Q.   And whose list were you given?
17    A.   I believe Mr. Skowrenski's.
18    Q.   Right. So Mr. Skowrenski had a list of
19 appraisers, and then you, Mr. Walsh -- I'm sorry.
20 You, Mr. Kane, chose which appraiser would do the
21 appraisals; is that correct?
22    A.   Correct.
23    Q.   Did you ever get or see a list of
24 approved appraisers given by Walsh Securities?
25    A.   Not to my knowledge.

**Page 241**

1    Q.   When you picked which appraisers would
2 do the appraisals, you were wearing your National
3 Home Funding hat; is that correct?
4    A.   Correct.
5    MR. MAGNANINI: Objection to form.
6 BY MR. KOTT:
7    Q.   And the appraisers that Mr. Magnanini
8 asked you about that he sued in this case, the
9 five of those engaged in dishonesty in giving the
10 appraisals, correct?
11    A.   Correct.
12    Q.   They valued the properties at a higher
13 value than their true appraised value would have
14 been; is that correct?
15    A.   Correct.
16    Q.   And they -- on some occasions there
17 would be an eight-family, and they'd write up the
18 appraisal as a four-family; is that correct?
19    A.   Correct.
20    Q.   It was a fraud because under Walsh's
21 guidelines, Walsh would not issue a mortgage --
22 excuse me.
23    That was a fraud because under Walsh's
24 guidelines, Walsh would not purchase an
25 eight-family mortgage; correct?

61 (Pages 238 - 241)

# Exhibit G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA :
                                        Criminal
            v.                  :       Nos.

LORRAINE KING and               :       TRANSCRIPT OF
KELLIE O'NEILL,                           PROCEEDINGS
                                :
            Defendant.
------------------------x

                        Newark, New Jersey
                        October 29, 1999

BEFORE:

        THE HON. ALFRED M. WOLIN, U.S.D.J.

                        Reported by:
                        CHARLES P. McGUIRE, C.S.R.
                        Official Court Reporter

        Pursuant to Section 753, Title 28, United States Code,
        the following transcript is certified to be an
        accurate record as taken stenographically in the above
        entitled proceedings.

                        CHARLES P. McGUIRE, C.S.R.

                CHARLES P. McGUIRE, C.S.R.
                OFFICIAL COURT REPORTER

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

2

1    APPEARANCES:

2        ALAIN LEIBMAN, Assistant U.S. Attorney,
         On Behalf of the Government

3
         TONIANNE J. BONGIOVANNI, First Assistant Public
4        Defender,
         On Behalf of Defendant King

5
         BENNETT, BONNEY & GILBERTI, ESQS.,
6        BY: ROBERT S. BONNEY, JR., ESQ.,
         On Behalf of Defendant O'Neill

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHARLES P. McGUIRE, C.S.R.
OFFICIAL COURT REPORTER

11

1        DEFENDANT KING:  Yes.

2        THE COURT:  And did you affix your signature there

3   voluntarily and knowingly?

4        DEFENDANT KING:  Yes, I did.

5        THE COURT:  Let the record indicate that I, too, as

6   the judicial officer will sign this document and again file it

7   with the Clerk of the Court.

8        Ms. O'Neill and Ms. King, I have in front of me a

9   document that is entitled Application For Permission To Enter

10  A Plea of Guilty.  On page seven of your document,

11  Ms. O'Neill, and more than likely page seven of yours as well,

12  there are signatures that purport to be your individual

13  signatures under today's date, October 29th.

14        Is that, in fact, your signature, Ms. O'Neill?

15        DEFENDANT O'NEILL:  Yes.

16        THE COURT:  And your signature?

17        DEFENDANT KING:  Yes.  Yes, sir.

18        THE COURT:  And did each of you read these documents

19  before you signed them?

20        DEFENDANT O'NEILL:  Yes.

21        DEFENDANT KING:  Yes.

22        THE COURT:  Did you understand them?

23        DEFENDANT O'NEILL:  Yes.

24        DEFENDANT KING:  Yes, sir.

25        THE COURT:  And if you had any questions about the

12

1   documents, did you refer those questions to your respective

2   counsel?

3          DEFENDANT O'NEILL:  Yes.

4          DEFENDANT KING:  Yes.

5          THE COURT:  And did your respective counsel answer

6   your questions to your satisfaction?

7          DEFENDANT O'NEILL:  Yes.

8          DEFENDANT KING:  Yes.

9          THE COURT:  Okay.  Going over to entry number eight

10  in each document, it indicates that the matter that brings you

11  before the Court today is that you conspired with others to

12  commit wire fraud.  Is that correct?

13         DEFENDANT O'NEILL:  Yes, sir.

14         THE COURT:  That's your understanding of the charge?

15         DEFENDANT KING:  Yes.

16         THE COURT:  And you understand as I go over to entry

17  number 24 that, by statute, each of you face a maximum term of

18  imprisonment of five years, $250,000 fine and -- one says $50

19  for the assessment, one says $100.

20         I think $100 is probably correct.

21         MR. LEIBMAN:  That is correct, Your Honor.  It is

22  after April of 1996.

23         THE COURT:  All right.

24         Mr. Bonney?

25         MR. BONNEY:  Your Honor, it's $100.  Forgive me.

CHARLES P. McGUIRE, C.S.R.
OFFICIAL COURT REPORTER

13

1          THE COURT:  May I change $50 to $100?

2          MR. BONNEY:  Please.

3          THE COURT:  Thank you.

4          So each of you understand that, by statute, it's

5     five years' imprisonment, $250,000 fine, and $100 assessment.

6     Is that correct?

7          DEFENDANT O'NEILL:  Yes.

8          DEFENDANT KING:  Yes, sir.

9          THE COURT:  Okay.  And going over to entry number

10    37, you each indicate that in exchange for -- and it talks

11    about, do you have a plea agreement.

12          You each have a plea agreement; is that correct?

13          DEFENDANT O'NEILL:  Yes.

14          DEFENDANT KING:  Yes.

15          THE COURT:  And it says, in your case, Ms. O'Neill,

16    in exchange for your plea of guilty, the Government will not

17    initiate further charges against you regarding fraudulent

18    mortgage loans; you will cooperate with the U. S., and the

19    U. S. will inform the Court of the nature and extent of your

20    cooperation, and move for what's known as a 5K departure.

21    Correct?

22          DEFENDANT O'NEILL:  Yes.

23          THE COURT:  That's your understanding?

24          DEFENDANT O'NEILL:  Yes.

25          THE COURT:  Okay.

29

1    Securities, Inc., a wholesale mortgage lender with offices in

2    Parsippany, New Jersey?

3              DEFENDANT O'NEILL:  Yes.

4              THE COURT:  And would I be correct that your duties

5    included, A, reviewing the documents submitted by mortgage

6    originators and others in support of mortgage loan

7    applications?

8              DEFENDANT O'NEILL:  Yes.

9              THE COURT:  B, that you were preparing Walsh

10   Securities loan commitment letters following review of those

11   applications by the company's underwriters?

12             DEFENDANT O'NEILL:  Yes.

13             THE COURT:  And going to question number three, did

14   the commitment letters typically set forth certain conditions

15   which had to be met before a given mortgage loan could close?

16             DEFENDANT O'NEILL:  Yes, sir.

17             THE COURT:  And did an individual by the name of

18   Betty Ann Demola, the sales manager at Walsh Securities, on

19   various occasions direct that mortgage loans which you

20   processed be approved and funded without Walsh Securities

21   having received a written appraisal report?

22             DEFENDANT O'NEILL:  Yes, sir.

23             THE COURT:  Did Paul Del Rosso, the underwriting

24   department manager, and other underwriters approve mortgage

25   loan applications even though the loan application documents

30

1    included items such as pay stubs and I.R.S. forms W-2 which

2    you and they agreed were false or fake-looking?

3              DEFENDANT O'NEILL:  Yes.

4              THE COURT:  Did you in 1996, at the request of a

5    person buying and selling real properties, prepare fictitious

6    leases in connection with mortgage loan applications submitted

7    to and later approved by Walsh Securities?

8              DEFENDANT O'NEILL:  Yes, sir.

9              THE COURT:  Were those fictitious leases designed to

10   show that the multi-family properties that were the subject of

11   the loan applications were occupied by rent-paying tenants and

12   therefore would generate rental income?

13             DEFENDANT O'NEILL:  Yes, sir.

14             THE COURT:  Did you in 1996 at the request of the

15   same person prepare escrow letters falsely representing that

16   the attorney named in the letter was holding specific funds in

17   escrow on behalf of the buyer?

18             DEFENDANT O'NEILL:  Yes, sir.

19             THE COURT:  Now, at some other time, were you asked

20   by Betty Ann Demola to participate with other Walsh employees

21   in combing through closed files which were shortly to be

22   reviewed by representatives of Greenwich Capital, which funded

23   loans for Walsh Securities, in order to alter some of the

24   documents then in those files or to place documents, such as

25   written appraisals, in those files?

CHARLES P. McGUIRE, C.S.R.
OFFICIAL COURT REPORTER

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

31

1          DEFENDANT O'NEILL:  Yes, sir.

2          THE COURT:  Did the persons present during portions

3    of the file-cleaning process include Demola?

4          DEFENDANT O'NEILL:  Yes.

5          THE COURT:  President Robert Walsh?

6          DEFENDANT O'NEILL:  Yes.

7          THE COURT:  Vice president James Walsh?

8          DEFENDANT O'NEILL:  Yes.

9          THE COURT:  And Mr. Del Rosso?

10          DEFENDANT O'NEILL:  Yes, sir.

11          THE COURT:  In 1996 and 1997, did you accept

12    payments from various mortgage originators and others on a per

13    loan application basis for numerous mortgage loans which you

14    processed at Walsh Securities?

15          DEFENDANT O'NEILL:  Yes.

16          THE COURT:  And did you do all of these things

17    knowingly and willfully, and by "knowingly," you understood

18    that which you were doing; correct?

19          DEFENDANT O'NEILL:  Yes.

20          THE COURT:  And "willfully" meaning you had an

21    intent to do the things you were doing --

22          DEFENDANT O'NEILL:  Yes, sir.

23          THE COURT:  -- and understood what you were doing;

24    correct?

25          DEFENDANT O'NEILL:  Yes, sir.

CHARLES P. McGUIRE, C.S.R.
OFFICIAL COURT REPORTER

38

1          DEFENDANT KING:  Yes.

2          THE COURT:  Ms. Bongiovanni, are you satisfied that

3     the United States would be able to prove at trial that the

4     funds for the closings addressed by Ms. King were transmitted

5     by wire transfer from New York to a bank account of Mr. Yacker

6     in New Jersey?

7          MS. BONGIOVANNI:  Yes, I am, Your Honor.

8          THE COURT:  Any further questions to supplement the

9     factual basis of the plea?

10         MR. LEIBMAN:  No, Your Honor.

11         THE COURT:  Okay.

12         As to each of the Defendants here today:

13         Why are you entering your plea of guilty,

14    Ms. O'Neill?

15         DEFENDANT O'NEILL:  Excuse me.  I didn't hear you.

16         THE COURT:  Why are you entering your plea of

17    guilty?

18         DEFENDANT O'NEILL:  Because what I did was wrong.

19         I'm sorry.

20         Because what I did was wrong.

21         THE COURT:  Okay.  So what you're saying is, you're

22    guilty of the offense.

23         DEFENDANT O'NEILL:  Yes.

24         THE COURT:  Ms. King?

25         DEFENDANT KING:  I am guilty also of these --