# Exhibit H

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,

Action No. CV 97-3496 (WGB)

Plaintiff,

Hon. William G. Bassler

vs.

CRISTO PROPERTY MANAGEMENT, LTD., a/k/a G.J.L. LIMITED, DEK HOMES OF NEW JERSEY, INC., OAKWOOD PROPERTIES, INC., NATIONAL HOME FUNDING, INC., CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT Co., Inc., CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C., WILLIAM KANE, GARY GRIESER, ROBERT SKOWRENSKI, III, RICHARD CALANNI, RICHARD DiBENEDETTO, JAMES R. BROWN, THOMAS BRODO, ROLAND PIERSON, STANLEY YACKER, ESQ., MICHAEL ALFIERI, ESQ., RICHARD PEPSNY, ESQ., ANTHONY M. CICALESE, ESQ., LAWRENCE CUZZI, ANTHONY D'APOLITO, DAP CONSULTING, INC., COMMONWEALTH LAND AND TITLE INSURANCE CO., NATIONS TITLE INSURANCE OF NEW YORK, INC., FIDELITY NATIONAL INSURANCE CO. OF NEW YORK, COASTAL TITLE AGENCY, STEWART TITLE GUARANTY COMPANY, IRENE DIFEO, DONNA PEPSNY, WEICHERT REALTORS, AND VECCHIO REALTY, INC. D/B/A MURPHY REALTY BETTER HOMES and GARDENS.

Defendants.

______________________________/ Volume I, Pages 1 - 131

DEPOSITION OF: WILLIAM KANE.

DATE/TIME: April 19, 2007; 9:30 a.m.

PLACE: Kanabay Court Reporters
Feather Sound Square, Suite 19
Clearwater, Florida

ORIGINAL

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

REPORTED BY: Robert William Wagner
Notary Public,
State of Florida at large.

APPEARANCES:

MR. ROBERT A. MAGNANINI, Esquire
Appearing via video conference
Boies, Schiller & Flexner, L.L.P.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
Attorney for Plaintiff Walsh Securities, Inc.

MR. DAVID KOTT, Esquire
Appearing via teleconference
McCarter & English, L.L.P.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Counsel for Commonwealth Land and Title

MR. MARTIN R. McGOWAN, JR., Esquire
Appearing via teleconference
Methfessel & Werbel
3 Ethel Road, Suite 300
Edison, New Jersey 08818
Attorney for Coastal Title

MS. MUKTI PATEL, Esquire
Appearing via telephone
Fox Rothschild, L.L.P.
Princeton Pike Corporate Center
997 Lennox Drive, Building 3
Princeton, New Jersey 08648
Attorney for Nations Title and Fidelity National

MR. RICHARD CALANNI, Pro Se
Appearing via teleconference.

ALSO PRESENT:

MS. VIRGINA MORAN, Esquire
Appearing via teleconference
In-house Counsel for Commonwealth Land and Title

**KANABAY COURT REPORTERS**
**TAMPA AIRPORT MARRIOTT HOTEL (813) 224-9500**
**ST. PETERSBURG - CLEARWATER (727) 821-3320**

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A. I would write the loan application, order the appraisal, and submit the loan to the bank under National Home Funding.

Q. Approximately when did you become employed by National Home Funding?

A. I believe it was sometime after Cristo was set up. The exact dates I am not sure of.

Q. And why did you go to work for National Home Funding.

A. Mr. D'Apolito introduced me to Robert. This way -- because Selective was charging a lot of points. Mr. Skowrenski, I believe, was taking either a quarter or a half a point on the deals. That was it.

Q. Do you know whether at that time Mr. Skowrenski or his company, National Home Funding, had any licenses from the State of New Jersey to operate as a mortgage banker or broker?

A. I'm assuming they did.

Q. Did you have any such licenses?

A. Yes.

Q. What licenses did you have?

A. I believe I had a -- either a loan originator or a loan solicitor's license under National Home Funding.

Q. When did you get that license?

A. Again, it would be sometime after Cristo, after we

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A. Not to my recollection.

Q. Had you ever worked in the mortgage origination business before you became employed by Mr. Skowrenski?

A. No. No --

Q. I missed -- I want to come back to -- I'm sorry. Did you --

A. No, no. I'm just saying, not to my knowledge, I was never employed, no.

Q. I wanted to come back to one of your earlier answers were you said -- and I'm going to paraphrase what you said -- that you went to work for National Home Funding because it charged lower points than Selective.

Do you remember that testimony?

A. Yes, I do, sir.

Q. Why would that mean that you would go to work for National Home Funding rather than simply use National Home Funding's services?

A. Because by me doing the work is the reason why there were less points involved.

Q. Would you explain that to me, please?

A. If he had one of his other loan representatives or loan officers or solicitors do my work -- my deals, they would want to get a point, two, two points, whatever the fee might be. By me doing it, I -- we eliminated that fee to somebody.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q. And would that mean National Home Funding would make less money than if another originator had worked on the deal?

A. It would depend on what deals he had with his other originators.

Q. I guess my question is what was in it for Mr. Skowrenski in hiring you. And I'm not being a wise guy when I phrase it that way.

A. No, no. I understand. Volume. He was making, whether it be a quarter of a point or a half a point or -- I forget the exact deal at this point in time -- but he was generating it in volume, and his company could show that they were doing big numbers.

Q. And what would be the advantage to his company in showing big numbers?

A. You can get different banks. You can go to different banks when you do certain volume. I believe at one point he had talked about being a national wholesaler himself where you would get more back-end money from the banks. They would pay you.

Q. Did Mr. Skowrenski supervise your work in any way or did you pretty much work on your own?

A. Pretty much worked on my own.

Q. Did you actually have an office at National Home Funding?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

What exactly was your deal with Mr. Skowrenski?
A. Like I said before, it was either a quarter of a point or a half a point he received on each deal.
Q. And put that in terms that people not familiar with real estate could understand.
A. Okay. If the loan was worth -- if it was $100,000 loan, one point would be $1,000. So a quarter of a point would be $250 to $500 for Mr. Skowrenski's end.
Q. And did you get any payment from Mr. Skowrenski?
A. Yes, sir.
Q. What was your payment from Mr. Skowrenski?
A. The difference between what he received and what was charged to the borrower or the back end that came back on the rate.
Q. Was that the same deal that his other mortgage originators would have had?
A. Again, each deal is done differently. I couldn't say, no, or indifferent.
Q. One of the witnesses in this case suggested or testified that you also received some cash payments from Mr. Skowrenski beyond what your stated compensation or stated deal with him was.
Is that correct or is that incorrect?
A. That's definitely incorrect.
Q. With respect to the loans you originated through

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A. No.

Q. Can you describe your business dealings with Walsh Securities?

A. Well, I worked for National Home Funding. We would get -- I would identify a house or one of my people would identify a house. We'd go to contract on it. We'd call Mr. Grieser or another gentleman that worked for him at the time, Mr. Cuzzi.

He would bring in a straw buyer, a borrower, a straw buyer. We'd process the paperwork for the straw buyer and bring it into Walsh Securities to get the loan done.

Q. And do you know who owners of Walsh Securities were?

A. I was told back at that time it was Betty Ann, Jimmy, and Robert.

Q. Betty Ann Demola and Jimmy Walsh and Robert Walsh?

A. That is correct, sir.

Q. And who told you that those were the owners?

A. To the best of my recollection, it had to be D'Apolito, Anthony D'Apolito.

Q. The reason I asked whether you were ever employed by Walsh, there's a number of the witnesses in this case who testified that you either had an office or a desk at Walsh.

Is that correct or is that incorrect?

A. That would be incorrect. It was a joke, but there

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

I think they were $24,000 or $25,000. So I know that Billy definitely had some interaction with either Mr. DelRusso or with Betty Ann on the loans.

Q. How do you know that, Mr. Kane?

A. I remember sitting in the office and he was talking on the phone. And I believe at one time, at one point he did go up to Walsh with Mr. D'Apolito.

Again, to say it was this date and time, you know, I couldn't; but I know there was a situation.

Q. You had told me how often you were in Walsh Securities. When you would be up in Walsh Securities, would you interact with Ms. O'Neill?

A. Yes.

Q. And how about with Mr. D'Apolito?

A. Yes.

Q. And when you had your visits to Walsh Securities that you've told us about, did you interact with Betty Ann Demola?

A. Yes.

Q. With respect to your interactions with Betty Ann Demola, could you tell us about that, please?

A. With Betty Ann, we would go over the deals. If there were problems on the deals, we'd push her to get them resolved, help us overcome obstacles. On the last night of the month, she would have a candy party, where, you know,

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

she would just be with the whip out to get the deals processed.

MR. KOTT: I'm going to ask the court reporter to please read that answer back.

(Court reporter reads back answer.)

(Discussion off the record.)

BY MR. KOTT:

Q. Mr. Kane, I have some questions about that answer you gave.

Why would you be going over your deals with Betty Ann Demola?

A. Because if the underwriters had a problem and either Paul -- Mr. DelRusso was busy or whatever, we would go to Betty Ann with it. Meaning when I say we, either myself and Anthony D'Apolito or myself and Kellie or myself and the underwriter.

Betty Ann was involved in our deals.

Q. Earlier when I asked you for everybody's job description, you had told me Mr. DelRusso was the head of underwriting and Ms. Demola in charge of sales. That's a general sense.

So my question is, why would Ms. Demola be involved in underwriting decisions?

A. Well, her sales -- she was in sales, so she needed the deals to go through. She needed the volume.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q. Why did she need the volume?

A. Well, she was the national sales manager I believe. So I'm sure she had a quota as did her loan officers.

Q. And you said she was involved in your deals. Did you have a sense that she really only got involved in your deals and not deals of other customers of --

A. No, she got in deals with other customers. I felt that. But, you know, I mean there were other people up there besides me that would deal with her.

Q. Okay. And you said in your answer that if there were problems, you would push her to get the problems resolved.

Was it that you would push her or she would push Mr. DelRusso?

A. Well, I think the way it went really is Kellie would tell me there was a problem or the underwriter or myself or D'Apolito. We push Mr. D'Apolito into getting it resolved, which means he would push Betty Ann.

I mean, I wouldn't personally go in there and tell her you have to do this or it has to be done. We would always make Mr. D'Apolito be intermediate.

Q. Okay. Were you ever in any meetings where you heard Ms. Demola talking about problems on your deals?

A. Yes.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q. Would you tell me about that, please?

A. I remember once. Specifically, I mean, there's one I can remember where the borrower was -- had too may loans out already. And that deal specifically was one of the homes that Gary Grieser was buying for himself, using somebody else's name.

And, you know, we pushed Betty Ann -- or I, through D'Apolito. It was the very beginning. And he pushed her, and, you know, she got him -- he got her to override the underwriting guidelines on that where they got the deal to close.

Q. All right. About how many occasions did Betty Ann Demola have the underwriting guidelines overwritten so a deal could close? Give me an approximation on that.

A. To be approximating would even be hard. I couldn't give you an exact number, you know. It could have been 1 to 20, 1 to 30. I'm not sure, sir. Each was individual, you know.

Q. And what would be her incentive for doing that? Withdrawn.

Let me try it this way.

Underwriting guidelines of lenders are designed to protect the lender; is that correct?

A. That's correct.

Q. The lender has the underwriting guidelines because

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

the lender wants to make sure that the risk they accepted is an appropriate risk; correct?

A. Correct.

Q. So for what reason would Betty Ann Demola have to override the underwriting guidelines on some of your loans?

A. The reason she would do it, in my opinion, is she wanted the numbers for the sales volume, but overriding also meant that they could have been putting it someplace else, that she might have found another source to place the loan. Just because, you know, they're dealing with Bank A and they're doing a lot of deals with Bank A, she could have went in and found other ways to do it through other lenders or places where they would place the loans afterwards.

Again, they were the bank, so she could have changed her own guidelines or whatever.

Q. Well, that's my question. Being the national sales manager would she ordinarily have been in a position to change the underwriting guidelines?

A. No, I don't think -- let's clarify that. She would -- after I would go to D'Apolito or Kellie come to me and they went to Betty Ann, or Anthony and I walked into Betty Ann together, which I'm sure happened, she would have to go to Mr. DelRusso and get him to sign off on it.

I don't think that Betty Ann on that end could actually go in and sign it and say it's done. I believe

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Mr. DelRusso had to do it.

So whether -- I was never involved -- in my recollection -- in the meetings with them as far as that goes. Did stuff get overwritten? Yes, without a doubt. The reason for it? Don't know. Don't know whether they found a different place to put the loan; or, you know, since they were the bank, they could have changed the guidelines. I don't know.

Q. Was it your --

A. But, yes, that's --

Q. I'm sorry. Go ahead.

A. That's okay. It's, you know, just reiterating myself that, you know, yes, the changes were made. But behind the scenes, I don't know exactly why or how.

Q. A couple times in the deposition you've referred to the need to get loans closed at the end of the month?

A. That's correct, sir.

Q. And in fact in the answer that I asked the court reporter to read back, you talked about Betty Ann having the candy out and got the whip out.

Was that at the end of the month?

A. Yes, sir.

Q. As far as you know, was part of Betty Ann's compensation based upon the number of loans that would close during a month?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q. Why did you have a few conversations with her?

A. She kept calling. She wanted to know if we heard anything else, what was going on at that point, that Robert wanted to meet with me. You know, she didn't know how to handle Robert, how's she's going to tell Robert. She was just very, very nervous.

Q. The Robert that you're referring to, was that Robert Walsh?

A. That would be correct, sir.

Q. So you were told by Betty Ann Demola the day that Walsh Securities was served with subpoenas that Robert Walsh wanted to meet with you; is that a true statement?

A. Later that evening, yes, sir.

Q. You were told that by Betty Ann later that evening?

A. Yes, sir.

Q. Did Betty Ann tell you why Robert Walsh wanted to meet with you?

A. He wanted to find out what was happening for himself.

Q. And what happened next?

A. We went up to Walsh Securities the next morning. When I say "we," it was myself, Gary Grieser, Anthony D'Apolito, and we met at Walsh Securities.

Q. Why did Mr. Skowrenski not go up with you?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A. I'm not sure. And you want to know something? I just don't remember him being there. I don't believe he was.

Q. And who did you meet with at Walsh Securities?

A. We met with Robert, a gentleman -- I forget his last name. I believe his first name was Art, and I believe that was it. Betty Ann was supposed to show up. She didn't.

Q. Do you know why?

A. No. She probably just -- I'm assuming she didn't want the confrontation.

Q. What do you mean by that?

A. She was nervous and wouldn't know how to handle herself. She gets very nervous, very hyper; and I just believe she just got scared off and didn't want to confront Robert with us there.

Q. And tell us what happened in the meeting.

A. Basically Robert wanted to know what was going on, how the deals were being done, why the prosecutors were looking at us. I filled him in. Gary Grieser explained things to him; and, you know, just -- he was there for factual information.

And when he left the meeting, he said that, you know, basically there's no -- you know, unless he cries victim, there would be no victim, so that we should all talk

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

together and stay together.

Q. What did you think he meant by that?

A. I assumed -- my assumption at the point was is that, you know, if he was the bank and he wasn't crying foul, that nobody could do anything.

Q. And what do you think he meant by him saying you should all -- did you say you all stick together?

A. Well, we should communicate together. Basically he wanted to know everything we knew, so I guess he could keep his stuff in -- you know, he would know exactly what's going on.

Q. Did he indicate to you that he was not going to claim that Walsh Securities was a victim?

A. His comment was, "Only if I claim a victim, then the government can claim a victim." You know, my own opinion -- you know, I shouldn't give my opinion, no.

Q. I'll take your opinion. Go ahead.

A. I don't know whether he got blind-sided by everything. You know, he was caught off.

Q. But when you left the meeting was it your impression that he was not going to claim to the government that Walsh was victimized by whatever you and the other gentlemen had done?

A. That's -- in hindsight you look back and say he was just trying to get as much information as possible, that

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q. When you gave this testimony and you referred to one or more principals and officers of Walsh, who were you referring to?

A. Betty Ann.

Q. Betty Ann Demola?

A. Yes.

Q. Okay. Tell me more about Betty Ann Demola agreeing to falsify documents in connection with loans.

A. Okay. One specific one I can give is there was a borrower who worked for a car company and his -- a quality control was done after the loan had closed, and somebody called up to verify his income and current employment status, and he wasn't working there. So Betty Ann got ahold of Anthony D'Apolito, and -- I believe she called me. I'm not 100 percent sure, but I spoke to her about it afterwards and let her know that the problem would be resolved.

And Larry Cuzzi, who was an ex-car salesman from this place, had somebody there who handled the situation.

Q. What do you mean by that?

A. Got them to call back and say that the guy was there, that the guy worked there.

Q. Okay. And Betty Ann was aware that that was untrue?

A. Yes.

Q. Okay. And then you also said in this section of

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

the sworn testimony that -- withdrawn.

Did Betty Ann also agree to conceal the true conditions of properties from representatives of Walsh's warehouse credit facility?

A. That is correct.

Q. Tell us about that, please.

A. Okay. There was a day when a representative from Greenwich Capital showed up at their office. I don't remember the timeframe. It might have been November, December of '06 -- 1996. I apologize. And he wanted to go and look at houses.

Betty Ann -- you know, properties that they had put loans on. Betty Ann called us up there. I was -- I went up there with Anthony D'Apolito. She gave us the list of homes; and she wanted our crews to get out there, look at the properties, make sure that there are curtains up, no boards on the windows, and make sure that they looked good for a drive-by appearance. She had the quality control girl take him out to lunch to stall for time, and that was it.

Q. When you say she called you up there, was that she called you to the Walsh building in Parsippany?

A. That would be correct, sir, yes.

Q. So you actually went up and met with her to talk about this activity?

A. Yes, sir.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q. Did you think it was improper at the time?
A. What do you mean by "improper"?
Q. I mean, did you think she was defrauding the warehouse lender?
A. To be honest with you, I probably didn't think about it. It was more just get it done so there was no headaches.
Q. Okay. Did she tell you why she wanted that done?
A. She didn't want to have any problems with the loans. I believe the month or two prior to that they had had a problem with a DiBenedetto loan where Greenwich had done a drive-by and they had to buy the loan back. And actually DiBenedetto bought it back from them.
Again, that was hearsay. I did not hear that. DiBenedetto had told me about that at the time.
Q. And what happened after your meeting at Walsh? Did you arrange -- did you or Mr. Grieser arrange to have done what she wanted done?
A. We both did, sir, yes.
Q. How did you get it done?
A. She gave us a list of houses. I believe to the best of my knowledge it was like 10 houses. He took North Jersey -- I took North Jersey. He took South Jersey, and we sent our crews out to do what had to be done.
Q. And after you got it done, did you report back to

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

her that it was done and it was okay to send the Greenwich Capital person to see the houses?

A. Yes, sir.

Q. And did you get it done? That is, did the houses look lived in and in an okay condition?

A. Yes, sir.

Q. So Greenwich would have received a false impression of the condition of the properties; is that true?

A. That'd be correct, sir.

Q. Do you know whether Robert Walsh or James Walsh was aware that Betty Ann has asked you to do that?

A. To my recollection, I don't know. I don't remember.

Q. Let me come back to something I asked you early on.

You said you had a solicitor's license. Is that the same thing as a broker, mortgage broker, or mortgage banker's license?

A. No, sir. Again, it was either called a solicitor's license or a loan originator's license. Totally -- you know, I mean, the only thing I could do was write loans. I couldn't go in and broker loans between different banks.

Q. Having a solicitor's license, could you operate in business without working for somebody who had a mortgage

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A. There was never any nonpayments prior to that. Now, I could be wrong, but that's -- you know...

Q. This is where I got the five more loans from because D'Apolito goes on and he says, "After that there were five more loans that were approved."

A. No. I mean, you can look at the dates on them. I mean, you know, Walsh Securities could have supplied them, but there was nothing. Once the subpoenas came, that was it.

Q. On any of the loans you were involved in, did the loans close before the appraisals were done?

A. Not done before the bank had them in hand, yes.

Q. What does that mean? I'm not sure I know what you --

A. Okay. There were a couple of times, rarely, but where the appraiser hadn't finished typing the loan up, but had the value, had done his inspection, and called the bank and said, this is what it's being appraised at. And, yes, they did fund it; and five days later or eight days later, they got the appraisal into the bank.

Q. Was Betty Ann Demola aware that Walsh was funding loans before the written appraisals arrived at the bank?

A. Yes.

Q. How do you know that?

A. Because she had to -- we had to call the value

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

into her. I remember one specifically sitting at James Brown's office and he called Betty Ann with the value.

Q. Was Betty Ann Demola aware that you were buying houses without any of your own money being down?

A. I'm not sure of that.

Q. Was Betty Ann Demola aware that you and Mr. Grieser were taking cash out from the sales?

A. Well, she knew I was, the fact that I was selling the properties. Whether Mr. Grieser was getting cash or not, I don't know whether she knew that or not.

Q. Was Betty Ann Demola aware that the buyers in fact were straw buyers?

A. I can't answer yes or no.

Q. Was Betty Ann Demola aware that certain of the W-2's and paystubs were false?

A. Yes, sir.

Q. How do you know that?

A. I just gave you the description of what happened on one of the deals where they called up and the person didn't work there. So...

Q. That's the one with the car dealer?

A. Yes, sir.

Q. Okay. Do you know anything about Kellie O'Neill preparing false escrow letters?

A. No, sir.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q. Do you know whether there were ever any payments to Mr. DelRusso?

A. Not by myself. I don't know if anybody else.

Q. As far as you could tell, was Mr. DelRusso a straight shooter, if I can use that phrase?

A. He was -- he was a straight shooter. He was just a pawn in the chest game, you know.

Q. Was it your impression that Betty Ann Demola could overrule Mr. DelRusso because at a minimum she was a sister of Robert and James Walsh?

A. Yes.

MR. MAGNANINI: Object to the form of the question.

MR. KOTT: What's the basis of the objection?

MR. MAGNANINI: Phrasing for one thing. At a minimum.

(Counsel talking at once.)

BY MR. KOTT:

Q. I think I'll pose the question a different way even though I disagree with my brother, Mr. Magnanini, as to whether it's improper or not.

Was it your impression that Betty Ann Demola could overrule Mr. DelRusso on underwriting decisions?

A. She could overrule him with her persuasion.

Q. What do you mean?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A. She has to go in and justify it to him. It wasn't just going in saying, you're changing this and that's it. She had to go in and plead her case to him and make it sound like it had to work.

Q. The money you made out of this, I know you made some money from selling properties. Did you make any other money out of this? Get any other source of funds, anyone giving you money?

A. The mortgage end. The mortgages, I told you I made money on the points and the back. And, no.

What do you mean, as far as anybody else giving me money? What do you mean by that?

Q. Well, I'm just referring to your sources for money out of this.

A. Was the sales and the mortgages.

Q. Did the straw buyers in fact get paid for people using their credit?

A. I believe, yes. I never paid them directly. That was out of Gary's office.

Q. Okay.

A. You know.

Q. Do you know how much they were paid?

A. I believe it was $1,000 a deal with a minimum of four deals.

Q. Was Mr. Grieser's intent in this as a money

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,

Plaintiff,

vs.

Action No. CV 97-3496 (WGB)
Hon. William G. Bassler

CRISTO PROPERTY MANAGEMENT, LTD., a/k/a G.J.L. LIMITED, DEK HOMES OF NEW JERSEY, INC., OAKWOOD PROPERTIES, INC., NATIONAL HOME FUNDING, INC., CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT Co., Inc., CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C., WILLIAM KANE, GARY GRIESER, ROBERT SKOWRENSKI, III, RICHARD CALANNI, RICHARD DiBENEDETTO, JAMES R. BROWN, THOMAS BRODO, ROLAND PIERSON, STANLEY YACKER, ESQ., MICHAEL ALFIERI, ESQ., RICHARD PEPSNY, ESQ., ANTHONY M. CICALESE, ESQ., LAWRENCE CUZZI, ANTHONY D'APOLITO, DAP CONSULTING, INC., COMMONWEALTH LAND AND TITLE INSURANCE CO., NATIONS TITLE INSURANCE OF NEW YORK, INC., FIDELITY NATIONAL INSURANCE CO. OF NEW YORK, COASTAL TITLE AGENCY, STEWART TITLE GUARANTY COMPANY, IRENE DIFEO, DONNA PEPSNY, WEICHERT REALTORS, AND VECCHIO REALTY, INC. D/B/A MURPHY REALTY BETTER HOMES and GARDENS.

Defendants.

_______________________________/ Volume II, Pages 132-258

DEPOSITION OF: WILLIAM KANE.

DATE/TIME: May 4, 2007; 9:30 a.m.

PLACE: Kanabay Court Reporters
Feather Sound Square, Suite 19
Clearwater, Florida

CONDENSED

REPORTED BY: Robert William Wagner
Notary Public,
State of Florida at large.
APPEARANCES:
MR. ROBERT A. MAGNANINI, Esquire
Appearing via video conference
Boies, Schiller & Flexner, L.L.P.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
Attorney for Plaintiff Walsh Securities, Inc.

MR. DAVID KOTT, Esquire
Appearing via teleconference
McCarter & English, L.L.P.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Counsel for Commonwealth Land and Title

MR. MARTIN R. McGOWAN, JR., Esquire
Appearing via teleconference
Methfessel & Werbel
3 Ethel Road, Suite 300
Edison, New Jersey 08818
Attorney for Coastal Title
MS. MUKTI PATEL, Esquire
Appearing via teleconference
Fox Rothschild, L.L.P.
Princeton Pike Corporate Center
997 Lennox Drive, Building 3
Princeton, New Jersey 08648
Attorney for Nations Title and Fidelity National
MR. RICHARD CALANNI, Pro Se
Appearing via teleconference.

KANABAY COURT REPORTERS
TAMPA AIRPORT MARRIOTT HOTEL (813) 224-9500
ST. PETERSBURG - CLEARWATER (727) 821-3320

INDEX

| | | | |
|---|---|---|---|
| WILLIAM KANE | | 135 | 1 |
| DIRECT | By Mr. Kott | 135 | 4 |
| DIRECT | By Mr. Calanni | 142 | 7 |
| DIRECT | By Ms. Patel | 153 | 17 |
| DIRECT | By Mr. McGowan | 158 | 21 |
| REDIRECT | By Mr. Kott | 163 | 24 |
| DIRECT | By Mr. Magnanini | 167 | 18 |
| REDIRECT | By Mr. Kott | 245 | 10 |
| REDIRECT | By Mr. Calanni | 254 | 8 |
| FURTHER REDIRECT | By Mr. Kott | 255 | 6 |
| Errata sheet | | 256 | 1 |
| Reporter's Certificates | | 257 | 1 |

WILLIAM KANE,
the witness herein, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION CONTINUED

BY MR. KOTT:
Q. Mr. Kane, since your last deposition have you review anything or talked with anybody about this case?
A. No, just verifying I was coming today.
Q. Okay. I have two more subjects, not two questions, but two subjects. The first subject deals with second mortgages. And my question, there were second mortgages that were issued by Oakwood Properties or by DEK Homes.
And let me start by asking you, do you recollect whether there was a time when Walsh Securities changed its procedures and demanded instead of just a copy of an escrow letter that there was an endorsed copy of the check or a copy of the deposit when the closing occurred?
A. No.
Q. None of that sounds familiar to you?
A. No.
(Court reporter asks to have microphone moved.)
Q. At some point were there second mortgages given by Oakwood Properties or DEK Homes?
A. Right from the get-go, there were second

mortgages, yes.
Q. Who prepared those second mortgages?
A. I think an original one was prepared either by Pepsny or Yacker, and then it was just a form. We just had a copy of it and just fill it in and put in the package submitted to Walsh.
Q. Okay. So Walsh was aware of the second mortgages?
A. Yes.
Q. Was Walsh aware -- withdrawn.
Were there -- the second mortgages, is that where the money came from for the deposits?
A. Yes, sir.
Q. Was Walsh aware that the money from the deposits came from the second mortgages?
A. Depending on how it was. It was either a 90/10 or an 80/20. And the 20 -- 10 percent would have to be shown as a deposit, with the 10 percent as a mortgage. But, yes, the second mortgage had to be submitted with your package.
Q. I know that, but was Walsh aware that the deposit was coming from the second mortgage?
MR. MAGNANINI: Objection to form.
A. Again, it would depend on what -- which program they were going under. If they were going under an 80/20, Walsh would require 10 percent down, 10 percent mortgage, or a 20 percent mortgage, no down.

BY MR. KOTT:
Q. Who was giving the second mortgages? Who was the lender?
A. It would be the seller of the property, whether it be DEK, Oakwood, or Cristo.
Q. And did DEK or Oakwood ever collect money on the second mortgages?
A. DEK tried. It's my understanding Dinaso's still trying.
Q. Did you have any discussions with Mr. Grieser about the second mortgages?
A. Just that they would never be collected. You know, it was just a -- you know, it would never be collected.
Q. That's why I asked, because Mr. Grieser testified in his deposition that he was told by you that the second mortgages were supposed to be forgiven.
A. Yes.
Q. Okay. And --
A. I don't know whether it was by me -- excuse me. I don't know whether it was by me or D'Apolito, you know, who was our intermediate. But there was -- the second mortgages with -- let me put it this way. With Cristo and Oakwood, definitely not collected. With Dinaso, he was trying to collect on everything. So...

Q. Was Walsh Securities aware that the second mortgages would not be collected?
A. D'Apolito and Kellie, yes. Up above, I don't believe so. It was never a discussion.
Q. And were these second mortgages given by your companies the way -- the way to get around the deposit requirements that Walsh had?
A. Well, it wasn't to get around the deposit requirements. It was whichever program you were under. Okay? At one point it was -- they required a minimum of 10 percent down, and they allowed a 10 percent mortgage; or in, I think January of 1996, it went to an 80 percent loan with a 20 percent mortgage.
Q. Okay. The other subject I wanted to ask you about was a few more questions about Robert Skowrenski and his company National Home Funding.
A. Uh-huh.
Q. Have you -- withdrawn.
Do you have an understanding of the allegations that Mr. Magnanini is making in this lawsuit on behalf of Walsh; that is, what he is alleging the frauds were?
A. Basically, yes.
Q. Tell us what your understanding is. And I understand it's only a basic understanding.
A. Is that basically that he knew nothing about what

was going on and that everybody defrauded him.
Q. On the subject of every -- well, on the subject of he knew -- he didn't know what was going on, you're referring to Robert Walsh?
A. Yes, sir.
Q. On the subject of everybody defrauded him, do you have any knowledge with respect to whether Mr. Skowrenski or anybody with his company, National Home Funding, engaged in any fraud or acts of dishonesty in connection with these transactions?
A. To sit down and tell you a specific deal or a specific situation, no. Did Robbie know everything that was going on? 100 percent.
Q. Why do you say that Robbie Skowrenski knew everything that was going on with the frauds 100 percent?
A. Again, it was just common. It was known that the money was going back to Gary to do the work. I can't for sure say he knew about the straw buyers. Do I believe it? Yes.
Robbie's girlfriend's sister wound up being one of Gary's girlfriends, so she knew everything that was going on. At the end when the -- everything became public and there was subpoenas out, Bobbie was purging all of his files.
So, you know, to say -- again it's 10, 11 years --

a specific situation or specific action, no. But in general, yes, he knew.
Q. When you said subpoenas were served, Bobbie Skowrenski purged his files, are you referring to subpoenas that were served by the Federal Bureau of Investigation?
A. No, I believe it was the first subpoenas that came down from the Monmouth County Prosecutor's Office.
Q. Prosecutor?
A. Yes.
Q. And when the Monmouth County Prosecutor's Office served those subpoenas, were they starting to investigate the frauds that we're talking about in this case?
A. Yes, sir.
Q. Okay. And when you say that Mr. Skowrenski purged his files when the Monmouth County Prosecutor's served the subpoenas, what do you mean by the term "purged his files?"
A. Well, there was one night -- I can't give you a date or specifics on it -- but I was at his office in Freehold with Anthony D'Apolito, myself, his girlfriend, his girlfriend's sister, and another gentleman that Bobbie had working for him, I forget his name; and they were going through file by file, pulling papers out, putting them in the shredder. And then they moved all the files out of the office.
Q. Was Mr. Skowrenski one of the people that night

who was pulling papers out of the files and shredding them?
A. Yes, sir.
Q. And when say Mr. Skowrenski moved the files out of the office, what do you mean?
A. He took all the files and brought them to his house.
Q. Okay. Was that -- did those activities occur after the Monmouth County Prosecutor had served the subpoenas?
A. I don't believe the Monmouth County Prosecutors had served him with subpoenas. I believe Walsh. So, yes, it was after the fact.
Q. Okay. Do you know why it was that Mr. Skowrenski would have removed files from his office to his house after Walsh was served with criminal -- I'm sorry -- subpoenas from the Monmouth County Prosecutor?
A. To make sure that he had nothing in his files that could hurt him.
Q. Okay.
A. I mean, that's an assumption. There's no other reason why to purge it.
MR. KOTT: Okay. Mr. Kane, I don't have any further questions. The way we've been doing these depositions is the defendants have been asking all the questions before Mr. Magnanini does.

So I think the next lawyer who is going to question you is Mr. Calanni, who is a defendant in the case and was an appraiser; and he is what we call pro se, which means he does not have a lawyer.
THE DEPONENT: Okay.
(Discussion off the record.)

DIRECT EXAMINATION

BY MR. CALANNI:
Q. Bill, did notice he called me an attorney when he first introduced me to you?
A. Yes, sir.
Q. I moved up from an appraiser to an attorney.
Bill, you and I have gone through hell is the least to say here. I'm not an attorney. There's no trick questions here. There's no follow-ups. It's just me and you. And you and I worked together in a certain routine along with Robert; and with us, there's one -- there's two answers; one is either the truth or one is a lie. And what I read in the paper was at the time you were sentenced, you did say, "Your Honor, I want to make things right." And this is your opportunity with me.
First of all, there were things that I was told you said during the investigation with the FBI that I didn't believe and I wouldn't believe. And I waited this long to get an opportunity to talk to you and ask you questions.

And so far what I've seen is exactly what I've been expecting and in the answers from you, at least 95 percent from what I can tell, have been truthful.
And one thing you did say was when Mr. Kott asked you, "Did you ever pay any appraisers $1,500," I've been bombarded with that question because I was told from deposition that Anthony D'Apolito has said you paid me $1,500 an appraisal cash.
Did that ever happen, Bill?
A. No.
Q. Did you and I ever sit down to conspire against anyone?
A. No.
Q. When we first met, we basically were talking about pricing, the pricing of appraisals. And that's a normal thing two businessmen would do. I continued to have said that my appraisals and my work included an appraisal and included a final inspection.
When we sat down and spoke about doing the appraisal fees, do you recall that my basic appraisal for multi-families, whether it was two or four families, were around $450?
A. I have no clue about what the fees were.
Q. Do you remember us discussing that because there were so many final inspections that we finally came to a

conclusion and a reasonable understanding it would be better to just put one price on the appraisals rather than continuously keep billing you for final inspections?
A. I don't remember any final inspections to be honest with you, and I don't remember the conversation. The only time I remember is on reinspections if there was wood on the windows and we had to go back. But as far as final inspections and things like that, you know, that had to be something with DEK maybe. Nothing with Cristo because Cristo never did any of the work. I know in the beginning DEK was trying to do work, but -- or D & Sons, but I never did any of the work. So...
Q. Your brother-in-law Gary, is that his name?
A. That's correct.
Q. Okay. Didn't Gary come with me onto sites?
A. Surely.
Q. And Gary also came with me to see if certain parts of the jobs were done on some of the sites also; isn't that correct?
A. Only for ascetics because we never did any major construction works on anything we sold.
Q. There aren't any houses that I went into that were being repaired at any given time?
A. Possibly for D & Sons. For Cristo, no. Not -- Cristo, we never did work. The only time we did some work

Page 169

sequence?
A. Yes. Again, just summing it up, remember I was in and out of that meeting. I go out, phone, cigarettes. But the gist of the meeting was is that he told Rick how the deals had to be done. I mean, you know, what was there, was there, and that's the way it was recorded. But he told Rick the sequence going forward.
Q. So the deals that had been recorded where Cristo had sold a property before it had acquired title, they were -- they were wrong? They were improper in some way?
A. Yes, they were improper, yes, because, you know, we sold before we bought.
Q. And did Coastal Title Agency record deeds for these transactions?
A. I believe so, yes, sir.
MR. KOTT: What time period? At the time of the transaction?
MR. MAGNANINI: Well, not at the time of the -- well, after --
MR. KOTT: Well, the reason I made the objection was because the witness had previously said some of the deeds were not recorded until a great deal --
MR. MAGNANINI: -- after.
BY MR. MAGNANINI:

Page 170

Q. Okay. Yes. Well, what I'm focused on are the transactions in which Cristo has sold them before it's acquired title.
Were those transactions recorded by Coastal Title Agency?
A. Okay. The sequence in the way it went was nine out of ten times we'd sell it before it was bought. Okay? And then I believe it was up to Lori, who was supposed to take both the buy title and buy deed and the sell deed and put them over to Coastal Title.
So it wasn't that a -- Rick sent something first and then Yacker's office sent something second. Okay? They were all supposed to go together, and that's how when they got these 10, 20, 30 deals, whatever it was in the beginning, at one shot, is when it came out.
Q. Okay. And by Lori, do mean Lorraine King?
A. Lorraine King, yes.
Q. And who was she, Mr. Kane?
A. She was -- well, she ran Stanley Yacker's office. She did everything.
Q. Did she also work of Mr. Cicalese?
A. Yes, she did.
Q. Okay. So your testimony is then that Coastal Title would actually receive a package from Ms. King that included both a purchase by Cristo and a sale by Cristo and

Page 171

not only at the same time, but they received 30 such transactions at one time?
A. Yes.
Q. Did Mr. Agel mention at the meeting that he had an obligation to tell anybody about this? Tell a lender or tell anyone else?
A. Not to my recollection.
Q. Going back to Mr. Calanni's questions to you. He had asked you about one time that he thought Kellie O'Neill had wanted him to remove Cristo Property as an owner on the appraisal, and you said you didn't have any recollection of that.
MR. CALANNI: Can I object to that? I never said I thought. I said you did.
MR. MAGNANINI: Okay. There we go. Even better. I got -- Calanni for my co-counsel.
BY MR. MAGNANINI:
Q. So does that make any business sense or how could you -- I'm sorry. It's a poorly phrased question.
But what sense does it make to have Cristo removed as owner of the appraisal if in fact Cristo is listed as the seller on the property and Cristo would be receiving the money that was being wired to one of the closing agents?
A. The only thing is if they got the title in and Cristo wasn't on the title report.

Page 172

Q. And -- okay. So then at that point, Kellie O'Neill -- and you had said -- you had testified last time that you had paid Kellie O'Neill some money to process paperwork for you?
A. Yes, sir.
Q. And how much did you pay her? Did you pay her per loan or was it each week?
A. It was per loan.
Q. And how much was that?
A. You know, in the beginning -- again, before I'm almost positive my testimony last time was it was like $100 or $150. And then it came to a point, I believe, we would give the money directly to D'Apolito, and then he was taking care of her. To say the exact dollar amount, I don't remember, sir.
Q. And just when we had deposed Ms. O'Neill she had testified that she only recalled receiving one payment. She did not actually recall the amount and said that it was to prepare a one false escrow letter based on -- again, this is her testimony -- that you had told her that Mr. Yacker had money in his escrow account, which in fact wasn't there, and to prepare three leases.
But your testimony is you paid her to actually process --
A. Yes.

Q. -- every loan package?
A. Yes. She got paid on every deal because we had to get our deals put ahead of time, and problems she'd catch, different things. So it was every deal.
Q. Okay. So in the event that the title paperwork showed up and she saw that Cristo wasn't listed as an owner, one of the things you would have paid her to do was to call an appraiser like Mr. Calanni and have them to try and change the appraisal?
MR. KOTT: Object.
BY MR. MAGNANINI:
Q. You can answer. He can object.
A. Yes. I mean, we would call him up and say, hey, you know -- going back assuming, I don't remember any specific instances; but the only time it would was if it was in underwriting and the title was there and it got caught, we'd just have to change it. That would be the only reason.
Q. Did Betty Ann Demola know that you were paying Kellie O'Neill?
A. No.
Q. Did she know that you were paying Mr. D'Apolito?
A. No.
Q. Did either Robert Walsh of James Walsh know that you had paid Kellie O'Neill and Mr. D'Apolito?
A. No.

Q. Mr. Kane, one of the problems with all cases is the longer you do them, the more information you amass; and then the more depositions you have, the more people say.
And one of the things I believe we had heard was that Mr. Epp or Mr. Dinaso were both involved in the condominium project in Brooklyn that was being investigated by the Eastern District of New York; is that in fact true?
A. You mean my project?
Q. Your project, yes.
A. That's incorrect.
Q. And then we also heard -- this one wasn't sworn testimony, so I give it less credence. But we'd also heard at a break that at some point the mafia had sent someone to have you executed, and you talked your way out of that?
A. To have me executed? No, I don't know about that.
Q. To have you shot or -- you don't recall anyone showing up to shoot you from the mob or the mafia or anything like that?
A. I don't remember trying to be shot, but I'm sure there were instances.
Q. Okay. Yes, they didn't have any details on it. It was a claimed prison meeting of -- of this person with the supposed assassin.
MR. KOTT: I can't remember his name.
BY MR. MAGNANINI:

Q. Okay.
A. Do you remember the name? I'll tell you.
Q. No, it was a conversation at a break during another deposition. But it doesn't -- it doesn't stick in my head. But I have, like I said, different things that I'd like to get some confirmation on if possible.
And then you worked, you testified, at National Home Funding as a loan originator?
A. Yes, sir.
Q. What was the structure of National Home Funding when you worked there?
A. I wouldn't say there was a structure. We'd do our loans, drop them off, and either give them to the secretary or, you know, Robbie. And if things were missing, either the girls that worked for me would put it in, or I remember Robbie's girlfriend would come down to the office and put things together in my office. You know, things like that.
Q. You testified that you did not have an office at National Home Funding; is that correct?
A. That is correct.
Q. And then how many loan originators were affiliated with National Home funding at the time you were there?
A. Well, there was myself. There was a couple other guys. There was another guy from Walsh used to put his loans through Robbie into Walsh. I don't remember his name

He had people in and out. It was -- you say, there was three, four, five. You know, I knew a couple, like two.
Q. Did you receive a salary from National Home Funding?
A. No.
Q. Did they pay you commission for the loans you brought in?
A. Yes.
Q. And then how were your commissions determined?
A. It was whatever I charged minus a quarter or a half, whatever Bobbie was receiving at the time, Mr. Skowrenski. So whatever I put on the loan, whether it be on the back end or the front end, it would be -- he would take off his part, and I would get the difference minus a processing fee.
Q. And Mr. Skowrenski got the quarter or a half or eighth, whatever of the point --
A. Right.
Q. -- because you had to use his license to put the loans through as a licensed mortgage loan broker?
A. Yes, sir.
Q. Did you have any sort of sales quota from National Home Funding?
A. No, sir.
Q. How many loans did you bring into National Home

mortgage back.
Q. Okay. And did she tell you all of those events? The events around this DiBenedetto mortgage, did she tell you that as she was discussing with you going to have the houses looked lived in because Greenwich Capital was coming to look at some of the houses?
A. I believe she had -- I had known about this prior to the Greenwich coming down -- you know, when they were going to look at our houses.
Q. And did she discuss it again with you when she had the discussion with you about Greenwich coming down?
A. I could say yes. I could say no. I honestly don't remember.
Q. Okay. Fair enough.
What -- was it your thought at the time when Betty Ann Demola told you to have the houses looked in that she had a concern that the ultimate lender here, Greenwich Capital, would ask Walsh to buy back the securities -- I'm sorry -- to buy back the mortgages?
MR. MAGNANINI: Objection to form.
A. No, because I don't think -- again, my opinion is that they were sold. So I think Walsh -- my opinion was Greenwich was just going out to look at stuff they had done already. Because I was under the assumption that the minute a deal comes in, Greenwich funds it; and then within

x-amount of time, the deal's gone. It's off -- it's off their warehouse line. So...
BY MR. KOTT:
Q. I'm trying to get inside your head, your thought process.
A. You're in trouble.
Q. When Betty Ann told you to make sure -- go out and have these looked at -- I'm sorry -- have these houses look okay when Greenwich was coming down to inspect them, why did you think she was telling you that? That is, what was her reason for doing that?
A. Her reason must have been that she was nervous about something, you know, to make sure there was no wood on the windows or, you know, curtains in the windows, just not empty homes. Remember, these -- assuming all these had leases on them.
Q. Okay. But do you know what she was nervous about?
MR. MAGNANINI: Objection to form.
A. I don't think I was -- I could say what she was nervous about. I know what I was nervous about, which I assume would have been the same thing, you know, nothing was ever sat down and said that, you know, houses or boards up. There was an air of assumption there that everyone knew what was going on.
So I would assume that she was afraid of boards,

you know, board-ups on the windows or houses in disarray.
BY MR. KOTT:
Q. What were you afraid about? You said you assumed she would have been afraid of the same thing as you. What were you afraid of?
A. You know, wood on the windows, and, you know, being cut off, not being able to close loans if Greenwich sees that there's -- the houses aren't the way they're supposed to be.
Q. And you mentioned that these houses were supposed to have leases, and I think you said earlier that all the leases in these transactions we're talking about in this case were phony; is that correct?
A. That is correct, sir.
Q. Was Mr. Skowrenski aware that all of the leases we're talking about in these transactions were phony?
A. Without a doubt.
Q. Okay. And was Mr. -- we had some discussions about 60/40; that is, the transfer -- the later transfer 60/40.
Was Mr. Skowrenski aware of the 60/40 transfers?
A. To the best of my knowledge, yes.
Q. Okay. And I think you told Mr. Magnanini that Ms. Demola was aware that you owned Cristo Properties; is that correct?

A. That is correct.
Q. I want to talk about Ms. Demola's interaction with you and her knowledge about your involvement here.
You and Ms. Demola met on a very regular basis; is that fair?
A. Whenever I was up there, yes.
Q. And you were up there about how many times a month?
A. Most of the time would be towards the end of the month, the last couple of days.
Q. Would it be on average once a month or more than once a month?
A. I would say probably two to three times a month.
Q. Okay. And Ms. Demola was aware that you owned Cristo Properties; is that correct?
A. That's correct.
Q. Was Ms. Demola aware that you originated these loans? That is, that you were working for Mr. Skowrenski?
A. I believe my name was on all the applications. So whether she looked through the applications or not, I'm not 100 percent sure. She knew -- any time there was a problem, she would speak to Skowrenski directly. But just -- I don't know. I can't answer your question there. You know, I can assume and surmise, but...
MR. KOTT: Mr. McGowan needs to leave. Do you

have any questions before you leave?

MR. McGOWAN: No, I'm just going to go.

BY MR. KOTT:

Q. Mr. Kane, I really am coming to the end.

Let me try it this way. You were kind of weaved through a lot of these transactions wearing a variety of hats; is that a fair statement?

A. That's an accurate statement, yes.

Q. What I was driving at is whether Ms. Demola knew all the hats that you wore in these transactions.

Do you know whether she knew all the various hats you wore?

A. I can't say yes or no to that. I really can't. She knew -- I know she knew I owned Cristo. She knew I was affiliated with National Home Funding because the deals were coming through National Home Funding. She knew I brought the deals up to National Home Funding.

Whether she knew or not I was writing the loans, I can't answer you that question. I don't know. Unless, you know -- I never saw her look, take a 1003 and look at it and say -- you know, and see my name on it. I don't know.

Q. But all that information would have been in the files; correct?

A. Yes.

MR. MAGNANINI: Objection to the form of the

question.

BY MR. KOTT:

Q. And would Ms. Demola have known about the 60/40 arrangement?

A. No.

MR. KOTT: Thank you. I do not actually have any further questions.

REDIRECT EXAMINATION

BY MR. CALANNI:

Q. Just a couple, Bill. I'm the only appraiser that shows up for the depositions or court, whatever. And it seems to me when a question's asked about appraisers, it's always appraisers like Rich Calanni. So I need to clear up something here.

(Court reporter asks for the microphone to be moved.)

BY MR. CALANNI:

Q. Did you get what I said?

A. Yes, we got that so far.

Q. Did you ever call me to ask me to come up with a price on an appraisal?

A. Not to my recollection, no.

MR. CALANNI: All right, Bill.

THE DEPONENT: Okay.

MR. CALANNI: Yes, there are others, but I think Mr. Kott covered it and...

MS. PATEL: I don't have any further questions.

MR. MAGNANINI: No further questions.

THE DEPONENT: All rightie.

MR. KOTT: Mr. Kane, just one or two others.

THE DEPONENT: You said you were finished.

FURTHER REDIRECT EXAMINATION

BY MR. KOTT:

Q. This is more of housekeeping. We have your home address.

If we wanted to reach you again, besides your home is there any other way we would reach you; a business address, a second phone, anything like that?

A. No, sir.

MR. KOTT: Okay. Thank you.

THE DEPOSITION WAS CONCLUDED AT 1:40 p.m.

ERRATA SHEET

| PAGE | LINE | CORRECTION |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

WILLIAM KANE (DATE)

# Exhibit I

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 97-3496 (DRD)

---

WALSH SECURITIES, INC., :

Plaintiff, :

v. :

CRISTO PROPERTY MANAGEMENT,LTD., a/k/a G.J.L. LIMITED; DEK HOMES OF NEW JERSEY, INC.; OAKWOOD PROPERTIES, INC.; NATIONAL HOME FUNDING, INC.; CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC.; CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C.; WILLIAM KANE; GARY GRIESER; ROBERT SKOWRENSKI, II; RICHARD CALANNI; RICHARD DI BENEDETTO; JAMES R. BROWN; THOMAS BRODO; ROLAND PIERSON; STANLEY YACKER, ESQ.; MICHAEL ALFIERI, ESQ.; RICHARD PEPSNY, ESQ.; ANTHONY M. CICALESE, ESQ.; LAWRENCE CUZZI; ANTHONY D'APOLITO; DAP CONSULTING, INC.; COMMONWEALTH LAND TITLE INSURANCE CO.; NATIONS TITLE INSURANCE OF NEW YORK, INC.; :

**ORIGINAL**

DEPOSITION UPON
ORAL EXAMINATION
OF
ROBERT C. WALSH

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 2

FIDELITY NATIONAL TITLE INSURANCE CO. OF NEW JERSEY; COASTAL TITLE AGENCY; DONNA PEPSNY; WEICHERT REALTORS and VECCHIO REALTY, INC. D/b/a MURPHY REALTY BETTER HOMES AND GARDENS, :

Defendants. :

----------------------------

T R A N S C R I P T of the stenographic notes of HOWARD A. RAPPAPORT, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, Certificate No. XI00416, taken at the offices of MC CARTER & ENGLISH, LLP, Four Gateway Center, Newark, New Jersey, on Friday, April 9, 2010, commencing at 9:35 a.m.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

A P P E A R A N C E S:

STONE & MAGNANINI
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
BY: ROBERT A. MAGNANINI, ESQ.,
AMY WALKER WAGNER, ESQ.,
For the Plaintiff

MC CARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-0652
BY: DAVID R. KOTT, ESQ.,
For Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Company

FOX, ROTHSCHILD, O'BRIEN & FRANKEL
997 Lenox Drive
Lawrenceville, New Jersey 08648
BY: EDWARD J. HAYES, ESQ.,
For Defendants Nations Title Insurance and Fidelity National Title Insurance

METHFESSEL & WERBEL
3 Ethel Road
Suite 300
Edison, New Jersey 08818
BY: MARTIN R. MC GOWAN, ESQ.,
For Coastal Title Agency

Walsh - direct

Page 21

The closing was then going to be scheduled.

Walsh would get closing letter instructions, they would send the closing instructions to Mr. Yacker.

Mr. Yacker would then take the funds that were being sent -- in the majority of the cases Mr. Kane did not own the property yet -- the funds were then transferred from Mr. Yacker. Mr. Yacker -- a part of the funds would allow Mr. Kane to backdate and buy the property before he actually acquired it with the proceeds of this particular loan.

Mr. Kane, from the corporations, was the mastermind of this transaction. He was the one that put the players in place and he started the transactions and picked and chose who he was going to be involved with.

Q And you said Mr. Kane was the mastermind of the fraud?

A That is definitely my understanding.

Q And would you also call him the ringleader of the frauds?

A Sure.

Q You used a couple of phrases in that answer. You referred to a straw buyer. What is a straw buyer?

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

Page 93

Q Why?
A In case of a default, the ability to understand what you're going to be able to achieve in recovery value.
Q Are B and C loans referred to as sub prime loans?
A They are.
Q And sub prime is just another way of saying they are not made to the most creditworthy borrowers, is that true?
A That is correct.
Q Are appraisals of great importance to a lender who is making B and C loans?
A I'm sure it is important to all lenders.
Q Why is that? Why would the B and C loan, the appraisals, be critically important?
A I said all lenders, A lenders as well as B and C lenders.
Q The appraisal more important with a C loan than an A loan?
A I don't think so.
Q Did your company have something called programs?
A Yes.
Q Was your company, in the time frame we

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

Page 124

acquire the Citiscape's judgment against Walsh?
A Approximately some properties that we owned outside of this transaction, and some cash and a note.
Q The properties that you owned, was that by virtue of foreclosure on mortgage?
A It was a combination, but, yes.
Q Does your company do any business directly or indirectly with William Kane since you learned of the frauds?
A I have not, no.
Q I asked about the company.
A The company does not.
Q The fraudulent loans that your company purchased from Selective, do you know whether William Kane was involved in that?
A I don't know.
Q Why were the deals with NHF structured that it would be NHF would order the appraisal rather than Walsh?
A All our correspondence, all our participants order their own appraisals.
Q Why is that the case?
A They were the real lender.
Q And were they also the insured under the

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

Page 125

title policies issued by the Commonwealth and Fidelity, Nations title insurers?

A They were the insured on the letter and the assignees.

Q How about under the policies? Who was the insured under the policies?

A It would be the same.

Q The policies were issued not only to NHF, but also to assigns?

A Yes. And I got to double-check that. I will get back to you, but to my knowledge --

Q I'm not saying you're wrong, but you should check that.

A Yeah, I'll check that.

Q When did you start thinking about selling the company?

A I acquired the company on April 16th, I think, of '96.

Q Right.

A Greenwich was my partner. We had some early discussions, I think we hired NatWest, which was -- NatWest Securities, which was the parent company, brokerage firm, sister company of Greenwich, and we looked at doing potentially a public offering in June of 1996.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

Page 126

It was way too premature.

Q So about two months after you formed the company you started to think about selling it?

A Greenwich wanted to bring in NatWest to try to come up with some strategic plans for going forward.

Q Let me try the question again.

Would it be true to say within two months of your purchasing Walsh Securities, you started to think about selling it?

A Oh, sure.

Q When did you tell your sister, Bette Ann DeMola, that that was -- that that thought process was going on?

A Probably more towards December, January of -- December '96, January of '97.

Q Now, would it be true -- withdrawn.

Do you know what made you an attractive merger candidate for Resource?

A Yeah, strategic fit. We were making a lot of money.

Q Was the quantity of loans that Bette Ann DeMola was putting on the books something that would have been attractive to Resource?

A I think profitability. Number of loans

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

Page 127

is meaningless. Doing 96 million or $98 million a month was meaningless. It was how much money you were producing. That was really what it was all about.

Q In terms of money you are producing, on a mortgage loan, as long as it's current, that's considered profitable, right?

A Yes.

Q So if you sell a fraudulent loan and it stays current for two years, it continues to look to be profitable, correct?

A Correct.

Q Would you agree that therefore anyone who is going to obtain stock in Resource by virtue of the merger would have an incentive to have Walsh appear to be more profitable to Resource?

MR. MAGNANINI: Objection to form.

Go ahead.

A The answer is yes, David, but not on these loans.

MR. KOTT: It's 12:30, how about we take a break for lunch?

(Luncheon recess.)

A F T E R N O O N S E S S I O N

(Deposition resumes at 1:40 p.m.)

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

Page 138

referring to?

A Yes.

Q Were there any other companies in that time period who Walsh was selling loans to?

A Yes. We were selling quite a bit of loans to The Money Store, and The Money Store did not have the appraisal issue.

Citiscape was the only investor that had the appraisal issue.

So one of the reasons why we were able to renegotiate with Citiscape to drop it was because they wanted to continue to buy loans from us and we didn't want to sell them loans.

We had sold loans to The Money Store. We sold loans to Ames. We sold loans to Beneficial, we sold loans to probably 10 different investors, our largest being The Money Store.

Citiscape was a pretty large buyer of our loans as well.

Q Did those other companies, Beneficial, Money Store, Ames, that you mentioned, what was your agreement with them as it relates to appraisals?

A We had none.

Q What is a flip?

A A flip, as being heard in this case,

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 262

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 97-3496 (DRD)

---------------------------

WALSH SECURITIES, INC.,

Plaintiff,

v.

CRISTO PROPERTY MANAGEMENT,LTD., a/k/a G.J.L. LIMITED; DEK HOMES OF NEW JERSEY, INC.; OAKWOOD PROPERTIES, INC.; NATIONAL HOME FUNDING, INC.; CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC.; CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C.; WILLIAM KANE; GARY GRIESER; ROBERT SKOWRENSKI, II; RICHARD CALANNI; RICHARD DI BENEDETTO; JAMES R. BROWN; THOMAS BRODO; ROLAND PIERSON; STANLEY YACKER, ESQ.; MICHAEL ALFIERI, ESQ.; RICHARD PEPSNY, ESQ.; ANTHONY M. CICALESE, ESQ.; LAWRENCE CUZZI; ANTHONY D'APOLITO; DAP CONSULTING, INC.; COMMONWEALTH LAND TITLE INSURANCE CO.; NATIONS TITLE INSURANCE OF NEW YORK, INC.;

ORIGINAL

CONTINUED
DEPOSITION UPON
ORAL EXAMINATION
OF
ROBERT C. WALSH

PAGE 262

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 263

FIDELITY NATIONAL TITLE INSURANCE CO. OF NEW JERSEY; COASTAL TITLE AGENCY; DONNA PEPSNY; WEICHERT REALTORS and VECCHIO REALTY, INC. D/b/a MURPHY REALTY BETTER HOMES AND GARDENS, :

Defendants. :

-----------------------------

T R A N S C R I P T of the stenographic notes of HOWARD A. RAPPAPORT, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, Certificate No. XI00416, taken at the offices of MC CARTER & ENGLISH, LLP, Four Gateway Center, Newark, New Jersey, on Friday, April 23, 2010, commencing at 8:35 a.m.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 264

A P P E A R A N C E S:

STONE & MANGANINI
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
BY: DAVID STONE, ESQ.,
AMY WALKER WAGNER, ESQ.,
For the Plaintiff

MC CARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-0652
BY: DAVID R. KOTT, ESQ.,
For Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Company

FOX, ROTHSCHILD, O'BRIEN & FRANKEL
997 Lenox Drive
Lawrenceville, New Jersey 08648
BY: EDWARD J. HAYES, ESQ.,
For Defendants Nations Title Insurance and Fidelity National Title Insurance

METHFESSEL & WERBEL
3 Ethel Road
Suite 300
Edison, New Jersey 08818
BY: MARTIN R. MC GOWAN, ESQ.,
For Coastal Title Agency

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 277

correct?

A That is correct.

Q Did you implement the changes that Greenwich suggested?

A To my knowledge we did.

Q You indicated there were certain number of changes that were made and you got that from quality control.

A Correct.

Q It's probably me, but I'm not sure I understand exactly what you did from the last deposition to today.

You indicated you looked at a few quality control reports.

A There was also directives. There was quality control reports and there was directives.

Q So was one of the things you did between the last deposition and today, reviewed quality control directives?

A Correct.

Q Where were they located?

A Within the quality control reports.

Q Describe for me what a quality control report is.

A They state how many loans that they

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

reviewed during that particular month. They determine what they found. If there was exceptions, what particular loans, what particular offices, what were the exceptions, minor or major exceptions.

They did review appraisals. There was a variance on the review appraisals and how much.

Q Do you recall when they were dated? The quality control review reports, do you recall when they were dated?

A I know somewhere in 1997. The exact date I don't recall.

Q Before or after the fraud?

A Before.

Q And you mentioned some directives. Were they within the control reports, or were they things that arose as a result of findings in the control reports?

A Both.

Q And where were the directives maintained at Walsh?

A They were in this file that I located, was in the quality control file.

Q But back at Walsh, when a directive was issued, where were they placed when they were issued? Was there a book of directives?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

Walsh - cross

Page 293

the majority of review appraisals were drive-bys?

A Correct.

Q And how did you draw that conclusion?

A Reviewing the appraisals that were in the file, in quality control.

Q Well, were review appraisals placed in the loan files?

A No.

Q So they were in quality control?

A Correct.

Q How many quality control files did you look at?

A There was one file with various different reports within the file.

Q So you looked at one quality control file that had within it various reports?

A That is correct.

Q And what were those reports? I know they are quality control reports, but what was in the reports that you looked at?

A Spread sheets showing review appraisals, showing exceptions, showing how many loans that they actually reviewed, showing follow-ups to our securities, what our underwriters did, underwriters of the securities. How many appraisal reviews that

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 323

commitment?

A Yes.

Q And it is that same person who would check everything would also be the person who would take out unnecessary copies?

A Correct.

Q In the years that you worked at Walsh, Mr. Walsh, did you ever see a mass -- I'll use the word "cleansing," and I don't mean it in a derogatory way, just this process that you're talking about, but a mass cleansing of the files in the conference room at Walsh as opposed to in cubicles?

A I believe I saw it many times.

Q And why did that take place?

A If an investor was coming in to look at files, and there were a lot of files, and that they were coming in in a relatively short period of time, the files would be on the table, and people would be taking the file and doing what they needed to do, putting documents in, taking documents out rather than just doing it at their cubicle.

Q So that was a common occurrence?

A It was.

Q And it was generally in relation to someone, an investor, coming in to look at files?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 324

A Yes.

Q Mr. Walsh, how was Walsh Securities' profitability determined? You testified at the last deposition that it wasn't about the number of loans. It was about profitability of Walsh, correct?

A Correct.

Q How was Walsh Securities' profitability determined?

A Under GAAP.

Q What does that mean?

A Generally accepted accounting principles.

Q What made Walsh profitable?

A Selling loans, acquiring loans, controlling expenses.

Q Were all nonperforming loans not profitable?

A Correct.

Q Were all performing loans profitable?

A Not necessarily.

Q Was Walsh Securities' profitability in any way affected by the jobs done by the broker/correspondents?

A Could you be more specific, please?

Q Let me ask you this first. I've been

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 349

profitability, because you indicated at the prior deposition that what made you an attractive merger partner to RBMG was the profitability. So I'm trying to find the basis for that statement.

A Fine.

Q Tell me as best as you can how Walsh made money and what made it profitable.

A There was two categories. One was the whole loan sale, and that would be to people like The Money Store.

We had a weighted average price that we paid the participants of 100 and one, and we would be selling the loan to the Money Store at between 105 and 106.

We sold Money Store approximately $200 million. So that was roughly eight to $10 million profitability on loans sold to Money Store.

Q And am I correct, Mr. Walsh, that the performance of the loan did not impact that profitability?

A Oh, sure it did.

Q How?

A If our performance was bad, The Money Store would have cut us off. We would not have been

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

able to do business with them. There would have been no profitability associated with The Money Store.

Q So you are talking about if The Money Store basically decided they were getting enough junk from you, they would no longer buy?

A Not if they were getting enough junk. If they didn't like our performance, they would not continue to buy loans from us.

Q Understood.

As to loans that they were buying, you earned your money on the sale of the loan. The subsequent nonperformance of that loan did not affect the profit that you made on the sale of that loan as an individual loan?

A That's correct, but it had a consequential damage to us.

If we had substantially bad loans, they were not willing to buy additional loans, nor would they be willing to pay us the premium.

The premium translated into the relationship as well as the performance of those loans from prior sales.

Q Would the secondary market purchaser have had the same expectation that you talked about at the prior deposition, that approximately one and a

Walsh - cross

Page 351

half percent of the loans might be bad or fraudulent?

A Correct.

Q So they wouldn't necessarily conclude that you were acting improperly in one and a half percent of your loans came in and were a problem?

A That's correct.

Q So that's how you made money on the whole loan sales, correct?

A Correct.

Q You mentioned there was another aspect.

A Securities.

Q Tell me how that worked.

A The basis in our loans is still 101. We have the option of selling them as whole loans and getting cash consideration of between 105 and 106.

So for purposes of this demonstration, why don't we just use 105 to make it simple.

We have a universe of loans, and let's stick with $100 million to make it again simple, if that's okay with you.

Q Sure.

A We have two choices: We can sell those loans and make $4 million in cash, pass on the risk of the performance to somebody else. Or we can retain that risk and put our capital at risk on the

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 352

performance of those loans.

If the loans do not perform, we are going to lose money, and we are going to lose a substantial amount of money.

If the loans perform accordingly the way we anticipate them to do, we'll make more money than selling as a whole loan.

The hundred million dollars worth of loans we sell into its trust. The trust then has an underwriter, and let's just use DLJ as an example, if you don't mind.

MR. KOTT: Did you say DLJ?

THE WITNESS: Yes.

A They did security 9711 and 972.

MR. STONE: Is that Donaldson, Lufkin --

THE WITNESS: And Jenrette.

MR. STONE: Okay.

A The $1 million would be identified by Walsh as going into the security.

DLJ would sign an underwriting agreement with Walsh.

DLJ would come in and review that hundred million dollars to make sure it understood the characteristics because they were going to sell the bonds.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 353

They would do a complete underwrite on the hundred million dollars to make sure they met the quality of the characteristics of the rating agency.

They would do a 20 percent sampling on the appraisals.

They were then satisfied, they would then present it to Standard and Poor's or -- and let's just use Standard and Poor's for a second, it's easier to say.

S&P would put it through their model based upon the characteristic of the loan. They would then state what -- how many of the bonds would be sold for double A, which obviously is a more attractive rate for us to be selling the loans at.

They would break out the components to a single A and they would go down to a triple B, all investment grade quality.

A small slither of the bonds would become double B, and that would be the formation of the security.

Now, on the hundred million dollars worth of securities that are now being sold, the proceeds of all of this translates into 98 cents on the dollar that Walsh is going to receive.

So we had the option of making

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 354

$4 million in cash by selling to The Money Store on the low side, or taking 98 cents and having a negative $3 million by doing a security.

There is a $7 million swing between doing a whole loan sale and a security.

Q When you say 98 percent, you're saying on the face value of the loan?

A That is correct.

Now, our residual on this hundred million dollars on an economic basis, cash, has got $7 million for cash associated into the security on $100 million, or seven percent.

So we have to feel very, very comfortable about the performance of the security, or we are not going to do that. We are going to take the cash.

We now own something called the residual piece of the security as well as something called the an IO piece of the security.

Let's deal with the IO piece first that's a simpler piece to understand.

If the security holders are looking to receive a seven percent coupon, weighted average, to all the investors, and the average coupon on this portfolio is ten percent, there is 300 basis points

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 355

annualized of availability of interest, excess interest on these particular loans.

The servicer who is going to service these loans in this particular case is Temple Inland. That's all they do for a living, is service loans, and they do it very efficiently. We have to pay them 50 basis points to service those loans.

We now have Bankers Trust, which is the trustee. They are now going to charge us 20 basis points to be the master trustee.

Now we are down to 230 basis points of the interest only component. We get to keep that, so that's on our side of the equation, 230 basis points annualized of the loans in a portfolio.

Get back to your question before. What happens if there is a bad loan?

Well, the bad loan is we don't get that interest. That bad loan goes away. We don't get that interest. This is only on the IO right now. We don't get that. We only get paid on the IO if the interest and principal is paid by the borrower.

It is really a huge incentive for us to be putting loans into the security that we know are going to perform, or we feel very strongly are going to perform.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Now we deal with the residual. The residual piece we own. The residual can be extremely valuable, and that's why people are into securities.

Now all the value of what's going to happen in the future lies with the residual. If any of the loans are in default and there are losses, unfortunately, the residual is the first piece that takes the loss.

So if you have a universe of $100 million which is spread over a vast amount of loans -- and that's why you are diversifying your risk by going into different states, the losses that are taking place go first to the residual loans.

Any fraud that takes place goes to the residual holder. Any of the particular losses within the security is going to the residual holder.

Now let go back to the IO portion for a second. The IO portion is subordinated against all the securities of top. They are going to be the second to last to get compensated.

The IO does not get any cash until there is a five percent built-in or $5 million cushion against the entire security.

We have already put in $2 million, which was the 98 percent. We have $2 million in something

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

Walsh - cross

Page 357

called the over collateralization account.

Now we have to build up $3 million, which we are building up rapidly because of the IO portion.

So what we are able to do on this structure, which is GAAP, again, we are able to present value the future value stream of the income that we are going to be getting less an assumption of losses associated with our overall hundred million dollars and come up with a net present value and allowed to book that for accounting purposes.

On average, we were able to book about a 107 price on our loans, again based on those calculations. So we are able to book a 107 price, and that's part of our profitability.

On this part of the transaction, for book purposes we were able to book $6 million in gain on sale.

We have the gain on sale in cash and we have the gain on sale of securities.

Now we have to monitor on a quarterly basis the residual performance. Now, if the residual performance is doing well, we are able to take in a portion of that IO back into income, because we are building up to over collateralization account.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 358

quickly.

If the performance is bad, we have to write down our residual because the loss assumption is wrong.

So that is how we make money. That is how on a quarterly basis profitability is reported, and we start the next day and do it all over again.

Q Do these securities tend to include not only Walsh loans, but loans from other companies? Or was each security limited to just your paper?

A No, we could have put in anything we wanted.

Q Did you generally put it in trusts or securities with other lenders?

A No.

Q And are you able to tell me, Mr. Walsh, in 1996, the percentage of loans that were whole loan sales versus placed in securities?

A In 1996, I believe it was about 15 percent were securities and about 85 percent were whole loans.

Q And was that a similar percentage throughout the life of Walsh, or did it change one way or the other?

A It changed.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 361

Q We talked a little bit, Mr. Walsh, last time about what I called the flip program and you called the rehab program.

Do you recall that as a topic being discussed?

A I do.

Q Did you do any investigation at all since the last deposition to see whether or not Walsh called that the flip program?

A I believe we called it the rehab program.

Q Okay.

Do you recall at any time Walsh being advised that it was handling many flip loans that were high risk?

MR. STONE: Object to the form of the question.

You can answer.

A I don't recall now.

Q Do you recall at any time Walsh being told that the appraisals that it was using were not listing prior sales of the property?

A I do not recall right now.

Q Do you recall being told -- and again, this is all prior to the fraud being discovered --

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 362

that appraisals were substantially overstating the value of property -- the value of the properties?

A Of which properties?

Q Of any properties.

A Oh, yes.

Q And who made that known to Walsh?

A Walsh Securities' quality control and Greenwich.

Q What did Walsh do in response to those warnings?

A Either we cut off an appraiser, we put some staff appraisers in, in Michigan, to review appraisals coming in, not to go out and do appraisals.

Q How about New Jersey, what did you do in New Jersey?

A I believe the same thing.

Q Do you recall being advised at some point in time that appraisals were substantially overstating the condition of the properties?

A I do not recall that.

Q Do you recall being advised that there was an unusual number of appraisals which were actually dated prior to the dates of the application for the loans?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 363

A I do not recall that.

Q Is that something that would be a red flag for you, Mr. Walsh, in your business?

A I don't know.

Q Do you recall being advised that appraisals that Walsh was using were not reflecting recent remodeling or rehabilitation of the properties?

A I don't recall.

Q Would you say, Mr. Walsh, that a flip or rehab program has an above average risk of loss for a lender such as Walsh?

A I believe it depends on the way it was structured.

Q Do you believe that risks, or that flips were more risky when they involved REO properties?

A If it was an arm's length transaction, the appraisal was correct, and if everything was correct, not necessarily.

Q I understand if all those things were in place.

I'm asking you in general, do you believe that flips involving REO properties are more risky than land flips involving other than REO properties?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

Page 480

Q Who else did they interview?

A Arnold Cohen, Pete Treubor, Jim Walsh, Fred Schlesinger, Paul DelRosso, Bob Gulga, who was the accounting person. I'm not sure you heard his name before. G-u-l-g-a. Vicky Bernhardt, and there may have been another person.

Q In addition to your brother and your sister and Mr. D'Apolito and Mr. Cohen, is my recollection correct there were a group of other individuals to whom you intended to give stock if the merger went through?

A Correct.

Q Why were they not listed on the filing with the Securities and Exchange Commission?

MR. STONE: Objection, calls for a legal conclusion.

You can answer.

A I'm not sure.

Q You stand by your story that this particular document was a mistake because it reflected what you were going to do if the merger went through?

A Correct. I never assigned -- I never signed over shares to anybody. This was my intent for the people to be able to acquire shares of RBMG

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No. 97-cv-3496 (DRD)(MAS)

WALSH SECURITIES, INC., :
Plaintiff, : DEPOSITION OF:
v. : ROBERT C. WALSH
(VOLUME III)

CRISTO PROPERTY MANAGEMENT, LTD., : a/k/a G.J.L. LIMITED; DEK HOMES OF NEW JERSEY, INC.; OAKWOOD : PROPERTIES, INC.; NATIONAL HOME FUNDING, INC.; CAPITAL ASSETS : PROPERTY MANAGEMENT & INVESTMENT CO., INC.; CAPITAL ASSETS PROPERTY: MANAGEMENT, L.L.C.; WILLIAM KANE; GARY GRIESER; ROBERT SKOWRENSKI, : II; RICHARD CALANNI; RICHARD DiBENEDETTO; JAMES R. BROWN; : THOMAS BRODO; ROLAND PIERSON; STANLEY YACKER, ESQ.; MICHAEL : ALFIERI, ESQ.; RICHARD PEPSNY, ESQ.; ANTHONY M. CICALESE, ESQ.; : LAWRENCE CUZZI; ANTHONY D'APOLITO; DAP CONSULTING, INC.; COMMONWEALTH: LAND TITLE INSURANCE CO.; NATIONS TITLE INSURANCE OF NEW YORK, INC.;: FIDELITY NATIONAL TITLE INSURANCE CO. OF NEW JERSEY; COASTAL TITLE : AGENCY; DONNA PEPSNY; WEICHERT REALTORS and VECCHIO REALTY, INC. : d/b/a MURPHY REALTY BETTER HOMES AND GARDENS, :
:
Defendants.

Certified Transcript

X---------------------------------X

TRANSCRIPT of testimony as taken by and before CHERYL McGANN, a Certified Court Reporter of the State of New Jersey, at the offices of McCARTER & ENGLISH, LLP, Four Gateway Center, Newark, New Jersey, on Friday, September 30, 2011, commencing at 9:14 a.m.

Job No. NJ356367

A P P E A R A N C E S :

STONE MAGNANINI LLP
BY: ROBERT A. MAGNANINI, ESQ.
150 JFK Parkway
Short Hills, New Jersey 07078
(973) 218-1111
rmagnanini@stonemagnalaw.com
Attorneys for Plaintiff

McCARTER & ENGLISH, LLP
BY: DAVID R. KOTT, ESQ.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-0652
(973) 622-4444
dkott@mccarter.com
Attorneys for Defendant
Commonwealth Land Title Insurance Co.

FOX ROTHSCHILD LLP
BY: EDWARD J. HAYES, ESQ.
997 Lenox Drive
Building 3
Lawrenceville, New Jersey 08543-5231
(609) 896-3600
ejhayes@foxrothschild.com
Attorneys for Defendants
Nations Title Insurance of New York, Inc. and
Fidelity National Title Insurance Co. of New Jersey

Fidelity or Nations?

A. I'm not sure what the answer would be, but let me tell you what I think it could be.

Q. Go ahead.

A. All right. I don't know if this was the first written response. It may have been; it may not have been, but based upon this, we'll assume for a second that it is. I know that there was several phone calls made fairly quickly in the process. I know that Fred Schlesinger made several calls, but I don't recall the dates.

Q. Okay.

A. I don't recall if it was in this time frame, before this time frame or after this time frame.

Q. Okay. Were the phone calls made by an employee of Walsh, as opposed to your outside lawyers at that time, the Latham firm?

A. It would have been our in-house counsel, Fred Schlesinger.

Q. Okay.

A. Want this back?

Q. Yes, please.

MR. KOTT: I'm going to ask the court reporter to mark for identification a three-page document which is an article that appeared in the

paper until September 29th to ask that question?

Q. Okay.

A. It's a rhetorical statement. I'm not asking you, as you're an attorney.

Q. Okay. Do you know whether there were other correspondence between the September 29 letter -- well, what's the date of those articles again?

A. The first, I think you said July 10th maybe.

Q. Uh-huh.

MR. MAGNANINI: The second one was --

A. July 13th and July 10th.

MR. MAGNANINI: -- July 10th.

Q. But if I'm correct that the first claim was made July 28th, that would be the first time Commonwealth would be aware of the claims being made; right?

A. I guess. It's a full 60 days after the fact that that came out. It's a full 65, 70 days since the articles.

Q. Okay. Well, actually, as to when it's received, it's marked received in the Commonwealth Claims Department on August 12, 1997; correct?

A. We don't know. I personally can't tell you what that means.

Q. All right. After Walsh Securities received

processing?

A. It would be speculation, but I can understand the logic.

Q. Okay. Mr. Skowrenski testified that there were occasions when the assignments didn't come in with the loan package but at some point that he might get a large number of assignments to execute.

Do you have any reason to disbelieve that testimony?

A. I do. Based on the files that we looked at, there was assignments in all the files; and they were dated as of that particular date.

Q. When Walsh sold the loan -- a whole loan sale, would it provide the NHF-to-Walsh assignment to the whole loan buyer?

A. Yes, and then Walsh to the whole loan buyer.

Q. So a whole loan buyer would get two assignments; one from NHF to Walsh, one from Walsh to, for example, Cityscape?

A. Yes.

Q. And Walsh would expect the whole loan buyer to record those assignments evidencing its ownership of the loan, correct?

A. Correct.

Q. Okay. When you bought back loans after the

Q. Anything is possible. I'm just asking if you can name anyone.

A. No, I cannot.

Q. Remember you had testified about the review appraisals not being in the files?

A. Yes.

Q. Is there any way that somebody reviewing these files, be it an underwriter or a purchaser, would have knowledge of the review appraisal?

A. If the review appraisal was over the 250,000, I think what I had mentioned last time was that there was two. There was a preclosing, and that would be for over $250,000 a review was done. That would be in the file. Anything that was quality control would not be in the file.

Q. Did you ever testify before the Grand Jury?

A. You're running out of questions to ask.

Q. I know, I asked you that.

MR. MAGNANINI: Objection, asked and answered.

A. Right.

Q. You know the lulling letters that form the basis for the indictment of Betty Ann Demola?

A. I do.

Q. Did you actually physically sign those

letters?

A. I did.

Q. At the time Carteret failed, were there articles in the newspaper that Carteret failed in part because of bad residential mortgages?

A. No.

Q. Are you as sure of that as you are of your other answers to the questions?

A. To the best of my knowledge, Carteret failed for two reasons. One was goodwill was eliminated from Carteret's balance sheet. When FIREA came in in 1988, Carteret had $300 million worth of goodwill on their books. One day FIREA comes in, and their $300 million worth of capital is wiped out. The second reason they went under was bad multi-family loans and commercial loans and construction loans which were not single family in nature. Commercial loans were on commercial properties, including golf courses; and the other loans or construction loans were not on single-family residential loans.

Q. You're aware that Betty Ann Demola gave a deposition in this case?

A. Yes.

Q. You're aware that Walsh Securities, the law firm of Stone & Magnanini represented her in

# Exhibit J

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 97-3407 (DRD)

WALSH SECURITIES, INC., :
:
Plaintiff, : DEPOSITION UPON
: ORAL EXAMINATION
v. : OF
: ROBERT WALTER
CRISTO PROPERTY MANAGEMENT, : SKOWRENSKI, II
LTD., et al., :
:
Defendants. :
- - - - - - - - - - - - - - - -

COPY

T R A N S C R I P T of the stenographic notes of STANLEY B. RIZMAN, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, Certificate No. XI00304, taken at the offices of Manning, Caliendo & Thomson, PA, 36 West Main Street, Freehold, New Jersey, on Tuesday, May 25, 2010, commencing at 10:12 a.m.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 2

A p p e a r a n c e s:

STONE & MAGNANINI, LLP
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
BY: ROBERT A. MAGNANINI, ESQ. and
AMY WALKER WAGNER, ESQ.
For the Plaintiff.

MC CARTER & ENGLISH, LLP,
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056
BY: DAVID R. KOTT, ESQ.,
For Commonwealth Land Title Insurance Company

FOX ROTHSCHILD, LLP
997 Lenox Drive
Lawrenceville, New Jersey 08648
BY: EDWARD J. HAYES, ESQ.
For Nations Title Insurance and
Fidelity National Title Insurance

METHFESSEL & WERBEL, PC
3 Ethel Road
Suite 100
Edison, New Jersey 08818
BY: MARTIN R. MC GOWAN, ESQ.
For Coastal Title Agency

MANNING, CALIENDO & THOMSON, PA
36 West Main Street
Freehold, New Jersey 07728
BY: VINCENT P. MANNING, ESQ.
For the Witness

RICHARD CALANNI,
Pro se.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Skowrenski - direct

Page 10

Q Were some articles also in the Star Ledger?

A Yes.

Q And various people were quoted in the articles, is that correct?

A Correct.

Q I'm calling your attention to Skowrenski-1. I'm going to put it in front of you, but I'm also going to read it into the record.

Do you see where I'm pointing? It states there, quote, paragraph: "In most cases, the loans were brokers by National Home Funding in Freehold. Period. Paragraoh.

"Michael Schottland, a lawyer who represents Robert Skowrenski, president of National Home Funding, does not believe the president of Walsh Securities is a victim." Period. Paragraph.

Quote within quotes. "Walsh is behind the whole thing, said Schottland." Quote within a quote. "He's now trying to distance himself from this because it looks so unpleasant, so unseemly." Period. Close quote within quote. Close quote.

Have I read that correctly?

A Yes.

Q This article states that Mr. Schottland

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Skowrenski - direct

Page 38

the most money or who generated the most business?

Q I'm asking you, as you sit here today, whether there is any name you can give me of anybody who generated more business than Mr. Kane?

A I can't give you the name of any more or any less. Any person that did any more or any less. I don't know the numbers sitting here today.

Q Would you agree that Mr. Kane was a big producer for National Home Funding?

A Yes.

Q Some of the witnesses in this case in depositions talked about cash payments being made at your company to various people. Did your company ever make cash payments to anyone?

A Never.

Q Never?

A Never.

Q So if anyone testified to that, they'd be mistaken?

A You're talking about the convicted felons that you deposed?

MR. MANNING: No. He said "anyone." You have to listen to the question.

A I'm sorry. Yes. Anyone. Anyone would be lying. Yes.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Skowrenski - direct

Page 123

effective, NHF was the owner of that loan and all of the security documents?

A Correct.

Q And if Walsh had not gotten the allonge ahead of time, would they follow up with you or do you believe they had it in every instance?

A I know they didn't because for years I was getting allonges and assignments. In my mind I signed allonges and assignments on every file because it didn't make sense that I wouldn't.

Q But do you recall requesting on some of the fraud loans after the fact to sign allonges?

A Absolutely.

Q You would have expected someone at Walsh to ensure that the allonge was in place before the loan funded, correct?

A Common sense, yes.

Q And you would have expected someone at Walsh to have a written appraisal in place before they would fund, correct?

A Correct.

Q And you would expect someone at Walsh to have a completed a HUD-1 in its possession before funding a loan, correct?

A Correct.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# Exhibit K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 97-3496

WALSH SECURITIES, INC.,

Plaintiff,

v.

CRISTO PROPERTY MANAGEMENT, LTD., et al.,

Defendants.

and

COMMONWEALTH LAND TITLE INSURANCE COMPANY,

Defendant/Third-Party Plaintiff,

v.

ROBERT WALSH and ELIZABETH ANN DE MOLA,

Third-Party Defendants.

ORIGINAL

DEPOSITION UPON ORAL EXAMINATION OF KELLIE O'NEILL

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

2

T R A N S C R I P T of the stenographic notes of HOWARD A. RAPPAPORT, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, Certificate No. XI00416, taken at the offices of MC CARTER & ENGLISH, LLP, Four Gateway Center, Newark, New Jersey, on Wednesday, December 20, 2006, commencing at 9:45 a.m.

A P P E A R A N C E S:

BOIES, SCHILLER & FLEXNER, LLP
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
BY: ROBERT A. MAGNANINI, ESQ.,
For the Plaintiff

MC CARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-0652
BY: DAVID R. KOTT, ESQ.,
For Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Company

FOX, ROTHSCHILD, O'BRIEN & FRANKEL
2000 Market Street
Philadephia, Pennsylvania 19103
BY: EDWARD J. HAYES, ESQ.,
For Defendants Nations Title Insurance and Fidelity National Title Insurance

METHFESSEL & WERBEL
3 Ethel Road
Suite 300
Edison, New Jersey 08818
BY: BENJAMIN R. MESSING, ESQ.,
For the Defendants

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

They would sit down, "they" being Betty Ann, Paul DelRosso and would sit and figure out how many loans were coming up, the time frame they needed to get them in, get them out, get them to closing.

That was the initial -- can you be a little bit more specific?

Q Were there any other meetings on other subjects between Betty Ann DeMola and Mr. Kane?

A Yes, there were.

Q Tell me about those.

A One in particular that I do remember. I don't remember what she did. Her name was Ronnie Gonzales. She worked for Walsh Securities.

There was a man by the name of Darryl -- I don't remember who he worked for -- and then there was Greenwich --

Q Greenwich Capital?

A Greenwich Capital, they were coming down to inspect some of Billy Kane's homes.

This one particular incident, one of the homes was a shell, and Betty Ann called me down. The office -- if this conference room was the office, I would be up by that gentleman up there, Betty Ann would be where you are, ask for me to get down, she said, get on the phone with Bill Kane immediately and

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

40

Q Do you know whether Betty Ann DeMola was aware before the fraud became public of any improper actions of the appraisers?

A In my opinion, yes, because I remember Rich DiBenedetto coming up to the office, and I remember a memo that went out specifically telling -- I don't remember who specifically they were telling, but they were saying how the appraisals had to be done, what the house was initially worth, all the repairs that had to be done to the home.

I know Mr. DiBenedetto had come up once and spoken with Ms. DeMola.

Q Was that before the fraud hit the papers?

A I don't remember.

Q Do you remember what the conversation was? Or do you know what the conversation was between Ms. DeMola and Mr. DiBenedetto?

A As of today, no, I don't recall.

Q Do you know whether anybody at Walsh Securities ever encouraged any appraiser to wilfully over appraise a house?

A I don't know.

MR. MAGNANINI: Objection to form.

Q Let me show you what I marked as exhibit

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

42

forth the questions that you were asked and the answers you gave?

A Yes.

Q And if you would turn to page 29, line 17, where you indicate in response to one of Judge Wolin's questions, that Betty Ann DeMola on various occasions directed that mortgage loans that you processed be approved and funded without Walsh Securities having received a written appraisal report.

Can you tell me more about that?

A I remember some of them didn't have the actual appraisal in hand, the actual certified copy. Some of them had a fax copy of the appraisal, but not the original.

I do remember that some of them did not have the appraisal at all.

Q At that time was an appraisal required under the terms of the of the commitment?

MR. MAGNANINI: Objection.

A Yes.

Q Was it required under the criteria of Walsh Securities?

A Yes, it was.

Q Did Ms. DeMola tell you why she was

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

47

Q And Mr. DelRosso was an officer in Walsh Securities?

MR. MAGNANINI: Objection.

A I don't know.

Q Was Mr. DelRosso the underwriting manager?

A Yes.

Q How do you know that Mr. DelRosso did that, that is, that he approved mortgage loan applications even though the loan application documents were false or fake looking?

A I don't know if they were always in regards to Bill Kane and/or Cristo Mortgage Funding. I do remember other loans coming through also in this case, also that they -- the W-2s and pay stubs just did not look correct. They didn't look right.

Q Would you have any knowledge why Mr. DelRosso would approve mortgage loan applications even though some of the loan application documents were false or fake looking?

A No -- I'm sorry, repeat that again.

Q Do you know why Mr. DelRosso would approve mortgage loan applications even though the loan application documents included items that were false or fake looking?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

48

A I know that he took in question some of the pay stubs and W-2s that did not look correct.

I know that at times, not all the time, but sometimes Betty Ann DeMola had told him to go ahead with the mortgage anyway.

Q Do you know why Ms. DeMola told him to go ahead with the mortgage anyway?

A I don't know why at the time she did.

Q Then calling your attention to page 30, lines 4 through 8, did you in 1996, at the request of a person buying and selling real properties, prepare fictitious leases in connection with mortgage loan applications submitted to and later approved by Walsh Securities?

A Yes.

Q Who was the person who requested that?

A Bill Kane.

Q Do you know why Mr. Kane requested that?

A At the time what he told me was that he didn't have the actual leases in his hands from the people, and to put their names on the lease and they submitted it and once he got the incorrect ones, he would put the correct ones in the file.

Q Have you since then found out that was not correct?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

that.

Can you clarify that?

A I'm sorry, can you repeat the question?

Q Yeah, let me ask you a question.

Do you know whether Robert Walsh was aware that at the request of Mr. Kane, you had prepared fictitious leases in connection with mortgage loan applications submitted to and later approved by Walsh Securities?

A I don't think he knew I did that.

Q How about Betty Ann DeMola, did she know you did that?

A I don't think she knew I did that.

Q How about Mr. DelRosso, did he know?

A I also don't think that he knew that I did that.

Q And then calling your attention to page 30, lines 14 through 18, did you prepare escrow letters falsely representing that the attorney named in the letter was holding specific funds in escrow on behalf of the buyer?

A It was one escrow letter.

Q Okay.

A Yes.

Q Why did you do that?

O'Neill - direct

51

A Because Mr. Kane told me he couldn't ahold of Stanley Yacker, that he did have the money --

Q That Mr. Yacker had the money?

A Yes. And that he just needed the escrow letter to be put into the file.

Q Was Robert Walsh aware of that?

A I don't believe he was.

Q How about Betty Ann DeMola?

A I don't believe she was, she knew that I did that.

Q You don't think Betty Ann DeMola knew that you did that. Is that what you're saying?

A Yes, I don't think she knew that I did that.

Q Okay, I want to be clear.

I would like it ambiguous, but Mr. Magnanini would have cleaned it up anyway.

MR. MAGNANINI: I would have come back to that.

Q Calling your attention to page 30, line 19 through 25, I had previously asked you to only read through page 30, is that correct?

A 31.

Q Calling your attention to page 30, lines

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

52

19 through 25, and 31, line 1, there you indicate, in response to a question of Judge Wolin, that you were asked by Betty Ann DeMola to participate with other Walsh employees in combing through closed files which were shortly to be reviewed by representatives of Greenwich Capital, which funded loans for Walsh Securities, in order to alter some of the documents then in those files or to place documents such as written appraisals in those files.

Did you in fact do that?

A Yes, I did.

Q About when did Betty Ann DeMola ask you to do that?

A I don't recall the date.

Q Why were Greenwich Capital representatives reviewing files?

A I don't remember at the time. I know that she had just called a big meeting for a bunch of us to go into the conference room. They gave us a list of stuff that had to be in the files, that had to be taken out of the files, and we were to go through batches of loans and put exactly what they had on these -- had written out for us, what had to be in the loan and what shouldn't be in the loan.

Q Did Betty Ann DeMola tell you why she

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

was asking you to do that?

A I don't recall.

Q This refers to altering some of the documents in the files. What documents were altered?

A I saw that there. I don't know what was altered. I don't remember what was altered.

I know that I personally put written appraisals that were in the files in the files, the actual hard copy.

I note that I put in and took out what was on the paper, but I don't recall what was altered.

Q Why weren't the written appraisals already in the files?

A I don't know. They should have been. They should have been there at closing.

Q Were some things also taken out of the files?

A Yes, they were.

Q Do you know the reason why they were taken out?

A I don't. I was just doing what they told me to do.

Q When she asked you to do that, did you have any feeling that there was something unkosher

O'Neill - direct

54

going on?

A Honestly, I wasn't paying much attention. I just did what they told me to do.

Q I understand that.

But in your thought process, did you think to yourself, gee, I wonder what's going on here, why we are putting documents in the files and altering documents?

A They just told us that they wanted the files to be cleaned up, presented nicely to them.

Q Well, did Greenwich Capital come in on earlier occasions before the occasion that you are talking about to look at loan files?

A As I stated before, they were coming down to take a look at a couple of Bill Kane's properties. I don't remember -- I think they were in the office prior to, but I don't know how many times.

Q Was the reference in this testimony you gave on page 30 and 31 to representatives of Greenwich Capital reviewing files, is that the same time they were coming down to look at Mr. Kane's properties?

A I don't know the time line. I know it was very crazy in there at the time of when -- what I spoke about with Betty Ann DeMola telling me to get

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Bill Kane on the phone and get them down to his houses.

I kind of remember this being towards the end of when they had us cleaning up the files.

Q Did you get Mr. Kane on the phone and tell them to clean up the houses?

A I believe I did. I believe I also contacted Robbie Skowrinski.

Q What did you tell Mr. Skowrinski?

A I don't think I could get ahold of Kane first, if he could get ahold of him. I know I had to get ahold of Anthony, I called Robbie, you know, got to him on the phone as soon as possible.

I believe we had pagers at the time.

Q Did you tell Mr. Skowrinski why you needed to talk to Mr. Kane, that is, you needed to get in touch with him about getting the houses cleaned up?

A Yes.

Q Did Mr. Skowrinski seemed surprised to you by that or not, surprised that certain of the houses were shells?

A I don't believe so.

Q You didn't get the impression -- did you get the impression he was surprised when you told him

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

O'Neill - direct

56

that certain of the houses were shells?

A I don't believe so.

Q On page 30 you indicate -- let me back up.

Was anything taken out of the files that Greenwich was going to look at?

A Yes.

Q I think you said that earlier.

Can you give me some examples of what was taken out?

A Honestly, I don't remember specifically what was taken out.

Q The document --

A That's not true. Notes from -- from the underwriters were taken out.

I'm sorry, yes, I do remember. Under any commitment letters that had gone out with Betty Ann DeMola's signature on them, her signing waiving off conditions were taken out.

Q Do you have any knowledge as to why those items would have been taken out?

A They did not want her signature on those -- on signing off of conditions.

Q Do you know why?

A I know why now. I didn't know why at

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters
66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

57

the time.

Q Tell me why now.

A They didn't want any -- they didn't want her waiving any conditions at all because they didn't want anything coming back to her.

Q What do you mean by that?

A Because she wasn't supposed to be signing off the conditions. It wasn't her job to do that.

Q That was for the underwriter?

A Yes.

Q Do you know why she was signing off conditions?

A To get them into closing.

Q Do you know why she wanted to get them into closing?

A As I stated before, I knew there was a meeting.

Q Do you know whether Robert Walsh was aware that Betty Ann DeMola was waiving conditions?

A It's my opinion that he did know.

Q What do you base that opinion on?

A Because he was in the room when we were cleaning up the files in the conference room. He had come in, walked in, walked out, walked in, walked

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

58

out, stayed a little bit, came in, walked back out.

Q Do you know what his reason was for coming into the room while you were cleaning the files?

A A couple times I thought it was just to see how it was going.

Q Did he say anything?

A He may have. I don't recall.

Q Who else was involved in this taking documents out of the files, putting documents in the file and altering documents?

A There was many people. I don't remember their names.

The only one I really -- I remember Paul DelRosso was in there, Betty Ann DeMola was in there constantly.

The closing manager -- I don't remember what her name was -- was in there. Some of the underwriters were in there, I believe, at times.

Q Was James Walsh -- withdrawn.

Page 31 you indicate that James Walsh was a vice president of Walsh Securities, is that correct?

A That's what I said, yes.

Q Was James Walsh present during the file

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

59

cleaning process that you described on page 30 or 31?

A Yes, he was.

Q Did he say anything?

A I don't recall.

Q With respect to page 31, lines 11 through 15, where it indicates that you accepted payments from various mortgage originators on a per loan basis for numerous mortgage loans that you processed at Walsh Securities, who gave you those payments?

A Bill Kane.

Q Would that have been while Mr. Kane was employed by National Home Funding and Robert Skowrinski?

A They were at various times.

Q Including --

A Yes --

Q Let me finish.

Would it have included while he was employed by National Home Funding and Mr. Skowrinski?

A I don't know if he was employed --

Q Let me try it again.

Would you have received payments from Mr. Kane for mortgage loans that you processed at Walsh Securities while Mr. Kane was associated with

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

63

wanting to get deals closed.

Do you know whether that had anything to do with the sale of Walsh Securities to the company in South Carolina?

A I don't.

Q Had you read the articles in the Asbury Park Press about what I'll call the frauds that occurred here?

A Yes.

Q Do you have a general understanding of what the fraudulent scheme was?

A I'm still very confused about it.

Q I'm going to ask you a broad question.

Do you have any information, other than what you already told me in the deposition, I don't want you to repeat what you already told me, but do you have any information as to whether Robert Walsh was aware of the frauds before they became public? This is a broad question.

A Being a broad question, in my opinion, I believe that he knew some of the things that were going on, because the conversations that he was having with Bill Kane and Robert Skowrinski.

MR. KOTT: Would you read that answer back, please?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

64

(Record read.)

Q And what are the things that you believe Robert Walsh knew was going on?

A In my opinion -- I'm sorry, I have to think about the way I got to say this.

I think because of the close relationship that he had with his sister and his brother Jim Walsh, and the meetings that Betty Ann DeMola had with Gary Grieser, Bill Kane, Anthony D'Apolito, Robert Skowrinski, and them telling them specifically how to do the loans, the appraisals, having the appraisers come up to the office, Mr. DiBenedetto being one of them, that they knew something was not right with some of these loans.

The fact that Paul DelRosso questioned a couple of times the pay stubs, the W-2s.

Q Okay.

A The fact that Betty Ann requested that I contact Bill Kane and tell him to get, you know, curtains, lamps, make the houses that were shells look like someone was living in the homes.

In my opinion she told her brother, but that's my opinion.

Q Was she -- withdrawn.

Is Betty Ann DeMola a full-time employee

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - direct

69

Q Are you aware of Betty Ann DeMola ever pressuring appraisers to make incorrect appraisals?

MR. MAGNANINI: Objection to form.

A I wasn't in the meetings.

Q I understand that, but maybe you heard it from somewhere else. Have you ever heard that?

A I honestly don't recall.

Q Okay.

Do you have any information from any source as to whether James Walsh was aware of any of the frauds involving Walsh Securities?

A All I know is that Jim Walsh was in the rooms when we were taking apart those loans.

Q Any other information beyond that?

A In my opinion, I believe he knew what was going on. Like I said, Betty Ann DeMola, Jim and Bob were all very close knit family and it was a family run business.

So in my opinion, I assume he would know anything that Betty Ann DeMola knew.

Q So if Robert Walsh were to say that any -- that he was unaware of any improper acts that Betty Ann DeMola did, you would be suspicious of that?

MR. MAGNANINI: Objection.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - cross

70

A Can you repeat that?

MR. KOTT: Mr. Rappaport will read it back to you.

(Record read.)

A I personally would be suspicious of that.

Q And why would you be suspicious of that?

A Because it's my opinion that he did know some things that were going on.

MR. KOTT: I don't have any further questions for you, but under the court rules the other attorneys are now allowed to.

CROSS-EXAMINATION BY MR. HAYES:

Q Good morning, Ms. O'Neill. I'll be very brief. My name is Ed Hayes.

A Hi.

Q You responded to a question by Mr. Kott that you believed Walsh was a family run business.

Who did you believe owned Walsh?

A Robert Walsh.

Q Did you believe at any time James Walsh had an ownership interest in the business?

A I thought that they had some type of interest in the company. I don't know if they actually did, but I thought. That was my

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - cross

71

understanding.

Q Did you also believe that Betty Ann DeMola had some interest in the company?

A I thought she did.

Q What was that based upon?

A I just thought they did.

Q They did.

Do you recall any conversations with Ms. DeMola in which she indicated that she had some ownership interest in the business?

A No.

Q What I'll call the culling of the files meeting that took place --

A I'm sorry, the what?

Q The culling of the files, the cleansing of the files that took place in the conference room, was that something that you had advance knowledge was going to take place? Or was it something that you came in one day and everyone was pulled into the conference room and you were told to do it?

A Yes, I was pulled in one day.

Q Were you aware, prior to being pulled in at that time, that Greenwich was coming to make a review of the files?

A I found out later while we were -- while

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - cross

72

we were cleansing the files.

Q Tell me if I'm mischaracterizing how this came about.

You come into work one day. Everyone is brought into the conference room, and you are instructed to do certain things with respect to the files?

A No, we weren't brought in -- not all of us were brought into the conference room.

Q Where did the cleansing take place?

A In the conference room.

Q How did the meeting begin at which you were advised what to do with the files?

A They told me to come to the room. I went in, and they said, here's a list of how we want the loans to look, what we want in them, what we don't want in them. Start going through them and do what they have on the paper.

Q How many other people participated in that meeting?

A There were a bunch of people. I can't tell you number-wise how many people were in there.

Q Were they just loan processors who were doing that?

A No.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - cross

73

Q Were there people that were there from underwriting?

A I believe some underwriting were in there, closures were in there. I cannot remember everybody that was in there.

Q But you know that Ms. DeMola was there?

A She was there.

Q Was she running the meeting?

MR. MAGNANINI: Objection to the form.

Q Was she dictating what was to be done to the files?

A She said just to make sure that we followed what was on the paperwork that they gave us.

Q And you did get some piece of paper that said this is what is to be in it and this is what you should remove?

A Right.

Q Was everyone given a copy of that paper?

A I think so. It was put in between everybody.

Q Was that a paper that you had ever seen before, Ms. O'Neill?

A No.

Q So this was not a checklist that was normally used in determining what documents should be

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

O'Neill - cross

74

in or out of a file?

MR. MAGNANINI: Objection to the form.

A I had never seen it before.

Q You indicated that one of the things that you specifically recall removing from the files were any underwriting approvals which had Ms. DeMola's signature on it, correct?

A Correct.

Q While you don't remember any other documents that you removed, do you recall any other items that were on the list to be removed?

A No, I do not.

Q Did Ms. DeMola or anyone else instruct you at that meeting why things with her signature on them were being removed?

A It was just my impression that they did not want her signature on --

Q I understand what your impression was.

At the meeting were you told why that was being removed?

A I don't think so.

Q Were you given any specific instruction as to why things were being added or removed as opposed to this is just the way we want the files to look?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# Exhibit L

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 97-3496

---

WALSH SECURITIES, INC.,

Plaintiff,

v.

CRISTO PROPERTY MANAGEMENT, LTD., et al.,

Defendants.

and

COMMONWEALTH LAND TITLE INSURANCE COMPANY,

Defendant/ Third-Party Plaintiff,

v.

ROBERT WALSH and ELIZABETH ANN DE MOLA,

Third-Party Defendants.

---

ORIGINAL

DEPOSITION UPON ORAL EXAMINATION OF RICHARD DI BENEDETTO

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

2

T R A N S C R I P T of the stenographic notes of HOWARD A. RAPPAPORT, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, Certificate No. XI00416, taken at the offices of MC CARTER & ENGLISH, LLP, Four Gateway Center, Newark, New Jersey, on Wednesday, January 3, 2007, commencing at 9:40 a.m.

A P P E A R A N C E S:

BOIES, SCHILLER & FLEXNER, LLP
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
BY: ROBERT A. MAGNANINI, ESQ.,
For the Plaintiff

MC CARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-0652
BY: DAVID R. KOTT, ESQ.,
For Defendant/Third-Party Plaintiff Commonwealth Land Title Insurance Company

FOX, ROTHSCHILD, O'BRIEN & FRANKEL
2000 Market Street
Philadephia, Pennsylvania 19103
BY: EDWARD J. HAYES, ESQ.,
For Defendants Nations Title Insurance and Fidelity National Title Insurance

METHFESSEL & WERBEL
3 Ethel Road
Suite 300
Edison, New Jersey 08818
BY: SCOTT V. HECK, ESQ.,
For the Defendants

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

38

told me. Then I got questioned by the United States Attorney about the same meeting, and I guess they asked him and he told them, as I recall.

Again, we are going back to their investigation which was years and years ago.

I remember Applegate saying that, you know, he came to the office, but he wasn't the only one. He was one of many, you know. The sales, this was their thing. This was their -- you know, you guys win cases, you have a reputation for doing something. If you want to push aside Citibank, if you want to push aside some of these big players, that's how they were going to do it. They had a choice, they could do it slowly and gradually, maybe get market share with somebody big, but obviously that wasn't how they did it.

Q In response to one of the questions you referred to, I think, the sale of the company for 300 million or 350 --

A That was a figure I just got from the last settlement negotiation.

Q Who was the purchaser, do you know?

A That was Resource Bank Shares.

Q Okay.

In one of your answers you said

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

39

something like -- I'm going to paraphrase it -- the ultimate plan was to get a lot of mortgages in and then sell them or securitize them or sell the company?

A Sell the company.

Q Before the mortgages became a problem?

A Yeah.

Q How do you know that? I'm not fighting with you, I'm trying to find out your factual basis for your statements.

A Well, I mean, with the type of loans they were writing, it would have to be a quick exit strategy unless Walsh was insane, because it's going to catch up to you. You're not going to write -- I mean, just think, if you're going to write those type of loans -- and again, they weren't doing this for an extremely long time. It's not like Walsh Securities was being bought by Resource Bank Shares with a 15, 20 year history where they were doing a certain volume.

You trace the volume of Walsh Securities, you will see it was doing basically nothing and went wow, and for a certain period of time, whoops, I'm for sale.

Q You also referred in one of your

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

50

Q Let me call your attention to page 33, lines 9 through 13.
A Okay.
Q You indicated there that in 1995 and 1996, Betty Ann DeMola verbally abused you in an effort to cause you to raise the value at which you appraised a particular property.
A Right.
Q On how many occasions did that happen?
A I don't know exactly what number, but I know it was common. Again, it was a common occurrence. She would call up and say, okay, the house is appraised for a hundred thousand. She would call up and say, you know, we need -- Kellie would have called also --
Q Let's just deal with Betty DeMola. I'll come back to Kellie.
A She would say the six appraisals were a hundred, 120, 130, 140, 150, she would say I need another 30, 35, $40,000 because I have to cover the closing costs of these people and the down payment of these people.
There would be a bit of a back and forth on something like that.
Q Was that unusual in your experience?

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

51

A No, it was not.

Q No, no. In your experience as an appraiser, was it unusual that a lender would call you as an appraiser and say to you, as Betty Ann DeMola did, I need you to raise the value at which you appraised a particular property?

A Yes, as a lender, yes.

Q Did Ms. DeMola tell you why she wanted you to raise the value?

A Yeah. I mean, after she said it, you know, four or five times on different occasions, you know, with the same story every time, but not the same stories in fact, obviously.

Q What did she tell you?

A What I just told you.

Q Okay.

And then on page 33, lines 13 through 18, you indicate that in 1996 you had a discussion with Betty Ann DeMola, Walsh Securities, concerning a number of Walsh loans that you learned had gone into default early in their history.

A Um-hum.

Q You further indicate in this transcript that, "Ms. DeMola stated, in substance, that she would have the loans brought current so they could be

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

52

sold by Walsh, and that the loans would be paid current by having them paid down with money orders which were not traceable."

A Yeah.

Q On how many occasions did you have that conversation with Ms. DeMola?

A Once.

Q Why were you having that discussion with her? That is, why was that a subject that you as an appraiser and Miss DeMola would be discussing?

A Well, I mean, I stopped real estate appraising based in part -- not based in part, but based on this company, because in the end I could see -- to her, my point was if all these loans -- you know, this is a great thing, your product is wonderful, I understand everyone is benefiting from it, it's a wonderful thing, no money down, no closing costs, values, whatever.

What happens when all the buyers are so qualified and everything? Now it turns out the buyers were in default. Nobody talked about that early on. The buyers were going into default.

She didn't worry about it. She said money orders were going to take care of it and they were going to be paid down.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

53

Q As I understand it, Ms. DeMola is the brother -- I'm sorry, as I understand it, Ms. DeMola is the sister of Robert and James Walsh, is that correct?

A Yes.

Q Okay.

A She was like the -- she managed the sales. She was like the sales manager, I would imagine, you know, that Mr. D'Apolito and the management reported to.

The questions were always deferred to her.

Q And then on pages 33 and 34 you indicate that thereafter you questioned Ms. DeMola as to what would happen when those payments stopped and the loans then went into default.

"Ms. DeMola stated, in substance, that the loans would be spread out among different purchasers minimizing the exposure to Walsh, and then at worst, Walsh would tie up the matters in extended civil litigation."

A This was pre they were going to sell it.

Q This is before they were going to sell the company?

A Yes, this is pre they were going to sell

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

58

I'm not appraising anymore. He's panicking because he's not getting appraisals.

I told him, Billy, I don't do appraisals anymore. When you depose him, you know, Bill.

He was in the car with Robert Walsh.

Q How do you know he was in the car with Robert Walsh?

A He said he was in the car with Robert Walsh. I could hear him in the background.

Q Were they traveling down to Atlantic City?

A They were at the convention.

Q Okay.

A Then what happened was, I think Robert -- I don't think, I know, when he was -- they were talking to me -- not they, Kane was doing most of the talking, but they began to bring up this merger thing, the first time I heard of this merger, Resource Bank Shares stock, and then Kane said to me -- you can ask him about this when you call him -- Walsh hurt his arm on the door or something. He was like sort of cursing a little bit, I hurt my f'ing arm, blah, blah, blah, I hurt my arm.

Then Kane said something to me to the effect -- you can ask him exactly what his words

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

59

were -- Walsh was saying, I'm going to be on the Forbes 400, I'm going to make the Forbes 400 after this deal.

Then I said to Kane, what the fuck is he talking about? He didn't, you know, sound too coherent. He was out late or whatever.

Then he said to me, Walsh is selling his company for whatever, for a lot of money, and he's talking about being on the Forbes 400, da, da, da, da.

Then what happened was after that was Kane called -- you know, I, upon hearing that, for my own personal reasons, though I hadn't done any appraisals for a year, was sort of like relieved, that maybe they got taken over, it would be a nice thing. Maybe this whole thing would go away. As luck would have it, that's not the way my life goes.

I was like, this could be good. Sell the company, good for him, everybody is happy, everybody goes away, but it didn't. Jesus Christ.

What happened was Kane got very angry -- you can ask Kane about this -- about a month later Broda told me, and then I talked to Kane myself.

He said Walsh was making -- telling him, we can't do this anymore, meaning these Cristo deals

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

60

anymore, this Ponzi scheme, which we got to stop this.

What it was, was for a year this was -- all these millions of loans, they were performing, paying 12 percent interest, the files looked perfectly okay, but guess what? The minute they pulled the plug, it's over. It's exposed, all these loans are all BS, and look what happened after this happened.

So Kane and Grieser went to Walsh Securities, and you can ask who said what to whom, but I think it was Grieser who came across the top and told Walsh -- this is several months before the merger -- you stopped funding our f'ing loans, I'm going to stop paying.

At that point Robert Walsh made the decision to continue funding his loans after knowing full well what was going on, but he knew full well what was going on the whole time. He wanted to keep everything copasetic until they had this big merger.

Two months later, or whatever exactly the time period was, I get a call from Bill Kane saying that, you know, he -- the Asbury Park Press is nosing around my company, no big deal -- understatement of the century, sarcastic -- and said

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

61

that, you know, this isn't a major problem, and I'm going to talk to some councilman or something.

I said, what's no big deal?

He says, they are going to write a big thing on our company.

I said, what's the problem?

At this point I still don't know that this wasn't -- the Asbury Park Press, this is the first time I read about the Capital Assets, I mean, a question to any appraiser, if somebody told me up front, seriously, that I'm going to buy a house and I want you to appraise the house and push the value up a lot, and then push up the value as a Ponzi scheme, you know, there is just so much you can take.

I said I pulled out a year before. I didn't know what the hell was going on here.

Obviously he didn't tell Colony, I'm sure he didn't tell Broda.

You don't say, hey, listen, I'm taking this house, I'm buying this house. I'm not going to fix it up. What do you think he told the appraiser? Of course he said he was going to. The appraiser would say, I'm not doing it.

Otherwise he would have to tell the appraiser, you know what? Guess what, we are

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

62

partners. Not only partners, the appraiser should be getting 75 percent of the profit.

He's very, very low key. He had that history. All of my properties all pay. You can call Walsh, you can call Betty Ann, everything is paid off, everything is going. I've never had a default. You can call them. Call them at the company.

Betty Ann would get on the phone and say, no, Cristo Properties never had a default.

So you say to yourself, you're appraising for these people, they are telling you the guy never had a default, he has a perfect track record, Betty Ann is on the other side yelling at you on the goddamn phone, oh, you got to get in with this number. You're out of your mind, you got to hit this number. They never had a default.

You got them having a perfect, perfect, perfect trade. Then, whatever the payoff is, they tell Kane, hey, guess what, get out of here. Good-bye. Go home.

Well, you know, Kane was a bit rough around the edges and Grieser was okay. Fine, when the deals come through, you have to keep on doing this. They made that deal and they kept on doing the deal before this merger was going on.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

63

Q Stay right with that.

How do you know, were you told by either Kane or Grieser about the conversation --

A Kane left --

Q Hold it.

With respect to the conversation that Kane and Grieser had with Robert Walsh where they told Robert Walsh that he had to continue funding even after it was a fraud and Robert Walsh agreed to do that, how do you know that?

A He called me up afterward.

Q "He" being whom?

A Kane.

Q Okay.

A He called me up afterwards and laughed and said that, you know, Gary -- now it's coming back to me -- Grieser was the one that laid him out. He said Gary laid him out.

He told Walsh, you're funding all these loans. If you don't, every single one of these other ones we done, whatever the amount was, 150, 200, 140 to 160 or 200, are going to go under, and that's the end of it.

Q Do you know where the meeting took place?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

64

A In Parsippany.

Q At Walsh Securities' office?

A I think D'Apolito set it up. You have to ask Kane about the particulars. He folded up like a cheap suit, Robert Walsh, and that was the end of it. They kept on folding the loans.

That's a couple of months before the thing in the paper, 30, 60 days, I don't know exactly. You have to get it from them exactly what the time frame was.

When this 60 day window hits and the thing hits the newspapers, that's when I'm told, don't worry about it, it's no big deal, they are going to talk to a councilman. How is a councilman going to save you?

Then I read the newspaper and I see that Kane -- you know, he still doesn't tell us. When I was talking to him in March and April, that was the first time it obviously resonated in my head.

I'm not saying you're in denial, but your head is up your you know what during this period. Even though I did appraisals, I remember calling Tom, he said that Grieser went in there and said that he told Walsh he's going to have it go by.

It's a fuckin' Ponzi scheme, Tom. We

Rizman Rappaport Dillon&Rose, LLC Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

65

been had. This was an Ponzi scheme. It's 200 loans. It's a Ponzi scheme.

He's like, oh my God, what do you mean it's a Ponzi scheme?

He calls Kane, and Kane's like, don't worry about it, don't worry about it, we'll take care of it, we'll take care of it.

When this merger is over, don't worry about it, the company, the company that's buying it, they will absorb it and everything will go away.

Didn't happen that way.

Then in the end of June the newspapers hit, and then I -- see, I thought it was a Ponzi scheme where like they were making the payments every month, like Betty Ann was talking about with the money orders. I didn't know Grieser had Capital Assets, which was the craziest thing I ever heard in my life, where he's doing this crazy Ponzi scheme. But that's what it was.

And Kane, he had the run of the place. Kane was the big star over there at Walsh Securities. He would walk in there and he's going through Robert Skowrenski's -- you know, they set him up with his own satellite, Walsh Securities office, where he would use the satellite of Skowrenski, you know,

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters
66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

66

where he would get the origination fees, and him and Betty Ann are like this.

Bill Kane always, he had Betty Ann and Robert Walsh wrapped around his fingers.

If you ever had a question to do with his loans, he was the only client I ever had who dealt with Walsh Securities and say, get Robert Walsh on the phone, Betty Ann, they would just vouch for his tremendous character and his deals were absolutely tremendous.

They did it nonstop. Ask Kane about it. That's what he did.

There was questions. If you were fixing up a house in the normal course of things -- which is why this got totally out of control in this case with Cristo and Walsh.

Other people, you would go see their houses, they paid 150,000 for it, they want to sell it for 220, they put 20,000 into the house. They might put five, 10, 15,000 into a house.

As Broda described to me later -- like I told you, I pulled out of this earlier -- nothing would be done. Nothing would be done on the house except for the front and stuff like that.

So invariably they would call up Walsh

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

67

and call up Betty Ann, and, you know, you would need somebody to vouch for the fact that this person had a perfect payment history, you know, it just boggled the senses.

But, you know, it was well planned, well calculated, and it worked for a period of time.

I think Pearson, as I recall, the people who did the majority of the appraisals, I think there was 200 some odd, and Clani, C-l-a-n-i, I think Broda might have done 40 or 50, I think I did 25, I think Pearson did four.

There is other people that did one or two, too. There was a Michael Pacillo. If he talks to you, he'll tell you the same thing. They didn't indict him. He did one or two. He was one of the lucky ones.

Another appraiser -- you talk to any appraiser out there in Jersey, say the same thing, Walsh Securities, no money down, no closing costs, no due diligence, and everybody knew about it.

Q You talked about the conversation with Kane when he was in the car with Robert Walsh.

A Right.

Q Were you ever with Kane on any other occasion when he spoke with Robert Walsh?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

81

the first part. Obviously they knew all this stuff was going to explode. That's the basis of their entire business, and that's why it obviously wasn't a long term loan.

Like I said, to plead ignorance, there is so many people that had to be involved. There were people asking questions, from the appraisers at the bottom to the lawyers. How many times did people go to settlement and say, what's going on here? I'm talking about a straight lawyer.

What's the wire? Do you know what I mean?

Q On page 34 of your plea, beginning on lines 8 through 23.

A Right, okay.

Q Where you do talk about land flippers, and you say you had a discussion with DeMola concerning a large portfolio of Walsh loans that were made to particular land flippers and which you believed involved borrowers who had little or no equity in the property.

A Yeah.

Q About when was that conversation? It was mid 1997? That's what you say here?

A I think -- I'm saying, when did this

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

whole thing collapse?

Q Was it before --

A I thought it was '96. When did the thing go in the newspapers?

Q I don't remember.

Was it before it got in the newspapers, your conversation?

A Oh, before, yeah.

Q And you say further in this transcript of your plea, that Ms. DeMola responded, in substance, that she was unconcerned because Walsh was going to be sold for a lot of money?

A Yes.

Q Was that a reference --

A That was -- they were giddy over -- like I said, I'll put this in context, it's a good question.

If I hadn't been doing appraisals for six or eight months, which I hadn't, for a year, what I was worried about was Walsh Securities is Walsh Securities. They went down in flames. I was worried everyone else was like, oh, they are going to sell it off.

I was sort of relieved they were selling it to Resource Bank Shares. That's the initial

DiBenedetto - direct

83

response, relief.

The next day my interpretation became a little more nuanced. It was like, wait a minute, they are going to see all these crappy loans. I don't care if I did them a year ago, 25 loans, oh, man, this is going to get ugly as hell.

So I panicked, and that's when I would call them up and say, what are you going to do about this? What are you going to do about these loans? What are you going to do? What are you going to do?

Betty Ann, you know, I would say to her, what are you going to do? What's your game plan here? What are you going to do?

The answers didn't make me too comfortable. But what am I supposed to do, you know what I'm saying, absent calling up Resource Bank Shares and telling them, don't do it. It didn't matter. The die was cast and the Asbury Park Press was on top of it anyway.

Like I said, then these things got to where they went, and unfortunately for everybody, this is what happened.

This whole scheme is so -- there are so many different layers, so many different people that have to deal and so many different levels of a loan

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

84

process, to seriously sit here and go through what we are going through now with all this litigation and everything else under the premise that somehow, some way, Walsh Securities didn't know about any of this is -- it boggles the imagination. It really does. It's bizarre.

Q Page 34, lines 18 through 23, Judge Wolin asked you the following question:

"Did you later discuss with Robert Walsh of Walsh Securities your concerns regarding defaults in that same portfolio of Walsh loans which were made to particular land flippers and which you believed involved borrowers who had little or no equity in the properties?"

You responded: "Yes, your Honor."

Tell us more about that conversation.

A It's all under the same -- it's the same venue, same subject matter, the same as Betty Ann, as my concerns to Broda, as my concerns to Kane, as my concerns to D'Apolito, as my concerns to anybody who would talk to me at this point.

How are you going to sell this company? How are you going to sell this company for all this money and not tell them about this?

Q Not tell the purchaser?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

85

A Not tell the purchaser.

What's going to happen when they find out -- I don't know about you, but if I'm a bank and I'm paying $300 million or 200, whatever, I'm going to be pretty well jacked off, pissed off and angry if I'm going to put three-tenths of a billion dollars in some crazy SOB's pockets, who I find out is nothing but a two bit criminal, for the last year and a half who has just this gigantic scheme going on which is lies to everybody, and then I'm going to sell my company and I know there is going to be ramifications.

What I'm telling you, my outlook, I wasn't very happy, because I saw as an appraiser, you know, look what happened? I did 25 appraisals. But guess what? For the first time in 25 years a real estate appraiser in New Jersey got indicted just due to this bozo scheme.

The only reason why I got in trouble and the reason why other people got in trouble was to get up the line, and they didn't get up the line. They got almost all the way up the line, but not all the way. They ran out of time for whatever reason, they said.

The point is, if the bank -- my point

Rizman Rappaport Dillon&Rose, LLC Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

was when they sold this thing they were making a lot of money going over the loans, afford to pay attorneys, making a lot of money as they are going along.

I didn't think it was too smart, you know, I sell the company, the company is going to get pissed off, you just defrauded me out of $300 million.

Walsh says, I, I didn't know anything, it's all baloney. I didn't do a goddamn thing.

Hire some expensive attorneys.

Guess who they are going to come after? Me, the attorneys, the title companies, just exactly what's happening now.

No, it wasn't me, it wasn't me. I was in charge, my sister was in charge. These are the loans we are doing. They are all flips, this and that, people are reviewing the documents, they don't see anything. Appraisers, forget it, everything is lies, no, no, no. Write it off.

I knew, I was very afraid of the fact that it was going to come down on us. It came down on me harder than I expected and quicker than I expected. I thought they were going to sell this company, and six months, a year later, you know, they

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

87

were going to find out.

Also, in my head I was thinking maybe they cut bait and they are in South Carolina. I don't want the bad publicity.

Then I heard the argument they are a publicly traded company. This is conversations going back and forth between the people. You're worried, that's why. Maybe they don't want this to get in the public because it will hurt the shareholder value. This is the kind of crazy shit you hear. It's going to hurt the shareholders.

It didn't get put under the rug. The Asbury Park Press came right over the top of it. Walsh Securities making -- you know, to sell for $300 million dollars, whatever, they had to be making 30, 40, $50,000 a year, and this little blip, 200 loans, set aside five, $10 million, that's it. It's over. Take a month's pay, put it aside. You go away and sell your company.

But, no, they couldn't do that because the entire company was cancer from the ground up. 90, 80 percent of their loans, cancer. No more credibility in the marketplace. You can't go in the marketplace now with all the people circling around.

Now, you're now an attorney and you get

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct
88

a deal now with Walsh Securities name on it, or any of you guys do after what's in the newspapers and everything, you will be prone to overlook the title and see it and take the proceeds and close it? I don't think so.

They collapsed because they weren't going to be allowed to do their scheme anymore. It wasn't their programs. Their programs were just, you know, a precursor for the rest of the scheme. But the big scheme was the flipping part, where I could use the proceeds from the mortgage loan to pay the buyer, to put the cart before the horse. That's their niche, the cart before the horse.

Q And then on 34, the bottom of page 35 at the top of the transcript, you stated that Robert Walsh sought to reassure you, in substance, that no difficulties would result from those loans because many of those loans had been sold by Walsh Securities and because the purchasers of those loans would not likely become aware of their problems.

A Yes.

Q Was that a single conversation that you had with Robert Walsh or a number of conversations?

A That was a conversation with Robert Walsh in the context of this whole transaction, when

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdcsr.com

DiBenedetto - direct

89

1   it was being contemplated with Resource Bank Shares.

2   This is all in the realm of -- the person I dealt

3   with, Kellie O'Neill, I dealt with D'Apolito,

4   obviously Betty Ann, all the loans are perfect,

5   everything is perfect, everything is wonderful.

6           Then Robert Walsh on a few occasions,

7   but on this particular occasion, mostly just, hello,

8   how are you?

9           But on this occasion, what's going to go

10  on here?  What's the end result going to be?  In

11  other words, I'm going to worry more about me.  He's

12  obviously not worried about me.  He's just worried

13  about this, much like he is with you guys.  That's

14  the way the man operates.  He's not worried about

15  anything but himself, and maybe he's not even worried

16  about his goddamn self.

17      Q       Let me ask you this.  Stay right there

18  for a second.

19          What Walsh Securities has said in this

20  litigation is that Robert Walsh himself did not have

21  any knowledge of any frauds or improprieties.

22      A       I'm sorry.

23      Q       Why do you say that?

24      A       Just on my own knowledge myself.  My own

25  knowledge.  My own knowledge.  I told you when he's



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

talking to me with Kane down in Atlantic City, you have to talk with Kane.

Kane dealt with him face to face a lot. They were buddies, obviously. I wouldn't be hanging out drinking with you in Atlantic City if I wasn't. Do you know what I mean?

Robert Walsh, he's going to sell his company for whatever, he's all excited, he's going to be on Forbes 400.

Who does he pick in the entire Atlantic City to hang out with but Bill Kane, Cristo Properties? I mean, do you think it was because they had mutual interests? Do you think it was because they had friends, family? No, because they were deep involved in this crap.

Do you think when Betty Ann DeMola gets on the phone and says, oh, no, no, no, he has perfect payment history, what are you doing? You got to get the appraisals up. What the hell is the matter with you? We'll cut you off. We'll cut you off.

You don't think they were involved in it? They were so involved in it, I got kicked off the appraisal list. I didn't care. I got kicked off their appraisal list after I stopped appraising them.

Betty called me up on the phone --

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - cross

116

1    been done?

2           A      Yeah.

3           Q      Who did you have those discussions with?

4           A      Anthony D'Apolito, obviously,

5    Skowrenski, Kane.

6           Q      How about Ms. DeMola?  Did you ever have

7    a conversation with Betty Ann DeMola?

8           A      Oh yea, Walsh, obviously, at the end.

9           Q      Did you expect that anyone was looking

10   at these appraisals at Walsh?

11          A      As far as reviews are concerned?

12          Q      Yes, sir.

13          A      At Walsh?

14          Q      At Walsh.

15          A      No, I knew that they were not.

16          Q      How did you know that?

17          A      They told me they weren't looking at

18   them.

19          Q      Who told you that?

20          A      Betty Ann, D'Apolito, Kellie O'Neill,

21   Robert Walsh.  The only time I ever got flagged on a

22   review appraisal at Walsh, ever, was I got a review

23   from I guess someone they had an independent loan and

24   sold it off, and like whatever, a couple months

25   later, whoever they sold that loan off to, they did a



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - cross

118

In other words, I bought the houses with my own money, fixed them on my own money and then sold them. I didn't get involved with buying the house for 50,000, using their money, 80,000, paying off, and using their money.

Q I understand.

When you were buying the properties, were you buying it with Walsh money?

A No, my money.

Q What was the involvement of Walsh in those transactions?

A They were the end lender. They were still the easiest to deal with for, you know, to sell your houses.

Q So you were buying the property with your own money, or you and your partners, fixing them with your own money or that of your partners, and then selling them to third parties, and the third parties were being processed as borrowers for Walsh?

A Exactly.

And during that time D'Apolito and Kellie O'Neill, and supposedly they were splitting it with Betty Ann, they made us pay them a thousand dollars each per house. In other words, if we wanted to close a house, if we had five houses we wanted to

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - cross

119

sell, D'Apolito would want a thousand, and he got it.

Q In order to approve the loans?

A In order to fund them immediately.

My point was like, well, Kane is getting his funding and he obviously hasn't done anything to the house yet. I bought it with my own money, I'm not using your money, I'm fixing the house and then I'm selling it. Somebody is giving you a clean deal.

But they basically -- the way they operated the company, it was sort of like a criminal organization type thing. They didn't want to hear it.

D'Apolito used to call it vigorish. I wasn't too happy with that. I basically wanted to punch him in the mouth. But I had to do business.

D'Apolito wanted a thousand, Kellie wanted a thousand, and, Kellie, what are you doing? You're just processing it. There are checks for all these things. The people were stupid enough to get the checks in their names.

Q These were moneys being paid to expedite the closing process?

A Yeah, and supposedly they were sharing it with Betty Ann. Again, I can only talk as to what I dealt with Betty Ann or I dealt with Robert Walsh.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - cross

126

one comp.

Colony was in there early, as I recall, and then Colony would do the second appraisal. She would have three comps, 158, 160, 162.

So I was like, you got three comps then. Okay.

Q So what did you do?

A Well, Broda went down, looked at the houses, they were all comparable for the houses they wanted appraised for 158, 160, 162. He appraised it and gave the values to me and I signed it.

Q So you reissued a second issue?

A In other words, they closed the one house. They established a market.

Q You do enough of them, you create a market upon which you can appraise the rest of them?

A Exactly.

Q I'm trying to figure out what you did.

A This is for number four. Like let's assume they had one, two, three, and they are coming up to me and saying they are spreading out.

Q My question to you is, had you already submitted an appraisal which Ms. DeMola then contacted you about which was not of sufficient value for her purposes and she then supplied you with

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - cross

127

comparables?

A Yes.

Q And you changed the appraisal?

A Yes.

Q All right.

A Yes, after some going back and forth, yes.

Q So you had originally submitted an appraisal at one price?

A Yes.

Q Supported by your comparables that you could find?

A Right.

Q She then contacts you and said, if this deal is going to close, we need $50,000 more?

A Yes. And she also said if I didn't do it, you would never do another appraisal for Walsh Securities again.

Q I understand.

Then she supplied you with comparables?

A Yes.

Q You send Broda out to look at those properties to see if they were in fact comparable?

A Right.

Q You resubmitted a new appraisal at the

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - cross

129

was the Multiple Listing Services?

A Yes, except for Walsh, that's where you use them. Walsh had the private sales list.

Like in Asbury park, the multiple listing, it might support a value of 50, $60,000. The ones that Walsh used supported a value of 250,000. Do you understand?

During that year, that's how this whole thing fell apart. The tax assessor, he's the one that brought this whole thing to the government and everything else, and I should have said the newspaper at first.

From what he saw -- the average ones I saw during the year, I'm guessing here, but from what he was saying, in a year in Asbury Park the normal amount of houses that would sell -- it's not a big town, now with the development there would be a lot more -- so you had maybe 30 houses that would sell for 50, 60, $70,000.

Now Cristo is doing 200 sales coming in for three or four times what he thinks the values were. I think he complained at that point, and that's where it ended up.

Q Did you ever have any discussions with Ms. DeMola or anyone else at Walsh where you were

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - cross

130

requested to alter appraisals after loans had closed?

A Yes.

Q Can you tell me about that?

A Well, a loan would close -- well, there is the instance of the ones like I told you, I thought the loan had closed, but I had to do the appraisals post closing.

Q I'm not talking about where you were supplying appraisals and asked to backdate them.

In other words, were there ever circumstances where you had done an appraisal --

A Yes.

Q -- and you were of the belief the loan closed and afterwards you were asked to change that appraisal?

A That was an issue, yes.

Q How did that come up?

A My appraisal was, let's say, 150,000. Then they would just take it upon their selves to make it 170,000 and call me afterwards, after it was submitted at 150,000, even though 150,000 -- you got to understand, the comps are 50 and 60,000, I'm coming in at 150.

They call me up afterwards and say, you know, afterwards, you got to come in at 170,000 to

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - cross

131

cover the costs and everything else.

So I have to say, how the hell am I going to do that? They show me three other comps, 170, 172, 174, and it kept on going up.

I basically tapped out of the card game and the market just kept on going in the other direction.

Q After you stopped doing appraisals for them, did Ms. DeMola ever come back to you and ask you to change anything that you had previously done?

A After what, after I stopped?

Q After you stopped doing appraisals for them, did Ms. DeMola or anyone else from Walsh --

A Yeah, a couple of requests where they wanted 175 versus 150, or 180 for 150.

Q In your two years or so doing appraisals, were you ever involved with any other lender that asked you to backdate an appraisal?

A No.

Q Involved with any other lender who asked you to perform an appraisal of a property that had already closed for purposes of justifying the amount of the loan?

A No.

MR. HAYES: That's all I have,

Rizman Rappaport Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 152

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
DOCKET NO. CIVIL NO. 97-3496

| | |
|---|---|
| WALSH SECURITIES, INC., Plaintiff, -vs- CRISTO PROPERTY MANAGEMENT, LTD., et al., Defendants, -and- COMMONWEALTH LAND TITLE INSURANCE COMPANY, Defendant/Third Party Plaintiff, -vs- ROBERT WALSH and ELIZABETH ANN DE MOLA, Third-Party Defendants. | CONTINUED DEPOSITION UPON ORAL EXAMINATION OF RICHARD DI BENEDETTO<br>Volume 2 |

COPY

T R A N S C R I P T of the stenographic notes of STANLEY B. RIZMAN, Certificate No. XI00304 and DIANE M. HOLMES Certificate No. XI01660, Notaries Public of the State of New Jersey, at the offices of Boise, Schiller & Flexner, LLP, 150 John F. Kennedy Parkway, Short Hills, New Jersey, on Tuesday, May 1, 2007, commencing at 10:10 a.m.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 153

A p p e a r a n c e s:

BOIES, SCHILLER & FLEXNER, LLP
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
BY: ROBERT A. MAGNANINI, ESQ., and
AMY WALKER WAGNER, ESQ.
For the Plaintiff

MC CARTER & ENGLISH, LLP
Four Gateway Center
Newark, New Jersey 07102-0652
BY: DAVID R. KOTT, ESQ.
For Commonwealth Land Title Insurance Company

FOX, ROTHSCHILD, O'BRIEN & FRANKEL, ESQS.
997 Lenox Drive
Lawrenceville, New Jersey 08648
BY: MUKTI PATEL, ESQ.
For Nations Title Insurance and
Fidelity National Title Insurance

METHFESSEL & WERBEL, ESQS.
Three Ethel Road
Suite 300
Edison, New Jersey 08818
BY: SCOTT V. HECK, ESQ.
For Coastal Title Agency

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

Page 226

brokers' offices for what I understand -- Selective Financing being one of them. I remember the guy calling me and saying "they came in."

I thought that was a little bizarre, too. Pretty brazen.

You're saying: All we need is this and that.

But I've also seen other companies that also didn't last long with the same type of: All we need is this, an escrow letter, all we need is a letter from an accountant, all we need, all we need.

My point is with the precursor before "all we need" -- you know what I mean?

Almost like saying it's fake. "All I need is -- all I need is an escrow letter."

Q With respect to Walsh Securities, what is it that made you suspect they were doing this?

A What do you mean, what makes me suspect they were doing it? What makes me know they were doing this?

Q What makes you know they were doing this?

A Know what? I know they were involved in this?

Q They knew these were fake escrow

Rizman Rappaport Dillon&Rose, LLC Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

Page 227

letters and they were giving these loans with no money down?

A Because if -- you got to like -- okay. You're funding at the end of the month X amount of loans. $50 million in loans. If 20 or $30 million of purchases -- that is right off the bat right there -- that is a red flag.

The mortgage companies, you know, normally have 80 or 85 percent refinance. Maybe 15 percent. Especially sub-prime. People will not want to put this money down. Especially back then. Maybe less than that. Maybe ten percent. Ninety/ten. The second red flag. People will not put down the excess money and pay the interest rate. Doesn't make sense.

The third red flag, they have underwriters on staff. They're putting the excess money down and paying the high interest rate and they have good credit.

Like the whole thing doesn't make any sense. To think that Walsh wouldn't have known would be like -- it just wouldn't make sense.

The same thing as me coming in here and saying I have these ten clients coming in tomorrow and I want to do ten real estate closings with you

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

Page 228

and the settlement charges -- you'll be able to charge us $25,000 each.

You'll not ask questions? What are you? Crazy?

I'll make $25,000 on settling on two houses. Do you know what it means? Obviously, didn't make sense.

Don't ask me how it was allowed to keep ongoing. He obviously offered these loans to whoever he was selling to. He had to know, too, unless they were crazy. He was selling to Wall Street and they wouldn't budge.

Why would the person with a 700 FICA score pay 11 percent and putting 20 percent down?

Doesn't make any sense, right?

Q Other than these red flags, is there anything specific that you recall from that time period that leads you --

A Leads me to believe they were doing the money-down deals?

Q Yes.

A Everybody I talked to said they were doing the no-money-down deals.

Q Who is "everybody"?

A Every client -- Walsh Securities caused

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

Page 240

would say that the world doesn't work that way.

All of a sudden, family members become very, very giving or the lawyers all of a sudden forget to make a copy. You do a closing, you make a copy of everything, don't you?

Q But you don't have any firsthand knowledge that somebody at Walsh Securities knew these were fake?

A I knew D'Apolito had to know because he was giving the seminars. I knew Kellie had to know because she was telling everybody. Betty Ann knew because she was telling they had the product.

Q Who were they telling?

A They were telling loan brokers. They were telling loan brokers.

Q And these loan brokers were telling you?

A No. I was always telling myself directly because I was doing houses with them, too.

Q Who told you directly?

A D'Apolito told me. I asked D'Apolito. It didn't matter. I put the cash in. Kellie O'Neill brought it in. Betty Ann DeMola brought it up.

Q Let's start with D'Apolito. You asked

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

DiBenedetto - direct

Page 244

Q How did you suspect this was going to help Walsh Securities?

A I think greed. Definitely one of the seven deadly sins. It got to be. I remember when I was out there. I remember when she was out there.

Q Who is "he" and who is "she"?

A I remember Bob Walsh. Specifically, Betty Ann. I remember her, you know, "You're not getting any business."

All she had to do was cross from here to here, I'm sure, and she made that decision to just step over the line.

As soon as she stepped over the line, they got tremendous riches and wealth.

Do you know what I'm saying?

They got the loan and got the chance to sell the company for a gigantic amount of money. Lot of advantages. Made all this money last month. They sold $16 million in loans.

By the way, back then -- sub-prime is now different. Sixteen million a month back then.

Remember, sub-prime was probably -- now it is like 10 or 15 percent of the market. Back then it was like two percent. That would be closing like four or 500 today in today's marketplace.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 266

was going to do, he was going to be -- what it turned out to be, just like Ponzi scheme, like a Ponsi. You know what I mean? It wasn't going to be good. That result wouldn't have been -- like I said, if it was 200 different people like yourself here at the table, just 200 different, it's one thing. Still horrible but explainable.

This is more like it would be something -- you know, it was cookie cutter perfect for someone to prosecute. Here's a guy that took 200. If they were going to let him do this, you know what I mean, with 200 properties, you know, what more is anyone -- what more could you get away with?

Q. What did you expect to come from this meeting when you went in there with D'Apolito, Bob Walsh?

A. I just wanted to be put at ease.

Q. And how did you think you were going to be put at ease?

A. I don't know. I don't know. I mean, you know, it was -- you know, I wasn't happy.

Q. I mean I think you've testified that you believed that all of them were involved in this Ponzi scheme?

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 267

A. Yes. Uh-hmm. Again --

Q. So why would you approach them to talk about this?

A. Because I understand where you're coming from. Okay? But, again, like I told you when I first -- I also testified when I first did the appraisals. Again, you're talking about in the heat. You know what I'm saying?

When I did -- when I first did the appraisals and I got the extra $500, you did that for this, and I told you that, if I would have known what I knew then, that Gary Greiser and him were going to go public with a REIT, again, I asked the question back to you. Don't you think I would have said, okay, I'll just do one of these, one, not 18, not 28, just not whatever, just one, and I'll make more money on one myself with not nearly any damage. You see what I'm saying?

If I would have known about it, what did I need? I didn't need Ken for $10,000. I didn't need Gary Greiser for anything. I could have done it myself. You see what I'm saying? When I talked to them, I didn't know where the hell they were at. I knew they were doing no money down programs. I knew their underwriting was crazy. I

Rizman Rappaport Dillon&Rose, LLC Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 268

knew all that.

To be honest with you, I -- you know, judging by the situation, I definitely don't think that -- you know, and I'll say that too. I mean I'm not defending. Again, I don't think this is big offense. I told you I think he obviously knew about the underwriting. He knew this. He knew that. He didn't know about the Greiser, Kane thing till the end. Then out of that, he called Greiser and Kane in, and I heard this from Kane, and then that's when Greiser told him he didn't want to do business with him anymore because, obviously, Walsh himself didn't want to do this anymore, because he didn't know. Again, he might have thought it was spread out over 200 people. It wasn't going to be this crazy thing that looked ridiculous. He went to cut them off.

That's when Greiser told him that's not happening. He didn't cut them off because they would have cut them off and stopped it. They wouldn't have made the payments on those mortgages in the middle of due diligence, and the whole thing would have collapsed, and at that point was also Greiser and Kane knew. Everybody knew. When they were getting -- when they were merging, everybody -- it was a big thing. Walsh is merging. Walsh is

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 269

merging. Walsh is merging. So everybody knew that. So they just basically held that against them.

So my point is, at the time when -- I don't think the Walshes, I don't think Betty, I don't think any of them might have known until -- you see what I'm saying? None of us knew that. We all had different times when we knew about it. You understand?

Q. You don't think they knew about the straw buyers?

A. I think they knew the buyers were straw. I didn't think they knew what the kickback to Gary Greiser. Big difference. If you have a bunch of straw buyers, like I said, spread over 200 properties, it's a problem. If you've got straw buyers who sold their credit to Gary Greiser, that's a gigantic problem, because now you got, you know, 200 different mortgages all going back, and then like, evidently, they did the deed back to Gary Greiser back too. So that's going to be like -- in other words, if the securitization of loans got not only Walshes loans, but 50 other companies' loans, all the other thing, it would have been Walsh had a very high default rate versus some of the other companies at that time that were spread out over

Rizman Rappaport Dillon&Rose, LLC Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 270

these 200 different loans. Maybe one person had four loans, one person had five loans, ran into bad luck, bad broker, bad seed. Do you understand what I'm saying?

It's an ugly situation. It's poor underwriting. It's this. It's that. Your programs stink, blah, blah, blah, blah, blah.

Q. Bad business?

A. Right, if you do the Gary Greiser got 220 loans with capital assets.

Q. You said you had two meetings with Walsh Securities. Why was it that it seemed Walsh Securities were calling you all the time?

A. No. I reached out to them.

Q. So you were the one that was initiating contact with them?

A. Well, the first time they -- the first time I got called myself, I got called in the office, Bettyann called me on the appraisal and told me to come in, and then, you know, talked to D'Apolito, and then we went in a second time was just based on, like I said, finding this out from Kane that, you know, this was the real estate investment trust.

Q. So are those the only two instances in

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters
66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 304

underwrote these very weakly just like a lot of other companies, and he just pushed them a little further than most. You understand?

Now, he was in the middle of it. To say he wasn't involved in it, of course. The other thing is you got to look at it this way. Bettyann is telling you to push the appraisals. Bettyann is telling you this, telling you that. Bettyann is telling you all this stuff. Do you think she's operating in a vacuum? It's her brother for Christ sakes. It's his company. You think she's having these conversations with me and everybody and he's not talking to her brother? Come on.

Q. Do you know firsthand what she was saying to Bob Walsh?

A. I talked to him firsthand. I got it out of his mouth straight. It wasn't good. Like I said, he didn't respond like I thought he was going to respond. It was basically like, you know, it's going to be handled, gonna sell, be this, be that. Then he talked to -- Kane called him on the carpet, just wanted to tell him, not that he was going to turn them in, which you think he'd have the responsibility to do both socially, ethically and everything else, doesn't turn them in, just tells

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 305

you I want to cut you off. Why? Because I'm greedy. I want to get the $360 million.

What does he do? Greiser puts up against the wall, says I'm not paying my mortgages. So then he agrees to do more. So then he does more. Whatever he did through April, May, June, in those months, those he did with full knowledge of everybody. I don't know how many he did during those months, whatever that time was, April, March, May, June. Whatever those months, it was a long time. It was several months. Now, he knows full well he's cheating. Well, he knew he was closing with no money down. There were other companies doing it too.

Now, he knows he's right in the middle of this conspiracy. He's right in the middle of it and was in it for several months unless, like I said, on top of the fact though -- and I'm telling you I was the first person to tell him. If you're going to assume that his sister did this all in a vacuum, nobody else in the world knew about it, and she just lived with this all the time, and she said to myself I know what I'm going to do, I'm going to do all of this for my brother because I'm going to make my brother super wealthy, I want to do it

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 332

to say you only have to have a escrow letter? Now, do you see where I'm coming from where you only have to have a -- the reason you say you only have to have a -- because you're comparing yourself to competitors who are saying, no, you don't need an escrow letter. You need an escrow letter, plus copy of the check. You need escrow letter, plus copy of the check and the bank statements.

Now, some of the places would tell you they wanted just a copy of the check. Some of the places would tell you they want a check and the bank statements. So the farther -- the easier you made it for people, the better chance of you getting the business, obviously, and like I said, I mean that's what Walsh did. They -- basically, they made it easy for the appraisals. They made it easy for the escrow letters. They made the whole process very seamless.

So, really, the only thing if -- you know, if you had no money and all you had to do is get a corrupt lawyer, and, evidently, there's a lot of yous out there, by the way, and, you know, you're set with no money down, no closing costs, you've got the whole -- you can run the table. Now, if you got a couple bucks, you don't even need the lawyer now.

Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650 Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# Exhibit M

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO.
97-CV-3496 (DRD)(MAS)

WALSH SECURITIES, INC., :

Plaintiff, :

DEPOSITION OF:

-vs- : RICHARD PEPSNY, ESQ.

CRISTO PROPERTY MANAGEMENT, LTD., a/k/a G.J.L. LIMITED NATIONAL HOME FUNDING, INC.; CAPITAL ASSETS PROPERTY MANAGEMENT & INVESTMENT CO., INC.; CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C.; WILLIAM SKOWRENSKI, II; RICHARD CALANNI; RICHARD DiBENEDETTO; JAMES R. BROWN; THOMAS BRODO; ROLAND PIERSON; STANLEY YACKER, ESQ.; MICHAEL ALFIERI, ESQ.; RICHARD PEPSNY, ESQ.; ANTHONY M. CICALESE, ESQ.; LAWRENCE CUZZI; ANTHONY D'APOLITO; DAP CONSULTING, INC.; COMMONWEALTH LAND TITLE INSURANCE COM; NATIONS TITLE INSURANCE OF NEW YORK, INC.; FIDELITY NATIONAL TITLE INSURANCE CO. OF NEW YORK; COASTAL TITLE AGENCY; DONNA PEPSNY; WEICHERT REALTORS; and VECCHIO REALTY, INC., D/B/A MURPHY REALTY BETTER HOMES and GARDENS, :

Defendants. :

------------------------------

TRANSCRIPT OF TESTIMONY taken by and before HELEN DOHOGNE, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, held at the law offices of STONE & MAGNANINI, 150 John F. Kenney Parkway, Short Hills, New Jersey, on Wednesday, August 4, 2010, commencing at 10:20 a.m.

A P P E A R A N C E S:

STONE & MAGNANINI, LLP
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
(973) 218-1111
BY: ROBERT A. MAGNANINI, ESQ.
DANIEL IAN MEE, ESQ.
Attorneys for the Plaintiff

MARK W. CATANZARO, ESQ.
Blason IV - Suite 208
513 South Lenola Road
Moorestown, New Jersey 08057
(856) 235-4266
Attorneys for the Witness Richard Pepsny

McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056
(973) 622-4444
BY: DAVID R. KOTT, ESQ.
Attorneys for the Defendant
Commonwealth Land Title Insurance Co.

FOX ROTHSCHILD, LLP
75 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 992-4800
BY: LAUREN J. TALAN, ESQ.
Attorneys for the Defendants Nations Title Insurance of New York, Inc., and Fidelity National Title Insurance Co. of New York

MARTIN R. McGOWAN, ESQ.
4400 U.S. 9
Freehold, New Jersey 07728-1383
(732) 248-4200
Attorneys for the Defendant Coast Title Agency

those conversations?

A. I really don't recall that.

Q. Did you ever meet Jim Walsh?

A. No, I don't believe I ever met Jim.

Q. How about Robert Walsh?

A. I met Robert.

Q. When was that?

A. In fact, I don't know if Jim was there or not -- at one point after Kane had been funding his transactions through Walsh, I guess ultimately from Selective to Walsh, I think he arranged for a meeting with me and Bob Walsh regarding handling mortgage foreclosures for his mortgage company.

Q. Okay. And for his mortgage company, you mean Walsh Securities?

A. Walsh Securities.

Q. And so you had a meeting with -- what came of the meeting?

A. Nothing. I never ultimately represented him.

Q. Okay. And then did you ever speak with Betty Ann DeMola?

A. I think she was in that meeting. I think she was there.

Q. Who else was at that meeting, do

# Exhibit N

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA :
v. :
RICHARD DiBENEDETTO and :
ROLAND PIERSON, :
Defendants. :
-------------------------x

Criminal No. 98-427

TRANSCRIPT OF PROCEEDINGS

Newark, New Jersey
December 2, 1998

EXHIBIT
NO. DiBenedetto 1
FOR IDENTIFICATION
1-3-01
DATE
RPTR.

BEFORE:

THE HON. ALFRED M. WOLIN, U.S.D.J.

Reported by:
CHARLES P. McGUIRE, C.S.R.
Official Court Reporter

Pursuant to Section 753, Title 28, United States Code, the following transcript is certified to be an accurate record as taken stenographically in the above entitled proceedings.

CHARLES P. McGUIRE, C.S.R.

2

APPEARANCES:

ALAN LIEBMAN, Assistant U.S. Attorney,
On Behalf of the Government

BIAGIOTTI, MARINO & MONTECALLO, ESQS.,
BY: ROBERT M. BIAGIOTTI, ESQ.,
On Behalf of Defendant DiBenedetto

KAUFF & MENNA, ESQS.,
BY: PASQUALE MENNA, ESQ.,
On Behalf of Defendant Pierson

CHARLES P. McGUIRE, C.S.R.
OFFICIAL COURT REPORTER

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Permission To Enter A Plea of Guilty, there are certain blanks that have typing in them, and that's usually done either by the lawyer, the lawyer's secretary, or if it's handwritten, it's done by the lawyer.

Is that what happened in this case as far as you know?

DEFENDANT DiBENEDETTO: On what page are you referring -- yes.

THE COURT: All right. Have you had an opportunity to read where something has been typed in?

DEFENDANT DiBENEDETTO: Yes, Your Honor, I was.

THE COURT: All right. And do you accept what has been typed in as if you had written it with your own hand?

DEFENDANT DiBENEDETTO: Yes, Your Honor.

THE COURT: And it's true?

DEFENDANT DiBENEDETTO: Yes, Your Honor.

THE COURT: Going over to entry number eight, it indicates that the charge that confronts you here today and which is the subject matter of this plea is that you conspired to commit wire fraud by inflating and falsifying residential real estate appraisals; is that correct?

DEFENDANT DiBENEDETTO: Yes, Your Honor.

THE COURT: And, going over to entry number 24, you understand that for the crime that's charged in Count 1 of the indictment, by statute, you face a maximum of five years' imprisonment, a maximum fine of $250,000, and a hundred-dollar

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

assessment; is that correct?

DEFENDANT DiBENEDETTO: Yes, Your Honor.

THE COURT: Also, going over to entry number 37, where it asks whether there's a plea agreement, you indicate that this is a cooperating plea agreement, that you've agreed to testify truthfully in all proceedings, and, if you comply with that, the U.S. Attorney will notify this Court of your cooperation and move pursuant to section 5K1.1; correct?

DEFENDANT DiBENEDETTO: Yes. Yes, Your Honor.

THE COURT: Do you have any questions of either Mr. Biagiotti or the Court pertaining to this particular document?

DEFENDANT DiBENEDETTO: Not at this time, Your Honor.

THE COURT: Sir, may I infer that when you signed this document, you did so voluntarily, meaning of your own free will, --

DEFENDANT DiBENEDETTO: Yes, Your Honor.

THE COURT: -- and you did so knowingly, understanding the document and what you were doing?

DEFENDANT DiBENEDETTO: Yes, Your Honor.

THE COURT: All right.

Mr. Pierson, I want to ask you the same questions about the Application For Permission To Enter A Plea of Guilty that has been submitted on your behalf.

And on page eight of that document under today's date

FORM CSH - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

THE COURT: Did various of your reports falsely state that the properties in their current "as is" condition required no repairs?

DEFENDANT PIERSON: Yes, Your Honor.

THE COURT: Was it your understanding that a number of the appraisal reports which you prepared in this period related to properties as to which Walsh Securities was the lender?

DEFENDANT PIERSON: Yes, Your Honor.

THE COURT: Did you prepare and sign the false appraisal reports identified in overt acts 17EE through 17JJ of Count 1 of the indictment?

DEFENDANT PIERSON: Yes, Your Honor.

THE COURT: Did you do all of these acts voluntarily, knowingly, and willfully, meaning by voluntarily of your own free will, knowingly, you understood what you were doing, and willfully, you intended to bring about the result that occurred?

DEFENDANT PIERSON: Yes, Your Honor.

THE COURT: Mr. DiBenedetto, would you please rise?

Mr. DiBenedetto, why are you entering your plea of guilty here today?

DEFENDANT DiBENEDETTO: Because I'm guilty, Your Honor.

THE COURT: And Mr. Pierson?

DEFENDANT PIERSON: Because I did the acts with which I've been charged, Your Honor.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313