# Exhibit O

1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2          CIVIL NO. 97-3496

3  WALSH SECURITIES, INC.,    :

**ORIGINAL**

                        :
4          Plaintiff,   :  DEPOSITION UPON
                        :  ORAL EXAMINATION
5      -vs-             :       OF
                        :  ANTHONY J. D'APOLITO
6  CRISTO PROPERTY MANAGEMENT,  :
  LTD., et al.,           :
7                        :
          Defendants,   :
8                        :
9       -and-          :
                        :
10 COMMONWEALTH LAND TITLE    :
  INSURANCE COMPANY,       :
11                        :
      Defendant/Third Party :
      Plaintiff,      :
12                        :
13     -vs-           :
                        :
14 ROBERT WALSH and       :
  ELIZABETH ANN DE MOLA,   :
15                        :
      Third-Party      :
      Defendants.     :
16 - - - - - - - - - - - - - - -

17

18         T R A N S C R I P T  of the

19 stenographic notes of STANLEY B. RIZMAN, a Notary

20 Public and Certified Shorthand Reporter of the State

21 of New Jersey, Certificate No. XI00304, taken at

22 the offices of Boise, Schiller & Flexner, LLP,

23 150 John F. Kennedy Parkway, Short Hills, New

24 Jersey, on Wednesday, January 17, 2007, commencing

25 at 9:45 a.m.



**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

2

```
1   A p p e a r a n c e s :

2   BOIES, SCHILLER & FLEXNER, LLP
    150 John F. Kennedy Parkway
3   Short Hills, New Jersey  07078
    BY:  ROBERT A. MAGNANINI, ESQ., and
4        AMY WALKER WAGNER, ESQ.
    For the Plaintiff

5
    MC CARTER & ENGLISH, LLP
6   Four Gateway Center
    Newark, New Jersey  07102-0652
7   BY:  DAVID R. KOTT, ESQ.
    For Commonwealth Land Title Insurance Company

8
    FOX, ROTHSCHILD, O'BRIEN & FRANKEL, ESQS.
9   2000 Market Street
    Philadelphia, Pennsylvania  12103
10  BY:  EDWARD J. HAYES, ESQ.
    For Nations Title Insurance and
11       Fidelity National Title Insurance

12  METHFESSEL & WERBEL, ESQS.
    Three Ethel Road
13  Suite 300
    Edison, New Jersey  08818
14  BY:  MARTIN R. MC GOWAN, ESQ.
    For Coastal Title Agency

15

16

17

18

19

20

21

22

23

24

25
```



**Rizman Rappaport Dillon&Rose, LLC** Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

51

1    Who knows?  Maybe you can get make a deal with Rob.

2                 They sat down and they talked.

3                 It ended up being that Skowrenski was

4    getting paid from Kane a half a point out of the

5    proceeds on every loan besides what Skowrenski made

6    on the loans.

7         Q       Explain what that means.

8         A       If there was a $100,000 loan, he was

9    getting $500.  If it was a $200,000 loan he would

10   get paid cash a thousand dollars.  However amount of

11   loans -- he would do all the paperwork and

12   everything would come in from Kane.  Then Rob would

13   take all the paperwork and put it all together in

14   the package the way it needed to be.

15        Q       To go to Walsh?

16        A       To go to Walsh.  He would either FedEx

17   them.  Or if I was heading up there that day, he

18   would give them to me and I would bring up the loans

19   and give them to Kellie O'Neill, who was the

20   processor for National Home Funding working for

21   Walsh.  They had processors and they had

22   underwriters.  So the processors worked directly

23   with the mortgage companies telling them what

24   paperwork they had, what paperwork they needed, what

25   was missing or if it was a full package and it went



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

52

1   to Underwriting.

2           Q       I think you had said -- but you correct

3   me if I'm wrong -- that Skowrenski was paid in cash

4   a half a point for any loans that Kane brought to

5   him?

6           A       Yeah.

7           Q       Is there something not kosher about

8   that?

9           A       I mean -- ethically?

10          Q       Yes.

11          A       Yes.  But, you know, is it against the

12  law to pay somebody to give them -- that is doing

13  your loans?

14                  No.  Knowing what was going on, yeah,

15  it was unethical.

16          Q       Why do you say that?

17          A       Because those loans were coming

18  through.  He was paying an extra fee.

19                  To me -- excuse the phrase, but there

20  is a nigger in the wood pile.  You don't do that.

21                  I would say something.  They would say:

22  What do you care?  We're giving you $500 a loan to

23  go carry them up there.

24                  I said, "You know what?  You're right.

25  I'm starting the corporation.  I want you to pay



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

53

1    that.  Because I'm going to make it legal.  At least

2    the money will be legal.  If you want to pay me $500

3    to carry a loan up, there is nothing wrong with

4    that."

5              At least, that is how I looked at it.

6    But I went away for two years for doing that.

7         Q     Why would Mr. Kane pay Mr. Skowrenski

8    an extra half point that presumably he would not

9    need to pay to Selective?

10        A     Because he was making up leases.

11   People didn't live in those houses.  He just made

12   them up and gave it to them.  It was a complete

13   fraud.

14        Q     Was Skowrenski aware it was complete

15   fraud?

16        A     Without a doubt.

17        Q     Why do you say that?

18        A     I was there.  He knew it.

19              I never said anything to the government

20   when they questioned me because I thought he was my

21   friend, but he buried me.

22              MR. MC GOWAN:  In other words, what

23   you're saying is this $500 extra that Skowrenski got

24   from Kane was basically payment for services

25   rendered by Skowrenski in phonying up the leases,


**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

58

1        MR. MAGNANINI:  You mean at the time

2   the loans were made, David?

3        A       Put it this way.

4              You would have him on top as the

5   corporation but he never had any decision on what

6   was being done with the loans.  It all went through

7   either Paul or Betty Ann.  A lot of these loans

8   Betty Ann would just go and sign off on.

9        Q       Was Betty Ann an underwriter?

10       A       No.  She was a salesperson.  She looked

11  at it from the sales aspect.  But because, you know,

12  she was who she was, you know.

13             As long as she signed off on it, then

14  it was fine because she was Betty Ann DeMola,

15  Robert's sister.  She wouldn't even tell Robert any

16  of the stuff.  She would just do it on her own.

17       Q       Did you mean in your last answer that

18  because Betty Ann DeMola was the sister of the

19  President of the company, that if she wanted to do

20  something the other employees would not complain

21  about it?

22       A       Yeah.  They wouldn't question her at

23  all.

24       Q       In one of your answers you said -- I'm

25  going to paraphrase.  This is not an exact phrase,



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

59

1          "Betty Ann knew what was going on."

2    What do you mean by that?

3          A      I told her.  I told Betty Ann.  Listen,

4    I live down the Shore.  These properties aren't

5    worth what they're worth.  They're not worth --

6    they're not worth as much as what they're saying

7    they're worth.  The appraisals are wrong.  You got

8    to look into this.

9                And she told me to shut up.  She didn't

10   care.

11               So I did.  I figured I told her.  She

12   would never tell her brothers.  You know, that is

13   how she was.

14         Q      Did you also tell Betty Ann that there

15   were phony leases and phony paperwork in connection

16   with the loans?

17         A      Betty Ann knew everything.  She met

18   with Bill Kane without me.

19         Q      In lawsuits we sometimes need to know

20   what you know and how you know it.

21         A      Do I know?

22               Yes.

23               Can I prove it all?

24               Probably not.

25         Q      Did Betty Ann know about the leases,



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

60

1   the phony leases?

2        A       I believe she did.

3        Q       How do you know that Betty Ann knew

4   about the phony leases?

5        A       We talked about it.

6        Q       Okay.

7        A       She used to say "Just get the leases."

8        Q       Did Betty Ann know that other paperwork

9   in connection with the loans we're talking in this

10  case was false or fraudulent?

11       A       She knew about the escrow letters.

12       Q       She knew they were false and

13  fraudulent?

14       A       She didn't care.  Yes.

15       Q       Do you know that Betty Ann knew that

16  the escrow letters were false or fraudulent because

17  you and Betty Ann talked about it?

18       A       Because her and Bill Kane talked about

19  it and I was present.

20       Q       You heard her talk about it?

21       A       Yes.

22       Q       Some of these loans, as I understand

23  the transactions, Cristo would purchase the loans

24  and then sell them -- I'm sorry.

25       A       Purchase the house.


**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

61

1          Q          Cristo would purchase the house and

2     then sell the house to somebody who had a joint

3     venture agreement with Capital Assets and

4     immediately assigned the property to Capital Assets?

5          A          You want me to explain the whole

6     process?

7          Q          Yes.  While you explain it, then I'm

8     going to ask you whether Betty Ann DeMola was aware

9     of that.

10         A          All right.

11                    First, the answer to that question is

12    yes.  Betty Ann knew exactly what was happening.

13         Q          Okay.

14         A          Cristo Property Management would buy a

15    property -- go in contract to buy it.

16                    In turn, they would buy it real cheap,

17    sell it to -- they wouldn't sell it.  What they

18    would do is they would find investors that Capital

19    Assets had found with excellent credit and they

20    would -- you're allowed to have up to four

21    mortgages.  So they would get somebody and pay them

22    $2,000 per mortgage.  So they would get $8,000 to

23    sign the mortgage papers and be responsible.

24                    These people were fully aware of

25    everything that was going on.  They knew they were



**Rizman Rappaport Dillon&Rose, LLC**  Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

62

1    just signing the houses.  Cristo would buy them.

2    Sell them to these people.

3            These people, in turn, would assign the

4    deed for a dollar to Capital Assets for them to

5    maintain the property.

6            Basically, they were as you would call

7    "straw buyers."  But they knew -- the people knew

8    what was going on, they were well aware of it.  They

9    wanted their money.  They knew they were just

10   selling their credit for money.  Basically, Capital

11   Assets would then manage the property, rent them

12   out, make the mortgage payments and do everything.

13       Q       What you just described, was Betty Ann

14   DeMola aware of that?

15       A       Yes.

16       Q       Was she aware of that because you and

17   she had discussed it?

18       A       She was aware of it because I was

19   present when her and Billy Kane had discussed it.

20       Q       Were these discussions before all of

21   this became public in the newspaper?

22       A       Yes.  Basically, what would happen is

23   if Bill Kane bought a house, say, for 40,000 just to

24   use an example, sold it to this person, here, for

25   100,000, he would pay an appraiser $1500, which was



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

63

1    more than what an appraiser on a single-family would

2    chose to appraise the property for 100,000.

3                Now, in the beginning the properties

4    were worth it and they were fixed up and done.  But

5    what happened was they got greedy.  They wanted to

6    close 30 houses a month.  Well, you can't get all

7    those houses fixed up in time.  They were fixing up

8    the front and fixing up the back.

9                Betty Ann got it clear they wouldn't

10   have to take individual -- pictures of the interior.

11   So they didn't know if people lived there or not.

12   That was it.

13               So they got a house that is worth 100

14   but the sides and the inside were gutted.  Then they

15   would take that money.  He would get his 40.  They

16   had $40,000 left.  They would give you 2,000 for

17   that mortgage that you took out and the rest of the

18   money would go into fixing up the house.

19               But what happened was when she started

20   doing so many, they were running out of money and

21   the mortgage payments at that time were on like all

22   those properties like $250,000 a month.  After a

23   while it's going to all come crumbling down.

24        Q     What incentive would Betty Ann DeMola

25   have to be aware this was going on and allow it to



**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

64

1  go on?

2      A      She was getting pressure from Robert, I

3  believe, you know, just like in any sales company.

4  You got to have the numbers.  You got to have the

5  numbers.  You got to get the numbers.  Betty Ann was

6  getting numbers.  She didn't care how she would get

7  them.  Didn't think anything of it.  Thinking

8  anything would ever go wrong.  But, you know, it

9  did.

10      Q      At the time the straw borrowers or

11  straw purchasers were allowing their credit to be

12  used, did you think that was improper?

13      A      Did I think it was improper?  No.

14  Because there is investors all the time.  Then there

15  is management companies.

16            I mean, then you also have rights where

17  they put them on the Stock Exchange.  Basically,

18  that part of it is not, I believe, illegal.  They

19  weren't saying they were owner occupied.  They were

20  saying they were investment properties, REITs.  Part

21  of it is not bad.

22            To pay somebody for it?  You know, to

23  me, I don't think it is bad.  To you, you may not

24  think it is.  But, you know, you may.

25            If somebody came to you and said:



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

68

1    just sit -- Betty Ann would say, "Use that phone

2    there."

3                I think he even may have used the phone

4    in Betty Ann's office once.

5        Q      Why would Kane bring up loans on his

6    own as opposed to them coming through National Home

7    Funding?

8        A      He wanted to get them done quick.

9    That's what I was telling you before.  Greed.  They

10   just wanted to keep closing loans.

11               "I need the money.  I need the money."

12       Q      Did Kane, to your knowledge, ever meet

13   with Jim Walsh?

14       A      Did they meet in a meeting?

15               I believe that one time when Billy came

16   up and Gary came up, we were in a conference room

17   with Betty Ann and Paul Del Rosso -- they were

18   talking.  Robert came in but basically came in to

19   meet the people that would send him loans and walked

20   out.

21               Jimmy was in there brief.  Maybe 10 or

22   15 minutes.  But other than that, not that I'm aware

23   of.

24       Q      What was the purpose of the meeting you

25   just described?



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

69

1      A      Betty Ann wanted them to come up
2  because I think she felt the heat.  The shit was
3  going to hit the fan.  Because when both brothers
4  were out, I remember her saying something about I
5  think that the investor was going to come down and
6  start looking at some of the properties.  So she
7  told them to go buy cheap blinds and put them up in
8  the windows and make the houses look like they're
9  lived in.
10     Q      The investor you're talking about, is
11 that Greenwich Capital?
12     A      Yes.
13     Q      Was the purpose of the meeting that
14 Betty Ann had with Kane and with Grieser to talk
15 about Greenwich Capital coming down to look at some
16 of the houses?
17     A      Yes.
18     Q      At that meeting were you present?
19     A      Yes.
20     Q      Did Betty Ann instruct Grieser or Kane
21 or both to have the houses looked lived in when they
22 weren't, in fact, lived in?
23     A      Yes.
24     Q      Was the point of that so that way the
25 investor, which was Greenwich Capital, would think



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

70

1  that the houses were lived in when, in fact, they

2  were not lived in?

3      A     Yes.  They were doing a ride-by.  They

4  weren't knocking on doors.  They were just riding

5  by.

6      Q     Wasn't that conduct by Betty Ann

7  improper?

8      A     Oh, yes.  Definitely.

9      Q     Wasn't it fraudulent?

10     A     Without a doubt.

11           MR. MAGNANINI:  I object to the form.

12     Q     That is one meeting that Kane had with

13  Betty Ann.  Are you aware of other meetings Kane had

14  with Betty Ann?

15     A     There were other meetings, but I wasn't

16  present.  They have gone to lunch.

17     Q     Do you know the subject of the

18  meetings?

19     A     No.

20     Q     Are you aware of any other meetings

21  that Gary Grieser had with Betty Ann?

22     A     No.  Billy was more the guy that would

23  meet with her.

24           There was one time I went to Cristo

25  Property because they had loan documents ready to be


**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito – direct

74

1   "If he doesn't make his payment" -- I passed the

2   word on.  "You do not make your payment, she's not

3   doing it."

4                He said, "I'm not doing it, then, if

5   you'll not close any loans."

6        Q       Did Grieser or Kane tell Betty Ann in

7   this meeting if Walsh stopped funding then -- that

8   is, stopped making the mortgage loans -- she would

9   stop making mortgage payments?

10       A       Grieser told Betty Ann.

11       Q       What did Betty Ann say?

12       A       She panicked.  She said, I'll take care

13  of it.  I'll take care of it.  We can still do

14  loans.  Give me to the end of the day."

15               That is when she told them to make the

16  houses look livable.  Then, I guess, she sweet

17  talked Robert and, I guess, she lied to them and

18  said they'll make the payments.

19               I guess like another five loans went

20  through.  They were happy, pacified and the payment

21  came up.

22       Q       After the meeting that you described,

23  Walsh, with the approval of Robert Walsh, funded

24  five more loans to what I'll call "Kane-Grieser"?

25       A       Yes.  Because a payment was coming or


**Rizman**
**Rappaport**
**Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

80

1     Q     With respect to the loans we're talking

2  about in this case.  Was Anna the underwriter?

3     A     Yes.

4     Q     What is Anna's last name?

5     A     I have no idea.  I don't remember.

6     Q     Did Anna -- withdrawn.

7           Are you aware of a company called

8  Resource Bankshares, a South Carolina company that

9  was going to take over?

10    A     That was going to take over our

11 company?

12          Yes.

13    Q     Was that going on while you were still

14 employed by Walsh?

15    A     Oh, yeah.  As a matter of fact, I got,

16 as being their top salesman -- Paul Del Rosso.  I

17 guess Betty Ann put the word in for us.

18          It was Betty Ann, Paul Del Rosso,

19 myself and I believe Betty Ann's two-son-in laws,

20 who were the other two sales reps.  We were getting

21 shares in the stock.  I never got them.  We were

22 supposed to get -- when it went through, we were

23 supposed to get -- I was getting $150,000 in shares,

24 then another $300,000 in stock options.  But I never

25 received them.  I got fired.



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

81

1      Q      Was Betty Ann also getting those?

2      A      I believe she was probably getting

3   more.

4      Q      Why would you, as an employee of Walsh,

5   get that kind of compensation as a result of the

6   Resource acquisition?

7      A      I believe Betty Ann was giving me that.

8   She's the one that got it.  Because I was the top

9   sales rep that they had and also because she

10   probably wanted me to keep quiet.

11              MR. KOTT:  We'll take a break.

12              (Recess.)

13   BY MR. KOTT:

14      Q      Mr. D'Apolito, at some point the fraud

15   became public in the newspapers, is that correct?

16      A      Yes.

17      Q      Do you know whether Robert Walsh had

18   any knowledge of the frauds before it became public

19   in the newspaper?

20      A      No.

21      Q      How about Jim Walsh?

22      A      No.

23      Q      In this lawsuit Walsh Securities has

24   sued a number of appraisers.  Some of the ones they

25   have sued are Richard Calanni, Tom Brodo, Roland



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

83

1       A       I believe it is correct; that the

2  appraisers were making fraudulent appraisals.

3       Q       In what way were the appraisers making

4  fraudulent appraisals?

5       A       When they went to take a picture of the

6  house they knew it wasn't complete, but yet they

7  were putting in their appraisal that it was.

8       Q       Were you aware of that at the time you

9  were employed at Walsh?

10      A       Yeah.  I was aware of it.

11      Q       Was Betty Ann DeMola aware that the

12 appraisers were putting in false appraisals for the

13 loans that we're talking about in this lawsuit?

14      A       Yes.

15      Q       How was she aware of that?

16      A       She met with them.  Even in Walsh.

17 Told them what to do.

18      Q       Were you present when that occurred?

19      A       Once.

20      Q       Tell me what you heard her tell --

21 withdrawn.

22              Tell me what you heard Betty Ann DeMola

23 tell the appraisers to do.

24      A       She told them not to take any interior

25 photos because she knew she got it approved, that



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

84

1  they didn't need them.  We didn't care what the

2  inside looked like.  If there is any work that had

3  to be done, don't mention it.

4       Q       Did she explain to them why she was

5  telling them that?

6       A       So far as I know, no.

7               MR. KOTT:  Off the record.

8               (Discussion off the record.)

9  BY MR. KOTT:

10      Q       Do you remember which appraisers were

11 present when you overheard Betty Ann DeMola told

12 that to them?

13      A       Yeah.  I believe it was DiBenedetto and

14 Brody -- Brodo.

15      Q       Putting aside --

16      A       In two separate occasions.  They

17 weren't together.

18      Q       You actually told that to appraisers on

19 two different occasions?

20      A       Yes.

21      Q       Putting aside what you heard Betty Ann

22 DeMola tell appraisers, did you and Betty Ann DeMola

23 ever discuss the appraisals being phony?

24      A       I told her, when I explained before,

25 about the properties not being worth what they were.



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

89

1     Q     What was Citiscape?

2     A     I believe they were just another

3 investor.

4     Q     Meaning that they would be assigned

5 mortgages by Walsh?

6     A     Yeah.

7     Q     Do you know anything about the

8 Citiscape versus Walsh lawsuit?

9     A     No.

10     Q     Did Walsh have other loans other than

11 the ones involved in this lawsuit that went into

12 default?

13     A     I'm sure they had loans that have gone

14 into default.  Any banker would.  Which ones?  I

15 have no idea.

16     Q     Do you know whether the underwriting

17 standards -- withdrawn.  Did Walsh have underwriting

18 standards?

19     A     Yes.

20     Q     Do you know whether the underwriting

21 standards were applied -- withdrawn.

22     Do you know whether the underwriting

23 standards were applied to these loans, the loans in

24 this lawsuit?

25     A     I have no idea.  But I can tell you



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

90

1   that the underwriting guidelines were designed by

2   Paul Del Rosso and Betty Ann would change them

3   whenever she wanted to make whatever loan she needed

4   to get done fit.

5         Q      Are you including loans within this

6   case?

7         A      Within this case or any case.

8         Q      So Betty Ann would not only change

9   underwriting standards to have a loan get done for

10  the loans in this case but she would do that for

11  loans that were not involved in this lawsuit, is

12  that correct?

13        A      Correct.

14        Q      Why would she do that?  Do you know?

15        A      Betty Ann was in sales.  She wanted

16  numbers.  If she could make a loan she wasn't going

17  to not make it.  She would do whatever it took to

18  get a loan done.

19               You know, if a guy said -- the

20  guidelines read they needed three pay stubs but the

21  guy only had one, they wouldn't make the loan wait

22  until we got paid another month.  He got paid every

23  week.  She would get it done with just the one pay

24  stub.  Whatever it was.  You know.

25               A loan came in and they said they


Rizman
Rappaport
Dillon&Rose,LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

91

1 needed $3,000 to fix a bathroom, well, instead of

2 waiting to get the bathroom fixed, maybe she'd

3 escrow $1500 or 3,000, if the money was there.  Like

4 up the loan a little bit and escrow the money and

5 then release it when the work was done.  She would

6 do whatever she had to do to make a loan.

7        Q        Did Walsh ever close loans or allow

8 loans to be closed before an appraisal was done?

9        A        Betty Ann did.

10       Q        Why would she have done that?

11       A        Because they were Billy's loans.

12       Q        Was that in violation of Walsh's

13 procedures?

14       A        Without a doubt.  She overrode Paul

15 Del Rosso.  I mean, I mean asked.

16                I said, "How are you closing this if

17 you don't even know?"

18                She goes --

19       Q        Don't even know the appraised value?

20       A        She said "Well, I got a verbal."

21                I said, "But what about the condition

22 of the house?

23                "Don't worry about it.

24                "Okay."

25                I mean, to me it didn't matter because


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

93

1   to either remove from files for put them in.  Do you

2   remember anything about that?

3        A     Yeah.  I remember Kellie telling me.

4        Q     Were you present when the file

5   cleansing occurred?

6        A     No.

7        Q     What did Kellie Ann tell you about it?

8        A     Kellie Ann called me and said, "Let's

9   go to lunch."

10             I said, "Sure.

11             "Something's going down, something is

12   wrong because they're coming down to look at files."

13             I said, "Who?

14             "Greenwich."

15             And Betty Ann just told us to cleanse

16   the files.

17             I said, "What do you mean by "cleanse"

18   them?

19             "Take stuff out that shouldn't be there

20   and needed stuff to be there that wasn't."

21        Q     What were examples of what needed to be

22   there?

23        A     If there were escrow letters that we

24   needed.  Files that she closed without appraisals.

25   The appraisals had to be there by the time they got



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

94

1    there.

2            So Kellie was calling up the appraisers

3    letting them know.

4        Q      Asking the appraisers to send the

5    appraisal?

6        A      We needed.

7        Q      Kellie would call the appraisers and

8    ask the appraisers to send appraisals for loans that

9    had already been closed?

10       A      Yes.

11       Q      Did Kellie tell you that Betty Ann was

12   aware of that?

13       A      Yeah.   Betty Ann instructed her to do

14   it.

15              I also believe Paul Del Rosso knew.

16       Q      Why do you believe that?

17       A      Because he was in there doing the

18   cleansing.

19       Q      How do you know that?

20       A      I mean, I was at the office but I

21   wasn't in the conference room.

22       Q      You saw Mr. Del Rosso in there?

23       A      Yeah.

24       Q      Can you think of any legitimate reason

25   to take papers out of mortgage files or put them in



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

97

1        Do you remember telling Judge Wolin

2   that?

3        A       I remember that.  Was it fraudulent?

4   It was fraudulent in the case that I figured -- I

5   was present.  I saw the people sign the documents,

6   but I thought as a Notary it was a conflict of

7   interest for me to sign it as Anthony D'Apolito

8   because I worked for Walsh.

9             So Gary gave me -- his wife was a

10  Notary and Sue wasn't there.  It's his ex-wife now.

11            I took it and signed her name and

12  stamped it.

13       Q      Was Betty Ann DeMola aware of that;

14  that you were doing that?

15       A       I only did it on five loans.  Did I

16  tell her?  No.

17       Q      In your plea before Judge Wolin you

18  told Judge Wolin that Betty Ann DeMola directed

19  underwriters to overlook suspicious loan application

20  documents such as pay stubs and IRS forms, W-2?

21       A      Yes.

22       Q      Was that before the fraud was made

23  public?

24       A      Yes.

25       Q      Did Betty Ann tell you why you should



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

98

1  overlook that?

2      A      Not me overlook it.  The underwriters

3  overlook it.

4      Q      I see you're correct.

5             Did Betty Ann say to the underwriters

6  why they should overlook loan application documents

7  that look suspicious?

8      A      She didn't have to.  She was Betty Ann.

9  She can tell them whatever and they would just do

10 it.

11     Q      Explain or give me an example how a pay

12 stub would look suspicious.

13     A      If the pay stub looked as if it didn't

14 match what the income needed to be, she would change

15 the loan to a stated income and tell her to overlook

16 the pay stub and get rid of it.

17     Q      When you say "stated income," what does

18 that mean?

19     A      Like that no-income verification loan.

20 She would pull that out and that was it.

21     Q      The same thing as to the W-2 forms?

22     A      Yes.  Because you wouldn't need them.

23     Q      One of the witnesses in depositions

24 talked about at the National Home Funding office

25 cash payments being made to borrowers.  Are you



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

99

1  aware of that?

2       A      If the borrowers happened to be there,

3  maybe Robbie brought them in.  But cash payments

4  were made to every borrower.  Everyone got $2,000 in

5  cash.

6       Q      Was that payment made by Skowrenski?

7       A      At that point it might have been.  The

8  money came from Billy Kane.  But if they were

9  friends of Robbie, you know, that he brought them

10  in, yeah, the money would have got transferred to

11  them from Robbie.

12       Q      You were in National Home Funding's

13  offices a lot during these events, correct?

14              MR. MAGNANINI:   Objection to form.

15       Q      I'll withdraw the question.

16              During the time you were employed by

17  Walsh, did you have visits to National Home

18  Funding's office?

19       A      Yes.

20       Q      Was that on a frequent basis?

21       A      Yes.  But it wasn't just for business.

22  I was -- you know, like I said, Robbie was going to

23  be my best man.  We would go there if I wasn't

24  working.  Or if I took the day off to go golfing, I

25  would show up afterwards.  Robbie and I would go out



**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

102

1  DIRECT EXAMINATION

2  BY MR. HAYES:

3      Q     Mr. D'Apolito, who masterminded or

4  created this scheme?

5      A     Billy.  Billy Kane.

6      Q     Do you believe they were using this

7  scheme with other lenders or just with Walsh?

8      A     I mean, I believe they were going

9  through Selective, first, with the scheme and were

10  getting loans through, but not as quick as Walsh or

11  Betty Ann was letting them go through.  So then it

12  all went in through Betty Ann.

13      Q     You indicated -- in response to a

14  question Mr. Kott asked you, you had raised with

15  Betty Ann your concern, being from the area, that

16  the appraisals that had come in were not proper.  Is

17  that correct?

18      A     Yes.

19      Q     And that her comment to you was,

20  basically, shut up?

21      A     Yes.

22      Q     Did you conclude in your mind from that

23  that she was already aware that there were problems

24  with the appraisals and just didn't want to hear it

25  from you?



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

103

1    A    Yes.

2    Q    Did you come to learn at some point in

3    time how she became aware that the appraisals were

4    fraudulent?

5    A    No.  I mean, it would be assumed

6    that -- because she's met with Billy Kane down in

7    his office -- him up in our office more than once,

8    more than a half a dozen times, and met in Betty

9    Ann's office with the doors closed.  That's how she

10   would know.

11   Q    Do you believe she was aware of the

12   fraud before you were aware of it?

13   A    That I couldn't tell.

14   Q    Since you were an employee at Walsh,

15   would it be fair to say you were familiar with both

16   the manner in which loans were processed as well as

17   underwritten?

18   A    Yes.

19   Q    Kellie O'Neill was the processor on all

20   of the bad loans?

21   A    Yes.

22   Q    To summarize what she would do, would

23   she basically put a package of documents together

24   that would have been necessary in order to make an

25   underwriting decision on the loan?


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

104

1          A          Yes.  Basically, what she would do

2     is -- the package would already be put together

3     because every banker or broker that we dealt with

4     had to process the loans to our guidelines.

5                    Basically, her job was to look at it

6     and go through to make sure everything was there.

7     If there was a document missing or one document that

8     didn't get signed, she would call the broker or the

9     banker up and tell him that:  We're missing this

10    document or we have this document and it's not

11    signed; you're going to have to get it signed.

12                    And until then, you know, she would

13    say:  Well, you -- I'll send it into Underwriting.

14    If that's all it is after the underwriter checks it,

15    we'll give you a commitment on condition that you

16    get this document to us, this, this and this, prior

17    to us scheduling the closing.

18         Q          In the fraudulent loans the package was

19    actually put together by Skowrenski or Kane?

20         A          Yes.

21         Q          Once they believed it met what Walsh

22    needed, they would forward it on to Kellie O'Neill?

23         A          Yes.

24         Q          She would check through the package to

25    make sure it met whatever standards existed?

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

105

1      A      Yes.

2      Q      How would she know what the standards

3  were if Betty Ann DeMola was changing them all the

4  time?

5      A      Betty Ann had what the standards were.

6  If she changed it, then there was a memo that went

7  out that said:  From now on we can do loans like

8  this, this, and this.  That's it.

9              Once it changed, that was it.  Unless

10  she changed it again.  If there was one that didn't

11  meet the guidelines, they would send it to Betty

12  Ann.  Betty Ann would put the signature on it and

13  that was it.  It was passed.  There were still

14  guidelines they were all going by, but she would

15  make exceptions.

16      Q      That was my question.

17              Was she changing the guidelines or was

18  she simply saying although this loan doesn't meet

19  the guidelines --

20      A      She would make exceptions on all of

21  them.

22      Q      When a loan would go from Kellie

23  O'Neill to -- I believe the woman's name was Anna?

24      A      Yes.

25      Q      The underwriter.  What would she be



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

106

1    looking for?

2        A      Just make sure all those documents are

3    there.  She was the underwriter.  She was the only

4    one that had the approval based on the guidelines to

5    print out a commitment and sign it and send it.

6    She'd give it back to Kellie to fax out to the

7    mortgage banker or broker.

8        Q      What documentation existed at Walsh to

9    signify that Anna had approved a package as

10   satisfactory?  Was there a checklist?

11       A      In the computer.  There are underwriter

12   guidelines.  A big, huge book.

13       Q      I understand that.  Was there, for

14   example, a form that said I have reviewed The Loan

15   No. 1, 2, 3 and approve it with a signature by Anna?

16       A      Yes.

17       Q      So one of those should be in every

18   Walsh loan file?

19       A      I would imagine that they are, yes.  If

20   not that loan file, in a master file for just the

21   underwriting.  If it didn't have Anna's signature on

22   it, it would have Betty Ann's and Anna's.  Meaning

23   Betty Ann signed off on it.

24       Q      That was my next question.

25              Did Betty Ann have the authority, as


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

107

1    you understood it, to approve loans from an

2    underwriting standpoint?

3         A       I would have to say yes.

4         Q       Is that because she did?

5         A       Yeah.

6         Q       Do you know whether or not Robert or

7    James Walsh were aware that Betty Ann was actually

8    approving loans from an underwriting standpoint?

9         A       No.

10        Q       Once the loan was signed off by someone

11   in Underwriting, they would print out a commitment

12   letter?

13        A       Yes.

14        Q       The commitment letter would set forth

15   the terms and conditions under which Walsh would

16   make the loan?

17        A       Yes.

18        Q       At that time would Walsh have any idea

19   where it was ultimately going to dispose of that

20   loan?

21        A       No.  Like I had said earlier, basically

22   they would take -- after they had 40 million, 10

23   million, whatever, in loans, be it these loans or

24   all the loans, you know, they mixed all the loans

25   together, what they closed in a month, and they put



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

112

1       A       I believe they had a few.

2               What they did was they ordered the desk

3       review that Brodo did.   They ordered the desk review

4       from Benedetto or from Brown.

5       Q       Who did?

6       A       Betty Ann.   She would tell them who to

7       use.   "If you're going to use it, why not use the

8       one that is involved in the appraisal as it is?"

9               I think that's how Roland Pierson

10      actually got involved because he would do review

11      work for Richie Calanni.

12      Q       There has been some testimony in this

13      case from other witnesses that Betty Ann instructed

14      the appraisers to use prior deals that Walsh had

15      closed for purposes of picking comparables for new

16      appraisals.   In essence, you create your own

17      fraudulent market and then use that market to

18      support subsequent comparables.   Do you have any

19      knowledge or were you involved --

20      A       Yes.

21      Q       Let me finish my question.

22              Were you involved in any conversations

23      where Betty Ann instructed the appraisers as to

24      which comparables to use?

25      A       Yes.



**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

113

1        Q        Go ahead.

2        A        Was it ones from this case to comp out

3   the ones from this case?

4                 In some cases, yeah.  But in other

5   cases, I mean, you could do that legally.  Have a

6   file and take a comp from Short Hills to comp out

7   another house in Short Hills.

8                 In a lot of cases that she needed desk

9   review and they couldn't get it to match up, they

10  would take it from another appraisal that was from

11  Asbury Park, which was a fraudulent deal, to comp it

12  out.

13       Q        You indicated that at some point in

14  time Betty Ann got approval but you didn't need

15  interior pictures on appraisals.

16                MR. KOTT:  Got approval or gave

17  approval?

18       Q        I thought you said "got approval."

19                That was going to be my question.  Who

20  did she get approval from or did she simply give the

21  approval that you didn't need them any more?

22       A        To tell you the truth, she would

23  probably -- she couldn't just give it.  She would

24  have to get it.

25                Do I have knowledge how she got it?



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

115

1          Even though they will give licenses to

2    anybody like James Brown, who was in jail for a year

3    before he got his license.

4          Q      Were the NHF loans treated differently

5    than other loans at Walsh?

6               MR. MAGNANINI:   Objection to form.

7          A      Were they treated any differently?

8    They were written to the guidelines that Betty Ann

9    created if she needed to make exceptions.  But Betty

10   Ann would make exceptions on any loan.  The only

11   thing that was different about them is Betty Ann

12   knew about them.  But as far as being treated any

13   different, I don't think they were treated

14   different.

15         Q      So you are aware of circumstances where

16   Betty Ann changed the guidelines on non-Kane NHF

17   loans, also, just to get the loans in and done?

18         A      Oh, yeah.

19         Q      Were other loans being closed as

20   quickly as the NHF loans were being closed?

21         A      I would have to say no.  Only because

22   any time an NHF loan came in it also got risen to

23   the top, the cream.

24         Q      What was the typical -- strike that.

25               Was there a normal time period that it



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

117

1          A F T E R N O O N     S E S S I O N

2

3    A N T H O N Y     J.     D ' A P O L I T O,

4    resumes.

5    BY MR. HAYES:

6          Q      Mr. D'Apolito, on the non-NHF or the

7    non fraud loans, was there an average turnaround

8    time for a loan coming in and then being closed at

9    Walsh?

10         A      Three to five days.

11         Q      Was the time period any different for

12   the NHF loans?

13         A      More on the lower side.  Three.  Toward

14   the end of the month any loan could close in a day.

15   She needed to make her numbers and she would do it.

16   All processed, underwritten and closed in one day.

17         Q      When you first became employed by

18   Walsh, approximately what volume of business was the

19   company doing a month?

20         A      I mean, just in the Jersey accounts.

21   Between the three reps there, four reps that they

22   had, probably maybe like 15 million.  But they did

23   operate in other states that, you know, we wouldn't

24   have.

25         Q      Let's talk about the Jersey accounts.


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1    that package, also?

2        A      Everything is all the same. The only

3    difference between the purchase and the re-fi is on

4    the purchase you'll have a purchase contract in

5    there. But all the appraisals are there and

6    everything.

7        Q      Who at Walsh would review a package on

8    a refinance after it closes in order to approve the

9    funds?

10       A      The Closing Department.

11       Q      Who would that be?

12       A      I don't remember their names. It was

13    three women that sat outside of Paul Del Rosso's

14    office.

15       Q      Who would actually authorize the

16    funding on a refinance?

17       A      They would.

18       Q      They had the authority to do that?

19       A      Yeah. If everything was there, they

20    knew what they needed, they would authorize it. If

21    they authorized something and there was stuff

22    missing, they would lose their job.

23       Q      What, if any, involvement did Ms.

24    DeMola have in the Closing Department?

25       A      She would go there and have a loan


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

123

1    funded if, for some reason, something was missing,

2    just say "Get it to me right away."  Because she

3    needed to fund it for her numbers.

4         Q      Are you aware, Mr. D'Apolito, that the

5    types of transactions that were involved in this

6    case were oft times referred to as a AB

7    transactions?

8         A      Are you saying because of the straw

9    buyers where they were having two closings at the

10   same time?

11        Q      Yes.

12        A      Yes.

13        Q      There is an allegation that has been

14   made by Walsh in this case that there were occasions

15   where the B transaction actually closed before the A

16   transaction.  Are you aware of occasions on which

17   that happened?

18        A      Sure.

19        Q      How regularly did that happen?

20        A      A lot.

21        Q      Was Ms. DeMola aware that the B

22   transactions were closing before the A transactions?

23        A      I couldn't tell you if she was or not.

24   I would have to assume she was.

25        Q      What would you base that assumption on?


**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

125

1    houses.  Get them rented and get them going because

2    he wanted to actually keep it all legit.

3                The understanding for the whole thing

4    was they really were going to try to do it and be

5    legitimate, per se, but he just got greedy.  They

6    loved the money coming in.

7        Q      At some point in time the repairs were

8    not being done?

9        A      They couldn't be kept up with.  Thirty

10   houses a month.  There is no way you can get 30

11   houses fixed up in a short amount of time.

12       Q      How did you become aware the repairs

13   were not being performed?

14       A      I was there.  I knew it all.  I was

15   involved with all of them.

16       Q      Was Ms. DeMola aware that the homes

17   were not being fixed up?

18       A      Without a doubt.  Especially her

19   saying, "Go and put blinds on them."

20       Q      Did that happen on more than one

21   occasion?

22       A      To put the blinds on them?

23       Q      Yes.

24       A      It happened on more than one occasion.

25               Did she say it on more than one



**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

126

1    occasion?

2              I only heard her say it once.

3              You know, did she say it again?

4              I have no idea.

5              As many times, though, Greenwich, if

6    they came down to inspect the property and have

7    somebody ride by it, it was done.  If they came once

8    or if they came ten times, I don't know how many

9    times they came.

10        Q       Did Ms. O'Neill ever reach out to you

11   to get in touch with Kane or Grieser to make sure

12   places looked lived in?

13        A       Yeah.  Her and Betty Ann were very,

14   very close.  She would be in Betty Ann's office a

15   lot of times with the door closed.  Then later on

16   would talk to me.

17              MR. HAYES:  That's all I have.

18              Thank you, sir.

19              MR. MC GOWAN:  I have a few.

20   DIRECT EXAMINATION

21   BY MR. MC GOWAN:

22        Q       Let's go back to National Home Funding.

23   Was it you, I guess, who introduced Mr. Kane to Mr.

24   Skowrenski?  Is that right?

25        A       Yes.



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

129

1  Q   He was also connected in the same sense

2  that Mr. DiNonno was?

3  A   Yes.  They were shylocks.

4  Q   And Skowrenski was a banker but not --

5  he didn't have the full-service license, is that

6  right?

7  A   Right.  He just needed $150,000 net

8  worth.

9  Q   What that allowed Skowrenski to do was

10 to advertise himself as a mortgage banker but, in

11 fact, he was not a full-service mortgage banker?

12 A   No.

13 Q   So if I were to walk in to his place

14 looking for a purchase-money mortgage, he could tell

15 me he was a personal-money mortgagor with a license?

16 A   Yes.

17 Q   But he would have to assign that

18 mortgage off the minute it closed, is that right?

19 A   Exactly.

20 Q   In connection with these particular

21 deals that were brought into his house by -- what is

22 his name?

23 A   Bill Kane.

24 Q   Yes.  Kane.  They were to be assigned

25 to Walsh?



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

137

1     A      Yes.

2     Q      Because it was not a legitimate deal,

3  right?

4     A      Yes.

5     Q      What he's getting is another half a

6  point?

7     A      Yes.

8     Q      Where is he getting that from?

9     A      Bill Kane.

10     Q      Where is Kane getting that money to

11  give him?

12     A      Out of the proceeds of the loan.

13     Q      So out of the money that Kane is taking

14  out of that inflated loan, a half a point of that is

15  going back to Skowrenski?

16     A      Yes.  So is the money going to the

17  borrowers who get $2,000 per loan that they do.  So

18  is the money that the appraisers get $1500 from --

19     Q      Okay.

20     A      All of it.  The money that came to me.

21  The money that went to Kellie.

22     Q      Kellie worked for whom?

23     A      Walsh.

24     Q      Who is the person that worked for

25  Skowrenski that was involved with some of these



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

142

1    I want to say, you know, all 50 states or maybe

2    minus a couple.

3         Q        Do you have any idea -- I don't know

4    that you would, but do you have any idea back

5    before, say, in the months -- the two months or

6    three months before the stuff started to hit the fan

7    and the paper, what percentage of business was New

8    Jersey as opposed to anywhere else?  Do you know?

9         A        No.  I would never be privy to that.

10        Q        But Rose was the National Sales

11   Manager, is that right?

12        A        Rose a/k/a Betty Ann.

13        Q        Betty Ann was the National Sales

14   Manager?

15        A        Yes.

16        Q        I would assume from that she was

17   responsible for sales nationally?

18        A        Without a doubt.

19        Q        So she was not only concerned about

20   numbers in New Jersey, she was concerned about

21   numbers everywhere?

22        A        Yes.  She had more control in New

23   Jersey because she was there.  She didn't like to

24   travel too much.

25        Q        You have described how she would



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

143

1  sometimes waive underwriting requirements, is that

2  right?

3       A      Yes.

4       Q      Not only for the files involved in this

5  litigation, but other files as well?

6       A      Yes.

7       Q      You described sometimes not only just

8  waiving underwriter requirements, she would change

9  the underwriter requirements, is that right?

10      A      Well, waive, change.  I'm using the

11 words kinds of similar.

12      Q      Would that be true for files in other

13 parts of the country, too?

14      A      Sure.

15      Q      You saw that?

16      A      If they had a loan that needed to be

17 closed and it was a broker that she got to be very

18 friendly with, yeah, she would do them a favor every

19 once in awhile but not as much as the ones here.

20      Q      Did you ever see Betty Ann have to ask

21 somebody else for permission to make those kinds of

22 waivers or favors, as you've called them?

23      A      Yeah.

24      Q      On how many occasions did you have to

25 see her ask somebody for permission to do that and


**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

158

1   you would see accounts and I would imagine that

2   there are checks -- that Robbie gave Kane money.

3   But he would short the money that was owed to him.

4   Do you understand?

5           Q       I think I'm following you.

6           A       Put it this way.  You're an attorney.

7   You have an escrow account.  That money gets funded

8   into your escrow account.  On the closing documents

9   it says who gets the money.

10          Well, it has to fund through the

11  mortgage company.  So like the points, all that

12  stuff, those fees -- that would get paid to the

13  mortgage company.  The money that would go to Kane

14  would be the house that they bought from Cristo

15  Property Management.

16          So the fees that Robbie charged all

17  went to him.  Then he would pay back Billy whatever

18  fees that Billy wanted.  It was an agreement that

19  they had.  Like the appraisal fee went back to

20  Billy.  So he would give him a check, you know, for

21  that fee.  But all the points he would keep and the

22  half a point that Billy was paying him would all

23  come out of those fees that he got.

24          I believe if there were three points

25  charged on every loan, because that is how Billy had


Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

159

1    it, he was letting Robbie keep a half a point of

2    that.

3        Q     Of that three?

4        A     Of that three.  Then there were points

5    on the back end because they up-sold the rates.

6              So Robbie was making half a point from

7    Billy and then he was making the back end points

8    that came from Walsh because, you know, the rate was

9    supposed to be seven percent or eight percent and

10   they took it to ten percent.

11             So Robbie wasn't dumb.  He was getting

12   money.  He just wasn't being a glutton.  Billy's

13   money out of the points he got back minus the half

14   and the back end points he was paying the 2,000 and

15   stuff like that.  So this way nobody took money out

16   of their pockets.  It all really came from Walsh.

17       Q     Which I think is what Mr. Yacker

18   testified at one point.  The point of this was to

19   defraud the mortgage banker because they were the

20   ones with the money?

21       A     Exactly.

22       Q     I'm confused, though, because maybe I

23   have read too much about this case.  At least so far

24   as I understood it, the closing attorneys when the

25   money would come to their account -- they would pay


**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

171

1    who were in Walsh reviewing the loans doing due

2    diligence to go into the securities?

3         A      No.  The only reason I met anybody --

4    Betty Ann grabbed me to meet someone from Greenwich

5    to give them directions from their office down to

6    the shore.  He would buy a Hagstrom map to ride by

7    those properties.  I told him how to get down 24 --

8    to 78 to the Parkway south.  Get off at exit 98 and

9    you're there.

10        Q      When you had testified earlier that Ms.

11   DeMola had told you to tell Kane to make the

12   properties look lived in, when was that?

13        A      Just before Greenwich came down.  She

14   got a phone call knowing they were coming.

15        Q      Where were the properties they were

16   going to review?  Do you recall?

17        A      Long Branch, Asbury.  I think mainly

18   there.  There may have been a couple in like Hazlet.

19        Q      How do you know that?

20        A      The Keyport area.

21        Q      How do you know that now?  Is that

22   because -- I understand ten years have gone by?

23        A      No.  She told him which properties to

24   go to.

25        Q      You do not recall them going to review


**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

172

1    properties in Newark?

2        A        No.  Not that I know of.

3        Q        You had described a meeting at which

4    you, Mr. Grieser, Mr. Kane, I think you said Art.

5    Was his last name Gilgar?

6        A        That guy Art.  Yes.

7        Q        Mr. Gilgar.  That Robert Walsh walked

8    into.  Do you recall if Mr. Walsh was away prior to

9    that meeting?

10       A        No.  I wouldn't remember.  At least, I

11   know when he came into the meeting he basically came

12   in, introduced himself and walked out.

13       Q        Did you stay in the meeting the whole

14   time it went on?

15       A        Most of it.  Then I stepped out.  I

16   don't know what they said after that.  Then from

17   there we went to lunch.  They asked me to go.

18                The meeting wasn't discussed at lunch.

19       Q        Who was the "we"?

20       A        Betty Ann, Billy, myself and Gary.

21       Q        Do you recall when that meeting was?

22       A        It was in the summer sometime.

23       Q        It was right before all of this broke?

24       A        Right.

25       Q        You said that at that meeting Mr.



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito – direct

173

1   Grieser had said unless Walsh Securities funded more

2   loans he wouldn't be making payments?

3       A     Right.  He said he wouldn't be able to.

4       Q     Do you know when Capital Assets made

5   the last block of payments on those loans?

6       A     It may have been for June.

7       Q     How would you know that?

8       A     Because I think they started to go in

9   foreclosure and I lost my job in August.

10       Q     I thought you lost your job after all

11   this all broke in the beginning of July?

12       A     Let me see.  You may be right.  I

13   bought my house -- I thought I bought the house in

14   August, but it could have been July.  All I know is

15   two weeks after I bought it, I was gone.  I had no

16   job and they were the ones that held my mortgage on

17   my house.

18       Q     Walsh Securities?

19       A     Yeah.  They gave me the mortgage on the

20   house.  I was engaged.  Then the shit hit the fan.

21   It may have hit the fan in June, July -- it may have

22   been that.  I may have closed at the end of June,

23   then, very beginning of July.  Two weeks after that

24   I lost my job.  It may have been July.

25       Q     You thought Walsh Securities funded a



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

174

1    few more of these loans that were in the pipeline?

2         A       I believe they funded like around five

3    of them.

4         Q       How do you know that those loans were

5    funded?

6         A       They would be on my report.  The funded

7    loans.

8         Q       When was the last report you got?

9         A       June.

10        Q       It was the end of June?

11        A       Yes.

12        Q       You got it like the first couple of

13   days of July?

14        A       You get your report of what closed in

15   June.  The month prior.

16        Q       You said you thought that Robert Walsh

17   approved the closing of these five loans that were

18   in the pipeline?

19        A       He approved them based on Betty Ann

20   telling him that, "You know, listen, they're going

21   to make the payment.  It was just a

22   misunderstanding.  Don't worry about it.  I have

23   everything under control" and he trusted his sister.

24                He said, "Listen there are a bunch of

25   loans in the pipeline.  Let's close five for the end



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

175

1    of the month.  Make sure the payments come in and

2    then we'll go from there.

3         Q       When did Mr. Walsh say this?  Was it in

4    that meeting with --

5         A       No.  He said it after the meeting.

6    When she came back from lunch, she went into his

7    office and talked to them.

8         Q       Then?

9         A       She came out and said, "You can call

10   Billy and Gary and let them know they can close"

11   this, this, this and this loan.

12        Q       Did you ever go to lunch with Betty Ann

13   and Gary Grieser prior to that time?

14        A       No.  I only remember going to lunch

15   with him once and it was at that meeting.  Before

16   that?  I don't remember it if I did.

17        Q       Yesterday Mr. Grieser testified that

18   you brought him up to Walsh Securities?

19        A       I did.  I brought him and Billy the day

20   of that meeting.

21        Q       He said this was prior to that meeting.

22   He didn't remember the timing.  A few days or a week

23   or something.  He said you brought him to Walsh

24   Securities to have lunch with Ms. DeMola.  She was

25   unavailable.  You stopped in and introduced him to



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

177

1    Q    You don't remember a meeting where Mr.
2    Grieser explained he was buying properties, prepping
3    them, getting tenants into them?

4    A    No.

5    Q    Any of that to Jim Walsh?

6    A    No.  If it happened, it wasn't when I
7    was there.

8    Q    You also testified that Ms. DeMola had
9    told the appraisers not to take interior photos.
10   When did that occur?

11   A    Within a couple of months of the loans
12   being done.  Right away in the beginning.  She was
13   like "We don't need interior photos" because some of
14   the appraisers were getting -- noting that there was
15   work that needed to be done.

16        Then she said, "We don't care about
17   that."

18        That is when Brodo and DiBenedetto came
19   up and she talked to them about it and that was it.

20        Then I told Robbie and Robbie told Rich
21   Calanni, you know.

22        James Brodo I don't think was in the
23   picture.  Betty Ann didn't even like him.

24   Q    I think he did the majority of the
25   appraisals?



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

184

1     He was sitting there yelling back at

2 her.  The next thing you know he walked in and she

3 came out and said "nobody ever use this guy ever

4 again.  He's done.  And I can't wait to tell people

5 in the industry."

6     That was it.  He probably has a little

7 ill will against Walsh.

8   Q  We have yet to find that out.

9   A  He has probably a little ill against

10 everybody.  He still believes he isn't guilty and

11 shouldn't have to go through any of this.  But he

12 should be lucky and happy he didn't have to go to

13 jail because he probably wouldn't have made it.

14   Q  You said you got paid $300 per loan

15 that closed.  Did you receive any other money from

16 Mr. Skowrenski and/or National Home Funding?

17   A  No.  Skowrenski was another greedy son

18 of a bitch.

19   Q  Did you ever get paid money for

20 bringing in loans from your friends or family --

21   A  No.

22   Q  -- that got sent through NHF?

23   A  I never brought in any loans from my

24 friends or family that I can even remember.  I mean,

25 I didn't do any retail loans anymore.  I was doing



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

185

1  all wholesale.

2         Q       Then you had a company called DAP,

3  Inc.?

4         A       I took all the money.  He paid me by

5  check.  I didn't hide it.  It wasn't cash.  I would

6  take it and put it through DAP, Inc.  I filed taxes

7  on it and everything.  It was DAP Consulting, Inc.

8  I treated it as a consulting fee.

9         Q       The money that you got from?

10        A       Billy.  I mean, they were trying to get

11 me -- the government was trying to get me on, like,

12 tax evasion but couldn't because I paid taxes on

13 that money.  I didn't hide it.  I left myself wide

14 open for it.

15        Q       What account were the checks written

16 on?  Was it --

17        A       Whatever check Billy had.  Even if he

18 gave me cash, I'd put it through the business

19 account.  Most of the time it was always a check.

20 It was out of Cristo.  Sometimes his checks bounced.

21 But they came from Billy all the time.

22        Q       Did you ever get checks from any of the

23 lawyers like Mr. Pepsny?

24        A       No.

25        Q       What happened to DAP, Inc.?


**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

186

1      A      Nothing.  I just let it go.

2      Q      Does it have any assets now?

3      A      No.  It just dissolved.

4      Q      Did anybody at Walsh Securities know

5   you were getting money from Mr. Kane to bring these

6   loans in?

7      A      Yeah.

8      Q      Who knew that?

9      A      Betty Ann and Kellie.

10     Q      How did they know that?

11     A      I told them.  Kellie was there.  Kellie

12   was all part of the whole thing.  Betty Ann -- I

13   just told her.  I was real close with Betty Ann.  I

14   used to tell her everything.  That is why I told her

15   about the properties.  I didn't want her to get in

16   trouble.  They basically blew me off.  My wife -- at

17   the time she was my fiance and she would say "maybe

18   you should quit."

19            I said, "No.  Listen, I did what I was

20   supposed to do.  I told my supervisor.  It is not on

21   me.  Not them.  Don't worry.  Nothing is going to

22   happen."

23            See you later.

24     Q      Did you ever tell Bob Walsh or Jim

25   Walsh that you were getting paid by Mr. Kane to


**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

193

1    justify what the LTV would be.  They even had them

2    for people with C credit but the LTV would be like

3    60 percent.

4         Q      How would Mr. Kane or whoever, Mr.

5    Grieser, was putting these loans together -- how

6    would they know what the Walsh requirements were?

7    Did you have to present that?

8         A      I told what the programs were that we

9    had.  Billy used to meet with Betty Ann.  Betty Ann

10   would tell him exactly what you needed to do for

11   this program.  That's how you have to do it.  Done.

12   Billy knew exactly what it was.

13        Q      How many times did they meet?

14        A      Oh, a lot.  They met frequently.  At

15   least once a week.

16        Q      You said you were at some of the

17   meetings.  How do you know they met that often.

18        A      Because I would go up and show up at

19   Billy's office for whatever reason.  She'd be there.

20   I'd be in Parsippany and he'd be up there.  Kellie

21   was in Parsippany every day.  She had to go there

22   from 9 to 5.  That was her job.  Billy would be up

23   there.  It's all wide open so you'll see whoever

24   walks in.  When he would walk in, he would go there,

25   deliver loans, go to her.



**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

D'Apolito - direct

214

1   what was going on.  Billy wasn't -- didn't lie to

2   any of them.  They all knew it.  They all were in

3   agreement.  I don't care what any of them say.

4         Q      All these buyers who testified -- they

5   didn't understand what was going on but they were

6   being paid for some unknown reason?

7         A      They knew exactly what they were

8   getting involved with.  So was Skowrenski and so was

9   Betty Ann and all of them.

10        Q      These transactions have been referred

11  to as "flips"?

12        A      Right.

13        Q      Did Walsh have a program that allowed

14  for a flip to be funded?

15        A      No.  Not that I'm aware of.  I don't

16  remember them having a program for it.  But I know

17  that you could legally flip the properties because

18  there was no prepayment penalty in the state of New

19  Jersey.

20        Q      So a legitimate flip -- let me ask this

21  question.

22               If the appraisals had been legitimate

23  and the work had been done, the fact that the

24  property had been bought for a lesser amount and

25  sold for a greater amount would have been a



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Exhibit P

1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No. 97-cv-3496(DRD)(MAS)
------------------------------------x
WALSH SECURITIES, INC.,
         Plaintiff,

    - against -

CRISTO PROPERTY MANAGEMENT, LTD., a/k/a
G.J.L. LIMITED; OAKWOOD PROPERTIES, INC.;
NATIONAL HOME FUNDING, INC.; CAPITAL ASSETS
PROPERTY MANAGEMENT & INVESTMENT CO., INC.;
CAPITAL ASSETS PROPERTY MANAGEMENT, L.L.C.;
WILLIAM KANE; GARY GRIESER; ROBERT
SKOWRENSKI, II; RICHARD CALANNI; RICHARD
DiBENEDETTO; JAMES R. BROWN; THOMAS BRODO;
ROLAND PIERSON; STANLEY YACKER, ESQ.;
MICHAEL ALFIERI, ESQ.; RICHARD PEPSNY,
ESQ.; ANTHONY M. CICALESE, ESQ.; LAWRENCE
CUZZI; ANTHONY D'APOLITO; DAP CONSULTING,
INC.; COMMONWEALTH LAND TITLE INSURANCE
CO.; NATIONS TITLE INSURANCE OF NEW YORK,
INC.; FIDELITY NATIONAL TITLE INSURANCE CO.
OF NEW YORK; COASTAL TITLE AGENCY; DONNA
PEPSNY; WEICHERT REALTORS; and VECCHIO
REALTY, INC. D/B/A MURPHY REALTY BETTER
HOMES and GARDENS,
         Defendants.
------------------------------------x
                March 23, 2010
                10:00 a.m.


     Deposition of KELLIE FUMAROLA, taken
by Plaintiff, pursuant to Subpoena, held at
the offices of Stone & Magnanini LLP, 150
John F. Kennedy Parkway, Short Hills, New
Jersey, before Todd DeSimone, a Certified
Shorthand Reporter and Notary Public of the
State of New Jersey.

2

```
1
2    A P P E A R A N C E S :
3    STONE & MAGNANINI LLP
     150 John F. Kennedy Parkway
4    Short Hills, New Jersey 07078
             Attorneys for Plaintiff
5    BY:    AMY WALKER WAGNER, ESQ.
                awagner@stonemagnalaw.com
6
7
8
     McCARTER & ENGLISH LLP
9    Four Gateway Center
     100 Mulberry Street
10   Newark, New Jersey 07101
             Attorneys for Defendant
11           Commonwealth Land Title
             Insurance Co.
12   BY:    SARA F. MERIN, ESQ.
                smerin@mccarter.com
13
14
15
     FOX ROTHSCHILD LLP
16   2000 Market Street
     20th Floor
17   Philadelphia, Pennsylvania 19103-3222
             Attorneys for Defendants Nations
18           Title Insurance of New York, Inc.
             and Fidelity National Title
19           Insurance Co. of New York
     BY:    DAVID H. COLVIN, ESQ.
20              dcolvin@foxrothschild.com
21
22
23
24
25
```

3

1

2      A P P E A R A N C E S: (Continued)

3      METHFESSEL & WERBEL

       3 Ethel Road

4      Suite 300

       Edison, New Jersey 08818

5              Attorneys for Defendant

               Coastal Title Agency

6      BY:    MARTIN McGOWAN, ESQ.

               mcgowan@methwerb.com

7

8

9      RICHARD CALANNI

       1 Old Farm Road

10     Tinton Falls, New Jersey 07724

               Defendant Pro Se

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22

```
 1                    FUMAROLA
 2              MR. COLVIN:   Objection to form.
 3        Q.      You can answer.
 4        A.      I believe what happened, if I'm
 5   remembering correctly -- well, let me ask
 6   you a question:  Did I say it in this
 7   transcript?
 8        Q.      No.
 9        A.      What I believe, from what I
10   remember, we were sitting at a table.  He
11   said he needed leases, that he would switch
12   them out with the correct leases once he
13   got a hold of them, and he needed some
14   names on the leases.  He did have the
15   figures.  He told us to write the figures
16   down.  That's what I remember.
17        Q.      Do you recall getting names out
18   of the phone book?
19        A.      Yes.
20        Q.      Mr. Kane testified that one of
21   the locations where you got names for these
22   leases was out of the phone book.
23        A.      That's correct.
24        Q.      Where did you get the
25   information for the escrow letter?
```

23

1                              **FUMAROLA**

2           A.      Bill Kane gave me the

3    information.  He said -- I believe he said

4    they had the money, they just had to get it

5    from -- was it Yacker, Stanley Yacker?

6           Q.      That is one of the closing

7    attorneys.

8           A.      Yes, Stanley Yacker.

9           Q.      Do you remember anything more

10   about that?

11          A.      Can you be specific?

12          Q.      Do you remember anything more

13   about preparing the escrow letter and Bill

14   Kane saying that he had the money, but that

15   he needed to --

16          A.      He needed the letter put into

17   the loan to submit it, and then he was

18   going to get the original from Mr. Yacker.

19          Q.      Do you know if he ever got the

20   original from Mr. Yacker?

21          A.      I don't recall, I'm sorry.

22          Q.      Would he have given you the

23   original to be placed in the loan files

24   since you were the loan processor?

25          A.      They would go through the

**FUMAROLA**

2  leases and the escrow letter?

3        A.      I'm sorry, how did he what?

4        Q.      How did it come about that

5  Mr. Kane asked you to prepare these

6  fictitious documents such as the fictitious

7  leases and the fictitious escrow letter?

8        A.      I don't remember.

9        Q.      Were you friends with William

10  Kane?

11        A.      We were friendly.  We were

12  friends at the time.

13        Q.      Would it have been in a social

14  setting that he requested that you come to

15  his office and prepare these documents?

16        A.      I don't remember, I'm sorry.

17        Q.      So if I told you that Mr. Kane

18  testified that you were paid between $100

19  and $200 for each loan that you helped him

20  process, you would say you don't recall

21  that?

22        A.      I know I was given money, but I

23  don't remember the specific amounts.

24        Q.      Was the money that he gave you,

25  was it to expedite the loan approval

30

1                    FUMAROLA

2    process?

3         A.    Can you be more specific?

4         Q.    I'm just trying to understand

5    why William Kane would have given you

6    money.

7         A.    To help get the loan through.

8         Q.    Did anyone at Walsh Securities

9    know that you were getting this money?

10        A.    D'Apolito.

11        Q.    Did anyone else at Walsh

12   Securities know?

13        A.    I don't know.

14        Q.    So you don't recall telling

15   anyone at Walsh Securities that William

16   Kane was providing you money to help get

17   loans through?

18        A.    I don't believe I did.

19        Q.    Did you ever go through closed

20   files and alter some of the documents that

21   were contained in those loan files?

22        A.    Can you be specific?

23        Q.    Did you ever go through closed

24   files and take some documents out, put some

25   documents in, clean up the file?

31

FUMAROLA

1

2     A.     We were requested to do so.

3     Q.     Periodically?

4     A.     I don't remember if it was

5  periodically.  I know Robert Walsh and

6  Betty Ann DeMola put a bunch of people in a

7  conference room and gave us a list of stuff

8  that had to be taken out of the files.

9          MR. McGOWAN:  Could you read

10  that answer back, please.

11          (The record was read.)

12     Q.     What kinds of documents would

13  you have taken out of the files?

14     A.     I don't recall.

15     Q.     Do you recall the reason for

16  taking documents out of the files?

17     A.     As of today, no.  I mean, no,

18  today I don't remember.

19     Q.     As a general matter, what kinds

20  of documents would be contained in the loan

21  file?

22     A.     I don't remember.  It has been

23  a very, very long time.

24     Q.     On occasion would there

25  sometimes be more than one copy of a

32

1                    FUMAROLA
2   document in a loan file?
3        A.      There could have been.
4        Q.      Could there have been drafts of
5   documents in a loan file?
6        A.      I'm guessing.  I don't want to
7   say yes or no to something that I'm
8   guessing at.
9        Q.      Could there have been documents
10  in a loan file that had handwritten
11  notations?
12       A.       I do recall that.  I do recall
13  that.
14       Q.      And would those have been final
15  documents or would those have been drafts?
16       A.      I don't know.
17       Q.      Would you ever remove
18  duplicates of documents in loan files?
19       A.      If they requested us to.
20       Q.      Wasn't it part of your job to
21  remove duplicates so that when the loans
22  were packaged for possibly a
23  securitization, there wouldn't be multiple
24  copies of the same document in a file?
25       A.      I'm sorry, I don't recall.

33

1                    FUMAROLA

2        Q.      Do you recall when you were put

3    in a conference room and given a list of

4    documents to take out of the loan files?

5        A.      No, I don't.  I don't know the

6    date.

7        Q.      Do you recall if it was close

8    to when the subpoenas were issued?

9        A.      I have no idea.

10       Q.      Do you recall who was in the

11   room with you when you were asked to take

12   these documents out?

13       A.      I know Robert Walsh was there,

14   Betty Ann DeMola.  I remember the lady that

15   was the head of closing, but I don't

16   remember what her name was.  I can only see

17   her face.  There was a bunch of people in

18   there.  I don't remember all of who were

19   there.

20       Q.      Had you ever been asked prior

21   to this to remove documents from loan

22   files?

23       A.      I don't remember.

24       Q.      Did anyone in the room seem to

25   think it was unusual that you were removing

34

1                    FUMAROLA
2   documents from these loan files?
3        A.      It wasn't just myself removing.
4   There was a bunch of us in the room that
5   were doing that.
6        Q.      Did you think it was unusual
7   that you were removing documents from the
8   loan files?
9        A.      I don't know if I even thought
10  about it.  I don't recall.
11       Q.      Was there any conversation
12  amongst you about it being unusual to
13  remove documents from the loan files?
14       A.      I don't remember.
15       Q.      Do you recall if you were also
16  inserting documents in the loan files at
17  this time?
18       A.      I don't remember.
19       Q.      If you will look at pages 56
20  and 57 of your deposition testimony.
21  Between page 56, line 8, and 57, line 13,
22  if you could just read that.
23              (Witness perusing document.)
24       A.      Could you refresh my memory who
25  Greenwich is?

35

1                        FUMAROLA
2          Q.      Greenwich Capital.   You don't
3    recall who Greenwich Capital is?
4          A.      The name sounds familiar, but I
5    don't --
6          Q.      We will get to Greenwich
7    Capital in a minute.
8                  (Witness perusing document.)
9          Q.      Between pages 56 and 57, you
10   testified that you had removed commitment
11   letters --
12         A.      Wait, I'm sorry, I'm still
13   reading.
14         Q.      Okay.
15                 (Witness perusing document.)
16         A.      Okay, I'm sorry, could you
17   repeat your question?
18         Q.      My question was, do you recall
19   that you testified to removing commitment
20   letters that had Ms. DeMola's signature on
21   them indicating that she was waiving
22   conditions?
23         A.      That is what I said.
24         Q.      What kinds of conditions would
25   she have been waiving?

36

1                    FUMAROLA

2        A.      I don't recall now -- I'm

3   sorry, I'm just rereading this.

4                (Witness perusing document.)

5        A.      Okay, I'm sorry?

6        Q.      What kinds of conditions would

7   Ms. DeMola have been waiving?

8        A.      I don't recall now.

9        Q.      Do you recall how many letters

10  were in the files that had conditions that

11  were waived?

12       A.      No.

13       Q.      Did Ms. DeMola have authority

14  to waive conditions?

15       A.      I don't believe she did.

16       Q.      Did underwriters normally waive

17  conditions?

18       A.      Underwriters did waive

19  conditions.

20       Q.      Why do you think that Robert

21  Walsh would have known that she was waiving

22  conditions?

23       A.      As I stated back here, it was

24  in my opinion that he knew that she was

25  waiving conditions.

37

FUMAROLA

1

2      Q.      But in your testimony

3  previously you had stated it was because he

4  was in and out of the room while you were

5  cleaning up the files?

6      A.      Correct.

7      Q.      Why do you think that just

8  because he walked in and out of the room

9  that he would be aware that she waived

10 conditions on the commitment letters?

11     A.      It is only my opinion that I

12 stated back then.  I mean, it is hard for

13 me to say now.

14     Q.      Did you have any conversations

15 with Mr. Walsh?

16     A.      Personal conversations?

17     Q.      During these incidents where

18 you were in the conference room removing

19 documents.

20     A.      No, I don't believe I did.  I

21 mean, from reading this, I remember they

22 did not want her signatures on anything.

23     Q.      When you say "they did not want

24 her signatures on anything," who is that?

25     A.      The upper management.

38

1                      FUMAROLA

2          Q.      And who would that be?

3          A.      Well, at the time it was Jim

4    Walsh, I remember Art, was it Gilgar?

5          Q.      Yes.

6          A.      Robert Walsh being another one

7    who was upper management.  They didn't want

8    anything with her name on it.  After

9    rereading this, I do remember that.

10         Q.      Was Betty Ann DeMola upper

11   management?

12         A.      Yes.  In my opinion, she was.

13         Q.      And why is it your opinion that

14   she was upper management?

15         A.      Because that's my opinion.

16         Q.      So this list that you were

17   given to remove documents, was it handed to

18   you by Jim Walsh, Art Gilgar, Robert Walsh,

19   Betty Ann DeMola?

20         A.      I don't remember who handed it

21   to me.

22         Q.      Then why do you think that

23   upper management gave you this list of

24   documents to remove?

25         A.      Where else would it come from?

39

FUMAROLA

1

2      Q.      So you believe that upper

3   management gave you this list?

4      A.      They were in the room.  We were

5   told to take it out by them.  And I did

6   what I was told to do.

7      Q.      So Jim Walsh, Art Gilgar,

8   Robert Walsh, and Betty Ann DeMola were all

9   present when you were handed this list of

10  documents to remove?

11     A.      I don't remember if they were

12  present when it was handed.  They were in

13  and out of the rooms.

14     Q.      Do you have any firsthand

15  knowledge that Jim Walsh, Art Gilgar,

16  Robert Walsh, or Betty Ann DeMola knew

17  exactly what was on this list?

18     A.      I assume they did, since they

19  were in and out of the rooms.

20     Q.      Did upper management frequently

21  walk by the area in which you sat at Walsh

22  Securities?

23     A.      Everybody came back and forth

24  throughout that area.

25     Q.      And when they were walking back

45

1                    FUMAROLA

2    Robbie Skowrenski."

3         Q.      Who was it that told you to

4    contact Mr. Kane?

5         A.      I remember Betty Ann DeMola.

6         Q.      And how would Betty Ann DeMola

7    have known that somebody was going to be

8    going and looking at this property?

9              MR. COLVIN:   Objection.

10        Q.      You can answer.

11        A.      I'm sorry, can you repeat that?

12        Q.      Do you have any knowledge about

13   how Betty Ann DeMola would have known that

14   somebody was going to be going and looking

15   at one of William Kane's properties?

16        A.      What I remember -- from what I

17   remember today, they were all at the end of

18   the office having a big conversation.  They

19   called me down.  I went down.  Betty Ann

20   had stated to me that somebody was going to

21   go do a drive-by inspection of a house.

22              I don't remember who said the

23   house was just a shell, as it was stated

24   also in this deposition, but I was to get

25   Kane on the phone, call him, get there, get

46

1              FUMAROLA

2     some curtains, lights, whatever, put up, so

3     it looked like somebody was living in it.

4     That I do recall.

5          Q.     When you say they called you

6     over, who was it that you spoke with?

7          A.     I remember Betty Ann being down

8     there.  I don't remember if Anthony

9     D'Apolito was down there at the end of the

10    office.  I remember speaking with Betty

11    Ann.

12         Q.     Do you remember who else was

13    present?

14         A.     I don't.

15         Q.     And why would it have mattered

16    if the house looked lived in or not?

17         A.     Well, I don't remember the

18    specifics as to why, what was going on at

19    the time.  I don't remember.

20         Q.     Sometimes houses are sold

21    without anything in them, so you don't have

22    any recollection as to why it would have

23    mattered --

24         A.     I don't remember specifically

25    what was going on at the time as to why

64

1                    FUMAROLA

2         Q.      Because there was going to be a

3    drive-by, right?

4         A.      I believe that is what was

5    stated, yes.

6         Q.      So that's the third thing that

7    happened, we have the escrow letter, we

8    have the phony leases, and we have Betty

9    Ann telling you to call Kane and Skowrenski

10   because there is going to be a drive-by?

11        A.      Yes.

12        Q.      There is a fourth thing that

13   happened, when you were all in the

14   conference room putting stuff in and taking

15   stuff out of these mortgage files, right?

16        A.      Yes.

17        Q.      And you took part in that as

18   well, right?

19        A.      Yes.

20        Q.      Along with other people?

21        A.      Yes.

22        Q.      And Betty Ann DeMola, how was

23   she involved in that?  Was she there?

24        A.      She came in and out of the

25   office.

66

                    **FUMAROLA**

1

2       Q.      And I think you told me that

3   Robert Walsh -- you told us that Robert

4   Walsh was in and out of that room from time

5   to time?

6       A.      Yes.

7       Q.      While this activity was going

8   on?

9       A.      Yes.

10      Q.      And based upon the fact that he

11  was in and out of the room from time to

12  time while this activity was going on, it

13  was your impression from having been there,

14  without anybody telling you this, that he

15  knew what was happening in that room that

16  day; is that right?

17      A.      In my opinion, yes.

18      Q.      There was also some testimony

19  from your prior deposition, and it will

20  probably take me ten minutes to find it --

21          MS. WAGNER:   There is a word

22  index at the back, if that helps.

23      Q.      On page 56 and 57 of your prior

24  deposition, you are talking about that

25  meeting where things are being taken out of

67

1               **FUMAROLA**

2    the files in the conference room.

3                On page 56, at line 10, you say

4    "Honestly, I don't remember specifically

5    what was taken out."  Then you say, a

6    little further down, "I'm sorry, yes, I do

7    remember.  Under any commitment letters

8    that had gone out with Betty Ann DeMola's

9    signature on them, her signing waiving off

10   conditions were taken out."

11               Do you see where you said that?

12       A.     Yes.

13       Q.     Does that refresh your

14   recollection that was at least one of the

15   things being taken out of those files?

16       A.     Yes, now that I read that.

17       Q.     They ask you why did you do

18   that, you said you didn't know at the time,

19   at the very bottom of page 56.

20               But I guess by the time this

21   deposition took place, your first

22   deposition, you had come to some

23   conclusions in that regard, right?

24       A.     Yes.

25       Q.     . Why was it that they wanted the

68

FUMAROLA

1

2       things with Betty Ann waiving off the

3       conditions out of the files, in your

4       opinion?

5           A.      She didn't have authorization,

6       as I recall it.

7           Q.      Who is supposed to waive

8       conditions?

9           A.      The underwriters.

10          Q.      Betty Ann was not an

11      underwriter, was she?

12          A.      No.

13          Q.      What was her position, if you

14      know?

15          A.      I don't remember what her

16      position was.

17          Q.      Now, you stated a couple of

18      times here and a couple of times in your

19      prior deposition that at least one of the

20      reasons why you are suspicious about the

21      Walshes and Betty Ann is that they are a

22      very close family; is that right?

23          A.      I'm sorry, can you repeat that?

24          Q.      There is nothing wrong with

25      being a close family.  But one of the

69

1                    FUMAROLA
2    reasons why you are suspicious about the
3    knowledge of the Walshes and Betty Ann
4    DeMola regarding the frauds that were going
5    on here in this case is because they are
6    close, they talk a lot, they are in
7    business together, and they are family,
8    right?
9         A.    I can't tell you what they
10   speak about as a family.  I remember them
11   being close.
12        Q.    As you sit here today, do you
13   think Betty Ann DeMola was involved in the
14   frauds, or at least had knowledge of the
15   frauds?
16        A.    In my opinion?
17        Q.    Yes.
18        A.    I do, only based on, I mean, I
19   can't be specific, but one of the instances
20   being that she asked that.
21        Q.    And you also think based upon
22   him walking in and out of the room that
23   Mr. Robert Walsh was aware of what was
24   going on that day when you were taking
25   stuff out of the files?

70

FUMAROLA

1

2    A.    It is my opinion that he knew

3  what was going on when we were all in the

4  room.

5    Q.    And you were also asked on page

6  57, "Do you know whether Robert Walsh was

7  aware that Betty Ann DeMola was waiving

8  conditions?"  That's line 18 and 19 on page

9  57.  And line 20 is your answer.  "It is my

10  opinion that he did know."

11            Once again, you say because he

12  was in the conference room walking in and

13  out and that sort of thing, right?

14    A.    That's what I said.

15    Q.    Is that still your view?

16    A.    If that's what I said, then at

17  the time that's what I believed.

18            MR. McGOWAN:  I don't have

19  anything else.  Thank you very much.

20            MS. MERIN:  I have a few

21  questions for you

22  EXAMINATION BY MS. MERIN:

23    Q.    My name is Sara Merin.  I'm

24  from McCarter & English, and we represent

25  Commonwealth Land Title Insurance Company.

# Exhibit Q

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEW JERSEY
2    CIVIL NO. 97-3496

3    WALSH SECURITIES, INC.,          :

                                      :   **ORIGINAL**
4            Plaintiff,               :   DEPOSITION UPON
                                      :   ORAL EXAMINATION
5        -vs-                         :   OF
                                      :   GARY D. GRIESER
6    CRISTO PROPERTY MANAGEMENT,      :
     LTD., et al.,                    :
7                                     :
             Defendants,             :
8                                     :
         -and-                        :
9                                     :
     COMMONWEALTH LAND TITLE          :
10   INSURANCE COMPANY,               :

11       Defendant/Third Party       :
         Plaintiff,                   :
12                                    :
         -vs-                         :
13                                    :
     ROBERT WALSH and                 :
14   ELIZABETH ANN DE MOLA,           :

15       Third-Party                  :
         Defendants.                  :
16   - - - - - - - - - - - - - - - -

17

18           T R A N S C R I P T  of the

19   stenographic notes of STANLEY B. RIZMAN, a Notary

20   Public and Certified Shorthand Reporter of the State

21   of New Jersey, Certificate No. XI00304, taken at

22   the offices of Boise, Schiller & Flexner, LLP,

23   150 John F. Kennedy Parkway, Short Hills, New

24   Jersey, on Tuesday, January 16, 2007, commencing at

25   10:15 a.m.



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

2

1   A p p e a r a n c e s:

2   BOIES, SCHILLER & FLEXNER, LLP
    150 John F. Kennedy Parkway
3   Short Hills, New Jersey   07078
    BY:   ROBERT A. MAGNANINI, ESQ., and
4         AMY WALKER WAGNER, ESQ.
    For the Plaintiff

5

6   MC CARTER & ENGLISH, LLP
    Four Gateway Center
    Newark, New Jersey   07102-0652
7   BY:   DAVID R. KOTT, ESQ.
    For Commonwealth Land Title Insurance Company

8

9   FOX, ROTHSCHILD, O'BRIEN & FRANKEL, ESQS.
    2000 Market Street
    Philadelphia, Pennsylvania   19103
10  BY:   EDWARD J. HAYES, ESQ.
    For Nations Title Insurance and
11        Fidelity National Title Insurance

12  METHFESSEL & WERBEL, ESQS.
    Three Ethel Road
13  Suite 300
    Edison, New Jersey   08818
14  BY:   MARTIN R. MC GOWAN, ESQ.
    For Coastal Title Agency.

15

16

17

18

19

20

21

22

23

24

25



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser - direct

29

1          You made some comments in this

2   transcript about Robert Walsh and Walsh Securities

3   being aware of your activities.  That is what my

4   questions are going to concern themselves with.

5          If you would turn to page 71.  When I

6   refer to 71, Mr. Grieser, I'm not referring to the

7   bottom.  If you look at each page, you'll see there

8   is --

9          A      Seventy-one.

10         Q      On that page you refer to there being

11   no reliance from the mortgage lenders on anything.

12         Then on page 72 you said that you

13   "dealt with the people for ten years or better and

14   they've all known who" you were, "certainly with the

15   mortgaging things, and the president of that company

16   said to me there is no fraud unless I" -- I think

17   the "I' refers to the president, says so -- "no

18   fraud, no bank fraud."

19         Then later on 72 you say, "So I was

20   concerned with the way things were being handled

21   with the companies and I put it to the president and

22   I put it to the vice president of the company at

23   that time in the meeting which I've talked about

24   with various agencies here, that, you know, I've

25   disclosed everything that I was doing and that they



**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser - direct

30

1    were full aware of this stuff going into it and

2    afterwards.

3                "I wanted to make sure that the higher-

4    ups in the company certainly knew about what was

5    going on and I said if they continued to fund me and

6    said there's no fraud, then I guess I'm not doing

7    anything wrong because they say it's their money."

8                Then later on page 73 you say, m"I

9    apparently went up to Mr. Walsh and his company to

10   make it very clear what was going on because I was

11   told by people below him that the company was aware

12   and, in fact, some of the company's people supplied

13   the paperwork for it, and I certainly ran my Social

14   Security number to make sure that it was clear."

15               That is, apparently, your son's Social

16   Security number?

17          A    Yes.

18          Q    Again, what am I driving at?  That is

19   what you want to know.  I want to find out what

20   people at Walsh Securities knew about your

21   activities.  That is what my questions now are going

22   to deal with.

23               With respect to using your son's Social

24   Security number, was there anybody at Walsh

25   Securities aware that you were doing that?



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser - direct

31

1      A      One thing, if you don't mind.

2      Q      Sure.  Go ahead.

3      A      Can we just say with respect to using

4  the false Social Security number, years ago this got

5  in the papers.  It is kind of a sore spot to have my

6  son involved.  He's an infant.  He's a minor.  I

7  had -- I've paid for what I've done wrong.  It kind

8  of keeps rubbing me with the.  Just the false

9  Social Security number would be adequate?

10         I don't like my son being in this

11  hearing.

12     Q      I'll rephrase the question.

13         With respect to you providing a false

14  Social Security number or an incorrect Social

15  Security number for some of the loans that ended up

16  with Walsh Securities, was Walsh Securities aware of

17  that?

18     A      I can break it down how I viewed it, if

19  you don't mind.

20     Q      Go ahead.

21     A      I was dealing in business for people

22  for ten years.  What I was talking about with that.

23  People like D'Apolito who were for other places that

24  I did business with.  He knew I wasn't -- I don't

25  know, born in 1966, certainly.  I was born in '55.



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser - direct

32

1          The thing was I bought, like, 12 houses

2    under that false Social Security number.  It was

3    fraud.  I knew it was fraud.  Then I came up with

4    this joint venture concept.  I thought, well, this

5    is legitimate.  I thought.  I'm not an attorney.

6    Just a little knowledge is dangerous sometimes.

7          We were buying things and things were

8    going so well.  I wanted to go up.  Where I was

9    going to Walsh Securities, I was told, the only

10   people I was dealing with was D'Apolito, maybe, one

11   of the other underwriters in the company, and

12   National Home Funding.

13         So, you know, he told me it was fine.

14         I wanted to go up.  I was invited up by

15   Betty Ann to have lunch that day.  Before we went to

16   lunch I sat down.  I talked to Jimmy Walsh.  I

17   explained to him what I was doing with the joint

18   ventures, how it was going.  How we were controlling

19   it.

20         I said, "If I tell them and they still

21   fund me, then it's okay, it's legitimate."

22         Betty Ann wasn't there.  D'Apolito,

23   Betty Ann and myself went out to lunch and D'Apolito

24   said, "You know, Gary just laid out this whole thing

25   to Jim."  And he explained, I guess, when I went to



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser - direct

33

1    the bathroom, at lunch. He laid out to her

2    basically -- I guess she got nervous or upset about

3    the whole thing because she put a lot of loans

4    through us. I don't recall whether she was nervous

5    because she didn't know about it or she was nervous

6    because she did know about it.

7            I'd only be guessing at that. But she

8    got upset about it.

9            She called Jim. Basically, my thoughts

10   at the time was she was calling Jim to say: We

11   screwed up or I screwed up. Something has gone bad

12   here. Don't tell Robert.

13           At that point when this whole story

14   unfolded, I was fairly convinced that Robert had no

15   knowledge of this because she was trying to hide

16   this activity from him.

17           I guess that is where I went with that.

18   That is where I thought how it unfolded.

19           MR. KOTT: Could you read that answer

20   back?

21           (Record read.)

22   Q      I have some questions about that

23   answer, which the court reporter has read back.

24           You referred to another underwriter in

25   that answer. Do you remember who the other

**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser - direct

37

1  and we were controlling the names.

2          As to the first part you said, I don't

3  know if I was that specific or not.

4          Q      Were you specific that the loans were

5  in the name of borrowers who had a joint venture who

6  would then transfer the property or 60 percent of

7  the interest in the property to your company,

8  Capital Assets?

9          A      I believe I was.  Again --

10         Q      Who is Jim Walsh?

11         A      I believe he was one of the Vice

12  Presidents at Walsh Securities.

13         Q      So far as you know, is he the brother

14  of Robert Walsh and Betty Ann DeMola?

15         A      Yes.

16         Q      You said in response to one of the

17  answers that after that Walsh continued to fund your

18  loans?

19         A      I think what I said was if they

20  continue to fund, then we'll know we're legitimate;

21         Q      Did they continue to fund the loans?

22         A      I believe they funded a few more.

23  Again --

24         Q      Best recollection?

25         A      -- best recollection.  I believe they



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser - direct

43

1      Q      My understanding -- and I have no

2    personal knowledge.  My understanding was that it

3    was in the newspapers and then Mr. Walsh, Robert

4    Walsh, indicated he want to meet with you and Kane.

5                Do you have that recollection or not?

6      A      I'm not sure.  I'm not sure which came

7    first.

8      Q      Okay.

9      A      I can remember being at that meeting

10   with him, some of the things that were said.  But I

11   don't remember how it broke.

12     Q      Where was the meeting?

13     A      It was in his offices.

14     Q      Walsh Securities' headquarters in

15   Parsippany?

16     A      Yes.

17     Q      Who was in the meeting with Robert

18   Walsh?

19     A      I believe one of his attorneys or some

20   representative with him in the company.  I think

21   D'Apolito, Bill Kane.  I don't know if anybody else

22   was there.  Maybe Jim.  I don't know.

23     Q      What happened in that meeting?

24     A      Again, I said "Okay.  I'm here again to

25   explain this."



**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser - direct

44

1    He listened to it.  Basically, he made
2    that statement.
3    He said, "It's our money and it is not
4    fraud unless we say it's fraud."
5    That is pretty much what I got out of
6    the meeting.  Whether he decided after I left the
7    hell with it, it is fraud, I'm not sure.
8    Q    What did you interpret him as meaning
9    when he said "it's our money; and if we don't say
10   it's fraud, it's not fraud"?
11   I'm paraphrasing what you said, but
12   what was your interpretation of that?
13   A    My interpretation.  I guess in my mind
14   I was thinking it's his company.  It's his money
15   that is being lent.  As to the way it's being lent
16   and the way it's being borrowed, more importantly,
17   it's not fraud unless he judges it to be fraud.
18   Q    Was it your impression that he did not
19   think it was fraud?
20   A    At that moment I was thinking that he
21   was thinking that it wasn't.
22   Q    Do you have a recollection of whether
23   Walsh Securities funded any of your loans after the
24   meeting with Robert Walsh that you just described?
25   A    I don't have any clear recollection of



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Grieser – direct

141

1    time to go file the deed?

2           A     Unless that is the time when he got

3    wind of his Indictment or possible Indictment from

4    New York for selling stuff to dead people that he

5    was going to be looked at.

6           Q     Jumping back to the meeting with Jim

7    Walsh and the lunch with Ms. DeMola.  Do you recall

8    when that was?  Was that the middle of June of '97?

9           A     It was somewhere around there.  I don't

10   recall exactly, but that was about the date.

11          Q     Do you recall -- was it a couple of

12   days before you had the meeting with Robert Walsh?

13          A     It was either a couple of days or

14   within that period, yeah.

15          Q     When you had the meeting with Jim

16   Walsh, did you tell him that you had actually

17   purchased the first couple of properties you were

18   using as part of the REIT?

19          A     I don't recall if I told him that or

20   not.  I may have just laid the whole thing out.  I

21   could have.  I was just trying to be honest with

22   everybody at that point.  I don't know if I would

23   have spoken about that.  I don't know.  I could

24   have.  I don't know.

25          Q     That is what I was wondering.  You said



**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# Exhibit R

***

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW JERSEY
 2                                CRIMINAL NO. 02-508
    UNITED STATES OF AMERICA        :
 3                       Plaintiff,  :
    -vs-                            :
 4                                  :
    ELIZABETH ANN DEMOLA,           :
 5                                  :
                                    : MOTIONS
 6                       Defendant  :
 7  - - - - - - - - - - - - - - - - -
                                 Newark, New Jersey
                                 September 12, 2003 10:30 a.m.
 8  B E F O R E:

 9          THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.

10  A p p e a r a n c e s:

11  CHRISTOPHER J. CHRISTIE
    UNITED STATES ATTORNEY-NEWARK
12  Attorneys for Plaintiff-USA
    970 Broad Street
13  Newark, New Jersey 07102
    BY: ALAIN LEIBMAN, AUSA, ESQ.

14

15  DECOTIS, FITZPATRICK, COLE & WISLER, LLP
    Attorneys for Defendant-Elizabeth Ann DeMola
16  Glenpointe Centre West
    500 Frank W. Burr Boulevard
17  Teaneck, New Jersey 07666
    BY: JEFFREY D. SMITH, ESQ.

18

19          Pursuant to Section 753 Title 28 United States Code,
    the following transcript is certified to be an accurate
20  record as taken stenographically in the above-entitled
    proceedings.
21

22                              Ralph F. Florio
                                Official Court Reporter
23

24

25
```

UNITED STATES DISTRICT COURT NEWARK, NEW JERSEY

32

***

1  superceding in that case.  The judge did no testimony, there

2  were no affidavits, no factual materials of any kind.

3      So there's no support in any case I've seen and

4  none any defense cited for a factual hearing, whether your

5  Honor could conceivably put victims on the witness stand to

6  find out whether they were lulled or not lulled.  That's not

7  the role of the Court on a 12(b) motion to dismiss.

8      So those are two I think undeniable aspects of

9  where we stand procedurally:  You can neither hold a factual

10  hearing nor in this case, I submit, resolve this without

11  letting it go to the jury for the reasons I'll discuss in a

12  moment.

13      Let me give you a different background, a fuller

14  background, one that comports with the indictment that was

15  returned.

16      What you'll hear at trial if this matter goes

17  forward and what the jury will hear, is that Walsh Securities

18  which was founded in 1996, was founded with one of two

19  purposes in mind.  There are documents to support this and

20  witnesses will testify.  And it's helpful to the government,

21  your Honor, that the principals of Walsh are actually here

22  today.  Because you will be hearing names at trial and now

23  you can put a face to a name.

24      In middle of the first row is Robert Walsh.  He was

25  the principal, the lead principal, chief executive of Walsh

UNITED STATES DISTRICT COURT NEWARK, NEW JERSEY

*** 

33

1  Securities.  His brother to his right, his left, your Honor's

2  right, is James Walsh.  And Betty Ann DeMola was their

3  sister.  The three of them were the principals of Walsh

4  Securities.

5       There are memorandum and other evidence to suggest

6  that when Robert Walsh took this company out of Donaldson

7  Lufkin and Jenette where it was a subsidiary or entity and

8  brought it out on its own, he either wanted to conduct an

9  initial public offering, taking it public and cash out that

10  way or find a merger partner.  So from day one the whole

11  objective was to cash out their interest.  This whole scheme

12  was founded on those notions:  Take our interest in this

13  modest privately held entity, make it bigger, make it more

14  successful and cash out.  The indictment expresses that

15  theory.

16       The indictment further goes on to explain that the

17  driving engine behind this fraud was Elizabeth DeMola, known

18  as Betty Ann DeMola the national sales manager.  The

19  indictment doesn't say this but I will elaborate the proofs.

20  Robert Walsh was the idea guy, the big the picture guy.

21  James Walsh the marketing guy, the secondary loan guy. He

22  would find people to buy Walsh's loans.  He was involved in

23  what we call securitizations, where these loans are pooled

24  and sold in share interests to large institutional investors

25  for the most part.  Betty Ann DeMola day-to-day,

*** 34

1  week-to-week, month-to-month was the driving force in these

2  sales.

3        Your Honor will hear testimony about how crazed she

4  was at the end of every month to meet her sales quota, how

5  loans were rammed through the loan processing and

6  underwriting procedures to get on the books of Walsh.  How

7  she insisted that appraisers raise their appraisal values

8  beyond what is reasonable and accurate.  How she threw policy

9  manuals in garbage cans to demonstrate her profanely many

10 times and loudly expressed views about the value of their

11 policy and procedures internally.  How she pushed their

12 representatives to make loans of any kind.  How she allowed

13 land flippers, such as a gentleman named William Kane that

14 will testify in this case, actually set up a desk at Walsh to

15 bring his loans in quickly and conveniently, the whole

16 process to bring in loans.

17       Now, as we do acknowledge in our papers, that

18 somewhat is counter-intuitive.  Most lenders would be

19 concerned about the quality of the loans that they have in

20 inventory because after all, you don't want a lot of bad

21 loans.  You can't make a lot of money in loans if they all go

22 bad.

23       But Walsh's objective was not the fee income on the

24 loans. It was not the points they were charged.  Or not the

25 premiums they would get for selling loans.  Their idea was to

UNITED STATES DISTRICT COURT NEWARK, NEW JERSEY

***

35

1   increase inventory.  Take this little nothing company that

2   was spun off DLJ and make it a big company, an attractive

3   company for an IPO and an attractive company for a merger.

4   That was the whole objective.

5           Yes, that allowed land flippers like Kane to make

6   very good money buying and selling decrepit properties in

7   Asbury Park with these loans. Betty Ann DeMola was there on

8   many of those transaction pushing, aware of the fraud,

9   counseling the use of phony second mortgages.  And there are

10  a number of specifications I won't go into now, but the

11  proofs will establish these at trial all with that purpose in

12  mind.  Those were the objectives of the fraud.

13          In early 1997, they find a merger partner.  Success

14  was on the horizon.  The big idea, the Robert Walsh idea is

15  about to come to fruition.  They find a company in South

16  Carolina, Resource Bank Shares Mortgage Group, RBMG, that's

17  prepared to essentially merge with Walsh.  It's not quite a

18  merger but I'll use that as a paraphrase of the business

19  arrangement.  Walsh will disappear, there will be a new

20  entity created in the South Carolina Mortgage Company.

21          Through 1997 the fraud continues.  Your Honor will

22  hear about meetings.  And a number of cooperating witnesses

23  have already implicated Robert Walsh, James Walsh and Betty

24  Ann DeMola in this fraud.  They put them at meetings where

25  fraud is discussed.  They put them in places where these

UNITED STATES DISTRICT COURT NEWARK, NEW JERSEY

***

36

1   things are on the table.  This proceeds through 1997.  Things

2   are going swimmingly as far as the conspirators are

3   concerned.  Until in late of June 1997, the Asbury Park Press

4   prints the first of 35 stories perhaps, 40 stories.  What

5   they call the House of Cards, because quite aptly this whole

6   pyramidal scheme with Walsh at the top.  Mr. Smith asks why

7   did it take five years to get to Betty Ann DeMola, because in

8   the meantime we've convicted layers of attorneys, CPAs,

9   mortgage brokers, mortgage reps, appraisers, we are now at

10  the top of the pyramid.  This whole pyramid is built on

11  fraud.  The foundation is unsound.

12      The first story comes out about decrepit houses

13  that are overvalued backed by Walsh mortgages and that puts,

14  according to the indictment, the conspirators into a frenzy

15  how to keep alive the merger.

16      Now one way that Walsh had been making loans, in

17  fact the only way Walsh had been able to make the loans is

18  with a funding source called Greenwich Capital, a company in

19  Connecticut not involved in the scheme.  They were the

20  warehouse credit facility.  They provided the money, Walsh

21  has the money wire transferred in to make the loans.

22      The vision, the goal, the objective is in sight,

23  it's close at hand, but now it starts slipping away.  Now the

24  merger, the cash-out, which will put money in each of their

25  pockets, bonuses, salaries far beyond what they're earning

UNITED STATES DISTRICT COURT NEWARK, NEW JERSEY

*** 37

1  now, positions with a substantial company with one of the

2  largest mortgage lenders in the country, now that's starting

3  to ebb away.  There's a risk that's going to slip away after

4  all of this work and everything that's gone on, these letters

5  then follow.

6          So it has nothing to do with lulling the FBI, has

7  nothing to do with lulling the government.  When we talk

8  about letters in this case, and we can look at them I have

9  them here, your Honor.  We're talking about acts in

10  furtherance of this scheme.  Lulling is a characterization

11  that courts have placed on certain categories of

12  communications.  They are all under the rubric in furtherance

13  of the scheme.  But occasionally there are schemes where the

14  perpetrators appear to have achieved their objectives and

15  then are charged with acts that follow afterwards.

16          Courts in many cases have said, well, that's

17  appropriate, those acts lulled persons into not acting.  For

18  example, in this case we don't need to make that semantic

19  split or semantic division.  Clearly under the government's

20  theory, these letters to the merger partner and to the

21  warehouse credit facility were designed to keep them in line,

22  keep them on track, keep this program moving forward to the

23  end.

24          Let me interject one thing here.  Mr. Smith, who

25  otherwise makes a good argument for his side, made a

UNITED STATES DISTRICT COURT NEWARK, NEW JERSEY

# Exhibit S

**GREENWICH CAPITAL MARKETS, INC.**
600 STEAMBOAT ROAD
GREENWICH, CONNECTICUT 06830

January 6, 1997



Mr. Robert Walsh,
President & CEO
Walsh Securities
4 Campus Drive
Parsippany, NJ 07054

Dear Bob:

Following are Greenwich's thoughts on which of Walsh's loan programs or policies and procedures are causing the majority of the issues that we have noted in the past three months.

I.   Appraisal Issues

Problems:   We believe a number of Walsh's appraisals may be overstated by significant amounts.  The following issues have been observed:

- Appraisals fail to report prior sale of subject properties.
- Comps are inappropriate (too distant or superior to subject).
- Review appraisals are ordered by the broker.
- Appraisals are substantially overstating the property condition or failing to report items which negatively impact value.
- Appraisers are not noting improvements or reasons for valuation increases versus recent sales.

Solutions:

1.   Improve in house desk reviews; probably best accomplished by putting a staff appraiser in each branch office.   A chief appraiser should also be hired to oversee the company's overall appraisal review and control functions.

WSI 83363

2.     Increase the percentage of pre-funding third party field review appraisals, ordered directly by Walsh personnel, covering both specific programs and random reviews.

3.     If a property has purportedly had recent remodeling, rehab, additions, etc., this should be documented in detail by the appraiser including photographs of the improvements.

4.     Material valuation increases should be fully explained.

5.     Appraisers and brokers that submit questionable appraisals should be removed from the company's approved. These approved lists should also be adhered to with minimal exceptions or with proper controls.

## II. Loan Programs

Problems:   Certain loan programs possess above average risks if they are not stringently underwritten with specific emphasis appraisals and underwriting documentation. Problem loan programs are as follows:

- Land contract refinancings
- Concurrent property sales (e.g., flips); often related to REO acquisitions
- Unseasoned refinancings with large valuation increases; again often related to REO transactions

Solutions:

1.     Refinancings of land contracts should be limited to land contracts where a number of payments (i.e., 6) have been made by the buyer. These payments should be verified by receiving copies of canceled checks or bank statements from the borrower.

2.     Land contracts with less than 6 months seasoning should be treated as purchase money mortgages.

3.     Discontinue making loans to principals and employees of the brokers with whom Walsh does business. If loans are done with brokers or their employees then all appraisals and title policies should be ordered by Walsh, with processing and underwriting performed by the company's head underwriter at its headquarters. Added safeguards should be built in to ensure the absence of fraud.

4.     Purchase money transactions involving concurrent sales of properties should not be done or should only be done with tight controls. Ones that happen to make sense, should only be done with extensive explanation and documentation, including stringent appraisal procedures.

5.     Refinancings of recent REO purchases need stricter appraisal controls. Valuation increases should be properly supported and all rehab expenses documented. A high percentage of review appraisals directly ordered by Walsh are also warranted.

6.     Appraisals should always support material valuation changes.

## III. Underwriting and Prefunding Documentation

Problem:     Certain types of inaccurate, or possibly fraudulent documentation can negatively impact the salability of loans. This inaccurate information frequently masks the actual nature of a loan transaction.

Solution:

1. Every loan file should have an initial and final loan application signed by all borrowers to the transaction. Every application should be fully completed. This includes a complete listing of the borrower's liquid assets and an answer to the question regarding source of down payment for purchase money loans. For refinancings, the questions as to when the property was acquired, for how much, and what improvements were made should be fully completed.

2. Funds to close purchase transactions should be verified. If the total amount was deposited with the closing agent, the source should be separately verified as having come from the borrower (prior bank statement, HUD 1 on sale or refinance, etc.)

3. Required documentation (i.e., copies of land contracts, purchase contracts, leases) should be complete, signed by all appropriate parties (i.e. a land contract needs to be signed by both the buyer and the seller), and the signatures of the parties should be consistent throughout the origination file.     )

4. Ensure closing instructions are complete and accurate. Ensure these instructions are sufficiently specific to provide adequate recourse against the closing agent should a loan be closed incorrectly.

## IV. Post Closing Review:

Problems:     Certain types of documentation problems, closing agent performance problems, and borrower and/or broker misrepresentation and possibly fraud are occurring.

Solutions:

1. Obtain a copy of the HUD 1 for all closed transactions. Review the HUD 1 to ascertain if the transaction was closed in accordance with the closing instructions (no new secondary financing or increased amounts of secondary financing, no new credits, no closing credits in excess of the closing costs, etc.)

2. Compare the borrower's signature as shown on the note and mortgage with the borrower's signature on various origination documents (i.e. application, purchase contract, etc.)

3. Confirm that underwriting conditions were met and that the documents obtained support the underwriting decision.

4. Take appropriate actions against brokers, appraisers, and closing agents where there is evidence of fraud, misrepresentation, or failure to follow the closing instructions.

We believe that adopting the above suggestions would greatly improve the company's loan quality. We look forward to discussing these issues with you and your management team at your earliest convenience.

Sincerely,

Don Lawson

# Exhibit T

1

```
                    IN THE UNITED STATES DISTRICT COURT
 1
                    FOR THE DISTRICT OF NEW JERSEY
 2                  CIVIL NO. 97-3496
 3   ----------------------------
     WALSH SECURITIES,                  :
 4   INC.,                              :
                                        :
 5        Plaintiff,                    :
                                        :
 6        v.                            :
                                        :
 7   CRISTO PROPERTY                    :
     MANAGEMENT,                        :
 8   LTD., et al.,                      :
                                        :
 9        Defendants.                   :
                                        :
10        and                           :
                                        :
11   COMMONWEALTH LAND                  :
     TITLE INSURANCE                    :
12   COMPANY,                           :
                                        :
13        Defendant/                    :
          Third-Party                   :
14        Plaintiff,                    :
                                        :
15        v.                            :
                                        :
16   ROBERT WALSH and                   :
     ELIZABETH ANN DE MOLA,             :
17                                      :
          Third-Party                   :
18        Defendants.                   :
     ----------------------------
19
20
21
22
23
24
25
```

ORIGINAL

DEPOSITION UPON
ORAL EXAMINATION
OF
RICHARD CALANNI



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

2

1     T R A N S C R I P T  of the stenographic

2 notes of HOWARD A. RAPPAPORT, a Notary Public and

3 Certified Shorthand Reporter of the State of

4 New Jersey, Certificate No. XI00416, taken at the

5 offices of BOIES, SCHILLER & FLEXNER, LLP.

6 150 John F. Kennedy Parkway, Short Hills, New Jersey,

7 on Wednesday, January 10, 2007, commencing at 10:05 a.m.

8 A P P E A R A N C E S:

9

10 BOIES, SCHILLER & FLEXNER, LLP
  150 John F. Kennedy Parkway
11 Short Hills, New Jersey 07078
  BY: ROBERT A. MAGNANINI, ESQ.,
12    AMY WALKER WAGNER, ESQ.,
  For the Plaintiff

13

14 MC CARTER & ENGLISH, LLP
  Four Gateway Center
15 100 Mulberry Street
  Newark, New Jersey 07102-0652
16 BY: DAVID R. KOTT, ESQ.,
  For Defendant/Third-Party Plaintiff Commonwealth Land
17 Title Insurance Company

18 FOX, ROTHSCHILD, O'BRIEN & FRANKEL
  2000 Market Street
19 Philadephia, Pennsylvania  19103
  BY:  EDWARD J. HAYES, ESQ.,
20 For Defendants Nations Title Insurance and
  Fidelity National Title Insurance

21

  METHFESSEL & WERBEL
22 3 Ethel Road
  Suite 300
23 Edison, New Jersey 08818
  BY:  KEITH MURPHY, ESQ.,
24 For the Defendants

25



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Calanni - direct

74

1    explained to me, and all these investors, now we find

2    out never existed, I never had a client like that,

3    no.

4           Q       Were you uncomfortable doing it that

5    way?

6           A       I was uncomfortable in the beginning.

7    That's why I would go up to the offices to look to

8    see if my appraisals were in a particular place that

9    I put them, like on a desk or on the side, and they

10   were there.

11          Q       And you were uncomfortable, and what you

12   wanted to check was that National Home Funding or

13   Cristo had not sent them up to Walsh before you had

14   gone back to do the reinspection?

15          A    .  Correct.

16          Q       All right.

17                  In your guilty plea before

18   Judge Wolin -- I have a transcript here, I'll show it

19   to you in a moment --

20                  MR. KOTT:  Showing the witness a

21   December 1, 1998 transcript in United States of

22   America versus Thomas Brodo, James Brown and Richard

23   Calanni.

24          Q       At page 51, line 25, Judge Wolin asked

25   you as follows.



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Calanni - direct

75

1          "At a meeting which occurred at Walsh

2    Securities, did James Walsh, in substance, urge you

3    to increase the values you placed on the Walsh

4    properties?"

5          The answer you gave is:  "That is true,

6    your Honor."

7          Is that meeting the one you just told me

8    about?

9     A      That's the meeting that I told you

10   about.  The answer to that question is as descriptive

11   as I've given you.

12    Q      Okay.

13    A      This plea doesn't offer a description.

14    Q      I'm going to show you this, if you want

15   to look at it, but it looked like what you were

16   telling Judge Wolin you did wrong was that while some

17   of the properties were in a state of repair, you

18   assigned values to them as if they had already been

19   repaired.

20    A      For the reasons that I have explained to

21   you in this testimony.

22    Q      Not being a lawyer here, I'm asking just

23   your understanding, is that what you were pleading

24   guilty to?

25    A      Let me -- let's go with this plea.



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Calanni - direct

100

1    A      In the beginning, with that reasoning

2    about the higher prices with the market approach,

3    yes, because they couldn't find comparable sales out

4    in the multiple listing, of which I said to them, but

5    I already brought that to everybody's attention,

6    Robert Skowrenski, and it was my understanding

7    through him, Robert Skowrenski, to use the closing

8    attorneys because your sales are going there

9    approved, because I reconfirmed that through Kellie.

10   Q      So would it be fair to say that your

11   meeting with Jim Walsh, he expressed a view that your

12   appraisals might have been too high, and then he

13   suggested that you use an appraisal method, meaning

14   the income approach, which might even result in a

15   higher appraisal?

16          MR. MAGNANINI:  Objection to the form.

17   A      Without question.

18          MR. KOTT:  I don't have any further

19   questions, but the other attorneys probably do.

20          MR. HAYES:  Would you like to take a

21   break?

22          THE WITNESS:  Yes.

23          (Recess.)

24          (Luncheon recess.)

25


**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Calanni - cross

126

1    value on appraisals, no.

2         Q        Any other persons at Walsh that you had

3    discussions with about your appraisals?

4         A        No, other than the names I mentioned.

5         Q        Other than that one occasion where you

6    went up and had the meeting with James Walsh, were

7    you ever in the Walsh offices?

8         A        Not that I can recall.

9         Q        Are you able to estimate at all,

10   Mr. Calanni, when the conversation or meeting with

11   James Walsh took place in relation to when the fraud

12   broke?

13        A        Long before.  It wasn't an issue with me

14   to remember, but I know it was -- you know, had no

15   significance to me at all to compare the two.

16        Q        Were you ever asked by anyone at Walsh

17   to backdate any of your appraisals?

18        A        To backdate my appraisals?

19        Q        Yes, sir.

20        A        Backdating meaning what?

21        Q        Meaning indicating that the fair market

22   value was being determined as of some different date,

23   a prior date than when you actually performed your

24   review?

25        A        Not that I can recall.



**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

162

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 97-3496

WALSH SECURITIES, INC.,                  :
                                         :      CONTINUED
              Plaintiff,                  :      DEPOSITION UPON
                                         :      ORAL EXAMINATION
         -vs-                             :           OF
                                         :      RICHARD CALANNI
CRISTO PROPERTY MANAGEMENT,              :
LTD., et al.,                             :      Volume 2
                                         :
              Defendants,                 :
                                         :
         -and-                            :
                                         :
COMMONWEALTH LAND TITLE                   :
INSURANCE COMPANY,                        :
                                         :
         Defendant/Third Party            :
         Plaintiff,                       :
                                         :
         -vs-                             :
                                         :
ROBERT WALSH and                          :
ELIZABETH ANN DE MOLA,                    :
                                         :
         Third-Party                      :
         Defendants.                      :
- - - - - - - - - - - - - - - - :

**ORIGINAL**

          T R A N S C R I P T  of the

stenographic notes of STANLEY B. RIZMAN, a Notary

Public and Certified Shorthand Reporter of the State

of New Jersey, Certificate No. XI00304, taken at

the offices of Boise, Schiller & Flexner, LLP,

150 John F. Kennedy Parkway, Short Hills, New

Jersey, on Monday, January 22, 2007, commencing at

10:23 a.m.



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

163

```
 1   A p p e a r a n c e s :

 2   BOIES, SCHILLER & FLEXNER, LLP
     150 John F. Kennedy Parkway
 3   Short Hills, New Jersey  07078
     BY:  ROBERT A. MAGNANINI, ESQ., and
 4        AMY WALKER WAGNER, ESQ.
     For the Plaintiff

 5
     MC CARTER & ENGLISH, LLP
 6   Four Gateway Center
     Newark, New Jersey  07102-0652
 7   BY:  DAVID R. KOTT, ESQ.
     For Commonwealth Land Title Insurance Company

 8
     FOX, ROTHSCHILD, O'BRIEN & FRANKEL, ESQS.
 9   2000 Market Street
     Philadelphia, Pennsylvania  19103?
10   BY:  ANTHONY ARGIROPOULOS, ESQ.
     For Nations Title Insurance and
11        Fidelity National Title Insurance

12   METHFESSEL & WERBEL, ESQS.
     Three Ethel Road
13   Suite 300
     Edison, New Jersey  08818
14   BY:  MARTIN R. MC GOWAN, ESQ.
     For Coastal Title Agency.

15

16

17

18

19

20

21

22

23

24

25
```



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Calanni - direct

273

1        Why wouldn't the lender want to know

2   what the income was to determine whether or not the

3   investor could make the mortgage payments?

4        A        They would have an idea or a

5   guesstimate or a market estimate of the income.  But

6   do they want to use it?  That's a question that the

7   lenders have to answer because I don't know.

8        From my knowledge, it doesn't make

9   sense to me.  I could sit there and ask the same

10  questions you are.  I don't know.  To me it sounds

11  logical.

12       Q        You said Jim Walsh asked you about

13  using the income method.  How -- I don't know if you

14  can recall.  How did he phrase his question?  Was

15  it:  Why don't you do use this or was he telling

16  you?

17       You just testified the plea made it

18  sound like he was telling you you have to use the

19  income method to come up with a greater value.

20       A        No.  That plea doesn't mention income.

21  That plea is just talking about values, you may

22  notice.

23       Q        Right.

24       A        That plea sounds as if Jim Walsh told

25  me to come up with a higher market valued and I did,



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Calanni - direct

274

1    it sounds like.  That is not what I did.

2                 Jim Walsh waved this up and said, "Why

3    don't you use the income approach and come up with a

4    higher value?"

5                 I said, "Why would I want to do that?

6                 "Because I can hold the loans.  Kellie,

7    All the rentals are being paid every month?"

8    Turning to the left pointing to Kellie.  She shook

9    her head.

10                Veronica.  She checked everything is

11   being paid.

12                "Bill, are you collecting all the

13   money?"

14                He's still waving this up in the air.

15                "Are the rents being paid?"

16                Bill just nodded and said "Yes.  Why

17   don't you use the income?  Everybody is telling you

18   we're getting the money."

19                I said, "Because it's not to be done in

20   the industry.  That is why.  I can't do it.  The

21   banks don't want us to do it and the appraisal

22   industry says we can't.  So I'm not."

23                That was it.

24        Q       Did Jim Walsh mention what he did --

25   what his position was at Walsh Securities when he


**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# Exhibit U

# WALSH SECURITIES, INC.

## QUALITY CONTROL MEMORANDUM

**DATE:**     January 31, 1997

**FROM:**     Veronica R. Gonzalez-Lehman

**SUBJECT:**     Greenwich Capital Audit

This is to confirm that on the morning of January 29, 1997, I met with Mr. Donald Lawson, from Greenwich Capital regarding the audit of files selected for review.

In addition to the attached list, Mr. Lawson selected nine additional files originated by National Home Funding.

During my conversation, I informed Mr. Lawson that on all of the National Home Funding loans, we had requested documentation evidencing:

1. Amount of Rehabilitation to property in question;

2. Inside photographs;

3. Copy of Deeds following title, and circumstances of conveyance; and

4. Addendums to the appraisals noting rehabilitation of property and inside photographs showing work completed.

WSI 0075078



DEFENDANT'S
EXHIBIT
Robert Walsh-30
9/30/11    cw

I further informed him that the files he was looking at were not yet fully documented, since these were additional requirements by Walsh and that future files would be so documented prior to closing.

I also pointed out that the escrow letters had been questioned by Quality Control and in fact most of the loans he was reviewing, actually contained revised letters from the closing attorney.

Veronica R. Gonzalez-Lehman
Quality Control Department

cc: James Walsh
    Peter Trebour

WSI 0075079

# Exhibit V

**In The Matter Of:**

*Walsh Securities v.*

*Cristo Property Management*

---

*Peter Trebour*

*September 24, 2011*

---

*Rizman Rappaport Dillon & Rose*

*66 W. Mt. Pleasant Ave.*

*Livingston, N.J. 07039*

*(973) 992-7650*



1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2          CIVIL NO. 97-3407 (DRD)

 3     ---------------------------

       WALSH SECURITIES,                :
 4     INC.,                            :
                                        :
 5          Plaintiff,                  :   DEPOSITION UPON
                                        :   ORAL EXAMINATION
 6          v.                          :          OF
                                        :   PETER TREBOUR
 7     CRISTO PROPERTY                  :
       MANAGEMENT,LTD.,                 :
 8     et al,                           :
                                        :
 9     ---------------------------      :

10

11

12

13              T R A N S C R I P T  of the stenographic

14     notes of HOWARD A. RAPPAPORT, a Notary Public and

15     Certified Shorthand Reporter of the State of

16     New Jersey, Certificate No. XI00416, taken at the

17     offices of STONE & MAGNANINI, 150 John F. Kennedy

18     Parkway, Short Hills, New Jersey, on Saturday,

19     September 24, 2011, commencing at 11:35 a.m.

20

21

22

23

24

25
```

2

1   A P P E A R A N C E S:

2   STONE & MAGNANINI
    150 John F. Kennedy Parkway
3   Short Hills, New Jersey 07078
    BY:   AMY WALKER WAGNER, ESQ.,
4   For the Plaintiff

5   MC CARTER & ENGLISH, LLP
    Four Gateway Center
6   100 Mulberry Street
    Newark, New Jersey 07102-0652
7   BY:   DAVID R. KOTT, ESQ.,
    For Commonwealth Land Title Insurance Company
8
    FOX, ROTHSCHILD, O'BRIEN & FRANKEL
9   997 Lenox Drive
    Lawrenceville, New Jersey  08648
10  BY:   EDWARD J. HAYES, ESQ.,
    For Nations Title Insurance and
11  Fidelity National Title Insurance

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Trebour - direct**

85

1    the loans?

2          A      I don't know.

3          Q      Questions about whether or not the

4    property had been rehabilitated?

5          A      Based on number four, yes.

6          Q      Requests about whether or not inside

7    photographs existed where you could see work done on

8    the property?

9          A      Based on number two.

10         Q      Questions on the extent of the

11   rehabilitation actually done to the property?

12         A      Yes.

13         Q      And questions regarding the manner in

14   which title was acquired in the property, correct?

15         A      Yes.

16         Q      All pertaining to National Home Funding

17   files?

18         A      Based on this, yes.

19         Q      And do you see that going forward, at

20   least according to the second page here, all of these

21   missing documents and all this missing information

22   was supposed to be dealt with in any future NHF

23   files?

24         A      Based on that first paragraph, yes.

25         Q      So you would have expected that in

**Trebour - direct**

1   response to this memo certain care would have been

2   exercised before underwriting and funding any

3   National Home Funding loans going forward, wouldn't

4   you?

5           A       If this had gone to the branch offices.

6           Q       It went to Jim Walsh, didn't it?

7           A       I don't know who it went to.

8           Q       Who is the cc on it?

9           A       Oh, yes.

10          Q       So you would expect Jim Walsh to have

11  gotten this?

12          A       Yes.

13          Q       And you got it?

14          A       Yes.

15          Q       Did you do anything to insure that

16  National Home Funding was looked at a little

17  differently going forward?

18          A       I don't recall.

19          Q       Would you have expected someone to?

20          A       Yes.

21          Q       Would you have expected there to be some

22  change in the way in which National Home Funding

23  files were looked at?

24          A       Yes.

25          Q       Would you have expected more scrutiny to

Trebour - direct

87

1    be given to National Home Funding originated loans

2    than other loans?

3              MS. WAGNER:   Objection.

4         A    Yes.

5         Q    Would you have suspected there to be

6    some suspicion going forward as to whether or not

7    National Home Funding properties actually involved

8    legitimate and completed rehabilitation?

9              MS. WAGNER:   Objection.

10        A    Yes.

11        Q    Would you expect after seeing something

12   like this to have five more months of loans that were

13   fraudulent where rehab work wasn't done and

14   documentation wasn't requested?

15             MS. WAGNER:   Objection.

16        A    Well, I don't know what was put in place

17   from January through the next five months.

18        Q    In fact, NHF submitted similar

19   fraudulent loans for another five months that got --

20   I'm just telling you, in the case, I'm not asking you

21   to agree with me, but for five more months, same

22   packages came in, same boarded up properties, same

23   lack of documentation.  They got approved and funded.

24             My question to you is, would you have

25   expected that to happen in light of this memo?

Trebour - direct

88

1          MS. WAGNER:  Objection.

2     A     I don't know if it happened or not.

3     Q     I'm saying assume for purposes of my

4  question that it did --

5     A     Uh-huh.

6     Q     Would that surprise you after reading

7  this memo?

8     A     Yes.

9          MS. WAGNER:  Objection.

10     Q     Would that lead you to conclude that

11  Walsh ignored what was set forth in this memo?

12          MS. WAGNER:  Objection.

13     A     No opinion.

14          (Exhibit marked for identification

15  Trebour-7, Document entitled, "Underwriting

16  exceptions, first payment defaults, February 1997".)

17          (Exhibit handed to the witness.)

18     Q     Mr. Trebour, I'm handing you a two-page

19  document marked Trebour-7, Bates 654309, 65310.  Just

20  let me know when you have had a chance to look at it.

21          (Pause.)

22     A     Okay.

23     Q     Do you recall seeing any documents like

24  this when you were employed by Walsh?

25     A     Not at this point.

# Exhibit W

799674

NUMBER
5

SHARES
5

**WALSH HOLDING CO., INC.**

*1,250 SHARES CLASS "A" VOTING COMMON STOCK. PAR VALUE 5.01*

INCORPORATED UNDER THE LAWS OF
THE STATE OF
DELAWARE

**This Certifies that**

ELIZABETH ANN DEMOLA

CLASS "A" VOTING

*is the owner of*

*fully paid
and non-assessable Shares of the Capital Stock of the above named Corporation
transferable only on the books of the Corporation by the holder hereof in person or
by duly authorized Attorney upon surrender of this Certificate properly endorsed.*

*In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers
and its Corporate Seal to be hereunto affixed this* 30th *day of* April *A.D. 18 96.*

SECRETARY/TREASURER

PRESIDENT

© 1997 ALL-STATE LEGAL A DIVISION OF ®ALL-STATE INTERNATIONAL, INC. 89C1412

NS2 000000462

# Exhibit X

Execution Copy

## NONCOMPÉTE AND CONFIDENTIALITY AGREEMENT

THIS AGREEMENT (the "Agreement"), dated as of this 18th day of April, 1997, by and between RESOURCE BANCSHARES MORTGAGE GROUP, INC., a Delaware corporation ("RBMG"), and Elizabeth Ann Demola ("Ms. Demola"), an individual resident of the State of New Jersey.

### R E C I T A L S:

1.   Ms. Demola is a shareholder and officer of Walsh Holding Co., Inc., a Delaware corporation ("WSI").

2.   WSI has entered into the Agreement of Merger (the "Merger Agreement"), dated as of April 18, 1997, among RBMG, Newco, WSI and the principal stockholder of WSI, pursuant to which WSI will be merged (the "Merger") with Carolina Merger Sub, Inc. ("Newco"), a wholly-owned subsidiary of RBMG. As a result of the Merger, WSI will become a wholly-owned subsidiary of RBMG.

3.   In connection with the Merger, Ms. Demola has entered into an employment agreement with WSI.

4.   In connection with the Merger, RBMG will acquire the "Confidential Information" and "Trade Secrets" (both as defined below) of WSI and, to protect RBMG's substantial investment in the Confidential Information and Trade Secrets, and to protect the goodwill associated with WSI's customer relationships, Ms. Demola and RBMG (together, the "Parties") have agreed to abide by the terms and conditions of this Agreement.

In consideration of the premises and of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.   Definitions.   The following terms shall have the following meanings when used in this Agreement:

(a)   "Company Activities" shall mean all activities of the type currently conducted, offered, or provided by WSI as well as all other activities of the type conducted, offered, or provided at any time by WSI during the period beginning at the "Effective Time" (as defined in the Merger Agreement) and ending as of the date as of which Ms. Demola is no longer an employee of WSI. For purposes of reference, such activities as of the date of this Agreement

WS2000002540

include originating, purchasing, and selling high-yielding nonconforming mortgage loans secured by liens on one- to four-family residential properties.

(b)     "Confidential Information" shall mean any data or information (whether written or not), of WSI, other than Trade Secrets, which is valuable to WSI and not generally known to competitors.

(c)     "Noncompete Period" or "Nonsolicitation Period" shall mean, the period beginning at the Effective Time (as defined in the Merger Agreement) and continuing until the later of (i) the first anniversary of the date as of which Ms. Demola ceases to be an employee of WSI and (ii) the fifth anniversary of the date of this Agreement.

(d)     The term "Territory" as used herein shall mean the United States of America, such area being where any customer or actively sought prospective customer of WSI is located.

(e)     "Trade Secrets" shall mean information related to Company Activities, including, but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, including, without limitation, computer software and related source codes, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, lists of actual or potential customers or suppliers, or other information similar to any of the foregoing, which derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can derive economic value from its disclosure or use.

2.     Trade Secrets.  Ms. Demola shall hold in confidence at all times after the date hereof all Trade Secrets, and shall not disclose, publish or make use of Trade Secrets at any time after the date hereof, without the prior written consent of RBMG.  Nothing in this Agreement shall diminish the rights of WSI or RBMG regarding the protection of Trade Secrets and other intellectual property pursuant to applicable law.

3.     Trade Name and Confidential Information.  Ms. Demola hereby agrees that during the Noncompete Period:

(a)     she shall not, directly or by assisting others, own, manage, operate, join, control or participate in the ownership, management, operation or control of any business conducted under any corporate or trade name of WSI or any name similar thereto without the prior written consent of RBMG; and

(b)     she shall hold in confidence all Confidential Information and shall not disclose, publish or make use of Confidential Information without the prior written consent of RBMG.

-2-

WS2000002541

WS2000002542

4. Non-Competition.

(a) Coverage. Ms. Demola hereby acknowledges that WSI conducts Company Activities throughout the Territory. Ms. Demola acknowledges that to protect adequately the interest of RBMG in the business of WSI, it is essential that any noncompete covenant with respect thereto cover all Company Activities and the entire Territory.

(b) Covenant. Ms. Demola hereby agrees that she shall not, during the Noncompete Period, in any manner (other than as an employee of or a consultant to WSI or any affiliate of WSI), directly or by assisting others, engage in, have an equity or profit interest in, or render services (of an executive, marketing, research and development, administrative, financial or consulting nature) to any business that conducts any of the Company Activities in the Territory.

Notwithstanding anything contained herein to the contrary, Ms. Demola shall not be prohibited from owning, directly or indirectly, up to 5% of the outstanding equity interest of any company the stock of which is publicly traded on a national securities exchange or in the over-the-counter market.

5. Nonsolicitation of Employees and Customers. Ms. Demola hereby agrees that she shall not, during the Nonsolicitation Period, in any manner (other than as an employee of or a consultant to WSI or any affiliate of WSI), directly or by assisting others:

(a) solicit or attempt to solicit, any business from any customers or correspondents of WSI or others having business dealings with WSI, including actively sought prospective customers and correspondents, for purposes of providing products or services that are competitive with the Company Activities; or

(b) recruit or hire away or attempt to recruit or hire away, on her behalf or on behalf of any other person, firm or corporation, any employee of WSI.

6. Acknowledgment. Ms. Demola and RBMG acknowledge and agree that the covenants set forth in Sections 2, 3, 4 and 5 are reasonable as to time, scope and territory given RBMG's need to protect its Trade Secrets, its Confidential Information and its substantial investment in WSI's customer base, particularly given (a) the complexity and competitive nature of WSI's business and (b) that Ms. Demola has sufficient skills to find alternative, commensurate employment or consulting work in her field of expertise that would not violate Sections 2, 3, 4 or 5.

7. Injunctive Relief. Ms. Demola hereby agrees that any remedy at law for any breach of the provisions contained in this Agreement shall be inadequate and that RBMG shall be entitled to injunctive relief in addition to any other remedy RBMG might have under this Agreement.

-3-

WS2000002543

8.    Indemnification.  Ms. Demola hereby agrees to indemnify and defend RBMG and to hold RBMG wholly harmless from and against any and all losses, liabilities, damages, deficiencies, costs (including, without limitation, court costs), and expenses (including, without limitation, attorneys' fees) incurred by RBMG or WSI and arising out of or due to any breach of any covenant or agreement of Ms. Demola contained in this Agreement.

9.    Miscellaneous Provisions.

(a)    Entire Agreement.  This Agreement constitutes the sole understanding of the Parties with respect to the subject matter hereof; provided, however, that this provision is not intended to abrogate any other written agreement between or among the Parties executed with or after this Agreement or any written agreement pertaining to another subject matter. No amendment of this Agreement shall be binding unless made in writing and duly executed by the Parties.

(b)    Parties Bound by Agreement.  The terms, conditions and obligations of this Agreement shall inure to the benefit of and be binding upon Ms. Demola and her heirs and representatives and RBMG and its successors and assigns.  Without the prior written consent of RBMG, Ms. Demola shall not assign her rights, duties or obligations hereunder or any part thereof to any other person or entity.

(c)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.

(d)    Number; Gender.  Whenever the context so requires, the singular number shall include the plural and the plural shall include the singular, and the gender of any pronoun shall include the other genders.

(e)    Headings.  The headings of the Sections of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

(f)    Modification and Waiver.  Any of the terms or conditions of this Agreement may be waived in writing at any time by the Party which is entitled to the benefits thereof. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provision hereof.

(g)    Severability.  If a judicial or arbitral determination is made that any of the provisions of this Agreement constitutes an unreasonable or otherwise unenforceable restriction against Ms. Demola, the provisions of this Agreement shall be rendered void only to the extent that such judicial or arbitral determination finds such provisions to be unreasonable or otherwise unenforceable with respect to Ms. Demola.  In this regard, Ms.

-4-

WS2000002544

Demola and RBMG hereby agree that any judicial or arbitral authority construing this Agreement shall be empowered to sever any portion of the Territory, any prohibited business activity or any time period from the coverage of this Agreement and to apply the provisions of this Agreement to the remaining portion of the Territory, the remaining business activities and the remaining time period not so severed by such judicial or arbitral authority. Moreover, notwithstanding the fact that any provision of this Agreement is determined not to be specifically enforceable, RBMG shall nevertheless be entitled to recover monetary damages as a result of the breach of such provision by Ms. Demola. The time period during which the prohibitions set forth in this Agreement shall apply shall be tolled and suspended for a period equal to the aggregate quantity of time during which Ms. Demola violates such prohibitions in any respect.

(h)     Jurisdiction and Venue.  In the event that any Party commences a lawsuit or other proceeding relating to or arising from this Agreement, the Parties agree that the United States District Court of the Southern District of New York shall have the sole and exclusive jurisdiction over any such proceeding.  If such court lacks federal subject matter jurisdiction, the Parties agree that the New York state courts shall have sole and exclusive jurisdiction. Any of these courts shall be proper venue for any such lawsuit or judicial proceeding and the Parties waive any objection to such venue. The Parties consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

(i)     Notices.  Any notice or other document to be given hereunder by any Party to any other Party shall be in writing and delivered by courier or by telecopy transmission (provided that any notice sent by telecopy transmission must also be sent by an express mail service or courier service, postage or fees prepaid, within two (2) days of such transmission by telecopy) or sent by any express mail service, postage or fees prepaid,

If to Ms. Demola to:

Walsh Holding Co., Inc.
4 Campus Drive
Parsippany, New Jersey 07054
Attention: Elizabeth Ann Demola
Telecopier: (201) 538-0574

with a copy to:

St. John & Wayne, L.L.C.
Two Penn Plaza East
Newark, New Jersey 07105
Attention: John J. Oberdorf, Esq.
Telecopier: (201) 491-3402

-5-

WS2000002545

If to RBMG to:

Resource Bancshares Mortgage Group, Inc.
7909 Parklane Road
Columbia, South Carolina 29223
Attention: David W. Johnson, Jr.
Telecopier: (803) 741-3708

or at such other address or number for a Party as shall be specified by like notice. Any notice which is delivered in the manner provided herein shall be deemed to have been duly given to the Party to whom it is directed upon actual receipt by such Party or its agent.

(j)     Construction.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York.  No provision of this Agreement shall be construed against or interpreted to the disadvantage of any Party by any court or other governmental or judicial authority or by any board of arbitrators by reason of such Party or its counsel having or being deemed to have structured or drafted such provision.  All references in this Agreement to Section(s) shall refer to the Section(s) of this Agreement.

WS2000002546

APR 18 '97 10:46 FR KING & SPALD.9299    404 572 5145 TO 5117#03474#01300 P.23/29

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed, as of the date first above written.

RESOURCE BANCSHARES MORTGAGE GROUP, INC.

By: _Edward J. Sebastian_

Name: Edward J. Sebastian

Title: Chairman of the Board & Chief Executive Officer

Executed before me this _____ day of _____, 1997.

_____
Notary Public

My commission expires:

_____


_E A Demola_

Elizabeth Ann Demola

Executed before me this _18th_ day of _April_, 1997.

_John J. Oberdorf_
Notary Public
As Attorney - AT - LAW
of New Jersey
My commission expires:

_____

-7-

WS2000002547
** TOTAL PAGE 29 **

Exhibit Y

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------x

CITYSCAPE CORP.,                                    :

                         Plaintiff,       98 Civ. 0223

                                              (SHS)

        -against-                                   :

WALSH SECURITIES, INC., (formerly known as    :

GF MORTGAGE CORP.),

                                                    :

                         Defendant.

                                                    :

----------------------------------------------x

        DEPOSITION of the Defendant, WALSH

SECURITIES, INC., by ROBERT WALSH, taken by the

Plaintiff, pursuant to Notice, held at the

offices of Gibson, Dunn & Crutcher, Esqs., 200

Park Avenue, New York, New York, on March 24,

1999, at 10:10 a.m., before a Notary Public of

the State of New York.

*************************************************

        BARRISTER REPORTING SERVICE, INC.

                 120 Broadway

            New York, N.Y. 10271

                 212-732-8066

2

1

2    A P P E A R A N C E S :

3

4

5         GIBSON, DUNN & CRUTCHER, ESQS.

6             Attorneys for Plaintiff

7             200 Park Avenue

8             New York, New York 10166

9

10    BY:   JEFFREY STROCHLIC, ESQ.

11                -and-

12             LAURIE MC LAUGHLIN, ESQ.

13

14

15

16

17    ST. JOHN & WAYNE, LLC

18             Attorneys for Defendant

19             70 East 55th Street

20             New York, New York 10022

21

22    BY:   DAVID W. PHILLIPS, ESQ.

23

24                xxxxx

25

3

1

2          S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED by

5     and between the attorneys for the respective

6     parties herein, that filing, sealing and

7     certification, be and the same are, hereby

8     waived.

9

10         IT IS FURTHER STIPULATED AND AGREED

11    that all objections except as to the form of

12    the question, shall be reserved to the time

13    of the trial.

14

15         IT IS FURTHER STIPULATED AND AGREED

16    that the within deposition may be signed and

17    sworn to by an officer authorized to

18    administer an oath, with the same force and

19    effect as if signed and sworn to before the

20    Court.

21

22                         xxxxx

23

24

25

14

1                               Walsh

2      A.      I am the largest shareholder of Walsh.

3      I own approximately 75 percent of the

4      company.

5      Q.      Who owns the other 25 percent?

6      A.      Betty Ann Demola, my sister, owns five

7      percent.  Jim Walsh, my brother, owns five

8      percent.  And then there are a lot of smaller

9      fractions.

10      Q.      Can you remember who those people are,

11      or entities?

12      A.      There are about 15 people.  We can get

13      you names.

14      Q.      What can you remember as you sit here

15      today?

16      A.      Employees of the company, Art Gilgar,

17      Arnold Cohn, Fred Schlesinger, Paul LaRosa,

18      Dan Glasky.

19      Q.      How do you spell that?

20      A.      G-L-A-S-K-Y, something along those

21      lines.  And those are the ones that stick out

22      in my mind.

23      Q.      From the time Walsh was formed to the

24      present, have the percentages of stock

25      ownership changed?

# Exhibit Z

A. D'APOLITO

Page 1

```
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
 2        CIVIL ACTION NO. 97-cv-3496 (DRD)(MAS)
 3
    WALSH SECURITIES, INC.,          :
 4                                   :        DEPOSITION OF:
                                     :
 5              Plaintiff,           :
                                     :
 6                                   : ANTHONY J. D'APOLITO
            Vs.                      :
 7                                   :
                                     :
 8  CRISTO PROPERTY                  :
    MANAGEMENT, LTD., a/k/a          :
 9  GJL LIMITED, OAKWOOD             :
    PROPERTIES, INC.; NATIONAL       :
10  HOME FUNDING, INC.,              :
    CAPITAL ASSETS PROPERTY          :
11  MANAGEMENT, L.L.C.,              :
    WILLIAM KANE; GARY               :
12  GRIESER; ROBERT                  :
    SKOWRENSKI, II; RICHARD          :
13  CALANNI; RICHARD                 :
                                     :
14                                   :
    (Caption Continued ...    )      :
15  - - - - - - - - - - - - - -
16
            TRANSCRIPT of the deposition of the Witness,
17  called for Oral Examination in the above-captioned
    matter, said deposition being taken pursuant to
18  Superior Court Rules of Practice and Procedure by
    and before JAMES A. KORWAN, Certified Shorthand
19  Reporter, (License No. 1800), and Notary Public of
    the State of New Jersey, at the offices of
20  MANNING, CALIENDO & THOMSON, 36 West Main Street,
    Freehold, New Jersey  07728, on Friday, September
21  17, 2010, commencing at approximately 10:11 a.m.
22
23
24
25
```



A. D'APOLITO

Page 2

1   DIBENEDETTO; JAMES R.                    :
    BROWN; THOMAS BRODO;                     :
2   ROLAND PIERSON; STANLEY                  :
    YACKER, ESQ.; MICHAEL                    :
3   ALFIERI, ESQ.; RICHARD                   :
    PEPSNY, ESQ.; ANTHONY M.                 :
4   CICALESE, ESQ.; LAWRENCE                 :
    CUZZI; ANTHONY D'APOLITO;                :
5   DAP CONSULTING, INC.;                    :
    COMMONWEALTH LAND TITLE                  :
6   INSURANCE CO.; NATIONS                   :
    TITLE INSURANCE OF NEW                   :
7   YORK, INC.; FIDELITY                     :
    NATIONAL TITLE INSURANCE                 :
8   CO. OF NEW YORK; COASTAL                 :
    TITLE AGENCY; DONNA                      :
9   PEPSNY; WEICHERT REALTORS;               :
    And VECCHIO REALTY, INC.,                :
10  D/B/A MURPHY REALTY BETTER               :
    HOMES and GARDENS,                       :
11                                           :
                                             :
12                    Defendants.            :

- - - - - - - - - - - - - -

13
14
15
16
17
18
19
20
21
22
23
24
25

A. D'APOLITO

Page 3

```
 1    A P P E A R A N C E S:

 2

 3

 4

 5         STONE MAGNANINI
           150 John F. Kennedy Parkway
 6         Short Hills, New Jersey  07078
           BY:  ROBERT A. MAGNANINI, ESQ.
 7         Attorneys for the Plaintiffs

 8

 9

           FOX ROTHSCHILD
10         2000 Market Street
           20th Floor
11         Philadelphia, Pennsylvania  19103-3222
           BY:  EDWARD J. HAYES, ESQ.
12         Attorneys for the Defendants, Nations
           Title Insurance of New York, Inc., and
13         Fidelity National Title Insurance
           Company of New York

14

15

16         METHFESSEL & WERBEL
           3 Ethel Road
17         Edison, New Jersey  08818
           BY:  MARTIN R. McGOWAN, JR., ESQ.
18         Attorneys for the Defendant,
           Coastal Title Agency

19

20

21         McCARTER & ENGLISH
           Four Gateway Center
22         100 Mulberry Street
           Newark, New Jersey  07102-4056
23         BY:  DAVID R. KOTT, ESQ.
           Attorneys for the Defendant,
24         Commonwealth Land Title Insurance
           Company

25
```

A. D'APOLITO

Page 4

1   A P P E A R A N C E S:   (Continued)

2

3

4

5   A L S O   P R E S E N T:

6

7        RICHARD CALANNI, PRO SE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. D'APOLITO

Page 25

1    believe it was towards the end when Gary -- they

2    didn't want to close as many loans, so Gary was

3    threatening to not make the payments on the

4    mortgages, because Gary's responsibility, the

5    management company, was to make payments on all of

6    the mortgages.

7        Q. On the mortgages.  Where did Mr. Grieser get

8    money to make the payments for the mortgage

9    payments?

10       A. From every loan he did.  So if they didn't

11   make loans, he wasn't going to have money to pay.

12       Q. So after each closing they would use the

13   mortgage money to pay other mortgages off?

14       A. (Witness nodding head.)

15       Q. And then my -- what happened to the rest of

16   the money?  They sent it?

17       A. I have no idea where it is.  For all I know,

18   it is in an off-shore account.  They never fix up

19   those houses.  I told Betty Ann all of that.  I

20   said, this is ridiculous.  In the beginning they

21   used to do the right thing, do the repairs and fix

22   the house and rent it out.  Then they got greedy.

23   They'd have a guy that is dead now that used to do

24   the work that I met in jail.  His name is John

25   Kasair (ph) from Staten Island that was friends

A. D'APOLITO

Page 26

1   with Billy Kane.  They did the front, front of the

2   house, and the appraisers took pictures of the

3   inside and outside.  Betty Ann waived in the

4   guidelines that you didn't have to have interior

5   photos.  Betty Ann, I said, what are you doing?

6   She told me to shut up.  That's why I figured I

7   wouldn't get in trouble.

8           MR. KOTT:  Can you read that back?

9           (Whereupon, the Court Reporter read back

10   the record as requested.)

11           MR. KOTT:  Mr. D'Apolito, the reason I

12   asked the court reporter to read it back, when I

13   have a chance to ask you questions, I will.

14      Q. Do you know if John Kasair was related to

15   Nicholas Kasair?

16      A. No. I don't even know who Nicholas Kasair

17   is.

18      Q. Other than meeting him in prison, you never

19   met him before?

20      A. I met him once, and I kind of, like -- when

21   I came -- when I first got arrested and then they

22   put me into prison, they told me, you know, I was

23   going to a hospital because of my diabetes.  They

24   sent me to a maximum penitentiary.  So there was

25   guys like John Gambino, all of these, like, big

A. D'APOLITO

Page 48

1   check would come the following month.

2    Q. Okay.  And so what percentage of the loans

3   that you brought in were National Home Funding

4   loans?

5    A. 10 percent.  It wasn't a lot.  That's only

6   one vendor out of them all.

7    Q. And from what I've seen, at least, not all

8   of the loans from National Home Funding were Bill

9   Kane loans?

10    A. No. That was just an agreement he made with

11   Rob and he paid Rob a lot of money.  Rob,

12   probably, made over a million dollars to do his

13   loans.

14    Q. And that's Robert Skowrenski?

15    A. Yes.

16    Q. How did that relationship get started?

17    A. Through me.  I met Billy.  Actually, I met

18   Billy when I was in Selective Finance, because

19   they were one of my accounts.  And Billy was Rick

20   Pepsny and Michael Alfieri's client.

21    Q. At Selective?

22    A. Right.

23    Q. And then you introduced Mr. Kane?

24    A. I was closer friends -- I was engaged to get

25   married.  Rob Skowrenski was going to be my best

A. D'APOLITO

Page 56

1      A. They just said they were going to close

2  loans again.

3           MR. McGOWAN:  Said what?  I'm sorry.

4      A. We're going to close loans again.

5      Q. And, then, did you speak to Mr. Walsh after

6  the meeting?

7      A. No.

8      Q. Okay.  How about Mr. Gilgar?

9      A. No.

10      Q. Okay.  You said Ms. DiMola would give

11  exceptions to loans or waive conditions.  I'm not

12  sure which term you used.  Could Mr. DelRosso do

13  that, as well?

14      A. Yes.

15      Q. What if there was a disagreement between Ms.

16  DiMola, as a sales manager wanting to close a

17  loan, and Mr. DelRosso as an underwriter,

18  underwriting a loan; how did those disagreements

19  get resolved?

20      A. Almost ten times out of ten Betty Ann would

21  win.

22      Q. How did she win?

23      A. She would get her way.

24      Q. What was the process of that, though?

25      A. They would go behind closed doors, do

A. D'APOLITO

Page 60

1      Q. Why would the loan get turned down?

2      A. Because they couldn't meet the guidelines of

3   what they set.  Once the loan goes to processing

4   -- and that was Kelly O'Neill's job to put all the

5   paperwork in and get it in order.  She would turn

6   it and just give it right over to the cubicle to

7   the underwriter.  Then the underwriter would go

8   through it, check all of the, all of the

9   information.  And she would say that that debt

10  ratio is 35 or, say, 40 percent debt ratio,

11  debt-to-income ratio.  And the guidelines said it

12  had to be 38.  So it's up to her, if she wants to

13  make an exception.  Something that minute she may

14  not have the authority, but Betty Ann and Paul

15  could do that.

16      But if they were at 45, 50 percent debt

17  ratio after the income docs came in, they just

18  can't afford the loan.  Then they would turn it

19  down, and then the loan doesn't happen, unless

20  they can go out.  Then they would send out

21  conditions saying, is there a cosigner?  Is there

22  another job?  Is there income that we don't know

23  about?  They would go back and ask that.  And if

24  there was, then, fine.  If it was a part-time job

25  that was only like a month or two months, they

A. D'APOLITO

Page 61

1   probably wouldn't count it.  But if it was at
2   least six months to a year, they've been on it,
3   you know, they would take it.  Even if it is a
4   letter from the employer, because they pay them
5   cash.  They would take that and then make the
6   exception.  But if they didn't want to accept,
7   that's where Betty Ann and Paul may get into an
8   argument.

9        Here is a letter.  She's been here taking
10  care of this woman's kid for $500 a month every
11  month for the last four years.  And, you know,
12  Paul would go, but we can't approve that kind of
13  income.  Maybe she would bring Jimmy in and she
14  would get it, and they would either approve it or
15  deny it.

16      Q. She was the sales manager?

17      A. She was -- the national sales manager was
18  her title.

19      Q. So she wanted to close every loan she can?

20      A. She wants -- every loan that comes in she
21  wants closed.  She was paid based on that.

22      Q. And Mr. Delrosso?

23      A. He was on a salary.  He was the underwriter.
24  He is, basically, the, you know, the security
25  guard, you know, of all of the loans.  He --

A. D'APOLITO

Page 62

1   because if, if they -- if he signed off on a loan

2   and it was never, ever bought, it is his ass.

3   They would come down on him.

4       Q. Right.

5       A. This didn't meet any guidelines.  Why did

6   you approve it?

7       Q. Okay.

8       A. And, then, he wouldn't say Betty Ann made

9   me.

10      Q. Right.

11      A. You know what I mean?  You know?  No.  Well,

12  Betty Ann gave me a -- you know what I mean -- off

13  the record.  It's like you wouldn't do that.

14      Q. Okay.

15      A. But she would -- I mean, seeing her beg.

16  She would be in there going, please, Paul, please.

17  She needed every loan closed for her commission.

18      Q. Jumping back, the one question I didn't ask.

19  When you were at the closing with Mr. Cicalese and

20  you notarized the thing, were there any buyers

21  present?

22      A. Yes.  They signed.  That's why I did it.

23  They were actually there and signed.  I witnessed

24  their signatures.  I don't remember who they were.

25      Q. Okay.  And, then, were you at any other

A. D'APOLITO

Page 67

1    were missing.  Billy would fax them up.  A lot of

2    times Billy came up, himself, and delivered

3    them --

4        Q. Uh-huh.

5        A. -- right to Kelly's desk.

6        Q. Do you know if Kelly ever, prepared documents

7    herself?

8        A. Yes, she did.

9        Q. To, to -- I wouldn't say, to complete the

10   record, but to fill in gaps in the loan files?

11       A. Uh-huh.

12       Q. Did you ever do that?

13       A. I was with her one time when we were looking

14   for lenders for the leases, and she was filling

15   out the leases.  And I was in the phone book

16   pulling out names.

17       Q. Other than that time, did you ever fill out

18   a document that was needed for a loan?

19       A. No, I didn't.

20       Q. Okay.  How do you know Kelly did?

21       A. I was by her desk.  I saw her writing

22   something up.

23       Q. Do you remember what it was?

24       A. No. I can tell you that Billy had Kelly

25   under her payroll.  Billy's payroll?

A. D'APOLITO

Page 73

1        A. No. We would never have any dealings with

2    them, at all.

3        Q. Okay.   You wouldn't?

4        A. Yes.   Us as reps.

5        Q. Do you recall ever talking to a man named

6    Donald Larson, Lawson?

7        A. No.

8        Q. I just called him Larson.   We had this

9    debate.

10       A. No.

11       Q. Okay.   So you don't remember ever being

12   asked any questions about the DNFH Properties?

13       A. I don't remember.

14       Q. Do you know if Mr. Lawson or Larson had an

15   office in Walsh Securities?

16       A. Not that I know of.   I don't remember the

17   guy, at all.

18            MR. MAGNANINI:   Off the record.

19            (Discussion off the record.)

20       Q. You had testified last time, Mr. D'Apolito,

21   about a conversation Betty Ann had, supposedly,

22   telling you to tell either Kane or Mr. Grieser to

23   put blinds on --

24       A. Oh, yeah.

25       Q. -- on buildings?

A. D'APOLITO

Page 74

1    A. And put fake mail in the mailbox.

2    Q. That's now a new one.  Let me go back.

3    A. Make the house look livable, because

4  somebody was going to go there from, I guess it

5  was Greenwich or somewhere to go look at the

6  properties to see if the properties were

7  habitable.

8    Q. And when was this conversation?

9    A. Sometime in '97.

10   Q. Do you remember if it was cold or was it

11  spring or --

12   A. No. I don't remember.  I would be lying if I

13  told you.

14   Q. So how did Betty Ann know somebody from

15  Greenwich was going to look at the properties?

16   A. I don't know if they came in and told her in

17  a meeting or if they called her on the phone.  But

18  she came right to me and told me I had to get

19  Billy on the phone and tell him that.

20   Q. And she said, make the properties look

21  livable?

22   A. Like somebody lives there.

23   Q. Did she say anything else?

24   A. She just said somebody was going by to make

25  sure they were habitable properties.

A. D'APOLITO

Page 87

1   basically, they, they worked every day, like, as a

2   loan rep for a mortgage company, where they would

3   be working the phones, working lists that they had

4   of all loans, whatever. Trying to re-fi them.

5   That's what their job was. They were there every

6   day. As far as us, we were on the road. We were

7   never there. Sal, myself and I don't know. Even

8   remember her two nephews' names. And then their

9   son worked there, but I don't know what his

10  capacity was, besides just collecting a paycheck.

11      Q. So, all right. You were not in the meeting

12  with Calanni?

13      A. No. I wasn't there.

14      Q. Okay. All right. How did Betty Ann benefit

15  from the Kane loans?

16      A. She got paid commission on all of the loans

17  that closed. She had a high salary plus a

18  commission on every loan. And that's what I said.

19  I mean, if anybody else got paid -- you may want

20  to ask if Billy paid her, if anybody asked that

21  question. It could only benefit Bill.

22      Q. When you started taking payments from

23  Mr. Kane, did you know the loans were frauds?

24      A. No. In the beginning, no. But, then, when

25  they were, I brought it to Betty Ann's attention,

A. D'APOLITO

Page 90

1    Q. Do you recall what that was?

2    A. Now, that you say it, I remember.

3    Q. And they were the company that was going to

4    buy Walsh Securities?

5    A. Right.  And --

6    Q. And so the press release was in April of

7    '97, say, RBMG?

8    A. (Witness nodding head.)

9    Q. Is that when you said you were going to get

10   stock options?

11   A. Uh-huh.

12   Q. Who told you that?

13   A. Betty Ann.

14   Q. Okay.  Did you ever sign anything or --

15   A. I don't remember if I did or not.  I don't

16   think I did.

17   Q. Okay.  So about that time did you tell Betty

18   Ann that you were concerned with problems with the

19   loans?

20   A. (Witness nodding head.)

21   Q. What did you tell her, specifically?  Did

22   you tell her there were straw buyers involved?

23   A. I told her everything.  I told her that

24   there was straw buyers.  I said, none of these

25   houses are habitable.  They're not fixing them up.

A. D'APOLITO

Page 91

1    That was my main concern.  Straw buyers weren't

2    really my main concern.  If the houses were fixed

3    up, they were going to rent them.  So who cares.

4         You can buy a property and still deed my 60

5    percent.  There's nothing really wrong with this.

6    But there is something wrong with it when you do

7    that and I don't fix the property and lease it

8    out.  I mean, if I want to buy a piece of property

9    and give Mr. Calanni 60 percent to manage that

10   property and take care of it, that's on me.  But

11   we're collecting rent.  So 40 percent is my

12   credit, but we're making sure out of that 60

13   percent he's making the payments, he's renting it

14   out, he's taking care of the property.  Whenever

15   there is damage to it, he is taking care of it.

16   To me, that is not really a straw buyer.  They

17   made up that word, but they came out.  So that

18   wasn't my concern.

19        My concern was, the houses were all pieces

20   of shit.  You wouldn't put your worst enemy in.

21   Some of them were gutted.

22        Q. One of the things -- and my question is --

23   did you ever tell Betty Ann that the properties

24   were not in that bad shape or that they were being

25   bought for $10,000 and sold for $200,000?

A. D'APOLITO

Page 106

1  kept on going up.  So if -- I mean, if they were

2  doing five loans a week, it could go to ten loans,

3  and then the next time it would go to 20.  You

4  know?  Just keep on pumping them in.  They

5  wouldn't all close, you know?  And your numbers

6  are based on closed loans, not on volume.  That's

7  in your pipeline.

8      Q. And every loan that did close, Ms. DiMola

9  made a few more bucks?

10     A. Without a doubt.

11     Q. And Ms. DiMola would have made those few

12 bucks at the time the loan closed, correct?

13     A. Exactly.

14     Q. As far as you understood her financial

15 arrangement with the company, she didn't have any

16 responsibility for whether those loans ultimately

17 performed?

18     A. No.

19     Q. You never heard her complaining about her

20 being charged back any of her commissions because

21 loans had defaulted?

22     A. I never heard her say it.

23     Q. And was it your understanding,

24 Mr. D'Apolito, that --

25     A. I'm not married to her.

A. D'APOLITO

1    Q. So from Ms. DiMola's standpoint, as long as

2   loans kept getting funded --

3    A. And performing.

4    Q. -- and the group had money to continue to

5   make the monthly payments, there was not a lot of

6   risk on the down side on these loans.  Is that

7   your understanding?

8         MR. MAGNANINI:  Objection to form.  You

9   can answer.

10         MR. HAYES:  You can answer.

11    A. Yes.  That's my understanding.

12    Q. So Ms. DiMola would have every reason to be

13   sure that loans continued to get approved not only

14   because she would make money, but because it

15   created an income flow for loans to be repaid?

16         MR. MAGNANINI:  Objection to form.  You

17   can answer it.

18    A. Yes.  That's what I believe.

19    Q. Now, Ms. DiMola had testified that at some

20   point in time she was in the office and heard

21   about potential problems with these properties.

22   And she ran in and had a couple of people run out

23   with cameras, and they went out and took some

24   pictures of these properties which showed, of

25   course, that these properties were just as you had