## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,

               Plaintiff,

             v.

CRISTO PROPERTY MANAGEMENT, LTD.,
G.J.L. LIMITED; DEK HOMES OF NEW JERSEY, INC.;
OAKWOOD PROPERTIES, INC.; NATIONAL HOME
FUNDING, INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO., INC.; CAPITAL
ASSETS PROPERTY MANAGEMENT, LLC; WILLIAM
KANE; GARY GRIESER; ROBERT SKOWRENSKI, II;
RICHARD CALANNI; RICHARD DiBENEDETTO;
JAMES R. BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.; MICHAEL
ALFIERI, ESQ.; RICHARD PEPSNY, ESQ.; ANTHONY
M. CICALESE, ESQ.; LAWRENCE CUZZI; ANTHONY
D'APOLITO; DAP CONSULTING, INC.;
COMMONWEALTH LAND TITLE INSURANCE CO.;
NATIONS TITLE INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE INSURANCE CO. OF
NEW YORK; COASTAL TITLE AGENCY; STEWART
TITLE GUARANTY COMPANY; IRENE DiFEO;
DONNA PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., d/b/a MURPHY REALTY
BETTER HOMES AND GARDENS,

               Defendants.

Judge Dickinson R. Debevoise
Magistrate Judge Michael A. Shipp

Civ. A. No. 97-3496 (DRD)(MAS)

---

### BRIEF OF NATIONS TITLE INSURANCE OF NEW YORK, INC. AND FIDELITY TITLE INSURANCE CO. OF NEW YORK IN OPPOSITION TO WALSH SECURITIES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Edward J. Hayes, Esquire
David H. Colvin, Esquire
Fox Rothschild LLP
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103
(215) 299-2092
(215) 299-2150 (facsimile)

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................... 2

III. LEGAL ARGUMENT .............................................................................. 7

    A.   As each closing service letter and/or title insurance policy was issued in connection with a specific transaction, Walsh cannot lump all of the transactions together but must instead produce satisfactory evidence of the conduct engaged in by the closing attorneys at each transaction for which recovery is sought. Walsh fails to do so. ........................................................................... 8

    B.   Walsh cannot prevail by simply claiming that "but-for" the conduct of the closing attorneys, Walsh would not have made the loans. This is a breach of contract case and in order to prevail, Walsh must prove that its losses were caused by the closing attorneys engaging in conduct covered by the specific language of the closing service letters or that any title claims which have arisen are covered by the specific language of the title insurance policies. Walsh has not done so. ....................................................... 12

        1.   Walsh's claims are not covered by the closing service letters. ............................................................................... 14

        2.   The case law cited by Walsh does not support its position as those cases were not decided based on the form of closing service letters issued in this case. ................................. 21

    C.   Walsh is barred from recovering on its claims due to NHF's involvement in the fraud. ................................................................... 27

    D.   Walsh cannot recover on its claims since Walsh was involved in the fraud and, at the least, was fully aware of it and failed to either stop the fraud or notify Fidelity of the fraud. ........................... 34

IV. CONCLUSION ....................................................................................... 36

## TABLE OF AUTHORITIES

Page(s)

CASES

*Caldwell Trucking PRP Group v. Spaulding Composites Co., Inc.,*
  *890 F. Supp. 1247 (D.N.J. 1995)* ...................................................................................27, 29

*Clients' Security Fund of the Bar of New Jersey v. Security Title and Guar. Co.,*
  *134 N.J. 358 (1993)* .............................................................................................21, 22, 24, 26

*Conair Corp. v. Old Dominion Freight,*
  *22 F.3d 529 (3rd Cir. 1994)* ..............................................................................................17

*Connecticut General Life v. Punia,*
  *884 F.Supp. 148 (D.N.J. 1995)* ..........................................................................................17

*Corwin v. Lawyers Title Insurance Corporation,*
  *2011 WL 3346824 (E.D.Mich. 2011)* ..................................................................................11

*Cuciak v. Prison Health Care Serv., Inc., No. 05-cv-1860,*
  *2006 WL 1228582 (D.N.J. May 5, 2006)* .............................................................................1

*Dare v. Chicago Title Insurance Company,*
  *2011 U.S. Dist. LEXIS 70080 (D.N.J. June 29, 2011)* .........................................................31

*Deutsche Bank Nat'l Trust Co. v. Mitchell,*
  *422 N.J. Super. 214 (App. Div. 2011)* ................................................................................12

*Feldman v. Urban Commercial, Inc.,*
  *87 N.J. Super. 391 (App. Div. 1965)* .......................................................................30, 33, 34

*First American Title Insurance Co. v. Vision Mortgage Corp.,*
  *298 N.J.Super. 138 (App.Div. 1997)* ......................................................................13, 21, 24, 27

*Gerrold v. Penn Title Ins. Co.,*
  *271 N.J. Super. 50 (App. Div. 1994)* ...........................................................................27, 29

*Keown v. West Jersey Title and Guaranty Co.,*
  *161 N.J. Super. 19 (1978)* ..................................................................................................30

*McManus v. Saleeby,*
  *2011 WL 1661074 (App. Div. 2011)* ...................................................................................34

*McNeillab, Inc. v. North River Ins. Co.,*
  *645 F.Supp. 525 (D.N.J. 1986)* ................................................................................................33

*New Freedom Mortgage v. Global Mortgage,*
  *281 Mich.App. 63, 761 N.W.2d 832 (2008)* ............................................................................25

*Nolan v. Lee Ho,*
  *120 N.J. 465 (1990)* .................................................................................................................34

*Pennbar Corp. v. Insurance Company of North America,*
  *976 F.2d 145 (3rd Cir. 1992)* ...................................................................................................17

*Sears Mortgage Corporation v. Rose,*
  *134 N.J. 326 (1993)* ..........................................................................................................passim

*Smith v. Trusted Universal Standards,*
  *2011 WL 900096 (D.N.J. 2011)* ...............................................................................................10

*Stamato v. Agamie,*
  *24 N.J. 309, 131 A.2d 745 (1957)* ...........................................................................................17

*Travelers Indemnity v. Dammann,*
  *594 F.3d 238 (3rd Cir. 2010)* ...................................................................................................17

*Video Pipeline v. Buena Vista Home Entertainment,*
  *210 F.Supp.2d 552 (D.N.J. 2002)* ..............................................................................................9

*Watson v. City of Salem,*
  *943 F.Supp. 643 (D.N.J. 1995)* ................................................................................................16


**STATUTES**

*N.J.S.A. 17:46B-12* ..........................................................................................................................26


**OTHER AUTHORITIES**

*L.Civ.R. 56.1* .......................................................................................................................................3

*F.R.C.P. 56(f)* ...................................................................................................................................35

*Fineberg, Handbook of New Jersey Title Practice, § 2704* .........................................................26

*Insurance Law (1971) § 5.3(a) at 278-79* ..............................................................................32, 33

Defendants, Fidelity National Title Insurance Co. of New York and Nations Title Insurance of New York, Inc. (collectively, "Fidelity"), by and through their undersigned counsel, Fox Rothschild LLP, respectfully submit this brief in opposition to the motion for partial summary judgment filed by plaintiff, Walsh Securities, Inc. ("Walsh"). For the reasons that follow, as well as for the reasons set forth in the Brief of Commonwealth Land Title Insurance Company ("Commonwealth"), which arguments are incorporated herein by reference and adopted, *see Cuciak v. Prison Health Care Serv., Inc., No. 05-cv-1860, 2006 WL 1228582 (D.N.J. May 5, 2006),* the Court should deny Walsh's motion and, upon searching the record, award summary judgment to Fidelity.

## I.   INTRODUCTION

Walsh's motion shows a fundamental misunderstanding of Walsh's claims against Fidelity and its burden in pursuing a motion for summary judgment. Walsh seems to think that all it needs to prove in order to recover against Fidelity is that the closing attorneys committed fraud in connection with real estate transactions involving loans funded by Walsh. That is simply wrong. This is a breach of contract case so Walsh must establish that the conduct of the closing attorneys is covered by the very specific language of the closing service letters and Walsh must do so for each transaction on which recovery is sought. As the closing attorneys were not Fidelity's agents, Fidelity is not generally responsible for their fraud.

Instead, Fidelity could be responsible only to the extent of the coverage provided in the closing service letters. Walsh's motion ignores the actual language of the closing service letters, which is integral to an analysis of coverage. By ignoring such language, Walsh tries to create the incorrect impression that coverage provided in the letters is limitless, when it clearly is not. Further, Walsh must establish not only that the closing attorneys violated Walsh's closing instructions, whether fraudulently or otherwise, but Walsh must also prove, ***inter alia***, that the closing attorneys' conduct created a loss of the type specified in the closing service letters. Walsh's motion does not provide this Court with any proof that any loss is covered under the closing service letters. Furthermore, Walsh simply ignores the overwhelming evidence that National Home Funding ("NHF"), the entity to which the closing service letters and title policies were issued, and Walsh itself, the current claimant under those documents, participated in the very fraud about which Walsh now complains. This Court cannot allow recovery when the claimant and its assignor were active participants in the fraud.

## II.    **FACTUAL BACKGROUND**

This case involves approximately 220 loans which were made to various third parties between April of 1996 and June 5, 1997. In all of the complaints that Walsh has filed in these proceedings, Walsh alleges that it was the "victim" of a fraudulent scheme perpetrated by a vast number of individuals, mortgage companies, real

2

estate appraisers and attorneys to induce it to fund the mortgage loans at artificially inflated prices.[1]  All of the loans in this case were originated by Defendant NHF and were funded by Walsh.

Walsh alleges a variety of claims against the other defendants, ranging from negligence to fraud to RICO violations.  All of the claims against those parties have either been dismissed, settled, defaulted or stayed by bankruptcy, leaving only the claims against Fidelity and Commonwealth, the title insurance companies, remaining in the litigation.  It is important to note that in <u>every</u> one of Walsh's complaints, Fidelity has never been alleged to be a participant in the scheme, directly or indirectly.  Instead, the sole claim asserted by Walsh, prior to the Fourth Amended Complaint, was a breach of contract claim in which Walsh alleged that Fidelity, as well as Commonwealth, breached the terms of certain closing service letters that were allegedly issued in connection with the fraudulent transactions. ***See, Walsh's Amended Complaint, Second Amended Complaint and Third Amended Complaint.***  In the Fourth Amended Complaint, Walsh asserted, for the first time, several title policy claims against Fidelity, despite the fact that those

---

[1]  As discussed in detail later, and as set out at length in Commonwealth's Supplemental Statement of Disputed Material facts filed pursuant to L.Civ.R. 56.1, which is adopted herein by Fidelity, Walsh was not a "victim" but rather was a willing participant in and beneficiary of the fraud.  Two of Walsh's employees, Anthony D'Apolito and Kellie O'Neill, were indicted and pled guilty to involvement in the fraud.  Elizabeth Demola, the national sales manager and a shareholder of Walsh, and the sister of Walsh's principal shareholder, was also indicted and pled guilty to conduct relating to the fraud.

claims had not been raised in the more than a decade that had passed since the subject transactions. *Fourth Amended Complaint , Count V.*

## General Background

A relevant loan transaction would start with the taking of a loan application by a participant/mortgage broker (the "broker"). *Walsh deposition, p. 325.*[2] The broker would gather all documentation necessary for the underwriting of the loan. and would also order an appraisal of the subject property. *Walsh deposition, p. 325-327.* Once the loan package was completed, it would be forwarded to Walsh. *Walsh deposition, p. 327.*

If Walsh was satisfied with the package, it would issue a commitment for the loan to the broker. *Walsh deposition, p. 328.* Walsh would then prepare the loan documents. *Walsh deposition, p. 329.* At this point, the closing department would issue closing instructions and would arrange for the transfer of funds to the closing attorney. *Walsh deposition, p. 331.*

Notably, Walsh itself did not close a single loan that is the subject of this litigation; rather, it required that all of the loans be closed by NHF and that the title insurance policies be issued to NHF. *Walsh deposition, p. 382.* Robert C. Walsh, the president of Walsh, admitted that Walsh structured the mortgage loan transactions in this manner in an effort to limit its liability for possible wrongdoing

---

[2] A copy of relevant portions of the transcript of the deposition of Robert C. Walsh is attached as Exhibit "A" to the Hayes certification.

4

by NHF, admitting his suspicion as to the manner in which NHF conducted its business. **Walsh deposition, p. 668.** Furthermore, Mr. Walsh was specifically apprised of NHF's questionable business, but took no steps to inquire, much less notify Fidelity.

## The assignments of loans originated by NHF

At his deposition, Mr. Walsh acknowledged that assignments are the manner in which mortgages are transferred and that it is important to record assignments in the public records. **Walsh deposition, p. 667.** More importantly, Mr. Walsh admitted that (1) Walsh prepared the assignments on these transactions, **Walsh deposition, p. 670,** (2) Walsh sent the assignments to NHF for execution, **Walsh deposition, p. 671**, (3) after being executed, the assignments were returned by NHF to Walsh, **Walsh deposition, pp. 671-672,** (4) upon receipt, Walsh would execute an additional assignment of the loan documents in blank for the benefit of the ultimate purchaser of the loan in the secondary market, **Walsh deposition, p. 672,** (5) Walsh would transmit both assignments to the whole loan buyer of the mortgage, **Walsh deposition, p. 675**, and (6) Walsh expected the whole loan buyer to record the assignments, **Walsh deposition, p. 675.** On its motion, Walsh has produced no evidence that Walsh instructed or even expected the closing attorneys or the title agent to record the assignments. In fact, Walsh has produced no evidence that the closing attorneys or the title agent came in contact with the assignments in any way.

5

Mr. Walsh admitted that the assignment is not one of the documents identified in Walsh's closing instructions as being transmitted by Walsh to the closing attorneys. ***Walsh deposition, p. 674.***[3]   To the extent Walsh has suffered any losses due to divestiture of its mortgages, as alleged in its recently asserted title policy claims, those losses are directly attributable to Walsh's failure to record assignments, not to any actions of the closing attorneys.  For further discussion of the facts supporting this position, we respectfully refer the Court to Fidelity's November 10, 2011 brief in support of its motion for partial summary judgment on the title policy claims. ***[Docket No. 477].***

## Facts relevant to Walsh's motion for summary judgment

Since Walsh filed the motion for partial summary judgment, it carries the burden of producing evidence to show that there are no material issues of fact in dispute regarding what occurred at the subject real estate transactions and that Walsh can establish, on each transaction for which its seeks recovery, facts necessary to show a breach of contract on the part of Fidelity.  A review of the "facts" set out by Walsh in its motion papers reveals that Walsh has failed to present to this court <u>any</u> facts regarding any of the underlying transactions; further, many of the "facts" set forth in Walsh's Rule 56.1 statement contain no citation to any record

---

[3] The closing instructions used by Walsh in these transactions are included as part of exhibit "A" to the certification of Robert Magnanini ("Magnanini cert."). A review of the letters reveals no reference to the assignments whatsoever.

authority. In short, Walsh has not presented the facts necessary to establish a breach of contract and for that reason alone its motion must be denied.

Furthermore, the evidence is clear that Walsh and its assignor, NHF, were active participants in the very fraud about which Walsh now complains. Rather than repeat these facts in detail in this brief, Fidelity instead incorporates by reference the facts set forth in Commonwealth's Rule 56.1 Statement of Disputed Facts as though set forth in full herein.

## III.   **LEGAL ARGUMENT**[4]

Walsh's motion must be denied for five independent reasons. First, Walsh cannot simply lump all of the transactions together for purposes of a request for summary judgment without producing evidence of the particular conduct engaged in at each transaction for which summary judgment is sought; that is because each closing service letter is a separate contract under which liability must be proven. Walsh makes no effort to produce such evidence. Second, Walsh's attempt to use a tort "but-for" standard of liability is improper since the "but-for" standard is not applicable to this breach of contract case. Rather, Walsh must present evidence establishing each of the elements required in a breach of contract case, which it has not done. Third, Walsh has not even attempted to show how the conduct engaged in

---

[4] Fidelity will not recite the standard for summary judgment as this Court is well aware of the standard and the standard was previously set forth fully in Fidelity's motion for summary judgment previously filed.

by the closing attorneys is covered by the specific language of the closing service letters, a fundamental prerequisite to any recovery. Instead, Walsh ignores the language of the letters and attempts to support its request with case law which is inapposite. Fourth, Walsh cannot recover under the closing service letters when NHF, the entity to which the closing service letters was issued, was involved in the fraud. Walsh, as the assignee of NHF, is charged with all of the wrongful conduct of NHF, thereby barring its claims. Finally, Walsh cannot recover against Fidelity when there is overwhelming evidence that Walsh itself was involved in the fraud or, at the very least, was fully aware of the fraud and failed to either stop the fraud or notify Fidelity of the fraud. Each of these reasons independently mandates denial of Walsh's request for summary judgment.

> **A.** **As each closing service letter and/or title insurance policy was issued in connection with a specific transaction, Walsh cannot lump all of the transactions together but must instead produce satisfactory evidence of the conduct engaged in by the closing attorneys at each transaction for which recovery is sought. Walsh fails to do so.**

Each closing service letter and each title insurance policy is a separate contract. As a result, in order for Walsh to prevail, it must present evidence regarding each transaction for which it seeks recovery. It is not enough to make a general allegation that a fraud was committed by the closing attorneys or that Walsh's closing instructions were generally violated. In order to recover, Walsh must establish that a fraud and/or a violation of the closing instructions occurred in

each transaction for which recovery is sought and that the fraud and/or failure to adhere to closing instructions related to the specific and limited type of loss covered under Fidelity's closing service letters and/or title insurance policies. As discussed later, under the closing service letters, the title company agrees to indemnify for loss only when the instructions pertain to the type of problem identified in the closing service letter. Walsh's Brief glosses over the need for the presentation of evidence and instead, Walsh merely produces copies of the title commitments, portions of the title policies and closing service letters. While these documents may be used in an attempt to establish the existence of a contract between the parties, this does not establish a breach of any such contract. Walsh discusses the nature of the fraud in general and then asks this Court to simply assume that the conduct in each and every transaction was identical. This Court cannot assume what occurred or assume there was a breach. Evidence on each transaction must be produced and since Walsh has not produced such evidence, the motion for summary judgment should be denied on that basis alone.

In order to prevail on a breach of contract claim, a party must prove "(1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." *Video Pipeline v. Buena Vista Home Entertainment, 210 F.Supp.2d 552 (D.N.J. 2002).* It is clear that "the party bringing the action [for breach of contract] has the burden of establishing each

element in order to establish breach of contract." ***Smith v. Trusted Universal Standards, 2011 WL 900096 (D.N.J. 2011)***.  As a result, in order to prevail on summary judgment, Walsh needs to show a contract, i.e. a closing service letter or a title insurance policy, covering each transaction for which judgment is sought, sufficient evidence to establish a breach of that contract in each transaction, damages flowing from the breach of contract in each transaction and that Walsh fulfilled its contractual duties, including the duty of good faith in its dealings with Fidelity.  Walsh's motion contains no individualized evidence as to any of the transactions in respect of which it claims damages.

Each closing service letter is issued to cover <u>one</u> specific transaction. Similarly, each title insurance policy is issued to provide insurance on <u>one</u> specific transaction.  Walsh issued individual closing instructions for <u>each</u> particular loan and the contents of those letters varied because they were tailored to a particular loan. As Walsh is well aware, the conduct occurring at the various loan transactions was not the same.  For example, some used fraudulent deposit letters while others used second mortgages. Some closed the "B" side of the transaction before the "A" side closed, while others did not.  Some made distributions before settlement was complete while others did not.  Some had delays in the recording of documents while others did not.  In the face of these facts, Walsh gives this Court nothing to show what occurred in any particular transaction.  Instead, it wants to paint all of the

transactions with one broad brush, for which there is no legal support. In essence, Walsh wants this Court to take a "back-door" class action type approach to Walsh's proofs and simply assume that every transaction was identical. This case is not a class action and even if it were, the evidence of a "general scheme" in a case involving a title company with individual contracts and individual transactions would not meet Walsh's burden. *See, e.g. Corwin v. Lawyers Title Insurance Corporation, 2011 WL 3346824 (E.D.Mich. 2011),* which denied class certification against a title company absent allegations of individualized evidence. The *Corwin* Court pointed out that "such proof is uniquely individualized; it cannot be established on a class wide basis. Therefore, instead of liability being established "in one stroke," it would take an assessment of each transaction to determine if the absent class member qualified for the discount rate." *Id.* Although this case is not a class action, the principles are the same. This Court needs to make an assessment of each individual transaction in order to determine if a breach of the closing service letter or title policy occurred in that particular transaction. Since Walsh has failed to supply this Court with the evidence necessary to do so on an individualized basis, the motion for summary judgment must be denied.

It should also be noted that the record presented by Walsh does not contain evidence that Walsh is actually the current holder of the loans alleged by Walsh to have been repurchased. Walsh simply attaches a list of loans it contends it

11

repurchased from the secondary market. Where are the assignments showing that Walsh is the holder of the loans? Where is there any other evidence establishing that the loans are not still held by the secondary market purchasers? No such evidence is presented. Absent evidence that Walsh is the current holder of these loans by assignment, Walsh cannot establish that it even has standing to bring a claim against Fidelity under the closing service letters or title policies. *See Deutsche Bank Nat'l Trust Co. v. Mitchell, 422 N.J. Super. 214 (App. Div. 2011)* (lender had no standing where it did not have the assignment and failed to demonstrate that it was in possession of the note).

Because of the lack of evidence as to Walsh's ownership of the loans and the lack of evidence of what occurred in each individual transaction, the motion for summary judgment must be denied.

**B.   Walsh cannot prevail by simply claiming that "but-for" the conduct of the closing attorneys, Walsh would not have made the loans. This is a breach of contract case and in order to prevail, Walsh must prove that its losses were caused by the closing attorneys engaging in conduct covered by the specific language of the closing service letters or that any title claims which have arisen are covered by the specific language of the title insurance policies. Walsh has not done so.**

As this Court is well aware, despite the fact that numerous causes of action have been asserted by Walsh against the other defendants in this case, the case against the title companies is a contract case alleging a breach of closing service letters and/or title insurance policies. A review of the summary judgment

12

submission made by Walsh shows that either (1) Walsh recognizes that it cannot produce the evidence necessary to establish that the conduct of the closing attorneys is covered by the language of the closing service letter, and to compensate for its inability to do so, Walsh misrepresents/mischaracterizes the terms of the closing service letter in its Brief, or (2) Walsh simply fails to understand what its burdens are in seeking to recover under the closing service letters.   Both scenarios are unacceptable.   Walsh argues that the closing attorneys were engaged in conduct which was essential to the mortgage fraud scheme and that without their involvement, Walsh would not have been defrauded.   ***Walsh Brief pp. 1, 20***. According to Walsh, this ends the inquiry.   In essence, Walsh is making an argument based on one element of <u>tort</u> liability, i.e., Fidelity issued closing service letters covering some undescribed conduct of the closing attorneys, the closing attorneys committed fraud and, "but-for" the fraud, Walsh would not have funded the loans. Walsh misses the point completely. This is a breach of contract case, so Walsh must establish that the conduct of the closing attorneys is covered by the very specific and limited language of the closing service letters which, clearly on their face, do <u>not</u> cover all fraud engaged in by a closing attorney.  Even the authority cited by Walsh in its brief acknowledges that not every case in which a closing attorney commits fraud will trigger coverage under a closing service letter. ***See, First American Title Insurance Co. v. Vision Mortgage Corp., 298 N.J.Super. 138,***

13

*157 (App.Div. 1997).*   As shown below, in this case, no coverage is triggered because the conduct complained of by Walsh does not fall within the language of the relevant documents.

### 1.   Walsh's claims are not covered by the closing service letters.

A review of the closing service letters reveals that the letters do not cover any and all losses which might be suffered by the lender.   Certainly, title underwriters had no intention of converting themselves into a fidelity insurer for <u>all actions</u> of a closing attorney in consideration for receipt of a $25 closing service letter fee. Contrary to Walsh's argument, a closing service letter does not provide indemnity to the claimant simply because a closing attorney commits malfeasance or fails to follow the lender's closing instructions.   Instead, liability under the closing service letter is limited because the letter sets forth the specific and only conduct for which the issuer will be liable on a claim involving attorney malfeasance or the failure to follow closing instructions.[5]

The closing service letters issued to Walsh provide that Fidelity will indemnify the lender for actual loss, if that loss arises out of:

> (1)   Failure of the Issuing Agent or Attorney to comply with your written closing instructions <u>to the extent that they relate to</u>:

---

[5] As shown later in this brief, the limiting language was added to the form of closing service letter to specifically address certain decisions issued by the New Jersey courts.

> (a) the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the documents [sic] and the disbursement of funds necessary to establish such title or lien; or
>
> (b) the collection and payment of funds due you; or
>
> (2)    Fraud of or misapplication by the Issuing Agent or Attorney in handling your funds in connection with the matters set forth in numbered paragraph 1 above. [emphasis added].

*See, closing service letters attached as Exhibit A-1 to the Magnanini cert.* As can be seen, the closing service letters indemnify for loss caused by the closing attorney's failure to comply with the lender's closing instructions but only (1) *to the extent those instructions relate to the validity, enforceability and priority of the lien of the mortgage or to the extent they relate to the collection and payment of funds due to Walsh* or (2) if the closing attorney engaged in fraud, only to the extent the fraud was *in connection with matters involving the validity, enforceability and priority of the lien of the mortgage or the collection and payment of funds due to Walsh*. This is the protection afforded to Walsh under the language of the closing service letters--nothing more--and Walsh does not even attempt to address in its Brief how these conditions are met by the evidence in this case. It is respectfully submitted that Walsh does not attempt to address these limiting conditions because it recognizes it cannot satisfactorily do so.

15

Walsh's Brief contains only one reference to the limiting language of the closing service letters. The only mention of the limiting language occurs when Walsh initially recites the language of the closing service letter. *Walsh Brief, p. 6.* There is not another reference in the Brief to the limitations contained in the letter. It is noteworthy that in a Brief of 30 pages, Walsh makes no effort to address how the closing attorneys' failure to comply with its closing instructions related to either the validity, enforceability and priority of the lien of the mortgages given to NHF, or to the collection and payment of funds due to Walsh. Without this proof, there can be no recovery under the letters. Similarly, Walsh makes no effort in its Brief to address whether or how the fraud engaged in by the closing attorneys related to matters involving the validity, enforceability and priority of the lien of the mortgages given to NHF or to the collection and payment of funds due to Walsh. Walsh simply claims a fraud occurred and that it has sustained a loss as a result of the fraud. It is almost as though Walsh believes the limiting language is not contained in the body of the closing service letters. Walsh cannot rewrite the closing service letters to remove the limiting language and courts are obligated to enforce limiting language contained in contracts.

"Under New Jersey law, parties to a contract are at liberty to agree on one or more conditions precedent upon which their liability will depend." *Watson v. City of Salem, 943 F.Supp. 643, 660 (D.N.J. 1995).* If such a limitation is contained in a

contract it should be enforced since it is the responsibility of the Court to give effect to the entire document, not just a part of it. *Pennbar Corp. v. Insurance Company of North America, 976 F.2d 145, 151 (3rd Cir. 1992).* "A construction that gives reasonable meaning to all of the contract's provisions is "preferred to one which leaves a portion of the writing useless or inexplicable." *Id.* While Walsh would like to ignore the limiting language contained in the closing service letters, this Court cannot permit Walsh to rewrite the language of the closing service letter in order to obtain coverage which does not exist. "A party may not ignore the provisions of his agreement to suit his own convenience or profit." *Stamato v. Agamie, 24 N.J. 309, 316, 131 A.2d 745 (1957).* That is exactly what Walsh is trying to do in this case.

The limiting language of the closing service letters cannot be ignored. *Connecticut General Life v. Punia, 884 F.Supp. 148 (D.N.J. 1995). See also Conair Corp. v. Old Dominion Freight, 22 F.3d 529, 533-534 (3rd Cir. 1994).* In reviewing the coverage provided by the closing service letter, the Court must "endeavor to avoid ignoring certain words or reading the contract in such a way as to make any words meaningless." *Travelers Indemnity v. Dammann, 594 F.3d 238, 255 (3rd Cir. 2010).* It is respectfully suggested to this Court that only by rewriting the closing service letter can Walsh establish any entitlement to recover for the losses it alleges to have suffered.

If, arguendo, Walsh is contending that the closing attorneys failed to follow its closing instructions, it must show that the instructions which were not followed related to the validity, enforceability and priority of the mortgage lien or the collection of funds due to Walsh. The mere fact that Walsh repurchased the loans does not establish a problem with the validity, enforceability and priority of the mortgage lien. A repurchase may have been required by any number of provisions of the agreements between Walsh and the secondary market purchasers, including a provision dealing with variances between the appraised value of the property and the actual value of the property.[6] But such a problem does not relate to the validity, enforceability and priority of the mortgage lien and is not covered under the closing service letters. Walsh does not produce evidence as to why the loans were allegedly purchased. If there were problems with the mortgages on the 66 loans allegedly repurchased by Walsh, one would expect Walsh to be able to present evidence that it submitted title claims on those 66 loans and to specify the nature of the title claims. Walsh did not do so. Interestingly, of the 220 loans at issue in this case, Walsh has only submitted title claims on 36 loans, thereby creating the presumption that there are no issues with the validity, enforceability and priority of the mortgage liens in those other transactions. Without such a title problem, no coverage exists under the

---

[6] Note in particular that in the Cityscape order attached as Exhibit X to the Magnanini certification, the Court notes on page 1 of the order that of the 140 loans which were the subject of that litigation, 32 were part of a fraudulent land flipping scheme but 108 were based on inflated property appraisals.

closing service letters because those letters specify that a failure to follow closing instructions or fraud of the closing attorneys must be related to the validity, enforceability and priority of the mortgage lien.   If there is no issue with the validity, enforceability and priority of the mortgage liens, there can also be no claim under the title insurance policies which insure, subject to the conditions and stipulations of the policy, the validity, enforceability and priority of the mortgage liens.

Walsh did make some title claims, for the first time, after leave was granted to file the fourth amended complaint.  As to the few transactions in which the validity, enforceability and priority of the mortgages was put at issue by those title claims, Fidelity directs this court's attention to its motion for partial summary judgment *[Docket No. 477]* in which uncontroverted evidence has been submitted to the Court to show that any problem mortgages resulted not from any failure of the closing attorneys to act properly or to follow Walsh's closing instructions, but instead resulted from the failure of Walsh to record assignments of the mortgages, which responsibility Walsh admitted rested at its feet. *Walsh deposition, pp. 670-675.*  On these loans, Walsh cannot prove a problem with the validity, enforceability and priority of the mortgages resulting from a failure to follow closing instructions. Absent such proof, no recovery is permitted.

19

As to Walsh's blanket statement regarding delays in the recording of documents, while delays could violate Walsh's closing instructions, Walsh must also produce evidence in its moving papers that the delays resulted in an issue with the validity, enforceability or priority of the mortgages in order to bring its alleged loss within the coverage of the closing service letters.  What evidence did Walsh present this Court on this issue?  Nothing.  As this Court is well aware, delays in recording documents only create a problem when there are intervening liens during the gap in recording.  Here, however, Walsh is silent as to the existence of such problems.

Just as Walsh cannot establish a breach of closing instructions relating to the validity, enforceability and priority of the mortgages, neither can Walsh establish that the failure to follow its closing instructions related to the collection and payment of funds due to Walsh.  Indeed, Walsh has never asserted that the closing attorneys failed to comply with Walsh's closing instructions to the extent those closing instructions related to the collection and payment of funds due Walsh.  Walsh received all of the points, fees, etc. from the closing attorneys on the loans at issue.  Therefore, there is no coverage under either paragraph 1(a) or 1(b) of the closing service letters.

As to the fraud provision in paragraph 2 of the closing service letter, Walsh's reference to the "fraud" of the closing attorneys misses the point.  Walsh was

20

required to establish not only fraud, but also that any such fraud involved the validity, enforceability and priority of Walsh's mortgage liens, or the collection and payment of funds due to Walsh. No such evidence was produced.

The record presented to this Court by Walsh fails to include <u>any</u> evidence from which this Court could conclude that the closing service letter covers any losses incurred by Walsh. As there is no proof necessary to establish a breach of the closing service letters, the requested summary judgment must be denied.

**2.    The case law cited by Walsh does not support its position as those cases were not decided based on the form of closing service letters issued in this case.**

Because Walsh recognizes that it cannot produce evidence to support a claim under the language of the closing service letters, Walsh attempts to shift this Court's focus away from the language of the letters by arguing that under ***Clients' Security Fund of the Bar of New Jersey v. Security Title and Guar. Co., 134 N.J. 358 (1993), Sears Mortgage Corporation v. Rose, 134 N.J. 326 (1993)*** and ***First American Title Insurance Co. v. Vision Mortgage Corp., 298 N.J.Super. 138 (App.Div. 1997),*** Fidelity is somehow responsible for <u>all</u> improper acts of the closing attorneys. This argument ignores the fundamental distinction between those cases and the instant matter before the Court. While each of those earlier cases created broad liability on the part of a title underwriter, those cases are not controlling in this matter as the form of closing service letter issued in this case was

modified specifically to address the results in the ***Clients' Security Fund*** and ***Sears*** cases.

In ***Clients' Security Fund,*** the closing protection letter was vastly different from the letters issued in the NHF transactions in this case. The ***Clients' Security Fund*** form of letter provided that the title underwriter would reimburse the lender for actual loss:

> when such loss arises out of …fraud or dishonesty of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with the closing."

***Clients' Security Fund, 134 N.J. at 370-371.*** The Court found that this language was broad enough to cover the conduct occurring in that case. By contrast, the letters issued to NHF include additional limiting language indicating that Fidelity will cover loss resulting from the fraud of the closing attorney in handling Walsh's funds if such fraud <u>relates to the validity, enforceability and priority of the lien of</u> <u>the mortgages given to NHF or to the collection and payment of funds due to Walsh</u>. This language clearly limits the breadth of the protection provided under the letter and the language sufficiently distinguishes ***Clients' Security Fund*** from the instant case.

As to the ***Sears*** case, it should be noted that ***Sears*** was not a case in which the court imposed liability under a closing service letter. In fact, in that case, there was no closing service letter issued. Because there was no contract governing the

relationship between the parties, the Court made its finding of liability based on an agency analysis, not a breach of contract analysis, holding that the attorney retained by the purchaser in the subject real estate transaction functioned as an apparent agent for the title underwriter and, as a result, the underwriter was liable for the embezzlement of closing funds by that attorney.  Since *Sears* did not address closing service letter liability, it is irrelevant as to the scope of the closing service letters issued by Fidelity.

Furthermore, the apparent agency argument which existed in *Sears* cannot be used to create liability in the current matter because of the language contained in the closing service letters in this case.  In specific response to the finding of apparent agency in *Sears*, the title industry revised the closing service letter to make clear that "THIS LETTER DOES NOT APPOINT THE ABOVE NAMED ATTORNEY AS AN AGENT OF FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK." *See, closing service letters attached to Magnanini cert.*  In the face of this language, no argument can be made that apparent agency exists and, without apparent agency, *Sears* is completely inapposite.

It should also be noted that the rationale behind the Court's decision in *Sears* was that when there are two innocent parties who have suffered as a result of the wrongdoing of a third party, the one who placed the wrongdoer in the position to commit the wrong must bear the loss.  In *Sears*, both the claimant and the title

23

company were found to be innocent victims.  In the instant case, there is no basis for Walsh to argue that there are two innocent victims.  As will be set forth in detail in the later portion of this Brief, and as set forth in Commonwealth's Brief, Walsh was knee-deep in the fraud and cannot be considered an innocent victim, entitled to the kind of protection afforded by the Court in **Sears.**

Finally, Walsh's citation to **Vision** is also inapposite.  As with the form of letter issued in **Clients' Security Fund**, the language of the closing service letter issued in **Vision** differed from the letters issued in the current case.  The language of the closing service letter in **Vision** provided that the title underwriter:

> hereby agrees to reimburse you for actual loss …when such loss arises out of:
>
> \*    \*    \*    \*
>
> 2. Fraud or dishonesty of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closing.

**Vision, 298 N.J.Super. at 140.**  As with **Clients' Security Fund**, the liability of the title underwriter in **Vision** was premised on the fact that the closing service letter did not include the limitations contained in the closing service letters issued by Fidelity in this case.  **Vision** cannot control this court's decision in light of the limiting language of the closing service letters here.  While Walsh's entire brief is aimed at getting the Court to ignore that language, this court must enforce the agreement existing between the parties, limitations and all.

Courts which have reviewed the revised form of closing service letter have found that its language requires that a claimant establish not just a breach of closing instructions or fraud, but also that the breach or fraud relate to title issues or the collection of funds due the claimant. *See, New Freedom Mortgage v. Global Mortgage, 281 Mich.App. 63, 761 N.W.2d 832 (2008).* In *New Freedom,* although the lender could prove that there were violations of the closing instructions and fraud, recovery against the title underwriter was not permitted as the lender could not establish that either the violations of the closing instructions or the fraud related to the lien of the mortgage or the collection of funds due to the lender. *Id., 761 N.W.2d at 844.*

In regard to the language of the closing service letter, it is respectfully submitted that the history of closing service letters in New Jersey is illuminating. As this Court is well aware, for a number of years title insurers issued title insurance policies to lenders insuring that the mortgage being insured was a valid first lien. There were no closing service letters.  There were occasions in which closing attorneys (under the "North Jersey Closing Procedure") or title agents (under the "South Jersey Closing Procedure") engaged in acts of dishonesty, resulting in financial loss to the lender which were not covered by the title insurance policies. In response, lenders requested that the title insurance industry protect them from acts of dishonesty of closing attorneys and closing agents, thereby resulting in the birth

of the closing service letter.  Obviously, the closing service letter was not intended to offer protection to a lender who was involved in a fraud leading to the loss or was aware of the existence of a fraud leading to the loss and took no steps to stop it. Similarly, the closing service letter was not intended to substitute as malpractice or fidelity insurance for all acts of the closing attorney.   Indeed, title insurance companies are prohibited by New Jersey law from offering any kind of insurance other than title insurance. *See, N.J.S.A. 17:46B-12* ("a title insurance company shall not transact, underwrite or issue any kind of insurance other than title insurance.")

As a result of the decisions in *Clients' Security Fund* and *Sears,* title insurers found themselves cast in the unintended role of fidelity insurers responsible for any act of dishonesty of the closing attorney.  As a result, after *Clients' Security Fund* and *Sears* were decided, the title insurers revised the language of the closing service letters to specifically address the holdings of those cases and to make it clear that only certain limited actions of the closing attorneys would be covered by the letter, bringing the coverage afforded back in line with the reasonable expectation of the parties as to what it covered by a closing service letter. *See, Fineberg, Handbook of New Jersey Title Practice, § 2704.*  The revised form of letter, containing these limitations, was submitted to the New Jersey Department of Insurance and was approved for use in New Jersey. *Id.*  It is this revised form of letter which was issued by Fidelity on all of the transactions involving NHF.

By virtue of the revised language, and since the claims in this case are governed by the language of the revised closing service letter--not some earlier form that did not include the limiting language of the current letter--the holdings of *Sears, Clients' Security Fund* and *Vision Mortgage* do not apply to this case, and the coverage under the closing service letters is limited to the narrow coverages recited earlier in this Brief. As Walsh has not established in its moving papers that the narrow coverages are implicated, summary judgment must be denied as neither *Sears, Clients' Security Fund* nor *Vision Mortgage* negate the language of the parties' contract.

**C.    Walsh is barred from recovering on its claims due to NHF's involvement in the fraud.**

From the inception of this case, Fidelity has denied liability for the claims asserted by Walsh because, among other things, the overwhelming evidence proves that Walsh's assignor, NHF, was involved in the fraud. Not one of the closing service letters or title insurance policies in this case were issued to Walsh. Instead, at the specific direction of Walsh, all of the letters and policies were issued to NHF. Now, recognizing that the law mandates that Walsh stand in the shoes of NHF when making claims against Fidelity, *see, Gerrold v. Penn Title Ins. Co., 271 N.J. Super. 50 (App. Div. 1994)* and *Caldwell Trucking PRP Group v. Spaulding Composites Co., Inc., 890 F. Supp. 1247 (D.N.J. 1995)*, and that those shoes are dirty from the fraud, Walsh has attempted to get itself a "new pair of shoes" by asserting two

different positions from those previously taken in this case.  First, despite (1) naming NHF as a RICO defendant in almost all of its prior filings in this case, (2) making public statements that NHF and its principal were directly involved in the fraud, and (3) receiving substantial insurance proceeds from a fidelity bond based on its allegations that NHF was involved in the fraud, Walsh now contends that it is not really sure if NHF had any involvement in the fraud.  It takes this position despite overwhelming evidence of such involvement. Second, Walsh makes the audacious argument that because the closing service letter did not expressly state that recovery would be precluded if the claimant engages in fraud, a fraudster is entitled to recover under the letter. Both arguments are wrong.[7]

As to Walsh's efforts to distance itself from its prior statements, pleadings and its fidelity bond submission, all of which specifically alleged that NHF engaged in the fraud, Walsh is clearly bound, for purposes of summary judgment, by its prior statements and conduct on the involvement of NHF.  It would be inequitable to allow Walsh to take one position when it seeks recovery under a fidelity bond and a completely different position when it seeks recovery under the closing service letters.  More importantly, even if this court were to permit Walsh to back off its prior statements, the fact is that there is overwhelming evidence of NHF's

---

[7] Walsh's reference to a different closing service letter which has not been adopted or approved, and which was not used in the subject transactions, provides no support for its argument.

involvement in the fraud, all of which must be considered as credible evidence by this Court at the summary judgment stage.[8]  As evidence of NHF's involvement in the fraud exists, any rights Walsh obtained by assignment are no greater than the rights NHF would have if it chose to make a claim against Fidelity. *Gerrold, supra; Caldwell, supra.*  As NHF would be barred from recovery, Walsh, standing in the shoes of NHF, would similarly be barred.

Walsh's argument that a fraudster can recover on the closing service letters because the letters did not expressly state that fraud is a defense is patently wrong for at least two reasons.  First, the closing service letter incorporates the conditions and stipulations of the title policy into the letter. *See paragraph F of the closing service letters attached to Magnanini cert.*  The provisions of the title policy clearly provide that claims are barred when the claimant has engaged in wrongdoing, because in such a circumstance, the claimant "created" or "assumed" the loss by its wrongful conduct.

## EXCLUSIONS FROM COVERAGE

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

---

[8] Reference is made to the submissions made by Commonwealth Land Title Insurance Company in opposition to Walsh's motion for summary judgment, which submissions detail with great specificity the evidence establishing NHF's involvement, all of which must be taken as true for purposes of the motion for summary judgment.

    *          *          *          *

3.   Defects, liens, encumbrances, adverse claims or
other matters:

              (a) created, suffered, assumed or agreed to by
        the insured claimant.

***1992 Loan Policy, Exclusion 3(a).*** [9]   As a result of the incorporation of the policy

provisions into the closing service letter, since both NHF and Walsh participated in

the fraud, the claims raised by Walsh are barred as any losses were created, suffered,

assumed or agreed to by NHF and/or Walsh.  In its Brief in support of its request for

summary judgment on the title policy claims ***[Docket no. 477]***, Fidelity set forth the

law regarding Exclusion 3(a) and this Court recently explained the meaning of these

terms:

              Exclusion   3(a)  bars  coverage  for  "defects,  liens,
        encumbrances, adverse claims or other matters . . . created,
        suffered, assumed or agreed to by the Insured Claimant."  .
        . . In the context of such an exclusionary clause, the term
        "created"  has  been  interpreted  to  mean  "the  idea  of
        knowledge, the performance of some affirmative act by
        the  insured,  a  conscious  or  deliberate  causation."
        ***Feldman v. Urban Commercial, Inc., 87 N.J. Super. 391,***
        ***404 (App. Div. 1965).***   An insured who creates a defect
        under a title policy generally engages in "some fraudulent
        or inequitable behavior."  ***Keown v. West Jersey Title and***
        ***Guaranty Co., 161 N.J. Super. 19, 26 (1978).*** . . .

---

[9] Walsh has not supplied complete copies of title policy jackets in connection with
its motion, ***see exhibit "A" to Magnanini cert.***, which jackets include the
Exclusions.  A copy of the jacket for the 1992 ALTA loan policy used in this case is
attached as Exhibit "B" to the Hayes certification.

*Dare v. Chicago Title Insurance Company, 2011 U.S. Dist. LEXIS 70080 at pp. 31*
*(D.N.J. June 29, 2011).* The case law interpreting 3(a) is just as applicable to a
claim under a closing service letter as it is to a claim under the title policy due to the
incorporation of the provisions of the policy into the closing service letter.

In addition, paragraph 3(b) of the policy also bars relief as it excludes
"matters not known to [Fidelity], not recorded in the public records at Date of
Policy, but known to the insured claimant and not disclosed in writing to [Fidelity]
by the insured claimant prior to the date the insured claimant became an insured
under this policy." Fidelity was not aware of the fraud. Walsh does not even claim
it disclosed any of the wrongdoing to Fidelity in these transactions, despite clear
indications that Walsh was fully aware of what was going on.[10] Like Exclusion
3(a), the 3(b) Exclusion limits liability when the insured does not act in good faith
and does not disclose to the title underwriter all information relevant to the
underwriter's involvement in a transaction. In light of these provisions of the
policy, which are incorporated into the closing service letter, any argument that
there needs to be a specific reference to the wrongdoing of the recipient in the
closing service letter itself is meritless.

Second, even if, arguendo, policy terms were not incorporated into the closing
service letter, Walsh's argument would still fail. There is no requirement that

---

[10] For a detailed recitation of the facts showing Walsh's knowledge of the fraud, see
Commonwealth's brief and the Supplemental Statement of Disputed Material Facts.

specific language be included in the closing service letter in order to void a claim

based on fraud of the claimant.  The doctrine of "implied exception" provides that

there are certain limitations on coverage which are implicit in the nature of the

insurance relationship, one of them being a limitation on the ability of one to seek

redress for its own wrongdoing.   As stated by Professor Robert E. Keeton, in

*Insurance Law (1971) § 5.3(a) at 278-79:*

> The phrase "implied exception" as used in insurance law
> ordinarily refers to a basis for an insurer's non-liability that
> is not expressed anywhere in the contract but is said to be
> implicit in the nature of the agreement and the
> circumstances to which it applies. Common examples of
> implied exceptions are the rules denying recovery under
> fire insurance for losses caused by "friendly fires," under
> marine insurance for losses caused by ordinary
> deterioration of goods or by inherent vice, and under
> liability insurance for losses caused intentionally by the
> insured.

> An examination of the whole array of implied exceptions
> recognized in insurance law reveals that most of the losses
> to which implied exceptions apply can be explained as
> illustrations of one or the other of two principles. First,
> insurance contracts do not ordinarily cover economic
> detriment of a type occurring so regularly in relation to an
> insured enterprise or activity that it is commonly regarded
> as a cost rather than a risk of that activity or enterprise.
> Second, insurance contracts do not cover economic
> detriment that is not fortuitous from the point of view of
> the person (usually the insured) whose detriment is
> asserted as the basis of the insurer's liability. For example,
> a loss is not fortuitous in this sense if caused intentionally
> by that person.

*Id.* It is astonishing that Walsh would proffer an argument to this Court that in order to bar a fraudster's claim under a closing service letter there needs to be specific language in the body of a closing service letter stating that participation in the fraud is a defense. Clearly, the law will not allow recovery under a closing service letter if such recovery would reward the claimant for its participation in the very fraud about which it complains, whether language exists in the letter to that effect or not. "Public policy strongly condemns, and thus disallows, any insurance against a criminal act or omission." *McNeillab, Inc. v. North River Ins. Co., 645 F.Supp. 525, 552 (D.N.J. 1986).* "Further, most states disallow insurance for intentional, reckless and grossly negligent acts or omissions on similar public policy grounds, regardless of whether there is a specific exclusion or not." *McNeillab, supra, 645 F.Supp. at 552.* A title insurance policy does not insure against the consequences of an insured's own acts and any loss occasioned thereby, *Feldman v. Urban Commercial, Inc., 87 N.J.Super. 391, 404, 209 A.2d 640, 648 (App.Div. 1965),* and the identical rationale would apply to the closing service letters.

Independently, NHF, as an insured and as the recipient and beneficiary of the indemnity in the closing service letters, had a duty to act in the utmost good faith when dealing with Fidelity. *Id., 87 N.J.Super. at 408, 209 A.2d at 650.* It failed to fulfill that duty and instead was intricately involved in a massive fraud scheme without telling Fidelity the true facts of the transactions. As stated by the Court in

33

*Feldman*, "such conduct bears all the earmarks of fraud from which equity will relieve." *Id*. Furthermore, NHF's breach of the duty of good faith and fair dealing is a material breach of the contract with Fidelity, and when there is a material breach, Fidelity is excused from performance. *McManus v. Saleeby, 2011 WL 1661074, at *3 (App. Div. 2011) (citing Nolan v. Lee Ho, 120 N.J. 465, 472 (1990))*. There is simply no way a participant in a fraudulent real estate scheme has the right under New Jersey law to claim a loss under a closing service letter when the claimant was a participant in the very scheme giving rise to the claim under the letter.

### D. Walsh cannot recover on its claims since Walsh was involved in the fraud and, at the least, was fully aware of it and failed to either stop the fraud or notify Fidelity of the fraud.

Not only does the fraud of NHF bar the claims being asserted in this litigation, but Walsh itself, through its officers and employees, participated in the fraud.[11] Walsh had the same duty of utmost good faith when dealing with Fidelity that NHF had. Despite this obligation, Walsh closed transactions knowing full well there was fraud in those transactions, knowing full well that the closing attorneys were assisting in the perpetration of the fraud and simply believing that it could get away with its actions because it would be selling the loans in the secondary market

---

[11] Reference is made to the submissions made by Commonwealth in opposition to Walsh's motion for summary judgment, which submissions detail with great specificity the evidence establishing Walsh's involvement, all of which must be taken as true for purposes of the motion for summary judgment.

so no one would ever get wind of Walsh's participation in the fraud. Unfortunately for Walsh, the Asbury Park Press discovered the fraud before Walsh was able to complete its merger with RBMG and before the Walsh family was able to personally profit from the merger (which profit was based in part on the loans Walsh put on its books through these fraudulent transactions), and after which merger the existence of the fraudulent loans would have been someone else's problem, namely RBMG. Walsh, which now pleads ignorance regarding the fraud, was knee deep in the fraud and, at a minimum, was well aware of what was going on and continued funding the loans. It is incredible that Walsh could cry "victim" when the evidence (including its employees' criminal convictions) establishes that Walsh knew full well what was going on and took no steps to stop the fraudulent transactions from closing in the face of volumes of evidence that Walsh knew what NHF was doing. Under these circumstances, it is respectfully suggested that Walsh's participation must bar any recovery under the closing service letters or the title insurance policies for the same reasons described above with respect to NHF.

As stated in Commonwealth's brief, not only should this Court deny Walsh's request for summary judgment, but upon searching the record, it should grant summary judgment to Fidelity pursuant to F.R.C.P. 56(f). The uncontradicted involvement of NHF in the fraud, and the established participation of Walsh's officers and employees in the fraud, coupled with the showing herein of the limits

35

on Walsh's right of recovery, mandate that summary judgment be granted in favor of Fidelity.

## IV.   <u>CONCLUSION</u>

For all of the foregoing reasons, defendants, Fidelity respectfully request that the motion for partial summary judgment be denied and that the Court grant of summary judgment in favor of Fidelity.

Respectfully submitted,

s/David H. Colvin, Esquire
Edward J. Hayes, Esquire
David H. Colvin, Esquire

Fox Rothschild LLP
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103
(215) 299-2092
(215) 299-2150 (facsimile)

Attorneys for Defendants, Fidelity National
Title Insurance Co. of New York  and
Nations Title Insurance of New York, Inc.

Dated:  December 23, 2011