```
 1                IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF NEW JERSEY
                  CIVIL NO. 97-3496 (DRD)
 3
                  ----------------------------
 4      WALSH SECURITIES,                :
        INC.,                            :
 5                                       :
             Plaintiff,                  :
 6                                       :
             v.                          :
 7                                       :
        CRISTO PROPERTY                   :
 8      MANAGEMENT,LTD., a/k/a            :
        G.J.L. LIMITED; DEK              :
 9      HOMES OF NEW JERSEY,             :
        INC.; OAKWOOD                    :
10      PROPERTIES, INC.;                :
        NATIONAL HOME FUNDING,           :
11      INC.; CAPITAL ASSETS             :
        PROPERTY MANAGEMENT &            :
12      INVESTMENT CO., INC.;            :        CONTINUED
        CAPITAL ASSETS                   :        DEPOSITION UPON
13      PROPERTY MANAGEMENT,             :        ORAL EXAMINATION
        L.L.C.; WILLIAM KANE;            :              OF
14      GARY GRIESER; ROBERT             :        ROBERT C. WALSH
        SKOWRENSKI, II;                  :
15      RICHARD CALANNI;                 :
        RICHARD DI BENEDETTO;            :
16      JAMES R. BROWN; THOMAS           :
        BRODO; ROLAND PIERSON;           :        PAGE 262
17      STANLEY YACKER, ESQ.;            :
        MICHAEL ALFIERI, ESQ.;           :
18      RICHARD PEPSNY, ESQ.;            :
        ANTHONY M. CICALESE,             :
19      ESQ.; LAWRENCE CUZZI;            :
        ANTHONY D'APOLITO; DAP           :
20      CONSULTING, INC.;                :
        COMMONWEALTH LAND                :
21      TITLE INSURANCE CO.;             :
        NATIONS TITLE                    :
22      INSURANCE OF NEW YORK,           :
        INC.;                            :
23                                       :
                                         :
24                                       :
                                         :
25                                       :
                                         :
```

COPY



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

EXHIBIT
A

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

```
 1                      :
 2   FIDELITY NATIONAL    :
     TITLE INSURANCE CO. OF  :
 3   NEW JERSEY; COASTAL    :
     TITLE AGENCY; DONNA    :
 4   PEPSNY; WEICHERT      :
     REALTORS and VECCHIO   :
 5   REALTY, INC. D/b/a     :
     MURPHY REALTY BETTER   :
 6   HOMES AND GARDENS,     :
                          :
 7       Defendants.      :
     ------------------------------
 8
 9
10
11
12          T R A N S C R I P T  of the stenographic
13   notes of HOWARD A. RAPPAPORT, a Notary Public and
14   Certified Shorthand Reporter of the State of
15   New Jersey, Certificate No. XI00416, taken at the
16   offices of MC CARTER & ENGLISH, LLP, Four Gateway
17   Center, Newark, New Jersey, on Friday,
18   April 23, 2010, commencing at 8:35 a.m.
19
20
21
22
23
24
25
```

263

```
 1                      INDEX
 2
 3   WITNESS                          PAGE
 4   ROBERT C. WALSH
 5
       Cross-Examination by Mr. Hayes        266
 6
 7   EXHIBITS    DESCRIPTION            FOR IDENT.
 8
     Robert    Closing instructions       373
 9   Walsh-7
     Robert    Closing service letter     373
10   Walsh-8
     Robert    Letter via e-mail and      409
11   Walsh-9   regular mail dated
               March 5, 2010
12   Robert    Letter via e-mail dated    409
     Walsh-10  April 6, 2010
13   Robert    Uniform settlement         420
     Walsh-11  statement
14   Robert    Secondary mortgage loan    421
     Walsh-12
15   Robert    Wholesale mortgage         421
     Walsh-13  commitment
16   Robert    Contract for sale of real  433
     Walsh-14  estate
17   Robert    Document entitled,         433
     Walsh-15  "Fidelity National Title"
18   Robert    Review checklist           440
     Walsh-16
19   Robert    HUD 1, Uniform Settlement  440
     Walsh-17  Statement
20   Robert    HUD 1 review form          448
     Walsh-18
21   Robert    Uniform underwritten       448
     Walsh-19  transmittal summary form
22   Robert    Wholesale mortgage         453
     Walsh-20  commitment
23   Robert    WSJ common stock           476
     Walsh-21  ownership, SEC filing
24
25
```

265

```
 1   A P P E A R A N C E S:
 2   STONE & MANGANINI
     150 John F. Kennedy Parkway
 3   Short Hills, New Jersey 07078
     BY: DAVID STONE, ESQ.,
 4       AMY WALKER WAGNER, ESQ.,
     For the Plaintiff
 5
     MC CARTER & ENGLISH, LLP
 6   Four Gateway Center
     100 Mulberry Street
 7   Newark, New Jersey 07102-0652
     BY: DAVID R. KOTT, ESQ.,
 8   for Defendant/Third-Party Plaintiff Commonwealth Land
     Title Insurance Company
 9
     FOX, ROTHSCHILD, O'BRIEN & FRANKEL
10   997 Lenox Drive
     Lawrenceville, New Jersey  08648
11   BY: EDWARD J. HAYES, ESQ.,
     for Defendants Nations Title Insurance and
12   Fidelity National Title Insurance
13   METHFESSEL & WERBEL
     3 Ethel Road
14   Suite 300
     Edison, New Jersey 08818
15   BY: MARTIN R. MC GOWAN, ESQ.,
     for Coastal Title Agency
16
17
18
19
20
21
22
23
24
25
```

264

```
 1   R O B E R T  C.  W A L S H, having been previously
 2         sworn, testifies as follows:
 3   CROSS-EXAMINATION (CONTINUING)
 4   BY MR. HAYES:
 5       Q     Good morning, Mr. Walsh.
 6       A     Good morning.
 7       Q     You recall you were sworn at the last
 8   deposition and that oath continues this morning?
 9       A     I do.
10       Q     At the last deposition, Mr. Walsh, you
11   indicated that there were any number of things that
12   you were going to do in response to questions between
13   that deposition and before this morning.
14             Do you recall that?
15       A     I do.
16       Q     Did you take steps to try to answer some
17   of the questions that you could not answer at the
18   last deposition?
19       A     I did.
20       Q     Can you tell me what you did between the
21   last deposition and today to further prepare for
22   today's deposition other than speaking with your
23   attorneys?
24             MR. STONE:  You can answer that
25   question, other than conversations with counsel.
```

266

2 (Pages 263 to 266)



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

323

1  commitment?
2      A    Yes.
3      Q    And it is that same person who would
4  check everything would also be the person who would
5  take out unnecessary copies?
6      A    Correct.
7      Q    In the years that you worked at Walsh,
8  Mr. Walsh, did you ever see a mass -- I'll use the
9  word "cleansing," and I don't mean it in a derogatory
10 way, just this process that you're talking about, but
11 a mass cleansing of the files in the conference room
12 at Walsh as opposed to in cubides?
13     A    I believe I saw it many times.
14     Q    And why did that take place?
15     A    If an investor was coming in to look at
16 files, and there were a lot of files, and that they
17 were coming in in a relatively short period of time,
18 the files would be on the table, and people would be
19 taking the file and doing what they needed to do,
20 putting documents in, taking documents out rather
21 than just doing it at their cubicle.
22     Q    So that was a common occurrence?
23     A    It was.
24     Q    And it was generally in relation to
25 someone, an investor, coming in to look at files?

324

1      A    Yes.
2      Q    Mr. Walsh, how was Walsh Securities'
3  profitability determined?  You testified at the last
4  deposition that it wasn't about the number of loans.
5  It was about profitability of Walsh, correct?
6      A    Correct.
7      Q    How was Walsh Securities' profitability
8  determined?
9      A    Under GAAP.
10     Q    What does that mean?
11     A    Generally accepted accounting
12 principles.
13     Q    What made Walsh profitable?
14     A    Selling loans, acquiring loans,
15 controlling expenses.
16     Q    Were all nonperforming loans not
17 profitable?
18     A    Correct.
19     Q    Were all performing loans profitable?
20     A    Not necessarily.
21     Q    Was Walsh Securities' profitability in
22 any way affected by the jobs done by the
23 broker/correspondents?
24     A    Could you be more specific, please?
25     Q    Let me ask you this first.  I've been

325

1  using a couple of terms.
2          Is a broker and a correspondent the same
3  thing as far as you are concerned, or are they
4  different?
5      A    If we use participant, it is easier, and
6  we would be on the same track.
7      Q    Okay.
8          My understanding of the process,
9  Mr. Walsh -- and correct me if I'm wrong -- is that
10 the vast majority of your loans came from
11 participants, correct?
12     A    Correct.
13     Q    Did Walsh do its own origination?
14     A    Very small some.
15     Q    And a participant would be made aware of
16 the types of loans that Walsh was interested in
17 acquiring, correct?
18     A    Correct.
19     Q    Those were the programs or guidelines
20 that you told Mr. Kott about at the last deposition?
21     A    Correct.
22     Q    And these participants would take a loan
23 application, correct?
24     A    Correct.
25     Q    They would order an appraisal, correct?

326

1      A    Correct.
2      Q    The appraiser would have to be on the
3  Walsh approved list, correct?
4      A    Correct.
5      Q    Walsh would not underwrite or approve a
6  loan that was not accompanied by an approved Walsh
7  appraiser, correct?
8      A    Correct.  There may have been an
9  exception, but correct.
10     Q    What would the exception be?
11     A    I don't know.  There is nothing 100
12 percent in life.  So there may be an exception.
13     Q    Would the participant do the employment
14 verification?
15     A    Walsh would.
16     Q    Would the employment do down payment
17 verification?
18     A    Walsh would.
19     Q    Would the participant gather any
20 documentation from the borrowers, potential
21 borrowers, other than a loan application?
22     A    They would gather the information.
23     Q    What information would they gather in
24 general?  I don't want to get bogged down.
25     A    All the information that is necessary.

17 (Pages 323 to 326)



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

327

1  They would be getting -- whatever conditions that the
2  underwriter would put on the commitment, the
3  participant would gather that.
4      Q    You're ahead of me. I'm not at
5  commitment yet.
6          What did the participant do other than
7  placing the necessary information into a loan
8  application?
9      A    They would gather certain documentation.
10     Q    What documentation pre commitment would
11 they gather?
12     A    If they were self-employed, they would
13 get certain documentation. If they are a wage
14 earner, they would get their W-2.
15         They get just general type of
16 information depending on what the program would be.
17     Q    Once all the information and
18 documentation was gathered, they would submit it to
19 Walsh for underwriting?
20     A    Correct.
21     Q    Walsh would then review the appraisal?
22     A    Correct.
23     Q    Walsh would verify employment?
24     A    Correct.
25     Q    Walsh would verify assets or deposits

328

1  available for the borrower?
2      A    If need be, correct.
3      Q    That was all a function of your pre
4  closing personnel?
5      A    Correct.
6      Q    And assuming that Walsh was satisfied
7  with the package that it received, it would issue a
8  commitment, correct?
9      A    Correct.
10     Q    And that was a form also that Walsh had,
11 a commitment that had certain general requirements
12 and then left space for individualized requirements
13 of a particular loan, correct?
14     A    That is correct.
15     Q    That commitment would go to the
16 participant?
17     A    Correct.
18     Q    And to the extent a commitment had
19 conditions, it is the participant who would see that
20 those conditions are fulfilled, correct?
21     A    Correct.
22     Q    What happened next in the process? You
23 now have a committed to loan.
24     A    Correct.
25     Q    What happens next?

329

1      A    Closing documents are drawn.
2      Q    By whom, by Walsh?
3      A    Correct.
4      Q    Closing documents being all the various
5  loan documents, the mortgage, the notes, the
6  affidavits?
7      A    Correct.
8      Q    And they are sent where?
9      A    Sent to the closing agent -- the
10 attorney or the closing agent.
11     Q    Would Walsh require a signed commitment
12 letter by the participant and the borrower before
13 preparing the closing docs?
14     A    I think it was the participants.
15     Q    So the participant could commit the
16 borrower to go forward in the transaction?
17     A    I think the borrower committed to the
18 participant and the participant committed to us.
19     Q    Closing documents are prepared. They
20 are sent to the closing attorney, correct?
21     A    Correct.
22     Q    Prior to that you receive information
23 from the closing attorney regarding the manner in
24 which the funds should be sent to the closing
25 attorney, generally wire instructions?

330

1      A    Could you repeat that for me?
2      Q    Sure.
3          After you prepared the closing documents
4  and sent them to the closing attorney, or prior to
5  sending them, would you receive from the closing
6  attorney information on how to transmit the funds to
7  the closing attorney?
8      A    Correct.
9      Q    And you would receive prior to closing
10 the title commitment, correct?
11     A    Correct.
12     Q    Now, are we still in the underwriting
13 department at Walsh, Mr. Walsh, at that point in
14 time, or are we now in some other department?
15     A    We are out of underwriting.
16         I'm assuming, unless the commitment to
17 the participant is now done, there are conditions on
18 the commitment. I'm assuming that they have been
19 filled.
20     Q    I'm assuming if there are problems with
21 those conditions, then it goes back to underwriting
22 to see whether or not an exception would be made?
23     A    Correct.
24     Q    Assuming they are met, underwriting is
25 now done.

18 (Pages 327 to 330)



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
**Certified Court Reporters**

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

331

1   A    That is correct.
2   Q    Which department at Walsh is now
3   involved up to the closing?
4   A    The closing department.
5   Q    Now, the closing department is not doing
6   any separate, independent verification. Those were
7   things that the underwriting department did, correct?
8   A    Could you be more specific?
9   Q    Rather than me ask you, tell me what the
10  closing department did from the time it took over a
11  file to the time of closing besides preparing the
12  closing docs.
13  A    And reviewing whatever documents that
14  were necessary to review.
15  Q    Would the closing department be the
16  department that reviewed the title or the
17  underwriting department?
18  A    Closing.
19  Q    Generally, you wouldn't expect to see a
20  title commitment prior to committing to make the
21  loan, correct?
22  A    Correct.
23  Q    So that department would look at the
24  title report?
25  A    Correct.

333

1   A    Correct.
2   Q    Were there any exceptions made to that?
3   A    I don't know the answer to that.
4   Q    In your review of the files, either in
5   anticipation of your deposition several years ago or
6   today, did you see any loan files that didn't have
7   closing protection letters in them?
8   A    It's tough to see something that's not
9   there. I saw files that I reviewed, it appeared like
10  they were in there.
11  Q    Did you see any closing protection
12  letters that were not signed?
13  A    I don't recall seeing that.
14  Q    Are you aware, Mr. Walsh, in New Jersey
15  closing protection letters are transaction specific?
16  A    I believe so, yes.
17  Q    Unlike other states where they are
18  issued in general and effective until revoked,
19  correct?
20  A    I don't know the answer to that.
21  Q    Based on your experience around the
22  country, you don't know the way closing protection
23  letters are drawn in other states?
24  A    I do not.
25  Q    Did you see closing protection letters

332

1   Q    Would issue the closing documents?
2   A    Correct.
3   Q    What else would that department do?
4   A    Issue the closing instructions.
5   Q    They would be prepared by that
6   department, correct?
7   A    Correct.
8   Q    And then sent to the closing attorney?
9   A    And the title agent, correct.
10  Q    What else would that department do?
11  A    A range that would get the closing
12  protection letter, arrange their funds to be
13  transferred, and that they would get the package
14  returned to them.
15  Q    So that department's functions start at
16  mortgage commitment and end at the receipt of the
17  documents from closing?
18  A    To my knowledge that's correct.
19  Q    And then from that point forward it's
20  post closing?
21  A    To my knowledge, correct.
22  Q    And is it a condition, Mr. Walsh, or was
23  it a condition of your company that a signed closing
24  protection letter had to be in Walsh Securities'
25  possession before you would fund?

334

1   in any of the files that were blank as to what the
2   transaction was they were issued for?
3   A    I don't recall.
4   Q    Do you recall if closing protection
5   letters are issued for the actions of a particular
6   individual?
7   A    Yes.
8   Q    And that it's important to be sure that
9   the closing protection letter is actually issued to
10  cover the conduct of the actual person conducting the
11  closing, correct?
12  A    Could you repeat that?
13  Q    Sure. Was it important to Walsh to have
14  a closing protection letter that referenced the
15  actual closing attorney who was conducting the
16  settlement?
17  A    To my knowledge, yes.
18  Q    You believe that was something that was
19  necessary in order to protect Walsh, correct?
20  A    Correct.
21  Q    In general, Mr. Walsh, can you tell me
22  what protection did Walsh believe the closing
23  protection letter afforded it?
24  A    If the approved attorney committed
25  fraud, he did not follow our closing instructions,

19 (Pages 331 to 334)



**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

335

1  did something other than what our closing
2  instructions called for, did something wrong, we were
3  going to be covered to the extent of the letter.
4      That's fraud, but I don't want to get
5  into specifics.
6    Q    We will today.
7    A    I'm sure we will.
8      MR. STONE:  Can we just take a short
9  break?
10      MR. HAYES:  Sure.
11      (Recess at 9:50 a.m.)
12      (Deposition resumes at 10:05 a.m.)
13    Q    Ready to proceed, Mr. Walsh?
14    A    I am.
15    Q    Thank you.
16      Did you believe, Mr. Walsh, that a
17  closing protection letter protected Walsh against any
18  type of fraud committed by a closing agent?
19    A    Yes.
20    Q    Did you believe it protected against any
21  violation of your closing instruction letters?
22      MR. STONE:  Objection to form.
23      You can answer it to the extent it
24  didn't call for a legal conclusion. Just your own
25  understanding.

336

1    A    Yeah.
2    Q    Did you ever read a closing protection
3  letter?
4    A    I did.
5    Q    Did you read the ones in this case?
6    A    I did.
7    Q    How many of them did you read?
8    A    Approximately 10.
9    Q    To your knowledge, Mr. Walsh, did anyone
10  from Walsh ever go through all of the loan files to
11  determine -- on the 220 loans, to determine if you
12  had a closing protection letter for all of those
13  files?
14    A    I do not know.
15    Q    Who would know that?
16    A    Fred Schlesinger.
17    Q    Do you have any reason to believe,
18  Mr. Walsh, that any of the loans were closed without
19  a closing protection letter?
20    A    I have no reason to believe they were.
21    Q    We were back in the process of a loan
22  making its way from the initial application with the
23  participant to the sale in the secondary market.
24      We were talking about, I believe, the
25  closing people, which you said took us up to the

337

1  point in time when documents were received back from
2  the attorney, correct?
3    A    Correct.
4    Q    Is that the person, Mr. Walsh, with whom
5  the closing attorney was to communicate regarding any
6  issues?
7    A    Correct.
8    Q    Is that the person that had the ultimate
9  say-so as to whether or not Walsh would fund a loan?
10    A    I'm not sure if I understand the
11  question.
12    Q    Someone at Walsh had to decide whether
13  or not you were satisfied, such that the loan would
14  be funded, correct?
15    A    Closing instructions were sent to the
16  attorney.
17    Q    Right.
18    A    We'll use Yacker, if you don't mind.
19    Q    Fine.
20    A    Closing instructions were sent to
21  Yacker. We said, do not release the funds until
22  these things are done, follow the instructions.
23    Q    Here's my question. From my
24  understanding -- correct me if I'm wrong -- in the
25  vast majority of mortgage transactions, the funding

338

1  takes place at or after the closing.
2      Is that a correct understanding on my
3  part?
4    A    Correct.
5    Q    Funding does not take place prior to
6  settlement, correct?
7    A    Correct.
8    Q    So the reason funding takes place at or
9  after settlement -- and again, correct me if I'm
10  wrong -- is that you want to be able to insure that
11  your conditions and requirements are met before you
12  leave your money out the door, correct?
13    A    Correct.
14    Q    That's one of the reasons why you
15  require an HUD at closing, so that you can determine if the
16  financial terms of the deal match what you expect
17  them to be, correct?
18    A    Correct.
19    Q    And that's why you expect the closing
20  attorney to certify to you that I have fulfilled my
21  obligations under the closing instructions, correct?
22    A    Correct.
23    Q    You expect that to take place before
24  funding, correct?
25    A    Correct.

20 (Pages 335 to 338)



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

379

1  Q   The HUD lists the buyer and seller, does
2  it not?
3  A   Yes.
4  Q   If in fact the closer had required the
5  conditions to be fulfilled, he or she would see an
6  HUD that has the financial terms and who the parties
7  to the transaction are, correct?
8  A   Correct.
9  Q   And then below that it says, "You are
10 authorized to disburse the loan proceeds only when
11 all of the requirements and conditions have been
12 satisfied."
13     Do you see that?
14 A   I do.
15 Q   Was the closing agent permitted to
16 disburse without having a verbal okay from the
17 funder?
18 A   Could you repeat that, if possible?
19 Q   Sure.
20     The loans had to be funded before the
21 closing agent could disburse, correct?
22 A   Correct.
23 Q   So at some point in time Carolynn is
24 going to be satisfied that she can fund this loan of
25 $165,000, correct?

380

1  A   Correct.
2  Q   And those funds would be likely wired to
3  the closing attorney's account, correct?
4  A   Correct.
5  Q   And the closing attorney was then
6  responsible to disburse the funds, correct?
7  A   Correct.
8  Q   And would it be your understanding,
9  Mr. Walsh, based on your experience, that this should
10 be consistent with the HUD 1?
11 A   Yes.
12 Q   My question is, after the funding took
13 place from Carolynn, was there any further obligation
14 on the part of the closing attorney to get a blessing
15 to disburse the moneys that he had received?
16 A   Could you repeat that one more time?
17 Q   Sure.
18     The closing attorney has now received a
19 wire because Walsh is satisfied to fund the
20 transaction.
21 A   Correct. He probably received it prior
22 to that. He wasn't authorized to disburse it.
23 Q   When he is ready to disburse, my
24 question is, does he need further approval from Walsh
25 before he can disburse after he receives the funds?

381

1  A   I do not know the answer.
2  Q   Who would know that, Mr. Fred
3  Schlesinger?
4  A   Yes.
5  Q   That was not something you asked him
6  after the last deposition?
7  A   I did not.
8  Q   Now, below that section B, Mr. Walsh,
9  there appear to be specific requirements placed into
10 this particular transaction.  Would you agree with
11 me?
12 A   I would.
13 Q   So this part would be tailored to the
14 particular loan involved, correct?
15 A   Correct.
16 Q   Section C says, "Payoff requirements,"
17 and in this one it's blank.
18     What is that section used for?
19 A   I do not know.
20 Q   Section B indicates that there must be
21 satisfactory evidence of hazard insurance, correct?
22 A   Correct.
23 Q   And there needs to be a listing of
24 National Home Funding as the insurance loss payee,
25 correct?

382

1  A   Correct.
2  Q   Why was that not Walsh?
3  A   It is the way procedures were set up.
4  Q   In fact, it was set up in such a way
5  that these loans would in fact be made in the name of
6  National Home Funding, correct, not Walsh?
7     MR. STONE: Object to the form of the
8  question.
9     You can answer.
10 A   Correct, and Walsh supplied the funds.
11 Q   Section E deals with the title insurance
12 requirements, correct?
13 A   Correct.
14 Q   And it requires that a policy be issued
15 in the name of National Home Funding, its successors
16 and or assigns?
17 A   Correct.
18 Q   And it indicates which endorsements are
19 being required, correct?
20 A   It does.
21 Q   Subsection F is, "Additional closing
22 requirements."  Do you see that?
23 A   I do.
24 Q   And then the last page, Mr. Walsh,
25 section G, sets forth the permitted fees and costs of

31 (Pages 379 to 382)



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 537

1                UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
2                Civil Action No. 97-cv-3496 (DRD)(MAS)
3    WALSH SECURITIES, INC.,        :
4          Plaintiff,               :  DEPOSITION OF:
5       v.                          :  ROBERT C. WALSH
                                       (VOLUME III)
6    CRISTO PROPERTY MANAGEMENT, LTD., :
     a/k/a G.J.L. LIMITED; DEK HOMES
7    OF NEW JERSEY, INC.; OAKWOOD     :
     PROPERTIES, INC.; NATIONAL HOME
8    FUNDING, INC.; CAPITAL ASSETS    :     Certified
     PROPERTY MANAGEMENT & INVESTMENT
9    CO., INC.; CAPITAL ASSETS PROPERTY:    Transcript
     MANAGEMENT, L.L.C.; WILLIAM KANE;
10   GARY GRIESER; ROBERT SKOWRENSKI,  :
     II; RICHARD CALANNI; RICHARD
11   DiBENEDETTO; JAMES R. BROWN;      :
     THOMAS BRODO; ROLAND PIERSON;
12   STANLEY YACKER, ESQ.; MICHAEL     :
     ALFIERI, ESQ.; RICHARD PEPSNY,
13   ESQ.; ANTHONY M. CICALESE, ESQ.;  :
     LAWRENCE CUZZI; ANTHONY D'APOLITO;
14   DAP CONSULTING, INC.; COMMONWEALTH:
     LAND TITLE INSURANCE CO.; NATIONS
15   TITLE INSURANCE OF NEW YORK, INC.;:
     FIDELITY NATIONAL TITLE INSURANCE
16   CO. OF NEW JERSEY; COASTAL TITLE  :
     AGENCY; DONNA PEPSNY; WEICHERT
17   REALTORS and VECCHIO REALTY, INC. :
     d/b/a MURPHY REALTY BETTER HOMES
18   AND GARDENS,                      :
19                                     :
               Defendants.
20   X-------------------------------X
21        TRANSCRIPT of testimony as taken by and
     before CHERYL McGANN, a Certified Court Reporter
22   of the State of New Jersey, at the offices of
     McCARTER & ENGLISH, LLP, Four Gateway Center,
23   Newark, New Jersey, on Friday, September 30, 2011,
     commencing at 9:14 a.m.
24
25   Job No. NJ356367

Page 538

1    A P P E A R A N C E S :
2    STONE MAGNANINI LLP
     BY:   ROBERT A. MAGNANINI, ESQ.
3    150 JFK Parkway
     Short Hills, New Jersey  07078
4    (973) 218-1111
     rmagnanini@stonemagnalaw.com
5    Attorneys for Plaintiff
6    McCARTER & ENGLISH, LLP
     BY:   DAVID R. KOTT, ESQ.
7    Four Gateway Center
     100 Mulberry Street
8    Newark, New Jersey  07102-0652
     (973) 622-4444
9    dkott@mccarter.com
     Attorneys for Defendant
10   Commonwealth Land Title Insurance Co.
11   FOX ROTHSCHILD LLP
     BY:   EDWARD J. HAYES, ESQ.
12   997 Lenox Drive
     Building 3
13   Lawrenceville, New Jersey  08543-5231
     (609) 896-3600
14   ejhayes@foxrothschild.com
     Attorneys for Defendants
15   Nations Title Insurance of New York, Inc. and
     Fidelity National Title Insurance Co. of New Jersey
16
17
18
19
20
21
22
23
24
25

Page 539

1                        I N D E X
2      WITNESS                EXAMINATION
3      ROBERT C. WALSH
4          By Mr. Kott:     541,576,606,665,691,715,719,740
           By Mr. Hayes:    563,597,619,667,689,704,722,739
5
                        E X H I B I T S
6
       Number            Description              Page
7
       Robert     Confidential Settlement Agreement
8      Walsh-22   Bates stamped COM-Cherokee-00303-392   555
9      Robert     Three-page article from July 13, 1997,
       Walsh-23   edition of Sunday Star Ledger          581
10
       Robert     Two-page article from July 10, 1997,
11     Walsh-24   edition of Asbury Park Press           581
12     Robert     File copy of September 29, 1997, letter
       Walsh-25   to Mr. Schlesinger from David R. Kott
13                with certified mail slip attached      583
14     Robert     August 12, 1997, letter Bates stamped
       Walsh-26   COM 01490 from Donna Sullivan to
15                Jeffrey Goodman                        593
16     Robert     September 5, 1997, letter Bates stamped
       Walsh-27   COM 01715 through 16 from Fred Schlesinger
17                to Donna Sullivan                      593
18     Robert     July 28, 1997, letter to Commonwealth from
       Walsh-28   Jeffrey M. Goodman, Latham & Watkins   605
19
       Robert     Fax from John Oberdorf to Dinah Raven
20     Walsh-29   with attached press release Bates stamped
                  WSI 0070147-0070149                    608
21
       Robert     January 31, 1997, Quality Control
22     Walsh-30   Memorandum from Veronica Gonzalez-Lehman,
                  CC to James Walsh and Peter Trebour
23                Bates stamped WSI 0075078              649
24     Robert     Closing Instructions document Bates
       Walsh-31   stamped SYSW 020142, 20143 and 20141  672
25

Page 540

1              E X H I B I T S (Continued)

2    Number          Description                    Page

3    Robert      Commonwealth Land Title Insurance

     Walsh-32    Company document Bates stamped

4                COM 18304                          732

5    Robert      Document Bates stamped COM/Walsh

     Walsh-33    000668                             733

6

7

8
                     *           *           *

9
                 (Exhibits retained by counsel.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 667

1          MR. KOTT:  That's all I have on that.

2    Off the record.

3          (A discussion was held off the record.)

4    FURTHER EXAMINATION BY MR. HAYES:

5      Q.  Mr. Walsh, will you agree with me that

6    assignments are critical documents to evidence

7    ownership of a mortgage?

8      A.  I don't know legally what's the response on

9    that.

10     Q.  Well, based on your years of experience in

11   the mortgage business, sir, you do understand, do

12   you not, that assignments are the manner in which

13   mortgages are transferred?

14     A.  I do.

15     Q.  And do you understand the importance of

16   recording documents?

17     A.  I do.

18     Q.  And do you understand the importance of

19   assignments being recorded so that the public

20   records reflect the current owner of a mortgage

21   obligation?

22     A.  I do.

23     Q.  You understood these loans were all closing

24   in NHF's name, correct?

25     A.  Correct.

Page 668

1    Q.  And you were asked at at least one, if not

2    both, of the prior depositions why Walsh mandated

3    that these loans be closed in NHF's name, not

4    Walsh's name; and in those prior two depositions,

5    you didn't have an answer for that.

6         Have you been able to determine now, prior to

7    today, why it was done that way?

8    A.  Yes.

9    Q.  Tell us why.

10   A.  It was done like that throughout the whole

11   company.  It wasn't unique to NHF.  It was done for

12   RESPA.  It was done because it became a secondary

13   market transaction, and we believed that it would

14   limit some of our potential risk.

15   Q.  So part of the reason why it was set up this

16   way was so that if NHF had engaged in wrongdoing you

17   would limit your potential liability as the holder

18   of the loan?

19   A.  That was my understanding.

20   Q.  And what was the RESPA violation or RESPA

21   compliance issue that you felt doing it this way

22   required?

23   A.  Yield spread premiums.

24   Q.  Okay, and what effect did this manner of

25   doing business have on the yield spread premium that

Page 669

1   could be charged and/or disclosed on these

2   transactions?

3       A.   The lender did not need to disclose.

4       Q.   And the yield spread premium was a charge to

5   the borrower, correct?

6       A.   No.

7       Q.   What was it?

8       A.   It was a price paid from a company like Walsh

9   that was acquiring the loans.

10      Q.   Did it come out of the loan, Mr. Walsh?

11      A.   Did the borrower pay, no.  It was a premium

12  paid for from Walsh to the correspondent.

13      Q.   But if it had to be disclosed, it would have

14  been disclosed to the borrower; correct?

15      A.   That is correct.

16      Q.   Who would understand more about the financial

17  arrangements that existed between a participant and

18  Walsh?

19      A.   Well, that was HUD's ruling; and that's

20  exactly what we followed was HUD's rulings.

21      Q.   So the loans were in part set up the way in

22  which they were so that you wouldn't have to make

23  that disclosure?

24      A.   We wouldn't make the disclosure.  It wasn't

25  our disclosure to make.

Page 670

1      Q.   Who would have made the disclosure, NHF?

2      A.   Correct, NHF and all our other

3   correspondents.

4      Q.   That's fine.  And, again, I'm not suggesting --

5      A.   That's fine.

6      Q.   -- that you dealt with NHF differently.

7      A.   Okay.

8      Q.   What I was trying to get at is why Walsh

9   mandated that the loans be closed in NHF's name.

10     A.   Fine.

11     Q.   Who prepared the assignments on the NHF

12  loans?

13     A.   I believe we did.

14     Q.   Okay, and how were those assignments

15  transmitted to the closing attorneys?

16     A.   I don't know the answer.

17     Q.   Would you expect those assignments to be a

18  part of the loan package that was sent to the

19  closing attorney?

20     A.   I don't know if it was the loan package.  I

21  don't know what loan package you're referring to.

22  Was it the closing package?

23     Q.   Yes, sir.

24     A.   Oh, okay.  I'm not sure.

25     Q.   Well, if it was not transmitted as part of

Page 671

1    the closing package -- again, and I'm going to ask

2    you to draw on your years of experience in the

3    business -- how else would it have been transmitted

4    to the closing attorney?

5        A.   It's possible "NHF" in this case would have

6    sent it there.

7        Q.   Well, would Walsh have prepared it, sent it

8    to NHF, and then NHF would send it to the closing

9    attorney?

10       A.   It's clear it would have been sent to NHF and

11   probably would have been sent to the closing

12   attorney, but it's clear it would have been sent to

13   NHF.

14       Q.   So you would have relied on NHF to deliver

15   that assignment to the closing attorney so that it

16   could be recorded as part of the package?

17       A.   That's not what I'm saying.  I'm saying I

18   don't know.

19       Q.   Well, can you explain for me, Mr. Walsh,

20   why Walsh did not require the recording of the

21   assignment as part of its closing instructions?

22       A.   We got the assignment from NHF, and we

23   assigned that loan in blank to the trust.

24       Q.   So what you're telling me is at some point in

25   time, Walsh sent the assignments to NHF.  NHF would

Page 672

1   execute those assignments and send them back to

2   Walsh?

3       A.   Correct.

4       Q.   And then Walsh would execute an assignment in

5   blank, which could ultimately be used by whoever the

6   acquirer of that loan is?

7       A.   Correct.

8       Q.   So that would explain why Walsh didn't ask

9   the closing attorney to record those assignments,

10  because they didn't go to the closing attorney.

11  They came directly back to you, correct?

12      A.   I don't know the answer to that.

13              (Closing Instructions document Bates

14  stamped SYSW 020142, 20143 and 20141 was received

15  and marked Defendant's Exhibit Robert Walsh-31 for

16  Identification.)

17              Exhibit Robert Walsh 31 is something

18  entitled Closing Instructions by Walsh Securities,

19  Inc. on the first page.  It indicates it's for

20  Rafael Bustos, Sr., at a property 138 Ridge Avenue,

21  Asbury Park, New Jersey, Bates stamped SYSW 020142

22  through 020141.

23      Q.   Mr. Walsh, do you have that document before

24  you?

25      A.   I do.

Page 673

1      Q.   I will represent to you, sir, there's nothing

2   particular about this one transaction, as to why

3   this set of closing instructions was pulled.  It was

4   just a set of closing instructions.

5      A.   Okay.   That's fine.

6      Q.   Do you recognize this as the form of closing

7   instructions that Walsh generated?

8      A.   I do.

9      Q.   Okay, and these would have been generated

10  after the loan commitment had been issued?

11     A.   Correct.

12     Q.   And you would expect these closing

13  instructions to be generated before the loan funded,

14  correct?

15     A.   Correct.

16     Q.   Okay.   And these loan instructions, closing

17  instructions, would be sent to Mr. Yacker; correct?

18     A.   Correct.

19     Q.   Mr. Agel testified in his deposition that

20  Walsh never sent any of the closing instructions to

21  him; that they were, in fact, sent directly to

22  Mr. Yacker.

23          Do you have any reason to disagree with his

24  testimony?

25     A.   The only reason, I think that in Coastal's

Page 674

1    files we saw these, and so that's my only basis.

2        Q.   Okay.  So you know they were in the files,

3    but you don't know whether they got in the files

4    because after this closing was completed Mr. Yacker

5    may have included them with what he sent Coastal?

6        A.   That's correct.

7        Q.   Under the document section of this closing

8    instruction, the capital letter A, Mr. Walsh, do you

9    see that section?

10       A.   I do.

11       Q.   There's a listing of all the documents that

12   are being transmitted to the closing attorney for

13   use in the transaction.

14            Do you see that?

15       A.   I do.

16       Q.   And do you see that the assignment is not

17   referenced anywhere within that document?

18       A.   I do.

19       Q.   And would you expect, Mr. Walsh, that if the

20   assignment was transmitted to Mr. Yacker on this

21   transaction it would be an identified document here?

22       A.   I do.

23       Q.   Okay, and is this consistent with what you

24   believe happened here in that these assignments went

25   to NHF and then came back directly to Walsh for

Page 675

1    processing?

2    A.   It would be speculation, but I can understand

3    the logic.

4    Q.   Okay.  Mr. Skowrenski testified that there

5    were occasions when the assignments didn't come in

6    with the loan package but at some point that he

7    might get a large number of assignments to execute.

8         Do you have any reason to disbelieve that

9    testimony?

10   A.   I do.  Based on the files that we looked at,

11   there was assignments in all the files; and they

12   were dated as of that particular date.

13   Q.   When Walsh sold the loan -- a whole loan

14   sale, would it provide the NHF-to-Walsh assignment

15   to the whole loan buyer?

16   A.   Yes, and then Walsh to the whole loan buyer.

17   Q.   So a whole loan buyer would get two

18   assignments; one from NHF to Walsh, one from Walsh

19   to, for example, Cityscape?

20   A.   Yes.

21   Q.   And Walsh would expect the whole loan buyer

22   to record those assignments evidencing its ownership

23   of the loan, correct?

24   A.   Correct.

25   Q.   Okay.  When you bought back loans after the

Page 676

1    fraud was discovered, were there assignments from

2    the whole loan purchaser back to Walsh?

3        A.   I believe so, but I don't know the answer to

4    that.

5        Q.   Where are those documents?

6        A.   I don't know the answer to that.

7        Q.   Is it possible, Mr. Walsh, that the whole

8    loan buyers never recorded the assignments into the

9    whole loan buyer such that you didn't need an

10   assignment back from the whole loan buyer?

11       A.   I don't know the answer to that.

12       Q.   Okay.  Are you aware, Mr. Walsh, that part of

13   your claim in the title claim portion of this case

14   is that Walsh did not get notice of certain tax or

15   foreclosure sales because the assignments to Walsh

16   were not recorded?

17       A.   Yes.

18       Q.   Can you tell me the basis upon which the

19   title company is responsible for the lack of

20   recording of the assignments when you have

21   acknowledged that those assignments never went into

22   the possession of the title company?

23       A.   I can't explain that.

24       Q.   But are you still pursuing that claim on

25   those files?

Page 677

1      A.   I got to talk to my attorney.

2      Q.   Are you aware of any factual basis upon which

3    you can submit a claim that is based on the lack of

4    recording of an assignment?

5      A.   Again, it's a legal conclusion.

6      Q.   That's not my question.  I understand you'll

7    talk to Mr. Magnanini afterwards as to whether

8    you've got a legal basis.

9           I'm asking you as the 30(b)(6) witness do you

10   have any facts that support a claim against the

11   title company on nonrecorded assignments when those

12   assignments never went to the title company in the

13   first place?

14     A.   No.

15              MR. MAGNANINI:  Objection to form.

16              You answered it.

17     Q.   Mr. Walsh, I'm going to show you a document

18   that was previously marked at one of your earlier

19   depositions as Robert Walsh-11.  It is a two-page

20   HUD-1 from the Salvatoriello transaction.

21           Do you see that?

22     A.   Yes, I do.

23     Q.   Okay.  Mr. Walsh, this is a transaction where

24   Dee & Sons was selling the property to the

25   Salvatoriellos; correct?