**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Defendant/Third Party Plaintiff
     Commonwealth Land Title Insurance Company

|  |  |
|---|---|
| WALSH SECURITIES, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>CRISTO PROPERTY MANAGEMENT,<br>LTD., A/K/A G.J.L. Limited, ET AL.,<br><br>        Defendants. | UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF NEW JERSEY<br><br>Civil Action No. 97-cv-3496 (DRD)(MAS)<br><br>Hon. Dickinson R. Debevoise, U.S.S.D.J.<br>Hon. Michael A. Shipp, U.S.M.J.<br><br>**CERTIFICATION OF SARA F. MERIN IN<br>SUPPORT OF COMMONWEALTH'S<br>REPLY BRIEFS** |

**SARA F. MERIN**, hereby certifies as follows:

1.     I am an attorney at law of the State of New Jersey and am associated with the firm

of McCarter & English, LLP, attorneys for Defendant Commonwealth Land Title Insurance

Company ("Commonwealth"). I make this Certification in support of Commonwealth's reply

briefs in further support of Commonwealth's motions for partial summary judgment pursuant to

Rule 56. I am fully familiar with the facts and information set forth herein.

2.     Attached hereto as Exhibit A is a true and accurate copy of relevant portions of

the transcript of the September 30, 2011 deposition of Robert Walsh.

3.      Attached hereto as Exhibit B is a true and accurate copy of the conditions and stipulations from the ALTA Loan Policy Form (10-17-92) issued by Commonwealth.

4.      Attached hereto as Exhibit C is a true and accurate copy of the "Irrevocable Proxy Agreement" between Robert C. Walsh, James Walsh, Elizabeth Ann Demola, Trust f/b/o Melissa C. Walsh, Trust f/b/o Stephanie E. Walsh and Resource Bancshares Mortgage Group, Inc.

5.      Attached hereto as Exhibit D is a true and accurate copy of relevant portions of the transcript of the May 25, 2010 deposition of Robert Skowrenski.

6.      Attached hereto as Exhibit E is a true and accurate copy of relevant portions of the transcripts of Robert Agel's June 23, 2010 and August 5, 2010 depositions as a 30(b)(6) representative for Coastal Title Agency.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

SARA F. MERIN

Dated:  January 13, 2012

-2-

# Exhibit A

Page 537

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
2                    Civil Action No. 97-cv-3496 (DRD)(MAS)
3      WALSH SECURITIES, INC.,          :
4               Plaintiff,              :  DEPOSITION OF:
5          v.                           :  ROBERT C. WALSH
                                            (VOLUME III)
6      CRISTO PROPERTY MANAGEMENT, LTD., :
       a/k/a G.J.L. LIMITED; DEK HOMES
7      OF NEW JERSEY, INC.; OAKWOOD      :
       PROPERTIES, INC.; NATIONAL HOME
8      FUNDING, INC.; CAPITAL ASSETS     :
       PROPERTY MANAGEMENT & INVESTMENT
9      CO., INC.; CAPITAL ASSETS PROPERTY:
       MANAGEMENT, L.L.C.; WILLIAM KANE;
10     GARY GRIESER; ROBERT SKOWRENSKI,  :
       II; RICHARD CALANNI; RICHARD
11     DiBENEDETTO; JAMES R. BROWN;       :
       THOMAS BRODO; ROLAND PIERSON;
12     STANLEY YACKER, ESQ.; MICHAEL      :
       ALFIERI, ESQ.; RICHARD PEPSNY,
13     ESQ.; ANTHONY M. CICALESE, ESQ.;   :
       LAWRENCE CUZZI; ANTHONY D'APOLITO;
14     DAP CONSULTING, INC.; COMMONWEALTH:
       LAND TITLE INSURANCE CO.; NATIONS
15     TITLE INSURANCE OF NEW YORK, INC.;:
       FIDELITY NATIONAL TITLE INSURANCE
16     CO. OF NEW JERSEY; COASTAL TITLE   :
       AGENCY; DONNA PEPSNY; WEICHERT
17     REALTORS and VECCHIO REALTY, INC. :
       d/b/a MURPHY REALTY BETTER HOMES
18     AND GARDENS,                       :
19                                        :
                    Defendants.
20     X--------------------------------X
21          TRANSCRIPT of testimony as taken by and
       before CHERYL McGANN, a Certified Court Reporter
22     of the State of New Jersey, at the offices of
       McCARTER & ENGLISH, LLP, Four Gateway Center,
23     Newark, New Jersey, on Friday, September 30, 2011,
       commencing at 9:14 a.m.
24
25     Job No. NJ356367

Certified
Transcript

Page 549

1    Q.   Okay.   Were all of those repurchased from

2    securitizations?

3    A.   They were not.

4    Q.   Were some repurchased from securitizations?

5    A.   Yes, they were.

6    Q.   What ones were repurchased from securitizations?

7    A.   We supplied I believe a schedule to you.   I

8    do not -- I don't know those things offhand.

9    Q.   Okay.   The individual ones, the ones that

10   were purchased individually, give me an example from

11   whom they were repurchased.

12   A.   Money Store, they were repurchased from

13   Cityscape, and they were repurchased from the

14   securities.   I don't believe I'm missing anyone.

15   Q.   Can you break down how many were repurchased

16   from the securities?

17   A.   I believe that we supplied that information

18   to you.   I don't have that offhand.

19   Q.   Was the majority repurchased from securities?

20   A.   No, it was not.

21   Q.   The ones that were repurchased from The Money

22   Store, how was the value decided what they'd be

23   repurchased for?   Let me withdraw that, please.

24        How was the price decided what they would be

25   repurchased for?

Page 550

1    A.  Unpaid principal balance plus any premiums

2    that we had received plus any accrued interest.

3    Q.  And of those 85 or so loans that were

4    repurchased, did all of them go into default?

5    A.  Yes.  Well, the answer is yes.  That's

6    correct, they did.

7    Q.  Did Walsh foreclose on any of those 85 loans?

8    A.  Well, as I said, I don't have the information

9    in front of me.  We did supply information to you on

10   a schedule.

11   Q.  Okay.  Now, you said the securitizations that

12   the 80 or 85 were repurchased from was Cristo and

13   someone else?

14   A.  I don't understand the question.

15   Q.  Okay.  You told me you repurchased the 80 or

16   85 loans from individual loans from The Money Store

17   and then from Cityscape, right?

18   A.  Correct.

19   Q.  Anyone else they were repurchased from?

20   A.  The securities.

21   Q.  Which securities?

22   A.  I don't have the information offhand, but I

23   assume it was loans from -- it had to be loans from

24   either the first security or the last security,

25   somewhere in between.

Page 551

1     Q.   Okay.

2     A.   I believe we provided a schedule that

3     shows -- as an example, 96-1, that would mean it was

4     the first security done in 1996.   1997 -- 97-1,

5     97-2, 97-3, 97-4.   I believe they were identified

6     per that.

7     Q.   I want to put Cityscape aside.

8          How can you and I refer to the other ones?

9     Can we call them Bankers Trust?

10    A.   Sure.

11    Q.   Okay, so of the 80 or 85 that you repurchased

12    from securitizations, were they all repurchased from

13    either Cityscape or Bankers Trust?

14    A.   I'm sorry.   Could you repeat that, please?

15    Q.   Yes.   Of the 80 to 85 that were repurchased,

16    of those that were repurchased from securitizations,

17    were they all repurchased from Cityscape or from

18    Bankers Trust?

19    A.   Nothing from Cityscape on the

20    securitizations.   It would have been all Bankers

21    Trust.

22    Q.   Okay.   What did you repurchase from

23    Cityscape, individual loans?

24    A.   Individual 32 loans.

25    Q.   Did Cityscape do a securitization of any of

Page 554

1    A.   Yeah.   I'm not exactly sure, like I said, the

2    specifics of the securities.   I'm not sure if that

3    was several of the securities.   We provided that

4    information.   Unfortunately, I'm trying to go by

5    memory to help; and it's a little hazy.

6    Q.   Now, when you said we repurchased the

7    Cityscape judgment, did you mean Walsh Securities

8    repurchased it?

9    A.   Walsh Securities repurchased it.

10   Q.   And how much did you pay for the Cityscape

11   judgment?

12   A.   Well, we're under a confidentiality

13   agreement.   I'm not sure what we should be saying or

14   not right now.

15        MR. HAYES:   Just so you know, you've

16   taken the position in this litigation previously

17   that you paid $3.5 million for that, so you

18   disclosed that figure before.

19        MR. MAGNANINI:   Yeah, the amount I think

20   is fine.

21   A.   Okay, yes.

22        MR. MAGNANINI:   That's fine.

23        THE WITNESS:   You're correct, Mr. Hayes.

24        MR. HAYES:   Is that your recollection of

25   the amount?

Page 555

1          THE WITNESS:  It's approximately that.

2     That's correct.

3     Q.  And for that approximate 3.5 million, did you

4     purchase the judgment as well as the approximately

5     32 loans from --

6     A.  It was two separate transactions.

7          MR. KOTT:  Would you mark this, please.

8          I'm going to mark as Exhibit Robert

9     Walsh-22 a document entitled Confidential Settlement

10    Agreement, and it's Bates stamped COM-Cherokee-00303

11    through COM-Cherokee-00392.

12         (Above-described document was received

13    and marked Defendant's Exhibit Robert Walsh-22 for

14    Identification.)

15    Q.  Mr. Walsh, can you identify the document I

16    just marked and identified.

17    A.  Yeah.  This is a Confidential Settlement

18    Agreement with Walsh Securities Windsor and

19    Cherokee.

20    Q.  Okay, and is that the agreement by which

21    Walsh purchased both the Cherokee judgment against

22    Walsh and the loans we had talked about?

23    A.  That's correct.

24    Q.  Okay.  If you'll turn to the document Bates

25    stamped COM-Cherokee-00385.

Page 577

1    into in April of 1997, can you estimate when it was

2    projected it would go to the shareholders of both

3    companies?

4         A.   Again, I believe it was sometime in that time

5    frame.

6         Q.   Approximately September?

7         A.   Yeah.  I think once the shareholders'

8    approval took place, the merger agreement would have

9    been finalized the next day.

10        Q.   Okay.  Approximately when did the frauds

11   become public in the Asbury Park Press?  Give me an

12   approximation on that.

13        A.   End of June of '97.

14        Q.   End of June or early part of June?

15        A.   When the Asbury Park Press?

16        Q.   Yeah.

17        A.   I think it was sometime late June.

18        Q.   Okay, and remind me again when the company

19   received the subpoena and you had the meeting with

20   Mr. Kane.  We went over that earlier.  I just want

21   to get a time frame here.

22        A.   It was prior to that.

23        Q.   How much before that?

24        A.   You're going by memory now, Mr. Kott.  I'm

25   sure you have the subpoenas with you.

Page 578

1      Q.   Right.

2      A.   So it's the date of those subpoenas.

3      Q.   Okay.   When it first became public in the

4   Asbury Park Press, did the Asbury Park Press

5   thereafter do a series of articles on it?

6      A.   They did.

7      Q.   And do you remember I asked you in one of

8   your earlier depositions whether in any of those

9   articles anyone suggested that you, Robert Walsh,

10  were either involved in the fraud or had knowledge

11  of the frauds?

12     A.   Can you define did anybody?   Who is

13  "anybody"?   Could you just help me with that?

14     Q.   Okay.   All I'm asking you is if you remember

15  in your earlier depositions I asked you about

16  whether there was anything written in the newspaper

17  that suggested that you, Robert Walsh, personally

18  were aware of the frauds or participated in the

19  frauds before they became public.

20     A.   I don't know when --

21     Q.   Right.   We're going to get to when.   I

22  just --

23     A.   Okay.   I think so, but I don't really

24  specifically recall.

25     Q.   Okay.   Do you remember when your company,

Page 579

1   Walsh Securities, Inc., first made the claims -- and

2   I'm going to take you through all three title

3   companies -- first to Commonwealth, the first claim?

4      A.  Again, I'd be going by memory.  If you have

5   the information, I'd be more than glad to look at

6   it.

7      Q.  Okay.  I'm not going to mark for

8   Identification, but I'm going to hand to the witness

9   a letter dated July 28, 1997, from Jeffrey Goodman

10  at Latham & Watkins to Commonwealth Land and ask you

11  whether this refreshes your recollection that it was

12  late July that your company first made a claim to

13  Commonwealth.

14     A.  Slow mail department.

15          MR. MAGNANINI:  Slow mail, yeah, July

16  28th and received August 12th.  They walked it to

17  Philly.

18     A.  It's possible, Mr. Kott.

19     Q.  Well, I know it's possible because anything

20  is possible; but can we agree that it was in the

21  area of late July that your company first made a

22  claim to Commonwealth?

23     A.  I don't know the answer to that.

24     Q.  Okay.  Would you know the answer to that if I

25  were to change the question and ask you as to

Page 580

1    Fidelity or Nations?

2       A.   I'm not sure what the answer would be, but

3    let me tell you what I think it could be.

4       Q.   Go ahead.

5       A.   All right.  I don't know if this was the

6    first written response.  It may have been; it may

7    not have been, but based upon this, we'll assume for

8    a second that it is.  I know that there was several

9    phone calls made fairly quickly in the process.  I

10   know that Fred Schlesinger made several calls, but I

11   don't recall the dates.

12      Q.   Okay.

13      A.   I don't recall if it was in this time frame,

14   before this time frame or after this time frame.

15      Q.   Okay.  Were the phone calls made by an

16   employee of Walsh, as opposed to your outside

17   lawyers at that time, the Latham firm?

18      A.   It would have been our in-house counsel,

19   Fred Schlesinger.

20      Q.   Okay.

21      A.   Want this back?

22      Q.   Yes, please.

23           MR. KOTT:  I'm going to ask the court

24   reporter to mark for identification a three-page

25   document which is an article that appeared in the

Page 581

1   July 13, 1997, edition of the Sunday Star Ledger.

2          (Above-described three-page article was

3   received and marked Defendant's Exhibit Robert

4   Walsh-23 for Identification.)

5          MR. KOTT:  And I'm going to mark as

6   Robert Walsh-24 a two-page document which is an

7   article that appeared in the July 10, 1997, edition

8   of the Asbury Park Press.

9          (Above-described two-page article was

10  received and marked Defendant's Exhibit Robert

11  Walsh-24 for Identification.)

12   Q.  Mr. Walsh, calling your attention to Robert

13  Walsh-23, the Sunday Star Ledger article, if you

14  turn to the last page of that, do you see in the

15  first column there there's a reference to Michael

16  Schottland, who represents Robert Skowrenski?

17   A.  Yes.

18   Q.  And Schottland is there quoted as follows,

19  "Walsh is behind the whole thing.  He's now trying

20  to distance himself because it looks so unpleasant,

21  so unseemly."

22          I read that correctly?

23   A.  Yes.  I don't know if "Walsh" is me

24  individually or Walsh, the company.

25   Q.  Well, it does say "He's now," right?

Page 582

1    A.  Yes.

2    Q.  Okay.  And then down a little bit you're

3  quoted, right?

4    A.  Yes.

5    Q.  Okay.  And then in the Asbury Park Press

6  article marked Robert Walsh-24, in that article

7  again, Mr. Schottland is quoted as saying that you,

8  Robert Walsh, were involved in these frauds; is that

9  correct?

10    A.  Can you show me about what paragraph?  I'm

11  sure it says it here, but I just don't see it.

12    Q.  Yeah.  Let me just take a look here.

13       On the first page Mr. Schottland is quoted as

14  saying, "The suggestion we're making in this is that

15  the whole affair is no surprise to some people in

16  Walsh."  Is that correct?

17    A.  I don't know where you are, Mr. Kott.

18            MR. MAGNANINI:  It's the paragraph that

19  begins, "I'm not even sure that there's a difference

20  between Cristo Capital Assets and Walsh, Schottland

21  says."

22    A.  I see.

23    Q.  Right.  And then your lawyer, Mr. Oberdorf,

24  said that that was absolute nonsense; correct?

25    A.  That is correct.

Page 583

1          The power of the press.

2               THE WITNESS:  Can we go off the record

3     for a second?

4               MR. KOTT:  Yeah.

5               (File copy of September 29, 1997, letter

6     to Mr. Schlesinger from David R. Kott with certified

7     mail slip attached on the third page was received

8     and marked Defendant's Exhibit Robert Walsh-25 for

9     Identification.)

10              MR. KOTT:  I've marked as Exhibit Robert

11    Walsh-25 a file copy of a September 29, 1997, letter

12    to Mr. Schlesinger from me with a certified mail

13    slip attached on the third page.  This is from the

14    McCarter & English files.  However, a copy of it was

15    produced, Mr. Magnanini, at COM-017-12 and

16    COM-017-13, and when I say it was produced meaning

17    the client's copy of this letter was produced.

18              THE WITNESS:  Just out of curiosity,

19    were these produced?

20              MR. KOTT:  I believe -- I think they

21    were, but I might be able to tell you at a break.

22              THE WITNESS:  Okay.  Yeah.  I'd

23    appreciate that.

24              MR. KOTT:  Okay.  'Cause those are from

25    the Commonwealth files, I think.

Page 584

1           MR. MAGNANINI:  Sorry, David, what did

2    you say this was?  This is from the client's files?

3           MR. KOTT:  No, that's from my files.

4           MR. MAGNANINI:  Your files, oh, okay.

5    A.  Okay.

6    Q.  Do you recollect seeing that letter?

7    A.  I don't personally, no.

8    Q.  Okay.  There is a certified mail slip

9    attached to it.  Would you agree that that letter

10   was received by Walsh Securities?

11   A.  Yes, absolutely.  I believe Fred Schlesinger

12   probably received it.

13   Q.  Okay.  Do you recollect that your outside

14   lawyers, the Latham firm, filed the First Amended

15   Complaint that added the title insurance companies

16   in late -- I'm sorry -- in November of 1997?

17   A.  Yes, I do.

18   Q.  The letter that I've shown you, my September

19   29, 1997, letter, did you receive similar letters

20   asking for that type of information from Fidelity or

21   from Nations?

22   A.  You know, again, sitting here today,

23   Mr. Kott, I don't know; but if Mr. Hayes has a copy

24   of it or if somebody has a copy of it, that would be

25   helpful.

1      Q.   Okay.   If Mr. Hayes produced those and

2    indicated they were sent, you would not deny that;

3    is that correct?

4      A.   That is correct.

5      Q.   And calling your attention to the first page,

6    Paragraph 1, "We ask, therefore, as to each loan,

7    identify the name, address, position and title of

8    any employee of Walsh, including but not limited to

9    Robert Walsh, having knowledge of the acts, events

10   and/or circumstances which you contend give rise to

11   coverage and the date that the employee acquired the

12   knowledge."   Correct?

13     A.   Yes.

14     Q.   And then we ask some more detailed

15   information as to the basis for the coverage for

16   each loan, is that correct?

17     A.   That is correct.

18     Q.   Given the articles that I've shown you that

19   appeared in the Asbury Park Press and in the Star

20   Ledger, could you see a reason why the title

21   insurers would want to know whether you, Robert

22   Walsh, were either involved in these frauds or were

23   aware of them before they became public?

24     A.   I don't know your internal or your client's

25   internal procedures.   This is one attorney making

1    some type of wild speculation about what it is that

2    I knew or not.  Mr. Schottland was sent a letter by

3    Mr. Chertoff putting him on notice that if he

4    continued this it would be bad for him.  So I'm

5    not really sure if you're taking a look at

6    Mr. Schottland and trying to determine that we don't

7    have to pay or we need more information.

8        Q.  No, my question was a little different.

9            Can you understand, given what Mr. Schottland

10   alleged in the newspapers, why a title insurance

11   company would want to know whether the senior

12   management, including you, were aware of the frauds

13   or were involved in the frauds before they became

14   public?

15           MR. MAGNANINI:  Objection to form.

16       A.  I think that's acceptable.  I think I

17   understand now what you're saying.

18       Q.  And what's the answer to the question?

19       A.  I think it's acceptable.

20       Q.  Why is it acceptable?

21       A.  They're looking to do their due diligence and

22   understand.

23       Q.  Okay.

24       A.  But also I'll give you a follow-up on that.

25   Why did it take from July when this first hit the

Page 587

1    paper until September 29th to ask that question?

2         Q.   Okay.

3         A.   It's a rhetorical statement.  I'm not asking

4    you, as you're an attorney.

5         Q.   Okay.  Do you know whether there were other

6    correspondence between the September 29 letter --

7    well, what's the date of those articles again?

8         A.   The first, I think you said July 10th maybe.

9         Q.   Uh-huh.

10             MR. MAGNANINI:  The second one was --

11        A.   July 13th and July 10th.

12             MR. MAGNANINI:  -- July 10th.

13        Q.   But if I'm correct that the first claim was

14   made July 28th, that would be the first time

15   Commonwealth would be aware of the claims being

16   made; right?

17        A.   I guess.  It's a full 60 days after the fact

18   that that came out.  It's a full 65, 70 days since

19   the articles.

20        Q.   Okay.  Well, actually, as to when it's

21   received, it's marked received in the Commonwealth

22   Claims Department on August 12, 1997; correct?

23        A.   We don't know.  I personally can't tell you

24   what that means.

25        Q.   All right.  After Walsh Securities received

Page 588

1    the September 29, 1997, letter and before the First

2    Amended Complaint was filed in November of 1997

3    adding the title insurance companies, did Walsh

4    Securities respond to the September 29 letter and

5    provide the information requested?

6        A.   Sitting here today, Mr. Kott, I don't know

7    the answer to that.

8        Q.   Okay.  Well, in one of your depositions you

9    said you wanted to go back and look at the files on

10   what I'll call the bad faith.

11       A.   Yes.

12       Q.   And I assume you did that after that

13   deposition where you said you needed to go back and

14   look at some dates and correspondence, right?

15       A.   I probably did, yes, if I said I would do it.

16       Q.   All right, and you're here as a -- this is a

17   little unfair to us for you to say you're not sure.

18   But would it be fair to say that your company never

19   responded to the September 29, 1997, letter?

20            MR. MAGNANINI:  Well, objection to form;

21   and just for the record, his last deposition was

22   April 23, 2010.

23            MR. KOTT:  Okay.  Then withdraw all my

24   comments.

25       Q.   Would it be fair to say that, as far as you

Page 589

1    know, your company never responded to the September

2    29, 1997, letter?

3        A.  I don't know either way, yes.

4        Q.  Okay.  Well, how are we going to find that

5    out if you --

6        A.  Do you have records that could help me?  Are

7    you saying that there's no records that Commonwealth

8    has that we responded to this?

9        Q.  Well, I will represent to you this letter was

10   sent by me.

11       A.  Yes, I understand that.

12       Q.  And I'll represent to you that there was no

13   response; and the next event that occurred, as far

14   as I know, was the filing of the First Amended

15   Complaint adding the title insurance companies as

16   defendants.

17       A.  I would then take your statement.  I don't --

18   I wouldn't challenge it.

19       Q.  Okay.  Now, are you aware that this case,

20   this lawsuit, was delayed because a request by a

21   party or by the United States Attorney for a stay of

22   the lawsuit?

23       A.  I am.

24       Q.  And that was a very long delay, is that

25   correct?

Page 590

1      A.   From what I recall, it was a very long delay,

2    yes.

3      Q.   Did your attorneys oppose the stay?

4      A.   I don't know the answer to that.

5      Q.   Okay.   Did your attorneys after the stay was

6    put in place ever ask that the stay be lifted?

7      A.   Yes.

8      Q.   They did?

9      A.   Yes.

10     Q.   What's your basis for that?

11     A.   Conversation --

12          MR. MAGNANINI:  Well, without giving the

13   details of the conversations.

14          MR. KOTT:  Bob, am I wrong on that?  I

15   have a clear recollection that it was not your firm

16   that asked for the lifting of the stay, that it was

17   the Hobbie Corrigan firm that asked.

18          MR. HAYES:  As a result of what the

19   state court --

20          MR. MAGNANINI:  Your recollection how

21   the stay got lifted is correct, but I'm not going to

22   be answering questions about what we did in the six

23   years or five years.

24          MR. KOTT:  No, I'm not asking you that,

25   but can you and I agree -- because I think it's

Page 591

1    based on the docket -- that the plaintiff did not

2    oppose the requests for stays that were made by the

3    United States Attorney, and that the stay was

4    ultimately lifted not because the plaintiffs asked

5    that it be lifted but because a different law firm

6    representing one of the lawyers asked that it be

7    lifted?

8              MR. MAGNANINI:  No, that's not right.

9              MR. KOTT:  Okay.  You'll tell me at a

10   break why that's wrong.

11             MR. MAGNANINI:  Yes.  Because, remember,

12   the stay was actually asked for by attorneys for

13   people who were targets, Larry Lustberg and company.

14       Q.  Whomever asked for the stay initially, did

15   the plaintiff ever oppose that?

16       A.  I don't know the answer to that.

17       Q.  Okay.  After --

18             MR. MAGNANINI:  Mr. Kott, for the

19   record, there's a written opinion on it with us

20   opposing it and losing.

21             MR. KOTT:  Okay.  Well, then I'll stand

22   corrected.

23       Q.  After the First Amended Complaint was filed,

24   did your company ever provide the information

25   requested in the September 29, 1997, letter and, in

Page 592

1    particular, Paragraph 1?

2        A.   I don't know the answer to that.

3        Q.   Okay.   I want to come back.   There is a count

4    in the Fourth Amended Complaint for bad faith.

5            Do you know what I'm referring to?

6        A.   I do.

7        Q.   I'm not following what Walsh's position is on

8    the bad faith count against all three title

9    insurers.   Can you tell me as clearly as you can

10   what the position is.

11       A.   It's what our position has been all along,

12   and it's what the documents say and what our

13   Complaint states.

14           Did not address this quickly enough.   You're

15   taking a look and saying the first letter you sent

16   us was September 29th, two months later.   You're

17   having the facts prior to that.   You're now bringing

18   it up for the first time.   We believe you just

19   stalled, and you didn't act in a professional

20   manner.

21       Q.   Can you be any more specific than that?

22       A.   The rest would be based on what counsel has

23   represented.

24       Q.   What are you referring to?

25       A.   Our pleadings.

Page 593

1          MR. KOTT:  Will you mark these

2    sequentially, please.

3          (August 12, 1997, letter Bates stamped

4    COM 01490 from Donna Sullivan to Latham & Watkins,

5    Jeffrey Goodman was received and marked Defendant's

6    Exhibit Robert Walsh-26 for Identification.

7          September 5, 1997, letter Bates stamped

8    COM 01715 through 16 from Fred Schlesinger to Donna

9    Sullivan was received and marked Defendant's Exhibit

10   Robert Walsh-27 for Identification.)

11      Q.  I've marked as Exhibit Robert Walsh-26, Bates

12   stamped COM 01490 a letter dated August 12, 1997,

13   from Donna Sullivan to Latham & Watkins, Attention:

14   Jeffrey Goodman; and I've marked a letter dated

15   September 5, 1997, and its enclosures from Fred

16   Schlesinger to Donna Sullivan.

17      Calling your attention to Robert Walsh-26 --

18   and I'm sorry for standing over you.

19      A.  That's fine.

20      Q.  -- were you aware that that letter was sent

21   by Donna Sullivan to your lawyers, Latham & Watkins?

22      A.  I'm not sure if I was at the time or not.

23      Q.  Okay, and Ms. Sullivan there --

24          MR. MAGNANINI:  Take a look at this one,

25   too, Bob.

Page 594

1    A.   Yes.

2    Q.   -- asked for copies of the closing service

3    letters, closing instructions for each transaction,

4    specifics to how the instructions were violated, and

5    how the violations caused a loss to Walsh in the

6    amount of the loss.

7         You think those are reasonable questions for

8    an insurer faced with a large claim as Walsh was

9    making to ask?

10   A.   I do.

11             MR. MAGNANINI:  Objection to the form.

12   Q.   And then the September 27 letter from

13   Mr. Schlesinger seems by the first paragraph to

14   respond to the August 12 letter, is that correct?

15   A.   It does.  This is -- I don't know what the

16   date you just mentioned, but September 5th.

17   Q.   September 5, 1997.

18   A.   Oh, 5, okay, yes.

19   Q.   And so here it took almost a month for

20   Mr. Schlesinger to respond to Ms. Sullivan's letter,

21   is that correct, four weeks, three weeks?

22   A.   It appears on those documents, correct.

23   Q.   And then, in fact, Mr. Schlesinger asks at

24   the end to contact him if you have any questions or

25   require additional materials; right?

Page 595

1      A.   That is correct.

2      Q.   In one of your earlier depositions I asked

3  you about being in court in the matter of United

4  States v. Demola when there was a motion before

5  Judge Hayden concerning the Statute of Limitations.

6           Do you remember that?

7      A.   I do.

8      Q.   And you recollect that in that motion the

9  United States Attorney suggested that you, Robert

10  Walsh, either were involved in the frauds or were

11  aware of the frauds before they became public; is

12  that true?

13      A.   I think that was in what, 2008?

14      Q.   Right.

15      A.   I believe that's what his comments were.

16      Q.   And earlier than 2008 a number of the people

17  involved in this fraud pled guilty to various

18  federal crimes, is that correct?

19      A.   That is correct.

20      Q.   And a number of them when they pled guilty

21  pointed the finger at various other people, is that

22  correct?

23      A.   That is correct.

24      Q.   And some of them pointed the finger at Betty

25  Ann Demola, is that correct?

Page 596

1     A.  That is correct.

2     Q.  And some of the people pointed the finger at

3  you, is that correct?

4     A.  I don't recall.

5          MR. MAGNANINI:  Objection to form.

6          Go ahead.

7     A.  I don't recall other than DiBenedetto who did

8  or who didn't.  It's been a while.

9     Q.  Would you agree that Mr. DiBenedetto pointed

10  the finger at you as someone who was involved in the

11  fraud or had knowledge of it before it became

12  public?

13          MR. MAGNANINI:  Objection to form.

14     A.  I believe that people were saying whatever

15  they could say.

16     Q.  No, I didn't ask that.

17     A.  Well --

18     Q.  Would you agree that Mr. DiBenedetto in his

19  guilty plea suggested that --

20     A.  Yes.

21     Q.  Let me finish -- suggested that you were

22  either involved in the fraud or were aware of the

23  fraud before it became public?

24          MR. MAGNANINI:  Objection to form.

25     A.  What I recall of his allocution, yes.

Page 597

1    Q.   And would you agree that it is reasonable

2    for a title insurer to have concern about in this

3    situation the senior management and shareholders of

4    the company being involved?

5                MR. MAGNANINI:   Objection to form.

6                You can answer.

7    A.   Yes.

8    Q.   As the corporate deponent of Walsh Securities,

9    does Walsh Securities allege bad faith for anything

10   that occurred after the filing of the First Amended

11   Complaint in November of 1997?

12   A.   Yes, the continuation of where we are today,

13   the continuation of the acts of what the title

14   companies have been going through.

15   Q.   What are you referring to in specifics?

16   A.   Delays, mediation that lasted a

17   year and a half, coming up with a conclusion that

18   nothing should be paid.

19               MR. KOTT:   Okay.  I'm going to turn it

20   over to Mr. Hayes on this subject now.

21   FURTHER EXAMINATION BY MR. HAYES:

22   Q.   Mr. Walsh, would you agree with me that in

23   addition to the accusations that were made by

24   various parties as to the involvement of yourself or

25   others at Walsh, during this same period of time,

# Exhibit B

# CONDITIONS AND STIPULATIONS

## 1. DEFINITION OF TERMS.

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes

(i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

(iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1 (a) (iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

## 2. CONTINUATION OF INSURANCE.

(a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) After Conveyance of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) Amount of Insurance: The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

(i) the Amount of Insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

## 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

## 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion to appeal from any adverse judgement or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

Conditions and Stipulations Continued Inside Cover

**CONDITIONS AND STIPULATIONS**
(Continued)

**5. PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If no proof of loss or damage is provided, the Company's obligation to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulations, shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the additional options:

(a) To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i) to pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii) to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**7. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time of loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

**8. LIMITATION OF LIABILITY.**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

**9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

**10. LIABILITY NONCUMULATIVE.**

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

**11. PAYMENT OF LOSS.**

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

**12. SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

(b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a) (i) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

**13. ARBITRATION.**

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or a validating officer or authorized signatory of the Company.

**15. SEVERABILITY.**

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

**16. NOTICES, WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to COMMONWEALTH LAND TITLE INSURANCE COMPANY, 1700 Market Street, Philadelphia, PA 19103-3990.

NM2          PA 20
ALTA Loan Policy (10-17-92)                          ORIGINAL
Cover Page
**Form 1191-3**

Valid Only If Face Page and Schedules A and B Are Attached

COM  14901

# Exhibit C

Execution Copy

## IRREVOCABLE PROXY AGREEMENT

THIS PROXY AGREEMENT (the "Agreement"), dated as of April 18, 1997, by and between the Stockholders listed on Annex I attached hereto (each such stockholder individually referred to as a "Walsh Stockholder" and collectively as the "Walsh Stockholders") and RESOURCE BANCSHARES MORTGAGE GROUP, INC., a Delaware corporation (the "Company").

## W I T N E S S E T H:

WHEREAS, the Company, Walsh Holding Co., Inc., a Delaware corporation ("WSI"), Carolina Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of the Company ("Merger Sub"), and Robert C. Walsh, an individual resident of the State of New Jersey ("Walsh"), have entered into an Agreement of Merger, dated as of April 18, 1997 (the "Merger Agreement"), pursuant to which Merger Sub will be merged with and into WSI with WSI as the surviving corporation (the "Merger");

WHEREAS, each Walsh Stockholder is the owner of the number of shares (with respect to each Stockholder the "Shares") of Class A Common Stock, par value $.01 per share, of WSI (the "WSI Common Stock") set forth opposite such Walsh Stockholder's name on Annex I (the term "Shares" shall also include any shares of WSI Common Stock of which the respective Walsh Stockholders shall obtain beneficial ownership (including sole voting power) during the term of this Agreement);

WHEREAS, in order to induce the Company and Merger Sub to enter into the Merger Agreement, the Walsh Stockholders desire to grant to certain officers of the Company a proxy to vote the Shares;

NOW, THEREFORE, in consideration of the premises and the agreements herein contained and intending to be legally bound, the parties agree as follows:

1.    Proxy.  Subject to the terms and conditions hereof, each Walsh Stockholder hereby appoints the Company, with full power of substitution, as proxy holder (the duly authorized officers of the Company hereinafter referred to as the "Proxy Committee") to represent and to vote the Shares in favor of the Merger Agreement and the Merger (including with respect to any procedural matters related thereto) at any meeting (whether special or annual, and whether or not adjourned) or by written action of stockholders of WSI; the authority granted hereunder (the "Proxy") shall be irrevocable during the term of this Agreement and deemed to be coupled with an interest sufficient in law as required by Section 212(e) of the Delaware General Corporation Law.

2.    Changes in Shares.  For all purposes of this Agreement, the Shares shall include any securities issued or exchanged with respect to such Shares upon any recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up or combination of the securities of WSI or any other change in WSI's capital structure.

3.    Representations and Warranties of the Walsh Stockholders.  The Walsh Stockholders, jointly and severally, represent and warrant to the Company as follows:

3.1    Ownership of the Shares.  Each Walsh Stockholder has valid and marketable title to the Shares, free and clear of all security interests, liens, claims, pledges, assessments, options, equities, charges and encumbrances whatsoever, and with no proxies or restrictions on the voting rights or other incidents of record or beneficial ownership pertaining thereto (except for the Proxy being granted pursuant to this Agreement) and there are no outstanding options, warrants or rights to purchase or acquire or agreements relating to any of the Shares.  The Shares are validly issued and outstanding, fully paid and non-assessable with no personal liability attaching to the ownership thereof.

3.2    Valid and Binding Agreement; No Violation.  This Agreement constitutes a valid and binding agreement of each Walsh Stockholder, enforceable in accordance with its terms.  Neither the execution of this Agreement, the granting of the Proxy, nor the voting of the Shares by the Proxy Committee, will constitute a violation of, or conflict with, or result in a default under, any contract, commitment, agreement, understanding, arrangement or restriction of any kind to which any Walsh Stockholder is a party or by which any Walsh Stockholder is bound or to which the Shares are subject.

4.    Representations and Warranties of the Company.  The Company represents and warrants to the Walsh Stockholders as follows:

4.1    Authorization.  The execution and delivery of this Agreement by the Company has been duly authorized by all requisite corporate action.

4.2    Valid and Binding Agreement.  This Agreement constitutes a valid and binding agreement of the Company, enforceable in accordance with its terms.

5.    Covenants of the Walsh Stockholders.  The Walsh Stockholders hereby covenant and agree, jointly and severally, as follows:

5.1    Inquires or Proposals.  From the date of execution of this Agreement to termination hereof, the Walsh Stockholders shall not, directly or indirectly, solicit, initiate or knowingly encourage (including by way of furnishing non-public information), or take any other action knowingly to facilitate, any inquiries or the making of any proposal or offer (including, without limitation, any proposal or offer to the stockholders of WSI) that constitutes, or may reasonably be expected to lead to, any "Competing Transaction" (as defined in the Merger Agreement), or to enter into or maintain or continue discussions or negotiate with any person in furtherance of such inquiries or to obtain a Competing Transaction, or authorize or permit any investment banker, financial advisor, attorney, accountant or other representative retained by such party to take any such action.

5.2    Sale of Shares.  The Walsh Stockholders shall not sell, transfer, pledge, encumber or otherwise dispose of any Shares except pursuant to the Merger, between the date hereof and the termination of this Agreement.

2

5.3   Legend. Until termination of this Agreement, each certificate representing the Shares shall include a legend in substantially the following form:

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN IRREVOCABLE PROXY AND RESTRICTIONS ON TRANSFER SET FORTH IN AN IRREVOCABLE PROXY AGREEMENT, DATED AS OF APRIL 18, 1997, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION.   NO VOTE OR TRANSFER OF ANY SHARES REPRESENTED BY THIS CERTIFICATE SHALL BE VALID UNLESS MADE IN ACCORDANCE WITH THE TERMS OF SUCH AGREEMENT.

6.   Miscellaneous.

6.1   Expenses. All costs and expenses (including legal fees) incurred in connection with this Agreement shall be paid by the party incurring such expense.

6.2   Survival of Representations. Notwithstanding any provision of this Agreement, all representations, warranties and agreements made by the Walsh Stockholders and the Company in this Agreement shall survive until the earlier of (a) the closing of the Merger or (b) the termination of the Merger Agreement.

6.3   Further Assurance and Cooperation. From time to time, and without further consideration, each party will execute and deliver to the other such documents and take such action as the other may reasonably request in order to consummate more effectively the terms of this Agreement.

6.4   Parties in Interest; Complete Agreement; Amendment. All authority herein conferred or agreed to be conferred by a Walsh Stockholder shall survive such Walsh Stockholder's death, incapacity, dissolution, liquidation or termination. This Agreement constitutes the sole understanding of the parties hereto with respect to the subject matter hereof; provided, however, that this provision is not intended to abrogate any other written agreement between or among the parties executed with or after this Agreement or any written agreement pertaining to another subject matter. No amendment of this Agreement shall be binding unless made in writing and duly executed by the Company and the Walsh Stockholders. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the Company (if such assigning party is a Walsh Stockholder) or Robert C. Walsh (if such assigning party is the Company), which consent will not be unreasonably withheld.

6.5   Specific Performance. Each party acknowledges that its obligations hereunder are unique and agrees that the other shall have the right, in addition to any other rights it may have, to specific performance or equitable relief by way of injunction if it shall fail to perform any of its obligations hereunder.

3

ATL-381338-6
April 18, 1997--18:18:3

WS2000002603

6.6    <u>Law Governing; Construction</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware.  No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority or by any board of arbitrators by reason of such party or its counsel having or being deemed to have structured or drafted such provision.  Unless otherwise expressly provided herein, all references in this Agreement to Section(s) shall refer to the Section(s) of this Agreement.  The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of this Agreement.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

6.7    <u>Consent to Jurisdiction; Venue</u>.  Each of the parties hereto irrevocably submits to the exclusive jurisdiction of the state courts of Delaware and to the jurisdiction of the United States District Court for the District of Delaware, for the purpose of any action or proceeding arising out of or relating to this Agreement, and each of the parties hereto irrevocably agrees that all claims in respect to such action or proceeding may be heard and determined exclusively in any state or federal court sitting in Wilmington, Delaware.  Each of the parties hereto agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the parties hereto irrevocably consents to the service of any summons and complaints and any other process in any other action or proceeding relating to this Agreement, on behalf of itself or its property, by the personal delivery of copies of such process to such party.  Nothing in this Section 6.7 shall affect the right of any party hereto to serve legal process in any other manner permitted by law.

6.8    <u>Term of the Agreement</u>.  This Agreement shall terminate upon the first to occur of (i) the termination of the Merger Agreement or (ii) the closing of the Merger.

ATL-381338-6
April 18, 1997—18:18:3

WS2000002604

Annex I

| Name | Shares |
|------|--------|
| Robert C. Walsh | 49.5625 |
| James Walsh | 5.0 |
| Elizabeth Ann Demola | 5.0 |
| Trust f/b/o Melissa C. Walsh | 5.0 |
| Trust f/b/o Stephanie E. Walsh | 5.0 |

ATL-381338-6
April 18, 1997—18:18:3

WS2000002605

APR 04 '97 20:05 FR KING & SPALDING          404 572 5146 TO

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

RESOURCE BANCSHARES MORTGAGE GROUP, INC.

By: _____

Name: David W. Johnson, Jr.

WALSH STOCKHOLDERS:

_____

Robert C. Walsh

Lorraine Walsh, as Trustee of the MELISSA C. WALSH 1996 TRUST created under the Melissa C. Walsh 1996 Trust Agreement dated April 12, 1996, with Robert C. Walsh as Grantor

By: _____

Lorraine Walsh

Title:   Trustee

Lorraine Walsh, as Trustee of the STEPHANIE E. WALSH 1996 TRUST created under the Stephanie E. Walsh 1996 Trust Agreement dated April 12, 1996, with Robert C. Walsh as Grantor

By: _____

Lorraine Walsh

Title:   Trustee

_____

James Walsh

_____

Elizabeth Ann Demola

5

WS2000002606

# Exhibit D

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEW JERSEY
2    CIVIL ACTION NO. 97-3407 (DRD)

3

WALSH SECURITIES, INC.,            :
4                                   :
              Plaintiff,            :   DEPOSITION UPON
5                                   :   ORAL EXAMINATION
        v.                          :        OF
6                                   :   ROBERT WALTER
CRISTO PROPERTY MANAGEMENT,         :   SKOWRENSKI, II
7    LTD., et al.,                  :
                                    :
8             Defendants.           :   COPY
     - - - - - - - - - - - - - - - -:

9

10           T R A N S C R I P T  of the

11   stenographic notes of STANLEY B. RIZMAN, a Notary

12   Public and Certified Shorthand Reporter of the State

13   of New Jersey, Certificate No. XI00304, taken at the

14   offices of Manning, Caliendo & Thomson, PA, 36 West

15   Main Street, Freehold, New Jersey, on Tuesday, May

16   25, 2010, commencing at 10:12 a.m.

17

18

19

20

21

22

23

24

25



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Skowrenski - direct

Page 108

1      Q      When you were working for the prior
2 company, you were dealing with predominantly A
3 quality paper?

4      A      Correct.

5      Q      When you were working at NHF, was that
6 primarily or exclusively sub-prime paper?

7      A      Primarily, yes.

8      Q      Did you find any different level of
9 sophistication between the borrowers when you worked
10 at the prior mortgage company than this?  "This" one
11 being NHF.

12      A      No.  I would say some borrowers got
13 themselves in need of more help financially.

14      Q      You indicated to Mr. Kott there were a
15 couple of companies that NHF sold mortgage loans to,
16 Walsh being one of them.  Coastal.  Decision One,
17 Aimes.  Any others that you can recall?

18      A      There were others I don't recall.

19      Q      Do you recall what percentage of your
20 business was done with Walsh versus any of these
21 other mortgage lenders?

22      A      I wouldn't be able to recall the
23 breakdown.

24      Q      Had you been asked that question in
25 1999, is that a question you would have been able to



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# Exhibit E

ROBERT AGEL



Page 1

```
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
 2                    Civil Action No.
                      97-cv-3496 (DRD) (MAS)
 3
    WALSH SECURITIES, INC.,   :
 4                            :
                 Plaintiff,   :
 5                            :
         vs.                  :    DEPOSITION OF:
 6                            :    ROBERT AGEL
    CRISTO PROPERTY MANAGEMENT,
 7  LTD., a/k/a G.J.L. LIMITED;
    OAKWOOD PROPERTIES, INC.;
 8  NATIONAL HOME FUNDING, INC.;
    CAPITAL ASSETS PROPERTY
 9  MANAGEMENT & INVESTMENT CO.,
    INC.; CAPITAL ASSETS PROPERTY
10  MANAGEMENT, L.L.C.; WILLIAM
    KANE; GARY GRIESER; ROBERT
11  SKOWRENSKI, II; RICHARD CALANNI;
    RICHARD DiBENEDETTO; JAMES R.
12  BROWN; THOMAS BRODO; ROLAND
    PIERSON; STANLEY YACKER, ESQ.;
13  MICHAEL ALFIERI, ESQ.; RICHARD
    PEPSNY, ESQ.; ANTHONY M.
14  CICALESE, ESQ.; LAWRENCE CUZZI;
    ANTHONY D'APOLITO; DAP CONSULTING,
15  INC.; COMMONWEALTH LAND TITLE
    INSURANCE CO.; NATIONS TITLE
16  INSURANCE OF NEW YORK, INC.;
    FIDELITY NATIONAL TITLE
17  INSURANCE CO. OF NEW YORK;
    COASTAL TITLE AGENCY; DONNA
18  PEPSNY; WEICHERT REALTORS; and
    VECCHIO REALTY, INC., D/B/A
19  MURPHY REALTY BETTER HOMES
    And GARDENS               :
20                            :
                 Defendants. :
21                            :
    - - - - - - - - - - - - - -
22
23
24
25
```

ROBERT AGEL

Page 2

1          TRANSCRIPT of the stenographic notes of

2    the proceedings in the above-entitled matter, as

3    taken by and before JANET BAILYN, a Certified

4    Shorthand Reporter and Notary Public of the State of

5    New Jersey, held at the office of MANNING, CALIENDO &

6    THOMSON, 36 West Main Street, Freehold, New Jersey,

7    on June 23, 2010, commencing at 10:10 in the

8    forenoon.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ROBERT AGEL

1      A.      Right.

2      Q.      But you never saw any of the properties

3   physically?

4      A.      No.

5      Q.      Were you concerned at that point that

6   there might be a fraud going on?

7      A.      No.  No.  They gave me all the right

8   answers.  The ones that we thought were legitimate

9   answers.

10      Q.      And you said you spoke to Commonwealth's

11   counsel.  Do you recall who that was?

12      A.      Yes, Nancy Koch.

13      Q.      And when was the first time you spoke

14   with Miss Koch about the -- these Kane properties?

15      A.      I don't recall when.

16      Q.      Was it about the time you started -- you

17   had to record these documents?

18      A.      No, I think it was before that.

19      Q.      It was even before that.  Do you recall

20   whether it was cold or warm?

21      A.      No.  I was in an office and she was in

22   an office.  At that time my office had no windows.

23           MR. McGOWAN:  Off the record.

24           (A discussion takes place off the

25   record).

ROBERT AGEL

Page 62

```
 1    the very early spring, I presume, of '97, whenever
 2    all of this started to go bad in terms of documents
 3    not getting recorded, having closings without owning
 4    property.
 5          Q.     We've seen -- I've seen that, although
 6    we have -- and I will get to the paper in a bit, we
 7    actually have I think loan closings taking place up
 8    until June of 1997.  And I thought Coastal is the
 9    title agent on those.
10          A.     Well, it's possible.  We -- I don't
11    recall having any contact with them after say April
12    or so, but it is possible they continued to use the
13    title commitments that were issued.
14          Q.     Okay.
15          A.     And I couldn't even tell you if we were
16    paid on them at this point because we handed all of
17    our files over to -- any pending files I think we
18    turned over to the FBI.
19          Q.     And when was that?
20          A.     Had to be summer of '97.
21          Q.     How did you terminate your business
22    relationship Coastal had with, I'll say, Cicalese and
23    Kane?
24          A.     I never really had a business
25    relationship with Kane.  It was through Pepsny, and I
```

ROBERT AGEL

1   just told Pepsny and I -- I don't know if we said

2   anything -- that might be the one time I spoke with

3   Cicalese, I don't know, but I just told them that we

4   can't insure these any more.

5        Q.     Okay.  Did you send him a letter or

6   anything?

7        A.     Probably not.

8        Q.     You told -- what did you tell Mr.

9   Pepsny?

10       A.     That I can't continue to insure these,

11   there's something seriously wrong here.

12       Q.     Do you recall if Mr. Pepsny or Mr.

13   Cicalese said anything?

14       A.     No, not really.

15              MR. KOTT:  You don't recall or they

16   didn't say anything?

17              THE WITNESS:  I don't recall.  I don't

18   recall.

19       Q.     Did you ever speak to Mr. Kane at that

20   point in time?

21       A.     You know, I do recall talking to him on

22   the telephone and -- you know, because I do believe

23   that we had conversation where he said:  Listen, I'm

24   legit, I'm doing everything right.  But that was

25   about it.  No, I don't recall having any other

ROBERT AGEL

1    conversations with him.

2         Q.    Do you recall when that conversation

3    occurred?

4         A.    It was probably after the story broke in

5    the paper, the newspaper story.

6         Q.    And then you said that whatever pending

7    files you had for Mr. Kane or his companies were

8    turned over to the FBI.  What other documents did you

9    give the government?

10        A.    Well, I gave them my entire files.  You

11   know, I gave them everything.  There were more

12   documents where they had not recorded -- that they

13   had not recorded.  They might have gotten two

14   batches, I don't recall, frankly, but there were

15   original documents, like, original deeds and

16   mortgages that we turned over to --

17        Q.    To the government?

18        A.    To the FBI, yes.

19        Q.    When you said that they had gotten you

20   these additional documents, were they for sales that

21   occurred after you already recorded all of these

22   documents that were recorded in April?

23        A.    I think, I am not certain but I think

24   so.

25        Q.    Do you remember how many properties were

ROBERT AGEL

Page 65

1    involved in those?

2        A.    No.

3        Q.    Did you ever get your documents back

4    from the government?

5        A.    I don't think so.  I don't recall.

6        Q.    Were you interviewed by the government?

7        A.    Yes.

8        Q.    And did you ever testify before a grand

9    jury?

10       A.    No.

11       Q.    How many times were you interviewed?

12       A.    Once.

13       Q.    When was that?

14       A.    Probably in the springtime of '97.  It

15   was Alan Leibman.

16       Q.    Actually were you interviewed after the

17   story was public or before that?

18       A.    You know, I don't recall. That I

19   couldn't tell you.  I was also interviewed by Larry

20   Willis and Tom Jobs.

21       Q.    From the FBI?

22       A.    Yes.  That happened first, and then I

23   went in to see Alan Leibman after that.

24       Q.    Do you know who produced -- once the

25   civil litigation was filed who produced documents on

ROBERT AGEL

1          (Coastal-5, Plaintiffs' First Request

2    for Production of Documents to Defendant Coastal

3    Title Agency, is received and marked for

4    identification.)

5          Q.      Mr. Agel, I ask you to look at what's

6    been marked as Coastal Exhibit Number 5, which is

7    Walsh Securities' First Request For Production of

8    Documents.  That's dated August 15, 2008.

9          A.      Okay.

10         Q.      There's a whole bunch of legal

11   definitions and things.  The requests I would

12   actually ask you to look at are on pages ten through

13   15.

14         A.      Okay.

15         Q.      You testified earlier that your files

16   were copied by your initial counsel, the Ansell firm?

17         A.      Yes.

18         Q.      And did they copy any other documents of

19   Coastal other than the files related to each of the

20   transactions?

21         A.      I don't think so.

22         Q.      And then did you produce any other

23   documents other than the files -- one question I

24   would ask you about that is:  You said there were

25   some pending transaction files which you provided to

ROBERT AGEL

Page 84

1   the FBI in the summer of 1997.  Were they copied by

2   the Ansell firm?

3        A.     No, I think those were original files

4   that I turned over at that point.  I either did that

5   or I gave them to Commonwealth.  I don't recall, but

6   I'm pretty sure it all went to the FBI.

7        Q.     And then in this litigation Fidelity had

8   produced about eight boxes of files, which I

9   understand came from Coastal.

10       A.     Uh-huh.

11       Q.     And did Coastal provide copies of its

12  files to Fidelity or send the originals to Fidelity?

13       A.     I think we would have provided originals

14  and we would have kept the photocopy.

15       Q.     What about for Commonwealth?

16       A.     Same thing.

17       Q.     So you sent the original files to the

18  title insurance company?

19       A.     That's generally our procedure with a

20  claim so yes.

21       Q.     When were you first notified of a claim?

22       A.     Probably in the summer of '97.  I guess

23  when people started to default on mortgages and

24  foreclosures started.

25       Q.     And how was Coastal alerted that there's

Page 141

```
1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
2                    Civil Action No.
                     97-cv-3496 (DRD) (MAS)
3
  WALSH SECURITIES, INC.,  :
4                          :
               Plaintiff,  :
5                          :  VOLUME II
       vs.                 :  DEPOSITION OF:
6                          :  ROBERT AGEL
  CRISTO PROPERTY MANAGEMENT,
7 LTD., a/k/a G.J.L. LIMITED;
  OAKWOOD PROPERTIES, INC.;
8 NATIONAL HOME FUNDING, INC.;
  CAPITAL ASSETS PROPERTY
9 MANAGEMENT & INVESTMENT CO.,
  INC.; CAPITAL ASSETS PROPERTY
10 MANAGEMENT, L.L.C.; WILLIAM
  KANE; GARY GRIESER; ROBERT
11 SKOWRENSKI, II; RICHARD CALANNI;
  RICHARD DiBENEDETTO; JAMES R.
12 BROWN; THOMAS BRODO; ROLAND
  PIERSON; STANLEY YACKER, ESQ.;
13 MICHAEL ALFIERI, ESQ.; RICHARD
  PEPSNY, ESQ.; ANTHONY M.
14 CICALESE, ESQ.; LAWRENCE CUZZI;
  ANTHONY D'APOLITO; DAP CONSULTING,
15 INC.; COMMONWEALTH LAND TITLE
  INSURANCE CO.; NATIONS TITLE
16 INSURANCE OF NEW YORK, INC.;
  FIDELITY NATIONAL TITLE
17 INSURANCE CO. OF NEW YORK;
  COASTAL TITLE AGENCY; DONNA
18 PEPSNY; WEICHERT REALTORS; and
  VECCHIO REALTY, INC., D/B/A
19 MURPHY REALTY BETTER HOMES
  And GARDENS               :
20                          :
               Defendants. :
21                          :
   - - - - - - - - - - - -
22
23
24
25
```



ROBERT AGEL

1        TRANSCRIPT of the stenographic notes of

2   the proceedings in the above-entitled matter, as

3   taken by and before JANET BAILYN, a Certified

4   Shorthand Reporter and Notary Public of the State of

5   New Jersey, held at the office of MANNING, CALIENDO &

6   THOMSON, 36 West Main Street, Freehold, New Jersey,

7   on August 5, 2010, commencing at 10:25 in the

8   forenoon.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ROBERT AGEL

1           MR. KOTT:  I object to the form of the

2   question.

3           MR. McGOVERN:  I object to the form of

4   that also.  Legal conclusion but you can answer it.

5       Q.   I am asking for your understanding.

6       A.   No.

7       Q.   We had talked prior about the cover

8   searches.  And when we went back and looked at the

9   deeds recorded by Coastal Title in April of 1997 some

10  of them stretched back as far as closings from June

11  of 1996.  Do you know why it took so long to uncover

12  this pattern that Mr. Yacker had not been filing the

13  deeds or mortgages as required?

14          MR. McGOWAN:  Number one, I think that

15  was asked and answered last time, but you can go

16  ahead and answer if you can.  I don't know how he

17  knows what Yacker was doing.

18      A.   I don't know.

19      Q.   My question to you is:  Since you

20  were -- since Coastal Title was doing the bring down

21  searches, why did it take so long for Coastal to

22  determine that deeds and mortgages weren't being

23  filed?

24      A.   I don't know.  I don't recall.  I can

25  tell you that we -- once we found out we contacted

ROBERT AGEL

Page 186

1   them.  I don't think -- I don't recall it happening

2   in 1996.  I only recall it happening late '96, early

3   '97.

4        Q.     I'm saying June -- based on what was

5   filed by Coastal Title and recorded it was your --

6   like I said it was about 150 deeds and mortgages

7   recorded April 8th and 9th in Monmouth County.

8        A.     I thought that was in '97.

9        Q.     In '97 it was, but some of the deeds and

10  mortgages that were being recorded were from closings

11  in June of '96.

12       A.     That's possible.

13       Q.     And -- but I was just trying to figure

14  out why there was a ten-month lag between closings

15  and deeds not being filed and then --

16       A.     You would be shocked at how many

17  attorneys don't record deeds on time.

18       Q.     But in numbers like this?

19       A.     This was a very small percentage of our

20  business so I didn't pay that much attention.

21       Q.     Okay.

22              (A recess takes place.)

23       Q.     Mr. Agel, continuing on.  Last time we

24  discussed, Mr. Agel, Mr. Kane had given you a check

25  for 50 to 60,000 to cover the recording fees and