# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

WALSH SECURITIES, INC.,
    Plaintiff,

v.

CRISTO PROPERTY MANAGEMENT, LTD.,
G.J.L. LIMITED; DEK HOMES OF NEW JERSEY, INC.;
OAKWOOD PROPERTIES, INC.; NATIONAL HOME
FUNDING, INC.; CAPITAL ASSETS PROPERTY
MANAGEMENT & INVESTMENT CO., INC.; CAPITAL
ASSETS PROPERTY MANAGEMENT, LLC; WILLIAM
KANE; GARY GRIESER; ROBERT SKOWRENSKI, II;
RICHARD CALANNI; RICHARD DiBENEDETTO;
JAMES R. BROWN; THOMAS BRODO; ROLAND
PIERSON; STANLEY YACKER, ESQ.; MICHAEL
ALFIERI, ESQ.; RICHARD PEPSNY, ESQ.; ANTHONY
M. CICALESE, ESQ.; LAWRENCE CUZZI; ANTHONY
D'APOLITO; DAP CONSULTING, INC.;
COMMONWEALTH LAND TITLE INSURANCE CO.;
NATIONS TITLE INSURANCE OF NEW YORK, INC.;
FIDELITY NATIONAL TITLE INSURANCE CO. OF
NEW YORK; COASTAL TITLE AGENCY; STEWART
TITLE GUARANTY COMPANY; IRENE DiFEO;
DONNA PEPSNY; WEICHERT REALTORS; and
VECCHIO REALTY, INC., d/b/a MURPHY REALTY
BETTER HOMES AND GARDENS,
    Defendants.

Judge Dickinson R. Debevoise
Magistrate Judge Michael A. Shipp

Civ. A. No. 97-3496 (DRD)(MAS)

**REPLY BRIEF OF NATIONS TITLE INSURANCE OF NEW YORK, INC.
AND FIDELITY NATIONAL TITLE INSURANCE CO. OF NEW YORK
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Edward J. Hayes, Esquire
David H. Colvin, Esquire
Fox Rothschild LLP
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103
(215) 299-2092
(215) 299-2150 (facsimile)

**TABLE OF AUTHORITIES**

| | | | |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | ARGUMENT | | 3 |
| | A. | Walsh still has not established that it is the current holder of the mortgages and that it has standing to assert claims against Fidelity. | 3 |
| | B. | Walsh has not established that the error in recording some of the joint venture deeds before recording the NHF mortgages is the cause of any loss. | 4 |
| | C. | Walsh cannot assert claims for the first time more than 12 years after the transactions. | 7 |
| | | 1. The policies require that Fidelity be given timely notice of claims so that it can exercise certain rights under the policy. | 7 |
| | | 2. The policy provided Fidelity with the option to correct the title problem, a right that was lost due to the failure to give notice. | 9 |
| | | 3. Fidelity has suffered appreciable harm due to the lack of timely notice. | 10 |
| | | 4. Fidelity also suffered appreciable harm as a result of Walsh's failure to notify Fidelity of the Bustos litigation until long after judgment had been entered. | 13 |
| III. | CONCLUSION | | 15 |

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Trico Mortgage v. Penn Title Insurance Company,
   281 N.J.Super. 341, 657 A.2d 890 (App. Div. 1995) .................................................. 8, 12

British Insurance Co. v. Safety National Casualty,
   335 F.3d 205 (3rd Cir. 2003) .................................................................................... 8

Chrysler First Financial v. Chicago Title Insurance Co.,
   226 A.D.2d 183, 641 N.Y.S.2d 13 (App. Div. 1996) ................................................ 12

Cox v. RKA Corporation,
   164 N.J. 487, 753 A.2d 1112 (2000) ........................................................................ 11

Diversified Mortgage v. U.S. Life Title,
   544 F.2d 571 (2nd Cir. 1976) .................................................................................. 10

Goldberg v. Levy,
   99 N.J.Eq. 634, 134 A. 353 (1926) .......................................................................... 11

Goldenstein v. Marlboro Construction Co.,
   7 N.J. Misc. 185, 145 A. 2 (1929) ........................................................................... 11

Scult v. Bergen Valley Builders,
   76 N.J. Super. 124, 183 A.2d 865 (1962) ................................................................. 11

Summonte v. First American Title,
   180 N.J.Super. 605, 436 A.2d 110 (1981) ................................................................ 4

Willow Ridge v. Stewart Title Guaranty,
   706 F.Supp. 477 (S.D. Miss. 1988) .................................................................. 5, 6, 7, 8

Worthey v. Sedillo Title Company,
   85 N.M. 339, 512 P.2d 667 (1973) .......................................................................... 12

**STATUTES**

N.J.S.A. 46:21-1 ............................................................................................................ 10

N.J.S.A. 46:22-1 ............................................................................................................ 11

Defendants, Fidelity National Title Insurance Co. of New York and Nations Title Insurance of New York, Inc. (collectively, "Fidelity"), by and through their undersigned counsel, Fox Rothschild LLP, respectfully submit this reply brief in further support of their motion for partial summary judgment dismissing the title insurance policy claims asserted by plaintiff, Walsh Securities, Inc. ("Walsh"). For the reasons set forth in Fidelity's initial brief and below, the court should grant Fidelity's motion.

## I.  INTRODUCTION

Initially, Walsh's 12 year delay in asserting any title claims has prejudiced Fidelity and, of itself, bars recovery on such claims. Claims under title insurance policies were asserted for the first time in the Fourth Amended Complaint filed on July 10, 2009, some 12 years after the last transactions which are the subject of this litigation. **[Docket 302]**. Walsh has not and cannot produce a single document evidencing its assertion of title claims on the subject properties prior to the filing of the Fourth Amended Complaint. While counsel for Walsh attempts to create the impression that title claims were asserted shortly after the transactions, by making reference to notice letters sent to Fidelity in July of 1997, a review of those letters clearly shows that the claims made to Fidelity in 1997 related <u>solely</u> to the closing

1

service letters, not title insurance policies.[1] By waiting twelve years to assert title claims, long after its mortgages had already been divested by foreclosure sales, Walsh precluded Fidelity from exercising its valuable rights under the title policies (e.g. the right to initiate proceedings to correct the now complained of problem with the joint venture deeds), which lost opportunity constitutes "appreciable harm" to Fidelity and requires that the title claims be dismissed.

Second, Walsh's title claims should be dismissed for an independent reason, namely, no error by Fidelity caused a loss compensable under the policies. Fidelity's motion for partial summary judgment pointed out the 30(b)(6) testimony of Robert Walsh in which he admitted that these newly asserted title claims arose from Walsh's own failure to record assignments. In its response, Walsh was unable to answer that admission, so it changed the basis for its title claims. Now, Walsh states that the failure to record assignments is not the basis for its title claims. ***Walsh brief in opposition to Fidelity motion for partial summary judgment, p.3 ("Walsh Brief")***. Instead, Walsh now contends that its title claims are based on the fact that joint venture deeds, by which the borrowers conveyed a 60% ownership interest in the subject properties to Capital Assets Management ("Capital"), were

---

[1] The notice letters stated that "[t]he purpose of this letter is to put you on notice that our client Walsh Securities, Inc. has retained us to seek recovery for losses or claims covered by Closing Service Letters issued by Fidelity...". ***See December 22, 2011 certification of Amy Walker Wagner ("Walker certification), exhibits 2 and 3.*** There is no mention whatsoever of title policies or title claims in those letters.

recorded prior to the recordation of the mortgage from the borrowers to NHF. Walsh concludes, without a scintilla of fact to support it, that this error in order of recording rendered the title to the property unmarketable and that, as a result, liability exists under the title policy. But the order of recording of these joint venture deeds is not what resulted in the divestiture of the mortgages from the properties. Rather, the divestiture resulted from foreclosure sales which had nothing to do with the joint venture deeds. The reason Walsh did not take any action in those foreclosures is that it did not receive notice of the foreclosure solely because of its own failure to record assignments which would have made public its alleged interest in the mortgages. Even with Walsh's late shift in position, Fidelity respectfully suggests that its request for summary judgment should be granted since the divestiture of Walsh's mortgage liens occurred as a result of foreclosure sales, not the joint venture deeds.

## II.   ARGUMENT

### A.   Walsh still has not established that it is the current holder of the mortgages and that it has standing to assert claims against Fidelity.

Fidelity's moving papers showed that Walsh must be the current holder of the NHF mortgages in order to assert a title claim. Yet, Walsh has not provided this Court with any evidence that it is the current holder of the mortgages on which it is making title claims. Walsh admits that loans were closed in the name of NHF, not Walsh. *Walsh brief, p.3.* Walsh next states that the loans were assigned by NHF to

3

Walsh. ***Walsh Brief, p. 4.*** Walsh then states that it would execute an assignment in blank for the benefit of the whole loan buyer *Id.* Those assignments would be transmitted by Walsh to the whole loan buyer for recording. *Id.*

In fact, attached as exhibits to the Wagner certification are examples of assignments from NHF to Walsh and of assignments from Walsh to the whole loan buyers. ***See Wagner cert., exhibits 6 and 7.*** Those assignments would allow title claims to be asserted by the whole loan buyers, as the assignments establish their standing to bring title claims. However, it is Walsh that is here asserting the title claims, not the whole loan buyers. While Walsh contends it was forced to repurchase the loans on which it is making claims, Walsh has never produced (on this motion or otherwise) any assignments evidencing the transfer to it of the mortgages. Since Walsh has not produced the assignments despite numerous requests that such documentation be produced (assuming such assignments exist), then Walsh has not established it has legal standing to make these claims.

    **B.    Walsh has not established that the error in recording some of the joint venture deeds before recording the NHF mortgages is the cause of any loss.**

"A title insurance policy is a contract of indemnity under which the insurer for a valuable consideration agrees to indemnify the insured in a specified amount against loss through defects in title to, or liens or encumbrances upon realty in which the insured has an interest." ***Summonte v. First American Title, 180***

4

*N.J.Super. 605, 610, 436 A.2d 110, 112 (1981).* In order to recover under a title policy, in addition to proving a title defect, an insured must show "actual loss which he has sustained <u>by virtue of title defects, encumbrances and the like</u>." *Id.* *[Emphasis added].* As a result, for Walsh to make title claims based on the recording of the joint venture deeds prior to the recording of its mortgages (its most recent position), it must establish that the loss it sustained, i.e., the divestiture of its mortgages, results from the recording of those joint venture deeds before the mortgages. Walsh's opposition papers do not contain a single fact showing that the loss of its mortgage liens related to the filing of the joint venture deeds prior to the mortgages. The evidence produced by Fidelity in support of its motion for partial summary judgment clearly establishes that the divestiture of Walsh's mortgage liens occurred as a result of foreclosures, not joint venture deeds. Since there is no evidence that the loss now claimed relates to the recording of the joint venture deeds before the mortgages, and since Walsh has the burden of producing such evidence, there is no claim under the title policies.

Fidelity directs this Court's attention to *Willow Ridge v. Stewart Title Guaranty, 706 F.Supp. 477 (S.D. Miss. 1988)* in which the insured sought damages under a title policy due to the existence of unrecorded materialmen's liens which had not been excepted from coverage under the policy. The insured contended that title was defective and unmarketable due to the liens and demanded payment under

5

the policy. The Court denied relief noting that although the liens existed and were covered by the policy, the loss of the insured's interest in the property resulted from a foreclosure of a mortgage, not from any materialman's lien, and that, therefore, the loss was not covered by the policy. *Id., at p. 482.* The Court stated that:

> Once Willow Ridge lost title to the property through foreclosure, it no longer had any legal interest in the property and the policy was rendered ineffective. And, since there was never a determination as to the validity of liens prior to the foreclosure, Stewart Title's duty to pay based on the alleged defect never arose.

*Id. at p. 486.* The reasoning of *Willow Ridge* is applicable to Walsh's claims as Walsh is attempting to shift this Court's focus away from the fact that its mortgages were divested as the result of its own inactivity, not from the fact that the joint venture deeds were recorded prior to the NHF mortgages.

Walsh also argues that the conveyance of an interest in the properties to Capital rendered the properties unmarketable since the consent of Capital would now be required in order to convey the properties. This argument makes no sense as the mere fact that a third party has an interest in property does not render the title to that property unmarketable. The title is marketable. A transfer of this marketable title simply requires an additional signature for a conveyance to take place.

Furthermore, Walsh does not even attempt to produce evidence that any loss allegedly sustained by Walsh resulted from the fact that Capital held a 60% interest in the properties. Walsh produces no evidence that it was unable to foreclose a mortgage because Capital asserted ownership of 60% of the property. Walsh produces no evidence that an attempt was made to sell any of these properties and the sale was unsuccessful due to Capital's recorded interest in the property. Walsh simply jumps to the legal conclusion that Fidelity is liable because the joint venture deeds were recorded before the mortgages. There is simply no support for such a conclusion since the divestiture of Walsh's mortgages resulted from the foreclosures of the properties, not from the joint venture deeds. As the Court stated in *Willow Ridge*, "even if title were unmarketable, Willow Ridge would not automatically be entitled to recover under the policy. The unmarketability must have caused a loss to the insured....There must be a causal connection between the unmarketability and the loss sustained. *Id. at p. 487.* No such causal connection exists in this case.

### C. Walsh cannot assert claims for the first time more than 12 years after the transactions.

#### 1. The policies require that Fidelity be given timely notice of claims so that it can exercise certain rights under the policy.

The title policies under which Walsh is making its claims contain specific provisions obligating the insured to notify Fidelity when there is a claim adverse to

7

the insured's mortgage interest. Specifically, the conditions and stipulations of the policies provide as follows:

> The insured shall notify the Company <u>promptly in writing</u> (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable. *[Emphasis added].*

*1992 Policy, conditions and stipulations, ¶3.* The policies go on to state that:

> If <u>prompt</u> notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice. *[Emphasis added].*

*Id.* New Jersey law recognizes that because "notice provisions are geared toward protecting the insurer's interest", the failure to provide timely notice may be the basis for denial of the claim, if "the title insurance company can prove that it suffered appreciable harm due to the late notification." *Trico Mortgage v. Penn Title Insurance Company, 281 N.J.Super. 341, 439, 657 A.2d 890, 894 (App. Div. 1995).* In determining if there is appreciable harm due to the late notice, Courts examine "(1) whether substantial rights have been irretrievably lost and (2) the likelihood of success of the insurer in defending against the victim's claim." *British*

8

*Insurance Co. v. Safety National Casualty*, 335 F.3d 205, 213 (3rd Cir. 2003). Walsh's failure to provide notice to Fidelity until long after the foreclosure sales had already occurred has caused Fidelity to lose valuable rights under the policy.

### 2. The policy provided Fidelity with the option to correct the title problem, a right that was lost due to the failure to give notice.

The title policies specifically state that upon notice of a claim, Fidelity has certain options, one of which is to initiate legal proceedings to "correct" the underlying title problem. Fidelity was never afforded that opportunity since Walsh never notified Fidelity of the recording "problem" until after its mortgages had already been divested. Paragraph 4 of the policies provides as follows:

> (a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

9

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

*1992 Policy, conditions and stipulations, ¶4.* Courts have recognized that an insured who fails to comply with these provisions, thereby prejudicing the insurer, is not entitled to recover under the policy. *See, Diversified Mortgage v. U.S. Life Title, 544 F.2d 571, 575 (2nd Cir. 1976).* Here, Walsh has prejudiced Fidelity by not providing notice until after the mortgages had already been divested.

### 3. Fidelity has suffered appreciable harm due to the lack of timely notice.

Had Walsh promptly notified Fidelity of the recording issues, Fidelity could have easily corrected the issues arising from the order of recording of the joint venture deed by initiating an action against Capital to establish that Capital, which acted with actual knowledge of the NHF mortgages and without paying any monies for its interest in the properties, was not a bona fide purchaser. Walsh complains that its mortgages only encumbered a 40% interest in the collateral due to the order of recording. According to Walsh, Capital's 60% interest in the property was not

encumbered by the mortgage since the mortgage was recorded after the recording of the deed. This argument ignores New Jersey law regarding recording.

New Jersey's recording statutes provide that deeds and mortgages are to be recorded and that upon recording, third parties have constructive notice of the contents of the recorded documents. *N.J.S.A. 46:21-1.* The statutes go on to provide that unrecorded documents shall be void and of no effect against subsequent bona fide purchasers or mortgagees who are without notice of the unrecorded document. *N.J.S.A. 46:22-1.* As a result, while New Jersey is a "race-notice" jurisdiction, protection is only afforded to the first to record "so long as that party had no actual knowledge of the other party's previously-acquired interest." *Id.; Cox v. RKA Corporation, 164 N.J. 487, 496, 753 A.2d 1112, 1117 (2000); Goldenstein v. Marlboro Construction Co., 7 N.J. Misc. 185, 145 A. 2 (1929)*("our recording acts invalidate unrecorded...mortgages, only as to subsequent [parties] without actual notice of the mortgage"). Since there can be no dispute that Capital was aware of the mortgages being given by the purchasers to NHF[2], Capital could not qualify for bona fide purchaser status because of its knowledge of the unrecorded

---

[2] Gary Grieser was the principal of Capital Assets. *Grieser deposition p. 20; Grieser plea, p.14.* Mr. Grieser was fully aware of the loan transactions with NHF and he knew William Kane was putting the loans through NHF. *Id., p. 26.* He also knew that Walsh was involved but that Walsh could not loan the money directly. *Id., p. 26.* According to Mr. Grieser, everyone knew the joint ventures were being used. *Id., p. 34.* Mr Grieser pled guilty to his involvement in the fraud, including the conveyance of the 60% interest to Capital. *Grieser plea, p. 15.*

11

NHF mortgages. Furthermore, Capital did not pay any consideration for the transfers, another basis upon which bona fide purchaser status would be defeated. *Goldberg v. Levy*, 99 N.J.Eq. 634, 635, 134 A. 353 (1926); *Scult v. Bergen Valley Builders*, 76 N.J. Super. 124, 132, 183 A.2d 865 (1962). Therefore, when Capital acquired an interest in the property with knowledge of the NHF mortgages and without the payment of consideration, Capital Assets acquired that interest subject to the NHF mortgage under New Jersey law.

Based on the above quoted authority, it is clear that Fidelity would have been successful in an action against Capital seeking to confirm the validity of the NHF mortgages on the entirety of the subject properties. That ability to "correct" the problem was taken away from Fidelity due to Walsh's failure to timely notify Fidelity of the existence of this problem. In causing Fidelity to irretrievably lose the right to "correct" the problem, Walsh has caused Fidelity the appreciable harm which bars recovery on the title claims. *Trico Mortgage, supra.* When an insured waits until after its rights have been lost before notifying a title insurer of a title defect, recovery is barred. *See, Worthey v. Sedillo Title Company*, 85 N.M. 339, 512 P.2d 667 (1973)(notice of claim was not sent until 18 months after complaint had been filed and over a month after a judgment had been entered adverse to the insured, therefore liability was denied); *Chrysler First Financial v. Chicago Title Insurance Co.*, 226 A.D.2d 183, 641 N.Y.S.2d 13 (App. Div. 1996)(failure to notify

12

insurer prior to foreclosure sale bars recovery under title policy since policy requires timely notice of a claim and late notice prevented the title company from taking steps to mitigate its liability and protect its interest). It is indisputable that Walsh failed to provide timely notice of a claim relating to the recordation of the joint venture deeds before the mortgages were divested as a result of foreclosure sales. That failure precluded Fidelity from initiating an action, while Walsh allegedly held a mortgage on the properties, seeking to obtain a judicial determination that the interest acquired by Capital was subject to the NHF mortgages due to Capital's knowledge and its failure to pay consideration. This is clearly the appreciable harm required by the Courts when denying a claim based on untimely notice.

### 4. Fidelity also suffered appreciable harm as a result of Walsh's failure to notify Fidelity of the Bustos litigation until long after judgment had been entered.

Walsh also attempts to support its claims by making reference to the adverse judicial determination rendered in the Monmouth County action involving Rafael Bustos and other borrowers. ***Walsh brief, p. 6.*** Walsh contends that in that case, the Court rescinded the transactions and declared its mortgages invalid. Conspicuously absent from Walsh's submission is any document showing the basis of the claims asserted by the borrowers in that litigation. Also conspicuously absent is any evidence that Walsh provided Fidelity with notice of the *Bustos* litigation before the adverse ruling was issued. The fact is that no such notice was ever provided.

13

Once again, had Fidelity been notified, it had the right, under paragraph 4(a) of the policies, to take action to defend against the attempt to rescind the mortgages. Assuming the basis for the claims was that the buyers were victims of a fraud (and again Fidelity needs to make this assumption because Walsh did not provide copies of the pleadings in that litigation), there has been testimony in this case that the buyers knew what was going on in the transactions and that they were paid for their participation in the transactions. ***Grieser dep. P. 18; Grieser plea, p. 15.*** As this testimony would enable Fidelity to establish that the buyers had unclean hands in these transactions, Fidelity could have established that the borrowers were not entitled to rescind the transactions. By not being notified of the lawsuit, Fidelity was deprived of the opportunity to do so.[3]

Furthermore, the caption of the ***Bustos*** proceeding shows that NHF, not Walsh, was a defendant in the proceeding. That Walsh was not a party resulted from the fact that Walsh did not ensure that the necessary assignments were recorded evidencing its alleged ownership of the loans which were the subject of that action. Had it done so, it would have been made a party to the action and, once served with the papers, could have notified Fidelity that the mortgages were being

---

[3] It is interesting to note that the ***Bustos*** opinion attached by Walsh to the Brief indicates that some of the relief was awarded "by default." It is quite possible the mortgages were rescinded because no opposition was submitted by the lender to the relief requested by the borrowers as to the mortgages. Once again, the Court is left to guess because of the incomplete record presented by Walsh.

14

attacked as part of the ***Bustos*** litigation, providing Fidelity with the ability to defend against the claims. By not notifying Fidelity of that litigation until 12 years after the adjudication of the litigation, Walsh precluded Fidelity from exercising its rights under the policy, thereby resulting once again in appreciable harm to Fidelity. Under these circumstances, Walsh has lost its right to recover under the policies.

### III. CONCLUSION

It is clear that whatever loss Walsh may have suffered on the claims which are identified in Fidelity's initial motion for partial summary judgment, the loss resulted from Walsh's failure to record assignments (a loss not covered under the title insurance policies), or from its failure to provide timely notice to Fidelity of an adverse claim, thereby prejudicing Fidelity's right and indeed, making it impossible for Fidelity to correct the title problems, as was Fidelity's right under the subject title policies. For these reasons, Fidelity respectfully requests that its motion for partial summary judgment be granted.

Respectfully submitted,

s/David H. Colvin, Esquire
Edward J. Hayes, Esquire
David H. Colvin, Esquire
Fox Rothschild LLP
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103
(215) 299-2092; (215) 299-2150 (facsimile)

Dated: January 13, 2012