FOX ROTHSCHILD LLP

Princeton Pike Corporate Center
997 Lenox Drive – Building 3
Lawrenceville, New Jersey 08648-2311
(609) 896-3600

Attorneys for Defendants, Fidelity National
Title Insurance Co. of New York and Nations
Title Insurance of New York, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WALSH SECURITIES, INC., | : | |
| | : | |
| Plaintiff, | : | Judge Dickinson R. Debevoise |
| | : | Magistrate Judge Michael A. Shipp |
| v. | : | |
| | | |
| CRISTO PROPERTY MANAGEMENT, LTD., a/k/a | : | No. 97-3496 (DRD)(MAS) |
| G.J.L. LIMITED; DEK HOMES OF NEW JERSEY, INC.; | : | |
| OAKWOOD PROPERTIES, INC.; NATIONAL HOME | : | Motion Return Date:1/17/12 |
| FUNDING, INC.; CAPITAL ASSETS PROPERTY | : | |
| MANAGEMENT & INVESTMENT CO., INC.; CAPITAL | : | |
| ASSETS PROPERTY MANAGEMENT, LLC; WILLIAM | : | |
| KANE; GARY GRIESER; ROBERT SKOWRENSKI, II; | : | |
| RICHARD CALANNI; RICHARD DiBENEDETTO; | : | |
| JAMES R. BROWN; THOMAS BRODO; ROLAND | : | |
| PIERSON; STANLEY YACKER, ESQ.; MICHAEL | : | |
| ALFIERI, ESQ.; RICHARD PEPSNY, ESQ.; ANTHONY | : | **CERTIFICATION OF** |
| M. CICALESE, ESQ.; LAWRENCE CUZZI; ANTHONY | : | **EDWARD J. HAYES IN** |
| D'APOLITO; DAP CONSULTING, INC.; | : | **FURTHER SUPPORT OF** |
| COMMONWEALTH LAND TITLE INSURANCE CO.; | : | **MOTION FOR PARTIAL** |
| NATIONS TITLE INSURANCE OF NEW YORK, INC.; | : | **SUMMARY JUDGMENT** |
| FIDELITY NATIONAL TITLE INSURANCE CO. OF | : | |
| NEW YORK; COASTAL TITLE AGENCY; STEWART | : | |
| TITLE GUARANTY COMPANY; IRENE DiFEO; | : | |
| DONNA PEPSNY; WEICHERT REALTORS; and | : | |
| VECCHIO REALTY, INC., d/b/a MURPHY REALTY | : | |
| BETTER HOMES AND GARDENS, | : | |
| Defendants. | : | |
| | : | |

I, EDWARD J. HAYES, hereby certify as follows:

1.    I am an attorney-at-law licensed to practice in the Commonwealth of Pennsylvania and am a partner in the law firm of Fox Rothschild LLP, attorneys for Fidelity National Title Insurance Company of New York and Nations Title Insurance Company of New York (collectively, "Fidelity").  On February 5, 1998, the Court granted my admission pro hac vice in this matter.  As such, I am fully familiar with the facts stated herein based upon personal knowledge and review of documents.  I make this certification in further support of the motion for partial summary judgment filed by Fidelity.

2.    Attached as Exhibit "A" are copies of relevant portions of the deposition transcript of Gary Grieser.

3.    Attached as Exhibit "B" is a copy of the transcript of the plea of Gary Grieser. I certify under the penalty of perjury that the foregoing statements made by me are true and correct.


Date:  January 13, 2012                          s/ Edward J. Hayes, Esquire

# Exhibit "A"

# Excerpts from deposition of Gary Grieser

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CIVIL NO. 97-3496

COPY

WALSH SECURITIES, INC.,           :
                                  :
              Plaintiff,          :    DEPOSITION UPON
                                  :    ORAL EXAMINATION
       -vs-                       :         OF
                                  :    GARY D. GRIESER
CRISTO PROPERTY MANAGEMENT,       :
LTD., et al.,                     :
                                  :
              Defendants,         :
                                  :
       -and-                      :
                                  :
COMMONWEALTH LAND TITLE           :
INSURANCE COMPANY,                :
                                  :
       Defendant/Third Party      :
       Plaintiff,                 :
                                  :
       -vs-                       :
                                  :
ROBERT WALSH and                  :
ELIZABETH ANN DE MOLA,            :
                                  :
       Third-Party                :
       Defendants.                :
- - - - - - - - - - - - - - - -

        T R A N S C R I P T  of the

stenographic notes of STANLEY B. RIZMAN, a Notary

Public and Certified Shorthand Reporter of the State

of New Jersey, Certificate No. XI00304, taken at

the offices of Boise, Schiller & Flexner, LLP,

150 John F. Kennedy Parkway, Short Hills, New

Jersey, on Tuesday, January 16, 2007, commencing at

10:15 a.m.



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

**Page 2**

```
 2   BOIES, SCHILLER & FLEXNER, LLP
     150 John F. Kennedy Parkway
 3   Short Hills, New Jersey  07078
     BY:  ROBERT A. MAGNANINI, ESQ., and
 4        AMY WALKER WAGNER, ESQ.
     For the Plaintiff
 5
     MC CARTER & ENGLISH, LLP
 6   Four Gateway Center
     Newark, New Jersey 07102-0652
 7   BY:  DAVID R. KOTT, ESQ.
     For Commonwealth Land Title Insurance Company
 8
     FOX, ROTHSCHILD, O'BRIEN & FRANKEL, ESQS.
 9   2000 Market Street
     Philadelphia, Pennsylvania  19103
10   BY:  EDWARD J. HAYES, ESQ.
     For Nations Title Insurance and
11      Fidelity National Title Insurance
     METHFESSEL & WERBEL, ESQS.
12   Three Ethel Road
     Suite 300
13   Edison, New Jersey  08818
14   BY:  MARTIN R. MC GOWAN, ESQ.
     For Coastal Title Agency.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

### I N D E X

WITNESS                                      PAGE
GARY D. GRIESER
    Direct examination by Mr. Kott          4, 89, 143
    Direct examination by Mr. Hayes         62, 151
    Direct examination by Mr. Manganini     90, 159
    Direct examination by Mr. McGowan       153

EXHIBITS        DESCRIPTION           IDENT.
Grieser-1   Transcript dated 3-28-01      28
Grieser-2   Copy of Third Amended         57
            Complaint

Grieser-3   Deed                         137

**Page 4**

```
 2        330 Shore Drive, Highlands, New Jersey, being
 3        first duly sworn, testifies as follows:
 4   DIRECT EXAMINATION
 5   BY MR. KOTT:
 6        Q    Mr. Grieser, my name is Dave Kott.  I'm
 7   a lawyer and I represent Commonwealth Land Title
 8   Insurance Company in a lawsuit started by Mr.
 9   Magnanini, who is sitting at the end of the table,
10   on behalf of his client, Walsh Securities,
11   Incorporated.  Sitting to my left is Edward Hayes.
12   He represents two other different title insurance
13   companies.  Sitting to your right is Martin McGowan.
14   He represents a title agent called Coastal Title.
15        Today we're doing a deposition.  Have
16   you ever given a deposition before?
17        A    Yes, I have.
18        Q    On how many occasions?
19        A    I don't recall the exact amount.
20        Q    Approximately?
21        A    Over the years, the last six or seven
22   years, maybe three that I can recall.
23        Q    Let me give you some ground rules for
24   today's deposition.
25        If you are asked a question and you do
```

**Page 5**

```
 1   not understand it, will you tell us?
 2        A    Yes.
 3        Q    So if you answer a question, we will
 4   assume you understood it.
 5        Is that okay with you?
 6        A    That's fine.
 7        Q    If you are interrupted or cut off in
 8   the middle of one of your answers, will you tell us
 9   that you have been interrupted?
10        A    Yes.
11        Q    So if you answer a question, we will
12   assume your answer is a full, fair and complete
13   answer to the question.
14        Is that okay with you?
15        A    Yes.
16        Q    Do you understand that the man to your
17   left, Mr. Rizman, is a court reporter and he's
18   taking down everything that is stated in the room
19   and, therefore, you need to answer out loud.  You
20   cannot answer with a nod of the head or with
21   something like "aha."
22        Do you understand that?
23        A    I understand.
24        Q    Do you also understand when we're done
25   here Mr. Rizman will return to his office and will
```

2 (Pages 2 to 5)



Rizman
Rappaport
Dillon & Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

14

1  buying properties again.
2      Q    When you refer to running the
3  businesses you had, were you referring to the bar
4  and the tanning salon and gym?
5      A    Bar, tanning salon, plumbing supply.
6  Yeah.
7      Q    Did you file bankruptcy?  Were you able
8  to hold onto those businesses?
9      A    There are years of, I guess, litigation
10 or whatever you want to call it when things weren't
11 going well.  I just bought too much stuff.  So I was
12 running it.  They were being run into the ground,
13 basically.  Going down.
14     Q    You said in 1995 you started buying
15 houses.  That was something you had done before
16 1995, is that true?
17     A    Yes.
18     Q    What did you mean when you said in 1995
19 you started buying houses?
20     A    I thought you asked me what I was doing
21 at this point after '91.  My first memory of what I
22 did after '91 and the businesses was I started
23 buying houses again.
24     Q    The houses you started to buy, let's
25 say in 1994 and 1995, where were they located in

15

1  terms of county?
2      A    Monmouth County.
3      Q    In what municipalities in Monmouth
4  County?
5      A    Well, actually, there were some up
6  North Jersey, too.  Most were in Monmouth County.
7  Asbury Park, Long Branch, Neptune.
8      Q    In that time period, that time period
9  being approximately 1995 when you were buying
10 houses, did you have a partner or partners?
11     A    No.
12     Q    Describe the houses you were buying.
13     A    I guess depressed -- depressed housing,
14 income properties.
15     Q    When you say "depressed housing," what
16 does that mean?
17     A    It means that you're paying 30 to
18 $100,000 for a building that is bringing in 3,000 a
19 month.  The rent is high but the area is bad.
20 You're buying very undervalued properties in a
21 depressed area because my thought was the numbers
22 were good.  As they say, it is what it is.  Tenants
23 weren't so good.  The houses weren't in such good
24 shape but the numbers were good, so they were
25 capable of carrying themselves.

16

1      Q    When you referred to a "depressed
2  housing," were you referring to the condition of the
3  house or were you referring to the area it was in or
4  both?
5      A    I would say both.  I think it is more
6  the area.  But I would say both.
7      Q    When you referred to "income
8  properties," do you mean tenants paying rent?
9      A    Yes.
10     Q    Again, in this approximately 1995 time
11 range when you buy the depressed houses in these
12 municipalities you mentioned, was it your intent to
13 fix the houses up?
14     A    Yes.
15     Q    Was it your intent then to sell them or
16 to hold onto them and ask for a higher rent or ask
17 for something else?
18     A    My intention was to accumulate 1,000
19 buildings and turn it into a real estate investment
20 trust and market it on Wall Street.
21     Q    You were sued in the Walsh Securities
22 case.  Are you aware of that?
23     A    Yes.
24     Q    Are you familiar, generally, with the
25 allegations made against you by Walsh in the

17

1  lawsuit?
2      A    Not really.  At the time that, I guess,
3  it was going on, I was also criminally indicted.  My
4  focus was there and not on a lawsuit, to be honest
5  with you.
6      Q    You referred to starting to purchase
7  buildings in 1995 or residences.  For how long did
8  you do that?  From 1995 until when?
9      A    I guess until mid-'97, approximately.
10     Q    In that time period, 1995 to mid-1997,
11 were you purchasing residences, as you described, as
12 depressed residences, purchased with the goal of
13 acquiring 1,000 buildings and then putting together
14 a real estate investment trust?
15     A    Was that my goal?
16     A    Yes.
17     A    Yes.
18     Q    Approximately how many of the thousand
19 properties did you purchase?
20     A    I think the number was 220 or 230.
21     Q    In the lawsuit one of the defendants
22 that was sued was something called Capital Assets
23 Property Management & Investment Co., Inc.  Was that
24 your company?
25     A    Yes.

5 (Pages 14 to 17)



**Rizman
Rappaport
Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

18

1   Q   When did you start that company?
2   A   I believe in '95.
3   Q   With respect to the approximate 220 or
4   230 houses that you purchased from '95 to mid-1997,
5   were they actually purchased by Capital Assets?
6   A   No.
7   Q   Who was the actual purchaser?
8   A   The first 12 or 13 houses were in my
9   name or a fraudulent loaner name that I served time
10  for.  The rest were in the names of joint ventures
11  which then assigned us a 60 percent interest.
12  Q   When you refer to the first 12 or 13 in
13  a fraudulent name, were you referring to you
14  applying for a loan with your son's name?
15  A   Yes.
16  Q   With respect to the others; that is,
17  the joint ventures, describe that setup for me more.
18  A   Well, I thought it was the way to clean
19  it up.
20      As we know, I filed bankruptcy.  I had
21  to do this.  I had to commit fraud to accumulate
22  anything else.  So I offered -- people were also
23  asking me to get involved in real estate.  I
24  thought:  Well, I'll offer these people a percentage
25  and pay them for, basically, their credit and being

19

1   involved and they'll get a percentage of whatever it
2   sells for in the future.
3       So we entered into joint venture
4   agreements where Capital Assets had control and we
5   conveyed 60 percent interest in each of the
6   properties that we wanted them to buy.
7   Q   Although I'm a lawyer, I'm going to ask
8   you to give me an example of one of those
9   transactions just so we understand how the
10  transaction went.
11  A   As to the joint venture or the complete
12  transaction?
13  Q   The complete transaction.
14  A   There were two entities, Cristo
15  Properties with Bill Kane.  He would basically find
16  the properties and go into contract from the
17  original seller.  He would then flip it to us, to
18  Capital or actually this joint venture, selling
19  it -- the joint venture would mortgage it for enough
20  money so that we could get a credit back on the
21  closing for future repairs.
22      As we discussed before, the properties
23  were in need of repair and/or in bad areas.
24  Q   So the first step would be Cristo and
25  Kane would find a property and purchase it?

20

1   A   Right.  At least go into contract.
2       We typically had a double closing.  You
3   know, Kane would close and pay off the original
4   seller.  Then we would close with him the same day
5   using the same money, basically.
6   Q   I'm going to go a little slowly over
7   this.  I want to make sure we understand it.
8       Kane would purchase the property --
9   withdrawn.
10      The first step would be Kane would
11  identify a property that he wanted to purchase?
12  A   Right.
13  Q   And he would negotiate a price for that
14  property?
15  A   Right.
16  Q   That would be the first step.  What is
17  the next step that would occur?
18  A   Present that property to me.
19  Q   To you being Capital Assets?
20  A   Seeing if it fit the criteria that we
21  were interested in.  If it did, then we would match
22  that joint venturer up with the property.
23  Q   The joint venturer would be an
24  individual?
25  A   Right.

21

1   Q   Okay.
2   A   They would then put an application into
3   the mortgage company.  Based on their approval, we
4   pretty much knew they would be approved based on
5   their credit, you know.
6       Then we would set up a closing.  Again,
7   the property that Kane bought for -- let's just use
8   numbers -- 50,000.  Would sell to us for 100,000.
9   Between the 50 and 100 is money that we would get
10  back and Kane would get his money out of it, too,
11  for doing the deal, for buying the properties.
12  Q   Why would you pay 100 for a piece of
13  property that he had just bought for 50?
14  A   I needed, say, the 25 or 30,000 out of
15  it to do improvements on the property and to carry
16  the mortgage payments until I could get tenants in
17  there.
18  Q   The joint venture would be between an
19  individual.  Who would solicit or seek out the
20  individuals?
21  A   This one guy that worked for me, Larry
22  Cuzzi, basically handled all that.
23      It was just a lot of people that wanted
24  to be involved.  It wasn't really a lot of
25  solicitation, although I think he might have taken



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

22

1  it to another level.
2      Q    Were the individuals who were part of
3  the joint venture -- withdrawn. The joint venture
4  was between an individual who was solicited often by
5  Mr. Cuzzi and Capital Assets?
6      A    Right.
7      Q    Were those individuals, this is my
8  word, victims, or did they know what they were
9  getting into?
10      A    Well, I believe they knew what they
11  were getting into. If this thing hadn't collapsed,
12  they certainly would not have been victims.
13          The real estate that I bought back then
14  for 24 million is worth somewhere between 100 and
15  150 million right now. I don't know they would have
16  been victims.
17          As it turned out, I guess they could
18  call themselves victims. They were paid for each
19  transaction. They were willing to do all these
20  deals.
21          I don't know. I guess it's an opinion.
22      Q    Was the use of a joint venture because
23  you had declared bankruptcy?
24      A    Yes.
25      Q    If you had attempted, either you or

23

1  your company, Capital Assets, had attempted to
2  obtain a mortgage, would you have difficulty doing
3  that because of the bankruptcy?
4      A    Yeah. I would have imagined we would
5  have.
6      Q    Was that the reason you put together
7  the joint venture?
8      A    My thought was that would clean up the
9  deals; that it would no longer be fraud.
10      Q    After the joint venture -- as I
11  understand what you're telling me, there were two
12  closings on the same day; a closing where Kane
13  purchased the property and the same day a sale by
14  Kane or Cristo to the joint venture?
15      A    Yes.
16      Q    When did the joint venture transmit the
17  property to Capital Assets?
18      A    I would say almost the same day or
19  somewhere in the next couple of days. I would say
20  it was all part of the closing.
21      Q    When there was a transfer to Capital
22  Assets, would Capital Assets own the entire property
23  or 60 percent?
24      A    Sixty percent, but we had complete
25  control of it via our joint venture agreement.

24

1      Q    Were the individuals who were a partner
2  in the joint venture, were they buying for
3  investment or to live in?
4      A    Investment.
5      Q    My client, Commonwealth Land Title
6  Insurance Company. Have you ever had any contact
7  with them?
8      A    I've seen the name around. I'm not
9  sure in what capacity I've seen the name. I don't
10  have an answer for that.
11      Q    I have the same question as to Nations
12  Title Insurance Company and Fidelity National Title
13  Insurance Company. Did you ever have any contact
14  with them?
15      A    Again, the years go by. I couldn't
16  give you a good answer on it. Whether they served
17  me with papers or I read it in the newspaper or I
18  read it in some court documents, I don't know.
19      Q    When I was asking "contact," I mean
20  speak with anybody from those companies?
21      A    Not that I recall.
22      Q    How about Coastal Title? Did you ever
23  speak to anybody from Coastal Title?
24      A    That sounds more familiar, the name. I
25  don't recall talking to anybody.

25

1      Q    Who was the first person associated
2  with Walsh that you ever met?
3      A    I would have to say Anthony D'Apolito.
4  I had known him from a prior company.
5      Q    How did you know Mr. D'Apolito?
6      A    He was in the same position with
7  another company that I dealt with, mortgage company.
8      Q    What company was that?
9      A    I believe it was Investors & Lenders.
10  Out of East Brunswick, I think it was.
11      Q    What was Mr. D'Apolito's position with
12  Investor & Lenders?
13      A    I guess he was some kind of a loan
14  officer. I don't really remember.
15      Q    Do you know Mr. Skowrenski from
16  National Home Planning?
17      A    Yes, I do.
18      Q    How did you come to know Mr.
19  Skowrenski?
20      A    He worked for some other mortgage
21  companies some years prior to that as well.
22      Q    You said you ended up purchasing
23  approximately 220 or 230 buildings?
24      A    Yes.
25      Q    Is that the right word. Should I call

7 (Pages 22 to 25)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

26

1   them buildings or houses?  What should I call them?
2       A   Buildings.  They are mentioned.  Some
3   had more apartments and store fronts or warehouse.
4       Q   Was Walsh a lender for all of those 220
5   or 230 properties?
6       A   I'm only guessing.  I think he was.
7           We went through National Home Funding.
8   We went through maybe one other mortgage company.  I
9   believe they ultimately went to him.  I'm not sure.
10      Q   You said you went through National Home
11  Funding.  Was that the primary mortgage banker or
12  mortgage broker you used?
13      A   I believe we were using them most of
14  the time.
15      Q   How did that come about?
16      A   I don't believe that Walsh could lend
17  directly.  We knew Robert Skowrenski, we knew
18  D'Apolito.  That was a circle of everything going in
19  of the people I knew.  Bill Kane was with them.
20  When I met up with him, that was just -- the thing
21  was flowing.
22      Q   You said Bill Kane was working with
23  them.  Who was Kane working with?
24      A   He was putting the loans at the time
25  through National Home Funding, as I recall.  He got

27

1   a solicitor's fee from there.
2       Q   From National Home Funding?
3       A   Yes.
4       Q   What is a solicitor's fee?
5       A   If you get loans and put them through,
6   you know, that company, you get, like, one point or
7   whatever.  I don't know the exact terminology what
8   it legally means.
9       Q   So was it your understanding that Mr.
10  Kane was getting fees for mortgages he placed
11  through National Home Funding?
12      A   It was my understanding now.  Back then
13  it wasn't.
14      Q   What is your source of that
15  understanding?  How do you know that?
16      A   Just some of the legal documents that I
17  viewed over the years.
18      Q   How did you get linked up with Mr.
19  Kane?
20      A   I would have to say that -- I'm not
21  sure who introduced me to him.  I'd be guessing.  I
22  don't want to guess at something like that.
23      Q   Whomever introduced you, would it have
24  been either Mr. D'Apolito or Mr. Skowrenski?
25      A   I don't think Skowrenski.  It could

28

1   have been D'Apolito.
2           There was one other guy -- I don't
3   recall his name -- that was a real estate agent who
4   might have introduced me to him, but I'm only
5   guessing.  I don't want to guess.
6       Q   I have the transcript of one of your
7   pleas.  The one before Judge Wolin in 2001.
8           MR. MAGANINI:  Do you have an extra
9   copy of that, David?
10          (Copy handed to counsel.)
11          (Exhibit Grieser-1, Transcript dated
12  3-28-01, marked for identification.)
13      Q   Did you ever have an opportunity to see
14  the transcript of your -- withdrawn.
15          I have marked as Exhibit Grieser-1 a
16  transcript of the sentencing on March 28, 2001
17  before Judge Wolin in the case of United States of
18  America against Gary Grieser.
19          Have you ever had an opportunity to see
20  this transcript?
21      A   Yes.
22      Q   I have some questions about some things
23  you said in the transcript.  And witnesses want to
24  know where lawyers are going.  Let me tell you where
25  I'm going.

29

1           You made some comments in this
2   transcript about Robert Walsh and Walsh Securities
3   being aware of your activities.  That is what my
4   questions are going to concern themselves with.
5           If you would turn to page 71.  When I
6   refer to 71, Mr. Grieser, I'm not referring to the
7   bottom.  If you look at each page, you'll see there
8   is --
9       A   Seventy-one.
10      Q   On that page you refer to there being
11  no reliance from the mortgage lenders on anything.
12          Then on page 72 you said that you
13  "dealt with the people for ten years or better and
14  they've all known who" you were, "certainly with the
15  mortgaging things, and the president of that company
16  said to me there is no fraud unless I" -- I think
17  the "I" refers to the president, says so -- "no
18  fraud, no bank fraud."
19          Then later on 72 you say, "So I was
20  concerned with the way things were being handled
21  with the companies and I put it to the president and
22  I put it to the vice president of the company at
23  that time in the meeting which I've talked about
24  with various agencies here, that, you know, I've
25  disclosed everything that I was doing and that they

8 (Pages 26 to 29)



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

30

1 were full aware of this stuff going into it and
2 afterwards.
3        "I wanted to make sure that the higher-
4 ups in the company certainly knew about what was
5 going on and I said if they continued to fund me and
6 said there's no fraud, then I guess I'm not doing
7 anything wrong because they say it's their money."
8        Then later on page 73 you say, m"I
9 apparently went up to Mr. Walsh and his company to
10 make it very clear what was going on because I was
11 told by people below him that the company was aware
12 and, in fact, some of the company's people supplied
13 the paperwork for it, and I certainly ran my Social
14 Security number to make sure that it was clear."
15        That is, apparently, your son's Social
16 Security number?
17    A    Yes.
18    Q    Again, what am I driving at?  That is
19 what you want to know.  I want to find out what
20 people at Walsh Securities knew about your
21 activities.  That is what my questions now are going
22 to deal with.
23        With respect to using your son's Social
24 Security number, was there anybody at Walsh
25 Securities aware that you were doing that?

31

1    A    One thing, if you don't mind.
2    Q    Sure.  Go ahead.
3    A    Can we just say with respect to using
4 the false Social Security number, years ago this got
5 in the papers.  It is kind of a sore spot to have my
6 son involved.  He's an infant.  He's a minor.  I
7 had -- I've paid for what I've done wrong.  It kind
8 of keeps rubbing me with the son.  Just the false
9 Social Security number would be adequate?
10        I don't like my son being in this
11 hearing.
12    Q    I'll rephrase the question.
13        With respect to you providing a false
14 Social Security number or an incorrect Social
15 Security number for some of the loans that ended up
16 with Walsh Securities, was Walsh Securities aware of
17 that?
18    A    I can break it down how I viewed it, if
19 you don't mind.
20    Q    Go ahead.
21    A    I was dealing in business for people
22 for ten years.  What I was talking about with that.
23 People like D'Apolito who were for other places that
24 I did business with.  He knew I wasn't -- I don't
25 know, born in 1966, certainly.  I was born in '55.

32

1        The thing was I bought, like, 12 houses
2 under that false Social Security number.  It was
3 fraud.  I knew it was fraud.  Then I came up with
4 this joint venture concept.  I thought, well, this
5 is legitimate.  I thought.  I'm not an attorney.
6 Just a little knowledge is dangerous sometimes.
7        We were buying things and things were
8 going so well.  I wanted to go up.  Where I was
9 going to Walsh Securities, I was told, the only
10 people I was dealing with was D'Apolito, maybe, one
11 of the other underwriters in the company, and
12 National Home Funding.
13        So, you know, he told me it was fine.
14        I wanted to go up.  I was invited up by
15 Betty Ann to have lunch that day.  Before we went to
16 lunch I sat down.  I talked to Jimmy Walsh.  I
17 explained to him what I was doing with the joint
18 ventures, how it was going.  How we were controlling
19 it.
20        I said, "If I tell them and they still
21 fund me, then it's okay, it's legitimate."
22        Betty Ann wasn't there.  D'Apolito,
23 Betty Ann and myself went out to lunch and D'Apolito
24 said, "You know, Gary just laid out this whole thing
25 to Jim."  And he explained, I guess, when I went to

33

1 the bathroom, at lunch.  He laid out to her
2 basically -- I guess she got nervous or upset about
3 the whole thing because she put a lot of loans
4 through us.  I don't recall whether she was nervous
5 because she didn't know about it or she was nervous
6 because she did know about it.
7        I'd only be guessing at that.  But she
8 got upset about it.
9        She called Jim.  Basically, my thoughts
10 at the time was she was calling Jim to say:  We
11 screwed up or I screwed up.  Something has gone bad
12 here.  Don't tell Robert.
13        At that point when this whole story
14 unfolded, I was fairly convinced that Robert had no
15 knowledge of this because she was trying to hide
16 this activity from him.
17        I guess that is where I went with that.
18 That is where I thought how it unfolded.
19        MR. KOTT:  Could you read that answer
20 back?
21        (Record read.)
22    Q    I have some questions about that
23 answer, which the court reporter has read back.
24        You referred to another underwriter in
25 that answer.  Do you remember who the other

9 (Pages 30 to 33)



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

34

1  underwriter was?
2      A    It was a girl.  Just one of the girls.
3  If you said her name, I'd probably remember it.
4      Q    Kellie O'Neill?
5      A    Yes.
6      Q    You said you were told by National Home
7  Funding that this joint venture was fine.  Who told
8  you that from National Home Funding?
9      A    I don't know if I said that; I was told
10 by National Home Funding it was fine.
11         It was just that this is what I started
12 to do as far as the funding rather than going in my
13 own name.  At that level they were all aware.
14 National Home Funding, Robert Skowrenski, D'Apolito,
15 anybody that was processing the loans, understood
16 what I was doing.
17     Q    Understood about the joint venture?
18     A    Right.
19     Q    Why do you say that Skowrenski
20 understood that?
21     A    He was around enough.  I mean, I know
22 he played himself off as being drunk and somewhere
23 else all the time.  I wish I had that defense, you
24 know.
25     Q    Why were you invited up to Walsh by

35

1  Betty Ann DeMola?
2      A    I believe because she was happy with
3  the amount of loans that we were doing, if I recall
4  correctly.  She wanted to meet me, I think, for the
5  first time.
6      Q    When you went into Betty Ann DeMola's
7  office, was that in Parsippany?
8      A    Yes.
9      Q    Did you meet Jim Walsh when you went to
10 have lunch with Betty Ann DeMola?
11     A    No.
12     Q    Did Jim Walsh have lunch with you?
13     A    No.
14     Q    Did you meet Jim Walsh before you went
15 to work with Betty Ann DeMola?
16     A    That same day.
17     Q    Had you ever met Betty Ann DeMola
18 before that day?
19     A    I don't believe I had.  Again, ten
20 years ago.  I think I was brought up there that day
21 to meet her.
22     Q    When you went up to Parsippany --
23 withdrawn.
24         When you went up to Walsh's
25 headquarters in Parsippany that day and met Jim

36

1  Walsh, was anybody in the meeting with you and Jim
2  Walsh?
3      A    Anthony D'Apolito.
4      Q    Anyone else?
5      A    I don't believe so.
6      Q    During that meeting did you tell Mr.
7  Walsh about how these transactions were structured?
8         What I mean by that, that the
9  transactions went from Kane and Cristo to a joint
10 venture and then to Capital Assets?
11     A    I can't recall exactly the
12 conversation.  But it was -- in my mind -- again,
13 this is ten years ago -- what I was doing there was
14 explaining to him how the joint ventures were
15 working out.
16         That is what I was there to do that
17 day.
18     Q    You wanted to explain to him how the
19 property was transferred from Cristo to the joint
20 venture and then to Capital Assets, is that true?
21         MR. MAGANINI:  Objection to form.
22     Q    You can answer.
23     A    Being that specific, I can't be.  I
24 know I went in there to explain about the joint
25 ventures that we were getting loans in their names

37

1  and we were controlling the names.
2         As to the first part you said, I don't
3  know if I was that specific or not.
4      Q    Were you specific that the loans were
5  in the name of borrowers who had a joint venture who
6  would then transfer the property or 60 percent of
7  the interest in the property to your company,
8  Capital Assets?
9      A    I believe I was.  Again --
10     Q    Who is Jim Walsh?
11     A    I believe he was one of the Vice
12 Presidents at Walsh Securities.
13     Q    So far as you know, is he the brother
14 of Robert Walsh and Betty Ann DeMola?
15     A    Yes.
16     Q    You said in response to one of the
17 answers that after that Walsh continued to fund your
18 loans?
19     A    I think what I said was if they
20 continue to fund, then we'll know we're legitimate;
21     Q    Did they continue to fund the loans?
22     A    I believe they funded a few more.
23 Again --
24     Q    Best recollection?
25     A    -- best recollection.  I believe they

10 (Pages 34 to 37)



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# Exhibit "B"

# Guilty Plea of Gary Grieser

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CRIMINAL NO. 01-CR-648-1

UNITED STATES OF AMERICA,    :    TRANSCRIPT OF PROCEEDINGS

           v.        :          PLEA

                  :

GARY GRIESER,          :

        Defendant.    :

- - - - - - - - - - - - - - - -

Newark, New Jersey
August 11, 2003

B E F O R E:

        THE HONORABLE JOHN C. LIFLAND, U.S.D.J.

A P P E A R A N C E S:

    CHRISTOPHER J. CHRISTIE, UNITED STATES ATTORNEY
    BY:  ALAIN LEIBMAN, ASSISTANT U.S. ATTORNEY
        JOYCE MALLIET, ASSISTANT U.S. ATTORNEY
    For the Government

    JAMES C. PATTON, ESQ.
    For the Defendant

Pursuant to Section 753 Title 28 United States Code, the
following transcript is certified to be an accurate record as
taken stenographically in the above entitled proceedings.

*[signature]*

THOMAS F. BRAZAITIS, C.S.R., Official Court Reporter

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

2

1           THE COURT:  Please be seated.

2           May I have the appearances, please.

3           MR. LEIBMAN:  Good morning, your Honor.

4           Alain Leibman, Assistant United States Attorney, for

5      the United States,

6           MS. MALLIET:  Joyce Malliet, Assistant United States

7      Attorney, for the United States.

8           MR. PATTON:  Good afternoon.

9           James Patton for Gary Grieser.

10          THE COURT:  Good afternoon, Mr. Leibman, Ms. Malliet,

11     Mr. Patton, Mr. Grieser.

12          It's my understanding that without a plea agreement,

13     Mr. Grieser wishes to enter a plea of guilty to the following

14     counts of the indictment 01-648:  First, Count 1, which charges

15     conspiracy to commit wire fraud contrary to 18, United States

16     Code, Section 1343 in violation of 18, United States Code,

17     Section 371.

18          Next, Count 28, which charges him with engaging in a

19     monetary transaction in criminally derived property 18, United

20     States Code, Section 1957 and two.

21          And third, Count 30, which is income tax evasion in

22     violation of 26, United States Code, Section 7201.

23          Before I deal with these Rule 11 proceedings, I will

24     advise counsel that I have considered the motions made on behalf

25     of Mr. Grieser and the United States' cross-motions, and for

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

3

1    reasons to be set forth in more detail I have determined to deny

2    Mr. Grieser's motions, and I believe that under the

3    circumstances the government's cross-motion is moot.  And, as I

4    said, that will be expanded upon in more detail shortly.

5           In order to satisfy myself that Mr. Grieser's desire to

6    enter a plea of guilty is knowing and voluntary and supported by

7    an independent basis in fact, I will be asking Mr. Grieser some

8    questions.  And I'll ask Mr. Basilone to administer the oath.

9

10   G A R Y    G R I E S E R, sworn.

11

12                          EXAMINATION

13   BY THE COURT:

14   Q   Mr. Grieser, do you understand that you're now under oath,

15   that if you answer any of my questions falsely, your answers may

16   later be used against you in another prosecution for perjury, or

17   making a false statement?

18   A   Yes, your Honor.

19   Q   How old are you, Mr. Grieser?

20   A   48.

21   Q   What's the extent of your education?

22   A   High school plus some college courses.

23   Q   How is your health today?

24   A   Good, sir.

25   Q   Have you been treated recently for any mental illness or

4

1   addiction to narcotic drugs of any kind?

2   A   No, sir.

3   Q   Are you currently under the influence of any drug or

4   medication?

5   A   No.

6   Q   Or any alcoholic beverage of any kind?

7   A   No, sir.

8   Q   Are you taking any medication at this point?

9   A   No, your Honor.

10  Q   Have you received a copy of the indictment containing the

11  charges pending against you?

12  A   Yes, I have.

13  Q   And have you fully discussed the charges and the case in

14  general with Mr. Patton as your counsel?

15  A   Yes, your Honor.

16  Q   Are you fully satisfied with counsel's representation and

17  advice given to you by Mr. Patton in this case?

18  A   Yes, your Honor.

19         THE COURT:  As I indicated at the outset, there is no

20  plea agreement in this case.

21         MR. PATTON:  Your Honor, I think there's no written

22  plea agreement.  There is an agreement that the parties have

23  reached on this indictment.

24         Mr. Grieser will plead guilty to Counts 1, 28 and 30.

25  And, upon sentencing, it's my understanding that the government

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

5

1    will agree to dismiss the other charges in the indictment.

2              But beyond that, there is no plea agreement.

3              MR. LEIBMAN:  That's a correct statement of facts, your

4    Honor.

5              THE COURT:  Okay, I agree, and that is a correct

6    statement.

7    Q   Mr. Grieser, has anyone made any promise or assurance to you

8    of any kind in an effort to induce you to enter a plea of

9    guilty?

10   A   No, your Honor.

11   Q   Has anyone attempted to force you to plead guilty?

12   A   No, sir.

13   Q   Are you pleading guilty of your own free will because you

14   are guilty?

15   A   Yes, sir.

16   Q   Do you understand that the offenses to which you're pleading

17   guilty are felonies, and that if I accept your plea, you'll be

18   adjudged guilty of those felonies and those adjudications may

19   deprive you of valuable civil rights, such as the right to vote,

20   the right hold public office, the right to serve on a jury, or

21   the right to possess any kind of a firearm?

22   A   Yes.

23   Q   Mr. Grieser, I'm going to go over the substance of each of

24   the charges to which you've indicated a desire to plead guilty.

25             Count 1 involves Section 371 of Title 18 of the United

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

6

1      States Code, which deals with conspiracy.  And that provides

2      that if two or more persons conspire either to commit any

3      offenses against the United States or to defraud the United

4      States, or any agency thereof, in any manner or for any purpose

5      and one or more of such persons do any act to affect the object

6      of the conspiracy, each shall be guilty of an offense against

7      the United States.

8            The conspiracy charge involves Section 1343 of Title

9      18, the wire fraud statute.  And that provides, whoever having

10     devised or intending to devise any scheme or artifice to defraud

11     or for obtaining the money or property by means of false or

12     fraudulent pretenses, representations or promises transmits or

13     causes to be transmitted by means of wire, radio or television

14     communication in interstate or foreign commerce any writings,

15     signs, signals, pictures or sounds for the purpose of executing

16     the scheme or artifice, shall be guilty of an offense against

17     the United States.

18           The next count is Count 28.  Section 1957 of Title 18

19     of the United States Code provides -- excuse me, relates to

20     engaging in monetary transactions and criminally derived

21     proceeds.  And provides that:  Whoever, in any of the

22     circumstances set forth in subsection (d), knowingly engages or

23     attempts to engage in any monetary transaction in criminally

24     derived property of a value greater than $10,000, and is derived

25     from specified unlawful activity, shall be punished as provided

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

7

1    in Subsection (b).

2          In a prosecution for offense under this section, the

3    government is not required to prove the defendant knew that the

4    offense from which the criminally derived property was derived

5    was specified unlawful activity.

6          And the circumstances referred to in Subsection (a) are

7    (1) that the offense under this section takes place in the

8    United States or in the specific maritime and territorial

9    jurisdiction of the United States.

10          As used in this section, the term "monetary

11    transaction" means the deposit, withdrawal, transfer, or

12    exchange in or affecting interstate or foreign commerce, of

13    funds or a monetary instrument (as defined under Section

14    1956(c)(5) of this title) by, through, or to a financial

15    institution (as defined in Section 1956 of this title),

16    including any transaction that would be a financial transaction

17    under Section 1956(c)(4)(B) of this title, but such term does

18    not include any transaction necessary to preserve a person's

19    rights to representation as guaranteed by the Sixth Amendment of

20    the Constitution.

21          This is a definition of the term "criminally derived

22    property."  And the definition of the term "specified unlawful

23    activity."  And under 18, United States Code, Section 1956(c),

24    the term "knowing that the property involved in a financial

25    transaction represents the proceeds of some form of unlawful

8

1    activity" means that the person knew the property involved in

2    the transaction represented proceeds from some form, though not

3    necessarily which form, of activity that constitutes a felony

4    under state, federal or foreign law.

5          There are also definitions in Section 1956(c) of the

6    term "conduct," the term "transaction," the term "financial

7    transaction," the term "monetary instruments," the term

8    "financial institution," the term "specified unlawful activity,"

9    and there is a definition under 18, United States Code, Section

10   1961 of the term "racketeering activity."  And under 31, United

11   States Code, Section 5312(a), there's a definition of a

12   financial institution.

13         Have you discussed with Mr. Patton those provisions of

14   the statute and those definitions that apply in this case?

15   A    Yes, your Honor.

16   Q    Do you understand them?

17   A    Yes, sir.

18   Q    The third count to which you indicated a desire to plead

19   guilty is Count 30.  And that involves Section 7201 of Title 26

20   of the United States Code, the tax evasion statute.  And that

21   provides that:  Any person who willfully attempts in any manner

22   to evade or defeat any tax imposed by this title or the payment

23   thereof shall be guilty of an offense against the United States.

24         Do you understand all of those provisions and law that

25   are involved in the three counts to which you've indicated a

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

9

1    desire to plead guilty?

2    A    Yes, your Honor.

3    Q    With respect to those three counts, the maximum penalties,

4    Mr. Grieser, are as follows:  The violation of 18, United States

5    Code, Section 371 that's charged in Count 1 carries a statutory

6    maximum penalty of five years' imprisonment.  The violation of

7    18, United States Code, Section 1957, which is charged in Count

8    28, carries a statutory maximum penalty of 10 years'

9    imprisonment.  And the violation of 26, United States Code,

10   Section 7201 that's charged in Count 30 carries a statutory

11   maximum penalty of five years' imprisonment.

12           Do you understand that those statutory maximums add up

13   to a total maximum of 20 years?

14   A    Yes, your Honor.

15   Q    And do you understand those penalties?

16   A    Yes, sir.

17   Q    With respect to fines, Mr. Grieser, on Counts 1 and 28, you

18   face the statutory maximum fine of $250,000.  On Count 30, you

19   face a statutory maximum fine of $100,000 together with costs of

20   prosecution.  And on each count the Court may, pursuant to 18

21   United States Code Section 3571, impose an alternative fine of

22   up to twice the gross profits to you or gross loss to any

23   victims of these offenses.  All fines imposed may be subject to

24   the penalty of interest.

25           You will be required to pay a special assessment of

10

1    $100 as to each of Counts 1, 28 and 34, a total special

2    assessment of $300, which must be paid on or before the date of

3    sentencing.

4         As to restitution, you will be ordered to pay

5    restitution pursuant to 18, United States Code, Sections 3663

6    and 3663(a) and 3664.  And you may be ordered pursuant to 18

7    United States Code, Section 3555 to give notice to any victims

8    of your offenses.

9         As to supervised release, pursuant to 18, United States

10   Code, Section 3583 and Section 5D1.2 of the sentencing

11   guidelines, the Court may require you to serve a term of

12   supervised release on each count of at least two but not more

13   than three years, which will begin at the expiration of the term

14   of imprisonment imposed.  Should you be placed on a term of

15   supervised release and subsequently violate any of its

16   conditions on or before the expiration of its term, you may be

17   sentenced to not more than two years' imprisonment in addition

18   to any prison term previously imposed and in addition to the

19   statutory maximum term of imprisonment.

20        You understand all those possible consequences of your

21   plea of guilty, Mr. Grieser?

22   A    Yes, your Honor.

23   Q    Under the Sentencing Reform Act of 1984, the United States

24   Sentencing Commission has issued guidelines for judges to follow

25   in imposing sentence.

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

11

1          Have you and Mr. Patton talked about how the guidelines

2     might apply to your case?

3     A    Yes, your Honor.

4     Q    You understand that I will not be able to determine the

5     guideline sentence for your case until after a presentence

6     report has been completed and you and the government have had an

7     opportunity to challenge the reported facts and the application

8     of the guideline recommended by the probation officer?

9     A    Yes, your Honor.

10    Q    Do you understand that the sentence imposed may be different

11    from any estimate that Mr. Patton may have given you?

12    A    Yes, sir.

13    Q    Do you understand that after your guideline range has been

14    determined, the Court has the authority in some circumstances to

15    impose a sentence that is more severe or less severe than that

16    called for by the guideline?

17    A    Yes, your Honor.

18    Q    Do you understand that parole has been abolished, and if

19    you're sentenced to prison, you will not be released on parole?

20    A    Yes, sir.

21    Q    Do you understand that under some circumstances you or the

22    government may have the right to appeal any sentence that I

23    impose?

24    A    Yes, your Honor.

25    Q    You understand that you have a right to plead not guilty to

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

1    any offense charged against you and to persist in that plea and

2    you have then a right to trial by jury?

3    A    Yes.

4    Q    Do you understand that at trial you'd be presumed to be

5    innocent and the government has to prove your guilt beyond a

6    reasonable doubt?

7    A    Yes, sir.

8    Q    Do you understand that you have the right to the assistance

9    of counsel for your offense, the right to see or hear all the

10   witnesses and have them cross-examined in your defense, and the

11   right on your own part to decline to testify unless you

12   voluntarily chose to do so in your own defense?

13   A    Yes, your Honor.

14   Q    Do you understand you have the right with the issuance of

15   subpoenas to compel the attendance of witnesses to testify in

16   your defense?

17   A    Yes, sir.

18   Q    Do you understand that should you decide not to testify or

19   put on any evidence, those facts cannot be used against you?

20   A    Yes, sir.

21   Q    Do you understand that by entering a plea of guilty, if I

22   accept that plea, that there'll be no trial and you'll have

23   given up your right to a trial as well as those rights

24   associated with the trial as I have just described?

25   A    Yes, your Honor.

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

1    Q   Mr. Grieser, let me turn to the specific offenses in Count

2    1, Count 28 and Count 30.

3            The offense in the offense of Count 1, conspiracy to

4    commit wire fraud, has three essential elements, each of which

5    the government must prove beyond a reasonable doubt.  First, the

6    existence of an unlawful agreement between two or more persons

7    to commit mail fraud as described in Count 1.  Two, that the

8    defendant knowingly and willfully became a member of the

9    conspiracy or unlawful agreement.  And three, that one of the

10   coconspirators committed at least one overt act in furtherance

11   of some object or for the purpose of the conspiracy.

12           On Count 28, the offense of engaging in monetary

13   transactions with criminally derived property under 18, United

14   States Code, Section 1957, has five essential elements:  First,

15   that the defendant -- again, each of which the government must

16   prove beyond a reasonable doubt -- First, that the defendant

17   engaged or attempted to engage in the monetary transaction in or

18   affecting interstate commerce; two, that the defendant knew the

19   transaction involved criminally derived property of a property

20   greater than $10,000; three, the property was derived from a

21   specified unlawful activity which include wire fraud; four, that

22   the defendant acted with the knowledge that the transaction

23   involved proceeds of a criminal offense; and five, the

24   transaction occurred in the United States.

25           As to Count 30, the offense of income tax evasion,

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

14

1    under 26, United States Code, Section 7201, there are three

2    essential elements, each of which the government must prove

3    beyond a reasonable doubt:  First, that the defendant evaded or

4    attempted to evade or defeat his personal income taxes or the

5    payment thereof as set forth in Count 30 of the indictment.

6    Next, that he did so knowingly and willfully.  And third, that

7    as a result of this attempt, the federal evasion additional

8    personal income tax became due and owing as set forth in Count

9    30.

10           You understand those essential elements of each of the

11   three counts to which you've agreed to plead guilty, Mr.

12   Grieser?

13   A    Yes, your Honor.

14   Q    Mr. Grieser, I'm going to ask you some questions about what

15   happened in this matter.

16           First, with respect to Count 1, the offense of

17   conspiracy to commit wire fraud:

18           In 1996 and 1997, were you an officer of companies

19   called Capital Assets Property Management and Investment, LLC;

20   Capital Assets Property Management Co., Inc.; and Property

21   Management and Investment Co., Inc., LLC, all of New Jersey?

22   A    Yes, your Honor.

23   Q    Beginning as early as 1996, did you and other persons

24   identify for purchase numerous properties throughout New Jersey,

25   which often were distressed, dilapidated or in need of

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

15

1    substantial immediate repairs, to make them habitable?

2    A    Actually, that would be as early as 1995, your Honor, but,

3    yes.

4    Q    Did another person, with your knowledge, arrange for real

5    estate appraisals which inflated the value of the properties in

6    their current conditions?

7    A    Yes, sir.

8    Q    In 1996 and 1997, did you act and agree with others to

9    solicit and locate persons willing to act as straw buyers in

10   more than 200 transactions, whereby mortgage loans would be

11   obtained and the properties acquired in the names of the straw

12   buyers?

13   A    Yes, your Honor.

14   Q    After the closing on those properties, did you then cause

15   each straw buyer to convey a 60 percent interest in the given

16   property to Capital Assets in a joint venture arrangement which

17   left the straw buyer holding a 40 percent interest as co-owner

18   with Capital Assets?

19   A    Yes, sir.

20   Q    In order to facilitate these fraudulent transactions, did

21   you:

22       a. pay each of more than seventy straw buyers thousands of

23   dollars per transactions, often as much as $4,000, to allow the

24   use of their names and credit histories?

25   A    Yes, your Honor.

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

16

1    Q    B. control the number of transactions in which each straw

2    buyer could participate, intending to limit each to four

3    transactions but using some for as many as ten transactions?

4    A    Yes, your Honor.

5    Q    C. provide checks to be held and later returned by an

6    attorney closing the transactions by which the straw buyers took

7    title, which checks were to be used by the attorney to generate

8    letters falsely claiming that a particular buyer had deposited

9    those funds with the attorney and that the attorney was holding

10   the funds in escrow?

11   A    Yes, your Honor.

12   Q    For a period of time did you utilize a portion of the

13   mortgage loans received and rents collected on the joint venture

14   properties to make some of the required mortgage payments and to

15   perform some maintenance on the properties?

16   A    Yes, your Honor.

17   Q    By sometime in 1997, however, did you cease making mortgage

18   payments and repairs, and did the mortgage loans thereafter go

19   into default and many into foreclosure?

20   A    Yes, your Honor.

21   Q    Did the balances on the mortgages then become the legal

22   responsibility of the straw buyers, whose names had remained on

23   the original mortgage documents for the properties?

24   A    Yes, your Honor.

25   Q    With respect to Count 28, Mr. Grieser, the charge of

1      engaging in monetary transactions and criminally derived

2      proceeds, were proceeds of the fraudulently obtained mortgage

3      loans -- including the loan for the property recited in Count

4      28, namely, 305 Second Avenue, Asbury Park, New Jersey --

5      generally deposited by wire transfer into the trust account of

6      the New Jersey attorney conducting the closing on the straw

7      buyer property?

8      A    Yes, your Honor.

9      Q    Did that attorney then disburse and transfer moneys from his

10     trust account to persons and entities, including the trust

11     account of the attorney representing Cristo, the seller of the

12     property to the straw buyer?

13     A    Yes.

14     Q    Did Capital Assets place versus Section 8 tenants, including

15     those under the jurisdiction of the Long Branch Housing

16     Authority, into straw properties and did Capital Assets then

17     collect rent for those tenants?

18     A    Yes, your Honor.

19     Q    With respect to Count 30, Mr. Grieser, the income tax

20     evasion count:  In or around April of 1997, did you use several

21     hundred thousand dollars of Capital Assets funds, derived from

22     the scheme to which you have referred, to establish a tanning

23     salon in a called The Tanning Factory?

24     A    Yes, sir.

25     Q    Between 1996 and 1998, did you pay personal expenses out of

18

1   the business checking accounts for Capital Assets and The

2   Tanning Factory and did you take cash from both businesses to

3   support your lifestyle?

4   A   Yes, your Honor.

5   Q   Did you use substantial moneys from the funds of Capital

6   Assets and The Tanning Factory for your personal benefit?

7   A   Yes, sir.

8   Q   Did you fail to file the United States individual income tax

9   returns, Forms 1040, during the period from 1996 through 1998?

10   A   Yes, your Honor.

11   Q   In or about April 15th of 1998, as a resident of Sea Bright,

12   New Jersey, did you attempt to evade and defeat a large part of

13   the income tax due and owing by you to the United States for

14   calendar year 1996 by these means and by failing to file a 1996

15   United States individual income tax return, Form 1040?

16        MR. LEIBMAN:   Your Honor, that should be 1997, for

17   calendar year 1997.   Filed in 1998.   Pardon me.

18   Q   You understand that, Mr. Grieser, when I said 1996 in this

19   most recent question, I meant 1997?

20   A   Yes, sir.

21   Q   And your answer is yes?

22   A   Yes.

23        THE COURT:   There are two places where 1996 appears.

24   Let me ask that question over again -- no, I'm sorry.

25   Substituting 1997 for 1996 in both places where 1996 appears.

19

1   Q   And your answer is still yes?

2   A   Yes, your Honor.

3   Q   As to all counts, Mr. Grieser, did you do all of these

4   things knowingly and willfully?

5   A   Yes, your Honor.

6         THE COURT:  Mr. Leibman, what would the United States

7   be prepared to show in addition to what I have elicited from Mr.

8   Grieser?

9         MR. LEIBMAN:  Predominantly, your Honor, the fact that

10   as to Count 1, the conspiracy charge to which defendant is

11   entering a plea of guilty, we will be prepared to prove that the

12   loan proceeds were more than 200 transactions involving straw

13   buyers and including fraudulent loan documents of various kinds

14   were sent by wire transfer from outside New Jersey into the New

15   Jersey bank account of two closing attorneys who handled all of

16   those closings.

17         THE COURT:  All right.

18   Q   Mr. Grieser, how do you now plead to the charges in Counts

19   1, 28 and 30?

20   A   Guilty, your Honor.

21         THE COURT:  I'm satisfied with the responses given

22   during this hearing.  I find that Mr. Grieser is fully competent

23   and capable of entering an informed plea; that he's aware of the

24   nature of the charges and the consequences of the plea; and that

25   his plea of guilty is a knowing and voluntary plea supported by

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

1    an independent basis in fact containing each of the essential

2    elements of the offenses.

3           I, therefore, accept his plea and adjudge him guilty of

4    the offenses charged in Counts 1, 28 and 30 of the indictment.

5           THE CLERK:  Sentencing will be November 17, 2003, 9:30

6    a.m.

7           MR. PATTON:  Mr. Grieser and I have prepared an

8    application for permission to enter a plea of guilty.  We did

9    that -- we started that process last week.  I prepared the forms

10    and reviewed it with him today.  The form is correct for the one

11    exception that the form that we prepared was with the

12    anticipation of Mr. Grieser was going to be asked to enter a

13    plea to all counts on the indictment.

14           At any rate, he signed it this morning, I witnessed it

15    and signed the other certification, and I'll hand that up to the

16    Court.

17           THE COURT:  Have you made the appropriate changes?

18           MR. PATTON:  Your Honor, I did not make the appropriate

19    changes.  What I did, the one section in here is listing all of

20    the various elements and all the various penalties.  The

21    penalties were higher than what we ended up facing as a result.

22           THE COURT:  All right.

23           You placed on the record how this form, which will be

24    filed, differs from the proceedings we actually engaged in

25    today, and that's sufficient.

1          MR. LEIBMAN:  The form that we prepared anticipating

2     he'll be pleading to over 30 counts, we're actually pleading to

3     three.

4          THE COURT:  That's so noted.

5          MR. PATTON:  The other thing, your Honor, is Mr.

6     Grieser is a sentenced prisoner on another matter and is serving

7     a federal sentence in the Fort Dix, FCI there.  I would ask that

8     you ask the marshals to return him to Fort Dix as soon as

9     possible.  He has all his legal documents there that he is going

10    to need access to so we can start preparing for the sentencing

11    hearing.

12         He also advised me that the last time he was brought up

13    to northern New Jersey on a matter relating to a motion that he

14    had filed in the case for which he's serving sentence, when he

15    was returned to Fort Dix, he was kept in solitary confinement

16    for three or four weeks, apparently because there was some

17    confusion as to whether or not his designation would change

18    because of his coming up here.

19         If you would be so kind, if you're putting together an

20    order directing the marshals to return him to Fort Dix, if you

21    could note in that order that Mr. Grieser is -- was here to

22    enter a plea on charges which had been pending for some period

23    of time, that way I think the officials at Fort Dix will realize

24    there's no need to change the designation based on these charges

25    that he pled guilty to.

1          THE COURT:  All right.  I will ask the marshals to

2    return Mr. Grieser to Fort Dix as soon as possible rather than

3    to -- was it Passaic County, wherever he was?

4          MR. PATTON:  Yes.

5          THE COURT:  And I will -- any objection to the order

6    with respect to not placing him in solitary?

7          MR. LEIBMAN:  No, your Honor, no objection.

8          THE COURT:  Okay.

9          MR. LEIBMAN:  Your Honor, I don't know if Mr. Patton is

10   finished, I just have two brief housekeeping related matters

11   really.

12         The first, just because the question has now been

13   raised over the counts to which the plea has been entered.  The

14   record should reflect, to be complete, that the government

15   accepted a plea to less than all counts principally because

16   defense counsel urged that the financial burden on the

17   defendants of paying certain assessments for 31 counts would be

18   onerous.  The guidelines exposure is exactly the same to the

19   plea taken today as compared to the plea for the entire

20   complaint.

21         The other comment, the level of counsel's preparation

22   in this case, I think the record should reflect that, and

23   perhaps Mr. Patton can comment on that as well, from our

24   perspective, Mr. Patton worked diligently in this matter

25   spending many hours on numerous days at the U.S. Attorney's

23

1   Office reviewing seized records and other case documents as well

2   as trial exhibits.

3          It's our understanding from talking to witnesses whom

4   we were preparing for trial that the investigator retained by

5   Mr. Patton had been out contacting many of the same witnesses.

6   Again, another indication of an extremely diligent and thorough

7   approach to preparing this matter for trial.  And I fully

8   expected that Mr. Patton was preparing to try this case, as was

9   the United States.

10          I also believe that Mr. Patton provided his client with

11   copies of many of the critical documents in this case so he too

12   could assist in the preparation.  And I know we would be remiss

13   if we didn't note all of that outstanding work by Mr. Patton on

14   the record.

15          THE COURT:  Thank you, Mr. Leibman.

16          Certainly, as to the services of the investigator, I'm

17   personally familiar with the extent of that work because under

18   the Criminal Justice Act I was required to review the

19   investigator's request for compensation.  I did that and

20   approved it, and it was certainly substantial.

21          I will also add that Mr. Patton's pretrial motions,

22   while I have denied them, were all of substance and well

23   prepared, well presented.

24          Anything further at this point?

25          MR. LEIBMAN:  Nothing from the government, your Honor.

24

1      MR. PATTON:  No, sir.

2      THE COURT:  Mr. Patton, could you consult with me and

3   give me the exact wording that you would like me to direct to

4   the Bureau of Prisons at Fort Dix?

5      MR. PATTON:  Yes, your Honor, I will.

6      I need to make a telephone call or two to find out what

7   that would be.  But then if --

8      THE COURT:  I'll be around . . .

9      MR. PATTON:  One other request, your Honor:  If Mr.

10   Grieser could have a copy of that order to take with him, that

11   may help the actual -- that may help him to avoid being put in

12   the custody that he faced for that period of time.

13      THE COURT:  Fine.

14      MR. LEIBMAN:  Thank you, your Honor.

15      MR. PATTON:  Thank you, your Honor.

16      THE COURT:  Thank you all.

17      MR. PATTON:  Thank you, Judge.

18      (The Court stands adjourned.)

19

20

21

22

23

24

25

THOMAS F. BRAZAITIS, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.