# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____

WALSH SECURITIES, INC.,                        :
                                               :
        Plaintiff,                        :   Civil Action No. 97-cv-3496 (DRD)(MAS)
                                               :
vs.                                            :   Hon. Dickinson R. Debevoise, U.S.D.J.
                                               :
CRISTO PROPERTY MANAGEMENT,                    :
LTD., a/k/a G.J.L. LIMITED; *et al.*,          :
                                               :
_____Defendants._____   :

_____

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
_____

STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111

*Attorneys for Plaintiff Walsh Securities, Inc.*

January 13, 2012

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ...................................................................................... i

**TABLE OF AUTHORITIES** ............................................................................. iii

**PRELIMINARY STATEMENT** .........................................................................1

**ARGUMENT** .........................................................................................................3

    I.  DEFENDANTS' ADMISSIONS TRIGGER LIABILITY UNDER THE LAW IN
       NEW JERSEY ...............................................................................................3

    II.  THE TITLE INSURANCE DEFENDANTS' "APPROVED ATTORNEYS" ENGAGED
       IN THE SAME SCHEME TO DEFRAUD INVOLVING ALL OF THE PROPERTIES
       IN THIS MOTION .......................................................................................6

    III.  *SEARS, CLIENTS' SECURITY FUND* AND *VISION MORTGAGE* REMAIN THE LAW
        THAT CONTROLS THIS LITIGATION; DEFENDANTS' CLAIM THAT THEY
        "WROTE AROUND" THESE CASES MUST BE REJECTED AS IT HAS BEEN BY
        OTHER COURTS IN NEW JERSEY ............................................................8

    IV.  WSI IS A HOLDER IN DUE COURSE; NHF'S ACTIONS ARE NOT ATTRIBUTABLE
        TO WSI .......................................................................................................15

        *A. Standard for Holder in Due Course* ..............................................15

        *B. WSI Is as a Holder In Due Course Under Defendants' CPLs and
          Title Policies, as well as Under New Jersey Law* ...........................17

    V.  MISDEEDS COMMITTED BY LOWER-LEVEL EMPLOYEES WHOSE SOLE
       PURPOSE WAS TO ENRICH THEMSELVES CANNOT, AS A MATTER OF LAW,
       BE IMPUTED TO WSI ...............................................................................23

        *A. Defendants' Smearing Arguments Should Not be Credited* ...........24

        *B. Defendants Cannot Turn the Tables on WSI and Impute the Fraud
          to WSI Under Traditional* **Respondeat Superior** *Principles* ............26

        *C. Defendants' Theory also Fails Under the Law of Agency
          Because WSI Employees' Knowledge is Clearly Not Imputed to WSI* .........29

        **1. Imputation Fails as a Matter of Contract Law** .........................30

        **2. Imputation Fails Because the Defendants Are Not Innocent Parties** .....31

**D. The Doctrine of In Pari Delicto Does Not Apply**............................................37

**VI. Defendant's Rule 56(f) Argument should be rejected**................................39

**CONCLUSION** ..........................................................................................40

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Aguilar v. City Lights of China Rest., Inc.*,
   No. 11-2416, 2011 U.S. Dist. LEXIS 122531 (D. Md. Oct. 24, 2011) ...................................25

*Alberton v. Commonwealth Land Title Ins. Co.*,
   247 F.R.D. 469 (E.D. Pa. 2008) ................................................................................8

*Alpern v. Utilicorp United*,
   No. 92-0538, 1994 U.S. Dist. LEXIS 17529 (W.D. Mo. Nov. 14, 1994), *rev'd on
   other grounds*, 84 F.3d 1525 (8th Cir. 1996)........................................................................33

*American Home Mortgage v. First American Title Ins. Co.*,
   No. 07-1257, 2007 U.S. Dist. LEXIS 83337 (D.N.J. Nov. 9, 2007) ...................................8, 13

*AT&T v. Winback & Conserve Program*,
   42 F.3d 1421 (3d Cir. 1994)........................................................................................8

*Belmont v. MB Inv. Partners*,
   No. 09-4951, 2012 U.S. Dist. LEXIS 1656 (E.D. Pa. Jan. 6, 2012).......................................36

*C&E Servs v. Ashland, Inc.*,
   601 F. Supp. 2d 262 (D.D.C. 2009) .............................................................................37

*Chassen v. Fidelity National Financial, Inc.*,
   2009 U.S. Dist. LEXIS 107602 (D.N.J. Nov. 16, 2009)................................................. 7, 12-13

*FDIC v. Shrader & York*,
   991 F.2d 216 (5th Cir. 1993) ....................................................................................31

*In re CBI Holding Co.*,
   529 F.3d 432 (2d Cir. 2008)................................................................................. 33-34

*In re Cendant Corp. Sec. Litig.*,
   109 F. Supp. 2d 225 (D.N.J. 2000) .............................................................................32

*In re Crazy Eddie Sec. Litig.*,
   802 F. Supp. 804 (E.D.N.Y. 1992) .............................................................................34

*In Re Jack Greenberg, Inc.*,
   212 B.R. 76 (Bankr. E.D. Pa. 1997) .............................................................................32

*In re Lemington Home for the Aged*,
   659 F.3d 282 (3d Cir. 2011)................................................................................ 38-39

*In re Pinnacle Investment Corp.*,
   No. 98-0489, 1998 U.S. Dist. LEXIS 23289 (D.N.J. Dec. 9, 1998)........................................19

*Inter Med. Supplies v. EBI Med Sys.*,
   975 F. Supp. 681 (D.N.J. 1997) ........................................................................................37

*JP Morgan Chase Bank, N.A. v. FDIC*,
   No. 09-14891, 2011 U.S. Dist. LEXIS 62692 (E.D. Mich. June 10, 2011) ............................5

*Kaplan v. Utilicorp United, Inc.*,
   9 F.3d 405 (5th Cir. 1993) ................................................................................................32

*Martin Marietta Corp. v. Gould*,
   70 F.3d 768 (4th Cir. 1995) ....................................................................................... 35-36

*Mitchell-Tracey v. United General Title Ins. Co.*,
   237 F.R.D. 551 (D. Md. 2006)............................................................................................3

*Official Comm. Of Unsecured Creditors of Allegheny Health v. PriceWaterhouseCoopers*,
   607 F.3d 346 (3d Cir. 2010)...............................................................................................35

*Phar-Mor, Inc. v. Coopers & Lybrand (In re Phar-Mor, Inc. Sec. Litig.)*,
   900 F. Supp. 784 (W.D. Pa. 1995)......................................................................................34

*Siemens Bldg. Techs., Inc. v. PNC Fin. Servs. Group, Inc.*,
   226 F. App'x 192 (3d Cir. 2007) ............................................................... 26-27, 29

*Stewart Title Guar. Co. v. Greenlands Realty, LLC*,
   58 F. Supp. 2d 370 (D.N.J. 1999) .......................................................................................5

*United Fixtures Co. v. Base Mfg.*,
   No. 6:08-cv-506-Orl-28GJK, 2008 U.S. Dist. LEXIS 114766, 2008 WL 4550212
   (M.D. Fla. Oct. 8, 2008)...................................................................................................25

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
   125 F.3d 899 (5th Cir. 1997) ..............................................................................................25

*United States v. Phillip Morris USA, Inc.*,
   300 F. Supp. 2d 61 (D.D.C. 2004) .............................................................................. 37-38

## **Federal Statutes**

12 C.F.R. § 1024.2(b) ...........................................................................................................19

## Federal Rules

Fed. R. Civ. P. 56(c) ............................................................................................3

Fed. R. Civ. P. 56(f ) .................................................................................... 39-40

L. Civ. R. 56.1...............................................................................................3, 23

## State Cases

*Arizona Title Ins. & Trust Co. v. Smith*,
  519 P.2d 860 (Ariz. 1974)............................................................... 30-31

*Breslin v. New Jersey Investors, Inc.*,
  70 N.J. 466 (1976) ...........................................................................16, 17

*Capital Wireless Corp. v. Deloitte & Touche*,
  216 A.D.2d 663, 627 N.Y.S.2d 794 (3d Dep't 1995) ............................33

*Carnegie Bank v. Shalleck*,
  256 N.J. Super. 23 (App. Div. 1992) ...........................................16, 17, 18

*Carter v. Reynolds*,
  175 N.J. 402, 815 A.2d 460 (2003)................................................. 26-27

*Clients' Sec. Fund of the Bar of N.J. v. Sec. Title & Guar. Co.*,
  134 N.J. 358 (1993) ......................................................................*Passim*

*Crisp v. Southwest Bancshares Leasing Co.*,
  586 S.W.2d 610 (Texas Civ. App. 1979)...............................................31

*Davis v. Clark*,
  85 N.J.L. 696 (E. & A. 1914)................................................................17

*Dep't of Ins. v. Blackburn*,
  633 So.2d 521 (Fla. Ct. App. 1994)......................................................31

*First American Title Insurance Co. v. Vision Mortgage Corp.*,
  298 N.J. Super. 138 (App. Div. 1997) ..........................................*Passim*

*Hillsdale Nat'l Bank v. Sansone*,
  11 N.J. Super. 390 (App. Div. 1951) ....................................................19

*In re Opinion 682 of the Advisory Comm. on Prof'l Ethics*,
  147 N.J. 360 (1997) .............................................................................13

*Keyingham Invs., LLC v. Fid. Nat'l Title Ins. Co.*,
    298 Ga. App. 467 (Ga. Ct. App. 2009) ...................................................................6

*Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp.*,
    655 S.E.2d 269 (Ga. Ct. App. 2007) ................................................................... 5

*Magie v. Reynolds*,
    51 N.J. Eq. 113 (Ch. Div. 1893) ........................................................................16

*MorEquity, Inc. v. Stanton*,
    2007 N.J. Super. Unpub. LEXIS 1932 (App. Div. Mar. 8, 2007) ...........................16

*New Freedom Mortgage v. Globe Mortgage Corp.*,
    281 Mich. App. 63 (2008).................................................................................9

*New Jersey Lawyers' Fund for Client Protection v. Stewart Title Guar. Co.*,
    409 N.J. Super. 28 (App. Div. 2009), *rev'd*, 203 N.J. 208 (2010).........................15

*Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found.
    v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 989 A.2d 313 (2010) ...................35

*Sears Mortgage Corp. v. Rose*,
    134 N.J. 326 (1993) .............................................................................*Passim*

*Zions First Nat'l Bank, N.A. v. National American Title Ins. Co.*,
    749 P.2d 651 (Utah 1988) .................................................................................30

## State Statutes

N.J.S.A. 12A:1-201(19) ........................................................................................16

N.J.S.A. 12A:1-201(25) ........................................................................................17

N.J.S.A. 12A:3-104 .............................................................................................16

N.J.S.A. 12A:3-302a(2) .......................................................................................16

## Miscellaneous

2 Joyce Palomar, Title Insurance Law § 20:11 (2010) ...............................................12

Arthur S. Horn, *Residential Real Estate Law and Practice in New Jersey*, section 4.8
(2d ed. 1989) ....................................................................................................20

James Bruce David, *The Law of Closing Protection Letters*, 36 Tort & Ins. L.J. 845 (2001) ..9, 12

*Restatement (Second) of Agency* § 228 ........................................................................27

*Restatement (Second) of Agency* § 275 ........................................................................31

Plaintiff Walsh Securities, Inc. ("WSI" or "Plaintiff") submits this single reply to the two separate opposition briefs filed by defendants Fidelity National Title Insurance Co. of New York ("Fidelity"), Nations Title Insurance of New York, Inc. ("Nations"), and Commonwealth Land Title Insurance Company ("Commonwealth") (collectively, "Title Insurance Defendants" or "Defendants").

## PRELIMINARY STATEMENT

Despite the fact that the Defendants are all owned by a single entity (Fidelity), they unnecessarily pepper the Court with two briefs consisting of more than 68 pages of cross-references briefing arguments not responsive to WSI's affirmative motion.  Regardless of their kitchen-sink approach, Defendants have presented no issues of material fact worthy of overcoming summary judgment. Therefore, the Court should award Plaintiff judgment on the issue of Defendants' liability under their closing service protection letters ("CPLs") and title insurance policies.

In opposing WSI's motion, Defendants avoid discussing the clear, stark, and uncontroverted breaches of contract wherein the Defendants promised to insure WSI for the very fraud at issue in this case.  Indeed, the Defendants fail to even mention their "approved closing attorneys" Yacker and Cicalese, and minimize the role of their agent Coastal Title Agency ("Coastal") which created a system to assist defrauding WSI.  The simple fact is that without their agents, WSI would

1

have suffered no losses because it would never have wired funds to the closing attorneys without the protection afforded by the Defendants' CPLs and the title insurance policies issued by Coastal.  Likewise, without the involvement of their agents, the Defendants' would not be required to indemnify WSI for the losses suffered as a result of the fraud – but the fact is that their agents were central to the fraud.  Their opposition epitomizes the tortured history of this case, and the constantly moving targets and roadblocks that the Defendants have erected to justify avoiding their liability on *every single one* of the more than 200 properties involved in this case in the face of longstanding New Jersey precedent.

Rather than simply deny liability based on the law, which they cannot do, Defendants embark on a smear campaign because they have no good faith defenses left to explain their actions.  They incredulously claim that they are the victims in this scheme – a scheme where *their agents*, both approved closing attorneys and their title agent, unabashedly committed the fraud during hundreds of real estate closings without which WSI would never have table-funded the fraudulent loans. Without any hint of irony, they attempt to pin the fraud on the lender, WSI which, when compounded with the Defendants' abject failure to honor their clear contractual obligation to provide insurance coverage, led to the destruction of WSI. These self-serving, hollow, superficial allegations are unavailing.  As such, WSI is entitled to partial summary judgment on Defendants' liability for breaching their

contracts as there are no genuine issue of *material* facts that exist, for even accepting as true the fairytale spun by the Defendants, there are no genuine disputes over the insurance coverage that flowed to WSI as a result of the fraud created by their agents.

## **ARGUMENT**

### I.    **DEFENDANTS' ADMISSIONS TRIGGER CONTRACTUAL LIABILITY UNDER THE LAW IN NEW JERSEY**

The question for the Court is simple: are the Defendants liable under the CPLs and title policies that they issued?  Under New Jersey law, the Title Insurance Defendants' admissions alone trigger liability under their CPLs and their title policies.  The Defendants admit:

- they issued the CPLs (Defendants' Responsive Statement of Undisputed Facts ("Defendants' Responsive Statement") at ¶¶ 51-55);[1]
- they issued the title policies (*Id.* at ¶ 56-67);[2]

_____

[1] Throughout Defendants' Responsive Statement and Supplemental Statement, they make many assertions without proper citations to the record.  They should, therefore, be disregarded by this Court.  Fed. R. Civ. P. 56(c); L. Civ. R. 56.1.  These citations are not competent evidence sufficient to oppose summary judgment, so they should be disregarded.

[2] Defendants attempt to avoid admitting that they issued the loan policies identified in this Motion.  Without citing to the record, Defendants baldly allege that "[n]o proof of payments has been provided in this lawsuit" – which is a blatant mischaracterization of the facts.  (Defendants' Responsive Statement at ¶ 56).  *See Mitchell-Tracey v. United General Title Ins. Co.*, 237 F.R.D. 551, 560 (D. Md. 2006)  ("[i]t strains credulity to suggest, as Defendants do, that the Defendants

- their "approved attorneys" were involved in the scheme (Defendants' Supplemental Statement of Disputed Facts ("Defendants' Supplemental Statement") at ¶ 12);

- their direct agent, Coastal, based on their agreement, issued title policies and CPLs that facilitated the fraud (Defendants' Responsive Statement at ¶ 129-132; 136-138); and

- that certain judgments in New Jersey state court and in the Southern District of New York rescinded mortgages at issue here and ordered WSI to pay damages on other un-repurchased properties also at issue. (*Id.* at ¶¶ 142-143).

Moreover, the Title Insurance Defendants failed to:

- present *any* evidence that WSI holds a first lien position on any property at issue;

- provide any credible, particularized evidence that WSI knew or should have known that the Title Defendants' "approved attorneys" and title agent were involved in a fraudulent scheme; nor

- establish particularized proof as to *each property* establishing the "who, what, when, where, and how" of WSI's supposed fraudulent involvement.

---

(and their agents) lack the ability to compile information on insurance policies that they have issued, even if those policies have been issued by independent agents."). WSI produced hundreds of thousands of pages of materials to the case repository, including evidence of payments to the Defendants' agent for title insurance policies paid out of WSI's loan proceeds.  Moreover, the Defendants' corporate representative testified that the Defendants are in possession of payment information that they have not produced to WSI.  (Magnanini Certif., Ex. G, Nations 12:1-21; 102:13-104:20).

Rather, as a direct result of the admitted fraud committed by *their* "approved attorneys" and facilitated by *their* title agent, WSI was harmed by their breaches of the contracts they were paid to issue.

The Defendants do not contest, because they cannot, that liability under a CPL is determined by the actions of the their "approved attorneys" Yacker and Cicalese. *See Sears Mortgage Corp. v. Rose*, 134 N.J. 326 (1993); *Clients' Sec. Fund of the Bar of N.J. v. Sec. Title & Guar. Co.*, 134 N.J. 358 (1993); *First American Title Insurance Co. v. Vision Mortgage Corp.*, 298 N.J. Super. 138 (App. Div. 1997); *Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp.*, 655 S.E.2d 269 (Ga. Ct. App. 2007); *JP Morgan Chase Bank, N.A. v. FDIC*, No. 09-14891, 2011 U.S. Dist. LEXIS 62692 (E.D. Mich. June 10, 2011). Additionally, the Title Insurance Defendants do not even address the fact that the loan policies issued to WSI cover, among other things, the title defects for which they are now liable.[3] *See Stewart Title Guar. Co. v. Greenlands Realty, LLC*, 58 F. Supp. 2d 370, 382

_____

[3] The Defendants have waived their responses to entire sections of WSI's motion for partial summary judgment, including WSI's arguments under *Vision* and the Title Insurance Defendants' title policies by not responding. (*See* WSI's Motion for Partial Summary Judgment at 24-29 [Doc. 478-1]). Under Vision, like the case here, the court noted because of the fraud, the transaction "*was a sham transaction from the outset*." 298 N.J. Super. at 144. The court noted that because there was no bona fide mortgagor it eliminated one of the remedies for which the lender bargained – the ability to recoup its losses through foreclosure. *Id.* at 140. The Title Insurance Defendants also waived responding to WSI's claims under the title policies regarding "unmarketability of title" because they have not opposed the argument in either of their motions.

(D.N.J. 1999) (defining "defect" in title insurance policies as "the want or absence of something necessary for completeness or perfection . . . a lack or absence of something essential to the property use for the purpose for which the thing is to be used."); *Keyingham Invs., LLC v. Fid. Nat'l Title Ins. Co.*, 298 Ga. App. 467 (Ga. Ct. App. 2009) ("one of the very purposes of title insurance is to protect a party from the consequences of forgery in the chain of title, which necessarily results in the party not receiving an interest in the land.").

## II.    THE TITLE INSURANCE DEFENDANTS' "APPROVED ATTORNEYS" ENGAGED IN THE SAME SCHEME TO DEFRAUD INVOLVING ALL OF THE PROPERTIES IN THIS MOTION

Through a series of circular arguments Defendants try to avoid liability by resting on a flawed analysis of an unreported case from another district.  No matter how obtuse their argument becomes, it unravels *ab initio* because they never deny that this case involves the same scheme, the same individuals, the same "approved attorneys," the same title insurance companies, the same title insurance agency, the same CPLs, and the same title policies.[4]  *Everything* their agents and "approved

---

[4] The Defendants' circuitous argument that "the principles" of a class action litigation "are the same" while claiming that "Walsh wants this Court to take a 'back-door' class action type approach," is baseless.  In *Corwin*, the unreported case upon which the Defendants so heavily rely, the court concluded that without first "establish[ing] that there was a previous title policy," the plaintiff could not establish a class of individuals who the title insurer improperly refused to give a credit for the prior policy.  In the instant case, however, there is no dispute that the Title Insurance Defendants issued the CPLs and title policies for which they were paid.  Intentionally or inadvertently, the Defendants have misrepresented the

attorneys" did was in furtherance of a scheme to defraud WSI.  Liability attaches
not simply because of a single act but because it was a wide-spread scheme –
which the Title Insurance Defendants have never contested.  The Defendants never
address the fact that absent the involvement of Coastal Title and their "approved
attorneys," there would have been no fraud.  In other words, they admit that the
underlying fraud caused the damages on every single property at issue.  Therefore,
their suggestion that particularized proof is necessary must be rejected as it has
been by other judges in this Circuit.

In *Chassen v. Fidelity National Financial, Inc.*, Judge Sheridan allowed a
class of plaintiffs (all New Jersey residents) to proceed on breach of contract
claims against Fidelity on CPLs.  No. 09-291, 2009 U.S. Dist. LEXIS 107602, at
*15-22 (D.N.J. Nov. 16, 2009).  Obviously, there are differences in the facts
arising from each class member's claim when a class action is comprised of every
New Jersey resident who "purchased, financed, or refinanced residential real estate
property in New Jersey during the six years prior to the complaint."  *Id.* at *4.
Nevertheless, the class action must be resolved on a whole and not on the
particularized claims of each member.  The undeniable result of *Chassen* is that the
Court can rule on *overarching* breach of contract claims notwithstanding multiple

---

holding of the case about whether the putative class could be certified and recover
without a showing that earlier policies were issued.

contracts at issue.  This rationale applies equally to WSI's claims.  Indeed, WSI's claims are less cumbersome than those in *Chassen*.

Here, the Court is dealing with *the same* underlying scheme for *the same* contracts.  *See also American Home Mortgage Corp. v. First American Title Insurance Co.*, No. 07-1257, 2007 U.S. Dist. LEXIS 83337 (D.N.J. Nov. 9, 2007) (considering breach of contract claims on multiple CPLs and finding that closing attorneys were the agents of the title insurers); *Alberton v. Commonwealth Land Title Ins. Co.*, 247 F.R.D. 469, 473 (E.D. Pa. 2008) (" [the Court] joins a growing list of courts around the country that have certified similar classes of insurance purchasers bringing similar claims against insurance sellers and arising from practices nearly identical to the sales practices challenged here").

### III. *SEARS, CLIENTS' SECURITY FUND* AND *VISION MORTGAGE* REMAIN THE LAW THAT CONTROLS THIS LITIGATION; DEFENDANTS' CLAIM THAT THEY "WROTE AROUND" THESE CASES MUST BE REJECTED AS IT HAS BEEN BY OTHER COURTS IN NEW JERSEY

The Title Insurance Defendants go to great lengths to argue that the title insurance industry wrote around *Sears* and its progeny; however, *Sears*, *Clients' Security Fund* and *Vision Mortgage* have been left undisturbed for nearly two decades and the Defendants have not shown otherwise.  *Sears*, 134 N.J. 326 (1993); *Clients' Sec. Fund*, 134 N.J. 358 (1993); *Vision Mortgage*, 298 N.J. Super. 138 (App. Div. 1997).  Moreover, these cases examined the same issues presented in this litigation.  According to the Third Circuit, the proposition that "independent

contractors may never bind principals for their torts . . . *was eviscerated*" in *Sears*.

*AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1436 n. 17 (3d Cir. 1994)

(emphasis added).  "Since it can in no way be argued that the attorney was the title

insurer's servant, the Court implicitly recognized the category of agent-

independent contractors."  *Id.*  The Defendants cannot deny the impact of this

result.  They have not cited *a single case* from New Jersey[5] that contradicts the

driving force of these decisions – that title insurance companies are in the best

position to foresee and prevent defalcations of their approved agents and/or actual

agents.  The Title Insurance Defendants do *not* argue that the actions of their

"approved attorneys" fell outside the scope of these cases.  (Fidelity/Nations Br.

21-27).  Rather, they *admit* that their "approved attorneys" engaged in the fraud

that ultimately caused WSI's collapse:

———————————————

[5] The Title Insurance Defendants proffered *only one* out-of-state case in support of
their argument even though the current form of the CPL has been in existence for
almost two decades.  Moreover, *New Freedom* is inapposite for numerous reasons.
First, the law in New Jersey controls – not the law in Michigan.  "No court outside
New Jersey has followed the holding in *Sears* that a title insurer's issuing agent or
approved attorney is automatically the title insurer's agent for the purpose of
conducting closings."  James Bruce David, *The Law of Closing Protection Letters*,
36 Tort & Ins. L.J. 845 (2001).  Second, there was *no* evidence that the issuing
agent in *New Freedom* engaged in fraud.  *New Freedom Mortgage v. Globe
Mortgage Corp.*, 281 Mich. App. 63, 81 (2008).  Here, the Title Insurance
Defendants *admit* that their "approved attorneys" engaged in fraud.  (Defendants'
Supplemental Statement at ¶ 12).  Third, the trial court found that the plaintiff
suffered no damages – that is not the case here, WSI has suffered enormous
damages that will be presented during a damages hearing.  Finally, *New Freedom*
was an action in foreclosure where, on the other hand, the purchases here were the
initial sales.

- Stanley Yacker, Esq., Michael Alfieri, Esq., Richard Pepsney, Esq., and Anthony Cicalese, Esq., were the closing attorneys involved in the fraudulent scheme.  (Defendants' Supplemental Statement at ¶ 12);

- Yacker also admitted in his guilty plea that in 1996 and 1997, Gary Grieser and others solicited and located persons willing to act as straw buyers in numerous transactions, whereby mortgage loans would be obtained and the properties acquired in the names of the straw buyers, even though those individuals had no interest in obtaining such loans or purchasing such properties.  (Defendants' Responsive Statement at ¶ 85);

- After the closing on those properties, each straw buyer conveyed a 60-percent interest in the given property to Grieser's entity, Capital Assets, in a joint venture arrangement which left the straw buyer holding a 40 percent interest as co-owner with Capital Assets.  (*Id.* at ¶ 86);

- Yacker prepared the joint venture agreement used in those transactions.  Yacker also acknowledged that he knew that each of the straw buyers was being paid for the use of their names and credit histories in obtaining the subject mortgage loans and in acquiring the subject properties. (*Id.* at ¶ 87);

- Yacker also committed various fraudulent acts to further the straw buyer scheme, including: (a) issuing false letters regarding nonexistent deposits of funds by purchaser/borrowers, which funds he claimed to be holding in escrow; (b) closing title on the resale portion of flip transactions knowing that the original purchase of the property had not yet closed; and (c) signing and causing straw buyers to sign false and fraudulent closing documents, including HUD-1/RESPA settlement statements which did not truthfully describe receipts and disbursements of funds.  (*Id.* at ¶ 88);

- Yacker pleaded guilty to all 10 counts of an Indictment, which charged him with conspiracy to commit wire fraud and nine counts of wire fraud.  In 2003, Yacker was sentenced to 18 months in prison

10

and ordered to pay an unspecified portion of $787,985.00 in restitution.  (*Id.* at ¶ 89);

- Despite being a paralegal for Yacker and Cicalese, King also admitted that she was not recording deeds and mortgages.  King testified that she was instructed to hold the deeds and mortgages "because the way Bill Kane put it, somebody in Monmouth County was becoming suspicious of the influx of property being sold and bought in Asbury Park and Long Branch."  (*Id.* at ¶ 103);

- King did not send the deeds and mortgages until Kane told her to that she sent in a stack of deeds and mortgages "eight to ten inches" high.  (*Id.* at ¶ 104);

- Yacker also testified that he lied about the existence of monies being held in escrow.  (*Id.* at ¶ 107, 115);

- King testified that on behalf of Yacker and Cicalese she prepared HUD-1 Settlement Statements, that she lied on the HUD-1s about the existence of second mortgages, and that she issued disbursements of the loan proceeds from Yacker's and Cicalese's trust accounts according to Kane's direction rather than according to the Settlement Statements.  The purpose of the secondary mortgages was to create the appearance that the seller was providing funds to close the transactions.  She further testified that Yacker showed her how to create these phony documents.  (*Id.* at ¶ 108);

- Cicalese admitted that the HUD-1 Settlement Statements contained inaccurate information, specifically that balances remained after the closings that were not reflected on the HUD-1.  (*Id.* at ¶ 109);

- Cicalese also admitted that the loan proceeds were often disbursed before the properties were owned by Kane.  (*Id.* at ¶ 110);

- Yacker admitted that he allowed his attorney trust account to be set up by Kane and controlled by King and Kane.  (*Id.* at ¶ 112);

- Essentially, Yacker's trust fund flowed according to Kane's direction so that all the conspirators received their illicit payments.  (*Id.* at ¶ 113);

- Yacker admitted that even though Walsh Securities provided the recording funds, closing documents were not being recorded because he had depleted the funds in his attorney trust account and there was no money to pay for the recording fees. (*Id.* at ¶ 114);

- Yacker also testified that he lied about the existence of monies being held in escrow.  (*Id.* at ¶ 115).

The Defendants but then claim self-servingly that their CPLs exempted this fraudulent behavior from coverage.  This argument holds no weight for several reasons.  First, the entire purpose of the CPL is to enable the "risky practice" of "mortgage lenders . . . entrust[ing] large sums of money to settlement agents." James Bruce David, *The Law of Closing Protection Letters*, 36 Tort & Ins. L.J. 845 (2001).  In fact, CPLs came into being precisely to assuage lenders' fears of entrusting such large sums to unknown persons and are offered in exchange for the actions taken by the lender.  *Id.  See also* 2 Joyce Palomar, TITLE INSURANCE LAW § 20:11 (2010) (CPLs create trust with lenders by holding out the "financial resources of the national title insurance underwriter . . . to indemnify lenders . . . for the [approved attorney's] errors or dishonesty with escrow or closing funds.").

Second, having argued this theory in other litigation (and lost), they knowingly hide behind an argument that has been considered and rejected by state and federal courts in New Jersey.  In *Chassen v. Fidelity National*, Judge Sheridan

held that despite the fact that the title insurance companies added language purporting to disclaim their agency relationship with their closing attorneys (*e.g.*, the same language the Title Insurance Defendants now claim get them around *Sears* and its progeny (Nations/Fidelity Br. at 23)), the law of agency controls. *Chassen*, 2009 U.S. Dist. LEXIS 107602.  Judge Sheridan adopted the same rationale used by Judge Linares in *American Home Mortgage*, 2007 U.S. Dist. LEXIS 83337.  "[E]ven though the letters included disclaimers of agency, the actual purpose of the CSL tended to establish that such a relationship did in fact exist. . . . Here, as in *American Home*, the Court concludes that *the CSL letters exhibited an agency relationship* where the Defendants would indemnify Plaintiffs if certain actions by their agents occurred."  *Chasen*, 2009 U.S. Dist. LEXIS 107602, at * 16-17 (emphasis added).

Both *Chassen* and *American Home* adopt and reinforce the proposition in *Sears* that title insurance companies cannot simply carve out their own self-serving exceptions to the law.  *Sears*, 134 N.J. at 338 ("even if a person is not an 'actual agent,' he or she may be an agent by virtue of apparent authority based on manifestations of that authority by the principal.").  *Cf. In re Opinion 682 of the Advisory Comm. on Prof'l Ethics*, 147 N.J. 360, 366 (1997) ("In addition to representing purchasers, attorneys frequently act as the representatives of the title insurers and perform the functions of title agents.  Those functions include, but are

13

not limited to, accepting the deed, title, and closing documents from the seller, removing the exceptions from the title according to the title commitment, disbursing all moneys, and authorizing the issuance of insurance." (citations omitted)).[6] The Title Insurance Defendants' recycled and already discredited argument favors form over substance and it should be rejected as it has been by the federal and state courts of New Jersey.

The New Jersey Appellate Division also considered and rejected the arguments now being presented by the Title Insurance Defendants (Nations/Fidelity Br. at 26) that revisions to the CPL modified the holdings in *Sears*, *Clients' Security* and *Vision Mortgage*:

> Both Stewart Title and Amicus Curiae, New Jersey Land Title Association (NJLTA), assert that after the Court's decision in *Sears*, the title insurance industry successfully lobbied the Commissioner of the Department of Banking and Insurance (DOBI) to approve two forms that: (1) negate the agency status upon which *Sears* is predicated; and (2) provide a type of optional coverage for situations involving attorney misappropriation. These forms are: "Important Notice and Disclosure" (IN & D); and "Closing Service Letter" (CSL). *Stewart Title and NJLTA have not presented any evidence, however, that, in approving these forms, the Commissioner addressed the central question under review here: whether inclusion of these notices in a title commitment packet that is*

_____

[6]  The Title Insurance Defendants have not produced a scintilla of evidence remotely suggesting that they establish notice to any insured, specifically mortgage lenders like WSI, that in their own interests they changed the CPLs to carve out exceptions to *Sears* and its progeny.

14

> *sent only to the closing attorney is sufficient to place the insured on notice of the content of these disclaimers.  In our view, the* Sears *Court answered that question in the negative.*

*New Jersey Lawyers' Fund for Client Protection v. Stewart Title Guar. Co.*, 409 N.J. Super. 28, 37 (App. Div. 2009), *rev'd*, 203 N.J. 208 (2010) (emphasis added).[7] The New Jersey Supreme Court ultimately reversed the Appellate Division on different grounds, finding that the closing attorney's actions occurred prior to an agency relationship being created between the lawyer and the title insurance company.  203 N.J. at 221.  Nevertheless, the Appellate Division and the Supreme Court reaffirmed their conclusion that because of the close relationship between the title insurance companies and their "approved attorneys," the responsibility for the attorneys' fraud falls to the insurance company.  *Id.* at 219 (reaffirming its holding that "[w]e ultimately determined that a closing attorney designated as the 'approved attorney' by the title insurer severed in a dual capacity as an agent for the purchaser and the title insurance company, and therefore *the responsibility for the attorney's theft of the money deposited at the closing should be placed on the insurer, which exercised greater control over the attorney and was in a better position to avoid the loss*." (emphasis added)).

## IV.  WSI IS A HOLDER IN DUE COURSE; NHF'S ACTIONS ARE NOT ATTRIBUTABLE TO WSI

———————————————

[7] *See supra*, footnote 4.

15

### A.    Standard for Holder in Due Course

WSI is a holder in due course and therefore is not barred from recovery by the acts of NHF.  Under New Jersey law, a holder in due course ("HDC") is "the person or entity who takes a negotiable instrument for value, in good faith, and without notice of any defense or claim against it."  *MorEquity, Inc. v. Stanton*, 2007 N.J. Super. Unpub. LEXIS 1932 (App. Div. Mar. 8, 2007) (citing N.J.S.A. 12A:3-302a(2)).  WSI satisfies this test.

"[I]f the mortgage is given to secure a negotiable promissory note, and the note is negotiated for value in the ordinary way before maturity, the holder will hold it and the mortgage free from all defences [sic].  But if the mortgage be given to secure a non-negotiable instrument, the assignee takes it subject to all defences [sic] to the bond or other instrument manifesting the indebtedness."  *Carnegie Bank v. Shalleck*, 256 N.J. Super. 23, 44 (App. Div. 1992) (citing *Magie v. Reynolds*, 51 N.J. Eq. 113 (Ch. Div. 1893)).  The notes on the loans at issue are negotiable instruments, N.J.S.A. 12A:3-104, therefore, the mortgages securing those notes are also negotiable instruments.  *Carnegie Bank*, 256 N.J. Super. 23.

"Good faith" is defined, for the purposes of the HDC doctrine, as "honesty in fact in the conduct or transaction concerned."  N.J.S.A. 12A:1-201(19).  More specifically, "good faith is determined by looking to the mind of the particular holder who is claiming to be a holder in due course, not what the state of mind of a

16

prudent man should have been." *Breslin v. New Jersey Investors, Inc.,* 70 N.J. 466, 471 (1976) (citations omitted).

To be considered "on notice," the HDC must have *actual knowledge*, have received actual notice, or have reason to know of the claims or defenses based on the circumstances known at the time of the transaction.  N.J.S.A. 12A:1-201(25). "[P]roof of circumstances calculated merely to arouse suspicion" is insufficient to defeat the application of HDC status.  *Breslin,* 70 N.J. at 473 (citations omitted). Before HDC status will be defeated, bad faith and "*not merely suspicious circumstances*, must be brought home to a holder for value." *Id.* (emphasis added) (citations omitted).  In other words, the existence of suspicious circumstances - such as the January 31, 1997 from Greenwich Capital - that would put a prudent man on inquiry does not preclude the application of HDC status where the holder for value has no actual knowledge of any underlying fraud.  *Davis v. Clark*, 85 N.J.L. 696, 699 (E. & A. 1914).

### B.  *WSI Is a Holder In Due Course Under Defendants' CPLs and Title Policies, as well as Under New Jersey Law*

WSI is entitled to HDC status on the CPLs and title insurance policies issued by the Defendants because they were "mere incident[s] or accessor[ies] to" the notes and mortgages. *Carnegie Bank,* 256 N.J. Super. at 45.  As such, "the quality of negotiability [of the note] is necessarily imparted to" the incident or accessory.

*Id.*  This conclusion is supported by the very language of the Defendants' title

policies.  Defendants' standard title policy provides:

> The term "insured" also includes
>
>> (i) *the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness* except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, *unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim* or other matter insured against by this policy as affecting title to the estate or interest in the land)

*See, e.g.*, 1992 ATLA Loan Policy Form (10-17-92), *Policy of Insurance Issued by*

*First American Title Ins. Company*, http://ncs.firstam.com/socal/policies. cfm?poli

cy= 1992_ALTA_Loan (last visited January 12, 2012) (emphasis added).  Clearly,

the policies cover the owner of the indebtedness as a HDC.  Additionally, because

the CPLs are part and parcel of the title insurance policy, the CPLs also

contemplate the owner of the indebtedness as a HDC.  *Sears*, 134 N.J. at 350-52;

*Clients' Sec. Fund*, 134 N.J. at 377.  The CPLs and title policies are truly

"incident[s] or accessor[ies]" to the notes and mortgages.  Thus, WSI acquires its

HDC status through the notes and mortgages as well as the policies and CPLs.  As

WSI's enforcement of the notes and mortgages is insulated from NHF's fraud, so

too are its enforcement of the CPLs and title insurance policies.  This argument is

not only a logical extension of the principle announced in *Carnegie Bank*, it is

supported by public policy and other equitable considerations.

First, the principles underlying the HDC doctrine, and the Uniform

Commercial Code ("UCC") generally, support applying the doctrine to the CPLs

and title policies.  These principles, deeply rooted in the law of New Jersey,

include the desirability of using negotiable instruments in conjunction with

mortgages and the recognition of the importance of the right to transfer negotiable

instruments.  *Id*. at 43.  Indeed, the latter policy is so important that it has been

described by one court as "the indescribable utility of the untrammeled and

unencumbered negotiation of commercial paper."  *Hillsdale Nat'l Bank v. Sansone*,

11 N.J. Super. 390, 398 (App. Div. 1951).  It has been similarly held that the

policies underlying the UCC (on which New Jersey's HDC doctrine is based),

include "to meet the contemporary needs of fast moving commercial society. . .

and to enhance the marketability of negotiable instruments [allowing] bankers,

brokers and the general public to trade in confidence."  *In re Pinnacle Investment*

*Corp.,* No. 98-0489, 1998 U.S. Dist. LEXIS 23289, *36 (D.N.J. Dec. 9, 1998)

(citations omitted).

Generally speaking, CPLs and title policies are intended to protect the

lender[8] against improper behavior on the part of the title insurer's approved attorneys and agents and are issued to induce lenders to make loans.  It has been recognized that the issuance of the CPL is "one of the most important services rendered by title insurance companies."  Arthur S. Horn, *Residential Real Estate Law and Practice in New Jersey*, section 4.8 (2d ed. 1989).  By providing incentives for lenders to issue loans, CPLs and title policies undeniably support and enhance the market for negotiable instruments in that absent the original loan, there would not be an instrument to market.  Surely, CPLs and title policies are *as important* to the "untrammeled and unencumbered negotiation of commercial paper" as the notes and mortgages themselves.  This is especially the case where, as here, the CPLs and title policies (which are drafted by the title insurers)

———————————

[8] In accordance with the Residential Real Estate Procedures Act ("RESPA"), a "lender" is defined as "the secured creditor or creditors named in the debt obligation and document creating the lien. For loans originated by a mortgage broker that closes a federally related mortgage loan in its own name in a table funding transaction, the lender is the person to whom the obligation is initially assigned at or after settlement." 12 C.F.R. §1024.2(b).  A "mortgage broker" is defined as "a person (not an employee of a lender) or entity that renders origination services and serves as an intermediary between a borrower and a lender in a transaction involving a federally related mortgage loan, including such a person or entity that closes the loan in its own name in a table funded transaction. A loan correspondent approved under HUD regulation 24 CFR 202.8 for Federal Housing Administration programs is a mortgage broker for purposes of this part." *Id.*  In addition, "table funding" is defined as "a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds."  *Id.*

specifically state that they will apply to a successor or assignee indicating that the insurer agreed to that assignment. (Magnanini Certif., Ex. A).

Should the opposite rule be adopted, and an innocent purchaser of a note be deemed not protected by an otherwise applicable CPL or title policy, the market for negotiable instruments would suffer. Purchasers of negotiable instruments who qualify as a HDC would be left unprotected from a fraud committed by the *title insurer's closing agent or attorney*. Such an outcome leaves buyers unprotected and therefore unable to "trade in confidence" and mortgage loans "unmarketable" – exactly what had happened to WSI. Such a result is particularly undesirable because CPLs are specifically triggered by fraud of the title insurer's agents and attorneys. In other words, a purchaser with CPL insurance only seeks coverage for the loss resulting from the fraud of the title insurer's agents and attorneys.

Not only do the policies underlying the UCC and the HDC doctrine support WSI's HDC status, general equitable principles also support such a result. More specifically, to the extent that the loss resulting from an approved attorney's fraud must fall somewhere, equity dictates that it fall to the title insurance company, which is in the best position to prevent a fraud. *See, e.g., Clients' Sec. Fund*, 134 N.J. 358, 370; *Vision Mortgage*, 298 N.J. Super. 138, 144. In *Clients Security Fund*, the title insurer issued a CPL to the lender, Southern Mortgage Associates ("SMA") and paid off the mortgage in order to place SMA, as its insured, in a first

lien position.  134 N.J. at 371.  The Court held that as between the lender and the buyer, the title insurer is liable for the attorney's defalcation because "under the circumstances liability for the attorney's embezzlement ultimately must be Security's."  *Id.* at 367.  The Court went further and held that "the closing-protection letter . . . was part of the title-insurance protection purchased," *id.* at 377.  Consequently, the insurer was liable for the loss under the CPL.  *Id.* at 378.

Similarly, in *Vision Mortgage,* the court held that the original lender was protected by the CPL even though the lender's own action contributed to the loss it sustained.  298 N.J. Super. at 144.  This holding was based on the court's finding that "the title insurance company was in the best position to prevent the loss created by the fraud and defalcation of the [closing agent]."  *Id.*  In both *Clients' Security Fund* and *Vision Mortgage,* the party seeking coverage under the CPL could be said to have contributed to its own loss and yet deserved protection against the far worse behavior of the title insurers' closing agents.

The same reasoning applies here.  Inasmuch as the loss must be allocated, as between a title insurance company that affirmatively undertook the obligation to protect against fraud committed by the closing agent and the lender of the underlying mortgage which wired its money to table fund the mortgage directly to the title insurance company's "approved attorneys," equity supports WSI.  *Clients' Security Fund,* 134 N.J. at 370, 634 A.2d at 95; *First American Title*, 298 N.J.

Super. at 144.  Regardless of the alleged actions of NHF, the Title Insurance Defendants remain in the best position to protect against the defalcation of their own agent and "approved attorneys."  Any other result would distort equity and work a disservice to the secondary market for notes and mortgages and overturn years of New Jersey Supreme Court precedential opinion.

## V. MISDEEDS COMMITTED BY LOWER-LEVEL EMPLOYEES WHOSE SOLE PURPOSE WAS TO ENRICH THEMSELVES CANNOT, AS A MATTER OF LAW, BE IMPUTED TO WSI

The edifice on which Defendants' defense is built stands or falls on a very basic question: when lower level employees of WSI committed fraud, did they do so for the benefit of the corporation or to benefit themselves?  The answer is found over and over again, in Defendants' Supplemental Statement under Local Rule 56.1: Anthony D'Apolito, Kellie O'Neill, and Betty Ann Demola (agents) acted in such stark contravention to the interests of WSI (the principal) that their rogue acts simply cannot be imputed as a matter of law.  As explained below, this is a sufficient reason to cast aside Defendants' arguments to the contrary but it surely is not a necessary one, for there is simply no policy exclusion at issue in this case that bars coverage under the CPLs.  Since Defendants' imputation argument fails, it is fatal to their entire opposition because they simply cannot point to anything that *genuinely* raises *factual* doubt as to whether coverage was implicated.

23

Defendants' argument is based on a theory of agency. Putting aside Robert Walsh and James Walsh, whose knowledge and conduct should have absolutely no bearing on this motion because there simply is no evidence (and there was no arrest, no indictment, no trial, *nothing*) that they engaged in fraud (and Defendants' smear campaign lacks the precision required by the Federal Rules), the employees of WSI who were criminally culpable for perpetrating the fraud on Walsh were acting *expressly adverse* to WSI, completely abandoning the company's interest, instead acting solely to enrich themselves at the company's expense. As a result, as a matter of law, these lower level employees' actions[9] cannot and do not bind WSI.

### A.   *Defendants' Smearing Arguments Should Not be Credited*

While Defendants have averred that high-level WSI employees were involved in the fraud, they have not injected these allegations with enough precision to pass the red-face test such that these allegations cannot properly be considered in their opposition. Indeed, in support of their arguments they rely on testimonial statements based on hearsay, opinion, and lack of foundation. (*See, e.g.*, Plaintiff's Counterstatement to Defendants' Supplemental Statement of Disputed Material Facts ¶¶ 203, 268, 272, 276, 277). The laws involving fraud

---

[9] The lower-level employees at issue are Anthony D'Apolito, a sales representative (Plaintiff's Counterstatement ¶ 226), Kellie O'Neill, a loan processor (¶ 249) and Betty Ann Demola, national sales manager (¶ 86), did not plead guilty to anything related to the fraud at issue.

compels those who allege it to do so with particularity, and while this concept is most often applied within the framework of a pleading standard, it stands to reason that if one must allege fraud with particularity, there must be a delineation of a "who," "what," "when," "where," and "why," and "how" with respect to naked allegations at the summary judgment stage.

Defendants make threadbare recitals in their Supplemental Statement that should not be credited because they have not been put forth with any sort of particularity, completely undermining the letter and spirit of the Federal Rules.  "It is well-established that a party alleging fraud must do so with particularity, regardless of whether the allegation is made by way of a claim or an affirmative defense." *Aguilar v. City Lights of China Rest., Inc.*, No. 11-2416, 2011 U.S. Dist. LEXIS 122531, at *11 (D. Md. Oct. 24, 2011).  It stands to reason that in opposing a motion for summary judgment, their proposed facts must be more than conclusory.  *United Fixtures Co. v. Base Mfg.*, No. 6:08-cv-506-Orl-28GJK, 2008 U.S. Dist. LEXIS 114766, 2008 WL 4550212, at *5 (M.D. Fla. Oct. 8, 2008).

Defendants' suppositions could not withstand the Fed. R. Civ. P. 9(b) threshold.  Bereft of a story implicating top-level Walsh executives in a fraud, their cherry-picking of deposition testimony entirely out of context surely does not suffice in this instance.  *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp*., 125 F.3d 899, 903 (5th Cir. 1997) ("At a minimum, Rule 9(b)

requires . . . the 'who, what, when, where, and how' of the alleged fraud.")
(citation omitted).   Accordingly, bald suppositions alone cannot by themselves
defeat a motion for summary judgment.  Even if they did, *arguendo*, the
Defendants have not posited *any* evidence with regard to each property at issue as
they claim must be done.  (Nations/Fidelity Br. 8-9).

### B.   *Defendants Cannot Turn the Tables on WSI and Impute the Fraud to WSI Under Traditional* **Respondeat Superior** *Principles*

Defendants cannot escape liability by pinning the fraud on WSI.  Under the
doctrine of *respondeat superior* – nowhere mentioned in Defendants' papers – the
fraud cannot be imputed to WSI as a matter of law.

The Third Circuit explained, in a like instance, that an employer cannot be
charged with a fraud when an employee acts for his or her own benefit.  *Siemens
Bldg. Techs., Inc. v. PNC Fin. Servs. Group, Inc.*, 226 F. App'x 192 (3d Cir. 2007).
In *Siemens*, a Siemens employee engaged in a fraudulent scheme where she made
out checks to various Siemens employees, forged their endorsements, and then
cashed the checks for her own benefit.  *Id.* at 193.  The investigation into the
scheme revealed that the employee that cashed all of the fraudulent checks at the
same PNC Bank.  *Id.* at 194.  The investigation further revealed that the same teller
cashed every one of fraudulent checks.  *Ibid.*  Siemens brought suit against PNC
under a theory of *respondeat superior*.

Judge Hayden rejected Siemens' argument and the Third Circuit affirmed the judgment.  The court canvassed New Jersey law concluding that PNC simply could not be on the hook for its employee's fraud.  An employer may be found liable under *respondeat superior* only if the employee was acting within the scope of his or her employment at the time of the occurrence.  *Id.* at 195 (quoting *Carter v. Reynolds*, 175 N.J. 402, 815 A.2d 460, 463 (2003)).  The court noted that the New Jersey Supreme Court has adopted section 228 of the *Restatement (Second) of Agency*, which states that conduct is in the scope of employment "if, only if

>     (a) it is the kind he is employed to form
>
>     (b) it occurs substantially within the authorized time and space limits
>
>     (c) it is actuated, at least in part, by a purpose to serve the master."

*Siemens*, 226 F. App'x at 195.  The court distilled to its essence the crux of the issue: the employee's intent in perpetrating the fraud.  Judge Hayden found that "no reasonable jury could conclude that [the PNC employee] was motivated, in whole or in part, to serve PNC's interests."  *Id.* at 196.  The Court of Appeals did not disturb this conclusion, for Siemens offered no evidence that the employee was motivated, even in part, to serve the principal.

Here, it is clear that the fraud at issue was solely designed to enrich its participants – participants that pleaded guilty to conduct underlying the fraud.  (*See*

27

Defendants' Supplemental Statement at ¶¶ 241, 242, 243, 244, 246, 247, 264, 265, 266, 267).

- As to Anthony D'Apolito, a low level WSI employee who pleaded guilty to engaging in fraud, William Kane made $10,000 or $20,000 in cash payments to him for doing a variety of improper things (¶ 241); Kane paid D'Apolito additional money to draft fraudulent leases (¶ 242); and D'Apolito received a kickback of $300 per loan that closed from Robert Skowrenski of NHF (¶ 243).

- As for Kellie O'Neill, she also engaged in the fraud to enrich herself. O'Neill admitted to accepting payments from mortgage originators on a per loan application basis (¶ 263); William Kane paid O'Neill per fraud loan (¶ 264); Kane also paid her for fictitious leases (¶ 266); and O'Neill really wanted $1,000 per loan for herself (¶ 267).

Thus, according to Defendants' own statement of facts, which are admissions, it is clear that the two participants engaged in the fraud with no purpose to serve their master, but instead, with the intent to enrich themselves. Liability thus cannot be imputed to WSI as it is beyond cavil that the lower-level fraudsters were enriching themselves.

Even if one were to include Betty Ann Demola in this mix, even though she did not plead guilty to offenses relating to the fraud in the *factum* as did D'Apolito and O'Neil, she purely acted for her own benefit, once again as explained by Defendants' Statement of Facts (*e.g.*, "Every time WSI made a loan, DeMola made money on it;" "DeMola benefited from the loans through higher sales volume;" "Allowing the loans to close before the written appraisal is received allowed DeMola's production numbers to look better;" "DeMola benefitted from the Kane

28

loans, because she got paid commission on all the loans that closed. She had a high salary plus a commission on every loan;" "D'Apolito testified that he would see [DeMola] going in there to beg, 'because she needed every loan closed for her commission'") (Defendants' Supplemental Statement at ¶¶ 211-218).

*     *     *

As the Third Circuit squarely held in *Siemens*, "[w]e believe the *core issue* before us to be . . . *intent*." 226 F. App'x at 196 (emphasis added). Under Defendants' own admissions, the intent of the WSI employees in engaging in the fraud was to line their own pockets. The record is entirely bereft of a notion that the convicted players acted to benefit WSI, the principal. Accordingly, there is simply no genuine issue of material fact as to the breaches of contract at issue, because fraud as a defense against WSI is untenable as a matter of law.

### C. Defendants' Theory also Fails Under the Law of Agency Because WSI Employees' Knowledge is Clearly Not Imputed to WSI

Notwithstanding WSI's *respondeat superior* arguments, which defeat Defendants' implication that WSI is charged with knowledge of the fraud, Defendants argue that WSI, under traditional agency principles, is charged with knowledge because the act "of even a single employee [is] attributed or imputed to the corporation itself." (Commonwealth Br. 7-8). In a footnote, Defendants then state that WSI cannot avoid imputation based on the adverse interest exception to

29

imputation.  (*Id.* at 7 n. 1).  But this law clearly renders WSI not culpable for the knowledge of its employees in a situation where those employees acted for their sole personal benefit, and not to benefit the company.

### 1.    Imputation Fails as a Matter of Contract Law

Assuming, solely for the sake of argument, that an insured's employee's knowledge of a fraud acts as an exclusion for coverage, such knowledge must be *actual* knowledge and not merely *constructive* knowledge.  The title policies only disclaim coverage if the insured has "actual knowledge" of a defect or encumbrance in title.  The Title Insurance Defendants argue that since Ms. Demola allegedly knew of the fraud, that knowledge should be imputed to WSI as a whole.

While Ms. Demola pled guilty to constructive knowledge of a fraud relating to other, unrelated properties not the subject of this action, Defendants' argument is flawed: both the language of the actual policies at issue in this case as well as the law of insurance simply does not equate constructive knowledge with actual knowledge.  *See, e.g.*, *Zions First Nat'l Bank, N.A. v. National American Title Ins. Co.*, 749 P.2d 651 (Utah 1988).  If the Defendants wanted to embrace a constructive knowledge concept in their policies, they "could have included appropriate language."  *Id.* at 654.  Moreover, the Title Insurance Defendants, even if they wanted to argue that Ms. Demola had actual knowledge and that knowledge could be imputed to WSI, could not do so under traditional principles of agency.

"The American Law Institute . . . recognized that the knowledge imputed by law from an agent to his principal *is irrelevant in situations where actual knowledge is required . . .*" *Arizona Title Ins. & Trust Co. v. Smith*, 519 P.2d 860, 865 (Ariz. 1974) (citing *Restatement (Second) of Agency* § 275) (emphasis added).

### 2. Imputation Fails Because the Defendants Are Not Innocent Parties

The Title Insurance Defendants are simply not entitled to the benefit of imputation because they are not innocent parties. The imputation rule exists to protect innocent parties – not the Title Insurance Defendants here whose breaches of contracts led to the destruction of WSI and whose agents caused WSI to be defrauded. Because *Sears* and its progeny stand for the proposition that since the Title Insurance Defendants' "approved attorneys" or title agent which knew there were problems with each property and created a system to hide the problems from WSI, the fraud caused by *their agents* must also be imputed back to the Defendants. *FDIC v. Shrader & York*, 991 F.2d 216, 226 (5th Cir. 1993) ("[t]he imputation rule is for the protection of innocent third parties . . ." (quoting *Crisp v. Southwest Bancshares Leasing Co.*, 586 S.W.2d 610, 615 (Texas Civ. App. 1979)) (alteration omitted); *Dep't of Ins. v. Blackburn*, 633 So.2d 521, 524 (Fla. Ct. App. 1994 ) ("the imputation rule can only be invoked to protect innocent parties . . ."). *See also Sears Mortgage*, 134 N.J. at 345-46. Defendants have tried to muddy

what are really crystal clear waters: the clear breaches of the CPLs where coverage was implicated due to the closing attorneys' fraud.

While the general proposition under the law is that knowledge by a corporation's agents is generally imputed to the corporation, there is an adverse interest exception to this law that is widely applied and should be applied here. Specifically, "the knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation." *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 225, 232 (D.N.J. 2000) (quoting *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407 (5th Cir. 1993)). The exception underlying the basic rule is an important one, for it recognizes that when lower level employees commit actions that are irreconcilable and indeed, on a collision course with the business operations of a corporation, the corporation will not gain knowledge of these actions as a matter of logic and common sense, for this would deny the corporation the right to recover when it is the innocent party. The court in *In Re Jack Greenberg, Inc.*, 212 B.R. 76, 84 (Bankr. E.D. Pa. 1997) put the exception aptly into focus:

> The rule that knowledge or notice on the part of the agent is to be treated as notice to the principal is founded on the duty of the agent to communicate all material information to his principal, and the presumption that he has done so. But the legal presumptions ought to be logical inferences from the natural and usual conduct of men under the circumstances. *But no agent who is acting in his own antagonistic interest, or who is about to commit a fraud*

32

> *by which his principal will be affected, does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature.*

*Id.* (emphasis added).  And nowhere in the vast number of citations provided by Defendants does Mr. D'Apolito or Ms. O'Neill testify to telling Robert or James Walsh about the fraud.

The Second Circuit's decision in *In re CBI Holding Co.*, 529 F.3d 432 (2d Cir. 2008) is instructive on when the adverse interest exception applies.  As an initial matter, as under the *responeat superior* analysis conducted by the Third Circuit in *Siemens*, the exception "looks principally to the intent of the managers engaged in the misconduct."  *Id.* at 451.  As explained in the foregoing, the intent of the lower-level WSI employees who engaged in the fraud cannot be disputed: they acted to enrich themselves at the expense of the company.[10]  Quoting the Appellate Division in New York, the court wrote that the issue was "whether mismanagement of [the company] was the vehicle by which [the manager] intended to advance his own interest or whether it was simply incidental to his continued efforts to retain some economic viability in the company."  *Ibid.*

---

[10] To credit, *arguendo*, Defendants' argument that Robert and James Walsh were in on the fraud, it has no bearing on the analysis.  Courts will not even impute knowledge to a corporation where there is adverse interest even where high level executives of a corporation have knowledge of a fraud.  *Alpern v. Utilicorp United*, No. 92-0538, 1994 U.S. Dist. LEXIS 17529, at *11-12 (W.D. Mo. Nov. 14, 1994), *rev'd on other grounds*, 84 F.3d 1525 (8th Cir. 1996).

(quoting *Capital Wireless Corp. v. Deloitte & Touche*, 216 A.D.2d 663, 666, 627

N.Y.S.2d 794 (3d Dep't 1995)) (*CBI*'s alterations).

The *CBI* court's holding is also instructive and debunks Defendants' primary

argument: that the fraud may have somehow benefited WSI notwithstanding its

collapse.  (*See* Defendants' Supplemental Statement ¶¶ 325-344).  The Second

Circuit rejected the argument that mere benefitting incident to a fraud is enough to

impute knowledge.  "Evidence that CBI *actually benefitted* from CBI's

management's fraud does not make the bankruptcy court's finding that CBI's

management did not *intent to benefit* the company clearly erroneous."  529 F.3d at

451 (emphasis in the original).  Indeed, the court found that even where the

purpose of a fraud was to keep a company solvent, such motivation does not equate

to a finding that the fraudulent actors intended to benefit the corporation – it is

equally plausible that the wrongdoers acted to protect "their employment, salaries,

. . . and reputations . . . ."  *Id.* (quoting *Phar-Mor, Inc. v. Coopers & Lybrand (In re*

*Phar-Mor, Inc. Sec. Litig.*), 900 F. Supp. 784, 787 (W.D. Pa. 1995).  *See also In re*

*Crazy Eddie Sec. Litig.*, 802 F. Supp. 804, 818 (E.D.N.Y. 1992) ("The fact that

some of the embezzled money was put back into the corporation to help inflate

sales and facilitate public offerings is not inconsistent with an abandonment by the

Antar Management of the corporation's interest").

The law is thus clear that even if the fraud benefited in a tangential way[11] WSI for the short-term, this does not vitiate the fact that the lower-level WSI employees were acting for their own self-benefit and their own self-interest. Defendants misrepresent the extent of the fraud that began before Mr. Walsh purchased WSI and never explain how the fraud allegedly benefited WSI, which paid millions of dollars to people unrelated to the company and its owners and sold or securitized loans that it had to repurchase instead of underwriting somewhat more risky loans. Other case law supports the notion that the adverse interest exception to imputation applies in like circumstances. *See, e.g.*, *Official Comm. Of Unsecured Creditors of Allegheny Health v. PriceWaterhouseCoopers*, 607 F.3d 346, 352 (3d Cir. 2010) ("The Court took pains, however, to limit the corporate-benefit test to non-collusive scenarios. It took a different approach to secretive, collusive conduct between corporate agents and third parties that was 'overwhelmingly adverse to the corporation' even if the collusion provided 'a peppercorn of benefit'") (quoting *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 989 A.2d 313, 334-35 (2010)); *Martin Marietta Corp. v. Gould*, 70 F.3d

---

[11] Of course, WSI's position from the outset of this litigation has been that because the Title Insurance Defendants' refusal to pay on the insurance policies precipitated to the destruction of its business. Antecedent to that was the fraud committed by the low-level employees which ultimately cost WSI the fruits of a nine-figure merger and led to the destruction of the company. In no way did the fraud benefit WSI if viewed from a rational perspective.

768, 773 (4th Cir. 1995) ("Not surprisingly, the [adverse interest] exception rests upon two theories that defeat the fiction and presumption underlying the general rule imputing knowledge from agent to principal.  First, *when the agent is acting outside the scope of the agency relationship, the legal fiction that the agent and the principal share an identity of interest is destroyed.*  And second, when the interests of the agent and the principal are adverse, the presumption that an agent will perform his duty and communicate knowledge to his principal no longer exists") (emphasis added); *see also Belmont v.  MB Inv. Partners*, No. 09-4951, 2012 U.S. Dist. LEXIS 1656, at *34 (E.D. Pa. Jan. 6, 2012) (finding adverse interest exception applies at summary judgment and fraud could not be imputed where fraudster stole money to benefit himself)

*       *       *

The adverse interest exception can be applied at this stage because by Defendants' own admissions, the fraudsters acted to solely benefit themselves.  *See* Defendants' Supplemental Statement ¶¶ 211-218, 241, 242, 243, 244, 246, 247, 264, 265, 266, 267.  There is no genuine issue of material fact on this point. Defendants aver in their Supplemental Statement that WSI benefitted from the fraud, but the law is clear that their allegation is bereft of any credibility where the

evidence points to personal enrichment only.  Plaintiff's Motion for Partial

Summary Judgment should accordingly be granted.[12]

### D.    The Doctrine of In Pari Delicto Does Not Apply

Defendant argue that the doctrine of *in pari delicto* – meaning in the case of

mutual or equal fault the position of the defending party is the meritorious one –

applies to the case at bar.

It would be improvident at this juncture to find that *in pari delicto* applied

given the procedural posture of this case.  There is scant caselaw on the doctrine in

this District, but Judge Orlofsky's decision in *Inter Med. Supplies v. EBI Med Sys.*,

975 F. Supp. 681 (D.N.J. 1997) is instructive.  There, the court considered

applying the doctrine, but only *after a trial*.  Finding that the doctrine did not

apply, the court recognized that given that the jury found for the plaintiff and not

for the defendants, the doctrine simply could not apply because there was no

mutual fault.

Moreover, Defendants must show that the Plaintiff undertook to act

illegally *with the Defendants*.  This is a breach of contract suit; far from

---

[12] Defendants strangely dedicate a section to pointing out that this is a "pure
contract action" and they did not participate in the fraud.  But by their own
admission, they issued closing protection letters and title insurance policies on
properties involved in the fraud.  (Supplemental Statement ¶ 14).  Thus, it is
beyond cavil that the Title Insurance Defendants' *agents*, the closing attorneys
Yacker and Cicalese, and Coastal participated in the fraud, so under the law of
imputation those actions should be ascribed to the Defendants.

undertaking any illicit activity at all, the Plaintiff surely did not do so in concert with Defendants.  "The doctrine is generally *only* applied when the parties agree to undertake an illegal activity; the Court will not enforce a contract between two parties to engage in illegal activities."  *C&E Servs v. Ashland, Inc.*, 601 F. Supp. 2d 262, 276 (D.D.C. 2009) (emphasis added).  Indeed, a party "truly *in pari delicto* is one who himself violated the law *in cooperation with the defendant*."  *United States v. Phillip Morris USA, Inc.*, 300 F. Supp. 2d 61, 76 (D.D.C. 2004) (emphasis added).  Evidence of such cooperation, let alone illicit activity at all, is utterly lacking here.  Indeed, Defendants' own cases demonstrate both propositions: that there has to be some concerted action wi*th the defendant and the conduct at issue must be illegal*.  (Commonwealth Br. 28).[13]  Both are simply absent from this case.

Even assuming, *arguendo*, that the doctrine might apply at this stage of the case, the adverse interest exception as delineated by a recent Third Circuit decision applies.  In *In re Lemington Home for the Aged*, 659 F.3d 282 (3d Cir. 2011), the court vacated a District Court's decision that the doctrine barred recovery.  Specifically, in *Lemington*, a nursing home filed for bankruptcy and the committee of creditors brought suit against the home's officers and directors for breach of fiduciary duty.  The defendants asserted an *in pari delicto* defense as they were

---

[13] *Ryan* ("plaintiff conspired with defendant"); *Marx* ("contract was illegal"); *R.C. Search Co.* ("contract deemed illegal"); *City of Cape May* ("lease was deemed illegal").

entitled to do in the bankruptcy situation against the committee, because the bankruptcy trustee stands in the shoes of the debtor.  The Court of Appeals rejected the defense, however, holding that the adverse interest exception applied.  *Id.* at 293.

Indeed, the court catalogued the considerable evidence proffered by the committee that the defendants were only acting *in their self interest* and not in the interests of the nursing home.  *Id.*  In the case at bar, Plaintiff has, *supra*, catalogued the Defendants' own admissions which completely implicate the adverse interest exception, given that the low-level employees who committed fraud were acting in their own self-interest.  (*See* Defendants' Supplemental Statement ¶¶ 211-218, 241, 242, 243, 244, 246, 247 264, 265, 266, 267).  The most interesting aspect of the Defendants' efforts to raise the *in pari delicto* defense is their acknowledgement that they are not an innocent party and are tainted by the fraud.  While both opposition briefs fail to mention the closing attorneys and barely mention Coastal, their use of the *in pari delicto* defense shows that they know their agents were involved in the fraud and that they did nothing to stop the fraud even after speaking to Coastal Title about problems with the loans on a daily basis.  On the basis of the agency principles cited in their own briefs, the Defendants are liable for the acts of their agents.  WSI is plainly entitled to judgment as a matter of law.

## VI.   DEFENDANTS' RULE 56(f) ARGUMENT SHOULD BE REJECTED

Federal Rule 56(f) provides, "the court may grant summary judgment for *a nonmovant . . . on grounds not raised by a party*; or consider summary judgment *on its own*. . . . Fed. R. Civ. P. 56(f) (emphasis added). The Rule clearly applies to *sua sponte* dispositions by the Court, not to the arguments already raised by the parties as mentioned by the notes for the Advisory Committee on the 2010 amendments. The Title Insurance Defendants waste the Court's and Plaintiff's time arguing that this Rule somehow applies to the arguments that they made – it does not. Obviously, they make this argument either because (1) they failed to properly file on time their own summary judgment arguments (which is unlikely because they managed to file three other briefs), (2) to harass and/or further delay these proceedings, or (3) they misunderstood this Rule. Regardless of their reasons, the Court should reject all of Defendants' arguments to the extent they go beyond WSI's moving brief and use Rule 56(f) as a bootstrap for an out-of time request.

## CONCLUSION

Defendants have failed to meaningfully countermine WSI's affirmative motion, where it demonstrated that it was entitled to judgment as a matter of law under the clear, stark breaches of the CPLs. WSI's Motion should, therefore, be granted in full.

Respectfully submitted,

/s/ Robert A. Magnanini
Robert A. Magnanini
Amy Walker Wagner
Daniel Ian Mee
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ  07078
(973-218-1111)

*Attorneys for Plaintiff Walsh Securities, Inc.*

Dated: January 13, 2012