# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| WALSH SECURITIES, INC., | : |
| | : |
| Plaintiff, | : Civil Action No. 97-cv-3496 (DRD)(MAS) |
| | : |
| vs. | : Hon. Dickinson R. Debevoise, U.S.D.J. |
| | : |
| CRISTO PROPERTY MANAGEMENT, | : |
| LTD., a/k/a G.J.L. LIMITED; et al., | : |
| | : |
| Defendants. | : |

---

## PLAINTIFF WALSH SECURITIES, INC.'S COUNTERSTATEMENT TO DEFENDANT COMMONWEALTH LAND TITLE INSURANCE COMPANY'S SUPPLEMENTAL STATEMENT OF DISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

---

STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111
*Attorneys for Plaintiff Walsh Securities, Inc.*

Pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1 of the Local Rules for the District of New Jersey, Plaintiff Walsh Securities, Inc. ("Plaintiff" or "WSI") hereby submits its responses to Defendant Commonwealth Land Title Insurance Company's ("Defendant" or "Commonwealth") supplemental statement of disputed material facts in support of its motion for partial summary judgment on the subject properties pursuant to the CPLs and/or title insurance policies issued by Defendant.[1]

While Defendant has publicly admitted that all of these statements are "disputed material facts" (*see* Defendant's Supplemental Statement of Disputed Material Facts Filed Pursuant to Local Civil Rule 56.1 at p. 1), Defendant has improperly attempted to assert that it should be granted summary judgment pursuant to Rule 56(f) where it waived that right to file an affirmative motion by the due date pursuant to this Court's Amended Scheduling Order dated July 19, 2011 [Docket Entry 458]. Nevertheless, Plaintiff has prepared its statement of disputed issues by responding to each of Defendant's statements of purportedly undisputed facts and by identifying those statements that are actually undisputed and those that are disputed.

### PLAINTIFF'S RESPONSES TO DEFENDANT'S SUPPLEMENTAL LOCAL RULE 56.1 STATEMENT

**A.     General Background**[2]

1.     Robert Walsh was President and Chief Executive Officer of WSI. (*See* Certification of Sara F. Merin in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Merin Certif."), Ex. A: Copies of Three Lulling Letters, dated July 3, 10, & 24, 1997 (The Lulling Letters) (listing Robert Walsh as President and CEO of WSI).)

---

[1] Defendants, Fidelity National Title Insurance Co. of New York and Nations Title Insurance of New York, Inc. (collectively, "Fidelity") Statement  incorporated by reference Commonwealth's supplemental statement of Disputed Facts. [Docket Entry 493-1].

[2] Any statements contained in this response that are deemed undisputed or admitted are done so solely for the purpose of this motion and are not binding admissions by WSI.  In addition, WSI need not dispute Defendant's headings because they represent not a proper factual statement by legal conclusions.

**RESPONSE:**

Disputed to the extent that Mr. Walsh continues to be President of Walsh Securities, Inc. (*See* Certification of Amy Walker Wagner in further support of Plaintiff's Motion for Partial Summary Judgment ("Wagner Cert."), Ex. A, page 5 of Walsh Securities Bankruptcy Petition filed November 9, 2010).

2.      Robert Walsh was also the principal shareholder of WSI.  (*See* Merin Certif., Ex. B: Form S-4, Resource Bancshares Mortgage Group Inc. – RBMG (June 13, 1997) ("RBMG S-4 (June 13, 1997)") 145.)

**RESPONSE:**

Disputed to the extent that Mr. Walsh continues to be the principal shareholder of WSI. (*See* Wagner Cert., Ex. B, WSI Dep. 480:23-24).

3.      James Walsh was the Vice President, Director of Underwriting and Operations at WSI and Robert Walsh and Betty Ann DeMola's brother.  (*See* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997) 146-147; Ex. C: Dep. of Elizabeth Ann DeMola (June 11 and 21, 2010) ("DeMola Dep.") 13.)

**RESPONSE:**

Undisputed.

4.      James Walsh was also a shareholder of WSI.  (*See* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997) 145.)

**RESPONSE:**

Disputed.  Mr. Walsh testified that the SEC filing for the RBMG merger incorrectly identified certain individuals as shareholders in the company, including James Walsh.  (*See* Wagner Cert., Ex. B, WSI Dep. at 478:5-9; 480:23-24).

5.      Betty Ann DeMola is Robert and James Walsh's sister and was the National Sales Manager for WSI and a shareholder of the company.  (*See* Merin Certif., Ex. D: Transcript of Plea Hearing, *United States v. DeMola*, No. 02-448 (Sept. 9, 2005) ("DeMola Plea") 17-18.)  She had knowledge of and was a participant in the fraud.  (*See* Merin Certif., Ex. D: DeMola Plea 18-21.)

**RESPONSE:**

Disputed to the extent the statement represents that Ms. Demola was a shareholder of the company.  Mr. Walsh testified that the SEC filing for the RBMG merger incorrectly identified certain individuals as shareholders in the company, including Ms. Demola.  This statement is further disputed because it mischaracterizes that testimony to which it is citing and further contradicts Ms.

Demola's deposition testimony (*See* Wagner Cert., Ex. B, WSI Dep. at 478:5-9; 480:23-24; Ex. C, Demola Dep. 123:6-124:11.).

6.      Anthony D'Apolito "was an employee of [WSI] who was responsible for transmitting to [WSI] mortgage loans orginated at NHF. . . . He admitted to receiving $90,000 from NHF and $10,000 directly from Kane" for his role in the scheme.  D'Apolito owned and controlled an entity called DAP Consulting, Inc.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4.)  DeMola was D'Apolito's supervisor.  (*See* Merin Certif., Ex. F: Dep. of William (Oct. 5, 2011) ("Kane 2011 Dep.") 234.

**RESPONSE:**

It is undisputed that Defendant's statement summarized Mr. D'Apolito's testimony; however it is directly contradicted by Mr. Skowrenski's testimony wherein he explained that the only money that was paid was by NHF to DAP Consulting for recruiting brokers to work at NHF.  As he recalled, the compensation to DAP Consulting amounted to .125 points on the volume produced by the referred brokers.  (*See* Wagner Cert., Ex. L, Skowrenski Dep. at 15:16-21:17).

7.      Kellie O'Neill "was a [loan] processor at [WSI] responsible for clearing conditions placed on loans by underwriters[.]"  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4.) She was actively involved in the scheme and pled guilty to federal charges stemming from that involvement in the fraud.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4; Ex. G: Tr. of Proceedings, *United States v. King & O'Neill* (Oct. 29, 1999) ("O'Neill Plea Tr.") 13.)

**RESPONSE:**

Undisputed.

8.      William Kane owned and controlled Cristo Property Management, Ltd., a/k/a G.J.L. Limited, DEK Homes of New Jersey, Inc., and Oakwood Properties, Inc. and was an employee of National Home Funding, Inc.  (*See* Merin Certif., Ex. E: Letter from Fred H. Schlesinger, Vice President & General Counsel of Walsh Securities, Inc. to William T. Lutz, Esq. regarding Proof of Loss (Apr. 3, 1998) ("WSI Fidelity Ins. Proof of Loss") 2, 3; Ex. F: Kane 2011 Dep. 239 (same); Ex. H: Dep. of William Kane (Apr. 19 & May 4, 2007) ("Kane 2007 Dep.") 25, 27 (same).)

**RESPONSE:**

Disputed to the extent that it contradicts Mr. Kane's testimony wherein he testified that he was an independent contractor of National Home Funding.  (*See* Wagner Cert., Ex. D, Kane Dep. 2011 at 160:19-163:17).

9.      Robert Skowrenski, II owned and controlled National Home Funding, Inc. ("NHF"). (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 2, 3.)
**RESPONSE:**

Undisputed.

10.     Gary Greiser owned and controlled Capital Assets Property Management & Investment Co., Inc. and Capital Assets Property Management, LLC.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 2, 3.)

**RESPONSE:**

    Undisputed.

11.     Richard Calanni, Richard DiBenedetto, James Brown, Thomas Brodo, and Roland Pierson were the appraisers involved in the fraudulent scheme.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 3.)

**RESPONSE:**

    Undisputed.

12.     Stanley Yacker, Esq., Michael Alfieri, Esq., Richard Pepsny, Esq., and Anthony Cicalese, Esq., were the closing attorneys involved in the fraudulent scheme.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 3-4.)

**RESPONSE:**

    Undisputed.

13.     Lawrence Cuzzi "was an employee of Capital Assets until March or April, 1997."  In that capacity, "he solicited buyers for the properties, including his own family members, and received a commission for each 'buyer'."  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4.)

**RESPONSE:**

    Undisputed.

14.     Coastal Title Agency, Inc. was title insurance broker operated by Robert Agel and sold the closing service letters, title insurance commitments, and title insurance policies at issue in this lawsuit.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 5.)
**RESPONSE:**

    Undisputed.

15.     WSI alleges that all of the individuals and entities above – with the exception of the Walsh siblings – were involved in the fraudulent scheme that ran from 1996 to 1997 in which properties were given falsely inflated appraisals – upon which WSI financed mortgage loans – and were then "flipped" and re-sold – sometimes in as little as a day – for up to eight times the immediately preceding sales prices.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 5.)

**RESPONSE:**

Disputed to the extent that Defendant's statement oversimplifies that Exhibit to which it is referencing.  It is undisputed, however, that WSI has never alleged that Robert Walsh, James Walsh, or Betty Ann Demola were involved in the fraudulent scheme. (*See, generally* Fourth Am. Compl.).

16.    As set forth below, facts uncovered during discovery demonstrate that Robert Walsh, James Walsh, and Betty Ann DeMola also knew of and were involved in the fraudulent scheme. (*See infra*, sections entitled "Robert Walsh," "James Walsh," and "Betty Ann Demola.")

**RESPONSE:**

For the reasons set forth below, Defendant's statement is disputed and mischaracterizes significant portions of the discovery.

17.    Commonwealth, Nations Title Insurance of New York, Inc., and Fidelity National Title Insurance Company of New York, Inc. issued closing service letters on the properties involved in the fraud.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 4-5.)  None of these entities are implicated in any of the RICO allegations set out in Plaintiff's Fourth Amended Complaint, nor – at any time – is or was any part in or knowledge of the fraudulent scheme alleged against Commonwealth, Nations, or Fidelity.  (*See* Fourth Am. Compl. [document 302].

**RESPONSE:**

It is undisputed that Commonwealth, Nations Title Insurance of New York, Inc., and Fidelity National Title Insurance Company of New York, Inc. (collectively the "Title Insurance Defendants") issued closing service letters on the properties involved in the fraud.   The remainder of Defendant's statement mischaracterizes those facts, because there was no discovery into whether these entities are implicated in any of the RICO allegations because Plaintiff's Fourth Amended Complaint has not alleged that they were part of or had knowledge of the fraudulent scheme.

**B.**    **Walsh's Employees and Officers Were Involved in and/or Had Knowledge of the Fraudulent Scheme**

**Robert Walsh**

18.    Robert Walsh, the President and C.E.O. of WSI, had knowledge of the fraud and was involved in covering it up.  For example, Robert Walsh signed lulling letters in July 1997, which were sent to third parties including Champ Meyercord of Greenwich Capital – WSI's warehouse lender, which indicated that WSI had no knowledge of the frauds and downplayed any negative impact of the frauds.  (*See, e.g.* Merin Certif., Ex. A: The Three Lulling Letters; *see also* DeMola Plea at 20-21 (discussing awareness and intentional nature of her acts regarding the lulling letters); Ex. A: The Three Lulling Letters (listing Robert Walsh as President and CEO of WSI).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the facts and the documents upon which it is citing.  Further, the documents upon which Defendant is relying in no way establish that Robert Walsh "had knowledge of the fraud and was involved in covering it up." This statement is complete fabrication and there is nothing in the fact discovery to support it.  WSI further objects to the characterization of the letters referenced in the statement as being "lulling letters."  These letters were an update on what was going on with their investigation into the fraud that was requested by Champ Meyerchord of Greenwich Capital and RBMG.  (*See* Wagner Cert., Ex. B, WSI Dep. at 70:1-22).

19.    The lulling letters formed a basis for DeMola's indictment, and Robert Walsh admitted to physically signing them.  (*See* Merin Certif., Ex. I: Dep. of Robert Walsh (Apr. 9, 2010, Apr. 23, 2010, & Sept. 30, 2011) ("R. Walsh Dep.) 743-44.)

**RESPONSE:**

Undisputed except to the extent that Defendant mischaracterizes the letter as "lulling letters."

20.    Betty Ann DeMola – Robert's sister – disclaimed responsibility for the lulling letters – testifying that she thinks the lulling letters were signed by Robert Walsh or that they went out under his name.  (*See* Merin Certif., Ex. C: DeMola Dep. 129.)

**RESPONSE:**

Undisputed except to the extent that Defendant mischaracterizes the letter as "lulling letters."

21.    Moreover, testimony exists implicating Robert Walsh as being involved in the fraud itself.  Robert Skowrenski, II, testified about a newspaper article that stated, "In most cases, the loans were brokers by National Home Funding in Freehold.  Michael Schottland, a lawyer who represents Robert Skowrenski, president of National Home Funding, does not believe the president of Walsh Securities is a victim.  Walsh is behind the whole thing said Schottland.  He's now trying to distance himself from this because it looks so unpleasant, so unseemly." Skowrenski explained that Schottland was one of the attorneys he retained to represent him in connection with these matters, the Walsh referred to in the article is Robert Walsh, and "behind the whole thing" referred to the Asbury Park flipping scheme.  (*See* Merin Certif., Ex. J: Dep. of Robert Skowrenski, II (May 25, 2010) ("Skowrenski Dep.") 10.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Skowrenski's testimony purportedly about a newspaper article that was used as an exhibit at his deposition.  The testimony speaks for itself and as the Court will see, is merely a recitation by counsel of the contents of a newspaper article.  Further, there is no support for the final sentence in this statement in the citation provided.

22.     Similarly, Kellie O'Neill, a loan processor at WSI who pled guilty to federal charges arising from her role in the fraudulent scheme, testified that she believed Robert Walsh was aware of the improper acts going on at WSI related to the fraud.  (Merin Certif., Ex. K: Dep. of Kellie O'Neill, Day One (Dec. 20, 2007) ("O'Neill First Dep.") 70; Ex. G: O'Neill Plea Tr. 31.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony.  The transcript reference cited speaks for itself and states "it's my opinion that he did know some things that were going on."  The testimony demonstrates merely Ms. O'Neill's subjective belief and not that "Robert Walsh was aware of the improper acts going on at WSI related to the fraud."

23.     O'Neill testified that this belief was based on a number of facts that she believed made it clear that something was wrong with some of the loans, including the close relationship that Robert Walsh had with his sister Betty Ann DeMola and his brother Jim Walsh; the meetings that Betty Ann DeMola had with the participants in the scheme, namely Gary Grieser, Bill Kane, Anthony D'Apolito, and Robert Skowrenski, telling them specifically how to do the loans and the appraisals; having the appraisers come up to the office, Mr. DiBenedetto being one of them; the fact that head underwriter Paul Del Rosso questioned a couple of times the pay stubs, the W-2s; and the fact that DeMola requested that O'Neill contact William Kane – the mastermind of the fraudulent scheme –  and tell Kane to get curtains and lamps and make the houses that were shells look like someone was living in the homes.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 64.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony which speaks for itself.  Furthermore, Ms. O'Neill's opinion, which is not based on any substantive facts or knowledge, does not constitute admissible evidence in this case.

24.     O'Neill also testified that she believed that Robert Walsh was aware that DeMola was waiving conditions on the loans.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony and omits her complete explanation that the basis for her belief that "Robert Walsh was aware that Demola was waiving conditions on the loans" was based upon her opinion and that by being in a conference room where they were removing duplicative papers from files somehow involves Ms. Demola waiving conditions and does not constitute admissible evidence in support of this statement.

25.     Kane, who Robert Walsh classified as the "mastermind" of the fraud, met with Robert Walsh frequently.  (*See* Merin Certif., Ex. L: Dep. of Richard DiBenedetto (Jan. 3 & May 1, 2007) ("DiBenedetto Dep.") 89-90; Ex. F: Kane 2011 Dep. 129 (Kane met with Walsh about 10 times).)
**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the testimony cited.  While Mr. Kane

testified that he met with Robert Walsh about ten times, the next page in the transcript reveals that they only had two substantive conversations where Mr. Kane discussed a potential joint venture and another time where Mr. Walsh was telling Mr. Kane about the upcoming merger. Furthermore, Mr. DiBenedetto's outlandish statement that Mr. Kane and Mr. Walsh were "buddies" is simply not to be believed and is not based on any credible evidence.

26.    Richard Pepsny, an attorney involved in the fraud, met with Robert Walsh regarding handling mortgage foreclosures for WSI.  (*See* Merin Certif., Ex. M: Deposition of Richard Pepsny (Aug. 4, 2010) 56.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Pepsny's testimony which speaks for itself and merely stated that Mr. Pepsny met with Robert Walsh on one occasion regarding his firm handling mortgage foreclosures for WSI and that he never ultimately did enter into any sort of engagement for representation of WSI.

27.    Richard DiBenedetto also testified that Robert Walsh was involved in the fraud, explaining, when Robert Walsh was talking with Richard DiBenedetto and William Kane in Atlantic City, it was obvious that Kane frequently dealt with Robert Walsh face to face.  "They were buddies obviously."  DiBenedetto stated that Robert Walsh is going to sell his company and is going to be on the Forbes 100 and out of all the people in Atlantic City he chooses to hang out with Bill Kane.  That was not because they had mutual interests or because they were friends and family but because they were deep involved in this.  When Betty Ann DeMola gets on the phone and says that Kane has a perfect payment history and you need to get the appraisals up or you'll cut him off, they are involved in it.  When DiBenedetto was with the United States Attorney, DeMola called him up and said that she knows that he was not appraising anymore but that they had to put together a list of the kicked-off appraiser list and he said she could kick him off.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 89-90; Ex. N: Tr. of Proceedings, *United States v. DiBenedetto*, No. 98-427 (Dec. 2, 1998) 11-12, 37.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. DiBenedetto's rambling and incoherent testimony and fails to mention his long history of psychological problems.  These transcripts speak for themselves**.**

28.    DiBenedetto also testified that, "Bill Kane always had Betty Ann and Robert Walsh wrapped around his fingers.  If you ever had a question to do with his loans he was the only client I ever had who dealt with Walsh Securities and say, get Robert Walsh on the phone, Betty Ann, they would just vouch for his tremendous character and his deals were absolutely tremendous.  They did it nonstop." "As Brodo described to me later . . . nothing would be done . . . on the house except for the front and stuff like that.  So invariably they would call up Walsh and call up Betty Ann, and . . . you would need somebody to vouch for the fact that this person had a perfect payment history, . . . it just boggled the senses.  But . . . it was well planned, well calculated, and it worked for a period of time."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 66-67.)

**RESPONSE:**

Disputed to the extent that Defendant's statements do not provide the full four pages of rambling testimony by Mr. DiBenedetto in response to the simple question about whether a meeting took place at WSI's offices, and the testimony speaks for itself.

29.     Robert Walsh pressured DeMola to have high numbers, which DeMola achieved through participation in the fraud.  (*See* Merin Certif., Ex. O: First Dep. of Anthony D'Apolito (Jan. 17, 2007) ("D'Apolito First Dep.") 63-64; Ex. F: Kane 2011 Dep. 224.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates the testimony of Mr. D'Apolito and Mr. Kane.  Neither portions of the cited testimony state that Ms. Demola achieved higher numbers through participation in the fraud.

30.     Robert Walsh – along with DeMola and O'Neill – told DiBenedetto that Walsh was not looking at the appraisals.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 116.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. DiBenedetto's testimony in which Mr. DiBenedetto was discussing "review" appraisals, not appraisals.

31.     DiBenedetto also testified that Robert Walsh sought to reassure him in substance that no difficulties would result from the fraudulent loans, because many of those loans had been sold by WSI and because the purchasers of those loans were not likely to become aware of their problems. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 88.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. DiBenedetto's testimony in which Mr. DiBenedetto testified, in response to whether he'd had a single conversation with Mr. Walsh or a number of conversations with Mr. Walsh, as follows:

> A.     That was a conversation with Robert Walsh in the context of this whole transaction, when it was being contemplated with Resource Bank Shares.  This is all in the realm of – the person I dealt with, Kellie O'Neill, I dealt with D'Apolito, obviously Betty Ann, all the loans are perfect, everything is perfect, everything is wonderful. Then Robert Walsh on a few occasions, but on this particular occasion, mostly just, hello, how are you? But on this occasion, what's going to go on here? What's the end result going to be? In other words, I'm going to worry about me. He's obviously not worried about me. He's just worried about this, much like he is with you guys.

> That's the way the man operates. He's not worried about
> anything but himself, and maybe he's not even worried
> about his goddamn self.

(*See* Merin Certif., Ex. L: DiBenedetto Dep. 88:24-89:16).

32.    DiBenedetto testified that he believed DeMola, D'Apolito, O'Neill and Robert Walsh were all involved in the scheme, that Robert Walsh obviously knew about the underwriting problems all along, and that Robert Walsh, Jim Walsh, and DeMola were aware of the straw buyers.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 266-70.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates Mr. DiBenedetto's four pages of rambling testimony which speaks for itself.

33.    Robert Walsh planned to give RBMG stock to D'Apolito when the merger went through.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 480.)

**RESPONSE:**

Undisputed.

34.    DiBenedetto also testified that he "talked firsthand to Bob Walsh [about the fraud] and got it out of Bob Walsh's mouth straight and it was not good.  Bob Walsh did not respond like he thought Walsh was going to respond.  It was basically like it was going to be handled.  Kane called Bob Walsh on the carpet and just wanted to tell him not that Walsh was going to turn them in which you'd think he would have responsibility to do socially, ethically and every other way but he does not turn them in but just says he's going to turn them off.  He did that because he was greedy and wanted to get $360 million.  Grieser puts up against the wall and says he's not going to pay Grieser's mortgages and then Robert Walsh agrees to do more and then Robert Walsh does more.  Whatever Robert Walsh did through April, May and June he did with full knowledge of everybody.  He does not know how many Robert Walsh was doing during those months but it was a long time and several months and now Robert Walsh knows full well that he is cheating and Robert Walsh knows that Walsh is closing with no money down and there are other companies doing it too.  Robert Walsh knows that Walsh is right in the middle of the conspiracy."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 304-05.)

**RESPONSE:**

Disputed to the extent that Mr. DiBenedetto's testimony is taken out of context and is a portion of his multi-page ramblings which speaks for itself.

***Involvement with File Cleaning***

35.    Robert Walsh – along with DeMola – put a group of WSI employees in a conference

room to "clean" closed files.  They instructed employees to go through closed-out files to clean them up by taking some documents out and putting others in, and provided a list of items that had to be removed from the files.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57-58; Ex. P: Dep. of Kellie O'Neill, Day Two (Mar. 23, 2010) ("O'Neill Second Dep.") 30-34.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony in which she originally stated that Robert Walsh did not speak with her and had just gone in the room to see how things were going.  In her next deposition, cited in Defendant's statement, she could not even identify the types of documents she was putting in or taking out of the files.

36.     Robert Walsh did not deny that file cleansing occurred at WSI, and explained that it was a common occurrence that was generally related to an investor coming in to look at files.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 323-24.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Walsh's complete testimony in which he described the file cleansing as something that occurs at post-closing in a mortgage company.  He stated:

> A.     At a closing, executed documents are done at a closing.  Your note is signed, your mortgage is signed, you're getting various different documents that may have been brought to the closing.  Those documents then come back to the mortgage company.  The originals go to the warehouse bank.  They go to the trustee.  The other documents come in and they are photo copies and those documents are put into the underwriting file.  When those documents are put into the underwriting file, the older documents are pulled out, like the unsigned notes, all kinds of different various things.  This happens on a daily basis.  We had ten post closures whose functions were that job.  From time to time they got overloaded.  We had too much loans coming in at once.  If The Money Store was coming in to take a look and buying quite a few loans, yes, we had additional staff members sitting down to help the post closures take out documents that were notes that were unsigned, various different over components of the file that would need to be cleaned, and to put in photocopies of executed notes.

In addition, Mr. Del Rosso testified that:

> Q     Some of the witnesses in this case in depositions have testified under oath about file cleansing.  Have you ever heard that phrase?
> A     Yes.
> Q     What is file cleansing?

> A      We would take the file and organize it so that when the person who was going to purchase the loan opened the file, and it was in order and it wasn't, you know, extra duplication, that type of thing.
>
> Q      Were you involved in that?
>
> A      I did.
>
> Q      As part of that process were documents removed from the file and discarded before the purchaser arrived?
>
> A      Only if there was -- you know, not pertinent to the file.  It might be three pay stubs or whatever it was, and they only needed one.
>
> Q      Okay.
>
> A      We tried to present the file so that the guy could go through it in an orderly fashion.
>
> Q      What else besides pay stubs were removed from the files when they were cleansed?
>
> A      Anything that was not pertinent to the loan.  For example, could be some scribble notes, you know, sloppy writing of whatever, illegible whatever. We just cleaned them out.

(*See* Wagner Cert. Ex. B, WSI Dep. at 153:7-154:5; Ex. E, Del Rosso Dep. at 60:9-61:10).

37.      The upper management – Jim Walsh, Art Gilgar, and Robert Walsh – did not want anything in the files with DeMola's name on it.  (*See* Merin Certif., Ex. P: O'Neill Second Dep. 37-38.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony wherein she essentially admitted to not having any personal recollection of any of the details regarding the removal of documents from the files.  (*See* Merin Cert., Ex. P, O'Neill Second Dep. at 30-38).

38.      During this cleaning of files, Robert Walsh was in and out of the conference room; O'Neill testified that she thought he came into the room while the files were being cleaned to monitor the progress of the cleaning.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57-58; Ex. P: O'Neill Second Dep. 30-31, 33-35, 66.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates Ms. O'Neill's testimony regarding her recollection.

39.      Because Robert Walsh was in and out of the conference room during the file cleaning, it was O'Neill's impression that Robert Walsh knew what was happening in that room on that day.  (*See* Merin Certif., Ex. P: O'Neill Second Dep. 66; 69-70.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates Ms. O'Neill's testimony which speaks for itself.

40.     Despite this, Robert Walsh testified that, before the fraud was uncovered, he recalled being told that appraisals were substantially overstating the value of certain properties.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 361-62.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Walsh's testimony in which he stated that he had been told by WSI's quality control and Greenwich that there were appraisals that had substantially overstated the value of properties, including in Michigan and in New Jersey, and that in response to those warnings, they implemented measures such as cutting off an appraiser and putting in some staff appraisers to review appraisals.

***Meetings with Key Fraud Players***

41.     Robert Walsh had conversations with Bill Kane and Robert Skowrenski before the frauds became public.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 63.)

**RESPONSE:**

It is undisputed that this was Ms. O'Neill's testimony; however, Plaintiff disputes its relevance to this partial summary judgment motion.

42.     A few months before the fraud was uncovered, there was a meeting between DeMola, Kane, D'Apolito, and Grieser at WSI, which Robert Walsh stopped in on.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 68, 172; Ex. L: DiBenedetto Dep. 63-67.).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates the testimony cited.  The testimony was that Mr. Walsh came in to meet these individuals and then left.

43.     The meeting was in response to WSI telling Kane that they could not do the Cristo deals anymore and that they had to stop the fraudulent scheme.  For a year the loans were performing, paying 12%, and the file looked okay, but if WSI stopped doing the deals, the fraud would be exposed showing that the loans were fraudulent.  That is why Kane and Greiser went to WSI.  At that meeting, Greiser told Robert Walsh that WSI had stopped funding the loans so Greiser is going to stop paying.  At that point Robert Walsh decided to continue funding Greiser's loans with full knowledge of what was going on.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 58-62.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates Mr. DiBenedetto's convoluted and rambling testimony.  Furthermore, this testimony is inadmissible evidence because Mr. DiBenedetto was not even in attendance at the alleged meeting.

44.    In the meeting, Greiser told Robert Walsh that WSI must fund the loans, because, if Walsh did not fund them, all of the other 140 to 200 loans would go under.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 63.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates Mr. DiBenedetto's convoluted and rambling testimony.  Furthermore, this testimony is inadmissible evidence because Mr. DiBenedetto was not even in attendance at the alleged meeting.

45.    Despite the meeting with Greiser and Kane where the scheme was explained, Walsh knew what was going on the whole time.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 58-62.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates Mr. DiBenedetto's convoluted and rambling testimony.  Furthermore, this testimony is inadmissible evidence because Mr. DiBenedetto was not even in attendance at the alleged meeting.

46.    Robert Walsh funded the loans, because he wanted to keep everything running smoothly until the merger between Walsh and Resource Bankshares Mortgage Group ("RBMG") was completed.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 60)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates Mr. DiBenedetto's convoluted and rambling testimony.  Furthermore, this testimony is inadmissible evidence because Mr. DiBenedetto was not even in attendance at the alleged meeting.

47.    After that meeting, D'Apolito testified that WSI funded about five more loans that were in the pipeline.  (Merin Certif., Ex. O: D'Apolito First Dep. 173-74.)

**RESPONSE:**

It is undisputed that this statement summarizes Mr. D'Apolito's testimony which also indicated that this occurred in June or July of 1997, which was right around the time that the Government and WSI began investigating the Asbury Park frauds.

48.    Robert Walsh approved closing those five loans that were in the pipeline.  After the meeting, Robert Walsh said that there were a bunch of loans in the pipeline and that WSI should

close five for the end of the month and make sure the payments come in and then WSI would proceed from there.  (Merin Certif., Ex. O: D'Apolito First Dep. 174-75.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony which also indicated that he was not present at the time Mr. Walsh allegedly made these statements, and would not be admissible evidence.

49.     Early in the morning on the day after the subpoenas were issued, Robert Walsh met with the masterminds of the fraud – William Kane, Gary Greiser, and Anthony D'Apolito – in a meeting in which his sister, Betty Ann DeMola, was also supposed to be present.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. at 135; *see also* Merin Certif., Ex. H: Kane 2007 Dep. 87-88; Ex. Q: Dep. of Gary D. Greiser (Jan. 16, 2007) ("Greiser Dep.") 43.)

**RESPONSE:**

It is undisputed that this statement summarizes the testimony cited.

50.     At the meeting, Kane explained to Robert Walsh what was going on, how the deals were done, and why the prosecutors were looking at them."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 88-89.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the testimony cited.  Mr. Kane further testified that he was not sure if by asking these questions Mr. Walsh was just trying to get as much information as possible from them, and that he was "blindsided by everything."

51.     By way of Greiser's account of the meeting, Greiser told them that he was there "again" to explain the mechanics of the scheme.  Robert Walsh listened to it and basically made that statement -- Robert Walsh said:  "It's our money and it is not fraud unless we say it's fraud."  (*See* Merin Certif., Ex. Q: Greiser Dep. 43-44.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and overstates Mr. Greiser's testimony. Mr. Greiser did not state that he was there to explain the mechanics of the scheme and he did not testify at to what specifically was stated in this meeting, but he did state that he wasn't sure if after he left Mr. Walsh thought "the hell with it, it is a fraud."

52.     Gary Greiser testified that he disclosed the entirety of the fraud to Robert Walsh and that he was fully aware of the fraud after that point.  In his guilty plea, Greiser explained that he wanted to make sure that the higher-ups in the company knew about what was going on, reasoning that, if they continued to fund him and said there was no fraud, then Greiser guessed he was not

doing anything wrong, since it was their money.  (*See* Merin Certif., Ex. Q: Greiser Dep. 29-30 (Greiser discussing his March 28, 2001 plea in *United States of America v. Gary Grieser*).)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation provided.

53.     Greiser also explained that he went up to Robert Walsh to make it very clear what was going on with the fraudulent scheme, because he was told by people below him that WSI was aware of the scheme and that some of WSI's people supplied the paperwork for the scheme.  (*See* Merin Certif., Ex. Q: Greiser Dep. 29-30.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation provided.

54.     Similarly, Kane testified that Robert Walsh said that, ". . . unless he [Robert] cries victim, there would be no victim, so that we should all talk together and stay together."  (*See* Merin Certif., Ex. F: Kane 2011 Dep. at 210; *see also id.* at 136-37 (same); Ex.  H: Kane 2007 Dep. 89 (stating that Robert Walsh's comment was, "[o]nly if I claim a victim, then the government can claim a victim."); Ex. Q: Greiser Dep. 29-30 (same).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the testimony cited.  Mr. Kane further testified that he was not sure if by asking these questions Mr. Walsh was just trying to get as much information as possible from them, and that he was "blindsided by everything."

55.     Kane testified that he understood Robert Walsh's statement regarding "no victim" to mean that if Robert and WSI were not crying foul, than no one could do anything about the fraud. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 210; *see also* Merin Certif., Ex. Q: Greiser Dep. 44 (same).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the testimony cited.  Mr. Kane further testified that he was not sure if by asking these questions Mr. Walsh was just trying to get as much information as possible from them, and that he was "blindsided by everything."

56.     WSI had a full-time, in-house general counsel: Fred Schlesinger.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 173; Ex. I: Robert Walsh Dep. 580.)

**RESPONSE:**

Undisputed.

57.    Notably, no lawyers were present at this meeting despite it occurring the morning after the subpoenas were issued.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. at 135; Ex. H: Kane 2007 Dep. 87-88; Ex. Q: Greiser Dep. 43.)

**RESPONSE:**

It is undisputed that no lawyers were present at the meeting, but Plaintiff disputes Defendant's characterization as this being notable.

58.    Robert Walsh and William Kane also discussed the RBMG merger during a convention in Atlantic City, where Walsh disclosed that he was selling WSI for a lot of money.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 58-59.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. DiBenedetto's incoherent testimony that is contradicted by the testimony of Mr. Kane and Mr. Walsh. (*See* Wagner Cert., Ex. D, Kane Dep. 2011 at 137:19-138:17).

59.    During a court hearing, the Assistant United States Attorney prosecuting the federal case against DeMola implicated Robert Walsh squarely at the center of this scheme, culminating in the sending of the lulling letters "to the merger partner and to the warehouse credit facility" to "keep them in line, keep them on track" and keep the fraud "moving forward to the end":

> What you'll hear at trial if this matter goes forward and what the jury will hear, is that Walsh Securities[,] which was founded in 1996, was founded with one of two purposes in mind.  There are documents to support this and witnesses will testify. . . .  There are memorandum and other evidence to suggest that when Robert Walsh took this company out of Donaldson Lufkin and Jenette where it was a subsidiary or entity and brought it out on its own, he either wanted to conduct an initial public offering, taking it public and cash out that way or find a merger partner.  So from day one the whole objective was to cash out their interest.  This whole scheme was founded on those notions: Take our interest in this modest privately held entity, make it bigger, make it more successful and cash out. . . .

> Robert Walsh was the idea guy, the big picture guy.  James Walsh the marketing guy, the secondary loan guy.  He would find people to buy Walsh's loans.  He was involved in what we call securitizations, where loans are pooled and sold in share interests to large institutional investors for the most part.  Betty Ann DeMola day-to-day, week-to-week, month-to-month was the driving force in these sales.

> But Walsh's objective was not the fee income on the loans.  It was not the points that were charged.  Or not the premiums they would get for selling loans.  Their idea was to increase inventory.  Take this little

nothing company that was spun off DLJ and make it a big company, an attractive company for an IPO and an attractive company for a merger. That was the whole objective.

In early 1997, they find a merger partner. Success was on the horizon. The big idea, Robert Walsh['s] idea is about to come to fruition. They find a company in South Carolina, Resource Bank Shares Mortgage Group, RBMG, that's prepared to essentially merge with Walsh. . . . Walsh will disappear, there will be a new entity created in the South Carolina Mortgage Company.

Through 1997 the fraud continues. Your Honor will hear about meetings. And a number of cooperating witnesses have already implicated Robert Walsh, James Walsh and Betty Ann DeMola in this fraud. They put them at meetings where fraud is discussed. They put them in places where these things are on the table. This proceeds through 1997. Things are going swimmingly as far as the conspirators are concerned. Until in late of June 1997, the Asbury Park Press prints the first of 35 stories perhaps, 40 stories. What they call the House of Cards, because quite aptly this whole pyramidal scheme with Walsh at the top.

The first story comes out about decrepit houses that are overvalued backed by Walsh mortgages and that puts, according to the indictment, the conspirators into a frenzy how to keep alive the merger.

Now one way that Walsh had been making loans, in fact the only way Walsh had been able to make the loans is with a funding source called Greenwich Capital, a company in Connecticut not involved in the scheme. They were the warehouse credit facility. They provided the money, Walsh has the money wire transferred to make the loans.

The vision, the goal, the objective is in sight, it's close at hand, but now it starts slipping away. Now the merger, the cash-out, which will put the money in each of their pockets, bonuses, salaries far beyond what they're earning now, positions with a substantial company with one of the largest mortgage lenders in the country, now that's starting to ebb away. There's a risk that's going to slip away after all of this work and everything that's gone on, these [lulling] letters then follow.

(*See* Merin Certif., Ex. R: Motions, *United States v. DeMola*, No. 02-508 (Sept. 12, 2003) 32-37.)

**RESPONSE:**

Disputed. Defendant's preliminary statement mischaracterizes the testimony quoted, which speaks for itself. In addition, an attorney's arguments before the court does not constitute evidence

and was not under oath.  Further, no evidence has been present nor exists that any government official has asserted any criminal charges against Robert Walsh with respect to this matter.

**James Walsh**

60.     Testimony exists implicating James Walsh, the Vice President of WSI, in the fraud. For example, O'Neill testified that, because of the close relationship that Robert Walsh had with his sister DeMola and his brother Jim Walsh, the meetings that DeMola had with Gary Grieser, Bill Kane, Anthony D'Apolito, Robert Skowrenski, DeMola's telling them specifically how to do the loans, the appraisals, and having the appraisers come up to the office, Mr. DiBenedetto being one of them, that they – including Jim Walsh – knew something was not right with some of those loans. (*See* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997) 145 (James Walsh was the Vice President of WSI; Ex. K: O'Neill First Dep. 69.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony. The statements are not fully supported by the citation provided, and Ms. O'Neill's opinion, that is not based on any substantive facts or knowledge, does not constitute admissible evidence in this case.  It is undisputed that James Walsh was the Vice President of WSI.

61.     O'Neill further explained that James Walsh "knew what was going on.  Betty Ann DeMola, J[ames] [Walsh] and Bob [Walsh] were all very close knit family and it was a family run business."  O'Neill assumed that James Walsh would know anything that DeMola knew.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 69.)

**RESPONSE:**

Disputed.  Defendant's statement improperly relies upon Ms. O'Neill's opinion which is not based on any substantive facts or knowledge and does not constitute admissible evidence in this case.

62.     DiBenedetto also testified that he believed that Jim Walsh – with others at Walsh– was involved in the scheme.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 266-67.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation provided.

63.     DiBenedetto explained that he thought Jim Walsh – along with Robert Walsh and DeMola – knew about the straw buyers, and that "[i]f you have a bunch of straw buyers spread over 200 properties it is a problem.  If you have straw buyers who sold their credit to Grieser that's a gigantic problem, because now you have 200 mortgages and they did the deed back to Grieser.  If the securitization of loans got not only Walsh loans but loans of 50 other companies it would have been Walsh had a high default rate versus some of the other companies at the time that were spread

19

out over the 200 different loans.  It is bad business if you do Gary Grieser had 220 loans at Capital Assets."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 269-70.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. DiBenedetto's rambling and convoluted testimony.  Nowhere in this specific testimony does he specifically discuss what James Walsh, Robert Walsh or Ms. Demola knew or when they knew it.  Furthermore, this testimony is merely Mr. DiBenedetto's opinion not based on any substantive facts or knowledge and does not constitute admissible evidence in this case.

### *January 1997 Letter From Greenwich Capital Alerting WSI of a Likely Fraud*

64.     Months before the fraud became public, on January 31, 1997, Greenwich Capital, WSI's warehouse lender, sent James Walsh and another individual at WSI a letter alerting them to a potential fraud involving "loans closed in the name of National Home Funding."  (*See* Merin Certif., Ex. S: Letter from Don Lawson of Greenwich Capital Markets, Inc. to James Walsh and Arnold Cohn of WSI (Jan. 31, 1997) ("Jan. 31, 1997 Greenwich Letter").)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation to Exhibit S as cited.

65.     The letter explained that, on "January 29 and 30[, 1997, Don Lawson of Greenwich Capital Markets, Inc.] reviewed 17 loans from a universe of loans closed by one of two closing agents (Yacker or Cicalese)[.]"  (*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter 1.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation to Exhibit S as cited.

66.     That review set out troubling facts surrounding the 17 loans, namely similar parties involved, questionable appraisals, the same buyers – of questionable financial stability – buying more than one property, questionable underwriting, and more:

> All loans closed in the name of National Home Funding.  All loans were purchase money transactions with the seller of the properties being Cristo Property Management or its subsidiary, GJL Ltd.  All but one purchase transaction was a flip (seller acquiring concurrently with resale).  The one exception was a property acquired 2 months previously.  Of the 17 properties, 3 were probably recently foreclosed REO (the seller to Cristo being Fleet or Ocwyn).  The other 14 properties were acquired by Cristo (GJL) from individual property owners per the title work in the file.
>
> All properties were appraised by Richard Calanni (15) or Thomas Brodo (2).  The only remodeling or rehab mentioned in the 17

appraisals was a new roof on one property.  All properties were rated as average condition with no repairs required.  Even though most of the properties were 2-4 units[] virtually all were vacant per the appraiser.  I could find no reference to Cristo's acquisition or acquisition cost in the file.

The 17 loans are to 8 borrowers who are buying multiple investment properties from Cristo (usually 4 per each borrower).  7 of the 8 borrowers currently rent as their primary residence at $500 to $800 per month and these 7 have apparently never owned real estate.  All loans were done under the no income verification program.  2 borrowers had prior bankruptcies, although they both stated they had not had prior bankruptcies on their loan application.  One borrower had no prior credit history.  None of the loan applications had the name of the interviewr at National Home (person taking loan application) on the loan application.  No file had verification of funds to close in the file other than a letter from the closing agent saying he was holding a check for the deposit.  6 of the 8 borrowers had no assets listed on the loan application other than the deposit with the attorney.  The other 2 listed a bank account each, one with $5300 and the other with $1900.  Neither of these accounts were verified.  Keep in mind each borrower needs around $60K to $80K in down payments to close their 4 transactions.

(*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter 1.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation to Exhibit S as cited.

67.     Based on these findings, the letter from Greenwich Capital alerted WSI to a possible fraud:

Given the credit history and life style of the borrowers, the fact that the deposits with the attorney were never verified as being the borrower's own funds (or that the borrowers had any verified assets), and the flip nature of the transactions, I believe that there is a good chance that these are no down payment purchase transactions and possibly are straw buyers used to facilitate very large cash back transactions to Cristo Property Management.

(*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter 2.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation to Exhibit S as cited.

68.     Greenwich Capital then requested that James Walsh and Arnold Cohn call Greenwich Capital at their "earliest convenience to discuss these loans and this originator in detail." (*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter 2.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation to Exhibit S as cited.

69.     James Walsh testified that he did not recall what was done in response to Greenwich Capital's notifying WSI of these problems apart from WSI no longer using the flagged appraisers. (*See* Merin Certif., Ex. I: James Walsh Dep. 152.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation to Exhibit S as cited.

***File Cleaning***

70.     James Walsh was in the room during the file cleaning process discussed above when "they were taking apart those loans." (*See* Merin Certif., Ex. K: O'Neill First Dep. 58-59, 69.)

**RESPONSE:**

It is undisputed that Ms. O'Neill testified that James Walsh was in the room during the file cleaning process.

71.     DeMola testified that she thought that James Walsh sat in on the scrubbing of files, but that she does not think he was there for all of the file cleaning.  She explained that if anyone would go in, it would be him.  (*See* Merin Certif., Ex. C: DeMola Dep. 281-82.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. Demola's testimony.  Ms. Demola testified that she did not recall if James Walsh was involved in the file cleaning process, but speculated that he might have because he would know the documents.

72.     O'Neill testified that James Walsh was among those who "did not want [DeMola's] signature on anything" in the files.  (*See* Merin Certif., Ex. P: O'Neill Second Dep. 37-38.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony.  Ms. O'Neill did not identify James Walsh at the citation provided.  Furthermore, in another part of her deposition she testified that she did not recall if James Walsh said anything during the file cleaning process.  Moreover, Ms. O'Neill could not even identify the types of documents she was putting in or taking

out of the files.  (*See* Merin Certif., Ex. K, O'Neill First Dep. at 59, Ex. P, O'Neill Second Dep. at 30-34).

      73.     O'Neill also explained that she assumes James Walsh – along with Robert Walsh and DeMola – knew exactly what was on the list of information to be scrubbed from the files, since they were in and out of the room where the file cleansing was occurring.  (*See* Merin Certif., Ex. P: O'Neill Second Dep. 39.)

**RESPONSE:**

      Disputed. Ms. O'Neill's testimony merely recounts her assumption that is not based on any firsthand knowledge or on any substantive facts and does not constitute admissible evidence in this case.

### Meetings with Key Players in the Fraud & Related Decisions

      74.     James Walsh also had lunch with key players in the fraud during which the fraud was discussed.  Specifically, Kane had lunch with James Walsh once in "December 1996 or January or February 1997[,]" and DeMola, D'Apolito, and Grieser were also present.  Either DeMola or James Walsh organized the meeting, which was about the type of loans that could and could not be done.  Kane believed there was a problem with the loan-to-value ratio of the loan, and WSI wanted a down payment or an escrow letter where he had to have the down payment down and then the second mortgage.  Kane explained that "that is why you will see a lot of deals that had 100% financing between the first and the second.  And the other one starting up where the requirements come in, and we had to have an escrow letter from the attorney."  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 139-140, 228.)

**RESPONSE:**

      Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony.  The transcript reference cited speaks for itself and no where in this cited portion does it indicated that the "fraud was discussed."

      75.     Regarding that meeting, Kane testified, that the lunch meeting took place due to issues raised by Greenwich when it noticed that the same escrow letters were being used on multiple transactions and due to delays that were occurring in the loan approval process:

> Q.     Sure.  Your testimony at the prior deposition was you had lunch with Ms. DeMola and Jim Walsh, that Ms. DeMola did most of the talking, that Ms. DeMola indicated how important it was to continue to get your loans approved.
> A.     Ok.
> Q.     And Greenwich had raised a problem with these escrow letters because they noticed the same escrow letters were being used on more than one transaction.  And that is why the structure of the deals

changed from one that had escrow letters to one that had secondary mortgages.  Does that sound right to you?

A.      Now it sounds correct, yes.  And I think we actually went from an 80% loan to value to a 75% loan to value, which is –

Q.      Am I correct, Mr. Kane, that lenders like to see that buyers have money in the deal?

A.      That is correct.

Q.      And the way in which the money in the deals was evidenced before the meeting was through the phony escrow letters; correct?

A.      Correct.

Q.      The buyer had no money in these deals; correct?

A.      Correct.

Q.      And Greenwich noticed that several of the escrow letters on these deals were identical; correct?

A.      Ok.  I'm going to go by that, yes.

*Q.      And the way in which that issue was dealt with was not to get legitimate escrow letters, were to ensure that the buyers actually had enough money, but it was done in such a way that we would simply substitute second mortgages for the escrow letters; correct?*

*A.      Correct.*

*Q.      And this was discussed in the presence of Ms. DeMola and in the presence of James Walsh; correct?*

*The witness: I believe so, yes.*

*Q.      And you recall testifying that shortly after that meeting, all of the problems with Greenwich went away and the loans started getting approved again?*

*A.      Now I remember, yes.*

(*See* Merin Certif., Ex. F: Kane 2011 Dep. 171-73 (emphasis added).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the circumstances surrounding Mr. Kane's cited testimony.  Counsel for Defendant led Mr. Kane to believe that he had previously testified in a certain manner and sought his admission at his later deposition that this was correct.  In fact, at his prior deposition, Mr. Kane had not testified that Greenwich had raised a problem with this escrow letters.  Rather, he testified that "I believe that – again, this is my assumption because it's been so long – when I think about it, I think that Greenwich or whoever they were selling the loans to had a problem with seeing the same escrow letter from the attorney."  Furthermore, there was no prior testimony as counsel suggests in this quoted text that lulled Mr. Kane into simply agreeing with the statements.  (*See* Wagner Cert., Ex. D, Kane Dep. at 78:19-23).

76.      Gary Greiser testified that he explained his role in the scheme to James Walsh before an approximately mid-June 1997 lunch with D'Apolito and DeMola: "Before we went to lunch I sat down.  I talked to Jimmy Walsh.  I explained to him what I was doing with the joint ventures, how it was going.  How we were controlling it.  I said, 'If I tell them and they still fund me, then it's okay, it's legitimate.'  Betty Ann wasn't there.  D'Apolito, Betty Ann and myself went out to lunch and

D'Apolito said, 'You know, Gary just laid out this whole thing to Jim.'" (*See* Merin Certif., Ex. Q: Greiser Dep. 31-32, 141.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes that Mr. Greiser explained his role in the scheme to James Walsh. The testimony cited speaks for itself. Mr. Greiser's testimony is further contradicted by the testimony of James Walsh wherein Mr. Walsh described the only time he ever met Mr. Greiser was when Mr. Greiser had brought in a letter, purportedly from the mayor of Asbury Park, describing his work in rehabbing properties. (*See* Wagner Cert., Ex. F, J. Walsh Dep. at 206:21-207:7.)

77.      In this discussion, Greiser believes he was specific that the loans were in the names of the borrowers who had a joint venture and who would then transfer the property or 60% of the interest in the property to his company Capital Assets. (*See* Merin Certif., Ex. Q: Greiser Dep. 37.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes Mr. Greiser's testimony. Defendant only attached one page of the relevant testimony but when viewing the prior page with the page cited, it is clear that Mr. Greiser was unsure as to his specificity about the joint ventures. (*See* Wagner Cert., Ex. G, Greiser Dep. at 36:6-37:9).

78.      Additionally, Jim Walsh told another appraiser, Richard Calanni, to increase the values he placed on the Walsh properties during a conversation that "took place long before the fraud broke." (*See* Merin Certif., Ex. T: Dep. of Richard Calanni (Jan. 1 & 22, 2007) ("Calanni Dep.") 74-75, 126.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes Mr. Calanni's testimony because the testimony relied upon here is a question regarding Mr. Calanni's testimony at his plea hearing which Mr. Calanni clearly stated in his deposition that much of what was in his plea was not true. Mr. Calanni repeatedly stated that his plea was "someone else's truth." Therefore, anything stated in his plea cannot be relied upon. (*See* Wagner Cert., Ex. H, Calanni Dep. at 76:12-13; 305:20-21).

79.      Specifically, Jim Walsh expressed a view that Calanni's appraisals might be too high, but then Jim Walsh suggested Calanni use an appraisal method – the income approach – that might result in an even higher appraisal. (*See* Merin Certif., Ex. T: Calanni Dep. 100, 273-74.)

**RESPONSE:**

It is undisputed that Mr. Defendant's statement summarizes Mr. Calanni's testimony, however, the income approach is just one of several legitimate appraisal methods and there is nothing in the evidence to suggest that it would in fact have resulted in a higher number or have been improper.

*Ignorance of Explicit Warnings Regarding Problems with National Home Funding Loans*

80.     WSI issued a "Quality Control Memorandum" on January 31, 1997, regarding an audit by Greenwich Capital of National Home Funding loans, on which James Walsh was copied. (*See* Merin Certif., Ex. U: WSI Quality Control Memorandum regarding Greenwich Capital Audit (Jan. 31, 1997).)

**RESPONSE:**

Undisputed.

81.     Peter Trebour, who worked in quality control and was also copied on the January 31 memorandum, testified that he would expect that, in response to that memorandum, additional care would have been exercised before underwriting and funding any National Home Funding loans going forward.  (*See* Merin Certif., Ex. V: Dep. of Peter Trebour (Sept. 24, 2011) ("Trebour Dep.") 85-86.)

**RESPONSE:**

Disputed.  Defendant's statement and line of questioning in the deposition testimony mischaracterizes the January 31, 1997 quality control memorandum referenced in the prior paragraph.  The quality control memorandum specifically indicates that Ms. Gonzalez-Lehman documented that "during my conversation, I informed Mr. Lawson that on all of the National Home Funding loans we had requested documentation evidencing 1) Amount of Rehabilitation to property in question; 2) Inside photograph; 3) Copy of Deeds following title, and circumstances of conveyance; and 4) Addendums to the appraisals noting rehabilitation of property and inside photographs showing work completed."  Accordingly, Plaintiff disputes the relevance of this statement to the partial summary judgment motion because the memorandum clearly states that WSI was already exercising care with respect to the National Home Funding loans.  (*See* Merin Certif., Ex. U: WSI Quality Control Memorandum regarding Greenwich Capital Audit (Jan. 31, 1997)).

82.     Trebour testified that, as James Walsh was cc'ed on the January 31, 1997 memorandum, he would have expected that James Walsh received the memorandum.  (*See* Merin Certif., Ex. V: Trebour Dep. 86.)

**RESPONSE:**

Disputed.  Defendant's statement and line of questioning in the deposition testimony mischaracterizes the January 31, 1997 quality control memorandum.  The memorandum clearly states that WSI was already exercising care with respect to the National Home Funding loans.

83.     Trebour did not recall if he did anything to ensure that NHF was looked at differently going forward, but he would have expected there to be some change in the way NHF files were looked at, namely that the NHF-originated loans would be given more scrutiny than other loans. (*See* Merin Certif., Ex. V: Trebour Dep. 86-87.)

**RESPONSE:**

Disputed.  Defendant's statement and line of questioning in the deposition testimony mischaracterizes the January 31, 1997 quality control memorandum.  The memorandum clearly states that WSI was already exercising care with respect to the National Home Funding loans.

84.     Trebour also testified that he would have suspected there to be some suspicion going forward as to whether or not NHF properties actually involved legitimate and completed rehabilitation.  (*See* Merin Certif., Ex. V: Trebour Dep. 87.)

**RESPONSE:**

Disputed.  Defendant's statement and line of questioning in the deposition testimony mischaracterizes the January 31, 1997 quality control memorandum.  The memorandum clearly states that WSI was already exercising care with respect to the National Home Funding loans.

85.     Trebour did not know what was put in place between January and the next five months regarding NHF, and, after counsel represented that NHF submitted similar fraudulent loans for another five months with the same packages, the same boarded up properties, and the same lack of documentation and that those loans got approved and funded, Trebour testified that surprised him after reading the January 31, 1997 memorandum.  (*See* Merin Certif., Ex. V: Trebour Dep. 87-88.)

**RESPONSE:**

Disputed.  Defendant's statement and line of questioning in the deposition testimony mischaracterizes the January 31, 1997 quality control memorandum.  The memorandum clearly states that WSI was already exercising care with respect to the National Home Funding loans.

**<u>Betty Ann DeMola</u>**

86.     Betty Ann DeMola was the National Sales Manager for WSI.  (*See* Merin Certif., Ex. D: DeMola Plea at 17-18.)

**RESPONSE:**

Undisputed.

***DeMola was a Shareholder of WSI***

87.     Betty Ann DeMola was a shareholder of WSI.  (*See, e.g.,* Merin Certif, Ex. W: Walsh Holding Co., Inc. Stock Certificate of Elizabeth Ann DeMola (Apr. 30, 1996) ("DeMola Stock Certificate"); Ex. D: DeMola Plea 17-18.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes facts in evidence and has selectively produced just one side of a stock certificate marked as Exhibit W which indicates five shares of stock representing that at most Ms. Demola was a minority shareholder of WSI and the shares were to be issued in conjunction with the merger with RBMG, which did not occur.  Furthermore, the colloquy at Ms. Demola's plea hearing demonstrates solely that Greenwich Capital was a warrant holder of WSI.  (*See* Wagner Cert., Ex. B, WSI Dep. at 44:6-45:1).

88.     WSI listed DeMola as a shareholder in a securities filing related to WSI's planned merger with RBMG.  (*See* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997) 145 (listing DeMola as owning shares of WSI Class A Common Stock in a section entitled, "WSI Common Stock Ownership by Management & Principal Stockholders").)

**RESPONSE:**

Disputed.  Mr. Walsh testified that the SEC filing for the RBMG merger incorrectly identified certain individuals as shareholders in the company, including Ms. Demola.  Even assuming it was correct, Defendant failed to point out that it indicates that Ms. Demola had five shares of stock and clearly would be a minority shareholder of WSI and the shares were to be issued in conjunction with the merger with RBMG, which did not occur. (*See* Wagner Cert., Ex. B, WSI Dep. at 44:6-45:1; 478:5-9; 480:23-24).

89.     WSI produced a stock certificate issued to DeMola as a shareholder of Walsh Holding Co., Inc.  (*See* Merin Certif., Ex. W: DeMola Stock Certificate).

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes facts in evidence and has selectively produced just one side of a stock certificate marked as Exhibit W which indicates five shares of stock representing that at most, Ms. Demola was a minority shareholder of WSI and the shares were to be issued in conjunction with the merger with RBMG, which did not occur.  (*See* Wagner Cert., Ex. B, WSI Dep. at 44:6-45:1).

90.     In her Noncompete and Confidentiality Aggreement with RBMG, DeMola is referred to as a shareholder of WSI.  (*See* Merin Certif., Ex. X: Noncompete and Confidentiality Agreement Between RBMG and DeMola (Apr. 18, 1997) ("DeMola Noncompete Agreement") ¶ 1.)

**RESPONSE:**

It is undisputed that the document speaks for itself.

91.     Robert Walsh testified in a deposition unrelated to this case that DeMola was a shareholder of WSI.  (*See* Merin Certif., Ex. Y: Deposition of Robert Walsh, *Cityscape Corp. v. Walsh Securities, Inc.*, S.D.N.Y. Docket No. 98-cv-223 (Mar. 24, 1999) 14.)

**RESPONSE:**

It is undisputed except to the extent that Robert Walsh later testified that his statement that Ms. Demola was a shareholder of WSI was a mistake.  In response to a specific question about this testimony, Mr. Walsh testified as follows:

> A.      When we were doing the merger with RBMG, we knew what the exchange rate for Walsh Securities shares going into RBMG were going to be in the first week of April of 1997.  I went to 19 people, some relatives outside that didn't work for Walsh, some friends outside of Walsh, and some Walsh people.  I said, listen, I'm giving you shares of my stock, and you are going to be able to convert these shares into RBMG shares and you are going to be able to get blank number of shares, and at the closing of Walsh-RBMG merger, I'm going to give you the shares and you can convert them into RBMG shares.  That was in my mind.  That sticks in my mind, and to this day that's in my mind.  The S4 was a document that was prepared by my attorneys.  There were certain things in the document that were going to be done once the merger took place.  The merger did not take place. I was not giving up shares of my company to people if there was going to be no merger.

(*See* Wagner Cert., Ex. B, WSI Dep. at 44:6-45:1).

92.      In her guilty plea before the Honorable Katherine S. Hayden, U.S.D.J., on September 9, 2005, DeMola admitted that she was a shareholder of WSI:

> THE COURT:      Okay.  In 1996 and 1997, were you the national sales manager at and with your brothers and an entity called Greenwich Capital, a shareholder of Walsh Securities, Inc., a company engaged primarily in the business of purchasing and funding residential mortgage loans with its main office in Parsippany, New Jersey and with numerous branch offices throughout the United States?
> THE DEFENDANT:  Yes.

(*See* Merin Certif., Ex. D: DeMola Plea at 17-18.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the colloquy at Ms. Demola's plea hearing, which speaks for itself.  Ms. Demola admitted that Greenwich Capital was a shareholder of WSI as can be seen from the quoted language cited by Defendant.

93.      DeMola also admitted in her guilty plea that she was a member of the management of WSI.  (*See* Merin Certif., Ex. D: DeMola Plea at 20-21.)

**RESPONSE:**

It is undisputed that Ms. Demola was a member of the management of WSI in her capacity as National Sales Manager.

94.     In her Noncompete and Confidentiality Aggreement with RBMG, DeMola is referred to as an officer of WSI.  (*See* Merin Certif., Ex. X: DeMola Noncompete Agreement ¶ 1.)

**RESPONSE:**

It is undisputed that the document cited refers to Ms. Demola as an officer; however, Ms. Demola did not hold the tile of President, Vice President, Secretary or any officer level position. Ms. Demola specifically testified that she was never an officer.  (*See* Wagner Cert., Ex. C, Demola Dep. at 102:6-103:5).

***Active Participation in the Fraudulent Scheme***

95.     DeMola knew that Kane owned Cristo Properties and was affiliated with NHF, and Kane testified that he believes DeMola knew that he originated the loans and was working for Skowrenski, because Kane believes his name was on all the applications.  All of this information was in the files.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 252-53; Ex. F: Kane 2011 Dep. 224-25 (stating that Kane told DeMola that he owned Cristo).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony about what Ms. Demola knew.  Further, Ms. Demola testified that she believed he renovated properties and only knew him as an owner of Cristo Properties.  Ms. Demola testified that she did not know that Mr. Kane had any association with National Home Funding and only found after the fraud investigation began.  (*See* Wagner Cert., Ex. C, Demola Dep. at 83:19-84:24, 90:16-91:6).

96.     Kane testified that, three is no doubt in his mind that DeMola was at least aware that he was selling all of these properties.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 205.)

**RESPONSE:**

It is undisputed that Mr. Kane testified that he "would agree" that Ms. Demola was aware that he was selling these properties.

97.     D'Apolito testified that DeMola "knew what was going on[,]" explaining that he told her that he lived down at the shore and the properties were not worth as much as WSI was being told they were worth.  He told her that the appraisals were wrong and that she needed to look into it.  In response, DeMola told him to shut up.  He explained that she did not care, so he "did shut up, figuring he told [DeMola]."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 58-59; 65 (same), 84-85 (same).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony and does not demonstrate that Ms. Demola knew that there was a fraud occurring.  Further, Exhibit O does not contain pages 65 or 85 of Mr. D'Apolito's deposition.  Further, when asked if at some point he learned that Ms. Demola became aware that the appraisals were fraudulent, Mr. D'Apolito stated "No.  I mean, it would be assumed that – because she's met with Billy Kane down in his office – him up in our office more than once, more than a half a dozen times, and met in Betty Ann's office with the doors closed.  That's how she would know."  (*See* Merin Certif., Ex. O, D'Apolito First Dep. at 103:2-10).

98.     Because of DeMola's response that D'Apolito should "shut up," he concluded in his mind that she was already aware that there were problems with the appraisals and just did not want to hear it from him.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 102-03.)

**RESPONSE:**

Disputed to the extent that Mr. D'Apolito's testimony was his opinion and not based on any substantive facts or knowledge and does not constitute admissible evidence in this case.

99.     D'Apolito testified that he told DeMola that they never fixed the houses up, explaining that, "in the beginning they used to do the right thing and do repairs and fix the house and rent it out.  Then they got greedy.  They'd have a guy that is dead that used to do the work that he met in jail.  His name is John Kasair from Staten Island that was friends with Billy Kane.  They did the front of the house and the appraisers took pictures of the inside and outside.  [DeMola] waived in the guidelines that they did not have to do interior photos.  He asked [DeMola] what she was doing and she told him to shut up.  That's why he figured he would not get in trouble."  (*See* Merin Certif., Ex. Z: Dep. of Anthony D'Apolito (Sept. 17, 2010) ("D'Apolito Second Dep.") 25-26.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony.  While his testimony speaks for itself, a substantial portion of this quote is merely his narration of the fraud and has nothing to do with Ms. Demola's knowledge of the fraud.  Mr. D'Apolito's testimony is further contradicted by Ms. Gonzalez-Lehman's January 31, 1997 quality control memorandum that documented that "on all of the National Home Funding loans we had requested documentation evidencing 1) Amount of Rehabilitation to property in question; 2) Inside photograph; 3) Copy of Deeds following title, and circumstances of conveyance; and 4) Addendums to the appraisals noting rehabilitation of property and inside photographs showing work completed."  (*See* Merin Certif., Ex. U: WSI Quality Control Memorandum regarding Greenwich Capital Audit (Jan. 31, 1997)).

100.     D'Apolito further testified that he told DeMola

everything.  I told her that there was straw buyers.  I said, none of these houses are habitable.  They're not fixing them up.  That was my main concern.  Straw buyers weren't really my main concern.  If the

houses were fixed up, they were going to rent them. So who cares. You can buy a property and still deed my 60 percent. There's nothing really wrong with this. But there is something wrong with it when you do that an I don't fix the property and lease it out. I mean, if I want to buy a piece of property and give Mr. Calanni 60 percent to manage that property and take care of it, that's on me. But we're collecting rent. So 40 percent is my credit, but we're making sure out of that 60 percent he's making the payments, he's renting it out, he's taking care of the property. Whenever there is damage to it, he is taking care of it. To me, that is not really a straw buyer. They made up that word, but they came out. So that wasn't my concern. My concern was, the houses were all pieces of shit. You wouldn't put your worst enemy in. Some of them were gutted.

(*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 90-91.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes Mr. D'Apolito's testimony. While his testimony speaks for itself, a substantial portion of this quote is merely his narration of the fraud and has nothing to do with Ms. Demola's knowledge of the fraud.

101.    DeMola met with Kane without D'Apolito and "knew everything." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 59.)

**RESPONSE:**

Disputed to the extent that the statement is merely Mr. D'Apolito's opinion that by virtue of Ms. Demola meeting with Kane she knows everything about the fraud is not based on any substantive facts or knowledge and does not constitute admissible evidence in this case.

102.    According to D'Apolito, DeMola knew about the phony leases, because "we" talked about it, and she used to tell him, "just get the leases." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 60.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes the complete portion of Mr. D'Apolito's testimony. In response to an earlier question asking "Did Betty Ann know about the leases, the phony leases?" Mr. D'Apolito stated "I believe she did." (*See* Merin Cert., Ex. O, D'Apolito First Dep. at 59:25-60:2).

103.    DeMola also knew that the escrow letters were false and fraudulent. D'Apolito testified that he knew that DeMola was aware that the escrow letters were false or fraudulent but that she did not care, because he was present for conversations between DeMola and Kane on the topic. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 60; Ex. L: DiBenedetto Dep. 240.)

**RESPONSE:**

Disputed to the extent that the statements are not supported by the citation provided to Mr. Di Benedetto's testimony. Further, Mr. D'Apolito's testimony on this point is at most vague and does not support this statement.

104.    DeMola was aware that Cristo Properties would purchase a house and then sell the house to somebody who had a joint venture with Capital Assets and immediately assign the property to Capital Assets. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 61.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes Mr. D'Apolito's testimony. Mr. D'Apolito did not testify as to exactly what Ms. Demola knew, but rather he stated "Betty Ann knew exactly what was happening." (*See* Merin Cert., Ex. O, D'Apolito First Dep. at 61:12).

105.    DeMola "without a doubt" knew that the homes were not being repaired. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 125.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes the complete testimony of Mr. D'Apolito in which he also supported the alleged assertions by stating that he believed she knew because she said "Go and put the blinds on them." (*See* Merin Cert., Ex. O, D'Apolito First Dep. at 125:19).

106.    Similarly, DeMola was aware of what fraudulent actions Kane and Skowrenski were committing. (*See* Merin Certif., Ex. K:O'Neill First Dep. 54.)

**RESPONSE:**

Disputed. Defendant's statement is not supported by the citation provided.

107.    Before the fraud became public, DiBenedetto had a discussion with DeMola concerning a large portfolio of WSI loans that were made to particular land flippers, and which DiBenedetto believed involved borrowers who had little or no equity in the property, and DeMola responded in substance that she was unconcerned because WSI was going to be sold for a lot of money. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 81-82 (discussing the content of his plea hearing).)

**RESPONSE:**

Disputed to the extent it is unclear as to whether Mr. DiBenedetto was even discussing the loans that are in issue in this case. Further, Mr. DiBenedetto's testimony is contradicted by Ms. Demola's testimony wherein she testified that she had seen Mr. DiBenedetto as WSI on one or two occasions when he was there to be removed from the approved appraiser list. (*See* Wagner Cert., Ex. C, Demola Dep. at 400:18-401:4).

108.    Anthony Cicalese also testified that he also informed DeMola of problems with the loans towards the beginning of the time in which the fraud was occurring: "Well, there was a point in time where, you know, that the procedures that were being used to close these properties didn't exactly sit right with me and I called [DeMola], because she was the one that I was referred to that I needed to speak to over there, and who was constantly on the phone with either Lori or myself, and about when these deals would come.  So I called her and asked her if she was aware of, you know, the way the properties were being flipped and whatnot at the closings and she said, yes, this is the way that we have been doing it.  Just go ahead and do it, because I was worried about disbursing the funds." (*See* Merin Certif., Ex. AA: Dep. of Anthony M. Cicalese (Sept. 29, 2010) ("Cicalese Dep.") 28-29.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the complete context of Mr. Cicalese's testimony when he further stated that this phone call was probably in March or April and that the discussion was solely with respect to the joint venture deeds, which he did not even believe were sent to WSI.   He further testified that he did not tell Ms. Demola that Mr. Kane was purchasing properties and then selling them before he purchased them, he did not tell her that the deeds were not being filed or that they were being pre-dated and post-dated, he did not tell her that he received $20,000 to hold in escrow to justify all the escrow letters on each individual sale when they really were not for each individual sale, and he did not tell Ms. Demola how the money was improperly distributed from the closing. (*See* Wagner Cert., Ex. I, Cicalese Dep. at 156:25-157:25).

109.    Cicalese further explained that, "[b]asically, I was a little concerned that at the closings they were – they were basically selling off 60 percent of the property to Capital Assets, and there was no paperwork indicating that sale to [WSI], who was the lender who had an interest, you know, now in only 40 percent of a property that they had an interest in 100 percent of before and they told me they were okay with that . . . "; "they" refers to DeMola.  (*See* Merin Certif., Ex. AA: Cicalese Dep. 156.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the complete context of Mr. Cicalese's testimony when he further stated that this phone call was probably in March or April and that the discussion was solely with respect to the joint venture deeds, which he did not even believe were sent to WSI.   He further testified that he did not tell Ms. Demola that Mr. Kane was purchasing properties and then selling them before he purchased them, he did not tell her that the deeds were not being filed or that they were being pre-dated and post-dated, he did not tell her that he received $20,000 to hold in escrow to justify all the escrow letters on each individual sale when they really were not for each individual sale, and he did not tell Ms. Demola how the money was improperly distributed from the closing. (*See* Wagner Cert., Ex. I, Cicalese Dep. at 156:25-157:25).

110.    DeMola knew about the straw buyers.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 269-270.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the complete context of Mr. DiBenedetto's testimony which stated "I think they knew the buyers were straw."  Mr. DiBenedetto does not define "they", and his opinion is not based on any substantive facts or personal knowledge and does not constitute admissible evidence in this case.  (*See* Merin Cert., Ex. L, DiBenedetto Dep. at 269:11-12).

111.   DeMola was aware that WSI was funding loans before the written appraisals arrived at the bank, and Kane testified that he knew this, because appraisers had to call the value into her, and he recalls sitting in James Brown's office (an appraiser) and Brown called DeMola with the value.  (*See* Merin Certif., Ex. H: Kane Dep. at 116-17.)

**RESPONSE:**

It is undisputed that Kane testified that Ms. Demola was aware that loans were being funded before written appraisals arrived at the bank; however, he testified that that statement is solely based upon him overhearing an alleged conversation that he heard an appraiser have with someone the appraiser claimed to be Ms. Demola while he was sitting in the appraiser's office.  There is not evidence that Mr. Kane actually heard Ms. Demola on the phone with this appraiser, and there is no evidence that there is anything improper about funding a loan based upon a verbal appraisal.  Furthermore, Kane testified that WSI did receive the written appraisal within five or eight days later after receiving the verbal appraisal.  (*See* Merin Cert., Ex. H: Kane Dep. at 116:18-117:2).

112.   DeMola also knew that certain of the W2s and pay stubs were false.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 117.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony that is not based on any first-hand knowledge and is merely his assumption based upon the fact that when quality control called an employer on one of the false tax returns, they were told that the person did not work there.  Larry Cuzzi, a co-conspirator of Mr. Kane's, then arranged for someone at the employer to say that the person did work there. Therefore, when quality control called back, it was reported that the person did work there.  He specifically testified "Then we got a hold of Larry and they called back and the whole thing was taken care of.  So that would be the only time I could say she knew or didn't know, but that would be an assumption."  (*See* Wagner Cert., Ex. D, Kane Dep. at 200:3-16).

113.   DeMola agreed to falsify documents being used in connection with the loans.  For example, one borrower was listed as working for a car company.  Quality control was done after the loan closed, and someone called the car company to verify the borrower's income and current employment status, but was told that the borrower was not working there.  DeMola spoke to D'Apolito, Kane also believes he spoke to DeMola afterwards and told her the problem would be resolved.  Larry Cuzzi, who was an ex-car salesman from the car company had somebody at the company call quality control back and say the guy was there and that the guy worked there.  DeMola was aware that this was untrue.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 102.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony that is not based on any first-hand knowledge and is merely his assumption based upon the fact that when quality control called an employer on one of the false tax returns, they were told that the person did not work there. Larry Cuzzi, a co-conspirator of Mr. Kane's, then arranged for someone at the employer to say that the person did work there. Therefore, when quality control called back, it was reported that the person did work there.  He specifically testified "Then we got a hold of Larry and they called back and the whole thing was taken care of.  So that would be the only time I could say she knew or didn't know, but that would be an assumption."   Mr. Kane testified that he did not speak with Ms. Demola about this.  He stated "That was not my conversation with her.  That was her to D'Apolito." (*See* Wagner Cert., Ex. D, Kane Dep. at 200:3-20).

114.    In 1996, DiBenedetto had a discussion with DeMola who told him that WSI was going to use money orders to make the loans current: "Ms. DeMola stated, in substance, that she would have the loans brought current so they could be sold by Walsh, and the loans would be paid current by having them paid down with money orders which were not traceable."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 51-52 (discussing his statements at page 33 of the transcript of his May 26, 2005 plea hearing in *United of America v. Richard DiBenedetto*), 269-70.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the context of Mr. DiBenedetto's testimony wherein he stated that he had this discussion with Ms. Demola on one occasion but could not coherently explain why he would have even been having such a discussion as an appraiser with Ms. Demola.  Furthermore, this is contradicted by Ms. Demola's testimony.  Furthermore, there has never been any evidence that WSI made any payments on the loans or that any payments were ever made by money order.  (*See* Merin Cert., Ex. L, DiBenedetto at Dep. 52:5-25; Wagner Cert., Ex. C, Demola Dep. at 400:18-401:4).

115.    D'Apolito explained that he was present for discussions on how the fraud worked that took place between Kane and DeMola, namely that

> Cristo would go and contract and buy a property.  What they would do is find investors that Capital Assets had found with excellent credit and you're allowed to have up to four mortgages so they would get somebody and pay them $2,000 per mortgage.  So they would get $8,000 to sign the mortgage papers and be responsible.  These people were fully aware of everything that was going on.  They knew they were just signing the houses.  Cristo would buy them and sell them to these people.  These people in turn were to sign the deed for a dollar to Capital Assets for Capital Assets to maintain the property.  Basically they were "straw buyers".  But the people knew what was going on and were well aware of it.  They wanted their money and they knew they were just selling their credit for money.  Capital Assets would

36

> then manage the property, rent them out, make the mortgage payments
> and do everything.

(*See* Merin Certif., Ex. O: D'Apolito First Dep. 61-62.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the complete portion of Mr. D'Apolito's testimony.  While it is admitted that D'Apolito described the fraud as set forth in this statement, he did not state that that was a discussion that he was present at with Ms. Demola.  Mr. D'Apolito is merely agreeing that Ms. Demola was aware of these facts because he was allegedly present when Mr. Kane allegedly discussed the fraud with her.  Mr. D'Apolito's testimony, however, is explicitly contradicted by that of Mr. Kane.  Mr. Kane was asked "And would Ms. Demola have known about sixty/forty arrangement?"  Mr. Kane responded "No."  (*See* Wagner Cert., Ex. D, Kane Dep. at 254:3-5).

116.    DeMola would go to the closing department and have a loan funded.  If for some reason something was missing, she would just say "get it to me right away[,]" because she needed to fund the loan to reach her sales number.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 122-23.)

**RESPONSE:**

It is undisputed that this is Mr. D'Apolito's testimony; however, Plaintiff disputes its relevance to a partial summary judgment motion because there is nothing improper with making sure that documentation is in before a loan is funded.

117.    Kane used to meet with DeMola frequently – at least once a week.  During this time, DeMola would tell Kane exactly what he needed to do for this program.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 193.)

**RESPONSE:**

It is undisputed that this is Mr. D'Apolito's testimony, however, it is directly contradicted by Mr. Kane's testimony that he never told Ms. Demola "[t]his is what we're doing, this is how we're doing it."  Mr. Kane further testified that he never told Ms. Demola that he was selling the properties before they had been purchased, that he was paying the appraisers for the appraisals, that he was rehabilitating these houses, that he was paying the straw buyers for the use of their credit history, that he was paying Ms. O'Neill, that he was paying Mr. D'Apolito, that Ms. King was taking some of the attorneys' closing fees to perform all of the legal work to close the loans, that the escrow letters sent to WSI by Mr. Yacker were false and that he did not actually have money in escrow, that people other than the straw buyers for the loans funded by WSI were fraudulently signing the straw buyers names and having them notarized, that the straw buyers were deeding 60% of their interest in the properties to Capital Assets, that some of the proceeds from the sales were being used to pay other existing mortgages, that the straw buyers were in fact straw buyers, that the straw buyers were paid for their credit history that loan applications were not even signed by the straw buyers and were signed by other people, that the appraisals were drafted as if the property had already been improved, that the closings were performed by a non-attorney, Ms. King, and not by attorneys Yacker and

37

Cicalese. (*See* Wagner Cert., Ex. D, Kane Dep. at 230:15-233:9; Wagner Cert., Ex. D, Kane Dep. 2011 at 149:1-150:10).

118.    Kane and DeMola would go over deals, and where there was a problem on the deals, Kane would push her to get them resolved and she helped them overcome obstacles.  "On the last night of the month [DeMola] would have a candy party, where, you know, she would just be with the whip out to get the deals processed."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 66-67.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony to the extent that he specifically stated "With Betty Ann, we would go over the deals.  If there were problems on the deals, we'd push her to get them resolved, help us overcome obstacles."  Mr. Kane further testified that if some sort of problem arose "we push Mr. D'Apolito into getting it resolved, which means he would push Betty Ann [Demola].  I mean, I wouldn't personally go in there and tell her you have to do this or it has to be done.  We would always make Mr. D'Apolito be intermediate."  He also testified that he was aware that there were other customers that dealt with Ms. Demola (*See* Merin Cert., Ex. H, Kane 2007 Dep. at 66:22-24; 68:5-22).

119.    Kane explained that, he would go over the deals with DeMola because, if the underwriters had a problem and Del Rosso was busy, they – meaning he and D'Apolito or he and O'Neill or he and the underwriter – would go to DeMola with it.  He stated that, "[DeMola] was involved in our deals."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 67.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony about going over deals with Ms. Demola.  Specifically, Mr. Kane testified that if Mr. Del Rosso, the head of underwriting, was busy when they had a problem one of them would then go to Ms. Demola." (*See* Merin Cert., Ex. H, Kane 2007 Dep. at 67:12-16).

120.    Kane's ordinary practice was for O'Neill, an underwriter, or D'Apolito to tell DeMola about a problem with a loan and then push DeMola to get it resolved.  Kane testified as to one instance specifically: the borrower had too many loans out already.  That deal specifically was one of the homes that Grieser was buying for himself using somebody else's name.  It was in the very beginning.  D'Apolito pushed DeMola and got DeMola to override the underwriting guidelines on that issue so they were able to close the deal.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 68-69.)

**RESPONSE:**

It is undisputed that the statement summarizes Mr. Kane's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve. Furthermore, as set forth in ¶ 22 above, Ms. O'Neill was a loan processor, not an underwriter.  (*See* Wagner Cert., Ex. C, Demola

Dep. at 116:14-117:25).

121.    It would be hard to approximate on how many occasions DeMola had the underwriting guidelines overwritten so a deal could close.  He could not give an exact number.  It could have been one to 20 or one to 30.  He is not sure.  Each was individual.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 69.)

**RESPONSE:**

It is undisputed that the statement summarizes Mr. Kane's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve. (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25).

122.    The reason DeMola would override the underwriting guidelines on some of Kane's loans was that DeMola wanted the numbers for the sales volume, but overriding also meant that she may have found another source to place the loan.  "Just because they are dealing with Bank A and there are a lot of deals with Bank A DeMola could have went in and found out other ways to do it through other lenders or places where they would place the loan afterwards.  They were the bank, so DeMola could have changed her own guidelines.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 70-71.)

**RESPONSE:**

It is undisputed that the statement summarizes Mr. Kane's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve. She also had no involvement in the secondary marketing of loans funded by WSI.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; 185:7-14).

123.    DeMola also vouched for Kane to move his loans through: Kane "was the only client [DiBenedetto] ever had who dealt with Walsh Securities and sa[id], get Robert Walsh on the phone, Betty Ann, they would just vouch for [Kane's] tremendous character and [Kane's] deals were absolutely tremendous.  They did it nonstop."  "Nothing would be done on the house except the front and stuff like that.  So invariably they would call up Walsh and call up Betty Ann, and, you know, you would need somebody to vouch for the fact that this person had a perfect payment history, you know, it just boggled the senses.   But you know, it was well planned, well calculated, and it worked for a period of time."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 66-67.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. DiBenedetto's rambling and incoherent testimony, which is irrelevant to the partial summary judgment motion.

124.     NHF loans were being closed quicker than any other loans; anytime an NHF loan came in it rose to the top.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 115.)

**RESPONSE:**

Undisputed.  This statement summarizes Mr. D'Apolito's testimony at the citation provided; however, he also testified that the average turn around time for an NHF loan was about three days, whereas the timeframe for another loan would be three to five days.  Therefore, this statement is irrelevant to this partial summary judgment motion.  (*See* Merin Cert., Ex. O, D'Apolito Dep. at 117:6-16).

125.     Non-NHF or non-fraud loans usually took three to five days turnaround, but the NHF loan time period was on the lower side, three days.  Toward the end of the month any loan could close in a day.  DeMola needed to make her numbers and she would do it.  All processed, underwritten and closed in one day.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 117.)

**RESPONSE:**

Defendant's statement summarizes Mr. D'Apolito's testimony; however, Plaintiff disputes its relevance to the partial summary judgment motion because it does not demonstrate anything that is improper.

126.     DeMola and O'Neill knew that D'Apolito was getting bribes from Kane to bring the loans in, because D'Apolito told them.  O'Neill was part of the fraud, and D'Apolito told DeMola, with whom he was very close and used to tell everything.  D'Apolito explained that he did not want DeMola to get in trouble, but she "basically blew [him] off."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 186.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony with the exception that he stated that Ms. Demola knew he was "getting money from Mr. Kane to bring these loans in."  He did not testify that she knew he was getting bribes from Kane and the statement further demonstrates that Ms. Demola was not part of the fraud as were Ms. O'Neill and Mr. D'Apolito. (*See* Merin Cert., Ex. O, D'Apolito Dep. at 186:4-16).

127.     DiBenedetto explained that he and his partners were buying the properties with their own money, fixing them up with their own money, selling the properties to third parties, and the third parties were being processed as borrowers for Walsh.  "During that time D'Apolito and [O'Neill] made them pay $1,000 per house and splitting it with [DeMola].  If they wanted to close a house, they had five houses they wanted to sell D'Apolito would want $1,000 and got it in order to fund them immediately.  Kane was getting funding even though Kane obviously had not done anything to the house yet.  He bought it with his own money and was not using Walsh money and fixing the house up and then selling it and was giving Walsh a clean deal.  The way they operated Walsh it was sort of like a criminal organization type thing.  D'Apolito used to call it vigorish.  He was not too happy with it but he had to do business.  D'Apolito wanted $1,000, and Kellie wanted

$1,000 even though she was just processing it.  The people were stupid enough to get the checks in their name."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 118-19.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the complete rambling and incoherent testimony of Mr. DiBenedetto and fails to include subsequent statement that with respect to the $1,000 Ms. O'Neill and Mr. D'Apolito "supposedly they were sharing it with Betty Ann."  Further, Plaintiff disputes the relevance of this statement to the partial summary judgment motion when these facts have nothing to do with the case at hand."  (*See* Merin Cert., Ex. L, DiBenedetto Dep. at 119:23-24).

128.    DiBenedetto testified that, before plans for the sale of WSI, he questioned DeMola as to what would happen when the payments stopped and the loans went into default, and DeMola stated in substance ". . . that the loans would be spread out among different purchasers minimizing the exposure to [WSI] and then at worst, [WSI] would tie up the matters and extend its civil litigation."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 53 (discussing his statements at page 33 and 34 of the transcript of his plea hearing).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the context of Mr. DiBenedetto's testimony wherein he stated that he had this discussion with Ms. Demola on one occasion but could not coherently explain why he would have even been having such a discussion as an appraiser with Ms. Demola.  Furthermore, this is contradicted by Ms. Demola's testimony.  (*See* Merin Cert., Ex. L, DiBenedetto at Dep. 52:5-25; Wagner Cert., Ex. C, Demola Dep. at 400:18-401:4).

129.    None of the scheme's participants were "scammed" by Kane; they all – including DeMola – knew what they were getting involved with.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 214.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the context of Mr. D'Apolito's testimony about what was known.  Further, his testimony is directly contradicted by others, including Mr. Kane.  (*See* Response to Statement No. 117.)

### *Cover-Up Before Greenwich Capital's Inspection of Properties Involved in the Fraud*

130.    DeMola agreed to conceal the true conditions of properties from representatives of Walsh's warehouse credit facility.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 103.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's complete testimony in which he further stated that "she wanted our crews to go out there, look at the properties, make sure that

there are curtains up, no boards on the windows, and make sure that they look good for a drive by appearance, that was going to occur within hours of that time." This is further contradicted by Ms. Demola's testimony in which she stated that the representative of WSI's warehouse credit facility, "Don Lawson, was in the kitchen. We had a big kitchen. He said I'm concerned about some of these properties. So I said, go take a look. He goes, I don't really know my way around New Jersey. I said, no problem. Ronnie, the quality control person, will take you. Pick out whatever properties you want. I then did not go to my office. I went right on the floor in front of all the underwriters, I used [Carley] Winston's phone on her desk, and I called Billy Kane. I said, Billy, people are going to look at your property, tell me now. He said, they're in good shape. That's what happened. Period. End of story. I didn't say go put blinds up and make them look lived in. I would never use the word "cheap." I would have said shades if I said anything. It never happened." (*See* Wagner Cert., Ex. C, Demola Dep. at 216:5-217:2).

131.    D'Apolito testified that DeMola met with Kane, Greiser, D'Apolito, with Jim Walsh, Robert Walsh, and Paul Del Rosso coming in and out, because DeMola "felt the heat. The shit was going to hit the fan." D'Apolito testified that when both brothers were out he remembers DeMola saying something about thinking that Greenwich Capital, WSI's warehouse lender, was going to come down and start looking at some of the properties. So DeMola told them to go buy cheap blinds and put them in the windows and make the houses look like they're lived in. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 68-69.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes Mr. D'Apolito's testimony. Further, it is directly contradicted by Ms. Demola's testimony as set forth above in Paragraph 130 and by the fact that Greenwich Capital had a representative, Don Lawson, working in WSI's offices every day. (*See* Wagner Cert., Ex. C, Demola Dep. at 212:11-213:2).

132.    The purpose of the instruction to make the houses look lived in was so that Greenwich Capital – which was doing a ride by and was not knocking on doors – would think that the houses were lived in when in fact they were not lived in. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 69-70.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 130.

133.    At the meeting, DeMola panicked. "She said, 'I'll take care of it. I'll take care of it. We can still do loans. Give me to the end of the day.' That is when [DeMola] told [Greiser and Kane] to make the houses look livable. Then, [] , she sweet talked Robert and []she lied to [them] and said [Greiser and Kane would] they'll make the payments. I guess like another five loans went through. They were happy, pacified and the payment came up." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 74.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony.  Further, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 130.

134.    Just before Greenwich Capital came down, DeMola told D'Apolito to tell Kane to make the properties looked lived in.  DeMola had received a phone call, so she knew Greenwich was coming.  The properties were in mainly Long Branch and Asbury Park, but there may have been a couple in Hazlet or the Keyport area.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 186.)

**RESPONSE:**

Disputed.  Defendant's statements are not supported by the citation provided.  Further, they are directly contradicted by Ms. Demola's testimony as set forth above in Paragraph 130 and by the fact that Greenwich Capital had a representative, Don Lawson, working in WSI's offices every day.  (*See* Wagner Cert., Ex. C, Demola Dep. at 212:11-213:2).

135.    DeMola told the person which properties to go to.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 186.)

**RESPONSE:**

Disputed.  Defendant's statements are not supported by the citation provided.  Further, they are directly contradicted by Ms. Demola's testimony as set forth above in Paragraph 130.

136.    DeMola also instructed that fake mail should be put in the mailboxes of the specified properties.  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 73-74.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is directly contradicted by Ms. Demola's testimony as set forth above in Paragraph 130.

137.    O'Neill testified similarly, explaining that "[w]hat I remember -- from what I remember today, they were all at the end of the office having a big conversation.  They called me down.  I went down.  [DeMola] had stated to me that somebody was going to go do a drive-by inspection of a house.  I don't remember who said the house was just a shell, . . . but I was to get Kane on the phone, call him, get there, get some curtains, lights, whatever, put up, so it looked like somebody was living in it.  That I do recall." (*See* Merin Certif., Ex. P: O'Neill Second Dep. 45-46; *id.* at 63 (same); Ex. K: O'Neill First Dep. 36 (same).)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. O'Neill's testimony; however, it is directly contradicted by Ms. Demola's testimony as set forth above in Paragraph 130.

138.    O'Neill reached out to D'Apolito to get in touch with Kane or Grieser to make sure that the properties being inspected by Greenwich Capital looked lived in.  O'Neill reached out to him to get in touch with Kane or Grieser to make sure places looked lived in.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 126.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony.  This testimony is further contradicted by other testimony set forth in the foregoing paragraphs.

139.    After receiving instruction from DeMola, O'Neill called Kane with the instruction to clean up the houses.  She also believes she contacted Skowrenski.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 55.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony.  This testimony is further contradicted by other testimony set forth in the foregoing paragraphs.

140.    Kane similarly testified that "There was a day when a representative from Greenwich Capital showed up at their office.  [He] do[es not] remember the timeframe.  It might have been November, December of [] 1996. . . .  And [the representative] wanted to go and look at houses . . . properties that they had put loans on.  [DeMola] called us up there [to the WSI Parsippany office].  . . . I went up there with Anthony D'Apolito.  [DeMola] gave us the list of homes; and [DeMola] wanted our crews to get out there, look at the properties, make sure that there are curtains up, no boards on the windows, and make sure that they looked good for a drive-by appearance.  She had the quality control girl take [the Greenwich representative] out to lunch to stall for time, and that was it."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 103.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's complete testimony in which he further stated that "she wanted our crews to go out there, look at the properties, make sure that there are curtains up, no boards on the windows, and make sure that they look good for a drive by appearance, that was going to occur within hours of that time."  This is further contradicted by Ms. Demola's testimony in which she stated that the representative of WSI's warehouse credit facility, "Don Lawson, was in the kitchen.  We had a big kitchen. He said I'm concerned about some of these properties.  So I said, go take a look.  He goes, I don't really know my way around New Jersey.  I said, no problem.  Ronnie, the quality control person, will take you.  Pick out whatever properties you want.  I then did not go to my office.  I went right on the floor in front of all the underwriters, I used Carter Winston's phone on her desk, and I called Billy Kane.  I said, Billy, people are going to look at your property, tell me now.   He said, they're in good shape.  That's what happened. Period. End of story.  I didn't say go put blinds up and make them look lived in.  I would never use the word "cheap."  I would have said shades if I said anything.  It never happened."  This is further contradicted by the fact that Greenwich Capital had a representative, Don Lawson, working in WSI's offices every day.  (*See* Wagner Cert., Ex. C, Demola Dep. at 212:11-213:2; 216:5-217:2).

141.    The call from DeMola giving Kane a list of homes came in November or December 2006.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 200-01.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony because he said "I don't remember the time frame.  It might have been November, December '06."

142.    DeMola gave Kane a list of approximately ten houses.  Kane took North Jersey and Grieser took South Jersey, and they sent their crews out to do what had to be done.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 104.)

**RESPONSE:**

It is undisputed the Defendant's statement summarizes Mr. Kane's testimony; however, it is contradicted by other testimony, including that of Ms. Demola as quoted in Paragraph 130 above.

143.    The properties on DeMola's list all had leases on them.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 250.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony and is not supported by the citation provided.

144.    One of the reasons the houses needed to be looked at was that the basis for the loans was that the houses were going to be leased out to provide the investor-owners with the money to pay the mortgage.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 217.)

**RESPONSE:**

It is undisputed that this is a summary of a portion of Mr. Kane's testimony.

145.    Kane and Greiser arranged to have the properties made to look lived in and in okay condition, per DeMola's instruction.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 104, 105.)

**RESPONSE:**

It is undisputed that this is a summary of this portion of Mr. Kane's testimony; however, it is contradicted by Ms. Demola's testimony as quoted in Paragraph 130 above.

146.    Once their task was done, Kane and Greiser reported back to Betty Ann that it was done and it was ok to send the Greenwich Capital person to see the houses.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 104-05.)

**RESPONSE:**

It is undisputed that this is a summary of this portion of Mr. Kane's testimony; however, it is contradicted by Ms. Demola's testimony as quoted in Paragraph 130 above.

147.    Kane also testified that, if that phone call had not come in and Greenwich had gone out and looked at properties and saw that they were boarded up and not lived in, it would have put an end to the whole fraudulent scheme.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 201-02.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony. Mr. Kane responded "probably" to the question "Would it be fair to say, Mr. Kane, that if that phone call had not come in and Greenwich had gone out and looked at properties and saw that they were boarded up and not lived in, that that would have brought this whole scheme to an end?" (*See* Merin Cert., Ex. F, Kane 2011 Dep. at 201:20-202:1.)

***Improper Interactions with Underwriters & Underwriting Standards***

148.    During her allocution, DeMola testified that she improperly took part in decisions to eliminate underwriting decisions:

> THE COURT: Did you concur in decisions improperly to eliminate
> underwriting conditions that were not met?
> THE DEFENDANT:  Yes.

(*See* Merin Certif., Ex. D: DeMola Plea 20.)

**RESPONSE:**

Disputed.  Defendant's statement misstates Ms. Demola's testimony at her plea hearing which speaks for itself.

149.    There were disputes between underwriting and sales about whether a loan should close.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 131.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation provided.  Furthermore, Plaintiff disputes the relevance of this statement to the partial summary judgment motion.

150.    While DeMola was not an underwriter, as long as she signed off then it was fine because she was DeMola, who was Robert's sister.  Specifically, because DeMola was the sister of the president of the company, if she wanted to do something, the other employees would not complain about it or even question her at all.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 58.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve. (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25).

151.    DeMola, to D'Apolito's understanding, had the authority to approve loans from an underwriting standpoint. D'Apolito stated that he believed this to be the case, because DeMola did in fact approve loans from an underwriting standpoint. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 106-07.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve. Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it. (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

152.    WSI's underwriting guidelines were designed by Paul Del Rosso, but DeMola would change them whenever she wanted to make the loans she needed to get done – including those in this case – comply. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 89-90.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve. Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it. (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; 151:8-14; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

153.    Even though Del Rosso was the head of underwriting and DeMola was in charge of sales, DeMola would be involved in underwriting decisions, because she needed the deals to go through – she needed the volume. (*See* Merin Certif., Ex. H: Kane 2007 Dep. 67.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony; however, it is

contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; 151:8-14; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

154.    DeMola changed the underwriting standards, because she "was in sales.  She wanted to [make the] numbers. . . .  She would do whatever it took to get a loan done.  [I]f . . . the guidelines read [that the borrower] needed three pay stubs but the guy only had one, they wouldn't wait to make the loan until [he] got paid another month.  He got paid every week.  She would get it done with just the one pay stub."  the guy had enough pay stubs but she would just get it done with the one pay stub."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 90.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; 151:8-14; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

155.    D'Apolito described the process by which DeMola would review and obtain approval for loans: a loan would get turned down

> [b]ecause they couldn't meet the guidelines of what they set.  It was Kell[ie] O'Neill's job to put all the paperwork in and get it in order.  She would turn it and just give it right over to the cubicle to the underwriter.  Then the underwriter would go through it, and check all the . . . information.  And she would say that that debt ratio was 35, [] 40 percent debt ratio, debt-to-income ratio.  And the guidelines said it had to be 38.  So it's up to [DeMola] if [DeMola] wants to make an exception.  Something that minute she may not have had the authority but [DeMola] and Paul [Del Rosso] could do that.
>
> But if they were at 45, 50 percent debt ratio after the income docs come in, they just can't afford the loan.  Then they would turn it down, and the loan doesn't happen, unless they can go out.  Then they would send out conditions saying, is there a co-signer?  Is there another job?  Is there income that we don't know about[?]  They would go back and ask that.  And if there was, then fine.  If it was a part-time job that was only like a month or two months, they probably wouldn't count it.  But if it was at least six months to a year, . . . they would take it.  Even if it

is a letter from the employer, because they pay them cash.  They would take that and then make the exception.  But if they didn't want to accept that's where [DeMola] and [Del Rosso] may get into an argument.

Here is a letter.  She's been here taking care of this woman's kid for $500 a month every month for the last four years.  And, . . . [Del Rosso] would go, but we can't approve that kind of income.  Maybe [DeMola] would bring [James Walsh] in and she would get it, and they would either approve it or deny it.

(*See* Merin Certif,, Ex. Z: D'Apolito Second Day 60-61.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

156.    "[T]he underwriting guidelines were designed by [] Del Rosso and [DeMola] would change them whenever she wanted to make whatever loan she needed to get done [fit]."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 90.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:2; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-235).

157.    DeMola would sometimes waive underwriting requirements for the files involved in this litigation and for other files.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 142-43.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she

would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-235).

158.    DeMola did not have the authority to waive conditions – that was solely an underwriter's job – but Robert Walsh was aware DeMola was waiving conditions.  (*See* Merin Certif., Ex. P: O'Neill Second Dep. 36.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony.  Ms. O'Neill testified that "It was in my opinion that he knew that she was waiving conditions."  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Merin Cert., Ex. P, O'Neill Second Dep. at 36:23-25; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-235).

159.    D'Apolito only saw DeMola ask for permission to waive underwriting requirements a few times, and she went to James Walsh.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 143.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation provided.

160.    Before the fraud ever became public, DeMola "direct[ed] underwriters to overlook suspicious loan application documents such as pay stubs and IRS forms W-2."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 97 (discussing his statement to Judge Wolin in at plea hearing); Ex. BB: Transcript of Plea Hearing, United States v. D'Apolito,  (Dec. 23, 1998) ("D'Apolito Plea") 31.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

161.    DeMola did not have to explain to the underwriters why they should overlook loan application documents that looked suspicious; "she was [DeMola]. She can tell them whatever and they would just do it."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 98.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

162.    For example, a suspicious pay stub would be one that looked as if it did not match what the income needed to be.  There, DeMola would change the loan to a stated income and tell "her" to overlook the pay stub and get rid of it.  "Stated income" refers to the no income verification loan. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 98.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

163.    DeMola had control over the underwriting standards.  If she changed the standards, "there was a memo that went out that said:  From now on we can do loans like this, this, and this. That's it.  Once it changed, that was it.  Unless [DeMola] changed it again.  If there was one that didn't meet the guidelines, they would send it to [DeMola].  [DeMola] would put the signature on it and that was it. It was passed.  There were still guidelines they were all going by, but [DeMola] would make exceptions."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 105.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

164.    DeMola allowed Kane's loans to be closed before an appraisal was done, which was "without a doubt" a violation of WSI's procedures, and DeMola overrode Paul Del Rosso.  When D'Apolito asked DeMola how she was closing this if she did not know the appraised value, she would say that she got a verbal, he would tell her that the verbal did not indicate the condition of the house, and she would tell him not to worry about it.  It did not matter to him because it made his report look good.  These were his accounts but he would question her.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 91.)

**RESPONSE:**

Disputed.  Defendant's statements are not supported by the citation provided.

165.    DeMola was signing off on conditions to get the loans into closing despite signing off on conditions being an underwriter's job, not DeMola's.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. O'Neill's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; 151:8-14; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

166.    Del Rosso did question some of the pay stubs and W-2s that did not look correct, but at times, DeMola told Del Rosso to go ahead with the mortgage anyway.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 47-48.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. O'Neill's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve.  Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it.  (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; 151:8-14; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

167.    Kane testified that, it was his impression that DeMola could overrule Del Rosso "with her persuasion," meaning that DeMola had to go in and justify whatever she was seeking to do to Del Rosso.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 118-19.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony; however, it is contradicted by Ms. Demola's testimony that she did not play any part in underwriting, except to the extent that she might receive a call about an underwriting decision from a wholesaler that she would then convey to the underwriting department for them to resolve. Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it. (*See* Wagner Cert., Ex. C, Demola Dep. at 116:14-117:25; 151:8-14; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

168.    It is a fair statement, according to Paul Del Rosso, that DeMola bullied people within the office. (*See* Merin Certif., Ex. CC: Dep. of Paul Del Rosso (Sept. 24, 2011) ("Del Rosso Dep.") 118.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes Mr. Del Rosso's testimony. This was not a statement by Mr. Del Rosso. In response to a question, he responded "I guess." (*See* Merin Cert., Ex. CC, Del Rosso Dep. at 118:19).

169.    Del Rosso testified that DeMola tried to bully him into making exceptions to allow certain loans to go through. (*See* Merin Certif., Ex. CC: Del Rosso Dep. 119.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Del Rosso's testimony about what Ms. Demola purportedly tried to do.

170.    Del Rosso explained that, if DeMola was bullying him and asking him to approve a loan that did not meet the guidelines and he felt that the bullying was inappropriate, he believes the issue would be referred higher up the chain to let others deal with it. (*See* Merin Certif., Ex. CC: Del Rosso Dep. 120.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Del Rosso's testimony.

171.    When there were disagreements between DeMola wanting to close a loan and Del Rosso, the underwriter regarding underwriting a loan, "almost 10 times out of 10 [DeMola] would win." "[DeMola] would get her way." (*See* Merin Certif., Ex. Z: D'Apolito Second Day 56.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes Mr. D'Apolito's full testimony. Mr. D'Apolito also stated that the process to resolve their dispute would be as follows "They would go

behind closed doors, do whatever they had to do. And, I guess, Paul would give in." This testimony is in direct conflict with the testimony provided by Mr. Del Rosso. Ms. Demola's ability to approve loans is also contradicted by the testimony of Mr. Del Rosso who explained that if Ms. Demola ever requested an exception that he did not agree with that he would refer her to Arnold Cohn and then either Arnold Cohn or James Walsh would resolve it. (*See* Wagner Cert., Ex. J, D'Apolito Dep. at 56:25-57:2; Merin Cert., Ex. CC, Del Ross Dep. at 120:1-19; Merin Certif., Ex. CC: Del Rosso Dep. 119:11-23).

172.     Robert Walsh testified that he could not think of a reason why DeMola would be interacting with underwriters outside of the ordinary course of business during the day or interacting at any time as part of her job with closing attorneys or people who worked with them. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 138.)

**RESPONSE:**

Disputed.  Defendant's statements are not supported by the citation provided.

*Improper Interactions & Actions with Appraisers*

173.     DeMola was aware that appraisers were putting in false appraisals for the loans in this lawsuit, because she met with the appraisers, even at WSI, and told them what to do.  D'Apolito was there once when that occurred.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 83.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony; however, it is contradicted by Ms. Demola's testimony that she would speak with appraisers that dropped by socially and would not discuss any business aspect of a loan with an appraiser.  In addition, there were a few times where they would write up appraisers and they would appeal the decision. (*See* Wagner Cert., Ex. C, Demola Dep. at 348:8-21).

174.     O'Neill testified that DeMola was aware of the false appraisals before the fraud become public, as O'Neill remembers DiBenedetto coming to the WSI office and also remembers a memorandum that went out specifically addressing how the appraisals had to be done, what the house was initially worth, and all the repairs that had to be done to the home.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 40.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony.  She did not state that "Demola was aware of the false appraisals before the fraud became public," she stated "yes" in response to the question "Do you know whether Betty Ann Demola was aware before the fraud became public of any improper actions of the appraisers?"  Furthermore, Ms. O'Neill's testimony is contradicted by Ms. Demola.  (*See* Merin Cert., Ex. K, O'Neill First Dep. at 40:1-4; Wagner Cert., Ex. C, Demola Dep. at 348:8-21).

175.     Specifically, D'Apolito testified that he heard DeMola tell the appraisers not to take any interior photos, because DeMola knew she got it approved and that they did not need them.  She instructed that "we" did not care what the inside looked like, and if there was any work that had to be done, the appraisers should not mention it.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 83-84.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony, which is contradicted by Ms. Demola's testimony regarding her communications with the appraisers and also because she testified that WSI's appraisals were, according to her understanding, supposed to include interior photographs. (*See* Wagner Cert., Ex. C, Demola Dep. at 190:13-23).

176.     DeMola's instruction to the appraisers not to take interior photos occurred within a couple months of the first fraudulent loans being done.  That is when Brodo and DiBenedetto came to the WSI office, and DeMola talked to them about it.  Then D'Apolito told Skowrenski and Skowrenski told Rich Calanni.  He does not think James Brodo was in the picture because DeMola did not even like Brodo.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 177.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony, which is contradicted by Ms. Demola's testimony regarding her communications with the appraisers and also because she testified that WSI's appraisals were, according to her understanding, supposed to include interior photographs. In addition, Ms. Gonzalez-Lehman' quality control memorandum specifically indicated there were interior photos.  (*See* Wagner Cert., Ex. C, Demola Dep. at 190:13-23; Merin Certif., Ex. U: WSI Quality Control Memorandum regarding Greenwich Capital Audit (Jan. 31, 1997)).).

177.     DeMola also instructed the appraisers to use prior deals that Walsh had closed for purposes of comparables for new appraisals and specifically instructed the appraisers as to which comparables to use.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 112.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony, which is contradicted by Ms. Demola's testimony regarding her communications with the appraisers and also because she testified that WSI's appraisals were, according to her understanding, supposed to include interior photographs. (*See* Wagner Cert., Ex. C, Demola Dep. at 190:13-23).

178.     D'Apolito explained that, in some cases "it was ones from this case to comp out the ones from this case…you could do that legally."  "In a lot of cases that she needed desk review and they couldn't get it to match up, they would take it from another appraisal that was from Asbury Park, which was a fraudulent deal, to comp it out."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 113.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony, which is contradicted by Ms. Demola's testimony regarding her communications with the appraisers and also because she testified that WSI's appraisals were, according to her understanding, supposed to include interior photographs. (*See* Wagner Cert., Ex. C, Demola Dep. at 190:13-23).

179.   DeMola told Brodo, an appraiser, that if he did not do appraisals in the amount DeMola desired, he would not get appraisal assignments in the future on Walsh loans.  (*See* Merin Certif., Ex. DD: Dep. of Thomas Brodo (April 24, 2007) ("Brodo Dep.") 26.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation provided.

180.   During her allocution, DeMola admitted that she improperly concurred in the funding of loans without obtaining accurate written appraisals:

> THE COURT: Specifically, did you, (a), concur in the funding of loans
> without first having obtained an accurate written appraisal?
> THE DEFENDANT:  Referrals, yes.
> THE COURT: And did you direct persons at Walsh to participate in
> efforts with respect to closed funded loans which were to be reviewed
> by representatives of Greenwich Capital, which efforts included
> altering certain documents in those files and placing other documents,
> such as written appraisals, in the files?
> THE DEFENDANT:  Yes.  After the verbals we would get the written
> ones and put them in the files.

(*See* Merin Certif., Ex. D: DeMola Plea 20.)

**RESPONSE:**

Disputed to the extent that it states "Demola admitted that she improperly concurred in the funding of loans."  Otherwise, Ms. Demola's plea allocution speaks for itself that loans were closed based on verbal appraisals from state-licensed appraisers and that WSI would subsequently receive written appraisals.  This is a regular practice and not improper or illegal.

181.   Similarly, D'Apolito gave sworn testimony that DeMola "direct[ed] that loans for which [D'Apolito] [was] the account executive be approved and funded based upon verbal representations of market value by an appraiser, without having received a written appraisal report." (*See* Merin Certif., Ex. BB: D'Apolito Plea 30.)

**RESPONSE:**

It is undisputed that this is a quote from Mr. D'Apolito's plea hearing.  This statement is specifically contradicted by Ms. Demola's testimony as set forth above in paragraph 180.

182.    O'Neill testified as to the same during her allocution:

> THE COURT: And did an individual by the name of Betty Ann Demola, the sales manager at Walsh Securities, on various occasions direct that mortgage loans which you processed be approved and funded without Walsh Securities having received a written appraisal report?
> DEFENDANT O'NEILL: Yes, sir.

(*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29; Ex. K: O'Neill First Dep. 42.)

**RESPONSE:**

It is undisputed that this is a quote from Ms. O'Neill's plea hearing. This statement is, however, specifically contradicted by Ms. Demola's testimony as set forth above in paragraph 180.

183.    Brodo explained that DeMola asked him to change appraisals; at times DeMola would call saying that an appraisal number he gave Kane or was submitted in a written appraisal did not work with a particular deal.  (*See* Merin Certif., Ex. DD: Brodo Dep. 74-75.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Mr. Brodo's testimony; however, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.

184.    Brodo stated that the conversations with DeMola about changing numbers related to both verbal and written appraisals.  (*See* Merin Certif., Ex. DD: Brodo Dep. 102-03.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Mr. Brodo's testimony; however, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.

185.    Where Brodo had only given DeMola a verbal appraisal, and he agreed to DeMola's request to change the number, he could have just written the higher number on the form or "made some changes that would justify that number.  There is a process of adjustments where you come down to at least three comparables."  This is how he would come up with the right number.  He was able to do this, because he had not yet physically finished the form.  "It was all on the computer, so even if it had been printed out, you could easily print it out again."  (*See* Merin Certif., Ex. DD: Brodo Dep. 103.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Mr. Brodo's testimony; however, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.

186.    Where Brodo had already provided DeMola with a written appraisal, DeMola had the hard copy of that appraisal in her possession, and she asked him to change it, "normally [they] would ask for that old appraisal back, and then give her a replacement one." (*See* Merin Certif., Ex. DD: Brodo Dep. 103-04.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Mr. Brodo's testimony; however, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.

187.    The replacements for the written appraisals that had been changed per DeMola's request did not indicate that the replacement was a rescission or that the replacement in any way contained any alterations.  Because of this, if someone were to look at the second version of the appraisal, that person would not know that there previously had been a lower number on the same appraisal.  (*See* Merin Certif., Ex. DD: Brodo Dep. 104.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Mr. Brodo's testimony; however, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.

188.    DeMola also requested that DiBenedetto raise appraisals: DeMola "would say the six appraisals were 100, 120, 130, 140 and 150 and [she] would say she needs another 30, 35, 40 because she has to cover the closing costs of these people and the down payment of these people, there would be a bit of back and forth or something like that." (*See* Merin Certif., Ex. L: DiBenedetto Dep. 50; *see also id.* at 126-127 (discussing a specific example where DeMola contacted him to tell him the appraisal needed to be $50,000 higher and provided him with comparables); *id.* at 131 (after he stopped working for WSI, DeMola requested that he raise certain appraisals that he had previously done).)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Mr. DiBenedetto's testimony; however, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.

189.    DeMola or others at WSI also asked DiBenedetto to do appraisals after the loans closed, and there were circumstances where DiBenedetto was of the belief the loan had already closed and he was asked to change that appraisal afterwards.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 129-30.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Mr. DiBenedetto's testimony; however, it is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.

190.    DeMola verbally abused appraisers to cause them to increase their appraisals.  For example, appraiser Thomas Brodo was asked by Judge Wolin at his plea hearing, "At various times in 1996 and 1997, did Betty Ann DeMola of Walsh Securities verbally abuse you in an effort to cause you to raise the appraised values you assigned to the properties as to which Walsh was lending money, and did she state in substance that if you could not bring in the figure she desired, then you would not get appraisal assignments on Walsh loans?"  The answer that Brodo gave was:  "She did, and that's true, your Honor."  (*See* Merin Certif., Ex. DD: Brodo Dep. 26 (confirming the testimony from his plea hearing).)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Brodo's testimony at his plea hearing.  Notwithstanding that testimony, Mr. Brodo also testified in his deposition that Ms. Demola "wasn't always abusive.  It wasn't always a yelling and screaming conversation…I can't say she was the only person that ever did it.  I think it's endemic in the industry…."  (*See* Merin Cert., Ex. DD, Brodo Dep. at 75:16-25).

191.    DeMola would call Brodo and verbally abuse him at the end of the month.  (*See* Merin Certif., Ex. DD: Brodo Dep. 72.)

**RESPONSE:**

Disputed to the extent that the statement says that "Demola would call Brodo".  Mr. Brodo testified "Um-hum." in response to the question "You had said earlier that Betty Ann Demola had called you up and verbally abused you at the end of the month."  In addition, this statement is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.  (*See* Merin Cert., Ex. DD, Brodo Dep. at 72:17-20).

192.    Brodo stated that it would not be unusual for someone to call and want to discuss the amounts of appraisals but that DeMola "was quite a bit more verbal about her displeasure with the numbers than some other people on that.  It was partially her nature.  [He] thinks she was just that kind of abusive person."  (*See* Merin Certif., Ex. DD: Brodo Dep. 72-73.)

**RESPONSE:**

Undisputed to the extent that Defendant's statement summarizes Mr. Brodo's testimony, however this statement is contradicted by Ms. Demola's testimony as set forth above in Paragraph 173.

193.    Similarly, DiBenedetto, another appraiser, testified that, in 1995 and 1996 DeMola verbally abused him in an effort to cause him to raise the value at which he appraised a particular

property and described this as a common occurrence.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 50.).)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. DiBenedetto's testimony; however, this contradicted by Ms. Demola's testimony as set forth above in Paragraph 173. (*See* Wagner Cert., Ex. C, Demola Dep. at 348:8-21).

194.   DiBenedetto testified that, in his experience as an appraiser, it was unusual that a lender would call him as an appraiser and say to him, as DeMola did, that he needed to raise the value at which he appraised a particular property.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 50-51.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. DiBenedetto's testimony; however, this contradicted by Ms. Demola's testimony that she would not have these types of conversations with appraisers.  (*See* Wagner Cert., Ex. C, Demola Dep. at 348:8-21).

195.   Notably, Robert Walsh testified – as the 30(b)(6) witness for WSI – that, to his knowledge, there would never be any reason that DeMola would interact with an appraiser.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 93.)

**RESPONSE:**

Undisputed.

196.   O'Neill was "asked by Betty Ann DeMola to participate with other Walsh employees in combing through closed files which were shortly to be reviewed by representatives of Greenwich Capital, which funded loans for Walsh Securities, in order to alter some of the documents then in those files or to place documents, such as written appraisals, in those files[,]" and DeMola was present "during portions of the file-cleaning process."  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29-30.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. O'Neill's plea testimony. Notwithstanding her testimony, Ms. Demola's testimony, which implies that there was something improper with the file cleansing process, is inconsistent with the facts and the testimony of other WSI employees.  (*See* Wagner Cert., Ex. B, WSI Dep. at 153:7-154:5; Wagner Cert., Ex. E, Del Ross Dep. at 60:9-61:10).

197.   DeMola called a meeting of a group of WSI employees, they went into a conference room, and were given a list of items that had to be in the files and items that had to be taken out of the files.  They were instructed too go through batches of loans and to make the loan files conform

with the written list they were given, which specified what had to be in the loan and what should not be in the loan.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 52.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Ms. O'Neill's testimony; however, it does not demonstrate that anything improper occurred.

198.    DeMola gave the instruction to the employees cleaning the files – who included some people from underwriting and closers – to make sure that they followed what was on the paperwork she gave them that stated what should be in a file and what should be removed.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 73; Ex. P: O'Neill Second Dep. 64.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Ms. O'Neill's testimony; however, it does not demonstrate that anything improper occurred.

199.    O'Neill had never before seen a paper like the one she was given for the file cleansing.  It was not a checklist normally used in determining what documents should be in a file.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 73-74.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. O'Neill's testimony.  She never stated that this document "was not a checklist normally used in determining what documents should be in a file."  (*See* Merin Cert., Ex. K, O'Neill First Dep. at 73:24-74:3.)

200.    In the file cleansing, notes from the underwriters were taken out, and, where any commitment letters had gone out with DeMola's signature on them, her signing to waive conditions was taken out.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 56.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. O'Neill's testimony; however, it is inconsistent with other statements by Ms. O'Neill where she did not recall details regarding documents removed from the files. (*See* Merin Cert., Ex. P, O'Neill Second Dep. at 30-38).

201.    O'Neill specifically remembers removing from the files all underwriting approvals that had DeMola's signature on them.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 74.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. O'Neill's testimony; however, it is inconsistent with other statements by Ms. O'Neill where she did not recall details regarding documents removed from the files. (*See* Merin Cert., Ex. P, O'Neill Second Dep. at 30-38).

202.    O'Neill explained that they did not want evidence of DeMola waiving any conditions at all in the file, because they did not want anything coming back to DeMola and it was not DeMola's job to sign off on conditions – that was the underwriters' job.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 57; Ex. P: O'Neill Second Dep. 37-38, 67-68.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. O'Neill's testimony; however, it is inconsistent with other statements by Ms. O'Neill where she did not recall details regarding documents removed from the files. (*See* Merin Cert., Ex. P, O'Neill Second Dep. at 30-38).

203.    Additional alterations during the file cleansing included that some files needed escrow letters. Also, "[f]iles that were closed without appraisals. The appraisals had to be there by the time they got there so Kellie was calling up the appraisers and letting them know. . . . Kellie would call the appraisers and ask the appraisers to send appraisals for loans that had already been closed."  O'Neill told D'Apolito that DeMola was aware of that and instructed her to do it.  He believes Del Rosso also knew. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 93-94.)

**RESPONSE:**

Disputed. Mr. D'Apolito's testimony is based upon hearsay and not based upon any substantive facts or knowledge that he had.

204.    At her deposition, DeMola testified that she did not remember whether she directed persons at Walsh to participate in efforts with respect to closed funded loans which were to be reviewed by representatives of Greenwich Capital which efforts included altering certain documents in those files and placing other documents such as written appraisals in the files.  (*See* Merin Certif., Ex. C: DeMola Dep. 124-25.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. Demola's testimony.

### *Indictment & Admitting Involvement in the Fraud by Sending Lulling Letters*

205.    DeMola was indicted, in part, for, with her "co-consiprators[,] [seeking] for their benefit to preserve the proposed merger with RBMG and the warehouse credit line with Greenwich Capital – both of which were threatened by law enforcement investigation and the press disclosures of the allegations of fraud – by causing [WSI] to issue false, lulling communications to outside parties concerning the nature and scope of the fraud and the purported lack of involvement of management personnel at [WSI].  In those communications and by other means, [WSI] falsely ascribed sole blame for the fraud to persons outside the company and to lower-level employees of the company." (*See* Merin Certif., Ex. EE: Indictment, *United States of America v. DeMola*, No. 02-508 ("DeMola Indictment") at Count 1 ¶¶ 13, 15(e), 15(f), 15(g), 15(h); Count 2 ¶¶1-2.)

**RESPONSE:**

This paragraph need not be disputed because an indictment is not evidence, it simply states the charge. Neither the indictment nor the fact that an indictment has been filed constitutes evidence. *U.S. v. McDade,* 28 F.3d 283, 301 (3d Cir. 1994).

206. The factual recitation of the allegations within the federal indictment against DeMola alleged:

> 6.     From in or around 1996 to at least as late as in or around August 1997, in the District of New Jersey and elsewhere, defendant **ELIZABETH A. DEMOLA** knowingly and wil[l]fully combined, conspired, confederated, and agreed with others to commit an offense against the United States, that is, to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and to do so by means of interstate wire communications, contrary to 18 U.S.C. § 1343.
>
> ### OBJECTS OF THE CONSPIRACY
>
> 7.     The objects of the conspiracy included: (a) allowing various co-conspirators to benefit from fraudulently participating in sales of properties utilizing falsified transaction documents; and (b) allowing Walsh Securities to fraudulently increase its inventory of mortgage loans; to the anticipated benefit of defendant **ELIZABETH A. DEMOLA** and other co-conspirators.
>
> ### MEANS AND METHODS OF THE CONSPIRACY
>
> 8.     In furtherance of the conspiracy, defendant **ELIZABETH A. DEMOLA** and her co-conspirators sought to cause Walsh Securities to fund an increasing number of mortgage loans initiated by various mortgage originators and others, including persons participating in fraudulent land flips. Their purpose in doing so was to enlarge Walsh Securities' inventory of mortgage loans to permit Walsh Securities to profitably securitize its loan pools. **DEMOLA** and her co-conspirators planned thereby to make Walsh Securities appear financially more successful and attractive, in order to benefit themselves by facilitating either an initial public offering of the company's stock or an acquisition by, or merger with, another mortgage company.
>
> 9.     In order to facilitate fraudulent land flipping activity and to generate the resulting mortgage loans for Walsh Securities, defendant **ELIZABETH A. DEMOLA** and her co- conspirators took the following actions, among others:
>
> a.     accepting kickbacks from land flippers in connection with the processing of fraudulent mortgage applications and related documents on properties sold by such persons;
>
> b.     preparing fictitious leases designed to show that multi-family properties which were the subject of loan applications were

occupied by rent-paying tenants and therefore would appear to generate rental income sufficient to support a mortgage loan;

     c.     agreeing to have the fraudulent land flipping seller and others create second mortgage documents in order to conceal the absence of actual down payments by buyers;

     d.     approving and funding loans knowing that buyers had not made the down payments reflected in the loan documents;

     e.     preparing fictitious attorney escrow letters showing non-existent down payments by buyers;

     f.     pressuring appraisers to inflate their valuations of properties to justify higher mortgage loans;

     g.     pressuring and demanding that loan originators and others submit their loan applications and related documents to Walsh Securities, particularly towards the end of each month;

     h. .     improperly eliminating underwriting conditions which were not met;

     i.     directing loan underwriters and others to overlook suspicious loan applications and supporting documentation;

     j.     approving and funding loans without first having obtained an accurate, written appraisal;

     k.     approving, funding, reselling and securitizing loans supported by appraisals they knew contained inflated market values and other false information;

     l.     approving, funding, reselling and securitizing loans supported by escrow letters and second mortgages which were not genuine;

     m.     approving, funding, reselling and securitizing loans knowing that mortgage payments would be made not by the buyer-borrower but by co-conspirators; and

     n.     directing and participating in the purging of documents from loan files and the alteration of documents in loan files.

10.     When Greenwich Capital sought to have its representatives inspect various properties which stood as the collateral for Walsh Securities' mortgage loans, defendant **ELIZABETH A. DEMOLA** and her co-conspirators took steps to forestall those inspections and to conceal problems with the properties by, among other things, causing persons to temporarily and cosmetically cover up defects in the properties and physically delaying inspections by a Greenwich Capital representative in order to allow that concealment activity to be completed.

11.     As a result of the increased loan volume generated through the fraudulent land flipping activity, in or around early 1997, the principals of Walsh Securities were able to induce Resource Bancshares Mortgage Group, Inc. ("RBMG"), a large South Carolina mortgage company, to enter into an agreement to merge with Walsh Securities. Under the terms of the proposed merger, shareholders of

Walsh Securities, including defendant **ELIZABETH A. DEMOLA,** were to receive substantial and valuable shareholdings in RBMG when the merger was concluded. In addition, **DEMOLA** was to become an Executive Vice-President of the merged entity, with a substantial salary, as well as bonuses, commissions, and benefits.

12.     Beginning in or around late June 1997 the fraudulent land flipping activity and the corresponding number of mortgage loans funded by Walsh Securities began to decline, as the result of a law enforcement investigation into the fraudulent activity and a series of newspaper articles concerning the allegations.

13.     Defendant **ELIZABETH A. DEMOLA** and her co-conspirators sought for their benefit to preserve the proposed merger with RBMG and the warehouse credit line with Greenwich Capital -- both of which were threatened by the law enforcement investigation and the press disclosures of the allegations of fraud -- by causing Walsh Securities to issue false, lulling communications to outside parties concerning the nature and scope of the fraud and the purported lack of involvement of management personnel at Walsh Securities. In those communications and by other means, Walsh Securities falsely ascribed sole blame for the fraud to persons outside the company and to lower-level employees of the company.

14.     For a period of time defendant **ELIZABETH.A. DEMOLA** and her co-conspirators were able through these communications and other means to successfully delay action by RBMG and Greenwich Capital which would have threatened the financial windfall anticipated by **DEMOLA** and her co-conspirators.  Ultimately, however, and despite those efforts, RBMG terminated the proposed merger and Greenwich Capital terminated its warehouse line of credit.

## OVERT ACTS

15.     In furtherance of the conspiracy and in order to effect the objects thereof, defendant **ELIZABETH A. DEMOLA** and her co-conspirators caused the following overt acts to be committed in the District of New Jersey and elsewhere:

        a.      In 1996 and 1997 **DEMOLA** instructed lower-level employees at Walsh Securities to approve and fund mortgage loans without written appraisals.

        b.      In 1996 and 1997 **DEMOLA** caused Greenwich Capital Markets on various occasions to wire transfer, through various bank accounts outside New Jersey into attorneys' bank accounts in New Jersey, monies to fund mortgage loans being approved and funded on the basis of falsified documents.

        c.      In January 1997 **DEMOLA** participated in meetings at Walsh Securities with co-conspirators to discuss fraudulent loan activity.

d.      In June 1997 **DEMOLA** participated in meetings at Walsh Securities with co-conspirators to discuss fraudulent loan activity.

e.      On or about July 3, 1997 **DEMOLA** caused a letter, sent from Walsh Securities to Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

f.      On or about July 10, 1997 **DEMOLA** caused a letter, sent from Walsh Securities to parties including Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

g.      On or about July 24,1997 **DEMOLA** caused a letter, sent from Walsh Securities to parties including Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

h.      On or about August 27, 1997 **DEMOLA** caused a letter, sent from Walsh Securities to parties including RBMG and Greenwich Capital Markets, to falsely describe the fraudulent loan activity.

All in violation of Title 18, United States Code, Section 371.

(*See* Merin Certif., Ex. EE: DeMola Indictment at Count 1 ¶¶ 6-15.)

**RESPONSE:**

This paragraph need not be disputed because an indictment is not evidence, it simply states the charge. Neither the indictment nor the fact that an indictment has been filed constitutes evidence. *U.S. v. McDade,* 28 F.3d 283, 301 (3d Cir. 1994).

207.    Counts two through four of DeMola's indictment also alleged, based on the allegations set out in Count One, that DeMola engaged in wire fraud with respect to the July 3, July 10, and August 27, 1997 lulling letters. (*See* Merin Certif., Ex. EE: DeMola Indictment at Count II.)

**RESPONSE:**

This paragraph need not be disputed because an indictment is not evidence, it simply states the charge. Neither the indictment nor the fact that an indictment has been filed constitutes evidence. *U.S. v. McDade,* 28 F.3d 283, 301 (3d Cir. 1994).

208.    In her guilty plea to conspiracy to commit wire fraud, DeMola admitted to having knowledge of the fraud, participating in the fraud, and sending "lulling letters" in July and August 1997. (*See* Merin Certif., Ex. D: DeMola Plea 18-21.)

**RESPONSE:**

Disputed. Defendant's statement mischaracterizes Ms. Demola's plea testimony, which speaks for itself. Specifically, Ms. Demola did not admit to having knowledge of the fraud, participating in the fraud or sending "lulling letters."

209.     DeMola admitted that WSI closed loans with funds provided by Greenwich Capital, acquired loans from mortgage originators including NHF, and knew that William Kane worked at NHF and also bought and sold properties on loans that WSI bought from entities including NHF. (*See* Merin Certif., Ex. D: DeMola Plea 18-20.)

**RESPONSE:**

It is undisputed that Defendant's statement is a summary of Ms. Demola's plea testimony.

210.     Specifically as to her sending lulling letters, at her allocution, DeMola admitted as follows:

> THE COURT: Are you aware that in July and August 1997 Walsh Securities sent communications to third parties, as described in Counts 2 through 4 of the indictment, which failed to fully and accurately apprise those parties of your knowledge and activities as a member of the management of Walsh Securities?
> THE DEFENDANT: I am aware now, yes.
> THE COURT: I am sorry?
> THE DEFENDANT: I am aware now, yes.
> THE COURT: Did you do all of these things deliberately and intentionally, and not by reason of ignorance mistake or accident?
> THE DEFENDANT: Yes.

(*See* Merin Certif., Ex. D: DeMola Plea 20-21.)

**RESPONSE:**

It is undisputed that Ms. Demola testified as quoted in Defendant's statement; however, it is notable that when asked about sending the lulling letters, Ms. Demola testified "I am aware now, yes." Ms. Demola did not testify that she sent the lulling letters.

***Benefit From the Fraud***

211.     Every time WSI made a loan, DeMola made money on it. (*See* Merin Certif., Ex. C: DeMola Dep. 145; *see also* Ex. Z: D'Apolito Second Dep. 61 (DeMola wanted every loan coming in, to close, because she was paid based on that).)

**RESPONSE:**

Undisputed.

212.     DeMola benefited from the loans through higher sales volume. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 230.)

**RESPONSE:**

Undisputed.

213.    As to DeMola's financial arrangement with the company, DeMola did not have any responsibility for whether the loans ultimately performed. (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 106.)

**RESPONSE:**

Disputed.  Defendant's statement improperly relies upon Mr. D'Apolito's testimony that is based upon inadmissible hearsay.

214.    Allowing the loans to close before the written appraisal is received allowed DeMola's production numbers to look better.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 226.)

**RESPONSE:**

It is undisputed that the substance of Mr. Kane's testimony was that "if you look at it that way, yes,"  "allowing loans to close before the written appraisal is received allowed Betty Ann's numbers, production numbers, to look better."  (*See* Merin Cert., Ex. F, Kane 2011 Dep. at 226:4-8.)

215.    If the fraudulent scheme was brought to an end, DeMola would not have had the same volume of loans in her portfolio.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 202.)

**RESPONSE:**

Disputed to the extent that the fraudulent scheme was in fact brought to an end; therefore, it does not make sense to question if the fraudulent scheme was brought to an end.

216.    DeMola benefitted from the Kane loans, because she got paid commission on all the loans that closed.  She had a high salary plus a commission on every loan.  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 87, 106.)

**RESPONSE:**

This is undisputed; however, Ms. Demola benefitted from all loans that were closed, not just Mr. Kane's.

217.    DeMola also had "every reason to be sure that loans continued to get approved not only because [DeMola] would make money, but because it created an income flow for loans to be repaid."  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 108.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

218.    D'Apolito testified that he would see [DeMola] going in there to beg, "because she needed every loan closed for her commission".  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 62.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

219.    At the luncheon with James Walsh, Kane, D'Apolito, and Grieser, DeMola told James Walsh at that she wanted to continue to fund the loans.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 230.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes this portion of Mr. Kane's testimony.

220.    DeMola had an incentive to be aware this was going on and allow it to go on, because she was getting pressure from Robert Walsh just like in any sales company that she had to have the numbers, she was getting the numbers, and she did not care how she got them.  She did not think anything of it or thought nothing would ever go wrong.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 63-64; Ex. F: Kane 2011 Dep. 224.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony and is not supported by the citation provided to Mr. Kane's testimony.  Mr. D'Apolito did not testify that "Demola had an incentive to be aware that this was going on and allow it to go on."

221.    DeMola was enthusiastic about the RBMG merger.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 226.)

**RESPONSE:**

Undisputed.

222.    DeMola testified at her plea hearing that she stood to benefit financially from the merger of WSI with RBMG and that increased loan production volume enhanced WSI's prospects of concluding the merger.  (*See* Merin Certif., Ex. D: DeMola Plea at 18.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Ms. Demola's testimony at her plea hearing.  The colloquy at the plea hearing was as follows:

THE COURT:        In performing your duties did you strive to meet or exceed
                  monthly quotas for closed loans and to increase the company's

loan production volume, at least in part to enhance the company's prospects of concluding a merger with another loan company from which – which you and other shareholders would benefit financially?

THE DEFENDANT: Yes.  I was a sale manager and that was my job. Yes.

(*See* Merin Cert., Ex. D, Demola Plea at 18:15-22).

223.    DeMola, Del Rosso, D'Apolito, and DeMola's two sons-in-law who were the other two sales reps were getting shares in stock.  D'Apolito never received any of the stock benefits,  but when the merger went through, he was supposed to get $150,000 in shares and then $300,000 in stock options.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 80; Ex. O: D'Apolito First Dep. 88-89.)

**RESPONSE:**

It is undisputed with the exception that Mr. D'Apolito testified that he "believed" that Ms. Demola's sons-in-law were receiving stock, and that he did not receive any stock because he was terminated and the merger did not go through.  Furthermore, no one was scheduled to be issued stock options.

224.    D'Apolito believed that he, as an employee of WSI, was going to get compensation as a result of the RBMG acquisition, because it was a portion of what DeMola was receiving, he was the top sales representative at WSI, and DeMola probably wanted to keep him quiet.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 81.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes this Mr. D'Apolito's testimony, with the exception that he did not state "it was a portion of what DeMola was receiving."

**Anthony D'Apolito**

225.    D'Apolito was intricately involved in the fraudulent scheme and was wholly aware of Kane's involvement.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 205.)

**RESPONSE:**

Undisputed.

226.    D'Apolito was "employed as an account executive at [WSI.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 27.)

**RESPONSE:**

It is undisputed that at Mr. D'Apolito's plea he described himself as "an account executive;" however, at his deposition he described himself as a sales rep and an account rep. (*See* Wagner Cert., Ex. J, D'Apolito Second Dep. at 20:4-5; 34:12-14).

227.   DeMola was D'Apolito's supervisor.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 234.)

**RESPONSE:**

Undisputed.

228.   D'Apolito was paid by WSI "a base salary and commissions based upon the total principal amount of closed mortgage loans [he] generated and, on occasion, bonuses for meeting certain targets set by [WSI.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 28.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

229.   D'Apolito pled guilty to a two-count felony of conspiracy to commit wire fraud and the substantive offense of wire fraud. (*See* Merin Certif., Ex. BB: D'Apolito Plea 11, 15, 32.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

230.   At his allocution, D'Apolito testified that he knowingly and willfully engaged in the fraudulent scheme here.  (*See* Merin Certif., Ex. BB: D'Apolito Plea 30-31.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

231.   D'Apolito understood "that underwriting decisions as to mortgage loans were based, at least in part[,] on information contained in the mortgage application, supporting documentation submitted with the application, and appraisal reports on the property[.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 28.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

232.   D'Apolito admitted to, "[i]n early 1996 . . ., by agreement and understanding with various persons including William Kane, prepar[ing] fictitious leases and tak[ing] other actions in

71

connection with mortgage applications submitted to and later approved by [WSI.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 28.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

233.    The "fictitious leases [were] designed to show that the multi-family properties that were the subject of the mortgage applications were occupied by rent-paying tenants and therefore would generate rental income[.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 28-29.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes this Mr. D'Apolito's plea testimony.

234.    D'Apolito understood "that in 1996 and 1997 numerous mortgage applications accompanied by similar fictitious leases and other false supporting documents, such as fraudulent pay stubs and IRS Forms W-2, were used to generate mortgage loans by [WSI] which were funded by Greenwich Capital[.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 29.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

235.    D'Apolito also understood that, in 1996 and 1997, "the transactions generating those mortgage loans were [] 'land flips[.']  That is, the properties that secured the loans had been purchased or were under contract to be purchased by William Kane and other persons and entities at a relatively low price and were resold shortly thereafter to another at a significantly higher price[.]"  (*See* Merin Certif., Ex. BB: D'Apolito Plea 29.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

236.    Kane would sit with O'Neill and D'Apolito at WSI and get his loans closed.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 129.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.

237.    D'Apolito also admitted to, "[i]n early 1997, . . . forg[ing] notarizations on various closing documents for a number of fraudulent land flips."  (*See* Merin Certif., Ex. BB: D'Apolito Plea 30.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

238.    Regarding his forging notarizations, D'Apolito testified that he "saw the people sign the documents, but [] thought as a notary it was a conflict of interest for [him] to sign it as Anthony D'Apolito because [he] worked for Walsh. So [Grieser] gave [him] . . . [Grieser's wife Sue's notary] . . . [he] took it and signed her name and stamped it." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 97.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony, with the exception that he also stated the he only did it on the five loans and did not tell Ms. Demola. (*See* Merin Cert., Ex. O, D'Apolito First Dep. at 97:13-16).

239.    D'Apolito admitted that DeMola and O'Neill reached out to him with a list of properties in the Long Branch and Asbury Park area and instructed him to contact Kane and tell Kane to make those properties "look lived in" before a representative of Greenwich Properties came down to inspect them. (*See* Merin Certif., Ex. O: D'Apolito First Dep. 126, 171; Ex. BB: D'Apolito Plea 30-31.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's  testimony in his deposition and his plea, which were contradictory.  In his plea, he testified that Ms. Demola contacted  him. In  his deposition testimony, he testified that Ms. O'Neill called him.

240.    As part of his involvement in this fraudulent scheme, D'Apolito "accept[ed] payments from William Kane in connection with hundreds of fraudulent land flip transactions that generated mortgage loans for [WSI.]" (*See* Merin Certif., Ex. BB: D'Apolito Plea 29-30.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's plea testimony.

241.    Kane made $10,000 or $20,000 in cash payments to D'Apolito as part of the fraudulent scheme at the WSI office, and Skowrenski of NHF also made cash payments to D'Apolito.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 235.)

**RESPONSE:**

It is undisputed, except to the extent that Mr. Kane stated that he made these payments to Mr. D'Apolito for "doing a variety of improper things" – not as Defendant represents "as part of the fraudulent scheme at the WSI office."  In addition, Defendant's statement is not supported by the citation provided.  (*See* Merin Cert., Ex. F, Kane 2011 Dep. at 234:18-235:15).

242.   Kane also paid D'Apolito additional money to draft fraudulent leases.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 235.)

**RESPONSE:**

Undisputed.

243.   D'Apolito admitted that he received "$300 per loan that closed" from Robert Skowrenski of NHF.  (*See* Merin Cert., Ex. O: D'Apolito First Dep. 184.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

244.   D'Apolito stated that he "took all the money [paid to him through the fraudulent scheme].  [Kane] paid [him] by check.  [D'Apolito] didn't hide it.  It wasn't cash.  [D'Apolito] would take it and put it through DAP, Inc.  [D'Apolito] filed taxes on it and everything.  It was DAP Consulting, Inc.  [He] treated it as a consulting fee."  D'Apolito added, "[t]he government was trying to get me on tax evasion but couldn't because I paid taxes on that money.  I didn't hide it."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 185.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

245.   D'Apolito explained that the checks were written on whatever checking account Kane had.  "Even if [Kane] gave [him] cash, [he would] put it through the business account.  Most of the time it was always a check.  It was out of Cristo.  Sometimes [Kane's] checks bounced.  But they came from [Kane] all the time."  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 185.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

246.   Kane explained how he paid D'Apolito: "[t]he bank paid a commission to National Home Funding based on the rate of the mortgage."  Thus, the higher the interest rate, the more money would be paid to National Home Funding.  "So that went to National Home Funding. [Skowrenski] took a piece of it, [D'Apolito] took a piece of it, and then [Kane] got the balance." Kane then paid D'Apolito for taking the loans to Walsh Securities.  He paid "usually in the beginning [with] cash.  And then [D'Apolito] opened up a company, and then [Kane] was paying him through his company."  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 51, 52; *see also id.* at , 103-04 (admitting that paid money to D'Apolito and that Kane paid money to D'Apolito).)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's and Mr. D'Apolito's testimony.

247.    DiBenedetto explained that, on each deal, "D'Apolito would want $1000[.]"  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 119.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. DiBenedetto's testimony.

**<u>Kellie O'Neill</u>**

248.    O'Neill was intricately involved in the fraudulent scheme and was aware of Kane's involvement.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 205.)

**RESPONSE:**

Undisputed.

249.    O'Neill was employed as a loan processor at WSI during 1996 and 1997.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29.)

**RESPONSE:**

Undisputed.

250.    O'Neill's duties at WSI included "reviewing the documents submitted by mortgage originators and others in support of mortgage loan applications" and "preparing [WSI] loan commitment letters following review of those applications by [WSI's] underwriters.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29.)

**RESPONSE:**

It is undisputed that Defendant's statement quotes Ms. O'Neill's plea transcript.

251.    "[T]he commitment letters typically set forth certain conditions which had to be met before a given mortgage loan could close[.]"  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29.)

**RESPONSE:**

It is undisputed that Defendant's statement quotes Ms. O'Neill's plea transcript.

252.    O'Neill pled guilty to conspiracy to commit wire fraud based on her involvement in the fraudulent scheme at issue here in exchange for an agreement with the Government that it would

"not initiate further charges against her regarding fraudulent mortgage loans" and that she would cooperate with the Government.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 11-12, 38.)

**RESPONSE:**

Undisputed.

253.    O'Neill testified that she knowingly and willfully engaged in all of the fraudulent actions to which she admitted during her allocution.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 31.)

**RESPONSE:**

Undisputed.

254.    DeMola "on various occasions direct[ed] that mortgage loans which [O'Neill] processed be approved and funded without [WSI] having received a written appraisal.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29.)

**RESPONSE:**

It is undisputed that Defendant's statement quotes Ms. O'Neill's plea transcript; however, as stated above, it was not necessary for WSI to receive a written appraisal prior to funding provided that WSI obtained a verbal appraisal.

255.    "Paul Del Rosso, the underwriting department manager, and other underwriters[,] approve[d] mortgage loan applications even though the loan application documents included items such as pay stubs and I.R.S. forms W-2 which [O'Neill] and they agreed were false or fake-looking[.]  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 29-30.)

**RESPONSE:**

It is undisputed that Defendant's statement quotes Ms. O'Neill's plea transcript.

256.    O'Neill admitted that she, "in 1996, at the request of a person buying and selling real properties, prepare[d] fictitious leases in connection with mortgage loan applications submitted to and later approved by [WSI.]"  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 30.)

**RESPONSE:**

It is undisputed that Defendant's statement quotes Ms. O'Neill's plea transcript.

257.    The person "buying and selling real properties" who requested that she prepare the fictitious leases was William Kane.  (*See* Merin Certif., Ex. K: O'Neill First Dep. 48.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Ms. O'Neill's testimony.

258.    O'Neill further admitted that the "fictitious leases [were] designed to show that the multi-family properties that were the subject of the loan applications were occupied by rent-paying tenants and therefore would generate rental income." (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 30.)

**RESPONSE:**

Undisputed.

259.    O'Neill testified that she recalled "getting the names out of the phone book." (*See* Merin Certif., Ex. P: O'Neill Second Dep. 22-23; Ex. Z: D'Apolito Second Dep. 67.)

**RESPONSE:**

Undisputed.

260.    O'Neill admitted that, "in 1996[,] at the request of the same person[, she] prepare[d] escrow letters falsely representing that the attorney named in the letter was holding specific funds in escrow on behalf of the buyer. (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 30.)

**RESPONSE:**

It is undisputed that Defendant's statement quotes Ms. O'Neill's plea transcript.

261.    O'Neill explained that she prepared the false escrow letter, "because Kane told her that [he] could not get a hold of Stanley Yacker and that Yacker had the money and that Kane just needed the escrow letter put into the file." (*See* Merin Certif., Ex. K: O'Neill First Dep. 50-51.)

**RESPONSE:**

Undisputed.

262.    At another time, O'Neill and other WSI employees were asked by DeMola to "comb[] through closed files which were shortly to be reviewed by representatives of Greenwich Capital, which funded loans for [WSI], in order to alter some of the documents in those files or to place documents, such as written appraisals, in those files[.]" (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 30-31; *see also* Ex. K: O'Neill First Dep. 56-58, 71-74 (discussing how the file cleaning occurred and what was done).)

**RESPONSE:**

It is undisputed that Defendant's statement quotes Ms. O'Neill's plea transcript; however, the remainder of Defendant's statement is disputed to the extent it is contradicted by the statements of others as set forth above in Paragraph 36.

263.    O'Neill further admitted to "accept[ing] payments from various mortgage originators and others on a per loan application basis for numerous mortgage loans which [she] processed at [WSI]" in 1996 and 1997.  (*See* Merin Certif., Ex. G: O'Neill Plea Tr. 31.)

**RESPONSE:**

It is undisputed that Defendant's statement quotes Ms. O'Neill's plea testimony.

264.    Kane paid O'Neill per loan.  "In the beginning it was like $100 or $150.  And then it came a point, I believe, we would give the money directly to D'Apolito, and then he was taking care of her."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 172; Ex. F: Kane 2011 Dep. 53; *id.* at 236 (stating that he paid O'Neill $100 to $200 per deal to help get his loans through); Ex. P: O'Neill Second Dep. 29 (same).)

**RESPONSE:**

Undisputed.

265.    Kane explained that he paid O'Neill to actually process every loan package: "[O'Neill] got paid on every deal because we had to get our deals put ahead of time, and problems she'd catch, different things.  So it was every deal."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 172-73.)

**RESPONSE:**

Undisputed.

266.    Kane also paid O'Neill extra money for creating fictitious leases.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 236.)

**RESPONSE:**

Undisputed.

267.    DiBenedetto testified that, on each deal, "Kellie wanted $1000" even though she was just processing the loan. (*See* Merin Certif., Ex. L: DiBenedetto Dep. 118-19.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. DiBenedetto's testimony.

**Walsh Securities, as an Entity, Knew of the Scheme & Made it Possible**

268.    WSI's procedures made the fraud possible: "You talk to any appraiser out there in Jersey, say the same thing, Walsh Securities, no money down, no closing costs, no due diligence, and everybody knew about it."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 67.)

**RESPONSE:**

Disputed.  Defendant's statement sets forth merely Mr. DiBenedetto's opinion that is not based on any substantive facts about what "everybody knew" and does not constitute admissible evidence in this case.

269.    Despite this testimony as to the importance of reliable loans for the long-term success of WSI, a report issued by AGS Financial on October 9, 1997:  "Walsh established operations by selling loans in the whole loans market.  Once Walsh shifted to securitization executions, the underwriting guidelines, due diligence, quality control and post closing reviews provided by the whole loan buyer were eliminated.  Walsh has been very slow to develop these functions internally and the quality of mortgage loan underwriting has deteriorated."  (*See* Merin Certif., Ex. FF: Walsh Securities, Inc.: Results of Operational Review, AGS Financial (Oct. 9, 1997) ("Operational Review of WSI") 4.)

**RESPONSE:**

It is undisputed that Defendant's statement is a quote from an Operational Review that was requested by WSI after the discovery of this fraud in the summer of 1997.

270.    The report further stated that, "[t]he loan files are characterized by minimal documentation.  Often the documentation contained in the file is insufficient to allow for an independent review of the underwriting decision."  (*See* Merin Certif., Ex. FF: Operational Review of WSI 4.)

**RESPONSE:**

It is undisputed that Defendant's statement is a quote from an Operational Review that was requested by WSI after the discovery of this fraud in the summer of 1997.  This document also stated "the majority of the [NHF] loans were fraudulently conceived and assembled in such a manner that detection was unlikely," which was borne out that during the time that WSI was underwriting the loans, underwriters from Greenwich Capital, DLJ, Solomon Smith Barney, Prudential and RBMG were at WSI's office doing due diligence and underwriting the same loans. (*See* Merin Cert., Ex. FF, Operational Review – Executive Summary at 4; Wagner Cert., Ex. B, WSI Dep. at 691:25-693:24, 706:21-707:8).

271.    WSI conducted review appraisals of loan files, but those review appraisals were never put in the loan files that were given to purchasers; the review appraisals were only kept in WSI's quality control files.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 277-78, 293.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes the testimony of Mr. Walsh.  Mr. Walsh testified "If the review appraisal was over the 250,000, I think that I had mentioned last time was that there was two.  There was a preclosing, and that would be for over $250,000 a review was done.  That would be in the file.  Anything that was quality control would not be in the file."  Mr. Walsh explained that review appraisals were ordered by quality control.  In addition, Mr. Trebour testified that for the most part, by the time he was looking at a loan file for the purpose of a quality control review, the loan was already in the secondary market or in a securitization.  Therefore, the review appraisals could not be put in the loan file that had already been given to the purchasers, and they were therefore kept in WSI's quality control files.  (*See* Wagner Cert., Ex. B, WSI Dep. at 296:22-297:25; WSI Dep. at 743:10-15; Wagner Cert., Ex. K, Trebour Dep. at 53:3-11).

272.    "[T]he easier you made it for people, the better chance of you getting the business, obviously, and . . . that's what Walsh did.  They . . . made it easy for the appraisals.  They made it easy for the escrow letters.  They made the whole process very seamless.  So . . . if you had no money and all you had to do is get a corrupt lawyer, . . . you're set with no money down, no closing costs, . . . you can run the table[.]"  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 332.)

**RESPONSE:**

Disputed.  Defendant's statement parses out portions of Mr. DiBenedetto's testimony that is merely his opinion, was not responsive to the question asked, and is not based on any substantive facts that would be admissible evidence in this case.

273.    An underwriter at WSI by the name of Acevedo was removed by WSI from the underwriting function on NHF loans, because she was being too strict in requiring that the loans coming from NHF complied with WSI's guidelines.  As explained by Kane, "[s]he was making our lives miserable at the time, yes."  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 167-68.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.

274.    WSI was aware of problems with the closing attorneys long before news of the fraud broke.  WSI's in-house counsel, Fred Schlesinger, discovered that – around the time that Kane met with DeMola, James Walsh, and Robert Walsh to resolve problems with Greenwich Capital – deeds and mortgages were not being recorded by the closing attorneys, and WSI learned of this because the buyers of the loans in the secondary market were asking for documents.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 173-74, 177; *see also id.* at 178-79 (agreeing that WSI's in-house corporate counsel was aware – prior to the publication of newspaper articles in June 1997 uncovering the fraud – that deeds and mortgages were not being recorded).)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony which, as cited, was in response to questions about prior testimony that was never read or cited to Mr. Kane. Further, no time frame was established because Mr. Kane, in the cited testimony, specifically said "I don't remember when it was, sir." Furthermore, these facts do not demonstrate that WSI's counsel was aware that deeds and mortgages were not being recorded; at most, it demonstrates that WSI's counsel was trying to obtain copies of recorded deeds and mortgages to pass along to buyers in a secondary market.

275.    Schlesinger "was going crazy on this issue" to the point that Stanley Yacker, one of the closing attorneys involved in the fraud, "was avoiding him[.]"  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 174.)

**RESPONSE:**

Defendant's statement summarizes Mr. Kane's testimony.

276.    The reason for Schlesinger's concern was that, secondary market purchasers want to have in their possession a series of assignments that show that the mortgage was transferred from NHF to WSI to the secondary market purchaser, but because some transactions did not get recorded by Yacker for six or more months, WSI could not provide these documents to the secondary market purchasers.  For the same reason, WSI could not produce a final title policy to the secondary market. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 175-76.)

**RESPONSE:**

Disputed.  Defendant's statement merely summarizes Mr. Kane's opinion about the reason for Mr. Schlesinger's concern and is not based on any substantive facts or any personal knowledge, and does not constitute admissible evidence in this case.

277.    Thus, Schlesinger or someone else at WSI was getting dunned from the secondary market as to the whereabouts of the documents.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 177.)

**RESPONSE:**

Disputed.  Defendant's statement merely summarizes Mr. Kane's opinion about the reason for Mr. Schlesinger's concern and is not based on any substantive facts or any personal knowledge, and does not constitute admissible evidence in this case.

278.    Schlesinger, as a result, reached out to Yacker to determine why WSI did not have recorded documents, and, in the end, money was provided to Yacker or Coastal so that all of the mortgages could be recorded.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 177.)

**RESPONSE:**

Disputed.  Defendant's statement merely summarizes Mr. Kane's opinion about the reason for Mr. Schlesinger's concern and is not based on any substantive facts or any personal knowledge, and does not constitute admissible evidence in this case.

279.    As a result, between April 7 and 9, 1997, Yacker recorded a large number of previously unrecorded mortgages.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 87-89.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony, which specifically states that these unrecorded mortgages were recorded on these dates by Mr. Agel, the principal at Coastal Title Agency, the agency that issued this Defendant's title policies, title commitments and closing protection letters.

280.    Further, unrecorded documents should be a red-flag to a mortgage lender, because, until the mortgage is recorded, the lender is at risk of being divested of its mortgage on the property. (*See* Merin Certif., Ex. F: Kane 2011 Dep. 177-78.)

**RESPONSE:**

It is undisputed that Defendant's statement fairly represents Mr. Kane's testimony.

281.    Despite the problems with Yacker's closings being known by WSI, Yacker closed at least one more property for NHF that is involved in this lawsuit after it was discovered that he had not recorded mortgages and he was caused to record the unrecorded mortgages: 206 Sherman Street in Perth Amboy was closed on April 25, 1997.  (*See* Merin Certif., Ex. GG: HUD-1 Uniform Settlement Statement, Loan No. 625402 to Cruz and Julio Crespo for 206 Sherman Street, Perth Amboy, NJ (Apr. 25, 1997).)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation provided, which merely demonstrates that this particular loan may have been closed by Mr. Yacker on April 25, 1997.

282.    Furthermore, testimony implicates WSI in the scheme at an early date: "Walsh says that it did not know anything, it's all baloney. . . ."  They could not sell the company "because the entire company was cancer from the ground up.  90, 80 percent of their loans, cancer.  No more credibility in the marketplace.  You cannot go in the marketplace now with all the people circling around."  WSI "collapsed because they weren't going to be allowed to do its scheme anymore.  Walsh's programs were a precursor for the rest of the scheme.  The big scheme was the flipping part where a person could use the proceeds from a mortgage loan to pay the buyer, to put the cart before the horse."  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 86-88.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. DiBenedetto's three pages of rambling and convoluted testimony.  Further, this testimony is merely Mr. DiBenedetto's opinion not based on any substantive facts or knowledge, other than his long history of psychiatric illness, and does not constitute admissible evidence in this case.  (*See* Wagner Cert., Ex. M, DiBenedetto Dep. at 160:4-162:25).

283.   DiBenedetto testified that he knew that WSI knew the escrow letters were fake and that WSI was giving loans with no money down: "You're funding at the end of the month X amount of loans.  $50 million in loans.  If [$]20 or $30 million of purchases . . . that is a red flag.  The mortgage companies . . . normally have 80 or 85 percent refinance.  Maybe 15 percent.  Especially on sub-prime.  People will not want to put this money down.  Especially back then.   . . .  Maybe 10 percent.  Ninety/ten.  The second red flag.  People will not put down the excess money and pay the interest rate.  Doesn't make sense.  The third red flag, they have underwriters on staff.  They're putting the excess money down and paying the high interest rate and they have good credit.  Like the whole thing doesn't make any sense.  To think that Walsh wouldn't have known . . . – it just wouldn't make sense."  He added, "Why would the person with a 700 FICA score pay 11 percent and put 20 percent down?  Doesn't make any sense, right?"  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 226-28.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. DiBenedetto's three pages of rambling and convoluted testimony.  Further, this testimony is merely Mr. DiBenedetto's opinion not based on any substantive facts or knowledge and does not constitute admissible evidence in this case.

284.   WSI's wholesale lender, Greenwich Capital, alerted WSI to a possible fraud, in January 1997, setting out the facts leading it to believe a fraud was taking place that involved at a minimum Cristo, Calanni, and Brodo, and concluding that, based on those facts:

> Given the credit history and life style of the borrowers, the fact that the deposits with the attorney were never verified as being the borrower's own funds (or that the borrowers had any verified assets), and the flip nature of the transactions, I believe that there is a good chance that these are no down payment purchase transactions and possibly are straw buyers used to facilitate very large cash back transactions to Cristo Property Management.

(*See* Merin Certif., Ex. S: Jan. 31, 1997 Greenwich Letter.)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation to Exhibit S.

285.     Despite receiving the letter, WSI continued to work with both Cristo Property Management and appraiser Brodo.  (*See*, e.g., Magnanini Certif., Ex. A-65 (Commitment demonstrates WSI worked with Cristo after January 1997); *See* Merin Certif., Ex. DD: Brodo Dep.47-48 (Brodo's stopped doing appraisals related to the fraud in April 1997 and did not know the reason why he stopped).)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citation provided because there is no such letter cited.

286.     WSI also never timely informed Commonwealth of the possible fraud following receipt of that January 31, 1997; Commonwealth was first notified of the fraud in July 1997, when it made its insurance claim.  (*See, e.g.,* Merin Certif., Ex. HH: Letter from Jeffrey M. Goodman of Latham & Watkins to Commonwealth Land Title Ins. Co. (July 28, 1997) (notice of the fraud was first provided in July 1997).)

**RESPONSE:**

Disputed.  Defendant's statement is not supported by the citations provided because no such letter dated January 31, 1997 has been provided; however, it is admitted that Commonwealth was first notified of the fraud by WSI in July 1997.

287.     WSI's first claim to Commonwealth under the Closing Service Letters was dated July 28, 1997, and received by Commonwealth on August 12, 1997.  (*See* Merin Certif., Ex. HH: Letter from Jeffrey M. Goodman of Latham & Watkins to Commonwealth Land Title Ins. Co. (July 28, 1997); Ex. I: Robert Walsh Dep. 587:13-19.)

**RESPONSE:**

It is undisputed that WSI's first claim to Commonwealth was dated July 28, 1997; however, Defendant has not provided any evidence to demonstrate conclusively that the received it on August 12, 1997.

288.     While a small amount of information was exchanged by WSI and Commonwealth, WSI never responded to Commonwealth's September 29, 1997 letter requesting additional information that would permit Commonwealth to "evaluate and respond" to WSI's claim.  (*See* Merin Certif., Ex. II: Letter from David R. Kott of McCarter & English to Fred Schlesinger of Walsh (Sept. 29, 1997) ("Sept. 29, 1997 Letter to WSI") 1-2.)

**RESPONSE:**

Disputed.  Defendant's statements are not supported by the citation provided, which is merely a letter written by defense counsel and does not demonstrate that WSI never responded to this letter.

289.    WSI unquestionably received the Sept. 29, 1997 letter, as it produced a copy of that letter in this lawsuit as document number WS2000001280.  (*See* Merin Certif., Ex. II: Sept. 29, 1997 Letter to WSI.)

**RESPONSE:**

Undisputed.

290.    Of particular note, no response was received to the September 29, 1997 letter's request for detailed information "as to each loan" requesting identification of "the name, address and position/title of any employee of [WSI], including but not limited to Robert Walsh, having knowledge of the acts, events and/or circumstances which [WSI] contend[s] gives rise to coverage and the date that the employee acquired the knowledge[.]"  (*See* Merin Certif., Ex. II: Sept. 29, 1997 Letter to WSI 1.)

**RESPONSE:**

Disputed.  Defendant's statements are not supported by the citation provided, which is merely a letter written by defense counsel and does not demonstrate that WSI never responded to this letter.

291.    Similarly, no response was received to the September 29, 1997 letter's request for, "[a]s to each loan, identif[ication of] the specific in-house person(s) who reviewed the loans prior to closing with [WSI]."  (*See* Merin Certif., Ex. II: Sept. 29, 1997 Letter to WSI 2.)

**RESPONSE:**

Disputed.  Defendant's statements are not supported by the citation provided, which is merely a letter written by defense counsel and does not demonstrate that WSI never responded to this letter.

**C.    National Home Funding Was Involved in the Scheme**

**NHF was the "Real Lender"**

292.    Robert Walsh testified – as WSI's 30(b)(6) witness – that all of the deals with NHF were structured so that it would be NHF that would order the appraisal rather than Walsh.  ***This was because NHF was the real lender.***  All of Walsh's participants ordered their own appraisals.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 124.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Walsh's testimony.  It is undisputed that it was the standard procedure at WSI for all loans to be closed in the name of the participant, such as NHF, while WSI supplied the closing funds directly to the closing attorney (table funding),

because WSI was the real lender.  It is further undisputed that the participants ordered their own appraisals.  (*See* Wagner Cert., Ex. L, Skowrenski Dep. at 53).

293.    All of the closing service letters on the loans at issue in this lawsuit were issued to NHF.  (*See e.g.,* Certification of Robert A. Magnanini in Support of Plaintiff's Motion for Partial Summary Judgment, Ex. A (containing copies closing service letters for 62 of 66 loans).)

**RESPONSE:**

It is undisputed that all of the closing service letters on the loans at issue in this lawsuit were issued to NHF, its successor, and/or assigns.

### Robert Skowrenski, II Worked in Tandem With William Kane, the Scheme's Mastermind

294.    Robert Skowrenski, II was the owner of National Home Funding.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 2, 3.)

**RESPONSE:**

Undisputed.

295.    NHF and Skowrenski were actively involved in the fraudulent scheme.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 6; Ex. O: D'Apolito First Dep. 53 (Skowrenski "without a doubt" was aware that the scheme in which he was participating was fraudulent); Ex. H: Kane 2007 Dep. 139 (Skowrenski knew "everything that was going on"); Ex. F: Kane 2011 Dep. 194 (same); *id.* at 236 (same).)

**RESPONSE:**

It is undisputed that WSI had initially alleged that NHF and Skowrenski were involved in the fraud, and the deposition testimony speaks for itself.

296.    Skowrenski "without a doubt" was aware that the leases in the fraudulent transactions were fictional, and Skowrenski was aware of the 60/40 transfers.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 251; Ex. F: Kane 2011 Dep. 238.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony because he stated that "to the best of [his] knowledge," Mr. Skowrenski was aware of the 60/40 transfers.

297.    WSI stated that Kane was an employee of NHF.  (*See* Merin Certif., Ex. E: Proof of Loss 3 ("**Kane** also is a licensed mortgage solicitor for, and an employee of, NHF" (emphasis in original)).)

**RESPONSE:**

It is undisputed that WSI alleged that Mr. Kane was an employee of NHF 14 years ago.

298.    Kane worked for NHF as a solicitor.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 25, 27 (explaining that he worked for NHF instead of just using NHF's services, because that allowed him to eliminate an added fee on each loan to another person at NHF); Ex. F: Kane 2011 Dep. 239.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.

299.    Robert Walsh, in his 30(b)(6) deposition, testified that Kane was the "mastermind" of the fraud.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 21.)

**RESPONSE:**

Undisputed.

300.    Skowrenski provided Kane with the list from which Kane chose the appraisers involved in the scheme.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 240.)

**RESPONSE:**

Disputed to the extent that Defendant's statement fails to accurately articulate that Mr. Kane testified that he believed that Mr. Skowrenski provided him with a list of appraisers. (*See* Merin Cert., Ex. F, Kane 2011 Dep. at 240:16-17.)

301.    When Kane picked those appraisers, he was doing so in his capacity as an employee of NHF.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 240.)

**RESPONSE:**

Disputed to the extent that it contradicts Mr. Kane's testimony wherein he testified that he was an independent contractor of National Home Funding.  (*See* Wagner Cert., Ex. D, Kane Dep. 2011 at 160:19-163:17).

302.    In its claim to its fidelity insurer for coverage related to the frauds at issue here, WSI stated that NHF and Skowrenski were at the heart of the fraudulent scheme:

> The **RICO Perpetrators** [(defined to include both Skowrenski and NHF)] carried out these frauds through an enterprise, an association in fact of individuals and entities, including attorneys and appraiser (referred to as the **NHF/Cristo Property Enterprise**").  The **NHF/Cristo Property Enterprise**, was formed to, among other things, turn real property into illicit profits generated by mortgage loan

proceeds financed by Walsh Securities, and to engage in other activities. These loan proceeds were far in excess of the actual value of the underlying properties because the loans were based on fraudulently inflated appraisals. The **RICO Perpetrators** also engaged in a "mini-scam" wherein the value of the property was fraudulently inflated so that the buyer was able to secure a mortgage for 100% of the purchase price of the property. Presumably, this was initially done to create a market by inflating prices in Asbury Park.

The **NHF/Cristo Property Enterprise** relied on the use of mortgage loan applications containing false information. Such false mortgage loan applications were reviewed, approved, and originated by **NHF**, and then sold to Walsh Securities pursuant to a contract between Walsh Securities and **NHF**, with the understanding by members of the **NHF/Cristo Property Enterprise** that Walsh Securities would rely on the fraudulent applications in deciding whether to accept mortgage loans originated by the **NHF/Cristo Property Enterprise**. Apart from other illicit profits received, **Skowrenski**, through **NHF**, received fees from these transactions in excess of one million dollars.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 6 (emphasis in original).)

**RESPONSE:**

It is undisputed that WSI's proof of loss cited by Defendant speaks for itself.

303.    WSI also stated to its fidelity insurer that NHF was responsible for obtaining falsely-inflated appraisals and "flipping" properties:

**Kane**, acting through **Cristo Property and/or NHF**, usually purchased distressed properties from the bona fide owner, usually for $10,000 to $45,000. He then had the properties appraised by licensed appraisers. In almost all instances, the property was appraised by **Calanni, DiBenedetto, Brown, Brodo** or **Pierson**. Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth. These appraisals were for amounts up to eight times the actual value of the properties.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 7 (emphasis in original).)

**RESPONSE:**

It is undisputed that WSI's proof of loss cited by Defendant speaks for itself.

304.    NHF compiled the loan applications and submitted them to WSI, through D'Apolito, whom it was bribing:

> Mortgage loan applications for borrowers/buyers of the properties were then compiled by the **NHF/Cristo Properties Enterprise** and submitted, through **D'Apolito**, to Walsh Securities.  **D'Apolito** received payments of $100,000.00 from **NHF** and **Kane**, some of which was paid directly to **D'Apolito** and some to his newly created corporation, **DAP Consulting**.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 7 (emphasis in original); Ex. D: DeMola Plea 19 (WSI acquired loans from mortgage originators including NHF).)

**RESPONSE:**

It is undisputed that WSI's proof of loss cited by Defendant speaks for itself, and it states the "NHF/Cristo Properties Enterprise" and not just NHF.

305.    NHF and Skowrenski paid D'Apolito "in excess of $10,000.00" in bribes as part of the scheme:

> **D'Apolito** received these mortgage loan applications from **NHF** and transmitted or caused them to be transmitted to his employer, Walsh Securities, to induce Walsh Securities to finance the mortgage loans. In exchange for transmitting or causing to transmit the applications to Walsh Securities, **D'Apolito**, through **DAP Consulting**, received cash payments totaling at least $90,000.00 from **Kane**, through **Cristo Property**, and received cash payments in excess of $10,000.00 from **Skowrenski**, through **NHF**.  The payments were designed to, and did, corrupt **D'Apolito**, to place him in a conflict of interest and cause him to breach his obligations to Walsh Securities.  The payments from **NHF** and **Cristo Property** to **D'Apolito** were unknown by, and not disclosed to, Walsh Securities.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 9 (emphasis in original); Ex. F: Kane 2011 Dep. 235.)

**RESPONSE:**

It is undisputed that WSI's proof of loss cited by Defendant speaks for itself, and it states the "NHF/Cristo Properties Enterprise" and not just NHF.

306.    Kane paid Skowrenski a half a point for any loans that Kane brought to him, which was unethical.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 52.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

307.    Specifically, the payment arrangement between Skowrenski and Kane was that "Skowrenski was getting paid from Kane a half a point out of the proceeds on every loan besides

what Skowrenski made on the loans."  "If there was a $100,000 loan, he was getting $500.  If it was a $200,000 loan he would get paid cash a thousand dollars.  However amount of loans – he would do all the paperwork and everything would come in from Kane.  Then [Skowrenski] would take all the paperwork and put it all together in the package the way it needed to be."  "To go to Walsh.  He would either FedEx them.  Or if I was heading up there that day, he would give them to me and I would bring up the loans and give them to Kellie O'Neill, who was the processor for National Home Funding working for Walsh.  They had processors and they had underwriters.  So the processors worked directly with the mortgage companies telling them what paperwork they had, what paperwork they needed, what was missing or if it was a full package and it went to Underwriting." (*See* Merin Certif., Ex. O: D'Apolito First Dep. 51-52; *id.* at 129 (stating that Skowrenski got a half point plus NHF charged three points on every loan, and Skowrenski called this "the price of doing business")).)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

308.   Skowrenski and Kane worked together.  D'Apolito explained – using an example – how their payment arrangement worked:

> You're an attorney.  You have an escrow account.  That money gets funded into your escrow account.  On the closing documents it says who gets the money.

> Well, it has to fund through the mortgage company.  So like the points, all that stuff, those fees – that would get paid to the mortgage company.  The money that would go to Kane would be the house that they bought from Cristo Property Management.

> So the fees that [Skowrenski] charged all went to him.  Then he would pay back [Kane] whatever fees that [Kane] wanted.  It was an agreement that they had.  Like the appraisal fee went back to [Kane]. So[Skowrenski] would give [Kane] a check . . . for that fee.  But all the points [Skowrenski] would keep and the half a point that [Kane] was paying him would all come out of the fees that [Skowrenski] got.

> [D'Apolito] believe[s] if there were three points charged in every loan, because that is how [Kane] had it, he was letting [Skowrenski] keep a half point of that" . . . "three.  Then there were points on the back end because they up-sold the rates.

> So [Skowrenski] was making a half point from [Kane] and then [Skowrenski] was making the back end points that came from [WSI] because . . . the rate was supposed to be seven percent or eight percent and they took it to ten percent.

> So [Skowrenski] wasn't dumb.  He was getting money.  He wasn't
> being a glutton.  [Kane's] money out of the points he got back minus
> the half and the back end points he was paying the 2,000 and stuff like
> that.  So this way nobody took money out of their pockets.  It all really
> came from [WSI].

(*See* Merin Certif., Ex. O: D'Apolito First Dep. 158-59.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

309.    Kane explained that, "[t]he bank paid a commission to [NHF] based on the rate of the mortgage."  Thus, the higher the interest rate, the more money would be paid to NHF.  That commission "went to [NHF.]  [Skowrenski] took a piece of it, D'Apolito took a piece of it, and then [Kane] got the balance."  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 51.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.  In addition, Mr. Skowrenski explained that with Walsh, as in "a typical wholesale-retail relationship.  We are giving pricing in a wholesale model that is marked up, for all intents and purposes, and that spread is our profit."  (*See* Wagner Cert., Ex. D, Kane 2011 Dep. at 51:8-11.)

310.    Kane's compensation to Skowrenski resulted in Skowrenski probably making over a million dollars from doing Kane's loans.  (*See* Merin Certif., Ex. Z: D'Apolito Second Dep. 48.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony which stated "Rob, probably, made over a million dollars to do his loans." (*See* Merin Cert., Ex. Z, D'Apolito Second Dep. at 48:11-13.)

311.    Skowrenski and/or NHF paid D'Apolito $300 per loan.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 184.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

312.    Cash payments of $2,000.00 were made to every borrower, and some were made at the NHF office.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 98-99.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. D'Apolito's testimony.

313.    Skowrenski or Kane actually put together each fraudulent loan package that was then forwarded to WSI.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 104.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. D'Apolito's testimony because he did not represent whether it was Mr. Skowrenski or Mr. Kane that put together the loan packages.

314.    Kane explained that, as to his business dealings with WSI, he worked for NHF.  He or one of his people would identify a house and go to contract on it.  They would then call Grieser or another gentleman that worked for Grieser at the time named Mr. Cuzzi, and Cuzzi would bring in a straw buyer, they would process the paperwork for the straw buyer, and they would then bring the paperwork to WSI to get the loan done.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 62.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony, which specifically stated in response to the question "Can you describe your business dealings with Walsh Securities?" He responded "Well, I worked for National Home Funding.  We would get – I would identify a house or one of my people would identify a house.  We'd go to contract on it.  We'd call Mr. Greiser or another gentleman that worked for him at the time, Mr. Cuzzi.  He would bring in a straw buyer, a borrower, a straw buyer.  We'd process the paperwork for the straw buyer and bring it into Walsh Securities to get the loan done."  (*See* Merin Cert., Ex. H, Kane 2007 Dep. at 62:4-11.)

315.    Skowrenski purged NHF's files after the Monmouth County Prosecutor served Walsh with a subpoena, but before it served Skowrenski or NHF.  Namely, in Skowrenski's Freehold office, Skowrenski, Kane, D'Apolito, "his girlfriend, his girlfriend's sister and another gentleman that [Skowrenski] had working for him," purged the files, "going through file by file, pulling papers out, putting them in the shredder.  And then they moved all the files out of the office."   (*See* Merin Certif., Ex. H: Kane 2007 Dep. 140-41; Ex. F: Kane 2011 Dep. 239.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.

**<u>William Kane</u>**

316.    Kane was at the heart of the fraudulent scheme.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 1-13 (explaining the scheme and detailing Kane's involvement).)

**RESPONSE:**

Undisputed.

317.    Kane was an employee of NHF.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 3.)

**RESPONSE:**

Disputed to the extent that it contradicts Mr. Kane's testimony wherein he testified that he was an independent contractor of National Home Funding.  (*See* Wagner Cert., Ex. D, Kane Dep. 2011 at 160:19-163:17).

318.   Kane engaged in his fraudulent acts through NHF:

> **Kane**, acting through **Cristo Property and/or NHF**, usually purchased distressed properties from the bona fide owner, usually for $10,000 to $45,000.  He then had the properties appraised by licensed appraisers.  In almost all instances, the property was appraised by **Calanni, DiBenedetto, Brown, Brodo** or **Pierson**.  Such appraisals were in all instances for amounts falsely inflated above what the properties were actually worth.  These appraisals were for amounts up to eight times the actual value of the properties.

(*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 7 (emphasis in original).)

**RESPONSE:**

It is undisputed that the allegations assert that Mr. Kane engaged in his fraudulent acts through NHF and Cristo Property.

319.   Kane received money from the proceeds of each loan.  (*See* Merin Certif., Ex. O: D'Apolito First Dep. 137.)

**RESPONSE:**

Undisputed.

320.   Skowrenski paid Kane the difference between what Skowrenski charged and what was charged to the borrower or the back end that came back on the rate.  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 30.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.

321.   Kane paid D'Apolito – a WSI employee – "at least $90,000.00" to participate in the fraudulent scheme.  (*See* Merin Certif., Ex. E: WSI Fidelity Ins. Proof of Loss 9; Ex. F: Kane 2011 Dep. 235.)

**RESPONSE:**

It is undisputed that this fact has been alleged.

322.    Kane also paid Kellie O'Neill – a WSI employee – for her "assistance in facilitating the processing of loans on [] properties [involved in the scheme] and in creating false documents to further the loan applications[.]"  (*See* Merin Certif., Ex. JJ: Plea, *United States v. Kane* (June 14, 2002) ("Kane Guilty Plea") 22.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.

323.    Kane also "agree[d] and act[ed] with one or more principals and officers of Walsh Securities to falsify documents in connection with loans and to conceal the true conditions of properties from representatives of Walsh's warehouse credit facility, among other activities[.]"  (*See* Merin Certif., Ex. JJ: Kane Guilty Plea 22.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.

324.    Kane also acted with the attorneys Richard Pepsny and Stanley Yacker to carry out the fraud.  (*See* Merin Certif., Ex. JJ: Kane Guilty Plea 20-21.)

**RESPONSE:**

It is undisputed that Mr. Kane acted with the attorneys, Mr. Pepsny, Mr. Yacker, and Mr. Cicalese to carry out the fraud.

**D.    Walsh Securities Benefitted from the Fraudulent Scheme**

325.    Walsh benefitted from continuing to fund the fraudulent loans even after discovering that the loans were fraudulent:

> Q.    And the benefit to Walsh of doing this is that it would have increased loans that it could make more money on; correct?
> A.    Correct.
> Q.    Because he could sell those increased number of loans on the secondary market; correct?
> A.    Correct.
> Q.    And by "secondary market," you mean people like underwriters who package at a securitization for people who just buy single loans; correct?
> A.    I believe so, yes, sir.'

(*See* Merin Certif., Ex. F: Kane 2011 Dep. 230.)

94

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Kane's testimony.  There are no facts in Mr. Kane's testimony to demonstrate that WSI was aware of any fraud during the time-frame referenced in his deposition.

326.    The fraudulent scheme was going to help Walsh because of "greed."  "All [DeMola] had to do was cross from here to here . . . and she made the decision to step over the line.  As soon as she stepped over the line, they got tremendous riches and wealth. . . .  They got the loan and got the chance to sell the company for a gigantic amount of money."  This was possible, because "[s]ub-prime is now different."  At the present time sub-prime is 10-15% of the market but back then it was 2%.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 244.)

**RESPONSE:**

Disputed.  Defendant's statement is merely Mr. DiBenedetto's opinion and is not based on any substantive facts or knowledge and does not constitute admissible evidence in this case.

327.    WSI was not a long-term venture.  For almost the entirety of WSI's existence, its sale was contemplated: Robert Walsh had started thinking about selling WSI within two months of acquiring WSI.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 125-26.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes Mr. Walsh's testimony.  While Mr. Walsh testified that he started thinking about selling WSI within two months after forming the company, he determined "It was way too premature."  In addition, he did not mention to his sister until around December of 1996 or January of 1997 that he was thinking about selling WSI.

328.    The RBMG merger was going to be a financial windfall for WSI's shareholders.  (*See, e.g.,* Merin Certif., Ex. B: RBMG S-4 (June 13, 1997); Ex. D: DeMola Plea 18.)

**RESPONSE:**

It is undisputed that the RBMG merger was going to be profitable for WSI's shareholders.

329.    WSI made an attractive merger candidate for RBMG – it was a strategic fit and WSI was making a lot of money.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 126.)

**RESPONSE:**

Undisputed.

330.    The "profitability of the loans that [DeMola] was putting on the books was something that would have been attractive to RBMG.  Number of loans is meaningless.  Doing $96 million or $98 million a month was meaningless.  It is how much money you were producing.  That was really

what it was all about."  "In terms of money you were producing on a mortgage loan as long as it's current that's considered profitable."  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 126-27.)

**RESPONSE:**

     Undisputed.

     331.    WSI was profitable; it was selling loans, acquiring loans, controlling expenses.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 324.)

**RESPONSE:**

     Undisputed.

     332.    Specifically, WSI was profitable for two reasons, the first being "the whole loan sale . . . to people like The Money Store.  Walsh had a weighted average price that it paid the participants of 101 and Walsh would be selling the loan to The Money Store between 105 and 106.  Walsh sold The Money Store approximately $200 million so that was roughly eight to $10 million profitability on loans sold to The Money Store."  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 349.)

**RESPONSE:**

     Undisputed.

     333.    WSI made its money on the sale of a loan, ***and the subsequent nonperformance of that loan did not affect the profit that Walsh made on the sale of that loan as an individual loan***. (*See* Merin Certif., Ex. I: Robert Walsh Dep. 350 (emphasis added).)

**RESPONSE:**

     It is undisputed that Defendant's statement summarizes Mr. Walsh's testimony, which was solely discussing the nonperformance of legitimate loans, not fraudulent loans which would need to be repurchased.  Mr. Walsh further stated "The premium translated into the relationship as well as the performance of those loans from prior sales."  (*See* Merin Cert., Ex. I, WSI Dep. at 350:3-22).

     334.    In whole loan sales, the performance of the loan only indirectly impacted profitability in the long term, because if the WSI loans did not perform, The Money Store (for example) would stop buying loans from WSI: "[i]f [WSI]'s performance was bad, The Money Store would have cut [WSI] off.  [WSI] would not have been able to do business with them.  There would have been no profitability associated with The Money Store."  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 349-50.)

**RESPONSE:**

     The quotation contained in Defendant's statement is undisputed; however, Defendant's characterization of it is disputed and Mr. Walsh's testimony speaks for itself.

335.    A secondary market purchaser would have an expectation that approximately one and a half percent of the loans might be bad or fraudulent, so the secondary purchaser would not necessarily conclude that WSI was acting improperly if one and a half percent of the loans came in and were a problem.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 350-51.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Walsh's testimony.

336.    WSI was also profitable due to the money it made in securities.  (*See* Merin Certif., Ex. I: Robert Walsh Dep. 351.)

**RESPONSE:**

Undisputed.

337.    Robert Walsh, at his 30(b)(6) deposition, explained how Walsh made its money in securities:

> The basis in [the WSI] loans is still 101.  [WSI] has the option of selling it as whole loans and getting cash consideration of between 105 and 106.
>
> So for purposes of this demonstration, why don't we use 105 to make it simple.
>
> [WSI] ha[s] a universe of loans, and let's stick with $100 million to make it again simple[.]
>
> [WSI] ha[d] two choices: [it] can sell those loans and make $4 million in cash, pass on the risk of the performance to somebody else.  Or [WSI] can retain that risk and put [its] capital at risk on the performance of those loans.
>
> If the loans do not perform [WSI] [is] going to lose money, and [WSI] is going to lose a substantial amount of money.
>
> If the loans perform accordingly the way [WSI] anticipate[s] them to perform, [WSI will] make more money than selling as a whole loan.
>
> The hundred million worth of loans [WSI] sell[s] into its trust.  The trust then has an underwriter, and let's just use DLJ as an example.
>
> [DLJ] did security 9711 and 972 [and DLJ is Donaldson, Lufkin and Jenrette.]
>
> The $1 million would be identified by [WSI] as going into the security.

DLJ would sign an underwriting agreement with [WSI].

DLJ would come in and review the hundred million dollars to make sure it understood the characteristics because they were going to sell the bonds.

They would do a complete underwrite on the hundred million dollars to make sure they met the quality of the characteristics of the rating agency.

They would do a 20 percent sampling on the appraisals.

They were then satisfied, they would present it to Standard and Poor's . . . .

S&P would put it through the S&P model based upon the characteristic of the loan.  They would state [] how many of the bonds would be sold for double A, which obviously is a more attractive rate for Walsh to be selling the loan at.

They would break out the components to a single A and they would go down to a triple B, all investment grade quality.

A small slither of the bonds would become double B and that would be the formation of the security.

Now, on the hundred million dollars worth of securities that are now being sold, the proceeds of all this translates into 98 cents on the dollar that [WSI] is going to receive.

So [WSI] had the option of making $4 million in cash by selling to The Money Store on the low side, or taking 98 cents and having a negative $3 million by doing a security.

There is a $7 million swing between doing a whole loan sale and a security.

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 351-54.)

**RESPONSE:**

The quotation contained in Defendant's statement is undisputed, aside from some insignificant typographical errors; however, Plaintiff objects to Defendant's characterization of this testimony.

338.   Robert Walsh went on to explain that the 98 percent he referred to was on the face value of the loan.  He added, regarding the IO,

Now [WSI's] residual on this hundred million dollars on an economic basis, cash, has got $7 million for cash associated into the security on $100 million of seven percent.

So [WSI] has to feel very, very comfortable about the performance of the security or Walsh is not going to do that.  We are going to take the cash.

[WSI] now owns something called the residual piece of the security as well as something called an IO piece of the security.

Let's deal with the IO piece first that's a simpler piece to understand.

If the security holders are looking to receive a seven percent coupon, weighted average, to all investors, and the average coupon on the portfolio is ten percent, there is 300 basis points annualized of availability of [] excess interest on these particular loans.

The servicer who is going to service these loans in this particular case is Temple Inland.  That's all they do for a living, is service loans, and they do it very efficiently.  [WSI] has to pay them 50 basis points to service those loans.

We now have Bankers Trust, which is the trustee.  They are now going to charge us 20 basis points to be the master trustee.

Now we are down to 230 basis points of the interest only component. [WSI] get[s] to keep that, so on [WSI's] side of the equation, 230 basis points annualized of the loan in a portfolio.

[If there is a bad loan Walsh does not get that interest.]  That bad loan goes away.  [WSI] [does not] get that interest.  This is only on the IO right now.  [WSI] [does not] get that.  [WSI] only get[s] paid on the IO if the interest and principal is paid by the borrower.

It is really a huge incentive for [WSI] to be putting loans into the security that [WSI] know[s] are going to perform, or [WSI] feel[s] very strongly are going to perform.

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 354-55.)

**RESPONSE:**

The quotation contained in Defendant's statement is undisputed, aside from some insignificant typographical errors.

339.   Addressing the residual, Robert Walsh explained,

The residual piece [WSI] own[s].  The residual can be extremely valuable, and that is why people are into securities.

Now all the value of what's going to happen in the future lies with the residual.  If any of the loans are in default and there are losses, unfortunately, the residual is the first piece that takes the loss.

So if you have a universe of $100 million which is spread over a vast amount of loans – that's why you are diversifying your risk by going into different states, the losses that are taking place go first to the residual loans.

Any fraud that takes place goes to the residual holder.  Any of the particular losses within the security is going to the residual holder.

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 356.)

**RESPONSE:**

Undisputed.

340.   As for the profits made, Robert Walsh went on to explain,

Now lets go back to the IO portion for a second.  The IO portion is subordinated against all of the securities of top.  They are going to be the last to get compensated.

The IO does not get any cash until there is a five percent built-in or $5 million cushion against the entire security.

[WSI] ha[d] already put in $2 million, which was the 98 percent. [WSI] have $2 million in something called the over collateralization account.

Now we have to build up $3 million, which we are building up rapidly because of the IO portion.

So what we are able to do on this structure, which is GAAP, [] we are able to present value the future value stream of the income that we are going to be getting less an assumption of losses associated with [WSI's] overall hundred million dollars and come up with a net present value and allowed to book that for accounting purposes.

On average, [WSI was] allowed to book about a 107 price on [its] loans, [] based on those calculations.  So [WSI] w[as] able to book a 107 price and that's part of [WSI's] profitability.

On this part of the transaction, for book purposes [WSI] w[as] able to book $6 million in gain on sale.

[WSI] ha[s] the gain on sale in cash and [it] ha[s] the gain on sale of securities.

Now [WSI] ha[s] to monitor on a quarterly basis the residual performance.  [] [I]f the residual performance is doing well, [WSI] [is] able to take in a portion of that IO back into income, because [WSI] [is] building up [the] over collateralization account quickly.

If the performance is bad, [WSI] ha[s] to write down [its] residual because the loss assumption is wrong.

So that is how [WSI] make[s] money.  That is how on a quarterly basis profitability is reported[.]

(*See* Merin Certif., Ex. I: Robert Walsh Dep. 356-58.)

**RESPONSE:**

The quotation contained in Defendant's statement is undisputed aside from some insignificant typographical errors and the third sentence in the first paragraph which should state "They are going to be the second to last to get compensated."

341.   The ultimate plan was to get a lot of mortgages in and then sell the company (As opposed to securitize the mortgages) before the mortgages became a problem.  (*See* Merin Certif., Ex. L: DiBenedetto Dep. 38-39.)

**RESPONSE:**

Disputed.  Defendant's statement relies upon Mr. DiBenedetto's opinion that is not based on any substantive facts or knowledge and does not constitute admissible evidence in this case.  In response to the query about how Mr. DiBenedetto had this knowledge, he stated "Well, I mean, with the type of loans they were writing, it would have to be a quick exit strategy unless Walsh was insane, because it's going to catch up to you.  You're not going to write – I mean, just think, if you're going to write those type of loans – and again, they weren't doing this for an extremely long time.  It's not like Walsh Securities was being bought by Resource Bancshares with a 15, 20 year history where they were doing a certain volume.  You trace the volume of Walsh Securities, you will see it was doing basically nothing and went wow, and for a certain period of time, woops, I'm for sale."  (*See* Merin Cert., Ex. L, DiBenedetto at Dep. 39:8-24.)

**E.    National Home Funding Benefitted from the Fraudulent Scheme**

342.   NHF benefited from Kane's employment and the fraudulent loans due to the volume of loans: "Skowrenski was generating in volume and Skowrenski's company could show that they were doing big numbers."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 28.)

**RESPONSE:**

Disputed.  Defendant's statement mischaracterizes and misquotes Mr. Kane's testimony.  In addition, Mr. Kane was not testifying about fraudulent loans.

343.    Kane originated more of the NHF loans that were sold to WSI than anyone else at NHF.  (*See* Merin Certif., Ex. F: Kane 2011 Dep. 240; Ex. J: Skowrenski Dep. 38 (Kane was a big producer for NHF).)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony; however, Mr. Skowrenski merely agreed that Mr. Kane was a big producer for NHF.

344.    "The advantage to NHF showing big numbers is you can get different banks.  You can go to different banks when you do certain volume."  Kane stated that he believes "at one point Skowrenski had talked about being a national wholesaler himself where you would get more back end money from the banks and they would pay you."  (*See* Merin Certif., Ex. H: Kane 2007 Dep. 28.)

**RESPONSE:**

It is undisputed that Defendant's statement summarizes Mr. Kane's testimony.

Dated: January 13, 2012

Respectfully submitted,

/s/Robert A. Magnanini
Robert A. Magnanini
Amy Walker Wagner
Daniel Ian Mee
Jeffrey A. Shooman
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ  07078
(973) 218-1111
*Attorneys for Plaintiff Walsh Securities, Inc.*