# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT

| | |
|---|---|
| **In the Matter of:** | } |
| | }     Case No. |
| **Walsh Securities, Inc.,** | }     Chapter 11 |
| | } |
| **Debtor** | } |

### STATEMENT REGARDING AUTHORITY TO SIGN AND FILE PETITION

I, Robert Walsh, declare under penalty of perjury that I am the President of Walsh Securities, Inc., and that the following is a true and correct copy of the resolutions adopted by the Board of Directors of said Corporation at a special meeting duly called and held on the 9th day of November, 2010.

"Whereas, it is in the best interest of this Corporation to file a voluntary petition in the United States Bankruptcy Court pursuant to Chapter 11 of Title 11 of the United States Code;

Be It Therefore Resolved, that Robert Walsh, President of this Corporation, is authorized and directed to execute and deliver all documents necessary to perfect the filing of a Chapter 11 voluntary bankruptcy case on behalf of the Corporation; and

Be It Further Resolved, that Robert Walsh, President of this Corporation is authorized and directed to appear in all bankruptcy proceedings on behalf of the Corporation, and to otherwise do and perform all acts and deeds and to execute and deliver all necessary documents on behalf of the Corporation in connection with such bankruptcy case, and

Be It Further Resolved, that Robert Walsh, President of this Corporation is authorized and directed to employ the law firm of WASSERMAN, JURISTA & STOLZ, P.C. to represent the Corporation in such bankruptcy case."

Date: November 9, 2010      Signed:_____
                                        **ROBERT WALSH, PRESIDENT**

# EXHIBIT B



1

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
              CIVIL NO. 97-3496 (DRD)

      ---------------------------
      WALSH SECURITIES,                    :
      INC.,                                :
                                           :
           Plaintiff,                      :
                                           :
           v.                              :
                                           :
      CRISTO PROPERTY                      :
      MANAGEMENT,LTD., a/k/a               :
      G.J.L. LIMITED; DEK                  :
      HOMES OF NEW JERSEY,                 :
      INC.; OAKWOOD                        :
      PROPERTIES, INC.;                    :
      NATIONAL HOME FUNDING,               :
      INC.; CAPITAL ASSETS                 :
      PROPERTY MANAGEMENT &                :
      INVESTMENT CO., INC.;                :
      CAPITAL ASSETS                       :      DEPOSITION UPON
      PROPERTY MANAGEMENT,                 :      ORAL EXAMINATION
      L.L.C.; WILLIAM KANE;                :            OF
      GARY GRIESER; ROBERT                 :      ROBERT C. WALSH
      SKOWRENSKI, II;                      :
      RICHARD CALANNI;                     :
      RICHARD DI BENEDETTO;                :
      JAMES R. BROWN; THOMAS               :
      BRODO; ROLAND PIERSON;               :
      STANLEY YACKER, ESQ.;                :
      MICHAEL ALFIERI, ESQ.;               :
      RICHARD PEPSNY, ESQ.;                :
      ANTHONY M. CICALESE,                 :
      ESQ.; LAWRENCE CUZZI;                :
      ANTHONY D'APOLITO; DAP               :
      CONSULTING, INC.;                    :
      COMMONWEALTH LAND                    :
      TITLE INSURANCE CO.;                 :
      NATIONS TITLE                        :
      INSURANCE OF NEW YORK,               :
      INC.;                                :
                                           :
                                           :
                                           :
                                           :
                                           :
```

COPY



**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

---

**Page 2**

```
 1                          :
    FIDELITY NATIONAL       :
 2  TITLE INSURANCE CO. OF  :
    NEW JERSEY; COASTAL     :
 3  TITLE AGENCY; DONNA     :
    PEPSNY; WEICHERT        :
 4  REALTORS and VECCHIO    :
    REALTY, INC. D/b/a      :
 5  MURPHY REALTY BETTER    :
    HOMES AND GARDENS,      :
 6                          :
       Defendants.          :
 7  -------------------------
 8
 9
10
11        T R A N S C R I P T of the stenographic
12  notes of HOWARD A. RAPPAPORT, a Notary Public and
13  Certified Shorthand Reporter of the State of
14  New Jersey, Certificate No. XI00416, taken at the
15  offices of MC CARTER & ENGLISH, LLP, Four Gateway
16  Center, Newark, New Jersey, on Friday,
17  April 9, 2010, commencing at 9:35 a.m.
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2                    I N D E X
 3
    WITNESS                         PAGE
 4
 5  ROBERT C. WALSH
 6   Direct examination by Mr. Kott          6
     Cross-Examination by Mr. Hayes        172
 7
 8  EXHIBITS     DESCRIPTION         FOR IDENT.
 9  Robert    Notice to take oral        5
    Walsh-1    deposition of plaintiff
10             Walsh Securities
    Robert    Fourth amended complaint     5
11  Walsh-2
    Robert    Letter dated April 3,        5
12  Walsh-3    1998 from Walsh
               Securities to William T.
13             Lutz
    Robert    Letter dated July 3, 1997   107
14  Walsh-4
    Robert    Letter dated July 30,       108
15  Walsh-5    1996
    Robert    Agreement of settlement     110
16  Walsh-6
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1  A P P E A R A N C E S:
 2  STONE & MAGNANINI
    150 John F. Kennedy Parkway
 3  Short Hills, New Jersey 07078
    BY: ROBERT A. MAGNANINI, ESQ.,
 4      AMY WALKER WAGNER, ESQ.,
    For the Plaintiff
 5
    MC CARTER & ENGLISH, LLP
 6  Four Gateway Center
    100 Mulberry Street
 7  Newark, New Jersey 07102-0652
    BY: DAVID R. KOTT, ESQ.,
 8  For Defendant/Third-Party Plaintiff Commonwealth Land
    Title Insurance Company
 9
    FOX, ROTHSCHILD, O'BRIEN & FRANKEL
10  997 Lenox Drive
    Lawrenceville, New Jersey 08648
11  BY: EDWARD J. HAYES, ESQ.,
    For Defendants Nations Title Insurance and
12  Fidelity National Title Insurance
    METHFESSEL & WERBEL
13  3 Ethel Road
    Suite 300
14  Edison, New Jersey 08818
    BY: MARTIN R. MC GOWAN, ESQ.,
15  For Coastal Title Agency
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          (Exhibits marked for identification
 2  Robert Walsh-1, Notice to take oral deposition of
 3  plaintiff Walsh Securities; Robert Walsh-2, Fourth
 4  amended complaint; Robert Walsh-3, Letter dated
 5  April 3, 1998 from Walsh Securities to William T.
 6  Lutz.)
 7          MR. KOTT:  Before we swear the witness,
 8  I had marked for identification exhibit Robert
 9  Walsh-1, which is a notice to take oral deposition of
10  plaintiff Walsh Securities, Inc. which I served on
11  Mr. Magnanini.
12          Robert Walsh-2 is the fourth amended
13  complaint that is filed as document 302, filed with
14  the clerk electronically on 07/10/2009.  Attached to
15  it is document number 302-2, electronically filed the
16  same day, which are the exhibits.
17          Exhibit Robert Walsh-3 is an April 3,
18  1998 letter and its enclosures written by Fred H.
19  Schlesinger, vice president and general counsel of
20  Walsh Securities, Inc., to William T. Lutz, Esquire,
21  Sedwick Law Firm, apparently making a claim under a
22  mortgage bankers bond.
23          MR. MAGNANINI:  Do you have copies of
24  those?  I didn't bring any.
25          MR. KOTT:  Yes.
```



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

42

1    A    Walsh-1, this is noticing my deposition.
2    Q    Right.
3    A    For whatever reason, I believe Bette's
4    answer copied on this.  So she saw I was being
5    deposed.
6    Q    Okay.
7    A    And that she saw me being deposed, she
8    said, is this good or bad for you?
9    Q    Why would she speak to you about that?
10    A    You sent a copy of this to her.
11    Q    But why would she have an interest in
12    what's good or bad for you?
13    A    I'm her brother.
14    Q    Okay.
15        Are you aware of any reason that Bette
16    Ann could not give a deposition?
17    A    My personal knowledge, no.
18    Q    Are you aware whether Bette Ann is
19    available for a deposition on Tuesday?
20    A    I don't know.  I haven't spoken to her.
21    Q    Do you have access to Yankee tickets?
22    A    Personally, no.
23    Q    What do you mean when you say
24    "personally"?
25    A    You can buy Yankee Stadium tickets.  I

43

1    don't know what you're referring to.
2    Q    You don't have like season tickets or
3    anything like that?
4    A    Myself, no.
5    Q    What was Bette Ann's -- withdrawn.
6        When was Walsh Securities, Inc. formed,
7    approximately?
8    A    Walsh Securities, Inc. was formed in
9    April of 1996.
10    Q    And were you a stockholder?
11    A    I acquired in April of 1996 GF Mortgage,
12    which then became Walsh Securities, and there was
13    four shareholders, my two daughters and myself, and
14    Grinch Capital had a warrant and we were the
15    shareholders of Walsh Securities.
16    Q    Was Bette Ann DeMola ever a shareholder
17    of Walsh Securities?
18    A    No, she was not.
19    Q    Have you ever testified under oath that
20    she was?
21    A    I did.
22    Q    When was that?
23    A    Citiscape transaction, Citiscape
24    deposition.
25    Q    What did you testify under oath there?

44

1    A    That she was a shareholder.
2    Q    And how much stock did you say she
3    owned?
4    A    Five percent.
5    Q    And why did you testify to that?
6    A    When we were doing the merger with RBMG,
7    we knew what the exchange rate for Walsh Securities
8    shares going into RBMG were going to be in the first
9    week of April of 1997.
10        I went to 19 people, some relatives
11    outside that didn't work for Walsh, some friends
12    outside of Walsh, and some Walsh people.
13        I said, listen, I'm giving you shares of
14    my stock, and you are going to be able to convert
15    these shares into RBMG shares and you are going to be
16    able to get blank number of shares, and at the
17    closing of Walsh-RBMG merger, I'm going to give you
18    the shares and you can convert them into RBMG shares.
19        That was in my mind.  That stuck in my
20    mind, and to this day that's in my mind.
21        The S4 was a document that was prepared
22    by my attorneys.  There were certain things in the
23    document that were going to be done once the merger
24    took place.  The merger did not take place.  I was
25    not giving up shares of my company to people if there

45

1    was going to be no merger.
2    Q    The S4, what is that document?
3    A    The S4 was going to be the merger
4    agreement filed with the SEC by RBMG.
5    Q    I'm not sure I understand why you
6    testified in the Citiscape deposition that Bette Ann
7    owned five percent of the stock if that was not the
8    case.
9    A    I also testified in that deposition that
10    John Arbendorf was a board member, Bill Biggs was a
11    board member and Jill Walsh was a board member, and
12    they weren't.
13        There was a period of time that was very
14    difficult from '97 to this period of time.  A lot of
15    things stuck in my head.  These people were getting
16    that stock.  There is no question they were getting
17    the stock.  I was giving them that stock.  It stuck
18    in my head.  I made a mistake.
19    Q    Who else -- you said -- there were 19
20    people you were giving it to?
21    A    That's correct.
22    Q    Was one of those D'Apolito?
23    A    Yes, it was.
24    Q    What percentage was D'Apolito going to
25    get?

12 (Pages 42 to 45)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

70

1  Q    The letter that -- the letter that you
2  signed for which Bette was indicted as being a
3  lulling letter to RBMG, what did that state
4  generally?
5  A    Generally it was an update on what was
6  happening, and again, I don't remember specifically
7  individual letters, but generally it was -- the first
8  one was at Greenwich's request that we get something
9  out in the marketplace.
10     It went on to say that we had been --
11 there has been a fraud committed against us.
12     Again I'm going to commingle -- I
13 apologize, if you have them it will be easier for me
14 to review. Do you have them available that I can
15 review?
16     Q    The answer is yes, I can get them at the
17 next break, not right here.
18     A    The first one, there has been a fraud.
19 We think they are isolated. But we wanted to get
20 something out to the marketplace to say, hey, listen,
21 we are on top of this. We are doing it. We know
22 what we are doing. Things are going to work.
23     Q    Why did the government think that that
24 was a lulling letter?
25     A    I can only speculate at this time.

71

1  Q    Go ahead.
2  A    It was that we were trying to deceive
3  Greenwich and RBMG.
4  Q    In what way?
5  A    That we weren't part of anything or
6  Bette Ann DeMola wasn't part of anything.
7  Q    So that way the merger with RBMG would
8  be completed, is that correct?
9  A    Is that what their feeling was?
10     Q    Was that the theory of the prosecutor?
11     MR. MAGNANINI: Objection to form. He
12 doesn't know what the prosecutor's theory was going
13 to be.
14     A    From what I heard, David, that's it.
15     Q    Let's deal with that. From what you
16 heard.
17     You mean what you heard from the federal
18 prosecutor?
19     A    I'm not sure if I heard that from the
20 federal prosecutor, I'm not sure if I heard that from
21 somebody, if that was my understanding.
22     MR. MAGNANINI: I'm your attorney.
23 Don't talk to me.
24     A    If that's an okay way to put it, my
25 understanding.

72

1  Q    Were you ever present with Bette Ann
2  DeMola and any of her criminal lawyers other than
3  when you were in court with them?
4  A    Yes.
5  Q    Were you ever present just the three of
6  you?
7  A    No.
8  Q    Who was present when you were there?
9  A    I think that there was -- I think there
10 was another attorney, a corporate attorney for the
11 company, myself, I think Jimmy, and I think Jeff
12 Smith and Al DeCotiis.
13     Q    And was there a discussion with Bette
14 Ann about the events that had occurred?
15     A    Yes.
16     Q    And what did Bette Ann DeMola tell her
17 lawyers?
18     A    That she -- this was crazy --
19     MR. MAGNANINI: Wait.
20     THE WITNESS: I'm sorry.
21     MR. MAGNANINI: You're saying a
22 corporate lawyer for Walsh Securities was present?
23     THE WITNESS: John Oberdorf.
24     MR. KOTT: Can't see it, Bob.
25     MR. MAGNANINI: I don't think they had a

73

1  joint -- I don't think there was. Give me a minute.
2  (Pause.)
3  MR. MAGNANINI: All right, go question
4  by question.
5  MR. KOTT: Read back to Mr. Walsh what
6  my well stated question was.
7  (Record read.)
8  MR. MAGNANINI: I'll object to the form
9  of the question and the line of the questioning,
10 which is outside of the scope of the 30(b)(6) notice.
11     You already answered that.
12     A    She said it was crazy. This was in --
13 when Mr. Smith was putting together his defenses to
14 go in to get this dismissed.
15     We were going over, quote unquote, the
16 lulling letters.
17     John Oberdorf was present, because John
18 was the author of some of these letters, in
19 conjunction with Mr. Chertoff and Mr. Magnanini.
20     So going through the factual basis of
21 what the letters were, as far as who drafted them,
22 who saw them, who were involved with them, it was
23 going over my basis, going over with Jeff, and
24 helping or listening to Jeff explain what his basis
25 was going to be for his defense.

19 (Pages 70 to 73)


Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

150

1  clear on this.  Let's go back to Citiscape.
2       Mr. Kott, when you're selling loans to
3  The Money Store, you are selling those loans to their
4  underwriting guidelines.
5       Mr. Moeller or anybody else can't waive
6  conditions or change underwriting guidelines on
7  behalf of The Money Store.
8       If a loan is going to be bought by the
9  Money Store, and the guidelines come in and it's a
10  Money Store loan, those guidelines can't be changed
11  and the Money Store will not buy those loans.
12       Will somebody else potentially buy it
13  because there is another guideline fit for another
14  investor?  Sure.
15       The willy-nilliness of these depositions
16  and throwing stuff against the wall is unspeakable.
17       Q     Stay with me.
18       A     I am.
19       Q     I'm asking you a somewhat narrow
20  question.
21       Did Bette Ann DeMola ever vary from
22  underwriting guidelines?  That is, have the company
23  accept the loan that otherwise would not be accepted
24  under the underwriting guidelines?
25       MR. MAGNANINI:  Objection.

151

1       You can answer.
2       A     I don't have an answer to that.
3       Q     And why do you not know how to answer
4  that?
5       A     Bette Ann DeMola accept the loan -- I
6  don't know if that's coming in from a participant and
7  a loan came in -- let me -- I don't know how to
8  answer that, I'm sorry.
9       Q     Let me try it a different way.
10       Bette Ann DeMola was not in
11  underwriting, is that true?
12       A     Correct.
13       Q     The underwriting was a different
14  department, right?
15       A     Correct.
16       Q     Did Bette Ann DeMola ever play any part
17  in underwriting any loan that Walsh made?
18       A     No, she did not.
19       Q     Did Bette Ann ever influence anyone at
20  the underwriting department about any loan?
21       A     Define influence, if you don't mind.
22       Q     Interact?
23       A     Yes.
24       Q     Suggest that they ought to accept a loan
25  that the underwriting department was hesitant?

152

1       A     I'm not sure if she did it along those
2  lines, or she went to Paul DelRosso and said, Paul,
3  there is a condition in the file on this loan.  Do we
4  need this condition?
5       Paul would make the ultimate decision.
6       Q     I want to make sure I understand what
7  Walsh Securities' position is.
8       You saw a number of witnesses, a great
9  number said that Bette Ann DeMola would have the
10  company accept loans that otherwise were not
11  acceptable to the company.
12       MR. MAGNANINI:  Objection.
13       Q     Do you have any information about
14  whether that is true or that is false?
15       A     To my knowledge that is not a true
16  statement.
17       Q     Have you discussed that issue with Bette
18  Ann DeMola?
19       A     I've discussed it with Bette Ann, I
20  discussed it with Arnold Cohen, and I discussed it
21  with Fred Schlesinger.
22       Q     Did you also read about when Greenwich
23  was coming down to look at some loan files and
24  someone was cleansing the files?  Do you know what
25  I'm referring to?

153

1       A     I do.
2       Q     Do you have any information as to
3  whether that occurred?
4       A     Specifically that event, I don't know
5  what Kellie O'Neill is talking about.  But there is
6  something called post closing in a mortgage company.
7       At a closing, executed documents are
8  done at a closing.  Your note is signed, your
9  mortgage is signed, you're getting various different
10  documents that may have been brought to the closing.
11       Those documents then come back to the
12  mortgage company.  The originals go to the warehouse
13  bank.  They go to the trustee.
14       The other documents come in and they are
15  photo copied and those documents are put into the
16  underwriting file.
17       When those documents are put into the
18  underwriting file, the older documents are pulled
19  out, like the unsigned notes, all kinds of different
20  various things.  This happens on a daily basis.
21       We had ten post closures whose functions
22  were that job.  From time to time they got
23  overloaded.  We had too much loans coming in at once.
24       If The Money Store was coming in to take
25  a look and buying quite a few loans, yes, we had

39 (Pages 150 to 153)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - direct

154

1  additional staff members sitting down to help the
2  post closures take out documents that were notes that
3  were unsigned, various different over components of
4  the file that would need to be cleaned, and to put in
5  photocopies of executed notes.
6      Q    Would Bette Ann DeMola be involved in
7  that process?
8      A    Bette Ann being involved, and again
9  could she have been sitting at a table when that took
10 place?  Sure.
11     Q    Why would she, in her position, be
12 involved in that process?
13         MR. MAGNANINI:  Objection to form.
14         Go ahead.
15     A    At times most people in the company,
16 Arnold Cohen would pitch up, get his hands dirty if
17 need be.
18         Was Bette Ann DeMola actually working in
19 the files?  I don't think so.  Could she have been in
20 a room when some of this was happening?  Yes.
21         Was she directing the activities?  No,
22 she was not.
23     Q    Did Walsh buy back -- withdrawn.
24         We are talking about, as I understand
25 it -- withdrawn.

156

1  respect to those 140 loans, Walsh would have no claim
2  for damages other than a claim for the residuals?
3         MR. MAGNANINI:  Objection to form.
4  Calls for a legal conclusion.
5      A    What does that mean?
6      Q    That means you answer the question.
7         MR. MAGNANINI:  I'm objecting that he's
8  asking about legal damage theories, but it's a fact
9  question.  There is no privilege being asserted.  You
10 can answer.
11     A    Other than the residuals, that's
12 correct.
13     Q    That's correct?
14     A    That's correct.
15     Q    The 80 loans that Walsh currently owns,
16 were all 80 of those purchased back from someone?
17     A    Yes.
18     Q    From whom were they purchased?
19     A    They were purchased from The Money
20 Store, Citiscape, judgment and securities.
21     Q    What do you mean by securities?
22     A    Walsh had formed securities, mortgage
23 backed securities, and sold them.  We formed about a
24 billion dollars worth of securities.
25         Included in the securities, I think that

155

1          How many loans is Walsh making claims on
2  in this case?  How many loans are we talking about?
3      A    I think approximately 226.
4      Q    At this moment, how many of those loans
5  are actually owned by Walsh?
6      A    I think approximately 80-ish, yeah oh.
7      Q    What is the principal amount of those
8  loans, those 80 loans?
9      A    Maybe about 8.5 to $9 million.
10     Q    The other approximate 140 loans, who
11 owns those?
12     A    They are probably all gone by now.
13     Q    What do you mean by that?
14     A    They probably either have been
15 foreclosed on through the securities.
16     Q    Through the securities?
17     A    They were part of the security.
18     Q    Okay.
19         So with respect to the approximate 140
20 loans that Walsh sold and never repurchased, those
21 are gone, right?
22     A    But our residual is gone, too.
23     Q    We'll get to that.
24     A    Yes, okay.
25     Q    But would you agree with me that with

157

1  there was about $19 million worth of the fraudulent
2  loans were part of the securities.
3      Q    So how many loans were purchased back
4  from securities?
5      A    A little over $2 million.
6      Q    How many different loans of the 80?
7      A    How many were --
8      Q    You said there were 80 loans that came
9  from three sources, some from the Citiscape judgment,
10 some from The Money Store and some from securities.
11     A    Yes.
12     Q    Of the 80 loans, how many of that 80
13 were purchased from the securities?
14     A    19.
15     Q    How many were purchased from The Money
16 Store?
17     A    23, 24, 25.
18     Q    Approximately how many from Citiscape?
19     A    32.
20         MR. MAGNANINI:  You have those charts we
21 gave you, plus this isn't a memory test.  I think
22 they sum up what he's testifying to.
23     Q    And why did Walsh repurchase the loans
24 from The Money Store?
25     A    We had an obligation to repurchase them.

40 (Pages 154 to 157)


Rizman
Rappaport
Dillon&Rose,LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

262

```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF NEW JERSEY
           CIVIL NO. 97-3496 (DRD)
 3
           --------------------------
 4    WALSH SECURITIES,
      INC.,                          :
 5                                   :
           Plaintiff,                :
 6                                   :
           v.                        :
 7                                   :
      CRISTO PROPERTY                :
 8    MANAGEMENT,LTD., a/k/a         :
      G.J.L. LIMITED; DEK            :
 9    HOMES OF NEW JERSEY,           :
      INC.; OAKWOOD                  :
10    PROPERTIES, INC.;              :
      NATIONAL HOME FUNDING,         :
11    INC.; CAPITAL ASSETS           :
      PROPERTY MANAGEMENT &          :
12    INVESTMENT CO., INC.;          :      CONTINUED
      CAPITAL ASSETS                 :      DEPOSITION UPON
13    PROPERTY MANAGEMENT,           :      ORAL EXAMINATION
      L.L.C.; WILLIAM KANE;          :           OF
14    GARY GRIESER; ROBERT           :      ROBERT C. WALSH
      SKOWRENSKI, II;                :
15    RICHARD CALANNI;               :
      RICHARD DI BENEDETTO;          :
16    JAMES R. BROWN; THOMAS         :
      BRODO; ROLAND PIERSON;         :      PAGE 262
17    STANLEY YACKER, ESQ.;          :
      MICHAEL ALFIERI, ESQ.;         :
18    RICHARD PEPSNY, ESQ.;          :
      ANTHONY M. CICALESE,           :
19    ESQ.; LAWRENCE CUZZI;          :
      ANTHONY D'APOLITO; DAP         :
20    CONSULTING, INC.;              :
      COMMONWEALTH LAND              :
21    TITLE INSURANCE CO.;           :
      NATIONS TITLE                  :
22    INSURANCE OF NEW YORK,         :
      INC.;                          :
23                                   :
                                     :
24                                   :
                                     :
25                                   :
                                     :
```



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

```
                                          -263
 1              :
 2    FIDELITY NATIONAL       :
      TITLE INSURANCE CO. OF  :
 3    NEW JERSEY; COASTAL     :
      TITLE AGENCY; DONNA     :
 4    PEPSNY; WEICHERT        :
      REALTORS and VECCHIO    :
 5    REALTY, INC. D/b/a      :
      MURPHY REALTY BETTER    :
 6    HOMES AND GARDENS,      :
                              :
 7        Defendants.         :
      -------------------------
 8
 9
10
11
12         T R A N S C R I P T of the stenographic
13   notes of HOWARD A. RAPPAPORT, a Notary Public and
14   Certified Shorthand Reporter of the State of
15   New Jersey, Certificate No. XI00416, taken at the
16   offices of MC CARTER & ENGLISH, LLP, Four Gateway
17   Center, Newark, New Jersey, on Friday,
18   April 23, 2010, commencing at 8:35 a.m.
19
20
21
22
23
24
25
```

```
                                          264
 1   A P P E A R A N C E S:
 2   STONE & MANGANINI
     150 John F. Kennedy Parkway
 3   Short Hills, New Jersey 07078
     BY: DAVID STONE, ESQ.,
 4       AMY WALKER WAGNER, ESQ.,
     for the Plaintiff
 5
     MC CARTER & ENGLISH, LLP
 6   Four Gateway Center
     100 Mulberry Street
 7   Newark, New Jersey 07102-0652
     BY: DAVID R. KOTT, ESQ.,
 8   for Defendant/Third-Party Plaintiff Commonwealth Land
     Title Insurance Company
 9
     FOX, ROTHSCHILD, O'BRIEN & FRANKEL
10   997 Lenox Drive
     Lawrenceville, New Jersey  08648
11   BY: EDWARD J. HAYES, ESQ.,
     for Defendants Nations Title Insurance and
12   Fidelity National Title Insurance
13   METHFESSEL & WERBEL
     3 Ethel Road
14   Suite 300
     Edison, New Jersey 08818
15   BY: MARTIN R. MC GOWAN, ESQ.,
     for Coastal Title Agency
16
17
18
19
20
21
22
23
24
25
```

```
                                          265
 1
 2                  I N D E X
 3   WITNESS                          PAGE
 4   ROBERT C. WALSH
 5    Cross-Examination by Mr. Hayes    266
 6
 7   EXHIBITS     DESCRIPTION       FOR IDENT.
 8
 9   Robert     Closing instructions    373
     Walsh-7
10   Robert     Closing service letter  373
     Walsh-8
11   Robert     Letter via e-mail and   409
     Walsh-9    regular mail dated
12              March 5, 2010
     Robert     Letter via e-mail and   409
13   Walsh-10   regular mail dated
                April 6, 2010
14   Robert     Uniform settlement      420
     Walsh-11   statement
15   Robert     Secondary mortgage loan 421
     Walsh-12
16   Robert     Wholesale mortgage      421
     Walsh-13   commitment
17   Robert     Contract for sale of real 433
     Walsh-14   estate
18   Robert     Document entitled,      433
     Walsh-15   "Fidelity National Title"
19   Robert     Review checklist        440
     Walsh-16
20   Robert     HUD 1, Uniform Settlement 440
     Walsh-17   Statement
21   Robert     HUD 1 review form       448
     Walsh-18
22   Robert     Uniform underwritten    448
     Walsh-19   transmittal summary form
23   Robert     Wholesale mortgage      453
     Walsh-20   commitment
24   Robert     WSI common stock        476
     Walsh-21   ownership, SEC filing
25
```

```
                                          266
 1   R O B E R T  C.  W A L S H, having been previously
 2              sworn, testifies as follows:
 3   CROSS-EXAMINATION (CONTINUING)
 4   BY MR. HAYES:
 5       Q     Good morning, Mr. Walsh.
 6       A     Good morning.
 7       Q     You recall you were sworn at the last
 8   deposition and that oath continues this morning?
 9       A     I do.
10       Q     At the last deposition, Mr. Walsh, you
11   indicated that there were any number of things that
12   you were going to do in response to questions between
13   that deposition and before this morning.
14       Do you recall that?
15       A     I do.
16       Q     Did you take steps to try to answer some
17   of the questions that you could not answer at the
18   last deposition?
19       A     I did.
20       Q     Can you tell me what you did between the
21   last deposition and today to further prepare for
22   today's deposition other than speaking with your
23   attorneys?
24       MR. STONE: You can answer that
25   question, other than conversations with counsel.
```

2 (Pages 263 to 266)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdresr.com

Walsh - cross

295

1 reports were you looked at, Mr. Walsh?
2    A    It varied.
3    Q    How big was the file you looked at?
4    A    Maybe a couple hundred pages.
5    Q    Would you be able to locate that file
6 again relatively easily?
7    A    I believe I would.
8    Q    What I would like you to do, if you
9 would, if you could just locate that file so that
10 your counsel can provide us with the Bates numbers --
11    A    Sure.
12    Q    -- that were on what you looked at
13 between the last deposition and today.
14    A    Sure.
15    Q    Is that okay with you?
16    A    Um-hum.
17         MR. STONE:  Write us a letter and we'll
18 take it under advisement.
19         MR. HAYES:  Do you have an objection to
20 him doing that?
21         MR. STONE:  I don't have an objection to
22 him looking at it.
23         If you have a request for us to provide
24 you with something, I would like a letter requesting
25 it.

296

1    Q    One of the things you were going to do
2 last time, Mr. Walsh, was to check to see where
3 review appraisals were kept at Walsh.
4         Did you do that?
5    A    I did.
6    Q    What did you find?
7    A    In quality control.
8    Q    Did you see actual review appraisals in
9 the file that you reviewed prior to today's
10 deposition?
11    A    There were some there, yes.
12    Q    And who was doing the review appraisals?
13    A    Quality control.
14    Q    Was a recommendation made to you at any
15 time prior to the fraud that review appraisals should
16 be done by an outside appraisal firm or a group of
17 outside appraisers?
18    A    They were being done by an outside
19 appraisal firm.
20    Q    Did you just indicate a moment ago that
21 the review appraisals were done by quality control?
22    A    If that's what I stated, yes.  But my
23 comment meant to be they were ordering them.
24    Q    Okay.
25         So quality control was ordering

297

1 primarily drive-by appraisals from an outside
2 appraisal firm?
3    A    That's correct.
4    Q    And the review appraisals done on any
5 particular piece of property were not put in the
6 Walsh file for that particular loan, but were put,
7 instead, in the quality control file?
8    A    That's right.
9    Q    So we would not expect to see any review
10 appraisal documents at all in any Walsh loan file?
11         MR. STONE:  Objection to form, about
12 what you would expect to see.
13         You can answer.
14    A    No, that's not correct.
15    Q    Why not?
16    A    Any loan over 250,000 required a review
17 appraisal before it was funded.  You would see
18 that -- expect to see that in a file.
19    Q    In the loan file?
20    A    Correct.
21    Q    How about loans under $250,000, would
22 you expect me to find any review appraisal
23 documentation in any loan file under $250,000 based
24 on your review?
25    A    You may.

298

1    Q    Mr. Walsh, were there any additional
2 changes that you haven't already testified about that
3 were made at Walsh as a result of the discovery of
4 the fraud?
5    A    Not that I'm aware of.
6    Q    Do you believe that you have conducted
7 as exhaustive a search as you can to determine if
8 there were any other changes?
9    A    I'm not 100 percent sure.
10    Q    What more do you think you could do to
11 determine what other changes were made?
12    A    Maybe look at one or two other sources
13 of files.
14    Q    What would those sources be?
15    A    Additional loan files after the
16 closings.
17    Q    Why didn't you do that before this
18 deposition?
19    A    I attempted to do as much as I could.
20    Q    You didn't have enough time?
21    A    Correct.
22    Q    Is that basically it?
23    A    Right.
24    Q    Is there anyone else you believe you
25 could speak to on this issue that you haven't already

10 (Pages 295 to 298)



Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

475

1  the fraud, considered itself to be overburdened?
2      A    After the fact, yes. Prior, no.
3      Q    Would Jim Walsh have played any role in
4  acting upon recommendations made by quality control?
5      A    Arnold.
6      Q    I understand. But would Jim have played
7  a role?
8      A    It's possible.
9      Q    Is that the type of thing that would be
10 reported not only to Arnold, but also to Jim?
11     A    It would be.
12     Q    My understanding from prior deposition
13 of you, Jim was the outside guy handling the
14 relationships with people loaning you money and the
15 secondary market, is that correct?
16     A    That's correct.
17     Q    Would it be incorrect if someone were to
18 say that Jim Walsh controlled the quality control
19 procedures?
20     A    I'm not sure in what context the
21 statement was made.
22     Q    Did Jim play any role in the quality
23 control procedures at Walsh?
24     A    Quality control set the procedures.
25     Q    Did Jim play any role in what those

476

1  procedures were?
2      A    He may have. I'm not sure.
3      Q    Did Bette Ann?
4      A    No.
5      Q    She wouldn't have anything at all to do
6  with quality control?
7      A    She may understand what was happening on
8  some of the things that were happening within quality
9  control. She didn't set procedures.
10     Q    Would Mr. Treubor have interacted with
11 Bette Ann on quality control issues?
12     A    I'm not sure.
13     Q    Mr. Walsh, are you aware that as part of
14 the securities filing in connection with the merger,
15 Ms. DeMola was identified as an executive officer and
16 director?
17     A    I was not.
18     MR. STONE:  Can I hear the question
19 again?
20     (Record read.)
21     (Exhibit marked for identification
22 Robert Walsh-21, WSI common stock ownership, SEC
23 filing.)
24     MR. STONE:  I'm going to object to the
25 form of the question.

477

1      Before you showed us this, it seems that
2  it's not in evidence.
3      Having seen this, I would say it
4  mischaracterizes the evidence.
5      MR. HAYES:  Let's try to avoid any
6  mischaracterization.
7      Q    Mr. Walsh, I put before you a document
8  marked as Walsh-21.
9      Do you have it before you?
10     (Exhibit handed to the witness.)
11     A    I do.
12     Q    Okay.
13     Is this document, Mr. Walsh, correctly
14 reflecting the fact that prior to the merger you had
15 49.56 shares of class A common stock of Walsh?
16     A    Prior to the merger? That's -- this
17 document is reflective of what would have happened
18 with the merger, is my understanding of what this
19 document is.
20     Q    Prior to the merger, how many shares of
21 stock did you have, class A common stock, in Walsh?
22     A    I had -- assuming that the 25 shares
23 were exercised by Greenwich, there were 75 shares
24 remaining, of which I had 65 and the girls each had
25 five.

478

1      Q    The girls are Melissa and Stephanie?
2      A    Yes.
3      Q    Their stock was held in trusts?
4      A    Correct.
5      Q    Now, I believe you testified that you
6  have acknowledged previously that the SEC filing
7  incorrectly identified Bette Ann and James as owners
8  of the company, correct?
9      A    That's correct.
10     Q    And that that got through you and got
11 through your lawyers without being detected, correct?
12     A    Correct.
13     Q    And this particular document also
14 indicates, does it not, that the individuals
15 identified on this page are all directors and
16 executive officers of Walsh?
17     MR. STONE:  Object. That's not what it
18 says as far as I understand it.
19     You can answer.
20     A    I don't know.
21     Q    Do you see, Mr. Walsh, that the last
22 line of this document totals the numbers above and
23 identifies the individuals who are directors and
24 executive officers as a group?
25     A    That's what it says, correct.

55 (Pages 475 to 478)


**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Walsh - cross

479

1    Q    Is that something else that got through
2 not only you, but your lawyers?
3    A    Correct.
4    Q    One of the things that you indicated at
5 the last deposition, Mr. Walsh, you were attempting
6 to get the corporate records from your prior counsel.
7        Were you successful in doing that?
8    A    They are looking in storage. They are
9 looking wherever they store the records.
10    Q    Since the last deposition, was some
11 follow-up undertaken with the law firm to get those
12 records?
13    A    Yes.
14    Q    But as of today they still haven't found
15 them?
16    A    They haven't gotten back to us that they
17 found them, but they were looking.
18    Q    Did Ms. DeMola participate in any of the
19 discussions with RBMG about the merger?
20    A    She was interviewed by them, but she had
21 no discussions with them.
22    Q    What was the purpose for the interview?
23    A    They interviewed her on production.
24    Q    Production of loans?
25    A    Correct.

480

1    Q    Who else did they interview?
2    A    Arnold Cohen, Pete Treubor, Jim Walsh,
3 Fred Schlesinger, Paul DelRosso, Bob Gulga, who was
4 the accounting person. I'm not sure you heard his
5 name before. G-u-l-g-a. Vicky Bernhardt, and there
6 may have been another person.
7    Q    In addition to your brother and your
8 sister and Mr. D'Apolito and Mr. Cohen, is my
9 recollection correct there were a group of other
10 individuals to whom you intended to give stock if the
11 merger went through?
12    A    Correct.
13    Q    Why were they not listed on the filing
14 with the Securities and Exchange Commission?
15    MR. STONE: Objection, calls for a legal
16 conclusion.
17    You can answer.
18    A    I'm not sure.
19    Q    You stand by your story that this
20 particular document was a mistake because it
21 reflected what you were going to do if the merger
22 went through?
23    A    Correct. I never assigned -- I never
24 signed over shares to anybody. This was my intent
25 for the people to be able to acquire shares of RBMG

481

1 at these percentages once the transaction happen.
2    Q    Did you see anything, Mr. Walsh, in the
3 securities filing that indicated that those transfers
4 were something that was going to happen as opposed to
5 a representation as to the current status of
6 ownership of the company?
7    A    I did not.
8    Q    Have you been able to locate the
9 disclosure document that was supplied to RBMG in
10 connection with the ownership in the company?
11    A    I'm still looking at it. I found a
12 draft of the agreement, and I'm still waiting the
13 firm's.
14    Q    I'm not asking about the merger.
15    A    I'm sorry.
16    Q    The merger agreement references the fact
17 that Walsh supplied certain disclosure statements to
18 Walsh before the merger agreement was entered into.
19    What I'm asking you is, have you been
20 able to locate those disclosure statements?
21    A    I have not.
22    Q    Have you made an effort to find it?
23    A    Yes.
24    Q    Why?
25    A    You asked for it.

482

1    Q    I don't remember asking for it before
2 today.
3    A    Yes, last time, I believe.
4    Q    The disclosure statement or the merger
5 agreement?
6    A    I think you asked for both.
7    Q    Where have you looked for that?
8    A    John Oberdorf, the attorney handling it.
9    Q    The same person you're trying to get the
10 corporate records from?
11    A    Correct.
12    Q    Has he provided you with any response?
13    A    He's checking his warehouse or his
14 storage.
15    Q    Who is Sandra Zwickel?
16    A    She probably still is, but at the time
17 she was a legal assistant to Fred Schlesinger.
18    Q    She was not a lawyer?
19    A    She was a lawyer.
20    Q    Would you consider her to be in-house
21 counsel at Walsh?
22    A    No, I -- well, Fred Schlesinger was
23 general counsel. She worked for him.
24    Q    Did Ms. Zwickel play any role in the
25 submission of closing protection letter claims, to

56 (Pages 479 to 482)

**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 537

```
 1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
 2                  Civil Action No. 97-cv-3496 (DRD)(MAS)
 3   WALSH SECURITIES, INC.,              :
 4            Plaintiff,                  :  DEPOSITION OF:
 5        v.                              :  ROBERT C. WALSH
                                             (VOLUME III)
 6   CRISTO PROPERTY MANAGEMENT, LTD., :
     a/k/a G.J.L. LIMITED; DEK HOMES
 7   OF NEW JERSEY, INC.; OAKWOOD         :
     PROPERTIES, INC.; NATIONAL HOME
 8   FUNDING, INC.; CAPITAL ASSETS        :
     PROPERTY MANAGEMENT & INVESTMENT
 9   CO., INC.; CAPITAL ASSETS PROPERTY:
     MANAGEMENT, L.L.C.; WILLIAM KANE;
10   GARY GRIESER; ROBERT SKOWRENSKI,   :
     II; RICHARD CALANNI; RICHARD
11   DiBENEDETTO; JAMES R. BROWN;         :
     THOMAS BRODO; ROLAND PIERSON;
12   STANLEY YACKER, ESQ.; MICHAEL        :
     ALFIERI, ESQ.; RICHARD PEPSNY,
13   ESQ.; ANTHONY M. CICALESE, ESQ.;   :
     LAWRENCE CUZZI; ANTHONY D'APOLITO;
14   DAP CONSULTING, INC.; COMMONWEALTH:
     LAND TITLE INSURANCE CO.; NATIONS
15   TITLE INSURANCE OF NEW YORK, INC.;:
     FIDELITY NATIONAL TITLE INSURANCE
16   CO. OF NEW JERSEY; COASTAL TITLE   :
     AGENCY; DONNA PEPSNY; WEICHERT
17   REALTORS and VECCHIO REALTY, INC. :
     d/b/a MURPHY REALTY BETTER HOMES
18   AND GARDENS,                         :
19                                        :
                   Defendants.
20   X------------------------------X
21        TRANSCRIPT of testimony as taken by and
     before CHERYL McGANN, a Certified Court Reporter
22   of the State of New Jersey, at the offices of
     McCARTER & ENGLISH, LLP, Four Gateway Center,
23   Newark, New Jersey, on Friday, September 30, 2011,
     commencing at 9:14 a.m.
24
25   Job No. NJ356367
```

Page 691

1    A.  Yes.

2    Q.  Do you acknowledge Ms. Demola ever became a

3  shareholder?

4    A.  I acknowledge that the intent was to give her

5  the shares.

6    Q.  That's not my question.

7    A.  I'm not sure if she was or if she's not.

8    Q.  And is it your testimony that the date that

9  is on that Stock Certificate which has Ms. Demola's

10  name on it is incorrect?

11    A.  Yes.

12    Q.  And based on that date, you're telling us

13  that we can't rely on that Stock Certificate?

14    A.  That's correct.

15         MR. HAYES:  You want to pick up, and

16  I'll look through these.

17  FURTHER EXAMINATION BY MR. KOTT:

18    Q.  I'm going to just, if it's okay with you,

19  jump around a little which we haven't been doing.

20    A.  Sure.

21         MR. MAGNANINI:  Just let the record

22  reflect I don't agree with the not jumping around,

23  but that's okay.

24         MR. KOTT:  Okay.  That's fine.

25    Q.  When the loans were securitized, were the

Page 692

1  loans reviewed by the purchasers?

2      A.  Mr. Kott, the transaction, and I'll be brief

3  on it --

4      Q.  Right.

5      A.  -- the first thing that would be generated

6  would be a tape that shows all the characteristics

7  of the loans.

8      Q.  Right.

9      A.  That would be given to the "underwriter" of

10  that security.

11      Q.  Okay.

12      A.  The underwriter would be the one that was

13  representing the trust.  The trust and the

14  underwriter would have those reviewed by Standard &

15  Poor's to go through their calculations to come up

16  with subordination levels.  The underwriter's

17  responsibility was to underwrite those particular

18  loans.

19      Q.  Okay, and did the underwriter review each and

20  every loan file that it was purchasing or do a

21  sampling?

22      A.  Well, they weren't purchasing them, okay, and

23  again, it's semantics.  I just want to try to get

24  the path clear.

25          The trust was -- we were putting the loans in

Page 693

1  a trust to form a security.

2      Q.  Right.

3      A.  So there was no purchase by the underwriter.

4      Q.  Okay.  Did the underwriter or someone on

5  behalf of the underwriter review each and every loan

6  that went into the trust, or did they do a sampling

7  of the loans?

8      A.  I think they did -- it varied.  I think some

9  of them they did a sampling, and some of them they

10 actually did the full underwriting.  I think it

11 depended on who the underwriter was.

12     Q.  And the loans we're talking about in this

13 case, who were the underwriters?

14     A.  The last two transactions were Smith Barney.

15     Q.  Right.

16     A.  DLJ I believe underwrote two of them, and

17 Greenwich underwrote the first one.

18     Q.  And which of those underwriters would have

19 reviewed every loan, and which would have done

20 samplings?

21     A.  From what I recall, DLJ did the underwriting

22 on all; and Smith Barney did a random sampling.

23     Q.  And how about Greenwich?

24     A.  You know, I don't remember on that one.

25     Q.  Okay.  Was Greenwich going to profit as a

Page 706

1      Q.   Okay.   There has also been a lot of talk,

2    Mr. Walsh, about the 6040 deeds.   Are you familiar

3    with those?

4      A.   I am.

5      Q.   Are you agree with me, sir, that the transfer

6    of an interest in the borrower's property after a

7    mortgage on that property does not diminish the

8    ability of the lender to foreclose that property?

9           MR. MAGNANINI:   Objection to form.

10          It calls for a legal conclusion.

11     A.   I don't know the answer to that.

12     Q.   Do you have any reason to believe that if

13   Bob Walsh has a property with a mortgage on it and

14   he conveys the property to Ed Hayes without paying

15   off the mortgage that David Kott, the lender, cannot

16   foreclose that mortgage?

17     A.   I don't know.

18          MR. MAGNANINI:   It depends when things

19   are filed, anyway.

20          Objection to form.

21     Q.   Did Smith Barney conduct the underwriting

22   review on all of the loans that went into securities

23   or just a certain number of them?

24     A.   Again, I think what I just went over, I think

25   Smith Barney did a sampling.   I think DLJ did the

Page 707

1    full underwrite.

2        Q.   So is it your recollection that DLJ looked

3    not at every collateral file but every underwriting

4    file?

5        A.   Yes.

6        Q.   And that Smith Barney did a sampling of the

7    underwriting files?

8        A.   Correct.

9        Q.   Do you know what that sampling was?

10       A.   I'd only be guessing.

11       Q.   Does Walsh need to supply to a secondary

12   mortgage -- a secondary purchaser, secondary market

13   purchaser, a copy of the collateral documents?

14       A.   Yes.

15       Q.   Does it need to supply a copy of the title

16   policy?

17       A.   To my knowledge, yes.

18       Q.   Does it need to supply a copy of any and all

19   assignments?

20       A.   To my knowledge, yes.

21       Q.   Now, you're aware, are you not, that there

22   were substantial delays in the recording of some of

23   the documents that are a part of or some of the

24   mortgages that are a part of this fraud?

25       A.   Yeah.   I think that there was a mass amount,

Page 743

1    Q.  Anything is possible.  I'm just asking if you

2    can name anyone.

3    A.  No, I cannot.

4    Q.  Remember you had testified about the review

5    appraisals not being in the files?

6    A.  Yes.

7    Q.  Is there any way that somebody reviewing

8    these files, be it an underwriter or a purchaser,

9    would have knowledge of the review appraisal?

10   A.  If the review appraisal was over the 250,000,

11   I think what I had mentioned last time was that

12   there was two.  There was a preclosing, and that

13   would be for over $250,000 a review was done.  That

14   would be in the file.  Anything that was quality

15   control would not be in the file.

16   Q.  Did you ever testify before the Grand Jury?

17   A.  You're running out of questions to ask.

18   Q.  I know, I asked you that.

19       MR. MAGNANINI:  Objection, asked and

20   answered.

21   A.  Right.

22   Q.  You know the lulling letters that form the

23   basis for the indictment of Betty Ann Demola?

24   A.  I do.

25   Q.  Did you actually physically sign those

# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF NEW JERSEY
                CIVIL NO. 97-3407 (DRD)
 3
 4       ------------------------------
         WALSH SECURITIES,               :        COPY
 5       INC.,                           :
                                         :
 6            Plaintiff,                 :     DEPOSITION UPON
                                         :     ORAL EXAMINATION
 7            v.                         :          OF
                                         :     ELIZABETH ANN
 8       CRISTO PROPERTY                 :     DEMOLA
         MANAGEMENT,LTD.,                :
 9       et al,                          :
10
11       ------------------------------
12
13
14              T R A N S C R I P T  of the stenographic
15       notes of HOWARD A. RAPPAPORT, a Notary Public and
16       Certified Shorthand Reporter of the State of
17       New Jersey, Certificate No. XI00416, taken at the
18       offices of MC CARTER & ENGLISH, LLP, Four Gateway
19       Center, Newark, New Jersey, on Friday,
20       June 11, 2010, commencing at 9:45 a.m.
21
22
23
24
25
```



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

82

1    it.
2        MR. HAYES:  Is there an interview note
3    of this conversation similar to the ones that are now
4    the subject of the dispute with Magistrate Shipp?
5        MR. MAGNANINI:  No.  Not that I'm here
6    to testify, but I'll answer the question.
7        Q    And do you know a man named William
8    Kane?
9        A    Yes, I do.
10       Q    How do you know Mr. Kane?
11       A    I have to think now how I know him.
12            We called him Billy.  He would come to
13   the office.  Anthony D'Apolito introduced him.  He
14   would buy houses and fix them up.
15            I never went out socially with him or
16   anything like that.  I don't know him.  I just --
17   that's how I knew him.
18       Q    So you met him through Mr. D'Apolito?
19       A    That's correct.
20       Q    How was he introduced to you?  What was
21   the introduction?
22       A    That he bought houses and fixed them up.
23       Q    About how long before the frauds became
24   public in the newspaper was that introduction made?
25       A    I'm not sure, it was December of '96.

83

1        Q    Right.
2            We have seen some documentation that
3    some of the loans in this case were in approximately
4    January of 1997.  So is that the time period when you
5    first met Mr. Kane, approximately, then?
6        A    I think it was December.
7        MR. HAYES:  '96.
8        MR. KOTT:  January, February of '96?
9        MR. HAYES:  January, February of '96.
10       Q    Assuming, as Mr. Hayes says, the loans
11   in this case run from approximately June of '96 --
12       MR. HAYES:  January.
13       Q    Assuming that the loans in this case run
14   approximately from January of 1996 through June of
15   1997, about when did you meet Mr. Kane?
16       A    I think I'm wrong.  I thought I met him
17   in December of '96.
18       Q    Okay.
19            And when you met him, whenever the first
20   time was, you understood he was somebody who
21   purchased properties, meaning real estate,
22   residential properties?
23       A    Yes.
24       Q    And then resold them?
25       A    Fixed them up.

84

1        Q    And then resold them?
2        A    Yes.
3        Q    Who told you that?  Did he tell you
4    that, Mr. Kane, or Mr. D'Apolito or someone else?
5        A    I didn't have lengthy conversations.  I
6    was introduced to him, that he was a renovator, that
7    he would buy properties, fix them up and sell them.
8            I think probably Anthony and he both
9    said it when my first meeting with him was.
10       Q    Where was the first meeting, at Walsh
11   Securities?
12       A    Yes.
13       Q    Why was Mr. Kane at Walsh Securities?
14       A    He was with Anthony.  People would come
15   in all the time.
16            Mr. Kane apparently owned a company
17   called Cristo, C-r-i-s-t-o, Properties.  Are you
18   aware of that?
19       A    Yes.
20       Q    When did you learn that Mr. Kane was the
21   owner of Cristo Properties?
22       A    I think that's how I knew him.
23       Q    Right from the beginning?
24       A    Yes.
25       Q    Had you been -- have you read any of the

85

1    testimony of witnesses in this case?
2        A    No, I never saw anything.
3        Q    Have you read any of the pleas of people
4    who were witnesses in this case, by guilty pleas, I
5    mean?
6        A    No.
7        Q    Has anybody told you what any of the
8    witnesses ever said?
9        A    No.  They told me they pleaded guilty.
10       Q    Has Robert Walsh ever -- withdrawn.
11            Have you ever discussed this lawsuit
12   with Robert Walsh?
13       A    I really haven't.
14       Q    Not at all, not one word?
15       A    No, not at all.
16       Q    Have you ever discussed even as much as
17   one word of this lawsuit with James Walsh?
18       A    Yes.
19       Q    What were your discussions with James?
20       A    I got served with papers.  I was upset,
21   because the person that you sent lied and said we
22   wouldn't take the papers when she tried to give it to
23   my two daughters.
24            Then she came on Good Friday, and she
25   came on Easter Sunday in the middle of a party, and I

22 (Pages 82 to 85)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

90

1    I was in pretrial for seven years. It
2 was very traumatic.
3    Q    Let me try the question again.
4    Did your brother Robert or your brother
5 James at any time ever tell you that a number of
6 persons who said you were either aware of the frauds
7 in this case or you were involved in the frauds in
8 this case?
9    A    I'm going to be honest with you. I'm
10 confused as to if lawyers told me. I can't break it
11 down, I know it, but I'm not going to make up a lie
12 and say I'm telling you. I'm confused.
13    I don't know if I heard it from lawyers
14 or if I heard it from my brothers. I don't know
15 where I heard it from. I'm sorry.
16    Q    Did Mr. Kane have any association with a
17 company called National Home Funding?
18    A    I found out -- just tell you what I
19 believe. I found out -- I thought they were just
20 friends. I thought they were all just friends.
21    Then after the fraud was discovered I
22 had heard he was doing loans at National Home
23 Funding. I didn't know that when it was happening.
24 I really -- they would come into the office in work
25 clothes, like a contractor, and he would always say

91

1 his crews were here, his crews were there.
2    He was always like dirty, not dirty
3 dirty, like if he was working in the street.
4    He brought a letter up to the company to
5 say what good work he was doing in Asbury Park.
6 Supposedly it was from the City of Asbury.
7    At the time, David, I had -- not
8 David --
9    Q    David.
10    A    David. I had 45 loan officers. I had
11 18 offices. I was doing everything. I didn't -- you
12 know, now Billy Kane is a subject. Then he was
13 nothing. He was a nobody. It was less than two
14 percent of our production.
15    I had other companies selling me 50
16 loans a month. I didn't key into who Billy Kane was.
17 I greeted everyone. I was a greeter. I threw the
18 parties. I -- that was my job.
19    But for me to really sit here and say I
20 studied what his business -- I didn't care. I didn't
21 know who he was. I knew he renovated houses. I knew
22 from the beginning he owned Cristo Properties.
23    Q    What I was asking --
24    A    That wasn't the answer?
25    Q    What I was asking, were you aware before

92

1 the frauds became public, in June of 1997, that
2 Mr. Kane was associated with National Home Funding?
3    A    No.
4    Q    When did you find that out?
5    A    When Anthony -- after Anthony came to
6 the office and everybody started talking in the back.
7 People in the back had known that Billy Kane worked
8 at National Home Funding and worked doing Cristo
9 Properties.
10    I wasn't aware of it.
11    Q    What do you mean, people in the back?
12    A    Well, I --
13    Q    Bette Ann, you don't know how I'm going
14 to finish the question. I might change the question
15 in a way and then you'll give an answer that you
16 don't intend to give. I've asked a lot of witnesses
17 a lot of questions over the years, so I'm capable of
18 doing that. It is prudent for you to let me finish.
19    What do you mean, a lot of people in the
20 back knew that Kane was with National Home Funding?
21    A    Let me say that the right way.
22    We had one big floor, 10,000 square
23 feet. There were no dividers. There were little
24 dividers, short ones, no tall ones.
25    The floor had sales people, and the

93

1 underwriters and the processors and everything were
2 in the back.
3    So some of the other sales people
4 knew -- when I say the back, I don't mean the back,
5 on the floor -- let me change that -- on the floor,
6 knew that Billy Kane worked at National Home Funding
7 and at Cristo Properties.
8    Q    About how many times was Billy Kane in
9 the Walsh Securities office?
10    A    A lot.
11    Q    What do you mean by that?
12    A    I don't remember how many times.
13    Q    Can you give us an estimate?
14    A    I can't. I don't know.
15    Q    Would it have been over 100 times?
16    A    Oh, no, not that many times.
17    Q    Over 50 times?
18    A    I'm thinking. It wasn't over 50.
19    Q    Over 25 times?
20    A    I don't remember. It was between 25 and
21 50 in the course of two years.
22    Q    On some of those 25 to 50 times would
23 you see him in the office?
24    A    I would see him there, yes.
25    Q    What did you think he was doing?

24 (Pages 90 to 93)



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

102

1    Q    Who was confused?
2    A    Fred. It's like, what's going on?
3    Q    Assuming he was confused, why was he
4    asking you rather than Mr. DelRosso or, rather, one
5    of the other officers?
6    A    I wasn't an officer.
7    Q    Right, that's what I'm asking.
8         You were not an officer, right?
9    A    Never.
10   Q    Never an officer in the company, right?
11   A    No.
12   Q    On the day that Mr. Schlesinger had this
13   conversation with you, were there officers present in
14   the company?
15   A    He didn't tell me to do anything.
16   Q    Just stay with me.
17   A    I don't know.
18   Q    You don't know.
19        Who were the other officers in the
20   company?
21   A    You know, I don't know. I know Arnold
22   Cohen, C-o-h-e-n, was one.
23   Q    What was Mr. Cohen's job?
24   A    He was a risk manager.
25   Q    Any other officers?

103

1    A    My brother Jimmy. I think Jimmy was an
2    officer. I don't even know.
3    Q    What did you call yourself if not an
4    officer? Were you a manager?
5    A    I was a manager.
6    Q    Were there other managers in the
7    company?
8    A    Yes.
9    Q    Who were the other managers?
10   A    Vicky Burnhardt.
11   Q    What did she do?
12   A    Operations.
13   Q    Okay.
14   A    Paul DelRosso was an underwriting
15   manager.
16        MR. MAGNANINI: D-e-l-r-o-s-s-o.
17   A    We had another one, she quit. I don't
18   remember who took her position. I don't know who she
19   was.
20   Q    My question is, do you know why
21   Mr. Schlesinger asked you rather than some other
22   manager or officer?
23   A    I would like to clarify. Fred did not
24   ask me. Besides working together, we were friends.
25   And he said -- he made a statement. I took it upon

104

1    myself to do that. No one asked me to do that.
2    Q    Why did you take it upon yourself?
3    A    Because I was very upset.
4    Q    Let me finish.
5         Why did you take it upon yourself to do
6    that?
7    A    I was very upset.
8    Q    Why were you upset?
9    A    I didn't want an issue with any of the
10   files.
11   Q    What did you think the issue was with
12   the files?
13   A    The houses weren't fixed.
14   Q    Why would that be a issue?
15   A    Because they were supposed to be fixed,
16   renovated.
17   Q    What do you mean by that?
18   A    You buy a house for $10,000, and I'm
19   lending 100,000 on it, work should have been done to
20   make improvements to that property.
21   Q    What do you mean by that?
22   A    What does that mean? What do you mean?
23   Q    Who was buying the house for $10,000?
24   Was that Mr. Kane?
25   A    I don't know how much he paid for it.

105

1    Q    You are referring to Mr. Kane?
2    A    Oh, yes, I'm sorry.
3    Q    So when Mr. Schlesinger said this to
4    you, you were concerned that Mr. Kane had sold houses
5    that were not fixed up?
6    A    That's correct.
7    Q    How did you come to that conclusion?
8    A    Because whatever was delivered to Fred,
9    he said -- Fred said, it seems these houses aren't
10   fixed.
11   Q    You had loaned money on a lot of houses,
12   correct?
13   A    Excuse me?
14   Q    Your company had loaned money on a lot
15   of houses, correct?
16   A    Across the country, yes.
17   Q    And a lot in New Jersey, right?
18   A    Yes.
19   Q    How did you know that these were
20   Mr. Kane's houses?
21   A    Fred told me which houses they were.
22   Q    He told you the address?
23   A    He said to me, it looks like Billy Kane
24   has houses he didn't do any work on. I didn't say
25   that whole thing right.

27 (Pages 102 to 105)

**Rizman
Rappaport
Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

114

1    AFTERNOON SESSION
2    (Deposition resumes at 1:35 p.m.)
3    ELIZABETH ANN DEMOLA, resumes.
4    BY MR. KOTT:
5    Q    Are you ready, Ms. Demola?
6    A    Yes, I am.
7    Q    Ms. Demola, did Mr. Schlesinger show you
8    the subpoena?
9    A    No.
10   Q    Did he tell you whether he had spoken to
11   anyone else about the subpoena?
12   A    No, we didn't have a conversation.
13   Q    Was it your impression, though, when you
14   spoke to him, that you were the first person he was
15   speaking to about the subpoena?
16   A    I really don't know. I don't remember
17   my impression.
18   Q    Did he tell you how he knew the houses
19   weren't fixed up?
20   A    No.
21   Q    How would he know that?
22   A    I don't know. I can't tell you what he
23   thought.
24   Q    I understand that.
25   A    I think there was something -- this is

115

1    my thought, there was something in documents he must
2    have seen that I did not see.
3    Q    Would there be anything in Walsh
4    documents that he could look at that would tell him
5    that --
6    A    No.
7    Q    Let me finish.
8         Would there be anything in a Walsh file
9    that would tell him the houses had not been fixed up?
10   A    No, we thought they were fixed up.
11   Q    Right. Because in fact your company
12   would not have made the loans if you had known that
13   the houses had not been fixed up?
14   A    That's correct.
15   Q    Did your company, in making the loans,
16   know that Kane was flipping them, was doing what was
17   called a rehab flip program?
18   A    No, I don't think so. I don't know. I
19   wasn't an underwriter. I was in charge of sales.
20   Q    Let's talk about what you knew.
21        You said that you knew that Kane owned
22   the homes?
23   A    Yes, correct.
24   Q    You said you knew he was fixing them up?
25   A    That's correct.

116

1    Q    You knew that your company was making
2    loans on the homes --
3    A    Yes.
4    Q    -- that he was selling?
5    A    Yes.
6    Q    And you knew all of that before the
7    frauds became public?
8    A    That's correct.
9    Q    So do you know where he got the
10   financing to purchase the homes?
11   A    No, I don't even know how he found the
12   homes. It wasn't in my world. Like it wasn't part
13   of my world. I didn't care. It wasn't my business.
14   Q    Was underwriting part of your world?
15   A    No.
16   Q    Did you play any part in underwriting?
17   A    No. I was friendly with the people.
18   Like I would say good morning.
19   Q    My question is, professionally did you
20   ever play any part in underwriting?
21   A    No.
22   Q    Were you ever contacted by anybody about
23   an underwriting decision, meaning anybody outside
24   Walsh ever call you?
25   A    Yes.

117

1    Q    Why would that be?
2    A    Well, when you're a wholesale person you
3    can get testimony from other wholesale persons,
4    people, your job is to work with the brokers.
5         What a wholesale rep means is if I have
6    a broker, First United Mortgage, and First United
7    calls me up and says they are asking for a condition
8    that makes no sense to me, tell your underwriter they
9    are an asshole. That's how brokers talk.
10        So I would go to Paul DelRosso and I
11   would say, Paul, please pull this file. I would
12   write down what the broker stated. This is the
13   broker's version. He sat with the borrower.
14        I don't remember specifics, but that's
15   what a wholesaler's job is.
16        Then Paul DelRosso would pull the file,
17   go over it, call the broker and try to rectify the
18   program -- the problem.
19   Q    Did you ever say to Mr. DelRosso what
20   you thought should be done as far as underwriting?
21   A    No.
22   Q    That you stayed out of?
23   A    I didn't stay out of it. It wasn't part
24   of what I did. I didn't consciously stay out of it.
25   It wasn't what I did.

30 (Pages 114 to 117)


**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - direct

122

1  conditions that were not met?
2     A    I don't remember.
3     Q    Ms. Demola, did you direct persons at
4  Walsh to participate in efforts with respect to close
5  funded loans which were to be reviewed by
6  representatives of Greenwich Capital, which efforts
7  included altering certain documents in those files
8  and placing other documents such as written
9  appraisals in the files?
10    A    The only thing I did was when the review
11 appraisals came back, I gave them to Kellie to put in
12 the file, none of the other documents, just the
13 review appraisal.
14    Q    Ms. Walsh --
15    A    That's okay, I was a Walsh.
16    Q    Ms. Demola, did you concur in the
17 funding of loans without first having obtained an
18 accurate reappraisal?
19    A    A reappraisal?
20    Q    Yes.
21    A    State it again. I'm sorry. On a
22 verbal, we closed with a verbal.
23    Q    Did you concur in the funding of loans
24 without first having obtained an accurate
25 reappraisal?

123

1     A    We had a verbal on the review
2  appraisals.
3     Q    That wasn't what I asked.
4     A    But that was the answer.
5     Q    Okay.
6        Did you in fact accept money from
7  William Kane?
8     A    Absolutely never.
9     Q    Did you at some point become aware that
10 there were fraudulent documents used to support loans
11 by Walsh Securities?
12    A    At the end of June.
13    Q    Did you --
14    A    '97, end of June '97.
15    Q    Did you act a conscious purpose of
16 avoiding learning the truth by the use of appraisals
17 whose valuations were inaccurate and were used to
18 qualify buyers?
19    A    What does that mean, though? My
20 understanding it was asked of me, but in reality,
21 what does that mean?
22    Q    Do you not understand the question?
23    A    I don't.
24    Q    Okay.
25        Did you act with others with a conscious

124

1  purpose of avoiding learning the truth that there
2  were appraisals used which valued properties in their
3  as is condition when many of the subject properties
4  required substantial improvement?
5     A    I didn't. I didn't know there was an as
6  is until after I was made aware of it after the fact.
7        I didn't even know these people. I
8  didn't make a nickel from it. So draw your own
9  conclusions how I wound up here.
10       I never saw the letters. I never wrote
11 the letters.
12       Do you want me to go on and on?
13    Q    Did you direct persons at Walsh to
14 participate in efforts with respect to closed funded
15 loans which were to be reviewed by representatives of
16 Greenwich Capital, which efforts included altering
17 certain documents in those files and placing other
18 documents such as written appraisals in the files?
19    A    Could I read it?
20    Q    I'm asking you a question.
21    A    Say it again, I'm sorry.
22    Q    Did you direct persons at Walsh to a
23 participate in efforts with respect to closed funded
24 loans which were to be reviewed by representatives of
25 Greenwich Capital, which efforts included altering

125

1  certain documents in those files and placing other
2  documents such as written appraisals in the files?
3     A    I don't remember.
4        MR. MAGNANINI:  I'll object to the whole
5  line, asked and answered.
6     Q    You say you don't remember?
7     A    I don't remember.
8     Q    Did you testify under oath -- withdrawn.
9        When you testified before Judge Hayden
10 about your involvement with these frauds, did you
11 testify truthfully?
12    A    Um, I'll take the Fifth on that.
13    Q    I asked you earlier whether you were
14 aware that fraudulent loans were being made by Walsh
15 Securities, and you're taking the fifth as to that,
16 is that correct?
17    A    I didn't know --
18    Q    No, stay with me.
19    A    I'm sorry.
20    Q    Were you aware -- earlier I had asked
21 you whether you were aware that fraudulent loans were
22 being made by Walsh Securities, and you took the
23 Fifth amendment.
24       Do you remember that?
25    A    Yes, I do remember that.

32 (Pages 122 to 125)


Rizman
Rappaport
Dillon&Rose, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - cross

150

1   A   Unless the broker then attempted to get
2   whatever he said he couldn't get.
3   Q   If that loan didn't close, Bette Ann
4   wouldn't make any money on that loan, would she?
5   A   I had so many other loans, I didn't
6   really care about that one loan.
7   Q   Ms. Demola, listen to my question.
8   If that exception was not made, Bette
9   Ann would make no money on that loan, would she?
10  A   No.
11  Q   Your testimony is that despite the fact
12  that you had a direct financial interest in that loan
13  closing, you would not in any way attempt to
14  influence the underwriter to make an exception, is
15  that your testimony?
16  A   No, I absolutely would go in the back
17  with the written appeal. It was called an appeal. I
18  would write down what the broker would say.
19  Sometimes the brokers would write the
20  letters themselves and state, you know, he's not on
21  the job a full 12 months. He changed positions.
22  It could be for a number of reasons. We
23  needed two years employment. I had a year here, a
24  half a year here. Maybe you could make an exception?
25  It didn't bother me one way or the

151

1   other. It wasn't like there were two loans in the
2   pipeline and I wasn't going to make money for the
3   month. I was making $50,000 for a month.
4   Do you think I cared about one loan? Do
5   you think I cared about eight loans? I didn't. You
6   can't make me say I did. I didn't.
7   Q   Let go back to my question to you again.
8   My question was relatively simple. Are
9   you telling us that despite the fact that if the loan
10  didn't close you would not make any money, or that
11  you did not attempt in any way to influence the
12  underwriter to approve an exception to a guideline?
13  Is that your testimony?
14  A   That's my testimony.
15  MR. MAGNANINI: Objection to form.
16  Asked and answered.
17  THE WITNESS: What does that mean when
18  you say that?
19  MR. MAGNANINI: He asked the question a
20  couple of times.
21  THE WITNESS: Oh, I'm sorry.
22  Q   Did Walsh Securities have a flip
23  program, f-l-i-p, program?
24  A   We didn't call it a flip program.
25  Q   What did you call it?

152

1   A   I don't remember, but it wasn't a flip
2   program, and there was nothing wrong.
3   Q   Ma'am, just answer my question.
4   A   Okay.
5   Q   I don't want anyone else to tell me
6   nothing is wrong with a flip program. We all know
7   there is nothing wrong with a flip program when there
8   is no fraud.
9   A   That's right. That's what I was going
10  to say.
11  Q   We all agree to that.
12  Were you responsible for educating your
13  employees as to what products they should be
14  marketing for mortgage brokers and participants?
15  MR. MAGNANINI: Objection to form. They
16  were not her employees.
17  You can answer.
18  A   No. Wait.
19  Everything went through Arnold Cohen.
20  Anytime there was a new program, he would run the
21  training seminar to point out to all the wholesale
22  reps what should go into that program.
23  Q   Were you involved in those training
24  sessions?
25  A   Yes.

153

1   Q   When Arnold Cohen would explain a new
2   program offered by Walsh Securities, Bette Ann would
3   know about it?
4   A   That's right.
5   Q   Do you recall when Walsh first had a
6   program that would be called something like a flip
7   program?
8   A   If you want to tell me the name, I'll
9   tell you if I had it. I don't remember.
10  Q   Ma'am, I heard very -- I heard many
11  names for the Walsh flip program. I heard the flip
12  program. I heard the rehab program. I actually saw
13  at one point in time a no seasoning program. I don't
14  know what it was.
15  Can you tell me what it was called?
16  A   We had a no seasoning program, but we
17  copied it from Conte Mortgage.
18  Q   Is that a flip program?
19  A   What is your definition of a flip that
20  you're asking me? What are you trying to say a flip
21  is?
22  Q   Since this is your deposition, why don't
23  you tell me what you understood a flip program to be.
24  A   A flip program in my mind -- I'm not
25  saying I'm right -- is when an investor bought a

39 (Pages 150 to 153)



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - cross

182

1 you have any explanation for it.
2      A    No, because I didn't know about it, no.
3      Q    And you would fully expect, would you
4 not, ma'am, with the procedures that were in place at
5 Walsh Securities, for someone at Walsh Securities to
6 know that a mortgage didn't come back within a
7 reasonable period of time?
8              MR. MAGNANINI: Objection to form.
9              You can answer.
10      A    I'm sorry, I lost concentration.
11      Q    You have now educated me on various
12 processes that existed at Walsh Securities, one of
13 which was the post closing, correct?
14      A    Yes.
15      Q    One of the jobs of the post closer was
16 to make sure the mortgages came back, yes?
17      A    Yes.
18      Q    You testified a moment ago when a
19 mortgage didn't come back, they would follow up to
20 get the mortgages, correct?
21      A    I didn't testify that it was the
22 mortgage or anything that was missing.
23      Q    If a mortgage was missing, you would
24 expect that someone would have followed up to get it,
25 correct?  That's what you would have expected,

183

1 correct?
2      A    I'm thinking. I didn't think of it
3 then. I'm thinking now. I'm thinking.
4              I think that we were doing -- we had
5 over 1200 loans a month close and there was a lot of
6 work there. Perhaps the computer system -- I don't
7 know.
8      Q    That doesn't answer my question.
9              MR. MAGNANINI: Listen to his question.
10      Q    My question was, would you have expected
11 someone to follow up to find out why mortgages
12 weren't being returned timely?
13      A    How do I know they didn't follow up?
14      Q    I'm not asking you whether they did or
15 didn't. My question is, would you have expected
16 someone to follow up and find out why mortgages
17 weren't being returned?
18      A    No, but I think they might have been.
19              MR. MAGNANINI: Objection to form.
20              You can answer.
21      Q    You think that was being done?
22      A    I do. If they couldn't get it done, it
23 doesn't mean they didn't try. The people worked
24 hard. They were hard workers.
25              MR. MAGNANINI: Excuse me. Take a

184

1 moment.
2              (Recess at 3:30 p.m.)
3              (Deposition resumes at 3:35 p.m.)
4      Q    Are you okay to continue, Ms. Demola?
5      A    Yes.
6      Q    Would you also expect, Ms. Demola, if
7 the post closers were not receiving title policies,
8 that they would follow up?
9      A    I really wasn't in charge of that
10 department.
11      Q    So you wouldn't have any opinion at all
12 as to whether you would expect a post closer to
13 follow up to find out why the title policy wasn't
14 forwarded to Walsh Securities?
15              MR. MAGNANINI: Objection to form, but
16 you can answer.
17      A    I don't think they weren't doing it.
18 Just because --
19      Q    Ma'am, listen to my question. I'm not
20 asking you whether they were or they weren't.
21              I'm asking you, would you expect them to
22 follow up?
23      A    Yes.
24      Q    Get the title policies if they didn't
25 come in in a timely fashion?

185

1              MR. MAGNANINI: Objection to the form.
2      A    Yes.
3      Q    You would expect them, would you not, to
4 follow up with respect to any document that didn't
5 come back timely from the closer?
6      A    Yes.
7      Q    And you understood, did you not, that
8 all of these documents were critical in order for
9 Walsh Securities to be able to sell the loans in the
10 secondary market?
11              MR. MAGNANINI: Objection to form.
12      A    Had to be completed. I don't know what
13 documents you needed to put into a security or
14 anything.
15      Q    Would you think, ma'am, that you needed
16 to record a mortgage to put a loan in a security?
17      A    Yes.
18      Q    Would you think you need a title policy
19 to put a loan in a security?
20      A    Yes.
21      Q    Would you also agree with me, ma'am,
22 that title policies could not be issued before the
23 mortgages were recorded?
24      A    I don't know when that's done.
25      Q    You have seen title policies?

47 (Pages 182 to 185)

**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - cross

190

1  that Walsh was loaning money on properties that had
2  been remodeled or rehabbed, and that the remodeling
3  that was done was not being documented by the
4  appraiser?
5          MR. MAGNANINI:  Objection to form.
6          You can answer.
7      Q      Did you ever hear anything like that?
8      A      No.
9      Q      Did you ever hear Greenwich complaining
10  that the appraisals did not include interior
11  photographs?
12     A      No.
13     Q      Did the Walsh appraisals all include
14  interior photographs, ma'am?
15     A      To the best of my knowledge they were
16  supposed to.
17     Q      I understand what they were supposed to.
18          Do you recall a point in time when
19  direction was given to participants that they needed
20  to start including internal photographs of subject
21  properties because they were not doing that ahead of
22  time?
23     A      No, because they should have been done.
24     Q      So if I've got appraisals in Walsh
25  files, ma'am, that do not include interior

191

1  photographs, you would consider those appraisals to
2  be in violation of Walsh guidelines.  Is that true?
3          MR. MAGNANINI:  Objection to form.
4          You can answer it.
5      A      It wasn't my department, but doesn't
6  make sense to me.
7      Q      You wouldn't have approved a loan
8  without photographs of the interior, would you?
9      A      I wasn't an underwriter.
10     Q      I understand that.
11          Would you have approved a loan without
12  interior photographs?
13     A      I don't have an opinion.
14     Q      Do you believe, ma'am, based on your
15  involvement in the mortgage business, that a loan,
16  based on appraisal without interior photographs,
17  creates a higher degree of risk for Walsh Securities
18  than one with interior photographs?  You would agree
19  with that, would you not?
20          MR. MAGNANINI:  Objection to form.
21          You can answer.
22     A      I wouldn't agree or disagree.
23     Q      Do you recall Greenwich ever raising
24  concern, ma'am, that there were above average risks
25  because Walsh was loaning money on flips that were

192

1  often related to REO acquisitions?  You recall that,
2  don't you?
3      A      No, I don't.  I really wasn't involved
4  in any of those meetings.  I never saw whatever
5  you're reading from.
6      Q      Ma'am, if you're out there selling the
7  product, or the people who work under you are
8  advising the world as to the guidelines by which
9  Walsh will make loans, are you saying you didn't have
10  any interaction at all with people deciding what
11  would or would not be acceptable to Walsh Securities?
12     A      I'm giving you my opinion.  I think if
13  there were those issues, someone should have had a
14  meeting with all of us and told us that.
15     Q      I agree with you 100 percent, ma'am.
16  That's what I'm trying to figure out.
17          Why the person on the street, namely
18  you, didn't have such a meeting about any of those
19  things.  Do you have any explanation why that
20  wouldn't have been conveyed to you?
21     A      That's my opinion.
22          MR. MAGNANINI:  Objection to form.
23     Q      You don't have an explanation why?
24     A      No.
25     Q      Do you know what an REO acquisition is?

193

1      A      A bank owned property.
2      Q      Are you aware that's the properties that
3  Billy was buying?
4      A      I didn't know where he got them from.
5      Q      You didn't know that at the time?
6      A      Even to this moment.  So he just found
7  dilapidated properties.
8      Q      Are you aware that Greenwich recommended
9  to Walsh that it should discontinue making loans to
10  principals and employees of the brokers with whom
11  Walsh Securities does business?
12     A      I think at the end we were given notice,
13  a printed thing was passed out.
14     Q      That one you were aware of?
15     A      Yes.
16     Q      Do you know why that change was
17  recommended?
18     A      I don't remember.  Maybe I knew at the
19  time, but I remember that they would not lend if
20  someone owned a mortgage company.
21     Q      In fact, they wouldn't loan to Billy
22  Kane either, would they, because of his involvement
23  with NHF?
24     A      I don't know.
25          MR. MAGNANINI:  Objection to form.

49 (Pages 190 to 193)

**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - cross

210

1  rehabilitation work had to be detailed within the
2  appraisal, who would get something like that?
3      A    My guess?  I don't really know.
4      Q    You don't know, you don't know.
5      A    I don't know.
6      Q    Would you expect to get something like
7  that?
8      A    Yes.
9      Q    Would the loan processors get something
10 like that?
11     A    Yes.
12     Q    Would your brother be aware of issuance,
13 your brother Robert, be aware of issuance of the
14 directive like that?
15     A    I don't think Robert was involved in
16 that part of the business.  He was working on
17 business, not day-to-day business.
18     Q    If there were directives that were
19 issued, ma'am, that dealt with the no seasoning
20 program and fraud in the no seasoning program, who
21 would get directives like that?
22     A    The quality control people, the risk
23 manager, the underwriting manager, and he would then
24 go over them with the underwriters.
25     Q    Do you recall at one point in time,

211

1  ma'am, a guideline or directive coming out that no
2  loan should be made in the no seasoning/flip program
3  for properties that were not owned by the seller for
4  at least six months?
5      A    That was a change at the end, but I
6  don't remember when it came.
7      Q    Do you know why that change was made?
8      A    No.
9      Q    Do you know why -- strike that.
10          Would you agree with me, ma'am, that
11 that change was made before the frauds came to light?
12     A    Yes.
13     Q    Do you know, ma'am, why that directive
14 was not followed after it was issued with respect to
15 the Kane loans?
16     A    I didn't know about it.
17          MR. MAGNANINI:  Objection to form.
18     Q    Would you be surprised, ma'am, after a
19 directive like that was issued, that Walsh Securities
20 would have continued to fund loans to a seller who
21 didn't own the property for at least six months?
22     A    It depended.
23     Q    Would that surprise you?
24     A    It depended on if the file was committed
25 prior to the directive.  Any file that was committed

212

1  prior to the directive had to be honored, because in
2  New Jersey, you can't have a commitment on the street
3  and then pull it back.
4          We didn't know there was fraud there.
5  We could have pulled it back if we knew there was
6  fraud.
7          Once a commitment is issued, it's
8  issued.  It could have happened that some of those
9  were before the changes were already committed, but
10 just not closed.
11     Q    Are you aware, ma'am, that in 1997
12 Greenwich came down and performed a review of a
13 certain number of loan files?
14     A    They were there every day.  I don't know
15 what they did.  They were there every day.
16     Q    They had an employee at your location,
17 correct?
18     A    That's correct.
19     Q    What was his or her name?
20     A    You made me say a her.  It's a man.  Don
21 Larsen, L-a-r-s-e-n.
22     Q    Donald B. Lawson, Junior, L-a-w-s-o-n,
23 does that sound right?
24     A    I don't know he was a junior, but that's
25 right.

213

1      Q    Where was his office situated?
2      A    He sat right on the floor in his office.
3      Q    And to your knowledge did he review
4  every file that Walsh Securities underwrote?
5      A    No, he picked whatever files he wanted.
6  He took over the cabinets whenever he wanted.
7      Q    Do you recall at one point in time,
8  ma'am, someone other than Mr. Lawson came in
9  especially to review Walsh loan files?
10     A    I don't remember that.
11     Q    There has been a lot of testimony,
12 ma'am, about you in connection with an inspection by
13 someone from Greenwich advising either Mr. Kane
14 directly or advising Kellie O'Neill to advise
15 Mr. Kane that the properties, quote unquote, better
16 be what he says they are.
17          Has anyone talked to you at all
18 about the accusations that were made as to that
19 issue?
20          MR. MAGNANINI:  Again, I caution you --
21     Q    Just yes or no first.
22     A    At what time?
23     Q    At any time.
24     A    Yes.
25     Q    Has anyone spoken to you about that

54 (Pages 210 to 213)

**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdresr.com

Demola - cross

214

1 other than your attorney?
2     A    No.
3     Q    So your testimony is that at no time did
4 you have any conversations with your brother Robert
5 or your brother James, at which time they asked you
6 about the accusations that had been made against you
7 that you told Mr. Kane to go make the properties look
8 lived in before Greenwich comes and sees them?
9     A    That's not true.
10     Q    That's not my question, ma'am.
11          My question is when a serious allegation
12 has been made against someone like that, is it your
13 testimony that you never had a discussion with either
14 Robert or James about whether you did anything like
15 that?
16     A    I had a discussion with Jimmy. I don't
17 remember I had it with Robert.
18     Q    Tell me what you recall about the
19 discussion with Jimmy, starting first with when did
20 you have it?
21     A    It was after the fraud broke. Someone
22 said that, I want Kane to go put up cheap blinds in
23 the house. Never happened. Never happened.
24     Q    Tell me the discussion that you had with
25 your brother. Who said what to whom?

215

1          Did your brother say to you, Bette Ann,
2 I need to ask you something. It's been stated that
3 in anticipation of Greenwich coming down to look at
4 some of its collateral, you told Billy Kane to go put
5 some blinds up.
6          Did he say something like that?
7     A    He asked me how it happened, what
8 happened.
9     Q    What did you tell him?
10     A    That's not what happened.
11     Q    Did you tell him anything more?
12     A    Yeah, we had a conversation.
13     Q    Tell me the conversation.
14     A    You didn't ask that.
15     Q    Now I'm asking.
16     A    Well, you didn't ask that. Before you
17 yelled at me for going on and on, and now you're
18 yelling at me for going on and on.
19     Q    I'm not yelling. It's my Philadelphia
20 voice. I'm not as laid back as Mr. Kott.
21     A    No, here's what happened.
22     Q    That's what I would like to know, and
23 take as long as you need.
24     A    Now I can take long, yay.
25     Q    Take as long always you need to tell me

216

1 every single thing you said to him and he said to you
2 about this topic.
3     A    I'm going to tell you what happened.
4     Q    Okay.
5     A    Don Lawson was in the kitchen. We had a
6 big kitchen. He said, I'm concerned about some of
7 these properties.
8          So I said, go take a look.
9          He goes, I don't really know my way
10 around New Jersey.
11          I said, no problem. Ronnie, the quality
12 control person, will take you. Pick out whatever
13 properties you want.
14          I then did not go to my office. I went
15 right on the floor in front of all the underwriters,
16 I used Carter Winston's phone on her desk, and I
17 called Billy Kane.
18          I said, Billy, people are going to look
19 at your property, tell me now.
20          He said, they are in good shape.
21          That's what happened. Period. End of
22 story.
23          I didn't say go put blinds up and make
24 them look lived in. I would never use the word
25 "cheap." I would have said shades if I said

217

1 anything.
2          It never happened.
3     Q    So Mr. Lawson, the gentleman from
4 Greenwich, says to you I'm concerned about some of
5 these properties?
6     A    Yes.
7     Q    What was his concern?
8     A    He said -- you know, he sat there
9 underwriting it. He came in the back in the kitchen,
10 I was in the kitchen, he goes, I'm getting concerned
11 about some of the properties.
12          I said, Don, why don't you go look for
13 yourself?
14          That was a good answer, I thought.
15     Q    Is it your testimony you didn't say to
16 him, what's your concern?
17     A    I didn't ask him what his concern was.
18     Q    He just comes out and says --
19     A    The condition of the properties, yes.
20     Q    Now, his statement was, I'm concerned
21 about the condition of some of these properties?
22     A    Something to that effect.
23     Q    That would be based upon what?
24     A    He must have been looking at files.
25     Q    So Mr. -- the gentleman from Greenwich

55 (Pages 214 to 217)



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

256

1
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
2
CIVIL NO. 97-3407 (DRD)

3
---------------------------
                                    :
4
WALSH SECURITIES,
INC.,                               :        CONTINUED
5
                                    :    DEPOSITION UPON
        Plaintiff,                  :    ORAL EXAMINATION
6
                                    :          OF
        v.                          :     ELIZABETH ANN
7
                                    :        DEMOLA
CRISTO PROPERTY                     :
8
MANAGEMENT,LTD.,                    :
et al,                              :
9
                                    :

10
---------------------------

11
                                        COPY

12

13
            T R A N S C R I P T  of the stenographic

14
notes of HOWARD A. RAPPAPORT, a Notary Public and

15
Certified Shorthand Reporter of the State of

16
New Jersey, Certificate No. XI00416, taken at the

17
offices of STONE & MAGNANINI, 150 John F. Kennedy

18
Parkway, Short Hills, New Jersey, on Monday,

19
June 21, 2010, commencing at 11:15 a.m.

20

21

22

23

24

25



**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - redirect

345

1    A    I answered that question when you asked
2 me how many times he was there.  I said quite a few,
3 about 25 or 30.
4    Q    How did Anthony get to work during the
5 period that he lost his license?
6    A    Some of the days he didn't come in, some
7 of the days other people drove him.
8    Q    Other than Mr. Kane?
9    A    That's correct.
10   Q    So what do you mean the rumor got
11 started?
12   A    There was a rumor -- I'm sorry.
13   Q    Go ahead, tell me about the rumor.
14   A    After the stories broke in the paper, it
15 said Billy Kane had an office at Walsh.  He never had
16 an office at Walsh.  He never had a cubicle.  He
17 never had a phone.  Never had anything.
18       He sat at a desk and he waited for his
19 friend that he drove up to work on the pipeline.
20   Q    Was there any individual -- withdrawn.
21       Was there any specific desk he sat at?
22   A    No.  If someone was out in the back --
23 all the cubicles were usually taken.  If somebody was
24 out for the day, he would sit in the back waiting.
25   Q    You said -- I don't want to put words in

346

1 your mouth -- your job at Walsh was marketing?
2    A    Marketing.
3    Q    What do you mean by marketing?
4    A    Well, for example, I did the best
5 parties.  Want to hear about them?
6       I would do the trade shows.  We did a
7 big trade show in Florida, and half the floor was
8 Mexico, half was Texas.
9       I had to come up with cool gifts to give
10 out.  We gave out shot glasses with our name on it.
11 I hired a man to pass them out, because I picked the
12 Mexican side.  I picked out green cards, across the
13 border, and I came out highest.
14       I supported them.  I would throw parties
15 for them.  The first anniversary in Indianapolis,
16 I sent out a birthday party card, come to a birthday
17 party.  I would order all the marketing material to
18 try to keep to the theme.
19       I would do an underwriting trade show
20 down in the Woodbridge Hilton.  We had all the booths
21 and tables and people would come.
22       That's really where my strengths were.
23 I would make the brokers get involved and have fun.
24 We had fun.
25       I wasn't a serious person, I'm not a

347

1 serious person, I talk a lot, which you're all
2 starting to find out, and that's who I am.
3    Q    Would you have had any responsibility
4 for underwriting?
5    A    Not at all.
6    Q    Would you have any responsibility for
7 quality control?
8    A    None at all.
9    Q    Would you have any responsibility for
10 closing procedures?
11   A    None at all.
12   Q    Now, were the loans that we are talking
13 about in this case appraised by appraisers?
14   A    To the best of my knowledge.
15   Q    How do you know that?
16   A    Because I don't believe that they would
17 have been in underwriting without an appraisal.
18   Q    Why do you say that?
19   A    Because it was one of our stipulations
20 that a file needed it.
21   Q    When you say stipulations --
22   A    On our stacking order.
23   Q    Is that something that would have been
24 given to the correspondent?
25   A    Yes, every correspondent had a flow

348

1 chart.  I don't know if I have any of them.
2       Like remember what happens to a loan
3 when it comes to Walsh and Elvis is entering it?  Did
4 you ever see that?
5       I had a flow chart and it showed the
6 brokers, like where your file would be when it comes
7 to Walsh, what was included in it.
8    Q    Did you ever talk to appraisers?
9    A    Probably a couple of times they would
10 come in.  We wrote up people and they would appeal
11 it.  They would appeal the appraisal, and sometimes I
12 probably would.
13   Q    Why would you be talking to an
14 appraiser?
15   A    Just to be nice when they were in the
16 office, not about why they were there.
17   Q    Just a social thing?
18   A    Yes.
19   Q    Did you ever talk about any business
20 aspect of a loan with an appraiser?
21   A    No.  We didn't order the appraisal.
22   Q    Are you aware that a number of the
23 appraisers involved in this case have said that you
24 discussed appraisals with them?
25   A    Yes, I'm aware that I threatened them.

24 (Pages 345 to 348)



**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - recross

397

1    Q    The actual pick was not up to Walsh, it
2  was up to somebody else?
3    A    That's correct.
4    Q    So long as they were on the list, right?
5    A    That's correct.
6    Q    And in these instances, my understanding
7  is -- was it NHF that made the pick, or the loan
8  originator there that made the pick as to the
9  appraiser, or was it the closing attorney that made
10 the pick as to the appraiser?
11   A    I have no knowledge of that.
12   Q    Could have been any one of those three
13 as far as you're concerned, right?
14   A    I have no idea.
15   Q    But you don't know?
16   A    I don't know.
17   Q    But you do know it wasn't Walsh?
18   A    That's correct.
19   Q    Now, that being the case, and it being
20 that all the paper -- all the paper was in the name,
21 initially, anyway, before it got filed, of NHF or
22 Walsh?
23   A    No, they closed in their own name.
24   Q    Pardon me?
25   A    NHF closed in their own name.

398

1    Q    There was some course of assignment or
2  something from NHF to Walsh?
3    A    An assignment.
4    Q    That didn't occur until after the
5  closing, right, temporarily?
6        MR. MAGNANINI:  Objection to form.
7    A    I don't know when it occurred.
8    Q    Certainly it wouldn't occur before the
9  closing, would it?
10   A    I think that we needed it at the closing
11 table.  It had to be at the closing table.
12   Q    At the table?
13   A    Yes.
14   Q    Simultaneous with the closing?
15   A    I don't know exactly, but I know that
16 the broker had to sign the loan over to me before I
17 could close it.
18   Q    All of that being so, why are these
19 appraisers up at Walsh at all for any reason?
20   A    A lot of times that we would write them
21 up -- not me, I say "we," but I got yelled at for
22 saying "we," I don't mean "we."  I mean Walsh
23 Securities would -- say, for example, an appraisal
24 would come back and we have to buy the loan back and
25 it's based on an appraisal.  I'm using a loan for an

399

1  example.
2        So then we would look at all the parts,
3  do the appraisal, and we gave the appraisers an
4  opportunity to rebut what the wholesale person would
5  buy.
6    Q    Okay.
7        That's where there had been a problem on
8  a given loan?
9    A    Excuse me?
10   Q    That's where there had been some sort of
11 issue as to a given loan?
12   A    It could have been any loan that we had
13 to buy back, right.
14   Q    To the point where Walsh is going to buy
15 it back.  That's a big problem, right?
16   A    Yeah, we bought a lot of loans back.
17   Q    Other than a situation where there is an
18 issue, where you're calling some guy in and giving
19 him a chance to explain, is there any reason for
20 these appraisers to be up there?
21   A    To the best of my knowledge we didn't
22 have visitors that were appraisers.
23   Q    You were asked before questions about
24 whether or not you talked to the appraisers when they
25 were up at Walsh regarding values with respect to the

400

1  loans involved in these transactions.
2        Notwithstanding the fact that some of
3  the appraisers said yes, you did, you told us they
4  would be lying, because no, you didn't, right?
5    A    I didn't.  The government said I wrote
6  letters.
7    Q    Why were those appraisers at Walsh in
8  the first place?
9    A    Who?
10   Q    The appraisers that claimed they talked
11 to you about the loans.
12   A    Oh, I like this question very much.
13 Two of them I never met.  If you put me
14 in a room, they couldn't pick me out unless somebody
15 else told them.  I never met them.
16   Q    Do you know the names of the ones that
17 you do recall meeting?
18   A    I met DiBenedetto was in the office.
19   Q    You met a Mr. DiBenedetto?
20   A    Yes.
21   Q    How many times did you see him at Walsh?
22   A    Maybe once or twice.
23   Q    And why was Mr. DiBenedetto there?
24   A    He was getting cut off the approved
25 list.

37 (Pages 397 to 400)



**Rizman**
**Rappaport**
**Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Demola - recross

401

1    Q    Basically getting fired?
2    A    Yes.
3    Q    Taken off the approved list?
4    A    Yes.
5    Q    Because of why, do you know?
6    A    I don't know specifics, but it must have
7    been because his appraisals were not good.
8    Q    Do you know whether or not it had to do
9    with appraisals in connection with the properties
10   involved in this litigation or other appraisals?
11   A    I don't know which properties.
12   Q    Do you ever recall a situation involving
13   these NHF Kane loans involved in this litigation,
14   where you personally waived an underwriting
15   requirement to get the loan to go through?
16   A    I never waived conditions.
17   Q    Never, ever?
18   A    Never. I didn't have authority.
19   Q    On these loans or any other loans?
20   A    On any loan, I didn't have authority.
21   Q    My client is Coastal Title agency. Did
22   Walsh have any say in what title agency was used in
23   these transactions?
24   A    I don't believe so.
25   Q    Does the name Bob Agel, A-g-e-l, Robert

402

1    Agel, mean anything to you?
2    A    Not really.
3    Q    Do you know whether or not you ever
4    visited Coastal Title?
5    A    I know I never visited them. If he was
6    at one of my parties I could have met him.
7    Q    When you arranged one of these parties,
8    would you be in the habit of inviting local title
9    agencies?
10   A    We would invite brokers and they would
11   bring people. We didn't invite title companies.
12   Q    If you know, on these loans involved in
13   this transaction, who was required under the closing
14   instructions, Walsh's closing instructions, to file
15   the deeds subsequent to the closing?
16   A    I don't know who did that.
17       MR. MC GOWAN: I have nothing else.
18   Thank you.
19   RECROSS EXAMINATION BY MR. HAYES:
20   Q    Ms. Demola, do you know what an
21   appraisal variance is?
22   A    No. I know it means a certain
23   percentage, like a review appraisal was allowed to be
24   in a certain percentage, but I don't know what the
25   percentage was.

403

1    Q    I understand.
2        During the time period that you were in
3    the employ of Walsh, were you aware that there was a
4    concept 19 as appraisal variance?
5    A    No. That's not a correct term, I don't
6    think.
7    Q    Were you aware that if a purchaser of a
8    loan from Walsh ultimately determines that an
9    appraised value of the property differed from the
10   appraisal that was part of a Walsh package, that
11   Walsh could be required to buy the loan back?
12   A    I don't really -- I'm assuming I know,
13   but I don't think I know.
14   Q    Do you recall ever hearing from your
15   brother Robert that he had negotiated a more
16   favorable variance provision in any of the agreements
17   with companies buying loans from Walsh?
18   A    I never heard that.
19   Q    You testified in response to one of
20   Mr. Kott's questions that Mr. Kane was supposed to
21   have fixed up the properties, correct?
22   A    That's what he was, he was a builder.
23   Q    So it was your understanding that on all
24   of the properties that Mr. Kane was selling, he had
25   bought them, fixed them up and then was selling them,

404

1    correct?
2    A    That's correct. I thought he bought
3    pools of houses.
4    Q    Houses.
5        So your recollection is that every
6    Cristo deal was a rehab or fixer upper?
7    A    To my knowledge, that's what I thought.
8    Q    You told Mr. Kott there was hearsay
9    within the office about delays in getting title
10   policies, correct?
11   A    That's correct.
12   Q    Was there also hearsay in the offices
13   that mortgages were not being returned promptly back
14   to Walsh?
15   A    I don't really remember what documents
16   there were, but there were people that were taking
17   their time getting things back.
18       I don't remember what documents they
19   were.
20   Q    Well, do you recall it being no more
21   than just title policies?
22   A    I don't really remember.
23   Q    Do you recall hearing hearsay within the
24   office that the delay in getting title policies
25   resulted from the fact that the mortgages weren't

38 (Pages 401 to 404)

**Rizman Rappaport Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

# EXHIBIT D

1                  UNITED STATES DISTRICT COURT

2                     DISTRICT OF NEW JERSEY

3

4

5    WALSH SECURITIES, INC.,
                                    Action No. CV 97-3496 (WGB)

6          Plaintiff,              Hon. William G. Bassler

7    vs.

8

9    CRISTO PROPERTY MANAGEMENT, LTD.,
     a/k/a G.J.L. LIMITED, DEK HOMES OF
     NEW JERSEY, INC., OAKWOOD PROPERTIES,
10   INC., NATIONAL HOME FUNDING, INC., CAPITAL
     ASSETS PROPERTY MANAGEMENT &
11   INVESTMENT Co., Inc., CAPITAL ASSETS
     PROPERTY MANAGEMENT, L.L.C., WILLIAM
12   KANE, GARY GRIESER, ROBERT SKOWRENSKI, III,
     RICHARD CALANNI, RICHARD DiBENEDETTO,
13   JAMES R. BROWN, THOMAS BRODO, ROLAND
     PIERSON, STANLEY YACKER, ESQ., MICHAEL
14   ALFIERI, ESQ., RICHARD PEPSNY, ESQ.,
     ANTHONY M. CICALESE, ESQ., LAWRENCE
15   CUZZI, ANTHONY D'APOLITO, DAP CONSULTING,
     INC., COMMONWEALTH LAND AND TITLE INSURANCE
16   CO., NATIONS TITLE INSURANCE OF NEW YORK,
     INC., FIDELITY NATIONAL INSURANCE CO.
17   OF NEW YORK, COASTAL TITLE AGENCY,
     STEWART TITLE GUARANTY COMPANY,
18   IRENE DIFEO, DONNA PEPSNY, WEICHERT
     REALTORS, AND VECCHIO REALTY, INC. D/B/A
19   MURPHY REALTY BETTER HOMES and GARDENS.

20          Defendants.

21   _____/ Volume I, Pages 1 - 131

22   DEPOSITION OF:     WILLIAM KANE.

23   DATE/TIME:         April 19, 2007; 9:30 a.m.

24   PLACE:             Kanabay Court Reporters
                        Feather Sound Square, Suite 19
25                      Clearwater, Florida

COPY

KANABAY COURT REPORTERS

78

1    there was a problem with loans getting through.

2          Do you mean that there was a problem with Walsh

3    approving loans?

4          A.    I guess at one point -- again, it's recollection.

5    I can't be specific.  It's been so long -- is that Greenwich

6    Capital had come down and done some quality control, or

7    whoever the loans were sold to, there was some questions

8    about them.  So we were temporarily not getting loans done.

9          Q.    And you referred to loan-to-value ratio.  What did

10   you mean by that?

11         A.    Originally when the first set of loans were

12   getting done, there was usually a -- there was an 80 percent

13   loan-to-value loan, meaning that if the loan was -- if the

14   sale price was $100,000, we would get an $80,000 mortgage.

15         At the time the way the deals were being

16   structured, I believe there had to be a copy of a $10,000

17   down payment check representing 10 percent of the sales

18   price and then a 10 percent second mortgage.

19         I believe that -- again, this is my assumption

20   because it's been so long -- when I think about it, I think

21   that Greenwich or whoever they were selling the loans to had

22   a problem with seeing the same escrow letter from the

23   attorney.  So the outcome weeks after our meeting was that

24   we would do an 80 percent loan, but the 20 percent would be

25   a second mortgage instead of a down payment to an escrow

KANABAY COURT REPORTERS

```
 1                    UNITED STATES DISTRICT COURT
 2                      DISTRICT OF NEW JERSEY
 3
 4
    WALSH SECURITIES, INC.,
 5                                   Action No. CV 97-3496 (WGB)
 6           Plaintiff,             Hon. William G. Bassler
 7   vs.
 8
    CRISTO PROPERTY MANAGEMENT, LTD.,
 9   a/k/a G.J.L. LIMITED, DEK HOMES OF
    NEW JERSEY, INC., OAKWOOD PROPERTIES,
10   INC., NATIONAL HOME FUNDING, INC., CAPITAL
    ASSETS PROPERTY MANAGEMENT &
11   INVESTMENT Co., Inc., CAPITAL ASSETS
    PROPERTY MANAGEMENT, L.L.C., WILLIAM
12   KANE, GARY GRIESER, ROBERT SKOWRENSKI, III,
    RICHARD CALANNI, RICHARD DiBENEDETTO,
13   JAMES R. BROWN, THOMAS BRODO, ROLAND
    PIERSON, STANLEY YACKER, ESQ., MICHAEL
14   ALFIERI, ESQ., RICHARD PEPSNY, ESQ.,
    ANTHONY M. CICALESE, ESQ., LAWRENCE
15   CUZZI, ANTHONY D'APOLITO, DAP CONSULTING,
    INC., COMMONWEALTH LAND AND TITLE INSURANCE
16   CO., NATIONS TITLE INSURANCE OF NEW YORK,
    INC., FIDELITY NATIONAL INSURANCE CO.
17   OF NEW YORK, COASTAL TITLE AGENCY,
    STEWART TITLE GUARANTY COMPANY,
18   IRENE DIFEO, DONNA PEPSNY, WEICHERT
    REALTORS, AND VECCHIO REALTY, INC. D/B/A
19   MURPHY REALTY BETTER HOMES and GARDENS.
20           Defendants.
21   _____/ Volume II, Pages 132-258
22
    DEPOSITION OF:    WILLIAM KANE.
23
    DATE/TIME:        May 4, 2007; 9:30 a.m.
24
    PLACE:            Kanabay Court Reporters
25                    Feather Sound Square, Suite 19
                      Clearwater, Florida
```

Page 197

1   increasing the number of loans being allowed from four to
2   five or five to six.
3       Do you know if Ms. Demola waived the condition or
4   would she speak to Mr. DelRusso about that --
5       A.   She'd speak --
6       Q.   -- and have him --
7       A.   She'd speak to Mr. DelRusso -- I apologize for
8   that, sir.  Go ahead.
9       Q.   No, that was it.
10      A.   Okay.  She would speak to Mr. DelRusso.  Anything
11  that needed to be waived, whether it would be the appraisal
12  or a couple of times where we had verbal appraisals or a
13  person had too many properties or -- it would go through
14  D'Apolito.
15      Now, once I was up there, standing up there with
16  the -- the buyer's name, I think it was Liebler, and he had
17  too many houses.  And D'Apolito I assume went to Betty Ann.
18  Betty Ann went in to Paul.  And then it came back to me that
19  it was waived.
20      Now, whether Betty Ann did it or Paul did or
21  D'Apolito spoke to somebody, I couldn't answer you.  I
22  assume the way the track went, through D'Apolito.
23      Q.   And then because he's the sales officer bringing
24  the loans into Walsh Securities?
25      A.   Yes, and he was getting paid, you know, by us.

Page 198

1   So...
2       Q.   Yes, that too, but...
3       You mentioned Mr. Liebler.  Was that David
4   Liebler?
5       A.   David Liebler, yes, sir.
6       Q.   His family owns the Hillside Auto Mall?
7       A.   That I don't know.
8       Q.   Side business.  It's a pretty big mall he's got of
9   cars.
10      Mr. Kane, do you recall ever asking Kellie O'Neill
11  to prepare a false escrow letter?
12      A.   I don't remember, but it's probably possible.
13      Yes, I do.  Yes, it was on a John Perone Deal.  It
14  was in the very beginning.  It was DEK.
15      Q.   And was that done at your offices in Staten
16  Island?
17      A.   That is correct.
18      Q.   And did you have offices there or were they the
19  D & S or the Dinaso's offices?
20      A.   That was Dinaso's offices.
21      Q.   Okay.  What I'm asking you, you didn't have a
22  separate office or building there for yourself in Staten
23  Island?
24      A.   No, no.  It was a two-story building.  Downstairs
25  he ran his lumber business.  Upstairs was Blue Horizon Home

Page 199

1   Development, Horizon Developers, D & Son's, and DEK.
2       Q.   Was that on Industrial Loop in Staten Island?
3       A.   Yes, sir.
4       Q.   Do you recall how much you paid Kellie O'Neill in
5   total?
6       A.   No.
7       Q.   Were false -- I haven't been able to verify it.
8   But we've heard that false income statements were prepared
9   for some of the straw buyers; is that true?
10      A.   Yes, sir, it is.
11      Q.   Who prepared those?
12      A.   Either Gary Grieser or Larry Cuzzi had them done.
13  At one point Gary Grieser had an accountant who would
14  prepare them; tax returns, W-2 forms.  And then he hooked up
15  with a payroll company that was doing everything for him.
16      Q.   Do you recall the name of the accountant?
17      A.   Silverman, Silverstein.  I know he's the one that
18  opened up his first corporation.  So I'm sure you could
19  check it that way.
20      Q.   And then what payroll company did he use?
21      A.   I don't remember, sir.  It's been a long time.
22      Q.   How did he use the payroll company to get the
23  false income statements?
24      A.   He would call them up and give them a name and how
25  much he needed, and they would calculate it and come up with

Page 200

1   pay stubs and W-2 forms and 1099's or whatever we needed at
2   the time.
3       Q.   Was Betty Ann Demola aware that these applications
4   contained false pay stubs or false tax returns?
5       A.   There was just one instance where quality control
6   was done, and I guess they called up and the gentleman
7   didn't work there.  It was --
8       Q.   You testified last time about this.  They called
9   the Hillside Auto Mall.
10      A.   Was it Hillside?  I'm not sure who it was.  Okay.
11  I thought --
12      Q.   Where Larry Cuzzi worked.
13      A.   Okay.  Then we got ahold of Larry and they called
14  back and the whole thing was taken care of.
15      So that would be the only time I could say she
16  knew or didn't know, but that would be an assumption.
17  Because, again --
18      Q.   Sorry.  Go on.
19      A.   That was not my conversation with her.  That was
20  her to D'Apolito.
21      Q.   And did D'Apolito ever told -- tell you what he
22  told Betty Ann Demola about that?
23      A.   Just to have them call back, that it was resolved,
24  it was a mistake.
25      Q.   Did you ever tell or have any conversations with

18 (Pages 197 to 200)

Page 229

1    Q.   And then did you ever tell Betty Ann Demola that
2  you owned Cristo Properties?
3    A.   Yes, I believe she knew I owned Cristo.
4    Q.   And how do you believe that she knew that you
5  owned Cristo?
6    A.   I had invited her down to our office once to come
7  see Cristo's offices.
8    Q.   Did she come down?
9    A.   No, no.
10    Q.   Did you ever tell Robert Walsh or James Walsh that
11  you owned Cristo?
12    A.   Not a conversation that I remember, no.
13    Q.   Did you ever have any discussions with Robert
14  Walsh or James Walsh about Mr. Grieser's proposed Ret?
15    A.   I don't believe so.
16    Q.   Well, on the meeting you had in June with Robert
17  Walsh, did Mr. Grieser discuss his Ret plans?
18    A.   It's possible.  Again, I think my mind was more
19  other places, you know, with the subpoenas and everything
20  else coming down.  I really don't remember.
21    Q.   Mr. Kane, the last time we were here Mr. Kott had
22  asked you a question about receiving -- I believe your
23  testimony was that when Walsh Securities received a subpoena
24  Betty Ann Demola called you up and asked you what was going
25  on, and you had told her you don't know, but you'd take care

Page 230

1  of it.
2       We've had a lot of allegations that Ms. Demola
3  knew everything that was involved here; but if she knew
4  everything, why would she have called you and asked what the
5  subpoenas were about or why would you have responded I'll
6  find out rather than just say, you know what it's about?  A
7  long question, sir.
8    A.   It's a long question with a vague, hard answer.
9  The only conversation with Betty Ann on -- I'm just trying
10  to think of the right way to say it -- was about when the
11  person came down from Greenwich that time to do spot checks
12  and it was to go out and make sure the houses looked lived
13  in; you know, no wood on the windows, anything else.
14       There was never any sit-down discussion saying
15  this is what we're doing, this is how we're doing it.
16    Q.   All right.  Let me break down, I guess what I had
17  anyway, is the elements.
18       Did you ever tell Betty Ann Demola that Cristo was
19  selling the properties before Cristo had purchased the
20  properties?
21    A.   No.
22    Q.   Did you ever tell Ms. Demola that -- I don't know
23  how to say -- either Cristo or you were paying the
24  appraisers for the appraisals?
25    A.   No.

Page 231

1    Q.   Now, Mr. DiBenedetto testified on Tuesday that he
2  thought his standard appraisal rate for a multi-family house
3  was $500 each, and he thought you paid him $1,000 per
4  appraisal.
5       Do you recall paying him --
6    A.   I couldn't even tell you that yes, no, or
7  indifferent.
8    Q.   Did Ms. Demola -- did you have any discussions
9  with Ms. Demola about what Cristo did, since she knew that
10  you owned Cristo Properties?
11    A.   Yes.  Again, it's -- you know, how do I say it?
12  I'm assuming, you know, she knew we bought and sold.  She
13  knew I owned Cristo.  I don't know whether she went in and
14  looked at the deals that were presented from Cristo, whether
15  she knew Cristo was the buyers or not.  She knew I -- she
16  knew I bought houses and sold houses.
17    Q.   Did you have discussions with her that when you
18  bought and sold houses, the houses would be rehabilitated or
19  fixed up?
20    A.   I don't think there was ever a discussion of that.
21    Q.   Because I believe at some point there was an
22  article in the Asbury Park Press about some urban renewal or
23  redevelopment that talked about Cristo, and I don't remember
24  if it mentioned Mr. Grieser's company.
25       Do you recall that?

Page 232

1    A.   Any articles in the Asbury Park Press through the
2  whole timeframe we had no comment.  So we never spoke to the
3  press at all.  So there would be nothing in the press from
4  me.
5    Q.   Okay.  This one was actually back in like 1996
6  talking about houses being purchased, fixed up, and then
7  sold and being occupied in Asbury Park?
8    A.   By us or?
9    Q.   Yes, you were mentioned.
10    A.   I don't remember.
11    Q.   Okay.  Did you ever tell Ms. Demola that
12  Mr. Grieser was paying the straw buyers for use of their
13  credit history?
14    A.   No, sir.
15    Q.   Did you ever tell Ms. Demola that you were paying
16  Ms. O'Neill or Mr. D'Apolito?
17    A.   No, sir.
18    Q.   Did you ever tell Ms. Demola that Ms. King was
19  taking some of the attorney's closing fees to actually do
20  all the legal work to close the loans?
21    A.   No, sir.
22    Q.   Did you ever tell Ms. Demola that the escrow
23  letters sent by Mr. Yacker were false and he actually didn't
24  have any money in escrow?
25    A.   No, sir.

Page 233

1    Q.  Did you ever tell Ms. Demola that people other
2  than the buyers for the loans funded by Walsh Securities
3  signed the buyer's names or that Mr. D'Apolito was
4  notarizing those signatures?
5    A.  No, sir.
6    Q.  Did you ever have any discussions with Ms. Demola
7  about the straw buyers deeding 60 percent of the properties
8  to Capital Assets?
9    A.  No, sir.
10    Q.  Did you have any discussions with Robert Walsh,
11  James Walsh, or Ms. Demola that Capital Assets was making
12  the mortgage payments for all of the properties that had
13  been funded by Walsh Securities?
14    A.  No, sir.  No, sir.
15    Q.  Mr. Kane, a couple questions on that, what you
16  said before, that Greenwich Capital was coming down to look
17  at some of the property.
18        When you were at Walsh Securities any time during
19  the 1996/1997 timeframe, did you see any employees of
20  Greenwich Capital at Walsh Securities?
21    A.  No, sir.
22    Q.  Did Mr. D'Apolito ever tell you there was a
23  Greenwich Capital representative who sat in Walsh
24  Securities' offices and reviewed the various loan
25  applications?

Page 234

1    A.  No, sir.
2    Q.  Now, you said -- Kellie O'Neill had actually
3  testified that she called either you or Mr. Grieser she said
4  at Betty Ann's behest to tell you to make sure these houses
5  looked lived in.
6        Do you recall if Ms. Demola called you or did
7  Ms. O'Neill call you?
8    A.  I don't remember to be honest with you.
9    Q.  And then you said that -- and tell me what I
10  remember because I didn't -- I don't remember the specific
11  page number.
12    A.  I don't remember the phone call.  If I'm not
13  mistaken, I was in Walsh when that came down.
14    Q.  Okay.  Well, that was going to be my question,
15  where were you.  Because I thought you said you got a list
16  of the properties they were going to --
17    A.  Yes, I'm not -- I'm 99.9 percent sure I was in
18  Walsh when that whole thing came down.
19    Q.  And then where were the -- do you recall -- how
20  many properties were on the list?
21    A.  I believe it was 10.
22    Q.  Do you recall where they were located?  Were they
23  all in Asbury Park and Longbranch or different areas?
24    A.  No, they were from, you know, down in Asbury up to
25  Irvington.  They were spread.

Page 235

1    Q.  And then where -- I think what we've heard is that
2  some of your construction crews were going to take care of
3  some properties and some of Mr. Grieser's construction
4  people would take care of --
5    A.  Correct.
6    Q.  -- some other properties?
7    A.  Correct.
8    Q.  Where was your construction people located?
9    A.  My guys were up north at that time.  They were
10  doing up in Irvington, Jersey City, that area.
11    Q.  What were they doing up there?  Because I thought
12  they didn't -- you guys didn't really rehabilitate the
13  properties?
14    A.  Yes.  But if we had to go down for appraisals, if
15  we had to go down and take wood down, windows, different
16  things, that is what my guys did.
17        And plus at that point in time we owned an
18  apartment building in Jersey City and one in Asbury.  So I
19  had them busy there.
20    Q.  What happened to those apartment buildings?
21    A.  We sold them.
22    Q.  When was that?
23    A.  '97.
24    Q.  And where was Mr. Grieser's construction people
25  located?  Was that at the Capital Assets office in Redbanks?

Page 236

1    A.  Yes, sir.
2    Q.  Actually jumping back to what you just said, you
3  said for the appraisals you had to send people out to take
4  down wood, put in windows.
5        Who told you to do that?
6    A.  I don't think it was anyone in particular.  You
7  had to have some pictures taken, so the house couldn't have
8  wood on the front.  You know, so it was more common sense
9  than somebody saying, you know, we can't take pictures with
10  the wood on it.
11    Q.  And then -- I don't remember.  Somebody asked you
12  this last year, but we -- or last year -- last time we
13  talked.  Somebody I think had testified that Ms. Demola had
14  told someone that the appraisers didn't need to take
15  photographs.
16        Did you ever hear that?
17    A.  No, sir.
18    Q.  And did all the loan applications that you
19  submitted have photographs as part of the appraisals?
20    A.  Yes, sir.
21    Q.  I think actually you testified last time,
22  Mr. Kane, that one of the appraisers suggested that one of
23  the houses had some fire damage and that you hire a painter
24  to paint over the smoke damage and put a tarp on the roof.
25    A.  Correct.

27 (Pages 233 to 236)

Page 253

```
1        have any questions before you leave?
2            MR. McGOWAN:  No, I'm just going to go.
3    BY MR. KOTT:
4        Q.  Mr. Kane, I really am coming to the end.
5            Let me try it this way.  You were kind of weaved
6    through a lot of these transactions wearing a variety of
7    hats; is that a fair statement?
8        A.  That's an accurate statement, yes.
9        Q.  What I was driving at is whether Ms. Demola knew
10   all the hats that you wore in these transactions.
11           Do you know whether she knew all the various hats
12   you wore?
13       A.  I can't say yes or no to that.  I really can't.
14   She knew -- I know she knew I owned Cristo.  She knew I was
15   affiliated with National Home Funding because the deals were
16   coming through National Home Funding.  She knew I brought
17   the deals up to National Home Funding.
18           Whether she knew or not I was writing the loans, I
19   can't answer you that question.  I don't know.  Unless, you
20   know -- I never saw her look, take a 1003 and look at it and
21   say -- you know, and see my name on it.  I don't know.
22       Q.  But all that information would have been in the
23   files; correct?
24       A.  Yes.
25           MR. MAGNANINI:  Objection to the form of the
```

Page 254

```
1    question.
2    BY MR. KOTT:
3        Q.  And would Ms. Demola have known about the 60/40
4    arrangement?
5        A.  No.
6            MR. KOTT:  Thank you.  I do not actually have
7        any further questions.
8            REDIRECT EXAMINATION
9    BY MR. CALANNI:
10       Q.  Just a couple, Bill.  I'm the only appraiser that
11   shows up for the depositions or court, whatever.  And it
12   seems to me when a question's asked about appraisers, it's
13   always appraisers like Rich Calanni.  So I need to clear up
14   something here.
15       (Court reporter asks for the microphone to be moved.)
16   BY MR. CALANNI:
17       Q.  Did you get what I said?
18       A.  Yes, we got that so far.
19       Q.  Did you ever call me to ask me to come up with a
20   price on an appraisal?
21       A.  Not to my recollection, no.
22           MR. CALANNI:  All right, Bill.
23           THE DEPONENT:  Okay.
24           MR. CALANNI:  Yes, there are others, but I
25       think Mr. Kott covered it and...
```

Page 255

```
1            MS. PATEL:  I don't have any further questions.
2            MR. MAGNANINI:  No further questions.
3            THE DEPONENT:  All rightie.
4            MR. KOTT:  Mr. Kane, just one or two others.
5            THE DEPONENT:  You said you were finished.
6            FURTHER REDIRECT EXAMINATION
7    BY MR. KOTT:
8        Q.  This is more of housekeeping.  We have your home
9    address.
10           If we wanted to reach you again, besides your home
11   is there any other way we would reach you; a business
12   address, a second phone, anything like that?
13       A.  No, sir.
14           MR. KOTT:  Okay.  Thank you.
15           THE DEPOSITION WAS CONCLUDED AT 1:40 p.m.
16
17
18
19
20
21
22
23
24
25
```

Page 256

```
1                    ERRATA SHEET
2    PAGE    LINE     CORRECTION
3    _____   _____    _____
4    _____   _____    _____
5    _____   _____    _____
6    _____   _____    _____
7    _____   _____    _____
8    _____   _____    _____
9    _____   _____    _____
10   _____   _____    _____
11   _____   _____    _____
12   _____   _____    _____
13   _____   _____    _____
14   _____   _____    _____
15   _____   _____    _____
16   _____   _____    _____
17   _____   _____    _____
18   _____   _____    _____
19   _____   _____    _____
20   _____   _____    _____
21   _____   _____    _____
22   _____   _____    _____
23   _____   _____    _____
24
25
             _____
             WILLIAM KANE (DATE)
```

32 (Pages 253 to 256)

WILLIAM KANE

Page 1

1          UNITED STATES DISTRICT COURT
            DISTRICT OF NEW JERSEY

2

3      CIVIL ACTION NO: 97-cv-3496(DRD)(MAS)

4

5  WALSH SECURITIES, INC.,

6          Plaintiff,

7  vs.

8  CRISTO PROPERTY MANAGEMENT ET AL.,

9          Defendants.
   _____/

10

11

12                        2701 N. Rocky Point Dr.
                          Suite 1200
13                        Tampa, FL 33607
                          October 5, 2011
14                        10:36 a.m. to 5:08 p.m.

15

16      VIDEOTAPE DEPOSITION OF WILLIAM KANE

17

18

19      Taken on behalf of the Plaintiff before PHILIP

20  RYAN, RPR, Court Reporter, Notary Public in and

21  for the State of Florida at Large, pursuant to

22  Plaintiff's Notice of Taking Deposition in the

23  above cause.

24

25

WILLIAM KANE

1      A.     Basically, you know, in a nice way, he

2  said forget it, you know?

3      Q.     And then what did Mr. Gilgar say during

4  the meeting, if you recall?

5      A.     I don't remember.  I think he was just

6  more quiet than anything.

7      Q.     Okay.  And then after that meeting,

8  which was the day or so after the subpoenas, did

9  you -- were you able to close any more loans

10  with --

11      A.     No.

12      Q.     -- Walsh Securities?

13  Okay.  And then did you ever speak to Robert

14  Walsh at any time thereafter, after that meeting?

15      A.     No.  I think there was one or two phone

16  calls to find out who his attorney was.  And his

17  attorneys was going to talk to my attorney and --

18  but there was never any substance conversations.

19      Q.     Okay.  One of the appraisers, Richard

20  DiBenedetto, had testified at his deposition --

21  and I'll -- just let me lay the story out and you

22  can say if it's true or not -- was that

23  Mr. DiBenedetto had testified that approximately a

24  year after he had completed the last of the

25  appraisals that he had done, that you had called

WILLIAM KANE

Page 138

1   him at about three in the morning in Atlantic

2   City, with Mr. Walsh with you, both of you being

3   drunk.  Mr. Walsh having hit his elbow on your car

4   and cursing in the background.

5        And you told Mr. DiBenedetto, don't worry

6   about those appraisals.  Mr. Walsh has just sold

7   his company for hundreds of millions of dollars,

8   and everything's going to be okay.

9        And my question is:  Did that conversation

10  ever occur?

11       A.    No.

12       Q.    Okay.  Have you ever been to Atlantic

13  City?

14       A.    Once, with Gary Grieser.

15       Q.    Okay.

16       A.    And that was before this.  And I've

17  never socialized with Mr. Walsh.

18       Q.    Okay.  Are you familiar with James

19  Walsh?

20       A.    Yes.

21       Q.    And who is James Walsh?

22       A.    Robert Walsh's brother.

23       Q.    Okay.  And did he work at Walsh

24  Securities?

25       A.    Yes.

WILLIAM KANE

Page 149

1    again, this is testimony from different people,

2    but did you ever tell Miss Demola that Cristo was

3    selling properties before it purchased them?

4        A.    No.

5        Q.    Did you tell Miss Demola that the

6    proceeds from the sale were necessary to buy the

7    property?  And did you ever tell Miss Demola that

8    some of the proceeds from the sale were used to

9    pay other existing mortgages?

10       A.    No.

11       Q.    And did you ever tell Miss Demola that

12   the straw buyers were, in fact, straw buyers?

13       A.    No.

14       Q.    Did you ever tell Miss Demola that the

15   straw buyers were paid for their credit history?

16       A.    Not to my recollection.

17       Q.    Did you ever tell Miss Demola that

18   the -- or at least some of the applications were

19   signed for by people like Cristo and not even

20   straw buyers?

21       A.    No.

22       Q.    Okay.  Did you ever tell Miss Demola

23   that the appraisals were not, I guess, as-is, that

24   they reflected, I guess -- I'm trying to think who

25   said it, Mr. Calanni -- Mr. Brown, James Brown

WILLIAM KANE

Page 150

1    said, I believe, that he wrote the appraisals as

2    if the property had been improved or renovated.

3    And was that information ever conveyed to Miss

4    Demola?

5         A.    No.

6         Q.    No.  Okay.  Sorry.

7         And did you ever tell Miss Demola that the

8    closings were actually done by Lory King and not

9    Mr. Yacker or Mr. Cicalese?

10        A.    No.

11        Q.    I think you had a variety of -- I don't

12   want to say roles or hats that you wore, Mr. Kane.

13   At some point you were president of Cristo, of

14   Oakwood, you were a partner in DEK, you worked at

15   NHF.  Did Miss Demola know all -- all of your

16   different roles in the process?

17        A.    I believe she knew I was with NHF.  She

18   knew I owned Cristo.  I don't know about DEK or

19   Oakwood.  That was, you know, there was never that

20   volume there, so...

21        Q.    Okay.  At some point, would the homes

22   sold by DEK or Dinaso & Sons, were they actually

23   rehabilitated or refurbished?

24        A.    Some were, some weren't.

25        Q.    And then those homes were sold to

WILLIAM KANE

1    were with Selective?

2         A.    No.  And can I clarify something?

3         Q.    Sure.

4         A.    I didn't work for Selective at that

5    point in time.  They did the loans for us, just

6    like I was an independent person.  So I never got

7    paid or had a solicitor's license or had a desk

8    there.

9         Q.    And you testified previously that at

10   some point in time you recognized that you could

11   get a better deal with NHF by placing the loans

12   through NHF.  Is that a fair statement?

13        A.    That's a fair statement.

14        Q.    And from the point in time when you

15   obtained your license through NHF, did all of the

16   loans that you were involved with, Mr. Kane, get

17   submitted through NHF?

18        A.    Yes, sir.

19        Q.    And you testified in the prior

20   deposition on numerous occasions that you worked

21   for NHF.  Did you consider yourself to work for

22   that entity?

23        A.    I was an independent contractor, yes.

24        Q.    Now, is it fair to say that in these

25   transactions, Mr. Kane, you wore different hats?

WILLIAM KANE

Page 161

1      A.     That is correct.

2      Q.     And with one hat, you were the principal

3   of Cristo Property; correct?

4      A.     Yes, sir.

5      Q.     And Cristo Property was the entity that

6   was going out and finding properties to buy that

7   would ultimately be flipped, correct?

8      A.     Yes, sir.

9      Q.     Was the intent at the beginning,

10   Mr. Kane, that properties would be bought at a

11   certain price, they would be improved or

12   rehabilitated in some way and then sold to third

13   parties at a profit?

14      A.     Yes, sir.

15      Q.     And Mr. Grieser's role in this was to

16   actually rehabilitate the properties?

17      A.     Yes, sir.

18      Q.     And your role was to find the properties

19   that would be purchased for rehabilitation

20   purposes?

21      A.     Yes, sir.

22      Q.     And whose job was it, Mr. Kane, to find

23   the buyers?

24      A.     Mr. Grieser's.

25      Q.     And did I understand your testimony

WILLIAM KANE

1    correctly that you would find a particular

2    property, determine what the cost to rehabilitate

3    it would be, and then based on that cost plus the

4    profit that you hoped to make, a sale price would

5    be determined?

6              MR. MAGNANINI:  Objection to form.  You

7        can answer, though.

8              THE WITNESS:  Yes.  Adding in money for

9        Gary and for the construction, yes.

10   BY MR. HAYES:

11       Q.    And then you would go out to see whether

12   or not appraisals would warrant that sale price;

13   correct?

14       A.    Correct.

15       Q.    Now, with all of the activities that you

16   engaged in of finding properties and purchasing

17   properties, you were acting as William Kane, a

18   principal of Cristo Property; correct?

19       A.    I would assume.  That might be a

20   technical question.  I'm not aware whether I can

21   answer or not but --

22       Q.    From the standpoint of what hat you were

23   wearing in finding properties and acquiring the

24   properties, that hat was a Cristo hat, was it not?

25       A.    Correct.

WILLIAM KANE

1      Q.    And in connection with the mortgage

2   monies that were necessary for the third parties

3   to buy the property, you did play some role in

4   that process as a mortgage solicitor; correct?

5      A.    Correct.

6      Q.    And in that process, you would, to

7   summarize, put together the loan package that was

8   necessary to submit to Walsh?

9      A.    Correct.

10      Q.    And that would include a loan

11   application, the employment information, asset

12   information, correct?

13      A.    Correct.

14      Q.    And when you were putting that

15   information together, you were wearing your hat as

16   an independent contractor for NHF; correct?

17      A.    Correct.

18          MR. MAGNANINI:  Objection to form.

19          MR. HAYES:  While the package was -- I'm

20      sorry, Bob?

21          MR. MAGNANINI:  Yeah.  I was just

22      objecting to the form, Ed.

23   BY MR. HAYES:

24      Q.    The loan package that was submitted to

25   Walsh was submitted on behalf of NHF; correct,