

**McCARTER**
**&ENGLISH**
ATTORNEYS AT LAW

**VIA ELECTRONIC FILING & REGULAR MAIL**

February 10, 2012

Hon. Michael A. Shipp, U.S.M.J.
United States District Court
District of New Jersey
M.L. King, Jr. Federal Bldg. & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

David R. Kott
Partner
T. 973.622.4444
F. 973.624.7070
dkott@mccarter.com

**Re:  *Walsh Securities, Inc. v. Cristo Property Management, et al.***
 **Civil Action No. 97-cv-3496 (DRD) (MAS)**

Dear Judge Shipp:

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
T. 973.622.4444
F. 973.624.7070
www.mccarter.com

We represent defendant Commonwealth Land Title Insurance Company
("Commonwealth") and submit this letter brief in support of our Motion to Compel the
Production of any Supplemental Reports/Letters/Findings regarding Latham &
Watkins' Internal Investigation.  We have been advised by Edward J. Hayes that co-
defendants Fidelity National Title Insurance Company ("Fidelity") and Nations Title
Insurance Company ("Nations") join in this request.

**I.   History of the Discovery Dispute**

During discovery, Plaintiff produced a September 30, 1997 letter from the law firm of
Latham & Watkins that summarized the results of its internal investigation.   The
September 30, 1997 Latham internal investigation report (hereinafter "9/30/97
Report") stated that it supplied Latham's "preliminary findings" and that as Latham
completed its internal review of certain loans Latham would "… supplement our
findings as appropriate."  *See* September 30, 1997 Report by Latham & Watkins,
attached hereto as Exhibit A.

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

On December 15, 2011, we emailed plaintiff's attorney and requested any
supplemental reports/letters/findings rendered by Latham & Watkins.  Plaintiff's
attorney on that day indicated that he did not recall another report but he would look
into it and get back to us.  We received no response from plaintiff's attorney, but
included the request in the January 19, 2012 Letter to the Court outlining current
discovery disputes [document 510].

Plaintiff's counsel responded in its own January 19, 2012 Letter to the Court
[document 511], refusing to produce the documents and invoking the protection of
the work product doctrine for any "internal investigation reports prepared by counsel
as a basis for the lawsuits fled by WSI beyond what was previously supplied to

ME1 12912400v.1

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 2

counsel for Defendants." By this statement, plaintiff implies that investigation reports do exist beyond the 9/30/97 Report.

The present briefing, requested by this Court at the January 25, 2012 Status Conference, is the result of the dispute.

## II.   The Internal Investigation in Discovery

In addition to producing the 9/30/97 Report in discovery, plaintiff's 30(b)(6) witness, Robert C. Walsh, testified as to the internal investigation done by attorney Michael Chertoff, Esq. and his firm Latham & Watkins:

> Q.   When you retained Mr. Chertoff, did you put any limitations on the scope of his investigation as to who was involved in the fraud and how it happened and things of that nature?
>
> A.   No, I did not.
>
> Q.   So Mr. Chertoff was free to interview anyone he wanted, is that correct?
>
> A.   That is correct.
>
>       *      *      *
>
> Q.   We were talking about the internal investigation done by Mr. Chertoff. Do you recollect that?
>
> A.   I do.
>
> Q.   Did Mr. Chertoff and the Latham firm as part of that internal investigation interview employees of Walsh?
>
> A.   They did.
>
> Q.   And have you read the interview notes that they prepared and interview memos of what the witnesses told them?
>
> A.   I did, but it was – some of them a while ago, but yes, I did.
>
> Q.   Did Mr. Chertoff or anyone from the Latham firm interview Bette Ann DeMola?
>
> A.   I never saw one.
>
> Q.   Do you know why that is?

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 3

A.    I don't.

Q.    Did you ever have any discussions with Bette Ann DeMola as to whether she would agree to be interviewed by the Latham firm?

A.    No, I did not.

Q.    Did you in any way tell the Latham firm or Mr. Chertoff that Bette Ann DeMola was off limits?

A.    I did not.

Q.    Do you know why it was that the Latham firm did not interview Bette Ann DeMola?

A.    I do not.

Q.    Was Ms. DeMola ever charged with any federal offenses?

A.    She was.

Q.    Who was her lawyer for that?

A.    Jeff Fahy.  F-A-H-Y

Q.    How did she get to Mr. Fahy?

A.    She—I believe it was Mr. Chertoff recommended him.

Q.    Do you know why it was that Mr. Chertoff who was doing the internal investigation was recommended a lawyer for Bette Ann DeMola?

A.    He also recommended lawyers for other people within the firm as well.

Q.    I didn't ask you that.

A.    I'm sorry.

Q.    The question was, do you know why Mr. Chertoff, who was doing an internal investigation on behalf of Walsh Securities, recommend that Ms. DeMola retain Mr. Fahy as her lawyer?

A.    I do not.

ME1 12912400v.1

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 4

*        *        *

Q.    The Latham investigation did not look to me as if they
      interviewed you as a part of the investigation, did they?

A.    They interviewed myself, Jimmy, Bette Ann every day. I
      literally mean it was a constant—I guess it wasn't a formal
      write up, but I was there. I was meeting with Michael, I was
      meeting with Jeff Berman, I was meeting with Bob Magnanini.
      This was a fluid transaction. As you pointed out earlier, Mr.
      Kott, what type of investigation were they hired to do? It was
      a lot.  So I was in constant dialogue with everybody. They
      spoke to Bette Ann. I don't know if they had a formal
      interview with Bette Ann. They spoke to Bette Ann, they
      spoke to Jimmy, myself, Fred Schlesinger, they spoke to Paul
      DelRosso, they spoke to everybody within that group.  I read
      what I think was turned over to you, and some of those
      people, I didn't see them in a formal discussion with them, but
      I know they all had these conversations with them.

Q.    Lets try to clear this up.

A.    Sure

Q.    You believe that Latham interviewed you as part of its internal
      investigation, but you have not seen any write up of that
      interview, is that correct?

A.    I apologize, I wasn't clear enough. I'm not sure if they did a
      formal interview with me, but we had many hours of
      discussions on probably everything that you would consider
      an interview, but I'm not sure if it was categorized as an
      interview.

Q     Have you seen any write up of an interview view [sic] with
      James Walsh done by Latham?

A.    I have not.

*See* the Relevant Portions of Robert C. Walsh's April 9, 2010 Deposition, at T56:12-
19; T57:9 to 59:9; T169:10 to 170:20, attached hereto as Exhibit B.    Notably,
counsel for plaintiff at no time objected to this line of questioning by defense
counsel, nor gave any indication of their belief that any of this testimony regarding
the subject of the internal investigation might be privileged.

ME1 12912400v.1

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 5

Mr. Walsh further testified about the internal investigation at his September 30, 2011 deposition:

> Q.     Okay, and we had talked about the internal investigation done by the Latham firm; is that correct?
>
> A.     I believe we have, yes.
>
> Q.     The Latham firm actually took written witness statements as to who was involved in the fraud and wrote a report to Walsh Securities?
>
> A.     Michael Chertoff gave us a letter stating that he believed no senior management was involved with the fraud.
>
> Q.     All right.  When, if ever, was that letter given to the title companies?
>
> A.     I don't know the answer to that.
>
> Q.     Okay.  And, in fact, you're aware in this lawsuit your lawyers have taken the position that the title companies are not allowed to see the witness statements?   Are you aware of that?
>
> A.     I am, yes.
>
> *          *          *
>
> Q.     Okay. At the time the Complaint was filed, the initial Complaint, was Chertoff still doing his internal investigation?
>
> A.     I believe it was over.

*See* Relevant Portions of Robert C. Walsh's September 30, 2011 Deposition, T607:8 to 608:2; T701:6 - 9, attached hereto as Exhibit C.  Again, counsel for plaintiff did not place any objections on the record as to the possible privileged nature of this testimony.

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 6

### III. Discussion and Analysis

    **A. Plaintiff waived any work product protection of the supplemental reports by producing the September 30, 1997 Latham & Watkins report in discovery and freely discussing the internal investigation at deposition.**

Plaintiff's counsel *voluntarily* produced the 9/30/97 Report to counsel for defendants as part of discovery. Robert Walsh discussed specifics of the investigation at his deposition. Now, plaintiff claims that any supplemental reports/letters/findings are covered by the work product doctrine. Those supplemental reports are clearly within the scope of the waiver.

Waiver of work product protection occurs when a party makes disclosures that "do not further the goal of protecting an attorney's work product from falling into the hands of an adversary." *In re Neurontin Antitrust Litig.*, MDL 1479, 2011 WL 253434 (D.N.J. Jan. 25, 2011) *aff'd*, MDL 1479, 2011 WL 2357793 (D.N.J. June 9, 2011), citing *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991). The "essential question" in determining whether a waiver of work product has occurred is whether "the material has been kept away from adversaries." *Cooper Health Sys. v. Virtua Health, Inc.*, 259 F.R.D. 208, 215 (D.N.J. 2009), *citing Maldonado v. New Jersey ex rel. Admin. Office of Courts-Prob. Div.*, 225 F.R.D. 120, 131 (D.N.J. 2004). Undoubtedly, when a party gives a document directly to its adversary, the disclosure "waive[s] any ordinary work product shroud they may have enjoyed had [the document] not been given to [the adversary]." *In re Neurontin Antitrust Litig.*, 2011 WL 253434. Certainly, plaintiff's counsel waived any work product protection concerning the 9/30/97 Report when he voluntarily produced the report to defense counsel in discovery.

Once it is established that a waiver of the work product privilege has occurred as to a certain communication or information, the waiver may also extend to undisclosed communications or information. Federal Rule of Evidence 502(a) defines the scope of waiver resulting from a disclosure of privileged or protected information:

> When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a). Therefore, deliberate disclosure of otherwise protected information may lead to the disclosure of additional related otherwise protected

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 7

information if it concerns the same subject and fairness dictates they be considered together. The Explanatory Note to Rule 502 notes that the subject matter waiver is reserved for those "unusual situations in which fairness requires a further disclosure of related, protected information in order to prevent a selective, and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502 advisory committee note (revised Nov. 28, 2007).

Subject matter waiver under Fed. R. Evid. 502(a) has not yet been addressed in this particular context in the Third Circuit, however a very recent Southern District of California case lends some guidance. The District Court was asked to consider a defendant's objection to a magistrate judge's ruling that unredacted copies of investigative reports prepared by counsel be produced to plaintiffs. *See Coleman v. Sterling*, 2011 WL 2005227 (S.D. Cal. May 23, 2011). Plaintiffs were former senior executives of the defendant corporation. Plaintiffs were placed on administrative leave while defendant hired an outside law firm to conduct an internal investigation into their alleged misconduct. The law firm conducted the investigation and produced three reports, and a fourth written by a non-attorney. Based upon the findings in these reports, the plaintiffs were terminated. *Id.* at *1. Plaintiffs filed suit and as part of defendant's initial disclosures, they produced "substantial portions of the investigative reports. . . [but] redacted several sections of these reports . . . [contending] that the redacted materials [were] protected by the attorney-client privilege and work-product doctrine." Of the 364 pages produced, 292 were prepared by an attorney and only 9 pages were redacted. *Id.* Plaintiffs sought production of the unredacted reports.

The Court analyzed the produced reports and the redacted information under Fed. R. Evid. 502(a). It was undisputed that the defendants voluntarily produced the investigative reports in discovery. The Court then analyzed whether the disclosed and undisclosed communications concerned the same subject. The Court concluded that the redacted sections concerned the same subject – the investigation of Plaintiffs, including investigation into employment status, the law regarding termination, and findings that cause existed for termination—as the disclosed reports. *Id.* at *3.

Finally, the Court considered whether or not the disclosed and undisclosed communications should be considered together in fairness. The Court noted that the redacted reports included an investigation of employee performance, review of contracts and a legal analysis. Some of the redactions included portions of the legal analysis and the redactions "deprived the plaintiffs of important context." *Id.* at 3. The Court concluded that the redacted materials should be produced as the subject matter waiver covered the reports in their entirety, noting that "denying plaintiff's access to the redacted sections would advantage defendants by allowing them to use attorney-client privilege and work-product protection at once as a shield and a sword." *Id.* at *4, citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 8

Other Courts have found that the deliberate disclosure of an attorney-prepared investigative report will constitute a subject-matter waiver of related documents. *See Lerman v. Turner*, 2011 WL 62124 (N.D. Ill. Jan. 6, 2011). In fact, the *Lerman* court confronted a situation analogous to the one presented here: an attorney hired by the defendant produced an investigative report, which was then disclosed to the plaintiff and her counsel. *Id.* at *1. The plaintiff sought additional related materials, and the defendant argued they were protected by the work-product doctrine. The Court concluded that the undisputedly deliberate disclosure of the report constituted an intentional waiver, and that the additional materials concerned the same subject matter, noting "it would be unfair to allow defendants to selectively produce [one report] summarizing his interview of some [] employees, and yet withhold two other documents summarizing another interview." *Id.* at *9–10.

Here, there is no question that plaintiff deliberately and intentionally disclosed the 9/30/97 Report which summarizes Latham & Watkins findings and analysis regarding investigation of loans originated by National Home Funding between February 1996 and June 1997 and loans of properties in Providence, Rhode Island between June 1996 and May 1997 and ultimately, the approximately 200 fraudulent loans referred to in the report as the "Pyramid Scheme." *See* Exhibit A. Despite the Report's findings being deemed "preliminary" in several places, Plaintiffs never produced any additional reports or findings related to the investigation. Robert Walsh also freely discussed the internal investigation in deposition. Now, using a classic "sword and shield" tactic with regard to its discovery, plaintiff seeks to invoke the work-product protection to prevent the production of the supplemental reports.

Defendants have only requested that plaintiffs produce any supplemental reports/letters/findings as referenced in the 9/30/07 Report ("we will supplement our findings as appropriate". *See* Exhibit A, pg. 1. Plaintiff has only yet implied that these supplemental reports exist; however it would be difficult to imagine that they do not concern the same subject matter as the 9/30/97 Report. A review of the documents would most certainly reveal that they are of the same subject—the Latham & Watkins investigation into certain mortgage loans.

Finally, fairness requires that any supplemental reports be produced in conjunction with the 9/30/97 Report. The Report notes that "Our investigation to date has not developed evidence indicating that any senior management official at Walsh Securities was a participant in the Pyramid Scheme." *See* Exhibit A, pg. 2, footnote 2. This statement is clearly beneficial to Plaintiff in its suit against defendants. However, the curious lack of production of any supplemental reports from Latham & Watkins despite the "preliminary" nature of the 9/30/97 report implies that the supplemental findings may provide additional information or be important to the understanding the full context of findings in the 9/30/97 Report. It appears that part of the task assigned to the law firm was to determine if senior management were involved in the fraud, which involvement is one of the defenses asserted by the title underwriters in defense of the claims asserted by plaintiff in this litigation. Thus,

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 9

subject matter waiver is appropriate as a matter of fairness where "the privilege holder seeks to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials." Charles A. Wright, et al., 8 Federal Practice and Procedure§ 2016.2 (3d ed., 2010 update).

   **B.  Plaintiff bears the burden of showing the September 30, 1997 Report and any supplemental reports/letters/findings are protected by the work product doctrine.**

Of course, for a waiver of work product protection to have occurred, the communication or information had to be protected at the outset.  Under Federal Rule of Civil Procedure 26(b) (3), a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative. Fed. R. Civ. P. 26(b)(3).  The work product privilege is not absolute, although it provides "absolute protection" for "[t]he mental impressions, conclusions, or legal theories of a party's attorney . . . and disclosure cannot be compelled upon a showing of undue hardship." *Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 422 (D.N.J. 2009), citing *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662-63 (3d Cir. 2003). The purpose of the work product privilege is to safeguard an attorney's work product from disclosure to an adversary. *In re Grand Jury (Impounded)*, 138 F.3d 978, 981 (3d Cir. 1998).

Most importantly for this dispute, and as recently explained by this Court, "[t]he party asserting the work-product privilege has the burden of demonstrating that the documents he or she claims are privileged were 'prepared in anticipation of litigation.'"  *See e.g.* Kane *v. Mfrs. Life Ins. Co.*, Slip Copy, 2010 WL 2178837 at *8 (D. N.J. May 26, 2010), quoting *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000).  Plaintiff has made no showing that the 9/30/97 Report and any supplemental reports were prepared in anticipation of litigation.   In fact, plaintiff has made no attempt to protect the supposed attorney work product contained in the 9/30/97 Report. Nevertheless, even after freely producing the 9/30/97 Report and Mr. Walsh's testimony regarding the internal investigation, plaintiff's counsel now baldly asserts that any supplemental reports regarding the investigation are protected under the work product doctrine.   Defendants leave plaintiff to its proofs.

## III. Conclusion

Given that plaintiff voluntarily produced the 9/30/97 Report and freely discussed the internal investigation at deposition, if ever work-product protection attached to the 9/30/97 Report, an intentional waiver is clear. Therefore, under Fed. R. Evid. 502(a) and applicable federal law, any work product protection for supplemental reports/letters/findings are similarly waived under a subject matter waiver.

ME1 12912400v.1

Hon. Michael A. Shipp, U.S.M.J.
February 10, 2012
Page 10


Accordingly, Commonwealth, Fidelity and Nations respectfully request that this Court find that any and all supplemental reports/letters/findings regarding Latham & Watkins Internal Investigation be produced, unredacted, to defendants.

Respectfully submitted,

David R. Kott

Enclosures

cc:     Robert Magnanini, Esq. (w/encls.) (electronic filing and regular mail)
        Daniel Mee, Esq. (w/encls.) (e-mail and regular mail)
        Jeffrey Shooman, Esq. (w/encls.) (e-mail and regular mail)
        Amy Walker Wagner, Esq. (w/encls.) (e-mail and regular mail)
        Edward J. Hayes, Esq. (w/encls.) (e-mail and regular mail)

*EXHIBIT A*

LATHAM & WATKINS
ATTORNEYS AT LAW
ONE NEWARK CENTER
NEWARK, NEW JERSEY 07101-3174
TELEPHONE (973) 639-1234
FAX (973) 639-7298

PAUL R. WATKINS (1899 - 1973)
DANA LATHAM (1898 - 1974)

CHICAGO OFFICE
SEARS TOWER, SUITE 5800
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 876-7700
FAX (312) 993-9767

HONG KONG OFFICE
23RD FLOOR
STANDARD CHARTERED BANK BUILDING
DES VOEUX ROAD CENTRAL, HONG KONG
TELEPHONE + 852-2905-6400
FAX + 852-2905-6940

LONDON OFFICE
ONE ANGEL COURT
LONDON EC2R 7HJ ENGLAND
TELEPHONE + 44-171-374 4444
FAX + 44-171-374 4460

LOS ANGELES OFFICE
633 WEST FIFTH STREET, SUITE 4000
LOS ANGELES, CALIFORNIA 90071-2007
TELEPHONE (213) 485-1234
FAX (213) 891-8763

MOSCOW OFFICE
ITSA GASHEKA, 7, DUCAT II, SUITE 900
MOSCOW, RUSSIA 125047
TELEPHONE + 7-095 785-1234
FAX + 7-095 785-1235

NEW YORK OFFICE
885 THIRD AVENUE, SUITE 1000
NEW YORK, NEW YORK 10022-4802
TELEPHONE (212) 906-1200
FAX (212) 751-4864

ORANGE COUNTY OFFICE
650 TOWN CENTER DRIVE, SUITE 2000
COSTA MESA, CALIFORNIA 92626-1925
TELEPHONE (714) 540-1235
FAX (714) 755-8290

SAN DIEGO OFFICE
701 "B" STREET, SUITE 2100
SAN DIEGO, CALIFORNIA 92101-8197
TELEPHONE (619) 236-1234
FAX (619) 696-7419

SAN FRANCISCO OFFICE
505 MONTGOMERY STREET, SUITE 1900
SAN FRANCISCO, CALIFORNIA 94111-2562
TELEPHONE (415) 391-0600
FAX (415) 395-8095

SILICON VALLEY OFFICE
75 WILLOW ROAD
MENLO PARK, CALIFORNIA 94025-3656
TELEPHONE (415) 328-4600
FAX (415) 463-2600

TOKYO OFFICE
INFINI AKABAKA, MINATO-KU
TOKYO 107, JAPAN
TELEPHONE + 813-3423-3970
FAX +813-3423-3971

WASHINGTON, D.C. OFFICE
1001 PENNSYLVANIA AVE., N.W., SUITE 1300
WASHINGTON, D.C. 20004-2505
TELEPHONE (202) 637-2200
FAX (202) 637-2201

FILE NO. 025776-0000

September 30, 1997

Walsh Securities Inc.
4 Campus Drive
Parsippany, NJ 07054

Re:     Loans Originating from National Home Funding, Inc. and
        <u>Loans on Properties Located in Providence, Rhode Island</u>

Ladies and Gentlemen:

Over the past several weeks, we have investigated, with the assistance of Deloitte & Touche LLP, two general categories of mortgage loans financed by Walsh Securities Inc. ("Walsh Securities"): (i) loans that were originated by National Home Funding, Inc. ("National Home Funding") between February, 1996 and June, 1997 (the "National Home Funding Loans"), and (ii) loans on properties located in Providence, Rhode Island between June, 1996 and May, 1997 (the "Providence Loans"). You have asked us to summarize for you our preliminary findings with respect to these two categories of loans, and we do so herein. As we complete our internal review of these loans, we will supplement our findings as appropriate.

I. The National Home Funding Loans

Walsh Securities financed a total of 388 loans originated by National Home Funding between April, 1995 and June, 1997. We have examined loan files for 342 of these loans and have reached preliminary findings with respect to them, as set forth below.[1]

---

[1] We are in the process of reviewing the remaining National Home Funding loan files (with the exception of four files that Walsh Securities, as of this date, has been unable to obtain).

LATHAM & WATKINS

Walsh Securities Inc.
September 30, 1997
Page 2

      Of the 342 National Home Funding loans we have examined (which total approximately $37 million), our preliminary determination is that (i) approximately 220 loans (representing approximately $24 million) were fraudulently obtained from Walsh Securities pursuant to an elaborate pyramid scheme which required the concerted action of several individuals and entities (the "Pyramid Scheme Loans"); (ii) approximately 100 loans (representing approximately $11 million) involved no apparent fraud; and (iii) approximately 20 loans (representing approximately $2.5 million) were based on inflated appraisals for the apparent purpose of allowing the borrowers to receive one hundred percent financing for the properties.

      The object of the Pyramid Scheme was to obtain mortgage loans from Walsh Securities based on fraudulently inflated appraisals, appraisals that were in some cases up to several times the actual value of the homes. In addition to the fraudulent appraisals, those involved in this Pyramid Scheme would submit to Walsh Securities other false information. For example, the loan applications would (i) indicate that the borrowers had provided a down payment for the properties when, in fact, none was provided; (ii) indicate that the seller had taken back a second mortgage when, in fact, there was no bona fide second mortgage; and (iii) often contain false information about the real estate transactions designed to present them as better credit risks.

      Central to this Pyramid Scheme was the secret conveyance, often through a filed deed, of a sixty percent interest in the property from the borrowers to one of the key entities in the fraud, which entity was responsible for (i) collecting and "pooling" the rents, if any, from the properties and (ii) making mortgage loan payments on behalf of the borrowers. Proceeds from the new loans fraudulently obtained from Walsh Securities in this scheme would be used to enrich the participants in the fraud[2] and to make principal and interest payments on prior loans fraudulently obtained from Walsh Securities. As in a classic pyramid or Ponzi scheme, new loans were needed to keep the prior loans current.

      Most of the Pyramid Scheme Loans have been delinquent since June, 1997, when Walsh Securities discontinued funding new loans originated by National Home Funding. It is our preliminary estimate that the losses on these mortgages will be significant. On average, the actual value of these properties is far less than the amount of the mortgage. Many of these properties are uninhabited and some properties cannot be inhabited without substantial improvements. We estimate that, on average, the loss on these mortgages may be greater than one-half of the mortgage amount.

      Separate and apart from the Pyramid Scheme Loans discussed above are approximately 20 National Home Funding Loans that are based on inflated appraisals. It appears

---

[2] Our investigation to date has not developed evidence indicating that any senior management official at Walsh Securities was a participant in the Pyramid Scheme.

LATHAM & WATKINS

Walsh Securities Inc.
September 30, 1997
Page 3

that the appraisals were inflated so that the borrowers could obtain approximately one hundred percent financing for the property. A percentage of the mortgage proceeds may also have been distributed to enrich the sellers and their representatives. However, unlike the Pyramid Scheme Loans which, by their nature, inevitably lead to a substantial loss to Walsh Securities, it is unclear what loss, if any, will result from these approximately 20 loans, for which the appraisal was inflated to obtain approximately one hundred percent financing. As long as the borrowers continue to make payments on these mortgages, there is no loss to the mortgage holder. Moreover, unlike the Pyramid Scheme Loans, there is no indication that the income from these properties is being "pooled" or that the borrowers have transferred an interest in the property to another entity. Thus, unlike the Pyramid Scheme Loans, these loans can be self-sustaining and capable of performance. Moreover, even if these loans were to become delinquent, the loss would be far less than in the Pyramid Scheme Loans because the appraisals are less exaggerated.

While our analysis is very preliminary with respect to these approximately 20 loans, the loans do appear to share certain characteristics with approximately 95 of the loans we examined in Providence, Rhode Island, which we discuss below.

## II. The Providence Loans

We have examined 170 loan files on properties located in Providence, Rhode Island (approximately totaling $12 million). Our preliminary determination is (i) none of the loans involve any form of the Pyramid Scheme discussed above; (ii) approximately 95 loans were based on inflated appraisals apparently designed to achieve approximately one hundred percent financing for the properties (representing approximately $7 million); and (iii) approximately 75 loans involved no apparent fraud (representing approximately $5 million).

With respect to the approximately 95 loans involving inflated appraisals, it is unclear whether any significant loss will result to Walsh Securities. The properties, on inspection, appear to be well maintained. Those that are not owner-occupied are generally rented. There also does not appear to be dissatisfaction among either the tenants or the borrowers to whom we spoke. The mortgage payments for these properties are not being "pooled" and there have been no secret transfers of interest in the properties of which we are aware. Thus, these loans can be self-sustaining. Significantly, the delinquency rate for these properties does not appear to be materially different from the delinquency rate for the other Providence Loans which do not involve apparent fraud. Were these properties to be foreclosed as a result of non-performance, the actual value of the properties, in general, may be approximately seventy-five to eighty percent of the loan amount.[3]

---

[3] The approximate twenty to twenty-five percent differential appears to reflect the financing of the transaction costs of the sale and profit to the seller.

LATHAM & WATKINS

Walsh Securities Inc.
September 30, 1997
Page 4

We understand that Walsh Securities does not require additional investigation into the remainder of its loan portfolio.  We further understand that Walsh Securities has adopted internal procedures to help curtail fraud against the company and has currently suspended funding for any property with a recent sale transaction until additional underwriting policies and procedures can be implemented.  We are prepared to provide additional assistance to Walsh Securities, as appropriate.

Very truly yours,

Michael Chertoff
of LATHAM & WATKINS

*EXHIBIT B*

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2          CIVIL NO. 97-3496 (DRD)
3    ---------------------------
4    WALSH SECURITIES,                :
     INC.,                            :
                                      :
5          Plaintiff,                 :
                                      :
6          v.                         :
                                      :
7    CRISTO PROPERTY                  :
     MANAGEMENT,LTD., a/k/a           :
8    G.J.L. LIMITED; DEK              :
     HOMES OF NEW JERSEY,             :
9    INC.; OAKWOOD                    :
     PROPERTIES, INC.;                :
10   NATIONAL HOME FUNDING,           :
     INC.; CAPITAL ASSETS             :
11   PROPERTY MANAGEMENT &            :
     INVESTMENT CO., INC.;            :
12   CAPITAL ASSETS                   :     DEPOSITION UPON
     PROPERTY MANAGEMENT,             :     ORAL EXAMINATION
13   L.L.C.; WILLIAM KANE;            :           OF
     GARY GRIESER; ROBERT             :     ROBERT C. WALSH
14   SKOWRENSKI, II;                  :
     RICHARD CALANNI;                 :
15   RICHARD DI BENEDETTO;            :
     JAMES R. BROWN; THOMAS           :
16   BRODO; ROLAND PIERSON;           :
     STANLEY YACKER, ESQ.;            :
17   MICHAEL ALFIERI, ESQ.;           :
     RICHARD PEPSNY, ESQ.;            :
18   ANTHONY M. CICALESE,             :
     ESQ.; LAWRENCE CUZZI;            :
19   ANTHONY D'APOLITO; DAP           :
     CONSULTING, INC.;                :
20   COMMONWEALTH LAND                :
     TITLE INSURANCE CO.;             :
21   NATIONS TITLE                    :
     INSURANCE OF NEW YORK,           :
22   INC.;                            :
                                      :
23                                    :
                                      :
24                                    :
                                      :
25                                    :
                                      :

**ORIGINAL**



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

```
1        FIDELITY NATIONAL            :
2        TITLE INSURANCE CO. OF       :
         NEW JERSEY; COASTAL          :
3        TITLE AGENCY; DONNA          :.
         PEPSNY; WEICHERT             :
4        REALTORS and VECCHIO         :
         REALTY, INC. D/b/a           :
5        MURPHY REALTY BETTER         :
         HOMES AND GARDENS,           :
6                                     :
            Defendants.               :
7    ---------------------------
8
9
10
11              T R A N S C R I P T  of the stenographic
12   notes of HOWARD A. RAPPAPORT, a Notary Public and
13   Certified Shorthand Reporter of the State of
14   New Jersey, Certificate No. XI00416, taken at the
15   offices of MC CARTER & ENGLISH, LLP, Four Gateway
16   Center, Newark, New Jersey, on Friday,
17   April 9, 2010, commencing at 9:35 a.m.
18
19
20
21
22
23
24
25
```



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

```
 1     A P P E A R A N C E S :

 2    STONE & MAGNANINI
      150 John F. Kennedy Parkway
 3    Short Hills, New Jersey 07078
      BY:   ROBERT A. MAGNANINI, ESQ.,
 4          AMY WALKER WAGNER, ESQ.,
      For the Plaintiff
 5
      MC CARTER & ENGLISH, LLP
 6    Four Gateway Center
      100 Mulberry Street
 7    Newark, New Jersey 07102-0652
      BY:   DAVID R. KOTT, ESQ.,
 8    For Defendant/Third-Party Plaintiff Commonwealth Land
      Title Insurance Company
 9
      FOX, ROTHSCHILD, O'BRIEN & FRANKEL
10    997 Lenox Drive
      Lawrenceville, New Jersey  08648
11    BY:   EDWARD J. HAYES, ESQ.,
      For Defendants Nations Title Insurance and
12    Fidelity National Title Insurance

13    METHFESSEL & WERBEL
      3 Ethel Road
14    Suite 300
      Edison, New Jersey 08818
15    BY:   MARTIN R. MC GOWAN, ESQ.,
      For Coastal Title Agency

16

17

18

19

20

21

22

23

24

25
```



**Rizman Rappaport Dillon & Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1

2                              I N D E X

3

   WITNESS                                          PAGE

4

5     ROBERT C. WALSH

6     Direct examination by Mr. Kott                    6
      Cross-Examination by Mr. Hayes                  172

7

8     EXHIBITS          DESCRIPTION              FOR IDENT.

9     Robert            Notice to take oral              5
      Walsh-1           deposition of plaintiff
10                      Walsh Securities
      Robert            Fourth amended complaint         5
11    Walsh-2
      Robert            Letter dated April 3,            5
12    Walsh-3           1998 from Walsh
                        Securities to William T.
13                      Lutz
      Robert            Letter dated July 3, 1997      107
14    Walsh-4
      Robert            Letter dated July 30,          108
15    Walsh-5           1996
      Robert            Agreement of settlement        110
16    Walsh-6

17

18

19

20

21

22

23

24

25



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
*Certified Court Reporters*

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 56

1    legal services to you, Robert Walsh, individually?

2           A       I know I went down to the prosecutor's

3    office once and Michael went with me, and I think I

4    went down as a corporate representative.

5           Q       When you refer to the prosecutor's

6    office, you are referring to the United States

7    Attorney here in New Jersey?

8           A       That's correct.

9           Q       It is your understanding that is the

10   federal prosecutor in New Jersey?

11          A       That is correct.

12          Q       When you retained Mr. Chertoff, did you

13   put any limitations on the scope of his

14   investigation, as to who was involved in the fraud

15   and how it happened and things of that nature?

16          A       No, I did not.

17          Q       So Mr. Chertoff was free to interview

18   anyone he wanted to interview, is that correct?

19          A       That is correct.

20                  MR. KOTT:  Off the record.

21                  (Recess at 10:40 a.m.)

22                  (Deposition resumes at 10:55 a.m.)

23                  MR. KOTT:  It's 10:55.

24                  MR. MAGNANINI:  You saw we served

25   Lorraine -- no, off the record.



**Rizman Rappaport Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 57

1              (Discussion off the record.)

2      Q      Mr. Walsh, let's start again.

3              One thing I should have said to you, if

4  you ever want to take a break, all you need to do is

5  tell us you want to take a break and we'll

6  accommodate you.

7              Do you understand that?

8      A      I do.  Thank you.

9      Q      We were talking about the internal

10  investigation done by Mr. Chertoff.  Do you recollect

11  that?

12      A      I do.

13      Q      Did Mr. Chertoff and the Latham firm as

14  part of that internal investigation interview

15  employees of Walsh?

16      A      They did.

17      Q      And have you read the interview notes

18  that they prepared and interview memos of what the

19  witnesses told them?

20      A      I did, but it was -- some of them a

21  while ago, but, yes, I did.

22      Q      Did Mr. Chertoff or anyone from the

23  Latham firm interview Bette Ann DeMola?

24      A      I never saw one.

25      Q      Do you know why that is?



**Rizman**
**Rappaport**
**Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1    A      I don't.

2    Q      Did you ever have any discussions with

3  Bette Ann DeMola as to whether she would agree to be

4  interviewed by the Latham firm?

5    A      No, I did not.

6    Q      Did you in any way tell the Latham firm

7  or Mr. Chertoff that Bette Ann DeMola was off limits?

8    A      I did not.

9    Q      Do you know why it was that the Latham

10 firm did not interview Bette Ann DeMola?

11   A      I do not.

12   Q      Was Ms. DeMola ever charged with any

13 federal offenses?

14   A      She was.

15   Q      Who was her lawyer for that?

16   A      Jay Fahy.  F-a-h-y.

17   Q      How did she get to Mr. Fahy?

18   A      She -- I believe it was Mr. Chertoff

19 recommended him.

20   Q      Do you know why it was that Mr. Chertoff

21 who was doing the internal investigation was

22 recommending a lawyer for Bette Ann DeMola?

23   A      He also recommended lawyers for other

24 people within the firm as well.

25   Q      I didn't ask you that.



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1       A       I'm sorry.

2       Q       The question was, do you know why

3   Mr. Chertoff, who was doing an internal investigation

4   on behalf of Walsh Securities, recommended that

5   Ms. DeMola retain Mr. Fahy as her lawyer?

6       A       I do not.

7       Q       Have you ever heard of Mr. Fahy before

8   that?

9       A       I did not.

10      Q       Have you paid, you, Robert Walsh,

11  individually, paid any legal fees for Bette Ann

12  DeMola?

13      A       I have.

14      Q       Whose legal fees have you paid?

15      A       I paid part of DeCotiis.

16      Q       Who is DeCotiis?

17      A       DeCotiis was Bette Ann's legal firm

18  after Jay Fahy.

19      Q       So at some point did Bette Ann DeMola

20  change lawyers from Jay Fahy to the DeCotiis law

21  firm?

22      A       Yes, she did.

23      Q       Why did that occur?

24      A       She got indicted and she felt like Jay

25  Fahy was not doing his job.



**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Page 169

1  fraud?

2      A      I do.

3      Q      What about that?

4      A      Never happened.

5      Q      After Walsh Securities became aware of

6  the fraud, that is, after the day that you had the

7  meeting with Kane, did Walsh Securities close any

8  loans in which Kane or Grieser or NHF were involved?

9      A      To my knowledge, no.

10     Q      The Latham investigation did not look to

11  me as if they interviewed you as part of that

12  investigation, did they?

13     A      They interviewed myself, Jimmy, Bette

14  Ann every day.  I literally mean it was a constant --

15  I guess it wasn't a formal write up, but I was there.

16  I was meeting with Michael, I was meeting with Jeff

17  Berman, I was meeting with Bob Magnanini.

18          This was a very fluid transaction.  As

19  you pointed out earlier, Mr. Kott, what type of

20  investigation were they hired to do?  It was a lot.

21          So I was in constant dialogue with

22  everybody.  They spoke to Bette Ann.  I don't know if

23  they had a formal interview with Bette Ann.  They

24  spoke to Bette Ann, they spoke to Jimmy, myself, Fred

25  Schlesinger, they spoke to Paul DelRosso, they spoke



**Rizman
Rappaport
Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

1  to everybody within that group.

2          I read what I think was turned over to

3  you, and some of those people, I didn't see them in a

4  formal discussion with them, but I know they had all

5  these conversations with them.

6      Q    Let's try to clear this up.

7      A    Sure.

8      Q    You believe that Latham interviewed you

9  as part of its internal investigation, but you have

10  not seen any write up of the interview, is that

11  correct?

12      A    I apologize, I wasn't clear enough.

13          I'm not sure if they did a formal

14  interview with me, but we had many hours of

15  discussions on probably everything that you would

16  consider an interview, but I'm not sure if it was

17  categorized as an interview.

18      Q    Have you seen any write up of an

19  interview view with James Walsh done by Latham?

20      A    I have not.

21      Q    Did Greenwich audit files?

22      A    They did.

23      Q    Give me an example of what an audit is

24  of a file by Greenwich.

25      A    They had a gentleman on staff in our


**Rizman
Rappaport
Dillon&Rose,**LLC
*Certified Court Reporters*

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

*EXHIBIT C*

Page 537

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
 2            Civil Action No. 97-cv-3496 (DRD)(MAS)
 3   WALSH SECURITIES, INC.,         :
 4           Plaintiff,              :  DEPOSITION OF:
 5       v.                          :  ROBERT C. WALSH
                                        (VOLUME III)
 6   CRISTO PROPERTY MANAGEMENT, LTD., :
     a/k/a G.J.L. LIMITED; DEK HOMES
 7   OF NEW JERSEY, INC.; OAKWOOD      :
     PROPERTIES, INC.; NATIONAL HOME
 8   FUNDING, INC.; CAPITAL ASSETS     :      ORIGINAL
     PROPERTY MANAGEMENT & INVESTMENT
 9   CO., INC.; CAPITAL ASSETS PROPERTY:
     MANAGEMENT, L.L.C.; WILLIAM KANE;
10   GARY GRIESER; ROBERT SKOWRENSKI,  :
     II; RICHARD CALANNI; RICHARD
11   DiBENEDETTO; JAMES R. BROWN;      :
     THOMAS BRODO; ROLAND PIERSON;
12   STANLEY YACKER, ESQ.; MICHAEL     :
     ALFIERI, ESQ.; RICHARD PEPSNY,
13   ESQ.; ANTHONY M. CICALESE, ESQ.;  :
     LAWRENCE CUZZI; ANTHONY D'APOLITO;
14   DAP CONSULTING, INC.; COMMONWEALTH:
     LAND TITLE INSURANCE CO.; NATIONS
15   TITLE INSURANCE OF NEW YORK, INC.;:
     FIDELITY NATIONAL TITLE INSURANCE
16   CO. OF NEW JERSEY; COASTAL TITLE  :
     AGENCY; DONNA PEPSNY; WEICHERT
17   REALTORS and VECCHIO REALTY, INC. :
     d/b/a MURPHY REALTY BETTER HOMES
18   AND GARDENS,                      :
19                                     :
             Defendants.
20   X--------------------------------X
21        TRANSCRIPT of testimony as taken by and
     before CHERYL McGANN, a Certified Court Reporter
22   of the State of New Jersey, at the offices of
     McCARTER & ENGLISH, LLP, Four Gateway Center,
23   Newark, New Jersey, on Friday, September 30, 2011,
     commencing at 9:14 a.m.
24
25   Job No. NJ356367
```

Page 538

```
 1    A P P E A R A N C E S :
 2    STONE MAGNANINI LLP
      BY:  ROBERT A. MAGNANINI, ESQ.
 3    150 JFK Parkway
      Short Hills, New Jersey  07078
 4    (973) 218-1111
      rmagnanini@stonemagnalaw.com
 5    Attorneys for Plaintiff
 6    McCARTER & ENGLISH, LLP
      BY:  DAVID R. KOTT, ESQ.
 7    Four Gateway Center
      100 Mulberry Street
 8    Newark, New Jersey  07102-0652
      (973) 622-4444
 9    dkott@mccarter.com
      Attorneys for Defendant
10    Commonwealth Land Title Insurance Co.
11    FOX ROTHSCHILD LLP
      BY:  EDWARD J. HAYES, ESQ.
12    997 Lenox Drive
      Building 3
13    Lawrenceville, New Jersey  08543-5231
      (609) 896-3600
14    ejhayes@foxrothschild.com
      Attorneys for Defendants
15    Nations Title Insurance of New York, Inc. and
      Fidelity National Title Insurance Co. of New Jersey
16
17
18
19
20
21
22
23
24
25
```

Page 539

I N D E X

| WITNESS | EXAMINATION |
| --- | --- |

ROBERT C. WALSH

By Mr. Kott:       541,576,606,665,691,715,719,740
By Mr. Hayes:      563,597,619,667,689,704,722,739

E X H I B I T S

| Number | Description | Page |
| --- | --- | --- |
| Robert Walsh-22 | Confidential Settlement Agreement Bates stamped COM-Cherokee-00303-392 | 555 |
| Robert Walsh-23 | Three-page article from July 13, 1997, edition of Sunday Star Ledger | 581 |
| Robert Walsh-24 | Two-page article from July 10, 1997, edition of Asbury Park Press | 581 |
| Robert Walsh-25 | File copy of September 29, 1997, letter to Mr. Schlesinger from David R. Kott with certified mail slip attached | 583 |
| Robert Walsh-26 | August 12, 1997, letter Bates stamped COM 01490 from Donna Sullivan to Jeffrey Goodman | 593 |
| Robert Walsh-27 | September 5, 1997, letter Bates stamped COM 01715 through 16 from Fred Schlesinger to Donna Sullivan | 593 |
| Robert Walsh-28 | July 28, 1997, letter to Commonwealth from Jeffrey M. Goodman, Latham & Watkins | 605 |
| Robert Walsh-29 | Fax from John Oberdorf to Dinah Raven with attached press release Bates stamped WSI 0070147-0070149 | 608 |
| Robert Walsh-30 | January 31, 1997, Quality Control Memorandum from Veronica Gonzalez-Lehman, CC to James Walsh and Peter Trebour Bates stamped WSI 0075078 | 649 |
| Robert Walsh-31 | Closing Instructions document Bates stamped SYSW 020142, 20143 and 20141 | 672 |

Page 607

1      A.   That is correct.

2      Q.   And she would not have given a deposition

3  without taking the Fifth Amendment until after her

4  guilty plea, correct?

5            MR. MAGNANINI:   Objection to form.

6      A.   I don't know firsthand.  I can't speculate.

7  Chances are yes.

8      Q.   Okay, and we had talked about the internal

9  investigation done by the Latham firm; is that

10 correct?

11     A.   I believe we have, yes.

12     Q.   The Latham firm actually took written witness

13 statements as to who was involved in the fraud and

14 wrote a report to Walsh Securities?

15     A.   Michael Chertoff gave us a letter stating

16 that he believed no senior management was involved

17 with the fraud.

18     Q.   All right.  When, if ever, was that letter

19 given to the title companies?

20     A.   I don't know the answer to that.

21     Q.   Was it given as part of this lawsuit?

22     A.   I don't know the answer to that.

23     Q.   Okay.  And, in fact, you're aware that in

24 this lawsuit your lawyers have taken the position

25 that the title companies are not allowed to see the

1    witness statements?  Are you aware of that?

2       A.  I am, yes.

3              MR. KOTT:  I'm ready for a break.  Are

4    you ready?

5              THE WITNESS:  Yes.

6              MR. KOTT:  We'll take a break.  Thank

7    you.

8              (A short recess was taken.)

9              MR. KOTT:  Will you mark this.

10             (Fax from John Oberdorf to Dinah Raven

11   with attached press release Bates stamped WSI

12   0070147 through 0070149 was received and marked

13   Defendant's Exhibit Robert Walsh-29 for

14   Identification.)

15             MR. KOTT:  I have marked as Exhibit

16   Robert Walsh-29 a fax from John Oberdorf to Dinah

17   Raven that has attached to it I'll call it a press

18   release Bates stamped WSI 0070147 through 0070149.

19      Q.  Mr. Walsh, that was a document prepared by

20   Walsh Securities.  Are you generally familiar with

21   that document?

22             MR. MAGNANINI:  Objection to the form.

23             I don't know if it was prepared by Walsh

24   Securities.

25      Q.  I'm sorry, produced by Walsh Securities.

Page 701

1     Q.   What was the reason for the name change?

2     A.   A fresh start.

3     Q.   Was that because you had gotten some bad

4     publicity, and a new name might help on that?

5     A.   Yes.

6     Q.   Okay.  At the time the Complaint was filed,

7     the initial Complaint, was Chertoff still doing his

8     internal investigation?

9     A.   I believe it was over.

10    Q.   Okay.

11    A.   And you did say initially?

12    Q.   Yes.

13    A.   Okay.

14    Q.   In this case, there have been different forms

15    of the closing service letter produced.  Are you

16    aware of that?

17    A.   I am.

18    Q.   One has a Paragraph F, and one does not.

19    A.   Yes.

20    Q.   How did it come to be that your company

21    received different forms of closing service letters?

22    A.   You'd have to ask Coastal.

23    Q.   Well, did anybody at your company review the

24    forms of the closing service letter?

25    A.   I don't know the answer to that.

Page 702

1    Q.   Did anyone ever contact Coastal or anyone

2  else to ask why some of the forms had a Paragraph F

3  and the others did not?

4    A.   I don't know the answer to that.

5    Q.   Did Walsh require any particular form of

6  closing service letter?

7    A.   I don't know the answer to that.

8    Q.   At one point, you said you hadn't found the

9  final draft of the merger agreement.  Has that been

10  located?  Do you remember that, that you --

11    A.   I remember that conversation, yes.

12    Q.   Has it been located?

13    A.   I have not found it.

14    Q.   How much unpaid bills are there that you're

15  claiming in this case?

16    A.   When you say, "how much unpaid bills," can

17  you be more specific?

18    Q.   I'm sorry, withdrawn.

19         How much bills are you seeking in this case?

20  What is the dollar amount?

21    A.   I'd have to confer with the attorneys.  I

22  don't know where we are right now.

23    Q.   Can you give me an approximation?

24    A.   I think it's 5 million.

25    Q.   And does that include the Chertoff internal