

## McCARTER & ENGLISH
ATTORNEYS AT LAW

February 21, 2012

**VIA ECF AND REGULAR MAIL**

Honorable Michael A. Shipp
U.S. Magistrate, United States District Court
Martin Luther King Federal Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

David R. Kott
Partner
T. 973.622.4444
F. 973.624.7070
dkott@mccarter.com

Re: <u>Walsh Securities, Inc. v. Cristo Property Management, et al.</u>
United States District for the District of New Jersey
Civil Action No. 97-3496 (DRD)(MAS)

Dear Judge Shipp:

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
T. 973.622.4444
F. 973.624.7070
www.mccarter.com

We represent defendant, Commonwealth Land Title Insurance Co. ("Commonwealth"), in this case. The plaintiff has filed a motion requesting that the Court enter an Order with respect to the proceeds of the settlement paid by the insurance carrier for defendant Coastal Title Agency ("Coastal") [Document 516, filed 02/10/12]. Please accept this letter brief and the enclosed Affidavit of David R. Kott in Opposition to Plaintiff's Motion (Document 516 Filed 02/10/12) Awarding Plaintiff Settlement Funds Paid by Defendant Coastal Title Agency ("Kott Affidavit") in opposition to plaintiff's motion. I have spoken with Edward J. Hayes, Esq., of the Fox Rothschild law firm who represents defendants, Fidelity National Title Insurance Co. of New York and Nations Title Insurance of New York, Inc. (collectively "Fidelity"), and Mr. Hayes informs me that he and his clients join in this letter brief. <u>In addition, Mr. Hayes and I request oral argument on the motion</u>.

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

As set forth below, plaintiff's motion should be denied. Defendant Coastal was insured by virtue of a Business Errors or Omissions Liability Policy (the "policy") issued by General Star Indemnity Company ("General Star"). This policy was essentially a malpractice policy, insuring Coastal for acts of negligence in acting as a title agent. Throughout the litigation, General Star took the position that it did not have an obligation to insure Coastal for the claims made by the plaintiff in the litigation. As set forth in greater detail below, the only claims made by the plaintiff against Coastal were intentional tort type claims, <u>i.e.</u>, that Coastal engaged in civil RICO conduct, civil conspiracy, and common law fraud. General Star took the position that both by virtue of the terms of the policy and by virtue of well-settled public policy in New Jersey that it did not -- and could not -- indemnify Coastal for the types of intentional tort claims made by plaintiff in this case.

On the other hand, General Star <u>never</u> took the position that it did not have a duty to insure Coastal for the claims asserted against Coastal by the title insurance defendants, here, Commonwealth, Fidelity and Nations. Specifically, the claims asserted by the title insurers against Coastal were <u>not</u> claims that Coastal engaged in intentional torts or misconduct; rather, the claims of the title insurers in this litigation

ME1 13022046v.1

Honorable Michael A. Shipp
February 21, 2012
Page 2

against Coastal were based upon claims of breach of contract by Coastal resulting from its alleged negligence in the transactions, and General Star never took the position that the claims of the title insurers were not covered; indeed, the claims of the title insurers against Coastal are precisely the types of claims that an agent such as Coastal would be protected against under the policy issued by General Star. It is the possibility that such conduct may occur which causes title insurers to require under their agency agreements that policy issuing agents obtain such policies.

Hence, if the plaintiff prevailed in the matter against Coastal, insofar as General Star had no duty to indemnify Coastal for the claims made by the plaintiff, Coastal would not be covered under the General Star policy. On the other hand, insofar as the claims against Coastal made by the title insurers <u>are</u> covered by the General Star policy, and insofar as the title insurers have expended significant sums defending this case, it is plain that the settlement proceeds paid by General Star on behalf of Coastal, which are the subject of the instant motion, should be paid to the title insurers; indeed, payment of those settlement proceeds to the plaintiff would not only be inconsistent with the coverage under the General Star policy, but would violate public policy as set forth by the New Jersey Courts.

I.  **Plaintiff's Claims Against Coastal Are Intentional Tort Claims**

Coastal was one of the original defendants sued by Walsh and, although there has been no direct evidence of Coastal's actual participation in any of the above listed frauds, Walsh contends that Coastal was a participant in the frauds. A review of the Fourth Amended Complaint discloses that each of the claims brought by Walsh against Coastal involve only intentional torts. In fact, Coastal is identified by Walsh as one of the "RICO Defendants" in its pleading. (Fourth Amended Complaint ¶ 36 [Document 302].)

There are three Counts in the Fourth Amended Complaint in which Coastal is a named defendant. In Count I, Walsh alleges that the "RICO Defendants" engaged in a pattern of racketeering activity which included wire fraud and commercial bribery and seeks damages under 18 U.S.C. § 1962(c). In Count II, Walsh alleges that the "RICO Defendants" engaged in a conspiracy to commit wire fraud and commercial bribery and seeks damages under 18 U.S.C. § 1962(d). Count III asserts claims against the "RICO Defendants" for common law fraud. It is important to note for purposes of entitlement to the settlement proceeds that, although Walsh does include a claim for negligence in its Fourth Amended Complaint, Coastal is not a defendant in that Count. (*See* Fourth Amended Complaint, Count VI.)[1] It is these claims upon which Walsh alleges entitlement to the settlement proceeds.

The Fourth Amended Complaint clearly sets forth intentional tort claims made by the plaintiff against Coastal. Specifically, the Fourth Amended Complaint alleges that Coastal violated 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") by engaging in wire fraud and commercial bribery that

---

[1] Indeed, earlier in the litigation, the Court denied plaintiff's motion for leave to amend the Complaint to include a negligence claim against Costal. (*See* Opinion & Order

Honorable Michael A. Shipp
February 21, 2012
Page 3

"caused Walsh Securities to finance mortgage loans based on falsely inflated appraisals for real properties and other fraudulent acts . . ." causing "Walsh Securities [to be] unable to recoup the full amounts of many of the outstanding mortgage loans." (Fourth Amended Complaint ¶¶ 71-73.) The Complaint also alleges that Coastal conspired with certain other Defendants, not including Commonwealth, to violate 18 U.S.C. § 1962(c), thus violating 18 U.S.C. § 1962(d) of RICO. (*Id.* at ¶¶ 76-78.) The Complaint further alleges that Coastal engaged, with other Defendants but not Commonwealth, in the "willful[] and intentional[] defraud[ing of] Walsh Securities and made or caused to be made false, fraudulent and material misrepresentations and omissions to plaintiff concerning mortgage loans bought by Walsh Securities from NHF." (*Id.* at ¶ 81.) Specifically to Coastal alone, the Complaint alleges that "Coastal Title issued, on behalf of the Title Insurance Defendants, closing service protection letters and title insurance protection letters with the intent and purpose that Walsh Securities would rely on the same. In doing so, Coastal failed to disclose that the loan transactions at issue were fraudulent and that the closing documents were not timely and properly recorded." (*Id.* at ¶ 82.)

Indeed, to this date plaintiff continues to assert that Coastal engaged in a pattern of racketeering activity and intentional wrongful conduct. For example, in its February 10, 2012 letter brief in support of its motion, plaintiff's counsel states:

> In its Fourth Amended Complaint ("FAC"), WSI alleged that Coastal engaged in a pattern of racketeering activity in violation of 18 U.S.C. 1962. Specifically, WSI alleged that Coastal and other defendants in this lawsuit induced WSI to purchase mortgage loans for up to 8 times the value of the properties at issue, and that the proceeds from WSI's mortgage loans were then distributed among the RICO defendants as illicit profits. This was, simply stated, a fraudulent 'land-flipping' scheme based on inflated, fraudulent appraisals, straw-buyers who signed on to buy properties they had no intention of utilizing, dirty closing attorneys who knew of the fraud and perpetuated it, and other malfeasants who would up destroying WSI through their pernicious scheme.
>
> The process played out as follows:
>
>> Using Coastal as its agent, Fidelity Title (one of the Title Insurance Defendants) issued a title insurance policy and a closing service protection letter to WSI. The policy and CPL issued through Coastal required Fidelity to reimburse WSI for the following losses: (1) those arising out of fraud or misapplication by its agent (Coastal Title) and/or by its approved attorney (Stanley Yacker) for failing to comply with WSI's written closing

Honorable Michael A. Shipp
February 21, 2012
Page 4

> instructions; or (2) those arising out of fraud or misapplication by Coastal or Yacker in handling WSI's funds.
>
> Notably, Mr. Yacker is one of several settling defendants who went to prison for several years for perpetrating the fraud at issue in this case. Coastal committed fraud by, among other things, failing to disclose that the loan transactions were fraudulent and that the closing documents were not timely and properly recorded. Coastal's President and owner, Bob Agel, admitted during his deposition that Coastal issued two title insurance commitments on each property. One title commitment was issued to Mr. Kane (another convicted felon involved in the scheme) and his companies that purchased the issue properties for small amounts of money. The title commitments issued to Mr. Kane detailed the numerous problems with the property's title. A second commitment, however, was issued to WSI bearing a nearly identical file number apart from the addition of an (A). This title commitment issued to WSI, however, showed no title defects. Mr. Agel also testified that in April 1997, Mr. Kane came to him with several hundred deeds, mortgages and joint venture agreements and a check for $50,000 to file the documents that had never been filed by Mr. Yacker after the closings with the straw buyers. Mr. Agel further testified that this was not a customary business or industry practice. Finally, Mr. Agel testified that he spoke to attorneys and underwriters for the Title Insurance Defendants on an almost daily basis because of numerous problems with the properties."

(Letter Brief from Stone & Magnanini LLP to Hon. Michael A. Shipp, U.S.M.J. (Feb. 10, 2012) at 2-3 [Document 516-1] ("Pl.'s Feb. 10, 2012 Letter Br.").)

Plaintiff, in its moving papers, has conceded that Coastal's insurance carrier, General Star, took the position in this litigation ". . . that it did not have an obligation to indemnify Coastal for its intentional actions, . . . ." (*Id.* at 3.) Indeed, General Star's position in this regard was supported both by the General Star policy, as well as by public policy of New Jersey. As to the General Star policy, it contains an exclusion for dishonest, fraudulent or criminal conduct. The General Star policy states:

Honorable Michael A. Shipp
February 21, 2012
Page 5

> "SECTION 2
>
> EXCLUSIONS
>
> The Company [General Star] is not obligated to defend or indemnify any <u>insured</u> and this policy does not apply to any claims for or arising out of:
>
> > (a) acts or omissions committed by an <u>insured</u> or any <u>person</u>, for whose acts or omissions an <u>insured</u> is legally responsible, which are judicially determined to be: (i) dishonest, fraudulent or criminal, or (ii) acts of willful misconduct committed with reckless disregard or with knowledge that such willful misconduct is a tort or is unlawful;
>
> > \* \* \*
>
> > (m) any willful or intentional failure on the part of the <u>Insured</u> to comply with escrow instructions;
>
> > (n) defects in title of which the <u>Named Insured</u> had knowledge at the date of issuance of such title insurance;"

(See Kott Affidavit, Ex. A: General Star Indemnity Company Business Errors Omissions Liability Policy.). The conduct alleged by plaintiff fits squarely within the above listed exclusions from coverage.

Moreover, General Star has taken the position that it had no obligation to indemnify Coastal for the Walsh claims by virtue of Coastal's alleged untruthful statements to General Star when Coastal applied for the policy. In its November 8, 1997 application for the General Star policy, Coastal denied having any knowledge or information of any alleged defects, omissions, offenses, or circumstances that could reasonably expect it to result in a claim being made against the applicant:

> 20. Does the applicant have any knowledge, information or is the applicant aware of any alleged errors, omissions, offenses, or circumstances which may reasonably be expected to result in a claim being made against the applicant, any proposed insured or any person or entity listed above?   ☐ YES   ☒ NO

(See Kott Affidavit, Ex. A: Coastal Application for General Star Policy.)

Honorable Michael A. Shipp
February 21, 2012
Page 6

In this case, the plaintiff alleges that Coastal's misconduct began in "early 1996" and continued into 1997. (*See, e.g.*, Fourth Amended Complaint at ¶ 36.) The General Star application for the policy was signed by Robert Agel on November 8, 1997. (*See* Kott Affidavit, Ex. A: Coastal Application for General Star Policy.) Thus, if plaintiff's claims against Coastal in the Fourth Amended Complaint are correct, Mr. Agel's statement in the application was untruthful. By virtue of Mr. Agel's failure to inform General Star in the application of the acts alleged by the plaintiff in this lawsuit, General Star would have no obligation to indemnify Coastal for the claims made by the plaintiff in the Fourth Amended Complaint, and again, plaintiff would have no claim to insurance proceeds. E.g., Gallagher v. New England Mutual Life Insurance Co., 19 N.J. 14, 20 (1955); Pioneer National Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338-39 (App. Div.), aff'd o.b., 78 N.J. 320 (1978).

Even if there were coverage for Coastal for the claims made by Walsh under the General Star policy -- an untenable finding on this record -- under New Jersey law, as a matter of public policy, General Star would be barred from indemnifying Coastal for the claims made by the plaintiff. "Public policy strongly condemns, and thus disallows, any insurance against a criminal act or omission." McNeillab, Inc. v. North River Ins. Co., 645 F. Supp. 525, 552 (D.N.J. 1986) (citing *Ruvolo v. American Cas. Co.*, 39 N.J. 490 (1963)); see also 6B Appleman Ins. Law. & Practice § 4252 (1979) ("[a]s a general rule, one cannot insure himself against the consequences of his willful acts, committed with the intent to commit injury"). Further, "[m]ost states also disallow insurance for intentional, reckless, and grossly negligent acts or omissions on similar public policy grounds . . . ." McNeillab, Inc., supra, 645 F. Supp. at 552 (citing Annot., Liability Insurance as Covering Accident, Damage, or Injury Due to Wanton or Willful Misconduct or Gross Negligence, 20 A.L.R. 3d 320 (1968 & 1985 Supp.); 6B Appleman Ins. Law. & Practice § 4252 at 4-7, § 4255 at 45-46 & n. 53 (1979 & 1986 Supp.); 11 Couch § 44:275 at 426-29 (1982 & 1985 Supp.).

Hence, allowing General Star to indemnify Coastal for the claims made by the plaintiff would allow Coastal -- contrary to longstanding, accepted public policy -- to be covered for the consequences of its own illegal acts. This is simply not permitted under New Jersey law. See, e.g., McNeillab, Inc., supra, 645 F. Supp. at 552.

II.     **The Claims Asserted by the Title Insurance Defendants Against Coastal Sound in Contract**

The title insurers filed cross-claims for contribution against Coastal. Plaintiff asserts that those cross-claims are only cross-claims for contribution in tort and, by virtue of rulings made earlier in the litigation by Judge Debevoise dismissing cross-claims for contribution that sounded in tort, the Title Insurance Defendants' cross-claims pending against Coastal at the time of settlement are also without merit. Plaintiff is simply incorrect.

The cross-claims filed by the title insurers against Coastal are not only for contribution in tort. Specifically, after plaintiff filed its Fourth Amended Complaint on July 10, 2009, Commonwealth filed its answer, which included a cross-claim for indemnification

ME1 13022046v.1

Honorable Michael A. Shipp
February 21, 2012
Page 7

against Coastal. (Commonwealth's Answer, Cross-Claim, and Defenses to the Fourth Amended Complaint and Third Party Complaint [Document 304] ("Commonwealth's Answer to the Fourth Amended Complaint").) Similar claims for indemnification were made by Fidelity. Fidelity's Answer, Cross-Claim, and Defenses to the Fourth Amended Complaint and Third Party Complaint [Document 308].

The cross-claims asserted by the title insurers for indemnification are based both on common law indemnification and on contractual indemnification. Indeed, Coastal materially breached the plain language of the Agency Agreements that it entered into with Commonwealth and Fidelity, entitling the title insurers to contractual indemnification.

On April 15, 1989, Coastal and Commonwealth entered into a contract whereby Commonwealth appointed Coastal as its agent for "Freehold and County of Monmouth[,]" New Jersey. (Kott Affidavit, Ex. B: Agency Agreement at 1.) As Commonwealth's Agent, Coastal was authorized

> [t]o originate applications for title insurance, to prepare abstracts, to examine titles to real estate, to prepare and issue commitments, binders and reports of title, and to issue policies of title insurance on properties located in the State of New Jersey, all in accordance with the rules, regulations and instructions of COMMONWEALTH and the applicable Insurance Department.

(Id.)

The April 15, 1989 Agreement ("Agency Agreement") provides that Coastal had certain obligations to Commonwealth in exchange for operating as Commonwealth's agent. The Agency Agreement provided:

> 2. AGENT COVENANTS AND AGREES WITH COMMONWEALTH AS FOLLOWS:
>
> (a) To observe strictly all general instructions, rules and regulations issued by COMMONWEALTH.
>
> (b) To exercise due diligence and reasonable care in the abstracting and examination of title to properties examined by AGENT and to make sure that all abstracts and examinations made by partners or associates of AGENT or other parties are also made with due diligence and in the exercise of reasonable care;

\*   \*   \*

Honorable Michael A. Shipp
February 21, 2012
Page 8

> (l) **AGENT agrees to be solely liable for all attorney's fees, court costs, expenses and loss or aggregate of losses resulting from (a) fraud, negligence\* or misconduct of AGENT, its officers or employees in the performance of its duties as AGENT of COMMONWEALTH**; (b) escrow and/or closing loss or losses wherein AGENT fails to disburse properly or close in accordance with escrow and/or closing instructions or where such escrow and/or closing funds are misappropriated by AGENT, its officers or employees[.] (emphasis added)[2]

(Id. at 2-3) Title agents contractually bind themselves to indemnify their title insurers for losses arising from, *inter alia*, their negligence. An errors and omissions policy provides a title agent protection against either direct negligence claims asserted by third parties or indirect negligence claims for which liability exists under the terms of the agency agreement. Clearly, liability under an agency agreement for negligent conduct on the part of a title agent is covered under an errors and omissions policy.

Provisions of general contract interpretation under New Jersey law are well settled. Determining "whether the terms of a contract are clear or ambiguous is a question of law." Consol. Brick & Bldg. Supplies, Inc., Docket No. 05-1490 (MLC), 2006 WL 2135805, at *4 (July 28, 2006) (citing Seidenberg v. Mut. Life Ins. Co., 949 F. Supp. 269, 274 (D.N.J. 1996), aff'd, 135 F.3d 76 (3d Cir. 1997)). As explained by a court within this District, "[w]hen interpreting the terms of [a contract], a Court must give the contract terms their 'plain and ordinary meaning.' If the terms of the agreement are clear, the Court must enforce the contract as written." Moran v. DaVita, Inc., Docket No. 06-cv-5620 (JAP), 2009 WL 792074, at *11 (D.N.J. Mar. 23, 2009) (citations omitted). As such, where an unambiguous contract exists, "[t]he court has no right 'to re-write the contract merely because one might conclude that it might well have been functionally desirable to draft it differently.' Nor may the courts remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other." Karl's Sales & Service, Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div.) (citations omitted), certif. denied, 127 N.J. 548 (1991).

The plain language of the Agency Agreement between Commonwealth and Coastal is entirely clear and susceptible to only one reading. See Moran, supra, No. 06-cv-5620, at *11. As it is unambiguous, it should be enforced as written. See ibid.; Karl's Sales & Service, Inc., supra, 249 N.J. Super. at 493. Section 2 of the Agency Agreement clearly sets out the duties owed to Commonwealth by Coastal, its agent, including strict observance of Commonwealth's rules and instructions along with performing those duties with due diligence and reasonable care. (See Kott Affidavit, Ex. B: Agency Agreement at 1.) Section 2(l) expressly provides that,

---

[2] The "*" following "negligence" references a note indicating, "Agent's liability for its negligence shall not exceed the amount covered by its E&O Policy of $250,000.00."

Honorable Michael A. Shipp
February 21, 2012
Page 9

> AGENT agrees to be solely liable for all attorney's fees, court costs, expenses and loss or aggregate of losses resulting from (a) fraud, negligence[] or misconduct of AGENT, its officers or employees in the performance of its duties as AGENT of COMMONWEALTH[.]

(See id. at 3.) Coastal therefore, by contract, has agreed to responsibility for "all attorney's fees, court costs, expenses and loss or aggregate of losses" for "fraud, negligence[] or misconduct of AGENT, its officers or employees in the performance of its duties as AGENT of COMMONWEALTH[.]" (See ibid.) The mortgage scheme that plaintiff alleges Coastal engaged in is without question, if true, "fraud, negligence[] or misconduct" which, if plaintiff prevails in this lawsuit, will cause Commonwealth to incur a loss (along with the other expenses relating with this defense to date). (See id. at 2 & at 3.)

Moreover, Coastal, at the time of the transactions in this case, was a policy issuing agent for Commonwealth, Fidelity and Nations pursuant to separate written agency agreements. Under the agency agreements, Coastal was permitted to issue closing service letters in transactions in which title insurance was being issued. In fact, on certain of the loans at issue in this case Coastal conceded in depositions that it used the incorrect form of closing service letter on Commonwealth's behalf.

Only one of the two versions of closing service letters included a paragraph (F), which limited Commonwealth's liability under the agreement. (See Kott Affidavit, Ex. E: Closing Service Letter to National Home Funding by Robert F. Agel of Coastal Title Agency, Inc. (July 30, 1996) ("July 30 Closing Service Letter"); Ex. F: Closing Service Letter to National Home Funding by Robert F. Agel of Coastal Title Agency, Inc. (March 27, 1997) ("March 27 Closing Service Letter").) Paragraph (F) provides,

> F.   Liability under this letter is limited to the amount of insurance committed for and is subject to all of the Conditions and Stipulations of the policy or policies committed by the Company. Any payment of loss under this letter shall constitute a payment under the policy.

(Kott Affidavit, Ex. F: March 27 Closing Service Letter.) The Rule 30(b)(6) representative of Coastal, Robert Agel, at his August 5, 2010 deposition, acknowledged that Coastal "could have" issued the wrong closing service letter "and it could have been by mistake." (See Kott Affidavit, Ex. G: Agel Dep. Tr. 259:16-260:3 (Aug. 5, 2010).) Commonwealth believes that plaintiff will assert that, because subsection (F) was absent from certain closing service letters, damages in those cases are larger. Thus, Coastal's issuance of the incorrect closing service letter form may ultimately increase Commonwealth's exposure, depending upon the rulings at trial.

In simpler terms, this is how the conduct of Coastal in issuing the incorrect form of the closing service letter increased the exposure of Commonwealth: Coastal used the "old," no longer effective closing service letter form; as a result of Coastal using the

Honorable Michael A. Shipp
February 21, 2012
Page 10

"old" no longer effective Commonwealth closing service letter form that lacked the limitations set out in Paragraph F of the then-current letter, plaintiff now seeks damages from Commonwealth well beyond the limits of the title policies, relying upon <u>Vision Mortgage.</u> Despite the fact that Coastal used the wrong form of the closing service letter, and the then-current closing service letter form precluded this type of damages, plaintiff asserts under agency principles (either express agency or apparent agency) that Commonwealth is nevertheless bound by the terms of the improper closing service letter issued by Coastal on behalf of Commonwealth.

But there is more. Robert Agel is the owner of Coastal. At his deposition, Mr. Agel was asked why Coastal issued the Commonwealth closing service letter that exposes Commonwealth to "<u>Vision Mortgage</u> damages." Mr. Agel conceded in his deposition that Coastal simply made a mistake and issued the wrong (and older) closing service letter form. (<u>See</u> Kott Affidavit, Ex. G: Agel Dep. Tr. 259:16-260:3.). This mistake would be negligent conduct for which liability exists under the agency agreement and for which coverage exists under the General Star policy.

Accordingly, Commonwealth's indemnification claim against Coastal arises from Coastal issuing a Commonwealth closing service letter on the incorrect form. Given the testimony of Mr. Agel at his deposition, there is little question that, if plaintiff obtains damages against Commonwealth beyond what plaintiff would be entitled to had the correct form of the closing service letter been used, Commonwealth is entitled to indemnification from Coastal pursuant to paragraph 2 of the April 15, 1989 contract between Commonwealth and Coastal. <u>See</u> <u>Enright v. Lubow</u>, 202 N.J. Super. 58, 85 (App. Div. 1985) <u>certif. denied</u>, 104 N.J. 376 (1986).

The Fidelity agency contract with Coastal also provides that Fidelity will be indemnified as a result of the wrongful conduct of Coastal. The Fidelity contract provides as follows:

> 6B. In the event that a Loss sustained or incurred for a matter arising under this Agreement resulted or arose from the negligent, willful or reckless conduct of Agent, Agent's employees or any independent contractor relied upon by Agent, then Agent shall reimburse Company for the Loss. The instances where Agent shall be liable to Company under this subparagraph shall include, without limitation, the following:
>
> > 1. Failure of Agent to comply with the terms and conditions of this Agreement or with the manuals, underwriting bulletins and/or instructions given to Agent by Company.
> >
> > 2. Issuance of Title Assurances which contain errors or omissions which could reasonably have

> been detected by Agent from the commitment, examiner's report, title search or abstract.
>
> 3. Loss arising from the escrow or Non-Title Assurance operations of Agent including, but not limited to, preparation of documents providing abstracting services, providing accommodation services and the handling and disbursement of funds.
>
> 4. Any loss arising out of the issuance of an insured closing service letter naming Agent.
>
> 5. Commission of fraud, conspiracy, dishonesty, misrepresentation or defalcation by Agent or Agent's aiding and abetting therein.
>
> 6. Any act, or failure to act, of Agent which results in Company sustaining Loss for bad faith, deceptive trade practices, unfair claim practices, consumer protection violations or punitive damages.

(See Kott Affidavit, Ex. C: Fidelity Agency Contract at 2.)

Similarly, the agency contract between Nations[3] and Coastal provides as follows:

> Paragraph 8d. is amended to reach in part:
>
> Agent shall indemnify Principal and save Principal harmless for all losses, including attorneys' fees, suffered by Principal to the extent to which such losses are fairly attributable to any dishonest, fraudulent, malicious, criminal or grossly negligent act or omission of Agent in connection with the issuance of a title binder, Commitment to Insure Title, Title Insurance Policy or Abstract of Title on behalf of principal or any failure of Agent to comply with the terms of this contract. In the event . . . .

(See Kott Affidavit, Ex. D: Nations Agency Contract at Rider, Bates Number FY-01305.)

Accordingly, the claims asserted by the Title Insurance Defendants against Coastal arise out of the agency contracts with Coastal. While Judge Debevoise had previously held that the Title Insurance Defendants could not assert claims against co-defendants

---

[3] Defendant Nations Title Insurance of New York, Inc. ("Nations") was formerly known as TRW.

Honorable Michael A. Shipp
February 21, 2012
Page 12

in tort, that conclusion was based on the reasoning that, since the title insurance defendants were sued by the plaintiff in contract, cross-claims by the three Title Insurance Defendants against other defendants could not sound in tort. However, the claims of the Title Insurance Defendants against Coastal are not based in tort but rather are based in contract, namely Coastal's agency contracts with the three Title Insurance Defendants. Given that plaintiff's claims against the Title Insurance Defendants sound in contract, surely the Title Insurance Defendants have valid contract claims against Coastal arising from the breach of the agency agreements.

### III. There is a Fact Dispute that Requires Denial of Plaintiff's Motion: The Plaintiff Has Not Proven Liability Against Coastal

In plaintiff's motion, the plaintiff asserts – without any citation to the record – that it was damaged by the intentional, wrongful conduct of Coastal Title. However, that has not been proven -- and Coastal throughout the litigation denied that it engaged in RICO/intentional conduct. (See Commonwealth's Responsive Statement of Material Facts Pursuant to Local Civil Rule 56.1 at ¶¶ 135-138 (Dec. 23, 2011) [Document 492-2].) In effect, plaintiff's motion seeks summary judgment that Coastal engaged in wrongful conduct resulting in damages to the plaintiff in an effort to get at the insurance proceeds without having to prove wrongful conduct. Given Coastal's statements under oath in discovery that it had not engaged in any intentional wrongful conduct, there is surely a factual dispute that precludes the Court making such a finding at this stage; it appears that a trial would be needed to determine whether, in fact, plaintiff's allegations against Coastal were true or whether Coastal's denial of those allegations was true.

Moreover, extensive evidence has been developed in discovery that the owners of Plaintiff Walsh Securities (Robert and James Walsh and their sister Betty Ann DeMola) were involved in the frauds and/or were aware of the frauds. (See id. at ¶¶ 18-210.) A jury must determine Plaintiff's involvement in the fraud before the Court can hold on this motion that the Plaintiff can prove liability against Coastal, because Plaintiff's involvement would preclude any recovery. (See Commonwealth's Br. In Opp. To Pl.'s Mot. for Partial Summ. J. (Dec. 23, 2011) [Document 492-1].)

### IV. The Title Insurance Defendants Have Been Damaged

On the other hand, the Title Insurance Defendants have already incurred damages by virtue of Coastal's breach of its agency contracts with them. Specifically, the Title Insurance Defendants have expended significant legal fees and expenses in defending the action, which fees greatly exceed the amount of the settlement proceeds. Under the agency contracts that Coastal had with the title insurers, Coastal has a duty to indemnify the title insurers the fees and expenses incurred by them. See Section II, supra. Moreover, it is well-settled under New Jersey law that where a party (here, Coastal) owes indemnity to a different party (here, the title insurers), the indemnitee is entitled not only to the cost of any judgment but also to the cost of defense. E.g., Central Motor v. E.I. DuPont de Nemours, 251 N.J. Super. 5, 9 (App. Div. 1991).

ME1 13022046v.1

Honorable Michael A. Shipp
February 21, 2012
Page 13

* * *

Finally, plaintiff makes two additional arguments in support of its position. It argues that based upon the "balancing" of the equities, the settlement proceeds of the Coastal settlement should be paid to plaintiff. However, plaintiff does not cite to any legal authority that the determination of which parties are entitled to the settlement proceeds turns on the "balancing" of the equities; indeed, based upon the legal arguments above, it appears that the plaintiff has no legal right at all to the settlement proceeds in question. To that extent, any 'balancing" of the equities requires that the settlement proceeds be paid to the Title Insurance Defendants, who have a legal right to those settlement proceeds and which have incurred substantial losses (in terms of counsel fees and expenses) by virtue of Coastal's breach of contract to the title insurers.

Second, plaintiff's proposed solution that the Title Insurance Defendants receive an offset for that portion of damages for which they are deemed by the fact-finder to be jointly and severally liable for Coastal's conduct in this matter is no solution at all. Plaintiff's claims against the Title Insurance Defendants sound solely in contract. See Walsh Securities, Inc. v. Cristo Property Mgmt., Ltd., No. 97-cv-3496 (D.N.J. Dec. 16, 2009) (slip op. at 8-13) (dismissing the Title Insurance Defendants' third-party complaint for contribution after finding that the claims against the title insurers were "essentially contractual in nature" and therefore cannot form the basis for the tort-based claim of contribution); Walsh Securities, Inc. v. Cristo Property Mgmt., Ltd., No. 97-cv-3496 (D.N.J. Mar. 28, 2007) (dismissing the Title Insurance Defendants' tort-based third-party claims against Coastal Title Agency, Inc., whom they alleged violated its agency agreement, due to WSI's claims against the Title Insurance Defendants sounding only in contract). Plaintiff's counsel has even acknowledged this fact in the brief submitted in support of the motion to dismiss third-party claims against Robert Walsh. (See, e.g., Br. in Supp. of Robert Walsh's Mot. to Dismiss Third-Party Compl. 7 [document 327-1] ("Nowhere in Walsh Securities' Fourth Amended Complaint has it alleged that Commonwealth or Fidelity/Nations engaged in a tort.").)

Plaintiff did not name any of the Title Insurance Defendants as RICO defendants in any of its complaints. See, e.g., Fourth Amended Complaint [Document 302]. Thus, plaintiff has not alleged that any of the Title Insurance Defendants either engaged in the fraud or that the fraud can be imputed to the Title Insurance Defendants through actions of others. See ibid. Hence, the Title Insurance Defendants, which are sued only in contract and not in tort, cannot be held jointly and severally liable with Coastal.

Furthermore, if the claims asserted by Walsh are successfully defeated at trial, there would be no liability against which to offset the settlement proceeds. Instead, plaintiff will have received the insurance proceeds, which it will likely use to fund the balance of this litigation, when a determination will have been made that plaintiff had no right to recover. Yet the title insurers, who will have successfully defeated plaintiff's claims, will have paid substantial attorney's fees and costs, which are the obligation of Coastal under the agency agreements, and for which there will be no recourse since the settlement proceeds will have been spent by plaintiff. The offset argument made by plaintiff simply makes no sense.

ME1 13022046v.1

Honorable Michael A. Shipp
February 21, 2012
Page 14

For the foregoing reasons, plaintiff's motion should be denied, or alternatively, the settlement proceeds should be paid to the title insurers.

Respectfully submitted,

David R. Kott

DRK:tas

cc: Robert A. Magnanini, Esq. (via ECF & email)
Amy Walker Wagner, Esq. (via email)
Daniel I. Mee, Esq. (via email)
Edward J. Hayes, Jr., Esq. (email and regular mail)
Sara Merin, Esq. (by email)