# *EXHIBIT G*

ROBERT AGEL

Page 141

```
 1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
 2                  Civil Action No.
                    97-cv-3496 (DRD) (MAS)
 3
   WALSH SECURITIES, INC.,    :
 4                            :
                  Plaintiff,  :
 5                            :    VOLUME II
         vs.                  :    DEPOSITION OF:
 6                            :    ROBERT AGEL
   CRISTO PROPERTY MANAGEMENT,
 7 LTD., a/k/a G.J.L. LIMITED;
   OAKWOOD PROPERTIES, INC.;
 8 NATIONAL HOME FUNDING, INC.;
   CAPITAL ASSETS PROPERTY
 9 MANAGEMENT & INVESTMENT CO.,
   INC.; CAPITAL ASSETS PROPERTY
10 MANAGEMENT, L.L.C.; WILLIAM
   KANE; GARY GRIESER; ROBERT
11 SKOWRENSKI, II; RICHARD CALANNI;
   RICHARD DiBENEDETTO; JAMES R.
12 BROWN; THOMAS BRODO; ROLAND
   PIERSON; STANLEY YACKER, ESQ.;
13 MICHAEL ALFIERI, ESQ.; RICHARD
   PEPSNY, ESQ.; ANTHONY M.
14 CICALESE, ESQ.; LAWRENCE CUZZI;
   ANTHONY D'APOLITO; DAP CONSULTING,
15 INC.; COMMONWEALTH LAND TITLE
   INSURANCE CO.; NATIONS TITLE
16 INSURANCE OF NEW YORK, INC.;
   FIDELITY NATIONAL TITLE
17 INSURANCE CO. OF NEW YORK;
   COASTAL TITLE AGENCY; DONNA
18 PEPSNY; WEICHERT REALTORS; and
   VECCHIO REALTY, INC., D/B/A
19 MURPHY REALTY BETTER HOMES
   And GARDENS                :
20                            :
                  Defendants. :
21                            :
    - - - - - - - - - - - -
22
23
24
25
```

ROBERT AGEL

**Page 142**

1   TRANSCRIPT of the stenographic notes of
2 the proceedings in the above-entitled matter, as
3 taken by and before JANET BAILYN, a Certified
4 Shorthand Reporter and Notary Public of the State of
5 New Jersey, held at the office of MANNING, CALIENDO &
6 THOMSON, 36 West Main Street, Freehold, New Jersey,
7 on August 5, 2010, commencing at 10:25 in the
8 forenoon.

**Page 143**

1 APPEARANCES:

STONE & MAGNANINI, LLP
BY: ROBERT MAGNANINI, ESQ.
    AMY WALKER WAGNER, ESQ.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
Attorneys for Plaintiff

McCARTER & ENGLISH, LLP
BY: DAVID R. KOTT, ESQ.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056
Attorneys for Defendant
Commonwealth Land Title Insurance Co.

METHFESSEL & WERBEL
BY: MARTIN R. McGOWAN, ESQ.
3 Ethel Road Box 3012
Edison, New Jersey 08818
Attorneys for Defendant
Coastal Title Agency
FOX ROTHSCHILD, LLP
BY: IRINA B. ELGART, ESQ.
P.O. Box 5231
Princeton, New Jersey 08543-5231
997 Lenox Drive
Lawrenceville, New Jersey 08648-2311
Attorneys for Defendants, Nations Title
Insurance of New York, Inc. and Fidelity
National Title Insurance Company
Of New York

**Page 144**

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROBERT AGEL | | | | |
| BY MR. MAGNANINI | 145 | | 264 | |
| BY MR. KOTT | | 252 | | 267 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Coastal-7 | Invoice dated 12/9/96 | 155 |
| Coastal-8 | Letter dated 1/14/97 | 156 |
| Coastal-9 | Letter dated 4/9/97 | 156 |
| Coastal-10 | Letter dated 1/28/97 | 156 |
| Coastal-11 | Copy of Check | 156 |
| Coastal-12 | Deed | 156 |
| Coastal-13 | Letter dated 7/15/97 | 156 |
| Coastal-14 | Letter dated 5/29/97 | 157 |
| Coastal-15 | Copy of Check dated 4/19/97 | 185 |

**Page 145**

1 ROBERT AGEL, having been duly sworn by the
2 Notary, testified as follows:
3 DIRECT EXAMINATION BY MR. MAGNANINI:
4   Q.   Good morning, Mr. Agel. How are you?
5   A.   Fine thanks. How are you?
6   Q.   Good. First question: Did you get a
7 chance to review your transcript?
8   A.   No.
9   Q.   Normally you ask the question in case
10 there's something you want to change. Do you have
11 anything you recall you answered that you want to
12 change an answer to or add something?
13   A.   No.
14   Q.   Then we can just proceed. I have a
15 couple of follow-up questions so we will be less
16 coherent than usual jumping ahead.
17       MR. McGOWAN: I talked with personal
18 counsel late yesterday afternoon and indicated to him
19 that at least the beginning portion of this
20 deposition will be a continuation of the corporate
21 dep and that there may or may not come a point where
22 we're ready to go into the other. Because of some
23 miscommunication, I don't know, I thought he was
24 going to be available this afternoon if we got to
25 this point, he is not, but he's authorized me to

2 (Pages 142 - 145)

ROBERT AGEL

**Page 254**

1 ironically I happen to know this fellow that was the
2 seller and he had been arrested and put his
3 property -- it was a general recognizance so it's a
4 lien against all of your real estate. He -- we
5 needed that property released from the recognizance
6 in order to insure it. There were other judgments
7 against him, money suits where he had been sued and
8 we needed the property released from that judgment or
9 it would need to be paid off and discharged. Those
10 type of things.
11    Q.    Is this a situation where the closing
12 has occurred and there's some lien on the property
13 that has not been taken care of at the closing?
14    A.    The situation we're in right now?
15    Q.    No, no, what you just referred to.
16    A.    No. These are situations where they
17 probably -- not probably. Where they did clear them,
18 they did pay things off. They just didn't get us the
19 documentation.
20    Q.    Does that include some of the liens
21 we're talking about in this case?
22    A.    Yes, it should be, yes.
23    Q.    Now, the other thing, you had mentioned
24 about Banker's Trust and Cityscape. Can you tell us
25 in lay terms what you were talking about?

**Page 255**

1    A.    Yeah, in those cases they were --
2 Cityscape and Banker's Trust were -- I assumed that
3 they were lenders that bought these loans from Walsh
4 Securities.
5    Q.    And I will represent to you that there's
6 been some discovery in this case indicating that
7 those lenders did purchase some of these loans from
8 Walsh.
9    A.    Right.
10       MR. MAGNANINI: Let me just clarify the
11 record. Cityscape was a whole loan purchased. They
12 purchased loans. Banker's Trust was a trustee for
13 loans that Walsh Securities securitized. So Walsh
14 issued I think about a billion five in five different
15 securities so they were a trustee and a purchaser.
16    Q.    So go ahead.
17    A.    So what would happen in those cases, and
18 in particular probably this one right here, Bustos on
19 138 Ridge, the deed and the mortgage into Bustos --
20 the Bustos deed and then the Bustos mortgage were not
21 recorded. When the loans defaulted the lender
22 started foreclosure, discovered that the deed and
23 mortgage were not recovered and their lien had not
24 been properly perfected. So they made a motion to
25 the court to have a lien -- their lien imposed as a

**Page 256**

1 first lien on the property so that they could
2 continue on and foreclose the property, get it back
3 ultimately on the market.
4    Q.    Did that happen with a number of the
5 loans we're talking about in this case as far as you
6 know?
7    A.    Yes. It happened with quite a few. I
8 don't know how many. Just from one -- loans or
9 properties that I insured when they sold after this
10 happened.
11    Q.    Now, you might not know the answer to
12 this question but let me ask it: Cityscape and
13 Banker's Trust in those situations I assume would
14 have had a lawyer representing them in the mortgage
15 foreclosure. Is that correct?
16    A.    Correct.
17    Q.    Do you know who hired that lawyer? And
18 what I mean by that is: Do you know whether either
19 Commonwealth or Fidelity or Nations hired a lawyer
20 for Banker's Trust or for Cityscape or whether they
21 hired their own lawyers and did it?
22    A.    I don't know.
23    Q.    Okay. Mechanically the closing -- do
24 you call it closing protection letter or closing
25 service letter?

**Page 257**

1    A.    Closing service letter.
2    Q.    Now, I'm going to take you back and
3 switch the time period. I'm going to take you back
4 to the time of these loans when your company was
5 dealing with it. What was it called then in your
6 lingo?
7    A.    Well, we would call it an AA letter, an
8 approved attorney letter. That was just our lingo
9 though. It became closing service letter sometime in
10 the late -- in the late '90s. Sometime around this
11 time.
12    Q.    So closing service letter?
13    A.    Yes.
14    Q.    Okay. Mechanically in your office with
15 respect to these loans, physically how did you get
16 the closing service letters? And what I'm asking is:
17 Did you print them off a computer? Did you print
18 them yourself? Were they sent to you by the title
19 insurance company?
20    A.    In the beginning they would come from
21 the title company. We would get a batch of them.
22 They were pre-numbered and we would -- the
23 old-fashioned way have to type the name of the
24 attorney and then all the pertinent information.
25 That didn't last very long. They took the control

30 (Pages 254 - 257)

ROBERT AGEL

Page 258

1 numbers away probably in less than a year, and they
2 were installed on our computer systems.
3    Q.   Is that the case when we're talking
4 about the time period here?
5    A.   Yes.
6    Q.   And how would they get installed in your
7 computer system? Let me tell you what I'm driving at
8 just so you know. In some of the loans that -- in
9 some of the Commonwealth loans that Coastal was the
10 agent in this time period there are different
11 approved attorney forms. Some have one additional
12 paragraph and others don't, and I'm trying to figure
13 out how that would have occurred. All out of your
14 agency.
15    A.   Probably we were exhausting a supply
16 that we already had. Or I would have to see them to
17 tell you whether they were preprinted or they were
18 installed in the computer. But if they were
19 installed in the computer, those would have been
20 forms that we got directly from either Commonwealth
21 or Fidelity.
22    Q.   But can you help us -- assume as true
23 just for my question, just assume it is true that in
24 this time period there are different forms for the
25 Commonwealth letters.

Page 259

1    A.   Right.
2    Q.   And I was trying to figure out how that
3 would happen.
4        MR. MAGNANINI: David, are you saying
5 different forms within Commonwealths forms, within
6 Commonwealth letters themselves?
7    Q.   If we look at the Commonwealth in this
8 case -- and by Commonwealth, the ones you would have
9 issued letters under Commonwealth's name.
10    A.   Right.
11    Q.   There's different forms, and one of the
12 differences is one of the forms has an extra
13 paragraph that the others did not and that's -- I was
14 trying to see if you could help me with how that
15 could occur.
16    A.   It could have happened. I need to see
17 those letters in order to give you a good answer, but
18 my guess is that the ones that had the extra
19 paragraph or didn't, whichever, one of them -- one
20 was a form that was a preprinted form that we would
21 have to fill in information on it in the typewriter.
22 The other one was in the computer. So when -- we
23 would exhaust all of our forms, the preprinted forms
24 that they gave us.
25    Q.   Even if they had issued a new form;

Page 260

1 would you still use the old form?
2    A.   We could have and it could have been by
3 mistake, that's possible.
4    Q.   Let me call your attention to exhibit
5 Commonwealth 6(A) from the March -- sorry, May 27,
6 2010 deposition of a representative of Commonwealth
7 who was Donna Sullivan and it's Bates stamped WSWT
8 000505. It's a two-page document.
9        Can you tell whether that one was off
10 the computer or whether that was one of the --
11    A.   This is off the computer definitely.
12    Q.   And how would they get on your computer?
13 That is, how would this form get on your computer?
14 That is, did it go directly from a Commonwealth
15 computer to you or how did that work?
16    A.   No. It would have been coming in
17 through our software -- we all use approved software
18 providers for the title industry and it would have
19 come from that provider. They all have agreements
20 with the underwriters as to the use and installation
21 of their forms.
22    Q.   Again, even though I represent
23 Commonwealth this is not something I know. Does
24 Commonwealth hire somebody to give you software?
25    A.   No.

Page 261

1    Q.   How does that work?
2    A.   What they do is they have -- I guess
3 they would have -- my provider right now I'll use an
4 example. Title Support Software, TSS. They have I
5 guess licensing agreements with Commonwealth and all
6 the other companies to sell their -- not sell but to
7 install their forms. They have written a package, a
8 software package specific to title insurance. They
9 need those forms from the various underwriters in
10 order to install.
11        So what they do between Commonwealth and
12 TSS I don't know. All I know is that TSS and every
13 other provider I have had since we had computers
14 would come and install that package which includes
15 the closing service letter.
16    Q.   Was TSS your service provider back at
17 the time --
18    A.   No.
19    Q.   -- you were involved with these loans?
20    A.   No.
21    Q.   Did you have a service provider at the
22 time you had these loans?
23    A.   Yes.
24    Q.   Did it operate essentially the way you
25 just described TSS's operation with you?

31 (Pages 258 - 261)

ROBERT AGEL

Page 262

1    A.    Yes.
2    Q.    And do you know the mechanics of how TSS
3  would get the Commonwealth documents?
4    A.    No.
5    Q.    I have one more subject for you, and
6  again I'm going to paraphrase just to get you back
7  there. You said -- and this is my use of the term.
8  You said if there was a break in the title you would
9  not insure the title. And I realize "break in the
10  title" may not be the right word but you know what
11  I'm referring to?
12    A.    Yes.
13    Q.    Could you explain that to us in lay
14  terms?
15    A.    That would be where there would be the
16  case here where the deed into G.J.L., the seller, was
17  not recorded, something like that. Just using it in
18  these terms, it's dealing where they ended up
19  closing -- selling properties before they bought
20  them. That would be -- it was a good term, a break
21  in the chain of title.
22    Q.    And in that situation, if I understand
23  your testimony, you would have been paid but you
24  would have transmitted that to the underwriter
25  anyway?

Page 263

1    A.    Yes.
2    Q.    And the reason you would have
3  transmitted it to the underwriter anyway was the
4  assumption based on your many years in the industry
5  that that problem would be cured and then ultimately
6  a policy would be issued?
7    A.    Yes. It would either be cured or I
8  would put it in as an exception.
9    Q.    Right. And to the extent they were not
10  cured in this case, was that because this fraud
11  became public and everything blew up?
12    A.    Correct.
13    Q.    When you say you would have put it in
14  with an exception, what do you mean by that?
15    A.    In this case -- in G.J.L. we would have
16  put into the owner's policy, possibly the loan
17  policy, I don't know if we would have put it in the
18  loan because of the closing service letter, but we
19  would have put: Subject to the outstanding interest
20  of G.J.L. Limited and said that because of a lack of
21  a deed from G.J.L. into Bustos.
22    Q.    And if -- withdrawn. When you sent that
23  to your client -- here would your client be the
24  lawyer?
25    A.    Yes.

Page 264

1    Q.    When you sent the policy to the lawyer,
2  would the lawyer be able to take action that would
3  end up with that exception being removed?
4    A.    Yes.
5    Q.    How would the lawyer do that?
6    A.    You would record the deed in this case.
7  That would be the proper -- record the deed and then
8  possibly get a corrective deed from G.J.L. into
9  Bustos and then record or rerecord the deed and
10  rerecord the mortgage so that there would be proper
11  sequence.
12    Q.    Full circle from where I started. After
13  these frauds became public when you talked about
14  Cityscape and you talked about Banker's Trust, do you
15  know whether some unrecorded earlier deeds were
16  recorded during the foreclosure process? That is,
17  somebody chased them down and got them recorded?
18    A.    I do believe so, yes.
19    Q.    To solve that problem. Right?
20    A.    Yes.
21    Q.    Thank you. I don't have any further
22  questions.
23        MS. ELGART: I have no questions.
24  REDIRECT EXAMINATION BY MR. MAGNANINI:
25    Q.    Just to follow up then. What happened

Page 265

1  when the form of the closing service letter changed,
2  the title company changed the form? The title
3  companies would provide it to your software provider?
4    A.    Yes.
5    Q.    And then were you instructed -- was
6  Coastal Title instructed to destroy old versions,
7  delete old versions?
8    A.    Yeah. You would either -- we are
9  getting again above my pay grade but it's -- we would
10  get a disk or a -- today we download them over the
11  Internet, which is still something I don't know
12  about, but we would then put the disk in and it would
13  do whatever it did. It would modify the forms or it
14  would delete, whatever it did, I don't know exactly
15  what it did.
16    Q.    The reason I was following up, Mr. Agel,
17  is you said you thought you could have issued some
18  closing service letters in a different format by
19  mistake.
20    A.    Yes.
21    Q.    And I would have thought that if the
22  title company had given you new ones you would have
23  just discarded the old ones and gone from there.
24    A.    No. They made sure -- especially if you
25  take a look at this one it has an audit number on it.

32 (Pages 262 - 265)

ROBERT AGEL

Page 266

1   Q.   6(A)?
2   A.   Yes.
3   Q.   Where is the audit number?
4   A.   Top right. We had to account for this.
5   Q.   And is this one of the examples that --
6   with the audit number that came preprinted?
7   A.   No, this is not preprinted.
8   Q.   So your computer would generate a
9   different audit number for each CSL?
10   A.   Yes.
11   Q.   And that way the tight company knew what
12   letters --
13   A.   That's right.
14   Q.   Okay. And one last question as a follow
15   up to what Mr. Kott said. I think you had said you
16   would -- you started answering his second to last
17   question that said: We would not include it in the
18   loan because of the CSL?
19   A.   I think I said we may not.
20   Q.   What did you mean by that in lay
21   people's terms?
22   A.   If it was an exception that was related
23   to the attorney's work but the attorney did something
24   wrong, in this case record the deed, we may not be --
25   I would try to put it in the mortgage policy. I

Page 267

1   would put it in and if asked to omit it, we would
2   have to get clearance -- I would have to get
3   clearance from the underwriter.
4   Q.   Because it concerned a mistake by the
5   closing attorney?
6   A.   Yes.
7   Q.   Okay. I think that's all I have.
8   RECROSS EXAMINATION BY MR. KOTT:
9   Q.   Are you an attorney?
10   A.   No.
11   Q.   Are you familiar with all of the New
12   Jersey cases that interpret closing service letters?
13   A.   No.
14   Q.   So when you say -- when you said, and I
15   am going to paraphrase, if it was a mistake of an
16   attorney then it would be under the closing service
17   letter, do you know whether all mistakes of attorneys
18   are covered by the closing service letter or just
19   certain types of mistakes?
20   A.   I don't know.
21   Q.   As to what the closing service letter
22   actually covers, that you would leave to judges and
23   lawyers?
24   A.   Yes.
25   Q.   Thank you. I have no further questions.

Page 268

1   (The deposition is concluded at 3:42
2   p.m.)
3
4
5   _____
6   ROBERT AGEL
7   Subscribed and sworn to before me
8   this _____ day of _____, 2010.
9   _____
10   Notrary Public

Page 269

1   CERTIFICATE.
2
3   I, JANET BAILYN, a Notary Public and
4   Certified Court Reporter of the State of New Jersey,
5   do hereby certify that prior to the commencement of
6   the examination ROBERT AGEL was duly sworn by me to
7   testify the truth, the whole truth and nothing but
8   the truth.
9   I DO FURTHER CERTIFY that the foregoing
10   is a true and accurate transcript of the testimony as
11   taken stenographically by and before me at the time,
12   place and on the date hereinbefore set forth.
13   I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of any
15   of the parties to this action, and that I am neither
16   a relative nor employee of such attorney or counsel,
17   and that I am not financially interested in the
18   action.
19
20   _____
   Notary Public of the State of New Jersey
21   My commission expires February 3, 2013
   License No. XI00970
22
   Date: August 9, 2010
23
24
25

33 (Pages 266 - 269)