```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
 2                      CIVIL ACTION 97-cv-3496-DRD

 3     WALSH SECURITIES,              : TRANSCRIPT OF PROCEEDINGS
                                      :
 4                  Plaintiff,        :     M O T I O N
                                      :
 5            -vs-                     :     Pages 1 - 86
                                      :
 6     CRISTO PROPERTY,               :
                                      :
 7                  Defendant.        :
       - - - - - - - - - - - - - - -

 8
                                          Newark, New Jersey
 9                                        January 17, 2012

10     B E F O R E:   HONORABLE DICKINSON R. DEBEVOISE,
                      SENIOR UNITED STATES DISTRICT JUDGE
11

12     A P P E A R A N E S S:

13            ROBERT A. MOGNANINI, ESQ.
              AMY WALLER WAGNER, ESQ.
14            DANIEL I. MEE, ESQ.
              JEFFREY SHOOM, ESQ.
15            Attorneys for the Plaintiff

16            EDWARD J. HAYES, ESQ.
              DAVID R. KOTT, ESQ.
17            SARA F. MERIN, ESQ.
              Attorneys for the Defendant

18

19

20     _____
       Pursuant to Section 753 Title 28 United States Code, the
21     following transcript is certified to be an accurate record as
       taken stenographically in the above entitled proceedings.
22

23                       M/Mollie Ann Giordano
                         MOLLIE ANN GIORDANO
24                       Official Court Reporter
                         (973) 220-9465
25
```

1          THE COURT:  The question will be, how are we going to

2     allocate our limited time?

3          MR. MAGNANINI:  Bob Magnanini for Walsh Securities.  I

4     thought I was going to handle our affirmative motion for

5     partial summary judgment, and then my associates Amy Wagner,

6     Jeff Shoom, and Dan Mee had each taken a lead to responding to

7     the defendants' three motions for summary judgment.  I was

8     going to let the defendants respond to me, and let them go

9     ahead and lay out their summary judgment motions, and each of

10    my associates could respond in kind, and I would have a short

11    reply at the end.

12         THE COURT:  I'm going to have to limit your time.

13         All right.  What do you think?  It's now about 11

14    o'clock.  Well, why don't we give you 45 minutes for the whole

15    motion for summary judgment, I gather, on both title policies

16    and the closing protection letters.  All right.  Well, go

17    ahead.  I was going to do it differently, but we'll do it your

18    way.  Everybody else can be seated.

19         MR. MAGNANINI:  Thank you, your Honor.  I should be

20    able to get through this a little quicker than 45 minutes.

21    We've inundated you with a lot of paper.

22         THE COURT:  Well, I've been wading through the mass of

23    material which keeps coming in, but gradually I think I'm

24    getting the gist of it all.  Yes, go ahead.

25         MR. MAGNANINI:  Robert Magnanini from the law firm of

1    Stone & Magnanini.  Your Honor, we apologize for the delivery

2    this morning of the courtesy copy to you.  By the time we

3    completed our papers on Friday night, we had missed the Fed Ex

4    deadlines.  If we put it in Fed Ex, you wouldn't have gotten it

5    until tomorrow, which is why we hand delivered it today.

6            First, I'd like to thank you, the Court, for getting

7    this motion to summary judgment.  As your Honor knows, this

8    case has been around for 15 years now, since 1997, through a

9    variety of mediation, settlement attempts, three different

10   judges, and now we're here.  What Walsh Securities tried to do

11   is cut through all of the chaff and get down to the center of

12   the case.  We believe that we were entitled to summary

13   judgment, not on all of the loans, but on 66 of the loans.  But

14   the reason Walsh was entitled to summary judgment, Walsh

15   Securities, as your Honor knows, was a mortgage lender in the

16   sub prime market.  It had loaned money on these various

17   properties, and it then turned around and sold the properties

18   to whole loan purchasers, such as The Money Store or Cityscape,

19   and there are a variety of other whole loan purchasers as well.

20   And it also took its loans and bundled them into securities.

21   They were unwritten by Donaldson London, who doesn't exist

22   anymore.  Goldman Sachs, Solomon Smith Barney, and a variety of

23   entities came into Walsh Securities and reviewed the loan

24   packages that it had.  And if they made the cut, those loans

25   were included in the securities.

 1              Now, both the securities and sales to the whole loan

 2    buyers, Walsh had to issue what they call reps and warrant,

 3    representations and warrantees that the mortgage was a valid

 4    instrument, and that it would perform.  And basically what

 5    Walsh attested to was that if the mortgage was a product of

 6    fraud, if any of the things that Walsh had bargained for wasn't

 7    true, i.e., that Walsh got a bona fide purchaser of value, as

 8    the mortgagee, that Walsh had an ability to foreclose or pursue

 9    any deficiency from the mortgagor or Walsh had a first lien

10    position.  If any of those three things weren't true, Walsh was

11    obligated to repurchase loans from the whole money buyers, The

12    Money Store or Cityscape, or it was obligated to repurchase the

13    loans out of five different securities that issued in 1996 or

14    1997.  As a result of the fraud that's laid out in the papers,

15    of course, and one of them, the major things in the fraud was

16    not only did Walsh get a strawbuyer, somebody who had no

17    interest in making mortgage payments and no ability to make a

18    mortgage payments, but Walsh got a defective mortgage because

19    at the closing, the straw buyers or someone, since a lot of

20    these papers were not even signed by the straw buyers, executed

21    what they call the joint venture deed.

22              THE COURT:  Sixty percent.

23              MR. MAGNANINI:  Right, 60 percent.  That's an act of

24    default under the terms of the mortgage.  So Walsh, unbeknownst

25    to it, was being defrauded when it sold one of these fraud

 1    loans and/or included one in the security, the mortgage was

 2    already in default.  The title was unmarketable.  And those

 3    entities, the whole line buyers or the securities, had the

 4    right to demand that under the reps and warrants, Walsh

 5    repurchas the loan.  So this universe that we've offered up to

 6    the Court of 66 loans includes those that were sold to an

 7    entity called The Money Store.  Reagon Sarison represented The

 8    Money Store and told Walsh it needsed to repurchase 28 loans, I

 9    believe it was, for 2.4 million dollars.  Walsh Securities

10    repurchased those loans and held onto those.

11              Another section of whole loans were sold to an entity

12    called Cityscape.  Cityscape, in 1998 or 1999, was going

13    bankrupt and they sued Walsh, and Walsh demanded that they

14    purchase all the loans sold to Cityscape, whether they were the

15    product of this fraud or not.

16              Judge Stein in the Southern District ruled that Walsh

17    had to repurchase 32 of the loans from Cityscape because those

18    32 loans were the product of this fraud.  Walsh, by the time

19    that judgment came down, did not have the cash to repurchase

20    the loans.  Cityscape obtained a judgment.  Walsh then ended up

21    satisfying the judgment and thereby repurchased the 32 loans

22    from Cityscape.

23              The other amount of loans that Walsh had to repurchase

24    were with the securities that are in issue.  These loans were

25    repurchased and given to Walsh.  So the 66 loans that we were

 1    moving on were all loans that had been repurchased by Walsh

 2    Securities.  All of them, your Honor, except I believe one, and

 3    I'm not even sure that this is part of the pool, were then lost

 4    at title sales or foreclosed upon by other parties and

 5    therefore Walsh got no recovery from the mortgagor, no recovery

 6    from a foreclosure, and no ability to pursue the mortgagor -- I

 7    keep saying the mortgagor, in their deficiency action.  So what

 8    we ended up with was, because of the fraud, and because of the

 9    subsequent actions of the title company, Walsh Securities was

10    bankrupted and is in the position it's in today.  And we

11    pursued this case basically because when I worked at Latham &

12    Watkins in 1997 and we did an investigation, we believe that

13    certain members of Walsh Securities were involved in the fraud,

14    that is Kelly O'Neill and Anthony D'Apolito.  They were

15    terminated for the participation in the fraud.

16            THE COURT:  Considerable evidence has been presented

17    that Robert and James Walsh were also at least knowledgeable of

18    what was going on.

19            MR. MAGNANINI:  And it's in something I'm going to

20    address, your Honor.  What I'd like to do is lay down -- and

21    I'll tell you the reason I was getting to this.  The reason we

22    pursued this case for so long is that there were two comments

23    made, not on the record, just off the record, by Mr. Kott and

24    Mr. Hayes, that it just stayed around with me.  One was in

25    2005, Judge Bassler, after hearing motion argument, asked Mr.

 1    Kott:  Why haven't the title companies paid?  And Mr. Kott

 2    said:  We think we have some valid defenses.  And Judge Bassler

 3    said:  I'm sure you have case law to back that up.  And they

 4    said:  No, your Honor, we think we can develop something.  And

 5    they said:  We ought to have settlement conferences.  The title

 6    companies are obligated to pay.  We ended up in a mediation

 7    that didn't resolve the matter.

 8              And the second comment, your Honor, that Mr. Hayes

 9    made to Mr. Rappaport during Mr. DeBenedetto's deposition, Mr.

10    DeBenedetto rambled on and on and on.  While there was

11    extensive paper given to Mr. DeBenedetto's statement about

12    Robert Walsh and James Walsh's involvement about the fraud,

13    they never mentioned his long-standing running psychological

14    illness, his continued problems and incarceration or

15    commitments for being mentally unstable.  And during that

16    deposition, in the men's room, Mr. Hayes came in, just

17    completely after, off the record, and said to Mr. Rappaport:

18    This is the craziest stuff I've ever heard.  For 40 years I've

19    done this.  I've never heard anything as crazy as what Mr.

20    DeBenedetto has just said.  The basis for smearing Mr. Walsh,

21    Mr. Robert, is Mr. DeBenedetto's testimony.

22              And like I said, when we were going through this, we

23    looked at the statements that the defendant raised saying that

24    Walsh Securities either participated in or knew about the

25    fraud.  And what we had said is:  A, we don't think the

 1      statements should be given any credence; and B, based on the
 2      law in New Jersey as it's existed for the last 14 or 19 years,
 3      the central part of this fraud was these properties could have
 4      been purchased by Cristo.  They could have been appraised by,
 5      if they had been repaired and fixed up, straw buyers could have
 6      been brought in to get their credit history.  But the two key
 7      players that made this fraud possible was Coastal Title Agency,
 8      the titles company's agent, because without Coastal, they never
 9      would have issued -- they're never would have been a closing
10      protection letter issued to Walsh Securities.  Without that
11      CPL, Walsh Securities would never have wired its funds to an
12      approved agent to the title companies that it didn't know or
13      chose.  The two approved agents in this case, your Honor,
14      Stanley Yacker, Anthony Cicalese, both of them have said they
15      knew there was a fraud, and I'll go through it, based on the
16      fact that the fraud title companies therefore harmed Walsh
17      Securities.  Under the law, title insurance in New Jersey, we
18      believe we're entitled to partial summary judgment on these
19      properties that Walsh repurchased.
20              And then, your Honor, when we were going through the
21      defendants' papers, it seems that some of their arguments are
22      rehased by those raised and considered in Sears Mortgage and
23      Client Protection Fund, or by the New Jersey appellate court in
24      Vision Mortgage.  Other ones seemed to be cobbled together or
25      don't really address Walsh Securities at all.  When you step

1    back from them, were kind of like two ships in the night.

2            And one of the points I wanted to make clear to the

3    Court, when we did a thorough review of the opposition briefs

4    submitted by both sets of defendants and, your Honor, just so

5    the record is clear, Commonwealth Title is now owned by

6    Fidelity Nations.  And during the on-going fraud, there were

7    three title companies involved, Nations and Fidelity, which

8    then merged back, I believe, in 1998.  And then Commonwealth,

9    Commonwealth has since been acquired -- all three title

10   insurance companies are under the same umbrella now.

11           We got two opposition briefs, and Nations and Fidelity

12   took some arguments --

13           THE COURT:  I don't know if you're lumping the title

14   companies' briefs together.  You're relying, each one relying

15   on the others.

16           MR. MAGNANINI:  And one of the things we had, nowhere

17   in the title company opposition briefs do they address Walsh

18   Securities' argument that pursuant to the Vision case, the New

19   Jersey appellate court case saying it's not just enough to ave

20   a first lien position, the lender has to get the three things

21   it bargained for:  A bona fide purchaser with an ability to

22   make payments; and the purchaser who you can pursue a

23   difficiency  If you're forced to foreclose.  Like Vision,

24   neither of those -- I was going to say revenue or remedies that

25   are available to Walsh Securities.  So what we get in

1    opposition is not a legal argument but the statement that title

2    companies road around vision, that they changed the closing

3    protection letters, and therefore the cases that proceed it,

4    Sears Mortgage, Client Security Fund, and Vision, itself, are

5    inapplicable because the closing protection letters are

6    different.

7              And as I said, your Honor, when you went through all

8    of the paper that was in there, one of the things we raised,

9    your Honor, 56.1 is just a side procedural note.  The 56.1

10   statement we think was improper.  What the rules allow is that

11   you can file your statement of undisputed facts, and any

12   non-moving parties file a statement that says it's either

13   disputed or not disputed.  If it's disputed, it puts its cites

14   in, and the non-moving party gets to put it its undisputed

15   facts.  That is a provision that allows for the moving party to

16   then dispute the undisputed facts of the non-moving party.

17             This is an issue we had raised with the defendants,

18   but they said they weren't going to withdraw their things.  We

19   suggested that the Court not rely on any of their disputed

20   facts or the undisputed facts of the non-moving parties.  When

21   we go -- a convoluted statement.  I apologize, your Honor.

22   When we go through the papers that they have, there was

23   numerous cites to Mr. DeBenedetto and various other people,

24   that Robert Walsh, James Walsh, knew about or had some

25   involvement in the fraud, or their sister Betty Ann knew about

     1     it.  What their brief is completely lacking in is any statement

     2     that they were even closing attorneys involved.  The closing

     3     attorneys are their approved agents.

     4              THE COURT:  And as I understand it, they rely on early

     5     extensive statement as undisputed facts, which lays out the

     6     fraudulent, I guess that maybe the supplemental statement of

     7     disputed material facts filed pursuant to local Rule 56.1,

     8     which goes through a great deal of detail as to each alleged

     9     participant in the fraud.  And doesn't this at least create an

    10     issue of fact?

    11              MR. MAGNANINI:  It was calculated or couched as

    12     disputed facts.  But then at the end of -- I think it was

    13     Commonwealth's brief, they said, based on everything that's

    14     gone before us, we're actually entitled to summary judgment.

    15     And so it didn't appear on certain of those facts that are in

    16     there, that is lots of them too is kind of -- they are cherry

    17     picked, we had to go back and say:  Wait a minute, where is

    18     this from?  Get the two pages before it, get the three pages

    19     after it.  It's a very kind of narrow view to lay out -- what I

    20     said was, just like a smear campaign, because some of the --

    21     some of what you need to do, when you law out material facts,

    22     is make them material.

    23              What was the relevance or what was the reason Walsh

    24     Securities would:  A, undertake this fraud; or B, know about it

    25     and not do anything?  There's a whole series of things that we

1       had raised in our papers which was -- and one of the things

2       that Fidelity's brief is just incorrect on is they say that the

3       fraud actually started in April of 1996.

4              Throughout this case we've said the fraud began in

5       February of 1996.  That was the first of these properties that

6       were part of the fraud involved in -- the reason Fidelity

7       doesn't want to acknowledge there were sales in February and

8       March of 1996, is because Walsh Securities did not exist at

9       that point.  Up until April 16th of 1996, Walsh Securities was

10      only owned by Grundel Financial.  It was a subsidiary of

11      Grundel Financial.

12             On April 16th, 1996, Robert Walsh purchases the entity

13      in an LBL leverage buyout with his partner, Leverage Capital.

14      They set up Walsh -- one of the things that is not laid out as

15      material fact is any explanation why the fraud began in

16      February and March.  What benefit did it have to Walsh

17      Securities, or to Mr. Walsh, other than if you can believe the

18      argument that the defendants have adopted from various criminal

19      defendants who sought a 5K letter, the argument is, Walsh was

20      trying to expand its portfolio of business so therefore it

21      could sell itself.  And that's the simplistic argument that's

22      raised.  But, again, the material questions of fact that should

23      have been raised was why was the fraud again in February, if

24      Walsh knew about it or was involved in it?  The only reason

25      was, so that Mr. Walsh could pay more money for the company he

1    bought.

2         The second question that's never explained by anyone

3    is, why would Walsh participate or know about and not stop a

4    fraud that took 24 million dollars of its money and gave it to

5    complete strangers?  There's no evidence anywhere that Mr.

6    Kane, Mr. Grieser, and that any of these people knew the -- the

7    people who received the money, Pepsny, Yacker, Cicalese, and

8    somehow Walsh either constructed a fraud, or acknowledged a

9    fraud, and let it go forward.  That took 24 million dollars

10   from it and gave it to complete strangers.  No reason.

11        Now, again, your Honor, another big point here is that

12   the reason they claim that Miss DeMola, and Robert Walsh, and

13   James Walsh, participated or knew about the fraud was to

14   increase the volume of Walsh so that it could be sold.  Walsh

15   Securities had a number of sale offers prior to this time.  And

16   if Walsh Securities really wanted to increase the number of

17   loans it was doing, Mr. Walsh testified in '98 in this case,

18   Walsh Securities was getting two thousand loans a month.  And

19   of the 2,000 loans a month.  It rejected approximately one

20   thousand, and underwrote one thousand.  If it really needed to

21   increase its numbers, what it would have done was simply take

22   more risks on 10 loans, underwrite 10 more loans.  Why again

23   participate or construct a fraud to give 45 million dollars to

24   people you don't know, and leave you on the hook for the fraud?

25        And the other thing that's very interesting, when you

 1    look at the number of loans, your Honor, which again began

 2    February of '96, they kind of ramp up.  There's a lot of loans

 3    done in January, '97, and there's only six loans I believe done

 4    between February and March of 1997.  Now, Walsh Securities and

 5    the Walsh family had a real motivation to sell their company.

 6    It was February and March of 1997.  Because RBMG, Resource Bank

 7    Mortgage Group, was doing due diligence on Walsh Securities.

 8    They were looking at the numbers in order to come up with a

 9    prior price to purchase Walsh Securities.  So at a time when it

10    could have most benefited Walsh Securities, only six loans are

11    done.  And is that because Walsh Securities said something?

12    No.  The reason there's only six loans done is because up until

13    January of 1997, Mr. Kane has used Mr. Yacker to do his

14    closings.  At that point Mr. Yacker has not filed hundreds of

15    documents relating to deeds, mortgages, joint venture

16    agreements.  Nothing has been filed.  So with nothing on file,

17    Mr. Kane says:  We need to file these because Mr. Agel is

18    pushing him, saying:  I can't issue title policies, and nothing

19    has come through.

20         Mr. Kane at that time who, like I said, controls, or I

21    will say controls Mr. Yacker's trust account, takes $50,000

22    from Mr. Yacker and gives it to Mr. Cicalese to pay title

23    companies agents to go ahead and file all these documents.  Mr.

24    Yacker and Mr. Kane are in a dispute about this $50,000 Mr.

25    Kane has taken from Mr. Yacker's trust account, which has

1    caused him to bounce checks, and has caused an ethics

2    investigation against Mr. Yacker.  At that time they're

3    changing over and they're switching now to Mr. Cicalese to get

4    him to close loans.  And so the time when this was most

5    relevant to walsh Securities so it could sell itself, there are

6    only six loans put through.

7           And one of the next issues that the Court needs to

8    look at, again, there is no evidence anywhere that if the Walsh

9    Securities family knew about this fraud, why would they sell

10   the loans to the whole loan buyers or put them in a security?

11   Nothing that these loans were the product of fraud.  As long as

12   the fraud continued, the defendants would have made payments on

13   the loans.  So the fact that once Walsh sold the loans, or put

14   them in securities, as I told your Honor earlier, Walsh was

15   forced to repurchase the mortgages because the 60/40 joint

16   venture, beyond anything else, put them into default.

17          And then two other things that was -- there was some

18   citation in one of the reply briefs to the transaction between

19   Walsh and RBMG to two of the provisions that wasn't cited.  One

20   is that pursuant to the agreement, ten percent of the purchase

21   price was going to be escrowed by RBMG in case of any fraud or

22   loss of Walsh Securities.  If Walsh knew about the loans, why

23   sit agreeing to put 42 million dollars into an escrow that's

24   going to have to be used to pay for the 24 million dollar fraud

25   loans which people, completely unrelated to Walsh, are going to

1     walk away with this money?

2          And the next thing is, if the Walsh family knew about

3     the fraud, why did they consent to getting restricted stock and

4     agreeing to work for RBMG's knew entity?  It's going to be

5     called Walsh Securities for five years.  This wasn't like a

6     Crazy Eddie merger blowout where they created the inventory.

7     Walsh's family was including Mr. Robert Walsh, the president;

8     Mr. James Walsh; and Mr. Moda, were all going to be employees

9     at the new entity.  And for five years their stock was going to

10    be restricted.  And so -- since none of those issues which

11    really would go to any of those things could be answered in the

12    affirmative, there was a reason that Walsh started the fraud

13    before it bought the company, or that Walsh was happy to give

14    away 24 million to strangers instead of simply underwriting

15    more loans that it was turning down or that Walsh didn't care

16    about 42 million dollars, or that somehow the purpose of this

17    fraud was to make Walsh more valuable during the very time that

18    the diligence was being done by the entity --

19         THE COURT:  This 20 million dollars, was that Walsh,

20    that they put into the venture?

21         MR. MAGNANINI:  The 24 million dollars was the money

22    Walsh wired to the approved agencies to close all the fraud

23    loans.

24         THE COURT:  All right.

25         MR. MAGNANINI:  So they gave their money away.  If the

 1     fraud was to be believed that it was set up and operated by the

 2     Walsh family, they're giving money to people they don't even

 3     know.  And when you go back through all the various statements,

 4     and --

 5              THE COURT:  The 24 million dollars come from -- where

 6     did the 24 million dollars come from in the first place?

 7              MR. MAGNANINI:  That's money they received from

 8     Greenwich Capital.  They were the -- what they call the

 9     warehouse line.  So they gave Walsh Securities money to buy it

10     out, and Walsh Securities was in the LBL, for Robert Walsh to

11     buy it from Grundel Financial, and they remained as the

12     financial warehouse line.  They were to receive 25 percent.  So

13     at the closing they would have gotten 105 million dollars.

14              And then what we've shown, and I think when you go

15     through -- when you go through the -- if you -- like I said,

16     God bless your clerk for having to parse through this morass of

17     stuff.  If you get down to this, there's no real evidence that

18     Robert Walsh knew about this.  There's no evidence at all that

19     he got anything of value.  There's no evidence of value that

20     James Walsh knew about this.

21              Mr. Calanni makes a statement that he told Mr. Walsh

22     to use a certain kind of an appraisal.  And when we went back

23     through Mr. Calanni's appraisal, not only the net worth

24     approach but two other approaches are used on each of these

25     appraisals, and on a number of appraisals, the net worth

 1      approach, which is supposedly suggested by James Walsh to Mr.

 2      Calanni to increase its value, actually produces the more value

 3      on the property than the other two methods Mr. Calanni uses.

 4      And, again, other than I think Mr. DeBenedetto's, which is

 5      completely incredible, testimony about Robert Walsh, there's

 6      nothing to show that he received anything of value, and knew

 7      about this, or benefited in any way.

 8              Similarly, Miss DeMola, who everybody and their mother

 9      blamed, her job was the national sales manager, to get in

10      everyone she could.  So all of the defendants cite, she must

11      have known about this.  And when you go through --

12              THE COURT:  She was indicted.

13              MR. MAGNANINI:  She was indicted, but not related to

14      this, your Honor.  And she was re -- indicted for, and if you

15      read through the indictment, none of what she did is actually

16      criminal.  And it's related to an unrelated set of loans which

17      people bought properties from Mr. Kane, and the properties were

18      in unfit condition to move into.  So her plea, which

19      continually gets mixed in here, is completely unrelated to this

20      fraud within these properties.

21              And the other thing, when you get to -- when you look

22      at what she's pleading to, and what's being suggested, she's

23      saying -- and the plea is that she had some constructive

24      knowledge that things were going on that was improper.  That

25      supposedly loans were being closed without written appraisals,

1    and there were various other things happening.  And nowhere

2    does she admit -- and nowhere does anybody say:  We paid DeMola

3    money.  DeMola signed fake documents.  All of the things that

4    we found out that Mr. D'Apolito and Miss O'Neill did, all

5    things which benefited them, to -- at a cost to the

6    corporation, none of those happened with Miss DeMola.  She was

7    simply somebody who must have known what was going on, because

8    Mr. Kane talked to her, or Miss O'Neill said she saw her taking

9    documents out of a folder, or she did something else.  Nowhere

10   in there does anybody have her, you know, doing anything to

11   advance the fraud, or doing anything, accepting any payments,

12   or anything like that.

13          Completely different than we have Miss O'Neill and Mr.

14   D'Apolito.  Each of them -- actually Miss O'Neill denying she

15   gets any money, and Mr. D'Apolito paying her, both of them

16   saying she was demanding more money.  Mr. D'Apolito comes out

17   and admits that he paid her 10,000, 20,000 to bring the

18   paperwork in.  And if there was a problem with the loans, Mr.

19   D'Apolito, as a sales manager, would say -- he would fill out

20   the loan application, or Miss O'Neill would fill it out.  So

21   that you have two low-level employees who were terminated as as

22   a result of the participation in the fraud, completely distinct

23   from Robert Walsh, James Walsh, or Miss DeMola.

24          And then, I think, your Honor, if you look through

25   what we've laid out about the agents of the title companies, is

1          that that Coastal Title, it's admitted, issued the closing

2          protection letters, the commitments, and the title policies on

3          behalf of the title insurance companies.  They also received

4          money from each of the closings.  Walsh Securities' funds that

5          it wired to the approved attorney, Yacker or Cicalese, and it

6          admitted the funds to the title insurance companies.  It's also

7          acknowledged both from the title insurance companies and

8          everybody else who's been deposed, without the closing

9          protection letter, either Walsh or someone else would have

10         wired its funds to the approved attorneys.  And when you go

11         back to client security in Sears, the closing protection letter

12         in New Jersey, your Honor, is considered part of the coverage

13         provided by the title insurance.

14              And even more specifically, when you go to the --

15         there's one difference with the closing protection letters.

16         Commonwealth does not have a paragraph F.  The Coastal Title

17         has a paragraph F.  When you look at Nations' and Fidelity's

18         paragraph F, the last sentence says:  Any payment under the

19         title insurance policy will constitute a payment under the CPL.

20         So under their plain reading of their document, the closing and

21         protection letter is part of the title insurance policy

22         coverage.

23              And then one of the other things Coastal admitted to

24         doing is it provided Walsh title commitment.  Without title

25         commitment, Walsh Securities would not have gone forward with

1    the loan, and would not have wired the money.  The one thing

2    Coastal did here, which Mr. Agel said in 30 years of doing

3    business he has never done before, and he has never done since,

4    he issued two title commitments, one from Mr. Kane when he

5    purchased the property, and he used the same title commitment

6    number, and he paid a, capital A in parenthesis, and that was

7    sent to Walsh Securities.  When you hold these two commitments

8    up, the one issued to Mr. Kane said:  You don't own the

9    property.  There's liens.  There's tax liens, there's

10   foreclosures.  There's taxes that haven't been paid.

11   Whatever's wrong with the title is listed on the commitment Mr.

12   Kane got.

13        On the commitment sent to Walsh Securities by Coastal

14   Title Agency, it's blank.  There's nothing.  It looks like

15   there's clear title.  He said he did that after speaking with

16   Mr. Kane.  He's never done it before, and never done it since,

17   thinking that there wasn't any sort of title problem with the

18   properties.

19        Mr. Agel said in his deposition, which we cited to,

20   throughout the process of Mr. Kane buying properties and

21   selling them, he regularly consulted with what he called the

22   underwriters, sometimes employers, and sometimes not.  One of

23   the persons we depose, Nancy Cook from the title companies, Mr.

24   Agel consulted with them on an almost daily basis because he

25   said there were so many problems with the properties, so the

    1    title companies, unlike we say Walsh Securities, had knowledge
    2    that this was going on throughout the case.

    3         And the next thing he did, he said he accepted a
    4    $50,000 payment from Mr. Kane, and a $50,000 payment was used
    5    to clear up the title issues and other problems like that.
    6    But -- and the other thing Mr. Agel did and, again, your Honor,
    7    I said I've never done it before and I've never do it since, he
    8    took hundreds of these documents that he said Mr. Yacker had
    9    not filed and he filed them.  And he filed the 60/40 deeds
   10    ahead of the mortgage.

   11         And as Mr. Sullivan, the corporate representative from
   12    the title companies says, that seems to indicate that we should
   13    cover this loss, never mind the bona fide purchaser, never mind
   14    there's actions, there's no first lien here to Walsh Securities
   15    because of the actions of their title agent.

   16         And then the last thing Mr. Agel says at his
   17    deposition was, at the end of the fraud, a bunch of title
   18    documents and deeds were stacked up on his desk.  Once the
   19    fraud was uncovered, he never filed those.  So there's a number
   20    of documents at Walsh Securities that were of these properties
   21    that were never filed.  So Walsh again is damaged by that, your
   22    Honor.

   23         And then, your Honor, we also had pointed out in our
   24    facts that there was two closing lawyers involved.  I got
   25    Yacker, and I got Cicalese.  Yacker admits he's involved in the

1     fraud.  He pleads guilty, directly involved in the fraud, and

2     is sentenced to prison.  He uses Lorraine King to do the

3     closings.  He admits:  I didn't even do these closings.  I know

4     I'm a lawyer, but I had other things -- closing for paralegal.

5     She did all the closings.  My trust account was a mess.  I let

6     Mr. Kane buy me a computer, and Mr. Kane ran my trust account.

7               And then they said the criminals need a 60/40 joint

8     venture.  Mr. Yacker provides that.

9               And the other thing that Mr. Yacker does, your Honor,

10    and like I said, Mr. Yacker in his deposition, very

11    Clintonesque, he holds up a check in his hand and he signs it

12    as the escrow letter.  So when he sends escrow letters to Walsh

13    Securities, Mr. Yacker says, "I'm holding a check in escrow,"

14    he physically is holding the check in escrow.  It is not made

15    out to Mr. Yacker's trust account.  It's not made out to any

16    amount.  He physically holds a blank check and sends letters to

17    Walsh Securities, that they used in their underwriting process,

18    and says -- as I said, your Honor, once there's a dispute

19    between Kane and Yacker, they bring in Mr. Cicalese.  He's a

20    brand new lawyer.  He doesn't have a client base.  He knows Mr.

21    Grieser.  He's glad to do the closings.  What he says is:  I

22    have a paralegal that I partner with.  We'll take care of the

23    closings.  What he's told by Mr. Yacker is:  You use Lorraine

24    King, or you won't get the closings.  Mr. Cicalese says:  I

25    knew this was a fraud.  He says none of the -- by the time Mr.

 1    Cicalese was involved, your Honor, none of the straw buyers

 2    even show up.  He says:  I know other people are signing for

 3    these documents.  I know that the properties are being sold to

 4    straw buyers.  And Walsh Securities' money is being used to

 5    close that deal.  But Mr. Crane doesn't even own the

 6    properties.  He said that, you know, I know Miss King was being

 7    paid by Mr. Kane to do the closings.  And then he says he did

 8    two things that Mr. Yacker did exactly.  They both violate

 9    Walsh Securities' closing instructions, not on any kind of the

10    small things, the big thing about the closing, HUD 1 Yacker and

11    Cicalese sends back.  It shows where the money is going.  Both

12    Yacker and Cicalese says Kane has to purchase the property.

13    I'm going to take a ton of money, and then I'm going to send a

14    chunk of money to Mr. Grieser, and then I'm going to send a

15    chunk of money to Mr. Kane as his profit, and then I'm going to

16    send money to me, and I'm going to pay Lorraine King.

17            And the last thing that they both do is they send the

18    money to Coastal Title to pay the -- that's the violation of

19    the closing instructions.  And like I said, when you look at

20    what the defendants have admitted, they provided the title

21    insurance coverages.  They provided the CPLs.  And unless the

22    Court is going to buy the defense that they wrote around Sears

23    and Client Protection, and they wrote around the Vision case,

24    that they're liable under existing New Jersey law, particularly

25    because, as I said, Walsh did not get what it bargained for.

1          And, your Honor, one of the things the title company

2     keeps bringing up, and the ships in the night business, they

3     keep telling us that we need to prove that each and every

4     transaction was a fraud.  Yet, when you read the 56.1 statement

5     of facts, nowhere in there does it say that Robert Walsh knew

6     that the 606 Fifth Avenue in Asbury Park, or Mr. Mullen knew

7     that 1113 Asbury Avenue in Asbury Park was a fraud, or that

8     property in Long Beach or Long Branch was a fraud.

9          So, again, what you get is Walsh Securities should be

10    forced to prove that every transaction individually was a

11    fraud, and however they're allowed to defend by saying, people

12    at Walsh, they're without the fraud.  And one of the things

13    that you get to, your Honor, when you go through their papers

14    is, and our papers is, all these transactions were alike.  Kane

15    buys a property, and an appraiser says it's worth it, and a

16    strawbuyer gives credit, and Coastal Title issues a CPL, title

17    commitment, Walsh wires money, and the money is distributed to

18    the RICO enterprises, and it's paid for title insurance

19    protection, and also paid for the CPL.

20         Now, I'll say certain properties are different, but

21    the basic fracture is the same.  And when you look at New

22    Jersey district law here, Judge Sheridan was faced with the

23    same situation in the Chan case.  And you can't rule on this,

24    your Honor, because it's a class action, because all of these

25    title policies are individual instances.  And judge Sheridan

 1    said, as a matter of fact, I can rule on multiple title claims,

 2    and also the closing attorney is an agent of the title

 3    companies.

 4            Judge Linares is faced with a similar situation in

 5    American Home Mortgage.  There's multiple closing protection

 6    letters.  And he finds he can make a decision on multiple

 7    closing -- and he finds the same thing that everybody else has

 8    found, that is that the approved attorneys are the agents of

 9    the title companies and their actions bind the title companies.

10    And the title companies are in the best position to prevent the

11    defalcation or fraud by the closing attorneys.  And then that

12    is, your Honor, the basis of the Sears, Clients Protection and

13    Vision, and the center piece of title law in New Jersey.

14            And just to -- we were following up on this, there's

15    another case, 2010 Lawyers Fund case, and in that case, even

16    though ostensively the title companies wrote around the closing

17    and protection letters, the 2010 Lawyers Fund finds the same

18    thing, that the approved attorney is still the agent of title

19    insurance company.  And so what we got from the title insurance

20    companies is that they want to say:  Look at Walsh Securities

21    and the individuals within it, all of the acts of the

22    individuals are attributed to agency of Walsh Securities.

23    However, when it comes to us, don't look at the acts of the

24    closing lawyers, and none of that should be attributed to us.

25    And we're saying it's got to be -- it's got to be one or the

 1    other.  This is my ships in the night.  What's good for them is
 2    apparently not good for anybody else.

 3          And one of the other defenses, I'll just hit their
 4    defenses quick, your Honor, Walsh is in the shoes of National
 5    Home Funding.  We despute that National Home Funding, Mr.
 6    Kane's involvement, using their paper, and so.  But as your
 7    Honor saw that we laid out in the papers, we believe Walsh is a
 8    holder in due course, and paid good money at the closing, and
 9    that's a table funding, so Walsh got a negotiable instrument
10    that it was in fact able to turn around and close, or
11    securitize, and so in our defense, and we think it's a valid
12    one to anything there, NHF is an assignee, Walsh was a holder
13    in due course.

14          And, again, as I said throughout this process, one
15    thing is clear, Mr. Yacker, and Mr. Cicalese, and Mr. Aiker was
16    involved up to their eye balls.  And Mr. Yacker is having
17    constant conversation with the title companies.  And then --
18    let me skip that.  And then, as I said, your Honor, when you
19    have to parse through the facts, there's nothing in the facts
20    that they present that shows that Mr. Walsh, either James or
21    Robert, or Ms. DeMola, were given any sort of consideration,
22    participated in this fraud, and were involved in any way.  And
23    as I said, the basic premise of their theory was that Walsh
24    participated in this to expand its volume, falls when you look
25    at the actual facts of what was done.

 1           And then, as to Mr. D'Apolito and Miss O'Neill, we

 2    admit that they were involved in the fraud.  We fired them.  We

 3    went to the U.S. Attorney and they were both sentenced for

 4    involvement in this fraud.  But when you look at Judge Hayden's

 5    decision in the Siemens case, it's based on that old line of

 6    commercial paper cases, the teller cases, somebody at the

 7    bottom is participating in the fraud to rip off the bank, it

 8    doesn't preclude the bank from getting any recovery on any sort

 9    of fidelity bonds.  Their actions cannot be imputed from

10    Walsh's corporation.  And their actions as defendants lay out,

11    were merely for one purpose, to line their own pocket.  No

12    benefit to Walsh Securities.  And, in fact, it costs them the

13    fraud.

14           Defendants also threw in, your Honor, at the very end,

15    this in pari delicto defense.  This came out of the Bondi cases

16    that was published December 22nd, the day before the briefs

17    were filed.  And when I read that, I wasn't quite sure, when

18    you read Bondi, in pari delicto was an affirmative defense that

19    was argued through trial, and it was put on through Judge Haris

20    in Bergen County.  And I went back and looked at affirmative

21    defenses, failure to state a claim, latches, and estoppel,

22    waiver and step into the shoes of NHF, nowhere in there is in

23    pari delicto.

24           We went through Nations Fidelity.  The interesting

25    thing about that is when you read what it actually is, it's

     1    somebody else who's as liable to the plaintiff.  And because

     2    the Court doesn't want to benefit two wrongdoers, they rule for

     3    the non-moving party or the defendant in that case.  In order

     4    for the defendants to be in pari delicto, they actually had to

     5    participate in the fraud with Walsh, where they keep saying

     6    they didn't, and Walsh has never alleged -- that agents were,

     7    and their actions should be imputed to them.  But at the of the

     8    day, what I -- you can gleen from them is in order to raise an

     9    in pari delicto defense, they have to admit that they're

    10    tainted with the acts of the agents, Mr. Yacker and Mr.

    11    Cicalese, approved closing arguments, and Coastal Title, and

    12    that's why their hands are unclean as well.

    13         But I think when you look at it, it brings you back to

    14    the same basic position that we started, which was, in a

    15    situation where there's a loss in this case to a lender because

    16    the borrowers had no loss, who does the loss fall on?  Who is

    17    in the best situation to avoid that loss?  That is, according

    18    to the New Jersey Law, is the title companies.  And at that

    19    time --

    20         THE COURT:  Your 45 minutes.

    21         MR. MAGNANINI:  I've taken all the my time, I

    22    apologize.

    23         THE COURT:  We'll take a 10-minute break to give my

    24    court reporter a release from that rapid machine gun fire

    25    presentation.  All right.  So we'll resume at five after.

1        (Recess)

2        THE COURT:   Now, the defense proposes to allocate its

3   time, your 45 minutes.

4        MR. HAYES:   Judge, I don't think I'm going to need

5   even twenty minutes, and Mr. Kott should have enough time.

6        THE COURT:   You can split it up as best suitS your

7   purposes.

8        MR. HAYES:   Thank you, sir.

9        Good morning, your Honor.   My name is Ed Hayes.   I

10  represent Fidelity and Nations in this case.   Judge, I always

11  have a problem understanding how a party thinks they're

12  entitled to summary judgment when they spend two-thirds of

13  their argument talking about the facts of the case.

14       The facts of this case, which for purposes of summary

15  judgment must accept as facts and draw all the reasonable

16  inferences, chose that the Walsh family was involved in this

17  case.   This was not a case like Sears or Vision or Clients

18  Security Fund.   We have a blameless victim.   This is a case

19  which showed at a minimum that Walsh was aware of what was

20  going on, and more likely we believe was directly involved and

21  participated in the frauds.

22       Mr. Magnanini said:   Why would they do this?   That's a

23  jury argument to ultimately make.   To say the jury won't

24  believe those facts because why would they do this?   Let me

25  just address one of the questions that Mr. Magnanini raised.

 1    First, why would they give away 24 million dollars in these

 2    loans?  Well, the bottom line, Judge, is the way Walsh worked,

 3    Walsh didn't give away anything.  They would fund these

 4    particular loans with the monies that were obtained from their

 5    warehouse credit line.  And within a very short period of time,

 6    sell those loans on the secondary market making a handsome

 7    profit.  Yes, it was ultimately funding loans, as does any

 8    lender in the mortgage business, but ultimately that money

 9    comes back to it from the third party whole loan purchasers

10    from the securities.  Why else would they make all those loans?

11    They made these loans because they were increasing the value of

12    the business.

13            There was testimony from several witnesses in this

14    case that these loans were all about increasing the book of

15    business that Walsh had, so that it would make it both a more

16    attractive merger candidate as well as an entity that RBMG

17    would pay far more money to.  There are lots of explanations in

18    this case, Judge, as to why Walsh would do the things that they

19    do.  And ultimately we believe that it would be for the jury to

20    decide whether or not those explanations are acceptable.  But

21    the bottom line is, the facts in this case, Judge, when viewed

22    in the light most favorable to us, are overwhelming that the

23    Walsh family was involved in this.  And is not the innocent

24    victim that Clients Security Funds, that Sears and that Vision

25    had.

1          Now, not only is the evidence overwhelming, Judge,

2     that Walsh was involved in the fraud, but the evidence is

3     overwhelming that the mortgage broker, National Home Funding,

4     was also involved in the fraud.  As your Honor has seen from

5     the paperwork in this case, these loans were made in the name

6     of the National Home Funding.  The title policies were issued

7     to National Home Funding.  The closing service letters were

8     issued to National Home Funding.  Throughout its first four

9     complaints in this case, Walsh has made allegations that NHF

10    was intricately involved in this fraud, and in fact named it as

11    a RICO defendant in its filing.  Your Honor has within the

12    record that Walsh submitted a claim on its blog in which it

13    alleged that NHF was indirectly involved in the fraud, and was

14    paid close to a million dollars under that bond because of its

15    allegations that NHF was involved in the fraud.

16         When Mr. Kott and I began to defend this case in part

17    on the basis that Walsh as an assignee stood in the shoes of

18    NHF, at that point in time the record miraculously changes.

19    Now Walsh is no longer sure that NHF was involved in the fraud.

20    Very shortly thereafter, Walsh entered into a confidential

21    settlement from NHF to get it out of this case.  I would

22    respectfully suggest to your Honor that whatever its current

23    position, doesn't really matter because the evidence in this

24    case points to NHF's involvement in the fraud.  And at a

25    minimum, we have the right to present that issue to the jury so

1    that the jury can make the decision whether NHF was involved in

2    the fraud.

3           In it's last response, Walsh contends for the first

4    time now that it is a holder in due course of this paper, and

5    that as a result it does not stand in the shoes of NHF for

6    purposes of determining whether or not its claim would be

7    barred for wrongful conduct.

8           There are really two responses to that, Judge.  The

9    first thing, relatively simple, holder in due course, you must

10   in fact take an interest in the item being transferred in good

11   faith without knowledge of any problems in connection with the

12   document that you're taking.  Again, going back to its evidence

13   in this case, which your Honor must consider as true for

14   purposes of this motion, Walsh knew exactly what it was getting

15   when it was taking these mortgages from NHF.  It knew it was

16   getting loans from substantial problems that were the product

17   of fraud.  More importantly, from a legal standpoint, your

18   Honor has already ruled on whether or not holder in due course

19   status applies to a mortgage under New Jersey law.

20          Your Honor in the case of SBA vs. Martin Label

21   analyzed the New Jersey statutes that dealt with assignments of

22   mortgages, and the interplay between New Jersey statutes and

23   the holder in due course doctrine.  And the New Jersey statutes

24   specifically provides when a mortgage is assigned, it's

25   assigned with the burdens that that mortgage has from the

1          original holder of that mortgage.  And in SBA, your Honor

2          decided that the holder in due course concept is not applicable

3          under New Jersey in connection with the assignment of mortgages

4          based on that New Jersey statute.

5                    I respectfully suggest to your Honor that that holding

6          is just as binding in this case, that Walsh cannot hide behind

7          the holder in due course status.  So I think, your Honor, based

8          on the mere factor alone that there are facts that had been put

9          into this record that show the involvement of Walsh, and the

10         involvement of NHF, your Honor must deny the summary judgment

11         based on that alone.

12                   Your Honor, I heard a lot of argument from Mr.

13         Magnanini, and saw a lot of argument in their briefs about

14         agency and an agency theory.  This case is not an agency case.

15         This case is a breach of contract case.  We have not been sued

16         in this case for vicarious liability on the conduct of either

17         Coastal Title, or on the conduct of the closing attorneys.

18         This case, through its first three versions of the complaint,

19         was a breach of contract claim under the closing service

20         letters.  Despite our protestations, a forth amended complaint

21         was allowed to add a breach of contract under the title

22         insurance policies.  The question ultimately for decision in

23         this case is whether or not the conduct falls within the

24         language of the closing service letter, or within the language

25         of the title policies.  The fact that the closing attorneys

 1          engaged in fraudulent conduct is not attributable to us, unless

 2          the type of conduct they engaged in is covered under the

 3          contract, under the closing service letter.  The type of

 4          conduct that it's alleged Coastal Title engaged in is not our

 5          responsibility, unless it's covered under the title insurance

 6          policy, because the closing protection letters are not issued

 7          for the conduct of Coastal, they're issued for the conduct of

 8          the closing attorneys.

 9                  So I would suggest respectfully to your Honor that

10          this case is not about agency, it's about contract, and whether

11          or not the plaintiff has presented to your Honor evidence that

12          the contracts were breached in this case.  The plaintiff's

13          position is simple, there was a fraud.  The closing attorneys

14          were intricately involved in the fraud.  And but for the

15          wrongful conduct of the closing attorneys, we never would have

16          funded these loans in the first place.  Judge, that's not the

17          standard for your Honor's analysis in this case, a "but for"

18          standard.  It gets back to this case is a contract case, and

19          can continue to establish that the requirements of the closing

20          service letters have been met in this case, and we respectfully

21          suggest that they have not.

22                  Now, one of the other problems that we've had all

23          along in this case, Judge, is that Walsh has not presented to

24          your Honor for consideration in this motion any evidence,

25          evidence that it is even the holder of the mortgages about

 1    which it, or through which it makes closing service letters

 2    claims, or through which it makes title insurance claims.  I

 3    think you have to start with a fundamental proposition, Judge,

 4    that in order to have standing to even bring these claims

 5    before your Honor, Walsh needs to establish that it is the

 6    current holder of the mortgages.

 7              As your Honor knows from reviewing the paperwork,

 8    these mortgages started in the name of NHF, that were

 9    assignments to Walsh.  Walsh assigned the mortgages to whole

10    own buyers in the secondary market or to securities.  In order

11    for Walsh to make a claim, it has to have re-acquired those

12    mortgages.  And the way in which one re-acquires a mortgage is

13    via assignment.

14              Your Honor saw in the certification that I submitted,

15    an indication of the assignments which are of record in

16    connection with at least the mortgages on which title claims

17    are submitted.  And that record showed that mortgages are

18    currently held by either NHF, by an entity called Dougan

19    Partners, L.L.C., still by The Money Store, by an entity called

20    ERC7, but not Walsh.  Now, one would have expected, your Honor,

21    when we indicated in our submissions that Walsh needs to

22    establish its standing to bring this claim, that Walsh would

23    have produced something within the record to show that it has

24    standing to bring this claim.  And what the certification that

25    counsel submitted in response to my motion for summary judgment

1    on the title claims were copies of assignments from NHF to

2    Walsh, and then copies of assignments to Walsh into the

3    secondary market.  It is yet to produce a piece of paper that

4    shows that it is the current holder of the mortgage and title

5    to bring the claim.  As your Honor I'm sure is aware with all

6    the secondary market transactions that take place, it's a hot

7    issue today in the courts as to whether or not a lender has the

8    right to bring a proceeding when it be a foreclosure or a

9    claim.  There is nothing in this record, Judge, that shows

10   assignment from either the secondary mortgage -- or its

11   secondary market purchaser or the securities back to Walsh.

12   And without that evidence, Judge, I think it would also require

13   that you dismiss their claim for lack of standing.

14            As to Sears, and Vision, and Client Security Fund,

15   again, the argument on the part of the plaintiff is, there was

16   a fraud.  We would not have made the loan but for the fraud.

17   And you're responsible, because Sears, Vision and Client

18   Security Funds say that, your Honor.

19            Well, we don't believe it's that simple, Judge.

20   First, the Sears case was not a closing service letter case, as

21   your Honor is aware, it was an agency case.  And it was a

22   question of whether or not the wrongdoer in that case, whether

23   his conduct would be charged to the title company under a

24   parent agency theory.  And, in fact, the Sears court said that

25   the title company in their case was responsible under a parent

1    agency theory for the conduct of the wrongdoer.  When we come
2    to Client Security Fund, we in fact have a closing protection
3    letter.  It is a closing protection letter case.  However, as
4    much as counsel for plaintiff would like to have us ignore the
5    language in the letter, it is different than the letter that
6    existed in this case.  Both Client Security and Vision
7    Mortgage, your Honor, had a closing service letter which
8    provided as follows:  That the title underwriter would
9    reimburse the lender for actual loss when such loss arises out
10   of fraud or dishonesty of the issuing agent or approved
11   attorney in handling your funds or documents in connection with
12   the closing.  So fraud or dishonesty in handling your funds or
13   documents in connection with the closing.  Both the Client
14   Security Funds court and the Vision Mortgage court construed
15   that language very broadly and said:  Title companies, in those
16   cases, we had a situation where the fraud occurred either in
17   connection with the handling of your funds or in connection
18   with the closings.  Because that expanded dramatically the
19   liability of a title company in New Jersey.  The title company
20   did in fact make revision to the closing service letters which
21   were in place at the time of all these transactions.  And those
22   revised letters were approved by the New Jersey Department of
23   Insurance.  And what those letters provide, Judge, is that loss
24   will be indemnified if the loss arises out of failure of the
25   issuing agent or attorney to comply with your written closing

  1      instructions.  And then there's a modifier, to the extent they

  2      relate to the title -- to the interest in the land or the

  3      validity, enforceability and priority of the land, and the

  4      mortgage, or the disbursement of funds necessary to establish

  5      the title or lien, or in connection with the collection and

  6      payment of funds due to you.  So we took a very general letter

  7      that was in existence under Client Security Fund and Vision,

  8      and limited the situations in which the liability would exist

  9      under that letter.

 10              There's another paragraph that talks about fraud or

 11      misapplication of the closing attorney in handling funds, but

 12      again a modification in connection with the matter set forth in

 13      the prior paragraph which I just read.

 14              So there's no question that the title industry has

 15      attempted to ride around the liability that existed in Clients

 16      Security Fund and Vision Mortgage.  And we believe that this

 17      language, Judge, under New Jersey law where the courts say the

 18      entirety of an instrument is to be looked at, that this in fact

 19      changes the landscape upon which one would make a liability

 20      decision.

 21              Now, counsel argues:  Well, that hasn't worked.  And

 22      they cite you, I believe, the Stewart Title case, where the

 23      Court still found liability under the new letter.  But what the

 24      Stewart Title case focussed on when referencing the fact that

 25      the letter had been amended, said that although the letter was

 1    amended, it did not address the question of whether or not a

 2    limitation letter was sent directly to a victim.  The letter

 3    had been modified, and the agency had been modified, but there

 4    was no evidence that in that case the limitation letter which

 5    arose out of Sears, which says this individual was not our

 6    agent, was ever sent to the victim.  All the Court said in that

 7    case, Judge, was:  You changed the letter, but I don't think

 8    you've addressed the question which I've raised, which is was

 9    the victim aware of limitations on the liability here?

10         Judge, we have a different letter.  You've heard

11    nothing from the plaintiff in this case as to how the conduct

12    fits within that modified language.  In all of its submissions,

13    it's referenced that language only once, when it initially

14    identified the language of the letter.  There's been no

15    analysis given to whether or not the conduct in this case falls

16    within that letter.

17         Now, it's interesting, your Honor, here's about 66

18    mortgages of 220 some mortgages that Walsh has repurchased.

19    But it broad brushes and says:  Every one of these loans were

20    fraudulent.  Well, Judge, what about the other 160 some loans

21    that were the subject of this fraud?  Why have they not been

22    repurchased?  Was there a demand for repurchase?  Have those

23    mortgages been paid?  Were they refinanced?  All issues of fact

24    ultimately that the jury's going to have to look at in this

25    case.

1           We would respectfully suggest to your Honor that these
2    cases are not all the same.  There is testimony that
3    distinguished the cases at trial regarding how disbursements
4    were made.  There was testimony regarding the manner in which
5    the fraud was conducted.  And the fact is that they've only
6    repurchased 66 of the 200 loans in this case.  I would suggest
7    to you a reasonable inference from that fact, Judge, is that on
8    the other 166 loans that were not problems, or if there were
9    problems they were not sufficient to create issues for the
10   holder of those loans, several of which in fact foreclosed
11   their mortgages.

12           Lastly, Judge, if I may just address the extent to
13   the motion for summary judgment is making an arguments on the
14   title claims, and it ites in with our motion on the title
15   claims.  Your Honor heard an acknowledgement by Mr. Magnanini
16   in the initial part of his argument that Walsh has collected
17   nothing from these mortgages because the mortgages were
18   divested by other foreclosure sales which took place after
19   Walsh had allegingly re-acquired these mortgages.  We presented
20   our motion evidence that in fact there are no assignments of
21   record to Walsh, and that's why Walsh did not receive notice of
22   these tax sales that took place.  It's mortgages were divested,
23   not because there was a defect in the mortgage, its mortgages
24   were divested, not because of these joint venture deeds being
25   reported out of order, mortgages were divested because of

1          foreclosure sales that took place.  After these properties

2          closed, no one paid the taxes on the properties.  The tax sales

3          certificates were sold, were foreclosed, and whatever liens,

4          including the Walsh mortgages, assuming they held it, were

5          requested.

6                    There's not a bit of evidence in this case, Judge,

7          that Walsh has suffered any loss as a result of a title

8          problem.  And, again, it raises the issue of these joint

9          venture deeds.  Where is the evidence that Walsh could not

10         foreclose a mortgage because of the joint venture deed?  Where

11         is the evidence that the order of recording precluded Walsh

12         from taking any action?  We cited the Willow Ridge case in our

13         reply, Judge, which was a case where a buyer had purchased the

14         property, and there were material liens on the property which

15         were not excepted from coverage.  A title claim arose as a

16         result of those.  And then during the pendency of the title

17         claim, the property was foreclosed because its insured did not

18         pay its mortgage on the property.

19                   The Court analyzed that case, and I think it's exactly

20         the situation which exists before your Honor.  The Court looked

21         at that and said:  Okay, there are material liens on this

22         property which were not excepted from coverage.  Clearly the

23         title company has some responsibility for those.  They're

24         covered, however, the loss in that case did not arise as a

25         result of the existence of the material in its liens, the loss

1       arose from the fact that the insured had not paid its mortgage,

2       and its rights were divested.  What the court said in that case

3       is that:  You had a title claim, you must not only prove

4       coverage under the policy, but you must prove the loss.  And

5       the loss in their that arose from the foreclosure of the first

6       mortgage, not from the problem that existed in title.

7               I would suggest, your Honor, that's this case.  That

8       is this case.  We don't deny the closing attorneys engaged in

9       wrongdoing.  We don't deny that there were problems.  What we

10      do deny is we created any records, is the conduct developed in

11      the loss -- all of those mortgages that they lost, Judge, they

12      lost because of tax sale foreclosures.  They got no notice of

13      those tax sale foreclosures and were unable to protect their

14      interest because they didn't record the assignments.  There's

15      an admission by the 30(b)(6) witness that they didn't record

16      the assignments.

17              So as I look at this case, Judge, you have a plethora

18      of evidence that NHF was involved in this fraud.  You have a

19      plethora of evidence that Walsh was involved in the fraud.  You

20      have no evidence that Walsh actually is in current title to the

21      mortgages about which it makes a claim.  And you have no

22      attempt by the plaintiffs to set forth for your Honor evidence

23      that they can meet the limited language that's set forth in the

24      revised closing service letters.

25              We believe, Judge, that any one of those bases, alone,

 1    and certainly all of them combined, are a basis upon which

 2    summary judgment should be denied.

 3              I know Mr. Kott wants to address the in pari delicto

 4    issue and a few more.

 5              THE COURT:  All right.

 6              MR. KOTT:  Good morning, your Honor.  David Kott for

 7    Commonwealth.

 8              THE COURT:  Good morning, Mr. Kott.

 9              MR. KOTT:  Just a few things briefly before I get into

10    in pari delicto.  With respect to National Home Funding, Robert

11    Walsh testified in his 30(b)(6) deposition that the mastermind

12    of this scheme was a man named William Kane.  Kane is somebody

13    who was sued by the plaintiff in this case, and Kane was

14    sentenced to federal prison for this fraud.  Kane was

15    associated with National Home Funding.  So there is no fact

16    dispute about William Kane's involvement.  The plaintiffs

17    acknowledge, and indeed the plaintiffs retained a default

18    judgment from your Honor against William Kane.  He was someone

19    who originated the loans that the plaintiff is suing on.

20              Now we move to Walsh Securities.  And we have five

21    employees involved there.  We have three members of the Walsh

22    family, Robert Walsh, James Walsh, and Betty, and all officers

23    of the company, all shareholders of the company.  And as Mr.

24    Magnanini argued to your Honor why they were not involved, I

25    thought he was facing the wrong direction.  And what I mean by

     1      that is, I thought he should have been facing in this

     2      direction.  Because his argument was entirely factual that they

     3      weren't involved, despite the overwhelming proofs from which a

     4      jury could reasonably conclude that they were aware of the

     5      fraud.  And, in fact, the proofs are not only oral testimony,

     6      they're documents.

     7               One of the documents, and we cite to it in paragraphs,

     8      I think it's 66 and 67, our statement of facts, is a letter

     9      addressed to James Walsh, dated January 31, 1997.  And the

    10      letter is from Greenwich Capital, which is the lender to Walsh.

    11      And Greenwich Capital says:  It has looked at 17 loans that

    12      were originated by National Home Funding.  This is January,

    13      1997.  And at the end of the letter, they talk about all the

    14      problems they see.  And at the end of the letter, the letter

    15      addressed to James Walsh, it says:  "Given the credit history

    16      and life style of the borrowers, the fact of the deposit with

    17      the attorneys were never verified as being the borrowers own

    18      funds (or that the borrowers had any verified assets closed).

    19      And the flip nature of the transactions, I believe there's a

    20      good chance that these are no down payment purchase

    21      transactions, and possibly are straw buyers used to facilitate

    22      very large cash back transactions to Cristo Property

    23      Management,

    24               THE COURT:  Cristo Property Management was William

    25      Kane's company?

1          MR. KOTT:  Yes.

2          THE COURT:  Now, what are you reading from?

3          MR. KOTT:  I'm reading from paragraph 67.

4          THE COURT:  Sixty-seven.

5          MR. KOTT:  Let me find it, your Honor.  I believe it's

6     paragraph 67 of our statement of facts, 66 and 67.  It's on

7     page 17.

8          THE COURT:  Yes, I think I have it here.

9          MR. KOTT:  Yes.

10         THE COURT:  Page 17 of the -- supplemental statement

11    of disputed material facts.

12         MR. KOTT:  Right.  And now my point on that, Judge, is

13    any lender, honest lender, being told that they purchased 17

14    loans with no cash in the loans and straw buyers, would do a

15    couple things.  They'd stop dealing with National Home Funding,

16    that's the first thing they would do.  The second thing they

17    would do is be on the phone with either the FBI or the Monmouth

18    County Prosecutors and say:  We've been sold a bunch of

19    fraudulent loans and we've been sold them by National Home

20    Funding.  Instead, what Walsh did was absolutely nothing.

21    Indeed, they continued to purchase loans from National Home

22    Funding.  All Mr. Magnanini criticizes is the quality of the

23    proofs.  But the quality of the proofs are for the jury on a

24    motion for summary judgment.  The documents in -- in Walsh's

25    own files demonstrate that Walsh -- Walsh, company, and if the

1    family members were aware of the fraud.

2            We have two other Walsh employees who I want to

3    address.  One is Anthony D'Apolito, and the other is Kelly

4    O'Neill.  And now we get into the issues of imputation.  And

5    there are, fortunately for your Honor, there is New Jersey

6    authority that guides the way.  The two cases are the Bondi

7    case, which was decided by the New Jersey Appellate Division on

8    December 22nd, 2011.  It has been approved for publication, but

9    I don't have the New Jersey super cite yet.  And NCP, which is

10   a New Jersey Supreme Court case at 187 New Jersey 353.  And NCP

11   simply says, the black letter law, that a corporation is deemed

12   to know and deemed to be responsible for the acts of its

13   employees.

14           So under NCP, the knowledge of D'Apolito, and the

15   knowledge and the involvement of O'Neill, are attributable to

16   Walsh.  And here again there's no fact dispute because Mr.

17   Magnanini, about an hour ago, told you that they were involved

18   in the fraud, and the fact that they had received cash

19   payments.  That is an exception to the imputation rule, and

20   it's called the adverse interest exception.  And that's

21   discussed in Bondi.  Bondi and NCP aren't even discussed in the

22   plaintiff's cases.  But under the adverse interest exception,

23   the employee has to, solely for his benefit, act adverse to the

24   company.

25           And with respect to D'Apolito and O'Neill, their

1    conduct, while wrongful, benefited the company because it

2    allowed the company to put additional loans on the book which

3    meant two things. The company was more profitable, and the

4    company had a higher value from which they could put itself in

5    play and be aquired by somebody. Bondi says that the fact that

6    the company goes bankrupt ultimately because of the wrongful

7    acts does not mean that the adverse interest exception does not

8    apply.

9        The plaintiff relies on a few different cases, the

10   Siemens case, which is a Third Circuit case, that was an

11   embezzlement case. The employee embezzled money from the

12   company. Well, there's no benefit to the company where the

13   employee benefit and wrongful benefit were from Kane and

14   Skowrenski. Skowrenski is the owner of National Home Funding.

15   The plaintiff argues that the question is a question of intent:

16   Did the employee intend to benefit the company? Well, I submit

17   to your Honor: A, that's an inherently factual question. But

18   I'd also say under Bondi, intent doesn't matter when we look at

19   the adverse interest exception.

20       The plaintiffs argue that we, the defendants, must be

21   innocent parties to have imputation. That's not correct under

22   Bondi and NCP. Both in Bondi NCP, the defendants got sued

23   because it's alleged they engaged in wrongful conduct. The

24   plaintiffs says actual knowledge is needed. Well, on this

25   record you could find actual knowledge from Robert James and

1    Betty Ann.

2         So we come back to this case, and I acknowledge on

3    Robert, Betty Ann and James, there's a fact dispute.  But

4    there's not a fact dispute as to D'Apolito and Kelly O'Neill.

5    Not a fact dispute on the following, that:  A, their conduct is

6    imputed to the company; and B, they were involved in the fraud;

7    and C, that fraud benefited Walsh by putting loans on the books

8    and giving Walsh profits at a higher value.  On those two

9    employees, there is no fact dispute, and that's why we said in

10   our brief, under Federal Rule 55F, even though we have not

11   moved for summary judgment, where there is no fact, the Court

12   can search the record and conclude that summary judgment is

13   appropriate.

14        And once we get to Robert, James, Betty Ann, D'Apolito

15   and O'Neill being involved in the fraud, then under New Jersey

16   law there can be no recovery by the plaintiff.

17        THE COURT:  Well, what is your answer to the

18   contention that the fraud of the executive is -- sister was not

19   related to this particular transaction?

20        MR. KOTT:  When you actually look at -- I think that

21   was a statement about her guilty plea.  When you look at our

22   statement of facts, you will see on the loans in this case,

23   there are ample facts that she was aware that they were

24   fraudulent.  Doing such things as when the warehouse lender

25   said:  I want to come and look at some of the properties,

 1      because the properties were supposed to be fixed up and they

 2      weren't, she gets on the phone and calls Kane and says:   The

 3      warehouse lender is going to inspect the properties.  Go fix

 4      them up before they get there.

 5              When a purchaser of these loans, such as The Money

 6      Store or Citicorp would purchase the loans, they come in and

 7      they look at the underwriting file.  They want to see what

 8      they're purchasing, who is the borrower, and things of that

 9      nature.  What's the borrower's income?  What's the appraisal

10      look like?  There's testimony in this record that on these

11      loans, that Betty Ann DeMola had ch) party <KHREPBTS> go

12      files -- she would have employees come in and pull things out

13      of the files, the things that might make a buyer not want to

14      buy the loans.

15              So although Mr. Magnanini said that in terms of her

16      guilty plea, that was not with respect to these loans, when you

17      actually read each of the statement of facts beyond that, in

18      our statement of facts as it relates to Betty Ann DeMola on

19      these loans, there's ample proof that she lunches where they're

20      talking about the fraud.  She's telling appraisers that they

21      should improperly appraise properties, and there's an

22      underwriter at the company named Rossi.  And when he didn't

23      want to approve one of these loans, she came in and put

24      pressure on him as the sister of the company.  There was an

25      underwriter on these monies named Acevito, who was taken off

 1      the loans.  By these loans -- Acevito is taken off because she

 2      was raising questions about them.  So I think under the

 3      standard for summary judgment, I think when you look at our

 4      facts, they do link up to these loans as to Betty Ann DeMola.

 5              THE COURT:  All right.  Anybody else?  Any response?

 6              MR. MAGNANINI:  Your Honor, very quick.  Well, I think

 7      I have nine quick points.

 8              First one is, Mr. Kott or Mr. Hayes had actually said

 9      that Walsh gave nothing away.  Walsh suffered no losses.

10      That's clearly incorrect.  Walsh wired 24 million dollars to

11      the two agents, and that was used to fund these loans.  Walsh

12      received the loans back from the closing lawyer and they were

13      sold, as I told your Honor, because of the 60/40 deeds, its

14      mortgages were already in default.  Walsh was obligated to

15      repurchase some.  They bought back 2.4 million from The Money

16      Store.  They bought back what ended up being about a 6 million

17      dollar judgment from these 32 loans from Cityscape, and they

18      brought back a number of loans.  Walsh also in the securities

19      was entitled to receive residual rights on each of those

20      securities.  Walsh would have gotten about 7.5 million dollars,

21      so they lost all five residuals, which is about 37.5 million

22      dollars.  And, again, the reason we moved on these loans were

23      these loans were the ones that Walsh Securities had brought

24      back.  The other loans Walsh Securities was unable to

25      repurchase.  None of them turned out to be legitimate loans.

 1      None of them anyone was happy with.  But Walsh ran out of

 2      money.  The reason it ran out of money was because of title

 3      companies investigation.

 4              When we deposed Nancy Cook, who had worked on their --

 5      this investigation for the title company, at least for the

 6      Commonwealth, said she went down, met with Coastal Title

 7      Company, and she copied its filed.  And she came back:  Did you

 8      take any notes?  No.  Do you have any report?  It looks like an

 9      investigation that the titles companies did was just a sham.

10      And they came back and what they did by not moving forward,

11      Walsh amended their complaint, and then we engaged in

12      litigation.  And here we are 15 years later and they still

13      haven't paid a penny, Walsh Securities, because they could not

14      repurchase these loans, as Mr. Walsh testified.  They could not

15      get a clean bill of financial health from the accounts at that

16      time, that lead to our BMG canceling the mergers.  So the loss

17      was borne completely by Walsh Securities.  And as they said,

18      the Fidelity bond was issued by Lloyds of London, and the

19      Fidelity bond paid Walsh Securities, not the fraud of NHF, but

20      the fraud of these employees.  And because Sedgewick Debtor,

21      which was hired by Lloyds of London, and did a giant

22      investigation, they came to the conclusion that Walsh

23      Securities was victimized by the fraud and D'Apolito and

24      O'Neill had acted against the company's interest and in their

25      own interest, and therefore Lloyds of London paid Walsh on the

1    Fidelity bond.

2              And Mr. Hayes had addressed the issue that Walsh
3    Securities does not have any standing, your Honor, mostly --
4    and he said they weren't holders of the mortgage.  When you
5    flip back to Nat -- let me just check.  It's a double answer.
6    When you flip back to the answer filed by Fidelity National
7    Title Insurance Company and you go to their eighth affirmative
8    defense, which has not be withdrawn, the eighth affirmative
9    defense says the claim -- I'm sorry, I'm going to read -- when
10   I go fast.  The eight affirmative defense in Fidelity National
11   said the claims asserted by plaintiff do not arise under the
12   title insurance policies.  In each transaction pleaded in the
13   fourth amended complaint, plaintiff maintains a valid first
14   mortgage lien on the subject premises.  Here, the affirmative
15   defense is Walsh has a valid first mortgage lien.  And then Mr.
16   Hayes is saying Walsh has no standing because it does in fact
17   have a valid first mortgage lien.  This Walsh Securities sued
18   the title companies because they breached their contract.
19   There was an offer of the closing protection letter entitled
20   insurance policy.  There was an acceptance by Walsh Securities.
21   It was performance at the closing.  Walsh Securities funds were
22   taken from the closing attorney, Yacker or Cicalese, paid to
23   closing title, and were admitted to title insurance companies.
24   The monies have never been refunded to Walsh Securities.  Once
25   it came to putting in a claim for the breach of the contract,

 1    the title companies have failed to perform, and that's a simple

 2    breach.

 3            And Mr. Hayes says again, don't look at the current

 4    law in New Jersey, don't look at Sears, and don't look at

 5    Clients Security Funds, and don't look at Vision.  We wrote

 6    around that.  They also wrote in the closing protection letters

 7    that are issued here, the closing attorneys are not our agent.

 8    That's specifically what it says.  Two district courts and the

 9    New Jersey appellate courts have since found the closing

10    attorneys are their agents, regardless of what they wrote.

11            And one of the interesting things, I did raise before,

12    your Honor, in 2006, they wrote to amend closing protection

13    letters again.  And one of the things they specifically exclude

14    in 2006 is that the recipient and closing protection letter or

15    its employees participated in the underlying fraud.  And so if

16    you go back to basic insurance Hornbook law, it's not excluded,

17    therefore it's covered.  What they're doing in '06 is excluding

18    the very fraud they're now complaining about.  Earlier in this

19    litigation they used to complain that Walsh was negligent.  And

20    I think when you look at this January 31, 1997 letter that Mr.

21    Kott raised, that's a letter from Greenwich Capital to Walsh

22    Securities that says:  You need to be careful.

23            Now, the interesting thing that Mr. Kott didn't tell

24    you about, one of the actual interesting things in the copy we

25    got, it's listed as Exhibit S.  What's in Exhibit S is not that

1    letter, so I don't know if it's somewhere else in there.  That

2    letter is -- that's quoted in the 56.1 statement, it's not in

3    their exhibit.  But that letter, your Honor, was issued by

4    Greenwich Capital by a fellow named Don Lawson.  And Don Lawson

5    worked for -- he -- every day he was that and he looked at --

6    if he was concerned that this was a fraud, which is what Mr.

7    Kott would like you to draw from the letter, that Walsh

8    Securities was on actual notice, again, not the construction

9    notice of a fraud, Mr. Lawson could have said to Greenwich

10   Capital:  We're going to stop funding -- Greenwich doesn't.

11   Mr. Lawson continues to stay in Walsh Securities, even after

12   the letters, and reviews other loans from NHF.  So the idea

13   that January 31, '97 letter put a senior management of Walsh

14   Securities on notice of a fraud is incorrect.

15              And then Mr. Kott says also that the reason Walsh

16   wanted these additional loans was it would increase their

17   inventory.  That's directly contradicted -- the people involved

18   in the fraud knew enough to get these loans at a very high

19   interest rate.  Loans with a very high interest rate were in

20   demand.  Walsh paid the least amount of money for those and

21   then sold them.  A loan with the high interest rate like these

22   were the least profitable to Walsh Securities and they actually

23   took away from the underlying value of the company.  And I

24   think when we get down to the bottom of this, your Honor, when

25   you look at the title insurance policy which is what's at issue

1    in these 66 loans, the second thing that the title insurance

2    companies insured for, beyond just the lien, as soon as the

3    fraud was uncovered and Walsh told people it had purchased or

4    sold liens to, that there's a fraud out there and we're going

5    to figure out the number of the loans involved in the fraud.

6    These entities turned out.  We don't want this.  It's

7    fraudulent.  There's nobody we can collect the deficiency.  And

8    sixty percent of the property has been deeded away.  You must

9    buy it back.  Walsh was forced to buy the loans back, and

10   that's where the lossess occurred.

11          THE COURT:  Just stay here a minute, if you would.

12   Let me do what I was going to do at the outset.  I want to run

13   through one of these transactions and see if I can -- and the

14   one I'm going to run through is 1507 Summerfield Avenue -- what

15   town?  I forget what town I was in.  And outlined on page 2 of

16   one of your memoranda in opposition.  Do you have that?  I

17   think it's in opposition to defendants' motion for partial

18   summary judgment.

19          MR. MAGNANINI:  I believe it's in opposition to the

20   bad faith --

21          THE COURT:  It is the --

22          MR. MAGNANINI:  Bad faith.

23          THE COURT:  It's the December 22nd, 2011 memorandum in

24   opposition to the motions for partial summary judgment to

25   dismiss with prejudice the bad faith claims.

1              MR. MAGNANINI:  Yes, your Honor.

2              THE COURT:  I want to run down through that and see

3    where you say the fraud was committed, or where the title

4    insurance of the closing letter came in.  I'm just running down

5    the sequence of events that's set forth in your brief.

6              So you say on October 14th, 1996, Coastal Title, which

7    was the agency you say for the title companies issued two title

8    commitments to two different purchasers.  One of them was to

9    Cristo saying that the property was owned by HUD,

10             MR. MAGNANINI:  Right.

11             THE COURT:  And the other commitment was to NHF, which

12   is owned by Cristo.  Now, Schedule B, of the first one, first

13   title commitment, says that in order to convey title, you

14   needed a deed from HUD.  Where did HUD come into this?

15             MR. MAGNANINI:  HUD was the actual owner of the

16   property, your Honor.  So they had -- they had acquired this

17   property in -- and I would assume in some sort of foreclosure

18   action.  So Cristo property is purchasing it from HUD.

19             THE COURT:  All right.  So that was a legitimate

20   statement.  So they needed a deed from HUD to convey title.

21             MR. MAGNANINI:  Correct.

22             THE COURT:  So Schedule B of the parallel, HUD title

23   commitment, said they needed a deed from Cristo to Racigliano,

24   and a mortgage by Racigliano.

25             MR. MAGNANINI:  Correct.

 1              THE COURT:  Now, there was, what, assuming that HUD

 2    would convey to Cristo, what was the point of all that?

 3              MR. MAGNANINI:  Yes, your Honor.  This was the nature

 4    of these transactions, that Cristo would buy the property from

 5    a legitimate entity, and then turn around and sell it to a

 6    strawbuyer, and so Racigliano is not, as I keep saying, a bona

 7    fide --

 8              THE COURT:  He was a strawbuyer.

 9              MR. MAGNANINI:  A strawbuyer, yes, your Honor.  So

10    what Coastal Title does, your Honor, in order to keep these

11    things clear, as you see they have a commitment number which is

12    18721 on the purchase from HUD to Cristo, and then they flip

13    over and on the commitment number from Cristo to Racigliano,

14    they have -- it's CT 18721 and in parenthesis there's a capital

15    A.

16              THE COURT:  This looks like funny business to me right

17    from the beginning.

18              MR. MAGNANINI:  That's what we're saying.  The one

19    that shows that there's problems with HUD to Cristo, never

20    gives to Walsh.  What they give Walsh Securities is --

21              THE COURT:  Cristo and Racigliano.

22              MR. MAGNANINI:  Yes, your Honor.  And what would

23    happen is once Cristo closes with Racigliano, they would then

24    from have the cash to actually pay HUD.

25              THE COURT:  All right.  And then on -- all this --

 1    this is listed in the background.  On October 30th, 1996,

 2    Coastal Title issued a closing protection letter which had two

 3    obligations, failure to comply with written instructions and

 4    fraud.

 5            MR. MAGNANINI:  Correct, your Honor.

 6            THE COURT:  And those were the two eventualities that

 7    protected against.

 8            MR. MAGNANINI:  Correct.

 9            THE COURT:  And then November 25th, 1996, a person

10    named Hill sold 1507 to Cristo for $37,500.  Where did Hill

11    come from?

12            MR. MAGNANINI:  Yeah.  We're actually not sure, your

13    Honor.  Well, I think what we got from -- in discovery from

14    Coastal Title was that the property was actually owned by HUD

15    and was being transferred to Cristo.  This Mr. Hill, I'm not

16    sure if he was the original owner and HUD doesn't actually have

17    a claim on it, or he had acquired it from HUD and then he sold

18    it to Cristo.  But the deed that gets filed here is actually --

19    says from Hill to Cristo, which is different than the original

20    title commitment issued by Coastal Title.

21            THE COURT:  All right.  So now we have the Hill

22    through Cristo for 37,500.  Then on December 18th, 1996, Walsh

23    table funded the purchase of this property pursuant to a

24    $110,625.00 mortgage and $147,500 purchase price.

25            MR. MAGNANINI:  Correct, your Honor.

    1            THE COURT:  With no down payment by Racigliano, who
    2    was a strawbuyer.
    3            MR. MAGNANINI:  And I believe this was one where a
    4    second mortgage was given on the property.
    5            THE COURT:  All right.  That was December 18th.
    6    December 27th, 1996, you have to prepare -- you have to prepare
    7    a deed giving Capital assets, a 60 percent interest in 1507.
    8    That's called the joint venture deed.
    9            MR. MAGNANINI:  That's what we refer to as a joint
   10    venture, correct.
   11            THE COURT:  And the deed was from whom to whom?
   12            MR. MAGNANINI:  The deed then is from Racigliano, the
   13    strawbuyer, to Capital Asset, getting 60 percent and Racigliano
   14    retaining 40 percent to the property.
   15            THE COURT:  All right.
   16            MR. MAGNANINI:  And so the only person they have a
   17    mortgage with is Racigliano.  So all that's securing the
   18    mortgage of 110,000 is now a minority share of the property of
   19    40 percent.
   20            THE COURT:  Had Racigliano already signed the $110,000
   21    mortgage?
   22            MR. MAGNANINI:  Yeah.  These documents, as we
   23    understand, were all signed together at the closing.  So she'd
   24    signed the mortgage and the joint venture agreement, and all
   25    the paperwork together.

 1              THE COURT:  All right.  And then on April 9th, 1997,

 2     the joint venture deed was recorded prior to the mortgage by

 3     Coastal Title.

 4              MR. MAGNANINI:  Correct, your Honor.  That's part of

 5     that large batch of documents that I referenced, that Coastal

 6     Title was given $50,000, and Kane took it from attorney

 7     Yacker's trust account.  And they filed hundreds of --

 8     literally hundreds of documents in three days in April.

 9              THE COURT:  All right.  That was April 9th.  Also on

10     April 9th Commonwealth Title issued a title policy that said

11     that title was vested in Racigliano.

12              MR. MAGNANINI:  Correct, your Honor.

13              THE COURT:  Well, do you call that part of the fraud?

14     Why would it be vested in Racigliano?

15              MR. MAGNANINI:  They would have had to do a -- go back

16     and make sure that all of these things were correct before

17     issuing the title insurance policy.  But this one that gets

18     issued is to Pamela Racigliano as the owner of the property.

19              THE COURT:  Well, where does Walsh come in on all

20     this?  You're the mortgagee?

21              MR. MAGNANINI:  Correct, your Honor.  These loans

22     were -- Walsh was a mortgage lender, and it had a series of

23     people who called correspondence, who were out there getting

24     people who needed mortgages.  National Home Funding was one of

25     these correspondence, so it would bring loans to Walsh

1    Securities the same as any number of them.  Walsh would look at

2    it, and if it was acceptable, they would table fund it.  So at

3    the closing, the documents were done in the name of National

4    Home Funding, Walsh's money gets used, and then at the closing,

5    Walsh's money is distributed and the paperwork and the note and

6    everyting was returned to Walsh Securities.  And Walsh

7    Securities falls into this by the name of the insured, your

8    Honor.  National Home Funding, it's you subserves and/or

9    assigns, and as I think Mr. Hayes was saying at the closing

10   Walsh Securities would send over assignments to National Home

11   Funding.  The loan would close in the name of National Home

12   Funding with Walsh Securities funding it, with the Capital

13   table funding it, and then it would be assigned over to Walsh

14   Securities.

15           THE COURT:  Now, where do the assignments come in?

16   Well, were the assignments from National Home Funding executed

17   at the closing to Walsh?

18           MR. MAGNANINI:  No, your Honor, they were executed by

19   Mr. Skowrenski, who was the president of National Home Funding.

20   So Mr. Skowrenski's business operated -- he had a small staff

21   and got loans in, and he had a number of loan officers out

22   there, Mr. Kane included, running around getting properties,

23   bringing them into him.  And so once the money was paid at

24   closing, or actually before the money was paid at closing, NHF

25   would receive assignment from Walsh Securities, and Mr.

1     Skowrenski would execute it, and he know send it back to Walsh

2     Securities.  That would then be married up with the closing

3     packet that would then been returned from the approved closing

4     agent at Walsh Securities.

5          THE COURT:  All right.  Well, where does the closing

6     letter, protection letter and the title policy come in that is

7     the basis for your claim?

8          MR. MAGNANINI:  Both of them, your Honor, were

9     prepared, and I guess issued in the regular course of business,

10    and they were both issued to NHF, it subserves and assigns.  So

11    because Walsh -- the way that this part of the mortgage

12    business works, it works like this.  They were brokers who

13    would get the property and bring them to a lender.  The lender

14    would fund the closing and then would be assigned the mortgage

15    and paperwork.  Well, Walsh Securities would take this packet

16    and say:  Here's a mortgage note, deed, and here's assignment

17    from NHF.  And it would either provide them for sale to the

18    whole buyer, or to the title, or to the security, and then they

19    would be transferred out of Walsh Securities.  Walsh would then

20    receive money back that would go back to Greenwich Capitol, and

21    that would go back to make a subsequent loan.

22         THE COURT:  All right.  I want to run down National

23    Title's sequence of events, and see how it relates to what

24    we've just discussed here.  It says that the first step would

25    be the mortgage broker would take a loan application and get

 1    documentation and then a loan package would be forwarded to

 2    Walsh.

 3              MR. MAGNANINI:  Correct.

 4              THE COURT:  And this is page 4 of National Title's

 5    brief, I'm not sure which one.  You can just follow the

 6    sequence of events.  The mortgage broker takes the loan

 7    application, and gets the documentation, and orders an

 8    appraisal and brings the loan package to Walsh

 9              MR. MAGNANINI:  Yes.

10              THE COURT:  So that would be the first step.  And then

11    Walsh would review the package and issue a commitment for the

12    loan to the broker and prepare the loan documents.

13              MR. MAGNANINI:  Correct, your Honor, yes.  Mr.

14    D'Apolito was the salesman for Walsh, so he had a relationship

15    with National Home Funding.  They would say to him:  We'd like

16    this loan to be funded by Walsh.  He would bring it in, the

17    Walsh underwriters, a separate department, and say:  It meets

18    our credit risk guidelines, and we can fund this at this

19    interest rate.

20              THE COURT:  This is in anticipation of National --

21    actually executing the loans, advancing the loans.

22              MR. MAGNANINI:  Exactly.  The National Home Funding,

23    what they would do is the correspondence or mortgage brokers

24    would actually shop the loan to a number of different lenders

25    and try to get the most points for themselves at the best

 1    interest rate for the buyer.  And so depending on what the

 2    response was, the loan would be either funded by Walsh or NHF

 3    was free to say:  Your interest rate is too high, we're not

 4    going to receive sufficient points, we'll fund our loans

 5    somewhere else.

 6              THE COURT:  Then this description of the procedure

 7    goes on to say that the closing department -- was that the

 8    closing Department of Walsh?

 9              MR. MAGNANINI:  At Walsh Securities, yes, your Honor.

10              THE COURT:  Not NHF, it would be Walsh?

11              MR. MAGNANINI:  Yes, correct.

12              THE COURT:  And issue the closing instruction and

13    arrange for the transfer of the funds to the closing attorney.

14    Now, the instructions would be issued to whom?

15              MR. MAGNANINI:  To Mr. Yacker or Mr. Cicalese.

16              THE COURT:  Whom was Yacker working for?

17              MR. MAGNANINI:  Yacker worked ostensively for -- he

18    was a representative of the strawbuyer.  And as the case law

19    says, the agents and the title companies, in fact he was

20    working for Mr. Kane because he didn't do the closings, his

21    paralegal Mr. Kane did.

22              THE COURT:  All right.  And this would go to him?

23              MR. MAGNANINI:  Yeah.

24              THE COURT:  And I'm just trying to link this up to the

25    description of the 1507 transaction.  Where it says that on

 1      December 27th, Yacker prepared the deed giving Capital

 2      Associates 60 percent interest.  I guess that would be

 3      independent of your instructions.

 4                MR. MAGNANINI:  Correct, your Honor.

 5                THE COURT:  All right.  All right.  Then all the loans

 6      going back again to Nations Title, a description of the

 7      procedure, all the loans subject to the litigation were closed

 8      by NHF, title policy issued to NHF, and subsequently assigned

 9      to Walsh.  That would be correct?

10                MR. MAGNANINI:  That's correct, your Honor.  I believe

11      the two title policies were actually sent directly to Walsh

12      Securities and not to --

13                THE COURT:  Not to NHF.

14                MR. MAGNANINI:  Not to NHF.

15                THE COURT:  And then the next step Walsh prepared the

16      assignment.  Which assignments were those?

17                MR. MAGNANINI:  They were actually what they call

18      assignments in blank, your Honor.  And so on the mortgage

19      package, once they got everything done on top, they're being an

20      assignment, it says assignment dated January 18th, 2012, from

21      Walsh Securities to, and it would be left --

22                THE COURT:  NHF to Walsh.

23                MR. MAGNANINI:  That was already in the package, your

24      Honor, before the closing occurred.  NHF would execute

25      assignment assigning the mortgage and loan back to Walsh

1    Securities.

2              THE COURT:  And where they say Walsh prepared

3    assignments and sent them to NHF for executions, which

4    assignments would those be?

5              MR. MAGNANINI:  Those are the assignments from NHF

6    back to Walsh.

7              THE COURT:  Okay.

8              MR. MAGNANINI:  I was further on in the process.

9              THE COURT:  All right.  Then it says NHF executed the

10   assignments and returned them to Walsh.

11             MR. MAGNANINI:  Correct.

12             THE COURT:  And then Walsh executed the additional

13   assignments of the loan document blank for the benefit of the

14   ultimate purchaser of the loan on the secondary market.

15             MR. MAGNANINI:  Correct, your Honor.  So at the top of

16   the loan packet is assignment date, with a date from Walsh

17   Securities to blank, therefore, The Money Store, if it

18   purchased the loan.  And if it decided to keep the loan, it

19   would fill its name in, or it would sell it again and it would

20   go -- it could go further on in the secondary market.

21             THE COURT:  And then that's the last step listed here,

22   Walsh transmits both assignments to the whole loan, to the

23   whole loan buyer of the mortgage, expecting it to record the

24   assignments.

25             MR. MAGNANINI:  Correct.

 1              THE COURT:  Well, why wouldn't Walsh -- well, I

 2      suppose at that point, that at that point there had not been

 3      the 60 percent assignment, it would have been no problem.

 4              MR. MAGNANINI:  Initially it wouldn't have been a

 5      problem, your Honor.  Eventually once Walsh discovered that

 6      these loans were part of a fraud and the strawbuyers couldn't

 7      make the payments, you have the market contact problem we're

 8      complaining of.

 9              THE COURT:  Well, I'm just trying to think, what if

10      there had not been this assignment of 60 percent of the

11      mortgage, then the whole hundred percent would be covered by

12      the assignments to the loan buyer of the mortgage.

13              MR. MAGNANINI:  Yes, your Honor.

14              THE COURT:  It shall be a worthless piece of property.

15              MR. MAGNANINI:  Right.  In our most extreme example,

16      the property was purchased for $10,000 and was appraised at

17      100- or $200,000, and Walsh loaned 150,000 on it.  So there was

18      no way the $10,000 property was going to be worth 150.  And

19      because the strawbuyer wasn't a bona fide purchaser, he was

20      never going to make payments.  And if Walsh pursued him, he was

21      never going to be able to collect them.

22              THE COURT:  So you were victimized where in this

23      process?

24              MR. MAGNANINI:  We're victimized throughout the

25      process that initially, like your Honor said, with the 60/40,

1      you've given away the majority of the loan securing the

2      property, thereby putting the mortgage into default.  So as

3      soon as Walsh transferred this to someone else, it was

4      subjecting itself to having to repurchase these loans because

5      of the fraud.  And then because of the nature of these

6      transactions that the strawbuyers were used, and the

7      strawbuyers were paid money.  They each got about $1,750.00 for

8      the property.  They were mostly used because they had clean

9      credit.  Again, when Walsh -- even if it received a first lien

10     interest in the property, the other two things that Vision

11     court says the lender bargains for, didn't get, it didn't get a

12     bona fide purchaser to make payments, and it didn't get

13     purchasers to pursue.  Even if it foreclosed on a $10,000

14     property, it would have still be owning $140,000 property.

15             THE COURT:  Well, the real fraud was at the beginning.

16             MR. MAGNANINI:  Yes, your Honor.  Yes, your Honor.

17     The flip was Mr. Kane's purchase and the subsequent --

18             THE COURT:  And you're just transferring a piece of

19     junk up and down the line.

20             MR. MAGNANINI:  Right.  But it was junk that had been

21     appraised to make it not look like junk.

22             THE COURT:  All right.  Well, I'm just -- so where

23     does -- where did the title companies come into this?

24             MR. MAGNANINI:  Well, the title companies come in, we

25     believe, in two areas.  Again, contract claims, they issued the

 1      closing protection letters to protect Walsh against failure to

 2      follow their closing instructions, which as we said, the

 3      closing attorneys Mr. Yacker and Cicalese admit that they knew

 4      all about the strawbuyers, and knew none of these guys could

 5      make any payments.  They took money and they didn't give it to

 6      Cristo as the seller, they took money and gave it to Mr.

 7      Pepsny, Cristo's lawyer, to buy the property.  They took money

 8      and gave it to Mr. Cristo to pay the mortgage.  And they took

 9      money and gave it to Kane as profits.  They took money to gave

10      it to Grieser to pay the strawbuyers.

11              THE COURT:  What was the -- what was the fraud -- what

12      was the instructions they failed to follow?

13              MR. MAGNANINI:  We've got -- like I said, your Honor,

14      when they signed the HUD-1, it shows that they -- they've

15      actually disbursed the proceeds in the matter according to the

16      HUD-1, and the HUD-1 fails to mention payment to Mr. Pepsny.

17      After the closing, they would do a number of closings, and Mr.

18      Kane would have a memo that she would send around to the

19      various participants.  And one memo says:  Looks like a good

20      Christmas.  Here's $300,000 to Mr. Pepsny to pay for the

21      properties that Mr. Kane has already sold and has been funded

22      with Walsh Securities' money.  Here's money to Mr. Grieser to

23      make mortgage payments.  And here's money to pay off the

24      strawbuyers.  Here's money to Mr. Yacker.  Here's money to Mr.

25      Kane.  And so at the closing, the closing attorney, knowing of

 1    Walsh Securities closing instructions, and there's a number of
 2    instructions that were listed in our papers, which Mr. Mee will
 3    pull out for me, that were violated.  The base one is that they
 4    send back a HUD-1 not showing where all this money was
 5    distributed, and that's a lie.  And so that with the
 6    participation of the closing attorneys, we're arguing vigorous
 7    coverage under the closing protection letter, which insures
 8    against the fraud in the lawyer because we're not getting good
 9    title.  And when you go to the title insurance policy that the
10    protection letter is part of, it's the second thing that
11    they're insuring against is the marketability of the property.
12    And it's clearly not marketable because once it's discovered
13    that these properties are part of a fraud, all of the
14    purchasers demand they be repurchased.
15              THE COURT:  Well, the fraud element of the closing
16    letter has certain limitations.  It has to be fraud with
17    respect to it.  I forget what the exact language was.  Mr. Kott
18    very eloquently said it.  Nothing to do with the -- what you're
19    claiming.  And the fraud that you're alleging didn't fall
20    within that category that was specified in the closing
21    protection letter.
22              MR. MAGNANINI:  Well, as base, your Honor, what we're
23    alleging is the title we got to this property was worthless
24    because 60 percent had been deeded away.  And then, as I said,
25    under the policy, it's not marketable.  And the first thing is

 1    it's insuring is the title.  There's a --

 2             THE COURT:  Well, I'm with the closing letter at the

 3    moment.  What is the qualification of the fraud?  Do you have

 4    the closing letter?  I made a copy of it, but I don't seem to

 5    have it in hand.

 6             MR. MAGNANINI:  Here you go, your Honor.

 7             THE COURT:  What does the fraud have to be?

 8             MR. MAGNANINI:  The first thing that it's insuring

 9    circumstances against is failure of the issuing agent or the

10    attorney, Mr. Yacker or Mr. Cicalese, to comply with the

11    written closing instructions.  And like I said in our papers,

12    there's a number of things that they failed to comply with.

13             THE COURT:  I'm not on that one.  Number 2, fraud, it

14    has to be in relationship to --

15             MR. MAGNANINI:  And that flips you back.  Number 2 is

16    fraud in handling the funds in connection with the matter set

17    forth in number paragraph 1 above.  And when I went back to

18    number 1, your Honor, number 1 says the failure of the issuing

19    agent or the attorney to comply with Walsh Securities' written

20    instructions --

21             THE COURT:  You have to read it more slowly and more

22    loudly.

23             MR. MAGNANINI:  Your Honor, number 1 says the failure

24    of the issuing agent or attorney to comply with Walsh

25    Securities' written closing instructions, to the extent that

1    written closing instructions relate to the title in said

2    interest in land --

3              THE COURT:  Relate to what?

4              MR. MAGNANINI:  The title in said interest in land.

5              THE COURT:  Yes.

6              MR. MAGNANINI:  And what we're saying is, at the

7    closing, 60 percent of the title to the land is being deeded

8    away.  That 60 percent in certain instances, the one we gave it

9    in here, is actually being recorded ahead of the mortgages.  So

10   Walsh Securities is giving a mortgage for $110,000, and is only

11   receiving security of 40 percent.  What they're getting back,

12   unbeknownst to them because of the fraud of the closing agent,

13   is a mortgage that's defective.  It's a mortgage that's been --

14   that's been accelerated, and it's a mortgage that's in

15   default --

16             THE COURT:  How did that fall into the final paragraph

17   of the qualifiers of fraud that's covered by the closing

18   letter?

19             MR. MAGNANINI:  What do you mean by the final

20   paragraph, your Honor?

21             THE COURT:  Well, there's --

22             MR. MAGNANINI:  Well, at the very end --

23             THE COURT:  There are two things you're protected

24   against, the failure to file instructions, and the second

25   thing --

 1              MR. MAGNANINI:  Right, your Honor.

 2              THE COURT:  And the fraud has to relate to --

 3              MR. MAGNANINI:  That takes you back and relates to the

 4      first paragraph, which says if they fail to comply with the

 5      closing instructions relating to the title to said interest in

 6      land.

 7              THE COURT:  Now, Mr. Kott, you've given me every

 8      final written -- which I can't find what I'm looking for.

 9              MR. MAGNANINI:  Yeah.  I think what you're looking

10      for, in number one, there's an A, and a B.

11              THE COURT:  All right.  Number 1, paragraph -- yes.

12              MR. MAGNANINI:  And so it says, one says, if the agent

13      fails to follow the closing instructions and that violation

14      relates to the title to said interest in land, which is what

15      we're saying, we got a defective title because our mortgage was

16      already in default when it came back to Walsh Securities; and

17      then two, or validity and enforcement of priority of lien in

18      said mortgage and said land.  And on those -- on the examples

19      that we gave your Honor, the 60/40 deed is filed and recorded

20      ahead of Walsh Securities.  And in those cases, the validity

21      and enforceability and priority of the lien is secondary to

22      joint venture deed.  So Walsh is being harmed in that way as

23      well.  And then the net -- the ending sentence, the little

24      about, in parenthesis, the collection of payment of funds due

25      you, doesn't really apply here.  All the money came from Walsh

 1    Securities.  There was no money going back to Walsh Securities.

 2    So what we're alleging is the violation of the closing

 3    protection letter falls under both number one, the failure to

 4    follow the closing instructions which results in its defective

 5    title; and number two, the fraud, which again takes you back,

 6    and both things we ended up with the same piece --

 7              THE COURT:  Well, I think that covers what I was going

 8    to go into.  All right.

 9              Mr. Kott, do you have anything you want to add to

10    this?  In one of your briefs, you contend that the -- the

11    grievance here doesn't fall within the closing protection

12    letter.

13              MR. KOTT:  Correct.  And I'm going to yield to Mr.

14    Hayes on that.  I think the Court has focussed in on the issue,

15    we first examined the closing service letter and what coverage

16    it provides.  And I was listening to the colloquy with Mr.

17    Magnanini and your Honor where Mr. Magnanini went through six

18    or seven items which clearly were fraud, there were no question

19    there was frauds in these loans, but none of which he was able

20    to articulate fit within the terms of paragraph one and two of

21    the closing service letter.

22              When your Honor had asked him that --

23              THE COURT:  Well, it seems to me that the coverage in

24    the closing letter is pretty broad.

25              MR. KOTT:  Well, I'm not sure I agree with you.  It's

 1    limited in the following way, ITS failure to follow the closing

 2    instructions.

 3            THE COURT:  Right.

 4            MR. KOTT:  So that could be an act of fraud by the

 5    closing lawyer that is unrelated to the closing instructions.

 6            THE COURT:  Well, I don't know what the closing

 7    instructions were.

 8            MR. KOTT:  And I'm not the moving party on plaintiffs'

 9    motion, and I'm going to yield to Mr. Hayes right now.  This

10    relates to a core argument of the defendants in opposition to

11    plaintiffs' motion for summary judgment.  And that is, the

12    burden on the motion for summary judgment on plaintiffs is to

13    demonstrate that they're entitled to a judgment as a matter of

14    law, which means, number one, they have to show you the closing

15    instructions; number two, they have to show you how there was a

16    violation of the closing instructions; and number three, how

17    the violation of the closing instructions fits within the

18    closing service letter.

19            Mr. Hayes.

20            MR. HAYES:  Judge, if I may, with respect to the 60/40

21    deeds, we need to understand what we're dealing with, and the

22    ramifications of the 60/40 deeds, because with all due respect

23    to Mr. Magnanini, his position simply ignores New Jersey law

24    regarding the effect of these deeds.  We have a strawbuyer

25    purchasing a property, one hundred percent of the property,

1         from whomever the third party is.  That straw party is

2         borrowing 100 percent of the inflated purchase price from NHF.

3         That buyer then is given 60 percent of his ownership interest

4         in the property to Capital Assets.  So what you have is after

5         the transaction is complete, you have a mortgage signed by the

6         borrower, the strawbuyer on a property that is owned 60 percent

7         by Capital Assets and 40 percent by the strawbuyer.

8               Now, in many of these transactions, Judge, the

9         recordation occurred the way they were supposed to, and that is

10        that the deed to the strawbuyer was recorded.  The mortgage

11        from the strawbuyer to NHF was recorded --

12              THE COURT:  First or second, before or after the

13        strawbuyer?

14              MR. HAYES:  The deed into the strawbuyer was recorded.

15        In most of the transactions, you've got -- so if we say Hayes

16        is a strawbuyer, the deed from Cristo to Hayes is recorded.

17        The mortgage from Hayes to NHF is recorded.

18              THE COURT:  All right.

19              MR. HAYES:  And then the deed from Hayes and Capital

20        Assets is recorded.  Okay, that's the way the bulk of these

21        transactions took place.  So that when --

22              THE COURT:  I understood that the deed to Capital

23        Assets was recorded before.

24              MR. HAYES:  There were some.  What I'm trying to show,

25        your Honor, the whole plethora of what we're dealing with here.

1       I think it's important to understand there were deeds recorded

2       in the proper order.  When the proper recordation occurred,

3       Judge, you had Capital Assets requiring a 60 percent interest

4       in the property, subject to the mortgage that had been given by

5       Hayes to NHF.

6               THE COURT:  All right.

7               MR. MAGNANINI:  So much like, your Honor buys a

8       property and you get a mortgage from FMAC.  And you then

9       transfer an interest in the property.  That third party

10      requires, let's focus on what happened on the 21 -- on the 21

11      of 220 claims that they've asserted where the recordation was

12      in the incorrect order, and that is that the deed that Hayes

13      acquires, the property is recorded, the deed from Hayes and

14      Capital assets is recorded, and then the mortgage is recorded.

15      We acknowledge, Judge, there is a title problem that exists as

16      a result of that recordation.  The problem, however, is with

17      the statement that's made.  Their problem is one that renders

18      the property valueless, or that enables Capital Assets to argue

19      that its 60 percent interest in the mortgage -- 60 percent

20      interest in the property is not subject to the mortgage.  The

21      problem with that analysis is New Jersey law is very clear,

22      Judge, when a third party acquires an interest in a property,

23      okay, it can only be a good faith purchaser for value under New

24      Jersey law such that it could take an interest separate and

25      apart from a mortgage that may have been given, if it takes

 1    title to the property without knowledge of the existence of

 2    that mortgage and it pays fair value for it.

 3         In this case let's not forget who Capital Assets is,

 4    the person that got these 60 percent interest.  It was Gary

 5    Grieser, a ring leader of this fraud.  Mr. Grieser, at the time

 6    he acquired his 60 percent interest in the property, knew full

 7    well that NHF had lent the monies to the buyers.  When Mr.

 8    Grieser acquired his 60 percent interest in the property, they

 9    did not so for no consideration.  So although counsel is

10    correct, a title property was created by the recordation, it

11    does not render that mortgage invalid.  And in fact, Judge, had

12    they notified the title companies of this error in the

13    recording, long before their mortgages were divested by

14    foreclosures, tax foreclosure sales, the title companies could

15    have fixed this problem.  Title companies all the time, myself

16    included, Judge, bring corrective actions to fix problems such

17    as this.  I would have filed a lawsuit against Capital Assets,

18    Mr. Grieser, saying because of an error in the recordings of a

19    deed, your ownership interest appears to be free and clear of

20    the mortgage.  However, because you bought the property and

21    took possession of the property, and because you did not pay

22    fair value for it, New Jersey recording statutes say you,

23    Capital Assets, took your interest in that property, subject to

24    the mortgage.

25         So we can't jump, Judge, from the fact that there's an

     1    error in recording to the fact that this mortgage is worthless,

     2    or to the fact that there's a violation of the closing

     3    instructions, or to the fact that this had something to do with

     4    the fraud.  Counsel would need to acknowledge that if the fraud

     5    was to give away this 60 percent interest before the mortgage

     6    was recorded, they viewed it up on all those 200 transactions,

     7    they only did this on 21 transactions.  And the record I think

     8    will be relatively clear at the time of trial, they did it

     9    because of the confusion that it existed when this mass filing

    10    took place.

    11           Now, the problem that we're in, Judge, is that until

    12    the forth amended complaint, Walsh does not make title claims

    13    until Magistraate Judge Shipp directs Walsh to identify the

    14    properties on which it makes title claims.  We don't even know

    15    which properties are the subject of the title claims until

    16    their response to my motion for summary judgment, where I state

    17    that all the title claims should be thrown out because they

    18    lost their interest due to their failure to report their

    19    assignments.  It was only in their response that they raised

    20    for the first time that you had these 60/40 deeds.  Raising it

    21    then for the first time puts us in the improper position, our

    22    argument where they've already lost their mortgages at

    23    foreclosure sales, we're not in a position to bring the

    24    proceeding that we could very easily brought against Capital

    25    Assets to fix the problems on those 21 properties that

 1    resulted --

 2              THE COURT:  Why would you want to fix them if they're

 3    worthless properties?

 4              MR. HAYES:  We have an obligation to fix them.  We

 5    don't insure the value of the real estate.  What title policies

 6    do is say you have a valid mortgage on the properties.  We have

 7    the burden to fix that property.  If it turns out because of

 8    phony appraisals those properties are not worth what they

 9    should be worth, we don't insure the appraisal value.  But what

10    happened in this case, by them waiting until -- and let's get

11    the dates right here, to almost twelve years after all of these

12    transactions closed to raise title issues for the first time,

13    and after all of their mortgages had already been divested, not

14    because of the 60/40 deeds, and not because of any fraud, but

15    because the properties were all sold at tax sales of which they

16    got no notice because they hadn't recorded that assignment, we

17    weren't in the position to do anything, Judge.

18              So counsel can talk all he wants about failure to

19    follow closing instructions and fraud relating to these 60/40

20    deeds, that didn't fall within the language of the closing

21    service latter.  That's a title claim.  There's a title policy

22    that's in effect.  Errors are made in recording documents all

23    the time, Judge, but that doesn't mean a closing service letter

24    claim arises.  If your Honor looks, there's nothing in the

25    closing service letter that's violated by that 60/40 deed.  Any

 1     buyer has the right to transfer an interest in a property after
 2     they borrowed money.  It may be a default under the mortgage,
 3     but there's no prohibition against a buyer transferring his
 4     interest.  When the buyer transfers his interest in the legal
 5     estate, it doesn't make the property unmarketable.
 6                 In this case, those 60/40 deeds we think are a red
 7     herring, Judge, that have been raised simply because Walsh
 8     cannot find a way to fit the conduct in this case, into the
 9     limited language that currently exists in the letter.  Thank
10     you.
11                 THE COURT:  All right.  Well, I think as far as the
12     other defense motions, I might as well do them on the papers,
13     unless you feel you need argument?
14                 MS. WAGNER:  Your Honor, one quick thing.  What I was
15     looking for is the section of the closing instructions that we
16     allege that lawyers failed -- the closing instructions that the
17     lawyers failed to comply with, 12 and 13 of our moving papers.
18                 THE COURT:  Okay.
19                 MS. WAGNER:  Your Honor, if I can have one minute with
20     respect to Nations and Fidelity with respect to the title
21     claims.
22                 THE COURT:  All right.
23                 MS. WAGNER:  Amy Wagner from Stone and Magnanini on
24     behalf of plaintiff Walsh Securities.  I just want to make sure
25     it's clear to the Court, you'll probable notice when you're

 1      looking at the papers in the moving brief with respect to the
 2      title claims, they categorize the issue as, can Walsh make
 3      claims under title insurance policies for losses resulting from
 4      the failure to record assignments on the 29 properties when
 5      Walsh was in control of the assignments and never provided them
 6      to the closing attorney or the title agent for recording,
 7      instead relying on the secondary market purchasers to record
 8      the assignments?  And as we said in our opposition brief, we
 9      never made that allegation.  We never said that we were holding
10      the title insurance companies liable for the assignments not
11      being recorded.  And in their reply they allege a slew of other
12      arguments that we never had an opportunity to respond to, and
13      we just think that the Court should not consider those
14      additional arguments.

15                  THE COURT:  All right.  Good.  What about these three
16      or four motions of the defense?

17                  MR. KOTT:  Your Honor, I'll let Mr. Hayes speak for
18      himself on his motion.  I think he just addressed late notice.
19      That is Mr. Hayes' motion on the policy claim, not on the
20      closing service letters.  He raised on behalf of all the
21      defendants what we would call a late notice defense, that is,
22      they first put us on notice 12 or 14 years after the loss
23      occurred, and by that time we were not able to prevent the
24      loss, as we normally would.  So I think in effect you heard
25      from Mr. Hayes on that.

1          There are two additional motions, and I'm going to

2    just set -- tell the Court what they are, and what the issues

3    are, and then your Honor can tell us if you want oral argument.

4    We have a motion on damages.

5          THE COURT:  Yes.  You don't think they are entitled to

6    the damages, the value of the merger.

7          MR. KOTT:  Right.

8          THE COURT:  And the loss of the business value.

9          MR. KOTT:  And that's a partial summary judgment on

10   damages because they are entitled, if they meet all their

11   elements, to what they lost on the loans, the merger damages,

12   or the diminution.  That we have an argument on standing and we

13   have an argument back to law school, Hadley vs. Backsendale,

14   that it's not foreseeable that we would get $25.00 for a

15   closing service letter that insured $100,000 property in Asbury

16   Park, and that we would end up being faced with 400 on --

17   $440,000,000 in damages.  That's the issue on that.

18         On bad faith, the issue as we frame it is under

19   Kretster, which is a Third Circuit case.  Under the New Jersey

20   Supreme Court case in Picken.  Under your Honor's decision in

21   Dare, which is one of the cases you had a motion on.  If the

22   plaintiff is not entitled to summary judgment on coverage, then

23   the plaintiff, as a matter of law under New Jersey law, is not

24   entitled to bad faith or breach of fiduciary duty.  The Third

25   Circuit said that, and the Supreme Court of New Jersey said

1    that, and your Honor in some of your conclusions have said

2    that.   Those are the issues.

3         If the Court wants argument on those --

4         THE COURT:   I really don't.

5         MS. KOTT:   Okay.

6         THE COURT:   All right.   I've read the briefs and all

7    those arguments, and I think the response to those arguments

8    are IN the answering briefs.   So i figured that, the main

9    motion for summary judgment would bring out these various

10   issues, and I think it has.   So why don't we just, let us go to

11   work on the briefs, on all the motions, and on the argument on

12   the summary judgment motion of the plaintiff today.   All right.

13   Well, thank you, very much, you've given me lots to think

14   about.

15        (Matter concluded.)

16

17

18

19

20

21

22

23

24

25