**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALSH SECURITIES, INC., | Civ. No. 97-3496 (DRD) |
| Plaintiff, | |
| v. | **O P I N I O N** |
| CRISTO PROPERTY MANAGEMENT, LTD., a/k/a G.J.L. LIMITED, et al., | |
| Defendants. | |

*Appearances by:*

STONE & MAGNANINI LLP
by: Robert A. Magnanini, Esq.
    Amy Walker Wagner, Esq.
    Daniel Ian Mee, Esq.
    Jeffrey A. Shooman, Esq.
150 JFK Parkway, 4th Floor
Short Hills, New Jersey 07078

    *Attorneys for Plaintiff,*

FOX ROTHSCHILD LLP
by: Edward J. Hayes, Esq.
    David H. Colvin, Esq.
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103

    *Attorneys for Defendants Fidelity National Title Insurance Co. of New York and Nations Title Insurance of New York, Inc.*

MCCARTER & ENGLISH, LLP
by: David R. Kott, Esq.
    Sara F. Merin, Esq.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

*Attorneys for Defendant Commonwealth Land Title Insurance Company*

**<u>DEBEVOISE, Senior District Judge</u>**

This matter arises out of a mortgage fraud scheme that took place between April 1996 and June 1997.  In the roughly fifteen years since the scheme—which involved multiple lawsuits and indictments—no one has quite gotten to the bottom of it.  What remains are claims asserted by Plaintiff Walsh Securities, Inc. ("WSI") against Defendants Commonwealth Land Title Insurance Company ("Commonwealth"), Fidelity National Title Insurance Co. of New York ("Fidelity"), and Nations Title Insurance of New York ("Nations) (collectively referred to as "the Title Insurers") for breach of contract, bad faith, and compensatory damages.

WSI now moves for summary judgment in its favor on certain claims for breach of contract.  In addition, the Title Insurers move for summary judgment in their favor on a number of WSI's claims for breach of contract, as well as on its claim for bad faith and portions of its claim for compensatory damages.  For the reasons set forth below, WSI's motion is DENIED, and the Title Insurers' motion is DENIED with respect to WSI's claims for breach of contract and compensatory damages, but GRANTED with respect to WSI's claim for bad faith.

## I.  BACKGROUND

WSI was a wholesale residential mortgage lender in the business of, among other things, purchasing subprime retail mortgage loans from other mortgage bankers or mortgage brokers, known as correspondents, and packaging those mortgage loans for use as securities in secured

transactions, or reselling the loans to whole loan purchasers.[1]  Robert Walsh is the president, Chief Executive Officer, and principal shareholder of WSI.  James Walsh, Robert Walsh's brother, was the Vice President, Director of Underwriting and Operations at WSI, and a shareholder in the company.  Betty Anne DeMola, the sister of Robert and James Walsh, was the National Sales Manager at WSI and a shareholder in the company.

In this case, WSI, as the mortgage loan wholesaler, purchased mortgage loans from a correspondent known as National Home Funding ("NHF") by funding them at the time of their closing—a process called table funding.  To table fund these mortgage loans, WSI drew on a $200 million warehouse line of credit with Greenwich Capital Markets, Inc. ("Greenwich Capital").  WSI then sold the mortgage loans to entities called whole loan purchasers, such as The Money Store and Cityscape Financial, or to a Trust on behalf of note holders in securities issued by WSI.  WSI's sale of mortgage loans included representations and warranties requiring WSI to repurchase all loans found to be unmarketable or fraudulent.

## A.    The Mortgage Loans

This case involves approximately two hundred and twenty mortgage loans that WSI table funded between April 1996 and June 5, 1997.  A relevant loan transaction begins with a licensed mortgage broker accepting a loan application from a consumer that wants to purchase real property (the "borrower").  The mortgage broker would gather all necessary documentation to obtain the loan and order an appraisal of the subject property by a licensed appraiser to determine its fair market value.  The mortgage broker would then forward the loan package to WSI.  If WSI was satisfied with the package, it would issue a commitment for the loan to the broker and begin preparing the loan documents.

---

[1] WSI is the "primary operating subsidiary" of Walsh Holding Company, Inc.  (Shooman Cert., Ex. 7.)  In April 1996, WSI became a successor in interest GF Mortgage Corp through a leveraged buyout.

At this point, WSI's closing department would issue closing instructions and transfer the loan funds to the escrow account of a closing attorney on the day of the closing, or shortly before that time.  The closing attorney would have to certify that it had complied with WSI's closing instructions before releasing WSI's funds from his or her escrow account.

WSI's closing instructions required, among other things, (1) "[t]wo forms of acceptable identification from all borrowers;" (2) that "[n]o . . . documents be executed by Power of Attorney unless authorized by Walsh Securities, Inc.;" (3) that the mortgage loan be recorded "in the First Lien position;" (4) that a full ALTA title policy be issued; and (5) that "[p]rior to disbursement [the closing attorney] must FAX HUD-1[2] to the [WSI] Closing Department." (Magnanini Cert., Ex. C.)

None of the two hundred and twenty loans in this case was actually closed in WSI's name.  Instead, WSI issued those loans in the name of NHF—which also brokered the loans—in order to limit WSI's exposure in case of wrongdoing on the part of NHF.  WSI maintained the loans in NHF's name by assigning them to NHF.  In doing so, WSI prepared the loan assignments and sent them to NHF for execution.  Upon execution, NHF assigned the loans back to WSI, which would then execute an additional assignment of the loan documents in blank[3] for the benefit of the ultimate purchaser of the loan in the secondary market.  WSI then transmitted

---

[2] HUD-1 is shorthand for a HUD-1 Settlement Statement—a standard form in which closing agents are required to set forth an accounting of all transactions related to the closing of a federally regulated mortgage loan.  See Martinez v. Wells, 598 F.3d 549, 557 (9th Cir. 2010).  In this case, the closing attorneys certified that "[t]o the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have caused or will cause the funds to be disbursed in accordance with this statement." (Magnanini Cert., Ex. D.)

[3] A mortgage assignment "in blank" is a means by which a mortgage owner can assign a mortgage without naming the ultimate buyer.  Such assignments are common in the mortgage loan securitization process.

both assignments—the assignment from NHF to WSI, and the in blank assignment from WSI—
to the whole loan buyer for recordation.

**B.      The Title Policies**

Prior to the closing, WSI would take out a title insurance policy[4] to protect against losses
arising from defects in, or encumbrances on, the title to the real property subject to the mortgage
loans that it was table funding.[5]  In this case, WSI took out title policies from The Title Insurers.
These title policies were brokered and issued on behalf of the Title Insurers by Coastal Title
Agency, Inc. ("Coastal") and Monmouth Title Agency, Inc. ("Monmouth").  The Title Insurers
had agency agreements with Coastal and Monmouth.

WSI took out the title insurance policies in the following manner.  First, WSI submitted a
request for a title commitment to Coastal or Monmouth for a particular property.  Upon receiving
the request, Coastal or Monmouth was required to investigate and evaluate issues regarding title
to, and judgments, taxes, and assessments on the property.  All potential encumbrances and title
defects were noted in the title commitment so that they could be rectified before the closing.
After the closing, the closing attorney submitted documents indicating that there were no
encumbrances on, or title defects in, the subject property, such as recorded deeds and mortgages,
affidavits of title, and satisfaction of liens.  Upon submission of these documents, Monmouth or
Coastal issued a title insurance policy on behalf of the title insurer to WSI describing the insured
property, insuring that the property was vested in fee simple in the buyer's name, and that the

---

[4] The policies were issued in NHF's name because the insured loans were closed in
NHF's name.

[5] The title policies in this case used standard language from the 1992 form policy of the
American Land Title Association.  <u>See</u> (Hayes Cert., Ex. E); (Magnanini Cert., Ex. A.)

insured mortgage loan was recorded as a valid first lien on the property in the mortgage book of

the county clerk's office.  <u>See</u> (Magnanini, Ex. A.)

As such, the title policies at issue in this case insure, in pertinent part, against losses

arising from:

1.  Title to the estate or interest described [in the policy] being vested other than as stated
    therein;

2.  Any defect in or lien or encumbrance on the title;

3.  Unmarketability of the title;

***

5.  The invalidity or unenforceability of the lien of the insured mortgage upon the title;

(Hayes Cert., Ex. E.)

The policies exclude, among other things, "Defects, liens, encumbrances, adverse claims or other

matters: (a) created, suffered, assumed, or agreed to by the insured claimant" ("Exclusion 3(a)").

(<u>Id.</u>)

The policies also provide the following:

The insured shall notify the [insurer] promptly in writing . . . (ii) in case knowledge shall
come to an insured hereunder of any claim of title or interest which is adverse to the title
to the estate or the lien of the insured mortgage, as insured, and which might cause loss or
damage for which the [insurer] may be liable by virtue of this policy or (iii) if title to the
estate or interest or the lien of the insured mortgage, as insured, is rejected as
unmarketable.  If Prompt notice shall not be give to the [insurer], then as to the insured
all liability of the [insurer] shall terminate with regard to the matter or matters for which
prompt notice is required.

* * *

Upon written request by the insured and subject to the [limitations of the title policy] . . .
[the insurer], at its own cost and without unreasonable delay, shall provide for the defense
of an insured in litigation in which any third party asserts a claim adverse to the title or
interest as insured, but only as to those stated causes of action alleging a defect, lien, or
encumbrance or other matter insured against by this policy . . . .

6

The [insurer] shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured.  The [insurer] may take any appropriate action under the terms of this title policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy.

(Id.)

## C.  The Closing Service Protection Letters

In conjunction with each title policy, Coastal or Monmouth issued WSI a Closing Service Protection Letter ("CPL")—an agreement to indemnify a lender for a closing attorney's malfeasance or failure to comply with the WSI's closing instructions—in NHF's name on behalf of the title insurer.  The CPL provides coverage for "actual loss incurred . . . in connection with" the closing of the mortgage "when conducted by the . . . above named Attorney and when such loss arises out of:

1.  Failure of the . . . Attorney to comply with your written closing instructions to the extent that they relate to: (a) the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land including the obtaining of documents and disbursements or funds necessary to establish such title or lien; or (b) the collection and payment of funds due you; or

2.  Fraud or misapplication by the . . . Attorney in handling your funds in connection with the matters set forth in numbered paragraph 1 above.

(Magnanini Cert., Ex. A.)  The CPL incorporates all the terms and conditions of the corresponding title policy.  See (id.)  In addition, it states: "THIS LETTER DOES NOT APPOINT THE ABOVE NAMEND ATTORNEY AS AN AGENT OF [the insurer]."  (Id.)

The closing attorney named in a given CPL is known as an Approved Attorney—i.e. an attorney chosen by the title insurer that does not have a disciplinary record with the bar or "a negative claims history or lack of cooperation."  (Magnanini Cert., Ex. B at 83:5-20.)  Stanley Yacker, Esq. and Anthony M. Cicalese, Esq. were Approved Attorneys chosen by the Title

7

Insurers to close the mortgage loans that are the subject of this case.  As such, they were the named attorneys in the CPLs.

**D.      The Fraud**

In contrast to the typical mortgage loan transaction described above, the two hundred and twenty mortgage loans in this case fell victim to a mortgage fraud scheme.  According to WSI, the fraudulent scheme was carried out in the following manner.  William Kane, an employee of NHF and the mastermind of the scheme, would purchase a piece of property in a low income area through a company that he owned, such as Cristo Property Management, Inc. ("Cristo") or Oakwood Properties and sell it—oftentimes before having title to it—for a significantly inflated value.  In doing so, Mr. Kane's co-conspirators would locate a straw buyer and arrange for the property to be appraised at an inflated value.

At that point, Mr. Kane's company would prepare a mortgage loan application for the straw buyer and submit it to WSI.  The application would contain a number of false items of information to ensure that WSI would approve the loan, including (1) an inflated appraisal value, (2) escrow letters stating that the buyer had made a down payment, (3) indication of a second mortgage on the property[6], and (4) indication that the buyer would own the entire property.  Mr. Kane paid Anthony D'Apolito, a sales manager at WSI who was in charge of bringing loan applications to the company, and Kellie O'Neal, a loan closer at WSI, to facilitate approval of the fraudulent loan applications.

---

[6] The second mortgage was to show that the named buyer was a bona fide purchaser.

At the closing, WSI would transfer the loan proceeds to Mr. Yacker or Mr. Cicalese's[7] attorney trust account.  Despite knowing that (1) the named buyer was not a bona fide purchaser, (2) there was no down payment on the property or second mortgage, (3) the named buyer did not own the entire property, and (4) certain closing expenses would never be paid, Mr. Yacker or Mr. Cicalese would transfer the loan proceeds to themselves and other co-conspirators.  At the same time, the straw buyer would execute a deed, at the behest of Mr. Yacker or Mr. Cicalese, giving sixty percent ownership in the property (the "Joint Venture Deed") to Capital Assets Property Management ("Capital Assets"), an entity owned by Gary Greiser, one of Mr. Kane's co-conspirators.  To facilitate the scheme, Mr. Kane paid Mr. Yacker and Mr. Cicalese to employ the same assistant, Lorraine King, to work exclusively on the fraudulent closings.[8]

In deposition and elsewhere, Mr. Yacker, Mr. Cicalese, and Ms. King admitted to their knowledge and participation in the fraudulent scheme.  In deposition, Mr. Yacker admitted that the closings he performed for Mr. Kane were "typically [] double closing[s]" in that "there was a straw buyer purchasing a property from Mr. Kane's companies and then there was a transfer by the buyer to a joint venture" between "Capital Assets Property Management and the straw buyer."  (Wagner Cert., Ex. 8 at 117-118.)  Further, during his allocution before the Honorable Alfred M. Wolin, in the District of New Jersey, to a criminal information, Mr. Yacker admitted that, in 1996 and 1997, there was a scheme to "solicit and locate persons willing to act as straw buyers in numerous transactions whereby mortgage loans would be obtained and the properties acquired in the names of the straw buyers, even though those persons actually had no interest in obtaining such loans or purchasing such properties," and that he and Ms. King prepared the Joint

---

[7] Mr. Kane used Mr. Yacker to conduct fraudulent closings until early 1997, when a dispute arose between them.  After that point, Mr. Kane began using Mr. Cicalese to conduct his closings.

[8] Mr. Kane paid Ms. King's salary during that time.

Venture Deeds whereby "each straw buyer convey[ed] [a] 60 percent interest in the given property to . . . Capital Assets, in a joint venture arrangement which left the straw buyer holding a 40 percent interest as co-owner with Capital Asserts."  (Magnanini Cert., Ex. T at 25-26.)

They testified that oftentimes (1) the straw buyers were not present for the closings; (2) closings were conducted without ever meeting or seeing the straw buyer; (3) a co-conspirator would sign loan documents on behalf of the straw buyer; (4) the closing documents were falsely notarized or forged; (5) Mr. Kane himself would fill out loan applications; (6) closing documents were purposefully not recorded[9]; and (7) the responsibility for recording closing documents was delegated to Ms. King, which she did not fulfill.

Furthermore, Mr. Yacker admitted to, among other things, (1) devising the aforementioned Joint Venture Deeds; (2) delegating nearly all closing responsibilities to Ms. King; and (3) allowing his attorney trust account to be controlled by Mr. Kane and Ms. King, who dispersed WSI's funds among various co-conspirators pursuant to Mr. Kane's instructions. Both Mr. Yacker and Mr. Cicalese admitted that the HUD-1 Settlement Statements supplied in accordance with WSI's closing instructions contained false information regarding (1) who prepared and signed those documents, (2) the existence of second mortgages, and (3) the disbursement of loan proceeds.  Ms. King testified that both Mr. Yacker and Mr. Cicalese knew that, on many occasions, Cristo sold properties it had yet to purchase, and the proceeds from those sales were used to purchase the properties.

A number of properties subject to the fraudulent scheme were designated as rental properties.  Thus, to keep the scheme going, Capital Assets made mortgage and other payments

---

[9] Mr. Yacker's and Mr. Cicalese's failure to ensure recordation of certain documents—for example, a mortgage lien on a particular property in the first lien position—is to be distinguished from WSI's aforementioned failure to ensure recordation of a loan assignment from NHF to WSI.

from rent proceeds.  However, many of those properties were never renovated to serve as rentals.
Thus, Capital Assets also made payments on older mortgage loans using proceeds from newly
closed mortgage loans.

To further facilitate the scheme, Mr. Kane asked Robert Agel, the owner of Coastal, to
ensure that WSI, for its own benefit, was provided with title commitments indicating that there
were no outstanding issues regarding title to the properties or the validity of the mortgage liens.
Mr. Agel ultimately discovered that Mr. Kane was selling properties before his company
purchased them, but nonetheless continued to issue fraudulent title commitments and did not
inform WSI of the fraud.  In addition, Coastal accepted $50,000 from Mr. Cicalese's trust
account in exchange for recording closing documents, including the aforementioned Joint
Venture Deeds to Capital Assets, for a number of mortgage loans between April 7, 1997 and
April 9, 1997.  Shortly after recording these documents, Coastal stopped working with Mr.
Yacker, Mr. Cicalese, and Mr. Kane.

**E.     Issuance of the Title Policies, Title Commitments, and CPLs During the Time of the
        Fraud**

WSI sets forth a timeline of the fraudulent scheme with respect to three properties[10] that,
according to WSI, is representative of the manner in which the fraud was carried out in
conjunction with the issuance of title commitments, CPLs, and title policies.  The Court will
recite one of these timelines.

On October 14, 1996, Coastal issued two different title commitments on 1507
Summerfield Avenue, Asbury Park, New Jersey, on behalf of Commonwealth, for two different
purchasers.  These commitments maintained virtually identical file numbers: CT-18721 and CT-
18721(A).  CT-18721 was issued to Cristo, while on the same day, CT-18721(A) was issued to

---

[10] These properties include 1507 Summerfield Avenue, 104 West End Avenue, and 1032-
1034 Bangs Avenue.

Pamela Ricigliano, a straw buyer, and NHF, its successors, and assigns.  CT-18721 identifies

The Secretary of Housing and Urban Development as the fee simple owner of 1507 Summerfield

Avenue as of October 14, 1996, while CT-18721(A) identified Cristo as the fee simple owner of

the property as of the same day.  Moreover, CT-18721 stated that what was required to create an

insurable interest in 1507 Summerfield Avenue was a deed from the Secretary of Housing and

Urban Development to Cristo, while CT-18721(A) required a deed from Cristo to the straw

buyer and a mortgage by the straw buyer.  Thus, it is clear Cristo did not own 1507 Summerfield

Avenue as of October 14, 1996—the date of the title commitment.[11]

On October 30, 1996, Coastal issued a CPL on 1507 Summerfield Avenue.  On

November 25, 1996, the owner[12] of 1507 Summerfield Avenue deeded the property to Cristo for

$37,500.  On December 18, 1996, WSI table funded the purchase of 1507 Summerfield Avenue

pursuant to a $110,625 mortgage.  Cristo then deeded the property to straw buyer Ricigliano for

$147,500.  The difference between the $147,500 sale and the $110,625 mortgage was intended to

give the appearance that Ricigliano had, as a bona fide purchaser, used her own funds to

purchase a portion of the property, although she in fact provided no funds at all.  To further give

the appearance of a bona purchaser, Mr. Yacker misrepresented that he was holding the straw

buyer's money in escrow.

On December 27, 1996, Mr. Yacker prepared a deed under which Ms. Ricigliano gave

Capital Assets a sixty percent interest in 1507 Summerfield Avenue.  On April 9, 1997, Coastal

recorded that deed and intentionally failed to record the mortgage beforehand, so that the

---

[11] Mr. Agel of Coastal admitted to issuing dual title commitments in order to conceal that Cristo had yet to purchase the property and ensure that WSI would table fund the mortgage loan to the straw buyer in exchange for having a valid first lien on the property.

[12] While the CT-18721 title commitment suggests that HUD was the owner of 1507 Summerfield Avenue, the deed to Cristo indicates that William B. Hill was the owner of the property.

mortgage could not be recorded in the first lien position on the property.  That same day, Commonwealth issued a title policy stating that 1507 Summerville Avenue was vested fee simple in Ms. Ricigliano subject to the mortgage.

With respect twenty-one properties, WSI submits copies of (1) a deed from the owner of the property to Cristo; (2) a deed from Cristo to a straw buyer for a vastly inflated amount; (3) a portion of a title commitment on the property issued by Coastal; (4) a Joint Venture Deed between the straw buyer and Capital Assets prepared by either Mr. Yacker, Mr. Cicalese, or Ms. King; and (5) a mortgage loan for the property from NHF to the straw buyer—for an amount far greater than the value of the property—that was recorded either concurrently or shortly after the Joint Venture Deed.  See (Wagner Cert., Ex. 10(A)-(U).)

## F.    NHF's Knowledge of and Participation in the Fraud

The Title Insurers present undisputed evidence of NHF's knowledge of, and participation in the fraudulent scheme.  Specifically, Mr. Kane, an employee of NHF, testified that Robert Skowrenski, II, NHF's owner, had full knowledge of the fraudulent scheme and participated in it to his benefit.  In addition, WSI details NHF's involvement in the scheme in its proof of loss statement submitted to its fidelity insurer in support of a claim for coverage for losses arising out of NHF's involvement in the fraudulent scheme.

## G.    WSI's Knowledge of and/or Participation in the Fraud

The Title Insurers present a mountain of evidence to suggest that Robert Walsh and James Walsh knew about the aforementioned fraud and even participated in it.  Specifically, they present (1) testimony from Kellie O'Neill, a loan processer at WSI who participated in the fraud, and Richard DiBenedetto, an appraiser for Cristo who participated in the fraud, among others, indicating their belief that Robert and James Walsh were aware of and participated in the fraud;

(2) testimony and other evidence that Betty Ann DeMola, Robert and James Walsh's sister and an employee of WSI, and Anthony D'Apolito, a WSI employee who worked with Ms. DeMola, participated in the fraud; and (3) testimony that, upon discovering the circumstances under which WSI had been table funding mortgage loans, Robert Walsh denied that WSI was engaged in fraud.

The title insurers also submit a January 6, 1997 letter from Don Lawson of Greenwich Capital, addressed to Robert Walsh, alerting him of seventeen mortgage loans that Mr. Lawson believed to be fraudulent.  See (Merin Cert., Ex. S.)  The letter states (1) that those loans involved "[a]ppraisals substantially overstating the property condition or failing to report items which negatively impact value" and that "[a]ppraisers are not noting improvements or reasons for valuation increases versus recent sales"; (2) the loans were the subject of "[c]oncurrent property sales (e.g. flips)" and "unseasoned refinancing with large valuation increases;" (3) that "inaccurate, or possibly fraudulent documentation . . . frequently masks the actual nature of a loan transaction; " and (4) that after the loans were closed, "certain types of documentation problems, closing agent performance problems, and borrower and/or broker misrepresentation and possibly fraud are occurring."  (Id.)

On January 31, 1997, WSI issued a Quality Control Memorandum—which was copied to Robert and James Walsh—regarding the loans that Mr. Lawson found troubling.  See (Merin Cert., Ex. U.)  The memo states that Veronica R. Gonzalez-Lehman of WSI's Quality Control Department met with Mr. Lawson on the morning of January 29, 1997 regarding an auditing by Greenwich Capital of the aforementioned seventeen mortgage loans as well as nine additional loans that were flagged for similar concerns.  (Id.)  The memo further states that Ms. Gonzalez-Lehman told Mr. Lawson that "the files he was looking at were not yet fully documented" and

that most of the loans he was reviewing "contained revised [escrow] letters from the closing attorney."  (Id.)

The Title Insurers further submit testimony that, upon receiving notice that certain mortgage loans were going to be audited by Greenwich Capital, Ms. DeMola orchestrated a mass cleansing of WSI's files regarding those loans.  Ms. O'Neill, who participated in the cleansing, testified that Robert Walsh was, at times, present in a conference room where it was taking place. In addition, Ms. DeMola organized a campaign to make properties that were being audited by Greenwich Capital appear as if they were being lived in, even though they were unoccupied.

## H.      WSI's Claims for Coverage

On July 28, 1997, WSI put Commonwealth on notice of coverage claims for one hundred and thirteen mortgage loans under the CPLs.  (Merin Cert., Ex. F.)  On August 12, 1997, Commonwealth issued a letter stating that it was "unable to assess [WSI's] claim as [its] letter does not provide any detail about how the closing attorneys violated the closing instructions, how such violations caused a loss to [WSI] or the amount of the loss."  (Merin Cert., Ex. G.) The letter further stated that Commonwealth would respond to WSI's claims upon receipt of this information.   (Id.)  On September 5, 1997, WSI sent a letter to Commonwealth setting forth the general nature of the fraudulent scheme that was facilitated by Mr. Yacker and Mr. Cicalese. See (Merin Cert., Ex. H.)  On September 29, 1997, Commonwealth sent a letter to WSI stating that in order to process WSI's claim, it needed information regarding WSI employees' knowledge of, and participation in, the fraudulent scheme giving rise to WSI's claims under the CPLs.  See (Merin Cert., Ex. I.)  WSI never provided this information and instead, as discussed below, sued the Title Insurers for coverage under the CPLs.[13]

---

[13] WSI never put the Title Insurers on notice of its claims for coverage under the title policies, per se, until July 10, 2009, the date of the Fourth Amended Complaint.

I.      **WSI's Losses from the Fraud**

   *i.   Litigation and Repurchasing of Fraudulent Loans*

The fraudulent mortgage loans at issue in this case were sold and purchased by whole loan purchasers, such as the Money Store and Cityscape Financial, pursuant to agreements requiring WSI to repurchase all loans found to be fraudulent.  Consequently, WSI repurchased many of these loans.

At some point after the fraud was revealed, a number of plaintiff straw buyers sued Cristo, NHF, Capital Assets, and various Monmouth County clerks for rescission and cancellation of certain fraudulent mortgages that were table funded by WSI.  On February 5, 1999, the Chancery Division of the New Jersey Superior Court, Monmouth County, entered an Order granting summary judgment and default judgment in favor of the plaintiffs' claims, resulting in the rescission and cancellation of documents relating to thirty-two mortgages.[14]  See (Wagner Cert., Ex. 12.)  The court further declared those mortgages unenforceable.  See (id.)

In addition, Cityscape brought an action against WSI in the Southern District of New York for damages arising from WSI's refusal to repurchase a number of fraudulent mortgage loans pursuant to a Master Agreement for Sale and Purchase of Mortgages.  See (Wagner Cert., Ex. 13.)  On June 8, 2000, the court, among other things, granted a motion for partial summary judgment submitted by Cityscape with respect to thirty-two of those loans.  See (id.)  On October 20, 2000, the court awarded Cityscape $4,732,568.93 in damages for WSI's failure to repurchase those loans.[15]  See (id.)

   *ii.   Loss of Merger and Diminution in Value*

---

[14] Two of those mortgages were repurchased by WSI.

[15] WSI ultimately repurchased the thirty-two loans as part of a settlement.

In 1997, WSI and Resource Bancshares Mortgage Group ("RBMG") were in discussions regarding a merger between the two companies.  On April 18, 1997, Walsh Holding Co., Inc. ("Walsh Holding"), Robert Walsh, and RBMG entered into a merger agreement.  See (Merin Cert., Ex. D.)  According to the agreement, Walsh Holding would merge with a RBMG merger subsidiary, rendering Walsh Holding the surviving corporation, although it would be renamed BCA.[16]  See (id.); (Shooman Cert., Ex. 7.)  Robert Walsh would be the President of BCA.

The merger was revealed in the press on April 21, 1997.  See (Shooman Cert., Ex. 7.) According to one article, BCA "will be among the nation's largest full-service correspondent mortgage lenders, combining RBMG's strong national presence in the agency—eligible segment of the mortgage marketplace with Walsh's position as a leading originator in the subprime and home equity market."  (Id.)  Indeed, [t]he combination of RBMG's 3,200 and Walsh's 1,500 approved account relationships will create a unique and powerful full-service mortgage lender." (Id.)  However, both RBMG and Walsh Holding "will maintain their separate corporate identities for marketing purposes."  (Id.)

On November 3, 1997, after the fraud became public, WSI and RBMG agreed to terminate the merger due to the fraud and WSI's inability to repurchase all the fraudulent mortgage loans that it transferred to the secondary market, which rendered WSI unable to produce accurate financial statements for 1996 and 1997.  WSI continued to lose revenue and ultimately filed for bankruptcy.

**J.      Litigation by WSI**

---

[16] The agreement specifically provides that "all the property rights, privileges, powers and franchises of [Walsh Holding] and Merger Sub shall vest in [Walsh Holding] as the Surviving Corporation . . . .  [T]he Surviving Corporation shall be a direct wholly owned subsidiary of RBMG."  (Merin Cert., Ex. D.)

On July 17, 1997, WSI filed a Complaint against a host of parties, setting forth RICO and common law fraud allegations.  On November 7, 1997, WSI filed an Amended Complaint, adding additional parties, factual allegations, and causes of action against NHF for breach of contract and against the Title Insurers for breach of the CPLs.  On July 10, 2009, after two additional amendments, WSI filed a Fourth Amended Complaint adding, among other things, claims against the Title Insurers for breach of the title policies regarding thirty-nine mortgage loans, bad faith delay/denial of WSI's insurance claims, and declaratory judgment in favor of coverage under the CPLs and title policies, and seeking upwards of $450,000,000 in compensatory damages.

## II.  DISCUSSION

WSI now moves for summary judgment in favor of its coverage claims on sixty-six of the approximately two hundred and twenty fraudulent mortgage loans, pursuant to Federal Rule of Civil Procedure 56(a).  In doing so, WSI argues that (1) Mr. Yacker and Mr. Cicalese's admissions of fraud trigger liability under the CPLs; and (2) the joint venture deeds to Capital Assets, and the recordation of those deeds prior to the corresponding mortgages, trigger coverage under the title policies for thirty-nine mortgage loans.

The Title Insurers, in contrast, move for summary judgment against WSI's coverage claims on twenty-nine mortgage loans that were not recorded before the tax foreclosure sales on the corresponding properties.  In doing so, they argue that, in failing to ensure the recordation of those mortgages, WSI assumed the risk of a title defect under the title policies.  In addition, the Title Insurers move for summary judgment on WSI's claim for damages arising out of diminution of WSI's value and the failed merger with RBMG, arguing that those two events were wholly unforeseeable when considering the breach of an individual CPL or title policy.

18

Finally, the Title Insurers move for summary judgment against WSI's claim for bad faith because they had a fairly debatable reason for denying and investigating WSI's claim for coverage.

## A.     Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In deciding whether a dispute of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the

evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

**B.     WSI's Coverage Claims**

WSI argues that it is entitled to summary judgment in favor of its coverage claims with respect to sixty-six mortgage loans because the Title Insurers (1) breached the terms of the CPLs by failing to indemnify WSI for Mr. Yacker's and Mr. Cicalese's fraud involving those loans; and (2) breached the terms of the title policies by failing to indemnify WSI for unmarketable title as a result of the Joint Venture Deeds giving Capital Assets a sixty percent interest the properties subject to the mortgage loans.  The Title Insurers counter that (1) WSI fails to provide evidence of fraud regarding each of the sixty-six mortgage loans; (2) WSI lacks standing to pursue its breach of contract claims because it fails to present evidence that it currently holds the sixty-six mortgage loans; (3) WSI fails to show that Mr. Yacker's and Mr. Cicalese's conduct is covered by the language of the CPLs; (4) WSI's and NHF's knowledge of, and involvement in, the fraudulent scheme bars recovery under the CPLs and title policies.  The Title Insurers further argue that they are entitled to summary judgment against WSI's breach of contract claims under the title policies with respect to twenty-nine mortgage loans because those claims arise out of WSI's failure to ensure recordation of the assignment of those loans to from NHF to WSI.

*i.     Necessity of Individualized Evidence*

The Title Insurers argue that, because each CPL and corresponding title policy constitutes a single contract, WSI must provide evidence of fraud with respect to each mortgage loan for which recovery is sought under its corresponding CPL and title policy.  Citing to Corwin v. Lawyers Title Ins. Corp., 276 F.R.D. 484 (E.D. Mich. 2011), the Title Insurers contend that

"evidence of a 'general scheme' in a case involving a title company with individual contracts and individual transactions" is insufficient for WSI to discharge its burden under the summary judgment standard.

In Corwin, the plaintiff sued a title insurer on behalf of a class of persons who had not received a discount in the purchase of title policies on their property in exchange for showing that they had previously been issued a title policy in connection with that property. 276 F.R.D. at 485. The court denied class certification because an absent class member would be unable to recover "unless he or she can establish that there was a previous title policy issued on the specific property in question." Id. at 490. The court found that "[s]uch proof is uniquely individualized [and] it cannot be established on a classwide basis. . . . [I]nstead of liability being established 'in one stroke,' it would take an assessment of each transaction to determine if the absent class member qualified for the discount rate." Id.

On the other hand, where certain transactions are subject to a scheme whose common elements trigger coverage under insurance policies issued in connection with those transactions, a plaintiff need not detail each aspect of the scheme with respect to each individual transaction. See Fidelity Nat'l Financial, Inc., No. 09-291 2009 WL 4508581, at 2*, *6 (D.N.J. Nov. 16, 2009) (upholding breach of contract claims under language of closing service letter issued to class plaintiffs providing coverage for "misapplication of [] issuing agent or attorney in handling [plaintiff's] funds" where plaintiffs alleged "similar discrepancies" between the cost of recording land deed and mortgage instruments and the amounts charged by defendants' settlement agents); Alberton v. Commonwealth Land Title Ins. Co., 247 F.R.D. 469, 473 (E.D. Pa. 2008) (certifying "similar classes of insurance purchasers bringing similar claims against insurance sellers and arising from practices nearly identical to the sales practices challenged here.") overruled on other

grounds by <u>Hunt v. U.S. Tobacco Co.</u>, 538 F.3d 214 (3d Cir. 2008).  Here, WSI claims coverage for sixty-six mortgage loans that were subject to a fraudulent scheme, under the CPLs and title policies issued in connection with each of those loans.  Accordingly, WSI must show that one or more elements of the scheme triggering coverage applied to all sixty-six loans.

WSI submits admissions from Mr. Yacker, Mr. Cicalese, and Ms. King, showing that they knew of and participated in a mortgage fraud scheme affecting a number of transactions between 1996 and 1997, which involved, among other things, (1) dual title commitments to conceal the fact that title had not been vested in the seller of the property; (2) an inflated appraisal value of the property resulting in an inflated mortgage loan funded by WSI; (3) a straw buyer who was not a bona fide purchaser of the property; and (4) a Joint Venture Deed giving a sixty percent interest in the property to Capital Assets, which was recorded before the mortgage lien.  However, none of these admissions makes clear that one or more of these elements of the scheme applied to the sixty-six loans for which WSI seeks coverage under their corresponding CPLs and title policies.  Thus, the Court cannot grant summary judgment in favor of WSI based solely on these admissions.

However, with respect twenty-one of the sixty-six mortgage loans closed by Mr. Yacker or Mr. Cicalse, WSI presents evidence of (1) a deed from the owner of the property to Cristo; (2) a deed from Cristo to a straw buyer for a vastly inflated amount; (3) a title commitment on the property issued by Coastal; (4) a Joint Venture Deed between the straw buyer and Capital Assets prepared by either Mr. Yacker, Mr. Cicalese, or Ms. King; and (5) a mortgage loan for the property from NHF to the straw buyer—for an amount far greater than the value of the property—that was recorded shortly after the Joint Venture Deed.  <u>See</u> (Wagner Cert., Ex. 10(A)-(U)); (Magnanini Cert., Ex. A(6, 7, 13, 15, 35, 38, 40-42, 46-49, 51-56, 60, 61.))  This

evidence, combined with the aforementioned admissions by Mr. Yacker, Mr. Cicalese, and Ms.

King, makes clear that each of these twenty-one mortgage loans was subject to (1) an inflated

appraisal value of the corresponding property, resulting in an inflated mortgage loan; (2) a straw

buyer who was not a bona fide purchaser of the property; and (3) a Joint Venture Deed giving a

60% interest in the property to Capital Asserts that was recorded shortly before the mortgage

loan.  Thus, to the extent WSI can show that one or more of these elements trigger coverage

under the CPLs and title policies in this case, it need not provide the details of the fraud with

respect to each of the twenty-one loans.

  ii.  *Coverage under the CPLs*

  In general, "[c]losing protection letters make [title insurers] contractually responsible for

their issuing agents and approved attorneys' closing errors, fraud, and dishonesty."  2 Title Ins.

Law § 20:11; <u>see also</u> James Bruce Davis, 36 Tort & Ins. L.J. 845, 845 ("A closing protection

letter is an agreement by a title insurance company to indemnify a lender . . . for loss caused by a

settlement agent's [or approved attorney's] fraud or dishonesty or by the agent's [or attorney's]

failure to follow the written closing instructions.").   This is "to address a customer's natural

concern about entrusting money or documents to unfamiliar settlement agents."  Davis, 36 Tort

& Ins. L.J. at 845.

  CPLs are integral to title insurance policies.[17]  <u>See</u> <u>Sears Mortgage Corp. v. Rose</u>, 134

N.J. 326, 350 (1993) ("Title-insurance carriers specifically protect [] institutional lenders against

the risk of defalcation" by the closing attorney).  As such, they should be interpreted in the same

manner as a title insurance policy—that is, "liberally construed in favor of the insured and

strictly construed against the insurer."   <u>New Jersey Lawyers' Fund For Client Protection v.</u>

---

[17] Indeed, the CPLs in this case incorporate all the terms and conditions of their
corresponding title policies.  <u>See</u> (Magnanini Cert., Ex. A.)

Stewart Title Gauranty Co., 203 N.J. 208, 217 (2010) (quotation omitted).  Thus, if the language

of the CPL "is clear, it should be enforced as written."  Id. (quotation omitted).  On the other

hand, if the language is "ambiguous, courts generally interpret [it] in accordance with the

reasonable expectation of the insured."  Id.  (quotations omitted).  To be sure, "a court must not

rewrite the policy in favor of the insured under the guise of interpreting a [policy's] reasonable

terms."  Id. (quotation omitted).

Here, the CPLs provide coverage for "actual loss incurred . . . in connection with" the

closing of the mortgage conducted by the named closing attorney that arises out of the attorney's

failure "to comply with" WSI's closing instructions "to the extent that they relate to: (a) the title

to [the specified] interest in land or the validity, enforceability and priority of the lien of the

[specified] mortgage on [the specified] interest in land . . . or (b) the collection and payment of

funds due to [WSI]."  (Magnanini Cert., Ex. A.)  The CPLs further provide coverage for the

closing attorney's "[f]raud or misapplication . . . in handling [WSI's] funds in connection with . .

. (a) the title to [the specified] interest in land or the validity, enforceability and priority of the

lien of the [specified] mortgage on [the specified] interest in land . . . or (b) the collection and

payment of funds due to [WSI]."  (Id.)

The Title Insurers contend that Mr. Yacker's and Mr. Cicalese's participation in the

aforementioned fraudulent scheme does not trigger coverage under the CPLs because their

conduct did not affect the validity, enforceability, or priority of the lien of the mortgages owned

by WSI or the collection and payment of funds due to WSI.[18]  This contention is unpersuasive.

_____

[18] The Title Insurers also argue that the agency disclaimer in the CPLs bars WSI's claim
seeking coverage for Mr. Yacker and Mr. Cicalese's acts as closing attorneys.  The Title
Insurers' attempt to write around their agency relationship with Mr. Yacker and Mr. Cicalese is
unavailing, and this court has found similarly with respect to such attempts.  See Chassen v.
Fidelity Nat'l Financial, Inc., No. 09-291, 2009 WL 4508581, at *5 (D.N.J. Nov. 16, 2009); Am.
Home Mortgage Corp., No. 07-1257, 2007 WL 3349320, at *5 (D.N.J. Nov. 9, 2007).   Indeed, it

In taking out a title insurance policy to insure a valid and enforceable mortgage with first-lien status, the lender's reasonable expectation is that the policy will insure (1) that the borrower is "a bona fide mortgagor with the financial capacity to make the mortgage payments;" (2) that the mortgage is "a first-lien on the property subject to foreclosure, if necessary;" and (3) "the right to seek recovery of a deficiency after foreclosure from the mortgagor." First American Title Ins. Co. v. Vision Mortgage Corp., 298 N.J. Super. 138, 144 (App. Div. 1997). Consequently, WSI has a reasonable expectation under the CPLs in this case that their terms insure against losses arising out of the closing attorney's fraud or misapplication in handling WSI's funds, to the extent that such fraud affects (1) the borrower's status as a bona fide purchaser; (2) the mortgage's status as a first-lien on the property; or (3) WSI's right to seek recovery of a deficiency after foreclosure from borrower.

Here, there is no dispute that twenty-one mortgage loans that were closed by Mr. Yacker and Mr. Cicalese, and for which WSI was issued CPLs to protect against their fraud, were subject to a fraudulent scheme involving (1) a straw buyer and (2) an inflated appraisal value of the property—resulting in a mortgage loan for an amount far greater than the value of the property, with full knowledge and participation by Mr. Yacker and Mr. Cicalese.  This scheme deprived WSI of a borrower who was a bona fide purchaser and, in turn, WSI's right to pursue deficiency proceedings after foreclosure—a right that it would almost certainly have had to exercise because the value of those twenty-one mortgage loans greatly exceeded the value of their corresponding properties.[19]  Thus, there is coverage under the CPLs for these twenty-one

---

would be nonsensical to indemnify a mortgage lender for certain acts of an approved attorney and simultaneously disclaim all liability for the acts of that attorney.

[19] In other words, WSI would be unable to enforce its rights against a straw buyer with no bona fide interest in a property on which WSI forecloses.  Indeed, as previously noted, the Chancery Division of the New Jersey Superior Court found a number of fraudulent mortgages

fraudulent mortgage loans because Mr. Yacker's and Mr. Cicalese's participation in the fraudulent scheme affected their validity and enforceability.[20]

However, the Court cannot grant summary judgment in favor of WSI's coverage claims under the CPLs for those loans because, as discussed below, there is a factual question concerning whether WSI knew of and/or participated in the fraudulent scheme.  In addition, there is a factual question as to whether WSI sustained actual losses from the fraud that affected the mortgages' validity and enforceability.  To be sure, WSI sold the mortgages to whole loan purchasers pursuant to agreements requiring WSI to repurchase loans found to be unmarketable or fraudulent.  Consequently, WSI would only have sustained actual losses if it repurchased the twenty-one aforementioned mortgage loans.  While WSI presents evidence that it was required to repurchase thirty-two mortgage loans from Cityscape, it is unclear whether that repurchase included the twenty-one mortgage loans that were subject to the aforementioned fraudulent scheme.[21]  Moreover, WSI points to no other evidence suggesting that it repurchased those loans.  Thus, WSI's motion for summary judgment in favor of its coverage claim under the CPLs is denied.

### iii.    *Coverage under the Title Policies*

The title policies in this case provide coverage for losses arising from, among other things, (1) "Title to the estate or interest described [in the policy] being vested other than as

---

table funded by WSI to be unenforceable against a number of straw buyers.  See (Wagner Cert., Ex. 12.)

[20] In addition, the other forty-five mortgage loans for which WSI seeks coverage would be covered by the language of the CPLs to the extent that WSI can show that those loans involved (1) a straw buyer and (2) an inflated appraisal value of their corresponding properties resulting in an inflated value of the loans.  See discussion in Section B(i), supra.

[21] This factual question implicates yet another factual question regarding whether those loans were, in fact, reassigned to WSI in order to establish standing to seek coverage under the CPLs.

stated therein;" (2) "Any defect in or lien or encumbrance on the title;" (3) "Unmarketability of the title;" and (4) "The invalidity or unenforceability of the lien of the insured mortgage upon the title."  (Hayes Cert., Ex. E.)

WSI argues that it is entitled to summary judgment in favor of its claims for coverage under the title policies because the Joint Venture Deeds conveying a sixty percent interest in thirty-nine properties to Capital Assets rendered (1) title to those properties being vested in an entity other than that stated in Schedule A of the title policies—i.e. the named borrower; (2) title to those properties unmarketable; and (3) WSI's mortgage lien on the properties unenforceable as to the sixty percent interest conveyed to Capital Assets.  The Title Insurers argue that it is entitled to summary judgment against WSI's title claims with respect to twenty-nine of the thirty-nine properties at issue because those claims result from WSI's failure to ensure the recordation of assignments of the mortgage liens on the properties from NHF or another entity to WSI.  According to the Title Insurers, WSI's failure to ensure recordation of those assignments deprived WSI of its right to foreclose on the twenty-nine properties, thereby causing its loss.

The Title Insurers' position is largely beside the point.  While WSI's failure to ensure the recordation of assignments from NHF may have divested WSI of its right to foreclose on certain properties, the major loss claimed by WSI, and previously discussed, resulted from having to repurchase mortgage loans (1) where the borrower was not a bona fide mortgagor, and (2) that were issued for an amount far greater than the value of their corresponding properties.  Thus, even if WSI had ensured recordation of every assignment from NHF and was able to foreclose on every property, it would nonetheless have sustained significant losses because it would only be able to recover a small portion of the mortgage loans through foreclosure and remain unable

27

to seek the balance from the straw buyers, who had no bona fide interest in the properties.  See discussion in Section B(ii), supra.

And while there remains a factual question regarding which mortgage loans WSI repurchased, see Section B(ii), supra, there is no dispute that WSI had to repurchase mortgage loans from Cityscape due, in part, to the fact that the Joint Venture Deeds rendered title to their corresponding properties unmarketable.[22]  See (Wagner Cert., Ex. 13.)  Thus, it is clear that WSI suffered actual losses due to unmarketability of title.

The Title Insurers further argue that WSI is not entitled to coverage under the title policies because it failed to give timely notice of its claims and therefore prejudiced the Title Insurers' right to bring an action to quiet title to those properties subject to a Joint Venture Deed in order to restore marketable title to them.  According to the Title Insurers, WSI first put them on notice of the its title claims in 2009—shortly before it set forth those claims in the Fourth Amended Complaint—which was more than twelve years after the fraudulent transactions giving rise to those claims took place.  They contend that, had WSI provided prompt notice of its claims, they would have been able to bring successful actions to cure the title defects caused by the Joint Venture Deeds and thereby limit their liability under the title policies for WSI's losses.[23]

_____

[22] Moreover, there can be little doubt that a Joint Venture Deed giving Capital Assets a 60% interest in a property renders title to that property unmarketable.  See Keown v. West Jersey Title & Guarantee Co., 161 N.J. Super. 19, 23 (App. Div. 1978) ("If it is reasonably probable that the purchaser would be exposed to litigation not of a frivolous nature concerning the title, or would have to bring an action to quiet title, then . . . the title would be considered unmarketable.").  To transfer that properties would require the signatures of both the straw buyer (or WSI if it successfully foreclosed on the property) and Capital Assets, and marketable title could only be restored through an action against Capital Assets to quiet title.

[23] The Title Insurers further argue that prompt notice would have allowed them to cure any defect in the enforceability of mortgage liens, which would have restored WSI's right to

The record is clear, however, that WSI put the Title Insurers on notice of the fraudulent scheme, including the Joint Venture Deeds, in 1997. See (Amended Compl. 58(i).) Accordingly, WSI provided the Title Insurers prompt notice of "claim[s] of title or interest which [are] adverse to the title to the estate or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the [the Title Insurers] may be liable" under the title policies. (Hayes Cert., Ex. E.) The Title Insurers therefore had the opportunity under the title policies to exercise "the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in [their] opinion may be necessary or desirable to establish the title to the state or interest, as insured, or to prevent or reduce loss or damage to the insured." (Hayes Cert., Ex. E.) Consequently, the Title Insurers' motion for summary judgment against WSI's title claims is denied.

To be sure, WSI's motion for summary judgment in favor of its title claims is also denied for the same reasons for denying its motion for summary judgment in favor of its claims under the CPLs, namely the factual questions concerning (1) whether WSI repurchased the mortgage loans that were subject to a Joint Venture Deed; and (2) whether, as discussed below, WSI had knowledge of the fraudulent scheme giving rise to its claims.

**C.    Bars to Coverage**

**i.    *WSI's Knowledge of and/or Participation in the Fraud***

The Title Insurers argue that WSI's claims for coverage under the CPLs and title policies is barred under Exclusion 3(a) because WSI had knowledge of the fraudulent scheme and participated in it. Exclusion 3(a) bars coverage for "defects, liens, encumbrances, adverse claims or other matters . . . created, suffered, assumed or agreed to by the Insured Claimant." (Hayes

---

foreclose on the properties. However, as previously discussed, restoring WSI's right to foreclose would not have prevented the losses in this case.

Cert., Ex. E.)  In the context of such an exclusionary clause, the term "created" has been

interpreted to mean "the idea of knowledge, the performance of some affirmative act by the

insured, a conscious or deliberate causation."  Feldman v. Urban Commercial, Inc., 87 N.J.

Super. 391, 404 (App. Div. 1965).  An insured who creates a defect under a title policy generally

engages in "some fraudulent or inequitable behavior."  Keown v. West Jersey Title and Guaranty

Co., 161 N.J. Super. 19, 26 (1978).  In contrast, "[t]he term 'suffer' implies the power to prevent

or hinder, and includes knowledge of what is to be done under the sufferance and permission,

and the intention that what is done is to be done."  Id.

New Jersey courts have not interpreted the terms "assumed" or "agreed to."  However, in

the oft-cited case of American Savings and Loan Ass'n v. Lawyers Title Ins. Co., 793 F.2d 780

(6th Cir. 1986), the Sixth Circuit defined "assumed" as "requir[ing] knowledge of the specific []

defect," and explained that "agreed to carries connotations of 'contracted,' requiring full

knowledge by the insured of the extent and amount of the claim against" it.  793 F.2d at 784.

WSI counters that (1) the evidence submitted by the Title Insurers of WSI's knowledge

of the fraud is not specific enough to satisfy the requirements of Rule 9(b); (2) knowledge of and

participation in the fraud by lower level employees cannot be imputed to WSI when those

employees were acting for their own benefit and at the expense of WSI; and (3) there is no

indication of actual knowledge on the part of Robert or James Walsh that would allow the Title

Insurers to disclaim coverage.

Under common law agency principles, "a principal is deemed to know facts that are

known to its agent."  NCP Litig. Trust v. KPMG LLP, 187 N.J. 353, 366 (2006).  However,

"[T]he knowledge and actions of employees acting adversely to the corporate employer cannot

be imputed to the corporation."  In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 225, 232

(D.N.J. 2000) (citations omitted); see also CBI Holding Co. v. Ernst & Young, LLP, 529 F.3d 432, 449 (2d Cir. 2008) ("[T]he knowledge of company management involved in a fraud will not be imputed to the company itself if such management was acting totally for its own interest and not that of the corporation.") (emphasis and quotation omitted).

Here, there is no dispute that those WSI employees who participated in the fraud—namely Ms. DeMola, Ms. O'Neill, and Mr. D'Apolito—did so for their own benefit.  Indeed, Mr. D'Apolito and Ms. O'Neill received kickbacks from Mr. Kane in exchange for their participation, while Ms. DeMola benefited because she was paid a commission for each loan issued by WSI.  In other words, Ms. DeMola helped issue the fraudulent mortgage loans in order to increase her commissions and sales numbers.  Further, there can be little doubt that issuing invalid mortgage loans on unmarketable properties are actions adverse to WSI's interests as a mortgage lender. [24]  Thus, Ms. DeMola's, Ms. O'Neill's, and Mr. D'Apolito's knowledge of and participation in the fraudulent scheme cannot be imputed to WSI.

Nonetheless, there is remains a factual dispute as to whether WSI had actual knowledge of the fraudulent scheme.  Specifically, the January 6, 1997 letter from Greenwich Capital to Robert Walsh detailing several critical elements of the fraudulent scheme, and WSI's continuing to table fund mortgage loans after that time using Coastal and its closing attorneys creates a factual dispute as to whether WSI created, suffered, or assumed the risk associated with the fraudulent loans in this case that would bar coverage under Exclusion 3(a).  Consequently, as

---

[24] The Title insurers contend that the fraudulent scheme was intended to benefit WSI because WSI was looking to merge with RBMG, and the more loans issued by WSI, the more attractive WSI appeared to RBMG.  While there is evidence that Ms. DeMola participated in the fraud with the partial intent of facilitating a proposed merger between WSI and RBMG, it is undisputed that she was a shareholder in WSI and testified that she stood to benefit from the merger.  Thus, no reasonable juror could find that Ms. DeMola participated in the fraud to benefit WSI, as opposed to herself.

31

previously discussed, this factual dispute bars summary judgment in favor of WSI's claims for coverage under the CPLs and title policies.

### ii.     NHF's Involvement in the Fraud

The Title Insurers argue that WSI's coverage claims are also barred under Exclusion 3(a) because NHF, who assigned the mortgage loans to WSI after their closing, was involved in the fraudulent scheme, and WSI, as the assignee of those loans, steps into the shoes of NHF and therefore only assumes NHF's right to seek coverage for the loans—a right that NHF cannot enforce under the CPLs and title policies due to its involvement in the fraudulent scheme.  WSI counters that NHF's participation in the fraud does not bar recovery under the CPLs and title policies because WSI is a holder in due course of the mortgage loans.

Under the Uniform Commercial Code ("UCC"), a holder in due course is "one who takes a negotiable instrument for value, in good faith and without notice of any defense or claim against it."  Carnegie Bank v. Shalleck, 256 N.J. Super. 23, 33 (App. Div. 1992); see also N.J.S.A. 12A:3-302a(2).  "[I]f [a] mortgage is given to secure a negotiable promissory note, and the note is negotiated for value in the ordinary way before maturity, the holder will hold it and the mortgage free from all defences.  But if the mortgage be given to secure a non-negotiable instrument, the assignee takes it subject to all defences to the bond or other instrument manifesting the indebtedness."  Carnegie Bank, 256 N.J. Super. at 44 (citing Magie v. Reynolds, 51 N.J. Ee. 113 (Ch. Div. 1893)).

Thus, if WSI can show that it is a holder in due course of the mortgage loans assigned to it by NHF, it will be able to pursue its claims for coverage under the CPLs and title policies free and clear of all defenses to coverage that the Title Insurers would otherwise assert against

NHF.[25]  If, on the other hand, WSI does not qualify as a holder in due course, its coverage claims

will be barred under Exclusion 3(a) of the title policies—whose terms are incorporated into the

CPLs—because NHF's participation in the fraud will be imputed to WSI.

There is no dispute that the mortgage loans in this case are unconditional promises to pay

NHF a fixed sum of money with interest, in installments, and with full payment due at a definite

time.  As such they are negotiable instruments under the UCC.[26]  See N.J.S.A. 12A:3-104.

The UCC defines "Good faith" as "honesty in fact in the conduct or transaction

concerned."  N.J.S.A. 12A:1-201(19).  "[G]ood faith is determined by looking to the mind of the

particular holder who is claiming to be a holder in due course, not what the state of mind of a

prudent man should have been."  Breslin v. New Jersey Investors, Inc., 70 N.J. 466, 471 (1976)

(citations omitted).  "The test is neither freedom from negligence in entering into the transaction

nor awareness of circumstances calculated to arouse suspicions either as to whether the

instrument is subject to some defense not appearing on its face or whether the promise to pay is

not as unconditional as it appears therein."  Carnegie Bank, 256 N.J. Super. at 34 (quoting

General Investment Corp. v. Angellini, 58 N.J. 403-04 (1971)).  "Ordinarily where the note

appears to be negotiable in form and regular on its face, the holder is under no duty to inquire as

to possible defenses, such as failure of consideration, unless the circumstances of which he has

knowledge rise to the level that the failure to inquire reveals a deliberate desire on his part to

---

[25] Indeed, the title policies in this case provide that insurance extends to "the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness . . . (reserving, however, all rights and defenses as to any successor that the [insurer] would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land)."  See (Magnanini Cert., Ex. A); (Hayes Cert., Ex. E).

[26] "[T]he mortgage is mere 'incident' or 'accessory' to the debt and when the debt is embodied in a negotiable instrument the quality of negotiability is necessarily imparted to the accompanying mortgage."  Carnegie Bank, 256 N.J. Super. at 45 (quotation omitted).

evade knowledge because of a belief or fear that investigation would disclose a defense arising from the transaction." Id. at 35.  In other words, "fraud, not merely suspicious circumstances, must be brought home to a holder for value whose rights accrued before maturity in order to defeat his recovery on a negotiable note upon the ground of fraud in its inception or between the parties to it." Breslin, 70 N.J. at 473.

WSI cannot satisfy the good faith requirement of the holder in due course doctrine because, as discussed below, there is a factual question as to whether WSI had actual knowledge of the fraudulent scheme.  Thus, on the current record, WSI cannot qualify as a holder in due course and, as a result, is subject to the same bars to coverage that would be asserted against NHF.

**D.    WSI's Bad Faith Claims**

WSI asserts claims for bad faith based on the Title Insurers' (1) unreasonable denial of coverage under the CPLs and title policies and (2) unreasonable delay in processing WSI's coverage claims under the CPLs and title policies.  The Title Insurers are entitled to summary judgment on both.

To prevail on a bad faith claim based on unreasonable denial of coverage, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." Pickett v. Lloyd's, 131 N.J. 457, 453 (1992) (quotation and citation omitted).  In other words, "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insured's bad-faith refusal to pay the claim." Id. at 454.  In light of the previously discussed factual questions regarding (1) which mortgage loans WSI repurchased; and (2) whether WSI had knowledge of

the fraudulent scheme giving rise to its claims, the Court cannot find that WSI is clearly entitled to coverage under the CPLs and title policies and grant summary judgment in favor of its claims for breach of contract.  Consequently, the Title Insurers' motion for summary judgment against WSI's claim for bad faith denial of coverage under the CPLs and title policies is granted.

"In the case of processing delay, bad faith is established by showing that no valid reasons existed to delay processing the claim and the insurance company knew or recklessly disregarded the fact that no valid reasons supported the delay."  Id. at 481.  Here, the Title Insurers had ample reason to delay processing WSI's coverage claims.  Specifically, it is undisputed that, around the time WSI made its coverage claims under the CPLs, a number of newspaper articles came out suggesting that Robert Walsh had knowledge of, and participated in, the fraud.  And upon request for information regarding WSI's knowledge of and/or involvement in the fraud, WSI sued for coverage.  Moreover, it is undisputed that, as WSI's lawsuit developed, a number of parties involved in the fraud indicated that Robert Walsh had knowledge of and/or participated in it.  Therefore, the Title Insurers' motion for summary judgment against WSI's claim for bad faith delay in processing WSI's coverage claims under the CPLs and title policies is granted.[27]

## E.     WSI's Damages Claims

The Title Insurers contend that they are entitled to summary judgment against WSI's claim for damages resulting from its diminution in value and the failed merger between Walsh Holding and RBMG because (1) those two events are not the foreseeable result of a breach of a single CPL or title policy; and (2) WSI does not have standing to seek damages for the failed merger with RBMG because only WSI's shareholders, not WSI itself, would have benefited from the merger.  Both contentions are unavailing.

---

[27] There is no issue of delay with respect to WSI's claims for coverage exclusively under the title policies, as those claims were made for the very first time on July 10, 2009, in WSI's Fourth Amended Complaint.

### i.       Foreseeability

"Judicial remedies upon breach of contract fall into three general categories: restitution, compensatory damages and performance." Donovan v. Bachstadt, 91 N.J. 434, 443 (1982). "Compensatory damages are designed to put the injured party in as good a position as he would have had if performance had been rendered as promised." Id. at 444 (quotations and citations omitted).  In other words, damages "should be such as may fairly be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it." Id. at 444-45 (quotation and citations omitted); see also Pickett, 131 N.J. at 474 ("[A] party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract.").  To be sure, New Jersey law takes a flexible approach to contract damages. See Donovan, 91 N.J. at 446 ("What the proper elements of damage are depend upon the particular circumstances surrounding the transaction, especially the terms, conditions and nature of the agreement.").

Here, the Court must consider the damages flowing from the breaches of the approximately two hundred and twenty CPLs and title policies at issue in this case, as opposed to those resulting from the breach of a single CPL and title policy.  The record makes clear that WSI, as a wholesale mortgage lender, took out a CPL and title policy to insure each mortgage loan that it issued.  Consequently, there is little doubt that, upon issuing WSI a CPL and title policy for an individual mortgage loan, the Title Insurers and WSI understood that WSI might seek similar CPLs and title policies from them for future mortgage loans.

As a result, at the time WSI and the Title Insurers entered into one of the CPLs and title policies in this case, a jury could reasonably find that the parties should have reasonably

contemplated that a fraudulent scheme affecting hundreds of mortgage loans would give rise to substantial losses.  And to the extent that WSI is entitled to coverage under the CPLs and title policies for those losses, a jury could reasonably find that the Title Insurers' failure to indemnify WSI would foreseeably hinder its ability to (1) offset its losses and (2) repurchase the fraudulent mortgage loans from the secondary market, thereby causing WSI to be in a state of financial disarray and leading to the breakdown of the merger between Walsh Holding (WSI's parent company) and RBMG and diminution of WSI's value.  Thus, whether the breakdown of the merger with RBMG and WSI's diminution in value was caused by the Title Insurers' breach of the CPLs and title policies remains an issue of fact.

### ii.   Standing

"It is generally accepted that [a] corporation is an entity distinct from its shareholders with rights and liabilities not the same as theirs individually and severally."  1 Fletcher Cyc. Corp. § 25 (2012).  Thus, "[a] corporation, and not its officers, shareholders, or creditors, may sue to recover corporate property or recover damages for injuries done to it."  9A Fletcher Cyc. Corp. § 4469 (2012).  In contrast, "[a] corporation ordinarily cannot sue where the subject of the cause of action are rights belonging to a shareholder or shareholders, or to the corporation's officers."  Id.

The Title Insurers argue that WSI lacks standing to seek damages arising out of the failed merger between Walsh Holding and RBMG because WSI was not a party to the merger agreement and therefore suffered no injury as a result of its rescission.  The Title Insurers liken this case to Design Strategies, Inc. v. Davis, 355 F. Supp. 2d 715 (S.D.N.Y. 2005), which involved a lawsuit by a corporation for losses sustained as a result a failed sale of the corporation's subsidiary.  The court found that the corporation lacked standing to pursue these

damages because only the corporation's shareholders, not the corporation itself, were parties to the agreement.  Design Strategies, 355 F. Supp. 2d at 716-17.  Further, the agreement merely specified the sale of shareholder stock, not corporate stock or assets, and in no way indicated "that the property of the corporation was an intended subject of that transaction."  Id. at 717. Thus, the court could not find "any specific harm that would accrue to the corporation from the" failed sale.  Id.

Here, however, the evidence suggests that WSI was harmed from the failed merger between Walsh Holding and RBMG.  While WSI was not a party to the merger agreement, the agreement contemplated the sale of its corporate assets to RBMG—specifically providing for the sale of "all the property rights, privileges, powers and franchises of [Walsh Holding]," which includes WSI, its main operating subsidiary, to RBMG to become RBMG's "direct wholly owned subsidiary."  (Merin Cert., Ex. D.)  Indeed, the intent of the merger agreement was to combine "RBMG's strong national presence . . . with Walsh's position as a leading originator in the subprime" mortgage market, as well as the two companies' "approved account relationships[,] [to] create a unique and powerful full-service mortgage lender."  (Shooman Cert., Ex. 7.)  Furthermore, both RBMG and Walsh Holding would "maintain their separate corporate identities for marketing purposes."  (Id.)

Thus, it is clear that WSI was set to benefit enormously from the merger, as it would have been able to continue to continue its subprime lending operations through Walsh Holding, while taking advantage of RBMG's national reach and substantial account relationships. Consequently, WSI has standing to claim damages from the failed merger between Walsh Holding and RBGM.

## III.  CONCLUSION

For the foregoing reasons, WSI's Motion for Summary Judgment is DENIED.  The Title Insurers' Motion for Summary Judgment is DENIED with respect to WSI's claims for breach of contract and compensatory damages, but GRANTED with respect to WSI's claim for bad faith. WSI's bad faith claim is dismissed with prejudice.

The Court will enter an order implementing this opinion.


           **/s/ Dickinson R. Debevoise_____**
           DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: April 17, 2012